# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: <u>6:09−cv−00105−RAW</u>

| | |
|---|---|
| Barrett v. USA | Date Filed: 03/16/2009 |
| Assigned to: Judge Ronald A. White | Date Terminated: 03/28/2019 |
| Case in other court:  10th Circuit, 12−07086 | Jury Demand: None |
|  10th Circuit, 19−07049 | Nature of Suit: 535 Death Penalty − Habeas Corpus |
|  ED/OK, 6:04−cr−115 | Jurisdiction: U.S. Government Defendant |
| Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence | |

**Petitioner**

**Kenneth Eugene Barrett**     represented by     **David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405−521−9600
Fax: 405−521−9669
Email: <u>dbautry77@gmail.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carrie L. Ward**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Email: <u>carrie_ward@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−5706
Email: <u>joan.fisher@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Karl J. Saddlemire**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−6656
Email: <u>karl_saddlemire@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender − Sacramento

801 I St, Third Floor
Sacramento, CA 95814
916–498–6666
Fax: 916–498–6656
Email: tim.schardl@fd.org
*TERMINATED: 11/26/2018*

V.

**Respondent**

**USA**                                        represented by     **Christopher J. Wilson**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice – Capital Case
Unit
1331 F St NW, Rm 345
Washington, DC 20530
202–305–8910
Fax: 202–353–9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918–684–5100
Fax: 918–684–5150
*TERMINATED: 11/24/2010*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1–36; 59–60**)(EXHIBITS 37–58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |

| | | | |
|---|---|---|---|
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr−04−115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr−04−115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |

| | | | |
|---|---|---|---|
| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, Deputy Clerk). (Entered: 09/22/2009) |
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |

| | | | |
|---|---|---|---|
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | |

| | | | |
|---|---|---|---|
| | | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |
| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |

| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: 01/13/2010) |
|---|---|---|---|
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on |

| | | | |
|---|---|---|---|
| | | | Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | |

| | | | |
|---|---|---|---|
| | | | REDACTED EXHIBIT **159 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 125 | | REDACTED EXHIBITS **167, 168, 169** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 126 | | REDACTED EXHIBIT **159 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 127 | | REDACTED EXHIBITS **170, 171** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 128 | | REDACTED EXHIBIT **160 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 129 | | REDACTED EXHIBIT **160 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 130 | | REDACTED EXHIBITS **172, 173** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 131 | | REDACTED EXHIBIT **177 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 132 | | REDACTED EXHIBITS **174, 175, 176, 178** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 133 | | REDACTED EXHIBIT **177 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 134 | | REDACTED EXHIBIT **177 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 135 | | |

| | | | |
|---|---|---|---|
| | | | REDACTED EXHIBITS **179, 180, 181a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 136 | | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 137 | | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | | |

| | | | |
|---|---|---|---|
| | | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas |

| | | | |
|---|---|---|---|
| | | | Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript |

| | | | |
|---|---|---|---|
| | | | may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to R&R due by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following |

| | | | |
|---|---|---|---|
| | | | documents under seal: Petitioners Motion to Vacate or Modify Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: |

| | | | |
|---|---|---|---|
| | | | 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255*, 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |

| | | | |
|---|---|---|---|
| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) (Entered: 10/30/2012) |

| | | | |
|---|---|---|---|
| 12/26/2012 | 222 | | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |
| 03/06/2013 | 227 | | RECORD on Appeal Sent to Circuit Court (Record includes: Volume 1 – Pleadings 1, 2, 3, 4, 5, 6, 7, 45, 51, 52, 57, 58, 59, 61, 62, 66, 67, 68, 69, 70, 91, 94, 95, 96, 100, 102, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 157, 161, 170, 171, 174, 178, 179, 199, 200, 201, 206, 207, 208, 209, 210, 212, 213, 214, 216, 217, 220, 221, 222; Volume 2 – Sealed Pleadings #8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 97, 101, 162, 163, 164, 168, 175, 181, 184, 185, 186, 187, 193, 197, 198 and 215; Volume 3 – Transcripts: Show Cause Hearing held 10/6/2009 and Motion/Status Hearing held 3/31/10.) Also included from 04–cr–115–JHP – Volume 1 – Pleadings 1 – 15, 17 –19, 22, 26 – 29, 31 – 36, 38, 41 – 45, 47 – 49, 52 – 56, 58 – 60, 62, 63 – 66, 69 – 82, 85 – 87, 90, 92 – 94, 96, 97, 99, 101, 102, 104 – 106, 114, 115, 117, 120 – 122, 124, 125, 127, 128, 132 – 137, 139 – 142, 145 – 147, 152 – 155, 157, 158, 163 – 167, 169 – 175, 177, 178, 180 – 190, 192 – 194, 199, 201 – 206, 209 – 213, 215 – 218, 226, 228, 229, 231, 239, 240 – 243, 245 – 249, 252, 253, 255 – 258, 260, 263, 267, 268, 276, 279, 280, 282 – 285, 287, 288, 290, 291, 293, 302, 306 – 308, 359 – 367, 374, 382, 384, 387, 390, 391, 397, 400 – 405, 410 – 412, 415, 417 and 421; Volume 2– Sealed Pleadings 23 – 25, 50, 51, 57, 107, 113, 116, 118, 208, 214, 232, 237, 238, 264 – 266, 274, 301, 368 – 371, 375, 377, 379, 380, 383, 392, 394 – 396, 398, 399 and 416; Volume 3 – Sealed Transcripts (5): Budget Hearing held 12/09/04, Ex Parte Hearing held 01/07/05, Motion Hearing held 3/22/05, Telephone Conference held 5/12/05 and Hearing on Governments Motion held 9/13/05; Volume 4 – Sealed Presentence Report; Volume 5 – Transcripts (54): Proceedings held 10/25/04, Arraignment held 11/17/04, Status Conference held 1/07/05, Proceedings held 2/15/05, Status Conference held 3/22/05, Status Conference held 5/18/05, Telephone Conference held 6/02/05, Motion |

| | | | |
|---|---|---|---|
| | | | to Continue held 6/5/05, Status Conference held 7/15/05, Status Conference 8/12/05, Criminal Pretrial held 8/31/04, Telephone Conference held 9/06/05, Status Hearing held 9/9/05, Sealed Hearing 9/12/05, Individual Juror Qualification Stage One Proceedings held 9/12 through 9/16/05, (5 transcripts), Hearing on USA Motion for Order Delaying Production of Witness Names and Protective Order held 9/13/05 – (Vol 1 and 2), Pretrial Hearing held 9/20/05, Courts Rulings on Motions held 9/26/05, Jury Trial (27 Transcripts, Vol 1 through 27) held 9/26/05 through 11/17/05, Ex Parte Budget Hearing held 10/3/05, Partial Transcript of Proceedings dated 11/10/05, Sentencing held 12/19/05; Record on Appeal transmitted to 10th Circuit Court of Appeals electronically. Under separate mailing 03/06/2013, certified #7009–3410–0001–4052–7584 – (Videotape – attachment to Pleading 237) and (Disk – Attachment to Pleading 265). (Re: 222 Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) Modified on 12/1/2016 ***Pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, both filed in CR–04–115–JHP received from 10th Circuit and STORED IN CLERK'S OFFICE 2ND FLOOR VAULT (See 268 LETTER from Circuit Court)*** (cjt, Deputy Clerk). Modified on 5/10/2019 ***to reflect #237 Sealed Psychological Eval with VIDEOTAPE and #265 Sealed Notice with DISK, both filed in CR–04–115–RAW, returned to 10th Circuit (See Pleading 485 LETTER to Circuit Court)*** (cjt, Deputy Clerk). (Entered: 03/06/2013) |
| 03/06/2013 | | | ***Remark: Record on Appeal transmitted to 10th Circuit Court of Appeals electronically. (Re: 227 Appeal Record Sent to USCA, 222] Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 03/07/2013) |
| 03/11/2013 | | | ***Remark: Notice of receipt of Record on Appeal by 10th Circuit Court of Appeals (Re: 227 Appeal Record Sent to USCA, 222] Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) (Entered: 03/12/2013) |
| 02/21/2014 | 228 | | ORDER from Circuit Court (Re: 222 Notice of Appeal – Final Judgment) directing Clerk to transmit supplemental record (With attachments) (cjt, Deputy Clerk) (Entered: 02/21/2014) |
| 02/26/2014 | 229 | | SUPPLEMENTAL RECORD on Appeal Sent to Circuit Court (Record includes: Per Order of the 10th Circuit Court of Appeals entered 2/21/14 228 , supplemental record sent to 10th Circuit Court of Appeals consisting of CJA Voucher Forms with attachments (Voucher #060125000010 for period of service from 12/1/05 to 1/10/06; Voucher #051216000002 for period of service from 11/1/05 to 11/30/05; Voucher #051216000001 for period of service from 10/1/05 to 10/31/05; Voucher #051213000016 for period of service from 9/1/05 to 9/30/05; #051213000015 for period of service from 8/1/05 to 8/31/05; Voucher #050922000006 for period of service from 7/1/05 to 7/31/05; Voucher #050922000005 for period of service from 6/1/05 to 6/30/05; Voucher #050715000012 for period of service from 5/1/05 to 5/31/05; Voucher #050516000003 for period of service from 4/1/05 to 4/30/05; Voucher #050506000011 for period of service from 3/1/05 to 3/31/05; Voucher #050506000009 for period of service from 2/1/05 to 2/28/05; and Voucher #050506000008 for period of service from 10/25/04 to 1/31/05. Supplemental record transmitted to 10th Circuit Court of Appeals by Federal Express #8723–8982–6061.) (Re: 222 Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) (Entered: 02/27/2014) |

| | | | |
|---|---|---|---|
| 08/19/2015 | 230 | | DECISION from Circuit Court Reverse and Remand death sentence for evidentiary hearing; Affirm in all other respects, denying motion for certificate of appealability – Decision of the District Court (awaiting mandate) (Re: 222 Notice of Appeal – Final Judgment) (With attachments) (cjt, Deputy Clerk) (Entered: 08/19/2015) |
| 08/19/2015 | 231 | | JUDGMENT from Circuit Court (Re: 230 USCA Decision, 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 08/19/2015) |
| 10/26/2015 | 232 | | MANDATE letter from Circuit Court (Re: 230 USCA Decision, 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 10/28/2015) |
| 11/30/2015 | 233 | | ORDER by District Judge James H. Payne: Evidentiary Hearing set for 6/2/2016 at 09:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 11/30/2015) |
| 12/06/2015 | 234 | | MOTION PERMIT INSPECTION OF THE EXPANDED RECORD by USA. Responses due by 12/21/2015(Kahan, Jeffrey) (Entered: 12/06/2015) |
| 12/08/2015 | 235 | | MINUTE ORDER by District Judge James H. Payne: Directing response by 12/15/2015 (Re: 234 GOVERNMENT'S UNOPPOSED MOTION TO PERMIT INSPECTION OF THE EXPANDED RECORD) (cjt, Deputy Clerk) (Entered: 12/08/2015) |
| 12/14/2015 | 236 | | Unopposed RESPONSE to Motion (Re: 234 MOTION PERMIT INSPECTION OF THE EXPANDED RECORD ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 12/14/2015) |
| 12/17/2015 | 237 | | ORDER by District Judge James H. Payne: denying 234 Government's Unopposed Motion to Permit Inspection of the Expanded Record; striking 233 Order Setting Hearing, including Evidentiary Hearing set for 6/2/2016 at 9:30 AM and all other deadlines set in said order (cjt, Deputy Clerk) (Entered: 12/17/2015) |
| 01/11/2016 | 238 | | NOTICE OF EXTENSION OF TIME TO FILE PETITION FOR CERTIORARI by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/11/2016) |
| 02/16/2016 | 239 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari deadline for filing has been extended to 3/14/2016 (U.S. Supreme Court Case Number: 15A644) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 02/17/2016) |
| 03/16/2016 | 240 | | NOTICE OF FILING OF PETITION FOR CERTIORARI by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/16/2016) |
| 03/17/2016 | 241 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been filed on 3/14/2016 (U.S. Supreme Court Case Number: 15–8565) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 03/17/2016) |
| 06/24/2016 | 242 | | ORDER from the Tenth Circuit, re: motion for authorization to file second or successive 2255 (dma, Deputy Clerk) (Entered: 06/24/2016) |
| 10/03/2016 | 243 | | |

| | | | |
|---|---|---|---|
| | | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been denied (U.S. Supreme Court Case Number: 15–8565) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 10/03/2016) |
| 11/07/2016 | 244 | | ORDER from Circuit Court: denying authorization to file the proposed second Sec. 2255 motion (Re: 242 Order) (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/07/2016 | 245 | | ORDER from Circuit Court: denying authorization to file proposed second Sec. 2255 motion (Re: 242 Order, 244 USCA Order) (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/07/2016 | 246 | | ORDER by District Judge James H. Payne: Evidentiary Hearing set for 2/16/2017 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/10/2016 | 247 | | Unopposed MOTION to Extend Scheduling Order Dates by Kenneth Eugene Barrett Responses due by 11/24/2016(Fisher, Joan) (Entered: 11/10/2016) |
| 11/15/2016 | 248 | | ORDER by District Judge James H. Payne: denying 247 Petitioner's Unopposed Motion to Modify Scheduling Order (cjt, Deputy Clerk) (Entered: 11/15/2016) |
| 11/18/2016 | 249 | | MOTION for Discovery *Leave to Conduct Civil Discovery* by Kenneth Eugene Barrett Responses due by 12/2/2016(Fisher, Joan) (Entered: 11/18/2016) |
| 11/18/2016 | 250 | | MOTION for Discovery *of Counsel's File* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 251 | | MOTION for Discovery *(Deposition of Experts)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 252 | | MOTION for Discovery *(Interrogatories)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 253 | | MOTION for Psychiatric Evaluation of Defendant by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) Modified on 11/22/2016 to edit event and text (dma, Deputy Clerk). (Entered: 11/18/2016) |
| 11/18/2016 | 254 | | MOTION for Discovery *(Subpoena Duces Tecum – Third Parties)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 255 | | MOTION for Discovery *(Subpoena Duces Tecum – Petitioner)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 256 | | MOTION to Unseal Document(s) (Report of Dr. Randall Price) (Re: 67 Order) by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 257 | | MOTION to Unseal Document(s) (Re: 24 Sealed Document, 12 Sealed Document, 16 Sealed Document, 21 Sealed Document, 143 Exhibit(s) in Support of Document(s), 14 Sealed Document, 9 Sealed Document, 20 Sealed Document, 22 Sealed Document, 11 Sealed Document, 19 Sealed Document, 145 Exhibit(s) in Support of Document(s), 8 Sealed Document, 13 Sealed |

| | | | |
|---|---|---|---|
| | | | Document, 17 Sealed Document, 15 Sealed Document, 27 Sealed Document, 42 Sealed Document, 25 Sealed Document, 26 Sealed Document, 18 Sealed Document, 142 Exhibit(s) in Support of Document(s), 141 Exhibit(s) in Support of Document(s), 28 Sealed Document, 43 Sealed Document, 23 Sealed Document, 10 Sealed Document ) by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/23/2016 | 258 | | RESPONSE to Motion (Re: 250 MOTION for Discovery *of Counsel's File* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 259 | | RESPONSE to Motion (Re: 251 MOTION for Discovery *(Deposition of Experts)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 260 | | RESPONSE to Motion (Re: 252 MOTION for Discovery *(Interrogatories)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 261 | | RESPONSE to Motion (Re: 254 MOTION for Discovery *(Subpoena Duces Tecum – Third Parties)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 262 | | RESPONSE to Motion (Re: 255 MOTION for Discovery *(Subpoena Duces Tecum – Petitioner)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 263 | | RESPONSE to Motion (Re: 256 MOTION to Unseal Document(s) *(Report of Dr. Randall Price)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 264 | | RESPONSE to Motion (Re: 257 MOTION to Unseal Document(s) ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 265 | | RESPONSE to Motion (Re: 253 MOTION ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/25/2016 | 266 | | RESPONSE to Motion (Re: 249 MOTION for Discovery *Leave to Conduct Civil Discovery* ) by USA ;(Kahan, Jeffrey) (Entered: 11/25/2016) |
| 11/28/2016 | 267 | | MINUTE ORDER by District Judge James H. Payne: The Court hereby strikes the Evidentiary Hearing set herein on 2/16/2017 at 9:00 AM. The Court will set a new Evidentiary Hearing date as soon as all pending motions have been ruled upon. (cjt, Deputy Clerk) (Entered: 11/28/2016) |
| 11/29/2016 | 268 | | LETTER from Circuit Court with enclosed pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, both filed in CR–04–115–JHP (Re: 222 Notice of Appeal – Final Judgment, 227 RECORD on Appeal Sent to Circuit Court) ***STORED IN CLERK'S OFFICE 2ND FLOOR VAULT*** (cjt, Deputy Clerk) Modified on 5/10/2019 to reflect #237 and #265, with original pleadings, VIDEOTAPE AND DISK, both filed in CR–04–115–RAW, returned to Tenth Circuit (See 485 Letter to Circuit Court) (cjt, Deputy Clerk). (Entered: 11/29/2016) |
| 12/06/2016 | 269 | | ORDER re: DISCOVERY by District Judge James H. Payne: denying 249 Petitioner's Motion to Conduct Discovery; granting 250 Government's Motion to Secure Trial Counsel's Files; denying in part and granting in part 251 Government's Motion to Obtain Discovery from Defense Experts; denying 252 |

| | | | |
|---|---|---|---|
| | | | Government's Motion to Propound Interrogatories; granting 253 Government's Motion for Psychiatric Evaluation of Defendant; denying 254 Government's Motion to Serve Discovery on Third Parties; denying 255 Government's Motion to Serve Subpoenas Duces Tecum; granting 256 Government's Unopposed Motion to Permit Inspection of Expanded Record; denying in part and granting in part 257 Government's Unopposed Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 12/06/2016) |
| 12/06/2016 | 270 | | SCHEDULING ORDER by District Judge James H. Payne: Evidentiary Hearing set for 3/13/2017 at 09:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 12/06/2016) |
| 12/12/2016 | 271 | | MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT by Kenneth Eugene Barrett Responses due by 12/26/2016(Fisher, Joan) (Entered: 12/12/2016) |
| 12/13/2016 | 272 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 12/15/2016 (Re: 271 Petitioner's MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT) (cjt, Deputy Clerk) (Entered: 12/13/2016) |
| 12/13/2016 | 273 | | Unopposed MOTION to Continue Hearing(s) by USA (With attachments) Responses due by 12/27/2016(Kahan, Jeffrey) (Entered: 12/13/2016) |
| 12/14/2016 | 274 | | ORDER by District Judge James H. Payne: denying 273 Motion for Continuance of Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 12/14/2016) |
| 12/15/2016 | 275 | | RESPONSE in Opposition to Motion (Re: 271 MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT ) by USA ; (With attachments)(Kahan, Jeffrey) (Entered: 12/15/2016) |
| 12/15/2016 | 276 | | ORDER by District Judge James H. Payne: denying 271 Petitioner's Motion for Order of Access to Petitioner by Mental Health Expert (cjt, Deputy Clerk) (Entered: 12/15/2016) |
| 12/19/2016 | 277 | | MOTION for Reconsideration *For Order of Access to Petitioner by Mental Health Expert* (Re: 276 Ruling on Motion for Miscellaneous Relief ) by Kenneth Eugene Barrett Responses due by 1/3/2017(Fisher, Joan) (Entered: 12/19/2016) |
| 12/20/2016 | 278 | | RESPONSE in Opposition to Motion (Re: 277 MOTION for Reconsideration *For Order of Access to Petitioner by Mental Health Expert* ) by USA ;(Kahan, Jeffrey) (Entered: 12/20/2016) |
| 12/21/2016 | 279 | | ORDER by District Judge James H. Payne: denying 277 Petitioner's Motion to Reconsider Expedited Motion for Order of Access to Petitioner by Mental Health Expert (Re: 271 MOTION, 276 Order) (cjt, Deputy Clerk) (Entered: 12/21/2016) |
| 01/03/2017 | 280 | | NOTICE of Petitioner's Written Summaries of Anticipated Testimony of Experts (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/03/2017) |
| 01/03/2017 | 281 | | MOTION for Reconsideration *of the Court's Order Denying The Government's Unopposed Motion for Reconsideration* (Re: 274 Ruling on |

| | | | |
|---|---|---|---|
| | | | Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 1/17/2017(Fisher, Joan) (Entered: 01/03/2017) |
| 01/03/2017 | 282 | | Unopposed MOTION Order to Transport Petitioner to Personally Attend Evidentiary Hearing (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett Responses due by 1/17/2017(Fisher, Joan) (Entered: 01/03/2017) |
| 01/11/2017 | 283 | | ORDER by District Judge James H. Payne: granting in part 281 Petitioner's Motion for Reconsideration; Evidentiary Hearing as to Roger Hilfiger's testimony ONLY is RESET from 3/31/2017 to 3/30/2017 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 274 Order) (cjt, Deputy Clerk) (Entered: 01/11/2017) |
| 01/11/2017 | 284 | | MINUTE ORDER by District Judge James H. Payne: granting 282 Petitioner's Unopposed Motion to Transport Petitioner to Evidentiary Hearing. Government is directed to secure Petitioner's presence at said hearing commencing on 3/13/2017 at 9:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK. (cjt, Deputy Clerk) (Entered: 01/11/2017) |
| 01/11/2017 | 285 | | Opposed MOTION FOR ORDER OF ACCESS TO PETITIONER BY GEORGE WOODS, M.D. by Kenneth Eugene Barrett Responses due by 1/25/2017(Fisher, Joan) (Entered: 01/11/2017) |
| 01/12/2017 | 286 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 1/13/2017 (Re: 285 Petitioner's Opposed MOTION FOR ACCESS TO PETITIONER BY GEORGE WOODS, M.D.). (cjt, Deputy Clerk) (Entered: 01/12/2017) |
| 01/13/2017 | 287 | | RESPONSE in Opposition to Motion (Re: 285 Opposed MOTION FOR ORDER OF ACCESS TO PETITIONER BY GEORGE WOODS, M.D. ) by USA ;(Kahan, Jeffrey) (Entered: 01/13/2017) |
| 01/18/2017 | 288 | | ORDER by District Judge James H. Payne: granting 285 Petitioner's Motion for Access to Petitioner by George Woods, M.D. (cjt, Deputy Clerk) (Entered: 01/18/2017) |
| 01/30/2017 | 289 | | MOTION to Exclude Proposed Witnesses by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 01/30/2017) |
| 02/01/2017 | 290 | | MOTION to Exclude a Proposed Witness by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 02/01/2017) |
| 02/01/2017 | 291 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 289 MOTION to Exclude Proposed Witnesses, 290 MOTION to Exclude a Proposed Witness) (cjt, Deputy Clerk) (Entered: 02/01/2017) |
| 02/01/2017 | 292 | | MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 02/01/2017) |
| 02/01/2017 | 293 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone) (cjt, Deputy Clerk) (Entered: 02/01/2017) |
| 02/01/2017 | 294 | | Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 295 | | MOTION in Limine *to Preclude Post–Hoc Rationalizations, and Supporting Brief* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 296 | | MOTION to Extend Scheduling Order Dates *for Motion in Limine Regarding Dr. Steven Pitt* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 297 | | Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* by Kenneth Eugene Barrett Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 298 | | Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* (Re: 269 Ruling on Motion for Discovery, Ruling on Motion for Miscellaneous Relief, Ruling on Motion to Unseal Document(s) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 299 | | MOTION to Expand the Record with Exhibits 206 through 220 by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 300 | | MOTION for Order Barring Witness Collusion and Brief in Support by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 301 | | MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 302 | | MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* (Re: 269 Ruling on Motion for Discovery, Ruling on Motion for Miscellaneous Relief, Ruling on Motion to Unseal Document(s)) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 303 | | MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 304 | | MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 305 | | |

| | | | |
|---|---|---|---|
| | | | MOTION in Limine *to Exclude Testimony by Randall Price* by Kenneth Eugene Barrett (With attachments); Responses due by 2/8/2017(Schardl, Tivon) (Entered: 02/01/2017) |
| 02/03/2017 | 306 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited deadlines as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court*, 296 MOTION for Additional Time to File *Motion in Limine Regarding Dr. Steven Pitt*, 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony*, 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, 299 MOTION to Expand the Record, 300 MOTION for Order Barring Witness Collusion, 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing, 302 MOTION for Reconsideration of Order Denying Deposition of Roger Hilfiger)* (cjt, Deputy Clerk) (Entered: 02/03/2017) |
| 02/03/2017 | 307 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations*, 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony*, 305 MOTION in Limine *to Exclude Testimony by Randall Price*) (cjt, Deputy Clerk) (Entered: 02/03/2017) |
| 02/08/2017 | 308 | | Unopposed MOTION to Seal Document *Response to Docket Entry 305* by USA (With attachments) Responses due by 2/22/2017(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 309 | | RESPONSE in Opposition to Motion (Re: 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 310 | | RESPONSE in Opposition to Motion (Re: 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 311 | | RESPONSE in Opposition to Motion (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 312 | | RESPONSE in Opposition to Motion (Re: 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing ) by USA ; (With attachments)(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 313 | | RESPONSE in Opposition to Motion (Re: 304 MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 314 | | RESPONSE in Opposition to Motion (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations, and Supporting Brief* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 315 | | RESPONSE to Motion (Re: 296 MOTION to Extend Scheduling Order Dates *for Motion in Limine Regarding Dr. Steven Pitt* ) by USA ;(Wilson, |

| | | | |
|---|---|---|---|
| | | | Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 316 | | MINUTE ORDER by District Judge James H. Payne: granting 308 Government's Unopposed Motion to Seal Response in Opposition to Motion (Re: 305 MOTION in Limine *to Exclude Testimony by Randall Price*). (cjt, Deputy Clerk) (Entered: 02/08/2017) |
| 02/08/2017 | 317 | | RESPONSE to Motion (Re: 299 MOTION to Expand the Record with Exhibits 206 through 220 ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 318 | | RESPONSE in Opposition to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 319 | | RESPONSE in Opposition to Motion (Re: 302 MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 320 | | RESPONSE in Opposition to Motion (Re: 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 321 | | SEALED RESPONSE in Opposition to Motion (Re: 305 MOTION in Limine to Exclude Testimony by Randall Price) by USA (cjt, Deputy Clerk) (Entered: 02/08/2017) |
| 02/08/2017 | 322 | | RESPONSE in Opposition to Motion (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/08/2017) |
| 02/08/2017 | 323 | | RESPONSE in Opposition to Motion (Re: 289 MOTION to Exclude Proposed Witnesses ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/08/2017) |
| 02/15/2017 | 324 | | REPLY to Response to Motion (Re: 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 325 | | REPLY to Response to Motion (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 326 | | REPLY to Response to Motion (Re: 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 327 | | REPLY to Response to Motion (Re: 304 MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 328 | | REPLY to Response to Motion (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations, and Supporting Brief* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 329 | | REPLY to Response to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by Kenneth Eugene Barrett ;(Fisher, Joan) |

| | | | |
|---|---|---|---|
| | | | (Entered: 02/15/2017) |
| 02/15/2017 | 330 | | REPLY to Response to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 331 | | REPLY to Response to Motion (Re: 302 MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 332 | | REPLY to Response to Motion (Re: 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 333 | | REPLY to Response to Motion (Re: 305 MOTION in Limine *to Exclude Testimony by Randall Price* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 334 | | REPLY to Response to Motion (Re: 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 335 | | REPLY to Response to Motion (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone ) by USA ;(Kahan, Jeffrey) (Entered: 02/15/2017) |
| 02/15/2017 | 336 | | REPLY to Response to Motion (Re: 289 MOTION to Exclude Proposed Witnesses , 290 MOTION to Exclude a Proposed Witness ) by USA ;(Kahan, Jeffrey) (Entered: 02/15/2017) |
| 02/16/2017 | 337 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to Extend Scheduling Order Dates for Motion in Limine regarding Dr. Steven Pitt (Dkt # 296 ) is granted as follows: Expert reports shall be exchanged by 12:00 p.m. Central Standard Time on 3/3/2017. Motions in Limine regarding Dr. Steven Pitt, D.O. and/or Dr. George Woods, M.D. shall be filed by close of business on 3/8/2017. Responses shall be filed by noon on 3/10/2017. (cjt, Deputy Clerk) (Entered: 02/16/2017) |
| 02/16/2017 | 338 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by USA (Kahan, Jeffrey) (Entered: 02/16/2017) |
| 02/16/2017 | 339 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/16/2017) |
| 02/16/2017 | 340 | | STIPULATION *Joint Pre-Hearing Statement* by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/16/2017) |
| 02/21/2017 | 341 | | MOTION to Extend Scheduling Order Dates by Kenneth Eugene Barrett (With attachments) Responses due by 3/7/2017(Fisher, Joan) (Entered: 02/21/2017) |
| 02/22/2017 | 342 | | Unopposed MOTION to Seal Document *Motion for Partial Summary Judgment* by USA (With attachments) Responses due by 3/8/2017(Kahan, Jeffrey) (Entered: 02/22/2017) |
| 02/23/2017 | 343 | | MINUTE ORDER by District Judge James H. Payne: granting 342 Government's Unopposed Motion to File Sealed Motion for Partial Summary |

| | | | |
|---|---|---|---|
| | | | Judgment. (cjt, Deputy Clerk) (Entered: 02/23/2017) |
| 02/23/2017 | 344 | | Unopposed MOTION to Amend *Joint Statement* (Re: 340 Stipulation ) by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 345 | | Unopposed MOTION Permit Use of Computers in the Courthouse During Hearing by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 346 | | Unopposed MOTION for Authorization to Serve Subpoenas Without Tendering Fees and Mileage by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 347 | | SEALED MOTION for Partial Summary Judgment by USA (With attachments); Responses due by 3/9/2017 (cjt, Deputy Clerk) (Entered: 02/23/2017) |
| 02/23/2017 | 348 | | MINUTE ORDER by District Judge James H. Payne: Petitioner is directed to file an expedited response to Government's SEALED MOTION for Partial Summary Judgment (Re: 347 SEALED MOTION). Said Response is due by Close of Business on 2/27/2017 (dma, Deputy Clerk) (Entered: 02/23/2017) |
| 02/24/2017 | 349 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's 294 Motion to Recuse and Disqualify, pursuant to 28 U.S.C. Section 455, is denied for reasons previously set out in 66 Order filed herein on 9/11/2009. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 350 | | MINUTE ORDER by District Judge James H. Payne: granting 290 Government's Motion to Exclude a Proposed Witness. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 351 | | ORDER by District Judge James H. Payne: granting 292 Government's Motion to Exclude Evidence of Unavailable Witnesses by Declaration Alone (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 352 | | MINUTE ORDER by District Judge James H. Payne: denying 295 Petitioner's Motion in Limine to Preclude Post–Hoc Rationalizations. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 353 | | MINUTE ORDER by District Judge James H. Payne: denying 297 Petitioner's Motion for Production of 18 U.S.C. § 3500 Materials Concerning Trial Counsel Testimony. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 354 | | MINUTE ORDER by District Judge James H. Payne: denying 298 Petitioner's Motion for Reconsideration of Order denying Discovery of Trial Counsel's Emails. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 355 | | MINUTE ORDER by District Judge James H. Payne: denying 299 Motion to Expand the Record with Exhibits 206 through 220 as these documents are already part of the court records in this case. See, Dkt. # 178 . If counsel desires the Court to consider these or any other documents contained within the court record, the documents must be introduced and properly admitted at the evidentiary hearing in accordance with the Federal Rules of Evidence, Rule 1101(e). (cjt, Deputy Clerk) (Entered: 02/24/2017) |

| | | | |
|---|---|---|---|
| 02/24/2017 | 356 | | MINUTE ORDER by District Judge James H. Payne: denying 300 Petitioner's Motion for Order Barring Witness Collusion. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 357 | | MINUTE ORDER by District Judge James H. Payne: 301 Petitioner's Motion to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing is moot. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 358 | | MINUTE ORDER by District Judge James H. Payne: denying 302 Petitioner's Motion for Reconsideration of Order denying the deposition of Roger Hilfiger (Dkt. # 302 ) as the Court has previously indicated it prefers to hear live testimony of counsel, see Dkt. # 246 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 359 | | MINUTE ORDER by District Judge James H. Payne: denying 303 Petitioner's Motion in Limine to Rely upon Declarations for Direct Examination Testimony. While declarations may be admissible, Petitioner will be required to seek permission to admit each declaration at the evidentiary hearing scheduled herein and the Government will be granted an opportunity to object to such admission pursuant to the Federal Rules of Evidence. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 360 | | ORDER by District Judge James H. Payne: denying 304 Petitioner's Motion in Limine to Exclude Novel Theories of Aggravation; denying 305 Petitioner's Motion in Limine to Exclude Testimony from J. Randall Price (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 361 | | ORDER by District Judge James H. Payne: granting in part 289 Government's Motion to Exclude Proposed Witnesses; Amended Joint Pre–Hearing Statement due by close of business on 3/3/2017 (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 362 | | MINUTE ORDER by District Judge James H. Payne: denying 341 Petitioner's Unopposed Motion for Extension of Time to File Expert Report. See, Dkt. # 361 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 363 | | MINUTE ORDER by District Judge James H. Payne: denying as moot 344 Petitioner's Unopposed Motion to Amend Joint Statement. See, Dkt. # 361 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 364 | | MINUTE ORDER by District Judge James H. Payne: granting 345 Petitioner's Unopposed Motion for Authorization to Use Computers in the Courthouse during Evidentiary Hearing. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/27/2017 | 365 | | MINUTE ORDER by District Judge James H. Payne: granting in part 346 Petitioner's Unopposed Motion for Authorization to Serve Subpoenas Without Tendering Fees and Mileage. Pursuant to 28 U.S.C. § 1825(b) and (c), the court finds witness fees for lay witnesses whose testimony has not been excluded by previous order of the court shall be paid by the United States Marshal as provided by statute. (cjt, Deputy Clerk) (Entered: 02/27/2017) |
| 02/27/2017 | 366 | | RESPONSE in Opposition to Motion (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 02/27/2017) |
| 02/28/2017 | 367 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: Directing expedited reply by close of business on 3/1/2017 (Re: 347 SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk) (Entered: 02/28/2017) |
| 02/28/2017 | 368 | | MOTION to Exclude Witnesses by USA; Responses due by 3/14/2017(Wilson, Christopher) (Entered: 02/28/2017) |
| 02/28/2017 | 369 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM Central Standard Time on 3/2/2017 (Re: 368 Opposed MOTION to Exclude Witnesses). (cjt, Deputy Clerk) (Entered: 02/28/2017) |
| 03/01/2017 | 370 | | Unopposed MOTION to Seal Document *Reply in Support of Motion for Partial Summary Judgment* by USA Responses due by 3/15/2017(Kahan, Jeffrey) (Entered: 03/01/2017) |
| 03/01/2017 | 371 | | MINUTE ORDER by District Judge James H. Payne: granting 370 Government's Unopposed Motion to File Sealed Reply (Re: 347 SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk) (Entered: 03/01/2017) |
| 03/01/2017 | 372 | | SEALED REPLY (Re: 347 SEALED MOTION for Partial Summary Judgment) by USA (cjt, Deputy Clerk) (Entered: 03/01/2017) |
| 03/02/2017 | 373 | | RESPONSE in Opposition to Motion (Re: 368 Opposed MOTION to Exclude Witnesses ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 03/02/2017) |
| 03/02/2017 | 374 | | MOTION to Supplement *Response in Opposition to Government Motion for Partial Summary Judgment* (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett (With attachments) Responses due by 3/16/2017(Schardl, Tivon) (Entered: 03/02/2017) |
| 03/02/2017 | 375 | | MINUTE ORDER by District Judge James H. Payne: The Court hereby directs Petitioner to file a Sur–Reply to 347 Government's SEALED MOTION for Partial Summary Judgment by close of business on Monday, 3/6/2017. Said Sur–Reply shall specifically address whether or not Petitioner contests the 38 facts contained within the Government's Reply. (cjt, Deputy Clerk) (Entered: 03/02/2017) |
| 03/03/2017 | 376 | | EXPERT WITNESS REPORT *Proffered for Excluded Witnesses* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/03/2017) |
| 03/03/2017 | 377 | | NOTICE of Exchange of Rule 26 Disclosures of George W. Woods, Jr. M.D. (Re: 337 Ruling on Motion to Extend Scheduling Order Dates) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/03/2017) |
| 03/03/2017 | 378 | | ORDER by District Judge James H. Payne: Bifurcating 3/13/2017 evidentiary hearing (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 379 | | MINUTE ORDER by District Judge James H. Payne: Counsel for Petitioner is directed to provide forthwith for use by the Court a bound manual copy of the pleading and/or exhibits as filed. Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 376 Petitioner's |

| | | | |
|---|---|---|---|
| | | | Proffer of Expert Testimony) (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 380 | | RESPONSE in Opposition to Motion (Re: 374 Opposed MOTION to Supplement *Response in Opposition to Government Motion for Partial Summary Judgment* ) by USA ;(Kahan, Jeffrey) (Entered: 03/03/2017) |
| 03/03/2017 | 381 | | MINUTE ORDER by District Judge James H. Payne: denying 374 Petitioner's Motion to Supplement Response in Opposition to Government Motion for Partial Summary Judgment. (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 382 | | REPLY to Response to Motion (Re: 368 Opposed MOTION to Exclude Witnesses ) by USA ;(Kahan, Jeffrey) (Entered: 03/03/2017) |
| 03/03/2017 | 383 | | AMENDED Joint Pre–Hearing Statement (Re: 361 Ruling on Motion to Exclude) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/03/2017) |
| 03/06/2017 | 384 | | SURREPLY to Motion (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/06/2017) |
| 03/06/2017 | 385 | | Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider, and MOTION to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies (Re: 378 Order) by Kenneth Eugene Barrett; Responses due by 3/20/2017(Fisher, Joan). Added MOTION to Stay and edited text on 3/7/2017 (cjt, Deputy Clerk). (Entered: 03/06/2017) |
| 03/07/2017 | 386 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM on 3/8/2017 (Re: 385 Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider, and Motion to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies). (cjt, Deputy Clerk) (Entered: 03/07/2017) |
| 03/07/2017 | 387 | | Second Amended Joint Pre–Hearing Statement (Re: 383 Stipulation) by USA (Wilson, Christopher) (Entered: 03/07/2017) |
| 03/07/2017 | 388 | | RESPONSE in Opposition to Motion (Re: 385 Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider and MOTION to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies ) by USA ;(Kahan, Jeffrey) (Entered: 03/07/2017) |
| 03/08/2017 | 389 | | MINUTE ORDER by District Judge James H. Payne: granting 368 Government's Second Motion to Exclude Proposed Witnesses. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/08/2017 | 390 | | MINUTE ORDER by District Judge James H. Payne: In light of the stipulation of the parties submitted on 3/7/2016, 347 Government's Motion for Partial Summary Judgment is moot. After the submission of testimony herein, the government can reurge its motion if the facts are different than what the parties anticipated at the time of the filing of their proposed findings of fact filed on 2/16/2017. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/08/2017 | 391 | | MINUTE ORDER by District Judge James H. Payne: After consideration of 385 Petitioner's Motion to Reconsider, the motion is granted and this Court will allow the parties to submit all of their evidence in one evidentiary hearing subject to the Federal Rules of Evidence. Pursuant to 28 U.S.C. Section 636(b)(1)(B), the evidentiary hearing is referred to Magistrate Judge Steven P. Shreder for Findings and Recommendation. The evidentiary hearing is |

| | | | |
|---|---|---|---|
| | | | continued to 3/27/2017 at 9:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/10/2017 | 392 | | Unopposed MOTION to Continue Hearing(s) *in Part* by USA Responses due by 3/24/2017(Wilson, Christopher) (Entered: 03/10/2017) |
| 03/10/2017 | 393 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Government's Motion for Partial Continuance of Evidentiary Hearing (Dkt. Entry No. 392 ) is hereby GRANTED. The evidentiary hearing scheduled on March 27, 2017 will proceed as scheduled. The Court will, however, hear testimony from the government's experts (Dr. Randall Price and Dr. Steven Pitt), beginning on June 12, 2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder.(ndd, Deputy Clerk) (Entered: 03/10/2017) |
| 03/14/2017 | 394 | | NOTICE of Availability of Ruth Harris to Testify (Re: 387 Stipulation ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/14/2017) |
| 03/21/2017 | 395 | | Unopposed MOTION to Unseal 10/20/05 Budgetary Hearing Transcript (Re: 67 Order) by Kenneth Eugene Barrett; Responses due by 4/4/2017(Fisher, Joan) (Entered: 03/21/2017) |
| 03/21/2017 | 396 | | MINUTE ORDER by District Judge James H. Payne: Petitioner is requesting the court enter an order unsealing the transcript of the "second sealed" hearing on budgetary matters; however, no such transcript was ever filed with the court and, therefore, there is nothing for the court to unseal. Accordingly, 395 Petitioner's Unopposed Motion to Unseal Transcript of 10/20/2005 Hearing is denied. (cjt, Deputy Clerk) (Entered: 03/21/2017) |
| 03/24/2017 | 397 | | NOTICE of Appearance by Kenneth Eugene Barrett [NOTE: Attorney Karl J. Saddlemire added to party Kenneth Eugene Barrett(pty:pet)]. (Saddlemire, Karl) (Entered: 03/24/2017) |
| 03/27/2017 | 398 | | NOTICE of Presentation of Additional Exhibits 96–101 by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/27/2017) |
| 03/27/2017 | 399 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing held on 3/27/2017. (Court Reporter: Ken Sidwell) (ndd, Deputy Clerk) (Main Document 399 replaced on 4/20/2017 to reflect Rule of Sequestration invoked 3/27/17. NEF regenerated) (ndd, Deputy Clerk). (Entered: 03/27/2017) |
| 03/27/2017 | 400 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/28/2017 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 03/27/2017) |
| 03/28/2017 | 401 | | MOTION to Compel *Compliance with Discovery Order* by USA (With attachments) Responses due by 4/11/2017(Kahan, Jeffrey). (Attachments 1–8 and 10 replaced with redacted versions on 4/6/2017 per Docket Entry No. 415; NEF regenerated) (ndd, Deputy Clerk). (Entered: 03/28/2017) |
| 03/28/2017 | 402 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to 28 U.S.C. Section 636(b)(1), the following motion is referred for disposition to Magistrate Judge Steven P. Shreder: 401 USA's MOTION to Compel |

| | | | |
|---|---|---|---|
| | | | *Compliance with Discovery Order.* (cjt, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 403 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day two) held on 3/28/2017. (Court Reporter: Ken Sidwell) (ndd, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 404 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/29/2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder.(ndd, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 405 | | STIPULATION OF FACT. (tls, Deputy Clerk) (Entered: 03/29/2017) |
| 03/28/2017 | 406 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 401 MOTION to Compel Compliance with Discovery Order by USA. Accordingly, any documents currently in custody of Petitioner's counsel, which have not already been produced, shall be provided to the Government forthwith. All non–privileged documents acquired from attorney Jack Gordon relating to Kenneth Eugene Barrett shall be produced no later than 4/21/2017, along with a detailed privilege log pursuant to LCvR 26.2. (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 407 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day three) held on 3/29/2017. (Court Reporter: Karla McWhorter) (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 408 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/30/2017 at 10:30 a.m in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 409 | | NOTICE of Filing Proffer of Testimony from Richard H. Burr by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/29/2017) |
| 03/30/2017 | 410 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day four) held on 3/30/2017. (Court Reporter: Karla McWhorter) (tls, Deputy Clerk) (Entered: 03/30/2017) |
| 04/05/2017 | 411 | | Unopposed MOTION to Seal Document *401, Exhibits 1–8 & 10* by USA Responses due by 4/19/2017(Kahan, Jeffrey) (Entered: 04/05/2017) |
| 04/05/2017 | 412 | | Unopposed MOTION for Leave to File Redacted Substitute Exhibits to Doc. 401 *Exhibits 1 to 8 & 10* by USA (With attachments) Responses due by 4/19/2017(Kahan, Jeffrey) (Entered: 04/05/2017) |
| 04/06/2017 | 413 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 411 Unopposed MOTION to Seal Document 401 , Exhibits 1–8 & 10 by USA. (ndd, Deputy Clerk) (Entered: 04/06/2017) |
| 04/06/2017 | 414 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder continuing Evidentiary Hearing on 6/12/17 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder (dma, Deputy Clerk) (Entered: 04/06/2017) |
| 04/06/2017 | 415 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 412 Unopposed MOTION for Leave to File Substitute Exhibits by USA. |

| | | | |
|---|---|---|---|
| | | | Accordingly, Exhibits 1 to 8 & 10 of Docket Entry No. 401 are hereby ordered replaced with redacted versions. (ndd, Deputy Clerk) (Entered: 04/06/2017) |
| 04/19/2017 | 416 | | Unopposed MOTION to Exclude Expert Witnesses from Court's Order of Sequestration by USA Responses due by 5/3/2017(Wilson, Christopher) (Entered: 04/19/2017) |
| 04/20/2017 | 417 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to 28 U.S.C. Section 636(b)(1), the following motion is referred for disposition to Magistrate Judge Steven P. Shreder: 416 Unopposed MOTION to Exclude Expert Witnesses from Court's Order of Sequestration. (cjt, Deputy Clerk) (Entered: 04/20/2017) |
| 04/20/2017 | 418 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 416 Unopposed Motion to Exclude Expert Witnesses from Court's Order of Sequestration by USA. (ndd, Deputy Clerk) (Entered: 04/20/2017) |
| 04/21/2017 | 419 | | NOTICE of Petitioner's Privilege Log (Re: 406 Ruling on Motion to Compel,, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 04/21/2017) |
| 05/02/2017 | 420 | | NOTICE of Petitioner's Fourth Proffer of Testimony by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 05/02/2017) |
| 05/03/2017 | 421 | | Unopposed MOTION to Seal Document *Motion for Copy of Videotape* by Kenneth Eugene Barrett (With attachments) Responses due by 5/17/2017(Schardl, Tivon) (Entered: 05/03/2017) |
| 05/04/2017 | 422 | | MINUTE ORDER by District Judge James H. Payne: granting 421 Petitioner's Unopposed Motion to File Motion and Exhibits Under Seal. (cjt, Deputy Clerk) (Entered: 05/04/2017) |
| 05/04/2017 | 423 | | SEALED Unopposed MOTION for a Copy of the Videotaped Evaluation of Petitioner Conducted by Randall Price on October 13 and 14, 2005 (cjt, Deputy Clerk) (Entered: 05/04/2017) |
| 05/05/2017 | 424 | | Unopposed MOTION for Leave to Appear by Video Conference by Kenneth Eugene Barrett Responses due by 5/19/2017(Fisher, Joan) (Entered: 05/05/2017) |
| 05/09/2017 | 425 | | MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation by Kenneth Eugene Barrett Responses due by 5/23/2017(Schardl, Tivon) (Entered: 05/09/2017) |
| 05/09/2017 | 426 | | MINUTE ORDER by District Judge James H. Payne: denying 424 Petitioner's Motion to Attend Evidentiary hearing June 12–14, 2017 with Counsel by Video Conference. (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/09/2017 | 427 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's 423 Motion for a Copy of the Videotaped Evaluation of Petitioner Conducted by Randall Price on October 13 and 14, 2005 is hereby granted. The Court Clerk is directed to make copies of the videotape, attached to Dkt. # 237 in Criminal Case CR–04–115–JHP, and provide a copy of the same to counsel for both parties. (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/09/2017 | 428 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 5/15/2017 (Re: 425 Petitioner's MOTION to |

| | | | |
|---|---|---|---|
| | | | Exclude Testimony of J. Randall Price). (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/10/2017 | 429 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing held on 3/27/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 1–250). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 399 Minutes of Evidentiary Hearing, ) (kns, Court Reporter) (Entered: 05/10/2017) |
| 05/10/2017 | 430 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing held on 3/28/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 251–514). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 403 Minutes of Evidentiary Hearing ) (kns, Court Reporter) (Entered: 05/10/2017) |
| 05/11/2017 | 431 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: In light of the Court's denial of Petitioner's 424 Unopposed Motion for Leave to Appear by Video Conference, the Government is directed to secure Petitioner's presence at said Evidentiary Hearing commencing on June 12, 2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 05/11/2017) |
| 05/11/2017 | 432 | | MOTION to Exclude Witness Steven Pitt by Kenneth Eugene Barrett (With attachments) Responses due by 5/25/2017 (Schardl, Tivon) (Additional attachment(s) added per 434 MINUTE ORDER on 5/12/2017: # 4 Sealed Exhibit A) (cjt, Deputy Clerk). (Entered: 05/11/2017) |
| 05/11/2017 | 433 | | Unopposed MOTION to Seal Document *: Exhibit A to Motion to Exclude Witness Steven Pitt* by Kenneth Eugene Barrett (With attachments) Responses due by 5/25/2017(Schardl, Tivon) (Entered: 05/11/2017) |
| 05/12/2017 | 434 | | MINUTE ORDER by District Judge James H. Payne: granting 433 Petitioner's Unopposed Motion to File Exhibit Under Seal (Re: 432 MOTION to Exclude Witness Steven Pitt) (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 435 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 5/19/2017 (Re: 432 MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 436 | | RESPONSE in Opposition to Motion (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation ) by USA ;(Wilson, Christopher) (Entered: 05/12/2017) |
| 05/12/2017 | 437 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/19/2017. (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation) (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 438 | | WAIVER of Presence at Evidentiary Hearing (Re: 431 Minute Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 05/12/2017) |
| 05/18/2017 | 439 | | REPLY to Response to Motion (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/18/2017) |
| 05/19/2017 | 440 | | RESPONSE in Opposition to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt ) by USA ;(Kahan, Jeffrey) (Entered: 05/19/2017) |
| 05/19/2017 | 441 | | MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/26/2017 (Re: 432 MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk) (Entered: 05/19/2017) |
| 05/25/2017 | 442 | | REPLY to Response to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/25/2017) |
| 05/25/2017 | 443 | | Corrected REPLY to Response to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 05/25/2017) |
| 05/30/2017 | 444 | | MINUTE ORDER by District Judge James H. Payne: denying 425 Motion to Exclude Testimony of J. Randall Price Due to Discovery Violation. (cjt, Deputy Clerk) (Entered: 05/30/2017) |
| 05/30/2017 | 445 | | MINUTE ORDER by District Judge James H. Payne: denying 432 Petitioner's Motion to Exclude Witness Steven Pitt. (cjt, Deputy Clerk) (Entered: 05/30/2017) |
| 06/04/2017 | 446 | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on March 29, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 515 – 642). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 407 Minutes of Evidentiary Hearing ) (ksm, Court Reporter) (Entered: 06/04/2017) |
| 06/04/2017 | 447 | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on March 30, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 643–762). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 410 Minutes of Evidentiary Hearing ) (ksm, Court Reporter) (Entered: 06/04/2017) |

| 06/12/2017 | 448 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day five) held on 6/12/2017. (Court Reporter: Brian Neil) (tls, Deputy Clerk) (Entered: 06/12/2017) |
|---|---|---|---|
| 06/12/2017 | 449 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder, setting continuation of Evidentiary Hearing for 6/13/2017 at 9:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (tls, Deputy Clerk) (Entered: 06/12/2017) |
| 06/13/2017 | 450 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume V held on 6/12/2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Brian Neil) (Pages: 763–944). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 448 Minutes of Evidentiary Hearing ) (bpn, Court Reporter) (Main Document 450 replaced on 6/14/2017) (dma, Deputy Clerk). (Entered: 06/13/2017) |
| 06/13/2017 | 451 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day 6) held on 6/13/2017 (Court Reporter: K.Sidwell and B. Neil) (tls, Deputy Clerk) (tls, Deputy Clerk). (Entered: 06/13/2017) |
| 06/13/2017 | 452 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder, setting continuation of Evidentiary Hearing for 6/26/2017 at 10:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (tls, Deputy Clerk) (Entered: 06/13/2017) |
| 06/15/2017 | 453 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume VII held on 6/13/2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Brian Neil) (Pages: 1084–1136). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 451 Minutes of Evidentiary Hearing ) (bpn, Court Reporter) (Entered: 06/15/2017) |
| 06/15/2017 | 454 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume VI held on 6/13/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 945–1083). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 451 Minutes of Evidentiary Hearing ) (kns, Court Reporter) (Entered: 06/15/2017) |
| 06/16/2017 | 455 | | MOTION Leave to Present Additional Witnesses by USA Responses due by 6/30/2017(Kahan, Jeffrey) (Entered: 06/16/2017) |

| | | | |
|---|---|---|---|
| 06/16/2017 | 456 | | MINUTE ORDER by District Judge James H. Payne directing Petitioner to file an expedited Response to Respondent's 455 MOTION to Call Additional Rebuttal Witnesses. Response is due by noon on Monday, 6/19/2017 (dma, Deputy Clerk) (Entered: 06/16/2017) |
| 06/19/2017 | 457 | | RESPONSE in Opposition to Motion (Re: 455 MOTION Leave to Present Additional Witnesses ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/19/2017) |
| 06/19/2017 | 458 | | MINUTE ORDER by District Judge James H. Payne: The Government's Motion to Call Additional Rebuttal Witnesses is referred to Magistrate Judge Steven P. Shreder as it involves matters arising out of the evidentiary hearing previously referred to him on 03/08/2017. (Re: 455 MOTION Leave to Present Additional Witnesses ) (tls, Deputy Clerk) (Entered: 06/19/2017) |
| 06/19/2017 | 459 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: 455 Government's Motion to Call Additional Rebuttal Witnesses is GRANTED IN PART to the extent that the USA may call Dr. Faust Bianco as a rebuttal witness to the testimony of Dr. Miora on Monday, 6/26/2017. Motion is otherwise DENIED. (tls, Deputy Clerk) (Entered: 06/19/2017) |
| 06/21/2017 | 460 | | MOTION for Disclosure , MOTION for Discovery *Report of Faust Bianco's Opinions, the Bases and Reasons Therefor* by Kenneth Eugene Barrett (With attachments) Responses due by 7/5/2017(Schardl, Tivon) (Entered: 06/21/2017) |
| 06/21/2017 | 461 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Since the Petitioner has indicated that Dr. Miora will not implicate Dr. Bianco's testimony, it appears Dr. Bianco will not testify at the hearing set for Monday, June 26, 2017, at 10:00 a.m. Consequently, Petitioner's Motion For Immediate Production Of Report From Expert Witness (Docket No. 460 ) is hereby DENIED. (tls, Deputy Clerk) (Entered: 06/21/2017) |
| 06/23/2017 | 462 | | Third Amended EXHIBIT LIST by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 06/23/2017) |
| 06/26/2017 | 463 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing held on 6/26/2017. (Court Reporter: Karla McWhorter) (Attachments: # 1 Petitioner's Witness List, # 2 Petitioner's Exhibit List, # 3 Government's Witness List, # 4 Government's Exhibit List)(tls, Deputy Clerk) (Main Document 463 replaced on 6/30/2017 to reflect correct dates hearing held; NEF regenerated) (tls, Deputy Clerk). (Exhibit Lists replaced on 7/10/2017 to reflect admitted date; NEF regenerated) (tls, Deputy Clerk). Modified on 4/15/2019 ***Pursuant to Dkt. #482, all Exhibits from these evidentiary hearings are maintained by the Clerk and located in the Clerk's Office, 2nd Floor Vault.*** (cjt, Deputy Clerk). (Entered: 06/27/2017) |
| 07/13/2017 | 464 | | TRANSCRIPT of Proceedings (Unredacted) of Motions Hearing Volume VIII held on June 26, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 1137–1366). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public |

| | | | |
|---|---|---|---|
| | | | terminal. There is no charge to view the transcript at the court public terminal. (Re: 463 Minutes of Evidentiary Hearing) (ksm, Court Reporter) (Entered: 07/13/2017) |
| 07/31/2017 | 465 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 07/31/2017) |
| 07/31/2017 | 466 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by USA (Kahan, Jeffrey) (Entered: 07/31/2017) |
| 08/10/2018 | 467 | | REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder (Re: (391) Minute Order by District Judge James H. Payne referring Evidentiary Hearing to Magistrate Judge Steven P. Shreder for Findings and Recommendation). Objections to R&R due by 8/24/2018. (ndd, Deputy Clerk) (Entered: 08/10/2018) |
| 08/20/2018 | 468 | | MOTION to Extend Deadline to File Objection to Magistrate Judge's Report and Recommendation by USA Responses due by 9/4/2018(Wilson, Christopher) (Entered: 08/20/2018) |
| 08/21/2018 | 469 | | ORDER by District Judge James H. Payne: granting 468 Government's Motion for Extension of Time to Object to Magistrate's Report and Recommendation; Objections to R&R due by 10/23/2018; Responses to Objections due by 11/26/2018 (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder) (cjt, Deputy Clerk) (Entered: 08/21/2018) |
| 10/12/2018 | 470 | | OBJECTION to Report and Recommendation (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/12/2018) |
| 10/23/2018 | 471 | | OBJECTION to Report and Recommendation (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder ) by USA (Kahan, Jeffrey) (Entered: 10/23/2018) |
| 11/26/2018 | 472 | | RESPONSE (Re: 467 REPORT AND RECOMMENDATION and 470 Objection to Report and Recommendation) by USA (Kahan, Jeffrey) Modified on 11/27/2018 to edit text and add links (dma, Deputy Clerk). (Entered: 11/26/2018) |
| 11/26/2018 | 473 | | NOTICE of Substitution and Appearance of Counsel by Joan M. Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified text on 11/27/2018 (cjt, Deputy Clerk). (Entered: 11/26/2018) |
| 11/26/2018 | 474 | | RESPONSE (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder, 471 Objection to Report and Recommendation ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 11/26/2018) |
| 12/10/2018 | 475 | | REPLY (Re: 471 Objection to Report and Recommendation ) by USA (Kahan, Jeffrey) (Entered: 12/10/2018) |
| 12/10/2018 | 476 | | REPLY (Re: 472 Response ) by Kenneth Eugene Barrett (Ward, Carrie) (Entered: 12/10/2018) |
| 01/31/2019 | 477 | | MINUTE ORDER by Court Clerk: Pursuant to the recusal of Judge James H. Payne and at the direction of the Court, this case is reassigned to Judge Ronald |

| | | | |
|---|---|---|---|
| | | | A. White. All documents filed in this case in the future shall reflect the new case number CIV−09−105−RAW. (cjt, Deputy Clerk) (Entered: 01/31/2019) |
| 03/28/2019 | 478 | | OPINION AND ORDER by Judge Ronald A. White: affirming in part and denying in part 467 Report and Recommendation; Petitioner's 2255 motion is denied as it relates to his claim of ineffective assistance of counsel during the penalty phase of trial; Certificate of Appealability granted. dismissing/terminating case (case terminated) (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 03/28/2019 | 479 | | JUDGMENT by Judge Ronald A. White entering judgment in favor of USA against Kenneth Eugene Barrett on his challenge to the legality of his sentence. (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 04/10/2019 | 480 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: It is ordered that each party is directed to withdraw their respective exhibits offered and admitted into evidence at the evidentiary hearings conducted on 3/27/2017, 3/28/2017, 3/29/2017, 3/30/2017, 6/12/2017, 6/13/2017 and 6/26/2017, the same to be kept and maintained for possible appeal purposes. (cjt, Deputy Clerk) Modified on 4/15/2019 ***VACATED per Dkt #482 Minute Order*** (cjt, Deputy Clerk). (Entered: 04/10/2019) |
| 04/11/2019 | 481 | | Unopposed MOTION to Vacate Minute Order and Hold Exhibits Pending Transmittal to the Circuit Court of Appeals (Re: 480 Minute Order) by Kenneth Eugene Barrett; Responses due by 4/25/2019(Fisher, Joan) Modified text on 4/12/2019 (cjt, Deputy Clerk). (Entered: 04/11/2019) |
| 04/15/2019 | 482 | | MINUTE ORDER by Judge Ronald A. White: granting 481 Petitioner's Unopposed Motion to Vacate Minute Order and Hold Exhibits Pending Transmittal to the Circuit Court of Appeals. The Clerk is directed to maintain the exhibits until further order of the Court. (Re: 480 Minute Order) (cjt, Deputy Clerk) (Entered: 04/15/2019) |
| 04/24/2019 | 483 | | MOTION to Alter or Amend Judgment and Brief in Support (Re: 479 Judgment, 478 Ruling on Report and Recommendation, Granting Certificate of Appealability) by Kenneth Eugene Barrett Responses due by 5/8/2019(Fisher, Joan) (Entered: 04/24/2019) |
| 05/07/2019 | 484 | | RESPONSE to Motion (Re: 483 MOTION to Alter Order/Judgment ) by USA ;(Kahan, Jeffrey) (Entered: 05/07/2019) |
| 05/09/2019 | 485 | | LETTER to 10th Circuit Court of Appeals returning pleadings, videotape and disks included in the Record on Appeal 222 Notice of Appeal and 227 Record on Appeal (With attachments)(jcb, Deputy Clerk) (Entered: 05/09/2019) |
| 05/17/2019 | 486 | | REPLY to Response to Motion (Re: 483 MOTION to Alter Order/Judgment ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/17/2019) |
| 06/11/2019 | 487 | | ORDER from Circuit Court denying authorization to file second or successive 2255 motion (See Dkt. #451 in CR−04−115−RAW and Dkt. #3 in CIV−19−152−RAW) (cjt, Deputy Clerk) (Entered: 06/13/2019) |
| 08/13/2019 | 488 | | ORDER by Judge Ronald A. White: denying 483 Petitioner's Motion to Alter or Amend Judgment, with the exception of the clarification described in the Order (cjt, Deputy Clerk) (Entered: 08/13/2019) |

| 10/07/2019 | 489 | | NOTICE OF APPEAL to Circuit Court (Re: 479 Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/07/2019) |
|---|---|---|---|
| 10/08/2019 | 490 | | Transmission of Notice of Appeal and Docket Sheet to U.S. Court of Appeals (Re: 489 Notice of Appeal – Final Judgment ) (With attachments)(jcb, Deputy Clerk) (Main Document 490 replaced on 10/10/2019) (jcb, Deputy Clerk). (Entered: 10/08/2019) |
| 10/08/2019 | 491 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 19–7049 (Re: 489 Notice of Appeal – Final Judgment ) (jcb, Deputy Clerk) (Entered: 10/08/2019) |
| 10/21/2019 | 492 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 489 Notice of Appeal – Final Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/21/2019) |
| 10/21/2019 | 493 | | DESIGNATION of Record on Appeal (Re: 489 Notice of Appeal – Final Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/21/2019) |

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT          )
                                )
    *Movant*,                    )
                                )
v.                              )          **Case No. 09-CV-00105-JHP**
                                )
UNITED STATES OF AMERICA        )
                                )
    *Respondent*.                )

**RESPONSE IN OPPOSITION TO PETITIONER'S MOTION
TO ALTER OR AMEND JUDGMENT**

**COMES NOW** the United States of America by and through undersigned counsel and files this response in opposition to Barrett's Motion to Alter or Amend Judgment (Doc. 217).  In its present form, the 59(e) Motion is procedurally defective and must be denied or amended, because it mixes successive substantive § 2255 claims with non-successive procedural claims attacking the conduct of the § 2255 proceeding.  Alternatively, it fails to state any basis for reconsideration of this Court's orders denying relief, judicial recusal, an evidentiary hearing or a certificate of appealability.

**PROCEDURAL HISTORY**

On March 16, 2009, Barrett filed a 17-claim motion for relief under 28 U.S.C. § 2255, attacking his federal homicide conviction and death sentence.  Doc. 1.  On December 5, 2009, he filed a second-amended § 2255 motion, raising 19 claims.  Doc. 95.  On March 1, 2010, he filed a brief in support of his motion.  Doc. 149.  On May 17, 2010, the government answered the second-amended motion for collateral relief.  Doc. 174.  On August 16, 2012, this Court issued an Opinion and Order denying relief under § 2255 and denying a certificate of appealability.  Doc. 214.  On September 13, 2012, 28 days after the Court issued its Order, Barrett filed the

1

instant Motion to Alter or Amend Judgment and Brief in Support. Doc. 217 ("Mot."). This Response in Opposition follows.

## I. THE FIRST TWO CLAIMS ON RECONSIDERATION CONSTITUTE A SECOND OR SUCCESSIVE PETITION FOR RELIEF

Barrett has failed to heed the limitation on his ability to file successive applications for § 2255 relief by the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), as codified at 28 U.S.C. §§ 2244(b) & 2255(h).

A motion to reconsider the denial of a § 2255 motion is treated as a request to file a second or successive motion under § 2255 if it "in substance or effect asserts or reasserts a federal basis for relief from the petitioner's underlying conviction [or sentence]." *United States v. Pedraza*, 466 F.3d 932, 933–34 (10th Cir. 2006). Such claims should be transferred to the Court of Appeals. *Id*. District courts may, however, consider a "true" motion for relief from judgment. *See Gonzalez v. Crosby*, 545 U.S. 524, 528–32 (2005); *Pedraza*, 466 F.3d at 933–34. To avoid treatment as a successive motion, the movant must challenge "some defect in the integrity of the federal habeas process" rather than the "substance of the federal court's resolution of a claim on the merits." *Gonzalez*, 545 U.S. at 532. Pleadings that mix "true" requests for relief under Rule 59(e) with second or successive § 2255 claims, are viewed as separate documents. *See Spitznas v. Boone*, 464 F.3d 1213, 1217 (10th Cir.2006).

Ordinarily, a claim of judicial bias in the determination of a § 2255 motion might fall outside the scope of the successive application rule. Here, however, Barrett presented two claims of judicial bias as part of his § 2255 Motion, and argued within it that the Court should recuse itself. *E.g*., Doc. 95 at 31 & 400. Indeed, Barrett specifically relied on alleged judicial bias as a basis for collateral relief. Doc. 95 at 31 ("For the foregoing reasons, the trial judge should recuse himself from this case. Thereafter, this Court should grant the relief sought

2

herein."). Barrett maintained the § 2255 request for recusal long after this Court had observed that the local rules required separate filings for separate motions. *See* Tran. Oct. 6, 2009 at 8. Barrett's maintenance of the request within the § 2255 motion clearly indicates his apparent belief that it directly supported collateral relief.

The procedural nexus between Barrett's request for recusal and § 2255 relief clearly reflect a desire for a substantive connection. Presumably, he anticipated that this Court would rely on recusal as a concession of bias supporting his § 2255 claims that the trial defense was improperly denied necessary resources. *See* Doc. 95 (claims I and III). Given the symbiosis between Barrett's claim of judicial bias in the collateral proceedings and his claim of bias during trial, the present claim "in substance or effect asserts or reasserts a federal basis for relief from the petitioner's underlying conviction [or sentence]." *United States v. Pedraza*, 466 F.3d at 933– 34. Accordingly, this Court should refuse to consider it as a second or successive request for collateral relief.

Barrett's second claim, that the Court erroneously failed to grant an evidentiary hearing, appears facially to attack an alleged defect in the procedures employed in this case. Barrett begins his argument by identifying instances in which he believes the Court relied on its recollection to the exclusion of the record. Mot. at 15-16. However, his contentions devolve into substantive arguments about the bases of the Court's factual findings and legal rulings. For instance, he argues that the Court improperly rejected the opinion of Susan Otto (Mot. at 17); he argues that the Court baselessly found counsel learned in the law of capital cases (*id*.); he argues that the Court did not adequately address a declaration from former counsel Echols about foregone preparations for trial (*id*.); he argues that the Court relied on unsupportive facts in determining that Mr. Echols was seeking to obtain improper compensation (*id*. at 17-18); and he

argues that the Court relied on inappropriate information in determining the reasonableness of trial counsel's conduct (*id*. at 18-19).  Barrett then drops any guise of arguing that he was deprived of an evidentiary hearing and simply takes issue with the Court's interpretation of his proffered mitigation evidence.  *Id*. at 19-21.

Barrett's claim, in large measure a naked attempt to relitigate the § 2255 motion, should be treated as a second or successive petition.

## II.  BARRETT HAS NOT IDENTIFIED ANY ERROR MERITING RECONSIDERATION

Assuming, arguendo, that this Court construes any of Barrett's arguments as "true" requests for reconsideration, rather than as second or successive petitions for collateral relief, it should deny relief as to each contention.  Barrett has failed to meet the pertinent standard for reconsideration of this Court's final order denying relief.

The Federal Rules of Civil Procedure do not recognize a "motion to reconsider."  *Miller v. State of Kan. Highway Patrol*, 383 F. App'x 813, 814 (10th Cir.2010) (quoting *Van Skiver v. United States*, 952 F.2d 1241, 1243 (10th Cir.1991)); *Ysais v. Richardson*, 603, F.3d 1175, 1178 n.2 (10th Cir. 2010).  The rules permit litigants to request alteration or amendment of an adverse judgment under Federal Rule of Civil Procedure 59(e).  *Van Skiver*, 603 F.3d at 1178 n.2.  "Grounds warranting a [Rule 59(e)] motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice."  *Devon Energy Production Co., v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1212 (10th Cir. 2012) (quoting *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).

A.  <u>Barrett Fails to Establish a Basis to Alter or Amend the Denial of a Judicial Recusal</u>

Barrett has not identified any change in the law or evidence[1] that would support judicial recusal following this Court's denial of his repeated requests for such action (*see* Docs. 1, 2, 45, 70, 95 & 178).  In fact, the only changed circumstance identified by Barrett is the Court's issuance of an opinion denying relief.  He makes a perfunctory attempt to rely on the language of the opinion to demonstrate bias (Mot. at 6-10) but his effort is for naught.  For example, he complains that the court disparaged him by observing that he expanded the record to "voluminous proportions."  But Barrett, himself, conceded as much when he sought permission to file an oversized brief: "Petitioner cites as grounds for the oversized brief the serious nature and complexity of the subject matter; the ***voluminous nature of the record and the Amended Motion***."  Doc. 111-2 (emphasis added).  Putting aside Barrett's concession of the obvious, the Court had long-ago noted the out-sized proportions of the pleadings in this case.  *See, e.g.*, Doc. 66 ("the Court is aware that the voluminous § 2255 motion"); Doc. 74 (referring to the "voluminous Motion").

Apart from the references to the size of the record, Barrett also complains about the Court's opinion that his attorneys have not acted entirely in good faith and have filed documents with the intent to delay disposition.  Of course, adverse rulings are not a basis for recusal.  *Glass v. Pfeffer*, <u>849 F.2d 1261, 1268</u> (10th Cir. 1988).  Indeed, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-

---

[1] Barrett relies in part on an exhibit that purports to compare this Court's treatment of his motion for collateral relief with those of other litigants.  Mot. Ex. B.  The declaration does not constitute new evidence.  Barrett presented the same information orally to this Court and as an exhibit in support of his mandamus request to the Tenth Circuit.  Tran. Oct. 6, 2009 at 27-28; Doc. 94-2; Petitioner's Reply to Brief for the United States in Opposition to the Petition for Writ of Mandamus, at Appendix A, *In re Barrett*, No. 09-7096 (10th Cir. Dec. 8, 2009).

seated favoritism or antagonism that would make fair judgment impossible." *Liteky v. United States*, 510 U.S. 540, 555 (1994); *see also LoCascio v. United States*, 473 F.3d 493, 495 (2d Cir. 2007) (holding that issuance of contempt decision against attorney did not require recusal).

Not only has Barrett failed to identify any changed circumstance supporting reconsideration, he has not shown any clear error, nor could he. The Tenth Circuit's decision on mandamus precludes a finding of clear error at this juncture. The law of the case doctrine applies to mandamus decisions actually deciding issues on the merits. *See Kennedy v. Lubar*, 273 F.3d 1293, 1299 (10th Cir.2001). In rejecting mandamus in this case, the Tenth Circuit held, "We are not convinced that Mr. Barrett has established a *clear and indisputable right* to the district judge's recusal under any of § 455's subsections or that this case presents the exceptional circumstances required to issue a writ of mandamus." *In re Barrett*, No. 09-7096, Doc. No. 01018330196 (10th Cir. Dec. 14, 2009) (emphasis added). The Tenth Circuit's ruling, on ostensibly the same facts advanced here, demonstrates a lack of clear error in this Court's own recusal ruling and should preclude any relief here.

Accordingly, the Court should deny the request to alter or amend the judgment.

B. Barrett Fails to Establish a Basis to Alter or Amend the Denial of an Evidentiary Hearing

In arguing that the Court erroneously denied him an evidentiary hearing, Barrett does not identify an intervening change in controlling law or any new evidence in support of his initial request. Instead, he attempts to demonstrate clear error by arguing that the Court improperly relied on its recollection of events, thereby providing untested evidence and avoiding an evidentiary hearing. Mot. at 10-22.

Barrett's effort to demonstrate error fails on a legal and a factual basis. Courts may rely on their recollections in ruling on § 2255 motions, so long as they do not do so to the exclusion

of a corroborative or contradictory record: "Where a record is available which would support or contradict a defendant's factual challenge to his conviction, the district court judge cannot rely solely on his own recollection of events to rule on the merits." *United States v. Scully*, 798 F.2d 411, 413 (10th Cir.1986)). In this case, the record expressly supported the Court's findings.

According to Barrett, the Court has improperly opined that it encouraged trial counsel, following a change in appointments, to submit an amended budget request because of their lack of familiarity with the prior state court proceedings. Mot. at 15. In fact, the Court's opinion cites Trial Document 133, which specifically explained the Court's concern and motivation, consistent with its recollection in the opinion:

> Counsel shall have until May 27, 2005, to submit an amended budget proposal if they feel (1) delegation of hours needed to be shifted between counsel, or (2) certain categories may require additional hours due to the unfamiliarity of both counsel with the background of the case. . . . [T]his Court is not so concerned with counsel shifting the approved number of hours . . . as it is with counsel exceeding the total number of hours approved."

Tr. Doc. 133 at 1-2.

Barrett also inaccurately accuses the Court of relying on its present-day opinion when it wrote that it attempted to get counsel to "focus" on the need for expert witnesses. Mot. 16. The Court, in fact, expressly premised the pertinent portion of its opinion on the record:

> *[T]he record makes it clear* that the budget was not carved in stone but was an estimate of what might reasonably be required. . . . Thus [this] court, in carrying out its administrative functions in this case, *attempted to get counsel to focus on exactly what would be needed in the way of experts in order to ensure that the requests were reasonable and necessary to provide fair compensation.* . . . since the underlying incident had been the focus of two prior state court trials, counsel should have been able to utilize the factual investigations completed in the earlier cases to [defray expenses]. Once the court approved a budget, however, counsel were not prevented from . . . [requesting increases in] budgeted amounts and the court, on several occasions, encouraged defense counsel to submit supplemental budget requests if they felt they needed additional funding.

7

52

Doc. 214 at 32 (emphasis added).  In support, the Court relied on three documents from the record (Tr. Docs. 321, 318 and 128), explaining its citations with parentheticals.  Doc. 214 at 32-33 n.93.  The Court's order appointing Messrs. Hilfiger and Smith, while not cited, also set forth the Court's concern for identifying expert witness expenses.  Doc. 133 at 2-3.  Thus, the opinion denying § 2255 relief reflected the record, rather than the Court's present-day recall of events.

Barrett also attacks the Court's opinion that Messrs. Hilfiger and Smith were active members of the CJA defense panel.  But these facts are supported by contemporaneous records.  In May of 2005, the Court noted Mr. Hilfiger's substantial experience, as prosecutor and defense counsel, in its order granting Mr. Echols's request to withdraw.  Tr. Doc. 128 at 5.  As to Mr. Smith, the Court's records amply demonstrate his federal court experience at the time of appointment.  A search of his name as attorney in this District's PACER system, indicates that he had appeared as counsel in 66 cases when he was appointed in this one.  Ex. A.

Barrett claims the Court improperly dismissed as "ludicrous" a declaration concerning qualifications for appointment as defense counsel in a capital case.  Mot. at 17.  While the Court characterized as "ludicrous" a single, erroneous assertion in that declaration, it made no such determination as to the balance of the document.[2]  Doc. 214 at 24 n.62.  More significantly, the Court amply explained its reasoning for finding Barrett's lead trial counsel, Mr. Hilfiger, learned in the law applicable to capital cases – he had served as a defense attorney, the U.S. Attorney, and as defense counsel for a capital defendant in the Eastern District of Oklahoma, facts the Court recounted when it appointed him in Mr. Echols's place.  Tr. Doc. 128 at 5.

Barrett next argues that the Court improperly relied on its present-day opinions of Mr. Echols, who withdrew as lead trial counsel prior to trial.  Mot. at 18.  Barrett's argument simply

_____

[2] Barrett makes no attempt to defend the accuracy of the declarant's statement.

8

disregards the record citations in support of the Court's findings. *See* Doc. 214 at 141-43 & nn. 192-94.

Barrett also faults the Court for failing to rely on the declarations of experts that he submitted in support of his ineffective assistance of counsel claims. Specifically, Barrett complains that the Court failed to heed the command of *Strickland v. Washington*[3] to impose an objective standard of reasonableness on counsel's conduct. Mot. at 18-19. He misconstrues the opinion, which states that "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." 466 U.S. at 688-89. The opinion continues in this vein: "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance . . . .and it is all too easy for a court . . . to conclude that a particular act or omission . . . was unreasonable." *Id*. at 690. This Court stood on firm legal ground in rejecting the opinions of Barrett's speculative experts in favor of the explanations offered by trial counsel and cited in the opinion denying § 2255 relief. *See* Doc. 214 at 178-79.

Barrett also complains that this Court improperly rejected his position that counsel's alleged errors had prejudiced him. Doc. 19-20. Barrett does not attempt to demonstrate legal error: he simply states his disagreement with the Court's judgment. He does rely on the declaration of a supposed jury expert in contradicting the Court's findings about the value of certain omitted evidence. That declaration was never presented to the Court prior to the filing of this Motion, but the reasoning and information offered in it could not carry the day for Barrett. The declarant purports to forecast the views of the jury in this case based on his extensive

---

[3] *Strickland v. Washington*, 466 U.S. 668 (1984).

interviews of capital case jurors.  Were the jurors in this case available, their own opinions would not be admissible.  Fed. R. Evid. 606(b).  A witness's speculation, premised on the hearsay views of jurors in other cases does not demonstrate any error, much less clear error.

Finally, Barrett argues that the Court did not properly analyze the prejudice prong of his ineffective assistance of counsel claims in light of *Porter v. McCollum*, 558 U.S. 30 (2009). Mot. at 20-22.  He appears to take the position that this Court must give weight to any mitigation evidence he can identify, but he has once again misconstrued the pertinent law.  A determination of prejudice "requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial." *Strickland*, 466 U.S. at 687.  In the context of a challenge to a sentence of death, the question is whether "there is a reasonable probability that [the judge and jury] would have returned with a different sentence." *Wiggins v. Smith*, 539 U.S. 510, 536 (2003).  "To assess that probability, [courts] consider the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding – and reweig[h] it against the evidence in aggravation." *Porter*, 558 U.S. at ___, 130 S. Ct. at 453-54 (citation and internal quotes omitted).  "The likelihood of a different result must be substantial, not just conceivable." *Harrington v. Richter*, 131 S. Ct. 770, 792 (2011).  As the Supreme Court did in *Porter*, this Court properly considered the weight of the mitigation evidence offered by the petitioner.  *Porter* did not obligate the Court to blindly credit Barrett's proffer, and this Court correctly declined to do so.  Accordingly his attempt to demonstrate clear error should fail.

Barrett's entire attack on the decision to deny him an evidentiary hearing is fraught with legal and factual error.  This Court should therefore deny the request to alter or amend the judgment.

C.  Barrett Fails to Establish a Reason to Alter or Amend the Denial of a Certificate of Appealability

Barrett asks this Court to reconsider its denial of a certificate of appealability as to every issue raised in his § 2255 motion. He asserts that the length of the Court's opinion denying relief is evidence that his claims are "debatable" and therefore merit appeal. Mot. at 22-24. Barrett's inference finds no support in the law or the record.

A petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel*, 529 U.S. 473, 483–84 (2000). In other words, he "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack*, 529 U.S. at 484. The length of an opinion denying collateral relief does not necessarily signal that reasonable jurists would find the claims debatable. No inference of debatability arises if the claims contain legal, factual or logical flaws that the court must address at length in order to place the assertions in context. *See Pantano v. Donat*, No. 3:08–cv–00685–ECR–VPC, 2012 WL 3929515, *58 (D. Nev. Sept. 7, 2012).

Barrett cannot show, based on the length of the Court's opinion, that it was clearly obligated to grant him an appeal. In fact, the sheer size of the case, discussed above, necessitated a lengthy opinion. The Court confronted a 403-page Second Amended Motion for § 2255 relief (Doc. 95) that was supported by a 277-page legal brief (Doc. 149), a 215-page reply brief (Doc. 178) and a total of 219 exhibits (Docs. 95 & 178). The Court's opinion addressed Barrett's 895 pages of argument and a few thousand pages of exhibits in a little under 170 pages of text. The Court's brevity, under the circumstances, provides no basis for concluding that it identified issues subject to debate. Instead, it confronted several claims that were time or procedurally barred. *E.g.*, Doc. 214 at 56, 77, 102, 109-10, 12, and 167. It also corrected factual flaws (e.g., *id.* at 70 and 78) and legal errors (*e.g. id.* at 8 n. 13, 40) in Barrett's claims. On this record,

11

Barrett cannot show that the denial of a certificate of appealability constituted clear error because the Court required a lengthy opinion to address his claims. *See Jackson v. United States*, <u>638 F. Supp. 2d 514</u> (W.D.N.C. 2009) (251-page slip opinion denying § 2255 relief in a capital case reduced to 104-pages in official reporter), *certificate of appealability denied*, <u>2010 WL 2775402</u> (W.D.N.C. July 13, 2010), *certificate of appealability denied, sub nom.*, *United States v. Jackson*, No. 09-10, Doc. 30 (4th Cir. 2011), *cert. denied, sub. nom., Jackson v. United States*, ___ S. Ct. ___, <u>2012 WL 4475543</u> (2012).

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges the Court to transfer in part or deny in total Barrett's Motion to Alter or Amend the Judgment.

Dated: October 29, 2012

<div style="margin-left:40%">

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ Jeffrey B. Kahan
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779

</div>

12

## **CERTIFICATE OF SERVICE**

I, hereby certify that on 29th day of October, 2012, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry, Attorney for Petitioner
Joan M. Fisher, Attorney for Petitioner
Tivon Schardl, Attorney for Petitioner

/S/ Christopher  J. Wilson
United States Attorney's Office

13

58

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.)))**

This case was not selected for publication in the Federal Reporter.

Not for Publication in West's Federal Reporter. See Fed. Rule of Appellate Procedure 32.1 generally governing citation of judicial decisions issued on or after Jan. 1, 2007. See also Tenth Circuit Rule 32.1. (Find CTA10 Rule 32.1)

United States Court of Appeals,
Tenth Circuit.
Barney MILLER, Plaintiff-Appellant,
v.
STATE OF KANSAS HIGHWAY PATROL, Defendant-Appellee.

No. 10-3046.
June 23, 2010.

**Background:** Applicant brought action alleging that state highway patrol discriminated against him, in violation of Americans with Disabilities Act (ADA), by not allowing him to test for position for which he had applied. The United States District Court for the District of Kansas, 2010 WL 497651, dismissed complaint and denied applicant's motion to reconsider. Applicant appealed.

**Holdings:** The Court of Appeals, Deanell Reece Tacha, Circuit Judge, held that:
(1) applicant's complaints did not provide basis for altering or amending judgment, and
(2) applicant forfeited his right to appellate review.

Affirmed.

West Headnotes

**[1] Federal Civil Procedure 170A ⊂⊃2653**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(G) Relief from Judgment
         170Ak2651 Grounds

170Ak2653 k. Error in general. Most Cited Cases

**Federal Civil Procedure 170A ⊂⊃2655**

170A Federal Civil Procedure
   170AXVII Judgment
      170AXVII(G) Relief from Judgment
         170Ak2651 Grounds
            170Ak2655 k. Further evidence or argument. Most Cited Cases

Plaintiff's complaint about adequacy of his attorney's representation in employment discrimination case and his request to have his case reinstated so he could bring claim under different statute did not implicate manifest errors of law or newly discovered evidence, and thus did not provide basis for altering or amending judgment. Fed.Rules Civ.Proc.Rule 59(e), 28 U.S.C.A.

**[2] Federal Courts 170B ⊂⊃915**

170B Federal Courts
   170BVIII Courts of Appeals
      170BVIII(K) Scope, Standards, and Extent
         170BVIII(K)7 Waiver of Error in Appellate Court
            170Bk915 k. In general. Most Cited Cases

Pro se plaintiff in employment discrimination action forfeited his right to appellate review of district court's dismissal of his complaint as result of his failure to present court with any reasoned arguments supported by citations to record or legal authority. F.R.A.P.Rule 28(a)(5-9), 28 U.S.C.A.

**\*813** Barney Miller, Dwight, IL, pro se.

Christopher M. Grunewald, Kimberly Michelle Grunewald, Attorney General for the State of Kansas, Topeka, KS, for Defendant-Appellee.

Before TACHA, HOLLOWAY, and ANDERSON, Circuit Judges.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT ONE

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.)))**

**\*814 ORDER AND JUDGMENT** FN\*

FN\* After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

DEANELL REECE TACHA, Circuit Judge.

**\*\*1** Barney Miller, proceeding pro se, appeals from the district court's dismissal of his complaint and the denial of his motion to reconsider. We have jurisdiction under 28 U.S.C. § 1291 and we affirm.

*Background*

Mr. Miller filed a pro se "Employment Discrimination Complaint" against the State of Kansas Highway Patrol, alleging that the State discriminated against him in violation of the Americans with Disabilities Act (ADA) by not allowing him to "test" for a "Communication Specialist" position for which he had applied. *See* R. at 6-11. The district court later appointed counsel to assist Mr. Miller with his case. The State filed a motion to dismiss Mr. Miller's complaint, arguing that his ADA employment discrimination claim was barred by the State's sovereign immunity under the Eleventh Amendment. Mr. Miller responded through counsel, asserting that the State's immunity to suit only applied to claims brought under Title I of the ADA and that his claim should be allowed to proceed under Title II of the ADA. The district court granted the motion to dismiss based on the following reasoning:

If the plaintiff is asserting the claim pursuant to Title I of the ADA, the claim[ ] is dismissed pursuant to Rule 12(b)(1) for a lack of jurisdiction,

as the State is immune from suit. If the plaintiff is asserting a claim pursuant to Title II of the ADA, the claim is dismissed pursuant to Rule 12(b)(6) for failure to state claim, as the plaintiff has not shown that Title II of the ADA applies to employment discrimination claims.

*Id.* at 53.

Mr. Miller then filed a pro se motion to reconsider the district court's dismissal of his complaint. Mr. Miller first notified the court that he was no longer represented by an attorney. He then asked the district court to "consider reversing the[ ] earlier dismissal of [his] case" and to have his case "reinstated under section 504 of the rehabilitation act of 1973." *Id.* at 55. The district court denied the motion to reconsider. Mr. Miller then filed a pro se notice of appeal.

*Discussion*

We first consider the district court's decision to deny Mr. Miller's motion to reconsider.

The Federal Rules of Civil Procedure do not recognize a "motion to reconsider." Instead, the rules allow a litigant subject to an adverse judgment to file either a motion to alter or amend the judgment pursuant to Fed. R. Civ. P. 59(e) or a motion seeking relief from the judgment pursuant to Fed. R. Civ. P. 60(b).

*Van Skiver v. United States,* 952 F.2d 1241, 1243 (10th Cir.1991). Here, Mr. Miller did not specify whether he was seeking relief under Rule 59(e) or Rule 60(b). In his motion, Mr. Miller asked the court to reconsider the dismissal of his complaint and to allow him to amend his complaint to add a new claim under section 504 of the Rehabilitation Act of 1973. He asserted that he did not know about the possibility of bringing such a claim until after his **\*815** complaint was dismissed and that his attorney had not adequately represented him.

**\*\*2** Without a specific reference to Rule 59(e) or Rule 60(b), the district court considered the mo-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT ONE

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.)))**

tion to reconsider under both rules. The district court first concluded that, if the motion was seeking relief under Rule 59(e), then it was not timely filed because it was filed more than ten days after judgment was entered. The district court then determined that Mr. Miller's motion failed to set forth any grounds for relief under Rule 60(b). Accordingly, the district court denied the motion to reconsider.

We review the denial of a Rule 59(e) or Rule 60(b) motion for abuse of discretion. *See Ysais v. Richardson,* 603 F.3d 1175, 1180 (10th Cir.2010), *petition for cert. filed,* (June 10, 2010) (No. 09-11225); *Manning v. Astrue,* 510 F.3d 1246, 1249 (10th Cir.2007). Mr. Miller initially complains about the district court's decision to deny his motion to reconsider because it was filed more than ten days after the district court's dismissal order. He contends that his attorney did not give him timely notice of the district court's ruling. We conclude that the district court erred in denying the motion as untimely because Mr. Miller's motion was timely filed under the amended Rules of Civil Procedure that took effect on December 1, 2009.

[1] The district court entered judgment on December 18, 2009; as a result, Mr. Miller had twenty-eight days to file a motion to alter or amend the judgment. *See* Fed. R. Civ. P. 59(e). His motion was filed on January 11, 2010, which was timely under Rule 59(e) because it was twenty-four days after judgment was entered. But denial of a Rule 59 motion as untimely is harmless error if there was no basis for granting the motion on its merits. *See Anderson v. Deere & Co.,* 852 F.2d 1244, 1246 (10th Cir.1988); *Monod v. Futura, Inc.,* 415 F.2d 1170, 1175 (10th Cir.1969). "A Rule 59(e) motion to alter or amend the judgment should be granted only to correct manifest errors of law or to present newly discovered evidence." *Phelps v. Hamilton,* 122 F.3d 1309, 1324 (10th Cir.1997) (quotations omitted). In his motion to reconsider, Mr. Miller complained about the adequacy of his attorney's representation and asked to have his case reinstated so he could bring a claim under a different statute. Neither of

these issues implicate manifest errors of law or newly discovered evidence. We therefore conclude it was harmless error for the district court to deny the motion as untimely.[FN1]

> FN1. Mr. Miller's brief does not articulate a challenge to the district court's decision that he was not entitled to relief under any of the provisions of Rule 60(b). Accordingly, he has waived any challenge to that portion of the district court's decision. *See Becker v. Kroll,* 494 F.3d 904, 913 n. 6 (10th Cir.2007).

[2] As for the district court's decision to dismiss his complaint, Mr. Miller has not provided this court with any substantive basis on which to overturn the district court's decision. His pro se brief contains a rambling narrative about his case in which he includes complaints about his attorney[FN2] and the district court judge. *See* Aplt. Br. at 1-6. He has made no attempt to comply with Federal Rule of Appellate Procedure 28. His brief fails to include a statement of issues for review, a statement of the case, a statement of the facts, a summary of the argument, and an **\*816** argument section with citations to legal authority or to the record-all of which are required by Rule 28(a)(5)-(9).

> FN2. We note that any alleged ineffective assistance by Mr. Miller's counsel is not a basis for appeal or retrial. *See Nelson v. Boeing Co.,* 446 F.3d 1118, 1119 (10th Cir.2006); *MacCuish v. United States,* 844 F.2d 733, 735-36 (10th Cir.1988). His remedy is a legal malpractice suit against his attorney. *See id.*

**\*\*3** Although a pro se litigant's pleadings are to be construed liberally and held to a less stringent standard than formal pleadings drafted by lawyers, this court has repeatedly insisted that pro se parties follow the same rules of procedure that govern other litigants. Thus, although we make some allowances for the pro se plaintiff's failure to cite proper legal authority, his confusion of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT ONE

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))
**(Not Selected for publication in the Federal Reporter)**
**(Cite as: 383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.)))**

various legal theories, his poor syntax and sentence construction, or his unfamiliarity with pleading requirements, the court cannot take on the responsibility of serving as the litigant's attorney in constructing arguments and searching the record.
*Garrett v. Selby Connor Maddux & Janer,* 425 F.3d 836, 840 (10th Cir.2005) (quotations, citations, and alterations omitted). We conclude that Mr. Miller has forfeited his right to appellate review of the district court's dismissal of his complaint because he has failed to comply with Rule 28 and he has not presented this court with any reasoned arguments that are supported by citations to the record or legal authority.[FN3] *See id.* at 840-841 (concluding that appellant had forfeited his right to appellate review where his brief failed to comply with Rule 28 and his issues on appeal consisted of "mere conclusory allegations with no citations to the record or any legal authority or support"); *see also Eateries, Inc. v. J.R. Simplot Co.,* 346 F.3d 1225, 1232 (10th Cir.2003) (concluding that appellant's superficial argument with no record citations or legal authority was "insufficient to garner appellate review"). Accordingly, the judgment of the district court is AFFIRMED. Mr. Miller's "Motion to Recuse" is DENIED.

> FN3. Mr. Miller appears to summarize the basis for his appeal as follows:

> I'm appealing Judge Brown[']s decision to dismiss this case under inadequate representation of counsel, evidence of malicious intent by the state of Kansas, the EEOC, and the Attorney General, and even though Judge Brown used case law against me he also did it out of spite and even though it can't be directly proven its v[e]ry suspicious.

> Aplt. Br. at 5.

C.A.10 (Kan.),2010.
Miller v. State of Kansas Highway Patrol

383 Fed.Appx. 813, 2010 WL 2511544 (C.A.10 (Kan.))

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT ONE

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Only the Westlaw citation is currently available.

United States District Court,
D. Nevada.
Angelo PANTANO, Petitioner,
v.
William DONAT, et al., Respondents.

No. 3:08–cv–00685–ECR–VPC.
Sept. 7, 2012.

Megan Hoffman, Federal Public Defender, Las Vegas, NV, for Petitioner.

ORDER

EDWARD C. REED, District Judge.

**\*1** This represented habeas matter under 28 U.S.C. § 2254 comes before the Court for a final decision on the merits.

### Background

Petitioner Angelo Pantano seeks to set aside his 2004 Nevada state judgment of conviction, pursuant to a jury verdict, of sexual assault of a minor under the age of 14. He is serving a life sentence with the possibility of parole after 20 years.

In its published decision on direct appeal, the Supreme Court of Nevada summarized the principal trial evidence as follows:

Respondent Angelo Pantano digitally penetrated his seven-year-old female cousin, D.D., while visiting at her home in Las Vegas. Several days elapsed before D.D. disclosed the incident. Ultimately, after D.D.'s mother discovered the child's stained underwear, D.D. indicated that Pantano had digitally penetrated her "kiki," a term she used for her vagina.

The mother later asked D.D. to repeat to her father what she had said about the incident. D.D.'s initial failure to respond evoked the father's concern that someone had inappropriately touched her at school. When he asked her if that had been the case, D.D. implicated Pantano. Because Pantano would not have had access to D.D. at the school, and because she remained reluctant to describe the incident, her father more specifically inquired as to whether someone had been touching her in a sexual manner. To this, D.D. responded in the affirmative as follows: "he [Pantano] stick [sic] his finger in my kiki, Daddy." The father asked her three further times if she was sure about the accusation and received uniform affirmative responses. When asked why D.D. did not report the incident sooner, she responded that Pantano had warned her that she would be in trouble if she did so. Shortly thereafter, the parents reported the matter to the Las Vegas Metropolitan Police Department (LVMPD).

As part of the initial investigation, LVMPD Detective Rick Given took a further statement from the child confirming the incident. Detective Given also took a voluntary statement from Pantano, during which Pantano confessed to digitally penetrating the child. He further admitted to touching D.D.'s buttocks with his penis while masturbating behind her in her bed.

The State charged Pantano with sexual assault with a minor under the age of 14 for the digital penetration, and lewdness with a child under the age of 14 for the penile contact. At a pretrial hearing, the district court conducted a statutory reliability determination under NRS 51.385, discussed infra, regarding D. D.'s hearsay statements to her mother, father, and Detective Given. The district court permitted use of all three sets of statements at trial, concluding that they were sufficiently reliable under the statute. D .D. testified regarding the digital penetration at a preliminary hearing and at trial, but she failed to confirm the facts underlying the lewdness charge. When asked at trial on cross-examination and redirect if

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

she had spoken to anyone regarding the incident, she either responded negatively or that she could not remember.

**\*2** *Pantano v. State* 122 Nev. 782, 785–86, 138 P.3d 477, 479–80 (2006). Petitioner has not demonstrated by clear and convincing evidence to the contrary in the state court record that the state supreme court's summary of the trial evidence was incorrect. The foregoing summary of the evidence thus is presumed to be correct. *See, e.g., Sims v. Brown,* 425 F.3d 560, 563 n. 1 (9th Cir.2005).

### Generally Applicable Standard of Review

The Antiterrorism and Effective Death Penalty Act (AEDPA) imposes a "highly deferential" standard for evaluating state-court rulings that is "difficult to meet" and "which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster,* —— U.S. ——, ——, 131 S.Ct. 1388, 1398, 179 L.Ed.2d 557 (2011). Under this standard of review, a federal court may not grant relief merely because it might conclude that the state court decision was incorrect. 131 S.Ct. at 1411. Instead, under 28 U.S.C. § 2254(d), the court may grant relief only if the state court decision: (1) was either contrary to or involved an unreasonable application of clearly established law as determined by the United States Supreme Court based on the record presented to the state courts; or (2) was based on an unreasonable determination of the facts in light of the evidence presented at the state court proceeding. 131 S.Ct. at 1398–1401.

A state court decision is "contrary to" law clearly established by the Supreme Court only if it applies a rule that contradicts the governing law set forth in Supreme Court case law or if the decision confronts a set of facts that are materially indistinguishable from a Supreme Court decision and nevertheless arrives at a different result. *E.g., Mitchell v. Esparza,* 540 U.S. 12, 15–16, 124 S.Ct. 7, 157 L.Ed.2d 263 (2003). A state court decision is not contrary to established federal law merely because it does not cite the Supreme Court's opinions. *Id.* Indeed, the Supreme Court has held that a state

court need not even be aware of its precedents, so long as neither the reasoning nor the result of its decision contradicts them. *Id.* Moreover, "[a] federal court may not overrule a state court for simply holding a view different from its own, when the precedent from [the Supreme] Court is, at best, ambiguous." 540 U.S. at 16. For, at bottom, a decision that does not conflict with the reasoning or holdings of Supreme Court precedent is not contrary to clearly established federal law.

A state court decision constitutes an "unreasonable application" of clearly established federal law only if it is demonstrated that the state court's application of Supreme Court precedent to the facts of the case was not only incorrect but "objectively unreasonable." *E.g., Mitchell,* 540 U.S. at 18; *Davis v. Woodford,* 384 F.3d 628, 638 (9th Cir.2004).

To the extent that the state court's factual findings are challenged, the "unreasonable determination of fact" clause of Section 2254(d)(2) controls on federal habeas review. *E.g., Lambert v. Blodgett,* 393 F.3d 943, 972 (9th Cir.2004). This clause requires that the federal courts "must be particularly deferential" to state court factual determinations. *Id.* The governing standard is not satisfied by a showing merely that the state court finding was "clearly erroneous." 393 F.3d at 973. Rather, AEDPA requires substantially more deference:

**\*3** .... [I]n concluding that a state-court finding is unsupported by substantial evidence in the state-court record, it is not enough that we would reverse in similar circumstances if this were an appeal from a district court decision. Rather, we must be convinced that an appellate panel, applying the normal standards of appellate review, could not reasonably conclude that the finding is supported by the record.

*Taylor v. Maddox,* 366 F.3d 992, 1000 (9th Cir.2004); *see also Lambert,* 393 F.3d at 972.

Under 28 U.S.C. § 2254(e)(1), state court fac-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

tual findings are presumed to be correct unless rebutted by clear and convincing evidence.

The petitioner bears the burden of proving by a preponderance of the evidence that he is entitled to habeas relief. *Pinholster,* 131 S.Ct. at 1398.

### *Discussion*
### *Ground 1: Confrontation Clause—"Facial Challenge" to N.R.S. 51.385*

In Ground 1, petitioner alleges that he was denied rights to confrontation, due process, and a fair trial because N.R.S. 51.385 allegedly is unconstitutionally overbroad, essentially because the statute provides for the admission of hearsay in some circumstances that allegedly would violate the Confrontation Clause under the standards set forth in *Crawford v. Washington,* 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004).

The Supreme Court of Nevada rejected the corresponding claim along with related claims presented to that court on direct appeal on the following grounds:

*Constitutionality of NRS 51.385*

Pantano challenges the constitutionality of NRS 51.385 facially and as applied based on the United States Supreme Court decision in *Crawford v. Washington.*

NRS 51.385 provides in pertinent part:

1. In addition to any other provision for admissibility made by statute or rule of court, a statement made by a child under the age of 10 years describing any act of sexual conduct performed with or on the child or any act of physical abuse of the child is admissible in a criminal proceeding regarding that act of sexual conduct or physical abuse if:

(a) The court finds, in a hearing out of the presence of the jury, that the time, content and circumstances of the statement provide sufficient circumstantial guarantees of trustworthi-

ness; and

(b) The child testifies at the proceeding or is unavailable or unable to testify.

2. In determining the trustworthiness of a statement, the court shall consider, without limitation, whether:

(a) The statement was spontaneous;

(b) The child was subjected to repetitive questioning;

(c) The child had a motive to fabricate;

(d) The child used terminology unexpected of a child of similar age; and

(e) The child was in a stable mental state.

As demonstrated above, this statute permits introduction of statements made by a child declarant describing sexual conduct or physical abuse as an exception to the hearsay rule if (1) a court holds a hearing outside the jury's presence to assess the circumstances surrounding the trustworthiness of such statements, (2) the child testifies at the hearing or is unavailable or unable to testify, and (3) the court finds such statements sufficiently trustworthy.

**\*4** In *Bockting v. State,* relying upon the 1980 United States Supreme Court decision in *Ohio v. Roberts,* this court upheld the constitutionality of NRS 51.385. *Roberts* concluded that a trial court may admit hearsay statements without violence to the Confrontation Clause of the Sixth Amendment when the hearsay declarant is unavailable for cross-examination, if "(1) the statement satisfies the indicia of a 'firmly rooted' hearsay exception; or (2) the statement reflects 'particularized guarantees of trustworthiness.' " In *Bockting,* this court determined that, despite the declarant's unavailability, NRS 51.385 survived constitutional muster under the second *Roberts* criterion because the statute requires dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

trict courts to determine if the " 'time, content, and circumstances of ... [hearsay] statement[s] provide sufficient circumstantial guarantees of trustworthiness.' "

In *Crawford v. Washington,* decided in 2004, the United States Supreme Court overturned *Roberts* with regard to testimonial hearsay. Under *Crawford,* if a hearsay statement of an unavailable declarant is "testimonial" in nature, the statement is admissible only if the defendant had prior opportunity to cross-examine the declarant concerning it. Therefore, under *Crawford,* when the declarant is unavailable, reliability assessments of testimonial hearsay cannot survive scrutiny under the Confrontation Clause without actual confrontation.

The Court provided the following illustrations of testimonial hearsay: (1) ex parte in-court testimony, or its functional equivalent, such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or " 'similar pretrial statements that declarants would reasonably expect to be used prosecutorially' "; (2) " 'extrajudicial statements ... contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions' "; (3) " 'statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial' "; and (4) statements made to law enforcement in the course of interrogations.

NRS 51.385 implicates *Crawford's* holding because the statute permits a district court to assess the reliability of a child-declarant's statements, rather than requiring assessment by means of cross-examination. We recognized this implication in *Flores v. State,* in which we stated that "our prior ruling in *Bockting,* holding that NRS 51.385 is constitutional under *Roberts,* cannot survive analysis under *Crawford.*"

Our recognition of this constitutional dilemma

does not end our analysis of the instant matter. The Court in *Crawford* also stated that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Notwithstanding D.D.'s presence and testimony at trial, Pantano asserts that several of D.D .'s nonresponsive answers during cross-examination effectively rendered her unavailable for confrontation purposes. From this, he reasons that introduction of her prior statements through the testimony of others renders NRS 51.385 unconstitutional as applied to him. We disagree.

**\*5** In *Delaware v. Van Arsdall,* the United States Supreme Court stated that " 'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Further, "[w]hen a witness gives 'testimony that is marred by forgetfulness, confusion, or evasion ... the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination.' "

We conclude that Pantano had an adequate opportunity to cross-examine D.D. The fact that she answered negatively or "I don't know" when asked on cross-examination to identify to whom she spoke regarding the incident does not render the cross-examination ineffective. If anything, such testimony served to undermine her testimony and that of the surrogate witnesses.

We therefore further conclude that D.D.'s availability for cross-examination at trial defeats Pantano's "as-applied" challenge to NRS 51.385 and renders immaterial the testimonial nature of her statements to others regarding the assault. Having said this, we now take this opportunity to clarify *Flores* regarding the circumstances under which NRS 51.385 does and does not pass constitutional muster. First, subject to general rules of admissibility, a district court may properly admit

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

a statement under this statute when a competent child witness testifies, regardless of whether the hearsay statement at issue is testimonial. Here, as noted, the child was competent to testify as to her allegations against Pantano. Second, if the hearsay statement is nontestimonial, a district court may exercise its discretion under NRS 51.385 to admit the statement, even though the child does not testify. Finally, per *Crawford* and *Flores,* when testimonial hearsay is at issue, admission of a child-victim's hearsay statement under NRS 51.385 violates confrontation rights when the victim is unavailable and the defendant has not had a prior opportunity to cross-examine. Accordingly, NRS 51.385 is not facially unconstitutional in all of its applications.

122 Nev. at 480–83, 138 P.3d at 787–91 (citation footnotes omitted).

The state supreme court's rejection of petitioner's claim or claims in this regard was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court at the time of the court's July 20, 2006, decision on direct appeal.

Petitioner maintains that N.R.S. 51.385 is unconstitutional and overbroad "on its face" because it allows the introduction of testimonial hearsay so long as the statement is reliable and trustworthy regardless of whether or not the child testifies or was subject to prior crossexamination. As discussed, *infra,* as to Ground 2, the victim testified at trial, although petitioner challenges whether she nonetheless was "available" for purposes of *Crawford.* On Ground 1, petitioner maintains that because of the above alleged "facial unconstitutionality" of the statute, "the improper admission of evidence through an unconstitutional statue violated Pantano's rights to due process, confrontation, and a fair trial."[FN1]

> FN1. # 46, at 6; see also # 20, at 12 (Petitioner maintains: "A conviction obtained by the admission of evidence

through an unconstitutional statute cannot stand.") Petitioner contends that the state supreme court's holding—that the statute survives scrutiny because is not facially unconstitutional in all of its applications—is contrary to *Crawford.*

**\*6** Petitioner's "facial" challenge to this evidentiary statute for "overbreadth" has no valid underpinning in clearly established United States Supreme Court constitutional doctrine. It would be one thing to hold, on the claim discussed *infra* under Ground 2, that a defendant was denied his right to at least confrontation if evidence in fact was admitted at *his* trial that violated the Confrontation Clause. It would be quite another to hold that a defendant can overturn his conviction because an *evidentiary* statute was "facially overbroad and/or unconstitutional" without regard to whether the evidence admitted at *his* trial in fact violated the Confrontation Clause. And that in truth is what petitioner argues in the "facial challenge" in Ground 1. He is urging that the alleged "overbreadth" of the law renders the introduction of the evidence at his trial unconstitutional because the statute allegedly is not constitutional as written in all of its applications. See also # 22, Ex. 36, at 27–28 (direct appeal brief).

Petitioner does not cite a single decision of the United States Supreme Court overturning a conviction based upon a holding that an evidentiary statute was "facially unconstitutional" and "overbroad" under the Confrontation Clause without regard to whether the evidence actually introduced at the defendant's trial was admitted in violation of the Confrontation Clause. *Crawford* clearly made no such holding. There is no Supreme Court authority holding that the introduction of otherwise *arguendo* constitutionally admissible evidence is rendered unconstitutional because it was admitted through a statute that was in some other respect unconstitutional because it allegedly allows other evidence in other cases that violates confrontation rights.

There is no such authority with good reason,

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

because established Supreme Court constitutional doctrine instead leads inexorably to the contrary conclusion.

It is a firmly entrenched fundamental principle of constitutional doctrine that "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *New York v. Ferber,* 458 U.S. 747, 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (1982).

As the Supreme Court repeatedly has instructed, "facial challenges" for "overbreadth" are restricted to *First Amendment* challenges, and then only in narrow circumstances:

Prototypical exceptions to this traditional rule are First Amendment challenges to statutes based on First Amendment overbreadth. "At least when statutes regulate or proscribe speech ... the transcendent value to all society of constitutionally protected expression is deemed to justify allowing 'attacks on overly broad statutes with no requirement that the person making the attack demonstrate that his own conduct could not be regulated by a statute drawn with the requisite narrow specificity.' " *Gooding v. Wilson,* 405 U.S. 518, 520–521, 92 S.Ct. 1103, 31 L.Ed.2d 408 (1972) (quoting *Dombrowski v. Pfister,* 380 U.S. 479, 486, 85 S.Ct. 111, 14 L.Ed.2d 22 (1965)). "This is deemed necessary because persons whose expression is constitutionally protected may well refrain from exercising their right for fear of criminal sanctions provided by a statute susceptible of application to protected expression." *Gooding v. Wilson, supra,* at 520–521, 405 U.S. 518, 92 S.Ct. 1103, 31 L.Ed.2d 408. *See also Thornhill v. Alabama,* 310 U.S. 88, 60 S.Ct. 736, 84 L.Ed. 1093 (1940).

.....

**\*7** But the allowance of a facial overbreadth challenge to a statute is an exception to the traditional rule that "a person to whom a statute may constitutionally be applied may not challenge that statute on the ground that it may conceivably be applied unconstitutionally to others in situations not before the Court." *Ferber, supra,* at 767, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (citing *Broadrick, supra,* at 610, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830). This general rule reflects two "cardinal principles" of our constitutional order: the personal nature of constitutional rights and the prudential limitations on constitutional adjudication. 458 U.S., at 767, 102 S.Ct. 3348, 73 L.Ed.2d 1113. "By focusing on the factual situation before us, and similar cases necessary for development of a constitutional rule, we face 'flesh and blood' legal problems with data 'relevant and adequate to an informed judgment.' " *Id.,* at 768, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (footnotes omitted).

Even though the challenge be based on the First Amendment, the overbreadth doctrine is not casually employed. "Because of the wide-reaching effects of striking down a statute on its face at the request of one whose own conduct may be punished despite the First Amendment, we have recognized that the overbreadth doctrine is 'strong medicine' and have employed it with hesitation, and then 'only as a last resort.' " *Id.,* at 769, 458 U.S. 747, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (citing *Broadrick, supra,* at 613, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830). " '[F]acial overbreadth adjudication is an exception to our traditional rules of practice and ... its function, a limited one at the outset, attenuates as the otherwise unprotected behavior that it forbids the State to sanction moves from "pure speech" toward conduct and that conduct-even if expressive-falls within the scope of otherwise valid criminal laws....' " 458 U.S., at 770, 102 S.Ct. 3348, 73 L.Ed.2d 1113 (quoting *Broadrick, supra,* at 615, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830). *See also Board of Airport Commis of Los Angeles v. Jews for Jesus, Inc.,* 482 U.S. 569, 107 S.Ct. 2568, 96 L.Ed.2d 500 (1987).

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*Los Angeles Police Dept. v. United Reporting Publishing Corp.,* 528 U.S. 32, 38–40, 120 S.Ct. 483, 145 L.Ed.2d 451 (1999).

Petitioner has not invoked—either in this Court or significantly for exhaustion purposes in the state supreme court—the First Amendment on this claim. Nor has he articulated any related First Amendment interests. Clearly, no such interests are implicated on this claim.

Petitioner's "facial challenge" for "overbreadth" thus never even gets out of the starting gate, whether on deferential AEDPA review or even on *de novo* review. There simply is no constitutional doctrinal underpinning for a "facial challenge" to an evidentiary statute for "overbreadth" based upon the fact that a statute allegedly may violate the Confrontation Clause in some circumstance or circumstances not then presented to the reviewing court.

To be sure, some lower federal courts and state courts, as in the Nevada *Bockting* case, will address an issue of whether an evidentiary statute is unconstitutional "on its face" or "facially" under the Confrontation Clause. However, such inquiry is directed not to whether the statute is "overbroad" and allows for the admission of both constitutional and unconstitutional evidence. Rather, such inquiry is directed to whether the statute is *wholly* unconstitutional, "on its face," in all of its potential applications, which of course necessarily also would include the particular application to the case then before the bar. Petitioner cannot validly morph that quite distinct "facial" validity inquiry—conducted in lower court opinions—into clearly established federal law as determined by the United States Supreme Court holding that an evidentiary statute that *arguendo* permits the introduction of unconstitutional evidence in other situations not then before the court is "facially unconstitutional" for "overbreadth." Petitioner thereby necessarily references wholly inapposite constitutional doctrine that instead recognizes a viable overbreadth challenge only for First Amendment challenges, not Con-

frontation Clause claims.

**\*8** Accordingly, even on a *de novo* review, the amorphous "facial challenge" for "overbreadth" in Ground 1 would be at best surplusage and at worst frivolous. If the evidence actually admitted at petitioner's trial was admitted in violation of the Confrontation Clause, then a "facial" challenge to the statute is surplusage vis-à-vis the challenge to his own particular conviction. If, on the other hand, the evidence actually admitted at petitioner's trial was *not* introduced in violation of the Confrontation Clause, then there is no nonfrivolous federal constitutional claim by which the otherwise constitutional admission of the evidence is rendered unconstitutional because the evidentiary statute allegedly would permit the unconstitutional admission of other evidence in other situations in other trials.

A fortiori, on deferential AEDPA review, the state supreme court's rejection of such a "facial challenge" for "overbreadth" indisputably was neither contrary to nor an unreasonable application of clearly established federal law.

Ground 1 therefore in truth does not state, much less present, a viable ground for federal habeas relief, based upon alleged "facial unconstitutionality" for "overbreadth."[FN2]

> FN2. In the amended petition and reply, petitioner also refers to the specifics of his particular case, but in doing so he cross-references to his discussion of Ground 2. To the extent, if any, that petitioner presents any as-applied claim in Ground 1 as to the specifics of his particular case, such claim is wholly redundant of the claims in Ground 2 and thus is disregarded as a separate claim. The only non-redundant claim in Ground 1, the facial challenge for overbreadth discussed in the text, plainly is without merit.

***Ground 2: Confrontation Clause—"As–Applied" Challenge***

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

In Ground 2, petitioner alleges that he was denied rights to confrontation, due process, and a fair trial because allegedly testimonial out-of-court statements by the child victim to her father and to a detective were admitted at trial. Petitioner contends principally: (a) that the child was "unavailable" for purposes of the Confrontation Clause analysis under *Crawford* because her responses in her trial testimony allegedly were so vague and inadequate that effective cross-examination was not possible, allegedly thereby rendering her "unavailable;" and (b) that the child's statements not only to the investigating detective but also to her father were "testimonial" statements for purposes of Confrontation Clause protection under *Crawford.*

The Supreme Court of Nevada rejected the corresponding claim or claims presented to that court on the following grounds: FN3

> FN3. For ease of reference and context, the Court sets forth the previously-quoted holding particularly on the "unavailability" issue and adds newly-quoted material herein with the holding on the "testimonial" issue.

.... The Court in *Crawford* ... stated that, "when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Notwithstanding D.D.'s presence and testimony at trial, Pantano asserts that several of D.D.'s nonresponsive answers during cross-examination effectively rendered her unavailable for confrontation purposes. From this, he reasons that introduction of her prior statements through the testimony of others renders NRS 51.385 unconstitutional as applied to him. We disagree.

In *Delaware v. Van Arsdall,* the United States Supreme Court stated that " 'the Confrontation Clause guarantees an opportunity for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.' " Further, "[w]hen

a witness gives 'testimony that is marred by forgetfulness, confusion, or evasion ... the Confrontation Clause is generally satisfied when the defense is given a full and fair opportunity to probe and expose these infirmities through cross-examination.' "

**\*9** We conclude that Pantano had an adequate opportunity to cross-examine D.D. The fact that she answered negatively or "I don't know" when asked on cross-examination to identify to whom she spoke. regarding the incident does not render the cross-examination ineffective. If anything, such testimony served to undermine her testimony and that of the surrogate witnesses.

We therefore further conclude that D.D.'s availability for cross-examination at trial defeats Pantano's "as-applied" challenge to NRS 51.385 and renders immaterial the testimonial nature of her statements to others regarding the assault.....

*Testimonial hearsay*

Despite the immateriality in this case of the testimonial nature of D.D.'s hearsay statements, we will address the issue of whether D .D.'s statements to her father were testimonial, given the likelihood that this issue will arise in future cases.

Pantano asserts that D.D.'s father questioned her to elicit evidence. From this, Pantano analogizes D.D.'s responses to her father's questioning to responses given to questions by law enforcement, which *Crawford* characterized as testimonial.

We reject Pantano's analogy between statements made to D.D.'s father and statements made to law enforcement. A parent questioning his or her child regarding possible sexual abuse is inquiring into the health, safety, and well-being of the child. To characterize such parental questioning as the gathering of evidence for purposes of litigation would unnecessarily and undesirably

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

militate against a parent's ability to support and nurture a child at a time when the child most needs that support. We therefore conclude that D.D.'s statements to her father were nontestimonial in nature.

The State concedes that D.D.'s statements to Detective Given are testimonial. However, in line with the above, the district court acted within its discretion in admitting these statements because the child victim testified and the district court assessed these statements for reliability under NRS 51.385. We therefore discern no error with regard to Detective Given's testimony.

122 Nev. at 482–83, 138 P.3d at 790–91 (footnotes omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On the availability issue, the Supreme Court rarely has addressed what it means to be "unavailable" for Confrontation Clause purposes. *See, e.g., Hardy v. Cross,* —— U.S. ——, 132 S.Ct. 490, 181 L.Ed.2d 468 (2011)(per curiam); *Meras v. Sisto,* 676 F.3d 1184, 1191 (9th Cir.2012)(Bea, J., concurring). There are no Supreme Court decisions intimating, much less holding, that a witness may be "unavailable" for Confrontation Clause purposes even though they actually take the stand and testify, albeit allegedly too vaguely to allow allegedly effective cross-examination.

The more general—or undeveloped—that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in reaching outcomes in particular applications. It is not an unreasonable application of clearly established federal law for a state court to decline to apply a specific legal rule that has not been squarely established by the Supreme Court. *See, e.g., Harrington v. Richter,* —— U.S. ——, ——, 131 S.Ct. 770, 786, 178 L.Ed.2d 624 (2011).

**\*10** Here, as noted by the state supreme court, established principles of Confrontation Clause law cut directly against petitioner's argument. As the Ninth Circuit recently summarized the relevant principles in the Supreme Court's jurisprudence:

" '[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.' " *United States v. Owens,* 484 U.S. 554, 558, 108 S.Ct. 838, 98 L.Ed.2d 951 (1988) (quoting *Delaware v. Fensterer,* 474 U.S. 15, 21–22, 106 S.Ct. 292, 88 L.Ed.2d 15 (1985)(per curiam)). All the Confrontation Clause requires is the ability to cross-examine the witness about his faulty recollections. *Id.; see also Crawford v. Washington,* 541 U.S. 36, 59 n. 9, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) ( "Finally, we reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements.").

*United States v. Romo–Chavez,* 681 F.3d 955, 961 (9th Cir.2012).

Particularly given the unqualified statement in *Crawford* that the Confrontation Clause places "no constraints at all" on the use of a declarant's prior testimonial statements when the declarant testifies at trial, the state supreme court's rejection of petitioner's claim clearly was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. This Court has substantial doubts as to whether petitioner's novel "unavailability" argument would carry the day even on a *de novo* review. The argument plainly does not carry the day on highly deferential merits review under AEDPA. FN4

> FN4. The Court does not tacitly adopt petitioner's characterization of the then eight-year-old child victim's testimony as its own. The child victim in fact provided definitive testimony on a number of specif-

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

ic points regarding the sexual assault, as to which petitioner was convicted; and she adhered to that testimony on cross-examination and redirect. However, as chronicled by petitioner, she gave inconclusive responses on other points, including in particular regarding the lewdness charge on which petitioner ultimately was not convicted and further regarding with whom she talked about the sexual assault incident. See # 22, Ex. 18, at 12–31. The salient point under previously-established Confrontation Clause case law is that any deficiencies in her testimony were subject to exploration, and were explored, on cross-examination. Under established Supreme Court jurisprudence, that is "[a]ll that the Confrontation Clause requires." *Owens,* 484 U.S. at 558. Petitioner's claim runs against, rather than with, the grain of established Confrontation Clause case law.

If petitioner cannot prevail on the unavailability issue on federal habeas review under AEDPA, that in truth is the end of the matter with regard to the claims in Ground 2. As *Crawford* reflects, if the child victim was "available" and testified, the Confrontation Clause placed no constraints on the admission of her prior statements, even if the prior statements *arguendo* were "testimonial" under *Crawford.*

In any event, on the "testimonial statement" issue, the state supreme court's rejection of petitioner's claim regarding the victim's statements to her father also was neither contrary to nor an unreasonable application of clearly established federal law.

In *Crawford,* the Supreme Court held that admission of an out-of-court "testimonial" statement by a witness, is barred by the Confrontation Clause of the Sixth Amendment unless the witness is unavailable and the defendant had a prior opportunity to cross-examine the witness. *See* 541 U.S. at 52, 59 & 68–69. However, quite clearly, "not all hearsay implicates the Sixth Amendment's core

concerns" under *Crawford.* 541 U.S. at 51. Sixth Amendment protections instead apply only to out-of-court statements that were "testimonial" in nature. 541 U.S. at 52.

**\*11** Significantly, the *Crawford* Court did not provide a definitive guide as to what statements were and were not "testimonial." As the Ninth Circuit has observed:

.... The [*Crawford* ] Court identified "[v]arious formulations" that had been offered to define the "core class of 'testimonial' statements." *Crawford,* 541 U.S. at 51, 124 S.Ct. 1354, 158 L.Ed.2d 177. One of these formulations included statements "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial." *Id.* at 52, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177 (internal quotation marks omitted). But the Court did not adopt this formulation, or any other. It left "for another day any effort to spell out a comprehensive definition of 'testimonial,' " and held only that, "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* at 68, 541 U.S. 36, 124 S.Ct. 1354, 158 L.Ed.2d 177. This left the term susceptible to a broad range of reasonable applications. *See Yarborough v. Alvarado,* 541 U.S. 652, 664, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). Indeed, the Court acknowledged that its "refusal to articulate a comprehensive definition [would] cause interim uncertainty." *Crawford,* 541 U.S. at 68 n. 10, 124 S.Ct. 1354, 158 L.Ed.2d 177.

*Meras,* 676 F.3d at 1188.

In its June 19, 2006, decision in *Davis v. Washington,* 547 U.S. 813, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006), the Supreme Court again expressly declined to establish "whether and when statements made to someone other than law enforcement personnel are 'testimonial.' " 547 U.S. at 823 n. 2.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Accordingly, at the time of the July 20, 2006, decision in question by the Supreme Court of Nevada,[FN5] the Supreme Court not only had left the term "testimonial" largely undefined, if further had expressly left open the question of "whether and when statements made to someone other than law enforcement personnel are 'testimonial." Clearly, the state supreme court's rejection of petitioner's claim that the child's statements to her father were not "testimonial" under the inchoate standard left by *Crawford* was neither contrary to nor an unreasonable application of clearly established federal law. *Accord Alberni v. McDaniel,* 458 F.3d 860, 866 (9th Cir.2006)(constitutional principle could not be regarded as clearly established where the Supreme Court had expressly declared the issue an open question).

> FN5. In applying the AEDPA deferential standard of review, "clearly established federal law as determined by the United States Supreme Court" refers to the law at the time of the state-court decision on the merits. *Greene v. Fisher,* ––– U.S. ––––, 132 S.Ct. 38, 181 L.Ed.2d 336 (2011).

Petitioner urges that the child's statements to her father were testimonial under *Crawford* because "they were more than casual [remarks] made during casual conversation."[FN6] He relies in this regard upon federal appellate decisions rejecting claims that statements were testimonial in situations where the statements were made during casual conversation between friends or family members. This Court is not sanguine that the lower federal courts in question thereby were stating a rule that noncasual statements between family members thus were "testimonial" under *Crawford.* In all events, however, the decisions of lower federal courts do not constitute "clearly established federal law as determined by the United States Supreme Court" on AEDPA review. There is no Supreme Court precedent—and was no such precedent at the time of the state supreme court's July 20, 2006, decision—holding that a statement to a family mem-

ber that are more than casual remarks during casual conversation are testimonial statements under *Crawford.* Nor was the state supreme court required by then-existing Supreme Court jurisprudence to conclude that, objectively, a young child in the victim's situation reasonably would believe that her statements to her father would be available for use later at a trial, assuming that a child of that age reasonably would know of and contemplate such things.

> FN6. # 46, at 10.

**\*12** The state supreme court's rejection of petitioner's "testimonial statement" argument as to the child's statements to her father thus was neither contrary to nor an unreasonable application of United States Supreme Court precedent at the time of the court's decision.[FN7]

> FN7. Patano did not contend that the child's statements to her mother were testimonial. *See* 122 Nev. at 791 n. 2, 138 P.3d at 483 n. 2.

Ground 2 therefore does not provide a basis for federal habeas relief. Petitioner cannot prevail on the "unavailability" issue on deferential review, and that issue wholly undercuts his claim. Petitioner further cannot prevail on the "testimonial statement" issue with respect to the child's statements to her father, even if he otherwise could prevail on the "unavailability" issue.

### Ground 3: Jury Possession of Excluded Transcript of Confession

In Ground 3, petitioner alleges that he was denied rights to confrontation, due process and a fair trial because the jury was given copies of a transcript of his confession in spite of a trial court ruling that the transcript, as distinguished from an audio recording of the statement played at trial, was not admissible.

The Supreme Court of Nevada summarized the relevant facts and held as follows regarding the cor-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

responding claims presented to that court:

The district court also permitted the playing of an audiotaped interview between Detective Given and Pantano regarding the incident. As part of this procedure, the court also permitted the prosecution to distribute copies of an uncertified transcript of the interview for the limited purpose of allowing the jury to read along while the taped version was played. The transcript, however, was not admitted into evidence. After hearing final arguments and the court's instructions, the jury returned verdicts of guilty on both charges.

Prior to the reading of the verdicts following deliberations, the defense noticed that several jurors were in possession of the excluded transcript. Unsure as to how to proceed, the defense waited until after rendition of the verdicts before moving for a mistrial.

Following a hearing on the mistrial motion, the district court found that the transcript contained an admission relating to the lewdness charge that was not included in the audiotape due to a copying error. Because the portions of the tape played at trial did not contain the admission, and because the State introduced no other evidence in support of the lewdness count, the district court granted a mistrial as to the lewdness count only. The district court eventually dismissed the separate charge after the State elected not to pursue it further.

.....

*Jury's possession of excluded transcript during deliberations*

As stated, the district court restricted its mistrial order to the lewdness verdict. Pantano argues that the continued possession of the excluded transcript infected the deliberations on both charges and, accordingly, that the district court should have granted a mistrial as to the entire case. In addition to the portion of the written statement omitted from the tape, he asserts that

the transcript contained excessive blanks and omissions not reflected on the tape, and improperly failed to reflect the inflection of his voice in response to several questions soliciting admissions. More specifically, Pantano asserts that the tape accurately reflects one "I did" response as interrogative, whereas the transcript erroneously reflects the same "I did" response in the declarative voice.

**\*13** Under *Winiarz v. State,* "[t]he determination of whether reversible prejudice has resulted from jurors' consideration of inadmissible evidence in a given case 'is a fact question to be determined by the trial court, and its determination will not be disturbed on appeal in the absence of a showing of an abuse of discretion.' " Relevant considerations in such an analysis include (1) " 'whether the issue of innocence guilt is close, [ (2) ] the quantity and character of the error, and [ (3) ] the gravity of the crime charged.' "

Because Pantano failed to include the tape or transcript of his confession in the record on appeal, we must resolve this claim of error based upon Detective Given's testimony at trial. That testimony recounted Pantano's confession to sexual assault, which confirmed D.D.'s accusations to her parents and in open court.

We conclude that the district court's limited mistrial ruling satisfies the *Winiarz* criteria. First, as noted, the evidence adduced as to the sexual assault count finds more than adequate support in D.D.'s testimony and Pantano's confession, as conveyed in Detective Given's testimony. Second, the quantity and character of the error appears slight, given that the jury heard the tape with the accurate voice inflections and was previously exposed to the excluded transcript, without objection, during the playing of the tape. Third, although the gravity of a sexual assault charge is serious indeed, it does not appear that the sexual assault verdict was in any way influenced by the lewdness admission or by any of the alleged blanks or omissions. Finally, Pantano offers no

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

concrete theory that the lewdness confession somehow infected deliberations on both charges. Accordingly, any prejudice relating to the sexual assault verdict resulting from the jury's possession of the excluded transcript was harmless beyond a reasonable doubt.

Based upon this record, we conclude that the district court properly acted within its discretion in granting a mistrial as to the lewdness count only.

122 Nev. at 786–87 & 791–93, 138 P.3d at 480 & 483–84 (citation footnotes omitted).

The state supreme court's implicit rejection of petitioner's constitutional claims on the merits was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.[FN8]

> FN8. Cf. *Fenenbock v. Director,* 681 F.3d 968, (9th Cir.2012)(implicit ruling on constitutional claim). The Court further notes that on direct appeal petitioner argued the *Winiarz* case applied by the state supreme court as a case applying the enunciated standard "in light of the confrontation clause and due process implications." See # 22, Ex. 36, at 37. Petitioner has not contended here in the district court that the claim instead is subject to *de novo* review.

At the outset, review under § 2254(d)(1) is limited "to the record that was before the state court that adjudicated the claim on the merits." *Pinholster,* 131 S.Ct. at 1388. Here, petitioner did not include a copy of either the transcript or the tape of the statement in the record presented on appeal to the Supreme Court of Nevada, which is the court that adjudicated the claims on the merits. Federal habeas review thus is restricted under § 2254(d)(1) to the same record presented to the state supreme court on appeal when it adjudicated the claims.[FN9] The transcript, Exhibit 85 in this matter, therefore may not be considered by this Court in applying the

standard of review under § 2254(d)(1).

> FN9. *See also* 131 S.Ct. at 1400 (" 'must be assessed in light of the record the court had before it' ")("must overcome the limitation of § 2254(d)(1) on the record that was before that state court"); *id., at 1402 n. 11* ("has failed to show that the California Supreme Court unreasonably applied clearly established federal law on the record before that court"); *id., at 1404 n. 14* ("Both parties agree that these billing records were before the California Supreme Court.") Nothing in *Pinholster* supports a view that federal habeas review extends to materials *arguendo* in the state district court record that were not included in the record on appeal when the state supreme court adjudicated the claims on the merits.

**\*14** Turning to review of the constitutional claims, the state supreme court's implicit rejection of the Confrontation Clause claim was neither contrary to nor an unreasonable application of clearly established federal law as of the time of the court's July 20, 2006, decision. The alleged statements in question were Pantano's own statements. Their presentation to the jury, regardless of whether or not presented in a manner consistent with the trial court's ruling, therefore did not necessarily implicate Confrontation Clause protections under clearly established federal law on July 20, 2006. *See, e.g., Romo–Chavez,* 681 F.3d at 961 (challenged translations were construed as defendant's own statements and thus did not implicate Confrontation Clause).[FN10]

> FN10. Judge Berzon questioned the viability of the underlying Ninth Circuit case law following upon 2009 and 2010 decisions of the United States Supreme Court. 681 F.3d at 962 n. 1 (Berzon, J., concurring). However, in this case, the reviewing court must look instead to the law as it stood at the time of the state supreme court's July 20, 2006, decision. *Greene,*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*supra.* Judge Berzon acknowledged that *Crawford* alone likely would not have been enough to overturn the prior circuit precedent, and he of course was writing a concurring rather than a majority opinion.

Petitioner further has not demonstrated that the state supreme court's implicit rejection of his due process and fair trial claims further was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Petitioner relies upon an assortment of federal appellate decisions arising in what petitioner maintains are analogous situations in federal criminal cases and/or pre-AEDPA federal habeas cases decided on *de novo* review. Petitioner does not identify any controlling Supreme Court decisions concerning the right to a due process or to a fair trial in apposite circumstances that were contrary to the state supreme court's decision or that were unreasonably applied in rejecting his claims. FN11

FN11. Petitioner begins the reply on Ground 3 with extended argument and case citation seeking to establish that the presentation of the transcript to the jury violated his rights to an impartial jury and to a jury trial under the Sixth Amendment. # 46, at 13–14. No such legal claims were alleged in Ground 3 in the counseled amended petition. Petitioner may not use the federal reply to amend the petition. *E.g., Cacoperdo v. Demosthenes,* 37 F.3d 504, 507 (9th Cir.1994). The only way to add what in truth are new legal claims to Ground 3 is by a properly-filed amended petition. At this juncture, under Rule 15(a) of the Federal Rules of Civil Procedure, petitioner can amend the petition only with respondents' written consent or by obtaining leave of court to amend. Significantly, neither was obtained, despite repeated rejections by this Court of similar attempts by the Federal Public Defender in prior

habeas cases to *de facto* amend the petition by adding new claims in the reply. Habeas pleading is not notice pleading, either as to the underlying facts or as to the legal theories relied upon. Additionally, it does not appear that these belated new legal claims were exhausted. The late-breaking added legal claims are disregarded herein.

The rights to due process and a fair trial guarantee that a criminal defendant will be treated with " 'that fundamental fairness essential to the very concept of justice.' " *E.g., United States v. Valenzuela–Bernal,* 458 U.S. 858, 872, 102 S.Ct. 3440, 73 L.Ed.2d 1193 (1982)(quoting prior authority). In order to find such a denial of the rights to due process and a fair trial, the reviewing court " 'must find that the absence of that fairness fatally infected the trial [such that] the acts complained of must be of such quality as necessarily prevents a fair trial.' " *Id.* Trial errors "rise to the level of due process violations only when they so infect the fairness of the trial as to make it 'more spectacle or trial by ordeal than a disciplined contest.' " *Id.*

Even without regard to deferential review under AEDPA, the circumstances under which such a violation will be found are limited. As the Supreme Court explained in *Dowling v. United States,* 493 U.S. 342, 110 S.Ct. 668, 107 L.Ed.2d 708 (1990):

Beyond the specific guarantees enumerated in the Bill of Rights, the Due Process Clause has limited operation. We, therefore, have defined the category of infractions that violate "fundamental fairness" very narrowly. As we observed in *Lovasco, supra,* at 790, 97 S.Ct., at 2048;

"Judges are not free, in defining 'due process,' to impose on law enforcement officials [their] 'personal and private notions' of fairness and to 'disregard the limits that bind judges in their judicial function.' *Rochin v. California,* 342 U.S. 165, 170, 72 S.Ct. 205, 208, 96 L.Ed. 183 (1952).... [They] are to determine only whether the action complained of ... violates

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

those 'fundamental conceptions of justice which lie at the base of our civil and political institutions,' *Mooney v. Holohan,* 294 U.S. 103, 112, 55 S.Ct. 340, 341, 79 L.Ed. 791 (1935), and which define 'the community's sense of fair play and decency,' *Rochin v. California, supra,* at 173, 72 S.Ct., at 210."

**\*15** 493 U.S. at 352–53.

Moreover, with regard to deferential review under AEDPA, as previously noted, the more general that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in reaching outcomes in particular applications. *See, e.g., Harrington, supra.* The above-described standard for deprivation of rights to due process and a fair trial is as about a general of a rule as there can be in this regard.

In the present case, petitioner's claim boils down to the contention that he was denied fundamental fairness as to his sexual assault conviction because the jury saw: (a) his alleged statement in the transcript as to a charged lewdness offense as to which the state trial court subsequently declared a mistrial and as to which he does not stand convicted; (b) the words "I did"—that the jury heard on the tape—reflected in the transcript as—allegedly—an affirmative declaration when the words instead were said as a question; and (c) allegedly "excessive" omissions and blanks being reflected in the transcript that allegedly were not reflected by the tape that the jury in fact heard. The state supreme court hardly unreasonably applied the general standard discussed above when it rejected petitioner's claims in essence that the improper jury possession of the transcript "violate[d] those 'fundamental conceptions of justice which lie at the base of our civil and political institutions.'" Such matters hardly denied Pantano due process and a fair trial, particularly given: (a) that he admitted—in uncontested undeniably declarative statements in his taped statement—that he sexually assaulted the child victim; and (b) that the jury already had been allowed—without defense objec-

tion—to follow along in the transcript when the tape was played.[FN12]

> FN12. See # 22, Ex. 20, at 123; *id.,* Ex. 28, at 6.

In the alternative, the Court reaches the same conclusion on *de novo* review. For substantially the reasons assigned above, the possession of the transcript in contravention of the trial court's ruling did not deny petitioner fundamental fairness.[FN13]

> FN13. The pre-AEDPA decision upon which petitioner places principal reliance would not dictate the outcome of this case even on *de novo* review, much less on deferential AEDPA review.
>
> In *Dickson v. Sullivan,* 849 F.2d 403 (9th Cir.1988), a deputy sheriff responsible for supervising the jury during trial stated to two jurors that the defendant had "done something like this before." The state appellate court held that the deputy's comment violated the defendant's Sixth Amendment right to confrontation but held that the error did not require reversal of the conviction. The Ninth Circuit vacated the conviction on federal habeas review applying a standard from federal criminal trials that a new trial was required following the comment if there was "a reasonable possibility that the extrinsic material *could* have affected the verdict." 849 F.2d at 405 (emphasis in original).
>
> As discussed in the text, the Confrontation Clause is inapplicable in *this* context under controlling Ninth Circuit law because the statements in question on the transcript are petitioner's own alleged statements. *Dickson* does not state an overarching principle—much less one applicable on deferential AEDPA review—of due process that an occurrence

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

such as was involved in this situation mandates reversal if there was "a reasonable possibility that the extrinsic material *could* have affected the verdict." That is not the governing constitutional standard stated in the Supreme Court opinions discussed in the text, and it would not be applied by this Court even on a *de novo* review.

On deferential review, *Dickson* even more clearly does not dictate the outcome in this case. On such review, petitioner of course must demonstrate that the state court's rejection of his claim was contrary to or an unreasonable application of clearly established law as determined by the United States Supreme Court. Citing a pre-AEDPA federal appellate case applying pre-AEDPA federal criminal appellate case law to a habeas case does not carry petitioner's burden under AEDPA.

The Court further notes in this regard that, if it were to consider the transcript, Exhibit 85 in this matter, on a *de novo* review, the transcript belies two central factual allegations made by petitioner on this claim.

*First,* the transcript in fact shows Pantano's response as a *question, not* as a declarative statement. In the trial court, defense counsel stated that the transcript showed the words as a declaration rather than a question.[FN14] Trial counsel's argument was repeated on direct appeal,[FN15] but, as noted previously, petitioner did not include a copy of either the transcript or the tape in the record presented on appeal to the Supreme Court of Nevada. What the transcript actually contains is the following: "I did?"[FN16] The moving factual premise for this part of petitioner's claim is clearly and directly refuted by the actual record.[FN17]

FN14. # 22, Ex. 28, at 4.

FN15. # 22, Ex. 37, at 50.

FN16. # 24, Ex. 85, at 56.

FN17. The Court additionally would note that the "I did?" response was in response to a question as to whether petitioner put his finger inside the child victim's vagina. At this point in his statement, petitioner still was equivocating and denying the sexual assault offense. He later expressly admitted in his statement sufficient penetration of the child's vagina with his finger to constitute a sexual assault. E.g., *id.,* at 60–64. Even if, *arguendo,* the transcript instead had reflected "I did" rather than "I did?" any prejudice from such a mistranscription—which never happened—would have been wholly eliminated by petitioner's later confession to the crime. But, in all events, petitioner's assertion that the transcript reflected "I did" is utterly refuted by the actual record presented to this Court.

Rule 11 of the Federal Rules of Civil Procedure requires that federal habeas counsel do more than merely parrot factual argument from state court filings without examining the actual record. Arguing a factual point that is directly belied by the record is, at the very best, unpersuasive.

*Second,* per the record presented to this Court, the challenged material regarding the lewdness count that allegedly was in the transcript but not on the tape was not the only evidence supporting the lewdness count, as petitioner maintains.[FN18] According to the transcript, Pantano also admitted in another portion of his statement that his penis "was kinda touchin' her butt" as he was masturbating.[FN19] Petitioner has not argued that other portions of the transcript, such as this particular statement, were not contained in the tape; and, similar to the state court direct appeal, petitioner has not provided

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

this Court with a copy of the tape.[FN20] On the record presented to this Court, the evidence clearly preponderates that there was other, unchallenged evidence in petitioner's statement to support the set-aside lewdness conviction. While Pantano perhaps persuaded the state trial court to declare a mistrial in part on the premise that there was no other evidence supporting the lewdness count, this Court, on *de novo* review, is not required to ignore what it sees with its own eyes in assessing the alleged collateral impact on the sexual assault conviction from the challenged statement as to the lewdness count being before the jury in the transcript. The challenged passage that was in the transcript alone was duplicative of other evidence in Pantano's confession that even more strongly supported the lewdness count.

> FN18. See # 46, at 22, line 19; 24, lines 8–9; & 25, lines 2–3.

> FN19. # 24, Ex. 85, at 73. On the same page, petitioner stated "I don't remember" when asked whether his penis touched the child's "butt crack." However, his statement that his penis "was kinda touchin' her butt" was sufficient for a lewdness conviction. The statements on page 73 of the transcript are not at the start or end of a changed tape.

> FN20. Petitioner—who is represented by counsel herein—at all times has the burden of proof on federal habeas review. If he does not present all possibly available state court record material, then the case will be decided on the inferences supported by the material presented.

**\*16** That would leave only the allegedly excessive omissions and blanks—as to a recorded statement that the jury listened to—as the sole remaining factual underpinning of the claim. On an *arguendo de novo* review, the Court has no difficulty at all holding that the jury's possession of a transcript with such allegedly "excessive" omis-

sions and blanks did not "violate those fundamental conceptions of justice which lie at the base of our civil and political institutions."

Ground 3 does not provide a basis for federal habeas relief.

### Ground 4: Alleged Prosecutorial Misconduct

In Ground 4, petitioner alleges that he was denied rights to due process and a fair trial because of prosecutorial misconduct. He alleges in particular: (a) that the prosecutor inappropriately sought to inflame the jury and appeal to their passions and emotions by urging jurors to convict Pantano to make the victim's parents "feel better" and improperly injected her personal opinion into the argument; (b) that the prosecutor inappropriately argued evidence that was never admitted which implied Pantano's guilt, disparaged defense counsel and the defense, talked about religious characters, and again injected her personal opinion; (c) that the prosecutor improperly elicited testimony from a State witness that lying to a suspect is legal, in an effort to bolster the witness' credibility; and (d) improperly elicited testimony referencing a prior bad act.

With regard to Grounds 4(a) and 4(b), the Supreme Court of Nevada summarized the relevant facts and held as follows regarding the claims presented to that court:

*Prosecutorial misconduct*

*Closing arguments*

Pantano argues that the prosecution made several improper statements during closing argument. The first prosecutorial statement with which Pantano takes issue was as follows: "There's no doubt he's guilty. This is a parent's worst nightmare. Make them feel better. Thank you." The State notes that the prosecutor made this statement after extensively discussing the evidence adduced against Pantano and that the prosecutor was entitled to comment on and interpret the evidence.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Regardless of any logical or rhetorical connection that the State might wish to draw during closing argument, this type of comment is always improper. With regard to the statement, "[t]here's no doubt he's guilty," the prosecutor improperly stated her personal opinion regarding Patoano's guilt. Further, the two sentences following the statement of guilt were also improper because they urged the jury to convict on a basis other than the evidence. In telling the jury that the crime committed is a "parent's worst nightmare" and asking the jury to aid the parents in their suffering through conviction, the prosecution improperly appealed to juror sympathies by diverting their attention from evidence relevant To the elements necessary to sustain a conviction. Making D.D.'s parents feel better is not one of these elements.

**\*17** Despite the impropriety of these statements, we conclude that they were harmless beyond a reasonable doubt, given that D.D. testified to the acts underlying the alleged sexual assault and that Pantano confessed to them. Further, the district court sustained the defense's objection and instructed the jury to disregard the statements, which supplied Pantano with an adequate remedy. We do, however, admonish the prosecution to refrain from such commentary in the future.

Pantano also takes issue with the State's comments made during its concluding remarks:

BY [State]: Most of what he [defense counsel] just said [argued] is inadmissible, inappropriate, and should never have been said.

[Defense]: Objection, Judge. If it was inadmissible, inappropriate, Your Honor would have sua sponte stopped me.

[State]: Well—

[Defense]: That's improper on her part.

THE COURT: The Court will sustain the ob-

jection.

[Defense]: Move to strike.

BY [State]: If I had said anything about Daniel and the Christians—

THE COURT: Granted.

[State]: Sorry?

THE COURT: Granted.

BY [State]: If I had said anything about Daniel and the Christians, there would have been a mistrial. If I had started talking about, well, speculate about sperm on the panties, there would have been a mistrial, because you can't speculate. There was no DNA analysis done on the panties, so you can't speculate whether or not there was sperm there....

The State made these statements in response to arguments by defense counsel that he felt like the proverbial "Daniel in the lions' den," in dealing with the State's case, and arguing that the State provided no toxicological evidence, *i.e.,* the presence of sperm or semen, in support of its case. Regardless of whether these arguments were "invited," we agree with Pantano's claims of error on this issue.

First, we view as improper the prosecution's rebuttal argument characterizing the defense's closing argument as inadmissible and inappropriate, because such argument improperly disparaged the defense. While the prosecution may object to a defense argument perceived as improper, it may not first argue to the jury, rather than the court, that the defense's argument was improper. We conclude, however, that Pantano received the remedy for this statement when the district court sustained his objection and granted his motion to strike.

Second, the defense polemics concerning "Daniel and the Christians" and the speculation

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

about the lack of physical evidence does not justify the prosecution's continuation of a properly stricken line of argument. It is also improper to argue that the State would somehow not receive the same treatment as the defense under hypothetical situations, such as, "[i]f I had said anything about Daniel and the Christians." Needless to say, there are other more effective ways to demonstrate that the State has met its burden of proof than to complain about something that has not occurred or that there is some inherent unfairness in the rules of trial engagement that negatively affects the State's ability to secure convictions in such matters.

**\*18** Despite the impropriety of the State's arguments, we conclude that they were harmless beyond a reasonable doubt, given D.D.'s testimony and Pantano's confession describing the assault. [FN27]

> FN27. Because we have applied a harmless error analysis to these instances of prosecutorial misconduct, some prosecutors may be tempted to continue use of the arguments discredited in this opinion. We will not hesitate to refer such misconduct in the future for bar discipline.

122 Nev. at 793–95, 138 P.3d at 484–85 (remaining footnotes omitted).

The state supreme court's rejection of petitioner's constitutional claims corresponding to those in Ground 4(a) and 4(b) was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court.

On federal habeas review of a state court conviction for constitutional error, the standard of review for a claim of prosecutorial misconduct, is " 'the narrow one of due process, and not the broad exercise of supervisory power' " applied in federal criminal trials. *See, e.g., Darden v. Wainwright,*

477 U.S. 168, 181, 106 S.Ct. 2464, 91 L.Ed.2d 144 (1986)(quoting *Donnelly v. DeChristoforo,* 416 U.S. 637, 642, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974)). "The relevant question is whether the prosecutor['s] comments 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.' " *Id.* (quoting *Donnelly,* 416 U.S. at 643).

Petitioner proceeds essentially on the premise that the state supreme court's holding that the prosecutor's comments were improper constituted the equivalent of a holding that the comments violated due process, and he then challenges the court's conclusion that the error constituted harmless error.

However, as this Court has observed multiple times in other cases, a conclusion that prosecutorial argument was "improper" under federal decisions based on the exercise of supervisory power in federal criminal trials and that make no pertinent constitutional holding, state court decisions applying state law standards, and/or the American Bar Association (ABA) Standards for Criminal Justice does not necessitate a conclusion that the "improper" argument violated rights to due process or a fair trial. That is, a conceded "improper" argument does not necessarily "so infect the trial with unfairness as to make the resulting conviction a denial of due process." FN21

> FN21. *See, e.g., Mario Lopes Benitez v. McDaniel,* No. 3:08–cv–00543–ECR–VPC, # 70, at 12–15, 2012 WL 2151482, slip op., at \*7–9 (D.Nev., June 13, 2012).

The Court need go no further to illustrate this point than the principal case relied upon by petitioner, *Hein v. Sullivan,* 601 F.3d 897 (9th Cir.2010). In *Hein,* the Ninth Circuit applied the due process standard under the aforementioned *Darden* and *Donnelly* Supreme Court decisions in conducting AEDPA review of a state court conviction. The *Hein* panel clearly held that "[t]here were a number of instances of improper argument" in the

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

State's closing.[FN22] The panel nonetheless did not conclude that the improper argument gave rise to a due process violation. The court applied the prejudice analysis that is subsumed within the underlying due process analysis in *Darden* and *Donnelly,* not a harmless error analysis that potentially also could apply to a wholly state law impropriety.[FN23]

> FN22. 601 F.3d at 912–14.

> FN23. *Id.,* at 914–16.

**\*19** In the present case, a number of factors counsel strongly against a conclusion that the prosecutor's improper argument so infected the trial with unfairness as to make the resulting conviction a denial of due process.

First, the state trial court immediately sustained defense objections to the argument, and the court further expressly instructed the jury to disregard the comments vis-à-vis making the victim's parents feel better.

Second, while the prosecutor made undisputedly improper argument appealing to emotion, referring to her personal opinion, and disparaging defense counsel, she did not misstate the evidence. Petitioner urges that the prosecutor "improperly argued about 'sperm on the panties' and DNA analysis when no such evidence existed."[FN24] What the prosecutor stated, however, in direct response to a defense argument, was: "There was no DNA analysis done on the panties, so you can't speculate whether or not there was sperm there. It's something that you simply cannot consider."[FN25] The prosecutor thus was not "argu[ing] about 'sperm on the panties' and DNA analysis," thereby implying that there was inculpatory evidence "when no such evidence existed." She instead was stating the very fact that *no such evidence existed* and that the jury thus was not to consider it. The prosecutor no doubt engaged in "over the top" contentious rhetoric in other respects, as to which immediate defense objection quite properly was sustained, but just as assuredly she did not misstate the evidence.

> FN24. # 46, at 20, lines 23–24.

> FN25. # 22, Ex. 22, at 30–31. Defense counsel had argued: "I'll tell you something. If there was sperm DNA all over those panties, I wouldn't be standing here right now." *Id.,* at 28. Defense counsel's argument was close to, if not over, the line as well.

Third, the evidence of guilt on the sexual assault charge was compelling. Pantano confessed to the crime. And, while the child victim did not provide testimony supporting the lewdness charge of which Pantano does not stand convicted, she did provide definitive testimony on a number of specific points regarding the sexual assault of which he does stand convicted.[FN26]

> FN26. See discussion in note 4, *supra,* and trial transcript citations therein. The Court is not persuaded by petitioner's contrasting characterization of the then eight-year-old child victim's testimony as wholly unreliable.

The undisputed impropriety of the prosecutor's statements under nonconstitutional standards applicable to federal prosecutors, to Nevada state prosecutors under state law, and under the ABA Standards of Criminal Justice, again, does not equate to a due process violation in and of itself. The state supreme court's rejection of petitioner's constitutional claims was neither contrary to nor an unreasonable application of clearly established federal law on the record presented to the state supreme court. In this regard, the Court reiterates that the more general that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in reaching outcomes in particular applications. *See, e.g., Harrington, supra.* As with the prior ground, the above-described standard under *Darden* and *Donnelly* for deprivation of rights to due process and a fair trial is as about a general of a rule as there can be in this regard.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Grounds 4(a) and 4(b) therefore do not provide a basis for federal habeas relief.[FN27]

> FN27. Petitioner further urges that the prosecutor improperly disparaged defense counsel when she stated: "Mr. Banks talks about all the lies, all the deceits, all the this, all the that, he yelled and hooted and hollered for how long about all the things that Detective Given said wrong." # 22, Ex. 22, at 34. She made this comment in the course of responding to a defense argument that the detective's interview technique had been psychologically coercive because he lied to Pantano about DNA and fingerprint evidence that did not exist. *Id.* This "hoot and holler" statement, to which no objection was made, hardly is such as would "so infect the trial with unfairness as to make the resulting conviction a denial of due process."

With regard to Ground 4(c), the Supreme Court of Nevada summarized the relevant facts and held as follows regarding the claims presented to that court:

**\*20** *Testimony concerning propriety of subterfuge in police questioning*

Pantano asserts that the prosecution improperly asked, and Detective Given improperly testified, that lying to a suspect was proper according to his training and this court's precedent. Pantano reasons that the prosecution improperly utilized this line of questioning to vouch for Detective Given's credibility and to convey inadmissible hearsay.

Pantano failed to object to this testimony on the grounds he now claims. His counsel merely objected to the form of the question posed to the witness, rather than to its substance, which is generally insufficient to preserve the claimed error for appellate review [FN28] unless it rises to plain error affecting substantial rights.[FN29] We

conclude that this testimony does not constitute plain error and whatever error that could be ascribed to it did not affect Pantano's substantial rights in light of D.D.'s testimony and Pantano's confession. Finally, beyond misleading a suspect concerning his constitutional rights, it is proper for police authorities to use certain types of subterfuge as part of custodial and noncustodial interrogations.

> FN28. *See Merica v. State,* 87 Nev. 457, 462, 488 P.2d 1161, 1163–64 (1971) (despite the defendant's objection below, the defendant's failure to specifically object on the grounds urged on appeal precluded appellate consideration on the grounds not raised below).

> FN29. *See Green v. State,* 119 Nev. 542, 545, 80 P.3d 93, 95 (2003)(under plain error review, this court examines whether an "error" occurred, whether it was "plain" or clear, and whether it affected the defendant's substantial rights); *see also Dzul v. State,* 118 Nev. 681, 688, 56 P.3d 875, 880 (2002).

122 Nev. at 793–95, 138 P.3d at 484–85 (remaining footnotes omitted).

At the outset as to this claim, respondents contend, without citation to supporting authority, that petitioner "failed to exhaust the claim for review other than review of the Nevada Supreme Court for plain error."[FN28] Although exhaustion may not be waived, the scheduling order directed respondents to present all procedural defenses in a single motion to dismiss without consolidating procedural defenses with the merits. As the Court repeatedly has emphasized, there is nothing about an exhaustion defense such as the one belatedly raised in the answer that could not have been ascertained at the time of the motion to dismiss.[FN29] In this case, counsel has buried an exhaustion defense, without any notice to the Court of its late assertion, literally

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

in the middle of a forty-seven page answer on an over three-year-old case. On the minimal argument made and the absence of supporting citation presented at this late juncture, the Court concludes that the state supreme court addressed the claim on the merits and that it is exhausted. *Accord Walker v. Endell,* 850 F.2d 470, 473–74 (9th Cir.1987)(the panel held that the consideration of a claim as to which no contemporaneous objection was made for plain error constituted an adjudication on the merits, without stating that federal review then was only for plain error).

> FN28. # 41, at 23–24.

> FN29. See, e.g., *McCaskill v. Budge,* No. 3:08–cv–00687–ECR–WGC, # 91, at 4–5.

**\*21** On the merits, the state supreme court's rejection of the claim corresponding to Ground 4(c) was neither contrary to nor an unreasonable application of clearly established federal law as determined by the United States Supreme Court. Petitioner relies on this ground on Supreme Court and federal appellate decisions in federal criminal trials that appear to be based on principles of supervisory authority rather than federal constitutional doctrine. As the Court has stated also repeatedly, a conclusion that prosecutorial argument was improper under federal decisions based on the exercise of supervisory power in federal criminal trials and that make no pertinent constitutional holding does not necessitate a conclusion that the closing argument violated rights to due process or a fair trial. Petitioner at bottom has failed to present authority on this claim establishing that the state supreme court's rejection of the claim was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court *applying federal constitutional standards.*FN30

> FN30. See text and note at note 21, *supra.* In *United States v. Young,* 470 U.S. 1, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985), the Supreme Court held that the prosecutor's argument, although error, did not constitute

plain error warranting overlooking the failure to make a timely objection. The Court appears to have discussed fairness solely in the context of applying the plain error standard of review. Justice Brennan's separate opinion indeed repeatedly distinctly references review as an exercise of supervisory authority. See 470 U.S., at 22 n. 1, 24 n .3, 33 n. 16 & 34 (Brennan, J., concurring in part and dissenting in part). In all events, the Supreme Court found no plain error in *Young,* so citation to the case hardly establishes that the state supreme court unreasonably applied federal *constitutional* law in not finding plain error in its case, under an exceedingly general standard of "fairness." *See Harrington, supra.* The Ninth Circuit decision in *United States v. Molina,* 934 F.2d 1440 (9th Cir.1991), is subject to the same basic comments. The First Circuit decision in *United States v. Manning,* 23 F.3d 570 (1st Cir.1994), which is not binding in this circuit even on *de novo* review, expressly applied supervisory authority review. See 23 F.3d at 574 n. 2. If petitioner wishes to overturn a state court conviction under AEDPA for a constitutional prosecutorial misconduct violation, petitioner needs to demonstrate that the decision is contrary to or an unreasonable application of Supreme Court authority applying federal constitutional law, not federal criminal decisions based on the exercise of supervisory authority that make no constitutional holding. The showing and argument made here fails to even begin to shoulder petitioner's burden under AEDPA.

The Court is not sanguine that it would overturn a conviction on the basis of the challenged testimony even on a *de novo* review. What the prosecutor sought to establish in the testimony is indisputably true—a police officer can lie to a suspect in an effort to ferret out the truth and elicit a confes-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

sion. Petitioner pejoratively characterizes this testimony as "prosecutorial vouching for the witness," relying exclusively on federal criminal cases on direct appeal involving closing argument rather than presentation of testimony. However, what the prosecutor was doing was responding to an extensive focus on this point during the defense cross-examination and seeking to address the very argument in fact made in the defense closing, that the confession should be disregarded because it was obtained through the use of alleged psychological coercion and lies. See # 22, Ex. 21, at 9–18; # 22, Ex. 22, at 13 & 24–27. It is highly questionable whether the testimony—to which no objection was made as to substance—was objectionable in the first instance. What it clearly was not was a matter that so infected the trial with unfairness as to make the resulting conviction a denial of due process, even without also taking into account the fact that Pantano confessed to the sexual assault with corroborating testimony by the then eight-year-old child victim on that offense.

Ground 4(c) does not provide a basis for federal habeas relief.

With regard to Ground 4(d), concerning testimony as to a prior bad act, the state high court denied this claim along with other claims in a blanket summary statement of denial.[FN31]

> FN31. *See* 122 Nev. at 796 n. 30, 138 P.3d at 486 n. 30 ("We have examined Pantano's other assignments of error and find them without merit.").

The deferential AEDPA standard of review applies fully to a summary rejection of a claim on the merits without assigned reasons. *Harrington,* 131 S.Ct. at 784. When a state court's decision is unaccompanied by an articulated explanation, the petitioner still must demonstrate that there was no reasonable basis for the state court to deny relief. *Id.* The state court's determination that a claim lacks merit precludes federal habeas relief under the AEDPA so long as fairminded jurists could disagree

on the correctness of the state court's decision. 131 S.Ct. at 786. When considering a summary state court denial of a claim, the federal habeas court thus "must determine what arguments or theories ... could have supported ... the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision of" the United States Supreme Court. *Id.*

**\*22** During examination of the victim's mother, Leticia Shand, the prosecutor asked her about Pantano's familial relationship to her, as he was her nephew. During this line of inquiry, the prosecutor asked whether Pantano ever would come over and play with the kids at a point nearly a decade prior to the incident. Defense counsel objected on the basis of relevancy as Shand embarked on a narrative that gave no immediately clear direction as to where it was heading. The trial court overruled the objection, after which Shand stated, without any further questioning: "His mom called me to get him in that house. She told me to get him out in the house because she's scared of him." # 22, Ex. 18, at 36–37.

Defense counsel objected and counsel conferred with the trial court at the bench. Coming off the bench conference, the court stated on the record that counsel had stipulated that the last answer be stricken. The court instructed: "Therefore, the jury will disregard it."[FN32] Defense counsel in fact had not stipulated to merely striking the statement, however, and on the next break counsel sought to make a record that he instead had requested a mistrial.[FN33] The prosecution did not dispute that the defense had not stipulated to just striking the testimony.[FN34] Significantly, as well, defense counsel also acknowledged that "[c]learly, [the prosecutor] didn't expect to hear that answer."[FN35] After hearing the on-the-record argument, the trial court denied the defense motion for a mistrial.

> FN32. *Id.,* at 37, 138 P.3d 477.
>
> FN33. *Id., at 48–56, 138 P.3d 477.*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

FN34. *Id.,* at 51, 138 P.3d 477.

FN35. *Id.,* at 51 & 53, 138 P.3d 477.

The only possibly applicable substantive standard on this claim is the general standard of fundamental fairness under the Due Process Clause. As noted herein, the more general that a rule is in Supreme Court jurisprudence, the more leeway that the state courts have in reaching outcomes in particular applications. *See, e.g., Harrington, supra.* While petitioner presents this claim, at least on federal habeas review, as a prosecutorial misconduct claim, the Court notes at the outset on this claim that there is absolutely no indication in the record that the prosecutor intentionally elicited the testimony in question. Every indicium in the state court record, including defense counsel's express concession at the time, instead points to the opposite conclusion.

Moreover, even if one were to assume, purely *arguendo,* that there actually was prosecutorial misconduct involved in eliciting the testimony, despite the complete absence of any evidence of same, there is no clearly established law in Supreme Court jurisprudence establishing that the introduction of prior bad act evidence denies a defendant due process of law. The Supreme Court instead expressly reserved the question in *Estelle v. McGuire,* 502 U.S. 62, 75 n. 5, 112 S.Ct. 475, 116 L.Ed.2d 385 (1991). The Ninth Circuit thus has held that a state supreme court therefore does not act unreasonably in concluding that the introduction of particular propensity evidence does not violate due process. *See Alberni v. McDaniel,* 458 F.3d 860, 863–67 (9th Cir.2006).

**\*23** The Court thus is left on this claim with: (a) a state court record, including an express defense concession, that reflects that the prosecutor did not intentionally elicit the testimony; (b) Supreme Court case law that does not establish now and did not establish at the time of the state supreme court's July 20, 2006, decision that introduction of alleged propensity evidence necessarily vi-

olates due process and denies a defendant a fundamentally fair trial; (c) the fact that the state trial court struck the testimony and expressly instructed the jury to disregard it; and (d) substantial evidence of petitioner's guilt of sexual assault, including his confession and corroborating testimony by the then eight-year-old child victim.

Against this backdrop, the state supreme court's rejection of the claim corresponding to Ground 4(d) was neither contrary to nor an unreasonable application of clearly established federal law, as fairminded jurists readily could conclude that no due process violation arose in these circumstances under controlling Supreme Court jurisprudence at the time of the state supreme court's decision.

Ground 4(d) not provide a basis for federal habeas belief.

The Court otherwise is not persuaded that the state court's rejection of the claims in Grounds 4(a) through (d) in combined cumulative effect was either contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court. The claims are not substantially stronger in aggregate effect than they are when considered individually.

Ground 4 does not provide a basis for federal habeas relief.

### Ground 5: Effective Assistance of Trial Counsel

In Ground 5, petitioner alleges that he was denied a right to effective assistance of trial counsel in violation of the Sixth and Fourteenth Amendments. He alleges fifteen distinct instances of alleged ineffective assistance, which are described in more detail below.

On a claim of ineffective assistance of counsel, a petitioner must satisfy the two-pronged test of *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). He must demonstrate that: (1) counsel's performance fell below an objective standard of reasonableness; and (2) coun-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

sel's defective performance caused actual prejudice. On the performance prong, the issue is not what counsel might have done differently but rather is whether counsel's decisions were reasonable from his perspective at the time. The court starts from a strong presumption that counsel's conduct fell within the wide range of reasonable conduct. On the prejudice prong, the petitioner must demonstrate a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. *E.g., Beardslee v. Woodford,* 327 F.3d 799, 807–08 (9th Cir.2003).

While surmounting Strickland's high bar is "never an easy task," federal habeas review is "doubly deferential" in a case governed by the AEDPA. In such cases, the reviewing court must take a "highly deferential" look at counsel's performance through the also "highly deferential" lens of § 2254(d). *Pinholster,* 131 S.Ct. at 1403 & 1410.

***Ground 5(a): Alleged Failure to Protect Speedy Trial Rights***

**\*24** In Ground 5(a), petitioner alleges that he was denied effective assistance when trial counsel allegedly failed to protect his constitutional and statutory rights to a speedy trial.

A complaint was filed in the justice court on May 29, 2003, and Pantano was arraigned the next day on May 30, 2003. During extensive proceedings in the justice court from that date through October 2, 2003, the justice court minutes do not reflect that Pantano requested a speedy trial under either state law or the Sixth Amendment.[FN36] Pantano waived any further preliminary hearing on the latter date, and the matter therefore was bound over to the state district court.

> FN36. See # 21, Ex. 1, at electronic docketing pages 2–4.

On October 16, 2003, Pantano was arraigned on an information in the state district court. Defense counsel brought to the court's attention that "[o]n the one hand my client would like me to file a

writ with some suppression issues, on the other hand he wants to a speedy trial, and I've tried to explain to him ... you can't have both of those things." The court explained the same thing to Pantano, that he could pursue the writ "or you can invoke your speedy trial rights and have a speedy trial date set within the next 60 days but you can't have both." Pantano thereupon stated: "Speedy trial is my choice." Nothing in the transcript reflects that Pantano distinctly invoked a Sixth Amendment right to a speedy trial as opposed to the state statutory right under N.R.S. 178.566 to a speedy trial "within 60 days after the arraignment on the indictment or information" to which the judge instead was referring. The matter was set for a December 1, 2003, trial, with a November 25, 2003, calendar call.[FN37]

> FN37. # 21, Ex. 9, at 4–5.

At a November 13, 2003, motion for bail reduction, defense counsel preliminarily raised the matter that Pantano's desire for a speedy trial within the 60–day state period potentially was hampering presentation of his defense. Lab results, including DNA analysis, most likely would not be back from the lab by the time of the scheduled trial date. The defense investigator further was in the hospital. Counsel merely was broaching the topic. He queried preliminarily whether the circumstances might rise to the level possibly requiring a competency determination following upon what at least was an unwise choice by Pantano.[FN38]

> FN38. # 21, Ex. 10, at 6–10.

At the November 25, 2003, calendar call, defense counsel noted that his supervisor, after meeting and speaking with Pantano, had a concern as to petitioner's competency. Counsel further stated that he was not prepared to go to trial and felt that it would be ineffective assistance to do so, as he believed, *inter alia,* that evidentiary matters and suppression issues should be resolved first. Counsel sought a continuance, but the court observed that the existence of a competency issue required that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

the trial date be reset in all events for a competency determination. The trial setting was continued pending the competency evaluation. The transcript of the hearing does not contain any renewed request by Pantano—who had engaged in colloquy with the court earlier in the proceeding on another issue—for a speedy trial, whether under the Sixth Amendment or state law. # 21, Ex. 12.

**\*25** When the matter came back before the trial court for a December 16, 2003, status check, Pantano appeared through a new public defender, *i.e.,* the earlier referenced supervisor. Defense counsel advised the court that Pantano had been found competent. Pantano did speak up at this proceeding, voicing the concern that "[i]sn't that waiving my speedy trial if I—if they give me another attorney?" The trial court stated that "we had to freeze the case because of the competency issue" but that Pantano would remain in "an invoked status" with regard to his original invocation of the 60–day statutory speedy trial right. The trial date again was set for February 2, 2004. Defense counsel represented that he would complete the remaining steps necessary for trial preparation within that time. Pantano personally stated a desire for a quicker trial setting, but the court informed him that the February 2 date was the next available and earliest possible setting. The proceeding closed with an express confirmation by Pantano and the court that he did not waive his speedy trial rights.[FN39]

> FN39. # 21, Ex. 13. Petitioner alleges that the start of trial was delayed by the public defender's office substituting three different attorneys, that the delay was exacerbated because he had a conflict with the attorneys because they would not prepare for trial and instead insisted that he accept a plea offer, and that he continued to claim his actual innocence and invoke his constitutional right to a speedy trial. # 20, at 36. Petitioner does not cite to any portion of the state court record presented to the state supreme court on the state post-conviction

appeal corroborating these factual allegations.

The matter came on for trial as scheduled on February 2, 2004.[FN40]

> FN40. The matter was called for trial that date, but the defense wanted to have a hearing on the child victim's competency to testify. This hearing consumed the better part of the time available. The trial judge finally was able to call the venire in later in the day and had them come back the next day to commence *voir dire.* See # 22, Ex. 16, at 2–5 & 132–34; # 21, Ex. 1, at electronic docketing pages 8–10.

On the state post-conviction appeal, the Supreme Court of Nevada rejected the corresponding claim presented to that court on the following grounds:

> ... [A]ppellant claimed that his trial counsel was ineffective for failing to ensure his speedy trial rights. Appellant failed to demonstrate that he was prejudiced. Appellant failed to identify how the outcome of his trial would have been different had the trial been conducted earlier. Therefore, the district court did not err in denying this claim.

> # 24, Ex. 82, at 4 (citation footnote omitted).

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

At the outset, while petitioner frames the claim as one of a failure to protect Pantano's state and federal speedy trial rights, petitioner presents no apposite authority establishing that either his state or federal constitutional speedy trial rights in fact were violated.

With regard to the Nevada statutory speedy trial right, petitioner cites no Nevada case law estab-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

lishing that a state speedy trial violation occurred. N.R.S. 178.566 refers to a sixty-day period for a defendant "whose trial has not been postponed upon the defendant's application." Petitioner cites no Nevada state case law establishing that counsel in truth allowed petitioner's statutory speedy trial right to be violated, particularly given the need to pursue a competency evaluation once a question was raised as to competency. While Pantano may have voiced a desire for a speedy trial, in proceedings other than the November 25, 2003, proceeding, petitioner has cited no apposite Nevada state decisions establishing that a state speedy trial violation in fact occurred under N.R.S. 178.566 on the procedural history presented.

**\*26** With regard to the Sixth Amendment speedy trial right, petitioner went to trial eight months after his arrest and the initial charges in the justice court. Such an interval of time does not necessarily approach the threshold at which the Sixth Amendment speedy trial right becomes implicated. While petitioner cites to considerable general "boilerplate" law regarding the Sixth Amendment speedy trial right in the abstract, he does not cite a single apposite case establishing that Pantano's constitutional speedy trial right was violated in this case. *Cf. Doggett v. United States,* 505 U.S. 647, 651–52 & n. 1, 112 S.Ct. 2686, 120 L.Ed.2d 520 (1992)(noting that the lower courts had found that post-accusation delay approaching a year generally was necessary to trigger a Sixth Amendment speedy trial right inquiry).

Petitioner thus has not established by apposite citation that either his state statutory or federal constitutional speedy trial right in truth was violated in this case.

Petitioner thus in essence claims that he was denied effective assistance of counsel because trial counsel did not secure a quicker trial setting after he had invoked his state statutory speedy trial right, albeit without a showing of an actual state or federal constitutional speedy trial violation in and of itself.

The state supreme court's conclusion that Pantano failed to present allegations tending to establish prejudice was not an objectively unreasonable application of *Strickland.*

Petitioner seeks to establish prejudice, first, on the premise that the child victim was being coached by her parents during the period before trial and therefore would not have given as definitive testimony had she testified earlier. Petitioner seeks to maintain that the victim's testimony was deficient as maintained on the Confrontation Clause claims in Grounds 1 and 2 but nonetheless was more polished in other respects in this Ground 5(a). He maintains that her responses were more polished in particular with respect to "certain questions and basic concepts such as honesty."[FN41] Petitioner quotes from portions of the victim's July 8, 2003, preliminary hearing testimony that he maintains reflects an inability to distinguish between the truth and a lie.

FN41. # 46, at 25.

The Court is not persuaded that petitioner has demonstrated a reasonable probability that, but for counsel's failure to secure an earlier trial setting, the result of the proceeding would have been different on account of the victim's testimony being substantially different. In the federal reply, petitioner quotes only selectively from the preliminary hearing testimony where the prosecutor sought to establish for the record that the child understood the difference between the truth and a lie. Petitioner drops out the responses indicating that the child understood the difference. Petitioner in particular drops out the critical final responses where the adult lawyer finally made a definitive connection with the child witness on the point in terms that she could relate to, and the child affirmed that she would tell the judge only what really happened and would not make anything up.[FN42] When the child testified at trial, it was the third time that she had testified, including testimony on the very first day of trial when the defense challenged her competency to testify. See # 22, Ex. 16, at 119–132. It is entirely

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

speculative that her answers at trial resulted from alleged coaching, if any, as opposed to merely having been through the same basic line of inquiry as to truth and lies twice before in the normal course of the proceedings. Moreover, her testimony at trial was substantially the same as her testimony at the preliminary hearing regarding the sexual assault. FN43

> FN42. # 21, Ex. 4, at 80–82.

> FN43. Compare # 21, Ex. 4, at 82–92 (preliminary hearing) with # 22, Ex. 18, at 16–19 (trial). Further, as discussed *infra* as to Ground 5(l), petitioner's purported evidence of coaching itself is thin to nonexistent.

**\*27** Petitioner further seeks to establish prejudice, second, on the premise that the delay "also resulted in the destruction of exculpatory evidence," *i.e.,* bedding and other items from the crime scene. Petitioner maintains that the bedding allegedly would have shown an absence of semen and other DNA evidence, contrary to Pantano's confession where he maintained that he masturbated and ejaculated during the offense, thus discrediting his confession. FN44

> FN44. # 46, at 25.

This argument is a *non sequitur.* Whether or not the trial was held sooner rather than later had no causal relationship to whether alleged exculpatory evidence was destroyed. The trial could have been held on the day after petitioner's May 27, 2003, arrest and that would not have resulted in evidence being preserved that theretofore had not been logged into evidence by the police (although that likely would have precluded test results being available on any such evidence). One simply has nothing to do with the other.

Moreover, it is entirely speculative: (a) that the bedding and other materials from the May 3, 2003, incident still would have been available in their im-

mediately post-incident condition by the time of the police investigation, much less by the time of a defense request made after Pantano's arrest on or about May 27, 2003; (b) that petitioner's statement to the police that he ejaculated purportedly "all over the place" necessarily meant that his confession would be disproved if his semen and DNA were not recovered from any such materials that *arguendo* still would have been available; FN45 and (c) what forensic examination in fact would have shown if the post-offense condition of the materials had been preserved, as it is wholly speculative that such examination would have been materially exculpatory—based merely upon an absence of evidence of semen on particular material—rather than directly inculpatory.

> FN45. Pantano stated specifically that his semen "was spread all over everywhere," "was everywhere," and "was all over." He made these statements in the course of questioning as to whether he put his penis rather than his finger inside the child victim and whether his semen possibly might be found on or in her with her panties having been pulled down at the time. See # 24, Ex. 85, at 66–67 & 73. Pantano of course had an incentive to shade what he was saying in order to provide an explanation that did not involve actual penile penetration for his semen possibly being found on or inside the victim, as the officer was insinuating that there might be such evidence. Purportedly disproving Pantano's inherently self-serving response by showing an absence of semen on bedding or other materials would not necessarily disprove his confession, in which he changed and shaded his account throughout.

According to the testimony at trial, the incident occurred on Saturday, May 3, 2003, but the victim's mother did not first learn of the incident until five days later on Thursday, May 8, 2003, when she found certain stained panties while doing laundry

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

and questioned the victim. The mother did not immediately tell the father. She then found blood-stained panties after having finished the rest of the laundry on the Friday. She then told the father on the Saturday, now approximately a full week after the incident, and the sexual assault medical examination and police investigation thereafter ensued. In light of this testimony, it is not only speculative but improbable that the bedding and other materials would have been preserved in their post-offense condition even at the beginning of the police investigation on May 10, 2003, much less when defense counsel became involved at the end of May.[FN46]

> FN46. # 22, Ex. 18, at 33–36 & 39–47; *id.,* Ex. 19, at 9–12. The testimony about finishing the laundry on Friday is at 40 in Ex. 18. Petitioner alleged on state post-conviction review that he told defense counsel on June 13, 2003, to secure the bedding materials. See # 24, Ex. 61, at 17. It is speculative, and improbable, to the extreme that the evidence still would have been available at that time and/or would have proved what petitioner baldly alleges that it would have established.

Even if, *arguendo,* the failure to secure an earlier trial setting had any logical or causal relationship to preservation of such evidence, petitioner has not established a reasonable probability that, but for counsel's failure to secure an earlier trial setting, the result of the proceeding would have been different on account of such evidence somehow being preserved by an earlier trial setting. The claim of prejudice is grounded in pure speculation.

**\*28** Ground 5(a) therefore does not provide a basis for federal habeas relief.[FN47]

> FN47. Petitioner urges that because the state supreme court did not decide the performance issue, that issue is reviewed *de novo.* However, a petitioner must establish both deficient performance and resulting prejudice. If petitioner fails to demonstrate

one, the reviewing court, whether the state court or the federal court, need not address the other, whether on *de novo* or any other standard of review. Petitioner failed to satisfy the prejudice prong under *Strickland,* which ends inquiry on the claim.

### Ground 5(b): Alleged Failure to Seek Suppression of Petitioner's Confession

In Ground 5(b), petitioner alleges that he was denied effective assistance when trial counsel: (1) failed to seek to suppress his confession to the police on the grounds that it was involuntary; and (2) failed to bring forth evidence to demonstrate that his statements to the police were not corroborated by other physical and testimonial evidence.

### Ground 5(b)(1)

In Ground 5(b)(1), petitioner alleges that trial counsel should have challenged the voluntariness of his confession because: (a) the detective allegedly intimidated Pantano by banging or slamming his fists on the table as "clearly indicated" by "thumps" on the audio recording and transcript of the statement; (b) the detective allegedly raised a closed fist to within a few inches of Pantano's face and said: "Okay, well, just tell me, man. Tell me. Tell me what happened."; (c) the detective lied to Pantano about having recovered his fingerprints from inside the child victim and about DNA samples having been collected at the crime scene and from the victim's body; and (d) the detective's alleged actions had an overbearing effect on Pantano because he allegedly had been subjected to, witnessed, and/or heard of prior police excessive force or other misconduct while in the Phillippines, San Diego, and Tijuana.

The Supreme Court of Nevada held as follows on the claim presented to that court:

> ... [A]ppellant claimed that his trial counsel was ineffective for failing to file a motion to suppress his confession. Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. "The question of the admiss-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

ibility of a confession is primarily a factual question addressed to the district court: where that determination is supported by substantial evidence, it should not be disturbed on appeal." Moreover, in determining whether a confession is voluntary, the court looks at the totality of the circumstances. During his interview by Detective Given, appellant was informed that his interview was voluntary and that he could leave at any time. Thus, the circumstances indicate that appellant's confession was voluntary. As such, appellant failed to demonstrate that a motion to suppress had a reasonable likelihood of success. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 2–3 (footnotes omitted).

The state supreme court's rejection of the claim corresponding to Ground 5(b)(1) was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner's factual claims that the detective banged his fists on the table and held his fist to within a few inches of his face at point in truth are based on nothing other than his own self-serving *post hoc* assertions in his state post-conviction memorandum.[FN48]

> FN48. # 24, Ex. 61, at 19.

**\*29** The transcript of the statement does indeed refer to "thumps" throughout. However, nothing in the transcript remotely reflects that these thumps were caused by an experienced detective leaving a clearly audible record that he was physically intimidating an interviewee into a confession. Rather, the thumps start from the very first line of the transcribed material, during a wholly mundane preliminary statement in a context where no rational person would suggest that the detective would be pounding the table to intimidate the interviewee:

This is Detective R. Given, P number 4890, (thumping sound) investigating a possible S/A under event number (thump) 030510–2592. Date

and time is 5–28 of 03 (thump) at 1448 hours. We're here at 3010 West Charleston (thump) Boulevard, suite 120, (thump) Las Vegas, Nevada 89102.....

# 24, Ex. 85, at 1. Nothing in the record remotely supports an inference that such thumps were caused by a detective beating on the table—even as he stated his name, badge number and street address—to intimidate Pantano. Rather, a far more likely inference would be that someone—such as perhaps a nervous Pantano—was drumming their fingers or otherwise fidgeting too close to the microphone or recorder. A motion to suppress based upon such thumps would have received short shrift.

Moreover, on the face of the transcript of the statement, the interview technique in fact employed by the detective was fundamentally at odds with the "rubber hose" methodology reflected by Pantano's self-serving statements. It is abundantly clear from the transcript that, throughout, the detective was seeing to coax, cajole and inveigle a statement from Pantano.[FN49] Indeed, the statement specifically referred to by petitioner—"Okay, well, just tell me, man. Tell me. Tell me what happened."—reads in the transcript clearly in that mode, with the detective coaxing and imploring Pantano to "just tell me, man ... what happened."[FN50] No one reading the transcript would come to a conclusion that base physical intimidation, rather than a seasoned interview technique, was being used to secure a confession from Pantano.

> FN49. See, e.g., # 24, Ex. 85, at 29–33 ("I don't want to blow this into anything big, huge")("not, not to make, to blow it into anything bigger than it is, is just say, you know what, this is what happened").

> FN50. *Id.,* at 56. Counsel needs to provide correct record citations rather than unconfirmed record cites parroted from a *pro se* state court memorandum.

At trial, the jury heard the actual tape. No argu-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

ment was made to the jury that the recorded confession that they heard in open court was the product of physical intimidation, as purportedly "clearly indicated" by the multiple thumps heard on the tape. Defense counsel sought to challenge the confession on other factual bases in closing argument, but not one whit of argument was presented to the jury that the detective used base physical intimidation rather than the interview technique reflected on the face of the transcript.[FN51]

> FN51. E.g., # 22, Ex. 22, at 25–26. The Court notes again, as it observed as to Ground 3, that petitioner did not present a copy of the actual tape in the state court record exhibits on federal habeas review. It also does not appear that a copy of the tape was presented to the state supreme court on either direct appeal or state post-conviction review. Petitioner—who is represented by counsel herein—at all times has the burden of proof on federal habeas review. If he does not present all possibly available state court record material, then the case will be decided on the inferences supported by the material presented. The transcript plainly does not support an inference of physical coercion being applied.

Thus, the record in this Court belies, rather than tends to support, petitioner's bald selfserving *post hoc* assertion that the investigating detective banged on the table and held his fist inches from Pantano's face during the interview. There was no probability that a motion to suppress premised upon such allegations would have led to the suppression of petitioner's confession.

**\*30** Given that the record belied rather than supported the factual claim of physical intimidation, what happened in Tijuana, San Diego and/or the Phillipines years before had no significant bearing on the likely admissibility of the confession. There was no probability that such circumstances would have led to a grant of a motion to suppress in this case.

Petitioner's reliance upon the detective's subterfuge regarding the other evidence that the police had as a basis for suppressing his confession flies in the face of long-established law to the contrary. *See, e.g., Frazier v. Cupp,* 394 U.S. 731, 739, 89 S.Ct. 1420, 22 L.Ed.2d 684 (1969); *see also Ortiz v. Uribe,* 671 F.3d 863, 871 (9th Cir.2011), *cert. denied,* —— U.S. ——, 132 S.Ct. 1811, 182 L.Ed.2d 631 (2012)("this type of 'deception' is well within the range of permissible interrogation tactics necessary to secure a lawful confession by the police").

For the first time in the federal reply, petitioner further relies upon the fact that he was not given the *Miranda* warnings prior to or during his statement as a new basis for maintaining that there was a reasonable probability that a motion to suppress would have been granted.[FN52] The Court repeatedly has admonished federal habeas counsel that a habeas petitioner may not raise a new legal claim for the first time in the reply. Counsel instead must file a motion for leave to amend the complaint. In all events, petitioner's late-breaking *Miranda* argument is wholly without merit. *Miranda* applies only to custodial interrogations.[FN53] Pantano plainly was told at the outset of the interview that he could leave at any time.[FN54]

> FN52. # 46, at 26–27.

> FN53. *Miranda* bars the admission of statements made during a custodial interrogation without the *Miranda* warnings first having been given. *E.g., Yarborough v. Alvarado,* 541 U.S. 652, 660–61, 124 S.Ct. 2140, 158 L.Ed.2d 938 (2004). The custody determination is fact specific and the ultimate inquiry is whether there is a formal arrest or restraint on freedom of movement of the degree associated with a formal arrest. 541 U.S. at 662. The fact that police may view the person being questioned as a suspect does not establish that the questioning is custodial. *See id.* Whatever reference defense counsel may

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

have made to the absence of *Miranda* warnings during a calendar call hearing, the issue simply was a nonstarter.

FN54. # 24, Ex. 85, at 2.

Finally, as discussed in more detail *supra* regarding Ground 5(a), it was *Pantano* who personally not only made the decision—but indeed insisted—on invoking his state statutory speedy trial right expressly in lieu of pursuing the suppression issue. Petitioner attempts to dismiss this fact by urging that "[e]ven assuming Pantano told counsel not to file a motion because he was concerned about his speedy trial rights, defense counsel" had a professional duty to pursue the motion.[FN55] However, Pantano did not merely tell counsel not to file a motion in some undocumented discussion. He expressly personally elected on the record, after the situation was explained to him by both counsel and the trial court, to invoke his speedy trial right rather than pursuing the suppression issue.[FN56]

FN55. # 46, at 27.

FN56. See text, *supra,* at 36–39.

Under Nevada procedure, Pantano could not pursue a pretrial writ seeking to suppress his conviction without waiving the 60–day statutory speedy trial period. *See* N.R.S. 34.700(1)(b)(1). As counsel and the trial judge explained to Pantano, there was not enough time to pursue the writ while also invoking the 60–day rule. After being so advised, Pantano personally elected to invoke the 60–day rule rather than pursue the writ. To be sure, there was additional delay thereafter. But the delay was for a competency determination, and a writ to suppress the confession could not have been pursued while Pantano's competency was being examined. Thereafter, once he was determined to be competent, Pantano thereupon immediately once again expressly and personally not only invoked, but again insisted, on the 60–day rule. His actions necessarily precluded pursuit of a writ to suppress his confession whether or not counsel would have

wanted to pursue such a writ in his professional judgment.

**\*31** Criminal defendants no doubt would favor a rule under which: (a) the defendant personally could make an election, against the advice of counsel, that necessarily precluded certain action being taken by counsel; and (b) the defendant thereafter could overturn his conviction based upon counsel's failure to pursue the action necessarily precluded by the defendant's own personal election. In all events, in the present case, the state supreme court's holding that petitioner could not demonstrate prejudice from counsel's failure to seek to suppress his confession was neither contrary to nor an unreasonable application of clearly established federal law. Ground 5(b)(1) thus does not provide a basis for habeas relief.

### Ground 5(b)(2)

In Ground 5(b)(2), petitioner alleges that counsel failed to contest the following alleged particulars in his confession as not being corroborated by other evidence: (a) whereas he told officers that he gave his cell phone to the victim's brother to play with, he did not own or possess a cell phone at that time; (b) whereas he told officers that he arrived at the residence at 5:30 a.m. and left at 2:00 p.m., the parents instead stated that he arrived at 9:00 a.m. and left at 10:00 p.m., and another witness' testimony allegedly established that Pantano did not have access to the child to commit the offense, which the child had stated occurred at nighttime; (c) whereas Pantano told officers that he had ejaculated with his semen allegedly being "just ... all over," defense counsel failed to test the victim's underwear to establish that the physical evidence allegedly would show that none of Pantano's DNA was present; (d) whereas Pantano told officers that he kissed the victim, the State allegedly presented no evidence to support Pantano's admission on this particular point; and (e) whereas Pantano told officers that the victim's clothes, shorts, and/or panties had been removed to facilitate the offense, the victim instead informed officers that her panties

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

were on during the incident.

The Supreme Court of Nevada rejected the claim or claims presented to that court on the following grounds:

... [A]ppellant claimed that his trial counsel was ineffective for failing to investigate whether appellant possessed a cell phone at the time of the incident. Appellant claimed that he lied to the police about having a cell phone with him during the incident; therefore, his trial counsel should have investigated to show that appellant did not have a cell phone at the time of the assault and that would have shown his confession was false. Appellant failed to demonstrate that he was prejudiced. Appellant confessed to the police that during the sexual assault, he distracted the victim's brother by allowing the brother to play a game on his cell phone. In light of his confession, the victim's testimony and the physical evidence, appellant failed to demonstrate that such an investigation would have resulted in a reasonable probability of a different outcome at trial. Therefore, the district court did not err in denying this claim.

**\*32** # 24, Ex. 82, at 7–8 (footnote omitted).

The state supreme court's express rejection of the claim with regard to the cell phone allegation was neither contrary to nor an unreasonable application of *Strickland.* The child victim also testified that Pantano gave his cell phone to her brother to play with during the incident, so his statement to the police was not wholly uncorroborated.[FN57] Moreover, there was no way to conclusively establish that Pantano had no cell phone in his possession. Even if counsel called a witness from every conceivably possible cell phone carrier in May 2003 to testify that Pantano had no account with them,[FN58] that would not have established that Pantano otherwise did not have a borrowed phone in his possession or possibly a prepaid phone under no name or another name. At bottom, Pantano's claim that he lied to the police about having a cell

phone and that his entire confession therefore allegedly was false would have had to have been based either on his own self-serving testimony (and he did not testify at trial) or the testimony of others who would not have been able to conclusively rule out his possessing a cell phone without their knowing it (even if their testimony otherwise was found credible). Trial counsel thus would have been expending considerable effort—in a case where Pantano was insisting on going to trial within state speedy trial time limits—trying to prove a negative that simply could not be conclusively proved. All to support the most gossamer of inferences that because Pantano allegedly lied to the police about the collateral point of having a cell phone he therefore lied to the police about inserting his finger into the vagina of a seven-year-old child. Clearly, his confession would not have been suppressed on this basis. Nor was there a reasonable probability that such testimony would have changed the outcome at trial. The state supreme court's holding that petitioner could not demonstrate prejudice from counsel's failure to pursue such a pointless avenue of defense was neither contrary to nor an unreasonable application of *Strickland.*[FN59]

FN57. # 22, Ex. 18, at 19. The child also testified consistently at the July 8, 2003, preliminary hearing that her brother was playing with a cell phone during the incident that he got from Pantano. # 21, Ex. 4, at 87.

FN58. Such a list of every conceivably possible carrier would not necessarily have been restricted only to carriers available specifically in Las Vegas, given roaming capability.

FN59. If Pantano had testified in support of this defense avenue, he essentially would have been testifying: "My confession demonstrably was false because I lied to the police about the collateral detail of having a cell phone, but I am not lying now when I state, facing conviction for a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

serious crime, that I did not have a cell phone." A conclusion that there was not a reasonable probability that such self-serving, and inferentially strained, testimony would have led to either the suppression of the confession or a different outcome at trial clearly was neither contrary to nor an unreasonable application of *Strickland.*

The state supreme court's implicit rejection of petitioner's remaining factual arguments in this same general vein also was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner's argument with regard to the time that he was at the victim's residence does not appear to make logical sense, so the Court will quote the argument verbatim to assure that it has addressed the argument as made:

.... Further, Pantano informed investigative officers he had arrived at Ms. Shand's apartment at approximately 5:30 a.m. and left on same date at approximately 2:00pm. [sic] ( [Ex. 85,] at 19–20. In fact, two separate police reports immediately following the allegations indicate Leticia Shand and Demetrice Dade [the victim's mother and father] stated that Pantano arrived at Ms. Shand's apartment at 9:00am [sic] and left at approximately 10:00pm [sic] on same date. (Ex. 61, Exs. 3 & 4) Maria Pantano's (Rosero) sworn affidavit states that she was then speaking to Leticia Shand on the telephone at approximately 10:00am [sic] on same date. Ms. Shand informed Maria Pantano that Pantano had arrived approximately one hour earlier and was sleeping while DD and KD were then playing in the presence of Ms. Shand. (Ex. 61, Exh. 2) Thus, Pantano did not have access to DD to commit the instant allegations.

**\*33** ... Pantano's statements to LVMPD Detective Given, if believed, would result in the alleged incidents occurring during daylight hours. In fact, DD's first transcribed statements to LVMPD de-

tectives indicate she stated the alleged incident occurred at "night time." (Ex. 61, Exh. 5.)

# 20, at 38–39.

Pantano initially stated during the police interview that he was at the apartment from "like four, five, three, four o'clock in the morning" until "like until afternoon like probably three or four," such that he was playing with the children during the daytime.[FN60] Petitioner stated this approximately only one quarter of the way through the interview. At this point, Pantano still was denying that he had committed the crime, that he had touched the child inappropriately, or that he even was alone with the children at any time. His stating, initially, that he was at the apartment only during the daytime—in contrast to the evening when the incident occurred—bespoke of an effort to avoid culpability. Such a self-serving statement by an interviewee who then was denying having committed the crime logically does not establish beyond peradventure that he did not have access to the victim, any more than any of his other initial denials did. Nor did Pantano's initial statement as to the timeline demonstrate, logically or otherwise, that his subsequent confession to the crime later in the interview necessarily was false, which is what the claim in Ground 5(b)(2) purportedly concerns.

FN60. # 24, Ex. 85, at 19–21.

In any event, once Pantano did confess, he indicated to the detective, with some hedging, that he thought that he committed the offense at nighttime.[FN61] Pantano's ultimate confession, as opposed to his initial denials, was consistent with the victim's statement to the police. Pantano's statements—in their entirety and in full context—thus do not establish that he did not have access to the victim to commit the offense but instead corroborate the State's evidence that he had such access, that he had such access at the relevant time, and that he committed the offense.

FN61. # 24, Ex. 85, at 74–76.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Further, alleged statements by the mother and the father that Pantano was at the apartment from 9:00 a.m. until 10:00 p.m. hardly would establish that Pantano did not have access to the child at nighttime. As the Court observed above, much of petitioner's claim in this regard does not make appear to make logical sense.[FN62]

> FN62. See also the discussion of the actual content of the statements in the discussion of Ground 5(g), *infra,* at 70–71.

Nor would the statement alleged to have been made by Pantano's sister, Maria Pantano (Rosero), establish that Pantano did not have access to the victim to commit the offense. According to the sister's alleged statement, the victim's mother said to her over the telephone at 10:00 a.m. on the morning in question that Pantano then was sleeping and the children were playing in her presence. Such a statement, if admitted in the first instance over objections as to hearsay and relevance, would not establish that Pantano did not have access to the child at all other times while he was there. Such testimony would have had virtually nil probative value, even if admitted over objection.[FN63]

> FN63. The sister's affidavit actually attests that the telephone conversation occurred on May 4, 2003, which actually would have been the day *after* the offense. # 24, Ex. 61, Ex. 2 thereto. The Court assumes, *arguendo,* that she meant May 3, 2003. Moreover, even if the testimony had been admitted over objection, the witness was Pantano's natural sister. Her testimony would have been subject to at least argument that her testimony was influenced by familial bias, which is not wholly irrelevant in determining whether there was a reasonable probability that presenting such testimony would have changed the outcome at trial. On its face, however, such testimony would not have changed the outcome even if the witness had been a wholly disinterested witness.

**\*34** Petitioner thus clearly cannot demonstrate prejudice under the *Strickland* standard based on counsel's failure to pursue a defense based upon such timeline testimony as allegedly establishing the falsity of his confession.[FN64]

> FN64. Nor would it appear that counsel rendered deficient performance by not presenting such a factually and conceptually flawed argument.

Nor can petitioner demonstrate prejudice based upon counsel's failure to test the victim's underwear for Pantano's semen and DNA. Similar to the discussion above as to Ground 5(a), petitioner's statement to the police purportedly that he ejaculated "all over the place"[FN65] does not establish that his semen necessarily would be present on the victim's panties or present in sufficient quantity for forensic examination. That is, a statement that semen "was all over" does not categorically establish beyond all peradventure that each and every possible surface that might thereafter be tested was covered in semen in sufficient quantity for forensic examination. Moreover, as discussed *infra* as to Ground 5(d)(1), it is not established that the specific panties in evidence in fact even were the panties worn during the incident.[FN66] Accordingly, *arguendo* establishing that Pantano's semen was not present on the panties worn at the time—much less the specific panties in evidence, which were not even necessarily the panties worn at the time—would not necessarily disprove his confession. It is entirely speculative that such an examination would have been even marginally exculpatory—based upon an absence of semen on the panties tested, which did not necessarily disprove his confession—rather than instead directly inculpatory, by confirming Pantano's confession with direct physical evidence.[FN67]

> FN65. As the Court noted as to Ground 5(a), Pantano actually stated specifically that his semen "was spread all over everywhere," "was everywhere," and "was all over." He made these statements in the course of questioning as to whether he put

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

his penis rather than his finger inside the child victim and whether his semen possibly might be found on or in her with her panties having been pulled down at the time. See # 24, Ex. 85, at 66–67 & 73. As noted as to Ground 5(a), Pantano of course had an incentive to shade what he was saying in order to provide an explanation that did not involve penile penetration for his semen possibly being found on or inside the victim, as the officer was insinuating that there might be such evidence. Purportedly disproving Pantano's inherently self-serving response by showing an absence of semen on the victim's underwear would not necessarily disprove his confession, in which he changed and shaded his account throughout.

FN66. See text, *infra,* at 57–63.

FN67. A defense decision to test the panties for semen and DNA thus would have been placing a bet with no compelling upside and considerable downside. If the test results were negative, little would have been gained because an absence of semen and DNA on the panties would not necessarily have disproved Pantano's confession. If the test results instead were positive for the presence of semen and/or specifically Pantano's DNA, then the evidence then would further corroborate his confession, helping the State prove its case. Moreover, such evidence would establish that he not only inserted his finger into the child but also at least ejaculated on her or her pulled-down underwear, which would not have helped the defense.

What defense counsel instead did was argue that the State's failure to introduce evidence of the sheets and panties having semen on them undercut the State's case, closing with the assertion that "[i]f there was sperm DNA all over those

panties, I wouldn't be standing here right now." # 22, Ex. 22, at 27–28. Even if petitioner *arguendo* could establish prejudice, which he cannot, such a tactical decision to pursue the issue instead in that manner virtually is unassailable on the independent performance prong under the *Strickland* standard, whether on deferential review or instead on *de novo* review.

Nor can petitioner demonstrate prejudice from trial counsel not pursuing an alleged discrepancy between his confession and the victim's statement regarding whether her panties were on or off at the time. Petitioner maintains that Pantano told officers that the victim's clothes, shorts, and/or panties had been taken off during the offense but the victim instead informed officers that her panties were on during the incident. Petitioner cites in this regard not to the victim's statement to the police but instead to her trial testimony.[FN68] This argument is not supported by the record upon which petitioner relies. *Both* Pantano *and* the victim stated or testified that her panties were pulled down.[FN69] The victim's cited testimony was fully consistent with what Pantano stated in this regard. There was no discrepancy with one stating that her panties were "off" and the other stating that they were "on." They instead both stated that her panties had been "pulled down." Moreover, even if there *arguendo* were such an alleged inconsistency, there was not a reasonable probability that showing any such *arguendo* inconsistency would have changed the outcome at trial. Demonstrating such an inconsistency would not necessarily demonstrate that the confession was false.

FN68. See # 20, at 39.

FN69. See # 22, Ex. 18, at 18 (child's testimony); # 24, Ex. 85, at 58, 60–63, 67, 68, 71 & 73 (Pantano's confession); see also # 21, Ex. 4, at 87 (child's preliminary hearing testimony); # 22, Ex. 18, at 33 (mother's testimony as to what child told

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

her when she first questioned her).

Finally, petitioner cannot demonstrate prejudice from trial counsel not pursuing a defense based upon there being no other evidence—over and above petitioner's own express admission—establishing that he kissed the victim during the incident. At bottom, petitioner proceeds in Ground 5(b)(2) on the fundamentally flawed premise that if every jot and tittle of his statement to the police is not corroborated by other evidence, then his confession is demonstrably false. Pantano's confession to the crime for which he stands convicted—sexual assault of a child under 14—is corroborated by, *inter alia,* the victim's testimony that Pantano inserted his finger in her vagina and by at least not inconsistent results from the delayed medical exam. Petitioner cites no apposite law establishing that the State was required to independently corroborate his admission that he also kissed the victim during the sexual assault in order to sustain a conviction. His underlying premise on Ground 5(b)(2)—that if his statement was contradicted by or was not corroborated by other evidence on any collateral point then his entire confession was demonstrably false—is wholly flawed. He has not demonstrated prejudice by counsel's failure to pursue such a line of defense.

**\*35** Ground 5(b)(2), which is not argued by habeas counsel in the federal reply, does not provide a basis for federal habeas relief.

### Ground 5(c): Stipulation to Competency of Child Victim

In Ground 5(c), petitioner alleges that he was denied effective assistance when trial counsel stipulated to the competency of the victim.

Defense counsel sought and obtained a hearing when the case was called for the first morning of the trial, prior to *voir dire,* as to the victim's competency. Following testimony by the victim outside the presence of the jury venire, discussed further below, defense counsel stated: "I think she's competent, based on what I saw, so I'll submit it." FN70

FN70. See # 22, Ex. 16, at 2–5 & 119–132.

The Supreme Court of Nevada rejected the corresponding claim presented to that court on the following grounds:

... [A]ppellant claimed that his trial counsel was ineffective for stipulating to the competency of the minor child victim. Appellant argued that the short answers that the victim gave at trial indicate that she was not competent to testify. Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. Prior to trial, the district court held a hearing to determine if the minor child victim was competent to testify. Following the questioning of the victim, appellant's trial counsel stipulated that the victim was competent to testify. "Tactical decisions [of counsel] are virtually unchallengeable absent extraordinary circumstances" and appellant failed to demonstrate any such circumstances. Further, when the testimony of the victim is viewed as a whole, there is nothing to indicate that she was incompetent. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 4–5 (citation footnote omitted).

The state high court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner relies upon excerpts from the victim's testimony not from the competency hearing but instead from the preliminary hearing and trial.

With regard to the child's preliminary hearing testimony, as discussed above regarding Ground 5(a), petitioner quotes only selectively from the preliminary hearing testimony where the prosecutor sought to establish for the record that the child understood the difference between the truth and a lie. FN71 Petitioner omits the responses indicating that the child understood the difference. Petitioner in particular drops out the critical final responses

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

where the adult lawyer finally made a definitive connection with the child witness on the point in terms that she could relate to, and the child affirmed that she would tell the judge only what really happened and would not make anything up. [FN72]

> FN71. Petitioner not only quotes selectively, petitioner further misquotes the child's preliminary hearing testimony, albeit not necessarily always to petitioner's advantage. Compare # 20, at 40–41, with # 21, at 80–81.

> FN72. # 21, Ex. 4, at 80–82.

Petitioner, as noted, does not address the child's testimony at the competency hearing, which was the testimony that defense counsel's challenged statement immediately followed. In that testimony, *inter alia,* the child affirmed, with no difficulty, that she would "promise that while you're in this room that you'll only tell things that really happened," that a lie was a "bad thing," and that the truth was a "good thing." [FN73]

> FN73. # 22, Ex. 16, at 127–31. The Court would note, in comparing the child's preliminary hearing and competency hearing testimony, that it is not always easy for an adult examiner initially to immediately speak to a child witness in terms that that particular child can relate to and understand. It of course is difficult for lawyers on occasion to speak to even adult witnesses in terms that the witness can relate to and understand. The prosecutor here had the benefit of her prior, ultimately successful, efforts at the preliminary hearing to relate to the child in terms that she individually could understand when she examined her later in the case.

**\*36** With regard to trial testimony, defense counsel of course did not have the benefit of a transcript of the child's trial testimony—which had not

occurred yet—when he submitted the competency issue on the first day of trial. In any event, the child again affirmed in her trial testimony that she would promise to tell the truth. [FN74]

> FN74. # 22, Ex. 18, at 12–13.

Petitioner otherwise relies upon selected excerpts from the child's preliminary hearing and trial testimony (the latter of which, again, trial counsel did not have the benefit of at the competency hearing) where she did not know or recall the answer to a question and/or gave an inadequate response. As the Court has stated previously herein, it is not persuaded that the then eight-year-old child victim's testimony was rendered wholly unreliable by the selected responses isolated from her full testimony. The child provided definitive testimony, at both the preliminary hearing and trial, on a number of specific points regarding the sexual assault. Selectively presenting responses where she did not know or recall the answer or otherwise gave an inadequate response does not establish that she was not competent to testify.

In this regard, petitioner seeks to establish prejudice on the basis that he was unable to effectively cross-examine the victim in violation of the Confrontation Clause. As discussed regarding Ground 2, [FN75] " '[t]he Confrontation Clause includes no guarantee that every witness called by the prosecution will refrain from giving testimony that is marred by forgetfulness, confusion, or evasion.' " *Romo–Chavez,* 681 F.3d at 961 (quoting prior Supreme Court authority). The fact that petitioner was able to explore such matters in cross-examination wholly mitigated any such alleged prejudice in this regard.

> FN75. See text, *supra,* at 13–14.

Neither tactical decisions of trial counsel—nor decisions by reviewing courts—are made based upon only selected excerpts from a transcript, much less from a transcript of trial testimony that had not even been received at the time of counsel's de-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

cision. The state supreme court's rejection of this claim based upon selective presentation of excerpts from the child's testimony was neither contrary to nor an unreasonable application of clearly established federal law. When the entirety of the child's testimony is considered, including her responses affirming that she would testify truthfully to what happened, it is abundantly clear that there was not a reasonable probability that a competency objection to her testifying would have been sustained. Moreover, the state supreme court found, twice, that the child was competent to testify, first on direct appeal and a second time on state post-conviction review.[FN76] Petitioner's selective presentation cannot overcome that finding.

> FN76. 122 Nev. at 482, 138 P.3d at 790 (direct appeal); # 24, Ex. 82, at 5 (post-conviction appeal).

Ground 5(c) therefore does not provide a basis for federal habeas relief.

### Ground 5(d): Admission of Victim's Underwear and Blood and DNA Evidence

In Ground 5(d), petitioner alleges that he was denied effective assistance when trial counsel: (1) did not object to the admission of the victim's underwear as irrelevant and prejudicial; and (2) stipulated that it was the victim's blood and DNA on her underwear.

**\*37** The Supreme Court of Nevada held as follows regarding the corresponding claims presented to that court:

> ... [A]ppellant claimed that his trial counsel was ineffective for stipulating that the DNA and blood of the victim were on the victims undergarments, for failing to conduct an independent DNA test on the victim's underwear to determine if the blood was actually that of the victim, and for failing to force the State to reveal evidence concerning the underwear that appellant claimed was exculpatory. Appellant failed to demonstrate that his trial counsel was deficient or that he was

prejudiced. The victim's mother found undergarments belonging to the victim which had a dark stain. A test performed by a nurse following an examination of the victim determined that the stain was blood. Appellant failed to identify any reason why the blood on the victim's undergarments would not have come from the victim. Further, tactical decisions of counsel are virtually unchallengeable absent extraordinary circumstances and appellant failed to demonstrate any such circumstances. In addition, as there was overwhelming evidence of appellant's guilty [sic] due to his confession the victim's testimony and corroborating physical evidence, appellant failed to demonstrate that there was a reasonable probability of a different outcome of the trial had his counsel not stipulated that the blood was that of the victim. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 5 (citation footnote omitted).

### Ground 5(d)(1)

The state supreme court did not expressly address a claim corresponding to the claim identified as Ground 5(d)(1) herein, *i.e.,* that counsel was ineffective for failing to object to the admission of the victim's underwear. For the reasons discussed below, this claim does not present a basis for habeas relief even if a *de novo* rather than a deferential standard of review *arguendo* is applied.

The underwear in question was admitted as part of the "Rape Kit" or "Sexual Assault Kit" preserved as part of the sexual assault examination.

As initial background, as discussed below, it was the mother's discovery of a pair of panties that prompted her initially to question the child victim, and it thereafter was the discovery of a second pair of panties that served as a catalyst for her telling her husband.

As also discussed as to Ground 5(a), according to the testimony at trial, the incident occurred on Saturday, May 3, 2003, but the victim's mother did

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

not first learn of the incident until five days later on Thursday, May 8, 2003, when she found stained panties while doing laundry and questioned the victim. She then found blood-stained panties after having finished the rest of the laundry on the Friday. She then told the father on the Saturday, now approximately a full week after the incident, and the sexual assault medical examination and police investigation thereafter ensued.[FN77]

> FN77. # 22, Ex. 18, at 33–36 & 39–47; *id.,* Ex. 19, at 9–12. The testimony about finishing the laundry on Friday is at 40 in Ex. 18. See also text, *supra,* at 42 (similar discussion as to Ground 5(a)).

**\*38** The physician who conducted the sexual assault examination, Dr. Theresa Vergara, M.D., testified in pertinent part as follows. In the more typical context where a patient presented within 72 hours of the incident and did so with panties, the examination team merely would collect the panties in the rape kit for possible later police examination. Dr. Vergara stated that in that context: "I wouldn't touch those." In this instance, however, it was nearly a week later, and there were "several panties that the mother was collecting these past days prior to my examination." Dr. Vergara selected one pair of panties and tested it with an emergency room bedside test for the presence of blood. There were "several pairs of panties," and "they had various dark stains, all of them, that the mom presented to me, and I just randomly took one and tested that one." The test result was "[p]ositive for blood." The panties that were tested then were placed in the rape kit.[FN78]

> FN78. # 22, Ex. 22, at 37–39.

Later in the trial, the sexual assault kit, with the panties, was admitted into evidence without objection at the same time that the parties stipulated as to the victim's blood and DNA being on the panties.[FN79]

> FN79. *Id.,* at ii & 94.

On both state[FN80] and federal post-conviction review, petitioner has claimed that trial counsel provided ineffective assistance by not objecting to the admission of the panties as irrelevant and prejudicial. Petitioner contends: (a) that "other than [the victim's] statement," there was no evidence presented that she wore the underwear on or after the date of the alleged incident; (b) that it was "just as likely" that she instead wore the underwear prior to the incident and placed them in the laundry basket prior to that time; (c) that the blood on her underwear could have been due to her own alleged poor hygiene as per medical testimony at trial; (d) that the presence of stains on several pairs of underwear supports "the theory" that the stains were due to poor hygiene, not sexual assault; (e) that counsel's stipulation allegedly prevented the jury from learning that there were multiple pairs of stained underwear; (f) that the jury instead was led to believe that the underwear in evidence was worn on the day of the incident and that the presence of the blood proved the assault; and (g) that admission of the evidence thus was prejudicial because the presence of the blood allegedly tended to prove that there had been digital penetration.[FN81]

> FN80. See # 24, Ex. 61, at 33–35.

> FN81. # 20, at 43–45; # 46, at 29–30.

The Court, applying *de novo* review *arguendo,* is not persuaded.

The fact that petitioner must qualify the argument with the phrase "other than the [victim's] statement" is telling. The victim testified that after Pantano put his finger inside her "kiki":

.... Then I went to the bathroom and I saw my blood in my panty. Then I felt a nail in my "kiki."

# 22, Ex. 18, at 18. The child testified that it hurt. *Id.*[FN82]

> FN82. See also # 21, Ex. 4, at 88–92 (substantially consistent preliminary hearing testimony). As the Court has indicated

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

previously, the child's testimony was not simply an assemblage of nonresponsive answers. There were, to be sure, lapses in her recollection in her trial testimony, including as to what she did with her panties after the incident, but she nonetheless provided definitive testimony on a number of points.

As discussed in the text previously, the victim's mother also testified that she found the panties while doing the laundry on the Thursday following the Saturday incident. There was no testimony that she found similarly stained panties while doing the laundry prior to the incident.

Petitioner cannot simply disregard the victim's testimony in assessing whether other potentially corroborative evidence is probative and admissible. The child testified that she sustained a bleeding injury from Pantano's assault, and the recovery of panties after the incident with blood stains tended to corroborate her testimony. Petitioner urges that it was "just as likely" that she instead wore the underwear in evidence prior to the incident, but there was no testimony that she was bleeding or had sustained injury prior to the assault. Petitioner was free to argue to the jury that it was just as likely that the panties were worn prior to the incident, but petitioner could not rule out the victim's testimony as a basis for establishing relevancy in admitting the panties into evidence. If no blood-stained panties had been recovered after the assault, petitioner no doubt would have been seeking to draw a favorable inference from that fact. Instead, multiple pairs of stained panties were recovered. The lack of rock-solid chain of custody evidence establishing specifically when the particular panties in evidence were worn and placed in the laundry went to the weight of the evidence, not its admissibility.

**\*39** In this regard, petitioner posits poor hygiene as an alternate theory for the stains, allegedly pursuant to medical testimony at trial.

With respect to this contention, prosecution witness Dr. Vergara testified as follows in pertinent part. When she examined the victim—a full week after the assault—there was only a non-tender localized area of redness in a posterior or six o'clock position. This finding was "at least consistent" with something having been inserted into the vagina, as there could be localized redness a week after a trauma, but it also "just could be her hygiene." The type of tissue involved healed quickly. It was possible with such tissue for a finger to cause a scratching injury with bleeding and for there to not be evidence of that one week later. There was no medical condition extant at the time of the examination that would cause bleeding.[FN83]

FN83. # 22, Ex. 20, at 23–25 & 32–35.

Dr. Vergara provided absolutely no testimony that the *stains,* and in particular the *blood* stains—as opposed to the localized area of redness that she observed—resulted or possibly resulted from hygiene. The representative sample stain that she randomly tested was positive for blood, and the child did not have a bleeding injury at the time of the exam seven days after the assault. The physician, again, provided absolutely no medical testimony that such a blood stain resulted from poor hygiene rather than a bleeding injury.

The non-examining defense expert, Dr. Lawrence Ricci, M.D., in truth testified substantially the same as Dr. Vergara on several points, albeit with different emphasis. He testified that a localized area of redness could result either from a penetrating trauma or from hygiene. However, he found it unlikely that the redness observed would have been caused by a trauma from a week prior, given the rapid healing of the involved tissue. He accordingly also testified, as Dr. Vergara had, that, with such tissue, a scratching injury from a finger with bleeding likely would have been completely healed one week later, leaving no sign.[FN84]

FN84. # 22, Ex. 20, at 48–51.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

Like Dr. Vergara, Dr. Ricci provided absolutely no testimony that the *stains,* and in particular the *blood* stains—as opposed to the localized area of redness that the examining physician observed—resulted or possibly resulted from hygiene. Dr. Ricci provided no testimony that such a blood stain would have resulted from hygiene rather than from a traumatic bleeding injury, an injury that both expert witnesses testified no longer would have been evident at the time of the exam conducted seven days after the incident.

There thus was no medical testimony—at all—supporting petitioner's lay "theory" that the blood stain on the underwear resulted from poor hygiene. Rather, the fact that there were multiple stained pairs of panties consistent with a bleeding injury that no longer was evident on exam—and that per all medical testimony presented no longer *would* be evident on an exam seven days after the incident—supported an entirely permissible corroborating inference that the stains resulted from the injury testified to by the child, before it healed.

**\*40** Moreover, no stipulation entered by counsel either prevented the jury from learning that there were multiple pairs of stained underwear or led the jury to believe that the underwear in evidence was the underwear worn on the day of the incident. The jury heard clear testimony from the stand from Dr. Vergara that the mother presented her with multiple pairs of stained underwear, that the physician then "just randomly took one and tested that one," and that that, randomly-selected, pair of panties was the pair that was placed in the rape kit that was received in evidence. It is axiomatic that how and what the lawyers argue is not evidence. Whatever the lawyers for both sides may or may not have argued in the case, Dr. Vergara's testimony clearly established that the panties received in evidence in the rape kit were only a randomly selected pair of panties and not necessarily the panties worn at the time of the assault.[FN85] The stipulation entered by counsel that the blood found on the panties was the victim's blood in no sense precluded the jury from learning what they already had heard from the witness stand in open court.

> FN85. See text, *supra,* at 59.

In sum, the panties were neither irrelevant, unfairly prejudicial, nor inadmissible as evidence. The situation presented is a classic instance of petitioner's arguments as to probative value going to the weight rather than the admissibility of the evidence. The victim testified to injury and bleeding thereafter, the medical testimony as to an examination conducted seven days after the incident at least was not inconsistent with her account, and the discovery of stained panties after the incident tended to establish a permissible corroborating inference for the jury's consideration. Each piece of evidence tendered for admission need not establish, standing alone and in and of itself, a particular factual inference beyond a reasonable doubt to be admissible in the first instance. Here, there was not a reasonable probability that an objection to the admission of the rape kit with the panties either would have been successful or altered the outcome at trial, particularly given the victim's testimony and petitioner's confession. Petitioner thus cannot establish prejudice on this claim, even assuming, *arguendo,* first, the application of *de novo* review and, second, deficient performance.

Ground 5(d)(1) therefore does not provide a basis for federal habeas relief.

### Ground 5(d)(2)

In Ground 5(d)(2), petitioner alleges that counsel provided ineffective assistance when he stipulated that it was the victim's blood and DNA on her underwear.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law. Trial counsel did not stipulate that the blood and DNA was that of the victim without the benefit of any forensic examination

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

whatsoever. Counsel so stipulated only after the lab results from the police lab both confirmed Dr. Vergara's preliminary emergency room test result reflecting that the stain was a blood stain and further established that the blood was the victim's blood. FN86 Petitioner has not identified any flaw in the police lab's methodology or results that would have provided defense counsel with a viable basis for objecting to and excluding testimony presenting the lab results. The state supreme court's conclusion that petitioner could not demonstrate a reasonable probability of a different outcome at trial had his counsel not stipulated to the presence of the victim's blood on her underwear was not an objectively unreasonable application of *Strickland* or other Supreme Court precedent.

FN86. # 22, Ex. 20, at 94.

**\*41** Ground 5(d)(2) does not provide a basis for federal habeas relief.

### Ground 5(e): Failure to Obtain Exculpatory Evidence

In Ground 5(e), petitioner alleges, in the main, that he was denied effective assistance when trial counsel failed to obtain exculpatory evidence allegedly in possession of the State.

On this claim, petitioner points to argument by defense counsel in support of a continuance request stating that "I believe that there could be some exculpatory evidence which might belie some of what happened" in terms of Pantano's confession. FN87 Counsel did not identify what the exculpatory evidence was that he "believed" "might" belie "some" of what happened. Petitioner nonetheless asserts: (a) that "the physical exculpatory evidence referred to by counsel is *the* underwear, allegedly worn by the victim, *admitted to trial* by the prosecution;" (b) that "the" underwear failed "to contain any traces of his semen, sperm, or other DNA evidence;" (c) that "the" underwear thus supported his claim that his confession was not supported by physical evidence; and (d) that the alleged absence of semen on "the" panties therefore "support[ed] his request for

counsel to investigate and file a motion to suppress his false statement to investigators." # 20, at 45–46 (emphasis added).

FN87. # 21, Ex. 10, at 7.

The state supreme court's rejection of this claim, in the passage quoted in the discussion of Ground 5(d)(1), FN88 together with other related claims, was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

FN88. See text, *supra,* at 58.

At the very outset on this claim, there was no actual evidence presented at trial that the underwear in evidence was the underwear that the victim was wearing at the time of the assault. As discussed at length above as to Ground 5(d)(1), the victim's mother brought multiple pairs of stained panties to the physician conducting the sexual assault examination a full week after the assault, the physician randomly selected one pair of panties and performed an emergency room test for the presence of blood, and the randomly-selected pair of panties then was placed in the rape kit. FN89 *Arguendo* testing the randomly-selected panties that were in evidence and establishing that there was no semen on those panties would have had virtually nil probative value. That is, proving that panties that very well may have been worn by the victim at another point in time after the assault had no semen on them would have established nothing, for lack of actual evidence that the panties in question were "the" panties as baldly asserted by petitioner on post-conviction review. The examining physician's testimony clearly belied any claim that it was established, or even could have been established, that the panties in the rape kit admitted into evidence at trial were "the" panties worn by the victim during Pantano's sexual assault.

FN89. See text, *supra,* at 59–63.

Further, as discussed in regard to his multiple

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

prior related claims, Pantano's statement to the detective—in a context where he had a potential motive to exaggerate to try and explain away the potential presence of his semen where it should not be—that he ejaculated "all over" does not necessarily establish that his semen covered any and all surfaces that thereafter might be tested.[FN90] The absence of semen in sufficient quantity for forensic examination on a particular surface, such as panties (much less panties not actually established to have been worn by the victim during the assault), would not have necessarily disproved Pantano's confession. As noted as to prior similar claims, it is entirely speculative that such testing would have been marginally exculpatory—based upon the absence of a semen on a particular surface—rather than instead directly inculpatory in the event that the panties in evidence not only were the panties worn at the time but also had semen on them.[FN91]

> FN90. See text, *supra,* at 42–43 & n. 45; 52–53 & n. 65.

> FN91. Also, as noted previously, what defense counsel instead did was argue that the State's failure to introduce evidence of the sheets and panties having semen on them undercut the State's case, closing with the assertion that "[i]f there was sperm DNA all over those panties, I wouldn't be standing here right now." # 22, Ex. 22, at 27–28. Even if petitioner *arguendo* could establish prejudice, which he cannot, such a tactical decision to pursue the issue instead in that manner virtually is unassailable on the independent performance prong under the *Strickland* standard, whether on deferential review or instead on *de novo* review.

**\*42** Petitioner has made affirmative declarative assertions that the panties in evidence were the panties worn by the victim during the assault and that no semen would have been detected on the panties. However, these bald allegations in truth are based upon nothing other than sheer, unbridled speculation. Defense counsel's unsworn argument in support of a continuance that he "believed" that there "might" be exculpatory evidence as to "some" of what happened has no evidentiary value whatsoever.

In any event, petitioner's moving premise that his confession was admissible only if every jot and tittle of his statement to the police was proved true is fundamentally flawed.[FN92]

> FN92. See text, *supra,* at 54.

Moreover, as discussed as to Ground 5(b)(1), it was Pantano who personally insisted on invoking the 60–day statutory speedy trial period after being informed that doing so necessarily precluded pursuit of a motion and writ to suppress his confession. Given that his own personal election on the record necessarily precluded pursuit of a writ to suppress his confession, it is subject to some question as to whether petitioner can now claim prejudice based upon his counsel's failure to challenge the admission of his confession.[FN93]

> FN93. See text, *supra,* at 46–47.

In all events, the state supreme court's holding that petitioner had not presented a viable claim of prejudice on this wholly speculative claim was neither contrary to nor an unreasonable application of clearly established federal law. Ground 5(e) therefore does not provide a basis for federal habeas relief.[FN94]

> FN94. To the extent that petitioner claims under Ground 5(e) that counsel was ineffective for delaying petitioner's speedy trial, the discussion as to Ground 5(a) applies fully here as well. To the extent that petitioner claims that the State withheld exculpatory evidence in this regard, the claim similarly is grounded completely on speculation.

***Ground 5(f): Failure to Adequately Cross–Examine***

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

In Ground 5(f), petitioner alleges that he was denied effective assistance when trial counsel failed to adequately cross-examine witnesses. He alleges in particular that counsel failed to impeach the testimony of the child victim and her mother and father with prior inconsistent statements, thereby allegedly failing to subject the State's case to adversarial testing.

The Supreme Court of Nevada rejected the claim presented to that court on the following grounds:

... [A]ppellant claimed that his trial counsel was ineffective for failing to properly cross-examine witnesses. Specifically, appellant claimed that his trial counsel did not question the State's witnesses concerning prior inconsistent statements. Appellant failed to demonstrate that he suffered prejudice. The inconsistencies appellant cited were minor and given the overwhelming evidence of appellant's guilt, appellant failed to demonstrate a reasonable probability of a different outcome of the trial had the witnesses been questioned concerning these minor inconsistencies. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 6.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

In the federal reply, petitioner does not provide any specific argument regarding any of the alleged inconsistencies but instead merely refers *in globo* to the alleged inconsistencies set forth in the amended petition. On the largely conclusory and formulaic argument presented, the Court is not persuaded that the state supreme court unreasonably applied *Strickland* when it held that there was not a reasonable probability that the failure to bring out the inconsistencies alleged in the amended petition would have altered the outcome at trial. For example,

there was not a reasonable probability of a different outcome at trial simply because counsel did not bring out the fact that the child did not testify at trial specifically when the assault occurred, in contrast to her stating in her police statement that it occurred at nighttime .[FN95] Petitioner confessed to the sexual assault with corroborating testimony by the child that he inserted his finger into her vagina. There was not a reasonable probability that parsing over inconsistent or incomplete statements as to sundry details—which hardly are uncommon in witness' accounts over time—would have altered the outcome at trial.

> FN95. Of course, not testifying to a factual detail does not render a prior statement that includes the detail inconsistent. Counsel first would have had to elicit testimony at trial on the detail that was inconsistent with the prior statement to impeach the trial testimony. Otherwise, the prior statement could be referenced only in an effort to refresh the witness' recollection.

**\*43** Ground 5(f) therefore does not provide a basis for federal habeas relief.

### Ground 5(g): Failure to Confer, File Pretrial Motions, and Put Forth a Defense

In Ground 5(g), petitioner alleges that he was denied effective assistance when trial counsel failed to confer with him, failed to file appropriate pretrial motions, and failed to put forth a proper defense. The underlying particulars of the claim, many of which are the subject of other claims, are noted in the discussion below. Petitioner alleges that counsel failed to confer with him "and meet his demands," including demands in letters that Pantano allegedly sent to counsel.

The Supreme Court of Nevada held as follows as to this claim:

... [A]ppellant claimed that his trial counsel was ineffective for failing to sufficiently meet with him to discuss trial strategy, including dis-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

cussing witnesses to call in his defense, inconsistencies in the State's witnesses' stories, which defense strategy to use, and how to question the State's witnesses. Appellant failed to demonstrate that he was prejudiced. As there was overwhelming evidence of appellant's guilt due to his confession, the victim's testimony and corroborating physical evidence, appellant failed to demonstrate a reasonable probability of a different outcome had his trial counsel met further with appellant to discuss these issues. Therefore, the district court did not err in denying this claim.

> # 24, Ex. 82, at 6.

The state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

On this claim as well, petitioner provides only cursory supporting argument in the federal reply, largely incorporating *in globo* the list in the amended petition of particular alleged failures, which list basically was copied virtually verbatim from petitioner's *pro se* state court filing.[FN96]

> FN96. Compare # 20, at 51–52, with # 24, Ex. 61, at 47–48.

On the largely conclusory argument made, the Court is not persuaded that the state supreme court unreasonably applied *Strickland* when it held that there was not a reasonable probability of a different outcome at trial had counsel instead proceeded as Pantano allegedly had requested.

*First,* petitioner contends that he requested counsel to call his sister to testify as to "coaching" of the child victim's testimony by her mother. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *infra* as to the parallel claim in Ground 5(l).

*Second,* petitioner contends that he requested counsel to call his mother to testify to the falsity of the child's mother's testimony concerning a prior bad act. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *infra* as to the parallel claim in Ground 5(j).

*Third,* petitioner contends that he requested counsel to call an alibi witness. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *infra* as to the parallel claim in Ground 5(h).

**\*44** *Fourth,* petitioner contends that he requested counsel to obtain testing of the victim's underwear and other materials to refute Pantano's statement that he ejaculated "all over," in order to support a motion to suppress his confession as being uncorroborated and/or contradicted by other evidence. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons assigned in the discussion as to the multiple parallel claims in Ground 5(a), at pages 41–42, *supra;* Ground 5(b)(2), at pages 52–53, *supra;* and Ground 5(e), at pages 64–67, *supra.*

*Fifth,* petitioner contends that he requested counsel to investigate and interview the victim's father because he indicated in his police statement that he had returned home at approximately 7:30 a.m. on May 3, 2003, and that Pantano was not at the residence until 9:00 a.m.

The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* in this regard.

When the father testified for the time in the case at trial, he testified that he worked the graveyard shift from 11:00 p.m. until 7:00 a.m., that he came home on the Saturday morning in question and went straight to bed, and that he did not know even that Pantano was in the house until he woke up in the afternoon. The following Saturday, the child's mother told him what had happened, he

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

questioned the child, and then he later spoke with the police at the hospital after they reported the incident.[FN97]

FN97. # 22, Ex. 20, at 61–66.

Petitioner attached with his state post-conviction filings what appears to be only a single page from a police report. Whoever wrote the page stated that the father "advised that ... [he] remembers that [Pantano] had arrived at approximately 0900 hours in the morning and left about 2200 hours."[FN98] Yet petitioner attached another single page from either the same or a different report that instead stated:

FN98. # 24, Ex. 61, Exhibit # 4 thereto.

Demetrice [the father] said Angelo [Pantano] was at their house on the 3rd and he is unaware of what time he arrived, but Angelo was there when he woke up. Demetrice said he works graveyard and was uncertain as to when Angelo got there. When I asked Leticia [the mother] when Angelo arrived at their house, she said that he got there at approximately 0900 hours in the morning, after Demetrice had gone to sleep, and he left at about 2200 hours.

# 24, Ex. 61, Exhibit # 3 thereto.

The Court is unable to discern anything of substance in the foregoing that would lead to a reasonable probability of a different outcome at trial. Perhaps an officer misstated in the first segment quoted above what the mother instead actually said as being what the father said. Perhaps the father merely was repeating secondhand what he just had heard the mother say. The report of what the father said in the second segment quoted above indeed lines up fully with his trial testimony. In all events, as discussed as to Ground 5(b)(2), a statement by the father and/or mother that Pantano was at the residence from 9:00 a.m. until 10:00 p.m. hardly rules out his being present to commit the offense during nighttime.[FN99] And the existence of a prior statement that Pantano arrived at 9:00 a.m. rather than at 5:30 a.m. as he maintained initially during his confession would not have rendered his confession inadmissible. The potential existence of other inconsistent evidence on one point or another, or even on several points, did not render his confession inadmissible.

FN99. See text, *supra,* at 51.

**\*45** *Sixth,* petitioner contends that he requested counsel to investigate the tactics used by the interviewing detective to coerce him into making an involuntary statement, "specifically the 'thumping' noises as indicated"[FN100] on the transcript of the statement. The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *supra* as to the parallel claim in Ground 5(b)(1).[FN101]

FN100. # 20, at 51.

FN101. See text, *supra,* at 43–46.

*Seventh,* petitioner contends that he requested counsel to put forth a defense "based on the facts of Pantano's statement to police being coerced, involuntary, and not corroborated by the physical or testimonial evidence offered by the prosecution."[FN102] The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *supra* as to the parallel claims in Grounds 5(b)(1) and 5(b)(2), *supra,* at pages 43–54.

FN102. # 21, at 51.

*Eighth,* petitioner contends that he requested counsel "to investigate [the father's] preliminary hearing statement that he was in the 'room' with his kids at the time and date Pantano allegedly committed the instant offenses."[FN103] Petitioner does not provide a record citation for this factual contention.

FN103. # 20, at 51–52.

The record citation given in Pantano's state post-conviction papers is to preliminary hearing

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

testimony by the *mother,* not the father.[FN104] In the testimony in question, the prosecutor is asking questions of the mother about both Pantano and the father—with both the prosecutor and the witness referring to both Pantano and the father as "he" during the questioning. The prosecutor asks the mother "was the defendant still at your home" when the father came home at 7:30 a.m., and she responded "yes." The prosecutor asks the mother "what does he do" when the father come home, and she responded "nothing." The prosecutor asks her "does he go to bed," and she responds that "[h]e was there at the bedroom with the kids."[FN105]

> FN104. Compare # 24, Ex. 61, at 48, with # 21, Ex. 4, at 41, lines 16–17.

> FN105. # 21, Ex. 4, at 41.

The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* in this regard. It appears that what the mother was actually testifying—in testimony lacking immediate clarity when taken out of context because of the use of the indefinite pronoun "he"—was that *Pantano* did "nothing" when the father came home because he "was there at the bedroom with the kids." Indeed, the mother explicitly so testifies on the very next page of the preliminary hearing transcript, specifically that *Pantano* was in the children's bedroom with the children "the whole time." The actual testimony cited by petitioner therefore not only is not by the father but further does not state what petitioner maintains that it states. Even if the testimony *arguendo* had reflected—which it did not—that the children instead were with the father at one point, that would not establish that Pantano did not have access to the children at other times, such as later during the evening. Such strained, if not in truth wholly illusory, inconsistencies are not the stuff of which acquittals, or reversals on deferential AEDPA review, are made.

**\*46** *Ninth,* overlapping the first contention above, petitioner contends that he requested counsel "to put forth a defense based on the complaining

witness being subjected to overly suggestive and repetitive leading interrogation by [the mother] with amounted to 'coaching.' "[FN106] The Court is not persuaded that petitioner can demonstrate the requisite prejudice under *Strickland* for the reasons discussed *infra* as to the parallel claim in Ground 5(l).

> FN106. # 20, at 52.

Ground 5(g) accordingly does not provide a basis for federal habeas relief.

***Ground 5(h): Failure to Investigate and Present Alibi Defense***

In Ground 5(h), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present an alleged alibi defense.

The Supreme Court of Nevada held as follows as to this claim:

> ... [A]ppellant claimed that his trial counsel was ineffective for failing to investigate alibi witnesses and failing to call additional witnesses to testify in his defense. Appellant claimed that an investigation would have revealed witnesses that would have testified that he was with them at the time the incident was alleged to have occurred. Appellant further claimed that multiple other witnesses should have been called to testify concerning the victim and her family members' motives for fabricating their stories. In addition, appellant claimed that an expert witness should have been retained to refute the testimony of the State's expert witnesses and to perform an independent psychological examination of the victim. Appellant failed to demonstrate that he was prejudiced. Appellant confessed that he sexually assaulted the victim. Appellant failed to demonstrate that testimony from any additional witnesses had a reasonable possibility of altering the outcome of the trial under the circumstances. Therefore, the district court did not err in denying this claim.

> # 24, Ex. 82, at 6.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

The state high court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner alleged in the state court that trial counsel failed to investigate and present the alibi testimony of Jeric Asuncion "and others." According to petitioner, the State's alleged theory was that he was at the victim's residence from 9:00 a.m. until 10:00 p.m. on May 3, 2003. Petitioner asserted that Asuncion "and others" would testify that he was "in the presence of" Asuncion and others from 5:30 p.m. that date until the early morning hours of the next day. He maintained that he therefore could not have been present for the "nighttime" sexual assault referred to by the victim in her statement to police. Petitioner referred to a purported supporting affidavit of Asuncion attached as "Exhibit 12" to his state papers.[FN107]

> FN107. # 24, Ex. 61, at 57–59.

However, according to the record presented to this Court, no such purported Asuncion affidavit was presented to the state courts. The exhibits attached with Pantano's state memorandum include cover sheets for Exhibit 12 and certain other exhibits, but no such exhibits.[FN108] The record thus reflects that the state courts were presented only with the bald unsupported allegation that Asuncion "and others" would testify that Pantano was in their presence on from 5:30 p.m. on May 3, 2003, through the early hours of the following morning.

> FN108. See # 24, Ex. 61, at electronic docketing pages 133–34 & 144–48. See also *id.,* at 149 (Pantano states that not all of the alleged affidavits referred to in the memorandum were filed with the memorandum).

**\*47** Even taken at face value, the purported alibi testimony would not have eliminated the possibility of Pantano committing the sexual assault at "nighttime" as stated by the victim. Pantano told the police that he was in the residence from the early morning hours of May 3, 2003. The testimony would not rule out Pantano committing the sexual assault during the early morning hours before arising, which the child easily also might consider nighttime.[FN109]

> FN109. Pantano initially stated during the police interview that he was at the apartment from "like four, five, three, four o'clock in the morning." # 24, Ex. 85, at 19–21. Petitioner's argument that the children were in another room at least after the father arrived home from the graveyard shift is addressed *supra,* at 72–73.

In all events, even if the purported alibi testimony would have sought to eliminate all time that potentially could be regarded as "nighttime," petitioner cannot establish the requisite prejudice on this claim. Pantano confessed to inserting his finger into the vagina of a seven-year-old child, with corroborating testimony by the victim as to the sexual assault. The state supreme court's determination that there was not a reasonable probability that presenting alleged alibi testimony from a friend "and others" that he instead was elsewhere on the evening of May 3, 2003, would have altered the outcome a trial was neither contrary to nor an objectively unreasonable application of *Strickland.*

Ground 5(h) does not provide a basis for federal habeas relief.

### Ground 5(i): Failure to Present Testimony on Alleged Motive to Fabricate

In Ground 5(i), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony by Pantano's sister, Maria Pantano (Rosero), that the victim's mother and father had a motive to fabricate their testimony. According to the amended petition, Pantano's sister would have testified that the victim's parents owed Pantano money and had refused to repay him a portion of the money only a few hours prior to the alleged incident.[FN110]

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

FN110. # 22, at 55.

The Supreme Court of Nevada held as follows as to this claim:

... [A]ppellant claimed that his trial counsel was ineffective for failing to present evidence concerning witnesses' motives for fabricating their testimony. Appellant claimed that the mother of the victim owed him money and that she coached the victim's testimony so that she would not have to repay appellant. Appellant failed to demonstrate that he was prejudiced. In light of appellant's confession that he sexually assaulted the victim, appellant failed to demonstrate that this testimony would have had a reasonable possibility of altering the outcome of the trial. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 7.

The state high court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

At the very outset on this claim, the state court exhibits referenced in the federal amended petition do not state what petitioner states that they do. The sister did not state either in the affidavit or in the statement reported by the defense investigator either that the parents owed money to Pantano in particular or that they refused to repay him only hours before the alleged incident. The sister instead stated in her 2007 affidavit that the mother "owed numerous persons in our family money due to her extensive gambling habits" and that "she was going to testify at Angelo Pantano's trial for the prosecution because she was afraid she was going to have to pay for hospital bills she did not have funds for." FN111 In this same vein, the defense investigator's November 25, 2003, report states:

FN111. # 24, Ex. 61, Exhibit 2 thereto, at 3 (at electronic docketing page 104).

**\*48** Maria would later state that [the victim's] mother ... [was] sorry that this had to happen, but if the did not go through with this, they would have to pay the medical bill [referring to the medical bill from the examination one week after the assault] and get in trouble if they did not cooperate. The doctor was the one pressing the charges. Maria also stated [that the victim's] mother and father are going through financial problems.

# 24, Ex. 61, Exhibit 16 thereto (at electronic docketing page 143).

Nowhere in either the affidavit or the investigator's report does the sister state that the victim's parents owed *Pantano* money. Nowhere in either the affidavit or the report does the sister state that the victim's parents had refused to repay Pantano only hours before the alleged incident. Further, a concern over a payment of the medical bill from the May 10, 2003, sexual assault examination does not provide a basis for fabricating a story about the May 3, 2003, sexual assault in the first instance.

In all events, petitioner cannot establish the requisite prejudice on this claim. Again, Pantano confessed to inserting his finger into the vagina of a seven-year-old child. The state supreme court's determination that there was not a reasonable probability that presenting testimony from a hardly disinterested witness seeking to establish that the victim's parents had a motive to fabricate their testimony because they allegedly owed Pantano money would have altered the outcome a trial was neither contrary to nor an objectively unreasonable application of *Strickland.*

Ground 5(i) does not provide a basis for federal habeas relief.

### Ground 5(j): Failure to Present Mother's Testimony to Refute Prior Bad Act

In Ground 5(j), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony by his mother to refute testimony by the victim's mother regarding an alleged prior bad act. The background circum-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

112

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

stances regarding the victim's mother's testimony are summarized in the discussion of Ground 4(d). FN112

> FN112. See text, *supra,* at 33–35.

The Supreme Court of Nevada held as follows as to this claim:

> ... [A]ppellant claimed that his trial counsel was ineffective for failing to present his mother's testimony to refute claims that his mother was afraid of him. At trial, the victim's mother testified that appellant's mother was afraid of him. Appellant included an affidavit from his mother in which she stated that she was not afraid of appellant. Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. Following an objection to the victim's mother's statement regarding appellant's mother, the district court admonished the jury to disregard the statement concerning appellant's mother's fear. As stated earlier, there was overwhelming evidence of appellant's guilt. Thus, he failed to demonstrate that testimony concerning his mother's feelings towards him would have changed the outcome of the trial. Therefore, the district court did not err in denying this claim.

> **\*49** # 24, Ex. 82, at 7.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

At the outset on this claim, there clearly was no pretrial investigation that reasonably could have been conducted by trial counsel with regard to this particular point. As discussed as to Ground 4(d), the state court record, including an express defense concession, reflects that the prosecutor did not intentionally elicit the testimony. It would have taken a prescience beyond that required by *Strickland* for defense counsel to investigate the point before trial.

In any event, petitioner cannot demonstrate

prejudice on this claim. The victim's mother's testimony in this regard was stricken and the jury was instructed to disregard the testimony. Over and above the points noted by the state supreme court, it was improbable to the extreme that the state trial court would have permitted the defense to present testimony to respond to testimony on a collateral matter that had been stricken in the first instance. In all events, Pantano confessed to inserting his finger into the vagina of a seven-year-old child, with corroborating testimony by the victim as to the sexual assault. The state supreme court's determination that there was not a reasonable probability that presenting testimony from his mother that she was not afraid of Pantano would have altered the outcome a trial was neither contrary to nor an objectively unreasonable application of *Strickland.*

Ground 5(j) does not provide a basis for federal habeas relief.

### Ground 5(k): Failure to Present Evidence of Alleged Lack of a Cell Phone

In Ground 5(k), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony establishing that he allegedly did not have a cell phone. The background circumstances regarding this claim are summarized in the discussion of Ground 5(b)(2). FN113

> FN113. See text, *supra,* at 48–49.

The Supreme Court of Nevada held as follows as to this claim:

> ... [A]ppellant claimed that his trial counsel was ineffective for failing to investigate whether appellant possessed a cell phone at the time of the incident. Appellant claimed that he lied to the police about having a cell phone with him during the incident; therefore, his trial counsel should have investigated to show that appellant did not have a cell phone at the time of the assault and that would have shown his confession was false. Appellant failed to demonstrate that he was pre-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

113

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

judiced. Appellant confessed to the police that during the sexual assault, he distracted the victim's brother by allowing the brother to play a game on his cell phone. In light of his confession, the victim's testimony and the physical evidence, appellant failed to demonstrate that such an investigation would have resulted in a reasonable probability of a different outcome at trial. Therefore, the district court did not err in denying this claim.

**\*50** # 24, Ex. 82, at 7–8 (citation footnote omitted).

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

As discussed in more detail as to Ground 5(b)(2), petitioner cannot establish prejudice from trial counsel's failure to pursue what would have been a pointless exercise. There in truth was no way for counsel to conclusively prove the negative that Pantano did not have at least a borrowed cell phone or other cell phone not in his name in May 2003, whether by presenting cell phone carrier testimony or the testimony of friends. Even if Pantano himself had taken the stand, which he did not do at trial, to testify that he did not a cell phone, he essentially would have been testifying: "My confession demonstrably was false because I lied to the police about the collateral detail of having a cell phone, but I am not lying now when I state, facing conviction for a serious crime, that I did not have a cell phone." All to support the strained inference that because Pantano, allegedly, lied to the police about the collateral point of having a cell phone he therefore lied to the police about inserting his finger into the vagina of a seven-year-old child. Nor has petitioner cited apposite case law establishing that he would have been able to prevent introduction of his confession at trial based on this strained argument. The state supreme court's holding that petitioner could not demonstrate prejudice from counsel's failure to pursue such a pointless avenue

of defense was neither contrary to nor an unreasonable application of *Strickland.*

Ground 5(k) does not provide a basis for federal habeas relief.[FN114]

> FN114. As also discussed as to Ground 5(b)(2), Pantano's statement that he had a cell phone was not uncorroborated as petitioner contends on post-conviction review. The child victim also testified—both at the preliminary hearing and at trial—that Pantano gave his cell phone to her brother to play with during the sexual assault. # 21, Ex. 4, at 87; # 22, Ex. 18, at 19.

***Ground 5(l): Failure to Present Evidence of Alleged Coaching of Testimony***
In Ground 5(l), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony establishing that the victim's parents coached her testimony.

The Supreme Court of Nevada addressed this claim within the context of the claim pertaining to fabrication discussed as to Ground 5(i) above, holding that petitioner could not demonstrate prejudice. The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner alleges on this claim: (a) that the victim's mother spoke to a number of relatives and others about the alleged incident prior to telling the victim's father about the incident one week later; (b) that "[i]t is believed" that this occurred within the hearing of the child; (c) that the victim's mother owed Pantano $1200 and he sought repayment on the morning of May 3, 2003; and (d) that Pantano's then roommates—Bernard Pangalia and LaLain Nicolas—knew of the monies owed by the victim's mother to Pantano, as allegedly reflected in Exhibits 17 and 18 to Exhibit 61 in the record in this Court.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

**\*51** In principal part, the foregoing allegations in federal court, including what the victim's mother allegedly said in particular to whom during the week after the incident, are based upon bald, unsupported allegations in Pantano's state post-conviction papers.[FN115] The exhibits attached with Pantano's state memorandum included a cover sheet for Exhibits 17 and 18, but no such exhibits.[FN116] Moreover, it is not difficult to discern that there potentially may have been hearsay issues with regard to alleged testimony by Pangalia and Nicolas regarding an alleged debt owed by the mother to Pantano, even if the alleged testimony otherwise were admissible. There further clearly were hearsay issues—at the very least as to the truth of the matter asserted—with regard to the testimony outlined in the 2007 affidavit of Pantano's sister, who asserts that she would have testified that the victim's mother said to her that she rehearsed the child's account with the victim before she spoke with the child's father.[FN117]

> FN115. Compare # 20, at 57–59, with # 24, Ex. 61, at 63–66.

> FN116. See # 24, Ex. 61, at electronic docketing pages 144–48. See also *id.,* at 149 (Pantano states that not all of the alleged affidavits referred to in the memorandum were filed with the memorandum). Federal habeas counsel repeated essentially verbatim the allegations of the *pro se* state court filing citing to alleged supporting exhibits in the state court record that the record in this matter reflects were not actually in the state court record. Rule 11 of the Federal Rules of Civil Procedure requires more of counsel.

> FN117. See # 24, Ex. 61, Exhibit 2 thereto, at 2.

In all events on this claim, petitioner cannot demonstrate the requisite prejudice based upon such an in large part speculative claim of coaching based upon such problematic evidence—perhaps even nonexistent evidence in certain respects. Pantano confessed to inserting his finger into the vagina of the seven-year-old child. The state supreme court's determination that there was not a reasonable probability that presenting testimony as to alleged coaching that not one of the alleged witnesses in question themselves observed would have altered the outcome a trial was neither contrary to nor an objectively unreasonable application of *Strickland.*

Ground 5(l) does not provide a basis for federal habeas relief.

### Ground 5(m): Failure to Object to Jury Instruction

In Ground 5(m), petitioner alleges that he was denied effective assistance when trial counsel failed to challenge a jury instruction stating that the victim's testimony, if believed beyond a reasonable doubt, was sufficient and that no corroboration of the victim's testimony was required in that circumstance. Petitioner contends that the instruction shifted the burden of proof from the State to Pantano, in violation of the due process requirement recognized under *In re Winship,* 397 U.S. 358, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970), that every element of a state criminal offense must be proved beyond a reasonable doubt.

The jury instruction challenged stated:

There is no requirement that the testimony of an alleged victim of sexual offenses be corroborated, and her testimony standing alone, if believed beyond a reasonable doubt, is sufficient to sustain a verdict of guilty.

# 22, Ex. 23, Instruction No. 9.

The charges to the jury included instructions stating, *inter alia,* that the State was required to prove every element of the crime charged beyond a reasonable doubt, that the defendant was presumed innocent until the contrary was proved, and that the instructions were to be considered as a whole, along

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

with instructions regarding assessing the credibility of witnesses.[FN118]

> FN118. # 22, Ex. 23, Instructions Nos. 2, 12 & 14.

**\*52** The Supreme Court of Nevada held as follows as to this claim:

> ... [A]ppellant claimed that his trial counsel was ineffective for allowing a jury instruction to shift the reasonable doubt burden to the defense. Appellant failed to demonstrate that his trial counsel was deficient. A proper reasonable doubt instruction was used at trial. [FN14] Therefore, the district court did not err in denying this claim.

> > FN[FN 14] NRS 175.211; *see, e.g., Chambers v. State,* 113 Nev. 974, 982–83, 944 P.2d 805, 810 (1997); *Milton v. State,* 111 Nev. 1487, 1492, 908 P.2d 684, 687 (1995).

> # 24, Ex. 82, at 9.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

Petitioner—who has the burden of persuasion on federal habeas review—has not cited an apposite decision of the United States Supreme Court holding that a jury instruction as was used in this case shifts the burden of proof to the defendant and violates the rule of *In re Winship.* Significantly, the Ninth Circuit held in its July 19, 2004, decision in *Bruce v. Terhune,* 376 F.3d 950 (9th Cir.2004), applying consistent prior Circuit authority, that a California state court decision rejecting a substantially identical challenge to a substantially identical California charge was neither contrary to nor an unreasonable application of *Winship* or other clearly established federal law. 376 F.3d at 954–56. Given *Bruce,* and the prior Ninth Circuit decisions cited therein, the December 17, 2008, decision of the Su-

preme Court of Nevada rejecting a substantially identical challenge in this case indisputably was neither contrary to nor an unreasonable application of *Winship, Strickland,* or other clearly established federal law as determined by the United States Supreme Court.

Moreover, consideration of counsel's performance under the deficient performance prong of *Strickland* must be evaluated from trial counsel's perspective at the time. *E.g., Harrington,* 131 S.Ct. at 779. At the time of the February 2004 trial, there was no apposite Supreme Court jurisprudence supporting petitioner's argument under *Winship,* and there were multiple Ninth Circuit, Supreme Court of Nevada, and other state court decisions rejecting substantially the same or similar arguments. *See Bruce, supra; Gaxiola v. State,* 121 Nev. 638, 647–50, 119 P.3d 1225, 1231–33 (2005)(collecting prior state cases). Particularly under the "doubly deferential" standard of review applicable to this context, petitioner simply cannot establish that the state supreme court's 2008 decision holding that trial counsel's performance in 2004 was not deficient was either contrary to or an unreasonable application of clearly established federal law.[FN119]

> FN119. Petitioner urges that the challenged instruction suggested that none of the alleged deficiencies in the child victim's testimony mattered and that the jury thereby was allowed to ignore expert testimony and alleged inconsistencies in the testimony of prosecution witnesses. Even if this matter were being reviewed *de novo,* which it is not, petitioner's argument glosses over the fact that the instruction stated that the victim's testimony was sufficient " *if believed beyond a reasonable doubt.* " In all events, the Ninth Circuit's *Bruce* decision establishes beyond any good faith argument to the contrary that the state supreme court's decision was neither contrary to nor an unreasonable application of clearly established federal law.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

It would appear that petitioner's argument is grounded on the contention that the instruction was subject to objection solely under federal law. Of course, if the challenge instead were premised upon a contention that the instruction was subject to objection also under state law, the state supreme court's rejection of any such state law component to the claim would be the end of the matter on federal habeas review in that regard.

Ground 5(m) therefore does not provide a basis for federal habeas relief.

### Ground 5(n): Failure to Object to Alleged Vouching by State Expert

**\*53** In Ground 5(n), petitioner alleges that he was denied effective assistance when trial counsel failed to object to alleged vouching for the credibility of the victim's mother's testimony by the physician who performed the sexual assault examination.

Petitioner alleges that the second question and answer in the following exchange during the physician's testimony constituted such objectionable and impermissible vouching:

Q: Were you able to appropriately do your examination?

A: Yes.

Q: Okay. How about the mother? You indicated that the mother was there. What was her demeanor?

A: Very concerned for her daughter. She, too, was quiet; not shocked, but she knows she's there for her—with a daughter being abused.

# 22, Ex 20, at 20.

The Supreme Court of Nevada held as follows as to this claim:

... [A]ppellant claimed that his trial counsel

was ineffective for failing to object when Dr. Vergara vouched for the credibility of the victim. Appellant claimed that Dr. Vergara's testimony concerning the examination of the victim improperly vouched for the credibility of the victim. Appellant failed to demonstrate that his trial counsel was deficient or that he was prejudiced. Statements amounting "to an opinion as to the veracity of a witness in circumstances where veracity might well have determined the ultimate issue of guilt or innocence" are improper. Dr. Vergara simply testified that the examination of the victim revealed injuries that were consistent with sexual assault. As such, Dr. Vergara's testimony was proper and appellant failed to demonstrate that any objection would have had a reasonable probability of changing the outcome at trial. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 9 (citation footnote omitted).

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland.*

Petitioner's core premise on this claim is fundamentally flawed. The physician stated that the mother's demeanor reflected that "she knows she's there for her—with a daughter being abused." Petitioner urges that the physician thereby "testified that [the victim] had in fact been abused and this opinion as to the ultimate issue of guilt was improper." [FN120] The physician was responding to a question about the demeanor of the mother and her apparent state of mind reflected thereby. Nothing in the statement in truth constituted an opinion by the physician herself on the ultimate issue of guilt or a vouching for the credibility of the mother's testimony. It simply was testimony by the physician as to the mother's demeanor and apparent state of mind—as to the mother presenting to the physician as being concerned for a daughter believed by the mother to have been abused. The state supreme court's holding that there was not a reasonable probability that the failure to object to this in truth

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

largely innocuous testimony would have altered the outcome of the trial was neither contrary to nor an unreasonable application of *Strickland.* [FN121] While petitioner points to an alleged absence of corroborating physical evidence, Pantano confessed to inserting his finger into the vagina of the seven-year-old child. He cannot demonstrate prejudice under *Strickland* based on the failure to object to the physician's testimony.

> FN120. # 46, at 40.

> FN121. Petitioner relies upon a number of federal appellate decisions regarding improper expert witness vouching in federal criminal trials. See # 46, at 47–48. Even if the Court were to assume *arguendo,* that the cases were on point and apposite to the facts of the case at hand, which they are not, the Supreme Court of Nevada is not bound to follow federal court of appeals decisions. This is not *de novo* review.

**\*54** Ground 5(n) therefore does not provide a basis for federal habeas review.

***Ground 5(o): Failure to Obtain Psychological Examination of Child Victim***

In Ground 5(o), petitioner alleges that he was denied effective assistance when trial counsel failed to obtain an independent psychological examination of the child victim to assess her propensity for veracity.

The Supreme Court of Nevada held as follows as to this claim:

> [A]ppellant claimed that his trial counsel was ineffective for failing ... to call additional witnesses to testify in his defense. .... In addition, appellant claimed that an expert witness should have been retained to refute the testimony of the State's expert witnesses and to perform an independent psychological examination of the victim. Appellant failed to demonstrate that he was prejudiced. Appellant confessed that he sexually as-

saulted the victim. Appellant failed to demonstrate that testimony from any additional witnesses had a reasonable possibility of altering the outcome of the trial under the circumstances. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 6.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland.*

Initially on this claim, it is subject to substantial question whether a motion for a psychological examination of the victim would have been granted in the first instance.

A psychological examination of a sexual offense victim is required neither by the federal constitution nor Nevada statutory law, and the procedure instead has arisen in Nevada as a matter of what has been frequently changing state decisional law. *See, e.g., State v. Eighth Judicial District Court (Romano),* 120 Nev. 613, 619–20 & 621 n. 26, 97 P.3d 594, 598 & 599 n. 26 (2004)(modifying rule in 2000 *Koerschner* decision which in turn had overruled prior authority); *see also Abbott v. State,* 122 Nev. 715, 138 P.3d 462 (2006)(later overruling, after the trial in this case, *Romano* and reinstating *Koerschner* test).

At the time of Pantano's February 2004 trial, the defendant was required to prove a compelling need for the examination. *See Koerschner v. State,* 116 Nev. 1111, 13 P.3d 451, (2000). In determining whether a compelling need had been demonstrated, the state courts looked to a number of factors, including whether the State was calling or benefitting from a psychiatric or psychological expert, whether there was corroborating evidence over and above the child's testimony, and whether there was a reasonable basis to believe that the child's mental or emotional state may have affected her veracity. *Id.*

In Pantano's case, the State was not calling or

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

benefitting from a psychiatric or psychological expert,[FN122] the child's testimony was corroborated by Pantano's own confession, and it is subject to substantial question whether the defense could have established under the then-applicable case law that there was a reasonable basis to believe that the child's mental or emotional state may have affected her veracity.[FN123] It thus is subject to substantial question whether a defense motion for a psychological examination would have been granted.[FN124]

> FN122. *Cf. Koerschner,* 116 Nev. at 1117, 13 P.3d at 455 (fact that State did not elicit psychological evidence or use psychological evidence weighed against grant of defense request for victim psychological examination); *Chapman v. State,* 117 Nev. 1, 4–5, 16 P.3d 432, 434 (2001)(similar).

> FN123. *Cf. Chapman,* 117 Nev. at 5, 16 P.3d at 434 (the facts of an ugly divorce between the victim's parents and animosity between the victim's father and the defendant were insufficient grounds to believe that the victim's mental or emotional state may have affected her veracity); *Koerschner,* 116 Nev. at 1117, 13 P.3d at 456 (although the child-victim had experienced a very tragic and stressful childhood, there was no indication in the record that her veracity was affected to any particular degree by her mental or emotional state).

> FN124. Petitioner urges that an examination would have been required because the victim allegedly was coached, but this coaching allegation in truth is based on nothing more than supposition and hearsay that likely was inadmissible for the truth of the matter asserted. See text, *supra,* at 79–81. This discussion further necessarily assumes *arguendo* that Pantano's insistence—personally on the record—on being tried within the state statutory law sixty-day speedy trial period allowed sufficient time for such a motion and then a psycho-

logical examination of the child victim. *Cf.* the discussion as to Ground 5(b)(1), *supra,* at 46–47.

**\*55** In all events, however, given Pantano's confession to inserting his finger into the vagina of the seven-year-old child, the state supreme court's holding that petitioner could not establish a reasonable probability of a different outcome at trial but for counsel's performance in this regard was neither contrary to nor an unreasonable application of *Strickland.*

Ground 5(o) therefore does not provide a basis for federal habeas relief.

### Ground 6: Alleged Ineffective Assistance of Appellate Counsel

In Ground 6, petitioner alleges that he was denied effective assistance of appellate counsel in violation of the Sixth and Fourteenth Amendments. He alleges three distinct claims of alleged ineffective assistance of appellate counsel, which are described in more detail below.

When evaluating claims of ineffective assistance of appellate counsel, the performance and prejudice prongs of the *Strickland* standard partially overlap. *E.g., Bailey v. Newland,* 263 F.3d 1022, 1028–29 (9th Cir.2001); *Miller v. Keeney,* 882 F.2d 1428, 1434 (9th Cir.1989). Effective appellate advocacy requires weeding out weaker issues with less likelihood of success. The failure to present a weak issue on appeal neither falls below an objective standard of competence nor causes prejudice to the client for the same reason—because the omitted issue has little or no likelihood of success on appeal. *Id.*

### Ground 6(a): Transcript and Audio Recording of Confession

In Ground 6(a), petitioner alleges that he was denied effective assistance when appellate counsel failed to include the audio recording and transcript of his confession into the record before the state supreme court on direct appeal.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

The background to this claim is outlined in the discussion of Ground 3, *supra.*[FN125]

> FN125. See text, *supra,* at 17–24.

On state post-conviction review, the Supreme Court of Nevada held as follows:

> [A]ppellant claimed that his appellate counsel was ineffective for failing to include the audiotape or a certified transcript of his police interview with the appendix for his direct appeal. Appellant failed to demonstrate that he was prejudiced. At trial, a noncertified transcript was used so that the jury could follow along with an audiotape of the interview. The noncertified transcript was not admitted into evidence. Appellant failed to demonstrate that the transcript of the interview that was used at trial was substantially different from the audiotape. Thus, appellant failed to demonstrate that the result of the direct appeal would have been different if this transcript had been included. Therefore, the district court did not err in denying this claim.

> # 24, Ex. 82, at 10 (footnote omitted).

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland.*

In the federal reply, petitioner contends, first, that "unlike the audiotape, the transcript contained Pantano's confession that he touched [the victim's] butt."[FN126] At the outset in this regard, review under § 2254(d)(1) is limited "to the record that was before the state court that adjudicated the claim on the merits." *Pinholster,* 131 S.Ct. at 1388. Here, it does not appear that a copy of either the audio recording or the transcript was in the record before the Supreme Court of Nevada on the *post-conviction* appeal.[FN127] Federal habeas review thus is restricted under § 2254(d)(1) to the same record presented to the state supreme court when it adjudicated the claim on the merits on the state post-conviction appeal.[FN128] Petitioner's asser-

tions as to what was or was not contained in the audio recording as compared to the transcript constitute nothing more than bald assertions vis-à-vis the record actually before the state court that adjudicated the claim on the merits.

> FN126. # 46, at 43–44.

> FN127. See # 24, Ex. 61. Indeed, the audio recording is not even in the federal record in this matter.

> FN128. See also note 9, *supra.*

**\*56** Moreover, as discussed as to Ground 3, petitioner successfully prevailed upon the state district court to dismiss the lewdness charge, which was the charge based upon the alleged touching of the victim's buttocks. Pantano achieved this result despite the fact that another portion of the transcript that was not challenged as containing material not contained in the audio recording in truth also referenced the touching that supported the lewdness charge.[FN129] Pantano thus arguably obtained more relief on this basis than he was entitled in the first instance, and his claim of prejudice as to the remaining sexual assault charge is questionable at best. Particularly on the record presented to the state supreme court on the state post-conviction appeal, the rejection of the claim of prejudice in this regard was not an unreasonable application of *Strickland.*

> FN129. See text, *supra,* at 23–24.

Petitioner contends, second, that "without the transcript, the court was unable to properly review the additional inaccuracies and blanks and omissions."[FN130] Again, the record presented to the state supreme court on state post-conviction review also did not include either the audio recording or the transcript. Moreover, as discussed as to Ground 3, *supra,* the alleged inaccuracies identified by petitioner are belied by the transcript. And, as with Ground 3, even on an *arguendo de novo* review, the Court has no difficulty at all holding that the jury's

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

120

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

possession of a transcript with such allegedly "excessive" omissions and blanks while they listened to the audio recording itself did not "violate those fundamental conceptions of justice which lie at the base of our civil and political institutions." FN131 Particularly on the record presented on state post-conviction review, the rejection of the claim of prejudice in this regard as well was not an unreasonable application of *Strickland.*

> FN130. # 46, at 44.

> FN131. See text, *supra,* at 21–24.

Ground 6(a) does not provide a basis for federal habeas review.

### Ground 6(b): Alleged False Statements in Confession

In Ground 6(b), petitioner alleges that he was denied effective assistance when appellate counsel failed to inform the state supreme court on direct appeal that his statements to police investigators were false and not supported by corroborating facts.

The background circumstances pertaining to this claim are outlined in the discussion of Ground 5(b)(2), *supra.* FN132

> FN132. See text, *supra,* at 48–54.

The Supreme Court of Nevada held as follows as to this claim:

> [A]ppellant claimed that his appellate counsel was ineffective for failing to include assertions that appellant's statements to police, including his confession, were false. Appellant failed to demonstrate that his appellate counsel was deficient or that he was prejudiced. As discussed above, appellant's confession was voluntary and appellant did not identify any additional grounds upon which his confession should have been suppressed. Appellant failed to demonstrate that any claim regarding the veracity of his confession would have had a reasonable probability of success on appeal. Therefore, the district court did

not err in denying this claim.

> **\*57** # 24, Ex. 82, at 10–11.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland.*

As discussed exhaustively above as to Ground 5(b)(2), the factual, logical, and legal underpinnings of petitioner's core claim that he was entitled to relief because his confession allegedly was demonstrably false all are fundamentally flawed. There was not a reasonable probability either that he would have been able to exclude his confession from evidence on this basis or that he would have been able to obtain a different outcome at trial based on this argument. The state supreme court's rejection of the parallel claim that appellate counsel should have pursued this factually, logically, and legally flawed argument on appeal clearly was neither contrary to nor an unreasonable application of *Strickland.*

Ground 6(b) therefore does not provide a basis for federal habeas relief.

### Ground 6(c): A Failure to Communicate

In Ground 6(c), petitioner alleges that he was denied effective assistance when appellate counsel failed to communicate and confer with him regarding the issues to be pursued on appeal.

The Supreme Court of Nevada held as follows as to this claim:

> [A]ppellant claimed that his appellate counsel was ineffective for failing to communicate with him while preparing his direct appeal. Appellant failed to demonstrate that he was prejudiced. Appellant failed to identify any issues, other than the claim relating to his confession, which he wished to raise, but were not raised due to his lack of communication with his appellate counsel. Therefore, the district court did not err in denying this claim.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

# 24, Ex. 82, at 11.

The state supreme court's rejection of the claim presented to that court was neither contrary to nor an unreasonable application of *Strickland* or other clearly established federal law.

The preceding discussion as to an inability to demonstrate prejudice under *Strickland* as to Grounds 6(a) and 6(b) applies here as well.[FN133]

> FN133. Under established law, a defendant does not have a constitutional right to have appointed counsel on direct appeal present every nonfrivolous issue requested by the defendant. *See Jones v. Barnes,* 463 U.S. 745, 103 S.Ct. 3308, 77 L.Ed.2d 987 (1983). The mere fact that counsel did not pursue an issue that petitioner would have wanted him to pursue thus does not establish prejudice in and of itself. Petitioner instead must demonstrate a reasonable probability of a different outcome on appeal from the failure to pursue the particular issue in question.

Ground 6(c) therefore does not provide a basis for federal habeas relief.

### Ground 7: Alleged Cumulative Error

In Ground 7, petitioner alleges that he was denied rights to due process and a fair trial due to the cumulative effect of the alleged trial errors raised on direct appeal combined with the alleged instances of ineffective assistance of counsel raised on state post-conviction review.

The Supreme Court of Nevada held as follows:

[A]ppellant claimed that the cumulative errors of his trial and appellate counsel caused them to be ineffective. Appellant failed to demonstrate that he was prejudiced. As appellant failed to demonstrate any error for the reasons discussed previously, appellant failed to demonstrate cumulative error. Therefore, the district court did not err in denying this claim.

# 24, Ex. 82, at 11.

This Court held previously in this matter that it would review this ground *de novo* because the state supreme court reviewed the claim solely as one based on the cumulative effect of the alleged ineffective assistance of counsel without considering the claim as also based on the cumulative effect of alleged trial error therewith .[FN134]

> FN134. See # 34, at 5–6.

**\*58** On *de novo* review, the Court is not persuaded, for substantially the reasons assigned previously as to the preceding claims, that petitioner has demonstrated the presence of constitutional error in isolation. The Court notes in this regard that petitioner in truth has not demonstrated constitutional error—as opposed to state law error—on his claims of prosecutorial misconduct under Ground 4. Nor has he demonstrated a basis for constitutional error on any of his claims related directly to the admission of either his own confession or the corroborating testimony of the child victim.[FN135] Particularly given his confession and the corroborating testimony of the child victim, the Court is not persuaded that any *arguendo* constitutional error claimed herein—which has not been established—so infected petitioner's trial with unfairness as to make the resulting conviction a denial of due process, whether any such *arguendo* error claimed herein is considered singly or in the aggregate. In all events, the Court, having found no constitutional error in isolation, holds on *de novo* review that the conviction is not infirm based upon alleged cumulative error. *See, e.g., Hayes v. Ayers,* 632 F.3d 500, 524 (9th Cir.2011)("Because we conclude that no error of constitutional magnitude occurred, no cumulative prejudice is possible.").

> FN135. To the extent that this Court has denied relief on preceding claims under the deferential review standard without assigning additional factual or legal reasons over and above those assigned by the Supreme Court of Nevada, this Court denies relief

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

on a *de novo* review for substantially the reasons assigned by the state supreme court. Applying *de novo* review to petitioner's claims, singly as well as in the aggregate, the Court is not persuaded that petitioner was denied a fundamentally fair trial or that his conviction otherwise is constitutionally infirm. The reasons supporting this conclusion have been adequately canvassed herein in the discussion of the prior claims.

Ground 7 therefore does not provide a basis for federal habeas relief.

### Evidentiary Hearing Request

Petitioner's request for an evidentiary hearing is denied, as review under AEDPA is restricted to the record presented to the state court that adjudicated the merits of the claims. *See Pinolster,* 131 S.Ct. at 1398–1401. Petitioner otherwise has not demonstrated a basis for a federal evidentiary hearing under the applicable standards for same.

### Consideration of Possible Issuance of a Certificate of Appealability

Under Rule 11 of the Rules Governing Section 2254 Cases, the district court must issue or deny a certificate of appealability (COA) when it enters a final order adverse to the applicant.

As to the claims rejected by the district court on the merits, under 28 U.S.C. § 2253(c), a petitioner must make a "substantial showing of the denial of a constitutional right" in order to obtain a certificate of appealability. *Slack v. McDaniel,* 529 U.S. 473, 483–84, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000); *Hiivala v. Wood,* 195 F.3d 1098, 1104 (9th Cir.1999). To satisfy this standard, the petitioner "must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claim debatable or wrong." *Slack,* 529 U.S. at 484.

The Court denies a certificate of appealability as to all claims, for the reasons noted below. The length of this order does not signify that the any of the multiple claims presented would be found to be debatable by jurists of reason. On federal habeas review, petitioner has repeated numerous claims from his *pro se* state papers that were flawed factually, logically and/or legally. Additional discussion was required in this order on multiple claims literally to set the record straight and to put petitioner's arguments in proper context.

### Ground 1

**\*59** In Ground 1, petitioner alleges that he was denied rights to confrontation, due process, and a fair trial because the state statute allowing admission of prior statements of a child sexual offense victim allegedly is unconstitutionally "overbroad." He alleges that the statute is overbroad essentially because the statute allegedly provides for the admission of hearsay in some circumstances that allegedly would violate the Confrontation Clause under the standards set forth in *Crawford v. Washington, supra.* Such "overbreadth" challenges are restricted to challenges to statutes restricting freedom of speech protected by the First Amendment. Accordingly, even on an *arguendo de novo* review, the amorphous "facial challenge" for "overbreadth" presented in Ground 1 would be at best surplusage and at worst frivolous. If the evidence actually admitted at petitioner's trial was admitted in violation of the Confrontation Clause, then a "facial" challenge to the statute is surplusage vis-à-vis the challenge to his own particular conviction. If, on the other hand, the evidence actually admitted at petitioner's trial was *not* introduced in violation of the Confrontation Clause, then there is no nonfrivolous federal constitutional claim by which the otherwise constitutional admission of the evidence is rendered unconstitutional because the evidentiary statute allegedly would permit the unconstitutional admission of other evidence in other situations in other trials. Reasonable jurists therefore would not find debatable or wrong this Court's conclusion rejection of this claim. **See text,** *supra,* **at 4–11.**

### Ground 2

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

In Ground 2, petitioner alleges that he was denied rights to confrontation, due process, and a fair trial because allegedly testimonial out-of-court statements by the child victim to her father and to a detective were admitted at trial. Petitioner contends principally: (a) that the child was "unavailable" for purposes of the Confrontation Clause analysis under *Crawford* because her responses in her trial testimony allegedly were so vague and inadequate that effective cross-examination was not possible, allegedly thereby rendering her "unavailable;" and (b) that the child's statements not only to the investigating detective but also to her father were "testimonial" statements for purposes of Confrontation Clause protection under *Crawford.*

On the "availability" issue, there are no Supreme Court decisions intimating, much less holding, that a witness may be "unavailable" for Confrontation Clause purposes even though they actually take the stand and testify, albeit allegedly too vaguely to allow allegedly effective cross-examination. *Crawford* instead states apparently categorically that the Confrontation Clause places "no constraints at all" on the use of a declarant's prior testimonial statements when the declarant testifies at trial, which the child did in this case. Any alleged vagueness in the testimony of a witness on the stand is matter to be highlighted on cross-examination.

**\*60** An adverse ruling on the "availability" issue undercuts the entire claim, including as to the victim's statements to the investigating detective. Moreover, on the "testimonial statement" issue with regard to the child's statements to her father, the Supreme Court not only has not fully defined "testimonial statement," it expressly has declined to establish whether and when statements made to someone other than law enforcement personnel are "testimonial." Given this express reservation of the issue, petitioner cannot establish that the state supreme court's rejection of the claim as to the child's statement to her father was an unreasonable application of clearly established federal law.

Reasonable jurists therefore would not find debatable or wrong this Court's conclusion that the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. **See text,** *supra,* **at 11–16 .**

*Ground 3*

In Ground 3, petitioner alleges that he was denied rights to confrontation, due process and a fair trial because the jury was given copies of a transcript of his confession in spite of a trial court ruling that the transcript, as distinguished from an audio recording of the statement played at trial, was not admissible. At the outset, neither the transcript nor the audio recording was presented to the state supreme court in the record on appeal, such that AEDPA review herein is restricted to the record before that court when it decided the merits. Given that the statements in question were Pantano's own statements, a holding that the Confrontation Clause was not implicated was not contrary to clearly established federal law. A state court conclusion that the jury having access to the transcript in the circumstances of the case did not violate a general due process standard, which requires a violation of those "fundamental conceptions of justice which lie at the base of our civil and political institutions," was not an unreasonable application of such a generalized standard. Further, on an alternative *arguendo de novo* review, the actual transcript in question directly belies two of petitioner's central factual allegations in support of the claim. As to the third factual allegation, this Court has no difficulty at all holding that the jury's possession of a transcript with allegedly "excessive" omissions and blanks did not "violate those fundamental conceptions of justice which lie at the base of our civil and political institutions." Reasonable jurists therefore would not find debatable or wrong this Court's rejection of this claim. **See text,** *supra,* **at 17–24.**

*Grounds 4(a) and 4(b)*

In Grounds 4(a) and (b), petitioner alleges that he was denied rights to due process and a fair trial

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

because of prosecutorial misconduct, contending in particular: (a) that the prosecutor inappropriately sought to inflame the jury and appeal to their passions and emotions by urging jurors to convict Pantano to make the victim's parents "feel better" and improperly injected her personal opinion into the argument; and (b) that the prosecutor inappropriately argued evidence that was never admitted which implied Pantano's guilt, disparaged defense counsel and the defense, talked about religious characters, and again injected her personal opinion.

**\*61** Petitioner proceeds essentially on the premise that the state supreme court's holding that the prosecutor's comments were improper equated to a holding that the comments violated due process, and he then challenges the court's conclusion that the error constituted harmless error. However, a conclusion that prosecutorial argument was improper under federal decisions based on the exercise of supervisory power in federal criminal trials, state court decisions applying state law standards, and/or the ABA Standards for Criminal Justice does not necessitate a conclusion that the improper argument violated rights to due process or a fair trial. In the present case, a number of factors counsel strongly against a conclusion that the prosecutor's improper argument so infected the trial with unfairness as to make the resulting conviction a denial of due process. First, the state trial court immediately sustained defense objections to the argument, and the court expressly instructed the jury to disregard the comments vis-à-vis making the victim's parents feel better. Second, while the prosecutor made undisputedly improper argument appealing to emotion, referring to her personal opinion, and disparaging defense counsel, she—contrary to petitioner's assertions-did not misstate the evidence. Third, the evidence of guilt on the sexual assault charge was compelling. Pantano confessed to the crime, and the child victim corroborated his confession to the sexual assault of which he stands convicted. The clear impropriety of the prosecutor's statements under nonconstitutional standards applicable to federal and state prosecutors, again, does not equate to a

due process violation in and of itself. Reasonable jurists thus would not find debatable or wrong this Court's rejection of these claims. **See text, *supra,* at 24–30.**

### Ground 4(c)

In Ground 4(c), petitioner alleges that he was denied rights to due process and a fair trial because of prosecutorial misconduct, contending that the prosecutor improperly elicited testimony from a State witness that lying to a suspect is legal, in an alleged effort to bolster the witness' credibility. Petitioner at bottom has failed to present authority on this claim establishing that the state supreme court's rejection of the claim was contrary to or an unreasonable application of clearly established federal law as determined by the United States Supreme Court applying federal constitutional standards. The Court is not sanguine that it would overturn a conviction on the basis of the challenged testimony even on a *de novo* review. What the prosecutor sought to establish in the testimony is indisputably true—a police officer can lie to a suspect in an effort to ferret out the truth and elicit a confession. It is highly questionable whether the testimony—to which no objection was made as to substance—was objectionable in the first instance. What it was not was a matter that so infected the trial with unfairness as to make the resulting conviction a denial of due process, even without also taking into account the fact that Pantano confessed to the sexual assault with corroborating testimony by the then eight-year-old child victim on that offense. Reasonable jurists thus would not find debatable or wrong this Court's rejection of this claim. **See text, *supra,* at 30–33.**

### Ground 4(d)

**\*62** In Ground 4(d), petitioner alleges that he was denied rights to due process and a fair trial because of prosecutorial misconduct, contending that the prosecutor improperly elicited testimony referencing a prior bad act. The victim's mother testified that petitioner's mother said that she was afraid of him, and the state trial court struck the testimony and instructed the jury to disregard it. The only pos-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

sibly applicable substantive standard on this claim is the general standard of fundamental fairness under the Due Process Clause. There is no indication in the record that the prosecutor intentionally elicited the testimony in question, and every indication instead is to the contrary. Moreover, there is no clearly established law in Supreme Court jurisprudence establishing that the introduction of propensity evidence denies a defendant due process of law. Particularly against the backdrop of the substantial evidence of petitioner's guilt of sexual assault, including his confession and corroborating testimony by the then eight-year-old child victim, the state supreme court's rejection of this claim was neither contrary to nor an unreasonable application of clearly established federal law. Reasonable jurists thus would not find debatable or wrong this Court's rejection of this claim. **See text,** *supra,* **at 33–35.**

### Ground 5(a)

In Ground 5(a), petitioner alleges that he was denied effective assistance when trial counsel allegedly failed to protect his constitutional and statutory rights to a speedy trial. At the outset, while petitioner frames the claim as one of a failure to protect Pantano's state and federal speedy trial rights, he presents no apposite authority establishing that either his state or federal constitutional speedy trial rights in fact were violated. Petitioner in essence claims that he was denied effective assistance because trial counsel did not secure a quicker trial setting after he had invoked his state statutory speedy trial right, albeit without a showing of an actual state or federal constitutional speedy trial violation in and of itself. Petitioner's claim that he was prejudiced because the child victim was coached prior to the trial is based on a selective presentation of the child's testimony and further on speculation. His claim that he was prejudiced because a later trial setting resulted in exculpatory evidence being destroyed is based on wholly flawed logic and speculation. Reasonable jurists would not find debatable or wrong this Court's rejection of this claim. **See text,** *supra,* **at 36–43.**

### Ground 5(b)(1)

In Ground 5(b)(1), petitioner alleges that he was denied effective assistance when trial counsel failed to seek to suppress his confession on the ground that it was involuntary. The record in this Court belies, rather than tends to support, petitioner's bald self-serving *post hoc* assertion that the investigating detective banged on the table and held his fist inches from Pantano's face during the interview. There was no probability that a motion to suppress premised upon such allegations would have led to the suppression of petitioner's confession or to a different result at trial. Petitioner's reliance upon the detective's subterfuge regarding the other evidence that the police had as a basis for suppressing his confession flies in the face of long-established law to the contrary. Further, petitioner's late-breaking reliance for the first time in the federal reply on the fact that he was not given *Miranda* warnings ignores the fact that the interview indisputably was a noncustodial interview. Moreover, as discussed in Ground 5(a), it was petitioner who personally elected on the record to invoke his state statutory speedy trial right in lieu of pursuing a motion and writ seeking to suppress his confession, which was a clear either/or choice under Nevada procedure. In all events, the state supreme court's holding that petitioner could not establish prejudice was neither contrary to nor an unreasonable application of clearly established federal law. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 36–47.**

### Ground 5(b)(2)

**\*63** In Ground 5(b)(2), petitioner alleges that he was denied effective assistance when trial counsel failed to bring forth evidence to demonstrate that his statements to the police were not corroborated by other physical and testimonial evidence. This claim, which was repeated nearly verbatim on federal habeas review from petitioner's *pro se* state papers, is flawed factually, logically and legally. Petitioner's underlying contention that his confession was subject to exclusion and/or was suspect

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

because it was demonstrably false underlies many of his claims. However, petitioner' claim in this regard is completely without merit, as the Court exhaustively details in the discussion of the claim. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text, *supra,* at 48–54.**

*Ground 5(c)*

In Ground 5(c), petitioner alleges that he was denied effective assistance when trial counsel stipulated to the competency of the victim. Petitioner relies upon excerpts from the victim's testimony from the preliminary hearing and trial, not the competency hearing, which occurred prior to *voir dire.* Petitioner's selective presentation omits the responses indicating that the child understood the difference between telling the truth and lying. When the entirety of the child's testimony is considered, including her responses affirming that she would testify truthfully to what happened, it is abundantly clear that there was not a reasonable probability that a competency objection to her testifying would have been sustained. Moreover, the state supreme court found, twice, that the child was competent to testify, first on direct appeal and a second time on state post-conviction review. Petitioner's selective presentation cannot overcome that finding. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text, *supra,* at 54–57.**

*Ground 5(d)(1)*

In Ground 5(d)(1), petitioner alleges that he was denied effective assistance when trial counsel did not object to the admission of the victim's underwear as irrelevant and prejudicial because it was not established to be the underwear that she wore during the sexual assault, contending that it was just as likely that the underwear in evidence had been worn by the victim prior to the incident. On an *arguendo de novo* review, a sufficient foundation for the introduction of the underwear in evidence was established by the victim's testimony that she felt a "nail" in her vagina and bled after the assault,

the mother's testimony that she found stained panties when she was doing the laundry several days after the assault, and the examining physician's testimony that she field tested one of several similar pairs of panties brought by the mother with a positive result for blood. The field-tested panties were the panties placed in, and introduced in evidence as part of, the police sexual assault kit. Petitioner's speculation that the underwear in evidence could have been from prior to the incident went at best to weight, not admissibility. Petitioner's assertion that the medical evidence established that the stain on the underwear could have resulted from poor hygiene in fact was not supported by the actual medical evidence at trial. The lack of objection to introduction of the underwear did not prevent the jury from learning that there were multiple pairs of stained underwear because the examining physician testified from the stand to this very fact. The probative value of the evidence accordingly was not substantially outweighed by a danger of unfair prejudice. Reasonable jurists therefore would not find this Court's rejection of the claim to be debatable or wrong. **See text, *supra,* at 57–63.**

*Ground 5(d)(2)*

**\*64** In Ground 5(d)(2), petitioner alleges that he was denied effective assistance when trial counsel stipulated that it was the victim's blood and DNA on her underwear. Counsel so stipulated only after the police lab results confirmed that the blood on the underwear was the victim's blood, and petitioner has not identified any viable basis for challenging, objecting to and/or excluding testimony presenting the lab's results. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text, *supra,* at 63–64.**

*Ground 5(e)*

In Ground 5(e), petitioner alleges, in the main, that he was denied effective assistance when trial counsel failed to obtain exculpatory evidence allegedly in possession of the State. He contends—directly opposite to his claim in Ground 5(d)(1)—that the underwear in evidence instead

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*was* the underwear worn by the victim and that testing would have shown no semen on the underwear, allegedly belying his confession that he ejaculated "all over" during the assault. However, as discussed with regard to Ground 5(d)(1), the actual evidence at trial did not establish that the underwear necessarily was the underwear worn by the victim during the assault as opposed to underwear potentially worn thereafter with evidence of *sequelae* from her injury. The examining physician's testimony clearly belied any claim that it was established, or even could have been established, that the panties in the sexual assault kit admitted into evidence at trial were "the" panties worn by the victim during Pantano's sexual assault. Petitioner's factual predicate for this claim thus was undercut by the actual trial evidence from the very outset. Further, as is discussed in regard to multiple claims herein, Pantano's statement to the detective—in a context where he had a potential motive to exaggerate to try and explain away the potential presence of his semen where it should not be—that he ejaculated "all over" does not necessarily establish that his semen covered any and all surfaces that thereafter might be tested. As noted as to such similar claims, it is entirely speculative that such testing would have been marginally exculpatory—based upon the absence of a semen on a particular surface—rather than instead directly inculpatory in the event that the panties in evidence not only were the panties worn at the time but also had semen on them. Moreover, petitioner's underlying legal premise that his confession was admissible only if every jot and tittle of his statement to the police was corroborated or proved true is fundamentally flawed. Reasonable jurists therefore would not find this Court's rejection of the claim to be debatable or wrong. **See text,** *supra,* **at 64–67.**

*Ground 5(f)*

In Ground 5(f), petitioner alleges that he was denied effective assistance when trial counsel failed to adequately cross-examine witnesses. In the federal reply, petitioner does not provide any specific argument regarding any of the alleged inconsisten-cies but instead merely refers *in globo* to the alleged inconsistencies set forth in the amended petition. On the largely conclusory and formulaic argument presented, in a case where petitioner confessed to inserting his finger into the vagina of a seven-year-old child, reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text,** *supra,* **at 67–68.**

*Ground 5(g)*

**\*65** In Ground 5(g), petitioner alleges that he was denied effective assistance when trial counsel failed to confer with him, failed to file appropriate pretrial motions, and failed to put forth a proper defense. As discussed in detail herein, petitioner's claims in Ground 5(g) either duplicate other claims in the amended petition and/or present claims that are belied by the actual state court record. Reasonable jurists would not find this Court's rejection of the claims in Ground 5(g) to be debatable or wrong. **See text,** *supra,* **at 68–73.**

*Ground 5(h)*

In Ground 5(h), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present an alleged alibi defense. On federal habeas review, petitioner cites to a purported affidavit in the state court record that it does not appear ever in fact was presented in state court in support of the bald assertions in petitioner's state papers. Moreover, the purported alibi testimony would not exclude all of the time period in which the offense potentially could have been committed. In all events, there was not a reasonable probability that testimony by a friend or friends seeking to establish that petitioner was not present at the victim's residence after a particular time would have altered the outcome at trial—given Pantano's confession to inserting his finger into the vagina of a seven-year-old child, with corroborating testimony by the victim as to the sexual assault. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 73–75.**

*Ground 5(i)*

In Ground 5(i), petitioner alleges that he was

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

denied effective assistance when trial counsel failed to investigate and present testimony by Pantano's sister, Maria Pantano (Rosero), that the victim's mother and father had a motive to fabricate their testimony based on their allegedly owing money to Pantano. At the outset, the state court exhibits referenced in the federal amended petition do not state what petitioner states that they do. In all events, petitioner cannot establish the requisite prejudice on this claim. There was not a reasonable probability that such alleged fabrication testimony would have altered the outcome at trial, given Pantano's confession to inserting his finger into the vagina of a seven-year-old child. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 75–76.**

### Ground 5(j)

In Ground 5(j), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony by his mother to refute testimony by the victim's mother regarding an alleged prior bad act. The claim pertains to the testimony discussed as to Ground 4(d) wherein the victim's mother testified that petitioner's mother said that she was afraid of him. The state trial court struck the testimony and instructed the jury to disregard it. It of course would have taken considerable prescience for defense counsel to investigate this unanticipated testimony before trial. Petitioner in any event cannot demonstrate prejudice. It was improbable to the extreme that the state trial court would have permitted the defense to present testimony to respond to testimony on a collateral matter that had been stricken in the first instance. Even if such testimony were allowed, there was not a reasonable probability of a different outcome at trial given Pantano's confession and the victim's corroborating testimony. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 76–78.**

### Ground 5(k)

**\*66** In Ground 5(k), petitioner alleges that he was denied effective assistance when trial counsel

failed to investigate and present testimony establishing that he allegedly did not have a cell phone. As discussed in rejecting a virtually identical claim under Ground 5(b)(2), it would have impossible for defense counsel to conclusively prove the negative that Pantano did not have at the very least a borrowed phone or other phone not in his name in May 2003. All to support the strained inference that because Pantano, allegedly, lied to the police about the collateral point of having a cell phone he therefore lied to the police about inserting his finger into the vagina of a seven-year-old child. Moreover, petitioner's statement to the police in this regard was not uncorroborated because the victim testified that Pantano handed a cell phone with games to her brother to play with during the sexual assault. Nor has petitioner cited apposite case law establishing that he would have been able to prevent introduction of his confession at trial based on this strained argument. Reasonable jurists thus would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 78–79.**

### Ground 5(l)

In Ground 5(l), petitioner alleges that he was denied effective assistance when trial counsel failed to investigate and present testimony establishing that the victim's parents coached her testimony. In principal part, the allegations in federal court are based upon bald, unsupported allegations in Pantano's state post-conviction papers. The purported affidavits cited on federal review in fact were not attached with Pantano's state papers. The purported testimony that is described in petitioner's state memorandum in any event would have been subject to substantial hearsay issues. None of the purported testimony was based on personal observation of such alleged coaching. Petitioner cannot demonstrate prejudice based upon what in truth was a speculative claim of coaching based on such hearsay, given that Pantano confessed to inserting his finger into the vagina of the seven-year-old child. Reasonable jurists thus would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 79–81.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*Ground 5(m)*

In Ground 5(m), petitioner alleges that he was denied effective assistance when trial counsel failed to challenge a jury instruction stating that the victim's testimony, if believed beyond a reasonable doubt, was sufficient and that no corroboration of the victim's testimony was required in that circumstance. The Ninth Circuit has held that a substantially identical California jury instruction does not violate due process. Petitioner cannot establish under the doubly deferential standard of review of *Strickland* claims under AEDPA that counsel's failure to challenge the instruction in the February 2004 trial provides a basis for federal habeas relief. Reasonable jurists thus would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 81–83.**

*Ground 5(n)*

**\*67** In Ground 5(n), petitioner alleges that he was denied effective assistance when trial counsel failed to object to alleged vouching for the credibility of the victim's mother's testimony by the physician who performed the sexual assault examination. Petitioner's core premise on this claim is fundamentally flawed, as the physician's testimony did not vouch for the credibility of any witness. Petitioner cannot demonstrate the requisite prejudice, particularly given his confession to the sexual assault. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 83–85.**

*Ground 5(o)*

In Ground 5(o), petitioner alleges that he was denied effective assistance when trial counsel failed to obtain an independent psychological examination of the child victim to assess her propensity for veracity. It is subject to substantial question at the very outset whether a motion for a psychological examination would have been successful under the applicable Nevada state case law at the time. In all events, however, given Pantano's confession to inserting his finger into the vagina of the seven-year-old child, the state supreme court's holding

that petitioner could not establish a reasonable probability of a different outcome at trial but for counsel's performance in this regard was neither contrary to nor an unreasonable application of *Strickland.* Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 85–86.**

*Ground 6(a)*

In Ground 6(a), petitioner alleges that he was denied effective assistance when appellate counsel failed to include the audio recording and transcript of his confession into the record before the state supreme court on direct appeal. These items similarly were not presented to the state supreme court in the record presented on state post-conviction review, and the federal record is restricted to what was presented on state review. In all events, as discussed as to Ground 3, petitioner cannot demonstrate prejudice. First, the transcript itself and state court record belies petitioner's principal factual contentions. Second, allegedly "excessive" blanks in the transcript—with respect to an audio recording that the jury heard at trial—did not give rise to a due process violation. Reasonable jurists would not find this Court's rejection of this claim to be debatable or wrong. **See text,** *supra,* **at 87–89.**

*Ground 6(b)*

In Ground 6(b), petitioner alleges that he was denied effective assistance when appellate counsel failed to inform the state supreme court on direct appeal that his statements to police investigators were false and not supported by corroborating facts. As the Court noted with respect to Ground 5(b)(2), the underlying substantive claim is flawed factually, logically and legally. Appellate counsel's failure to pursue such a completely meritless claim was not a deprivation of effective assistance of counsel. While petitioner has sought to base a number of his claims on the premise that his confession was false, this meritless argument is the weakest link in, not the strength of, his petition. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text,** *supra,* **at 89–90.**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Slip Copy, 2012 WL 3929515 (D.Nev.)
**(Cite as: 2012 WL 3929515 (D.Nev.))**

*Ground 6(c)*

**\*68** In Ground 6(c), petitioner alleges that he was denied effective assistance when appellate counsel failed to communicate and confer with him regarding the issues to be pursued on appeal. The discussion as to Grounds 6(a) and 6(b) demonstrates that petitioner cannot demonstrate prejudice on this claim as well. A defendant of course does not have a right to have appellate counsel present every nonfrivolous claim that he would wish to pursue. Reasonable jurists would not find this Court's rejection of the claim to be debatable or wrong. **See text,** *supra,* **at 90–91.**

*Ground 7*

In Ground 7, petitioner alleges that he was denied rights to due process and a fair trial due to the cumulative effect of the alleged trial errors raised on direct appeal combined with the alleged instances of ineffective assistance of counsel raised on state post-conviction review. On *de novo* review, including as to the underlying individual claims, petitioner has not demonstrated, substantially for the reasons noted previously, the presence of constitutional error in isolation. Reasonable jurists would not find the rejection of his cumulative error claim to be debatable or wrong. **See text,** *supra,* **at 91–92.**

A certificate of appealability thus will be denied as to all claims herein.

IT THEREFORE IS ORDERED that the petition is DENIED on the merits and that this action shall be DISMISSED with prejudice.

IT FURTHER IS ORDERED that a certificate of appealability is DENIED as to all claims. **See text,** *supra,* **at 92–107.**

The Clerk of Court shall enter final judgment accordingly in favor of respondents and against petitioner, dismissing this action with prejudice.

D.Nev.,2012.
Pantano v. Donat

Slip Copy, 2012 WL 3929515 (D.Nev.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT TWO

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

H

Only the Westlaw citation is currently available.

United States District Court, W.D. North Carolina,
Asheville Division.
Richard Allen JACKSON, Petitioner,
v.
UNITED STATES of America, Respondent.

Civil No. 1:04cv251.
Criminal No. 1:00cr74.
July 13, 2010.

West KeySummary**Criminal Law 110** 🔑1891

110 Criminal Law
   110XXXI Counsel
      110XXXI(C) Adequacy of Representation
         110XXXI(C)2 Particular Cases and Issues
            110k1891 k. Preparation for Trial.
Most Cited Cases

   Defense counsel's investigation into the scientific basis of the Government's theory that the defendant tortured his victim with a stun gun was not deficient performance, as required to support a claim of ineffective assistance of counsel, in a trial for capital murder. Counsel secured both the appointment of a forensic pathologist and a mathematician to counter the Government's evidence that a stun gun was used on the victim. Counsel also moved for the appointment of a forensic anthropologist to testify that the alleged stun gun marks actually were the result of insect infestations and moved to subpoena the forensic pathologist who testified at the defendant's state capital trial that the marks were not stun gun marks. The cross-examination of the Government's expert showed that the defense experts had assisted counsel as to the manner in which to approach stun gun evidence. Futhermore, counsel had consulted a forensic entomologist who opined that the marks on the victim's body were consistent with post-mortem insect activity colonizing a corpse, which information was used during cross-examination. U.S.C.A.

Const.Amend. 6.

M. Gordon Widenhouse, Jr., Rudolf, Widenhouse & Fialko, Chapel Hill, NC, Shelagh Rebecca Kenney, Durham, NC, for Petitioner.

Jeffrey Bradford Kahan, United States DOJ, Capital Case Unit, Washington, DC, Richard Lee Edwards, United States Attorney, Asheville, NC, for Respondent.

*ORDER*
MARTIN REIDINGER, District Judge.
   **\*1 THIS MATTER** is before the Court on the Petitioner's Request for Certificate of Appealability [Doc. 54.].

**PROCEDURAL HISTORY**[FN1]

   FN1. A more complete procedural history can be found in the Court's Order denying Petitioner's § 2255 Motion to Vacate. [Doc. 47].

   The Petitioner's conviction and sentence of death became final on November 17, 2003. *Jackson v. United States of America,* 540 U.S. 1019, 124 S.Ct. 566, 157 L.Ed.2d 434 (2003) (petition for writ of *certiorari* denied). In 2004, the Petitioner filed a Motion to Vacate, Set Aside or Correct Sentence pursuant to 28 U.S.C. § 2255, which was denied on June 19, 2009. [Doc. 47]. His Motion to Alter or Amend Judgment was denied on August 26, 2009. [Doc. 52]. The Petitioner filed the pending Request for Certificate of Appealability on October 26, 2009 and the Government responded on January 6, 2010. [Doc. 54; Doc. 60]. The Petitioner's Reply was filed on January 25, 2010. [Doc. 63]. The Petitioner seeks leave to appeal the denial of some of the claims which were asserted in the § 2255 motion. [Doc. 47].

**STANDARD OF REVIEW**
   Orders denying a motion pursuant to § 2255

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

are not appealable unless a court issues a certificate of appealability (COA). 28 U.S.C. § 2253(c)(1). A COA may issue only if the Petitioner makes a "substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2). A petitioner satisfies this standard by demonstrating that "reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong" and that any dispositive procedural ruling by the district court is also debatable. *Miller–El v. Cockrell,* 537 U.S. 322, 336–38, 123 S.Ct. 1029, 154 L.Ed.2d 931 (2003), *quoting Slack v. McDaniel,* 529 U.S. 473, 484, 120 S.Ct. 1595, 146 L.Ed.2d 542 (2000).

### DISCUSSION

**I. Denial of an evidentiary hearing**

The Petitioner claims that the Court [FN2] erred by failing to grant him an evidentiary hearing but does not identify the claims as to which a hearing was required. [Doc. 54, at 4]. He argues generally that the Court's failure to hold an evidentiary hearing is a matter about which "reasonable jurists could debate' or is 'adequate to deserve encouragement to proceed further." [*Id.* (citation omitted) ].

> [FN2.] This case was reassigned to the undersigned when Hon. Lacy H. Thornburg retired.

It is first noted that the denial of an evidentiary hearing is not a dispositive procedural ruling. *United States v. Dixon,* 208 Fed.Appx. 257 (4th Cir.2006), *certiorari denied* 552 U.S. 933, 128 S.Ct. 327, 169 L.Ed.2d 231(2007) (declining to issue certificate of appealability as to claim that court should have conducted evidentiary hearing on § 2255 motion); *accord, United States v. Michael,* 141 Fed.Appx. 208 (4th Cir.2005); *Garcia v. United States,* 2007 WL 1652537 (W.D.N.C.2007).

In order to obtain a COA, the Petitioner must show that "reasonable jurists would find the district court's assessment of [a] *constitutional* claim [ ] debatable or wrong.' " *Miller–El,* 537 U.S. at 338 (citation and internal quotation marks omitted) (emphasis provided). A petitioner's right to an evid-

entiary hearing in connection with a motion pursuant § 2255 is governed by the statute which provides that a hearing is not required when "the motion and the files and records of the case conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b). The Petitioner's argument is based on his conclusion that the statutory scheme presumes that a hearing will be granted. To the contrary, the statute does not provide for a hearing in every case and, as noted by the Court, "[i]n this case, it is particularly compelling that almost every allegation of ineffective assistance or other ground for relief is refuted by the contemporaneous record." [Doc. 52, at 4].

**\*2** In concluding that a hearing was not required, the Court stated:

As the Court which presided over all pretrial proceedings as well as the trial of the action, the undersigned is uniquely qualified to compare the contentions of ineffective assistance of counsel with the contemporaneous conduct and statements of counsel. Moreover, concerning the other issues raised in this motion, it is clear from the pleadings, files and records that the Petitioner is not entitled to any relief; therefore, the [Court] concludes that a hearing is not required. "A § 2255 motion 'can be dismissed without a hearing if (1) the petitioner's allegations, accepted as true, would not entitle the petitioner to relief, or (2) the allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact."

[Doc. 47, at 22–24] (citations omitted).

Although the Petitioner has argued that he should have been given an evidentiary hearing, he has not identified a constitutional right tied to the failure to hold a hearing. In fact, the Petitioner has not identified the issues as to which he claims a hearing was necessary. "If no constitutional violation is asserted, the non-constitutional claims are only considered to the extent that they are connec-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

ted to a claim on which a COA is granted." *Alix v. Quarterman,* 309 Fed.Appx. 875, 878 (5th Cir.2009), *certiorari denied* —— U.S. ——, 130 S.Ct. 364, 174 L.Ed.2d 52 (2009); *United States v. Hadden,* 475 F.3d 652, 660 n. 5 (4th Cir.2007) (rejecting COA because the alleged errors under § 2255 were not of constitutional dimension); *Dixon,* 208 Fed. Appx. at 257 (refusing to issue COA based on court's failure to conduct hearing on § 2255); *United States v. Squillacote,* 183 Fed.Appx. 393 (4th Cir.2006) (granting COA as to claim that hearing in § 2255 proceeding should have been held on issue of whether prisoner had been denied the right to testify at trial). The Petitioner having failed to establish either, no COA may issue.

**II. Exclusion of affidavits**

The Petitioner seeks a COA on the issue of whether the Court improperly refused to consider six affidavits offered in support of the 22 ineffective assistance of counsel claims raised in his § 2255 motion.[FN3] Most of the affidavits were those of attorneys who had prior experience litigating capital cases.[FN4]

> FN3. The affidavits were attached as exhibits to the Petitioner's supplemental memorandum in support of his motion to vacate. [Doc. 17, at Exhibits. 6, 15, 28, 34, 36, 85].

> FN4. The Petitioner also contends that the Court excluded the affidavits of trial counsel from consideration. [Doc. 54, at 10]. This is a misstatement of the record. Judge Thornburg made reference to these affidavits of trial counsel in his decision regarding the § 2255 Motion when adjudicating the Petitioner's allegations of ineffectiveness and concluded that they either did not support his allegations or were contradicted by the contemporaneous record.

The Petitioner first claims that the Court made an erroneous procedural ruling by excluding the affidavits. That ruling, however, is not a dispositive procedural ruling and thus, there is no issue of whether reasonable jurists could find the ruling debatable. *Slack,* 529 U.S. at 484–85; 28 U.S.C. § 2246 (granting discretion to habeas court to consider affidavits).

The Petitioner also claims that the exclusion of these affidavits deprived him of the ability to show ineffective assistance of counsel. Whether the Petitioner has established a valid Sixth Amendment ineffective assistance claim is a mixed question of fact and law. *U.S. v. Nicholson,* 475 F.3d 241, 248 (4th Cir.2007) (citation omitted). The attorneys who provided the affidavits relied at least partially on facts outside the record of these proceedings.[FN5] Indeed, the attorneys offered their opinions on the reasonableness of trial counsel's actions and drew the legal conclusion that counsel were ineffective. The Court concluded that the affidavits were excludable because they presented legal conclusions on an ultimate issue of law.

> FN5. For example, one of the affiants relates experiences he had with one of Jackson's trial counsel in an unrelated capital trial. [Doc. 17 Ex. 85 ¶¶ 21–26.]

**\*3** Although not designated as such by the Petitioner, it is evident that he relies on these affiants as experts in the field of capital litigation. An expert's opinion on an issue of law, in this case whether counsel were ineffective, may be excluded from consideration of the merits of an issue. *United States v. McIver,* 470 F.3d 550, 562 (4th Cir.2006), *certiorari denied* 550 U.S. 936, 127 S.Ct. 2276, 167 L.Ed.2d 1094 (2007) ("[O]pinion testimony that states a legal standard or draws a legal conclusion by applying law to the facts is generally inadmissible"). Furthermore, "when an expert witness is not in a better position than the fact finder to render an opinion on a matter, [for example the reasonableness of counsel's actions,] it is not error to exclude that [expert] witness' testimony." *Noland v. French,* 134 F.3d 208, 217 (4th Cir.1998), *certiorari denied* 525 U.S. 851, 119 S.Ct. 125, 142 L.Ed.2d 101 (1998). Moreover, to the extent that trial counsel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

made strategic decisions, "the reasonableness of a strategic choice is a question of law to be decided by the court, not a matter subject to factual inquiry and evidentiary proof." *Provenzano v. Singletary,* 148 F.3d 1327, 1332 (11th Cir.1998), *rehearing denied* 162 F.3d 100 (11th Cir.1998). The affiants were therefore in no better position than the Court to assess the adequacy of trial counsel's performance.

Additionally, the Court found the attorneys, through the affidavits, did not provide true expert opinions because their opinions were based on subjective opinion instead of statements of fact. As the Court noted:

> Statements in affidavits filed years after the trial do not create credibility issues when trial counsel's documented contemporaneous statements show the contrary because, in that event, the allegations do not warrant relief pursuant to § 2255 . Such documented contemporaneous statements include, for example, vouchers submitted by trial counsel which show the [voluminous] amount of time spent in trial preparation.

> [Doc. 52, at 10].

For the foregoing reasons, the Court concludes that the Petitioner is not entitled to the issuance of a COA on this issue.

### III. Stun gun evidence

In Claim III of his Motion to Vacate, the Petitioner alleged that trial counsel were ineffective for failing to investigate adequately and challenge the scientific basis for a government witness's testimony regarding the Petitioner's use of a stun gun during the crime. In Claims IV and V, he alleged that counsel were ineffective for failing to challenge the admissibility of the government witness's testimony.

### A. Investigation of stun gun theory

The Petitioner argued that trial counsel conducted an inadequate investigation into the scientific

basis of the Government's theory that Petitioner tortured the victim with a stun gun. The Court concluded that trial counsel conducted a reasonable investigation of the Government's stun gun theory. The Petitioner now claims that reasonable jurists would find this ruling debatable.

**\*4** As noted by the Court in its decision, trial counsel secured the appointment of both a forensic pathologist and a mathematician to counter the Government's evidence that a stun gun was used on the victim. Additionally, counsel moved for the appointment of a forensic anthropologist to testify that the alleged stun gun marks actually were the result of insect infestations. That request was denied, as was counsel's motion to subpoena the forensic pathologist who testified at the Petitioner's state capital trial and who was expected to testify at the federal trial that the marks were not stun gun marks. The fact that the Court denied counsel's requests for experts is not ineffective assistance of counsel. See, *e.g., Moore v. Reynolds,* 153 F.3d 1086, 1099 (10th Cir.1998), *certiorari denied* 526 U.S. 1025, 119 S.Ct. 1266, 143 L.Ed.2d 362 (1999) ("Whittaker filed a motion for funds to hire a mental health expert, but the trial court denied that request. Moore offers no explanation in his habeas petition concerning how Whittaker could have discovered and presented this information without receiving the requested funds."); *Barnes v. Johnson,* 184 F.3d 816 (5th Cir.1999), *certiorari denied* 528 U.S. 974, 120 S.Ct. 421, 145 L.Ed.2d 329 (1999).

Indeed, the questioning by trial counsel on cross-examination of the Government's expert, Dr. Robert Stratbucker, clearly showed that the defense experts had assisted trial counsel as to the manner in which to approach the stun gun evidence. For example, although not provided any funds with which to do so, counsel consulted a forensic entomologist who opined that the marks on Karen Styles' body were consistent with post-mortem insect activity and that he did not see any marks on her body "inconsistent with the natural process of insects colonizing a corpse." [Doc. 49 Ex. 3: Byrd Aff. ¶¶

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

7–10]. This information, as well as that received from the other experts, was used during cross-examination.

The Court cannot find, in light of these efforts on the part of trial counsel, that reasonable jurists could debate that counsel were ineffective as to this preparation and investigation.

**B. Admissibility of expert testimony**

The Petitioner also alleged that counsel failed to challenge the scientific basis of Dr. Stratbucker's testimony under *Daubert.*[FN6] The record shows otherwise.

> FN6. *Daubert. v. Merrill Dow Pharmaceuticals,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993).

In addition to hiring and/or consulting the experts referenced in the previous section of this Order, counsel moved twice for a *Daubert* hearing to challenge two potential Government stun gun experts. The Government ultimately decided to call a third expert, Dr. Stratbucker. Prior to his testimony, the Court conducted a *Daubert* hearing at which trial counsel challenged the validity of Dr. Stratbucker's opinion, arguing that it was based only upon review of photographs, not a review of the victim's body; the opinion relied on testimony from the state trial, and the opinion was not reliable under *Daubert.* Counsel also argued that the Government had failed to meet its burden under *Daubert* because it had failed to produce the testimony and documentary evidence upon which Dr. Stratbucker had relied to form his opinion.

**\*5** The record shows that trial counsel did in fact challenge the scientific basis for Dr. Stratbucker's opinion and used the information received from defense experts to attack Dr. Stratbucker on cross-examination.

The Petitioner also alleged that counsel failed to "aggressively" pursue a pretrial *Daubert* hearing, as opposed to a hearing at the time of trial. As this

Court has noted previously, trial counsel twice moved for a pre-trial *Daubert* hearing. However, as was the custom of the trial Court, the hearing was deferred until the time of trial. Counsel were not ineffective for failing to raise a third motion for a pre-trial *Daubert* hearing in the face of guaranteed rejection by the Court.

The Court finds that no COA should issue as to these claims.

**IV. Claims related to the investigation and presentation of mitigating evidence at sentencing**

Petitioner seeks a COA for a number of ineffective assistance of counsel claims related to the mitigation defense presented during the sentencing phase of the trial. Each raises a specific allegation of ineffectiveness, but all allege that counsel conducted an inadequate mitigation investigation.

**A. The Petitioner's biological sister**

The Petitioner seeks to appeal the Court's rejection of his claim that trial counsel were ineffective for not discovering, obtaining, and passing on to his mental health experts all mitigating evidence regarding the Petitioner's biological sister. He argues that this information was critical for a complete assessment of his mental health. However, none of the post-conviction affidavits provided by the Petitioner's mental health experts states how additional information about his sister would have affected their diagnoses of the Petitioner or altered their proposed testimony. Claudia Coleman, Ph.D., the Petitioner's forensic psychologist and neuropsychologist at trial, merely stated that the additional information about the Petitioner's sister would have been "relevant" to her evaluation. [Doc. 17: Ex. 9, Coleman Aff. ¶ 13.] Dr. Seymour Halleck, the Petitioner's forensic psychiatrist, makes no mention of the Petitioner's biological sister in his affidavit. [*Id.* at Ex. 16]. Pamela Laughon, Ph.D., a psychologist who was the Petitioner's mitigation investigator at trial, does not refer to the additional information about the Petitioner's sister in her post-conviction affidavit. [*Id.* at Ex. 25]. In short, the Petitioner has failed to provide any factual support for the allega-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

tions made in this claim. *Strickland v. Washington,* 466 U.S. 668, 689, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984) (to require counsel to raise every possible colorable issue "would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions.").

The Petitioner also seeks to appeal the Court's rejection of his claim that counsel were ineffective for failing to introduce evidence of his biological sister's mental health problems. At the sentencing trial, this Court refused to allow lay testimony about the sister's mental health problems unless the defense also presented expert testimony establishing a link between the Petitioner's alleged mental conditions and those of his sister. This holding was affirmed on direct appeal. *United States v. Jackson,* 327 F.3d 273 (4th Cir.2003), *certiorari denied* 540 U.S. 1019, 124 S.Ct. 566, 157 L.Ed.2d 434 (2003). In the Motion to Vacate, the Petitioner argued that several of his mental health experts had the necessary information to establish such a link and trial counsel rendered ineffective assistance by not presenting their testimony. The Court rejected the claim because trial counsel had made a strategic decision not to present expert mental health testimony at the penalty phase in order to avoid damaging rebuttal testimony from the Government's mental health expert.

**\*6** Prior to trial, the Government provided notice, in writing, that during the penalty phase of the trial, it would introduce mental health evidence only to rebut mental health evidence introduced by the Petitioner during his case-in-chief. [Criminal Case No. 1:00cr74, at Doc. 33.] On April 19, 2001, the Government and defense counsel entered into a consent order pursuant to which the report of the Government's mental health expert, Dr. Park Dietz, and the videotapes of his interviews with Petitioner were disclosed to defense counsel. [*Id.,* at Doc. 132]. After reviewing Dr. Dietz's report, watching the videotapes of his interviews with the Petitioner, and discussing the report with at least one of the de-

fense experts, trial counsel, on May 8, 2001, withdrew their notice of intent to offer evidence of mental condition during the penalty phase of the trial. [*Id.,* at Doc. 177]. It is evident from that very intentional act that trial counsel concluded the mitigating mental health evidence would not have outweighed the damaging impact of Dr. Dietz's testimony, report, and interview tapes offered by the Government in rebuttal.

As he did in his habeas claim, Petitioner labels as "unfounded" counsel's fear that expert testimony showing a genetic connection between the siblings' mental health issues would open the door to rebuttal from government mental health experts. Petitioner made no attempt in his Motion to Vacate to support this conclusory accusation with actual evidence or citation to law. Nor does he make up for that deficiency here. For these reasons the Court will not issue a COA based on this issue. *Sanders v. United States,* 314 Fed.Appx. 212 ——2 (11th Cir.2008) (decision not to call witness "was strategic, and we will not second guess it."); *Chandler v. United States,* 218 F.3d 1305, 1314 n. 14 (11th Cir.2000) ("calling some witnesses and not other is 'the epitome of a strategic decision.' "); *United States v. Jenkins,* 132 Fed.Appx. 743 (10th Cir.2005) (declining to issue certificate of appealability as to counsel's strategic decision regarding examination of witness).

**B. The failure to conduct adequate mitigation investigation**

The Petitioner contends that because his trial counsel conducted an inadequate mitigation investigation they were unable to make reasoned, strategic decisions about whether to offer expert mental health testimony or to call witnesses in addition to Sally Jackson, the Petitioner's mother.

To prepare for sentencing, trial counsel requested and received a mitigation specialist, Pam Laughon, Ph.D., who conducted the mitigation investigation. She uncovered a great deal of medical and social information about the Petitioner's biological family. See, *American Bar Association Guidelines*

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

*for the Appointment and Performance of Counsel in Death Penalty Cases* 11.4.1(C), 11.8.3(F.2), 11.8.6(B), 11.8.6 cmt.; 1.1 cmt. 5.1.1(A.v), 11.4.1. (1989) (ABA Guidelines); 1 ABA Standards for Criminal Justice 4–4.1, cmt. P.4–55 (2d ed.1982). It was not unreasonable for counsel to rely on Dr. Laughon to discover potential witnesses and to conduct interviews. She was a professional and an expert in her field, and she had worked competently with both defense attorneys on previous occasions. "It is certainly within the 'wide range of professionally competent assistance' for an attorney to rely on properly selected experts." *Fields v. Brown,* 431 F.3d 1186, 1205 (9th Cir.2005), *certiorari denied* 552 U.S. 1314, 128 S.Ct. 1875, 170 L.Ed.2d 752 (2008), *quoting Harris v. Vasquez,* 949 F.2d 1497, 1525 (9th Cir.1990), *certiorari denied* 503 U.S. 910, 112 S.Ct. 1275, 117 L.Ed.2d 501 (1992).

**\*7** Additionally, trial counsel hired a forensic psychiatrist, a future dangerousness expert, and a neuropsychologist. Counsel subpoenaed the Petitioner's records from the United States Navy, the North Carolina Department of Corrections, the Buncombe County Detention Facility, the North Carolina Department of Social Services, the Juvenile Court for Buncombe County, the Blue Ridge Mental Health Center, and the Buncombe County Health Department. *ABA Guidelines.* The Court denied counsel's request to subpoena the Department of Social Services' records for the Petitioner's biological mother and sister. Counsel nonetheless obtained the Petitioner's academic records, reviewed the mitigation evidence offered at the state trial and consulted with the Petitioner's state trial attorneys. Counsel interviewed the Petitioner's adoptive mother, biological mother, relatives of both mothers and some of his foster parents. His mitigation specialist and mental health experts interviewed others, including the adoptive parents of the Petitioner's biological sister.

The Petitioner's complaint is that counsel failed to discover all of the potentially mitigating evidence. The Supreme Court, however, has never held

that counsel's mitigation investigation must be anything but reasonable and it has not laid down a requirement that counsel must uncover every available piece of mitigating information about a defendant. See, *e.g., Rompilla v. Beard,* 545 U.S. 374, 125 S.Ct. 2456, 162 L.Ed.2d 360 (2005); *Wiggins v. Smith,* 539 U.S. 510, 123 S.Ct. 2527, 156 L.Ed.2d 471 (2003); *Williams v. Taylor,* 529 U.S. 362, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). Neither this trilogy of cases nor *Strickland* requires "defense counsel to 'investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing.' " *Gray v. Branker,* 529 F.3d 220, 228–29 (4th Cir.2008), *certiorari denied* 129 S.Ct. 1579, 173 L.Ed.2d 678 (2009), *quoting Wiggins,* 539 U.S. at 533. "Instead, [the cases] impose[ ] upon counsel 'a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.' " *Id.* In light of the investigative efforts taken by trial counsel, the Court finds that there is no reasonably debatable issue with respect to the adequacy of counsel's mitigation investigation. *See Strickland,* 466 U.S. at 687.

**C. Lay witness testimony**

Next, the Petitioner seeks to appeal the Court's rejection of his claim that trial counsel unreasonably decided to call only one lay witness, Sally Jackson, at sentencing. As with his other ineffective assistance of counsel claims, the Petitioner first alleged that counsel's mitigation investigation was inadequate. The Petitioner, however, failed to identify any mitigating evidence uncovered during post-conviction proceedings which was unknown to trial counsel. Instead, the Petitioner merely presented all of the evidence to which various lay witnesses potentially could have testified, had they been called.

**\*8** Most of this information is found in the reports of the Petitioner's mental health experts and mitigation specialist. Consequently, Petitioner failed to provide factual support for his allegation that counsel's investigation was inadequate.

The crux of this claim is the decision by trial

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

counsel to offer lay mitigation testimony only through Sally Jackson, the Petitioner's adoptive mother. After having conducted a reasonable mitigation investigation, counsel lined up a number of lay witnesses who could have testified about the Petitioner's life prior to his adoption by the Jacksons or who could have corroborated Sally Jackson's testimony about the Petitioner after his adoption. [Doc. 17, Ex. 4: Belser Aff. ¶ 19; Ex. 25: Laughon Aff. ¶ 14; Ex. 27: Lindsey Aff. ¶ 26.]. Counsel also had intended to call at least one of the adoptive parents of the Petitioner's biological sister. To do so, however, would have required that counsel present expert mental health testimony which, in turn, would have opened the door to damaging rebuttal testimony from the Government's mental health expert. For these and other reasons presented in the Court's § 2255 decision, counsel made the strategic decision not to call any lay witnesses other than Sally Jackson.[FN7] The Court concluded that trial counsel's decision was a reasoned and strategic one. [Doc. 47, at 70–77]. The rejection of these claims does not create a reasonably debatable issue. Indeed, on direct appeal the Fourth Circuit found Mrs. Jackson's testimony "was broad-ranging, and the conclusions that could have been made [concerning mitigation] covered everything from Jackson's childhood, his disabilities, his mental condition, his intelligence, his remorse, his ability to hold jobs, his social deficiencies, and more." *Jackson,* 327 F.3d at 293–94.

> FN7. For example, counsel were rightfully wary of calling witnesses concerning the Petitioner's life with the Jacksons. During his state court trial, it appears that such evidence of an upper middle class lifestyle backfired.

### V. Failure to secure additional experts for trial

The Petitioner argued in the § 2255 motion that trial counsel should have provided all mitigating evidence to his mental health experts because, had they done so, those experts would have diagnosed him differently resulting in additional experts in the

fields of early childhood development and developmental disorders. This argument overlooks the strategic decision made by trial counsel not to inject the Petitioner's mental health into the sentencing phase of the trial in order avoid the damning testimony of Dr. Dietz and the videotape of his interview with the Petitioner.

Moreover, during post-conviction proceedings, the Petitioner moved the Court for the appointment of an expert in early childhood development and developmental disorders. In refusing that request, the Court pointed out that each of the following previously appointed experts had been qualified to testify to such matters: Seymour Halleck, Pam Laughon, Mark Cunningham, and Claudia Coleman. [Doc. 47, at 97].

Dr. Halleck stated that he had reviewed at least a portion of the Petitioner's mental health records. Dr. Coleman, the Petitioner's forensic psychologist and neuropsychologist, testified that her review of subsequent records confirmed her diagnosis of a developmental disorder. Neither of the Petitioner's trial counsel stated they would have changed their strategy regarding presentation of expert mental health testimony had they had a firm diagnosis of autism or any other developmental disorder.

**\*9** The Petitioner's argument rests on the speculative assumption that had trial counsel moved during pre-trial proceedings for the appointment of additional experts, the Court would have granted those motions. That assumption is highly unlikely in light of the Court's previous appointment of three mental health experts and a mitigation specialist with a doctorate in psychology. As previously noted by the Court, any one or more of these witnesses had the expertise to testify regarding the impact of biological factors and early childhood experiences on mental development. Reasonable jurists would not find the Court's handling of these claims debatable or wrong.

### VI. Sally Jackson

The Petitioner also claimed that trial counsel

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

failed to collect all available mitigating evidence from Sally Jackson, their sole penalty phase witness. Had they done so, Petitioner contends, counsel would have discovered a wealth of mitigating evidence that was critical to his mental health experts in performing their evaluations.

The evidence the Petitioner claims should have been elicited is that the Petitioner was afraid of the dark as a child; he had a heightened sensitivity to light; he spoke in an extremely loud voice when excited; he could only calm down after being given a stimulant [sic]; and his behavior during high school was so aberrant that his father began to have a drinking problem. None of the Petitioner's mental health experts mentioned this evidence in their post-conviction affidavits and none of them claimed the evidence was crucial to their ability to accurately diagnose Petitioner. Indeed, the evidence appears merely cumulative and when weighed with all of the other mitigating evidence against the aggravating evidence, there is no reasonable probability that the undiscovered evidence would have changed the jury's verdict. *Wiggins,* 539 U.S. at 534.

**VII. Absence of a mental health defense**

The Court rejected the Petitioner's argument in the § 2255 motion that trial counsel were ineffective for electing not to present a mental health defense at sentencing. As has been discussed previously, the decision not to offer expert mental health testimony was a reasoned, strategic one.

Prior to trial, the Government provided notice, in writing, that during the penalty phase of the trial, it would introduce mental health evidence only to rebut mental health evidence introduced by the Petitioner during his case-in-chief. [Case No. 1:00cr74, Doc. 33.] By early December 2000, trial counsel had obtained the appointment of a forensic psychiatrist, Dr. Seymour Halleck, who evaluated Petitioner in January, February and March, 2001. In March 2001, when the Government indicated that it might present evidence at sentencing of the Petitioner's propensity for future dangerousness, coun-

sel moved for the appointment of another mental health expert, Dr. Mark Cunningham. That motion was granted on March 15, 2001. [*Id.* at Doc. 89].

**\*10** During pre-trial preparation, trial counsel decided not to offer a mental health defense. At a pre-trial hearing on April 6, 2001, however, counsel indicated that they were reevaluating that decision in light of the Government's service of a subpoena on one of the mental health experts who had testified at the Petitioner's state capital trial. [Case No. 1:00cr74, Mot. Hr'g Tr. 4–5, April 6, 2001, filed under seal Aug. 6, 2001]. That expert would have testified that at the time of the crime, the Petitioner had the capacity to form the specific intent to commit the crime of premeditated murder. In addition, the Government had disclosed new evidence physically linking the Petitioner to the victim's murder. As a result of these developments, counsel sought and was granted, the appointment of another mental health expert, Dr. Claudia Coleman. [*Id.,* at Doc. 123–1].

On April 19, 2001, the Government and defense counsel entered into a consent order pursuant to which the report of the Government's mental health expert, Dr. Park Dietz, and the videotapes of his interviews with the Petitioner were disclosed to defense counsel. [*Id.,* at Doc. 132]. On May 3, 2001, the Government filed a notice advising the Court that Dr. Dietz's final interview with Petitioner would take place on May 6, 2001. [*Id.,* at Doc. 169–1]. After reviewing Dr. Dietz's report, watching the videotapes of his interviews with Petitioner, and discussing the report with at least one of their defense experts, counsel, on May 8, 2001, withdrew their notice of intent to offer evidence of mental condition during the penalty phase of the trial. [*Id.,* at Doc. 177]. In other words, any benefit which might have been attained by a mental health defense during sentencing was greatly outweighed by the evidence on the videotapes and Dr. Dietz's potential testimony. Trial counsel made the strategic decision not to offer a mental health defense at sentencing in order to avoid the introduction of that

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

evidence and the Court's rejection of this claim does not create a debatable issue for reasonable jurists. *Sanders,* 314 Fed.Appx. 212 at ——2; *Chandler,* 218 F.3d at 1314; *Jenkins,* 132 Fed.Appx. at 743.

### VIII. Experts in post-conviction proceedings

As previously noted, the Petitioner was provided with some experts in the prosecution of his Motion to Vacate but was denied others. The Petitioner argues that this denial of expert assistance deprived him of the effective assistance of counsel to pursue the Motion to Vacate. [Doc. 54, at 56–57.] Where there is no constitutional right to counsel, however, there can be no deprivation of effective assistance. *See Wainright v. Torna,* 455 U.S. 586, 587–88, 102 S.Ct. 1300, 71 L.Ed.2d 475 (1982). There is no constitutional right to counsel in post-conviction proceedings. *Pennsylvania v. Finley,* 481 U.S. 551, 555–56, 107 S.Ct. 1990, 95 L.Ed.2d 539 (1987); *Murray v. Giarratano,* 492 U.S. 1, 109 S.Ct. 2765, 106 L.Ed.2d 1 (1989). Consequently, there can be no Sixth Amendment deprivation of the effective assistance of post-conviction counsel. *Coleman v. Thompson,* 501 U.S. 722, 752, 111 S.Ct. 2546, 115 L.Ed.2d 640 (1991). Since the Petitioner has not identified a constitutional right which is at stake, no COA may issue.

**\*11** Moreover, access to the assistance of experts to litigate a § 2255 action is provided by statute, not the Constitution. 18 U.S.C. § 3599(a)(2). FN8 To obtain a COA, Petitioner must show that "reasonable jurists would find the district court's assessment of [a] *constitutional* claim[ ] debatable or wrong." *Miller–El,* 537 U.S. at 338 (citation and internal quotation marks omitted) (emphasis added). The Petitioner has not stated a constitutional claim.

> FN8. At the time that Petitioner filed his motions, the appointment of experts in a § 2255 motion was governed by 21 U.S.C. § 848(q)(4)(B)(9), which was repealed in 2006.

### IX: Newly discovered evidence

After filing the § 2255 motion, the Petitioner moved for leave to amend, claiming that he was entitled to a new trial and/or sentencing because of newly discovered evidence that he had an accomplice in his murder of Karen Styles. It is axiomatic that for evidence to be newly discovered, it must have been unknown to the defendant at the time of the relevant legal proceeding. *In re Williams,* 364 F.3d 235, 240 n. 3 (4th Cir.2004), *certiorari denied* 543 U.S. 999, 125 S.Ct. 618, 160 L.Ed.2d 457 (2004) (" 'The traditional definition of newly discovered evidence is evidence discovered since the trial [.]' ") (citation omitted). If Jackson had an accomplice, he would have been aware of that fact at the time of trial.

The Petitioner also claimed that the victim had been taken from Pisgah National Forest to another location and then returned to the federal national forest. Again, the Petitioner, who confessed to raping and murdering the victim within the Pisgah National Forest, would have been aware of that fact. Consequently, the evidence at issue in this claim, if true, cannot be newly discovered.

The Court's ruling on this issue does not present a constitutional claim about which reasonable jurists could debate.

### X: Double jeopardy

Finally, the Petitioner claimed that his federal conviction and death sentence violated the Double Jeopardy Clause of the United States Constitution due to his previous prosecution in state court. The Fourth Circuit Court of Appeals rejected an identical claim raised by Petitioner on direct appeal. *Jackson,* 327 F.3d at 295 (4th Cir.2003) ("Unless and until the Supreme Court overrules its existing precedents, we are bound to conclude that the federal prosecution under federal law is not barred by the fact that the defendant was previously tried and convicted under State law on the basis of the same facts."). Consequently, the Court relied on procedural bar to reject this claim. Petitioner has failed to show that the Court's rejection of this claim on pro-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)
**(Cite as: 2010 WL 2775402 (W.D.N.C.))**

cedural grounds created a debatable issue among reasonable jurists. *United States v. Linder,* 552 F.3d 391, 397 (4th Cir.2009), *certiorari denied ——U.S. ——,* 130 S.Ct. 736, 175 L.Ed.2d 514 (2009) (" 'It is well established that a § 2255 petition cannot be used to relitigate questions which were raised and considered on direct appeal.' ") (citation omitted). Consequently, no COA may issue.

### CONCLUSION

The Court finds that the Petitioner has not made a substantial showing of a denial of a constitutional right. 28 U.S.C. § 2253(c)(2); *Miller–El,* 537 U.S. at 336–38 (in order to satisfy § 2253(c), a petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong) (citations omitted). As a result, the Court declines to issue a certificate of appealability. Rule 11(a), *Rules Governing Section 2255 Proceedings for the United States District Courts.*

### ORDER

**\*12 IT IS, THEREFORE, ORDERED** that Petitioner's Request for a Certificate of Appealability [Doc. 54] is hereby **DENIED.**

W.D.N.C.,2010.
Jackson v. U.S.
Not Reported in F.Supp.2d, 2010 WL 2775402 (W.D.N.C.)

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT THREE

Page 1

--- S.Ct. ----, 2012 WL 4475543 (U.S.), 81 USLW 3161
**(Cite as: 2012 WL 4475543 (U.S.))**

Only the Westlaw citation is currently available.

Supreme Court of the United States
JACKSON, RICHARD A. V. UNITED STATES.

No. 11-6315.
Oct. 1, 2012.

**\*1** The petition for writ of certiorari is denied.

U.S.,2012
Jackson v. U.S.
--- S.Ct. ----, 2012 WL 4475543 (U.S.), 81 USLW
3161

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

ATTACHMENT FOUR

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
            Petitioner/Defendant,  )
                                   )
vs.                                )        Case No. 09-CIV-105-JHP
                                   )
UNITED STATES OF AMERICA,          )
                                   )
            Respondent/Plaintiff.  )

## OPINION AND ORDER

This matter comes before the court on the petitioner's motion to alter or amend judgment (Doc. # 217) filed on September 13, 2012. The government filed its response opposing said motion on October 29, 2012 (Doc. # 220). The government urges this court to deny the motion for two reasons: 1) the first two claims in the petitioner's motion constitute a second or successive petition for relief; and 2) the petitioner has failed to identify any error meriting reconsideration.

Petitioner's motion indicates it is brought pursuant to Fed.R.Civ.P. 59(e)[1] and it is styled "Motion to Alter or Amend Judgment" which is the terminology utilized in Fed.R.Civ.P. 59(e). In reality, the petitioner is requesting this court to "reconsider" its opinion regarding judicial bias, failure to grant an evidentiary hearing, and the denial of a certificate of appealability. To be entitled to relief under Rule 59(e), Petitioner must demonstrate that there has been an intervening change in the controlling law or that there is

---

[1] *See*, Doc. # 217, at p. 6.

144

new evidence previously unavailable or that there is the need to correct clear error. *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). Upon careful review of the petitioner's motion and record in this matter, the court finds no basis for reconsidering the Opinion and Order denying the amended § 2255 motion. Contrary to the petitioner's allegations, the court carefully considered the trial record and the petitioner's legal arguments in denying his amended motion to vacate. Nothing provided by the petitioner in his motion to alter or amend judgment persuades the Court that the rulings were clearly erroneous or that there is a need to prevent manifest injustice. Finding no clear error or any other reason to alter or amend the judgment, the Court finds Petitioner's Rule 59(e) motion to alter or amend judgment should be denied.

Insofar as Petitioner also requests reconsideration of the denial of a certificate of appealability, the Court finds that request should be denied. Other than claiming that the length of the court's opinion and the nature of the penalty imposed establishes that the issues are "certainly debatable," the petitioner makes no attempt to establish a "substantial showing of the denial of a constitutional right," *i.e.*, he has not shown that "reasonable jurists would find [this court's] assessment of the constitutional claim debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 483-84 (2000).

**ACCORDINGLY, IT IS HEREBY ORDERED** that the petitioner's motion to alter or amend judgment (Doc. # 217) is denied.

DATED THIS 30th day of October, 2012.

James H. Payne
United States District Judge
Eastern District of Oklahoma

2

145

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,     )
     )
     Movant/Defendant,     )
     )
v.     )     Case Nos.     CIV-09-105-JHP
     )     CR-04-115-JHP
UNITED STATES OF AMERICA,     )     (underlying criminal
     )     case)
     Respondent/Plaintiff.     )

### NOTICE OF APPEAL

Movant/Defendant, Kenneth Eugene Barrett, hereby appeals to the United States Court of Appeals for the Tenth Circuit from the Judgment and Opinion and Order entered on August 16, 2012 (Docs. 214, 215, 216) denying his motions to vacate, set aside, and correct sentence pursuant to 28 U.S.C. § 2255 (Docs. 1, 2, 95), and the Opinion and Order entered on October 30, 2012 denying Mr. Barrett's motion to alter order and judgment filed pursuant to Fed.R.Civ.P. 59(e).  (Docs. 217, 221)  Counsel are appointed under the Criminal Justice Act.

Dated this 26th day of December, 2012

1

146

Respectfully submitted,

/s/ _David B. Autry_
DAVID B. AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone: (405) 521-9600

DANIEL J. BRODERICK, Cal. Bar No. 89424
Federal Defender

by /s/ _Joan M. Fisher_
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender

TIVON SCHARDL FL Bar No. 73016
801 I Street, Third Floor
Sacramento, CA 95814
Telephone: (916) 498-5700

Lawyers for Kenneth Eugene Barrett

2

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 26th day of December, 2012, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with service to be made electronically on the following ECF registrants: Jeffrey B. Kahan, United States Department of Justice, jeffrey.kahan@usdoj.gov, and Christopher J. Wilson, Assistant United States Attorney, Chris.Wilson@usdoj.gov.  To the undersigned's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ David Autry

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

<u>**PUBLISH**</u>

**UNITED STATES COURT OF APPEALS**

**August 19, 2015**

**TENTH CIRCUIT**

**Elisabeth A. Shumaker**
**Clerk of Court**

---

UNITED STATES OF AMERICA,

    Plaintiff - Appellee,

v.

KENNETH EUGENE BARRETT,

    Defendant - Appellant.

No. 12-7086

---

**APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**
**(D.C. Nos. 6:09-CV-00105-JHP and 6:04-CR-00115-JHP-1)**

---

David B. Autry, Oklahoma City, Oklahoma, (Heather E. Williams, Federal Defender, Joan M. Fisher and Tivon Schardl, Assistant Federal Defenders, Sacramento, California, with him on the briefs) for Defendant - Appellant.

Jeffrey B. Kahan, Trial Attorney, United States Department of Justice, Washington, D.C., (David A. O'Neil, Acting Assistant Attorney General, Washington, D.C., Mark F. Green, United States Attorney, and Christopher J. Wilson, Assistant United States Attorney, Muskogee, Oklahoma, with him on the brief) for Plaintiff - Appellee.

---

Before **KELLY**, **HARTZ**, and **MATHESON**, Circuit Judges.

---

**HARTZ,** Circuit Judge.

---

Defendant Kenneth Barrett was sentenced to death after being convicted in federal court on two counts of felony murder and one count of intentionally killing a state law-enforcement officer.  We affirmed on direct appeal.  *See United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).  Defendant then filed a motion for relief under 28 U.S.C. § 2255, which the district court denied.  *See Barrett v. United States*, No. 6:09-civ-105-JHP, 2012 WL 3542609 (E.D. Okla. Aug. 16, 2012) (unpublished).  We granted a certificate of appealability (COA) enabling him to appeal on several of his claims of ineffective assistance of counsel.  *See* 28 U.S.C. § 2253(c)(1)(B) (requiring COA to appeal denial of § 2255 motion).  Exercising jurisdiction under 28 U.S.C. § 2255(d), we now consider the merits of those claims and affirm on all but one.  Because Defendant may be entitled to relief on his contention that his trial attorneys were ineffective by failing to investigate and present evidence of his background and mental health for the trial's penalty phase, we reverse and remand for an evidentiary hearing on this issue.

## I.    BACKGROUND

### A.    The Offenses

In January 1999 a warrant was issued for Defendant's arrest for failure to appear at a state criminal trial on drug charges.  That September an agent for Oklahoma's District 27 Drug Task Force learned from a confidential informant that Defendant had methamphetamine at his residence.  The confidential informant also told the agent that Defendant had promised to kill any officer who came to arrest him and that he was

operating his drug business at night because of his belief that law enforcement could not execute a search warrant at night. The agent obtained a no-knock, day-or-night search warrant for Defendant's residence. Viewing the execution of the two warrants as high-risk, he obtained assistance from the Oklahoma Highway Patrol Tactical Team (the Tact Team).

On the evening of September 23 three troopers surveilled Defendant's residence in a white, unmarked Ford Bronco. Travis Crawford, Defendant's cousin, was with him at the time. According to Crawford, Defendant saw a white vehicle pass by and recognized it as belonging to law enforcement, but he said that he did not care and that he "was going out in a blaze of glory." R., Vol. 5 pt. 1 at 629.

The Tact Team devised its plan to secure Defendant's residence: Two white Broncos and a marked patrol car with its emergency lights activated, each containing two troopers, would approach Defendant's residence single-file from the east while three troopers in another patrol car would approach the fence south of Defendant's residence. A fifth vehicle would drive to a trailer occupied by Defendant's mother, which was west of the house, to provide security and protect her. The six troopers approaching from the east would enter and secure the residence. Of the three troopers approaching from the south, one would stay at the fence to provide sniper cover and the other two would apprehend anyone fleeing west from the residence.

Shortly after midnight on September 24 the Tact Team met with members of the Task Force, who planned to follow two minutes after the Tact Team. The Tact Team

3

then began to execute its plan.  The lead Bronco approaching from the east was driven by

Trooper John Hamilton with Trooper David "Rocky" Eales as passenger.  Its emergency

lights were not on.  The second Bronco and patrol car followed closely behind.  The

patrol car and perhaps the second Bronco had emergency lights on.  As the vehicles drove

toward the residence, the lead Bronco began receiving gunfire at "approximately head

level, middle of the windshield."  *Id.* at 700.  The gunfire intensified as the vehicle drew

closer.  Hamilton was struck in the face with glass or bullet fragments.

Meanwhile, the troopers coming from the south arrived at the fence.  Two of them

scaled it and headed toward the residence.  They saw Defendant's son, Toby Barrett,

outside the residence and ordered him to get on the ground.  Toby eventually complied.

The gunfire erupted either shortly before or while they were shouting at Toby.  After

Toby was handcuffed he yelled for his father.

The lead Bronco continued to receive gunfire until it reached the residence.  The

driver, Hamilton, ducked between the bucket seats.  The passenger, Eales, exited and was

shot three times while attempting to get behind the Bronco.  Hamilton threw a "flash-

bang" stun grenade out the window, which temporarily stopped the gunfire.  *Id.* at 707.

He exited the Bronco and was shot in the shoulder as he moved toward Eales, who was

lying face-down.  Trooper Ricky Manion joined him behind the vehicle.  Hamilton saw

Defendant standing in his doorway holding a rifle, and Manion saw him entering the

house.  Hamilton fired two shots at Defendant that missed, but Manion shot him through

a window and hit his legs.  Defendant was dragged out to the front yard.  He tried to

4

152

move his hand toward the front of his body, where he had a pistol in his waistband, but he was subdued and the gun removed.

Eales was fatally wounded.  An autopsy indicated that one of the three bullets entered his upper back, broke four ribs, and perforated his left lung and aorta.

Later investigation showed that 18 bullets struck the lead Bronco and that Defendant probably fired 19 shots from a Colt Sporter .223 rifle (there were 72 rounds remaining in a set of three magazines taped together to hold 90 rounds, and one could have been in the chamber to start).  A search of the premises revealed several firearms, including two that were loaded, and various items used to manufacture methamphetamine.  A later search of Defendant's clothes at a police laboratory revealed $2120.10 in cash and plastic bags holding red phosphorus, an ingredient for manufacturing methamphetamine.

### B.    Procedural History

The same day as the shootings, Defendant was charged by information in Oklahoma state court with one count of first-degree murder and three counts of shooting with intent to kill.  After several amendments the final information charged him with one count of first-degree murder (for Eales's death), one count of shooting with intent to kill (for shooting Hamilton), and two counts of discharging a firearm with intent to kill (for shots fired at two other troopers).  His first state trial resulted in a hung jury.  In 2004 he was retried and found not guilty on the two counts of discharging a firearm with intent to kill but guilty on two lesser-included offenses—namely, manslaughter, instead of first-

degree murder, and assault and battery with a dangerous weapon, instead of shooting with intent to kill.  He was sentenced to 30 years in prison.

On September 23, 2004, Defendant was charged with various federal drug and murder offenses in the United States District Court for the Eastern District of Oklahoma. A superseding indictment charged him with three offenses:  (1) causing Eales's death in the course of using a firearm in furtherance of a drug-trafficking offense, *see* 18 U.S.C. § 924(c)(1)(A), (j); (2) causing Eales's death in the course of using a firearm in furtherance of a crime of violence, *see id.*; and (3) intentionally killing Eales during a federal drug offense while Eales was engaged in, and on account of, the performance of his official duties, *see* 21 U.S.C. § 848(e)(1)(B).  The government sought the death penalty on each count.  On November 4, 2005, a jury found him guilty on all three counts, and thereafter recommended life imprisonment on the first two and death on the third.  The judge imposed the recommended sentence.  On direct appeal we affirmed the convictions and sentence.  *See Barrett*, 496 F.3d 1079.  The Supreme Court denied Defendant's petition for certiorari.  *See Barrett v. United States*, 552 U.S. 1260 (2008).

Defendant then moved for relief under 28 U.S.C. § 2255.  The district court denied the motion and declined to issue a COA.  *See Barrett*, 2012 WL 3542609, at *94. Defendant then sought a COA from this court.  We granted a COA on seven issues related to ineffective assistance of counsel:

> 1. "Whether trial counsel provided ineffective assistance in the guilt phase by failing to present an expert as to whether the police tactics employed

6

154

during the search warrant's execution would have identified the police as law-enforcement personnel";

2. "Whether trial counsel provided ineffective assistance in the guilt phase by failing to present a crime-scene expert";

3. "Whether trial counsel provided ineffective assistance in the guilt phase by failing to investigate and present mental-health evidence";

4. "Whether trial counsel provided ineffective assistance in the guilt phase by failing to seek an instruction concerning the credibility of drug-addict witnesses";

5. "Whether trial counsel provided ineffective assistance in the guilt phase by failing to seek an instruction on the defense's theory of the case";

6. "Whether appellate counsel provided ineffective assistance by not raising the trial court's refusal to give a lesser-included-offense instruction"; and

7. "Whether trial counsel provided ineffective assistance in the penalty phase by failing to develop mitigation evidence."

Case Mgmt. Order at 1–2, *United States v. Barrett*, No. 12-7086 (10th Cir. May 2, 2013).

## II.   DISCUSSION

### A.   Standard of Review

On appeal from the denial of a § 2255 motion, ordinarily "we review the district court's findings of fact for clear error and its conclusions of law de novo." *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011). "[W]here, as here, the district court does not hold an evidentiary hearing, but rather denies the motion as a matter of law upon an uncontested trial record, our review is strictly de novo." *Id.* We review claims of ineffective assistance of counsel according to the two-pronged test in *Strickland v. Washington*, 466 U.S. 668 (1984). First, a movant must show that counsel's performance was deficient, meaning it "fell below an objective standard of reasonableness as measured by prevailing professional norms." *Rushin*, 642 F.3d at 1302 (internal

quotation marks omitted).  This is a demanding standard, requiring a showing that the performance was "outside the wide range of professionally competent assistance."  *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011) (internal quotation marks omitted).  The performance "must have been completely unreasonable, not merely wrong."  *Id.* (internal quotation marks omitted).  Next, a movant must show prejudice, meaning "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  *Rushin*, 642 F.3d at 1302 (internal quotation marks omitted).  "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial . . . ."  *Byrd*, 645 F.3d at 1168 (internal quotation marks omitted).  "Courts are free to address these two prongs in any order, and failure under either is dispositive."  *Id.*

## B.    Police-Tactics Expert

Defendant first contends that his trial attorneys were ineffective by choosing the wrong expert on police tactics.  He asserts that criminologist George Kirkham (whom the court had authorized the defense to retain as an expert) could have established that the Tact Team's raid was ill-conceived in that it prevented him from knowing that it was law-enforcement officers, rather than drug dealers or other trespassers, who had invaded his property.  Instead of using Kirkham, Defendant's trial attorneys called as an expert witness Cloyce Van Choney, a former FBI SWAT-team leader who had testified for the prosecution in the two state trials.  Defendant contends that this was an inexplicable mistake because his attorneys knew that Choney was extremely hostile and would

8

inevitably change his testimony in the federal trial to the defense's detriment.  We disagree.

"[T]he decision of which witnesses to call is quintessentially a matter of strategy for the trial attorney."  *Boyle v. McKune*, 544 F.3d 1132, 1139 (10th Cir. 2008).  And "[t]he selection of an expert witness is a paradigmatic example of the type of strategic choice that, when made after thorough investigation of the law and facts, is virtually unchallengeable."  *Hinton v. Alabama*, 134 S. Ct. 1081, 1089 (2014) (per curiam) (brackets and internal quotation marks omitted).  We are satisfied that the decision to call Choney was a strategic choice within the bounds of professionally reasonable conduct.  Even though Defendant's trial attorneys did not contact Kirkham, they had good reason to use Choney instead.  As they said to the trial court at the ex parte hearing to establish a trial budget, Choney's testimony on cross-examination at the first state trial was extremely helpful to the defense in establishing that the methods used by the Tact Team were contrary to best practices.  *See* R., Vol. 3 at 98–101.  At the second state trial, he apparently refused to testify for the defense.  But when the defense said it would read to the jury his testimony from the first trial, the prosecution called him and his testimony was, as acknowledged in Defendant's opening brief on appeal, a "debacle" for the prosecution.  Aplt. Br. at 19.

Although Defendant contends that, given Choney's hostility, he would inevitably change his testimony in the federal trial, he had not done so between the two state trials.  Defendant's trial attorneys could have reasonably believed his testimony would be much

<div align="center">9</div>

the same the third time around.  "[F]or counsel to repeat a winning strategy in a later trial for the same type of crime, involving the same defendant, strikes us as eminently reasonable." *Laws v. Armontrout*, 863 F.2d 1377, 1393 (8th Cir. 1988) (en banc).  To the contrary, had they departed from that strategy, Defendant may well have argued that it was ineffective to do that instead.  *See Guerrero v. United States*, 84 F. App'x 933, 934–35 (9th Cir. 2003) (remanding for § 2255 hearing on ineffectiveness claim when attorney departed from strategy that led to hung jury in first trial); *cf. Putman v. Head*, 268 F.3d 1223, 1229, 1244–45 (11th Cir. 2001) (rejecting habeas applicant's argument that trial counsel in second trial should have followed the same strategy used in first trial).  Although Defendant contends that his trial attorneys could have avoided the risk of Choney's testimony going awry by calling Kirkham instead, there is no guarantee that Kirkham's testimony would have survived cross-examination.  *See Boyle*, 544 F.3d at 1138–39 (medical experts if called may have made damaging concessions on cross-examination).  They could have rationally concluded that it was preferable to use Choney—a known commodity who had testified favorably twice in the past—rather than a new expert.

Defendant's claim thus fails *Strickland*'s first prong because the decision to call Choney was within "the wide range of professionally competent assistance." *Byrd*, 645 F.3d at 1168 (internal quotation marks omitted).

10

## C.       Crime-Scene Reconstruction Expert

Defendant contends that his trial attorneys were ineffective by failing to counter

the government's crime-scene reconstruction expert, Iris Dalley.  He says they could have

called or at least consulted with Edward Hueske, a ballistics and crime-scene

reconstruction expert who had been retained in the state-court proceedings and for whom

the district court had authorized funding.  Instead, they decided to rely solely on cross-

examining Dalley.  According to Defendant, that was an ineffective strategy:  His trial

attorneys should have objected to Dalley's testimony in the first place; called Hueske as a

witness; and prepared adequately for Dalley's testimony by consulting with Hueske and

reviewing all Dalley's state-court transcripts.[1]  Defendant states that Dalley's testimony

was damaging for two reasons.  First, it placed him standing outside his residence when

shooting, which countered his defense that he shot from a prone position inside his

residence where he could not see any emergency lights on the vehicles behind the lead

Bronco and thus did not know that the intruders were law-enforcement officers.  Second,

Dalley's testimony established that Eales was shot after he exited the Bronco, which, he

---

[1] The government argues that the first and third of these arguments are outside the bounds
of the COA, which provides for argument only on "[w]hether trial counsel provided
ineffective assistance in the guilt phase by failing to present a crime-scene expert."  Case
Mgmt. Order at 1, *Barrett*, No. 12-7086.  Defendant responds that his request for a COA
on this issue encompassed all the challenges he now raises on appeal.  We need not
decide whether Defendant's claims exceed the scope of the COA because they fail
regardless.

says, again tended to negate Defendant's defense that he was unaware he was firing on law-enforcement officers.

Central to all of Defendant's complaints is the contention that his trial attorneys could not have made an informed strategic choice to forgo Hueske and rely solely on cross-examination of Dalley because they never consulted with Hueske about Dalley's testimony, did not have transcripts of her testimony from the second state trial, and spent little time preparing for her cross-examination. The government does not appear to contest that Defendant's trial attorneys consulted no expert and concedes that they were without the second-trial transcripts. Nevertheless, the government argues that an informed strategic choice was made. It points to an affidavit executed during the § 2255 proceedings by one of Defendant's trial attorneys, Roger Hilfiger, which states:

> The State Court transcripts caused me to be aware that during the pendency of Mr. Barrett's Sequoyah County prosecution, the presiding judge had considered striking Iris Dalley's testimony. I felt that during the federal trial, the defense could rely on the same plan for cross-examination that Mr. Barrett's lawyers had successfully employed in the county case. I did not think that employing a defense expert on crime scene reconstruction would make a difference in our ability to confront Ms. Dalley's testimony.

Aplee. Br. at 26 (internal quotation marks omitted). And it contends that Dalley's testimony from the *first* state trial included a critical concession that Defendant's trial attorneys knew would negate her impact: a concession that Defendant may have fired every shot from inside his residence.

As was true for the decision to call Choney, we cannot condemn the decision to rely solely on cross-examination of Dalley when that strategy apparently worked well in

12

the state trials.  According to one of Defendant's previous lawyers, "[H]er testimony was, quite frankly, I think kind of embarrassing for the Government down there, because she contradicted her written reports with her testimony in court, and her creation of [a] computer model had numerous flaws that were pointed out to the jurors in both trials." R., Vol. 3 at 218.  Although consultation with an expert to prepare for cross-examination, or calling a rebuttal expert in addition to cross-examination, may have been a better choice, we cannot say that failure to do so was deficient performance.  "[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation." *Strickland*, 466 U.S. at 690–91.  When a strategy produced such favorable results at a prior trial on essentially the same charges, a reasonably competent attorney could decide that it would be foolhardy to experiment with a different approach absent a good reason to believe that some new factor would alter the equation.

Defendant also contends that his trial attorneys were ineffective for failing to consult with Hueske on whether the bullet fragments found in Eales's body came from Defendant's rifle.  A government expert testified that they matched Defendant's weapon. But Defendant has not shown that Hueske would have testified to the contrary.  All he proffers is a letter from Hueske stating that he was "unable to assess the validity" of the government's bullet-fragment analysis without access to that analysis and the evidence. R., Vol. 1a pt. 1 at 1221.  This is not enough.  To establish the prejudice prong of

13

*Strickland*, Defendant was required to go a step farther, showing that Hueske would have contradicted the government's expert if he had obtained access to the fragments.

### D.    Guilt-Phase Mental-Health Evidence

Defendant argues that his trial attorneys were ineffective because they failed to present evidence of his mental defects during the guilt phase of the trial. Defendant's theory is that this evidence would have borne "directly on what he perceived and what his (diminished) intent was in the midst of an unannounced raid led by an unmarked vehicle." Aplt. Br. at 41–42. We need not decide whether Defendant's trial attorneys should have investigated Defendant's mental health more vigorously during the guilt phase of his trial because Defendant has failed to show prejudice.

Our analysis is guided by *United States v. Brown*, 326 F.3d 1143 (10th Cir. 2003). That opinion noted that "psychological or psychiatric evidence that negates the essential element of specific intent can be admissible," but "[t]he admission of such evidence will depend upon whether the defendant clearly demonstrates how such evidence would negate intent rather than merely present a dangerously confusing theory of defense more akin to justification and excuse." *Id.* at 1147 (internal quotation marks omitted). A court must "carefully scrutinize proposed psychiatric evidence to determine whether the evidence rests upon a legally acceptable theory for negating intent." *Id.* This requires screening out invalid legal theories, such as those that show only "impaired volitional control or inability to reflect on the consequences of . . . conduct." *Id.* The "proper focus" is on whether the evidence shows a "link or relationship between the specific

14

162

psychiatric evidence offered and the *mens rea* at issue in the case."  *Id.* at 1148 (internal

quotation marks omitted).  Yet Defendant points to no available expert testimony that he

could not form the intent to shoot the victims (or any other relevant *mens rea*).  We reject

this claim of error.

### E.    Jury Instructions

Defendant's next issues relate to the failure to give various jury instructions.  Most

of these omitted jury instructions would supplement the jury instructions given by the

court on Defendant's three charged offenses, so we set out the relevant portions of those

instructions.  Count One, charging a drug-trafficking felony-murder violation of

18 U.S.C. § 924(c)(1)(A) and (j), required the jury to find the following elements:

> *First:* The defendant committed at least one of the drug trafficking
> crimes charged in Count One of the superseding indictment;
> *Second:* During and in relation to the commission of one of those
> drug trafficking crimes, the defendant knowingly used or carried a firearm,
> or possessed a firearm in furtherance of such drug trafficking crime;
> *Third:* The firearm played an integral part in one or more of the drug
> trafficking crimes charged in Count One; that is, the firearm increased its
> likelihood of success; and
> *Fourth:* During the commission of one or more of the drug
> trafficking crimes charged in Count One of the superseding indictment, the
> defendant directly caused the death of David Eales through the use of a
> firearm.

R., Vol. 1 pt. 1 at 1398–99.  Count Two, charging a crime-of-violence felony-murder

violation of 18 U.S.C. § 924(c)(1)(A) and (j), required the jury to find the following

elements:

> *First:* The defendant committed a crime of violence, the killing of a
> state law enforcement officer engaged in or on account of the performance

15

> of such officer's official duties, as charged in Count Two of the superseding indictment;
>
> *Second:* During and in relation to the commission of such crime of violence, the defendant knowingly used or carried, or in furtherance of such crime of violence possessed a firearm;
>
> *Third:* The firearm played an integral part in the crime of violence charged in Count Two; that is, the firearm increased its likelihood of success; and
>
> *Fourth:* During the commission of such crime of violence as charged in Count Two, the defendant directly caused the death of David Eales through the use of a firearm.

*Id.* at 1399–1400.  And Count Three, charging the killing of a state law-enforcement officer in violation of 21 U.S.C. § 848(e)(1)(B), required the jury to find the following elements:

1. During the commission of, or in furtherance of, or while attempting to avoid apprehension, prosecution, or service of a prison sentence for, a felony drug violation;
2. The defendant, Kenneth Eugene Barrett, intentionally killed and/or counseled, commanded, induced, procured and/or caused the intentional killing of David Eales;
3. That David Eales was a State law enforcement officer;
4. That the defendant, Kenneth Eugene Barrett, knew or had reason to know David Eales was a law enforcement officer; and
5. David Eales was killed while engaging in and on account of the performance of his official duties.

*Id.* at 1411.  We address in turn each of Defendant's arguments related to omitted jury instructions.

### 1.    Self-Defense

Defendant contends that his trial attorneys were ineffective for failing to request a jury instruction on self-defense and defense of another.  "A person may resort to self-defense if he reasonably believes that he is in imminent danger of death or great bodily

harm, thus necessitating an in-kind response." *United States v. Toledo*, 739 F.3d 562, 567 (10th Cir. 2014). A defendant's "burden of production to warrant a self-defense instruction is not onerous." *Id.* at 568 (internal quotation marks omitted). It requires only that there be "evidence sufficient for a reasonable jury to find in his favor." *Id.* at 567. Because the government must disprove a defense of self-defense beyond a reasonable doubt, *see United States v. Corrigan*, 548 F.2d 879, 883 (10th Cir. 1977), it follows that the defendant need only produce enough evidence to persuade the jury to have a reasonable doubt about whether the defendant acted in self-defense. *See Toledo*, 739 F.3d at 568 ("a defendant is entitled to an instruction if the evidence viewed in his favor could support the defense"). In other words, a self-defense instruction would have been warranted if the jury could have had a reasonable doubt about whether Defendant reasonably believed he was "in imminent danger of death or great bodily harm, thus necessitating an in-kind response." *Id.* at 567.

Perhaps a self-defense instruction was warranted and Defendant's trial attorneys should have requested one. Even so, however, Defendant has failed to show the requisite prejudice. To convict on Count Three (and by extension, Count Two) the jury had to find that Defendant "knew or had reason to know David Eales was a law enforcement officer." R., Vol. 1 pt. 1 at 1411. Thus, the jury must have found that Defendant knew, or that "a reasonable person who possessed the information possessed by [Defendant] would have the requisite knowledge," that Eales was a law-enforcement officer. *United*

17

*States v. Williamson*, 746 F.3d 987, 994 (10th Cir. 2014) (defining *having reason to know*).

In light of that jury finding beyond a reasonable doubt, we think it exceedingly unlikely that the jury, on the evidence before it, could have had a reasonable doubt that Defendant reasonably believed that he needed to use deadly force to defend himself (or anyone else). Nothing in the record would support the view that Defendant had reason to believe that law enforcement (who he had reason to know were the "intruders") had come to his home to kill him (or anyone else). The possibility that a self-defense instruction would have resulted in acquittal is far too slim to undermine our confidence in the verdict.

### 2.       Identity of Victim

Defendant contends that his trial attorneys were ineffective by failing to request an instruction that the jury should acquit him if it found that he did not know that the vehicles approaching his residence contained law-enforcement officers. But the one-sentence "argument" in his brief, which cites no authority, is woefully inadequate to preserve this highly questionable proposition for review. *See, e.g.*, *Vondrak v. City of Las Cruces*, 535 F.3d 1198, 1204 n.4 (10th Cir. 2008) (argument in one-sentence footnote insufficient to invoke appellate review).

### 3.       Drug Manufacturing

Defendant argues that his trial attorneys were ineffective for failing to request an instruction that he was not engaging in drug manufacturing or distribution when the raid

18

took place.  We are not persuaded.  Count 1 charged a violation of 18 U.S.C.

§ 924(c)(1)(A) and (j), which requires that the defendant "[1] during and in relation to

any . . . drug trafficking crime . . . , uses or carries a firearm, or . . . [2] in furtherance of

any such crime, possesses a firearm."  *Id.* § 924(c)(1)(A).  Count 3 charged a violation of

21 U.S.C. § 848(e)(1)(B), which punishes anyone who intentionally kills a law-

enforcement officer "during the commission of, in furtherance of, or while attempting to

avoid apprehension . . . for . . . a felony violation of [the drug laws in 21 U.S.C. §§ 801–

971]."  Neither statute required Defendant to be manufacturing or distributing drugs at

the time of the shooting.  Rather, the jury needed to find only that Defendant possessed a

controlled substance with intent to manufacture or distribute, *see* 21 U.S.C. § 841(a)(1),

possessed any equipment or chemical intending to use it to manufacture a controlled

substance, *see id.* § 843(a)(6), or maintained a place for the manufacture or distribution of

drugs, *see id.* § 856(a).  Since Defendant's suggested instruction was not warranted under

the law, his trial attorneys could not have been ineffective for failing to propose it.  *See*

*Hawkins v. Hannigan*, 185 F.3d 1146, 1158 (10th Cir. 1999) ("Because this claim is

meritless, [defense] counsel was not ineffective for failing to raise it."); *see also*

*Williamson*, 746 F.3d at 990 ("[O]f course, the court can reject an instruction that

misstates the law.").

### 4. Drug-Addicted Witnesses

Defendant argues that his trial attorneys were ineffective for failing to seek an

instruction cautioning the jury to assess the testimony of drug-addicted witnesses with

extra care.  Such an instruction should be given when warranted.  *See United States v. Smith*, 692 F.2d 658, 661 (10th Cir. 1982).  But the failure to give a drug-addict instruction is rendered harmless when vigorous cross-examination and other jury instructions alert the jury to view with skepticism a drug addict's testimony.  *See United States v. Nicholson*, 983 F.2d 983, 991–92 (10th Cir. 1993); *United States v. Cook*, 949 F.2d 289, 295 (10th Cir. 1991); *Smith*, 692 F.2d at 661.  The failure was harmless here.  The government called seven witnesses with a history of drug use, and defense counsel cross-examined each of them about that issue.  Also, the jury was instructed on evaluating the credibility of witnesses in general and to treat with caution the testimony of witnesses who have given inconsistent statements, who have been discredited or impeached by prior criminal convictions, or who have been promised an advantage for testifying.  Defendant's claim that his trial attorneys were ineffective for failing to request a drug-addict jury instruction fails the prejudice prong of the *Strickland* test.

### 5.   Lesser-Included Offenses

Finally, Defendant argues that his attorneys on direct appeal were ineffective for failing to raise the trial court's denial of a lesser-included-offense instruction.  During the trial both the defense and the prosecution requested an instruction on voluntary manslaughter on the theory that it was a lesser-included offense of the crimes charged.

20

But the district court rejected the idea, stating its view that the evidence could not support

that offense and "[i]t's either murder or it's nothing."  R., Vol. 5 pt. 2 at 2951.[2]

Our analysis begins with the constitutional requirement established in *Beck v.*

*Alabama*, 447 U.S. 625 (1980).  *Beck* holds that a court must not leave the jury with an

"all-or-nothing" choice between a capital conviction and acquittal when a lesser-included

offense is available, *Hooks v. Ward*, 184 F.3d 1206, 1224 (10th Cir. 1999) (internal

quotation marks omitted), even when the jury can sentence the defendant on the capital

charge to something less than death, *see id.* at 1227.  Whether one offense is a lesser-

included offense of another is determined by the law of the jurisdiction prosecuting the

offense.  *See Hopkins v. Reeves*, 524 U.S. 88, 94–98 (1998) (because Nebraska law holds

that second-degree murder and manslaughter are not lesser-included offenses of felony

murder, defendant charged with capital offense of felony murder was not entitled to

instructions on those two offenses).  Under federal law an offense is not a lesser-included

offense of another offense "unless the elements of the lesser offense are a subset of the

elements of the charged offense.  Where the lesser offense requires an element not

required for the greater offense, no [lesser-included-offense] instruction is to be given

. . . ."  *Schmuck v. United States*, 489 U.S. 705, 716 (1989).

---

[2] The government argues that Defendant defaulted on the claim by failing to raise it on
appeal.  The claim, however, is not that the district court failed to instruct but that
appellate counsel should have raised the failure on appeal.  This claim of ineffective
appellate counsel obviously could not have been raised until this § 2255 motion.

We examine whether voluntary manslaughter was an available lesser-included offense for any of Defendant's three counts.  Because we decide that it was not available, Defendant's appellate counsel was not inadequate for failing to raise it.  *See Hooks*, 184 F.3d at 1221 ("If the omitted issue is without merit, [appellate] counsel's failure to raise it does not constitute constitutionally ineffective assistance of counsel." (internal quotation marks omitted)).

### a.    Counts One and Two

Counts One and Two charged Defendant with felony-murder violations of 18 U.S.C. § 924(c)(1)(A) and (j).  To determine whether a lesser-included offense was available, we must first review the statutory scheme underlying these charges.  Subparagraph (c)(1)(A) provides:  "[A]ny person who, during and in relation to any crime of violence or drug trafficking crime . . . uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall" be guilty of an offense.  *See Abbott v. United States*, 562 U.S. 8, 12 (2010) (describing § 924(c)(1)(A) as an offense).  Subsection (j) expands on the offense, treating it as a more serious offense (with harsher punishment) when someone is killed as a result.  It states:

> (j) A person who, in the course of a violation of subsection (c), causes the death of a person through the use of a firearm, shall—
>> (1) if the killing is a murder (as defined in [18 U.S.C.] section 1111), be punished by death or by imprisonment for any term of years or for life; and
>> (2) if the killing is manslaughter (as defined in [18 U.S.C.] section 1112), be punished as provided in that section.

22

18 U.S.C. § 924(j).  In turn, 18 U.S.C. § 1111(a) states that "[m]urder is the unlawful

killing of a human being with malice aforethought."  It then sets forth four varieties of

first-degree murder and one variety of second-degree murder:

> *Every murder* [1] perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing; or [2] *committed in the perpetration of,* or attempt to perpetrate, *any arson, escape, murder, kidnapping, treason, espionage, sabotage, aggravated sexual abuse or sexual abuse, child abuse, burglary, or robbery*; or [3] perpetrated as part of a pattern or practice of assault or torture against a child or children; or [4] perpetrated from a premeditated design unlawfully and maliciously to effect the death of any human being other than him who is killed, *is murder in the first degree*.
>
> Any other murder is murder in the second degree.

*Id.* § 1111(a) (emphasis added).

As the jury was instructed, Counts One and Two incorporated only the second

variety of first-degree murder.  This provision—"[e]very murder . . . committed in the

perpetration of, or attempt to perpetrate, [various crimes]"—is a felony-murder provision,

with the listed crimes as the available predicate felonies.[3]

What is not obvious from the language of §1111, but is settled law in this circuit,

is that the meaning of *malice aforethought*, which is required for all murder, is not the

---

[3] In his reply brief Defendant mentions in passing that the predicate felonies charged in Counts One and Two—drug trafficking and the killing of a law-enforcement officer, respectively—are not among the crimes listed in § 1111's felony-murder provision.  This mention is not adequate to present the issue for review.  And we typically do not consider issues first raised in a reply brief, *see United States v. Smith*, 606 F.3d 1270, 1284 n.5 (10th Cir. 2010), especially when the appellant fails to invoke plain error, as is the case here, *see United States v. MacKay*, 715 F.3d 807, 834 (10th Cir. 2013).

same for felony murder as it is for the other varieties of murder.  *See United States v. Chanthadara*, 230 F.3d 1237, 1258 (10th Cir. 2000) (although "'malice aforethought' is an element of every type of murder" under § 1111(a), its meaning "differs with respect to each kind of murder" (internal quotation marks omitted)).  For felony murder, "malice aforethought is proved by commission of the felony, [and] there is no actual intent requirement."  *Id.*  In contrast, the "malice aforethought" requirement of § 1111(a)'s second-degree murder provision requires proof of "(1) intent-to-kill without the added ingredients of premeditation and deliberation; (2) intent to do serious bodily injury; (3) a depraved-heart; or (4) commission of a felony when the crime does not fall under the first-degree murder paragraph of § 1111(a)."  *Id.* (internal quotation marks omitted).  Because § 1111 felony murder does not require proof of any of these four alternatives, second-degree murder is not a lesser-included offense of felony murder.  We so held in *Chanthadara*:

> Unlike second-degree murder, conviction for felony murder under 18 U.S.C. § 1111 requires the commission of an enumerated felony with the requisite mens rea for the underlying offense.  Obversely, second-degree murder requires proof that defendant acted with malice aforethought, whereas under a felony murder charge the commission of the underlying offense substitutes for malice aforethought.  Therefore, the elements of second-degree murder are not a subset of the elements of first-degree felony murder, for each offense requires proof of an element that the other does not.

*Id.* at 1259 (internal quotation marks omitted).

Likewise, voluntary manslaughter (Defendant makes no argument regarding involuntary manslaughter) is not a lesser-included offense of felony murder.  Voluntary

manslaughter is defined in 18 U.S.C. § 1112(a) as "the unlawful killing of a human being

without malice" and "[u]pon a sudden quarrel or heat of passion."  We have held:

> [V]oluntary manslaughter encompasses all of the elements of murder:  it
> requires proof of the physical act of unlawfully causing the death of
> another, and of the mental state that *would* constitute malice, but for the
> fact that the killing was committed in adequately provoked heat of passion
> or provocation.  Thus, the only difference between second degree murder
> and voluntary manslaughter in the homicide hierarchy is that voluntary
> manslaughter is committed in the heat of passion, and the presence of this
> mitigating factor negates the malice that would otherwise attach given an
> intentional or reckless mental state.

*United States v. Serawop*, 410 F.3d 656, 665 (10th Cir. 2005) (citation and internal

quotation marks omitted).  As we concluded, "Voluntary manslaughter requires proof

beyond a reasonable doubt that the defendant acted, while in the heat of passion or upon a

sudden quarrel, with a mental state that would otherwise constitute second degree

murder—either a general intent to kill, intent to do serious bodily injury, or with

depraved heart recklessness."  *Id.* at 666.  Because felony murder does not require this

mental state (it requires only commission of the predicate felony, not "a mental state that

would otherwise constitute second-degree murder," *id.*) the elements of voluntary

manslaughter are not a subset of the elements of felony murder, and therefore voluntary

manslaughter is not a lesser-included offense of felony murder.  *See United States v.*

*Miguel*, 338 F.3d 995, 1005 (9th Cir. 2003) ("neither [§ 1112] voluntary nor involuntary

manslaughter is a lesser included offense of [§ 1111] felony murder").

### b.    Count Three

25

173

Count Three charged Defendant with a violation of 21 U.S.C. § 848(e)(1)(B), which provides:

> [A]ny person, during the commission of, [or] in furtherance of, . . . a felony violation of [the drug laws in 21 U.S.C. §§ 801–971] who intentionally kills . . . any Federal, State, or local law enforcement officer engaged in, or on account of, the performance of such officer's official duties . . . shall be sentenced . . . up to life imprisonment, or . . . to death.

Defendant contends that he was entitled to an instruction on voluntary manslaughter as a lesser-included offense of this offense. The problem with that contention is that Defendant has not identified any federal voluntary-manslaughter statute whose elements are a subset of those for this offense. Section 848(e)(1)(B) defines no other offense, much less a lesser-included voluntary-manslaughter offense; and, unlike 18 U.S.C. § 924(j), it does not incorporate or cross-reference 18 U.S.C. § 1112. Defendant seems to suggest that § 1112 can still apply, but it defines a voluntary-manslaughter offense only "[w]ithin the special maritime and territorial jurisdiction of the United States," *id.* § 1112(b), which is quite narrowly defined by 18 U.S.C. § 7 and does not include the area around Defendant's property where the offense occurred.

As a result, Defendant's only contention could be that *Beck* requires the courts to create a lesser-included offense for this case. That contention would fail. In *Hopkins*, 524 U.S. at 96–97, the Supreme Court held that *Beck* does not compel a state court to instruct on a noncapital offense that was not a lesser-included offense under the state's law. To do so, the Court reasoned, would "require[] in effect that States create lesser included offenses to all capital crimes, by requiring that an instruction be given on some

26

174

*other* offense—what could be called a 'lesser related offense'—when no lesser included offense exists." *Id.* at 97. That would be both "unprecedented" and "unworkable" because "[u]nder such a scheme, there would be no basis for determining the offenses for which instructions are warranted." *Id.* That same reasoning would also apply to judicial creation of a federal criminal offense (which is barred in any case, *see United States v. Hudson*, 11 U.S. (7 Cranch) 32, 34 (1812)).

### c.     Ineffective Assistance

The above analysis reflects our view that there was no available lesser-included offense of voluntary manslaughter for the charges against Defendant. Perhaps we have missed something. But even so, in light of that analysis we can hardly say that Defendant's counsel on direct appeal was ineffective for failing to make the argument we reject. A reasonable, even a highly competent, attorney could examine the issue and decide that raising a lesser-included-offense issue would do little more than detract from the strength of other issues to be presented on appeal. *See Smith v. Robbins*, 528 U.S. 259, 288 (2000) ("counsel . . . need not (and should not) raise every nonfrivolous claim, but rather may select from among them in order to maximize the likelihood of success on appeal"); *accord Cargle v. Mullin*, 317 F.3d 1196, 1201 (10th Cir. 2003). We therefore reject this claim of ineffective assistance of counsel on appeal.

### F.     Penalty-Phase Mental-Health Evidence

Defendant's final argument is that his trial attorneys were ineffective by failing to properly investigate his background and mental health in preparation for the penalty

phase of his case.  We evaluate trial counsel's penalty-phase performance "under the prevailing professional norms at the time of . . . trial [September 2005 in this case]." *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (per curiam).  We must bear in mind that "[b]eyond the general requirement of reasonableness, specific guidelines are not appropriate," and "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions." *Cullen v. Pinholster*, 131 S. Ct. 1388, 1406 (2011) (internal quotation marks omitted).  Still, the Supreme Court has emphasized that as a general rule counsel has a duty to pursue leads indicating a defendant's troubled background and diminished mental capacity.  *See Wiggins v. Smith*, 539 U.S. 510, 523–525 (2003); *see also Hooks v. Workman*, 689 F.3d 1148, 1201 (10th Cir. 2012) ("Counsel has a duty to conduct a thorough investigation—in particular, of mental health evidence—in preparation for the sentencing phase of a capital trial."  (internal quotation marks omitted)).  That standard is supported (though not mandated, *see Bobby v. Van Hook*, 558 U.S. 4, 7–9 (2009)) by the American Bar Association's Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (rev. 2003) (ABA Guidelines), which state that a capital defense team should include a "mitigation specialist" and someone "qualified by training and experience to screen individuals for the presence of mental or psychological disorders or impairments."  ABA Guidelines 4.1.A.1 to .2.

The issue before us is whether Defendant's trial attorneys prepared a mitigation case that measures up to professional norms and, if not, whether that made a difference. In our view, the record before us is inadequate to resolve the issue. Defendant has presented considerable evidence supporting his claims. But other evidence may counter it. Rule 8(a) of the Rules Governing Section 2255 Proceedings requires the district court to review the record "to determine whether an evidentiary hearing is warranted." That decision turns on "whether such a hearing could enable [the movant] to prove the [motion's] factual allegations, which, if true, would entitle the [movant] to . . . relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (stating standard in § 2254 cases). We hold that an evidentiary hearing is necessary to enable the district court to make the findings needed to determine whether Defendant has a valid claim. We therefore reverse and remand for further proceedings on the issue.

### 1. Deficient Performance

We begin with an overview of the penalty-phase defense that was presented. Defendant's trial attorneys called his mother, father, stepmother, brother, ex-wife, uncle, and cousin to testify that Defendant was a loved family member and good person who was sorry for killing Eales. The defense also called a state-court clerk to testify about Defendant's state-court proceedings and his lack of prior felonies, several state-prison employees to testify that Defendant was a well-behaved prisoner, two neighbors to testify that Defendant was a good mechanic and a nonviolent person, and a bondsman to testify that he had no concerns about Defendant's being a danger while his bench warrant was

outstanding.  None of the witnesses discussed Defendant's mental health or troubled background in any significant detail, and Defendant's closing argument included only one mention of his commitment to a hospital almost 20 years earlier "for drug abuse and other treatment," and that was in the context of describing his "rocky" marriage.  R., Vol. 5 pt. 2 at 4108.

The defense that was presented apparently helped to some extent.  The jury did not find unanimously that the government had proved beyond a reasonable doubt that Defendant would pose a continuing and serious danger to others in prison, and unanimously found that he was a father and a loved son and stepson, and that his death would have an impact on his family and friends.  Seven jurors found that he was a good neighbor and friend; five found that he had accepted responsibility for Eales's death from his state-court conviction and that he had been convicted and punished for the killing; and two found that he would not be a danger to society if imprisoned for life without parole.

What was missing from the presentation was evidence of Defendant's mental condition that could have been persuasive to the jury.  In his § 2255 proceedings Defendant has presented a case that his defense team did little to investigate his background and mental condition.  First, it may never have hired a mitigation expert or a mental-health professional to assess Defendant's mental capacity.  The district court pointed to one of the defense attorneys' expense vouchers and attached documentation that said that they had retained the services of psychologist Jeanne Russell for "mitigation and assistance on mental health questions" at least in part because "she [had been]

30

consulted during the State trials as the mitigation expert." *Barrett*, 2012 WL 3542609, at

*72 (internal quotation marks omitted).  There is evidence, however, that Dr. Russell's

work was restricted to an assessment of Defendant's future dangerousness.  According to

her declaration in these § 2255 proceedings, she "did not evaluate [Defendant's]

neuropsychological functioning or focus on his psychological make-up, as the referral

request was specific to risk assessment."  Am. Mot. for Collateral Relief, to Vacate, Set

Aside, or Correct Sentence & for a New Trial, Ex. 56 at 1–2, *Barrett*, No. 6:09-civ-105-

JHP (Sept. 25, 2009).  She states that in mid-August 2005, about a month before the

federal trial began, she was approached by Bret Smith, one of Defendant's trial attorneys,

to be a mitigation investigator.  She declined, stating that she was unqualified to perform

such an investigation and there was not time to do so.  She updated her risk assessment

on Defendant and submitted it to Defendant's trial attorneys on September 15.  On

October 12 she visited Defendant in prison but this was after she had already submitted

her updated report.

Additional evidence further supports Defendant's assertion of a lack of effort to

retain mitigation expertise.  According to the declaration of Julia O'Connell, Federal

Defender for the Northern and Eastern Districts of Oklahoma, defense attorney Hilfiger

called her office less than three months before the start of trial to ask if her mitigation

specialist would be willing to meet sometime in the future.  O'Connell referred him to

Dick Burr, a federal death-penalty resource attorney.  Burr declares that he never heard

from Hilfiger or Smith on anything of substance.  Similarly, the firm that was approved

31

by the court for mitigation services, Inquisitor, Inc., was contacted only once by John

Echols (an attorney for Defendant who withdrew and was replaced by Smith) and was

never asked to perform any mitigation work.

Defendant's trial attorneys also apparently did little to investigate his background

or mental health through his family.  According to the declarations of the family

members who testified during the sentencing phase, the trial attorneys' preparation for

their testimony consisted more or less of five-minute interviews before going on the

stand, and none were asked about Defendant's background, mental health, or family

history.

Typically, this kind of superficial investigation would constitute deficient

performance.  *See Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002) ("A decision

not to undertake substantial pretrial investigation and instead to 'investigate' the case

*during* the trial is not only uninformed, it is patently unreasonable." (brackets and internal

quotation marks omitted)); *see also Sears v. Upton*, 561 U.S. 945, 952 (2010) (per

curiam) (quoting, with apparent approval, the postconviction state-court determination

that "the cursory nature of counsel's investigation into mitigation evidence—limited to

one day or less, talking to witnesses selected by [the defendant's] mother—was on its

face constitutionally inadequate") (ellipsis and internal quotation marks omitted)).  The

government nevertheless offers three reasons why trial counsel's efforts were not

deficient:  first, they had no indications that Defendant suffered from a mental

impairment, so there was no reason to pursue that line of inquiry; second, Defendant

32

opposed a mitigation strategy based on personal sympathy or his childhood; and third,

they already had a reasonable mitigation strategy.  Each is questionable on this record.

To support the first argument, the government directs us to the declarations of

Hilfiger and Smith.  They state that nothing in Defendant's behavior during the federal

case, nor in what his family members reported to them during interviews, nor in what

Dr. Russell said to them indicated that Defendant had a significant mental impairment.  In

essence, according to the government, there were no "red flags" indicating a need to go

further.  *Rompilla v. Beard*, 545 U.S. 374, 392 (2005) (internal quotation marks omitted);

*see Strickland*, 466 U.S. at 690–91 ("strategic choices made after less than complete

investigation are reasonable precisely to the extent that reasonable professional

judgments support the limitations on investigation").  What the trial attorneys'

declarations fail to address, however, is whether they ever *asked* about Defendant's

mental health, background, or family history.  *Cf. Cole v. Trammell*, 755 F.3d 1142, 1161

(10th Cir. 2014) ("[b]ecause 'family and social history' is one of the crucial areas of

investigation emphasized in the ABA Guidelines," court assumes that a failure to contact

family members was constitutionally deficient performance).

Also, the record suggests that Defendant's trial attorneys had indications that

Defendant's mental health and background merited further investigation.  According to

Echols, Defendant's previous attorney:

> At the time I withdrew from the case, I advised Mr. Hilfiger that he needed
> to immediately undertake extensive investigation and preparation for a
> possible penalty phase.  I explained to him that the work performed by

> Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete. Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt. In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family illness.

R., Vol. 1a pt. 1 at 547. Hilfiger does not recall this conversation, but factual disputes should be resolved in an evidentiary hearing. Further, it is undisputed that six months before trial Echols and Hilfiger requested funding from the court for an expert on diagnosing organic brain disorders resulting from Defendant's drug use and significant head injuries, and that even earlier Echols copied Hilfiger on a letter to the court discussing the use of Schaye's mitigation-investigation services during the state proceedings and stating that she and another psychologist "disagreed completely concerning Mr. Barrett's mental well being." *Id.* at 967. In addition, Hilfiger admits that Echols gave him Defendant's medical, educational, and mental-health records. Those records reveal that Defendant developed at a delayed pace as an infant, struggled in school, attempted suicide with a shotgun in January 1986, was subjected to a mental-health proceeding in October 1986 and committed to a hospital after complaints from his mother and ex-wife that he was violent and very suicidal, and was hospitalized for three days in 1995 after arriving in the emergency room complaining of "losing his mind." *Id.*, Vol. 2d pt. 8 at 358. During his hospital stay in October 1986 he was diagnosed with substance abuse and mixed personality disorder, and during his hospital stay in 1995 he was diagnosed with substance abuse and organic affective disorder. Also, the report

34

182

prepared by Dr. Russell and given to Hilfiger and Smith includes a list of records she

relied upon, which included records noting Defendant's suicide attempt in January 1986,

hospital stays in October 1986 and in 1995, and a psychological evaluation completed in

2002 by psychologist William Sharp, who found that Defendant was paranoid and had a

family history of depression and mental illness, and who said that his behavior warranted

investigation for organic brain damage.  Defendant's trial attorneys never contacted

Dr. Sharp.

This is evidence that counsel failed to make an effort "to discover all reasonably

available mitigating evidence" despite ample indication of potential mental-health

problems.  *Wiggins*, 539 U.S. at 524 (emphasis and internal quotation marks omitted).

The government's second argument is that Defendant's trial attorneys were

constrained from conducting a mental-health investigation by their client, who did not

want a mitigation strategy based on personal pity or embarrassment of his family.  The

government again cites the declarations of Hilfiger and Smith, which both state in

identical words:

> Mr. Barrett did not want the defense to "beg for his life" during the penalty
> phase of the trial.  He did not want the outcome of the case to hinge on
> personal sympathy for him.

> Mr. Barrett did not want the mitigation case to dwell on his childhood.  He
> also wanted to minimize the amount of testimony elicited from his
> relatives, particularly his son, mother and ex-wife, though he understood
> that decision could work to his detriment.

35

R., Vol. 2d pt. 8 at 346 (paragraph numbering omitted); *see also id.* at 349 (same).  The

government also directs us to Defendant's outburst during the prosecution's closing

argument in the guilt phase.  After United States Attorney Sheldon Sperling mentioned

Defendant's mother, Defendant exclaimed, "Get off my family, Sperling.  This is about

murder, not my family. . . .  I've heard enough of him talking about my family.  Take me

out of the courtroom.  Take me out." *Id.*, Vol. 5 pt. 2 at 4151.

This evidence, however, does not establish an unambiguous command to refrain

from investigating or presenting evidence of Defendant's personal history or mental

health.  Defendant has presented evidence that his trial attorneys were not so constrained.

Echols stated in a declaration that during state-trial preparation Defendant willingly

submitted to a mental-health examination, provided information about his background,

and placed no restrictions on mitigation investigation.  Smith stated in his declaration that

Defendant "impressed me as among the most cooperative criminal defense clients I have

ever had." *Id.*, Vol. 2d pt. 8 at 345.  Most strongly indicating Defendant's cooperative

attitude is his undated letter to Hilfiger apologizing for his changes of mind and

expressing his willingness (at least at that moment) to allow his attorneys to do their best

to win the case:

> [A]t this time I don't know what I'm doing or going to do.  Or should
> do. . . .  One day I feel one way and the next I feel another.  I guess I have
> no choice now than to let you do your best. . . .  Just try your hardest to beat
> this to w[h]ere I can go home. . . .  I've got alot of thangs that are good for
> this case.  So hopefully now that there is no-other means for me but to beat
> this we can put this behind us and start over and do this right and win.  I'll
> try my best to act right.

*Id.*, Vol. 1a pt. 1 at 555.

As for Defendant's outburst during closing argument (which both his trial attorneys say was an exceptional event), Hilfiger suggests in his declaration that it was not a reaction to the presentation of mitigation evidence, but to argument about Defendant's family:

> Mr. Barrett's outburst during the prosecution's penalty phase argument was a very unusual and unanticipated event.  That outburst must be placed in a perspective that this was toward the end of a very contentious trial.  At this stage the U.S. Attorney was arguing about the defendant's mother or step-mother, as she related to the case, and Mr. Barrett's outburst was to inform the prosecutor that he was the one on trial and his mother or step-mother should not be subjected to that kind of examination.

*Id.*, Vol. 2d pt. 8 at 349.

The government nonetheless contends that the Supreme Court's opinion in *Schriro* forecloses an evidentiary hearing.  We are not persuaded.  *Schriro* involved a challenge under 28 U.S.C. § 2254 to a state death sentence.  *See* 550 U.S. 465.  At the sentencing hearing the defendant in *Schriro* confirmed to the judge that he had told his counsel not to present mitigating evidence and then repeatedly interrupted his counsel's efforts to do so, often by interjecting incriminating details.  *See id.* at 469–70.  The record in this case (at least as it currently stands) is hardly as definitive as *Schriro*'s.  Defendant's one ambiguous outburst during closing argument is not the same as repeatedly interrupting at sentencing to strengthen the case against oneself.  And the conclusory descriptions of Defendant's wishes in the declarations of Hilfiger and Smith are a far cry from the *Schriro* defendant's statement to the judge at the close of the sentencing hearing, "I think

if you want to give me the death penalty, just bring it right on. I'm ready for it." *Id.* at 470. Perhaps most importantly, the Court in *Schriro* was applying § 2254's deferential standard of review, which permits setting aside the state-court finding of waiver only if it "was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(2). Given that standard, a federal-court evidentiary hearing on waiver was unnecessary.

Because of the evidence that Defendant (1) changed his mind from time to time on how he wished the case to be tried, (2) at least at some times deferred to the best judgment of his lawyers, and (3) may not have made a fully informed decision (because his attorneys inadequately investigated his background and mental health), we cannot say that the unelaborated statements by his attorneys necessarily establish that those attorneys were barred by Defendant from pursuing a defense to the death penalty based on his background or mental health. We express no opinion on the issue; an evidentiary hearing can resolve the matter.

Finally, the government suggests that the actions of Defendant's trial attorneys were justifiable because they were able to present an alternative yet still effective portrayal of Defendant as a beloved family member. But an uninformed choice is not a reasonable tactical decision: "[A] decision to focus on one potentially reasonable trial strategy [cannot be] justified by a tactical decision when counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background." *Sears*, 561 U.S. at 954 (citation and internal quotation marks omitted); *see also Littlejohn v.*

38

186

*Trammell*, 704 F.3d 817, 867 (10th Cir. 2013) (*Sears* and *Rompilla* "emphasized the need

for courts to consider the prejudicial effect of counsel's failure to investigate a viable

mitigation theory *even in the face* of an otherwise reasonable mitigation defense");

*Brecheen v. Reynolds*, 41 F.3d 1343, 1368 (10th Cir. 1994) ("If . . . the decision is not

tactical, and counsel's performance is therefore deficient, then the first prong of

*Strickland* is satisfied."). Defendant's trial attorneys had an obligation to investigate

carefully before setting out on a course of action, and there is evidence that they did not

do so.

### 2.     Prejudice

To obtain relief, Defendant must also establish that the alleged deficient

performance of counsel caused him prejudice. His burden is to show that "there is a

reasonable probability that, but for counsel's unprofessional errors, the result of the

proceeding would have been different." *Rushin*, 642 F.3d at 1302 (internal quotation

marks omitted). "To assess that probability, we consider the totality of the available

mitigation evidence—both that adduced at trial, and the evidence adduced in the [§ 2255]

proceeding—and reweigh it against the evidence in aggravation." *Porter*, 130 S. Ct. at

453–54 (brackets and internal quotation marks omitted). This is a "probing and fact-

specific analysis," which "will necessarily require a court to 'speculate' as to the effect of

the new evidence." *Sears*, 561 U.S. at 955–56. But we need not be certain that the

omitted evidence would have changed the outcome of the proceeding: it is sufficient if

confidence in the outcome has been undermined. *See Byrd*, 645 F.3d at 1168.

39

187

Taking Defendant's proffered mitigation evidence as true, it is sufficient to require an evidentiary hearing.  It includes documents and declarations and the assessments of three experts:  Dr. Bill Sharp, who examined Defendant in 2002; Dr. Myla Young, a clinical neuropsychologist who examined Defendant in 2009 and reviewed his records; and Dr. George Woods, a psychiatrist who also reviewed Defendant's records and examined him in 2009.  The evidence supports the following:

Defendant's family has a long history of mental-health problems, alcoholism, and abuse.  On Defendant's maternal side, several members of his extended family suffer from mental-health problems and relatives of his grandparents committed suicide or were involuntarily committed for psychiatric treatment.  On his paternal side, several members of the extended family have mental-health problems, his great-great-grandfather was once committed to a psychiatric hospital, his great-grandfather committed suicide, and his grandfather was an alcoholic who spent time in a mental hospital under a Certificate of Lunacy and who chronically abused his family members, including Defendant's father.

Defendant's childhood was less than ideal.  His father supported the family financially but was largely absent.  Throughout Defendant's childhood and adolescence his father drank, fought constantly with Defendant's mother and others, and engaged in numerous extramarital affairs.  He once had a violent altercation with Defendant's mother.  He also punched Defendant once when Defendant was in ninth grade. Defendant's parents separated when he was 10 or 11 years old.  His mother drank constantly and subjected him to physical and emotional abuse and neglect.  Such

evidence of childhood abuse, neglect, and instability can play a significant role in mitigation. *See Sears*, 561 U.S. at 948 (emotionally abused by parents, who fought physically and divorced, and sexually abused by cousin); *Wiggins*, 539 U.S. at 516–17 (neglected and abused by birth mother and abused physically and sexually in foster care); *Williams v. Taylor*, 529 U.S. 362, 395 (2000) ("nightmarish childhood" of abuse and neglect by parents and foster home); *see also, e.g.*, *Hooks*, 689 F.3d at 1203 (defendant's "premature birth, . . . abusive father, frequent moves, educational handicaps, and personal family tragedies" constituted "a life story worth telling"). Also, Dr. Woods said that Defendant's genetic history and poor upbringing increased his risk for developing mental disorders and chemical dependency.

Defendant's own history suggests mental illness. His mother drank alcohol while pregnant with him, he was developmentally delayed as an infant, repeated a grade in school, and dropped out after being referred to special-education classes. He suffered various incidents of head trauma while growing up and as a young man. He began consuming alcohol, tobacco, and other drugs between the ages of 11 and 14, when the brain's frontal lobes are first beginning to develop. In January 1986, at the age of 24, he attempted suicide by shooting himself in the chest with a shotgun, after which he received psychiatric intervention and was prescribed antidepressants. Later that year he was involuntarily committed to a hospital after complaints from his mother and ex-wife that he was violent and suicidal; he was diagnosed as suffering from substance abuse and mixed personality disorder. In 1995 he was again hospitalized for three days after

41

189

arriving in the emergency room complaining of "losing his mind."  R., Vol. 2d pt. 8 at

358.  He was discharged with diagnoses of substance abuse and organic affective

disorder.  According to Dr. Woods, throughout Defendant's life he has had a significantly

impaired ability to function normally and live independently and has suffered from

irritability, racing thoughts, paranoia, and cognitive impairment.

Drs. Young, Woods, and Sharp concluded that Defendant labors under substantial

mental impairment.  Dr. Woods diagnosed Defendant with bipolar disorder and

posttraumatic stress disorder.  Dr. Sharp's evaluation from 2002 (during the state-court

proceedings) found that Defendant had avoidant personality disorder, long-term memory

problems, a tremor in his hands, and buzzing in his ears.

Most important are the findings relating to Defendant's judgment.  Dr. Young said

(1) that Defendant's history suggests he has sustained brain damage that inhibits his

ability to process new information and (2) that tests she administered likewise indicated

that Defendant's executive functioning—which involves the ability to reason, anticipate

consequences to actions, and respond to new information and act accordingly—was

significantly impaired.  She stated that Defendant's "brain dysfunction . . . would

particularly impair his abilities to organize, think, reason, plan, anticipate consequences

of actions, and change actions as needed based on information he receives from the

environment.  His disabilities would be further exacerbated under conditions of

complexity and/or highly stressful situations."  R., Vol. 1a pt. 1 at 1105.  Dr. Woods

concurred with Dr. Young's findings.  He determined that Defendant suffers from brain

42

damage sustained early in his life, which impairs his inhibition, reasoning, and judgment.

He opined that Defendant's "frontal lobe impairments are known to be the foundation for

disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder."

*Id.* at 1297. Dr. Sharp's 2002 evaluation found Defendant to be fearful and paranoid, and

he agreed with Dr. Young's findings and Dr. Wood's diagnosis.

We have said that evidence of mental impairments "is exactly the sort of evidence

that garners the most sympathy from jurors," *Smith v. Mullin*, 379 F.3d 919, 942 (10th

Cir. 2004), and that this is especially true of evidence of organic brain damage, *see*

*Littlejohn*, 704 F.3d at 864 ("Evidence of organic mental deficits ranks among the most

powerful types of mitigation evidence available."). Organic brain damage is so

compelling, according to one of our decisions, because "the involuntary physical

alteration of brain structures, with its attendant effects on behavior, tends to diminish

moral culpability, altering the causal relationship between impulse and action." *Hooks*,

689 F.3d at 1205. This evidence goes beyond the generalized mental conditions we have

determined to be unhelpful in mitigation. *See Grant v. Trammell*, 727 F.3d 1006, 1020–

21 (10th Cir. 2013) (generalized personality disorders, borderline personality disorder,

bipolar disorder, compulsive personality disorder, and severe emotional distress). It

enables counsel to "explain to the jury why [the] defendant may have acted as he did[,]

. . . connect[ing] the dots between, on the one hand, [his] mental problems, life

circumstances, and personal history and, on the other, his commission of the crime in

question." *Hooks*, 689 F.3d at 1204. Little of this evidence was presented to the jury.

On the other hand, "we do not consider omitted mitigation evidence in a vacuum." *Wilson v. Trammell*, 706 F.3d 1286, 1305 (10th Cir. 2013). "[W]e must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been." *Id.* at 1306; *cf. Burger v. Kemp*, 483 U.S. 776, 788–95 (1987) (reasonable for counsel not to present evidence of defendant's background in mitigation because it would have revealed defendant's violent tendencies).

That response would have surely called into question Defendant's diagnoses of various mental defects and suggested he was simply a dangerous drug addict. The government directs us to evidence that when Defendant was involuntarily committed for psychiatric treatment in 1986, his then-wife executed a sworn statement describing Defendant as "a very dangerous person to himself and others" and stating that he was abusing drugs and had sexually abused her, had kidnapped their son, had destroyed and burned her possessions, and had threatened to kill her and to take away their son. R., Vol. 2d pt. 8 at 350. A medical history sheet completed at that time stated that he had no symptoms of neurological problems and that he denied having suffered any head injuries. Although his discharge summary from that stay diagnosed him with a "[m]ixed personality disorder," it also described him as a drug abuser who had failed to continue taking his medication after his suicide attempt. Also, it offered a prognosis of "[g]uarded, because of the unpredictability of his behavior, depending on the circumstances and depending on whether or not he is taking drugs at the time." *Id.* at

44

353. A few months after his release from the hospital, Defendant had a claim denied by the Social Security Administration. The denial letter stated that "[m]edical reports show that you are moderately depressed but there are no signs of a severe mental illness. Most of the time you are able to think clearly and to carry out your normal activities." *Id.* at 362. As for Defendant's 1995 hospitalization, the government points out that a physician's evaluation found him to be calm, normal, and free of any paranoia, delusions, hallucinations, or homicidal ideation, but still addicted to drugs. And finally, the government could have introduced evidence that Defendant had amphetamines and marijuana in his system on the night of the shooting.

Perhaps the evidence of spousal abuse and drug involvement would not have surprised the jury and presented little downside risk to Defendant's offering evidence of his mental condition. *See Smith*, 379 F.3d at 943 & n.11 (when aggravating aspects of defendant's mental illness had already been presented to jury, little risk to presenting the mitigating aspects as explanation for defendant's behavior). After all, the jury heard extensive testimony of Defendant's abuse of his ex-wife, including her requests for and his violations of multiple protective orders, an incident in which he destroyed her furniture and other items, and his threat after their separation to "blow off her head." *Id.*, Vol. 5 pt. 2 at 3486. Their divorce was granted, the jury learned, on grounds of physical abuse. The jury was also presented with significant evidence of Defendant's drug use, including the testimony of a drug addict that he took methamphetamine with Defendant, and the testimony of a state prison employee that Defendant self-reported first using

45

alcohol at age 12, cocaine and heroin at age 14, and methamphetamine at age 20, and had been using marijuana, methamphetamine, heroin, tranquilizers, and other drugs up until the time of the shooting.  And, of course, there was the guilt-phase evidence of Defendant's outstanding warrant for failure to appear in state court on drug charges and the drug paraphernalia found on Defendant's person and property after the shooting.

But additional *current* mental-health evidence could have been offered by the government once Defendant opened the door to such evidence.  In particular, the government could have called Dr. Randall Price in rebuttal.  Dr. Price conducted a psychological evaluation of Defendant on behalf of the government, and he may have testified that Defendant was a psychopath and would be at a high risk of committing violent offenses if freed.  Such expert testimony can be devastating.  *See Wilson*, 706 F.3d at 1298–99, 1307–08.  We hesitate, however, to rely on Dr. Price's evaluation to establish lack of prejudice.  Although the district court noted the report and apparently relied on it to some extent, it is not clear how much of the report was disclosed to Defendant, which may explain why the government's appellate brief does not discuss it.

In short, we believe that Defendant presented sufficient evidence of deficient performance and prejudice to entitle him to an evidentiary hearing.  Based on the evidence presented at a hearing, the district court can make findings on disputed facts and render its decision, both on performance and prejudice.

### III.    CONCLUSION

We REVERSE and REMAND Defendant's death sentence for the district court to hold an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial.  In all other respects we AFFIRM.  Also, we DENY Defendant's Motion for Certificate of Appealability in Light of *Carter v. Bigelow*.

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK
Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

**August 19, 2015**

Chris Wolpert
Chief Deputy Clerk

Mr. David B. Autry
1021 N.W. 16th Street
Oklahoma City, OK 73106

Ms. Joan M. Fisher
Mr. Tivon Schardl
Office of Federal Defender for Eastern District of California
Capital Habeas Unit
801 "I" Street
Sacramento, CA 95814-0000

**RE:      12-7086, United States v. Barrett**
            Dist/Ag docket: 6:04-CR-00115-JHP-1, 6:09-CV-00105-JHP

Dear Counsel:

Enclosed is a copy of the opinion of the court issued today in this matter. The court has entered judgment on the docket pursuant to Fed. R. App. P. Rule 36.

Pursuant to Fed. R. App. P. Rule 40, any petition for rehearing must be filed within 14 days after entry of judgment. Please note, however, that if the appeal is a civil case in which the United States or its officer or agency is a party, any petition for rehearing must be filed within 45 days after entry of judgment. Parties should consult both the Federal Rules and local rules of this court with regard to applicable standards and requirements. In particular, petitions for rehearing may not exceed 15 pages in length, and no answer is permitted unless the court enters an order requiring a response. If requesting rehearing en banc, the requesting party must file 12 paper copies with the clerk, in addition to satisfying all Electronic Case Filing requirements. *See* Fed. R. App. P. Rules 35 and 40, and 10th Cir. R. 35 and 40 for further information governing petitions for rehearing.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court


cc:     Linda A. Epperley
        Jeffrey Bradford Kahan
        Christopher Wilson


EAS/as

2

197

**FILED**
**United States Court of Appeals**
**Tenth Circuit**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

**August 19, 2015**

**Elisabeth A. Shumaker**
**Clerk of Court**

_____

UNITED STATES OF AMERICA,

      Plaintiff - Appellee,

v.

KENNETH EUGENE BARRETT,

      Defendant - Appellant.

No. 12-7086
(D.C. Nos.  6:09-CV-00105-JHP &
6:04-CR-00115-JHP-1)
(E.D. Okla.)

_____

**JUDGMENT**
_____

Before **KELLY**, **HARTZ**, and **MATHESON**, Circuit Judges.
_____

This case originated in the Eastern District of Oklahoma and was argued by

counsel.

The judgment of that court is affirmed in part and reversed in part.  The case is

remanded to the United States District Court for the Eastern District of Oklahoma for

further proceedings in accordance with the opinion of this court.

Entered for the Court

ELISABETH A. SHUMAKER, Clerk

# UNITED STATES COURT OF APPEALS
## FOR THE TENTH CIRCUIT
## OFFICE OF THE CLERK

Byron White United States Courthouse
1823 Stout Street
Denver, Colorado 80257
(303) 844-3157

Elisabeth A. Shumaker
Clerk of Court

October 26, 2015

Chris Wolpert
Chief Deputy Clerk

Patrick Keaney
United States District Court for the Eastern District of Oklahoma
Office of the Clerk
100 North 5th Street
P.O. Box 607
Muskogee, OK 74401

**RE:    12-7086, United States v. Barrett**
Dist/Ag docket: 6:04-CR-00115-JHP-1, 6:09-CV-00105-JHP

Dear Mr. Keaney:

Please be advised that the mandate for this case has issued today. Please file accordingly in the records of your court.

Please contact this office if you have questions.

Sincerely,

Elisabeth A. Shumaker
Clerk of the Court

EAS/as

cc:     David B. Autry
        Linda A. Epperley
        Joan M. Fisher
        Jeffrey Bradford Kahan
        Tivon Schardl
        Christopher Wilson

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar 122664
Federal Defender of the Eastern District of California
**JOAN M. FISHER**, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-5700
(916) 498-5710 [fax]
Joan_Fisher@fd.org

Attorneys for Petitioner,
Kenneth Eugene Barrett

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | **CAPITAL CASE** |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | **MOTION FOR LEAVE TO** |
| | ) | **CONDUCT CIVIL** |
| Respondent, | ) | **DISCOVERY** |
| _____ | | |

Motion for Leave to Conduct Civil Discovery
And Memorandum of Points and Authorities

*Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

## TABLE OF CONTENTS

MOTION FOR LEAVE TO CONDUCT CIVIL DISCOVERY ..............................1

MEMORANDUM OF POINTS AND AUTHORITIES ...........................................2

I.   GOVERNING LEGAL STANDARDS ......................................................2

II.  MR. BARRETT'S REQUESTS FOR DISCOVERY .....................................4

   A.  FOR GOOD CAUSE SHOWN..............................................................4

   B.  DISCOVERY REQUESTED.................................................................5

     1.  Disclosure of Exculpatory Information.....................................5

     2.  Depositions and subpoenas duces tecum of government experts, trial counsel, and other witnesses.................................................7

       a.  J. Randall Price, Ph.D. .........................................................8

         i.   Subpoena Duces Tecum.................................................8

         ii.  Deposition ...................................................................8

           a)  Dr. Steven Pitt, D.O., Government Requested Psychiatrist. ..........10

           b)  Roger Hilfiger and Bret Smith, Appointed Trial Counsel..............10

         iii. Depositions of Trial Counsel .........................................10

         iv. Subpoenas Duces Tecum. ..............................................11

         v.  Request for Production .................................................11

           a)  Alan Frank Lloyd, former District 27 Drug Task Force Agent......12

         vi. Deposition ...................................................................12

         vii. Subpoena Duces Tecum. ...............................................13

           a)  Michael Littlefield, former Assistant United States Attorney........14

     3.  Requests for Production of Documents. ..................................16

     4.  Request For Additional Subpoenas Duces Tecum...................20

     5.  Motion to Order the Government to Collect and Preserve Evidence from the Scene.....................................................................22

III. COMPLIANCE WITH LOCAL CIVIL RULE 7.1(g). .............................23

IV.  CONCLUSION .................................................................................23

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          i          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

201

## TABLE OF AUTHORITIES

**Federal Cases**

*Bracy v. Gramley*, 520 U.S. 899 (1997) ............................................................. 2, 3

*Brady v. Maryland*, 373 U.S. 83 (1963) ............................................................. 7

*Browder v. Dir., Dep't of Corr.*, 434 U.S. 257 (1978) ....................................... 2, 3

*Giglio v. United States*, 405 U.S. 150 (1972) ..................................................... 7

*Hilton v. Braunskill*, 481 U.S. 770 (1987) ......................................................... 3

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) ......................................... 5

*Houston v. Lack*, 487 U.S. 266 (1988) ............................................................... 3

*Johnston v. Love*, 165 F.R.D. 444 (E.D. Pa. 1996) ........................................... 3, 4

*Lockett v. Ohio*, 438 U.S. 586 (1978) ................................................................. 6

*Murray v. Giarratano*, 492 U.S. 1 (1989) ......................................................... 3

*Pa. v. Finley*, 481 U.S. 551 (1987) ..................................................................... 2

*Teague v. Scott*, 60 F.3d 1167 (5th Cir. 1995) ................................................... 3

*Toney v. Gammon*, 79 F.3d 693 (8th Cir. 1996) ................................................. 3

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ................................. 4, 9

*Wiggins v. Smith*, 539 U.S. 510 (2003) ............................................................... 7

**Federal Statutes**

28 U.S.C. § 2255 ................................................................... 2, 9, 11, 18, 19

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          ii                    *Barrett v. USA*
                                                                OKED Case No. 6:09-cv-00105-JHP

202

## <u>MOTION FOR LEAVE TO CONDUCT CIVIL DISCOVERY</u>

Pursuant to the Court Order dated November 7, 2016 (Doc 246), for good cause shown Mr. Barrett asks the Court to enter an Order authorizing the discovery requested in the supporting Memorandum of Points and Authorities that follows. This motion is being made pursuant to Rule 6 of the Rules Governing Section 2255 Cases; Rules 26, 30, 33 and 34 of the Federal Rules of Civil Procedure; Local Rules of Criminal Procedure and Local Rules of Civil Procedure 7.1, 26.1, 37.1, 12.1 and the Fifth and Eighth Amendments to the United States Constitution.

Based on the authority and good cause set out in the attached Memorandum of Points and Authority, Petitioner is entitled to and requests this Court enter an Order permitting Counsel to conduct the discovery requested below.

DATED:  November 18, 2016          Respectfully submitted,

/s/ *Joan M. Fisher*
JOAN M. FISHER, Idaho Bar No. 2854
Assistant Federal Defender


/s/ *David Autry*
DAVID AUTRY, OBA No. 11600
Attorney at Law

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          1                              *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

203

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.  GOVERNING LEGAL STANDARDS

Rule 6 of the Rules Governing § 2255 Cases authorizes discovery with leave of the district court.  Rule 6 contemplates that the Court may allow discovery permitted under the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure, for "good cause."

A habeas corpus petitioner is entitled to discovery if he can establish "good cause" for his request.  *Bracy v. Gramley,* 520 U.S. 899, 908-09 (1997).  A petitioner establishes "good cause" whenever "specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief."  *Bracy*, 520 U.S. at 908-09 (1997) (quoting Harris v. Nelson, 394 U.S. 286, 299 (1969)); *see also* Rule 6 of the Rules Governing § 2255 Cases.

In exercising its discretion and in determining whether Petitioner has established "good cause" for the requested discovery, this Court should be guided by the recognition that habeas corpus litigation is a civil proceeding.  The more restrictive rules which apply to discovery in criminal cases do not control.  *See e.g., Pennsylvania v. Finley*, 481 U.S. 551, 556 (1987) (habeas proceeding is "not part of the criminal proceeding itself, and it is in fact considered to be civil in nature."), citing, *Fay v. Noia,* 372 U.S. 391, 423-424 (1963 ); *Browder v. Director, Department of Corrections*, 434 U.S. 257, 269 (1978 ) ("It is well settled that

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities        2                              *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

habeas corpus is a civil proceeding"); *Murray v. Giarratano*, <u>492 U.S. 1, 8</u> (1989);

*Houston v. Lack*, <u>487 U.S. 266, 272</u> (1988); *Hilton v. Braunskill*, <u>481 U.S. 770,</u>

<u>775-76</u> & n.5 (1987) ("Our decisions have consistently recognized that habeas

corpus proceedings are civil in nature. . . Where [] the need is evident for

principles to guide the conduct of habeas proceedings, it is entirely appropriate to

'use . . . [civil] rules by analogy or otherwise'") (quoting *Harris v. Nelson*, <u>394</u>

<u>U.S. 286, 294</u> (1969)); *Browder v. Director*, <u>434 U.S. 257, 269</u> (1978).

A court's denial of discovery is an abuse of discretion if discovery is

indispensable to a fair, rounded development of the material facts found.  *Toney v.*

*Gammon*, <u>79 F. 3d 693, 700</u> (8th Cir. 1996) (finding discovery was essential to

petitioner's ineffective assistance of counsel claim.)  "Denial of an opportunity for

discovery is an abuse of discretion when the discovery is necessary to fully

develop the facts of the claim." *Teague v. Scott,* <u>60 F.3d 1167, 1172</u> (5th Cir.

1995).

When a habeas petitioner has shown good cause for the discovery he seeks,

discovery must be allowed.  "[I]t is the duty of the courts to provide the necessary

facilities and procedures for an adequate inquiry." *Bracy*, <u>520 U.S. at 909</u>.  The

purpose of post-conviction discovery "is to ensure that the facts underlying a

[habeas] claim are adequately developed." *Johnston v. Love*, <u>165 F.R.D. 444, 445</u>

(E.D. Pa. 1996).  Discovery is appropriate whenever "a petitioner has provided a

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          3                          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

sufficient basis for believing that discovery may be necessary to adequately explore a petitioner's claim for relief." A discovery request may not be denied "if there is a sound basis for concluding that the requested discovery might allow him to demonstrate" his entitlement to relief. *Id.*

## II. MR. BARRETT'S REQUESTS FOR DISCOVERY

In the following subsections, Petitioner lists his discovery requests, how they are relevant to the issues before the Court, and good cause supporting the requests.

### A. FOR GOOD CAUSE SHOWN.

In *United States v. Barrett,* 797 F. 3d 1207, 1232 (10th Cir. 2015), the Tenth Circuit Court of Appeals addressed the issue of whether Mr. Barrett's trial counsel "prepared a mitigation case that measures up to professional norms and, if not, whether that made a difference" and found that the record before them was "inadequate." *Id.* at 1224. Consequently, the Court reversed and remanded Mr. Barrett's death sentence to this Court for an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating [Mr. Barrett's] background and mental health and whether [he] suffered any prejudice from any deficiency during the penalty phase of his trial." The hearing now contemplated must address both deficiency in performance and prejudice. *Id.* at 1214 (citing *Strickland v. Washington,* 466 U.S. 668, 694 (1984)). Prejudice is determined by

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          4                    *Barrett v. USA*
                                                              OKED Case No. 6:09-cv-00105-JHP

the cumulative impact of deficient performance.  *Hooks v. Workman,* 689 F.3d 1148, 1187–88 (10th Cir. 2012).

Within that mandate there are four areas of inquiry:

1.) The mental health of Mr. Barrett as it relates to any mitigating factor that was, could or should have been discovered, investigated and presented to the jury;

2.) Whether or not the facts and circumstances surrounding the execution of the no-knock, nighttime warrant, when viewed by a person suffering from Mr. Barrett's mental problems (which were not investigated, developed, or ever presented to the jury) made Mr. Barrett deserving of the death penalty;

3.) Whether it is reasonably probable that a jury made aware of these facts would have imposed a sentence less than death; and

4.) Whether the evidence described above and proffered to a jury would have raised, at a minimum, residual doubt of Mr. Barrett's guilt, which is in itself a significant mitigating factor.

It is to these inquiries that the discovery requested below is directed.

## B. DISCOVERY REQUESTED.

### 1. Disclosure of Exculpatory Information.

Petitioner requests the government disclose any and all mitigating evidence in its actual or constructive possession.  This includes anything that disputes, refutes or undermines the credibility of any evidence relied upon by the government at sentencing.

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities                5                                    *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

**Good Cause.** There is reason to believe the government, through its agents or former agents, have in their actual or constructive possession mitigating evidence to which Mr. Barrett is constitutionally entitled.

Mitigating evidence is any evidence concerning the defendant or the offense, whether admissible under the rules of evidence or not, that reduces the moral blameworthiness and culpability of the defendant, suggesting that a life sentence rather than the death penalty is appropriate. *See Lockett v. Ohio*, 438 U.S. 586, 600, 604 (1978).   A sentencing jury may not be precluded from hearing "any aspect of a defendant's character or record and any of the circumstances of the offense" that could reasonably have been proffered "as a basis for a sentence less than death." *Id.* at 604.

Thus Mr. Barrett asks the Court to order the government to state and disclose any document, note, memoranda, or other tangible form of communication and/or documentation, including audio and video recordings, whether found in the government's files related to the prosecution and sentencing of Mr. Barrett, or known to exist and in the possession of third parties, that would mitigate punishment.  The agencies from which Petitioner seeks discovery of this evidence include, but are not limited to: 1) the Sequoyah County Sheriff's Office; 2) the City of Sallisaw Police Department; 3) the District 27 Multi-County Drug Task Force; 4) the DEA; 5) the FBI; 6) the ATF; 7) the Oklahoma Bureau of Narcotics and

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          6                              *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

208

Dangerous Drugs; ["OBNDD"]; 8) The Oklahoma State Bureau of Investigation ["OSBI"]; 8) the Oklahoma Highway Patrol ["OHP"]; and 9) the Oklahoma Department of Public Safety ["ODPS"].

Good cause for this specific request rests on the United States Supreme Court decisions in *Brady v. Maryland,* 373 U.S. 83, 87 (1963) (holding the "suppression by the prosecution of evidence favorable to the accused upon request violates due process where evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution."); *Giglio v. United States*, 405 U.S. 150, 155(1972) (extending *Brady* to impeachment evidence). *Strickland v. Washington*, *supra; Wiggins v. Smith,* 539 U.S. 510, 534 (2003) (finding deficient performance in trial counsel's strategic decision to end an investigation was not supported by reasonable professional judgement.)

## 2. *Depositions and subpoenas duces tecum of government experts, trial counsel, and other witnesses.*

Based upon good cause, Mr. Barrett requests the right to depose the individuals named below. FED.R.CIV.P. 26, 30.

Movant seeks to depose trial counsel concerning matters relevant to their failure to adequately investigate and present mitigating evidence. The evidence omitted at trial includes, but is not limited to, Mr. Barrett's mental health, including evidence that would tend to negate the requisite intent to kill or which would diminish his ability to form such intent, as well as mitigating aspects of his

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          7          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

209

personal history and background.  Petitioner seeks to depose government experts to determine what their testimony will be and to develop evidence favorable to him.

a.  J. Randall Price, Ph.D.
i.   *Subpoena Duces Tecum*

Petitioner requests the Court issue an order authorizing counsel to serve subpoenas duces tecum regarding the mental health evaluation of Mr. Barrett prior to trial conducted by government expert J. Randall Price that requires Dr. Price to produce any and all documentation of his examination. This includes, but is not limited to, all notes, reports, memoranda, materials of whatever form or nature in the possession of Dr. Price, or within his constructive possession.  Petitioner also seeks production of the entirety of any video or audio record of Dr. Price's examination of him.

Counsel are advised that the government again seeks to unseal the result of the complete mental health examination.  Mr. Barrett has no opposition to the unsealing and disclosure of all related documentation, including a video-taped interview of Mr. Barrett.

ii.   *Deposition*

Mr. Barrett seeks to depose Dr. Price within thirty days of full disclosure by the Court and/or United States Attorney of the complete mental health evaluation conducted by him, and all records related to the examination.

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          8          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

**Good Cause**.  Pursuant to Court Order, a Sealed Psychological Evaluation/Risk Assessment of Mr. Barrett was prepared by Dr. J. Randall Price. The report was provided to a fire-walled Assistant United States Attorney in the Northern District of Oklahoma. The fire-walled attorney filed the sealed report with the Court. (Trl. Doc. 237.) The report remained sealed through the conclusion of trial, and remains sealed today.

There is no question Dr. Price's evaluation was considered by the Court in denying Mr. Barrett § 2255 relief.  *See* Doc. 214 at 91 n.159 & 189 (citing Trl. Doc. 237).  On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to consider whether counsel were ineffective in the penalty phase for failing, among other things, to present mitigating mental health evidence.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).  The Tenth Circuit noted this Court relied on Dr. Price's report, noting its potential effect on Mr. Barrett's claim.  *Id.*  Dr. Price's evaluation is without question relevant to Petitioner's claim that he received ineffective assistance of counsel in the penalty phase.

Mr. Barrett is entitled to Dr. Price's report and all material related to his examination.  Mr. Barrett is also entitled to depose, and serve a subpoena duces tecum on, Dr. Price.

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          9                          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

211

*a)* <u>*Dr. Steven Pitt, D.O.,*</u> *Government Requested Psychiatrist.*

Mr. Barrett moves to depose, and serve a subpoena duces tecum on, Dr. Steven Pitt, D.O., or any other mental health expert designated and relied upon by the government, assuming his objection to a government psychiatric exam is overruled.

Petitioner seeks an Order authorizing counsel to depose Dr. Pitt and to serve him with a subpoena duces tecum for any and all documents or recordings of whatever form or nature that relate to his examination of Mr. Barrett and his communications with the government.  If the government elects to call Dr. Pitt as a witness at the evidentiary hearing, counsel further request full and complete disclosure of the written expert report under Rule 26.

*b)* <u>*Roger Hilfiger and Bret Smith*</u>, *Appointed Trial Counsel.*

Mr. Barrett seeks to depose trial counsel Roger Hilfiger and Bret Smith.  He also seeks permission to serve them with subpoenas duces tecum.

*iii.    Depositions of Trial Counsel*

Depositions of trial counsel are necessary for adequate preparation of the evidentiary hearing.  It is a matter of record that former trial counsel Hilfiger and Smith submitted affidavits against Mr. Barrett without first securing a court order to determine the extent and scope of the waiver of attorney-client confidentiality. This raises an appearance of hostility toward Mr. Barrett, making depositions of Messrs. Hilfiger and Smith critical to preparation for the evidentiary hearing, a

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          10                                    *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

212

hearing at which Mr. Barrett bears the burden of proof.  *See Strickland v. Washington, supra.*

iv.   *Subpoenas Duces Tecum.*

Mr. Barrett requests an Order permitting him to serve subpoenas duces tecum on trial counsel Roger Hilfiger and Bret Smith to produce any and all documentation memorialized in any manner (including records, files, or written indicia, including emails, texts, notes, memoranda, reports or any other means of documentation, as well as any and all recordings, including voicemails) relating to their representation of Mr. Barrett and not previously provided to Mr. Barrett's § 2255 counsel.  These materials will be held in confidence by Mr. Barrett's § 2255 counsel until review makes clear what, if any, of the requested materials are the subject of a waiver of confidentiality by Mr. Barrett.

v.   *Request for Production*

Related to these requests, Mr. Barrett also seeks production of any and all documentary evidence (including emails, texts or other digital communications, phone call messages, voicemail, notes, memoranda, reports, and recordings [audio or video]) of every communication between trial counsel Roger Hilfiger and/or Bret Smith with AUSA Christopher Wilson, or any agent of the United States Attorney's Office for the Eastern District of Oklahoma and/or Jeffrey Kahan,

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities            11            *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

213

United States Department of Justice, or any agent of the United States Department of Justice.  *See also* Requests for Production 3 and 4 below.

> a) *Alan Frank Lloyd, former District 27 Drug Task Force Agent.*

> vi.   *Deposition*

Mr. Barrett requests an Order permitting him to depose Alan Frank Lloyd, who was employed as an investigator for the District Attorney and who assisted in setting up Mr. Barrett for a 1996 one-quarter gram delivery charge.  Although the charge was ultimately dismissed, a bench warrant was issued for failure to appear. This incident served in part as "probable cause" for the no-knock warrant that resulted in the trooper's tragic death.  Mr. Lloyd is also the agent for the District 27 Drug Task Force Unit who contacted OHP Trooper Danny Oliver to arrange for the OHP's participation in the execution of the no-knock, nighttime warrant on September 24, 1999.  Mr. Lloyd was a fellow agent of Clint Johnson, who allegedly advised both OHP (and later the OSBI) that Mr. Barrett had purportedly made threats against law enforcement that made execution of the warrant a high risk.

On information and belief, former Agent Lloyd's activities surrounding the original charges of delivery of drugs (including approaching Mr. Barrett before the December 19, 1996 date of the alleged delivery charged on March 24, 1997 and advising him that he must become an informant and turn three deals to avoid

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          12          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

214

"going down" for 25 years) likely exacerbated Mr. Barrett's paranoia and overall mental illness. Evidence of this triggering event would have produced admissible mitigating evidence related to Mr. Barrett's mental state and what he believed to be the reasonableness of his conduct.

**Good Cause.** Mr. Lloyd was a purported witness in the delivery case. He was subpoenaed to testify at the preliminary hearing. Although he was in the courthouse, the hearing was aborted and he was not called to testify. Nonetheless, OBN Agent Kevin Ottwell admitted under oath that Agent Lloyd may have attempted to flip Mr. Barrett to give evidence against drug users or dealers. Former Sallisaw Police officer Larry Blount was also involved in the 1997 drug delivery, and has now admitted under oath that he lied when he said he observed the sale. (Cr.0115, Doc 433 Exh. 4). The testimony of Agent Lloyd is relevant and material to the claims of second stage ineffective assistance of counsel. Had counsel investigated the circumstances surrounding the drug delivery charge, and subsequent acts and failures to act by law enforcement, which impacted Mr. Barrett's mental health and mental state, his actions on the night OHP Trooper Rocky Eales was killed could have been cast in a mitigating light.

> vii.  *Subpoena Duces Tecum.*

Mr. Barrett requests a court Order permitting him to serve a subpoena duces tecum on Mr. Lloyd to produce any and all documentation memorialized in any

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          13          *Barrett v. USA*

manner whatsoever (including but not limited to emails, texts, records, files, or written indicia including notes, memoranda, reports or any other means of documentation and/or any and all recordings including but not limited to voicemail) related to Mr. Barrett from January 1996 (i.e., prior to the approach to Mr. Barrett to turn informant) through 2005, the start of the federal trial.

There is good cause to believe former Agent Lloyd possesses such files. Mr. Barrett asserts that an interview by his investigator with DEA Agent Juan Beal revealed Mr. Lloyd "had two secret rooms in his house, one upstairs in his bedroom with an escape route, and one in which he stores old DTF files and reports." Cr-0115 Doc 432 Exh. 1 (Interview of Juan Beal). The manner in which Mr. Barrett had been used and abused by law enforcement in Sallisaw and Sequoyah County over many years is relevant to establishing his mental state when his property was raided by the OHP Tact Team.

> a) <u>Michael Littlefield</u>, *former Assistant United States Attorney.*

Michael Littlefield was the lead investigating attorney for the United States in the prosecution of Mr. Barrett. Mr. Littlefield is the only person known to have cultivated and interviewed the seven informant witnesses who testified against Mr. Barrett at the federal trial. These witnesses did not testify at the state trials. What they said to Mr. Littlefield in his interviews of them is relevant, one way or the other, to the question of Mr. Barrett's mental health and general conduct in the

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities       14       *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

216

months preceding the raid on his home.  Trial counsels' failure to demand full disclosure of those conversations and to insist on unimpeded access to those witnesses was in part a function of the failure to appropriately investigate penalty phase evidence.  Mr. Barrett's request is grounded in his burden to show prejudice stemming from ineffective assistance of counsel in the penalty phase.

In addition to any documents or materials relating to the interviews of these informant witnesses, Petitioner also requests that the deposition subpoena command Michael Littlefield (and the government, which likely retained Mr. Littlefield's files after his departure from the U.S. Attorney's Office) to produce at the deposition any notes, memoranda or writing, audio-recordings or photographic or video recordings, or digital evidence that Mr. Littlefield, or any person acting at his direction, may have made or possessed prior to Petitioner's sentencing concerning Mr. Barrett's state of mind, and evidence of any intimidation practiced by Mr. Littlefield on any of the seven informant witnesses, including Charles "Monk" Sanders, Travis Crawford, Randy Weaver, Randy Turman, Karen Real, Brandy Price and/or Cindy Crawford, by law enforcement agents or government retained experts.  Any evidence that these witnesses were threatened or intimidated by Mr. Littlefield is relevant mitigating evidence, because it calls into question the credibility of the government's case.  The testimony of the seven informants was

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities           15                          *Barrett v. USA*
                                                                OKED Case No. 6:09-cv-00105-JHP

217

the most damning evidence of Mr. Barrett's purported state of mind, which profoundly reflected the state of his mental health.

### 3. *Requests for Production of Documents.*

Mr. Barrett further requests this Court grant him permission to conduct the following Discovery pursuant to FED.R.CIV.P. 33 and 34 by submitting to the government the following Motion to Produce.

a. Request for Production No. 1: Produce for inspection and copying any writing or documentation in the government's actual or constructive possession, whether admissible or not, whether in hard or electronic copy form, and of whatever nature, including emails, texts, or other digital communications, notes, memoranda, logs, contracts or agreements, monies, surveillance reports, offense reports, and all evidence or information concerning Mr. Barrett's mental condition prior to the raid on his home on September 24, 1999.

b. Request for Production No. 2: Produce for inspection and copying any writing or documentation, whether in hard or electronic copy form, and of whatever nature, including emails, texts, other digital forms of communication, notes, memoranda, logs, contracts or agreements, monies, surveillance reports, offense reports, audio or video recordings or reproductions, including voicemail, or the like, related to any and all of the evidence offered by the government in

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities            16                          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

aggravation of sentence, including the evidence submitted at the guilt/innocence stage which was relied upon to seek the death penalty.

That evidence includes but is not limited to the evidence presented by following witnesses called by the government to testify at the sentencing hearing: William DeWeese, Stanley Philpot, Johnny Philpot, Cindy Crawford, Charles Sanders, Larry Lane, Shannon Smith (RT CR-115 vol. 22); Shannon Smith (cont'd) Nancy Eales Stalcup, Bobbie Eales, Gene Hise, Kelli Eales (RT Cr-0115, vol. 23); Joshua Arnold; Lloyd Vellek, Rick Fargo, Richard Carter, George Borman, Michael Hendricks (RT Cr-0115, vol. 26).

It further relates to the non-testimonial evidence offered at sentencing including Government Exhibit Nos. 302, 306, 309, 316, 318, 326, 329 (RT Cr-0115, vol. 23); Government Exhibits Nos. 330, 331,332, 334, 335, 336, 337, 338, 339, 340, 341 (RT Cr-0115, vol. 24); Government's Exhibits No. 344, 345 (RT Cr-0115, vol. 25).

It further relates to any evidence possessed regarding defense witnesses called at sentencing including:  Maudeen Vann, Kathy Trotter, Jimmy Wilson, Abby Stites, Craig Edgmon, Clyde Edgmon (RT Cr -0115, vol. 24); Robert Gude, Courtney Burk, Martin Daggs, Steven Wayne Barrett, Roger Crawford, Gelene Dotson, Ernest Barrett, Doris Barrett (RT Cr-0115 vol. 25).

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities                17                          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

219

It further relates to the non-testimonial evidence offered at sentencing including Defendant's Exhibit Nos. 230, 231, 232, 233, 234, 235, 240-249 (RT CR-115 vol. 24).

    c. <u>Request for Production No. 3</u>: Produce for inspection and copying the following:

    i.    Any and all interview notes, reports and video-conferences between trial counsel and AUSA Christopher Wilson, DOJ attorney Jeffrey Kahan, or any agents thereof, individually or together, during these § 2255 proceedings regarding counsel's representation of Mr. Barrett, and including in preparation of the affidavits filed as exhibits with their Answer.

    ii.    Any and all communications documented in any way, written or oral, including but not limited to calendar entries, notes, memos, reports, files, records, emails, text messages or other digital communications, including those held by the U.S. Attorney's Office and/or DOJ with Mr. Barrett's appointed trial counsel, Roger Hilfiger and/or Bret Smith.

    iii.    Any and all written or oral memoranda, recorded or otherwise, memorialized in any manner whatsoever, by email, text, or voicemail, held in the records and files of either the United States Attorney's Office for the Eastern District of Oklahoma or the Department of Justice regarding any *ex parte*

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities    18    *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

220

communications between the United States Attorney's Office and/or the Department of Justice with the Hon. James H. Payne.

iv.    The complete files of the United States Attorney for the Eastern District of Oklahoma and Department of Justice files related to:

A. the determination to file federal capital charges, and to the federal or state trials and § 2255 proceedings regarding Kenneth Barrett;

B. the OBNDD and DEA investigations of Clint Johnson;

C. the DEA files related to the investigation of Kenneth Barrett, Janesse Thomas, Monk Sanders, Travis Crawford, and/or Chip Teague on or prior to September 24, 1999.

D.  Any and all information relevant to mitigation, including but not limited to the mental health and/or the actual innocence of Kenneth Barrett, which is in the possession of the United States Attorney's Office, the Department of Justice, or any governmental agency, including but not limited to the DEA, the ATF, and/or the FBI, related to any investigation of Kenneth Barrett.

**Good Cause.**  Mr. Barrett asserts each and every item requested in this Request for Production is relevant to questions raised in Mr. Barrett's § 2255 petition concerning ineffective assistance of counsel in failing to investigate, develop, raise and present evidence in mitigation of the death sentence.  Trial counsels' communications with the Court and the prosecutors relating to the very

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          19          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

221

claim upon which the Tenth Circuit has granted a hearing should be available to Mr. Barrett for full exploration and investigation in anticipation of trial counsels' testimony at the hearing to show the bias and interests of trial counsel. This information will shed light on counsels' failure to investigate, develop, and introduce mitigating evidence. It will also shed light on both Mr. Barrett's state of mind and mental health at the time of these investigations and determinations.

### 4. Request For Additional Subpoenas Duces Tecum.

FED.R.CIV.P. 34(c) and 45 permit a litigant to subpoena documents in the possession of a non-party. Good cause exists to permit Mr. Barrett to disclose any documents related to government investigations possessed by the government or held by third parties identified below related to:

a.      A Drug Task Force and/or DEA investigation of Mr. Barrett during the six-month period during which the warrant for failure to appear was issued but left unserved, despite the ready availability of Mr. Barrett and the lack of any reason to believe Mr. Barrett could not be peaceably served with it.

Petitioner further requests this Court permit the service of subpoenas duces tecum on the District 27 Drug Task Force, the DEA and OBN regarding the investigation of Kenneth Barrett and his supposed drug-related activities from January 1999 through the conclusion of the investigation, at least through September 24, 1999.

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          20                              *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

222

b.      An Oklahoma Bureau of Narcotics investigation of Drug Task Force Agent Clint Johnson, the affiant on the no-knock warrant, execution of which led directly to the events giving rise to the death of Trooper Eales and Mr. Barrett's conviction and sentence of death.

Petitioner further requests this Court permit service of subpoenas duces tecum on the District 27 Drug Task Force, the DEA and OBN on the investigation of Clint Johnson in relation to Clint Johnson's possession of stolen evidence.  Cr.-0115 Doc 433 Exh. 12 (Det. Courtney Bates), Exh. 14, 15 (Former D.A. Richard Gray), Exh. 16 (Marshal Sgt. Michael Reese), Exh. 17 (Interview of Earl Beaver).

**Good Cause.**  Mr. Barrett believes that these productions will shed light on both Mr. Barrett's state of mind and mental health at the time of these investigations and how the government perceived his state of mind and mental health at the times of these investigations and determinations.

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          21                          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

223

**5.** ***Motion to Order the Government to Collect and Preserve Evidence from the Scene.***

On April 18, 2016, Mr. Barrett's counsel Joan Fisher and investigator Leonard Post visited the crime scene.  While observing the scene, it was determined that a bullet was still lodged in the wall directly behind the door of Mr. Barrett's former residence.  The bullet appeared to be in a direct line of trajectories of other bullets fired by law enforcement during the fatal incident.  Ms. Fisher advised United States Attorney Mark Green and Assistant United States Attorney Chris Wilson of the lodged bullet and requested that we be present when it was extracted.  Mr. Wilson stated he would discuss the matter with the DEA because it was their case.  Now months later, we still have heard nothing further from the United States Attorney's Office.

The bullet is potentially significant mitigating evidence, because, upon examination, it could well rebut the ballistics and crime scene reconstruction testimony presented by the government at trial, and perhaps establish the most mitigating factor of all, Mr. Barrett's actual innocence.  Mr. Barrett requests that the United States Attorney make arrangements for the extraction of the lodged bullet, document and process the same against all other weapons at the scene, and grant the defense full access to the evidence and to conduct any relevant testing beyond the government's handling of the evidence.

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          22          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

224

## III.   COMPLIANCE WITH LOCAL CIVIL RULE 7.1(g).

The undersigned has conferred with counsel for the government by email to apprise the Court of the government's position on this Motion on Thursday, November 17, 2016.  Counsel did not confer in person because they are more than thirty (30) miles apart, a distance which renders face-to-face consultation unfeasible.  On November 18, 2016, Counsel for Respondent advised Petitioner that the Government objects to the following: 1.) Any further disclosure requested under *Brady v. Maryland* as the government believes it has previously satisfied its obligations under that doctrine; 2.) Depositions of anyone other than Drs. Pitt and Price; 3) All demands for document production.

## IV.   CONCLUSION

Based upon the requests and showings made above, Mr. Barrett requests an Order granting him leave to conduct the discovery sought.

DATED:  November 18, 2016                Respectfully submitted,

                                                                /s/ Joan M. Fisher
                                                                JOAN M. FISHER

                                                                /s/ David Autry
                                                                DAVID AUTRY

                                                                Attorneys for Petitioner,
                                                                KENNETH EUGENE BARRETT

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          23                              *Barrett v. USA*
                                                                        OKED Case No. 6:09-cv-00105-JHP

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 18th day of November, 2016, I caused the foregoing Motion for Leave to Conduct Discovery and Memorandum and Authorities to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

DATED:  November 18, 2016

/s/ Joan M. Fisher
JOAN M. FISHER

Motion for Leave to Conduct Civil Discovery
and Memorandum of Points and Authorities          24                          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

226

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,             )
                                    )
  Petitioner/Defendant,       )
                                    )
 v.                            )  Case No. CV-09-00105-JHP
                                    )
UNITED STATES OF AMERICA,            )
                                    )
  Respondent/Plaintiff.       )

## GOVERNMENT'S MOTION TO SECURE TRIAL COUNSEL'S FILES

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to order Barrett to disclose his trial attorneys' files and records concerning their representation of him.  Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, counsel for the government consulted by e-mail with Barrett's attorney, David Autry, who stated he and co-counsel "have no objection to this motion assuming reciprocity and disclosure of the government's files related to presentation of aggravation at penalty phase, consistent with the scope of the waiver related to the IAC claims, which includes guilt/innocence claims as they relate directly to evidence considered at the penalty phase of trial, and the question of residual doubt.  [Counsel] make this request because, to properly apply the *Strickland* standard to Mr. Barrett's IAC sentencing claim, the Court must consider all the available but uninvestigated, undeveloped and unpresented mitigating evidence as it related to Mr. Barrett's mental health in connection with the intent requirements of the charges themselves and penalty phase findings, as well as all Brady evidence as it affects sentencing.  All this would undoubtedly have been weighed in the aggregate by the jury in determining punishment."

## PROCEDURAL HISTORY

Barrett was convicted and sentenced to death by a jury.  Following affirmance on appeal by the Tenth Circuit, Barrett sought collateral relief under 28 U.S.C. § 2255.  This Court denied relief on all grounds (Doc. 214), but the Tenth Circuit reversed on a single issue, and remanded the case for an evidentiary hearing to consider the alleged ineffective assistance of penalty phase counsel in the investigation and presentation of mitigating evidence.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).  After the Tenth Circuit denied a request to file a second and successive collateral action under 28 U.S.C. § 2255(h), this Court ordered the parties to submit any discovery requests by November 18, 2016.

The government now moves for this Court to order Barrett to disclose his trial counsel's files to the government.  Alternatively, the government seeks authorization to serve a subpoena duces tecum on trial counsel so that it may secure the necessary records.

## **ARGUMENT**

### BARRETT SHOULD DISCLOSE TRIAL COUNSEL'S RECORDS CONCERNING THE INVESTIGATION AND PRESENTATION OF PENALTY PHASE EVIDENCE

This Court should order Barrett to disclose his trial attorneys' files and records concerning their representation of him during the penalty phase of his trial, as the information contained within those documents is necessary for a full and fair adjudication of counsel's performance, which the defendant has placed in issue.

Rule 6 of the Rules Governing § 2255 Cases authorizes discovery with leave of the district court.  Rule 6 contemplates that the court may allow discovery permitted under the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure, for "good cause." For the government to meaningfully reply to Barrett's assertions, it requires access to the documents that informed and reflect trial counsel's contemporaneous impressions and actions.

As such, good cause exists for disclosure of counsel's files.  *See Strickland v. Washington*, <u>466 U.S. 668, 689</u> (1984) (stating that "every effort [must] be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time").

Barrett has, of course, waived his attorney-client privilege in regard to communications concerning his claims of ineffective assistance.  A habeas petitioner who claims ineffective assistance of counsel impliedly waives attorney-client privilege with respect to communications necessary to prove or disprove his claim.  *United States v. Pinson*, <u>584 F.3d 972, 978</u> (10th Cir.2009).  Given the breadth of Barrett's claim at issue, the government urges this Court to issue an order pursuant to Federal Rule of Civil Procedure, Rules 26 and 34,[1] requiring Barrett to disclose within 15 days trial counsel's complete case files relating to their representation of Barrett at the penalty phase.  Any electronically stored information should be produced in its original form.  To the extent that Barrett denies having custody and control over the requested records, the government seeks, in the alternative, this Court's authorization to serve subpoenas duces tecum on John Echols, Roger Hilfiger and Brett Smith, in order to secure the necessary records.

To the extent Barrett intends to assert that records in his possession remain protected by privilege in spite of his claim of ineffectiveness (*see generally United States v. Pinson*, <u>584 F.3d 972, 978</u> (10th Cir. 2009)), he should bear the burden of identifying such records in a log.  The log should describe any identified documents with sufficient particularity to permit the government to dispute the assertion of privilege if necessary.  As to Barrett's argument that his

---

[1] The government relies upon the Rules of Civil Procedure because no Rule of Criminal Procedure provides an ample procedural vehicle for the scope of disclosures that should flow from the defendant to the government in this instance.

assertion of a claim of ineffective assistance of counsel provides with a right of access to prosecution files, the government disagrees.  Among other things, Barrett has premised his argument on an incorrect assumption that Strickland permits him to retrospectively dictate the government's case at trial.  No such right exists.

**CONCLUSION**

Based on the foregoing, the government respectfully urges this Court to order the

disclosure of trial counsel's files regarding the penalty phase.

Dated: November 18, 2016:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on November 18, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S [PROPOSED] ORDER RE: MOTION TO SECURE TRIAL COUNSEL'S FILES

The Government's Motion for Barrett to disclose his trial attorneys' files and records or, in the alternative, for it to propound subpoenas duces tecum to former counsel is hereby granted.

**IT IS ORDERED THAT** within 15 days, Barrett shall disclose trial counsel's complete files relating to their representation of him during the penalty phase of his trial.  To the extent Barrett denies custody of the requested records, the government may serve subpoenas duces tecum on John Echols, Roger Hilfiger and Brett Smith to secure the necessary documents.

_____
**JAMES H. PAYNE**
United States District Judge

233

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S MOTION TO OBTAIN CIVIL RULE 26 DISCOVERY FROM
DEFENSE EXPERTS**

---

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order that will require written reports from Barrett's mental health experts and permit the government to depose those witnesses.  Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, counsel for the government consulted by e-mail with Barrett's attorney, David Autry, who stated, "We have no such reports to disclose, other than those that are already filed with the § 2255 petition. We also believe that the deadlines proposed (e.g., within 30 days of signing the Court's Order, or within 30 days of evaluations for newly retained experts) are unnecessarily and overly restrictive, and the parties should stipulate to an alternate date just prior to the evidentiary hearing."

**PROCEDURAL HISTORY**

Barrett was convicted and sentenced to death by a jury.  Following affirmance on appeal by the Tenth Circuit, Barrett sought collateral relief under 28 U.S.C. § 2255.  This Court denied relief on all grounds (Doc. 214), but the Tenth Circuit reversed on a single issue, and remanded the case for an evidentiary hearing to consider the alleged ineffective assistance of penalty phase

1

counsel in the investigation and presentation of mitigating evidence.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).  After the Tenth Circuit denied a request to file a second and successive collateral action under 28 U.S.C. § 2255(h), this Court ordered the parties to submit any discovery requests by November 18, 2016.

The government now moves for an order for Barrett to provide reports from his mental health expert witnesses consistent with the requirements of Federal Rule of Civil Procedure 26. It further moves for permission to depose those witnesses ahead of the evidentiary hearing.

## ARGUMENT

### THE COURT SHOULD ORDER BARRETT TO SUBMIT EXPERT REPORTS AND PERMIT THE GOVERNMENT TO DEPOSE DEFENSE EXPERTS WHO HAVE OPINED ABOUT BARRETT'S MENTAL HEALTH AND SOCIAL HISTORY

Barrett asserts that his attorneys inadequately presented evidence of his mental health and social history.  In support of those arguments, Barrett relies upon several expert witnesses, including Bill Sharp, George Woods, Jeanne Russell, and Myla Young.  This Court should permit the government to depose the expert witnesses in anticipation of the upcoming hearing.

Rule 6 of the Rules Governing § 2255 Cases authorizes discovery with leave of the district court.  Rule 6 contemplates that the court may, for good cause, allow discovery under the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure.  Good cause exists when a need exists to investigate scientific developments that post-date the trial.  *See Lee v. Glunt*, 667 F.3d 397, 404 (3d Cir. 2012).

2

In this case, good cause exists for the Court to order Barrett to make written disclosures under Federal Rule of Civil Procedure 26(a)(2) with regard to each of his experts.[1]  At present, Barrett's principle expert, George Woods, has presented a declaration that contains a single paragraph to outline the basis of his opinion.  *See* Doc. 95 Ex. 117 at ¶ 14.  Within it, he vaguely refers to unnamed academic, medical and social records of various people, whom he does not identify beyond the defendant's parents and ex-wife.  As for Dr. Young, the other mental health expert retained for the § 2255 proceedings, Barrett's counsel has informed the government that she passed away, and that they will seek the appointment of another neuropsychologist in her stead.  The government will, of course, seek to learn the bases of any opinion rendered by Dr. Young's successor.  The government observes that Dr. Young's declaration also lacks a complete recitation of such preliminary matters as the documents she reviewed.  *See* Doc. 95 Ex. 89.  Instead, it states that she relied on unspecified "excerpts of academic records" and "medical records" from various named sources.  *See id*. at ¶ 20.

The thumbnail sketches provided by Barrett's experts do not lend themselves to meaningful testing.  The government requires a complete understanding of the facts underlying these opinions, and the credentials and experience of their authors, in order to meaningfully respond, and Rule 26 disclosures provide an ideal vehicle for the communication of such information.  The government proposes that Barrett serve the reports within 30 days of this Court's order.  It further proposes that it will serve any reports on behalf of any newly-retained expert within 30 days of his or her evaluation of Barrett.

---

[1] With regard to the sealed report authored by Dr. Randall Price, the government has already moved, without opposition, for its disclosure to all counsel, and will refile the request in accordance with the Court's previous denial without prejudice.  Docs. 234, 237.

Good cause also exists to permit the government to depose Barrett's experts. As noted, Barrett presently relies on the opinions of Sharp, Woods, Russell, and Young, who respectively speak to four areas of expertise – psychology, psychiatry, risk assessment, and neuropsychology. All their analyses and conclusions occurred outside of trial. In particular, the psychiatric and neuropsychological opinions post-date the judgment in this case. Given the centrality of those witnesses to the claim of ineffectiveness (*see* Doc. 95 at 230-55), the government seeks to depose them, pursuant to Federal Rule of Civil Procedure 26(b)(4), and thereby determine the scope and reliability of their opinions. *See* Fed. R. Civ. P. 32(a)(1) ("Any deposition may be used by any party for the purpose of contradicting or impeaching the testimony of deponent as a witness, or for any other purpose permitted by the Federal Rules of Evidence").

Barrett has, of course, waived any privilege concerning his mental health. Numerous courts have concluded that a therapist-patient privilege is not absolute and that "similar to [the] attorney-client privilege that can be waived when the client places the attorney's representation at issue, a plaintiff waives the psychotherapist-patient privilege by placing his or her medical condition at issue." *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir.2000) (collecting cases) (cited in *Fisher v. Sw. Bell Tel. Co.*, 361 F. App's 974, 978 (10th Cir.2010) (unpublished decision); *see also Doe v. Oberweis Dairy*, 456 F.3d 704, 718 (7th Cir. 2006) (stating the psychotherapist-patient privilege is not absolute and therefore a plaintiff who seeks damages for emotional distress "places his or her psychological state in issue, [and] the defendant is entitled to discover any records of that state."). Barrett has placed in issue his mental health and cannot validly assert an ongoing privilege in any evidence related to those subjects, including the records, recollections, and analyses of his expert witnesses.

<div align="center">4</div>

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to require written disclosures by Barrett's mental health experts and to permit government counsel to depose those experts.

Dated: November 18, 2016:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

       I, hereby certify that on November 18, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

      Mr. David B. Autry dbautry44@hotmail.com
      Ms. Joan M. Fisher Joan_Fisher@fd.org

                         /S/ *Christopher J. Wilson*
                         Christopher J. Wilson
                         United States Attorney's Office

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S [PROPOSED] ORDER RE: MOTION TO OBTAIN CIVIL RULE 26
DISCOVERY FROM DEFENSE EXPERTS**

The government's motion for written reports from and depositions of Barrett's mental health experts is hereby granted.

**IT IS ORDERED THAT** within 30 days, Barrett shall provide the written reports of any previously-retained expert.  Barrett shall provide any report on behalf of a newly-retained expert within 30 days of his or her evaluation of the defendant.  The government shall have 30 days from the receipt of any such report to conduct a deposition of the authoring witness.

_____
**JAMES H. PAYNE**
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S MOTION TO PROPOUND INTERROGATORIES

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order authorizing the government to propound interrogatories to Barrett concerning the sources of records concerning his physical and mental health and that of the relatives upon whom he has premised his claim.  Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, counsel for the government consulted by e-mail with Barrett's attorney, David Autry, who stated, "With respect to the health related matter of Mr. Barrett's relatives, this request is too burdensome in the time permitted by the Court's scheduling order.  As to their personal records, we have no objection, so long as the personal records sought relate to health information and not every aspect of their lives.  Their relevant statements are contained in the declarations already filed with the §2255 applications."

### PROCEDURAL HISTORY

Barrett was convicted and sentenced to death by a jury.  Following affirmance on appeal by the Tenth Circuit, Barrett sought collateral relief under 28 U.S.C. § 2255.  This Court denied relief on all grounds (Doc. 214), but the Tenth Circuit reversed on a single issue, and remanded

1

the case for an evidentiary hearing to consider the alleged ineffective assistance of penalty phase counsel in the investigation and presentation of mitigating evidence. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015). After the Tenth Circuit denied a request to file a second and successive collateral action under 28 U.S.C. § 2255(h), this Court ordered the parties to submit any discovery requests by November 18, 2016. Doc. 246.

The government now moves for this Court to issue an order that will permit it to propound interrogatories to Barrett in order to facilitate its investigation into his mental health.

## ARGUMENT

### THE COURT SHOULD PERMIT THE GOVERNMENT TO PROPOUND INTERROGATORIES TO BARRETT CONCERNING THE DEFENDANT'S MENTAL HEALTH AND THAT OF HIS FAMILY MEMBERS

This Court should permit the government to propound interrogatories designed to permit it to determine the scope and sources of Barrett's medical treatment in the community, as the information is necessary for the government to efficiently investigate Barrett's claim that his trial attorneys ineffectively failed to present evidence concerning his mental health.

Rule 6 of the Rules Governing § 2255 Cases authorizes discovery with leave of the district court. Rule 6 contemplates that the court may allow discovery permitted under the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure, for "good cause." As a premise of Barrett's current claim, he asserted that his attorneys knew of a need to "'engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting.'" Doc. 95 at 190. Absent the ability to investigate Barrett's medical history, the government must rely entirely on those documents the defendant chooses to adduce in support of his claim, including his self-reports and

2

those of his relatives.  To fully explore the evidence probative of counsel's investigation and effectiveness, the government requires access to Barrett's health history and that of the family members whose health histories form a factual premise of his claim.

Barrett has, of course, waived his any privilege concerning his health records by placing his medical history in issue.  Numerous courts have concluded that a therapist-patient privilege is not absolute and that "similar to [the] attorney-client privilege that can be waived when the client places the attorney's representation at issue, a plaintiff waives the psychotherapist-patient privilege by placing his or her medical condition at issue." *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir. 2000) (collecting cases) (cited in *Fisher v. Sw. Bell Tel. Co.*, 361 F. App's 974, 978 (10th Cir. 2010) (unpublished decision); *see also Doe v. Oberweis Dairy*, 456 F.3d 704, 718 (7th Cir. 2006) (stating the psychotherapist-patient privilege is not absolute and therefore a plaintiff who seeks damages for emotional distress "places his or her psychological state in issue, [and] the defendant is entitled to discover any records of that state.").  Here, Barrett has placed in issue both his mental health and his physical health, including recreational drug use, as it relates to his mental health.  Thus, he cannot assert an ongoing privilege in any evidence related to his own mental health, including the records of his caregivers, employers and educators.

Barrett's relatives have likewise placed their mental health in issue, as they volunteered information about their disorders and health histories in support of the defendant's claim, by way of sworn declarations.  *See e.g.*, Doc. 95 at 197-213; *see e.g.*, Doc. 95 Exs. 77 (admitting depression, mood swings and illicit drug use); 78 (admitting bipolar disorder and Welbutrin use); 81 (admitting family mental problems, alcohol abuse); 83 (admitting own bipolarism, moodiness and drug abuse and asserting her children's mental health issues); 86 (admitting mental hospitalization, chemical imbalance, anxiety and depression); 87 (admitting Welbutrin use,

3

family therapy and possible depression and observing mental health issues in other relatives); 91 (admitting depression and observing mental health issues in other relatives).  At least one relative noted the supposed mental health of family members, observations that Barrett presumably intends to rely upon as support for his claim.  *See* e.g., Doc. 95 Ex. 84 (referring to alcohol abuse by the defendant's parents and noting mental health issues supposedly suffered by other relatives).

None of Barrett's witnesses have made any effort to assert privilege in their declarations. A witness may waive a claim of privilege by failing to properly assert it during testimony. *United States v. Bolander*, 722 F.3d 199, 223 (4th Cir. 2013) (citing *United States v. Hayes*, 227 F.3d 578, 586 (6th Cir. 2000)).  Accordingly, the government assumes, to the extent Barrett intends to rely on the information in the declarations, that the declarant-relatives will forgo any claim of privilege as to their medical histories.  Significantly, it appears those declarations informed the opinion of at least one defense expert, as George Woods stated that he premised his opinion, in part, on "declarations and/or medical and social records of various family members." Doc. 95 Ex. 117 at ¶ 14.

Because such information is closely held, the government cannot as a practical matter direct its investigators to identify the schools, employers and medical providers who have provided care to Barrett and who might retain records pertinent to the issue of his mental health. Investigation of this material is complicated by the fact that Barrett has lived in several states, from New Jersey to Idaho.  Doc. 95 at 187.  Given that Barrett is in the best position to identify his medical caregivers, educators and employers, the government respectfully seeks authorization to propound to the defendant interrogatories under Federal Rule of Civil Procedure

33 to identify all relevant individuals and entities.[1]  In particular, the government will seek the identity and last known contact information for any medical or mental health professional who has diagnosed or treated Barrett for 1) any mental health condition; 2) any abuse of drugs, whether illicit or not; 3) any physical condition that may have impacted the defendant's mental health; and 4) any genetic condition that may have impacted the defendant's mental health.  The government will also seek the name and last known address of any of Barrett's schools and employers.  This information will facilitate the government's investigation, specifically its efficient service of subpoenas duces tecum.[2]

Because Barrett's claim also relies on the alleged conditions of his relatives, the government also seeks to propound interrogatories intended to facilitate its discovery of information relevant to those contentions.  Specifically, the government requests leave to propound interrogatories to Barrett to 1) identify and provide addresses and phone numbers for all of the relatives he believes suffer from conditions that are supportive of his claim of personal mental illness; 2) identify all of the documents produced to his expert witnesses to substantiate those conditions 3) identify and provide the last known contact information for any medical or mental health professional who has diagnosed or treated each of the named relatives for a) any mental health condition; b) any abuse of drugs, whether illicit or not; c) any physical condition that may have impacted the defendant's mental health; and d) any genetic condition that may have impacted the defendant's mental health.

---

[1] The government relies upon the Rules of Civil Procedure because no Rule of Criminal Procedure provides an ample procedural vehicle for the scope of disclosures that should flow from the defendant to the government in this instance.

[2] The government seeks authorization to serve subpoenas in a separately-filed motion.

To the extent Barrett intends to assert that information in his possession remains protected by privilege in spite of his health-based claims, he should bear the burden of asserting those claims in a log.  The log should describe any omitted information with sufficient particularity to permit the government to dispute the assertion of privilege if necessary.

246

**CONCLUSION**

Based on the foregoing, the government respectfully urges this Court to permit it to serve interrogatories on Barrett concerning the identities of his schools, employers and health care providers.

Dated: November 18, 2016:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on November 18, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org

/S/ *Christopher J. Wilson*
Christopher J. Wilson
United States Attorney's Office

8

248

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S [PROPOSED] ORDER RE: MOTION TO PROPOUND
INTERROGATORIES**

The government's motion to propound interrogatories is hereby granted.

**IT IS ORDERED THAT** within the 30 days the government may serve upon Barrett interrogatories to identity any medical or mental health professional who has diagnosed or treated him for: a) any mental health condition, b) any drug abuse, c) any physical condition that may have impacted his mental health, and d) any genetic condition that may have impacted his mental health; to identify schools he has attended; to identify employers for whom he has worked; to identify relatives he believes suffer from conditions pertinent to his claims of mental illness; to identify medical or mental health professionals who has diagnosed or treated each named relative for: a) any mental health condition, b) any drug abuse, c) any physical condition that may have impacted the defendant's mental health, and d) any genetic condition that may have impacted the defendant's mental health; and to identify all documents transmitted to his expert witnesses to substantiate any claimed mental health condition

_____
**JAMES H. PAYNE**
United States District Judge

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S MOTION FOR PSYCHIATRIC EVALUATION OF DEFENDANT**

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order that permits the government to have a psychiatrist evaluate Barrett in anticipation of providing testimony as an expert witness. Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, counsel for the government consulted by e-mail with Barrett's attorney, David Autry, who stated "We think this should be re-named a motion for a government psychiatric exam, not an independent psychiatric exam because Dr. Pitt is your expert. Also, we object to a government psychiatric examination absent the presence of counsel on Sixth Amendment grounds, and object to a government psychiatric examination on Fifth and Sixth Amendment grounds. Should the court grant your request, we object to any examination outside the presence of counsel on Fifth and Sixth Amendment grounds."

**PROCEDURAL HISTORY**

Barrett was convicted and sentenced to death by a jury. Following affirmance on appeal by the Tenth Circuit, Barrett sought collateral relief under 28 U.S.C. § 2255. This Court denied relief on all grounds (Doc. 214), but the Tenth Circuit reversed on a single issue, and remanded

1

the case for an evidentiary hearing to consider the alleged ineffective assistance of penalty phase counsel in the investigation and presentation of mitigating evidence.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).  After the Tenth Circuit denied a request to file a second and successive collateral action under 28 U.S.C. § 2255(h), this Court ordered the parties to submit any discovery requests by November 18, 2016.

The government now moves for this Court to issue and order that will permit Steven Pitt, D.O., a psychiatrist retained by the U.S. Attorney's Office, to evaluate Barrett ahead of the evidentiary hearing.

## ARGUMENT

### THE COURT SHOULD PERMIT THE GOVERNMENT'S PSYCHIATRIC EXPERT WITNESS TO EVALUATE BARRETT

Barrett asserts that his attorneys inadequately presented evidence of his mental health and social history.  In support of those arguments, Barrett relies, directly upon the expert opinions of psychiatrist George Woods in addition to that of neuropsychologist Myla Young.[1]  To date, the government has only had an opportunity to obtain a neuropsychological evaluation of the defendant.  This Court should permit a psychiatrist retained by the government to evaluate Barrett, placing the prosecution on equal footing with the defense.

Rule 6 of the Rules Governing § 2255 Cases authorizes discovery with leave of the district court.  Rule 6 contemplates that the court may allow discovery permitted under the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure, for "good cause."  Federal Rules of Civil Procedures 34(c) and 45 permit a litigant to subpoena documents in the

---

[1] Barrett's counsel has informed the government that Dr. Young passed away, and that they will seek the appointment of another neuropsychologist in her stead.

possession of a non-party.  Good cause exists to permit the government to permit a psychiatric

evaluation by the government.

Because Barrett asserts that his psychiatric condition informs his mental state at the time

of the crime and, by extension, the reasonableness of trial counsel's conduct, good cause exists

for the government to evaluate his present mental condition.  Federal Rule of Civil Procedure

35(a)(1) authorizes courts to order a party whose mental condition is in controversy to submit to

a mental examination by a suitably licensed or certified examiner.  In this case, Barrett has

placed in controversy his psychiatric health as diagnosed by Dr. Woods.  *E.g.* Doc. 95 at 231-33

(citing Doc. 95 Ex. 117).  Woods has opined, based on clinical observations of Barrett, that the

defendant exhibits "neurologically impaired cognitive and psychosocial functioning, including

severe depression, mania, psychotic ambivalence, adhedonia, sleep disturbance, suicidality,

hypervigilance, avoidant behavior, withdrawal, constricted emotional range, and inability to

sustain lasting relationships secondary to his severe mental illness."  Doc. 95 Ex. 117 at ¶ 15.

Barrett places particular emphasis on Dr. Woods's opinion, relying on it as the basis of his

assertions that his abnormal brain function sprung from a mixture of genetics and chemical

"insults" in vitro.  *See* Doc. 95 at 232-33.

For the government to independently assess the reliability of Dr. Woods's findings, it

should have an opportunity to evaluate Barrett's psychiatric health.  Accordingly, the

government proposes that within the next 60 days, Steven Pitt, D.O. will evaluate Barrett at the

Special Confinement Unit in Terre Haute, where the defendant is currently housed by the Bureau

of Prisons.  The government further requests that the order permitting the evaluation also allow

Dr. Pitt to bring electronic audio and video recording equipment into the facility and use it to

record his meeting with Barrett.  Finally, the government asks that the order exclude any third

3

252

parties from the room in which Dr. Pitt conducts the evaluation with Barrett, as the government will make the audio and video recordings of the meeting available to the defense.  *See e.g., United States v. Fell*, 372 F.Supp.2d 753, 762 (D. Vt. 2005) (defendant's rights adequately safeguarded through audio-taping of evaluation); *United States v. Johnson*, 362 F.Supp.2d 1043, 1091 (N.D. Iowa 2005) (same); *United States v. Sampson*, 335 F.Supp.2d 166, 247-48 (D. Mass 2004) (setting forth criteria for evaluating whether defendant had right to presence of his own expert during government expert examination); *United States v. Kaczynski*, No. CR-S-96-259GEB, 1997 WL 668395, at *3 (E.D.Cal. Oct. 22, 1997) (allowing examinations to be audio-taped and permitting defense counsel to view examinations via live audio or video feed, but denying government request to videotape examinations); *United States v. Byers*, 740 F.2d 1104, 1172 (D.C. Cir.1984) (suggesting in dissent that "a taped record would facilitate constitutional aims without impairing the interview process itself.") (internal citations omitted).

**CONCLUSION**

Based on the foregoing, the government respectfully urges this Court to permit its expert

Steven Pitt to perform a psychiatric evaluation of Barrett.

Dated: November 18, 2016:

> Respectfully submitted,
>
> MARK F. GREEN
> United States Attorney
> Eastern District of Oklahoma
>
> /S/ *Christopher J. Wilson*
> CHRISTOPHER J. WILSON, OBA # 13801
> Assistant United States Attorney
> 1200 West Okmulgee
> Muskogee, OK 74401
> Telephone: (918) 684-5100
> FAX: (918) 684-5150
>
>
> /S/ *Jeffrey B. Kahan*
> JEFFREY B. KAHAN, PaBN #93199
> Trial Attorney, Capital Case Unit
> U.S. Dept. of Justice
> 1331 F Street, NW; 6th Fl.
> Washington, DC 20530
> Telephone: (202) 305-8910
> FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on November 18, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org

/S/ *Christopher J. Wilson*
Christopher J. Wilson
United States Attorney's Office

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S [PROPOSED] ORDER RE: MOTION FOR PSYCHIATRIC
EVALUATION OF DEFENDANT**

The government's motion for psychiatric evaluation of the defendant is hereby granted.

**IT IS ORDERED THAT** within 60 days, Barrett will submit to an evaluation of his psychiatric health conducted by Steven Pitt, D.O. at the Special Confinement Unit in Terre Haute.  Dr. Pitt may bring electronic audio and video recording equipment into the facility and use it to record his meeting with Barrett.  No representative of the defense shall be permitted in the room in which Dr. Pitt conducts the evaluation, which will be electronically recorded (audio and visual) for the benefit of all counsel.

_____
**JAMES H. PAYNE**
United States District Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S MOTION TO SERVE DISCOVERY ON THIRD PARTIES
RELATED TO DEFENDANT'S MENTAL HEALTH AND SOCIAL HISTORY**

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order that will permit the government to serve subpoenas on third parties so that it can investigate contentions of familial mental illness that allegedly reflect upon the defendant's mental health and social history.  Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, counsel for the government consulted by e-mail with Barrett's attorney, David Autry, who stated, "We object because your requests are overbroad, seek privileged information, infringe upon privacy interests, and are not limited to records relevant to mitigation of punishment."

**PROCEDURAL HISTORY**

Barrett was convicted and sentenced to death by a jury.  Following affirmance on appeal by the Tenth Circuit, Barrett sought collateral relief under 28 U.S.C. § 2255.  This Court denied relief on all grounds (Doc. 214), but the Tenth Circuit reversed on a single issue, and remanded the case for an evidentiary hearing to consider the alleged ineffective assistance of penalty phase counsel in the investigation and presentation of mitigating evidence.  *United States v. Barrett*,

1

797 F.3d 1207, 1232 (10th Cir. 2015).  After the Tenth Circuit denied a request to file a second and successive collateral action under 28 U.S.C. § 2255(h), this Court ordered the parties to submit any discovery requests by November 18, 2016.

The government now moves for this Court to issue an order that will permit it to utilize discovery on third parties, specifically depositions, written or oral, of Barrett's relatives, principally to determine if and when they have ever been diagnosed with or treated for a relevant physical or mental condition, by whom they were diagnosed or treated, and whether they will execute a waiver of any state or federal privileges with regard to their health care providers' records.  The government further seeks authorization to serve subpoenas duces tecum on those health care providers in an effort to obtain any records concerning treatment and diagnosis.

**ARGUMENT**

**THE COURT SHOULD PERMIT THE GOVERNMENT TO DEPOSE BARRETT'S RELATIVES AND SUBPOENA THEIR HEALTH CARE PROVIDERS**

Barrett asserts that his attorneys inadequately presented evidence of his mental health and social history.  In support of those arguments, Barrett has relied upon the asserted medical histories of several of his family members.  This Court should permit the government to depose those family members and subpoena their health care providers so that it can determine the scope and veracity of the relatives' claimed conditions.

Rule 6 of the Rules Governing § 2255 Cases authorizes discovery with leave of the district court.  Rule 6 contemplates that the court may allow discovery permitted under the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure, for "good cause."  Federal Rules of Civil Procedures 34(c) and 45 permit a litigant to subpoena documents in the possession of a non-party.  Good cause exists to permit the government to subpoena the medical history documents of Barrett's relatives, as he has specifically relied upon the declarations of his

2

258

relatives attesting to their mental health disorders.  Moreover, Barrett's experts have premised their opinions, in part, upon the self-reports of the defendant's family members.  *See* Doc. 95 Exs. 89 & 117.  Given the apparent importance of family medical information to Barrett's claims, the Court should permit the government to subpoena records from the medical providers of those relatives.  Access to the records of disinterested professionals – including any notes, interview notes, raw test data, normative data, diagnostic criteria, and other documents – will doubtless prove more enlightening than the self-reports of Barrett's supporters.

The government does not view this request as an open-ended "fishing expedition," and has separately sought leave to serve interrogatories on Barrett with which it intends to identify all of the relatives he believes suffer from conditions that support his claim of personal mental illness; 2) identify all of the documents produced to his expert witnesses to substantiate those conditions 3) identify and provide the last known contact information for any medical or mental health professional who has diagnosed or treated each of the named relatives for a) any mental health condition; b) any abuse of drugs, whether illicit or not; c) any physical condition that may have impacted the defendant's mental health; and d) any genetic condition that may have impacted the defendant's mental health.  The government intends to limit its use of subpoenas on the basis of Barrett's responses to those interrogatories.

By volunteering information about their disorders in sworn declarations, Barrett's relatives have placed their mental health in issue.  *See e.g.* Doc. 95 Exs. 77 (admitting depression, mood swings and illicit drug use); 78 (admitting bipolar disorder and Welbutrin use); 81 (admitting family mental problems, alcohol abuse); 83 (admitting own bipolarism, moodiness and drug abuse and asserting her children's mental health issues); 86 (admitting mental hospitalization, chemical imbalance, anxiety and depression); 87 (admitting Welbutrin use,

3

family therapy and possible depression and observing mental health issues in other relatives); 91 (admitting depression and observing mental health issues in other relatives).  None of the declarants have made any effort to assert a privilege.  A witness may waive a claim of privilege by failing to properly assert it during testimony.  *United States v. Bolander*, 722 F.3d 199, 223 (4th Cir. 2013) (citing *United States v. Hayes*, 227 F.3d 578, 586 (6th Cir. 2000)).

Given the lack of any reservation of rights in the declarations, the government assumes that if Barrett intends to rely on the information in those statements, his declarant-relatives will forgo any claim of privilege as to their medical histories.  Because the declarants are not parties to this action, the government will seek written releases from them as necessary.  To the extent that Barrett's relatives are not willing to permit an independent investigation into their medical histories, the government reserves the right to seek the exclusion of evidence concerning their health, whether presented directly or through an expert.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to permit it to utilize discovery on third parties, specifically depositions, written and oral, of Barrett's relatives, and for authorization to serve subpoenas duces tecum on Barrett's health care providers.

Dated: November 18, 2016:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on November 18, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org

/S/ *Christopher J. Wilson*
Christopher J. Wilson
United States Attorney's Office

6

262

263

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S [PROPOSED] ORDER RE: MOTION TO SERVE DISCOVERY ON THIRD PARTIES RELATED TO DEFENDANT'S MENTAL HEALTH AND SOCIAL HISTORY

The government's motion to serve discovery on third parties related to the defendant's mental health and social history is hereby granted.

**IT IS ORDERED THAT** within the government may serve subpoenas duces tecum on the health care providers of Barrett's relatives whom he claims to have suffered from mental and physical health conditions relevant to his own mental state. Additionally, the government may conduct depositions of those relatives.

_____
**JAMES H. PAYNE**
United States District Judge

263

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S MOTION TO SERVE SUBPOENAS DUCES TECUM REGARDING
RECORDS RELATED TO DEFENDANT'S MENTAL HEALTH**

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order that will authorize the government to serve subpoenas duces tecum concerning the defendant's mental health. Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, counsel for the government consulted by e-mail with Barrett's attorney, David Autry, who stated, "We object because your requests are overbroad, seek privileged information, infringe upon privacy interests, and are not limited to records relevant to mitigation of punishment."

**PROCEDURAL HISTORY**

Barrett was convicted and sentenced to death by a jury. Following affirmance on appeal by the Tenth Circuit, Barrett sought collateral relief under 28 U.S.C. § 2255. This Court denied relief on all grounds (Doc. 214), but the Tenth Circuit reversed on a single issue, and remanded the case for an evidentiary hearing to consider the alleged ineffective assistance of penalty phase counsel in the investigation and presentation of mitigating evidence. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015). After the Tenth Circuit denied a request to file a second

1

and successive collateral action, this Court ordered the parties to submit any discovery requests by November 18, 2016.

The government now moves for this Court to issue and order that will permit it to serve subpoenas duces tecum to individuals and entities in possession of documents probative of Barrett's mental health.

## ARGUMENT

### THE COURT SHOULD PERMIT THE GOVERNMENT TO SERVE SUBPOENAS DUCES TECUM ON ENTITIES AND INDIVIDUALS IN POSSESSION OF RECORDS CONCERNING BARRETT'S MENTAL HEALTH

Barrett asserts that his attorneys inadequately presented evidence of his mental health and social history.  In support of those arguments, Barrett relies, directly and indirectly, upon his personal history – including aspects of his education, employment, family life, and medical history – and the opinions of several expert witnesses.  This Court should permit the government to subpoena documents relating to Barrett's life history and the files of various witnesses, including trial counsel and the defense's experts.

Rule 6 of the Rules Governing § 2255 Cases authorizes discovery with leave of the district court.  Rule 6 contemplates that the court may allow discovery permitted under the Federal Rules of Criminal Procedure and the Federal Rules of Civil Procedure, for "good cause."  Federal Rules of Civil Procedures 34(c) and 45 permit a litigant to subpoena documents in the possession of a non-party.  Good cause exists to permit the government to subpoena documents related to Barrett's personal history.  Indeed, Barrett has related his claim to events as distant as the Trail of Tears, the Depression, and the westward migration of Oklahomans during the Dust Bowl.  *See* Doc. 95 at 195-230.  Moreover, Barrett's conduct and performance at work, at school, and in custody bear on the reliability of his mental health diagnoses, which form the core of

several of his ineffective assistance of counsel claims.  Of course, his physical medical records also inform the reliability of his mental health diagnoses, as Barrett has specifically cited physical trauma as a source of his supposed mental health issues.  Additionally, the records of many other institutions – such as schools, employers and government agencies – will likely shed light on Barrett's claims of mental health disorders and a mitigating personal history.

Given the significance of life history records to Barrett's claims, the Court should permit the government to subpoena records from the following third parties: the U.S. Social Security Administration (for all records of Barrett's benefits and paid employment), all organizations and individuals who employed Barrett in a paid or unpaid capacity (for all records of his employment); all schools that Barrett attended (for all of his academic, administrative, behavioral and counseling records); all judicial and administrative courts in which Barrett has been a litigant or witness (for any sealed transcripts of his testimony or any non-public records related to litigation in which he was a party or witness); all penal and detention facilities in which Barrett has been an inmate (for all records of his custody), all medical professionals who have treated or diagnosed Barrett (for all of medical records related to his mental health), all mental health professionals who have treated or diagnosed Barrett (for all of his mental health records).

To the extent any such records are privileged under state or federal law, this Court should order Barrett to execute the waivers necessary for the government to obtain the material.  With regard to any records in existence but not physically in the possession or custody of Barrett or his attorneys, the government asks that he execute an authorization to allow it to examine and obtain copies of the documents from their custodians by way of subpoena.

Barrett has, of course, waived his any privilege concerning his health records by placing his medical history in issue.  Numerous courts have concluded that a therapist-patient privilege is

not absolute and that "similar to [the] attorney-client privilege that can be waived when the client places the attorney's representation at issue, a plaintiff waives the psychotherapist-patient privilege by placing his or her medical condition at issue." *Schoffstall v. Henderson*, 223 F.3d 818, 823 (8th Cir.2000) (collecting cases) (cited in *Fisher v. Sw. Bell Tel. Co.*, 361 F. App's 974, 978 (10th Cir.2010) (unpublished decision); *see also Doe v. Oberweis Dairy*, 456 F.3d 704, 718 (7th Cir. 2006) (stating the psychotherapist-patient privilege is not absolute and therefore a plaintiff who seeks damages for emotional distress "places his or her psychological state in issue, [and] the defendant is entitled to discover any records of that state."). Here, Barrett has placed in issue both his mental health and his physical health, including recreational drug use, as it relates to his mental health. Accordingly, he cannot validly assert an ongoing privilege in any evidence related to those subjects, including the records of his caregivers, employers and educators.

As noted, Barrett has relied upon the opinions of several medical and mental health experts as the bases for his claims of ineffective assistance of counsel. *See* Doc. 95 at 230-42. To permit the government to test the veracity and reliability of the experts' testimony, it should have the opportunity to subpoena the documents that they considered in forming those opinions. Accordingly, good cause exists for the government to issue subpoenas for such material, including any notes, interview notes, raw test data, normative data, diagnostic criteria, and other documents provided by the defendant or his attorneys that were considered in forming the experts' opinions.

To the extent Barrett intends to assert that information in his possession remains protected by privilege in spite of the fact that he has put his mental and physical health in issue, he should bear the burden of identifying such information in a log. The log should describe any

4

omitted information with sufficient particularity to permit the government to dispute the assertion of privilege if necessary.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to permit it to serve subpoenas duces tecum on Barrett's schools, employers and health care providers.

Dated: November 18, 2016:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on November 18, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org

<div align="right">

/S/ *Christopher J. Wilson*
Christopher J. Wilson
United States Attorney's Office

</div>

6

269

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S [PROPOSED] ORDER RE: MOTION TO SERVE SUBPOENAS DUCES TECUM REGARDING RECORDS RELATED TO DEFENDANT'S MENTAL HEALTH**

The government's motion to serve subpoenas duces tecum regarding records related to the defendant's mental health is hereby granted.

**IT IS ORDERED THAT** the government may subpoena records from the following third parties: the U.S. Social Security Administration (for all records of Barrett's benefits and paid employment), all organizations and individuals who employed Barrett in a paid or unpaid capacity (for all records of his employment); all schools that Barrett attended (for all of his academic, administrative, behavioral and counseling records); all judicial and administrative courts in which Barrett has been a litigant or witness (for any sealed transcripts of his testimony or any non-public records related to litigation in which he was a party or witness); all penal and detention facilities in which Barrett has been an inmate (for all records of his custody), all medical professionals who have treated or diagnosed Barrett (for all of medical records related to his mental health), all mental health professionals who have treated or diagnosed Barrett (for all of his mental health records).

1

270

To the extent any such records are privileged under state or federal law, Barrett must execute an authorization to allow the government to obtain copies of the documents from their custodians.

_____
**JAMES H. PAYNE**
United States District Judge

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S UNOPPOSED MOTION TO PERMIT INSPECTION OF THE EXPANDED RECORD

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to formally expand the record in this § 2255 case to include a mental health evaluation report that was sealed before trial (Trl. Doc. 238).[1]  Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, counsel for the government consulted by e-mail with Barrett's attorney, David Autry, who stated, "As to Dr. Randall Price's examination/report(s), we have no objection as long as we receive these materials as well, and the request to unseal includes all the related documentary evidence of the examination, including but not limited to rough notes and other notes, testing, the testing protocols, memoranda, communications between the government and Dr. Price, and any and all video and audio recordings of the same or related thereto which are in possession of Dr. Price, the Court, or the government. We also request access to all records reviewed by Dr. Price in formulating his

---

[1] "Trl. Doc." refers to the docket in case no. 04-115-JHP.  "Doc." refers to the docket under the instant case number.

1

diagnosis or conclusions. In short, we do not object to unsealing these materials, provided they cannot be used in the (remote) event of retrial in order to secure conviction(s)."

## PROCEDURAL HISTORY

On September 23, 2005, Barrett's trial counsel filed Document 208, a Notice of Expert Evidence of a Mental Condition Pursuant to F.R.Cr.P. 12.2. The notice prompted the Government to file a Motion for Psychiatric Examination (Trl. Doc. 214), which the Court granted (Trl. Doc. 216). Pursuant to that Order, a Sealed Psychological Evaluation/Risk Assessment was prepared by J. Randall Price, Ph.D., ABPP, ABPN. The entire report was provided to a fire-walled Assistant United States Attorney in the Northern District of Oklahoma. The fire-walled attorney filed the sealed report with the Court. Trl. Doc. 237. The report remained sealed through the conclusion of trial.

Following the affirmance of the conviction, Barrett sought § 2255 relief in a motion that asserted, inter alia, that he suffered from mental health issues. Docs. 1, 2 & 95. As a result, the government moved to unseal the fire-walled mental health evidence, arguing that it was relevant to rebut claims about Barrett's mental health and probative of trial counsel's efforts to investigate those issues. Doc. 52. The Court, however, found that three of the documents at issue (Trl. Docs. 208, 210 and 238) were already available to government counsel, while it denied the motion with regard to the complete mental health evaluation report of Dr. Price (Trl. Doc. 237). Doc. 67. In so doing, the Court reasoned that Federal Rule of Criminal Procedure 12.2(c)(2) precluded disclosure because Barrett had not introduced mental health evidence at trial.

Subsequently, the Court denied § 2255 relief, relying in part on Dr. Price's report. *See* Doc. 214 at 91 n.159 & 189 (citing Trl. Doc. 237). On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to consider the alleged

2

ineffective assistance of penalty phase counsel in the presentation of, among other things, mental health evidence. *United States v. Barrett*, <u>797 F.3d 1207, 1232</u> (10th Cir. 2015). In its opinion, the appellate panel observed that this Court had relied on Dr. Price's report, and noted that his testimony was potentially "devastating" to Barrett's claim. *Id.* The Tenth Circuit subsequently denied Barrett's motions for rehearing en banc and for a stay of mandate pending a petition for writ of certiorari. § 2255 App. Docs. 01019508445 & 01019512751. Barrett did not seek a stay of mandate in the Supreme Court. *See generally* Sup. Ct. R. 23.

The government now moves, without opposition, for this Court to formally expand the record to include Dr. Price's report and to permit the parties to inspect and copy it.

## <u>ARGUMENT</u>

### THE COURT SHOULD PERMIT COUNSEL FOR BOTH PARTIES ACCESS TO DR. PRICE'S REPORT

This Court should formally expand the record in this § 2255 proceeding to include Dr. Price's report, providing access for all counsel. The prior opinions of this Court and the Tenth Circuit make manifest the fact that the report is relevant to the issue of ineffective assistance of counsel. This Court has authority under the Rules following § 2255 to disregard any limitations imposed by Rule 12.2 as to disclosure.

By their own terms, the Rules following § 2255 supersede those concerning criminal trials: "The Federal Rules of Civil Procedure and the Federal Rules of Criminal Procedure, to the extent that they are not inconsistent with any statutory provisions or these rules, may be applied to a proceeding under these rules." Rules foll. § 2255, R. 12; *United States v. Nelson*, <u>465 F.3d 1145, 1147</u> (10th Cir. 2006). In the § 2255 setting, then, the Rules of Criminal Procedure apply only with the permission of the court and to the extent they are consistent with "the overall frame work of habeas corpus." *See United States v. Quin*, <u>836 F.2d 654, 657-58</u> (1st Cir. 1988) (noting

3

the permissive application of the Civil rules under § 2255 under *United States v. Frady*, 456 U.S. 152, 166-68 n.15 (1982)).  In particular, Rule 7 of the Rules Following § 2255 provides that "the judge may direct the parties to expand the record by submitting additional materials relating to the motion.  Furthermore, Rule 7 presumes the rights of the parties to view expanded-record materials, as subpart (a) contemplates that one party will submit documents, while subpart (c) provides a right of inspection to the opposing party.

At this juncture, the Court has, de facto, expanded the record to include Dr. Price's report, which it twice cited in its opinion denying § 2255 relief.  *See* Doc. 214.  The Court's action was consistent with the spirt of Rule 7, as its Advisory Committee Notes explain that "Revised Rule 7(a) is not intended to restrict the court's authority to expand the record through means other than requiring the parties themselves to provide the information."  The government respectfully urges the Court to formally expand the record and permit counsel to access the report.  Given the rights of the parties to view record augmentations under Rule 7, any prohibition under the auspices of Rule 12.2 would be inconsistent with framework of the evidentiary hearing required by the Tenth Circuit, which contemplated a fulsome exploration of the pertinent facts and specifically mentioned Dr. Price's report.  797 F.3d at 1232.

The equities of the case as presently postured also support disclosure.  When the Court previously denied the government access to the report under Rule 12.2, Barrett's challenges to his conviction remained pending.  Since then, this Court and the Tenth Circuit have disposed of every request for collateral relief concerning questions of guilt and innocence.  Accordingly, there exists little likelihood Barrett will ever face retrial on guilt and, likewise, little likelihood that exposure to the report will taint government counsel in seeking another conviction.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to formally expand the record to include Dr. Price's report and to permit counsel for the parties to inspect and copy it.

Dated: November 18, 2016:

<div align="right">

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

</div>

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on November 18, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org

/S/ *Christopher J. Wilson*
Christopher J. Wilson
United States Attorney's Office

6

277

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S [PROPOSED] ORDER RE: MOTION TO PERMIT INSPECTION
## OF THE EXPANDED RECORD

The government's motion to permit inspection of the expanded record is hereby granted.

**IT IS ORDERED THAT** the Court hereby expands the record of this case to include the

Psychological Evaluation/Risk Assessment was prepared during the underlying trial by J.

Randall Price, Ph.D., ABPP, ABPN and currently in the custody of firewalled counsel in the

Northern District of Oklahoma.  Counsel for both parties may inspect and copy the report.

_____
**JAMES H. PAYNE**
United States District Judge

278

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S UNOPPOSED MOTION TO UNSEAL DOCUMENTS AND
PROVIDE THEM TO A POTENTIAL EXPERT WITNESS SUBJECT TO A
PROTECTIVE ORDER**

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order unsealing certain exhibits to Barrett's Motion for Relief under 28 U.S.C. § 2255 (Docs. 1, 2, 70 & 95) so that the government can furnish the documents to a potential expert witness, subject to a protective order.  Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, government counsel consulted by e-mail with Barrett's attorney, David Autry, who stated "Assuming Dr. Pitt is allowed to conduct an evaluation for Mr. Barrett, over our objection, we have no objection, so long as all documents of whatever form or nature are used for purposes of the evaluation only, are preserved, and are kept confidential throughout. If our objection to a government psychiatric exam is denied, and if Dr. Pitt is permitted by the court to conduct an examination outside our presence, we would at the very least request to be present to make introductions before the exam, be allowed to consult with Mr. Barrett as needed, and be allowed to visit Mr. Barrett upon the conclusion of the examination."

1

**PROCEDURAL HISTORY**

Barrett was convicted and sentenced to death.  The Tenth Circuit Court of Appeals subsequently affirmed the judgment on direct appeal.  On March 11, 2009, this Court granted Barrett's motion to seal certain exhibits in support of a motion for § 2255 relief.  Doc. 5.  This Court subsequently denied § 2255 relief on all grounds.  Doc. 214.  On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to consider the alleged ineffective assistance of penalty phase counsel in the presentation of, among other things, mental health evidence.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).  On November 30, 2015, this Court entered an order scheduling an evidentiary hearing and requiring the parties to submit discovery requests in anticipation of the hearing.  Doc. 233.   The Court later vacated the scheduling order to permit Barrett to seek Supreme Court review of the Tenth Circuit's opinion.  Doc. 237.  After the Tenth Circuit denied a request to file a second and successive collateral action under 28 U.S.C. § 2255(h), this Court ordered the parties to submit any discovery requests by November 18, 2016.

The government now moves for this Court to issue an order that will permit it to provide a psychiatrist who may testify as an expert witness in the ordered evidentiary hearing with access to sealed material submitted by Barrett.  Barrett's attorneys [[[do not object]]] to this request.

**ARGUMENT**

**THE COURT SHOULD PERMIT THE GOVERNMENT TO PROVIDE A POTENTIAL EXPERT WITNESS WITH ACCESS TO DOCUMENTS NECESSARY FOR HIM TO EVALUATE BARRETT'S MENTAL HEALTH**

Barrett asserts that his attorneys inadequately presented evidence of his mental health and relies upon the opinions of several expert witnesses.  Those experts, in turn, relied on records Barrett later attached to his § 2255 motion as sealed exhibits.  As such, it has contacted a

2

psychiatrist, Dr. Steven Pitt, who has agreed to undertake a preliminary investigation in anticipation of his potential evaluation of Barrett. This Court should permit the government to furnish Dr. Pitt with access to sealed documents necessary for him to complete his preliminary evaluation of the case.

By placing his mental state at issue, Barrett has waived any protection of his supporting evidence, at least insofar as necessary for the government to investigate and respond to the contentions. The Supreme Court has held that a government's use of properly obtained mental health evidence to rebut a "mental status" defense does not violate the Fifth or Sixth Amendments. *Buchanan v. Kentucky*, 483 U.S. 402, 422-24 (1987). As the Fifth Circuit has succinctly stated, "a defendant who puts his mental state at issue with psychological evidence may not then use the Fifth Amendment to bar the state from rebutting in kind." *Schneider v. Lynaugh*, 835 F.2d 570, 575 (5th Cir. 1988); *see United States v Madrid*, 673 F.2d 1114, 1121 (10th Cir. 1982) (permitting admission of evidence from a government mental health examination authorized under Fed. R. Crim. Proc. 12.2).

In this case, Barrett has squarely placed his mental health in issue by presenting the opinions of experts who relied on the documents the government seeks to utilize. Barrett's psychiatric expert, George Woods, not only relied on the material but made clear that his review was within the standard of care for mental health professionals:

> I . . . reviewed and considered the declaration of neuropsychologist, Myla Young, PhD; Mr. Barrett's institutional records, to include available academic, medical and custodial records; declarations and/or medical and social records of various family members, including his father, Ernie Barrett; his mother, Gelene Dotson; and his former wife, Abby Stites. These are the types of data customarily relied upon by qualified mental health professionals to perform an accurate and reliable neuropsychiatric assessment.

3

Doc. 95 Ex. 117 at 5.  Likewise, neuropsychologist Dr. Young reviewed social, medical and educational history documents about Barrett.  Doc. 95 Ex. 89 at 6.

For the government's potential mental health expert, Dr. Pitt, to have a fair opportunity to evaluate the defendant, he must have access to the same range of material that informed the opinions of Barrett's experts.  Accordingly, the government requests that the Court unseal the exhibits to Barrett's § 2255 motion (Doc. 95) to the extent necessary to permit their release to Dr. Pitt, so that he can evaluate the defendant:  Exhibits 119 through 134 (birth and death certificates); Exhibit 135 (Brandon Smith Social Security Records, Itemized Statement of Earnings); Exhibit 136 (Education Records for Kenneth Barrett); Exhibit 137; (Education Records for Gwendolyn Barrett); Exhibit 138 (Education Records for Ernest Barrett); Exhibit 139 (Medical Records for Carolyn Joseph); Exhibit 140 (Medical Records for Kathy Trotter); Exhibit 141 (Medical Records for Brandie Hill); Exhibit 142 (Medical Records for Toby Barrett); Exhibit 143 (Medical Records for Travis Crawford); Exhibit 145 (Medical Records for Linda Riley);Exhibit 146 (Medical Records for A.J. Barrett); Exhibit 147A-G (Medical Records for Kenneth Barrett); Exhibit 148 (Report of Interview with Kenneth Barrett by OSBI); Exhibit 149 (Marriage Certificate for Ernest and Diana Barrett); Exhibit 150 (Divorce File for Eugene and Sylvia Gelene Dudley); Exhibit 151 (Divorce File for Kenneth Barrett and Abigail Barrett); Exhibit 152 (*Kimberly Pulice v. Richard Barrett*, Case No. JFP-2004-17); Exhibit 153 (*In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG);  Exhibit 154 (*In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481); Exhibit 155 (Sylvia Gelene Dotson's Genealogy Memorandum); Exhibit 182 (Bill Ed Rogers's File); Exhibit 195 (*State of Oklahoma vs. Randy Turman*, Case Number CF-02-477); Exhibit 196 (Military Records for Travis Crawford); Exhibits 197-99 (birth certificates); Exhibit 200 (Education Records for Kenneth

4

Barrett); Exhibit 201 (Medical Records for Gwen Crawford); Exhibit 202 (Medical Records for Carolyn Joseph); Exhibit 203 (Social Security Records for Travis Crawford).

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to unseal pertinent

exhibits to Barrett's § 2255 motion.

Dated: November 18, 2016:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on November 18, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org

/S/ *Christopher J. Wilson*
Christopher J. Wilson
United States Attorney's Office

7

285

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
        Petitioner/Defendant,      )
                                   )        Case No. CV-09-00105-JHP
    v.                             )
                                   )
UNITED STATES OF AMERICA,          )
                                   )
        Respondent/Plaintiff.      )


**GOVERNMENT'S [PROPOSED] ORDER RE: MOTION TO UNSEAL DOCUMENTS
AND PROVIDE THEM TO A POTENTIAL EXPERT WITNESS SUBJECT TO A
PROTECTIVE ORDER**

_____

The government's motion to unseal documents and provide them to a potential expert witness subject to a protective order is hereby granted.

**IT IS ORDERED THAT** the Court unseals to the extent that the government may provide to Steven Pitt, D.O., the following exhibits to Barrett's § 2255 motion (Doc. 95): Exhibits 119 through 134 (birth and death certificates); Exhibit 135 (Brandon Smith Social Security Records, Itemized Statement of Earnings); Exhibit 136 (Education Records for Kenneth Barrett); Exhibit 137; (Education Records for Gwendolyn Barrett); Exhibit 138 (Education Records for Ernest Barrett); Exhibit 139 (Medical Records for Carolyn Joseph); Exhibit 140 (Medical Records for Kathy Trotter); Exhibit 141 (Medical Records for Brandie Hill); Exhibit 142 (Medical Records for Toby Barrett); Exhibit 143 (Medical Records for Travis Crawford); Exhibit 145 (Medical Records for Linda Riley);Exhibit 146 (Medical Records for A.J. Barrett); Exhibit 147A-G (Medical Records for Kenneth Barrett); Exhibit 148 (Report of Interview with Kenneth Barrett by OSBI); Exhibit 149 (Marriage Certificate for Ernest and Diana Barrett);

286

Exhibit 150 (Divorce File for Eugene and Sylvia Gelene Dudley); Exhibit 151 (Divorce File for Kenneth Barrett and Abigail Barrett); Exhibit 152 (*Kimberly Pulice v. Richard Barrett*, Case No. JFP-2004-17); Exhibit 153 (*In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG);  Exhibit 154 (*In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481); Exhibit 155 (Sylvia Gelene Dotson's Genealogy Memorandum); Exhibit 182 (Bill Ed Rogers's File); Exhibit 195 (*State of Oklahoma vs. Randy Turman*, Case Number CF-02-477); Exhibit 196 (Military Records for Travis Crawford); Exhibits 197-99 (birth certificates); Exhibit 200 (Education Records for Kenneth Barrett); Exhibit 201 (Medical Records for Gwen Crawford); Exhibit 202 (Medical Records for Carolyn Joseph); Exhibit 203 (Social Security Records for Travis Crawford).

The Court further orders that Dr. Pitt is directed to maintain the privacy and confidentiality of such records and the information contained therein.  Dr. Pitt may not (without prior authorization of this Court) disseminate such records or information to any person, apart from his own staff, who is not directly involved in the preparation of the government's presentation of this case.  At the conclusion of these proceedings, he will destroy all copies of the sealed records, whether held in physical or electronic form.

_____
**JAMES H. PAYNE**
United States District Judge

2

287

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar No. 122664
**JOAN M. FISHER**, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-5700
(916) 498-5710 [fax]
Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | **CAPITAL CASE** |
| Petitioner, | ) | |
| | ) | Case No. 6:09-cv-00105-JHP |
| v. | ) | |
| | ) | PETITIONER'S RESPONSE |
| UNITED STATES OF AMERICA, | ) | TO GOVERNMENT'S MOTION |
| | ) | TO SECURE TRIAL COUNSEL'S |
| Respondent, | ) | FILE |
| _____ | ) | |

Pursuant to the Court Order dated November 7, 2016 (Doc 246), Petitioner

through his counsel files his Response to the Government's Motion to Secure Trial

Counsel Files (Doc 250).

**PETITIONER'S RESPONSE TO**                                         *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**               OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**                    1

288

## I.  INTRODUCTION

### A.  The Scope of the Remand and Waiver of the Attorney-Client Privilege.

As indicated in the Government's Motion (Doc 250 at 1), to the extent trial counsel has surrendered the files in question,[1] Petitioner has no objection to disclosing the requested files as it relates to relevant and material information regarding trial counsel's investigation and preparation for the penalty phase of Mr. Barrett's proceedings.  Even then, the disclosure should rest in reciprocity and disclosure of the government's files. The conditions requested by Petitioner are consistent with the order of remand by the Tenth Circuit Court of Appeals.   It is apparent from the requested discovery of both parties that the parties rely on a reading of the Tenth Circuit opinion that envisions a broad scope of relevant evidence at the evidentiary hearing, including matters related to guilt/innocence and thus a broad waiver.  To that extent, Mr. Barrett stands ready to disclose the

---

[1]  Petitioner believes and anticipates that appointed trial counsel, Roger Hilfiger and Bret Smith have, in fact, delivered to the undersigned counsel all of the files save any and all email communications other than actual pleadings.  Counsel only recently requested the same and anticipate delivery of the same as soon as practicable.  If and when trial counsel discover other and additional files in their possession, Petitioner has requested and anticipates that those files be maintained consistent with the attorney-client privilege of confidentiality and will be delivered directly to counsel, at which point, counsel will disclose the same to the government to the extent constitutionally required assuming a Court Order to that effect.

PETITIONER'S RESPONSE TO                                    *Barrett v. USA*
GOVERNMENT'S MOTION TO SECURE             OKED Case No. 6:09-cv-00105-JHP
TRIAL COUNSEL'S FILES                    2

relevant and material trial counsel files that relate to the penalty phase, assuming the government's similar disclosure.

Petitioner does not waive generally his rights of attorney-client privilege beyond that required by law and the constitution as laid out in the Due Process clause of the Fifth and as contemplated by the Eighth Amendment's prohibition of the infliction of cruel and unusual punishment, including freedom from the arbitrary and capricious infliction thereof, and the Sixth Amendment right to counsel.   Counsel further relies upon the Government's ethical obligations in a capital case and argues that in the spirit of fairness, equity and judicial efficiency, the reciprocity required is mandated.

**B.      The Tenth Circuit Order of Remand**

It is apparent from the parties' discovery requests that both the Respondent and Petitioner contemplate a broad array of relevant evidence under the remand order.  In *United States v. Barrett,* 797 F. 3d 1207, 1232 (10th Cir. 2015), the Tenth Circuit Court of Appeals addressed the issue of whether Mr. Barrett's trial counsel "prepared a mitigation case that measures up to professional norms and, if not, whether that made a difference" and found that the record before them was "inadequate." *Id.* at 1224.  Consequently, the Court reversed and remanded Mr. Barrett's death sentence to this Court for an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating [Mr. Barrett's]

**PETITIONER'S RESPONSE TO**                                                        *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**                          OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**                    3

290

background and mental health and whether [he] suffered any prejudice from any deficiency during the penalty phase of his trial."  The hearing now contemplated must address both deficiency in performance and prejudice.  *Id.* at 1214 (citing *Strickland v. Washington,* 466 U.S. 668, 694 (1984)).  Prejudice is determined by the cumulative impact of deficient performance.  *Hooks v. Workman,* 689 F.3d 1148, 1187–88 (10th Cir. 2012).

As Petitioner laid out in his Motion for Leave to Conduct Discovery, the evidentiary hearing must necessarily address all of the available mitigation.  Doc 249 at 4-5. Failure of trial counsel to investigate, develop, and present mitigation in all areas including mental health, background, residual doubt, and actual innocence necessarily impacts this Court's finding on both performance and prejudice.

## II.  GOVERNING LAW

Pursuant to Rule 6 of the Rules Governing Section 2254 Cases, "a judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance to practices and principles of law.  Unlike regular discovery, discovery in a 2255 proceeding requires a showing of good cause.  "[I]t is appropriate for the court, in exercising its discretion . . . , to undertake some substantive balancing of interests . . . ." *Laxalt v. McClatchy*, 809 F.2d 885, 890 (D.C. Cir. 1987).

**PETITIONER'S RESPONSE TO**                                                          *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**                            OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**                 4

291

As Petitioner laid out in his Motion for Leave to Conduct Discovery, the evidentiary hearing must necessarily address all of the available mitigation. Doc 249 at 4-5. Failure of trial counsel to investigate, develop, present mitigation in all areas including mental health, background, residual doubt, and actual innocence necessarily impacts this Court's finding on both performance, and prejudice.

## II. THE GOVERNMENT'S REQUEST FOR TRIAL COUNSEL FILES IS TOO BROAD AND UNSUPPORTED BY SPECIFITY OR GOOD CAUSE.

### A. Respondent's request is overbroad and does not comply with specificity requirements

Petitioner objects to respondent's request on grounds that it is vague, overbroad and ambiguous, and as such, does not comply with the dictates of § 2255 Rule 6 requiring "specific allegations before the court" and additionally because it seeks discovery of trial preparation materials within the meaning of Federal Rule of Civil Procedure 26(b)(3). The Due Process Clause protects a defendant from burdensome requirements not imposed on the State or government. See *Wardius v. Oregon*, 412 U.S. 470 472 (1973).

Respondent's only showing of cause is the vague and conclusory assertion that the documents are sought "for the government to meaningfully reply to Barrett's assertions, it requires access to the documents that informed and reflect trial counsel's contemporaneous impressions and actions[.]" Doc 250 at p.2. Such

**PETITIONER'S RESPONSE TO**                                 *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**           OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**                 5

292

an assertion falls far short of establishing good cause under Habeas Rule 6(a). See

*Campbell v. Blodgett*, 982 F.2d 1356, 1359 (9th Cir. 1993) (because petitioner

failed to establish that his requested discovery would lead to evidence supporting

specifics of his claim, district court did not abuse its discretion in denying request);

*Calderon v. U.S. District Court* (Nicolaus), 98 F.3d 1102, 1106 (9th Cir. 1996)

("'Conclusory allegations are not enough to warrant discovery under Rule 6,'"

quoting *Ward v. Whitley*, 21 F.3d 1355, 1364 (5th Cir. 1994)).  "[T]he *Bracy*

requirement that proposed discovery be based upon 'specific allegations before the

court' . . .  mean[s] something other than merely the recitation of a generic claim,"

of an inability to construct a defense and to "meaningfully reply to Barrett's

assertions." *Sherman v. McDaniel,* 333 F.Supp. 2d 960, 967 (2004).  Because of

the general and nonspecific basis on which respondent seeks discovery, this Court

should find that respondent has failed to demonstrate good cause within the

meaning of *Bracy* to justify this discovery.[2]

Respondent's vague and conclusory statements are also insufficient to

establish that it "has substantial need of the materials in the preparation of the

---

[2]  The government's attempt to wholly circumvent the Sixth Amendment's
protections with its suggestions that any files not in Mr. Barrett's current counsel's
files should be subject to an expansive unmonitored subpoena duces tecum on Mr.
Barrett's prior attorneys (Doc 250 at 3) suggests a total lack of appreciation or
respect for Mr. Barrett's rights under the Fifth, Sixth and Eighth Amendments and
must be summarily rejected in its breathtaking breadth and constitutional
violations.

**PETITIONER'S RESPONSE TO**                            *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**          OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**          6

party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed. R. Civ. P. 26(b)(3). Respondent has no substantial need; it has only the commonly shared, if unrealized, longing of a lawyer to peer over the shoulder of opposing counsel.

Respondent's obvious goal is to construct a post-hoc rationalization of trial counsel's indisputable failure to conduct an adequate investigation at the penalty phase of the trial. See Doc. 250 at 2. As "necessary to a full and fair adjudication of trial counsel's performance, Respondent requests the entire trial attorney record, including "informal notes on scraps of paper. The governing substantive law precludes such a strategy. *See Wiggins v. Smith*, 539 U.S. 510, 526-27 (2002). "Just as a reviewing court should not second guess the strategic decisions of counsel with the benefit of hindsight, it should also not construct strategic defenses which counsel does not offer." *Harris v. Reed*, 894 F.2d 871, 878 (7th Cir. 1990), citing *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986).

**B.      Respondent requests documents that are subject to**

1. The Attorney-client privilege.

The files of trial counsel in this matter are, in general, protected by the attorney-client privilege and the work-product privilege. These privileges are rooted in the constitutional guarantees of the Sixth and Fourteenth Amendments. *See, United States v. Rosner*, 485 F.2d 1213, 1224 (2nd Cir. 1992). However, as

**PETITIONER'S RESPONSE TO**                                    *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**              OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**                    7

the government points out in the motion, the attorney-client privilege may be waived, "with respect to communications necessary to prove or disprove his claim. *United States v. Pinson*, 584 F. 3d 972, 978 (10th Cir. 2009). The waiver, however, is limited to "*communications*" between the petitioner and his attorney" "necessary to prove or disprove his claim." *Id.* Nothing in *Pinson* suggests the broad waiver to everything in trial counsel's files. *Id.; see also, Bittaker v. Woodford*, 331 F.3d 715, 718-721 (9th Cir. 2003)(en banc). Indeed, the Tenth Circuit specifically finds the "potential scope and lack of specificity in that case "troubling." *Id.*, at 979. As *Bittaker* notes, in such a situation there has been an implied waiver as to communications between attorney and petitioner with regard to matters relevant to the subject matter of the claim. See 331 F.3d 719-721. Mr. Barrett does not deny the broad nature of the claim on which the the Tenth Circuit remanded this matter for an evidentiary hearing to include the entire penalty phase of Mr. Barrett's case; he does, however, dispute that the breadth of the claim permits unlimited access to trial counsel's file without more specificity of the need for the files beyond *communications* between counsel and Petitioner on the penalty phase investigation, preparation, strategy and presentation.

The implied waiver concept is founded upon the notion of fairness. A party cannot assert attorney mistake or ineffectiveness without allowing the other party some inquiry into matters relevant to the mistake or ineffectiveness. As explained

**PETITIONER'S RESPONSE TO**          *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**      OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**      8

in *Tasby v. United States*, 503 F.2d 332, 336 (8th Cir. 1974) (cited in the *Bittaker*

opinion): the "privilege is waived when a client attacks his attorney's competence

in giving legal advice, [and] puts in issue that advice. . . A client is not allowed to

make allegations of misconduct while preventing the attorney from responding."

As *Bittaker* also notes, however, the waiver of the privilege is limited by the

scope of the claim, and must be narrowly contoured to the allegations presented:

> [T]he court must impose a waiver no broader than needed to ensure
> the fairness of the proceedings before it.  Because a waiver is required so as
> to be fair to the opposing side, the rationale only supports a waiver broad
> enough to serve that purpose.  Courts, including ours, that have imposed
> waivers under the fairness principle have therefore closely tailored the scope
> of the waiver to the needs of the opposing party in litigating the claim in
> question.

*Bittaker*, 331 F.3d at 720.

Again, the touchstone is fairness: "an overarching consideration is whether

allowing the privilege to protect against disclosure of the information would be

'manifestly unfair' to the opposing party." *Home Indemnity Company v. Lane*

*Powell Moss and Miller*, 43 F.3d 1322, 1326 (9th Cir. 1995), quoting *Hearn v.*

*Rhay,* 68 F.R.D. 574, 581 (E.D. Wash. 1975); see *In re Von Bulow*, 828 F.3d 94,

102-103 (2nd Cir. 1987).  Consequently, the waiver exists only as to matters put in

issue by the claim, and then only if, as a matter of fairness, the government has

demonstrated "a real need for the evidence." *United States v. Amlani*, 169 F.2d at

1195.

PETITIONER'S RESPONSE TO                                              *Barrett v. USA*
GOVERNMENT'S MOTION TO SECURE                    OKED Case No. 6:09-cv-00105-JHP
TRIAL COUNSEL'S FILES                    9

## 2. The Work-Product privilege

The work-product privilege is a separate, but related, privilege. Like the attorney-client privilege, the work-product privilege can be waived by certain types of ineffective assistance of counsel allegations, but only as to matters actually put in issue by the petitioner. *See, e.g., Osband v. Woodford*, 290 F.3d 1036, 1038 (9th Cir. 2002). Under Federal Rule of Civil Procedure 26(b)(3), the work-product privilege protects documents from disclosure unless the party seeking disclosure "has substantial need of the materials in the preparation of the party's case and . . . is unable without undue hardship to obtain the substantial equivalent of the materials elsewhere." Once again, the overarching consideration is fairness: whether the respondent has demonstrated that it can only fairly respond to petitioner's allegations by having access to the materials otherwise protected by privilege. See *Hickman v. Taylor,* 329 U.S. 495, 509-510 (1947). The government has not made such a showing.

The government seeks discovery of every piece of paper that the trial attorneys had in their possession. The language of *Pinson* and/or *Bittaker* fails to support the scope of this demand and, indeed, instructs the opposite: the court must impose a narrowly drawn, "closely tailored" waiver no broader than necessary to allow a respondent a chance to refute the allegations. *Bittaker, supra,*

**PETITIONER'S RESPONSE TO**                  *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**       OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**         10

297

331 F.3d at 720; *see also Amlani*, 169 F.3d at 1195; *Home Indemnity Company,* 43 F.3d at 1326.

Respondent has not shown sufficient reason, nor good cause, to warrant discovery of these documents.

### C. Petitioner is entitled to a Protective Order under *Bittaker.*

Respondent's motion makes no mention of the need for a protective order. See *Bittaker*, 331 F.3d at 717 n. 1.  Should this Court grant respondent's request for discovery, petitioner requests a protective order as appropriate, using language comparable to the language of the order approved in *Bittaker*.  Petitioner would request an opportunity to submit a proposed protective order to this Court.

## III. FAIRNESS IN A CAPITAL CASE REQUIRES PETITIONER BE ENTITLED TO RECIPROCAL DISCOVERY.

The government has not shown sufficient good cause to set aside these privileges and compel discovery.  To the extent there is a waiver and the government is entitled to trial counsel's files, equity and fairness, due process of the Fifth and Sixth Amendments to the United States Constitution and the Criminal and Civil Rules of Discovery demand equal access by Petitioner to the government's files and communications regarding preparation, investigation, development and presentation of its case in aggravation.  *See e.g., Wardius v.*

**PETITIONER'S RESPONSE TO**            *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**     OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**      11

*Oregon; Jenkins v. Atkins*, <u>515 F. 2d 1078</u> (10th Cir. 1975); *see generally,* Fed. R. Crim. Proc. Rule 16.

The scope of reciprocity includes any and all mitigating evidence in the government's actual or constructive possession.  This includes anything that disputes, refutes or undermines the credibility of any evidence relied upon by the government at sentencing.  To do less is place a heavy and unfair burden on Petitioner without a similar burden on the government.  Whatever discovery this court finds appropriate must be framed in reciprocal terms.  *Id.*

DATED:  November 23, 2016            Respectfully submitted,


                                    /s/ *David Autry*
                                    DAVID AUTRY
                                    Attorney at Law

                                    /s/ *Joan M. Fisher*
                                    JOAN M. FISHER
                                    Assistant Federal Defender


                                    Attorneys for Petitioner,
                                    KENNETH EUGENE BARRETT


**PETITIONER'S RESPONSE TO**                    *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**         OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**          12

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 23rd day of November, 2016, I caused the foregoing Petitioner's Response to the Government's Motion to Secure Trial Counsel's Files to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ Joan M. Fisher
JOAN M. FISHER

**PETITIONER'S RESPONSE TO**                                   *Barrett v. USA*
**GOVERNMENT'S MOTION TO SECURE**              OKED Case No. 6:09-cv-00105-JHP
**TRIAL COUNSEL'S FILES**        13

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Movant/Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S RESPONSE |
| | ) | TO GOVERNMENT'S |
| United States of America | ) | MOTION FOR RULE 26 |
| | ) | DISCOVERY FROM |
| Respondent. | ) | DEFENSE EXPERTS |
| _____ | ) | |

PETITIONER'S RESPONSE TO
GOVERNMENT'S MOTION FOR RULE 26
DISCOVERY FROM DEFENSE EXPERTS          1          OKED Case No. 6:09-cv-00105-JHP

301

Petitioner, Kenneth Eugene Barrett, submits the following as his response to the Government's motion to obtain Rule 26 Discovery from Defense Experts (Doc 251).

1. The Government seeks broad expert discovery under Rule 6 of the Rules Governing § 2255, including expert reports and depositions. Respondent lacks any authority for its overly broad request. The sole case cited by Respondent justifies Petitioner's discovery for "good cause" due to new scientific developments that post-date trial—specifically, where developments in the science of arson investigation rendered the Government's expert Guilt Phase trial testimony unreliable. *Lee v. Glunt*, 667 F.3d 397 (3d. 2012).  Here, Petitioner's post-conviction experts relied on methodologies and techniques in neuropsychology and psychiatry concurrent with trial, not cutting-edge scientific developments, and no Government expert testified at trial. No authority supports Respondent's overreaching request.

2. Petitioner opposes Respondent's request for additional "expert reports" from Dr. George Woods and Dr. Myla Young, premised on its disapproval of the "preliminary matters" reviewed by such experts as detailed in their declarations. At present, Petitioner has no additional expert reports from Dr. Woods and Dr. Young, other than those filed with the original § 2255 petition. Petitioner proposes

PETITIONER'S RESPONSE TO
GOVERNMENT'S MOTION FOR RULE 26
DISCOVERY FROM DEFENSE EXPERTS          2          OKED Case No. 6:09-cv-00105-JHP

302

disclosures from any newly-retained experts whose testimony Petitioner intends to offer to the court should be made consistent with the timing proposed hereinafter.

3. Petitioner opposes Respondent's burdensome request for depositions in advance of the evidentiary hearing. Instead, Petitioner proposes live testimony from Mr. Barrett's experts at the evidentiary hearing in support of his ineffective assistance of counsel claim, subject to narrow rebuttal testimony by Respondent's experts. *See* Petitioner's Response to Government's Motion for Psychiatric Evaluation of Defendant (Government's rebuttal testimony may not be predicated on new testing). However, we do not disagree, that the court, in its discretion, may order such depositions at the government's expense, § 2255 Rule 6 (c), but suggest to order the same with insufficient time to prepare and conduct them would be an abuse of discretion.

4.  Petitioner opposes the  request for depositions of Bill Sharp and Jeanne Russell, as these are not Petitioner's experts, but fact witnesses whose opinions were ignored by trial counsel. The ultimate reliability of their opinions is irrelevant. Rather, the question at issue is whether trial counsel rendered objectively reasonable performance when  they ignored what they learned from Drs. Sharp and  Russell, key witnesses whose reports, Petitioner alleges, would have triggered further investigation by competent counsel.

PETITIONER'S RESPONSE TO
GOVERNMENT'S MOTION FOR RULE 26
DISCOVERY FROM DEFENSE EXPERTS          3          OKED Case No. 6:09-cv-00105-JHP

303

5.  Petitioner opposes the timing of Respondent's request for discovery. The Government's proposed deadlines are unnecessarily and overly restrictive. Mr. Barrett proposes Rule 26 disclosures either two weeks prior to the start of the evidentiary hearing (i.e., on present schedule, February 2, 2017), or thirty days from the date of evaluation of Mr. Barrett by any new defense experts—whichever date is later.  Petitioner opposes the evaluation of Mr. Barrett by any new Respondent's experts, *see* Petitioner's Response to Government's Motion for Psychiatric Evaluation of Defendant. Accordingly, all Government disclosures should be made at least two weeks prior to the start of the evidentiary hearing.

6. WHEREFORE, Petitioner requests that the Government's request to obtain Rule 26 discovery be denied consistent with the above objections.

DATED:  November 23, 2016                    Respectfully submitted,

/s/ *Joan M. Fisher*
JOAN M. FISHER

/s/ *David Autry*
DAVID AUTRY

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

PETITIONER'S RESPONSE TO
GOVERNMENT'S MOTION FOR RULE 26
DISCOVERY FROM DEFENSE EXPERTS        4            OKED Case No. 6:09-cv-00105-JHP

304

## CERTIFICATE OF ELECTRONIC FILING AND SERVICE

This is to certify that on this 23rd day of November, 2016, I caused the foregoing Petitioner's Response to Government's Motion for Rule 26 Discovery From Defense Experts to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, United States Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

<div style="text-align:right">

/s/ Joan M. Fisher
JOAN M. FISHER

</div>

PETITIONER'S RESPONSE TO
GOVERNMENT'S MOTION FOR RULE 26
DISCOVERY FROM DEFENSE EXPERTS          5          OKED Case No. 6:09-cv-00105-JHP

305

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:   (916) 498-6666
Facsimile:   (916) 498-6656
Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Movant/Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S RESPONSE |
| | ) | TO GOVERNMENT'S |
| United States of America | ) | MOTION TO PROPOUND |
| | ) | INTERROGATORIES |
| Respondent. | ) | (Doc. 252) |
| _____ | ) | |

Petitioner, Kenneth Eugene Barrett, submits the following as his response to

the government's motion to propound interrogatories.  (Doc. 252)

1.  The government seeks to submit interrogatories to Petitioner and his family members regarding their physical and mental health.  (Doc. 252, p. 1) This request is based on the fact Petitioner has claimed his trial counsel were ineffective for failing to investigate, develop, and introduce evidence regarding his mental illnesses and organic impairments.  The government contends that such interrogatories are necessary so it can "determine the scope and sources of Barrett's medical treatment in the community, as the information is necessary for the government to efficiently investigate Barrett's claim that his trial attorneys ineffectively failed to present evidence concerning his mental health."  (Doc. 252, p. 2) The same request is made with respect to Mr. Barrett's relatives who provided declarations in support of his § 2255 motion, because "Barrett's relatives have likewise placed their mental health at issue [.]" (Doc. 252, p. 3)

2.  Petitioner objects to government interrogatories being propounded to Mr. Barrett's relatives regarding their physical and mental health.  This far-ranging request is too burdensome to comply with and smacks of a fishing expedition.  It is certainly too far-reaching and burdensome to comply with given the Court's scheduling order.  Mr. Barrett's relatives' declarations, and any supporting documentation filed with the § 2255 petition, speak for themselves.  Petitioner has no objection to making available to the government Mr. Barrett's relatives personal

PETITIONER'S RESPONSE TO
GOVERNMENT'S MOTION TO PROPOUND
INTERROGATORIES (Doc. 252)                    2                OKED Case No. 6:09-cv-00105-JHP

records that form the basis of the claim.  The government has no right to more and certainly is not permitted to delve into every aspect of their lives at will.

3.  Petitioner objects to interrogatories being propounded to Mr. Barrett with respect to every aspect of his physical and mental health.  Again, this request is too burdensome in light of the time constraints imposed by the Court's scheduling order.  The best evidence on these matters consists of Mr. Barrett's mental health and other health records which were filed as exhibits with the § 2255 motion, to which the government has or will have access, as well as the reports of the experts who examined him in support of his § 2255 motion.  Again, these records and reports speak for themselves.  Propounding interrogatories to Mr. Barrett personally would be redundant and time consuming.

WHEREFORE, Petitioner requests that the government's request to propound interrogatories be denied consistent with the above objections.

DATED:  November 23, 2016                    Respectfully submitted,

                                             /s/ Joan M. Fisher
                                             JOAN M. FISHER

                                             /s/ David Autry
                                             DAVID AUTRY

                                             Attorneys for Petitioner,
                                             KENNETH EUGENE BARRETT

PETITIONER'S RESPONSE TO
GOVERNMENT'S MOTION TO PROPOUND
INTERROGATORIES (Doc. 252)          3          OKED Case No. 6:09-cv-00105-JHP

308

# CERTIFICATE OF ELECTRONIC FILING AND SERVICE

This is to certify that on this 23rd day of November, 2016, I caused the foregoing Petitioner's Response to Government's Motion to Propound Interrogatories (Doc. 252) to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, United States Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ Joan M. Fisher
JOAN M. FISHER

PETITIONER'S RESPONSE TO
GOVERNMENT'S MOTION TO PROPOUND
INTERROGATORIES (Doc. 252)                4                OKED Case No. 6:09-cv-00105-JHP

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com


**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
Joan_Fisher@fd.org


Attorneys for Petitioner,
KENNETH EUGENE BARRETT


## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA


| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Movant/Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S RESPONSE |
| | ) | TO GOVERNMENT'S |
| | ) | MOTION TO SERVE |
| United States of America | ) | DISCOVERY ON THIRD |
| | ) | PARTIES RELATED TO |
| Respondent. | ) | DEFENDANT'S MENTAL |
| | ) | HEALTH AND SOCIAL |
| | ) | HISTORY |
| _____ | ) | |


PETITIONER'S RESPONSE TO GOVERNMENT'S               *Barrett v. United States*
MOTION TO SERVE DISCOVERY ON THIRD               OKED Case No. CV-09-00105-JHP
PARTIES RELATED TO DEFENDANT'S
MENTAL HEALTH AND SOCIAL HISTORY          1

Kenneth Eugene Barrett, Movant/Petitioner, through his attorneys files his Response to the Government's Motion to Serve Discovery on Third Parties Related to Defendant's Mental Health and Social History.

## I.  INTRODUCTION

In its Motion, the government seeks an order allowing it to depose Petitioner's relatives "principally to determine if and when they have ever been diagnosed with or treated for a relevant physical or mental condition, by whom they were diagnosed or treated, and whether they will execute a waiver of any state or federal privileges with regard to their health care providers' records. The government further seeks authorization to serve subpoenas duces tecum on those health care providers." (Doc. 254 at 2).

Petitioner objects to these requests because they are overbroad, seek privileged information, infringe on the privacy interests of Petitioner's family and are not limited to records relevant to the evidentiary hearing regarding trial counsel's performance in the investigation and presentation of mitigation evidence at the penalty phase. Moreover, the purpose of these requests is to cause embarrassment to Petitioner's family.

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE DISCOVERY ON THIRD
PARTIES RELATED TO DEFENDANT'S
MENTAL HEALTH AND SOCIAL HISTORY          2

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

311

## II. ARGUMENT

### A. The Government's request is overbroad and not limited to records relevant to mitigation of punishment.

Rule 6 of the Rules Governing § 2255 Proceedings permits discovery for "good cause." The government cannot demonstrate "good cause" for discovery without first "provid[ing] reasons for the request" related to the "essential elements" of the claim. Rule 6(b), Rules Governing Section 2255 Proceedings; *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Generalized statements about the possible existence of discovery material are insufficient; Rule 6 "does not . . . authorize fishing expeditions." *Harris v. Johnson*, 81 F.3d 535, 540 (5th Cir. 1996).

The government's claimed "good cause" for needing this information is that Petitioner "specifically relied upon the declarations of his relatives attesting to their mental disorders." (Doc 254 at 2-3). The government further states that it does not view this request as a "fishing expedition," but will limit its use of subpoenas after Petitioner responds to interrogatories regarding family members. (Doc 254 at 3).

The government is not specifying exactly who it wants to depose or serve subpoenas duces tecums upon. Instead, the government speaks in broad brushstrokes stating only that it wants to depose Petitioner's "relatives" regarding their health care information.  This request is excessively broad, especially given

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE DISCOVERY ON THIRD
PARTIES RELATED TO DEFENDANT'S
MENTAL HEALTH AND SOCIAL HISTORY            3

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

312

the fact that the government easily could have specifically referred to the named relatives who gave declarations. By framing its Motion in this unrestricted manner, the government is seeking permission to depose any of Petitioner's relatives about any plausible health matter. This is not a reasonable request. Although the government assures that it will limit its use of subpoenas for the health care providers after Petitioner responds to interrogatories, there is no excuse for this excessive over-reach.

The question before the court is what, if anything, trial counsel did in the investigation and development of mitigation for sentencing.  The declarations and documents relied upon by Petitioner will be made available to the government – it is to those allegations the government's response must be directed.  If warranted, the government has the opportunity to depose or cross-examine the witnesses and challenge the documents.

The Tenth Circuit has upheld district courts' decisions to be prudent in controlling the breadth of discovery:

PETITIONER'S RESPONSE TO GOVERNMENT'S                              *Barrett v. United States*
MOTION TO SERVE DISCOVERY ON THIRD                    OKED Case No. CV-09-00105-JHP
PARTIES RELATED TO DEFENDANT'S
MENTAL HEALTH AND SOCIAL HISTORY          4

> [I]t is not unreasonable to be cautious about ordering their entire contents disclosed willy-nilly. Indeed, the Supreme Court has underscored that "the requirement of Rule 26(b)(1) that the material sought in discovery be `relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery [to protect] `a party or person from annoyance, embarrassment, [or] oppression. . . .'" *Herbert v. Lando,* 441 U.S. 153, 177, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (quoting Fed.R.Civ.P. 26(c)(1)); *see also Gehring v. Case Corp.,* 43 F.3d 340, 342 (7th Cir.1994) (no abuse of discretion where "privacy interests, coupled with [the district court's] determination to keep the trial focused . . ., justified limiting [plaintiff's discovery of] personnel files").

*Regan-Tougy v. Walgreen Co.*, 526 F.3d 641, 648-49 (10th Cir. 2008); *see also Calderon v. US District Court,* 98 F.3d 1102, 1106 (9th Cir. 1996) ("Conclusory allegations are not enough to warrant discovery under Rule 6.") (citation omitted).

Here, the government's far-reaching requests for disclosure of sensitive information are nothing more than an excuse to annoy, harass and embarrass Petitioner's relatives.

**B. The Government's Requests Seek Privileged Information that Infringes on the Privacy Interests of Petitioner's Relatives.**

There is perhaps nothing more sacred and private than mental health information:

PETITIONER'S RESPONSE TO GOVERNMENT'S                    *Barrett v. United States*
MOTION TO SERVE DISCOVERY ON THIRD                    OKED Case No. CV-09-00105-JHP
PARTIES RELATED TO DEFENDANT'S
MENTAL HEALTH AND SOCIAL HISTORY        5

314

> The psychiatric patient confides more utterly than anyone else in the world. He exposes to the therapist not only what his words directly express; he lays bare his entire self, his dreams, his fantasies, his sins, and his shame. Most patients who undergo psychotherapy know that this is what will be expected of them, and that they cannot get help except on that condition. * * * It would be too much to expect them to do so if they knew that all they say — and all that the psychiatrist learns from what they say— may be revealed to the whole world from a witness stand.

*Taylor v. United States,* 222 F.2d 398, 401 (DC Cir. 1955), *quoting* from Guttmacher and Weihofen, Psychiatry and the Law 272 (1952). In this situation the stakes are higher, because the privacy interests belong to non-parties to this action.

There is no doubt that the sensitive medical and psychiatric information of Petitioner's relatives is protected privileged information under federal law. *See Jaffee v. Redmond,* 518 U.S. 1, 15 (1996). However, the government asserts that because none of Petitioner's relatives has made any effort to assert this privilege thus far, they have waived any claim of privilege regarding their medical histories. (Doc 254 at 4) ("Given the lack of any reservation of rights in the declarations, the government assumes that if Barrett intends to rely on the information in those statements, his declarant-relatives will forgo any claim of privilege as to their medical histories.").

In reliance of this statement, the government cites to *United States v. Bolander,* 722 F.3d 199, 223 (4th Cir. 2013) (citing *United States v. Hayes,* 227

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE DISCOVERY ON THIRD
PARTIES RELATED TO DEFENDANT'S
MENTAL HEALTH AND SOCIAL HISTORY            6

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

315

F.3d 578, 586 (6th Cir. 2000)) (holding that a witness may waive a claim of privilege by failing to properly assert it during testimony). *Bolander* presented a far different situation that is distinguishable from the case at hand. In *Bolander*, the court held that a defendant waived his claim of privilege when he disclosed his own psychiatric records to his expert during depositions without claiming privilege. *See id.* ("By answering questions without asserting the psychotherapist—patient privilege, Bolander waived any privilege he may have enjoyed.") The government somehow extends that holding to mean that a non-party must claim privilege when simply stating in a declaration that they have had mental health treatment; otherwise, failure to do so will result in waiver of that privilege with respect to *all* medical records for the entirety of all proceedings. That giant leap is simply not a logical extension of the *Bolander* holding.

In sum, Petitioner's family has a protected privilege in their confidential medical records. They have not waived that privilege. Petitioner intends to provide all underlying documentation of his expert witnesses, including relevant documents of his health and social history. *See* Doc. 251 at 1. Beyond that, the government has not shown that this Court should order disclosure of privileged information of non-parties.

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE DISCOVERY ON THIRD
PARTIES RELATED TO DEFENDANT'S
MENTAL HEALTH AND SOCIAL HISTORY          7

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

316

**C. To Any Extent that the Court Grants the Government's Motion, Petitioner Requests a Protective Order for Sensitive Medical and/or Psychiatric Information of Petitioner's Relatives.**

Upon motion by a party and for good cause shown, the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. Proc. 26(c). Trial courts have broad discretion in determining what constitutes good cause, whether good cause exists, and, if it does exist, what protection is appropriate when considering a protective order. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 36 (1984).

Accordingly, Petitioner requests an opportunity to submit an appropriate proposed protective order to this Court for any such disclosed records.

DATED:  November 23, 2016          Respectfully submitted,

> /s/   *David Autry*
> DAVID AUTRY
> Attorney at Law
>
> /s/ *Joan M. Fisher*
> JOAN M. FISHER
> Assistant Federal Defender
>
> Attorneys for Petitioner,
> KENNETH EUGENE BARRETT

PETITIONER'S RESPONSE TO GOVERNMENT'S                    *Barrett v. United States*
MOTION TO SERVE DISCOVERY ON THIRD              OKED Case No. CV-09-00105-JHP
PARTIES RELATED TO DEFENDANT'S
MENTAL HEALTH AND SOCIAL HISTORY          8

317

Case 6:09-cv-00105-RAW   Document 261   Filed 11/23/16   Page 9 of 9

# CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 23rd day of November, 2016, I caused the foregoing Petitioner's Response to the government's Motion to Serve Discovery on Third Parties Related to Defendant's Mental Health and Social History to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE DISCOVERY ON THIRD
PARTIES RELATED TO DEFENDANT'S
MENTAL HEALTH AND SOCIAL HISTORY          9

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

318

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
Joan_Fisher@fd.org

Attorneys for Petitioner
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Movant/Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S RESPONSE |
| | ) | TO GOVERNMENT'S |
| | ) | MOTION TO SERVE |
| United States of America | ) | SUBPOENAS DUCES |
| | ) | TECUM REGARDING |
| | ) | RECORDS RELATING TO |
| | ) | DEFENDANT'S |
| Respondent. | ) | MENTAL HEALTH |
| _____ | ) | |

PETITIONER'S RESPONSE TO GOVERNMENT'S                                    *Barrett v. United States*
MOTION TO SERVE SUBPOENA DUCES TECUM           OKED Case No. CV-09-00105-JHP
REGARDING RECORDS RELATING TO
DEFENDANT'S MENTAL HEALTH                     1

Kenneth Eugene Barrett, Movant/Petitioner, through his attorneys files his Response to the Government's Motion to Serve Subpoenas Duces Tecum Regarding Records Relating to Defendant's Mental Health.

## I.  INTRODUCTION

In its Motion, the government seeks an order allowing it to subpoena records from the following third parties:

> the U.S. Social Security Administration (for all records of Barrett's benefits and paid employment), all organizations and individuals who employed Barrett in a paid or unpaid capacity (for all records of his employment); all schools that Barrett attended (for all of his academic, administrative, behavioral and counseling records); all judicial and administrative courts in which Barrett has been a litigant or witness (for any sealed transcripts of his testimony or any non-public records related to litigation in which he was a party or witness); all penal and detention facilities in which Barrett has been an inmate (for all records of his custody), all medical professionals who have treated or diagnosed Barrett (for all of medical records related to his mental health), all mental health professionals who have treated or diagnosed Barrett (for all of his mental health records).

(Doc. 255 at 3).

The government further seeks to subpoena the documents of the "several medical and mental health experts" that Barrett relies upon for his claims of ineffective assistance of counsel, "including any notes, interview notes, raw test data, normative data, diagnostic criteria, and other documents provided by the

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE SUBPOENA DUCES TECUM
REGARDING RECORDS RELATING TO
DEFENDANT'S MENTAL HEALTH                2

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

320

defendant or his attorneys that were considered in forming the experts' opinions" (Doc 255 at 4).

Petitioner objects to these requests because they are overbroad, seek privileged information, infringe on privacy interests and are not limited to records relevant to the evidentiary hearing regarding trial counsel's performance in the investigation and presentation of mitigation evidence at the penalty phase.

## II. ARGUMENT

### A. The Government's request is overbroad and not limited to records relevant to mitigation at the penalty phase.

Rule 6 of the Rules Governing § 2255 Proceedings permits discovery for "good cause." The government cannot demonstrate "good cause" for discovery without first "provid[ing] reasons for the request" related to the "essential elements" of the claim. Rule 6(b), Rules Governing Section 2255 Proceedings; *Bracy v. Gramley*, 520 U.S. 899, 904 (1997). Generalized statements about the possible existence of discovery material are insufficient; Rule 6 "does not . . . authorize fishing expeditions." *Harris v. Johnson*, 81 F.3d 535, 540 (5th Cir. 1996).

The government's claimed "good cause" for needing this information is that "Barrett's conduct and performance at work, at school, and in custody bear on the reliability of his mental health diagnoses, which form the core of several of his

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE SUBPOENA DUCES TECUM
REGARDING RECORDS RELATING TO
DEFENDANT'S MENTAL HEALTH                3

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

ineffective assistance of counsel claims." (Doc. 255 at 2-3).  This very general, conclusory statement does not establish a relationship with the "essential elements" of Petitioner's claim. The government is, in effect, stating that Petitioner's entire life is relevant to his claim. This is not a proper discovery request.

In fact, the expanse of information sought by the government borders on the absurd. The government does not ask for any enumerated or specific documents or reports from any specific institutions or professionals for any specific time frames; instead, the government seeks virtually every record of every aspect of Petitioner's life. This is the very definition of unduly burdensome. Petitioner acknowledges that he has put aspects of his mental health and background at issue; however, that does not give the government carte blanche to explore *every single component of his entire life,* unlimited in time and regardless of its relevancy to mitigation available to trial counsel at the time of sentencing.

The Tenth Circuit has upheld district courts' decisions to be prudent in controlling the breadth of discovery:

PETITIONER'S RESPONSE TO GOVERNMENT'S                                    *Barrett v. United States*
MOTION TO SERVE SUBPOENA DUCES TECUM                          OKED Case No. CV-09-00105-JHP
REGARDING RECORDS RELATING TO
DEFENDANT'S MENTAL HEALTH                    4

322

> [I]t is not unreasonable to be cautious about ordering their entire contents disclosed willy-nilly. Indeed, the Supreme Court has underscored that "the requirement of Rule 26(b)(1) that the material sought in discovery be `relevant' should be firmly applied, and the district courts should not neglect their power to restrict discovery [to protect] `a party or person from annoyance, embarrassment, [or] oppression. . . .'" *Herbert v. Lando,* 441 U.S. 153, 177, 99 S.Ct. 1635, 60 L.Ed.2d 115 (1979) (quoting Fed.R.Civ.P. 26(c)(1)); *see also Gehring v. Case Corp.,* 43 F.3d 340, 342 (7th Cir.1994) (no abuse of discretion where "privacy interests, coupled with [the district court's] determination to keep the trial focused . . ., justified limiting [plaintiff's discovery of] personnel files").

*Regan-Tougy v. Walgreen Co.*, 526 F.3d 641, 648-49 (10th Cir. 2008); *see also Calderon v. US District Court,* 98 F.3d 1102, 1106 (9th Cir. 1996) ("Conclusory allegations are not enough to warrant discovery under Rule 6.") (citation omitted).

The government's Motion is requesting the very "willy-nilly" sort of disclosure discussed in *Regan-Tougy.* This Court should deny the government's fishing expedition.

### B. The Government's Requests Seek Privileged Information that Infringes on Petitioner's Privacy Interests.

The government states "Barrett has, of course, waived his any [sic] privilege concerning his health records by placing his medical history in issue." (Doc 255 at 3). The government assumes that because Petitioner's mental health is an issue – which Petitioner acknowledges – that Petitioner has waived any and all privilege to

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE SUBPOENA DUCES TECUM
REGARDING RECORDS RELATING TO
DEFENDANT'S MENTAL HEALTH          5

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

323

any medical, psychological or social record from his entire life. That is simply not the case.

The government cites *Schoffstall v. Henderson,* 223 F.3d 818, 823 (8th Cir. 2000), for the proposition that a patient waives the psychiatrist-patient privilege when he places his medical condition at issue. The law is not quite that settled. *See generally* 21 George Mason Law Review 117, "*The Psychotherapist Privilege: Privacy and "Garden Variety" Emotional Distress*" (Fall 2013). In contrast to *Schoffstall*, a Massachusetts District Court held otherwise, declining to find waiver of the psychiatrist-patient privilege in a plaintiff who raised a claim of emotional distress. *See Vanderbilt v. Town of Chilmark*, 174 F.R.D. 225, 225-30 (D.Mass.1997).

The government glibly asks this Court for an Order to subpoena mental health records from *all* of Petitioner's physicians, mental health professionals, school counselors, employers and the Social Security Administration. (Doc 255 at 3). This is a blanket request with no specified dates or specified named professionals. Petitioner has submitted detailed declarations by two mental health experts and does not oppose depositions of its experts, if time permits.  Petitioner will provide all of the underlying documentation including relevant documents of Mr. Barrett's health and social history.  *See* Doc 251 at 1.  Mr. Barrett does not

PETITIONER'S RESPONSE TO GOVERNMENT'S                                    *Barrett v. United States*
MOTION TO SERVE SUBPOENA DUCES TECUM                          OKED Case No. CV-09-00105-JHP
REGARDING RECORDS RELATING TO
DEFENDANT'S MENTAL HEALTH                    6

324

object to disclosing all of the documents that § 2255 counsel have submitted in support of the claim. Petitioner's objection and concern goes to the breadth and lack of specificity in the government's request. The government has illustrated no need to expand its search beyond the claim presented or to impose on Petitioner in the manner it suggests.

The government further asserts that to any extent that Petitioner claims that this information is privileged, he should bear the burden of identifying this information in a privilege log. (Doc 255 at 4).  Petitioner disagrees. The government has an obligation to specify which records it wants short of everything from your entire life before Petitioner could begin to attempt to create a privilege log.

### C. To Any Extent that the Court Grants the Government's Motion, Petitioner Requests a Protective Order for Sensitive Medical and/or Psychiatric Information.

Upon motion by a party and for good cause shown, the court "may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense." Fed. R. Civ. Proc. 26(c). Trial courts have broad discretion in determining what constitutes good cause, whether good cause exists, and, if it does exist, what protection is appropriate

PETITIONER'S RESPONSE TO GOVERNMENT'S                                    *Barrett v. United States*
MOTION TO SERVE SUBPOENA DUCES TECUM                      OKED Case No. CV-09-00105-JHP
REGARDING RECORDS RELATING TO
DEFENDANT'S MENTAL HEALTH                    7

325

when considering a protective order. *Seattle Times Co. v. Rhinehart*, <u>467 U.S. 20, 36</u> (1984).

Medical and/or psychiatric records are highly sensitive as evidenced by the protections accorded to them under federal law by the Health Insurance Portability and Accountability Act of 1996 (HIPPA). *See also* <u>45 C.F.R. § 164.512(e)(1)</u> (defining a qualified protective order under HIPPA). Accordingly, Petitioner requests an opportunity to submit an appropriate proposed protective order to this Court for any such disclosed records.

DATED: November 23, 2016                    Respectfully submitted,

<u>/s/ *David Autry*</u>
DAVID AUTRY
Attorney at Law

<u>/s/ Joan M. Fisher</u>
JOAN M. FISHER
Assistant Federal Defender

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE SUBPOENA DUCES TECUM
REGARDING RECORDS RELATING TO
DEFENDANT'S MENTAL HEALTH          8

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

326

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 23rd day of November, 2016, I caused the foregoing Petitioner's Response to the Government's Motion to Serve Subpoena Duces Tecum Regarding Records Relating to Defendant's Mental Health to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

> /s/ *Joan M. Fisher*
> JOAN M. FISHER

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO SERVE SUBPOENA DUCES TECUM
REGARDING RECORDS RELATING TO
DEFENDANT'S MENTAL HEALTH                    9

*Barrett v. United States*
OKED Case No. CV-09-00105-JHP

327

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
Joan_Fisher@fd.org

Attorneys for Movant/Petitioner,
KENNETH E. BARRETT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Movant/Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S RESPONSE |
| | ) | TO GOVERNMENT'S MOTION |
| United States of America, | ) | TO PERMIT INSPECTION OF |
| | ) | THE EXPANDED RECORD |
| Respondent. | ) | |
| _____ | ) | |

Kenneth Eugene Barrett, Movant/Petitioner, through his attorneys files his

Notice of Non-Opposition to the government's Unopposed Motion to Permit

Inspection of the Expanded Record filed on November 18, 2016, wherein the

government seeks "to formally expand the record in this § 2255 case to include a

PETITIONER'S RESPONSE TO GOVERNMENT'S                    *Barrett v. United States*
MOTION TO PERMIT INSPECTION OF THE                OKED Case No. CV-09-00105-JHP
EXPANDED RECORD                    1

328

mental health evaluation report and that was sealed before trial (Trl. Doc. 238)".

(Doc 256.)

By this Notice, Mr. Barrett has no objection to the unsealing and disclosure

of the mental health evaluation report and all related documentary evidence of the

examination including but not limited to rough notes and other notes, testing, the

testing protocols, memoranda, communications between the government and Dr.

Price, and any and all video and audio recordings of the same or related thereto

that are in the possession of Dr. Price, the Court, or the government. We also

request access to all records reviewed by Dr. Price in formulating his diagnosis or

conclusions.  We do not object to the unsealing of these materials provided they

cannot be used in the event of retrial in order to secure conviction(s).

DATED:  November 23, 2016           Respectfully submitted,

                                    /s/   David Autry
                                    DAVID AUTRY
                                    Attorney at Law

                                    /s/ Joan M. Fisher
                                    JOAN M. FISHER
                                    Assistant Federal Defender

                                    Attorneys for Petitioner,
                                    KENNETH EUGENE BARRETT

PETITIONER'S RESPONSE TO GOVERNMENT'S                    *Barrett v. United States*
MOTION TO PERMIT INSPECTION OF THE                    OKED Case No. CV-09-00105-JHP
EXPANDED RECORD                    2

329

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 23rd day of November, 2016, I caused the foregoing Petitioner's Response to the Government's Motion to Permit Inspection of the Expanded Record to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

PETITIONER'S RESPONSE TO GOVERNMENT'S                    *Barrett v. United States*
MOTION TO PERMIT INSPECTION OF THE                 OKED Case No. CV-09-00105-JHP
EXPANDED RECORD                3

330

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:   (916) 498-6666
Facsimile:   (916) 498-6656
Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH E. BARRETT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Movant/Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S RESPONSE |
| | ) | TO GOVERNMENT'S |
| | ) | MOTION TO UNSEAL |
| United States of America | ) | DOCUMENTS AND |
| | ) | POTENTIAL EXPERT |
| | ) | SUBJECT TO PROTECTIVE |
| Respondent. | ) | ORDER |
| _____ | ) | |

PETITIONER'S RESPONSE TO GOVERNMENT'S                              *Barrett v. United States*
MOTION TO UNSEAL DOCUMENTS AND                              OKED Case No. 6:09-cv-00105-JHP
PROVIDE THEM TO A POTENTIAL EXPERT
WITNESS SUBJECT TO A PROTECTIVE ORDER.      1

Kenneth Eugene Barrett, Movant/Petitioner, through his attorneys files his Notice of Non-Opposition to the government's Unopposed Motion to Unseal Documents and Provide them to a Potential Expert Witness Subject to a Protective Order filed on November 18, 2016, wherein the government seeks "to provide a psychiatrist who may testify as an expert witness in the ordered evidentiary hearing with access to sealed material submitted by [Mr.] Barrett."  (Doc 257 at 1, 2).

As the government has advised the Court, Mr. Barrett objects to the examination (Brief in Opposition filed herewith.)  If Dr. Pitt is allowed to conduct an evaluation over Petitioner's objection, Petitioner has no objection to unsealing the documents identified provided that all documents of whatever form or nature are used for purposes of the evaluation only, are preserved, and are kept confidential throughout.  Petitioner's counsel requests to be present to make introductions before the exam, be allowed to consult with Mr. Barrett as needed, and be allowed to visit Mr. Barrett upon the conclusion of the examination."

DATED:  November 23, 2016

Respectfully submitted,

/s/ *David Autry*
DAVID AUTRY
Attorney at Law

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

PETITIONER'S RESPONSE TO GOVERNMENT'S
MOTION TO UNSEAL DOCUMENTS AND
PROVIDE THEM TO A POTENTIAL EXPERT
WITNESS SUBJECT TO A PROTECTIVE ORDER.     2

*Barrett v. United States*
OKED Case No. 6:09-cv-00105-JHP

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 23rd day of November, 2016, I caused the foregoing Petitioner's Response to the Government's Motion to Unseal Documents and Potential Expert Subject to Protective Order to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

PETITIONER'S RESPONSE TO GOVERNMENT'S                          *Barrett v. United States*
MOTION TO UNSEAL DOCUMENTS AND                          OKED Case No. 6:09-cv-00105-JHP
PROVIDE THEM TO A POTENTIAL EXPERT
WITNESS SUBJECT TO A PROTECTIVE ORDER.      3

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar 122664
Federal Defender
**JOAN M. FISHER**, Idaho Bar No. 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-5700
(916) 498-5710 [fax]
Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | **CAPITAL CASE** |
| | ) | |
| v. | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | **RESPONSE TO** |
| | ) | **GOVERNMENT'S MOTION** |
| Respondent, | ) | **FOR PSYCHIATRIC** |
| | ) | **EVALUATION OF** |
| | ) | **DEFENDANT** |
| _____ | ) | |

**TABLE OF CONTENTS**

I.  INTRODUCTION ............................................................................................................. 1

II.  BACKGROUND............................................................................................................... 1

III.  PETITIONER'S RESPONSE TO THE GOVERNMENT'S MOTION TO COMPEL
PSYCHIATRIC EVALUATION OF MR. BARRETT................................................................ 4

  A.  Any New Psychiatric Testing by the Government Using New Experts on Any Issues
During this Advanced Stage of Post-Conviction Proceedings Would Violate the Sixth
Amendment to the U.S. Constitution........................................................................................ 4

    1.  Declarations by Dr. Woods and Dr. Young on the Basis of Prior Testing of Petitioner
Substantiate Petitioner's Claim that Trial Counsel Failed to Perform their Sixth  Amendment
Duty to Adequately Investigate, Prepare, and Present Mitigating Evidence ........................... 4

    2.  Deficiency And Prejudice Analysis of Ineffective Assistance of Counsel Claims Under
*Strickland*: Barrett Is Constitutionally Entitled to Offer New Mitigating Evidence During
Post-Conviction Proceedings While the Government Remains Severely Limited it What is
Permitted to Present ................................................................................................................ 10

    3.  In Addition to Clearly Established and Controlling Federal Law, the Principle of
Fairness Enshrined in Decades of U.S. Supreme Court Jurisprudence Also Prohibits New
Testing of Mr. Barrett by the Government .............................................................................. 14

  B.  If the Court Permits the Government's New Proposed Expert to Testify—Even Without
New Testing, Solely on Basis of the Written Record Alone—The Important Principle of
Judicial Economy Will Be Imperiled ...................................................................................... 16

  C.  In the Event of Any Retesting by Respondent. Mr. Barrett Should be Afforded the
Presence of Counsel During Evaluation, and the Government Should be Subjected to Video
Monitoring Protocols, to Guard Against Additional Possible Constitutional Violations........... 17

    1.  If the Court Allows Any New Testing by New Experts, Mr. Barrett Should be Afforded
Presence of Her Counsel to Ward Against Sixth Amendment and Fifth Amendment
Violations  and to Help to Ensure Reliability of Results as Demanded by the Eighth
Amendment ............................................................................................................................. 17

    2.  If the Court Permits New Examinations by Respondent's New Expert, it Should Also
Allow  Videotaped Monitoring of the Evaluation to Shield Against Constitutional Violations
and  Enhance Reliability of the Results................................................................................... 19

IV. CONCLUSION................................................................................................................. 19

Response to Governments Motion For
Psychiatric Evaluation of Defendant       i                *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

## TABLE OF AUTHORITIES

**Federal Cases**

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) .............................................................. 16

*Eddings v. Okla.*, 455 U.S. 104 (1982) ....................................................................... 19

*Engle v. Isaac*, 456 U.S. 107 (1982) ......................................................................... 17

*Estelle v. Smith*, 451 U.S. 454 (1981) ....................................................................... 20

*Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012) ........................................................ 12, 13, 17

*Lockett v. Ohio*, 438 U.S. 586 (1978) ....................................................................... 18, 20

*McCleskey v. Zant*, 499 U.S. 467 (1991) ..................................................................... 18

*McKoy v. North Carolina*, 494 U.S. 433 (1990) ............................................................... 19

*Morrison v. Stephenson*, 244 F.R.D. 405 (S.D. Ohio 2007) ..................................................... 21

*Porter v. McCollum*, 130 S. Ct. 447 (2009) ................................................................. *passim*

*Purvis v. Crosby*, 451 F.3d 734 (11th Cir. 2006) ............................................................ 17, 18

*Robinson v. Schriro*, 595 F.3d 1086 (9th Cir. 2010) ......................................................... 8, 9

*Rompilla v. Beard*, 545 U.S. 374 (2005) ..................................................................... 4, 8, 14

*Sears v. Upton*, 130 S. Ct. 3259 (2010) .................................................................... *passim*

*Smith v. Mullin*, 379 F.3d 919 (10th Cir. 2004) ............................................................. 13, 17

*Strickland v. Washington*, 466 U.S. 668 (1984) .............................................................. 4, 7, 8, 11

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ................................................... 1

*Wiggins v. Smith*, 539 U.S. 510 (2003) ...................................................................... *passim*

*Williams v. Taylor*, 529 U.S. 362 (2000) .................................................................... *passim*

**Federal Statutes**

21 U.S.C. § 848 ............................................................................................. 3

21 U.S.C. § 848(n)(8) ....................................................................................... 9

28 U.S.C. § 2255 ............................................................................................ 1, 3, 13

Response to Governments Motion For
Psychiatric Evaluation of Defendant                    ii                              *Barrett v. USA*
                                                            OKED Case No. 6:09-cv-00105-JHP

336

## I.  INTRODUCTION

The government has moved to compel Mr. Barrett to submit to a battery of  psychiatric

examinations by its requested new expert, Dr. Steven Pitt, on November 18, 2016. The government

has supplied no apposite authority in support of its  request. Respondent's request for testing by

Dr. Pitt violates the Sixth Amendment to the U.S. Constitution. Given the many shortfalls in its

Penalty Phase case, the government now seeks to amass new statutory and non-statutory aggravating

evidence: this is expressly forbidden by binding constitutional precedent. Accordingly, the Court

should enter an Order prohibiting new testing of Mr. Barrett by Respondent.

## II.  BACKGROUND

At the guilt phase of the proceedings, the government sought to remedy the central

weakness of two state court trials, where juries failed to convict Mr. Barrett of first-degree

murder due to a lack of intent to kill. The government introduced testimony from seven

informant witnesses in order to secure a conviction.  This testimony was also critical to the

government's case in aggravation at the Penalty Phase.  *See, e.g.,* 27 RT 5414:23-5415:6

(prosecutor Sperling arguing against "leniency" at the Penalty Phase; acknowledging "the

difference in the [state and federal] cases" was the aggravating testimony of the seven Guilt Phase

snitches, and admitting "[the government] required their testimony" at the federal prosecution to

secure a death sentence).

Testimony by all seven of these witnesses has been thoroughly discredited by witness

recantation and unimpeachable documentary evidence of deals they received in exchange for false

testimony. Also at the Penalty Phase of the proceedings, the government presented aggravating

evidence from several witnesses on future dangerousness—including Stanley Philpot, Johnny

Response to Governments Motion For
Psychiatric Evaluation of Defendant                1                              *Barrett v. USA*

Philpot, Cindy Crawford, and Charles "Monk" Sanders—in order to secure a death verdict.[1]

Testimony by these witnesses of Mr. Barrett's future dangerousness was tenuous and has also

been discredited; the government's case in aggravation now stands in tatters.

Trial counsel, however, failed to contest the  lack of credible aggravating evidence during

the Penalty Phase. Trial counsel also failed to perform its constitutional duty to investigate,

prepare, and  present mitigating evidence on Mr. Barrett's mental health and social history despite

clear  indications of Petitioner's troubled family background and cognitive impairments.

Accordingly,  Petitioner was sentenced to death on a single count for the offense of capital murder,

pursuant  to 21 U.S.C. § 848.

Upon institution of § 2255 proceedings, investigation by the defense uncovered an

abundance of classic mitigating evidence neglected by trial counsel. For instance, opinions by

Myla H. Young, Ph.D., and Dr. George Woods, M.D. demonstrate the grossly incomplete and

inaccurate portrait of Petitioner presented at the  Penalty Phase due to the earlier lack of

mitigation investigation: 1) Dr. Woods reviewed  Petitioner's family background and diagnostic

history, including Mr. Barrett's exposure to high levels of  neurotoxins in *utero* due to his

mother's alcohol abuse; his early trauma due to early childhood neglect and physical abuse by his

parents; and his vast  intergenerational family history of major mood disorders, mental illness, and

chemical  dependence; 2) clinical interviews by Dr. Woods confirmed that Mr. Barrett suffered

from post-traumatic stress disorder (PTSD), bipolar disorder, and executive dysfunction

---

[1] Testimony by the government's witnesses was so weak to begin with, that Assistant United States Attorney Michael Littlefield flailed about in trying to persuade the jury of Mr. Barrett's future dangerousness: in desperation, he argued that petitioner deserved to die because he threw a food tray in prison and "hit [a guard] in the testicles with a [baked] potato." 27 RT 5349-50. Apparently, an errant russet potato "show[ed] [Barrett's] willingness to commit assaultive behavior upon authorities in a correctional setting" and rendered him worthy of a sentence of death. *Id.*

Response to Governments Motion For
Psychiatric Evaluation of Defendant               2                         *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

syndrome; and 3) neuropsychological testing by Dr. Young confirmed Applicant's brain damage and dysfunction across several areas, including his intellectual functioning, attention and concentration, memory and learning, language, and executive functioning. In light of these findings, Dr. Young concluded that Mr. Barrett's "experiences significant brain damage and consequent brain dysfunction primarily of prefrontal and temporal cortices," with etiologies of his brain damage including "possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries." Declaration of George Woods, M.D. ("Woods Declaration"); Declaration of Myla H. Young, Ph.D., ABPN ("Young Declaration") at ¶66, 36.

Dr. Woods and Dr. Young therefore advance classic mitigating evidence that should have formed the heart of trial counsel's investigation for the Penalty Phase—information concerning Mr. Barrett's PTSD; brain damage with possible etiologies of his mother's prenatal alcohol abuse, of repeated head trauma, and of his own drug and alcohol abuse; other cognitive impairments; and his hereditary inheritance of mental illness.

Confronted with this evidence in support of Petitioner's preexisting Sixth Amendment claim due to failure to present mitigating evidence, the government has asked to engage in a barrage of new psychiatric examinations using a new expert (Doc 253) to ostensibly uncover new aggravating evidence in order to compensate for the obvious shortcomings of its prior Penalty Phase case. Most importantly, the government has ignored clear U.S. Supreme Court authority. This issue remains a Sixth Amendment question governed by clearly established federal law. *Strickland v. Washington*, 466 U.S. 668 (1984); *see also Williams v. Taylor*, 529 U.S. 362 (2000); *Wiggins v. Smith*, 539 U.S. 510 (2003); *Rompilla v. Beard*, 545 U.S. 374 (2005); *Porter v. McCollum*, 130 S.Ct. 447 (2009); and *Sears v. Upton*, 130 S.Ct. 3259 (2010). Accordingly, rules of civil procedure and evidentiary findings that would have been at issue in sentencing are

Response to Governments Motion For
Psychiatric Evaluation of Defendant                3                        *Barrett v. USA*
                                                      OKED Case No. 6:09-cv-00105-JHP

"need[less]" to a just resolution of this federal constitutional claim, which must be disposed of in accord with binding Sixth Amendment authority. *See Wiggins*, <u>539 U.S. at 536</u>. The government lacks any authority to engage in new psychiatric testing using its new expert during post-conviction proceedings that are far removed from its earlier presentation of aggravating evidence at the Penalty Phase of the trial. Mr. Barrett cannot be compelled to be available for another psychiatric examination by Respondent. He is therefore forced to file this response in opposition to the Government's Motion to Compel a Psychiatric Evaluation (Doc 253).

**III. PETITIONER'S RESPONSE TO THE GOVERNMENT'S MOTION TO COMPEL PSYCHIATRIC EVALUATION OF MR. BARRETT**

> **A. Any New Psychiatric Testing by the Government Using New Experts on Any Issues During this Advanced Stage of Post-Conviction Proceedings Would Violate the Sixth Amendment to the U.S. Constitution**

> > **1. Declarations by Dr. Woods and Dr. Young on the Basis of Prior Testing of Petitioner Substantiate Petitioner's Claim that Trial Counsel Failed to Perform their Sixth Amendment Duty to Adequately Investigate, Prepare, and Present Mitigating Evidence**

Declarations by Dr. Woods and Dr. Young submitted to this Court in 2009 support Petitioner's arguments that trial counsel failed in its constitutional duty to investigate and present mitigating evidence during the original Penalty Phase of the proceedings. Accordingly, resolution of the Government's request to engage in new psychiatric interviews and new psychiatric testing by its proposed new expert in response to these opinions remains governed squarely by *Strickland v. Washington,* and other landmark cases that have interpreted its dictates to evaluate ineffective assistance of counsel claims due to failure to investigate mitigating evidence. *See Williams v. Taylor*, <u>529 U.S. at 363</u> ("*Strickland* provides sufficient guidance for resolving virtually all ineffective assistance claims . . . .").

Trial counsel Hilfger and Smith performed a grossly inadequate investigation prior

Response to Governments Motion For
Psychiatric Evaluation of Defendant                    4                                    *Barrett v. USA*
                                                          OKED Case No. 6:09-cv-00105-JHP

to the Penalty Phase of the original proceedings. In derogation of professional norms, trial counsel failed to hire a mitigation specialist. ABA Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases (2003) 4.1.A.1 to 2 (capital defense team should include a "mitigation specialist" and someone "qualified . . . to screen . . . for the presence of mental or psychological disorders or impairments . . . ."); Ex. 56 at 1-2 (Dr. Jeanne Russell's work restricted to future dangerousness, not mitigation); Ex. 67 (Declaration of Julia O'Connell; Hilfiger calling Federal Defender's Office less than three months before Penalty Phase seeking mitigation assistance, referred to Dick Burr, Federal Death Penalty Resource Counsel); Ex. 118 (Declaration of Richard Burr; "neither Mr. Hilfiger nor Mr. Smith ever approached me for assistance as resource counsel in Mr. Barrett's case;" after Burr offered his assistance to Mr. Hilfiger, he "never heard back . . . ."). No one  employed by trial counsel was charged with preparing a case in mitigation for the Penalty Phase.

Despite tell-tale red flags of brain dysfunction, physical abuse,  familial mental illness, gross neglect during childhood, head injuries, paranoid personality disorder, suicidal behavior, trauma, and other cognitive  impairments, trial counsel presented scant witnesses—ineffectively prepared—before urging a naked plea for mercy during closing arguments at the Punishment Phase. Smith inexplicably emphasized the government's worst aggravating evidence—that Mr. Barrett had ostensibly beaten his ex-wife—and incoherently faulted Deputy Eales for accepting a high risk profession, before mentioning (in passing, for mere seconds) his sole "mitigating" evidence. 27 RT 5385:2-13, 5394:12-15. Mr. Barrett accepted responsibility for Deputy Eales' death, "is a father . . . . a loved son, and a step-son," and on that basis alone the jury should not serve as an instrument of death. 27 RT 5397:23-5398:12, 5399:13-16.

Smith failed to investigate and present evidence of Mr. Barrett's gross childhood neglect,

Response to Governments Motion For
Psychiatric Evaluation of Defendant                    5                                        *Barrett v. USA*

mental illness, and severe brain damage—including the possible consequences of alcohol abuse by his mother   during gestation and his history of head trauma with confirmed loss of consciousness—and other   classic evidence that should have anchored their case in mitigation. *See, e.g., Wiggins*, 539 U.S.   at 535 (ineffective assistance due to failure to investigate and present mitigating evidence that   revealed both the nature and full extent of troubles suffered by petitioner, including early abuse,   custodial care provided by an alcoholic, and other excruciating life   history); *Porter*, 130 S.Ct. at 455-56 (ineffective assistance due to failure to perform reasonable   investigation and present evidence of petitioner's troubled history, including post-traumatic stress disorder, childhood history, brain abnormality, and limited schooling); *Sears*, 130 S.Ct. at   3262-67 (ineffective assistance due to failure to investigate and later present new evidence of   "'significant' mental and psychological impairments" alongside original mitigating evidence in   Penalty Phase, including struggles in school, learning disability, frontal lobe abnormalities due to chemical abuse and traumatic experiences, and difficulty in suppressing impulses). Given trial counsel's failure to probe potentially powerful mitigating evidence of   childhood neglect, early physical abuse, trauma, intergenerational mental illness,   and other troubled life history like Mr. Barrett's shotgun-suicide attempt that stared them in the face, the failure to investigate was not a reasonable decision nor was the decision based on sufficient investigation that would have rendered further investigation unnecessary. *Strickland*, 466 U.S. at 691; *Wiggins*, 539 U.S. at 525.

In addition to trial counsel's constitutionally inadequate investigation of mitigating evidence, Hilfiger and Smith also failed to prepare their own witnesses for the Penalty   Phase. The family members who testified at sentencing all now attest that the attorneys' preparation

Response to Governments Motion For
Psychiatric Evaluation of Defendant                6                        *Barrett v. USA*
                                        OKED Case No. 6:09-cv-00105-JHP

consisted of five-minute interviews before taking the stand, and none were asked about Mr. Barrett's background, family history, or history of mental illness. These witnesses' unprepared testimony in mitigation served as further confirmation that trial counsel had already rendered   ineffective assistance due to Hilfiger and Smith's failure to pursue mitigating evidence, or their   inability to make reasonable decisions that would have rendered such investigations unnecessary   as required by the Constitution and controlling U.S. Supreme Court authority. *See, e.g., Williams*, 529 at 396; *Wiggins*, 539 U.S. at 533-38; *Rompilla*, 545 U.S. at 387-93; *Porter*, 130 S.Ct. at 452-6; *Sears*, 130 S.Ct. at 3265-7; *Strickland*; 466 U.S. at 691. On   the basis of trial counsels' profound constitutional inadequacies and shortfalls, Mr. Barrett was   sentenced to death.

Subsequent declarations by Drs. Young and Woods substantiate Mr. Barrett's claim that Hilfiger and Smith rendered ineffective assistance of counsel by failing to adequately present classic mitigation evidence. *See Robinson v. Schiro*, 595 F.3d 1086, 1111-12 (9th Cir. 2010) (ineffective assistance due inadequate investigation into "classic mitigating evidence," such as petitioner's troubled background, unstable and sometimes abusive upbringing, cognitive impairments, and non-violent nature). In part, this constitutional claim is premised on the psychiatric assessment of Dr. Woods and the neuropsychological   testing of Dr. Young; together, along with the documentary record and affidavits by family members, friends, and acquaintances secured by current   counsel, these findings show the nature and extent of classic mitigating   evidence that should have been presented to the jury at sentencing. *See Robinson*, 595 F.3d at 1111-12; *See, e.g.*, Young Declaration; Woods Declaration; and Declarations of Phyllis Crawford, Carolyn Joseph, Mark Dotson, Brandy Hill, Travis Crawford, Nona Reich, Isaac Barrett, Linda Riley, Kathy Trotter, Warren Dotson, Gelene Dotson, Ernest Barrett, Steve Barrett, Abby Stites, Toby Barrett, Alvin Hahn, Shawn Hill, Ruth Harris, Janice Sanders, and

Response to Governments Motion For
Psychiatric Evaluation of Defendant                7                        *Barrett v. USA*
                                                             OKED Case No. 6:09-cv-00105-JHP

Rick Lunsford.

Confronted with the richness of Mr. Barrett's new mitigating evidence, Respondent has requested new psychiatric testing out of grave concern for its tenuous and now thoroughly discredited case in aggravation: 1) at the time of sentencing, two jurors concluded that Mr. Barrett would not present a future danger to society despite trial counsel's ineffectiveness in rebutting aggravating evidence; 2) the government's case in aggravation was ever precarious, given that six jurors found Sheriff Johnny Philpot's beating of Mr. Barrett was an additional mitigating factor, despite the prosecution's strained arguments that this act of police brutality somehow evinced Mr. Barrett's future dangerousness, *see, e.g.*, 27 RT 5345:12-5346:3; 3) the statutory aggravating factor of substantial planning and premeditation has been discredited by the documentary record, impeachment witnesses, and multiple recanting witnesses, who now say that Mr. Barrett never said he intended to kill police, *see, e.g.,* 21 U.S.C. § 848(n)(8) (substantial planning and premeditation); 27 RT 5340:16-5341:19 (prosecution arguing substantial planning and premeditation based largely on testimony of Karen Real, Charles "Monk" Sanders, Brandie Price, Randy Turman, including prior statements about killing police); Decl. of Sean Hill (Real not reliable, and informed on her boyfriend and those close to her to get favorable treatment); Decl. of Charles "Monk" Sanders (repudiating trial testimony about Mr. Barrett's ready access to weapons and threats to kill police; "I lied about Kenny Barrett when I testified in the federal trial because of threats made against me and my family by U.S. Attorney Mike Littlefield and because of promises he made . . . . I had no personal knowledge of anything Ken was doing in the two or three weeks prior to the raid on the house . . . ."); Decls. of Sean Hill and Brandy Hill (Brandie Price's statements about going to the Barrett residence where she allegedly observed weapons and overheard threatening statements

Response to Governments Motion For
Psychiatric Evaluation of Defendant                    8                          *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

344

about police were not credible; Price's purported route to the Barrett residence is not possible to traverse; Price thoroughly dishonest and would say and do anything for drugs; Randy Turman also not reliable and "as low as you get"); File in Sequoyah Case No. CF-02-477 (circumstantial evidence of Turman as informant who received deal in exchange for testimony against Mr. Barrett; outstanding charges against Turman dropped "in the best interest of justice" only after trial testimony, despite Turman's swearing that said charges had "been taken care of" at trial); and 4) central, non-statutory aggravating evidence of future dangerousness stands wholly discredited by impeachment witnesses or mitigated by the principal witnesses themselves, *see, e.g.*, 27 RT 5348:7-11, 5416:22-24 (prosecution's arguments that Mr. Barrett allegedly pressed a shotgun against Cindy Crawford's leg for refusing the sleep with him when she was in presence of her brother, Richie Barrett); Decl. of Richie Barrett (Cindy Crawford's shotgun story was fabricated out of whole cloth; it never happened), and Decls. of Roger Crawford, Mike Mackey, Brandy Hill, Sean Hill, Carolyn Joseph, Gwendolyn Crawford (extrinsic evidence of Cindy Crawford's complete unreliability); 27 RT 5346:4-20 (prosecution arguing domestic violence against Abby Stites as proof of future dangerousness); Decl. of Abby Stites (discord in marriage was due to mental health issues, and Mr. Barrett's mother subverted Mr. Barrett's attempts to get psychiatric care in inpatient facility).

With this current paucity of aggravating evidence, any new testing of Mr. Barrett by the government would serve as an open invitation to Respondent to unfairly amass new aggravating evidence in lieu of securing narrow rebuttal testimony on mitigation. The government will be irresistibly compelled to deviate from developing limited, responsive testimony to Petitioner's mitigation experts given the tattered state of its former case in aggravation, thereby inevitably

Response to Governments Motion For
Psychiatric Evaluation of Defendant                9                                    *Barrett v. USA*
                                                          OKED Case No. 6:09-cv-00105-JHP

345

confusing the present issue before the court—mitigation—with aggravation and future dangerousness. As well, any new psychiatric examinations by Respondent patently violate binding constitutional authority and should be disallowed on such grounds.

> **2. Deficiency And Prejudice Analysis of Ineffective Assistance of Counsel Claims Under *Strickland*: Barrett Is Constitutionally Entitled to Offer New Mitigating Evidence During Post-Conviction Proceedings While the Government Remains Severely Limited it What is Permitted to Present**

When evaluating ineffective assistance claims due to failure to present mitigating evidence under *Strickland*, petitioners must demonstrate that counsels' performance was deficient and that such performance prejudiced that defense. *Strickland*, 466 U.S. at 687. Deficient performance is measured against an "objective standard of reasonableness" informed by professional norms. *Strickland*, 466, U.S. at 688 (ABA Standards, though not dispositive, "are guides to determining what is reasonable); *Wiggins*, 539 U.S. at 521. Professional norms at the time of Petitioner's trial required his attorneys—at a bare minimum—to "conduct thorough and independent investigations relating to the issue[] of . . . penalty." ABA Guidelines for the Appointment of Defense Counsel in Death Penalty Cases 10.7 (rev. 2003).

To establish prejudice, petitioner must show that there is a reasonable probability that, but for counsels' unprofessional errors, the results of the proceedings would have been different. *Id.* at 694. A reasonable probability is one that proves sufficient to undermine confidence in the outcome. *Id*. In assessing prejudice, courts must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding' and 'reweig[h] it against the [original] evidence in aggravation" presented during the penalty phase of the trial. *Porter*, 130 S.Ct. at 454-55 (citations omitted); *accord Williams*, 529 U.S. at 397-98; *Sears*, 130 S.Ct. at 3266; *Wiggins*, 539 U.S. at 536 ("in assessing prejudice, the court reweighs the [original] evidence in aggravation against the totality of available mitigating evidence . . . .");

Response to Governments Motion For
Psychiatric Evaluation of Defendant             10                     *Barrett v. USA*
                                                            OKED Case No. 6:09-cv-00105-JHP

see also *Hooks v. Workman*, 689 F.3d 1148, 1202 (10th Cir. 2012) (same; "[t]o assess prejudice arising out of counsel's errors at a capital-sentencing proceeding, we must 'reweigh the [original] evidence in aggravation against the totality of available mitigating evidence;'" prejudice shown where new, post-conviction evidence of "chaotic, tragic upbringing" and organic brain damage outweighed that State's original case presented at trial consisting of three aggravators); *Smith v. Mullin*, 379 F.3d 919, 941-44 (10th Cir. 2004) (same; concluding prejudice shown where original mitigating evidence and new mitigating evidence of troubled background and brain damage adduced during post-conviction outweighed the original nine aggravating factors previously found by jury at trial).

The Tenth Circuit Court of Appeals follows *Strickland's* bar on the introduction of new evidence  by the Government: in analyzing prejudice, courts consider only the original evidence presented in   aggravation during the penalty phase against the totality of a Petitioner's mitigating evidence—including new mitigating evidence solely from Petitioner's psychiatric experts during post-conviction proceedings—to determine if there is a reasonable probability that at least one juror would have struck a different balance. *Smith*, 379 F.3d at 944.

The government is not entitled to conduct new psychiatric tests using a new expert  as part of this Court's evaluation of Mr. Barrett's Sixth Amendment claim. The Court is bound to consider Petitioner's previously undiscovered mitigating evidence—including conclusions from psychiatric   experts presented during § 2255 proceedings showing post-traumatic disorder, bi-polar disorder, attention and memory deficits, and other cognitive impairments—and to evaluate these assessments alone alongside the government's *original* evidence in aggravation. *See Hooks*, 689 F.3d at 1205-08  (ineffective assistance where the petitioner supplied new conclusions from an expert during post-conviction proceedings—showing organic brain damage to frontal lobes due

Response to Governments Motion For
Psychiatric Evaluation of Defendant          11                    *Barrett v. USA*
                                                  OKED Case No. 6:09-cv-00105-JHP

to head trauma—against the backdrop of aggravating evidence presented by the government at the original penalty phase); *see also Sears,* 130 S.Ct. at 3262-67 (ineffective assistance where recently uncovered evidence of Petitioner's "'significant' mental and psychological impairments" due to trauma and chemical abuse, first presented by two psychiatrists for Petitioner during post-conviction proceedings, was considered along with mitigating evidence originally presented at trial; no new experts by government when the evaluating court speculates on the effects of newly presented mitigating evidence); *Rompilla*, 545 U.S. at 377-93 (recounting post-conviction proceedings; five experts from defense, including two new specialists adducing mitigating evidence of organic brain damage during post-conviction, juxtaposed against old aggravating evidence originally posed during penalty phase of trial by one prosecution expert; no new aggravating evidence, no new government experts, and no new testing by the prosecution during post-conviction proceedings despite marked disproportion of experts in favor of Petitioner); *Wiggins*, 539 U.S. at 516-18 (ineffective assistance where court recounted new mitigating evidence advanced by Petitioner during post-conviction proceedings—including life history by licensed social worker certified as expert—absent new experts from government).

At most, the government may present the very same experts originally used at trial to incorporate Petitioner's experts' assessments on mitigation and then abnegate their earlier findings that Petitioner poses a future danger to society. *See Williams*, 529 U.S. at 370-71 (after incorporating new mitigating evidence presented during habeas proceedings on childhood mistreatment, abuse, neglect, and on possibly organic cognitive impairments, same experts used by the government at trial may reject prior findings of future dangerousness). If no experts previously testified for the government at trial—as in the instant matter—the government is not allowed to now remediate its original case in aggravation. Petitioner is merely asserting his

Response to Governments Motion For
Psychiatric Evaluation of Defendant  12  *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

constitutional right to effective assistance of counsel by demonstrating that there is a reasonable probability that at least one juror would have struck a different balance had the totality of mitigating evidence been presented to a jury. It is staggeringly unfair to permit the opposition, in response, to exploit his trial counsels' constitutional deficiencies and prejudicial shortcomings in mitigation by allowing new proposed government experts to stockpile unrelated aggravating evidence on other material issues necessary to support a death verdict—including statutory and non-statutory aggravators and circumstances of the offense for which Petitioner was convicted. *See Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 536; *Porter*, 130 S.Ct. at 454-55; *Sears*, 130 S.Ct. at 3266. The government seeks to conflate the original trial court proceeding with a brand new Penalty Phase, consisting of completely new evidence concerning future  dangerousness, the mechanics of the crime and facts supporting death eligibility. This is  clearly improper, as the present inquiry is much narrower—confined strictly to mitigation. *See  Id.*

Alternatively, the  Court might allow the government to present testimony by new experts—*if* it meets its burden of  showing that they satisfy all requirements posed by the Federal Rules of Evidence and *Daubert*—but only to narrowly review Petitioner's experts' final reports on mitigation and to opine on their methodology and conclusions without the aid of new psychiatric testing. *See Porter*, 130 S.Ct. at 450-52 (ineffective assistance where Petitioner presented two new psychiatric experts on post-traumatic disorder during state post-conviction proceedings, and two new government experts narrowly testified on statutory mitigating circumstances on the basis of their   review of the record; no new testing by government); *Daubert v. Merrill Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589-92 (1993). In such circumstances, the U.S. Supreme Court does not allow any such testimony by the State to covertly augment the original evidence in aggravation at trial: instead, the ballast on the aggravating side of the scale remains

Response to Governments Motion For
Psychiatric Evaluation of Defendant                    13                                  *Barrett v. USA*
                                                                              OKED Case No. 6:09-cv-00105-JHP

"appropriately reduced" and the inquiry centers upon whether there is a reasonable probability that at least one juror would have struck a different balance if presented with all old and new mitigating evidence. *Porter,* 130 S. Ct. at 453-55.

Overwhelmingly, the *Strickland* line of cases dictates that new psychiatric testing of any kind is not permitted to be performed by the government's proposed new expert at this stage of the proceedings as part of this court's evaluation of Petitioner's ineffective assistance claim. The court may not consider a whisper of new evidence in aggravation: constitutionally, it must  consider the totality of Petitioner's new mitigating evidence about post-traumatic stress, physical   abuse, intergenerational mental illness, and other mental impairments along with all original   evidence in mitigation. *Porter*, 130 S.Ct. at 454-55; *Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 536; *Sears*, 130 S.Ct. at 3266. At most, the  government may present its new expert to review the written conclusions of Drs. Young and  Woods—on a highly limited basis, *if* scientifically reliable, relevant, and helpful to the specific question of mitigation—and reflect on their methodology and professional opinions. *See Porter*, 130 S.Ct.  at 450-52. The Constitution does not countenance indiscriminate new testing by the government at this  late stage of the proceedings.

   3.  **In Addition to Clearly Established and Controlling Federal Law, the Principle of Fairness Enshrined in Decades of U.S. Supreme Court Jurisprudence Also Prohibits New Testing of Mr. Barrett by the Government**

Again, clearly established and controlling federal law under the *Strickland* line of cases demands that no new aggravating evidence be interjected into the proceedings in response to  Mr. Barrett's assertion of ineffective assistance of counsel. This clearly-established and controlling rule has been applied for well over a decade by the U.S. Supreme  Court, and it also has been dutifully applied by the Tenth Circuit Court of Appeals. *Williams*,  529 U.S. at 397-98 (when

Response to Governments Motion For
Psychiatric Evaluation of Defendant                 14                         *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

assessing prejudice, courts must "evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding" and "reweig[h] it against the [original] evidence in aggravation" presented during the penalty phase of the trial); *Wiggins*, 539 U.S. at 536 (same; no new aggravating evidence); *Porter*, 130 S.Ct. at 454-55 (same; no new aggravating evidence); *Sears*, 130 S.Ct. at 3266 (same; no new aggravating evidence); *Hooks*, 689 F.3d at 1202 (same; no new aggravating evidence); *Smith*, 379 F.3d at 941-44 (same; no new aggravating evidence).

Although the government now demands testing of the Petitioner, any such examinations would violate the overarching precept of fairness enshrined in several decades of U.S. Supreme Court jurisprudence. The principle of finality transparently informs post-conviction proceedings: certain things both parties would like are no longer permitted, but governing U.S. Supreme Court authority protects both the government and Petitioner in a co-equal fashion. *See, e.g., Engle v. Isaac,* 456 U.S. 107, 135 (1982) (principle of finality informs concepts of cause and prejudice); *Purvis v. Crosby*, 451 F.3d 734, 741-43 (11th Cir. 2006) (concluding "[t]he principle that collateral review is different from direct review resounds throughout [U.S. Supreme Court] habeas jurisprudence").

Here, *Strickland's* prejudice analysis disallows new evidence in aggravation from the government in response to ineffective assistance of counsel claims due to failure to mitigate under *Williams*, just as complementary procedural default rules employ the very same prejudice analysis to limit Mr. Barrett from introducing unrelated, defaulted legal issues in later motions to vacate. *See Id.*; *see, e.g., Williams*, 529 U.S. at 537-8 (no new aggravating evidence for government in post-conviction); *cf., e.g., McClesky v. Zant,* 499 U.S. 467, 493 (1991) (citations omitted) "[w]e have held that a procedural default will be excused [only] upon a showing of

Response to Governments Motion For
Psychiatric Evaluation of Defendant            15                        *Barrett v. USA*
                                                          OKED Case No. 6:09-cv-00105-JHP

cause and prejudice . . . ."). The proceedings become increasingly final, but parity, fairness, and fundamental justice are preserved through the operation of off-setting bars: no unrelated new evidence for the government, no unrelated, defaulted legal issues for Petitioner.

**B. If the Court Permits the Government's New Proposed Expert to Testify—Even Without New Testing, Solely on Basis of the Written Record Alone—The Important Principle of Judicial Economy Will Be Imperiled**

The principle of judicial economy would be woefully undermined by allowing new experts from the government to infiltrate the upcoming evidentiary hearing. The U.S. Constitution zealously safeguards Mr. Barrett's entitlement to present as much mitigating evidence as possible—virtually without limit—in order to prevent wrongful execution of those with lesser moral culpability. *See, e.g., Lockett v. Ohio*, 438 U.S. 586, 604 (1978).

Supreme Court jurisprudence emphasizes, time and time again, the insistent constitutional imperative that all mitigating evidence must be considered in capital contexts. *Id; Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *McKoy v. North Carolina*, 494 U.S. 433, 435 (1990). Whether or not the government's proposed expert is permitted to testify at the evidentiary hearing, there is no conceivable constitutional authority for now curtailing Mr. Barrett's right to introduce additional new mitigating evidence. —*i.e.,* evidence submitted to demonstrate ineffective assistance of counsel due to failure to investigate and present new mitigating evidence. Virtually all reviewing courts recognize that admitting rebuttal testimony by new government experts at this late stage—even without new testing—poses too great a constitutional danger, proves practically impossible to administer, and represents false judicial economy.

Response to Governments Motion For
Psychiatric Evaluation of Defendant          16                          *Barrett v. USA*

**C. In the Event of Any Retesting by Respondent. Mr. Barrett Should be Afforded the Presence of Counsel During Evaluation, and the Government Should be Subjected to Video Monitoring Protocols, to Guard Against Additional Possible Constitutional Violations**

    **1. If the Court Allows Any New Testing by Experts, Mr. Barrett Should be Afforded Presence of His Counsel to Ward Against Sixth Amendment and Fifth Amendment Violations and to Help to Ensure Reliability of Results as Demanded by the Eighth Amendment**

For the foregoing overriding constitutional reasons, the Court should deny any additional psychiatric or other examinations of Mr. Barrett by Respondent. In the event the Court permits any such interviews and testing, however, Petitioner requests the Court to allow one of his attorneys, their agents, or another appropriate member of his post-conviction team to be present during any evaluation conducted by the government's expert(s). Without benefit of counsel, new testing by the government would serve as an open invitation for Respondent's expert(s) to manipulate Mr. Barrett and amass new aggravating evidence or other incriminating matter in derogation of the Sixth Amendment and the Fifth Amendment of the U.S. Constitution. *See, e.g., Porter*, 130 S.Ct. at 454-55 (citations omitted); *Williams*, 529 U.S. at 397-98; *Wiggins*, 539 U.S. at 536; *Sears*, 130 S.Ct. at 3266; *see also See Estelle v. Smith*, 451 U.S. 454, 462-63, 64-65, 68-69 (1981) (Fifth Amendment violation; "[w]e can discern no basis to distinguish between the guilt and penalty phases of respondent's capital murder trial so far as protection of the Fifth Amendment privilege is concerned;" "[t]he Fifth Amendment privilege is 'as broad as the mischief against which it seeks to guard.'"). Moreover, because an expert may interpret an inmate's uncooperative or hostile behavior as evidence that the inmate is malingering and, therefore, possesses a rational understanding of his predicament, it is also essential that Mr. Barrett's counsel be present to facilitate any such evaluation for purposes of ensuring the heightened reliability of findings required by the Eighth Amendment. *Cf. Lockett*,

Response to Governments Motion For
Psychiatric Evaluation of Defendant    17    *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

353

438 U.S. at 604 (noting that the "qualitative difference between death and other penalties calls for a greater degree of reliability" in death penalty proceedings).  Counsel's presence may reduce or alleviate his possible anxiety or opposition to testing that   could otherwise lead to invalid results.

A court should weigh concerns that third-party observers in the examination room could undermine the integrity of testing. However, such concerns should not lead it to impose an automatic prohibition on all third-party observers. Instead, a court should consider the specific circumstances of each case, and then exercise its discretion to allow third-party observation.  *See, e.g.*, *Morrison v. Stephenson*, 244 F.R.D. 405, 406-07 (S.D. Ohio 2007). The primary consideration should be whether the third party's presence would facilitate or detract from the validity or fairness of any such testing. *See* American Psychological Association, Statement on Third Party Observers in Psychological Testing and Assessment: A Framework for Decision-Making (2007) at 4 ("The overall goal of any situation surrounding the formal psychological evaluation of an individual is to maximize the assessment conditions to complete the most valid and fair evaluation in order to obtain the best data possible"). For example, if an examinee is highly anxious or disruptive in while being tested, and if a third-party observer would  mollify the examinee, then to proceed without the third-party observer could undermine the  validity of any testing results. APA Statement at 2; *see id.* at 1 ("[I]n some cases, the  presence of a third party may help develop and sustain rapport in order to facilitate validity"). The presence of counsel would help to ward against questioning by experts that risk further  violations of the Sixth Amendment and the Fifth Amendment. As long as counsel for  Petitioner takes steps, in consultation with Respondent's experts, to facilitate fairness of the testing and   minimize any distraction his presence may cause, the Court should allow Mr. Barrett's counsel to  attend any

Response to Governments Motion For
Psychiatric Evaluation of Defendant                18                        *Barrett v. USA*
                                          OKED Case No. 6:09-cv-00105-JHP

354

examination that the court might order.

**2. If the Court Permits New Examinations by Respondent's New Expert, it Should Also Allow  Videotaped Monitoring of the Evaluation to Shield Against Constitutional Violations and  Enhance Reliability of the Results**

In the event of any new testing by Respondent, counsel for Mr. Barrett does not oppose the Government's request to order videotaping  of the expert evaluation by Dr. Pitt to facilitate resolution of Petitioner's claims.

## IV. CONCLUSION

For the aforesaid reasons, the government's Motion to Conduct a Psychiatric Evaluation of Defendant (Doc 253) should be denied.

DATED:  November 23, 2016                      Respectfully submitted,

/s/ *David Autry*
**DAVID AUTRY**, OBA No. 11600
Attorney at Law

/s/*Joan M. Fisher*
**JOAN M. FISHER**, Idaho Bar No. 2854
Assistant Federal Defender

Response to Governments Motion For
Psychiatric Evaluation of Defendant              19                      *Barrett v. USA*
OKED Case No. 6:09-cv-00105-JHP

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 23rd day of November, 2016, I caused the foregoing

Petitioner's Response to the Government's Motion to on for Leave to Conduct Discovery and

Memorandum and Authorities to be filed with the Clerk of the Court using the ECF System for

filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan,

U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no

non-ECF registrants who are counsel in this case.


/s/ Joan M. Fisher
JOAN M. FISHER


Response to Governments Motion For
Psychiatric Evaluation of Defendant                    20                          *Barrett v. USA*
                                                              OKED Case No. 6:09-cv-00105-JHP

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S PARTIAL OPPOSITION TO MOTION FOR LEAVE TO CONDUCT CIVIL DISCOVERY

**COMES NOW** the United States of America, by and through undersigned counsel and partially opposes Barrett's request for leave to conduct discovery.

## PROCEDURAL HISTORY

Barrett was convicted and sentenced to death.  The Tenth Circuit Court of Appeals affirmed the judgment on direct appeal, and this Court denied § 2255 relief.  Doc. 214.  On appeal from the § 2255 denial, the Tenth Circuit remanded the case for an evidentiary hearing to consider the alleged ineffective assistance of counsel in investigating and presenting mitigating evidence relating to the defendant's background and mental health.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015); *see also* Docs. 233 at 1, 246 at 1, 248 at 2.  In anticipation of that hearing, Barrett moved for leave to depose the government's mental health experts and engage in several other forms of discovery.  Doc. 249 ("Mtn").  With the exception of the proposed expert depositions and associated requests for the witnesses' notes, the government objects to Barrett's discovery requests.

1

**ARGUMENT**

**THE COURT SHOULD DENY BARRETT'S DISCOVERY REQUESTS, APART FROM THOSE CONCERNING THE GOVERNMENT MENTAL HEALTH EXPERTS**

Barrett, like the government, seeks leave to depose the opposing party's mental health experts. Having advocated that it has shown good cause to take such depositions, the government does not object to Barrett's request in that regard or his related request for the experts' notes. Barrett also asks to engage in the following forms of discovery: receipt of government disclosures under *Brady v. Maryland*, 373 U.S. 83, 87 (1963) and *Giglio v. United States*, 405 U.S. 150, 155 (1972); depositions of Barrett's trial counsel, a former federal prosecutor, and a former drug task force agent; service of subpoenas duces tecum on government mental health experts, Barrett's trial counsel, a former prosecutor, a former drug task force agent, and a pair of law enforcement agencies; and production of government documents concerning all aspects of this case. Mtn. at 4-21. The government objects, as further explained below.

Rule 6 of the Rules Governing § 2255 Cases authorizes discovery with leave of the court, based on good cause shown. In this case, apart from the requests concerning the government's mental health experts in this case, Barrett fails to establish good cause for his proposed discovery. Moreover, several of his requests contemplate irrelevant and privileged material.

1. Requests for Production of Exculpatory/Mitigating Evidence

Barrett requests that the government produce exculpatory or mitigating evidence under *Brady* and *Giglio*, and argues that he is entitled to disclosures from a vast swath of local and federal agencies, most of which had tenuous, if any, connections to the prosecution. Mtn. at 6-7. The Court should deny the request as moot and unsupported by law.

This Court has previously found that the government complied with its *Brady* obligations, despite Barrett's many claims to the contrary. *See generally* Doc. 214 at 35-73.

2

Moreover, the Court has agreed with the government that it did not bear the burden of obtaining favorable evidence from agencies that were not working with it or otherwise under its authority. *See id.* at 37 (citing *United States v. Beers*, 189 F.3d 1297, 1303 (10th Cir. 1999) and *Moon v. Head*, 285 F.3d 1301, 1309 (11th Cir. 2002) (finding the U.S. Attorney and DEA comprised the prosecution team)). Given that the government has discharged its disclosure obligations, which did not require it to obtain information from local agencies outside its control, Barrett's request is not only moot but vastly overstates the prosecution's obligation to have sought evidence from such disparate agencies as the Sequoyah County Sheriff's Department; the Sallisaw Police Department; the District 27 Drug Task Force; the Federal Bureau of Investigation; the Bureau of Alcohol, Tobacco, Firearms and Explosives; the Oklahoma Bureau of Narcotics and Dangerous Drugs; the Oklahoma Bureau of Investigation; the Oklahoma Highway Patrol; and the Oklahoma Department of Public Safety. The government did not prosecute this case in association with those agencies and has no authority over them. *See generally United States v. Hall*, 434 F.3d 42, 55 (1st Cir.2006) (holding the *Brady* obligation "does not extend to information possessed by government agents not working with the prosecution").

Barrett's reliance on *Brady* is also legally unsupportable, as its doctrine does not apply during collateral review. *District Attorney v. Osborne*, 557 U.S. 52, 68-69 (2009).

For all the foregoing reasons, the Court should deny Barrett's requests.

2. Subpoena Duces Tecum for Drs. Pitt and Price

In addition to the proposed depositions of mental health experts, to which the government has not objected, Barrett requests authority to serve subpoenas duces tecum on Drs. Steven Pitt and J. Randall Price for all documents related to their examination of Barrett and their communications with the government. Mtn. at 7-10. The government objects to subpoenas

3

359

duces tecum, but is amenable to an exchange of notes from all the mental health experts.

The government has agreed to provide Barrett with a recording of any evaluation performed by Dr. Pitt, mooting any request in that regard.  The government would ask Dr. Pitt to produce his notes at or before his deposition as part of a mutual exchange of information.  As to Dr. Price, the government cannot speculate what documents will be exposed to inspection if the Court grants the pending motion to expand the record to include firewalled mental health evidence (Doc. 256).  *See* Rules foll. 28 U.S.C. § 2255, R. 7(c).  Potentially, the firewalled material includes Dr. Price's notes, but if they remain in the witness's possession, the government would request that material as part of an exchange with opposing counsel, mooting the need for a subpoena.

The government also objects to any subpoena intended to target communications between the prosecutors and expert witnesses.  Barrett has not identified any legal basis upon which he might premise a demand for such communications.  *See generally* Fed. R. Civ. Proc., R. 26(a)(2) (setting forth the disclosure obligations for expert witnesses); Fed. R. Crim. Proc. 12.2.  At one time, Rule 26 supported such disclosures.  *See In re Application of Ecuador*, 735 F.3d 1179, 1186 (10th Cir. 2013).  However, the current rules of discovery do not expose draft reports or attorney-expert communications to disclosure, and Barrett has not demonstrated any reason to ignore that doctrine in this case.  *See id.*

Because the requested subpoenas are either unnecessary or legally unjustifiable, the government urges the Court to deny the request.

3.   Depositions of Trial Counsel

Barrett requests the opportunity to depose his former trial attorneys, Bret Smith and Roger Hilfiger.  In support of his request, he argues that the witnesses created an appearance of

hostility toward him by submitting declarations to the government without first securing a court order that set forth the extent to which Barrett's claims of ineffective assistance had waived attorney-client privilege.  Mtn. at 10-11.  Barrett fails to justify his request with good cause.

This Circuit has clearly defined the extent to which a claim of ineffective assistance of counsel implies a waiver of attorney-client privilege.  *See United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009) (holding "a habeas petitioner [who] claims ineffective assistance of counsel . . . waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim").  Barrett does not identify any authority for the proposition that trial counsel had an obligation to secure this Court's imprimatur on the scope of his privilege waiver.  Tellingly, Barrett makes no effort to show that counsel exceeded the bounds of that waiver or evinced any actual hostility toward him.  At bottom, Barrett provides no basis for this Court to conclude that depositions of Messrs. Smith and Hilfiger would materially advance preparations for the hearing, especially given that the two attorneys outlined their views of the case in sworn declarations attached to the government's answer.  Doc. 174 Exhs. 11 & 12.

For the foregoing reasons, Barrett has failed to establish good cause for his deposition request, which the Court should deny.

4.   Subpoenas Duces Tecum for Trial Counsel

Barrett seeks leave to serve subpoenas duces tecum upon his trial counsel for them to produce any documentation concerning their representation of him.  Mtn. at 11.  He fails to show good cause for this request.

Barrett has been litigating this § 2255 action for more than seven years and has never previously indicated that his trial attorneys deprived him of any documents.  *Cf. e.g.*, Doc.. 150 (premising a request for discovery on alleged error by the court and the government).  The

absence of such an allegations is hardly surprising, as Barrett is legally entitled to his former counsel's files and loyalty. *See* Okla. Rules of Prof. Conduct, R. 1.16(d); *Bar Ass'n v. Wilcox*, 227 P.3d 642, 653 (Okla. 2009). Given trial counsel's obligation to have disgorged their files, Barrett fails to explain why he should now invoke this Court's authority to mandate the same result. Indeed, Barrett provides no basis for this Court to suspect that trial counsel has failed to surrender property to which the law entitled him.

Given Barrett's manifest failure to establish good cause for this entirely speculative form of discovery, the Court should deny the request.

5.   Disclosure of Communications between the Government and Trial Counsel

Barrett seeks to obtain, via subpoena and request for production, disclosures of communications between the government and Messrs. Smith and Hilfiger. Mtn. at 11-12, 18. Barrett's requests are overbroad and unsupportable under the law.

Barrett does not confine his request to discovery of communications between the government and trial counsel. Rather, he seeks all documents relating to those communications, a body of material that sweeps across the privileged work product of government counsel. That privilege is well established as a matter of rule and common law. *See United States v. Nobles*, 422 U.S. 225, 236-37 (1975); *see generally*. Fed. Rules of Crim. Proc., R. 16(a)(1)(E). Barrett provides no factual or legal basis for piercing the privilege to allow him access to the government's internal communications and files. Indeed, Barrett fails to so much as hint how the government's work product would shed light on the credibility or reliability of Messrs. Smith and Hilfiger, if and when they appear as witnesses in this action.

To the extent Barrett seeks communications between trial counsel and the government, he fails to demonstrate good cause. As noted, the government appended the defense attorneys'

6

362

declarations to its answer.  Doc. 174 Exhs. 11 & 12.   Those declarations contained the relevant observations of trial counsel concerning their representation in this case.  As statements the witnesses expressly adopted, the declarations satisfy the government's obligation under the *Jencks* Act.  18 U.S.C. § 3500(e).  The government's summaries of the witnesses' interview remarks are not subject to disclosure.  *See Palermo v. United States*, 360 U.S. 343, 352-53 (1959); *United States v. Marshall*, 985 F.2d 901, 908 (7th Cir. 1993).  Likewise, any earlier iterations of the declarations that the witnesses refused to adopt are not subject to disclosure and could not possibly assist Barrett in examining the witnesses.  *See United States v. Phibbs*, 999 F.2d 1053, 1088-89 (6th Cir. 1993) (holding no duty to disclose notes a witness did not adopt as substantially verbatim); *United States v. Ricks*, 817 F.2d 692, 697-98 (11th Cir. 1987) (holding no duty to disclose memoranda that witnesses never adopted).  Barrett cannot show how statements the witnesses refused to adopt would advance his understanding of the case or his preparation for the hearing.

As this Court has previously observed, the Messrs. Smith and Hilfiger are sophisticated members of the criminal defense bar.  *E.g.*, Doc. 214. at 24 n.64, 33.   Despite the witnesses' sophistication, Barrett does not identify any reason to suspect they were misled by the government or that they executed deceptive declarations.  As such, he has not shown good cause to obtain discovery related to the preparation of those declarations.

6.   Deposition of and Subpoena Duces Tecum for Frank Lloyd

Barrett requests leave to conduct discovery of Frank Lloyd because he "may have attempted to flip Mr. Barrett to give evidence against drug users or dealers."  Barrett specifically asks to depose Mr. Lloyd and to serve a subpoena duces tecum on him.  Mtn. 12-13.  Barrett cannot show good cause for the requested discovery, which does not concern facts germane to

his only remaining § 2255 claim – the alleged ineffectiveness of trial counsel.

As noted, the Tenth Circuit remanded this case for evidentiary development of a claim that trial counsel ineffectively investigated and presented evidence relating to Barrett's background and mental health. *Barrett*, 797 F.3d at 1232. Until filing this discovery motion, Barrett has never intimated that Mr. Lloyd possessed information about the ineffectiveness issue. Barrett's claim of ineffectiveness spans 63 pages of text (Doc. 95 at 185-248), which he supported with another 23 pages of briefing (Doc. 149 at 102-25). None of that material mentions Mr. Lloyd. In fact, Lloyd's name received only passing reference in Barrett's § 2255 motion. Doc. 95 at 117, 122 (summarizing trial testimony of Randy Turman). As such, it appears that the present discovery request has less to do with Barrett's pending claim and more to do with reviving issues the Tenth Circuit recently rejected, when it refused to let him file a second and subsequent § 2255 action. *See In re Barrett*, ___ F.3d ___, ___, 2016 WL 6576389, *7-8 (10th Cir. 2016). Barrett cannot show good cause for discovery of irrelevant information.

Given the lack of nexus between the proposed discovery and the issue at bar, this Court should deny the requests concerning Mr. Lloyd.

7. Subpoena Duces Tecum for Michael Littlefield

Barrett seeks leave to conduct discovery concerning former Assistant U.S. Attorney Michael Littlefield's interviews with seven guilt phase trial witnesses. Barrett argues the seven witnesses testified to facts probative of his criminal intent and that Mr. Littlefield therefore possess information about his mental health. Mtn. 14-16. Barrett cannot show good cause for the proposed discovery. Like his requests concerning Frank Lloyd, this one does not concern facts probative of the issue at bar.

As repeatedly noted, the surviving claim in this case stems from an allegation that trial

8

counsel failed to properly investigate and present evidence of Barrett's background and mental health. Barrett has never claimed Mr. Littlefield possessed any information about the defendant's mental health or personal history. *See* Docs. 95 at 185-248, 149 at 102-25. If Mr. Littlefield did glean that information during his investigative interviews, Barrett is free to interview or subpoena the witnesses, who presumably possess first-hand knowledge of the relevant facts. Instead, he asks permission to engage in a speculative and roundabout effort to determine the state of mind of a hearsay witness who could have last engaged in a relevant discussion more than a decade ago. "Mere speculation" of some exculpatory material is "unlikely to establish good cause for a discovery request on collateral review." *Strickler v. Greene*, 527 U.S. 263, 286 (1999).

Ultimately, it appears that Barrett's theories about Mr. Littlefield are entirely irrelevant to the inquiry at hand. In advancing his subpoena request, Barrett argues that Mr. Littlefield's alleged intimidation of witnesses constitutes mitigating evidence. Mtn. at 15. The argument suggests that Barrett hopes to breathe life into another failed claim, concerning the former prosecutor's alleged mistreatment of witnesses. *See* Docs. 95 at 283-89, 214 at 72-73. But Barrett's contention that he could rely in mitigation upon evidence of witness intimidation should fail. The argument misapprehends the permissible scope of mitigation evidence, which involves only the defendant's character or record and any circumstance of the offense. *See Roper v. Simmons*, 543 U.S. 551, 568 (2005); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality opinion); *see also* 18 U.S.C. § 3592(a)(8). Putting aside the fact that this Court rejected the claims that Mr. Littlefield intimidated witnesses, his actions would not mitigate Barrett's crimes.

Barrett has not demonstrated good cause to serve discovery on an individual with no

personal knowledge of any facts relevant to the upcoming hearing.  Accordingly, this Court should deny the request.

8.   Requests for Production

Barrett makes a series of requests for the government to produce documents.  The requests expand upon one another, first, seeking access to evidence about Barrett's mental condition; second, concerning evidence presented by the parties at trial; third, concerning trial counsel's representation of the defendant; fourth, concerning ex parte communications between the Court and U.S. Attorney's Office; fifth, concerning the government's files about the litigation of Barrett's case at trial and on collateral review; sixth, concerning investigations of third parties; and seventh, seeking information about Barrett's actual innocence.  Mtn. 18-19.  The requests nakedly seek to invade the government's work-product privilege without any attempt at justification, and Barrett has no right to such protected material. *See Nobles*, 422 U.S. at 236-37.

To the extent the government possessed evidence subject to disclosure under *Brady* or any related doctrine, it discharged those obligations long ago, and Barrett need not obtain further copies of that material.  The remainder of the government's records are privileged work product.  Given that defense counsel did not have access to the government's files, apart from properly disclosed evidence, the attorneys' performance could not have been affected by the prosecutors' privileged work product.  Accordingly, the requested information is immaterial to the upcoming hearing, which concerns only defense counsel's performance in the penalty phase of trial, and Barrett cannot show good cause to access it.  *See Brady*, 373 U.S. at 87 (holding that the prosecutor need not deliver his entire file, only evidence favorable to the accused); *see also United States v. McVeigh*, 954 F. Supp. 1441, 1449 (D. Colo. 1997) (holding "The Constitution does not require the government's lawyers to defend against the evidence they present or to take

10

affirmative action to prepare a defense for the accused").

The Court should deny Barrett's request for an invasive fishing expedition in the government's privileged records.

367

**CONCLUSION**

Except as expressly conceded above, the government respectfully urges the Court to

reject Barrett's discovery requests.

Dated: November 25, 2016:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

368

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on November 25, 2016, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Defendant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org

/S/ *Jeffrey B. Kahan*
Jeffrey B. Kahan
United States Dept. of Justice

13

369

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**
Office of the Clerk
Byron White United States Courthouse
Denver, Colorado 80257
(303) 844-3157

Betsy Shumaker
Clerk of Court

Chris Wolpert
Chief Deputy Clerk

November 28, 2016

**To:** Clerk, U.S. District Court or Agency

**District**  Eastern District of
Oklahoma Muskogee

**Subject:** Records /Original File Returns
From: Tammy DuVall
303-335-2983

**Shipped via:** Fed Ex

Attention Carla Trzcinski
918-684-7906

**Attention:** Records Clerk

The mandate(s) have issued in the appeal(s) listed below.  Materials are being
returned to you under cover of this letter. Please acknowledge receipt of the materials by
receive stamping, dating, signing and returning this letter to our office.

| 10th Circuit Case Number | District Court Case Number | Short Caption | Volumes/File | Document Number |
|---|---|---|---|---|
| 12-7086 | 6:09-CV-00115-JHP-1 | US vs.Barnett | Volume 6-Videotape attachments to pleading 237 and Disk attachment to pleading 265 | 10424846 |

*** Please return at your convenience.

RECEIVED

NOV 2 9 2016

PATRICK KEANEY
Clerk, U.S. District Court
By_____
Deputy Clerk

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,      )

                                 )

         Petitioner/Defendant,    )

                                 )

vs.                             )      Case No. 09-CIV-105-JHP

                                 )

UNITED STATES OF AMERICA,    )

                                 )

         Respondent/Plaintiff.    )

## ORDER re: DISCOVERY

Before the Court are the requests of the parties for discovery[1] pursuant to Rule 6 of the Rules Governing Section 2255 proceedings.  Under this rule, discovery is available, but is only granted in the court's discretion, and after a showing of "good cause."

"A habeas petitioner, unlike the usual civil litigant in federal court, is not entitled to discovery as a matter of ordinary course."  *Bracy v. Gramley*, 520 U.S. 899, 117 S.Ct. 1793, 138 L.Ed.2d 97 (1997).  While the broad discovery provisions of the Federal Rules of Civil Procedure do not apply in habeas proceedings, the All Writs Act, 28 U.S.C. § 1651 gives federal courts the authority to allow discovery where "good cause" is established by the requesting party.  *See*, Rule 6 of the Rules Governing § 2255Cases.  In order to determine whether either party has established "good cause" for their discovery requests, this Court begins by reminding the parties that the evidentiary hearing ordered by the Tenth Circuit is not a license to completely "re-try" the case.  Rather, defendant stands convicted of three

---

[1]Dkt. #s 249-257.  Responses have been filed to all of these motions (Dkt. #s 258-266).

counts, *i.e.* Count I and II, Committing a murder through the use of a firearm during or in relation to a drug trafficking crime, or possession of a firearm in furtherance of such crime; and, Count III, Intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties.  The defendant was sentenced on Counts I and II to Life in Prison without possibility of release and to death on Count III.  Cr. Dkt. No. 285.  These convictions and sentences were affirmed in *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 522 U.S. 1260, 128 S.Ct. 1646, 170 L.Ed.2d 359 (2008).  Thereafter, petitioner moved for relief under 28 U.S.C.§ 2255.  This Court denied relief.  Dkt. # 214.  Petitioner filed an appeal and, after consideration of the merits, the Tenth Circuit affirmed all but one claim of ineffective assistance of counsel in the penalty phase of trial.  *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015), *cert. denied*, 137 S.Ct. 36 (2016).  As to that one claim, the Tenth Circuit indicated an evidentiary hearing was needed to enable this court to make findings on the sole issue of "whether Defendant's trial attorneys prepared a mitigation case that measures up to professional norms and, if not, whether that made a difference."  *Id.*, 797 F.3d, at 1224.  Thus, this is the only issue before this Court and any discovery requests must, therefore, be narrowly tailored to address this specific issue and no others.

2

372

## I. Petitioner's Motion for Leave to Conduct Discovery (Dkt. # 249)

### A. Disclosure of Exculpatory Information

Petitioner seeks broad ranging discovery in this federal habeas proceeding in an attempt to retry many issues which have previously been disposed of and are, therefore, not relevant to this proceeding. For instance, Petitioner asks this Court to require the "disclosure of exculpatory information" asking this Court "to order the Government to state and disclose any document, note, memoranda, or other tangible form of communication and/or documentation, including audio and video recordings, whether found in the government's files related to the prosecution and sentencing of Mr. Barrett, or known to exist and in the possession of third parties, that would mitigate punishment." Dkt. # 249, at p. 9. Petitioner then lists nine different county, state, and federal agencies from which the requested discovery should be ordered. During the course of these proceedings, this Court found the Government had complied with its *Brady*[2] obligations.[3] Discovery is not intended to allow "fishing expeditions." This Court finds Petitioner has failed to establish "good cause" for this discovery request. It is, therefore, denied.

---

[2] *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 2115 (1963).

[3] Dkt. # 214, at pp. 35-73.

### B. Depositions and subpoenas duces tecum of government experts, trial counsel and other witnesses

### (1) Trial Counsel

Next, Petitioner asks this Court to allow him to "depose trial counsel concerning matters relevant to their failure to adequately investigate and present mitigating evidence." Dkt. # 249, at p. 10. Petitioner claims this evidence "includes, but is not limited to, Mr. Barrett's mental health, including evidence that would tend to negate the requisite intent to kill or which would diminish his ability to form such intent,[4] as well as mitigating aspects of his personal history and background." *Id.*, at pp. 10-11. This Court finds, however, that the **only** issue before this court is whether or not mitigating evidence existed to justify a sentence less than death. As to petitioner's request to submit requests for production, to issue a subpoena duces tecum to and allow depositions of trial counsel, this Court finds Petitioner has not demonstrated that trial counsel have refused to cooperate or, that simply by submitting declarations on issues raised by Petitioner in this § 2255 proceeding, trial counsel have become hostile toward Mr. Barrett. Accordingly, this request is denied.

### (2) J. Randall Price, Ph.D.

Petitioner also requests this Court to issue and order "authorizing counsel to serve subpoenas duces tecum regarding the mental health evaluation" conducted by Dr. Price in

---

[4]On direct appeal, the Tenth Circuit found the "evidence presented by the government was more than sufficient to allow the jury to reasonably find that Barrett intentionally killed Eales." *United States v. Barrett*, 496 F.3d 1079, 1113 (10th Cir. 2007). Thereafter, the Tenth Circuit held the Defendant did not present any "available expert testimony to establish he could not form the intent to shoot the victims (or any other relevant *mens rea*)," *United States v. Barrett*, 797 F.3d 1207, 1217 (10th Cir. 2015). Therefore, any evidence regarding intent to kill is no longer an appropriate topic for discussion in this proceeding. As a result, no discovery of any kind will be allowed on this issue.

anticipation of testifying during the sentencing stage of trial. Cr. Dkt. # 237. Additionally, Petitioner requests authorization to depose Dr. Price. These requests are denied for the reasons discussed in paragraph II(G) herein.

### (3) Alan Frank Lloyd, former District 27 Drug Task Force Agent

Petitioner also requests this Court allow him to issue a subpoena duces tecum to depose Mr. Lloyd, who was employed as an investigator for the Sequoyah District Attorney's office in 1996 and 1999. Petitioner states that Mr. Lloyd was "a purported witness" on the underlying crime from which the failure to appear warrant that the Oklahoma Highway Patrol was attempting to serve when the crimes in this case occurred and, therefore, his testimony is relevant and material to the claims of second stage ineffective assistance of counsel. This Court disagrees and finds this request is nothing more than an attempt to revive issues which the Tenth Circuit Court has previously rejected. *See*, *In re Barrett*, --- F.3d ---, 2016 WL 6576389, *7-8 (10th Cir. 2016).

### (4) Michael Littlefield, former Assistant United States Attorney

Next, Petitioner requests leave to conduct discovery from a former United States Attorney regarding his interviews with seven guilt phase trial witnesses. To support this request, Petitioner states "[a]ny evidence that these witnesses were threatened or intimidated by Mr. Littlefield is relevant mitigating evidence, because it calls into question the credibility of the government's case." Dkt. # 249, at p. 18. Again, this is not the issue before this Court.

Petitioner also asks to be allowed to serve requests for production of documents on the government for evidence concerning Mr. Barrett's mental condition prior to the raid on his home on September 24, 1999 and/or related to any evidence offered in aggravation by the government, "including the evidence submitted at the guilt/innocence stage which was relied upon to seek the death penalty." Dkt. # 249, 15 20. This Court has previously denied all *Brady* claims which were raised in this particular case. Dkt. # 214, at pp. 35-73. No appeal was perfected on these issues. Petitioner does not now present any evidence to establish that the government suppressed any records which were subject to disclosure under *Brady*. Moreover, the government is not required to deliver its entire file to a defendant. Rather, it is only evidence favorable to an accused that falls within the purview of *Brady*. Furthermore, as to Petitioner's request for files relating to the determination to file federal capital charges, the OBNDD and DEA investigations of Clint Johnson or the DEA files related to the investigation of individuals prior to September 24, 1999, the Court finds these requests are nothing more than "fishing expeditions" related to issues which have previously been decided against Petitioner. Further, the Court finds these matters are not currently before the Court. For these reasons, it appears Petitioner has failed to establish "good cause" to depose or serve subpoena duces tecum or requests for production of documents on either Mr. Littlefield or any government agency. Accordingly, the request is denied.

### (5) Request for Additional Subpoenas Duces Tecum

On pages 23-24 of the motion for discovery, Petitioner requests additional subpoenas be served upon third parties regarding matters underlying the investigation of state drug-related activities from January 1999 through September 24, 1999.  Despite Petitioner's belief that "these productions will shed light on both Mr. Barrett's state of mind and mental health at the time of these investigations and how the government perceived his state of mind and mental health at the times of these investigations and determinations," none of the requested information is relevant to the issue to be decided.  Rather, this is simply yet another "fishing expedition" aimed at trying to revive issues which have previously been rejected. Accordingly, this  request is denied.

### (6)  Motion to Order the Government to Collect and Preserve Evidence from Scene

Finally, Petitioner claims there is a bullet lodged in a wall directly behind the door of Mr. Barrett's former residence.  Petitioner claims that "[t]he bullet is potentially significant mitigating evidence, because, upon examination, it could well rebut the ballistics and crime scene reconstruction testimony presented by the government at trial, and perhaps establish the most mitigating factor of all, Mr. Barrett's actual innocence."  Dkt. # 249, at p. 25. Despite the fact it has now been more than seventeen (17) years since Petitioner intentionally fired at law enforcement officers attempting to serve an arrest warrant at his residence, Petitioner now claims a lone bullet in his wall behind the door of his former residence could prove he is "actually innocent."  A barrage of bullets were fired from multiple guns during

7

the raid on defendant's residence.  Regardless of how this particular bullet got into the wall, it does nothing to rebut the substantial evidence at trial of Barrett's intent to kill a law enforcement officer.  *See*, *United States v. Barrett*, 496 F.3d 1079, 1112-1115 (10th Cir. 2007).  Moreover, the bullet has nothing whatsoever to do with Barrett's background or mental health.  Therefore, this request is also denied.

## II.  Government's Discovery Requests

### A.  Government's Motion to Secure Trial Counsel's Files (Dkt. # 250)

The government requests this Court order Barrett to disclose his defense counsel's files to the government.  Alternatively, the government seeks authorization to serve a subpoena duce tecum on defense counsel so that it may secure necessary records.  Petitioner states he has no objection to disclosing the requested files "as it relates to relevant and material information regarding defense counsel's investigation and preparation for the penalty phase of Mr. Barrett's proceedings."  Dkt. # 258.  However, Petitioner claims his disclosure of these files "should rest in reciprocity and disclosure of the government's files." *Id*., at p. 2.  Petitioner continues by stating: "It is apparent from the requested discovery of both parties that the parties rely on a reading of the Tenth Circuit opinion that envisions a broad scope of relevant evidence at the evidentiary hearing, **including matters related to guilt/innocence** and thus a broad waiver." *Id.* (Emphasis added).  Regardless of the parties understanding of the nature of the evidence which will be heard at the evidentiary hearing, this Court believes the scope of the evidentiary hearing is extremely narrow.  Since Mr. Barrett stands convicted of three crimes which have been affirmed on appeal, the evidentiary

8

hearing will **not** deal with guilt/innocence issues. Rather, the hearing will deal solely with mitigating evidence which could have been presented during the sentencing stage of trial.

How to deal with the government's motions for discovery makes this proceeding unusual. In a criminal case, unlike a civil matter, the government is required to put on their case and the defendant is able to, for the most part, do nothing unless the government puts on sufficient evidence to sustain a conviction. *See*, Rule 16 of Fed.R.Cr.P. Obviously, defense counsel is hopefully marshaling evidence to defend the case should their motion for judgment of acquittal be denied and in a capital case preparing evidence in anticipation of a second stage of trial. Where, as in this case, a defendant gives notice under rule 12.2(b), of expert evidence of a mental condition, certain procedures authorize a court to order the defendant to submit to a mental examination. This aspect of criminal proceedings will be discussed in more detail when the Court deals with the government's motion for psychiatric exam (Dkt. # 253) below.

To determine whether the government has shown "good cause" for the discovery requested, this Court must first identify the "essential elements" of petitioner's claim. According to the Tenth Circuit, "Defendant's . . . . . argument is that his trial attorneys were ineffective by failing to properly investigate his background and mental health in preparation for the penalty phase of his case." *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015). When a habeas petitioner claims that he received ineffective assistance of counsel, "he impliedly waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim." *United States v. Pinson*, 584 F.3d 972, 977-78

(10th Cir. 2009).  The waiver, however, must be no broader than needed to ensure the fairness of the proceeding before the court.  *Id*.

The government's motion asks this Court to order "disclosure of his trial attorneys' files and records concerning their representation of him during the penalty phase of his trial." Dkt. # 250, at p. 2.  Since the issue of defense counsel's effectiveness during this phase of trial has been placed directly in issue, this Court finds "good cause" exists and, therefore, grants the government's motion.  Petitioner's counsel shall disclose, within fifteen (15) days of this order, all of petitioner's defense attorneys' files and records which could in any way be considered impacting their representation of Petitioner during the penalty phase of his trial.  These files should contain, at a minimum, any communications which Barrett had with his counsel regarding his family, mitigation, and/or what evidence, if any, counsel would pursue in the event of a conviction.

**B.      Government's Motion to Obtain Civil Rule 26 Discovery from Defense Experts (Dkt. # 251)**

In this motion, the government requests this Court "issue an order that will require written reports from Barrett's mental health experts and permit the government to depose those witnesses."  Dkt. # 251. Petitioner claims depositions are too burdensome and therefore, he proposes "live testimony from Mr. Barrett's experts, . . . . .  subject to narrow rebuttal testimony by Respondent's experts."  Dkt. # 259.  Depositions are not routinely granted in § 2255 proceedings. *United States v. Hollis*, 2010 WL 892196 (D. Alaska 2010). The Court does not believe depositions should be granted in this case.

10

Trial counsel was required, pursuant to Rule 12.2 (b) of the Federal Rules of Criminal Procedure, to provide notice if they intended to put the defendant's mental health at issue. Once notice was provided, the government had the right to request a written summary of any testimony that the defendant intended to use at trial. Fed.R.Cr.P. 16(b)(1)(C). As a result, the Court directs Petitioner's counsel to provide a written summary of any mental health expert which he intends to call at the evidentiary hearing scheduled herein by January 3, 2017. At the evidentiary hearing, the government will be able to present whatever evidence they have to rebut this testimony. The government will **not** be limited as suggested by Petitioner so long as their witnesses are providing rebuttal testimony as contemplated by the Federal Rules of Criminal Procedure.

### C.  Government's Motion to Propound Interrogatories (Dkt. # 252)

This motion requests this Court to "issue an order authorizing the government to propound interrogatories to Barrett concerning the sources of records concerning his physical and mental health and that of the relatives upon who he has premised his claim." Dkt. # 252. While this Court's duty is to ensure both parties get a fair hearing in this matter, the Court does not believe this information would have been readily available to the government at the time of trial. Rather, the government would have been required to rebut whatever evidence the defendant put on at trial in a very short amount of time, *i.e.,* overnight in many instances. In fact, other than a summary of an expert's testimony describing the witness's opinions, the basis and reasons for those opinions, and the witness's qualifications, *see*, Fed.R.Cr.P. 16(C), the government would have had nothing more than the names and addresses of any defense

witnesses on the day trial began.  Based upon the wealth of information post-conviction counsel has uncovered in the years since the trial in this case, the government has much more information at this point than it would have had at trial.

Much of the information contained in the petitioner's declarations, however, is hearsay and will not be admissible at an evidentiary hearing herein.  In order to have this Court consider his physical and mental health and that of his relatives, someone will have to provide live testimony regarding these matters.  Obviously, if no documents or medical records exist to support this testimony, the Court will consider that when determining the credibility of the witnesses.  If such records do exist and they are authenticated such as to be admissible, the government will be provided a copy of these exhibits.  As a result, this motion is denied.

D.    **Government's Motion for Psychiatric Evaluation of Defendant (Dkt. # 253)**

In this motion, the government asks this Court to "issue an order that permits the government to have a psychiatrist evaluate Barrett in anticipation of providing testimony as an expert witness." Dkt. # 253.   Petitioner objects on Fifth and Sixth Amendment grounds, claiming the government is seeking "to amass new statutory and non-statutory aggravating evidence." Dkt. # 265.

The various discovery requests filed herein point out the very real problem with trying to recreate portions of a trial twelve years after the trial.  First, trial counsel did not have sufficient time to find all of the mitigating evidence that post-conviction counsel has

12

provided and they would not have been able to locate all of the mitigating evidence which post-conviction counsel has now accumulated within the amount of time between the filing of the indictment and the criminal trial.  Second, the prosecutor would have been required to rebut whatever evidence trial counsel put on in a very short amount of time (with the exception of expert testimony), *i.e.*, overnight in many instances.

In the underlying criminal case,[5] the defendant gave notice at trial, pursuant to Rule 12.2(b)(2) of the Federal Rules of Criminal Procedure, of his intent to introduce expert evidence through the testimony of Jeanne Russell, Ed.D., a licensed psychologist regarding defendant's mental and medical health records.  As a result, the government was given permission to have the defendant examined by a psychiatrist or other mental health professional(s) selected by the government.  *See,* Cr. Dkt. # 216.  According to the Court's order authorizing the examination, the sole purpose of the government's examination was to "confirm or rebut mental health evidence presented by the defendant."  *Id*., at p. 5.  Such examination was ultimately conducted and  was filed under seal pursuant to Rule 12.2(c)(2).  *See*, Cr. Dkt. # 237.  Since, however, the defendant never advised the government that he intended to call a psychiatrist, this Court finds it would be unfair to not allow the government an opportunity to rebut evidence which the government anticipates the petitioner will present at the evidentiary hearing through Dr. George Woods who performed a neuropsychiatric

---

[5]Case No. CR-04-115-JHP.

evaluation on Mr. Barrett in February of 2009.[6]   Pursuant to Fed.R.Cr.P. 12.2(c), the government would have had an opportunity to have an examination conducted to rebut the defendant's expert opinion if it had known of the expert at that time of trial; therefore, this Court finds such an examination should be permitted now.  The right of the government to offer rebuttal evidence of the defendant's mental condition would be meaningless unless the government is provided an opportunity to conduct discovery on this issue.  In this Court's opinion, how the government would have met the introduction of the evidence at trial is relevant in determining whether prejudice occurred as a result of the omission of this evidence.  This Court can not effectively assess the prejudice prong of *Strickland*,[7] without hearing the evidence which the government would have brought forward to rebut the evidence which will be offered by petitioner.  Accordingly, the government's motion to have Petitioner submit to a psychiatric examination is granted.  The government shall have forty-five (45) days from the date of this order to conduct a psychiatric examination of the Petitioner at the Special Confinement Unit in Terre Haute, where the defendant is currently housed by the Bureau of Prisons.  The examiner shall be permitted to bring electronic audio

---

[6]Petitioner suggests this request is nothing more than an attempt by the government to uncover new aggravating evidence.  While that could occur, it is just as likely that it will not occur.  Regardless, had mitigating evidence relating to Mr. Barrett's background and/or mental health been introduced at the sentencing stage of Petitioner's criminal trial, the government would have been allowed to rebut such evidence.  Even if Petitioner shows that counsel's performance was deficient, he must also show prejudice.  This Court can not determine prejudice without hearing how Petitioner's mitigating evidence would have been rebutted.  In *Williams v. Taylor*, 529 U.S. 362, 394, 120 S.Ct. 1495, 1513-1514, 146 L.Ed.2d 389 (2000), the Supreme Court indicated "it is insufficient to show only that the errors had some conceivable effect on the outcome of the proceeding, because virtually every act or omission of counsel would meet that test.  The petitioner bears the 'highly demanding' and 'heavy burden' in establishing actual prejudice."  Additionally, the purpose of the effective assistance guarantee of the Sixth Amendment is "to ensure that criminal defendants receive a fair trial."  *Strickland v. Washington*, 466 U.S. 668, 689, 104 S.Ct. 2052, 2065, 80 L.Ed.2d 674.  In determining whether or not the defendant received a fair trial, the government must have an opportunity to rebut evidence which was never presented to the jury in this case.

[7]*Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

14

and video recording equipment into the facility and use it to record his examination of Petitioner. No third parties shall be permitted in the examining room during the evaluation of Petitioner other than the physician (and, if necessary, his staff) conducting said evaluation, as the government will be required to make copies of the audio and video recordings of the meeting available to defense counsel ten (10) days prior to the evidentiary hearing herein. Failure of the defendant to participate in this court-ordered examination shall result in forfeiture of the right to present mental health testimony in the upcoming evidentiary hearing. *See*, Fed.R.Crim.P. 12.2(d).

> **E.      Government's Motion to Serve Discovery on Third Parties Related to Defendant's Mental Health and Social History (Dkt. # 254)**

This motion requests this Court to issue an order to "permit the government to serve subpoenas on third parties so that it can investigate contentions of familial mental illness that allegedly reflect upon the defendant's mental health and social history." Dkt. # 254. In essence, the government wants to depose the petitioner's relatives and subpoena their health care providers so that it can determine the scope and veracity of the relatives' claimed conditions. Petitioner objects on the grounds that the requests are overbroad, seek privileged information, infringe upon privacy interests, and are not limited to records relevant to mitigation.

For the reasons discussed in paragraph II(c) herein, this request is denied.

> **F.      Government's Motion to Serve Subpoenas Duces Tecum Regarding Records related to Defendant's Mental Health (Dkt. # 255)**

15

Next, the government requests an order authorizing it to serve subpoenas duces tecum on entities and individuals in possession of records concerning defendant's mental health. Petitioner objects to this request because he claims the request is overbroad and not limited to records relevant to mitigation at the penalty phase of trial.

Again, this information would not have been readily accessible to the government in the criminal trial of this matter. Therefore, for the reasons discussed herein, this request is denied.

**G.      Government's Unopposed Motion to Permit Inspection of the Expanded Record (Dkt. # 256)**

In this motion, the Government requests this Court to formally expand the record in this § 2255 proceeding to include the mental health evaluation report that was filed under seal in Petitioner's Criminal Case No. 04-CR-115-JHP, Cr. Dkt. # 238.[8] Petitioner does not object to the unsealing of these materials "provided they cannot be used in the event of retrial in order to secure conviction(s)."[9] Dkt. # 263. Barrett also requests that "all related documentary evidence of the examination including but not limited to rough notes and other notes, testing, the testing protocols, memoranda, communications between the government and Dr. Price, and any and all video and audio recordings of the same or related thereto that

---

[8]The motion references Cr. Dkt. # 238. Cr. Dkt. # 238 contains only an excerpt taken from Cr. Dkt. # 237, which is the Psychological Evaluation/Risk Assessment. Counsel for both parties received a copy of Cr. Dkt.# 238 at the time of trial.

[9]Since the only remaining issues in this case deal with the sentencing phase of trial, the only purpose for which this material could be utilized is the evidentiary hearing or, possibly a new sentencing trial, Petitioner's concerns regarding use of this material in a new guilt/innocence phase of trial are unwarranted.

16

are in the possession of Dr. Price, the Court, or the government" also be disclosed.  Dkt. # 263, at p 2.

Since Petitioner claims counsel provided ineffective assistance of counsel by not presenting evidence regarding his mental health, this Court finds this report, dealing with an evaluation of Petitioner conducted at the time of trial, is relevant and should be made a part of this proceeding.  Due to the confidential nature of the information contained within said report, the Court will not order the report to be unsealed.  The Clerk of Court is, however, directed to make a copy of the report available to counsel for both parties.  If counsel desires to review the videotape, they will have to make arrangements with the Clerk of Court to view the same during regular business hours.  Accordingly, the motion is granted and the record in this §2255 is expanded to include the sealed mental health evaluation as well as the videotape of the evaluation, Cr. Dkt. # 237 from Case No. O4-CR-115-JHP.  If Dr. Price is ultimately called at the evidentiary hearing herein, he will be required to provide any notes made during his evaluation and testing of the defendant to defense counsel at the time of his testimony.

**H.    Government's Unopposed Motion to Unseal Documents and provide them to a potential expert witness subject to a protective order (Dkt. # 257)**

In this motion, the government requests the Court unseal various documents so they can be provided to the physician who conducts the evaluation of Mr. Barrett. Petitioner does not object to the unsealing the documents for the purpose of providing them to the evaluator so long as the documents are kept confidential.

The Court finds no reason to unseal any of the documents identified by the government. The government, however, may provide copies of any documents contained in this case, Case No. 09-CIV-105-JHP, or the related criminal case, Case No. 04-CR-115-JHP, to the evaluator retained to examine Mr. Barrett. The government shall mark any document "sealed" if said document has been sealed in either of these two cases. The Court further orders that said evaluator is directed to maintain the privacy and confidentiality of any document marked "sealed." The evaluator may not, without prior authorization of this Court, disseminate such sealed records or information to any person, apart from his own staff, who is not directly involved in the preparation of the government's presentation of this case. At the conclusion of these proceedings, the evaluator shall destroy all copies of the sealed records, whether held in physical or electronic form. Accordingly, this motion is denied in part and granted in part.

It is so ordered on this 6th day of December, 2016.

James H. Payne
United States District Judge
Eastern District of Oklahoma

18

388

# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH E. BARRETT,** | ) | **CAPITAL CASE** |
| | ) | Case No. 6:09-cv-00105-JHP |
| **Movant/Petitioner,** | ) | |
| | ) | |
| **v.** | ) | **PETITIONER'S EXPEDITED** |
| | ) | **MOTION FOR ORDER OF** |
| **UNITED STATES OF AMERICA,** | ) | **ACCESS TO PETITIONER BY** |
| | ) | **MENTAL HEALTH EXPERT** |
| **Respondent.** | ) | |
| _____ | ) | |

Petitioner, Kenneth E. Barrett, by and through his attorneys of record hereby moves this Court for an Order granting access to Mr. Barrett by consulting, licensed psychiatrist, Pablo Stewart, M.D., well-experienced in all phases of capital litigation and correctional psychiatry, whose expertise involves a variety of psychiatric, forensic, substance abuse and organizational issues at the Federal Correctional Institute at Terre Haute, Indiana.

Petitioner requests that Dr. Stewart be allowed to administer a complete pharma-psychiatric evaluation of Mr. Barrett.

The Motion is based upon the following grounds:

1.      The purpose of the interview is to enable Dr. Stewart to address potentially mitigating aspects of Mr. Barrett's mental health at the time of the offense for which he stands convicted with an emphasis on the substance abuse both long term and as it affected Mr. Barrett on the September 24, 1999.

2.      Dr. Stewart's evaluation is not and will not be duplicative of the evaluation conducted by Dr. George Woods, whose evaluation and declaration laid out Mr. Barrett prima

Petitioner's Expedited
Motion For Order Of Access
To Petitioner By Experts            – Page 1

facie showing of prejudice as a result of trial counsel's failure to develop mitigating evidence, including mental health evidence, at Mr. Barrett's capital sentencing;

3.      The services of Dr. Stewart are necessary and material to the adequate and competent representation of Petitioner in his evidentiary hearing scheduled for March 13, 2017 in his § 2255 Motion to Vacate proceedings.

4.      Counselor Andrew Sutton of FCT-Terre Haute has advised that Dr. Stewart can meet with Mr. Barrett on January 5-6, 2017 once a Court Order is entered.  The Federal Correctional Institution's requirement of a Court Order is a newly imposed requirement, not statutory in nature.

5.      Because this matter addresses concerns of Mr. Barrett's litigation strategy and development, the motion should appropriately be considered *ex parte* in nature, requiring no position nor response from the government.  In order to expedite the ability of Dr. Stewart to meet with and evaluate Mr. Barrett, however, counsel did on this date advise the government of its intent to request access to Petitioner for Dr. Stewart.  The government's counsel Jeffrey Kahan advised:  "To the extent you intend to expand your existing claim through Dr. Stewart, we object as untimely under 28 U.S.C. § 2255(f).  Apart from that, we have no objection.

6.      The motion is specifically based on the claim upon which the Tenth Circuit remanded this matter for an evidentiary hearing.  It does not expand the claim.  Any objections to its admissibility will be addressed at the evidentiary hearing and cannot preclude our access, including by experts of our choice, to our client in preparation for the hearing.

7.      Mr. Barrett is compelled to seek this Order only because the correctional institute in which Mr. Barrett is being held has changed its internal policies since Mr. Barrett's prior experts evaluated him to require a court order before giving counsel access to their own client on

matters related to the development of evidence in preparation for litigation. Mr. Barrett has a Sixth Amendment right to the assistance of counsel which includes access to expert witnesses retained thereby; he has a Fifth Amendment right to Due Process in the full and fair adjudication of the ineffective assistance of counsel claim now before the court; and, he has an Eighth Amendment right to a reliable and accurate capital sentencing.  Denial of this request will violate those constitutional right under the Fifth, Sixth and Eighth Amendments to the United States Constitution.

THIS MOTION is based upon the files, records and proceedings in this case.

WHEREFORE, Petitioner respectfully requests that this Court enter an Order granting access to Petitioner by Dr. Pablo Stewart, as follows:

1.   Dr. Stewart shall be granted access to Mr. Barrett to evaluate, interview and obtain information from Petitioner at the USP-Terre Haute Institution, in Terre Haute, Indiana, on January 5-6, 2017 as arranged by USP Terre Haute between the hours of 9:00 a.m. and 5:00 p.m.

2.   Dr. Stewart shall be provided a private place to meet with the Petitioner which will allow face-to-face access without a glass barrier so the interview can be conducted under confidential and privileged conditions;

3.   Mr. Barrett's hands shall not be shackled during the interview; and

4.   Dr. Stewart shall bring with him only paper and pen or pencils.

5.   Dr. Stewart shall comply with any and all instructions and directives of prison staff deemed necessary to ensure security, except that prison staff shall not require that guards be present or within earshot of the interview.

Petitioner's Expedited
Motion For Order Of Access
To Petitioner By Experts          – Page 3

DATED this 12th day of December, 2016          Respectfully submitted,


                                               /s/ Joan M. Fisher
                                               JOAN M. FISHER

                                               /s/ David Autry
                                               DAVID AUTRY

                                               Attorneys for Petitioner,
                                               KENNETH EUGENE BARRETT


Petitioner's Expedited
Motion For Order Of Access
To Petitioner By Experts          – Page 4

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 12th day of December, 2016, I caused the foregoing Motion for Leave to Conduct Discovery and Memorandum and Authorities to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

DATED:  December 12, 2016

/s/ Joan M. Fisher
JOAN M. FISHER

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com, nitawright73@yahoo.com), Joan M.
Fisher (brenda_turbeville@fd.org, jmfisher@turbonet.com, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov),
Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:862651@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 12/13/2016 at 10:21 AM CST and filed on 12/13/2016

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 272(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 12/15/2016 (Re: [271] Petitioner's MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT) (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, jmfisher@turbonet.com, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT    )
    )
    **Movant,**    )
    )    Case No. 09-CV-00105-JHP
**v.**    )
    )
UNITED STATES OF AMERICA,    )
    )
    **Respondent.**    )

## GOVERNMENT RESPONSE TO EXPEDITED MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and, pursuant to this Court's order (Doc. 272), files this response to Movant's expedited motion for order of access to petitioner by mental health expert.

### PRELIMINARY STATEMENT

Following the affirmance of his convictions for three homicide crimes and the imposition of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255. Docs. 1, 2, 70 & 95. This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222). The Tenth Circuit Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and personal history. Doc. 230. This Court has scheduled the hearing to commence March 13, 2017. Docs. 246 & 270.

Barrett's counsel has indicated that one of the defense's original mental health experts, neuropsychologist Myla Young, Ph.D., passed away after the filing of the § 2255 motion. *See* Doc. 247 at 3. Counsel further indicated "[a] new expert will have to evaluate Mr. Barrett or

1

undertake a thorough review of Dr. Young's work." *Id*. On December 12, 2016, Barrett filed the instant motion to have Pablo Stewart, M.D. evaluate him at U.S. Penitentiary, Terre Haute. Doc. 271. On December 13, 2016, the Court ordered this expedited response.

## ARGUMENT

### THE GOVERNMENT OBJECTS TO A MENTAL HEALTH EVALUATION DESIGNED TO INTRODUCE A NEW THEORY INTO THIS CASE

Barrett claims the Fifth, Sixth and Eighth Amendments to the Constitution entitle him to an evaluation by Dr. Stewart. Doc. 271. Barrett overstates the authority supporting his request to investigate claims on a motion for collateral relief. While Barrett may have a statutory right to conduct a mental health evaluation ahead of the scheduled evidentiary hearing, he has no right to authorization of any investigation intended to expand his existing § 2255 claim.

Barrett does not have a Sixth Amendment right to counsel during collateral proceedings. The Sixth Amendment right to counsel guarantees assistance "when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor." *United States v. Ash*, 413 U.S. 300, 309 (1973). Like the Sixth Amendment, the Eighth Amendment does not vest convicted capital defendants with any right of assistance during collateral proceedings. *See Murray v. Giarratano*, 492 U.S. 1, 10 (1989). As such, there is no "constitutional right to counsel in federal habeas corpus." *McCleskey v. Zant*, 499 U.S. 467, 495 (1991) (citing *Pennsylvania v. Finley*, 481 U.S. 551, 555 (1987)), *superseded by statute on other grounds*, *Thomas v. Superintendent*, 136 F.3d 227, 229 (2d Cir. 1997).

Indigent defendants have a due process right to public funding only to the "basic and integral tools" needed to present an adequate defense. *Ake v. Oklahoma*, 470 U.S. 68, 77 (1985); *see Medina v. California*, 505 U.S. 437, 445 (1992). But convicted defendants do not have the same due process rights as those presumed innocent under the law. *Dist. Attorney's Office for*

2

*Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009) (citing *Herrera v. Collins*, 506 U.S. 390, 399 (1993)).  Thus, the due process clause of the Fifth Amendment does not guarantee Barrett the right to any particular investigative tools.  *See Finley*, 481 U.S. 551, 559 (1987).  The contraction of due process rights after conviction reflects the primacy of trial, the "'main event'" in the criminal process.  *See Williams v. Trammell*, 782 F.3d 1184, 1211 (10th Cir. 2015) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 90 (1977)).

In regard to this case, Barrett cannot establish any constitutional right to the requested mental health evaluation.  He does enjoy the right to counsel, previously appointed under 18 U.S.C. § 3599.  Moreover, it appears that this Court has, under § 3599(f), exercised its discretion to permit the retention of Dr. Stewart as a mental health expert.  The government does not intend to interfere in Barrett's relationship with counsel, counsel's investigation of this case, or the Court's funding of the defense.  As such, it does not interpose any objection to Dr. Stewart's evaluation of the defendant, except to the extent that counsel intends to use the fruits of that visit as the basis of some novel claim not contemplated by the existing § 2255 litigation.

Federal inmates must file any § 2255 motion within one year of the date upon which their convictions becomes final.  28 U.S.C. § 2255(f)(1).  Barrett's conviction became final on March 17, 2008, the date the Supreme Court denied certiorari from his direct appeal.  Doc. 214 at 17. Barrett timely filed his § 2255 motion on March 17, 2009.   Under the Rules of Civil Procedure, Barrett may amend his motion with claims that relate "back to the date of the original pleading." Fed. R. Civ. Proc. 15(c).  But the law does not permit him to amend an existing motion to "add a new claim or to insert a new theory into the case."  *United States v. Espinoza–Saenz*, 235 F.3d 501, 505 (10th Cir. 2000).

3

To the extent Barrett proposes that Dr. Stewart conduct an evaluation to facilitate his testimony about existing allegations, the government has no objection.  But at this late date, nearly nine years after the judgment became final, the Court should not permit a mental health evaluation intended to smuggle a new theory into this case.  Barrett seems intent upon concealing his aims for the evaluation: he requests authorization for prison staff to remain out of earshot during the testing[1] and for Dr. Stewart to attend the meeting with nothing more than paper and pen, rather than an electronic recording device.  Doc. 271 at 3.  Furthermore, Dr. Stewart is – unlike the late Dr. Young – a psychiatrist, not a neuropsychologist.  *Compare* Ex. 1; *with* Doc. 95, Ex. 89.  Accordingly, the government has reason to believe that Dr. Stewart cannot and will not attempt to replicate the Dr. Young's findings.  Given that another psychiatrist, George Woods, has already evaluated Barrett (*see* Doc. 95, Ex. 117), Dr. Stewart may intend to investigate a new and untimely theory.  Barrett has no right to such an investigation at this juncture of his post-conviction litigation.

---

[1] The Bureau of Prisons has informed government counsel that it will visually monitor the visit if the Court grants Barrett's request to attend the meeting without hand restraints.  While officers will not be able to hear the evaluation, the Bureau's need to ensure institutional security and Dr. Stewart's safety requires observation of Barrett's proposed "contact" visit.  Additionally, Barrett asks that the evaluation occur between 9:00 a.m. and 5:00 p.m., but the prison only accommodates such visits between 8:00 a.m. and 3:30 p.m., and prefers a 3:00 p.m. cutoff.

4

## **CONCLUSION**

The government respectfully urges this Court to deny Barrett's request for a mental health evaluation, to the extent it is intended to investigate a novel theory.

Dated: December 15, 2016,

Respectfully submitted,

MARK F. GREEN
United States Attorney

CHRISTOPHER J. WILSON
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov


*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

399

## CERTIFICATE OF SERVICE

I, hereby certify that on December 15, 2016, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry: dbautry44@hotmail.com

Joan M. Fisher joan.fisher@fd.org, Paul_Mann@fd.org, jmfisher@turbonet.com


/S. *Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney

400

401

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF OKLAHOMA**


KENNETH EUGENE BARRETT )
)
    Movant, )
)     Case No. 09-CV-00105-JHP
v. )
)
UNITED STATES OF AMERICA, )
)
    Respondent. )


**GOVERNMENT RESPONSE TO EXPEDITED MOTION FOR ORDER OF ACCESS TO**
**PETITIONER BY MENTAL HEALTH EXPERT**

# EXHIBIT 1

1

CURRICULUM VITAE


*PABLO STEWART, M.D.*
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 264-0237; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated February 2016)**


EDUCATION:  University of California School of Medicine, San Francisco, California, M.D., 1982

United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry


LICENSURE:  California Medical License #GO50899
Hawai'i Medical License #MD-11784
Federal Drug Enforcement Administration #BS0546981
Diplomate in Psychiatry, American Board of
Psychiatry and Neurology, Certificate #32564


ACADEMIC APPOINTMENTS:

September 2006-
Present

Academic Appointment: Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

July 1995 -
August 2006

Academic Appointment: Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

August 1989 -
June 1995

Academic Appointment: Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine.

August 1986 -
July 1989

Academic Appointment: Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine.


EMPLOYMENT:

December 1996-
Present

Psychiatric Consultant
Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry.


**EXHIBIT 1**

1

| | |
|---|---|
| January 1997-<br>September 1998 | <u>Director of Clinical Services, San Francisco Target Cities</u><br><u>Project</u>.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | <u>Medical Director, Comprehensive Homeless Center,</u><br><u>Department of Veterans Affairs Medical Center, San Francisco.</u><br>Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | <u>Chief, Intensive Psychiatric Community Care Program,</u><br><u>(IPCC) Department of Veterans Affairs Medical Center, San</u><br><u>Francisco.</u>  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | <u>Chief, Substance Abuse Inpatient Unit, (SAIU), Department</u><br><u>of Veterans Affairs Medical Center, San Francisco.</u><br>Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | <u>Psychiatrist, Substance Abuse Inpatient Unit, Veterans</u><br><u>Affairs Medical Center, San Francisco.</u>  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | <u>Director, Forensic Psychiatric Services, City and County of</u><br><u>San Francisco</u>.  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | <u>Senior Attending Psychiatrist, Forensic Unit, University of</u><br><u>California, San Francisco General Hospital.</u>  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward.  Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

403

| July 1985<br>June 1986 | Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital. Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
|---|---|
| July 1984 -<br>March 1987 | Physician Specialist, Westside Crisis Center, San Francisco, CA. Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital. Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | Psychiatric Consultant, Marin Alternative Treatment, (ACT). Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA. Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | Psychiatric Resident, University of California, San Francisco. Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | Infantry Officer - United States Marine Corps. Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp. Received an Honorable Discharge. Highest rank attained was Captain. |

3

404

HONORS AND AWARDS:

| | |
|---|---|
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

4

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |

5

406

| | |
|---|---|
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |
| February 2006-<br>January 2007;<br>April 2013-<br>January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>March 2013;<br>February 2015-<br>present | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing. Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine. Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |

6

407

| | |
|---|---|
| September 1983 - June 1989 | Admissions Committee, University of California, School of Medicine. Duties included screening applications and interviewing candidates for medical school. |
| October 1978 - December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic. Provided free instruction to the public on proper methods of exercise and preventative health measures. |

## TEACHING RESPONSIBILITIES:

| | |
|---|---|
| August 2014- Present | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003- Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002- January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health." This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001- June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999- April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998- June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 - November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995- December 20002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 - June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse." This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 - February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 - February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |
| July 1992 - June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |

7

408

| | |
|---|---|
| July 1991-<br>Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 -<br>February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 -<br>June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 -<br>November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 -<br>June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 -<br>Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 -<br>December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine. Designed, planned and taught course, Psychiatry 170.02, "Alcoholism". This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional. This course is offered fall quarter each academic year. |
| July 1987-<br>June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 -<br>June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 -<br>August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |
| July 1986 - | Coordinator of Medical Student Education, University of |

8

409

| | |
|---|---|
| August 1990 | California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| | |
|---|---|
| June 2015- Present | Senior Fellow, University of California Criminal Justice & Health Consortium. |
| April 2014- Present | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012-Present | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007 -Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners. My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata,* __ U.S. ___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011). |
| July/August 2008-Present | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.) This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |

9

| | |
|---|---|
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD). This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project. This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities. NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs. NCCD ceased to be the monitoring agency for this project in June 1999. At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency. The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996-<br>June 2003 | Psychiatric Consultant to the San Francisco Drug Court. |
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |

| | |
|---|---|
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic.<br>Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic,<br>Drug Detoxification and Aftercare Project. Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services,<br>Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School,<br>San Francisco, CA. |
| April 1989 -<br>July 1996 | Umpire, Rincon Valley Little League, Santa Rosa, CA. |
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

11

PRESENTATIONS:

1. San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2. Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3. Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4. 24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5. Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6. Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7. First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8. American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9. Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10. University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11. American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

12

413

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client". (11/14/96)

13

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery". (11/22/96)

31. Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32. Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33. DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California. (7/31/97)

34. The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender". Wilsonville, Oregon. (8/1/97)

35. The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children." Newport Beach, California. (2/12/98)

36. American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37. "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience." The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis. San Francisco, California. (3/6-3/8/1998)

38. "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection." The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39. Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40. Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

41. Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems." (6/19/1998)

42. "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer." The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference. San Rafael, California. (6/20/1998)

14

43. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44. Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse." (7/15/1998)

45. "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii. (9/2/98)

46. 9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco. "Care Issues and Pain Management for Chemically Dependent Patients." San Francisco, CA. (9/10/98)

47. Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000." "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA. (9/18/98)

48. Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder." Napa, CA. (9/23/98)

49. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA. (9/30/98)

50. "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA. (10/13/98)

51. California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient." Concord, CA. (10/15/98)

52. California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel. (10/15/98)

53. Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada. (10/23/98)

54. 1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders." Sacramento, CA. (12/11/98)

55. "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA. (1/7/99)

56. Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder." (1/19/99)

57. "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA. (1/22/99 & 2/5/99)

15

58. Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender." (2/17/99)

59. American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999). Entry Level Process Group Leader.

60. "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii. (3/5 & 3/6/99)

61. "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA. (3/10/99)

62. "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA. (3/11/99)

63. "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA. (3/17/99)

64. Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i. Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies. Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility. (4/2-4/9/99)

65. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA. (4/14/99)

66. "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA. (4/21/99)

67. California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California. (4/29/99)

68. "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i. (4/30/99)

69. State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital." Honolulu, Hawai'i. (4/30/99)

70. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71. 11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

16

72.     The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74.     "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75.     15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76.     "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77.     "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78.     "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79.     "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81.     "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82.     "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83.     "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84.     1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?" "Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering." La Jolla, California. (8/3/99)

85.     "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center. Kahului, Maui. (8/23/99)

86.     "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California. (9/13/99)

87. "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California. (9/14/99)

88. "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California. (9/16/99)

89. "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California. (9/23/99)

90. "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona. (9/28/99)

91. "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i. (10/8-10/10/99)

92. "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California. (10/12/99)

93. "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California. (10/14/99)

94. "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California. (10/21/99)

95. "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California. (1/27/00)

96. "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California. (3/6/00)

97. "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California. (3/16/00)

98. "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California. (3/17/00)

99. "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California. (4/3/00)

100. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California. (4/4-4/5/00)

101. "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California. (5/15/00)

102. National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California. "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103. "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California. (6/9/00)

104. "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California. (6/29 & 7/27/00)

105. "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California. (9/8/00)

106. "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California. (9/9/00)

107. Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey. "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108. "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (11/1/00, 3/13/01)

109. "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California. (11/12-11/17/00)

110. "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California. (12/5/00)

111. "Wasn't One Problem Enough?" Mental Health and Substance Abuse Issues. 2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California. (3/2/01)

112. "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process." County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California. (3/8 & 4/5/01)

113. "Assessment of the Patient with Substance Abuse and Mental Health Issues." San Mateo County General Hospital Grand Rounds. San Mateo, California. (3/13/01)

114. "Dual Diagnosis-Assessment and Treatment Issues." Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California. (5/8/01)

115. Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California. (5/10/01)

116. National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117. Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118. Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

19

119. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

131. "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Pasadena, California. (4/2/04)

132. Lecture tour of Japan (4/8-4/18/04). "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (9/9/04)

134. "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section. Sacramento, California. (4/8/05)

135. "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University. San Francisco, California. (8/13/05)

136. Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse." San Francisco, California. (10/24/05)

137. Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse." Woodland, California. (1/25/06), (6/23/06)

138. "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139. Lecture tour of Japan (4/13-4/23/06). "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness." Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140. "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference. Sacramento, California. (4/25/06)

141. "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142. "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference. Sacramento, California. (4/27/07)

143. "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network. Medford, Oregon. (5/10/07)

144. "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar. San Francisco, California. (8/2/07)

145. "Capital Punishment," Human Writes 2007 Conference. London, England. (10/6/07)

146. "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California. (10/30/07)

147. "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference. San Diego, California. (12/13/07)

148. "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149. "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program. Chelan, Washington. (6/3/08)

150. "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference. Burlingame, California. (6/19/08)

423

151.   Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152.   2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153.   Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA.  This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154.   Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court.  San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155.   2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156.   2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157.   Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158.   Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159.   "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160.   San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.


PUBLICATIONS:

1)   Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients*. Hospital and Community Psychiatry, 39, 437-439.

2)   Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3)   Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)      Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)      Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)      Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)      Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)      Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)      Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)     Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)     James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)     Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)     Stewart, P., Inaba, D.S., and Cohen, W.E. (2007). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14)     Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.

15)     Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of *Amici Curiae* Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: *Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.*

23

424

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## ORDER

This matter comes before the Court on Petitioner's Motion for Order of Access to Petitioner by Mental Health Expert (Dkt. # 271). The government filed a response on December 15, 2016 (Dkt. # 275).

Petitioner asks the Court to allow another licensed psychiatrist, "whose expertise involves a variety of psychiatric, forensic, substance abuse and organizational issues at the Federal Correctional Institute at Terre Haute, Indiana" to conduct an interview with him "to address potentially mitigating aspects of Mr. Barrett's mental health at the time of the offense for which he stands convicted with an emphasis on the substance abuse both long term and as it affected Mr. Barrett on the (sic) September 24, 1999." Dkt. # 271. Although the government's response indicates that "Barrett may have a statutory right to conduct a mental health evaluation ahead of the scheduled evidentiary hearing. . . .," this Court is not aware of any such statutory right and neither of the parties have referenced such a statute. Further, while government indicates this Court has "exercised its discretion to permit the retention

425

of Dr. Stewart as a mental health expert," this Court has not previously ruled on the retention of Dr. Stewart.

As this Court has indicated previously, Petitioner's motion to vacate contains documents, declarations and assessments of three experts: Dr. Bill Sharp, who examined the Defendant in 2002; Dr. Myla Young, a clinical neuropsychologist who examined Defendant in 2009 and reviewed his records; and Dr. George Woods, a psychiatrist who reviewed Defendant's records and examined him in 2009.  Dkt. # 248.  *See also*, *United States v. Barrett*, 797 F.3d 1207, 1229 (10th Cir. 2015).  This Court believes the testing and examination of Petitioner which has occurred over the past fourteen (14) years is more than sufficient to adequately address the issues in the upcoming evidentiary hearing.  Therefore, Petitioner's motion is **denied**.

It is so ordered on the 15th day of December, 2016.

James H. Payne
United States District Judge
Eastern District of Oklahoma

2

427

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH E. BARRETT, | ) | CAPITAL CASE |
| | ) | Case No. 6:09-cv-00105-JHP |
| Movant/Petitioner, | ) | |
| | ) | |
| v. | ) | MOTION TO RECONSIDER |
| | ) | EXPEDITED MOTION FOR |
| UNITED STATES OF AMERICA, | ) | ORDER OF ACCESS TO |
| | ) | PETITIONER BY MENTAL |
| Respondent. | ) | HEALTH EXPERT |
| _____ | ) | |

Kenneth E. Barrett asks the Court to reconsider its order denying Dr. Pablo Stewart access to him at USP Terre Haute for the purpose of conducting a mental health examination. (Docs. 271, 276)

The Court misunderstands the purpose of Mr. Barrett's motion. Although he is indigent, Mr. Barrett is not asking the Court to authorize funds to pay Dr. Stewart for his time and services. Dr. Stewart has been hired from funds available to the Federal Defenders Office in the Eastern District of California. All counsel is asking is that the Court authorize Dr. Stewart to go to the prison to examine Mr. Barrett in aid of developing relevant mitigating evidence for the evidentiary hearing. The only reason counsel is seeking an order authorizing access for Dr. Stewart is because USP Terre Haute requires a court order before permitting an expert to examine an inmate. (Exh. 1 to Government's Response, Doc. 275-1) This is a relatively new policy instituted by the current warden. In recent times past, no such order was required.

Counsel know of no precedent for the Court's order denying one of their experts access to the client. In the context the request was made, the government did not object.

MOTION TO RECONSIDER PETITIONER'S
EXPEDITED MOTION FOR ACCESS
TO PETITIONER BY EXPERT                1

The Court's order usurps counsels' right to engage, with funds available to them, expert assistance they deem necessary to the development of their case at the evidentiary hearing. *E.g.*, *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985) (an indigent defendant is entitled to expert assistance if reasonably necessary to advance his defense; likewise, counsel who have funds available to engage expert assistance they believe necessary to their case are certainly entitled – and indeed are duty bound – to do so). Any testimony Petitioner might glean from Dr. Stewart will not go to a new claim. If favorable to Mr. Barrett, Dr. Stewart's testimony will complement that of Dr. Woods, and the findings made by Dr. Young.

The trial featured abundant evidence of Mr. Barrett's involvement with methamphetamine. Mr. Barrett's current counsel have argued that trial counsel were ineffective, in part, for failing to prepare a mitigating response to that evidence. *E.g.*, *Anderson v. Sirmons*, 476 F.3d 1131, 1144-45 (10th Cir. 2007); *Johnson v. United States*, 860 F.Supp.2d 663, 869-73 (N.D. Iowa 2012) (in light of other mitigating facts, drug use can be explained in an extenuating light). Dr. Stewart is a psycho-pharmacologist. Evidence he develops could mitigate Mr. Barrett's drug use by showing it was the product of or was exacerbated by other mental and organic impairments; could represent independent evidence of Mr. Barrett's mental illnesses; and could well be relevant to the intent questions the jury had to resolve in both stages of trial. Dr. Woods and the late Dr. Young commented on Mr. Barrett's drug use in their evaluations in the context of his mental and organic problems. Again, if Dr. Stewart appears as a witness at the evidentiary hearing, he will not be testifying to matters that constitute a "new" claim or claims. Dr. Stewart's services are reasonably necessary in making Mr. Barrett's case.

For the above reasons, the Court's order denying Dr. Stewart access to Mr. Barrett at USP Terre Haute is unreasonable, and should be re-considered. The Court's order improperly

MOTION TO RECONSIDER PETITIONER'S
EXPEDITED MOTION FOR ACCESS
TO PETITIONER BY EXPERT                    2

interferes with Mr. Barrett's right to counsel and his right to develop his case at the evidentiary hearing, in violation of the Fifth and Sixth Amendments.  The Court's ruling also unfairly circumscribes the scope of the hearing ordered by the Tenth Circuit.

There are other troubling aspects to the Court's ruling.

The Court believes "the testing and examination of Petitioner which has occurred over the past fourteen (14) years is more than sufficient to adequately address the issues in the upcoming evidentiary hearing."  (Doc. 276)  This signals that before a single witness has been heard, the Court has formed an opinion as to the credibility and sufficiency of Mr. Barrett's mental health case.  In fact, the only evidence of "testing and examination of Petitioner" over the past 14 years (absent the examination of Mr. Barrett by Dr. Randall Price, which was conducted at the time of trial) was presented in the § 2255 petition and supporting declarations and reports.  The Court previously found the evidence in the record and expanded record inadequate to even warrant an evidentiary hearing, a conclusion the appeals court emphatically rejected.

The Court recently granted the government's motion to have an expert of their choosing examine Mr. Barrett.  (Doc. 269 at 12)  The Court stated it "would be unfair to not allow the government an opportunity to rebut evidence which the government anticipates the petitioner will present at the evidentiary hearing through Dr. George Woods."  (Doc. 269 at 13)  But in denying Dr. Stewart access to Mr. Barrett, this Court is both unjustifiably precluding him from fully developing his case and preventing the development of rebuttal evidence to the expert testimony offered by the government.  This is in clear derogation of Mr. Barrett's right to a full and fair hearing.[1]

---

[1]  In combination, the Court's order denying Dr. Stewart access to Mr. Barrett, its apparent prejudgment of Mr. Barrett's mental health case as it reflects on trial counsels' effectiveness, and

MOTION TO RECONSIDER PETITIONER'S
EXPEDITED MOTION FOR ACCESS
TO PETITIONER BY EXPERT                    3

Accordingly, the Court should reconsider its ruling and allow Dr. Stewart access to Mr. Barrett.

DATED:  December 19, 2016

Respectfully submitted,
*/s/ Joan M. Fisher*
JOAN M. FISHER, Idaho Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-6656 [fax]

*/s/ David Autry*
DAVID AUTRY, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]

Lawyers for Petitioner,
KENNETH E. BARRETT

---

its permitting the government, over objection, to have Mr. Barrett examined by its expert while denying access to a defense expert reasonably necessary to Petitioner's case raises questions as to the Court's impartiality. *E.g., In re Murchison*, 349 U.S. 133, 136 (1955), citing *Tumey v. Ohio*, 273 U.S. 510, 532 (1927).

MOTION TO RECONSIDER PETITIONER'S
EXPEDITED MOTION FOR ACCESS
TO PETITIONER BY EXPERT                4

431

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 19th day of December, 2016, I caused the foregoing Motion to Reconsider Expedited Motion for Order of Access to Petitioner by Mental Health Expert to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

DATED: December 19, 2016

/s/ Joan M. Fisher
JOAN M. FISHER

MOTION TO RECONSIDER PETITIONER'S
EXPEDITED MOTION FOR ACCESS
TO PETITIONER BY EXPERT                5

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT  )
             )
  **Movant,**      )
             )  Case No. 09-CV-00105-JHP
**v.**          )
             )
UNITED STATES OF AMERICA,  )
             )
  **Respondent.**     )

## GOVERNMENT RESPONSE IN OPPOSITION TO MOTION FOR RECONSIDERATION

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and files this response in opposition to Movant's motion for reconsideration of his motion for order of access to petitioner by mental health expert (Doc. 277).

## PRELIMINARY STATEMENT

Following the affirmance of his convictions for three homicide crimes and the imposition of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255. Docs. 1, 2, 70 & 95. This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222). The Tenth Circuit Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and personal history. Doc. 230. This Court has scheduled the hearing to commence March 13, 2017. Docs. 246 & 270. On December 12, 2016, Barrett filed the instant motion to have Pablo Stewart, M.D. evaluate him at U.S. Penitentiary, Terre Haute. Doc. 271. On December 15, 2016, the Court denied the motion. Doc. 276.

1

432

**ARGUMENT**

**THE COURT SHOULD NOT RECONSIDER ITS ORDER DENYING AN ADDITIONAL MENTAL HEALTH EVALUATION**

In his motion to reconsider, Barrett once against claims a Fifth Amendment right to an evaluation by Dr. Stewart.  Doc. 277 (citing *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985)).  Barrett fails to demonstrate that the Court's denial of the requested evaluation constitutes a clear error or manifest injustice that would merit reconsideration of the existing order.

Courts evaluate motions to reconsider under the same standards governing a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e). *See, e.g., United States v. Thompson*, 125 F.Supp.2d 1297 (D. Kan. 2000).  Accordingly, they may grant reconsideration on three discrete grounds: an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice.  See Doc. 221 (citing *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  A motion for reconsideration "is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed."  *Voelkel v. Gen. Motors Corp.*, 846 F.Supp. 1482, 1483 (D. Kan.), *aff'd*, 43 F.3d 1484 (10th Cir.1994).

As the government has previously argued, Barrett does not have a Sixth Amendment right to counsel during collateral proceedings.  The Sixth Amendment right to counsel guarantees assistance "when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor."  *United States v. Ash*, 413 U.S. 300, 309 (1973).  Moreover, convicted defendants do not have the same due process rights as those presumed innocent under the law.  *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009) (citing *Herrera v. Collins*, 506 U.S. 390, 399 (1993)).  Thus, the due process clause of the Fifth Amendment does not guarantee Barrett the right to any particular investigative tools.  *See Finley*,

2

433

481 U.S. 551, 559 (1987).  This Court enjoys discretion to determine the scope of the ordered evidentiary hearing.  *See Raysor v. United States*, 647 F.3d 494, 494 (2d Cir. 2011).

Barrett fails to identify a clear error of law or manifest injustice stemming from the denial of the requested mental health evaluation.  Barrett has had many years, and the services of several experts, to investigate and present his mental illness claims.  *See* Doc. 276.  Neither his original motion nor his request for reconsideration demonstrate that he will suffer any prejudice from the absence of the requested evaluation.  Indeed, it appears Barrett aims to investigate novel evidence in service of claims he could have presented long ago, before the limitations period expired under 28 U.S.C. § 2255(f).

To the extent that the Court does grant the requested meeting, the Bureau of Prisons has informed government counsel that it will visually monitor the visit if the Court grants Barrett's request to attend the meeting without hand restraints.  It will only permit Barrett to attend the meeting without handcuffs if such an arrangement is required to complete the evaluation.  As previously noted, the prison only accommodates such visits between 8:00 a.m. and 3:30 p.m., and prefers a 3:00 p.m. cutoff.  Further, the institution requests that any order for an evaluation not specify a date, so that it can react to unanticipated emergencies.

## CONCLUSION

The government respectfully urges this Court to deny Barrett's request for reconsideration.

Dated: December 20, 2016,

Respectfully submitted,

MARK F. GREEN
United States Attorney

CHRISTOPHER J. WILSON
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov


*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

435

## <u>CERTIFICATE OF SERVICE</u>

I, hereby certify that on December 20, 2016, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry: dbautry44@hotmail.com

Joan M. Fisher joan.fisher@fd.org, Paul_Mann@fd.org, jmfisher@turbonet.com

/S. *Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney

436

## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                    )
    Petitioner/Defendant,           )
                                    )
vs.                                 )       Case No. 09-CIV-105-JHP
                                    )
UNITED STATES OF AMERICA,           )
                                    )
    Respondent/Plaintiff.           )

## ORDER

This matter comes before the Court on Petitioner's Motion to Reconsider Expedited Motion for Order of Access to Petitioner by Mental Health Expert (Dkt. # 277).   The government has filed a response in opposition to said motion (Dkt. # 278).

Petitioner claims "[t]he Court misunderstands the purpose of [his] motion." Additionally, Petitioner claims this "Court has formed an opinion as to the credibility and sufficiency of Mr. Barrett's mental health case." Dkt. # 277.  For the record, this Court has not made any decision on the merits of the issues currently pending herein.  The concern this Court has with Petitioner's request, however, is counsel's continued assertion that the evidence he seeks to present "could well be relevant to the intent questions the jury had to resolve in **both stages of trial**." *Id*.  The Tenth Circuit has not allowed this evidentiary hearing for the purpose of trying to resurrect issues which have been fully resolved, *i.e.*, the defendant has been convicted on three counts, *i.e.* Count I and II, Committing a murder through the use of a firearm during or in relation to a drug trafficking crime, or possession

of a firearm in furtherance of such crime; and Count III, Intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties, as discussed in this Court's order entered on December 6, 2016. Any questions regarding defendant's intent in the first stage of trial is not relevant to the issues for which this case has been remanded. *See*, Dkt. # 269.

Petitioner claims this Court's order denying the requested mental health examination, which will undoubtedly focus upon Petitioner's current mental health as opposed to his mental health on September 24, 1999, is a denial of his rights under *Ake v. Oklahoma*, 470 U.S. 68, 76 (1985). The issue in *Ake*, however, dealt with the rights of a criminal defendant to have expert assistance to prepare a defense in his criminal trial prior to taking away the defendant's liberty interests. "A criminal defendant proved guilty after a fair trial does not have the same liberty interests as a free man." *Dist. Attorney's Office for third Judicial Dist. v. Osborne*, 557 U.S. 52, 68 (2009).

Moreover, this is not a case where the defendant has never been examined by any psychiatric or mental health experts. Rather, according to the record herein, Petitioner has been examined by mental health professionals hired by counsel on, at least four separate occasions.[1] Specifically, as previously noted by this Court, Dr. Bill Sharp, a licensed clinical psychologist performed an assessment, including an interview with Mr. Barrett and the administration of psychological tests on September 28, 2002 in preparation for his state court

---

[1]These examinations do not include medical records from petitioner's stays at Eastern State Hospital or Sequoyah Memorial Hospital.

2

trials arising out of the shooting on September 24, 1999 (*see*, Dkt. # 72-5); Dr. Myla Young, a clinical psychologist conducted a neuropsychological evaluation of approximately 16 hours over the course of three days on February 9 - 11, 2009 (*see*, Dkt. # 72-38);[2] and Dr. George Woods, a licensed physician specializing in psychiatry and neuropsychiatry,[3] conducted a neuropsychiatric evaluation of Mr. Barrett over the course of two full days on February 17 and 18, 2009 (*see*, Dkt. # 72-66).[4]  Additionally, the record indicates in 2002 Dr. Jeanne Russell performed a risk assessment on Mr. Barrett.  Now Mr. Barrett seeks to have another licensed psychiatrist "whose expertise involves a variety of psychiatric, forensic, substance abuse and organizational issues at the Federal Correctional Institute at Terre Haute, Indiana" to administer "a complete pharma-psychiatric evaluation of Mr. Barrett." Dkt. # 271.  While counsel have stated the examination will not be duplicative, this Court is not convinced that the evaluation would not be a repeat of previous evaluations.  Furthermore, as the Court has tried to communicate previously, *see* Dkt. #s 248 and 276, this Court does not believe a psychological evaluation conducted fourteen years after the shooting in this case, provides any insight to the Court regarding mitigating evidence which was available to counsel at the time of Petitioner's criminal trial in this Court.  As a result, Petitioner's Motion to Reconsider

---

[2]In performing her evaluation, Dr. Young reviewed the "[s]ocial and medical history data obtained in interviews with Mr. Barrett and contained in records that reportedly were available at the time of his trial."  Dkt. # 72-38.

[3]It should be noted that this Dr. Woods' private practice focuses on "neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations."  Dkt. # 72-66.

[4]In performing his evaluation, Dr. Woods "reviewed and considered the declaration of neuropsychologist, Myla Young, PhD."  Dkt. # 72-66.

Expedited Motion for Order of Access to Petitioner by Mental Health Expert (Dkt. # 277)

is **denied**.

**IT IS SO ORDERED** this 21st day of December, 2016.

James H. Payne
United States District Judge
Eastern District of Oklahoma

4

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:          dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:          Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH E. BARRETT,** | ) | **CAPITAL CASE** |
| | ) | |
| **Movant/Petitioner,** | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| **v.** | ) | **NOTICE OF PETITIONER'S** |
| | ) | **WRITTEN SUMMARIES OF** |
| **UNITED STATES OF AMERICA,** | ) | **ANTICIPATED TESTIMONY** |
| | ) | **OF EXPERTS** |
| **Respondent.** | ) | |
| | ) | |

Movant/Petitioner KENNETH E, BARRETT, through counsel and pursuant to the

Scheduling Order of December 6, 2016 files the summaries of the testimony of currently

anticipated experts. (Docs. 270). [1]

---

[1]   Petitioner's counsel notes that the Scheduling Order requires only the summaries of mental
health experts but to assure full compliance summaries of the testimony of all anticipated experts
is included.

NOTICE OF PETITIONER'S WRITTEN                                    *Barrett v. United States,*
SUMMARIES OF ANTICIPATED TESTIMONY                               *6:09*-cv-09-00105-JHP
OF EXPERTS                          1

**ERIN BIGLER, Ph.D.**

Mr. Barrett intends to present testimony from Erin Bigler, Ph.D. who is the Susa Young

Gates Professor of Psychology and Neuroscience at Brigham Young University and the former

President of the International Neuropsychological Society. Dr. Bigler is board-certified in

clinical neuropsychology by the American Board of Professional Psychology. He is an expert in

neuropsychology-neurophysiology, neuropsychological diagnostics, neuroimaging, and

traumatic brain injury. Dr. Bigler will testify to his review of Mr. Barrett's neurospsychological,

psychological, psychiatric, and medical histories. Dr. Bigler will review prior

neuropsychological testing, psychological and psychiatric evaluations of Mr. Barrett. Mr. Barrett

intends to present Dr. Bigler's opinions on Mr. Barrett's neuropsychological functioning,

cognitive impairment, history of head trauma, and/or brain damage. Dr. Bigler may opine on the

possible etiologies of Mr. Barrett's brain damage. In addition, Mr. Barrett may present Dr. Bigler

in rebuttal to the government's case on issues that may include the evaluations and opinions

offered from Dr. Randall Price or Dr. Steven Pitt.

**RICHARD BURR**

Mr. Burr is an attorney licensed to practice law who has represented over one hundred

capital clients in state and federal courts at all stages of litigation including trial, appeal, and

post-conviction and at every court level including the United States Supreme Court. He was trial

counsel in three capital cases including *United States v. Timothy James McVeigh*, and is well

familiar with the prevailing professional norms for capital representation at the time of Mr.

Barrett's trial.  Mr. Burr will testify to factual matters concerning his consultation and advice in

the matter of Mr. Barrett's defense as set out in his Declaration (Doc. 95, Exh. 118) and

supplemental Declaration (Doc. 178, Exh. 219).   Mr. Burr will also testify to his familiarity with

NOTICE OF PETITIONER'S WRITTEN                                    *Barrett v. United States,*
SUMMARIES OF ANTICIPATED TESTIMONY                          *6:09*-cv-09-00105-JHP
OF EXPERTS                                     2

the community standards of prevailing professional norms in the defense of capital clients at the time of Mr. Barrett's trial.  He will render his professional opinion of appointed counsel's failures in performing in a manner consistent with those norms.  Mr. Burr may also be called to rebut the government's evidence.

## GEORGE KIRKHAM, Ph.D.

Dr. Kirkham is a well-renowned Police Standards and Procedures Expert who has served as consultant and expert witness in police litigation in over 1500 cases in nearly every state in the country.  He has testified extensively in federal and state courts in behalf of both plaintiffs and defendants in civil actions, as well as in criminal cases for prosecution and defense.  Dr. Kirkham has previously proffered a report in this matter.  Doc. 95, Exh. 44.  We will call him to testify to the contents of the report, as well as, to address the mitigating circumstance of law enforcement's failure to adequately consider the emotional instability of a known meth user with other evident mental health issues in the planned execution of the search warrant. Dr. Kirkham may also be called to rebut the government's evidence.

## THOMAS KOSTEN, M.D.

Mr. Barrett intends to present testimony from Thomas Kosten, M.D., who is the Jay H. Waggoner Endowed Chair and Professor of Psychiatry, Neuroscience, Pharmacology, Immunology & Pathology at Baylor College of Medicine, Michael E. DeBakey VAMC, in Houston, Texas. Dr. Kosten is also Director, Dan Duncan Institute for Clinical and Translational Research; Vice Chair, Psychiatry for Research; and Director, Division of Alcohol and Addiction Psychiatry at Baylor. He is an expert in substance abuse, pharmacology, and addiction psychiatry. As relevant to his testimony in this case, Dr. Kosten's areas of expertise include genetic and environmental factors in explaining drug and alcohol use; psychiatric co-morbidities;

NOTICE OF PETITIONER'S WRITTEN
SUMMARIES OF ANTICIPATED TESTIMONY
OF EXPERTS                                    3

*Barrett v. United States,*
*6:09*-cv-09-00105-JHP

443

potential association with violence, paranoia, and/or psychosis; and treatment and rehabilitation outcomes. Dr. Kosten will testify to his review of Mr. Barrett's psychiatric, medical, and substance abuse histories; his social history; his review of prior evaluations of Mr. Barrett; and/or his own clinical evaluation of Mr. Barrett.  Mr. Barrett may present Dr. Kosten in rebuttal to the government's case, including but not limited to the psychological evaluations by Dr. Randall Price and Dr. Steven Pitt.

**DEBORAH S. MIORA, Ph.D.**

Mr. Barrett intends to present testimony from Deborah S. Miora, Ph.D., a licensed clinical psychologist who is board-certified in neuropsychology. If called, Dr. Miora will testify about Mr. Barrett's psychological and neuropsychological functioning at the time of the offense. Her testimony will be based on the methods and opinions described in the declarations of Myla Young, Ph.D., Bill Sharp, Ph.D., and George Woods, M.D. Dr. Miora may testify about whether and how testing methods and results other than neuropsychological tests bear on an assessment of Mr. Barrett's psychological or neuropsychological functioning at the time of the offense. If necessary, Mr. Barrett may call Dr. Miora as a rebuttal witness to respond to testimony offered by any witness called by the government.

**THOMAS J. REIDY, Ph.D.**

Mr. Barrett intends to present testimony from Thomas J. Reidy, Ph.D., a clinical psychologist in private practice. Dr. Reidy is board-certified in Forensic Psychology by the American Board of Professional Psychology (ABPP), and he is an expert in violence risk assessment with numerous peer-reviewed publications related to prison violence. Dr. Reidy will testify to his review of Mr. Barrett's psychiatric, psychological, medical histories, and testify to Mr. Barrett's conduct during incarceration. Dr. Reidy may testify to the violence risk

NOTICE OF PETITIONER'S WRITTEN                                      *Barrett v. United States,*
SUMMARIES OF ANTICIPATED TESTIMONY                          *6:09*-cv-09-00105-JHP
OF EXPERTS                                    4

444

assessments previously performed by Dr. Jeanne Russell and Dr. Randall Price, and he will assess and testify to the evidence the government has indicated it intends to present in opposition of Petitioner's claim of ineffective assistance of counsel. Dr. Reidy may testify to his opinions regarding Mr. Barrett's potential risk for committing violent criminal offenses in prison. He will opine on the validity of various measures and techniques used in violence risk assessment as related to predicting "future dangerousness" in a prison context. Mr. Barrett may call Dr. Reidy to critique the use of antisocial personality disorder and psychopathy as diagnostic considerations in risk assessment for prison violence.

**PABLO STEWART, M.D.**

Dr. Pablo Stewart, a physician licensed to practice medicine in California and Hawaii who is board certified in psychiatry by the American Board of Psychiatry and Neurology. Dr. Stewart completed his medical and psychiatric training at the University of California in 1986 and has practiced in a number of settings, including jails, jail psychiatric hospitals, and Veterans' Administration hospitals. Dr. Stewart has qualified as an expert in seven federal courts and several state courts.

Dr. Stewart will testify to his review of Mr. Barrett's psychiatric, medical and substance abuse history, as well as his social history.  He will then address  specifically the how the substance abuse may have impacted Mr. Barrett's previous psychiatric disorders or medical condition at the time of the offense.  Based on that information and assessment, he will offer a number of opinions Mr. Barrett's ability to perceive, understand, assess or evaluate and make judgments under the conditions at issue.  The standard of practice in evaluating the issues at hand includes a face to face interview with Mr. Barrett, however, Dr. Stewart will be able to render a number of opinions based solely on chart and/or record review but those opinions are qualified

NOTICE OF PETITIONER'S WRITTEN
SUMMARIES OF ANTICIPATED TESTIMONY
OF EXPERTS                                 5

*Barrett v. United States,*
*6:09*-cv-09-00105-JHP

due to the lack of face to face interview time with Mr. Barrett. Dr. Stewart may also be called to rebut the government's evidence.

**GAYLAN WARREN**

Mr. Warren is a criminologist in private practice in Newport, Washington, qualified as an expert in crime forensics and has testified in numerous police shootings on matters related to self-defenses, police procedures, crime scene reconstruction, firearms and ballistics.  He may be called to testify to relevant matters in mitigation regarding perception and response time in shooting incidents, inconsistent testimony presented in the purported execution of a nighttime search warrant as it relates to the reasonable likelihood that such a warrant would be executed with notice and whether or not emergency lights as described by some of the witnesses would have, in fact, served as notice to the emotionally unstable target of the search warrant.  He may also be called to testify to the mitigating impact of the observations similar in kind and nature that were proffered by Mr. Barrett in this 2255 proceeding through criminalist, Ed Hueske.  See Doc. 95, Exh. 109.  Mr. Warren may also be called to rebut the government's evidence.

**GEORGE W. WOODS, M.D.**

Dr. Woods is a licensed physician specializing in psychiatry and neuropsychiatry who maintains a private practice in Oakland, California, focusing on neuropsychiatry, psycho-pharmacology, workplace safety, and forensic consultations. He is board-certified in Psychiatry and has testified as an expert in in numerous civil and criminal cases in state and federal courts.

In 2009, Dr. Woods performed a neuropsychiatric evaluation of Mr. Barrett, including conducting a structured clinical interview, at the federal prison in Terre Haute, Indiana, over the course of two full days on February 17 and 18, 2009. Dr. Woods reviewed and considered the declaration of neuropsychologist, Myla Young, PhD; Mr. Barrett's institutional records, to

NOTICE OF PETITIONER'S WRITTEN                          *Barrett v. United States,*
SUMMARIES OF ANTICIPATED TESTIMONY                      *6:09*-cv-09-00105-JHP
OF EXPERTS                              6

include available academic, medical and custodial records; declarations and/or medical and social records of various family members, all of which is the type of data customarily relied upon by qualified mental health professions to perform an accurate and reliable neuropsychiatric assessment. Dr. Woods will testify to his observations and medical and psychiatric conclusions set out in his declaration dated March 14, 2009, Doc. 95, Exh. 117. Because the evaluation was conducted over seven years ago, it is consistent with standard medical practice and with forensic evaluations to re-interview Mr. Barrett prior to testifying at the evidentiary currently set for the week of March 13, 2017. Further and additional testimony may result from that interview. Dr. Woods may also be called to rebut the government's evidence.

DATED:  January 3, 2017

Respectfully submitted,

*/s/ Joan M. Fisher*
JOAN M. FISHER, Idaho Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656

*/s/ David Autry*
DAVID AUTRY, OBA #11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

NOTICE OF PETITIONER'S WRITTEN                          *Barrett v. United States,*
SUMMARIES OF ANTICIPATED TESTIMONY                      *6:09*-cv-09-00105-JHP
OF EXPERTS                           7

447

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 3rd day of January, 2017, I caused the foregoing Notice of

Petitioner's Written Summaries of Anticipated Testimony of Experts to be filed with the Clerk of

the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher

J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To

counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

DATED:  January 3, 2017

/s/ Joan M. Fisher
JOAN M. FISHER

NOTICE OF PETITIONER'S WRITTEN
SUMMARIES OF ANTICIPATED TESTIMONY
OF EXPERTS                              8

*Barrett v. United States,*
*6:09*-cv-09-00105-JHP

448

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S MOTION FOR |
| | ) | RECONSIDERATION OF THE |
| UNITED STATES OF AMERICA, | ) | COURT'S ORDER DENYING |
| | ) | THE GOVERNMENT'S |
| Respondent. | ) | UNOPPOSED MOTION FOR |
| | ) | CONTINUANCE |
| | ) | |
| _____ | ) | |

Kenneth Eugene Barrett asks this Court to reconsider its order denying the government's

unopposed motion for continuance of the March 13, 2016 hearing date (Doc. 273, 274). The

Court denied the request for continuance based on the unavailability of government witness

PETITIONER'S MOTION FOR RECONSIDERATION
OF THE COURT'S ORDER DENYING THE
GOVERNMENT'S UNOPPOSED MOTION FOR
CONTINUANCE

*Barrett v. United States*
CV—09-00105-JHP

1

Roger Hilfiger, but stated that "[i]f either party believes that Mr. Hilfiger's testimony is essential after hearing the remaining witnesses, the Court will continue the hearing to March 31, 2017, for the sole purpose of hearing Mr. Hilfiger's testimony." (Doc. 274).

Petitioner submits that this Order, as written, is prejudicial to him. Petitioner had and continues to have no objection to the government's Motion for Continuance. Petitioner's objection is to the bifurcation of the hearing such that a second date has now been established for the sole purpose of Mr. Hilfiger's testimony.

Mr. Hilfiger is one of four witnesses on the government's witness list and is also on Petitioner's witness list. He served as lead trial counsel for Petitioner. The subject of the hearing is his ineffectiveness. The Court has denied Petitioner's Motion to Depose Mr. Hilfiger. It is safe to assume that Mr. Hilfiger's testimony will be essential.

A bifurcated hearing is prejudicial to Petitioner for a myriad of reasons including, but not limited to, the following:

- Petitioner's right to rebuttal witnesses after Mr. Hilfiger's testimony is not addressed in the Order but is essential to Mr. Barrett's right to a full and fair hearing;

- The unlikely completion of Mr. Hilfiger's testimony and Petitioner's rebuttal on March 31, 2017 makes continuance of the hearing into the following week more than likely, compounding the expense and delay, as well as, disrupting the orderly presentation of evidence;

- The parties' legal teams will have to incur additional travel expenses for the team and relevant rebuttal witnesses; and,

PETITIONER'S MOTION FOR RECONSIDERATION
OF THE COURT'S ORDER DENYING THE
GOVERNMENT'S UNOPPOSED MOTION FOR
CONTINUANCE

*Barrett v. United States*
CV—09-00105-JHP

2

450

- If Mr. Hilfiger testifies at a later date he will have an opportunity to confer with Bret Smith and other witnesses who have previously testified.[1]

Petitioner has no objection to a continuance in this case.  There have been no previous motions for continuances granted. The prejudice to Mr. Barrett by the decision to deny the government's motion and continue the hearing for the testimony of a single witness rendered "unavailable" by vacation plans is unreasonable and should be reconsidered.

DATED:  January 3, 2017.

<div style="margin-left: 40%;">

Respectfully submitted,

/s/ *David Autry*
DAVID AUTRY
Attorney at Law

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

</div>

---

[1]  Mr. Barrett will seek to minimize the damage by seeking an Order of sequestration and will hold Mr. Hilfiger to ethical standards enunciated by the American Bar Association Formal Opinion 10-456 (20110) "Disclosure of Information to Prosecutor When Lawyer's Former Client Brings Ineffective Assistance of Counsel Claim" and *U.S. v. Pinson*, 584 F. 3d 972, 978 (10th Cir. 2009)(finding implied waiver of attorney-client privilege only to extent necessary communications are necessary to prove or disprove his claim.")

PETITIONER'S MOTION FOR RECONSIDERATION                                  *Barrett v. United States*
OF THE COURT'S ORDER DENYING THE                                              CV—09-00105-JHP
GOVERNMENT'S UNOPPOSED MOTION FOR
CONTINUANCE

452

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 3rd day of January 2017, I caused the foregoing Petitioner's Motion for Reconsideration of the Court's Order Denying the Government's Unopposed Motion for Continuance to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

PETITIONER'S MOTION FOR RECONSIDERATION
OF THE COURT'S ORDER DENYING THE
GOVERNMENT'S UNOPPOSED MOTION FOR
CONTINUANCE

*Barrett v. United States*
CV—09-00105-JHP

4

452

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**ORDER**

This matter comes before the Court on Petitioner's Motion for Reconsideration of the Court's Order Denying the Government's Unopposed Motion for Continuance (Dkt. # 281). On December 6, 2016, this Court entered a scheduling order setting an evidentiary hearing for March 13, 2017 (Dkt. # 270). The earlier motion for continuance requested this Court continue the evidentiary hearing for twenty-eight days because one witness, Roger Hilfiger, had prepaid international travel plans beginning March 13, 2017 to March 28, 2017. *See*, Dkt. # 273. No other conflicts were reported to the Court for March 13, 2017. The motion did, however, indicate that one government witness had no conflicts in April, one government witness had no conflicts until the end of April and another government witness had existing conflicts but was available from April 10 through April 18. *Id.*, at p. 2, ¶ 5. Additionally, the Court was aware that counsel for Petitioner had previously requested a continuance of the evidentiary hearing which was originally set on February 16, 2017, due to his counsel's heavy caseload. *See*, Dkt. # 247.

453

Unfortunately, it is next to impossible to schedule court hearings with as many counsel and potential witnesses as are involved in this case without running into scheduling conflicts.  This Court also has an extremely busy court schedule.  As a result, the Court decided to bifurcate the hearing and allow all testimony to be put on beginning on March 13, 2017 and indicated that the hearing would be continued to March 31, 2017 for the sole purpose of hearing Mr. Hilfiger's testimony (Dkt. # 274).

Petitioner claims in his motion for reconsideration that a bifurcated hearing is prejudicial to him because: 1) the Court has not addressed his right to rebuttal witnesses after Mr. Hilfiger's testimony and it is unlikely that Mr. Hilfiger's testimony and Petitioner's rebuttal can be completed in one day, thus compounding the expense and delay, as well as, disrupting the orderly presentation of evidence; 2) the parties' legal teams will have to incur additional travel expenses for the team and relevant rebuttal witnesses; and 3) while admitting an order of sequestration could be entered, Petitioner still claims Mr. Hilfiger will have an opportunity to confer with Bret Smith and other witnesses who have previously testified.  While this Court does not believe that a bifurcated hearing would be prejudicial to Petitioner, the Court has decided to move Mr. Hilfiger's testimony to March 30, 2017.  In the event Mr. Hilfiger's testimony and any rebuttal testimony can not be completed by March 31, 2017, the Court will hear testimony on Saturday, April 1, 2017.  This will hopefully reduce the amount of travel time and expenses required for this evidentiary hearing.  If the case can not be completed on April 1, 2017, however, the Court will continue the evidentiary hearing until Monday, April 3, 2017.  This adjustment to the Order entered on December 14,

2016, should accommodate all of the conflicts which were reported to the Court in the Government's Unopposed Motion for Continuance of Evidentiary Hearing as well as the Court's busy schedule.

For the reasons stated, this Court reconsiders its earlier Order setting Mr. Hilfiger's testimony for March 31, 2017 and moves his testimony to March 30, 2017.

It is so ordered on this 11th day of January, 2017.

James H. Payne
United States District Judge
Eastern District of Oklahoma

455

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH E. BARRETT,** | ) | **CAPITAL CASE** |
| | ) | |
| **Movant/Petitioner,** | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| **v.** | ) | **[OPPOSED]** |
| | ) | **PETITIONER'S MOTION FOR** |
| | ) | **ACCESS TO PETITIONER BY** |
| | ) | **GEORGE WOODS, M.D.** |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

Petitioner, Kenneth E. Barrett, respectfully moves this Court for an Order granting access

to Petitioner KENNETH BARRETT at the United States Penitentiary at Terre Haute, Indiana, by

consulting psychiatrist, GEORGE W. WOODS, M.D. a physician specializing in psychiatry and

Petitioner's Motion For Access To
Petitioner By George Woods, M.D.        – Page 1

neuropsychiatry, whose prior evaluation of Petitioner is relevant to his claims of ineffective assistance of counsel in the penalty phase of trial.

The Motion is based on the following grounds:

1.  Dr. Woods evaluated Petitioner in 2009 and submitted a sworn declaration which was filed in support of Mr. Barrett's § 2255 Motion to Vacate.  Doc 3, Exh. 117, as incorporated into Doc 95 at 249-50.

2.  In its decision to vacate Petitioner's death sentence and remand this matter for an evidentiary hearing on the claim of ineffective assistance of counsel at the penalty phase, the Tenth Circuit relied in significant part on Dr. Woods' 2009 evaluation and declaration.  *See United States v. Barrett,* 797 F. 3d 1207, 1229 (10th Cir. 2015).

3.  Dr. Woods will be a witness for Mr. Barrett at the evidentiary hearing scheduled for March 13, 2017.   In preparation for the hearing, Dr. Woods requests to meet with Mr. Barrett for a period of no less than six (6) hours. The reasons supporting his request are set out in the declaration by Dr. Woods, attached hereto, Appendix A.  They include his desire to refresh his memory regarding the evaluation conducted approximately seven (7) years ago, to determine the impact of continued structured institutionalization on Mr. Barrett's mental health as it relates to his 2009 state of mental health and to prepare for rebuttal testimony, if necessary, to the government's named experts, particularly Dr. Steven Pitt, who pursuant to this Court's Order is scheduled to evaluate Mr. Barrett prior to January 20, 2017.  See Appendix A.

4.   Mr. Barrett has a right to secure reasonably necessary expert assistance.  18 U.S.C. § 3599(f).  For the reasons stated in the Tenth Circuit's opinion and in Dr. Woods' attached declaration, the requested access is necessary for adequate and competent representation of Mr. Barrett at his evidentiary hearing.

Petitioner's Motion For Access To
Petitioner By George Woods, M.D.        – Page 2

5.  Because this motion concerns Mr. Barrett's litigation strategy, it should be considered *ex parte*, requiring no response from the government. However, as a matter of courtesy, Mr. Barrett, through counsel, advised the government of their intent to request access to Petitioner by Dr. Woods.  On January 9, 2017, the government's counsel, Assistant United States Attorney Chris Wilson advised Petitioner's counsel that the government opposes the motion.

6.  Mr. Barrett has a Sixth Amendment right to the assistance of counsel, which includes access to expert witnesses.  He has a Fifth Amendment due process right to a full and fair adjudication of his ineffective assistance of counsel claim.  He has an Eighth Amendment right to a reliable and accurate capital sentencing proceeding.  Denial of this request will violate those constitutional rights.

7.  Mr. Barrett is compelled to seek this order only because the prison in which Mr. Barrett is being held has changed its internal policies since Mr. Barrett's prior evaluation by Dr. Woods. The prison now requires a court order before it will permit an expert witness to see Mr. Barrett.

WHEREFORE, Petitioner respectfully requests that this Court enter an Order granting access to Petitioner by Dr. Woods, as follows:

1. Dr. Woods shall be granted access to Mr. Barrett for no less than six (6) hours to evaluate, interview and obtain information from Petitioner at the USP Terre Haute, at a time convenient to Dr. Woods and USP Terre Haute;

2. Dr. Woods shall be provided a private place to meet with Petitioner that permits face-to-face access without a glass barrier so the interview can be conducted under confidential and privileged conditions;

3. Petitioner's hands shall not be shackled during the interview;

4.  Dr. Woods shall comply with any and all instructions and directives of prison staff;

and

5.  Prison staff shall not be present or within earshot of the interview.

DATED this 11th day of January, 2017

RESPECTFULLY SUBMITTED,

/s/ Joan M. Fisher
JOAN M. FISHER

/s/ David Autry
DAVID AUTRY

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Motion For Access To
Petitioner By George Woods, M.D.        – Page 4

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 11th day of January, 2017, I caused the foregoing [Opposed] Petitioner's Motion for Access to Petitioner by George Woods, M.D. to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

DATED:  January 11, 2017

/s/ Joan M. Fisher
JOAN M. FISHER

Petitioner's Motion For Access To
Petitioner By George Woods, M.D.        – Page 5

# APPENDIX A

## DECLARATION OF GEORGE W. WOODS, JR., M.D.

I, George W. Woods, M.D., declare as follows:

1. I am a licensed physician specializing in psychiatry and neuropsychiatry. I currently maintain a private practice focusing on neuropsychiatry, psychopharmacology, workplace safety, and forensic consultations.

2. At the request of counsel representing Kenneth Barrett, I performed a neuropsychiatric evaluation to determine whether Mr. Barrett suffers from any mental disease or defect and, if so, what functional impact his condition may have had before, during and after the commission of his current commitment offense. In order to complete this assessment, I evaluated Mr. Barrett, including conducting a structured clinical interview, at the federal prison in Terre Haute, Indiana, over the course of two full days on February 17 and 18, 2009.

3. Counsel advises that an evidentiary hearing in which I will be called to testify to my professional findings regarding Mr. Barrett's mental health is now scheduled to commence on March 13, 2017.

4. In anticipation and preparation for my testimony, it will be helpful and useful to the accuracy and completeness of my testimony to see and re-interview Mr. Barrett prior to testifying. The reasons for so doing include:

   a. Because it has been very nearly ten (10) years since my evaluation, seeing Mr. Barrett will significantly aid my testimony by refreshing my recollection and allowing me to carefully consider the prior evaluation and professional opinions;

1

462

b. The ability to view Mr. Barrett at the present time after more than ten years in a highly structured environment will significantly aid and enhance my ability to explain and assist the court in understanding Mr. Barrett's mental health in 2005.

c. It will also aid in determining whether the symptoms and behaviors previously observed are stuck in stone or if there have been changes as a function of age or institutionalization or other facts, all of which may need to be carefully considered and explained to the court.

d. I am given to understand that a government's expert witness will evaluate Mr. Barrett and may be called to testify as to any professional opinion he adopts as a result of the evaluation. It will be helpful to see what the government witness sees.

5. In sum, it is my professional opinion that my testimony will be enhanced and of greater assistance to the court in the decisions to be made if I am able to meet and interview Mr. Barrett before testifying to the professional observations, conclusions and opinions derived from the 2009 evaluation.

6. It is also my understanding that I may be called in rebuttal to respond to the government's mental health experts, at least one of whom will have evaluated Mr. Barrett as recently as this month. In order to fully assess the accuracy and reliability of government expert's evaluation, it is necessary, or at the very least, useful to see Mr. Barret at or near the same time.

7. I am available to meet with Mr. Barrett at the USP- Terre Haute facility Wednesday – Friday and will need approximately _____6_____ hours.

2

I declare under the penalty of perjury under the laws of the State of California and the United States of America that the foregoing is true and correct and was executed on January 7, 2017.

/s/ *George W. Woods*
George W. Woods, Jr., M.D.

3

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com, nitawright73@yahoo.com), Joan M.
Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:869374@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 1/12/2017 at 1:12 PM CST and filed on 1/12/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 286(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 1/13/2017 (Re: [285] Petitioner's Opposed MOTION FOR ACCESS TO PETITIONER BY GEORGE WOODS, M.D.). (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT     )
                        )
     Movant,             )
                        )     Case No. 09-CV-00105-JHP
v.                     )
                        )
UNITED STATES OF AMERICA,     )
                        )
     Respondent.       )

## GOVERNMENT RESPONSE IN OPPOSITION TO MOTION FOR ACCESS TO PETITIONER BY GEORGE WOODS, MD

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and files this response in opposition to Movant's motion for access to petitioner by George Woods (Doc. 285).

## PRELIMINARY STATEMENT

Following the affirmance of his convictions for three homicide crimes and the imposition of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255, relying in part on a mental health evaluation by Dr. George Woods. Doc. 95 Exh. 117. This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222). The Tenth Circuit Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and personal history. Doc. 230. In anticipation of the hearing, this Court has permitted the government to conduct a mental health evaluation of the defendant in order to investigate rebuttal evidence under Federal Rule of Criminal Procedure 12.2. Doc. 269 at 14. On January

1

11, 2017, Barrett moved to have Dr. Woods reevaluate him at U.S. Penitentiary, Terre Haute.

Doc. 285.  The Court ordered this expedited response.  Doc. 286.

## ARGUMENT

### CONSISTENT WITH ITS EARLIER ORDERS, THE COURT SHOULD DENY FURTHER MENTAL HEALTH EVALUATIONS BY DR. WOODS

Citing the Constitution, Barrett asks this Court to order the Bureau of Prisons ("BOP") to permit Dr. Woods to evaluate him in an undivided visiting room.  Barrett further requests that the Court bar BOP from physically restraining him during the evaluation or placing staff within earshot of the visiting room.  Doc. 285.  Barrett cannot demonstrate any legal right to the evaluation, and this Court has previously indicated that it sees limited utility in contemporaneous mental health evaluations by defense experts, given the existing record.  It should therefore deny the requested evaluation.  However, if the Court is inclined to grant the motion, the government asks that it permit BOP to determine the appropriate security measures and date for the evaluation.

The Constitution does not vest Barrett with any right to the requested mental health evaluation, by way of the rights to counsel, due process or freedom from cruel and unusual punishment.  Defendants do not have a Sixth Amendment right to counsel during collateral proceedings.  The Sixth Amendment right to counsel guarantees assistance "when the accused [is] confronted with both the intricacies of the law and the advocacy of the public prosecutor." *United States v. Ash*, 413 U.S. 300, 309 (1973).  Furthermore, convicted defendants do not have the same due process rights as those presumed innocent under the law.  *Dist. Attorney's Office for Third Judicial Dist. v. Osborne*, 557 U.S. 52, 68-69 (2009) (citing *Herrera v. Collins*, 506 U.S. 390, 399 (1993)).  Thus, the Due Process Clause of the Fifth Amendment does not guarantee the right to any particular investigative tools. *See Pennsylvania v. Finley*, 481 U.S.

2

551, 559 (1987). Furthermore, the Eighth Amendment does not vest convicted capital defendants with any right of assistance during collateral proceedings. *See Murray v. Giarratano*, 492 U.S. 1, 10 (1989). Finally, capital defendants lack any statutory right to expert assistance during collateral review. *See* Doc. 276 at 1.

Accordingly, Barrett cannot sustain his arguments that the Constitution guarantees him the right to the requested mental health evaluation, and he has otherwise failed to justify the need for one as a factual matter. As this Court has observed, Barrett's defense has obtained evaluations by four experts, psychologist Bill Sharp, psychologist Myla Young, psychologist Jeanne Russell, and neuropsychiatrist George Woods. *See* Doc. 279 at 2-3. In view of those evaluations, the Court has expressed skepticism that a current assessment will provide "insight . . . regarding mitigating evidence which was available to counsel at the time of Petitioner's criminal trial." *Id*. at 3. Here, Barrett requests an evaluation by Dr. Woods, an expert who already authored a 28-page declaration, so the witness can refresh his recollection and prepare rebuttal to the government's case in light of "the impact of continued structured institutionalization." Doc. 285 at 2. Certainly, Dr. Woods can refresh his recollection with his own notes and reports. As to the notion that he requires a new evaluation to rebut the government's case, that argument finds no basis in law or reason.

Barrett has no right of rebuttal in this context. This Court has indicated that the upcoming hearing will explore the impact of a foregone penalty phase trial conducted within the bounds of Federal Rule of Criminal Procedure 12.2. Doc. 269. Rule 12.2 does not provide Barrett with a right to seek rebuttal evidence. *See United States v. Sampson*, 82 F. Supp. 3d 502, 513 (D. Mass. 2014) (holding that Rule 12.2 seeks to protect the *government's* right of rebuttal, among other things). In fact, this Court has observed "The right of the government to offer

rebuttal evidence of the defendant's mental condition would be meaningless unless the government is provided an opportunity to conduct discovery on this issue." Doc. 269 at 14. The right of the government to offer rebuttal evidence would be just as meaningless if Barrett could now obtain new diagnoses expressly intended to upend any findings by the prosecution's expert.

Furthermore, the requested evaluation appears superfluous to any effort by Dr. Woods to preemptively attack possible government evidence. According to Barrett, Dr. Woods intends to determine the extent to which incarceration has stabilized Barrett's mental health. Doc. 285 at 2. Presumably, Dr. Woods intends to rely on such findings to blunt any government evidence that Barrett does not presently suffer from a major mental illness. But Dr. Woods presaged such testimony in his 2009 declaration, asserting that "Mr. Barrett was unable rationally to assist his attorneys in the preparation of his trial. His triad of neuropsychiatric impairments . . . were not bound, as they are today, in a structured environment without the overwhelming stress Mr. Barrett was facing at the time of trial." Doc. 95 Exh. 117 ¶ 81. Barrett fails to explain why Dr. Woods would need to reassess him to reach the same conclusion now.

Assuming the Court does grant the requested meeting, the Bureau of Prisons has informed government counsel that it will visually monitor the visit if the Court grants Barrett's request to attend the meeting without restraints. It will only permit Barrett to attend the meeting without handcuffs if such an arrangement is required to complete the evaluation. As previously noted, the prison only accommodates such visits between 8:00 a.m. and 3:30 p.m., and prefers a 3:00 p.m. cutoff. Further, the institution requests that any order for an evaluation not specify a date, so that it can react to unanticipated emergencies.

## CONCLUSION

The government respectfully urges this Court to deny Barrett's request for a new mental health evaluation by Dr. George Woods.

Dated: January 13, 2017,

Respectfully submitted,

MARK F. GREEN
United States Attorney

CHRISTOPHER J. WILSON
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov


*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

471

**CERTIFICATE OF SERVICE**

I, hereby certify that on January 13, 2017, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry: dbautry44@hotmail.com

Joan M. Fisher joan.fisher@fd.org, Paul_Mann@fd.org, jmfisher@turbonet.com

/S. *Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney

471

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## **ORDER**

This matter comes before the Court on Petitioner's Motion for Access to Petitioner by George Woods, M.D. (Dkt. # 285). The respondent has filed a response opposing said motion (Dkt. # 287).

According to Petitioner's Motion, Dr. Woods desires "to meet with Mr. Barrett for a period of no less than six (6) hours" in order to refresh his memory regarding an evaluation he conducted approximately seven (7) years ago, "to determine the impact of continued structured institutionalization on Mr. Barrett's mental health as it relates to his 2009 state of mental health and to prepare for rebuttal testimony, if necessary, to the government's named experts, particularly Dr. Steven Pitt . . . . . . . ." Dkt. # 285, at ¶ 3. In its objection, the government correctly identifies the reason the Court authorized the government to conduct a mental health evaluation of the defendant, *i.e.* to rebut defendant's mental health evidence pursuant to Fed.R.Cr.P. 12.2.

As this Court has pointed out on several occasions, the Tenth Circuit Court of Appeals has remanded this § 2255 proceeding for an evidentiary hearing on two very limited issues - whether or not trial counsel's performance was deficient during the penalty phase of trial for failing to investigate defendant's background and mental health; and, if so, whether the defendant suffered prejudice. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015). In considering the appellate court's order, this Court is reminded that the defendant's trial in federal court was somewhat different than a normal criminal federal trial. In particular, two state court trials had occurred prior to the defendant being indicted in federal court. As a result, substantial information was available to trial counsel regarding the evidence against the defendant, as well as background information which had been accumulated by the state court defense counsel for use, if necessary, in the anticipated penalty phases of those trials. This Court interprets the appellate court's order as directing this Court to ascertain these issues within the parameters of the evidence which was available to defense counsel in 2005. Petitioner's mental health in 2017 is not very useful to this Court's determination regarding his mental health in 2005.

If the government had been provided notice of Dr. Woods proposed testimony, at the time of trial, the government would have had an opportunity to examine the defendant with a similarly qualified expert. After the government's proposed expert examined the defendant, the defendant's expert would not have needed an additional examination because the two examinations would have occurred close in time such that each expert would have hopefully observed the same behaviors regardless of how those behaviors were characterized

2

by the respective experts.  Asking Dr. Woods to remember his prior evaluation of Mr. Barrett approximately eight (8) years after his examination such that he can explain his prior evaluation is not realistic.  As a result, this Court hereby grants Petitioner's motion to allow Dr. Woods to re-interview Mr. Barrett.  Both parties, however, are reminded that the focus of any mental health testimony at the upcoming evidentiary hearing should be Mr. Barrett's background and mental health at the time of his criminal trial before this Court in late 2005 as opposed to his mental health in 2017.

For the reasons stated herein, it is hereby ordered that:

1.  Dr. George W. Woods shall be granted access to Petitioner, Kenneth E. Barrett, at the USP-Terre Haute Institution, in Terre Haute, Indiana, on a day to be agreed upon by the parties prior to February 10, 2017 and access on that day shall be allowed between the hours of 8:00 a.m. and 3:00 p.m.

2.  Dr. George W. Woods shall comply with any and all instructions and directives of prison staff.

3.  To the extent security allows, Dr. Woods shall be provided as much privacy as possible when meeting with Mr. Barrett.

It is so ordered on this 18th day of January, 2017.

James H. Payne
United States District Judge
Eastern District of Oklahoma

3

474

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,            )
                                   )
     Petitioner/Defendant,         )
                                   )          Case No. CV-09-00105-JHP
  v.                               )
                                   )
UNITED STATES OF AMERICA,          )
                                   )
     Respondent/Plaintiff.         )

**GOVERNMENT'S MOTION TO EXCLUDE PROPOSED WITNESSES**

**MARK F. GREEN**
United States Attorney
Eastern District of Oklahoma

CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**GOVERNMENT'S MOTION TO EXCLUDE PROPOSED WITNESSES**

## TABLE OF CONTENTS

PROCEDURAL HISTORY ........................................................................................................ 2

ARGUMENT .......................................................................................................................... 2

THE COURT SHOULD LIMIT BARRETT TO WITNESSES WHO CAN TESTIFY ABOUT FOREGONE PENALTY PHASE EVIDENCE ........................................................................ 2

    A.   Proposed Witnesses with Knowledge of Guilt Phase Issues ........................................... 4

    B.   Proposed Witnesses to Current Mental Health Opinions.................................................. 7

    C.   Proposed Witnesses Whose Testimony Does not Relate Back to an Existing Claim.... 10

    D.   Proposed Witnesses Whose Testimony Does not Relate to Any Current Issue............. 12

CONCLUSION...................................................................................................................... 16

# TABLE OF AUTHORITIES

**Cases**

*Bobby v. Van Hook*, 558 U.S. 4, 7, 10-12 (2009) ........................................................................ 13

*Bonfillo v. United States*, Civil no. 15-1015, 2016 WL 6124487 (W.D. Pa. Oct. 20, 2016).......... 3

*Breechen v. Reynolds*, 41 F.3d 1343 (10th Cir. 1994)................................................................... 8

*Cullen v. Pinholster*, 563 U.S. 170 (2011).................................................................................... 3

*Dean v. United States*, 278 F.3d 1218 (11th Cir. 2002)................................................................ 11

*Mayle v. Felix*, 545 U.S. 644 (2005)............................................................................................. 11

*Strickland v. Washington*, 466 U.S. 668 (1984) ...................................................................... 8, 13

*Thomas v. Gilmore*, 144 F.3d 513 (7th Cir. 1998)........................................................................ 8

*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007)............................................................. 2

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015).................................................. 2, 3, 8, 13

*United States v. Basham*, 561 F.3d 302 (4th Cir. 2009) ............................................................... 3

*United States v. Espinoza-Saenz*, 235 F.3d 501 (10th Cir. 2000)................................................ 11

*United States v. Francischine*, 512 F.2d 827 (5th Cir. 1975) ....................................................... 3

*United States v. Guerrero*, 488 F.3d 1313 (10th Cir. 2007) ....................................................... 10

*United States v. Lujan*, 603 F.3d 850 (10th Cir. 2010).................................................................. 3

*United States v. McVeigh*, 153 F.3d 1166 (10th Cir. 1998)........................................................... 3

*United States v. Weeks*, 653 F.3d 1188 (10th Cir. 2011)............................................................. 11

*United States v. Willis*, 202 F.3d 1279 (10th Cir. 2000)............................................................. 10

*Wiggins v. Smith*, 539 U.S. 510 (2003)......................................................................................... 3

**Statutes**

18 U.S.C. § 3593.............................................................................................................................. 3

28 U.S.C. § 2255 .................................................................................................... 2, 3, 4, 5, 10

**Rules**

Federal Rule of Criminal Procedure 12.2 ........................................................................ 9

Federal Rule of Evidence 401 ......................................................................................... 3

Local Civil Rule 7.1(g) .................................................................................................... 1

Local Criminal Rule 12.1.................................................................................................. 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,                )
                                       )
            Petitioner/Defendant,      )
                                       )        Case No. CV-09-00105-JHP
    v.                                 )
                                       )
UNITED STATES OF AMERICA,              )
                                       )
            Respondent/Plaintiff.      )

### GOVERNMENT'S MOTION TO EXCLUDE PROPOSED WITNESSES

COMES NOW the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order excluding Paul Gordon, Edward Hueske, George Kirkham, Charles Sanders, Janesse Thomas, Mike Mackey, Billy Poindexter, Dewey Padgett, Hon. John Garrett, Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy, Pablo Stewart, Gaylan Warren, Richard Burr, Julia O'Connell, Susan Otto, Gary Philpot, John Philpot, Amanda Grizzle and Christine Calbert as witnesses for the upcoming evidentiary hearing in this matter. The government also urges the Court to order Barrett to provide an offer of proof, so that it can determine the relevance and timeliness of testimony from proposed witnesses Dale Anderson, Isaac Barrett, Tamara Bedwell, Faust Bianco, Courtney Burke, Cindy Crawford, Martin Daggs, Sharon Greenfeather, Robert Gude, Scharlette Holdeman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stovell, Jan Walkingstick and Randy Weaver. Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, government counsel consulted by e-mail with Barrett's attorney, David Autry, who opposes this motion.

1

## PROCEDURAL HISTORY

Barrett's was convicted of three homicide offenses he committed when a state police tactical unit attempted to serve a warrant at his home. The trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment on appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008). This Court subsequently denied § 2255 relief on all grounds. Doc. 214. On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to determine whether trial counsel, Roger Hilfiger and Bret Smith, ineffectively failed to investigate and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

In accordance with this Court's scheduling order (Doc. 246), Barrett provided the government with a list of 71 proposed witnesses for appearance at the evidentiary hearing (Ex. 1), by declaration or live testimony. The government respectfully asks this Court to issue an order that limits Barrett to witnesses who can offer testimony relevant to the issue on remand. Barrett's attorneys object to this request.

## ARGUMENT

### THE COURT SHOULD LIMIT BARRETT TO WITNESSES WHO CAN TESTIFY ABOUT FOREGONE PENALTY PHASE EVIDENCE

This Court has noted the limited nature of the hearing contemplated by the Tenth Circuit, explaining that it "expects to hear live testimony from trial counsel whose conduct is at issue but otherwise encourages the submission of written exhibits in lieu of live testimony." Doc. 246. The hearing has one purpose: "to determine what evidence could have been presented at the

2

480

sentencing phase of Petitioner's trial in 2005 and whether Petitioner was prejudiced as a result of a lack of presenting that evidence in his trial." Doc. 248. More specifically, the Court has observed "The Tenth Circuit has not allowed this evidentiary hearing for the purpose of trying to resurrect issues which have been fully resolved." Doc. 279 at 1 (further noting that questions regarding intent are irrelevant to the upcoming hearing).

Despite the narrow scope of the upcoming hearing, Barrett appears intent upon calling witnesses who can only offer irrelevant testimony. The Federal Rules of Evidence generally apply to evidentiary proceedings under 28 U.S.C. § 2255. *United States v. Francischine*, 512 F.2d 827, 829 (5th Cir. 1975); *see Bonfillo v. United States*, Civil no. 15-1015, 2016 WL 6124487, *7 (W.D. Pa. Oct. 20, 2016). While the upcoming § 2255 hearing concerns the presentation of evidence at a capital penalty phase proceeding, relevance remains a threshold concern, despite the liberal evidentiary provision of the Federal Death Penalty Act, 18 U.S.C. § 3593(c). *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010). Relevance has the same meaning under § 3593(c) as it does under Federal Rule of Evidence 401. *Lujan*, at 854. (citing *United States v. McVeigh*, 153 F.3d 1166, 1212-13 (10th Cir. 1998) and *United States v. Basham*, 561 F.3d 302, 331-32 (4th Cir. 2009)). Specifically, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information]." Fed. R. Evid. 401.

As the Tenth Circuit recognized in this case, "'as a general rule counsel has a duty to pursue leads indicating a defendant's troubled background and diminished mental capacity.'" *Barrett*, 797 F.3d at 1223 (quoting *Wiggins v. Smith*, 539 U.S. 510, 523-25 (2003). However, "'[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the

3

481

variety of circumstances faced by defense counsel or the range of legitimate decisions.'" *Id.* (citing *Cullen v. Pinholster*, 563 U.S. 170, 195 (2011)).

    A.  Proposed Witnesses with Knowledge of Guilt Phase Issues

It appears that Barrett intends to call nine witnesses who can offer testimony relevant only to guilt phase issues that have been disposed of during the course of this litigation. Specifically, Barrett proposes to call Paul Gordon, Edward Hueske, George Kirkham, Charles Sanders, Janesse Thomas, Billy Poindexter, Mike Mackey, Dewey Padgett, and the Honorable John Garrett. Ex. 1. This Court has recognized that guilt phase evidence is inconsequential to the upcoming hearing, and it should bar witnesses who cannot offer relevant testimony.

Paul Gordon was an Oklahoma Highway Patrol investigator who criticized his agency's tactical entry on Barrett's property, which gave rise to the homicide in this case. Though Gordon did not testify in this trial, the defense frequently alluded to him. *See e.g.*, Tr. 3:630, 632; 4:686, 812, 816; 5:1071, 1075, 1119-20, 1129, 1142-43; 6:1204, 1291-94, 1297-98, 1325, 1329-30; 7:1549, 1559; 17:4040-41, 4047-51. Barrett later proffered Gordon in support of a failed motion to supplement his § 2255 motion and in his first motion to file a second or subsequent § 2255 motion. Doc. 201; 10th Cir. case no. 16-7035 Doc. 01019619073. At no time, has Barrett suggested the Mr. Gordon has knowledge of the defendant's mental health or social history.

Edward Hueske is a crime scene reconstruction expert, who consulted with Barrett's defense during his state trials. During the federal trial, this Court authorized the defense to hire Hueske, but they elected not to do so, prompting a claim of ineffective assistance of counsel. Doc. 95 at 127-39. Barrett has never suggested that Hueske has personal knowledge of him, and

4

there exists no reason to suspect that he can offer any information about the defendant's mental health or social history.[1]

George Kirkham is a police tactics expert. As with Hueske, this Court authorized funds to hire Kirkham, but the defense elected to forgo his testimony, prompting a guilt-phase § 2255 claim of ineffective assistance of counsel. Doc. 95 at 139-43. According to Barrett, Kirkham will "address the mitigating circumstance of law enforcement's failure to adequately consider the emotional instability of a known meth user with other evident mental health issues in the planned execution of the search warrant." Doc. 280 at 3. Barrett also proffers Kirkham "to address the mitigating circumstance of law enforcement's failure to adequately consider the emotional instability of a known meth user with other evident mental health issues." *Id.* But Barrett did not offer a mitigator based on the alleged errors of the Tact team, and no so such omission is at issue on remand. Barrett offers no reason to believe that the proposed witness can offer any relevant testimony about his mental health, social history, or communications with counsel.

Charles Sanders, the confidential informant described in the state search warrant affidavit, testified that Barrett often had methamphetamine at his residence and that he had observed Barrett sell methamphetamine from his residence. Tr. 11: 2511, 2515, 2520-22, 12: 2631-33. Sanders further testified that Barrett knew of the warrant for his arrest, kept firearms, and had threatened to kill law enforcement officers if they attempted to serve the warrant. According to Sanders, Barrett said that he hoped the first people through his door were either Sheriff Philpot or Drug Task Force Agent Frank Lloyd. Tr. 11: 2515. Barrett's § 2255 motion

---

[1] Barrett did not list Hueske in his written summary of anticipated expert testimony (Doc. 208). If he intends to offer Hueske as an eyewitness to some factual matter, perhaps related to counsel's performance, the government objects that the testimony will relate back to the sole timely-presented issue remaining in this case. *See generally*, *infra*, § C; 28 U.S.C. § 2255(f).

5

made frequent reference to Sanders, but never indicated that the putative witness had any knowledge of his mental health or social history. Indeed, Barrett complained at length that his trial attorneys failed to adequately impeach Sanders or otherwise establish his lack of reliability. *See e.g.* Doc. 95 at 44-47, 81-108. Barrett provides no hint why he would present a witness whose testimony he has previously attempted to undermine, and nothing in the record indicates that Sanders could provide meaningful insight into the issues before the court – the defendant's social history and mental health.

Janesse Thomas was offered in the § 2255 motion as someone who could impeach and contradict Sanders. Doc. 95 at 266. This Court disposed of that issue, which the Court of Appeals neither considered nor revived. Doc. 214; *see* Doc. 279 at 1-2. As to the existing issues, Ms. Thomas is an unlikely witness. She became acquainted with Barrett in the mid-1990s, occasionally received drugs him, and last saw him about a year before the murder. Doc. 174 Ex. 3. She is not a mental health expert and knew the defendant briefly during his adulthood. It does not appear that she can offer any testimony about the defendant's social history or emotional well-being.

Barrett proffered Billy Poindexter as a witness who could have impeached Charles Sanders. Doc. 95 Exh. 76. Poindexter's declaration provides no hint that he had any acquaintance with Barrett, Barrett's family, or Barrett's mental health. *See id.* Barrett did not rely on Poindexter's declaration in the claim that gave rise to the upcoming hearing. *See* Docs. 95 at 185-42, 149 at 102-25, 178 at 69-112. Seemingly, Poindexter lacks any relevant knowledge of the issues before this Court.

Like Thomas and Poindexter, Michael Mackey was offered in the § 2255 motion as someone who could impeach a guilt phase trial witness. Specifically, Barrett offered Mackey to

6

484

impeach Cindy Crawford.  Doc. 95 Ex. 88.  It appears Mackey ranches cattle in Alva, Oklahoma,

and has no known connection to the defendant's family or any expertise in mental health.  As

such, it does not appear he can offer any testimony relevant to the pending issues.

In the § 2255 motion, Barrett proposed that Dewey Padgett, a barber in Sallisaw, could

testify about the defendant's mental state as a possible defense to the substantive charges.  Doc.

95 at 56 (citing Doc. 95 Exh. 79).  Padgett's declaration does not, however, offer any insight into

Barrett's mental health or social history.  Doc. 95 Exh. 79.  Rather, it offers lay opinions about

the conduct of the police raid and the subsequent federal prosecution of the defendant.  *Id*.

Assuming those opinions provided some support for the claim in which Barrett cited them, they

certainly provide no insight into the issues remaining in the case.  Moreover, the declaration

indicates that the witness could offer little more than hearsay accounts of any relevant fact.

Judge John Garrett presided over Barrett's two state trials regarding the Eales homicide.

According to Barrett's Motion to Amend his § 2255 action, Judge Garrett could have provided

character testimony about two guilt phase witnesses, Charles Sanders and Clint Johnson.  Doc.

201.  Barrett also argued that Garrett could have offered testimony that would have led this Court

to deny a request for the defendant to wear a stun belt during trial.  None of the knowledge

Barrett has attributed to the state court judge concerns the penalty phase generally, or the issues

before this Court specifically.  Certainly, there is no reason to believe that Judge Garrett would

have presided over the murder trials of a personal acquaintance or, by extension, any reason to

think that he has any knowledge of the defendant's mental health or social history.

The Court should exclude the irrelevant testimony of Gordon, Hueske, Kirkham, Sanders,

Thomas, Poindexter, Mackey, Padgett, and Garrett.

B.  Proposed Witnesses to Current Mental Health Opinions

Barrett intends to call several expert witnesses who can offer opinion that was not available to trial counsel or event § 2255 counsel at the time they filed their last of four § 2255 motions. *Cf.* Docs. 1, 2, 70 & 95. Specifically, Barrett proposes to call Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy, and Pablo Stewart. Ex. 1; Doc. 280. The proposed witnesses will offer testimony about present-day evaluations and opinions that Barrett has never claimed were available to trial counsel or constitutionally necessary for his case.

To establish that counsel's performance was deficient, Barrett must establish counsel made errors so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland v. Washington*, 466 U.S. 668, 687 (1984). Under this test, the Court determines "not what is prudent or appropriate, but only what is constitutionally compelled." Doc. 214 at 136 (quoting *Breechen v. Reynolds*, 41 F.3d 1343, 1365 (10th Cir. 1994)). Under the Constitution, "[a] reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Id.* at 144 citing *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998)).

In its opinion remanding this case, the Court of Appeals found that trial counsel did not present potentially persuasive mental health evidence and "apparently did little to investigate [Barrett's] background or mental health." 797 F.3d at 1224, 1225. As such, the Tenth Circuit ordered resolution of three discrete questions: did counsel have indications that they should undertake a mental health investigation, did Barrett resist the presentation of evidence about his upbringing, and did counsel make an informed decision to portray Barrett as a beloved family member, rather than a mentally ill product of a dysfunctional home? *See id.* at 1226-29. The Tenth Circuit also asked this Court to determine the likely impact of mental health and social

8

history evidence identified in the § 2255 motion in light of the government's response.  *Id*. at 1229-32.

The Tenth Circuit did not ask this Court to undertake a dress rehearsal for a wholly reconceived penalty phase trial as presented by defense attorneys unburdened by budget constraints or Rule of Criminal Procedure 12.2. In line with its limited mandate, this Court has recognized the existing mental health evaluations performed by Bill Sharp, Myla Young and George Woods.  Doc. 279 at 2-3.  But the Court has also stated that it does not believe contemporaneous evaluations provide "any insight . . . regarding mitigating evidence which was available to counsel at the time of Petitioner's criminal trial."  *Id*. at 3.

Nonetheless, Barrett proposes that Erin Bigler would testify to his neuropsychological functioning, cognitive impairment, history of head trauma, and/or brain damage . . . . [and possibly] etiologies of Mr. Barrett's brain damage."  Doc. 280 at 2.  Thomas Kosten would testify about "review of Mr. Barrett's psychiatric, medical, and substance abuse histories; his social history; his review of prior evaluations of Mr. Barrett; and/or his own clinical evaluation of Mr. Barrett."  *Id*. at 4.  Deborah Miora would testify about "Barrett's psychological and neuropsychological functioning at the time of the offense" based on the opinions of Myla Young, Bill Sharp and George Woods.  *Id*.  Thomas Reidy would testify about a risk assessment of Barrett and "opine on the validity of various measures and techniques used in violence risk assessment as related to predicting "future dangerousness" in a prison context."  *Id*. at 4-5.  Pablo Stewart would opine about Barrett's ability to "perceive, understand, assess or evaluate and make judgments under the conditions at issue."  *Id*. at 5.

Using these new experts, it appears Barrett intends to exploit the evidentiary hearing to present irrelevant opinion testimony meant to fortify existing theories or blunt the impact of

9

government-sponsored testimony. Barrett seems anxious to reiterate existing opinions about his mental health, reduce the impact of his drug abuse on mitigation evidence, and blunt the psychopathy diagnosis offered by a government expert.[2]

The Tenth Circuit did not remand this case to determine if counsel could have presented a stronger case given the advantages of infinite resources, infinite time and infinite hindsight. The only existing claim stems from a failure to call Myla Young and George Woods. The trial record provides no reason to believe counsel would have reason to have retained or presented Bigler, Kosten, Miora, Reidy, or Stewart. Accordingly, their putative testimony appears irrelevant, and the Court should exclude it.

C. Proposed Witnesses Whose Testimony Does not Relate Back to an Existing Claim

Barrett intends to call Gaylan Warren, who would offer testimony about facts in support of untimely claims or facts that would render existing claims untimely. Ex. 1; Doc. 280. As such, this Court should bar Warren's testimony. Additionally, several other listed witnesses have no apparent involvement in the issue before this Court, which should require an offer of proof that their testimony is relevant and relates back to the remaining habeas claim.

The Antiterrorism and Effective Death Penalty Act of 1996 imposes a one-year period of limitations in which federal prisoners may seek collateral relief from criminal judgments. 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000). The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from a direct appeal. *Willis*, 202 F.3d at 1280-81. The limitation period bars untimely amendments that add new claims to an initial § 2255 motion. *United States v. Guerrero*, 488

---

[2] With one expert, Reidy, Barrett seeks to adduce evidence to rebut a dangerousness aggravator that the jury rejected at trial. *See* Trl. Doc. 258 at 13-18.

10

F.3d 1313, 1316 (10th Cir. 2007).  The limitation period is not an absolute bar to revisions: §

2255 movants may make untimely amendments that relate back to existing claims.  *United States*

*v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000).  An amendment that "clarifies or

amplifies" an existing claim relates back to the original motion.  *United States v. Weeks*, 653

F.3d 1188, 1206 n.12 (10th Cir. 2011) (quoting *Espinoza– Saenz*, 235 F.3d at 505); *see also*

*Mayle v. Felix*, 545 U.S. 644, 655 (2005) (holding amendments relate back "if the original and

amended pleadings arise out of the same conduct, transaction, or occurrence").  Thus, a proposed

amendment may not introduce a new theory based on facts different from those underlying

existing issues.  *See Dean v. United States*, 278 F.3d 1218, 1221 (11th Cir. 2002).

 Gaylan Warren is a criminologist in the State of Washington.  Barrett proposes that he

will testify about "matters in mitigation regarding perception and response time in shooting

incidents, inconsistent testimony presented in the purported execution of a nighttime search

warrant . . . and whether or not emergency lights as described as described by some of the

witnesses would have, in fact, served as notice."  Doc. 280 at 6.  The testimony described bears

no meaningful relation to the issue on remand – whether trial counsel ineffectively investigated

and presented evidence of Barrett's mental health and social history.  Instead, it appears to

support theories this Court has already rejected.  Alternatively, the proposed testimony would

alter the existing claim in a manner that introduces a new theory based on facts different from

those in the existing issue.

 Additionally, several other listed witnesses have no apparent connection to Barrett's

claim of ineffectiveness, as the defendant did not identify them in support of the contention.  *See*

Docs. 95 at 185-242, 149 at 102-25, and 178 at 69-112.  Specifically, Barrett has named Dale

Anderson, Isaac Barrett, Tamara Bedwell, Faust Bianco, Courtney Burke, Cindy Crawford,

11

489

Martin Daggs, Sharon Greenfeather, Robert Gude, Scharlette Holdeman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stovell, Jan Walkingstick and Randy Weaver.  This Court should require an offer of proof to determine whether those individuals can offer relevant testimony that relates back to the existing issue.

  D. <u>Proposed Witnesses Whose Testimony Does not Relate to Any Current Issue</u>

  This Court should bar the testimony Richard Burr, Julia O'Connell, Susan Otto, Gary Philpot, John Philpot, Amanda Grizzle and Christine Calbert, who can testify to facts and opinions that do not relate to any issue before the Court.  Ex. 1; Doc. 280.  Unlike the other witnesses at issue in this motion, these seven appear to have knowledge about counsel or penalty phase evidence.  Nonetheless, the testimony of the aforementioned seven still will not illuminate the narrow ineffectiveness claim before the Court.

  Richard Burr is a criminal defense attorney who provided a declaration in support of Barrett's § 2255 motion.  *See* Doc. 95 Exh. 118.  The declaration recounted Burr's working relationship with Barrett's former attorney, John Echols, and his low opinion of Mr. Hilfiger.  *Id*. at 2-3.   The declaration also provided a hearsay account of Mr. Echols's frustrations over the pre-trial budgeting process and Burr's efforts to support requests for the authorization of funding.  *Id*. at 3-4.  The declaration recounts Mr. Echols's departure from the case, and the fact that Messrs. Hilfiger and Smith did not thereafter seek Burr's assistance.  *Id*. at 4-5.  According to Barrett, Burr will "also testify to his familiarity with the community standards of prevailing professional norms in the defense of capital clients" around the time of the defendant's trial.  Doc. 280 at 2-3.

  Mr. Burr's relationship with trial counsel is not an issue in this case, nor is his opinion about the prevailing professional norms of practice for this district.  After impliedly relying on

<div align="center">12</div>

Burr's declaration, the Tenth Circuit found that trial counsel "also apparently did little to investigate [Barrett's] background or mental health through his family." 797 F.3d at 1225. The circuit court held, "Typically, this kind of superficial investigation would constitute deficient performance." *Id*. The court then remanded the case for consideration of the reasons why trial counsel elected to present a case in mitigation largely devoid of mental health or social history evidence and – assuming a showing of deficient performance under the circumstances – what prejudicial impact their tactics might have had. *Id*. at 1226-32.

The remand order obviates the need for Burr's putative testimony about his lack of contact with trial counsel or any supposed local norms of practice. The seminal authority in all ineffective assistance claims eschews the application of specific rules of practice:

> [T]he performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances. Prevailing norms of practice as reflected in American Bar Association standards and the like, *e.g*., ABA Standards for Criminal Justice 4–1.1 to 4–8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides. No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Strickland*, 466 U.S. at 688-89; *see Bobby v. Van Hook*, 558 U.S. 4, 7, 10-12 (2009).

In view of *Strickland* and the Tenth Circuit's existing evaluation of counsel's performance, the Court has no need of evidence concerning Burr's opinions about prevailing professional norms. Furthermore, there exists no dispute whether trial counsel consulted with Burr. The government has never attempted to contradict Burr's statements in that regard. *See e.g*.., Doc. 174. Counsel had no professional obligation to seek the views of more experienced defense attorneys, and the Tenth Circuit has already made clear that the investigation undertaken and case presented would constitute deficient performance were it not a product of circumstance.

13

Those circumstances form the crux of the questions raised by the Tenth Circuit.  Given that Burr insists that he did not consult with counsel before trial, he appears uniquely unqualified to provide even second-hand evidence about the relevant influences on counsel's strategies.

Ms. O'Connell is a federal public defender.  According to a declaration she provided in support of Barrett's § 2255 motion, O'Connell turned down an appointment to represent the defendant based on her existing workload.  Doc. 95 Exh. 67 at 1-2.  She further declared that she provided Burr's contact information to Mr. Hilfiger after he left her a message that suggested he had underestimated the time and resources necessary for a complete mitigation investigation.  *Id*. at 3-4.  Ms. O'Connell's scant knowledge of this trial counsel's preparations would not shed light on any issue before the Court.  Her decision to decline an appointment in this matter has no relevance, and her brief correspondence with Mr. Hilfiger does not inform the issues at bar.  Indeed, Ms. O'Connell appears ignorant of the fact that Burr and Hilfiger were acquainted before her introduction.  *See* Doc. 95 Exh. 118 at 2-3.  Because Ms. O'Connell did not participate in the trial defense and appears to lack any knowledge about the circumstances that informed trial counsel's decisions, her testimony would not assist the Court.

Ms. Otto is also a federal public defender.  According to a declaration she provided in support of the § 2255 motion, she advised this Court to appoint Robert Nigh, Gary Peterson or John Echols as trial counsel in this matter.  Doc. 95 Exh. 54 at 2-4.  Ms. Otto also recounted the Court's responses to her suggestions.  Her recollection of the process by which Messrs. Smith and Hilfiger were appointed does not bear on their investigation and presentation of any mitigation evidence, much less that concerning mental health and social history.  Because Ms. Oto did not participate at trial and has no apparent knowledge about the defendant or the bases of trial counsel's actions, her testimony would not assist the Court.

14

John and Gary Philpot were law enforcement officials in Sequoyah County during Barrett's residence there. *See* Trl. Tran. 8:1764 (noting Gary Philpot was chief of the Sallisaw Police Department), 8:1788-89 (noting John Philpot was sheriff of Sequoyah County). While John Philpot's mistreatment of the defendant formed the basis of a mitigating factor (*see* Trl. Doc. 258 at 21, 24 & 27), Barrett never relied on either brother as a witness to his mental health or social history. *See* Docs. 95 at 185-42, 149 at 102-25, 178 at 69-112. Given that the Court took evidence at trial about John Philpott's relationship with Barrett, there exists no reason to further explore the issue. Moreover, Barrett does not suggest that either Philpot brother possesses special knowledge about his family or mental health, much less trial counsel's tactical decision making. As such, it does not appear that either Philpot brother could offer the Court any relevant testimony.

Amanda Grizzle and Christine Calbert were custodians of records at law enforcement agencies in Sequoyah County who provided Barrett with declarations concerning the fate of certain documents. Doc. 95 Exhs. 40 & 42. Barrett has never relied on either individual as a witness to his mental health or social history (*cf.* Docs. 95 at 185-42, 149 at 102-25, 178 at 69-112) and there exists no basis in reason to suspect that they could offer meaningful testimony about those issues or the tactics of trial counsel.

15

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to exclude the testimony of Paul Gordon, Edward Hueske, George Kirkham, Charles Sanders, Janesse Thomas, Mike Mackey, Billy Poindexter, Dewey Padgett, Hon. John Garrett, Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy, Pablo Stewart, Gaylan Warren, Richard Burr, Julia O'Connell, Susan Otto, Gary Philpot, John Philpot, Amanda Grizzle and Christine Calbert and to require an offer of proof as to Dale Anderson, Isaac Barrett, Tamara Bedwell, Faust Bianco, Courtney Burke, Cindy Crawford, Martin Daggs, Sharon Greenfeather, Robert Gude, Scharlette Holdeman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stovell, Jan Walkingstick and Randy Weaver.

Dated: January 30, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150


/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on January 30, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit

17

496

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S MOTION TO EXCLUDE PROPOSED WITNESSES**

EXHIBIT 1

Petitioner's Witnesses for Evidentiary Hearing
Kenneth Barrett v. United States of America, Case No. 09-CIV-105-JHP


Anderson, Dale
P.O. Box 926
Oklahoma City, OK 73070

Barrett, Doris
11260 W. 61st St.
Sapulpa, OK 74066

Barrett, Ernest
By Declaration, Deceased

Barrett, Isaac
PO Box 911
Sallisaw, OK 74955

Barrett, Steve
704 Parkwoods Dr.
Noble, OK 73068

Barrett, Toby
103 588 South 4690 Road
Sallisaw, OK 74955

Bedwell, Tamara
406 S. Poplar St.
Sallisaw, OK 74955

Bianco, Faust, Ph.D.
7146 S. Braden Ave. #500
Tulsa, OK 74136

Bigler, Erin, Ph.D.
Psychology Department
1001 SWKT Brigham Young University
Provo, Utah 84602

Blount, Ada
By Declaration, Deceased

Burke, Courtney
2030 Aspen Dr.
Tahlequah, OK 74464

1

Richard H. Burr
PO Box 525
Leggett, Texas  77350

Calbert, Christine
926 Clifton Ct.
Fort Smith, AR 72903

Cook, Carl
By Declaration, Deceased

Crawford, Cindy
1001 SE 10th Street
Muldrow, OK 74948

Crawford, Gwendolyn
RR 2, Box 92-8
Vian, OK

Crawford, Phyllis
RR 2, Box 92-8
Vian, OK

Crawford, Roger
RR 2, Box 92-8
Vian, OK

Crawford, Travis
800 East Creek, #10
Colonial Square Apts
Sallisaw, OK 74955

Daggs, Martin
RR 3, Box 338
Sallisaw, OK 74955-9527

Dotson, Gelene
PO Box 926
Vian, OK 74962

Dotson, Mark
Rt 2, Box 91-0
Vian, OK 74962

Dotson, Warren
By Declaration, Deceased

2

Echols, John
PO Box 701196
Tulsa, OK 74170

Garrett, John
504 W. Maple St.
Stilwell, OK 74960

Gordon, Jack
111 S. Muskogee Avenue
Claremore, OK

Gordon, Paul
1000 NW 19th St.
Moore, OK  73160

Greenfeather, Sharon
106 10th Street NE, Apt. 202
Auburn, WA 98002

Grizzle, Amanda
108 S. 7th Street
Tecumseh, OK

Gude, Robert
1400 Pond St.
Muldrow, OK 74948

Harris, Ruth
1528 Cherokee Trail
Van Buren, AK 72956

Henricksen, Mark
600 N Walker Avenue, Ste. 201
Oklahoma City, OK 73102-3035

Hilfiger, Roger
620 W. Broadway St.
Muskogee, OK 74401

Hill, Brandy
404 5th Avenue
Warner, OK 74469

Hill, Shawn
308 Adysen Ln.
Roland, OK 74954-5303

3

Holdeman, Scharlette, Ph.D.
1116 Powhattan Avenue
San Francisco, CA 94110

House, Judy
17041 S. Maple
Kellyville, OK  74039

Hueske, Edward
300 Anderson County Rd. 3582
Palestine, TX

Joseph, Carolyn
406 E. Ruth #546
Sallisaw, OK 74955

Kirkham, George
1402 James Bay Rd.
Palm Beach Gardens, FL 22410

Kosten, Thomas, M. D.
2002 Holcombe Blvd.
Research (151), Building 110, Rm. 229
Houston Texas  77030

Lunsford, Paul Rickie
811 Meadow Lark Dr.
Sallisaw, OK 74955

Mackey, Mike
42204 Jefferson Rd.
Alva, OK 73717

Miora, Deborah S., Ph.D.
435 North Roxbury Dr., Suite 406
Beverly Hills, CA  90210

Nelson, Gary
17071 S. Maple
Kellyville, OK  74039

O'Connell, Julia
423 S. Boulder, Suite 300
Tulsa, OK 74103

4

Otto, Susan
Federal Public Defender
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102

Padgett, Dewey
PO Box 336
Sallisaw, OK 74955-0336

Philpot, Gary
112980 S. 4632 Rd.
Gans, OK 74936-5033

Philpot, John
469847 Highway 101
Sallisaw, OK
74955-8518

Poindexter, Billy
5301 E. 47th Pl. Apt. 1A
Tulsa, OK 74135-6627

Post, Leonard
262 Moss Street
New York, NY 10012

Reich, Nona
1941 Scott Street
Sapulpa, OK 74066

Riley, Linda
1312 Meadow Lane
Fort Smith, AK 72908

Russell, Jeanne, Ed. D.
3314 E. 51st Ste. 204F
Tulsa, OK 74135

Sanders, Charles
3365 Deer Trl.
Oologah, OK 74053

Sanders, Janice
PO Box 92-3
Vian, OK 74962

5

Schaye, Roseann
PO Box 86914
Tucson, AZ 85754-6914

Sharp, Bill, Ph. D.
1300 McGee Drive, Ste. 104
Norman, OK 73072

Sinyard, Steven
1901 W. Ruth Avenue # 73
Sallisaw, OK 94955

Smith, Bret
533 W. Broadway St.
Muskogee, OK 74401

Standing Bear, Geoffrey
110 E. 6th St.
Pawhuska OK

Stewart, Pablo, M.D.
824 Ashbury Street
San Francisco, CA  94117

Stovell, Ellen
935 S. Ross Road
Sallisaw, OK 74955

Thomas, Janesse
109 E. Vine Street
Sallisaw, OK 74955

Trotter, Kathy
PO Box 1178
Sallisaw, OK 74955

Jan Walkingstick
4585 W. Marge St.
Tucson, AZ 85741-1832

Gaylan Warren
202 Casey Court
Newport, WA 99156-9363

Weaver, Randy
474176  E. 1140 Rd.
Muldrow, OK 74948

6

Woods, George, M. D.
1633 N. Mountain Avenue
Upland, CA  91784

Young, Myla, Ph. D.
By Declaration, Deceased

**And Custodians of the Records from the following agencies or offices:**

Bureau of Prisons, North Central Region
Clerk of the Court for all courts in Cherokee County
Clerk of the Court for all courts in Sequoyah County
Clerk of the Court for U.S. District Court, Eastern District of Oklahoma
Clerk of the Court for U.S. District Court, Western District of Oklahoma
Cooper Clinic
Drug Enforcement Agency, McAlester
District 27 Drug Task Force Office
Dr. Murray Crow's Office
Eastern State Hospital
Federal Bureau of Investigation
Harbor View Mercy Hospital
Illinois Department of Health – Division of Vital Records
Jefferson Township High School
Joliet Public School District
National Personnel Records Center
Oklahoma State Department of Health – Division of Vital Records
Oklahoma State Penitentiary
Plainfield Elementary School
Sallisaw High School
Sallisaw Police Department
Sequoyah Memorial Hospital
Social Security Administration
Sparks Medical Center
St Edwards Mercy Medical Center
St Francis Hospital, Tulsa
Stanhope Schools, New Jersey
Wagoner Community Hospital
Wood Family Medical Center

7

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,     )
)
    Petitioner/Defendant,     )
)     Case No. CV-09-00105-JHP
 v.     )
)
UNITED STATES OF AMERICA,     )
)
    Respondent/Plaintiff.     )

## [PROPOSED] ORDER TO EXCLUDE PROPOSED WITNESSES

The government's motion to exclude witnesses is hereby granted.

**IT IS ORDERED THAT** in regard to the evidentiary hearing scheduled to commence on March 13, 2017, in the above-captioned case, the Court hereby excludes the testimony of Paul Gordon, Edward Hueske, George Kirkham, Charles Sanders, Janesse Thomas, Mike Mackey, Billy Poindexter, Dewey Padgett, Hon. John Garrett, Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy, Pablo Stewart, Gaylan Warren, Richard Burr, Julia O'Connell, Susan Otto, Gary Philpot, John Philpot, Amanda Grizzle and Christine Calbert.

Additionally, the Court orders counsel for Petitioner Barrett to provide, within seven days of this order, a written offer of proof as to the planned testimony of Dale Anderson, Isaac Barrett, Tamara Bedwell, Faust Bianco, Courtney Burke, Cindy Crawford, Martin Daggs, Sharon Greenfeather, Robert Gude, Scharlette Holdeman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stovell, Jan Walkingstick and Randy Weaver.

 

_____
**HON. JAMES H PAYNE**
U.S. District Court Judge

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
        Petitioner/Defendant,      )
                                   )        Case No. CV-09-00105-JHP
    v.                             )
                                   )
UNITED STATES OF AMERICA,          )
                                   )
        Respondent/Plaintiff.      )

## GOVERNMENT'S MOTION TO EXCLUDE A PROPOSED WITNESS

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order excluding the testimony of Dale Anderson. Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, government counsel consulted by e-mail with Barrett's attorney, David Autry, who opposes this motion.

## PROCEDURAL HISTORY

Barrett was convicted of three homicide offenses he committed when a state police tactical unit attempted to serve a warrant at his home. The trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment on appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008). This Court subsequently denied § 2255 relief on all grounds. Docs. 214 & 215. On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to determine whether trial counsel, Roger Hilfiger and Bret Smith,

1

505

ineffectively failed to investigate and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

Pursuant to the Court's scheduling order (Doc. 246), Barrett transmitted a list of 71 proposed witnesses for appearance at the evidentiary hearing (Ex. 1), by declaration or live testimony. The government moves to exclude the testimony of Dale Anderson, whom it unintentionally omitted from its earlier motion to exclude witnesses, (Doc. 289).

## ARGUMENT

### THE COURT SHOULD LIMIT BARRETT TO WITNESSES WHO CAN TESTIFY ABOUT FOREGONE PENALTY PHASE EVIDENCE

This Court has noted the limited nature of the hearing contemplated by the Tenth Circuit, explaining that it "expects to hear live testimony from trial counsel whose conduct is at issue but otherwise encourages the submission of written exhibits in lieu of live testimony." Doc. 246. The hearing has one purpose: "to determine what evidence could have been presented at the sentencing phase of Petitioner's trial in 2005 and whether Petitioner was prejudiced as a result of a lack of presenting that evidence in his trial." Doc. 248. More specifically, the Court has observed "The Tenth Circuit has not allowed this evidentiary hearing for the purpose of trying to resurrect issues which have been fully resolved." Doc. 279 at 1 (further noting that questions regarding intent are irrelevant to the upcoming hearing).

Despite the narrow scope of the upcoming hearing, Barrett appears intent upon calling a witness who can only offer irrelevant testimony. The Federal Rules of Evidence generally apply to evidentiary proceedings under 28 U.S.C. § 2255. *United States v. Francischine*, 512 F.2d 827, 829 (5th Cir. 1975); *see Bonfillo v. United States*, Civil no. 15-1015, 2016 WL 6124487, *7 (W.D. Pa. Oct. 20, 2016). While the upcoming § 2255 hearing concerns the presentation of

2

506

evidence at a capital penalty phase proceeding, relevance remains a threshold concern, despite the liberal evidentiary provision of the Federal Death Penalty Act, 18 U.S.C. § 3593(c). *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010).  Relevance has the same meaning under § 3593(c) as it does under Federal Rule of Evidence 401.  *Lujan*, at 854. (citing *United States v. McVeigh*, 153 F.3d 1166, 1212-13 (10th Cir. 1998) and *United States v. Basham*, 561 F.3d 302, 331-32 (4th Cir. 2009)).  Specifically, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information]."  Fed. R. Evid. 401.

Barrett intends to call Dale Anderson, a witness who can offer testimony relevant only to issues that the Court previously decided.  Ex. 1.  At the outset of the case, Anderson provided a declaration that recounted his interview of Cindy Crawford.[1]  Doc. 95  Ex. 14.  According to Anderson's hearsay account, Crawford claimed to have experienced intimidation by law enforcement officials, including former Assistant U.S. Attorney Michael Littlefield, and to have received indications – but not outright promises – of lenience if she cooperated with the government.  Anderson further reported Ms. Crawford's admission that she was under the influence of methamphetamine prior to her trial testimony and an interview with Mr. Littlefield.  Anderson asserted that Ms. Crawford had claimed to suffer from post-traumatic stress disorder, to which she supposedly attributed a possible embellishment of her penalty phase testimony about Barrett's assault on her with a firearm.  Anderson also related Ms. Crawford's claims that prosecutors threatened her because her guilt phase testimony did not sufficiently assist the government.  Finally, Anderson claimed that Ms. Crawford knew of an incident in which Sheriff John Philpott had visited Barrett's home shortly before the murder in this case.

---

[1] Anderson declared that he conducted the interview with another listed defense witness, Leonard Post.  As such, Anderson's proposed testimony appears cumulative as well as irrelevant.

Anderson does not appear to have any first-hand knowledge of this case, much less the questions before the Court in its present procedural posture.  This Court long ago disposed of the witness intimidation claims that fill the bulk of Anderson's declaration.  *See* Doc.. 214 at 72-73; Doc. 215.  The Court described as "meritless" Barrett's attacks on Ms. Crawford and her testimony, despite Anderson's declaration and other documentary evidence.  Doc. 214 at 53.  The Court also rejected a claim of evidence suppression arising from Sheriff Philpott's supposed visit to the defendant's home.  *Id*. at 72.  Admittedly, Anderson's declaration briefly touches on one aspect of the penalty phase, Ms. Crawford's supposed embellishment of an incident in which Barrett assaulted her with a firearm.  But no aspect of that incident or Ms. Crawford's testimony informs the allegation that trial counsel allegedly omitted mental health and social history evidence.

Because it appears that Anderson can offer only irrelevant, second-hand, and possibly cumulative testimony, this Court should exclude him as a witness.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to exclude the

testimony of Dale Anderson.

Dated: February 1, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on February 1, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

6

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,    )
    )
    Petitioner/Defendant,    )
    )    Case No. CV-09-00105-JHP
  v.    )
    )
UNITED STATES OF AMERICA,    )
    )
    Respondent/Plaintiff.    )

## [PROPOSED] ORDER TO EXCLUDE A PROPOSED WITNESS

The government's motion to exclude witnesses is hereby granted.

**IT IS ORDERED THAT** in regard to the evidentiary hearing scheduled to commence on March 13, 2017, in the above-captioned case, the Court hereby excludes the testimony of Dale Anderson.

_____
**HON. JAMES H PAYNE**
U.S. District Court Judge



**OFFICE OF THE FEDERAL DEFENDER**
Eastern District of California
801 I Street, 3rd Floor
Sacramento, California 95814-2510
(916) 498.6666 FAX (916) 498.6656

HEATHER E. WILLIAMS
Federal Defender

LINDA C. ALLISON
Chief Assistant Defender

JOAN M. FISHER
Assistant Federal Defender

December 13, 2016

Mr. Christopher Wilson
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401

Mr. Jeffrey B. Kahan
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F. Street, NW, 6th Fl.
Washington DC 20530

   Re: United States v. Barrett
     OK–ED Nos. 6:04-cr-115-JHP, 6:09-CV-00105-JHP, Tenth Cir. No. 12-7086

Messrs. Kahan and Wilson:

Pursuant to the Court's Scheduling Order, please find the names and addresses of Mr. Barrett's potential witnesses for the evidentiary hearing currently scheduled for March 13, 2017.

Sincerely,

Joan M. Fisher
Assistant Federal Defender

Petitioner's Witnesses for Evidentiary Hearing
Kenneth Barrett v. United States of America, Case No. 09-CIV-105-JHP

Anderson, Dale
P.O. Box 926
Oklahoma City, OK 73070

Barrett, Doris
11260 W. 61st St.
Sapulpa, OK 74066

Barrett, Ernest
By Declaration, Deceased

Barrett, Isaac
PO Box 911
Sallisaw, OK 74955

Barrett, Steve
704 Parkwoods Dr.
Noble, OK 73068

Barrett, Toby
103 588 South 4690 Road
Sallisaw, OK 74955

Bedwell, Tamara
406 S. Poplar St.
Sallisaw, OK 74955

Bianco, Faust, Ph.D.
7146 S. Braden Ave. #500
Tulsa, OK 74136

Bigler, Erin, Ph.D.
Psychology Department
1001 SWKT Brigham Young University
Provo, Utah 84602

Blount, Ada
By Declaration, Deceased

Burke, Courtney
2030 Aspen Dr.
Tahlequah, OK 74464

1

Richard H. Burr
PO Box 525
Leggett, Texas  77350

Calbert, Christine
926 Clifton Ct.
Fort Smith, AR 72903

Cook, Carl
By Declaration, Deceased

Crawford, Cindy
1001 SE 10th Street
Muldrow, OK 74948

Crawford, Gwendolyn
RR 2, Box 92-8
Vian, OK

Crawford, Phyllis
RR 2, Box 92-8
Vian, OK

Crawford, Roger
RR 2, Box 92-8
Vian, OK

Crawford, Travis
800 East Creek, #10
Colonial Square Apts
Sallisaw, OK 74955

Daggs, Martin
RR 3, Box 338
Sallisaw, OK 74955-9527

Dotson, Gelene
PO Box 926
Vian, OK 74962

Dotson, Mark
Rt 2, Box 91-0
Vian, OK 74962

Dotson, Warren
By Declaration, Deceased

2

Echols, John
PO Box 701196
Tulsa, OK 74170

Garrett, John
504 W. Maple St.
Stilwell, OK 74960

Gordon, Jack
111 S. Muskogee Avenue
Claremore, OK

Gordon, Paul
1000 NW 19th St.
Moore, OK  73160

Greenfeather, Sharon
106 10th Street NE, Apt. 202
Auburn, WA 98002

Grizzle, Amanda
108 S. 7th Street
Tecumseh, OK

Gude, Robert
1400 Pond St.
Muldrow, OK 74948

Harris, Ruth
1528 Cherokee Trail
Van Buren, AK 72956

Henricksen, Mark
600 N Walker Avenue, Ste. 201
Oklahoma City, OK 73102-3035

Hilfiger, Roger
620 W. Broadway St.
Muskogee, OK 74401

Hill, Brandy
404 5th Avenue
Warner, OK 74469

Hill, Shawn
308 Adysen Ln.
Roland, OK 74954-5303

3

Holdeman, Scharlette, Ph.D.
1116 Powhattan Avenue
San Francisco, CA 94110

House, Judy
17041 S. Maple
Kellyville, OK  74039

Hueske, Edward
300 Anderson County Rd. 3582
Palestine, TX

Joseph, Carolyn
406 E. Ruth #546
Sallisaw, OK 74955

Kirkham, George
1402 James Bay Rd.
Palm Beach Gardens, FL 22410

Kosten, Thomas, M. D.
2002 Holcombe Blvd.
Research (151), Building 110, Rm. 229
Houston Texas  77030

Lunsford, Paul Rickie
811 Meadow Lark Dr.
Sallisaw, OK 74955

Mackey, Mike
42204 Jefferson Rd.
Alva, OK 73717

Miora, Deborah S., Ph.D.
435 North Roxbury Dr., Suite 406
Beverly Hills, CA  90210

Nelson, Gary
17071 S. Maple
Kellyville, OK  74039

O'Connell, Julia
423 S. Boulder, Suite 300
Tulsa, OK 74103

4

Otto, Susan
Federal Public Defender
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102

Padgett, Dewey
PO Box 336
Sallisaw, OK 74955-0336

Philpot, Gary
112980 S. 4632 Rd.
Gans, OK 74936-5033

Philpot, John
469847 Highway 101
Sallisaw, OK
74955-8518

Poindexter, Billy
5301 E. 47th Pl. Apt. 1A
Tulsa, OK 74135-6627

Post, Leonard
262 Moss Street
New York, NY 10012

Reich, Nona
1941 Scott Street
Sapulpa, OK 74066

Riley, Linda
1312 Meadow Lane
Fort Smith, AK 72908

Russell, Jeanne, Ed. D.
3314 E. 51st Ste. 204F
Tulsa, OK 74135

Sanders, Charles
3365 Deer Trl.
Oologah, OK 74053

Sanders, Janice
PO Box 92-3
Vian, OK 74962

5

Schaye, Roseann
PO Box 86914
Tucson, AZ 85754-6914

Sharp, Bill, Ph. D.
1300 McGee Drive, Ste. 104
Norman, OK 73072

Sinyard, Steven
1901 W. Ruth Avenue # 73
Sallisaw, OK 94955

Smith, Bret
533 W. Broadway St.
Muskogee, OK 74401

Standing Bear, Geoffrey
110 E. 6th St.
Pawhuska OK

Stewart, Pablo, M.D.
824 Ashbury Street
San Francisco, CA  94117

Stovell, Ellen
935 S. Ross Road
Sallisaw, OK 74955

Thomas, Janesse
109 E. Vine Street
Sallisaw, OK 74955

Trotter, Kathy
PO Box 1178
Sallisaw, OK 74955

Jan Walkingstick
4585 W. Marge St.
Tucson, AZ 85741-1832

Gaylan Warren
202 Casey Court
Newport, WA 99156-9363

Weaver, Randy
474176  E. 1140 Rd.
Muldrow, OK 74948

6

Woods, George, M. D.
1633 N. Mountain Avenue
Upland, CA  91784

Young, Myla, Ph. D.
By Declaration, Deceased

**And Custodians of the Records from the following agencies or offices:**

Bureau of Prisons, North Central Region
Clerk of the Court for all courts in Cherokee County
Clerk of the Court for all courts in Sequoyah County
Clerk of the Court for U.S. District Court, Eastern District of Oklahoma
Clerk of the Court for U.S. District Court, Western District of Oklahoma
Cooper Clinic
Drug Enforcement Agency, McAlester
District 27 Drug Task Force Office
Dr. Murray Crow's Office
Eastern State Hospital
Federal Bureau of Investigation
Harbor View Mercy Hospital
Illinois Department of Health – Division of Vital Records
Jefferson Township High School
Joliet Public School District
National Personnel Records Center
Oklahoma State Department of Health – Division of Vital Records
Oklahoma State Penitentiary
Plainfield Elementary School
Sallisaw High School
Sallisaw Police Department
Sequoyah Memorial Hospital
Social Security Administration
Sparks Medical Center
St Edwards Mercy Medical Center
St Francis Hospital, Tulsa
Stanhope Schools, New Jersey
Wagoner Community Hospital
Wood Family Medical Center

7

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com, nitawright73@yahoo.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov),
Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:873624@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/1/2017 at 9:18 AM CST and filed on 2/1/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 291(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: [289] MOTION to Exclude Proposed Witnesses, [290] MOTION to Exclude a Proposed Witness) (cjt, Deputy Clerk)**


**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S MOTION TO EXCLUDE EVIDENCE OF UNAVAILABLE**
**WITNESSES BY DECLARATION ALONE**

---

**COMES NOW** the United States of America, by and through undersigned counsel and

respectfully moves this Court to issue an order partially excluding the declarations of Ernest

Barrett and Warren Dotson, to the extent they specifically comment on the performance of trial

counsel.  Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, government counsel

consulted by e-mail with Barrett's attorney, David Autry, who opposes this motion.

**PROCEDURAL HISTORY**

Barrett was convicted of three homicide offenses he committed when a state police

tactical unit attempted to serve a warrant at his home.  The trial jury recommended a death

sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment

on appeal.  *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260

(2008).  This Court subsequently denied § 2255 relief on all grounds.  Docs. 214 & 215.  On

appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an

evidentiary hearing to determine whether trial counsel, Roger Hilfiger and Bret Smith,

1

521

ineffectively failed to investigate and present evidence about Barrett's background and mental health.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

Pursuant to the Court's scheduling order (Doc. 246), Barrett transmitted a list of 71 proposed witnesses for appearance at the evidentiary hearing (Ex. 1), by declaration or live testimony.  The government moves to exclude, in part, the declarations of two of those witnesses, Ernest Barrett and Warren Dotson, because they are unavailable for cross-examination and speak to issues outside the evidentiary standard applicable to penalty phase trials.

## ARGUMENT

### THE COURT SHOULD LIMIT BARRETT TO WITNESSES WHO ARE AVAILABLE FOR CONFRONTATION

This Court should bar Barrett from presenting, the declarations of two unavailable witnesses as to information that the defense could not present during a penalty phase trial.

The Federal Rules of Evidence generally apply to evidentiary proceedings under 28 U.S.C. § 2255.  *United States v. Francischine*, 512 F.2d 827, 829 (5th Cir. 1975); *see Bonfillo v. United States*, Civil no. 15-1015, 2016 WL 6124487, *7 (W.D. Pa. Oct. 20, 2016).  The upcoming § 2255 hearing concerns the omission of evidence from a capital penalty phase proceeding, at which the Court would apply the liberal evidentiary provision prescribed in the Federal Death Penalty Act, 18 U.S.C. § 3593(c).  *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010).  But "Courts have generally found . . . where a witness is unavailable, the affidavit testimony should not be allowed unless the opposing party had the opportunity to cross examine the witness."  *West v. United States*, No. 205-CR-124-FTM-29SPC, 2009 WL 1043962, at *6 (M.D. Fla. Apr. 16, 2009); *see generally* Fed. R. Evid. 801.

In this case, Barrett has presented declarations, in lieu of testimony by five deceased witnesses, Ernest Barrett (Doc. 95 Ex. 81; Doc. 178 Ex. 206), Ada Blount (Doc. 95 Ex. 74), Carl Cook (Doc 95 Ex. 102), Warren Dotson (Doc. 95 Ex. 100), and Myla Young (Doc. 95 Ex. 89). To the extent those declarations concern social history or mental health evidence Barrett might have offered in mitigation, the government does not object under the liberal evidentiary standard applicable to § 3593 proceedings.[1]  However, the government does object to those portions of Ernest Barrett and Warren Dotson's declarations that speak to issues other than the defendant's allegedly omitted mitigation evidence.  Ernest Barrett declared that one of the defendant's attorneys "only interviewed me a few minutes before I testified."  Doc. 95 Ex. 81 at 10.  In his supplemental declaration, Ernest Barrett recounted the performance of defense attorneys and investigators, but nothing about his son or family.  Doc. 178 Ex. 206.  Warren Dotson offered an opinion that "the law did not have to go to Kenny's place in the middle of the night to arrest him" because the defendant was not dangerous.  Doc. 95 Ex. 100 at 4.  Because this evidence concerns the actions of third parties, and could not have been offered in mitigation, the Court should not consider it, as the government had no opportunity to cross-examine these witnesses about these subjects.

---

[1] The government limits its position to this § 2255 proceeding, which contemplates the alleged omission of evidence a trial in 2005, when the five witnesses were alive.  The government reserves the right to object to the declarations under § 3593, should this Court order a retrial.

524

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to exclude in part

the declarations of Ernest Barrett and Warren Dotson.

Dated: February 1, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

524

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on February 1, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

525

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**[PROPOSED] ORDER TO EXCLUDE EVIDENCE OF UNAVAILABLE WITNESSES
BY DECLARATION ALONE**

The government's motion to exclude evidence of unavailable witnesses by declaration alone is hereby granted.

**IT IS ORDERED THAT** in regard to the evidentiary hearing scheduled to commence on March 13, 2017, in the above-captioned case, the Court hereby excludes those portions of Ernest Barrett and Warren Dotson's declarations mention subjects other than the defendant's allegedly omitted mental health and social history mitigation evidence.

_____
**HON. JAMES H PAYNE**
U.S. District Court Judge



**OFFICE OF THE FEDERAL DEFENDER**
Eastern District of California
801 I Street, 3rd Floor
Sacramento, California  95814-2510
(916) 498.6666    FAX (916) 498.6656

**HEATHER E. WILLIAMS**
Federal Defender

**LINDA C. ALLISON**
Chief Assistant Defender

**JOAN M. FISHER**
Assistant Federal Defender

December 13, 2016

Mr. Christopher Wilson
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401

Mr. Jeffrey B. Kahan
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F. Street, NW, 6th Fl.
Washington DC  20530

      Re:  United States v. Barrett
          OK–ED Nos. 6:04-cr-115-JHP, 6:09-CV-00105-JHP, Tenth Cir. No. 12-7086

Messrs. Kahan and Wilson:

Pursuant to the Court's Scheduling Order, please find the names and addresses of Mr. Barrett's potential witnesses for the evidentiary hearing currently scheduled for March 13, 2017.

Sincerely,

Joan M. Fisher
Assistant Federal Defender

527

Petitioner's Witnesses for Evidentiary Hearing
Kenneth Barrett v. United States of America, Case No. 09-CIV-105-JHP

Anderson, Dale
P.O. Box 926
Oklahoma City, OK 73070

Barrett, Doris
11260 W. 61st St.
Sapulpa, OK 74066

Barrett, Ernest
By Declaration, Deceased

Barrett, Isaac
PO Box 911
Sallisaw, OK 74955

Barrett, Steve
704 Parkwoods Dr.
Noble, OK 73068

Barrett, Toby
103 588 South 4690 Road
Sallisaw, OK 74955

Bedwell, Tamara
406 S. Poplar St.
Sallisaw, OK 74955

Bianco, Faust, Ph.D.
7146 S. Braden Ave. #500
Tulsa, OK 74136

Bigler, Erin, Ph.D.
Psychology Department
1001 SWKT Brigham Young University
Provo, Utah 84602

Blount, Ada
By Declaration, Deceased

Burke, Courtney
2030 Aspen Dr.
Tahlequah, OK 74464

1

Richard H. Burr
PO Box 525
Leggett, Texas  77350

Calbert, Christine
926 Clifton Ct.
Fort Smith, AR 72903

Cook, Carl
By Declaration, Deceased

Crawford, Cindy
1001 SE 10th Street
Muldrow, OK 74948

Crawford, Gwendolyn
RR 2, Box 92-8
Vian, OK

Crawford, Phyllis
RR 2, Box 92-8
Vian, OK

Crawford, Roger
RR 2, Box 92-8
Vian, OK

Crawford, Travis
800 East Creek, #10
Colonial Square Apts
Sallisaw, OK 74955

Daggs, Martin
RR 3, Box 338
Sallisaw, OK 74955-9527

Dotson, Gelene
PO Box 926
Vian, OK 74962

Dotson, Mark
Rt 2, Box 91-0
Vian, OK 74962

Dotson, Warren
By Declaration, Deceased

2

Echols, John
PO Box 701196
Tulsa, OK 74170

Garrett, John
504 W. Maple St.
Stilwell, OK 74960

Gordon, Jack
111 S. Muskogee Avenue
Claremore, OK

Gordon, Paul
1000 NW 19th St.
Moore, OK  73160

Greenfeather, Sharon
106 10th Street NE, Apt. 202
Auburn, WA 98002

Grizzle, Amanda
108 S. 7th Street
Tecumseh, OK

Gude, Robert
1400 Pond St.
Muldrow, OK 74948

Harris, Ruth
1528 Cherokee Trail
Van Buren, AK 72956

Henricksen, Mark
600 N Walker Avenue, Ste. 201
Oklahoma City, OK 73102-3035

Hilfiger, Roger
620 W. Broadway St.
Muskogee, OK 74401

Hill, Brandy
404 5th Avenue
Warner, OK 74469

Hill, Shawn
308 Adysen Ln.
Roland, OK 74954-5303

3

Holdeman, Scharlette, Ph.D.
1116 Powhattan Avenue
San Francisco, CA 94110

House, Judy
17041 S. Maple
Kellyville, OK  74039

Hueske, Edward
300 Anderson County Rd. 3582
Palestine, TX

Joseph, Carolyn
406 E. Ruth #546
Sallisaw, OK 74955

Kirkham, George
1402 James Bay Rd.
Palm Beach Gardens, FL 22410

Kosten, Thomas, M. D.
2002 Holcombe Blvd.
Research (151), Building 110, Rm. 229
Houston Texas  77030

Lunsford, Paul Rickie
811 Meadow Lark Dr.
Sallisaw, OK 74955

Mackey, Mike
42204 Jefferson Rd.
Alva, OK 73717

Miora, Deborah S., Ph.D.
435 North Roxbury Dr., Suite 406
Beverly Hills, CA  90210

Nelson, Gary
17071 S. Maple
Kellyville, OK  74039

O'Connell, Julia
423 S. Boulder, Suite 300
Tulsa, OK 74103

4

Otto, Susan
Federal Public Defender
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102

Padgett, Dewey
PO Box 336
Sallisaw, OK 74955-0336

Philpot, Gary
112980 S. 4632 Rd.
Gans, OK 74936-5033

Philpot, John
469847 Highway 101
Sallisaw, OK
74955-8518

Poindexter, Billy
5301 E. 47th Pl. Apt. 1A
Tulsa, OK 74135-6627

Post, Leonard
262 Moss Street
New York, NY 10012

Reich, Nona
1941 Scott Street
Sapulpa, OK 74066

Riley, Linda
1312 Meadow Lane
Fort Smith, AK 72908

Russell, Jeanne, Ed. D.
3314 E. 51st Ste. 204F
Tulsa, OK 74135

Sanders, Charles
3365 Deer Trl.
Oologah, OK 74053

Sanders, Janice
PO Box 92-3
Vian, OK 74962

5

Schaye, Roseann
PO Box 86914
Tucson, AZ 85754-6914

Sharp, Bill, Ph. D.
1300 McGee Drive, Ste. 104
Norman, OK 73072

Sinyard, Steven
1901 W. Ruth Avenue # 73
Sallisaw, OK 94955

Smith, Bret
533 W. Broadway St.
Muskogee, OK 74401

Standing Bear, Geoffrey
110 E. 6th St.
Pawhuska OK

Stewart, Pablo, M.D.
824 Ashbury Street
San Francisco, CA  94117

Stovell, Ellen
935 S. Ross Road
Sallisaw, OK 74955

Thomas, Janesse
109 E. Vine Street
Sallisaw, OK 74955

Trotter, Kathy
PO Box 1178
Sallisaw, OK 74955

Jan Walkingstick
4585 W. Marge St.
Tucson, AZ 85741-1832

Gaylan Warren
202 Casey Court
Newport, WA 99156-9363

Weaver, Randy
474176  E. 1140 Rd.
Muldrow, OK 74948

6

Woods, George, M. D.
1633 N. Mountain Avenue
Upland, CA  91784

Young, Myla, Ph. D.
By Declaration, Deceased


**And Custodians of the Records from the following agencies or offices:**

Bureau of Prisons, North Central Region
Clerk of the Court for all courts in Cherokee County
Clerk of the Court for all courts in Sequoyah County
Clerk of the Court for U.S. District Court, Eastern District of Oklahoma
Clerk of the Court for U.S. District Court, Western District of Oklahoma
Cooper Clinic
Drug Enforcement Agency, McAlester
District 27 Drug Task Force Office
Dr. Murray Crow's Office
Eastern State Hospital
Federal Bureau of Investigation
Harbor View Mercy Hospital
Illinois Department of Health – Division of Vital Records
Jefferson Township High School
Joliet Public School District
National Personnel Records Center
Oklahoma State Department of Health – Division of Vital Records
Oklahoma State Penitentiary
Plainfield Elementary School
Sallisaw High School
Sallisaw Police Department
Sequoyah Memorial Hospital
Social Security Administration
Sparks Medical Center
St Edwards Mercy Medical Center
St Francis Hospital, Tulsa
Stanhope Schools, New Jersey
Wagoner Community Hospital
Wood Family Medical Center

7

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com, nitawright73@yahoo.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov),
Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:873748@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/1/2017 at 1:36 PM CST and filed on 2/1/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09−cv−00105−JHP |
| **Filer:** | |
| **Document Number:** | 293(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: [292] MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone) (cjt, Deputy Clerk)**


**6:09−cv−00105−JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. 6:09-cv-00105-JHP |
| | ) | |
| v. | ) | **OPPOSED MOTION TO** |
| | ) | **RECUSE AND DISQUALIFY** |
| UNITED STATES OF AMERICA, | ) | **THE COURT, AND BRIEF IN** |
| | ) | **SUPPORT** |
| Respondent. | ) | |
| | ) | |

Petitioner, Kenneth Eugene Barrett, moves to recuse and disqualify the Hon. James H. Payne,

United States District Judge, from further participation in this case.  This motion is being filed under

the authority of 28 U.S.C. § 455, the due process clause of the Fifth Amendment, and the Eighth

Opposed Motion to Recuse and
Disqualify the Court, and Brief in
Support                                1                        *Barrett v. United States*
                                                              OK-ED No. 6:09-cv-00105-JHP

536

Amendment to the United States Constitution.[1]

The due process clause of the Fifth Amendment guarantees litigants the right to a neutral and detached judge. *Ward v. Village of Monroe,* 409 U.S. 57, 62 (1972); *In re Murchison,* 349 U.S. 133 (1959). Where a judge is not neutral and detached, structural error occurs. *Tumey v. Ohio,* 273 U.S. 510 (1927). Title 28 U.S.C. § 455(a) provides that a judge should recuse where "the impartiality of the judge might reasonably be questioned." *See also, Liteky v. United States,* 510 U.S. 540, 548 (1994). Even the appearance of partiality is to be avoided. *Nichols v. Alley,* 71 F.3d 347, 351 (10th Cir. 1995). "The test in this circuit is 'whether a reasonable person, knowing all the relevant facts, would harbor doubts about the judge's impartiality.'" *United States v. Cooley,* 1 F.3d 985, 993 (10th Cir. 1993) (citations omitted). Under § 455(a), a judge has "continuing duty to ask himself what a reasonable person, knowing all the relevant facts, would think about his impartiality." *United States v. Greenspan,* 26 F.3d 1001, 1005 (10th Cir. 1994).

At a minimum, the court has evinced the appearance of partiality in its discovery order. Indeed, certain language in that order shows the court has already pre-judged the performance prong of the *Strickland* test to Petitioner's detriment. *Strickland v. Washington*, 466 U.S. 668 (1984). This is one of the key issues the evidentiary hearing is supposed to resolve. The court has made a finding of fact rejecting Mr. Barrett's ineffectiveness claim before a scrap of evidence has been introduced at the hearing. The following language from the court's discovery order would lead any reasonable person to harbor significant doubts about the court's impartiality:

---

[1] The Eighth Amendment is relevant to this motion because capital cases require a heightened degree of reliability. Woodson v. North Carolina, 428 U.S. 280, 305 (1976). This obviously extends to a heightened need for reliable fact-finding by a neutral and detached judge.

Opposed Motion to Recuse and
Disqualify the Court, and Brief in
Support                                        2                              *Barrett v. United States,*
OK-ED No. 6:09-cv-00105-JHP

537

First, trial counsel did not have sufficient time to find all of the mitigating evidence that post-conviction counsel has provided and they would not have been able to locate all of the mitigating evidence which post-conviction counsel has now accumulated within the amount of time between the filing of the indictment and the criminal trial.  Second, the prosecutor would have been required to rebut whatever evidence trial counsel put on in a very short amount of time (with the exception of expert testimony), *i.e.*, overnight in many instances." (Doc. 269, pp. 12-13)

How does the court know this, before any evidence has been heard at the hearing ordered by the Tenth Circuit?  It is not evident from the pleadings filed in the § 2255 action.  The court's peremptory finding against Mr. Barrett as to *at least* the performance prong of the *Strickland* test raises the clear inference that it learned of this disputed "fact" from an extra-judicial source, and not during the course of the proceedings,  *Liteky,* 510 U.S. at 550-51, 555 (stating that generally, but not exclusively, disqualification for bias under § 455(a) must stem from an "extra-judicial" source).

Moreover, the record in the underlying criminal case shows this disputed fact, which the court has in effect already found in favor of the government, is incorrect.  *United States v. Barrett,* No. CR-04-115-JHP.  Mr. Barrett was charged by complaint on September 23, 2004.  (Doc. 1)  On October 25, 2004, he made his initial appearance on the complaint, represented by John Echols *and Roger Hilfiger.* Mr. Echols and Mr. Hilfiger were appointed to represent Mr. Barrett that same day.  (Doc. 5)  The grand jury indictment was returned on November 9, 2004.  (Doc. 9)  Although the notice of intent to seek the death penalty was not filed until February 15, 2005 (Docs. 59, 60), it was known all along, as a practical matter, that this would be a death penalty case.  The only reason this case was brought in federal court was in an effort to secure the equivalent of a first-degree murder conviction and the death sentence the state prosecutors had failed to achieve.  After Mr. Echols was allowed to withdraw and Mr. Hilfiger was elevated to first chair as learned counsel, Bret Smith was appointed on May 13, 2005.  (Doc. 130)  The court continued jury selection to August 29, 2005, with trial set for September 2005.  (Doc. 142)  The jury was sworn and the trial proper commenced on September 26, 2005.  Therefore, by

Opposed Motion to Recuse and
Disqualify the Court, and Brief in
Support                                                          3                                                *Barrett v. United States*
                                                                                                                        OK-ED No. 6:09-cv-00105-JHP
538

the time trial started on September 26, 2005, Mr. Hilfiger had been on the case for 11 months from the time of his appointment on October 25, 2004.  Although Mr. Smith was not appointed until May, 2005, Mr. Barrett had the assistance of Mr. Echols until this time.

Certiorari was denied following Mr. Barrett's direct appeal on March 26, 2008. (Doc.  363) Following appointment in late March, 2008, habeas counsel David Autry and Tivon Schardl entered their appearances on April 1, 2008 and April 2, 2008, respectively.  (Docs. 372, 373)   On March 16, 2009, habeas counsel filed the initial § 2255 petition and exhibits, including the reports of mental health experts and lay mitigation witnesses that will be the subject of the evidentiary hearing.  (Docs. 403, 404)  A corrected § 2255 petition was filed on March 17, 2009.  (Doc. 405)

Thus, trial counsel, including Mr. Hilfiger, had been on Mr. Barrett's case continuously for a period of 11 months before the jury was sworn and the trial began.  At the time the § 2255 petition with the "omitted" mitigating evidence that is the subject of the evidentiary hearing was filed, habeas counsel had been on the case approximately 11 and one-half months.  It goes without saying that before the habeas mitigation investigation could commence, counsel had to review the voluminous record, engage the services of investigators and experts, and the like.  So, in actuality, the mitigating evidence Mr. Barrett contends could have been discovered with due diligence and a reasonable investigation before trial was compiled by habeas counsel in well-less than 11 months.

Beyond this, while disqualification for bias or the appearance of bias must *generally* be grounded in an "extra-judicial" source (which circumstances plainly indicate was the basis for the above-quoted remark from the court's discovery order), disqualification for bias or its appearance may also be grounded from remarks by a judge in judicial proceedings which reveal an "excessive bias."

> A favorable or unfavorable predisposition can also deserve to be characterized
> as "bias" or "prejudice" because, even though it springs from the facts adduced
> or the events occurring at trial, it is so extreme as to display a clear inability to

Opposed Motion to Recuse and
Disqualify the Court, and Brief in
Support                                                                      4                                                      *Barrett v. United States,*
                                                                                                                                      OK-ED No. 6:09-cv-00105-JHP

539

render fair judgment.

*Liteky*, <u>510 U.S. at 555</u>.

Because the court's above-quoted comment from its discovery order shows the court has already made up its mind and reached conclusions on trial counsel's ineffectiveness, at least as to *Strickland's* performance prong, which would in effect lead to a finding that trial counsel were not Ineffective. it has already demonstrated a clear inability to render fair judgment, or the appearance of an inability to do so.

But that is not all.  This court has also evinced a disqualifying bias or the appearance of an inability to render fair judgment to any reasonable observer in its interference with defense counsel and its denial of necessary expert assistance from Dr. Pablo Stewart.  The court initially believed that it would have to disburse funds from the court's own "purse" for Dr. Stewart to be retained.  When this turned out not to be the case, because Dr. Stewart was going to be paid from funds available to the Federal Public Defender for the Eastern District of California, the court denied Dr. Stewart access to Mr. Barrett at USP Terre Haute because Mr. Barrett already had too many experts.  The court was also under the mistaken impression that anything Dr. Stewart could glean would only be relevant to Mr. Barrett's mental state in 2016-2017, not to his mental state in 1999 at the time of the offense or at the time of the federal trial in 2005.[2] The following remarks from various orders of the court are pertinent here:

> Petitioner claims this Court's order denying the requested mental health examination, which will undoubtedly focus upon Petitioner's current mental health as opposed to his mental health of September 24, 1999, is a denial of his rights ... .
> ...

---

[2] After some wrangling, the court did permit Dr. George Woods, who has been one of Mr. Barrett's mental health experts throughout these habeas proceedings, access to Mr. Barrett at the prison. Barrett v. United States, No. CV-09-00105-JHP. (Doc. 288)

Opposed Motion to Recuse and
Disqualify the Court, and Brief in
Support                                             5                        *Barrett v. United States*
OK-ED No. 6:09-cv-00105-JHP

540

> Moreover, this is not a case where the defendant has never been examined by any psychiatric or mental health experts.  Rather, according to the record herein, Petitioner has been examined by mental health professionals hired by counsel on, at least four separate occasions." [footnote omitted]

(Doc. 279, p. 4)

> Further, while the government indicates this Court has "exercised its discretion to permit the retention of Dr. Stewart as a mental health expert," this Court has not previously ruled on the retention of Dr. Stewart.

(Doc. 276, pp. 1-2)

> This Court believes the testing and examination of Petitioner which has occurred over the past fourteen (14) years is more than sufficient to adequately address the issues in the upcoming evidentiary hearing.  Therefore, Petitioner's motion is **denied**. (emphasis in original)

(Doc. 276, p. 2)

> While counsel have stated the examination will not be duplicative, this Court is not convinced that the evaluation would not be a repeat of previous evaluations.  Furthermore, as this Court has tried to communicate previously, *see* Dkt. #s 248 and 276, this Court does not believe a psychological evaluation conducted fourteen years after the shooting in this case, provides any insight to the Court regarding mitigating evidence which was available to counsel at the time of Petitioner's criminal trial in this Court.  As a result, Petitioner's Motion to Reconsider Expedited Motion for Order of Access to Petitioner by Mental Health Expert (Dkt. #277) is **denied**." (emphasis in original)

(Doc. 279, pp. 3-4)

Yet, even though the court denied Dr. Stewart access to Mr. Barrett to conduct an examination, it granted the government's motion to have him examined by an expert of their choosing at this late date, Dr. Steven Pitt, D.O.  (Doc.  269, pp. 12-15)  The obvious question arises:  if, according to the court's analysis, Dr. Stewart would be unable to find anything pertinent to Mr. Barrett's mental state at the "relevant time," how could Dr. Pitt, who conducted his examination in January, 2017, do so in order to rebut Mr. Barrett's mitigating mental health evidence?  Under the authority cited above, this stark anomaly in treatment of the defense and the government raises both

Opposed Motion to Recuse and
Disqualify the Court, and Brief in
Support                                            6                          *Barrett v. United States,*
                                                                              OK-ED No. 6:09-cv-00105-JHP

541

the *appearance* of partiality and the *fact* of actual bias, as any reasonable observer knowing all the

facts and circumstances would conclude.

Based on the foregoing argument and authority, the court should recuse and disqualify itself

from further participation in Mr. Barrett's case.

## Certificate of Conference

Mr. Barrett's counsel conferred with opposing counsel in an effort to resolve this issue. The

government opposes this motion.

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Opposed Motion to Recuse and
Disqualify the Court, and Brief in
Support                                    7                                    *Barrett v. United States*
OK-ED No. 6:09-cv-00105-JHP

542

## CERTIFICATE OF GOOD FAITH

David Autry and Joan M. Fisher, counsel for Kenneth Eugene Barrett, hereby certify, pursuant

to 28 U.S.C. § 455, that the foregoing motion to recuse and disqualify the Hon. James H. Payne is

being submitted in good faith.

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Opposed Motion to Recuse and
Disqualify the Court, and Brief in
Support                                                          8                                           *Barrett v. United States*
                                                                                                              OK-ED No. 6:09-cv-00105-JHP

543

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 1st day of February 2017, I caused the foregoing instrument

to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be

made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and

to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in

this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Opposed Motion to Recuse and
Disqualify the Court, and Brief in
Support                                                    9                              *Barrett v. United States*
                                                                                          OK-ED No. 6:09-cv-00105-JHP

544

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. 6:09-CV-00105-JHP |
| | ) | |
| | ) | **PETITIONER'S MOTION IN LIMINE** |
| v. | ) | **TO PRECLUDE POST-HOC** |
| | ) | **RATIONALIZATIONS, AND** |
| UNITED STATES OF AMERICA, | ) | **SUPPORTING BRIEF** |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner, Kenneth Eugene Barrett, moves the Court for an order precluding the

government from eliciting testimony from trial counsel regarding what they would have done

with information they did not possess or know about at the time of trial.  The law prevents the

government from seeking to defeat Mr. Barrett's penalty phase ineffective assistance of counsel

claim with post-hoc justifications or rationalizations for their acts and omissions.

Petitioner's Motion in Limine
To Preclude Post-Hoc Rationalizations,
And Supporting Brief                              1                    *Barrett v. United States*,
                                                                      OK-ED No. 6:09-cv-00105-JHP

Based on its Answer in this Court, its brief in the Tenth Circuit and its exhibit list, the government plans to have trial counsel justify their acts and omissions in representing Mr. Barrett in the second stage of trial with post-hoc rationalizations or excuses or otherwise testify about matters of which they lacked personal knowledge at the relevant time.

For example, trial counsel refer in their declarations to Dr. Bill Sharp's psychological report, which was done during the pendency of the state case, even though they state they never saw it before or during trial and it obviously could not have played a part in their strategic decisions.  Doc. 175, Smith Decl., Exh. 11, ¶¶ 8-10, Hilfiger Decl. Exh. 12, ¶¶ 10-12.

The government also relies on the declarations of trial counsel (couched in identical language) for the claim that "Kenneth Barrett did not want to present a case in mitigation that centered on sympathy for him or dwelled on his family."  Doc. 175, p. 116.  Along the same lines, and again in identical language, trial counsel parrot the non-sequitur that neither "want[ed] to premise our mitigation case on Mr. Barrett's drug use because [he] did not believe that the jury would be sympathetic to such a strategy."  Hilfiger Decl. ¶ 18, Smith Decl. ¶ 14.  The government argues the mitigation evidence submitted in this § 2255 proceeding would not have been presented based on what Mr. Barrett allegedly told them, or because the evidence was supposedly premised on Mr. Barrett's drug use.

Even though trial counsel's post-conviction declarations defending their conduct make no mention whatsoever of reports done during the state case from Faust Bianco, Ph.D. and Kathy LaFortune, Ph.D., the government's exhibit list indicates it is now seeking to have counsel justify their omissions based on this information. Govt's Exh. List, pp. 1, 3.

> It is also apparent the government will seek to excuse counsel's acts and omissions with "evidence" from Mr. Barrett's Bureau of Prisons file. Gov't Exh. List, p. 4. This information was not available to counsel

when they were preparing for trial or at trial and therefore it could not have played a part in any claimed decisions as to what lines of mitigating evidence to pursue. The same is true of any psychiatric report by the government's eleventh-hour expert, Dr. Steven Pitt, D.O.

It is rudimentary that witnesses may only testify regarding matters of which they have personal knowledge. Fed. R. Evid. 602. The requirement of personal knowledge precludes questions that call for speculation about past events such as "what if" questions. *Elyria-Lorain Broad. Co. v. Loraine J. Co.*, 298 F.2d 356, 360 (6th Cir. 1961).

In assessing whether trial counsel failed to conduct a professionally reasonable penalty phase investigation to Mr. Barrett's prejudice under *Strickland v. Washington,* 466 U.S. 668 (1984), the court is to view counsels' conduct from their perspective at the time of investigation and trial. *Strickland*, 466 U.S. at 689; *Wiggins v. Smith,* 539 U.S. 510, 523 (2003) (relying on *Strickland* to conclude that deficient performance analysis is "context dependent"). This includes, of course, what types of mitigating evidence counsel could have developed and introduced with a professionally reasonable investigation. The court "may not indulge 'post-hoc rationalizations' for counsel's decision-making that contradicts the available evidence of counsel's actions." *Harrington v. Richter,* 562 U.S. 86, 109 (2011) (quoting and citing *Wiggins*, 539 U.S. at 526-27). *See also Smith v. Mullin,* 379 F.3d 919, 929 (10th Cir. 2004)(citing *Wiggins* and holding that a court considering a second-stage ineffectiveness claim "must eschew post hoc rationalizations for [trial counsel's] deliberations, investigations, and defense strategy, or lack thereof"). Put another way, "an actual failure to investigate cannot be excused by a hypothetical decision not to use its unknown results." *Soffar v. Dretke,* 368 F.3d 441, 474 (5th Cir. 2004), *amended*, 391 F.3d 703 (5th Cir. 2004).

These principles were applied by the Tenth Circuit in Mr. Barrett's case. In response to the government's argument that trial counsels' actions were justified because they presented

Petitioner's Motion in Limine
To Preclude Post-Hoc Rationalizations,
And Supporting Brief                                  3                        *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

547

some evidence, the court noted "an uninformed choice is not a reasonable tactical decision."

*Barrett v. United States,* 797 F.3d 1207, 1228 (10th Cir. 2015).  This court is to determine

whether counsel made informed decisions based on a professionally reasonable investigation.

Permitting the government to elicit testimony from trial counsel as to how information they did

not have at the relevant time "justified" their omissions would deviate from the Tenth Circuit's

remand order and confuse the issues.  Hypothetical and speculative testimony about what

counsel "would have done" based on information they did not possess or consider is simply

irrelevant and outside their personal knowledge at the critical time.  Fed. R. Evid. 401, 602;

*Koch v. Koch Industries, Inc.*, 2 F. Supp. 2d 1385, 1388-89 (D. Kan. 1998) (relevance by legal

standards governing what is "properly provable in the case").

Petitioner respectfully requests this Court grant the instant motion, and that the evidence

and testimony identified above, and any evidence like it, be precluded.

### Certificate of Conference

Mr. Barrett's counsel conferred by email with opposing counsel regarding this

motion.  The government advised Mr. Barrett's counsel that it opposes this motion.

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Motion in Limine
To Preclude Post-Hoc Rationalizations,
And Supporting Brief                                4                    *Barrett v. United States,*
OK-ED No. 6:09-cv-00105-JHP

548

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 1st day of February 2017 I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsels' knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Motion in Limine
To Preclude Post-Hoc Rationalizations,
And Supporting Brief                               5                               *Barrett v. United States*,
                                                                        OK-ED No. 6:09-cv-00105-JHP

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:   (405) 521-9600
Facsimile:   (405) 521-9669
E-mail:      dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:   (916) 498-6666
Facsimile:   (916) 498-6656
E-mail:      Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| | ) | CASE NO. 6:09-cv-00105-JHP |
| Petitioner, | ) | |
| | ) | **PETITIONER'S MOTION FOR** |
| v. | ) | **ADDITIONAL TIME TO FILE** |
| | ) | **MOTION IN LIMINE REGARDING** |
| UNITED STATES OF AMERICA, | ) | **DR. STEVEN PITT, D.O.** |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner, Kenneth Eugene Barrett, asks the court to grant him ten (10) days following

the disclosure of any psychiatric report by Dr. Steven Pitt, D.O., within which to file appropriate

motions in limine respecting his testimony.

Petitioner's Motion for Additional Time
To File Motion in Limine re Dr. Steven Pitt, D.O.          1                    *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP   550

Over objection, the court granted the government's motion to allow Dr. Pitt to conduct a psychiatric examination of Mr. Barrett.  (Doc. 269, pp. 12-15)  Although Dr. Pitt has completed his evaluation, counsel for Petitioner have not yet received his report.   The court's scheduling order directs that motions in limine be filed by February 1, 2017.  (Doc. 270)

Petitioner has filed legal objections to Dr. Pitt's testimony, but obviously cannot frame a motion in limine with respect to the specifics of his proposed testimony without having reviewed his report.  Mr. Barrett therefore requests that he be given ten (10) days from the time Dr. Pitt's report is disclosed to counsel to file any appropriate motions in limine.

## Certificate of Conference

Mr. Barrett's counsel conferred with opposing counsel in an effort to resolve this issue.  The government is opposed to this motion.

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Motion for Additional Time
To File Motion in Limine re Dr. Steven Pitt, D.O.          2                                    *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP   551

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 1st day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Motion for Additional Time
To File Motion in Limine re Dr. Steven Pitt, D.O.          3          *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP   552

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:          dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:          Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. 6:09-cv-00105-JHP |
| | ) | |
| v. | ) | **OPPOSED MOTION FOR** |
| | ) | **18 U.S.C. § 3500 MATERIALS** |
| UNITED STATES OF AMERICA, | ) | **CONCERNING TRIAL COUNSEL** |
| | ) | **TESTIMONY AND BRIEF IN** |
| Respondent. | ) | **SUPPORT** |
| _____ | ) | |

Mr. Barrett moves for an order requiring the early production of material described in 18

U.S.C. § 3500 as it relates to the Mr. Barrett's trial counsel and government witnesses, Roger

Hilfiger and Bret A. Smith.

Opposed Motion for 18 U.S.C. § 3500
Materials Concerning Trial Counsel
Testimony and Brief in Support                            1                     *Barrett v. United States*,
                                                                                   OK-ED No. 6:09-cv-00105-JHP

The government has indicated its intent to call trial attorneys Roger Hilfiger and Brett Smith.  Their testimony will be directed toward Mr. Barrett's § 2255 allegations of ineffective assistance of counsel.  See Doc. 95 at 185.  Indeed, the government has submitted sworn testimony from each.  Doc 175-12 (Exhibit 11: Declaration of Bret Smith, SEALED, Doc 175-13 (Exhibit 12).

Mr. Barrett is entitled to know what transpired in the acquisition of the sworn testimony.

Section 3005 materials include:

> (1) a written statement made by said witness and signed or otherwise adopted or approved by him;
>
> (2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement;

18 U.S.C. § 3500 (e).  In other words, Mr. Barrett is entitled to every document, written or recorded, electronic or not, surrounding the government's acquisition of their sworn statements, and their upcoming testimony, from initial contact until now, and ongoing, until they testify.  Because this is capital case and because little to no discovery has been granted in this matter, it would be appropriate for this Court to order the early production of *Jencks* material.

"A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of *Criminal* Procedure or Civil Procedure, *or in accordance with the practices and principles of law.*"  Rule 6 (a), Rules Governing Section 2255 Proceedings for the United States District Courts ("§ 2255 Rules") (emphasis added). Available discovery in § 2255 proceedings is, thus, broader than Rule 6(a) of the Rules Governing § 2254 proceedings ("Habeas Rules"), which provides for discovery pursuant to the civil rules of procedure only.  Habeas Rule 6 governing § 2254 Proceedings.  In § 2255 Proceedings, Petitioner for good cause is entitled to

Opposed Motion for 18 U.S.C. § 3500
Materials Concerning Trial Counsel
Testimony and Brief in Support                      2                      *Barrett v. United States*,
                                                                         OK-ED No. 6:09-cv-00105-JHP

discovery under either the civil or *criminal* rules of procedure. § 2255 Rules, Rule 6 ("A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery.")  Because 18 U.S. C § 3500 is embraced by the criminal rules of procedure, and in accordance with the practices and principles of law, Mr. Barrett is entitled to discovery of the materials identified therein.  *See also* § 2255 Rule 8(d).

Such production is especially appropriate where material covered by the *Jencks* Act also contains information covered by the attorney-client privilege and where production is necessary in order to ensure that the defendant receives effective assistance of counsel. *See generally, United States v. Lujan*, 530 F. Supp.2d 1224, 1254 (D. N.M. 2008); *United States v. Beckford*, 962 F. Supp. 780, 795 (E.D. Va. 1997).  Beyond § 3500, Petitioner is also entitled to any evidence that may corroborate his claim of ineffectiveness. *Cf. Lujan, supra,* at 1224 (discussing *Brady* material).

The question of whether a criminal defense attorney facing ineffective assistance of counsel claim may help the prosecution establish the attorney's competency by disclosing confidential information without either the former client's informed consent or a court order has been addressed by the American Bar Association. ABA Opinion 10-456 (July 14, 2010).  It concludes that while "[t]he lawyer may have a reasonable need to disclose relevant client information in a judicial proceeding to prevent harm to the lawyer that may result from a finding of ineffective assistance of counsel . . ., it is highly unlikely that a disclosure in response to a prosecution request, prior to a court-supervised response by way of testimony or otherwise, will be justifiable."[1]  *Id.* Counsel have acted with reckless disregard in their communications with the

---

[1] Beyond Rule 6, § 2255 Rule 8(d) addressing statements by witnesses in an evidentiary hearing makes clear disclosure of *Jencks'* materials under § 3500 is contemplated by the 2255 Rules.

Opposed Motion for 18 U.S.C. § 3500
Materials Concerning Trial Counsel
Testimony and Brief in Support                                    3                              *Barrett v. United States*,
                                                                                                OK-ED No. 6:09-cv-00105-JHP

government, made without benefit of a court order defining the scope of the limited waiver.  See

ABA Opinion.

The government's interviews with trial counsel Hilfiger and Smith which informed the

proffered testimony by declarations were conducted without notice to Mr. Barrett or pursuant to

a court order defining the *limited scope* of the waiver of the attorney-client privilege implied by

an ineffective assistance of counsel claim. *See Bittaker v. Woodford*, 331 F.3d 715, 722, 726 (9th

Cir. 2003)(en banc), *cert. denied,* 540 U.S. 1013 (2003).  Beyond the need to prepare for the

hearing that determines whether the sentence of death is constitutional or not, Petitioner must be

advised of full substantive content of communications between the government and  attorneys

Hilfiger and Smith to determine if there is a breach of confidentiality and the scope of the breach,

if there is one.

Any waiver is narrow, limited by the claim of ineffectiveness. In *United States v. Pinson,*

584 F. 3d 972, 978 (10th Cir. 2009), the Tenth Circuit Court of Appeals acknowledged the

implied waiver of the attorney-client privilege in ineffectiveness claims but warned it is no

"'broader than needed to ensure the fairness of the proceeding before it.'"  *Id.,* at 978, quoting

*Bittaker v. Woodford,* 331 F. 3d 715, 716 (9th Cir. 2003).  Disclosure of the communications is

essential to the protection of Mr. Barrett's attorney-client privilege.

Given the attorneys' duty not to divulge privileged information absent a court order, the

gravity of the punishment imposed on Mr. Barrett, in the interest of due process and the effective

assistance of counsel, and to minimize delays during the hearing, this Court should grant

Petitioner's motion.

Opposed Motion for 18 U.S.C. § 3500
Materials Concerning Trial Counsel
Testimony and Brief in Support                          4                          *Barrett v. United States*,
                                                                                    OK-ED No. 6:09-cv-00105-JHP

556

**Certificate of Conference**

Mr. Barrett's counsel conferred with opposing counsel in an effort to resolve this issue.

The government opposes this motion.

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
 DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Opposed Motion for 18 U.S.C. § 3500
Materials Concerning Trial Counsel
Testimony and Brief in Support                5                *Barrett v. United States*,
                                                                            OK-ED No. 6:09-cv-00105-JHP

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 1st day of February 2017 I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Opposed Motion for 18 U.S.C. § 3500
Materials Concerning Trial Counsel
Testimony and Brief in Support                    6                    *Barrett v. United States,*
                                                                       OK-ED No. 6:09-cv-00105-JHP

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:       dbautry77@gmail.com


**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:       Joan_Fisher@fd.org


Attorneys for Petitioner,
KENNETH EUGENE BARRETT


# IN THE UNITED STATES DISTRICT COURT

# FOR THE EASTERN DISTRICT OF OKLAHOMA


| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. 6:09-cv-00105-JHP |
| | ) | |
| v. | ) | **OPPOSED MOTION TO** |
| | ) | **RECONSIDER ORDER DENYING** |
| UNITED STATES OF AMERICA, | ) | **DISCOVERY OF TRIAL COUNSEL'S** |
| | ) | **E-MAILS, AND BRIEF IN SUPORT** |
| Respondent. | ) | |
| _____ | ) | |


Petitioner, Kenneth Eugene Barrett, moves the court to reconsider the discovery request

for subpoenas duces tecum for trial counsels' e-mails and digital communications regarding their

representation of Mr. Barrett, including their electronic/digital/recorded communications with

Opposed Motion to Reconsider
Order Denying Discovery of Trial Counsel's
E-mails, and Brief in Support                    1                    *Barrett v. United States*,
                                                                      OK-ED No. 6:09-cv-00105-JHP

559

government counsel in aid of compiling their post-conviction affidavits and in preparation for their testimony at the evidentiary hearing. (Doc. 269, p. 4)

Should the court decide to reconsider its earlier ruling, Petitioner asks that trial counsel be directed to bring these materials to the United States District Courthouse in Muskogee sufficiently in advance of the March 13, 2017 evidentiary hearing date to allow Mr. Barrett's lawyers sufficient time to review them in preparation for the hearing. While under review to determine whether the requested materials are relevant to the issues at the evidentiary hearing or subject to a waiver of confidentiality, these items will be held in confidence and not disseminated to third parties.

This motion is being filed pursuant to Rule 6 of the Rules governing § 2255 proceedings, and other relevant provisions. These include Fed.R.Civ.P. 45; LCvR 7.1, 26.1. 37.1, 12.1; the due process clause of the Fifth Amendment; the Sixth Amendment right to counsel; and the Eighth Amendment, as this is a capital case.

In its discovery order, which denied Mr. Barrett's request for these materials, the court found Petitioner had failed to establish "good cause," since it had not been shown that trial counsel were being hostile or uncooperative with current counsel. (Doc. 269, p. 4) But no such showing is required.

Although trial counsel has turned over what purport to be all their hard copy files related to Mr. Barrett's case, they have not disclosed their e-mail communications, despite a request by current counsel. (See Exhibit A)

The e-mails and other materials requested in this motion are part and parcel of the files in Petitioner's case. The files belong to the client, not the lawyers. Therefore, Messrs. Hilfiger and Smith are required to produce what might be termed the "electronic" portion of their files.

Opposed Motion to Reconsider
Order Denying Discovery of Trial Counsel's
E-mails, and Brief in Support                    2                              *Barrett v. United States*,
                                                                               OK-ED No. 6:09-cv-00105-JHP
560

Regardless of the current posture of the case, trial counsel still have a duty of loyalty to their client, Mr. Barrett. See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 10.3 (2003). Trial counsels' e-mail and other electronic or digital communications – including their communications in these forms with government counsel in an effort to mount a defense to the claim of penalty phase ineffectiveness – are relevant to whether they conducted a professionally reasonable investigation into available mitigating evidence, and whether errors and omissions on their part prejudiced Mr. Barrett in the determination of punishment.

Petitioner has established good cause for the production of the requested materials. He has made "specific allegations before the court [to] show reason to believe that [he] may, if the facts are fully developed, be able to demonstrate that he is ... entitled to relief." *Bracy v. Gramley*, 520 U.S. 899, 908-09 (1997), quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969). The materials requested in this motion are necessary to a fair, rounded development of material facts relating to Mr. Barrett's ineffective assistance of counsel claim. *Toney v. Gammon*, 79 F.3d 693, 700 (8th Cir. 1996). In the context of this request, "[d]enial of an opportunity for discovery is an abuse of discretion," because the discovery asked for here "is necessary to fully develop the facts of the claim." *Teague v. Scott*, 60 F.3d 1167, 1172 (5th Cir. 1995).

Accordingly, Mr. Barrett moves the court to reconsider its previously ruling and order the discovery requested in this motion.

Opposed Motion to Reconsider
Order Denying Discovery of Trial Counsel's
E-mails, and Brief in Support                    3                    *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP     561

**Certificate of Conference**

Mr. Barrett's counsel conferred with opposing counsel in an effort to resolve this issue.

The government opposes this motion.

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Opposed Motion to Reconsider
Order Denying Discovery of Trial Counsel's
E-mails, and Brief in Support              4              *Barrett v. United States*,
                                                          OK-ED No. 6:09-cv-00105-JHP   562

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 1st day of February 2017 I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Opposed Motion to Reconsider
Order Denying Discovery of Trial Counsel's
E-mails, and Brief in Support                    5                    *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

# Exhibit A



**Barrett v.United States, 09-civ-105-JHP**
**Joan Fisher**   to: Roger Hilfiger, Bret Smith
Cc:  "david autry (dbautry77@gmail.com)"

11/18/2016 03:03 PM

Counsel:

Judge Payne has set Kenny Barrett's evidentiary hearing for February 16, 2017.
It appears to be an immovable.  Both of you will be called to testify.

We have one immediate request of each of you, and a reminder to both of you,
which is laid out fully in  ABA Opinion-10-456, which is attached..



2010-07-14 ABA Formal Opinion 10_456 re Privilege and IAC.pdf

First, the request. Please forward to me ALL your writings concerning Kenneth
Barrett, including correspondence, pre-appointment to present ,in whatever form,
including electronic:

    1.   Between both of you
    2.   Between each of you and any government entity, including but not
limited to the U.S. attorney's office, the justice department and the Court.
For the purpose of this request, transmittal letters for filings are excepted
as are the filings themselves.

If we can help facilitate this request, please do not hesitate to ask for our
assistance. We would ask that you comply within 10 business days. If you need
additional time, please let me know as soon as possible. The court has indicated
it will not grant an extension.

Second, the reminder, really a caveat. Ken Barrett has NOT waived, for any
purposes, HIS attorney-client privilege re your representation of him. We know
you take this responsibility seriously. I will not try to interpret the Model Rule for
you. The fact that Ken has raised effective assistance of counsel is not a general
waiver, nor should you construe it as such. You must, with certain very limited
exceptions in limited circumstances, invoke his privilege.  Any waiver by
operation of the allegations is narrow and limited to the scope of the allegations
so until you are fully apprised of the specific allegations and the questions, you
should continue to protect Mr. Barrett's attorney-client privilege.  Please read it
thoroughly and discuss with me any government requests that you speak with
them and/or waive this privilege AND give me advance notice of how you intend
to respond so that we can assert the privilege on his behalf, if such assertion
would not be frivolous -- if ever you intend to waive it under whatever

circumstances, for whatever reason.

Thank you both.

Joan Fisher
David Autry
Attorneys for Kenneth Barrett


Joan M. Fisher
Assistant Federal Defender
Federal Defender's Office for the Eastern District of California
801 I St., 3rd Flr.
Sacramento, CA  95814
Telephone: 916-498-6666
Facsimile:  916-498-6656

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee(s) named above.  If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited.  If you have received this e-mail in error, please notify me by reply e-mail.  Thank you for your cooperation.

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:     (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT,<br><br>          Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>          Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | **CAPITAL CASE**<br><br>CASE NO. CV-09-00105-JHP<br><br>**PETITIONER'S COMBINED SUPPLEMENTAL MOTION TO EXPAND THE RECORD AND BRIEF IN SUPPORT** |

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, respectfully moves this Court for an order adding the exhibits listed herein to those with which this Court expanded the record by order filed March 30, 2010. (Doc. 161.) This Court's previous order granted Mr. Barrett's motion to expand the record with Exhibits 1 through 57, 59 through 118, 139 through 143, 144A, 144B, 145, 146, and 147A-G. Order (Doc. 161). Those exhibits

Petitioner's Combined Supplemental
Motion to Expand the Record and Brief
In Support                                    1

constitute most of Mr. Barrett's evidence for his case in chief, i.e. the direct testimony of most witnesses and related exhibits. Mr. Barrett now seeks the same treatment for the following additional exhibits that he previously submitted in support of the Second Amended Motion for § 2255 Relief (Doc. 96):

- Exhibit 206      Suppl. Decl. of Ernie Barrett (supplements Ex. 81)

- Exhibit 207      Suppl. Decl. of Doris Barrett (supplements Ex. 80)

- Exhibit 208      Suppl. Decl. of Issac Barrett (supplements Ex. 84)

- Exhibit 209      Suppl. Decl. of Phyllis Crawford (supplements Ex. 91)

- Exhibit 210      Suppl. Decl. of Gelene Dotson (supplements Ex. 97)

- Exhibit 211      Suppl. Dec. of Mark Dotson (supplements Ex. 98)

- Exhibit 212      Suppl. Decl. of Ruth Harris (supplements Ex. 93)

- Exhibit 213      Suppl. Decl. of Carolyn Joseph (supplements Ex. 78)

- Exhibit 214      Suppl. Decl. of Linda Riley (supplements Ex. 87)

- Exhibit 215      Suppl. Decl. of Janice Sanders (supplements Ex. 85)

- Exhibit 216      Suppl. Decl. of Abbie Stites (supplements Ex. 103)

- Exhibit 217      Suppl. Decl. of Kathy Trotter (supplements Ex. 86)

- Exhibit 218      Suppl. Decl. of Leonard Post (supplements Ex. 31)

- Exhibit 219      Suppl. Decl. of Richard Burr (supplements Ex. 118)

- Exhibit 220      Suppl. Decl. of Toby Barrett (supplements Ex. 96)

Rule 7 of the Rules Governing § 2255 Proceedings provides that if the motion is not dismissed, this Court "may direct the parties to expand the record by submitting additional materials relating to the motion." R. Gov. § 2255 Proc. 7(a).

> The materials that may be required include letters predating the filing of the motion, documents, exhibits, and answers under oath to written

Petitioner's Combined Supplemental
Motion to Expand the Record and Brief
In Support      2      *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP    568

interrogatories propounded by the judge. Affidavits also may be
submitted and considered as part of the record.

R. Gov. § 2255 Proc. 7(b). Rule 7's only constraint on the Court's discretion to expand the

record with the listed documents is that the Court "give the party against whom the additional

materials are offered an opportunity to admit or deny their correctness." R. Gov. § 2255 Proc.

7(c).

The exhibits listed herein *supra* are declarations. A declaration under penalty of perjury is

admissible to the same extent as an affidavit, 28 U.S.C. § 1746, and therefore falls within Rule 7.

Each listed declaration was appended to Mr. Barrett's Reply to the Government's Response in

Opposition to the Second Amended Motion to Vacate (Doc. 178). These exhibits have the same

qualities as those with which this Court previously expanded the record. Indeed, each declaration

merely supplements a declaration with which this Court has already expanded the record.

The Government has possessed all exhibits referenced in this motion since July 1, 2010,

and has never questioned the authenticity of these declarations.

The Court of Appeals' decisions to remand this case for an evidentiary hearing expands

upon the grounds this Court previously found to warrant record expansion. Section 2255(b) of

the Judicial Code provides (with emphasis added):

> Unless the motion and the files and records of the case conclusively
> show that the prisoner is entitled to no relief, the court *shall* cause notice
> thereof to be served upon the United States attorney, *grant a prompt
> hearing thereon*, determine the issues and make findings of fact and
> conclusions of law with respect thereto.

Rule 8(a) of the Rules Governing § 2255 Proceedings provides:

> If the motion is not dismissed, the judge must review the answer, any
> transcripts and records of prior proceedings, and any materials submitted
> under Rule 7 to determine whether an evidentiary hearing is warranted.

The use of mandatory language indicates this Court is required, on its own motion; to order an evidentiary hearing unless there is conclusive evidence Mr. Barrett is entitled to no relief. The Tenth Circuit's holding that an evidentiary hearing is warranted and this Court's previous order expanding the record with the initial declarations of the listed declarants demonstrates that it would be appropriate to expand the record with their supplemental declaration.

## Certificate of Conference

Mr. Barrett's counsel conferred by email with opposing counsel in an effort to resolve this issue. The Government advised that it opposes this Motion.

## Conclusion

For the foregoing reasons, Mr. Barrett respectfully requests this Court enter an order expanding the record with the supplemental declarations listed herein *supra*.

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,
/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 1st day of February 2017, I caused the foregoing Petitioner's

Motion in Limine to Preclude Post-Hoc Rationalizations and Brief in Support to be filed with the

Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to

Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel

of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this

case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:    dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:    Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, <br><br> Petitioner, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) <br> ) | **CAPITAL CASE** <br><br> CASE NO. 6:09-cv-00105-JHP <br><br> **PETITIONER'S MOTION FOR AN ORDER BARRING WITNESS COLLUSION AND BRIEF IN SUPPORT** |

Petitioner, Kenneth Eugene Barrett, moves the Court for an order directing the

Government not to attempt to shape witness testimony by exposing witnesses to the statements

of other witnesses, and barring further Government-mediated collusion between witnesses.

On March 30, 2010, the Court entered an order expanding the evidentiary record with

declarations Mr. Barrett submitted in support of his Motion to Vacate and his amended motion.

Petitioner's Motion for an
Order Barring Witness Collusion and
Brief in Support                    1                    *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

572

(Doc. 161.) On May 5 and 10, 2010, the Government secured declarations from witnesses Bret Smith and Roger Hilfiger. Those declarations show the Government asked the witnesses to review declarations by other witnesses, at a minimum Bill Sharp and Jeanne Russell, whose testimony had already been admitted into the record. Hilfiger Decl. at ¶¶ 10-12; Smith Decl. at ¶¶ 8-10. The Government also asked Mr. Hilfiger and Mr. Smith to opine in their declarations on the veracity of Dr. Russell's declaration. *See* Smith Decl. at ¶ 8-9. Parts of the two declarations are worded identically or almost identically. *E.g.*, *compare* Hilfiger Decl. at ¶¶ 6, 10, 15-16 & 18 *with* Smith Decl. at ¶¶ 7, 8, 11-12 & 14.

Had Mr. Barrett been given the opportunity before the Government submitted its declarations, he would have invoked the witness sequestration rule, Fed. R. Evid. 615. "The purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373 (5th Cir. 1981). Rule 615 has been applied to bar a party from providing witnesses transcripts of other witness testimony. *Ibid.* The court's reasoning applies to Mr. Barrett's case:

> The opportunity to shape testimony is as great with a witness who reads trial testimony as with one who hears the testimony in open court. The harm may be even more pronounced with a witness who reads trial transcripts than with one who hears the testimony in open court, because the former need not rely on his memory of the testimony but can thoroughly review and study the transcript in formulating his own testimony.

*Ibid.*

The Government's tactics deviated from a tradition

> which goes back to "our inheritance of the common Germanic law," [and] serves two purposes: it "exercises a restraint on witnesses 'tailoring' their testimony to that of earlier witnesses; and it aids in detecting testimony that is less than candid." *Geders v. United States*, 425 U.S. 80, 87 (1976).

Petitioner's Motion for an
Order Barring Witness Collusion and
Brief in Support                                 2                        *Barrett v. United States*,
                                                                         OK-ED No. 6:09-cv-00105-JHP

*United States v. Jackson*, 60 F.3d 128, 133 (2nd Cir. 1995). Although this Court must take into account these tactics when evaluating the credibility of the exposed witnesses, it cannot undo what has been done. Mr. Barrett seeks an order preventing further tailoring and mediated collusion.

The Government's tactics further deviated from long-established norms when it asked these key witnesses whether they agreed or disagreed with Dr. Russell's account, Hilfiger Decl. at ¶ 11; Smith Decl. at ¶ 9, rather than giving their own, independent account of events. It is black-letter law that a prosecutor may not ask one witness to speculate on whether another witness is being truthful. 5 Handbook of Fed. Evid. § 611.18, n.6 (7th ed. 2016) (collecting cases); *cf. United States v. Velarde*, 214 F.3d 1204, 1211 (10th Cir. 2000) ("testimony which essentially simply vouches for the truthfulness of another witness is impermissible"). Although the Government was careful to couch the witnesses' answers in terms of their personal recollections, the intention is unmistakable. The Government chose to expose the attorney-witnesses to the testimony of other witnesses. In doing so, the Government knew the attorney-witnesses were hand-picked by this Court against the advice of people with a demonstrated and unadulterated commitment to Mr. Barrett's interest in effective representation. *See* Decl. Julia O'Connell (Ex. 67) at ¶ 4-6. The Government's effort to play off this Court's favoritism for trial counsel succeeded until the Court of Appeals remanded for the present proceedings. *Compare* Order Denying Motion to Vacate at 145-46 (discussing ex parte statement of trial counsel about Russell's work while omitting mention of Russell's declaration giving her own account) *with United States v. Barrett*, 797 F.3d 1207, 1225 (10th Cir. 2015) (quoting Russell's conflicting account).

In order to bring the future proceedings into line with long-established law, Mr. Barrett

Petitioner's Motion for an
Order Barring Witness Collusion and
Brief in Support                                     3                          *Barrett v. United States*,
                                                                                OK-ED No. 6:09-cv-00105-JHP

574

moves this Court to enter an order (a) stating that <u>Fed. R. Evid. 615</u> is in effect and will remain in effect throughout the evidentiary hearing; (b) directing the Government not to present the proffered testimony of any witness to any other witness whether that testimony is in written or oral form, and whether or not the witness has already testified; (c) ordering the Government to direct its witnesses not to collude on their testimony; (d) directing the Government to cease its actions mediating collusion by presenting witnesses with written testimony that is identical or nearly identical with that of another witness or witnesses.

### Certificate Of Conference

Mr. Barrett's counsel conferred by email with opposing counsel by telephone in an effort to resolve this issue. The Government advised the undersigned that it opposes this Motion.

### Conclusion

For the foregoing reasons, Mr. Barrett respectfully requests this Court enter an order granting the relief specified herein.

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,
/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Motion for an
Order Barring Witness Collusion and
Brief in Support                    4                    *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 1st day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Motion for an
Order Barring Witness Collusion and
Brief in Support                                    5                                    *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. 6:09-cv-00105-JHP |
| | ) | |
| v. | ) | **PETITIONER'S OBJECTION TO** |
| | ) | **SUBMITTING PROPOSED FINDINGS** |
| UNITED STATES OF AMERICA, | ) | **OF FACT AND CONCLUSIONS OF** |
| | ) | **LAW IN ADVANCE OF HEARING** |
| Respondent. | ) | |
| | ) | |

The court's scheduling order directs counsel for the parties to submit proposed findings

of fact and conclusions of law on February 16, 2017, in advance of the evidentiary hearing,

which is to commence on March 13, 2017.  (Doc. 270)

Petitioner's Objection to Submitting
Proposed Findings of Fact and Conclusions
Of Law in Advance of Hearing                           1                           *Barrett v. United States*,
OK-ED 6:09-cv-00105-JHP

Petitioner objects.  This is not a typical civil case in which all the witnesses have been deposed, interrogatories and requests for admission answered, demurs and summary judgment motions heard. Therefore, it makes no sense to submit proposed findings of fact and conclusions of law at this time,  since we don't know what  witnesses will be heard, what they will say and what exhibits will be  introduced.  Nor do we have any idea what if, any declarations, this court intends to permit despite the fact, for example, that the Government  has filed no counter-declarations re Mr. Barrett's family history contained in numerous declarations, including that of Mr. Barrett's deceased father.

The findings of fact and conclusions of law that the court will ultimately make will be dependent on the evidence introduced at the hearing, not what counsel might anticipate the evidence will be, or hopes it will be.  Therefore, the court should take the reasonable step of requiring the parties to submit their proposed findings and conclusions *after* the hearing, not *before* it.

Petitioner asks the court to modify its scheduling order to require submission of proposed findings of fact and conclusions of law at some reasonable time after the evidentiary hearing concludes.

### Certificate of Conference

Mr. Barrett's counsel conferred with opposing counsel in an effort to resolve this issue. The government objects to this motion.

Petitioner's Objection to Submitting
Proposed Findings of Fact and Conclusions
Of Law in Advance of Hearing                    2                    *Barrett v. United States*,
OK-ED 6:09-cv-00105-JHP

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Objection to Submitting
Proposed Findings of Fact and Conclusions
Of Law in Advance of Hearing                    3                    *Barrett v. United States*,
OK-ED 6:09-cv-00105-JHP

579

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 1st day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Objection to Submitting
Proposed Findings of Fact and Conclusions
Of Law in Advance of Hearing                        4                        *Barrett v. United States*,
OK-ED 6:09-cv-00105-JHP

**DAVID AUTRY**, OBA No. <u>11600</u>
<u>1021 N.W. 16th Street</u>
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:          <u>dbautry77@gmail.com</u>

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:          <u>Joan_Fisher@fd.org</u>

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Movant/Petitioner, | ) | CASE NO. 6:09-cv-00105-JHP |
| | ) | |
| v. | ) | **MOTION TO RECONSIDER** |
| | ) | **ORDER DENYING REQUEST** |
| UNITED STATES OF AMERICA, | ) | **TO DEPOSE ROGER HILFIGER** |
| | ) | **AND BRIEF IN SUPPORT** |
| Respondent, | ) | |
| _____ | ) | |

Petitioner, Kenneth Eugene Barrett, asks the court to reconsider its denial of his

discovery request to take the deposition of one of his trial lawyers, Roger Hilfiger. (Docs. 246,

Motion To Reconsider Order Denying                                      *Barrett v. United States*
Request to Depose Roger Hilfiger and                                   OK-ED No. 6:09-cv-00105-JHP
Brief in Support

581

269).[1]  In denying the request to depose Mr. Hilfiger, the court found Mr. Barrett failed to demonstrate "good cause" because it was not shown trial counsel was uncooperative or hostile to Petitioner's current counsel. But no such showing is required. Depositions of trial counsel are routine where claims of ineffective assistance of counsel are made, whether requested by the petitioner or the government. *E.g., Smith v. Workman,* 550 F.3d 1258, 1264 (10th Cir. 2008); *Myrick v. Maschner,* 799 F.2d 642 (10th Cir. 1986); *Hurd v. Mondragon,* 851 F.2d 324, 327 (10th Cir. 1988); *White Thunder v. Hunter,* 149 F.2d 149 F.2d 578, 579 (10th Cir. 1945).

Permitting Mr. Barrett's counsel to depose Mr. Hilfiger will unquestionably advance the interests of the court and the parties, and will help ensure a just result. Discovery depositions serve to fully frame the areas of dispute and assist in narrowing the issues. This conserves scarce judicial resources. A pre-hearing deposition will also allow for a more complete exploration of the facts related to the ineffectiveness claim.

Perhaps most importantly, this court's somewhat unique scheduling order (Docs 274, 283), which delays the testimony of the chief target of the ineffective assistance claim from March 13, 2017 to March 30, 2017, makes a deposition necessary in the interests of justice. A deposition of Mr. Hilfiger will permit the parties to prepare adequately in order to ensure a full and fair evidentiary hearing. It will give sufficient notice of Mr. Hilfiger's testimony beyond his previously submitted affidavit[2] should the government seek to broaden the scope of what he said in the affidavit. Allowing a deposition will conserve judicial resources by making the immediate

---

[1] This motion is being filed under the authority of Rule 6 of the rules governing § 2255 cases; Fed.R.Civ.P. 26 and 30; LCvR 7.1, 26.1, 37.1, and 12.1; and the Fifth, Sixth and Eighth Amendments of the United States Constitution.

[2] The government's interview with Mr. Hilfiger which informed his affidavit was conducted without notice to Mr. Barrett or pursuant to a court order defining the *limited scope* of the waiver of the attorney-client privilege implied by an ineffective assistance of counsel claim. *E.g.,*

Motion To Reconsider Order Denying                                    *Barrett v. United States*
Request to Depose Roger Hilfiger and                              OK-ED No. 6:09-cv-00105-JHP
Brief in Support

2

presentation of rebuttal evidence possible instead of Petitioner's counsel having to seek a continuance in order to investigate and rebut any unanticipated testimony. As a related matter, permitting a deposition will allow Petitioner to efficiently identify and schedule rebuttal witnesses. Finally, allowing a deposition of Mr. Hilfiger will prevent any further collusion between the government and Mr. Hilfiger in preparing his testimony.[3]

Based on Mr. Barrett's original discovery request and the above argument and authority, he has established good cause for his request to take Mr. Hilfiger's deposition. He has made specific allegations which show reason to believe he can fully develop facts demonstrating he is entitled to relief. *Bracy v. Gramley,* 520 U.S. 899, 908-09 (1997). Allowing Mr. Barrett's counsel to depose Mr. Hilfiger will "ensure that the facts underlying a [habeas] claim are adequately developed," which is the purpose of post-conviction discovery. *Johnston v. Love,* 165 F.R.D.444, 445 (E.D. Pa. 1996). Taking Mr. Hilfiger's deposition is indispensable to a fair, rounded development of material facts essential to proving Mr. Barrett's ineffective assistance of counsel claim. *Toney v. Gammon,* 79 F.3d 693, 700 (8th Cir. 1996). Conversely, denying Petitioner the opportunity to take the requested deposition will constitute an abuse of discretion, since this discovery is necessary to fully develop the facts. *Teague v. Scott,* 60 F.3d 1167, 1172 (5th Cir. 1995).

The court should reconsider its previous order and permit counsel for Petitioner to depose Roger Hilfiger.[4]

---

*Bittaker v. Woodford*, 331 F.3d 715, 722, 726 (9th Cir. 2003)(en banc), *cert. denied,* 540 U.S. 1013 (2003).

[3] Mr. Barrett has filed a separate motion requesting that collusion between witnesses be prohibited.

[4] This motion for reconsideration is not intended to waive Mr. Barrett's objection to the Court's earlier wholesale denial of his request for leave to conduct discovery. Should it be necessary, he reserves the right to appeal that denial.

| | |
|---|---|
| Motion To Reconsider Order Denying | *Barrett v. United States* |
| Request to Depose Roger Hilfiger and | OK-ED No. 6:09-cv-00105-JHP |
| Brief in Support | |

**Certificate of Conference**

Mr. Barrett's counsel conferred with opposing counsel in an effort to resolve this issue.

The government opposes this motion.

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Motion To Reconsider Order Denying                              *Barrett v. United States*
Request to Depose Roger Hilfiger and                            OK-ED No. 6:09-cv-00105-JHP
Brief in Support

4

584

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 1st day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M.FISHER

Motion To Reconsider Order Denying
Request to Depose Roger Hilfiger and
Brief in Support

*Barrett v. United States*
OK-ED No. 6:09-cv-00105-JHP

5

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S MOTION IN LIMINE TO |
| | ) | RELY UPON DECLARATIONS FOR |
| UNITED STATES OF AMERICA, | ) | DIRECT-EXAMINATION TESTIMONY |
| | ) | AND BRIEF IN SUPPORT |
| Respondent. | ) | |
| | ) | |

### MOTION

Petitioner, Kenneth Eugene Barrett, moves the Court for an order accepting as direct-examination testimony previously filed declarations of lay witnesses. By order filed March 30, 2010, the great majority of these declarations are already part of the evidentiary record. (Doc. 161) (expanding the record with Exhibits 1 through 57, 59 through 118, 139 through 143, 144A,

Petitioner's Motion in Limine to Reply
Upon Declarations for Direct-Examination
Testimony and Brief in Support                    1               *Barrett v. United States*,
                                                                  OK-ED No. 6:09-cv-00105-JHP

586

144B, 145, 146, and 147A-G).

By separate motion, Mr. Barrett is seeking to expand the record with Exhibits 206-219. Mr. Barrett may further supplement the direct-examination testimony of some witnesses who provided declarations, and he will make available for cross-examination all those whom the Government wishes to cross-examine. For the reasons stated *infra*, the relief requested is lawful, *see* 18 U.S.C. § 3593(c); R. Gov. § 2255 Proc. 7(b), is consistent with this Court's prior order and the purposes of Rule 7 of the Rules Governing § 2255 Proceedings, and, as the rule intended, will save time and expenses.

**BRIEF**

Mr. Barrett intends to present a minimum of twelve (12) professionals as witnesses and thirteen (13) lay witnesses, and may present more witnesses in each category. The vast majority of these witnesses have provided declarations that were previously made part of the record under Rule 7 of the Rules Governing § 2255 Proceedings. (Doc. 161.) Contemporaneous with this Motion, Mr. Barrett is moving the Court to expand the record with the supplemental declarations of fifteen (15) of these witnesses.

As the Court has already recognized, Rule 7(b) specifically authorizes expansion of the record with affidavits. (A declaration under penalty of perjury is admissible to the same extent as an affidavit. 28 U.S.C. § 1746.) Rule 7's only constraint on the Court's discretion to expand the record with the listed documents is that the Court "give the party against whom the additional materials are offered an opportunity to admit or deny their correctness." R. Gov. § 2255 Proc. 7(c). The Government has never questioned the authenticity of the declarations at issue. The Government will have further opportunity at the hearing to question their correctness.

The Advisory Committee Notes on the adoption of Rule 7 state that record expansion is

Petitioner's Motion in Limine to Reply
Upon Declarations for Direct-Examination
Testimony and Brief in Support                    2                    *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

587

permissible when a hearing is required, and that the procedure can save time and money. R. Gov. § 2254 Cases, advisory committee notes (referenced in R. Gov. § 2255 Proceedings, advisory committee notes). The Committee refers to *Harris v. Nelson*, 394 U.S. 286 (1969), which states:

> At any time in the proceedings, when the court considers that it is necessary to do so in order that a fair and meaningful evidentiary hearing may be held so that the court may properly "dispose of the matter as law and justice require," either on its own motion or upon cause shown by the petitioner, it may . . . take or authorize such proceedings . . . before or in conjunction with the hearing of the facts . . . as may be necessary and appropriate . . . .

*Harris*, 394 U.S. at 300 (cited and quoted in part in R. Gov. § 2254 Cases, advisory committee notes on R. 7 adoption). *See also Blackledge v. Allison*, 431 U.S. 63, 82-83 (1977). Even "[w]hen the issue is one of credibility, resolution on the basis of affidavits can rarely be conclusive, but that is not to say they may not be helpful." R. Gov. § 2254 Cases, advisory committee notes on R. 7 adoption (cited by R. Gov. § 2255 Proceedings, advisory committee notes on R. 7 adoption). Mr. Barrett merely proposes to shorten the hearing by not repeating testimony that is already in the record and that may be added to it if his recent Rule 7 motion is granted.

Much of the testimony Mr. Barrett seeks to introduce through declarations is relevant to mitigation and therefore to the prejudice prong of *Strickland v. Washington*, 466 U.S. 668 (1984). An assessment of prejudice requires that the Court take into account the law that governs a capital sentencing proceeding in the relevant jurisdiction. *Strickland*, 466 U.S. at 695; *Wiggins v. Smith*, 539 U.S. 510, 536-537 (2003). The Federal Death Penalty Act provides that during a capital sentencing hearing

> [i]nformation is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury.

Petitioner's Motion in Limine to Reply
Upon Declarations for Direct-Examination
Testimony and Brief in Support                    3                    *Barrett v. United States*,
                                                                      OK-ED No. 6:09-cv-00105-JHP

588

18 U.S.C. § 3593(c).

In the context of mitigation, § 3593(c)'s relaxed standard is consistent with Supreme Court law "recogniz[ing] that reliable hearsay evidence that is relevant to a capital defendant's mitigation defense should not be excluded by rote application of a . . . hearsay rule." *Sears v. Upton*, 561 U.S. 945, 950 (2010) (citing *Green v. Georgia*, 442 U.S. 95, 97 (1979) (*per curiam*), and *Chambers v. Mississippi*, 410 U.S. 284, 320 (1973)).

Other courts conducting hearings on ineffective-assistance claims have employed the same or similar procedures. *See*, *e.g.*, *Thomas v. Kelley*, No. 6:14-CV-06038 (W.D. Ark. Jul. 22, 2015); *Eaton v. Wilson*, No. 2:09-cv-00261-ABJ (D. Wy. Jul. 9, 2013); *Riel v. Warden of San Quentin*, No. 2:01-cv-00507-KJM-WB (E.D. Ca. May 20, 2010); *Sanders v. Ayers*, No. 1:92-cv-05471-LJO (E.D. Ca. Sept. 12, 2008); *United States v. Battle*, No. 1:95-CR-528-ODE (N.D. Ga. Mar. 13, 2002) (appended hereto).

### Certificate Of Conference

Mr. Barrett's counsel conferred by email with opposing counsel by telephone in an effort to resolve this issue. The Government advised the undersigned that it opposes this Motion.

### Conclusion

For the foregoing reasons, Mr. Barrett respectfully requests the Court enter an order stating that any declaration that has been made part of the record under Rule 7 of the Rules

////

////

////

Petitioner's Motion in Limine to Reply
Upon Declarations for Direct-Examination
Testimony and Brief in Support                    4                    *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

Governing Section 2255 Proceedings may stand as the witness's direct testimony or a portion thereof.

DATED this 1st day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Motion in Limine to Reply
Upon Declarations for Direct-Examination
Testimony and Brief in Support                5                *Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

590

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 1st day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Motion in Limine to Reply
Upon Declarations for Direct-Examination
Testimony and Brief in Support                    6                    *Barrett v. United States*,
                                                                        OK-ED No. 6:09-cv-00105-JHP

591

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:          dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:          Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. 6:09-CV-00105-JHP |
| | ) | |
| v. | ) | **PETITIONER'S MOTION IN LIMINE** |
| | ) | **TO EXCLUDE NOVEL THEORIES** |
| UNITED STATES OF AMERICA, | ) | **OF AGGRAVATION, AND BRIEF** |
| | ) | **IN SUPPORT** |
| Respondent. | ) | |
| _____ | ) | |

Petitioner, Kenneth Eugene Barrett, moves to preclude the government from relying on

new theories and evidence of aggravation never presented to the jury at trial in an effort to defeat

Mr. Barrett's penalty phase ineffective assistance of counsel claim.

The Government's exhibit list indicates the Government intends to rely on theories of

aggravation, and evidence, that either was not available to the Government at the time of trial or

Petitioner's Motion in Limine to
Exclude Novel Theories of Aggravation,
And Brief in Support                                  1                          *Barrett v. United States*,

that would not have been presented in Mr. Barrett's mitigation case. Mr. Barrett objects to the following examples listed in the Government's exhibit list, and to any other similar evidence the Government might attempt to introduce:

1. Testimony from, and evidence related to the work done by Faust Bianco, Ph.D.;

2. Testimony or evidence of any "risk assessment" of Kenneth Barrett by Jeanne Russell, Ed.D.;

3. Testimony or evidence related to a psychological evaluation of Kenneth Barrett by Kathy LaFortune, Ph.D.;

4. The Federal Bureau of Prisons file on Kenneth Barrett;

5. Testimony and evidence related to the "psychiatric evaluation" of Kenneth Barrett by Steven E. Pitt, D.O.;

6. Roseann Schaye's State of Arizona Board of Behavioral Health Examiners 2009 Disciplinary Action Record.

The sole focus of the upcoming evidentiary hearing is whether counsel rendered ineffective assistance in the second stage of trial. *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015). Despite this, the government wants to use the hearing to inject novel evidence and theories of aggravation. These include Mr. Barrett's institutional records from the Bureau of Prisons post-dating his trial, as well as an eleventh-hour "psychiatric" examination by Dr. Steven Pitt, D.O.[1]

This evidence is not relevant to whether counsel, faced with the aggravating

---

[1] Petitioner's lawyers have not yet received a report from Dr. Pitt, who examined Mr. Barrett less than two weeks ago. Mr. Barrett seeks to exclude his testimony as an anticipatory matter, and is moving for additional time to file any necessary motion in limine respecting his proposed testimony after counsel have an opportunity to review his report.

Petitioner's Motion in Limine to
Exclude Novel Theories of Aggravation,
And Brief in Support                    2                    *Barrett v. United States*,
                                                          OF-ED 6:09-cv-00105-JHP   593

circumstances for which they had notice and the evidence in aggravation the jury heard at trial, rendered ineffective assistance by unreasonably failing to investigate, develop, and introduce the mitigating evidence offered in these § 2255 proceedings. The new theories and evidence in aggravation in the form of the prison records and Dr. Pitt's examination do not have a tendency to make the material issue here – whether counsel provided ineffective assistance in the penalty phase – more or less probable. *E.g., Koch v. Koch Industries, Inc.,* 2 F.Supp.2d 1385, 1388-89 (D. Kan. 1998)(defining relevant evidence); Fed.R.Evid. 401.

The government cannot now argue trial counsel made reasonable strategic decisions to forego certain lines of investigation and the types of mitigating evidence developed in the post-conviction proceedings based on theories of aggravation and evidence not in existence at the time of trial. *Strickland v. Washington*, 466 U.S. 668, 689 (1984); *Wiggins v. Smith*, 539 U.S. 510, 523 (2003); *Harrington v. Richter*, 562 U.S. 86, 109 (2011); *Smith v. Mullin*, 379 F.3d 919, 929 (10th Cir. 2004); *Soffar v. Dretke*, 368 F.3d 441, 474 (5th Cir. 2004), *amended*, 391 F.3d 703 (5th Cir. 2004).

In the penalty phase of a capital case, the government is limited to aggravating circumstances of which it gave pretrial notice. 18 U.S.C. § 3592(b). The relevant law also precluded the government from presenting at trial expert evidence for which it failed to give notice. Fed.R.Crim.P. 16(a)(1)(G).

Just as a reviewing court may not uphold a conviction or sentence on the basis of a theory or theories not presented to the jury, *e.g., Chiarella v. United States,* 445 U.S. 222, 236 (1980); *Rewis v. United States*, 401 U.S. 808, 814 (1971); *Dunn v. United States*, 442 U.S. 100, 106 (1979), claims of ineffective assistance are not to be weighed against theories and evidence of aggravation the jury never heard. For purposes of the evidentiary hearing, the government is

Petitioner's Motion in Limine to
Exclude Novel Theories of Aggravation,
And Brief in Support                                     3                                     *Barrett v. United States*,
OF-ED 6:09-cv-00105-JHP    594

stuck with the aggravating circumstances and the evidence supporting them it presented at trial. The evidentiary hearing is not the sentencing or resentencing hearing the government wants to transform it into.

Put simply, the court is to reweigh the mitigating evidence presented at trial and the evidence in mitigation which could have and should have been developed against the aggravating circumstances and the evidence supporting them *that were presented at trial. Porter v. McCollum,* 539 U.S. 30, 41 (2009) (quoting *Williams (Terry) v. Taylor,* 529 U.S. 362, 397-98 (2000)) (in determining whether defendant was prejudiced by professionally unreasonable acts and omissions by counsel, the court must "consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding' and '*re*weig[h] it against the evidence in aggravation.'")(emphasis added); *Wiggins v. Smith,* 539 U.S. 510, 536 (2003)("in assessing prejudice, the court *re*weighs the evidence in aggravation against the totality of the *available* mitigating evidence)(emphasis added); *Hooks v. Workman,* 689 F.3d 1148, 1202 (10th Cir. 2012)("[t]o assess prejudice arising out of counsel's errors at a capital-sentencing proceeding, we must 'reweigh the [original] evidence in aggravation against the totality of available mitigating evidence'"); *Smith v. Mullin,* 379 F.3d 919, 941-44 (10th Cir. 2004)(concluding defendant was prejudiced by counsel's performance where the original mitigating evidence and mitigating evidence developed in collateral proceedings outweighed the original aggravating circumstances, and the evidence supporting them that were presented to the jury at trial). Case law requires that a reviewing court look *back* to assess "whether there is a reasonable probability that, absent the errors [of trial counsel], the sentencer . . . *would have concluded* that the balance of aggravating and mitigating circumstances *did not* warrant death."

Petitioner's Motion in Limine to
Exclude Novel Theories of Aggravation,
And Brief in Support                                        4                              *Barrett v. United States*,
                                                                                                  OF-ED 6:09-cv-00105-JHP   595

*Strickland*, 466 U.S. at 695 (emphasis added).[2]

The same holds true for the reports done by Faust Bianco, Ph.D., and Kathy LaFortune, Ph.D., who examined Mr. Barrett during the pendency of the state case. Neither trial counsel nor the trial jury ever heard evidence from them or relating to any findings (preliminary as they were) they made. And, as stated in Petitioner's motion to preclude counsel from indulging in post-hoc rationalizations for their acts and omissions respecting the penalty phase, neither trial counsel, in their post-conviction declarations, state that any strategic decisions they made were informed in any way by the reports of these psychologists.

Mr. Barrett asks that this motion be granted to include the "new aggravation" outlined above and any similar evidence including any evidence that post-dates the trial.

### Certificate of Conference

Mr. Barrett's counsel conferred by email with opposing counsel in an effort to resolve this issue. The government's counsel advise that they oppose this motion.

DATED this 1st day of February, 2017

<div align="right">

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

</div>

---

[2] *See also Strickland*, 466 U.S. at 696 (prejudice determination requires consideration whether "verdict or conclusion [was] only weakly supported by the record," and that reviewing court "[t]ak[e] the unaffected findings as *given*, and tak[e] due account of the effect of the errors on the *remaining* findings") (emphasis added).

Petitioner's Motion in Limine to
Exclude Novel Theories of Aggravation,
And Brief in Support                                          5

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 1st day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants  who are counsel in this case.


/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Motion in Limine to
Exclude Novel Theories of Aggravation,
And Brief in Support                                   6                                   *Barrett v. United States*,
OF-ED 6:09-cv-00105-JHP    597

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | CASE NO. CV-09-00105-JHP<br><br>PETITIONER'S COMBINED MOTION IN LIMINE TO EXCLUDE TESTIMONY FROM, AND ANY EVIDENCE RELATED TO, PROPOSED EXPERT J. RANDALL PRICE AND BRIEF IN SUPPORT |

1

# TABLE OF CONTENTS

MOTION.................................................................................................................... 1

BRIEF ..................................................................................................................... 2

I.    PROCEDURAL HISTORY ................................................................................ 2

II.   OBJECTED TO EVIDENCE.............................................................................. 4

III.  LEGAL GROUNDS FOR EXCLUDING THE EVIDENCE ............................................. 4

    A.   Dr. Price's Testimony Should Be Excluded Because it Is Not Being Used to Rebut Dr. Russell's Risk Assessment and Therefore Violates this Court's Order and Mr. Barrett's Fifth and Sixth Amendment Rights.................................................................................................... 4

    B.   Dr. Price's Testimony Must Be Excluded Because there is No Reliable Scientific Basis for It, and Thus His Testimony is Inadmissible Under Federal Rule of Evidence 702............... 5

    C.   Dr. Price's Testimony Should Be Excluded Because its Probative Value is Outweighed by the Danger of Unfair Prejudice, Confusion of the Issues, and Misleading the Jury Pursuant to 18 U.S.C. § 3593(c) ...................................................................................................... 12

    D.   Dr. Price's Testimony Should Be Excluded Because it Violates Due Process and the Eight Amendment ........................................................................................................ 15

CERTIFICATE OF CONFERENCE....................................................................... 17

CONCLUSION...................................................................................................... 17

CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY............................ 19

i

## TABLE OF AUTHORITIES

**Federal Cases**

*Barefoot v. Estelle*, 463 U.S. 880 (1983) ........................................................................ 17

*Daubert v. Merrell Dow Pharms.*, 509 U.S. 579 (1993) ................................................ 6, 7

*Estelle v. Smith*, 451 U.S. 454 (1981) ............................................................................. 6

*Flores v. Johnson*, 210 F.3d 456 (5th Cir. 2000) .......................................................... 6

*Ford v. Wainwright*, 477 U.S. 399 (1986) ..................................................................... 16

*Hernandez v. Johnson*, 213 F.3d 243 (5th Cir. 2000) ................................................... 17

*Johnson v. Mississippi*, 486 U.S. 578 (1988) ....................................................... 16-17, 17

*Kumho Tire Co. v. Carmichael*, 526 U.S. 137 (1999) ................................................... 7

*Strickland v. Washington*, 466 U.S. 668 (1984) ........................................................... 16

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ............................................ 4

*United States v. Beckford*, 962 F. Supp. 748 (E.D. Va. 1997) ...................................... 6

*United States v. Edelin*, 134 F. Supp. 2d 45 (D.D.C. 2001) ......................................... 6

*United States v. Perez-Vega*, 250 F. Supp. 429 (M.D. Pa. 1966) ................................. 16

*United States v. Sampson*, 335 F. Supp. 2d 166 (D. Mass. 2004) ............................. 6, 18

*Zant v. Stephens*, 462 U.S. 862 (1983) ......................................................................... 16

**Federal Statutes**

18 U.S.C. § 2255 ......................................................................................................... 4, 15

18 U.S.C. § 3593(c) ....................................................................................................... 16

18 U.S.C. § 3593(c) (2012) ....................................................................................... 2, 13, 18

**Other**

Eighth Amendments to the U.S. Constitution ................................................................ 2

Fed. R. Crim. P. 12.2 .................................................................................................... 3

Fed. R. Evid. 702 ................................................................................................... 2,  6, 13

**MOTION**

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, respectfully moves this Court for an order precluding the Government from adducing at the evidentiary hearing any evidence from or related to its proposed expert J. Randell Price, including his prior psychological evaluation/risk assessment report dated October 25, 2005 and filed with the Court on November 1, 2005; Price's concomitant videotaped interview of Mr. Barrett; and any testimony by Dr. Price. The Government did not and could not present such evidence at trial as rebuttal to Dr. Jeanne Russell—as intended—because trial counsel never opened the door by calling Dr. Russell as a witness.

Such evidence is not contained within the evidence Mr. Barrett now presents in mitigation, nor is it relevant to proving an aggravating circumstance of which the government gave notice prior to trial and that the jury did not reject.

And, critically, there was no reliable scientific basis for this proposed testimony by Dr. Price regarding risk assessment and psychopathy in 2005; at present, there remains no reliable basis for such testimony. Dr. Price's testimony would also prove grossly misleading: his misuse of the certain personality tests and his use of construct of "psychopathy" would cause unfair prejudice that would outweigh his testimony's utter lack of probative value.

Therefore, all testimony by or evidence relating to proposed expert Dr. Randall Price must be excluded pursuant to the Federal Rules of Evidence 702, 104 (a), 18 U.S.C. § 3593 (c), and the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution.

**BRIEF**

## I.   PROCEDURAL HISTORY

On September 23, 2005, trial counsel Roger Hilfiger and Bret Smith provided pre-trial notice of expert evidence to the government, pursuant to Federal Rule of Criminal Procedure Rule 12.2  Trial counsel indicated that Jeanne Russell, Ed.D., had conducted a risk assessment of Kenneth Barrett and that she would testify "if necessary" at his sentencing proceedings. Trial counsel did not maintain that Dr. Russell's report or testimony qualified as expert evidence of a mental condition under Rule 12.2. Instead, trial counsel averred that Dr. Russell's risk assessment "could possibly implicate" Rule 12.2, and they filed their notice merely to remove any chance of unfair surprise or unnecessary delay in the proceedings.

In response, the Government requested to have Randall Price, Ph.D., examine Mr. Barrett in order to rebut Dr. Russell. The Government emphasized repeatedly that the only permissible use of Dr. Price's report would be rebut Dr. Russell—if, in fact, Mr. Barrett later confirmed his intent to offer her at the sentencing proceedings. The Government acknowledged:

> [a]s provided by Rule 12.2(c)(4), the Government would be able to use . . . evidence it obtains [through Dr. Price's examination] only to rebut . . . evidence introduced by the defendant in his case-in-chief at second stage. If the defendant does not introduce the evidence [from Dr. Russell], the government will not introduce mental health evidence. The government merely seeks discovery . . . in order to rebut this anticipated evidence.

The Court concurred that the only permissible use of risk assessment evidence by Dr. Price was in rebuttal to Dr. Russell, and any other contemplated use would violate Mr. Barrett's constitutional rights. In its Order permitting rebuttal testing, the Court cautioned:

> [t]o allow the government to use the results of the defendant's mental examination [by Dr. Price], or any information derived therefrom for a purpose other than rebuttal at sentencing would violate the defendant's Fifth Amendment right against self-incrimination . . . . Further, to require the defendant to reveal his

2

strategy or disclose materials he provided to his experts would violate defendant's Sixth Amendment right to the effective assistance of counsel. (citations omitted).

Accordingly, the Court allowed the requested examination by Dr. Price, while delineating that "the sole purpose of the government's examination shall be to confirm or rebut evidence presented by the defendant" prior to trial. To safeguard defendant's constitutional rights, the Court ordered the results of Dr. Price's risk assessment findings to be served on a "fire-walled" Assistant United States Attorney pursuant to Rule 12.2, and placed under seal. Absent notice by defendant indicating his intent to offer Dr. Russell during sentencing proceedings, the results would remain sealed with the Court and would not be disclosed to any trial Assistant United States Attorneys or any other attorneys for the government or defense counsel. As defense counsel never indicated its intent to offer Dr. Russell, the results of Dr. Price's examination remained under seal at Mr. Barrett's sentencing proceedings.

Mr. Barrett has never suggested he would call Dr. Russell as an expert witness or rely upon her risk assessment as part of any case-in-chief.

On August 19, 2015, the Tenth Circuit of Appeals remanded Mr. Barrett's post-conviction claim of ineffective assistance of counsel due to failure to mitigate for an evidentiary hearing. *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015). Dr. Russell's risk assessment was not a part of the mitigation presentation Mr. Barrett proffered with his § 2255 Motion or in his presentation to the Tenth Circuit. Nevertheless, in its December 6, 2016, Discovery Order in anticipation of the upcoming evidentiary hearing, the Court deemed Dr. Price's report relevant to Mr. Barrett's post-conviction claim of ineffective assistance of counsel. Accordingly, the court ordered its unsealing, and directed the Clerk of the Court to make available Dr. Price's videotaped interview of Mr. Barrett. Mr. Barrett again refrained from evincing any intent to call Dr. Russell as a mental health expert witness at the hearing. Nevertheless, the Government has

3

expressed an intention to introduce testimony by Dr. Price at the evidentiary hearing.

## II.     OBJECTED TO EVIDENCE

The Government's exhibit list indicates the Government intends to rely on theories of aggravation, and evidence, that either was not available to the trial prosecutors at the time of sentencing or that would not have been presented in Mr. Barrett's mitigation case. Among such theories and evidence, Mr. Barrett objects to any testimony from, and evidence related to, the psychological evaluation/risk assessment of Dr. J. Randall Price.

The Government now proposes to have Dr. Price testify consistent with his 2005 report. Therein, Dr. Price concluded that Mr. Barrett's "emotional and behavioral traits result[] in unpredictable and violent outbursts of violence" and that he is a psychopath. Dr. Price based such conclusions chiefly on one risk assessment instrument, the Psychopathy Checklist-Revised ("PCL-R"). Consistent with his report, Dr. Price would testify to the asserted strong relationship between psychopathy and criminal behavior, violence, substance abuse, and recidivism. Dr. Price would also attest to the PCL-R as a reliable and valid measure of psychopathy and a "robust predictor of criminal behavior, including violence, in a variety of populations and contexts."

## III.    LEGAL GROUNDS FOR EXCLUDING THE EVIDENCE

### A. Dr. Price's Testimony Should Be Excluded Because it Is Not Being Used to Rebut Dr. Russell's Risk Assessment and Therefore Violates this Court's Order and Mr. Barrett's Fifth and Sixth Amendment Rights

The trial record establishes that the only permissible use of Dr. Price's testimony was to rebut testimony by Dr. Russell in the penalty phase case-in-chief. Defense counsel did not call

4

Dr. Russell in 2005, and Mr. Barrett has never endorsed her as a mental health witness in any subsequent proffer of his mitigation case.[1]

Accordingly, the introduction of Dr. Price's risk assessment testimony as part of the government's case-in-chief would exceed the scope of its permissible use under this Court's prior order. As this Court previously observed, the government's use of Dr. Price's testimony in the absence of opinion testimony by Dr. Russell violates Mr. Barrett's rights under the Fifth and Sixth Amendments. *See Estelle v. Smith*, 451 U.S. 454 (Fifth Amendment); *United States v. Sampson*, 335 F. Supp. 2d 166, 242 (D. Mass. 2004) (Sixth Amendment); *United States v. Beckford*, 962 F. Supp. 748, 764 n. 16 (same); *United States v. Edelin*, 134 F. Supp. 2d 45, 52 (D.D.C. 2001) (same).[2]

### B. Dr. Price's Testimony Must Be Excluded Because there is No Reliable Scientific Basis for It, and Thus His Testimony is Inadmissible Under Federal Rule of Evidence 702

Federal courts have routinely applied *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), to evaluate the reliability of expert predictions of future violence in capital sentencing proceedings. *See, e.g., Flores v. Johnson*, 210 F.3d 456, 463-70 (5th Cir. 2000) (Garza, J., concurring); *United States v. Sampson*, 335 F. Supp. 2d 166, 218-23 (D. Mass. 2004).

---

[1] Dr. Russell remains a potential percipient witness as to trial counsel's deficient performance, and, in the somewhat topsy-turvy circumstances, a potential rebuttal witness.

[2] As demonstrated in Mr. Barrett's Motion in Limine to Exclude Novel Theories in Aggravation and Brief in Support filed herewith, the Government is not now permitted to use Dr. Price to introduce new theories in aggravation—such as Mr. Barrett's "psychopathy" as asserted by Dr. Price—that were not previously presented at his original sentencing proceedings. Dr. Price's testimony also exceeds the scope of Mr. Barrett's original and new mitigating evidence regarding Mr. Barrett's mental health: "psychopathy" is not a generally accepted diagnosis in the relevant community of mental health professionals and proves irrelevant to the psychiatric diagnoses of Dr. George Woods and to the neuropsychological opinions of Dr. Deborah Miora. *See, e.g.,* Exhibit B (2-1-2017 Declaration of Thomas J. Reidy, Ph.D., ABPP) at pp. 18-19. Accordingly, Dr. Price's testimony must necessarily be excluded.

5

The *Daubert* Court established that expert testimony must be both relevant and reliable to be admissible. *Daubert*, 509 U.S. at 589; *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 141 (1999) (per *Daubert*, expert testimony admissible only if relevant and reliable).

The *Daubert* Court enumerated five factors to aid trial courts in making determinations whether expert evidence is reliable and relevant, and thus, admissible: (1) whether the reasoning or methodology underlying the testimony is scientifically valid, and whether that reasoning or methodology can be applied to the facts in issue; (2) whether the theory or technique can be and has been tested; (3) whether the theory or technique has been subject to peer-review and publication; (4) the known or potential error rate of the particular scientific technique; and (5) whether the technique has garnered general acceptance within the relevant scientific community. *Daubert*, 509 U.S. at 592-595. The *Daubert* Court emphasized that the inquiry is a flexible one, with the overarching subject being the "scientific validity and thus evidentiary relevance and reliability" of proffered expert submissions. *Id.* at 594-95.

Dr. Price's risk assessment methodology fails to satisfy any of the five *Daubert* factors. In particular, Dr. Price's use of the PCL-R in assessing violence risk in a prison has never been validated; psychopathy, as measured by the PCL-R, has never been probative of, or a valid predictor of, an individual's risk of committing serious violent acts during incarceration, and it has never been recognized as confirming or disconfirming of any psychiatric or neuropsychological diagnosis. This is a position that has received full support by the forensic psychology community.[3]

---

[3] For instance, in *United States v. Willis Haynes*, No. PJM-98-0520 (D. Md.), which was tried in 2000, five prominent clinical and forensic psychologists submitted affidavits that variously attested there was no scientific basis for claiming that a high PCL-R score accurately predicted persons with a high risk of committing prison violence. Those affidavits are attached hereto as Exhibit A. Since 2000, little has changed in the relevant scientific community. Mr.

6

In support of this Motion, Mr. Barrett submits and incorporates herein the attached Declaration of Thomas J. Reidy, Ph.D., ABPP. Exhibit B. Dr. Reidy is a licensed clinical psychologist and board-certified forensic psychologist with extensive experience in violence risk assessment. He is one of the leading experts in the country on this topic.

After review of Dr. Price's report, Dr. Reidy has concluded the state of the science indicates Dr. Price's report lacks reliability. In hazarding his opinions about Mr. Barrett's future violence, Dr. Price eschewed validated risk assessment methodology in favor of the PCL-R, MMPI-2, and PAI, which were used to reach highly misleading conclusions inapposite to the appropriate context—namely, capital inmates.

Dr. Reidy notes that Dr. Price failed to consider

the defendant's jail or prison records, which are critical to an assessment of prison violence risk in a similar context (e.g., Cunningham & Reidy, 2002). Instead, Dr. Price relies upon findings from the PAI, MMPI-2, and principally the PCL-R to make conclusions about general violence potential and implying but never directly stating the specific context and population related to his opinions. * * * While these test based descriptors may describe the defendant, there is no scientific basis for attributing these traits to risk of violence in a prison context, especially when a large percentage of inmates display similar traits. Rates of serious violence resulting in death or serious injury within prison are quite low, despite a large proportion of prison inmates with significant criminal histories and convictions for felonies and with half of the inmate populations incarcerated for violent offenses. [Ex. B at 5-6.]

A fundamental flaw in Dr. Price's report is his failure to acknowledge that the testing instrument he used—the PCL-R—has never obtained scientific validity for the specific context in which he is applying the purported results, namely a high-security prison population. As Dr.

---

Barrett has retained leading forensic psychologist Thomas J. Reidy, Ph.D., ABPP, to assess Dr. Price's opinions, in particular his use of the Psychopathy Checklist-Revised (PCL-R) in assessing violence risk in a prison, using the state of the science at the time of Mr. Barrett's trial, in 2005; also, Dr. Reidy has examined Dr. Price's opinions using post 2005 scientific developments. *See generally* Exhibit B. As discussed hereinafter, there remains no scientific basis for asserting that a PCL-R score accurately forecasts a high risk of violence in prison. *Id.*

7

Reidy observes, Dr. Price

cites the PCL-R as a reliable and valid measure of psychopathy and a "robust predictor of criminal behavior, including violence, in a variety of populations and contexts" but never specifies the particular contexts for which it has been validated by scientific studies. Seemingly in support of using the PCL-R for predicting violent or criminal behavior in an institutional setting, Dr. Price offers only a vague conclusionary statement pointing to "a few studies" demonstrating "relatively modest correlation between psychopathy and institutional misconduct" without further comment concerning the reliability and validity of these "studies" to the appropriate context.  This general statement is misleading when applied to institutional violence because the entire body of empirical evidence available in 2005 and at present does not support use of the PCL-R in the assessment of prison violence, particularly in a capital context (see Edens et al., 2001, 2005; Guy et al., 2005). For example, Edens et al., provide a table of 15 studies examining the relationship between psychopathy and institutional misconduct. Only one of these studies pertains to a very small sample (N=98) of adult inmates incarcerated in the U.S. and yielded nonsignificant correlations for both violent and nonviolent discipline reports. The remainder of the studies involved populations and contexts far different than inmates incarcerated U.S. prisons, that is, adolescents, mentally disordered offenders, Canadian inmates, sex offenders, and females; sample sizes were very small.

Validity refers to inferences derived from test scores in reference to a specific outcome criterion. Hence the question of validity for the PCL-R in the capital context should be framed around the violence risk for a capital population in prison. Dr. Price does not specifically mention use of the PCL-R in the capital arena, but declares a "few studies have demonstrated a relatively modest correlation between psychopathy and institutional misconduct." He does not define "relatively modest" or "institutional misconduct" and does not cite references. The scientific literature available in 2005 and to date suggests that Dr. Price's stated general conclusions about the results of the PCL-R are highly misleading with regard to any valid application of these findings to a prison population, and particularly to capital murderers, life without parole inmates, and related behavior in maximum security prisons. In fact, a large number of studies have pointed out that when assessing the risk of future institutional violence the predictive validity of the PCL-R has not been demonstrated in a capital context either prior to 2005 of thereafter (e.g., Edens, 1999, 2001, 2007, 2017; Edens, Buffington-Vollum, Keilen, Roskamp, & Anthony, 2005; Edens & Cox, 2012; Edens, Petrila, & Buffington-Vollum, 2001; Freedman, 2001; Edens, Smith, Davis, & Guy, 2012; Guy, Edens, Anthony, & Douglas, 2005). For example, the meta-analysis of 38 datasets by Guy et al. (2005) found extremely low correlations (.11 and .10) between physical violence and general aggression and PCL-R total scores for U.S. prisons meaning that the PCL-R made a negligible (1%) contribution to the violent outcomes. Such findings call into question the use of the PCL-R in the context of capital death penalty trials. [Ex. B at 6-8.]

8

Dr. Reidy identifies more aspects of Dr. Price's report that fail to meet basic scientific criteria for reliability. To wit:

Dr. Price's analysis of violence potential was based solely on his use of the PAI, MMPI-2, and PCL-R and did not address other correlates of prison violence that were well known in 2005. Although he generally alluded to moderating factors such as age reducing violence potential in the free world, he did not address a similar phenomenon occurring in prison. Dr. Price did not address base rates (frequency and prevalence) influencing the expression of violence in prison and that such rates vary by the population of interest and decrease as the definition of violence narrows. (Marquart et al., 1989; Cunningham & Reidy, 1998; Cunningham et al., 2005). Cunningham and Reidy (1998) summarized data showing that the prevalence of violent behavior dropped dramatically with age both in the community and in prison and subsequent studies across the last two decades have supported such trends. There are no data reflecting any relationship between psychopathy and age with regard to decreasing rates of prison violence. Seemingly, he did not review jail or prison records to assess the defendant's behavior in a similar context. These components of an institutional risk assessment and related methodology were widely known in 2005, routinely presented at federal and state capital trials, and generally accepted by the scientific community (Cunningham & Reidy, 1998a, b, 1999; 2002; Edens et al., 2005; Marquart, 1989). These studies and others over the past 25 years demonstrate that former death row inmates and capital inmates sentenced to life without parole who were described by mental health professionals at trial as a continuing threat to society demonstrated equivalent rates of violence toward inmates and staff, and in some instances were better behaved than comparison groups in high security prisons (e.g., Cunningham & Reidy, 2002; Cunningham et al., 2005a, b, 2016; Edens et al., 2005, Marquart et al., 1989, 1994; Reidy et al., 2001). These studies demonstrate low base rates of serious violent behavior that made it extremely difficult to determine exactly which capital defendants would engage in future acts of violence without identifying a large number of false positives. For example, Marquart et. al (1989) demonstrated that capital murderers serving a life sentence exhibited a rate of 2.6 serious violent infractions per 100 inmates in contrast to nearly 12 per 100 committed by general population inmates. Similarly, Cunningham, Reidy, & Sorensen (2005) provided evidence that approximately 10/100 life sentenced prisoners engaged in violent misconduct of some type in contrast to nearly half of parole eligible inmates and murder was nearly negligible with one homicide among 1,054 inmates. Any consideration of psychopathy in relation to prison violence must consider such moderators. Studies conducted subsequent to 2005, including one international perspective, further demonstrate the low base rates of prison violence for capital offenders and those serving a life sentence, and elucidate empirically derived correlates of prison violence, (e.g. Cunningham, 2010; Cunningham, Reidy, & Sorensen, 2008, 2016; Lucioni-Arbach et al., 2012). Empirically supported risk factors such as violence

9

base rates, age, prison context, and restrictive housing are critical components necessary for violence risk assessment at capital death sentencing as demonstrated by inclusion of this methodology in textbooks and by eschewing the use of instruments like the PCL-R that have poor applicability to capital case assessments (see e.g., Conroy & Murrie, 2007; DeMatteo, Murrie, Anumba, & Keesler, 2011). [Ex. B at 8-10.]

Dr. Price's failure to take into account validated risk assessment factors such as use of prior conduct during incarceration, base rates of violence, and capital context, all contribute to his methodological failings and grossly misleading conclusions.

Dr. Price's reliance on the PCL-R, MMPI-2, and PAI for his forecasts of Mr. Barrett's violence warrants the exclusion of his testimony under *Daubert*. As Dr. Reidy has concluded, "to a reasonable degree of scientific certainty, . . . the PCL-R" and other instruments employed by Dr. Price, the MMPI-2, and PAI , "do not meet *Daubert* standards for use in a decision making in a capital death penalty case." Exhibit B at 24. In fact, Dr. Price's "methodology" fails to satisfy each and every one of the five *Daubert* standards:

> Whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue. The scientific validity of psychopathy as measured by the PCL-R is not valid for purposes of capital sentencing. Validity refers to the usefulness of inferences that can be derived from specific test scores. When considering capital risk assessment, validity necessarily involves predictive validity with regard to a population of capital offenders given life sentenced inmates, and placed in secure housing. No studies have demonstrated such predictive validity attributed to PCL-R scores and the related construct of psychopathy. The use of PCL-R methodology cannot be applied to violence risk assessment for prison violence because no studies have demonstrated reliability and validity for such a purpose.
>
> Whether the knowledge or technique can be or has been tested by scientific methods. The above cited studies demonstrate that psychological test profiles cannot be reliably and validly associated with long-term prison violence. There is no direct scientific evidence that the PCL-R in particular is predictive of institutional violence by correctional offenders in the United States. Use of the term psychopath alone increases perceptions that a defendant will be a "future danger" in prison when no evidence supports such an assertion for capital inmates housed in maximum security prisons. A 2005 meta-analysis that considered all available research studies examining the relationship of psychopathy and violence

10

in US prisons concluded that there is weak evidence or no significant findings for the relationship between psychopathy and institutional misconduct. Although the predictive accuracy of the PCL-R has been studied, albeit insufficiently, in other settings, including psychiatric hospitals, that research does not provide an adequate basis on which to generalize the results to a different population, namely criminal offenders, in a different custodial setting. Conclusions about the predictive validity of the PCL-R with capitally convicted inmates housed in the secure correctional institution differ considerably from civil forensic psychiatric patients retained in a psychiatric hospital. Also, at this time, there is insufficient research to make generalizations from psychopathy ratings associated with violence from community behavior to prison behavior, and from psychiatric settings to life or death-sentenced correctional populations. These instruments fail to demonstrate a scientifically reliable and valid standard of performance in a capital death penalty case requiring jurors to make life or death decisions.

Whether the theory has been subjected to peer review and published in scientific journals. Research concerning the PCL-R, MMPI-2, and PAI through the year 2005 indicates no published, peer-reviewed studies examining the predictive validity of these instruments with respect to the institutional violence by capital offenders housed in high security prisons, or inmates serving a life sentence. No studies of the PCL-R and these other instruments have considered the influence or interaction of such moderating variables as base rates, aging, empirical correlates of violence, and risk management strategies to the actual expression of different forms of violence.

Whether there is a known or potential error rate associated with the theory or technique. There are no studies using the PCL-R, PAI, and MMPI-2 that permit establishment of error rates for the prediction of violence for in-custody populations of capital inmates serving life sentences in maximum security prisons. A 2001 study by Freedman specifically addressed "excessive false positive rates" related to the prediction of violent behavior by the PCL-R and reported the complete absence of significant findings for the few prison samples available at that time. Studies subsequent to this one through 2005 and beyond similarly report the absence of a relationship between psychopathy and personality traits with prison violence, which precludes the determination of error rates. Alhough error rates are unavailable for the PCL-R, the use of base rates can be used as an anchor to estimate meaningful probability of prison violence. Base rates differ according to the group being studied and definition of violence applied. To illustrate from the outer margin of prison base rate continuum, the rate of homicide of a correctional officer is 1 per 1,000,000 inmates per year, which is an exceedingly rare event. Over varying followup periods (ranging from 2-53 years) the rates of assault in the institution by death row, former death row, capital life, life-without-parole, life-with-parole inmates were relatively low ranging from 0% to 31% (Reidy et al., 2001) and these findings have been replicated in numerous studies over the years. Considering the low base rates, only estimates of improbability can be calculated because the error rates would range from 70-

11

100% depending on the definition of violence and the population studied. Hence, the false positive rate will be extraordinarily high.

<u>The degree to which the expert's theory or method is recognized and accepted as valid within the relevant scientific community.</u> The terms "psychopath" and "psychopathy" are not generally accepted diagnoses and the methodology used to to attach those labels, the PCL-R, is not part of the generally accepted methodology and diagnostic criteria used by the DSM [*Diagnostic and Statistical Manual of Mental Disorders*]. The PCL-R is not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in capital offenders in the United States, or inmates incarcerated for life in a maximum security prison. Currently, insufficient research has been conducted to justify the use of the PCL-R for assessing "future dangerousness" or future risk for aggression amongst populations of capital criminal offenders during their prison incapacitation from a life sentence. While it is possible to conduct scientific studies to assess the validity of the PCL-R in predicting future violent behavior in such correctional settings, only a small number of studies have addressed the institutional adjustment of any forensic population (e.g., civil psychiatric, forensic psychiatric, jail, or prison) through 2005. These studies do not investigate the pertinent population of relevance and the particular environment in which the defendant would be incarcerated if not given a death sentence (i.e., a maximum security prison).  Until more relevant research has been completed and sufficient data are available in the published, peer-reviewed literature to assess the instrument's predictive capacity in a prison setting, the PCL-R should not be used to judge a capital defendant's risk of future violence in such a prison setting. In fact, to do so would risk violating ethical and professional standards concerning the use of procedures and instruments not shown to be scientifically reliable and valid for a capital context. [Ex. B at 20-24.]

In sum, Dr. Price's evaluation must be excluded under Federal Rule of Evidence 702.

## C. Dr. Price's Testimony Should Be Excluded Because its Probative Value is Outweighed by the Danger of Unfair Prejudice, Confusion of the Issues, and Misleading the Jury Pursuant to <u>18 U.S.C. § 3593(c)</u>

The Federal Death Penalty Act affords stricter protection than the Federal Rules of Evidence by excluding information "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." <u>18 U.S.C. § 3593(c)</u>. Dr. Price's testimony must be excluded on statutory grounds. It would be misleading and of no probative value for the jury to hear testimony about the label "psychopathy" from an expert. As Dr. Reidy states and can readily be verified by reviewing the texts, the scientific community has

12

repeatedly excluded the "diagnosis" of psychopathy from successive editions of the DSM.

Psychopathy and the PCL-R are not part of the methodology of mental health diagnosis, known

as differential diagnosis. That is, how an individual is said to have scored on the PCL-R has no

bearing on whether that person suffers from a disorder that is included in the DSM.

> Neither the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) applicable in 2005, nor the edition in use today, DSM-5, identifies psychopathy as a diagnosis or mental disorder. Certain traits associated with the psychopathy construct are mentioned as part of Antisocial Personality Disorder (APD) in both editions, but APD is not the same as psychopathy. Although some similarity exists, APD and psychopathy are not interchangeable concepts yet have the same pejorative potential in an adversarial legal setting. The reliability and validity of an APD diagnosis has been questioned (e.g., Cunningham & Reidy, 1998, 1999). A diagnosis of APD with or without psychopathy describes little about the prison behavior except that an individual is similar to most prison inmates, and thus does not specifically lead to a conclusion that a particular inmate is incorrigible or "dangerous" in a prison environment (see Cunningham & Reidy, 1998, 1999, 2002). This conclusion is best exemplified in a recent study by Edens, et al. (2015) that determined a DSM 5 diagnosis of APD did not significantly predict prison misconduct. Additionally, the presence of APD and/or psychopathy does not preclude a diagnosis of major mental disorders (e.g., Schizophrenia) listed in the DSM. Mental disorders, apart from psychopathy ratings, can have a significant and disinhibiting effect on a person's proclivity for violence and other forms of maladjusted behavior in a prison context (Felson et al., 2012; Walters & Crawford, 2014).

> The use of the terms "psychopath" and "psychopathy" used or implied as a diagnosis by witnesses who have been deemed experts by courts is inaccurate and misleading. Diagnostic labels with widespread scientific acceptance are catalogued DSM. Psychopathy is not included in the DSM. Despite repeated efforts by supporters of the PCL-R to have psychopathy included in the DSM, it has been rejected. Lay jurors are unlikely to understand the significance of the American Psychiatry Association's decisions to reject the label as a diagnosis. It means that PCL-R and psychopathy fall outside  the model of differential diagnosis which is the generally accepted model for diagnosing mental health disorders. Differential diagnosis is the central feature of generally accepted practices in psychology and psychiatry. Allowing a mental health expert to testify that PCL-R supports a diagnosis of psychopathy misleadingly implies that the witness's methods and conclusions are in keeping with generally accepted practices in the field although they are not. [Ex. B at 18-19.]

> Just as the PCL-R is not part of the process of differential diagnosis related to the

disorders about which Mr. Barrett intends to introduce psychiatric testimony, the PCL-R has no probative value in assessing the neuropsychological testimony Mr. Barrett intends to offer. As stated in the attached declaration of Deborah S. Miora, Ph.D., none of the three tests mentioned in Dr. Reidy's declaration shed any light on the findings of Dr. Myla Young that were proffered with the § 2255 Motion. Exhibit C (Decl. Deborah S. Miora).

At the same time, studies show that the bare use of the term "psychopath" in capital proceedings has a strong prejudicial effect on juries and sentencing authorities. Dr. Reidy expounded on this prejudicial effect, in light of the empirical literature:

> The use of the PCL-R in this legal context poses a number of concerns. First and most importantly is the use of the term "psychopath" and the traits underlying the concept such as "remorselessness, callousness, grandiosity" etc. Such terms have a strong connotation that is stigmatizing and evokes frightening images of brazen killers such as Ted Bundy or Jeffrey Dahmer that have the potential to prejudice jurors. In a series of studies up through 2005, Edens and colleagues (2003, 2004, 2005) demonstrated that using evidence of psychopathy presented to mock jurors in a capital case, independent of expert testimony, revealed subjects merely labeled as psychopaths were considered more dangerous and death-worthy than others not so labeled (60% v. 38%) when all other facts remained the same. These studies demonstrate that attributions regarding undesirable personality traits can have a profound adverse influence on a potential juror's attitudes toward defendants perceived to exhibit psychopathy or its associated characteristics, particularly lack of remorse. The mere presentation of the psychopathic personality label and related traits, even if not directly connected to "future dangerousness" by an expert witness has a strong prejudicial effect causing jurors to be more supportive of a death sentence. Post 2005, another study by Edens et al. (2011) revealed similar findings that "… rating a defendant's perceived level of psychopathy strongly predicted support for executing him." [Ex. B at 16.]

In summary, Dr. Price's report has no probative value because, *inter alia*, (a) it was prepared and intended solely as rebuttal for testimony that will not be presented; (b) it lacks scientific testing, validity and reliability in the relevant context; (c) the PCL-R and the label it generates are not generally accepted in the scientific community for confirming or disconfirming mental health diagnoses made by Dr. George Woods or the neuropsychological findings of Dr.

14

614

Myla Young. Allowing an expert to present findings "psychopathy" in this case would be misleading and confusing in that it would suggest scientific reliability and relevance where none exists. Finally, the Court has been presented with evidence of a strong prejudicial effect from the label "psychopath." Therefore, Dr. Price's testimony is inadmissible under § 3593(c). Therefore, it can play no role in this Court's prejudice determination under *Strickland v. Washington*, 466 U.S. 668, 696 (1984).

### D. Dr. Price's Testimony Should Be Excluded Because it Violates Due Process and the Eight Amendment

Time and again, the U.S. Supreme Court has held that the Eighth Amendment mandates the need for "heightened reliability" in determining that death is the appropriate sentence in an individual case. *See, e.g., Zant v. Stephens*, 462 U.S. 862, 884 (1983); *Ford v. Wainwright*, 477 U.S. 399, 411 (1986). Accordingly, federal courts often invoke the "heightened reliability" requirement to exclude evidence that fails to satisfy the Federal Rules of Evidence. *See, e.g., United States v. O'Driscoll*, 250 F. Supp. 432, 436 (M.D. Pa. 2002) ("[W]here the government attempts to use unadjudicated acts of violence and misconduct the heightened standard of reliability applicable to capital sentencing proceedings requires that the hearsay rule be fully applicable to the penalty phase proceeding"). "Heightened reliability" cannot be satisfied by the admission of expert evidence that fails all *Daubert* standards and that proves even more unreliable than evidence admitted in civil litigation where the stakes are lower. Falling well short of the dictates of "heightened reliability," Dr. Price's evaluation and testimony must be excluded. *See, e.g., Zant*, 462 U.S. at 884; *Ford*, 477 U.S. at 411.

However, even if "heightened reliability" need not require the strict application of *Daubert* as a constitutional matter, the Eighth Amendment's bar on materially inaccurate evidence also stands to exclude unreliable expert testimony. *Johnson v. Mississippi*, 486 U.S. at

15

590 (no materially inaccurate evidence); *Hernandez v. Johnson*, 213 F.3d 243, 252-54 (5th Cir. 2000) (extending rule of *Johnson v. Mississippi* to expert testimony; inaccurate expert testimony that undermines confidence in the outcome of proceedings derogates the Eighth Amendment). In assessing expert testimony for material inaccuracy, the Fifth Circuit has applied a less stringent *Daubert*-review to the post-conviction phase of proceedings. *Hernandez, op. cit.* Such a flexible, post-conviction *Daubert*-review also proves broadly consistent with clearly-established federal law. *See Barefoot v. Estelle*, 463 U.S. 880 (1983) (presaging framework of *Daubert*; Eighth Amendment review of expert testimony for constitutional infirmities looking at error rate, later articulated as a factor under *Daubert,* methodological errors, and errors of application of method or technique to the facts of the case).

Any flexible, post-conviction *Daubert*-review as mandated by the Eighth Amendment dictates that Dr. Price's testimony cannot be admitted. *See, e.g., Barefoot,* 463 U.S. at 899-900 & n.7, 902-04; *Johnson,* 486 U.S. at 590; *Hernandez,* 213 F.3d at 252-54. Without any known error rate for the use of PCL-R in predicting prison violence, the Government cannot establish that the PCL-R falls within the constitutionally permissible error rate of two-thirds or less. As Dr. Reidy has demonstrated, even if an error rate for the PCL-R could be shown, very low base rates of violence in prison effectively guarantee constitutional difficulties: "[c]onsidering the low base rates, only estimates of improbability can be calculated because the error rates would range from 70-100% depending on the definition of violence and the population studied. Hence, the false positive rate [for the PCL-R] will be extraordinarily high . . . ." Exhibit B at 23. Accordingly, as the PCL-R has no known error rate, and any such error rate would necessarily be unacceptably high; Dr. Price opinion is entirely unreliable and must be excluded. *See Barefoot*, 463 U.S. at 899-900 & n.7, 902-04.

16

Rife with methodological errors that altogether ignore the state of the science and disregard known correlates of prison violence—including *inter alia* failure to use base rates for prison violence, failure to define severity of violence, misapplication of psychological testing, failure to consider measures used to prevent violence during incarceration—Dr. Price's report and testimony completely lack any scientific validity. *See, e.g.*, Exhibit B at 11-15. The Eighth Amendment mandates the exclusion of Dr. Price.

Additionally, the Due Process Clause dictates the exclusion of unreliable expert predictions of future violence during sentencing that are at variance with federal evidentiary law. *See Sampson*, *supra*, 335 F. Supp. 2d at 218-23 (applying federal evidence law, including *Daubert* factors and balancing test of 18 U.S.C. 3593(c), to conclude unreliable expert predictions of violence should be excluded; Due Process violation). As demonstrated *supra*, Dr. Price's evaluation fails all five *Daubert* factors, and the balancing test of 18 U.S.C. § 3593(c); accordingly, the Due Process Clause further mandates the exclusion of Dr. Price.

## CERTIFICATE OF CONFERENCE

Mr. Barrett's counsel conferred with opposing counsel by email in an effort to resolve this issue. The Government opposes this Motion.

## CONCLUSION

For the foregoing reasons, Mr. Barrett respectfully requests this Court enter an order precluding the Government from adducing at the evidentiary hearing testimony from, and any evidence related to, its proposed expert J. Randall Price.

///

///

///

17

DATED:  February 1, 2017

Respectfully submitted,

/s/ *David Autry*
DAVID AUTRY
Attorney at Law

*/s/ Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

 */s/ Tivon Schardl*
Tivon Schardl
Capital Trial & Habeas Attorney

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

18

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 1st day of February 2017, I caused the foregoing Petitioner's

Motion in Limine to Exclude Testimony from, and Evidence Related to, Proposed Expert J.

Randall Price, and Brief in Support to be filed with the Clerk of the Court using the ECF System

for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B.

Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there

are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

# Exhibit A

621

Affidavits Submitted in Support of
Motion in Limine to Exclude Expert Testimony
Regarding the PCL-R and HCR-20 Risk Assessment Instruments
and the Diagnosis of Psychopathy,
in *U.S. v. Willis Haynes*, May 24, 2000

AFFIDAVIT OF STEPHEN D. HART

I, Dr. Stephen David Hart, do declare the following:

1. I am an Associate Professor of Psychology at Simon Fraser University in Burnaby, British Columbia, Canada, where I teach, conduct research, and supervise graduate students in the areas of clinical and forensic psychology, with a particular focus on the assessment of psychopathy and risk for violence.

2. I obtained a doctoral degree in clinical and forensic psychology from the University of British Columbia in Vancouver, British Columbia, Canada, a graduate training program accredited by the American and Canadian Psychological Associations, where my studies focused on the assessment of psychopathy and my clinical training included supervised practice in the assessment and treatment of violent offenders.

3. I have written more than 150 books, chapters, and peer-reviewed articles in the area of forensic psychology and, more specifically, assessment of psychopathy and violence risk; presented more than 150 papers at academic and professional meetings on the same topics; and have co-authored psychological test and assessment procedures for assessing psychopathy and violence risk.

4. I am professionally active in the field of forensic psychology being, *inter alia*, a member of the executive committee of the American Psychology-Law Society (Division 41 of the American Psychological Association); a member of the editorial boards of academic journals, including *Law and Human Behavior* and *Legal and Criminological Psychology*; and a reviewer of articles submitted to academic journals and applications for funding submitted to granting agencies in Canada and the United States.

5. I have conducted more than 100 training workshops for legal, law enforcement, correctional, and forensic mental health agencies in the United States (including the U.S. Federal Bureau of Prisons, the U.S. Army, and the U.S. Navy), Canada (including the Correctional Service of Canada and the Royal Canadian Mounted Police), and the United Kingdom (including Her Majesty's Prison Service and the Scottish Prison Service), as well as in Sweden, Norway, Germany, and New Zealand.

6. I have testified as an expert witness concerning the topic of forensic psychology and, specifically, assessment of violence risk before courts, hearings, and tribunals in the Canadian provinces of British Columbia, Alberta, Manitoba, and Ontario; in the states of Florida, Washington, and Wisconsin; and before the Canadian Parliament.

7. I worked with Prof. Robert Hare, first as a student and later as a colleague, on the development and validation of the Hare Psychopathy Checklist-Revised (PCL-R), a psychological test for the assessment of psychopathic personality disorder; and I have conducted numerous training workshops on the use of the PCL-R, often with Prof. Hare.

8.  I worked with Prof. Christopher Webster, Dr. Derek Eaves, and Mr. Kevin Douglas on the development and validation of the HCR-20, a set of structured professional guidelines for the assessment of violence risk; and I have conducted numerous training workshops on the use of the HCR-20, often with Prof. Webster.

9.  The PCL-R, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the test manual allows that the PCL-R can be administered on the basis of case history information if that information is sufficiently detailed.

10.  Research indicates that PCL-R Total scores are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of the PCL-R with respect to institutional violence in correctional offenders in the North America.

11.  Research indicates that PCL-R Total scores are reliable when assessed in many populations; but to date only one published, peer-reviewed study has examined systematically the reliability of PCL-R scores in African-American correctional offenders in the United States. The results of that study were ambiguous, suggesting the need for further research on the reliability and applicability of the PCL-R in this context.

12.  Research indicates that PCL-R Total scores are correlated violence when scored on the basis of case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items 1, 2, 6, 7, 8, 13, and 16).

13.  The HCR-20, when used for clinical purposes, is scored on the basis of a comprehensive review of case history information and an interview; in cases where an interview is not possible, the manual allows that the HCR-20 can be administered on the basis of case history information if that information is sufficiently detailed.

14.  A limited body of scientific research indicates that HCR-20 ratings are correlated with violence in various contexts; but to date there are no published, peer-reviewed studies examining the predictive validity of HCR-20 ratings with respect to institutional violence in correctional offenders in the United States.

15.  A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in correctional offenders in the United States.

16.  A limited body of scientific research indicates that HCR-20 ratings are reliable; but to date there are no published, peer-reviewed studies examining systematically the reliability of HCR-20 ratings in African-American individuals.

AFFIDAVIT OF STEPHEN D. HART: Page 3

17.  A limited body of scientific research indicates that HCR-20 ratings are correlated with violence when based on case history information only; but the absence of an interview may negatively impact the reliability and predictive validity of HCR-20 scores, particularly on items that rely heavily on behavioral observations of the offender and information concerning his future plans (i.e., Items C1 through C5 and R1 through R5).

18.  It is my opinion, which I hold with a reasonable degree of scientific certainty, that there is no direct scientific evidence that the PCL-R and HCR-20 are predictive of institutional violence in correctional offenders in the United States; and that the PCL-R and HCR-20 are not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in correctional offenders in the United States.

I declare under penalty of perjury that the foregoing is true and correct.

_____
                                    Stephen D. Hart, Ph.D.
                                    19 May 2000

## MCP Hahnemann University

Operated by



Kirk Heilbrun, Ph.D.
Professor and Acting Chair
School of Health Professions
Department of Clinical and Health Psychology
Mail Stop 626 • 245 N. 15th Street • Philadelphia, PA 19102-1192
TEL 215 762.3634 • FAX 215.762.8625 • E-MAIL kheilbrun@compuserve.com
www.mcphu.edu

### Affidavit of Kirk Heilbrun

I, Kirk Heilbrun, state as follows:

1. I am currently Professor and Chair of the Department of Clinical and Health Psychology at MCP Hahnemann University. I am also Co-Director of the Law-Psychology Program, joint program in the Department of Clinical and Health Psychology at MCP Hahnemann and Villanova School of Law. I hold a Ph.D in Clinical Psychology from the University of Texas at Austin (1980), and completed a Postdoctoral Fellowship in Psychology and Law at Florida State University (1981-82). I am a Diplomate in Clinical Psychology and in Forensic Psychology, American Board of Professional Psychology.

2. I currently serve as a Violence Risk Assessment Consultant to the New Jersey Department of Human Services, Division of Mental Health Services and to the Pillsbury Corporation and the Giant Food Corporation as a Fitness for Duty Assessment consultant. I serve on the Advisory Board to the Forensic Psychology Program of the Federal Bureau of Investigation, and have previously served as a grant reviewer for the Office of Victims of Crimes for the United States Department of Justice. Between 1991 and 1993, I was the Clinical Director of Forensic Services for Central State Hospital in Florida, and prior to that was staff psychologist

1

625

and later Chief Psychologist in the Forensic Service, Florida State Hospital.

3. Since 1981, I have presented more than 80 lectures and workshops, primarily on risk assessment and risk management, to mental health and legal professionals. These have included invited lectures and presentations to the United States Department of Justice, the Federal Bureau of Prisons, the U.S. Medical Center for Federal Prisoners, the American Academy of Forensic Psychology, and the Forensic Services Unit of the Cook County Circuit Court. I have been the principal investigator or co-principal investigator on several grants to conduct research on risk assessment and criminal recidivism.

4. I have published extensively in the leading journals in my field on risk assessment and criminal behavior. These publications include more than 40 peer reviewed articles, five book chapters, and eight technical manuals. I am currently on the editorial boards of Law and Human Behavior, Journal of Threat Assessment, Criminal Justice and Behavior, Correctional Mental Health Report and the Journal of Behavioral Health Services and Research, and am an ad hoc reviewer for numerous additional journals.

5. Risk assessment and risk management have been a primary focus of my work since completion of my doctorate in 1980.

6. As a result of my extensive work in the field of risk assessment, I am familiar with the use of Psychopathy Checklist - Revised (PCL-R), having used it as a research instrument and in some applied clinical settings and forensic contexts with adults. I have administered the PCL-R and supervised its use in research. I am familiar with the published literature on the PCL-R and other risk assessment tools. Additionally, I have personal expertise in risk assessment and in the evaluation of reliability and validity as it relates to assessment instruments such as the PCL-R. I

2

626

believe that the PCL-R can be a useful too with which to assess the risk of future violent and nonviolent criminal behavior when used in the proper context and for the proper purposes.

7. Currently, insufficient research has been conducted to justify the use of the PCL-R for assessing future dangerousness or future risk for aggression amongst populations of criminal offenders during their incarceration. Because of the lack of scientific empirical research on the PCL-R for prediction of institutional violence, we do not know whether an individual's score on the instrument is related to the likelihood that this individual will commit acts of violence or aggression while in a secure prison environment. This is particularly true for prison settings that are the most structured and restrictive (the highest level of security). While it is certainly possible to conduct scientific studies to assess the validity of the PCL-R in predicting future violent behavior in such correctional settings, very few studies have addressed the institutional adjustment of *any* population (e.g., civil psychiatric, forensic psychiatric, jail, or prison) according to PCL-R score, let alone the specific population from the immediate case (death-sentenced or life-sentenced inmates) in the particular environment in which the defendant will be incarcerated (a maximum security prison). Until more relevant research has been completed and sufficient data are available in the published, peer reviewed literature to assess the instrument's predictive capacity in a prison setting, the PCL-R should not be used to judge an individual's risk of future violence in such a prison setting.

8. Although the predictive accuracy of the PCL-R has been studied in other settings, including psychiatric hospitals, that research does not provide an adequate basis on which to generalize the results to a different population, namely criminal offenders, in a different custodial setting. Those studies do not allow us to reach any conclusions about the predictive validity of

3

the PCL-R in the secure correctional institution setting because it is expected that a) civil and forensic psychiatric patients and convicted prisoners are dissimilar in significant ways, b) the treatment and psychiatric intervention needs of psychiatric patients are different than for prisoners, and c) the highly structured environment of prison is different in certain respects from even a structured forensic psychiatric hospital. Research based on psychiatric and community samples are substantially different from incarcerated samples, with whom little research has been focused on institutional adjustment. At this time, there is insufficient research to make generalizations from community behavior to prison behavior, and from psychiatric to life or death-sentenced correctional populations.

9. In any event, even the research conducted upon a secured psychiatric population suggests that the PCL-R may not be a strong predictor of institutional violence. I am the lead author on a study that examined how well the PCL-R predicted aggression in a mentally disordered offender population while in a forensic hospital (see, Kirk Heilbrun, Stephen Hart, Robert Hare, David Gustafson, Catherine Nunez and Adam White (1998) "Inpatient and postdischarge aggression in mentally disordered offenders" Journal of Interpersonal Violence 13(4) 514-27). We measured the PCL-R's predictive validity during the first two months and the last two months of secure forensic hospitalization. The PCL-R failed to predict aggressive behavior for the last two months of custody, as PCL-R scores were not significantly correlated with aggression during these final two months. The PCL-R had a statistically significant but modest-sized correlation with physical aggression during the first two months of custody. That correlation coefficient was .14, meaning that the PCL-R was accounting for approximately 2% of the variance in observed aggression. One conclusion of the study was that the PCL-R was not a

4

consistent predictor of institutional behavior, ranging from a modest association with aggression early in hospitalization to no association with aggression later in hospitalization. Any attempt to use the PCL-R to predict institutional aggression, therefore, would have resulted in a substantial rate of error. It should be added that none of the aggression observed in this study resulted in the death or serious injury of another individual.

10. While this study does not provide evidence about behavior in a prison setting, and should not be generalized to do so, it does provide some information concerning the overall predictive power of the PCL-R in a setting more similar to prison than in previous studies, which have followed individuals after they have been released into the community. Such research could be done, but has not, in a maximum security prison setting to determine the predictive validity of the PCL-R in relation to institutional violence by incarcerated life- or death-sentenced offenders. At this time, the PCL-R has not been tested and evaluated in this context.

11. There is also limited research at present using the PCL-R with African Americans or youth. Insufficient research has been performed to date to determine whether the meaning of PCL-R scores are comparable when the PCL is administered to African Americans.

12. Similarly, insufficient research has been done to determine whether the instrument is reliable and valid when used with a youthful or adolescent population. We do not currently know whether an adolescent who scores high on the PCL-R at the age 16 will persist in aggressive behavior beyond the late teens or early 20s. We do not yet have data to discriminate between "life course persistent" vs. "desistent" youth with respect to aggression; both may score high on the PCL when administered at the ages of 15 or 16, and the score may fail to discriminate between those who will persist and those who desist in aggression later in life. In

5

addition, not all adolescents achieve comparable levels of developmental maturity at a given chronological age. Influences such as child abuse and neglect, family dysfunction, cognitive deficits, learning problems, school problems, poverty, chronic exposure to violence, substance abuse, antisocial peers, and mental health problems can result in developmental delays, which could in turn mean that a particular adolescent was significantly less mature than comparably-aged peers. When an assessment instrument is applied with an individual at the very lower end of the technically-acceptable age range (e.g., 18 years old for the PCL-R), and such an individual has significant deficits in the areas described above, the instrument may yield results that are somewhat misleading if there is the assumption that a stable, adult "core personality structure" has been formed.

13. Absent such research, we cannot assume that the instrument possesses similar predictive validity when administered to African Americans or youths as it does with adult white males.

14. The PCL-R is a useful tool when used with a population and in a context in which it has been validated. Research conducted in non-prison settings cannot be generalized to the prison setting, and currently, there is insufficient scientific research to validly apply the PCL-R toward assessing future violence risk in a highly structured prison environment. Until sufficient research has been conducted with the PCL-R with this population and for this purpose, the scientifically sound conclusion is that it should not be used in this way.

15. The HCR-20, which is a risk assessment instrument that incorporates the PCL-R score as one of its items is a promising but new tool. Only in the past 1-2 years have studies begun to be published in the scientific literature. At this time, insufficient validation and

6

research has been completed on the HCR-20 to determine its predictive power.  Use of the HCR-20 at present to predict violent behavior in a correctional setting would result in all the problems discussed in relation to the PCL-R (in the context of correctional populations and sentencing). As with the PCL-R, the HCR-20 should not presently be used to assessing future violence risk in a highly structured prison environment until that research has been conducted, peer reviewed, and published.

I hereby declare under penalty of perjury that the foregoing is true and correct.

_Kirk Heilbrun_
Kirk Heilbrun

5-15-07
Date

7

631



Affidavit of Norman Poythress

I, Norman Poythress, state as follows:

1. I am currently a professor in the Department of Mental Health Law and Policy at the University of South Florida, where I teach forensic assessment (psychological evaluations for legal contexts) and conduct research on a variety of law-and-psychology issues.

2. I hold a Ph.D in clinical psychology from the University of Texas at Austin (1977) and am currently licensed to practice psychology in Florida. I have previously been licensed in Michigan and Alabama. I am a fellow of the American Psychological Association (APA) and past-president of the American Psychology-Law Society (Division 41 of APA).

3. I have published more than 50 book chapters and articles in peer-reviewed journals, most on psychology-and-law issues. I am a co-author of Psychological Evaluations for the Courts: A Handbook for Mental Health Professionals and Lawyers (1997), which is widely recognized as a leading resource on issues relating to psychological evaluations in the courts. I have served as faculty on risk assessment and risk management workshops for both clinical and legal (FBI, Secret Service) audiences and have served as a consultant to the Secret Service on issues related to risk management of persons who threaten government officials under their protection.

4. Prior to my academic career at the University of South Florida (1990-present) I worked as a forensic psychologist in maximum security forensic psychiatric hospitals (Center for

*Mental Health Law & Policy   The Louis de la Parte Florida Mental Health Institute*
University of South Florida   13301 Bruce B. Downs Boulevard   Tampa, Florida 33612-3807
(813) 974-4510   SunCom 574-4510   FAX (813) 974-9327   PDC/JJTA FAX (813) 974-4696

The University of South Florida is an Affirmative Action/Equal Access/Equal Opportunity Institution

Forensic Psychiatry, Ann Arbor, MI; Taylor Hardin Secure Medical Facility, Tuscaloosa, AL). In these settings my primary clinical duties were to conduct forensic psychological evaluations for the state courts on issues such as competence-to-proceed, insanity defense, and sentencing (including, in Alabama, capital sentencing). I have testified as an expert witness in state courts in Michigan, Florida, Alabama, and New Mexico, and before the House Armed Services Committee of the U.S. Congress regarding the U.S.S. Iowa incident.

5. Only very limited research is available that investigates the utility of the Psychopathy Checklist - Revised (PCL-R) in correctional settings for assessing the risk of violence posed by an individual while in custody. There is no such research available on individuals sentenced to life terms in maximum security prisons in the United States.

6. Error rates for the PCL-R, including false positive rates (the number of people who test high on the PCL-R and do not act aggressively), have not been established for estimates of risk for institutional violence for prison inmates generally or for maximum security detainees in particular. In order to assess these error rates, prospective studies which followed people sentenced to sufficiently long terms in custody need to be conducted. As a result of the lack of research, the predictive validity of a high score on the PCL-R in this context is unknown.

7. In a study which I co-authored, we administered the PCL-R to a group of youthful offenders in Florida and retrospectively assessed in-custody aggressive behavior [John Edens, Norman Poythress and Scott Lilienfeld (1999) *Identifying Inmates at Risk for Disciplinary Infractions: A Comparison of Two Measures of Psychopathy*, Behavioral Sciences and the Law 17:435-43]. We found a relatively low statistical association between PCL-R scores and institutional violence during the first year of incarceration, and we concluded that the PCL-R has only limited utility for purposes of individual classification. As our study is one of the few to

assess in-custody behavior, albeit using a retrospective methodology, and given our findings, it is inappropriate to conclude that sufficient research has been conducted at this time to reliably assess future behavior of the incarcerated based on PCL-R scores.

8. I know of no empirical research (e.g., survey of practitioners) that has attempted to establish a consensus in the psychological community as to the reliability and validity of using the PCL-R in the context of determining future dangerousness in a maximum security prison. In my opinion, the conclusions reached by Cunningham and Reidy in their recent review article [Mark D. Cunningham and Thomas J. Reidy (1998), *Antisocial Personality Disorder and Psychopathy: Diagnostic Dilemmas in Classifying Patterns of Antisocial Behavior in Sentencing Evaluations*, Behavioral Sciences and the Law: 16, 333-351] fairly represent the state of the field:

> "In summary, there is limited research regarding the prison behavior of psychopaths and most of the existing research is flawed by definition problems, lack of independent external criteria, small samples, and low base rates. Although some promising trends are apparent, estimations of the institutional assaultive potential of psychopaths remain tentative, particularly as a few studies cite no differences according to psychopathy ratings. Until a better research base develops caution should be exercised in utilizing the PCL-R in forecasting the likelihood of future serious person violence" (p. 343).

I hereby declare under penalty of perjury that the foregoing is true and correct.

Norman Poythress          5/23/00

Date

1. I, John F. Edens, Ph.D., am a licensed clinical psychologist in the state of Texas (license number 3-1105) and a faculty member in the Department of Psychology at Sam Houston State University (SHSU). I received my doctoral degree in clinical psychology from Texas A&M University in 1996, after which I completed a two-year post-doctoral fellowship in forensic psychology in the Department of Mental Health Law and Policy at the Louis de la Parte Florida Mental Health Institute at the University of South Florida. I have been a faculty member at SHSU since 1998.

I have conducted research on the area of risk assessment since 1997 and have published a professional manual, two book chapters, and eleven professional journal articles related to forensic assessment generally, and five articles specifically related to psychopathy.

I also occasionally conduct risk assessments on convicted sex offenders who are being evaluated for possible civil commitment in the state of Texas. These evaluations by statute require an assessment of psychopathy. When conducting these assessments I administer the Psychopathy Checklist-Revised (PCL-R).

2. I am familiar with the PCL-R, having used it in both clinical and research settings. Being familiar with the literature on it and having published original research related to its use, I believe it is an appropriate risk assessment instrument that can be helpful in making judgments regarding future violence in certain instances in which there is sufficient scientific support to justify its use.

3. At this time, however, there are relatively few studies examining the utility of the PCL-R in estimating the likelihood or risk for aggressive acts of incarcerated people. Those studies that have been conducted among inmates suggest an inconsistent association (e.g., some studies showing a weak to moderate relationship and others showing no significant relationship) between being identified as a "psychopath" (i.e., PCL-R score $\geq$ 30) and engaging in higher rates of various forms of prison violence. I am unaware of any published studies that have examined specifically the utility of the PCL-R to predict violence among inmates with life sentences who are kept in 23-hour per day lock-down facilities.

4. In my own study of a multi-cultural (54% African American, 32% Caucasian, 12% Hispanic) sample of 50 youthful offender prison inmates incarcerated in Florida (Edens, Poythress, & Lilienfeld, 1999), which is one of the few to use the PCL-R to assess in-custody infractions, my colleagues and I found a non-significant association between PCL-R scores and violent infractions during inmates' first year of incarceration. More specifically, we found that 5 of the 10 (50%) PCL-R-identified psychopaths committed some form of violent act that was judged by staff to warrant a disciplinary report. Of the 40 inmates whose PCL-R score was below 30 (i.e., "non-psychopaths"), 18 (45%) committed a violent infraction during this same time period. Notably, our study, as well as most others that have examined institutional misbehavior among psychopaths, was a postdictive (rather than predictive) design, in that we used PCL-R scores in an attempt to predict behavior that had already occurred rather than predict future behavior. Whether it would have performed similarly in terms of predicting inmates' subsequent violent acts is unknown.

5. In conclusion, I have significant concerns about the appropriateness of using the PCL-R to identify inmates who are highly likely to commit future acts of institutional violence, given the current scientific research base that exists to support the association between psychopathy and institutional aggression while incarcerated.

I declare under penalty of perjury that the foregoing is true and correct.

_John F. Edens, Ph.D._

5/22/00
Date

## AFFIDAVIT OF DONALD N. BERSOFF

I, Donald N. Bersoff, Ph.D., J.D., state that:

1.   I am a tenured full professor, Department of Clinical and Health Psychology, Medical College of Pennsylvania-Hahnemann University, and a tenured full professor, Villanova Law School.  I have served in those capacities since January 1990.

2.   As a faculty member in the above universities, I direct a J.D./Ph.D. Program in Law & Psychology jointly sponsored by both institutions.

3.   I received a Ph.D. in School Psychology from New York University in 1965 and a J.D. from Yale Law School in 1976.

4.   I have been a full member of the American Psychological Association (APA) since 1965 and was elected a fellow in 1974.  I was granted Diplomate status from the American Board of Professional Psychology in 1974.  Since 1997 I have presented annual workshops on the ethics of forensic testimony for the American Academy of Forensic Psychology.  From 1980-1981 I served as president of the American Psychology-Law Society and am a Fellow of that group.

5.   I have been a faculty member at several universities, including the University of Maryland School of Law, the Department of Psychology at the Johns Hopkins University, the University of Georgia, and the Ohio State University.

6.   From 1979-1989 I served as general counsel to the APA during which time I attended every meeting of the APA Ethics Committee and conducted all appeal hearings from decisions of the

1

636

Ethics Committee. From 1991-1994 I served on the APA's legislative body, the Council of Representatives, which adopted the current APA Code of Conduct (Code of Ethics) in 1992. From 1994-1997 I served on APA's 11-member elected Board of Directors. Part of my role was as a member of the Board's ethics subcommittee, reviewing all decisions of the Ethics Committee that led to expulsion or a stipulated resignation of APA members. I currently serve again on the Council of Representatives (1999-2001) and served as chair of the APA's Policy and Planning Board (1999-2000).

7. I am the author of Ethical Conflicts in Psychology, originally published by APA in 1995, and subsequently published in a second edition in 1999. It is a textbook used by a number of graduate departments of psychology as the basic text for courses in ethics. In that book I devote an entire chapter to the standards and ethics of testifying as a psychological expert witness in legal proceedings.

8. In all, I have published four texts, 25 chapters in texts, 47 articles in peer-reviewed journals, and presented at least 150 papers at major scientific and professional meetings. A great many of those publications and presentations concern ethical, legal, and policy issues in psychology. Most particularly, I have written and presented on the use and misuse of social science evidence in the legal system. In March 2000, I served as chair of a symposium on the impact of Daubert v. Merrell Dow Pharmaceutical Co. on the admissibility of social science evidence and presented a paper on that topic at the biennial meeting of the American

2

637

Psychology-Law Society.  In July 1997, at the invitation of the Federal Judicial Center, I gave an address at the National Workshop for Magistrate Judges on The Application of Daubert to Forensic and Social Science Evidence in Denver, Colorado.  In March and April 1996 I presented papers on the admissibility of expert psychological testimony at the Sixth Annual National Symposium on Mental Health and the Law and at American Psychology-Law Society, respectively.  I am currently drafting a law review article entitled, The Admissibility of Forensic and Social Science Evidence from Daubert to Kumho: A Quantitative and Qualitative Analysis. I have been selected to moderate an all-day session of a 3-day National Conference on Science and Law, co-sponsored by the National Institute of Justice, the Criminal Justice Section of the ABA, the American Academy of Forensic Sciences, the National Center for State Courts, the National District Attorneys Association and the National Science Foundation in collaboration with the National Academy of Sciences and the Federal Judicial Center.  I was the counsel of record for a Group of American Law Professors, submitting an amicus curiae brief in the original Daubert case before the U.S. Supreme Court in 1993.

9.   I have been retained, on a pro bono basis, by counsel for Defendant in the instant case for the purpose of advising this court regarding the validity of the conclusion drawn by Thomas V. Ryan, Ph.D. that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary," based on

3

the Psychopathy Check List Revised (PCL-R) and the HCR-20. Ryan, Capital Sentencing Evaluation, May 12, 2000, at 7.

10.    For the purposes of this affidavit, I have reviewed Dr. Ryan's Capital Sentencing Evaluation ("Evaluation") of the instant defendant, and the affidavits of Kirk Heilbrun, Ph.D., Stephen D. Hart, Ph.D., Norman Poythress, Ph.D., and John F. Edens, Ph.D. in this case.

11.    Dr. Ryan's psychological evaluation of the defendant, a 22 year old African-American male, consisted solely of administration of the PCL-R, the HCR-20, and Dr. Ryan's assessment of a variety of historical and demographic factors deemed to be associated with violence recidivism. In arriving at his opinion, he also relied on materials supplied by county, state and federal agencies, including audio and videotapes. He never personally saw, interviewed, nor tested the defendant. Nevertheless, Dr. Ryan asserted "that the impact of not personally examining Mr. Haynes resulted in essentially no limitations regarding conclusions rendered." Evaluation at 2.

12.    Dr. Ryan makes three other statements that are relevant herein.    First, he concludes that the defendant exhibits psychopathic features and asserts, "There is a plethora of empirical studies which demonstrate that individuals with psychopathic personalities are at very high risk for violence recidivism, including those who are institutionalized." Evaluation at 6.    Second, based on the HCR-20, Dr. Ryan concludes the defendant is "at the high range regarding final risk judgement."

4

Evaluation at 6.   Finally, his ultimate conclusion is that the defendant "is at a relatively high risk for engaging in violence recidivism, even given the structure of incarceration in a federal maximum security penitentiary."   Evaluation at 7.

13.   Based on my knowledge of the American Psychological Association's Code of Ethics[1] ("Ethics Code"), the Specialty Guidelines for Forensic Psychologists[2] ("Specialty Guidelines"), the Heilbrun, Hart, Pothress, and Edens affidavits, and my research on the application of Daubert to forensic psychological testimony, it is my opinion, to a reasonable certainty, that the opinions of Dr. Ryan, quoted above, do not represent an appropriate application of generally accepted ethical principles to the issues presented and violate the generally accepted standards of forensic psychological practice.

14.   One of the major purposes of the Ethics Code and the Specialty Guidelines is to safeguard against the misuse of science and to ensure that empirically-supported and generally accepted scientific conclusions are presented to the court.   Forensic experts recognize that their credentials and testimony may have a profound impact on jury decisionmaking and, therefore, have a responsibility to confirm that their opinions are firmly grounded in science and that any inferences they draw from science are generally supported.

---

[1]   APA, Ethical Principles of Psychologists and Code of Conduct, 47 Amer. Psychologist 1597 (1992).

[2]   Committee on Ethical Guidelines for Forensic Psychologists, 15 L. & Hum. Behav. 655 (1991).

5

640

15.    Dr. Ryan first states that a plethora of empirical studies demonstrates that institutionalized psychopaths are at a very high risk of recidivism for violent conduct. That statement is misleading because it implies that the studies referred to involved criminal offenders in correctional institutions. In fact, there are many kinds of institutionalized populations, including those with mental disabilities who are civilly committed and those who are in forensic criminal institutions. Based on the affidavits of Drs. Hart, Heilbrun, and Edens, there are no published, peer-reviewed studies examining the predictive validity of the PCL-R or the HCR-20 with respect to institutional violence in correctional offenders in the United States.  See Hart Affidavit at paras. 10, 14, 20; Heilbrun Affidavit at paras. 7, 8, 9, 14, 15; Edens Affidavit at para. 4.

16.    Second, Dr. Ryan fails to acknowledge the fact that the defendant is a young African-American adult. Both Drs. Hart and Heilbrun indicate that at most there is one study on the PCL-R and none on the HCR-20 evaluating the psychometric soundness (i.e., reliability) of these instruments with African-American correctional offenders, particularly youthful ones.  See Hart Affidavit, paras. 11, 15, 16; Heilbrun Affidavit, paras. 11, 12, 13, 15.  Dr. Ryan makes no mention of this fact and fails to acknowledge the resulting potential for inaccuracy in his conclusion.

17.    Third, Dr. Ryan, based solely on a subjective impression, concluded that his opinions were in no essential way limited by the

6

fact that he did not personally examine the defendant.  This opinion is at variance with that of Dr. Hart, one of the authors of the PCL-R, that "the absence of an interview may negatively impact the reliability and predictive validity of PCL-R scores," particularly on 7 of the 20 items that rely heavily on behavioral observations and the assessment of future plans.  Hart Affidavit at para. 11.  See also para. 17 (same conclusion regarding the HCR-20).  It is also at variance with at least one study indicating that administration of the PCL-R based solely on file review, as here, results in higher psychopathy scores than when combined with a personal interview.[3]  Dr. Ryan fails to acknowledge this source of inaccuracy as well.

18.    Based on the evidence of Drs. Hart, Heilbrun, Poythress, and Edens that:  (1)  There is not a generally accepted set of published, peer-reviewed studies examining violent recidivism on the population of offenders represented by defendant (young African-American males incarcerated in secure correctional facilities); (2) there are no studies using the PCL-R or the HCR-20 that establish error rates for in-custody populations concerning predictions of violent recidivism; (3 ) the use of the PCL-R and the HCR-20 to predict institutional violence in correctional offenders in the United States is not generally accepted in the relevant scientific community; and given that many federal cases have rejected psychological evidence in situations where the tests

---

[3]      R. C. Serin, Diagnosis of Psychopathy With and Without an Interview, 49 J. Clin. Psychology 367 (1993).

have not been validated for the specific purposes used in litigation, where there is insufficient published literature addressing the validity of the technique used in litigation, where there is the absence of a personal evaluation of the party by the expert, or, in the alternative, where the expert relied improperly on statements by the party calling the expert, it is my opinion that the evidence represented by Dr. Ryan's evaluation is inadmissible under Daubert.

19. Dr. Ryan's conclusions are not only inadmissible in my opinion under Daubert, but may also be at variance with accepted professional standards. The following provisions of the APA's Code of Ethics are relevant:

Standard 1.06: Psychologists rely on scientifically and professionally derived knowledge when making scientific or professional judgments . . . .

Standard 1.15: Because psychologists' scientific and professional judgments and actions may affect the lives of others, they are alert to and guard against personal, financial, social, organizational, or political factors that might lead to misuse of their influence.

Standard 2.01(b): Psychologists' assessments, recommendations, reports, and psychological diagnostic or evaluative statements are based on information and techniques (including personal interviews of the individual when appropriate) sufficient to provide appropriate substantiation of their findings.

Standard 2.02: (a) Psychologists who . . . administer, score, interpret, or use psychological assessment techniques . . . do so in a manner and for purposes that are appropriate in light of the research on or evidence of the usefulness and proper application of techniques.

(b) Psychologists refrain from misuse of assessment techniques, interventions, results, and interpretations and take reasonable steps to prevent others from misusing the information these techniques provide.

Standard 2.04: (a) Psychologists who . . . administer,

8

score, interpret, or use assessment techniques are familiar with the reliability, validation, and related standardization or outcome studies of, and proper application and the uses of the techniques they use.

(b) Psychologists recognize limits to the certainty with which diagnoses, judgments, or predictions can be made about individuals.

(c) Psychologists attempt to identify situations in which particular . . . assessment techniques or norms may not be applicable or may require adjustment in administration or interpretation because of factors such as individuals' . . . age, race, ethnicity . . . .

Standard 2.05: [P]sychologists . . . indicate any significant reservations they have about the accuracy of their interpretations.

Standard 3.03: Psychologists do not make public statements that are false, deceptive [or] misleading . . . .

Standard 7.01: Psychologists who perform forensic functions . . . base their forensic work in appropriate knowledge of and competence in the areas underlying such work, including specialized knowledge concerning special populations.

Standard 7.02: (a) Psychologists' forensic assessments, recommendations and reports are based on information and techniques (including personal interviews of the individual, when appropriate) sufficient to provide appropriate substantiation for their findings.

(b) Except as noted in (c) below, psychologists provide written or oral forensic reports or testimony of the psychological characteristics of an individual only after they have conducted an examination of the individual adequate to support their statements or conclusions.

(c) When, despite reasonable efforts, such an examination is not feasible, psychologists clarify the impact of their limited information on the reliability and validity of their reports and testimony, and they appropriately limit the nature and extent of their conclusions or recommendations.

Standard 7.04(b): Whenever necessary to avoid misleading, psychologists acknowledge the limits of their data or conclusions.

20. Similarly, Dr. Ryan's report may be at variance with relevant provisions of the Specialty Guidelines:

9

644

Guideline VI(A):  Because of their special status as persons qualified as experts to the court, forensic psychologists have an obligation to maintain current knowledge of scientific, professional, and legal developments within their area of claimed competence.

Guideline VI(H):  Forensic psychologists avoid giving written or oral evidence about the psychological characteristics of particular individuals when they have not had an opportunity to conduct an examination of the individual adequate to the scope of the statement, opinion, or conclusions to be issued.  Forensic psychologists make every reasonable effort to conduct such examinations.  When it is not possible or feasible to do so, they make clear the impact of such limitations on the reliability and validity of their professional products, evidence, or testimony.

Guideline VII(A):  Forensic psychologists make reasonable efforts to ensure that the products of their services, as well as their own public statements and professional testimony, are communicated in ways that will . . . avoid deception.

Guideline VII(B):  Forensic psychologists realize that their public role as "expert to the court" or as "expert representing the profession" confers upon them a special reponsibility for fairness and accuracy in their public statements.

Guideline VII(D):  Forensic psychologists do not, by either commission or omission, participate in a misrepresentation of their evidence . . . .

21.  Only the APA ethics committee can judge whether an APA member has violated the APA's code of ethics.  However, it is my opinion, to a reasonable certainty, that in rendering the conclusion that the defendant is a "relatively high risk for engaging in violence recidivism," given the dearth of data generally accepted in the relevant psychological community to support his opinion, his improper generalization of the test scores to the defendant, his failure to appropriately address the lessened accuracy of his findings as a result of the absence of a personal interview, and his misleading use of extant studies, Dr. Ryan acted below the professional standards of those holding themselves out as

10

645

646

forensic psychologists.

I declare under the penalty of perjury that the foregoing is true and correct.

_____
Donald N. Bersoff, Ph.D., J.D.
May 24, 2000

11

# Exhibit B

1

I, Thomas J. Reidy, Ph.D., ABPP, hereby declare, under oath, as follows:

1.  Counsel for Kenneth Barrett requested that I review the Psychological Report/Risk Assessment authored by Randall Price, Ph.D., ABPP at the behest of the U.S. Attorney's Office dated October 26, 2005. I was asked to specifically address the appropriateness of Dr. Price's risk assessment methodology in general, and in particular his use of the Psychopathy Checklist-Revised (PCL-R) in assessing violence risk in a prison, especially in a capital case context. I was also requested to address the scientific basis for the application of the PCL-R science in relation to *Daubert* standards as articulated in *Daubert v. Merrell-Dow Pharmaceuticals, Inc.* (1993), and as applied to violent risk predictions for prison in capital cases. The state of the scientific literature will be reviewed through 2005 and supplemented by studies completed post-2005 to date.

2.  I am a clinical and forensic psychologist licensed and qualified to practice psychology in the states of California, Idaho, and Illinois (inactive). I have personal knowledge of the facts contained in this affidavit and am competent to testify about them.  I received a Master's degree in Psychology from DePaul University in 1973, and a Doctorate degree in Clinical Psychology from DePaul University in 1976. For the past 40 years, I have maintained a private practice in clinical and forensic psychology in Monterey and Salinas, California.  My work history is documented on the attached resume. (Appendix II).

3.  I was Board Certified in Forensic Psychology in 1995 by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology.  Only 325 psychologists in the United States hold this distinction.

This credential is intended to signify the highest levels of expertise in practice in forensic psychology. Requirements for Board Certification include extensive education, training, submission of work samples, and a rigorous examination process. I have participated in extensive continuing education in the area of forensic psychology and violence risk assessment methods. I received initial training on the use of the PCL-R from its author, Robert Hare, and provided through the Darkstone Research Group.

4. I received the first annual Nelson Butters Award from the National Academy of Neuropsychology for research contributions to the field of neuropsychology in 1993.

5. I have qualified and testified as an expert witness in state and federal courts across the nation concerning various topics in forensic psychology, and specifically, assessment of prison violence risk, particularly in capital cases.

6. I have published extensively in the leading forensic journals in my field on violence risk assessment for prison in capital cases. I co-authored 26 articles in peer-reviewed psychology journals, including 18 scientific articles and two book chapters pertaining to the issues of inmate adjustment and the assessment of violence risk assessment for prison within a capital context.

7. I have served as an *ad hoc* peer reviewer for journal articles submitted to the following publications: *Journal of Personality Assessment*, *Violence and Victims*, and *Justice Quarterly*.

3

## Psychopathy and PCL-R: Broad Overview

8.  I am familiar with the published research literature regarding the Psychopathy Checklist-Revised (PCL-R) measuring psychopathy as a construct for maladaptive personality features and socially deviant behaviors that is used by evaluators in forensic and legal contexts. The PCL-R is a 20-item checklist of prototypically psychopathic traits (e.g., remorselessness, callousness, grandiosity, superficial charm, and antisocial/criminal behavior) scored on a scale ranging from 0 to 40 with higher scores considered more psychopathic and scores greater or equal to 30 generally considered evidence of a psychopath.   I have specifically examined the relationship between PCL-R scores and violence in a correctional setting, published scientific articles and testified as an expert witness concerning the use and misuse of the PCL-R in the assessment of violence risk for prison adjustment, particularly with a capital population (see Cunningham & Reidy, 1998 a,b, 1999).

9.  Situations in which decision making about "future danger" and potential for prison violence in life-or-death cases have emerged as relevant to the use of the PCL-R, but the scientific basis for rendering such conclusions is lacking at present. Only a small number of studies have addressed the PCL-R related to prison violence (see Edens et al., 2005)  with the results ranging from very weak to mostly nonsignifcant association. These studies were further criticized for methodology limitations, overly broad definition of violence, absence of physical violence as an outcome measure, and use of non-U.S populations. Despite the absence of scientific support, use of the PCL-R has emerged in capital murder

4

cases, but this has occurred nothwithstanding the utter lack of scientific basis for this application of the psychopathy construct.  There is a total absence of studies relating psychopathy to violence risk for capital offenders and inmates incarcerated for a term of life without parole in a maximum security prison. Moreover, there have been no research studies from 2005 to the present investigating the use of the PCL-R in capital sentencing to address "future danger" and acts of prison violence (see e.g., Patrick, Handbook of Psychopathy, 2007 and 2017 revision). In fact, new problems with the use of the term psychopathy measured via the PCL-R have arisen in recent years regarding jury perceptions, prejudicial effect of the term psychopath with related increase in death verdicts, reliability of examiner ratings, and lack of predictive validity that will be explored in the sections below (e.g., see Edens, Petrila, & Kelley in Handbook of Psychopathy, 2017).

### Other Test Measures Used: Broad Overview

10. I am also familiar with the Personality Assessment Inventory (PAI) and the Minnesota Multiphasic Personality Inventory-2 (MMPI-2). Both are self-report measures well established in the professional community for personality assessment and related mental health concerns. While the MMPI-2 is useful for many psychological assessment applications, the instrument has practical utility in assessing future risk for violence in a prison setting due to profile instability over time, context influences, and distortion potential. Similarly, the use of the PAI in prison populations has limitations for considering violence risk in prison. I have co-authored two recent peer reviewed articles concerning the PAI concluding that

instrument adds very modest predictive validity to estimating prison violence but other risk correlates contribute far more to violent behavior in prison. While both of these instruments are well known and accepted in the field of psychology and mental health, currently there is little scientific evidence to warrant general acceptance of these measures as predictors of institutional violence particularly with a capital inmate population, or inmates facing life without parole, or housed in a high security context (see Cunningham & Reidy, 1998, 1999a,b; Edens et al., 2005). For these instruments to be generally accepted for use as predictors of institutional violence, a more extensive and significant body of evidence must be gathered and vetted through the peer review process.

## Dr. Price's Risk Assessment Methods

11. Dr. Price's report is labeled "Report of Psychological Evaluation/Risk Assessment." The methodology underlying his opinions includes a review of certain records, background history, description of current mental status, and findings from six assessment instruments administered (PCL-R was omitted from the "Evaluation Methods" section but described in the text). It is noteworthy that he did not list the defendant's jail or prison records, which are critical to an assessment of prison violence risk in a similar context (e.g., Cunningham & Reidy, 2002). Instead, Dr. Price relies upon findings from the PAI, MMPI-2, and principally the PCL-R to make conclusions about general violence potential and implying but never directly stating the specific context and population related to his opinions. Dr. Price utilized significant score/scale elevations or codetypes on these test instruments to identify a range of adverse psychological and behavioral

6

factors related to potential for violence. For the PAI, he wrote that chronic substance abuse "interfered with…his ability to control his acting out behaviors," and mentioned paranoid tendencies, and suspicious or hostile demeanor perceived others. The MMPI-2 clinical profile yielded descriptions of the "low frustration tolerance, poorly controlled anger, and generally poor self-control, which results in outbursts of physical aggression." The MMPI-2 codetype (4/6) is interpreted as "poor judgment, impulsiveness, anger, and suspiciousness combine to foster unpredictable, irrational and violent cyclical outbursts of violence." He also  uses codetype (4/1) to further highlight violence potential, "his cyclical pattern of violent outbursts with intermittent episodes of appropriate behavior represents a chronic and stable personality disorder that is extremely difficult to change." While these test based descriptors may describe the defendant, there is no scientific basis for attributing these traits to risk of violence in a prison context, especially when a large percentage of inmates display similar traits. Rates of serious violence resulting in death or serious injury within prison are quite low, despite a large proportion of prison inmates with significant criminal histories and convictions for felonies and with half of the inmate populations incarcerated for violent offenses.

12. Dr. Price's report contains considerable detail about his findings from the PCL-R. He states that this instrument, as a measure of personality traits and behaviors associated with psychopathy is "an integral component of a risk assessment." He describes strong associations between psychopathy and criminal behavior, violence, substance abuse, and recidivism. He cites the PCL-R as a reliable and

valid measure of psychopathy and a "robust predictor of criminal behavior, including violence, in a variety of populations and contexts" but never specifies the particular contexts for which it has been validated by scientific studies. Seemingly in support of using the PCL-R for predicting violent or criminal behavior in an institutional setting, Dr. Price offers only a vague conclusionary statement pointing to "a few studies" demonstrating "relatively modest correlation between psychopathy and institutional misconduct" without further comment concerning the reliability and validity of these "studies" to the appropriate context. This general statement is misleading when applied to institutional violence because the entire body of empirical evidence available in 2005 and at present does not support use of the PCL-R in the assessment of prison violence, particularly in a capital context (see Edens et al., 2001, 2005; Guy et al., 2005). For example, Edens et al., provide a table of 15 studies examining the relationship between psychopathy and institutional misconduct. Only one of these studies pertains to a very small sample (N=98) of adult inmates incarcerated in the U.S. and yieled nonsignificant correlations for both violent and nonviolent discipline reports. The remainder of the studies involved populations and contexts far different than inmates incarcerated U.S. prisons—that is, adolescents, mentally disordered offenders, Canadian inmates, sex offenders, and females. Sample sizes were very small.

13. Validity refers to inferences derived from test scores in reference to a specific outcome criterion. Hence the question of validity for the PCL-R in the capital context should be framed around the violence risk for a capital population in

8

prison. Dr. Price does not specifically mention use of the PCL-R in the capital arena, but declares a "few studies have demonstrated a relatively modest correlation between psychopathy and institutional misconduct." He does not define "relatively modest" or "institutional misconduct" and does not cite references. The scientific literature available in 2005 and to date suggests that Dr. Price's stated general conclusions about the results of the PCL-R are highly misleading with regard to any valid application of these findings to a prison population, and particularly to capital murderers, life without parole inmates, and related behavior in maximum security prisons. In fact, a large number of studies have pointed out that when assessing the risk of future institutional violence the predictive validity of the PCL-R has not been demonstrated in a capital context either prior to 2005 of thereafter (e.g., Edens, 1999, 2001, 2007, 2017; Edens, Buffington-Vollum, Keilen, Roskamp, & Anthony, 2005; Edens & Cox, 2012; Edens, Petrila, & Buffington-Vollum, 2001; Freedman, 2001; Edens, Smith, Davis, & Guy, 2012; Guy, Edens, Anthony, & Douglas, 2005). For example, the the meta-analysis of 38 datasets by Guy et al. (2005) found extremely low correlations (.11 and .10) between physical violence and general aggression and PCL-R total scores for U.S. prisons meaning that the PCL-R made a negligible (1%) contribution to the violent outcomes. Such findings call into question the use of the PCL-R in the context of capital death penalty trials.

14. Dr. Price's analysis of violence potential was based solely on his use of the PAI, MMPI-2, and PCL-R and did not address other correlates of prison violence that were well known in 2005. Although he generally alluded to moderating factors

655

9

such as age reducing violence potential in the free world, he did not address a similar phenomenon occurring in prison. Dr. Price did not address base rates (frequency and prevalence) influencing the expression of violence in prison and that such rates vary by the population of interest and decrease as the definition of violence narrows. (Marquart et al., 1989; Cunningham & Reidy, 1998; Cunningham et al., 2005). Cunningham and Reidy (1998) summarized data showing that the prevalence of violent behavior dropped dramatically with age both in the community and in prison and subsequent studies across the last two decades have supported such trends. There are no data reflecting any relationship between psychopathy and age with regard to decreasing rates of prison violence. Seemingly, he did not review jail or prison records to assess the defendant's behavior in a similar context. These components of an institutional risk assessment and related methodology were widely known in 2005, routinely presented at federal and state capital trials, and generally accepted by the scientific community (Cunningham & Reidy, 1998a, b, 1999; 2002; Edens et al., 2005; Marquart, 1989). These studies and and others over the past 25 years demonstrate that former death row inmates and capital inmates sentenced to life without parole who were described by mental health professionals at trial as a continuing threat to society demonstrated equivalent rates of violence toward inmates and staff, and in some instances were better behaved than comparison groups in high security prisons (e.g., Cunningham & Reidy, 2002; Cunningham et al., 2005a, b, 2016; Edens et al., 2005, Marquart et al., 1989, 1994; Reidy et al., 2001). These studies demonstrate low base rates of serious violent behavior that

made it extremely difficult to determine exactly which capital defendants would engage in future acts of violence without identifying a large number of false positives. For example, Marquart et. al (1989) demonstrated that capital murderers serving a life sentence exhibited a rate of 2.6 serious violent infractions per 100 inmates in contrast to nearly 12 per 100 committed by general population inmates. Similarly, Cunningham, Reidy, & Sorensen (2005) provided evidence that approximately 10/100 life sentenced prisoners engaged in violent misconduct of some type in contrast to nearly half of parole eligible inmates and murder was nearly negligible with one homicide among 1,054 inmates. Any consideration of psychopathy in relation to prison violence must consider such moderators. Studies conducted subsequent to 2005, including one international perspective, further demonstrate the low base rates of prison violence for capital offenders and those serving a life sentence, and elucidate empirically derived correlates of prison violence (e.g. Cunningham, 2010; Cunningham, Reidy, & Sorensen, 2008, 2016; Lucioni-Arbach et al., 2012). Empirically supported risk factors such as violence base rates, age, prison context, and restrictive housing are critical components necessary for violence risk assessment at capital death sentencing as demonstrated by inclusion of this methodology in textbooks and by eschewing the use of instruments like the PCL-R that have poor applicability to capital case assessments (see e.g., Conroy & Murrie, 2007; DeMatteo, Murrie, Anumba, & Keesler, 2011).

**Common Errors in Violence Risk Assessment in Dr. Price's Report**

15. Cunningham and Reidy (1999) published a peer-reviewed article identifying 11 common errors made by mental health professionals at capital sentencing and Edens et al., (2001, 2005) offered similar practical considerations for assessing capital inmate risk for violence. The 11 errors include: inadequate reliance on base rates (frequency or prevalence of a particular behavior in a population); failure to consider context; susceptibility to illusory correlation (when a clinician believes two events are correlated, when, in fact they are not or are correlated in the opposite of the predicted direction); failure to define the severity of violence; overreliance on clinical interview; misapplication of psychological testing; faulty implications of antisocial personality disorder; ignoring the effects of aging; misuse of patterns of behavior (patterns of behavior can reliably estimate future behavior but only when the pattern is sufficiently established in a similar context); and neglect of preventive measures (e.g., prison security, restrictive housing). This article and others describe the need for use of empirically validated risk methodology in capital sentencing. Dr. Price's report includes some of these methodological errors in considering risk of future violence in prison such as failure to use base rates and consider context, failure to define severity of violence, and misapplication of psychological testing. He did not consider patterns of behavior in a similar context. He described prevention of recidivism for criminally violent offenses in the community by virtue of imprisonment, but did not consider preventive measures as playing a role in reducing prison violence.

16. Contrary to concerns and cautions raised by Cunningham & Reidy (1998a,b, 1999, 2002), and Edens et al., (2001a,b, 2005), Dr. Price's report heavily emphasizes violence related traits so as to leave the reader with the distinct impression that the defendant would likely engage in violence in any context and that such behavior would be difficult to change. He never specifically states that the defendant would have a high probability for prison violence but alludes to this possibility by mentioning that a few studies show a modest link between PCL-R scores and institutional violence as well as more general comments about violence proclivity such as "unpredictable and violent outbursts of violence." As a risk assessment methodology for institutional violence, Dr. Price's report focusing on test-based personality traits associated with violence potential to the extent that prison violence is an anticipated outcome is a misapplication of test data and a methodological flaw (Cunningham & Reidy, 1999).  Dr. Price's approach to violence risk assessment in this capital context is lacking in scientific rigor for his failure to accurately describe the state of the science in 2005 with regard to the known correlates of prison violence, and for the total lack of validity of the PCL-R as utilized in a capital risk assessment. Risk assessment methodology highlighted in recent textbooks (Conroy & Murrie, 2007; DeMatteo et al., 2011) broadly supports and cites the methods proposed prior to 2005 (Cunningham & Reidy, 1998; Cunningham et al., (2005); Edens et al., 2005), which were not considered by Dr. Price in his evaluation of Mr. Barrett. Specifically, these authors call for the use of base rates of violence and disaggregated definitions of violence by type and severity, consideration of context, and use of other empically

13

supported risk factors such as as age, sentence length, education, behavior in a similar setting.

17. Dr. Price's use of self-report instruments, PAI and MMPI-2, suffer from the same flaws as the PCL-R with regard to estimating future acts of violence from capital inmates serving a life term in a maximum security institution. Through 2005 and up to the present time, these instruments have shown very little to no practical utility in differentiating inmates likely to engage in serious prison maladjustment, particularly violence, in a population of capital inmates in high security prisons.

18. Guy et al. (2005) conducted a meta-analysis that combined the findings across 38 independent studies investigating the relationship between PCL-R and prison violence utilizing samples from civil psychiatric, forensic psychiatric, and correctional facilities. More specifically, the Guy et al (2005) study revealed that the correlation between the total PCL-R score and all institutional infractions was marginally moderate (.29) but this effect size was substantially lower when considering physical violence (e.g., correlation of .11 for physical violence for studies of five U. S. prisons). The meaning of these correlations is based on understanding that a perfect correlation is 1.0 with correlations below .3 considered small. Furthermore, a correlation of .29 means that only 8% of institutional infractions (violent and non-violent) is accounted for by the PCL-R, leaving 92% influenced by other factors. More importantly, a very low correlation of .11 between PCL-R scores and physical violence means that the PCL-R score accounts for only a negligible 1% of prison violence, leaving 99% of prison violence attributable to other sources—for example, age, violent

conviction history, and prior prison behavior. Similar weak effect sizes regarding the association of psychopathy and institutional violence were reported in later investigations (e.g., McDermott et al., 2008). Guy et al. (2005) concluded that their results called into question the use of the PCL-R in the context of capital murder trials in the United States, especially considering the lower rate of prison violence among death row and life sentenced inmates relative to general population offenders.

19. The MMPI-2 suffers from similarly weak statistical association to predictive validity as the PCL-R, and from a lack of studies evident in 2005 and at present related to assessing future violence potential within a capital context and specifically related to prison violence (Cunningham & Reidy, 1998a, b). When considering the PAI in a correctional setting only post-2005 investigations are available (e.g., Edens & Ruiz, 2006, 2008; Gardner et al., 2015); that is, there was no accepted scientific basis for its use in this context in 2005. A recent study by Reidy, Sorensen, & Davidson (2016) testing the predictive validity of the PAI in relation to inmate misconduct and violence revealed a modest relationship of certain scales adding incremental validity of only 2-4% to the outcome criteria consistent with other studies (Edens & Ruiz, 2006, 2009). The authors cautioned that such instruments were not designed as risk instruments and the scales accounted for only a small portion of the variance in the criterion measures with other sources accounting for considerably more of the institutional misconduct. These findings demonstrated that institutional violence is a complex and multi-determined behavior that interacts with mental health variables and other

15

individual and institutional/facility level factors that have been shown to mediate prison misconduct.

## Psychopathy and Violence Risk Assessment

20. As of 2005 relatively few studies examined the relationship between the PCL-R and the occurrence of violent acts among incarcerated individuals, and there were no peer-reviewed studies regarding death sentenced or capital inmates serving a life without parole term.  That is, although the PCL-R has been subjected to hundreds of studies in a variety of contexts, in 2005 the PCL-R had not been validated for use in the population of capital offenders. Those studies considering the link between psychopathy and institutional violence among prison inmates found either a nonsignificant, weak, or inconsistent association between being identified as a "psychopath" (i.e., PCL-R score $\geq$ 30) and engaging in higher rates of various forms of prison violence. Moreover, I am unaware of any published studies that have examined specifically the utility of the PCL-R to predict violence among inmates in a maximum-security correctional facility in the United States or those sentenced following capital trials to death or life imprisonment. The dearth of studies demonstrating an association between the PCL-R and the specific outcome criterion for capital risk assessment has continued post 2005 (see e.g., Patrick, 2007, 2017). The only conclusion that can be drawn from the absence of valid and empirically sound studies relating the PCL-R to prison violence in a capital context is that the use of the term psychopathy as measured by the PCL-R has no probative value in determinations of "future danger" or violence risk as those constructs are applied in capital trials.

16

## Psychopathy, Jury Perception, & Prejudicial Effect

21. Prosecutors have continually used the "psychopath" label in capital trials to assert that an inmate will be dangerous in the future or commit criminal acts of violence. The use of the PCL-R in this legal context poses a number of concerns. First and most importantly is the use of the term "psychopath" and the traits underlying the concept such as "remorselessness, callousness, grandiosity" etc. Such terms have a strong connotation that is stigmatizing and evokes frightening images of brazen killers such as Ted Bundy or Jeffrey Dahmer that have the potential to prejudice jurors. In a series of studies up through 2005, Edens and colleagues (2003, 2004, 2005) demonstrated that using evidence of psychopathy presented to mock jurors in a capital case, independent of expert testimony, revealed subjects merely labeled as psychopaths were considered more dangerous and death-worthy than others not so labeled (60% v. 38%) when all other facts remained the same. These studies demonstrate that attributions regarding undesirable personality traits can have a profound adverse influence on a potential juror's attitudes toward defendants perceived to exhibit psychopathy or its associated characteristics, particularly lack of remorse. The mere presentation of the psychopathic personality label and related traits, even if not directly connected to "future dangerousness" by an expert witness has a strong prejudicial effect causing jurors to be more supportive of a death sentence. Post 2005, another study by Edens et al. (2011) revealed similar findings that "… rating a defendant's perceived level of psychopathy strongly predicted support for executing him."

## Reliability of PCL-R Scores

22. Anecdotal reports about scoring discrepancies between prosecution and defense experts were noted prior to 2005. However, the first scientific study of this issue only appeared in 2006 and subsequently a number of scientific investigations have emerged indicating that PCL-R scores are highly unreliable in real world criminal cases. The first studies substantiated the anecdotal findings regarding disparities in PCL-R scores across experts testifying about the same defendant (Edens, 2006). Recent field studies with actual legal cases further highlight discrepancies in adversarial settings with prosecution experts providing "high" PCL-R scores, whereas defense experts find "low scores" (Boccacini et al., 2008, 2012; Edens et al., 2010; Jeandarme et al., 2017; Murrie et al., 2008). Additional evidence suggests that variation in PCL-R scores can also be a function of the expert conducting the exam without adversarial influence. Some PCL-R items call for subjective ratings that are most difficult to reliably assess in a forensic setting even though items such as remorselessness have a significant prejudicial effect on jurors (Edens et al., 2010) but without any systematic data regarding the relationship between remorse and violent prison conduct, particularly for capital inmates serving a life term. Levels of inter-rater reliability in real world studies are typically lower than in nonadversarial, controlled studies conducted in research settings (Boccaccini et al., 2012, 2013; DeMatteo et al., 2014; Edens et al., 2006, 2010, 2017; Heilbrun, 1992; Murrie et al., 2008, 2009; Sturup et al., 2013). For example, Murrie et al. (2018) cites an "alarming" 8-point discrepancy between defense and prosecution experts scoring the PCL-R with higher scores attributed to prosecution retained experts. Even more

concerning are the results reported more recently by DeMatteo et al. (2014) showing that in 50% of cases evaluated by prosecution retained experts PCL-R scores reached 30 or more points (defined as a psychopath) compared to defense experts that reached such scores in only 10% of the cases. Research suggests this low reliability among examiners may be due to a variety of factors including adversarial allegiance, level of training, and subjective judgment in scoring of interpersonal and affective traits, and individual evaluator differences.

## Psychopathy and Mental Disorders

23. Neither the *Diagnostic and Statistical Manual of Mental Disorders* (DSM-IV) applicable in 2005, nor the edition in use today, DSM-5, identifies psychopathy as a diagnosis or mental disorder. Certain traits associated with the psychopathy construct are mentioned as part of Antisocial Personality Disorder (APD) in both editions, but APD is not the same as psychopathy. Although some similarity exists, APD and psychopathy are not interchangeable concepts yet have the same pejorative potential in an adversarial legal setting. The reliability and validity of an APD diagnosis has been questioned (e.g., Cunningham & Reidy, 1998, 1999). A diagnosis of APD with or without psychopathy describes little about the prison behavior except that an individual is similar to most prison inmates, and thus does not specifically lead to a conclusion that a particular inmate is incorrigible or "dangerous" in a prison environment (see Cunningham & Reidy, 1998, 1999, 2002). This conclusion is best exemplified in a recent study by Edens, et al. (2015) that determined a DSM 5 diagnosis of APD did not significantly predict prison misconduct. Additionally, the presence of APD and/or psychopathy does not preclude a diagnosis of major mental

19

disorders (e.g., Schizophrenia) listed in the DSM. Mental disorders, apart from psychopathy ratings, can have a significant and disinhibiting effect on a person's proclivity for violence and other forms of maladjusted behavior in a prison context (Felson et al., 2012; Walters & Crawford, 2014).

24. The use of the terms "psychopath" and "psychopathy" used or implied as a diagnosis by witnesses who have been deemed experts by courts is inaccurate and misleading. Diagnostic labels with widespread scientific acceptance are catalogued DSM. Psychopathy is not included in the DSM. Despite repeated efforts by supporters of the PCL-R to have psychopathy included in the DSM, it has been rejected. Lay jurors are unlikely to understand the significance of the American Psychiatry Association's decisions to reject the label as a diagnosis. It means that PCL-R and psychopathy fall outside  the model of differential diagnosis which is the generally accepted model for diagnosing mental health disorders. Differential diagnosis is the central feature of generally accepted practices in psychology and psychiatry. Allowing a mental health expert to testify that PCL-R supports a diagnosis of psychopathy misleadingly implies that the witness's methods and conclusions are in keeping with generally accepted practices in the field although they are not.

## *Daubert* Considerations

25. Briefly, it is my understanding that the Supreme Court in *Daubert* held that expert testimony by a preponderance of the evidence must demonstrate a) whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue; b) whether the knowledge or technique can be or has been tested by scientific methods;

20

c) whether the theory has been subjected to peer review and published in scientific journals; d) whether there is a known or potential error rate associated with the theory or technique; e) the degree to which the expert's theory or method is recognized and generally accepted as valid within the relevant scientific community. The following reasons set forth my conclusions according to *Daubert*:

    a.  <u>Whether the reasoning or methodology underlying the testimony is scientifically valid and of whether that reasoning or methodology properly can be applied to the facts in issue.</u> The scientific validity of psychopathy as measured by the PCL-R is not valid for purposes of capital sentencing. Validity refers to the usefulness of inferences that can be derived from specific test scores. When considering capital risk assessment, validity necessarily involves predictive validity with regard to a population of capital offenders given life sentenced inmates, and placed in secure housing. No studies have demonstrated such predictive validity attributed to PCL-R scores and the related construct of psychopathy. The use of PCL-R methodology cannot be applied to violence risk assessment for prison violence because no studies have demonstrated reliability and validity for such a purpose.

    b.  <u>Whether the knowledge or technique can be or has been tested by scientific methods.</u> The above cited studies demonstrate that psychological test profiles cannot be reliably and validly associated with long-term prison violence. There is no direct scientific evidence that the PCL-R in particular is predictive of institutional violence by correctional offenders

in the United States. Use of the term psychopath alone increases perceptions that a defendant will be a "future danger" in prison when no evidence supports such an assertion for capital inmates housed in maximum security prisons. A 2005 meta-analysis that considered all available research studies examining the relationship of psychopathy and violence in US prisons concluded that there is weak evidence or no significant findings for the relationship between psychopathy and institutional misconduct. Although the predictive accuracy of the PCL-R has been studied, albeit insufficiently, in other settings, including psychiatric hospitals, that research does not provide an adequate basis on which to generalize the results to a different population, namely criminal offenders, in a different custodial setting. Conclusions about the predictive validity of the PCL-R  with capitally convicted inmates housed in the secure correctional institution differ considerably from civil forensic psychiatric patients retained in a psychiatric hospital. Also, at this time, there is insufficient research to make generalizations from psychopathy ratings associated with violence from community behavior to prison behavior, and from psychiatric settings to life or death-sentenced correctional populations. These instruments fail to demonstrate a scientifically reliable and valid standard of performance in a capital death penalty case requiring jurors to make life or death decisions.

c. Whether the theory has been subjected to peer review and published in scientific journals. Research concerning the PCL-R, MMPI-2, and PAI

through the year 2005 indicates no published, peer-reviewed studies examining the predictive validity of these instruments with respect to the institutional violence by capital offenders housed in high security prisons, or inmates serving a life sentence. No studies of the PCL-R and these other instruments have considered the influence or interaction of such moderating variables as base rates, aging, empirical correlates of violence, and risk management strategies to the actual expression of different forms of violence.

d.  Whether there is a known or potential error rate associated with the theory or technique. There are no studies using the PCL-R, PAI, and MMPI-2 that permit establishment of error rates for the prediction of violence for in-custody populations of capital inmates serving life sentences in maximum security prisons. A 2001 study by Freedman specifically addressed "excessive false positive rates" related to the prediction of violent behavior by the PCL-R and reported the complete absence of significant findings for the few prison samples available at that time. Studies subsequent to this one through 2005 and beyond similarly report the absence of a relationship between psychopathy and personality traits with prison violence, which precludes the determination of error rates. Athough error rates are unavailable for the PCL-R, the use of base rates can be used as an anchor to estimate meaningful probability of prison violence. Base rates differ according to the group being studied and definition of violence applied. To illustrate from the outer margin of prison base rate continuum, the rate of

23

homicide of a correctional officer is 1 per 1,000,000 inmates per year, which is an exceedingly rare event. Over varying followup periods (ranging from 2-53 years) the rates of assault in the institution by death row, former death row, capital life, life-without-parole, life-with-parole inmates were relatively low ranging from 0% to 31% (Reidy et al., 2001) and these findings have been replicated in numerous studies over the years. Considering the low base rates, only estimates of improbability can be calculated because the error rates would range from 70-100% depending on the definition of violence and the population studied. Hence, the false positive rate will be extraordinarily high.

e.  The degree to which the expert's theory or method is recognized and accepted as valid within the relevant scientific community. The terms "psychopath" and "psychopathy" are not generally accepted diagnoses and the methodology used to to attach those labels, the PCL-R, is not part of the generally accepted methodology and diagnostic criteria used by the DSM. The PCL-R is not generally accepted within the scientific community of clinical-forensic psychologists for the purpose of predicting institutional violence in capital offenders in the United States, or inmates incarcerated for life in a maximum security prison. Currently, insufficient research has been conducted to justify the use of the PCL-R for assessing "future dangerousness" or future risk for aggression amongst populations of capital criminal offenders during their prison incapacitation from a life sentence. While it is possible to conduct scientific studies to assess the validity of the

24

PCL-R in predicting future violent behavior in such correctional settings, only a small number of studies have addressed the institutional adjustment of any forensic population (e.g., civil psychiatric, forensic psychiatric, jail, or prison) through 2005. These studies do not investigate the pertinent population of relevance and the particular environment in which the defendant would be incarcerated if not given a death sentence (i.e., a maximum security prison). Until more relevant research has been completed and sufficient data are available in the published, peer-reviewed literature to assess the instrument's predictive capacity in a prison setting, the PCL-R should not be used to judge a capital defendant's risk of future violence in such a prison setting. In fact, to do so would risk violating ethical and professional standards concerning the use of procedures and instruments not shown to be scientifically reliable and valid for a capital context.

26. It is my opinion, which I hold with a reasonable degree of scientific certainty, that PCL-R, MMPI-2, and PAI used by Dr. Price do not meet *Daubert* standards for use in decision-making in a capital case.

I declare under penalty of perjury pursuant to 28 U.S.C. § 1746, and under the laws of

the State of California, that the foregoing is true and correct and was executed this 1st

day of February at Monterey, California.

_____

Thomas J. Reidy, Ph.D., ABPP

Board Certified, Forensic Psychology

American Board of Professional Psychology

26

**Appendix I**

<u>References</u>

Arbach-Lucioni, K., Martinez-Garcia, M., & Andres-Pueyo. (2012). Risk factors for violent behavior in prison inmates: A cross cultural contribution. *Criminal Justice and Behavior, 39*, 1219-1239. doi:10.1177/0093854812445875

Boccaccini, M.T., Turner, D.T. & Murrie, D.C. (2008). Do some evaluators report consistently higher or lower scores on the PCL-R?: Findings from a statewide sample of sexually violent predator evaluations. *Psychology, Public Policy, and Law, 14,* 262–283.

Boccaccini, M.T., Turner, D.T. & Murrie, D.C. (2008). Do some evaluators report consistently higher or lower scores on the PCL-R?: Findings from a statewide sample of sexually violent predator evaluations. *Psychology, Public Policy, and Law, 14,* 262–283.

Boccaccini, M.T., Turner, D.T. & Murrie, D.C., & Rufino, K. A. (2012). Do PCL-R scores from state or defense experts best predict future misconduct among civilly committed sex offenders? *Law and Human Behavior, 36*, 159-169. doi: 10.1037/h0093949

Conroy, M. A., & Murrie, D. C. (2007). Forensic assessment of violence risk: A guide for risk assessment and risk management. Hoboken, New Jersey: John Wiley & Sons, Inc.

Cunningham, M. D. (2010) *Evaluation for capital sentencing*. New York: Oxford University Press.

Cunningham, M. D., & Reidy, T. J. (1998a). Antisocial personality disorder and

psychopathy: Diagnostic dilemmas in classifying patterns of antisocial

behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 331-

351.

Cunningham, M. D., & Reidy, T. J. (1998b). Integrating base rate data in violence risk

assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M. D. & Reidy, T. J. (1999).  Don't confuse me with the facts:  Common

errors in violence risk assessment at capital sentencing.  Criminal Justice and

Behavior, 26, 20-43.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life and death: Special

considerations and heightened practice standards in capital sentencing

evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M. D. & Reidy, T .J. (2002).  Violence risk assessment at federal capital

sentencing:  Individualization, generalization, relevance, and scientific

standards.  Criminal Justice and Behavior, 29, 512-537.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005a). Is death row obsolete? A

decade of mainstreaming death-sentenced inmates in Missouri. Behavioral

Sciences & the Law, 23, 307-320.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005b). An actuarial model for

assessment of prison violence risk among maximum security inmates.

Assessment, 12, 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2008). Assertions of "future

dangerousness" at federal capital sentencing: Rates and correlates of subsequent

prison misconduct and violence. *Law and Human Behavior*, *32,* 46-63. doi:

10.1007/s10979-007-9107-7

DeMatteo, D., Edens, J.F., Galloway, M., Cox, J., Smith, S.T., & Formon, D. (2014a). The role

and reliability of the psychopathy checklist-revised in sexually violent predator

evaluations: A case law survey. *Law and Human Behavior*, *38*(3), 248-255.

DeMatteo, D., Murrie, D. C., Anumba, N. M., & Keesler, M. E. (2011). *Forensic mental

health assessments in death penalty cases.* NY: Oxford University Press.

Edens, J. F. (2001). Misuses of the Hare psychopathy checklist-revised in court. *Journal

of Interpersonal Violence, 16*, 1082-1093.

Edens, J. F. (2006). Unresolved controversies concerning psychopathy: Implications for

clinical and forensic decision-making. *Professional Psychology: Research and

Practice*, *37*, 59-65. doi:10.1037/0735-7028.37.1.59

Edens, J.F., Desforges, D., Fernandez, K., & Palac, C. (2004). Effects of psychopathy

and violence risk testimony on mock juror perceptions of dangerousness in a

capital murder trial. *Psychology, Crime & Law*, *10,* 393-412.

Edens, J. F., Poythress, N. G., & Lilienfeld, S. O. (1999). Identifying inmates at risk for

discipolinary infractions: A comparison of two measures of psychopathy.

*Behavioral Sciences and the Law, 17*, 435-443.

Edens, J. F., & Cox, J. C. (2012). Examining the prevalence, role, and impact of evidence

regarding antisocial personality, sociopathy and psychopathy in capital cases: A

survey of defense team members. *Behavioral Sciences and the Law, 30*, 239-255.

doi:10:1002/bsl.2009

Edens, J. F., Buffington-Vollum, J. K., Keilen, A., Ruskamp, P., and Anthony, C. (2005). Predictions of future dangerousness in capital murder trials: Is it time to "disinvent the wheel." *Law and Human Behavior, 29,* 55-86.

Edens, J.F., Desforges, D., Fernandez, K., & Palac, C. (2004). Effects of psychopathy and violence risk testimony on mock juror perceptions of dangerousness in a capital murder trial. *Psychology, Crime & Law*, *10,* 393-412.

Edens, J. F., Kelley, S. E., Skeem, J. L., Lilienfeld, S. O., & Douglas, K. S. (2015). DSM-5 Antisocial Personality Disorder: Predictive validity in a prison sample. *Law and Human Behavior, 39*, 123-129. Do.10.1037/lhb0000105

Edens, J.F., & Petrila, J. (2006). Legal and ethical issues in the assessment and treatment of psychopathy. In C. Patrick (Ed.), *Handbook of psychopathy*. New York: Guilford.

Edens, J.F., Petrila, J., & Buffington-Vollum, J.K. (2001). Psychopathy and the death penalty: Can the Psychopathy Checklist-Revised identify offenders who represent "a continuing threat to society?" *Journal of Psychiatry and Law, 29,* 433-481.

Edens, J. F., Magyar, M., & Cox, J. (2010). Taking psychopathy measures "out of the lab" and into the legal system: Some practical concerns. In K. Kiehl & W. Sinnott-Armstrong (Eds.) *Psychopathy and law*. New York: Oxford University Press.

Edens, J.F., & Petrila, J., & Kelly, S. E. (in press). Legal and ethical issues in the assessment and treatment of psychopathy. In C. Patrick (ed.). *Handbook of psychopathy*, 2nd edition. New York: Guilford.

Edens, J.F., Poythress, N.G., Lilienfeld, S.O., & Patrick, C.J. (2008). A prospective

comparison of two measures of psychopathy in the prediction of institutional

misconduct. *Behavioral Sciences and the Law, 26*, 529-541.

Edens, J.F., & Ruiz, M.A. (2006). On the validity of validity scales: The importance of

defensive responding in the prediction of institutional misconduct.

*Psychological Assessment, 18*, 220-224.

Edens, J. D., & Ruiz, M. A. (2008). Identification of mental disorders in an in-patient

prison psychiatric unit: Examining the criterion-related validity of the personality

assessment inventory. *Psychological Services, 5*, 108-117. doi:10.1037/1541-

1559.5.2.108

Edens, J. F., Smith, Davis, Guy

Felson, R. B., Silver, E., & Remster, B. (2012). Mental disorder and offending in

prison. *Criminal Justice and Behavior, 39*, 125-143.

doi:10.1177/0093854811428565

Freedman, D. (2001). False prediction of future dangerousness: Error rates and

psychopathy checklist-revised. *American Journal of the Academy of Psychiatry

and Law, 29*, 89-95.

Gardner, B.O., Boccaccini, M.T., Bitting, B.S., & Edens, J.F. (2015). Personality

Assessment Inventory Scores as predictors of misconduct, recidivism and violence: A

meta-analytic review. *Psychological Assessment, 27*, 534-544.

doi:10.1037/pas0000065

31

Guy, L.S., Edens, J., Anthony, C., & Douglas, J. (2005). Does psychopathy predict institutional misconduct among adults? A meta-analytic investigation. *Journal of Consulting and Clinical psychology, 73*, 1056-1064.

Heilbrun, K. (1992). The role of psychological testing in forensic assessment. *Law and Human Behavior, 16,* 257-272.

Jeardarme, I., Edens, J. R., Habets, P., Bruckers, L. Oei, K., & Bogarts, S. (2017). PCL-R field validity in prison and hospital settings. *Law and Human Behavior, 41*, 29-43.

Marquart, J. W., & Sorensen, J. R. (1989).  A national study of the Furman-commuted inmates: Assessing the threat to society from capital offenders. Loyola of Los Angeles Law Review, 23, 5-28.

Marquart, J.W., Ekland-Olson, S., & Sorensen, J. R. (1989). Gazing Into the crystal ball: Can jurors accurately predict dangerousness in capital cases? Law & Society Review, 23, 449-468.

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994).  *The rope, the chair, & the needle:  Capital punishment in Texas, 1923-1990*.  Austin:  University of Texas Press.

McDermott, B.E., Edens, J.F., Quanbeck, C.E., Busse, D., & Scott, C.L. (2008). Examining the role of static and dynamic risk factors in the prediction of inpatient violence: Variable- and person-focused analyses. *Law and Human Behavior, 32,* 325-338*.*

32

McDermott, B.E., Quanbeck, C.E., Busse, D., Yastro, K., & Scott, C.L. (2008). The

accuracy of risk assessment instruments in the prediction of impulsive

versus predatory aggression. *Behavioral Sciences and the Law, 26,* 759-777.

Murrie, D.C., Boccaccini, M., Johnson, J. & Janke, C. (2008). Does interrater

(dis)agreement on Psychopathy Checklist scores in sexually violent predator

trials suggest partisan allegiance in forensic evaluations? *Law and Human*

*Behavior,* 32, 352–362.

Murrie, D.C., Boccaccini, M., Turner, D., Meeks, D., Woods, C., & Tussey, C.

(2009.Rater (dis)agreement on risk assessment measures in sexually violent

predator proceedings: Evidence of adversarial allegiance in forensic

evaluation? Psychology, Public Policy and Law, 15, 19-53.

doi:10.1037/a0014897

Patrick, C. J. (2007). *Handbook of psychopathy*. New York: Guilford

Patrick, C. J. (2017). *Handbook of psychopathy*. New York: Guilford

Reidy, T. J., Cunningham, M. D., & Sorensen, J. R. (2001). From death to life: Prison

behavior of former death row inmates in Indiana. Criminal Justice and

Behavior, 28, 62-82.

Reidy, T. J., Sorensen, J. R., & Davidson, M. (2015). Testing the predictive validity of

the Personality Assessment Inventory (PAI) in relation to inmate misconduct

and violence. *Psychological Assessment, 28*, 871-884.

doi:10.1137/pas0000224

33

Walters, G. D., & Crawford, G. (2014). Major mental illness and violence historya

predictors of institutional misconduct and recidivism: Main and interactive

effects. *Law and Human Behavior, 38*, 238-247. doi:10.1037/lhb0000058

34

**Appendix II**

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

## Contact Information

|  |  |
|---|---|
| Address: | 20 Deer Stalker Path, CA  93940 |
| Telephone: | (831) 757-6673 |

## Education

Undergraduate: 1968 BS Biology, Fairfield University, Fairfield, CT

Graduate:  1973 MA Clinical Psychology, DePaul University, Chicago, IL

1976 Ph.D. Clinical Psychology, DePaul University, Chicago, IL

Certification:  Board Certified (Forensic), American Board of Professional Psychology, 1995

## Professional Experience

1972-1973:  Internship - Singer Mental Health Center & Rockford Memorial Hospital, Rockford, IL

1974-1975:  DePaul University Mental Health Center Fellowship

1974-1975:  Consultant to House of Good Shepherd for delinquent adolescents

1975-1977:  Staff Psychologist - Rehabilitation Institute of Chicago, Evaluation & treatment of brain-injured & physically handicapped adults & children

1977-1980:  Community Hospital of the Monterey Peninsula, Staff Psychologist:  Evaluation & treatment of inpatients & outpatients exhibiting a variety of psychological, neuropsychological, & medical diagnoses

1980:  Monterey County Office of Education, Consultant to AB Ingham School:  Behavior management of brain damaged and developmentally delayed students

1980-1981:  Western Pulmonary Services, Consulting Psychologist

1980-1981:  Community Hospital of the Monterey Peninsula Substance Abuse Program, Consulting Psychologist:  Psychological & neuropsychological assessment & treatment

1990-92:  Steinbeck Chemical Dependency Treatment Program, Community Hospital of Salinas, Consulting Psychologist

1

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

1985-1994:     US Army, Fort Ord, CA, Consultant

- *Department of Psychology*

- *Trial Counsel (Prosecution)*

- *Defense Counsel*

2007-Present:  US Air Force, Staff Judge Advocate –Forensic Consultant

- *Trial Counsel (Prosecution)*

- *Defense Counsel*

- *Consultations for violence risk, sex offender behavior, child pornography, child physical and sexual abuse, alcohol abuse, dependence & blackouts*

1980-Present:   Independent Practice

- *Forensic psychological assessment of juveniles & adults*

- *Court appointed expert forensic psychologist for Monterey, Santa Cruz & San Benito Counties:*

  - Violence risk assessment

  - Sex offender risk assessment

  - Child sexual abuse and child pornography

  - Mental health factors for sentencing evaluations

  - Competence for trial

  - Criminal responsibility

- *Expert forensic psychologist: Federal and state capital homicide cases*:

  - Violence risk assessment

  - Developmental risk assessment

2

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

1995-Present:   Law Enforcement Psychological Services, Inc.

- *Psychological screening of police & public safety applicants*

2006-2010      South Bay Regional Public Safety Training Consortium

- *Instructor, Background Investigators Course*

2006-Present   Monterey County Sheriff's Office & Soledad Police Dept.

- *Post Shooting Fitness for Duty Evaluations*

## Professional Recognition

1993 *Nelson Butters Research Award*
Presented by the National Academy of Neuropsychology for research contributions to the field of Clinical Neuropsychology

Journal Peer Reviewer: Justice Quarterly, Journal of Personality Assessment, Violence & Victims

## Licensure and Board Certification

California State Psychology License PSY 5575

Idaho State Psychology License PSY 203011

Illinois State Psychology License 0071-002109 (Inactive)

Board Certified 1995 in Forensic Psychology, American Board of Professional Psychology

## Professional Memberships

Fellow of the American Academy of Forensic Psychology

American Psychological Association

- *Law & Psychology Division*

International Association for Correctional & Forensic Psychology

## Community and Teaching Activities

- Forensic psychology lectures at Monterey College of Law

3

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

- Continuing Education for Attorneys: National Legal Aid Association
- Invited Address, California Public Defenders Association, 1995

- Invited Address: Monterey County Public Defenders 2005

- Invited Address, Monterey County Sheriff's Department, 1997 & 1998

- Invited Address, California County Counsel's Association, 1997

- Invited Address, Santa Cruz County Sexual Assault Investigators, 2000

- Invited Address, Monterey County Family Law Attorneys, 2005

- Instructor-Background Investigator's Course: South Bay Regional Public Safety Training Consortium, 2006-11

- Invited Continuing Education Lecture: *What the Forensic Neuropsychologist Needs to Know about Death Penalty Litigation*. American College of Professional Neuropsychology, Las Vegas, NV, 2010

- Invited Address: Nevada Bar Association Annual Meeting, *Born to be Bad? Developmental Pathways to Resilience or Deviance*, Monterey, CA**,** June 2010

- Invited Continuing Education Lecture: *What the Forensic Neuropsychologist Needs to Know About Death Penalty Litigation: Research, Ethics, and Professional Issues,* National Academy of Neuropsychology, Vancouver, BC, Canada, October 2010

- Invited Address: Staff Judge Advocate Office. *Causes and Correlates: Violence, Domestic Violence, and Stalking*, Tyndall Air Force Base, FL, December, 2011

- Invited Address: *Mass murderers: Mental status of suicide bombers and rampage shooters*. Monterey Institute of International Studies- A Graduate School of Middlebury College. September 11, 2014

- Invited Address: Supermax prison: A clean version of hell for terrorists. Monterey Institute of International Studies- A Graduate School of Middlebury College. March 31, 2015

## Conference Presentations

> *Reidy, T., & Tracy, R. (1974, May)*
> **The effects of neonatal illness and separation from mothers on subsequent maternal attentiveness.**

4

## THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Paper presented at the Midwest Psychological Association Annual Convention, Chicago, IL.

*Reidy, T., & Lamb, W. (1976, April)*
**S.O.A.P. System:  A proposed model of parent education.**
Paper presented at the American Personnel and Guidance Association National Convention, Chicago, IL.

*Reidy, T. (1976, April)*
**Child abuse:  A problem in the schools.**
Paper presented at the American Personnel and Guidance Association National Convention, Chicago, IL.

*Reidy, T., McLean, I., & Toerge, J. (1976, November)*
**Motivational factors for selecting the specialty of Physical Medicine and Rehabilitation.**
Paper presented at the American Congress of Rehabilitation Medicine, San Diego, CA.

*Reidy, T. (1977, November)*
**A case study of appropriate eating behavior in a rehabilitation setting.**
Paper presented at the American Congress of Rehabilitation Medicine, San Diego, CA.

*Reidy, T. (1977, May)*
**Accountability in the delivery of psychological services in a pediatric hospital setting.**
Paper presented at the Association for the Care of Children in Hospitals, Detroit, MI.

*Reidy, T. (1978, April)*
**Establishing a behavioral treatment approach in a rehabilitation setting.**
Paper presented at the Western Psychological Association, San Francisco, CA

*Reidy, T. (1979, May)*
**Psychological Child Abuse.**
Paper presented at the Western Psychological Association, San Diego, CA.

*Reidy, T. (1983, June)*
**Forensic applications of psychological principles.**
Paper presented at DePaul University, Department of Psychology and La Rabida Children's Hospital, Chicago, IL.

*Carstens, C., & Reidy, T. (1985, February)*
**Behavior problems discussed in pediatric settings:  Do researchers study the problems pediatricians confront?**

5

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Paper presented at the American Psychological Association Annual Convention, San Francisco, CA.

*Reidy, T., Silver, R., & Carlson, A. (1987, August)*
**Child custody decisions:  A survey of judges.**
Paper presented at the American Psychological Association Annual Convention, New York, NY.

*Reidy, T., Bowler, R.M., Pedroza, G.I., & Rauch, S.S. (1988, August)*
**Neuropsychological sequelae of pesticide exposure.**
Paper presented at the American Psychological Association Annual Convention, Atlanta, GA.

*Rauch, S.S., Bowler, R.M., Reidy, T., & Pedroza, G.I. (1989)*
**Neuropsychological symptoms one year following neurotoxic exposure and after award of compensation.**
Proceedings of the 8th Annual Meeting of the National Academy of Neuropsychology, 4, 152-153.

*Reidy, T. (1989)*
**Reaction time slowing after solvent exposure.**
Paper presented at the American Psychological Association Annual Convention, New Orleans, LA.

*Reidy, T., & Bolter, J. (1990, November)*
**Neuropsychological toxicology of Methylene Diphenyl Diisocyanate.**
Paper presented at the Annual Meeting of the National Academy of Neuropsychology, Reno, NV.

*Reidy, T., & Bolter, J. (1991, August)*
**Long-term outcome after exposure to Methylene Diphenyl Diisocyanate.**
Paper presented at the American Psychological Association Annual Convention, San Francisco, CA.

*Reidy, T. (1997, August)*
**Legal issues in police and public safety fitness for duty evaluations.**
Paper presented at the American Psychological Association Annual Convention, San Francisco, CA

*Reidy, T., Sorensen, J., & Davidson, M. (2015, March)*
**Predictive validity of the PAI for institutional misconduct.**
Poster session, American Psychological-Law Society Conference, San Diego, CA

## Peer Reviewed Professional Publications 1977 - 2016

*Reidy, T. (1977)*
**The aggressive characteristics of abused and neglected children.**

6

## THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Journal of Clinical Psychology, 33 (40), 1140-1145.

*Reidy, T. (1979)*
**Teaching appropriate eating behavior in a rehabilitation setting:  Case study.**
Archives of Physical Medicine, 60, 226-230.

*Reidy, T., Cotler, S., Tracy, R., & Anderegg, T. (1980)*
**Child abuse and neglect:  Cognitive, social and behavioral correlates.**
In J. Money and G.J. Williams (Eds.), Traumatic Abuse and Neglect of Children at Home.  Baltimore, MD:  John Hopkins University Press.

*Reidy, T., Silver, R., & Carlson, A. (1989)*
**Child custody decisions:  A survey of judges.**
Family Law Quarterly, 23 (1), 75-87.

*Reidy, T., & Carstens, C. (1990)*
**Stability of the Millon Adolescent Personality Inventory.**
Journal of Personality Assessment, 55, 692-697.

*Reidy, T., Bowler, R.M., Rauch, S.S., & Pedroza, G.I. (1992)*
**Pesticide exposure and neuropsychological impairment in migrant farm workers.**
Archives of Clinical Neuropsychology, 7, 85-95.

*Reidy, T., & Hochstadt, N. (1993)*
**Attribution of blame in incest cases:  A comparison of mental health professionals.**
Child Abuse and Neglect, 17, 371-381.

*Reidy, T., Bolter, J., & Cone, J. (1994)*
**Neuropsychological sequelae of methyl bromide:  A case study.**
Brain Injury, 8 (1), 83-93.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Integration of base rate data in violence risk assessment at capital sentencing.**
Behavioral Sciences and the Law, 16, 71-95.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Antisocial personality disorder and psychopathy:  Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations.**
Behavioral Sciences and the Law, 16, 333-351.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Antisocial personality disorder versus psychopathy as diagnostic tools.**

7

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Prosecutors Brief, California District Attorneys Association, Vol. XX, No. 4, 9-11.

*Cunningham, M. D., & Reidy, T. (1999)*
**Don't confuse me with the facts:  Common errors in violence risk assessment at capital sentencing.**
Criminal Justice and Behavior, 26, 20-43.

*Reidy, T.J., Cunningham, M. D., & Sorensen, J. R. (2001)*
**From death to life:  Prison behavior of former death row inmates in Indiana.**
Criminal Justice and Behavior, 28, 62-82.

*Cunningham, M.D., & Reidy, T. J.* (2001). **A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations.**
Behavioral Sciences and the Law, 19, 473-490.

*Cunningham, M. D., & Reidy, T. J. (2002)*
**Violence risk Assessment in federal capital sentencing: individualization, generalization, relevance and scientific standards.**
Criminal Justice and Behavior, 29, 512-537.

*Cunningham, M. D., Sorensen, J. R. & Reidy, T. J., (2004)*
**Revisiting future dangerousness revisited: Response to DeLisi and Munoz (2003).**
Criminal Justice Policy Review, 15, 365-376.

*Cunningham, M. D., Sorensen, J. R. & Reidy, T. J., (2005)*
**An actuarial model for assessment of prison violence.**
Assessment, 12, 40-49.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R.  (2005)*
**Is death row obsolete: A decade of mainstreaming death-sentenced inmates in Missouri.**
Behavioral Sciences and the Law, 22, 1-14.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R.  (2008)*
**Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence.**
Law and Human Behavior, 32, 46-63.

*Cunningham, M.D., Sorensen, J.R., & Reidy, T.J. (2009)*
**Capital jury decision-making: The limitations of predictions of future violence.**
Psychology, Public Policy and Law, 15, 223-256.

8

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

*Reidy, T.J., Sorensen, J.R., & Cunningham, M.D.* (2012). **Community violence to prison assault: A test of the behavioral continuity hypothesis** Law and Human Behavior, 36, 356-363.

*Reidy, T.J., Sorensen, J.R., & Cunningham, M.D.* (2013) **Probability of Acts of future violence: A test of jury accuracy in Oregon.** Behavioral Sciences and the Law, 32, 286-305.

*Reidy, T., Sorensen, J., & Davidson, M. (2016)* **Testing the Predictive Validity of the Personality Assessment Inventory (PAI) in Relation to Inmate Misconduct and Violence** Psychological Assessment, 28, 871-884.

*Davidson, M., Sorensen, J. R., & Reidy, T. J. (2016)* **Gender responsiveness in corrections: Estimating female inmate misconduct using the Personality Assessment Inventory (PAI)** Law and Human Behavior, 40, 72-81.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2016)* **Wasted Resources and Gratuitous Suffering: The Failure of a Security Rationale for Death Row** Psychology, Public Policy, and Law, 22, 185-199.

*Reidy, T. J., & Sorensen, J. R* (In Press) **Prison Homicides: A Multidimensional Comparison of Perpetrators and Victims** Journal of Forensic Psychology Research and Practice

*Sorensen, J. R., & Reidy, T. J. (in press)* **Incapacitation and life without parole.** In Bohm, R. M., & Lee, G. M. (eds.). Routledge Handbook on Capital Punishment. New York: Taylor & Francis

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (in press)* **The failure of a security rationale for death row.** In Acker, J. R., & Toch, H. (eds.). Living on death row

Reidy, T. J., Sorensen, J. R., & Bonner, H. S. (In Review). **Prison homicide: An extension of violent criminal careers?** Violence & Victims

Sorensen, J. R., & Reidy, T. J. (In Review) **Nothing to lose? An Examination of Serious and Assaultive Prison Misconduct among Life-Without-Parole Inmates** Journal of Interpersonal Violence

9

# Exhibit C

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | CASE NO. CV-09-00105-JHP<br><br>**DECLARATION OF DEBORAH S. MIORA, Ph.D.** |

I, Deborah S. Miora, declare the following:

I am a licensed psychologist practicing in Beverly Hills, California. I earned my Masters and PhD degrees at the California School of Professional Psychology in 1982 and 1987, respectively. My doctoral research evaluated circumscribed personality factors in convicted child molesters and rapists, as compared to a group of non-offenders. I was licensed as a psychologist in the state of California in 1990. My first pre-doctoral internship was at the Center for Legal Psychiatry (formerly the UCLA Section on Legal Psychiatry). There I worked with mentally disordered offenders (NGI and MDSO) being released from state hospitals who were still considered dangerous and in need of intensive outpatient treatment and monitoring. I wrote quarterly progress reports for the courts assessing risk factors present at the time of evaluation periods and tracking progress in treatment administered two to four times per week. I worked with the severely mentally ill and in cases of trauma in emergency services, crisis intervention, and day treatment settings at a community mental health clinic throughout my graduate education at CSPP. I trained in pediatrics and undertook a two-year post-doctoral program in neuropsychology in order to update the skills and knowledge base I had developed during my graduate education. I

have been trained in both psychodiagnostic and neurocognitive assessment. I developed a neuropsychological assessment program at a satellite community mental health clinic for children, and I have been extensively involved in pediatric outpatient and adult neurocognitive assessment at federal capital, habeas, and state levels for at least 10 years. I have specialized in juvenile justice and capital matters. I have written, lectured, and steered doctoral research in areas of competency; intellectual disability, age, and culpability; effects of race, age, and diagnosis on fitness and sentencing recommendations, and I have sat on committees of students developing built-in tools for assessment of feigned neurocognitive impairment.

I am on panels for the Los Angeles Superior Court as an expert in both juvenile justice and neuropsychology. I have conducted over 350-400 criminal cases at various phases in legal proceeding, have consulted to the California Appellate Project on issues pertaining to neurocognitive assessment for 13 years, and have taught in both clinical and forensic capacities at the graduate level over the past 25 years. I have presented on the value of neurocognitive data at conferences and to attorneys and educators. I have testified before both state and federal courts over the past ten years. I maintain an active private practice treating couples, adults, and children in psychoanalytic psychotherapy with particular emphasis on longstanding effects of trauma.

Lawyers representing Kenneth Barrett have asked me to advise the court on the following questions: (1) what types of tests did Dr. Myla Young administered to Kenneth Barrett in 2009? (2) Is the Personality Assessment Inventory (PAI), the Minnesota Multiphasic Personality Inventory-2 (MMPI-2), or the Psychopathy Checklist-Revised (PCL-R) the same kind of test that Dr. Young administered? (3) Do the tests administered by Dr. Young measure the same things as the PAI, MMPI-2 or PCL-R? (4) Is there a scientific basis for considering results obtained through the use of the PAI, MMPI-2, or PCL-R when evaluating the reliability of results obtained through the types of tests Dr. Young administered?

I have reviewed Dr. Young's declaration and her raw test data. Dr. Young administered the following tests:

- Wechsler Adult Intelligence Scale – Fourth Edition (WAIS-IV)
- Wechsler Memory Scale – Fourth Edition (WMS-IV)
- California Verbal Learning Test – Second Edition (CVLT-II)
- Rey Complex Figure Test and Recognition Trials (Meyers & Meyers edition)
- Wisconsin Card Sorting Test (WCST)
- Test of Memory Malingering (TOMM Trials 1 and 2)
- Short Categories Test
- PASAT
- Delis-Kaplan Executive Function System (D-KEFS)
- Wide Range Achievement Test (WRAT-3)

Dr. Young administered tests designed for specific purposes that differ markedly from the PAI, MMPI-2, and PCL-R. Dr. Young administered a battery of neuropsychological tests. These are quantitative tests developed, standardized, and normed for the purpose of assessing brain functioning, also called neurocognitive functioning. Neurocognitive functioning is inferred from performances on tests tapping different areas of brain function on reliable and valid measures relative to reference and normative samples. The PAI, MMPI-2, and PCL-R are personality tests and not neuropsychological test instruments. Personality tests are not valid or reliable measures of neurocognitive functioning. Neither the PAI, MMPI-2, nor the PCL-R has been shown to predict, measure or represent neurocognitive functioning. Thus, there is no scientific basis for an examiner to use results obtained using the PAI, MMPI-2 or PCL-R to question or explain the results obtained using the neuropsychological tests administered by Dr. Young. Further, personality measures in no way are able to replicate or be used to compare and contrast findings from said instruments to neurocognitive test results.

I declare, under penalty of perjury, as provided in the laws of the United States, that

the foregoing is true and correct and based on my personal knowledge.

Subscribed to by me this 1st day of February in Los Angeles County, California.

*/s/ Deborah S. Miora*
DEBORAH S. MIORA

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com, nitawright73@yahoo.com), Joan M.
Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:874248@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/3/2017 at 1:27 PM CST and filed on 2/3/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 306(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Directing expedited deadlines as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: [294] Opposed MOTION for Recusal *and to Disqualify the Court*, [296] MOTION for Additional Time to File *Motion in Limine Regarding Dr. Steven Pitt*, [297] Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony*, [298] Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails*, [299] MOTION to Expand the Record, [300] MOTION for Order Barring Witness Collusion, [301] MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing, [302] MOTION for Reconsideration of Order Denying Deposition of Roger Hilfiger) (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com, nitawright73@yahoo.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov),
Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:874253@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/3/2017 at 1:31 PM CST and filed on 2/3/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 307(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: [295] MOTION in Limine *to Preclude Post–Hoc Rationalizations*, [303] MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony*, [305] MOTION in Limine *to Exclude Testimony by Randall Price*) (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**UNOPPOSED MOTION TO FILE SEALED OPPOSITION TO MOTION IN LIMINE
TO EXCLUDE TESTIMONY FROM OR EVIDENCE RELATED TO PROPOSED
EXPERT J. RANDALL PRICE**

---

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully requests permission under Local Civil Rule 79.1(b) to file, under seal, a response in opposition to Barrett's motion to exclude testimony from or evidence related to Dr. Price (Doc 305).  In support of this request, government counsel avers as follows:

1. To fully respond to Petitioner's motion in limine regarding Dr. Price, Respondent must refer to and rely upon the contents of the psychologist's sealed report.  *See* Doc. 269 at 17 (maintaining the confidentiality of the report).

2. On March 3, 2011, undersigned counsel consulted with Barrett's attorney David Autry, via phone and e-mail.  Mr. Autry stated that defense counsel did not object to this request to file the motion response under seal.

1

699

**CONCLUSION**

Respondent respectfully urges this Court to permit respondent to file an under seal response to Petitioner's motion in limine to exclude testimony from or evidence related to proposed expert J. Randall Price.

Dated: February 8, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150


/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

700

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on February 8, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**[PROPOSED]  ORDER SEALING OPPOSITION TO MOTION IN LIMINE TO
EXCLUDE TESTIMONY FROM OR EVIDENCE RELATED TO PROPOSED EXPERT
J. RANDALL PRICE**

_____

The government's motion to file, under seal, a response in opposition to Barrett's motion

to exclude testimony from or evidence related to Dr. Price (Doc 305) is hereby **granted**.

_____
**HON. JAMES H PAYNE**
U.S. District Court Judge

702

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                    )
         Petitioner/Defendant,      )
                                    )         Case No. CV-09-00105-JHP
    v.                              )
                                    )
UNITED STATES OF AMERICA,           )
                                    )
         Respondent/Plaintiff.      )

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR 18 U.S.C. § 3500
MATERIALS CONCERNING TRIAL COUNSEL TESTIMONY**

---

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully submits this brief in opposition to Barrett's motion for information subject to disclosure under the *Jencks Act*, 18 U.S.C. § 3500 (Doc. 297).

## PROCEDURAL HISTORY

Barrett was convicted of three homicide offenses he committed when a state police tactical unit attempted to serve a warrant at his home. The trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment on appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008). In response to Barrett's motion for collateral relief, which claimed ineffective assistance of trial counsel, the government filed an opposition that included the declarations of the defendant's former attorneys, Bret Smith and Roger Hilfiger. Doc. 174 Exs. 11 & 12. This Court denied § 2255 relief on all grounds. Docs. 214 & 215. On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded the case for an evidentiary hearing to

1

703

determine whether Messrs. Smith and Hilfiger ineffectively failed to investigate and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

In anticipation of the evidentiary hearing, Barrett unsuccessfully moved for discovery of all documentary evidence of every communication between his trial counsel and the government. Doc. 249 at 11-12; Doc. 269 at 4. Barrett now requests production of the same material under the *Jencks Act* among other authority. Doc. 297. This opposition follows.

## ARGUMENT

### THE COURT SHOULD MAINTAIN ITS PRIOR ORDER DENYING ACCESS TO PRIVILEGED GOVERNMENT WORK PRODUCT

Barrett requests that this Court order this disclosure every document, in any form, concerning the government's acquisition of trial counsel's declarations. In support of this request, Barrett relies largely on the *Jencks Act*, but also reasserts the discretionary availability of discovery under § 2255. Barrett also attempts to justify his request based on his due process right to disclosure of exculpatory information and a need to enforce his attorney-client privilege. Doc. 297. Barrett's motion should fail because the submission of counsel's declarations satisfied the *Jencks* Act,[1] which does not contemplate production of statements and information the witnesses did not adopt. To the extent Barrett once again asserts counsel's communications in discovery, he fails to show why the Court should revisit its earlier denial. Moreover, Barrett's due process and privilege arguments are neither legally apt nor factually supportable.

Barrett's request for all the government's communications with Messrs. Smith and

---

[1] The Tenth Circuit has held that the *Jencks* Act applies to § 2255 proceedings, though at least one court of appeals has disagreed. *Compare United States v. Kelly*, 269 F.2d 448, 451 (10th Cir. 1959); *with Beavers v. United States*, 351 F.2d 507, 509 (9th Cir. 1965).

2

Hilfiger captures privileged work product. *See United States v. Nobles*, 422 U.S. 225, 236-37 (1975); *see generally*. Fed. Rules of Crim. Proc., R. 16(a)(1)(E).  Barrett provides no factual or legal basis for piercing the privilege to allow him access to the government's internal communications and files.  Indeed, Barrett fails to so much as hint how the government's work product would shed light on the credibility or reliability of Messrs. Smith and Hilfiger, if and when they appear as witnesses.

Trial counsel's previously-filed declarations contained their relevant observations.  As statements the witnesses adopted, the declarations satisfied any disclosure obligation under the *Jencks* Act.  18 U.S.C. § 3500(e).  In contrast, notes and summaries of the witnesses' interview remarks do not come within the Act.  *See Palermo v. United States*, 360 U.S. 343, 352-53 (1959); *United States v. Marshall*, 985 F.2d 901, 908 (7th Cir. 1993).  Likewise, any earlier iterations of the declarations that the witnesses refused to adopt are not subject to disclosure under *Jencks* and could not assist Barrett in examining the witnesses.[2]  *See United States v. Phibbs*, 999 F.2d 1053, 1088-89 (6th Cir. 1993) (holding no duty to disclose notes a witness did not adopt as substantially verbatim); *United States v. Ricks*, 817 F.2d 692, 697-98 (11th Cir. 1987) (holding no duty to disclose memoranda that witnesses never adopted).

Barrett's other justifications fare no better than his argument under *Jencks*.  Insofar as Barrett seeks discretionary discovery under Rule 6 of the Rules following § 2255, he has not even attempted to demonstrate that the Court erred in its earlier denial of that request.  *See Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000) (reciting the standard for reconsideration).  Barrett also fails in his effort to establish that disclosure is required under due

---

[2] Assuming the Court adopts Barrett's sweeping construction of the Jencks Act, the government presumes that it will order similar disclosures from defense counsel's files as to all of his 72 witnesses. *See* Fed. R. Crim. Proc. 26.2

3

process as explicated in *Brady v. Maryland*, <u>373 U.S. 83, 87</u> (1963).  The *Brady* doctrine does not apply during collateral review.  *District Attorney v. Osborne*, <u>557 U.S. 52, 68-69</u> (2009).

Finally, Barrett cannot sustain his argument that the Court should order disclosure to determine whether trial counsel violated the defendant's attorney client privilege in their communications with the government.  While Barrett correctly notes that a claim of ineffective assistance of counsel claim implies only a limited waiver of privilege (*United States v. Pinson*, <u>584 F.3d 972, 978</u> (10th Cir. 2009), he does not indicate how his attorneys might have run afoul of that limitation, given the depth, breadth, and quantity of his complaints about them.  *See generally* Doc. 95.  He fatuously argues that counsel – in communicating with the government – acted recklessly because they did not first seek the court's guidance under ABA guidelines that did not exist when the attorneys executed their declarations and do not, in any event, enjoy the force of law.  *Compare* Doc. 174 Exs. 11 & 12 (executed in May of 2010); *with* ABA Opinion 10-456 (July 14, 2010).

Assuming, arguendo, that trial counsel had exceeded the scope of the implied attorney-client privilege in their communications with the government, Barrett fails to demonstrate that their disclosure of irrelevant information might prejudice him in the upcoming hearing.  The hearing concerns a claim of ineffective assistance in penalty phase representation, and Barrett makes no effort to show how the government might use such a procedural vehicle to make prejudicial use of information that fell outside the waiver of privilege.  Such information would, by definition, have no relevance to the issue at hand.  *See Pinson*, <u>584 F.3d at 978</u>.  Should the government adduce arguably irrelevant testimony, Barrett can interpose a timely relevance objection.  But at this juncture, he cannot show good cause for discovery to forestall the presentation of irrelevant testimony.

Given that Barrett has identified no basis in law or reason for the disclosure of privileged government communications, this Court should deny his request.

**CONCLUSION**

Based on the foregoing, the government respectfully urges this Court to deny Barrett's

motion for disclosure of documents under 18 U.S.C. § 3500.

Dated: February 8, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150


/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on February 8, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

7

709

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,          )
                                 )
        Petitioner/Defendant,    )
                                 )          Case No. CV-09-00105-JHP
   v.                            )
                                 )
UNITED STATES OF AMERICA,        )
                                 )
        Respondent/Plaintiff.    )

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO RECONSIDER ORDER DENYING DISCOVERY OF TRIAL COUNSEL'S E-MAILS

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully submits this brief in opposition to Barrett's motion for reconsideration of the Court's order denying discovery of trial counsel's e-mails (Doc 298).

## PROCEDURAL HISTORY

Barrett was convicted of three homicide offenses that he committed when a state police tactical unit attempted to serve a warrant at his home. The trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment on appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008). In response to Barrett's request for collateral relief, the government filed an opposition that included the declarations of the defendant's trial attorneys, Bret Smith and Roger Hilfiger, responsive to multiple claims of ineffective assistance. Doc. 174 Exs. 11 & 12; *cf.* Doc. 95. This Court denied collateral relief. Docs. 214 & 215. On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to determine whether Messrs.

1

Smith and Hilfiger ineffectively failed to investigate and present evidence about Barrett's background and mental health.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

In a motion for discovery ahead of the hearing, Barrett asked to depose and serve subpoenas duces tecum on his trial attorneys and for production, by government counsel, of every communication between his trial counsel and the government.  Doc. 249 at 10-12.  Barrett argued that trial counsel had demonstrated hostility toward him by submitting declarations about the case without seeking a judicial permission.  This Court denied the request, finding that "Petitioner has not demonstrated that trial counsel have refused to cooperate or, that simply by submitting declarations on issues raised by Petitioner in this § 2255 proceeding, trial counsel have become hostile toward Mr. Barrett."  Doc. 269 at 4.  Barrett now requests reconsideration.  Doc. 298.  This opposition follows.

## ARGUMENT

## THE COURT SHOULD MAINTAIN ITS ORDER DENYING DISCOVERY OF TRIAL COUNSEL'S CORRESPONDENCE

Barrett asks this Court to reconsider his request to serve subpoenas for trial counsel's correspondence with the government as to the drafting of their declarations and preparation for their hearing testimony.  Barrett argues that he is entitled to this material because it is part of his own case file.  Doc. 298.  Barrett fails to demonstrate that the Court erred in denying his initial request and cannot show that he has maintained an attorney-client relationship with lawyers he has repeatedly accused of ineffective assistance.

Courts evaluate motions to reconsider under the same standards governing a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e).  *See, e.g.*, *United States v. Thompson*, 125 F.Supp.2d 1297 (D. Kan. 2000).  Accordingly, they may grant reconsideration on

2

three discrete grounds: an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice.  *See* Doc. 221 (citing *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). A motion for reconsideration "is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed."  *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan.), *aff'd*, 43 F.3d 1484 (10th Cir. 1994).

Rather than attempting to establish that this Court erroneously denied the requested discovery, Barrett incorrectly asserts that the law of professional conduct vests him with a proprietary right to communications made by his former attorneys in regard to his attacks upon them.  Barrett's claim of ineffectiveness implied a waiver of his attorney-client privilege.  *See United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009) (holding "a habeas petitioner [who] claims ineffective assistance of counsel . . . waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim").  Give his de facto waiver of privilege, Barrett cannot show that he has an ongoing attorney-client relationship with lawyers he has attacked as ineffective.  Indeed, the law of professional responsibility bars representation of client when "significant risk that the representation of one or more clients will be materially limited by . . . a personal interest of the lawyer."  Okla. Rules of Prof. Conduct, Rule 1.7.  Accordingly, Barrett cannot sustain his argument that former counsel have a continuing obligation to maintain records on his behalf.

Barrett may argue in response that his severance of the attorney-client relationship creates "hostility" between with former counsel that should have resulted in the granting of his initiall discovery request.  But the present conflict of interest does not demonstrate that the trial attorneys have acted with hostility.  In particular, Barrett fails to demonstrate that counsel have

demonstrated any enmity toward the defendant, much less have they attempted to mislead the Court or otherwise act in bad faith in this case. *See Bishop v. Smith*, 760 F.3d 1070, 1099 (10th Cir. 2014 (collecting definitions of "hostile"). As such, Barrett still has not shown good cause for discovery.

Accordingly, Barrett has failed to identify any error of law or fact that might give rise to reconsideration of this Court's order denying discovery of trial counsel's correspondence.

713

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to deny Barrett's motion for reconsideration of its order denying discovery of trial counsel's correspondence.

Dated: February 8, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

714

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on February 8, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,           )
                                  )
         Petitioner/Defendant,    )
                                  )     Case No. CV-09-00105-JHP
    v.                            )
                                  )
UNITED STATES OF AMERICA,         )
                                  )
         Respondent/Plaintiff.    )

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION TO RECUSE AND DISQUALIFY THE COURT

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully submits this brief in opposition to Barrett's motion to recuse and disqualify the court (Doc. 294).

## PROCEDURAL HISTORY

Barrett was convicted of three homicide offenses he committed when a state police tactical unit attempted to serve a warrant at his home.  The trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment on appeal.  *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008).  On March 16, 2009, Barrett filed his initial motion for relief under 28 U.S.C. § 2255.  Doc. 1.  On May 29, 2009, Barrett moved unsuccessfully to recuse and disqualify the Court.  Docs. 45 & 66.  On October 5, 2009, Barrett moved unsuccessfully for a second time to recuse the Court.  Docs. 66 & 78.  On October 14, 2009, Barrett unsuccessfully sought a writ of mandamus from the Tenth Circuit to require this Court's recusal.  *See In re Barrett*, case. no. 09-

1

716

7096, Doc. 01018330196 (10th Cir. Dec. 14, 2009).  This Court subsequently denied § 2255 relief on all grounds.  Docs. 214 & 215.

Barrett unsuccessfully requested that the Court of Appeals grant him a certificate of appealability with regard to the denial of his recusal requests.  *Compare United States v. Barrett*, case no. 12-7086, Doc. 01019024041 (Mar. 22, 2013); *with United States v. Barrett*, case no. 12-7086, Doc. 01019047087 (May 2, 2013).  On an appeal limited to issues other than the recusal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to determine whether trial counsel, Roger Hilfiger and Bret Smith, ineffectively failed to investigate and present evidence about Barrett's background and mental health.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

On remand this Court scheduled motions for discovery.  Based in large measure on an order that denied most of the government's discovery motions (Doc. 269), Barrett now asserts that Court evinced bias and prejudgment when noting the difficulties of recreating, twelve years post hoc, the conditions prevailing at trial.  As such, he seeks to recuse the Court for the fourth time.  Doc. 294.  This opposition follows.

## ARGUMENT

### THE COURT SHOULD CONTINUE TO PRESIDE OVER THIS MATTER

Barrett claims this Court should recuse itself because it demonstrated partiality by commenting that present counsel have had a greater opportunity to amass evidence in mitigation than did the trial attorneys.  He contends that the Court's statement indicates that it has prejudged the issue or had an extra-judicial source of information.  Barrett further argues that the Court expressed bias when it recently denied him a mental health evaluation but permitted one to the government.  Doc. 294.  Barrett cannot establish the existence of bias based on a few lines of

dicta and a discovery order that has placed the government nearly a decade behind the defense in seeking rebuttal evidence.

A court must recuse itself if "sufficient factual grounds exist to cause a reasonable, objective person, knowing all the relevant facts, to question the judge's impartiality." *United States v. Erickson*, 561 F.3d 1150, 1169 (10th Cir. 2009); *United States v. Pearson*, 203 F.3d 1243, 1277 (10th Cir. 2000); *see* 28 U.S.C. § 455(a). As the Supreme Court has noted, "[n]ot *all* unfavorable disposition towards an individual (or his case)" amounts to bias or prejudice. *Liteky v. United States*, 510 U.S. 540, 550 (1994) (emphasis in original). Bias and prejudice "connote a . . . disposition or opinion that is somehow wrongful or inappropriate, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess." *Id*. (emphasis in original). An opinion or view held by a judge based on information received in earlier proceedings is "not subject to deprecatory characterization as 'bias' or 'prejudice.'" *Id*. at 551. A judge has "as much obligation . . . not to recuse when there is no occasion for him to do so as [he has] when there is." *United States v. Burger*, 964 F.2d 1065, 1070 (10th Cir. 1992) (internal quotation marks omitted).

Barrett cannot succeed in showing this Court has prejudged the case by seizing on its observation that present counsel have had a greater opportunity to amass mitigation evidence, over the last nine years, than did trial counsel, in the months ahead of trial. Barrett quotes the Court's finding that trial "counsel did not have sufficient time to find all of the mitigating evidence that post-conviction counsel has provided" as an indication that the judge has already determined the adequacy of the prior attorneys' work. Doc. 269 at 12-13. The Court's statement helped explain its decision but was neither necessary to the order nor prejudicial to Barrett's position in the litigation. In any event, trial counsel's performance is not measured with

3

reference to the work of § 2255 attorneys, but according to the standard set forth in *Strickland v. Washington*, 466 U.S. 668 (1984). *See also Strickland*, at 689 (holding "[w]ithin "the wide range of reasonable professional assistance . . . [e]ven the best criminal defense attorneys would not defend a particular client in the same way"). The Court did not, as Barrett would have it, base its observation on extra-judicial evidence. The Court managed the budgets of trial counsel and one current § 2255 attorney. *See* Docs. 85, 92, 105; Trl. Docs. 93, 96, 261, 262, 410.

Furthermore, the Court appropriately permitted the government to conduct a mental health evaluation at this juncture (Doc. 269), while barring the defense from performing one because it would produce evidence of limited mitigating value (Doc. 279 at 3-4). The Court granted the government's request, recognizing "[t]he right of the government to offer rebuttal evidence of the defendant's mental condition would be meaningless unless the government is provided an opportunity to conduct discovery on this issue." Doc. 269 at 14.

The Court did not, however, attempt to place the government on equal footing with the defendant, who performed mental health evaluations much closer in time to the crime and trial. Presumably, had this evidentiary hearing occurred earlier, the Court would have permitted the government to complete its investigation closer to Barrett's evaluations. Given that the Court has no power to alter the passage of time, the government must develop its rebuttal evidence at this juncture. But the Court's inability to create parity in this regard provides no evidence of bias against Barrett, and did not obligate it to order another psychiatric evaluation by the defense that would have, at best, repeated earlier findings. At worst, such an evaluation would have introduced new and untimely theories to the case. *See United States v. Guerrero*, 488 F.3d 1313, 1316 (10th Cir. 2007).

4

Barrett has failed to demonstrate any wrongful or inappropriate action connoting bias on the part of the Court, which was entitled to consider information from all aspects of this protracted case in making its rulings.  As such, it should deny the motion to recuse.

720

721

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to deny the motion to recuse and disqualify itself.

Dated: February 8, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

722

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on February 8, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER'S OBJECTION TO
SUBMITTING FINDINGS OF FACT AND CONCLUSIONS OF LAW**

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully submits this brief in opposition to Barrett's objection to submitting proposed findings of fact and conclusions of law (Doc. 301).

## PROCEDURAL HISTORY

Barrett was convicted of three homicide offenses that he committed when a state police tactical unit attempted to serve a warrant at his home. The trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment on direct appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008). This Court denied collateral relief on all grounds. Docs. 214 & 215. On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to determine whether trial counsel ineffectively failed to investigate and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

1

723

Following the remand, this Court issued a scheduling order that requires the parties to submit proposed findings of fact and conclusions of law on February 16, 2017.  Docs. 246, 270. Barrett objects to that requirement.  Doc. 301.  This opposition follows.

## ARGUMENT

### THE COURT SHOULD MAINTAIN THE OBLIGATION TO SUBMIT PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

Barrett objects to the Court's order that the parties submit proposed findings of fact and conclusions of law, arguing that the case has not involved formal discovery and asserting that he cannot identify the evidence he might present.  Doc. 301.  The government disagrees.  Barrett bears the burden of persuasion and cannot maintain that, less than a month before the hearing, he cannot describe his evidence with reasonable certainty.

Habeas petitioners bear the burden of persuasion under 28 U.S.C. § 2255.  *David v. United States*, 134 F.3d 470, 474 (1st Cir. 1998).  To prevail, a § 2255 petitioner must establish the existence of a defect that resulted in a "complete miscarriage of justice."  *Davis v. United States*, 417 U.S. 333, 346 (1974).

In an effort to meet his burden, Barrett filed a 403-page motion for § 2255 relief (Doc. 95), supported by 202 exhibits, encompassing thousands of pages of records, including dozens of witness declarations.  He subsequently filed a 277-page brief in support of his motion (Doc. 149) and a 215-page reply (Doc. 178), to which he appended an additional 14 witness declarations. On December 13, 2017, Barrett transmitted to the government a list of 71 potential witnesses. Ex. 1.  He subsequently provided a list 263 potential exhibits (Ex. 2) and filed a catalog of nine potential experts (Doc. 280).  He has since indicated that he "present a minimum of twelve (12)

724

professionals as witnesses and thirteen (13) lay witnesses, and may present more witnesses in each category," most of whom had already provided declarations.  Doc. 303 at 2.

Under these circumstances, Barrett cannot show that the absence of formal discovery prevents him from describing his evidence.  He has spent close to a decade marshalling evidence in anticipation of the upcoming hearing.  With the proceeding at hand, he cannot credibly claim an inability to identify and describe the same information he has curated for nine years.  His sudden request to avoid a recitation of facts and law – about which he has filed multiple briefs – seems designed to maintain a tactical advantage over the government.

Accordingly, the Court should overrule Barrett's objection to the requirement that he file proposed findings of fact and law.

**CONCLUSION**

Based on the foregoing, the government respectfully urges this Court to overrule

Barrett's objection to the submission of proposed findings of fact and law.

Dated: February 8, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150


/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

726

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on February 8, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section



**OFFICE OF THE FEDERAL DEFENDER**
Eastern District of California
801 I Street, 3rd Floor
Sacramento, California  95814-2510
(916) 498.6666    FAX (916) 498.6656

**HEATHER E. WILLIAMS**
Federal Defender

**LINDA C. ALLISON**
Chief Assistant Defender

**JOAN M. FISHER**
Assistant Federal Defender

December 13, 2016

Mr. Christopher Wilson
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401

Mr. Jeffrey B. Kahan
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F. Street, NW, 6th Fl.
Washington DC  20530

> Re:  United States v. Barrett
> OK–ED Nos. 6:04-cr-115-JHP, 6:09-CV-00105-JHP, Tenth Cir. No. 12-7086

Messrs. Kahan and Wilson:

Pursuant to the Court's Scheduling Order, please find the names and addresses of Mr. Barrett's potential witnesses for the evidentiary hearing currently scheduled for March 13, 2017.

Sincerely,

Joan M. Fisher
Assistant Federal Defender

Petitioner's Witnesses for Evidentiary Hearing
Kenneth Barrett v. United States of America, Case No. 09-CIV-105-JHP

Anderson, Dale
P.O. Box 926
Oklahoma City, OK 73070

Barrett, Doris
11260 W. 61st St.
Sapulpa, OK 74066

Barrett, Ernest
By Declaration, Deceased

Barrett, Isaac
PO Box 911
Sallisaw, OK 74955

Barrett, Steve
704 Parkwoods Dr.
Noble, OK 73068

Barrett, Toby
103 588 South 4690 Road
Sallisaw, OK 74955

Bedwell, Tamara
406 S. Poplar St.
Sallisaw, OK 74955

Bianco, Faust, Ph.D.
7146 S. Braden Ave. #500
Tulsa, OK 74136

Bigler, Erin, Ph.D.
Psychology Department
1001 SWKT Brigham Young University
Provo, Utah 84602

Blount, Ada
By Declaration, Deceased

Burke, Courtney
2030 Aspen Dr.
Tahlequah, OK 74464

1

Richard H. Burr
PO Box 525
Leggett, Texas  77350

Calbert, Christine
926 Clifton Ct.
Fort Smith, AR 72903

Cook, Carl
By Declaration, Deceased

Crawford, Cindy
1001 SE 10th Street
Muldrow, OK 74948

Crawford, Gwendolyn
RR 2, Box 92-8
Vian, OK

Crawford, Phyllis
RR 2, Box 92-8
Vian, OK

Crawford, Roger
RR 2, Box 92-8
Vian, OK

Crawford, Travis
800 East Creek, #10
Colonial Square Apts
Sallisaw, OK 74955

Daggs, Martin
RR 3, Box 338
Sallisaw, OK 74955-9527

Dotson, Gelene
PO Box 926
Vian, OK 74962

Dotson, Mark
Rt 2, Box 91-0
Vian, OK 74962

Dotson, Warren
By Declaration, Deceased

2

Echols, John
PO Box 701196
Tulsa, OK 74170

Garrett, John
504 W. Maple St.
Stilwell, OK 74960

Gordon, Jack
111 S. Muskogee Avenue
Claremore, OK

Gordon, Paul
1000 NW 19th St.
Moore, OK  73160

Greenfeather, Sharon
106 10th Street NE, Apt. 202
Auburn, WA 98002

Grizzle, Amanda
108 S. 7th Street
Tecumseh, OK

Gude, Robert
1400 Pond St.
Muldrow, OK 74948

Harris, Ruth
1528 Cherokee Trail
Van Buren, AK 72956

Henricksen, Mark
600 N Walker Avenue, Ste. 201
Oklahoma City, OK 73102-3035

Hilfiger, Roger
620 W. Broadway St.
Muskogee, OK 74401

Hill, Brandy
404 5th Avenue
Warner, OK 74469

Hill, Shawn
308 Adysen Ln.
Roland, OK 74954-5303

3

Case 6:09-cv-00105-RAW   Document 312-1   Filed 02/08/17   Page 5 of 8

Holdeman, Scharlette, Ph.D.
1116 Powhattan Avenue
San Francisco, CA 94110

House, Judy
17041 S. Maple
Kellyville, OK  74039

Hueske, Edward
300 Anderson County Rd. 3582
Palestine, TX

Joseph, Carolyn
406 E. Ruth #546
Sallisaw, OK 74955

Kirkham, George
1402 James Bay Rd.
Palm Beach Gardens, FL 22410

Kosten, Thomas, M. D.
2002 Holcombe Blvd.
Research (151), Building 110, Rm. 229
Houston Texas  77030

Lunsford, Paul Rickie
811 Meadow Lark Dr.
Sallisaw, OK 74955

Mackey, Mike
42204 Jefferson Rd.
Alva, OK 73717

Miora, Deborah S., Ph.D.
435 North Roxbury Dr., Suite 406
Beverly Hills, CA  90210

Nelson, Gary
17071 S. Maple
Kellyville, OK  74039

O'Connell, Julia
423 S. Boulder, Suite 300
Tulsa, OK 74103

4

732

Otto, Susan
Federal Public Defender
215 Dean A. McGee, Suite 707
Oklahoma City, OK 73102

Padgett, Dewey
PO Box 336
Sallisaw, OK 74955-0336

Philpot, Gary
112980 S. 4632 Rd.
Gans, OK 74936-5033

Philpot, John
469847 Highway 101
Sallisaw, OK
74955-8518

Poindexter, Billy
5301 E. 47th Pl. Apt. 1A
Tulsa, OK 74135-6627

Post, Leonard
262 Moss Street
New York, NY 10012

Reich, Nona
1941 Scott Street
Sapulpa, OK 74066

Riley, Linda
1312 Meadow Lane
Fort Smith, AK 72908

Russell, Jeanne, Ed. D.
3314 E. 51st Ste. 204F
Tulsa, OK 74135

Sanders, Charles
3365 Deer Trl.
Oologah, OK 74053

Sanders, Janice
PO Box 92-3
Vian, OK 74962

5

Schaye, Roseann
PO Box 86914
Tucson, AZ 85754-6914

Sharp, Bill, Ph. D.
1300 McGee Drive, Ste. 104
Norman, OK 73072

Sinyard, Steven
1901 W. Ruth Avenue # 73
Sallisaw, OK 94955

Smith, Bret
533 W. Broadway St.
Muskogee, OK 74401

Standing Bear, Geoffrey
110 E. 6th St.
Pawhuska OK

Stewart, Pablo, M.D.
824 Ashbury Street
San Francisco, CA  94117

Stovell, Ellen
935 S. Ross Road
Sallisaw, OK 74955

Thomas, Janesse
109 E. Vine Street
Sallisaw, OK 74955

Trotter, Kathy
PO Box 1178
Sallisaw, OK 74955

Jan Walkingstick
4585 W. Marge St.
Tucson, AZ 85741-1832

Gaylan Warren
202 Casey Court
Newport, WA 99156-9363

Weaver, Randy
474176  E. 1140 Rd.
Muldrow, OK 74948

6

Woods, George, M. D.
1633 N. Mountain Avenue
Upland, CA  91784

Young, Myla, Ph. D.
By Declaration, Deceased

**And Custodians of the Records from the following agencies or offices:**

Bureau of Prisons, North Central Region
Clerk of the Court for all courts in Cherokee County
Clerk of the Court for all courts in Sequoyah County
Clerk of the Court for U.S. District Court, Eastern District of Oklahoma
Clerk of the Court for U.S. District Court, Western District of Oklahoma
Cooper Clinic
Drug Enforcement Agency, McAlester
District 27 Drug Task Force Office
Dr. Murray Crow's Office
Eastern State Hospital
Federal Bureau of Investigation
Harbor View Mercy Hospital
Illinois Department of Health – Division of Vital Records
Jefferson Township High School
Joliet Public School District
National Personnel Records Center
Oklahoma State Department of Health – Division of Vital Records
Oklahoma State Penitentiary
Plainfield Elementary School
Sallisaw High School
Sallisaw Police Department
Sequoyah Memorial Hospital
Social Security Administration
Sparks Medical Center
St Edwards Mercy Medical Center
St Francis Hospital, Tulsa
Stanhope Schools, New Jersey
Wagoner Community Hospital
Wood Family Medical Center

7

736

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH E. BARRETT,** | ) | **CAPITAL CASE** |
| | ) | |
| **Movant/Petitioner,** | ) | Case No. 6:09-cv-00105-JHP |
| | ) | |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |
| _____ | ) | |

### PETITIONER'S LIST OF PROPOSED EXHIBITS

**Exhibits for Evidentiary Hearing**
**Kenneth Barrett v. US, Case No. 09-CIV-105-JHP**

Notice: The following documents are proposed exhibits. The actual exhibits to be used will be made known when we have had the
opportunity to fully interview trial counsel and narrow evidentiary concerns.

| | **Exhibit** | **Where in Record** |
|---|---|---|
| 1. | Marriage Certificate for A.J. and Ada Barrett | Exhibit 1 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 2. | Marriage Certificate for Abe and Minnie Dotson | Exhibit 2 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 3. | Marriage Certificate for Allen and Ida Real | Exhibit 3 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 4. | Marriage Certificate for David and Carolyn Joseph | Exhibit 4 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 5. | Marriage Certificate for Ernest and Sylvia Gelene Barrett | Exhibit 5 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 6. | Declaration of Rodney Floyd | Exhibit 6 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 7. | Marriage Certificate for Kenneth and Abigail Barrett | Exhibit 7 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 8. | Marriage Certificate for Hugh and Hattie Dotson | Exhibit 8 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 9. | Marriage Certificate for Sam and Ida Hatter | Exhibit 9 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 10. | Marriage Certificate for Sam and Bessie Hatter | Exhibit 10 From Doc 70 - Amended Motion for Collateral Relief |

|  | Exhibit | Where in Record |
|---|---------|-----------------|
|  |  | 6:09-cv-00105-JHP.  9/25/2009 |
| 11. | Marriage Certificate for Paul and Sylvia Gelene Dudley | Exhibit 11 From Doc 70  - Amended Motion for Collateral Relief  6:09-cv-00105-JHP.  9/25/2009 |
| 12. | Divorce File for Ernest and Sylvia Gelene Barrett | Exhibit 12 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 13. | Declaration of Janesse Thomas | Exhibit 13 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 14. | Declaration of Dale Anderson | Exhibit 14 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 15. | Divorce File for Isaac and Marilyn Barrett | Exhibit 15 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 16. | State of Oklahoma vs. Abe Dotson, dated December 14, 1917 and December 15, 1917 (Commitment to Penitentiary) | Exhibit 16 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 17. | State of Oklahoma vs. Abe Dotson, Record of Information, dated November 12, 1915 (Assault with the Intent to Kill) | Exhibit 17 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 18. | *State of Oklahoma vs. Abe Dotson*, Criminal Docket, dated 1915 (Assault with the Intent to Kill) | Exhibit 18 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 19. | *State of Oklahoma vs. Abe Dotson,* Criminal Docket (Carrying Weapon) | Exhibit 19 From Doc 70  - Amended Motion for Collateral Relief |

| | Exhibit | Where in Record |
|---|---|---|
| | | 6:09-cv-00105-JHP.  9/25/2009 |
| 20. | *State of Oklahoma vs. Abe Dotson*, Criminal Trial Docket (Drunk in a Public Place) | Exhibit 20 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 21. | *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Drunk in a Public Place) | Exhibit 21 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 22. | *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Larcenry) | Exhibit 22 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 23. | *State of Oklahoma vs. Abe Dotson*, Criminal Docket (Obtaining Money Under False Pretense) | Exhibit 23 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 24. | Declaration of David Autry | Exhibit 24 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 25. | *State of Oklahoma vs. Billy Dean Maxwell*, Case Number 1715 (Burglary) | Exhibit 25 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 26. | In the Matter of Mental Illness of Billy Dean Maxwell, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982 | Exhibit 26 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 27. | In the Matter of the Sanity of A.J. Barrett, Case Number 141, Lunacy Record, dated August 12, 1918 | Exhibit 27 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 28. | In the Matter of the Sanity of A.J. Barrett, Case Number 709, Mental Health Record and | Exhibit 28 From Doc 70  - Amended Motion for Collateral Relief |

|  | **Exhibit** | **Where in Record** |
|---|---|---|
|  | Petition for Order of Admission to State Hospital | 6:09-cv-00105-JHP.  9/25/2009 |
| 29. | Declaration of Mark Henricksen | Exhibit 29 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 30. | Ada Blount vs. Kathleen Blake, Case Number 13026 | Exhibit 30 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 31. | In the Matter of the Sanity of Wallace Dotson, Lunacy Record, Case Number 366, dated May 4, 1948 | Exhibit 32 From Doc 70  - Amended Motion for Collateral Relief  6:09-cv-00105-JHP.  9/25/2009 |
| 32. | *In the Matter of Mental Illness of Kenneth Barrett*, Case Number 481, Record of Mental Health Proceeding | Exhibit 33 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 33. | Declaration of John Echols | Exhibit 34 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 34. | Excerpts from Kenneth Barrett's Baby Book | Exhibit 35 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 35. | Letter from Kenneth Barrett | Exhibit 36 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 36. | Declaration of Robert Thompson | Exhibit 37 From Doc 70  - Amended Motion for Collateral Relief  6:09-cv-00105-JHP.  9/25/2009 |
| 37. | Declaration of Randy Weaver | Exhibit 38 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|     | Exhibit | Where in Record |
| --- | --- | --- |
|     |     |     |
| 38. | Declaration of Vickie Beaty | Exhibit 39 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 39. | Declaration of Amanda Grizzle | Exhibit 40 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 40. | Declaration of Ellen Stovall | Exhibit 41 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 41. | Declaration of Christine Calbert | Exhibit 42 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 42. | Supplemental Declaration of Leonard Post | Exhibit 43 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 43. | Report of George Kirkham, Ph.D. | Exhibit 44 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 44. | Declaration of Travis Crawford | Exhibit 45 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 45. | *Diana Barrett vs. Ernest Barrett*, Case No. JFD-79-3274 | Exhibit 46 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 46. | *State of Oklahoma vs. Karen Real*, Case No. CF-99-00018, Docket Sheet | Exhibit 47 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|  | **Exhibit** | **Where in Record** |
|---|---|---|
| 47. | *State of Oklahoma vs. Karen Real*, Case No. CM-99-00040, Docket Sheet | Exhibit 48 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 48. | *State of Oklahoma vs. Karen Real*, Case No. CF-99-00250A, Docket Sheet | Exhibit 49 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 49. | *State of Oklahoma vs. Karen Real*, Case No. CF-99-00251, Docket Sheet | Exhibit 50 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 50. | *State of Oklahoma vs. Karen Real*, Case No. CF-98-00264A, Docket Sheet | Exhibit 51 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 51. | *State of Oklahoma vs. Karen Real*, Case No. CF-97-00445A, Docket Sheet | Exhibit 52 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 52. | State of Oklahoma vs. David Littlefield, Case No. OBAD No. 1729 and SCBD No. 5338, Order dated September 14, 2009 | Exhibit 53 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 53. | Declaration of Susan Otto | Exhibit 54 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 54. | Declaration of Bill Sharp, Ph.D. | Exhibit 55 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 55. | Declaration of Jeanne Russell, Ed.D. | Exhibit 56 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|  | **Exhibit** | **Where in Record** |
|---|---|---|
| 56. | *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-111, Docket Sheet | Exhibit 57 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 57. | *State of Oklahoma vs. Henry Edwards* (Manslaughter) | Exhibit 59 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 58. | State of Oklahoma vs. Marilyn Crawford, Case Number 3005, Criminal Docket (Cultivation of Mari) | Exhibit 60 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 59. | *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number CF-97-00086 | Exhibit 61 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 60. | *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket (Disposing of Mortgaged Property) | Exhibit 62 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 61. | *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket (Manslaughter in the First Degree) | Exhibit 63 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 62. | Letter from John Echols to Honorable James H. Payne, dated February 28, 2005 | Exhibit 64 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 63. | Letter from Honorable James H. Payne to John Echols, dated February 22, 2005 | Exhibit 65 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 64. | Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008 | Exhibit 66 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|  | **Exhibit** | **Where in Record** |
|---|---|---|
| 65. | Declaration of Julia O'Connell | Exhibit 67 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 66. | *United States of America vs. Karen Real*, Case Number, Case Number  CR-00-21-FHS | Exhibit 68 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 67. | *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27, 2007 | Exhibit 69 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 68. | *Drug Offender Receives Break*, Times Record | Exhibit 70 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 69. | Letter to the Editor, *She Questions Sheriff's Department*, dated October 17, 1999 | Exhibit 71 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 70. | *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022 | Exhibit 72 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 71. | Photographs of Kenneth Barrett's shack | Exhibit 73 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 72. | Declaration of Ada Blount | Exhibit 74 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 73. | Declaration of Alvin Hahn | Exhibit 75 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|  | **Exhibit** | **Where in Record** |
|---|---|---|
| 74. | Declaration of Billy Poindexter | Exhibit 76 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 75. | Declaration of Brandie Hill | Exhibit 77 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 76. | Declaration of Carolyn Joseph | Exhibit 78 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 77. | Declaration of Dewey Padgett | Exhibit 79 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 78. | Declaration of Doris Barrett | Exhibit 80 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 79. | Declaration of Ernest Barrett | Exhibit 81 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 80. | Declaration of Frank Gordon | Exhibit 82 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 81. | Declaration of Gwendolyn Crawford | Exhibit 83 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 82. | Declaration of Issac Barrett | Exhibit 84 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|      | **Exhibit**                          | **Where in Record**                                                                                  |
| ---- | ------------------------------------ | ---------------------------------------------------------------------------------------------------- |
| 83.  | Declaration of Janice Sanders        | Exhibit 85 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009           |
| 84.  | Declaration of Kathy Trotter         | Exhibit 86 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009           |
| 85.  | Declaration of Linda Riley           | Exhibit 87 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009           |
| 86.  | Declaration of Mike Mackey           | Exhibit 88 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009           |
| 87.  | Declaration of Dr. Myla Young        | Exhibit 89 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009           |
| 88.  | Declaration of Paul Rickie Lunsford  | Exhibit 90 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009           |
| 89.  | Declaration of Phyllis Crawford      | Exhibit 91 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009           |
| 90.  | Declaration of Roger Crawford        | Exhibit 92 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009           |
| 91.  | Declaration of Ruth Harris           | Exhibit 93 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009           |

|  | **Exhibit** | **Where in Record** |
|---|---|---|
| 92. | Declaration of Shawn Hill | Exhibit 95 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 93. | Declaration of Toby Barrett | Exhibit 96 From Doc 70 - Amended Motion for Collateral Relief  6:09-cv-00105-JHP.  9/25/2009 |
| 94. | Declaration of Sylvia Gelene Dotson | Exhibit 97 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 95. | Declaration of Mark Dotson | Exhibit 98 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 96. | Declaration of Steve Barrett | Exhibit 99 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 97. | Declaration of Warren Barrett | Exhibit 100 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 98. | Declaration of Nona Reich | Exhibit 101 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 99. | Declaration of Carl Cook | Exhibit 102 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 100. | Declaration of Abby Stites | Exhibit 103 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

| | Exhibit | Where in Record |
|---|---|---|
| 101. | Declaration of Doris Barrett | Exhibit 105 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 102. | New Articles from Vian American and Sequoyah County Democrat Regarding Abe Dotson | Exhibit 106 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 103. | Description Narrative, Written by Trooper Glen Smithson, dated September 29, 1999 | Exhibit 107 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 104. | Excerpt from the Deposition of John Philpot | Exhibit 108 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 105. | Report by Edward E. Hueske | Exhibit 109 From Doc 70 - Amended Motion for Collateral Relief  6:09-cv-00105-JHP.  9/25/2009 |
| 106. | Curriculum Vitae of Edward E. Hueske | Exhibit 110 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 107. | Declaration of Steve Leedy | Exhibit 111 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 108. | Declaration of Lauren Cohen Bell | Exhibit 112 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 109. | 2008 Declaration of Kevin McNally | Exhibit 113 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|     | **Exhibit** | **Where in Record** |
|-----|-------------|---------------------|
| 110. | Declaration of Rodney Floyd | Exhibit 114 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 111. | Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001 | Exhibit 115 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 112. | 2007 Declaration of Kevin McNally | Exhibit 116 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 113. | Declaration of Dr. George Woods | Exhibit 117 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 114. | Declaration of Richard H. Burr | Exhibit 118 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 115. | Birth Certificate of Kenneth Barrett | Exhibit 119 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 116. | Birth Certificate of Sylvia Gelene Dotson | Exhibit 120 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 117. | Birth Certificate of Richard Barrett | Exhibit 121 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 118. | Birth Certificate of Toby Barrett | Exhibit 122 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|  | Exhibit | Where in Record |
|---|---|---|
| 119. | Birth Certificate of Stephen Barrett | Exhibit 123 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 120. | Death Certificates of Allen M. Real and Allen Cleveland Real | Exhibit 124 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 121. | Death Certificate of A.J. Barrett | Exhibit 125 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 122. | Death Certificate of Ada Melton Barrett | Exhibit 126 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 123. | Death Certificate of Albert Maxwell | Exhibit 127 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 124. | Death Certificate of Billy Maxwell | Exhibit 128 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 125. | Death Certificate of Hattie Dotson | Exhibit 129 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 126. | Death Certificate of Hugh Dotson | Exhibit 130 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 127. | Death Certificate of Ida Melton | Exhibit 131 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|   | Exhibit | Where in Record |
|---|---------|-----------------|
| 128. | Death Certificate of Isaac Barrett | Exhibit 132 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 129. | Death Certificate of Mary Barrett | Exhibit 133 From Doc 70 - Amended Motion for Collateral Relief  6:09-cv-00105-JHP.  9/25/2009 |
| 130. | Death Certificate of Minnie Andrews | Exhibit 134 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 131. | Brandon Smith Social Security Records, Itemized Statement of Earnings | Exhibit 135 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 132. | Educational Records for Kenneth Barrett | Exhibit 136 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 133. | Educational Records for Gwendolyn Barrett | Exhibit 137 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 134. | Educational Records for Ernest Barrett | Exhibit 138 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 135. | Medical Records for Carolyn Joseph | Exhibit 139 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 136. | Medical Records for Kathy Trotter | Exhibit 140 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|     | Exhibit | Where in Record |
|-----|---------|-----------------|
| 137. | Medical Records for Brandie Hill | Exhibit 141 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 138. | Medical Records for Toby Barrett | Exhibit 142 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 139. | Medical Records for Travis Crawford | Exhibit 143 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 140. | Medical Records for Cynthia Crawford | Exhibit 144 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 141. | Medical Records for Linda Riley | Exhibit 145 From Doc 70 - Amended Motion for Collateral Relief  6:09-cv-00105-JHP.  9/25/2009 |
| 142. | Medical Records for A.J. Barrett | Exhibit 146 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 143. | Medical Records for Kenneth Barrett | Exhibit 147 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 144. | Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999 | Exhibit 148 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 145. | Marriage Certificate for Ernest and Diana Barrett | Exhibit 149 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|      | **Exhibit** | **Where in Record** |
|------|-------------|---------------------|
| 146. | Divorce File for Eugene and Sylvia Gelene Dudley | Exhibit 150 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 147. | Divorce File for Kenneth and Abigail Barrett | Exhibit 151 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 148. | *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17 | Exhibit 152 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 149. | *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG | Exhibit 153 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 150. | *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481 | Exhibit 154 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 151. | Sylvia Gelene Dotson's Genealogy Memorandum | Exhibit 155 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 152. | *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338 | Exhibit 156 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 153. | *State of Oklahoma vs. Charles Sanders,* Case Number CF-97-9 | Exhibit 157 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 154. | *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75 | Exhibit 158 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|      | **Exhibit** | **Where in Record** |
|------|-------------|---------------------|
| 155. | *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128 | Exhibit 159 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 156. | *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-346 | Exhibit 160 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 157. | *State of Oklahoma vs. Charles Sanders*, Case Number  CF-98-363 | Exhibit 161 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 158. | *State of Oklahoma vs. Charles Sanders*, Case Number  CF-99-562 | Exhibit 162 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 159. | *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2001-314 | Exhibit 163 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 160. | *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2003-124 | Exhibit 164 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 161. | *State of Oklahoma vs. Charles Sanders*, Case Number  CF-2004-19 | Exhibit 165 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 162. | *State of Oklahoma vs. Charles Sanders*, Case Number  CM-03-365 | Exhibit 166 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 163. | *State of Oklahoma vs. Charles Sanders*, Case Number  CM-96-0444 | Exhibit 167 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|  | Exhibit | Where in Record |
|---|---|---|
| 164. | *State of Oklahoma vs. Charles Sanders*, Case Number  CRF-92-91 | Exhibit 168 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 165. | *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-08-224 | Exhibit 169 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 166. | *State of Oklahoma vs. Cindy Crawford*, Case Number  CF-2004-613 | Exhibit 170 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 167. | *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number  CM-2001-885 | Exhibit 171 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 168. | *State Oklahoma vs. Brandie Price*, Case Number  CF-99-549 | Exhibit 172 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 169. | *State Oklahoma vs. Brandie Price*, Case Number  CM-00-900 | Exhibit 173 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 170. | *United States of America vs. Brandie Price*, Case Number CR-07-16-RAW | Exhibit 174 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 171. | *State Oklahoma vs. Charles Sanders*, Case Number CF-97-140 | Exhibit 175 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 172. | *Michael Mackey vs. Cindy Crawford*, Case Number PO-03-390 | Exhibit 176 From Doc 70  - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

| | Exhibit | Where in Record |
|---|---|---|
| 173. | *State Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie Price*, Case Number CF-98-481 | Exhibit 177 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 174. | *State of Oklahoma vs. Travis Crawford*, Case Number CM-08-655 | Exhibit 178 From Doc 70 - Amended Motion for Collateral Relief  6:09-cv-00105-JHP.  9/25/2009 |
| 175. | *State of Oklahoma vs. Randy Weaver*, Case Number CF-00-668 | Exhibit 179 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 176. | Letter from Larry and Brenda Sell to Honorable John Garrett | Exhibit 180 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 177. | Background Materials on Clint Johnson: Testimony of Clint Johnson in *State of Oklahoma vs. Richard Loy Gray* and Exhibits | Exhibit 181 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 178. | Bill Ed Rogers's File | Exhibit 182 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 179. | *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111 | Exhibit 183 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 180. | *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503 | Exhibit 184 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 181. | *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603 | Exhibit 185 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

|  | **Exhibit** | **Where in Record** |
|---|---|---|
| 182. | *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187 | Exhibit 186 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 183. | *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389 | Exhibit 187 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 184. | *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186 | Exhibit 188 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 185. | *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369 | Exhibit 189 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 186. | *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774 | Exhibit 190 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 187. | *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244 | Exhibit 191 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 188. | *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572 | Exhibit 192 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 189. | *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988 | Exhibit 193 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 190. | Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September 20, 1999 | Exhibit 194 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |

| | Exhibit | Where in Record |
|---|---|---|
| 191. | *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477 | Exhibit 195 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 192. | Military Records for Travis Crawford | Exhibit 196 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 193. | Birth Certificate of Phyllis Dotson | Exhibit 197 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 194. | Birth Certificate of Travis Crawford | Exhibit 198 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 195. | Birth Certificate of Stephen Barrett | Exhibit 199 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 196. | Educational Records for Kenneth Barrett | Exhibit 200 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 197. | Medical Records for Gwen Crawford | Exhibit 201 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 198. | Medical Records for Carolyn Joseph | Exhibit 202 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 199. | Social Security Records for Travis Crawford | Exhibit 203 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |

|      | Exhibit | Where in Record |
|------|---------|-----------------|
| 200. | *State of Oklahoma vs. Cindy Crawford*, Case Number CF-99-645 | Exhibit 204 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP.  9/25/2009 |
| 201. | *Cindy Crawford v. Jeffrey and Stacy Mattox and Larry and Brenda Shelley,* Case No. JFP-09-458 | Exhibit 205 – Doc 2 – Corrected Motion to Vacate, 6:09-cv-00105-JHP.  9/25/2009 |
| 202. | Supplemental Declaration of Ernie Barrett | Exhibit 206 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 203. | Supplemental Declaration of Doris Barrett | Exhibit 207 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 204. | Supplemental Declaration of Issac Barrett | Exhibit 208 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 205. | Supplemental Declaration of Phyllis Crawford | Exhibit 209 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 206. | Supplemental Declaration of Gelene Dotson | Exhibit 210From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 207. | Supplemental Declaration of Mark Dotson | Exhibit 211 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 208. | Supplemental Declaration of Ruth Harris | Exhibit 212 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 209. | Supplemental Declaration of Carolyn Joseph | Exhibit 213 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 210. | Supplemental Declaration of Linda Riley | Exhibit 214 From Doc 178 – Reply to Amended Motion  6:09-cv-00105-JHP. 7/1/2010 |

|     | **Exhibit** | **Where in Record** |
| --- | --- | --- |
| 211. | Supplemental Declaration of Janice Sanders | Exhibit 215 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 212. | Supplemental Declaration of Abbie Stites | Exhibit 216 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 213. | Supplemental Declaration of Kathy Trotter | Exhibit 217 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 214. | Supplemental Declaration of Toby Barrett | Exhibit 218 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 215. | Supplemental Declaration of Richard Burr | Exhibit 219 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 216. | Supplemental Declaration of Toby Barrett | Exhibit 220 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 217. | UNDER SEAL: US Attorney's Letter to Federal Defender's Office regarding Janesse Thomas | Attachment A - Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP |
| 218. | UNDER SEAL: Billing Records of Roger Hilfiger and Bret Smith | Appendix A - Doc No. 01019206246, 10th Circuit Case No. 12-7086 |
| 219. | US Attorney Wilson's Report to Court | Doc 167, 6:09-cv-00105-JHP, 4/5/2010 |
| 220. | Declaration of Paul Gordon | Doc 199-1, 6:09-cv-00105-JHP, 3/16/2012 |
| 221. | Paul Gordon Resume | Doc 199-2, 6:09-cv-00105-JHP, 3/16/2012 |
| 222. | DEA Dangers of Drug Labs - Training Video | Doc 199-3, 6:09-cv-00105-JHP, 3/16/2012 |
| 223. | The Meth Lab - Training Video | Doc 199-4, 6:09-cv-00105-JHP, 3/16/2012 |

|      | Exhibit | Where in Record |
|------|---------|-----------------|
| 224. | Kitchens of Death - Training Video | Doc 199-5, 6:09-cv-00105-JHP, 3/16/2012 |
| 225. | Multi- County Grand Jury, Partial Report SC-99-56 | Doc 199-6, 6:09-cv-00105-JHP, 3/16/2012 |
| 226. | Transcript of Interview with Robert Darst | Doc 199-7, 6:09-cv-00105-JHP, 3/16/2012 |
| 227. | Transcript of Interview with Raymond Greninger | Doc 199-8, 6:09-cv-00105-JHP, 3/16/2012 |
| 228. | Transcript of Interview with John Hamilton | Doc 199-9, 6:09-cv-00105-JHP, 3/16/2012 |
| 229. | Transcript of Interview with Steve Hash | Doc 199-10, 6:09-cv-00105-JHP, 3/16/2012 |
| 230. | Transcript of Interview with Gene Hise | Doc 199-11, 6:09-cv-00105-JHP, 3/16/2012 |
| 231. | Transcript of Interview with Jim McBride | Doc 199-12, 6:09-cv-00105-JHP, 3/16/2012 |
| 232. | Transcript of Interview with Rick Manion | Doc 199-13, 6:09-cv-00105-JHP, 3/16/2012 |
| 233. | Transcript of Interview with Bill Poe | Doc 199-14, 6:09-cv-00105-JHP, 3/16/2012 |
| 234. | Transcript of Interview with Kerry Pettingill | Doc 199-15, 6:09-cv-00105-JHP, 3/16/2012 |
| 235. | Transcript of Interview with Danny Oliver | Doc 199-16, 6:09-cv-00105-JHP, 3/16/2012 |
| 236. | Audio Tape at Crime Scene by Paul Gordon | Appendix A, Doc 201-2, 6:09-cv-00105-JHP, 3/16/2012 (Stored in file cabinet in vault on 2nd floor of Clerk's Office) |
| 237. | Crime Scene Videotape by Paul Gordon | Appendix A, Doc 201-2, 6:09-cv-00105-JHP, 3/16/2012 (Stored in file cabinet in vault on 2nd floor of Clerk's Office) |

|  | Exhibit | Where in Record |
|---|---|---|
| 238. | Transcripts of 1st and 2nd State Trials* | *Petitioner Kenneth Barrett will be filing a Motion to Take Judicial Notice of these Transcripts. See letter from AUSA Michael Littlefield to Hon. James H. Payne dated September 29, 2005. |
| 239. | OSBI Report dated 11/23/1999 | Exh. S-72, Case No. CF 99-493 Preliminary Hearing Volume 3 |
| 240. | OSBI Report dated 1/20/2000 | Exh. S-73, Case No. CF 99-493 Preliminary Hearing Volume 3 |
| 241. | Declaration of John Garrett | Exh. 2, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 |
| 242. | Declaration of Gary Philpot | Exh. 8, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 |
| 243. | Declaration of John Philpot | Exh. 7, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 |
| 244. | Declaration of Geoffrey Standing Bear | Exh. 44, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 |
| 245. | Declaration of Jack Stringer | Exh. 45, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 |
| 246. | Declaration of Ron Sullivan | Exh. 52, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 |
| 247. | Declaration of William Tobin | Exh. 55, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 |
| 248. | Additional Education Records for Kenneth Barrett | N/A, Attached to email of 1/6/2017 |
| 249. | Declaration of Judy House | N/A, Attached to email of 1/6/2017 |
| 250. | All Documents turned over to US Attorney on 12/21/2016 in Compliance with Discovery Order | Submitted to US Attorney on Disc. Specific documents within may be identified as separate exhibits at the appropriate time. |
| 251. | Medical Records of Kelly Cochran | To be procured. Release of records signed January 4, 2017. |
| 252. | Sealed Budget Conference Minutes | 6:04-cr-00115-JHP, 12/9/2004 |

| | Exhibit | Where in Record |
|---|---|---|
| 253. | SEALED ORDER by Mag. Judge Steven P. Shreder re: defendant's Ex Parte Motion for Approval of "Pre-Authorization" Budget for the Defense | Doc 38, 6:04-cr-00115-JHP, 1/19/2005 |
| 254. | SEALED LETTER (copy) from Hon. James H. Payne to defense counsel John David Echols regarding the eight ex parte budget requests | 2/22/2005, 6:04-cr-00115-JHP, |
| 255. | SEALED LETTER from John David Echols to Hon. James H. Payne in answer to the 2/22/05 letter of Judge Payne regarding ex parte litigation budget requests. | 2/28/2005, 6:04-cr-00115-JHP, |
| 256. | Minutes: SEALED HEARING: Defense counsel John D. Echols and Roger Hilfiger present. Before Hon. James H. Payne. …Discussion held regarding the Court's order on the budget. | 3/22/2005, 6:04-cr-00115-JHP, |
| 257. | SEALED ORDER by District Judge James H. Payne adopting the U.S. Magistrate's SEALED REPORT AND RECOMMENDATION on interim requests for attorneys' fees and costs [106-1], DENYING defendant's NINTH EXPARTE (SEALED) Motion [107-1], GRANTING defendant's motion TENTH EXPARTE (SEALED) and allowing John Echols to withdraw [113-1], DENYING defendant's EXPARTE (SEALED) ELEVENTH Motion [118-1], DENYING defendant's motion for ex parte conference on defense budget and funding [116-1] and [126-1] | Doc 128, 6:04-cr-00115-JHP, 5/5/2005 |
| 258. | SEALED BUDGET HEARING MINUTES before Honorable James H. Payne | 10/3/2005, 6:04-cr-00115-JHP, |
| 259. | MINUTES: Further Sealed Hearing regarding budget matters. | 10/20/2005, 6:04-cr-00115-JHP, |
| 260. | SEALED MINUTE ORDER before District Judge James H. Payne GRANTING defendant's motion to modify order approving budget of 3/18/05 | Doc. 244, 6:04-cr-00115-JHP, 11/4/2005 |
| 261. | SEALED MINUTE ORDER before District Judge James H. Payne regarding Defendant's Ex Parte Litigation Budget (Henricksen) | Doc 275, 6:04-cr-00115-JHP, 12/15/2005 |
| 262. | Childhood photos of Kenneth Barrett | N/A, Attached to email of 1/6/2017 |
| 263. | Defendant's Pro Se Motion for Change of Appointed Counsel | Doc 135, 6:04-cr-00115-JHP, 5/23/2005 |

| | Exhibit | Where in Record |
|---|---|---|
| 264. | ORDER by District Judge James H. Payne denying defendant Barrett's pro se motion for Change of Appointed Counsel | Doc 137, 6:04-cr-00115-JHP, 5/24/2005 |
| 265. | Declaration of Bret Smith | Doc 175, Exh. 11, 6:04-cr-00115-JHP, 5/17/2010 |
| 266. | Declaration of Roger Hilfiger | Doc 175, Exh. 12, 6:04-cr-00115-JHP, 5/17/2010 |

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION IN LIMMINE TO EXCLUDE NOVEL THEORIES OF AGGRAVATION

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully submits this brief in opposition to Barrett's motion to exclude novel theories of aggravation (Doc 304).

### PROCEDURAL HISTORY

Barrett was convicted of three homicide offenses that he committed when a state police tactical unit attempted to serve a warrant at his home. The trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment on appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008). In response to Barrett's request for collateral relief, the government filed an opposition that included the declarations of the defendant's trial attorneys, Bret Smith and Roger Hilfiger, concerning multiple claims of ineffective assistance. Doc. 174 Exs. 11 & 12. This Court denied § 2255 relief. Docs. 214 & 215. On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to determine whether Messrs. Smith and Hilfiger

1

ineffectively failed to investigate and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

Following remand, this Court ordered Barrett to disclose trial counsel's files to the government. Doc. 269 at 8-10. On December 13, 2017, the government informed Barrett's counsel of its intention to call psychiatrist Steven Pitt as a witness. On January 6, 2017, the government identified Barrett's Bureau of Prisons records and some of the material from trial counsel's file as potential evidentiary hearing exhibits. The government also noted its intention to present evidence that defense investigator Roseann Schaye was disciplined by the State of Arizona Board of Behavioral Health Examiners. Barrett objects, asserting the aforementioned evidence supports novel theories of aggravation. Doc. 304. This opposition follows.

## ARGUMENT

### THE GOVERNMENT'S PROPOSED EXHIBITS ARE RELEVANT TO THE ISSUES BEFORE THE COURT

Barrett claims that the Court has calendared the upcoming evidentiary hearing solely to determine whether trial counsel ineffectively failed to present mitigation evidence, and that the focus of the proceeding bars any reliance on any government evidence, apart from that which it adduced at trial. Doc. 304. Despite the narrow subject matter of the upcoming hearing, the government is not foreclosed from rebutting Barrett's evidence.

The operative test for ineffective assistance of counsel contemplates more than a simple review of evidence that could have been presented at trial. To demonstrate ineffective assistance, Barrett must show his attorneys' performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He bears the burden of demonstrating that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 556

2

U.S. 111, 124 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003).  To establish prejudice, Barrett must show that, absent his attorney's error, a reasonable probability exists that he would have received a more favorable verdict.  *See id. United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993).

Within the context of the operative test for ineffectiveness, the Tenth Circuit's remanded this case to address concerns beyond a straight forward recapitulation of foregone trial evidence.  *Barrett*, 797 F.3d at 1224-32.  The court asked whether trial counsel "ever *asked* about Defendant's mental health, background, or family history."  *Id*. at 1226 (emphasis original).  The court also observed ambiguity in the record concerning assertions that Barrett had barred his attorneys from presenting mental health and social history evidence.  *Id*. at 1227.  It further noted a lack of clarity regarding the extent to which trial counsel made an informed choice to present a defense that constituted a viable alternative to the evidence Barrett now claims they mistakenly omitted.  *Id*. at 1228-29.  In view of the Tenth Circuit's opinion, the subject matter of the hearing is narrow, but nonetheless responsive to two-prong *Strickland* analysis.  As such, Barrett cannot sustain his argument that the Court should restrict the upcoming hearing to a mere review of novel evidence, during which the government must sit mutely in view of the trial record.

In a § 2255 evidentiary hearing, the government has a right, on pain of possible forfeiture, to adduce evidence in rebuttal to the defendant's presentation.  *See Smith v. Richert*, 35 F.3d 300, 305 (7th Cir. 1994) (citing *Boykins v. Wainwright*, 737 F.2d 1539, 1545-46 (11th Cir. 1984)).  To the extent the upcoming hearing contemplates evidence that the parties could have introduced at Barrett's capital penalty trial, relevance remains a threshold concern, despite the liberal evidentiary provision of the Federal Death Penalty Act, 18 U.S.C. § 3593(c).  *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010).  Relevance has the same meaning under §

3

3593(c) as it does under Federal Rule of Evidence 401.  *Lujan*, at 854.  Specifically, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information]."  Fed. R. Evid. 401.

The government's challenged evidence is relevant to the ineffective assistance claim, and not intended to introduce novel theories of aggravation.[1]  The government intends to adduce the affidavit of Faust Bianco to demonstrate that trial counsel possessed a sworn expert's statement that Barrett did not suffer from any significant neurological deficit.  The government also intends to adduce reports from Jeanne Russell to demonstrate that counsel possessed an expert opinion that Barrett did not exhibit symptoms of a major mental illness but that his negative behaviors were "exacerbated by drug use."  Similarly, the government will seek to introduce a report from psychologist Kathy LaFortune, who, among other findings, recommended against the retention of a mental health expert.  Such evidence should assist the Court in determining whether trial counsel acted on the basis of sound information and whether the omission of mental health evidence likely prejudiced the verdict.

The government seeks to adduce the testimony of its mental health expert, Steven Pitt, to show that Barrett does not now suffer from a major mental illness, nor did he at the time of the crime.  It will seek to corroborate Dr. Pitt's opinion, in part, with evidence from Barrett's BOP records, which indicate that the defendant has never displayed evidence of a major mental illness or defect.  Dr. Pitt reviewed the BOP records in reaching his findings about the defendant.

---

[1] Barrett attempts to reserve the right to interpose the same objection to "similar" evidence.  Doc. 304 at 2.  Given that he has premised his arguments on an overly-restrictive characterization of the upcoming proceeding, any further relevance objections should also fail.

Finally, the government will seek to adduce a State of Arizona report concerning the discipline of a defense witness, Roseann Schaye. According to the report, Ms. Schaye suffered a suspension of her counseling credentials for, among other things, "engaging in a dual relationship with a client that could impair [her] objectivity or professional judgement [sic] or create a risk of harm to the client." The government believes the evidence impeaches the witness's credibility. *See* Fed. R. Evid. 607 (permitting any party to impeach a witness).

Given that the government does not intend to adduce any of the challenged evidence in order to pursue a novel theory of aggravation, this Court should deny Barrett's motion.

5

769

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to deny Barrett's motion in limine to exclude novel theories of aggravation.

Dated: February 8, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on February 8, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| v. | ) | Case No. 09-CV-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION IN LIMINE TO
PRECLUDE POST-HOC RATIONALIZATIONS**

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and files this response in opposition to Movant's motion to preclude post-hoc rationalizations (Doc. 295).

**PRELIMINARY STATEMENT**

Following the affirmance of his convictions for three homicide crimes and the imposition of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255. Docs. 1, 2, 70 & 95. This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222). The Tenth Circuit Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and personal history. Doc. 230. This Court has scheduled the hearing to commence March 13, 2017. Docs. 246 & 270. On February 1, 2017, Barrett filed the instant motion and an expedited answer was ordered to be submitted by February 8, 2017. Doc. 307.

1

## **ARGUMENT**

In this motion in limine, Barrett requests the Court enter an order "precluding the government from eliciting testimony from trial counsel regarding what they would have done with information they did not possess or know about at the time of trial." Motion at 1. He commences his motion with an observation that trial counsel previously admitted ignorance of Dr. Bill Sharp, who has declared he told former counsel he found evidence of mental health issues. See Doc. 95 Ex. 55. Barrett goes on to attack the attorneys for recalling their own tactical choice -- to avoid evidence of their client's drug use -- and their memory of the defendant's resistance to the presentation of mitigation evidence about his family. Barrett also seeks to prevent reliance on mental health evaluations performed by Faust Bianco, Ph.D. and Kathy LaFortune, Ph.D., which were disclosed to the government as part of the trial attorneys' files. Barrett suggests these documents did not influence counsel because the attorneys did not make mention of them in their previously-filed declarations. Taken as a whole, it appears that Barrett seeks to cast as post hoc rationalizations any testimony concerning the attorneys' tactics.

In its opinion remanding the case to the District Court for an evidentiary hearing, the Tenth Circuit directed this Court to determine "whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial." *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir.2015). To demonstrate ineffective assistance, Barrett must show his attorneys' performance was deficient and prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). He bears the burden of demonstrating that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003). To establish prejudice, Barrett must show that,

2

absent his attorney's error, a reasonable probability exists he would have received a more favorable verdict.  *See id*.; *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993).

In his motion, Barrett makes much of the Tenth Circuit's admonition in this case that "an uninformed choice is not a reasonable tactical decision."  *Barrett v. United States*, 797 F.3d 1207, 1228 (10th Cir. 2015).  But in his effort to foreclose any testimony about counsel's tactics, Barrett overstates the significance of the Tenth Circuit's statement, and the Supreme Court's recognition that "courts may not indulge "post hoc rationalization" for counsel's decision-making that contradicts the available evidence of counsel's actions."  *Harrington v. Richter*, 562 U.S. 86, 109 (2011).  A closer reading of the Supreme Court's opinion reveals a far more nuanced and permissive attitude than Barrett suggests, chiding the lower court for its reliance on the very premise the defendant extols in his motion:

> The Court of Appeals erred in dismissing strategic considerations . . . as an inaccurate account of counsel's actual thinking.  Although courts may not indulge "post hoc rationalization" for counsel's decisionmaking that contradicts the available evidence of counsel's actions, . . . neither may they insist counsel confirm every aspect of the strategic basis for his or her actions. There is a "strong presumption" that counsel's attention to certain issues to the exclusion of others reflects trial tactics rather than "sheer neglect." [Citation.] . . . even the most experienced counsel may find it difficult to resist asking whether a different strategy might have been better . . . *Strickland*, however, calls for an inquiry into the objective reasonableness of counsel's performance, not counsel's subjective state of mind.

*Id*. at 109-10.

Ultimately, *Harrington* undermines Barrett's attempt to bar this Court from considering the evidence that did or may have influenced counsel's strategies.  Significantly, the opinion does not bar any evidence; it merely guides the discretion of the courts in considering the reasons for counsel's actions.  The opinion requires Barrett to demonstrate that counsel have engaged in "post hoc rationalizations" if he wishes to prevent the Court from considering them, but he cannot simply

preclude counsel from explaining themselves.  Even if Barrett successfully demonstrates that counsel have offered justifications they did not possess at the time of trial, *Harrington* permits the Court to consider the circumstances surrounding counsel's actions to determine their objective reasonableness.

As Barrett notes, Mr. Hilfiger and Mr. Smith have declared their ignorance of Dr. Sharp. The government can rely on consistent testimony to show that the attorneys were unaware of evidence that might have reasonably led them to undertake further investigative efforts.  Such evidence is not a rationalization, it explains the circumstances in which counsel made decisions. In this § 2255 action, Barrett bears the burden of demonstrating that counsel knew or had reason to know of Sharp's findings and that the information available to them would have led reasonable attorney to undertake further investigation.

Evidence concerning the Bianco and LaFortune evaluations of Barrett's mental health is probative of counsel's tactics and the likely impact of their decision to forego further investigation into that area.  The reports, which were disclosed as part of trial counsel's file, indicate that two mental health professionals assessed Barrett's mental health as generally sound around the time of trial.  Presumably trial counsel knew of these records and made tactical decisions in accordance with them.  The experts' findings would have tended to confirm trial counsel's lay opinions that Barrett did not suffer from any mental illness that might yield meaningful mitigation.

Barrett observes that counsel did not mention the Bianco and LaFortune reports in their 2010 declarations.  Their silence is best explained by an innocent failure of recollection over the half decade that elapsed between trial and the drafting of counsel's declarations.  Given that Barrett only disclosed the reports within the last several weeks, the government could hardly have inquired about the documents when interviewing trial counsel in anticipation of an answer it filed in 2010.

4

*See* Doc. 174.  Even if trial counsel have no present recall of the reports, the documents remain probative of the circumstances that would have informed a reasonable attorney's decision making. Any contrary result would require this Court to determine the reasonableness of counsel's conduct on the basis of evidence they necessarily did not have – the post-trial mental health opinions offered by the defense – in favor of evidence they did.  In any event, the Bianco and LaFortune reports substantially weaken Barrett's efforts to demonstrate that the omission of mental health evidence in any way prejudiced the verdict, calling into question the reliability of retrospective opinions offered by the defense's current experts.

## CONCLUSION

Based upon the argument and authority above, the government respectfully urges this Court

to deny Barrett's motion in limine.

Dated: February 8, 2017.

Respectfully submitted,

MARK F. GREEN
United States Attorney

s/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov

*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

6

777

**CERTIFICATE OF SERVICE**

I, hereby certify that on February 8, 2017, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry: dbautry44@hotmail.com

Joan M. Fisher joan.fisher@fd.org, Paul_Mann@fd.org, jmfisher@turbonet.com


/s *Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT      )
                                         )

     Movant,               )

                                         )

v.                               )         Case No. 09-CV-00105-JHP

                                         )

UNITED STATES OF AMERICA,     )

                                         )

     Respondent.        )

## GOVERNMENT'S RESPONSE TO MOTION FOR ADDITIONAL TIME TO FILE MOTION IN LIMINE REGARDING DR. STEVEN PITT, D.O.

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and files this response to Movant's motion for additional time to file motion in limine regarding Dr. Steven Pitt, D.O. (Doc. 296).

## PRELIMINARY STATEMENT

Following the affirmance of his convictions for three homicide crimes and the imposition of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255. Docs. 1, 2, 70 & 95. This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222). The Tenth Circuit Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and personal history. Doc. 230. This Court has scheduled the hearing to commence March 13, 2017. Docs. 246 & 270. On December 6, 2016, the Court granted the Government's Motion for Psychiatric Evaluation of Defendant (Doc. 253) and ordered the evaluation to be completed within forty-five (45) days. Doc. 269. On January 18, 2017, the Court granted Barrett's Motion for Access to Petitioner by George Woods, M.D. (Doc. 285) and ordered the re-evaluation be

1

completed prior to February 10, 2017.  (Doc 288).  Pursuant to the Scheduling Order herein (Doc. 270), the parties are required to exchange Expert reports on March 3, 2017.  On February 1, 2017, Barrett filed the instant motion and an expedited answer was ordered to be submitted by February 8, 2017. Doc. 306.

## ARGUMENT

Barrett is requesting ten (10) days following the disclosure of Dr. Pitt's report to file a motion in limine as to Dr. Pitt's proposed testimony.  After further consideration, the Government would inform the Court it has no objection to Barrett's motion inasmuch as the same courtesy is extended to the Government.  The Government would also request ten (10) days from receipt of Dr. Woods' report of his re-evaluation of Barrett to file any and all appropriate motions in limine regarding the testimony of George Woods, M.D.

Dated: February 8, 2017.

Respectfully submitted,

MARK F. GREEN
United States Attorney

s/ Christopher J. Wilson
CHRISTOPHER J. WILSON
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov

/S. Jeffrey B. Kahan
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910

2

FAX: (202) 353-9779
Jeffrey.kahan@usdoj.gov

3

## **CERTIFICATE OF SERVICE**

I, hereby certify that on February 8, 2017, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry: dbautry44@hotmail.com

Joan M. Fisher joan.fisher@fd.org, Paul_Mann@fd.org, jmfisher@turbonet.com


/s *Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com, nitawright73@yahoo.com), Joan M.
Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:875157@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Seal
Document(s)
Content-Type: text/html
```

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/8/2017 at 3:48 PM CST and filed on 2/8/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 316(No document attached) |

**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: granting [308] Government's Unopposed Motion to Seal Response in Opposition to Motion (Re: [305] MOTION in Limine *to Exclude Testimony by Randall Price*). (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **v.** | ) | Case No. 09-CV-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S RESPONSE TO SUPPLEMENTAL MOTION
TO EXPAND THE RECORD**

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and files this response to Movant's supplemental motion to expand the record (Doc. 299).

**PRELIMINARY STATEMENT**

Following the affirmance of his convictions for three homicide crimes and the imposition of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255. Docs. 1, 2, 70 & 95. This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222). The Tenth Circuit Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and personal history. Doc. 230. This Court has scheduled the hearing to commence March 13, 2017. Docs. 246 & 270. On February 1, 2017, Barrett filed the instant motion and an expedited answer was ordered to be submitted by February 8, 2017. Doc. 306.

**ARGUMENT**

Petitioner is requesting to expand the record to include supplemental declarations which were submitted in support of his Second Amended Motion for §2255 Relief. After further

1

consideration the Government would advise the Court it has no objection to Petitioner's requested relief to the extent the Government maintains the right to interpose objections to the admissibility of certain contents of the exhibits should they be offered as evidence in the evidentiary hearing.

Dated: February 8, 2017.

Respectfully submitted,

MARK F. GREEN
United States Attorney

s/ Christopher J. Wilson
CHRISTOPHER J. WILSON
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov

/S. Jeffrey B. Kahan
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

**<u>CERTIFICATE OF SERVICE</u>**

I, hereby certify that on February 8, 2017, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry: dbautry44@hotmail.com

Joan M. Fisher joan.fisher@fd.org, Paul_Mann@fd.org, jmfisher@turbonet.com


/s *Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney

3

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT    )
                          )
    **Movant,**              )
                          )
v.                        )            Case No. 09-CV-00105-JHP
                          )
UNITED STATES OF AMERICA, )
                          )
    **Respondent.**          )

## GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION FOR ORDER BARRING WITNESS COLLUSION

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and files this response in opposition to Movant's motion to bar witness collusion (Doc. 300).

### PRELIMINARY STATEMENT

Following the affirmance of his convictions for three homicide crimes and the imposition of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255.  Docs. 1, 2, 70 & 95. This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222).  The Tenth Circuit Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and personal history.  Doc. 230.  This Court has scheduled the hearing to commence March 13, 2017.  Docs. 246 & 270.  On February 1, 2017, Barrett filed the instant motion, and an expedited answer was ordered to be submitted by February 8, 2017. Doc. 306.

1

## **ARGUMENT**

Petitioner requests this Court enter an order, prior to the commencement of the evidentiary hearing, invoking the rule of sequestration pursuant to Federal Rule of Evidence 615.  Rule 615 does not control this stage of the litigation.  The Rule states in relevant part: "At a party's request, the court must order witnesses so excluded that they cannot hear other witnesses' testimony or the court may do so on its own."  On its face, the rule applies to testimony, and none has been taken in this case, as the evidentiary hearing has not yet begun.[1]  *See United States v. Aguilar*, 948 F.2d 392, 397 n.6 (7th Cir. 1991) (refusing a defense attorney's attempt to obtain pretrial sequestration to prevent an AUSA from interviewing witnesses).

Petitioner premises his request on an unfounded allegation that government counsel has colluded with witnesses.  As evidence of the supposed misconduct, Barrett cites similarities in the declarations offered by trial counsel.  The resemblance is not accidental, it reflects the fact that government counsel prepared the declarations for the witnesses' review and execution.  "There is nothing unusual or improper about an attorney drafting a witness's declaration, so long as the witness reviews the declaration, agrees with its contents."  *Luxottica Grp. v. Light in the Box Ltd.*, No. 16-CV-05314, 2016 WL 6092636, at *4 (N.D. Ill. Oct. 19, 2016); *see also Rygg v. Hulbert*, no. C11-1827JLR, 2012 WL 12847290, *19 (W.D. Wash. July 16, 2012) (noting lack of impropriety in declaration prepared by counsel).

Barrett also accuses the government of misconduct for offering recollections of trial counsel that contradicted the assertions in Jeanne Russell's declaration for the defense.  Barrett baselessly accuses the government of presenting, through trial counsel's declarations, speculative

---

[1] Assuming the Court grants Barrett's motion, it appears that the order will preclude contact between the defendant's 72 named witnesses.

opinion testimony about Ms. Russell's truthfulness.  In truth, the declarations were confined to factual assertions without any comment on the credibility of any other person.

Barrett also argues the government took advantage of this Court's favoritism for trial counsel, who were supposedly appointed over the advice of more committed advocates for the defendant.  This allegation is likewise unfounded.  The government chose, interviewed and presented the declarations of Messrs. Smith and Hilfiger because they represented Barrett at trial, and because the defendant had accused them of ineffectiveness.  It hardly would have profited the government to have sought the memories of lawyers who did not represent Barrett to elicit their understanding of trial counsel's experience and tactics.  The government does not commit misconduct by interviewing pertinent witnesses.  *See generally United States v. Hillman*, 642 F.3d 929, 937-38 (10th Cir. 2011) (rejecting a claim that a criminal defendant has a due process right in a prosecutor's questions during a witness interview before indictment).

Given the absence of any applicable authority or factual basis for the motion, the Court should deny the request to exclude witnesses from extra-judicial contact with one another.

**CONCLUSION**

The government respectfully urges this Court to deny Barrett's motion.

Dated: February 8, 2017.

Respectfully submitted,

MARK F. GREEN
United States Attorney

*s/ Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov

*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

4

**CERTIFICATE OF SERVICE**

I, hereby certify that on February 8, 2017, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry: dbautry44@hotmail.com

Joan M. Fisher joan.fisher@fd.org, Paul_Mann@fd.org, jmfisher@turbonet.com

/s *Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT          )
                                )
        Movant,                 )
                                )
v.                              )          Case No. 09-CV-00105-JHP
                                )
UNITED STATES OF AMERICA,       )
                                )
        Respondent.             )

GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION
FOR RECONSIDERATION OF ORDER DEYING REQUEST
TO DEPOSE ROGER HILFIGER

        **COMES NOW** Respondent, United States of America, by and through undersigned

counsel and files this response in opposition to Movant's motion for reconsider order denying

request to depose Roger Hilfiger (Doc. 302).

## PRELIMINARY STATEMENT

        Following the affirmance of his convictions for three homicide crimes and the imposition

of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255. Docs. 1, 2, 70 & 95.

This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222). The Tenth Circuit

Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an

allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental

health and personal history. Doc. 230. This Court has scheduled the hearing to commence March

13, 2017. Docs. 246 & 270. On November 18, 2016, Petitioner filed a Motion for Leave to

Conduct Civil Discovery (Doc. 249) requesting, among other things, to depose trial counsel. In

an Order dated December 6, 2016, the Court denied Petitioner's request. Doc. 269. On February

1

1, 2017, Barrett filed the instant motion for reconsideration, and an expedited answer was ordered to be submitted by February 8, 2017. Doc. 306.

**ARGUMENT**

Rule 6 of the Rules Governing § 2255 Cases authorizes discovery with leave of the court, based on good cause shown. In his previous motion, Barrett requested leave to depose trial counsel Bret Smith and Roger Hilfiger. In support, Barrett claimed there was "an appearance of hostility toward Mr. Barrett" because Messrs. Hilfiger and Smith prepared declarations addressing the claims of ineffective assistance of counsel. Motion for Leave to Conduct Civil Discovery at 10. This Court denied the motion, finding that "Petitioner has not demonstrated that trial counsel have refused to cooperate or, that simply submitting declarations on issues raised by Petitioner in this § 2255 proceeding, trial counsel have become hostile toward Mr. Barrett." Order at 4.

Barrett now reasserts his motion for leave to conduct a deposition of only Mr. Hilfiger, but fails to establish sufficient grounds for reconsideration. Courts evaluate motions to reconsider under the same standards governing a motion to alter or amend judgment under Federal Rule of Civil Procedure 59(e). *See, e.g.*, *United States v. Thompson*, 125 F.Supp.2d 1297 (D. Kan. 2000). Accordingly, they may grant reconsideration on three discrete grounds: an intervening change in controlling law, the availability of new evidence, or the need to correct clear error or prevent manifest injustice. *See* Doc. 221 (citing *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000). A motion for reconsideration "is not a second chance for the losing party to make its strongest case or to dress up arguments that previously failed." *Voelkel v. Gen. Motors Corp.*, 846 F. Supp. 1482, 1483 (D. Kan.), *aff'd*, 43 F.3d 1484 (10th Cir. 1994).

Petitioner offers four justifications for his renewed deposition request: 1) to "allow for a more complete exploration of the facts related to the ineffectiveness claim," 2) to "permit the

<div align="center">2</div>

parties to prepare adequately," 3) to allow Petitioner to efficiently identify and schedule rebuttal witnesses," and 4) to "prevent further collusion between the government and Mr. Hilfiger in preparing his testimony." None of these grounds warrant reconsideration of the Court's previous order.

The Tenth Circuit has clearly defined the scope of the upcoming evidentiary hearing. Despite Petitioner's repeated attempts to resurrect issues that have been repeatedly rejected (*e.g.* OHP's execution of the warrant, credibility of government witnesses, crime scene investigation, or intimidation of witnesses by former AUSA Mike Littlefield), the March 13th hearing will contemplate one issue: whether trial counsel ineffectively investigated and presented evidence of Defendant's background and mental health. A deposition of Mr. Hilfiger for "additional exploration of the facts" is unnecessary, especially given that Mr. Hilfiger outlined his views of the case in a sworn declaration attached to the government's answer. Doc. 174, Ex 11. Likewise, the requested deposition will not materially advance hearing preparations or promote identification of rebuttal witnesses. As demonstrated by the length of the list of potential witnesses and exhibits, Petitioner's legal team has undoubtedly seined through trial counsel's files, interviewed counsel and spoken to scores of potential witnesses. Barrett's motion for reconsideration fails to provide good cause for the requested deposition.

Finally, the allegations of collusion between the government and Mr. Hilfiger are baseless and do not provide good cause for additional discovery. During the course of this litigation, Petitioner has repeatedly claimed the government improperly obtained declarations from trial counsel. The Tenth Circuit has clearly defined the extent to which a claim of ineffective assistance of counsel implies a waiver of the attorney-client privilege. *See United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009) (holding "a habeas petitioner [who] claims ineffective assistance of

3

counsel . . . waives attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim).  Barrett does not demonstrate that Mr. Hilfiger exceeded the implied waiver of privilege nor does he identify any authority that might have obliged him to secure this Court's guidance before communicating with the government.  Petitioner's empty allegations of corruption and witness tampering do not provide good cause for discovery much less reconsideration of an existing order.

## CONCLUSION

The government respectfully urges this Court to deny Barrett's motion to reconsider.

Dated: February 8, 2017.

Respectfully submitted,

MARK F. GREEN
United States Attorney

*s/ Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov

*/s Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

4

**CERTIFICATE OF SERVICE**

I, hereby certify that on February 8, 2017, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry: dbautry44@hotmail.com

Joan M. Fisher joan.fisher@fd.org, Paul_Mann@fd.org, jmfisher@turbonet.com


/s *Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney

5

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT | ) | |
| | ) | |
| **Movant,** | ) | |
| | ) | |
| **v.** | ) | Case No. 09-CV-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO MOTION IN LIMINE TO RELY
UPON DECLARATIONS FOR DIRECT-EXAMINATION TESTIMONY**

**COMES NOW** Respondent, United States of America, by and through undersigned

counsel and files this response in opposition to Movant's motion to rely upon declarations for

direct examination testimony (Doc. 303).

**PRELIMINARY STATEMENT**

Following the affirmance of his convictions for three homicide crimes and the imposition

of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255.  Docs. 1, 2, 70 & 95.

This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222).  The Tenth Circuit

Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an

allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental

health and personal history.  Doc. 230.  This Court has scheduled the hearing to commence March

13, 2017.  Docs. 246 & 270.  On February 1, 2017, Barrett filed the instant motion and an expedited

answer was ordered to be submitted by February 8, 2017. Doc. 307.

1

## **ARGUMENT**

The Petitioner moves this Court for an order "accepting as direct examination testimony previously filed declarations of lay witnesses." Motion at 1. The government acknowledges that the Rules following 28 U.S.C. § 2255 authorize expansion of the record by submission of additional materials. The government also recognizes that courts can and do rely on declarations in lieu of direct testimony during § 2255 evidentiary proceedings. The government, however, objects to the evasiveness of Barrett's request, which fails to identify any particular witness, declaration or portion of declaration upon which he might seek to rely.

Rule 7 of the Rules following § 2255 authorizes habeas courts to expand the record. Within the bounds of the rule, district courts occasionally adopt witness declarations as substitutes for direct testimony. *See e.g., United States v. McCaleb*, CV 10–4313 CBM, 2103 WL 2040013, *4 (C.D. Cal. May 13, 2013); *Christian v. Frank*, Civil No. 04–00743 DAE–LEK, 2008 WL 4055817, *3 (D. Haw. Aug. 29, 2008).

In view of that authority, the government does not offer a legal objection to Barrett's proposal that he rely on declarations in favor of direct examination. Rather, the government objects to the vagueness of Barrett's proposal. Barrett's motion does not identify any particular witness or declaration who might come within the proposed order. That silence is consistent with Barrett's approach when inquiring as to the government's position on the motion. In e-mail correspondence, Barrett's attorney informed the government, "I didn't mean to imply that we were going to present our whole case via declaration. Some of our witnesses might be presented in that fashion, but others will be called live to at least supplement their declarations. Some may just be called live."

2

The vagueness of Barrett's proposal places government counsel at a substantial disadvantage, having to simultaneously prepare for a case presented by live testimony and by unidentified portions of declarations. Many of the declarations that Petitioner has submitted in support of his § 2255 motion are arguably irrelevant or otherwise inadmissible, in part or in whole, as evidence bearing on the upcoming evidentiary hearing. On the other hand, the government may not contest the contents of some witnesses' declarations. Without knowing who might actually appear to testify in court, the government is left to prepare for a multitude of different scenarios. The government will not accede to an arrangement in which Barrett can, at the last moment, determine who will testify in person or who will appear by way of untold portions of declarations, some of which go uncited in the operative claim of ineffective assistance.

Accordingly, the government urges the Court to deny Barrett's motion. Assuming the Court is inclined to accept Barrett's offer of direct testimony by way of declaration, the government urges it to direct the defense to state with specificity who will testify in court and who will do so by way of specified portions of existing declarations.

<div align="center">3</div>

## CONCLUSION

The government respectfully urges this Court to deny Barrett's motion or, alternatively, to grant it on the condition that Barrett provide a timely identification of witnesses and documents he intends to present as his case-in-chief.

Dated: February 8, 2017.

Respectfully submitted,

MARK F. GREEN
United States Attorney

s/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov

*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

4

800

## CERTIFICATE OF SERVICE

I, hereby certify that on February 8, 2017, I electronically transmitted the attached documents to the Clerk of Court using the ECF System for filing.  Based on the records currently on file, the Clerk of Court will transmit a Notice of Electronic Filing to the following ECF registrants:

David B. Autry: dbautry44@hotmail.com

Joan M. Fisher joan.fisher@fd.org, Paul_Mann@fd.org, jmfisher@turbonet.com


/s *Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | CASE NO. 6:09-cv-00105-JHP |
| Petitioner, | ) | |
| | ) | PETITIONER'S RESPONSE TO |
| v. | ) | GOVERNMENT'S MOTION TO |
| | ) | EXCLUDE EVIDENCE OF |
| UNITED STATES OF AMERICA, | ) | UNAVAILABLE WITNESSES BY |
| | ) | DECLARATION ALONE |
| Respondent. | ) | |
| | ) | |

The government has moved to exclude certain evidence from now-deceased witnesses based on the declarations they submitted as exhibits in 2009 to Mr. Barrett's § 2255 petition and court-ordered amended petition. (Doc 292)

The government concedes that "[t]o the extent those declarations concern social history and mental health evidence Barrett might have offered in mitigation, the government does not

Petitioner's Response to Government's
Motion to Exclude Evidence of Unavailable
Witnesses by Declaration Alone                    1                    *Barrett v. United States*,
OK-ED 6:09-cv-00105-JHP    802

object under the liberal evidentiary standard applicable to § 3593 proceedings." (footnote omitted)(Doc. 292, p. 3)  Thus, the government agrees the court can consider the declaration of Myla Young, Ph.D., the neuropsychologist who examined Mr. Barrett in 2009.  (Doc. 95, Exh. 89)  It also agrees, for example, that Petitioner's deceased father Ernie Barrett's declaration regarding family history (including a paternal multi-generational history of mental problems and impairments), Petitioner's upbringing and immediate family background, and his evident mental or emotional problems may be considered substantively.  (Doc. 95, Exh. 81, Doc. 178, Exh. 206)

However, the government argues that absent an opportunity to "confront" the portion of Ernie Barrett's declaration stating the trial attorneys "only interviewed me a few minutes before I testified," and the statements in his supplemental declaration about the performance of trial counsel and any "investigator" they may have employed, these statements should be excluded from consideration.  The government's argument should be rejected.  (Doc. 292, pp. 2-3)

First, as a broad matter, the government does not have a right to "confront" Mr. Barrett's witnesses. The Sixth Amendment right of confrontation belongs to the accused in a criminal case, not to the government prosecutors.

Second, the government is seeking to take unfair advantage of the court's error in denying an evidentiary hearing, which was later corrected by the Tenth Circuit.  Mr. Barrett should not be made to suffer again from the consequent passage of time, by excluding relevant evidence about trial counsels' deficient performance, particularly with respect to their failure to conduct professionally reasonable interviews of family members.

Mr. Barrett filed his petition and amended petition in 2009.  (Docs. 1, 95)  The

Petitioner's Response to Government's
Motion to Exclude Evidence of Unavailable
Witnesses by Declaration Alone                    2                    *Barrett v. United States*,
                                                              OK-ED 6:09-cv-00105-JHP   803

government filed its response and Mr. Barrett filed his reply in 2010. (Docs. 153, 154) The court denied relief on all issues, including second-stage ineffectiveness and the request for an evidentiary hearing, in 2012. (Docs. 214, 216) The Tenth Circuit vacated Mr. Barrett's death sentence and ordered an evidentiary hearing on the claim of penalty phase ineffectiveness in 2015. *United States v. Barrett,* 797 F.3d 1207, 1232 (10th Cir. 2015). Ernie Barrett died on June 4, 2012. But for the fact the court wrongly denied Petitioner a *timely* evidentiary hearing in the first instance, an error that had to be corrected by the appeals court, Ernie Barrett would have been alive and able to testify.

Third, the government (and trial counsel) have already conceded that trial counsel, just as Ernie Barrett stated in his declarations, failed to interview him in "preparation" for his second- stage testimony in anything approaching a professionally reasonable manner and that, based on his observations, their penalty phase investigation respecting Petitioner's family was inadequate.

In his petition, amended petition, and appellate brief, Mr. Barrett stated that family members who appeared in the second stage of trial, including Ernie Barrett, were interviewed for only a few minutes each at the courthouse before they took the stand, and that no previous mitigation investigation as to what they could and would say had been conducted. Other available family witnesses were not interviewed at all. (Doc. 71, Exh. 37, Doc. 3, Exhs. 74, 77-78, 80-81, 83-87, 90-93, 95-99, 100-104, Doc. 178, Exhs. 206-217, Tenth Cir. brief, pp. 61-63) The government never contested this in its response to the § 2255 petition(s), or in its response brief in the Tenth Circuit. (Doc. 174, pp. 115-146, Tenth Cir. response brief, pp. 55- 68)

Petitioner's Response to Government's
Motion to Exclude Evidence of Unavailable
Witnesses by Declaration Alone                          3                          *Barrett v. United States*,
OK-ED 6:09-cv-00105-JHP   804

More importantly, trial counsel submitted declarations or affidavits in connection with the government's response to the petition and amended petition.  (Doc. 175, Exhs. 11, 12) Although the government was well aware of what Ernie Barrett (and the other family witnesses who testified)[1] had said about the last-minute, totally unilluminating courthouse "interviews" ahead of his (and their) testifying, and surely inquired of Messrs. Hilfiger and Smith about these matters in preparing their affidavits, trial counsel deny none of it.  Therefore, the statements of Ernie Barrett, which the government wants to exclude, are reliable.  If nothing else, they are admissible under the residual exception of the hearsay rule for unavailable witnesses. Fed.R.Evid. 807 (a)(1)-(4).  If further notice is needed, Petitioner gives the government notice under Fed.R.Evid. 807(b) that he intends to offer the statements of Ernie Barrett to which the government objects.

Fourth, while the government cites cases to the effect that the rules of evidence *generally apply* to § 2255 evidentiary hearings, *e.g., United States v. Fancischine,* 512 F.2d 827, 829 (5th Cir. 1975),[2] it cannot be invoked in this instance, for the reasons stated above. *See also Green v. Georgia,* 442 U.S. 95, 97 (1979) (citing *Lockett,* 438 U.S. at 604–05, 98 S.Ct. 2954) (per curiam).

The government makes similar arguments to exclude the declaration of Warren Dotson, who is deceased.  The government moves to exclude Mr. Dotson's statement, who says in his declaration, "the law did not have to go to Kenny's place in the middle of the night to arrest

---

[1]  Of some note is the possibility that other family witnesses are, at this time, unavailable.  For example, Phyllis Crawford, Mr. Barrett's maternal aunt, reportedly now suffers from dementia and may be unable to testify. Likewise, Ruth Harris suffers from a heart condition, which stress exacerbates.

[2]  *Francischine,* which involved the revocation of federal probation, discussed the proposition cited by the government in *dicta.*

Petitioner's Response to Government's
Motion to Exclude Evidence of Unavailable
Witnesses by Declaration Alone                    4                    *Barrett v. United States,*
OK-ED 6:09-cv-00105-JHP   805

him" because he was non-violent.  The government says this statement does not constitute

mitigating evidence, for which the relaxed rules of admissibility of 18 U.S.C. § 3593(c) might

apply.  This is incorrect.  Mitigating evidence encompasses testimony about a defendant's

character and background.  *E.g., Lockett v. Ohio,* 438 U.S. 586 (1978).

The government's motion should be denied.

DATED this 8th day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ David Autry
DAVID AUTRY

/s/ Joan M. Fisher
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Response to Government's
Motion to Exclude Evidence of Unavailable
Witnesses by Declaration Alone                5                   *Barrett v. United States,*
                                                              OK-ED 6:09-cv-00105-JHP   806

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 8th day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Response to Government's
Motion to Exclude Evidence of Unavailable
Witnesses by Declaration Alone                  6                                  *Barrett v. United States*,
                                                                                 OK-ED 6:09-cv-00105-JHP   807

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73016
Telephone:      405) 521-9600
Facsimile:      (405) 521-9669
E-Mail:         dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar # 122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | CASE NO. 6:09-cv-00105-JHP |
| Petitioner, | ) | |
| | ) | **RESPONSE TO GOVERNMENT'S** |
| v. | ) | **MOTION TO EXCLUDE PROPOSED** |
| | ) | **WITNESSES** |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

Petitioner, Kenneth Eugene Barrett, submits the following as his response to the

government's motion to exclude proposed witnesses.  (Doc. 289)

1. **Expert mental health witnesses – Drs. Erin Bigler, Thomas Kosten, Deborah Miora,**
   **Thomas Reidy and Pablo Stewart.**

   Petitioner takes each of the government's arguments for excluding these witnesses in turn.

   None is persuasive.

Response to Government's Motion to
Exclude Proposed Witnesses                    1              *Barrett v. United States*,
                                                          OK-ED 6:09-cv-00105-JHP

The government states, "Barrett intends to call several expert witnesses who can offer opinion that was not available to trial counsel or event [sic] § 2255 counsel at the time they filed their ... petitions." (Doc. 289, p. 8)  Along the same lines, the government argues "the only existing claim" respecting whether trial counsel were ineffective for failing to introduce mitigating mental health evidence concerns whether they should have retained *two specific* experts, Drs. Woods and Young.  ("The only existing claim stems from a failure to call Myla Young and George Woods.")(Doc. 289, p. 10)

The government goes on to claim Petitioner offers no reason why trial counsel would have had the time and resources to hire *specific experts* Drs. Erin Bigler, Thomas Kosten, Deborah Moira, Thomas Reidy and Pablo Stewart.  (Doc. 289, p. 10)

These arguments are both disingenuous and beside the point.

Petitioner has never argued counsel were ineffective for failing to engage the services of *specific* experts Dr. George Woods and Dr. Myla Young.  Nor does he argue now that counsel erred in failing to retain *specific* experts Drs. Bigler, Kosten, Miora, Reidy and Stewart.  In remanding the case for an evidentiary hearing, the Tenth Circuit *never* framed the issue as whether counsel performed in a constitutionally deficient manner by failing to hire, specifically, Drs. Woods and Young.  Nor did it limit Mr. Barrett's evidence at the hearing it ordered to the testimony of Drs. Woods and Young (a now-impossibility in light of the fact she is deceased). The court never stated that Mr. Barrett could not present the testimony of other mental health experts to corroborate the doctors who previously examined Mr. Barrett, (or rebut government mental health testimony), experts who  add weight to his claim that counsel should have and could have introduced compelling mental health mitigating evidence at trial.  *United States v.*

*Barrett,* 797 F.3d 1207, 1223-1231 (10th Cir. 2015).

The argument has always been that because counsel failed to conduct a professionally reasonable investigation, they failed to discover, develop, and present mitigating mental health evidence of *the types* found by Drs. Woods and Young.  It is believed Drs. Bigler, Kosten, and Stewart can corroborate and explicate certain aspects of Drs. Woods's and Young's findings.  Their testimony is therefore relevant because it makes more likely than not the mitigating mental health evidence Mr. Barrett will present at the evidentiary hearing is credible.[1]  The types of evidence these expert witnesses can offer are precisely the kinds the Tenth Circuit discusses at length in its opinion remanding the case.  *Barrett,* 767 F.3d at 1223-1231.

In a similar vein, the government complains Petitioner, through these witnesses, is attempting to "fortify existing theories" about his mental health identified by Drs. Woods and Young.  (Doc. 289, p. 9)  This is not an argument for exclusion.  That is the whole point.  As noted, the testimony of the experts the government seeks to exclude are intended to support and further explain Mr. Barrett's *pre-existing* chronic and long-standing mental and organic impairment, and is for that reason relevant by definition.  The testimony will aid in

---

[1] The government's characterization of the proposed testimony from Drs. Bigler, Kosten and Stewart shows the relevance of these witnesses to Mr. Barrett's argument that trial counsel were ineffective for failing to investigate and introduce the mitigating mental health evidence identified in his post-conviction filings.  ("Erin Bigler would testify to his [Mr. Barrett's] 'neuropsychological functioning, cognitive impairment, history of head trauma, and/or brain damage ... [and possibly] etiologies of Mr. Barrett's brain damage.' ... Thomas Kosten would testify about 'review of Mr. Barrett's psychiatric, medical, and substance abuse histories; his social history; his review of prior evaluations of Mr. Barrett; and/or his own clinical evaluation of Mr. Barrett.' ... Pablo Stewart would opine about Barrett's ability to 'perceive, understand, assess or evaluate or make judgements under the conditions at issue.'... ." (Doc. 289, p. 9) These summaries alone show the speciousness of the government's arguments that the testimony of these witnesses go to Mr. Barrett's "current mental state."  Clearly, as the government notes and we asserted, they relate back to the findings of Drs. Woods and Young re Mr. Barrett's mental state at the time of offense.   (Doc. 289, pp. 7-8).

demonstrating counsel performed deficiently in failing to marshal the kinds of evidence these witnesses could offer.  The evidence the government wants excluded would not have been "unavailable" to trial counsel had they conducted the type of investigation the Sixth Amendment requires in a capital case.  Nor were the types of evidence that could be offered through these witnesses "unavailable" to habeas counsel, because they are in harmony with the mental health evidence presented in the § 2255 petition.

The above-stated government arguments miss the mark entirely with respect to the proposed testimony Drs. Miora and Reidy.  Because Dr. Young is deceased, Dr. Miora has been brought aboard to validate her testing.  In so doing, Dr. Miora will add to the persuasiveness of Dr. Young's findings, and can blunt any attacks on them that might be offered by a government expert.  Dr. Miora's testimony is relevant to material issues in the case.  Fed.R.Evid. 401.

Should Petitioner's motion in limine to exclude the testimony of Dr. Randall Price (Doc. 305) be denied, Dr. Reidy will serve as a rebuttal witness to Dr. Price's use of the PCL-R to brand Mr. Barrett as having anti-social personality disorder (or psychopathy).  (Doc. 268, unsealing for a limited purpose Dr. Price's report and video-tape of his examination).  The government makes Petitioner's point for him by arguing that Dr. Reidy "will blunt the impact of government-sponsored testimony."  (Doc. 289, pp. 9-10).  That *is* Mr. Barrett's specific intention. In making his case that counsel were ineffective in the second-stage because they failed to develop and introduce mitigating mental health evidence, Mr. Barrett is required to show the findings of any government expert, such as Dr. Price, are either incorrect or entitled to little or no weight on balance.  He is entitled to rebut the testimony of Dr. Price, since the Tenth Circuit stated that Price's report, which was still under seal at the time of the appellate proceedings, might furnish "devastating" evidence undercutting Petitioner's mental health mitigating evidence.

*United States v. Barrett,* 797 F.3d at 1232. And, faced with Dr. Price's testimony at trial, any reasonable defense counsel would have sought expert assistance to refute it rather than simply challenging it via cross-examination. Preventing Mr. Barrett from rebutting Dr. Price's testimony would result in an incomplete and slanted picture, unfairly skewing the determination of deficient performance, prejudice per se in favor of the government.

Attempting to frame the issue as one of what counsel with "infinite" time and resources could have done is another straw-man argument.[2] (Doc. 289, p. 10) Yet again, the question is whether trial counsel were ineffective for failing to investigate and introduce the types of mental health mitigating evidence identified by Drs. Woods and Young, regardless of which experts (or how many) ultimately testify at the evidentiary hearing.

This argument echoes the suggestion in the court's scheduling order, where it prejudged the performance prong of the *Strickland* test, opining that trial counsel would not have had the time to marshal the mitigating mental health evidence presented in the § 2255 petition. (Doc. 270) The timeline of trial counsels' representation and habeas counsels' representation of Mr. Barrett shows otherwise. (Doc. 294)

Echoing the court's earlier misplaced finding, the government argues the expert witnesses it wants barred from testifying can only offer opinions on Petitioner's *current* mental health, not his mental health at the time of the offense or the time of trial. (Docs. 271, 276, 279, Doc. 289 p. 8) Even assuming purely for the sake of argument there was merit to this observation, the government's position amounts to a concession that its own psychiatric expert, Dr. Steven Pitt, D.O., should be excluded as a witness. Dr. Pitt did not examine Mr. Barrett

---

[2] The government made a similar argument in the Tenth Circuit to the findings of Drs. Woods and Young. (Respondent's Brief, p. 60) It was rejected. *Barrett,* 797 F.3d at 1223-1231.

Response to Government's Motion to
Exclude Proposed Witnesses      5      *Barrett v. United States*,
OK-ED 6:09-cv-00105-JHP

until January 2017. Using the government's logic, Mr. Barrett's motion in limine to exclude, among other evidence, Dr. Pitt's testimony, should be granted. (Doc. 304) Contrary to the belief of the court and the government, the witnesses the government wants excluded will testify to matters relating to the "relevant" time period, not just Mr. Barrett's "current" mental health, as explained above.

Finally, Mr. Barrett is not seeking to "undertake a dress rehearsal for a wholly reconceived penalty phase trial." (Doc. 289, p. 9) He is simply trying to present the court with all relevant mitigating evidence bearing on his mental health and organic deficits in support of his ineffective assistance claim. The types of evidence to be introduced through these witnesses are, in the cases of Drs. Bigler, Kosten, Miora, Reidy and Stewart, exactly the type of evidence discussed in the Tenth Circuit's opinion. *Barrett,* 797 F.3d at 1223-1231. Dr. Miora is testifying in the place of Dr. Young, a plainly reasonable step. Dr. Reidy will be a rebuttal witness to Dr. Price so a complete and accurate picture will be presented. Neither the government nor the court gets to make strategic decisions for counsel in the presentation of what is inarguably relevant evidence, based on the Tenth Circuit's opinion.

### 2. Attorney witnesses – Julia O'Connell, Richard Burr and Susan Otto.

The government argues Ms. O'Connell, the Federal Defender for the Northern District of Oklahoma, can offer only irrelevant evidence because her "scant knowledge of ... trial counsel's preparations would not shed light on any issue before the Court." It also says that because she "did not participate in the trial defense and appears to lack any knowledge about the circumstances that informed trial counsel's decisions, her testimony would not assist the Court." (Doc. 289, p. 14)

Ms. O'Connell will testify, in part, about Mr. Hilfiger contacting her regarding the

Response to Government's Motion to
Exclude Proposed Witnesses       6       *Barrett v. United States*,
OK-ED 6:09-cv-00105-JHP

813

mitigation investigator her office had used in another federal capital case. Because Mr. Hilfiger was contacting her with little time available before trial, she told him it was too late in the day to begin a competent second-stage investigation, and suggested he contact Federal Resource counsel Richard Burr. (Doc. 95, Exh. 67) This evidence is relevant to Mr. Barrett's claim that trial counsel were ineffective, and failed to develop the "omitted" mitigating evidence featured in his post-conviction filings, because they had not begun to take elementary steps to prepare for a penalty phase until it was too late to do a professionally reasonable investigation. It is a piece of the puzzle. Ms. O'Connell is aware of the professional standards that applied then to counsel in a capital case, as well as the nature and scope of a reasonable investigation. (Doc. 95, Exh. 67)

In his brief to the Tenth Circuit, Mr. Barrett argued Ms. O'Connell's statements were evidence of counsel's lack of preparation and investigation, and thus ineffectiveness. (Petitioner's Tenth Cir. brief, p. 60, n. 35) The Tenth Circuit did not discount Mr. Barrett's reliance on Ms. O'Connell's declaration. In fact, the court referred to it in its opinion. Whatever arguments the government may have made that her account was irrelevant were rejected. This makes Ms. O'Connell's testimony on this point relevant. *Barrett,* 797 F.3d at 1225.

The same analysis applies to Ms. O'Connell's rationale for not accepting an appointment in Mr. Barrett's case and her opinion regarding the appointments ultimately made by the court. This is relevant background information, which helps shed light on the deficient representation Mr. Barrett received at trial. The Tenth Circuit did not discount these aspects of Ms. O'Connell's declaration when it relied on it in its opinion.

That Ms. O'Connell was allegedly not aware of some previous acquaintance between

Response to Government's Motion to
Exclude Proposed Witnesses                     7                     *Barrett v. United States*,
                                                                  OK-ED 6:09-cv-00105-JHP

814

Richard Burr and Mr. Hilfiger goes to the weight, not the admissibility of her testimony.  It might be a proper subject for cross-examination.  Ms. O'Connell's and Mr. Burr's testimony is linked. She says that when she was contacted late in the day by Mr. Hilfiger, she referred him to Mr. Burr.  Mr. Burr says he never heard from Mr. Hilfiger on the matters he discussed with Ms. O'Connell.   (Doc. 95, Exhs. 67, 118)

Susan Otto's recommendations to this court as to who were appropriate counsel to represent Mr. Barrett at trial are relevant for the same reason Ms. O'Connell's testimony is. (Doc. 95, Exh. 54, Doc. 289, p. 14)  Ms. O'Connell's and Ms. Otto's proposed testimony carries additional weight because the court is required to at least have input from the Federal Defender's Office when making appointments in capital cases.

As noted, Richard Burr can give relevant testimony about his lack of communication with Mr. Hilfiger after Mr. Hilfiger contacted Julia O'Connell.  This is mentioned specifically by the Tenth Circuit.  It was relevant to the court's analysis, making Mr. Burr's testimony on this point unquestionably relevant.  *Barrett, 797* F.3d at 1225.

While the Tenth Circuit may not have mentioned explicitly the other matters Mr. Burr addresses in his declaration, it did not deem them irrelevant to any argument made by the government.  Mr. Burr is being called both as an expert on the generally accepted standards – *i.e.,* prevailing professional norms - that must  be met by counsel in a capital case, the extent of his personal familiarity of this case before trial, and based on what he has learned of counsel's investigation, preparation, and presentation at the penalty phase, whether, in his professional opinion, their performance was professionally reasonable.  He will also discuss whether the various justifications offered by trial counsel for their acts and omissions are professionally reasonable for a lawyer in a capital case.  (Doc. 95, Exh. 118, Doc. 289, pp. 12-14)

The government is correct that the ABA Standards for the performance of counsel in a death penalty case are not determinative.  (Doc. 289, p. 13)  However, they are relevant guides in assessing the constitutional adequacy of attorney performance, as the Tenth Circuit recognized in Mr. Barrett's case.  *Barrett,* 797 F.3d at 1224 (citing portion of ABA Standards dealing with mitigation specialists as relevant, but noting strict adherence to this or any other ABA Standard is not mandated, citing *Bobby v. Van Hook,* 558 U.S. 4, 7, 9 (2009)).  *See also, Young (Julius) v. Sirmons,* 551 F.3d 942, 957 (10th Cir. 2008), *relying on Wiggins v. Smith,* 539 U.S. 510, 523 (2003).

Therefore, Mr. Burr's testimony regarding the trial lawyers' performance as measured against the standards in the field of capital defense is relevant, though not dispositive.  The government states no valid ground for excluding Mr. Burr's testimony.  The court can either accept or reject, or accept in part and reject in part, his testimony.  The government's objection goes to the weight of the testimony, not admissibility.  Mr. Burr's testimony is relevant because, in conjunction with other testimony, what he has to offer makes it more probable than not that trial counsel rendered a constitutionally deficient performance in the penalty phase.

The government overlooks that death penalty expert attorney testimony is routinely admitted as relevant evidence in similar cases.  *E.g., Fanaro v. Warden, Hocking Corr. Facility,* No. 2:10- CV-1002, 2012 WL 3638691, at * 2 (S.D. Ohio, Aug. 23, 2012); *Compton v. Hartley,* No. 07-CV-02363-WYD, 2009 WL 3052290, at * 28 (D. Colo. Sept. 22, 2009); *Gutierrez v. Davis*, No. SA-09-CA-543-FB, 2016 WL 4079546, at * 17 (W.D. Tex. July 29, 2016).  Indeed Mr. Burr's declaration states that he has testified as an expert lawyer on questions of ineffective assistance of counsel before.  (Doc. 95, Exh. 118)

### 3. Other witnesses[3]

Among the other witnesses the government wants excluded, Mr. Barrett

responds specifically to the following:

**a. Paul Gordon** – Mr. Gordon conducted or assisted in conducting the internal affairs

investigation into the Highway Patrol raid on Mr. Barrett's property.  He found many flaws,

including "going in dark," and other tactics which increased the likelihood of a violent

response from the target, Mr. Barrett.  (Doc. 199-201)  The government argues in part his

testimony should be excluded because it goes only to first stage issues and was not subject to

the scope of the Tenth Circuit's remand order.  (Doc. 289, p. 4)

**b. George Kirkham** – Dr. Kirkham is an expert on police tactics and procedure who, in

a declaration provided to the court with the § 2255 petition, analyzed the raid on Mr. Barrett's

property.  Like Mr. Gordon, Dr. Kirkham found flaws in its planning and execution, which

unnecessarily (and significantly) increased the chances of a violent response.  (*E.g.,* Doc. 95, pp.

139-143)  The government makes the same objections to Dr. Kirkham's testimony as it does to

Mr. Gordon's.  Dr. Kirkham's testimony is relevant to the mitigating factors relating to the

circumstances of the offense, the penalty phase intent factors, and residual doubt in the same

way Mr. Gordon's does.

In his brief to the Tenth Circuit, Mr. Barrett tied the types of evidence Mr. Gordon and

Dr. Kirkham could give to the mitigating mental health evidence to argue counsel had failed to

marshal evidence bearing on both the first- and second-stage intent factors the jury had to find.

---

[3] This response does not address specifically witnesses Edward Hueske, Dewey Padgett, Hon. John Garrett, Gaylan Warren, Johnny Philpot, Amanda Girzzle, Christine Calbert, Mike Mackey, Dale Anderson, Tamera Bedwell, Faust Bianco, Courtney Burke, Cindy Crawford, Robert Gude, Scharlette Holdman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stovall, Jan Walkingstick, and Randy Weaver.

(*E.g.*, Petitioner's Brief, pp. 41-43)   While the appellate court rejected the issue as to the first stage argument, *Barrett*, 797 F.3d at 1214-1215, it did not explicitly foreclose it as relevant to the penalty phase. In fact, the Tenth Circuit placed particular emphasis on Dr. Young's findings of how Mr. Barrett's organic and mental impairments would have prevented him from accurately processing and responding appropriately to rapidly unfolding events (such as the law enforcement raid on his property).  *Barrett,* 797 F.3d at 1230.  Because the identified flaws in the execution of the raid tie directly into Mr. Barrett's mental state and would tend to undermine the penalty phase intent factors, it is appropriate mitigating evidence for this hearing.  The Tenth Circuit did not rule it out of bounds.

Beyond that, the testimony is relevant to this Court's determination of prejudice.  As the Tenth Circuit observed,

> To assess that probability, we consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [§ 2255] proceeding—and reweigh it against the evidence in aggravation." *Porter,* 130 S.Ct. at 453–54 (brackets and internal quotation marks omitted). This is a "probing and fact-specific analysis," which "will necessarily require a court to 'speculate' as to the effect of the new evidence." *Sears,* 561 U.S. at 955–56, 130 S.Ct. 3259. But we need not be certain that the omitted evidence would have changed the outcome of the proceeding: it is sufficient if confidence in the outcome has been undermined. *See Byrd,* 645 F.3d at 1168.

*Barrett,* 797 F. 3d at 1229.  The testimony of Gordon and Kirkham is relevant to both the deficient performance and prejudice prongs of *Strickland v. Washington,* 466 U.S. 668 (1984).

**c.  Charles Sanders, Janesse Thomas, and Billy Poindexter**  – The government argues the proposed testimony of these witnesses goes only to a first stage issue, because Sanders testified in the guilt-innocence stage of trial and was the confidential informant on the no-knock, nighttime search warrant that led to the law enforcement raid on Mr. Barrett's

property. (Doc. 289, pp. 5-6)

This overlooks that Sanders – who has since recanted his trial testimony – also testified as a penalty phase witness, presumably as to Mr. Barrett's intent. Intent factors were among the critical issues the jury had to resolve in selecting punishment. Evidence which could have been discovered with reasonable diligence that impeached the credibility of Sanders's second-stage testimony, including that of witnesses who could testify to his poor reputation for veracity (such as Ms. Thomas and Mr. Poindexter) is therefore relevant. (Doc. 95, Exhs. 76, 266)

**d. Isaac Barrett** – The government asks for an offer of proof of the proposed testimony of Mr. Isaac Barrett. To avoid duplicating the record, counsel would point the government to Isaac Barrett' declarations. (Doc. 95, Exh. 84, Suppl. Exh. 208, *see* Doc. 299) Isaac Barrett has testimony to give on Mr. Barrett's upbringing, a history of evident mental illness on the paternal side of Kenneth Barrett's family, and the dysfunctionality (including patterns of abuse in various forms) of the family. All these matters are clearly relevant, and were discussed in the Tenth Circuit opinion. *Barrett*, 767 F.3d at 1229. Mr. Isaac Barrett's testimony is relevant because it touches on matters regarding Petitioner's background and history that are mentioned specifically by the Tenth Circuit.

**e. Martin Daggs** – Mr. Daggs, a bail bondsman, testified as a penalty phase witness for the defense. In addition to the testimony he offered at trial, counsel should have and could have elicited testimony from him that it was common practice to have bonds forfeited for alleged failures to appear, but that the forfeitures were often not executed so as to hold something "in addition" over a defendant's head. Had counsel conducted a professionally reasonable interview of Mr. Daggs, he could have testified that if a warrant was going to be

executed on Mr. Barrett, he could have gone out and simply picked Mr. Barrett up without any difficulty.  Mr. Daggs's testimony complements the mitigating testimony of Paul Gordon and George Kirkham by casting doubt on the propriety and necessity for a police raid that was ill-advised and was executed in a manner that increased the chances of a violent response, especially by someone with Mr. Barrett's mental health and organic brain impairments.

        **f.  Sharon Greenfeather –** Ms. Greenfeather is a genetically-related family member of Mr. Barrett.  She can testify she is bipolar, her mother and brother were schizophrenic, and her daughter is bipolar with psychotic episodes.  Her brother committed suicide in a circumstance so similar to Mr. Barrett's attempted suicide as to be uncanny.   One of Ms. Greenfeather's late sisters was psychotic, and another sister was bipolar and on disability most of her life.  This evidence is relevant to Mr. Barrett's claim that trial counsel performed deficiently, to his prejudice, in not investigating and presenting evidence of his mental health and his family's mental health.  The mental health history of the family indicates that Mr. Barrett's problems have a genetic component.  The Tenth Circuit stated evidence of this sort is relevant to Mr. Barrett's claim.  *Barrett,* 767 F.3d at 1229.

### 4.  Conclusion

Based on the above argument and authority, the government's motion in limine to exclude certain witnesses should be denied, particularly with respect to the witnesses discussed.  When relevance turns on a condition of fact, the court "shall admit" the evidence subject to submission of evidence sufficient to fulfill the condition.  Fed.R.Evid. 103(b).

The government has failed to show that the witnesses (and the evidence they will offer) addressed in this are subject to exclusion.

Response to Government's Motion to
Exclude Proposed Witnesses            13                *Barrett v. United States*,
OK-ED 6:09-cv-00105-JHP

820

DATED this 8ᵗʰ day of February 2017

                         RESPECTFULLY SUBMITTED,

                         /s/ *David Autry*
                         DAVID AUTRY

                         /s/ *Joan M. Fisher*
                         JOAN M. FISHER

                         Attorneys for Petitioner
                         KENNETH EUGENE BARRETT

Response to Government's Motion to
Exclude Proposed Witnesses         14         *Barrett v. United States*,
                               OK-ED 6:09-cv-00105-JHP

821

## **CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 8th day of February, 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.


/s/ Joan M. Fisher
JOAN M. FISHER

**DAVID AUTRY**, OBA No. <u>11600</u>
<u>1021 N.W. 16</u><sup>th</sup> Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:          dbautry77@gmail.com


**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:          Joan_Fisher@fd.org


Attorneys for Petitioner,
KENNETH EUGENE BARRETT


### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA


| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. 6:09-cv-00105-JHP |
| | ) | **REPLY TO RESPONSE IN** |
| v. | ) | **OPPOSITION TO MOTION TO** |
| | ) | **RECONSIDER ORDER DENYING** |
| UNITED STATES OF AMERICA, | ) | **DISCOVERY OF TRIAL COUNSEL'S** |
| | ) | **E-MAILS, AND BRIEF IN SUPPORT** |
| Respondent. | ) | |
| _____ | ) | |

Petitioner, Kenneth Eugene Barrett, replies to the government's Response in Opposition

to Motion to Reconsider Order Denying Discovery of Trial Counsel's E-mails (Doc. 310), as

Reply to Response in Opposition to Motion                                 *Barrett v. United States*,
to Reconsider Order Denying Discovery of                                 OK-ED No. 6:09-cv-00105-JHP
Trial Counsel's E-mails

1

follows.

In his request, Mr. Barrett seeks no more than the law and ethical considerations mandate. He merely requests true and correct copies of Mr. Barrett's entire trial counsel file, including electronic communications by and between both counsel, the U.S. attorney's office, the Court and any other person or entity with whom communication was made regarding their representation of Mr. Barrett.

The motion is directed to the court's decision denying the same due to an inadequate showing of hostility from trial counsel. (Doc. 269, p. 4)   As noted in the motion, no showing of hostility is required to oblige trial counsel to disclose the client's file. The motion is a renewed request for the *complete* file, including the electronic, digital and recorded communications.  See ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, Guideline 10.3.  It is critical that, in accordance with Guideline 10.13, "counsel cooperate fully with successor counsel and turn over all relevant files promptly." *Id.,* 31 Hofstra L.Rev. 913, 1086 (2003).

Mr. Barrett seeks no more than what he is entitled to by law and under the rules which govern the conduct of lawyers.  The Oklahoma Rules of Professional Responsibility require:

> (d) Upon termination of representation, a lawyer shall take steps to the extent reasonably practicable to protect a client's interests, such as giving reasonable notice to the client, allowing time for employment of other counsel, surrendering papers and property to which the client is entitled and refunding any advance payment of fee or expenses that has not been earned or incurred. The lawyer may retain papers relating to the client to the extent permitted by other law.

Okla. R. 1.6 (d).

The right to the content of the files is also reflected in a state bar opinion.  *See* Gena

Reply to Response in Opposition to Motion
to Reconsider Order Denying Discovery of
Trial Counsel's E-mails

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

2

Hendryx, General Counsel, OSBA GC File Retention Guidelines, OBJ vol. 82, No. 2 (Jan. 15, 2011).  There, the Oklahoma state bar expressly states that "[t]he client *may have the file* upon expiration of the time period [designated for destruction]" and notes that "clients should be sent a closing letter notifying them of *their right to take any documents* not previously furnished to them." *Id.*  The files include the emails and other electronically held documents requested but not provided by trial counsel. (Doc. 298, Exh. A)[1]

Accordingly, the court should grant Mr. Barrett's renewed request, reconsider its previously ruling and grant the issuance of the Subpoena Duces Tecum requested.

DATED this 15th day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

---

[1]  Cf.   Formal Opinion No. 2007-174, Ca St Bar, Standing Committee on Professional Responsibility and Conduct, citing New Hampshire Bar Association Ethics Committee Opn. NO. 2005-06/3 (concluding that, under New Hampshire Rules of Professional Conduct, the contents of the file would necessarily include  both paper and electronic forms of communications, documents and other records pertaining to the client"); Illinois State Bar Association Advisory Opn. No. 01-01 (2001) (concluding a similar effect under the Illinois Rules of Professional Conduct).

Reply to Response in Opposition to Motion                                         *Barrett v. United States*,
to Reconsider Order Denying Discovery of                                    OK-ED No. 6:09-cv-00105-JHP
Trial Counsel's E-mails

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 15th day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Reply to Response in Opposition to Motion
to Reconsider Order Denying Discovery of
Trial Counsel's E-mails

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

4

**DAVID AUTRY**, OBA No. <u>11600</u>
<u>1021 N.W. 16th Street</u>
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:         dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | CASE NO. CV-09-00105-JHP |
| Petitioner, | ) | |
| | ) | **PETITIONER'S REPLY TO** |
| v. | ) | **GOVERNMENT'S RESPONSE TO** |
| | ) | **MOTION TO RECUSE AND** |
| UNITED STATES OF AMERICA, | ) | **AND DISQUALIFY THE COURT** |
| | ) | |
| Respondent. | ) | |
| _____ | ) | |

## CERTIFICATE OF CONFERENCE

Petitioner, Kenneth Eugene Barrett, submits the following as his reply to the government's

response to his motion to recuse and disqualify the court. (Docs. 294, 311)  The government's

arguments in opposition to the motion should be rejected.

In his motion, Mr. Barrett argues the court should disqualify itself because it has prejudged

Petitioner's Reply to Government's Response                              *Barrett v. United States*,
To Motion to Recuse and Disqualify the Court                    OK-ED No. 6:09-cv-00105-JHP

827

the performance prong of the test under *Strickland v. Washington,* 466 U.S. 668, 684 (1984) for judging claims of ineffective assistance of counsel. In its discovery order, the court made the factual determination (which even the government concedes was unnecessary to its order, Doc. 311, p. 3) that trial "counsel did not have sufficient time to find all of the mitigating evidence that post-conviction counsel has provided." (Doc. 311, p. 3, Doc. 269, pp. 12-13)

Petitioner contends this prejudgment of trial counsels' effectiveness before any evidence has been heard at the hearing ordered by the Tenth Circuit would lead a reasonable, objective person, based on all the facts, to question the court's impartiality, *United States v. Erickson,* 561 F.3d 1150, 1169 (10th Cir. 2009); 28 U.S.C. § 455(a). It reflects a "disposition or opinion that is somehow wrongful or inappropriate, either because it is undeserved, or because it rests upon knowledge that the subject ought not to possess." *Liteky v. United States,* 510 U.S. 540, 550 (1994).

The government argues the court's observation is immune from attack because it was based on what was learned in the course of litigation, rather than an outside source. As Petitioner pointed out in his motion, the "outside source" doctrine is not the be-all and end-all in determining whether the facts show a reasonable observer would question the court's impartiality. (Doc. 294) The challenged passage from the court's discovery order shows it has already concluded, at a minimum, that trial counsel's performance was professionally reasonable under *Strickland* and its progeny. Thus, the court has signaled it has all the information it needs, ahead of the evidentiary hearing, to rule against Mr. Barrett. The court's peremptory stance is both wrongful and inappropriate, since the court has apparently made up its mind before hearing any testimony.

The government is wrong on another score. To all appearances, the court had to arrive at

Petitioner's Reply to Government's Response                                                        *Barrett v. United States*,
To Motion to Recuse and Disqualify the Court                                              OK-ED No. 6:09-cv-00105-JHP

2

its opinion regarding the adequacy of trial counsels' performance from an outside source.  The time-line sketched out in Petitioner's motion shows habeas counsel had even less time, in light of the imperative to review the record before launching their investigation, than trial counsel did to investigate and prepare a persuasive mitigation case. (Doc. 294) Because the record flatly contradicts the court's observation on the time constraints faced by trial counsel versus those imposed on habeas counsel, the court's conclusion that trial counsel did not have the luxury of time habeas counsel supposedly enjoyed must derive from an "outside source."

The government's attempt to place the court's remark in the context of the nine years from the time habeas counsel were appointed to the time of the evidentiary hearing, as compared to the time between indictment and trial, is a red herring. (Doc. 311, pp. 3-4) The basis of Mr. Barrett's penalty phase ineffectiveness claim is grounded firmly in the mitigating evidence that was developed preceding his initial habeas filing in March, 2009. (The amended petition filed in the Fall of 2009 stated no new facts or evidence, but was simply re-formatted, at the court's direction, on the habeas form used by *pro se* prisoner litigants.) Any mental health expert witnesses in addition to Dr. George Woods who Petitioner wishes to call at the evidentiary hearing are either: 1) in substitution to Dr. Young, who is deceased; 2) in rebuttal of the anticipated testimony of government witness Dr. Randall Price; or 3) would corroborate the findings of Drs. Woods and Young against an attack on their validity by the government. These experts are not testifying to anything beyond the parameters laid out in the Tenth Circuit's opinion remanding the case for an evidentiary hearing.

The government again tries to shift the focus by claiming trial counsel's effectiveness is not measured by the evidence developed by post-conviction counsel, but based on what was available to trial counsel. (Doc. 311, pp. 3-4) Petitioner could not agree more. He has and will

Petitioner's Reply to Government's Response
To Motion to Recuse and Disqualify the Court

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

3

show that had trial counsel conducted a professionally reasonable investigation, the same types of

mitigating evidence presented on post-conviction could and should have been presented at trial.

If, however, the government is attempting to argue that the evidence developed in these post-

conviction proceedings is simply irrelevant, it is obviously wrong.  Otherwise, the effectiveness

of *any* trial counsel would be immune to challenge on collateral attack, and the Tenth Circuit

never would have remanded the case for an evidentiary hearing based on the mitigating evidence

developed in the post-conviction proceedings.

Last, the government says the court appropriately granted its request to have Mr. Barrett

examined by Dr. Steven Pitt, D.O., while denying access to Petitioner by defense expert Dr.

Pablo Stewart, and that these decisions reflect no improper bias or its appearance. (Doc. 311, pp.

4-5)  The government maintains the court "has no power to alter the passage of time" (Doc. 311,

p. 4), but this overlooks that much of that time is attributable to the court having denied an

evidentiary hearing the Tenth Circuit says Mr. Barrett deserves.

Moreover, nothing other than, at least, the appearance of bias explains the difference in

treatment between Dr. Pitt and Dr. Stewart. As Petitioner has pointed out elsewhere, the court's

permitting Dr. Pitt to examine Mr. Barrett in 2017 makes no sense when the court, at the

government's urging, denied access to Petitioner by Dr. Stewart on the ground that any

examination at this "late date" would only reflect Mr. Barrett's current mental state.

The government continues to insist that had counsel mounted a penalty phase mental

health case such as the one featured in these post-conviction proceedings, it would have been

entitled to rebut that case. (Doc. 311, p. 4) But this ignores, as Petitioner has argued elsewhere,

that in determining whether trial counsel rendered ineffective assistance in the penalty phase of

trial, the court is to measure the omitted evidence trial counsel could have discovered and

Petitioner's Reply to Government's Response                                  *Barrett v. United States*,
To Motion to Recuse and Disqualify the Court                          OK-ED No. 6:09-cv-00105-JHP

4

830

presented with the exercise of due diligence and through a reasonable investigation against the

aggravating evidence the jury heard *at trial*, not augmented by new theories or evidence of

aggravation.

Accordingly, the government's arguments should be rejected and the court should recuse

itself from further participation in this case.

DATED this 15th day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Reply to Government's Response                     *Barrett v. United States*,
To Motion to Recuse and Disqualify the Court                  OK-ED No. 6:09-cv-00105-JHP

5

831

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 15th day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Reply to Government's Response
To Motion to Recuse and Disqualify the Court

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

6

832

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | CASE NO. CV-09-00105-JHP |
| Petitioner, | ) | |
| | ) | **PETITIONER'S REPLY TO** |
| v. | ) | **GOVERNMENT'S RESPONSE** |
| | ) | **TO OBJECTION TO SUBMITTING** |
| UNITED STATES OF AMERICA, | ) | **FINDINGS OF FACT AND** |
| | ) | **CONCLUSIONS OF LAW PRE-** |
| Respondent. | ) | **HEARING** |
| _____ | ) | |

Petitioner, Kenneth Eugene Barrett, submits the following as his reply to the

government's response to his objection to having to submit proposed findings of fact and

conclusions of law in advance of the evidentiary hearing.  (Docs. 301, 312)

Stated briefly, the government argues that based on the post-conviction filings and

exhibits, counsel should know with precision what evidence will actually be presented at the

Petitioner's Reply to Government's Response                                    *Barrett v. United States*,
To Objection to Submitting Findings of Fact And                          OK-ED No. 6:09-cv-00105-JHP
Conclusions of Law Pre-Hearing

1

833

evidentiary hearing. (Doc. 312, pp. 2-3) Therefore, counsel should have no difficulty in submitting proposed findings of fact and conclusions of law.

This overlooks that the findings and conclusions which will actually be entered by the court at some point will be based in very large part on what the evidence at the hearing shows. Counsel can anticipate, but not predict, what the evidence and testimony at the hearing will actually consist of. Mr. Barrett's proposed findings and conclusions, as well as any offered by the government, should await the actual evidence. To submit proposed findings and conclusions beforehand is premature. At a minimum, should Petitioner's objection be denied, he would ask the court to permit the submission of amended findings and conclusions after the hearing, based on the testimony and evidence presented.

It should also be pointed out that in its response, the government misstates the law as to the legal burden placed on Petitioner. According to the government, "[t]o prevail, a § 2255 petitioner must establish the existence of a defect that resulted in a 'complete miscarriage of justice.'" *Davis v. United States,* 417 U.S. 333, 346 (1974). (Doc. 312, p. 2) Rather, the standard is whether 1) counsel's errors and omissions were professionally unreasonable, and 2) there is a reasonable probability that but for those errors and omissions, at least one juror would have declined to impose the death penalty. *Wiggins v. Smith,* 539 U.S. 510, 537 (2003).

DATED this 15th day of February, 2017

<div style="text-align: right">

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

</div>

Petitioner's Reply to Government's Response
To Objection to Submitting Findings of Fact And
Conclusions of Law Pre-Hearing

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

2

834

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 15th day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.


/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Reply to Government's Response
To Objection to Submitting Findings of Fact And
Conclusions of Law Pre-Hearing

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:       Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | **PETITIONER'S REPLY TO THE** |
| | ) | **GOVERNMENT'S RESPONSE IN** |
| UNITED STATES OF AMERICA, | ) | **OPPOSITION TO PETITIONER'S** |
| | ) | **MOTION IN LIMINE TO EXCLUDE** |
| Respondent. | ) | **NOVEL THEORIES OF** |
| | ) | **AGGRAVATION** |

Petitioner Kenneth Eugene Barrett has moved this Court for an order precluding the

government from relying at the evidentiary hearing on new theories and evidence of aggravation

never presented to the jury at trial. (Doc. 304.) The government has filed a Response in

Opposition. (Doc. 313.) For the reasons stated in the Motion and in this Reply, the government's

position must be rejected and Mr. Barrett's motion should be granted.

Petitioner's Reply to the Government's Response                    *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine to                  OK-ED No. 6:09-cv-00105-JHP
Exclude Novel Theories of Aggravation

The government lacks a coherent position before this Court. First, the government, with no good faith factual basis, accuses Mr. Barrett of exceeding the scope of the remand by "call[ing] several expert witnesses who can offer opinion [*sic*] that was not available to trial counsel or event [*sic*] § 2255 counsel at the time they filed their last four § 2255 motions." Doc. 289 at 8. The government bizarrely accuses Mr. Barrett of improperly "undertak[ing] a dress rehearsal for a wholly reconceived penalty phase trial," *id.* at 9, although the sole purpose of the hearing is determining whether trial counsel for the *defense* unreasonably misconceived their penalty phase case. *United States v. Barrett*, 797 F.3d 1207, 1229-1232 (10th Cir. 2015).

Then the government contradicts itself. It asserts, "the Tenth Circuit remanded this case to address concerns *beyond* a straightforward recapitulation of the foregoing trial evidence." Doc. 313 at 3 (emphasis added). The government cites the pages of the Tenth Circuit's decision that discuss the mitigation Mr. Barrett could have presented and the government's likely response. But in doing so the Tenth Circuit described evidence that existed at the time of trial. *Barrett*, 797 F.3d 1231-32. Nothing in the Tenth Circuit's opinion, or in the governing Supreme Court case law, suggests the *government* may present a reconceived case in aggravation because, unlike at the time of trial, it now knows the extent of the mitigation case available to the defense. Allowing the government to present a fresh case because of the insights it gained through the post-conviction process deviates wildly from *Strickland v. Washinton*'s focus on the reliability of the adversarial process that occurred at trial. *Strickland*, 466 U.S. 668, 696 (1984).

To the extent the remand is limited, it most surely is limited by the gravamen of Mr. Barrett's claim. That claim manifestly did not accuse the government of unreasonably failing to present aggravating evidence as the government suggests when it claims "the upcoming hearing contemplates evidence that the *parties* could have introduced at Barrett's capital penalty trial."

Petitioner's Reply to the Government's Response          *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine to          OK-ED No. 6:09-cv-00105-JHP
Exclude Novel Theories of Aggravation

2          837

Doc. 313 at 3 (emphasis added). Even accepting the government's framing, because the government at trial would not have had foreknowledge of all of Mr. Barrett's evidence, and would not have had years to prepare its case in response to that evidence, allowing the government to construct novel theories of aggravation skews the inquiry. That inquiry, under *Strickland*, 466 U.S. at 695, and 18 U.S.C. § 3593(e), is limited to whether "there is a reasonable probability that at least one juror would have struck a different balance" if the evidence omitted by trial counsel had been presented.[1] *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).

The government asserts that at trial it would have had the right to rebuttal. Doc. 313 at 3. That is true as far as it goes, but it does not go so far as to allow evidence the government could not have developed or adduced between the close of the defense case-in-chief and the resumption of the trial this Court wanted to conclude quickly. *See*, *e.g.*, *United States v. Jackson*, 327 F.3d 273, 306-307 (4th Cir. 2003) (trial court abused discretion in allowing entire videotape of defendant's rants as "rebuttal"); *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001) (district court abused its discretion in allowing victim impact evidence in rebuttal after government failed to give notice of aggravator). Moreover, any evidence the government might have been able to present in rebuttal could have been countered by reasonably well-performing defense counsel on

---

[1] The government wrongly relies upon *United States v. Haddock*, 12 F.3d 950 (10th Cir. 1993), as a case illustrating that Mr. Barrett must show "a reasonable probability exists that he would have received a more favorable verdict." Doc. 313 at 3. *Haddock* supports the proposition that a defendant who attacks his *conviction* on grounds of ineffective assistance must show a reasonable probability of a different verdict. But here the question is whether there is a reasonable probability of a different penalty phase result on Count 3. A jury deciding liability must unanimously agree on discrete factual questions that together constitute an offense. But the balancing and unanimity requirements of the Federal Death Penalty Act, 18 U.S.C. § 3593(e), mean the question before this Court is whether "there is a reasonable probability that at least one juror would have struck a different balance" if the evidence omitted by trial counsel had been presented. *Wiggins*, 539 U.S. at 537.

Petitioner's Reply to the Government's Response
In Opposition to Petitioner's Motion in Limine to
Exclude Novel Theories of Aggravation

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

sur-rebuttal. *United States v. Barnette*, 211 F.3d 803, 821-22 (4th Cir. 2000) (error to bar defense from presenting expert in surrebuttal of expert testimony government presented in rebuttal).

The government does not dispute two sets of authorities Mr. Barrett offered in support of his Motion and that are fatal to the government's position. First, the government does not dispute that it could only have presented at trial evidence of which it gave adequate notice under Fed. R. Crim. P. 16(a)(1)(g) and 18 U.S.C. §§ 3591 and 3593(b). *Stitt*, *op. cit.* Second, the government does not dispute the well-established rule that a reviewing court may not uphold a conviction or sentence on the basis of a theory that was not tried to the jury. *Chiarella v. United States,* 445 U.S. 222, 236 (1980); *Rewis v. United States*, 401 U.S. 808, 814 (1971); *Dunn v. United States*, 442 U.S. 100, 106 (1979).

The government only offers improper purposes for the objected-to evidence.

**Faust Bianco & Kathy LaFortune.** The government asserts that it "intends to adduce the affidavit of Faust Bianco to demonstrate that trial counsel *possessed* a sworn expert's statement that Barrett did not suffer from any significant neurological deficit." Doc. 313 at 4 (emphasis added). Similarly, the government intends to "introduce a report from psychologist Kathy LaFortune, who, among other things, recommended against the retention of a mental health expert. For the reasons stated in Mr. Barrett's Motion in Limine to Preclude Post Hoc Rationalizations (Doc. 295), and in the instant Motion (Doc. 304 at 3), unless the government has evidence that trial counsel had personal *knowledge* of and *relied upon* Bianco's statement or LaFortune's recommendation, the fact that they *possessed* either, if proved, would have no "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed. R. Evid. 401. (That is, unless the government intends to prove, consistent with Mr. Barrett's allegations, that

Petitioner's Reply to the Government's Response                          *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine to                       OK-ED No. 6:09-cv-00105-JHP
Exclude Novel Theories of Aggravation

4

839

trial counsel unreasonably failed to undertake a timely, thorough review of all the files of prior counsel before deciding what investigation it should undertake.)

The government previously submitted declarations from trial counsel in which they admitted not being aware of Dr. Bill Sharp's prior evaluation of Mr. Barrett. The government manifested its adoption and belief in trial counsel's statements when the government relied upon them. Trial counsel's failure to mention Dr. Bianco or Dr. LaFortune in response to Mr. Barrett's specific allegation that they failed to conduct a psychiatric or neuropsychological evaluation should be viewed as an adoptive admission by silence that neither state-court consultant played any role in their decision-making. *Cf. United States v. Pulido-Jacobo*, 377 F.3d 1124, 1132 (10th Cir. 2004); Fed. R. Evid. 801(d)(2).[2] The government is merely attempting to construct for trial counsel a post-hoc rationalization that is expressly prohibited by the governing case law. *Barrett*, 279 F.3d at 1228; *Wiggins*, *supra*, 539 U.S. at 526-527.

If this Court allows any evidence related to Bianco and LaFortune, it should hold the government to its assertion that the only purpose for which it wishes to present them is as attenuated evidence to "rebut" Mr. Barrett's allegations of deficient performance. Doc. 313 at 4 & 5. The government asserts no grounds for admitting the proposed evidence as relevant to prejudice. *Id.* at 5.

However, in responding to Mr. Barrett's Motion to Preclude Post-Hoc Rationalizations (Doc. 295), the government asserts it intends to offer Bianco and LaFortune in order to "weaken Barrett's efforts to demonstrate that the omission of mental health evidence in any way prejudiced the verdict." Doc. 314 at 5. The government cannot contend these witnesses would

---

[2] The government has acknowledged that it prepared the trial attorneys' declarations and they adopted them as their own statements. Doc. 318 at 2.

Petitioner's Reply to the Government's Response
In Opposition to Petitioner's Motion in Limine to
Exclude Novel Theories of Aggravation

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

have been available to it at the time of trial in that the government admits it only learned of them through discovery associated with Mr. Barrett's post-conviction claim. *Id.* at 4. Therefore, these witnesses are irrelevant to any prejudice inquiry.

**Jeanne Russell.** The government's proposed use of Dr. Russell's reports as "expert opinion that Mr. Barrett did not exhibit symptoms of a major mental illness but that his negative behaviors were 'exacerbated by drug use'" (Doc. 313 at 4), must be rejected. As to prejudice, due to this Court's order precluding the trial prosecutors from knowing of her evaluation unless she was called by the defense, any expert opinion she had to offer was not available to the government.

As to either deficient performance or prejudice, the government cannot present Dr. Russell as an expert because it failed to comply with this Court's Scheduling Order by designating Dr. Russell as an expert witness. Further, the government is fishing in an empty pond. Dr. Russell has already provided this Court with a declaration stating that she did not evaluate Mr. Barrett's psychological make-up and her focus was solely on whether he would pose a future risk of violence, concluding, correctly, that he would not. Ex. 56. *Cf. Wiggins*, 539 U.S. at 532 (rejecting attempt to rationalize trial counsel's omissions with their decision to hire a psychologist because "counsel's decision to hire a psychologist sheds no light on the extent of their investigation into petitioner's social background").

As to deficient performance, by her own account, Dr. Russell did not evaluate Mr. Barrett to determine the existence *vel non* of a major mental illness, Ex. 56, and, also by her own account, trial counsel approached her too late for her to conduct a thorough investigation of his background. *Ibid.* The government's evidence is irrelevant and an attempt to misrepresent the historical facts of what occurred prior to the penalty phase.

Petitioner's Reply to the Government's Response                                                *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine to                                              OK-ED No. 6:09-cv-00105-JHP
Exclude Novel Theories of Aggravation

**Steven Pitt.** The government again demonstrates its lack of coherence when it asserts that it intends to present expert testimony "that Barrett does not *now* suffer from a major mental illness, nor did he at the time of the crime," Doc. 313 at 4 (emphasis added), and to "corroborate" that opinion (formed, apparently, before Dr. Pitt evaluated Mr. Barrett) "with evidence from Barrett's BOP records," *ibid.* This Court has ruled that Mr. Barrett may not present evidence of his current mental health condition, although Mr. Barrett indicated no intention to do so. The government asserts that Dr. Pitt has already relied upon records that did not exist at the time of trial when forming or reforming his opinions. For the reasons previously stated, given that Dr. Pitt supported his opinions with evidence that did not exist at the time of trial, his opinions could not have been presented at the time of trial. At the same time the government affirmatively states it does not intend "to pursue a novel theory of aggravation." Doc. 313 at 5. Therefore, Dr. Pitt has no relevant testimony.

**Roseann Schaye.** Lastly, the government intends to offer reports from Roseann Schaye, Govt. Ex. List, and then to impeach her professional judgment and credibility with evidence that she "suffered a suspension of her counseling credentials." Doc. 313 at 5. Again, the government's position is incoherent. Mr. Barrett asserts, as defense counsel John Echols did pretrial, that Ms. Schaye's work during the state court proceedings was preliminary and inadequate, that counsel demonstrated that they recognized the need to go beyond Schaye's efforts (or what they knew of them) when they asked Dr. Russell to conduct a mitigation investigation, and that due to counsel's lack of diligence, no thorough investigation was conducted. The parties agree the mitigation investigation by Ms. Schaye was inadequate. The attack on her, however, is inaccurate, inadmissible and unnecessary.

Petitioner's Reply to the Government's Response
In Opposition to Petitioner's Motion in Limine to
Exclude Novel Theories of Aggravation

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

7

842

**CONCLUSION**

For the foregoing reasons, Mr. Barrett respectfully requests this Court enter an order binding the government to its representations and precluding the evidence proffered in the government's Response in Opposition.

DATED this 15th day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Reply to the Government's Response                    *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine to                 OK-ED No. 6:09-cv-00105-JHP
Exclude Novel Theories of Aggravation

8                                                                  843

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 15th day of February 2017, I caused the foregoing

Petitioner's Reply to the Government's Response in Opposition to Petitioner's Motion in Limine

to Preclude Novel Theories of Aggravation to be filed with the Clerk of the Court using the ECF

System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey

B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge,

there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Reply to the Government's Response                                              *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine to                                            OK-ED No. 6:09-cv-00105-JHP
Exclude Novel Theories of Aggravation

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
|---|---|---|
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | **PETITIONER'S REPLY TO THE** |
| | ) | **GOVERNMENT'S RESPONSE IN** |
| UNITED STATES OF AMERICA, | ) | **OPPOSITION TO PETITIONER'S** |
| | ) | **MOTION IN LIMINE TO EXCLUDE** |
| Respondent. | ) | **POST-HOC RATIONALIZATIONS** |
| | ) | |

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, has moved this

Court for an order precluding the government from relying on post-hoc rationalizations for trial

counsel's challenged acts and omissions. (Doc. 295.) The government has filed a Response in

Opposition (Doc. 314). Mr. Barrett makes the following reply to the government's Response.

Petitioner's Reply to Government's Response                                    *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine                                 OK-ED No. 6:09-cv-00105-JHP
To Exclude Post-Hoc Rationalizations

Lacking a valid legal basis for its strategy, the government seeks to recast Mr. Barrett's motion as relating to "any testimony concerning the attorneys' tactics." Doc. 314 at 2; *id.* at 3 ("effort to foreclose any testimony about counsel's tactics"). As stated in the Motion, Mr. Barrett objects to the government introducing trial counsel to information of which they lacked personal knowledge at the time relevant to these proceedings.

The government attempts to circumvent the Tenth Circuit's admonition that "'an uninformed choice is not a reasonable tactical decision,'" Doc. 314 at 3 (quoting *United States v. Barrett*, 279 F.3d 1207, 1228 (10th Cir. 2015)), with what the government unconvincingly claims is "a far more nuanced and permissive attitude" to be found in *Harrington v. Richter*, 562 U.S. 86, 109 (2011), which "does not bar any evidence; it merely guides the discretion of the courts in considering the reasons for counsel's actions." Doc. 314 at 3. Mr. Barrett submits that if *Richter* bars post-hoc rationalizations for counsel's actions, as it plainly does, then evidence supporting those "reasons" is irrelevant. The Tenth Circuit was aware of the then-four-year-old decision in *Richter* when it announced its decision in this case. The Tenth Circuit's view is consistent with *Strickland v. Washington*, 466 U.S. 668, 689 (1984), and *Wiggins v. Smith*, 539 U.S. 510, 526-27 (2003), two leading cases applied in *Richter*, whereas, for the reasons stated in the Motion, the government's strategy is utterly inconsistent with that clearly established law.

The government is free to ask trial counsel to "explain[] themselves," Doc. 314 at 4, provided those explanations are for counsel's *conduct* and the explanations are based on information counsel actually possessed and considered when they acted or failed to act. This Court has clear instructions to make "every effort . . . to eliminate the distorting effects of hindsight, to *reconstruct the circumstances* of counsel's challenged *conduct*, and to evaluate *the conduct from counsel's perspective at the time.*" *Strickland*, 466 U.S. at 689 (emphasis added).

Petitioner's Reply to Government's Response                          *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine                        OK-ED No. 6:09-cv-00105-JHP
To Exclude Post-Hoc Rationalizations

2                                                                                          846

What the government offers is not *re*constructive testimony about counsel's *conduct*, but newly constructed *opinions*, also known as hindsight, about information trial counsel failed to uncover. Present-day opinions about information trial counsel did not consider at the relevant time do not make counsel's explanations for their conduct at the time any more or less likely. Clearly the government lacks a reasonable explanation for those decisions, and that is why the government wants to waste this Court's time with evidence "of the circumstances that *would have* informed a reasonable attorney's decision making." Doc. 314 at 5 (emphasis added).

Consider the government's intention "to show that the attorneys were unaware of evidence that might have reasonably led them to undertake further investigative efforts" because it "explains the circumstances in which counsel made decisions." Doc. 314 at 4. As the Tenth Circuit's decision indicates, Mr. Barrett is prepared to "demonstrat[] that counsel knew or had reason to know of [Dr.] Sharp's findings and that the information available to them would have led reasonable attorney [*sic*] to undertake further investigation." *Ibid.* But that does not support the *converse* position taken by the government now, i.e. that trial counsel *would not have* pursued information if they had been aware of it because of an uninformed "decision" to pursue a different tack. *Barrett*, 279 F.3d at 1228.

The government's absurd inversion of the inquiry reaches its zenith when the government suggests that excluding post-hoc rationalizations "would require this Court to determine the reasonableness of counsel's conduct on the basis of evidence they necessarily did not have – the post-trial mental health opinions offered by the defense – in favor of evidence they did." Doc. 314 at 5.

In keeping with previously cited Supreme Court and Tenth Circuit law, this Court may not indulge in speculation about what trial counsel "[p]resumably . . . knew." Doc. 314 at 4. The

Petitioner's Reply to Government's Response                                          *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine                                OK-ED No. 6:09-cv-00105-JHP
To Exclude Post-Hoc Rationalizations

3                                                                                                   847

purpose of the hearing is determining what counsel *actually* knew and what they did or didn't do with that knowledge. If the government is unable to establish a foundation based on counsel's actual, personal knowledge, as Fed. R. Evid. 602 requires, it may not ask trial counsel about Faust Bianco and Kathy LaFortune. If trial counsel had relied upon either of those state-court consultants, they would have said so in their declarations responding to Mr. Barrett's assertion that counsel unreasonably failed to investigate his mental health history and condition. Trial counsel did not mention either, and, as the government admits, trial counsel were ignorant of the more recent evaluation by Dr. Sharp. Doc. 314 at 4.

Trial counsel's failure to mention Dr. Bianco or Dr. LaFortune in response to Mr. Barrett's specific allegation that they failed to conduct a psychiatric or neuropsychological evaluation should be viewed as an adoptive admission by silence that neither state-court consultant played any role in their decision-making, *Cf. United States v. Pulido-Jacobo*, 377 F.3d 1124, 1132 (10th Cir. 2004); Fed. R. Evid. 801(d)(2), in the absence of any evidence that the omissions were "innocent failure[s] of recollection." Doc. 314 at 4. It is extraordinarily unlikely that both trial counsel forgot not only the unusual names Faust Bianco and Kathy LaFortune, but that they also forgot that there was *any* expert opinion that lay behind their failure to consult mental health experts.

Petitioner's Reply to Government's Response          *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine               OK-ED No. 6:09-cv-00105-JHP
To Exclude Post-Hoc Rationalizations

4

848

**CONCLUSION**

For the foregoing reasons, Mr. Barrett respectfully requests this Court enter an order precluding the government from asking trial counsel what they would have done with information they did not possess and consider at the time of their challenged conduct.

DATED this 15th day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Reply to Government's Response                                    *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine                                  OK-ED No. 6:09-cv-00105-JHP
To Exclude Post-Hoc Rationalizations

5                                                                                                                 849

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 15th day of February 2017, I caused the foregoing Petitioner's Reply to the Government's Response in Opposition to Petitioner's Motion in Limine to Preclude Post-Hoc Rationalizations to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Reply to Government's Response
In Opposition to Petitioner's Motion in Limine
To Exclude Post-Hoc Rationalizations

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

6

850

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | **PETITIONER'S REPLY TO THE** |
| | ) | **GOVERNMENT'S RESPONSE TO** |
| UNITED STATES OF AMERICA, | ) | **PETITIONER'S COMBINED** |
| | ) | **SUPPLEMENTAL MOTION TO** |
| Respondent. | ) | **EXPAND THE RECORD** |
| | ) | |

On February 1, 2017, Petitioner Kenneth Eugene Barrett filed his Supplemental

Motion to Expand the Record (Doc. 299), requesting that this Court repeat its prior order

(Doc. 161) by expanding the record with Exhibits 206-220, which were proffered with

Mr. Barrett's Reply to the Government's Response in Opposition to the Second Amended

Petitioner's Reply to Government's Response          *Barrett v. United States*,
To Motion to Recuse and Disqualify the Court          OK-ED No. 6:09-cv-00105-JHP

Motion to Vacate (Doc. 178).[1] On February 8, 2017, the government timely filed its Response (Doc. 317). The government's position is unclear: it does not oppose Mr. Barrett's Motion "to the extent the Government maintains the right to interpose objections to the admissibility of certain contents of the exhibits should they be offered as evidence in the evidentiary hearing." (Doc. 317.) Mr. Barrett makes the following Reply to the government's Response.

On December 6, 2016, this Court issued a scheduling order directing the parties to file motions in limine and *Daubert* motions by February 1, 2017. (Doc. 270.) Mr. Barrett viewed his Supplemental Motion as consistent with the basic purpose of a motion in limine which is "to enable[] a court to rule in advance on the admissibility of documentary or testimonial evidence and thus expedite and render efficient a subsequent trial." *INSLAW*, *Inc*. *v*. *United States*, 35 Fed. Cl. 295, 302-03 (1996) (quotation omitted); *Starling v. Union Pacific Railroad Co.*, 203 F.R.D. 468, 482 (D. Kan. 2001). The Advisory Committee Notes on the Adoption of Rule 7 of the Rules Governing § 2254 Cases state that record expansion similarly serves to improve the efficiency of the fact-finding process by expanding the evidentiary record in lieu of live testimony. R. Gov. § 2254 Cases 7, Advisory Committee Notes on Adoption (cited by R. Gov. § 2255 Proceedings, Advisory Committee Notes on Adoption). In light of the government's Response to Mr. Barrett's Motion in Limine to Rely Upon Declarations for Direct-Examination Testimony, it is clear that the government understood Mr. Barrett's purpose. Doc. 320 at 2.

---

[1] This Court's prior order granted Mr. Barrett's Motion to Expand the Record with Exhibits 1 through 57, 59 through 118, 139 through 143, 144A, 144B, 145, 146, and 147A-G.

Petitioner's Reply to Government's Response            *Barrett v. United States*,
To Motion to Recuse and Disqualify the Court            OK-ED No. 6:09-cv-00105-JHP

The government's vague statement "maintaining the right to interpose objections" is, in fact, no response. The Response contradicts itself in that it does not oppose expansion of the record but leaves open the possibility of objecting to the evidence after it is in the record. The Response is inconsistent with the Scheduling Order inviting motions in limine and directing the parties to file statements of disputed and undisputed facts and to state how long the hearing will be. And the Response is at odds with the purpose of Rule 7 and motions in limine more generally. Mr. Barrett's Motion "g[a]ve the party against whom the additional materials are offered an opportunity to admit or deny their correctness." R. Gov. § 2255 Proc. 7(c).

The government has had more than six years to ascertain whether the declarations are correct. The plain language of Rule 7(c) and this Court's prior order put the government on notice that it should have presented in its Response any objections the government has to the admission into evidence of the specified declarations.

## CONCLUSION

For the reasons presented here and in the Motion, Mr. Barrett respectfully requests that this Court enter an Order admitting into the record Supplemental Exhibits 206-220.

DATED this 15th day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Reply to Government's Response                    *Barrett v. United States*,
To Motion to Recuse and Disqualify the Court               OK-ED No. 6:09-cv-00105-JHP

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 15th day of February 2017, I caused the foregoing Petitioner's Reply to the Government's Response to Petitioner's Combined Supplemental Motion to Supplement the Record to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Reply to Government's Response
To Motion to Recuse and Disqualify the Court

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

**DAVID AUTRY**, OBA No. <u>11600</u>
<u>1021 N.W. 16th Street</u>
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:        dbautry77@gmail.com


**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | **PETITIONER'S REPLY TO THE** |
| | ) | **GOVERNMENT'S RESPONSE IN** |
| UNITED STATES OF AMERICA, | ) | **OPPOSITION TO PETITIONER'S** |
| | ) | **MOTION IN LIMINE TO PREVENT** |
| Respondent. | ) | **WITNESS COLLUSION** |
| | ) | |

Petitioner, Kenneth Eugene Barrett, has moved this Court for an order precluding the

government from distorting witnesses' hearing testimony by advising them of factual

information they did not possess at the relevant time. (Doc. 300.) The government has filed a

Response in Opposition to that motion. (Doc. 318.) Mr. Barrett makes the following reply.

"A fair assessment of attorney performance requires that every effort be made to

Petitioner's Reply to the Government's Response
In Opposition to Petitioner's Motion in Limine to
Prevent Witness Collusion                                       1

eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). The government's responses to Mr. Barrett's motions in limine leave no doubt that the government hopes to confront trial counsel with statements and writings without a laying a foundation of personal knowledge, *cf.* Fed. R. Evid. 602, in the hope that counsel will testify either that they would have been influenced by a statement or writing if they had known about it, *e.g.*, Doc. 314 at 5, or that they would not have presented a witness's testimony if they had known what the witness would say. *See generally* Doc. 314.

It is undisputed that in furtherance of this strategy the government has already shown trial counsel evidence they did not possess in the form of Dr. Bill Sharp's opinions, Doc. 314 at 4, and that the government asked trial counsel to review his declaration and the declaration of Jeanne Russell after this Court expanded the record to include them. *See* Doc. 300 at 1-2. Under these undisputed circumstances, this Court is being asked to issue an order that will eliminate the distorting effects of the government's strategic reliance on hindsight and extra-judicial efforts to "reconstruct" trial counsel's perspective.

The government is correct that the witness sequestration rule "[o]n its face . . . applies to testimony," Doc. 318 at 2, but the government is wrong that "none has been taken here." *Ibid.* Mr. Barrett previously moved this Court to expand the record with his witnesses' declarations and this Court granted that motion *before* the government presented those declarations to other witnesses. Order (Doc. 161). More importantly, the government could not and does not dispute this Court's power to enter orders directed at achieving the purposes of the witness sequestration rule prior to the hearing. Those purposes—"to prevent the shaping of testimony by one witness

Petitioner's Reply to the Government's Response
In Opposition to Petitioner's Motion in Limine to
Prevent Witness Collusion                              2

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

856

to match that of another, and to discourage fabrication and collusion"[1]—are entirely consistent with *Strickland*'s requirements for a fair assessment of trial counsel's conduct. Under the undisputed circumstances of this case, an order directing the government not to expose trial counsel to information they did not rely upon at the relevant time is necessary to ensure a fair assessment.

Indeed, the government's methods are unfair to trial counsel insofar as they will make it far more difficult for trial counsel to distinguish between those writings or statements that actually formed part of their perspective at the time and those that existed prior to trial, but that counsel did not review. In sum, allowing the government to expose trial counsel to information extra-judicially, without first establishing that counsel possessed and considered the information at the relevant time, can only serve to make more difficult the job of reconstructing the circumstances of counsel's challenged conduct.

## CONCLUSION

For the foregoing reasons, Mr. Barrett respectfully requests this Court enter an order precluding the government from further exposing trial counsel to statements or writings of other witnesses or potential witnesses, or other documents that trial counsel have not already identified as containing information they relied upon.

DATED this 15th day of February, 2017

RESPECTFULLY SUBMITTED,
/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

---

[1] *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1373 (5th Cir. 1981).

Petitioner's Reply to the Government's Response                              *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine to                           OK-ED No. 6:09-cv-00105-JHP
Prevent Witness Collusion                    3

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 15th day of February 2017, I caused the foregoing Petitioner's Reply to the Government's Response in Opposition to Petitioner's Motion in Limine to Preclude Witness Collusion to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Reply to the Government's Response
In Opposition to Petitioner's Motion in Limine to
Prevent Witness Collusion                4

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

858

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:          dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:          Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Movant/Petitioner, | ) | CASE NO. 6:09-cv-00105-JHP |
| | ) | |
| v. | ) | **REPLY TO GOVERNMENT** |
| | ) | **RESPONSE TO PETITIONER'S** |
| UNITED STATES OF AMERICA, | ) | **MOTION TO RECONSIDER** |
| | ) | **ORDER DENYING MOTION** |
| Respondent, | ) | **TO DEPOSE ROGER HILFIGER** |
| _____ | ) | |

Petitioner, Kenneth Eugene Barrett, replies to the government's response in opposition

(Doc 319) to petitioner's motion to reconsider the order denying the request to depose trial

counsel Roger Hilfiger (Doc. 302).

Reply to Response to Motion To Reconsider Order                          *Barrett v. United States*
Denying Request to Depose Roger Hilfiger                          OK-ED No. 6:09-cv-00105-JHP

1

The government's concern that Mr. Barrett's motion is not sufficient under <u>Federal Rule of Civil Procedure 59(e)</u> is misplaced.  Though denominated a motion to reconsider, the motion more closely resembles a renewed motion of discovery, called a reconsideration only because the Court previously denied a similar request. (Docs. 246, 269).  The reasons for the request rest in the change of circumstance occasioned by the court's denial of the government's motion to continue the hearing to permit trial counsel Hilfiger to testify.  (Doc. 274, 283).  The arguments now made did not exist at the time of the original request for discovery and thus make reconsideration of the prior denial appropriate.

The government asserts that "[a] deposition of Mr. Hilfiger for 'additional exploration of the facts' is unnecessary, especially given that Mr. Hilfiger outlined his views of the case in a sworn declaration attached to the government's answer.  Doc 174, Ex. 11."  The government's representations of its intended offer of proof suggest otherwise.  *See e.g.* Doc.304.  Nonetheless, if the government does not elicit, and the court does not permit, Mr. Hilfiger to go beyond the four corners of his sworn declaration, no deposition is necessary.  If the government intends otherwise as its pleadings suggest, then its rationale, urged on this court to deny Mr. Barrett an opportunity to depose Mr. Hifiger, is both misleading and disingenuous.

The interests of justice and judicial economy will be best served by granting this motion. DATED this 15th day of February, 2017

<div align="right">

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

</div>

Reply to Response to Motion To Reconsider Order          *Barrett v. United States*
Denying Request to Depose Roger Hilfiger         OK-ED No. 6:09-cv-00105-JHP

2

860

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 15th day of February 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service to be made via CM/ECF to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M.FISHER

Reply to Response to Motion To Reconsider Order
Denying Request to Depose Roger Hilfiger

*Barrett v. United States*
OK-ED No. 6:09-cv-00105-JHP

3

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | **PETITIONER'S REPLY TO THE** |
| | ) | **GOVERNMENT'S RESPONSE IN** |
| UNITED STATES OF AMERICA, | ) | **OPPOSITION TO PETITIONER'S** |
| | ) | **MOTION IN LIMINE TO RELY** |
| Respondent. | ) | **UPON DECLARATIONS FOR** |
| | ) | **DIRECT-EXAMINATION** |
| | ) | **TESTIMONY** |

Petitioner Kenneth Eugene Barrett has filed a Motion asking that the Court accept

as direct-examination testimony previously filed declarations of lay witnesses. (Doc.

303.) The government then filed a Response in Opposition. (Doc. 320). In its Response,

the government admits that there is no legal basis to oppose Mr. Barrett's Motion ("The

Petitioner's Reply to Government's Response                          *Barrett v. United States*,
In Opposition to Petitioner's Motion in Limine                    OK-ED No. 6:09-cv-00105-JHP
to Rely Upon Declarations For Direct-Examination
Testimony

government also recognizes that courts can and do rely on declarations in lieu of direct testimony during § 2255 evidentiary proceedings." (Doc. 320 at 2.)) Instead, the government objects to the "vagueness" of Mr. Barrett's request, stating that Mr. Barrett's motion "does not identify any particular witness or declaration who might come within the proposed order." *Id.* Mr. Barrett now submits this Reply to the government's Response.

If the Court grants his Motion, Mr. Barrett will present most of his lay witnesses' direct-examination testimony by declaration, although he will supplement some witnesses' testimony with oral examination. The government points to no authority stating that Mr. Barrett must identify at this point exactly which declarations or parts of declarations he will rely upon as direct-evidence testimony.

The government asserts that "[w]ithout knowing who might actually appear to testify in court, the government is left to prepare for a multitude of different scenarios." (Doc. 320 at 3). That statement borders on the ridiculous. The parties have exchanged potential witness lists and are preparing a detailed prehearing statement. By providing the government with a witness list and proposing to present direct-examination testimony by declaration—declarations the government has had for six to eight years—the government has far greater ability to prepare than it would have before a trial. Litigation necessarily entails the preparation of a "multitude of different scenarios." In any event, Mr. Barrett is under no obligation to lessen the government's labors. The self-evident purpose of Mr. Barrett's motion is aiding the *Court*.

Offering evidence by declaration saves time and court resources. In its Scheduling Order, this Court stated that it "encourages the submission of written exhibits in lieu of

Petitioner's Reply to Government's Response
In Opposition to Petitioner's Motion in Limine
to Rely Upon Declarations For Direct-Examination
Testimony

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

2

863

live testimony." (Doc. 246.). Mr. Barrett is doing that. The government is obstructing the Court's efforts.

The government is put at no disadvantage by Mr. Barrett's reliance on declarations. The government has never questioned the reliability of the declarations. Most important, Mr. Barrett stated in his Motion that he will make available for cross-examination any witness whom the government wishes to cross-examine. Thus, the government will have every opportunity at hearing to question Mr. Barrett's direct-examination testimony.

### CONCLUSION

For the foregoing reasons, Mr. Barrett respectfully requests that this Court grant his Motion allowing him to rely upon declarations as direct-examination testimony.

DATED this 15th day of February, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Reply to Government's Response
In Opposition to Petitioner's Motion in Limine
to Rely Upon Declarations For Direct-Examination
Testimony

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 15th day of February 2017, I caused the foregoing Petitioner's Reply to the Government's Response in Opposition to Petitioner's Motion In Limine To Rely Upon Declarations For Direct-Examination Testimony to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Reply to Government's Response
In Opposition to Petitioner's Motion in Limine
to Rely Upon Declarations For Direct-Examination
Testimony

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:          dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:          Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | **PETITIONER'S REPLY TO** |
| | ) | **GOVERNMENT'S RESPONSE IN** |
| UNITED STATES OF AMERICA, | ) | **OPPOSITION TO COMBINED** |
| | ) | **MOTION IN LIMINE TO EXCLUDE** |
| Respondent. | ) | **TESTIMONY FROM, AND ANY** |
| | ) | **EVIDENCE RELATED TO,** |
| | ) | **PROPOSED EXPERT J. RANDALL** |
| | ) | **PRICE** |
| | ) | |

Mr. Barrett moved to exclude testimony from, and any evidence related to, proposed expert

J. Randall Price, on grounds that admission of any such testimony by Price, and in particular his

risk assessment, would violate Federal Rules of Evidence 702, 104 (a), 18 U.S.C. § 3593(c), and

Petitioner's Reply to Government's Response                                    *Barrett v. United States*,
In Opposition to Combined Motion in Limine                                    OK-ED No. 6:09-cv-00105-JHP
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

1

866

the Fifth, Sixth, and Eighth Amendments to the U.S. Constitution. In its Response, the government: (1) asserted that *Daubert* and the Rules of Evidence do not dictate the admission of evidence at a federal penalty phase trial, and that Mr. Barrett's attempt to exclude Price "should fail as a matter of law," notwithstanding its refusal to address binding statutory and constitutional authority; (2) claimed that the government "had a right to rebut Dr. [George] Woods' findings with those of Dr. Price," despite the fact that Dr. Price hazarded his "rebuttal" opinions *years before* Dr. Woods was even retained by Mr. Barrett; and (3) purported that Dr. Price "only made a limited finding" regarding psychopathy as a reliable predictor of future dangerousness, and that diagnosis "remains probative of that aggravator," "would have informed the decision" of trial counsel "to present mental health evidence" had his original report been available to them, and that Price more broadly responds to Mr. Barrett's post-conviction evidence of neurocognitive deficits.

The government's response altogether ignores the law and the substance of the issues before this Court to the extent that it borders on incoherence. The confusion stems from the government's bald desire to introduce highly prejudicial evidence of future dangerousness premised on an entirely new theory, psychopathy, not previously presented to the jury and contravened by governing authority, both scientific and legal. Accordingly, Dr. Price's testimony must be excluded from the evidentiary hearing.

I.     **The Government's Response Ignores and Mischaracterizes the Law**

The government does not address whether Dr. Price's opinions are admissible under 18 U.S.C. § 3593(c)'s exclusionary rule and does not address the related question whether the Fifth, Sixth, and Eighth Amendments bar the admission of Dr. Price's opinions. Overmatched by these authorities, the government wrestles with the more narrow *Daubert* issue.

Petitioner's Reply to Government's Response
In Opposition to Combined Motion in Limine
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

2

867

The "government disagrees that *Daubert* and the Rules of Evidence dictate the admissibility of evidence for purposes of any penalty phase trial." Doc. 321 at 5. But the government ignores authorities cited in the Motion that relate *Daubert* and Rule 702 to § 3593(c)'s exclusionary rule and to Eighth Amendment prohibitions on unreliable aggravating evidence. Unable to the defend on scientific or legal grounds the reliability of Dr. Price's opinion that psychopathy predicts future dangerousness in prison, the government sheepishly demurs that "Dr. Price made only a limited finding in this regard" and he "did not make a particular effort to correlate psychopathy with dangerousness." *Id.* at 5-6. For the reasons exhaustively demonstrated by Dr. Reidy's declaration in support of petitioner's motion, Dr. Price's methods and conclusions are not probative of the only issues on which the government would have him testify, namely, future dangerousness *in prison* and whether Dr. Woods or Dr. Young accurately diagnosed Mr. Barrett.

Arguing that relaxed evidentiary standards govern penalty phase proceedings, the government unintelligibly asserts "the relaxed evidentiary standard of the Federal Death Penalty Act serves, rather than undermines, the Constitution's insistence on heightened reliability. *United States v. Fell*, F.3d 135, 145 (2d. Cir. 2004); *United States v. Jones*, 132, F.3d 232, 241-42 (5th Cir. 1998). As such, the Court need not make separate determination (*sic*) under § 3593 and the Eighth Amendment." *Id.* at 5, n. 1.

First, the government's argument altogether ignores the exclusionary rule in § 3593(c). That rule provides *greater protection* than the Federal Rules of Evidence, not "more relaxed evidentiary standards." *Compare* 18 U.S.C. § 3593(c) ("information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or

Petitioner's Reply to Government's Response                                         *Barrett v. United States*,
In Opposition to Combined Motion in Limine                                      OK-ED No. 6:09-cv-00105-JHP
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

3

868

misleading the jury;") *with* Fed. R. Evid. 403 ("court may exclude relevant evidence if its probative value is *substantially outweighed* by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence") (emphasis added); *see also* Doc. 305 at 12.

Second, even under the scant authority the government cites, § 3593(c) still bars any and all testimony that proves more prejudicial than probative—regardless of *Daubert* and the Federal Rules. *Compare* Doc. 321 at 5, n. 1 (citing *Fell) with Fell,* 360 F.3d at 145 (noting *inter alia* that Fed. R. Evid. are not "the only means to safeguard [petitioner's] rights," and that the balancing test under § 3593(c) continues to exclude testimony found more prejudicial than probative; "under the FDPA Standard, 'judges continue their role as evidentiary gatekeepers and[, pursuant to the balancing test set forth in § 3593(c),] retain the discretion to exclude any type of unreliable or prejudicial evidence that might render a trial fundamentally unfair" . . . . [I]f the district court were to conclude that admission of statements . . . would unfairly prejudice [him], it would be obligated by the FDPA Standard to exclude them . . . .") (citations omitted). The government does not dispute the studies cited in Dr. Reidy's declaration finding that psychopathy is a highly prejudicial diagnosis, and it does not dispute the studies finding that psychopathy is not probative of future dangerousness in a prison setting. Thus, the government effectively concedes that the statutory balancing test—which remains in full force—mandates the exclusion of Dr. Price's nominally probative testimony.

Third, the tenuous authority the government cites in support of its argument for disregarding the Eighth Amendment is also inapposite. The government cites *Jones,* which *also* makes plain that prejudicial evidence must be excluded by operation of the Eighth Amendment

<table>
<tr><td>Petitioner's Reply to Government's Response<br>In Opposition to Combined Motion in Limine<br>To Exclude Testimony From, And Any Evidence Related<br>To, Proposed Expert J. Randall Price</td><td align="right">*Barrett v. United States*,<br>OK-ED No. 6:09-cv-00105-JHP</td></tr>
</table>

and the statutory balancing test of 18 U.S.C. § 3593(c). *Compare* Doc. 321 at 5, n. 1 (citing *Jones*) with *Jones*, 132 F.3d at 241-42 (quoting Eighth Amendment authority *Gregg v. Georgia*, 248 U.S. 153, 204, "*So long as the evidence introduced and the arguments made . . . do not prejudice a defendant*, it is preferable not to impose restrictions . . . .") (emphasis added); concluding "[a]lthough the sentencing hearing will not be governed by traditional evidentiary restraints, the district court will prevent the evidentiary free-for-all prophesied by [petitioner] by excluding unfairly prejudicial information under the standard enunciated in  . . . . § 3593(c) . . . . Consequently, the . . . evidentiary standard . . . helps to accomplish the individualized sentencing required by the constitution . . . .").

Additionally, *Jones* inexplicably ignores the constitutional evidentiary requirements imposed by the U.S. Supreme Court in *Barefoot v. Estelle*.  *See* Doc. 305 at 15-17. The government does not attempt to validate Price's testimony with a purported, known error for his PCL-R based prediction of violence, because any such error rate would exceed the constitutional floor of two-thirds mandated by *Barefoot*: accordingly, the government's proffered testimony still derogates the Eighth Amendment. *Id.*

Fourth, the government fails to address the issues arising under the Fifth and Sixth Amendments. The government silence indicates it has no response to this Court's prior ruling that the Fifth and Sixth Amendments bar Price's rebuttal without the introduction of testimony by Dr. Jeanne Russell, which Dr. Price's opinion was singularly intended to refute. *See generally* Doc. 305 at 4-5. Nor does the government present any argument as to why wholly unreliable "expert" testimony by Price would not render the sentencing hearing fundamentally unfair. *Id.* at 17. Indeed, given that this case has been remanded for the purpose of determining whether trial counsel were

Petitioner's Reply to Government's Response                                    *Barrett v. United States*,
In Opposition to Combined Motion in Limine                                   OK-ED No. 6:09-cv-00105-JHP
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

5

870

ineffective for, among other things, making an uninformed decision to have Dr. Russell update her 2003 risk assessment while conducting no real investigation of mental health mitigation, the use of Dr. Price would amount to quintessential unfair prejudice under § 3593(c).

Fifth, as to *Daubert*—the sole issue addressed in the Response—the government's argument fatally miscarries. The government cites *United States v. Lee*, 274 F.3d 485 (8th Cir. 2001), in support of its claim that the "Barrett's attempt to forestall the psychopathy diagnosis . . . should fail as a matter of law." Doc. 321 at 5. *Lee*, however, remains easily distinguishable. In *Lee*, the defendant introduced expert mental health evidence *at trial,* and the government then "exceeded the scope of . . . direct" examination by cross-examining on psychopathy. *Lee*, 274 F.3d at 495.

In the instant matter, Mr. Barrett never introduced testimony by Dr. Jeanne Russell at trial. The evidence Mr. Barrett has proffered in these post-conviction proceedings is of an entirely different kind than that proffered in Dr. Russell's report. Accordingly, Mr. Barrett has never "opened the door" to testimony about a risk assessment, and Dr. Price's opinions remain barred by the Fifth and Sixth Amendments. As well, Dr. Price's testimony now presents a novel theory of aggravation over a decade after trial—long after the jury rejected a finding of future dangerousness. On this basis, also, Dr. Price's testimony must be excluded. *See generally* Doc. 304. Finally, notwithstanding its factual distinction from the instant matter, the *Lee* opinion has never been followed—never been cited—by any federal or state court for the proposition the government asserts, i.e., the government can exceed the scope of direct testimony on mental health by introducing unreliable, allegedly "non-prejudicial" testimony of psychopathy on cross-examination.

Petitioner's Reply to Government's Response         *Barrett v. United States*,
In Opposition to Combined Motion in Limine         OK-ED No. 6:09-cv-00105-JHP
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

6

871

Instead, federal courts have repeatedly applied *Daubert* to evaluate the reliability of expert predictions of future violence in capital sentencing proceedings, s*ee, e.g., Flores v. Johnson*, 210 F.3d 456, 463-70 (5th Cir. 2000) (Garza, J., concurring); *United States v. Sampson*, 335 F. Supp. 2d 166, 218-23 (D. Mass. 2004). In keeping with *Daubert*, federal courts at the time of petitioner's trial routinely excluded use of the PCL-R and diagnoses of psychopathy in predicting danger as insufficiently reliable. *See, e.g., United States v. Taylor*, 320 F. Supp. 2d 790, 794 (N.D. Ind. 2004) ("due to the uncertainty of the validity and reliability of the PCL–R as it is used in capital sentencing hearings, the government and any of its experts is prohibited from utilizing this test in evaluating [defendant] . . . ."). *Daubert* dictates that predictions of future danger premised on the PCL-R and psychopathy should be excluded as invalid and unreliable.

## II.     The Government Does Not Have a "Right" to Rebut Dr. Woods' Mental Health Testimony with Testimony on Psychopathy by Dr. Price

The government's assertion that it has a "right" to rebut Dr. Wood's mental health testimony with Dr. Price's findings on psychopathy are specious. The case law the government cites stands for no such proposition, but instead merely states that the government has an obligation to present defenses—not a right—and any defenses not so presented remain waived. *Compare* Doc. 321 at 3 (asserting "right to rebut, citing *Smith*) *with Smith v. Richards*, 35 F.3d 300, 305 (7th Cir. 1994) ("the respondent must put in all his defenses, on pain of forfeiture if he does not . . . ."). Moreover, rebuttal testimony must be "reasonably tailored to the evidence it seeks to refute." *United States v. Stitt*, 250 F.3d 878, 897-98 (4th Cir. 2001) (abuse of discretion to admit irrelevant testimony in rebuttal); *accord Tanberg v. Sholtis*, 401 F.3d 1151, 1166-67 (10th Cir. 2005) ("rebuttal evidence is evidence which attempts to 'disprove or contradict' the evidence to which it is contrasted . . . . Rebuttal evidence is not any evidence an aggrieved litigant may wish to admit

Petitioner's Reply to Government's Response                                          *Barrett v. United States*,
In Opposition to Combined Motion in Limine                                          OK-ED No. 6:09-cv-00105-JHP
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

7

872

in response to a topic introduced by his opponent; whether or not rebuttal evidence is admissible depends on "whether the initial proof might affect the case and whether the rebuttal evidence fairly meets the initial proof"; upholding trial court's exclusion of proffered rebuttal evidence as proper due to confusion of issues) (citations omitted).

Plainly, Dr. Price's report and attendant testimony are not reasonably tailored to refute Dr. Woods' opinions—opinions which *followed* Price by some four years. Dr. Price's "rebuttal" presents a novel theory of psychopathy absent from Dr. Woods' mental health opinions, and Price therefore proves inadmissible. *Boles v. United States*, No. 1:13 CV 489, 2015 U.S. Dist. LEXIS 42332, at *5 (M.D.N.C. Apr. 1, 2015) ("'[R]ebuttal experts cannot put forth their own theories; they must restrict their testimony to attacking the theories offered by the adversary's experts.'") (citation omitted).

Further, Dr. Price's report must be excluded because it does not specifically address the mental health opinions of petitioner's experts it allegedly seeks to "refute." *Id.* ("[e]xpert reports that . . . do not directly contradict or rebut the actual contents of [a previously-submitted] report . . . do not qualify as proper rebuttal or reply reports . . . .") (citation omitted). Dr. Price's testimony on psychopathy, the PCL-R, and antisocial personality features do not fall within the scope of proper rebuttal to petitioner's mental health evidence, as federal courts have concluded. *See, e.g., United States v. Williams*, 731 F. Supp. 2d 1012, 1021-24 (D. Haw. 2010) ("To allow the government experts to go beyond rebutting Defendant's expert testimony that he has [mental health conditions and brain damage] and affirmatively assert that Defendant suffers from psychosis or Anti-Social Personality Disorder and that either of those conditions actually caused him to commit the alleged acts, is tantamount to using Defendant's own statements, for which he has not

Petitioner's Reply to Government's Response
In Opposition to Combined Motion in Limine
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

8

873

waived his *Fifth Amendment* rights, against him in a criminal proceeding . . . ."; "[i]n response [to [petitioner's proffer], the government asserts that the possible introduction of evidence that Defendant is a psychopath or has Anti-Social Personality Disorder is appropriate to rebut Defendant's [evidence of mental health conditions and brain damage]. Such a proposition is not tenable . . . . The Court finds . . . the PCL-R exceeds the scope of admissible rebuttal by the prosecution . . . . [A]ny diagnosis made as a result of the PCL-R exceeds the scope of the examination required to directly rebut Defendant's [evidence of mental health conditions and brain damage], and is therefore inadmissible . . . ."). Again, the government does not dispute Dr. Reidy's conclusion that the scientific community has rejected the PCL-R and risk assessment methodology generally as part of the process of differential diagnosis. There is no evidence in existence or before this Court that Dr. Price's methods or conclusions have any bearing on the opinions of Dr. Woods or Dr. Young. Therefore, Dr. Price's testimony does not properly rebut petitioner's mental health evidence, and it must not be admitted at the hearing.

### III. The Government's Claim that Dr. Price Made a "Limited Finding" of Psychopathy is Misplaced, Given the Prejudice Such a "Finding" Engenders

The government asserts that Price made a "limited finding" of psychopathy that "remains probative" of future danger, and that somehow, Dr. Price's findings—"had they been known to defense counsel—would have informed the decision [of trial counsel] to present mental health evidence . . . ." Doc. 321 at 5-6. However, the government's conjectural argument puts the cart before the horse: trial counsel did not present any mental health evidence, nor did it present risk assessment testimony by Dr. Jeanne Russell at trial. The existence of Dr. Price's later evaluation rebutting Russell—whose opinions trial counsel and post-conviction counsel never relied upon as

Petitioner's Reply to Government's Response
In Opposition to Combined Motion in Limine
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

9

874

evidence in mitigation and never presented to the jury—remains utterly beside the point, as to trial counsel's deficiencies. The government is merely attempting to construct a post-hoc rationalization for trial counsel's failures. That line of argument is foreclosed by the law governing this hearing, including the Tenth Circuit's decision in this very case. *United States v. Barrett*, 279 F.3d 1207, 1228 (10th Cir. 2015); *Wiggins v. Smith*, 539 U.S. 510, 526-527 (2003); *Strickland v. Washington*, 466 U.S. 668, 689 (1984).

Moreover, *even if* Price's finding of psychopathy has any probative value of dangerousness—a contention petitioner disputes—Mr. Barrett has demonstrated that the strong prejudicial effect of any such testimony outweighs its utility. *See generally* Doc. 305 at 12-15. As such, Price must be excluded altogether from the evidentiary hearing. If the Court admits any testimony by Price, it must bar his use of the PCL-R, MMPI, PAI, along with his diagnosis of "psychopathy" and "personality disorder, NOS, with Antisocial, Psychopathic . . . Traits/Features," and his predictions of future danger, and it must narrowly circumscribe his opinions to petitioner's mental health diagnoses and his neuropsychological functioning. However, in view of the Court's possible admission of rebuttal testimony by Dr. Steven Pitt, whose evaluation of Mr. Barrett post-dates evaluations by petitioner's experts Dr. Woods and Dr. Young, the risks of admitting any "rebuttal" testimony by Dr. Price prove too great. Dr. Price's testimony and report should be excluded from the upcoming evidentiary hearing.

## IV.   REQUEST FOR EVIDENTIARY HEARING

The government has not disputed the facts, methods or conclusions contained in Dr. Reidy's declaration. The government has put forth no evidence or factual averment calling Dr. Reidy's conclusions into question. However, should this Court believe there is a factual question to be

Petitioner's Reply to Government's Response
In Opposition to Combined Motion in Limine
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

10

resolved under *Daubert* or the other authorities on which the parties rely, Mr. Barrett requests a

hearing on the disputed factual issue.

## V.    CONCLUSION

For all of the foregoing reasons, Mr. Barrett respectfully requests this Court enter an

order precluding the government from adducing at the evidentiary hearing any testimony from,

and any evidence related to, its proposed expert J. Randall Price.

DATED:  February 15, 2017

Respectfully submitted,

/s/ *David Autry*
DAVID AUTRY
Attorney at Law

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Reply to Government's Response                              *Barrett v. United States*,
In Opposition to Combined Motion in Limine                        OK-ED No. 6:09-cv-00105-JHP
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

11

876

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 15th day of February 2017, I caused the foregoing

Petitioner's reply to government's Response in Opposition to Combined Motion in Limine to

Exclude Testimony from, and Any Evidence Related to, Proposed Expert J. Randall Price, to be

filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be

made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all

counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in

this case.

> /s/ *Joan M. Fisher*
> JOAN M. FISHER

Petitioner's Reply to Government's Response                        *Barrett v. United States*,
In Opposition to Combined Motion in Limine                   OK-ED No. 6:09-cv-00105-JHP
To Exclude Testimony From, And Any Evidence Related
To, Proposed Expert J. Randall Price

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
|---|---|---|
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | **PETITIONER'S REPLY TO THE** |
| | ) | **GOVERNMENT'S RESPONSE IN** |
| UNITED STATES OF AMERICA, | ) | **OPPOSITION TO PETITIONER'S** |
| | ) | **MOTION FOR 18 U.S.C. § 3500** |
| Respondent. | ) | **MATERIALS CONCERNING TRIAL** |
| | ) | **COUNSEL TESTIMONY** |

Petitioner Kenneth Eugene Barrett has filed a Motion asking for early production of 18 U.S.C. § 3500 ("Jenck's Act") materials concerning trial counsel/government witnesses Roger Hilfiger and Bret Smith. (Doc. 297). Mr. Barrett further asserts that this material may go beyond the limited waiver of attorney-client privilege. The government filed a Response in Opposition to Mr. Barrett's request. (Doc. 309).  Mr. Barrett now submits this Reply.

The government objects to Mr. Barrett's Motion, stating: 1) Mr. Barrett is seeking materials that the witnesses did not adopt which do not fall under the purview of the Jenck's Act; 2) due process does not require the disclosures that Mr. Barrett is seeking and; 3) Mr. Barrett failed to indicate how the witnesses may have violated the attorney-client privilege and, even if they did, Mr. Barrett points to no resulting prejudice.  The government is wrong on all counts.

In addition to written statements adopted by the witnesses, the Jencks Act requires production of

1

878

a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement

18 U.S.C. § 3500 (e).

The government has not stated whether a contemporaneous recorded statement or transcription was made of the sworn statements that have submitted; if so, Mr. Barrett is entitled to these recordings and/or transcriptions. The government cannot shirk its disclosure obligations by labeling material that falls squarely under the Jencks Act as "work product." This is disingenuous at best.

Next, the government boldly claims that Mr. Barrett cannot even make a due process argument, stating, "The *Brady* doctrine does not apply during collateral review."[1] This is simply not the law.

Finally, the government makes a circuitous challenge to Mr. Barrett's attorney-client privilege arguments. The government acknowledges that ineffective assistance of counsel claims imply only a limited waiver of that privilege yet argues that Mr. Barrett does not indicate how his attorneys might have run afoul of that limitation. *This is exactly the point that Mr. Barrett is making.* Mr. Barrett cannot make adequate arguments or assess whether the attorney-client privilege has been violated without adequate knowledge of the disclosures to which he is entitled under the Jencks Act.

The government further speculates that Mr. Barrett makes no showing of how the government might use such improper information. Again, Mr. Barrett cannot blindly

---

[1] For this statement, the government relies on the Supreme Court case of *District Attorney v. Osborne*, 557 U.S. 52, 68-69 (2009). That case held that post-conviction prisoners have no constitutional right to their DNA evidence.

2

shoot fish in a barrel. Without knowing what the improper information is, Mr. Barrett is helpless to guess how he might suffer prejudice. Mr. Barrett is not required to make any such showing before waiving his attorney-client privilege beyond the limits necessary for his ineffective assistance of counsel claims.

### Conclusion

For the foregoing reasons, Mr. Barrett respectfully requests that this Court grant his Motion for 18 U.S.C. § 3500 Materials Concerning Trial Counsel Testimony.

DATED this 15th day of February, 2017

RESPECTFULLY SUBMITTED,

*/s/ David Autry*
DAVID AUTRY

*/s/ Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 15th day of February 2017, I caused the

foregoing Petitioner's Reply to the Government's Response in Opposition to

Petitioner's Motion For 18 U.S.C. § 3500 Materials Concerning Trial Counsel

Testimony to be filed with the Clerk of the Court using the ECF System for filing,

with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan,

U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge,

there are no non-ECF registrants who are counsel in this case.

*/s/ Joan M. Fisher*
JOAN M. FISHER

881

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
        Petitioner/Defendant,      )
                                   )        Case No. CV-09-00105-JHP
    v.                             )
                                   )
UNITED STATES OF AMERICA,          )
                                   )
        Respondent/Plaintiff.      )

REPLY IN SUPPORT OF MOTION TO EXCLUDE EVIDENCE OF UNAVAILABLE
WITNESSES BY DECLARATION ALONE

COMES NOW the United States of America, by and through undersigned counsel and respectfully submits this reply in support of its motion to partially exclude the declarations of Ernest Barrett and Warren Dotson. Doc. 292. The government declines to reiterate the arguments in its motion, but incorporates them by reference.

## PROCEDURAL HISTORY

Pursuant to a Tenth Circuit order remanding this case, the Court has scheduled an evidentiary hearing to determine whether trial counsel, Roger Hilfiger and Bret Smith, ineffectively failed to investigate and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015). The government moved to exclude, in part, the declarations of two of Barrett's proposed witnesses, Ernest Barrett and Warren Dotson, because they speak to issues outside the evidentiary standard applicable to penalty phase trials and the witnesses are unavailable for cross-examination. Doc. 292. The government now files this reply to Barrett's opposition (Doc. 322).

1

## **ARGUMENT**

## **THE COURT SHOULD LIMIT BARRETT TO WITNESSES WHO ARE AVAILABLE FOR CROSS-EXAMINATION**

The Court should bar Barrett from offering hearsay evidence unamenable to any exception, including those portions of declarations by unavailable witnesses that concern evidence other than allegedly foregone mitigation testimony.

As observed, the Federal Rules of Evidence generally apply to evidentiary proceedings under 28 U.S.C. § 2255. *United States v. Francischine*, 512 F.2d 827, 829 (5th Cir. 1975). "Courts have generally found . . . where a witness is unavailable, the affidavit testimony should not be allowed unless the opposing party had the opportunity to cross examine the witness." *West v. United States*, No. 205-CR-124-FTM-29SPC, 2009 WL 1043962, at *6 (M.D. Fla. Apr. 16, 2009); *see generally* Fed. R. Evid. 801.

Barrett defends his right to rely on the hearsay declarations by observing that the government has no Sixth Amendment right of confrontation. Doc. 322. But the government has not claimed any such right, and limited its objections to portions of declarations that are not amenable to presentation under the Federal Death Penalty Act, 18 U.S.C. § 3593(c). Barrett fails in his attempts to analogize the evidence at issue to testimony in mitigation. *See* Doc. 322 at 4 (citing inter alia *Green v. Georgia*, 442 U.S. 95, 97(1979)). The government only seeks to exclude evidence that goes to counsel's performance or to the actions of the state police.

Barrett attempts to justify his reliance on hearsay by arguing that his witnesses would not have been unavailable but for this Court's refusal to grant a hearing earlier. The fact that the witness died before he could be called to the stand does not render his declaration reliable, or

2

883

otherwise amenable to some hearsay exception.  Barrett also argues that the government "conceded" the witnesses' factual assertions by failing to contradict them in earlier pleadings. Were this the case, Barrett would not need to present the evidence, much less do so by declaration.  Finally, Barrett argues that one declaration is amenable to the residual hearsay exception because no one has contradicted it, despite the opportunity to do so.  "Courts must use caution when admitting evidence under . . . the residual exception . . . . As this court has warned, Rule 803(24) should be used only "in extraordinary circumstances where the court is satisfied that the evidence offers guarantees of trustworthiness and is material, probative and necessary in the interest of justice." *United States v. Farley*, 992 F.2d 1122, 1126 (10th Cir.1993).  Barrett makes no effort to satisfy that rule, nor could he in reference to the accounts of the defendant's necessarily interested, and possibly biased, relatives.

Accordingly, the Court should grant the motion to partially exclude declaration evidence.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to exclude in part the declarations of Ernest Barrett and Warren Dotson.

Dated: February 15, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

885

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on February 15, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**REPLY IN SUPPORT OF GOVERNMENT'S MOTION TO EXCLUDE PROPOSED WITNESSES**

---

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully submits this reply in support of its motions (Doc. 289 & 290) for an order excluding witnesses and requiring an offer of proof as to others.  The government declines to reiterate the arguments in its motion, but incorporates them by reference.

## PROCEDURAL HISTORY

On appeal from the denial of relief under 28 U.S.C. § 2255, the Tenth Circuit Court of Appeals remanded this case for an evidentiary hearing to determine whether trial counsel, Roger Hilfiger and Bret Smith, ineffectively failed to investigate and present evidence about Barrett's background and mental health.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).  This court entered a scheduling order (Doc. 246), under which Barrett provided the government with a list of 71 proposed witnesses (Doc. 289, Ex. 1).  The government moved to exclude several of those witnesses and for offers of proof as to other (Doc. 289) and offers this reply to Barrett's response in opposition (Doc. 323).

1

887

## ARGUMENT

### THE COURT SHOULD LIMIT BARRETT TO WITNESSES WHO CAN TESTIFY ABOUT FOREGONE PENALTY PHASE EVIDENCE

The upcoming hearing has one purpose: "to determine what evidence could have been presented at the sentencing phase of Petitioner's trial in 2005 and whether Petitioner was prejudiced as a result of a lack of presenting that evidence in his trial." Doc. 248. Moreover, the hearing should not permit Barrett "to resurrect issues which have been fully resolved." Doc. 279 at 1.

Despite the limitations on the hearing, Barrett seeks to call a litany of mental health witnesses whom he first identified after the deadline for discovery motions and years after he alleged the underlying ineffectiveness claim in reference to the findings by three specific experts. From the outset of this litigation, Barrett has clearly alleged that trial counsel were ineffective for omitting the findings of George Woods and Myla Young, as corroborated by Bill Sharp. Doc. 95 at 230-42; *see* Doc. 178 at 72 (chiding the government for "not present[ing] any competent evidence disputing the opinions of" Woods and Young); *id*. at 75 (same); *id*. at 101 (specifically tying claimed ineffectiveness to the diagnoses of Sharp, Woods and Young). After the Court denied relief, Barrett sought, and received, a certificate of appealability based on an allegation that this Court ignored the diagnoses of Woods and Young. 10th Cir. Doc. 01019181996 at 79-80. At the conclusion of the appeal, the Tenth Circuit issued an opinion that assumed the veracity of Woods, Young and Sharp, but questioned the impact of evidence the government might have presented in response. 797 F.3d at 1229-32. In short, Barrett confined his ineffective assistance of counsel claim to the diagnoses of Woods, Young and Sharp, resulting in a Tenth Circuit's opinion that relied on their diagnoses. The appellate court's consideration was cabined

by the record and the certificate of appealability, and its mandate is no broader than the claims presented to it.  *See generally* 28 U.S.C. § 2253 (noting the specificity of certificates of appealability); *Carter v. Hopkins*, 151 F.3d 872, 874 (8th Cir.1998) (holding "review is limited to the issues specified in the certificate of appealability").

Furthermore, Barrett's lengthy list of proposed experts may illustrate that attorneys with unfettered time and budgets can present unlimited mental health evidence, but it does not inform the pending Sixth Amendment question – whether trial counsel provided minimally competent representation.  "The [*Strickland*] test has nothing to do with what the best lawyers would have done. Nor is the test even what most good lawyers would have done."  *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir.1992). "[A] petitioner must establish that no competent counsel would have taken the action that his counsel did take." *Chandler v. United States*, 218 F.3d 1305, 1315 (11th Cir.2000) (en banc).  Thus, a showing that counsel could have conducted a more thorough investigation that might have borne fruit does not establish ineffectiveness. *See Burger v. Kemp*, 483 U.S. 776, 794 (1987).  "A reasonable investigation is not . . . the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct." *Thomas v. Gilmore*, 144 F.3d 513, 515 (7th Cir. 1998).

The cavalcade of putative witnesses will not inform any pertinent legal question, and Barrett cannot demonstrate that trial counsel could have presented mental health evidence, as he proposes here, without providing the government with a meaningful opportunity to develop rebuttal evidence.  During the litigation of this case, trial counsel had to comply with Federal Rule of Criminal Procedure 12.2.  But in this proceeding, Barrett first alluded to his new experts after the deadline for discovery requests had passed.  Such actions will evade both the letter and

3

spirit of Rule 12.2, which would have otherwise permitted the government to undertake an investigation of the new experts' findings, including any necessary examination of Barrett himself.  *See generally* Doc. 269 at 9.  In the upcoming § 2255 proceedings, the Court should assess trial counsel in accordance with the circumstances in which they represented Barrett.

In regard to the new mental health witnesses, Barrett takes particular pains to defend the proposed testimony of Dr. Miora.  He argues that Dr. Miora will "validate" the findings of the late declarant, Dr. Young.  But he also claims that the witness "will *add* to the persuasiveness of Dr. Young's findings."  Doc. 323 at 4 (emphasis added).  The latter, more expansive, description of Dr. Miora's proposed testimony reflects Barrett's initial summary, which asserted that she would "testify about Mr. Barrett's psychological and neuropsychological functioning at the time of the offense. . . . based on the methods and opinions described in the declarations of Myla Young, Ph.D., Bill Sharp, Ph.D., and George Woods, M.D."  Doc. 280 at 4.  Barrett also stated that Dr. Miora could testify "whether and how testing methods and results other than neuropsychological tests bear on an assessment of Mr. Barrett's psychological . . . functioning." *Id*.  Barrett appears intent on expanding Dr. Miora's role beyond that of a "validating" witness. He seeks a free hand to offer opinions based on Dr. Young's techniques, leavened with obviously novel testimony that those findings were incomplete.  In essence, Barrett asks this Court to permit Dr. Miora's testimony because she will not disagree, entirely, with Dr. Young. If Barrett simply sought to utilize Dr. Miora as a hearsay conduit for the findings of Dr. Young, he would not run afoul of the limitations on this proceeding.  See Fed. R. Evid. 702.  But the Court should not permit him to engage in litigation by surprise, altering his claim and the evidence underlying it at the eleventh hour.  *See* 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000).

<div align="center">4</div>

Similarly, Barrett proffers Thomas Reidy as a rebuttal witness to the diagnosis of a retained government expert, Randall Price who diagnosed the defendant as a psychopath. Barrett has never accused trial counsel of ineffectiveness for failure to prepare rebuttal to Dr. Price. Rather, he claimed that counsel should have presented the diagnoses of Dr. Young and Dr. Woods, and that their failure to do so likely prejudiced the outcome of the trial. This Court should not permit Barrett to remanufacture his claim with a belated new theory, simply because it relates to the issue of mental health. Barrett cannot show the requisite relation back to demonstrate the timeliness of his radically amended claim. 28 U.S.C. 2255(f); *United States v. Guerrero*, 488 F.3d 1313, 1316 (10th Cir. 2007).

Barrett also insists that his Court should permit the testimony of three attorneys, Richard Burr, Julia O'Connell, and Susan Otto, because their opinions and recollections have some bearing on the issue of ineffectiveness. Barrett goes so far as to observe that the Tenth Circuit relied on Ms. O'Connell's declaration in remanding this case for evidentiary development. Barrett's observation underscores the government's point, the issues as framed by the Tenth Circuit obviate the need for the testimony of these witnesses. The Court of Appeals directed this Court to determine what counsel did, why they did it, and what impact their actions or omission may have had. *See Barrett*, 797 F.3d at 1223-32. In contrast, the putative attorney witnesses can only offer testimony about counsel's appointment, the timing of their investigation, and whether – as a matter of opinion – counsel's actions were reasonable. Such evidence cannot assist this Court now that the Tenth Circuit has determined that counsel's actions, if unjustified and unexplained, would not pass muster under the first prong of *Strickland v. Washington*, 466 U.S. 668, 687 (1984); see Barrett, 797 F.3d at 1225 (observing that "[t]ypically, this kind of superficial investigation would constitute deficient performance.").

Barrett also argues that this Court should permit the testimony of Paul Gordon and George Kirkham, because the Tenth Circuit did not reject an argument that those witnesses might offer penalty phase evidence. Doc. 323 at 10-11 (citing Petitioner's Brief at 41-43). Barrett appears mistaken. In his Tenth Circuit opening brief, Barrett divided his claims of ineffective assistance of counsel into those concerning the guilt phase (10th Cir. case no. 12-7086, Doc. 01019181996 at 13-51) and those concerning the penalty phase (*id*. at 51-89). In the section concerning the guilt phase, Barrett features Kirkham's foregone testimony in a section entitled "Lack of an Independent Defense Police Procedures Expert." *Id*. at 16. Barrett's brief last mentioned Kirkham on page 26 and lacks any mention of Paul Gordon. In his reply brief, Barrett followed a similar pattern, discussing Kirkham only in reference to guilt phase issues (10th Cir. case no. 12-7086, Doc. 01019274910 at 6-11), and alluding to Paul Gordon only as a declarant prepared to contradict some trial testimony (*id*. at 2 n.1). Given that Barrett did not alert the Tenth Circuit to the supposed probity of Gordon and Kirkham's testimony on penalty phase issues, the opinion's silence should not imply an acknowledgement of their relevance. By the same token, this Court should not permit Barrett to use the upcoming hearing to explore, without justification, issues that were previously rejected by this Court and the Tenth Circuit.

Barrett also argues that the Court should permit Charles Sanders to testify, despite the government's argument that the defense has relied upon the witness only to assert guilt-phase claims. By way of rejoinder, Barrett observes that Sanders recanted his guilt-phase testimony, alluding to a declaration attached to a request to file a second and successive § 2255 motion, which the Tenth Circuit rejected in a published opinion. *In re Barrett*, 840 F.3d 1223 (10th Cir. 2016). In denying the requested relief, the Tenth Circuit expressed unstinting skepticism of the recantation:

> Sanders's declaration falls far short of a prima facie showing of "clear and convincing evidence that no reasonable factfinder would have found [Defendant] guilty of the offense[s] of conviction," as required by § 2255(h)(1). Postconviction recantations are to be viewed with "extreme suspicion" and "ha[ve] long been disfavored as the basis for a claim of innocence." [Citation.] And in any event the recantation is quite limited in scope; and the testimony from other witnesses, as well as physical evidence, independently substantiates the gist of the recanted testimony.

*Id*. at 1229.

Even if the Tenth Circuit's opinion permitted reliance on Sanders's recantation, Barrett fails to explain how it might assist in assessing the efforts of trial counsel in investigating and presenting mitigation evidence. While Barrett accurately notes that Sanders testified during the penalty phase, he gives no hint how even a wholesale retraction of that evidence would impact the upcoming hearing. The government briefly offered Sanders's testimony to support the allegation that the defendant had threatened violence to others, as a factual basis for a future dangerousness aggravator. Tr. 22:4586-90. The jury rejected future dangerousness (Trl. Doc. 258), undermining any likelihood that Sanders could offer anything of value to the defense at this juncture.

Somewhat inexplicably, Barrett also proffers Janesse Thomas and Billy Poindexter as witnesses who could testify to Sanders's poor reputation for veracity. As demonstrated, Sanders's veracity played no role in the decision to impose the death penalty, since the jury rejected the only factor about which he testified. Barrett now offers to sponsor Sanders as a witness, regarding a recantation the Tenth Circuit rejected, but simultaneously seeks to present two witnesses who will impugn his credibility. Evidence designed to sow doubt about a witness who had no impact on the penalty phase will not inform the question of counsel's performance.

Barrett also argues that bail bondsman Martin Daggs could offer relevant testimony that "he could have gone out and simply picked Mr. Barrett up without difficulty." The putative testimony is speculative and irrelevant. Whether Barrett was amenable to arrest under different conditions does not alter the fact that the defendant intentionally killed a state trooper under circumstances presented here. Barrett can only establish mitigation on the basis of his character, his, record, or the circumstances of this crime. 18 U.S.C. § 3592(a)(8) (permitting mitigators based on circumstances of the offense); *Oregon v. Guzek*, 546 U.S. 517, 525-26 (2006) (defining constitutionally required mitigation as any aspect of the defendant's character or record and any circumstance of the crime). In these circumstances, the police entered Barrett's land with legal authority, and the defendant fired on them without any of his own. It would not profit the defense to offer a second-hand opinion that Barrett would not have committed the crime if he had not encountered the victim. Such evidence, even if believed, amounts to nothing more than a truism applicable to any offense.

The government withdraws its request for an offer of proof regarding Isaac Barrett, in view of Barrett's response. However, the government objects that Barrett's offer of proof with regard to Sharon Greenfeather is inadequate to demonstrate relevance. The fact that Greenfeather is "genetically related" to Barrett hardly demonstrates that her experience and that of her immediate family have any bearing on the issues at hand. To the extent Ms. Greenfeather is a relatively close relation of the defendant, it appears her testimony is cumulative to that of many other named witnesses.

**CONCLUSION**

Based on the foregoing, the government respectfully urges this Court to exclude the testimony of Paul Gordon, Edward Hueske, George Kirkham, Charles Sanders, Janesse Thomas, Mike Mackey, Billy Poindexter, Dewey Padgett, Hon. John Garrett, Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy, Pablo Stewart, Gaylan Warren, Richard Burr, Julia O'Connell, Susan Otto, Gary Philpot, John Philpot, Amanda Grizzle, Christine Calbert and Dale Anderson, Sharon Greenfeather, and to require an offer of proof as to Tamara Bedwell, Faust Bianco, Courtney Burke, Cindy Crawford, Martin Daggs, Robert Gude, Scharlette Holdeman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stovell, Jan Walkingstick and Randy Weaver.

Dated: February 15, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on February 15, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit

896

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com, nitawright73@yahoo.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov),
Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:876882@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Extend
Scheduling Order Dates
Content-Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/16/2017 at 3:32 PM CST and filed on 2/16/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 337(No document attached) |

**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to Extend Scheduling Order Dates for Motion in Limine regarding Dr. Steven Pitt (Dkt # [296]) is granted as follows: Expert reports shall be exchanged by 12:00 p.m. Central Standard Time on 3/3/2017. Motions in Limine regarding Dr. Steven Pitt, D.O. and/or Dr. George Woods, M.D. shall be filed by close of business on 3/8/2017. Responses shall be filed by noon on 3/10/2017. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

---

**COMES NOW** the United States of America, by and through undersigned counsel and, pursuant to this Court's scheduling order, respectfully submits the following proposed findings of fact and conclusions of law.

The government premises its proposed findings of fact and conclusions of law on the issues as framed by the Tenth Circuit, in its opinion remanding this case for evidentiary development.  The Court of Appeals began with a summary of the issue, noting that Barrett claimed "that his trial attorneys were ineffective by failing to properly investigate his background and mental health in preparation for the penalty phase of his case."  *United States v. Barrett*, 797 F.3d 1207, 1223 (10th Cir. 2015).

Courts review claims of ineffective assistance of counsel under the two prong test set forth in *Strickland v. Washington*, 466 U.S. 668 (1984).   First, a movant must show that counsel's performance ''fell below an objective standard of reasonableness as measured by prevailing professional norms.''  *United States v. Rushin*, 642 F.3d 1299, 1302 (10th Cir. 2011) (internal quotation marks omitted).  Generally, counsel must pursue "leads indicating a

1

899

defendant's troubled background and diminished mental capacity." *Barrett*, 797 F.3d at 1223 (citing *Wiggins v. Smith*, 539 U.S. 510, 523-25 (2003)); *see also Hooks v. Workman*, 689 F.3d 1148, 1201 (10th Cir.2012) (''Counsel has a duty to conduct a thorough investigation—in particular, of mental health evidence—in preparation for the sentencing phase of a capital trial.'' (internal quotation marks omitted)).  However, "[n]o particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions.'' *Cullen v. Pinholster*, 563 U.S. 170 (2011).  Next, a movant must show prejudice, meaning ''there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'' *Rushin*, 642 F.3d at 1302 (internal quotation marks omitted).

In assessing the performance prong, the Tenth Circuit found that, as portrayed by Barrett, the "kind of superficial investigation" conducted by trial counsel into mental health and social history would generally constitute deficient performance.  *Barrett*, 797 F.3d at 1225.  The court of appeals stopped short of finding Barrett had satisfied the first prong of *Strickland* in light of three arguments advanced by the government.  *Id.* at 1225-26.  The issues on remand are defined by the court's frustration with the factual record underlying those arguments.  Thus, within the context of the performance prong, this Court must determine why trial counsel mounted a seemingly perfunctory investigation into the defendant's mental health and social history.  *Id.* at 1226-27.  In particular, the court must determine if counsel omitted the investigation because there were no outward indications that one was warranted (*id.*), if Barrett barred his attorneys from presenting mental health or social history evidence (*id.* at 1227-28), and if counsel made an informed choice to present an alternative mitigation theory – that Barrett was simply a beloved family member (*id.* at 1228-29).  Assuming the court finds that Barrett has shown inadequate

900

performance, it must determine whether the investigation and evidentiary presentation prejudiced the defendant, in view of the allegations made in the § 2255 motion. *Id*. at 1229-32.

The government believes the evidence will establish the following facts:

A.  Defense Investigation of Mental Health Evidence

1.  John Echols and others who represented the defendant in a pair of murder trials prosecuted in state court, arising from the same incident at issue in the federal trial, undertook investigative efforts on behalf of Barrett.  After his appointment as lead counsel, Roger Hilfiger visited Mr. Echols's home and retrieved several boxes.  Mr. Hilfiger believed those boxes contained Mr. Echols's files in the Barrett case.  Mr. Hilfiger also received several boxes of material related to the Barrett case, and believes they came directly from the Oklahoma Indigent Defense System.

2.  Trial counsel's file (as provided to the government in discovery on December 21, 2016) contained an October 3, 2002 report from psychologist Bill Sharp, diagnosing the defendant with, inter alia, multiple substance abuse dependencies, a learning disorder, attention deficit/hyperactivity disorder, avoidant personality disorder, paranoid personality disorder, and organic impairment relative to tremor and long term memory difficulty.

3.  According to Sharp's report, the concern about possible neurological issues stemmed from an observation that Barrett had a hand tremor and difficulty recalling some events in the distant past.

4.  Trial counsel file contained a June 14, 2002 memorandum from psychologist Peter Rausch to defense investigator Steve Leedy concerning a review of Barrett's mental health history.  While finding Barrett's history indicated "polysubstance dependency and

3

mix personality disorder," the memo recommends against the pursuit of a mental health defense: "As far as how can this help his defense? It probably can not. Essentially Mr. Barrett is someone with poor coping skills, which leads him to act immaturely and abuse substances. Others, such as a jury, would probably see him simply as a drug addict."

5. Trial counsel's file contained an October 31, 2003 affidavit from psychologist Faust Bianco, attesting that he had performed neuropsychological testing on Barrett and found no evidence of brain damage.

6. Trial counsel's file contained a July 13, 2003 report from psychologist Kathy LaFortune which reported on personality testing:

> The clinical scales indicated that Mr. Barrett is having many interpersonal difficulties. He is hostile a great deal of the time, and easily angered. He is prone to displaying this anger physically and can be perceived by other as intimidating. Further, he is reckless to the point where he can be dangerous to himself or to others. He is moderately cautions [sic] and guarded around others, and is therefore somewhat closed off to interpersonal relationships. Because of this relational style, he has alienated himself from others. He feels as though he lacks the support and concern of others but perceives that this has little to do with his actions. He is currently unlikely to change any of his behaviors, because he is generally satisfied with himself and does not think he needs adjustment.

The report specifically rejected a diagnosis of post-traumatic stress disorder, and recommended that defense counsel not engage a mental health expert.

7. Trial counsel's file contained a December 15, 2003 risk assessment report from psychologist Jeanne Russell, which reported Barrett was not, then, exhibiting symptoms

4

of a major mental illness.  While finding Barrett was at low risk for future aggression in a prison setting, the report noted a long history of self-reported substance abuse.  It also observed that Mr. Barrett has led a generally irresponsible lifestyle.

8.  Trial counsel's file contained a September 15, 2005 risk assessment report from psychologist Jeanne Russell.  The report contains a much longer recitation of Barrett's drug use than the one written in 2003, and notes daily use of cocaine and methamphetamine in the five years leading up to the instant offense.  The report again notes that Barrett did not display any symptoms of a major mental illness, but did have issues with paranoia and impulsiveness.  The report observed that drug use exacerbated Barrett's impulsiveness.  The report concluded "Mr. Barrett's *risk* for future aggression may increase if he were to return to a community setting, resume regular use of drugs such as Methamphetimine, acquire a firearm and maintain a perception of harassment and negative interactions with law enforcement officers. However, even in this setting, it is important to note, that Mr. Barrett is unlikely to seek out potential victims."

9.  Dr. Russell's reports contained brief social histories of Barrett's families, including but not limited to a recitation of his parents' divorce, their permissive household, the family's frequent moves, and his mother's substance abuse.

10. After Barrett gave notice that he might present mental health evidence through Jeanne Russell, the government retained J. Randall Price, who conducted a battery of tests on the defendant.  Price concluded that Barrett did not have organic brain damage.  He diagnosed Barrett as suffering from "mild depressive tendencies and long-standing difficulty with alcohol and drug abuse, both which are consistent with his history.  Testing also indicates traits consistent with an antisocial and paranoid personality

903

disorder.  Mr. Barrett has low frustration tolerance, poorly controlled anger, shallow and superficial relationships and chronic suspiciousness of others. . . . His constellation of emotional and behavioral traits results in unpredictable and violent outbursts of violence."   Price also diagnosed Barrett as a psychopath.

11. Dr. Russell dissuaded trial counsel from presenting mental health evidence, because she believed it would invite damaging government rebuttal.

12. Trial counsel interviewed several of Barrett's relatives, none of whom reported that the defendant had suffered significant head injuries or had exhibited any symptoms of mental illness that led them to question his competence or to suspect that he had a significant mental health condition.

13. Trial counsel's file contained documents pertaining to Barrett's mental health treatment history.

B.   Defense Investigation of Social History Evidence

14. Trial counsel's file contained a memorandum from defense investigator Steve Leedy summarizing interviews with Gelene Dotson (Barrett's mother), Gwen Holt (Barrett's cousin), Tracy Swearingen (Barrett's friend), Sallisaw Police Chief Gary Philpott, Sequoyah County Sheriff John Philpott, Steve Smith (Barrett's friend), Pawhuska bondsman Fred Green, Ernie Barrett (Barrett's father), Doris Barrett (Barrett's stepmother), Diane Hamilton (Barrett's friend), Ruth Harris (Barrett's aunt), Abby Stites (Barrett's ex-wife), Steve Barrett (Barrett's brother), Debra Thompson (Barrett's friend), Toby Barrett (Barrett's son), and Phyllis Crawford (Barrett's aunt).  Several of the interviews include historical information about Barrett's upbringing, including recollections of family dysfunction and substance abuse.

15. Trial counsel's file contained reports of interviews by Roseann Schaye of Carolyn Joseph (Barrett's aunt), Elnora Long (Barrett's great aunt), Gelene Dotson, Linda Riley (Barrett's aunt), Ruth Harris (Barrett's aunt), Tracy Swearingen, Richard Barrett, and the defendant. Those reports recount, at least in part, Barrett's social history, including information about family dysfunction and substance abuse. According to her interview report, Linda Riley stated that she suffered from bipolar disorder and recognized some of her symptoms in the defendant.

16. Trial counsel's file contained other interview reports concerning Janice Sanders, Phyllis Crawford, Roger Crawford and Tommy Sanders.

17. Janice Sanders reported that Barrett had once threatened to shoot her.

C.   Trial Counsel's Interactions with Barrett

18. Trial counsel had regular contact with Barrett.

19. Based on their contact with Barrett, neither trial attorney suspected that he suffered from a significant mental illness.

20. Barrett repeatedly insisted that he did not want trial counsel to mount a mitigation case based on sympathy for him or evidence of his childhood.

21. Barrett insisted that trial counsel minimize the amount of testimony elicited from relatives, particularly his son, mother, and ex-wife.

22. While Barrett was generally cooperative with counsel he was insistent about the omission of evidence concerning his family and sympathy for him.

23. Trial counsel possessed medical records from the night of the murder. The records indicated that Barrett was under the influence of marijuana and methamphetamine.

24. Trial counsel did not want to premise their mitigation case on Barrett's drug use because they did not believe the jury would find such evidence sympathetic.

D.   The Government's Mental Health Evidence

25. The government has retained a psychiatrist, Steven Pitt, D.O. who will testify that he evaluated Barrett on January 19, 2017, and determined that he does not suffer from any major mental illnesses, including bipolar disorder, though he will acknowledge that Barrett had a dysfunctional upbringing and that several family members reportedly have mental illnesses.  Dr. Pitt will further testify that Barrett suffers from polysubstance abuse disorder and that he appears to be a psychopath.

26. The government has again retained J. Randall Price, who will testify in conformity with this previously filed report (Trl. Doc. 237), that he diagnosed Barrett as a psychopath, along with other findings summarized in the government's filing docketed in this case as no. 321.

The government believes the evidence will support the following conclusions of law:

1.   Barrett's trial counsel possessed ample investigatory material upon which to make a sound tactical choice to omit mental health evidence from the mitigation case.

2.   Barrett's trial counsel made a tactical decision, based on the desire to maintain a rapport with the defendant, to omit family history evidence that was personally odious to the defendant.

3.   Barrett's trial counsel possessed ample investigatory material upon which to make an informed decision to portray Barrett as a beloved family member, rather than the victim of familial dysfunction.

906

4.  Trial counsel's strategy did not prejudice the outcome of trial because the defense lacked, and still lacks, credible evidence that Barrett suffers from a significant mental illness, and a decision to present evidence of family dysfunction would have neutralized the chosen mitigation strategy, portraying Barrett as a beloved family member.

Dated: February 16, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

9

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on February 16, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

    Mr. David B. Autry dbautry44@hotmail.com
    Ms. Joan M. Fisher Joan_Fisher@fd.org
    Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit

10

908

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
Federal Defender's Office of Eastern District of California
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
Joan_Fisher@fd.org

Attorneys for Petitioner
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S PROPOSED |
| | ) | FINDINGS OF FACT AND |
| UNITED STATES OF AMERICA, | ) | CONCLUSIONS OF LAW |
| | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Kenneth Eugene Barrett, Petitioner, pursuant to the Scheduling Order (Doc 270) files this

his Proposed Findings of Fact and Conclusions of Law.

<center>1</center>

Case 6:09-cv-00105-RAW   Document 339   Filed 02/16/17   Page 2 of 98

## I.   PROPOSED FINDINGS OF FACT

### A.   DEFICIENT PERFORMANCE

#### 1.   *Prevailing Professional Norms*

*Strickland* and its progeny require this Court's assessment of trial counsel's performance be guided by objective standards such as those codified in the American Bar Association's *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases* (rev. ed. Feb. 2003), 31 Hofstra L. Rev. 913 (2003) ("ABA Guidelines"). *Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003).

1.      In 2005, one of the prevailing professional norms of capital defense practice that was both codified in the ABA Guidelines and practiced locally, was for the defense to work as a multi-disciplinary team including attorneys, investigators, a mitigation specialist and experts in fields indicated by the evidence, including the client's medical and mental health history. Guideline 4.1, 31 Hofstra L. Rev. at 956, 1003.

2.      A prevailing professional norm of capital defense work that was well-established at the time of this case was for defense counsel to "seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA Guideline 10.10.1, 31 Hofstra L. Rev. at 1059 (commentary on Guideline 10.11).

3.      Investigation is a core function of defense counsel, and the prevailing professional norms expressly call for "prompt investigation."   American Bar Association, Standards for Criminal Justice ("ABA Standards"), Defense Function, Standard 4-4.1.

4.      Under the prevailing professional norms, Mr. Barrett's trial attorneys "had an

2

910

obligation to investigate carefully before setting out on a course of action." Counsel's duty to investigate included a duty to conduct a thorough investigation of the client's background.

5.      The prevailing professional norm at the time of this federal death penalty trial was for defense counsel, or more often a mitigation specialist acting on their behalf, to speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . . would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death." ABA Guideline 10.11(F)(1), 31 Hofstra L. Rev. at 1055-56.

6.      The prevailing professional norms of capital defense practice at the time of this case recognized a need for defense counsel to develop and maintain a relationship of trust and confidence with the client due to the extraordinary stress and psychological strain the case can impose. ABA Guideline 10.5, 31 Hofstra L. Rev. at 1005-1011.

7.      Mr. Echols supported his funding requests with declarations of independent expert counsel regarding the prevailing professional norms of capital defense practice in federal death penalty cases, including courts' decisions validating these norms through the allocation of funds to similarly situated defendants.  (Exhibit 118.)

8.      The recommendations Richard Burr made in the declarations he provided in support of Mr. Echols's motions for defense funding reflect the prevailing professional norms of capital defense practice in federal cases tried before and at the time of Mr. Barrett's trial.

3

### 2. *Selection and Funding of Trial Counsel*

#### a. Appointment of Counsel

*Strickland* requires that the Court make every effort to reconstruct the circumstances of counsel's challenged conduct and to view that conduct from counsel's perspective at the time. *Strickland*, 466 U.S. at 689.

9. In this case, the circumstances of counsel's challenged conduct include the extent of penalty-phase preparation done by state trial counsel, John D. Echols, and those supporting him in the Oklahoma Indigent Defense System.

10. In this case, another circumstance of counsel's challenged conduct was the availability of funds for the defense including investigative and expert resources. The record shows Mr. Echols advised the court that the court's delay in authorizing funds for the defense to retain a mitigation specialist, and the amount of funding were inadequate to complete the necessary work prior to the start of trial.

11. The record and witness statements point to a connection between the defense funding issue, the selection of defense counsel, and who ultimately represented Mr. Barrett at trial. For example, during discussions about Mr. Barrett's representation, Judge Payne indicated he preferred to have the Federal Defender appointed so the court would not have to authorize funds for Mr. Barrett's representation. (Exhibit 54; Exhibit 67.) Judge Payne resisted Echols's funding requests and ultimately granted them only to a limited extent. Echols withdrew from the case for the stated reason that he believed those cuts made it impossible to provide Mr. Barrett effective representation.

<center>4</center>

12. The Judicial Conference's Guidelines for the Application of the Criminal Justice Act ("CJA Guidelines") state that district judges should consider the recommendations of the Federal Defender when appointing counsel, and should appoint counsel who are well qualified, by virtue of their prior defense experience, training and commitment, to serve as counsel in this highly specialized and demanding litigation.

13. Two Federal Defenders and an assistant federal defender recommended that the court appoint John D. Echols and Robert Nigh of Tulsa, based on their past capital defense experience and, in Mr. Echols's case, his demonstrated commitment to Mr. Barrett's defense. (Exhibit 54; Exhibit 67; Exhibit 34.)

14. Judge Payne rejected the defender's recommendation in part because he wanted to give local counsel more experience so that more local lawyers would be qualified to handle capital cases. (Exhibit 54; Exhibit 67; Exhibit 34.)

15. According to the Government, time limitations prevented defense counsel from developing the mitigation evidence presented by post-conviction counsel. The record shows Judge Payne expressed an interest in having the case proceed to trial quickly (Exhibit 34), and he instructed defense counsel to give the case the highest priority. (Doc. 31 in No. 05-cr- 115.)

16. Both the ABA Guidelines and the Judicial Conference's CJA Guidelines urge that defense functions be funded promptly so that the defendant's representation is not harmed by delay.

17. Mr. Echols expressly relied upon the ABA Guidelines relevant to penalty-phase preparation in seeking funds from the court.

5

18.     As relevant here, defense counsel filed an initial budget request on January 31, 2005 (Doc. 46), and an amended budget requests on February 7, 2005. (Docs. 50, 51.) On February 22, 2005, the court sent Mr. Echols a letter seeking further clarification. On February 28, 2005, Mr. Echols replied and advised the court that delay in providing funding was endangering counsel's ability to be effective. (Ex. 65.)

19.     On March 18, 2005, the trial court ruled on defense counsel's budget requests, including providing funds for investigative and expert services. At that point, the scheduling order called for discovery to close on May 11, 2005, and for trial to begin on July 11, 2005.

20.     Attorney Bret Smith was appointed as second chair when Mr. Echols was relieved and Mr. Hilfiger was made lead counsel.

21.     Mr. Smith began working on the case on May 18, 2005.

22.     The trial court did not consult the Federal Defender before appointing Mr. Smith

23.     Mr. Smith had no experience with a capital case before his appointment to represent Mr. Barrett.

24.     Despite Mr. Smith's complete lack of experience with capital defense work, Mr. Hilfiger gave him primary responsibility for preparing for the penalty phase of trial.

### b.  Julia O'Connell

25.     Julia O'Connell is an attorney licensed to practice law in the State of Oklahoma. She is an experienced criminal defense lawyer and currently serves as Federal Defender for the Northern and Eastern Districts of Oklahoma.

26.     As part of her duties as Federal Defender, Ms. O'Connell administers the

6

Criminal Justice Act panel for the Northern and Eastern Districts of Oklahoma.

27.     At the time the government indicted Mr. Barrett, Ms. O'Connell was an Assistant Federal Defender and the only attorney in her office with experience defending a capital case. At that time, she was assigned to represent the defendant in United States v. Edward Leon Fields, No. CR-03-73-RAW.

28.     Ms. O'Connell and then-Federal Defender Paul Brunton met with Judge Payne to discuss Mr. Barrett's representation. Judge Payne expressed a desire that the Federal Defender represent Mr. Barrett but, due to the office's resources already being over-stretched by the Fields case, the defenders prevailed upon Judge Payne to appoint CJA counsel.

29.     Ms. O'Connell had been concerned that Mr. Hilfiger lacked the experience necessary to understand the role of mitigation in a capital trial. That concern led her, on June 21, 2005, to send Mr. Hilfiger an order dealing with individual capital voir dire that had recently been filed in United States v. Donald Fell, No. 2:01-CR-12-01 (D. Vt.).

30.     On June 30, 2005, Mr. Hilfiger telephoned Ms. O'Connell. He left a voicemail message asking if the mitigation specialist who was working with the Federal Defender Office on the Fields case would be in Muskogee in the future and whether she would be willing to meet with him to discuss mitigation.

31.     Mr. Hilfiger's message left Ms. O'Connell with the impression that Mr. Hilfiger did not know what was expected of defense counsel during the penalty phase of a capital trial. The impression was sufficiently strong that she was alarmed by the message.

32.     Mr. Hilfiger's message suggested to Ms. O'Connell that Mr. Hilfiger thought a

7

mitigation investigation could be accomplished based on a short conversation with a mitigation specialist roughly ten weeks before trial.

33.    The timing of Mr. Hilfiger's call contributed to Ms. O'Connell's sense of alarm. At that time, Mr. Barrett's trial was scheduled to start in a few weeks. In Ms. O'Connell's experience a minimum of six months is necessary to investigate a capital defendant's background for purposes of developing a mitigation case. Ms. O'Connell believed it was too late by that time to conduct an adequate investigation of Mr. Barrett's background.

34.    On July 3, 2005, Ms. O'Connell responded to Mr. Hilfiger's message by emailing him. She sent him contact information for attorney Richard Burr of the Federal Death Penalty Resource Counsel Project. Ms. O'Connell knew Mr. Burr to be an extremely competent lawyer in the area of death penalty cases who was willing to help any lawyer who sought his assistance.

35.    Ms. O'Connell and those with whom she practiced recognized that the ABA Guidelines codified the prevailing professional norms of their practice in the Eastern District of Oklahoma.

### 3.    Richard Burr

36.    Attorney Richard Burr was retained by the Defender Services Office of the Administrative Office of the United States Courts to serve on the Federal Death Penalty Resource Counsel Project as an adviser and consultant to court-appointed and federal defender attorneys engaged in the defense of capital cases in the federal courts. *United States v. Barrett* was one of the cases that came within the purview of Mr. Burr's responsibilities to the Project.

37.    The Federal Death Penalty Resource Counsel Project ("Project") is a program of

8

the Defender Services Office designed to assist the federal courts, federal defenders, and appointed counsel in connection with matters relating to the defense function in federal capital cases at the trial level. In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States, the work of the Project was found to be "essential to the delivery of high quality, cost-effective representation in death penalty cases . . . ." Federal Death Penalty Cases: Recommendations Concerning the Cost and Quality of Defense Representation at 50 (May, 1998).

38.     Through the provision of consultative and other services the Project seeks to ensure that defense counsel in federal death penalty cases provide representation consistent with prevailing professional norms such as those set out in the ABA Guidelines.

39.     Members of the Project meet with personnel from Defender Services and with members of the Judiciary to discuss the needs of defense counsel and the concerns judges have when administering the Criminal Justice Act in capital cases.

40.     The Project collects data on federal death penalty cases including, as relevant here, the extent to which defense teams retain the services of investigators, mitigation specialists, and mental health experts. The relevant data the Project collects also include the rate at which investigators, mitigation specialists, and mental health experts are paid as part of their work for the defense in federal death penalty cases.

41.     At the time he worked on this case, Mr. Burr had been representing people facing the death penalty for more than 25 years and had represented more than 100 clients in those circumstances.

9

42.     Mr. Burr's experience with federal death penalty cases included serving as lead penalty phase counsel in *United States v. Timothy McVeigh*, No. 96-CR-68 (D. Colo.). Mr. Burr's familiarity with the scope and role of mitigation in capital cases also is reflected in his work on *Tennard v. Dretke*, 542 U.S. 274 (2004), and *Hitchcock v. Dugger*, 481 U.S. 393 (1987). Mr. Burr also had participated in meetings with Defender Services and representatives of the Judicial Conference committees whose work includes Defender Services and death penalty cases in particular.

43.     One of the Project's responsibilities is assisting Federal Defenders in their statutory duty under 18 U.S.C. § 3005 to recommend to the district courts appointment of counsel in federal capital prosecutions.  In this case, the Project, through Federal Defender Julia O'Connell, recommended that the court appoint Robert Nigh of Tulsa to be Mr. Echols's co-counsel.

44.     After the court decided to appoint Roger Hilfiger, Mr. Burr was concerned about the appointment because he did not meet the criteria to be learned counsel under the CJA Guidelines. Mr. Burr believed that Mr. Barrett's case required more capital-case experience than Mr. Hilfiger had.

45.     Mr. Echols consulted Mr. Burr about various issues including what investigative and expert resources the defense would need to prepare for a penalty trial. Mr. Echols shared with his co-counsel, Mr. Hilfiger, the information he received from Mr. Burr.

46.     Mr. Burr's first direct contact with the *Barrett* case came on October 1, 2004, when Mr. Echols called him to discuss the case. They discussed the process through which the

10

Department of Justice would decide whether to seek the death penalty and the case budgeting process. During that conversation, Mr. Echols recounted at length his previous representation of Mr. Barrett in the state case. Mr. Echols stressed that his mitigation investigation in the state case was not at all adequate. Mr. Echols was emphatic about the need to secure enough mitigation investigative and expert resources to develop mitigation fully.

47. After the first telephone call with Mr. Echols, Mr. Burr arranged for the Project to send a letter of introduction and a CD of materials to each of Mr. Barrett's counsel, Mr. Echols and Mr. Hilfiger. The letter introduced Mr. Burr and explained the kind of assistance the Project offered.

48. Over the course of November and December 2004, and January 2005, Mr. Burr communicated by email or telephone with Mr. Echols several times. The contacts were always initiated by Mr. Echols who focused the conversation on experts or investigators that he needed, motions that he was filing, and his ongoing relationship with co-counsel. Mr. Echols informed Mr. Burr that his relationship with Mr. Hilfiger was not developing very well in that he perceived Mr. Hilfiger to be unable or unwilling to take on his share of the work on the case.

49. In February, March, and April 2005, Mr. Burr had numerous contacts with Mr. Echols.

50. In early 2005 Mr. Echols set up a secure website for the case documents. Mr. Echols provided Mr. Hilfiger and Mr. Burr access to the website and its contents. and provided access for me to the website. Mr. Echols solicited Mr. Burr's views about all the work he was doing. Mr. Echols often needed more time than Mr. Burr was able to offer. Mr. Burr consulted

11

most heavily on difficulties Mr. Echols was having with the court in getting his budget requests funded adequately.

51.    In April 2005, Mr. Burr provided four declarations for Mr. Echols in support of his budget submissions to the court. These declarations concerned various aspects of attorney services, expert and investigative services, and the use of jury experts in federal capital cases.

52.    Each of those declarations was provided to Mr. Hilfiger.

53.    The declarations Mr. Burr provided to Mr. Echols in April 2005 responded to a case budgeting order the Court entered on March 18, 2005, and the report and recommendation of the Magistrate Judge that Mr. Echols should not be compensated for time spent seeking authorization for funds. Mr. Burr informed the court that Mr. Barrett's case was the only federal death penalty case in which the Project was aware of a defense attorney being denied compensation for seeking funds, and that this recommendation was contrary to the governing state and judiciary policies, in that the order infringed upon counsel's ability to exercise independent professional judgment. Mr. Burr informed the court that its cuts to Mr. Barrett's budget were unique in the experience of the project and that the court's estimate of the time reasonably necessary for Mr. Barrett's representation was far below projections made by the Spencer Committee.

54.    As to the preparation for a penalty phase, Mr. Burr advised the Court that the non-attorney funds Mr. Barrett had been granted were far below those courts granted other similarly situated defendants. Mr. Burr also informed the court that the Defender Services Committee had recently reaffirmed the principle that generalized concerns about the judiciary's budget should

12

not be met by cutting back on reasonable and necessary requests for defense funding.

55.     Mr. Burr informed the court that the number of hours requested by Mr. Barrett's attorneys for a mitigation specialist was well below average. The average number of hours worked by mitigation specialists in federal capital cases was 600 hours.  In a number of cases, mitigation specialist services have exceeded 1000 hours.  Investigating a client's life history thoroughly - through gathering and reviewing documents and interviewing scores of witnesses who are often difficult to find - and working with counsel and other experts to develop the themes of mitigation and the way in which mitigation will be presented, is extremely labor intensive.  The modest number of hours requested by the defense in Mr. Barrett's case reflects the hope that the mitigation investigation previously conducted, but not completed in the state prosecution, will be of use in the current investigation. (Decl. Richard H. Burr re Non-Attorney Costs, dated April 4, 2005, paragraph 7. a, page 4.)

56.     Mr. Burr's declaration also informed the court, and Mr. Hilfiger, that he was unaware of any federal capital case in which he court had refused to authorize the defense to hire a mitigation specialist.

57.     During the same period of time--the first third of 2005--Mr. Echols told Mr. Burr that he was increasingly frustrated with Mr. Hilfiger's lack of involvement in the ongoing work on Mr. Barrett's case. Mr. Echols told Mr. Burr that due to the lack of work by Mr. Hilfiger he was quite worried that he would not be able to prepare Mr. Barrett's case effectively by the then-scheduled trial date.

58.     Mr. Echols told Mr. Burr he decided to withdraw from the case because he

13

believed he could not provide Mr. Barrett effective representation due to the lack of funds available and the lack of work from Mr. Hilfiger. Mr. Echols expressed his belief that there was a great deal of work to be done on the case and he did not believe it could be accomplished under the circumstances.

59.     After Mr. Echols's withdrawal from the case, no one working on Mr. Barrett's defense contacted Mr. Burr.

60.     In late June 2005, after Mr. Hilfiger asked Julia O'Connell if he could meet with her mitigation specialist, Ms. O'Connell suggested Mr. Hilfiger contact Mr. Burr for assistance. Ms. O'Connell believed Mr. Burr was qualified and available to assist Mr. Hilfiger in preparing a mitigation case.

61.     In August 2005, Mr. Burr queried an internet list serve for federal death penalty attorneys about their experience of turnaround time for CJA 30 and CJA 31 vouchers. Mr. Hilfiger responded to the query by providing his experience. Mr. Burr replied with an inquiry about Mr. Barrett's case and an offer of assistance.

62.     Mr. Burr's experience at the time was that he was more effective in assisting those attorneys who wanted to consult with him than he was with attorneys who did not respond to his offers of assistance. On the basis of that experience, and his own caseload, Mr. Burr did not make further efforts to contact Mr. Barrett's defense counsel.

63.     None of Mr. Echols's communications with Mr. Burr indicated that Mr. Barrett disapproved of any form of mitigation investigation. In his communications with Mr. Burr, which occurred after Mr. Echols had represented Mr. Barrett through two state trials and during

14

the early months of the federal case, Mr. Echols was emphatic about the need to secure enough mitigation investigative and expert resources to develop mitigation fully. Mr. Echols's communications indicated he intended to investigate Mr. Barrett's background and mental health issues.

64.     Responding to a client who expresses concerns about mitigation and his family's role in presenting it is so rudimentary as to be considered "death penalty defense 101." If Mr. Barrett had expressed such concerns to his counsel, the prevailing norms of practice in 2005 would have provided his counsel several strategic and client-focused responses. These included the following:

    a.  Continue investigating and wait to see if the client, like many others, simply gets over it;

    b.  Consult more experienced capital defense counsel about how they responded to similar issues;

    c.  Advise the client that it is best to wait until all the facts are in and all the options for presenting the evidence have been explored because, *inter alia*, it may be unnecessary for specific family members to testify;

    d.  Investigate those sources of information that are readily available such as court and law enforcement records, medical, educational, employment, and mental health records, and explain to the client that those sources are available;

    e.  Explore the extent to which information can be presented to the

15

jury through a qualified mitigation specialist or mental health expert;

> f.   Inform the client once other sources of testimony have been identified;

> g.   Speak with family members about the problem.

65.   Capital defense counsel in 2005 were aware that the Supreme Court in *Rompilla v. Beard*, 545 U.S. 374 (2005), had found trial counsel ineffective for failing to uncover and present mitigation evidence despite having had a client who at times had been "uninterested in helping" and "even actively obstructive."

66.   Capital defense attorneys in 2005 recognized that under ABA Criminal Justice Standard 4-5.2 defense counsel has the authority to decide what evidence should be presented.

67.   The commentary on ABA Guideline 10.5 is accurate when it states, "Often, so-called 'difficult' clients are the consequence of bad lawyering – either in the past or present. Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation."

68.   Assuming for the sake of a hypothetical that Mr. Barrett expressed concerns about mitigation evidence, Mr. Hilfiger and Mr. Smith's statements that Mr. Barrett was very involved with his defense and cooperated indicate that trial counsel could have been successful and presented available mitigation evidence if they had employed any of the well-known strategies for responding to such concerns.

69.   The statements attributed to Mr. Barrett are more indicative of a problem with counsel than a defendant who is opposed to mitigation evidence.  Defense counsel who are

16

familiar with mitigation explain to their clients early on that mitigation does not involve begging for the defendant's life or relying on sympathy. Begging for mercy is not allowed in federal death penalty cases and a "generic" plea for mercy has been found by the Supreme Court to be evidence of ineffective assistance of counsel.

70.     The statements attributed to Mr. Barrett are consistent with those of an ill-informed or misinformed defendant.

71.     Defendants to whom mitigation has been explained do not object on grounds of "begging" or "sympathy" because they understand, if they have the capacity to understand, that mitigation is mostly telling their story. The statements attributed to Mr. Barrett about dwelling on his childhood and not relying on members of his family reflect a similar lack of insight into capital defense norms of practice particularly in that Mr. Hilfiger and Mr. Smith do not indicate that they made any effort to correct the misunderstanding.  Dwelling on a defendant's childhood could be seen as a plea for sympathy. That kind of one dimensional penalty phase case is not the norm in federal death penalty cases. Presenting the defendant's childhood experiences as a reason for his later use of drugs, or a contributing factor in a mental disorder, enables jurors to understand his criminal behavior as more than the isolated decision of the defendant not to comply with social norms. That kind of multi-dimensional understanding of mitigation is fundamental to death penalty defense practice.

72.     Mitigation evidence involves humanizing the defendant, making his life experiences familiar to jurors, and helping jurors to see that the life they are being asked to end amounts to more than the crime of conviction. Mitigation also involves offering the jury an

17

explanation for the defendant's actions. Nearly every initially-reluctant capital defendant allows this evidence to be presented.

73.     It is not necessary for the jury to see either the defendant's background or an explanation of his actions as grounds for sympathy. Experienced capital defense counsel know it is not even desirable to present mitigation as a basis for sympathy because such a strategy is likely to be ineffective or backfire by causing jurors to weigh sympathy for the victim against sympathy for the man who took his life. Both the experience of capital trial attorneys and scientific studies of how capital jurors decide whether to vote for life or death show that mitigation succeeds when jurors are able to identify with the defendant because of something in his background, or to understand his actions as something other than the product of a will to do harm.

74.     The norm in federal death penalty cases tried in 2005 was to follow the 2003 ABA Guidelines and employ a mitigation specialist to gather information about a defendant's family history over several generations, review that information with experts qualified to identify facts relevant to mitigation, and integrate the themes developed through that process into a consistent strategy for both phases of trial. The process of developing a trial strategy includes taking into account the client's concerns. However, as noted, advising a defendant without conducting an investigation is unprofessional conduct.

75.     Recognizing that appeals to sympathy, relying solely upon family witnesses, and dwelling on a bad childhood are ineffectual strategies, the ABA Guidelines codified the norm in capital defense practice of involving experts in the process of gathering background information,

18

interpreting it, and presenting it to jurors. Mitigation specialists are trained and experienced at avoiding problems like those implied in the statements attributed to Mr. Barrett. In 1998, the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, published recommendations including the use of a mitigation specialist. The Subcommittee recognized that mitigation specialists have the training and knowledge necessary to perform "work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." (Judicial Conference Recommendations.)

76.     Mitigation specialists can explain the different purposes of mitigation evidence, and, as the Subcommittee found, they are relied upon in some cases to testify about family history, educational records, work and military records.

77.     "Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase. Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant." (Judicial Conference Recommendations.)

78.     Misunderstandings, or a lack of understanding, like what Mr. Hilfiger and Mr. Smith have stated Mr. Barrett expressed, were seen often enough in cases that the ABA provided guidance for counsel faced with clients who truly oppose the presentation of mitigation evidence. If Mr. Barrett's trial counsel had felt the concerns they related in their declarations, they could have turned to the advice found in the commentary to ABA Guideline 10.5:

> Some clients will initially insist that they want to be executed as
> punishment or because they believe they would rather die than spend the

19

rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect overwhelming feelings of guilt or despair rather than a rational decision. Counsel should initially try to identify the source of the client's hopelessness. Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates. Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time. One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison.

79.     The ABA Standards, Guidelines and the advice in the commentary suggest a much more serious problem than what trial counsel imply in the statements they attribute to Mr. Barrett. Even so, it does not appear that Mr. Hilfiger or Mr. Smith took any of the recommended steps that are commonly used by capital defense counsel in similar situations.

80.     Mental health professionals, like those Mr. Burr recommended to Mr. Barrett's trial counsel, can advise counsel about what is significant in records or the accounts of family members, and rely upon hearsay when testifying to their opinions. Experienced capital defense counsel understand, and are able to explain to their clients, that dwelling on the past is not the point, and the accounts of family members can be presented through experts who, in any case, are able to place a traumatic or disadvantaged background in an objective context.

81.     Reliable information about a defendant's family, medical, and social history is one aspect of the forensic mental health evaluation typically carried out in a capital case. *See* Liebert and Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J .FORENSIC PSYCHIATRY 43 (1994). Mr. Hilfiger's declaration indicates that he had

access to information about Mr. Barrett from family members and records gathered during Mr. Echols' representation, but he does not indicate that he provided those records to any experts, or explained to Mr. Barrett that expert testimony was available.

### 4.    Kenneth Barrett

82.    Defense counsel described Mr. Barrett as fully cooperative.

83.    Mr. Barrett fully cooperated in the preliminary work done before the state trials to comprehensively document his family and social history.

84.    Mr. Barrett fully cooperated in the evaluation conducted by psychologist Bill Sharp and the risk assessment performed by Jeanne Russell.

85.    Mr. Barrett did not instruct his trial attorneys not to present any specific witness's testimony. He did not prevent them from asking any specific questions. He did not prevent them from calling any category of witnesses.

86.    Trial counsel were unaware of the mitigation case laid out in the § 2255 motion. Therefore, defense counsel could not have given Mr. Barrett advanced notice that they would present the information contained there. Therefore, Mr. Barrett could not have objected to it. Therefore, trial counsel were never called upon to counsel Mr. Barrett on the reasons he should allow the testimony.

### 5.    Mitigation Investigation: Ron Lax, Jeanne Russell, Trial Counsel

#### a.   Mitigation Specialist

87.    Mr. Echols advised the Court that he had contacted Ron Lax of Inquisitor, Inc.

21

about serving as a mitigation specialist in this case and that Mr. Lax had agreed to do the work.

88.     Mr. Lax's firm was referred to Mr. Echols by an assistant federal defender.

89.     On March 18, 2005, this Court found that Mr. Lax's services were reasonably necessary to the defense and authorized trial counsel to have him work 100 hours.

90.     Mr. Lax had a brief conversation or conversations with Mr. Echols prior to the latter's withdrawal from the case.

91.     No one from Mr. Barrett's defense team ever contacted Mr. Lax or anyone from his company about performing the services the Court had authorized.

92.     In late June 2005, Mr. Hilfiger telephoned then-Assistant Federal Defender Julia O'Connell and requested an opportunity to speak with her mitigation specialist. Ms. O'Connell believed that at that time it was already too late to conduct a thorough investigation of Mr. Barrett's background for purposes of developing a mitigation case.

### b.   Jack Gordon

93.     Jack Gordon is an attorney licensed to practice law in the state Oklahoma.

94.     Mr. Gordon was the second chair in the second state court trial of Kenneth Barrett for the murder of Trooper Eales.

95.     Mr. Gordon was primarily responsible for preparing for the penalty trial in state court, if one occurred.

96.     Mr. Gordon worked with Dr. Jeanne Russell. It was he who obtained the risk assessment Dr. Russell did in 2003. Mr. Gordon had provided Dr. Russell investigative reports, including those prepared by Roseann Schaye.

22

97.     Neither Mr. Hilfiger nor Mr. Smith every contacted Mr. Gordon about the work he did in relation to Mr. Barrett's second state-court trial. Neither Mr. Hilfiger nor Mr. Smith, nor anyone acting on their behalf contacted Mr. Gordon for his files on the case.

### c. *Steve Leedy*

98.     Steve Leedy is a former law enforcement officer who for many years has been employed as an investigator with Capital Division of Oklahoma Indigent Defense System. He works out of OIDS's Sapulpa office.  As part of his duties, Mr. Leedy was assigned to work with Mr. Echols on Mr. Barrett's defense.

99.     Mr. Leedy was part of the defense team during both state trials. Mr. Leedy was assisted on Mr. Barrett's case by investigator Jack Stringer.

100.    As part of his work on the defense, Mr. Leedy retrieved the files of Roseann Schaye, an investigator who was not an OIDS employee, but who did work on Mr. Barrett's defense under contract with OIDS prior to the first state trial. The files Mr. Leedy retrieved from Ms. Schaye included school records, medical records, psychiatric records, employment records, birth, marriage and divorce records related to Mr. Barrett's social history.

101.    Mr. Leedy does not consider himself a mitigation expert. His and Mr. Stringer's responsibilities in the state case primarily involved the investigation of guilt/innocence issues.

102.    In addition to his guilt/innocence investigation, Mr. Leedy reviewed the documents collected by Roseann Schaye and her reports, and he interviewed some potential mitigation witnesses.

103.    Mr. Leedy assembled the complete investigative file from Mr. Barrett's state case,

23

including the materials compiled by himself, Mr. Stringer and Ms. Schaye.

104.    Mr. Hilfiger never contacted Mr. Leedy about his work on Mr. Barrett's case. No one from Mr. Barrett's federal trial defense team retrieved the full investigative file from OIDS. It remained in Mr. Leedy's custody until it was retrieved by federal post-conviction counsel in 2008.

### d.   Jeanne Russell

105.    In mid-August 2005, Mr. Smith asked Jeanne Russell to serve as a mitigation specialist for Mr. Barrett's defense. Dr. Russell advised Mr. Smith that she was not qualified to fill that role and that, in any case, it was too late to complete a mitigation investigation. Mr. Smith replied that the court would not pay for such an investigation, anyway.

106.    Dr. Russell was not asked to conduct a mental health evaluation for the purpose of identifying mitigation evidence such as the existence of a serious mental illness or organic brain dysfunction.  (Exhibit 56.)

107.    Dr. Russell's work towards the penalty phase of the federal case consisted of the following:

  a.  On August 29, 2005, Dr. Russell spent two hours consulting with attorneys and a previous investigator from the state case.

  b.  On September 7, 2005, Dr. Russell spent 3.5 hours reviewing records and gathering additional information on the federal case.

  c.  On September 14, 2005, the day jury-selection began, Dr. Russell spent 5.3 hours updating the 2003 risk assessment and writing a report.

24

    d. On September 16, 2005, spent 3 hours finishing her draft report and discussing it with Mr. Barrett's attorney.

    e. On September 18, 2005, Dr. Russell spent 2 hours revising the draft risk assessment and consulting with Mr. Barrett's counsel.

    f. On October 7, 2005, Dr. Russell copied her testing materials and delivered them to the U.S. Attorney's Office in Tulsa.

    g. On October 11, 2005, Dr. Russell spent a total of 7 hours traveling to and from Muskogee, interviewing Mr. Barrett, and meeting with his attorney.

### *6. Trial Counsel's Mitigation Investigation*

### *a. Roger Hilfiger*

108. Roger Hilfiger had tried only one federal capital case prior to his work on Mr. Barrett's case.

109. The district court appointed Mr. Hilfiger against the recommendation of the Federal Defender for the Northern District of Oklahoma.

110. John Echols and Mr. Hilfiger did not work well together.

111. Mr. Echols informed the district court and Mr. Hilfiger before trial that the defense had not done a complete mitigation investigation during the state court cases at least in part because neither state trial went to a penalty phase.

112. Prior to his work on this case, Mr. Hilfiger had only defended one federal client in a case where the prosecution sought the death penalty. Mr. Hilfiger was not the lead attorney in that case, but he did work for the penalty phase.

113.    Mr. Hilfiger believed that Judge Payne put limitations on mitigation testimony so that it would only be about Mr. Barrett's future dangerousness as a prisoner. Mr. Hilfiger's pursuit of mitigation evidence was influenced by this perceived limitation.

114.    When Mr. Hilfiger referred to Dr. Jeanne Russell as a "mitigation expert" it was in the context of his belief that Judge Payne had limited the scope of mitigation to testimony that would be about Mr. Barrett's future dangerousness as a prisoner. Thus in his February 17, 2006, letter to the court regarding the CJA 31 voucher for Dr. Russell he referred to the "mitigation experts" consulted by "[b]oth sides" in the case.

115.    Mr. Hilfiger's view that Dr. Russell had not conducted a mental health evaluation is reflected in his contemporaneous statement to the court that the defense was not required to provide notice of Dr. Russell under Fed. R. Crim. P. 12.2 because she would not be testifying about Mr. Barrett's mental condition. Tr. Sept. 9, 2005, Hr'g at 41.

116.    Mr. Hilfiger's investigation for the penalty phase was limited to reviewing those materials from the state court case that he had and a few brief interviews with family members.

117.    Mr. Hilfiger cooperated with the government in its Response to Mr. Barrett's § 2255 Motion by providing the government a declaration that responded to Mr. Barrett's allegations of ineffective assistance of counsel. The government manifested that it adopted Mr. Hilfiger's statements when relied upon his declaration in its Response.

118.    Mr. Hilfiger's declaration specifically responded to Mr. Barrett's allegation that his trial counsel unreasonably failed to pursue mental health evidence. Mr. Hilfiger described his interactions with Dr. Jeanne Russell and declared that he had not been aware of the evaluation

26

performed by Dr. Bill Sharp prior to the second state trial.

119.    Mr. Hilfiger did not attribute his failure to have a mental health expert examine Mr. Barrett for purposes of mitigation to his reliance upon any previous examinations or opinions such as those performed by Dr. Faust Bianco and Dr. Kathy LaFortune.

120.    In light of Mr. Hilfiger's response to Mr. Barrett's allegations, if Mr. Hilfiger had relied upon Dr. Bianco or Dr. LaFortune, he would have said so in his declaration. Accordingly, the court finds that Mr. Hilfiger's failure to have a mental health expert examine Mr. Barrett for purposes of mitigation was not based on his consideration of any prior evaluation.

121.    Mr. Hilfiger stated in his declaration that Mr. Barrett wanted to minimize the amount of testimony elicited from his immediate family and ex-wife. Those are the very witnesses the defense called in the penalty phase.

122.    Other family member were available to testify but were not called.

123.    Mr. Hilfiger stated in his declaration that although he interviewed members of Mr. Barrett's family he was not aware of any information indicating Mr. Barrett had mental health problems. Therefore, Mr. Hilfiger could not have counseled Mr. Barrett on whether family members should be called to testify about mental health issues.

124.    Mr. Hilfiger stated in his declaration that nothing in Dr. Russell's 2003 report suggested that Mr Barrett "suffered from a significant mental health condition unrelated to his use of drugs."

125.    Mr. Hilfiger first saw Dr. Russell's 2003 report sometime in late August or early September 2005, at the earliest.

27

126.    Dr. Russell's report states that Mr. Barrett was struck in the head with an iron ball.

127.    Mr. Hilfiger did not consult any mental health experts regarding Mr. Barrett's use of drugs. Therefore, Mr. Hilfiger had no informed opinion about how Mr. Barrett's drug use was or was not related to his mental health condition. Mr. Hilfiger knew the jury would hear about Mr. Barrett's drug use. Mr. Hilfiger conducted no investigation or inquiry to determine whether Mr. Barrett's drug use was mitigated by his social history or an underlying mental health condition.

### b. Bret Smith

128.    In mid- to late August 2005, Mr. Smith first contacted Jeanne Russell about her work on Mr. Barrett's case. At that time, jury selection was only a few weeks away.

129.    As of September 9, 2005, when jury selection was a few days away, Mr. Smith did not possess all the files related to the mitigation investigation that was conducted in preparation for the state court trials.

130.    Mr. Smith never obtained all the files associated with the state court mitigation investigation.

131.    Mr. Smith did not attempt to get help or guidance from the Federal Death Penalty Resource Counsel Project.

132.    Mr. Smith was the primary contact with Dr. Jeanne Russell. He contacted her in mid-August 2005.

133.    Mr. Smith cooperated with the government in its Response to Mr. Barrett's §

28

2255 Motion by providing the government a declaration that responded to Mr. Barrett's allegations of ineffective assistance of counsel. The government manifested its adoption of Mr. Smith's statements and its belief in their truth when it relied upon Mr. Smith's declaration in its Response.

134.    Mr. Smith's declaration specifically responded to Mr. Barrett's allegation that his trial counsel unreasonably failed to pursue mental health evidence. Mr. Smith described his interactions with Dr. Jeanne Russell and declared that he had not been aware of the evaluation performed by Dr. Bill Sharp prior to the second state trial.

135.    Mr. Smith did not attribute his failure to have a mental health expert examine Mr. Barrett for purposes of mitigation to his reliance upon any previous examinations or opinions such as those performed by Dr. Faust Bianco and Dr. Kathy LaFortune.

136.    In light of Mr. Smith's response to Mr. Barrett's allegations, if Mr. Smith had relied upon Dr. Bianco or Dr. LaFortune, he would have said so in his declaration. Accordingly, the court finds that Mr. Smith's failure to have a mental health expert examine Mr. Barrett for purposes of mitigation was not based on his consideration of any prior evaluation.

137.    Dr. Russell's 2003 report states that Mr. Barrett suffered a head injury when he was struck in the head with an iron ball.

138.    Mr. Smith did not consult any mental health experts regarding Mr. Barrett's use of drugs. Therefore, Mr. Smith had no informed opinion about how Mr. Barrett's drug use was or was not related to his mental health condition. Mr. Smith knew the jury would hear about Mr. Barrett's drug use. Mr. Smith conducted no investigation or inquiry to determine whether Mr.

29

Barrett's drug use was mitigated by his social history or an underlying mental health condition.

### 7.    *Time and Resources Available to the Defense*

139.    Judge Payne expressed a desire that the case rapidly proceed to trial.

140.    Judge Payne's desire that the case rapidly proceed to trial was one factor that influenced him to reject the Federal Defenders' recommendations of a defense lawyer with more training and experience than Roger Hilfiger.

141.    Judge Payne admonished trial counsel that "this is a death penalty case, which should be given the highest priority by counsel." (Doc. 31.)

142.    In February 2005, Mr. Hilfiger informed Mr. Echols, and Mr. Echols informed the court, that Mr. Hilfiger believed he would need to spend 160 hours assembling and reviewing the files and records related to the case.  (Doc. 50 at 4; Exhibit 64 at 1 n.1.)  On March 18, 2005, the court reduced to 80 hours the compensable time for Mr. Hilfiger – then second-chair – to complete these tasks.  (Doc. 97 at 2.)

143.    On February 7, 2005, Mr. Barrett's counsel filed amended, more detailed budget proposals.  (Docs. 50, 51.)  On February 22, 2005, the court sent lead counsel a two-page single-spaced letter listing six categories of questions and concerns the court had about Mr. Echols, but not about Mr. Hilfiger's representation. (Exhibit 65).

144.    Mr. Echols responded by letter on February 28, 2005.  (Exhibit 64.)

145.    In his February 22, 2005, letter to defense counsel, Judge Payne expressed the view that no further investigation should need to be done after the previous trials. (Ex. 65.)

146.    On April 6, 2005, Mr. Echols also moved to withdraw as counsel for Mr. Barrett

30

citing five circumstances that prevented him from providing effective representation: (1) the trial was less than four months away; (2) no final budget had been approved that was adequate to prepare a defense; (3) the denial of compensation for budgeting and expert consultation placed an unreasonable burden on counsel; (4) Mr. Hilfiger had not done any significant work on the case; (5) the requirements of the March 18 order impaired counsel's exercise of independent professional judgment. (Doc. 113.)

147.    Mr. Hilfiger had urged Mr. Echols not to file the motion to withdraw from the case. (Exhibit 118; Exhibit 34.)

148.    During a hearing on Mr. Echols's motion to withdraw, Mr. Hilfiger did not join in Mr. Echols's concerns about the budget order.  (Exhibit 34.)

149.    In granting Mr. Echols's motion, the trial judge attributed to Mr. Echols the assertion that "he is unable to work with co-counsel Mr. Hilfiger," and omitted the information about Mr. Hilfiger's lack of work.  (Order filed 5/5/05 at 5.)

150.    On May 17, 2005, the trial court gave Mr. Barrett's counsel until May 27, 2005 to amend the budget that had been reduced by order filed March 18, 2005. The budget submitted for Mr. Barrett's defense had been prepared by Mr. Echols, and was informed by his extensive knowledge of the background of the case, including that many investigative and expert tasks had not been completed during the state proceedings, and that only preliminary work had been done to prepare for a penalty trial. (Exhibit 64; Exhibit 34; Doc. 113; Exhibit 118.) Mr. Hilfiger did not seek an amendment of the budget.

151.    On May 26, 2005, trial counsel Hilfiger filed a motion to continue the trial date.

31

(Doc. 138.)   Counsel averred as one ground for the continuance that Mr. Hilfiger had "been presented with ten storage boxes of materials, discovery, motions and other paperwork from defendant's two State jury trials, including transcripts of the first State jury trial; and all of such material needs to be reviewed to determine its value for defensive purposes, in this new action." (Doc. 138 at 1.) Mr. Hilfiger received these materials at some point during the ten days from May 17, 2005, the day Mr. Hilfiger was made lead counsel, and May 26, the date of his assertion.

152.   Before Mr. Hilfiger obtained the 10 boxes, Mr. Echols had given Mr. Hilfiger access to a password-protected website through which defense counsel could access much of the same information about the case. Mr. Echols maintained and administered the website which included assigning log-on credentials and monitoring who accessed the defense materials. He could tell when one of the log-on credentials had been used. At no time did Mr. Hilfiger use his log-on credentials to access the website.

153.   In mid-August 2005, Mr. Smith asked Dr. Russell for a copy of the risk assessment report that she had provided Mr. Echols in 2003. Mr. Smith's request indicated he had not seen Dr. Russell's 2003 report.

154.   During a hearing held on September 9, 2005, Mr. Smith revealed that Mr. Hilfiger had not assembled or reviewed all the files and records related to the mitigation investigation that had been done in state court.   (Tr. 9/9/05 Hr'g at 43.)

155.   Based on the foregoing timeline, at the time of the hearing on Mr. Echols's motion to withdraw, when Mr. Hilfiger declined to join Mr. Echols's statement of concern about the

32

adequacy of the defense budget, Mr. Hilfiger did not know the quantity or the quality of the work that had been done to prepare for a penalty trial.

156.   On June 8, 2005, the court granted a defense motion for a continuance and resent jury selection to August 29, 2005, and  the start of trial to September 6, 2005.

157.   On July 22, 2005, the court granted a defense motion for a continuance and reset the individual portion of jury selection to September 12, 2005.

158.   During the September 9, 2005, hearing, Judge Payne described the defense's trial preparation as "still work in progress." Tr. Sept. 9, 2005, Hr'g at 42.

159.   From the time of his appointment on October 25, 2004, until October 3, 2005, lead defense counsel Hilfiger had worked approximately 300 hours on Mr. Barrett's case. (Tr. Oct. 3, 2005, Hr'g at 5.) That is an average of just over 6 hours per week, or seven and one half full work-weeks over a period of 49 weeks. That time included all research, investigation, meetings and time spent in court, including, by then, one full week of jury selection and three and one half days of trial.

160.   Defense counsel did not request a continuance beyond those mentioned.

### 8.   *Information Available to Mr. Hilfiger and Mr. Smith Regarding Mr. Barrett's Mental Health History*

161.   Trial counsel Hilfiger and Smith were aware of the risk assessment performed by Jeanne Russell in 2003 at the request of Echols.

162.   Dr. Russell stated in her 2003 report that Mr. Barrett reported a head injury in which he was struck in the head with a steel ball and lost consciousness.

33

163.    Trial counsel Hilfiger and Smith were aware that Mr. Barrett had attempted suicide in 1986 by shooting himself in the chest with a shotgun.

164.    Trial counsel Hilfiger and Smith did not have all of the files created by Echols and other members of the Oklahoma Indigent Defense System team that represented Mr. Barrett in state court.

165.    Mr. Hilfiger and Mr. Smith were aware, prior to trial, that expert testimony regarding the mind's response to threats such as an unmarked S.U.V. driving off-road toward Mr. Barrett's cabin was important so that the jury could understand Mr. Barrett's reactions. (Doc. 50.)  Trial counsel were aware that Mr. Barrett "used drugs and suffered significant head injuries during his life," and that this history indicated a need for an "expert in diagnosing organic brain disorders." Ibid. Trial counsel were aware that the "defense need[ed] to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting."  Ibid.

166.    In response to the foregoing concern, the trial court authorized defense counsel "to hire a psychiatrist or psychologist for up to 40 hours." Order (Doc. 97).

167.    Dr. Russell was the only expert consulted by the defense that Mr. Hilfiger characterized as a "mental health expert." Mr. In a letter to Magistrate Judge Shreder dated February 17, 2006, Mr. Hilfiger stated that the only work performed by Dr. Russell that he would characterize as the work of a mental health expert was the work Dr. Russell did to help defense counsel cross-examine the prosecution's first-stage "expert" Dr. Horn.

34

168.    The report of psychologist Bill Sharp, Ph.D., prepared before the second state court trial, was available to Mr. Hilfiger and Mr. Smith.

169.    Dr. Sharp's report indicated that Mr. Barrett suffered from extreme paranoia and long-term memory problems (Ex. 55 at ¶¶ 3, 14)

170.    Dr. Sharp's report identified numerous sources of mitigation, and recommended further testing and treatment.  (Ex. 55 at ¶¶ 9-14.)

171.    Trial counsel did not review Dr. Sharp's report and they were wholly unaware of its contents at all relevant times.

172.    The United States Attorney, who was not aware of the contents of any prior mental health evaluations of Mr. Barrett, nevertheless said at the time of trial, "It's difficult for me to envision circumstances under which a psychologist, knowing the facts of this case, would not testify about mental condition" in mitigation.  (Tr. 9/9/05 Hr'g at 38.)

173.    Neither Mr. Hilfiger nor Mr. Smith, nor an investigator working for them, conducted detailed interviews of family and friends regarding Mr. Barrett's life history. At most, they spoke with members of Mr. Barrett's family for a few minutes. There were no follow-up interviews. Had a professionally reasonable investigation and preparation for the penalty phase been undertaken, these family members could have provided abundant evidence of Mr. Barrett's dysfunctional and abusive background; his parents' problems with alcohol and drugs; a family history of alcoholism, mental illness, and suicides, and their own mitigating opinions on Mr. Barrett's mental state.  (See, e.g., Exhibit 77; Exhibit 78; Exhibit 84; Exhibit 80; Exhibit 81; Exhibit 83; Exhibit 86; Exhibit 85; Exhibit 90; Exhibit 95; Exhibit 96; Exhibit 37.)

174. Neither Mr. Hilfiger nor Mr. Smith nor anyone working on their behalf asked members of Mr. Barrett's family to sign releases for documents such as medical, education, employment or legal records.

175. Neither Mr. Hilfiger nor Mr. Smith nor anyone working on their behalf provided documents related to Mr. Barrett's social history to Dr. Russell.

176. The files of Roseann Schaye, the mitigation investigator who worked on the case before the first state trial, were readily available. (Exhibit 111; Exhibit 34.) However, Mr. Hilfiger and Mr. Smith never obtained those files.

177. Mr. Hilfiger and Mr. Smith did not timely confer with the attorneys who worked on penalty-phase issues in preparation for the second state trial.

### B.    PREJUDICE

178. Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction"; (3) "Kenny Barrett's incarceration"; (4) "Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999."  (R. 4704).

> **Had trial counsel conducted a reasonable mitigation investigation, there was abundant, available evidence that a life sentence was sufficient for Mr. Barrett because of his neglectful upbringing, parental drug abuse and mental illness, the genetic components of his mental illness, and his organic brain impairments.**

179. The evidence of Kenny Barrett's life that was presented was incomplete and not "an accurate representation of Mr. Barrett."

36

a.      **The family, social, and medical background of Kenny Barrett.**

180**.**    A reasonable mitigation investigation would have produced a social history that revealed the following:

181.    Many of Mr. Barrett's family members, in previous generations, his generation, and those that followed struggled with profound mental illness and its attendant chaos.

182**.**    Intergenerational, genetic predisposition to mental illness affected Kenneth Barrett's development, behavior, perceptions, and experiences over the course of his life.

183.    As a result of the genetic predisposition, Mr. Barrett was vulnerable to developing major psychiatric illness.

184.    Mr. Barrett  was affected by a confluence of the most damaging genetic defects handed down from both the Barrett and the Dotson families.

185.    His mental illness was marked by severe neuropsychological deficits that manifested themselves in extraordinarily compromised cognitive and psychiatric functioning.

**Family History of Mental Illness**

186.    Mr. Barrett meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.

187.    Multiple generations on both his mother's and father's side include family members who succumbed to depression, bipolar disorder, schizophrenia and addictive diseases.

188.    Although people on both sides of the family carried genetic-based risk factors, some who were spared the most debilitating symptoms of mental illness were able to pursue successful professional careers as educators, doctors, ranchers, and business people.  Other

37

family members required psychiatric institutionalization.  Several committed suicide.

189.    This spectrum of impairment included family members who functioned marginally, but were unable to meet their responsibilities to their families and community.

190.    The nature and severity of Mr. Barrett's mental illness were both indicative of and exacerbated by significant neurological impairments, including pervasive damage to the prefrontal lobe of his brain.

191.    Mr. Barrett's mother, maternal aunt, and maternal cousins satisfy diagnostic criteria for various significant brain disorders, including bipolar mood disorder, depression, anxiety disorders, and developmental disabilities.

192.    Mr. Barrett's mother's family "had to deal with mental illness for a long time."

193.    Petitioner's mother, Gelene Dotson, has suffered from clinical depression, mood swings and anxiety since her teenage years.

194.    Gelene Dotson's sister, Carolyn Joseph, (Mr. Barrett's aunt), also suffers from bipolar mood disorder and requires therapeutic medication with a regimen of mood stabilizers and antidepressants.  One of Carolyn Joseph's daughters manifests signs of mood-related psychiatric distress and is unable to rear her children.

195.    Gelene Dotson's brother Mark, the youngest child in her family and now a podiatrist, witnessed Gelene and Carolyn struggle "with serious impairments."

196.    One of Mr. Barrett's maternal cousins, Gwendolyn Crawford, also has bipolar mood disorder that necessitates ongoing treatment and medication.  Gwendolyn Crawford's two children both have significant mental impairments.  Her 26 year old son Brandon has a

38

developmental disability and is unable to speak or live independently.  Gwendolyn Crawford's

daughter Brandy Hill reported that her family "learned first- hand about bipolar disorder and

depression" and that Brandy herself "battle[d] with depression," experienced episodes of "high

euphoria" and underwent treatment for her mood disorder until she could no longer tolerate

chemical regimens.

197.    Travis Crawford, another of Mr. Barrett's first cousins, also receives medication

for anxiety and reports a history of depression.  Travis Crawford has had "a long struggle with

drugs and ha[s] anxiety and panic attacks" and his "mind does not work that well."  Travis

Crawford struggled and did not succeed in the Army, or in his employment.   "[P]sychological

problems run in [his]family" and Travis Crawford's  oldest daughter, now "a grown young

woman" has bipolar disorder and one of his sons "seems a little slow and is having a tough time

of it."

198.  Gelene Dotson's uncle, Warren Dotson, Has two daughters who "each have a son

who is bipolar.

199.    In the maternal family, depression and mood disorders trace back to at least

Kenny's grandmother's (Hattie Gertrude Dotson) generation.

200.    Her maternal cousin, Ingram Goodwin, committed suicide around the turn of the

Twentieth Century.  Another relative, Wallace Dotson, was involuntarily hospitalized at the state

mental institution on a petition brought by his father, Tom Dotson, who described Wallace as

being "completely out of his mind," suffering from  "some kind of spells" and not having slept

for "three days and nights."

39

201. Mental disease and its effects on family life were transmitted down at least four generations of Barretts. Illness affected Mr. Barrett's great great grandfather, his great grandfather, his grandfather and finally Mr. Barrett himself.

202. Mr. Barrett's cousin Kathy Trotter observed that while her children are fine there was a time she was not and, "Several of our relatives have serious mental health problems that can be traced to chemical imbalance and depression."

203. Mr. Barrett's great great grandfather, A. J. (Jack) Barrett, was committed to a mental hospital and a Certificate of Lunacy was entered in the local courthouse in Sequoyah County in 1918.

204. Mr. Barrett's great grandfather, Issac Clifford Barrett ended his life by suicide.

205. Issac Barrett's oldest son, Andrew Jackson "A.J." Barrett, Petitioner's paternal grandfather, was haunted by suspicion, paranoia, and hostility, which was manifested by violent physical and sexual assaults against his wife and children, which forced one after the next to flee the home in search of safety. A.J. terrorized his wife who hid "in the woods" from him, raped one of his daughters who became pregnant and placed the baby for adoption, and went on drunken rampages through town. A.J. Barrett's Certificate of Lunacy documents auditory hallucinations, persecutory delusions and paranoid ideation. (Exhibit 27.) In fact, there are more certificates of lunacy in the Barrett family than college degrees. A.J. Barrett's family believed he "was bipolar." He was only able to work sporadically. At one point A.J. Barrett was involuntarily committed to the state hospital for one month.

206. A.J. Barrett's maternal family also faced mental illness. His mother (and Mr.

40

Barrett's great grandmother), Mary Ellen Maxwell, suffered a "mental breakdown," wandered the ranch at night talking to herself and believed that she was canning goods for the winter when she washed bottles in the middle of the night. She "died very confused."  Mary's brother Howard was described as "Loony Tunes."  Howard's son, Billy Dean Mall, who was a disabled veteran with a history of schizophrenia, committed suicide. Before committing suicide, Mr. Maxwell was committed to the state hospital four times in a ten year period.

207.     Mr. Barrett's great aunt, Elnora Long, is bipolar and requires significant doses of medication.  Elnora Long, who has a complicated lineage, is "very emotionally unstable" and "unpredictable."  Elnora Long is bi-polar.

208.     Kathy Trotter, Mr. Barrett's cousin, experienced anxiety and a  depressive episode and was hospitalized.

209.     Mr. Barrett has one paternal aunt (Linda Riley) and three paternal cousins who suffer from depression and bipolar disorder.  Ms. Riley is treated for depression, and both her adult daughters have been diagnosed with bipolar disorder  Ms. Riley's seven-year-old grandson has been diagnosed with Asperger's Syndrome, a neurodevelopmental disorder.

210.     Mr. Barrett's paternal grandparents, A.J. Barrett and his wife, Ada Mae "lived a hard life." (Exhibit 84.)  Three children "died at or near childbirth; the oldest was two weeks old.  The oldest of the five children born to A.J. and Ada Mae who survived is Ernest ("Ernie") Barrett, Kenneth Barrett's father.

211.     Ernie Barrett and his four siblings who survived, (Margaret, Issac, Gary and Linda),  lived under the shadow of A.J.'s mental illness, alcoholism, and cruelty in a cabin with

41

"a dirt floor and no electricity or running water. [W]ell water was not usable for humans, although it was all right for animals and crops." Because A.J. Barrett, due to his mental impairments, was only able to work sporadically, "[t]he entire family had to work in the fields traveling from one crop to the next."

212.    Ernie Barrett had a dismal upbringing. One of his "earliest memories is being taken out of school to work in the fields." Ernie described their grim life:

> As my brothers and sisters got big enough to walk and carry a load, they joined us in the field. Every year we pulled cotton in western Oklahoma, picked strawberries in Stillwell [sic], and picked beans in Moffitt [sic], Oklahoma.
> It was backbreaking work, even for little children, because we had to stoop, bend, and carry our loads up one long row and down the next from sunup to sundown. It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it. When cotton season came, we worked or we starved. When we went back home after cotton season, we ate mostly beans, potatoes, and commodities that were handed out as public assistance to farm families.

213.    A.J. Barrett was unable to ameliorate the harshness of poverty and its impact on his family. His parenting was derailed by mental illness that ultimately led to his being involuntarily institutionalized by court order at the state hospital for one month. None of his children "wanted him to be at home because of the crazy things he did."

214.    A.J. Barrett suffered from mood swings that he attempted unsuccessfully to self-medicate with copious amounts of alcohol, to which he became addicted. His alcoholism only aggravated his behavior. His behavior was erratic and unpredictable leaving his children unable to tell "from one day to the next what was going to happen." When he was in a "bad mood" he struck out against his children, hitting them with "any dumb thing, belt, club, board, or limb," but he "was difficult to figure out because he was also a decent guy when he was sober."

42

215.    A.J. Barrett spared no one; he raped his daughter who went away to New Orleans to have the baby and placed it for adoption.  A.J.'s psychiatric symptoms made it impossible for anyone in the family to appease him, and his sons, including Mr. Barrett's father Ernie, tried to "stay out of [his] way."  The children left home as soon as they could.  Family members reported that A.J.  Barrett had "two different personalities" and "angry spells about three times a week."  A.J. Barrett had "enormous moods swings from being an alright guy to being totally out of control."  A.J.'s mental illness "caused him not to be able to get along with neighbors and especially his employers."  A.J. thought "people were after him," heard "imaginary voices," was "somewhat confused," and reported "men outside his window that [were] going to kill him."  A.J. was "unpredictable, irresponsible, irritable, uncooperative and not in complete reality."

216.    A physician examining A.J. Barrett when he was admitted to the state hospital, reported his findings:

> His memory for past and remote past is poor.  He can retain a number of five digits but is unable to repeat them in reverse with any degree of facility.  Serial subtraction of eight from one hundred is done with much hesitation and inaccuracy.  His general intelligence seems in average [sic] and dull normal.  His reasoning and judgement are limited.  His insight is poor.

217.    Ernie and his siblings were powerless to protect themselves or their mother from A.J.'s assaults and terror.  A.J.'s wife, Ada Mae, was an old fashioned woman who "would not divorce" him, even though "nothing could stop him from attacking them."  Ernie Barrett believed his mother "was as good a woman as there is, but she had a hard life between my father being half crazy and always poor."  Ernie tried, "[a]s the oldest boy in the family," to protect his mother and the other children, but he was "no match" for his father until he was "half grown."

43

Because Ernie tried to "get between" his father and mother when A.J. attacked her, he "got beaten more than the other children."

218.   Ernie Barrett developed characteristic responses to the life threatening trauma that he witnessed and experienced.  He "learned never to cry" when his father hit him and he does not remember "feeling a hell of a lot."  In a community known for its poverty, Ernie's family stood out as still poorer than most.  Other students "made fun of [Ernie] and laughed at [him] because of the way [he] dressed."  Ernie responded to the taunts with fighting "every boy in [his] high school class to hold any respect."   Other students called Ernie "'Loco' because of the way he acted, and he never completely straightened out."  Ernie's brother described him as "pretty cruel."  He treated his younger siblings "pretty rough," and when he made them  cry, "he thought it was funny."  Ernie's brother. Ike,  thought Ernie was "a lot like [his] father," A.J.  An aunt of Mr. Barrett, Ruth Harris, who taught Ernie in elementary school. described him as "a mean child."

219.   Ernie Barrett left home without graduating from high school and joined the U.S. Marines, from which he was honorably discharged in 1960.  Ernie  kept memories of his maltreatment and his powerlessness to protect his family at bay by drinking to excess.

220.  Ernie Barrett was three months short of 17 the last time he stepped between his father and mother to try and protect her.  His father hit him across the shoulder with a "19-inch metal file that busted [his] shoulder wide open."  He still had a scar from it at the time of his sworn  declaration.  Ernie described that day: "I left home that day just running because I knew that if I stayed at home I would have to kill my father to protect the others.  I was 6'3" and

44

weighed 187 pounds."

221.   Ernie Barrett and Gelene Dotson brought to their marriage a strong genetic predisposition to major mental illness, alcoholism, and little understanding of the demands of parenting.  They met in high school, dated briefly before Ernie left to join the U.S. Marines, reunited by accident when both were back in their home town. and married July 8, 1960, without much thought.  Ernie and Gelene started married life in Joliet, Illinois, at the recommendation of Gelene's relatives who helped Ernie find work at a Kerr Glass manufacturing plant.

222.   Ernie and Gelene's marriage was tumultuous and marked by discord from its beginning.  Although Ernie was very "determined not to live in the kind of poverty [he] knew as a child growing up," he had little notion of family life or fatherhood.  In his declaration, Ernie acknowledged that he "did not give much thought to fatherhood" and "did not think about Gelene or, later on, the boys, other than working and supporting them."

223.   Ernie Barrett "almost immediately started running around with other women" and was gone for days at a time.  He had his "mind set on doing whatever" he wanted, as long as he worked.  After Mr. Barrett's father finished his shift at the plant, he went to bars and got "into as many brawls as there were" before coming home.  Ernie "did pretty much whatever [he] wanted to.  [He] would go out, drink as much as [he] wanted, and chase women," a pattern he maintained until well after his marriage with Gelene ended.  He "drank a fifth at a time."

224.   Before he died, Ernie Barrett was deeply ashamed of his behavior towards his children and wished he "could take it back and do for [his] children what they needed and be the kind of parent they deserved."

45

225.    At the time Ernie Barrett and Petitioner's mother Gelene started their family, his only measurement of success was being able to work himself "up from pushing brooms to production manager."

226.    Gelene Dotson Barrett was "pretty depressed" and "miserable" in the marriage. She was "a heavy drinker with dramatic mood swings." She had planned on going to college but discovered she was "crazy about Ernie" who "came home kind of like a knight in shining armor." Looking back, she "never imagined that life with Ernie could be so terrible, not just for [her], but for the children [they] had together."

227.    Ernie Barrett's infidelity, unpredictable absences, and lack of concern for her was "humiliating and embarrassing."     Gelene knew that Ernie chased after "other women," and she and her aunt went from bar to bar  "looking for him – he would be out drinking," but barkeepers would tell her he was not there. Throughout their 13-year marriage, Ernie "had his other women." There was never a time that Ernie Barrett did not have other women.

228.    Gelene "drank right from the beginning of the marriage," according to Ernie Barrett. One of Gelene's sisters, Phyllis Crawford,  who visited Gelene when she was pregnant with Kenneth Barrett, reported that "Gelene drank from the moment she woke up until she went to bed." Phyllis Crawford was available to testify at the sentencing proceeding. In fact, she was at the courthouse during the second-stage proceedings. In the years since the sentencing proceeding, Phyllis Crawford has become demented and is no longer available to testify.

229.    Mr. Barrett's parents separated multiple times, sometimes for extended periods and sometimes more briefly, but always in chaos. Their relationship was acrimonious and rife

46

with recrimination.  Ernie Barrett was unrepentant and "would not even talk" to Gelene "about what was going on" with her or the children. Gelene Dotson Barrett says that "[I]t drove [her] crazy," and that she "begged, pleaded, threatened, and cried with Ernie."  Mr. Barrett's parents "always had a difficult time of it, "split[ting] up and [getting] back together and threaten[ing] to leave each other over and over."  Petitioner Kenneth Barrett was born to this troubled marriage in Joliet, Illinois, June 29, 1961.  He was followed by his younger brother, Richard, born June 24, 1964.

230.    Shortly after Richard's birth, Gelene left Ernie Barrett for almost three years and returned home to Sallisaw with the boys.  Ernie Barrett "felt bad about leaving" his sons but he "could not take Gelene anymore."  Ernie Barrett admitted that he "was still young and immature" and not " much of a husband" who "just put the boys out of [his] mind as much as [he] could." The three-year separation ended when Ernie was not able to "keep the boys out of [his] mind" and he reunited with Gelene in 1967.  Gelene and the boys returned to Joliet and "moved into the same mobile home" Ernie had been living in with his girlfriend.  The nature of the marriage did not change after Gelene and the boys returned to Illinois.  Gelene gave birth to her third and last child with Ernie Barrett, Stephen, January 1, 1969.  Gelene and Ernie "both drank as much as [they] could," and Ernie "still stayed away from home."  Ernie Barrett was arrested multiple times for drunk and disorderly conduct, and a judge threatened him with a year's jail sentence.

231.    Ernie Barrett contacted a friend in New Jersey who found him a job at a glass plant.  Leaving Joliet allowed Ernie Barrett to avoid the inevitable jail sentence he knew would come because he could not stop drinking and fighting.        The family moved, living first in

47

Stanhope and then Lake Hopatcong, but Ernie "kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time." Gelene Barrett's humiliation at Ernie's hands continued. Ernie started "seeing another woman almost as soon as" the family arrived in New Jersey. Ernie Barrett had promised Gelene that "he wanted to leave Joliet and have a fresh start, straighten himself out, but that's not what happened."

Ernie moved out of the home and lived with another woman, but Gelene allowed him to move back home with her and the boys. Gelene contracted gonorrhea twice from Ernie. Although Ernie Barrett had vowed he would never become violent like his father, he assaulted Gelene and "gave her two black eyes and split [her] lip." Gelene "was at the end of her rope" and left Ernie for good in Lake Hopatcong, returning home to Sallisaw with her three young boys in 1972. Ernie and Gelene divorced June 20, 1973.

232.    Kenneth Barrett has long standing neurologic deficits that were apparent early in his infancy, continued throughout his childhood and adolescence, and affected his behavior and understanding over the course of his life. Although it is difficult if not impossible to determine with precision the etiology of his neurological deficits, there is no doubt that they are present and significant.

233.    These deficits can well be the result of his mother's ingestion of alcohol or other neurotoxins during her pregnancy, head trauma he sustained during childhood and young adulthood, ingestion or exposure to neurotoxins at work or home, or a combination of one or more of these factors. Gelene Dotson Barrett was stressed throughout her pregnancy with Kenneth Barrett, which she describes as "very difficult." She was in "constant pain,"

48

uncomfortable, and depressed.        She described her pregnancy as "battling with Mr. Barrett before he was born."

234.    Gelene Barrett drank throughout her pregnancy with Kenneth Barrett, unaware of alcohol's potentially devastating effect on a developing fetus's brain. Gelene's in-laws commented on her early alcoholism and stated she "was a drunk right out of high school."  After Kenneth Barrett's birth, he was breast-fed by his mother.

235.  Kenneth Barrett had a difficult infancy and "exhausted" his mother. His "days and nights were mixed up," and he "was colicky" and unable to be comforted.  He cried and fussed "all the time," making Gelene think all babies must be like him.  After she had her other two children and observed their development, she "realized something was wrong with Mr. Barrett."  Gelene received no help from her husband who acknowledged he "was not around the house much when Mr. Barrett was a little baby" but "he heard all about how hard it was to sooth him.

Kenneth Barrett was born with a large lump on the back of his head.

236.    Gelene Barrett faithfully recorded Kenneth Barrett's progress at three, six, nine, and 12 month intervals in a complimentary baby book she received at the hospital.  Although it appears that he met most of his three and six month milestones, he lagged in some.  At three months, Mr. Barrett did not "observe anyone speaking, inspect hand, laugh aloud, manipulate object placed in hand, splash in bath, take stepping movements when held erect," or "open mouth at sight of nipple before lips are touched."  At nine months, Mr. Barrett did not "knock down block houses in play, oppose thumb and forefinger in picking up one-inch cube, wave "bye-bye"

49

or play "peek-a-boo" instinctively, respond to animated facial expressions, express vocal sounds upon recognition of familiar person or object, associate outdoor clothing with being taken out, react to strangers, reach for objects persistently, say "ma-ma" or "da-da" or equivalent," or "make stepping movements when feet are touched to floor."  He could not "climb stairs, hold and drink from cup, put one block on another when shown, say two or three words indicating want, play "pat-a-cake," or "show preference for one hand in reaching."

237.    Kenneth Barrett early on demonstrated patterns of behavior associated with the prodromal symptom of bipolar mood disorder, which family members described as extreme hyperactivity.  Gelene Barrett recognized that his behavior lacked purpose and reported he "moved around without thinking about what he was doing" and was "very, very active."  Gelene described him as "a handful"  who "could not be still" and "was more than hyper."  An aunt stated he was "always hyperactive, on the go, into everything, and could not sit still."  Ada Blount, Mr. Barrett's maternal great aunt, agreed, describing him "as a hyper little boy who could not sit still."  Ernie Barrett recollected that when Mr. Barrett "got a little bigger, he could not sit still.  Even if I could get him to watch television, his feet were always moving, and he was bouncing."  Janice Sanders, a maternal cousin, remembered that "Mr. Barrett was a hyper little boy, the most hyper child" she had have ever seen.  Ms. Sanders also noticed that Mr. Barrett "had strong feelings," a common symptom of children who develop bipolar mood disorder.

238.    Family members recognized "that Kenny was different" and "needed so much more attention as a child than the other children."  Kenny Barrett "was extremely sensitive and

50

cried over every little thing from the time he was small until he was a grown man . . . . He would break down and cry easily." His cousin Kathy Trotter remembered that "back then we called Kenny hyper. He was erratic and temperamental. His mother reported that "any little thing could upset him, but it took a lot to calm him." Ernie Barrett also recognized that his son Kenny was "a sensitive little boy...who cried if you hurt his feelings."

239.    When Kenny was a toddler, he had to go to the hospital for several different accidents because "he got into everything." He had to have his stomach pumped twice when, on two separate occasions, he managed to climb to a top cabinet. Once he ate baby aspirins the other time he ate ex-lax." Mr. Barrett's mother had to "rush him to the hospital when he pulled a bag of groceries off the table and a large can fell on his head, busting it open and raising a big knot."

240.    Gelene Barrett was overwhelmed by the responsibility of a child with special needs. Already a very emotional person who was alcoholic, she reacted to her son Kenny's impairments by punishing him. Gelene Barrett admitted that she decided "to be especially hard on Kenny because he went from one thing to the next" and "was never still." It "almost drove [her] crazy." She thought he "was emotional about things that did not matter. He would cry and scream like there was no tomorrow."

241.    Gelene Barrett physically punished Kenny Barrett by beating him with a thin belt and degraded him verbally. In his declaration, Ernie Barrett remembered that Gelene Barrett "used to whip the boys over any little thing and whipped them all the time. She had a bad habit of saying cruel things not just to me but to the boys, too." Gelene Barrett's niece by marriage,

51

Kathy Trotter "thought Gelene was mean, that she had a mean spirit" and that the way "she would talk to . . . kids was angry." Children were "afraid of her." Kenny Barrett suffered "more verbal abuse from her than her other two children."

242.    Kenneth Barrett's neurologic impairments and his chaotic home life took their toll on his school work. Gelene Barrett stated he "had a difficult time in school and was in special classes part of the time." Kenneth Barrett had difficulty almost immediately in school. He failed reading and arithmetic in the first grade and was barely able to keep pace with his peers. He had difficulty learning to read.

243.    Ernie Barrett "hardly had anything to do with [his son Kenny] after the divorce, and everyone could see how much it hurt Mr. Barrett." Even when Ernie made semi-annual trips to town to see his sons, family reported he was insensitive to his children's needs. He came "by to show off his new Corvette when his children did not have shoes or decent clothes to wear." Ernie's sister-in-law did not think Ernie was "a good husband or father. Ernie did not come around and visit his children the way he should have. He was absent in their lives. Ernie has always been for Ernie." Ernie Barrett "went his way and let Gelene take care of the kids."

Ernie Barrett remembered that his son Kenneth "kicked and screamed to stay" with him and "did not want to go with his mother back to Oklahoma." Kenneth Barrett "wanted to stay" with his father, but Ernie felt he "was not set up to take care of him and work."

244.    As viewed by her sister, Phyllis Crawford, Gelene Barrett's emotional needs took precedence over her son Kenneth's. Gelene "had a lot of problems, especially with alcohol and men" and those problems "affected Kenny badly."

52

Gelene Barrett brought different men into the house when Mr. Barrett was entering his teenage years, and "it was very confusing for him." Kenneth Barrett's mother "seldom gave Kenny a kind word" and "screamed at him over anything." Gelene once asked her sister Phyllis Crawford to intervene and help her get Kenny Barrett out of his room. Phyllis and her husband, Roger Crawford, went to Gelene's house and talked to Ken. Ken Barrett told them "he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream."

245. Gelene Barrett's "ability to parent was very limited, not just by alcoholism, but by her extreme mood swings and unpredictability. She had a hard enough time dealing with her own needs, let alone having to deal with Mr. Barrett's hyperactivity and mood swings." Steve Barrett, Kenneth Barrett's youngest brother states that when his mother "lost control of herself," she whipped the boys, but "there was no real parenting." Gelene was harsher with Ken Barrett, "verbally and physically," than she was with her other two sons. According to Steve Barrett, their mother used a strap to whip Kenny and Kenny "hated" it. Mr. Barrett had a German shepherd that Ernie had given him, and the dog was very protective of Mr. Barrett. When Gelene "would try to beat" Mr. Barrett, he would hide behind the dog and the dog would growl at Gelene and not let her near him. The dog was run over by a car.

246. Steve, Mr. Barrett's youngest brother, lived at home with Mr. Barrett, Richard, and his mother, but found refuge and support with the extended family. Steve, an educator and principal at a junior high school, has given great thought to understanding how he "was able to overcome many of the challenges" he faced and "how those challenges affected Mr. Barrett." Steve and Kenny Barrett "were exposed to vastly different environments and experiences"

53

during their formative years due to Steve's much younger age.  Steve  benefitted from the guidance, support, and structure of an extended family that "Kenny never experienced in his developmental period."

247.    Mr. Barrett's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children.

248.    While Gelene Barrett's move back to Sallisaw separated 12-year-old Kenneth Barrett from the closeness and love he longed for from his father, the move placed Steve in the middle of a "village. . .in an extended support structure" when he was in the second grade and Mr. Barrett was repeating eighth grade.  Steve Barrett was "literally surrounded by aunts, uncles, cousins, and most importantly" his maternal grandparents, Hugh and Hattie Dotson.

249.    Steve Barrett believes "another critical factor" is that "Ernie . . . abandoned Mr. Barrett when Mr. Barrett most needed him" but that Steve, at the age of two, had no real relationship with Ernie.  Ernie's absence in Steve's childhood and adolescence was "replaced by attentive older men and women relatives who rooted [him] in their love and guidance."

250.    Steve also attributed his success to his academic ability and recognized that "Kenny had great difficulty with his education."  "Kenneth Barrett "failed in school."  School became the focal point for Steve and provided "the value system" that was absent at home. Steve developed close relationships with his extended family, and explained "it made all the difference in the world to have that support structure. It was a pivotal part" of his life, and he had "positive experiences and influences that Kenny never had."

54

251.    Gelene Barrett was unable "to have meaningful conversations about day-to-day problems, to figure out how to solve normal problems that arise in the course of everyday life, or to tolerate the routine activity of growing boys."  Steve Barrett once found "diary-type notes" of hers that "were very depressive and full of blackness and darkness."  Gelene Barrett "did not know how to respond to Mr. Barrett's special needs as a youngster with profound psychological problems."

252.    Mr. Barrett begged his father to allow him to live with him, and Ernie Barrett relented and "let him come three times after the divorce, the first time in Dunkirk, Indiana," where Mr. Barrett tried to complete ninth grade.  Kenneth Barrett resented his father's Ernie's then wife, Diana, and "it got the best" of Ernie, who "lost control when he sassed her" and "hit him pretty hard in the chest.  Petitioner went flying, slamming against the wall."  After his father's assault, Kenny Barrett went back to Sallisaw and soon withdrew from school.

253.    Gelene Barrett knew that "Mr. Barrett never adjusted" after the family moved back to Sallisaw when Mr. Barrett was in the seventh grade.  Kenneth Barrett "got pretty depressed and lost interest in school."  Kenneth Barrett's youngest brother Steve realized that Mr. Barrett "idolized Ernie."  Steve Barrett could tell "how much Kenny missed [their] dad by the way he acted when Ernie  was around him.  Kenny made sure to stay in close proximity. . . Ernie was a god to Mr. Barrett."  Extended family members knew that  "Kenny never had much of a father," and "never had any guidance."

254.    Kenneth Barrett had "a hard time with lessons" and repeated the eighth grade.  In the fall of 1976, at the age of 14, Kenneth Barrett enrolled in eighth grade for the second time at

55

Tommy Spear Junior High in Sallisaw.  Kenneth Barrett was placed in special education classes in English and staff made "some adjustments to the curriculum" for him.

255.   It was a very difficult year for Kenneth Barrett, whose beloved grandmother, Ada Mae, died in 1976.   According to Kenneth Barrett's cousin Kathy Trotter, Ada Mae "adored" him, and "[w]hen she died . . . Kenny was just 14.  Kathy Trotter states, "It was as if the only adult who ever cherished him had gone."

256.   Kenneth Barrett moved from Sallisaw to live with his father in Dunkirk, Indiana, and enrolled in the ninth grade at Jay County High School at the age of 15 in the fall of 1976. His grades declined in three of the five subjects (general math, comm arts, and life science).  Ken Barrett returned to Sallisaw, but "just couldn't make it in school, so he withdrew from school and went to work full time."

257.   When Mr. Barrett was 17, he was assaulted and beaten by Sallisaw police officer John Philpot, who hit Mr. Barrett so forcefully, it broke Officer Philpot's hand.  The assault had long term consequences on Kenneth Barrett who could not understand the reason for the assault. Kenneth Barrett had been arrested for "hot rodding, squealing his tires" when he was "out driving one of his souped-up cars."  The incident only added to Kenneth Barrett's already burgeoning paranoia.

258.   The traumatic impact of the assault on Mr. Barrett – then a youth with manic-depressive illness and  brain damage. – affected the development of paranoid delusions that would cause him, almost 20 years later, and 12 years after he shot himself in the chest with a shotgun, to fend off imaginary satellites or dirigibles that he thought were surveilling him.

56

259.    Kenneth Barrett entered late adolescence and young adulthood with modest expectations that were obliterated by the onset of major mental illness emanating from and exacerbated by his long standing neurologic deficits.  According to his mother, Kenneth Barrett battled "terrible mood swings" and periods of depression that lasted for days.  He hoped that hard work would make his pain go away.  It did not.

260.    Kenneth had worked steadily since he left high school, and "his bosses liked him."  He was "a good worker, strong, and able" and was "proud of his work."  By the time Kenneth Barrett was 18, he worked on pipelines and oil rigs and traveled throughout Oklahoma and other states.

261.    Kenneth Barrett married his wife Abby in 1980 when he was 19 and she was almost 16.  Kenneth and Abby's only child, Toby, was born December 1, 1980.

262.    Kenneth Barrett and Abby's marriage was "rocky. . . and they were more unhappy than happy even though they loved each other."  Kenneth Barrett "was far too mentally unstable" to live independently, so the young couple lived off and on with Gelene Barrett for the first few years of their marriage.  Kenneth Barrett's relationship with his mother was complex, and although she resented his presence, she insisted that he join her when her friends came over and used drugs.

Kenneth Barrett's wife, Abby, worried about the effect such goings on would have on her baby, and she desperately wanted to move into their own apartment.  Abby Barrett reported that "Gelene made Kenneth Barrett get up from bed and party with crack and pot."  Kenneth's mother Gelene never treated "her other sons the way she treated Kenneth Barrett."  His mother

57

Gelene and Kenneth Barrett had a "terrible relationship."

263.   Gelene remarried and divorced a local bar owner, and was frequently "depressed" and "intoxicated." Kenneth Barrett tried "to bury his problems under constant work and activity."

264.   Kenneth Barrett measured his life by how much he could work, but he was too depressed to keep a steady work schedule on his own. Depressive episodes overtook him, and he would "get real depressed and sleep all the time." Abby Barrett observed that the only antidote to his depression was drugs. Abby knew that Kenneth Barrett "smoked a lot of pot, but without it he never got motivated. He turned to drugs to make himself feel better." He used methamphetamine as an antidepressant and discovered that he could work well under its influence. Abby observed that Kenneth Barrett "would work hard and then sleep all the time. . . .[He] did the drugs to make himself feel better, because otherwise he would just sleep."

265.   Kenneth Barrett's behavior easily fit the pattern of bipolar mood disorder, and his family knew he was "deeply troubled." (Exhibit 86.) Kenneth's wife thought he was "like a manic depressive, hot one minute and depressed and even immobile the next." He had "racing thoughts," did things without thinking, and "then regretted them." Abby knew that Kenneth Barrett "did not act the way normal people act" and that he "got swept away in his emotions." When Kenneth Barrett lost control of himself, he hit Abby and later "would come back crying, begging" Abby to take him back. He was genuinely "remorseful" and would "be good as he could be—he would go the extra mile, . . . but he could not keep it up."

266.   Kenneth Barrett's cousin, Brandy Hill, recognized Kenneth Barrett's bipolar

58

mood disorder created severe problems for his marriage.  Brandy compared Kenneth Barrett's

behavior to her own behavior and reported that her "mood swings" made it "hard" on her

husband because she "used to attack him, kind of the way Kenneth Barrett and Abby fought."

267. Kenneth Barrett and Abby separated and reunited frequently; his mood

fluctuations and deep depressive episodes made him irritable, agitated, paranoid, and suspicious.

268. During one of the separations, he went to his father's home where Ernie found

work for him.  Ernie Barrett described his observations of the effect of Kenneth Barrett's mental

impairments on his behavior:

> Kenny had bouts of depression and did things that did not make any sense.
> Sometimes he would be very down but other times he would be manic, always on
> the go and upbeat.  Kenny cried a lot when he and Abby were separated. He
> bawled like a baby when he talked about it.  In 1986, when Kenny was separated
> from Abby and was very depressed, he stayed with Doris and me.  I got him a job
> with Kerr Glass and he was making real good money.  Kenny Barrett had a truck.
> He worked about three months and then left in the middle of a shift, just walked
> away from a $200,000 machine that he left running. Soon after that, he tried to
> kill himself by shooting himself in the chest with a shotgun I had lent his
> youngest brother Steve.

(Exhibit 81.)

269. Abby knew that Kenneth Barrett "had mental issues" and tried to persuade him to

seek psychiatric treatment.  Abby recognized that she "was the only stable thing he ever had in

his life" and that she "kept him together."

Abby opposed his drug use but stayed with him in their fitful marriage to try "to keep him from

falling off the deep edge."

270. Kenneth Barrett's brother Steve testified, "[a]s troubled as Kenneth Barrett was,

59

967

he worked all the time."

271.     Kenneth Barrett's use of drugs allowed him to keep working, despite his serious mental illness.  Kenneth Barrett increased the amount of drugs he ingested in direct response to the symptoms of depression he experienced; his goal was very simple.  He needed methamphetamines in order to work.

272.     In 1986, Kenneth Barrett attempted suicide and nearly succeeded in killing himself with a shotgun blast to his chest.  Kenneth Barrett's brother Steve was home at their mother's and witnessed Kenneth Barrett's suicide attempt:

> In a terrible episode of depression, he tried to kill himself.  I was home with Monty and Podgy in the living room watching Carl Sagan kind of stuff on television.  Kenneth Barrett came in to borrow my 12-gauge that Dad had lent me. It was loaded with 00 shot. I looked out and I saw Kenneth Barrett leaning against the truck, but I didn't see the shotgun. I don't remember hearing the actual shot, but I must have. Mom and Paul were in bed sleeping. I woke them up and told them to call an ambulance, and then I went outside. You couldn't see the hole all the way through because of the wadding. . . .Kenneth Barrett was in and out of it, mumbling, making no sense.  Kenneth Barrett was in ICU in Sparks Medical Center in Fort Smith for 11 days.

(Exhibit 99.)

273.     Abby Barrett convinced Kenneth Barrett to see a psychiatrist after he survived the shooting, and he briefly took Elavil and Ascendin.  Kenneth Barrett's dramatic mood swings continued to be "like a roller coaster."  Elavil was extremely helpful and made a big difference in Kenneth Barrett, but he discontinued his treatment.

274.     Kenneth Barrett continued to decline and was involuntarily committed to Eastern State Hospital October 8, 1986 "as a result of mental disorder or impairment by chronic

alcoholism or drug abuse" that created "an immediate likelihood of serious harm to self or others." The admitting psychiatrist provisionally diagnosed Kenneth Barrett with "depressive neurosis with suicidal potential extremely high." The nursing assessment reported that Kenneth Barrett did "not recognize problems." Kenneth Barrett had a nine year history of polysubstance abuse at the time. Kenneth Barrett hand wrote on a printed questionnaire, "I wish I was back home in the woods."

275. On the mental status examination, Kenneth Barrett was noted to be "labile" and to laugh "inappropriately at times." His insight and judgment were impaired. Staff found Kenneth Barrett to be "courteous, cooperative." Kenneth Barrett acknowledged that he had "a hot temper." Kenneth Barrett's highest level of functioning in the preceding year was "poor." He reported being anxious and depressed. He was paranoid and blamed his wife and mother for his being hospitalized. Kenneth Barrett was discharged early on October 17, 1986 to his cousin. His discharge summary noted he "wants to return to work." Kenneth Barrett was not able to return to work.

276. Kenneth Barrett sustained repeated head injuries from his work and from car accidents. Ken Barrett was preoccupied and distracted by depression and mania and unable to focus his attention. Petitioner Ken Barrett applied for disability due to his mental impairments, and was denied but evaluators found him to be "moderately depressed" and periodically unable to "think clearly."

277. Petitioner made repeated trips to the hospital after falling down stairs, sustaining a contusion to the right periorbital region of his head, being involved in a motor vehicle accident,

61

969

experiencing rib and chest pain, and suffering a rash "all over."

278.    When Kenneth Barrett's marriage ended after 14 years, he "never recovered." Ken Barrett and Abby Barrett had wanted the marriage to work for the sake of their son, but Abby was unable to tolerate the irritability, agitation, paranoia, and severe mood swings that came at unpredictable times and derailed their lives.

By the end of their marriage, Abby "felt like [they] were more like brother-sister than wife and husband because [she] was always bailing him out of trouble and taking care of him" and "trying to keep up with his mood swings." Kenneth Barrett was too impaired to take care of Abby, and she recognized that "he was mentally ill." It pained Abby to leave Kenneth Barrett because "[t]here were times he could be good. . . .and would try so hard to be good." She also knew that "he could not function without her."

279.    After their final separation, Kenneth Barrett spiraled downward, as Abby had predicted. His multiple impairments made it impossible for him to function independently. He was hospitalized January 20, 1995, given "10 mg of Haldol IM," and diagnosed with bipolar mood disorder after telling hospital staff,     "I'm losing my mind." Hospital staff noted he was "extremely agitated." During his three day hospitalization, staff reported he was "very agitated" and not able to sleep "for a few days." He demonstrated "lack of concentration" and "rapid thought process." Kenneth Barrett was discharged to his mother with "outpatient follow-up at the Bill Willis Community Mental Health," but he did not follow through.

62

280.    Kenneth Barrett "moved back home" and "built a little shack" next door to his mother's trailer.  His brother visited it and observed that the shack was "almost Waldenish in its own way."  The shack was constructed from discarded and used materials, did not have electricity or plumbing and only had "the essential stuff."  Kenneth Barrett "ran an electrical cord from (his mother Gelene's) trailer to his shack for electricity."  Gelene prepared his meals for him, and he ate at her trailer.

281.    Kenneth Barrett's son, Toby, visited often, but knew that his father had "some problems inside his head" and "always thought he had a chemical imbalance."  Even as a teenager, Toby "knew something was wrong with him because he had mood changes that were not normal."  Toby observed that his "dad could be in the best of moods one minute, then the worst" and was "a very paranoid" and "a very scared person."

282.    Everyone in the family and Kenneth Barrett's ex-wife knew he could not "live on his own."  During Ken's and Abby's frequent separations, "Kenneth Barrett always came home" to his mother.  An aunt explained that Kenneth Barrett's "only security was with Gelene because he did not have anybody else" to care for him.

283.    Kenneth Barrett's son who had to come to terms with his father's mental illness "had to bring things to him" after his father "stopped leaving his property."  Gelene Barrett "knew [Ken Barrett] had serious mental problems" but "hoped if he lived close to [her] and just worked on his cars and fixed things for people, he might be able to make it."  Ken stayed more and more to himself and became more and more paranoid, but he was not a loner at all because many friends visited him.

63

284.    Kenneth Barrett told a neighbor, Alvin Hahn, "he thought there were satellites watching him."

285.    As Kenneth Barrett's paranoia increased, so too did his dependency on family. His friends knew his paranoia was in full force and was the reason he "hardly left his property for several years."  Ken Barrett's aunt Phyllis understood that he "was never able to be independent as a grown man.  Mr. Barrett's emotions got in the way of his being able to live too far from home."  His aunt, Phyllis Crawford, described an incident that explained how Mr. Barrett relied on family when his emotions overcame him:

> [A] couple of years before the incident, Kenneth Barrett had run to my house in tears, crying,  "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenneth Barrett had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

(Exhibit 91.)

286.    Despite the limitations created by his mental impairments, Kenneth Barrett "would give you the shirt off his back if you needed it."  He "tried to stay close to home, always worked hard and took pride in his work."  Kenneth Barrett's family and friends uniformly reported that Kenneth Barrett was not violent or dangerous to them.  His great aunt Ada Blount stated, "I never felt threatened by Kenny.  He did not bother me any, but I worried about him."  Janice Sanders, his cousin, grew irritated and impatient with Kenneth Barrett on more one occasion for playing his music too loud and called the police to Kenneth Barrett's, but she loved Kenneth Barrett and "was never afraid of him."  Kenneth Barrett's maternal aunt Ruth Harris

64

found him to be "sweet person, nice, and respectful" whose drug use "may have hidden his

mental illness." Ruth and her husband, who visited Kenneth Barrett "to talk about the Bible and

how he could straighten out his life" were "never afraid of him" and did not "believe he would

intentionally hurt anyone."

287.   Relatives visited and talked with Kenneth Barrett. His second cousin Nona, who

"got along wonderfully" with him counseled him about religion. Nona described the last

conversation she had with Kenneth Barrett:

> The last conversation I had with Kenny was in 1995-96 when my husband
> at the time and I visited Gelene. Kenny came by to visit. It was clear to me that
> Kenny was studying life and thinking deeply, trying to figure things out. I
> remember he said, "'Aunt Nona, how do you know there's a God?" I took him to
> the window and said, "See how beautiful that is." He agreed but asked me "Why
> can't we see God?" I tried to explain to him that the Bible says we should
> worship God in spirit and we will see His truth.

(Exhibit 101.)

288.   Friends and family thought at times Kenneth Barrett would be alright. A friend

and neighbor reported that "Kenny had a reputation in the community as an excellent mechanic

who was fair." A cousin, Brandy Hill, remembered that "Kenny was very generous, and his auto

repair business was getting more solid every day. People would pay him hundreds of dollars in

cash to replace an engine or a transmission."

289.   Despite Kenneth Barrett's mental illness, his son Toby had "a lot of fond

memories of . . . going canoeing, and helping him work on cars." Toby was intimate with his

father's fears but knew that father "was not dangerous," and Toby "was not afraid of him." Toby

thought that Kenneth Barrett "did the best he could" and saw that his father "had a tender side to

65

him" that helped "offset the pain of having a dad with mental problems."

290.    The family hoped that Kenneth Barrett could recover.  His mother described their observations:

> As time went on, he did a little better, built a garage and fixed everything from appliances to cars, trucks, and trailers for friends and neighbors.  He stayed more and more to himself, though, and did not like to leave the property.  Friends bought him food and went grocery shopping for him.  He ate most of his meals at my trailer, and I cooked for him.  I hoped and prayed he was going to make it.  At least, I believed, with him living right next door, he was safe and I could keep an eye on him.  We had our arguments; that's for sure.  He was so paranoid and crazy at times, I was at my wit's end, but I knew he did not have anyplace else to go.

(Exhibit 97.)

291.    Both father's and mother's sides of Kenneth Barrett's family were burdened by multi-generational neurological impairments and affective mood disorders, as well as patterns of substance abuse and parental neglect consistent with an affective-laden family.  Kenneth Barrett's young parents were apparently ill-equipped cognitively, emotionally or financially to rear children.

292.    Kenneth Barrett's developmental years were characterized by parental neglect, lack of appropriate boundaries, domestic discord, inter-parental violence and physical abuse.  These factors likely potentiated Kenneth Barrett's genetic predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning.

293.    An expert presented with the available background data would have informed the jury that Kenneth "Barrett's own genetically based potential for developing a mental illness was

66

significantly increased by the circumstances of his upbringing, especially his parents' chemical dependency."

294.    Mr. Barrett's parents' dependency and their different, unpredictable behaviors while intoxicated, further compromised Kenneth Barrett's ability to perceive and incorporate a sense of appropriate boundaries, and develop an adequate perception of social cues and interpersonal interactions.

295.    Ernie Barrett was frequently physically absent for days at a time as a result of extramarital affairs, and Gelene Barrett was rendered emotionally distant and neglectful by her intoxication.  These behaviors left Kenneth Barrett's parents ill equipped to develop the primary attachments or provide the basic physical and emotional nurturing necessary for a young child's normal, healthy neurocognitive development.

296.    As Dr. George Woods explains, research published by the National Academy of Science documents the impact of such parenting on a child's developing brain:

> From Neurons to Neighborhoods, a study of early childhood development by the National Research Council and the Institute of Medicine, documented sensory stimulation, and social interactions as conditions that affect the developing brain. They also determined that chronic stress is detrimental to the normal development of the brain. ***
>
> [¶]    Parental neglect of the type suffered by Kenneth Barrett has been found to constitute as significant a risk factor for childhood trauma as physical abuse, and one which has some of the longest term and most pernicious effects of all such early traumatic experiences.
>
> [¶]    The brain is only starting to grow, mature, and differentiate at the time of birth.  Within the newborn brain there are certain structures that develop only if stimulated, and there are other structures that atrophy if not stimulated. The newborn child's interpersonal and environmental experiences determine the

rate and quality of development for domains that regulate definition of person and comprehension of one's place in his or her environment.  The absence of necessary caretaking or experiences that promote attachment between parent and child can alter both the structure and function of the child's developing brain. Kenneth Barrett's reactivity rather than responsiveness is directly related to the lack of parental training of appropriate coping mechanism, in addition to his genetically-derived mood disorder.

(Exhibit 117 at ¶¶ 33-35.)

297.    Documents and family history also present experts with data that are important to understanding what chemical and other physical insults touched Kenneth Barrett's development. His mother drank when she was pregnant with him.  Alcohol use during pregnancy is known to be associated with abnormal brain development and brain dysfunction.

298.    The history of maternal drinking of alcohol during pregnancy and Kenneth Barrett's cognitive and behavioral impairments are consistent with fetal alcohol syndrome, a possible condition worthy of further exploration.

299.    Kenneth Barrett's brain continued to be affected by alcohol and other drugs in adolescence and young adulthood.  His father initiated his drinking at age seven, and drinking and drug use, modeled by his parents, continued from there until it included a vast array of substances and prolonged exposure.  Research informed mental health clinicians that childhood and adolescent intoxication has damaging neurological consequences.

300.    Kenneth Barrett's chemical dependency history is consistent with the high incidence of substance use secondary to the increased neurovegetative symptoms of eating and sleep disorders, adhedonia and mania found in bipolar disorder. Kenneth Barrett's combination of traumatic stress and bipolar disorder predisposed him to chemical dependency.

68

301.    PTSD and bipolar disorder each have a co-occurring incidence with chemical dependence greater than 40% in the clinical literature.

302.    Jurors would want to, and have a right to, know whether there were signs that these sources of trauma and potential impairment had an effect on the young Kenneth Barrett. Records kept contemporaneously, when considered by clinicians, showed evidence of harm.

303.    As a child, Kenneth Barrett exhibited signs of impaired neurological growth, failing to meet developmental milestones expected of healthy infants.    During his first year, Kenneth Barrett exhibited increasing delays in areas associated with creating interpersonal relations and emotional development.

304.    Dr. George Woods testified by declaration and at the hearing as he or a similarly qualified expert would have testified at sentencing, that:

> Kenneth Barrett failed reading in the first grade, was required to repeat the eighth grade and was eventually referred to special education classes before he dropped out of school in the ninth grade.  By pre-adolescence his hyperactivity, irritability, isolation, and impaired academic functioning introduced the prodromal symptoms associated with major mood disorder.  He became more hyperactive, intrusive, and emotional labile, extremely sensitive, and a tendency to emotionally decompensate without apparent provocation.

(Exhibit 117 at ¶¶ 38-39.)

305.    The life history information that was available to trial counsel includes evidence of other sources of trauma that placed Mr. Barrett at risk for organic brain impairment.  He was hit in the head with a steel ball when he was eight or nine years old; at age 17, Johnny Philpot beat Kenneth Barrett about the face and head, including a blow that broke his jaw; in his early twenties, he was involved in motorcycle accidents; at age 24, he shot himself in the chest with a

69

shotgun.  *Id.*

306.    As explained by Dr. Myla Young in her sworn declaration:  "The hallmark of Kenneth Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex."

307.    The prefrontal cortex is responsible for executive functioning, which allows an individual to think and reason; solve problems; adapt to circumstances; accurately receive, process and organize information; make rational decisions; and, based on the information that is received, adapt behavior based on experience and make appropriate choices of action.

308.    More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation.  Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders.  The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Kenneth Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

309.    Dr. Myla Young's findings submitted by declaration and available at the time of sentencing and testified to by a similarly qualified neuropsychologist are based on approximately 16 hours of neuropsychological testing, including intelligence testing, a clinical interview including the taking of a history, review of educational records, and a review of psychiatric and

70

medical records.  The objective testing and historical study performed by Dr. Young constitutes an accepted, reliable method for assessing cognitive function.  Based on the historical data available at the time of trial and the scientific literature, Dr. Young opines that the damage to Kenneth Barrett's prefrontal cortex likely stems from abnormal prenatal development, traumatic brain injuries Kenneth Barrett suffered, and drug abuse.

310.    Like any other person, Kenneth Barrett has areas of weakness and areas of strength in the many brain functions evaluated by a neuropsychological test battery.  However, testing shows Kenneth Barrett, is and was at the time of the offense, impaired in some areas which means that he functions at a level below the average person, and sometimes far below.

311.     Kenneth Barrett's hypergraphia is consistent with the finding of  has temporal lobe dysfunction.

312.    The testing data and congruent findings on psychiatric study show Kenneth Barrett experiences dysfunction in areas of his brain

a.       that are central to integrated reasoning and thoughtful judgment, such as the processes necessary to inhibiting reflexive responding, interrupting, and returning to ongoing activity;

b.       interacting with and selectively directing attentional processes, screening out interference and sustaining attention; shifting cognitive resources to focus on new demands or respond to new conditions or information;

c.       directing the efficient use of, and alternation between, pattern and detail processing; monitoring and regulating speed of information processing;

71

d.      monitoring task performance for accuracy and efficiency; overseeing the selection of verbal-nonverbal and abstract-concrete processing mechanisms; directing motor output, altering performance based on feedback; directing the efficient use of fluid reasoning resources; directing the use of working memory resources;

e.      directing the efficient and fluent production of language when highly specific production demands are made; directing the integration of multiple abilities to produce oral or written responses or products that reflect the level of capacity of the component abilities involved;

f.      directing the efficient placement of information in long-term storage; directing the retrieval of information from long-term storage;

g.      regulating social behavior; regulating emotional control; enabling self-observation and self-analysis; and making use of hindsight and foresight in the direction of current processing.

313.   Kenneth Barrett suffers significantly impaired functioning in all these domains. In less scientific terms, Kenneth Barrett has brain damage that makes him less able than a normal person to process information and formulate a rational response.

314.   Kenneth Barrett's temporal cortex is also damaged or otherwise dysfunctional, and in ways that complement (aggravate) his other impairments, as they relate to culpability in the death of Trooper Eales.  The temporal cortex controls verbal and visual memory, as well as learning, interpreting and processing speech and the emotional tones and meaning in speech. The temporal cortex is also responsible for processing visual information.  Dysfunction of the

72

temporal cortex is associated with, among other things, amnesia, fear, paranoia, impulsivity, and outbursts of aggression.

315.    Based on Dr. Young's findings and his own assessment, psychiatrist George W. Woods, Jr., M.D. concludes that:

a.  Kenneth Barrett experiences dysfunction in the areas of the brain that are necessary to sound reasoning, judgment and planning.  That is, "Kenneth Barrett . . . suffers from a Dysexcutive Syndrome, which would be categorized on Axis III" of the DSM-IV-TR™.

b.  In other words, Kenneth Barrett's ability to accurately and appropriately process, retain, integrate and respond to information and events as they unfold is significantly compromised.

c.  The areas in which Kenneth Barrett experiences impairment make understanding his functioning a necessary part of understanding him as a unique human being trying to get along in the world, and for understanding the events of September 24, 1999.

d.  The problems Kenneth Barrett has experienced from organic brain impairments are compounded and exacerbated by severe psychiatric illness.

e.  Kenneth Barrett meets diagnostic criteria in the DSM-IV-TR™ for Bipolar Disorder, severe, 296.4x; and Post Traumatic Stress Disorder (PTSD), chronic, severe, 309.81.

f.  Kenneth Barrett's clinical profile medically indicates cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment.

73

316.     As Dr. Woods states it, Kenneth Barrett's cognitive functioning and behavior "is severely compromised by overlapping symptoms of depression and mania ... and impairments in [the] higher cortical regions necessary for inhibition, reasoning and judgment."

317.     The development of Kenneth Barrett's bipolar disorder was strongly influenced by his familial predisposition to this and other mental illnesses.  Kenneth Barrett comes from a family plagued with bipolar disorder.  The onset of his organic brain damage can likely be traced not only to early head trauma, but his mother's drinking while pregnant, and other factors.

318.     Dr. Woods explains that people with frontal lobe damage, and people with Bipolar Disorder share suffering in significant areas of daily functioning.  "Both groups of patients perseverate in that they continue to select stimuli in accordance with a previously enforced rule that has been changed by the examiner and thus become [sic] incorrect."

319.     Kenneth Barrett's difficulty in integrating multiple inputs, for example, his inability to integrate multiple environmental occurrences into a coherent picture, is based upon the neurocognitive deficits objectively identified by Dr. Young. These types of frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder.

320.     Kenneth Barrett's case would have presented the jury with extraordinary evidence to support these diagnoses.  Kenneth Barrett's personal and family history, is replete with incidence of major mental illness, including Bipolar Disorder.  A qualified clinician would have explained the significance of this remarkable history to jurors.

        a.     Although the severity of damage to the frontal and temporal lobes

74

of Kenneth Barrett's brain is consistent with external head trauma as a possible etiology, the pervasive distribution of measured dysfunction, and congruent deficits in early development and cognitive functioning, are all indicative of insidious onset and progress, such as congenital, genetic, or other early neurological insult.  The consistent pattern of impaired cognitive functioning observed since Kenneth Barrett's early childhood medically indicates that head traumas are likely to have been potentially contributing or exacerbating events relative to pre-natal or early acquired brain dysfunction.

      b.     The clinical literature consistently points to bipolar disorder having significant cognitive deficits as a course of the disorder, even when effectively treated. Impairments in judgment, effectively weighing and deliberating, being able to see the big picture, inhibit socially inappropriate behaviors, and plan effectively are all neurological functions that are impaired in bipolar disorder and also mediated by different aspects of the frontal lobe.

      c.     Kenneth Barrett's family history, the consistency of emotional dysregulation beginning early in his life, impairment in adult functioning and subsequent diagnosis by independent clinicians in a state facility all medically indicate a classic predisposition to bipolar disorder, prodromal symptomatology, followed by onset in late adolescence/early adulthood and course of the illness.

(Exhibit 117 at ¶¶ 63-65.)

321.    Dr. Woods further states that "Ample anecdotal and congruent documentary evidence confirm that Kenneth Barrett's mental disorders and defects pre-existed the date of the commitment offense and his trial."

322.    If trial counsel had informed themselves regarding Kenneth Barrett's history, and consulted relevant experts, the jury too would have been informed that

      a. Kenneth Barrett's functioning at the time of the offense was compromised by multiple neurological and neuropsychiatric symptoms.

      * * *

75

b.  Kenneth Barrett's paranoia, impaired judgment, and inability to effectively weigh and deliberate played into each step of his legal proceedings . . . . He was suffering from both acute and chronic symptoms of his Post Traumatic Stress Disorder and Bipolar Disorder.  The symptoms of these disorders, both disorders of mood, were amplified by a disinhibited, disjunctured, debilitated brain that limited Kenneth Barrett's understanding of both the legal proceedings and the fear, suspicion, racing thoughts, and poor adaptive function from which he was suffering.

c.  Kenneth Barrett's chronic PTSD became acutely activated by the event leading to his arrest. As previously noted, Kenneth Barrett had multiple individual stressors which qualified for a stressor that was life threatening.  Over the course of his life, he had been beaten multiple times by his caregiver and the police.  He had shot himself in the chest, at close range, almost losing his life.

d.  He was hypervigilant, having put up a sign warning people to stay away. He was extremely anxious and paranoid.  Delusional thinking and perceptual disorders, beliefs that helicopters were hovering, watching him, eroded Kenneth Bartlett's reality, raising his traumatic thinking to a psychotic level.

e.  Kenneth Barrett's paranoid ideation, hyperreactivity, and affective dysregulation primed his inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action and to gauge his reaction to unfolding events.

f.  Studies of the acutely traumatized have found that those individuals who are at increased risk for chronic PTSD are relatively more likely to experience a more severe acute emotional reaction.  This includes not only the intensity of emotions such as fear, anxiety, and/or despair, but also dissociative experiences and cognitive disruption.

g.  Kenneth Barrett's chronic PTSD had now become acute, faced with a new stressor.  Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

h.  Kenneth Barrett's bipolar disorder was, at this point in his life, at its most extreme.  He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce.  Kenneth Barrett had become increasingly withdrawn, by everyone's account.  He reported to me that the years from his divorce and the raid on his home were the darkest of his life.  He was self medicating more heavily than ever before.

76

i. Kenneth Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.  It is my professional belief that Kenneth Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property.  This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation. His belief that he was also doing the right thing was shaped by his hyperreactivity, a known stressor that was life threatening but unidentified, an exaggerated startle response and, again, extreme paranoia.

j. My belief that Kenneth Barrett, at the time of his offense, could not understand the difference between right and wrong is also based on, and bolstered by, consideration of Kenneth Barrett's profound cognitive Dysexecutive Syndrome, his perseveration which amplifies his rumination, the disinhibition which magnifies the impulsivity, the impaired sequencing which complicates the scanning of the environment.  The severe impairment of Kenneth Barrett's higher cortical functioning, which prevents mediation of limbic-based responses to perceived threats, neurologically disabled Kenneth Barrett from knowing or deliberating on the nature of his reactions before they occurred.

(Exhibit 117 at ¶¶ 69-78.)

323.    Trial counsel had available to them some resources for obtaining mental health evidence to present in mitigation.  If trial counsel had contacted Dr. Bill Sharp, who had done a preliminary evaluation during the state-court proceedings, he would have been able to rely upon the additional social history data and neuropsychological findings.  (Exhibit 55 at ¶ 16.)  Dr. Sharp concurs in the findings of Dr. Young and Dr. Woods.  (*Id.* at ¶ 23.)

324.    Dr. Sharp states,

Taking the social history information into account and Kenneth Barrett's assessment by myself, Dr. Young, and Dr. Woods, a jury could conclude that

77

> Kenneth Barrett's response to the raid on his property was impulsive and not thought-out, similar to person being surprised in the night by an unexpected phone call or alarm clock. In general, someone in those circumstances will experience some disorientation and difficulty understanding events. For someone with Kenneth Barrett's mental impairments those experiences would be magnified many times over. For a normally functioning person to understand how Kenneth Barrett would have experienced the assault on his property, he would have to think about his own sense of surprise or disorientation and think of that experience multiplied one thousand times over.

(*Id*. at ¶ 24.)

325. Dr. Pablo Stewart, or an equally well experienced and credentialed psychiatrist specializing in substance abuse, could have and would have testified at sentencing to the addictive nature, and the adverse pharmacological effect, of methamphetamine on perception, judgment, discernment and volition.

326. Armed with the available mitigating information, trial counsel would have been able to persuade the jury on multiple fronts including the mitigating facts or circumstances of the offense.

327. The evidence produced at trial and sentencing and postconviction leaves room for the mitigating impact of doubts about the truthfulness and motivations of the prosecution's informants having shown that:

a. doubts about the need for a no-knock warrant (including whether Kenneth Barrett could have failed to appear for a trial that was not going to happen);

b. the inappropriate nature of the raid and the tactics that call into doubt whether Kenneth Barrett could have seen that his attackers were law enforcement officers, especially in view of the inconsistent, contradictory, potentially perjurious testimony by law enforcement

78

986

regarding whether the emergency or any lights were engaged at the time of entry onto Mr. Barrett's property;

c. that the Tact Team recklessly approached a man who was hyper-reactive, who had been suicidal, who was extremely paranoid, and whose teenage son was threatened;

d. that Kenneth Barrett had pre-existing, organically induced impairments in the abilities to solve problems, the ability to engage in goal-directed behavior, the ability to plan strategically, the ability to anticipate the consequences of his actions, the ability to see the "big picture," and the ability to be mentally flexible rather than rigidly persist in an action that new information indicates is inappropriate;

e. that apart from the conditions existing at the time of the offense, Kenneth Barrett grew up in an environment of alcoholism, violence, selfishness, abuse, and neglect;

f. that he struggled to overcome the burdens of his background and mental impairments but in doing so fell into drug abuse that exacerbated these problems.

328.   Children of alcoholic parents are at higher risk for developing drug dependence than are children of non-alcoholic parents. Increased risk is due not solely to genetic predispositions but to environmental factors including modeling by custodians, neglect, early child abuse and poverty. The alcohol and substance abuse of one family member often influences the alcohol and substance abuse behavior in other family members and understanding these complex relationships. The Barrett family perpetuated multigenerational alcoholism and addiction, at least partly in response to pressing mental health symptoms not otherwise ameliorated by proper intervention and care.

79

329.   The inaccurate, incomplete and misleading  portrayal of Kenneth Barrett and his background and character given by the extremely superficial and unprofessional "mitigation case" that was placed before the jury was the prosecutors in closing arguments.

330.   Because of trial counsel's professionally unreasonable failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Kenneth Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance.  (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22).

331.   Because the jury never learned of Kenneth Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Kenneth Barrett as a prime candidate for the death penalty.

332.   Going down the list of the few, bare-bones mitigating circumstances that were instructed upon based on the evidence presented, AUSA Littlefield noted the jury had been told Kenneth Barrett was simply a "father," which involved no more than a biological process.  Left unsaid was what kind of father he was.  The prosecutor also ridiculed the claim that Kenneth Barrett was a loved son and stepson, remarking that what was missing was any feelings Kenneth Barrett had for his parents.  It was pointed out that Ernie Barrett had not seen his son for two years before the shooting of Trooper Eales, and that his stepmother had only had contact with him after he was in jail.  As to Kenneth Barrett's relationship with his mother, Gelene Dotson, the prosecutor pointed out that they had a tumultuous relationship with frequent arguments,

80

fights and threats between them.  Kenneth Littlefield remarked that Kenneth Barrett's parents cared so much for him that they could not tell the difference between him being "hyper" and being "hyped up" on drugs.  As to Kenneth Barrett being a good neighbor and friend, the prosecutor reminded the jurors that all they heard was that he fixed cars cheaply.   Dismissing the mitigating circumstance that Kenneth Barrett's execution would have an impact on his child, family and friends, the prosecutor was quick to point out that since Toby Barrett had not testified, there was no evidence that Kenneth Barrett's death would have any negative impact on his own child.  Indeed, the only testimony regarding the impact of Kenneth Barrett's execution on his family came from his stepmother, Doris Barrett, who would no longer be able to visit Kenneth Barrett in prison.  Making short work of the claim that Kenneth Barrett had expressed remorse, Littlefield told the jury that Kenneth Barrett only told his mother that he wished things had turned out differently.  This ambiguous statement was used as a springboard for the prosecutor to argue that by this, Kenneth Barrett simply meant that he was sorry he had gotten caught and was prevented from "killing more of the bastards."  Finally, the "catch-all" instruction on any other factors the jury might find to be mitigating opened the door for more negative characterizations of Kenneth Barrett, whom the prosecutor described as having dropped out of school because he did not want to get a haircut; as a user and seller of methamphetamine; as a wife-beater; and as a man so unconcerned about the safety of his son that he allowed him to remain on the property knowing full well that a police raid, which was going to be met by lethal force, was imminent.

333.    Since virtually nothing of Kenneth Barrett's background, history and upbringing

81

was placed before the jury by trial counsel, AUSA Littlefield was able to portray Kenneth Barrett as simply a bad and unrepentant seed when compared to his brother Steven Barrett, who became a successful educator and who was raised in the same home as Kenneth Barrett.

334.    Picking up the theme that Kenneth Barrett's case in mitigation was pitifully anemic, United States Attorney Sperling reminded the jury that Sequoyah County Court Clerk Maudeen Vann testified that Abby Barrett had filed seven domestic abuse complaints against Kenneth Barrett.

335.    Abby Barrett was portrayed as a pathetic, abused wife, helpless at the hands of a husband who was simply a mean person, a man who had stalked her and threatened to "blow [her] head off."

336.    Kathy Trotter was dismissed as a witness who knew very little about her cousin, Kenneth Barrett, since she stated she was ignorant of his drug activities, his penchant for being armed, his domestic violence record, and was unaware of his "threats" to law enforcement, as testified to by the seven snitch witnesses.

337.    Kenneth Barrett's "helpfulness," for all the jury knew, was limited to fixing a few cars.  Just as Littlefield had done, Kenneth Sperling contrasted Kenneth Barrett with his brother Steven, a success story who was raised by the same parents and in the same environment, but chose to take a different path than Kenneth Barrett, the knowing, violent criminal:  "How he [Kenneth Barrett] must envy his hard working, highly achieving brother's success."

338.  Government prosecutor Sperling pointed out that Kenneth Barrett had only sporadic contact with his mother until his arrest, hinting that he was a bad and neglectful son.

82

339.    Ernie Barrett, being the good father that he was, gave Kenneth Barrett several chances to succeed at work, but Kenneth Barrett simply chose to "[blow] them."

340.    Doris Barrett was loyal to her stepson, despite his misbehavior in jail, the implication being that her loyalty was more a tribute to her than anything positive or redeeming about Kenneth Barrett.

341.    Whatever Kenneth Barrett had done for his family was vague and undetermined, and was in any event far outweighed by the crimes he had committed.

342.    If the jurors were tempted to feel any sympathy for Kenneth Barrett's family at all, they should remember that Kenneth Barrett abandoned his family by his own conduct.

343.  Prosecutor Sperling stated that Kenneth Barrett had "victimized" his own family by making them serve as "props" or witnesses on his behalf in the penalty phase.

344.    Concluding his remarks on Kenneth Barrett's mitigation case, Sperling told the jury that Kenneth Barrett had paid for his membership among "the worst of the worst."  Kenneth Barrett was simply a murderer who had killed remorselessly, wantonly, and selfishly, a man who was devoid of sympathy or empathy for his victim.

345.    Despite the mania and paranoia, the hypervigilence, hyperactivity, and disinhibition, his family, friends, neighbors, bail bondsman, and even the local sheriff and Sallisaw City police chief, all knew that Kenneth Barrett would have gone peacefully into custody if someone he knew had simply asked him to.

346.    In the 2255 postconviction proceedings, Dr. George Kirkham, a criminologist, sworn law enforcement officer and expert in police tactics (Doc 50

83

at ), which, if heard by the jury at trial and/or sentencing would have been mitigating.

347.    Dr. Kirkham, or a similarly qualified expert, could have and would have testified that the raid on Mr. Barrett's home

a.  violated – indeed, was converse to – established law enforcement standards and procedures in that it relied upon force and aggression before any other methods were explored;

b.  was carried out in a way that minimized the chances of Mr. Barrett having visible evidence that his attackers were law enforcement officers and no audible evidence of law enforcement's presence;

c.  was carried out in a way that trained law enforcement officers would expect to provoke a violent response from the target; and

d.  unnecessarily exposed Troopers Hamilton and Eales to gunfire from the cabin and other law enforcement officers.

348.    Dr. Kirkham, or a similarly qualified expert, called to testify at trial and/or sentencing would have explained how Mr. Barrett's perception of the these things are just as true if the jury credited the testimony of the Government's seven informants, as they were when the second state court jury, without the

testimony of those witnesses, acquitted Mr. Barrett of first-degree murder.

349.    That is, with expert assistance, Mr. Barrett would have been able to show that at a minimum there was a residual doubt that Mr. Barrett did not have the intent to kill law enforcement officers, or, at a minimum, that there was every reason to doubt the Government's

84

claim that he had such intent.

350.    Dr. Kirkham could have and would have explained how the poorly planned and executed raid on Mr. Barrett's property was tailor made to exacerbate the impaired judgment and perceptions of Mr. Barrett and invited a misunderstanding and over-reaction by Mr. Barrett.

351.    Jurors at the second stage or trial would have had ample grounds to vote for a sentence less than death if they had known of the errors made in deciding upon, planning, and conducting the ill-fated attack.

352.    Paul Gordon, former Internal Affairs Investigator for the Oklahoma Highway Patrol, well qualified and experienced in investigations was available to testify and would have testified to the following mitigation:

a.  That he was called to the scene at Mr. Barrett's residence on September 24, 1999 shortly after the fatal attempt to execute the search and arrest warrants in question.

b.  That he spoke to Lt. Kerry Pettingill who told him that when everything started he thought it was his men (OHP East Tact Team and DEA agent liaison Danny Oliver) who started shooting at the Barrett cabin as they rolled up on it.

c.  That during the course of his investigation of the incident, it was clear that (1) the East Tact Team of the Oklahoma Highway Patrol had failed to follow appropriate protocol in the execution of the warrants at the residence of Kenneth Barrett on September 24, 1999; (2) neither the Oklahoma Highway Patrol nor the Oklahoma State Bureau of Investigation desired or pursued a through objection investigation of the incident and events following the incident; and that his efforts to conduct a thorough objective investigation of the incident resulted in attempts

85

by the State of Oklahoma to undermine the investigation and his ability to credibly conduct and report the same.

d.  That on the afternoon of September 24, 1999, with the exception of Trooper Ricky Manion who shot Kenneth Barrett, all of the involved troopers denied firing their weapons and none were willing to give up their state-issued weapons for analysis and testing, despite being routine in any officer-involved shooting;

e.  The investigation made clear that the OHP East Tactical Team failed to follow the OHP handbook protocol, at the very least in that the lead Bronco vehicles were unmarked and the troopers did not activate their emergency lights to warn Barrett he was dealing with the police.

f.  When 2d Lt. Gordon arrived at the shooting scene on September 24, the vehicle that was fired upon had its visor flip and emergency lights in the up position as were Lt. Pettingill's, the team leader.

g.  During the investigation, 2d Lt. Gordon asked Trooper Hamilton specifically about the lights. At first, Trooper Hamilton said the emergency lights were down.

h.  When confronted with the fact that the flip lights would have been shot up if they had been down, Trooper Hamilton admitted that they did not activate the lights; in fact that they did not have any lights on at all – a circumstance consistent with executing an anytime, no knock warrant.

i.  OHP Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights  and his flashing bar on but ultimately admitted that someone flipped the lights on

after the shooting to give needed light during the wounded troopers' evacuation;

j.  Under the circumstances admitted to and observed by Investigator Gordon, Mr. Barrett would not have known the incoming vehicles were law enforcement

k.  Mr. Barrett would not have seen the other vehicles approaching from the side because when he reportedly was outside the residence, he was on the porch looking where his son was yelling for help.

l.  The physical evidence and interviews made it clear that Mr. Barrett never left the porch and never went into the yard and that he only responded to the first tactical vehicle when it was accelerating towards the front of the residence, after making a circle in the yard from the side of the cabin.

m.  The vehicle then ran or slid into the front of Mr. Barrett's cabin, stopping with engine still running. Barrett was on the porch, shooting at the vehicle from a 45 degree angle, slightly elevated position and hit the vehicle's transmission lines which, under engine power, caused a major transmission fluid leak that emptied the transmission fluid onto the ground exactly where the vehicle originally stopped and the shooting occurred.

n.  The OSBI with the assistance of OHP Vernon Phillips,  inappropriately processed the Eales /Hamilton vehicle at the place where the
vehicle had been moved, rather than where it had been positioned during the shooting.

o.  Neither the scene nor Mr. Barrett were handled by law enforcement in the manner in which they would have been had there been any red phosphorous on Mr. Barrett's person.

p.  Mr. Barrett's property was thoroughly searched the morning of the of the shooting and

87

nothing which indicated drug activity was observed or reported to Investigator Gordon.

q. Mr. Barrett was not suspected of drug manufacturing at his residence but was suspected of being an enforcer, i.e., of facilitating sales of drugs between buyers and sellers who did not want to deal directly with each other;

353. Properly interviewed and prepared for trial and/or sentencing, Paul Gordon's testimony would have been mitigating, at the very least, giving the jury significant reason to sentence Mr. Barrett to less than death.

354. After hearing the evidence and observing the defendant's own conduct, the jury unanimously found that the defendant was not likely to commit future acts of violence.

. 355. The Government's case for death was not overwhelming.

356. The jury rejected the death sentence on Counts 1 and 2.

357. The statutory aggravating circumstances the jury did find with respect to Count 3 all revolved around the circumstances of the commission of the offense which would have been viewed in an entirely different way had counsel presented the jury with the mitigating testimony of Internal Affairs Investigator Paul Gordon and presented an expert such as George Kirkham.

358. The prosecution's penalty phase case did not indicate much additional "moral egregiousness" above and beyond the circumstances of the crime itself.

## II. PROPOSED CONCLUSIONS OF LAW

1. Trial counsel Hilfiger and Smith unreasonably delayed preparation for the penalty phase. Although Mr. Echols had been adamant that the work done in state court was incomplete and inadequate, Mr. Hilfiger and Mr. Smith did not begin the process of completing that work

88

until mid-August 2005.

2.      The prevailing professional norms of criminal defense practice in general and capital defense in particular required Mr. Hilfiger or Mr. Smith to advise Mr. Barrett of the risks and benefits of trial strategies "[a]fter informing himself . . . fully on the facts and the law." ABA Standard 4-5.1(a). That norm is further codified in Strickland's statement that an uninformed decision not to investigate is not reasonable.

3.      Trial counsel Hilfiger and Smith unreasonably failed to obtain the services of a mitigation specialist or otherwise to conduct the requisite thorough investigation of their client's background. Although this Court had found that the services of a mitigation specialist were reasonably necessary for Mr. Barrett's defense, authorized trial counsel to retain a mitigation specialist, and directed trial counsel to devote their full attention to the preparation of this case, trial counsel never contacted the authorized mitigation specialist. Far too late, trial counsel asked Dr. Russell to serve in that role but she declined.

4.      Trial counsel unreasonably failed to follow up on information indicating Mr. Barrett had a history of mental problems including Dr. Russell's notation of a head injury and Dr. Sharp's report of paranoia and likely cognitive impairment.

5.      To the extent Mr. Barrett believed that mitigation necessarily or predominantly entailed appeals to sympathy or begging for his life, trial counsel's advice to him fell below prevailing professional norms. As a matter of law and practice, mitigation evidence does not necessarily or predominantly entail appeals to sympathy and begging for the defendant's life is not permitted in federal capital cases.

89

6.      Mr. Barrett's trial counsel had a "continuing duty to investigate issues bearing upon penalty and to seek information that supports mitigation or rebuts the prosecution's case in aggravation." ABA Guideline 10.11(A).  The Supreme Court has found the performance of capital defense attorneys deficient for failing to investigate a single file, for failing to follow-up on reports of abuse, and for failing to complete an investigation into known aspects of a defendant's background.

7.      To the extent trial counsel's failure to consult mental health experts was based on their view that Mr. Barrett's mental condition was related to his drug use, their omission fell below prevailing professional norms. Trial counsel unreasonably failed to consult a mental health professional about their alleged concern even though funds were available for that consultation and the court urged trial counsel to amend the budget if necessary. Trial counsel knew the jury would hear about Mr. Barrett's drug use. Trial counsel's failure to investigate whether there was evidence to mitigate that information, such as whether Mr. Barrett had suffered trauma or from a mental illness, fell below prevailing professional norms.

8.      Contrary to 18 U.S.C. §§ 3005 and 3599 and the Judicial Conference's CJA Guidelines, the trial court did not consult the Federal Defender about a replacement for Mr. Hilfiger when he became lead counsel and there was a need to appoint a second lawyer for Mr. Barrett. Therefore, the appointment of Bret Smith, a lawyer with no previous experience in the defense of a capital case, fell outside the norms of legal practice.

9.      The two-and-one-half-month delay in authorization to retain a mitigation specialist--from January 31, 2005, when the request was first made, until March 18, 2005, when

90

the request was granted in part--was contrary to prevailing professional norms which call for assembly of the defense team "[a]s soon as possible after designation" of lead counsel. ABA Guideline 10.4(C). The Supreme Court has held that constitutionally deficient performance can occur when the omissions of defense counsel are due to restrictions imposed by the trial court. E.g., Genders v. United States, 425 U.S. 80 (1976). Thus, to the extent trial counsel's preparation for the penalty phase was adversely affected by the delayed authorization for expert and investigative services, their performance was constitutionally deficient.

10.     Trial counsel unreasonably delayed seeking the assistance of a mitigation specialist until late June 2005 and again in mid-August 2005. Trial counsel ultimately failed to retain the services of a mitigation specialist, although the court had authorized funds to retain one. The Supreme Court has found that delaying preparation for the penalty phase until shortly before trial is evidence of deficient performance. Williams (Terry) v. Taylor, 529 U.S. 362, 395 (2000). The Court also has found that the failure to obtain readily available assistance with mitigation evidence is evidence of deficient performance. Ibid. Both trial counsel's delay and their failure to retain a mitigation specialist at all fell below prevailing professional norms of practice in federal death penalty cases.

11.     Trial counsel unreasonably failed to obtain and review all the records gathered as part of the mitigation investigation that had been conducted prior to the two state trials. Due to trial counsel's failure to obtain and review all those materials, counsel were unaware that a mitigation specialist and a psychologist had identified areas of mitigation including Mr. Barrett's neglectful parents and his history of mental problems. Trial counsel's failure to obtain and review

91

the records from the state-trial investigation fell below prevailing professional norms.

12.     Trial counsel's unreasonable failure to obtain and review the files of the state-trial investigation meant trial counsel were unaware of the leads to further investigation contained in those files. Trial counsel's self-imposed ignorance of the files rendered them unable to make reasonable strategic decisions about what mitigation they could pursue.

13.     Trial counsel unreasonably believed that the only mitigation evidence that could be presented was evidence related to whether Mr. Barrett would be a future danger as a prisoner. It was clearly established long before Mr. Barrett's trial that the Eighth Amendment requires a capital sentencing jury to hear and consider any evidence that could be relied upon in support of a sentence less than death. The Supreme Court has held that a failure to take action that is based on a misunderstanding of the law constitutes deficient performance. Williams (Terry), 529 U.S. at 395; Kimmelman v. Morrison, 477 U.S. 365, 385 (1986). Trial counsel's misunderstanding of Mr. Barrett's constitutional right to present mitigation evidence fell below prevailing professional norms.

14.     Trial counsel's unreasonable belief about the limited scope of mitigation evidence had an adverse influence on their preparation for the penalty phase and the evidence they presented. Under Williams and Kimmelman, trial counsel's performance was constitutionally deficient.

15.     To the extent trial counsel believed that Mr. Barrett wanted to limit the scope of mitigation evidence they could present, counsel's response to Mr. Barrett fell below prevailing professional norms. It was common knowledge among capital defense attorneys at the time that

92

capital defendants often expressed reservations about revealing painful parts of their childhoods or mistreatment by their parents. Trial counsel had available to them an expert attorney, Richard Burr, who had offered to help through such difficulties, but trial counsel unreasonably failed to respond to Mr. Burr's offers of assistance. Again, trial counsel's failure to return a phone call, or in this case emails from the Federal Defender and Mr. Burr offering assistance, constitutes deficient performance.

16. Trial counsel's penalty phase investigation fell below prevailing professional norms. It was well understood by capital defense counsel at the time that developing evidence of a neglectful or abusive childhood and its effects very often required the use of expert interviewers. Trial counsel in this case had such expertise at their disposal but unreasonably failed to use it. It was well understood at the time of the trial in this case that defense counsel would need to spend many hours developing the trust and confidence of a client and his family members in order to discover and develop evidence of childhood neglect and abuse. Trial counsel in this case unreasonably failed to spend time needed to investigate and present readily available evidence that Mr. Barrett experienced neglect and abuse as a child.

17. It was commonplace at the time of this trial for prosecutors to contrast one sibling who was successful with the defendant who was convicted of murder. Trial counsel in this case unreasonably failed to anticipate that the prosecution would use this tactic when the defense presented Mr. Barrett's brother Steve as a penalty phase witness. Trial counsel failed to interview Steve about the difference between his childhood and Mr. Barrett's. Trial counsel's performance fell below prevailing professional norms.

93

18.     Kenneth Barrett's trial counsel had a professional duty to investigate and learn of the foregoing facts.

19.     Kenneth Barrett's trial counsel had a professional responsibility to make the jury fully aware of the story of who Kenneth Barrett was and how he came to be that unique person.

20.     Due to trial counsel's incompetence, the jury was not informed of the mitigating circumstances in Kenneth Barrett's background, including, the alcoholism of his parents, his mother's use and abuse of alcohol the entire time she carried him, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging, and harsher treatment than his brothers, he received from his mother, his father's abandonment of the family, this constant  uprooting throughout his childhood, his abandonment by his mother due when she was most depressed, his mother's abuse of him in encouraging him to party with drugs with her ever-changing boyfriends and other friends, his early childhood and other head injuries, his potential early childhood exposure to chemicals from the glass works in which both his parents worked, and that his suicide attempt was a symptom of mental disease.

21.     If trial counsel had gathered these  readily available facts  and provided them to qualified experts, as prevailing professional norms required, the jury would have understood how Kenneth Barrett's life history, while intrinsically compelling and heartbreaking, also had profound implications for  understanding the scientific underpinnings  of Mr. Barrett's s mental health and actions.

22.     If trial counsel had followed prevailing professional norms and had timely retained appropriate mental health experts to assist the defense, Kenneth Barrett's jury would

94

have heard extensive evidence of his mental illness and impaired brain functions due to organic damage.

23.     Residual doubt is a reasonable mitigating circumstance to be presented at sentencing in a capital case.

24.     The evidence of the impact the dead of night raid had on a drug-addicted, paranoid, mentally-ill person like Kenneth Barrett, and his inability to assess and appropriately react to the situation would have been mitigating in nature.

25.     The contradictory and potentially perjurious testimony of  law enforcement witnesses regarding whether or not the lights of the vehicle were on prior to the raid was mitigating.

26.     The factual impossibility of Kenneth Barrett having continuously fired, or fired at all, on law enforcement vehicles as they came across his property was mitigating.

27.     The overwhelming weight of the mitigating evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation before the raid, and in its conduct of the raid itself, which made it likely that there would be a firefight and that someone might die.

28.     Had the jury heard all of the evidence in mitigation including Kenneth Barrett's cultural and family and personal history, the medical, psychological and psychiatric history, the mitigating facts, (known to the Drug Enforcement Agency, the Drug Task Force, the Oklahoma Highway Patrol and local law enforcement),surrounding the raid, which was opposed by the Sequoia County Sheriff,  that led to the death of Trooper Eales, the jury would probably have

95

made findings that ultimately concluded that just as Trooper Eales should not have been put in danger, Kenneth Barrett should not have been sentenced to death.

29.     Had counsel presented the powerful case in mitigation that could have been marshaled, but which Kenneth Barrett's jury never heard, at least one juror would have opted not to impose the death penalty.

30.     Trial counsel had a clearly defined duty to investigate, develop and present the now-known mental health evidence in the penalty phase of trial.

31.     The mental health evidence that could have and should have been presented on Kenneth Barrett's behalf was not only powerful evidence in mitigation of punishment, as the Supreme Court has recognized repeatedly, but was also directly relevant to refuting the statutory aggravating circumstances that Kenneth Barrett knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Kenneth Barrett committed the offense after substantial planning and premeditation.

32.     The evidence presented at the § 2255 proceedings shows both that trial counsel's lack of investigation and expert consultation fell below the objective standards of reasonableness codified in the ABA Standards and Guidelines and in case law that predated the guidelines.

33.     There was abundant "undiscovered mitigating evidence [that], taken as a whole, might well have influenced the jury's appraisal" of Kenneth Barrett's culpability.

34.     Had the jury been able to weigh the evidence that should have been presented in both phases of the trial "on the mitigation side of the scale, there a reasonable probability that at least one juror would have struck a different balance." *Wiggins v. Smith*, 539 U.S. 510, 537

96

(2003).

35.     The totality of the available mitigation evidence – both that adduced at trial , and the evidence adduced in the [§ 2255] proceeding" outweighs the evidence in aggravation and would have affected the jury's consideration.  *United States v. Barrett,* 797 F. 3d 1207, 1229 (10th Cir. 2015).

36.     Prejudice from trial counsel's failures to properly investigate and present available evidence in mitigation is manifest.

37.     Mr. Barrett has shown by the preponderance of the evidence that he was prejudiced by trial counsel's deficient performance.

38.     Accordingly, the sentence of death should be vacated and a new sentencing proceeding held.

DATED: February 16, 2017                    Respectfully submitted,

                                            /s/ _David Autry_____
                                            DAVID AUTRY
                                            Attorney at Law

                                            */s/ Joan M. Fisher*
                                            JOAN M. FISHER
                                            Assistant Federal Defender

                                            Attorneys for Kenneth Eugene Barrett

97

1005

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 16th day of February, 2017, I caused the foregoing

Petitioner's Proposed Findings of Fact and Conclusions of Law to be filed with the Clerk of the

Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J.

Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To

counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

1006

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**JOINT PRE-HEARING STATEMENT**

---

**COME NOW** the parties to this action and, pursuant to the Scheduling Order issued

herein (Doc. 270), would submit the following Joint Pre-Hearing Statement:

A. <u>Counsel who will appear at evidentiary hearing</u>:

    a.  Petitioner: David Autry, Attorney; Joan Fisher, Assistant Federal Public Defender; Tivon Schardl, Assistant Federal Public Defender and Karl Saddlemire, Assistant Federal Public Defender.

    b.  Respondent: Christopher J. Wilson, Assistant United States Attorney and Jeffrey B. Kahan, Trial Attorney, Capital Case Section

B. <u>Stipulated or uncontested facts</u>:

Petitioner stipulates to the following proposed findings of fact filed this date by the

Respondent:  Paragraphs 2,3,13 and 23.

Respondent stipulates to the following proposed findings of fact filed this date by the

Petitioner: Paragraphs 20, 23, 25, 26, 51, 83, 89, 93, 94,107(a),(b),(d),(e),(f),g),

144,151,157,162,163,203,252,287,343

C. <u>Contested issues of fact and law</u>:

    a.  Contested Issues of Fact

1

Facts to which the parties have not stipulated as indicate in Section B above are contested. See Findings of Fact and Conclusions of Law filed by the respective parties this date.

b. Contested Issues of Law

Both parties contest the Conclusions of Law proposed by the opposing party, as filed this date.

D. <u>Witnesses to be called at evidentiary hearing, including brief description of their anticipated testimony</u>:

a. Petitioner: The anticipated testimony of the witnesses named below are identified by previously submitted. To the extent that no declaration is in the record, either a brief summary is included or a declaration or statement is attached.

1. Dick Burr – 6:09-cv-00105, Doc 71, Exh. 118; Doc 178, Ex 219
2. George Woods – 6:09-cv-00105, Doc 71, Exh. 117
3. Deborah Miora 6:09-cv-00105, Doc 305, Exh. 3
   Dr. Miora is a neuropsychologist in private practice. Dr. Miora will present the evaluation conducted by Dr. Myla Young who died after submitting her declaration. Dr. Miora will testify about Mr. Barrett's neurocognitive functioning at the time of the offense consistent with the declarations of Dr. George Woods and Dr. Young."
4. Pablo Stewart

Dr. Pablo Stewart, a physician licensed to practice medicine in California and Hawaii who is board certified in psychiatry by the American Board of Psychiatry and Neurology. Dr. Stewart completed his medical and psychiatric training at the University of California in 1986 and has practiced in a number of settings, including jails, jail psychiatric hospitals, and Veterans' Administration hospitals. Dr. Stewart has qualified as an expert in seven federal courts and several state courts. Dr. Stewart will testify to his review of Mr. Barrett's psychiatric, medical and substance abuse history, as well as his social history. Dr. Stewart will testify generally to the likely impact the long term and recent use of the methamphetamine had on Mr. Barrett's mental health and general functioning. He will testify more specifically to its impact on Kenneth Barrett on the night of the raid if and when the court permits access to Mr. Barrett. Dr. Stewart will address specifically

2

how the substance abuse likely impacted Mr. Barrett's previous psychiatric disorders or medical condition at the time of the offense, including  Based on that information and assessment, he will offer his professional opinion of the likely impact of the drug use on Mr. Barrett's ability to perceive, understand, assess or evaluate and make judgments under the conditions on September 24, 1999.  As a well-qualified in drug and substance abuse including alcohol, marijuana and methamphetamine and its effect on judgment, perception, reactions and related mental state.   A full and complete disclosure of Dr. Stewart's anticipated testimony will be made available in his March 3 Rule 26 Report.

5. Thomas Kosten, M.D. – Dr. Kosten is the Jay H. Waggoner Endowed Chair and Professor of Psychiatry, Neuroscience, Pharmacology, Immunology & Pathology at Baylor College of Medicine, Michael E. DeBakey VAMC in Houston, Texas. While a report from Dr. Kosten remains outstanding, Petitioner anticipates that Dr. Kosten will testify to his review of Mr. Barrett's psychiatric, medical, and substance abuse histories; his social history; his review of prior evaluations of Mr. Barrett; and/or his own clinical evaluation of Mr. Barrett. Petitioner anticipates Dr. Kosten will attest to the environmental and genetic factors explaining Mr. Barrett's drug and alcohol use; the psychiatric comorbidities of Mr. Barrett's substance use; the potential association or Mr. Barrett's substance use with violence, paranoia, and psychosis; and Mr. Barrett's treatment and rehabilitation outcomes. Dr. Kosten may address specifically how substance use and/or abuse may have impacted Mr. Barrett's previous psychiatric disorders or medical condition at the time of the offense and his risk of committing future acts of violence in prison. Based on that information and assessment, he may offer opinions on Mr. Barrett's ability to perceive, understand, assess or evaluate and make judgments under the conditions that obtained at the time of the offense. Dr. Kosten may testify in rebuttal to the government's case, including but not limited to the psychological evaluations by Dr. Randall Price and Dr. Steven Pitt.  Tom Kostin,

6. Tom Reidy, PhD ABPP - 6:09-cv-00105, Doc 305, Exh. B

Dr. Reidy is a clinical psychologist in private practice. Dr. Reidy filed an initial declaration in docket no. 04-115-P accompanying Petitioner's motion in limine to exclude testimony by proposed government expert J. Randall Price (§ 2255 Doc. no. 305). Petitioner believes that Dr. Reidy will testify in conformity with the findings in his

declaration. Dr. Reidy found that Dr. Price's 2005 report lacks reliability given the state of that science at the time of Petitioner's trial, and that Price's use of psychopathy and anti-social personality disorder as diagnostic considerations in risk assessment for prison violence also lack validity. Dr. Reidy will attest that risk assessment methods employed by Price are not confirming of psychiatric diagnosis or neuropsychological functioning. Petitioner anticipates that Dr. Reidy will attest to the validity of various measures and techniques used in risk assessment, including those employed or omitted by Dr. Price and Dr. Jeanne Russell. While an additional report from Dr. Reidy remains outstanding, Petitioner anticipates that Dr. Reidy will testify to his opinions regarding Mr. Barrett's potential risk for committing violent offenses in prison: principally, Mr. Barrett presents a reduced risk of prison violence.

7. George Kirkham – 6:09-cv-00105, Doc 71, Exh. 44

8. Erin Bigler, PhD., Dr. Bigler is the Susa Young Gates Professor of Psychology and Neuroscience at Brigham Young University. While Dr. Bigler's report remains outstanding, Petitioner anticipates that Dr. Bigler will testify to Mr. Barrett's neuropsychological functioning, cognitive impairment, history of head trauma, and/or brain damage, including the possible etiologies of his brain damage. Petitioner anticipates that Dr. Bigler will testify that Mr. Barrett has suffered from probable mild Traumatic Brain Injury (mTBI). Dr, Bigler may offer rebuttal testimony to the government's case, including the evaluations and opinions offered by Dr. Randall Price and Dr. Steven Pitt.

9. Myla Young, deceased – 6:09-cv-00105, Doc 71, Exh. 44

10. John Echols – 6:09-cv-00105, Doc 71, Exh. 34

11. Jack Gordon – 6:09-cv-00105, Doc 432, Ex 53

12. Julia O'Connoll – 6:09-cv-00105, Doc 71, Exh. 67

13. Susan Otto – 6:09-cv-00105, Doc 71, Exh. 54

14. Jeanne Russell – 6:09-cv-00105, Doc 71, Exh. 56

15. Steve Leedy – 6:09-cv-00105, Doc 71, Exh. 111

16. Roseanne Schaye – 6:09-cv-00105, Doc 403, Ex 118

17. Mark Henricksen – 6:09-cv-00105, Doc 71, Exh. 29

18. Ron Lax  - – 6:09-cv-00105, Doc 71, Exh. 66

19. Gelene Dotson Barrett – 6:09-cv-00105, Doc 71, Exh. 97; Doc 178, Ex 210

20. Steve Barrett – 6:09-cv-00105, Doc 71, Exh. 99

21. Issac Barrett – 6:09-cv-00105, Doc 71, Exh. 84; Doc 178, Ex 208

22. Abby Stites  – 6:09-cv-00105, Doc 71, Exh. 103; Doc 178, Ex 216

23. Roger Crawford – 6:09-cv-00105, Doc 71, Exh. 92

24. Kathy Trotter – 6:09-cv-00105, Doc 71, Exh. 86

25. Janice Sanders – 6:09-cv-00105, Doc 71, Exh. 85; Doc 178, Ex 215

26. Carolyn Joseph – 6:09-cv-00105, Doc 71, Exh. 78; Doc 178, Ex 213

27. Brandi Hill – 6:09-cv-00105, Doc 71, Exh. 77

28. Gwendolyn Crawford – 6:09-cv-00105, Doc 71, Exh. 83

29. Sharon Greenfeather – Attached, Not yet filed.

30. Linda Riley – 6:09-cv-00105, Doc 71, Exh. 87; Doc 178, Ex 214

31. Toby Barrett  – 6:09-cv-00105, Doc 71, Exh. 96

32. Mark Dotson – 6:09-cv-00105, Doc 71, Exh. 98; Doc 178, Ex 211

33. Judy House – Attached, not yet filed

34. Nona Reich – 6:09-cv-00105, Doc 71, Exh. 101

35. Gary Nelson  – Declaration of Testimony Attached, not yet filed

36. Paul Gordon – 6:09-cv-00105, Doc 432, Ex 18

37. Janesse Thomas – 6:09-cv-00105, Doc 71, Exh. 13

38. Iva Hines: Thomas and Iva Hines run Thomas Hines Construction. Iva is 60 years old. Ken worked for them for years, dined at their table, been to their house 100s of times. Mrs. Hines will testify that Ken was a good worker, a good guy. They had no right to come in on him like they did. They all would have done the same as him.  She will also testify that her husband and she were never contacted by Mr. Hilfiger and/or Mr. Smith. She does remember speaking to someone from the defense before the first state trial. … She will add that "Ken would do anything for you, give you the shirt off his back." If she had been contacted by his federal lawyers, she would have told them of her potential testimony and would have testified if called. "Kenny got along with everybody.  He had no enemies."

39. Gary Philpot – 6:09-cv-00105, Doc 432, Ex 8

40. Rick Lunsford  – 6:09-cv-00105, Doc 71, Exh. 90

41. Billy Poindexter  – 6:09-cv-00105, Doc 71, Exh. 76

42. Marty Daggs – 6:09-cv-00105, Doc 432, Ex 54

43. Doris Barrett – 6:09-cv-00105, Doc 71, Exhs. 80, 105; Doc 178, Exh. 207

44. *Karl Cook, deceased – 6:09-cv-00105, Doc 71, Exh. 102

45. *Warren Dotson, deceased – 6:09-cv-00105, Doc 71, Exh. 100

46. *Ernie Barrett, deceased – 6:09-cv-00105, Doc 71, Exh. 81; Doc 403, Exh. 84

47. *Ada Blount, deceased – 6:09-cv-00105, Doc 71, Exh. 74

48. *Phyllis Crawford, unavailable/dementia – 6:09-cv-00105, Doc 71, Exh. 91; Doc 178, Ex 209

49. *Ruth Harris, unavailable, poor health – 6:09-cv-00105, Doc 71, Exh. 93; Doc 178, Ex 212

50. Petitioner reserves the right to call witnesses identified by the government including Roger Hilfiger and Bret Smith and rely on the government's declarations of each as a summary of their testimony.

      b.   Respondent:

       1.   Roger Hilfiger – On October 25, 2005, Mr. Hilfiger was appointed as co-counsel to John Echols in the case of *United States v. Barrett* (ED Okla. case no. 04-115-P). He became lead counsel on May 5, 2005, upon Mr. Echols's withdrawal. After his appointment as lead counsel, Mr. Hilfiger obtained case files maintained by Mr. Echols and the Oklahoma Indigent Defense System. He believed the materials he received constituted the entire file in the case. He reviewed the material in the file. Based on his interactions with Barrett, and his interviews with Barrett's relatives, Mr. Hilfiger never had reason to suspect that the defendant suffered from a major mental illness. Mr. Hilfiger recalls that Dr. Jeanne Russell dissuaded him from calling her as a witness to present mental health evidence, out of concern for the rebuttal it would invite. Mr. Hilfiger recalls that Barrett repeatedly insisted that he did not want to present a mitigation case that dwelled on his childhood. Mr. Hilfiger does not have distinct memories of mental health and social history documents in counsel's file, but does recall that he and Mr. Smith made a conscious decision to present a mitigation case based on three principles: Barrett had already been punished for the homicide by the State of Oklahoma, Barrett behaved well in custody, and Barrett was a good enough person that he did not deserve to die for his crime.

       2.   Bret Smith - On May 5, 2005, Mr. Smith was appointed as co-counsel to Mr. Hilfiger in the case of *United States v. Barrett* (ED Okla. case no. 04-115-P). Mr. Smith maintained a good rapport with Barrett and sometimes met with the defendant alone. Based on his interaction, Mr. Smith found no reason to suspect Barrett suffered from a major mental illness. Mr. Smith recalls that Dr. Jeanne Russell dissuaded him from calling her as a witness to present mental

health evidence, out of concern for the rebuttal it would invite. Mr. Smith recalls that Barrett repeatedly insisted that he did not want to present a mitigation case that dwelled on his childhood. Mr. Smith does not have distinct memories of mental health documents from his file, but does recall that the material was developed earlier, during state proceedings. He recalls a meeting Mr. Echols who did not focus on mitigation evidence. Mr. Smith further recalls that he and Mr. Hilfiger made a conscious decision to present a mitigation case based on three principles: Barrett had already been punished for the homicide by the State of Oklahoma, Barrett behaved well in custody, and Barrett was a good enough person that he did not deserve to die for his crime.

3.    J. Randall Price, Ph.D. – Dr. Price is a forensic psychologist who evaluated Barrett at the time of trial. His expert report was filed on the docket case no. 04-115-P and made available to all counsel in the Court's discovery order (§ 2255 Doc. no. 269). The government believes that Dr. Price will testify in conformity with the findings in his report. Based on the report, it appears that Dr. Price conducted an evaluation that included the Reynolds Intellectual Assessment System, the Repeatable Battery for the Assessment of Neuropsychological Status, the Personality Assessment Inventory, the Minnesota Multiphasic Personality Inventory (2d ed.), the Structured Inventory of Malingered Symptoms, and the Psychopathy Checklist-Revised. Dr. Price diagnosed Barrett as a psychopath. Dr. Price found that Barrett suffered from a learning disorder, polysubstance dependence, dysthymic disorder, and a personality disorder with antisocial, psychopathic and paranoid traits.

4.    Steven E. Pitt, D.O. – Dr. Pitt is a forensic psychiatrist retained by the government to evaluate Barrett on January 19, 2017. While Dr. Pitt's report of the evaluation remains outstanding, the government anticipates that he will testify that at or around the time of the crime, Barrett had a substance abuse disorder and, at a minimum, maladaptive personality traits, but did not otherwise suffer from any major mental illness.

E.  Exhibits to be presented at evidentiary hearing, noting any objection(s):

a. Petitioner:

| Number | Exhibit | Where in Record | Objection |
|--------|---------|-----------------|-----------|
| 1 | Marriage Certificate for A.J. and Ada Barrett | Exhibit 1 From Doc 70 – Amended Motion for Collateral Relief6:09-cv-00105-JHP. 9/25/2009 | |
| 2 | Marriage Certificate for Abe and Minnie Dotson | Exhibit 2 From Doc 70 – Amended Motion for Collateral Relief 6:09-cv-00105-JHP. | |

7

| | | 9/25/2009 | |
|---|---|---|---|
| 3 | Marriage Certificate for Allen and Ida Real | Exhibit 3 From Doc 70 – Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 4 | Marriage Certificate for David and Carolyn Joseph | Exhibit 4 From Doc 70 – Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 5 | Marriage Certificate for Ernest and Sylvia Gelene Barrett | Exhibit 5 From Doc 70 – Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 6 | Declaration of Rodney Floyd | Exhibit 6 From Doc 70 – Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevancy, Hearsay |
| 7 | Marriage Certificate for Kenneth and Abigail Barrett | Exhibit 7 From Doc 70 – Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 8 | Marriage Certificate for Hugh and Hattie Dotson | Exhibit 8 From Doc 70 – Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 9 | Marriage Certificate for Sam and Ida Hatter | Exhibit 9 From Doc 70 – Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 10 | Marriage Certificate for Sam and Bessie Hatter | Exhibit 10 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 11 | Marriage Certificate for Paul and Sylvia Gelene Dudley | Exhibit 11 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. | |

8

| | | | |
|---|---|---|---|
| | | 9/25/2009 | |
| 12 | Divorce File for Ernest and Sylvia Gelene Barrett | Exhibit 12 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 13 | Declaration of Janesse Thomas | Exhibit 13 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 14 | Declaration of Dale Anderson | Exhibit 14 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance, Hearsay |
| 15 | Divorce File for Isaac and Marilyn Barrett | Exhibit 15 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 16 | State of Oklahoma vs. Abe Dotson, dated December 14, 1917 and December 15, 1917 (Commitment to Penitentiary) | Exhibit 16 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 17 | State of Oklahoma vs. Abe Dotson, Record of Information, dated November 12, 1915 (Assault with the Intent to Kill) | Exhibit 17 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 18 | State of Oklahoma vs. Abe Dotson, Criminal Docket, dated 1915 (Assault with the Intent to Kill) | Exhibit 18 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 19 | State of Oklahoma vs. Abe Dotson, Criminal Docket (Carrying Weapon) | Exhibit 19 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 20 | State of Oklahoma vs. Abe Dotson, Criminal Trial Docket (Drunk in a Public Place) | Exhibit 20 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. | Relevance |

9

| | | 9/25/2009 | |
|---|---|---|---|
| 21 | State of Oklahoma vs. Abe Dotson, Criminal Docket (Drunk in a Public Place) | Exhibit 21 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 22 | State of Oklahoma vs. Abe Dotson, Criminal Docket (Larcenry) | Exhibit 22 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 23 | State of Oklahoma vs. Abe Dotson, Criminal Docket (Obtaining Money Under False Pretense) | Exhibit 23 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 24 | Declaration of David Autry | Exhibit 24 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Hearsay |
| 25 | State of Oklahoma vs. Billy Dean Maxwell, Case Number 1715 (Burglary) | Exhibit 25 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 26 | In the Matter of Mental Illness of Billy Dean Maxwell, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982 | Exhibit 26 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 27 | In the Matter of the Sanity of A.J. Barrett, Case Number 141, Lunacy Record, dated August 12, 1918 | Exhibit 27 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 28 | In the Matter of the Sanity of A.J. Barrett, Case Number 709, Mental Health Record and Petition for | Exhibit 28 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. | |

| | | | |
|---|---|---|---|
| | Order of Admission to State Hospital | 9/25/2009 | |
| 29 | Declaration of Mark Henricksen | Exhibit 29 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Hearsay |
| 30 | Ada Blount vs. Kathleen Blake, Case Number 13026 | Exhibit 30 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 31 | In the Matter of the Sanity of Wallace Dotson, Lunacy Record, Case Number 366, dated May 4, 1948 | Exhibit 32 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 32 | In the Matter of Mental Illness of Kenneth Barrett, Case Number 481, Record of Mental Health Proceeding | Exhibit 33 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 33 | Declaration of John Echols | Exhibit 34 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Hearsay, Speculation, Relevance |
| 34 | Excerpts from Kenneth Barrett's Baby Book | Exhibit 35 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 35 | Letter from Kenneth Barrett | Exhibit 36 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 36 | Declaration of Robert Thompson | Exhibit 37 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 37 | Declaration of Randy Weaver | Exhibit 38 From Doc 70 - Amended Motion for Collateral Relief | Relevance |

| | | 6:09-cv-00105-JHP. 9/25/2009 | |
|---|---|---|---|
| 38 | Declaration of Vickie Beaty | Exhibit 39 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 39 | Declaration of Amanda Grizzle | Exhibit 40 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 40 | Declaration of Ellen Stovall | Exhibit 41 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 41 | Declaration of Christine Calbert | Exhibit 42 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 42 | Supplemental Declaration of Leonard Post | Exhibit 43 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Hearsay, Relevance |
| 43 | Report of George Kirkham, Ph.D. | Exhibit 44 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 44 | Declaration of Travis Crawford | Exhibit 45 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 45 | *Diana Barrett vs. Ernest Barrett*, Case No. JFD-79-3274 | Exhibit 46 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 46 | *State of Oklahoma vs. Karen Real*, Case No. CF-99-00018, Docket Sheet | Exhibit 47 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. | Relevance |

12

| | | 9/25/2009 | |
|---|---|---|---|
| 47 | *State of Oklahoma vs. Karen Real*, Case No. CM-99-00040, Docket Sheet | Exhibit 48 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 48 | *State of Oklahoma vs. Karen Real*, Case No. CF-99-00250A, Docket Sheet | Exhibit 49 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 49 | *State of Oklahoma vs. Karen Real*, Case No. CF-99-00251, Docket Sheet | Exhibit 50 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 50 | *State of Oklahoma vs. Karen Real*, Case No. CF-98-00264A, Docket Sheet | Exhibit 51 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 51 | *State of Oklahoma vs. Karen Real*, Case No. CF-97-00445A, Docket Sheet | Exhibit 52 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 52 | State of Oklahoma vs. David Littlefield, Case No. OBAD No. 1729 and SCBD No. 5338, Order dated September 14, 2009 | Exhibit 53 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 53 | Declaration of Susan Otto | Exhibit 54 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance, FRE 702 |
| 54 | Declaration of Bill Sharp, Ph.D. | Exhibit 55 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 55 | Declaration of Jeanne Russell, Ed.D. | Exhibit 56 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. | Admissible for Impeachment and to Refresh Recollection |

13

| | | 9/25/2009 | |
|---|---|---|---|
| 56 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-111, Docket Sheet | Exhibit 57 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 57 | *State of Oklahoma vs. Henry Edwards* (Manslaughter) | Exhibit 59 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 58 | *State of Oklahoma vs. Marilyn Crawford*, Case Number 3005, Criminal Docket (Cultivation of Mari) | Exhibit 60 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 59 | *State of Oklahoma vs. Kenneth Barrett*, Docket Sheet, Case Number CF-97-00086 | Exhibit 61 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 60 | *State of Oklahoma vs. Tom Dotson*, Case Number 3005, Criminal Docket (Disposing of Mortgaged Property) | Exhibit 62 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 61 | *State of Oklahoma vs. Tom Dotson*, Case Number 2763, Criminal Docket (Manslaughter in the First Degree) | Exhibit 63 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 62 | Letter from John Echols to Honorable James H. Payne, dated February 28, 2005 | Exhibit 64 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 63 | Letter from Honorable James H. Payne to John Echols, dated February 22, 2005 | Exhibit 65 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 64 | Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008 | Exhibit 66 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |

14

| 65 | Declaration of Julia O'Connell | Exhibit 67 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
|---|---|---|---|
| 66 | *United States of America vs. Karen Real*, Case Number, Case Number CR-00-21-FHS | Exhibit 68 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 67 | *Barrett Death Sentence Upheld*, Tahlequah Daily Press, dated July 27, 2007 | Exhibit 69 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 68 | *Drug Offender Receives Break*, Times Record | Exhibit 70 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 69 | Letter to the Editor, She Questions Sheriff's Department, dated October 17, 1999 | Exhibit 71 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 70 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-1998-00022 | Exhibit 72 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 71 | Photographs of Kenneth Barrett's shack | Exhibit 73 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 72 | Declaration of Ada Blount | Exhibit 74 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 73 | Declaration of Alvin Hahn | Exhibit 75 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |

1021

| 74 | Declaration of Billy Poindexter | Exhibit 76 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 75 | Declaration of Brandy Hill | Exhibit 77 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to p. 2, 3 |
| 76 | Declaration of Carolyn Joseph | Exhibit 78 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 77 | Declaration of Dewey Padgett | Exhibit 79 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 78 | Declaration of Doris Barrett | Exhibit 80 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 79 | Declaration of Ernest Barrett | Exhibit 81 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Motion in Limine (Doc. 292) |
| 80 | Declaration of Frank Gordon | Exhibit 82 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 81 | Declaration of Gwendolyn Crawford | Exhibit 83 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to last ¶ p. 1 and pp. 2,3 |
| 82 | Declaration of Issac Barrett | Exhibit 84 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |

16

| 83 | Declaration of Janice Sanders | Exhibit 85 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to ¶¶3, 5 of p. 1 and pp. 2-4 |
|---|---|---|---|
| 84 | Declaration of Kathy Trotter | Exhibit 86 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 85 | Declaration of Linda Riley | Exhibit 87 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 86 | Declaration of Mike Mackey | Exhibit 88 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 87 | Declaration of Dr. Myla Young | Exhibit 89 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Motion in Limine and Reply (Doc. 289, 336) |
| 88 | Declaration of Paul Rickie Lunsford | Exhibit 90 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 89 | Declaration of Phyllis Crawford | Exhibit 91 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to ¶¶ 3,4 of p. 3 and p. 4 |
| 90 | Declaration of Roger Crawford | Exhibit 92 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance, Hearsay |
| 91 | Declaration of Ruth Harris | Exhibit 93 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to last ¶ of p. 3 |

1023

| 92 | Declaration of Shawn Hill | Exhibit 95 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
|---|---|---|---|
| 93 | Declaration of Toby Barrett | Exhibit 96 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 94 | Declaration of Sylvia Gelene Dotson | Exhibit 97 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 95 | Declaration of Mark Dotson | Exhibit 98 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 96 | Declaration of Steve Barrett | Exhibit 99 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 97 | Declaration of Warren Dotson | Exhibit 100 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as ¶ 3 of p. 4 |
| 98 | Declaration of Nona Reich | Exhibit 101 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 99 | Declaration of Carl Cook | Exhibit 102 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 100 | Declaration of Abby Stites | Exhibit 103 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |

| 101 | Declaration of Doris Barrett | Exhibit 105 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 102 | New Articles from Vian American and Sequoyah County Democrat Regarding Abe Dotson | Exhibit 106 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 103 | Description Narrative, Written by Trooper Glen Smithson, dated September 29, 1999 | Exhibit 107 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 104 | Excerpt from the Deposition of John Philpot | Exhibit 108 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 105 | Report by Edward E. Hueske | Exhibit 109 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 106 | Curriculum Vitae of Edward E. Hueske | Exhibit 110 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 107 | Declaration of Steve Leedy | Exhibit 111 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 108 | Declaration of Lauren Cohen Bell | Exhibit 112 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 109 | 2008 Declaration of Kevin McNally | Exhibit 113 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |

| 110 | Declaration of Rodney Floyd | Exhibit 114 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance, Hearsay |
|-----|------|------|------|
| 111 | Memo Regarding DOJ Report on the Federal Death Penalty System, dated June 11, 2001 | Exhibit 115 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 112 | 2007 Declaration of Kevin McNally | Exhibit 116 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 113 | Declaration of Dr. George Woods | Exhibit 117 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 114 | Declaration of Richard H. Burr | Exhibit 118 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/20 | Admissible for Impeachment and to Refresh Recollection |
| 115 | Birth Certificate of Kenneth Barrett | Exhibit 119 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 116 | Birth Certificate of Sylvia Gelene Dotson | Exhibit 120 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 117 | Birth Certificate of Richard Barrett | Exhibit 121 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 118 | Birth Certificate of Toby Barrett | Exhibit 122 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |

| 119 | Birth Certificate of Stephen Barrett | Exhibit 123 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
|-----|--------------------------------------|-----------------------------------------------------------------------------------------------|---|
| 120 | Death Certificates of Allen M. Real and Allen Cleveland Real | Exhibit 124 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 121 | Death Certificate of A.J. Barrett | Exhibit 125 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 122 | Death Certificate of Ada Melton Barrett | Exhibit 126 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 123 | Death Certificate of Albert Maxwell | Exhibit 127 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 124 | Death Certificate of Billy Maxwell | Exhibit 128 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 125 | Death Certificate of Hattie Dotson | Exhibit 129 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 126 | Death Certificate of Hugh Dotson | Exhibit 130 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 127 | Death Certificate of Ida Melton | Exhibit 131 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |

| 128 | Death Certificate of Isaac Barrett | Exhibit 132 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 129 | Death Certificate of Mary Barrett | . Exhibit 133 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 130 | Death Certificate of Minnie Andrews | Exhibit 134 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 131 | Brandon Smith Social Security Records, Itemized Statement of Earnings | Exhibit 135 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 132 | Educational Records for Kenneth Barrett | Exhibit 136 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 133 | Educational Records for Gwendolyn Barrett | Exhibit 137 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 134 | Educational Records for Ernest Barrett | Exhibit 138 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 135 | Medical Records for Carolyn Joseph | Exhibit 139 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 136 | Medical Records for Kathy Trotter | Exhibit 140 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |

22

| 137 | Medical Records for Brandy Hill | Exhibit 141 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 138 | Medical Records for Toby Barrett | Exhibit 142 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 139 | Medical Records for Travis Crawford | Exhibit 143 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 140 | Medical Records for Cynthia Crawford | Exhibit 144 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 141 | Medical Records for Linda Riley | Exhibit 145 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 142 | Medical Records for A.J. Barrett | Exhibit 146 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 143 | Medical Records for Kenneth Barrett | Exhibit 147 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 144 | Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999 | Exhibit 148 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 145 | Marriage Certificate for Ernest and Diana Barrett | Exhibit 149 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |

| 146 | Divorce File for Eugene and Sylvia Gelene Dudley | Exhibit 150 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 147 | Divorce File for Kenneth and Abigail Barrett | Exhibit 151 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 148 | *Kimberly Pulice vs. Richard Barrett*, Case Number JFP-2004-17 | Exhibit 152 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 149 | *In the Matter of Guardianship of Brandon Leroy Smith*, Case Number PG | Exhibit 153 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 150 | *In re: Sale of Inherited Lands of Lewis Dotson*, Case Number 481 | Exhibit 154 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 151 | Sylvia Gelene Dotson's Genealogy Memorandum | Exhibit 155 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 152 | *State of Oklahoma vs. David Littlefield*, Case Number SCBD-5338 | Exhibit 156 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 153 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-9 | Exhibit 157 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 154 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-75 | Exhibit 158 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |

1030

| 155 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-128 | Exhibit 159 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
|---|---|---|---|
| 156 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-346 | Exhibit 160 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 157 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-98-363 | Exhibit 161 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 158 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-99-562 | Exhibit 162 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 159 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-2001-314 | Exhibit 163 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 160 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-2003-124 | Exhibit 164 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 161 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-2004-19 | Exhibit 165 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 162 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-365 | Exhibit 166 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 163 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-96-0444 | Exhibit 167 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |

| 164 | *State of Oklahoma vs. Charles Sanders*, Case Number CRF-92-91 | Exhibit 168 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
|---|---|---|---|
| 165 | *State of Oklahoma vs. Cindy Crawford*, Case Number CF-08-224 | Exhibit 169 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 166 | *State of Oklahoma vs. Cindy Crawford*, Case Number CF-2004-613 | Exhibit 170 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 167 | *State of Oklahoma vs. Cindy Crawford Mattox*, Case Number CM-2001-885 | Exhibit 171 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 168 | *State of Oklahoma vs. Brandie Price*, Case Number CF-99-549 | Exhibit 172 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 169 | *State of Oklahoma vs. Brandie Price*, Case Number CM-00-900 | Exhibit 173 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 170 | *United States of America vs. Brandie Price*, Case Number CR-07-16-RAW | Exhibit 174 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 171 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-97-140 | Exhibit 175 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 172 | *Michael Mackey vs. Cindy Crawford*, Case Number PO-03-390 | Exhibit 176 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |

26

| 173 | *State of Oklahoma vs. Aubrey Jacobs, Joseph Jacobs, James Jacobs, Brandie Price*, Case Number CF-98-481 | Exhibit 177 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
|---|---|---|---|
| 174 | *State of Oklahoma vs. Travis Crawford*, Case Number CM-08-655 | Exhibit 178 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 175 | *State of Oklahoma vs. Randy Weaver*, Case Number CF-00-668 | Exhibit 179 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 176 | Letter from Larry and Brenda Sell to Honorable John Garrett | Exhibit 180 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 177 | Background Materials on Clint Johnson: Testimony of Clint Johnson in State of Oklahoma vs. Richard Loy Gray and Exhibits | Exhibit 181 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 178 | Bill Ed Rogers's File | Exhibit 182 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 179 | *State of Oklahoma vs. Charles Sanders*, Case Numbers CM-08-1525 and CF-98-111 | Exhibit 183 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 180 | *State of Oklahoma vs. Charles Sanders*, Case Number CF-94-1503 | Exhibit 184 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 181 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-03-6603 | Exhibit 185 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |

1033

| 182 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-04- 1187 | Exhibit 186 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
|---|---|---|---|
| 183 | *State of Oklahoma vs. Charles Sanders*, Case Number CM-00-389 | Exhibit 187 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 184 | *State of Oklahoma vs. David Littlefield*, Case Number TRC-02-04186 | Exhibit 188 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 185 | *State of Oklahoma vs. David Littlefield*, Case Number CF-2007-369 | Exhibit 189 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 186 | *State of Oklahoma vs. Dawn Littlefield*, Case Number TRC-08-00774 | Exhibit 190 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 187 | *State of Oklahoma vs. Dawn Littlefield*, Case Number CF-2006-244 | Exhibit 191 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 188 | *Pam Littlefield vs. Mike Littlefield*, Case Number CJ-05-572 | Exhibit 192 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 189 | *Bank of Oklahoma vs. Jennifer and David Littlefield*, Case Number CJ-03-988 | Exhibit 193 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 190 | Affidavit for Search Warrant signed by Clint Johnson and Search Warrant, dated September | Exhibit 194 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. | Relevance |

28

| | | | |
|---|---|---|---|
| | 20, 1999 | 9/25/2009 | |
| 191 | *State of Oklahoma vs. Randy Turman*, Case Number CF-02-477 | Exhibit 195 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 192 | Military Records for Travis Crawford | Exhibit 196 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 193 | Birth Certificate of Phyllis Dotson | Exhibit 197 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 194 | Birth Certificate of Travis Crawford | Exhibit 198 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 195 | Birth Certificate of Stephen Barrett | Exhibit 199 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 196 | Educational Records for Kenneth Barrett | Exhibit 200 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 197 | Medical Records for Gwen Crawford | Exhibit 201 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 198 | Medical Records for Carolyn Joseph | Exhibit 202 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 199 | Social Security Records for Travis Crawford | Exhibit 203 From Doc 70 - Amended Motion for | |

29

| | | Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
|---|---|---|---|
| 200 | *State of Oklahoma vs. Cindy Crawford*, Case Number CF-99-645 | Exhibit 204 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 201 | *Cindy Crawford v. Jeffrey and Stacy Mattox and Larry and Brenda Shelley*, Case No. JFP-09-458 | Exhibit 205 – Doc 2 – Corrected Motion to Vacate, 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 202 | Supplemental Declaration of Ernie Barrett | Exhibit 206 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 203 | Supplemental Declaration of Doris Barrett | Exhibit 207 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 204 | Supplemental Declaration of Issac Barrett | Exhibit 208 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 205 | Supplemental Declaration of Phyllis Crawford | Exhibit 209 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 206 | Supplemental Declaration of Gelene Dotson | Exhibit 210From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 207 | Supplemental Declaration of Mark Dotson | Exhibit 211 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 208 | Supplemental Declaration of Ruth Harris | Exhibit 212 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. | Hearsay |

30

| | | 7/1/2010 | |
|---|---|---|---|
| 209 | Supplemental Declaration of Carolyn Joseph | Exhibit 213 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 210 | Supplemental Declaration of Linda Riley | Exhibit 214 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 211 | Supplemental Declaration of Janice Sanders | Exhibit 215 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 212 | Supplemental Declaration of Abbie Stites | Exhibit 216 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 213 | Supplemental Declaration of Kathy Trotter | Exhibit 217 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 214 | Supplemental Declaration of Toby Barrett | . Exhibit 218 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 215 | Supplemental Declaration of Richard Burr | Exhibit 219 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 216 | Supplemental Declaration of Toby Barrett | Exhibit 220 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 217 | UNDER SEAL: US Attorney's Letter to Federal Defender's Office regarding Janesse Thomas | Attachment A - Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP | Relevance |

31

| 218 | UNDER SEAL: Billing Records of Roger Hilfiger and Bret Smith | Appendix A - Doc No. 01019206246, 10th Circuit Case No. 12-7086 | |
| 219 | US Attorney Wilson's Report to Court | Doc 167, 6:09-cv-00105-JHP,4/5/2010 | Relevance |
| 220 | Declaration of Paul Gordon | Doc 199-1, 6:09-cv-00105-JHP 3/16/2012 | Relevance |
| 221 | Paul Gordon Resume | Doc 199-2, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 222 | DEA Dangers of Drug Labs - Training Video | Doc 199-3, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 223 | The Meth Lab - Training Video | Doc 199-4, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 224 | Kitchens of Death - Training Video | Doc 199-5, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 225 | Multi- County Grand Jury, Partial Report SC-99-56 | Doc 199-6, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 226 | Transcript of Interview with Robert Darst | Doc 199-7, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 227 | Transcript of Interview with Raymond Greninger | Doc 199-8, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 228 | Transcript of Interview with John Hamilton | Doc 199-9, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 229 | Transcript of Interview with Steve Hash | Doc 199-10, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 230 | Transcript of Interview with Gene Hise | Doc 199-11, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 231 | Transcript of Interview with Jim McBride | Doc 199-12, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 232 | Transcript of Interview with Rick Manion | Doc 199-13, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |

32

| 233 | Transcript of Interview with Bill Poe | Doc 199-14, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
|---|---|---|---|
| 234 | Transcript of Interview with Kerry Pettingill | . Doc 199-15, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 235 | Transcript of Interview with Danny Oliver | Doc 199-16, 6:09-cv-00105-JHP, 3/16/2012 | Relevance |
| 236 | Audio Tape at Crime Scene by Paul Gordon | Appendix A, Doc 201-2, 6:09-cv-00105-JHP, 3/16/2012 (Stored in file cabinet in vault on 2nd floor of Clerk's Office) | Relevance |
| 237 | Crime Scene Videotape by Paul Gordon | Appendix A, Doc 201-2, 6:09-cv-00105-JHP, 3/16/2012 (Stored in file cabinet in vault on 2nd floor of Clerk's Office) | Relevance |
| 238 | Transcripts of 1st and 2nd State Trials* | *Petitioner Kenneth Barrett will be filing a Motion to Take Judicial Notice of these Transcripts. See letter from AUSA Michael Littlefield to Hon. James H. Payne dated September 29, 2005. | Relevance |
| 239 | OSBI Report dated 11/23/1999 | Exh. S-72, Case No. CF 99-493 Preliminary Hearing Volume 3 | Relevance |
| 240 | OSBI Report dated 1/20/2000 | Exh. S-73, Case No. CF 99-493 Preliminary Hearing Volume 3 | Relevance |
| 241 | Declaration of John Garrett | Exh. 2, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 | Relevance |
| 242 | Declaration of Gary Philpot | Exh. 8, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 | Relevance |
| 243 | Declaration of John Philpot | Exh. 7, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 | Relevance |
| 244 | Declaration of Geoffrey Standing Bear | Exh. 44, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 | Relevance |
| 245 | Declaration of Jack Stringer | Exh. 45, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 | Relevance |

| 246 | Declaration of Ron Sullivan | Exh. 52, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 | Relevance |
|---|---|---|---|
| 247 | Declaration of William Tobin | Exh. 55, Doc. 432, 6:04-cr-00115-JHP, 5/11/2016 | Relevance |
| 248 | Additional Education Records for Kenneth Barrett | N/A, Attached to email of 1/6/2017 | |
| 249 | Declaration of Judy House | N/A, Attached to email of 1/6/2017 | |
| 250 | All Documents turned over to US Attorney on 12/21/2016 in Compliance with Discovery Order | Submitted to US Attorney on Disc. Specific documents within may be identified as separate exhibits at the appropriate time. | |
| 251 | Medical Records of Kelly Cochran | To be procured. Release of records signed January 4, 2017. | Relevance |
| 252 | Sealed Budget Conference Minutes | 6:04-cr-00115-JHP, 12/9/2004 | |
| 253 | SEALED ORDER by Mag. Judge Steven P. Shreder re: defendant's Ex Parte Motion for Approval of "Pre-Authorization" Budget for the Defense | Doc 38, 6:04-cr-00115-JHP, 1/19/2005 | |
| 254 | SEALED LETTER (copy) from Hon. James H. Payne to defense counsel John David Echols regarding the eight ex parte budget requests | 2/22/2005, 6:04-cr-00115-JHP, | |
| 255 | SEALED LETTER from John David Echols to Hon. James H. Payne in answer to the 2/22/05 letter of Judge Payne regarding ex parte litigation budget requests. | 2/28/2005, 6:04-cr-00115-JHP, | |
| 256 | Minutes: SEALED HEARING: Defense counsel John D. Echols and Roger Hilfiger present. Before Hon. James H. Payne. …Discussion held regarding the Court's order on the budget. | 3/22/2005, 6:04-cr-00115-JHP, | |

| 257 | SEALED ORDER by District Judge James H. Payne adopting the U.S. Magistrate's SEALED REPORT AND RECOMMENDATION on interim requests for attorneys' fees and costs [106-1], DENYING defendant's NINTH EXPARTE (SEALED) Motion [107-1], GRANTING defendant's motion TENTH EXPARTE (SEALED) and allowing John Echols to withdraw [113-1], DENYING defendant's EXPARTE (SEALED) ELEVENTH Motion [118-1], DENYING defendant's motion for ex parte conference on defense budget and funding [116-1] and [126-1] | Doc 128, 6:04-cr-00115-JHP, 5/5/2005 | |
| --- | --- | --- | --- |
| 258 | SEALED BUDGET HEARING MINUTES before Honorable James H. Payne | 10/3/2005, 6:04-cr-00115-JHP, | |
| 259 | MINUTES: Further Sealed Hearing regarding budget matters. | 10/20/2005, 6:04-cr-00115-JHP, | |
| 260 | SEALED MINUTE ORDER before District Judge James H. Payne GRANTING defendant's motion to modify order approving budget of 3/18/05 | Doc. 244, 6:04-cr-00115-JHP, 11/4/2005 | |
| 261 | SEALED MINUTE ORDER before District Judge James H. Payne regarding Defendant's Ex Parte Litigation Budget (Henricksen) | Doc 275, 6:04-cr-00115-JHP, 12/15/2005 | |
| 262 | Childhood photos of Kenneth Barrett | N/A, Attached to email of 1/6/2017 | |

1041

| 263 | Defendant's Pro Se Motion for Change of Appointed Counsel | Doc 135, 6:04-cr-00115-JHP, 5/23/2005 | |
|-----|-----|-----|-----|
| 264 | ORDER by District Judge James H. Payne denying defendant Barrett's pro se motion for Change of Appointed Counsel | Doc 137, 6:04-cr-00115-JHP, 5/24/2005 | |
| 265 | Declaration of Bret Smith | Doc 175, Exh. 11, 6:04-cr-00115-JHP, 5/17/2010 | |
| 266 | Declaration of Roger Hilfiger | Doc 175, Exh. 12, 6:04-cr-00115-JHP, 5/17/2010 | |
| 267 | Chart of Trial Counsel File Boxes | Sent to Government under separate cover | Lack of Authentication, Relevance, Competence |
| 268 | List of Roger Hilfiger's Caseload during relevant period | Sent to Government under separate cover | Lack of Authentication, Relevance, Hearsay |
| 269 | Hilfiger Letter to Shreder | Petitioner's Disc. No. 003889-91 | Relevance as to page 3889 |
| 270 | Handwritten Notes | Petitioners Disc. No. 005806-07 | Incomplete, Improper Allocution |
| | | | |

The Petitioner reserves the right to utilize Petitioner's exhibits for impeachment or to refresh recollection.

      b.  Respondent:

          Petitioner has a standing objection to any and all documents contained in trial counsel files of irrelevancy unless the government can establish that trial counsel had personal knowledge of the exhibit prior to Kenneth Barrett's sentencing hearing.

| Number | Exhibit | Where in Record | Objection |
|--------|---------|-----------------|-----------|
| 1 | Declaration of Roger Hilfiger | Exhibit 12 to Respondent Answer | |
| 2 | Declaration of Bret Smith | Exhibit 11 to Respondent Answer | |
| 3 | Declaration of Janesse Thomas | Exhibit 3 to Respondent Answer | HEARSAY |
| 4 | Voluntary statement of Abby of Stites | Exhibit 13 to Respondent Answer | HEARSAY |
| 5 | Eastern State Hospital Report of Contact | Exhibit 14 to Respondent Answer | |

36

| 6 | Eastern State Hospital Medical History | Exhibit 15 to Respondent Answer | |
| 7 | Eastern State Hospital Discharge Summary | Exhibit 16 to Respondent Answer | |
| 8 | St. Francis Chart Print Report | DISC 00382-00416 | |
| 9 | Wagoner Community Hospital Psychiatric Evaluation | Exhibit 18 to Respondent Answer | |
| 10 | Bill Willis Community Mental Health Center Referral Form | Exhibit 19 to Respondent Answer | |
| 11 | Social Security Administration Explanation of Determination | Exhibit 20 to Respondent Answer | |
| 12 | Sequoyah Memorial Hospital medical record of Kenneth Barrett | DISC 000527-28 | |
| 13 | Affidavit of Faust Bianco, Ph.D. | DISC 1991 | Standing objection |
| 14 | Professional Services Invoice from Faust Bianco, Ph.D. | DISC 001820 | Standing objection |
| 15 | Kenneth Barrett Medical Release to Faust Bianco, Ph.D. | DISC 008298-99 | Standing objection |
| 16 | John Echols Letter to Judge Payne dated 2/28/2005 | DISC 003743-48 | Standing objection |
| 17 | Psychological Evaluation of Kenneth Barrett by Bill Sharp, Ph.D. | DISC 006812-19 | Standing objection |
| 18 | Kenneth Barrett BOP Intake Screening | | Relevance |
| 19 | Roseann Schaye Memo of Interview of Carolyn Joseph | DISC 001197 | Standing objection |
| 20 | Roseann Schaye Memo of Interview of Elnora Long | DISC 001205 | Standing objection |
| 21 | Roseann Schaye Memo of Interview of Sylvia Gelene Dotson | DISC 000966 | Standing objection |
| 22 | Roseann Schaye Memo of Interview of Kenneth Barrett | DISC 000981-82 | Standing objection |
| 23 | Roseann Schaye Memo of Interview of Linda Riley | DISC 001208-09 | Standing objection |
| 24 | Roseann Schaye Memo of Interview of Richard Barrett | DISC 1207 | Standing objection |
| 25 | Roseann Schaye Memo of Interview of Ruth Harris | DISC 001006 | Standing objection |
| 26 | Roseann Schaye Memo of Interview of Tracy Swearingen | DISC 001124 | Standing objection |
| 27 | Declaration of Roseann Schaye | DISC 000880 | Standing objection |
| 28 | Roseann Schaye State of Arizona Board of Behavioral Health Examiners 2009 Disciplinary Action Record | | Relevance |

| 29 | John Echols billing records | DISC 003752-60 | |
| 30 | Gelene Dotson memo | DISC 001275 | Standing objection |
| 31 | Hattie Dotson memo | DISC 001276 | Standing objection |
| 32 | Roger Hilfiger letter to Magistrate Judge Shreder dated 1/17/2006 | DISC 003726-28 | |
| 33 | Roger Hilfiger letter to Magistrate Judge Shreder dated 2/17/2006 | DISC 003890-91 | |
| 34 | Roger Hilfiger letter to Office of Federal Public Defender dated 12/29/2005 | DISC 003892-95 | |
| 35 | Psychological Evaluation – Risk Assessment of Kenneth Barrett by Jeanne Russell, Ed.D. | DISC 006820-30 | Standing objection |
| 36 | Risk Assessment of Kenneth Barrett by Jeanne Russell, Ed.D. | DISC 008227-43 | |
| 37 | Kenneth Barrett Driving Record | DISC 006901-03 | Standing objection |
| 38 | Psychological Evaluation of Kenneth Barrett by Kathy LaFortune, Ph.D. | DISC 001644-48 | Standing objection |
| 39 | Handwritten notes | DISC 007414-36 | Standing objection |
| 40 | Handwritten notes | DISC 000895 | Standing objection |
| 41 | Handwritten notes | DISC 001191-96 | Standing objection |
| 42 | Handwritten notes | DISC 004757-68 | |
| 43 | Steve Leedy Memo | DISC 008304-06 | Standing objection |
| 44 | Letters from Roseann Schaye | DISC 008273-97 | Standing objection |
| 45 | OIDS Expert Service Providers Fee Schedule Table | DISC 002382-420 | |
| 46 | Phyllis Crawford memo | DISC 001264 | Standing objection |
| 47 | Roger Crawford memo | DISC 001265 | Standing objection |
| 48 | OIDS Interoffice Memo re: Tracy Swearingen | DISC 001966) | Standing objection |
| 49 | Tommy C. Sanders memo | DISC 001360 | Standing objection |
| 50 | OIDS Interoffice Memo | DISC 001013-23 | Standing objection |
| 51 | Kenneth Barrett BOP file | | Relevance/ |
| 52 | Psychological Evaluation of Kenneth Barrett by J. Randall Price, Ph.D. | | Standing objection/Motion in Limine Doc * |
| 53 | Psychiatric Evaluation of Kenneth Barrett by Steven E. Pitt, D.O. | | Relevance |
| 54 | Any and all data, notes, or communications with counsel regarding Petitioner's mental health expert witnesses | Pending receipt | Objection as Work Product; no objection to providing raw data to qualified expert |

The Government reserves the right to utilize Petitioner's exhibits for impeachment or to refresh recollection.

    F.   <u>Anticipated length of evidentiary hearing</u>: 13 days.

    Dated: February 16, 2017

<table>
<tr><td></td><td>Respectfully submitted,</td></tr>
<tr><td></td><td></td></tr>
<tr><td><i>/s/ David Autry</i></td><td>MARK F. GREEN</td></tr>
<tr><td>DAVID AUTRY, OBA #11600</td><td>United States Attorney</td></tr>
<tr><td>Attorney at Law</td><td>Eastern District of Oklahoma</td></tr>
<tr><td>1021 N.W. 16th Street</td><td></td></tr>
<tr><td>Oklahoma City, OK 73106</td><td><i>/s/ Christopher J. Wilson</i></td></tr>
<tr><td>(405) 521-9600</td><td>CHRISTOPHER J. WILSON, OBA #13801</td></tr>
<tr><td>(405) 521-9669</td><td>Assistant United States Attorney</td></tr>
<tr><td>dbautry77@gmail.com</td><td>520 Denison Avenue</td></tr>
<tr><td></td><td>Muskogee, OK 74401</td></tr>
<tr><td>HEATHER E. WILLIAMS</td><td>(918) 684-5175</td></tr>
<tr><td>Federal Defender</td><td>(918) 684-5150</td></tr>
<tr><td><i>/s/ Joan M. Fisher</i></td><td>chris.wilson@usdoj.gov</td></tr>
<tr><td>JOAN M. FISHER, ID Bar #2854</td><td></td></tr>
<tr><td>Assistant Federal Defender</td><td></td></tr>
<tr><td>801 I Street, 3rd Floor</td><td><i>/s/ Jeffrey B. Kahan</i></td></tr>
<tr><td>Sacramento, CA 95814</td><td>JEFFREY B, KAHAN, PaBN #93199</td></tr>
<tr><td>(916) 498-6666</td><td>Trial Attorney, Capital Case Unit</td></tr>
<tr><td>(916) 498-6656</td><td>U.S. Dept. of Justice</td></tr>
<tr><td>Joan_Fisher@fd.org</td><td>1331 F. Street, NW 6th Fl.</td></tr>
<tr><td></td><td>Washington, DC 20530</td></tr>
<tr><td></td><td>jeffrey.kahan@usdoj.gov</td></tr>
</table>

1045

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on February 16, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. Jeffrey B. Kahan at jeffrey_kahan@usdoj.gov

Mr. Christopher J. Wilson at Chris.Wilson@usdoj.gov

/s/ *Joan M. Fisher*
JOAN M. FISHER

1047

## DECLARATION OF GARY NELSON

I, Gary Nelson, a person over the age of eighteen (18) and competent to testify, deposes and says as follows:

I am the second cousin once removed from Kenneth Barrett. My late mother Karen was the daughter of Warren Dotson.

I have known Kenny all my life. I know him to be kind, honest, and compassionate. Ken is direct, but I have never seen him violent.

I have personal knowledge that several of my cousins suffer from various forms of mental illness, mostly anxiety and manic depression, but other things as well. You could pretty much throw a rock at any member of my family and hit someone who is mentally ill. Unfortunately, I am one who suffers from a disabling mental illness. I have been diagnosed with severe panic anxiety and PTSD. My psychiatric records are attached to this declaration as Exhibit A.

About nine months before the raid on Kenny's, I went to a bar with him in Sequoyah County on 59 Highway between the racetrack and Vian. Another friend named Dwayne came with us. While we were in the bar, a uniformed deputy sheriff came in. He had brown hair, a moustache, was about 5'10" tall and weighed about 180 pounds. He wore a ball cap. He came up to Kenny and he and Kenny stepped away from us so that I could not hear the conversation, except for the last words in which Ken told him to "F" himself. The officer then left. If Ken knew at that time that there was a warrant out for his arrest he never told me, but if there was it sure would have been easy to arrest Ken right then and there, but the sheriff didn't.

About six months before the raid, I had come down from Sapulpa, where I lived, to visit my mother who lived in Bunch.  I went by Kenny's while I was down. I was in his garage, where he worked on cars. A man drove through the gate onto Kenny's property. He wore a long-sleeve shirt and blue jeans. Kenny said an expletive when he saw him and then walked over toward his cabin to meet him in the driveway where they talked for about five minutes. Then the man got in his car and left. Ken came back to the garage, and said that it was "F-in" Philpot. Since I don't know the Philpots  I couldn't tell you which one it was. If there was a warrant out for Ken and Ken knew about it he never said, but Mr. Philpot did not arrest Ken.

I declare under penalty of perjury that, to the best of my recollection, the foregoing is true and correct.

Executed this 16 TH day of ~~August, 2016,~~ JANUARY, 2017 in Kellyville, Creek County, Oklahoma.

Gary Wayne Nelson

Gary Nelson

1048

## DECLARATION OF SHARON MAXWELL GREENFEATHER

I, Sharon Maxwell Greenfeather, a person over the age of eighteen (18) and competent to testify, deposes and says as follows:

I was a mortgage banker for 40 years.

My father Howard Albert Maxwell was the brother of Mary Ellen Maxwell who was married to Isaac Barrett. Ernie Barrett was my nephew and his son Kenneth Barrett is my great nephew.

My father Howard was an alcoholic. I was too until thirteen years ago.

There is a lot of mental illness and alcoholism in my family.

Both my daughter Melanie Lynn Greenfeather and I are severely manic depressive. My daughter has occasional psychotic episodes that the doctors say are a symptom of her manic depression.

My late sister Linda Jean Maxwell was psychotic. My other sister Connie Sue Maxwell is severely manic depressive and was an alcoholic. She has been on disability most of her life.

My brother Billy Dean Maxwell, who committed suicide in 1999, was schizophrenic.

I declare under penalty of perjury that, to the best of my recollection, the foregoing is true and correct.

Executed this 25 day of January, 2017, in Auburn, King County, Washington.

Sharon Maxwell Greenfeather

1

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**UNOPPOSED MOTION TO FILE SEALED MOTION FOR PARTIAL SUMMARY
JUDGMENT**

_____

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully requests permission under Local Civil Rule 79.1(b) to file, under seal, a motion for partial summary judgment. In support of this request, government counsel avers as follows:

1. The government intends to file a motion for partial summary judgment that relies upon, and attaches, mental health reports authored by Bill Sharp and Jeanne Russell. Those documents remain sealed, but their contents are integral to the government's position.

2. On February 22, 2017, undersigned counsel consulted with Barrett's attorney David Autry, via e-mail. Mr. Autry stated that defense counsel did not oppose this request to file the summary judgment motion under seal.

1

1050

## CONCLUSION

Respondent respectfully urges this Court to permit respondent to file an under seal motion for partial summary judgment.

Dated: February 22, 2017:

<div style="margin-left:50%">

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

</div>

1051

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on February 22, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

3

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**[PROPOSED]  ORDER SEALING GOVERNMENT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT**

The government's motion to file under seal a motion for partial summary judgment under

seal is hereby **granted**.

_____
**HON. JAMES H PAYNE**
U.S. District Court Judge

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com, nitawright73@yahoo.com), Joan M.
Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:877837@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Seal
Document(s)
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/23/2017 at 8:04 AM CST and filed on 2/23/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 343(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: granting [342] Government's Unopposed Motion to File Sealed Motion for Partial Summary Judgment. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>    Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Respondent. | CASE NO. CV-09-00105-JHP<br><br>**PETITIONER'S UNOPPOSED MOTION TO AMEND JOINT STATEMENT** |

Comes Now Petitioner, KENNETH EUGENE BARRETT, by and through his undersigned counsel, who moves this Court for leave to amend his portion of the Joint Statement filed February 16, 2017 (Doc. 340). This Motion is based on the files and records in this case, the points and authorities cited herein. Mr. Barrett states the following as good cause for granting this Motion.

After submitting Mr. Barrett's portion of the Joint Statement undersigned counsel learned

that witness Ron Lax died in 2013. Thus, Mr. Barrett should have listed him with an asterisk among those witnesses on whose prior letters or declarations Mr. Barrett intends to rely. Counsel regrets the error and any inconvenience it may have caused.

This Court will recall that John Echols sought authorization to hire Mr. Lax and his firm, Inquisitor, Inc., to serve as Mr. Barrett's mitigation specialist. This Court granted the request in part and denied it in part.

On March 30, 2010, this Court granted Mr. Barrett's Motion to Expand the Record (Doc. 151) with exhibits including Exhibit 66, a letter dated September 24, 2008, from Mr. Lax to Mr. Barrett's post-conviction counsel. Order (Doc. 161). Mr. Barrett intends to rely upon that letter in support of his showing of deficient performance by trial counsel.

Undersigned counsel have conferred by email with counsel for the government in an effort to resolve this matter. Counsel for the government have advised the undersigned that the government does not oppose this Motion.

WHEREFORE, Mr. Barrett respectfully requests this Court enter an order deeming the Joint Statement amended with the foregoing information.

DATED this 23rd day of February 2017.

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender
/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender
 /s/ *Tivon Schardl*
TIVON SCHARDL
Capital Trial & Habeas Attorney
Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 23rd day of February 2017, I caused the foregoing Petitioner's Motion to Amend Joint Statement to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

*/s/ Tivon Schardl*
TIVON SCHARDL

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com, nitawright73@yahoo.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov),
Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878122@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/23/2017 at 3:51 PM CST and filed on 2/23/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 348(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Petitioner is directed to file an expedited response to Government's SEALED MOTION for Partial Summary Judgment (Re: [347] SEALED MOTION). Said Response is due by Close of Business on 2/27/2017 (dma, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com, nitawright73@yahoo.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878452@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion for Recusal
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 3:59 PM CST and filed on 2/24/2017

**Case Name:**  Barrett v. USA
**Case Number:**  6:09–cv–00105–JHP
**Filer:**
**Document Number:** 349(No document attached)
**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: Petitioner's [294] Motion to Recuse and Disqualify, pursuant to 28 U.S.C. Section 455, is denied for reasons previously set out in [66] Order filed herein on 9/11/2009. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878466@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Exclude
Content-Type: text/html

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 4:23 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 350(No document attached) |
| **Docket Text:** | |

 **MINUTE ORDER by District Judge James H. Payne: granting [290] Government's Motion to Exclude a Proposed Witness. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**ORDER**

This matter comes before the Court on the Government's Motion to Exclude Evidence of Unavailable Witnesses by Declaration Alone (Dkt. # 292). On February 8, 2017, Petitioner filed his reply (Dkt. # 322). At 9:11 p.m. on February 15, 2017, the government filed its reply (Dkt. # 335).

The government requests exclusion, in part, of the declarations of two witnesses, Ernest Barrett and Warren Dotson, because "they are unavailable for cross-examination and speak to issues outside the evidentiary standard applicable to penalty phase trials." Dkt. # 292, at p. 2. The government's motion continues by stating

> . . . .Barrett has presented declarations, in lieu of testimony by five deceased witnesses, Ernest Barrett, Ada Blount, Carl Cook, Warren Dotson and Myla Young. To the extent those declarations concern social history or mental health evidence Barrett might have offered in mitigation, the government does not object under the liberal evidentiary standard applicable to § 3593 proceedings. However, the government does object to those portions of Ernest Barrett and Warren Dotson's declarations that speak to issues other than the defendant's allegedly omitted mitigation evidence.

*Id.*, at p. 3.

Barrett counters by saying the government "does not have a right to 'confront' Mr. Barrett's witnesses." Dkt. # 322, at p. 2. Additionally, he argues the government is seeking to take unfair advantage of the court's error in originally denying an evidentiary hearing. According to Barrett, "[b]ut for the fact the court wrongly denied Petitioner a timely evidentiary hearing in the first instance, . . . Ernie Barrett would have been alive and able to testify." Finally, because the government did not specifically contest the information contained in the declarations in their answer to the § 2255, petitioner claims it should be admissible under the residual exception of the hearsay rule for unavailable witnesses.

In *United States Francischine*, 512 F.2d 827 (5th Cir. 1975), the Fifth Circuit  in a revocation proceeding stated that a § 2255 proceeding is "a formal procedure with all of the usual accouterments of a civil trial.  The legal issues are determined under the established requirements of the Constitution, the statutes, and the judicial precedents.  The issues of fact will be resolved under the Federal Rules of Evidence, Rule 1101(e)." *Id.*, at p. 829.

"Courts have generally found that in situations where a witness is unavailable, the affidavit testimony should not be allowed unless the opposing party had the opportunity to cross examine the witness." *West v. United States*, 2009 WL 1043962 (M.D.Fla. 2009) (unpublished), citing *Crawford v. Washington*, 541 U.S. 36, 52, 124 S.Ct. 1354, 158 L.Ed.2d 177 (2004) which held in a criminal case that out-of-court statements by witnesses are barred, under the Confrontation Clause, unless witnesses are unavailable and defendant had a prior opportunity to cross-examine the witness, regardless of whether the statements are deemed reliable by the court. *See also*, Fed.R.Evid. 801.

1062

Under 18 U.S.C. § 3593(c), a defendant can "present any information relevant to a mitigating factor." To the extent the declarations relate to mitigating evidence concerning petitioner's mental health and/or background which was available at the time of trial, this Court will allow the declarations under § 3593(c). However, the portions of the declarations which speak to other aspects of the § 2255 matter will not be admitted since the government has not been given an opportunity to cross-examine the declarants.

For the reasons stated herein, the Government's motion (Dkt. # 292) is granted. The Petitioner will not be allowed to introduce any declarations or portions thereof that do not relate to Kenneth Eugene Barrett's background and/or mental health.

It is so ordered on this 24th day of February, 2017.

James H. Payne
United States District Judge
Eastern District of Oklahoma

1063

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878473@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion in Limine
```
Content−Type: text/html

<div align="center">

**U.S. District Court**

**Eastern District of Oklahoma**

</div>

**Notice of Electronic Filing**

The following transaction was entered on 2/24/2017 at 4:27 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09−cv−00105−JHP |
| **Filer:** | |
| **Document Number:** | 352(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying [295] Petitioner's Motion in Limine to Preclude Post−Hoc Rationalizations. (cjt, Deputy Clerk)**

**6:09−cv−00105−JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878475@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion for Production
Content-Type: text/html
```

<div align="center">

## U.S. District Court

### Eastern District of Oklahoma

</div>

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 4:29 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 353(No document attached) |

**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: denying [297] Petitioner's Motion for Production of 18 U.S.C. § 3500 Materials Concerning Trial Counsel Testimony. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878482@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Reconsider
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 4:32 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 354(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying [298] Petitioner's Motion for Reconsideration of Order denying Discovery of Trial Counsel's Emails. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878487@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion for
Miscellaneous Relief
Content-Type: text/html
```

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 4:35 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 355(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying [299] Motion to Expand the Record with Exhibits 206 through 220 as these documents are already part of the court records in this case. See, Dkt. # [178]. If counsel desires the Court to consider these or any other documents contained within the court record, the documents must be introduced and properly admitted at the evidentiary hearing in accordance with the Federal Rules of Evidence, Rule 1101(e). (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson      Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry      dbautry77@gmail.com

Tivon Schardl      tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan      jeffrey.kahan@usdoj.gov

Joan M. Fisher      joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878489@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion for
Miscellaneous Relief
Content-Type: text/html
```

# U.S. District Court

# Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 4:42 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 356(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying [300] Petitioner's Motion for Order Barring Witness Collusion. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878494@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion for
Miscellaneous Relief
Content-Type: text/html
```

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 4:45 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 357(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: [301] Petitioner's Motion to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing is moot. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878502@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Reconsider
Content-Type: text/html

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 4:49 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 358(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying [302] Petitioner's Motion for Reconsideration of Order denying the deposition of Roger Hilfiger (Dkt. # [302]) as the Court has previously indicated it prefers to hear live testimony of counsel, see Dkt. # [246]. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878507@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion in Limine
Content-Type: text/html
```

<center>

### U.S. District Court

### Eastern District of Oklahoma

</center>

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 4:50 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 359(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying [303] Petitioner's Motion in Limine to Rely upon Declarations for Direct Examination Testimony. While declarations may be admissible, Petitioner will be required to seek permission to admit each declaration at the evidentiary hearing scheduled herein and the Government will be granted an opportunity to object to such admission pursuant to the Federal Rules of Evidence. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                   )
            Petitioner/Defendant,  )
                                   )
vs.                                )     Case No. 09-CIV-105-JHP
                                   )
UNITED STATES OF AMERICA,          )
                                   )
            Respondent/Plaintiff.  )

## ORDER

This matter comes on before the Court on Petitioner's Motion to Exclude Novel Theories of Aggravation (Dkt. # 304) and Motion in Limine to Exclude Testimony of Randall Price (Dkt. # 305). On February 8, 2017, the Government filed its response to each motion (Dkt. #s 313 and 321, respectively). Petitioner filed replies to each response (Dkt. #s 327 and 333, respectively).

Petitioner requests the Court to "preclude the government from relying on new theories and evidence of aggravation never presented to the jury at trial in an effort to defeat Mr. Barrett's penalty phase ineffective assistance of counsel claim." Dkt. # 304. Petitioner continues by stating, based on the Government's exhibit list, that "the Government intends to rely on theories of aggravation, and evidence, that either was not available to the Government at the time of trial or that would not have been presented in Mr. Barrett's mitigation case." Petitioner then cites the following examples of evidence which he is seeking to exclude:

1. Testimony from, and evidence related to the work done by Faust Bianco, Ph.D.;

2. Testimony or evidence of any "risk assessment" of Kenneth Barrett by Jeanne Russell, Ed.D.;

3. Testimony or evidence related to a psychological evaluation of Kenneth Barrett by Kathy LaFortune, Ph.D.;

4. The Federal Bureau of Prisons file on Kenneth Barrett;

5. Testimony and evidence related to the "psychiatric evaluation" of Kenneth Barrett by Steven E. Pitt, D.O.;

6. Roseann Schaye's State of Arizona Board of Behavioral Health Examiners 2009 Disciplinary Action Record.

*Id.*, at p. 2.   Additionally, Petitioner objects to the Government submitting institutional records from the Bureau of Prisons post-dating the trial as well as a "psychiatric" examination by Dr. Steven Pitt, D.O.   According to Petitioner, the focus of the upcoming hearing bars the government from introducing evidence that was not introduced at trial. Petitioner claims this Court is limited to reweighing "the mitigating evidence presented at trial and the evidence in mitigation which could have and should have been developed against the aggravating circumstances and the evidence supporting them *that were presented at trial*."   *Id.*, at p. 4 (citations omitted).

The government counters that they have the right to rebut whatever evidence is presented by the defendant.   Moreover, the government claims the challenged evidence is relevant to Petitioner's ineffective assistance claim.

In remanding this case, the Tenth Circuit was careful to caution that

2

> ". . . . . we do not consider omitted mitigation evidence in a vacuum." *Wilson v. Trammell*, 706 F.3d 1286, 1305 (10th Cir. 2013). "[W]e must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been." *Id.* at 1306; *cf. Burger v. Kemp*, 483 U.S. 776, 788-95, 107 S.Ct. 3114, 97 L.Ed.2d 638 (1987) (reasonable for counsel not to present evidence of defendant's background in mitigation because it would have revealed defendant's violent tendencies).

*United States v. Barrett*, 797 F.3d 1207 (2015).

In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Court indicated a defendant must establish that the representation was deficient because it fell below an objective standard of reasonableness under prevailing professional norms. In deciding whether or not counsel was ineffective, this court is required to "judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed at the time of counsel's conduct." *Id.*, 466 U.S., at 690. To the extent Petitioner claims counsel was ineffective for failing to conduct more investigation regarding his mental health, the government will be permitted to introduce evidence of prior mental health diagnosis which counsel was aware of when they made their decision to forego searching for additional mental health opinions and/or background information regarding the defendant. Moreover, the government will be allowed to rebut any evidence offered by Petitioner to establish whether or not counsel's decisions were reasonable. To the extent Petitioner obtained mental health opinions from expert witnesses post-trial that he intends to introduce to establish counsel was ineffective for not obtaining such evidence, the government will be allowed to

3

introduce the evidence they accumulated after Petitioner put them on notice of such expert testimony.

In a similar motion, Petitioner asks this Court to exclude the testimony of Dr. J. Randall Price because that evidence was developed to rebut testimony of Dr. Jeanne Russell, who the defendant ultimately did not call at trial. Additionally, Petitioner raises a *Daubert* challenge to Dr. Price's testimony. To the extent, Petitioner has put in issue whether or not counsel was ineffective for failing to put on evidence of his mental health at the time of trial, this Court finds it is appropriate for the government to be allowed to rebut this evidence with the testimony of Dr. Price which was specifically obtained to rebut Petitioner's mental health expert at the time of trial. Moreover, during the penalty phase of trial, a defendant is allowed to present any "information relevant to a mitigating factor." 18 U.S.C. § 3593(c). "Information is admissible regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded it its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id*. Both the government and the defendant are allowed to rebut any information received at the sentencing hearing.[1] In *United States v. Scheffer*, 523 U.S. 303, 334, 118 S.Ct. 1261, 140 L.Ed.2d 413 (1998), Justice Stevens, in a dissenting opinion, stated "There is no legal requirement that expert testimony must satisfy a particular degree of reliability to be admissible. Expert testimony about a defendant's 'future dangerousness' to determine his eligibility for the death penalty, *even if wrong 'most of the time,' is routinely admitted."*

---

[1]

(emphasis added).  No other justices disagreed with Justice Stephens observation.  In *United States v. Fields*, 483 F.3d 313 (5th Cir. 2007), the Fifth Circuit stated it was unaware of any circuit that had applied *Daubert* in a federal death penalty sentencing hearing.  *See also*, *United States v. Beiermann*, 584 F.Supp.2d 1167 (N.D. Iowa 2008) (a party is not entitled to *Daubert*-style determination of the reliability of expert evidence at sentencing, even in a death-penalty case).  *But see*, *Flores v. Johnson*, 210 F.3d 456, 458 (5th Cir. 2000)(specially concurring, Garza, J.)(questioning the constitutionality of admitting an expert's testimony regarding future dangerousness after *Daubert*).  Therefore, the Court hereby denies petitioner's *Daubert* challenge of Dr. Price's opinion and finds the government will be allowed to rebut any evidence presented at the evidentiary hearing by Petitioner.

For the reasons stated herein, Petitioner's motions (Dkt. #s 304 and 305) are denied.

It is so ordered on this 24th day of February, 2017.

James H. Payne
United States District Judge
Eastern District of Oklahoma

5

1077

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,           )
                                  )
              Petitioner/Defendant, )
                                  )
vs.                               )     Case No. 09-CIV-105-JHP
                                  )
UNITED STATES OF AMERICA,         )
                                  )
              Respondent/Plaintiff. )

**ORDER**

This matter comes before the Court on the Government's Motion to Exclude Proposed

Witnesses (Dkt. # 289).  Petitioner filed his response on February 8, 2017 (Dkt. # 323).  The

Government filed its reply on February 15, 2017 at 9:13 p.m. (Dkt. # 336).

In this motion, the Government requests this Court enter an order excluding testimony

for twenty-two named witnesses; *i.e.* Paul Gordon, Edward Hueske, George Kirkham,

Charles Sanders, Janesse Thomas, Mike Mackey, Billy Poindexter, Dewey Padgett, Hon.

John Garrett, Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy, Pablo Steward,

Gaylan Warren, Richard Burr, Julia O'Connell, Susan Otto, Gary Philpot, John Philpot,

Amanda Grizzle and Christine Calbert.  In addition, the Government requests this Court

order Barrett to provide an offer of proof as to proposed testimony of seventeen (17) more

witnesses, *i.e.*, Dale Anderson, Isaac Barrett, Tamara Bedwell, Faust Bianco,[1] Courtney

---

[1]In response to the Petitioner's Motion to Exclude Novel Theories of Aggravation (Dkt. # 304), the Government indicates it "intends to adduce the affidavit of Faust Bianco to demonstrate that trial counsel possessed a sworn expert's statement that Barrett did not suffer from any significant neurological deficit."  To the extent the government intends to introduce such an affidavit, the Court is puzzled as to the Government's request for an offer of proof regarding this witness's proposed testimony.

Burke, Cindy Crawford, Martin Daggs, Sharon Greenfeather, Robert Gude, Scharlette Holdeman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stovell, Jan Walkingstick and Randy Weaver.

## PROCEDURAL HISTORY

On November 4, 2005, Defendant was convicted of three counts, *i.e.* Count I and II, Committing a murder through the use of a firearm during or in relation to a drug trafficking crime, or possession of a firearm in furtherance of such crime; and, Count III, Intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties (Cr. Dkt. # 241). On December 19, 2005, defendant was sentenced in accordance with the Penalty Phase Special Verdict (Cr. Dkt. # 258) to Life without the possibility of release on Counts I and II and to Death on Count III. The Judgment was filed of record on December 29, 2005 (Cr. Dkt. # 285). These convictions and sentences were affirmed in *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 522 U.S. 1260, 128 S.Ct. 1646, 170 L.Ed.2d 359 (2008).

Thereafter, petitioner moved for relief under 28 U.S.C. § 2255. This Court denied relief. Dkt. # 214. Petitioner filed an appeal and, after consideration of the merits, the Tenth Circuit affirmed all but one claim: "that his trial attorneys were ineffective by failing to properly investigate his background and mental health in preparation for the penalty phase of his case." *United States v. Barrett*, 797 F.3d 1207, 1223 (10th Cir. 2015), *cert. denied*, 137 S.Ct. 36 (2016). In its opinion, the Tenth Circuit made several findings of fact regarding

evidence presented by Petitioner in support of his allegations that his trial attorneys failed to

investigate his background and/or mental health.  These findings include the following:

> There is evidence, . . . . , that Dr. Russell's work was restricted to an assessment of Defendant's future dangerousness.  According to her declaration in these § 2255 proceedings, she "did not evaluate [Defendant's] neuropsychological functioning or focus on his psychological make-up, as the referral request was specific to risk assessment." Am. Mot. for Collateral Relief, to Vacate, Set Aside, or Correct Sentence & for a New Trial, Ex. 56 at 1–2, Barrett, No. 6:09–civ–105–JHP (Sept. 25, 2009). She states that in mid-August 2005, about a month before the federal trial began, she was approached by Bret Smith, one of Defendant's trial attorneys, to be a mitigation investigator. She declined, stating that she was unqualified to perform such an investigation and there was not time to do so. She updated her risk assessment on Defendant and submitted it to Defendant's trial attorneys on September 15. On October 12 she visited Defendant in prison but this was after she had already submitted her updated report.
>
> . . . . . . .  According to the declaration of Julia O'Connell, Federal Defender for the Northern and Eastern Districts of Oklahoma, defense attorney Hilfiger called her office less than three months before the start of trial to ask if her mitigation specialist would be willing to meet sometime in the future. O'Connell referred him to Dick Burr, a federal death-penalty resource attorney. Burr declares that he never heard from Hilfiger or Smith on anything of substance. Similarly, the firm that was approved by the court for mitigation services, Inquisitor, Inc., was contacted only once by John Echols (an attorney for Defendant who withdrew and was replaced by Smith) and was never asked to perform any mitigation work.
>
> . . . . . . . . .  According to the declarations of the family members who testified during the sentencing phase, the trial attorneys' preparation for their testimony consisted more or less of five-minute interviews before going on the stand, and none were asked about Defendant's background, mental health, or family history.
>
> . . . . . . . . . .  Also, the record suggests that Defendant's trial attorneys had indications that Defendant's mental health and background merited further investigation. According to Echols, Defendant's previous attorney:
>
>> At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase. I explained to him that the work performed by Roseann Schaye, the mitigation

<div align="center">3</div>

> investigator in the state case, was very preliminary in nature and far from complete. Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt. In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family illness.

R., Vol. 1a pt. 1 at 547. . . . . . . . . . .Further, it is undisputed that six months before trial Echols and Hilfiger requested funding from the court for an expert on diagnosing organic brain disorders resulting from Defendant's drug use and significant head injuries, and that even earlier Echols copied Hilfiger on a letter to the court discussing the use of Schaye's mitigation-investigation services during the state proceedings and stating that she and another psychologist "disagreed completely concerning Mr. Barrett's mental well being." *Id.* at 967. In addition, Hilfiger admits that Echols gave him Defendant's medical, educational, and mental-health records. Those records reveal that Defendant developed at a delayed pace as an infant, struggled in school, attempted suicide with a shotgun in January 1986, was subjected to a mental-health proceeding in October 1986 and committed to a hospital after complaints from his mother and ex-wife that he was violent and very suicidal, and was hospitalized for three days in 1995 after arriving in the emergency room complaining of "losing his mind." *Id.*, Vol. 2d pt. 8 at 358. During his hospital stay in October 1986 he was diagnosed with substance abuse and mixed personality disorder, and during his hospital stay in 1995 he was diagnosed with substance abuse and organic affective disorder. Also, the report prepared by Dr. Russell and given to Hilfiger and Smith includes a list of records she relied upon, which included records noting Defendant's suicide attempt in January 1986, hospital stays in October 1986 and in 1995, and a psychological evaluation completed in 2002 by psychologist William Sharp, who found that Defendant was paranoid and had a family history of depression and mental illness, and who said that his behavior warranted investigation for organic brain damage. Defendant's trial attorneys never contacted Dr. Sharp.

\* \* \* \* \*

Defendant's family has a long history of mental-health problems, alcoholism, and abuse. On Defendant's maternal side, several members of his extended family suffer from mental-health problems and relatives of his grandparents committed suicide or were involuntarily committed for psychiatric treatment. On his paternal side, several members of the extended family have mental-health problems, his great-great-grandfather was once

<center>4</center>

committed to a psychiatric hospital, his great-grandfather committed suicide, and his grandfather was an alcoholic who spent time in a mental hospital under a Certificate of Lunacy and who chronically abused his family members, including Defendant's father.

Defendant's childhood was less than ideal. His father supported the family financially but was largely absent. Throughout Defendant's childhood and adolescence his father drank, fought constantly with Defendant's mother and others, and engaged in numerous extramarital affairs. He once had a violent altercation with Defendant's mother. He also punched Defendant once when Defendant was in ninth grade. Defendant's parents separated when he was 10 or 11 years old. His mother drank constantly and subjected him to physical and emotional abuse and neglect. (case citations omitted)

Defendant's own history suggests mental illness. His mother drank alcohol while pregnant with him, he was developmentally delayed as an infant, repeated a grade in school, and dropped out after being referred to special-education classes. He suffered various incidents of head trauma while growing up and as a young man. He began consuming alcohol, tobacco, and other drugs between the ages of 11 and 14, when the brain's frontal lobes are first beginning to develop. In January 1986, at the age of 24, he attempted suicide by shooting himself in the chest with a shotgun, after which he received psychiatric intervention and was prescribed antidepressants. Later that year he was involuntarily committed to a hospital after complaints from his mother and ex-wife that he was violent and suicidal; he was diagnosed as suffering from substance abuse and mixed personality disorder. In 1995 he was again hospitalized for three days after arriving in the emergency room complaining of "losing his mind." R., Vol. 2d pt. 8 at 358. He was discharged with diagnoses of substance abuse and organic affective disorder. According to Dr. Woods, throughout Defendant's life he has had a significantly impaired ability to function normally and live independently and has suffered from irritability, racing thoughts, paranoia, and cognitive impairment.

Drs. Young, Woods, and Sharp concluded that Defendant labors under substantial mental impairment. Dr. Woods diagnosed Defendant with bipolar disorder and posttraumatic stress disorder. Dr. Sharp's evaluation from 2002 (during the state-court proceedings) found that Defendant had avoidant personality disorder, long-term memory problems, a tremor in his hands, and buzzing in his ears.

. . . . . . . . . . . Dr. Young said (1) that Defendant's history suggests he has sustained brain damage that inhibits his ability to process new information and (2) that tests she administered likewise indicated that Defendant's executive functioning—which involves the ability to reason, anticipate

5

consequences to actions, and respond to new information and act accordingly—was significantly impaired. She stated that Defendant's "brain dysfunction ... would particularly impair his abilities to organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment. His disabilities would be further exacerbated under conditions of complexity and/or highly stressful situations." R., Vol. 1a pt. 1 at 1105. Dr. Woods concurred with Dr. Young's findings. He determined that Defendant suffers from brain damage sustained early in his life, which impairs his inhibition, reasoning, and judgment. He opined that Defendant's "frontal lobe impairments are known to be the foundation for disinhibition, impaired judgment, and grandiosity/paranoia found in bipolar disorder." *Id.* at 1297. Dr. Sharp's 2002 evaluation found Defendant to be fearful and paranoid, and he agreed with Dr. Young's findings and Dr. Wood's diagnosis.

*United States v. Barrett*, 797 F.3d 1207, 1225-1230 (10th Cir. 2015), *cert. denied*, 137 S.Ct. 36, 196 L.Ed2.d 48 (2016).

Additionally, the Circuit Court noted the following evidence which was introduced in the trial of this matter:

. . . . . . . .when Defendant was involuntarily committed for psychiatric treatment in 1986, his then-wife executed a sworn statement describing Defendant as "a very dangerous person to himself and others" and stating that he was abusing drugs and had sexually abused her, had kidnapped their son, had destroyed and burned her possessions, and had threatened to kill her and to take away their son. R., Vol. 2d pt. 8 at 350. A medical history sheet completed at that time stated that he had no symptoms of neurological problems and that he denied having suffered any head injuries. Although his discharge summary from that stay diagnosed him with a "[m]ixed personality disorder," it also described him as a drug abuser who had failed to continue taking his medication after his suicide attempt. Also, it offered a prognosis of "[g]uarded, because of the unpredictability of his behavior, depending on the circumstances and depending on whether or not he is taking drugs at the time." Id. at 353. A few months after his release from the hospital, Defendant had a claim denied by the Social Security Administration. The denial letter stated that "[m]edical reports show that you are moderately depressed but there are no signs of a severe mental illness. Most of the time you are able to think

6

clearly and to carry out your normal activities." Id. at 362. As for Defendant's 1995 hospitalization, . . . . . a physician's evaluation found him to be calm, normal, and free of any paranoia, delusions, hallucinations, or homicidal ideation, but still addicted to drugs. And finally, the government could have introduced evidence that Defendant had amphetamines and marijuana in his system on the night of the shooting.

. . . . . . . . . the jury heard extensive testimony of Defendant's abuse of his ex-wife, including her requests for and his violations of multiple protective orders, an incident in which he destroyed her furniture and other items, and his threat after their separation to "blow off her head." Id., Vol. 5 pt. 2 at 3486. Their divorce was granted, the jury learned, on grounds of physical abuse. The jury was also presented with significant evidence of Defendant's drug use, including the testimony of a drug addict that he took methamphetamine with Defendant, and the testimony of a state prison employee that Defendant self-reported first using alcohol at age 12, cocaine and heroin at age 14, and methamphetamine at age 20, and had been using marijuana, methamphetamine, heroin, tranquilizers, and other drugs up until the time of the shooting.

Id., at 1231-1232.[2]

Moreover, in its opinion, the Tenth Circuit found that the "Defendant has presented a case that his defense team did little to investigate his background and mental condition." Id., at 1225. The Court then discussed the governments response to the defendant's case which included counsel "had no indications that Defendant suffered from a mental impairment, so there was no reason to pursue that line of inquiry;" "Defendant opposed a mitigation strategy based on personal sympathy or his childhood;" and counsel "had a

---

[2]Clearly, the government will have the opportunity in the upcoming evidentiary hearing to contest any of these factual findings. However, to the extent the government does not rebut these findings, the Court will rely upon these findings in making its final decision herein. Petitioner need not introduce evidence on facts which have already been found by the Tenth Circuit Court of Appeals.

7

reasonable mitigation strategy." *Id.*, at 1226. Finally, the Circuit indicated the government's response was "questionable on this record." *Id.*

Based upon these findings, the Tenth Circuit remanded the matter to this Court for an evidentiary hearing on "whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial." *Id.*, at 1232.

## MOTION IN LIMINE

Following issuance of a scheduling order herein, Petitioner provided the government with a list of 71 proposed witnesses. *See*, Dkt. # 289-1. The list of witnesses indicates some will be offered solely by declarations which have previously been submitted in this case. Before this Court had an opportunity to rule upon the litany of motions filed within the past few weeks, including reviewing the responses and replies, the parties submitted a Joint Pre-Hearing Statement which lists 49 witnesses to be called on behalf of the petitioner and 4 witnesses to be called on behalf of the government. In addition, Petitioner proposes submitting 270 exhibits and the government proposes submitting 54 exhibits. In this same pleading, the Court was advised the parties anticipate the evidentiary hearing will take 13 days. The parties should be aware that this Court intends to strictly limit the evidence which will be admitted in the upcoming evidentiary hearing to evidence which is relevant to the issues which are currently before the Court. The Court has previously advised the parties it

8

"expects to hear live testimony from trial counsel whose conduct is at issue but otherwise encourages the submission of written exhibits in lieu of live testimony."  Dkt. # 246.

The Federal Rules of Evidence will be applied in the upcoming evidentiary hearing. *See*, *United States v. Francischine*, 512 F.2d 827, 829 (5th Cir. 1975).  Where a witness is unavailable, their affidavit will not be allowed unless the opposing party has had the opportunity to cross examine the witness.  *See*, *West v. United States*, 2009 WL 1043962 (M.D.Fla. 2009) (unpublished).  One exception to this will be where the petitioner is presenting evidence which would have been admissible under 18 U.S.C. § 3593(c), *i.e.*, "any information relevant to a mitigating factor."  In the context of this § 2255 proceeding, however, the Court finds relevant information regarding a mitigating factor is limited to the mental health or background of the defendant since that is only issue currently before this Court.

Based upon the Joint Pre-Hearing Statement filed herein, the Court finds that Petitioner does not intend to introduce testimony from the following witnesses originally listed on his exhibit list which the government asked this Court to prevent from testifying herein: Edward Hueske, Dewey Padgett, Hon. John Garrett, Gaylan Warren, Johnny Philpot, Amanda Girzzle, Christine Calbert, Mike Mackey, Dale Anderson, Tamera Bedwell, Faust Bianco, Courtney Burke, Cindy Crawford, Robert Gude, Scharlette Holdman, Judy House, Gary Nelson, Steven Sinyard, Geoffrey Standing Bear, Ellen Stoval, Jan Walkingstick, and

Randy Weaver, Charles Sanders.  Therefore, this Court finds the government's motion moot as to these individuals.

Next, the government requests Petitioner not be allowed to call four more witnesses who can offer testimony relevant only to guilt phase issues, to-wit: Paul Gordon, George Kirkham, Janesse Thomas, and Billy Poindexter.  The Court has reviewed the declaration of each of these witnesses and finds none of their testimony is relevant to the issues which have been remanded to this Court.  Therefore, Paul Gordon, George Kirkham, Janesse Thomas and Billy Poindexter will not be allowed to testify at the upcoming evidentiary hearing either in person or by declaration.

The government also requests this Court limit the expert mental health testimony which can be presented at the upcoming evidentiary hearing.  In particular, the government objects to the testimony of Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy, and Pablo Stewart.  According to the government, these witnesses will "offer testimony about present-day evaluations and opinions that Barrett has never claimed were available to trial counsel or constitutionally necessary for his case." Dkt. # 289, at p. 12.   Throughout the pleadings filed since this case was remanded to this Court, Petitioner's counsel has repeatedly attempted to resurrect issues which have been finally determined herein. *See*, Dkt. # 269.  Since the Circuit has already made a finding regarding the mental health evidence which was available to trial counsel, this Court does intend to hear additional evidence in this regard.   Certainly, this Court does not need to hear from six different mental health

10

professionals to make a determination of the mental health evidence which was available to trial counsel nor to decide the issues which remain in this case. This Court finds the witnesses proposed by petitioner appear to involve the needless presentation of cumulative evidence and the Court will exclude such evidence pursuant to Rule 403 of the Federal Rules of Evidence. Accordingly, this Court grants the government's motion to exclude the testimony of Erin Bigler, Thomas Kosten, Deborah Miora, Thomas Reidy,[3] and Pablo Stewart.[4]

Third, the government asks the Court to exclude the testimony of proposed witnesses whose testimony does not relate back to an existing claim. While the government listed a number of witnesses, the only witnesses objected to and still contained on the Joint Pre-Hearing Statement that Petitioner intends to call in this category are: Isaac Barrett, Martin Daggs, Sharon Greenfeather. According to the declarations listed on the joint pre-hearing statement (Dkt. # 340), both Isaac Barrett and Sharon Greenfeather will detail family history which the Tenth Circuit has already made factual findings about. This Court finds that history was adequately described in the Tenth Circuit's opinion remanding this case and further direct testimony on this issue is not necessary.

---

[3]*See also*, Dkt. # 360.

[4]As to Stewart's proposed testimony regarding Petitioner's "ability to perceive, understand, assess or evaluate and make judgments under the conditions on September 24, 1999," this Court finds this evidence is irrelevant to the issues before the Court. *See*, *United States v. Barrett*, 496 F.3d 1079, 1112-1115 (10th Cir. 2007) and *United States v. Barrett*, 797 F.3d 1207, 1218-1219 (10th Cir. 2015).

11

In response to the government's motion to exclude Martin Daggs, Petitioner states his testimony would complement the testimony of Paul Gordon and George Kirkham "by casting doubt on the propriety and necessity for a police raid that was ill-advised and was executed in a manner that increased the chances of a violent response . . . . ." Dkt. # 323, at p. 13. This Court finds this evidence is not relevant to any issue currently before this Court. Accordingly, this Court hereby grants the government's motion to exclude the testimony of Isaac Barrett, Sharon Greenfeather, and Martin Daggs.

Additionally, the government requests this Court to exclude the testimony of proposed witnesses whose testimony does not relate to any current issue. The witnesses whom the government objects who are still contained on the Joint Pre-Hearing Statement include: Richard Burr, Julia O'Connell, Susan Otto, and Gary Philpot. According to the government, these witnesses "will not illuminate the narrow ineffectiveness claim before the Court." Dkt. # 289, at p. 12. This Court tends to agree. In *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), the Supreme Court set forth the proper standard to be applied in all ineffective assistance of counsel claims. Thus, this Court finds it does not need to hear Mr. Burr's opinion, as an attorney, as to what was reasonable in this particular case. This Court is intimately acquainted with the legal standards governing ineffective assistance of counsel claims. Expert testimony purporting to advise this Court how to apply those legal standards to the facts of this case would invade the court's province as a trier of the law, and are not helpful to the court in determining the facts of this particular case. Because the

12

proposed expert testimony of Mr. Burr goes beyond the appropriate boundaries of expert testimony and is unhelpful to this Court in its role as trier of fact, this Court finds his testimony will not be allowed.

Moreover, to the extent the government has never contested that Ms. O'Connell had a brief conversation with Mr. Hilfiger in which she referred him to Mr. Burr, this Court finds Ms. O'Connell testimony would not assist this Court in deciding any issues currently pending before this Court. Additionally, assuming Mr. Hilfiger did not follow through and contact Mr. Burr, that is irrelevant in ascertaining the reasonableness of counsel's performance in this particular case. Similarly, Ms. Otto's testimony regarding the process by which trial counsel came to be appointed has absolutely no bearing on any issues currently pending before this Court, *i.e.,* "whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial." *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015), *cert. denied*, 137 S.Ct. 36, 196 L.Ed2.d 48 (2016). Accordingly, the Court hereby grants the government's motion to exclude the testimony of Mr. Burr, Julia O'Connell and Susan Otto.

Finally, the government has asked to exclude the testimony of Gary Philpott. Based upon a review of Mr. Philpott's declaration listed in the Joint Pre-Hearing Statement, this Court finds this witnesses purported testimony is not relevant to the issues before the Court. Therefore, the government's motion to exclude the testimony of Gary Philpott is granted.

**CONCLUSION**

Based upon the Court's rulings herein, this Court finds the testimony of a majority of the witnesses listed in the Joint Pre-Hearing Statement are irrelevant to the issues currently pending before this Court. Similarly, a majority of the exhibits are not relevant. For instance, marriage certificates, birth and death certificates, divorce files and criminal records dating back to 1915 are irrelevant and would never have been admitted for any purpose in the criminal jury trial herein. Additionally, criminal files related to witnesses who testified below are not relevant to these proceedings. Moreover, the jury heard testimony in the second stage of trial regarding the findings in the state court trial. While the Court is aware that the defendant was tried twice in state court on state charges before being indicted in federal court, the transcript of the first and second trial is not relevant to the issues before this Court. Therefore, this Court orders the parties to redo the Joint Pre-Hearing Statement to incorporate all of the legal rulings made herein and in the other orders filed simultaneously this date. Moreover, the Court anticipates the evidentiary hearing should be completed within no more than five (5) days. The Amended Joint Pre-Hearing Statement shall be filed no later than close of business on March 3, 2017.

It is so ordered this 24th day of February, 2017.

_____
James H. Payne
United States District Judge
Eastern District of Oklahoma

14

1091

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878521@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Extend
Scheduling Order Dates
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 5:09 PM CST and filed on 2/24/2017

**Case Name:**      Barrett v. USA
**Case Number:**    6:09−cv−00105−JHP
**Filer:**
**Document Number:** 362(No document attached)
**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying [341] Petitioner's Unopposed
Motion for Extension of Time to File Expert Report. See, Dkt. # [361]. (cjt, Deputy Clerk)**

**6:09−cv−00105−JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878523@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Amend
Content-Type: text/html

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/24/2017 at 5:11 PM CST and filed on 2/24/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 363(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying as moot [344] Petitioner's Unopposed Motion to Amend Joint Statement. See, Dkt. # [361]. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:       dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:       Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>                    Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>                    Respondent. | CASE NO. CV-09-00105-JHP |

**PETITIONER'S COMBINED
RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT OF OPPOSITION**

Pet'r's Resp. Opp. Govt. MSJ                                        *U.S. v. Barrett*, CV-09-00105-JHP

1094

**TABLE OF CONTENTS**

RESPONSE IN OPPOSITION ........................................................................................ 1

BRIEF ........................................................................................................................... 1

I.   STATEMENT OF DISPUTED FACTS ................................................................ 1

ANALYSIS .................................................................................................................. 14

II.  LEGAL STANDARDS ......................................................................................... 14

   A.   Summary Judgment ....................................................................................... 14

   B.   Ineffective Assistance of Counsel ................................................................. 15

III. THE GOVERNMENT FAILED TO SUSTAIN ITS BURDEN ........................... 15

   A.   The Motion is Facially Defective .................................................................. 15

   B.   The Government Failed to Show the Absence of a Dispute of Material Fact ... 16

   C.   The Government's Motion is Barred by the Law of the Case ......................... 21

CONCLUSION ............................................................................................................. 22

CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY ................................ 23

Pet'r's Resp. Opp. Govt. MSJ        i        *U.S. v. Barrett*, CV-09-00105-JHP

1095

# TABLE OF AUTHORITIES

**Federal Cases**

*Abdul-Kabir v. Quarterman*, 550 U.S. 233 (2007) ........................................................... 19

*Adickes v. S.H. Kress & Co.* 398 U.S. 144 (1970) ........................................................ 15, 16

*Adler v. Wal-Mart Stores*, 144 F.3d 664 (10th Cir. 1998) ............................................ 14

*Alcala v. Woodford*, 334 F.3d 862 (9th Cir. 2003) ........................................................ 17

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) .............................................. 14, 16

*Bd. of Governors of Fed. Reserve Sys.v. Dimension Fin. Corp.*, 474 U.S. 361 (1986) .. 19

*Boyde v. California*, 494 U.S. 370 (1990) ...................................................................... 19

*Brown v. Sternes*, 304 F.3d 677 (7th Cir. 2002) ........................................................... 21

*Carmell v. Tex.*, 529 U.S. 513 (2000) ................................................................... 9, 13, 14

*Casey v. Frank*, 346 F. Supp. 2d 1000 (E.D. Wis. 2004) ............................................. 21

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) .............................................................. 14

*Garrison v. Bd. of Cty. Comm'rs*, No. CIV-09-441-JHP, 2011 WL 483994
(E.D. Okla. Feb. 7, 2011) .......................................................................................... 14, 16

*Littlejohn v. Trammell*, 704 F.3d 817 (10th Cir. 2013) ................................................ 20

*Martin v. Rose*, 717 F.2d 295 (6th Cir. 1983) ........................................................... 20-21

*Mason v. Texaco, Inc.*, 948 F.2d 1546 (10th Cir. 1991) ................................................ 21

*Mayes v. Gibson*, 210 F.3d 1284 (10th Cir. 2000) ......................................................... 20

*Mitchael v. Intracorp, Inc.*, 179 F.3d 847 (10th Cir. 1999) ...................................... 16, 17

*Reed v. Nellcor Puritan Bennett*, 312 F.3d 1190 (10th Cir. 2002) ............................. 15, 16

*Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181 (10th Cir. 1995) ........................................ 21

*Rompilla v. Beard*, 545 U.S. 374 (2005) ..................................................................... 9, 22

*Strickland v. Washington*, 466 U.S. 668 (1984) ......................................................... 6, 9, 17

*Tennard v. Dretke*, 542 U.S. 274 (2004) ....................................................................... 19

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ..................................... 6, 18, 21

*United States v. Monsisvais*, 946 F.2d 114 (10th Cir. 1991) ........................................ 21

*United States v. Purkey*, 428 F.3d 738 (8th Cir. 2005) ............................................. 19-20

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................................ 6, 22

*Williams v. Taylor*, 529 U.S. 362 (2000) ................................................................... 19, 22

*Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008) ..................................................... 20

**Federal Statutes**

18 U.S.C. § 3593(e) (2012) .............................................................................................. 20

**Other**

American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1015-27 (2003) ...................................... 8, 9

## RESPONSE IN OPPOSITION

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, hereby responds in opposition to the government's Motion for Partial Summary Judgment (Doc. 347) filed under seal on February 23, 2017. In summary, the Motion is frivolous; the Motion is facially, factually and legally defective under Fed. R. Civ. P. 56(c) and LCvR 56.1(b), the decision of the Tenth Circuit in this case, the law-of-the-case doctrine and the governing substantive law; the Motion is interposed for the improper purpose of interfering with Petitioner's preparation for the hearing scheduled to begin in two weeks as prohibited in Fed. R. Civ. P. 56(h); this Opposition, while more than sufficient to demonstrate the Motion's baselessness, is necessarily subject to amendment under Fed. R. Civ. P. 56(d) and basic notions of due process because this Court, without giving Mr. Barrett notice or an opportunity to be heard, has drastically shortened the time for Mr. Barrett to respond such that this Response is due well before Mr. Barrett's expert can produce his report.

## BRIEF

### I.      STATEMENT OF DISPUTED FACTS

The government's Motion fails to comply with Fed. R. Civ. P. 56(c)(1) and LCvR 56.1(b) which requires the following:

> The brief in support of a motion for summary judgment (or partial summary judgment) shall begin with a section stating the material facts to which the movant contends no genuine dispute exists. The facts shall be set forth in concise, numbered paragraphs.

Due to the government's flagrant disregard for the law, Mr. Barrett is unable to comply with LCvR 56.1(c) which requires that this Brief "begin with a section responding, *by*

Pet'r's Resp. Opp. Govt. MSJ               1               *U.S. v. Barrett*, CV-09-00105-JHP

1097

*correspondingly numbered paragraph* [*sic*], to the facts that the movant contends are not in dispute and shall state any fact that is disputed" (emphasis in original). Due to the government's noncompliance LCvR 56.1(b), in combination with the Motion being filed while counsel are extremely busy preparing for the upcoming hearing, and the Court's order denying Mr. Barrett a reasonable amount of time to respond, it would be unfair, unjust and an abuse of discretion for this Court to find that any omission on Mr. Barrett's part constitutes an admission under LCvR 56.1(e), the application of which depends upon compliance with LCvR 56.1(b).

1.      The Motion seems to turn on the government's contention that a table prepared by Petitioner's counsel establishes that neither trial counsel had access to the report, or the findings contained in the report, of psychologist Bill Sharp because the table supposedly shows the report was in the possession of state trial investigator Steve Leedy, and not federal trial counsel. Mot. 2, citing Mot. Ex. 1; *id.* at 5, citing same. However, it is unclear what the government's position is because the Motion fails to provide a consistent description of the fact the government claims is material and undisputed. It variously states the issue as whether trial counsel "had access to" Dr. Sharp's report, Mot. 3 & 5; whether counsel "'obtained a copy,'" *id.* at 4 (quoting Doc. 95 at 191 with emphasis added); whether Sharp's report put trial counsel "'on notice that Mr. Barrett suffered from extreme paranoia and long-term memory problems,'" *ibid.* (emphasis by government); whether trial counsel "had the benefit of Dr. Sharp's observations," *id.* at 5; whether anyone had a duty to "transmit the Sharp report" to trial counsel, *id.* at 5; and whether "trial counsel were unaware of Dr. Sharp's findings," *id.* at 6 (emphasis added), regardless of whether they obtained his report. Due to the government's inconsistency and its failure to comply with Rule 56(c) and LCvR 56.1(b), Mr. Barrett lacks fair notice of what fact the government considers material and whether that fact is genuinely in dispute.

Pet'r's Resp. Opp. Govt. MSJ                    2                    *U.S. v. Barrett*, CV-09-00105-JHP

1098

a. The Motion fails at the first hurdle because the government itself disputes that Mot. Ex. 1 establishes anything. A dispute exists where "the material cited to support or dispute a fact cannot be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The government itself objects to the admissibility of its Mot. Ex. 1, which is Mr. Barrett's Hr'g Ex. 267, on grounds of "Lack of Authentication, Relevance, Competence." Jt. Stmt. (Doc. 340) at 36. Even in the Motion, the government avoids endorsing its own exhibit as proof, stating that it merely "*purports to identify* the sources of documents that Barrett disclosed as counsel's files." Mot. 2 (emphasis added). Indeed, the government does not rely on a fact at all, but on counsel's representation, from which the government infers that "it *appears* Barrett is *prepared to confirm* . . . that Messrs. Smith and Hilfiger never had access to" the report. Mot. 2-3 (emphasis added). *See also id.* at 5 ("[a]t present . . . it appears that Barrett's factual assertion" about Sharp "was mistaken"). The government cannot sustain its burden of showing the absence of a disputed issue of material fact while playing fast and loose with the issue of materiality and simultaneously contending that its primary piece of evidence merely purports to establish something "[a]t present," but that the exhibit is incompetent evidence.

b. The evidence shows the government vastly understates the extent of trial counsel's ignorance. Trial counsel did not state in their declarations that they were merely unaware of Dr. Sharp's *report*, they stated that were "not familiar with Dr. Sharp" *or* his report. Doc. 175 Ex. 11 at ¶ 10; Doc. 175, Ex. 12 at ¶ 12. Yet Dr. Russell, who the government contends was trial counsel's psychological expert

Pet'r's Resp. Opp. Govt. MSJ          3          *U.S. v. Barrett*, CV-09-00105-JHP

1099

for the penalty phase, mentioned Dr. Sharp throughout her reports. Mot. Exs. 3, 4.

2.      Mr. Barrett contends, and the Motion appears to concede, that trial counsel had access to the information in Dr. Sharp's report that would have put reasonably competent trial counsel on notice that they should investigate Mr. Barrett's mental health for purposes of the penalty phase. The Motion endorses evidence that shows the following:

a.  It is undisputed that Dr. Sharp did his preliminary evaluation and drafted his report in September 2002, which is years before either federal counsel were appointed to represent Mr. Barrett.

b.  It is undisputed that both Mr. Hilfiger and Mr. Smith knew, or should have known based on the materials available to them, *see*, *e.g.*, Case No. CR-04-115-P, Doc. 46 at 7, Doc. 50 at 8, and Case No. CV-09-105-JHP, Doc. 95 Ex. 64, that the Oklahoma Indigent Defense System ("OIDS") had provided expert and investigative assistance to John Echols, and that investigator Leedy was the custodian of at least some of those records. Doc. 95, Ex. 64 at 2.

c.  It is undisputed that federal trial counsel had access to the OIDS files in that they could have obtained them from Mr. Leedy, if they had only asked for them. Mot. 5, citing Doc. 95 Ex. 111 (Decl. Steve Leedy); Doc. 95 Ex. 111 at 2 (explaining that files were available during Mr. Hilfiger's representation).

Thus, even if trial counsel did not obtain Dr. Sharp's report, based on the trial record and the exhibits attached to or cited in the Motion, there can be no genuine dispute that trial counsel had ready access to the report.

3.      Similarly, the Motion and exhibits appended to it *disprove* the government's assertion that there is no genuine dispute regarding whether trial counsel had actual knowledge

Pet'r's Resp. Opp. Govt. MSJ                    4                    *U.S. v. Barrett*, CV-09-00105-JHP

1100

of Dr. Sharp's findings. It is undisputed that trial counsel Hilfiger and Smith had actual possession of the 2003 report of Jeanne Russell that was prepared under the aegis of OIDS. Mot. 6; Mot. Ex. 3.

4.    The government contends that Dr. Russell's report "would not have alerted the lawyers to the need to investigate mental health generally or Dr. Sharp's findings." Mot. 6.

a.  First, the assertion is vague. However, based on the government's earlier statements, it appears the government contends it is undisputed that Dr. Russell's report did not put trial counsel on notice that Dr. Sharp found "'Mr. Barrett suffered from extreme paranoia and long-term memory problems.'" Mot. 5 (quoting Doc. 95 (Amended § 2255 Mot.) at 191). The following aspects of Dr. Russell's reports actually *disprove* the government's claim:

i.   Dr. Russell reviewed the "Psychological Evaluation completed by Dr. Bill Sharp." Mot. Ex. 4 (2003 Russell Report) at 2.

ii.  Dr. Russell's report states that she administered no tests of intellectually functioning, but that "[t]ests of intellectual functioning fall in the average range." *Id.* at 3 & 4. These references, together with the reference to Dr. Sharp, put any reader on notice that Dr. Sharp administered some tests of intellectual functioning.

iii. Dr. Russell's 2005 report, prepared at the request of federal trial counsel, added a list of the tests Dr. Sharp administered. Mot. Ex. 3 at DISC 008235.

iv.  Regarding the specific allegation of paranoia that the government asserts trial counsel lacked notice of, Mot. at 5, Dr. Russell's 2003 report says the

following at p. 9:

> Dr. Sharp described Mr. Barrett as being extremely paranoid during his initial interview. Prior hospital records indicate some evasiveness while talking to doctors. In addition, Mr. Barrett reports withdrawing and isolating behaviors prior to his arrest. He indicated he rarely left his home and would ask family members to pick up needed items when in town.

   v. Dr. Russell repeated this paragraph in the 2005 report she prepared for trial counsel. Mot. Ex. 3 at DISC 008241.

b. Second, the government fails to provide evidence of how trial counsel would have reacted, Fed. R. Civ. P. 56(c), and that is unknowable because, as the government concedes, trial counsel lacked the knowledge necessary to form a strategic plan at the time of trial. *See United States v. Barrett*, 797 F.3d 1207, 1228 (10th Cir. 2015).

c. Third, the issue under the substantive law is how a reasonable attorney would have responded to the information contained in Dr. Russell's report. *Strickland v. Washington*, 466 U.S. 668, 690-91 (1984); *Wiggins v. Smith*, 539 U.S. 510, 527-28 (2003).

   i. That determination must be based on the prevailing norms of capital defense practice. *Wiggins*, 539 U.S. at 524. The Supreme Court also has held that whether an attorney responded reasonably to the circumstances is a mixed question of fact and law. *Strickland*, 466 U.S. at 698. Therefore the government cannot sustain its burden by relying on the prosecutor's *ipse dixit*. However, the Motion presents no evidentiary basis for this Court to find it would be consistent with prevailing professional norms to ignore the information trial counsel had. Consequently, the Motion fails to establish any fact. Fed. R. Civ. P. 56(c).

ii.   However, as shown in Paragraph 8, *infra*, Mr. Barrett is prepared to present evidence that under prevailing professional norms, a reasonable attorney would have sought expert assistance following receipt of the information in Dr. Russell's report regarding Dr. Sharp.

5.      The government contends it is a "fact that Barrett places responsibility for the operative document at the feet of an investigator, rather than former counsel." Mot. 5. That assertion is false. Moreover, the government makes up an *allegation* not a material fact within the meaning of Fed. R. Civ. P. 56. The government's assertion is an attempt to construct a straw-man argument about Mr. Barrett's claim. Mr. Barrett has always asserted, as did this Court in its budgeting order, that federal trial counsel had an obligation to obtain the files on the case from OIDS.

a.   *See* Doc. 95 at 189 ("declarations of John Echols, Jack Gordon, and Steve Leedy (Exhibits 34, 82 and 111), show Mr. Hilfiger failed to undertake a reasonable investigation before concluding that no additional funds were needed to prepare for either stage of trial"); *ibid.* (Leedy declaration shows trial counsel failed to "familiarize[] *himself* with the results of an earlier mitigation investigation") (emphasis added).

b.   The transcript of the September 9, 2005, status hearing further demonstrates that the government is attempting to distract the Court with straw arguments. Trial counsel Smith stated at the time that he and Mr. Hilfiger were looking for the OIDS work product related to mitigation. Tr. Sept. 9, 2005, Hr'g at 43. The United States Attorney accurately described that as "the eleventh hour." *Id.* at 38.

c.   State second-stage counsel Jack Gordon has submitted a declaration contradicting

trial counsel's assertions at the September 9, 2005, hearing. Doc. 95, Ex. 82.

d. Trial counsel themselves, as well as this Court and the prevailing professional norms, American Bar Association, *Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases*, 31 Hofstra L. Rev. 913, 1015-27 (2003), Guideline 10.7 & commentary, placed the onus on trial counsel to obtain OIDS's files many months before September 2005.

6.     The government contends that "Echols had investigated mental health, apart from his receipt of Sharp's findings, and received reports that Barrett did not have brain damage or any other mitigating condition." Mot. 5. Again, the government is attempting to distract the Court with an immaterial fact, or alleged facts. First, Mr. Echols's representation is not at issue. Second, the government places its interpretation on the information provided to Mr. Echols, but Mr. Echols and Mr. Barrett dispute the significance of that information.

a. Mr. Echols advised Mr. Hilfiger and this Court that, based on the work done before the two state trials the defense needed to retain an "expert in diagnosing organic brain disorders" (Case No. CR-04-115-P, Doc. 46 at 7, Doc. 50 at 8):

Mr. Barrett is known to have used drugs and suffered significant head injuries during his life. The defense needs to engage an expert capable of assessing the likelihood that Mr. Barrett suffers from any identifiable psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting.

b. Mr. Echols advised this Court and Mr. Hilfiger that the prior psychological work to which the Motion refers was among the things he considered. Doc. 95 Ex. 64 at 2.

7.     The government urges this Court to reject the decision of the Tenth Circuit, contending that Dr. Russell's report "would not have alerted the lawyers to the need to

investigate mental health generally or Dr. Sharp's findings, notwithstanding the Court of Appeals' concerns to the contrary." Mot. 6. The government cites, and in its next paragraph selectively quotes from Dr. Russell's 2003 report. *Ibid.* Whether Dr. Russell's report would have alerted trial counsel to the need to investigate mental health must be assessed based on prevailing professional norms. *Strickland*, 466 U.S. at 690-91; *Wiggins*, 529 U.S. at 524-26; *Rompilla v. Beard*, 545 U.S. 374, 380-81 (2005). This Court must make "every effort to view the facts as a defense lawyer would have at the time," *Rompilla*, 545 U.S. at 385, and yet the Court has held evidence of that perspective is irrelevant. Docs. 361, 362. The government fails to identify any evidence of a prevailing professional norm or a defense lawyer's view of the facts to support its contention that Dr. Russell's report would not have triggered additional investigation by a reasonable attorney. Therefore, the government has failed to demonstrate that the fact is a fact or that it is undisputed. Fed. R. Civ. P. 56(c).

8. The government contends this Court is free to disregard the Tenth Circuit's decision because "Russell did not, in fact, refer to Sharp's stated concern that the defendant had suffered organic brain damage, nor did she mention a family history of depression and mental illness." Mot. 7. Here again the government changes its theory. First it alleged that Dr. Russell's report did not put trial counsel on notice that Dr. Sharp found Mr. Barrett paranoid. Now the focus has shifted to an issue that Mr. Echols identified. Again, the Motion offers nothing but a prosecutor's *ipse dixit*, whereas the Tenth Circuit remanded this case for the Court to obtain facts, guided by the governing Supreme Court cases. Nevertheless, in an abundance of caution, Mr. Barrett states the following:

    a. Mr. Barrett has demonstrated that he is preparing to present the testimony of Richard H. Burr, an indisputable expert on capital defense practices, who served

Pet'r's Resp. Opp. Govt. MSJ     9     *U.S. v. Barrett*, CV-09-00105-JHP

1105

as the defense's resource counsel on this very case. Doc. 95, Ex. 118 at ¶¶ 2-4. This Court has held Mr. Burr's testimony is irrelevant. At the same time, the government is asserting an entitlement to summary judgment on an issue that Mr. Barrett can dispute with Mr. Burr's testimony.

b. This Court previously established March 3, 2017, as the date for the exchange of expert reports. Order (Doc. 270) at 2. Mr. Barrett previously filed a declaration of counsel stating that Mr. Burr due to a medical issue, Mr. Burr is unable to file his report before March 8, 2017. Doc. 341. The government did not oppose Mr. Barrett's motion. *Ibid.* In light of the government's lack of support for its claims, and its improper purpose in bringing the Motion, this Court should deny the Motion. At a minimum, this Court should defer ruling and allow Mr. Barrett time to provide his expert's report on the question whether reasonable trial counsel would have seen nothing to investigate in Dr. Russell's report. Fed. R. Civ. P. 56(d).

c. Once given an opportunity to present his evidence, Mr. Barrett will show that reasonable trial counsel would have seen the following in Dr. Russell's report as worthy of investigation:

   i.  Mr. Barrett was hospitalized in Eastern State Hospital for nine to ten days due to psychiatric concerns in 1986. Mot. Ex. 3 at DISC 008234.

   ii.  Mr. Barrett received an evaluation and/or treatment at Bill Willis Community Mental Health Center in 1995. *Ibid.*

   iii.  Mr. Barrett was psychiatrically evaluated Wagoner Community Hospital in 1995. *Ibid.*

Pet'r's Resp. Opp. Govt. MSJ      10      *U.S. v. Barrett*, CV-09-00105-JHP

1106

    iv.  Mr. Barrett shot himself in the chest with a shotgun in 1986. *Ibid.*

    v.  Mr. Barrett reported five arrests for Driving Under the Influence of Alcohol. *Id.* at DISC 008236-37.

    vi.  Mr. Barrett "describes a series of separations from his father when his mother would simply move him and his siblings back to Oklahoma with no warning." *Id.* at DISC 008237.

    vii.  Mr. Barrett "reports his father ran around with other women and his mother drank a lot, which he believes she continues to do." *Ibid.*

    viii.  Mr. Barrett reported an unhealthy relationship with his mother (*ibid.*):

After his parent's [*sic*] divorce, Mr. Barrett lived primarily with his mother. He states she always worked and was gone most of the time. He describes his mother as drinking on a daily basis and reported she was often "hateful" when drinking. Overall he describes a very permissive home life explaining he never had to lie to his mother because she didn't really care what he did. He further describes times she would smoke Marijuana and use Cocaine with him and then lecture him the following day about his use. At the present time, he has little contact with his mother.

    ix.  "Mr. Barrett described himself as having a short attention span which is confirmed by statements made by other relatives who were around him as a child." *Ibid*.

    x.  School "records show he attended learning disabled classes in English." *Ibid.*

    xi.  "In 1986, Mr. Barrett shot himself in the chest after becoming despondent about Abby refusing to return to him. He remains perplexed about this shooting, explaining he was dating someone else and his life appeared to be going well at the time. He describes the shooting as impulsive, precipitated by his 'coming down off drugs.' Mr. Barrett expresses regret

Pet'r's Resp. Opp. Govt. MSJ        11         *U.S. v. Barrett*, CV-09-00105-JHP

1107

and guilt about the failure of his marriage." *Ibid.*

xii.   "Mr. Barrett reported having a head injury while in grade school when he was knocked unconscious after being hit by a steel ball. As described previously, he attempted suicide in 1986 by shooting himself in the chest with a 12 gauge shotgun." *Id.* at DISC 008238.

xiii.   The entirety of the two sections of report titled "Mental Health Treatment" and "Substance Abuse." *Id.* at DISC 008238-39.

xiv.   Regarding Dr. Sharp's assessment: "Results indicated Mr. Barrett lacked in adequate coping mechanisms, and endorsed items that indicated abnormal concerns regarding his health. Diagnoses included substance abuse disorders and both Avoidant and Paranoid Personality Disorders." *Id.* at DISC 008240.

xv.   The following three paragraphs appearing at DISC 008241:

Prior to his arrest in 1999, Mr. Barrett's family described symptoms of what they believed to be mental illness. For example, his ex-wife described him as too emotional and believed he had mental problems due to his mood swings. She further described him as suffering deep depressions during which time he couldn't go to work. His son Toby described him as having dramatic mood fluctuations and believed that he had some type of chemical imbalance. Mr. Barrett's mother also described her son as having intense emotions and dramatic mood fluctuations. As described previously, Mr. Barrett completed one serious suicide attempt in 1986. His previous suicide attempt and hospitalizations appear to reflect periods of depression and extensive substance abuse.

Although Mr. Barrett did not appear to suffer from a major thought disorder such as Paranoid Schizophrenia, there are reports indicating a history of paranoia. Dr. Sharp described Mr. Barrett as being extremely paranoid during his initial interview. Prior hospital records indicate some evasiveness while talking to doctors. In addition, Mr. Barrett reports withdrawing and isolating behaviors prior to his arrest. He indicated he rarely left his home and would ask family members to pick up needed items when in town.

Records further indicate a history of impulsiveness. However these

Pet'r's Resp. Opp. Govt. MSJ          12          *U.S. v. Barrett*, CV-09-00105-JHP

1108

behaviors appear exacerbated by drug use. This is supported by the fact we have not seen this impulsiveness during his incarceration. Psychological testing revealed feelings of longstanding personal inadequacies and ineffective coping. Coping skill deficits were also acknowledged as problematic, the lack of which were described in records provided by Eastern State Hospital, an inpatient psychiatric facility previously located in Vinita, Oklahoma.

      xvi.  "His mother was described by family as having a substance abuse problem

          and drinking on a daily basis." *Id.* at DISC 008241.

      xvii.  The following paragraph at DISC 008241-42:

Mr. Barrett reports he began drinking and using drugs at a young age and eventually dropped out of school, failing to complete the 9th grade. Although tests of intellectual ability indicate normal intelligence, he describes a lack of interest or completion of high school. Mr. Barrett's family described him as "hyper" which they reported as present from an early age. During his previous interviews (2003), he described the need to stay busy all the time. He felt he was able to do so while living out on his land where he repaired cars, hunted and fished.

  d.  Mr. Burr would testify that under the prevailing professional norms of federal capital defense work in 2005 the foregoing pieces of information would have caused any reasonable capital defense attorney to investigate Mr. Barrett's mental health.

9.     The government characterizes as "profitless" the "mental health investigation undertaken by Mr. Echols before he withdrew," and invites this Court to overrule the Tenth Circuit on that basis. Mot. 7. The portions of the trial record cited *supra* shows Echols did not view the investigation as profitless. He believed an evaluation for organic brain disorders was necessary. The government's motion fails to connect what it falsely alleges that Echols believed, without evidentiary support, Fed. R. Civ. P. 56(c), to what Mr. Hilfiger and Mr. Smith actually believed. Consequently, the government offers only a prohibited post-hoc rationalization for what it appears to admit was trial counsel's failure to investigate. *Wiggins*, *supra*, 529 U.S. at

526-27.

# ANALYSIS

## II.    LEGAL STANDARDS

### A.  Summary Judgment

As this Court has said previously:

> Summary judgment is appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c)(2). A material fact is one that "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). An issue is genuine if the evidence is such that a reasonable jury could return a verdict for either party. *Id.* at 255. All facts and reasonable inferences must be viewed in the light most favorable to the nonmoving party. *Id.* If a party who would bear the burden of proof at trial lacks sufficient evidence on an essential element of a claim, all other factual issues concerning the claim become immaterial. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

> The movant bears the initial burden of demonstrating the absence of a dispute of material fact warranting summary judgment. *Celotex*, 477 U.S. at 322–23. If the movant carries this burden, the nonmovant must then go beyond the pleadings and "set forth specific facts" that would be admissible in evidence and that show a genuine issue for trial. *See Anderson*, 477 U.S. at 248; *Celotex*, 477 U.S. at 324; *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 671 (10th Cir.1998); Fed.R.Civ.P. 56(e)(2). "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein." *Adler*, 144 F.3d at 671. Although a district court has discretion to go beyond referenced portions of the supporting material, it is not required to do so. *Id.* at 672. The Court's inquiry is whether the facts and evidence identified by the parties present "a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Anderson*, 477 U.S. at 251–52.

*Garrison v. Board of County Comrs.*, 2011 WL 483994 at *1 (E.D. Ok. Feb. 7, 2011).

## B. Ineffective Assistance of Counsel

The Motion focuses solely on the issue of deficient performance for failure to investigate mental health. The standard, as discussed *supra*, requires that counsel's performance be judged against prevailing professional norms such as those in the ABA Guidelines.

## III.  THE GOVERNMENT FAILED TO SUSTAIN ITS BURDEN

### A.  The Motion is Facially Defective

District courts must apply local rules in a manner consistent with Rule 56. *Reed v. Bennett*, 312 F.3d 1190, 1194 (10th Cir. 2002). Even where a party does not respond to a motion for summary judgment within the time allotted by the local rules, it may be error to grant the motion. *Ibid*. The Tenth Circuit treats the granting of a summary judgment on grounds that it was uncontested as a sanctions issue. *Reed*, 312 F.3d at 1193. Here, the movant ignored LCvR 56.1(b) to Mr. Barrett's prejudice by failing to state in discrete paragraphs those facts it claims are material and undisputed. The government added to the prejudice by stating its central point in a variety of forms. The Court added to the prejudice by shortening the time for Mr. Barrett to respond, especially at a time when any fairminded jurist would assume Mr. Barrett's counsel were preparing for the hearing. Under these circumstances, it would be error for this Court to deem any matter asserted by the government conceded, and error to grant the government's motion at all. *Reed*, 312 F.3d at 1194.

*Reed* makes clear that the movant bears the initial burden:

> As explained by the Supreme Court in *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160–61 (1970), the burden on the nonmovant to respond arises only if the summary judgment motion is properly "supported" as required by Rule 56(c). Accordingly, summary judgment is "appropriate" under Rule 56(e) only when the moving party has met its initial burden of production under Rule 56(c). If the evidence produced in support of the summary judgment motion does not meet this burden, "summary judgment must be

denied *even if no opposing evidentiary matter is presented.*" *Id.* at 160 (quoting Fed.R.Civ.P. 56 advisory committee notes to the 1963 amendments) (emphasis added).

312 F.3d at 1194. The government failed to sustain that burden for the reasons stated in § I, *supra*. Dr. Russell's reports, which are the governments Motion Exhibits 3 and 4, contradict the government's central claim that trial counsel was not on notice of that Mr. Barrett displayed extreme paranoia to Dr. Sharp, and further show that Mr. Barrett's family and medical records provided extensive information alerting trial counsel to his mental health problems, including Mr. Barrett's own account of being knocked unconscious when a steel ball struck him in the head.

### B. The Government Failed to Show the Absence of a Dispute of Material Fact

As the moving party, the government has the burden of demonstrating the absence of a dispute of material fact. *Garrison*, *supra*. For the reasons stated in §§ I and III.A, *supra*, the government failed to sustain its burden. The government failed even to state the issue it claims is undisputed with sufficient clarity to call it identified much less supported. The government disputes the authenticity of the first document on which it relies. The government's own exhibits then contradict the central factual claims of the government's motion. Under these circumstances, the government presented nothing on which this Court could base summary judgment. *Cf. Mitchael v. Intracorp., Inc.*, 179 F.3d 847, 855-56 (10th Cir. 1999). The government's presentation is very similar to the non-movant's rejected submission in *Mitchael* which was described as follows:

> "[P]laintiffs (1) failed to "specifically controvert" defendants' statements of facts with denials or counter-statements that fairly met the substance of defendants' statements, (2) failed to support many of their facts with adequate citations to the record, (3) intermixed their responses and their own statements of "facts" with legal arguments and asserted inferences to

Pet'r's Resp. Opp. Govt. MSJ                    16                    *U.S. v. Barrett*, CV-09-00105-JHP

1112

> be drawn from the facts, (4) mischaracterized much of the evidence, and (5) failed to present much of their documentary evidence in an admissible form."

179 F.3d at 856. Here, (1) the government's motions and exhibits contradict its own statements about what is admissible and what was available to trial counsel, (2) the government plays fast and loose with references to the district court and appellate records, and, (3) while failing to comply with LCvR 56.1(b), (4) the government freely intermingles its "facts" with conclusory statements on deficient performance, an issue the Supreme Court has held is a mixed question of law and fact. *Strickland*, 466 U.S. at 698.

Before the Tenth Circuit, the government argued that Mr. Barrett was not entitled to a hearing or relief under *Alcala v. Woodford*, 334 F.3d 862, 893 (9th Cir. 2003), because Mr. Barrett's family did not inform counsel that they observed evidence of mental problems. GB 37, 60. The government also contends in the Motion that Dr. Russell served as the defense psychologist for purposes of the penalty phase—a characterization the witness herself denies and that trial counsel repudiated at the time of trial—and Dr. Russell gave no indication that Mr. Barrett suffered mental problems. Mot. 6-7. These two claims contradict each other. As shown in § I, ¶ 8.c.xv, *supra*, Dr. Russell qualified her remarks about how mental health professionals had previously diagnosed Mr. Barrett with a lengthy description of the information his family provided that they viewed as evidence of his mental problems. Mot. Ex. 3 at DISC 008241.

Moreover, contrary to the government's claims about how Mr. Barrett presented his claim to the Tenth Circuit, Mr. Barrett did not base his showing on Dr. Sharp's report. Mr. Barrett asserted,

> Despite Mr. Barrett's previous documented contacts with the mental health system, of which counsel were aware (Docs. 15-27, Exh. 147; Doc. 175, Exhs. 11, 12), and despite the fact previous lead counsel had requested funds for a comprehensive mental health evaluation (Doc. 1, Exh. 34; Doc. 3, Exhs. 64-65; CrDoc. 97), counsel never employed a mental health expert

Pet'r's Resp. Opp. Govt. MSJ                    17                    *U.S. v. Barrett*, CV-09-00105-JHP

to perform this task.

AOB 61. The Tenth Circuit applied, *de novo*, the test for determining whether a petitioner is entitled to an evidentiary hearing. *Barrett*, *supra*, 797 F.3d at 1224. "That decision turn[ed] on 'whether such a hearing could enable [the movant] to prove the [motion's] factual allegations, which, if true, would entitle the [movant] to ... relief.'" *Ibid.* (quoting *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007)).

Rather than comply with the mandate that this Court "enable" Mr. Barrett prove his factual allegations, this Court's in limine rulings bar Mr. Barrett from presenting proof, including on an issue the government raises in its summary judgment motion. The government asserts that "[i]n the absence of Sharp's findings, Russell's report would not have led reasonable counsel to perform further investigation, especially into the areas of brain damage and major mental illness, which it either ignores or refutes." Mot. 7. The government presents no evidence regarding the prevailing professional norms it claims as a measure of what reasonable counsel would do. Additionally, Mr. Barrett is prepared to present evidence that it would have been consistent with prevailing professional norms to conduct a mental health evaluation in response to Dr. Russell's report, § I, ¶ 8, *supra*. However, this Court has ruled that such evidence is not relevant. Orders (Docs. 362, 361). Either the Motion is deficient because the government fails to substantiate its claim about what reasonable counsel would do in response to Dr. Russell's information, the Motion is deficient Mr. Barrett has demonstrated an ability to present competent evidence contradicting the government's contention, or the Motion is deficient because it relies on an issue this Court has deemed irrelevant. In either case, the Motion must be denied.

The government also rests its position on a legal fallacy, namely that trial counsel only have a duty to investigate and present evidence rising to the level of a "major mental illness." Mot. 7. Assuming *arguendo* that trial counsel for Mr. Barrett believed only evidence of "major

Pet'r's Resp. Opp. Govt. MSJ                 18                 *U.S. v. Barrett*, CV-09-00105-JHP

mental illness" could serve as a mitigating factor, and that trial counsel based their failure to investigate on that belief, as the government implies, trial counsel were ineffective for basing their decision on an erroneous view of the law. *See*, *e.g.*, *Williams (Terry) v. Taylor*, 529 U.S. 362, 395 (2000) (finding counsel deficient in part because they failed to investigate records "not because of any strategic calculation but because they incorrectly thought state law barred access to such records"); *Kimmelman v. Morrison*, 474 U.S. 365, 385 (1986) (finding trial counsel's failure to request discovery deficient where based "on counsel's mistaken beliefs that the State was obliged to . . . turn over all of its inculpatory evidence"). Like the petitioner in *Williams*, it should be "undisputed that [Mr. Barrett] had a right—indeed, a constitutionally protected right— to provide the jury with the mitigating evidence that his trial counsel either failed to discover or failed to offer." *Williams (Terry)*, 529 U.S. at 393. When the Supreme Court has "addressed directly the relevance standard applicable to mitigating evidence in capital cases . . . [the Court] spoke in the most expansive terms." *Tennard v. Dretke*, 542 U.S. 274, 284 (2004). "[S]entencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future." *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007). When the Supreme Court has discussed mitigation, it has referred not to "major mental illness," but to the "belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background, or to *emotional or mental **problems***, may be less culpable than defendants who have no such excuse." *Boyde v. California*, 494 U.S. 370, 382 (1990) (internal quotation marks and citation omitted) (emphasis added). In a federal death penalty case, it is error to exclude mental health testimony even if the evidence is equivocal. *United States v. Purkey*, 428 F.3d 738, 757-58

(8th Cir. 2005). That is the conception of mitigation that must underlie this Court's analysis. *Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000). The verdict forms appended to this Opposition show that federal jurors have found it mitigating that a defendant suffered mental health problems that did not rise to the level of a major mental illness. Ex. A at 17-19; Ex. B at 8-9; Ex. C at 7-8; Ex. D at 7-8; Ex. E at 7-9; Ex. F at 8-9, 12-13. If one juror found Mr. Barrett's emotional and mental health problems sufficiently weighty, a life sentence would be imposed. 18 U.S.C. 3593(e).

The government asserts that Mr. Barrett's claim of ineffective assistance of counsel cannot prevail because, "If trial counsel were unaware of Dr. Sharp's findings, it appears he cannot show that they acted ineffectively." Mot. 6. As shown in § I, the government's own exhibits show Dr. Russell advised trial counsel of Dr. Sharp's findings and additional evidence, such as Mr. Barrett's head injuries and suicide attempt, that any reasonable defense attorney would have followed up. As a matter of law, the government's argument fails. Trial counsel's failure to pursue red flags in Dr. Russell's report indicating evidence of organic brain damage *alone* warrants an evidentiary hearing on ineffective assistance of counsel due to failure to mitigate. *Littlejohn v. Trammell*, 704 F.3d 817, 861-67 (10th Cir. 2013) (remanding for evidentiary hearing because red flags of head injury were ignored by trial counsel;  where expert report contains red flags of physical brain damage, "we would be hard-pressed to conclude that [petitioner's] counsel was not constitutionally deficient in failing to follow up on the red flags" if they proved "worthy of belief"). *See also Wilson v. Sirmons*, 536 F.3d 1064, 1091-93 (10th Cir. 2008).

The government's exhibits show Dr. Russell mentioned Dr. Sharp repeatedly and yet trial counsel state they never heard of him. That ignorance is evidence of deficient performance.

Pet'r's Resp. Opp. Govt. MSJ                    20                    *U.S. v. Barrett*, CV-09-00105-JHP

1116

*Martin v. Rose*, 717 F.2d 295, 296-97 (6th Cir. 1983) ("ignorance by the attorney of some of the contents of a[] . . . file" assembled by prior counsel "constituted ineffective assistance of counsel"). Trial counsel's failure to obtain prior counsel's report of Dr. Sharp findings violated the duty to reasonably investigate. *Casey v. Frank*, 346 F.Supp.2d 1000, 1014-15 (E.D. Wis. 2004) ("A lawyer must request a file [of predecessor counsel] to discover what . . . it contains"); *see also Brown v. Sterns*, 304 F.3d 677, 692 (7th Cir. 2002) (holding that an "attorney must look into readily available sources of evidence).

### C.  The Government's Motion is Barred by the Law of the Case

As previously noted, the Tenth Circuit has held that Mr. Barrett presented sufficient evidence to be entitled to a hearing that would "enable" him to prove his claim. *Barrett*, 797 F.3d at 1224. The government's motion, and this Court's in limine rulings, are intended to preclude Mr. Barrett from proving his claim. These actions are barred by the law of the case.

> The law of the case doctrine provides "'[w]hen a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case.'" *Mason v. Texaco, Inc.*, 948 F.2d 1546, 1553 (10th Cir. 1991) (quoting *Arizona v. California*, 460 U.S. 605, 618 (1983)), *cert. denied*, 504 U.S. 910 (1992). Thus when a case is appealed and remanded, the decision of the appellate court establishes the law of the case and ordinarily will be followed by both the trial court on remand and the appellate court in any subsequent appeal. *United States v. Monsisvais*, 946 F.2d 114, 116 (10th Cir. 1991) (citing 1B J. Moore, J. Lucas & T. Currier, Moore's Federal Practice ¶ 0.404[1], at 119 (2d ed. 1991)).

*Rohrbaugh v. Celotex Corp.*, 53 F.3d 1181, 1183 (10th Cir. 1995).

The factual support for Mr. Barrett's claim has only grown stronger since the remand. As shown in § I, *supra*, the government makes only a sham attempt to show that the evidence is different than what the Tenth Circuit believed. To the extent the material facts are undisputed, the evidence is entirely in Mr. Barrett's favor. Trial counsel was on notice of Dr. Sharp's report and its underlying findings. Trial counsel knew Dr. Sharp had worked under the auspices of

Pet'r's Resp. Opp. Govt. MSJ                    21                    *U.S. v. Barrett*, CV-09-00105-JHP

OIDS, but they simply failed to seek the OIDS file. Contrary to the government's desperate, later-than-eleventh-hour attempt to reframe the issues, trial counsel, and only trial counsel, had a duty to obtain those files, and their failure to do so was not strategic. Mot. 5-6. Trial counsel's failure to pursue known sources of penalty phase evidence is deficient performance as a matter of law. *Rompilla*, 545 U.S. at 384-85; *Wiggins*, 539 U.S. at 522-23; *id.* at 527-28; *Williams (Terry)*, 529 U.S. at 395-96.

## CONCLUSION

For the foregoing reasons, this Court must deny the government's Motion for Partial Summary Judgment.

DATED:  February 27, 2017

Respectfully submitted,

/s/ *David Autry*
DAVID AUTRY
Attorney at Law

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

 /s/ *Tivon Schardl*
Tivon Schardl
Capital Trial & Habeas Attorney

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 27th day of February 2017, I caused the foregoing

Petitioner's Response in Opposition to the Government's Motion for Partial Summary Judgment

to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF

to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and

to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are

counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:         dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>           Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>           Respondent. | CASE NO. CV-09-00105-JHP |

**EXHIBIT A TO
PETITIONER'S COMBINED
RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT OF OPPOSITION**

App. Pet'r's Resp. Opp. Govt. MSJ                    *U.S. v. Barrett*, CV-09-00105-JHP

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FILED IN OPEN COURT

JUN 1 4 2005

CLERK, U.S. DISTRICT COURT
ALEXANDRIA, VA

UNITED STATES OF AMERICA )
)
v. )    Criminal No. 1:04CR283-A
)
ISMAEL JUAREZ CISNEROS, )
also known as: "Araña" )
)

## SPECIAL VERDICT FORM

### GENERAL DIRECTIONS:

This verdict form is supplied to you because you have previously found the defendant guilty of all five counts contained in the Indictment that carry a possible penalty of death. You have also found the defendant eligible for the death penalty. Therefore, this form applies as to your findings on Count One (conspiracy to tamper with a witness or an informant), Count Two (conspiracy to retaliate against a witness or an informant), Count Three (Killing a person aiding a federal investigation), Count Four (tampering with a witness or an informant), and Count Five (retaliating against a witness or an informant).

## SECTION I.  STATUTORY AGGRAVATING FACTORS
### (Unanimously found by Jury on May 24, 2005)

**As to COUNTS ONE, TWO, THREE, FOUR, and FIVE,**

1) Defendant ISMAEL JUAREZ CISNEROS committed the offenses described in an especially heinous, cruel, or depraved manner in that it involved torture and serious physical abuse to Brenda Paz, also known as "Smiley."

\_\_\_\_\_X\_\_\_\_\_      PROVEN

_____      NOT PROVEN

2) Defendant ISMAEL JUAREZ CISNEROS committed the offenses described after substantial planning and premeditation to cause the death of Brenda Paz, also known as "Smiley."

\_\_\_\_\_X\_\_\_\_\_      PROVEN

_____      NOT PROVEN

1

## SECTION II. <u>NON-STATUTORY AGGRAVATING FACTORS</u>

- **You are required to find, as to each statement below, that it has been "PROVEN" or "NOT PROVEN" beyond a reasonable doubt.**

- **Your finding(s) in this Section, whether "PROVEN" or "NOT PROVEN" must be unanimous.**

- **You may find more than one non-statutory aggravating factor per count, so check all that apply.**

**As to COUNT ONE (Conspiracy to Tamper With a Witness or an Informant):**

1. Defendant ISMAEL JUAREZ CISNEROS has engaged in a pattern of criminal activity including, but not limited to, the following:

    (a) Defendant ISMAEL JUAREZ CISNEROS, a citizen of Mexico, has repeatedly entered the United States illegally. On or about February 13, 2004, defendant CISNEROS pled guilty to illegal re-entry after deportation.

    (b) On or about April 17, 1999, defendant ISMAEL JUAREZ CISNEROS stabbed a fifteen-year-old victim four times in the back and once in the wrist at the Fairfax Towne Center shopping center in retaliation for the victim preventing co-defendant Oscar Antonio Grande from further assaulting a fellow student at school. On or about August 10, 1999, defendant CISNEROS pled guilty for this conduct.

    (c) On or about July 2, 2003, defendant ISMAEL JUAREZ CISNEROS sold a 12-gauge, pistol-grip shotgun loaded with four rounds of ammunition to a confidential informant.

    (d) On or about July 25, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol, ammunition, and cocaine to a confidential informant.

    (e) On or about October 15, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

    (f) On or about October 29, 2003, defendant ISMAEL JUAREZ

2

CISNEROS sold a .380 caliber pistol and cocaine to a confidential informant.

(g) On or about November 4, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .38 caliber revolver, which was loaded, and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

(h) On or about November 18, 2003, officers conducted a search of the residence occupied by defendant ISMAEL JUAREZ CISNEROS and recovered cocaine, tools of the drug trade, and ammunition.

_____X_____  PROVEN

_____  NOT PROVEN

2.  Defendant ISMAEL JUAREZ CISNEROS murdered Brenda Paz, also known as "Smiley," while knowing that she was pregnant at the time of her murder.

_____X_____  PROVEN

_____  NOT PROVEN

3.  Defendant ISMAEL JUAREZ CISNEROS committed Count One of the Indictment to prevent Brenda Paz, also known as "Smiley," from and to retaliate against her for assisting in the investigation and prosecution of MS-13 members for their criminal activity.

_____X_____  PROVEN

_____  NOT PROVEN

3

1124

4. Defendant ISMAEL JUAREZ CISNEROS attempted to obstruct justice after murdering Brenda Paz, also known as "Smiley," by threatening to kill anyone who revealed to law enforcement details of his and others' departure from the Holiday Inn Fair Oaks with Brenda Paz, also known as "Smiley," on July 13, 2003.

_____  PROVEN

____X____  NOT PROVEN

5. The impact of the loss of Brenda Paz, also known as "Smiley," on her family is an aggravating factor.

_____  PROVEN

____X____  NOT PROVEN

4

**As to COUNT TWO (Conspiracy to Retaliate Against a Witness or an Informant):**

1. Defendant ISMAEL JUAREZ CISNEROS has engaged in a pattern of criminal activity including, but not limited to, the following:

(a) Defendant ISMAEL JUAREZ CISNEROS, a citizen of Mexico, has repeatedly entered the United States illegally. On or about February 13, 2004, defendant CISNEROS pled guilty to illegal re-entry after deportation.

(b) On or about April 17, 1999, defendant ISMAEL JUAREZ CISNEROS stabbed a fifteen-year-old victim four times in the back and once in the wrist at the Fairfax Towne Center shopping center in retaliation for the victim preventing co-defendant Oscar Antonio Grande from further assaulting a fellow student at school. On or about August 10, 1999, defendant CISNEROS pled guilty for this conduct.

(c) On or about July 2, 2003, defendant ISMAEL JUAREZ CISNEROS sold a 12-gauge, pistol-grip shotgun loaded with four rounds of ammunition to a confidential informant.

(d) On or about July 25, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol, ammunition, and cocaine to a confidential informant.

(e) On or about October 15, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

(f) On or about October 29, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .380 caliber pistol and cocaine to a confidential informant.

(g) On or about November 4, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .38 caliber revolver, which was loaded, and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

5

(h) On or about November 18, 2003, officers conducted a search of the residence occupied by defendant ISMAEL JUAREZ CISNEROS and recovered cocaine, tools of the drug trade, and ammunition.

_____X_____ PROVEN

_____ NOT PROVEN

2. Defendant ISMAEL JUAREZ CISNEROS murdered Brenda Paz, also known as "Smiley," while knowing that she was pregnant at the time of her murder.

_____X_____ PROVEN

_____ NOT PROVEN

3. Defendant ISMAEL JUAREZ CISNEROS committed Count Two of the Indictment to prevent Brenda Paz, also known as "Smiley," from and to retaliate against her for assisting in the investigation and prosecution of MS-13 members for their criminal activity.

_____X_____ PROVEN

_____ NOT PROVEN

4. Defendant ISMAEL JUAREZ CISNEROS attempted to obstruct justice after murdering Brenda Paz, also known as "Smiley," by threatening to kill anyone who revealed to law enforcement details of his and others' departure from the Holiday Inn Fair Oaks with Brenda Paz, also known as "Smiley," on July 13, 2003.

_____ PROVEN

_____X_____ NOT PROVEN

6

5. The impact of the loss of Brenda Paz, also known as "Smiley," on her family is an aggravating factor.

   _____ PROVEN

   _____X_____ NOT PROVEN

1128

**As to COUNT THREE (Killing a Person Aiding a Federal Investigation):**

1. Defendant ISMAEL JUAREZ CISNEROS has engaged in a pattern of criminal activity including, but not limited to, the following:

> (a) Defendant ISMAEL JUAREZ CISNEROS, a citizen of Mexico, has repeatedly entered the United States illegally. On or about February 13, 2004, defendant CISNEROS pled guilty to illegal re-entry after deportation.
>
> (b) On or about April 17, 1999, defendant ISMAEL JUAREZ CISNEROS stabbed a fifteen-year-old victim four times in the back and once in the wrist at the Fairfax Towne Center shopping center in retaliation for the victim preventing co-defendant Oscar Antonio Grande from further assaulting a fellow student at school. On or about August 10, 1999, defendant CISNEROS pled guilty for this conduct.
>
> (c) On or about July 2, 2003, defendant ISMAEL JUAREZ CISNEROS sold a 12-gauge, pistol-grip shotgun loaded with four rounds of ammunition to a confidential informant.
>
> (d) On or about July 25, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol, ammunition, and cocaine to a confidential informant.
>
> (e) On or about October 15, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.
>
> (f) On or about October 29, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .380 caliber pistol and cocaine to a confidential informant.
>
> (g) On or about November 4, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .38 caliber revolver, which was loaded, and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

8

(h) On or about November 18, 2003, officers conducted a search of the residence occupied by defendant ISMAEL JUAREZ CISNEROS and recovered cocaine, tools of the drug trade, and ammunition.

_____X_____   PROVEN

_____   NOT PROVEN

2.   Defendant ISMAEL JUAREZ CISNEROS murdered Brenda Paz, also known as "Smiley," while knowing that she was pregnant at the time of her murder.

_____X_____   PROVEN

_____   NOT PROVEN

3.   Defendant ISMAEL JUAREZ CISNEROS committed Count Three of the Indictment to prevent Brenda Paz, also known as "Smiley," from and to retaliate against her for assisting in the investigation and prosecution of MS-13 members for their criminal activity.

_____X_____   PROVEN

_____   NOT PROVEN

4.   Defendant ISMAEL JUAREZ CISNEROS attempted to obstruct justice after murdering Brenda Paz, also known as "Smiley," by threatening to kill anyone who revealed to law enforcement details of his and others' departure from the Holiday Inn Fair Oaks with Brenda Paz, also known as "Smiley," on July 13, 2003.

_____   PROVEN

_____X_____   NOT PROVEN

9

5.  The impact of the loss of Brenda Paz, also known as "Smiley," on her family is an aggravating factor.

|  | PROVEN |
|---|---|
| X | NOT PROVEN |

10

**As to COUNT FOUR (Tampering With a Witness or an Informant):**

1.  Defendant ISMAEL JUAREZ CISNEROS has engaged in a pattern of criminal activity including, but not limited to, the following:

    (a) Defendant ISMAEL JUAREZ CISNEROS, a citizen of Mexico, has repeatedly entered the United States illegally. On or about February 13, 2004, defendant CISNEROS pled guilty to illegal re-entry after deportation.

    (b) On or about April 17, 1999, defendant ISMAEL JUAREZ CISNEROS stabbed a fifteen-year-old victim four times in the back and once in the wrist at the Fairfax Towne Center shopping center in retaliation for the victim preventing co-defendant Oscar Antonio Grande from further assaulting a fellow student at school. On or about August 10, 1999, defendant CISNEROS pled guilty for this conduct.

    (c) On or about July 2, 2003, defendant ISMAEL JUAREZ CISNEROS sold a 12-gauge, pistol-grip shotgun loaded with four rounds of ammunition to a confidential informant.

    (d) On or about July 25, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol, ammunition, and cocaine to a confidential informant.

    (e) On or about October 15, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

    (f) On or about October 29, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .380 caliber pistol and cocaine to a confidential informant.

    (g) On or about November 4, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .38 caliber revolver, which was loaded, and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

11

(h) On or about November 18, 2003, officers conducted a search of the residence occupied by defendant ISMAEL JUAREZ CISNEROS and recovered cocaine, tools of the drug trade, and ammunition.

_____X_____   PROVEN

_____   NOT PROVEN

2.    Defendant ISMAEL JUAREZ CISNEROS murdered Brenda Paz, also known as "Smiley," while knowing that she was pregnant at the time of her murder.

_____X_____   PROVEN

_____   NOT PROVEN

3.    Defendant ISMAEL JUAREZ CISNEROS committed Count Four of the Indictment to prevent Brenda Paz, also known as "Smiley," from and to retaliate against her for assisting in the investigation and prosecution of MS-13 members for their criminal activity.

_____X_____   PROVEN

_____   NOT PROVEN

4.    Defendant ISMAEL JUAREZ CISNEROS attempted to obstruct justice after murdering Brenda Paz, also known as "Smiley," by threatening to kill anyone who revealed to law enforcement details of his and others' departure from the Holiday Inn Fair Oaks with Brenda Paz, also known as "Smiley," on July 13, 2003.

_____   PROVEN

_____X_____   NOT PROVEN

12

1133

5.  The impact of the loss of Brenda Paz, also known as "Smiley," on her family is an aggravating factor.

_____   PROVEN

_____ X _____   NOT PROVEN

13

1134

**As to COUNT FIVE (Retaliating Against a Witness or an Informant):**

1. Defendant ISMAEL JUAREZ CISNEROS has engaged in a pattern of criminal activity including, but not limited to, the following:

> (a) Defendant ISMAEL JUAREZ CISNEROS, a citizen of Mexico, has repeatedly entered the United States illegally. On or about February 13, 2004, defendant CISNEROS pled guilty to illegal re-entry after deportation.
>
> (b) On or about April 17, 1999, defendant ISMAEL JUAREZ CISNEROS stabbed a fifteen-year-old victim four times in the back and once in the wrist at the Fairfax Towne Center shopping center in retaliation for the victim preventing co-defendant Oscar Antonio Grande from further assaulting a fellow student at school. On or about August 10, 1999, defendant CISNEROS pled guilty for this conduct.
>
> (c) On or about July 2, 2003, defendant ISMAEL JUAREZ CISNEROS sold a 12-gauge, pistol-grip shotgun loaded with four rounds of ammunition to a confidential informant.
>
> (d) On or about July 25, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol, ammunition, and cocaine to a confidential informant.
>
> (e) On or about October 15, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .45 caliber pistol and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.
>
> (f) On or about October 29, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .380 caliber pistol and cocaine to a confidential informant.
>
> (g) On or about November 4, 2003, defendant ISMAEL JUAREZ CISNEROS sold a .38 caliber revolver, which was loaded, and cocaine to an undercover agent with the Bureau of Alcohol, Tobacco, Firearms and Explosives.

14

1135

(h) On or about November 18, 2003, officers conducted a search of the residence occupied by defendant ISMAEL JUAREZ CISNEROS and recovered cocaine, tools of the drug trade, and ammunition.

_____✗_____   PROVEN

_____   NOT PROVEN

2.   Defendant ISMAEL JUAREZ CISNEROS murdered Brenda Paz, also known as "Smiley," while knowing that she was pregnant at the time of her murder.

_____✗_____   PROVEN

_____   NOT PROVEN

3.   Defendant ISMAEL JUAREZ CISNEROS committed Count Five of the Indictment to prevent Brenda Paz, also known as "Smiley," from and to retaliate against her for assisting in the investigation and prosecution of MS-13 members for their criminal activity.

_____✗_____   PROVEN

_____   NOT PROVEN

4.   Defendant ISMAEL JUAREZ CISNEROS attempted to obstruct justice after murdering Brenda Paz, also known as "Smiley," by threatening to kill anyone who revealed to law enforcement details of his and others' departure from the Holiday Inn Fair Oaks with Brenda Paz, also known as "Smiley," on July 13, 2003.

_____   PROVEN

_____✗_____   NOT PROVEN

15

5.   The impact of the loss of Brenda Paz, also known as "Smiley," on her family is an aggravating factor.

_____   PROVEN

_____ X _____   NOT PROVEN

**REGARDLESS OF WHETHER YOU HAVE ANSWERED "PROVEN" OR "NOT PROVEN" TO ANY OF THE QUESTIONS IN SECTION II, YOU MUST PROCEED TO SECTION III WHICH FOLLOWS ON THE NEXT PAGE.**

16

1137

## SECTION III.   <u>MITIGATING FACTORS</u>

**DIRECTIONS FOR SECTION III:**

- In this section, please indicate in the space provided the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence with regard to each of the capital counts. You will note each question requires a count of the number of jurors who vote that such finding has been made. If no jurors vote that such a finding has been made, indicate so by placing a "0" in the space provided.
- Your vote as a jury <u>need not be</u> unanimous with regard to each question in this section. A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

Ismael Juarez Cisneros has alleged the following mitigating factors in his background or character, the circumstances of the crimes, or other relevant facts or circumstances as mitigation. If any one juror finds any such factor established by a preponderance of the evidence, he or she may weigh that factor against any aggravating factors:

1. ISMAEL JUAREZ CISNEROS' capacity to appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was significantly impaired, regardless of whether the capacity was so impaired as to constitute a defense to the charges against him;

NUMBER OF JURORS WHO SO FIND _____1_____

2. ISMAEL JUAREZ CISNEROS was under unusual and substantial duress, regardless of whether the duress was of such a degree as to constitute a defense to the charges against him;

NUMBER OF JURORS WHO SO FIND _____1_____

3. ISMAEL JUAREZ CISNEROS committed the offense under severe mental or emotional disturbance;

17

1138

NUMBER OF JURORS WHO SO FIND ___3___

4. Another Defendant or Defendants, equally culpable in the crime will not be punished by death;

NUMBER OF JURORS WHO SO FIND ___0___

5. That should the jury so direct, ISMAEL JUAREZ CISNEROS will be sentenced to life in prison without any possibility of release if he is not sentenced to death;

NUMBER OF JURORS WHO SO FIND ___12___

6. That a sentence of life imprisonment without the possibility of release is severe and exacts both significant physical restraint and hardship as well as great psychological pain, particularly because ISMAEL JUAREZ CISNEROS is left for years to contemplate his wrongdoing and to feel the loss of his children and family;

NUMBER OF JURORS WHO SO FIND ___9___

7. That given his jail record and the fact that ISMAEL JUAREZ CISNEROS has adapted well to the prison environment, he will not present a risk to prison officials or other inmates and will make an excellent adjustment to prison if he is sentenced to life imprisonment without the possibility of release;

NUMBER OF JURORS WHO SO FIND ___5___

8. That ISMAEL JUAREZ CISNEROS has performed numerous acts of kindness and generosity for his family, his child Maria Isabel and Jorge Gomez, the son of Maria Gomez who ISMAEL JUAREZ CISNEROS treats as his own, through which he has demonstrated that there are other human beings for whom he cares;

NUMBER OF JURORS WHO SO FIND ___12___

9. That ISMAEL JUAREZ CISNEROS' children, mother and siblings will be adversely affected if he is executed;

NUMBER OF JURORS WHO SO FIND ___12___

18

1139

10. That ISMAEL JUAREZ CISNEROS is active in his daughter Maria Isabel's life and in the life of Maria Gomez' son Jorge;

NUMBER OF JURORS WHO SO FIND ___11___

11. That ISMAEL JUAREZ CISNEROS was raised in an environment of poverty and financial hardship;

NUMBER OF JURORS WHO SO FIND ___12___

12. That ISMAEL JUAREZ CISNEROS was subjected to emotional and physical abuse, abandonment and neglect as a child, including violence and brutality toward himself, his siblings, and his mother, and was deprived of the parental guidance and protection which he needed;

NUMBER OF JURORS WHO SO FIND ___12___

13. That ISMAEL JUAREZ CISNEROS suffers from neurological impairments which should have been identified and which could have been treated when he was a child and adolescent;

NUMBER OF JURORS WHO SO FIND ___5___

14. That ISMAEL JUAREZ CISNEROS suffers from brain dysfunction which has impaired his ability to function in the absence of strong support and guidance;

NUMBER OF JURORS WHO SO FIND ___3___

15. That ISMAEL JUAREZ CISNEROS suffers from a severe susceptibility to alcohol and drug abuse;

NUMBER OF JURORS WHO SO FIND ___3___

16. That ISMAEL JUAREZ CISNEROS meets the diagnostic criteria for a finding of mental retardation;

NUMBER OF JURORS WHO SO FIND ___1___

19

1140

17.  That ISMAEL JUAREZ CISNEROS was introduced to addictive drugs and alcohol as a child;

NUMBER OF JURORS WHO SO FIND _____11_____

18.  That ISMAEL JUAREZ CISNEROS grew up in an impoverished, brutal neighborhood wherein he was exposed to extreme violence, including the murder of his closest friend, as a child and throughout his life;

NUMBER OF JURORS WHO SO FIND _____9_____

19.  That ISMAEL JUAREZ CISNEROS was the victim of sexual abuse as a child;

NUMBER OF JURORS WHO SO FIND _____8_____

20.  That ISMAEL JUAREZ CISNEROS was exposed to graphic sexual behavior as a child;

NUMBER OF JURORS WHO SO FIND _____9_____

21.  That ISMAEL JUAREZ CISNEROS' father was physically and emotionally abusive to ISMAEL JUAREZ CISNEROS and his siblings, depriving him of a positive male role model during his formative years;

NUMBER OF JURORS WHO SO FIND _____11_____

22.  That ISMAEL JUAREZ CISNEROS suffered from multiple traumatic brain injuries as a child;

NUMBER OF JURORS WHO SO FIND _____10_____

23.  That ISMAEL JUAREZ CISNEROS suffers from deficient intelligence, neuropsychological deficits and other problems for which he never received adequate intervention and care;

NUMBER OF JURORS WHO SO FIND _____3_____

20

24. That ISMAEL JUAREZ CISNEROS has endured multiple insults to his central nervous system (including loss of consciousness, physical abuse and substance abuse);

NUMBER OF JURORS WHO SO FIND _____12_____

25. That ISMAEL JUAREZ CISNEROS' cognitive and neurological deficits made it more likely that he would behave impulsively and without insight or judgment;

NUMBER OF JURORS WHO SO FIND _____4_____

26. That ISMAEL JUAREZ CISNEROS obtained a sense of acceptance and belonging from his involvement in MS-13;

NUMBER OF JURORS WHO SO FIND _____12_____

27. That at the time of the offense, ISMAEL JUAREZ CISNEROS was youthful, although not under the age of 18;

NUMBER OF JURORS WHO SO FIND _____4_____

28. That ISMAEL JUAREZ CISNEROS' eagerness to be accepted by the members of MS-13 allowed him to be easily manipulated by other gang members;

NUMBER OF JURORS WHO SO FIND _____9_____

29. That ISMAEL JUAREZ CISNEROS committed the offenses for which he has been convicted based upon his sincere but misguided belief that his conduct was mandated by the rules of MS-13;

NUMBER OF JURORS WHO SO FIND _____1_____

30. That ISMAEL JUAREZ CISNEROS cared for Brenda Paz as a person and attempted to discourage others from agreeing to her murder;

NUMBER OF JURORS WHO SO FIND _____2_____

21

1142

31. That prior to his involvement with MS-13, ISMAEL JUAREZ CISNEROS had not been convicted of any criminal offense;

NUMBER OF JURORS WHO SO FIND ____10____

32. That ISMAEL JUAREZ CISNEROS was effectively raised and indoctrinated in the rules and behavior of MS-13 which promoted a culture of criminal activity and violence;

NUMBER OF JURORS WHO SO FIND ____1____

33. That, despite his strong need for acceptance by members of MS-13, ISMAEL JUAREZ CISNEROS voluntarily waived his constitutional right to silence and fully cooperated with law enforcement when interviewed regarding the murder of Brenda Paz and provided law enforcement with significant information that greatly assisted the United States in the prosecution of ISMAEL JUAREZ CISNEROS and others for the murder of Brenda Paz;

NUMBER OF JURORS WHO SO FIND ____7____

34. That other members of MS-13 who were involved in the conspiracy to murder Brenda Paz will not be punished by death;

NUMBER OF JURORS WHO SO FIND ____11____

35. That ISMAEL JUAREZ CISNEROS cooperated with law enforcement despite the fact that his cooperation placed himself and his family at risk of retaliation by MS-13;

NUMBER OF JURORS WHO SO FIND ____2____

36. That ISMAEL JUAREZ CISNEROS, as a result of his cooperation with law enforcement, has severed his ties to MS-13;

NUMBER OF JURORS WHO SO FIND ____1____

37. That ISMAEL JUAREZ CISNEROS has repeatedly expressed remorse for his role in the murder of Brenda Paz in his conversations with members of MS-13 and with law enforcement;

NUMBER OF JURORS WHO SO FIND ____12____

22

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X." If more space is needed, write "CONTINUED" and use the reverse side of this page.

1. Ismael Juarez Cisneros made repeated offers to speak out to youth against gang activity and involvement.

NUMBER OF JURORS WHO SO FIND ___9___

2. This crime was committed in a remote area so as not to traumatize the community.

NUMBER OF JURORS WHO SO FIND ___1___

3. Defendant's prior convictions were non capital.

NUMBER OF JURORS WHO SO FIND ___9___

23 A

Continued

4. Defendant Ismael Juarez Cisneros was subject to severe socio economic constraints while residing in the United States.

Number of Jurors who so find ___1___

5. Defendant Ismael Juarez Cisneros resided in a community that lacked adequate community based programs and resources to address his needs as a central American immigrant to the United States.

Number of Jurors who so find ___1___

6. This crime was against one of their own group who shared a common ideologic philosophy and understood the group's rules.

Number of Jurors who so find ___5___

7. Life in prison without release will give defendant the opportunity to reach out to the hispanic ~~Aspects~~ youth on the negative Aspects of gang Activities and involvement.
Number of Jurors who so find ___11___

1145

## SECTION IV. DETERMINATION OF SENTENCE

**DIRECTIONS: In this section, enter your determination of the defendant's sentence with regard to each of the five capital counts. Your vote as a jury must be unanimous with regard to death. If the jury is not unanimous with respect to death, the sentence will be life imprisonment without the possibility of release.**

Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist to justify a sentence of death, or, in the absence of any mitigating factors, whether the aggravating factors alone are sufficient to justify a sentence of death:

### As to COUNT ONE:

_____       We unanimously sentence the defendant to death

_____       We unanimously sentence the defendant to life imprisonment without the possibility of release

___X___       We are unable to agree unanimously as to a sentence of death and therefore understand that the defendant will be sentenced to life imprisonment without the possibility of release

### As to COUNT TWO:

_____       We unanimously sentence the defendant to death

_____       We unanimously sentence the defendant to life imprisonment without the possibility of release

___X___       We are unable to agree unanimously as to a sentence of death and therefore understand that the defendant will be sentenced to life imprisonment without the possibility of release

24

1146

**As to COUNT THREE:**

_____   We unanimously sentence the defendant to death

_____   We unanimously sentence the defendant to life imprisonment without the possibility of release

___X___   We are unable to agree unanimously as to a sentence of death and therefore understand that the defendant will be sentenced to life imprisonment without the possibility of release

**As to COUNT FOUR:**

_____   We unanimously sentence the defendant to death

_____   We unanimously sentence the defendant to life imprisonment without the possibility of release

___X___   We are unable to agree unanimously as to a sentence of death and therefore understand that the defendant will be sentenced to life imprisonment without the possibility of release

**As to COUNT FIVE:**

_____   We unanimously sentence the defendant to death

_____   We unanimously sentence the defendant to life imprisonment without the possibility of release

___X___   We are unable to agree unanimously as to a sentence of death and therefore understand that the defendant will be sentenced to life imprisonment without the possibility of release

1147

1148

Each juror must sign below, indicating that the above sentence determination reflects the jury's unanimous decision:

FOREPERSON

DATE: _14 June 2005_, 2005.

**CONTINUE TO SECTION V**

26

1149

## SECTION V:  CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin or sex of the defendant or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant, or the victim.



FOREPERSON

DATE: _14 June 2005_ 2005.

27

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**EXHIBIT B TO
PETITIONER'S COMBINED
RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT OF OPPOSITION**

App. Pet'r's Resp. Opp. Govt. MSJ                    *U.S. v. Barrett*, CV-09-00105-JHP

**FILE IN RECORD**

UNITED STATES DISTRICT COURT
EASTERN DISTRICT LOUISIANA

UNITED STATES OF AMERICA

VERSUS

JOHNNY DAVIS

CRIMINAL ACTION

NO. 01-282

SECTION: R(1)

**SPECIAL VERDICT FORM**

Section I:
Count Six, Murder of Samuel Collins Through the Use of a Firearm
During and in Relation to a Heroin Trafficking Conspiracy

Question No. 1(A):

Do you unanimously find beyond a reasonable doubt that Johnny Davis was eighteen years of age or older at the time he committed the murder of Samuel Collins, charged in Count Six of the Second Superseding Indictment?

Answer "Yes" or "No."

Answer: _____Yes_____.

Instruction: If you answered "Yes" to Question No. 1(A), proceed to Question No. 1(B). If you answered "No" to Question No. 1(A), you are finished with your deliberations as to Count Six and must proceed to Section II.

1151

Question No. 1(B):

1(B).   Mental State

(1) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally killed Samuel Collins?

Answer "Yes" or "No."

Answer: _____Yes_____.

(2) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally inflicted serious bodily injury that resulted in the death of Samuel Collins?

Answer "Yes" or "No."

Answer: _____Yes_____.

(3) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, Samuel Collins, died as a result of the act?

Answer "Yes" or "No."

Answer: _____Yes_____.

(4) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, Samuel Collins?

Answer "Yes" or "No."

Answer: _____Yes_____.

Instruction: If you unanimously answered "Yes" to **any** of these four questions, proceed to Question No. 1(C) on the following page.  If you answer "No" to **all** of these four questions, you are finished with your deliberations as to Count Six and must proceed to Section II.

2

1(C).   <u>Statutory Aggravating Factors</u>

Do you unanimously find beyond a reasonable doubt that Johnny Davis committed the offense against Samuel Collins after substantial planning and premeditation to cause the death of Samuel Collins?

Answer "Yes" or "No."

Answer: ___Yes___ .


<u>Instruction:</u> If you answered "Yes" to Question No. 1(C), proceed to Question No. 1(D) on the following page.  If you answered "No" to Question No. 1(C), you are finished with your deliberations as to Count Six and must proceed to Section II.

3

1(D).  Non-Statutory Aggravating Factors

(1) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, has engaged in a continuing pattern of violent conduct, beginning at the age of fifteen with an adjudication as a juvenile delinquent on October 29, 1991, for the illegal carrying of a weapon, resisting arrest and battery of a police officer in violation of Louisiana Revised Statutes 14:95, 14:108 and 14:34.2.  On August 14, 1991, the defendant, Johnny Davis, resisted arrest and committed a battery upon a police officer while in possession of a concealed firearm.

Answer "Yes" or "No."

Answer:_____Yes_____.

(2) We unanimously find that the government proved beyond a reasonable doubt that: The  defendant, Johnny Davis, was convicted on April 27, 1993, of a crime of violence which involved 11 counts of armed robbery in violation of Louisiana Revised Statutes 14:64.  On April 8, 1992, the defendant, Johnny Davis, along with several other gunmen shot and robbed several customers inside the Imperial Lounge located at 320 Westwego Avenue in Bridge City, Louisiana.

Answer "Yes" or "No."

Answer:_____Yes_____.

(3) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, was convicted on December 5, 2001 of being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1).  On April 18, 2001, the defendant, Johnny Davis, and Anthony Buckles were arrested by members of the New Orleans Police Department.  At the time of the arrest, Anthony Buckles provided a false statement to the police officers, at the request of Johnny Davis, claiming that the recovered firearm belonged to him and not Johnny Davis.

Answer "Yes" or "No."

Answer:_____Yes_____.

4

(4) We unanimously find that the government proved beyond a reasonable doubt that: While incarcerated, the defendant, Johnny Davis, has demonstrated his contempt for the criminal justice system and his low rehabilitative potential, by soliciting the assistance of a co-defendant, Anthony Buckles a/k/a "Nutta," to kill Leonard Smith a/k/a "Fu", who is a cooperating government witness in this case.

Answer "Yes" or "No."

Answer: _____Yes_____.

(5) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, solicited juveniles to serve under him as his lieutenants, these juveniles out of fear of Johnny Davis, acquiescing to any of his demands.

Answer "Yes" or "No."

Answer: _____Yes_____.

(6) We unanimously find that the government proved beyond a reasonable doubt that: While incarcerated on prior drug charges in 1998, the defendant, Johnny Davis, continued his participation in the illegal drug trade in the St. Thomas Housing Development by soliciting the aid of Leonard Smith a/k/a "Fu", a fellow drug dealer, to buy and sell drugs on his behalf.

Answer "Yes" or "No."

Answer: _____Yes_____.

(7) We unanimously find that the government proved beyond a reasonable doubt that: While incarcerated on prior drug charges in 1998, the defendant, Johnny Davis, solicited the aid of Leonard Smith a/k/a "Fu", a fellow drug dealer, in the smuggling of contraband into the Orleans Parish jail.

Answer "Yes" or "No."

Answer: _____Yes_____.

5

1155

(8)   We unanimously find that the government proved beyond a reasonable doubt that: As demonstrated by Samuel Collins's personal characteristics as an individual human being and the impact of his death upon his family, friends and co-workers, the defendant, Johnny Davis, caused injury, harm, and loss to the victim, his family, his friends, and his co-workers.

Answer "Yes" or "No."

Answer: _____Yes_____.

(9)   We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, has demonstrated a lack of remorse for his criminal conduct.

Answer "Yes" or "No."

Answer: _____ Yes ▮

Instruction: Proceed to Question No. 1(E) regardless of how you answered any part of Question No. 1(D).

6

1(E).  Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence.  A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that other participants in one or more of the capital offenses will not be punished by death, including but not limited to the following individuals: Richard Porter, Quandell Curtis, and Anthony Buckles?

Number of jurors who so find: ____12____

(2) Do **any** of you find by a preponderance of the evidence that other participants in the drug trafficking offenses and murders are now eligible to receive reduced sentences as a result of plea agreements with the government?

Number of jurors who so find: ____12____

(3) Do **any** of you find by a preponderance of the evidence that there is evidence that Richard Porter hired Johnny Davis to commit the murder of victim Leonard Morgan, and Richard Porter will not be punished by death?

Number of jurors who so find: ____12____

(4) Do **any** of you find by a preponderance of the evidence that all of the victims, Samuel Collins, Walter Naylor, and Leonard Morgan, engaged in criminal conduct that may have contributed to the circumstances leading to their deaths, in that these victims were involved in narcotics possession and or distribution?

Number of jurors who so find: ____12____

(5) Do **any** of you find by a preponderance of the evidence that if he is not put to death, Johnny Davis will live every day of the rest of his life incarcerated in a federal prison, he will die in federal prison and he will never enjoy freedom again?

Number of jurors who so find: ____12____

7

(6) Do **any** of you find by a preponderance of the evidence that Johnny Davis was subjected to emotional abuse, physical abuse, abandonment and neglect as a child?

*Number of jurors who so find:* ___12___

(7) Do **any** of you find by a preponderance of the evidence that Johnny Davis was deprived of the parental love, guidance, and protection that he needed?

*Number of jurors who so find:* ___12___

(8) Do **any** of you find by a preponderance of the evidence that Johnny Davis suffers from the effects of early childhood lead poisoning?

*Number of jurors who so find:* ___4___

(9) Do **any** of you find by a preponderance of the evidence that Johnny Davis suffers from brain damage?

*Number of jurors who so find:* ___0___

(10) Do **any** of you find by a preponderance of the evidence that Johnny Davis' brain was damaged by his mother's substance abuse during her pregnancy?

*Number of jurors who so find:* ___4___

(11) Do **any** of you find by a preponderance of the evidence that Johnny Davis' brain was damaged by several head injuries in which he was knocked unconscious?

*Number of jurors who so find:* ___0___

(12) Do **any** of you find by a preponderance of the evidence that Johnny Davis suffers from brain dysfunction, which has impaired his ability to make good decisions about his life and the lives of others, although he still must be held accountable for his actions?

*Number of jurors who so find:* ___0___

(13) Do **any** of you find by a preponderance of the evidence that Johnny Davis was introduced to addictive drugs and alcohol while a child and has suffered from alcoholism and drug addiction since then?

*Number of jurors who so find:* ___12___

8

(14) Do **any** of you find by a preponderance of the evidence that Johnny Davis had learning problems in school, which led to academic failure and an inability to progress in school?

*Number of jurors who so find:* _____12_____

(15) Do **any** of you find by a preponderance of the evidence that although the evidence presented at trial was sufficient to prove Johnny Davis' guilt beyond a reasonable doubt, additional evidence, including DNA and other forensic evidence, which might have proved his guilt or innocence to an absolute certainty, was not available?

*Number of jurors who so find:* _____12_____

(16) Do **any** of you find by a preponderance of the evidence that Johnny Davis has suffered from symptoms of Post-Traumatic Stress Disorder for many years, and will continue to suffer from mental illness?

*Number of jurors who so find:* _____5_____

(17) Do **any** of you find by a preponderance of the evidence that Johnny Davis has suffered from symptoms of depression for many years, and will struggle with depression for the rest of his life in prison?

*Number of jurors who so find:* _____8_____

(18) Do **any** of you find by a preponderance of the evidence that Johnny Davis has shown love and kindness towards his family?

*Number of jurors who so find:* _____0_____

(19) Do **any** of you find by a preponderance of the evidence that Johnny Davis' daughters will be forever deprived of their father if he is executed?

*Number of jurors who so find:* _____12_____

(20) Do **any** of you find by a preponderance of the evidence that although Johnny Davis has caused much pain and sorrow, his innocent family and friends love him deeply and will suffer if he is executed?

*Number of jurors who so find:* _____12_____

(21) Do **any** of you find by a preponderance of the evidence
that although Johnny Davis can distinguish right from wrong
and deserves to be held accountable for his actions, he
suffers from mild mental retardation?

*Number of jurors who so find:* _____0_____

(22) Do **any** of you find by a preponderance of the evidence
that although Johnny Davis can distinguish right from wrong
and deserves to be held accountable for his actions, he
suffers from borderline intellectual functioning?

*Number of jurors who so find:* _____12_____

(23) Do **any** of you find by a preponderance of the evidence
that the Louisiana juvenile justice system attempted to
intervene in Johnny Davis's life, but was unsuccessful in
part because of the lack of continuing family involvement,
direction and support?

*Number of jurors who so find:* _____12_____

(24) Do **any** of you find by a preponderance of the evidence
that other factors in Johnny Davis' childhood, background or
character mitigate against imposition of the death sentence?

*Number of jurors who so find:* _____0_____

The following extra spaces are provided to write in
additional mitigating factors, if any, found by any one or
more jurors by a preponderance of the evidence.  If none,
write "NONE" and cross out the extra spaces with a large
"X."  If more space is needed, write "CONTINUED" and use the
reverse side of this page?

Mitigating Factor                    Number of Jurors Who So Find



NONE                                              NONE

Instruction: Proceed to Question No. 1(F) regardless of how
you answered any part of Question No. 1(E).

10

1(F).   Determination

      We, the Jury, unanimously determine that the sentence to be
imposed on Johnny Davis as to Count 6 is:

_____Death

_____Life Imprisonment Without Possibility of
             Release

_____✓_____Some Other Lesser Sentence


      Instruction: Proceed to Section II regardless of how you
answered Question No. 1(F).

11

1161

1162

## Section II:
## Count Eight, Murder of Walter Naylor Through the Use of a Firearm During and in Relation to a Heroin Trafficking Conspiracy

Question No. 2(A):

Do you unanimously find beyond a reasonable doubt that Johnny Davis was eighteen years of age or older at the time he committed the murder of Walter Naylor, charged in Count Eight of the Second Superseding Indictment?

Answer "Yes" or "No."

Answer: __Yes__.

Instruction: If you answered "Yes" to Question No. 2(A), proceed to Question No. 2(B).  If you answered "No" to Question No. 2(A), you are finished with your deliberations as to Count Eight and must proceed to Section III.

12

Question No. 2(B):

2(B).  Mental State

(1) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally killed Walter Naylor?

Answer "Yes" or "No."

Answer: ____YES____.

(2) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally inflicted serious bodily injury that resulted in the death of Walter Naylor?

Answer "Yes" or "No."

Answer: ____YES____.

(3) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, Walter Naylor, died as a result of the act?

Answer "Yes" or "No."

Answer: ____YES____.

(4) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, Walter Naylor?

Answer "Yes" or "No."

Answer: ____YES____.

Instruction: If you unanimously answered "Yes" to **any** of these four questions, proceed to Question No. 2(C) on the following page.  If you answered "No" to **all** of these four questions, you are finished with your deliberations as to Count Eight and must proceed to Section TTT.

13

2(C).   Statutory Aggravating Factors

Do you unanimously find beyond a reasonable doubt that Johnny Davis committed the offense against Walter Naylor after substantial planning and premeditation to cause the death of Walter Naylor?

Answer "Yes" or "No."

Answer: _____Yes_____.

Instruction: If you answered "Yes" to Question No. 2(C), proceed to Question No. 2(D) on the following page.  If you answered "No" to Question No. 2(C), you are finished with your deliberations as to Count Eight and must proceed to Section III.

14

2(D). <u>Non-Statutory Aggravating Factors</u>

(1) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, has engaged in a continuing pattern of violent conduct, beginning at the age of fifteen with an adjudication as a juvenile delinquent on October 29, 1991, for the illegal carrying of a weapon, resisting arrest and battery of a police officer in violation of Louisiana Revised Statutes 14:95, 14:108 and 14:34.2. On August 14, 1991, the defendant, Johnny Davis, resisted arrest and committed a battery upon a police officer while in possession of a concealed firearm.

Answer "Yes" or "No."

Answer:_____Yes_____.

(2) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, was convicted on April 27, 1993, of a crime of violence which involved 11 counts of armed robbery in violation of Louisiana Revised Statutes 14:64. On April 8, 1992, the defendant, Johnny Davis, along with several other gunmen shot and robbed several customers inside the Imperial Lounge located at 320 Westwego Avenue in Bridge City, Louisiana.

Answer "Yes" or "No."

Answer:_____Yes_____.

(3) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, was convicted on December 5, 2001 of being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1). On April 18, 2001, the defendant, Johnny Davis, and Anthony Buckles were arrested by members of the New Orleans Police Department. At the time of the arrest, Anthony Buckles provided a false statement to the police officers, at the request of Johnny Davis, claiming that the recovered firearm belonged to him and not Johnny Davis.

Answer "Yes" or "No."

Answer:_____Yes_____.

1165

(4) We unanimously find that the government proved beyond a reasonable doubt that: While incarcerated, the defendant, Johnny Davis, has demonstrated his contempt for the criminal justice system and his low rehabilitative potential, by soliciting the assistance of a co-defendant, Anthony Buckles a/k/a "Nutta," to kill Leonard Smith a/k/a "Fu", who is a cooperating government witness in this case.

Answer "Yes" or "No."

Answer:_____Yes_____.

(5) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, solicited juveniles to serve under him as his lieutenants, these juveniles out of fear of Johnny Davis, acquiescing to any of his demands.

Answer "Yes" or "No."

Answer:_____Yes_____.

(6) We unanimously find that the government proved beyond a reasonable doubt that: While incarcerated on prior drug charges in 1998, the defendant, Johnny Davis, continued his participation in the illegal drug trade in the St. Thomas Housing Development by soliciting the aid of Leonard Smith a/k/a "Fu", a fellow drug dealer, to buy and sell drugs on his behalf.

Answer "Yes" or "No."

Answer:_____Yes_____.

(7) We unanimously find that the government proved beyond a reasonable doubt that: While incarcerated on prior drug charges in 1998, the defendant, Johnny Davis, solicited the aid of Leonard Smith a/k/a "Fu", a fellow drug dealer, in the smuggling of contraband into the Orleans Parish jail.

Answer "Yes" or "No."

Answer:_____Yes_____.

16

(8)   We unanimously find that the government proved beyond a reasonable doubt that: As demonstrated by Walter Naylor's personal characteristics as an individual human being and the impact of his death upon his family, friends and co-workers, the defendant, Johnny Davis, caused injury, harm, and loss to the victim, his family, his friends, and his co-workers.

Answer "Yes" or "No."

Answer:___Yes___.

(9)   We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, has demonstrated a lack of remorse for his criminal conduct.

Answer "Yes" or "No."

Answer:___YES___.

Instruction: Proceed to Question No. 2(E) regardless of how you answered any part of Question No. 2(D).

17

2(E).  Mitigating Factors

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence.  A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that other participants in one or more of the capital offenses will not be punished by death, including but not limited to the following individuals: Richard Porter, Quandell Curtis, and Anthony Buckles?

Number of jurors who so find: ___12___

(2) Do **any** of you find by a preponderance of the evidence that other participants in the drug trafficking offenses and murders are now eligible to receive reduced sentences as a result of plea agreements with the government?

Number of jurors who so find: ___12___

(3) Do **any** of you find by a preponderance of the evidence that there is evidence that Richard Porter hired Johnny Davis to commit the murder of victim Leonard Morgan, and Richard Porter will not be punished by death?

Number of jurors who so find: ___12___

(4) Do **any** of you find by a preponderance of the evidence that all of the victims, Samuel Collins, Walter Naylor, and Leonard Morgan, engaged in criminal conduct that may have contributed to the circumstances leading to their deaths, in that these victims were involved in narcotics possession and or distribution?

Number of jurors who so find: ___12___

(5) Do **any** of you find by a preponderance of the evidence that if he is not put to death, Johnny Davis will live every day of the rest of his life incarcerated in a federal prison, he will die in federal prison and he will never enjoy freedom again?

Number of jurors who so find: ___12___

10

1168

(6) Do **any** of you find by a preponderance of the evidence that Johnny Davis was subjected to emotional abuse, physical abuse, abandonment and neglect as a child?

Number of jurors who so find: ___12___

(7) Do **any** of you find by a preponderance of the evidence that Johnny Davis was deprived of the parental love, guidance, and protection that he needed?

Number of jurors who so find: ___12___

(8) Do **any** of you find by a preponderance of the evidence that Johnny Davis suffers from the effects of early childhood lead poisoning?

Number of jurors who so find: ___4___

(9) Do **any** of you find by a preponderance of the evidence that Johnny Davis suffers from brain damage?

Number of jurors who so find: ___0___

(10) Do **any** of you find by a preponderance of the evidence that Johnny Davis' brain was damaged by his mother's substance abuse during her pregnancy?

Number of jurors who so find: ___4___

(11) Do **any** of you find by a preponderance of the evidence that Johnny Davis' brain was damaged by several head injuries in which he was knocked unconscious?

Number of jurors who so find: ___0___

(12) Do **any** of you find by a preponderance of the evidence that Johnny Davis suffers from brain dysfunction, which has impaired his ability to make good decisions about his life and the lives of others, although he still must be held accountable for his actions?

Number of jurors who so find: ___0___

(13) Do **any** of you find by a preponderance of the evidence that Johnny Davis was introduced to addictive drugs and alcohol while a child and has suffered from alcoholism and drug addiction since then?

Number of jurors who so find: ___12___

19

1169

(14) Do **any** of you find by a preponderance of the evidence that Johnny Davis had learning problems in school, which led to academic failure and an inability to progress in school?

   *Number of jurors who so find:* ___12___

(15) Do **any** of you find by a preponderance of the evidence that although the evidence presented at trial was sufficient to prove Johnny Davis' guilt beyond a reasonable doubt, additional evidence, including DNA and other forensic evidence, which might have proved his guilt or innocence to an absolute certainty, was not available?

   *Number of jurors who so find:* ___12___

(16) Do **any** of you find by a preponderance of the evidence that Johnny Davis has suffered from symptoms of Post-Traumatic Stress Disorder for many years, and will continue to suffer from mental illness?

   *Number of jurors who so find:* ___5___

(17) Do **any** of you find by a preponderance of the evidence that Johnny Davis has suffered from symptoms of depression for many years, and will struggle with depression for the rest of his life in prison?

   *Number of jurors who so find:* ___8___

(18) Do **any** of you find by a preponderance of the evidence that Johnny Davis has shown love and kindness towards his family?

   *Number of jurors who so find:* ___0___

(19) Do **any** of you find by a preponderance of the evidence that Johnny Davis' daughters will be forever deprived of their father if he is executed?

   *Number of jurors who so find:* ___12___

(20) Do **any** of you find by a preponderance of the evidence that although Johnny Davis has caused much pain and sorrow, his innocent family and friends love him deeply and will suffer if he is executed?

   *Number of jurors who so find:* ___12___

20

1170

(21) Do **any** of you find by a preponderance of the evidence that although Johnny Davis can distinguish right from wrong and deserves to be held accountable for his actions, he suffers from mild mental retardation?

*Number of jurors who so find:* ___0___

(22) Do **any** of you find by a preponderance of the evidence that although Johnny Davis can distinguish right from wrong and deserves to be held accountable for his actions, he suffers from borderline intellectual functioning?

*Number of jurors who so find:* ___12___

(23) Do **any** of you find by a preponderance of the evidence that the Louisiana juvenile justice system attempted to intervene in Johnny Davis's life, but was unsuccessful in part because of the lack of continuing family involvement, direction and support?

*Number of jurors who so find:* ___12___

(24) Do **any** of you find by a preponderance of the evidence that other factors in Johnny Davis' childhood, background or character mitigate against imposition of the death sentence?

*Number of jurors who so find:* ___0___

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors by a preponderance of the evidence. If none, write "NONE" and cross out the extra spaces with a large "X." If more space is needed, write "CONTINUED" and use the reverse side of this page.



| Mitigating Factor | Number of Jurors Who So Find |
|---|---|
| NONE | NONE |

Instruction: Proceed to Question No. 2(F) regardless of how you answered any part of Question No. 2(E).

21

2(F).  Determination

We, the Jury, unanimously determine that the sentence to be imposed on Johnny Davis as to Count 6 is:

_____Death

_____Life Imprisonment Without Possibility of Release

___✓_____Some Other Lesser Sentence

Instruction: Proceed to Section III regardless of how you answered Question No. 2(F).

22

**Section III:**
**Count Ten, Murder of Leonard Morgan Through the Use of a Firearm**
**During and in Relation to a Heroin Trafficking Conspiracy**

Question No. 3(A):

Do you unanimously find beyond a reasonable doubt that Johnny Davis was eighteen years of age or older at the time he committed the murder of Leonard Morgan, charged in Count Ten of the Second Superseding Indictment?

Answer "Yes" or "No."

Answer: _____YES_____.

Instruction: If you answered "Yes" to Question No. 3(A), proceed to Question No. 3(B). If you answered "No" to Question No. 3(A), you are finished with your deliberations as to Count Ten and must proceed to Section IV.

1173

Question No. 3(B):

3(B). Mental State

(1) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally killed Leonard Morgan?

Answer "Yes" or "No."

Answer: ___Yes___.

(2) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally inflicted serious bodily injury that resulted in the death of Leonard Morgan?

Answer "Yes" or "No."

Answer: ___Yes___.

(3) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally participated in an act, contemplating that the life of a person would be taken or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim, Leonard Morgan, died as a result of the act?

Answer "Yes" or "No."

Answer: ___Yes___.

(4) Do you unanimously find beyond a reasonable doubt that Johnny Davis intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim, Leonard Morgan?

Answer "Yes" or "No."

Answer: ___Yes___.

Instruction: If you unanimously answered "Yes" to **any** of these four questions, proceed to Question No. 3(C) on the following page. If you answered "No" to **all** of these four questions, you are finished with your deliberations as to Count Ten and must proceed to Section IV.

1174

3(C).   <u>Statutory Aggravating Factors</u>

(1) Do you unanimously find beyond a reasonable doubt that Johnny Davis committed the offense against Leonard Morgan after substantial planning and premeditation to cause the death of Leonard Morgan?

Answer "Yes" or "No."

Answer: ___YES___.

(2) Do you unanimously find beyond a reasonable doubt that Johnny Davis committed the offense against Leonard Morgan in consideration for the receipt, or in the expectation of the receipt, of anything of pecuniary value?

Answer "Yes" or "No."

Answer: ___YES___.


Instruction: If you answered "Yes" to either part of Question No. 3(C), proceed to Question No. 3(D) on the following page.   If you answered "No" to both parts of Question No. 3(C), you are finished with your deliberations as to Count Ten and must proceed to Section IV.

25

3(D).   <u>Non-Statutory Aggravating Factors</u>

(1) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, has engaged in a continuing pattern of violent conduct, beginning at the age of fifteen with an adjudication as a juvenile delinquent on October 29, 1991, for the illegal carrying of a weapon, resisting arrest and battery of a police officer in violation of Louisiana Revised Statutes 14:95, 14:108 and 14:34.2.   On August 14, 1991, the defendant, Johnny Davis, resisted arrest and committed a battery upon a police officer while in possession of a concealed firearm.

Answer "Yes" or "No."

Answer:_____Yes_____.

(2) We unanimously find that the government proved beyond a reasonable doubt that: The  defendant, Johnny Davis, was convicted on April 27, 1993, of a crime of violence which involved 11 counts of armed robbery in violation of Louisiana Revised Statutes 14:64.   On April 8, 1992, the defendant, Johnny Davis, along with several other gunmen shot and robbed several customers inside the Imperial Lounge located at 320 Westwego Avenue in Bridge City, Louisiana.

Answer "Yes" or "No."

Answer:_____Yes_____.

(3) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, was convicted on December 5, 2001 of being a felon in possession of a firearm, in violation of Title 18, United States Code, Section 922(g)(1).   On April 18, 2001, the defendant, Johnny Davis, and Anthony Buckles were arrested by members of the New Orleans Police Department.   At the time of the arrest, Anthony Buckles provided a false statement to the police officers, at the request of Johnny Davis, claiming that the recovered firearm belonged to him and not Johnny Davis.

Answer "Yes" or "No."

Answer:_____Yes_____.

1176

(4) We unanimously find that the government proved beyond a reasonable doubt that: While incarcerated, the defendant, Johnny Davis, has demonstrated his contempt for the criminal justice system and his low rehabilitative potential, by soliciting the assistance of a co-defendant, Anthony Buckles a/k/a "Nutta," to kill Leonard Smith a/k/a "Fu", who is a cooperating government witness in this case.

Answer "Yes" or "No."

Answer:_____YES_____.

(5)   We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, solicited juveniles to serve under him as his lieutenants, these juveniles out of fear of Johnny Davis, acquiescing to any of his demands.

Answer "Yes" or "No."

Answer:_____YES_____.

(6)   We unanimously find that the government proved beyond a reasonable doubt that: While incarcerated on prior drug charges in 1998, the defendant, Johnny Davis, continued his participation in the illegal drug trade in the St. Thomas Housing Development by soliciting the aid of Leonard Smith a/k/a "Fu", a fellow drug dealer, to buy and sell drugs on his behalf.

Answer "Yes" or "No."

Answer:     YES     .

(7)   We unanimously find that the government proved beyond a reasonable doubt that: While incarcerated on prior drug charges in 1998, the defendant, Johnny Davis, solicited the aid of Leonard Smith a/k/a "Fu", a fellow drug dealer, in the smuggling of contraband into the Orleans Parish jail.

Answer "Yes" or "No."

Answer:_____YES_____.

27

(8) We unanimously find that the government proved beyond a reasonable doubt that: As demonstrated by Leonard Morgan's personal characteristics as an individual human being and the impact of his death upon his family, friends and co-workers, the defendant, Johnny Davis, caused injury, harm, and loss to the victim, his family, his friends, and his co-workers.

Answer "Yes" or "No."

Answer:_____Yes_____.

(9) We unanimously find that the government proved beyond a reasonable doubt that: The defendant, Johnny Davis, has demonstrated a lack of remorse for his criminal conduct.

Answer "Yes" or "No."

Answer:_____Yes_____.


Instruction: Proceed to Question No. 3(E) regardless of how you answered any part of Question No. 3(D).

28

1178

3(E).   <u>Mitigating Factors</u>

Instruction: For each of the following mitigating factors, you must indicate, on the space provided, the number of jurors, if any, who have found the existence of that mitigating factor by a preponderance of the evidence.  A finding of a mitigating factor by a preponderance of the evidence may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor must consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who concur that the factor has been established.

(1) Do **any** of you find by a preponderance of the evidence that other participants in one or more of the capital offenses will not be punished by death, including but not limited to the following individuals: Richard Porter, Quandell Curtis, and Anthony Buckles?

*Number of jurors who so find:* _____12_____

(2) Do **any** of you find by a preponderance of the evidence that other participants in the drug trafficking offenses and murders are now eligible to receive reduced sentences as a result of plea agreements with the government?

*Number of jurors who so find:* _____12_____

(3) Do **any** of you find by a preponderance of the evidence that there is evidence that Richard Porter hired Johnny Davis to commit the murder of victim Leonard Morgan, and Richard Porter will not be punished by death?

*Number of jurors who so find:* _____12_____

(4) Do **any** of you find by a preponderance of the evidence that all of the victims, Samuel Collins, Walter Naylor, and Leonard Morgan, engaged in criminal conduct that may have contributed to the circumstances leading to their deaths, in that these victims were involved in narcotics possession and or distribution?

*Number of jurors who so find:* _____12_____

(5) Do **any** of you find by a preponderance of the evidence that if he is not put to death, Johnny Davis will live every day of the rest of his life incarcerated in a federal prison, he will die in federal prison and he will never enjoy freedom again?

*Number of jurors who so find:* _____12_____

29

(6) Do **any** of you find by a preponderance of the evidence that Johnny Davis was subjected to emotional abuse, physical abuse, abandonment and neglect as a child?

  *Number of jurors who so find:*   12

(7) Do **any** of you find by a preponderance of the evidence that Johnny Davis was deprived of the parental love, guidance, and protection that he needed?

  *Number of jurors who so find:*   12

(8) Do **any** of you find by a preponderance of the evidence that Johnny Davis suffers from the effects of early childhood lead poisoning?

  *Number of jurors who so find:*   4

(9) Do **any** of you find by a preponderance of the evidence that Johnny Davis suffers from brain damage?

  *Number of jurors who so find:*   0

(10) Do **any** of you find by a preponderance of the evidence that Johnny Davis' brain was damaged by his mother's substance abuse during her pregnancy?

  *Number of jurors who so find:*   4

(11) Do **any** of you find by a preponderance of the evidence that Johnny Davis' brain was damaged by several head injuries in which he was knocked unconscious?

  *Number of jurors who so find:*   0

(12) Do **any** of you find by a preponderance of the evidence that Johnny Davis suffers from brain dysfunction, which has impaired his ability to make good decisions about his life and the lives of others, although he still must be held accountable for his actions?

  *Number of jurors who so find:*   0

(13) Do **any** of you find by a preponderance of the evidence that Johnny Davis was introduced to addictive drugs and alcohol while a child and has suffered from alcoholism and drug addiction since then?

  *Number of jurors who so find:*   12

30

(14) Do **any** of you find by a preponderance of the evidence that Johnny Davis had learning problems in school, which led to academic failure and an inability to progress in school?

*Number of jurors who so find:*    12

(15) Do **any** of you find by a preponderance of the evidence that although the evidence presented at trial was sufficient to prove Johnny Davis' guilt beyond a reasonable doubt, additional evidence, including DNA and other forensic evidence, which might have proved his guilt or innocence to an absolute certainty, was not available?

*Number of jurors who so find:* ___12___

(16) Do **any** of you find by a preponderance of the evidence that Johnny Davis has suffered from symptoms of Post-Traumatic Stress Disorder for many years, and will continue to suffer from mental illness?

*Number of jurors who so find:* ___5___

(17) Do **any** of you find by a preponderance of the evidence that Johnny Davis has suffered from symptoms of depression for many years, and will struggle with depression for the rest of his life in prison?

*Number of jurors who so find:* ___8___

(18) Do **any** of you find by a preponderance of the evidence that Johnny Davis has shown love and kindness towards his family?

*Number of jurors who so find:* ___0___

(19) Do **any** of you find by a preponderance of the evidence that Johnny Davis' daughters will be forever deprived of their father if he is executed?

*Number of jurors who so find:* ___12___

(20) Do **any** of you find by a preponderance of the evidence that although Johnny Davis has caused much pain and sorrow, his innocent family and friends love him deeply and will suffer if he is executed?

*Number of jurors who so find:* ___12___

31

(21) Do **any** of you find by a preponderance of the evidence that although Johnny Davis can distinguish right from wrong and deserves to be held accountable for his actions, he suffers from mild mental retardation?

> Number of jurors who so find: _____0_____

(22) Do **any** of you find by a preponderance of the evidence that although Johnny Davis can distinguish right from wrong and deserves to be held accountable for his actions, he suffers from borderline intellectual functioning?

> Number of jurors who so find: _____12_____

(23) Do **any** of you find by a preponderance of the evidence that the Louisiana juvenile justice system attempted to intervene in Johnny Davis's life, but was unsuccessful in part because of the lack of continuing family involvement, direction and support?

> Number of jurors who so find: _____12_____

(24) Do **any** of you find by a preponderance of the evidence that other factors in Johnny Davis' childhood, background or character mitigate against imposition of the death sentence?

> Number of jurors who so find: _____0_____

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors by a preponderance of the evidence. If none, write "NONE" and cross out the extra spaces with a large "X." If more space is needed, write "CONTINUED" and use the reverse side of this page.

Mitigating Factor | Number of Jurors Who So Find



NONE | NONE

  Instruction: Proceed to Question No. 3(F) regardless of how you answered any part of Question No. 3(E).

3(F). <u>Determination</u>

We, the Jury, unanimously determine that the sentence to be imposed on Johnny Davis as to Count 10 is:

_____Death

_____Life Imprisonment Without Possibility of Release

_____√_____Some Other Lesser Sentence

<u>Instruction:</u> Proceed to Section IV.

33

1183

## Section IV:
## Certification

The answers to the preceding questions represent the verdict of the jury.

JURY FOREPERSON                                    5-16-03
                                                   ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾
                                                   DATE

Certification:

By signing below, each juror certifies that, in considering whether a sentence of death is justified, consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victim(s) was not involved in reaching his or her individual decisions, and that the individual juror would have made the same recommendation regarding a sentence for the crime in question no matter what the race, color, religious beliefs, national origin, or sex of the defendant, or the victim(s).

**SIGNATURES OF ALL JURORS:**



GARY TORGERSON

DATE:  _5/15/03_

35

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,

        Petitioner,

vs.

UNITED STATES OF AMERICA,

        Respondent.

CASE NO. CV-09-00105-JHP

**EXHIBIT C TO
PETITIONER'S COMBINED
RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT OF OPPOSITION**

App. Pet'r's Resp. Opp. Govt. MSJ                              *U.S. v. Barrett*, CV-09-00105-JHP

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
--------------------------------------------------X

UNITED STATES OF AMERICA,

                                                    CR-01-389 (S-5) (RJD)

            -against-


EMILE DIXON,

                    Defendant.

--------------------------------------------------X




                    PENALTY PHASE:
                    SPECIAL VERDICT FORM

1187

## SECTION I. REQUIRED PRELIMINARY FACTORS

### General directions for Section I:

- As used in this section, the term "capital counts" refers to Counts Five, Seven, Eight, and Ten of the indictment.

- Please indicate whether the government has proven beyond a reasonable doubt a required preliminary factor for each count.  Mark your responses in Part A.

**Part A.**  Required Preliminary Factor – Intent

1.     That EMILE DIXON acted with the requisite intent.

_____✓_____     We unanimously find that the requisite intent has been proved beyond a reasonable doubt with regard to all of the capital counts.

_____     We unanimously find that the requisite intent has been proved beyond a reasonable doubt with regard to the following capital counts only (identify each count by number):

_____

_____

_____

_____

_____     We do not unanimously find that the requisite intent has been proved beyond a reasonable doubt with regard to any of the capital counts.

**Part B.**     After reviewing your findings in Section I, Part A, please identify by count number those capital counts, if any, for which you have not unanimously found that the government has proven beyond reasonable doubt the existence of any required preliminary factor.

_____

_____

_____

2

**Directions:**

- For each capital count, if you do not unanimously find that the government has proven beyond a reasonable doubt a required preliminary factor with respect to that count, then your deliberations are over as to that count.  That is to say, you are not to consider in Section II (or thereafter until Section VI) any of the counts you have specified in Section I, Part B.

- If there is no capital count for which you unanimously find a required preliminary factor has been proved beyond a reasonable doubt, skip forward to Section VI and complete that section in accordance with the directions there.  Then notify the Court that you have completed your deliberations.

- If you have found a required preliminary factor with regard to one or more capital counts, continue on to Section II.

## SECTION II. STATUTORY AGGRAVATING FACTORS

**General directions for Section II:**

- As used in this section, the term "capital counts" refers only to those counts for which you found one required preliminary factor in Section I.  Do not consider statutory aggravating factors in this section with regard to any counts for which you have not found one required preliminary factor in Section I.

- In this section, please indicate which, if any, of the following statutory aggravating factors you unanimously find that the government has proven beyond a reasonable doubt.  For each of the two statutory aggravating factors listed in Part A below, you must mark one of the responses.

**Part A.**

1.  Grave Risk of Death:

    √      We unanimously find that this factor has been proved beyond a reasonable doubt with regard to all of the capital counts.

    _____      We unanimously find that this factor has been proved beyond a reasonable doubt with regard to the following capital counts only (identify each count by count number):

3

_____   We do not unanimously find that this factor has been proved beyond a reasonable doubt with regard to <u>any</u> of the capital counts.

2.      Substantial Planning and Premeditation

_____   We unanimously find that this factor has been proved beyond a reasonable doubt with regard to <u>all</u> of the capital counts.

___✓___   We unanimously find that this factor has been proved beyond a reasonable doubt with regard to the following capital counts <u>only</u> (identify each count by count number):

_____7, 8 & 10_____

_____

_____

_____   We do not unanimously find that this factor has been proved beyond a reasonable doubt with regard to <u>any</u> of the capital counts.

**Part B.**      After reviewing your findings in Section II, Part A, please identify by count number those capital counts, if any, for which you have <u>not</u> unanimously found that the government has proven beyond a reasonable doubt the existence of <u>any</u> statutory aggravating factor:

_____

_____

_____

**Directions:**

•      For each capital count you are considering in this section, if you do <u>not</u> unanimously find that the government has proven beyond a reasonable doubt at least one of the above statutory aggravating factors with respect to that count, then your deliberations are over as to that capital count. In other words, you are not to consider in Section III (or thereafter

4

1190

until Section VI) any of the counts you have specified above in Section II, Part B.

- If there is no capital count for which you unanimously find that at least one statutory aggravating factor has been proved beyond a reasonable doubt, skip forward to Section VI and complete that section in accordance with the directions there. Then notify the Court that you have completed your deliberations.

- If you have found one or more statutory aggravating factors with regard to one or more capital counts, continue on to Section III.

## SECTION III. NON-STATUTORY AGGRAVATING FACTORS

**General directions for Section III:**

- As used in this section, the term "capital counts" refers <u>only</u> to those counts for which you have found one required preliminary factor in Section I <u>and</u> at least one statutory aggravating factor in Section II. Do not consider non-statutory aggravating factors in this section with regard to the counts for which you have not found one required preliminary factor in Section I <u>and</u> at least one statutory aggravating factor in Section II.

- In this section, please indicate which, if any, of the following three non-statutory aggravating factors you unanimously find that the government has proven beyond a reasonable doubt. For each of the proposed factors, you must mark one of the responses provided.

1.  Nature of the Offense:

    _____✓_____  We unanimously find that this factor has been proved beyond a reasonable doubt with regard to <u>all</u> of the capital counts.

    _____  We unanimously find that this factor has been proved beyond a reasonable doubt with regard to the following capital counts <u>only</u> (identify each count by count number):

    _____

    _____

    _____

    _____  We do not unanimously find that this factor has been proved beyond a reasonable doubt with regard to <u>any</u> of the capital counts.

5

2.    Future Dangerousness of the Defendant:

_____✓_____    We unanimously find that this factor has been proved beyond a reasonable doubt with regard to <u>all</u> of the capital counts.

_____    We unanimously find that this factor has been proved beyond a reasonable doubt with regard to the following capital counts <u>only</u> (identify each count by count number):

_____

_____

_____

_____    We do not unanimously find that this factor has been proved beyond a reasonable doubt with regard to <u>any</u> of the capital counts.

3.    Victim Impact Evidence:

_____✓_____    We unanimously find that this factor has been proved beyond a reasonable doubt with regard to <u>all</u> of the capital counts.

_____    We unanimously find that this factor has been proved beyond a reasonable doubt with regard to the following capital counts <u>only</u> (identify each count by count number):

_____

_____

_____

_____    We do not unanimously find that this factor has been proved beyond a reasonable doubt with regard to <u>any</u> of the capital counts.

**Directions:**

- After you have completed your findings in this section (whether or not you have found any of the above non-statutory aggravating factors to have been proved), continue on to

6

Section IV.

## SECTION IV. MITIGATING FACTORS

### General directions for Section IV:

- As used in this section, the term "capital counts" refers only to those counts for which you found one required preliminary factor in Section I and at least one statutory aggravating factor in Section II.

- As to the alleged mitigating factors which are listed below, please indicate which, if any, you find that the defendant has proven by a preponderance of the evidence.

- Recall that your vote as a jury need not be unanimous with regard to each question in this section. A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in making his or her individual determination of whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

- In the space provided, please indicate the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence with regard to each of the capital counts.

A.

1. Certain persons, equally or more responsible than EMILE DIXON for both the Gooden and the Thompson homicides, will not be subject to the death penalty.

   Number of jurors who find 1. ___0___

2. With respect to the Gooden homicide, the government does not allege that EMILE DIXON fired the fatal shot.

   Number of jurors who find 2. ___12___

3. EMILE DIXON, as reflected in his school records, suffered from intellectual and emotional deficits.

   Number of jurors who find 3. ___8___

4. EMILE DIXON has human qualities that make his life worth saving.

7

Number of jurors who find 4. ___0___

5.  EMILE DIXON grew up with risk factors not of his own making, including family and academic considerations and related emotional deficits;

Number of jurors who find 5. ___12___

6.  EMILE DIXON grew up in a community in which drugs and violence were rampant;

Number of jurors who find 6. ___3___

7.  EMILE DIXON's family, including four children who are innocent of any wrongdoing, would be grievously harmed if their father were killed.

Number of jurors who find 7. ___5___

8.  Should EMILE DIXON be sentenced to life in prison rather than death he will never be free again and would not present a risk to anyone outside prison.

Number of jurors who find 8. ___0___

9.  The likelihood is that EMILE DIXON will make a positive adjustment in prison.

Number of jurors who find 9. ___3___

10. The government has not proven EMILE DIXON's guilt with respect to each homicide to the exclusion of all doubt.

Number of jurors who find 10. ___0___

11. EMILE DIXON exhibited concern for the privacy and dignity of his family by his decision not to permit the introduction of his social history report or to permit his family members to testify on his behalf.

Number of jurors who find 11. ___6___

The law does not limit your consideration of mitigating factors to those that can be articulated in advance. Therefore, you may consider during your deliberations any other factor or factors in the EMILE DIXON's background, record, character, or any other circumstances of the offense that mitigate against imposition of a death sentence.

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If more space is needed, write "CONTINUED" and use the

8

reverse side of this page.

*N̸O*

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

_____

_____

Number of jurors who so find _____.

**Directions:**

- After you have completed your findings in this section (whether or not you have found any mitigating factors in this section), continue on to Section V.

## SECTION V. DETERMINATION OF SENTENCE

### General directions for Section V:

- As used in <u>this</u> section, the term "capital counts" refers only to those counts for which you found one required preliminary factor in Section I and at least one statutory aggravating factor in Section II. You may not impose a sentence of death on a particular capital count unless you have first found with regard to that count, unanimously and beyond a reasonable doubt, one required preliminary factor in Section I and at least one statutory aggravating factor in Section II.

- In this section, enter your determination of the defendant's sentence with regard to each of the capital counts. Your vote as a jury must be unanimous with regard to each question in this section.

After considering the information presented by both sides during the penalty phase and individually balancing the aggravating factors found to exist against the mitigating factors found

9

to exist:

_____ We, the jury, unanimously find that the government has failed to prove beyond a reasonable doubt that death is the appropriate sentence for EMILE DIXON for <u>any</u> of the capital counts.

_____ We, the jury, unanimously find beyond a reasonable doubt that a sentence of life in prison without possibility of release is the appropriate sentence for EMILE DIXON for <u>all</u> of the capital counts.

_____ We, the jury, unanimously find beyond a reasonable doubt, for some of the capital counts, that a sentence of life in prison without possibility of release is the appropriate sentence for EMILE DIXON with regard to each of the following capital counts <u>only</u> (identify each count by count numbers):

_____

_____

_____ We, the jury, unanimously find beyond a reasonable doubt, for <u>all</u> of the capital counts, that the aggravating factor or factors found to exist sufficiently outweigh the mitigating factor or factors found to exist or, in the absence of any mitigating factors, that the aggravating factor or factors are themselves sufficient – so that death is the appropriate sentence for EMILE DIXON. We vote unanimously that EMILE DIXON should be sentenced to death separately as to each count.

_____ We, the jury, unanimously find beyond a reasonable doubt, for some of the capital counts, that the aggravating factor or factors found to exist sufficiently outweigh the mitigating factor or factors found to exist or, in the absence of any mitigating factors, that the aggravating factor or factors are themselves sufficient – so that death is the appropriate sentence for EMILE DIXON with regard to each of the following capital counts <u>only</u> (identify each count by count number):

_____

_____

_____

10

_____   With regard to the above-listed capital counts, we vote unanimously that the defendant shall be sentenced to death separately as to each count. With regard to each of the remaining counts, we sentence the defendant to life imprisonment without the possibility of release separately as to each count.

____✓____   We, the jury, are unable to reach a unanimous verdict in favor of a life sentence or in favor of a death sentence, for any of the capital counts. We understand that the consequence of this is that the defendant will be sentenced to life imprisonment without the possibility of release.

Each juror must sign his or her juror number below, indicating that the above sentence determination reflects the jury's unanimous decision:

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____

_____         _____
                                  Foreperson (Juror No. ███)

                                  The foreperson shall indicate the date
                                  of signing:
                                  Date: ___12/22/03___

**Directions**:

- After you have completed your sentence determination in this section (regardless of what that determination was), continue on to Section VI.

## SECTION VI. CERTIFICATION

11

1197

By signing your juror number below, each of you individually certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant or the victims was not involved in reaching your individual decision.  Each of you further certifies that you, as an individual, would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of the race, color, religious beliefs, national origin, or sex of the defendant, or the victims.

_____

_____

_____

_____

_____

_____

Foreperson (Juror No. █

The foreperson shall indicate the date of signing:
Date: _____

After you have completed this form, you will each be given a new certification, headed Juror No. \_\_\_\_ , and an envelope which bears your juror number on the outside.  Please sign that certificate using your real name, place the certificate in the envelope, seal the envelope and give the envelope to the Marshal.  All of the certificates bearing your real name will be kept by the Court under seal.

12

1198

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:       dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:       Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,

            Petitioner,

vs.

UNITED STATES OF AMERICA,

            Respondent.

CASE NO. CV-09-00105-JHP

**EXHIBIT D TO
PETITIONER'S COMBINED
RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT OF OPPOSITION**

App. Pet'r's Resp. Opp. Govt. MSJ                    *U.S. v. Barrett*, CV-09-00105-JHP

COPY FOR THE COURT

FILED

MAY 2 9 2007

TERESA L. DEPPNER, CLERK
U.S. District Court
Southern District of West Virginia

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF WEST VIRGINIA
CHARLESTON

UNITED STATES OF AMERICA

v.                                          CRIMINAL NO. 2:05-00107-02

VALERIE FRIEND

## SPECIAL VERDICT FORM
## AS TO DEFENDANT VALERIE FRIEND

### MURDER OF CARLA COLLINS BY DEFENDANT VALERIE FRIEND

### AGE REQUIREMENT

### COUNTS ELEVEN AND TWELVE CONSIDERED SEPARATELY

We, the jury, unanimously find that the defendant was more than 18 years of age at the time of the offense.

**Yes**
_____
YES or NO

### SECTION I.  THRESHOLD INTENT FACTORS

**General Instructions for Section I:** For each of the following, indicate "YES" or "NO" after the appropriate finding by the jury.

### COUNTS ELEVEN AND TWELVE CONSIDERED SEPARATELY

### First Threshold Intent Factor:

1. Do you unanimously find that the United States has established beyond a reasonable doubt that defendant VALERIE FRIEND intentionally killed Carla Collins?

**Yes**
_____
YES or NO

**Second Threshold Intent Factor:**

2.  Do you unanimously find that the United States has established beyond a reasonable doubt that the defendant VALERIE FRIEND intentionally inflicted serious bodily injury which resulted in the death of Carla Collins?

_____Yes_____
**YES or NO**

**Third Threshold Intent Factor:**

3.  Do you unanimously find that the United States has established beyond a reasonable doubt that the defendant VALERIE FRIEND intentionally participated in an act, contemplating that the life of a person would be taken and/or intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and the victim Carla Collins died as a direct result of the act?

_____Yes_____
**YES or NO**

**Fourth Threshold Intent Factor:**

4.  Do you unanimously find that the United States has established beyond a reasonable doubt that the defendant VALERIE FRIEND intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life and the victim Carla Collins died as a direct result of the act?

_____Yes_____
**YES or NO**

5.  As to your separate deliberations on Counts Eleven and Twelve, do you make the foregoing findings as to both Counts?

_____Yes_____
**YES or NO**

If you responded "NO" to question 5, please explain below:

_____

_____

2

## General Instructions for Section I:

If you indicated that the United States has not established at least one of the Threshold Intent Factors in this Section I, then stop your deliberations and proceed to Section VI. Each juror should carefully read the statement in Section VI, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision. You should then advise the court that you have reached a decision.

If you indicated that the United States has established at least one of the Threshold Intent Factors in this Section I, proceed to Section II which follows.

## SECTION II. STATUTORY AGGRAVATING FACTORS

**General Instructions for Section II:** For each of the following, indicate "YES" or "NO" after the appropriate finding by the jury.

### COUNTS ELEVEN AND TWELVE CONSIDERED SEPARATELY

1. Do you unanimously find that the United States has established beyond a reasonable doubt that defendant VALERIE FRIEND killed Carla Collins in an especially heinous, cruel, or depraved manner?

<u>Yes</u>
**YES or NO**

2. Do you unanimously find that the United States has established beyond a reasonable doubt that defendant VALERIE FRIEND killed Carla Collins as consideration for the receipt or in the expectation of the receipt of anything of pecuniary value?

<u>Yes</u>
**YES or NO**

3. Do you unanimously find that the United States has established beyond a reasonable doubt that defendant VALERIE FRIEND killed Carla Collins after substantial planning and premeditation to cause the death of Carla Collins?

<u>Yes</u>
**YES or NO**

3

1202

4.     As to your separate deliberations on Counts Eleven and Twelve, do you make the foregoing findings as to both Counts?

_Yes_
**YES or NO**

If you responded "NO" to question 4, please explain below:

_____

_____

**General Instructions for Section II:**  If you indicated that the United States has not established at least one of the Statutory Aggravating Factors in this Section II, then stop your deliberations, and proceed to Section VI of this form. Each juror should then carefully read the statement in Section VI, and sign in the appropriate place if the statement accurately reflects the manner in which he or she reached his or her decision.  You should then advise the court that you have reached a decision.

If you indicated that the United States has established at least one or more of the Threshold Intent Factor(s) in Section I, and indicated that the United States has established at least one or more of the Statutory Aggravating Factors in this Section II as to the same count, proceed to Section III which follows.

**SECTION III.    NON-STATUTORY AGGRAVATING FACTORS**

**General Instructions for Section III:**  For each of the following, indicate "YES" or "NO" after the appropriate finding by the jury.

**COUNTS ELEVEN AND TWELVE CONSIDERED SEPARATELY**

1.    Do you unanimously find that the United States has established beyond a reasonable doubt that defendant VALERIE FRIEND caused injury, harm, and loss to Carla Collins' family and friends as demonstrated by the impact of death upon the victim's family and friends, and that this factor tends to support imposition of the death penalty?

_Yes_
**YES or NO**

4

2. Do you unanimously find that the United States has established beyond a reasonable doubt that defendant VALERIE FRIEND murdered Carla Collins to prevent Carla Collins from providing any additional information and assistance to law enforcement authorities regarding a federal criminal investigation, to retaliate against the victim for having provided assistance to law enforcement authorities with information regarding defendant's criminal activity, or both, and that this factor tends to support imposition of the death penalty.

*Yes*

**YES or NO**

3. As to your separate deliberations on Counts Eleven and Twelve, do you make the foregoing findings as to both Counts?

*Yes*

**YES or NO**

If you responded "NO" to question 3, please explain below:

_____

_____

**General Instruction for Section III**: Regardless of whether you found that the government has established one or more of the Non-Statutory Aggravating Factors in this Section III, proceed to Section IV, which follows.

**SECTION IV. MITIGATING FACTORS**

**General Instructions for Section IV:** For each of the following mitigating factors, please indicate, in the space provided, the number of jurors who have found the existence of that mitigating factor to be proven by a preponderance of the evidence.

Your vote with respect to a mitigating factor need not be unanimous. A finding with respect to a mitigating factor may be made by one or more of the members of the jury, and any member of the jury who finds the existence of a mitigating factor may consider such a factor established in considering whether or not a sentence of death shall be imposed, regardless of the number of other jurors who agree that the factor has been established.

5

1.  If she is not sentenced to death, Valeri Friend will spend the rest of her life in a federal prison without the possibility of release.

    NUMBER OF JURORS WHO SO FIND __12__

2.  Patricia Burton is equally culpable in the death of Carla Collins, and will not be executed and may receive a sentence of less than life imprisonment.

    NUMBER OF JURORS WHO SO FIND __7__

3.  Carmella Blankenship was involved in the death of Carla Collins, but she has not been prosecuted.

    NUMBER OF JURORS WHO SO FIND __12__

4.  At the time of Carla Collins' death, Valeri Friend was acting under severe mental or emotional disturbance, although it was not sufficient to constitute a defense to murder or excuse for her actions.

    NUMBER OF JURORS WHO SO FIND __0__

5.  Valeri Friend has never before been convicted of a crime.

    NUMBER OF JURORS WHO SO FIND __12__

6.  Valeri Friend has no significant prior history of other criminal conduct.

    NUMBER OF JURORS WHO SO FIND __0__

7.  At the time of Carla Collins' death Valeri Friend was under the influence of alcohol and cocaine.

    NUMBER OF JURORS WHO SO FIND __12__

8.  Valeri Friend is the mother of five children who will be emotionally harmed by her execution.

    NUMBER OF JURORS WHO SO FIND __12__

9.  The family and friends of Valeri Friend will suffer grief and loss if she is executed.

    NUMBER OF JURORS WHO SO FIND __12__

1205

10. Valeri Friend was a victim of sexual assault or rape.

    NUMBER OF JURORS WHO SO FIND ___11___

11. The men in Valeri Friend's life subjected her to physical and emotional abuse.

    NUMBER OF JURORS WHO SO FIND ___12___

12. Valeri Friend has suffered traumatic events including the deaths of friends and loved ones.

    NUMBER OF JURORS WHO SO FIND ___12___

13. Valeri Friend struggled under difficult circumstances to raise five sons with little assistance from their fathers.

    NUMBER OF JURORS WHO SO FIND ___12___

14. Valeri Friend suffered from depression and anxiety.

    NUMBER OF JURORS WHO SO FIND ___11___

15. Valeri Friend's abuse of alcohol, prescription pills and cocaine was, in part, caused by her depression, anxiety and the stress of raising five sons alone.

    NUMBER OF JURORS WHO SO FIND ___9___

16. At the time of Carla Collins death, Valeri Friend was suffering from Post-Traumatic Stress Disorder.

    NUMBER OF JURORS WHO SO FIND ___6___

17. Valeri Friend was suffering from mental and emotional problems which contributed to her substance abuse and involvement with persons related to the offenses.

    NUMBER OF JURORS WHO SO FIND ___11___

18. Valeri Friend cooperated with Social Services, worked to improve her parenting skills and sought services for her children.

    NUMBER OF JURORS WHO SO FIND ___12___

1206

19. Valeri Friend grew up in a family in which men were controlling.

    NUMBER OF JURORS WHO SO FIND ___0___

20. Valeri Friend grew up in a family in which harsh physical discipline was the norm.

    NUMBER OF JURORS WHO SO FIND ___0___

21. Valeri Friend's family history pre-disposed her to substance abuse and mental illness.

    NUMBER OF JURORS WHO SO FIND ___8___

22. Valeri Friend was a reliable and hard-working employee.

    NUMBER OF JURORS WHO SO FIND ___12___

23. Valeri Friend has demonstrated her ability to make a positive adjustment to incarceration.

    NUMBER OF JURORS WHO SO FIND ___12___

24. Valeri Friend has made positive contributions to others during her incarceration.

    NUMBER OF JURORS WHO SO FIND ___12___

The following extra spaces are provided to write in additional mitigating factors, if any, found by any one or more jurors. If none, write "NONE" and line out the extra spaces with a large "X." If more space is needed, write "CONTINUED" and use the reverse side of this page.

25. ___None_____

    _____X_____

    NUMBER OF JURORS WHO SO FIND ___X___

26. ___None_____

    _____X_____

    NUMBER OF JURORS WHO SO FIND ___X___

8

1207

27. As to your separate deliberations on Counts Eleven and Twelve, do you make the foregoing findings as to both Counts?

_Yes_
**YES or NO**

If you responded "NO" to question 27, please explain below:

_____

_____

**General Instructions for Section IV:** When you have completed Section IV above, proceed to Section V **and** Section VI which follow.

**V. DETERMINATION OF SENTENCE**

**General Instructions for Section V:** Based upon consideration of whether the aggravating factors found to exist sufficiently outweigh any mitigating factor or factors found to exist -- or in the absence of any mitigating factors, whether the aggravating factor(s) so found are themselves sufficient to justify a sentence of death -- we choose as follows between Option A and Option B below:

9

1208

**Option A.  Death Sentence**

We the jury determine, by unanimous vote, that a sentence of death shall be imposed as to Count Eleven.

*Yes*

**YES or NO**

We the jury determine, by unanimous vote, that a sentence of death shall be imposed as to Count Twelve.

*Yes*

**YES or NO**

If you indicate "YES,"  sign your names here, and then proceed to Section VI.  If you do not indicate "YES," the foreperson alone should sign, and you should proceed to Option B:

Date:  *5-29-07*

10

**Option B. Sentence of Life in Prison Without Possibility of
Release**

We the jury determine, by unanimous vote, that a sentence of
life imprisonment without possibility of release shall be
imposed as to Count Eleven.

_____
**YES or NO**

We the jury determine, by unanimous vote, that a sentence of
life imprisonment without possibility of release shall be
imposed as to Count Twelve.

_____
**YES or NO**

If you answer "YES," sign your names here, and then proceed to
Section VI.

_____        _____        _____
FOREPERSON


_____        _____        _____


_____        _____        _____


_____        _____        _____


Date: _____

11

1210

## VI.   CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or sex of the defendant, the defendant's children, or the victim was not involved in reaching his or her individual decision, and that the individual juror would have made the same recommendation regarding a sentence for the crime or crimes in question regardless of  the race, color, religious beliefs, national origin, or sex of the defendant, the defendant's children, or the victim(s).



Date:   5-29-07

12

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:          dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:          Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**EXHIBIT E TO
PETITIONER'S COMBINED
RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT OF OPPOSITION**

App. Pet'r's Resp. Opp. Govt. MSJ                     *U.S. v. Barrett*, CV-09-00105-JHP

1212

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-60216-CR-COHN/SNOW(s)(s)

UNITED STATES OF AMERICA,
        Plaintiff,

vs.

KENNETH PAUL WILK
  a/k/a "Wolfpackeines,"
        Defendant.
_____/

## SPECIAL VERDICT

We, the jury, make the following findings, relevant to a sentence of death or life imprisonment without the possibility of release:

A.    Age

    1.    All jurors unanimously agree that the Government has proved beyond a reasonable doubt that Defendant Kenneth Paul Wilk was eighteen (18) years of age or older at the time of the offense.

        Yes ✓            No _____

*If you answered "yes" in Subpart "A" then proceed to answer Subpart "B." If you answered "no" in Subpart "A," then your verdict is for life imprisonment without the possibility of release as to Counts One and Two and either life imprisonment without the possibility of release or a term of imprisonment to be determined by the Court as to Count Four. Do not answer the questions in Subparts "B" thru "F". You should proceed directly to Subpart "G" and then sign and date the verdict form.*

B.    Intent

    1.    All jurors unanimously agree that the Government has proved beyond a reasonable doubt that the Defendant:

a.      intentionally killed Todd M. Fatta.

Yes ☒ ∎                              No ✓

*If your answer is "yes" you should proceed to Subpart "C" regarding determination of necessary aggravating factors. If your answer is "no" you should proceed to determine whether the Government has proven intent factor "b."*

b.      intentionally inflicted serious bodily injury that resulted in the death of Todd M. Fatta.

Yes ✓                                No _____

*If your answer is "yes" you should proceed to Subpart "C" regarding determination of necessary aggravating factors. If your answer is "no" you should proceed to determine whether the Government has proven intent factor "c."*

c.      intentionally participated in an act, contemplating that a life of a person would be taken and intending that lethal force would be used in connection with a person, other than one of the participants in the offense, and Todd M. Fatta died as a direct result of the act.

Yes _____                           No _____

*If your answer is "yes" you should proceed to Subpart "C" regarding determination of necessary aggravating factors. If your answer is "no" you should proceed to determine whether the Government has proven intent factor "d."*

d.      intentionally and specifically engaged in an act of violence, knowing that the act created a grave risk of death to a person, other than one of the participants in the offense, such that participation in the act constituted a reckless disregard for human life, and Todd M. Fatta died as a direct result of the act.

Yes _____                           No _____

2

1214

*If your answer is "yes" you should proceed to Subpart "C" regarding determination of necessary aggravating factors.*

*If you answered "no" to all 4 intent factors in Subpart "A," then your verdict is for life imprisonment without the possibility of release as to Counts One and Two and either life imprisonment without the possibility of release or a term of imprisonment to be determined by the Court as to Count Four. Do not answer the questions in Subparts "C" thru "F". You should proceed directly to Subpart "G" and then sign and date the verdict form.*

C.    <u>Necessary Aggravating Factors</u>    *(Answer all questions in this section)*

1.    All jurors unanimously agree that the Government has proved beyond a reasonable doubt that the Defendant Kenneth Paul Wilk, killed or attempted to kill more than one person, that is, Todd M. Fatta and Angelo Cedeno, in the same criminal episode.

Yes __✓__          No _____

2.    All jurors unanimously agree that the Government has proved beyond a reasonable doubt that the Defendant committed the offense after substantial planning and premeditation to cause the death of Todd M. Fatta.

Yes _____          No __✓__

3.    All jurors unanimously agree that the Government has proved beyond a reasonable doubt that the Defendant in the commission of the offense knowingly created a grave risk of death to one or more persons in addition to Todd M. Fatta and Angelo Cedeno.

Yes _____          No __✓__

*If you answered "yes" to <u>any one of the three</u> questions "C.1", "C.2," or "C.3" then proceed to answer the remaining questions on this verdict form. If you answered "no" to <u>all three</u> questions "C.1"; "C.2"; and "C.3" then your verdict is for life imprisonment without the possibility of release as to Counts One and Two and either life imprisonment without the possibility of release or a term of imprisonment to be determined by the Court as to Count Four. Do not answer*

3

*the questions in Subparts "D" thru "F". You should proceed directly to Subpart
"G" and then sign and date the verdict form.*

D.   Additional Aggravating Factors   *(Answer all questions in this section)*

1.   All jurors unanimously agree that the Government has proved
beyond a reasonable doubt that the Defendant killed Todd M. Fatta
in an effort by the Defendant to obstruct justice or tamper with a
witness as described in Count Seven of the Superseding
Indictment.

Yes _____          No __✓__

2.   All jurors unanimously agree that the Government has proved
beyond a reasonable doubt that the Defendant has been convicted
of, in addition to the capital offenses, an endeavor to obstruct
justice through threats or force as charged in Count Five of the
Superseding Indictment.

Yes __✓__          No _____

3.   All jurors unanimously agree that the Government has proved
beyond a reasonable doubt that in the context of a life in prison
setting, the Defendant poses a continuing danger to the lives and
safety of other persons, alleged to be evidenced by specific threats
of violence to law enforcement officers, a continuing pattern of
violence toward law enforcement officers, specific admissions of
violence, low rehabilitative potential and lack of remorse for his
criminal activities.

Yes _____          No __✓__

4.   All jurors unanimously agree that the Government has proved
beyond a reasonable doubt that the Defendant caused injury,
harm, and loss to the family of Todd M. Fatta because
of Todd M. Fatta's personal characteristics as an individual human
being and the impact of his death upon those persons.

Yes __✓__          No _____

4

E.   <u>Mitigating Factors</u>   (*Answer all questions in this section*)

For each of the following factors indicate the number of jurors, if any, who have

found the existence of the mitigating factor by a preponderance of the evidence:

1.   For the first 40 years of Mr. Wilk's life, he was never arrested for any crime.

Yes ✓          If "yes", number of jurors 12

No _____

2.   For the first 40 years of Mr. Wilk's life, he was a productive, contributing member of society.

Yes ✓          If "yes", number of jurors 12

No _____

3.   If not sentenced to death, Mr. Wilk will spend the rest of his life in prison without the possibility of release.

Yes ✓          If "yes", number of jurors 12

No _____

4.   Even though not sufficient to constitute a defense to the charges, Mr. Wilk's capacity to fully appreciate the wrongfulness of his conduct or to conform his conduct to the requirements of the law was impaired.

Yes ✓          If "yes", number of jurors 2

No _____

5.   Mr. Wilk was under duress, even though not to such a degree as to constitute a defense to the charges.

Yes ✓          If "yes", number of jurors 12

No _____

5

1217

6. Mr. Wilk has obeyed all rules and regulations of the jail, and has had no disciplinary problems, during his pre-trial detention at the Federal Detention Center from August 19, 2004 to the present.

Yes ✓ If "yes", number of jurors 12

No _____

7. Even though not sufficient to constitute a defense to the charges, Mr. Wilk committed the offense under some degree of mental or emotional disturbance.

Yes ✓ If "yes", number of jurors 12

No _____

8. Mr. Wilk is not likely to commit future acts of violence if sentenced to life in prison without release.

Yes ✓ If "yes", number of jurors 9

No _____

9. From late 2000 through 2001, following the deterioration of Mr. Wilk's health and Kelly Jones' arrests, Mr. Wilk's life entered a downward spiral.

Yes ✓ If "yes", number of jurors 12

No _____

10. Mr. Wilk showed respect and decorum in this courtroom, even under the significant stress of a capital trial.

Yes ✓ If "yes", number of jurors 12

No _____

11. After the brief, initial exchange of shots had stopped, Mr. Wilk did not fire any remaining rounds and voluntarily walked out of his home.

Yes ✓ If "yes", number of jurors 12

No _____

1218

12.  Evidence you have heard of planning and premeditation may have been partially attributable to Mr. Wilk's mental or emotional disturbance.

Yes ✓          If "yes", number of jurors 12

No _____

13.  Although not sufficient to establish self defense, the following factors may have contributed to Mr. Wilk's reaction when the police forcibly entered his home:

a.  Mr. Wilk suffered from hearing loss.

Yes ✓          If "yes", number of jurors 4

No _____

b.  Mr. Wilk suffered prior acts of vandalism and harassment at his home.

Yes ✓          If "yes", number of jurors 5

No _____

c.  The entry team was not in full police uniform.

Yes ✓          If "yes", number of jurors 3

No _____

d.  Visibility inside Mr. Wilk's home may have been impaired.

Yes ✓          If "yes", number of jurors 2

No _____

e.  Dep. Fatta may have been in a crouched position with his firearm pointed at Mr. Wilk when Mr. Wilk fired.

Yes ✓          If "yes", number of jurors 2

No _____

7

f.   Mr. Wilk was lawfully in his home when the officers made the forced entry into his home.

Yes __√__          If "yes", number of jurors __7__

No _____

g.   Mr. Wilk had no advance knowledge that the police would forcibly enter his home on the morning of August 19, 2004.

Yes __√__          If "yes", number of jurors __4__

No _____

14.   Mr. Wilk's mental and/or emotional decline was at least partially attributable to matters beyond his control, including but not limited the following:

a.   Kelly Jones' conduct, criminal behavior and controlling nature.

Yes __√__          If "yes", number of jurors __12__

No _____

b.   Mr. Wilk's personal stressors led him to drugs/alcohol.

Yes __√__          If "yes", number of jurors __9__

No _____

c.   Mr. Wilk suffered from depression.

Yes __√__          If "yes", number of jurors __12__

No _____

d.   Mr. Wilk suffered from some degree of dementia.

Yes __√__          If "yes", number of jurors __2__

No _____

8

1220

e.   Mr. Wilk had some degree of organic brain damage.

Yes __✓__         If "yes", number of jurors __2__

No _____

f.   Mr. Wilk knew he had the fatal disease of AIDS.

Yes __✓__         If "yes", number of jurors __10__

No _____

15.   Mr. Wilk was subjected to a series of significant stressors between 2001 and 2004, which had an effect on his mental and emotional well-being.

Yes __✓__         If "yes", number of jurors __12__

No _____

16.   Mr. Wilk was ill-equipped to cope with the combination of stress factors that led to his mental and/or emotional decline.

Yes _____         If "yes", number of jurors _____

No __✓__

17.   During his life, Mr. Wilk has showed acts of generosity, kindness and charity to others.

Yes __✓__         If "yes", number of jurors __12__

No _____

18.   In light of the fact that Mr. Wilk has full blown AIDS, imprisonment until his death will be a particularly severe punishment for him.

Yes __✓__         If "yes", number of jurors __4__

No _____

9

19.  Mr. Wilk saved the life of a woman at a Miami Subs restaurant in Hollywood by performing the Heimlich Maneuver on her when she was choking.

Yes  √          If "yes", number of jurors  5

No _____

20.  Mr. Wilk counseled and helped Jim Sipowicz when Jim Sipowicz revealed to him that he had been abused as a child.

Yes  √          If "yes", number of jurors  4

No _____

21.  Defendant Kenneth P. Wilk has been a good and loyal friend to Jim Sipowicz, Richard Murphy and Donn Crothers.

Yes  √          If "yes", number of jurors  6

No _____

F.   Additional Mitigating Factors

Describe and identify any other factors that mitigate against the imposition of a sentence of death and identify the number of jurors, if any, who find such factor to have been established by a preponderance of the evidence:

Kelly Ray Jones presence, intimidation and corrupt influence on. Mr. Wilk
Number of jurors  12

The manner in which the search & arrest warrants were planned a carried out.

Number of jurors  10

_____,

Number of jurors _____

_____,

Number of jurors _____

10

_____,

Number of jurors _____

_____,

Number of jurors _____

G.    Determination of Sentence

    1.    As to **Count One**, the Intentional Killing of Deputy Sheriff Todd M. Fatta, as a State or Local Law Enforcement Officer engaged in the performance of his duties, we the jury unanimously find:

        a.    that the aggravating factor(s) to which we have provided a unanimous "yes" answer above sufficiently outweigh(s) the mitigating factor(s) to justify a sentence of death, or in the absence of a mitigating factor, that the aggravating factor(s) alone is (are) sufficient to justify a sentence of death, and that the Defendant should be sentenced to death.

            Yes _____            No  ✓_____

        b.    that the Defendant should be sentenced to life imprisonment without the possibility of release.

            Yes  ✓_____            No _____

    2.    As to **Count Two**, the murder of Todd M. Fatta, a person assisting a Federal Law Enforcement Officer engaged in the performance of that officer's duties, we the jury unanimously find:

        a.    that the aggravating factor(s) to which we have provided a unanimous "yes" answer above sufficiently outweigh(s) the mitigating factor(s) to justify a sentence of death, or in the absence of a mitigating factor, that the aggravating factor(s) alone is (are) sufficient to justify a sentence of death, and that the Defendant should be sentenced to death.

            Yes _____            No  ✓_____

11

b.    that the Defendant should be sentenced to life imprisonment without the possibility of release.

Yes ✓                  No _____

3.    As to **Count Four**, the Using, Carrying, or Possessing a firearm which crime caused the murder of Todd M. Fatta, as defined in Counts 1 and 2, we the jury unanimously find:

a.    that the aggravating factor(s) to which we have provided a unanimous "yes" answer above sufficiently outweigh(s) the mitigating factor(s) to justify a sentence of death, or in the absence of a mitigating factor, that the aggravating factor(s) alone is (are) sufficient to justify a sentence of death, and that the Defendant should be sentenced to death.

Yes _____               No ✓

b.    that the Defendant should be sentenced to life imprisonment without the possibility of release.

Yes ✓                  No _____

c.    that the Defendant should be sentenced to a lesser sentence to be determined by the Court.

Yes _____               No ✓

SO SAY WE ALL,

████████████████████      6/13/07

Foreperson                Date

12

1224

Each juror must sign below, indicating that the above sentence reflects the jury's unanimous decision:



6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

13

1225

By signing below, each of us, individually, hereby certifies that consideration of the race, color, religious beliefs, national origin, or sex of the Defendant Kenneth Paul Wilk or the victim Todd M. Fatta was not involved in reaching our individual decisions. Each of us, individually, further certifies that the same decision regarding a sentence for the crime in question would have been made no matter what the race, color, religious belief, national origin, or sex of Kenneth Paul Wilk or Todd M. Fatta may have been.



6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

6/13/07
Date

14

1226

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>                    Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>                    Respondent. | CASE NO. CV-09-00105-JHP |

**EXHIBIT F TO
PETITIONER'S COMBINED
RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT
AND BRIEF IN SUPPORT OF OPPOSITION**

App. Pet'r's Resp. Opp. Govt. MSJ                                    *U.S. v. Barrett*, CV-09-00105-JHP

1227

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII
MAY 23 2014
at __ o'clock and __ min __ M.
SUE BEITIA, CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 06-00079 JMS |
| | ) | |
| Plaintiff, | ) | SPECIAL FINDINGS FORM |
| | ) | REGARDING ELIGIBILITY |
| vs. | ) | |
| | ) | |
| NAEEM WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| _____ | ) | |

## SPECIAL FINDINGS FORM REGARDING ELIGIBILITY

**QUESTION 1** (Defendant's Age at Time of the Offense): Do you unanimously find that the government has proven beyond a reasonable doubt that the Defendant was eighteen (18) years of age or older at the time of the Offense?

YES ✓        NO _____

If you answer YES, proceed to QUESTION 2. If you answer NO, proceed to the CERTIFICATION at the end of this form.

**QUESTION 2** (Intent Factor Number 1): In committing the Offense, do you unanimously find that the government has proven beyond a reasonable doubt that the Defendant intentionally inflicted serious bodily injury that resulted in the death of Talia Williams?

YES ✓        NO _____

If you answer YES, skip QUESTION 3 and proceed to QUESTION 4. If you answer NO, proceed to QUESTION 3.

**QUESTION 3** (Intent Factor Number 2): In committing the Offense, do you unanimously find that the government has proven beyond a reasonable doubt that the Defendant intentionally and specifically engaged in an act of violence, knowing that the act of violence created a grave risk of death to Talia Williams, such that participation in the act of violence constituted a reckless disregard for human life and Talia Williams died as a direct result of the act of violence?

YES _____ NO _____

If you answer YES, proceed to QUESTION 4. If you answer NO, proceed to the CERTIFICATION at the end of the form.

**QUESTION 4** (Aggravating Factor Number 1): Do you unanimously find that the government has proven beyond a reasonable doubt that the Defendant committed the Offense in an especially heinous, cruel, or depraved manner that involved torture or serious physical abuse to Talia Williams?

YES _✓_____ NO _____

Proceed to QUESTION 5.

**QUESTION 5** (Aggravating Factor Number 2): Do you unanimously find that the government has proven beyond a reasonable doubt that the Defendant committed the Offense upon Talia Williams, who was particularly vulnerable due to youth?

YES _✓_____ NO _____

Proceed to the CERTIFICATION at the end of the form.

1229

████████████████

_____      DATED: _MAy 25, 2014_____
FOREPERSON'S SIGNATURE

1230

## CERTIFICATION

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or gender of the Defendant or Talia Williams was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision regarding the Defendant's eligibility for consideration of a death sentence no matter what the race, color, religious beliefs, national origin, or gender of the Defendant or Talia Williams.



1.                            7.

2.                            8.

3.                            9.

4.                            10.

5.                            11.

6.                            12.

3

ORIGINAL

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

FILED IN THE
UNITED STATES DISTRICT COURT
DISTRICT OF HAWAII

JUN 27 2014

at 9 o'clock and 40 min A M.
SUE BEITIA, CLERK

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | CR. NO. 06-00079 JMS |
| | ) | |
| Plaintiff, | ) | SPECIAL FINDINGS FORM |
| | ) | REGARDING PENALTY |
| vs. | ) | SELECTION |
| | ) | |
| NAEEM WILLIAMS, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## SPECIAL FINDINGS FORM REGARDING PENALTY SELECTION

### I. Findings Regarding Justification for a Death Sentence

#### A. Non-Statutory Aggravating Factors

The government has alleged that the following non-statutory aggravating factors are present in this case. For each factor listed below, answer "yes" or "no" as to whether you unanimously find that the government proved the existence of the factor beyond a reasonable doubt:

1. After committing the final act of physical abuse against Talia Williams, the Defendant intentionally waited before seeking medical attention for Talia Williams, with such delay reducing the possibility that Talia Williams could have been medically treated and saved.

   YES  ✓          NO  _____

2. The Defendant intentionally endeavored to impede the investigation into the murder of Talia Williams by washing her blood from her bedroom wall as charged in Count 4 of the Indictment.

   YES  ✓          NO  _____

1232

3. The Defendant knowingly and willfully made a false material statement to law enforcement officers to conceal the true cause of Talia Williams' death, as charged in Count 5 of the Indictment.

    YES  ✓          NO  _____

4. The Defendant endeavored to obstruct justice by instructing his wife, Delilah S. Williams, to give a false statement to law enforcement officers, that is, that Talia Williams fell in the bathtub, in order to conceal the true cause of Talia Williams' death.

    YES  ✓          NO  _____

5. The Defendant caused injury, harm, and loss to Tarshia Williams, by causing the death of her daughter, Talia Williams.

    YES  ✓          NO  _____

6. The Defendant retained custody of Talia Williams and continued to abuse, assault, and torture her while knowing that others were willing to accept custody of Talia Williams and raise her without physical abuse, assault, or torture.

    YES  _____          NO  ✓

7. The Defendant committed the offense against Talia Williams, who was particularly vulnerable due to her special needs, including her developmental delays and her asthma.

    YES  _____          NO  ✓

Proceed to the next section (I-B) of this Form.

2

1233

## B.    Mitigating Factors

The Defendant has alleged that the following mitigating factors are present in this case. For each of these factors, answer "yes" or "no" as to whether any juror (or jurors) finds that the Defendant has proved the existence of the factor by a preponderance of the evidence, and indicate the number of jurors who so find:

1.    Naeem Williams was born to a single mother who was serving in the Army when Naeem Williams was an infant.

YES __✓__                              NO _____

Number of jurors who so find __12__

2.    Naeem Williams' mother, Rosalyn Muse, concentrated on her performance and advancement in the military, which resulted in Naeem Williams living with relatives away from home for extended periods of time while he was growing up.

YES _____                              NO __✓__

Number of jurors who so find _____

3.    Uyless Muse, Naeem Williams' stepfather, felt that Naeem Williams was treated too gently by Rosalyn Muse, and was openly critical of Rosalyn Muse because of it.

YES __✓__                              NO _____

Number of jurors who so find __8__

1234

4. From an early age, Naeem Williams was exposed to verbal and sometimes physical altercations between Rosalyn and Uyless Muse.

   YES ✓                 NO _____

   Number of jurors who so find __11__

5. Naeem Williams never knew, and never received guidance from, his biological father.

   YES ✓                 NO _____

   Number of jurors who so find __12__

6. Naeem Williams was raised in a system of corporal punishment from an early age.

   YES ✓                 NO _____

   Number of jurors who so find __11__

7. Naeem Williams was verbally abused by Uyless Muse as a child.

   YES ✓                 NO _____

   Number of jurors who so find __4__

8. Uyless Muse regularly disciplined Naeem Williams using corporal punishment until Naeem Williams was a teenager.

   YES ✓                 NO _____

   Number of jurors who so find __12__

1235

9. Naeem Williams witnessed his sisters, especially his sister Astin Muse, being emotionally and physically abused as children.

YES __✓__                 NO _____

Number of jurors who so find ___1___

10. Uyless Muse treated Naeem Williams more harshly than he treated his daughters.

YES __✓__                 NO _____

Number of jurors who so find __12__

11. Uyless Muse made it clear to Naeem Williams that Naeem Williams was a disappointment to him.

YES __✓__                 NO _____

Number of jurors who so find __1__

12. Uyless Muse sometimes treated Naeem Williams as though he hated him.

YES __✓__                 NO _____

Number of jurors who so find __6__

13. Naeem Williams was never accepted by Uyless Muse.

YES _____                 NO __✓__

Number of jurors who so find _____

1236

14. Naeem Williams worked around 20 hours a week while he was in high school because his parents thought that he should be working during the school year.

   YES ✓          NO _____

   Number of jurors who so find ___8___

15. Uyless Muse charged Naeem Williams rent while Naeem Williams was still in high school.

   YES ✓          NO _____

   Number of jurors who so find ___9___

16. Naeem Williams served overseas during on-going military operations.

   YES ✓          NO _____

   Number of jurors who so find ___12___

17. Naeem Williams re-enlisted while the United States was involved in military operations overseas.

   YES ✓          NO _____

   Number of jurors who so find ___12___

18. While not involved in combat operations, Naeem Williams served with distinction and was decorated for his military service.

   YES ✓          NO _____

   Number of jurors who so find ___12___

1237

19. Naeem Williams was viewed as a soldier who would be a good non-commissioned officer.

   YES ✓                    NO _____

   Number of jurors who so find __10__

20. Notwithstanding some of his cognitive deficits and mental condition issues, Naeem Williams sought to advance while he was in the military.

   YES ✓                    NO _____

   Number of jurors who so find __1__

21. Naeem Williams was recommended for promotion by his immediate supervisor, Sgt Eugene Grace.

   YES ✓                    NO _____

   Number of jurors who so find __12__

22. Naeem Williams was well liked by fellow members of the military.

   YES ✓                    NO _____

   Number of jurors who so find __11__

23. Naeem Williams was viewed as a positive presence in the military units that he served in.

   YES ✓                    NO _____

   Number of jurors who so find __7__

1238

24. Naeem Williams respected his chain of command.

YES √          NO _____

Number of jurors who so find ___2___

25. Naeem Williams' parents did not realize that Naeem Williams had learning disabilities.

YES √          NO _____

Number of jurors who so find ___3___

26. Naeem Williams was never diagnosed as having learning disabilities even though he clearly was unable to do basic math.

YES √          NO _____

Number of jurors who so find ___2___

27. Naeem Williams has a mathematical disorder resulting in impaired reasoning abilities.

YES _____          NO √

Number of jurors who so find _____

28. Naeem Williams has an intellectual disability (formerly known as mental retardation) under current diagnostic criteria.

YES √          NO _____

Number of jurors who so find ___1___

1239

29. Naeem Williams' intellectual abilities are in the borderline intellectual functioning range.

YES __✓__　　　　　　　NO _____

Number of jurors who so find __1__

30. Naeem Williams has frontal lobe impairments which affect his every day functioning.

YES __✓__　　　　　　　NO _____

Number of jurors who so find __1__

31. Naeem Williams has a long standing learning disability.

YES __✓__　　　　　　　NO _____

Number of jurors who so find __2__

32. Naeem Williams has difficulties in efficiently taking in, processing, and weighing information.

YES __✓__　　　　　　　NO _____

Number of jurors who so find __3__

33. Naeem Williams does not have an antisocial personality disorder.

YES __✓__　　　　　　　NO _____

Number of jurors who so find __12__

1240

34. Naeem Williams is dependent on other people, particularly women with whom he has emotional ties including his mother and his partners.

   YES  √                          NO  _____

   Number of jurors who so find ___6___

35. Naeem Williams' underlying deficits affect his ability to understand and solve problems.

   YES  _____                      NO  √

   Number of jurors who so find _____

36. Naeem Williams has difficulties functioning independently in the manner that an adult of his age who is without deficits can.

   YES  √                          NO  _____

   Number of jurors who so find ___1___

37. Naeem Williams functions best when he is in a highly structured situation in which he has a supervisor who directs him.

   YES  √                          NO  _____

   Number of jurors who so find ___5___

38. Naeem Williams' performance gets worse when he is placed under stress.

   YES  √                          NO  _____

   Number of jurors who so find ___1___

1241

39.    Naeem Williams' abilities to solve problems, regulate his actions, and be mentally flexible deteriorate when he is under stress.

YES ✓                              NO _____

Number of jurors who so find __7__

40.    Naeem Williams has difficulties understanding the context of a situation or event, which makes it difficult for him to figure out the best way to respond to that situation or event.

YES ✓                              NO _____

Number of jurors who so find __1__

41.    Naeem Williams has difficulties in the area of functional academics, and those difficulties affect his ability to solve real world problems.

YES _____                          NO ✓

Number of jurors who so find _____

42.    Naeem Williams has difficulties in the conceptual area of adaptive functioning, and those difficulties affect his ability to plan, problem solve, and think abstractly.

YES _____                          NO ✓

Number of jurors who so find _____

43.    Naeem Williams' impairments made it difficult for him to do well in complex social relationships.

YES _____                          NO ✓

Number of jurors who so find _____

11

1242

44. Naeem Williams has difficulties understanding and responding appropriately to situational cues.

YES _____          NO _✓_

Number of jurors who so find _____

45. Naeem Williams has personality traits that interfere with his ability to reach out to others when he faces problems he cannot resolve appropriately himself.

YES _____          NO _✓_

Number of jurors who so find _____

46. From an early age, Naeem Williams was exposed to his parents' drinking of alcohol.

YES _✓_          NO _____

Number of jurors who so find _12_

47. Naeem Williams began drinking alcohol at an early age.

YES _✓_          NO _____

Number of jurors who so find _11_

48. Naeem Williams drank alcohol regularly in his teen years.

YES _✓_          NO _____

Number of jurors who so find _3_

12

1243

49. Naeem Williams was affected by his alcohol usage beginning in his teenage years.

   YES  √          NO  _____

   Number of jurors who so find  4

50. The Bureau of Prisons diagnosed Naeem Williams with an alcohol abuse disorder.

   YES  _____        NO  √

   Number of jurors who so find  _____

51. Naeem Williams' chronic alcohol use is an illness.

   YES  _____        NO  √

   Number of jurors who so find  _____

52. Naeem Williams committed the offense under some degree of mental or emotional disturbance.

   YES  √          NO  _____

   Number of jurors who so find  2

53. Naeem Williams was under duress, regardless whether such duress was of such a degree to as to constitute a defense to the charge.

   YES  _____        NO  √

   Number of jurors who so find  _____

1244

54. Naeem Williams' capacity to appreciate the wrongfulness of his conduct was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge.

YES _____          NO ___✓___

Number of jurors who so find _____

55. Naeem Williams' capacity to conform his conduct to the requirements of the law was impaired, regardless of whether his capacity was so impaired as to constitute a defense to the charge.

YES _____          NO ___✓___

Number of jurors who so find _____

56. During the period December 2004 through July 16, 2005, Naeem Williams suffered from impairments in his executive functioning (ability to solve problems, make decisions, and be mentally flexible).

YES ___✓___          NO _____

Number of jurors who so find ___2___

57. During the period December 2004 through July 16, 2005, Naeem Williams' suffered from impaired intellectual functioning.

YES _____          NO ___✓___

Number of jurors who so find _____

1245

58. During the period December 2004 through July 16, 2005, Naeem Williams' intellectual and executive functioning abilities were worsened by alcohol abuse.

YES  ✓          NO  _____

Number of jurors who so find ___1___

59. During the period December 2004 through July 16, 2005, Naeem Williams was under stress because Delilah Williams suffered from a depressive disorder.

YES  ✓          NO  _____

Number of jurors who so find ___1___

60. During the period December 2004 through July 16, 2005, Naeem Williams was under stress from the effect his marital problems were having on his employment.

YES  ✓          NO  _____

Number of jurors who so find  12

61. During the period December 2004 through July 16, 2005, Naeem Williams was under stress because he did not understand Talia's developmental delays.

YES  ✓          NO  ✓

Number of jurors who so find _____

1246

62. During the period December 2004 through July 16, 2005, Naeem Williams was under stress due to the expectation and delivery of a new infant in his home.

YES __✓__                    NO _____

Number of jurors who so find ___6___

63. During the period December 2004 through July 16, 2005, Naeem Williams' life was chaotic due to his domestic situation.

YES __✓__                    NO _____

Number of jurors who so find ___10___

64. Naeem Williams' impairments contributed to his inability to ask for help in parenting Talia.

YES __✓__                    NO _____

Number of jurors who so find ___1___

65. Naeem Williams' emotional numbing, a reaction to the physical abuse he suffered as a child, impaired his ability to recognize the harm he was causing Talia.

YES __✓__                    NO _____

Number of jurors who so find ___1___

66. Naeem Williams did not have the kind of emotional braking system that other people may have that would have prevented more extreme abuse from occurring.

YES _____                    NO __✓__

Number of jurors who so find _____

16

67. Naeem Williams had temperament qualities which impacted his ability to have insight into his behavior.

YES _____ NO __✓__

Number of jurors who so find _____

68. During the period December 2004 through July 16, 2005, Naeem Williams was under considerable pressure, and as with many people under pressure, he didn't think of alternatives but instead relied on those tried and trued ways that had worked in the past.

YES __✓__ NO _____

Number of jurors who so find ___2___

69. Naeem Williams was exposed to seven of the 32 risk factors that are identified as predictors for youth violence by the United States Department of Justice.

YES __✓__ NO _____

Number of jurors who so find ___6___

70. Naeem Williams was exposed to all of the risk factors for family violence identified by the Armed Forces Center for Child Protection.

YES _____ NO __✓__

Number of jurors who so find _____

71. The Williams' family possessed most of the risk factors identified as predictors for child abuse in 2005 when Talia was abused.

YES _____ NO __✓__

Number of jurors who so find _____

17

1248

72. When Naeem Williams got physical custody of Talia, he was excited about having her with him.

   YES __✓__          NO _____

   Number of jurors who so find __12__

73. Naeem Williams did not obtain custody of Talia with the expectation or intent to harm her.

   YES __✓__          NO _____

   Number of jurors who so find __12__

74. Naeem Williams took custody of Talia because he felt obligated to do so.

   YES __✓__          NO _____

   Number of jurors who so find __12__

75. Naeem Williams had a fixed belief system that Talia's behavior was voluntary.

   YES _____          NO __✓__

   Number of jurors who so find _____

76. Naeem Williams had a fixed belief system that Talia's problems could be corrected through physical punishment.

   YES __✓__          NO _____

   Number of jurors who so find __3__

1249

77. Naeem Williams had a fixed belief system that, if his physical punishment of Talia wasn't working, it was because he had not administered a sufficient amount of punishment.

YES _____         NO __✓__

Number of jurors who so find _____

78. Naeem Williams' belief system is the product of his upbringing and development.

YES _____         NO __✓__

Number of jurors who so find _____

79. For Naeem Williams, Talia's soiling became a sign of her disobedience, and not a recognition of her biologically or psychologically based disorder.

YES __✓__         NO _____

Number of jurors who so find __3____

80. Naeem Williams believed, through his method of discipline learned from his family, that some forms of discipline would eventually result in the desired impact; that is, Talia would stop soiling herself.

YES __✓__         NO _____

Number of jurors who so find __10____

81. Naeem Williams' belief about the use of corporal punishment with Talia is related to his relatively low intellectual functioning.

YES _____         NO __✓__

Number of jurors who so find _____

19

1250

82. Naeem Williams' use of corporal punishment with Talia is related to his executive functioning impairments.

YES __✓__ NO _____

Number of jurors who so find __1__

83. Naeem Williams' belief that his daughter Talia could control her bowel and bladder functions if she was physically disciplined was encouraged by Delilah Williams.

YES __✓__ NO _____

Number of jurors who so find __3__

84. Naeem Williams' striking of Talia was influenced and encouraged by Delilah Williams.

YES __✓__ NO _____

Number of jurors who so find __12__

85. Naeem Williams was dependent on Delilah Williams.

YES __✓__ NO _____

Number of jurors who so find __4__

86. Delilah Williams influenced Naeem Williams to use force and violence against Talia.

YES __✓__ NO _____

Number of jurors who so find __12__

1251

87. It was primarily Delilah Williams' decision not to allow Talia to speak to her mother, Tarshia Williams, because she did not like Tarshia Williams.

   YES  ✓                    NO  _____

   Number of jurors who so find ___9___

88. It was primarily Delilah Williams' decision to change the way Talia was dressed, and she never discussed this decision with Naeem Williams.

   YES  _____                NO  ✓

   Number of jurors who so find _____

89. On July 16, 2005 Naeem Williams told Delilah Williams to call 911 and, in response, she discouraged him from doing so until her cousin could come and take the baby, Azrah.

   YES  ✓                    NO  _____

   Number of jurors who so find ___11___

90. Delilah Williams inflicted serious bodily injury on Talia.

   YES  ✓                    NO  _____

   Number of jurors who so find ___12___

91. Delilah Williams stomped on Talia.

   YES  ✓                    NO  _____

   Number of jurors who so find ___12___

21

1252

92. Delilah Williams verbally abused Talia.

   YES _✓_          NO _____

   Number of jurors who so find _12_

93. Delilah Williams inflicted torture, including mental distress, on Talia.

   YES _✓_          NO _____

   Number of jurors who so find _12_

94. Delilah Williams was responsible for injuries that contributed to the death of Talia.

   YES _✓_          NO _____

   Number of jurors who so find _1_

95. Although Delilah Williams worked for Child and Youth Services, she failed to seek assistance for Talia.

   YES _✓_          NO _____

   Number of jurors who so find _12_

96. Delilah Williams understood better than did Naeem Williams how Talia was being harmed by her continuing to live in the Williams household in Hawaii.

   YES _____          NO _✓_

   Number of jurors who so find _____

22

97. Another defendant, Delilah Williams, equally culpable in the offense, will not be punished by death.

YES _____ NO _✓_

Number of jurors who so find _____

98. Naeem Williams did not have the intent to kill Talia.

YES _✓_ NO _____

Number of jurors who so find _9_

99. Naeem Williams did not commit the offense after substantial planning.

YES _✓_ NO _____

Number of jurors who so find _11_

100. Naeem Williams did not knowingly create a grave risk of death to one or more persons in addition to Talia.

YES _____ NO _✓_

Number of jurors who so find _____

101. There are lingering doubts as to Naeem Williams' guilt as to the offense and/or eligibility for the death penalty, even though those doubts do not rise to the level of "reasonable doubt" under the instructions given to you during the guilt and eligibility phases of trial.

YES _____ NO _✓_

Number of jurors who so find _____

23

1254

102.  Prior to trial, Naeem Williams met with counsel for the Government and CID Investigator Al Hazzard and answered their questions over a period of two days.

YES  √              NO  _____

Number of jurors who so find __12__

103.  Naeem Williams admitted both before and during trial that he committed acts of assault against Talia.

YES  √              NO  _____

Number of jurors who so find __12__

104.  Naeem Williams has accepted responsibility for injuring Talia and causing her death.

YES  √              NO  _____

Number of jurors who so find __4__

105.  Naeem Williams is remorseful for injuring Talia and causing her death.

YES  √              NO  _____

Number of jurors who so find __3__

106.  Naeem Williams is kind to other people.

YES  √              NO  _____

Number of jurors who so find __9__

1255

107. Naeem Williams was kind to his friends' and relatives' younger children.

YES  √            NO  _____

Number of jurors who so find  2

108. Naeem Williams is kind to his daughter, Azrah.

YES  √            NO  _____

Number of jurors who so find  12

109. Naeem Williams' daughter, Azrah, loves him dearly.

YES  √            NO  _____

Number of jurors who so find  5

110. Naeem Williams is a loving father to his daughter, Azrah.

YES  √            NO  _____

Number of jurors who so find  6

111. Naeem Williams is kind to his son, Khaleif.

YES  √            NO  _____

Number of jurors who so find  12

112. Naeem Williams is a loving father to his son, Khaleif.

YES  √            NO  _____

Number of jurors who so find  7

1256

113. Naeem Williams' son, Khaleif, loves him dearly.

YES _✓_         NO _____

Number of jurors who so find _12_

114. Naeem Williams' life has value to his son, Khaleif.

YES _✓_         NO _____

Number of jurors who so find _12_

115. Naeem Williams' life has value to his daughter, Azrah.

YES _✓_         NO _____

Number of jurors who so find _11_

116. Naeem Williams' life has value to his friends.

YES _✓_         NO _____

Number of jurors who so find _12_

117. Naeem Williams' life has value to members of his family.

YES _✓_         NO _____

Number of jurors who so find _12_

118. Naeem Williams continues to communicate with members of his family and continues to have a place within his family.

YES _✓_         NO _____

Number of jurors who so find _12_

1257

119. In the future, Naeem Williams' life will have value to others.

YES ✓            NO _____

Number of jurors who so find ___4___

120. Naeem Williams is a good brother to his sister, Lisa Muse, and continues to provide her with guidance and support even though he is incarcerated.

YES ✓            NO _____

Number of jurors who so find ___10___

121. Naeem Williams has been, and continues to be, his sister, Astin Muse's, best friend.

YES ✓            NO _____

Number of jurors who so find ___4___

122. Naeem Williams has no arrests or convictions for violent or assaultive conduct other than his arrest and convictions in this case.

YES ✓            NO _____

Number of jurors who so find ___12___

123. Naeem Williams has no record of violent or assaultive conduct either prior to December 2004 or after July 16, 2005.

YES ✓            NO _____

Number of jurors who so find ___12___

1258

124. Naeem Williams had a reputation for being peaceful prior to his conviction in this case.

YES _____          NO __✓__

Number of jurors who so find _____

125. Naeem Williams has not been previously convicted of any other offense besides driving under the influence of alcohol.

YES __✓__          NO _____

Number of jurors who so find __12__

126. Naeem Williams helped Jammorius Briscoe while they were inmates together at FDC Honolulu.

YES __✓__          NO _____

Number of jurors who so find __12__

127. Naeem Williams was kind to Noel Viyar while they were inmates together at FDC Honolulu.

YES __✓__          NO _____

Number of jurors who so find __12__

128. Naeem Williams has had a calming influence with others while he has been in custody.

YES __✓__          NO _____

Number of jurors who so find __12__

1259

129. Naeem Williams has been respectful to Correctional Officers and Correctional Administrators during his incarceration.

YES  ✓                              NO  _____

Number of jurors who so find __12____

130. Naeem Williams is liked by his fellow inmates.

YES  ✓                              NO  _____

Number of jurors who so find __6____

131. Naeem Williams is a model inmate.

YES  ✓                              NO  _____

Number of jurors who so find __11____

132. Naeem Williams has had only two minor write-ups in his nine years in custody.

YES  ✓                              NO  _____

Number of jurors who so find __12____

133. Naeem Williams has never been in any fights or involved in any assaults during his nine years in custody.

YES  ✓                              NO  _____

Number of jurors who so find __12____

1260

134. Even though other inmates at FDC Honolulu are aware of Naeem Williams' offense, he has not been targeted or victimized because he has been respectful to those around him.

YES _____ NO __✓__

Number of jurors who so find _____

135. Naeem Williams developed Type 1 Diabetes at the age of 29.

YES __✓__ NO _____

Number of jurors who so find __12__

136. Naeem Williams, having been convicted of an offense against a child, may be targeted by other inmates.

YES __✓__ NO _____

Number of jurors who so find __12__

137. Naeem Williams has demonstrated his willingness to be productive and work at an assigned job while in the BOP since his incarceration at FDC Honolulu.

YES __✓__ NO _____

Number of jurors who so find __10__

138. Naeem Williams has been rule abiding, and complies with staff directions and work assignments while in custody, and as such he is considered to be a good prospect for peaceful and productive adjustment while in custody.

YES __✓__ NO _____

Number of jurors who so find __3__

1261

139. If sentenced to life in prison without the possibility of release, Naeem Williams' conduct during his years of pre-trial incarceration indicates that he will not be a danger to staff or to other inmates while in custody.

YES __✓__  NO _____

Number of jurors who so find __12__

140. Naeem Williams is likely to succeed in a prison environment because that is a highly structured situation that involves supervision.

YES __✓__  NO _____

Number of jurors who so find __10__

141. Naeem Williams has pursued religious studies while incarcerated at FDC Honolulu.

YES __✓__  NO _____

Number of jurors who so find __12__

142. Naeem Williams has taken advantage of all available programs while incarcerated at FDC Honolulu.

YES __✓__  NO _____

Number of jurors who so find __8__

143. Naeem Williams has been respectful to the Court and counsel during trial.

YES __✓__  NO _____

Number of jurors who so find __12__

31

1262

144. Naeem Williams accepts and understands the jury's verdicts from the guilt trial.

YES __✓__     NO _____

Number of jurors who so find __11___

145. Delilah Williams was guaranteed less than a life sentence before the Government knew the complete story about her role in the offense.

YES _____     NO __✓__

Number of jurors who so find _____

146. Delilah Williams lied to authorities even after she had a plea agreement with the U.S. Attorney, and her plea agreement has not been revoked.

YES __✓__     NO _____

Number of jurors who so find __3___

147. Delilah Williams was permitted to continue her cooperation agreement with the government even though she has assaulted people and disobeyed prison regulations while in custody.

YES __✓__     NO _____

Number of jurors who so find __5___

148. Delilah Williams has admitted, by her plea agreement, that she shares responsibility for the death of Talia.

YES __✓__     NO _____

Number of jurors who so find __12___

1263

149.  Under all the facts and circumstances, the jury wishes to show mercy.

YES _____          NO __✓__

Number of jurors who so find _____

As explained in the court's instructions, the law permits you to consider any other relevant mitigating information, in addition to the specific mitigating factors alleged by the Defendant listed above, so long as you find that it was proved by a preponderance of the evidence. As with the specific mitigating factors listed above, your findings in this regard need not be unanimous.

Did one or more jurors find that other relevant mitigating information was proved?

YES __✓__          NO _____

If you answered "yes," list separately each additional mitigating factor you found to be present and for each factor, the number of jurors who so found in the space provided immediately below:

150. Uyless Muse was a primary influence on Naeem Williams' use of corporal punishment on Talia Williams

YES ✓          NO

Number of jurors who so find - 8

151. Naeem Williams has received salvation

YES ✓          NO

Number of jurors who so find - 6

33

1264

152. Naeem Williams has apologized to his family and children

YES ✓ NO

Number of jurors who so find- 1

153 Naeem Williams has asked for forgiveness from Talia Williams

YES ✓ NO

Number of jurors who so find- 7

154. Naeem Williams has apologized to Tarshia Williams

YES ✓ NO

Number of jurors who so find - 6

155. Naeem Williams and Delilah Williams had conflicts about their finances.

YES ✓ NO

Number of jurors who so find - 10

156. After his marriage to Delilah Williams and/or their move to Hawaii, Naeem Williams lacked the support system he previously had.

Proceed to the next section (I-C) of this Form.

YES ✓ NO

Number of jurors who so find- 7

### C.     Weighing Process

To determine that the death sentence is appropriate, you must be in unanimous agreement that the proved aggravating factors sufficiently outweigh the proved mitigating factors to justify a sentence of death (or, in the absence of any mitigating factors, that the proved aggravating factors alone justify a sentence of death).  Answer each question below.

1.     <u>Death Sentence</u>

We determine, by unanimous vote, that a sentence of death shall be imposed.

YES  _____          NO  _✓_


2.     <u>Sentence of Life in Prison Without Possibility of Release</u>

We determine, by unanimous vote, that a sentence of life imprisonment without possibility of release shall be imposed.

YES  _____          NO  _✓_


3.     <u>Unable to Come to Unanimous Decision</u>

After due deliberation, we are unable to come to unanimous agreement on the issues of punishment.  We understand that the court will impose a sentence of life imprisonment without the possibility of release.

YES  _✓_          NO  _____


Proceed to the next section (II) of this Form.

1266

## II.    Imposition of Sentence

This is the last step in your deliberations.  You must record your verdict.

If you have unanimously concluded that a sentence of death is justified and therefore should be imposed on the Defendant (that is, in Section I-C, question 1, the jury answered "YES"), record your decision in Section II-A, Verdict -- Sentence of Death below, sign the verdict, read and sign the certification that follows in Section III, and notify the court that you have reached a decision.

If you have unanimously concluded that a sentence of life imprisonment without the possibility of release is justified and therefore should be imposed on the Defendant (that is, in Section I-C, question 2, the jury answered "YES"), record your decision in Section II-B, Verdict -- Life Imprisonment below, sign the verdict, read and sign the certification that follows in Section III, and notify the court that you have reached a decision.

If you were unable to reach a unanimous determination as to the Defendant's sentence (that is, in Section I-C, question 3, the jury answered "YES"), record your decision in Section II-C, Verdict -- Unable to Reach Unanimous Verdict below, sign the verdict, read and sign the certification in Section III, and notify the court that you have reached a decision.

## II-A.  VERDICT -- SENTENCE OF DEATH

Based upon our consideration of the evidence and in accordance with the court's instructions, we find by unanimous vote that a sentence of death shall be imposed on the Defendant.

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____

_____     _____
Foreperson

Date: _____

1268

## II-B.  VERDICT -- LIFE IMPRISONMENT

Based upon our consideration of the evidence and in accordance with the court's instructions, we unanimously find that a sentence of life imprisonment without release should be imposed on the Defendant.

_____      _____

_____      _____

_____      _____

_____      _____

_____      _____

Foreperson

Date: _____

## II-C.  VERDICT -- UNABLE TO REACH UNANIMOUS VERDICT

Based upon our consideration of the evidence and in accordance with the court's instructions, all twelve members of the jury were unable to reach a unanimous verdict.  We understand that in this event, the court will impose the mandatory sentence of life imprisonment without release.

## REDACTED

Foreperson

Date: _06-26-2014_

1270

## III. Certification

By signing below, each juror certifies that consideration of the race, color, religious beliefs, national origin, or gender of the Defendant or Talia Williams was not involved in reaching his or her individual decision, and that the individual juror would have made the same decision regarding the appropriate sentence for the offense in question no matter what the race, color, religious beliefs, national origin, or gender of the Defendant or Talia Williams.

$$\boxed{\textbf{REDACTED}}$$

ForEperson

Date: 06-26-2014

1271

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:878963@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content−Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/28/2017 at 9:14 AM CST and filed on 2/28/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09−cv−00105−JHP |
| **Filer:** | |
| **Document Number:** | 367(No document attached) |
| **Docket Text:** | |

**MINUTE ORDER by District Judge James H. Payne: Directing expedited reply by close of business on 3/1/2017 (Re: [347] SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk)**

**6:09−cv−00105−JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,          )
                                 )
    Petitioner/Defendant,        )
                                 )
 v.                              )      Case No. CV-09-00105-JHP
                                 )
UNITED STATES OF AMERICA,        )
                                 )
    Respondent/Plaintiff.        )

**GOVERNMENT'S SECOND MOTION TO EXCLUDE PROPOSED WITNESSES**

       **COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order excluding Roger Crawford, Judy House, Gary Nelson and Iva Hines as witnesses in the upcoming evidentiary hearing.  Pursuant to Local Civil Rule 7.1(g) and Local Criminal Rule 12.1, government counsel consulted with Barrett's attorney, David Autry, via telephone who opposes this motion.

**PROCEDURAL HISTORY**

       Barrett was convicted of three homicide offenses he committed when a state police tactical unit attempted to serve a warrant at his home.  The trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment on appeal.  *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008).  This Court subsequently denied § 2255 relief on all grounds.  Doc. 214.  On appeal, the Tenth Circuit denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to determine whether trial counsel, Roger Hilfiger and Bret Smith, ineffectively failed to investigate

1

and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

In accordance with this Court's scheduling order (Doc. 246), Barrett provided the government with a list of 71 proposed witnesses for appearance at the evidentiary hearing (Ex. 1). On January 30, 2017, the government moved to exclude several of those witnesses. On February 16, 2017, Barrett listed 49 witnesses for purposes of the parties' joint statement, not all of whom appeared on his original list. On February 24, 2017, the Court partially granted the government's motion to exclude and ordered the parties to submit an amended joint statement. Doc. 361. Based on the witness list and testimonial summary offered in the joint statement, the government now respectfully moves this Court to issue an order excluding four witnesses: Roger Crawford, Judy House, Gary Nelson, and Iva Hines.

**ARGUMENT**

**THE COURT SHOULD LIMIT BARRETT TO WITNESSES WHO CAN TESTIFY ABOUT FOREGONE PENALTY PHASE EVIDENCE**

This Court has noted the limited nature of the hearing contemplated by the Tenth Circuit, explaining that it "expects to hear live testimony from trial counsel whose conduct is at issue but otherwise encourages the submission of written exhibits in lieu of live testimony." Doc. 246. Elaborating on that statement, the Court recently stated, "The parties should be aware that this Court intends to strictly limit the evidence which will be admitted in the upcoming evidentiary hearing to evidence which is relevant to the issues which are currently before the Court." Doc. 361 at 8. The hearing has one purpose: "to determine what evidence could have been presented at the sentencing phase of Petitioner's trial in 2005 and whether Petitioner was prejudiced as a result of a lack of presenting that evidence in his trial." Doc. 248.

2

Despite the narrow scope of the upcoming hearing, Barrett still appears intent upon calling witnesses who can only offer irrelevant testimony.  The Federal Rules of Evidence generally apply to evidentiary proceedings under 28 U.S.C. § 2255.  *United States v. Francischine*, 512 F.2d 827, 829 (5th Cir. 1975); *see Bonfillo v. United States*, Civil no. 15-1015, 2016 WL 6124487, *7 (W.D. Pa. Oct. 20, 2016).  While the upcoming hearing concerns the presentation of evidence at a capital penalty phase proceeding, relevance remains a threshold concern, despite the liberal evidentiary provision of the Federal Death Penalty Act, 18 U.S.C. § 3593(c).  *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010).  Relevance has the same meaning under § 3593(c) as it does under Federal Rule of Evidence 401.  *Lujan*, at 854. (citing *United States v. McVeigh*, 153 F.3d 1166, 1212-13 (10th Cir. 1998) and *United States v. Basham*, 561 F.3d 302, 331-32 (4th Cir. 2009)).  Specifically, evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information]."  Fed. R. Evid. 401.

According to the joint statement (Doc. 340 at 5), Barrett intends to call Roger Crawford to testify in accordance with his previously submitted declaration.  Doc. 95 Ex. 92.[1]  As the government's objection to that declaration indicates (Doc. 340 at 17), the document contains an attack on the credibility of Cindy Crawford and a lengthy hearsay account of an interview he heard between his son and Leonard Post, a defense investigator.  None of the information offered

---

[1] On January 6, 2017, Barrett provided notice of his intent to call certain witnesses at issue in this motion including Roger Crawford, Judy House and Gary Nelson.  The government did not seek to preclude those witnesses in its original motion to exclude because they appeared, based on their relationships to the defendant, to have some potentially relevant observations to offer.  Now that Barrett has summarized their testimony in light of existing declarations, the irrelevance of their putative testimony has become clear, prompting this motion.

in the declaration concerns Barrett's mental health or social history, much less counsel's efforts to investigate and present such evidence.

According to the joint statement (Doc. 340 at 5), Barrett intends to call Judy House to testify in accordance with her recent declaration, submitted to the government in January.  Ex. 2.  Although Ms. House refers to Barrett as her second cousin, it appears from the relationship she describes that they are first cousins once removed, five degrees of consanguinity from one another.  In her declaration, Ms. House describes mental illnesses that have allegedly afflicted her children and other distant relations to Barrett.  Given the attenuated genetic connection between Barrett and the people identified by Ms. House, her proffered testimony would not assist the court.  The putative testimony will not corroborate the existing evidence that Barrett has close relatives, including his aunts and first cousins, who have allegedly suffered with mental illness.  *See e.g.*, Doc. 95 Ex. 78 at 1-2, Ex. 91 at 3, Ex. 98 at 1-2.  Moreover, Ms. House's declaration does not suggest Barrett had a familial connection to her mentally ill relatives that might have merited mitigating weight.  For instance, if House's allegedly schizophrenic or bipolar kin had participated in Barrett's upbringing, his trial attorneys might have relied on their influence as evidence in mitigation.  But no such connection appears to exist, leaving Ms. House to describe irrelevancies.

Gary Nelson is another distant relative who complains of mental illness – in his case severe panic anxiety and post-traumatic stress disorder.  As a second cousin once removed from Barrett, Nelson's mental illness does not establish any useful fact.  Apart from the genetic distance between Nelson and Barrett, at least one of the witness's two diagnosed illnesses, PTSD, necessarily stems from his own trauma, not that of the defendant.  The balance of Nelson's declaration vaguely describes encounters between Barrett and unidentified law

enforcement officials who did not arrest the defendant while a warrant remained pending. The foregone arrests, even if established, would not illuminate any issue before the Court, as they have nothing to do with trial counsel's performance or the allegedly omitted mitigation evidence.

Iva Hines is a former employer of Barrett's.[2] According to the summary offered in the joint statement, Ms. Hines will testify as follows:

> Thomas and Iva Hines run Thomas Hines Construction. Iva is 60 years old. Ken worked for them for years, dined at their table, been to their house 100s of times. Mrs. Hines will testify that Ken was a good worker, a good guy. They had no right to come in on him like they did. They all would have done the same as him. She will also testify that her husband and she were never contacted by Mr. Hilfiger and/or Mr. Smith. She does remember speaking to someone from the defense before the first state trial. … She will add that "Ken would do anything for you, give you the shirt off his back." If she had been contacted by his federal lawyers, she would have told them of her potential testimony and would have testified if called. "Kenny got along with everybody. He had no enemies."

Doc. 340 at 5. None of the information attributed to Ms. Hines has any relevance to the upcoming hearing. In fact, Barrett's attorneys presented testimony much like this during the penalty phase of trial. *See Barrett*, 797 F.3d at 1224 (noting the presentation of evidence about Barrett's non-violence, lack of prior felonies, good behavior in prison, and demonstrated abilities as a car mechanic). The defendant is now complaining that trial counsel failed to present evidence of a different stripe, and it would not assist the Court to hear testimony that corroborated a mitigation strategy Barrett has characterized as inadequate.

Because the putative testimony of the foregoing witnesses will not assist the Court in finding facts pertinent to the issue on remand, it should not permit their testimony.

---

[2] The purported testimony of Iva Hines was first made known to the Government in the Joint Pretrial Hearing Statement, which was submitted by the parties on February 16, 2017 (Doc. 340) prompting the necessity and preparation of this motion.

5

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to exclude the

testimony of Roger Crawford, Judy House, Gary Nelson, and Iva Hines.

Dated: February 28, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150


/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on February 28, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney

1279

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:879281@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content–Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 2/28/2017 at 3:39 PM CST and filed on 2/28/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 369(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM Central Standard Time on 3/2/2017 (Re: [368] Opposed MOTION to Exclude Witnesses). (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## UNOPPOSED MOTION TO FILE SEALED REPLY IN SUPPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully requests permission under Local Civil Rule 79.1(b) to file, under seal, a motion for partial summary judgment.  In support of this request, government counsel avers as follows:

1. Pursuant to this Court's order, the government has prepared a reply in support of its motion for partial summary judgment.  Like the underlying sealed motion, the reply relies upon and quotes mental health reports authored by Bill Sharp and Jeanne Russell.  Those reports are sealed, but their contents are integral to the government's position.

2. On March 1, 2017, undersigned counsel consulted with Barrett's attorney David Autry, via e-mail.  Mr. Autry stated that defense counsel did not oppose this request to file the reply under seal.

1

**CONCLUSION**

Respondent respectfully urges this Court to permit respondent to file an under seal reply

in support of its motion for partial summary judgment.

Dated: March 1, 2017:

                                        Respectfully submitted,

                                        MARK F. GREEN
                                        United States Attorney
                                        Eastern District of Oklahoma

                                        /S/ *Christopher J. Wilson*
                                        CHRISTOPHER J. WILSON, OBA # 13801
                                        Assistant United States Attorney
                                        520 Denison Avenue
                                        Muskogee, OK 74401
                                        Telephone: (918) 684-5100
                                        FAX: (918) 684-5150


                                        /S/ *Jeffrey B. Kahan*
                                        JEFFREY B. KAHAN, PaBN #93199
                                        Trial Attorney, Capital Case Section
                                        U.S. Dept. of Justice
                                        1331 F Street, NW; 6th Fl.
                                        Washington, DC 20530
                                        Telephone: (202) 305-8910
                                        FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on March 1, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

    Mr. David B. Autry dbautry44@hotmail.com
    Ms. Joan M. Fisher Joan_Fisher@fd.org
    Mr. Tivon Schardl Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

1283

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:879419@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Seal
Document(s)
Content-Type: text/html

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 3/1/2017 at 12:28 PM CST and filed on 3/1/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09-cv-00105-JHP |
| **Filer:** | |
| **Document Number:** | 371(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: granting [370] Government's Unopposed Motion to File Sealed Reply (Re: [347] SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk)**

**6:09-cv-00105-JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09-cv-00105-JHP Notice has not been electronically mailed to:**

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:          dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:          Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
|---|---|---|
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | **PETITIONER'S RESPONSE TO** |
| | ) | **GOVERNMENT'S SECOND MOTION** |
| UNITED STATES OF AMERICA, | ) | **TO EXCLUDE PROPOSED** |
| | ) | **WITNESSES (DOC. 368)** |
| Respondent. | ) | |
| | ) | |

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, identified four

witnesses – Roger Crawford, Judy House, Gary Nelson and Iva Hines – whom he intends to call

to testify at the evidentiary hearing in this Court.  Joint Pre-Hearing Statement at 5, filed

February 16, 2017 (Doc. 340) (hereinafter "Joint Statement").[1]  The Government filed a motion

---

[1] All references to the docket are to No. 6:09-cv-00105-JHP, unless otherwise specified.

Petitioner's Response to Government's                                    *Barrett v. United States*,
Second Motion to Exclude Proposed                                  OK-ED No. 6:09-cv-00105-JHP
Witnesses

to exclude these proposed witnesses. Government's Second Motion to Exclude Proposed Witnesses, filed February 28, 2017 (Doc. 368) (hereinafter "Second Motion"). Because excluding these witnesses would deny Mr. Barrett his right to a full and fair evidentiary hearing that accords with due process, Mr. Barrett objects and offers this response.

I.       Relevant Procedural History

The Government set forth the procedural history leading up to the evidentiary hearing. Second Motion at 1-2. In short, the Tenth Circuit reversed and remanded this Court's orders denying Mr. Barrett's request for an evidentiary hearing and denying Mr. Barrett's Amended Motion to Vacate, Set Aside or Correct Sentence, filed December 4, 2009. Doc. 95 (hereinafter "§ 2255 Motion"). *See* Order dated March 29, 2010 (Doc. 157) (denying evidentiary hearing); Order dated August 16, 2012 (Doc. 214) (denying § 2255 Motion).

Mr. Barrett appealed. The Tenth Circuit held that this Court erred in denying Mr. Barrett's request for an evidentiary hearing on his ineffective assistance of counsel claim because he had "presented sufficient evidence of deficient performance and prejudice to entitle him to an evidentiary hearing." *United States v. Barrett,* 797 F.3d 1207, 1232 (10th Cir. 2015).

Mr. Barrett contended that his trial attorneys were ineffective in failing properly to investigate his background and mental health. *Id*. at 1223. The Tenth Circuit phrased the question as: "whether Defendant's trial attorneys prepared a mitigation case that measures up to professional norms and, if not, whether that made a difference." *Id*. at 1224. The Court could not decide those issues on the record before it. *Ibid*.

As to deficient performance, the Tenth Circuit found that the evidence that Mr. Barrett proffered showed that his trial attorneys did little to investigate his background or mental health through his family. *Id*. at 1225. The Tenth Circuit directed this Court to determine whether Mr.

Petitioner's Response to Government's                                            *Barrett v. United States*,
Second Motion to Exclude Proposed                                         OK-ED No. 6:09-cv-00105-JHP
Witnesses

Barrett's trial counsel ever asked family members or Dr. Russell about Mr. Barrett's mental health, background, or family history. *Id*. at 1226. The Tenth Circuit concluded that Mr. Barrett's trial attorneys had an obligation to investigate carefully before deciding on a strategy for the penalty phase, and "there is evidence that they did not do so." *Id*. at 1229.

As to prejudice, the Tenth Circuit found that Mr. Barrett's family "has a long history of mental-health problems, alcoholism, and abuse." *Id*. at 1229. The Court relied on information about Mr. Barrett's extended family, including "relatives of his grandparents" who committed suicide or were involuntary committed to psychiatric hospitalizations. *Ibid*.

The Court further found that Mr. Barrett's childhood was marked by a largely absent father who drank, physically abused Mr. Barrett and Mr. Barrett's mother, and had extramarital affairs. *Ibid*. Mr. Barrett's mother also drank heavily, including while she was pregnant with Mr. Barrett, and "subjected him to physical and emotional abuse and neglect." *Id*. at 1229, 1230. Dr. George Woods, a psychiatrist proffered by Mr. Barrett, opined that Mr. Barrett's genetic history and poor upbringing increased his risk for developing mental disorders. *Id*. at 1230. The Court concluded that Mr. Barrett, "presented sufficient evidence of deficient performance and prejudice to entitle him to an evidentiary hearing." *Id*. at 1232. The Tenth Circuit charged this Court with determining "whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial." *Ibid*.

II.     Legal Standards

A federal court must conduct evidentiary hearings in § 2255 proceedings in accordance with due process. A defendant must be allowed to be heard and to support his allegations with evidence. *Machibroda v. United States*, 368 U.S. 487, 495 (1962). *See also Walker v. Johnston*,

Petitioner's Response to Government's                                    *Barrett v. United States*,
Second Motion to Exclude Proposed                                       OK-ED No. 6:09-cv-00105-JHP
Witnesses

3                                                                        1287

312 U.S. 275, 287 (1941) ("Not by the pleadings and the affidavits, but by the whole of the testimony, must it be determined whether the petitioner has carried his burden of proof and shown his right to a discharge.").

To decide a claim of ineffective assistance of counsel at the penalty phase of a capital trial, a reviewing court must determine whether trial counsel's performance comported with prevailing professional norms. "The assessment of prejudice should proceed on the assumption that the decisionmaker is reasonably, conscientiously, and impartially applying the standards that govern the decision," *Strickland v. Washington*, 466 U.S. 668, 695 (1984), in this case the decision whether life or death is an appropriate sentence.

"The governing legal standard plays a critical rule in defining the question to be asked in assessing the prejudice from counsel's errors." *Strickland*, 466 U.S. at 695. Beginning with *Lockett v. Ohio*, 438 U.S. 586 (1978), the Supreme Court consistently has overturned efforts to limit the scope of information that juries must consider when offered by a defendant as a reason for imposing a sentence less than death. *See, e.g., Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (invalidating mandatory death-sentencing law before *Lockett* due to its "failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death"); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("the sentencer in capital cases must be permitted to consider any relevant mitigating factor"); *Hitchcock v. Dugger*, 481 U.S. 393 (1987) (unanimously invalidating death sentence where jury was precluded by instruction from considering aspects of defendant's background that he offered in mitigation); *McKoy v. North Carolina*, 494 U.S. 433 (1990) (invalidating State's requirement that mitigating circumstances must be found unanimously); *id.* 494 U.S. at 442 ("The Constitution requires States to allow consideration of mitigating evidence

Petitioner's Response to Government's
Second Motion to Exclude Proposed
Witnesses

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

4

1288

in capital cases. Any barrier to such consideration must therefore fall.") (emphasis in original); *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (overturning Fifth Circuit standard for "constitutional relevance" of mitigation evidence on grounds it "has no foundation in the decisions of this Court"); *ibid.* (when Court has "addressed directly the relevance standard applicable to mitigating evidence in capital cases . . . [the Court] spoke in the most expansive terms"); *Smith v. Texas*, 543 U.S. 37, 44-45 (2004) (*per curiam*) (rejecting "Texas nexus" requirement that mitigation be causally related to the offense); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) ("sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future").

The Supreme Court has held that it is "unquestioned" that counsel for a capital defendant must conduct a thorough investigation of the defendant's background. *Porter v. McCollum*, 558 U.S. 30, 39 (2009) (*per curiam*), citing *Williams v. Taylor*, 529 U.S. 362, 396 (2000). This is because the Eighth Amendment requires that the sentencer be able to give meaningful consideration to any aspect of a defendant's character, background or record that he offers in mitigation. *Eddings v. Oklahoma*, 455 U.S. 104, 110-112 (1982), citing *Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (plurality). The sentencer may determine the weight to give to relevant mitigating evidence, but may not give such evidence no weight by refusing to consider it. *Eddings*, 455 U.S. at 114. Likewise, a reviewing court may not discount entirely proffered mitigating evidence. *Porter*, 558 U.S. at 43. As one court put it, "more is generally better when it comes to the quantity of evidence that a jury should be permitted to consider when deciding between life or death." *United States v. Cheever*, 423 F. Supp. 2d 1181, 1194 (D. Kan. 2006).

Petitioner's Response to Government's
Second Motion to Exclude Proposed
Witnesses

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

In keeping with Supreme Court precedent, the Tenth Circuit has held that it was error to prevent the defendant from presenting family background information. *Dutton v. Brown*, 812 F.2d 593, 601 (10th Cir. 1987). *See also Hooks v. Workman*, 689 F.3d 1148, 1207 (10th Cir. 2012) (finding prejudice where counsel failed to present, *inter alia*, family background evidence).

The Federal Death Penalty Act authorizes a capital defendant to put forth virtually anything as a mitigating factor. 18 U.S.C. § 3592(a). Mitigating evidence is admissible in a capital sentencing proceeding "regardless of its admissibility under the rules governing admission of evidence at criminal trials except that information may be excluded if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). As such, the Federal Rules of Evidence do not apply in the penalty phase. *See United States v. Fell*, 531 F.3d 197, 231-232 (2d Cir. 2008).

"Relevant" evidence in the penalty phase context must have "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without such information." *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010), quoting Rule 401, Federal Rules of Evidence. The United States Supreme Court has described the "low threshold for relevance" applicable to mitigating evidence in capital cases:

> When we addressed directly the relevance standard applicable to mitigating evidence in capital cases in *McKoy v. North Carolina*, 494 U.S. 433, 440-441, 108 L. Ed. 2d 369, 110 S. Ct. 1227 (1990), we spoke in the most expansive terms. We established that the "meaning of relevance is no different in the context of mitigating evidence introduced in a capital sentencing proceeding" than in any other context, and thus the general evidentiary standard—"any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" —applies.

*Tennard v. Dretke*, 542 U.S. 274, 284 (2004), quoting *McKoy*, 494 U.S. at 440.

Petitioner's Response to Government's
Second Motion to Exclude Proposed
Witnesses

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

On the page of *McKoy* cited in *Tennard*, *supra*, the Court said, "our holdings in *Skipper v. South Carolina,* 476 U.S. 1 (1986), and *Eddings v. Oklahoma*, *supra*, show that the mere declaration that evidence is 'legally irrelevant' to mitigation **cannot bar the consideration of that evidence if the sentencer could reasonably find that it warrants a sentence less than death**." *McKoy*, 494 U.S. at 441 (emphasis added).

The Eighth Amendment thus requires that the defendant be permitted to present evidence about his character and background to argue for a sentence of less than death. As such, the Sixth Amendment requires that counsel representing a person charged with a capital murder conduct a thorough investigation into the defendant's character and background. Finally, § 2255 requires this Court to allow Mr. Barrett to present evidence that is relevant as mitigation, as the Tenth Circuit directed.

III.    Witnesses at Issue

   A. Roger Crawford

      1.  Testimony

Roger Crawford is Mr. Barrett's uncle by marriage. He is married to Phyllis, who is the sister of Mr. Barrett's mother, Gelene Dotson. Doc. 71, Exhibit 92 to § 2255 Motion. Mr. Crawford was Mr. Barrett's neighbor. *Id*. at 1. Roger Crawford will be called to testify to three relevant mitigating concerns:

(1) Travis Crawford, Roger Crawford's son, is a blood relative of Kenneth Barrett (first cousin). Travis also suffers from serious mental health issues. Roger can attest to that familial genetic component, as well as that of other of his progeny and their progeny.

(2) Cindy Crawford was called by the government as a witness in aggravation at the penalty phase (Doc 350, FedTr vol.22, pp. 4575-4586).

Petitioner's Response to Government's                                          *Barrett v. United States*,
Second Motion to Exclude Proposed                                          OK-ED No. 6:09-cv-00105-JHP
Witnesses

7                                                                                       1291

(3) On February 21, 2017, the undersigned counsel met with Phyllis Crawford, mother to Travis Crawford, sister to Gelene Dotson (Mr. Barrett's mother), and wife to Roger Crawford, a witness who lays out in her declaration (Exh 91, Doc 404-3 at 90) her family history and her observations of Petitioner, Gelene Dotson and Ernie Barrett (Petitiner's father). Phyllis Crawford is now suffering from dementia. Undersigned counsel Joan Fisher met with Phyllis and Roger Crawford to discuss their anticipated testimony and to determine Phyllis Crawford's availability to testify personally to the contents of her declarations. Mrs. Crawford unquestionably appears to be suffering from symptoms consistent with dementia, which are sufficiently debilitating to render her testimony unavailable. Roger Crawford, as her husband, can and will testify to Phyllis Crawford's inability to testify. Roger Crawford is personally aware of the substantive matters relayed by Phyllis Crawford in her declarations. Roger Crawford witnessed the execution of those declarations and can attest to the fact that Phyllis Crawford signed her declarations.

2. Objection

The government objects to Roger Crawford's testimony as follows:

> According to the joint statement (Doc. 340 at 5), Barrett intends to call Roger Crawford to testify in accordance with his previously submitted declaration. Doc. 95 Ex. 92.1 As the government's objection to that declaration indicates (Doc. 340 at 17), the document contains an attack on the credibility of Cindy Crawford and a lengthy hearsay account of an interview he heard between his son and Leonard Post, a defense investigator. None of the information offered in the declaration concerns Barrett's mental health or social history, much less counsel's efforts to investigate and present such evidence.

Second Motion at 3-4.

3. Response

The fact that much of Roger Crawford's testimony may be based on hearsay does not render it inadmissible. It falls well within the broad definition of mitigation and relates directly to trial counsel's failure to properly investigate and prepare a witness it called on behalf of Mr.

Petitioner's Response to Government's
Second Motion to Exclude Proposed
Witnesses

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

8

1292

Barrett at sentencing.  Roger Crawford's testimony is relevant, material and admissible at the evidentiary hearing. The government's motion to exclude it should be denied.

   B.  Judy House

      1.  Testimony

Judy House is a relative of Mr. Barrett's.  Her father, Warren Dotson, was the brother of Mr. Barrett's maternal grandfather, Hugh Dotson.  Ms. House will testify to mental illness in the Dotson side of the family (Mr. Barrett's mother's family).  Ms. House will testify:

> There was a lot of mental illness on the Dotson side of the family.  For example, my son Steve Kitterman has been diagnosed with manic depression . . . . My nephew, Gary Nelson, has an anxiety disorder.  My daughter, Starla Willingham, has been diagnosed with manic depression and schizophrenia.  My nephew Marty Luper is very mentally ill.  My first cousin Sue Raby has two sons who also have serious mental health issues.  Sue's dad was John E. Dotson, brother to Warren & Hugh Dotson.  Sue also has a brother David Dotson that has mental health issues.  Sue had a brother Richard Dotson who was a doctor in Poteau, OK that shot & killed himself a few yrs [sic] back.

Declaration of Judy House, dated August 2016.

      2.  Objection

The Government objects to Ms. House's testimony on relevance grounds.  Second Motion at 4.  The Government argues that Ms. House's familial relationship is too "attenuated" to assist the court.  *Ibid*.  See also ibid. ("Ms. House's declaration does not suggest that Barrett had a familial connection to her mentally ill relatives that might have merited mitigating weight.").

      3.  Petitioner's Response

Whether testimony will assist the court is the standard for admission of expert testimony, not the standard for relevance.  *See* Rule 702(a), Fed. R. Evid.  The standard for relevance in capital sentencing proceedings is that stated in *McKoy*:  evidence is relevant if "the sentencer

Petitioner's Response to Government's
Second Motion to Exclude Proposed
Witnesses

*Barrett v. United States*,
OK-ED No. 6:09-cv-00105-JHP

9

1293

could reasonably find that it warrants a sentence less than death." *McKoy*, 494 U.S. at 441. Ms. House's testimony is relevant to the issues that the Tenth Circuit required this Court to consider: "whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health. *Barrett*, 797 F.3d at 1232.

In forming his opinion regarding Mr. Barrett, Dr. George Woods relied on information about mental illness in Mr. Barrett's extended family. *See* Doc. 71, Exh. 117 at 7-10. Mental health experts typically rely on such evidence of multi-generational mental illness to perform a reliable assessment. *Id*. at 5.

Ms. House's testimony is relevant to this issues that the Tenth Circuit directed this Court to decide, specifically Mr. Barrett's family background and mental health and the extent to which trial counsel conducted a reasonable investigation into these issues. This Court should overrule the Government's objection and permit Mr. Barrett to present Ms. House's testimony.

C. Gary Nelson

1. Testimony

Gary Nelson will testify that he is Mr. Barrett's second cousin, once removed. Mr. Nelson's mother, Karen, was Warren Dotson's daughter. Joint Statement, Affidavit 1 at 1 (Doc. 340) (Declaration of Gary Nelson).

Mr. Nelson will testify that several of his cousins suffer from various forms of mental illness. He will testify that, "You could pretty much throw a rock at any member of my family and hit someone who is mentally ill. Mr. Nelson himself has been diagnosed with severe panic anxiety and post-traumatic stress disorder. *Id*. at 1.

Mr. Nelson will testify that he has known Mr. Barrett all his life, and knows him to be kind, honest and compassionate. Mr. Nelson has never seen Mr. Barrett violent. *Id*. at 1.

Petitioner's Response to Government's                                          *Barrett v. United States*,
Second Motion to Exclude Proposed                                          OK-ED No. 6:09-cv-00105-JHP
Witnesses

10                                                                            1294

2. Objection

The Government objects to Mr. Nelson's testimony because, like Judy House, the Government does not think that his familial relationship to Mr. Barrett is close enough to "establish any useful fact." Second Motion at 4. The Government does not discuss Mr. Nelson's testimony about Mr. Barrett's character for kindness, honesty and compassion.

3. Response.

For the reasons discussed in connection with Judy House, Section III.B.3, *supra*, the Government's view of relevance in the capital sentencing context is contrary to *McKoy*. Further, Mr. Nelson's testimony about Mr. Barrett's character expressly is made relevant by Supreme Court precedent and the Federal Death Penalty Act. *Penry v. Lynaugh*, 492 U.S. 302, 303 (1989) ("[R]espect for humanity underlying the Eighth Amendment requires consideration of the character and record of the individual offender . . . ."), quoting *Woodson v. North Carolina*, 428 U.S. 280, 304 (plurality opn.)[2]; 18 U.S.C. § 3592(a)(8).

Mr. Nelson's testimony is relevant to the issues that the Tenth Circuit directed this Court to decide, specifically Mr. Barrett's family background and mental health and the extent to which trial counsel conducted a reasonable investigation into these issues. This Court should overrule the Government's objection and permit Mr. Barrett to present Mr. Nelson's testimony.

D. Iva Hines

1. Testimony

Iva Hines will testify that Mr. Barrett worked for her and her husband at their construction company. Joint Statement at 5. Mr. Barrett has visited the Hineses in their home hundreds of times. Mr. Barrett was a good worker and a good guy. *Ibid*. Mr. Barrett "would do

---

[2] *Penry* was abrogated on other grounds by *Atkins v. Virginia*, 536 U.S. 304 (2002).

Petitioner's Response to Government's                              *Barrett v. United States*,
Second Motion to Exclude Proposed                              OK-ED No. 6:09-cv-00105-JHP
Witnesses

anything for you, give you the shirt off his back." *Ibid*.  Mr. Barrett "got along with everybody.

He had no enemies." *Ibid*.

Mrs. Hines will testify that Mr. Barrett's federal trial attorneys did not contact her.  *Ibid*.

If she had been contacted by his federal trial attorneys, she would have told them this

information and would have testified for Mr. Barrett.

2.  Objection

The Government objects to Mrs. Hines's testimony on relevance grounds.  Second

Motion at 5.  In the next sentence, the Government observes that Mr. Barret's trial attorneys

"presented testimony much like this during the penalty phase of the trial."  *Ibid*.  Therefore, the

Government argues, Mrs. Hines's testimony "would not assist the Court."  *Ibid*.

3.  Response

Evidence that was relevant at trial is relevant in these proceedings, where this Court must

determine what evidence was available that Mr. Barrett's trial attorneys failed to discover and

present.  The fact that Mrs. Hines's testimony was consistent with the theory of mitigation that

Mr. Barrett's trial attorneys presented establishes its relevance.  *Salladhin v. Gibson*, 275 F.3d

1211, 1240 n.10 (10th Cir. 2002) (that proffered evidence was consistent with trial counsel's

penalty phase theory is relevant to reasonableness of counsel's failure to pursue and present

proffered evidence).

As discussed in connection with Judy House's testimony, the standard for admissibility

of proposed testimony is not whether it would assist the court.  The standard is whether "the

sentencer could reasonably find that it warrants a sentence less than death."  *McKoy*, 494 U.S. at

441.  *See* Section III.B.3, *supra*.

Petitioner's Response to Government's                                        *Barrett v. United States*,
Second Motion to Exclude Proposed                                        OK-ED No. 6:09-cv-00105-JHP
Witnesses

12

1296

As to the Government's argument that "it would not assist the Court to hear testimony that corroborated a mitigation strategy that Barrett has characterized as inadequate," Second Motion at 5, evidence on a point that was not established at trial is not cumulative of the evidence presented in support of that point.  The sentencing jury was asked to make special findings regarding mitigation.  Only seven out of 12 jurors found that the defense had established that Mr. Barrett was a good neighbor and friend.  Penalty Phase Special Verdict Form at 20, 23, 26.  Doc. 258, No. 6:04-cr-00115-JHP.  Only one juror found that the defense had established "other factors in defendant's childhood, background or character [that] mitigated[d] against imposition of the death sentence."  *Id*. at 21, 24.  Not all 12 members of the jury agreed that the defense established that Mr. Barrett was a good neighbor and friend.  As such, Mrs. Hines's testimony as to Mr. Barrett's character is not cumulative of the evidence that trial counsel presented.

Mrs. Hines's testimony is relevant to this issues that the Tenth Circuit directed this Court to decide, specifically Mr. Barrett's family background and mental health and the extent to which trial counsel conducted a reasonable investigation into these issues.  This Court should overrule the Government's objection and permit Mr. Barrett to present Mrs. Hines's testimony.

## CONCLUSION

For the foregoing reasons, Mr. Barrett respectfully requests that this Court enter an order denying the Government's Second Motion to Exclude Proposed Witnesses.

Petitioner's Response to Government's                                      *Barrett v. United States*,
Second Motion to Exclude Proposed                                     OK-ED No. 6:09-cv-00105-JHP
Witnesses

13                                                                                      1297

DATED this 2nd day of March, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Petitioner's Response to Government's                                  *Barrett v. United States*,
Second Motion to Exclude Proposed                                  OK-ED No. 6:09-cv-00105-JHP
Witnesses

14

1298

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 2nd day of March 2017, I caused the foregoing Petitioner's Response to Government's Second Motion to Exclude Proposed Witnesses to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Response to Government's          *Barrett v. United States*,
Second Motion to Exclude Proposed               OK-ED No. 6:09-cv-00105-JHP
Witnesses

15

1299

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail: dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>        Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>        Respondent. | CASE NO. CV-09-00105-JHP<br><br>**PETITIONER'S MOTION TO SUPPLEMENT RESPONSE IN OPPOSITION TO GOVERNMENT MOTION FOR PARTIAL SUMMARY JUDGMENT** |

Comes Now Petitioner, KENNETH EUGENE BARRETT, by and through his undersigned counsel, who, pursuant to Fed. R. Civ. P. 56(d), moves this Court for leave to supplement his Response in Opposition to the Government's Motion for Partial Summary Judgment (Doc. 366). This Motion is based on the files and records in this case, the attached declaration of counsel, and points and authorities cited herein. Mr. Barrett states the following as good cause for granting this Motion.

Pet'r's Mot. Suppl. Resp. MSJ                                    *Barrett v. U.S.A.*, No. CV-09-00105-JHP

1300

On February 23, 2017, the Government filed under seal a Motion for Partial Summary Judgment. Doc. 347. The government contends, *inter alia*, that state-court counsel John "Echols had investigated mental health, apart from his receipt of Sharp's findings, and received reports that Barrett did not have brain damage or any other mitigating condition." Doc. 347 at 5. The government claims its assertion is supported by the affidavit of Faust Bianco. *Ibid.*

Mr. Barrett's counsel have had Dr. Erin Bigler, Ph.D., review Dr. Bianco's testing. On March 1, 2017, Dr. Bigler advised Mr. Barrett's counsel that Dr. Bianco failed to perform a complete test of Mr. Barrett's executive functioning, the general area of brain function that is most pertinent to a murder case like this one. Executive functions include decision-making, impulse control and changing a course of action in response to new information. Due to Dr. Bianco's failure to complete the tests of executive functioning, there was no basis for him to state in his affidavit that "further neurological testing is unwarranted," Mot. Ex. 5 at ¶ 3, and that "[f]urther testing . . . would not be indicative of significant deficits in Mr. Barrett's functioning," *id.* at ¶ 4. Dr. Bigler's testimony would show that Dr. Bianco's statement that "[f]urther testing will not provide evidence that is inconsistent with Mr. Barrett's neuropsychological test results," *ibid.*, is meaningless because (a) Dr. Bianco did not perform a complete test for impaired executive functioning, (b) tests he did perform indicated brain dysfunction, and (c) his test results were consistent with the evidence of organic brain syndrome that Dr. Bill Sharp found two years later. Decl. Tivon Schardl dated Mar. 2, 2017, at ¶ 2.

Mr. Barrett's counsel had previously retained Dr. Deborah Miora, Ph.D., for the purpose of reviewing the testing done by Dr. Myla Young, Ph.D., and Dr. Bianco. On March 2, 2017, while conferring with Dr. Miora about her report, Mr. Barrett's counsel asked her opinion regarding Dr. Bianco's testing of executive functioning and his affidavit. Dr. Miora informed

Pet'r's Mot. Suppl. Resp. MSJ                    2                    *Barrett v. U.S.A.*, No. CV-09-00105-JHP

1301

counsel that she agreed with Dr. Bigler's assessment and she would include that information in her report. *Id.* at ¶ 3.

The pretrial record shows, contrary to the government's averment, that Mr. Echols received conflicting information about Dr. Bianco's conclusions, Doc. 95 Ex. 64 at 2 & 3, and that Mr. Echols concluded that federal defense counsel needed to hire an "expert on diagnosing organic brain disorders[] affecting [Mr. Barrett's] judgment and ability to respond cognitively in a crisis setting." Case No. CR-04-115-P, Doc. 50 at 8. *See also* Doc. 95 Ex. 34 (Decl. John Echols) at 4, 8. Post-conviction counsel hired such an expert, Dr. Young then, after her death, Dr. Bigler and Dr. Miora, and Mr. Barrett would have presented their findings, but the Court excluded them. Doc. 361 at 10-11.

As previously noted, although by operation of the local rules Mr. Barrett's response would have been due on March 8, 2017, five days after the date for submitting Dr. Bigler's report, this Court ordered Mr. Barrett to respond by February 27, 2017, four days before the report was due. Mr. Barrett had no control over the timing of the government's motion or the Court's order. That order deprived Mr. Barrett the opportunity to gather and present evidence with in support of his response. However, Dr. Bigler's report will be ready by noon on March 3, 2017.

Mr. Barrett's counsel conferred vial email with counsel for the government in an effort to resolve this matter. Counsel for the government advised Mr. Barrett's counsel that they oppose this motion.

WHEREFORE, Mr. Barrett respectfully requests this Court enter an order authorizing him to supplement his Response in Opposition to the Government's Motion for Partial Summary Judgment.

Pet'r's Mot. Suppl. Resp. MSJ                    3                    *Barrett v. U.S.A.*, No. CV-09-00105-JHP

1302

DATED this 2nd day of March 2017.

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender
/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender
/s/ *Tivon Schardl*
TIVON SCHARDL
Capital Trial & Habeas Attorney

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Pet'r's Mot. Suppl. Resp. MSJ                    4                    *Barrett v. U.S.A.*, No. CV-09-00105-JHP

1303

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 2nd day of March 2017, I caused the foregoing Petitioner's

Motion to Supplement Response in Opposition to Government Motion for Partial Summary

Judgment to be filed with the Clerk of the Court using the ECF System for filing, with service

via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of

Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants

who are counsel in this case.

<div align="right">

*/s/ Tivon Schardl*
TIVON SCHARDL

</div>

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | **CAPITAL CASE** |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | **DECLARATION OF COUNSEL IN SUPPORT OF MOTION FOR LEAVE TO SUPPLEMENT RESPONSE IN OPPOSITION TO MOTION FOR SUMMARY JUDGMENT** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

I, Tivon Schardl, declare the following:

1.     I am an attorney licensed to practice law by the State of Florida. Since 2000 I have been employed by the Federal Defender for the Eastern District of California. In 2008, the Defender assigned me the case of Kenneth Eugene Barrett. Although I ceased regular work on the case in 2010, I have been assigned responsibilities for the upcoming evidentiary hearing in Mr. Barrett's case. One of those responsibilities is presenting the testimony of Dr. Erin Bigler,

Decl. Counsel re Mot. Suppl. Resp. MSJ                              *Barrett v. U.S.A.*, CV-09-00105-JHP

Dr. Deborah Miora, and attorney Richard H. Burr.

2.     On or about February 28, 2017, co-counsel received a draft report from Dr. Erin Bigler, Ph.D. I reviewed the draft on the morning of March 1, 2017, and that afternoon I spoke with Dr. Bigler about it. Based on my review and that conversation, I asked Dr. Bigler whether I correctly understood the import of his opinions to support the following statements, and he confirmed that my understanding was accurate:

> that Dr. Bianco failed to perform a complete test of Mr. Barrett's executive functioning, the general area of brain function that is most pertinent to a murder case like this one. Executive functions include decision-making, impulse control and changing a course of action in response to new information. Due to Dr. Bianco's failure to complete the tests of executive functioning, there was no basis for him to state in his affidavit that "further neurological testing is unwarranted," Mot. Ex. 5 at ¶ 3, and that "[f]urther testing . . . would not be indicative of significant deficits in Mr. Barrett's functioning," *id.* at ¶ 4. Dr. Bigler's testimony would show that Dr. Bianco's statement that "[f]urther testing will not provide evidence that is inconsistent with Mr. Barrett's neuropsychological test results," *ibid.*, is meaningless because (a) Dr. Bianco did not perform a complete test for impaired executive functioning, (b) tests he did perform indicated brain dysfunction, and (c) his test results were consistent with the evidence of organic brain syndrome that Dr. Bill Sharp found two years later.

3.     On March 2, 2017, I spoke by telephone with Dr. Miora and asked for her opinion on the foregoing sentences. Co-counsel had previously retained Dr. Miora to review and, if appropriate, to be prepared to present the testing and conclusions of Dr. Myla Young, Ph.D., who died in 2013. We also had asked Dr. Miora to review Dr. Bianco's work and affidavit. Dr. Miora informed me that she concurred in Dr. Bigler's view and that she would include in her report her observations and opinions regarding Dr. Bianco's tests of executive functioning.

4.     In October 2016, co-counsel Assistant Federal Defender Joan Fisher prepared a contract for Mr. Burr to serve as an expert at the evidentiary hearing. She subsequently provided Mr. Burr with background materials on the case.

5.     In January and February 2017, I conferred with Mr. Burr about his work on the

Decl. Counsel re Mot. Suppl. Resp. MSJ          2          *Barrett v. U.S.A.*, CV-09-00105-JHP

1306

case. We discussed his ability to provide a report by March 3, 2017. On February 16, 2017, I spoke with Mr. Burr and he advised that he would provide a draft of his report by March 1, 2017.

6.      Upon my arrival at work on February 21, 2017, I opened an email Mr. Burr sent a few minutes earlier. The email stated that on February 17, 2017, Mr. Burr learned that he had one or more blockages in one or more arteries around his heart. Mr. Burr said that he was going into hospital on February 21, 2017, for a procedure intended to correct the problem. Although he expressed uncertainty about his time for returning to work, he advised that at best he would be out for two days. Mr. Burr said he would need until at least March 6, 2017, to complete his report.

7.      The same day I drafted a motion for extension of time to file Mr. Burr's report. Lead counsel David Autry forwarded the draft to counsel for the government. Later that afternoon, Mr. Autry forwarded to me an email from counsel for the government stating that there was no opposition to the motion.

I declare, under penalty of perjury, as provided in the laws of the United States of America, that the foregoing is true and correct and based on my personal knowledge.

Subscribed to by me this 2nd day of March 2017 in Sacramento County, California.


                                    _/s/ Tivon Schardl____
                                    TIVON SCHARDL

Decl. Counsel re Mot. Suppl. Resp. MSJ          3          *Barrett v. U.S.A.*, CV-09-00105-JHP

1307

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:879769@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 3/2/2017 at 4:09 PM CST and filed on 3/2/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 375(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: The Court hereby directs Petitioner to file a Sur–Reply to [347] Government's SEALED MOTION for Partial Summary Judgment by close of business on Monday, 3/6/2017. Said Sur–Reply shall specifically address whether or not Petitioner contests the 38 facts contained within the Government's Reply. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:       dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:       Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>       Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>       Respondent. | CASE NO. CV-09-00105-JHP<br><br>**PETITIONER'S PROFFER OF<br>EXPERT TESTIMONY** |

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, herey proffers the qualifications, opinions, reasons and bases therefor, rendered in this case by Deborah Miora, Ph.D.; Pablo Stewart, M.D.; Thomas Reidy, Ph.D.; Erin Bigler, Ph.D.; George Kirkham, Ph.D.; and Thomas Kosten, M.D. This Court previously excluded their testimony. Order (Doc. 361) at 10-11.

The attached exhibits demonstrate that Mr. Barrett was prepared to comply with this Court's scheduling order (Doc. 270), and Fed. R. Civ. P. 26(a)(2). The exhibits further demonstrate that the witnesses' previously excluded testimony would have been admissible under the Eighth Amendment to the United States Constitution, 18 U.S.C. § 3593(c) to show that Mr. Barrett suffered from mental and emotional problems that made him less culpable and that therefore stood as reasons to impose a sentence less than death, and, under the same provisions, to rebut the government's evidence in aggravation, including, but not limited to, the government's evidence of future dangerousness. *See*, *e.g.*, *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (invalidating mandatory death-sentencing law before *Lockett* due to its "failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death"); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("the sentencer in capital cases must be permitted to consider any relevant mitigating factor"); *Skipper v. South Carolina*, 476 U.S. 1 (1986) (jury must be permitted to consider positive adjustment to jail after arrest); *Hitchcock v. Dugger*, 481 U.S. 393 (1987) (unanimously invalidating death sentence where jury was precluded by instruction from considering aspects of defendant's background that he offered in mitigation); *McCoy v. North Carolina*, 494 U.S. 433 (1990) (invalidating State's requirement that mitigating circumstances must be found unanimously); *id.* 494 U.S. at 442 ("The Constitution *requires* States to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall.") (emphasis in original); *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (overturning Fifth Circuit standard for "constitutional relevance" of mitigation evidence on grounds it "has no foundation in the decisions of this Court"); *ibid.* (when Court has "addressed directly the relevance standard applicable to mitigating evidence in capital

cases . . . [the Court] spoke in the most expansive terms"); *Smith v. Texas*, 543 U.S. 37, 44-45 (2004) (*per curiam*) (rejecting "Texas nexus" requirement that mitigation be causally related to the offense); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) ("sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future"). Accordingly, the witnesses' excluded testimony is relevant to assessing prejudice from trial counsel's unreasonable errors. *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

DATED this 3rd day of March, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 3rd day of March 2017, I caused the foregoing Petitioner's Proffer Expert Testimony to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

### PETITIONER'S PROFFER OF EXPERT TESTIMONY

### FROM DEBORAH S. MIORA Ph.D.

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | CASE NO. CV-09-00105-JHP |
| Petitioner, | ) | |
| | ) | **DECLARATION OF DEBORAH S. MIORA, Ph.D.** |
| vs. | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

I, Deborah S. Miora, declare the following:

I am a licensed psychologist practicing in Beverly Hills, California. I earned my Masters and PhD degrees at the California School of Professional Psychology in 1982 and 1987, respectively. My doctoral research evaluated circumscribed personality factors in convicted child molesters and rapists, as compared to a group of non-offenders. I was licensed as a psychologist in the state of California in 1990. My first pre-doctoral internship was at the Center for Legal Psychiatry (formerly the UCLA Section on Legal Psychiatry). There I worked with mentally disordered offenders (NGI and MDSO) being released from state hospitals who were still considered dangerous and in need of intensive outpatient treatment and monitoring. I wrote quarterly progress reports for the courts assessing

1

1314

risk factors present at the time of evaluation periods and tracking progress in treatment administered two to four times per week. I worked with the severely mentally ill and in cases of trauma in emergency services, crisis intervention, and day treatment settings at a community mental health clinic throughout my graduate education at CSPP. I underwent didactic neuropsychology training while in graduate school, worked on an NIMH-funded grant assessing the relationship between juvenile delinquency and learning disorders, and was trained in the administration of the Halstead-Reitan neuropsychological test battery and the Luria for children. I trained in pediatrics and later undertook a two-year post-doctoral program in neuropsychology in order to update the skills and knowledge base I had developed during my graduate education. I have been trained in both psychodiagnostic and neurocognitive assessment. I developed a neuropsychological assessment program at a satellite community mental health clinic for children in 2005, and I have been extensively involved in pediatric outpatient and adult neurocognitive assessment at federal capital, habeas, and state levels for the past 10 years. I have specialized in juvenile justice and capital matters. I have written, lectured, and steered doctoral research in areas of competency; intellectual disability, age, and culpability; effects of race, age, and diagnosis on fitness and sentencing recommendations, and I have sat on committees of students developing built-in tools for assessment of feigned neurocognitive impairment.

I am on panels for the Los Angeles Superior Court as an expert in both juvenile justice and neuropsychology. I have conducted over 350-400 criminal cases

2

at various phases in legal proceeding, have consulted to the California Appellate Project on issues pertaining to neurocognitive assessment for 13 years, and have taught in both clinical and forensic capacities at the graduate level over the past 25 years. I have presented on the value of neurocognitive data at conferences and to attorneys and educators. I have testified before both state and federal courts over the past ten years. I maintain an active private practice treating couples, adults, and children in psychoanalytic psychotherapy with particular emphasis on longstanding effects of trauma and how different brain-based cognitive and psychiatric conditions affect the processing and organizing of experience. Further information about my background and qualifications can be found in the curriculum vitae appended to this declaration.

Lawyers representing petitioner Kenneth Barrett asked that I evaluate the reliability and validity of Dr. Myla Young's testing protocol, test data, results and the interpretations contained in her declaration, and on that basis, whether I would be able to testify her assessment. I was told that Dr. Young died in 2013. I was provided Dr. Young's raw test data and declaration related to her assessment of Mr. Barrett in 2009. I was also provided the raw data and declaration of Dr. Faust Bianco who evaluated Mr. Barrett at he time of his initial trial proceedings. I reviewed the declarations of Drs. George Woods and Bill Sharp. Finally, I was provided the declarations of a number of persons who knew Mr. Barrett throughout the course of his life and were able to provide more intimate accounts of their perceptions and experiences relevant to his person and functioning. A complete list

3

of the materials I considered is appended to this declaration.  In summary, the set of records I was provided mirrored that Dr. Young was offered and on which she opined in order that my assessment of her data be comparably suited.

Neuropsychologists customarily review each other's work in clinical and forensic contexts whether called upon to do so because a patient seeks a second opinion, because a clinician is unavailable, as in this case, or due to the adversarial nature of legal proceedings. My methodology for reviewing the work of another neuropsychologist includes consideration of the following variables: (1) was the battery of tests appropriate to address the referral question; (2) were the tests robust as to their reliability and validity as measures of brain function; (3) were the tests selected normatively appropriate to the individual being assessed; (4) was the scoring and were interpretations generated consistent with the data; (5) were the conclusions reached scientifically derived and consistent with the data and interpretations relative to the individual (ipsative analysis), normative populations (compared to matched peers), and were they an accurate representation of that individual's abilities and functions (was effort properly assessed and considered); (6) was the literature relied upon current and relevant to the referral questions and conclusions.

I determined that Dr. Young's battery of tests amply covered the major brain functions considered necessary to establish presence or absence of organic brain dysfunction.  I determined that the tests she used were supported by research, sound test development protocol, and were normatively appropriate to the individual being assessed, in this case Mr. Kenneth Barrett.

I reviewed Dr. Young's scoring, and where unavailable, produced scoring protocols myself that are generated from computer programs (WAIS-IV and WMS-IV).   Minor errors were noted but did not affect overall interpretations Dr. Young generated or opinions she reached that were detailed in her declaration. My scoring sheets are appended to this declaration.

Evaluations of effort and feigned cognitive impairment are essential to any assessment to establish the validity and reliability of interpretations of the test data. Dr. Young administered both stand-alone measures of effort and tests  with built-in measures of effort, measures that serve double-duty in assessing neurocognitive functions and effort.   She surmised, and I concur, that Mr. Barrett made a strong effort on the tests, and that, therefore, they could be considered a valid representation of his neurocognitive status and functioning.   Her procedures were consistent with recommendations and aspirations generated by the leading neuropsychological bodies at the time (including the INS, the AACN, and NAN). Her methods and procedures also reflected those that were available at the time of Mr. Barrett's trial in 2005.

Dr. Young's selection of tests allowed for assessing Mr. Barrett's performances across different measures and brain functions, relative to himself and others, as well as within the context of the offenses with which he was charged.  Test results are meaningful as applied to real world situations where their ecological validity has meaningful implications.  For example, the capacity to inhibit unwanted responses, to attend selectively to material, and to quickly switch and alternate one's

5

attention and responses requires thought and the ability to move smoothly back and forth while keeping in mind the objectives. The ability to think on one's feet or to work on ideas in one's head and in the moment is another key aspect of everyday functioning that is required in other than rote and well-learned functioning.

Dr. Young's data showed Mr. Barrett's areas of weakness and brain dysfunction particularly in the areas of processing information quickly (particularly visual information), working with information deftly "on-line" or in the moment, and being able to use rapidly changing information to inform weighing alternatives, making decisions, inhibiting or initiating a response, and essentially thinking about one's behavior rather than simply reacting impulsively and quickly in the moment. These executive functions are essential to conducting oneself in a reasoned and measured manner in a variety of novel situations.

Having reviewed and scrutinized Dr. Young's data and her declaration, I can and do concur with her findings, interpretations of the data, the opinions she developed, and the conclusions she drew about Mr. Barrett's neurocognitive deficits and relative strengths. I concur with Dr. Young's findings and conclusions to a reasonable degree of neuropsychological certainty. Her comprehensive description of brain-based functions and evaluation of the roles they serve in processing, perceiving, organizing, and responding to incoming stimuli and generating or inhibiting behavioral responses were consistent with how I was taught and my way of conceptualizing brain-behavior relationships. Her assessment also was consistent with the neuropsychological literature and normative standards in operation in 2005

6

and in 2009.

By contrast, Dr. Faust Bianco's data, while in some ways reflecting an effort to assess all relevant areas of brain function, were limited to the extent that he did not fully assess the vital areas of attention and executive function that have to do with the processing or registering of information, verifying and organizing what is registered, and making informed and thought-based decisions about whether and how to respond to the information. Specifically, Dr. Bianco did not complete the Delis-Kaplan Executive Functioning Test nor tests that were available that cover this array of executive functions. His raw data on the card-sorting test is partial and contains  initials, the meaning of which is incomprehensible. A full assessment of executive functioning would have been essential to a meaningful forensic assessment given the nature of Mr. Barrett's legal charges at that time.

I am unable to state whether Dr. Bianco's interpretations of the data and his conclusion is reliable and whether it reflected the norming standards of the time because Dr. Bianco neglected to provide the sources of norms he used in analyzing his data set, excepting tests for which he provided computer printouts (WAIS-III and WMS-III) and aspects of the Halstead-Reitan battery he administered. This omission would have left Dr. Bianco vulnerable on cross-examination because he would have been unable to back up his conclusions by reference to normative standards or comparison groups used to classify his data that may or may not have been appropriate sources at the time of his evaluation.

I noted some disparities between the conclusion that Dr. Bianco drew in his

7

affidavit stating that no further assessment was necessary as his battery of tests revealed no neurocognitive deficits and the raw data he provided.  There were a number of physical renderings of material by Mr. Barrett that showed tremor and problems with stopping or inhibiting himself that would have warranted further investigation.  Thus, it is my opinion that his work was not complete, especially in light of the nature of the charges and the forensic context in general.

Dr. Bianco also administered the MMPI, which is a well-researched and respected longstanding measure of personality. The test revealed depressive and anxiety trends as well as other features relevant to Mr. Barrett's personality and brain-based style and status at that time. That is, the MMPI added perspective to the neurocognitive evidence that Mr. Barrett had what some clinicians would call organic brain syndrome, brain-based dysfunction that affected motor, neurocognitive, and emotional processes.

Having reviewed the declaration and test data of Dr. Myla Young, I am prepared to testify that her test data, results, and conclusions about Mr. Barrett's neurocognitive status and areas of dysfunction were sound and accurate.  Had I been requested at the time of his trial proceedings to perform a neurocognitive assessment of Mr. Barrett for an evaluation of possible organic brain disorders affecting his judgment and ability to respond with cognitive clarity in a crisis setting, I would have performed an assessment like Dr. Young's and could have testified to the conclusions she presented in her declaration. Accordingly, I am incorporating her declaration, which is appended to this declaration, as a reflection of the opinions

8

I would render in this case, the reasons and bases therefor.

I have been paid $250 per hour for my work on this case. If I had been permitted to testify, I anticipated being paid approximately $28,500 for the total of my time.

I declare under penalty of perjury that the statements made and opinions presented in this declaration are a true and accurate representation of my conclusions and were generated by myself.

Subscribed to by me this 3rd day of March 2017 in Los Angeles County, California.

*/s/ Deborah S. Miora*
DEBORAH S. MIORA, Ph.D.

# *Deborah S. Miora, Ph.D.*

*Clinical, Forensic and Neuropsychology*
*CA License # PSY11599*

---

435 North Roxbury Drive, Suite 406
Beverly Hills, California 90210
Tel and Fax: (310) 550-8443

## CURRICULUM VITAE

### EDUCATION

Analytic candidate at PCC

Certificate One-Year Program in Psychoanalytic Psychotherapy (2013)
Certificate Second-Year Program in Psychoanalytic Psychotherapy (2015)
*Psychoanalytic Center of California*
Los Angeles, CA

Ph.D., Clinical Psychology (1987)
M.A., Clinical Psychology (1981)
*California School of Professional Psychology*
Los Angeles, CA

Postdoctoral Certificate in Neuropsychology (2006)
*Fielding Graduate Institute*
Santa Barbara, CA

B.A., with honors
Psychology and Sociology (1979)
*Ithaca College*
Ithaca, New York

### PROFESSIONAL AFFILIATIONS & EXPERIENCE

*American Psychological Association, Member*
*-Division 39 (Division of Psychoanalysis)*
*-Division 40 (Division of Neuropsychology)*
*-Division 41(American Psychology-Law Society)*

*National Register of Health Service Providers in Psychology, Provider*

*National Academy of Neuropsychology, Member*

*International Neuropsychological Society, Member*

*Qualified Medical Examiner (QME), State of California*

*Los Angeles Superior Court Panel, Expert in Neuropsychology*

*Los Angeles Superior Court Panel, Expert in Juvenile Justice*

*Psychotherapy:* Pediatric and adult in individual and family modalities.

*Neuropsychological Assessment:* Pediatric and adult, clinical and forensic

*Forensic Evaluation:* Capital and other criminal psychosocial, sentencing, competency, fitness and neuropsychological evaluations, civil evaluations, medico-legal evaluations, deposition and testimony

*Academic Work:* Graduate level teaching, chair and committee member for dissertations, quality assurance assessment at practicum and internship training sites, student advisement

*Indirect Services:*  Consultation to teachers and staff in educational setting, mental health and health professionals, attorneys regarding mental health issues, invited speaker and lecturer, presentations at internship training sites and professional organizations

*Specialties:*   Psychoanalytic and cognitively-oriented psychotherapy with children and adults, evaluation and intervention in cases of attachment and trauma, forensic neuropsychological and psychosocial evaluations with emphasis on competency and capital cases, pediatric clinical and juvenile justice neuropsychological evaluation of complex neurocognitive and neuropsychiatric cases of developmentally, intellectually, and psychiatrically challenged persons[1]

## PROFESSIONAL HISTORY

*2012-2015*          *Associate Professor,* **California School of Forensic Studies, Alliant International University at Los Angeles, CA**
Teach core clinical and forensic coursework in developmental bases of behavior, psychopathology, assessment, multicultural perspectives, juvenile and adult assessment of competencies, doctoral dissertation development and execution of research in areas of juvenile justice, multicultural issues and neuropsychology; mentorship of students matriculating through program.

*2010-2012*          *Assistant Professor,* **California School of Forensic Studies, Alliant International University at Los Angeles, CA**
Teach core forensically oriented coursework in developmental bases of behavior, psychopathology, multicultural perspectives, juvenile and adult assessment of legal competencies, doctoral dissertation development; chair dissertations and membership on committees in juvenile justice, multicultural issues and neuropsychology; participate in review of applicants and mentorship of students in program.

*2008-2009*          *Assistant Professor & Program Director,* **California School of Forensic Studies, Alliant International University at Los Angeles, CA**
Graduate level course work, dissertation committee work, and administrative direction of faculty, students and staff, admissions interviews, assessment of compliance for accreditation, program development

---

[1] I was trained in pediatrics for two years in my Ph.D. Program; and in forensics at one-year internship treating MDSO's and NGRI's, a number of whom were developmentally and psychiatrically disabled.  I undertook an additional two-year post-graduate training in neuropsychology and was supervised by a pediatric neuropsychologist on cases of developmental and intellectual abilities.

I developed a neuropsychological component to a satellite clinic of a large mental health clinic in a disadvantaged area of Los Angeles.  There I evaluated MR/ID, low birth weight, in utero substance exposed, learning disabled, and other developmentally challenged youth.  I am on a Los Angeles Juvenile Justice panel as an expert in evaluating difficult to place youth who present with complex clinical pictures.  I evaluate MR in adult and youth defendants using neurocognitive, adaptive functioning, and other assessment tools.   My application and work sample have been accepted to sit for boards in pediatric neuropsychology (ABPdN).

**Curriculum Vitae for Deborah S. Miora, Ph.D.**                    **Page 3 of 8**

*2006-present*  **Adjunct Faculty, Center for Forensic Studies, Alliant International University at Los Angeles, CA**
Graduate level coursework in mental health assessment of legal competencies and dissertation development consultation

*1990-present*  **Private Practice, Beverly Hills, CA**
Individual and family treatment, clinical and forensic psychosocial and neuropsychological evaluation, supervision and consultation, neuropsychological consultation to attorneys, educators, physicians and mental health professionals

*1990-1997*  **Adjunct Clinical Professor, California School of Professional Psychology, Alhambra, CA**
Graduate level coursework and dissertation and Psy.D project committee member

*1993-1995*  **Director of Counseling, Hollywood Sunset Community Clinic, Los Angeles, CA**
Administered provision of mental health services by 15-17 interns, training provided by volunteer staff of seven supervisors, and daily operation of department

*1993-1994*  **Independent Contractor, Beverly Hills Psychological Services, Beverly Hills, CA**
Comprehensive evaluation in criminal, civil and worker's compensation cases

*1992-1993*  **Supervisor, Leeway School for Educational Therapy, Alhambra, CA**
Supervision of six therapists who provided mental health services to children with significant neurocognitive, neuropsychiatric and environmental challenges

*1990-1992*  **Evaluator, Barrington Psychiatric Center, Los Angeles, CA**
Full evaluation and written report in Workers' Compensation cases

*1988-1990*  **Staff Psychologist, California School of Professional Psychology, Clinical Field Training Office, Los Angeles, CA**
Graduate level teaching and clinical field training site development and liaison

*1984-1990*  **Psychological Assistant, Beverly Hills and Los Angeles, CA**
Psychodiagnostic assessment in Workers' Compensation cases and individual and couples psychotherapy

*1986*  **Case Worker, Didi Hirsch Community Mental Health Center, Culver City, CA**
Comprehensive intake interviews, intensive group, family, and individual therapy in adult day treatment program serving severely mentally ill population

*1980-1986*  **Emergency Services Crisis Consultant, Didi Hirsch Community Mental Health Center, Culver City, CA**
Consultant to individuals, families, social service agencies, and professionals; community outreach; 5150 evaluations coordinated with other agencies; liaison to medical and legal system in trauma cases; six-week crisis intervention

## SPECIALIZED FORENSIC WORK

*2000-present*        ***Testimony and Deposition***
Provide expert opinion, testimony and deposition in criminal and civil matters most often based on direct examination of individuals undergoing capital and competency cases, juvenile competency and fitness, and other matters in which court seeks education

*2004-present*        ***Consultant,* California Appellate Project, San Francisco, CA**
Review neuropsychological and other relevant data; consult about analysis and recommended additional evaluation in capital case appeals at guilt and penalty phases

*2003-present*        ***Competency and Neuropsychological Evaluation,* State and Federal Levels**
Competency evaluation and neuropsychological assessment in pretrial, sentencing and post-conviction habeas phases of capital and other criminal cases

*1994-present*        ***Psychosocial and Sentencing Evaluation,* State and Federal Levels**
Development of psychosocial histories in context of charges and convictions to be presented as evidence in mitigation

*1990-present*        ***Psychosocial and Neuropsychological Evaluation of Medico-Legal Cases***
Evaluation, deposition, and testimony in variety of civil matters

## SPECIALIZED PEDIATRIC WORK

*2003-present*        ***Juvenile Forensic Neuropsychological Evaluation,* Beverly Hills, CA**
Assessment of competency, fitness and related psycholegal questions

*2005*                ***Director of Neuropsychology,* Bright Minds Institute, Los Angeles, CA**
Neuropsychological consultation to pediatric neurologist, parents and educators

*2004-2006*           ***Neuropsychological Consultation,* Didi Hirsch Community Mental Health Center, Inglewood, CA**
Development and provision of neuropsychological evaluation service to ethnically and clinically diverse pediatric cases; consultation to therapists, social service agencies, educators and psychiatrists

*2003-present*        ***Neuropsychological Consultation,* Maple Center, Beverly Hills, CA**
Provision of consultation to clinicians, in-service training to staff on working with families and parents and neuropsychological assessment

## INTERNSHIP AND PRACTICUM EXPERIENCES

*1982-1983*           ***Pomona Valley Mental Health Authority, Pomona, CA***
Psychological Intern: Individual and family therapist to children and adults, PET evaluation for 5150, exposure to adult HRNB

*1981-1982*          *Center for Legal Psychiatry (formerly UCLA Section on Legal Psychiatry),* **Santa Monica, CA**
Psychological Intern: Individual and group therapist to MDSO and NGI patients released from inpatient psychiatric programs, prepared and submitted quarterly progress reports to courts with emphasis on risk assessment of current biopsychosocial stressors and status of offenders

*1980-1981*          *Intercommunity Child Guidance Clinic, Whittier, CA*
Practicum Student:  Intake interviews; individual, group and family systems therapist to community population of self-referred, school and court ordered children, adults and families

*1980*               *Mid-Valley Diagnostic Center,* **West Covina, CA**
Practicum Student: Data collection for NIMH-funded grant assessing relationship between juvenile delinquency and learning disorders, administered neuropsychological assessment instruments including the LNNB for Children, portions of the children's version of the HRNB and adjunctive measures, scored and analyzed protocols, wrote reports, provided parent feedback

*1979-1980*          *Portals House, Inc, Los Angeles, CA*
Practicum Student: Intake interview, case management and therapy with seriously and chronically mentally disordered adults in transition from hospital to community assisted living

---

## SELECTED LECTURES AND IN-SERVICES

*1991*               *Body as Waste Receptacle for Unwanted Contents*. Original Paper presented at SPEAR conference, Los Angeles, CA

*2003-2004*          *Invited Lectures in Assessment Issues*. California Graduate Institute, Los Angeles, CA

*2004*               *Pediatric Neuropsychological Evaluation*. Invited Presentation to Interns and Staff at Maple Counseling Center, Beverly Hills, CA

*2005*               *How to Talk to Parents*. Invited Presentation to Interns and Staff at Maple Counseling Center, Beverly Hills, CA

*2005*               *Pediatric Neuropsychological Evaluation*. Presentation to team of interns and staff, Didi Hirsch Community Mental Health Center, Inglewood, CA

*2005*               *Pediatric Neuropsychological Evaluation*. Invited Presentation to Interns and Staff at Maple Counseling Center, Beverly Hills, CA

*2005*               *Neuropsychological Evaluation in IME Cases*. Presentation at annual meeting of the American College of Forensic Psychiatry, San Francisco, CA

*Curriculum Vitae for Deborah S. Miora, Ph.D.*                                        ***Page 6 of 8***

*2006*                  *Neuropsychological Evaluation of Capital Defendants*. Presentation at annual
                        meeting of International Society of Traumatic Stress Studies, Hollywood, CA

*2007*                  *How to Talk to Parents*. Invited Presentation to Interns and Staff at Maple
                        Counseling Center, Beverly Hills, CA

*2007*                  *Value of Neuropsychological Assessment in Post-conviction Cases*. Invited Lecturer
                        to the California Appellate Project (CAP), San Francisco, CA

*2007*                  *Neuropsychological Assessment: Instruments and what they Measure.* Invited
                        Lecturer to the California Appellate Project (CAP), San Francisco, CA

*2008*                  *Value of Neuropsychological Evaluation in Capital Cases*. Presentation at Annual
                        Meetings of American College of Forensic Psychiatry, San Francisco, CA

*2009*                  *Frontal Lobes and Executive Function*. Presentation at Annual Capital Case Defense
                        Conference, Monterey, CA

*2009*                  *Juvenile Brain and Neuropsychological Functioning*, Invited Speaker. Los Angeles
                        County Public Defender, Los Angeles, CA

*2009*                  *Neuropsychological Assessment with Juveniles – Utility and Reliability*. Invited
                        Speaker, Los Angeles County Public Defender, Los Angeles, CA

*2010*                  *Competency and Fitness in Juveniles: Relationship between Neurocognitive
                        Evaluation of Fixed and Dynamic Factors and Dispositional Decisions*. Paper
                        delivered at International Association of Forensic Mental Health, Vancouver, British
                        Columbia.

*2013*                  *Invited Speaker, Airtalk, KPCC*, discussant on issue of knowing right from wrong in
                        California youth case of 10-year old who murdered his father.

Accepted Posters and Papers at Peer-Reviewed Conferences

Bendimez, L., Miora, D. S., Holt, S., & Slavin, T. J  (2011). *Does sexual orientation of couple influence
psychologists' perceptions of intimate partner violence?*  Paper accepted for presentation at the 2012
International Congress of Psychology Conference, Cape Town, South Africa.

Caffero-Tolemy, A., Fass, T., Miora, D.S., Wolff, M. Intelligence as a mediator in the relationship
between Asperger's traits and juvenile offending.  Poster presented at 2012 Annual American
Psychology-Law Society Conference, San Juan, Puerto Rico.

Inomaa-Bustillos, E., Miora, D. S., LaCarra, Robert, & Murphy, L.  (2011). *Probation officers'
conceptualizations of externalizing behavior in juvenile offenders*.  Poster accepted for presentation at the
2012 International Congress of Psychology Conference, Cape Town, South Africa.

Lance, D., Ermshar, A., Boone, K., & Miora, D. S. (2011).  *Evaluating executive functioning in
individuals with bipolar spectrum disorder using selected subtests from the D-KEFS*.  Paper accepted for
presentation at the 2012 California Psychological Association Conference, Monterey, CA.

Sobel, N. K., Boone, K., Ermshar, A., Miora, D., & Cottingham, M. (2013, March). *Bridging the gap between test versions: WAIS-III/IV Matrix Reasoning as an embedded performance validity indicator.* Paper presented at the 2013 Annual Conference of the American Psychology-Law Society.

Tross, R., Ermshar, A., Dixon, D., & Miora, D. S. (2011). *Assessing community and mental health perspectives on the use and effectiveness of sexual offender policies with juvenile sexual offenders.* Paper presented at the 2012 AP-LS Conference in San Juan, Puerto Rico.

Baumgart, M., Skidmore, S., Leark, R., & Miora, D. S. (2011). *Assessing response style in criminal forensic evaluations: A survey of current practices among professionals*. Paper presented at the 2011 American Psychology-Law Society Conference, Miami, FL.

Baumgart, M., Skidmore, S., Leark, R., & Miora, D. S. (2011). *Common practices in competency and criminal responsibility evaluations among psychologists with varying professional credentials*. Poster presented at the 2011 American Psychology-Law Society Conference, Miami, FL.

Geshti, S. N., Miora, D. S., Fass, T., & Dixon, D.  (2011). *Juvenile sexual offending*. Paper presented at the 2011 American Psychology-Law Society Conference. Miami, FL.

## RESEARCH INTERESTS AND ACTIVTIES

*2010 –*                CSFS representative to IRB committee on Los Angeles campus.  Duties include review of Masters level, doctoral research, and faculty grant proposals; make recommendations for clarification, revision, decisions for acceptance; counsel students about revisions; provide guidance to CSFS on policy and procedures relating to research with human participants

*2008 –*                CSFS chair and committee person for doctoral dissertations in forensic psychology; areas of juvenile justice, competency, Miranda rights, neuropsychology of intellectually and developmentally challenged youth, effort testing in executive function measures and IQ testing

*2009 – 2011*        CSFS involvement in I-MERIT academic implementation of diversity and international perspectives, evaluation of faculty candidates for Mexico immersion scholarship; participation in preparation of FIPSIE grant for diversity training of faculty and students

Neuropsychological underpinnings of functional abilities relevant to competency to stand trial, waive Miranda Rights and juvenile fitness issues

Juvenile competency and neuropsychological underpinnings; immature brain development as related to juvenile and capital matters

Executive functions as measures of reasoning, judgment and impulse control in capital cases

Development of test battery to measure subcortical functions related to higher-order cognition

## RESEARCH PUBLICATIONS

Participant in Proceedings: Romero, Heather R., Lageman, Sarah K., Kamath (Vidyulata), Vidya, Irani, Farzin, Sim, Anita, Suarez, Paola, Manly, Jennifer J., Attix, Deborah K. and the Summit participants (2009). Challenges in the Neuropsychological Assessment of Ethnic Minorities: Summit Proceedings. *The Clinical Neuropsychologist*, 23:5, 761 – 779.

Salseda, L. M., Fass, T. M., Miora, D. S., & Leark, R.  (2010). An evaluation of *Miranda* rights and interrogation in autism spectrum disorders.  *Research in Autism Spectrum Disorders* (2010), doi: 10.1016/j.rasd.2010.06.014

Solomon, R. E., Boone, K. B., Miora, D., Skidmore, S., Cottingham, M., Victor, T., Ziegler, E., & Zeller, M.  (2010). Use of the WAIS-III Picture Completion subtest as an embedded measure of response bias.  *The Clinical Neuropsychologist*, *24*(7), 1243-1256.

Bell-Sprinkel, T. L., Boone, K. B., Miora, D., Cottingham, M. E., Victor, T., Ziegler, E., Zeller, M., & Wright, M. (2013). Cross-validation of the Rey Word Recognition Symptom Validity Test. *The Clinical Neuropsychologist*.

Roberson, C., Boone, K. B., Goldberg, H., Miora, D., Cottingham, M. E., Victor, T., Ziegler, E., Zeller, M., & Wright, M. (2013). Cross validation of the b Test in a large known groups sample. *The Clinical Neuropsychologist*.

Cornett, K. A.; Miora, D. S.; Fass, T.; & Dixon, D. (2013). Memory functioning for personally experienced and witnessed events in children with autism and the implications for educators, mental health professionals, and the law. Journal of Applied Research on Children: Informing Policy for Children at Risk, 4(2).

Smith, K., Boone, K., Victor, T., Miora, D., Cottingham, M., Ziegler, E., Zeller, M., & Wright, M. (2014). Comparison of credible patients of low intelligence and non-credible patients on neurocognitive performance validity indicators. *The Clinical Neuropsychologist*. DOI: 10.1080/13854046.2014.931465

Fass, T. L., Miora, D. S., & Vaccarella, S. (2014). Adult consequences for juvenile behavior: Does sentencing policy aimed at serious adult behavior cast too wide a net? In M.K. Miller, J.A. Blumenthal, & J. Chamberlain (Eds.). *Handbook of Community Sentiment*. Springer.

*References furnished upon request*

*Deborah S. Miora, Ph.D.*
*Clinical, Forensic and Neuropsychology*
*CA License # PSY11599*

435 North Roxbury Drive, Suite 406
Beverly Hills, California 90210
(310) 550-8443

| Testimony Name | Type | Date | Appointment |
|---|---|---|---|
| State of CA v Richard Alvarez | Criminal | 2010 | PD |
| State of CA v Steve Champion | State Habeas | 2007 | PD |
| USA v Jeffrey Choi | Criminal | 2014 | Agreed/Court |
| State of CA v Giovanni Gallardo | Criminal | 2013 | APD |
| Gardner v Tropicana Las Vegas | Deposition | 2016 | Plaintiff |
| State of CA v Luis Gomez | Criminal | 2012 | APD |
| USA v John McCluskey | Criminal | 2014 | Defense |
| State of CA v Collin McGlaughlin | Criminal | 2014 | PD |
| State of CA v Barry Mosley | Criminal | 2012 | Defense |
| State of CA v BN | Juvenile | 2012 | PD |
| City of Hemut v. Chad Peters | Deposition | 2013 | Plaintiff |
| State of CA v IS | Juvenile | 2013 | PD |
| State of CA v EW | Juvenile | 2013 | PD |
| State of CA v Jose Martinez | Criminal | 2016 | PD |

Many appointments led to disposition without testimony (between 250-300 cases)

## DECLARATION OF MYLA H. YOUNG, Ph.D.

I, Myla H. Young, declare as follows:

1.      I am a clinical psychologist licensed to practice in the State of California, specializing in neuropsychology and neuropsychological assessments.   I am Board Certified in Neuropsychology by the American Board of Professional Neuropsychology (ABN).   I am a member in good standing of the American Psychological Association and its subspecialty divisions in Clinical Neuropsychology and Forensic Psychology; the National Academy of Neuropsychology; the International Neuropsychological Society; and the Society of Personality Assessment.

2.      I am currently in private practice and conduct neuropsychological evaluations of criminal offenders, medical patients, psychiatric patients, and medical-legal patients.   I have conducted neuropsychological evaluations of children, adolescents, and adults.   I am an instructor of continuing education courses in the Neuropsychological Evaluation of Criminal Offenders and Introduction to Neuropsychology at the University of California, Berkeley, and at Alliant University.

3.      I hold a doctorate in Clinical Psychology from Alliant University, formally known as the California School of Professional Psychology in San Francisco, California.   I received my Masters Degree in Experimental Psychology from Towson State University in Baltimore, Maryland, in 1977.   I earned my Bachelor of Arts Degree in 1975 with a major in Psychology from the University of Guam.

4.      From 1984 to 1985, I completed a pre-doctoral internship at Garfield Geropsychiatric Hospital in Oakland, California.   During this internship, I performed neuropsychological and psychological evaluations of geriatric patients who were hospitalized for medical, neurological, or psychiatric disorders.

5.      I completed a pre-doctoral internship at the McAuley Neuropsychiatric Institute at St. Mary's Hospital in San Francisco, California, from 1985 to 1987.   While at St. Mary's Hospital I conducted neuropsychological and psychological evaluations of children, adolescents, and adults

i

who were hospitalized for psychiatric treatment, and provided treatment to these same individuals. I also conducted neuropsychological evaluations of adults who were hospitalized for medical treatment or who were recovering from neurosurgery, neurological and other medical disorders.

6.    In 1989, I completed a post-doctoral fellowship in neuropsychology at San Francisco General Hospital/University of California, San Francisco. During this time I conducted neuropsychological and psychological evaluations of patients hospitalized for medical, neurological, and psychiatric disorders. I conducted neuropsychological and psychological evaluations of children and adolescents who had been referred to the Child and Adolescent Sexual Abuse Resource Center. In addition, I participated in research that evaluated the neuropsychological, neurophysiological (evoked potential), and psychological functioning of men and women who tested positive and negative for the human immunodeficiency virus (HIV).

7.    From 1990 to 2005, I was employed by the California Department of Mental Health at the Correctional Medical Facility, a California State Prison, in Vacaville, California. During this period I served as a staff psychologist, providing neuropsychological and psychological assessments of individuals who had been admitted for acute and sub-acute psychiatric treatment while confined in the California Department of Corrections. I was part of an interdisciplinary treatment team and served as the clinical coordinator responsible for the development, implementation, and evaluation of a behavioral milieu treatment program. I provided staff training in neuropsychological assessment and behavioral treatment and psycho-diagnostic evaluation, and supervised pre-licensed Ph.D. candidates. I also trained and supervised pre-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children at Oakes Children's Center in San Francisco, California. I trained and supervised pre- and post-doctoral psychology interns and conducted seminars in neuropsychological and personality assessment of children, adolescents and adults at the McAuley Institute of St. Mary's Hospital in San Francisco, California.

8.    From 1995 to 2000, I served as the Program Consultant for Psychology for the California Department of Mental Health facility located within the Correctional Medical Facility at

Vacaville, California, and served from 2000 to 2005 as the Senior Supervising Psychologist in the same prison's psychiatric treatment program. In these positions, I was the psychology consultant to the Executive Director, Medical Director, and Program Directors, was responsible for research and program evaluation, provided clinical supervision and consultation, and provided direct inmate/patient care. I was also the principal investigator for research, program evaluation, and treatment outcome measurement. I developed, accomplished accreditation of, and served as the director for an American Psychological Association accredited psychology intern training program, provided seminars in neuropsychological assessment, and provided individual and group supervision to psychology pre-doctoral interns and post-doctoral fellows.

9.  From January 1990 to June 2004, I served on the Adjunct Faculty at Alliant International University/California School of Professional Psychology where I taught courses on neuropsychological assessment. I was the dissertation chairperson for several doctoral students and served on the dissertation committees of numerous other doctoral students. The students pursued varied and wide-ranging areas of investigation involving both children and adults, psychotic and non-psychotic individuals, and persons confined in penal institutions as well as persons not so confined. I am the primary author of several studies which have appeared in peer-reviewed publications involving the prison population and the secondary author of several additional peer-reviewed publications.

10.  I have been the principal presenter at several professional conferences including: Asilomar Forensic Mental Health Conference; Patton State Hospital Forensic Mental Health Conference; California Psychological Association; American Correctional Mental Health Services Association; Behavioral Health Institute Conference; and the International Organization of Psychophysiology. I have been qualified as an expert witness in criminal cases in state and federal criminal courts in California, Nevada, Washington and Hawaii and in civil cases in California state courts. Further description of my education and professional experiences is included as Addendum A.

11.    I was asked by the current post-conviction attorneys for Kenneth Barrett to complete a neuropsychological evaluation of Mr. Barrett to determine if he experiences brain damage and, if brain damage exists, the nature, severity and functional impact of that brain damage.

### A.    Introduction: Brain Functioning and Neuropsychological Assessment

12.    The science of clinical neuropsychology studies the relationship between the brain and behavior.  Because the brain is the human organ that drives behavior, any injury or insult has the potential to adversely affect a person's actions, thought processes, cognitive abilities and psychological functioning.  Conversely, observable behavioral deficits, including failure to meet developmental milestones and impaired scholastic, occupational and/or social functioning may suggest compromised brain anatomy or neurophysiology.  Consequently, historical, academic, vocational, medical/psychiatric, family, and social history information may provide reasons to suspect brain dysfunction or damage and make a comprehensive neuropsychological evaluation appropriate and/or medically indicated.

13.    A competent evaluation of neuropsychological functioning requires administration of a full battery of standardized neuropsychological tests, review of information from documents that are available, interviews or reports of interviews of those who have knowledge of the individual's history, and interviews with the individual being evaluated.  Focus of information sought includes family, medical, psychiatric, and social histories, circumstances of prenatal development, circumstances of childhood and adolescent development, educational, work, offense information, and description of current functioning.

14.    A comprehensive neuropsychological testing battery also includes measures of different aspects of brain functioning, including general mental ability (intelligence), sensory perception, motor functions, attention and concentration, verbal and visual memory and learning, expressive and receptive language, psychomotor and executive functioning (abilities to think, organize, reason, plan, inhibit impulses, think and act flexibly).  Based on knowledge of brain anatomy, brain functioning, and neurological disorders, instruments used in a neuropsychological evaluation are developed to identify and measure cognitive deficits caused by brain dysfunction,

4

and, if impairment is demonstrated, to provide an indication of the potential cognitive and behavioral consequences of disrupted brain functioning for the individual.

15.     Neuropsychological testing is guided by understanding of the phylogenetic structure of brain structures and brain connecting systems. One such developmental understanding was proposed by Ivan Yakovlev in 1967 and is supported and relied upon by contemporary neuroscientists in understanding brain function and dysfunction.

16.     Yakovlev described the brain as organized in three separate but related systems, with three primary connecting systems.  There is a primitive nuclear core of the brain, the allocortex, which includes the brain stem, reticular activating system, pons, medulla and cranial nerves, and functions to maintain consciousness, metabolism, respiration, and circulation and to filter stimuli received from the environment.  The middle system, the neocortex, includes limbic system structures including the hypothalamus, hippocampus, thalamus, basal ganglia and amygdala, serves primary functions of motivation, memory, arousal, emotion and mood.  The outer layer, the isocortex, includes the sensory and motor cortices, corpus callosum, cerebrum (occipital, parietal, temporal, and frontal lobes) and cerebellum.  Orbitofrontal-paralimbic, hippocampal-paralimbic and subcortical-limbic connection circuits provide a "flow" of information throughout the brain (Yakovlev & Lacours, 1964/1967; Bear, Connors & Paradiso, 2001).

17.     In addition to knowledge of the phylogenetic development of the brain, neuroscientists have known for many years that the normal brain develops in a predictable and unchangeable sequence.   Brain regions responsible for arousal, filtering information, auditory, visual, and tactile/kinesthetic abilities develop first; brain regions responsible for analyzing and integrating information sequentially develop next; and brain regions responsible for simultaneously analyzing and integrating information develop last, with the brain continuing to develop through adolescence and into young adulthood.

18.     In early childhood, the primary portions of the brain that function for motor, sensory, attention filtering, visual dimension and color, and analyzing language sounds undergo the greatest maturation.  In middle childhood, the secondary portions of the brain that function to develop abilities for reading, writing, spelling, arithmetic and other secondary language

academic skills undergo the greatest maturation. In adolescence and into young adulthood, the tertiary portions of the cerebrum, particularly the temporal and frontal cortices undergo the greatest maturation (Luria, 1966/1973/1986).

19.     As the brain develops, those brain regions that are maturing the most are also those brain regions that are most vulnerable to brain damage, identified as the "vulnerability hypothesis." Consequently, the child who experiences brain trauma between the ages of approximately 8 – 12 years is most vulnerable to subsequent severe leaning disabilities. The adolescent who experiences brain injury between the ages of 12 and 16 years is most vulnerable to subsequently impaired executive functions. Additionally, brain insult(s) as a child interferes with further development of all other brain systems and structures (Pfefferhan, 1994; Gied, 1999; Sowell, 2000/2001/2003; Adelman, 2002; Casey, 2000/2005; Durston, 2001; Gogtay, 2004).

### B. Risk Factors and Indications of Neuropsychological Dysfunction

20.     Social and medical history data obtained in interviews with Mr. Barrett and contained in records that reportedly were available at the time of his trial indicated the existence of several risk factors and potential etiologies for congenital and/or acquired brain dysfunction. The pertinent information I reviewed included excerpts of academic records from Tommie Spear Junior High School, Sallisaw, Oklahoma and Jan County High School, Portland Indiana; Universal Cumulative Record, Plainfield Community Consolidated School District, Plainfield, Illinois; medical records from Sequoyah Memorial Hospital, Sallisaw, Oklahoma, St. Francis Hospital, Tulsa, Oklahoma, Wagoner Community Hospital, Wagoner, Oklahoma, and Bill Willis Community Mental Health Center, Sallisaw, Oklahoma; and a Disability Determination Unit Record, Sallisaw, Oklahoma. I also reviewed psychological evaluation test data obtained by Faust Bianco, Ph.D., Tulsa, Oklahoma, in August 2000 and psychological evaluation test data and a report prepared by Bill Sharp, Ph.D., Norman, Oklahoma, in October 2002. These data suggested potential insults to Mr. Barrett's brain functioning resulting from head trauma(s), both in childhood and as an adult; possible prenatal insult and brain development abnormality; and adolescent and adult abuse of alcohol and other drugs. Documented symptoms of possible

6

psychiatric disorders were also indicative of neurological brain substrate abnormality and consequent brain dysfunction.

21.    Mr. Barrett's history of potential head trauma(s) include a childhood injury, at age eight or nine years when he was struck in the head with some type of "steel ball" on the school yard. Mr. Barrett's description of the incident ("I just remember waking up and them picking me up") suggests loss of consciousness as a result of this incident, and as an adult, Mr. Barrett has a skull indentation which he attributes to this childhood injury.   At the approximate age of 22, Mr. Barrett also may have suffered a head injury, with consequent loss of consciousness, in a motorcycle accident.  He was treated at Sequoyah Memorial Hospital, Sallisaw, Oklahoma, and the Emergency Room Records describe "treatment for MVA," right periorbital area pain, edema, and possible head trauma. Immediately following his arrest in 1999 for his current commitment offense, Mr. Barrett was treated at St. Francis Hospital, Tulsa, Oklahoma, for multiple gunshot wounds and "bruising to the left eye and superficial abrasions to forehead…superficial blunt head trauma").

22.    Head traumas may cause damage to the cellular units of the brain (neurons), which transmit and store information.  The blood vessels transmitting oxygen and nutrients through the brain are also damaged.  Multiple small, and/or single large bleeds (hematomas) within the brain can occur.  The brain swells, pressing against the rigid bony skull, causing further damage to the brain.  Extensive research describing the damaging effects of head trauma as a child and head trauma as an adult is currently known and was well established in 1999.  Two sources which provide a representative description of this historical and current research are found in Kolb & Wishaw (2003) and  Silver, McAllister, & Yudofsky (2005).

23.    Mr. Barrett also may have been exposed to dysgenic disorder as the result of teratogenic effects of substance use by his mother during her pregnancy with him, as well as secondary to his mother's psychopharmacological treatment for depression during her pregnancy.  These factors are known to be associated with brain development abnormality, brain dysfunction and abnormal development of the fetal brain (Rasansen, 1999; Steissguth 1990; Tizabi, 1997; Cornelius, 2001; DiPietro; 2002, Ernst; 2001; Huizink, 2004; Weizman, 2002).  Mr. Barrett reports childhood

exposure to alcohol beginning at age seven, when his father provided alcohol to him and his brother, resulting in his severe intoxication and subsequent emesis. He indicates that he then consumed alcohol and other drugs "on a regular basis" beginning at approximately the age of 14 years, with particularly severe drug abuse between the ages of 16 and 18. Drug use was then reportedly intermittent until age 32 when it again became severe until the time of the offense for which he was incarcerated. The research describing the damaging neurocognitive effects of alcohol and drug abuse is currently known, and was well known in 1999. Two resources which provide a representative description of this past and current research include Tapert (1999) and Heimer (2003), as well as Kolb & Wishaw, 2003 and Adams, 2009.

24.     Medical records dating from several years before Mr. Barrett's arrest documented his hospitalization for a suicide attempt, as well as medically indicated need for psychopharmacological treatment with antidepressant and with antipsychotic medications. Brain abnormalities and consequent neuropsychological impairments associated with  major psychiatric disorders have been known for more than a decade. There is substantial research describing the neurological bases of psychiatric disorders, particularly the neurological bases of depression, bipolar, and psychotic disorders, and there is substantial research describing the neuropsychological patterns of impairment associated with these psychiatric disorders (Heaton, 1998; McIntosh, 2005; Savitz, 2008) to site a few sources of this extensive literature.

25.     This information about Mr. Barrett's history indicated the appropriateness of conducting a comprehensive neuropsychological assessment both in 1999 and currently.

**C. Nature and Circumstances of the Neuropsychological Evaluation**

26.     I conducted approximately 16 hours of neuropsychological evaluation of Kenneth Barrett over the course of three days on February 9 - 11, 2009. Mr. Barrett is a 47 year old White male. The evaluation was conducted at the United States Penitentiary, Terra Haute, Indiana in a confidential room without distraction or interruption. The examination room was reasonably quiet, reasonably private and with adequate ventilation and climate control. Mr. Barrett was not physically restrained during the evaluation and the evaluation proceeded uninterrupted. Multiple breaks in testing were taken, and Mr. Barrett was provided drink and snack. Mr. Barrett's

8

clinical presentation, which I observed during the evaluation, was consistent with the results of neuropsychological testing.

27.     Mr. Barrett completed 9 years of formal education, and school records for his 8th and 9th grade school experiences, as well as cumulative record from his 1st and 2nd grades were available at the time of this evaluation. It is unclear from these school records, but Mr. Barrett reports that he repeated the 8th grade of school and that he participated in special education for learning disability. He has attempted to complete a General Education Degree (GED) at several points in time, but has not been able to pass the required test. Mr. Barrett indicated that he is currently studying to take the GED examination again. He reports that he has taken several "pre-tests," but has not been able to successfully pass these pre-examinations.

28.     From the results of testing measures and from my own observations, Mr. Barrett fully cooperated with the evaluation, gave his best effort on all tests, and made no attempt to manipulate, fake or exaggerate his neurological dysfunction. Specific evaluation of Mr. Barrett's effort on and attitude toward the assessment was obtained through administration of tests that were specifically developed to determine the validity of the individual's effort on and attitude towards testing, including the 15 Item Test, the Test of Malingering Memory (TOMM), Green's Word Memory Test (WMT) and the Forced Choice Subtest of the California Verbal Learning Test (CVLT-II). These tests have demonstrated validity and reliability in distinguishing between individuals who are known to be attempting to manipulate their test ability and those who are not, with as high as 93% accuracy (Lee, 1992; Millis, 1995; Rees, 1998) for some of these tests. Mr. Barrett's abilities on these tests indicate that he was expending his best efforts in this evaluation and was not attempting to feign or exaggerate any deficits in his abilities.

29.     Mr. Barrett's attitude towards and effort on testing was also evaluated considering the expected consistency of his test ability within each test, across different measures of the same test, and across different neuropsychological tests that are known to be measuring the same brain region and functions. Mr. Barrett's attitude and effort on testing were further evaluated considering events in his personal history, what is known about potential brain damage

9

associated with those events of his personal history, and the consistency of Mr. Barrett's history, his brain function/dysfunction, and his neuropsychological testing abilities/disabilities.

30.    In addition to these validity testing measures, my own clinical observations of Mr. Barrett confirmed that he was cooperating and putting forth exceptional effort on testing.  He worked consistently, attempted all tasks that were requested of him and persisted until tasks were completed or terminated.  He was intent on completing the tasks asked of him and was particularly intent on trying to accomplish tasks that were difficult for him.  On several occasions Mr. Barrett asked me if he could re-attempt a previously administered test which was difficult for him. These observations were consistent indications that Mr. Barrett was marshalling all of his resources to complete neuropsychological testing and was putting forth an earnest effort to perform well.

31.    Consideration of all of these elements indicates that Mr. Barrett was putting forth substantial effort to complete neuropsychological testing, was cooperating with testing, and was not attempting to manipulate his abilities.  This evaluation is considered to be a valid measure of Mr. Barrett's neuropsychological profile, and can be relied upon in establishing conclusions about his brain functioning.

32.    Although he reported a history of what he identified as migraine headache, Mr. Barrett reported that he was not experiencing headache nor was he experiencing any other unusual pain on the days of testing.  On each day of testing he indicated that his sleep and eating were no different from his usual patterns.  He indicated that he did not require glasses and was able to see all information that was presented to him.  He was not experiencing any peripheral numbness in his hands or fingers.  Mr. Barrett reported a history of tinnitus, but indicated that he was not experiencing tinnitus on the days of testing, and that he was able to hear all information that was given to him.  Although he reported several serious medical disorders (Hepitis A, Hepitis C, prostate disorder, persisting staph infection and consequent eczema, and chronic ulcers) he indicated that he was not experiencing any unusual pain or discomfort on days of testing.  Mr. Barrett reported that although he has been prescribed both antidepressant and antipsychotic medications in the past that he was not currently prescribed and was not currently taking any

psychotropic medications. Although he has a history of past suicide attempt and psychiatric treatment, Mr. Barrett reported that his mood was reasonably stable, that he was not experiencing perceptual alternations such as hallucination, was not experiencing other psychotic symptoms and did not experience suicidal ideation or plan.

33.     Mr. Barrett reported that he was taking an anti-inflammatory medication but did not know the name or dosage, and that he was taking Prilosec for treatment of ulcers. He reported that he had not experienced any additional medical disorders of note since his incarceration at United States Penitentiary, Terra Haute, Indiana (USP Terra Haute, Indiana) for this offense. Mr. Barrett has an extensive past drug use history. Although he acknowledged availability of drugs in incarcerations facilities, he reported that he had not used any drug or alcohol since his incarceration at USP Terra Haute, Indiana. Mr. Barrett has a history of prior tobacco use. He indicated, however, that his last tobacco use was in 2005.

34.     Kenneth Barrett expressed his willingness to participate in this evaluation. He was advised of, understood and agreed to limits to his confidentiality. Although testing conditions were quite adequate, functional manifestation of Mr. Barrett's neuropsychological deficits made evaluation challenging at times. He presented as mildly hypomanic. His speech was rapid, he often started to respond to a question before the question was completed, at times was tangential, and often arbitrarily changed the focus of his discussion without warning indicating likely racing thought ("sometimes I just think too fast"). When attempting to provide information, Mr. Barrett often exhibited circumstantial speech, describing extensive, often irrelevant details. He responded to all requests, but often "talked around" the topic, rather than providing a direct response. He was not able to provide a simple "yes" or "no" response to questions that clearly called for only such a response. Although he provided many details, Mr. Barrett's thinking often was overly concrete and he often did not appear to fully understand testing instructions, often requiring test instructions to be presented several times, and in several different ways. Mr. Barrett appeared to be somewhat aware of his presentation, at times acknowledging that he sometimes "talked too much" and at times apologized for beginning to answer a question or provide a response before I had completed my question. Mr. Barrett responded positively to

11

appropriate clinical interventions, however, further assuring that all information obtained is valid and reliable.

35.     All neuropsychological tests administered have appropriate and documented standardization, reliability and validity. All tests administered are often used and are generally accepted in the neuropsychology community. In addition to the previously described validity tests (15 Item Test, Test of Malingering Memory (TOMM), Green Word Memory Test, CVLT II Forced Choice Subtest), the neuropsychological tests administered to Mr. Barrett included the following instruments: Wechsler Adult Scale of Intelligence Test (WAIS IV); Wide Range Achievement Test – Third Edition (WRAT-III); Smell Identification Test, Reitan-Klove Sensory Perception Examination, Finger Tapping Test, Grooved Pegboard, Seashore Rhythm, Speech Perception Test, California Verbal Learning Test (CVLT-II), Wechsler Memory Test (WMS IV), Rey Complex Figure Test; Executive Functioning Test (EFT), Wisconsin Card Sorting Test, and Short Category Test (SCT). Attempt was made to administer the Paced Auditory Serial Addition Test (PASAT). Mr. Barrett was quite cooperative with his attempts to complete this test, but he was simply unable to understand the instructions. Instructions were provided in the standardized format. Instructions were then also repeated several times, paraphrased several different ways, and demonstrated with examples. The PASAT was discontinued after the third trial. The administered neuropsychological battery consists of the most sensitive and reliable standardized tests currently available for measuring neuropsychological functioning that are also compatible with the testing conditions at USP Terra Haute, Indiana. All of these tests – or their predecessor editions – the methodology, and the research on which I based my conclusions were available and accepted in the neuropsychological community, and valid at the time of Mr. Barrett's arrest and trial in 1999.

**D.     Results of Testing**

36.     <u>Overview</u>: For Mr. Barrett, understanding of his brain dysfunction is particularly dependent on understanding the functions associated with the frontal cortex, temporal cortex, and interconnecting systems between these brain cortices. The frontal cortex is comprised of three general cortices—motor cortex, premotor cortex, and prefrontal cortex. The motor cortex

12

provides a mechanism to control execution of movement of limbs, hands, feet and fingers. The pre-motor cortex selects and carries out the movements to be executed including repetitive movements and actions in response to external cues. The pre-motor cortex also primarily mediates information that is communicated by the parietal cortex, cingulated cortex, and basal ganglia. The prefrontal cortex allows the individual to accommodate complexity and accommodate stress, and is responsible for thinking and acting, referred to as "executive functioning." Executive functioning is the ability to organize, think, reason, problem solve, initiate actions, monitor actions and change actions as needed based on information received. More specifically, executive functioning is the ability to organize and understand, deliberate, reason through a problem, apply that reasoning in making a decision, choose an action, recognize if the decision and actions are not effective, understand why the decision and choice of action is working or not working, and inhibit and/or change thinking and actions as needed by the situation. Damage to the prefrontal cortex is known to be specifically associated with multiple neurological and psychiatric disorders. The prefrontal cortex is particularly vulnerable to damage by multiple causes, and specific to Mr. Barrett's history, to possible prenatal developmental abnormality, drug use/abuse and traumatic brain injuries.

37.   The temporal cortex encompasses the primary auditory cortex, secondary visual cortex, and structures of the limbic system. Primary functions of the temporal cortex are both verbal and visual memory and learning, processing speech sounds and speech emotional tones, and interpreting speech sounds, tones and emotional meaning. The temporal cortex is also responsible for processing visual information and the ability to recognize facial expressions, and interpret facial emotions. Significant impact of temporal cortex dysfunction is particularly implicated in amnesia, hyper-religiosity, hypergraphia, fear, paranoia, impulsiveness and aggressive outbursts in addition to the previously described cognitive disabilities. Brain functioning associated with frontal and temporal cortices has been known, is described and is documented in multiple sources for many years. Two resources which provide a representative description of frontal and temporal brain functioning are Kolb & Wishaw, 2003 and Grant & Adams, 2009.

38.    The hallmark of Mr. Barrett's neuropsychological profile is strongly indicated dysfunction of prefrontal, temporal, and limbic system cortices, with the greatest impairment occurring in the orbitofrontal and dorsolateral regions of the prefrontal cortex.  The impairment of cognitive functioning produced by these deficits is manifested in a pattern of ability and disability indicating that although Mr. Barrett is generally able to reasonably access and provide information that is long-standing and that he has rehearsed and learned, his ability to actively attend to, take in, and learn and recall new information is significantly impaired.   While his previously learned information remains reasonably stable and accessible, Mr. Barrett's ability to actively process and comprehend new information in the "here and now" is significantly compromised.  Indicative of extensive dysfunction in Mr. Barrett's prefrontal cortex regions, his test performance was significantly impaired on executive functioning tasks which primarily required cognitive flexibility, particularly the ability to flexibly inhibit and change his thinking and actions in response to requirements of the task or situation (perseveration).  Also typical of individuals with significant prefrontal cortex impairment, Mr. Barrett exhibited multiple instances of confabulation, where he unknowingly provided information that had no real relationship to the problem at hand.  He presented that information in a self-assured way, seemingly not recognizing the errors—at time even absurdity —in his thinking.  Mr. Barrett was not purposefully "making up" information but, as is typical in prefrontal cortex damage, he reported information that was inaccurate, at times illogical.

39.    Intellectual Functioning:  Mr. Barrett's general mental ability was evaluated using the most recent revision of the Wechsler Adult Intelligence Scale (WAIS IV), which was published in January 2009.  WAIS-IV consists of 15 subtests, 10 of which are required.  Four Composite Indexes are developed (Verbal Comprehension Index (Vocabulary, Similarities, Information); Perceptual Reasoning Index (Block Design, Matrix Reasoning, Visual Puzzles); Working Memory Index (Digit Span Arithmetic Letter-Number Sequencing); and Processing Speed Index (Symbol Search, Coding).

40.    Mr. Barrett's abilities on this test demonstrate overall intellectual functioning in the low average range.  His full scale intelligence quotient (FSIQ) is 84 (95% Confidence Index = 80 –

14

88), placing him in the 14th %ile. His acquired knowledge, verbal reasoning, and attention to verbal material is in the average range (VCI = 95, 37th %ile) (95% Confidence Index = 90 – 101). His fluid reasoning, spatial processing, attentiveness to detail, and visual-motor integration is in the low average – average range (Perceptual Reasoning Index = 92, 30th %ile) (95% Confidence Index = 86 – 99). His ability to actively receive, organize and recall information (Working Memory Index) was, however, significantly lower and in the borderline - low average range (WMI = 83, 13th %ile) (95% Confidence Index = 77 – 91). His ability to attend and concentrate, recall information, and reproduce the information that he recalls (Processing Speed Index) was even lower and in the borderline range (PS = 76, 5th %ile) (95% Confidence Index = 70 – 87).

41.     Significantly lower abilities to actively receive, attend and concentrate, organize, recall and reproduce information as measured on the WAIS-IV Working Memory and Processing Speed indexes, are particularly relevant to understanding Mr. Barrett's brain dysfunction, including the pronounced disparity between his ability to access his stable fund of knowledge and his significant inability to appreciate and make sense of new information.

42.     Compromised prefrontal, temporal, and connecting systems (Orbitofrontal Paralimbic Connection; Hippocampal Paralimbic Connection; Frontal Subcortical Connection) relaying information from the frontal cortex to all other brain regions is particularly indicated. This pattern of brain function and dysfunction provides explanation as to why Mr. Barrett's overall intellectual quotient can be in the low average range even in the face of significant current brain dysfunction. This pattern also explains why at some point in time his overall intellectual quotient may have been measured as higher.

43.     Sensory and Motor Functioning: Mr. Barrett's sensory functioning was evaluated using the Smell Identification Test (SIT) and the Reitan-Klove Sensory-Perceptual Examination (SPE). His olfactory sensory abilities on the SIT were in the normal range (4 errors, 49th %). His abilities to accurately receive bilateral simultaneous auditory, visual, and tactile stimulation were normal. His tactile-finger recognition was normal. Mr. Barrett's finger-tip number writing perception, however, was significantly bilaterally impaired. He had 10 errors for his right hand

15

(T = 34, mild-moderate impairment) and 8 errors for his left hand (T = 32, mild-moderate impairment). Whereas other sensory-perceptual abilities in this examination represent simple sensory perception, finger-tip number writing perception is more complex. This ability requires more concentrated attention and more communication of information from the sensory strip in the posterior area of the frontal cortex through the frontal-hippocampal-limbic connection to and from the parietal cortex. This sensory perceptual ability also requires more complex communication across the corpus callosum to and from the right and left brain hemispheres. Dysfunction of the sensory cortex and communication of the sensory cortex to other brain regions is indicated for Mr. Barrett.

44. Mr. Barrett's motor coordination and repetition were evaluated using the Finger Tapping and Grooved Pegboard tests. He experienced mild-moderate bilateral impairment on both of these measures (Finger Tapping Right T-34; L T=32; Grooved Pegboard Right SS = -1; Left SS = -1). Dysfunction within the frontal motor cortex and communication of information from the frontal motor cortex to other brain regions is indicated.

45. Attention and Concentration: Mr. Barrett's attention and concentration were evaluated using Seashore Rhythm and Speech Sounds Perception tests. As has been previously described, Mr. Barrett was not able to comprehend and carry out instructions to complete the Paced Auditory Serial Addition Test (PASAT) and this test was discontinued after the third trial.

46. There are multiple indications that Mr. Barrett experiences impaired attention and concentration. During testing he frequently had to be re-directed to the task at hand and when he was not able to sustain his attention, frequent breaks on tests which had multiple subtests were needed. Additionally, his abilities on several neuropsychological tests which are strongly weighted to the ability to attend and concentrate (WAIS IV Digit Span, Letter-Number Sequencing, Symbol Search, Coding; Executive Functioning Trail Making Tests) were particularly impaired. Attention and concentration is primarily mediated by the prefrontal cortex, subcortical reticular activating system, and communication between these two brain regions through the frontal-subcortical connecting system, indicating dysfunction of these brain structures and connections for Mr. Barrett.

16

47.   Memory and Learning:   Multiple aspects of Mr. Barrett's memory and learning were evaluated assessing his ability to learn and recall information that was presented both verbally and visually and—in both of these modalities—assessing his immediate, delayed, free recall, interference, recognition and forced choice recall of information.   Memory and learning were evaluated using the California Verbal Learning Test (CVLT II), Wechsler Memory Scale (WMS IV), memory trials of the Rey Complex Figure Test (Rey), and Working Memory Index of the WAIS IV.   Mr. Barrett's abilities across these measures of memory and learning portray a distinct pattern of memory function and dysfunction.   On several measures his memory was within or above the normal range (Rey Complex Figure Immediate Recall T = 59, 82%; Rey Complex Figure Delayed Recall T = 59, 82%; Rey Recognition T = 51, 54%; WMS IV Auditory Memory = 95, 37th %ile; Immediate Memory = 108, 70th %ile; Delayed Memory = 100, 50th%; On CVLT II, his standard scores ranged from normal to mild-moderate impairment = +1.5 to -1.5).   On other measures of memory and learning, however, his ability was significantly impaired.   Mr. Barrett's ability to actively receive, organize and recall information (WAIS IV working memory) and his ability to concentrate, recall and reproduce information (WAIS IV processing speed) were within the borderline-low average range.   On the Wechsler Memory Scale (WMS IV) his Visual Working Memory (VWMI) was in the extremely low to borderline range (VWMI = 70, 2nd %ile), his delayed recall of word pairs was in the borderline range (WMS IV Paired Associates Delay = SS 8, 25th %ile ), his ability to store, manipulate, and ignore irrelevant or competing information was in the mildly impaired range  (Spatial Addition = SS 6, 9th%ile), and his ability to keep a mental image of a design in mind and to recall the relative spatial position of this information was in the moderately impaired range (Symbol Span SS = 4, 2nd%ile ).   Also of note, Mr. Barrett had a significant number of repetition errors indicating perseverative thinking (CVLT repetition errors = -1, mild impairment).   This same impairment of his ability to flexibly shift his thinking and acting was demonstrated across multiple tests of executive functioning, as described below.   Memory and learning is primarily mediated by the limbic system hippocampus, temporal cortex, prefrontal cortex and connecting systems among

17

these brain structures (Frontal-subcortical connecting system; Orbitofrontal Connecting System; Frontal-hippocampal Connecting System).

48.    Language:    Mr. Barrett's secondary language was evaluated using the Wide Range Achievement Test (WRAT3). This test measures academic achievement in three areas: Reading Word Recognition, Spelling, and Arithmetic Skills. Mr. Barrett's abilities on the WRAT3 placed him in the 25th percentile in reading recognition (high school equivalent), but in the 5th percentile (6th grade equivalent) in spelling, and the 7th percentile in arithmetic (7th grade equivalent).

49.    Executive Functioning:    As previously described, executive functioning is an umbrella construct, which encompasses abilities to think, reason, problem solve, make reasoned decisions, anticipate consequences of decisions and actions, and modify actions in response to information received from the environment. Executive functioning includes abilities to initiate, monitor and change actions depending on needs of the situation. Executive functioning also includes abilities to inhibit thinking and actions, understand and develop ways to accommodate complex situations, and inhibit thinking and actions as required by the situation. Executive functioning is mediated by the frontal cortex, predominantly by the prefrontal cortex, and through connections from the frontal cortex to all other brain regions. Intact executive functions are necessary for managing a wide range of experiences in daily living. Accommodating stressful situations, understanding complex constructs and situations, being able to plan and deliberate potential ways of solving a problem or situation, being able to describe why actions are selected or not selected for action, anticipating the consequences of those decisions, and changing decisions and actions based on understanding of the problem or situation are all examples of executive functioning abilities. Adequate executive functioning is demanded when a situation or problem is complex and/or stressful and requires the ability to understand, as well as to act thoughtfully. More specifically, executive functioning requires the individual to incorporate feedback concerning the effect of each piece of information and then consider how the new information affects subsequent actions or choices or requires the individual to modify his thinking and actions or change a course of action as needed by the problem or situation. The executive

18

functioning process is dynamic in that it requires continuous attention to, evaluation of, and incorporation of new information and inhibits thinking and actions as needed to solve the problem or situation (Delis, Kaplan & Kramer, 2001; Gioia, Isquith, Guy & Kenworthy, 1996/1998/2000). Mr. Barrett was significantly impaired across multiple tests of executive functioning, with his impairment ranging from mild to severe.

50.     The frontal cortex is the largest brain structure in the human brain, comprising 20-25% of all brain tissue. The frontal cortex is divided into four regions--motor, mesial, dorsolateral and orbitofrontal. Each of these regions mediates executive functioning, but each of these regions also is predominantly responsible for different aspects of executive functioning. For example, the motor region primarily regulates motor coordination and integration and repetition of motor abilities. The mesial region primarily regulates emotion, motivation, drive, spontaneity, motor aspects of speech, and the ability to monitor actions. The dorsolateral lateral region primarily regulates organization, initiation, planning, flexible thinking, problem solving, the ability to categorize and organize information and memory, and—in combination with the mesial region—the ability to monitor and change actions. The orbitofrontal region primarily regulates judgment, insight into deficits, irritability and emotional lability, olfaction, disinhibition, and control of actions. The orbitofrontal region also plays a particularly interactive role with the limbic system, assessing and altering emotional responsivity and inhibition of thought and actions. Knowledge of executive functioning and the role of executive functioning has been known by neuroscientists for many years, since and prior to 1996 (Benson, 1996; Casey, 1997; Constantine, 2004; Frank, 2006; Hinson, 2003; Janowsky, 1989; Kritchevsky, 1989; Lyketsos, 2004; Nagahama, 2005).

51.     Mr. Barrett's executive functioning was evaluated using tests that make up the Executive Functioning Test (EFT) (Trail Making Tests, Verbal Fluency Tests, Design Fluency Tests, Color-Word Interference Tests, Sorting Tests, Twenty Questions, and Tower Test), Wisconsin Card Sorting Test (WCST), and Short Category Test (SCT). Across EFT subtests, Mr. Barrett was able to accurately complete some tasks. He was, however, significantly impaired in his abilities on other tasks of executive functioning, with his impairment ranging from mild to

19

severe. A distinct pattern in the nature of Mr. Barrett's impairment on EFT measures was apparent.

52.    With the exception of his ability to complete the Twenty Questions subtest of the EFT, Mr. Barrett had some significant impairment on each of the EFT subtests. Trail Making Test is a series of four individual tests which primarily evaluate visual-scanning, attention, motor and the ability to flexibly switch thinking and actions. Mr. Barrett's ability to quickly scan the task was moderately impaired (SS = 4); his ability to sequentially process numbers was in the borderline range (SS = 8); his ability to sequentially process letters was mildly impaired (SS = 7) and his ability to flexibly shift his thinking and actions was mildly impaired (SS = 7). Of particular note, Mr. Barrett made multiple errors of several types on Trail Making. He had a significant number of errors where he was not able to effectively scan information, focusing on the relevant and ignoring the irrelevant (Omission Errors = 13%th, mild impairment); he had a significant number of errors correctly moving information in the expected order (Sequencing Errors = 16th ile – below average); and he had a significant number of errors where he could not order numbers and letters of the alphabet while sequentially and flexibly switching from number to letter (Set Loss Errors = 22% - below average). Overall, the number of errors that Mr. Barrett had on Trail Making Tests was impaired (SS = 7, mild impairment).

53.    Verbal Fluency Tests evaluate the ability to initiate and report verbal information, and this was a relative strength for Mr. Barrett. He was successfully able to retrieve and report letters and words and he was able to switch his verbal descriptions (Letter Fluency SS = 8; Category Fluency = 10; Category Switching SS = 10). Mr. Barrett again, however, had a significant number of errors in this process (Switching Accuracy SS = 5, mild impairment; Percent Switching Accuracy SS = 4, moderate impairment).

54.    On tests which evaluate fluency of visual information, Mr. Barrett's abilities were similar to his fluency with verbal information. Design Fluency was a relative strength for him (Filled Stimuli SS = 12; Empty Stimuli SS = 10; Design Switching SS = 10). Mr. Barrett's accuracy in carrying out these tasks was, however, significantly impaired (Percent Switching Accuracy SS = 8, borderline impairment).

20

55.    A similar pattern of ability/disability was demonstrated on EFT tests of the ability to name colors and words and his ability to withhold the familiar while reporting the accurate but less familiar (Color-Word Interference Tests (Color Naming SS = 10, average range; Word naming = SS 7, mild impairment; Inhibition = SS = 9, average range; Inhibition Switching SS = 10, average range).   Again, despite his ability to simultaneously process this information was significantly impaired (Inhibition Errors = SS 6, mild impairment; Inhibition/Switching Errors SS = 7, mild impairment).

56.    On tests of concept formation and conceptual knowledge (Sorting Tests) Mr. Barrett was successfully able to develop concepts (Free Sorting SS = 8 and 9, below average - average range).   His ability to transfer his skills to understand and describe concepts presented to him, however, was significantly impaired (Recognition Description SS = 3, moderate-severe impairment).

57.    Mr. Barrett's ability to view a problem and, using his hands, to manipulate objects (Tower Test) was within the normal range (SS = 11, average range).   In the process, however, Mr. Barrett's ability to accomplish this task while inhibiting his thinking and action was severely impaired.  Mr. Barrett reports substantial work history as an automobile mechanic.  He reports with pride that he could approach a difficult automobile mechanical problem and fix it but he could not explain *how* he went about fixing the problem, *why* he did what he did to fix the problem, or to *replicate* the process at another time on another vehicle.  Completing the EFT Tower Test is somewhat similar to completing an automotive repair project.  Completion of the Tower Test has two simple rules…move one piece at a time and always put a small object on top of a larger object.  Mr. Barrett was not able to inhibit his responding and he broke the "rule" a significant number of times ((Move Accuracy Ratio SS = 3-severe, moderate impairment; Rule Violations SS = 7, mild impairment).   Persistent errors on tests of executive functioning, as well as on tests of memory and learning, represent significant perseverative thinking and acting (tendency to rigidly repeat the same thought and action even though the situation or problem has changed) and tendency towards confabulation (the recitation of inaccurate often absurd experiences to unknowingly fill in gaps of memory) for Mr. Barrett.

21

58.    The entire frontal cortex system is required to complete these tests on the EFT. The pattern of Mr. Barrett's success and failures across the tests, however, indicate that the greatest prefrontal cortex impairment for him is within the dorsolateral and orbitofrontal regions, with relative sparing of structures within the mesial prefrontal system.

59.    The Wisconsin Card Sorting Test (WCST) is one of the oldest, most researched, and most utilized tests of executive functioning available to neuropsychologists (Buros, 2009).  It requires the individual to place cards with different symbols, numbers of symbols printed in various colors in piles under four key cards according to a pattern that the individual must deduce from the examiner's feedback to the individual's decisions for placement of the cards.  Although the entire frontal cortex system is involved in successfully completing this test, current neuroimaging research demonstrates particular involvement of the dorsolateral prefrontal region (Nagahama, Okina, Suzuki, Nabatame & Matsuda, 2005).  Mr. Barrett's ability to complete the WCST is significantly impaired, with Mr. Barrett experiencing impairment on 67% of the WCST measures, with impairment severity ranging from mild to severe.  The total number of errors made by Mr. Barrett on the WCST places him equal to or below the 1st %ile. The number of perseverative errors made by Mr. Barrett was impaired (Perseverative Errors = 42nd%ile); and the number of nonperseverative errors was severely impaired $\leq 1^{st}$%ile).

60.    One of several abilities measured by the WCS is the ability to develop a simple concept and then to carry out that simple concept.  Mr. Barrett experienced significant difficulty developing the concept required by this test (Conceptual Level Responses = $\leq 1^{st}$ %).  Of particular concern, Mr. Barrett frequently repeated out loud the "rule" he was using to solve this problem.  Nevertheless, he was unable to carry out the "rule" he had stated (Categories Completed = 0).  When impaired, his impairment was consistently in the severe range.  Current research demonstrates a significant relationship between ability/inability to grasp and to consistently carry out the demands of the WCST and daily functioning such as driving an automobile or successfully returning to work after a closed head trauma (Macklin, Horner, Harvey, & Stevens, 2005).

22

61. Again, the WCS requires the entire prefrontal system to successfully complete. Dorsolateral and orbitolateral prefrontal regions are, however, primarily involved in completing this test (Nagahama, Okina, Suziki, Nambatome, & Matsuda, 2006).

62. Category Test is another well-known and respected measure of functioning of the prefrontal cortex. Category Test was developed by Halstead in 1979, and one of the first standardizations of the Category Test was in 1985 (Reitan & Wolfson,). The Short Category Test (SCT, 1989) is a current revision of the Category Test. Using stimuli from the original Category Test, the SCT was developed as an instrument that could be more easily transported, more easily administered, and requires less time to accomplish the same goal. SCT and Category Test are significantly related (discriminate validity = .93) and reliable (reliability co-efficient = .81). SCT also has good sensitivity, correctly classifying 83% of individuals who do/do not experience brain damage. This indicates that these two tests are measuring the same construct and same brain region. Category Test and SCT are highly related (.93 to .80), providing confidence in substituting SCT for the longer, more demanding Category Test. (Buros, 2009).

63. Similar to the WCST, the Category Test assesses an individual's ability to solve problems which require abstract concept formation, use abstract principles, and understand complex information. Whereas neuroimaging has demonstrated the WCST to be primarily mediated by the dorsolateral region of the frontal cortex, the Category Test appears to be primarily mediated by the posterior frontal cortex, anterior parietal cortex, and connecting systems between these brain regions.

64. Like his abilities on the WCST, Mr. Barrett's abilities on the SCT were also severely impaired. SCT requires the individual to develop a concept to solve a problem, carry out the actions needed to accomplish the concept they developed, and flexibly change their thinking and acting in response to information that is actively provided to the individual by the neuropsychologist who is administering the test. The test requires that the neuropsychologist to verbally respond to each choice as being "right" or "wrong" while the test is actively being taken. The objective is for the individual to be able to develop a concept, try the concept out, and if their concept is accurate ("right") continue applying the concept, but if the concept is

23

1354

inaccurate ("wrong") to change the concept and try out a different concept. Out of 100 possible responses, Mr. Barrett was wrong 64% of the time, making 64 errors. The measured significant impairment on this test means that I had to say to Mr. Barrett 64 times that he was "wrong."

65. Mr. Barrett was not able to learn from the information he was being provided and his abilities on this test were severely impaired (T = <24, <1st%ile). Again, Mr. Barrett often stated the concept or "rule" he had developed, but then did not carry out that rule that he had just stated. The SCT assesses an individual's capacity for abstract reasoning and complex concept formation, as well as the individual's ability to flexibly change their thinking and actions considering information that they are provided. SCT is a measure of functioning of the entire prefrontal cortex system, evaluating abilities that are similar to those measured by the WCST.

66. In summary, Mr. Barrett's abilities and disabilities on neuropsychological testing portray the picture of an individual who, despite reasonably adequate general mental ability, nevertheless experiences significant brain damage and consequent brain dysfunction primarily of prefrontal and temporal cortices, which are necessary for the brain to effectively communicate information and function effectively. The nature and severity of brain dysfunction would negatively impact all aspects of Mr. Barrett's daily functioning, and would particularly impair his abilities to organize, think, reason, plan, anticipate consequences of actions, and change actions as needed based on information he receives from the environment. His disabilities would be further exacerbated under conditions of complexity and/or highly stressful situations.

67. I hold each one of the observations, findings, and conclusions I have reached above to a reasonable degree of scientific certainty and would have advised trial counsel and testified in accordance with them if called as a witness during Mr. Barrett's trial.

The foregoing is true and correct and executed under penalty of perjury under the laws of the United States and the State of California on March 5, 2009.

Myla H. Young, Ph.D.

24

1355

Addendum A

Myla H. Young, Ph.D., ABN

MYLA H. YOUNG, Ph.D., ABPN
Diplomate – American Board of Professional Neuropsychology
PSY 11916

RESUME

*Office:*                            *Mailing:*
1475 North Broadway # 335            1630 North Main Street #357
Walnut Creek, CA 94596               Walnut Creek, CA 94596

(925) 952-4350
925  945-8991 (FAX)
mylayoung@sbcglobal.net

**LICENSE-Psychology**

California        August, 1990        PSY 11916

**CERTIFICATION**

Board Certification in Neuropsychology – American Board of
    Professional Neuropsychology (ABPN)

Certification in Hare Psychopathy Checklist-#99-20
    Robert Hare, Ph.D.

**EDUCATION**

Ph.D.            Alliant International University
                 (Formerly California School of Professional
                 Psychology)
                     San Francisco, California
                     Doctor of Philosophy/Clinical Psychology
                     January, 1988

M.A.             Towson State University
                     Baltimore, Maryland
                     Master of Arts/Experimental Psychology
                     June, 1977

B.A.             University of Guam
                     Agana, Guam
                     Bachelor of Arts/Psychology
                     June, 1975

1

**POST-DOCTORAL FELLOWSHIP**

   University of California/San Francisco General Hospital
     San Francisco, California

        January 1988 - January 1990

**PRE-DOCTORAL INTERNSHIPS**

McAuley Neuropsychiatric Institute of St. Mary's Hospital
    San Francisco, California

       July 1985 - July 1987

Garfield Geropsychiatric Hospital
    Oakland, California

       October 1984 - July 1985

**PROFESSIONAL WORK EXPERIENCE - Current**

| | |
|---|---|
| Private Practice | Neuropsychological Assessment Child, Adolescent and Adult Forensic, Medical, Psychiatric, Medico-Legal, Educational |

       March 1992 - Present

| | |
|---|---|
| Continuing Education Faculty | Alliant International University Neuropsychological Evaluation of Criminal Offenders |

       2000 - Present

| | |
|---|---|
| Continuing Education Faculty | University of California-Berkeley Neuropsychological Evaluation of Criminal Offenders Introduction to Neuropsychological Assessment |

       2005 - Present

2

**PROFESSIONAL WORK EXPERIENCE - Prior**

Senior           California Department of Mental Health
Supervising      Correctional Medical Facility
Psychologist     Vacaville, California

                 Psychology Consultant to Executive Director,
                   Medical Director and Program Directors
                  Principal Investigator for Research Project
                  Program Evaluation, Program Development,
                    Treatment Outcome Measurement
                  Director-American Psychological Association
                   (APA) Psychology Intern Training Program
                  Director-Psychology Fellowship Training
                    Program
                   Standards of Practice/Quality Assurance
                   -Psychology Service
                   Staff Selection/Evaluation - Psychology
                    Service
                   Clinical Supervision and Consultation -
                   Psychology Service

              Staff Psychologist - January 1990 - June 1995
              Program Consultant - June 1995 - January 2000
              Senior Psychologist - January 2000 - July 2005

Adjunct          Alliant University - Berkeley/Alameda
Faculty            Instructor: Neuropsychological Assessment
                              Cognitive Bases of Behavior

                 Dissertation Chairperson:
                         -Neuropsychological Assessment of
                            Psychotic and Non-Psychotic
                            Inmate/Patients
                         -Neuropsychiatric Description of
                            Children in Day Treatment
                         -HIV/AIDS-Affected Children:  A
                          Study Utilizing the Rorschach To
                            Identify Depression
                         -Self Mutilation:  Analysis of
                            a Psychiatric Forensic
                            Population
                          -Relationships of Rorschach and
                            MMPI2 to the PCL-R among
                            Mentally Ill Felons

3

```
              Dissertation Committee:
                   -Development of Special
                        Aggression Content Scales for
                        Rorschach Test Administration
                        within a Prison Population
                   -Neuropsychological and Cognitive
                        Correlates of Academic
                        Achievement in a Child
                        Psychiatric Sample
                   -Emotional Descriptors of
                        Adolescents Who Have
                        Committed Homicide
                   -Rorschach Responses/Piagetian
                        Cognitive Development in Eight
                        to Twelve Year Old Children
                   -Understanding Malingering:
                        Theory and Treatment

                        1990 - 2005
```

Training,        Oaks Children's Center
Assessment,          San Francisco, California
Consultation     Training and Supervision of Pre-Doctoral
                     Psychology Intern
                 Seminars in Neuropsychological and
                  Personality Assessment of Children
                        1992 - 1995

Training,        McAuley Institute of St. Mary's Hospital
Assessment,       San Francisco, California
Consultation     Training and Supervision of Pre/Post-
                  Doctoral Psychology Interns/Fellows
                  Seminars in Neuropsychological Assessment
                     Of Children, Adolescents, Adults

                        1992 - 1995

Research         University of California-San Francisco
Training          NIDA Research Grant:  Longitudinal
                  Study of HIV Related Cognitive
                  Impairment in Groups of Gay Men and IV
                  Drug Users

                        1988 - 1990

4

1360

Child &           Florida United Methodist Children's Home
Family             Enterprise, Florida
Counselor         Child & Family Counselor at a Residential
                   Treatment Facility for Children/Adolescents
                  Individual and Group Counseling
                  Parent Education
                  Court Liaison
                  Consultation to Residential Group Home
                  Consultation to Children in Foster Care

                       1978 - 1980


Adjunct           University of Central Florida
Faculty           Valencia Community College
                  Seminole Community College
                  Lake-Sumter Community College
                   Orlando, Florida
                       General Psychology
                       Developmental Psychology
                       Child & Adolescent Psychology
                       Research Methods
                       Learning Theory and Animal Behavioral
                          Training Laboratory

                       1980 - 1984



**RESEARCH EXPERIENCE**

Principal         California Department of Mental Health
Investigator       Correctional Medical Facility-Vacaville
                   Prospective description of demographic,
                   neuropsychological and emotional
                   functioning in psychiatrically hospitalized
                   males

                  1994 - 2005 (Project Completed)

Principal         California Department of Mental Health
Investigator       Correctional Medical Facility-Vacaville
                       Multimethod description of inmates
                       referred for psychiatric treatment from
                       Pelican Bay State Prison

                  1994 - 1997 (Project Completed)

5

| | |
|---|---|
| Principal Investigator | California Department of Mental Health Correctional Medical Facility-Vacaville Development and Evaluation of a Behavioral Milieu Program in a Forensic Psychiatric Treatment Program<br><br>1990 – 1993 (Project Completed) |
| Participant | Spine Institute of San Francisco – Medtronic Spinal Cord Stimulator Project<br>  Principal Investigator:<br>  J. Schofferman, M.D.<br><br>1996 – 1998 (Project Completed) |
| Post Doctoral Research Assistant | University of California-San Francisco Psychiatric Aspects of AIDS Dementia in Gay Men and IV Drug Abusers<br>  Principal Investigators:<br>    Alicia Boccellari, Ph.D.<br>    J. Dilley, M.D.<br><br>1988 – 1990 (Project Completed) |
| Post Doctoral Research Assistant | McAuley Neuropsychiatric Institute of St. Mary's Hospital Longitudinal Study of Infant Attachment<br>  Principal Investigators:<br>    H. Massey, M.D.<br>    J. Afterman, M.D.<br><br>1988 –1990 (Project Completed) |
| Doctoral Dissertation | Neuropsychological and Piagetian Cognitive Development:  A comparison of children's responses to the Luria-Nebraska Neuropsychological Battery-Children's Revision, Piagetian Tasks, and the WISC-R |
| Master's Thesis | Piagetian Moral Development:  A comparison of children's responses to Piagetian Moral Intentionally stories presented in both verbal and videotaped versions |
| Graduate Research Assistant | Towson State University Piagetian Cognitive Development Behavioral Treatment |

6

1362

**PROFESSIONAL PRESENTATIONS**

Contra Costa Department of Defense Seminar Martinez,
     California.  *When juvenile offenders become adult
     offenders:  A prospective look* (July, 2006)

California Psychological Association Conference San Jose,
     California. *The sexual offender in prison psychiatric
     treatment: A multimethod description* (April, 2003)

Forensic Mental Health Association of California Conference
     Asilomar, California. *The sexual offender in prison
     psychiatric treatment: A multimethod description*
     (March, 2003)

International Organization of Psychophysiology Montreal,
     Canada  *Profiles of Violent Mentally Ill Incarcerated
     Males: Neuropsychology and Psychophysiology* (August,
     2002)

California Psychological Association Conference Pasadena,
     California *Research in Prison Psychiatric Treatment*
     (May, 2002)

American Correctional Health Services Association
     Conference Costa Mesa, California *Profiles in Violence*
     (September, 2001)

Forensic Mental Health Association of California Conference
     Asilomar, California *Profiles in Violence* (March,
     2001)

Behavioral Health Institute Conference – Los Angeles, CA.
     *Latinos is Forensic Psychiatric Treatment* (September,
     2000)

Forensic Social Work Conference – Palm Springs, California
     *The Violent Psychopath in Treatment* (May, 2000)

Forensic Mental Health Association of California Conference
     Asilomar, California *Danger to Self and Danger to
     Others:  A description of Inmates Who Harm Themselves
     or Harm Others* (March, 2000)

California Psychological Association Conference, San Jose,
     California
     *Neuropsychological and Psychological Evaluations in
     A Forensic Psychiatric Setting* (March, 2000)

7

1363

Forensic Mental Health Association of California Conference
Asilomar, California  *The Violent Psychopath in Psychiatric Treatment* (March, 1999)

Patton State Hospital Mental Health Conference, Patton, California *The Violent Psychopath in Psychiatric Treatment* (September, 1999)

Patton State Hospital Mental Health Conference, Patton, California *Psychopathy in a Forensic Psychiatric Population* (September, 1998)

Forensic Mental Health Association of California Conference Asilomar, California *A Multimethod Approach to Understanding Psychopathy* (March, 1998)

Patton State Hospital Mental Health Conference, Patton, California *Violence in the Community and Assaut in Prison:  A Multimethod Approach* (September, 1997)

Forensic Mental Health Association of California Conference Asilomar, California *Patterns of Violence: Demographic, neurocognitive, diagnostic, and emotional descriptions of inmates with high and low violence histories.* (April, 1997)

California Department of Corrections-Pelican Bay-Pelican Bay, California *Description of Inmate/Patient Populations Demographic, Cognitive, Neuropsychological, and Psychological Correlates with Violence* (July, 1996)

California Department of Corrections-Preston School for Boys – Ione, California *Demographic, Cognitive, Neuropsychological, and Psychological Correlates with Age of Offense* (July, 1996)

California Department of Corrections-Director's Cabinet Meeting – Sacramento, California *Description of Inmate/Patient Population* (July, 1996)

California Department of Corrections-Northern Regional Warden's Meeting – Folsom State Prison *Description of Inmate/Patient Population* (July, 1996)

8

California Department of Corrections-Warden's Meeting - CMF
    Vacaville, California *Description of Inmate/Patient
    Population* (June, 1996)

Patton State Hospital Forensic Mental Health Conference.
    *Development of a Forensic Psychiatric Treatment
    Program Based on Empirical Description of the
    Population* (October, 1995)

Patton State Hospital Forensic Mental Health Conference.
    *Opening Address - The Changing Face of Forensic Mental
    Health:  The Challenge Described* (October, 1994)


**PUBLICATIONS**

Young, M. H., Justice, J., & Erdberg, P. (2008). *The
    Rorschach Test in a prison population.* (Manuscript in
    press).

Young, M. H., Justice, J., & Erdberg P. (2008). *Sex
    offenders in prison psychiatric treatment: A
    biopsychosocial description.*  International Journal of
    Offender Therapy and Comparative Criminology. (in
    press).

Young, M. H., Justice J., & Erdberg, P. (2007). *A
    comparison of rape and molest offenders in prison
    psychiatric treatment.* (Manuscript in review).

Schofferman, J. & Young, M. H.  (2007).  *Previously
    unrecognized cognitive and psychological disorders in
    patients with chronic neck pain due to whiplash and
    other forms of cervical trauma.* Pain Medicine,
    (Manuscript in revision).

Young, M. H.,Justice, J., & Erdberg, P. (2006).  Risk of
    harm:  Inmates who harm themselves while in prison
    psychiatric treatment.  *Journal of Forensic Sciences,
    51*(1), 154-162.

Young, M. H., & Justice, J. (2003). Risk Factors for
    assault while in Prison Psychiatric Treatment. *Journal
    of Forensic Sciences, 49*(1), 141-149.

Justice, J. & Young, M. H. (2002).  *Managing violence in a
    Supermax facility:  A discussion of research findings
    and their application to reducing violence in supermax*

9

*institutions and beyond.* In D. Neal (ed.) Supermax Prisons (pp. 99 – 118). Lanham, MD. American Correctional Association.

Young, M. H., Siemsen, R., & Roman, T. (2000). Neuro-psychological and personality assessment in a forensic psychiatric setting. *California Psychological Association Convention Abstracts.*

Young, M.H., Justice, J., & Erdberg, P. (2000). A multi-method description of psychopathy among forensic psychiatric inmates. In C. Gacono (Ed.) *The Clinical Forensic Assessment of Psychopathy: A Practitioner's Guide* (pp. 313-332). Mahwah, New Jersey, Erlbaum.

Young, M.H., Justice, J., & Erdberg, P. (1999). Risk factors for violence among incarcerated male psychiatric patients: A multimethod approach. *Assessment, 6,* 243-258.

Young, M. H. & Justice, J. (1997). Neuropsychological functioning of inmates referred for psychiatric treatment. *Archives of Clinical Neuropsychology, 13,* 303 – 318.

Dilley, J., Boccellari, A., Davis, A., Young, M., & Bacchetti, P. (1989). Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men. *IV International Conference on AIDS. Montreal, Canada.*

Dilley, J., Boccellari, A., Davis, A., Young, M. & Bacchetti, P. (1989). Relationships between neuro-psychological and immune variables in HIV positive asymptomatic men. *Abstract and oral presentation. American Psychiatric Association, May 11, 1989. San Francisco, CA.*

Young, M.H. (1977). Visual Modality as a Preferred Mode presentation for Piagetian Moral Intentionally. *Monographs of Lida Lee Tall Learning Research Center.* Towson State University

10

PROFESSIONAL AWARDS

| | |
|---|---|
| University of Guam | Graduation - Magna Cum Laude<br>June, 1975 |
| Towson State<br>University | Graduation - Magna Cum Laude<br>June, 1978 |
| California School of<br>Professional Psychology | Superior Accomplishment Award<br>Dissertation<br>June, 1988 |
| State of California | Superior Accomplishment Award |
| Department of Mental Health<br>Correctional Medical<br>Facility | Exceptional Job Performance<br>April, 1993 |
| State of California<br>Department of Mental Health<br>Correctional Medical | Superior Accomplishment Award<br>Exceptional Job Performance<br>April, 1995 |
| State of California<br>Award<br>Department of Mental Health<br>Correctional Medical<br>Facility | Outstanding Accomplishment<br>Exceptional Job Performance<br>September, 1999 |

PROFESSIONAL ASSOCIATIONS

-American Board of Professional Neuropsychology (ABPN)
-American Psychological Association (APA)
    Division 40:  Clinical Neuropsychology
    Division 42:  Forensic Psychology
-California Psychological Association (CPA)
-National Academy of Neuropsychology (NAN)
-International Neuropsychological Society (INS)
-Society for Personality Assessment (SPA)


    April, 2008


11

# SCORE SUMMARY SHEET

NAME: _Kenneth Barrett_
DOB: _29 June 1961_
DOE: _09 February 2009 and 10 February 2009_

## INTELLECTUAL FUNCTIONING

### Wechsler Adult Intelligence Scale—~~Third~~ _Fourth_ Edition (WAIS-IV)

| Verbal | | | Performance | | |
|---|---|---|---|---|---|
| Vocabulary | 08 | (25 %ile) | Picture Completion | ___ | ( ___ %ile) |
| Similarities | 09 | (37 %ile) | Coding | * 04 | (2nd %ile) |
| Arithmetic | 07 | (16 %ile) | Block Design | 10 | (50 %ile) |
| Digit Span | 07 | (16 %ile) | Matrix Reasoning | 07 | (16th %ile) |
| # digits forward | 6 | | Picture Arrange | ___ | ( ___ %ile) |
| # digits backward | 3 | | Figure Weights | ___ | ( ___ %ile) |
| # digits arranged | 5 | | Symbol Search | * 03 | (01st %ile) |
| Information | 10 | (50 %ile) | Visual Puzzles | 09 | (37th %ile) |
| Comprehen | ___ | ( ___ %ile) | | | |
| L-N Sequen | 08 | (25 %ile) | | | |

95% conf. interval

**Full Scale IQ**    * 82 (12 %ile) 78-86 Low Average

Verbal Comprehension    95 (37 %ile) 90-107 Average
Perceptual Organization    92 (30 %ile) 86-99 Average
Working Memory Index    83 (13 %ile) 77-91 Low Average
Processing Speed    * 65 (01 %ile) 60-77 Extremely Low

## ATTENTION/CONCENTRATION

ENCODING

| | | | | |
|---|---|---|---|---|
| *WAIS Digit Span forwards | longest = ___ | 6 | ( ___ %ile) | |
| *WAIS L-N Sequence | | 4 | Z Score | |
| *CVLT Trial 1 | words ___ | 7 | ( 0 ~~%ile~~ ) | |
| *CVLT List B | words ___ | 3 | (1.5 ~~%ile~~ ) * | |
| *WMS LM Story A | ___ /25 | | | |
| *WMS LM Story B 1st | ___ /25 | see output SS 13 84th %ile | | |
| *Sentence Repetition | | ___ | ( ___ %ile) | |
| *WMS Faces ___ /48 | | ___ | ( ___ %ile) | |

ADULT SCORE SHEET
Page 2 of 6

## FOCUS-EXECUTE                                                SC

    **\*WAIS Coding**            D-KEFS            04 (2nd %ile)
    **\*WAIS Symbol Search**                        03 (1st %ile)
    **\*Trails A** _____ seconds Visual Scanning      04 (   %ile)
    Letter Sequencing      D-KEFS            07
## SHIFTING          Conceptual level Rs 03%      ↓ 1st %ile  T-Score of 20

    **\*WCST** Perseverative Errors 11%    68th %ile  T-Score of 52
    **\*Trails B** _____ seconds              _____ (   %ile)

## SUSTAINING

    **\*CPT**
    **\*WCST** set losses                       0   (>16th %ile)

## EXECUTIVE FUNCTIONS

## PLANNING    see D-KEFS output

| | SS | Percentile Rank |
|---|---|---|
| **\*Tower of London** | | |
| Total Move Score | _____ | (   %ile) |
| Total Correct Score | _____ | (   %ile) |
| Total Rule Violation | _____ | (   %ile) |
| Total Time Violation | _____ | (   %ile) |
| Total Initiation Time | _____ | (   %ile) |
| Total Execution Time | _____ | (   %ile) |
| Total Problem-Solving Time | _____ | (   %ile) |

## INHIBITION       see D-KEFS output.

    **\*CPT**       where inhibition + switching are deficits
    **\*Stroop**                                _____ (   %ile)
        Word _____
        Color _____
        CW _____
    Interference _____

## SHIFTING

    **\*WCST** conceptualization and perseveration scores

Short Category Test (SCT)   Raw Score   T-Score   %ile
                            64      < 24      < 1st

ADULT SCORE SHEET
Page 3 of 6

## IDEA GENERATION

**Verbal Fluency**    letter fluency d-kEFS              55
                                                          08
  F ( ) A ( ) S ( ) = _____        _____    (     %ile)
  Animals          = _____        _____    (     %ile)

**D-KEFS**                                            55
  Category Fluency                                    10
  Category Switch                                     10
  Switch Accuracy                                     05

**Ruff Figural Fluency**                    _____   (     %ile)
  Designs _____
  PSV     _____

**Design Fluency (D-KEFS)**                  12
  Filled Dots                                 10
  Empty Dots                                  10
  Switch

## WORKING MEMORY   PASAT  discontinued b/c of problems comprehending
                           instructions

  **WAIS Digit Span** backward  longest: _____   ___3___   (     %ile)
  **WAIS Arithmetic**                    _____   (     %ile)
  **WAIS Arithmetic** Addend.            (     %ile)
  Visual working memory Index on WMS-IV  SS70   2nd %ile

## MEMORY AND LEARNING

  **CVLT**
  **Rey Osterrieth Complex Figure and Recognition**        <1st
    Copy              _29_ /36              (E 10%ile) Time to copy
    Immediate Recall  _21_ /36    T51     (54 %ile) 273" >16th
    Delayed Recall    _26_ /36    T62     (88 %ile)
    Percent retained: _____
    Recognition       _21_  /24   T51     (54 %ile)
    False Positives   _0_   /12   _____  (     %ile)
    False Negatives   _3_   /12   _____  (     %ile)

  **Wechsler Memory Scales**
  **Logical Memory I**                   _____   (84th %ile)
    Story A  _____ /25
    Story B1 _____ /25
    Story B2 _____ /25                              > degradat.
  **Logical Memory II**                  _____   (37 %ile)

ADULT SCORE SHEET
Page 4 of 6

Story A _____ /25
Story B _____ /25
LM Recognition                                      (     %ile)
Story A _____ /15 (___ false +; ___ false -) ⟩ 26/30   >75th percentile
Story B _____ /15 (___ false +; ___ false -)
Faces Immediate _____ /48 _____              (     %ile)
Faces Delayed _____ /48 _____                (     %ile)
VPA II recognition                             10-16th percentile

## LANGUAGE

## COMPREHENSION

## REPETITION

## PHONOLOGICAL AWARENESSS

errors on WRAT Spelling phonetically correct

## NAMING

*Boston Naming   Test       _____        (     %ile)
*Verbal Fluency
F (   )+A(   )+S(   ) = _____  _____     (     %ile)
Animals              _____  _____        (     %ile)

## SENSORIMOTOR  fingertip # writing no errors on Rt. hand reported *

*Benton Finger Localization (pref'd)   ____  _____   (     %ile)
*Benton Finger Localization (nonpref'd) ____ _____   (     %ile)

*Grooved Pegboard
Right _____ sec        _____            (     %ile)
Left _____ sec         _____            (     %ile)

*Fingertapper
Right _____            _____            (     %ile)
Left _____             _____            (     %ile)

*Hand Dynamometer
Right ____ ____ ____ M ____  _____       (     %ile)
Left ____ ____ ____ M ____  _____        (     %ile)

# Finger tip # writing reported as impaired in dr. Young's
declaration - no data available for review + peripheral injury
status unknown

ADULT SCORE SHEET
Page 5 of 6

## VISUAL SPATIAL/VISUAL PERCEPTUAL

| | | |
|---|---|---|
| *Benton JOLO | | (    %ile) |
| *WAIS Block Design | 10 | (50 %ile) |
| *WAIS Object Assembly | | (    %ile) |
| *WAIS Matrix Reasoning | 07 | (    %ile) |
| *Rey Osterrieth copy 29 /36 | | (≤ 1st %ile) |

## ACHIEVEMENT

WRAT 3
~~WIAT~~ (see score summary sheets)

| Composites | SS | Percentile Rank |
|---|---|---|
| *Reading | 90 | 25th |
| *Mathematics | 87 | 19th |
| *~~Written Language~~ Spelling | 76 | 5th |
| *Oral Language | | |

## PERSONALITY/SOCIAL/EMOTIONAL   n/a

PAI  (see scale and subscale sheets)

ICN =
INF =
NIM =
PIM =
SOM =
ANX =
ARD =
DEP =
MAN =
PAR =
SCZ =
BOR =
ANT =
ALC =
DRG =
AGG =
SUI =
STR =
NON =
RXR =
DOM =

1372

ADULT SCORE SHEET
Page 6 of 6

WRM =

ASSESSMENT OF MALINGERING:   no evidence for feigned cognitive impairment or poor effort on either Bisnio or Young's data

RDS :   Ø

RMI RCFT :   Ø

RMI LM :   Ø   26/30

CT :

VDS Vocabulary versus Digit Span :   Ø

CVLT :   Ø

WCST :   Ø 7TMS or Ø responses

Tomm   Thal 1: 49
        Thal 2: 50

Client: Kenneth Barrett
Client ID:

Test Date: 02/11/2009
Page 2 of 4

## Test Results

| WCST scores | Raw scores | Age & Education Demographically Corrected | | | | U.S. Census Age-matched | | |
|---|---|---|---|---|---|---|---|---|
| | | Standard scores | T scores | %iles | | Standard scores | T scores | %iles |
| Trials Administered | 128 | | | | | | | |
| Total Correct | 33 | | | | | | | |
| Total Errors | 95 | < 55 | < 20 | < 1% | | < 55 | < 20 | < 1% |
| % Errors | 74% | 56 | 21 | < 1% | | < 55 | < 20 | < 1% |
| Perseverative Responses | 14 | 100 | 50 | 50% | | 96 | 47 | 39% |
| % Perseverative Responses | 11% | 107 | 55 | 68% | | 99 | 49 | 47% |
| Perseverative Errors | 14 | 97 | 48 | 42% | | 95 | 47 | 37% |
| % Perseverative Errors | 11% | 103 | 52 | 58% | | 98 | 49 | 45% |
| Nonperseverative Errors | 81 | < 55 | < 20 | < 1% | | < 55 | < 20 | < 1% |
| % Nonperseverative Errors | 63% | < 55 | < 20 | < 1% | | < 55 | < 20 | < 1% |
| Conceptual Level Responses | 4 | | | | | | | |
| % Conceptual Level Responses | 3% | 55 | 20 | < 1% | | < 55 | < 20 | < 1% |
| Categories Completed | 0 | | | ≤ 1 | | | | ≤ 1 |
| Trials to Complete 1st Category | 129 | | | 2 - 5% | | | | 2 - 5% |
| Failure to Maintain Set | 0 | | | > 16% | | | | > 16% |
| Learning to Learn | N/A | | | | | | | |



# Wide Range Achievement Test Revision 3 (WRAT3)
## Summary Report

by
Gary S. Wilkinson, PhD, and PAR Staff

### General Information

| | | | |
|---|---|---|---|
| Client Name : Kenneth Barrett | | Age : 47-07 |
| ID Number : | | Gender : Male |
| Referred By : | | Education : 9 |
| School : | | Test Date : 02/10/09 |
| Prepared For : Myla H Young Ph.D. | | Birth Date : 06/29/61 |

## Tan Test Results

| | Raw Score | Standard Score | Percentile | Grade Score | Absolute Score |
|---|---|---|---|---|---|
| Reading | | | | | |
| Spelling | | | | | |
| Arithmetic | | | | | |

## Blue Test Results

| | Raw Score | Standard Score | Percentile | Grade Score | Absolute Score |
|---|---|---|---|---|---|
| Reading | 44 | 90 | 25 | High School | 517 |
| Spelling | 32 | (76) | (5) | 6 | 506 |
| Arithmetic | 37 | 87 | 19 | 7 | 513 |

*phonetically correct even when misspelled* (handwritten annotation)

## Combined Test Results

| | Raw Score | Standard Score | Percentile | Grade Score | Absolute Score |
|---|---|---|---|---|---|
| Reading | | | | | |
| Spelling | | | | | |
| Arithmetic | | | | | |

WRAT3 Copyright © 1993 by Wide Range, Inc.
WRAT3 Scoring Program Copyright © 1996 by PAR, Inc.
All rights are reserved.



**CVLT-II**
**Comprehensive Scoring System**

**Standard Form - Core Report**

Name : Kenneth Barrett

Test Date :   2/9/2009

## Level of Recall

| Level of Immediate Recall | | | Level of Delayed Recall | | |
|---|---|---|---|---|---|
| | Number Correct | | | Number Correct | |
| | Raw | Standard Score | | Raw | Standard Score |
| Trial 1 | 7 | 0 | Short Delay Free Recall | 11.0 | 0.5 |
| Trial 5 | 12 | 0.5 | Short Delay Cued Recall | 14.0 | 1.5 |
| Trials 1-5 Total | 49 | 55 (T-Score) | Long Delay Free Recall | 12.0 | 1 |
| Trial B | 3 | (-1.5) | Long Delay Cued Recall | 14.0 | 1 |

## Learning Characteristics, Trials 1-5 Total

| | Raw | Standard Score |
|---|---|---|
| Semantic Clustering (Chance Adjusted) | 3 | (2.5) |
| Serial Clustering Bidirectional (Chance Adjusted) | 0.5 | 0 |
| Subjective Clustering Bidirectional (Chance Adjusted) | 0.7 | 0 |
| % Recall from Primacy | 31% | 0 |
| % Recall from Middle | 47% | 0.5 |
| % Recall from Recency | 22% | (-1) |
| Total Learning Slope Trials 1-5 | 1.5 | 0.5 |
| Across-Trial Recall Consistency | 78 | 0 |



**CVLT-II**
Comprehensive Scoring System

Standard Form - Core Report

Name : Kenneth Barrett

Test Date :   2/9/2009

## Recall Contrast Measures*

| | Percent Change | Z-Score Difference |
|---|---|---|
| *Proactive Interference* | | |
| List B vs. Trial 1 | -57.1% | -1.5 |
| *Short-Delay Retention/Retroactive Interference* | | |
| Short Delay Free Recall vs. Trial 5 | -8.3% | 0 |
| *Long-Delay Retention* | | |
| Long Delay Free Recall vs. Short Delay Free Recall | 9.1% | 0.5 |

*\* Norms derived from Z-Scores differences.*

## Recall Errors

| | Raw | Standard Score |
|---|---|---|
| Total Repetitions (All Recall Trials) | 1 | -1 |
| Total Intrusions (All Recall Trials, All Types) | 3 | 0 |
| Total Recall Discriminability (List A, All Trials vs. Total Intrusions) | 2.2 | 0.5 |

## Delayed Recognition Trials

| | Yes/No Recognition | | | Forced Choice Recognition | | |
|---|---|---|---|---|---|---|
| | Raw | Standard Score | | Raw | % with this score | Cum. % w/better score |
| | | | | | Age Group Freq. | |
| Total Hits | 15 | 0.5 | % Total Accuracy (Hits [16]/16)*100 | 100 | 94.7% | 0.0% |
| Total False Positives | 2 | 0 | | | | |
| Total Recognition Discriminability (d') (Hits vs. Total False Positives) | 3.1 | 0.5 | | | | |
| Total Response Bias (C)* | 0 | -0.5 | | | | |

\* embedded effort

\* positive raw scores are in 'NO' response-bias direction, negative raw scores are in the 'YES' response-bias direction.

1377



**CVLT-II**
Comprehensive Scoring System

Standard Form - Core Report

Name : Kenneth Barrett

Test Date :   2/9/2009

## *Recall/Recognition Contrast Measures**

| | Percent Change | Z-Score Difference |
|---|---|---|
| Total Recognition Discriminability vs. Long Delay Free Recall* | — | -0.5 |

*\* Norms derived from Z-Scores differences.*

## *Raw Score Graph--Correct, Instrusions, Hits, and False Positives*



02/16/2009

Page 4 of 4



DELIS • KAPLAN
D•K
Executive Function System™

# Score Report

Name: Kenneth Barrett

Test Date: 2/9/2009

**Trail Making Test**

| | Raw Score | Scaled Score |
|---|---|---|
| **Primary Measure: Completion Times** | | |
| Condition 1: Visual Scanning | 38 | 4 |
| Condition 2: Number Sequencing | 40 | 8 |
| Condition 3: Letter Sequencing | 43 | 7 |
| Condition 4: Number-Letter Switching | 96 | 9 |
| Condition 5: Motor Speed | | |

| | Sum of Scaled Scores | Composite Scaled Score |
|---|---|---|
| **Primary Combined Measure: Completion Times** | | |
| Combined Number + Letter Sequencing | 15 | 8 |

| | Scaled Score Difference | Contrast Scaled Score* |
|---|---|---|
| **Primary Contrast Measures: Completion Times** | | |
| Switching vs Visual Scanning | 5 | 14 |
| Switching vs Number Sequencing | 1 | 11 |
| Switching vs Letter Sequencing | 2 | 12 |
| Switching vs Combined Number + Letter Sequencing | 1 | 11 |
| Switching vs Motor Speed | | |

*A low or high contrast scaled score may reflect different cognitive problems; see examiner's manual.



THE PSYCHOLOGICAL CORPORATION®
A Harcourt Assessment Company

Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

Page 2 of 12



### Trail Making Test (cont.)

| | Raw Score | Cumulative %ile Rank |
|---|---|---|
| **Optional Measures: Error Analysis** | | |
| Omission Errors: Condition 1 (Visual Scanning) | 1 | 13 |
| Commission Errors: Condition 1 (Visual Scanning) | 0 | 100 |
| Sequencing Errors: Condition 2 (Number Sequencing) | 0 | 100 |
| Sequencing Errors: Condition 3 (Letter Sequencing) | 1 | (10) |
| Sequencing Errors: Condition 4 (Number-Letter Switching) | 2 | 16 |
| Set-Loss Errors Condition 2 (Number Sequencing) | 0 | 100 |
| Set-Loss Errors Condition 3 (Letter Sequencing) | 0 | 100 |
| Set-Loss Errors Condition 4 (Number-Letter Switching) | 1 | 22 |
| Time Discontinue Errors: Condition 2 (Number Sequencing) | 0 | 100 |
| Time Discontinue Errors: Condition 3 (Letter Sequencing) | 0 | 100 |
| Time Discontinue Errors: Condition 4 (Number-Letter Switching) | 0 | 100 |
| Time Discontinue Errors: Condition 5 (Motor Speed) | | |
| All Error Types: Condition 4 (Number-Letter Switching) | 3 | (7*) |

*Scaled Score.

Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

THE PSYCHOLOGICAL CORPORATION®
A Harcourt Assessment Company



# Score Report

Name: Kenneth Barrett

Test Date: 2/9/2009

## Verbal Fluency Test: Standard Form

|  | Raw Score | Scaled Score |
|---|---|---|
| **Primary Measures** | | |
| Letter Fluency: Total Correct | 32 | 8 |
| Category Fluency: Total Correct | 39 | 10 |
| Category Switching: Total Correct Responses | 14 | 10 |
| Category Switching: Total Switching Accuracy | 7 | 5 |

|  | Scaled Score Difference | Contrast Scaled Score* |
|---|---|---|
| **Primary Contrast Measures** | | |
| Letter Fluency vs. Category Fluency | -2 | 8 |
| Category Switching vs. Category Fluency | 0 | 10 |

*A low or a high contrast scaled score may reflect different cognitive problems; see examiner's manual.

|  | Letter Fluency Raw Score | Category Fluency Raw Score | Category Switching Raw Score | Total Raw Score | Scaled Score |
|---|---|---|---|---|---|
| **Optional Measures: Conditions 1-3 Combined** | | | | | |
| First Interval: Total Correct | 14 | 10 | 2 | 26 | 5 |
| Second Interval: Total Correct | 7 | 13 | 4 | 24 | 10 |
| Third Interval: Total Correct | 8 | 8 | 6 | 22 | 13 |
| Fourth Interval: Total Correct | 3 | 8 | 2 | 13 | 8 |
| Set-Loss Errors | 1 | 0 | 0 | 1 | 11 |
| Repetition Errors | 0 | 2 | 0 | 2 | 10 |
| Total Responses (Correct + Incorrect)* | 33 | 41 | 14 | 88 | — |

*Note: Some Repetition Errors are coded also as Set-Loss Errors, each double-coded error counts as only one response for the Total Responses Measure.

|  | Percent Raw Score | Scaled Score |
|---|---|---|
| Percent Set-Loss Errors | 1.1 | 11 |
| Percent Repetition Errors | 2.3 | 10 |
| Category Switching: Percent Switching Accuracy | 57 | 4 |



Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company. All rights reserved. Printed in the United States of America.

Page 4 of 12

A Harcourt Assessment Company



DELIS · KAPLAN
Executive Function System™

# Score Report

Name: Kenneth Barrett

Test Date: 2/9/2009

## Design Fluency Test

| | Raw Score | Scaled Score |
|---|---|---|
| **Primary Measures** | | |
| Condition 1 Filled Dots: Total Correct | 12 | 12 |
| Condition 2 Empty Dots Only: Total Correct | 11 | 10 |
| Condition 3 Switching: Total Correct | 7 | 10 |
| | **Sum of Scaled Scores** | **Composite Scaled Score** |
| Design Fluency Total Correct: | 32 | 11 |

| | **Sum of Scaled Scores** | **Composite Scaled Score** |
|---|---|---|
| **Primary Combined Filled + Empty Dots Measure** | | |
| Combined Filled + Empty Dots: Total Correct | 22 | 11 |

| | **Scaled Score Difference** | **Contrast Scaled Score*** |
|---|---|---|
| **Primary Contrast Measure** | | |
| Switching vs Combined Filled + Empty Dots | -1 | 9 |

*A low or a high contrast scaled score may reflect different cognitive problems; see examiner's manual.

| | Condition 1 Filled Dots | Condition 2 Empty Dots Only | Condition 3 Switching | Total Raw Score | Total Scaled Score |
|---|---|---|---|---|---|
| **Optional Measures** | | | | | |
| Total Set-Loss Designs | 0 | 1 | 2 | 3 | 10 |
| Total Repeated Designs | 1 | 3 | 0 | 4 | 11 |
| Total Attempted Designs* | 13 | 15 | 9 | 37 | 12 |

*Note: Some Repetition Errors are coded also as Set-Loss Errors; each double-coded error counts as only one response for the Total Attempted Design Measure.

| | Percent Raw Score | Scaled Score |
|---|---|---|
| Percent Design Accuracy | 81 | 8 |



THE PSYCHOLOGICAL CORPORATION
A Harcourt Assessment Company

Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company. All rights reserved. Printed in the United States of America.



<div align="right">

## Score Report

Name: Kenneth Barrett

Test Date: 2/9/2009

</div>

### Color-Word Interference Test

| | Raw Score | Scaled Score |
|---|---|---|
| **Primary Measures: Completion Times** | | |
| Condition 1: Color Naming | 29 | 10 |
| Condition 2: Word Reading | 27 | (7) |
| Condition 3: Inhibition | 59 | 9 |
| Condition 4: Inhibition/Switching | 62 | 10 |

| | Sum of Scaled Scores | Composite Scaled Score |
|---|---|---|
| **Primary Combined Measure: Completion Times** | | |
| Combined Naming + Reading | 17 | 9 |

| | Scaled Score Difference | Contrast Scaled Score* |
|---|---|---|
| **Primary Contrast Measures: Completion Times** | | |
| Inhibition vs. Color Naming | -1 | 9 |
| Inhibition/Switching vs. Combined Naming + Reading | 1 | 11 |
| Inhibition/Switching vs. Inhibition | 1 | 11 |

*A low or a high contrast scaled score may reflect different cognitive problems; see examiner's manual.

| | Scaled Score Difference | Contrast Scaled Score* |
|---|---|---|
| **Optional Contrast Measures: Completion Times** | | |
| Inhibition/Switching vs. Color Naming | 0 | 10 |
| Inhibition/Switching vs. Word Reading | 3 | 13 |

*A low or a high contrast scaled score may reflect different cognitive problems; see examiner's manual.

| | Cor. Errors Raw Score | Cor. Errors Cum. Freq. Rank | Uncor. Errors Raw Score | Uncor. Errors Cum. Freq. Rank | Total Errors Raw Score | Total Errors Scaled Score |
|---|---|---|---|---|---|---|
| **Optional Measures: Error Analysis** | | | | | | |
| Cond. 1: Color Naming | 0 | — | 0 | — | 0 | 100* |
| Cond. 2: Word Reading | 0 | — | 0 | — | 0 | 100* |
| ✗ Cond. 3: Inhibition | 0 | 100 | 4 | 5 | 4 | (6) |
| ✗ Cond. 4: Inhibition/Switching | 2 | 8 | 3 | 14 | 5 | (7) |

*Cumulative Percentile Rank



A Harcourt Assessment Company

Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

Page 6 of 12



**Sorting Test: Standard Form**

| Primary Measures | Card Set 1 Raw Score | Card Set 2 Raw Score | Total Raw Score | Scaled Score |
|---|---|---|---|---|
| **Condition 1: Free Sorting** | | | | |
| Confirmed Correct Sorts | 4 | 4 | 8 | 9 |
| Free Sorting Description Score | 12 | 16 | 28 | 8 |
| **Condition 2: Sort Recognition** | | | | |
| Sort Recognition Description Score | 8 | 4 | 12 | 3 |

| | Sum of Scaled Scores | Composite Scaled Score |
|---|---|---|
| **Combined Conditions 1 & 2** | | |
| Combined Description Score | 11 | 5 |

| | Scaled Score Difference | Contrast Scaled Score* |
|---|---|---|
| **Contrast Measure: Sort Recognition Versus Free Sorting Description Score** | | |
| Sort Recognition versus Free Sorting | -5 | 4 |

\* A Low or high contrast scaled score may reflect different cognitive problems; see examiner's manual.

| Optional Measures | Raw Score | Cum. %ile Rank |
|---|---|---|
| **Screening Pretest** | | |
| Word Reading Errors | 0 | 100 |
| Word Comprehension Errors | 0 | 100 |



Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company. All rights reserved. Printed in the United States of America.



**Score Report**

Name: Kenneth Barrett

Test Date: 2/9/2009

### Sorting Test: Standard Form (cont.)

| | Card Set 1 Raw Score | Card Set 2 Raw Score | Total Raw Score | Scaled Score |
|---|---|---|---|---|
| **Condition 1: Free Sorting Sorting Measures (Optional)** | | | | |
| Confirmed Correct Sorts: Card Set 1 | 4 | – | – | 9 |
| Confirmed Correct Sorts: Card Set 2 | – | 4 | – | 9 |
| Confirmed Correct Verbal Sorts | | | | |
| Confirmed Correct Perceptual Sorts | | | | |
| Confirmed/Unconfirmed Target Sorts | | | | |
| Repeated Sorts | | | | |
| Set-Loss Sorts | | | | * |
| Nontarget Even Sorts | | | | * |
| Attempted Sorts | | | | |

*Cumulative Percentile Rank

| | Percent Raw Score | Scaled Score |
|---|---|---|
| Percent Sorting Accuracy | | |

| | Cum. Sort Time: Both Sets Total Raw Score | Attempted Sorts Total Raw Score | Ratio Raw Score | Scaled Score* |
|---|---|---|---|---|
| Time-Per-Sort Ratio | | | | |

\* A Low or high ratio scaled score may reflect different cognitive problems; see examiner's manual.

| | Card Set 1 Raw Score | Card Set 2 Raw Score | Total Raw Score | Scaled Score |
|---|---|---|---|---|
| **Condition 1: Free Sorting Description Measures (Optional)** | | | | |
| Free Sorting Description Score: Card Set 1 | 12 | – | – | 7 |
| Free Sorting Description Score: Card Set 2 | – | 16 | – | 10 |
| Free Sorting Incorrect Descriptions | | | | |
| Free Sorting Repeated Descriptions | | | | * |
| Percent Description Accuracy | | | | |

*Cumulative Percentile Rank

| | Card Set 1 Raw Score | Card Set 2 Raw Score | Total Raw Score | Scaled Score |
|---|---|---|---|---|
| **Condition 2: Sort Recognition Description Measures (Optional)** | | | | |
| Sort Recognition Description Score: Card Set 1 | 8 | – | – | 6 |
| Sort Recognition Description Score: Card Set 2 | – | 4 | – | 4 |
| Sort Recognition Incorrect Descriptions | | | | |
| Sort Recognition Repeated Descriptions | | | | * |

*Cumulative Percentile Rank



Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

Page 8 of 12



## Sorting Test: Standard Form (cont.)

| | Condition 1: Free Sorting Total | Condition 2: Sort Recog. Total | Combined Raw Score | Scaled Score |
|---|---|---|---|---|
| **Combined Conditions 1 + 2: Description Measures (Optional)** | | | | |
| Combined Description Score: Verbal Rules | | | | |
| Combined Description Score: Perceptual Rules | | | | |
| Combined No/Don't Know Responses | | | | |
| Combined Noncredit Descriptions | | | | * |
| Combined Overly Abstract Descriptions | | | | * |

*Cumulative Percentile Rank

| | | Sum of Scaled Scores | Composite Scaled Score |
|---|---|---|---|
| Combined Incorrect Descriptions | | | |
| | | Total Raw Score | Cum. %ile Rank |
| Combined Repeated Descriptions | | | |

Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

THE PSYCHOLOGICAL CORPORATION®
A Harcourt Assessment Company



DELIS · KAPLAN
D·K
Executive Function System™

<div align="right">

**Score Report**

Name: Kenneth Barrett

Test Date: 2/9/2009

</div>

### Twenty Questions Test: Standard Form

| | Item 1 Raw Score | Item 2 Raw Score | Item 3 Raw Score | Item 4 Raw Score | Total Raw Score | Scaled Score |
|---|---|---|---|---|---|---|
| **Primary Measures** | | | | | | |
| Initial Abstraction Score* | 8 | 2 | 8 | 7 | 25 | 9 |
| *Minimum number of objects that can be eliminated by the first question asked regardless of the yes or no answer. | | | | | | |
| Total Questions Asked | 6 | 10 | 6 | 5 | 27 | 11 |
| Total Weighted Achievement Score | 4 | 3 | 4 | 5 | 16 | 12 |

| | Item 1 Raw Score | Item 2 Raw Score | Item 3 Raw Score | Item 4 Raw Score | Total Raw Score | Cum. %ile Rank |
|---|---|---|---|---|---|---|
| **Optional Measures** | | | | | | |
| Spatial Questions | | | | | | |
| Repeated Questions | | | | | | |
| Set-Loss Questions | | | | | | |

THE PSYCHOLOGICAL CORPORATION®
A Harcourt Assessment Company

Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company.
All rights reserved. Printed in the United States of America.

1387



# Score Report

Name: Kenneth Barrett

Test Date: 2/9/2009

## Tower Test

| | Total Raw Score | Scaled Score |
|---|---|---|
| **Primary Measure** | | |
| Total Achievement Score | 18 | 11 |

| | Total Raw Score | Cum. %ile Rank |
|---|---|---|
| **Optional Measures** | | |
| Total Rule Violations | 6 | 9 |

| | Ratio Score | Scaled Score |
|---|---|---|
| Mean First-Move Time* | 6.2 | 9 |
| Time-Per-Move-Ratio* | 3.1 | 11 |
| Move Accuracy Ratio* | 2.8 | 3 |
| Rule-Violations-Per-Item Ratio | 0.7 | 7 |

*A low or a high ratio scaled score may reflect different cognitive problems; see examiner's manual.



Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company. All rights reserved. Printed in the United States of America.

1388



**Score Report**

Name: Kenneth Barrett

Test Date: 2/9/2009

## Proverb Test

| Primary Measures | Raw Score | Scaled Score |
|---|---|---|
| Total Achievement Score: Free Inquiry | 23 | 10 |
| Total Achievement Score: Multiple Choice | 30 | 29* |

*Cumulative Percentile Rank

| Optional Measures: Free Inquiry | Total Raw | Scaled Score |
|---|---|---|
| Common Proverb Achievement Score: Free Inquiry | 19 | 12 |
| Uncommon Proverb Achievement Score: Free Inquiry | 4 | 8 |
| Accuracy Only Score | 9 | 8 |
| Abstraction Only Score | 2 | (1) |
| No/Don't Know Responses | 0 | 100* |
| Repeated Responses | 0 | 100* |

*Cumulative Percentile Rank

| Optional Measures: Multiple Choice | Total Raw | Cum. %ile Rank |
|---|---|---|
| Common Proverb Achievement Score: Multiple Choice | 18 | 20 |
| Uncommon Proverb Achievement Score: Multiple Choice | 12 | 100 |
| Total Correct Abstract Choices | 7 | 30 |
| Total Correct Concrete Choices | 1 | (<1) |
| Total Incorrect Phonemic Choices | | |
| Total Incorrect Unrelated Choices | | |
| Total Incorrect Phonemic + Unrelated Choices | | |



Copyright © 2001 by The Psychological Corporation, a Harcourt Assessment Company. All rights reserved. Printed in the United States of America.



# Score Report

| Examinee Name | KB B | Date of Report | 2/11/2017 |
|---|---|---|---|
| Examinee ID | | Grade | 9 |
| Date of Birth | 6/29/1961 | Home Language | English |
| Gender | Male | Handedness | Right |
| Race/Ethnicity | White not Hispanic Origin | Examiner Name | Deborah Miora |

| Test Administered | WAIS-IV (2/10/2009) | Age at Testing | 47 years 7 months | Retest? | No |

WAIS–IV Comments

## Composite Score Summary

| Scale | Sum of Scaled Scores | Composite Score | | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|---|
| Verbal Comprehension | 27 | VCI | 95 | 37 | 90-101 | Average |
| Perceptual Reasoning | 26 | PRI | 92 | 30 | 86-99 | Average |
| Working Memory | 14 | WMI | 83 | 13 | 77-91 | Low Average |
| Processing Speed | 7 | PSI | 65 | 1 | 60-77 | Extremely Low ✳ |
| Full Scale | 74 | FSIQ | 82 | 12 | 78-86 | Low Average |
| General Ability | 53 | GAI | 93 | 32 | 88-98 | Average |

Confidence Intervals are based on the Overall Average SEMs. Values reported in the SEM column are based on the examinee's age.

The GAI is an optional composite summary score that is less sensitive to the influence of working memory and processing speed. Because working memory and processing speed are vital to a comprehensive evaluation of cognitive ability, it should be noted that the GAI does not have the breadth of construct coverage as the FSIQ.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved. Produced in the United States of America.


**WAIS-IV**

## Composite Score Profile

The vertical bars represent the standard error of measurement (*SEM*).

### Composite Scores and Standard Error of Measurement

| Composite | Score | SEM |
|-----------|-------|------|
| VCI | 95 | 2.6 |
| PRI | 92 | 3 |
| WMI | 83 | 3.35 |
| PSI | 65 | 5.41 |
| FSIQ | 82 | 2.12 |
| GAI | 93 | 2.12 |

# Analysis

## Index Level Discrepancy Comparisons

| Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate Overall Sample |
|------------|---------|---------|------------|--------------------|------------------------------|--------------------------|
| VCI - PRI | 95 | 92 | 3 | 7.78 | N | 42.9 |
| VCI - WMI | 95 | 83 | 12 | 8.31 | Y | 17.7 |
| VCI - PSI | 95 | 65 | 30 | 11.76 | Y | 3.5 |
| PRI - WMI | 92 | 83 | 9 | 8.81 | Y | 25.7 |
| PRI - PSI | 92 | 65 | 27 | 12.12 | Y | 4 |
| WMI - PSI | 83 | 65 | 18 | 12.47 | Y | 11.8 |
| FSIQ - GAI | 82 | 93 | -11 | 3.29 | Y | 1.5 |

Base rate by overall sample.
Statistical significance (critical value) at the .05 level.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.  Produced in the United States of America.

KB B
Page 2 of 5

 **WAIS-IV**

## Verbal Comprehension Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Similarities | 24 | 9 | 37 | 10 | 1.04 |
| Vocabulary | 29 | 8 | 25 | 8 | 0.73 |
| Information | 15 | 10 | 50 | 11 | 0.73 |

## Perceptual Reasoning Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Block Design | 40 | 10 | 50 | 9 | 0.95 |
| Matrix Reasoning | 11 | (7) | 16 | 6 | 0.95 |
| Visual Puzzles | 13 | 9 | 37 | 8 | 0.85 |

## Working Memory Subtests Summary

consistent

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Digit Span | 22 | 7 | 16 | 7 | 0.73 |
| Arithmetic | 11 | 7 | 16 | 8 | 0.9 |
| (Letter-Number Seq.) | 16 | 8 | 25 | 7 | 1.04 |

## Processing Speed Subtests Summary

| Subtest | Raw Score | Scaled Score | Percentile Rank | Reference Group Scaled Score | SEM |
|---|---|---|---|---|---|
| Symbol Search | 12 | 3 | 1 | 3 | 1.56 |
| Coding | 30 | 4 | 2 | 3 | 1.2 |

## Subtest Level Discrepancy Comparisons

| Subtest Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate |
|---|---|---|---|---|---|---|
| Digit Span - Arithmetic | 7 | 7 | 0 | 2.57 | N | |
| Symbol Search - Coding | 3 | 4 | -1 | 3.41 | N | 40.1 |

Statistical significance (critical value) at the .05 level.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved. Produced in the United States of America.

KB B
Page 3 of 5

1392



## Subtest Scaled Score Profile



The vertical bars represent the standard error of measurement (*SEM*)

# Determining Strengths and Weaknesses

## Differences Between Subtest and Overall Mean of Subtest Scores

| Subtest | Subtest Scaled Score | Mean Scaled Score | Difference | Critical Value .05 | Strength or Weakness | Base Rate |
|---|---|---|---|---|---|---|
| Block Design | 10 | 7.40 | 2.6 | 2.85 | | 15-25% |
| Similarities | 9 | 7.40 | 1.6 | 2.82 | | >25% |
| Digit Span | 7 | 7.40 | -0.4 | 2.22 | | >25% |
| Matrix Reasoning | 7 | 7.40 | -0.4 | 2.54 | | >25% |
| Vocabulary | 8 | 7.40 | 0.6 | 2.03 | | >25% |
| Arithmetic | 7 | 7.40 | -0.4 | 2.73 | | >25% |
| Symbol Search | 3 | 7.40 | -4.4 | 3.42 | W | 5-10% |
| Visual Puzzles | 9 | 7.40 | 1.6 | 2.71 | | >25% |
| Information | 10 | 7.40 | 2.6 | 2.19 | S | 15-25% |
| Coding | 4 | 7.40 | -3.4 | 2.97 | W | 10-15% |

Overall: Mean = 7.4, Scatter = 7, Base rate = 48.9.
Base Rate for Intersubtest Scatter is reported for 10 Full Scale Subtests.
Statistical significance (critical value) at the .05 level.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.  Produced in the United States of America.

KB B
Page 4 of 5



## Process Analysis

### Working Memory Process Score Summary

| Process Score | Raw Score | Scaled Score | Percentile Rank | Base Rate | SEM |
|---|---|---|---|---|---|
| Digit Span Forward | 8 | 7 | 16 | -- | 1.24 |
| Digit Span Backward | 6 | 7 | 16 | -- | 1.12 |
| Digit Span Sequencing | 8 | 9 | 37 | -- | 1.27 |
| Longest Digit Span Forward | 6 | -- | -- | 79 | -- |
| Longest Digit Span Backward | 3 | -- | -- | 96 | -- |
| Longest Digit Span Sequence | 5 | -- | -- | 82 | -- |
| Longest Letter-Number Sequence | 4 | -- | -- | 93 | -- |

### Process Level Discrepancy Comparisons

| Process Comparison | Score 1 | Score 2 | Difference | Critical Value .05 | Significant Difference Y / N | Base Rate |
|---|---|---|---|---|---|---|
| Digit Span Forward - Digit Span Backward | 7 | 7 | 0 | 3.65 | N | |
| Digit Span Forward - Digit Span Sequencing | 7 | 9 | -2 | 3.6 | N | 31.7 |
| Digit Span Backward - Digit Span Sequencing | 7 | 9 | -2 | 3.56 | N | 28 |
| Longest DS Forward - Longest DS Backward | 6 | 3 | 3 | -- | -- | 33.5 |
| Longest DS Forward - Longest DS Sequence | 6 | 5 | 1 | -- | -- | 67 |
| Longest DS Backward - Longest DS Sequence | 3 | 5 | -2 | -- | -- | 37.5 |

Statistical significance (critical value) at the .05 level.

Scores based on U.S. normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.  Produced in the United States of America.

KB B
Page 5 of 5



## Score Report

| Examinee Name | KB B | Date of Report | 2/11/2017 |
|---|---|---|---|
| Examinee ID | | Education | 9 |
| Date of Birth | 6/29/1961 | Home Language | English |
| Gender | Male | Handedness | Right |
| Race/Ethnicity | White not Hispanic Origin | Examiner Name | Deborah Miora |

Test Administered  WMS-IV (2/10/2009)     Age at Testing  47 years 7 months     Retest?  No

WMS–IV Comments

### Index Score Summary

| Index | Sum of Scaled Scores | Index Score | Percentile Rank | 95% Confidence Interval | Qualitative Description |
|---|---|---|---|---|---|
| Auditory Memory | 34 | AMI | 91 | 27 | 85-98 | Average |
| Visual Memory | 58 | VMI | 130 | 98 | 123-134 | Very Superior |
| Visual Working Memory | 10 | VWMI | 70 | 2 | 65-79 | Borderline |
| Immediate Memory | 42 | IMI | 103 | 58 | 97-109 | Average |
| Delayed Memory | 50 | DMI | 118 | 88 | 110-124 | High Average |

Copyright © 2009 by NCS Pearson, Inc.
Normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.

KB B
Page 1 of 6

 WMS-IV

## Index Score Profile

| Index | Score | SEM |
|---|---|---|
| AMI | 91 | 3.35 |
| VMI | 130 | 3.35 |
| VWMI | 70 | 3.97 |
| IMI | 103 | 3.67 |
| DMI | 118 | 3.67 |

**Index Scores and Standard Error of Measurement**

The vertical bars represent the standard error of measurement (*SEM*).

## Primary Subtest Scaled Score Summary

| Subtest | Domain | Raw Score | Scaled Score | Percentile Rank |
|---|---|---|---|---|
| Logical Memory I | AM | 34 | 13 | 84 |
| Logical Memory II | AM | 19 | 9 | 37 |
| Verbal Paired Associates I | AM | 12 | 4 | 2 |
| Verbal Paired Associates II | AM | 8 | 8 | 25 |
| Designs I | VM | 89 | 14 | 91 |
| Designs II | VM | 73 | 14 | 91 |
| Visual Reproduction I | VM | 37 | 11 | 63 |
| Visual Reproduction II | VM | 43 | 19 | 99.9 |
| Spatial Addition | VWM | 7 | 6 | 9 |
| Symbol Span | VWM | 9 | 4 | 2 |

Copyright © **2009** by NCS Pearson, Inc.
Normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.

KB B
Page 2 of 6



## Primary Subtest Scaled Score Profile



## Process Score Conversions

### Auditory Memory Process Score Summary

| Process Score | Raw Score | Scaled Score | Percentile Rank | Cumulative Percentage (Base Rate) |
|---|---|---|---|---|
| LM II Recognition | 26 | - | - | >75% |
| VPA II Recognition | 35 | - | - | 10-16% |

### Visual Memory Process Score Summary

| Process Score | Raw Score | Scaled Score | Percentile Rank | Cumulative Percentage (Base Rate) |
|---|---|---|---|---|
| DE I Content | 38 | 11 | 63 | - |
| DE I Spatial | 17 | 10 | 50 | - |
| DE II Content | 34 | 10 | 50 | - |
| DE II Spatial | 15 | 12 | 75 | - |
| DE II Recognition | 9 | - | - | 3-9% |
| VR II Recognition | 4 | - | - | 17-25% |

Copyright © 2009 by NCS Pearson, Inc.
Normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.

KB B
Page 3 of 6


## WMS-IV

## Subtest-Level Differences Within Indexes

### Auditory Memory Index

| Subtest | Scaled Score | AMI Mean Score | Difference from Mean | Critical Value | Base Rate |
|---|---|---|---|---|---|
| Logical Memory I | 13 | 8.50 | 4.50 | 2.64 | <1% |
| Logical Memory II | 9 | 8.50 | 0.50 | 2.48 | >25% |
| Verbal Paired Associates I | 4 | 8.50 | -4.50 | 1.90 | 1% |
| Verbal Paired Associates II | 8 | 8.50 | -0.50 | 2.48 | >25% |

Statistical significance (critical value) at the .05 level.

### Visual Memory Index

| Subtest | Scaled Score | VMI Mean Score | Difference from Mean | Critical Value | Base Rate |
|---|---|---|---|---|---|
| Designs I | 14 | 14.50 | -0.50 | 2.38 | >25% |
| Designs II | 14 | 14.50 | -0.50 | 2.38 | >25% |
| Visual Reproduction I | 11 | 14.50 | -3.50 | 1.86 | 5-10% |
| Visual Reproduction II | 19 | 14.50 | 4.50 | 1.48 | 2-5% |

Statistical significance (critical value) at the .05 level.

### Immediate Memory Index

| Subtest | Scaled Score | IMI Mean Score | Difference from Mean | Critical Value | Base Rate |
|---|---|---|---|---|---|
| Logical Memory I | 13 | 10.50 | 2.50 | 2.59 | 25% |
| Verbal Paired Associates I | 4 | 10.50 | -6.50 | 1.82 | <1% |
| Designs I | 14 | 10.50 | 3.50 | 2.42 | 10% |
| Visual Reproduction I | 11 | 10.50 | 0.50 | 1.91 | >25% |

Statistical significance (critical value) at the .05 level.

### Delayed Memory Index

| Subtest | Scaled Score | DMI Mean Score | Difference from Mean | Critical Value | Base Rate |
|---|---|---|---|---|---|
| Logical Memory II | 9 | 12.50 | -3.50 | 2.44 | 10% |
| Verbal Paired Associates II | 8 | 12.50 | -4.50 | 2.44 | 2-5% |
| Designs II | 14 | 12.50 | 1.50 | 2.44 | >25% |
| Visual Reproduction II | 19 | 12.50 | 6.50 | 1.57 | <1% |

Statistical significance (critical value) at the .05 level.

### Subtest Discrepancy Comparison

| Comparison | Score 1 | Score 2 | Difference | Critical Value | Base Rate |
|---|---|---|---|---|---|
| Spatial Addition – Symbol Span | 6 | 4 | 2 | 2.74 | 62.1 |

Copyright © 2009 by NCS Pearson, Inc.
Normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.

KB B
Page 4 of 6



Statistical significance (critical value) at the .05 level.

## Subtest-Level Contrast Scaled Scores

### Logical Memory

| Score | Score 1 | Score 2 | Contrast Scaled Score |
|---|---|---|---|
| LM II Recognition vs. Delayed Recall | >75% | 9 | 7 |
| LM Immediate Recall vs. Delayed Recall | 13 | 9 | 3 |

### Verbal Paired Associates

| Score | Score 1 | Score 2 | Contrast Scaled Score |
|---|---|---|---|
| VPA II Recognition vs. Delayed Recall | 10-16% | 8 | 10 |
| VPA Immediate Recall vs. Delayed Recall | 4 | 8 | 17 |

### Designs

| Score | Score 1 | Score 2 | Contrast Scaled Score |
|---|---|---|---|
| DE I Spatial vs. Content | 10 | 11 | 11 |
| DE II Spatial vs. Content | 12 | 10 | 9 |
| DE II Recognition vs. Delayed Recall | 3-9% | 14 | 19 |
| DE Immediate Recall vs. Delayed Recall | 14 | 14 | 11 |

### Visual Reproduction

| Score | Score 1 | Score 2 | Contrast Scaled Score |
|---|---|---|---|
| VR II Recognition vs. Delayed Recall | 17-25% | 19 | 19 |
| VR Immediate Recall vs. Delayed Recall | 11 | 19 | 19 |

## Index-Level Contrast Scaled Scores

### WMS–IV Indexes

| Score | Score 1 | Score 2 | Contrast Scaled Score |
|---|---|---|---|
| Auditory Memory Index vs. Visual Memory Index | 91 | 130 | 17 |
| Visual Working Memory Index vs. Visual Memory Index | 70 | 130 | 19 |
| Immediate Memory Index vs. Delayed Memory Index | 103 | 118 | 17 |

Copyright © 2009 by NCS Pearson, Inc.
Normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.

KB B
Page 5 of 6

1399

 **WMS–IV**

## Raw Scores

| Subtest | Score Range Adult | Score Range Older Adult | Raw Score |
|---|---|---|---|
| Brief Cognitive Status Exam | 0–58 | 0–58 | |
| Logical Memory I | 0–50 | 0–53 | 34 |
| Logical Memory II | 0–50 | 0–39 | 19 |
| Verbal Paired Associates I | 0–56 | 0–40 | 12 |
| Verbal Paired Associates II | 0–14 | 0–10 | 8 |
| CVLT–II Trials 1–5 | 5–95 | 5–95 | 55 |
| CVLT–II Long-Delay | -5–5 | -5–5 | 1.0 |
| Designs I | 0–120 | | 89 |
| Designs II | 0–120 | | 73 |
| Visual Reproduction I | 0–43 | 0–43 | 37 |
| Visual Reproduction II | 0–43 | 0–43 | 43 |
| Spatial Addition | 0–24 | | 7 |
| Symbol Span | 0–50 | 0–50 | 9 |

| Process | Score Range Adult | Score Range Older Adult | Raw Score |
|---|---|---|---|
| LM II Recognition | 0–30 | 0–23 | 26 |
| VPA II Recognition | 0–40 | 0–30 | 35 |
| VPA II Word Recall | 0–28 | 0–20 | |
| DE I Content | 0–48 | | 38 |
| DE I Spatial | 0–24 | | 17 |
| DE II Content | 0–48 | | 34 |
| DE II Spatial | 0–24 | | 15 |
| DE II Recognition | 0–24 | | 9 |
| VR II Recognition | 0–7 | 0–7 | 4 |
| VR II Copy | 0–43 | 0–43 | |

Copyright © 2009 by NCS Pearson, Inc.
Normative data copyright © 2008 by NCS Pearson, Inc.
All rights reserved.

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**PETITIONER'S PROFFER OF EXPERT TESTIMONY**

**FROM ERIN BIGLER, Ph.D.**

<u>**DECLARATION OF ERIN D. BIGLER, PH.D.**</u>

I, Erin D. Bigler, declare as follows:

1.      I am the Susa Young Gates Professor of Psychology and Neuroscience at Brigham Young University (BYU) in Utah. I was formerly a Professor of Psychology and Psychiatry at the University of Texas. In 1990, I established BYU's Brain Imaging and Behavior Laboratory, which studies the role of neuroimaging variables in cognitive and neurobehavioral disorders such as traumatic brain injuries, neurodevelopmental disorders such as autism and learning disabilities, anoxic brain injuries and other acquired injuries of the brain, as well as aging and Alzheimer's disease. I also helped establish the Magnetic Resonance Imaging Research Facility at BYU and was the founding director of that research center.

2.      In 1999, I received the Distinguished Clinical Neuropsychologist Award from the National Academy of Neuropsychology. I am former President of that organization as well as the International Neuropsychological Society. I am a licensed psychologist in the states of California, Utah, Texas, and Hawaii. I am a Diplomate from the American Board of Professional Psychology, with special competence in neuropsychology. I am the author of over ten books, including multiple works on traumatic brain injury, clinical neuropsychology, and neuroimaging. I am co-author of the textbook *Neuropsychological Assessment*. I am the sole author or co-author of over one-hundred book chapters. I am also the sole author or co-author of hundreds of peer-reviewed journal articles. I have previously qualified as an expert in traumatic brain injury, neuropsychology, and/or neuroimaging in many federal and state

court proceedings. My curriculum vitae summarizing my qualifications follows as Appendix I.

3. Federal post-conviction counsel have asked me to review the records of Mr. Barrett, with particular focus on his neuropsychological test findings and history of multiple head trauma and other adverse conditions that could affect his brain. Specifically I have been asked to address the following: (1) whether there were any errors or omissions in the work done previously; (2) whether any additional neuropsychological testing, neuroimaging studies, or other methods of evaluation that were available in 2005 would have led to reliable conclusions in Mr. Barrett's case; (3) whether Mr. Barrett has brain damage or any clinically significant cognitive impairment; (4) the likely etiologies of that brain damage or cognitive impairment; and (5) the effects of that damage or impairment on Mr. Barrett.

4. I have reviewed background materials on Mr. Barrett to form my opinions; such materials are delineated in Appendix II. These materials include prior psychological and psychiatric evaluations of Mr. Barrett, lay witness declarations regarding Mr. Barrett's history, select educational and medical records, and other background information.

A. **Assessments of Mr. Barrett by Dr. Faust Bianco, Dr. Bill Sharp, and Dr. J. Randall Price**

5. With regards to the psychological and neuropsychological assessment by Faust Bianco, Ph.D. (evaluation of August 9 and 11, 2000) and by Bill Sharp, Ph.D. (September 28, 2002), I have reviewed all of the materials supplied. I will mention Dr. Sharp's assessment first since he generated a report. In Dr. Sharp's assessment, Mr. Barrett stated that he experienced a "… loud, 'buzzing' sound" apparently in both ears. Within the structured

assessment setting, Dr. Sharp reported that Mr. Barrett's "attention, concentration, and ability to calculate seemed only minimally impaired" and that he experienced "… greater difficulty in correctly reporting his life history regarding time frames and events" and "demonstrating some difficulty in his long-term recall of time frame and events…." He also demonstrated a "slight tremor in both of his hands while participating on tasks which required manual dexterity and coordination." While intellectual assessment with the Wechsler Abbreviated Scale of Intelligence (WASI) revealed a full-scale score of 96, testing of academic ability revealed Standard Scores of 85, 64 and 86 in Reading, Spelling and Arithmetic on the Wide Range Achievement Test (WRAT-3). The results of the Bender Visual Motor Gestalt (BVMG) test were interpreted as potentially indicating "… presence of depression, inadequacy, organicity, and paranoia." The BVMG was first developed in the 1930s as a standardized psychological test sensitive in detecting visomotor impairments related to brain damage. The original Diagnostic and Statistical Manual (DSM) formulations by the American Psychiatric Association initially classified mental health problems related to brain pathology as an "organic brain syndrome," and "organicity" was the term used to indicate that some type of brain impairment was present either in the psychological test data or clinical presentation of the individual. The presence of Mr. Barrett's three standardized errors may be further interpreted to reflect the presence of a much younger visual motor age and ability. Three of Dr. Sharp's "rule-outs" in his diagnostic impression section were:  (1) Learning Disability, (2) Attention-deficit /Hyperactivity Disorder, Predominantly Hyperactive-Impulsive Type and (3) Organic Impairment relative to tremor and long-term

memory difficulty. It is my opinion that these were deemed "rule-outs" because Dr. Sharp only conducted a screening assessment and not a full battery of neuropsychological tests.

6. It is my understanding that Dr. Bianco's assessment in 2000 was never formalized into a report. However, the conclusions of Dr. Bianco's later affidavit memorialized in 2003—i.e., that "further neurological testing is unwarranted" given his initial test results, and that further testing "would not be indicative of significant deficits in Mr. Barrett's functioning"—are not supported by his limited neuropsychological testing in 2000 or by Mr. Barrett's clinical history. To the contrary, Dr. Bianco's test results are broadly consistent with Dr. Sharp's, in that both evaluations reveal evidence of organic brain damage in Mr. Barrett.

7. I have been provided with some of the raw test data from Dr. Bianco's assessment, and I have reviewed this in detail. Part of the nature of neuropsychological assessment is to establish what may be an estimate of premorbid ability and to then use that as a reference point as well as using the obtained measures of intellectual functioning. This is referred to as a "discrepancy analysis" and that is what is typically done in attempting to interpret neuropsychological test findings. Where either there is a discrepancy between a normative standard or the individual's estimated premorbid ability level, that is where one makes a determination about potential differences/abnormalities. Part of the discrepancy analysis also depends on the normative standard that one is using to make a comparison and this has a major influence on the clinical distinction on whether something is a problem/deficit or not.

8.      First off, Dr. Bianco administered symptoms/performance validity tests, which Mr. Barrett passed.  In fact, his scores on one of the validity measures was actually a perfect score. Dr. Sharp concluded based on his testing that malingering was not suspected (i.e., "[Barrett] was cooperative with the testing protocol"; "[e]ndorsement provided by the client … reflected that the client provided a valid assessment"; and his MMPI findings "likely presented with a valid assessment"). This was also reflected in the testing performed by Dr. Bianco. All of the test results appeared to be a valid assessment of Mr. Barrett's abilities, given the tests that were administered. In other words, the symptom/performance validity tests indicate that Mr. Barrett put forth full effort on the instruments administered, and he was not malingering to benefit his legal case. This measure of validity does not mean all conclusions drawn from the testing are valid, only that the testing is an accurate measure of Mr. Barrett's functioning at the time.

9.      In review of Dr. Bianco's assessment, there are a number of summary scores that are presented.  On page twenty-one, there is a form completed that indicates this sheet to be the "Neuropsychological Assessment Profile".  This form is a deficit-scale form where "0" is no impairment and "5" is reflective of the most substantial impairment rating possible. The completion of this form is all dependent upon the normative reference being used, which is not indicated whatsoever in the document. There are suggestions in Dr. Bianco's data that he relied upon a normative reference from the Halstead-Reitan normative data from 1950s, which if the case would raise concerns about the validity of any conclusions he drew. Without knowing his normative reference, one cannot ascertain the population to whom he compares Mr. Barrett for prospective abnormalities. The earliest normative

*Declaration of Erin D. Bigler, Ph.D.*                                                                                          *Page 5*

database for the Halstead-Reitan Neuropsychological Test Battery, which Dr. Bianco partially administered, goes back to 1950s—i.e., some four decades before Mr. Barrett's trial, as our understanding of neuropsychological impairments was still evolving. Much of the published work using the Halstead-Reitan Battery in the 1970s through the time when Mr. Barrett was assessed scrutinized the normative standards. Without knowing what standard is being used—since there was no report or statement of such in Dr. Bianco's declaration—the basis for Dr. Bianco's conclusions is unknown. In sum, Dr. Bianco's lack of any normative reference undermines his conclusions as to Mr. Barrett's lack of significant deficits.

10.     As can been seen, a "1" was given to Tactual Performance Test-Memory, Rhythm Errors and Speech Errors. A "2" was given for finger tapping speed for either hand. On the Wechsler Adult Intelligence Scale (3rd Edition), the full-version, he obtained a verbal IQ score of 91, Performance IQ score of 90 and a Full Scale IQ score of 90.   In terms of the range of subtest scores, they were from a low of 6 on Picture Completion and Matrix Reasoning to a high of 13 on Picture Arrangement.  The difference between these two scores is greater than two standard deviations. A difference that large is a classic sign of pathology. It is my understanding from reading about his background that he would be considered a skilled laborer but was able to do manual skills quite well when he was younger. In terms of index scores, I see that his lowest index score is on Perceptual Organization (Index Score = 82), in contrast to his highest score, which is in the area of Verbal Functioning, with a score of 91. The low perceptual index score would also be consistent with what Dr. Sharp observed on the BVMG. The low index scores on Perceptual Organization, Picture Completion, and Matrix Reasoning indicate clear impairment in Mr.

Barrett's neuropsychological functioning in this areas, notwithstanding Dr. Bianco's summary conclusions to the contrary.  Theses low scores are what is typically interpreted in neuropsychology as reflecting an impairment in brain function.

11.     With regards to the Wide Range Achievement Test results, a standard score of 79 (8th percentile) was obtained in Reading, 75 (5th percentile) in Spelling and 81 (10th percentile) in Arithmetic. The discrepancy between his overall level of intellectual functioning reported as a standard score of 90 on the WAIS-III administered by Dr. Bianco, compared to his Spelling composite which was 75 is one standard deviation different. (Note that Dr. Sharp's assessment found a Spelling Standard score of 64 which is ~1.5 standard deviations below a FSIQ score of 90).  The low academic achievement scores in Spelling are at or greater than 1.5 standard deviations from an average standard score of 100, which is the standardization sample mean or average. These are significant discrepancies and can be the basis for identifying presence of longstanding learning disability.  This is probably also supported by the school and academic records that are alluded to in the above-mentioned documents.

12.     In regards to his ability to carry out graphomotor functioning, it is noted that there is some difficulty in copying of the Rey Complex Figure (31/36), although the overall gestalt is adequate.  His performance on the Rey Complex Figure, depending on which scoring system is used, reflects potentially mild problems with immediate (21.5/36) and delayed memory (23/36). This would also be consistent with what Dr. Sharp viewed on the BVMG.   Such results on the Rey Complex Figure test are consequential: the health and integrity of Mr. Barrett's frontal lobe—partly evaluated by this measure—appear

compromised. As correctly stated by Dr. Sharp when interpreting the BVMG findings, "[t]he client's brief involvement, as well as attempts of simplification are sometimes interpreted as indicators of impulsivity and impatience." The frontal lobe regions of the brain are involved in regulating emotional output, controlling impulses and processing the social context of any situation. As such, inferences of frontal lobe dysfunction from graphomotor tests have implications for these processes. The copy of the Rey Complex Figure drawing by Mr. Barrett in Dr. Bianco's testing shows that Mr. Barrett's graphomtor abilities are poor and there is a size distortion from the stimulus figure presented, consistent with what Dr. Sharp reports in the BVMG results. Problems with complex figure performance as administered by Dr. Bianco also have implications for Mr. Barrett's executive functioning, including impairments to decision-making and planning, an inability to withhold impulses, and difficulty in processing information and executing appropriate responses. His fluency was adequate as was comprehension on other measures.

13. He was only given apparently one subtest on the Delis-Kaplan Executive Functioning Test by Dr. Bianco, which he was able to pass, but was not administered the Halstead Category Test and therefore Halstead-Reitan Impairment Index could not be calculated. Dr. Bianco's failure to administer a complete Delis-Kaplan Functioning Test is remarkable for a couple of reasons. First, a full assessment of executive functioning is the most obvious purpose of a forensic evaluation in this case. One would want to know whether Mr. Barrett's ability to inhibit impulses, for example the fight-or-flight impulse, was impaired, and one would want to know whether he was otherwise impaired in his decision making and in his ability to shift sets, to discontinue a course of action in response to new

information. Second, without completing the Delis-Kaplan, Dr. Bianco could not score Mr. Barrett's executive functioning and therefore he could not say whether Mr. Barrett showed impairment that could mitigate his culpability or whether further testing was in order. Additionally, there were other executive function measures that were available then and these could have been administered.

14.     Based on Dr. Bianco's elliptical annotations, one cannot ascertain whether the Wisconsin Card Sort Test was validly administered. On the Trailmaking Test, Trails A time was 30 seconds and his Trails B time was apparently 76 seconds (score is only written on the summary sheet and not on the actual test) with 2 errors, which again, depending on the normative database used, is reflective of mild impairment.  The Trail Making Test is a well known neuropsychological measure that has implications for assessing executive function, especially Trails B. On Trails A he overshot on "14" and made what appears to be an impulsive error of jumping from #23 to #25. On Trails B there is clearly "overshooting" suggestive of motor impairment.  However, without a full report from Dr. Bianco there is no explanation of what his actual observations were during testing.  Motor examination indicate right handedness and footedness, but with left ocular dominance. Mr. Barrett's impairment on the Trailmaking Test, alone, should have signaled to Dr. Bianco that additional executive functioning tests were essential: without additional measures, Dr. Bianco possessed an incomplete and inaccurate portrait of Mr. Barrett's functioning.

15.     The notes accompanying Dr. Bianco's clinical history are similarly misleading, and critical facets of Mr. Barrett's background are not mentioned. In Dr. Bianco's handwritten notes, under "History of Childhood Trauma" he has a written symbol indicating

"nothing," which proves inconsistent with several accounts of physical and emotional violence in Mr. Barrett's childhood that were afforded by his family members. Dr. Bianco also failed to note the import of his own notations on Mr. Barrett's history of head trauma: he chronicles Mr. Barrett's loss of consciousness in childhood when struck with a steel ball, as "child hit [with] steel ball woke up in doc. ~15 min . . . ." Without any additional details, this loss of consciousness alone meets accepted diagnostic criteria for a mild traumatic brain injury at the time of trial: accordingly, Dr. Bianco simply neglected that Mr. Barrett suffered from a probable mild traumatic brain injury, and he further failed to probe for any attendant behavioral and cognitive consequences.

16.     Mr. Barrett was next seen by J. Randall Price, Ph.D., the final report dated October 26, 2005. There was no raw data for review. It should be pointed out that Dr. Price also administered measures to assess the potential for symptom and/or test performance exaggeration and malingering, and found that "Mr. Barrett's responses were not indicative of malingering of neurological, depressive, psychotic, or amnesia symptoms or of low intelligence." Dr. Price's Axis 1 diagnostic conclusions were for: 1) Learning Disorder, NOS; 2) Polysubstance dependence, in remission secondary to incarceration; and 3) Dysthymic Disorder. As for actual test results on the Reynolds Intellectual Assessment System (RIAS) he obtained a Verbal IQ score of 97, Non-Verbal IQ score of 91 and a Composite IQ Score of 92. He was also administered the Repeatable Battery for the Assessment of Neuropsychological Status (RBANS) with a low Index Score of 75 (5th percentile) on the "Attention" component. Dr. Price interpreted the discrepancy from his high "Visuospatial/Constructional Ability" subtest score of 126 (96th) percentile to his low

attention score as being "… entirely consistent with his history of mechanical aptitude and hyperactivity." Although Dr. Price makes the statement in reference to the RBANS that "… Mr. Barrett's neurocognitive functioning is within normal limits," he also contradicts that statement when he notes, "Deficits in these areas are suggestive of brain dysfunction due to a traumatic brain injury, substance abuse, or neurological disease. The records in this case suggested that Mr. Barrett had experienced two concussions secondary to head injuries. Also, his long history of polysubstance abuse is a risk factor for brain dysfunction. Significant neurocognitive dysfunction can affect an individual's risk of committing acts of aggression."

17.     Dr. Price's treatment of the RBANS as indicative of "normal" neurocognitive functioning proves misleading. The RBANS is merely a screening battery, and it does not evaluate neuropsychological functioning in any comprehensive way. Moreover, the findings of Mr. Barrett's low index score on the Attention Index, which is close to three standard deviations from the Visuospatial/Constructional Ability Index score, alone proves consistent with several conditions, including attention deficit disorder associated with a learning disorder identified by Dr. Price; Mr. Barrett's history of mild traumatic brain injuries alluded to by Dr. Price; attention deficit disorder indicated by Dr. Sharp; post-traumatic stress disorder diagnosed by Dr. Woods; and other conditions. Accordingly, Dr. Price's conclusion as to Mr. Barrett's "normal" neurocognitive functioning, based on a simple screening instrument like the RBANS, defies the reality of his own administration and test findings as well as prior and later assessments.  Dr. Price's low index score on Attention reflects significant impairment in Mr. Barrett, with multiple possible etiologies, and further

neuropsychological testing was required to accurately sketch his mental health conditions and cognitive deficits.

**B. Neuropsychological Assessment of Mr. Barrett by Dr. Myla Young Performed During Post-conviction Proceedings**

18.     I am also in receipt of the more recent assessment that was done by Myla H. Young, Ph.D. (February 9 – 11, 2009).  For this assessment, I have the advantage of her declaration, as there was no declaration by Dr. Bianco.  I have reviewed Dr. Young's declaration and consider it to be an accurate and appropriate interpretation of Mr. Barrett's test findings. Once again, Mr. Barrett passed all symptom and performance validity measures and the test results can be considered to reflect an accurate description of his neuropsychological test findings.

**C. Conclusions**

19.     From the above psychological and neuropsychological assessments that have been done involving Mr. Barrett, there are several straightforward conclusions that can be made. He meets criteria for learning disability and attention deficit disorder. The basis of both of these disorders reflect an underlying disorder of brain function.

20.     Furthermore, as reflected in the various records and declarations, there is other evidence of brain injury. In the mother's declaration, she indicated that her son was born with a "lump on the top of his head", that he was a very difficult infant and toddler to manage where one time "… he pulled a bag of groceries off the table and a large can fell on his head, busting his head open and raising a big knot."   As reflected in the various

*Declaration of Erin D. Bigler, Ph.D.*                                                      *Page 12*

documents, in particular detailed in Dr. Young's declaration when 8 or 9 years of age, Mr. Barrett sustained a head injury when he was struck in the head with some type of a "steel ball." Mr. Barrett has reported that he believes that he lost consciousness in that incident. Apparently there are no additional details related to that incident, but there are for an incident when he was 16 or 17 as described by his mother where as part of an arrest for "squealing his tires" that her son's face was "broken" as well as his "collarbone." Also, a motorcycle accident that was witnessed by his wife at the time, where he did sustain a loss of consciousness (LOC) as per Abby Stites declaration. In this accident, he was apparently going very fast and was not wearing a helmet. As detailed in the Sequoyah Records, he was seen for complaints of "Car wreck last week complains of chest pain –ribs". In that document they assess him with "Contusion right per—orbital region" and diagnose him with "Head Trauma" and provide information about "Blunt Head Trauma."

21. It is my opinion, to a reasonable degree of neuropsychological certainty, that Mr. Barrett has suffered probable mild traumatic brain injury based on his clinical history. Several of the above incidents of head trauma satisfy accepted diagnostic criteria for a mild traumatic brain injury used at the time of Mr. Barrett's trial. See, e.g., 1995 American Congress of Rehabilitation Medicine (ACRM) diagnostic criteria for mild traumatic brain injury, enumerating several factors: i) any loss of consciousness, or ii) any loss of memory for events immediately before or after the accident, or iii) any alteration in mental state at the time of the accident, such as feeling dazed, disoriented or confused, or iv) focal neurological deficits that may be transient. Both the steel ball incident described by Mr. Barrett and the motor cycle accident chronicled by his ex-wife indicate a loss of consciousness, reflecting

probable mild traumatic brain injuries. While I was not able to evaluate Mr. Barrett in person, additional details likely could be gleaned about other past incidents in a clinical interview setting; accordingly, the other incidents of head trauma may also meet diagnostic criteria for traumatic brain injury, subject to further confirmation. Prior to trial, any competent neuropsychologist acting in accord with professional standards at the time should have attempted to rule out or confirm such incidents, through clinical interview, as significant mild traumatic brain injuries that Mr. Barrett may have suffered.

22.     In 1988, Mr. Barrett made a suicide attempt wherein he shot himself in the chest and had an extensive hospitalization with a follow-up psychiatric hospitalization. In review of those records, it is apparent the focus was on his acute treatment for the chest wound, but it should be noted that the blast effects of a shotgun chest wound are sufficient to induce a blast-related closed head injury (concussion). Furthermore, the acute effects of loss of blood and pulmonary function may exacerbate the concussion related to the biochemical cascade occurring in the brain from the blast. There is well-established literature on the adverse effects of blast injury to the brain, made even worse when there is prior history of traumatic brain injury, as was the case in Mr. Barrett. Furthermore, the effects of this type of injury when it occurs in a heightened state of emotionality, as was the case when he attempted this suicide, compounds the effects of the brain injury with emotional control and regulation. These kinds of concussive brain injuries further damage frontal and temporal lobe functions.

23.     As outlined in Dr. Woods' declaration as well as all other mental health assessments, Mr. Barrett's family history was chaotic and problematic. There is potential for

in utero adverse effects because of the mother's history of alcohol and substance abuse, all of which could affect brain development, including fetal alcohol syndrome. Likewise, there are now established epigenetic effects that may influence offspring in parents who abuse alcohol and other chemical substances, even before conception. There are major adverse consequences of low socioeconomic status on brain development that may also play a role. Any brain injuries occurring during developmental periods, given that the brain does not reach full maturation until the mid-20s may adversely affect all subsequent development, where brain injuries from any source have the potential to lead to major neuropsychiatric conditions.

24.     Lastly, as documented in all of these records, Mr. Barrett as a young adolescent began to abuse drugs and alcohol. All of this abuse occurred within a timeframe that would adversely affect brain function and development.

25.     Taking all of this information into consideration, there are several straightforward conclusions, the first of which is that Mr. Barrett has an abnormal brain. As already stated, he meets criteria for learning disability and attention deficit disorder. Without debate, he meets criteria for having sustained concussive brain injuries, where multiple concussive injuries have additive effects. Presence of loss of consciousness (LOC) by definition means that a brain injury occurred and criteria met for diagnosis of traumatic brain injury (TBI). Residual symptoms of poor attention, memory, reduced motor functioning, poor mood/emotional regulation, tinnitus along with poor impulse control may all be a manifestation of residual effects of a TBI.  Also, it should be noted that acquired brain injury adversely affects the symptoms/problems associated with any existing developmental

disorder like learning disabilities and ADHD, especially in the domains of attention regulation. Polysubstance abuse has had an adverse influence on brain function. The motor deficits noted by both Drs. Sharp and Bianco, as well as the frontal lobe assessments performed by Dr. Young, in conjunction with the learning disability and ADHD all point to damaged frontal regulatory systems within Mr. Barrett's brain.

26.     In response to the questions I have been asked to respond to, I will address them in order:

(1)     **Whether there were any errors or omissions in the work done previously:** As indicated in my review, Dr. Bianco's affidavit is inconsistent with his test data, and my opinion is that Mr. Barrett met criteria for a variety of neurological and neuropsychiatric conditions as described above. These conditions include traumatic brain injury, neurodevelopmental disorders expressed as learning disorders and disorders of attention and hyperactivity, as well as psychiatric illnesses within the spectrum of mood and anxiety disorders, which were all established conditions at the time that Dr. Bianco evaluated Mr. Barrett. Everything that I have reviewed above was known about the conditions that Mr. Barrett had at the time of his trial and could have been discussed with defense counsel.

(2)     **Whether any additional neuropsychological testing, neuroimaging studies, or other methods of evaluation that were available in 2005 would have led to reliable conclusions in Mr. Barrett's case:** As shown by Dr. Young's assessment a more comprehensive neuropsychological assessment than performed by Dr. Bianco would have aided defense counsel in better understanding Mr. Barrett's neuropsychological impairments.

(3)     **Whether Mr. Barrett has brain damage or any clinically significant cognitive impairment:** My discussion in this report straightforwardly answers this question – yes, Mr. Barrett has a clinical history consistent with having a damaged brain.

(4)     **The likely etiologies of that brain damage or cognitive impairment:** The factors that have resulted in Mr. Barrett's neuropsychological impairments are multifactorial but include epigenetic, potential adverse effects in utero, including maternal substance abuse and fetal alcohol syndrome, neurodevelopmental disorders including learning disabilities and ADHD and multiple traumatic brain injuries. Based on record review alone, I conclude to a reasonable degree to scientific certainty that Mr. Barrett suffered from probable mild traumatic brain injuries. It should also be stated that at their core affective disorders are brain disorders.

(5)     **The effects of that damage or impairment on Mr. Barrett:** The type of compromised brain function experienced by Mr. Barrett has considerable implications for impaired impulse control, decision making and conforming behavior to societal norms, all of which may have played a role during the offense of his conviction.

27.     I have not directly examined Mr. Barrett and these conclusions are based on my review of the records and neuropsychological testing performed by other licensed psychologists, and where available, the direct review of their test data. My conclusions are based on acceptable standards in the field of neuropsychological assessment and are to a reasonable degree of scientific certainty. I hold the foregoing opinions to a reasonable degree of psychiatric certainty. The methods and source material I relied on were available at the time of Mr. Barrett's trial in 2005.

28.     I was available to testify at the time of Mr. Barrett's federal trial. If called to do so, I would have testified consistent with the foregoing.

29.     I am being paid at the rate of $275.00 per hour for my work on this case. My contract caps my compensation at $27,550 without further approval of the Federal Defender.

I declare, under the penalty of perjury, of the laws of the United States of America and the State of California, that this declaration is true and correct and based on my personal review of the information referenced here.

Executed by me this second day of March 2017 in El Dorado County, California.


/s/ Erin D. Bigler_____
ERIN D. BIGLER, PH.D.

# Appendix I

## Curriculum Vitae of Dr. Erin Bigler

January 2016

## VITA

| | |
|---|---|
| NAME: | **Erin D. Bigler, Ph.D.** |

OFFICE ADDRESS:  Psychology Department
1001 SWKT
Brigham Young University
Provo, Utah  84602

Phone:  (801) 422-4287
Fax:     (801) 422-0602
E-mail: erin_bigler@byu.edu

DATE OF BIRTH:  July 9, 1949

MARITAL STATUS:  Married
Two Children / Two Grandchildren

## EDUCATION:

Diploma  Vista High School
Vista, California
June 1967

B.S.  Psychology
Brigham Young University
May 1971

Ph.D.  Experimental-Physiological Psychology
Brigham Young University
December 1974

Post-Doctorate  National Institute of Health
Post-Doctoral Fellow in Neurophysiology-Neuropsychology
Barrow Neurological Institute
St. Joseph's Hospital and Medical Center
Phoenix, Arizona
January 1975 to June 1977

Major Areas of  Neuropsychology-Neurophysiology
Training and Expertise  Neuropsychological Diagnostics and Consultation
Neuroimaging

**EXPERIENCE:**

| | |
|---|---|
| 2003-Present | Susa Young Gates Professor of Psychology and Neuroscience<br>Brigham Young University<br>Provo, Utah |
| 2006-2010 | Visiting Scholar<br>Department of Psychiatry<br>University of California at San Diego<br>San Diego, California |
| 2006-2013 | Faculty<br>The Brain Institute of Utah<br>University of Utah<br>Salt Lake City, Utah |
| 2000-Present | Adjunct Professor of Psychiatry<br>Department of Psychiatry<br>University of Utah<br>Salt Lake City, Utah |
| 2000-2006 | Adjunct Professor of Radiology<br>Department of Radiology<br>University of Utah<br>Salt Lake City, Utah |
| 1996- 2002 | Department Chair<br>Psychology Department<br>Brigham Young University<br>Provo, Utah |
| 1990-Present | Professor of Psychology and Neuroscience<br>Department of Psychology<br>Brigham Young University<br>Provo, Utah |
| 1991-2003 | Steven V. and Georgia A. White<br>Professor of Psychology<br>Brigham Young University |
| 1989-1990 | Adjunct Professor of Psychology<br>Department of Psychology<br>University of Texas at Austin<br>Austin, Texas |
| 1978-1990 | Private Practice/Full Partner<br>Austin Neurological Clinic & EEG Laboratory<br>Austin, Texas |
| 1989-1990 | Adjunct Professor of Psychiatry<br>Department of Psychiatry<br>University of Texas Health Science Center at San Antonio<br>San Antonio, Texas |

Bigler, E. D.        2

1982-1989  Adjunct Associate Professor of Psychology
Department of Psychology
University of Texas at Austin
Austin, Texas

1986-1989  Adjunct Associate Professor of Psychiatry
Department of Psychiatry
University of Texas Health Science Center at San Antonio

Director of Neuropsychology Service at Austin State Hospital
Austin, Texas

1978-1982  Adjunct Assistant Professor of Psychology
Department of Psychology
University of Texas at Austin
Austin, Texas

1977-1978  Chief Psychologist-Program Director
Adolescent Unit
Austin State Hospital
Austin, Texas

1975-1977  Research Associate and NIH Post-Doctoral Fellow
Division of Neurobiology
Barrow Neurological Institute
St. Joseph's Hospital and Medical Center
Phoenix, Arizona

1975-1977  Consulting Psychologist, Outreach Services
Diagnostic and Evaluation Center
Mesa, Arizona

1976-1977  Visiting Instructor
Department of Psychology
Glendale College
Glendale, Arizona

1972-1974  Student Instructor
Department of Psychology
Brigham Young University
Provo, Utah

1972-1974  Research Assistant
Department of Psychology
Brigham Young University
Provo, Utah

Bigler, E. D.  3

**PSYCHOLOGY LICENSURE:**

State of Utah, License 116117-2501 (1990 – Present)
State of California, License 27509 (2015 - Present)
State of Texas, License 21600 (1977 – Present)
State of Arizona,  License 453 (1975 – 2013, retired)
State of Hawaii, License PSY 1019 (2008 – Present)
National Register of Health Service Providers in Psychology, Certificate 20639

**BOARD CERTIFICATION:**

Diplomate, American Board of Professional Psychology
(Clinical Neuropsychology), Awarded 1985, Diploma 3722

**NEUROPSYCHOLOGICAL TESTS AUTHORED:**

Reynolds, C.R.      & **Bigler, E.D.** (2001).  Test de memoria y aprendizaje. Adaptación española: (Edurne Goikoetxea). Madrid, Spain: Publicaciones de Psicología Aplicada, (TEA Ediciones).

Reynolds, C.R.      & **Bigler, E.D.** (2001). Clinical assessment scales for the elderly (CASE). Florida: Psychological Assessment Resources (PAR).

Reynolds, C.R.      & **Bigler, E.D.** (1994). Test of memory and learning. Austin, Texas: PRO-ED.

Stanton, H.C.,      Smith, E.C., Reynolds, C.R. & **Bigler, E.D.** (1994).  Test of memory and learning: Computer scoring program (IBM Version 1.0).  Austin, Texas: PRO-ED.

**BOOKS:**

**Bigler, E.D.**      (1996). Neuroimaging I. Basic science. New York: Plenum Press.

**Bigler, E.D.**      (1996). Neuroimaging II. Clinical applications. New York:  Plenum Press.

**Bigler, E.D.**      (1990). Traumatic brain injury: Mechanisms of damage, assessment, intervention, & outcome. Austin, Texas: PRO-ED.

**Bigler, E.D.**      (1988). Diagnostic clinical neuropsychology, (2nd edition). Austin, Texas: University of Texas Press.

**Bigler, E.D.**      (1984). Diagnostic clinical neuropsychology. Austin, Texas: University of Texas Press.

**Bigler, E.D.**,      Clark, E. & Farmer, J.E. (1997). Childhood traumatic brain injury: Diagnosis, assessment and intervention. Austin, Texas: Pro-ED.

**Bigler, E.D.**      & Clement, P. (1997). Diagnostic clinical neuropsychology, (3rd edition). Austin, Texas: University of Texas Press.

**Bigler, E.D.**,      Yeo, R. & Turkheimer, E. (1989). Neuropsychological function and brain imaging. New York: Plenum Press.

Bigler, E. D.      4

Lezak, M.D., Howieson, D.B., **Bigler, E.D.,** Tranel, D. (2012). <u>Neuropsychological Assessment</u>. Oxford University Press, USA.

Naugle, R., Cullum, C.M. & **Bigler, E.D.** (1998). <u>Introduction to Clinical Neuropsychology</u>. Austin, Texas: PRO-ED.

Nussbaum, N.L. & **Bigler, E.D.** (1990). <u>Identification and treatment of ADD: Child guidance mental health series</u>. Austin, Texas: PRO-ED.

## BOOK CHAPTERS:

**Bigler, E.D.,** (2015). Neuropathology of Mild Traumatic Brain Injury: Correlation to Neurocognitive and Neurobehavioral Findings. (pp. 433-50) In <u>Brain Neurotrauma: Molecular, Neuropsychological, and Rehabilitation Aspects</u>. (697 pp.) CRC Press. Boca Raton, FL.

**Bigler, E.D.,** (2013). Overview of Traumatic Brain Injury (pp. 3-32). In <u>Management of Adults with Traumatic Brain Injury</u> (587 pp.). American Psychiatric Publishing. Washington D.C.

**Bigler, E.D.,** (2012). Structural Neuroimaging (pp. 189-207). In <u>Neuropsychology: Science and Practice, I</u> (320 pp.). Oxford University Press.  N.Y.

**Bigler, E.D.,** (2012). Theoretical Approaches to Understanding Social Function in Childhood Brain Insults (pp. 207-30). In Vicki Anderson & Miriam H. Beauchamp (Eds) <u>Developmental Social Neuroscience and Childhood Brain Insult: Theory and Practice</u> (398 pp.). Guilford Press. N.Y.

**Bigler, E.D.,** (2012). Understanding Mild Traumatic Brain Injury: Neuropathology and Neuroimaging. In Jennifer J. Vasterling, Richard A. Bryant, & Terence M. Keane (Eds) <u>PTSD and Mild Traumatic Brain Injury</u> (308 pp.). Guilford Press. N.Y.

**Bigler, E.D.,** (2011). Structural Imaging (pp. 73-90). In J.M. Silver, T.W. McAllister and S.C. Yudofsky, (Eds) <u>Textbook of Traumatic Brain Injury</u> (686 pp). Washington, DC: American Psychiatric Publishing, Inc.

**Bigler, E.D.,** (2009). Traumatic Brain Injury (pp. 233-56). In M.F. Weiner & A.M. Lipton (Eds) <u>Textbook of Alzheimer Disease and Other Dementias</u> (557 pp.). Washington, D.C.: American Psychiatric Publishing, Inc.

**Bigler, E.D.,** (2009). Neuroimaging (pp. 441-74). In R.G. Frank, M. Rosenthal, & B. Caplan (Eds) <u>Handbook of Rehabilitation Psychology – 2nd Edition</u> (504 pp.). Washington D.C.: American Psychological Association.

**Bigler, E.D.,** (2008). Anoxic Brain Injury:  Daubert Challenge, Fixed versus Flexible Battery (pp. 149-69). In Robert L. Heilbronner (Ed) <u>Neuropsychology in the Courtroom: Expert Analysis of Reports and Testimony</u> (273 pp). New York: The Guilford Press.

**Bigler, E.D.,** (2007). Cognitive Disorders.  In M.S. Williams, Belnap, D., & Livingston, J.P. <u>Matters of the Mind: Latter-day Saint Helps for Mental Health</u> (448 pp.).  Salt Lake City: Deseret Book.

**Bigler, E.D.,**    (2007). Neuroimaging and Its Role in Developing Interventions.  In S.J. Hunter & J. Donders (Eds) (pp.415-443) <u>Pediatric Neuropsychological Intervention</u> (508 pp.). New York: Cambridge University Press.

**Bigler, E.D.**    (2007). Brain Imaging and Function. In S. Ayers, A. Baum, C. Mc Manus, S. Newman, K. Wallston, J. Weinmand & R. West (Eds)(pp.239-241). <u>Cambridge Handbook of Psychology, Health and Medicine (2nd Edition)(968 pp.)</u>. Cambridge, U.K.:  Cambridge University Press.

**Bigler, E.D.**    (2007). Head Injury. In S. Ayers, A. Baum, C. Mc Manus, S. Newman, K. Wallston, J. Weinmand & R. West (Eds)(pp.720-724). <u>Cambridge Handbook of Psychology, Health and Medicine (2nd Edition)(968 pp.)</u>. Cambridge, U.K.: Cambridge University Press.

**Bigler, E.D.**    (2007). Traumatic brain injury and cognitive reserve (pp. 85-116). In Y. Stern (Ed). <u>Cognitive Reserve Theory and Applications (344 pp).</u> New York: Taylor and Francis Group.

**Bigler, E.D.**    (2006). Mild Traumatic Brain Injury (mTBI):  Causality Considerations from a Neuroimaging and Neuropathology Perspective (pp.302-334). In Young, G., Kane, A., & Nicholson, K. (Eds.) <u>Psychological Knowledge in Court:  PTSD, Pain, and TBI (pp.391)</u>. New York: Springer Science+Business Media, Inc.

**Bigler, E.D.**    (2006). Neuroimaging correlates in functional outcome (pp.201-224). In Zasler, N.D., Katz, D.I., and Zafonte, R.D. (Eds.), <u>Brain Injury Medicine:  Principles and Practice (pp.1275)</u>. New York: Demos Medical Publishing, Inc.

**Bigler, E.D.**    (2005). Structural imaging. (pp. 79-105).  In J.M. Silver, T.W. McAllister and S.C. Yudofsky, (Eds): <u>Textbook of Traumatic Brain Injury, 2nd Edition (pp.771)</u> Washington, D.C.: American Psychiatric Publishing, Inc.

**Bigler, E.D.**    (2004). Neuroimaging and the ROCF. In Knight, J.A. and Kaplan, E. (Eds.). <u>The Handbook of Rey-Osterrieth Complex Figure Usage: Clinical and Research Applications</u>. (Ch. 10; pp.323-334) Lutz, Fl: Psychological Assessment Resources Inc. (P.A.R.).

**Bigler, E.D.**    (2003). Neuroimaging in forensic neuropsychology. In Horton, A.M. Jr., and Hartlage, L.C. (Eds.). <u>Handbook of Forensic Neuropsychology</u> (pp.195-213). New York, NY: Springer Publishing Co.

**Bigler, E. D.**    (2002). Neuroimaging and neuropsychologic studies in reading disabilities. In  I. Arcolini & G. Zardini (Eds.), <u>I disturbi di apprendimento della lettura e della scrittura</u> (pp. 36-64`). Milano, Italy: FrancoAngeli.

**Bigler, E.D.,**    (2002). Neuroimaging and the ROCF. In, Rey-Osterrieth Handbook.  Edited by Jeffery Knight and Edith Kaplan. (Chapter 10, pp.67-78) Lutz, Fl:  Psychological Assessment Resources, Inc. (PAR).

**Bigler, E.D.**    (2001). Structural and functional neuroimaging of traumatic brain injury.  In J.T. McDeavitt (Ed.), <u>Physical Medicine and Rehabilitation: State of the Art Reviews, 15</u>(2) (pp. 349-361). Philadelphia: Hanley & Belfus, Inc.

Bigler, E. D.    6

**Bigler, E.D.**          (2000). Neuroimaging and rehabilitation outcome. In R.G. Frank & T.R. Elliott (Eds.), Handbook of Rehabilitation Psychology, Washington, D.C.: American Psychological Association.

**Bigler, E.D.**          (1999).  Neuroimaging in mild TBI.  In N.R. Varney & R.J. Roberts (Eds.), The Evaluation and Treatment of Mild Traumatic Brain Injury.  Mahwah, New Jersey: Lawrence Erlbaum Associates.

**Bigler, E.D.**          (1999).  Neuroimaging in mild traumatic brain injury.  In M.J. Raymond, T.L. Bennet, L.C. Hartlage & C.M. Cullum (Eds.), Mild Traumatic Brain Injury.  A Clinician's Guide (pp. 11-29).   Austin, Texas: Pro-ED.

**Bigler, E.D.**          (1997).  Brain injury and behavioral outcome in traumatic brain injury.  In **Bigler, E.D.**, Clark, E., & Farmer, J.E. (Eds.),  Childhood traumatic brain injury: Diagnosis, assessment, and intervention.  Austin, Texas: Pro-ED.

**Bigler, E.D.**          (1997). Neuroimaging in aging and dementia.  In P.D. Nussbaum (Ed.), Handbook of Neuropsychology and Aging  (pp. 409-421).  New York:  Plenum Press.

**Bigler, E.D.**          (1996). Introduction.  In E.D. Bigler, (Ed.), Neuroimaging I: Basic science, and Neuroimaging II: Clinical applications.   New York and London: Plenum Press.

**Bigler, E.D.**          (1996). Bridging the gap between psychology and neurology: Future trends in pediatric neuropsychology.  In Batchelor, E.S. & Dean R.S. (Eds.), Pediatric neuropsychology  (pp. 27-54).   Boston: Allyn & Bacon.

**Bigler, E.D.**          (1996). Neuroimaging and traumatic brain injury.  In E.D. Bigler (Ed.), Neuroimaging II: Clinical applications. N.Y.:  Plenum Press.

**Bigler, E.D.**          (1995). Advances in brain imaging with children and adolescents.  In Tramontana, M.G. & S.R. Hooper (Eds.), Advances in child neuropsychology. New York: Springer-Verlag.

**Bigler, E.D.**          (1995). The neurobiology and neuropsychology of adult learning disorders.  In Patton, J.R. & Polloway, E.A. (Eds.), Learning disabilities: The challenge of adulthood (pp. 205-233).  Austin, Texas: PRO-ED.

**Bigler, E.D.**          (1994). Neuroimaging in neuropsychology.  In R.E.  Kelly (Ed.), Functional neuroimaging. (ch.7, pp.121-137)  Armonk, New York:  Futura Publishing Company, Inc.

**Bigler, E.D.**          (1994). Brain structure and cognitive function.  In C.R. Reynolds (Ed.), Cognitive assessment: A multidisciplinary perspective. New York: Plenum Press.

**Bigler, E.D.**          (1994). Neuroimaging and neuropsychological assessment.  In C.R. Reynolds (Ed.), Cognitive assessment: A multidisciplinary perspective. New York: Plenum Press.

**Bigler, E.D.**          (1992). Neuroimaging and neuropsychological assessment. In C.R. Reynolds (Ed.), Cognitive assessment. New York: Plenum Press.

**Bigler, E.D.**   (1992). Utilization of brain imaging techniques in neuropsychology. In D. Tucker (Ed.), Physical medicine and rehabilitation: State of the art reviews. Philadelphia: Hanley & Belfus.

**Bigler, E.D.**   (1990). Conclusion/Synthesis to traumatic brain injury. In E.D. Bigler (Ed.), Traumatic brain injury: Mechanisms of damage, assessment, intervention and outcome. Austin, Texas: PRO-ED.

**Bigler, E.D.**   (1990). Introduction to traumatic brain injury. In E.D. Bigler (Ed.), Traumatic brain injury: Mechanisms of damage, assessment, intervention and outcome. Austin, Texas: PRO-ED.

**Bigler, E.D.**   (1990). Neuropathology of traumatic brain injury. In E.D. Bigler (Ed.), Traumatic brain injury: Mechanisms of damage, assessment, intervention and outcome. Austin, Texas: PRO-ED.

**Bigler, E.D.**   (1990). Preface to traumatic brain injury. In E.D. Bigler (Ed.), Traumatic brain injury: Mechanisms of damage, assessment, intervention and outcome. Austin, Texas: PRO-ED.

**Bigler, E.D.**   (1989). Radiologic techniques in neuropsychological assessment. In C.R. Reynolds & E. Fletcher-Janzen (Eds.), Child neuropsychology: Techniques of assessment and treatment (pp. 247-264). New York: Plenum Press.

**Bigler, E.D.**   (1989). Remediating nonverbal problems associated with learning disabilities. In P.I. Myers & D.D. Hammill (Eds.), Learning disabilities. Austin, Texas: PRO-ED.

**Bigler, E.D.**   (1988). Neuropsychological and CT identification in dementia. In H.A. Whitaker (Ed.), Neuropsychological studies of non-focal brain damage: Dementia and trauma (pp. 61-85). New York: Springer-Verlag.

**Bigler, E.D.**   (1988). The role of neuropsychological assessment in relation to other types of assessment with children. In M.G. Tramontana & S.F. Hooper (Eds.), Assessment issues in child neuropsychology (pp. 67-91). New York: Plenum Press.

**Bigler, E.D.**   (1987). Assessment of cortical function. In L.C. Hartlage, M.J. Asken, & J.L. Horsby (Eds.), Essentials of neuropsychological assessment (pp. 46-70). New York: Springer.

**Bigler, E.D.**   (1987). CAT scan. In C.R. Reynolds & L. Mann (Eds.), Encyclopedia of Special Education (Vol. 1, pp. 279-280). New York: John Wiley & Sons Publishers.

**Bigler, E.D.**   (1987). Dendrites. In C.R. Reynolds & L. Mann (Eds.), Encyclopedia of special education (Vol. 1, pp. 471-473). New York: John Wiley & Sons Publishers.

**Bigler, E.D.**   (1987). Glial cells. In C.R. Reynolds & L. Mann (Eds.), Encyclopedia of special education (Vol. 2, pp. 724-725). New York: John Wiley & Sons Publishers.

**Bigler, E.D.**   (1987). Nuclear magnetic resonance (NMR) or magnetic resonance imaging (MRI). In C.R. Reynolds & L. Mann (Eds.), Encyclopedia of special education (Vol. 2, pp. 1110-1111). New York: John Wiley & Sons Publishers.

Bigler, E. D.    8

**Bigler, E.D.**          (1987). Putamen. In C.R. Reynolds & L. Mann (Eds.), <u>Encyclopedia of special education</u> (Vol. 3, p. 1288). New York: John Wiley & Sons Publishers.

**Bigler, E.D.**          (1987). Substantia nigra. In C.R. Reynolds & L. Mann (Eds.), <u>Encyclopedia of special education</u> (Vol. 3, p. 1515). New York: John Wiley & Sons Publishers.

**Bigler, E.D.**          (1987). X-ray scanning techniques. In C.R. Reynolds & L. Mann (Eds.), <u>Encyclopedia of special education</u> (Vol. 3, p. 1685). John Wiley & Sons Publishers.

**Bigler, E.D.**          (1986). Forensic neuropsychology. In D. Wedding, A.M. Horton, & J. Webster (Eds.), <u>The Neuropsychology Handbook</u> (pp. 526-547). New York: Springer.

**Bigler, E.D.**          (1982). Clinical assessment of cognitive deficit in traumatic and degenerative disorders: Brain scan and neuropsychologic findings. In R.N. Malathesa & L. Hartlage (Eds.), <u>Neuropsychology and Cognition</u> (Vol. 2, pp. 165-182). The Hague: Martinus Nijhoff Publishers.

**Bigler, E.D.**          (1980). Child and adolescent neuropsychology. In J.E. Gilliam (Ed.), <u>Emotional Disturbance</u> (pp. 63-82). Austin, Texas: University of Texas.

**Bigler, E.D.,**          & Petrie, J. (2011). Anencephaly. In B. Caplan, J. DeLuca, J.S. Kreutzer (Eds.), Encyclopedia of Clinical Neuropsychology (Neuroanatomy), New York: Springer Science + Business Media.

**Bigler, E.D.,**          & Petrie, J. (2011). Megalencephaly. In B. Caplan, J. DeLuca, J.S. Kreutzer (Eds.), Encyclopedia of Clinical Neuropsychology (Neuroanatomy), New York: Springer Science + Business Media.

**Bigler, E.D.,**          & Petrie, J. (2011). Microcephaly. In B. Caplan, J. DeLuca, J.S. Kreutzer (Eds.), Encyclopedia of Clinical Neuropsychology (Neuroanatomy), New York: Springer Science + Business Media.

**Bigler, E.D.,**          & Petrie, J. (2011). Minimal Brain Dysfunction . In B. Caplan, J. DeLuca, J.S. Kreutzer (Eds.), Encyclopedia of Clinical Neuropsychology (Neuroanatomy), New York: Springer Science + Business Media.

**Bigler, E.D.,**          & Orrison, Jr., W. W. (2004). Neuroimaging in sports-related brain injury. In Lovell, M.R., Echemendia, R.J., Barth, J.T. and Collins, M.W.(Eds.), <u>Traumatic Brain Injury in Sports: An International and Neuropsychological Perspective.</u> (pp.71-93). Lisse, The Netherlands: Swets & Zeitlinger Publishers.

**Bigler, E.D.**          & Adams, W.V. (2001).  Clinical neuropsychological assessment of child and adolescent memory with the Wide Range Assessment of Memory and Learning, the Test of Memory and Learning, and the California Verbal Learning Test–Children's Version.  In A. Kaufman & N. Kaufman (Eds.), <u>Specific Learning Disabilities and Difficulties in Children and Adolescents: Psychological Assessment and Evaluation.</u>(pp. 387-429). Cambridge, UK:  Cambridge University Press.

**Bigler, E.D.,**          Nielsen, D., Wilde, E., Bartholomew, J., Brooks, M. & Bradford, L.W. (1999). Neuroimaging and genetic disorders.  In S. Goldstein & C.R. Reynolds (Eds.),

Bigler, E. D.     9

Handbook of Neurodevelopmental and Genetic Disorders in Children (pp. 61-83).  New York: Guilford Press.

**Bigler, E.D.**,   Clark, E., & Farmer, J.E. (1997). Traumatic brain injury: 1990's update.  In **Bigler, E.D.**, Clark, E., & Farmer, J.E. (Eds.), Childhood Traumatic Brain Injury: Diagnosis, Assessment, and Intervention.  Austin, Texas: PRO-ED.

**Bigler, E.D.**,   Lowry, C.M., & Porter, S.S. (1997). Neuroimaging in clinical neuropsychology. In Horton A.M. Jr., Wedding, D., & Webster, J.  (Eds.) The Neuropsychological Handbook (Vol. 2, 2nd ed.).  New York, NY: Springer Publishing Co.

**Bigler, E.D.**,   Nilsson, D.E., Burr, R.B., & Boyer, R.S. (1997). Neuroimaging in pediatric neuropsychology.  In Reynolds, C.R. & Fletcher-Janzen, E.  (Eds.), Handbook of Clinical Child Neuropsychology.  New York and London: Plenum Press.

**Bigler, E.D.**,   Nussbaum, N.L., & Foley, H.A.  (1997). Child neuropsychology in the private medical practice.  In Reynolds, C.R. & Fletcher-Janzen, E.  (Eds.), Handbook of Clinical Child Neuropsychology.  New York and London: Plenum Press.

**Bigler, E.D.**,   Blatter, D.D. & Ryser, D. (1996).  Neuroimaging and traumatic brain injury.  In J. Ponsford, P. Snow & V. Anderson (Eds.), International Perspective in Traumatic Brain Injury (pp. 84-89). Bowen Hills: Australian Academic Press.

**Bigler, E.D.**,   Porter, S.S., & Lowry, C.M.  (1996). Neuroimaging:  Interface with clinical neuropsychology.  In M.E. Maruish & J.A. Moses (Eds.), Clinical Neuropsychology: Theoretical Foundations for Practitioners.  New York: Lawrence Erlbaum Associates.

**Bigler, E.D.**,   Lowe, J., & Yeo, R. (1989). Structural anomalies and neuropsychological function. In E.D. Bigler, et al. (Eds.), Neuropsychological Functions and Brain Imaging. New York: Plenum Press.

**Bigler, E.D.**,   & Nussbaum, N.L. (1989). The child neuropsychology in the private medical practice. In C.R. Reynolds & E. Fletcher-Janzen (Eds.), Handbook of Child Clinical Neuropsychology (pp. 557-572). New York: Plenum Press.

**Bigler, E.D.**,   Yeo, R., & Turkheimer, E. (1989). Neuropsychological function and brain imaging: Introduction and overview.  In E.D. Bigler, et al. (Eds.), Neuropsychological functions and brain imaging. New York: Plenum Press.

**Bigler, E.D.**,   Yeo, R., & Turkheimer, E. (1988). Neuropsychological function and brain imaging: Synthesis and future directions. In E.D. Bigler, et al. (Eds.), Neuropsychological Functions and Brain Imaging. New York: Plenum Press.

Yeates, K.O.,   **Bigler, E.D.,** Dennis, M., Gerhardt, C.A., Rubin, K.H., Stancin, T., Taylor, H.G., & Vannatta, K. (2012). Theoretical approaches to understanding social function in childhood brain insults: Toward the integration of social neuroscience and developmental psychology (Chapter 10, pp. 207-230). In Anderson, V. and Beauchamp, M. (Eds.), Developmental social neuroscience and childhood brain insult: Implications for theory and practice (398 pp). New York: Guilford Press.

Bigler, E. D.      10

Hopkins, R.O.,       & **Bigler, E.D.**, (2008). Hypoxic and anoxic conditions of the CNS (Chapter 27, pp. 522-535). In Morgan, J.E. and Ricker, J.H., (Eds.), <u>Textbook of Clinical Neuropsychology (1027 pp.).</u> New York:  Taylor & Francis Group.

Kurth, S.,       & **Bigler, E.D.**, (2008). Structural neuroimaging in clinical neuropsychology. (Chapter 40 – pp. 783-839). In Morgan, J.E. and Ricker, J.H., (Editors), <u>Textbook of Clinical Neuropsychology (1027pp.).</u> Lisse, The Netherlands: Swets & Zeitlinger Publishers.

Wolkowitz, O.M.,       Lupien, S.J., **Bigler, E.D.,** Reus. V.L. (2008). Steroid encephalopathy:  Steroid psychosis and dementia (pp. 323-362). In G.P. Sechi (Ed) <u>Drug Related Encephalopathy's (508 pp)</u>. New York:  Nova Science Publishers, Inc.

Lainhart, J.E.,       Lazar, M., Alexander, A., & **Bigler, E.D.** (2005).  The brain during life in Autism:  Advances in neuroimaging research (pp. 57-107). In Casanova, M.F. (ed.). <u>Recent Developments in Autism Research.</u> Hauppauge, New York:  NOVA Science Publishers, Inc.

Provencal, S.,       & **Bigler, E.D.** (2005). Behavioral neuroimaging:  What is it and what does it tell us?  (pp. 327-361).  In D'Amato, R. C., Fletcher-Janzen, E., & Reynolds, C.R. (Eds.). <u>The Handbook of School Neuropsychology</u>. Hoboken, New Jersey: John Wiley & Sons, Inc.

Provencal, S.,       & **Bigler, E.D.** (2005). Neuroimaging and genetic disorders in adults. (pp.58-88). In Reynolds, C.R. and Goldstein, S. (Eds.), <u>Handbook of Neurodevelopmental and Genetic Disorders in Adults</u>. New York, New York: Guilford Publications, Inc.

Miller, M.J.,       Petrie, J., **Bigler, E.D.,** & Adams, W.V. (2003). Neuropsychological assessment of child and adolescent memory:  The Wide Range Assessment of Memory and Learning, the Test of Memory and Learning, and the California Verbal learning Test – Children's Version. In Hersen, M., Goldstein, G., and Beers, S.R. (Eds.) <u>The Comprehensive Handbook of Psychological Assessment, Volume I: Intellectual and Neuropsychological Assessment.</u> (ch. 15, pp. 237-261). Hoboken, New Jersey:  John Wiley & Sons, Inc.

Miller, M.J.,       **Bigler, E.D.,** & Adams, W.V. (2003).  Comprehensive assessment of child and adolescent memory:  The Wide Range Assessment of Memory and Learning, the Test of Memory and Learning, and the California Verbal learning Test – Children's Version. In Reynolds, G., & Kamphaus, R. (Eds.) <u>Handbook of Psychological and Educational Assessment of Children 2nd Edition, Volume 1: Intelligence, Aptitude and Achievement</u>. (Ch. 12, pp. 275-304). New York: Guilford Press, Inc.

Hopkins, R.O.       & **Bigler, E.D.** (2001).  Pulmonary disorders. In R. Tarter et al. (Eds.), <u>Medical Neuropsychology (2nd ed.)</u> (pp.25-50). New York: Plenum Publishers.

Weight, D.G.       & **Bigler, E.D.** (1998).  Neuroimaging in psychiatry.  In D.A. Tomb (Guest Ed.), <u>The Psychiatric Clinics of North America.  Diagnostic Dilemmas, Part II</u>. Philadelphia, London, Toronto, Montreal, Sydney & Tokyo: W.B. Saunders Company.

Bigler, E. D.       11

Nussbaum, N.L.     & **Bigler, E.D.** (1997).  Halstead-Reitan neuropsychological test batteries for children.  In Reynolds, C.R. & Fletcher-Janzen, E. Handbook of Clinical Child Neuropsychology.  New York and London: Plenum Press.

Reynolds, C.R.     & **Bigler, E.D.** (1997). Clinical neuropsychological assessment of child and adolescent memory with the test of memory and learning.  In C.R. Reynolds, & E. Fletcher-Janzen (Eds.), Handbook of clinical child neuropsychology.  New York and London: Plenum Press.

Blatter, D.D.,     **Bigler, E.D.**, Johnson, C.S., Anderson, C., Gale, S.D. (1996).  A normative database from magnetic resonance imaging.  In E.D. Bigler, Neuroimaging I: Basic Science.  New York and London: Plenum Press.

Ryser, D.K.,     **Bigler, E.D.** & Blatter, D. (1996).  Clinical and neuroimaging predictors of post TBI outcome.  In J. Ponsford, P. Snow & V. Anderson (Eds.), International Perspectives in Traumatic Brain Injury (pp. 79-83).  Bowen Hills QLD: Australian Academic Press.

Steed, M.     & **Bigler, E.D.** (1996).  Appendix MRI brain atlas.  In E.D. Bigler (Ed.), Neuroimaging I:  Basic Science.  New York and London: Plenum Press.

Lilliquist, M.W.     & **Bigler, E.D.** (1992). Neurological and neuropsychological consequences of drug abuse. In L. Hartlage, D. Templer, & W.G. Cannon (Eds.), Preventable Brain Damage: Brain Vulnerability and Brain Health. New York: Springer.

Willerman, L.,     Schultz, R., Rutledge, J.N., & **Bigler, E.D.** (1992). Brain structure and cognitive function. In C.R. Reynolds (Ed.), Cognitive Assessment. New York: Plenum Press.

Naugle, R.I.     & **Bigler, E.D.** (1989). Brain imaging and neuropsychological identification in dementia of the Alzheimer's type. In E.D. Bigler, et al. (Eds.), Neuropsychological function and brain imaging. New York: Plenum Press.

Nussbaum, N.L.     & **Bigler, E.D.** (1989). Halstead-Reitan neuropsychological test batteries for children. In C.R. Reynolds & E. Fletcher (Eds.), Handbook of Child Clinical Neuropsychology (pp. 181-191). New York: Plenum Press.

**PUBLICATIONS:**

**Bigler, E.D.**     (2015) Neuroimaging as a biomarker in symptom validity and performance validity testing. *Brain Imaging and behavior, 2015 Sep;9(3):421-44. doi: 10.1007/s11682-015-9409-1.*

**Bigler, E.D.**     (2015) Structural Image Analysis of the Brain in Neuropsychology Using Magnetic Resonance Imaging (MRI) Techniques. *Neuropsychology Review. 2015 Sep;25(3):224-49.* doi: 10.1007/s11065-015-9290-0. Epub 2015 Aug 18.

**Bigler, E.D.**     (2014). Effort, symptom validity testing, performance validity testing and traumatic brain injury. *Brain Injury, Sep;12:1-16. 2014;28(13-14):1623-38. doi: 10.3109/02699052.2014.947627. Epub 2014 Sep 12.*

**Bigler, E.D.**     (2014). Magnetic resonance imaging in the evaluation of cognitive function. *Pediatric Blood & Cancer, Oct;61(10):1724-8.*

**Bigler, E.D.**          (2014). Comment: importance of cognitive reserve in traumatic brain injury. *Neurology, May 6;82(18):1641.*

**Bigler, E.D.**          (2013). Neuroimaging Biomarkers in Mild Traumatic Brain Injury (mTBI). *Neuropsychology Review, Sep;23(3):169-209.*

**Bigler, E.D.**          (2013). Traumatic brain injury, neuroimaging, and neurodegeneration. *Frontiers in Human Neuroscience, Aug 6;7:395.*

**Bigler, E.D.**          (2013). Neuroinflammation and the dynamic lesion in traumatic brain injury. *Brain: a journal of neurology, Jan;136(Pt 1):9-11.*

**Bigler, E.D.**          (2012). Response to Larrabee. *Journal of the International Neuropsychological Society, Jul 18(4):640-2.*

**Bigler, E.D.**          (2012). Symptom validity testing, effort, and neuropsychological assessment. *Journal of the International Neuropsychological Society, Jul;18(4):632-40.*

**Bigler, E.D.**          (2012). Mild traumatic brain injury: The elusive timing of "recovery". *Neuroscience Letters, Feb 10;509(1):1-4.*

**Bigler, E.D.**          (2011). Effort – What is it, How Should it be Measured? *Journal of the International Neuropsychological Society, 17, 751-2.*

**Bigler, E.D.**          (2010). Neuropsychology's future. Psychological critiques.

**Bigler, E.D.**          (2010). Neuroimaging in mild traumatic brain injury. *Psychological Injury and Law, 3:36-49.*

**Bigler, E.D.**          (2009). Hans-Lukas Teuber and 'The riddle of frontal lobe function in man' as published in *The Frontal Granular Cortex and Behavior* (1964). Historical Feature, commentary by Erin D. Bigler. *Neuropsychology Review, 19(1):9-24.*

**Bigler, E.D.**          (2009). Letters to the Editor. *Journal of Head Trauma Rehabilitation, 24(5):414-8.*

**Bigler, E.D.**          (2009). Letters to the Editor. Response to Ruff's (2009) "Best practice guidelines for forensic neuropsychological examinations of patients with traumatic brain injury". *Journal of Head Trauma and Rehabilitation, 24(5):1-7.*

**Bigler, E.D.**          (2008). Response to Russell's (2007) and Hom's (2008) commentary on "A motion to exclude and the 'fixed' versus 'flexible' battery in 'forensic' neuropsychology. *Archives of Clinical Neuropsychology, 23(7-8):755-61.*

**Bigler, E.D.**          (2008) Neuropsychology and clinical neuroscience of persistent post-concussive syndrome. *Journal of the International Neuropsychological Society, Jan;14(1):1-22.*

**Bigler, E.D.**          (2007). Anterior and middle cranial fossa in traumatic brain injury (TBI): Relevant neuroanatomy and neuropathology in the study of neuropsychological outcome. *Neuropsychology, Sep;21(5):515-31.*

Bigler, E. D.       13

**Bigler, E.D.**        (2007). A motion to exclude and the 'fixed' versus 'flexible' battery in 'forensic' neuropsychology: Challenges to the practice of clinical neuropsychology. *Archives of Clinical Neuropsychology, Jan;22(1):45-51. [Epub 2006 Dec 27].*

**Bigler, E.D.**        (2007) Neuropsychology and clinical neuroscience of persistent post-concussive syndrome. *Journal of International Neuropsychological Society, Jan 14(1):1-22.*

**Bigler, E.D.**        (2006). Letter to the Editor:  Can author bias be determined in forensic neuropsychology research published in Archives of Clinical Neuropsychology? *Archives of Clinical Neuropsychology, Aug;21(5):503-8. [Epub 2006 Jul 17].*

**Bigler, E.D.**        (2006) An Open Letter to the Editors of Brain Injury Professional. *Brain Injury Professional, 3(4):8-9.*

**Bigler, E.D.**        (2004). Neuropsychological results and neuropathological findings at autopsy in a case of mild traumatic brain injury. *Journal of the International Neuropsychological Society, Sep;10(5):794-806.*

**Bigler, E.D.**        (2003). Neurobiology and neuropathology underlie the neuropsychological deficits associated with traumatic brain injury. *Archives of Clinical Neuropsychology, Aug;18(6):595-621; discussion 623-7.*

**Bigler, E.D.**        (2001). Frontal lobe pathology and antisocial personality disorder. *Archives of General Psychiatry, Jun;58(6):609-11.*

**Bigler, E.D.**        (2001). Premorbid brain volume and dementia.  *Archives of Neurology, May;58(5):831-3.*

**Bigler, E.D.**        (2001). Neuropsychological testing defines the neurobehavioral significance of neuroimaging-identified abnormalities.  *Archives of Clinical Neuropsychology, Apr;16(3):227-36*

**Bigler, E.D.**        (2001). Distinguished Neuropsychologist Award Lecture 1999. The lesion(s) in traumatic brain injury: Implications for clinical neuropsychology.  *Archives of Clinical Neuropsychology, Feb;16(2):95-131.*

**Bigler, E.D.**        (2001). Quantitative magnetic resonance imaging in traumatic brain injury. *Journal of Head Trauma Rehabilitation, Apr;16(2):117-34.*

**Bigler, E.D.**        (2001). Neuropsychological testing defines the neurobehavioral significance of neuroimaging-identified abnormalities. *Archives of Clinical Neuropsychology, 2001 Apr;16(3):227-36.*

**Bigler, E.D.**        (2001). Structural and Functional Neuroimaging of Traumatic Brain Injury. *Physical Medicine and Rehabilitation, 15(2):349-61.*

**Bigler, E.D.**        (1999). Neuroimaging in pediatric traumatic head injury: Diagnostic considerations and relationships to neurobehavioral outcome. *Journal of Head Trauma Rehabilitation, Aug;14(4):406-23.*

**Bigler, E.D.**        (1998). Brain anomaly and plasticity: Hydrocephalus.  *In F. J. Vattano, T.C. Bennett & M. Butler (Eds.), The Brain: Teaching Modules (2nd Edition). From*

*The Annenberg/CPB Multimedia Collection. NY, NY: Worth Publishers. (Videotape).*

**Bigler, E.D.**  (1998). Living with amnesia: the hippocampus and memory.  *In F. J. Vattano, T.C. Bennett & M. Butler (Eds.), The Brain: Teaching Modules (2nd Edition). From The Annenberg/CPB Multimedia Collection. NY, NY: Worth Publishers. (Videotape).*

**Bigler, E.D.**  (1998). Neuroimaging: Revealing the brain.  *Recovery, 9(3):17-21.*

**Bigler, E.D.**  (1998). Magnetic resonance imaging of the brain:  Relationship between structure and function.  *Medical and Pediatric Oncology, Suppl 1:17-24.*

**Bigler, E.D.**  (1996). Brain imaging and behavioral outcome in traumatic brain injury.  *Journal of Learning Disabilities, Sep;29(5):515-30.*

**Bigler, E.D.**  (1995). Brain morphology and intelligence.  *Developmental Neuropsychology, 11(4):377-403.*

**Bigler, E.D.**  (1995). Design fluency in dementia of Alzheimer's type, multi-infarct dementia and dementia associated with alcoholism.  *Applied Neuropsychology, Feb;2(1):7-14.*

**Bigler, E.D.**  (1992). Neurobiology and neuropsychology of adult learning disorders. *Journal of Learning Disabilities, 25:488-506.*

**Bigler, E.D.**  (1992). Three-dimensional image analysis of trauma induced degenerative changes: An aid to neuropsychological assessment. *Archives of Clinical Neuropsychology, Oct;7(5):449-56.*

**Bigler, E.D.**  (1991). Neuropsychological assessment, neuroimaging, and clinical neuropsychology: A synthesis. *Archives of Clinical Neuropsychology, 6(3):113-32.*

**Bigler, E.D.**  (1991). Theophylline neurotoxicity resulting in diffuse brain damage. *Developmental Medicine and Child Neurology, Feb;33(2):179-81.*

**Bigler, E.D.**  (1990). Neuropsychology and malingering: Comment on Faust, Hart, and Guilmette (1988). *Journal of Consulting and Clinical Psychology, Apr;58(2):244-7.*

**Bigler, E.D.**  (1989). On the neuropsychology of suicide. *Journal of Learning Disabilities, Mar;22:180-5.*

**Bigler, E.D.**  (1989). Behavioral and cognitive changes in traumatic brain injury: A spouse's perspective. *Brain Injury, Jan-Mar;3(1):73-8.*

**Bigler, E.D.**  (1988). Acquired cerebral trauma: Attention, memory and language disorders. *Journal of Learning Disabilities, Jun-Jul;21(6):325-6.*

**Bigler, E.D.**  (1988). Acquired cerebral trauma: Epilogue. *Journal of Learning Disabilities, Oct;21(8):476-85.*

Bigler, E. D.      15

**Bigler, E.D.**       (1988). Frontal lobe damage and neuropsychological assessment. *Archives of Clinical Neuropsychology, 3(3):279-97.*

**Bigler, E.D.**       (1988). Good outcome associated with cerebral reconstitution in hydrocephalus. *Journal of Child Neurology, Oct;3(4):297-8.*

**Bigler, E.D.**       (1988). The neuropsychology of hydrocephalus. *Archives of Clinical Neuropsychology, 3(1):81-100.*

**Bigler, E.D.**       (1987). Acquired cerebral trauma: Behavioral, neuropsychiatric, psycho-educational assessment and cognitive retraining issues. *Journal of Learning Disabilities, Dec;20(10):579-80.*

**Bigler, E.D.**       (1987). Acquired cerebral trauma: Epidemiology, neuropsychological assessment, and academic/educational deficits. *Journal of Learning Disabilities, Nov;20(9):516-7.*

**Bigler, E.D.**       (1987). Acquired cerebral trauma: Introduction to a special series. *Journal of Learning Disabilities, 20:454-6.*

**Bigler, E.D.**       (1987). The clinical significance of cerebral atrophy in dementia. *Archives of Clinical Neuropsychology, 2(2):177-90.*

**Bigler, E.D.**       (1987). The clinical significance of cerebral atrophy in traumatic brain injury`. *Archives of Clinical Neuropsychology, 2(3):293-304.*

**Bigler, E.D.**       (1987). The clinical significance of cortical atrophy and ventricular enlargement in schizophrenia. *Archives of Clinical Neuropsychology, 2(4):385-92.*

**Bigler, E.D.**       (1987). Grand Rounds. *Archives of Clinical Neuropsychology, 2(2):175-6.*

**Bigler, E.D.**       (1987). Neuropathology of acquired cerebral atrophy in traumatic brain injury. *Archives of Clinical Neuropsychology, 2:293-304.*

**Bigler, E.D.**       (1987). Neuropathology of acquired cerebral trauma. *Journal of Learning Disabilities, Oct;20(8):458-73.*

**Bigler, E.D.**       (1983). Workshops in neuropsychological assessment. *Professional Psychology, 14:155.*

**Bigler, E.D.**       (1980). Forensic neuropsychology: A case example. *Texas Psychologist, 32:7-9.*

**Bigler, E.D.**       (1980). Neuropsychological assessment and brain scan results: A case study approach. *Clinical Neuropsychology, 2:13-24.*

**Bigler, E.D.**       (1979). Neuropsychological evaluation of adolescent patients hospitalized with chronic inhalant abuse. *Clinical Neuropsychology, 1:8-12.*

**Bigler, E.D.**       (1979). Visually evoked potentials: Neuropharmacologic interactions. *Gesellschaft fur Pharmakologie and Toxikologie der DDR, 20:12.*

**Bigler, E.D.**       (1978). Limitations of neuropsychological interpretations based on Bender-Gestalt and WAIS results. *Texas Psychologist, 30:5-8.*

Bigler, E. D.      16

**Bigler, E.D.**     (1977). Bicuculline potentiation of the photically evoked after-discharges. *Proceedings of the Western Pharmacology Society, 20:191-4.*

**Bigler, E.D.**     (1977). Comparison of effects of bicuculline, strychnine and picrotoxin with pentylenetetrazol on photically evoked after-discharges. *Epilepsia, Dec;18(4):465-70.*

**Bigler, E.D.**     (1977). Neurophysiology, neuropharmacology and behavioral relations of visual system evoked after-discharges: A review. *Biobehavioral Review, 1:95-112.*

**Bigler, E.D.**     (1976). Diazepam modification of evoked and spontaneous lateral geniculate activity. *Electroencephalography and Clinical Neurophysiology, Oct;41(4):428-33.*

**Bigler, E.D.**     (1976). Childhood and adolescent inhalant abuse: Where's the behavioral research? *Behavioral Disorders, 2:250-1.*

**Bigler, E.D.**     (1975). Lateral geniculate multiple-unit activity related to Metrazol potentiated after-discharges. *Electroencephalography and Clinical Neurophysiology, Nov;39(5):491-7.*

**Bigler, E.D.**     Jantz, P. B., Farrer, T. J., Abildskov, T. J., Dennis, M., Gerhardt, C. A., Rubin, K. H., Stancin, T., Taylor, H. G., Vannatta, K., & Yeates, K. O. (2015). Day of injury CT and late MRI findings: Cognitive outcome in a pediatric sample with complicated mild traumatic brain injury. *Brain Injury, 2015;29(9):1062-70.* doi: 10.3109/02699052.2015.1011234. Epub 2015 Jul 17

**Bigler, E.D.**     & Stern, Y. (2015). Traumatic brain injury and reserve. *Handbook of clinical neurology, 128:691-710.*

**Bigler, E.D.**     & Deibert, E. (2014). Lesion analysis in mild traumatic brain injury: Old school goes high tech. *Neurology, Sept 30; 83(14):1226-7.*

**Bigler, E.D.,**     Yeates, K.O., Dennis, M., Gerhardt, C.A., Rubin, K.H., Stancin, T., Gerry, T.H., & Vannatta, K. (2013). Neuroimaging and social behavior in children after traumatic brain injury: findings from the Social Outcomes of Brain Injury in Kids (SOBIK) study. *NeuroRehabilitation, 32(4):707-20.*

**Bigler, E.D.,**     Abildskov TJ, Petrie J, Farrer TJ, Dennis M, Simic N, Taylor HG, Rubin KH, Vannatta K, Gerhardt CA, Stancin T, & Owen Yeates K. (2013). Heterogeneity of brain lesions in pediatric traumatic brain injury. *Neuropsychology, Jul 27(4):438-51.*

**Bigler, E.D.,**     Deibert, E., & Filley, M. (2013). When is a concussion no longer a concussion? *Neurology, Jul 2 81(1):14-5.*

**Bigler, E.D.,**     Farrer, T.J., Pertab, J.L., James, K., Petrie, J.A., & Hedges, D.W. (2013). Reaffirmed limitations of meta-analytic methods in the study of mild traumatic brain injury: a response to Rohling et al. *Clinical Neuropsychology, 27(2):176-214.*

**Bigler, E.D.,**    & Maxwell, W.L. (2012). Neuropathology of mild traumatic brain injury: relationship to neuroimaging findings. *Brain Imaging Behavior, Jun 6(2):108-36.*

**Bigler, E.D.,**    & Karlawish, J. (2012). Expanding the understanding of disability in persons with traumatic brain injury. *Neurology, May 8, 78(19):1454-5*

**Bigler, E.D.,**    & Maxwell, W.L. (2011). Neuroimaging and neuropathology of TBI. *NeuroRehabilitation, 28(2):63-74.*

**Bigler, E.D.,**    & Wilde, E.A. (2010). Quantitative neuroimaging and the prediction of rehabilitation outcome following traumatic brain injury. *Frontiers in Human Neuroscience, 4:228.*

**Bigler, E.D.,**    & Bazarian, J.J. (2010). Diffusion tensor imaging: a biomarker for mild traumatic brain injury? *Neurology, Feb 23: 74(8):626-7.*

**Bigler, E.D.,**    & Wilde, E.A. (2010). Quantitative neuroimaging and the prediction of rehabilitation outcome following traumatic brain injury. *Frontiers in Human Neuroscience, Dec 23: 4:228.*

**Bigler, E.D.,**    Abildskov, T.J., Wilde, E.A., McCauley, S.R., Li, X., Merkley, T.L., Fearing, M.A., Newsome, M.R., Scheibel, R.S., Hunter, J.V., Chu, Z., & Levin, H.S. (2010). Diffuse damage in pediatric traumatic brain injury: A comparison of automated versus operator-controlled quantification methods. *NeuroImage, Apr 15;50(3): 1017-26.*

**Bigler, E.D.,**    McCauley, S.R., Wu, T.C., Yallampalli, R., Shah, S., Macleod, M., Chu, Z., Hunter, J.V., Clifton, G.L., Levin, H.S., & Wilde, E.A. (2010). The temporal stem in traumatic brain injury: preliminary findings. *Brain Imaging Behavior, Dec; 4(3-4):270-82.*

**Bigler, E.D.,**    Abildskov, T.A., Petrie, J.A., Johnson, M., Lange, Chipman, J., Lu, J., McMahon, W., & Lainhart, J.E. (2010). Volumetric and voxel-based orphometry findings in autism subjects with and without macrocephaly. *Developmental Neuropsychology, 35 (3), 278-95.*

**Bigler, E.D.,**    Green, R.R., Farrer, T.J., Roper, J.C. & Millward, J.B., (2009). The rigor of research design and 'forensic' publications in neuropsychological research. *Psychological Injury and Law, 2:43-52.*

**Bigler, E.D.,**    & Brooks, M. (2009). Traumatic brain injury and forensic neuropsychology. *Journal of Head Trauma Rehabilitation, Mar-Apr; 24(2):76-87. Review.*

**Bigler, E.D.,**    Mortensen, S., Neeley, E.S., Ozonoff, S., Krasny, L., Johnson, M., Lu, J., Provencal, S.L., McMahon, W., & Lainhart, J.E . (2007). Superior temporal gyrus, language function, and autism. *Developmental Psychology, 31(2):217-38.*

Bigler, E. D.      18

**Bigler, E.D.,**     Ryser, D. K., Gandhi, P., Kimball, J., & Wilde, E.A., (2006) Day-of-injury computerized tomography, rehabilitation status, and development of cerebral atrophy in traumatic brain injury. *American Journal of Physical Medicine and Rehabilitation, Oct;85(10):793-806.*

**Bigler, E.D.,**     Neeley, E.S., Miller, M.J., Tate, D.F., Rice, S.A., Cleavinger, H., Wolfson, L., Tschanz, J., & Welsh-Bohmer, K., (2004). Cerebral volume loss, cognitive deficit and neuropsychological performance: Comparative measures of brain atrophy: I. Dementia. *Journal of the International Neuropsychological Society, May;10:442-52.*

**Bigler, E.D.,**     Lowry, C. M., Kerr, B., Tate, D. F., Hessel, C. D., Earl, H. D., Miller, M.J., Rice, S. A., Smith, K. H., Tschanz, J. T., Welsh-Bohmer, K., Plassman, B., & Victoroff, J., (2003). Role of white matter lesions, cerebral atrophy, and APOE on cognition in older persons with and without dementia: The Cache County, Utah, study of memory and aging. *Neuropsychology, Jul;17(3):339-52.*

**Bigler, E.D.,**     Tate, D.F., Neeley, E.S., Wolfson, L. J., Miller, M.J., Rice, S.A., Cleavinger, H., Anderson, C., Coon, H., Ozonoff, S., Johnson, M., Dinh, E., Lu, J., Mc Mahon, W., & Lainhart, J.E. (2003). Temporal lobe, autism, and macrocephaly. *American Journal of Neuroradiology, Nov-Dec;24(10):2066-76.*

**Bigler, E.D.,**     Kerr, B., Victoroff, J., Tate, D.F., & Breitner, J.C. (2002). White matter lesions, quantitative magnetic resonance imaging, and dementia. *Alzheimer Disease and Associated Disorders, Jul-Sep;16(3):161-70.*

**Bigler, E.D.**     Anderson, C.V., & Blatter, D.D. (2002). Temporal lobe morphology in normal aging and traumatic brain injury. *American Journal of Neuroradiology, Feb;23(2):255-66.*

**Bigler, E.D.,**     Tate, D.F., Miller, M.J., Rice, S.A., Hessel, C.D., Earl, H.D., Tschanz, J.T., Plassman, B., & Welsh-Bohmer, K.A. (2002). Dementia, asymmetry of temporal lobe structures, and apolipoprotein E genotype: Relationships to cerebral atrophy and neuropsychological impairment. *Journal of the International Neuropsychological Society, Nov;8(7):925-33.*

**Bigler, E.D.**     & Tate, D.F. (2001). Brain volume, intracranial volume and dementia. *Investigative Radiology, Sep;36(9):539-46.*

**Bigler, E.D.**     Lowry, S.M., Anderson, C.V., Johnson, S.C., Terry, J. & Steed, M. (2000). Dementia, quantitative neuroimaging, and apolipoprotein E genotype. *American Journal of Neuroradiology, Nov-Dec;21(10):1857-68.*

**Bigler, E.D.**     Johnson, S.C. & Blatter, D.D. (1999). Head trauma and intellectual status: Relation to quantitative magnetic resonance imaging findings. *Applied Neuropsychology, 6(4):217-25.*

**Bigler, E.D.**     Lajiness-O'Neill, R. & Howes, N.L. (1998). Technology in the assessment of learning disability. *Journal of Learning Disabilities, Jan-Feb;31(1):67-82.*

**Bigler, E.D.,**     Blatter, D.D., Anderson, C.V., Johnson, S.C., Gale, S.D., Hopkins, R.O., & Burnett, B. (1997). Hippocampal Volume in Normal Aging and Traumatic Brain Injury. *AJNR. American Journal of Neuroradiology, Jan;18(1):11-23.*

**Bigler, E.D.**        & Dodrill, C.B. (1997). Assessment of neuropsychological testing. *Neurology, Oct;49(4):1180-2; author reply 1183-5.*

**Bigler, E.D.**,       Blatter, D.D., Johnson, S.C., Anderson, C.V., Russo, A.A., Gale, S.D., Ryser, D.K., Macnamara, S.E., & Bailey, B.J. (1996). Traumatic brain injury, alcohol and quantitative neuroimaging: preliminary findings. *Brain Injury, Mar;10(3):197-206.*

**Bigler, E.D.**,       Johnson, S.C., Anderson, C.V., Blatter, D.D., Gale, S.D., Russo, A.A., Ryser D.K., Macnamara, S.E., Bailey, B.J., Hopkins, R.O., & Abildskov, T.J. (1996). Traumatic brain injury and memory: The role of hippocampal atrophy. *Neuropsychology, 10:333-42.*

**Bigler, E.D.**,       Clark, E., & Farmer, J. (1996). Traumatic Brain Injury:  1990s Update-Introduction to the Special Series. *Journal of Learning Disabilities, Sep;29(5):512-3.*

**Bigler, E.D.**,       & Snyder, J.L. (1995). Neuropsychological outcome and quantitative neuroimaging in mild head injury. *Archives of Clinical Neuropsychology, Mar;10(2):159-74.*

**Bigler, E.D.**,       Johnson, S.C., Jackson, C., & Blatter, D.D. (1995).  Aging, brain size, and IQ. *Intelligence, 21(1):109-19.*

**Bigler, E.D.**,       Burr, R., Gale, S., Norman, M., Kurth, S., Blatter, D., & Abildskov, T. (1994). Day of injury CT scan as an index to pre-injury brain morphology. *Brain Injury, Apr;8(3):231-8.*

**Bigler, E.D.**,       Kurth, S., Blatter, D., & Abildskov, T.J. (1993). Day-of-injury CT as an index to pre-injury brain morphology: Degree of post-injury degenerative changes identified by CT and MR neuroimaging. *Brain Injury, Mar-Apr;7(2):125-34.*

**Bigler, E.D.**,       Kurth, S., Blatter, D., & Abildskov, T.J. (1992). Degenerative changes in traumatic brain injury: Post-injury magnetic resonance identified ventricular expansion compared to pre-injury levels. *Brain Research Bulletin, Apr;28(4):651-3.*

**Bigler, E.D.**,       Nelson, J.E., & Schmidt, R.D. (1989). Identification of mamillary body atrophy in Korsakoff's syndrome using magnetic resonance imaging. *The Journal of Neuropsychiatry and Clinical Neurosciences, Summer;1(3):341-2.*

**Bigler, E.D.**,       Nelson, J.E., & Schmidt, R.D. (1989). Mamillary body atrophy identified by magnetic resonance imaging in alcoholic amnestic (Korsakoff's) syndrome: Neuropsychological correlates. *Neuropsychiatry, Neuropsychology and Behavioral Neurology, 2:189-201.*

**Bigler, E.D.**,   Rosa, L., Schultz, F., Hall, S., & Harris, J. (1989). Rey-Auditory verbal learning and Rey-Osterrieth complex figure design test for performance in Alzheimer's Disease and closed head injury. *Journal of Clinical Psychology, Mar;45(2):277-80.*

**Bigler, E.D.**,   Schultz, F., Hall, S., Rosa, L., & Harns, J. (1989). Performance on the Raven Colored Progressive Matrices in patients with closed head injury and dementia of the Alzheimer's type: Clinical considerations. *Archives of Clinical Neuropsychology, 4:111-2.*

**Bigler, E.D.**   & Alfano, M. (1988). Anoxic encephalopathy: Neuroradiological and neuropsychological findings. *Archives of Clinical Neuropsychology, 3(4):383-96.*

**Bigler, E.D.**,   Rosenstein, L.D., Roman, M., & Nussbaum, N.L. (1988). The clinical significance of congenital agenesis of the corpus callosum. *Archives of Clinical Neuropsychology, 3(2):189-200.*

**Bigler, E.D.**,   Schultz, R., Grant, M., Knight, G., Lucas, J., Roman, M., Hall, S., & Sullivan, M. (1988). Design fluency in dementia of the Alzheimer's type. *Neuropsychology, 2:127-33.*

**Bigler, E.D.**   & Naugle, R.I. (1985).  Case studies in cerebral plasticity.  *The International Journal of Clinical Neuropsychology, 8:12-23.*

**Bigler, E.D.**,   Hubler, D.W., Cullum, C.M., & Turkheimer, E. (1985). Intellectual and memory impairment in dementia: Computerized axial tomography volume correlations. *Journal of Nervous and Mental Disease, Jun;173(6):347-52.*

**Bigler, E.D.**   & Naugle, R.I. (1985). Case studies in cerebral plasticity. *Clinical Neuropsychology, 7:12-23.*

**Bigler, E.D.**,   Cullum, M.C., Paver, S., Turkheimer, E., & Yeo, R. (1984). Neuropsychological and computerized tomographic correlates in post traumatic head injury. *The International Journal of Clinical Neuropsychology, 6:83.*

**Bigler, E.D.**,   Hubler, D.W., Cullum, C.M., Turkheimer, E., & Yeo, R. (1984). Neuropsychological performance and volumetric CT scan measures in degenerative diseases. *The International Journal of Clinical Neuropsychology, 6:77.*

**Bigler, E.D.**,   Hubler, D.W., Turkheimer, E., Cullum, C.M., Paver, S., & Yeo, R. (1984). Volumetric CAT measures and neuropsychological performance in Alzheimer's disease. *International Journal of Neuroscience, 24:291-4.*

**Bigler, E.D.**,   Paver, S., Cullum, C.M., Turkheimer, E., Hubler, D.W., & Yeo, R. (1984). Ventricular enlargement, cortical atrophy and neuropsychological performance following head injury. *International Journal of Neuroscience, 24:295-8.*

**Bigler, E.D.**,   Bennet, J., & Newton, J.S. (1983). The hyperlexic syndrome: A case study. *Clinical Neuropsychology, 5:95-6.*

Bigler, E. D.      21

**Bigler, E.D.**          & Ehrfurth, J.W. (1981). The continued inappropriate singular use of the Bender Visual Motor Gestalt Test. *Professional Psychology, 12(5):562-9.*

**Bigler, E.D.**          & Steinman, D.R. (1981). Neuropsychology and computerized axial tomography: Further comments. *Professional Psychology, 12:195-7.*

**Bigler, E.D.**          & Tucker, D.M. (1981). Comparison of verbal IQ, tactual performance, seashore rhythm, and finger oscillation tests in the blind and brain damaged. *Journal of Clinical Psychology, Oct;37(4):849-51.*

**Bigler, E.D.**,          Steinman, D.R., & Newton, J.S. (1981). Clinical assessment of cognitive deficit in neurologic disorder, I: Effects of age and degenerative disease. *Clinical Neuropsychology, 3:5-13.*

**Bigler, E.D.**,          Steinman, D.R., & Newton, J.S. (1981). Clinical assessment of cognitive deficit in neurologic disorder, II: Cerebral trauma. *Clinical Neuropsychology, 3:13-18.*

**Bigler, E.D.**          & Ehrfurth, J.W. (1980). Critical limitations of the Bender-Gestalt test in clinical neuropsychology: Response to lacks. *Clinical Neuropsychology, 2:88-90.*

**Bigler, E.D.**          & Tucker, D.M. (1979). The Quality Extinction Test: Results with psychiatric patients. *Clinical Neuropsychology, 1(4):8-12.*

**Bigler, E.D.**,          Tucker, D.M., & Piran, N. (1979). Neuropsychological differentiation in a psychiatric late adolescent-young adult population: Preliminary report. *Clinical Neuropsychology, 1:9-14.*

**Bigler, E.D.**,          Shearer, D.E., Dustman, R.E., & Fleming, D.E. (1978). Differential effects of convulsants on visually evoked responses in the albino rat. *Pharmacology, Biochemistry, and Behavior, Jun;8(6):727-33.*

**Bigler, E.D.**          & Fleming, D.E. (1977). Food-deprivation induced arousal: Evidence against "behavioral inhibition" in electrocortical hypersynchrony. *Psychological Reports, Apr;40(2):527-31.*

**Bigler, E.D.**,          Fleming, D.E., & Shearer, D.E. (1977). Comparison of ethanol consumption by methods of schedule-induced polydipsia and water deprivation. *Psychological Record, 3:577-80.*

**Bigler, E.D.**          & Eidelberg, E. (1976). Diazepam suppression of evoked after-discharges in rat lateral geniculate nucleus and visual cortex. *Proceedings of the Western Pharmacology Society, 19:435-8.*

**Bigler, E.D.**          & Eidelberg, E. (1976). Nigrostriatal effects of morphine in two mouse strains. *Life Sciences, Nov 1;19(9):1399-406.*

**Bigler, E.D.**          & Eidelberg, E. (1976). Principal cells in lateral geniculate: Effects of Metrazol on capacity to after-discharge. *Brain Research Bulletin, Sep-Oct;1(5):485-7.*

**Bigler, E.D.**          & Fleming, D.E. (1976). Effects of shock induced arousal on the elicitation and waveform elaboration of photically evoked after-discharges. *Physiological Psychology, 4:86-90.*

Bigler, E. D.      22

**Bigler, E.D.**        & Fleming, D.E. (1976). Frequency of intermittent photic stimulation: Effect on photic after-discharges, photic driving and behavioral activity. *Bulletin of the Psychonomic Society, 8:596-7.*

**Bigler, E.D.**        & Fleming, D.E. (1976). Pharmacological suppression of photically evoked after-discharges in rats: Incremental dose, hippocampal EEG and behavioral activity correlates. *Psychopharmacologia, 46(1):73-82.*

**Bigler, E.D.**,       Fleming, D.E., & Shearer, D.E. (1976). Metrazol potentiated after-discharges: Dose-response relationships and effects of selective lesions. *Pharmacology, Biochemistry, and Behavior, Oct;5(4):423-9.*

**Bigler, E.D.**,       Fleming, D.E., & Shearer, D.E. (1976). Stabilization of photically evoked after-discharge activity: Control procedures and effects of classical trace conditioning. *Behavioral Biology, Apr;16(4):425-37.*

**Bigler, E.D.**        & Fleming, D.E. (1974). Habituation and occurrence of photically evoked after-discharges in the albino rat. *Bulletin of the Psychonomic Society, 4(4A):275-7.*

**Bigler, E.D.**,       Fleming, D.E., & Shearer, D.E. (1974). Pharmacological modulation of photically evoked after-discharge patterns in hooded Long-Evans rats. *Bulletin of the Psychonomic Society, 4:179-81.*

**Bigler, E.D.**,       Fleming, D.E., & Shearer, D.E. (1974). Schedule-induced polydipsia and neocortic lesions in the rat. *Psychological Reports, Oct;35(2):935-41.*

Root, A.E.,        Wimsatt, M., Rubin, K., **Bigler, E.D.**, Dennis, M., Gerhardt, C.A., Stancin, T., Taylor, H.G., Vannatta, K., Yeates, K.O. (2016). Children with Traumatic Brain Injury: Associations Between Parenting and Social Adjustment. *Journal of Applied Developmental Psychology. 2016 Jan-Feb; 42:1-7.*

Moran, L. M.,        **Bigler, E.**, Dennis, M., Gerhardt, G. A., Rubin, K. H., Stancin, T., Taylor, H. G., Vannatta, K. A., & Yeates, K. O. (2015). Social problem-solving and social adjustment in paediatric traumatic brain injury. *Brain Injury. 2015 Dec;29(13-14):1682-90. doi: 10.3109/02699052.2015.1075140. Epub 2015 Sep 17.*

Max, J.E.,        Lopez, A., Wilde, E.A., **Bigler, E.D.**, Schachar, R.J., Saunders, A., Ewing-Cobbs., L., Chapman, S.B., Yang, T.T., Levin, H.S. (2015). Anxiety disorders in children and adolescents in the second six months after trauamatic brain injury. *Journal of Pediatric Rehabilitation Medicine, 2015 Dec 1; 8(4):345-55.*

Koerte, I.K,        Lin, A.P., Willems, A., Muehlmann, M., Hufschmidt, J., Coleman, M.J., Green, I., Tate, D., Wilde, E., Pasternak, O., Bouix, S., Rathi, Y., **Bigler, E.D.**, Stern, R.A., Shenton, M.E. (2015). A review of neuroimaging findings in repetitive brain trauma. *Brain Pathology, 2015 May;25(3):318-49. doi: 10.1111/bpa.12249.*

Heverly-Fitt, S.,        Rubin, K. H., Dennis, M., Taylor, H. G., Stancin, T., Gerhardt, C. A., Vannatta, K., **Bigler, E. D.**, & Yeates, K. O. (2015). Investigating a proposed model of social competence in children with traumatic brain injury. *Journal of Pediatric Psychology. 2015 Sep 15. pii: jsv085. [Epub ahead of print]*

Bigler, E. D.        23

Clark, A.L.,   Sorg, S.F., Schiehser, D.M., **Bigler, E.D.**, Bondi, M.W., Luc, N., Kim, R., Jacobson, M.W., Jak, A.J., & Delano-Wood, L. (2015, in press). White matter associations with Performance Validity Testing in veterans with mild traumatic brain injury (mTBI): The utility of biomarkers in complicated assessment. *Journal of Head Trauma Rehabilitation*. *2015 Sep 10*. [Epub ahead of print]

Delano-Wood, L.,   Bangen, K.J., Sorg, S.F., Clark, A.L., Schiehser, D.M., Luc, N., Bondi, M.W., Werhane, M., Kim, R.T., **Bigler, E.D.**, (2015). Brainstem white matter integrity is related to loss of consciousness and postconcussive symptomatology in veterans with chronic mild to moderate traumatic brain injury. *Brain Imaging and Behavior. 2015 Sep; 9(3):500-512.*

Travers, B.G.,   **Bigler, E.D.**, Tromp do, P.M., Adluru, N., Destiche, D., Samsin, D., Froehlich, A., Prigge, M.D., Duffield, T.C., Lange, N., Alexander, A.L., Lainhart, J.E. (2015) Brainstem White Matter Predicts Individual Differences in Manual Motor Difficulties and Symptom Severity in Autism. *Journal of autism and developmental disorders. 2015 Sep;45(9):3030-40. doi: 10.1007/s10803-015-2467-9.*

Green, R.R.,   **Bigler, E.D.**, Froehlich, A., Prigge, M.B., Travers, B.G., Cariello, A.N., Anderson, J.S., Zielinski, B.A., Alexander, A., Lange, N., Lainhart, J.E., (2015) Beery VMI performance in autism spectrum disorder. *Child Neuropsychology. 2015 Aug 21:1-23.* [Epub ahead of print]

Sullivan, E.V.,   **Bigler, E.D.**, (2015) Neuroimaging's Role in Neuropsychology: Introduction to the Special Issue of Neuropsychology Review on Neuroimaging in Neuropsychology. *Neuropsychology Review. 2015 Sep;25(3):221-3.* doi: 10.1007/s11065-015-9296-7. Epub 2015 Aug 15.

Max, J.E.,   Wilde, E.A., **Bigler, E.D.**, Hanten, G., Dennis, M., Schachar, R.J., Sauders, A.E., Ewing-Cobbs, L., Chapman, S.B., Thompson, W.K., Yang, T.T., Levin, H.S. (2015) Personality Change Due to Traumatic Brain Injury in Children and Adolescents: Neurocognitive Correlates. *The Journal of Neuropsychiatry and clinical neurosciences, 2015 Jul 17:appineuropsych15030073. [Epub ahead of print]*

Jantz, P.B.,   **Bigler, E.D.**, Froehlich, A.L., Prigge, M.B., Cariello, A.N., Travers, B.G., Anderson, J., Zielinski, B.A., Alexander, A.L., Lange, N., Lainhart, J.E. (2015) Wide Range Achievement Test in Autism Spectrum Disorder: Test-Retest Stability. *Psychological reports. 2015 Jun;116(3):674-84. doi: 10.2466/03.15.PR0.116k24w8. Epub 2015 Apr 14.*

Max, J.E.,   Friedman, K., Wilde, E.A., **Bigler, E.D.**, Hanten, G., Schachar, R.J., Saunders, A.E., Dennis, M., Ewing-Cobbs, L., Chapman, S.B., Yang, T.T., Levin, H.S. (2015). Psychiatric disorders in children and adolescents 24 months after mild traumatic brain injury. *The Journal of neuropsychiatry and clinical neurosciences. 2015 Spring;27(2):112-20. doi: 10.1176/appi.neuropsych.13080190.*

Wolfe, K.R.,          **Bigler, E. D.**, Dennis, M., Gerhardt, C., Rubin, K., Taylor, H.G., Vannatta, K., & Yeates, K.O. (2015). Self-awareness of peer-rated social attributes in children with traumatic brain injury. *Journal of Pediatric Psychology, Apr;40(3):272-84*

Travers, B.G.,          Tromp do, P.M., Adluru, N., Lange, N., Destriche, D., Ennis, C., Nielsen, J.A., Froechlich, A.L., Prigge, M.B., Fletcher, P.T., Anderson, J.S., Zielinski, B.A., **Bigler, E.D.**, Lainhart, J.E., Alexander, A.L. (2015). Atypical development of white matter microstructure of the corpus callosum in males with autism: A longitudinal investigation. *Molecular Autism, Mar 11;6:15.*

Ochs, A.L.,          Ross, D.E., Zannoni, M.D., Abildskov, T.J., **Bigler, E.D.** (2015). Comparison of automated brain volume measures obtained with Neuroquant® and FreeSurfer. *J Neuroimaging, Feb 26; doi: 10.1111/jon.12229 [Epub ahead of print].*

Lange, N.,          Travers, B.G., **Bigler, E.D.**, Prigge, M.B., Froechlich, A.L., Nielsen, J.A., Cariello, A.N., Zielinski, B.A., Anderson, J.S., Fletcher, P.T., Alexander, A.A., & Lainhart, J.E. (2015). Longitudinal volumetric brain changes in autism spectrum disorder ages 6-35 years. *Autism Research: official journal of the International Society for Autism Research, Feb;8(1):82-93. doi: 10.1002/aur.1427. Epub 2014 Nov 7.*

Trontel, H.G.,          Duffield, T.C., **Bigler, E.D.**, Abildskov, T.J., Froechlich, A., Prigge, M.B., Travers, B.G., Anderson, J.S., Zielinski, B.A., Alexander, A.L., Lange, N., Lainhart, J.E. (2015). Mesial temporal lobe and memory function in autism spectrum disorder: An exploration of volumetric findings. *Journal of clinical and expimental neuropsychology;37(2):178-92.*

Dennis, M.          Spiegler, B.J., Simic, N., Sinopoli, K.J., Wilkinson, A., Yeates, K.O., Taylor, H.G., **Bigler, E.D.**, & Fletcher, J.M. (2014). Functional plasticity in childhood brain disorders: When, what, how, and whom to assess. *Neuropsychology Review, Dec;24(4):389-408.*

Chuang, Y.F.,          Breitner, J.C., Chiu, Y.L., Khachaturian, A., Hayden, K., Corcoran, C., Tschanz, J., Norton, M., Munger, R., Welsh-Bohmer, K., Zandi, P.P., & **Cache County Investigators** (2014). Use of diuretics is associated with reduced risk of Alzheimer's disease: the Cache County Study. *Neurobiology of Aging, Nov;35(11):2429-35.*

Heverly-Fitt, S.          Wimsatt, M.A., Menzer, M.M., Rubin, K.H., Dennis, M., Taylor, H.G., Stancin, T., Gerhardt, C.A., Vannatta, K., **Bigler, E.D.**, & Yeates, K.O. (2014). Friendship quality and psychosocial outcomes among children with traumatic brain injury. *Journal of the International Neuropsychological Society, Aug;20(7):684-93.*

Jantz, P.B.          & **Bigler, E.D.** (2014). Neuroimaging and the school-based assessment of traumatic brain injury. *NeuroRehabilitation; 34(3):479-92.*

Lipton, M.L.          & **Bigler, E.D.** (2014). Clarifying the Robust Foundation for and appropriate use of DTI in mTBI patients. *AJOB (American Journal of Bioethics) Neuroscience, 5(2):41-3.*

Bigler, E. D.          25

Mathias, J.L.,     Harman-Smith, Y., Bowden, S.C., Rosenfeld, J.V., & **Bigler, E.D.** (2014) Contribution of Psychological Trauma to Outcomes after Traumatic Brain Injury: Assaults versus Sporting Injuries. *Journal of Neurotrauma, Apr 1;31(7):658-69.*

Nielsen, J.A.,     Zielinski, B.A., Fletcher, P.T., Alexander, A.L., Lange, N., **Bigler, E.D.**, Lainhart, J.E., & Anderson, J.S. (2014). Abnormal lateralization of functional connectivity between language and default mode regions in autism. *Molecular Autism, Feb 6; 5(1):8.*

Robinson, K.E.     Fountain-Zaragoza, S., Dennis, M., Taylor, H.G., **Bigler, E.D.**, Rubin, K., Vannatta, K., Gerhardt, C.A., Stancin, T., & Yeates, K.O. (2014). Executive Functions and Theory of Mind as Predictors of Social Adjustment in Childhood Traumatic Brain Injury. *Journal of Neurotrauma, Nov 15;31(22):1835-42.*

Slobounov, S.,     Bazarian, J., **Bigler, E.D.**, Cantu, R., Hallett, M., Harbaugh, r., Hovda, D., Mayer, A.R., Nuwer, M.R., Kou, Z., Lazzarino, G., Papa, L., & Vagnozzi, R. (2014). Sports-related concussion: ongoing debate. *British Journal of Sports Medicine, Jan; 48(2):75-6.*

Travers, B.G.,     **Bigler, E.D.**, Tromp, D.P., Adluru, N., Froehlich, A.L., Ennis, C., Lange, N., Nielsen, J.A., Prigge, M.B., Alexander, A.L., & Lainhart, J.E. (2014) Longitudinal processing speed impairments in males with autism and the effects of white matter microstructure. *Neuropsychologia, Jan 53:137-145.*

Wolfe, K.R.     **Bigler, E.D.**, Dennis, M., Gerhardt, C.A., Rubin, K., Taylor, H.G., Vannatta, K., & Yeates, K.O. (2014). Self-awareness of peer-rated social attributes in children with traumatic brain injury. *Journal of Pediatric Psychology, Apr;40(3):272-84.*

Yeates, K.O.,     **Bigler, E.D.**, Abildskov, T., Dennis, M., Gerhardt, C.A., Vannatta, K., Rubin, K.H., Stancin, T., & Taylor, H.G. (2014). Social Competence in Pediatric Traumatic Brain Injury: From Brain to Behavior. *Clinical Psychological Science, 2(1):97-107.*

Zielinski, B.A.     Prigge, M.B., Nielsen, J.A., Froechlich, A.L., Abildskov, T.J., Anderson, J.S., Fletcher, P.T., Zygmunt, K.M., Travers, B.G., Lange, N., Alexander, A.L., **Bigler, E.D.**, & Lainhart, J.E. (2014). Longitudinal changes in cortical thickness in autism and typical development. *Brain: A Journal of Neurology, Jun;137(Pt 6):1799-812.*

Clawson, A.,     Clayson, P.E., South, M., **Bigler, E.D.**, & Larson, M.J. (2013). An electrophysiological investigation of interhemispheric transfer time in children and adolescents with high-functioning autism spectrum disorders. *Journal of Autism and Developmental Disorders, Feb;45(2):363-75.*

Dennis, M.,     Spiegler, B.J., Juranek, J.J., **Bigler, E.D.**, Snead, O.C., & Fletcher, J.M. (2013) Age, plasticity, and homeostasis in childhood brain disorders. *Neuroscience & Biobehavioral Reviews, Dec;37(10 Pt 2):2760-73).*

Dennis, M.,     Simic, N., **Bigler, E.D.**, Abildskov, T., Agostino, A., Taylor, H.G., Rubin, K., Vannatta, K., Gerhardt, C.A., Stancin, T., & Yeates, K.O. (2013) Cognitive, affective, and conative theory of mind (ToM) in children with traumatic brain injury. *Developmental Cognitive Neuroscience, Jul; 5:25-39.*

Dennis, M.,        Simic, N., Agostino, A., Taylor, H.G., **Bigler, E.D.**, Rubin, K., Vannatta, K., Gerhardt, C.A., Stancin, T., & Yeates, K.O. (2013). Irony and empathy in children with traumatic brain injury. *Journal of the International Neuropsychological Society, Mar; 19(3):338-48.*

Dennis, M.,        Agostino, A., Taylor, H.G., **Bigler, E.D.,** Rubin, K., Vannatta, K., Gerhardt, C.A., Stancin, T., & Yeates, K.O. (2013). Emotional expression and socially modulated emotive communication in children with traumatic brain injury. *Journal of the International Neuropsychological Society, Jan 19(1):34-43.*

Duffield, T.C.,        Trontel, H.G., **Bigler, E.D.**, Froehlich, A., Prigge, M.B., Travers, B., Green, R.R., Cariello, A.N., Cooperrider, J., Nielsen, J., Alexander, A., Anderson, J., Fletcher, P.T., Lange, N., Zielinski, B., & Lainhart, J. (2013) Neuropsychological investigation of motor impairments in autism. *Journal of Clinical and Experimental Neuropsychology, Oct; 35(8):867-881.*

Harman-Smith, Y.E.,        Mathias, J.L., Bowden, S.C., Rosenfeld, J.V., & **Bigler, E.D.** (2013) Wechsler Adult Intelligence Scale-Third Edition profiles and their relationship to self-reported outcome following traumatic brain injury. *Journal of Clinical and Experimental Neuropsychology, Oct; 35(8):785-798.*

Kourtidou, P.,        McCauley, S.R., **Bigler, E.D.,** Traipe, E., Wu, T.C., Chu, Z.D., Hunter, J.V., Li, X., Levin, H.S., Wilde, E.A. (2013). Centrum Semiovale and Corpus Callosum Integrity in Relation to Information Processing Speed in Patients With Severe Traumatic Brain Injury. *Journal of Head Trauma Rehabilitation, Nov-Dec;28(6):433-41.*

Mathias, J.L.,        Dennington, V., Bowden, S.C., & **Bigler, E.D.** (2013) Community versus orthopaedic controls in traumatic brain injury research: how comparable are they? *Brain Injury, 27(7-8):887-95.*

Max, J.E.        Pardo, D., Hanten, G., Schachar, R.J., Saunders, A.E., Ewing-Cobbs, L., Chapman, S.B., Dennis, M., Wilde, E.A., **Bigler, E.D.**, Thompson, W.K., Yang, T.T., & Levin, H.S. (2013). Psychiatric disorders in children and adolescents six-to-twelve months after mild traumatic brain injury. *Journal of Neuropsychiatry and Clinical Neurosciences, Fall 25(4):272-82.*

Max, J.E.        Schachar, R.J., Landis, J., **Bigler, E.D.**, Wilde, E.A., Saunders, A.E., Ewing-Cobbs, L., Chapman, S.B., Dennis, M., Hanten, G., & Levin, H.S. (2013). Psychiatric disorders in children and adolescents in the first six months after mild traumatic brain injury. *Journal of Neuropsychiatry and Clinical Neurosciences, Jul 1 25(3):187-97.*

Merkley, T.L.,        Larson, M.J., **Bigler, E.D.**, Good, D.A., & Perlstein, W.M. (2013). Structural and Functional Changes of the Cingulate Gyrus following Traumatic Brain Injury: Relation to Attention and Executive Skills. *Journal of the International Neuropsychological Society, Sep 19(8):899-910.*

Nielsen, J.A.,        Zielinski, B.A., Fletcher, P.T., Alexander, A.L., Lange, N., **Bigler, E.D.**, Lainhart, J.E., & Anderson, J.S. (2013). Multisite functional connectivity MRI classification of autism: ABIDE results. *Frontiers in Human Neuroscience, Sep 25; 7:599.*

Prigge, M.D.,   Lange, N., **Bigler, E.D.,** Merkley, T.L., Neeley, E.S., Abildskov, T.J., Froehlich, A.L., Nielsen, J.A., Cooperrider, J.R., Cariello, A.N., Ravichandran, C., Alexander, A.L., & Lainhart, J.E. (2013). Corpus Callosum Area in Children and Adults with Autism. *Research in Autism Spectrum Disorders, 7(2):221-234.*

Prigge, M.D.,   **Bigler, E.D.**, Fletcher, P.T., Zielinski, B.A., Ravichandran, C., Anderson, J., Froehlich, A., Abildskov, T., Papadopolous, E., Maasberg, K., Nielsen, J.A., Alexander, A.L., Lange, N., & Lainhart, J. (2013). Longitudinal Heschl's gyrus growth during childhood and adolescence in typical development and autism. *Autism Research, Apr; 6(2):78-90.*

Spitz, G.,   **Bigler, E.D.**, Abildskov, T., Maller, J.J., O'Sullivan, R., & Ponsford, J.L. (2013) Regional cortical volume and cognitive functioning following traumatic brain injury. *Brain and Cognition, Oct; 8, 3(1):34-44.*

Trontel, H.G.   Duffield, T.C., **Bigler, E.D.**, Froechlich, A., Prigge, M.B., Nielsen, J.A., Cooperrider, J.R., Cariello, A.N., Travers, B.G., Anderson, J.S., Zielinski, B.A., Alexander, A., Lange, N., Lainhart, J.E. (2013). Fusiform Correlates of Facial Memory in Autism. *Behavioral Sciences, 3(3): 348-71.*

Wilde, E.A.,   Merkley TL, **Bigler E.D.**, Max JE, Schmidt AT, Ayoub KW, McCauley SR, Hunter JV, Hanten G, Li X, Chu ZD, & Levin HS. (2013). Longitudinal changes in cortical thickness in children after traumatic brain injury and their relation to behavioral regulation and emotional control. *International Journal of Developmental Neuroscience, May 30(3):267-76.*

Yallampalli R.,   Wilde, E.A., **Bigler, E.D.,** McCauley, S.R., Hanten, G., Troyanskaya, M., Hunter, J.V., Chu, Z., Li, X., Levin, H.S. (2013). Acute White Matter Differences in the Fornix Following Mild Traumatic Brain Injury Using Diffusion Tensor Imaging. *Journal of Neuroimaging, Apr;23(2):224-7.*

Yeates, K.O.,   Gerhardt, C.A., **Bigler, E.D.**, Abildskov, T., Dennis, M., Rubin, K.H., Stancin, T., Taylor, H.G., & Vannatta, K. (2013) Peer relationships of children with traumatic brain injury. *Journal of the International Neuropsychological Society, May;19(5):518-27.*

Cho, Y.,   Seong, J.K., Jeong, Y., Shin, S.Y., & **Alzheimer's Disease Neuroimaging Initiative\*\*** (2012). Individual subject classification for Alzheimer's disease based on incremental learning using a spatial frequency representation of cortical thickness data. *NeuroImage, Feb 1; 59(3):2217-30.*

Dennis, M.,   Simic, N., Gerry, Taylor H., **Bigler, E.D.,** Rubin, K., Vannatta, K., Gerhardt, C.A., Stancin, T., Roncadin, C., & Yeates, K.O. (2012). Theory of mind in children with traumatic brain injury. *Journal of the International Neuropsychological Society, Sep; 18(5):908-16.*

Eskildsen, S.F.,   Coupe, P., Fonov, V., Manjon, J.V., Leung, K.K., Guizard, N., Wassef, S.N., Ostergaard, L.R., Collins, D.L., & **Alzheimer's Disease Neuroimaging Initiative\*\*** (2012). BEaST: brain extraction based on nonlocal segmentation technique. *NeuroImage, Feb 1; 59(3):2362-73.*

Froehlich A.L.,   Anderson JS, **Bigler ED**, Miller JS, Lange NT, Dubray MB, Cooperrider JR, Cariello A, Nielsen JA, & Lainhart JE. (2012). Intact Prototype Formation but

Impaired Generalization in Autism. *Research in Autism Spectrum Disorders, 6(2):921-930.*

Hopkins, R.O.,    & **Bigler, E.D.** (2012). Neuroimaging of anoxic injury: implications for neurorehabilitation. *NeuroRehabilitation, 31(3):319-29.*

Max, J.E.    Wilde, E.A., **Bigler, E.D.,** Thompson, W.K., MacLeod, M., Vasquez, A.C., Merkley, T.L., Hunter, J.V., Chu, Z.D., Yallampalli, R., Hotz, G., Chapman, S.B., Yang, T.T., Levin, H.S. (2012) Neuroimaging correlates of novel psychiatric disorders after pediatric traumatic brain injury. *Journal of the American Academy of Child and Adolescent Psychiatry, Nov 51(11):1208-17.*

Max, J.E.    Wilde, E.A., **Bigler, E.D.**, MacLeod, M., Vasquez, A.C., Schmidt, A.T., Chapman, S.B., Hotz, G., Yang, T.T., Levin, H.S. (2012). Psychiatric disorders after pediatric traumatic brain injury: a prospective, longitudinal, controlled study. *The Journal of Neuropsychiatry and Clinical Neurosciences, Fall 24(4):427-36.*

Max, J.E.    Keatley, E., Wilde, E.A., **Bigler, E.D.,** Schachar, R.J., Saunders, A.E., Ewing-Cobbs, L., Chapman, S.B., Dennis, M., Yang, T.T., Levin, H.S. (2012). Depression in children and adolescents in the first 6 months after traumatic brain injury. *International Journal of Developmental Neuroscience, 17 May 30(3):239-45.*

Norton, M.C.,    Dew, J., Smith, H., Fauth, E., Piercy, K.W., Breitner, J.C., Tschanz, J., Wengreen, H., Welsh-Bohmer, K., & **Cache County Investigators\*** (2012). Lifestyle behavior pattern is associated with different levels of risk for incident demetia and Alzheimer's disease: the Cache County Study. *Journal of the American Geriatrics Society, Mar; 60(3):405-12.*

Shah, S.,    Yallampalli, R., Merkley, T., McCauley, S.R., **Bigler, E.D.,** MacLeod, M., Chu, Z., Xiaoqi, L., Troyanskaya, M., Hunter, J.V., Levin, H.S., Clifton, G.L., Wilde, E.A. (2012). Diffusion tensor imaging and volumetric analysis of the ventral striatum in adults with traumatic brain injury. *Brain Injury, 26(3):201-10.*

Shen, K.K.,    Fripp, J., Meriaudeau, F., Chetelat, G., Salvado, O., Bourgeat, P., & **Alzheimer's Disease Neuroimaging Initiative\*\*** (2012). Detecting global and local hippocampal shape changes in Alzheimer's disease using statistical shape models. *NeuroImage, Feb 1; 59(3):2155-66.*

Skoog, I.,    Olesen, P.J., Blennow, K., Palmertz, B., Johnson, S.C., **Bigler, E.D.** (2012). Head size may modify the impact of white matter lesions on dementia. *Neurobiological Aging, Jul; 33(7):1186-93.*

Tate, D.F.,    Shenton ME, & **Bigler ED**., (2012). Introduction to the brain imaging and behavior special issue on neuroimaging findings in mild traumatic brain injury. *Brain Imaging Behavior, Jun 6(2):103-7.*

Travers, B.G.,    Adluru N, Ennis C, Tromp DP, Destiche D, Doran S, **Bigler ED**, Lange N, Lainhart JE, Alexander AL. (2012). Diffusion Tensor Imaging in Autism Spectrum Disorder: A Review. *Autism Research, Oct;5(5):289-313.*

Wilde, E.A.    Hunter, J.V., & **Bigler, E.D.** (2012). Pediatric traumatic brain injury: neuroimaging and neurorehabilitation outcome. *NeuroRehabilitation, 31(3):245-60.*

Wilde, E.A.    Hunter, J.V., & **Bigler, E.D.** (2012). Neuroimaging in neurorehabilitation. *NeuroRehabilitation, 31(3):223-6.*

Wilde, E.A.,    Ayoub K.W., & **Bigler E.D.,** Chu ZD, Hunter JV, Wu TC, McCauley SR, Levin HS. (2012). Diffusion tensor imaging in moderate-to-severe pediatric traumatic brain injury: changes within an 18 month post-injury interval. *Brain Imaging Behavior, Sept;6(3):404-16.*

Wilde, E.A.,    McCauley SR, Barnes A, Wu TC, Chu Z, Hunter JV, **Bigler ED.** (2012). Serial measurement of memory and diffusion tensor imaging changes within the first week following uncomplicated mild traumatic brain injury. *Brain Imaging Behavior, Jun 6(2):319-28.*

Wilde, E.A.    Hunter, J.V., & **Bigler, E.D.** (2012). A primer of neuroimaging analysis in neurorehabilitation outcome research. *NeuroRehabilitation, 31(3):227-42.*

Zielinski, B.A.,    Anderson, J.S., Froehlich, A.L., Prigge, M.B., Nielsen, J.A., Cooperrider, J.R., Cariello, A.N., Fletcher, P.T., Alexander, A.L., Lange, N., **Bigler, E.D.,** Lainhart, J.E. (2012). scMRI reveals large-scale brain network abnormalities in autism. *PLoS One, 7(11):e49172.*

Anderson, J.S.,    Druzgal, T.J., Froehlich, A., DuBray, M.B., Lange, N., Alexander, A.L., Abildskov, T., Nielson, J.A., Cariello, A.N., Cooperrider, J.R., **Bigler, E.D.,** Lainhart, J.E. (2011). Decreased interhemispheric functional connectivity in autism. *Cerebral Cortex, May; 21(5); 1134-46.*

Anderson, J.S.,    Nielson, J.A., Froehlich, A.L., Dubray, M.B., Druzgal, T.J., Cariello, A.N., Cooperrider, J.R., Zielinski, B.A., Ravichandran, C., Fletcher, P.T., Alexander, A.L., **Bigler, E.D.**, Lange, N., & Lainhart, J.E. (2011). Functional connectivity magnetic resonance imaging classification of autism. *Brain, Oct. 17. Dec;134(Pt 12):3742-54.*

Christidi, F.,    **Bigler, E.D.,** McCauley, S.R., Schnelle, K.P., Merkley, T.L., Mors, M.B., Li, X., Macleod, M., Chu, Z., Hunter, J.V., Levin, H.S., Clifton, G.L., Wilde, E.A. (2011). Diffusion tensor imaging of the perforant pathway zone and its relation to memory function in patients with severe traumatic brain injury. *Journal of Neurotrauma, May; 28(5):711-25.*

Di Paola, M.,    Moscatelli, A., **Bigler, E.D.,** Caltagirone, C., Carlesimo, G.A. (2011). White matter changes in patients with hypoxic amnesia. *Neurocase, Feb; 17(1):46-56.*

Kauwe, J.S.,    Cruchaga, C., Karch, C.M., Sadler, B., Lee, M., Mayo, K., Latu, W., Su'a, M., Fagan, A.M., Holtzman, D.M., Morris, J.C., **Alzheimer's Disease Neuroimaging Initiative\*\***, & Goate, A.M. (2011). Fine mapping of genetic variants in BIN1, CLU, CR1 and PICALM for association with cerebrospinal fluid biomarkers for Alzheimer's disease. *PLoS One, Feb 9; 6(2):e15918.*

1450

Lajiness-O'Neill, R,   Erdodi, L., **Bigler, E.D.,** (2011). Demographic and Injury-Related Moderators of Memory and Achievement Outcome in Pediatric TBI. *Applied Neuropsychology, Oct; 18(4):298-308.*

Max, J.E.,   Keatley, E., Wilde, E.A., **Bigler, E.D.,** Levin, H.S., Schachar, R.J., Saunders, A., Ewing-Cobbs, L., Chapman, S.B., Dennis, M., Yang, T.T. (2011). Anxiety disorders in children and adolescents in the first six months after traumatic brain injury. *Journal of Neuropsychiatry and Clinical Neuroscience, 23(1):29-39.*

McCauley, S.R.,   Wilde, E.A., **Bigler, E.D.,** Chu, Z., Yallampalli, R., Oni, M.B., Wu, T.C., Ramos, M.A., Pedroza, C., Vasquez, A.C., Hunter, J.V., Levin, H.S. (2011). Diffusion tensor imaging of incentive effects in prospective memory after pediatric traumatic brain injury. *Journal of Neurotrauma, Apr; 28(4): 503-16.*

McEvoy, L.K.,   Holland, D., Hagler, D.J. Jr., Fennema-Notestine, C., Brewer, J.B., Dale, A.M., **& Alzheimer's Disease Neuroimaging Initiative\*\*** (2011). Mild cognitive impairment: baseline and longitudinal structural MR imaging measures improve predictive prognosis. *Radiology, Jun; 259(3):834-43.*

Olesen, P.J.,   Guo, X., Gustafson, D., Borjesson-Hanson, A., Sacuiu, S., Eckerstrom, C., **Bigler, E.D.,** Skoog, I. (2011) A population-based study on the influence of brain atrophy on 20-year survival after age 85. *Neurology, 76(10): 879-86.*

Pannek, K,   Mathias, J.L., **Bigler, E.D.,** Brown, G., Taylor, J.D., Rose, S.E. (2011). The average pathlength map: a diffusion MRI tractography-derived index for studying brain pathology. *NeuroImage, Mar 1; 55(1): 133-41.*

Southwick, J.S.,   **Bigler, E.D.,** Froehlich, A., Dubray, M.B., Alexander, A.L., Lange, N., Lainhart, J.E. (2011). Memory functioning in children and adolescents with autism. *Neuropsychology, Nov, 25 (6): 702-10.*

Tate, D.F.,   Neeley, E.S., Norton, M.C., Tschanz, J.T., Miller, M.J., Wolfson, L., Hulette, C., Leslie, C., Welsh-Bohmer, K.A., Plassman, B., **Bigler, E.D.** (2011). Intracranial volume and dementia: some evidence in support of the cerebral reserve hypothesis. *Brain Research, Apr 18; 1385: 151-62.*

Tate, D.F.,   Khedraki, R., Neeley, E.S., Ryser, D.K., **Bigler, E.D.** (2011). Cerebral volume loss, cognitive deficit, and neuropsychological performance: comparative measures of brain atrophy: II. Traumatic brain injury. *Journal of International Neuropsychological Society, Mar 17(2):308-16.*

Tate, D.F.,   Sampat, M., Harezlak, J., Fiecas, M., Hogan, J., Dewey, J., McCaffrey, D., Branson, D., Russell, T., Conley, J., Taylor, M., Schifitto, G., Zhong, J., Daar, E.S., Alger, J., Brown, M., Singer, E., Campbell, T., McMahon, D., Tso, Y., Matesan, J., Letendre, S., Paulose, S., Gaugh, M., Tripoli, C., Yiannoutsos, C., **Bigler E.D.,** Cohen, R.A., Guttmann, C.R., Navia, B.; HIV Neuroimaging Consortium (2011). Regional areas and widths of the midsagittal corpus callosum among HIV-infected patients on stable antiretroviral therapies. *Journal of Neurovirology, Aug; 17(4):368-79.*

Tosun, D.,   Schuff, N., Mathis, C.A., Jagust, W., Weiner, M.W., **& Alzheimer's Disease Neuroimaging Initiative\*\*** (2011). Spatial patterns of brain amyloid-beta

burden and atrophy rate associations in mild cognitive impairment. *Brain, Apr; 134(Pt 4):1077-88.*

Vos, P.E.,           & **Bigler, E.D.** (2011). White matter in traumatic brain injury: Dis- or disconnection? *Neurology, Aug 30; 77(9): 810-1.*

Wilde, E.A.,         Newsome, M.R., **Bigler, E.D.,** Pertab, J., Merkley, T.L., Hanten, G., Scheibel, R.S., Li, X., Chu, Z., Yallampalli, R., Hunter, J.V., Levin, H.S. (2011). Brain imaging correlates of verbal working memory in children following traumatic brain injury. *International Journal of Psychophysiology, Oct. 8, 2 (1), 86-96.*

Willis, P.F.,        & **Bigler, E.D.** (2011). Are effort measures sensitive to cognitive impairment? *Military Medicine, Dec 176(12):1426-31.*

Anderson, J.S.,      Lange, N., Froehlich, A., DuBray. M.B., Druzgal, T.J., Froimowitz, M.P. Alexander, A.L., **Bigler, E.D.**, & Lainhart, J.E. (2010). Decreased left posterior insular activity during auditory language in autism. *American Journal of Neuroradiology, Jan; 31(1).131-139.*

Chu, Z.,             Wilde, E.A., Hunter, J.V., McCauley, S.R., **Bigler, E.D.**, Troyanskaya, M., Yallampalli, R., Chia, J.M., & Levin, H.S. (2010). Voxel-based analysis of diffusion tensor imaging in mild traumatic brain injury in adolescents. *American Journal of Neuroradiology, Feb; 31(2):340-6.*

Fletcher, P.T.,      Whitaker, R.T., Tao, R., Dubray, M.B., Froehlich, A., Ravichandran, C., Alexander, A.L. **Bigler, E.D.**, Langue, N., & Lainhart, J.E. (2010). Microstructural connectivity of the arcuate fasciculus in adolescents with high-functioning autism. *NeuroImage, Jul 1; 51(3):1117-25.*

Lajiness-O'Neill, R, Erdodi, L., **Bigler, E.D.** (2010). Memory and learning in pediatric traumatic brain injury: a review and examination of moderators of outcome. *Applied Neuropsychology, Apr; 17 (2): 83-92.*

Lange, N.,           Dubray, M.B., Lee, J.E., Froimowitz, M.P., Froehlich, A., Adluru, N., Wright, B., Ravichandran, C., Fletcher, P.T., **Bigler, E.D.,** Alexander, A.L., Lainhart, J.E. (2010). Atypical diffusion tensor hemispheric asymmetry in autism. *Autism Research, Dec; 3(6):350-8.*

Lange, N.,           Froimowitz, M.P., **Bigler, E.D.,** Lainhart, J.E.; Brain Development Cooperative Group (2010). Associations between IQ, total and regional brain volumes, and demography in a large normative sample of healthy children and adolescents. *Developmental Neuropsychology, May; 35(3):295-317.*

Larsen, J.D.,        Allen, M.D., **Bigler, E.D.,** Goodrich-Hunsaker, N.J., Hopkins, R.O. (2010). Different patterns of cerebral activation in genuine and malingered cognitive effort during performance on the Word Memory Test. *Brain Injury, Feb 24(2):89-99.*

McCauley, S.R.,      Wilde, E.A., Merkley, T.L., Schnelle, K.P., **Bigler, E.D.,** Hunter, J.V., Chu, Z., Vasquez, A.C., Levin, H.S. (2010). Patterns of cortical thinning in relation to event-based prospective memory performance three months after moderate to severe traumatic brain injury in children. *Developmental Neuropsychology, May; 35(3):318-32.*

Olesen, P.J.,        Guo, X., Gustafson, D., Borjesson-Hanson, A., Sacuiu, S., Eckerstrom, C., **Bigler, E.D.**, Palmertz, B., Skoog, I. (2010). Brain atrophy at age 85 associated with mortality after up to 14 years (in review).

Oni, M.B.,        Wilde, E.A., **Bigler, E.D.,** Wu, T., Yallampalli, Y., McCauley, S.R., Chu, Z., Hunter, J.V., Vasquez, A.C., Levin, H.S. (2010). Diffusion tensor imaging analysis of frontal lobes in pediatric traumatic brain injury. *Journal of Child Neurology, Aug; 25(8):976-84.*

Pannek K,        Mathias, J.L., **Bigler, E.D.,** Brown, G., Taylor, J.D., Rose, S. (2010). An automated strategy for the delineation and parcellation of commissural pathways suitable for clinical populations utilising high angular resolution diffusion imaging tractography. *NeuroImage, Apr 15;50(3):1044-53.*

Schober, M.E.,        Block, B., Hsu, E., **Bigler, E.D.**, Abildskov, T., Beachy, J.C., Statler, K., Lane, R.H. (2010). Temporal pattern of brain neurotrophin expression in a rat model of pediatric traumatic brain injury, in preparation.

Wilde, E.A.,        Ramos, M.A., Yallampalli, R., **Bigler, E.D.,** McCauley, S.R., Chu, Z., Wu, T.C., Hanten, G., Scheibel, R.S., Li, X., Vasquez, A.C., Hunter, J.V., Levin, H.S. (2010). Diffusion tensor imaging of the cingulum bundle in children after traumatic brain injury. *Developmental Neuropsychology, May; 35(3):333-51.*

Wu, T.C.,        Wilde, E.A., **Bigler, E.D.,** Li, X., Merkley, T.L., Yallampalli, R., McCauley, S.R., Schnelle, K.P., Vasquez, A.C., Chu, Z., Hanten, G., Hunter, J.V., Levin, H.S. (2010). Longitudinal changes in the corpus callosum following pediatric traumatic brain injury. *Developmental Neuroscience, 32(5-6):362-73.*

Wu, T.C.,        Wilde, E.A., **Bigler, E.D.**, Yallampalli, R., McCauley, S.R., Troyanskaya, M., Chu, Z., Li, X., Hanten, G., Hunter, J.V., Levin, H.S. (2010). Evaluating the relation between memory functioning and cingulum bundles in acute mild traumatic brain injury using diffusion tensor imaging**.** *Journal of Neurotrauma, Feb; 27(2):303-7.*

Adluru, N.,        Hinrichs, C., Chung, M.K., Lee, J.E., Singh, V., **Bigler, E.D.,** Lange, N., Lainhart, J.E., & Alexander, A.L. (2009). Classification in DTI using shapes of white matter tracts. *Conference Proceedings of the IEEE Engineering in Medicine and Biology Society, 1:2719-22.*

Ghosh, A.,        Wilde, E.A., Hunter, J.V., **Bigler, E.D.,** Chu, Z., Li, X., Vasquez, A.C., Menefee, D., Yallampalli, R., Levin, H.S. (2009). The relation between Glasgow Coma Scale score and later cerebral atrophy in paediatric traumatic brain injury. *Brain Injury, Mar;23(3):228-33.*

Hayden, K.M.,        Zandi, P.P., West, N.A., Tschanz, J.T., Norton, M.C., Corcoran, C., Breitner, J.C., Welsh-Bohmer, K.A.; **Cache County Investigators*.** (2009). Effects of family history and apolipoprotein E epsilon4 status on cognitive decline in the absence of Alzheimer dementia: the Cache County Study. *Archives of Neurology, Nov;66(11):1378-83.*

Bigler, E. D.        33

Jacobson, M.W.,     Delis, D.C, Peavy, G.M., Wetter, S.R., **Bigler, E.D.,** Abildskov, T.J., Bondi, M.W., Salmon, D.P. (2009). The emergence of cognitive discrepancies in preclinical Alzheimer's disease: A six-year case study. *Neurocase, Aug;15(4):278-93.*

Lajiness-O'Neill, R.,     Erdodi, L., **Bigler, E.D.,** (2010). Memory and learning in pediatric traumatic brain injury:  a review and examination of moderators of outcome. *Applied Neuropsychology, 2010 Apr;17(2):83-92. doi: 10.1080/09084281003708837.*

Lange, N.,     DuBray, M.B., Alexander, A.L., Lee, J.E., Wright, B., Froehlich, A., Froimowitz, M.P., Ravichandran, C., Chipman, J., **Bigler, E.D.,** Lainart, J.E. (2009). Assymetry of white matter microstructure and volume in autism: Superior temporal gyrus and temporal stem (in preparation).

Lee, J.E.,     Chung, M.K., Lazar, M., DuBray, M., Kim, J., **Bigler, E.D.,** Lainhart, J.E., Alexander, A.L. (2009). A study of diffusion tensor imaging by tissue-specific, smoothing-compensated voxel-based analysis. *NeuroImage, Feb;44(3):870-83. [Epub 2008 Oct 11].*

Pertab, J.,     James, K.M., & **Bigler, E.D.** (2009).  Limitations of mild traumatic brain injury meta-analyses. *Brain Injury, Jun; 23(6):498-508.*

Welsh-Bohmer, K.A.,     Ostbye, T., Sanders, L., Pieper, C.F., Hayden, K.M., Tschanz, J.T., Nortonn, M.C., for the Cache Country[sic] Study Group (2009).  Neuropsychological performance in advanced age:  Influences of demographic factors and apolipoprotein E:  Findings from the **Cache County Memory Study**. *The Clinical Neuropsychologist, Jan;23(1):77-99. [Epub 2008 Jun 10].*

Wilde, E.A.,     McCauley, S.R., Chu, Z., Hunter, J.V., **Bigler, E.D.**, Yallampalli, R., Wang. Z.J., Hanten, G., Li, X., Ramos, M.A., Sabir, S.H., Vasquez, A.C., Menefee, D., Levin, H.S. (2009) Diffusion tensor imaging of hemispheric asymmetries in the developing brain. *Journal of Clinical & Experimental Neuropsychology. Feb;31(2):205-18. [Epub 2008 Dec 3].*

Cleavinger, H. B.,     **Bigler, E. D.,** Johnson, J.L., Lu, J., Lainhart, J. E. (2008). Quantitative magnetic resonance image analysis of the cerebellum in macrocephalic and normocephalic children and adults with autism. *Journal of the International Neuropsychological Society, May;14(3):401-13.*

Fearing, M.A.,     **Bigler, E.D.,** Wilde, E.A., Johnson, J.L., Hunter, J.V., Xiaoqui, Li., Hanten, G., Levin, H.S. (2008).  Morphometric MRI findings in the thalamus and brainstem in children after moderate to severe traumatic brain injury.  *Journal of Child Neurology, Jul;23(7):729-37.*

Hallam, B.J.,     Brown, W.S., Ross C., Buckwalter, J.G., **Bigler, E.D.,** Tschanz, J.T., Norton, M.C., Welsh-Bohmer, K.A., Breitner, J.C.S. (2008) Regional atrophy of the corpus callosum in dementia.  *The Journal of the International Neuropsychological Society, May;14(3):414-23.*

Kilian, S.,     Brown, W.S., Hallam, B.J., McMahon, W., Johnson, M., **Bigler, E.D.,** Lainhart, J.E., (2008) Regional callosal morphology in autism and macrocephaly. *Developmental Neuropsychology, 33(1):74-99.*

Lee, J.E.        Hsu, D., Hsu, M., Alexander, A., DuBray, M., Froehlich, A., Lu, J., **Bigler, E.D.**, Lainhart, J.E. (2008).  Structural underconnectivity in autism: A neural network method for diffusion tensor tractography. *Neurology, 70 (11):Suppl 1, A2.*

Merkley, T.K.,        **Bigler, E.D.,** Wilde, E. A., McCauley, S.R., Hunter, J.V., Levin, H.S. (2008). Diffuse changes in cortical thickness in pediatric moderate-to-severe traumatic brain injury. *Journal of Neurotrauma, Nov;25(11):1343-5.*

Norton, M.C.,        Singh, A., Skoog, I., Corcoran, C., Tschanz, J.T., Zandi, P.P., Breitner, J.C., Welsh-Bohmer, K.A., Steffens, D.C.; **Cache County Investigators*.** (2008). Church attendance and new episodes of major depression in a community study of older adults:  The Cache County Study. *The Journals of Gerontology. Series B, Psychological Sciences and Social Sciences, 63(3):129-137.*

Steinberg, M.,        Shao, H., Zandi, P., Lyketsos, C.G., Welsh-Bohmer, K.A., Norton, M.C., Breitner, J.C., Steffens, D.C., Tschanz, J.T., **Cache County Investigators*** (2008).  Point and 5-year period prevalence of neuropsychiatric symptoms in dementia: The Cache County Study. *International Journal of Geriatric Psychiatry, 23(2):170-7.*

Statler, K.D.,        Swank, S., Abildskov, R., **Bigler, E.D.**, White, H.S. (2008). Traumatic brain injury during development reduces minimal clonic seizure thresholds at maturity. *Epilepsy Research, Aug;80(2-3),163-70.*

Wilde, E.,A.,        McCauley, S.R., Hunter, J.V., **Bigler, E.D.,** Chu, Z., Wang, Z.I., Hanten, G.R., Troyanskaya, M., Yallampalli, R., Li, X., Chia, J., Levin, H.S. (2008).  Diffusion tensor imaging of acute mild traumatic brain injury in adolescents. *Neurology, Mar;70(12):948-55.*

Lee, J.E.,        **Bigler, E.D.,** Alexander, A.L., Lazar, M., Dubray, M.B., Chung, M.K., Johnson, M., Morgan, J., Miller, J.N., McMahon, W.M., Lu, J., Jeong E.K., Lainhart, J.E. (2007). Diffusion tensor imaging of white matter in the superior temporal gyrus and temporal stem in autism. *Neuroscience Letters, 2007 Sep 7;424(2):127-32. Epub 2007 Aug 6.*

Alexander, A.L.,        Lee, J.E., Lazar, M., Boudos, R.M., Dubray, M.B., Oakes, T.R., Miller, J.N., Lu, J., Jeong, E-K., McMahon, W.M., **Bigler, E.D.,** Lainhart, J.E. (2007) Diffusion tensor imaging of the corpus callosum in Autism.  *NeuroImage, Jan 1;34(1):61-73. [Epub 2006 Oct 4].*

Allen, M.D.,        **Bigler ED,** Larsen J, Goodrich-Hunsaker NJ, Hopkins RO. (2007). Functional neuroimaging evidence for high cognitive effort on the Word Memory Test in the absence of external incentives. *Brain Injury, Dec;21(13-14):1425-8.*

Fearing, M.A.,        **Bigler, E.D.,** Norton, M., Tschanz, J., Hulette, C., Leslie, C., Welsh-Bohmer, K., and the Cache County Investigators***. (2007). Autopsy-confirmed Alzheimer's disease versus clinically-diagnosed Alzheimer's disease in the Cache County Study on Memory and Aging: A comparison of quantitative MRI and neuropsychological findings.  *Journal of Clinical and Experimental Neuropsychology, Jul;29(5):553-60.*

Hedges, D.W.,        Thatcher, G.W., Bennett, P. J., Sood, S., Paulson, D., Creem-Regehr, S., Brown, B.L., Allen, S., Johnson, J., Froelich B., **Bigler, E.D.** (2007). Brain integrity and

cerebral atrophy in Vietnam combat veterans with and without posttraumatic stress disorder. *Neurocase, Oct;13(5):402-10.*

| | |
|---|---|
| Heilbronner, R.L., | Taylor, G.T., Lamberty, G., Schmidt, M., Wills, K.E., Artiola y Fortuny, L., **Bigler, E.D.**, Boone, K.B., Kaplan, R.F., Pliskin, N.H. (2007). American Academy of Clinical Neuropsychology (AACN) Practice Guidelines for Neuropsychological Assessment. *The Clinical Neuropsychologist,* 2007 Mar;21(2):209-31. |

Hobbs, K.,	Kennedy, A., Dubray, M., **Bigler, E.D.,** Petersen, B., McMahon, W., Lainhart, J.E. (2007). A retrospective fetal ultrasound study of brain size in autism. *Biological Psychiatry, Nov;62(9):1048-55.*

Lee, J.E.,	**Bigler, E.D.,** Alexander, A.L., Lazar, M., DuBray, M.B., Chung, M.K., Johnson, M., Morgan, J., Miller, J.N., McMahon, W.M., Lu, J., Jeong, E-K, Lainhart, J.E. (2007). Diffusion tensor imaging of white matter in the superior temporal gyrus and temporal stem in autism. *Neuroscience Letters, Sep 7;424(2):127-32. [Epub 2007 Aug 6].*

Lewine, J.D.,	Davis, J.T., **Bigler, E.D.**, Hartshorne, M., Thoma, R., Hill, D., Funke, M., Sloan, J.H., Hall, S., and Orrison, W.E. (2007). Objective documentation of traumatic brain injury subsequent to mild head trauma:  Multimodal brain imaging with MEG, SPECT, and MRI. *The Journal of Head Trauma Rehabilitation, May-Jun;22(3):141-55.*

Mathias, J.L.,	Bowden, S.C., **Bigler, E.D.** (2007). Is performance on the Wechsler Test of Adult Reading affected by traumatic brain injury? *British Journal of Clinical Psychology, Nov;46(Pt 4):457-66.*

Neeley, E.S.,	**Bigler, E.D.**, Krasny, L., Ozanoff, S., McMahon, W., & Lainhart, J.E. (2007). Quantitative temporal lobe differences: Autism distinguished from controls using Classification and Regression Tree Analysis. *Brain & Development, Aug;29(7)389-99.*

Spanos, G.K.,	Wilde, E.A., **Bigler, E.D.,** Cleavinger, H.B., Fearing, M.A., Levin, H.S., Li, X., Hunter, J.V. (2007). Cerebellar atrophy after moderate-to-severe pediatric traumatic brain injury. *American Journal of Neuroradiology. Mar;28(3):537-42.*

Sumner, J.M.,	Carpenter, B.N., **Bigler, E.D.**, (2007). Subsyndromal posttraumatic stress disorder and cognitive functioning in war-exposed school teachers (in review).

Tate, D. F.,	**Bigler, E.D.,** McMahon, W. Lainhart, J. (2007). The relative contributions of brain, cerebrospinal fluid-filled structures and non-neural tissue volumes to occipital-frontal head circumference in subjects with autism. *Neuropediatrics, Feb;38(1):18-24.*

Wilde, E.A.	**Bigler, E.D.,** Hunter, J. V., Fearing, M.A., Scheibel, R.S., Newsome, M.R., Johnson, J.L., Bachevalier, j., Li, X., Levin, H.S. (2007). Hippocampus, amygdala, and basal ganglia morphometrics in children after moderate-to-severe traumatic brain injury. *Developmental Medicine and Child Neurology, Apr;49(4):294-9.*

Wolkowitz, O.M.,  Lupien, S.J., & **Bigler, E.D.** (2007).  The "Steroid Dementia Syndrome": a possible model of human glucocorticoid neurotoxicity. *Neurocase, Jun;13(3):189-200.*

Yeates, K.O.,  **Bigler, E.D.**, Dennis, M., Gerhardt, C.A., Rubin, K.H., Stancin, T., Taylor, H.G., Vannatta, K. (2007). Social outcomes in childhood brain disorder:  A heuristic integration of social neuroscience and developmental psychology. *Psychological Bulletin, May;133(3):535-56.*

Hopkins, R.O.,  Beck, C.J., Burnett, D.L., Weaver, L.K., Victoroff, J., **Bigler, E.D.** (2006). Prevalence of white matter hyperintensities in a young healthy population. *Journal of Neuroimaging, Jul;16(3):243-51.*

Lainhart, J.E.,  **Bigler, E.D.**, Bocian, M., Coon, H., Dinh, E., Dawson, G., Deutsch, C.K., Dunn, M., Estes, A., Tager-Flusberg, H., Folstein, S., Hepburn, S., Hyman, S., McMahon, W., Minshew, N., Munson, J., Osan, K., Ozonoff, S., Rodier, P., Rogers, S., Sigman, M., Spence, M.A., Stodgell, C.J., Volkmar, F. (2006).  Head circumference and height in autism: A study by the Collaborative Program of Excellence in Autism. *American Journal of the American Genetics, Nov 1;140(21):2257-74.*

Norton, M.C.,  Skoog, I., Franklin, L.M., Corcoran, C., Tschanz, J.T., Zandi, P.P., Breitner, J.C., Welsh-Bohmer, K,A., Steffens, D.C.; **Cache County Investigators*.** (2006). Gender differences in the association between religious involvement and depression: The Cache County (Utah) Study. *The Journals of Gerontology. Series B, Psychological Sciences and Social Sciences, 2006 May;61(3):P129-36.*

Norton, M.C.,  Skoog, I., Toone, L., Corcoran, C., Tschanz, J.T., Lisota, R.D., Hart, A.D., Zandi, P.P., Breitner, J.C., Welsh-Bohmer, K,A., Steffens, D.C.; **Cache County Investigators*.** (2006). Three-year incidence of first-onset depressive syndrome in a population sample of older adults: the Cache County Study. *American Journal of Geriatric Psychiatry, 2006 Mar;14(3):237-45.*

Wilde, E.A.,  **Bigler, E.D.,** Haider, J.M., Chu, Z., Levin, H.S., Li, X.., Hunter, J.V. (2006). Vulnerability of the anterior commissure in moderate to severe pediatric traumatic brain injury. *Journal of Child Neurology, Sep;21(9):769-76.*

Wilde, E.A.,  **Bigler, E.D.,** Pedroza, C., & Ryser, D.K. (2006). Post-traumatic amnesia predicts long-term cerebral atrophy in traumatic brain injury. *Brain Injury, Jun;20(7):695-9.*

Wilde, E.A.,  Chu, Z., & **Bigler, E.D.** (2006).  Diffusion tensor imaging in the corpus callosum in children after moderate to severe traumatic brain injury. *Journal of Neurotrauma, Oct;23(10):1412-26.*

Hopkins, R.O.,  Tate, D.F., & **Bigler, E.D.** (2005).  Anoxia versus traumatic brain injury: Amount of tissue loss, not etiology, alters cognitive and emotional function. *Neuropsychology, Mar;19(2):233-42.*

Lajiness-O'Neill, R.,  Beaulieu, I., Titus, J.B., Asamoah, A., **Bigler, E.D.**, Bawle, E.V., Pollack, R. (2005).  Memory and learning in children with 22q11.2 Deletion Syndrome: Evidence for ventral and dorsal stream disruption? *Child Neuropsychology, Feb;11(1):55-71.*

Lyketsos, C.G.,    Toone, L., Tschanz, J., Rabins, P.V., Steinberg, M., Onyike, C.U., Corcoran, C., Norton, M., Zandi, P., Breitner, J.C., Welsh-Bohmer, K., Anthony, J., Ostbye, T., **Bigler, E.D.,** Pieper, C., Burke, J., Plassman, B., Green, R.C., Steffens, D.C., Klein, L., Leslie, C., Townsend, J.J., Wyse, B.W., Munger, R., Williams, M.; Cache County Study Group**\***. (2005). Population-based study of medical comorbidity in early dementia and "cognitive impairment, no dementia (CIND)": Association with functional and cognitive impairment: The Cache County Study. *American Journal of Geriatric Psychiatry, 13:656-6.*

Porter, C.    Lawson, J., & **Bigler, E.D.** (2005). Neurobehavioral sequelae of child sexual abuse. *Child Neuropsychology, Apr;11(2), 1-18.*

Rice, S.A.,    **Bigler, E.D.,** Cleavinger, H.B., Tate, D.F., Sayer, J., McMahon, W., Ozonoff, S., Lu, J., Lainhart, J.E. (2005).  Macrocephaly, corpus callosum morphology, and autism. *Journal of Child Neurology, Jan;20(1):34-41.*

Ryser, D.K.,    Egger, M.J., Horn, S., Handrahan, D., Gandhi, P., & **Bigler, E.D.** (2005). Measuring medical complexity during inpatient rehabilitation following traumatic brain injury. *Archives of Physical Medicine & Rehabilitation, Jun;86(6):1108-17.*

Wilde, E.A.,    Hunter, J.V., Newsome, M.R., Scheibel, R.S., **Bigler, E.D.**, Johnson, J.L., Fearing, M.A., Cleavinger, H.B., Li, X., Swank, P.R., Pedroza, C., Roberson, G.S., Bachevalier, J., Levin, H.S.. (2005). Frontal and temporal morphometric findings on MRI in children after moderate to severe traumatic brain injury. *Journal of Neurotrauma, Mar;22(3):333-44.*

Bergeson, A.G.,    Lundin, R., Parkinson, R.B., Tate, D.F., Victoroff, J., Hopkins, R.O., **Bigler, E.D.** (2004).  Clinical rating of cortical atrophy and cognitive correlates following traumatic brain injury. *The Clinical Neuropsychologist, Dec;18(4):509-20.*

Cato, M.,    Delis, D., Abildskov, T.J., & **Bigler, E.D.** (2004). Assessing the elusive cognitive deficits associated with ventromedial prefrontal damage:  A case study of a modern-day Phineas Gage.  *Journal of the International Neuropsychological Society, 10:453-65.*

Mathias, J. L.,    Beall, J. A., **Bigler, E. D.** (2004).  Neuropsychological and information processing deficits following mild traumatic brain injury. *Journal of the International Neuropsychological Society, Mar;10(2):286-97.*

Mathias, J.L.,    **Bigler, E.D.**, Jones, N.R., Bowden, S.C., Barrett-Woodbridge, M., Brown, G. C., Taylor, D.J. (2004). Neuropsychological and information processing performance and its relationship to white matter changes following moderate and severe traumatic brain injury: A preliminary study. *Applied Neuropsychology, 11(3):135-52.*

Wilde, E.A.,    **Bigler, E.D.**, Gandhi, P.V., Lowry, C.M., Ryser, D.K., Blatter, D.D., Brooks, J. (2004).  Alcohol abuse and traumatic brain injury:  Quantitative magnetic resonance imaging and neuropsychological outcome. *Journal of Neurotrauma, Feb;21(2):137-47.*

Wolkowitz, O.M.,     Lupien, S.J., **Bigler, E.D.,** Levin, R.B., & Canick, J. (2004). The "steroid dementia syndrome": an unrecognized complication of glucocorticoid treatment. *Annals of the New York Academy of Sciences, 1032:191-4.*

Hedges, D.W.,     Allen, S., Tate, D.F., Thatcher, G.W., Miller, M.J., Rice, S.A., Cleavinger, H.B., Sood, S., **Bigler, E.D.** (2003).  Reduced hippocampal volume in alcohol and substance naïve Vietnam combat veterans with posttraumatic stress disorder. *Cognitive & Behavioral Neurology, Dec;16(4):219-24.*

Howes, N.L.,     **Bigler, E.D.**, Burlingame, G.M., & Lawson, J.S. (2003).  Memory performance of children with dyslexia:  A comparative analysis of theoretical perspectives. *Journal of Learning Disabilities, May;36 (3):230-46.*

Kesler, S.R.,     Adams, H.F., Blasey, C.M., **Bigler, E.D.** (2003). Premorbid intellectual functioning, education, and brain size in traumatic brain injury: An investigation of the cognitive reserve hypothesis. *Applied Neuropsychology, 10(3):153-62.*

Hughes, S.K.,     Nilsson, D.E., Boyer, R.S., Bolte, R.G., Hoffman, R.O., Lewine, J.D., & **Bigler, E.D.**  (2002). Neurodevelopmental outcome for extended cold water drowning: A longitudinal case study. *Journal of the International Neuropsychological Society, May;8(4):588-95.*

Lu, L.,     & **Bigler, E.D.** (2002).  Normative data on Trail Making test for neurologically normal, Chinese-speaking adults. *Applied Neuropsychology, 9(4):219-25.*

Parkinson, R.B.,     Hopkins, R.O., Cleavinger, H.B., Weaver, L.K., Victoroff, J., Foley, J.F., & **Bigler, E.D.** (2002).  White matter hyperintensities and neuropsychological outcome following carbon monoxide poisoning. *Neurology, May 28;58(10):1525-32.*

Porter, S.S.,     Hopkins, R.O., Weaver, L.K., **Bigler, E.D.**, & Blatter, D.D. (2002).  Corpus callosum atrophy and neuropsychological outcome following carbon monoxide poisoning.  *Archives of Clinical Neuropsychology, Feb;17(2):195-204.*

Yount, R.,     Raschke, K.A., Biru, M., Tate, D.F., Miller, M. J., Abildskov, T., Gandhi P., Ryser, D., Hopkins, R.O. & **Bigler, E.D.** (2002).  Traumatic brain injury and atrophy of the cingulate gyrus. *The Journal of Neuropsychiatry and Clinical Neurosciences, Fall;14(4):416-23.*

Hopkins, R.O.,     & **Bigler, E.D.**, (2001).  Pulmonary Disorders. In R. Tarter et al. (Eds.), Medical Neuropsychology (2nd ed.) p. 25-50.

Hurley, R.A.,     Hopkins, R.O., **Bigler, E.D.**, & Taber, K.H. (2001). Applications of functional imaging to carbon monoxide poisoning.  *Journal of Neuropsychiatry and Clinical Neuroscience, Spring;13(2):157-60.*

Kesler, S.R.,     Hopkins, R.O., Weaver, L.K., Blatter, D.D., Edge-Booth, H., & **Bigler, E.D.** (2001). Verbal memory deficits associated with fornix atrophy in carbon monoxide poisoning.  *Journal of the International Neuropsychological Society, Jul;7(5):640-6.*

Bigler, E. D.     39

Kesler, S.R.,   Adams, H.F., **Bigler, E.D.** (2000). SPECT, MR and quantitative MR Imaging: Correlates with neuropsychological and psychological outcome in traumatic brain injury.  *Brain Injury, Oct;14(10):851-7.*

Lu, L.,   & **Bigler, E.D.** (2000).  Performance on original and a Chinese version of Trail Making Test Part B: A normative bilingual sample. *Applied Neuropsychology, 7(4):243-6.*

Tate, D.F.,   & **Bigler, E.D.** (2000). Fornix and hippocampal atrophy in traumatic brain injury. *Learning and Memory, Nov-Dec;7(6):442-6.*

Barker, L.H.,   **Bigler, E.D.**, Johnson, S.C., Anderson, C.V., Russo, A.A., Boineau, B. & Blatter, D.D. (1999).  Polysubstance abuse and traumatic brain injury: Quantitative magnetic resonance imaging and neuropsychological outcome in older adolescents and young adults.  *Journal of the International Neuropsychological Society, Nov;5(7):593-608.*

Gale, S.D.,   Hopkins, R.O., Weaver, L.K., **Bigler, E.D.**, Booth, E.J., & Blatter, D.D. (1999). MRI, Quantitative MRI, SPECT, and neuropsychological findings following carbon monoxide poisoning.  *Brain Injury, Apr;13(4):229-43.*

Hopkins, R.O.,   Weaver, L.K., Pope, D., Orme, J.F. Jr., **Bigler, E.D.**, & Larson-Lohr, V.  (1999). Neuropsychological sequelae and impaired health status in survivors of severe acute respiratory distress syndrome.  *American Journal of Respiratory Critical Care Medicine, Jul;160(1):50-6.*

Howes, N.L,   **Bigler, E.D.**, Lawson, J.S. & Burlingame, G.M. (1999).  Reading disability subtypes and the Test of Memory and Learning.  *Archives of Clinical Neuropsychology, Apr;14(3):317-39.*

Reynolds, C.R.   Hopkins, R.O. & **Bigler, E.D.** (1999).  Continuing decline of memory skills with significant recovery of intellectual function following severe carbon monoxide exposure: Clinical, psychometric, and neuroimaging findings.  *Archives of Clinical Neuropsychology, Feb;14(2):235-49.*

Yeates, K.O.,   Luria, J., Bartkowski, H., Rusin, J., Martin, L., **Bigler, E.D.**, Johnson, S.C. & Anderson, C.  (1999). Post-concussive symptoms in children with mild closed-head injuries.  *Journal of Head Trauma Rehabilitation, 1999 Aug;14(4):337-50.*

Hopkins, R.O.,   Larson-Lohr, V., Weaver, L.K., & **Bigler, E.D.** (1998). Neuropsychological impairments following hantavirus pulmonary syndrome.  *Journal of the International Neuropsychological Society, Mar;4(2):190-6.*

Kozora, E.,   West, S.G., Kotzin, B.L., Julian, L., Porter, S. & **Bigler, E.D.**  (1998). MRI abnormalities and cognitive deficits in Systemic Lupus Erythematosus patients without Overt Central Nervous System Disease.  *Arthritis & Rheumatism, 41(1):41-7.*

Weight, D.G.,   & **Bigler, E.D.**  (1998). Diagnostic dilemmas, Part I.  *The Psychiatric Clinics of North America, September.*

Weight, D.G.   & **Bigler, E.D.** (1998). Neuroimaging in psychiatry.  *Psychiatric Clinics of North America, Dec;21(4):725-59.*

Bigler, E. D.       40

Blatter, D.D.,          **Bigler, E.D.**, Gale, S.D., Johnson, S.C., Anderson, C.V., Burnett, B.M., Ryser, D., Macnamara, S.E., & Bailey, B.J.  (1997). MR-based brain and cerebrospinal fluid measurement after traumatic brain injury: Correlation with neuropsychological outcome.  *American Journal of Neuroradiology, Jan;18(1):1-10.*

Bowen, J. M.,          Clark, E., **Bigler, E.D.**, Gardner, M., Nilsson, D., Gooch, J., Pompa, J. (1997). Childhood traumatic brain injury: Neuropsychological status at the time of hospital discharge. *Developmental Medicine and Child Neurology, Jan;39(1):17-25.*

Hopkins, R.O.,          Abildskov, T.J., **Bigler, E.D.**, & Weaver, L.K.  (1997). Three dimensional image reconstruction of neuroanatomical structures: Methods for isolation of the cortex, ventricular system, hippocampus, and fornix.  *Neuropsychology Review, Jun;7(2):87-104.*

Plassman, B.L.,          Welsh, K.A., **Bigler, E.D.**, Johnson, S.C., Anderson, C.V., Helms, M.J., Saunders, A.M., Breitner, J.C.S.  (1997). Apolipoprotein E epsilon 4 allele and hippocampal volume in twins with normal cognition.  *Neurology, Apr;48(4):985-9.*

Primus, E.A.,          **Bigler, E.D.**, Anderson, C.V., Johnson, S.C., Mueller, R.M. & Blatter, D. (1997). Corpus striatum and traumatic brain injury.  *Brain Injury, Aug;11(8), 577-86.*

Anderson, C.V.,          Woods, D.M., **Bigler, E.D.**, & Blatter, D.D. (1996).  Lesion volume, injury severity, and thalamic integrity following head injury.  *Journal of Neurotrauma, Feb; 13(2), 59-65.*

Johnson, S.C.,          Pinkston, J.B., **Bigler, E.D.** & Blatter, D.D. (1996).  Corpus callosum morphology in normal controls and traumatic brain injury.  Sex differences, mechanisms of injury, and neuropsychological correlates.  *Neuropsychology, 10, 408-15.*

Reynolds, C.R.,          & **Bigler, E.D.** (1996).  Factor structure, factor indexes, and other useful statistics for interpretation of the Test of Memory and Learning (TOMAL). *Archives of Clinical Neuropsychology, 11, 29-43.*  doi:10.1093/arclin/11.1.29

Anderson, C.V.          & **Bigler, E.D.** (1995).  Ventricular dilation, cortical atrophy, and neuropsychological outcome following traumatic brain injury.  *Journal of Neuropsychiatry and Clinical Neurosciences, Winter;7(1), 42-8.*

Anderson, C.V.,          **Bigler, E.D.**, & Blatter, D.D. (1995).  Frontal lobe lesions, diffuse damage, and neuropsychological functioning in traumatic brain-injured patients. *Journal of Clinical and Experimental Neuropsychology, Dec;17(6), 900-8.*

Blatter, D.D.,          **Bigler, E.D.**, Gale, S.D., Johnson, S.C., Anderson, C., Burnett, B.M., Parker, N., Kurth, S. & Horn, S. (1995). Quantitative volumetric analysis of brain MR: Normative database spanning 5 decades of life. *American Journal of Neuroradiology, Feb;16(2), 241-51.*

Bigler, E. D.      41

Gale, S.D., Johnson, S.J., **Bigler, E.D.** & Blatter, D.  (1995). Trauma induced temporal horn dilation: Neuropsychologic correlates.  *Journal of the International Neuropsychological Society, 1 (4), 369-70.*

Gale, S.D., Johnson, S.C., **Bigler, E.D.** & Blatter, D. (1995).  Nonspecific white matter degeneration following traumatic brain injury.  *Journal of the International Neuropsychological Society, Jan;1(1):17-28.*

Gale, S.D., Johnson, S.C., **Bigler, E.D.** & Blatter, D. (1995).  Trauma-induced degenerative changes in brain injury: A morphometric analysis of three patients with pre-injury and post-injury MR scans.  *Journal of Neurotrauma, Apr;12(2), 151-8.*

Hopkins, R.O., Gale, S.D., Johnson, S.C., Anderson, C.V., **Bigler, E.D.**, Blatter, D.D. & Weaver, L.K. (1995). Severe anoxia with and without concomitant brain atrophy and neuropsychological impairments.  *Journal of the International Neuropsychological Society, Sep;1(5), 501-9.*

Johnstone, B., Frank, R.G., Belar, C., Belk, S., Bieliauskas, L.A., **Bigler, E.D.**, Caplan, B., Elliott, T.R., Glueckauf, R.L., Kaplan, R.M., Kreutzer, J.S., Mateer, C.A., Patterson, D., Puente, A.E., Richards, J.S., Rosenthal, M., Sherer, M., Shewchuk, R., Sigel, L.J., Sweet, J.J. (1995).  Psychology in health care: Future directions.  *Professional Psychology: Research and Practice, 26(4), 341-65.*

Wood, D.G., & **Bigler, E.D.** (1995).  Diencephalic changes in traumatic brain injury: Relationship to sensory perceptual function.  *Brain Research Bulletin, 38(6), 545-9.*

Anderson, C.V. & **Bigler, E.D.** (1994). The role of caudate nucleus and corpus callosum atrophy in trauma-induced anterior horn dilation.  *Brain Injury, Aug-Sep;8(6), 565-9.*

Gale, S.D., Johnson, S.C., **Bigler, E.D.** & Blatter, D.D. (1994).  Traumatic brain injury and temporal horn enlargement correlates with tests of intelligence and memory.  *Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 7(3), 160-5.*

Johnson, S.C., **Bigler, E.D.**, Burr, R.B., & Blatter, D.D. (1994). White matter atrophy, ventricular dilation, and intellectual functioning following traumatic brain injury.  *Neuropsychology, 8, 307-15.*

Johnson, S.C., Farnsworth, T., Pinkston, J.B., **Bigler, E.D.**, & Blatter, D.  (1994). Corpus callosum surface area across the human adult life span: Effect of age and gender.  *Brain Research Bulletin, 35(4), 373-7.*

Kurth, S.M., **Bigler, E.D.** & Blatter, D.D. (1994). Neuropsychological outcome and quantitative image analysis of acute hemorrhage in traumatic brain injury: preliminary findings.  *Brain Injury, Aug-Sep;8(6), 489-500.*

Gale, S.D., Burr, R.B., **Bigler, E.D.**, & Blatter, D. (1993).  Fornix degeneration and memory in traumatic brain injury.  *Brain Research Bulletin, 32(4), 345-9.*

Heaton, T.B. & **Bigler, E.D.** (1993). Neuroimaging techniques in neuropsychological research.  *Bulletin of the National Academy of Neuropsychology, 9, 14-7.*

Massman, P.J.          & **Bigler, E.D.** (1993). A quantitative review of the diagnostic utility of the WAIS-R field profile. *Archives of Clinical Neuropsychology, Oct;8(5), 417-28.*

Turkheimer, E.,        Farace, E., Yeo, R.A., & **Bigler, E.D.** (1993).  Quantitative analysis of gender differences in the effects of lateralized lesions on verbal and performance IQ. *Intelligence, 17, 461-74.*

Macnamara, S.E.,       **Bigler, E.D.**, Blatter, D., Pompa, J., Ryser, D., & Kurth, S. (1992). Magnetic resonance identified ventricular dilation in traumatic brain injury: Comparison of pre- and post-injury scan results. *Archives of Clinical Neuropsychology, 7(3), 275-284.*

Norman, M.A.,          & **Bigler, E.D.** (1992). Grand Rounds: Neuropsychological assessment and neuroimaging in traumatic brain injury. *Bulletin of The National Academy of Neuropsychology, 9, 11-16.*

Willerman, L.,         Schultz, R., Rutledge, J.N., & **Bigler, E.D.** (1992). Hemisphere size asymmetry predicts relative verbal and non-verbal intelligence differently in the sexes: An MRI study of structure-function relations. *Intelligence, 16, 315-328.*

Cullum, C.M.,          & **Bigler, E.D.** (1991). Short- and long-term psychological status following cerebrovascular accidents: Short-form MMPI findings. *Journal of Nervous and Mental Disease, May;179(5), 274-8.*

Lucas, J.A.            Telch, M.J., & **Bigler, E.D.** (1991). Memory functioning in panic disorder: A neuropsychological perspective. *Journal of Anxiety Disorders, 5, 1-20.*

Willerman, L.,         Schultz, R., Rutledge, J.N., & **Bigler, E.D.** (1991). In vivo brain size and intelligence. *Intelligence, 15, 223-228.  Reviewed in Science, 254, 1584, 1991.*

Grant, M.L.,           Ilai, D., Nussbaum, N.L., & **Bigler, E.D.** (1990). The relationship between continuous performance tasks and neuropsychological tests in children with attention-deficit hyperactivity disorder. *Perceptual and Motor Skills, Apr;70(2), 435-445.*

Naugle, R.I.,          Cullum, C.M. & **Bigler, E.D.** (1990). Evaluation of intellectual and memory function among dementia patients who were intellectually superior.  *The Clinical Neuropsychologist, 4, 355-374.*

Nussbaum, N.L.,        Grant, M.L., Roman, M.J., Poole, J.H., & **Bigler, E.D.** (1990). Attention deficit disorder and the mediating effect of age on academic and behavioral variables. *Journal of Developmental and Behavioral Pediatrics, Feb;11(1), 22-26.*

Turkheimer, E.,        Yeo, R.A., & **Bigler, E.D.** (1990). Basic relations among lesion laterality, lesion volume and neuropsychological performance. *Neuropsychologia, 28(10), 1011-9.*

Turkheimer, E.,        Yeo, R.A., Jones, C.L., & **Bigler, E.D.** (1990). Quantitative assessment of covariation between neuropsychological function and location of naturally occurring lesions in humans. *Journal of Clinical and Experimental Neuropsychology, Aug;12(4), 549-65.*

Yeo, R.A.,                Turkheimer, E., & **Bigler, E.D.** (1990). Neuropsychological methods of
                          localizing brain dysfunctions: Clinical versus empirical approaches.
                          *Neuropsychiatry, Neuropsychology, and Behavioral Neurology, 3, 290-303.*

Hall, S.,                 **Bigler, E.D.**, & Rutledge, J.N. (1989). Depression preceding choreiform
                          movements in Huntington's Disease: A case study. *Archives of Clinical
                          Neuropsychology, 4(1), 79-92.*

Lucas, J.A.               Rosenstein, L.D., & **Bigler, E.D.** (1989). Handedness and language among the
                          mentally retarded: implications for the model of pathological left-handedness and
                          gender differences in hemispheric specialization. *Neuropsychologia, 27(5), 713-
                          23.*

Tucker, D.M.,             & **Bigler, E.D.** (1989). Clinical assessment of tactile extinction: Traditional
                          double simultaneous stimulation versus quality extinction test. *Archives of
                          Clinical Neuropsychology, 4(3), 283-96.*

Cullum, C.M.,             & **Bigler, E.D.** (1988). Short-form MMPI findings in patients with redominately
                          lateralized cerebral dysfunction: Neuropsychological and CT-derived parameters.
                          *Journal of Nervous and Mental Diseases, Jun;176(6), 332-42.*

Massman, P.J.,            Nussbaum, N.L., & **Bigler, E.D.** (1988). The mediating effect of age on the
                          relationship between Child Behavior Checklist hyperactivity scores and
                          neuropsychological test performance. *Journal of Abnormal Child Psychology,
                          Feb;16(1), 89-95.*

Nussbaum, N.L.,           **Bigler, E.D.**, Ingram, J.W., Rosa, L., & Massman, P. (1988). Anterior/Posterior
                          functional cerebral asymmetry and personality/behavioral characteristics in
                          children. *Archives of Clinical Neurology, 3, 127-135.*

Nussbaum, N.L.,           **Bigler, E.D.**, Koch, W.R., Ingram, J.W., Rosa, L., Massman, P. (1988).
                          Personality/behavioral characteristics in children: differential effects of putative
                          anterior versus posterior cerebral asymmetry. *Archives of Clinical
                          Neuropsychology, 3(2):127-35.*

Raz, N.,                  Raz, S., & **Bigler, E.D.** (1988). Ventriculomegaly in schizophrenia: the role of
                          control groups and the perils of dichotomous thinking (a reply to Smith and
                          Iacono). *Psychiatry Research, Nov;26(2), 245-8.*

Raz, S.,                  Raz, N., & **Bigler, E.D.** (1988). Ventriculomegaly in schizophrenia: Is the choice
                          of controls important? *Psychiatry Research, Apr;24(1), 71-7.*

Craft, S.,                Willerman, L., & **Bigler, E.D.** (1987). Callosal dysfunction in schizophrenia and
                          schizoaffective disorder. *Journal of Abnormal Psychology, Aug;96(3), 205-13.*

Morris, J.M.,             & **Bigler, E.D.** (1987). Hemispheric functioning and the K-ABC: Results in
                          neurologically impaired children. *Developmental Neuropsychology, 3, 67-69.*

Naugle, R.I.,             **Bigler, E.D.**, Cullum, C.M., & Massman, P.J. (1987). Handedness and dementia.
                          *Perceptual and Motor Skills, 65(1), 207-10.*

Raz, N.,          Raz, S., Yeo, R.A., Turkheimer, E.N., **Bigler, E.D.**, & Cullum, C.M. (1987). Relationship between cognitive and morphological asymmetry in dementia of the Alzheimers type: A CT scan study. *International Journal of Neuroscience, Aug;35(3-4), 225-32.*

Raz, S.,          Raz, N., Weinberger, D.R., Boronow, J., Pickar, D., **Bigler, E.D.**, & Turkheimer, E. (1987). Morphological brain abnormalities in schizophrenia determined by computerized tomography: A problem of measurement? *Psychiatry Research, Oct;22(2), 91-8.*

Rosenstein, L.D.,   & **Bigler, E.D.** (1987). No relationship between handedness and sexual preference. *Psychological Reports, Jun;60(3 Pt 1), 704-6.*

Sands, D.,        McCary, R.C., **Bigler, E.D.**, Becker, H.A., & Walker, P.R. (1987). Understanding ECT. *Journal of Psychosocial Nursing, Aug;25(8), 27-30.*

Yeo, R.A.,        Turkheimer, E., Raz, N., & **Bigler, E.D.** (1987). Volumetric asymmetries of the human brain: Intellectual correlates. *Brain and Cognition, Jan;6(1), 15-23.*

Cullum, C.M.,      & **Bigler, E.D.** (1986). Ventricle size, cortical atrophy and the relationship with neuropsychological status in closed head injury: A quantitative analysis. *Journal of Clinical and Experimental Neuropsychology, Aug;8(4), 437-52.*

Massman, P.J.,     **Bigler, E.D.**, Cullum, C.M., & Naugle, R.I. (1986). The relationship between cortical atrophy and ventricular volume in Alzheimer's disease and closed head injury. *International Journal of Neuroscience, Aug;30(1-2), 87-99.*

Naugle, R.I.,      Cullum, C.M., **Bigler, E.D.**, & Massman, P. (1986). Neuropsychological characteristics and atrophic brain changes in senile and presenile dementia. *Archives of Clinical Neuropsychology, 1(3), 219-30.*

Nussbaum, N.L.,    & **Bigler, E.D.** (1986). Neuropsychological & behavioral profiles of empirically derived subgroups of learning disabled children. *International Journal of Clinical Neuropsychology, 8 (2), 82-89.*

Nussbaum, N.L.,    **Bigler, E.D.**, & Kich, W. (1986). Neuropsychologically derived subgroups of learning disabled children: Personality/behavioral dimensions. *Journal of Research and Development in Education, 19, 57-67.*

Pugh, M.,         & **Bigler, E.D.** (1986). Schizophrenia and prior history of "MBD": Neuropsychological findings. *The International Journal of Clinical Neuropsychology, 8, 22-26.*

Steinman, D.R.,    & **Bigler, E.D.** (1986). Neuropsychological sequelae of ruptured anterior communicating artery aneurysm. *International Journal of Clinical Neuropsychology, 8, 135-140.*

Cullum, C.M.,      & **Bigler, E.D.** (1985). Late effects of hematoma on brain morphology and memory in closed head injury. *International Journal of Neuroscience, Dec;28(3-4), 279-83.*

Bigler, E. D.      45

Naugle, R.I.,  Cullum, C.M., **Bigler, E.D.**, & Massman, P.J. (1985). Neuropsychological and computerized axial tomography volume characteristics of empirically derived dementia subgroups. *Journal of Nervous and Mental Disease, Oct;173(10), 596-604.*

Skenazy, J.A.,  & **Bigler, E.D.** (1985).  Psychological adjustment and neuropsychological performance in diabetic patients.  *Journal of Clinical Psychology, May;41 (3), 391-396.*

Cullum, C.M.,  Steinman, D.R., & **Bigler, E.D.** (1984). Relationship between fluid and crystallized cognitive function using Category Test and WAIS test scores. *The International Journal of Clinical Neuropsychology, 6, 172-174.*

Skenazy, J.A.,  & **Bigler, E.D.** (1984). Neuropsychological findings in Diabetes Mellitus. *Journal of Clinical Psychology, Jan;40 (1), 246-58.*

Turkheimer, E.,  Cullum, C.M., Hubler, D., Paver, S., Yeo, R.A., & **Bigler, E.D.** (1984). Quantifying cortical atrophy. *Journal of Neurology, Neurosurgery, & Psychiatry, Dec;47(12), 1314-8.*

Yeo, R.A.,  Turkheimer, E., & **Bigler, E.D.** (1984). The influence of sex and age on unilateral cerebral lesion sequelae. *International Journal of Neuroscience, 24, 299-301.*

Turkheimer, E.,  Yeo, R.A., & **Bigler, E.D.** (1983). Digital planimetry in APLSF. *Behavior Research Methods & Instrumentation, 15 (4), 471-473.*

Miller, V.S.,  & **Bigler, E.D.** (1982). Neuropsychological aspects of tuberous sclerosis. *Clinical Neuropsychology, 4 (1), 26-34.*

Piran, N.,  & **Bigler, E.D.** (1982). A neuropsychological contribution to the theory of schizophrenia. *Technical Report, Hogg Foundation, 83.*

Ehrfurth, J.W.,  Phelan, C., & **Bigler, E.D.** (1981). The utility of a short, modified WAIS with a neurological patient population. *Clinical Neuropsychology, 3, 42-43.*

Standage, C.P.,  Fleming, D.E., & **Bigler, E.D.** (1981). Thalamocortical coupling and component properties of visually evoked after-discharges. *Brain Research Bulletin, Jul;7(1), 89-92.*

Tucker, D.M.,  **Bigler, E.D.**, & Chelune, G.J. (1981). Reliability of the Halstead-Reitan Battery in individuals displaying acutely psychotic behavior. *Journal of Behavioral Assessment, 3 (4), 311-319.*

Shearer, D.E.,  Fleming, D.E., & **Bigler, E.D.** (1976). The photically evoked after-discharge: A model for the study of drugs useful in the treatment of petit mal epilepsy. *Epilepsia, Dec;17(4), 429-35.*

Fleming, D.E.,  & **Bigler, E.D.** (1974). Relationship between photically evoked after-discharge occurrence and hippocampal EEG rhythms in restrained and unrestrained albino rats. *Physiology and Behavior, Dec;13(6), 757-61.*

Bigler, E. D.      46

Shearer, D.E.,    Fleming, D.E., **Bigler, E.D.**, & Wilson, C.E. (1974). Suppression of photically evoked after-discharge bursting following administration of anticonvulsants in waking rats. *Pharmacology, Biochemistry and Behavior, Nov-Dec;2(6), 839-42.*

**\*Cache County Investigators:** Collaborators (36):  Anthony, J., **Bigler, E.D.,** Brookmeyer, R., Burke, J., Carlson, M., Christopher, E., Gagliardi, J., Green, R., Hart, A., Hayden, K., Hulette, C., Klein, L. Leslie, C., Lyketsos, C.,Miech, R.A., Morris, J., Munger, R., Onyike, C., Ostbye, T., Petersen, R., Pfister, R., Pieper, C., Piercy, K., Plassman, B., Rabins, P., Raj, P., Sanders, L., Steinberg, M., Toohill, M., Toone, L., Townsend, J.J., Wengreen H., West, N., Williams, M., Wyse, B.W.

**\*\*Alzheimer's Disease Neuroimaging Initiative:** Collaborators (1136); info at www.adni-info.org/

Lewine, J.D.,    Davis, J.T., Toma, R., **Bigler, E.D.,** Sloan, J.H., Funke, M., Moore, K.R., Orrison, W.W. (in press).  Long-term psychological consequences of mild and moderate head trauma:  A magnetoencephalographic investigation.  *Brain Injury.*

## PUBLISHED BOOK REVIEWS:

**Bigler, E.D.,**    (2010). Clinical neuropsychology's future.  [Review of Jagaroo, V. Neuroinformatics for neuropsychology. New York: Springer Science & Business Media, 124 pp.].

**Bigler, E.D.,**    (2000). [Review of Yeates, K.O., Ris, M.D., & Taylor, G.E. (Eds.), Pediatric Neuropsychology:  Research Theory, and Practice (Science and Practice of Neuropsychology). Guilford Publications: New York, 485 pp.].

**Bigler, E.D.**    (1997). A practical neuropsychology primer. [Review of R.E. Cytowic's The neurological side of neuropsychology, Cambridge, MA: MIT Press, 1996]. *Contemporary Psychology Journal of Review, 8, 529.*

**Bigler, E.D.**    (1997). Neuroimaging from two different angles. [Review of A. Kertesz Localization and neuroimaging in neuropsychology.  New York: Academic Press, 1994 and review of R. Thatcher, M. Hallett, T. Zeffiro, E. R. John, and M. Heurta. Functional neuroimaging: Technical foundations.  New York: Academic Press, 1994.] *Journal of International Neuropsychological Society, 3, 201-202.*

**Bigler, E.D.**    (1996). [Review of L. Cermak.  Neuropsychology explorations of memory and cognition:  Essays in honor of Nelson Butters.  New York: Plenum Press, 1994.] *Archives of Clinical Neuropsychology, 11 (4), 355-356.*

**Bigler, E.D.**    (1993). Brain and behavior. [Review of A. Ardila and F. Ostrosky-Solis Brain organization of language and cognitive processes, New York: Plenum Press, 1989.] *Contemporary Psychology, 38 (4), 356-357.*

**Bigler, E.D.**    (1992). Suicide intervention in the schools. [Review of S. Poland. Suicide intervention in the schools. New York: Guilford Press.] *Journal of Psychoeducational Assessment, 3, 302-304.*

**Bigler, E.D.**    (1992). Premorbid factors are critical in brain injury research. [Review of J. Schulkin (Ed.) Preoperative events: Their effects on behavior following brain

Bigler, E. D.    47

damage. New York: Lawrence Erlbaum, 1989.] *Contemporary Psychology, 37, 370-371.*

**Bigler, E.D.**   (1991). Neurobiology of higher cognitive function. [Review of A.B. Scheibel & A.F. Wechsler (Eds.), Neurobiology of higher cognitive function. New York: Guilford Press, 1990.] *Bulletin of The National Academy of Neuropsychology, 8, 14-15.*

**Bigler, E.D.**   [Review of Neurobehavioral recovery from head injury. H.S. Levin, J. Grafman, & H.M. Eisenberg (Eds.), New York: Oxford University Press, 1989.] *Archives of Clinical Neuropsychology, 4, 93-99.*

**Bigler, E.D.**   (1989). Brain organization of language and cognitive processes.  [Review of A. Ardilg & F. Ostrosky-Solix (Eds.), Brain organization of language and cognitive processes. New York: Plenum Press.]

**Bigler, E.D.**   (1984). The loss of a mind. [Review of R. Mayeux & W.G. Rosen (Eds.), Advances in neurology: The dementias. New York: Raven Press, 1982.] *Contemporary Psychology, 29, 420-421.*

**Bigler, E.D.**   (1984). The silent epidemic: Cerebral trauma. [Review of M. Rosenthal, E.R. Griffith, M.R. Bond, & J.D. Miller (1983). Rehabilitation of the head injured adult. Philadelphia: F.A. Davis.] *Contemporary Psychology, 29, 643-644.*

**Bigler, E.D.**   (1982). [Review of M.L. Albert, H. Goodglass, N.A. Helm, A.B. Rubens, & M.P. Alexander (Eds.), Clinical aspects of dysphasia. New York: Springer-Verlag, 1981.] *Clinical Neuropsychology, 4, 94.*

**Bigler, E.D.**   (1981). Functional disorders of memory. [Review of J.F. Kihlstrom & F.J. Evans (Eds.) Functional disorders of memory. Lawrence Erlbaum Associates, Hillside, NJ, 1979.] *Clinical Neuropsychology, 3, 39-40.*

Russo, A.A.,   & **Bigler, E.D.** (1996).  [Review of D.C. Delis, J.H. Kramer, E. Kaplan, & B.A. Ober, The California Verbal Learning Test--Children's version (CVLT-C).  San Antonio, TX: The Psychological Corporation, 1994 and T. Boll, Children's Category Test (CCT).  San Antonio, TX: The Psychological Corporation, 1993.] *Archives of Clinical Neuropsychology, 11(2), 171-173.*

## PUBLISHED ABSTRACTS/POSTERS:

**Bigler, E.D.,**   (2006, December) Traumatic Brain Injury Model [Report]. *The Utah Addiction Center Report, 2(2), p.5.*

**Bigler, E.D.,**   (2005, June 16-18).  Fine structural MRI analysis in traumatic brain injury: Relationship to neuropsychological outcome [Abstract]. *The Clinical Neuropsychologist, 19(2), 146.  Abstract and Poster presented at the 2005 Annual Meeting of the American Academy of Clinical Neuropsychology (AACN) Scientific Program at the Minneapolis Marriott  Center in Minneapolis, MN.*

**Bigler, E.D.,**   (2005, May 5-8).  Neuroimaging and neurocognitive outcome in traumatic brain injury – status report 2005 [Abstract]. *Brain Injury, Abstracts of the 6th World Congress on Brain Injury, Melbourne, 19 (Suppl.1) p.28.*

**Bigler, E.D.,**     (2004, February 4-7).  Volumetric analysis of the basal ganglia in autism with macrocephaly [Abstract]. *Symposium at the 32nd Annual Meeting of the International Neuropsychological Society in Baltimore, Maryland.*

**Bigler, E.D.,**     (2004, February 4-7).  Morphology of the Corpus Callosum in Autism and Macrocephaly [Abstract]. *Symposium at the 32nd Annual Meeting of the International Neuropsychological Society in Baltimore, Maryland, USA February 4-7, 2004.*

**Bigler, E.D.,**     (2004, February 4-7).  Neuropsychological assessment in less common medical disorders [Abstract]. *Symposium at the 32nd Annual Meeting of the International Neuropsychological Society in Baltimore, Maryland, USA February 4-7, 2004.*

**Bigler, E.D.,**     (2003, July 16-20).  Neuropsychological findings in a case of autopsy confirmed neuropathology in mild traumatic brain injury. [Abstract]. *Journal of the International Neuropsychological Society, 9 (4), p. 541.  Poster presented at the twenty-sixth annual mid-year international Neuropsychological Society, July 16-20, 2003, Berlin, Germany.*

**Bigler, E.D.,**     (2003). Traumatic brain injury, normal aging, and dementia: Hippocampal atrophy as the putative basis for a relationship [Abstract]. *Journal of the International Neuropsychological Society, 9 (4), p. 565.  Poster presented at the twenty-sixth annual mid-year international Neuropsychological Society, July 16-20, 2003, Berlin, Germany.*

**Bigler, E.D.,**     (2003). Functional brain imaging after acquired brain injury (ABI) [Abstract]. *Brain Injury, 17 (Supplement 1), p.16.*

**Bigler, E.D.**     (2001). 3-D and quantitative neuroimaging and neuropsychological outcome in traumatic brain injury [Abstract]. *Journal of the International Neuropsychological Society, 7 (2), 259.*

**Bigler, E.D.**     (1998). Quantitative neuroimaging in neuropsychology [Abstract].  *The Clinical Neuropsychologist, 12 (2), 284.*

**Bigler, E.D.**     (1997).  Neuroimaging correlates of APOE 04 [Abstract].  *Journal of the International Neuropsychological Society,  3 (1), 138.*

**Bigler, E.D.**     (1994). Day-of-injury CT as an index to pre-injury brain morphology [Abstract]. *Journal of Neurotrauma, 11, (2), 219.*

**Bigler, E.D.**     & Snyder, J.L. (1993). Pre- and Post-injury neuroimaging: Comparison with neuropsychological outcome in mild head injury [Abstract]. *Archives of Clinical Neuropsychology, 8, 214.*

**Bigler, E.D.**     & Naugle, R.I. (1985). Neuropsychological consequences of chloride deficiency during infancy [Abstract]. *International Journal of Neuropsychology, 7, 68.*

**Bigler, E.D.,**     Black, G., Abildskov, T., Dennis, M., Gerhardt, C., Rubin, K., Stancin, T., Vannatta, K., Taylor, G., Yeates, K. (November 5, 2015). Relation of Cortical Volume to Intellectual Function in Pediatric Traumatic Brain Injury [Poster]. *National Academy of Neuropsychology (NAN) Conference, Austin, Texas, USA.*

Bigler, E. D.     49

**Bigler, E.D.,** Black, G., Abildskov, T., Wilde, E., Max, J. (November 5, 2015). The Relation of Cortical Thickness to Post-Concussive Symptoms in Mild Traumatic Brain Injury or Orthopedic Injury in a Pediatric Sample [Poster]. *National Academy of Neuropsychology (NAN) Conference, Austin, Texas, USA.*

**Bigler, E.D.,** Abildskov, T.J., Wilde, E.A., Hunter, J.V., Scheibel, R., Newsome, M.R., Hanten, G.R., Li, X., Levin, H.S., (2007). How diffuse is brain damage in moderate-to-severe pediatric traumatic brain injury? [Abstract]. *Developmental Rehabilitation, 10(4), 271-310(P35).*

**Bigler, E.D.,** Provencal, S., Mortensen, S., Fearing M.A., McMahon, W., & Lainhart, J.E. (2005 February 2-5). Relationship between superior temporal gyrus and IQ in autism. [Poster]. *33rd Annual Meeting of International Neuropsychological Society, Adam's Mark Hotel, St. Louis, MI, USA, p.16.*

**Bigler, E.D.,** McMahon, W., Lainhart, J.E. (2004). Regional brain morphometry in autism [Abstract]. *Proceedings of CPEA/STAART Annual Meeting, May 17-20, 2004. Bethesda, MD.*

**Bigler, E.D.,** Neeley, E.S., Ozonoff, S., Coon, H., McMahon, W, Lainhart, J.E. (2004). Superior temporal gyrus and autism [Abstract]. *Brain Impairment, 5, 105-106.*

**Bigler, E.D.,** Provencal, S.L., McMahon, W., Lainhart, J.E. (2004). White and gray matter differences in autism using voxel-based morphometry [Abstract]. *Proceedings of International meeting for Autism Research. May 7-8, 2004; Sacramento, California. IMFAR Abstracts P1.1.13 and P2.3.9.*

**Bigler, E.D.,** Ryser, D.K., Gandhi, P., Kimball, J., Wilde, E.A. (2004). Day-of-injury computerized tomography, rehabilitation status, and long-term outcome as they relate to magnetic resonance imaging findings after traumatic brain injury [Abstract]. *Brain Impairment, 5, 122-123.*

**Bigler, E.D.**, Blatter, D.D., Johnson, S.C., & Pinkston, J.B. (1997). Effects of handedness and gender of the surface area of the human corpus callosum: A preliminary study using magnetic resonance imaging [Abstract]. *Archives of Clinical Neuropsychology, 12(4), 386.*

**Bigler, E.D.**, Lowry, C.M., Anderson, C.V., Johnson, S.C., Plassman, B.L., Tschantz, T., Welsh-Bohmer, K.A., Saunders, A.M., & Breitner, J.C.S. (1997). A population-based study of APOE, Alzheimer's disease and quantitative magnetic resonance imaging [Abstract]. *Journal of the International Neuropsychological Society. 3 (3), 214.*

**Bigler, E.D.**, Johnson, S.C., Anderson, C.V., Gale, S.D., & Blatter, D.D. (1996). Brain morphology and neuropsychological relationships: Time post injury [Abstract]. *Journal of the International Neuropsychological Society, 2(1), 16.*

**Bigler, E.D.**,    Burr, R.B., Abildskov, T.J., Norman, M.A., Gale, S.D., Kurth, S.M., & Blatter, D. (1993). Quantitative day of injury CT scan analysis in traumatic brain injury: A method for a within subjects design to estimate pre-injury brain morphology [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 15, 71.*

**Bigler, E.D.**,    Snyder, J.L., & Abildskov, T.J. (1992). PC-based three dimensional neuroimaging of MRI in cerebral trauma: An aid to neuropsychological assessment [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 14, 78.*

**Bigler, E.D.**,    Rosa, L., Schultz, F., Hall, S., & Harris, J. (1989). Rey-Auditory verbal learning and Rey-Osterrieth complex figure design test for performance in Alzheimer's disease and closed head injury. [Abstract]. *Clinical Digest Series, 1990.*

**Bigler, E.D.**,    Paver, S., Cullum, C.M., Turkheimer, E., Hubler, D., & Yeo, R. (1984). Ventricular enlargement, cortical atrophy, and neuropsychological performance following head injury. [Abstract]. *INS Bulletin, October, 1983, p. 36.*

**Bigler, E.D.**,    Hubler, D., Turkheimer, E.A., Cullum, C.M., Paver, S., & Yeo, R. (1983). Volumetric CT Measures and Neuropsychological Performance in Alzheimer's Disease. [Abstract]. *INS Bulletin, October 1983, pp. 40-41.*

Tsui-Caldwell, Y.,    Christensen, Z., Oleson D., Leete, R., Gonzales, J., Skiles, M., Smith, A., Schmidt, M., Neves, W., **Bigler, E.D.**, (November 5, 2015). Schelten et al. Ratings for Mesial Temporal Lobe Atrophy in the Social Outsomes of Brain Injury in Kids [Poster]. *National Academy of Neuropsychology (NAN) Conference, Austin, Texas, USA.*

Dean, D.C.,    Travers, B.G., **Bigler, E.D.**, Prigge, M.D., Froehlich, A., Lange, N., Alexander, A., Lainhart, J.E. (May13-16, 2015). Microstructural Covariance of White Matter in Autism Spectrum Disorder [Poster]. *Proceedings of the International Meeting for Autism Research (IMFAR), Grand America Hotel, Salt Lake City, Utah, USA.*

Prigge, M.D.,    Lange, N., **Bigler, E.D.**, Zygmunt, K., Travers, B.G., Abildskov, T., Froehlich, A., Fletcher, P.T., Alexander, A., Zielinski, B.A., Lainhart, J.E. (May 13-16, 2015). Longitudinal Cortical Thickness Development in Relation to Changes in SRS Scores over Time in Autism [Poster]. *Proceedings of the International Meeting for Autism Research (IMFAR), Grand America Hotel, Salt Lake City, Utah, USA.*

Tass, S.N.,    Stephenson, K., Prigge, M.D., Lundwall, R., Cox, J.C., South, M., Maisel, M.E., Kellems, R., Hansen, B.D., **Bigler, E.D.**, Gabrielsen, T.P. (May 13-16, 2015). Brain Volumes Associated with High Levels of Aggression in ASD [Poster]. *Proceedings of the International Meeting for Autism Research (IMFAR), Grand America Hotel, Salt Lake City, Utah, USA.*

Bigler, E. D.     51
1471

Travers, B.G.,    **Bigler, E.D.**, Prigge, M.D., Froehlich, A., Lange, N., Alexander, A., Lainhart, J.E. (May 13-16, 2015). Longitudinal Development of Manual Motor Performance in Autism Spectrum Disorder from Childhood to Mid-Adulthood and Predictions of Adaptive Daily Living Skills [Published Abstract]. *Proceedings of the International Meeting for Autism Research (IMFAR), Grand America Hotel, Salt Lake City, Utah, USA.*

Zielinski, B.A.,    Prigge, M.D., Lainhart, J.E., Alexander, A., **Bigler, E.D.**, Lange, N., Gerig, G. (May 13-16, 2015). Abnormalities in Large-Scale Brain Network Architecture in Autism [Published Abstract]. *Proceedings of the International Meeting for Autism Research (IMFAR), Grand America Hotel, Salt Lake City, Utah, USA.*

Alexander, A.L.,    Lee, J.E., Chung, M., DuBray, M., Froelich, A., Fletcher, P.T., **Bigler, E.D.**, Lange, N., Lainhart, J.E. (May 7-9, 2009). Relationships between diffusion tensor imaging and the social responsiveness scale [Abstract].  *Proceedings of the International Meeting for Autism Research (IMFAR), Chicago, Illinois, USA.*

McCauley, S.,    Wilde, E., Merkley, T., Schnelle, K., **Bigler, E.D.,** Vasquez, A., Hunter, J., Chu, Z., Chapman, S., Levin, H. (2009). Neural Correlates of Event-Based Prospective Memory in Children 3 Months After Moderate to Severe Traumatic Brain Injury: A Volumetric Study. [Published Abstract]. *The Journal of Head Trauma Rehabilitation, 24:5.*

McCauley, S.,    Merkley, T., Wilde, E., Schnelle, K., **Bigler, E.D.,** Vasquez, A., Hunter, J., Chu, Z., Chapman, S., Levin, H. (2009). Patterns of Cortical Thinning in Relation to Event-Based Prospective Memory Performance of Children with Traumatic Brain Injury. [Abstract]. *The Journal of Head Trauma Rehabilitation, 24:5.*

Merkley, T.L.,    Wilde, E.A., **Bigler, E.D.**, Li, X., Hunter, J.V., Hanten, G., Levin, H.S. (2009). Cortical thinning with age progression for traumatically brain injured and typically developing children [Abstract]. *Journal of the International Neuropsychological Society, 15(SS1), 192.*

Nielsen, J.,    Lange, N., Alexander, A., Lee, J.E., Dubray, M., Froehlich, A., **Bigler, E.D.** & Lainhart, J.E. (2009).  Subtypes of autism based on corpus callosum microstructure:  A diffusion tensor imaging and neuropsychological study [Abstract]. *Journal of the Neuropsychological Society, 15 (SS1); 169.*

Ngo, C.T.,    Wilde, E.A., Li, X., **Bigler, E.D.**, Yedururi, S., Hanten, G., Hunter, J.V., Chu, Z., Vasquez, A.C., and Levin, H.S. (2009). Amygdala volumes facilitate emotion identification in children with TBI during recovery [Abstract]. *Journal of the International Neuropsychological Society, 15(SS1), 192.*

Oni, M.B.,    Wilde, E.A., Yallampalli, R., Wu, T.C., Chu, Z., Li, X., Hunter, J.V., **Bigler, E.D.,** Vasquez, A.C., and Levin, H.S. (2009). Diffusion tensor imaging analysis of the frontal lobes in pediatric traumatic brain injury [Abstract]. *Journal of the International Neuropsychological Society, 15(SS1), 153.*

Wu, T.,                  Wilde, E.A., Yallampalli, R., **Bigler, E.D.,** Chu, Z., Li, X., Hunter, J.V., Vasquez, A.C., and Levin, H.S. (2009). Longitudinal changes of the corpus callosum pathways subsequent to traumatic brain injury [Abstract]. *Journal of the International Neuropsychological Society, 15(SS1), 194.*

Wu, T.,                  Wilde, E., Yallampalli, R., **Bigler, E.D.,** McCauley, S., Troyanskaya, M., Chu, Z., Li, Xiaoqi, Merkley, T., Hunter, J., Levin, H. (2009). Changes in the Cingulate in Acute Mild TBI Detectable with Diffusion Tensor Imaging and Their Relation to Memory Function. [Published Abstract]. *The Journal of Head Trauma Rehabilitation, 24:5.*

Yallampalli, R.,         Wilde, E.A., Merkley, T.L., **Bigler, E.D.,** Chu, Z., Hanten, G., Troyanskaya, M., Hunter, J.V., Li, X., and Levin, H.S. (2009). Relation of amygdala volume and processing of visually-based emotional stimuli using the face-emotion recognition task in pediatric traumatic brain injury. [Abstract]. *Journal of the International Neuropsychological Society, 15(SS1), 148.*

Yallampalli, R.,         Wilde, E.A., Merkley, T.L., **Bigler, E.D.,** Chu, Z., Hanten, G., Troyanskaya, M., Hunter, J.V., Li, X., and Levin, H.S. (2009). Effects of pediatric traumatic brain injury on short term memory processing and hippocampal volume. [Abstract]. *Journal of the International Neuropsychological Society, 15(SS1), 148.*

Alexander, A.L.,         Lee, J.E. Ardekani, B, Chung, M., **Bigler, E.D.**, Lainhart, J.E., (May 15 – 17, 2008). Evaluation of DTI image analysis using nonlinear spatial normalization and tissue-specific, smoothing-compensated voxel based analysis application in autism. [Abstract]. *Proceedings of the International Meeting for Autism Research (IMFAR), London, England.*

Lee, J.N.,               Lainhart, J.E., **Bigler, E.D.,** Dubray, M., Froelich, A., Lange, N., Fletcher, T., Chung, M.K., Alexander, A.L. (2008). White Matter is Diffusely Affected in Autism [Abstract].

Lee, J.N.,               Hsu, D., Alexander, A.L., Lazar, M., **Bigler, E. D.,** Lainhart, J.E. (May 3-9, 2008). A study of underconnectivity in autism using DTI: W-Matrix Tractography. [Abstract] *Presented at the International Society for Magnetic Resonance in Medicine (ISMRM) 16th Scientific Meeting and Exhibition in Toronto, Ontario, Canada.*

Lee, J.N.,               Hsu, D., Hsu, M., Alexander, A., DuBray, M., Froehlich, A., Lu, J.K., **Bigler, E.D.,** Lainhart, J.E. (April 12-16, 2008). Structural underconnectivity in autism: A neural network method for diffusion tensor tractography. [Abstract]. *Presented at 2008 Annual American Academy of Neurology (AAN), Chicago, Illinois.*

Allen M.D.,              **Bigler E.D.,** Larsen J., Goodrich-Hunsaker N.J., Hopkins R.O. (November 9, 2007). Functional magnetic resonance imaging (fMRI) evidence for high cognitive effort on the Word Memory Test in the absence of external incentives. [Abstract]. *Developmental Neurorehabilitation, 10(4), 2007, 271 - 310.*

Allen, M.D.,             **Bigler, E.D.,** Larsen, J., Goodrich-Hunsaker, & Hopkins, R.O. (2007). Functional magnetic resonance imaging (fMRI) evidence for high cognitive effort on the Word Memory Test in the absence of external incentives [Abstract]. *Developmental Neurorehabilitation, 10(4): 296-297.*

Bigler, E. D.      53

Cleavinger, H.B.,   **Bigler, E.D.,** Wilde, E.A., Hunter, J.V., Li, X., Levin, H. S. (2007).  Traumatic brain injury, atrophy of the entorhinal cortex and neuropsychological outcome in children [Abstract].  *Archives of Clinical Neuropsychology, 22(7), 898.*

Cramond, A.,   Woon, F.M., Wu, C., Cannon, P.C., **Bigler, E.D.**, Cleavinger, H.B., Johnson, J.L., Lainhart, J.E. (2007). Intellectual function and thalamic volume in autism [Abstract]. *Archives of Clinical Neuropsychology 22(7), 828.*

Hanten, G.,   Wilde, E.A., Yallampalli, R., Chu, A., Ramons, M.A., **Bigler, E.D.**, Menefee, D., Vasquez, Li, X., Hunter, J.V., Levin, H.S. (2007).  The relation between white matter disruption measured by diffusion tensor imaging and decision-making following childhood TBI [Abstract]. *Developmental Neurorehabilitation, 10(4), 271-310(P61).*

James, K.,   Pertab, J., **Bigler, E.D.** (2007).  Questionable generalizability for mild traumatic brain injury meta-analysis [Abstract]. *Archives of Clinical Neuropsychology, 22(7), 835.*

Lee, J.N.,   Alexander, A.L., Lazar, M., **Bigler, E.D.,** Lainhart, J.E. (May 3-9, 2007). Evaluation of voxel-based analysis methods for DTI studies [Abstract]. *Abstract presented at the International Society for Magnetic Resonance in Medicine (ISMRM) 16th Scientific Meeting and Exhibition in Toronto, Ontario, Canada.*

Wolkowitz, O.,   Lupien, S., **Bigler, E.D.** (2007).  The "Post-Steroid Dementia Syndrome":  An unrecognized complication of glucocorticoid treatment [Abstract]. *Annals of the New York Academy of Sciences.*

Woon, F.M.,   Cramond, A.C., Wu, C., Cannon, P.C., **Bigler, E.D.,** Cleavinger, H.B., Johnson, J.L., Lainhart, J.E. (2007). Intelligence scores and amygdala volume in individuals with autism. [Abstract]. *Archives of Clinical Neuropsychology, 22(7), 805.*

Wu, C.,   Cramond, S., Woon, F.m., Cannon, P.C., **Bigler, E.D.,** Cleavinger, H.B., Johnson, J.L., Lainhart, J.E. (2007). Fusiform gyral volume, intellectual ability and autism. [Abstract].  *Archives of Clinical Neuropsychology, 22(7), 804-805.*

Alexander, A.L.,   Lee, J.E., Lazar, M., Boudos, R., DuBray, M., Oakes, T.R., Miller, J.N., Lu, J., Jeong, E-K., McMahon, W.M., **Bigler, E.D.,** Lainhart, J.E. (2006). A diffuse tensor study of the corpus callosum in autism. [Poster].  *12th Annual Meeting of the Organization for Human Brain Mapping, Florence, Italy, June 11- 15, 2006.*

Alexander, A.L.   Lee, J.E., Lazar, M., Boudos, R., DuBray, M., Lu, J., Jeong, E.K., **Bigler, E.D.,** Lainhart, J.E. (2006) Diffusion Tensor Study of Corpus Callosum in Autism [Abstract]. *Human Brain Mapping, January 6, 2006.*

Beck, C.J.   Hopkins, R.O., Weaver, L.K., & **Bigler, E.D.** (February 1-4, 2006). Prevalence of white matter hyperintensities in a healthy normal population. [Poster]. *34th Annual Meeting of the International Neuropsychological Society, Boston Marriott Copley Place Hotel, Boston, MA, USA.*

Elison, J. T.,   **Bigler, E.D.,** Miller, J., Lu, J., McMahon, W.M., Lainhart, J.E. (July 1-3 2006). A case-control 3.0 Tesla MRI morphometric analysis of autism with and without

Bigler, E. D.     54

attention-deficit/hyperactivity disorder [Poster]. *5th International Meeting for Autism Research (IMFAR) Montreal, Canada.*

Fearing, M.A.    Hopkins, R.O., & **Bigler, E.D.** (February 1-4, 2006). Variability in basal ganglia lesions following anoxic brain injury. [Poster]. *34th Annual Meeting of the International Neuropsychological Society, Boston Marriott Copley Place, Boston, MA, USA.*

Fearing, M.,    Hopkins, R.O., Weaver, L.K., & **Bigler, E.D.**, (February 1-4, 2006). Neuropsychological and Neuroimaging Outcomes Following Group Carbon Monoxide Poisoning. [Abstract]. *34th Annual Meeting of the International Neuropsychological Society, Boston Marriott Copley Place, Boston, MA, USA.*

Fearing, M.A.    **Bigler, E.D.,** Wilde, E.A., Hunter, J.V., & Levin, H.S. (February 1-4, 2006). Morphometric findings in the thalamus and brainstem in children after moderate to severe traumatic brain injury. [Poster]. *34th Annual Meeting of the International Neuropsychological Society, Boston Marriott Copley Place, Boston, MA, USA.*

Lazar, M.    Baxter, B., Alexander, A.L., Oakes, T., Lu, J., McMahon, W., **Bigler, E.D.**, Lainhart, J., (2006). A Diffusion Tensor Imaging Study of the Thalamus in Autism [Abstract]. *Human Brain Mapping; January 8 2006.*

Levin, H.S.    Moeller, G., Wilde, E., Sullivan, E.V., **Bigler, E.D.,** Ranjeva, J.P., Mori, S., & Grant, E. (2006, February 1-4). Diffusion tensor imaging: Application to neuropsychological research. [Poster]. *34th Annual Meeting of the International Neuropsychological Society, Boston Marriott Copley Place Hotel, Boston, MA, USA, February 1-4, 2006.*

Mathias, J.L.,    Bowden, S.C., **Bigler, E.D.,** (2006) Is performance on the Wechsler Test of Adult Reading affected by traumatic brain injury? [Abstract]. *Proceedings of the International Neuropsychological Society (INS)/ German Neuropsychological Society (GNP) and the Swiss Neuropsychological Association (SVNP) Meeting July 26 -30, 2006, p.100.*

Fearing, M.    Hopkins, R.O., Weaver, L.K., & **Bigler, E.D.** (February 2-5, 2005). Basal ganglia lesions following carbon monoxide (CO) Poisoning. [Poster]. *33rd Annual Meeting of the International Neuropsychological Society, Adam's Mark Hotel, St. Louis, Missouri, USA, p.183.*

Hopkins, R.O.,    Tate, D.F., & **Bigler, E.D.** (2005). Hippocampal volume following carbon monoxide poisoning: Predictors and neuropsychological correlates [Abstract]. *International Neuropsychological Society, Division of the Neuropsychology of the British Psychological Society, British Neuropsychological Society, Joint Mid-Year Meeting, Dublin, Ireland, Program & Abstract Book, p.18.*

Miller, M.,    **Bigler, E.D.,** Neeley, S.L., Provencal, S., McMahon, W., & Lainhart, J.E. (2005, February 2-5,). Frontal lobe development in autism relative to head size. [Poster] *Proceedings of the 33rd Annual Meeting of the International Neuropsychological Society, St. Lois, MI, 2005, p.111.*

Provencal, S.,     Fearing, M.A., Johnson, J.L., Mortensen, S., Heidelberger, C., **Bigler, E.D.,** McMahon, W., & Lainhart, J.E. (February 2-5, 2005).  Basal ganglia morphometry in autism with and without Attention Deficit/Hyperactivity Disorder [Poster]. *Proceedings of the 33rd Annual Meeting of the International Neuropsychological Society, Adam's Mark Hotel, St. Lois, MI, Program & Abstracts, USA, p.111.*

Yeates, K. O.,     Taylor, G., Dennis, M., Vannatta, K., Gerhardt, C., Rubin, K., **Bigler, E.D.**, (2005) Social outcomes in pediatric traumatic brain injury: Toward an integrative, multi-level model [Abstract]. *Brain Injury, Abstracts of the 6th World Congress on Brain Injury, Melbourne, 5-8 May, 19 (Suppl.1) p.21.*

Alexander, A.L.,     Lazar, M., **Bigler, E.D.**, Jeong, E.K., Coon, H., McMahon, W., Lainhart, J.E. (2004).  Diffusion tensor imaging of white matter in autism [Abstract]. *Proceedings of CPEA/STAART Annual Meeting, May 17-20, 2004.  Bethesda, MD.*

Fearing, M. A.,     Larson, M.L., Hopkins, R.O., & **Bigler, E.D.** (2004, February 4-7).  Generalized vs. focal atrophy in dementia:  Their relationship to neuropsychological function [Abstract]. *32nd Annual Meeting of International Neuropsychological Society, Journal of the International Neuropsychological Society, Programs & Abstracts, 16.*

Jackson, J.,     Hopkins, R.O., Gale, S.D., & **Bigler, E.D.** (2004).  Neuropsychological assessment in less common medical disorders [Abstract]. *Journal of the International Neuropsychological Society, INS 32nd Annual Meeting Program & Abstracts, 98.*

Lainhart, J.E.,     **Bigler, E.D.**, Coon, H., McMahon, W. (2004).  Head and brain growth in autism: advances and implications for neuroimaging research [Abstract]. *Proceedings of CPEA/STAART Annual Meeting, May 17-20, 2004.  Bethesda, MD.*

Lainhart, J.E.,     Dinh, E., Coon, H., **Bigler, E.D.**, McMahon, W. (2004).  Head circumference in autism spectrum disorders: A CPEA network study [Abstract].  *Proceedings of International meeting for Autism Research. May 7-8, 2004; Sacramento, California.  IMFAR Abstracts S1.5.2.*

Lee, J.N.,     **Bigler, E.D.,** Provencal, S.L., McMahon, W., Lainhart, J.E. (2004).  Autism severity correlated with reduced brain activation during a face processing task [Abstract].  *Proceedings of International meeting for Autism Research. May 7-8, 2004; Sacramento, California.  IMFAR Abstracts P1.2.3.*

Provencal, S.     & **Bigler, E.D.** (February 4-7, 2004). The Delis-Kaplan executive function system (D-KEFS) compared to traditional tests of executive dysfunction in patients with frontal lesions. *International Neuropsychological Society 32nd Annual Conference, Baltimore, Maryland. Journal of the International Neuropsychological Society, Program & Abstracts, p. 113.*

Sanders, A.D.,     Neeley, E.S., & **Bigler, E.D.** (2004).  Memory performance in autism [Abstract]. *Brain Impairment, 5,112-113.*

Sayer, J.,     Fearing, M.A., **Bigler, E.D.,** McMahon, W.M., & Lainhart, J.E. (2004). Volumetric analysis of the basal ganglia in autism with macrocephaly [Abstract].

*International Neuropsychological Society 32nd Annual Conference, February 4-7, 2004, Baltimore, Maryland. Journal of the International Neuropsychological Society, Volume 10 (Supplement S1), Program & Abstracts, 133-134.*

Bergeson, A.G.,     Lundin, R., Parkinson, R. B., Tate, D.F., Victoroff, J., Hopkins, R.O., **Bigler, E.D.** (spring 2003). Clinical rating of cortical atrophy and cognitive correlates following traumatic brain injury [Abstract]. *Journal of Neuropsychiatry and Clinical Neuroscience 15(2), 276-277.  Poster presented at the 14th Annual meeting of the American Neuropsychiatric Association, Honolulu, Hawaii, February 1-4, 2003.*

Cato, M.,     Delis, D., Abildskov, T., & **Bigler, E.D.** (2003). Assessing the elusive cognitive deficits associated with orbitofrontal cortex damage:  Case study of a modern-day Phineas Gage [Abstract]. *Journal of the International Neuropsychological Society, 9(2), 183.*

Cleavinger, H.,     Sayer, J., Rice, S.A., McMahon, W., Lainhart, J., **Bigler, E.D.** (2003). Volumetric analysis of the mesencephalon and metencephalon in autism with macrocephaly [Abstract]. *Journal of the International Neuropsychological Society, 9 (4), p. 549. Poster presented at the Twenty-Sixth Annual Mid-year International Neuropsychological Society, July 16-20, 2003, Berlin, Germany.*

Fearing, M.A.,     **Bigler, E.D.,** Garrett, K.D., Tschanz, J., Welsh-Bohmer, K.A. (spring 2003). Relationship between cerebral atrophy and informant-based ratings of dementia participants in the Cache County study* [Abstract]. *Journal of Neuropsychiatry and Clinical Neuroscience, 15(2), 269.*

Fearing, M.,     Hannan, C.R., White, J., Mortensen, J., Rice, S., Tate, D., and **Bigler, E.D.** (2003, Feb. 5-8).  Dementia, cerebral atrophy, and neuropsychological performance:  Relationship to APOE-є 4 [Abstract]. *Journal of the International Neuropsychological Society, 9 (2), 317.*

Hopkins, R.O.,     Tate, D., **Bigler, E.D.** (spring 2003).  Acquired brain injury: amount of tissue loss, not etiology, alters cognitive and emotional function [Abstract].  *Journal of Neuropsychiatry and Clinical Neuroscience, 15(2), 261-262.*

Hopkins, R.O.,     McCourt, A., Cleavinger, H., Parkinson, R.B., Victoroff, J., **Bigler, E.D.** (2003). White matter hyperintensities and neuropsychological outcome following traumatic brain injury [Abstract].  *Journal of the International Neuropsychological Society, 9(2), 234. Paper presented at the 31st Annual International Neuropsychological Society Conference, Feb 5-8, 2003, in Honolulu, Hawaii.*

Mathias, J.L.,     **Bigler, E.D.,** Jones, N.R., Barrett-Woodbridge, M.P., Brown, G.C., Taylor, D.J. (2003). Information processing speed and its relationship to quantitative neuroimaging following moderate and severe traumatic brain injury. [Abstract]. *Brain Injury, 17, supplement 1, p.136.  Presented in the international TBI meeting, Stockholm.*

Mortensen, J.,     Hannan, C.R., White, J., Fearing, M., Tate, D., **Bigler, E.D.** (2003, February). The Boston Naming Test, Dementia, and Temporal Lobe Pathology. [Abstract]. *Journal of the International Neuropsychological Society, 9(2), 306. Poster*

Bigler, E. D.     57

*presented at the 31st Annual International Neuropsychological Society Conference, Feb 5-8, 2003, in Honolulu, Hawaii.*

Parish, R.V.,     Carpenter, B.N., **Bigler, E.D.,** (2003). Posttraumatic stress, mild traumatic brain injury, and memory function. [Abstract]. *Archives of Clinical Neuropsychology, 18, 687.*

Rice, S.A.,     **Bigler, E.D.,** Lainhart, J., McMahon, W. (2003). Corpus callosal differences in autism. [Abstract]. *Journal of the International Neuropsychological Society, 9(4), 551. Poster presented at the Twenty-Sixth Annual Mid-year International Neuropsychological Society, July 16-20, 2003, Berlin, Germany.*

Rice, S.A,     **Bigler, E.D.,** Lainhart, J., McMahon, W., Coon, H., Ozonoff, S. (2003, February 5-8). Corpus callosum morphology in autism. [Abstract]. *Journal of the International Neuropsychological Society, 9(2), 270.*

Ross, C.,     Hallam, B., Buckwalter, J.G., **Bigler, E.D.** (2003, Feb 5-8). Regional callosal changes in three forms of dementia. [Abstract]. *Journal of the International Neuropsychological Society, 9(2), 317. Poster presented at the 31st Annual International Neuropsychological Society Conference, Feb 5-8, 2003, in Honolulu, Hawaii.*

Skoog, I.,     **Bigler, E.D.,** (2003, August 17-22). The Gothenburg Longitudinal Study on Aging: Early life risk factors for dementia. [Abstract]. *Eleventh International Congress: International Psychogeriatric Association, Chicago, Illinois.*

White, J.,     Mortensen, J., Hannan, C. R., Fearing, M., Tate, D., and **Bigler, E.D.** (Feb 5-8, 2003).Performance on the logical memory measure and temporal lobe atrophy [Abstract]. *Journal of the International Neuropsychological Society, 9(2), 317.*

Hallam, B.J.,     Brown, W.S., Buckwalter, J.G., Ross, C., & **Bigler, E.D.** (2002).  Functional Channels of the Corpus Callosum:  Evidence from Alzheimer's Disease Patients [Abstract]. *Journal of the International Neuropsychological Society, 8(2), 266.*

Mathias, J.L.      **Bigler, E.D.**, Jones, N.R., Brown, G.C., & Taylor, D.J. (2002). Information processing deficits and their relationship to neuroimaging following moderate and severe traumatic brain injury. [Abstract]. *Journal of Neurotrauma, 19(10), 1293.*

Mortensen J.,     White J., Hannan C.R., Fearing M., Tate D., **Bigler, E.D.** (2002, October). The Benton Visual Retention Test, dementia, and temporal lobe pathology. *Poster accepted for presentation at the 22nd Annual Conference of the National Academy of Neuropsychology, Miami, FL.*

Gandhi, P.V.,     **Bigler, E.D.**, Wilde, E., Ryser, D.K, & Johnson, S. (2001). Quantitative lesion analysis, FIM, and neuropsychology test performance in TBI [Abstract]. *Journal of the International Neuropsychological Society, 7(2), 180.*

Hedges, D.,     Tate, D.F., Miller, M.J., Cleavinger, H.B., Rice, S.A., Thatcher, W., Allen, S., Sood, S., **Bigler, E.D.** (2001).Brain morphology in non-substance-abusing male Vietnam veterans with Posttraumatic Stress Disorder [Abstract].  *Archives of Clinical Neuropsychology, 16 (2001), 796-797.*

Bigler, E. D.     58

Hopkins, R.O.,   Weaver, L.K., Hessel, C., Tate, D., **Bigler, E.D.**, & Blatter, D.  (2001). Hippocampal atrophy following carbon monoxide poisoning:  Gender differences [Abstract].  *Journal of the International Neuropsychological Society, 7(2), 232.*

Parkinson, R.B.,   Hopkins, R.O., Cleavinger, H.B., Weaver, L.K., Victoroff, J., **Bigler, E.D.** (2001).  White matter hyperintensities in carbon-monoxide-poisoned subjects. [Abstract].  *Archives of Clinical Neuropsychology, 16, 731-732.*

Parish, R.V.,   Tate, D.F., & **Bigler, E.D.** (2001).  Estimation of intelligence with the Wechsler Abbreviated Scale of Intelligence (WASI) in an adult neuropsychological patient population:  are the two- and four-subtest forms of the WASI equivalent? [Abstract].  *Archives of Clinical Neuropsychology, 16 (8), 836.*

Ruger, J.,   Hopkins, R., Weaver, L., Johnson, S., Tate, D., **Bigler, E.D.**, & Blatter, D. (2001).  MR-based temporal horn enlargement following carbon monoxide poisoning [Abstract].  *Journal of the International Neuropsychological Society, 7 (2), 190.*

Gale, S.,   Hopkins, R., Weaver, L., Walker, J., **Bigler, E.D.**, & Cloward, T.  (2000). Hippocampal atrophy following sleep apnea and carbon monoxide poisoning: Similarities and differences [Abstract].  *Journal of the International Neuropsychological Society, 6 (2), 154.*

Hopkins, R.O.,   Gale, S.D., Pope, D., Weaver, L.K., & **Bigler, E.D.**  (2000). Ventricular enlargement in patients with acute respiratory distress syndrome [Abstract]. *Journal of the International Neuropsychological Society, 6(2), 229.*

Hopkins, R.O.,   Weaver, L.K. & **Bigler, E.D.**  (2000). Longitudinal outcome following carbon monoxide poisoning: Psychological changes [Abstract]. *Journal of the International Neuropsychological Society, 6(4), 393.*

Tate, D.F.,   Gilbert-Tate, J.J., & **Bigler, E.D.**  (2000).  Neurologic tests and their predictive value among children in India: Correlations between motor skills, VMI, and TONI-2 Scores [Abstract].  *Journal of the International Neuropsychological Society, 6(2), 133.*

Earl, H.D.,   Olsen, J., & **Bigler, E.D.** (1999).  Neuropsychological and anatomical correlates of ∈4 in Alzheimer's disease [Abstract].  *Archives of Clinical Neuropsychology, 14(8), 619-620.*

Gandhi, P.V.,   Wilde, E., **Bigler, E.D.**, Ryser, D.K., & Blatter, D.D. (1999).  QMRI correlates with neuropsychological indicators of general impairment in TBI patients [Abstract].  *Archives of Clinical Neuropsychology, 14(8), 773.*

Kesler, S.R.,   Hopkins, R.O., Weaver, L.K., **Bigler, E.D.**, Blatter, D.D., & Edge-Booth, H. (1999).  Fornix and mammillary body atrophy and verbal memory deficit in carbon monoxide (CO) poisoned humans [Abstract].  *Archives of Clinical Neuropsychology, 14(8), 660-661.*

Porter, S.,   Hopkins, R.O., Weaver, L.K., **Bigler, E.D.**, & Blatter, D.D. (1999).  White matter atrophy and neuropsychological outcome following carbon monoxide exposure [Abstract].  *Archives of Clinical Neuropsychology, 14 (8), 659-660.*

Bigler, E. D.      59

Tate, D.F.,       **Bigler, E.D.**, & Wolfson, L.J. (1999).  Fornix area and hippocampal volume in traumatic brain injury: Relationships to memory function [Abstract].  *Archives of Clinical Neuropsychology, 14(8), 776-777.*

Yeates, K.O.,     Luria, J., Bartkowski, H., Rusin, J., Martin, L., **Bigler, E.D.**, Johnson, S.C. & Anderson, C. (1999). Postconcussive symptoms in children with mild closed-head injuries.  *The Journal of Head Trauma Rehabilitation, Aug;14(4)337-50.*

Foley, H.A.,      Kesler, S. & **Bigler, E.D.** (1998).  The relationship of SPECT and MRI to neuropsychological outcome, intelligence quotients, and traumatic brain injury [Abstract].  *Archives of Clinical Neuropsychology, 13 (1), 132.*

Hopkins, R.O.,    Weaver, L.K., Gale, S.D. & **Bigler, E.D.**  (1998). Neuropsychological outcome, brain perfusion defects and quantitative magnetic brain resonance imaging following carbon monoxide (CO) poisoning [Abstract].  *Undersea and Hyperbaric Medicine, 25, 47-48.*

Hopkins, R.O.,    **Bigler, E.D.**, Weaver, L., Gale, S., & Brooth, E.  (1998). Neuropsychological outcome and brain perfusion defects following carbon monoxide poisoning [Abstract].  *The Clinical Neuropsychologist, 12 (2), 284.*

Kesler, S.R.,     Foley, H.A. & **Bigler, E.D.**  (1998). Relationships between brain abnormalities and cognitive-neurobehavioral symptoms in traumatic brain injury (TBI) using single photon mission computed tomography (SPECT), clinical (MRI) and quantitative (QMR) magnetic resonance [Abstract].  *Journal of the International Neuropsychological Society, 4(1), 8.*

Norman, M.A.,     Delis, D.C., Salmon, D. & **Bigler, E.D.** (1998).  Differential rates of cognitive decline in subgroups of Alzheimer's patients [Abstract].  *Journal of the International Neuropsychological Society, 4 (1), 31.*

Orme, S.F.,       Clark, E., **Bigler, E.D.**, Pompa, J., Kircher, J.C., & Gardner, M.K.  [1998]. Agreement of ratings and behavioral measures of attention and concentration (Abstract).  *The Clinical Neuropsychologist, 12 (2), 277.*

Tate, D.F.,       Gilbert-Tate, J.J. & **Bigler, E.D.** (1998).  Berry's Test of Visual-motor integration and the Test of Nonverbal Intelligence: A comparison among school children in India [Abstract].  *Journal of the International Neuropsychological Society, 4(1), 58.*

Wilde, E.A.,      Bartholomew, J., **Bigler, E.D.**, Nielsen, D., Brooks, M.,  Lowry, C., Foley, H.A., Ryser, D., & Blatter, D.  (1998).  PTA and QMRI outcome in TBI patients with positive blood alcohol levels at time of injury [Abstract].  *Journal of the International Neuropsychological Society, 4 (1), 9.*

Yeates, K.O.,     Luria, J., Bartkowski, H., Rusin, J., Martin, L., **Bigler, E.D.**, Johnson, S.C. & Anderson, C.  (1998). Postconcussive symptoms in children with mild closed-head injuries [Abstract].  *Journal of the International Neuropsychological Society, 4(1), 63.*

Barker, L.H.,     **Bigler, E.D.**, Blatter, D.D., Boineau, B., & Johnson, S. (1997).  Polysubstance abuse and traumatic brain injury: A quantitative study of magnetic resonance

imaging and neuropsychological assessment [Abstract].  *Archives of Clinical Neuropsychology, 12 (4), 284-285.*

Barker, L.H.,   **Bigler, E.D.**, Gale, S.D., Russo, A.A., & Stenroos, J.F. (1997).  Affective disturbance following traumatic brain injury: Severity of injury and the symptom-checklist-90-R [Abstract].  *Archives of Clinical Neuropsychology, 12(4), 399.*

Gale, S.D.,   Hopkins, R.O., Weaver, L.K., **Bigler, E.D.**, Booth, E.J., & Blatter, D.D. (1997).  Brain Perfusion Defects Following Carbon Monoxide Poisoning: Relationship to MRI, Quantitative MRI, and Neuropsychological Findings [Abstract].  *Archives of Clinical Neuropsychology, 12 (4), 321.*

Hopkins, R.O.,   Weaver, L.K. & **Bigler, E.D.**  (1997). Psychological/Emotional changes following carbon monoxide poisoning [Abstract].  *Undersea & Hyperbaric Medicine, 24 (20).*

Johnson, S.C.,   Anderson, C.V., **Bigler, E.D.** & Blatter, D.D. (1997).  Logical memory *versus* verbal paired associate learning and hippocampal volume in a sample of male closed head injury patients [Abstract].  *Journal of the International Neuropsychological Society, 3 (1), 54.*

Pinkston, J.B.,   Johnson, S.C., **Bigler E.D.,** & Blatter D.D. (1997).  Effects of handedness and gender on the surface area of the human corpus callosum: A preliminary study using magnetic resonance imaging [Abstract].  *Archives of Clinical Neuropsychology, 12 (4), 386.*

Plassman, B.L.,   Welsh, K.A., **Bigler, E.D.**, Johnson, S.C., Anderson, C.V., Simons, M.E., Helms, M.J., & Breitner, J.C.S.  (1997). Similarity in brain volumes of aging monozygotic twins [Abstract].  *JINS, 3(1), 68-69.*

Porter, S.S.,   Kozora, E., & **Bigler, E.D.** (1997).  Corpus callosum and cognitive performance in patients with systemic Lupus Erythematosis [Abstract]. *Archives of Clinical Neuropsychology. 12 (4), 388.*

Primus, E.A.,   **Bigler, E.D.**, Anderson, C.V., Johnson, S.C., & Mueller, R.M.  (1997). Subcortical dementia symptoms and corpus striatum degeneration following traumatic brain injury (TBI): a quantitative analysis of magnetic resonance imaging (MRI) and neuropsychological assessment [Abstract]. *JINS, 3(1), p.3.*

Russo, A.A.,   **Bigler, E.D.**, Gale, S.D., Barker, L.H., & Stenroos, J.F. (1997).  Affective disturbance following traumatic brain injury: Severity of injury and the symptom-checklist-90-R [Abstract].  *Archives of Clinical Neuropsychology. 12 (4), 399.*

Tate, D.F.,   Tate, J.J., Johnson, S., & **Bigler, E.D.** (1997).  Ethnic and socioeconomic differences on the developmental test of visual-motor integration:  A study of South Indian school children [Abstract].  *Journal of the International Neuropsychological Society, 3, 26.*

Grant, M.L.,   Nussbaum, N.L., & **Bigler, E.D.** (1996).  Electrophysiological components in children with ADD or ADHD [Abstract].  *Journal of the International Neuropsychological Society, 2(1), 58.*

Hopkins, R.O.,      Abildskov, T.J., **Bigler, E.D.**, Gale, S.D., Johnson, S.C., Anderson, C.V., Blatter, D.D., & Weaver, L.K. (1996). Three-dimensional image analysis of hippocampal atrophy and neuropathological changes following anoxia and traumatic brain injury [Abstract]. *Journal of the International Neuropsychological Society, 2(1), 34.*

Hopkins, R.O.,      Weaver, L.K., Pope, D., Orme, J.F., **Bigler, E.D.**, Larson-Lohr, V. (1996). One year quality of life (AOL) and neuropsychological outcome following adult respiratory distress syndrome (ARDS) [Abstract]. *Chest, 110, 58S.*

Hopkins, R.O.,      Weaver, L.K., Gale, S.D., Johnson, S.C., **Bigler, E.D.**, Blatter, D.D. & Abildskov, T.J. (1996). Three dimensional and quantitative image analysis of neuropathological changes following carbon monoxide poisoning [Abstract]. *Undersea & Hyperbaric Medicine, 23, 9.*

Johnson, S.C.,      Pinkston, J.B., **Bigler, E.D.** & Blatter, D.D. (1996). A regional analysis of the corpus callosum in TBI patients and normal controls: Neuropsychological correlates [Abstract]. *Archives of Clinical Neuropsychology, 11 (5), 404.*

Anderson, C.V.,      Wood, D.M. & **Bigler, E.D.** (1995). Lesion localization and executive functioning in traumatic brain injured patients [Abstract]. *Archives of Clinical Neuropsychology, 10, 290.*

Barker, L.H.,      Mueller, R.M., Russo, A.A., Lajiness-O'Neill, R., Johnson, S., Anderson, C., Norman, M.A., Sephton, S., Primus, E., **Bigler, E.D.**, & Reynolds, C.R. (1995). The word selective reminding subtest of the Test of Memory and Learning (TOMAL): A concurrent and construct validity study using the Rey Auditory Verbal Learning Test (RAVLT) and the Wechsler Memory Scale-Revised (WMS-R) [Abstract]. *Archives of Clinical Neuropsychology, 10, 295-296.*

Connor, P.D.,      Gale, S.D., Johnson, S.C., Anderson, C.V., **Bigler, E.D.** & Blatter, D.D. (1995). Cingulate degeneration following traumatic brain injury: Quantitative neuroimaging, memory and executive functions [Abstract]. *Journal of the International Neuropsychological Society, 1 (2), 174.*

Gale, S.D.,      **Bigler, E.D.**, Johnson, S.C. & Blatter, D.D. (1995). Global degeneration following traumatic brain injury: Anatomic and neuropsychologic correlates [Abstract]. *Journal of the International Neuropsychological Society, 1 (2), 162.*

Gale, S.D.,      Johnson, S.C., **Bigler, E.D.** & Blatter, D.D. (1995). Trauma induced cerebral peduncle degeneration: Correlative relationships with tests of motor function [Abstract]. *Archives of Clinical Neuropsychology, 10(4), 328-329.*

Mueller, R.M.,      Russo, A.A., Barker, L.H., Lajiness-O'Neil, R., Johnson, S., Anderson, C., Norman, M.A., Sephton, S., Primus, E., **Bigler, E.D.**, & Reynolds, C.R. (1995). Memory testing and memory for sentences: Concurrent and construct validity of the Test of Memory and Learning (TOMAL) Utilizing the Wechsler Memory Scale-Revised (WMS-R) [Abstract]. *Archives of Clinical Neuropsychology, 10, 369-370.*

Plassman, B.L.,      Welsh, K.A., Abildskov, T., Johnson, S.C., Anderson, C.V., **Bigler, E.D.**, & Breitner, J.C. (1995). Merging methods: MRI volumetric studies in twin pairs

Bigler, E. D.     62

discordant for Alzheimer's Disease [Abstract]. *Archives of Clinical Neuropsychology, 10, 377.*

Porter, S.S.,   Anderson, C.V., & **Bigler, E.D.** (1995).  Changes in medial temporal lobe and neuropsychological outcome of thirty-five traumatically brain-injured patients [Abstract]. *Archives of Clinical Neuropsychology, 10, 377-378.*

Russo, A.A.,   Barker, L.H., Mueller, R.M., Lajiness-O'Neil, R., Johnson, S., Anderson, C., Norman, M.A., Sephton, S., Primus, E., **Bigler, E.D.** & Reynolds, C.R. (1995). Memory and digit span: Concurrent and construct validity of the Test of Memory and Learning (TOMAL) utilizing the Wechsler Memory Scale-Revised (WMS-R) [Abstract].  *Archives of Clinical Neuropsychology, 10, 386.*

Russo, A.A.,   Johnson, S.C., Ryser, D., MacNamara, S., Bailey, B., Icke, W., Blatter, D., Gale, S., Anderson, C. & **Bigler, E.D.** (1995).  Functional assessment following traumatic brain injury: Correlations of the DRS, FIM, and MRI [Abstract]. *Journal of the International Neuropsychological Society, 1, 121.*

Reynolds, C.R.,   & **Bigler, E.D.** (1995).  Standardized factor scores for use with the Test of Memory and Learning (TOMAL) [Abstract].  *Archives of Clinical Neuropsychology, 10, 382-383.*

Anderson, C.V.   & **Bigler, E.D.** (1994).  Ventricular dilation as a predictor of cognitive outcome [Abstract].  *Archives of Clinical Neuropsychology, 9, 106-107.*

Gale, S.D.,   Johnson, S., **Bigler, E.D.**, & Blatter D.D. (1994).  Degenerative changes secondary to traumatic brain injury:  A morphometric analysis of three patients with pre- and post-injury MR scans and neuropsychological outcome [Abstract]. *Archives of Clinical Neuropsychology, 9, 129.*

Johnson, S.C.,   **Bigler, E.D.**, & Burr R.B. (1994).  Magnetic resonance imaging predictors of cognitive outcome in traumatic brain injury [Abstract].  *Archives of Clinical Neuropsychology, 9 (2), 144.*

Norman, M.A.,   Lajiness-O'Neill, R.R., Nilsson, D.E., Walker, M.L., Boyer, R.S., Connor, P.D., & **Bigler, E.D.** (1994).  Quantitative neuroimaging in neuropsychological outcome in benign hydrocephalous [Abstract].  *Archives of Clinical Neuropsychology, 9, 168-169.*

Reynolds, C.R.,   & **Bigler, E.D.** (1994). Factor structure of the Test of Memory and Learning (TOMAL) [Abstract]. *Archives of Clinical Neuropsychology, 9, 176.*

Weight, D.G.,   & **Bigler, E.D.** (1994).  The discrepancy between clinical history, ventricle/brain ratios and neurobehavioral test findings: Two case studies [Abstract].  *Archives of Clinical Neuropsychology, 9, 200.*

Burr, R.,   Gale, S., Johnson, S., & **Bigler, E.D.**, (1993). Corpus Callosum morphology and neuropsychological function following traumatic brain injury [Abstract]. *Archives of Clinical Neuropsychology, 8, 217.*

Gale, S.D.,   Burr, R.B., **Bigler, E.D.**, & Blatter, D.D. (1993). Neuropsychological outcome and morphological changes in the fornix as a result of traumatic brain injury [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 15, 104.*

Bigler, E. D.     63

Kurth, S.,    **Bigler, E.D.** & Blatter, D.D. (1993). The effects of petechial hemorrhages lesion volume and lesion location on clinical outcome in traumatic brain injury [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 15(1), 104.*

Sephton, S.E.,    Bloch, G.J., Burlingame, G.M., Steffen, P.R., Johnson,   S.C., Tuttle, K.C. & **Bigler, E.D.** (1993).  A structured interview to define and measure chronic stress in humans [Abstract].  *Society for Neuroscience Abstracts, 19, p.170.*

Blatter, D.D.,    Kurth, S.M., **Bigler, E.D.**, Pompa, J., & Ryser, D.K. (1992, August). MRI and CT in traumatic brain injury (TBI): Correlations with quantitative measures of cognitive outcomes [Abstract].  *Proceedings of the 11th Annual Scientific Meeting, 1992, Abstract No. 738, p.71.*

Gale, S.D.,    Norman, M.A., & **Bigler, E.D.** (1992). A comparison of performance on the Raven Coloured Progressive Matrices in patients with closed head injury (CHI) and dementia of the Alzheimer's type [Abstract]. *Archives of Clinical Neuropsychology, 7, 327-328.*

Grant, M.L.,    McNelly, M., Stavinoha, P.L., Nussbaum, N.L., & **Bigler, E.D.** (1992). A comparison of response behaviors on a continuous performance task in children with attention-deficit disorder with and without hyperactivity [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 14, 109-110.*

Macnamara, S.E.,    **Bigler, E.D.**, Blatter, D., Pompa, J., Ryser, D., & Kurth, S. (1992). Structural MRI changes in traumatic brain injury: Comparison of pre- and post-injury scan results [Abstract]. *Archives of Clinical Neuropsychology, 7, 346.*

Massman, P.J.,    & **Bigler, E.D.** (1992). A critical appraisal of the formulation and validity of the WAIS-R "cholinergic deficit" profile [Abstract]. *Archives of Clinical Neuropsychology, 7, 348-349.*

Norman, M.A.,    Gale, S.D., & **Bigler, E.D.** (1992). A comparison of performance on the raven coloured progressive matrices in patients with closed head injury (CHI), left cerebrovascular accidents (LCVA), and right cerebrovascular accidents (RCVA) [Abstract]. *Archives of Clinical Neuropsychology, 7, 352.*

Roman, M.J.,    Grant, M.L., & **Bigler, E.D.** (1992). Performance of boys with attention-deficit hyperactivity disorder and learning disabilities on the core and diagnostic subtests of the differential abilities scales [Abstract]. *Journal of Clinical and Experimental Psychology, 14, 108.*

Schultz, R.,    Willerman, L., Rutledge, J.N., & **Bigler, E.D.** (1992). The relationship between intelligence, gray-white matter image contrast, and brain size: An MRI study of healthy college students [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 14, 32.*

Turkheimer, E.,    Farace, E., Yeo, R.A., & **Bigler, E.D.** (1992). A closer look at gender differences in verbal and performance IQ following unilateral lesions [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 14, 88.*

Lucas, J.A.    **Bigler, E.D.** & Telch, M.J. (1991). Memory functioning in panic disorder [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 13, 31.*

Bigler, E. D.    64

Massman, P.J.,    & **Bigler, E.D.** (1991). Neuropsychological differentiation of depression pseudodementia from Alzheimer's disease [Abstract]. *Archives of Clinical Neuropsychology, 6, 205-206.*

Yeo, R.A.,    & **Bigler, E.D.** (1991). Callosal morphology in closed head injury patients [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 13, 63.*

Grant, M.L.,    Ilai, D., Nussbaum, N.L., & **Bigler, E.D.** (1990). The concurrent validity of continuous performance and traditional neuropsychological measures in attention deficit hyperactivity disorder and learning disabilities [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 12, 101.*

Lucas, J.A.    **Bigler, E.D.**, & Telch, M.J. (1990). Neuropsychological memory functioning in patients with panic disorder [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 12, 50.*

Roman, M.J.,    Nussbaum, N.L., Grant, M.L., & **Bigler, E.D.** (1990). A comparison of neuropsychological test performance in boys and girls with attention-deficit hyperactivity disorder [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 12, 101-102.*

Schultz, R.,    Willerman, L., Rutledge, J.N., & **Bigler, E.D.** (1989). MRI contrast and intelligence [Abstract]. *Archives of Clinical Neuropsychology, 5, 12.*

Cullum, C.M.,    & **Bigler, E.D.** (1988). Psychological adjustment following stroke: The effects of time and lesion size [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 10, 31.*

Nussbaum, N.L.,    Roman, M., Grant, M., & **Bigler, E.D.** (1988). ADD and the mediating effect of age on academic and behavioral variables [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 10, 29.*

Roman, M.J.,    Nussbaum, N.L., & **Bigler, E.D.** (1988). Neuropsychological findings in a case of occipital encephalocele [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 10, 44.*

Cullum, C.M.,    & **Bigler, E.D.** (1987). Lateralized cerebral dysfunction and the MMPI revisited [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 9, 61.*

Naugle, R.I.,    Cullum, C.M., **Bigler, E.D.**, & Massman, P. (1985). Senile and presenile dementia: Neuropsychological and CT brain morphology characteristics [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 7, 616.*

Nussbaum, N.L.,    & **Bigler, E.D.** (1985). Neuropsychological and Personality/Behavioral profiles in learning disabled children derived from cluster analysis [Abstract]. *International Journal of Clinical Neuropsychology, 7, 67-68.*

Raz, S.,    Raz, N., **Bigler, E.D.**, & Turkheimer, E.T. (1985). Volumetric assessment of CT abnormalities in schizophrenia [Abstract]. *Journal of Clinical and Experimental Neuropsychology, 7, 630.*

Cullum, C.M.,    & **Bigler, E.D.** (1984). The effects of prior hematoma on brain morphology and neuropsychological functioning following closed head injury [Abstract]. *The INS Bulletin, 1, 1-12.*

Morris, J.M.,    & **Bigler, E.D.** (1984). An investigation of the Kaufman Assessment Battery for Children (K-ABC) with neurologically impaired children [Abstract]. *The INS Bulletin. November, 1984, 27-28.*

Steinman, D.R.,    & **Bigler, E.D.** (1984). Neuropsychological sequelae of ruptured anterior communicating artery aneurysm [Abstract]. *The International Journal of Clinical Neuropsychology, 6, 83.*

Yeo, R.A.,    Turkheimer, E., & **Bigler E.D.** (1984). The influence of sex and age on unilateral cerebral lesion sequelae. [Abstract]. *INS Bulletin, October, 1983, p. 40.*

Yeo, R.A.,    Turkheimer, E., Raz, N., & **Bigler, E.D.** (1984). Volumetric parameters of the normal human brain: Intellectual correlates [Abstract]. *The INS Bulletin, November, 1984, 45.*

Yeo, R.A.,    Turkheimer, E., & **Bigler, E.D.** (1983). Computer analysis of lesion volume: Reliability, utility and neuropsychological applications [Abstract]. *Clinical Neuropsychology, 1, 45.*

Piran, N.,    **Bigler, E.D.**, & Cohen, D. (1982). Motoric laterality and eye dominance suggest a unique pattern of cerebral organization in schizophrenia. *Archives of General Psychiatry, 39(9), 1006-10. Digest of Neurology and Psychiatry, December 1982, 460.*

Schnelle, K.,    Wilde, E., Troyanskaya, M., Merkley, T., Scheibel, R., Newsome, M., **Bigler, E.D.,** Chu, Z., Li, Xiaoqi, Levin, H. [Published Abstract]. MR Volumetry in Blast-Injury Traumatic Brain Injury. *The Journal of Head Trauma Rehabilitation, 24:5.*


## ACADEMIC COURSES TAUGHT:

Psychobiology/Behavioral Neurobiology
Human Neuropsychology
Clinical Neuropsychology
Seminar in Clinical Neuropsychology
Experimental Psychology: Research Design
Neuropsychology Case Conference
Neuroimaging Analysis in Psychological Science


## PAPERS, SPECIAL LECTURES, ABSTRACT & POSTER PRESENTATIONS, TRAINING SEMINARS, VIDEO SERIES & STUDY GUIDES:

**Bigler, E.D.,**    (2015, Novmeber 12). Recent brain injury research findings and the implications for people with a brain injury, family caregivers, and professionals in the field. Invited Presenter, Brain Injury Alliace "Lunch and Learn' program, Salt Lake City, Utah.

Bigler, E. D.    66

**Bigler, E.D.,**            (2015, November 5). <u>The relation of cortical thickness to post-concussive symptoms in mild TBI or orthopedic injury in a pediatric sample</u>. Invited Presenter, National Academy of Neuropsychology (NAN) Conference, Austin, Texas.

**Bigler, E.D.**            (2015, August 27).  <u>Imaging or Imaginery in TBI – The Possibilities and Limitations of Current Structural Imaging in TBI</u>.  Invited Presenter, The 2nd Turku Traumatic Brain Injury Symposium in Turku, Finland.

**Bigler, E.D.**            (2015, August 28).  <u>Between unconsciousness and recovery – imaging correlates of cognitive deficits.</u>  Invited Presenter, The 2nd Turku Traumatic Brain Injury Symposium in Turku, Finland.

**Bigler, E.D.**            (2015, May 1).  <u>Using Advanced Neuroimaging Techniques to Predict Functional Outcome in TBI</u>.  Invited Presenter, Menninger Clinic/Department of Psychiatry in Houston, Texas.

**Bigler, E.D.**            (2015, April 23).  <u>Integrating Neuroimaging in the Practice of Clinical Psychology and Neuropsychology: Contemporary Methods of Analysis</u>.  Invited Presenter, California Psychological Association in San Diego, California.

**Bigler, E.D.**            (2015, April 16).  <u>Malingering</u>. Invited Lecturer, Scottsdale, Arizona.

**Bigler, E.D.**            (2015, April 11).  <u>Networks, Connectivity, and Neuropsychology</u>.  Distinguished Lecturer, Rocky Mountain Psychology Association Conference in Boise, Idaho.

**Bigler, E.D.**            (2015, March 14). <u>Neuroimaging Networks</u>. Invited presenter at the 10th Annual Brain Injury Rehabilitation Conference in San Diego, California.

**Bigler, E.D.**            (2015, March 4). <u>Neuroimaging Update in Mental Health</u>. Invited presenter at Utah State Hospital in Provo, Utah.

**Bigler, E.D.**            (2015, March 4). <u>Wada (Intracarotid Amobarbital) Procedure: Clinical Applications</u>. Invited presenter for the NAN DistanCE Live Webinar.

**Bigler, E.D.**            (2015, February 6). <u>Networks, Neural Connectivity and Neuropsychology</u>. Presidential Address given at The International Neuropsychological Society Conference in Denver, Colorado.

**Bigler, E.D.**            (2015, February 5). <u>Using neuroimaging and connectivity modeling to understand network plasticity after brain injury: Advancing theory and methods</u>. Symposium Participant for the International Neuropsychological Society in Denver, Colorado.

**Bigler, E.D.**            (2015, January 17). <u>Understanding the Latest Developments in Neuroimaging of Sports Concussion</u>. Lecturer at the 3rd Annual Research on the Concussion Spectrum of Disorders Symposium in Toronto, Canada.

**Bigler, E.D.**            (2014, November 8). <u>Neuroimaging: Latest Advances in Assessment of TBI</u>. Presenter in both the basic and advance course sessions at the Braintree Neurorehab Conference in Boston, Massachusetts.

**Bigler, E.D.**        (2014, November 1). <u>Advances in Neuroradiology</u>.  Presenter at the Scripps Neuro-Restorative Care Conference in San Diego, California.

**Bigler, E.D.**        (2014, October 23). <u>Imaging Brain Damage</u>. Presenter in the Bristol Neurotraining Course Lecture via web.

**Bigler, E.D.**        (2014, October 2). <u>Networks, Connectivity and Neuropsychology: Latest in Understanding TBI</u>. Invited Presenter at the Children's Specialized Hospital in Newark, New Jersey.

**Bigler, E.D.**        (2014, August 11). Invited Panel Member advising the Institutes of Medicine on the use of symptom validity testing for Social Security Administration Disability Determination in Washington, D.C.

**Bigler, E.D.**        (2014, July 9). <u>Neuropsychology, Networks & Connectivity.</u> Presidential Address in the International Neuropsychological Society mid-year meeting in Jerusalem, Israel.

**Bigler, E.D.**        (2014, June 26). <u>Current Controversies in Neuropsychology: The nature of the "I" in mTBI.</u> Invited Presenter in the AACN Meetings in New York, New York.

**Bigler, E.D.**        (2014, June 25). <u>Overview of Symptom Validity Testing and Performance Validity Testing in the Context of Psychological Testing.</u> Invited Participant of the SVT On-line Workshop.

**Bigler, E.D.**        (2014, May 19). <u>Clinical applications of DTI in Traumatic Brain Injury.</u> Invited Presenter in the American Society of Neuroradiology's Special Session on TBI in Montreal, Canada.

**Bigler, E.D.**        (2014, May 16). <u>Neuroimaging correlates of functioning outcome.</u> Invited Presenter at the Brain Injuury Rehab Conference in San Diego, California.

**Bigler, E.D.**        (2014, April 26). <u>The Future of Neuroimaging in Sports Neuropsychology.</u> Invited Keynote Speaker for the Sports Neuropsychology Society Conference in Dallas, Texas.

**Bigler, E.D.**        (2014, April 16). <u>Neuroimaging for Neuropsychologists.</u> Presenter, online NAN DistanCE Webinar.

**Bigler, E.D.**        (2014, March 26). <u>Neuroimaging and Traumatic Brain Injury.</u> Guest Lecturer, Utah State Hospital, Provo, Utah.

**Bigler, E.D.**        (2014, March 23). <u>Child Neuropsychology and Neuroimaging of Developmental Neural Networks</u>. Invited speaker for 22nd Annual Butters-Kaplan West Coast Neuropsychology Conference, Sponsored by University of California, San Diego School of Medicine, San Diego, California.

**Bigler, E.D.**        (2014, March 21). <u>Neuroimaging of TBI: How focal lesions disrupt brain networks</u>. Keynote Speaker for the Tenth World Conference in Brain Injury, International Brain Injury Association, San Francisco, California.

**Bigler, E.D.**        (2014, March 20). <u>Advances in Neuroimaging</u>. Invited speaker for North American Brain Injury Society's 27th Annual Conference on Legal Issues in Brain Injury, San Francisco, California.

**Bigler, E.D.**        (2014, March 6). Presenter for Utah Valley Stroke and Brain Injury Support Group, Provo, Utah.

**Bigler, E.D.**        & Bauer, R. **(**2014, February 12). <u>Function and Anatomy of the Temporal Lobe Memory System.</u> Presenter, Student Workshop, International Neuropsychological Society, Seattle, Washington.

**Bigler, E.D.**        (2014, February 21). <u>Traumatic Brain Injury, Neuroimaging and Neurocognitivity</u>. Presenter for Utah Attorney's Brain Injury Conference, Sponsored by Utah Association for Justice and the Brain Injury Alliance of Utah, Law and Justice Center, Salt Lake City, Utah.

**Bigler, E.D.**        (2013, November 8). <u>Neuroimaging of Network Damage in Traumatic Brain Injury.</u> Invited Presenter for Annual Neuroscience of Brain Injury Conference, Long Beach Memorial Medical Center and Brain Injury Association of California, Napa, California.

**Bigler, E.D.**        **(**2013, October 24). <u>Autism and neurodevelopmental disorders.</u> Invited Distance Lecturer, University of Bristol, Bristol, England.

**Bigler, E.D.**        **(**2013, October 23). <u>Neuropsychology and neuroimaging findings in the relation of concussion, mild traumatic brain injury, aging and dementia.</u> Invited Lecturer, Carl Zimet Lectureship: Division of Clinical Psychology, Psychiatry Grand Rounds, University of Colorado School of Medicine, Denver, Colorado.

**Bigler, E.D.**        **(**2013, October 3). <u>Neuroimaging of TBI.</u> Invited Lecturer, Traumatic Brain Injury Seminar Series, McCausland Center for Brain Imaging, University of South Carolina, Columbia, South Carolina.

**Bigler, E.D.**        **(**2013, September 13). <u>Traumatic Brain Injury - Neuropathology, memory and outcome.</u> International Neuropsychological Society Sponsored Symposium. Federation of the European Societies of Neuropsychology, Free University Berlin, Berlin, Germany.

**Bigler, E.D.**        (2013, September 4). <u>Latest in the Neuroimaging and Neuropsychology of Autism.</u> Speaker, Kids on the Move, Orem, Utah.

**Bigler, E.D.**        (2013, August 3). <u>Neuropsychological Assessment, Neuroimaging, Neural Pathways and Networks: Cognitive and Brain.</u> Presenter. American Psychological Association meetings, Honolulu, Hawaii.

**Bigler, E.D.**        **(**2013, August 3). <u>Speed Mentoring: Building research careers in geropsychology and neuropsychology</u>. Mentor. Divisions 20 and 40, American Psychological Association, Honolulu, Hawaii

**Bigler, E.D.**        (2013, June 14). <u>Neuroimaging of Traumatic Brain Injury: Neuropathological Correlates of Neurobehavioral Outcome</u>. Speaker. Wayne State University, Detroit, MI

**Bigler, E.D.**        (2013, May 24). <u>Mechanisms of degeneration in moderate-severe TBI.</u> Presenter. Symposium 9: Traumatic brain injury as a neurodegenerative disorder? 7th Annual Canadian Neuroscience Meeting 2013, Toronto, Canada

**Bigler, E.D.**        (2013, May 15**)**. <u>Through a Scanner Darkly: Functional Neuroimaging as Evidence of Mental Status</u>. Speaker, 2013 Appellate Court Conference, Salt Lake City, UT

**Bigler, E.D.**        (2013, March 28). <u>Role of neuroimaging in neuropsychology.</u> Presenter, Utah State Hospital, Provo, Utah.

**Bigler, E.D.**        (2013, March 23). <u>Correlates of neuroimaging and neuropsychology in traumatic brain injury</u>. Presenter, Scripps 8th Annual Brain Injury Rehabilitation Conference, San Diego, California.

**Bigler, E.D.**        (2013, March 7). <u>Neuroimaging and rehabilitation outcome.</u> Presenter via videoteleconferencing to International Conference on Recent Advances in Neurorehabilitation 2013; Conference, Valencia, Spain.

**Bigler, E.D.**        (2013, March 1). <u>Neuroimaging, networks and pediatric traumatic brain injury: Identifying the elusive lesion.</u> Presenter, Neurosciences & Mental Health Program Symposium, The Hospital for Sick Children; Toronto, Canada.

**Bigler, E.D.**        (2013, February 7). <u>Brain and Cognitive Reserve in Traumatic Brain Injury</u>. Presenter, International Neuropsychological Society Conference, Waikoloa, Hawaii.

**Bigler, E.D.**        (2013, February 7). <u>How to image the social brain in pediatric traumatic brain injury.</u> Presenter, International Neuropsychological Society Conference, Waikoloa, Hawaii.

**Bigler, E.D.**        (2012, December 6). <u>TBI for families.</u> Speaker, Utah Valley Traumatic Brain Injury and Stroke Support Group, Provo, Utah.

**Bigler, E.D.**        (2012, November 28). Participant: Scientific Advisory Board Member, San Diego, California.

**Bigler, E.D.**        (2012, November 4). <u>How to fulfill the TBI education requirement in the medical school curriculum</u>. Speaker, Association of American Medical Colleges," San Francisco, California

**Bigler, E.D.**        (2012, October 27). <u>Neuropsychology 2012.</u> Speaker, Houston Neuropsychological Society, Houston, Texas

**Bigler, E.D.**        (2012, October 11). <u>Neuropathology of mild traumatic brain injury: Relationship to neuroimaging findings.</u> Speaker, Controversy in Concussion: From Brain to Behavior Conference, Penn State, College Station, Pennsylvania

**Bigler, E.D.,**       (2012, July 26). Participant: USMA/USAMRMC-TATRC Sponsored Research Workshop on Mild/Moderate Brain Injury, West Point, New York..

**Bigler, E.D.,**       (2012, June 21). Participant: Scientific Advisory Board, San Diego, California.

Bigler, E. D.      70

1490

**Bigler, E.D.,**     (2012, June 9). Speaker: 12th International Conference on Long-Term Complications of Treatment of Children and Adolescents for Cancer, Williamsburg, Virginia.

**Bigler, E.D.,**     (2012, May 4). Neuroimaging analysis and behavioral outcomes in neurological disease, aging and traumatic brain injury. Speaker. Core Health Presentation, Austin, Texas.

**Bigler, E.D.,**     (2012, April 26). Mild TBI: What is it? What can be done? What can imaging bring to the table? Speaker. ASNR Conference, New York, New York.

**Bigler, E.D.,**     (2012, April 20). Speaker: Utah Valley University Annual Autism Conference, Orem, Utah.

**Bigler, E.D.,**     (2012, April 13). State of the Art Developments in Brain Imaging that Objectively Demonstrate Brain Injury: The Future is Now. Invited Speaker, UAJ/BIAU Brain Injury Conference Program. Utah Law and Justice Center

**Bigler, E.D.,**     (2012, March 28). The Role of Functional Neuroimaging in Clinical Neuropsychology. Invited Speaker Utah State Hospital, Provo, Utah.

**Bigler, E.D.,**     (2012, March 22-25). Neuroimaging the Brain's Connectivity in Childhood Neuropsychiatric Disorders. Speaker. 21st Annual Butters-Kaplan West Coast Neuropsychology Conference, San Diego, California

**Bigler, E.D.,**     (2012, Feb 16). Applied Memory and Hippocampal Functioning: Effects of Age and Disease. Attendee, International Neuropsychological Society Conference, Montreal, Canada

**Bigler, E.D.,**     (2012, Feb 9). Participant, Scientific Advisory Board Member San Diego, California

**Bigler, E.D.,**     (2011, Nov 8). Visual Rehabilitation. Invited Speaker. 15th Annual Yale Glaucoma Symposium. Orange, CT

**Bigler, E.D.,**     (2011, Oct 17). Neuroimaging, neural connectivity, and clinical neuropsychology. Speaker. Fuller Research Colloquium, Pasadena, California

**Bigler, E.D.,**     (2011, Oct 5). Autism: Neuroscience update. Speaker, Kids on the Move, Orem, Utah

**Bigler, E.D.,**     (2011, Aug 17). Neuropsychological consultation and assessment: Diagnostic clinical neuropsychology, rehabilitation and treatment outcome. Speaker. Utah Case Managers Association, Salt Lake City, Utah

**Bigler, E.D.,**     (2011, July 9). Neuroimaging, Neural Connectivity, and Neuropsychology. Invited Speaker. Sponsored by Neurological Foundation of NZ. INS/ASSBI 4th Pacific Rim Conference. Mid-Year Meeting of the International Neuropsychological Society 34th Annual Conference for the Australian Society for the Study of Brain Impairment. Australia.

**Bigler, E.D.,**     (2011, June 29). Television Appearance, Insights with Jon DuPre, Brain Injury and Healing. Brigham Young University Broadcasting, Provo, Utah

Bigler, E. D.     71

**Bigler, E.D.,**     (2011, May 6). Practical and Emerging Techniques for Imaging Sport-Induced Concussion. Invited Speaker. Sports Concussion Institute 5th Annual National Summit on Sports Concussion and Other Athletic Injuries. Los Angeles, CA.

**Bigler, E.D.,**     (2011, April 29). Speaker: Clinical Neuropsychology, Neuroimaging and Brain Connectivity. Colorado Neuropsychological Society, Denver, Colorado

**Bigler, E.D.,**     (2011, April 7). Speaker: Brain Injury Group, Provo, Utah

**Bigler, E.D.,**     (2011, March 9). Speaker, Grand Rounds Presentation, Utah State Hospital, Provo, Utah

**Bigler, E.D.,**     (2011, March 3). When Brain Injury Strikes a Professional. Invited Panel Member. Brain Injury Conference. Radisson Hotel Downtown, Salt Lake City, Utah.

**Bigler, E.D.,**     (2010, June 10).  Key Note Address: Putting the Brain Back into Mild TBI – Current Science and Future Directions.  Invited Speaker, Sunnybrook Health Sciences Centre: Advances in the Management of Early Traumatic Brain Injury Conference, Toronto, Canada.

**Bigler, E.D.,**     (2010, April 29).  Advances in Neuroimaging. Invited speaker, Brain Injury Litigation Series, Las Vegas, Nevada.

**Bigler, E.D.,**     (2010, March 12).  Windows to the Brain: Updates in TBI neuroimaging. Chairperson for plenary session.  International Brain Injury Association, Washington, D.C.

**Bigler, E.D.,**     (2010, March 11).  Mild TBI: Current science and future directions.  Invited speaker with James Kelly, M.D.  International Brain Injury Association, Washington, D.C.

**Bigler, E.D.,**     (2010, March 4).  Traumatic brain injury update. Invited speaker, Utah Association for Justice Conference, Radisson Hotel, Salt Lake City, Utah.

**Bigler, E.D.,**     (2010, March 3).  Functional neuroimaging in clinical neuropsychology. Invited speaker, Utah State Hospital, Provo, Utah.

**Bigler, E.D.,**     (2010, February 18-19). Distinguished Visiting Professor (DVP) of Psychology. Invited Speaker to the Department of Psychology at Wilford Hall Medical Center, Lackland Air Force Base, San Antonio, Texas.

**Bigler, E.D.**     (2010, February 5).  The profile of memory impairment in autism [poster session]. Presented at the Annual Conference of the International Neuropsychological Society, Acapulco, Mexico.

**Bigler, E.D.**     (2010, February 5).  Prominent recency effect in a list-learning task in autism [poster session].  Presented at the Annual Conference of the International Neuropsychological Society, Acapulco, Mexico.

**Bigler, E.D.**     (2010, February 4). Inconsistent recall on a verbal selective reminding task in autism [paper presentation].  Annual Conference of the International

Bigler, E. D.     72

Neuropsychological Society, Acapulco, Mexico.

**Bigler, E.D.**    (2010, February 4).  Stability of brain volume from mid-childhood through adolescence and early adulthood in autism. [paper presentation].  Annual Conference of the International Neuropsychological Society, Acapulco, Mexico.

**Bigler, E.D.**    (2010, February 4).  Cognitive reserve in pediatric traumatic brain injury. Symposium #4: The cognitive reserve hypothesis: Clinical expression of neurologic diseases across the lifespan. Presented at the annual conference of the International Neuropsychological Society, Acapulco, Mexico.

**Bigler, E.D.,**    (2010, February 3).  Admissibility and appropriate use of symptom validity science in forensic consulting (with Paul Kaufmann and Glenn Larrabee). Invited speaker, Annual Conference of the International Neuropsychological Society, Acapulco, Mexico.

**Bigler, E.D.,**    (2010, February 3).  Neurologic sequelae of medical illness: Neuroimaging predictors of cognitive outcomes (with Max Gunther).  Invited symposiast, Annual Conference of the International Neuropsychological Society, Acapulco, Mexico.

**Bigler, E.D.,**    (2009, December 8).  Neuroimaging: State-of-the-art neuroimaging of traumatic brain injury from acute injury to chronic abnormalities.  Invited speaker. Department of Veteran Affairs National VHA/DOH Conference: Sensory Impairment Issues in Traumatic Brain Injury, Chicago, Illinois.

**Bigler, E.D.,**    (2009, October 16).  Neuroimaging methods that define structural and functional pathology in traumatic brain injury.  Invited speaker, 22nd Annual Conference on Legal Issues in Brain Injury, Austin, Texas.

**Bigler, E.D.,**    (2009, October 16).  The limits of forensic neuropsychology: Legal and clinical perspectives.  Invited speaker, 22nd Annual Conference on Legal Issues in Brain Injury, Austin, Texas.

**Bigler, E.D.,**    (2009, October 8).  Neuroimaging Investigations of the Mind and Behavior. Graduate CS Department Colloquium Series, Brigham Young University, Provo, Utah.

**Bigler, E.D.**    (2009, September 24-25).  Neuroimaging Advances and Clinical Neuropsychology.  Invited speaker, Walter Reed Institute for Post-Graduate Study in Neuropsychology – Fall 2009 Conference, Walter Reed Hospital, Washington, D.C.

**Bigler, E.D.,**    (2009, August 14).  Persistent Post Concussion Syndrome.  Keynote Speaker, MTBI 2009 Conference, First International multidisciplinary conference on Mild Traumatic Brain Injury, Fairmont Hotel Vancouver, Vancouver, British Columbia, Canada.

**Bigler, E.D.,**    (2009, July 26).  Neuroimaging Today in Traumatic Brain Damage Cases. Invited speaker, American Association for Justice, San Francisco, California.

**Bigler, E.D.,**    (2009, June 19).  Mock Depositions and Cross Examinations of Experienced

Bigler, E. D.    73

Neuropsychologal Experts. Invited Speaker, American Academy of Clinical Neuropsychologists (AACN), San Diego, California.

Bigler, E.D.,       (2009, June 3).  Participant, External Advisory Board (EAB) for the Department of Defense Post-Traumatic Stress Disorder and Traumatic Brain Injury Clinical Consortium (INTRuST), San Diego, California.

Bigler, E.D.,       (2009, May 6). Neuroscience Grand Rounds. Department of Neuroscience, University of Portland, Portland, Oregon, USA.

Bigler, E.D.,       (2009, April 9). Contemporary Neuropsychological and Neuroimaging of Acquired Brain Injury. Invited Featured Presenter for the Brain Injury Association of Utah and the Utah Association for Justice, 25th Annual Conference, Salt Lake City, Utah, USA.

Bigler, E.D.,       (2009, April 8).  Mitch Rosenthal Webinar:  Model Systems TBI, May issue, *Archives of Physical Medicine and Rehabilitation*.  Mitch Rosenthal Lecture Series of the Academy of Certified Brain Injury Specialists (ACBIS). A special issue of the *Journal of Head Trauma Rehabilitation*.  Continuing Education Webinar for the Mitch Rosenthal Memorial Lecture Series.

Bigler, E.D.,       (2009, April 6).  Advances in Neuroimaging.  Keynote Speaker, 25th Annual Statewide Conference – Brain Storm!, Brain Injury Association of Texas (BIATX), 25th Annual Statewide Conference, AT&T Executive Education and Conference Center, Austin, Texas.

Bigler, E.D.,       (2009, April 6).  Brain Imaging and Traumatic Brain Injury (TBI).  Keynote Speaker, Austin Neuropsychological Society Quarterly Conference, Austin State Hospital, Austin, Texas.

Bigler, E.D.,       (2009, April 4).  How to Use Contemporary Neuroimaging Findings to Guide Neuropsychological Therapies in Child Clinical Populations. Faculty speaker: 19th Annual Nelson Butters' West Coast Neuropsychology Conference: Advances in the Neuropsychological Assessment and Treatment of School-Aged Children with Cognitive Disorders, San Diego Hilton Resort, California.

Bigler, E.D.,       (2009, March 26).  The Enchanted Loom:  MRI, The Developing Brain and Autism.  Invited lecturer, 16th Annual Martin B. Hickman Outstanding Scholar Lecture, College of Family, Home and Social Sciences, Brigham Young University, Provo, Utah, USA.

Bigler, E.D.,       (2009, March 4).  The Importance of Neuroimaging in Understanding Mental Health.  Invited Speaker, Utah State Hospital, Provo, Utah, USA.

Bigler, E.D.,       (2009, January 16) Grand Rounds Lecture, New Mexico State University, Las Cruces, New Mexico.

Bigler, E.D.,       (2008, November 14) Grand Rounds Lecture:  TBI: Neuroimaging Predictors of Cognitive and Rehabilitation Outcome.  Invited lecture, the Rush Presbyterian Hospital, Rush University, Chicago, Illinois.

Bigler, E.D.,       (2008, November 14) A Practical Guide to Neuroimaging Methods for Rehabilitation Prognosis in Traumatic Brain Injury.  Invited lecturer for

resident students, the Rush Presbyterian Hospital, Rush University, Chicago, Illinois.

**Bigler, E.D.,**     (2008, November 1) <u>Using Neuroimaging to Guide and Direct Therapies and Predict Outcome from TBI</u>.  Invited speaker/presenter, Braintree Rehabilitation, Boston, Massachusetts.

**Bigler, E.D.,**     (2008, November 1) <u>Advanced Neuroimaging Techniques in the Detection of Traumatic Brain Injury</u>.  Invited speaker/presenter, Braintree Rehabilitation, Boston, Massachusetts.

**Bigler, E.D.,**     (2008, October 30) <u>The Role of Structural MRI in the Assessment of TBI</u>.  Invited speaker:  The Advanced Imaging Modalities Related to TBI, at the Cleveland Clinic Annual Neuroimaging in Traumatic Brain Injury Conference, Intercontinental Hotel & Bank of America Conference Center, Cleveland, Ohio.

**Bigler, E.D.,**     (2008, October) <u>The Conversation Series:  Traumatic Brain Injury Companion Series: Traumatic Brain Injury:  Interviews With Experts</u>.  Invited presenter for ". . . a series of videotaped discussions on topics of professional importance by leaders in the field . . . starters for training seminars, or to meet continuing professional development (CPD) requirements for the Nationally Certified School Psychology (NCSP) credential." Published by the Publications Committee of Division 16 Division of School Psychology, of the American Psychological Association (APA).

**Bigler, E.D.,**     **(**2008, October 2) <u>Traumatic Brain Injury: From Concussion to Severe Injury</u>.  Invited speaker, The Utah Valley Regional Medical Center, Emergency Medicine/Critical Care Symposia.

**Bigler, E.D.,**     (2008, October 2)  <u>Neuroimaging and Cognitive and Neurobehavioral Assessment.</u>  Invited speaker, The Utah Valley Regional Medical Center, Emergency Medicine/Critical Care Symposia and Outcome.

**Bigler, E.D.,**     (2008, September 11-12) <u>Advanced Neuroimaging Techniques in Detecting the Sequelae of Traumatic Brain Injury.</u>  Sole, invited speaker/presenter, for Traumatic Brain Injury Litigation Group, Las Vegas, Nevada.

**Bigler, E.D.,**     (2008, July 21) <u>Cognitive and Behavioral Sequelae Found in Traumatic Brain Injury.</u> Invited speaker, Wasatch Mental Health, Provo, Utah.

**Bigler, E.D.,**     **(**2008, June 12-13) <u>Neuroimaging in Traumatic Brain Injury:  A Better Understanding of Cognitive and Behavioral Effects.</u> Invited speaker, Tripler Medical Facility, Honolulu, Hawaii.

**Bigler, E.D.,**     **(**2008, June 2) Grand Rounds (Rehab): "<u>Cognitive and Behavioral Effects in Brain Injury</u>," Rehabilitation Hospital of the Pacific, Honolulu, Hawaii.

**Bigler, E.D.,**     (2008, June 2) <u>Cognitive and Behavioral Effects in Brain Injury.</u> Invited speaker, Queens Medical Center, Honolulu, Hawaii.

**Bigler, E.D.,**     (2008, April 17). <u>Neuroimaging in Understanding Disabilities.</u>  Invited lecture for the Utah Chapter of the Association on Higher Education and Disability

Bigler, E. D.     75

(Utah AHEAD) Conference, Salt Lake City Community College, Salt Lake City, Utah.

**Bigler, E.D.,**   (2008, April 4-5). Neuropsychological Assessment in the Next Decade:  The Integration of Structural and Functional Neuroimaging. Invited presenter for the 18th Annual Nelson Butter's West Coast Neuropsychology Conference – Innovations in Assessment, held at the University of California at San Diego. Hilton San Diego Resort, San Diego, CA.

**Bigler, E.D.,**   (2008, March 20) Symptom-Validity Testing:  Its Proper Role in Neuropsychological Assessment.  Invited presenter for the 2008 Brain Injury Conference of The Brain Association of Utah and the Utah Association for Justice.  The Radisson Hotel, Salt Lake City, Utah.

**Bigler, E.D.,**   (2008, March 20) A Panel of Doctors Answer Questions on Pediatric Brain Injury.  Invited panel member for the 2008 Brain Injury Conference of TheBrain Association of Utah and the Utah Association for Justice. The Radisson Hotel, Salt Lake City, Utah.

**Bigler, E.D.,**   (2008, March 20) State of the Art Developments in Brain Imaging that Objectively Demonstrate Brain Injury:  The Future is Now.  Invited presenter for the 2008 Brain Injury Conference of The Brain Association of Utah and the Utah Association for Justice.  The Radisson Hotel, Salt Lake City, Utah.

**Bigler, E.D.,**   (2008, February) Neuroimaging in Neurobehavioral Research. Invited speaker for the Journal Club, HIV Neurobehavioral Research Center, HNRC, University of California, San Diego, California.

**Bigler, E.D.,**   (2008, January 30) Traumatic Brain Injury:  The Role of Quantitative Neuroimaging in Identifying Structural Abnormalities for Neuropsychological Outcomes Studies.  Invited presentation given for the Neuroimaging at Utah Symposium at The Brain Institute at the University of Utah, Utah.

**Bigler, E.D.,**   (2007, December 4) State-of-the-Art Neuroimaging of Traumatic Brain Injury from Acute Injury to Chronic Abnormalities. Invited presenter for Visual Consequences of Acquired Brain Injury Conference presented by the Department of Veterans Affairs Employee Education system and Department of Defense and Rehabilitation Strategic Healthcare Group, Course#.08.ST.PT.VCOTBICONF.A, Crowne Plaza San Antonio, Riverwalk, San Antonio, Texas.

**Bigler, E.D.,**   (2007, November 17) Useful Clinical Ratings of CT and MRI in the Clinical Practice of Neuropsychology.  Invited Speaker, 27th Annual Conference of the National Academy of Neuropsychology, Westin Kierland Resort & Spa in Scottsdale, Arizona, USA.

**Bigler, E.D.,**   (2007, November 8) Neuroimaging in Pediatric TBI.  Discussant. New Frontiers in Pediatric Traumatic Brain Injury International Conference held at the Westin San Diego at Emerald Plaza, San Diego, California, USA.

**Bigler, E.D.,**   (2007, June 2) Update on Neuroimaging and Clinical Neuropsychology in Children and Adults. Conference Speaker (CE provider) for 16th Annual conference on Neuropsychology of the Northern California Neuropsychology

Bigler, E. D.     76

Forum held at School of Nursing Auditorium, University of California San Francisco (UCSF), San Francisco, California, USA.

**Bigler, E.D,** (2007, April 30) <u>Neuroimaging and the Practice of Clinical Neuropsychology.</u> Invited speaker for the Houston Neuropsychology Society, Westheimer Medical Center, Manvel, Texas, USA.

**Bigler, E.D.** (2007, March 22) <u>Neuroanatomy for Health Care Professionals: BYOL (Bring Your own Laptop).</u> Invited pre-conference workshop, 17th annual Nelson Butters' West Coast Conference: Advances in the Neuropsychological Assessment and Treatment of School-Aged Children with Cognitive Deficits., University of California at San Diego (UCSD). San Diego, CA, USA.

**Bigler, E.D** (2007, March 8) <u>The Aging Brain: Implications for TBI Victims</u>. Featured Presentation. The 2007 Brain Injury Conference of The Brain Injury Association of Utah and The Utah Trial Lawyers Association, Salt Palace Convention Center, Salt Lake City, Utah, USA.

**Bigler, E.D** (2007, March 8) <u>Proving Brain Injury Objectively:  Major Conceptual and Technological Advances.</u> Featured Presentation. The 2007 Brain Injury Conference of The Brain Injury Association of Utah and The Utah Trial Lawyers Association, Salt Palace Convention Center, Salt Lake City, Utah, USA.

**Bigler, E.D.** (2007, March) <u>Distinguished Visiting Professor (DVP) of Psychology</u>. Invited Speaker to the Department of Psychology at Wilford Hall Medical Center, Lackland Air Force Base, San Antonio, Texas 78236, USA.

**Bigler, E.D.** (2007, January 11) <u>Neuroimaging and Biomedical Engineering.</u> Invited Presentation given to BYU Biomedical Engineering Club, Clyde Building, Brigham Young University, Provo, Utah, USA.

**Bigler, E.D.,** (2006, October 19) <u>Neuroimaging & Neurocognitive Outcome in TBI:  A Lifespan Perspective</u>. Keynote Speaker: 17th Annual Family & Professionals Conference, The Brain Injury Association of Utah (BIAU). Davis Conference Center, Layton, Utah, USA.

**Bigler, E.D.,** (2006, October 17) <u>Neuroimaging and Cognitive Neuroscience: Contemporary Methods for Studying Brain-Behavior Relationships.</u> Invited speaker:  Seminar for the Department of Statistics, Brigham Young University. Provo, Utah, USA.

**Bigler, E.D.,** (2006, October 6) <u>Neuroimaging and Neurocognitive Outcome in Mild Traumatic Brain Injury (TBI) – Status Update 2006.</u> Invited Speaker:  California Pacific Medical Center 5th Annual Brain Injury Conference for Health Care Professionals:  Mild Traumatic Brain Injury: Theory assessment & Practice. Cathedral Hill Hotel, San Francisco, California.

**Bigler, E.D.,** (2006, September 29) <u>Cognitive Neuroscience & Neuroimaging Findings in Pediatric Acquired Brain Injury & Developmental Disorders</u>. Invited Keynote presentation:  2006 Health and Wellness Forum: Developmental Disabilities: Innovations in diagnosis, Treatment & Service Delivery (September 27-29, 2006). Catamaran Resort Hotel, San Diego, California.

Bigler, E. D.      77

**Bigler, E.D.,**      (2006, September 14) <u>Recent Advances in Neuroimaging.</u>  Invited Speaker. North American Brain Injury Society (NABIS) 2006 Brain Injury Conference of the Americas (September 14-16, 2006). Eden Rock Hotel, Miami Beach, Miami, Florida.

**Bigler, E. D.,**      (2006, September 1) <u>Neuroimaging and Neurocognitive Outcome in Traumatic Brain Injury.</u>  Invited Speaker: California Brain Injury Association Conference (CALBIA) (September, 1- 3, 2006).  State of the Art Medical and Rehabilitative Care in Brain Injury:  Clinical and Legal Implications. Silverado Resort, Napa, California.

**Bigler, E.D.,**      (2006, July 26- 30)  <u>Emerging Neuroimaging Techniques in TBI:  Relationships to Neuropsychological Outcome</u>.  Invited Speaker:  International Neuropsychological Society Continuing Education Program:  From Plasticity to Rehabilitation, INS/SVNP/GNP Meeting, University of Zurich, Mid-Year Meeting. Zurich, Switzerland.

**Bigler, E.D.,**      (2006, May 22)  <u>Clinical Neuropsychology in the Era of cognitive Neuroscience and Neuroimaging</u>. Grand Rounds: University of Alabama at Birmingham, School of Medicine and Department of Psychiatry & Behavioral Neurobiology. Birmingham, Alabama.

**Bigler, E.D.,**      (2006, April 29 – May 5)  <u>Morphometric and Spectroscopic Imaging in Autism</u>. Invited Speaker: Neuroradiology Education and Research (NER) Foundation Symposium 2006:  Neuroimaging:  State of the Art and Beyond and American Society of Neuroradiology (ASNR) 44th Annual Meeting.  In session: The Brain – Basis of Autism:  Recent Neurobiological and Neuroimaging Research (Moderators: Gary L. Hedlund, D.O.; Santiago, Medino, M.D.). San Diego Convention Center, San Diego, California.

**Bigler, E.D.,**      (2006, March 23-26) Integrity <u>of the Medial Temporal Lobes in Childhood Disorders</u>. Invited Speaker: Nelson Butter's Annual Conference for Advances in Pediatric Neuropsychology: From Toddlers Through School-Aged Children. Wyndham San Diego at Emerald Plaza, San Diego, California.

**Bigler, E.D.,**      (2006, March 9)  <u>21st Century Technology that Demonstrates Brain Injury.</u> Invited Speaker:  2006 Utah Lawyer's Association & Brain Injury Association of Utah (UTLA/BIAU): 2006 Attorney's Brain Injury Conference Program. Little American Hotel, Salt Lake City, Utah.

**Bigler, E.D.,**      (2006, March 3)  <u>Advances in Neuroimaging and Traumatic Brain Injury.</u> Keynote Speaker: Leonard Diller Lecture, 8th Annual Conference of the American Board of Rehabilitation Psychology, Inc. (ABRP) and the American Psychological Association (APA) Division of Rehabilitation Psychology (Div 22). J.A. Nugget Hotel, Reno, Nevada.

**Bigler, E.D.,**      (2005, October 13-16) <u>Diffusion Tensor Imaging of TBI.</u>  Invited Presenter: the Conemaugh International Symposium: Group II – Acute Care; International Brain Injury Association. International symposium held in conjunction with the Conemaugh Health System, the John P Murtha Neuroscience and Pain Institute, and the National Brain Injury Research, treatment and Training foundation, in association with the Brain Injury Association of America:  Finding a "Cure" for Brain Injury, Improving Quality of Life.  Holiday Inn Downtown,

<div align="right">Bigler, E. D.   78</div>

Johnstown, Pennsylvania.  This symposium was the basis of a Report to Congress of the United States of America: A Call for Action. Conemaugh International Symposium: Toward Successful Recovery from Traumatic Brain Injury: Improving Outcomes – submitted April 6, 2006.

**Bigler, E.D.,**  (2005, September 30) <u>Clinical Neuroscience:  Neuroimaging and Mental Health</u>. Invited speaker at the Association of Mormon Counselors and Psychotherapists (AMCAP) Fall Convention 2005; Perspectives in Mental Health:  30 Years of AMCAP, Joseph Smith Memorial Building, Salt Lake City, Utah.

**Bigler, E.D.,**  **(**2005, September 29). <u>Neuroimaging and Neurocognitive Outcome in Traumatic Brain Injury,</u>  Invited Speaker, Brain Injury Association of Michigan 25th Annual Conference "Our Mission Continues", Radisson Hotel, Lansing, Michigan.

**Bigler, E.D.,**  (2005, September 22) <u>Structural and 3D Neuroimaging.</u> Invited Speaker, (Plenary III) 2005 North American Brain Injury Society (NABIS) Conference Brain Injury: New Science, Best Practices and Future Innovations. Ritz Carlton Resort, Jacksonville, Amelia Island, Florida.

**Bigler, E.D.,**  (2005, August 18-21).  <u>MRI & the future of the relevance of neuropsychology.</u> Invited Address, 2005 American Psychological Association (APA) Division 40 Convention. Renaissance Hotel, Washington, D.C.

**Bigler, E.D.,**  (2005, June 16-18). <u>Fine Structural MRI Analysis in Traumatic Brain Injury: Relationship to Neuropsychological Outcome</u>.  Abstract presented at the 2005 American Academy of Clinical Neuropsychology (AACN) Scientific Program, Workshops & Second Annual Meeting, Minneapolis Marriot Center. Minneapolis, Minnesota.

**Bigler, E.D.,**  (2005, May 23-24). Invited Reviewer of Department of Clinical and Health Psychology, College of Public Health and Health Professions, University of Florida. Gainesville, Florida.

**Bigler, E.D.,**  (2005, May 6).  <u>Neuroimaging and Neurocognitive Outcome in Traumatic Brain Injury – Status Report 2005</u>.  International Invited Speaker: 6th World Congress on Brain Injury, Presented by the International Brain Injury Association (IBIA). Melbourne, Australia.

**Bigler, E.D.,**  (2005, May 3).  <u>High Resolution 3T Imaging of the Fine Structure of the Ventral Striatum and Limbic System:  Relationship to Neuropsychological Outcome Following TBI</u>.  Invited Speaker: Australian Psychological Society (APS) College of Clinical Neuropsychologists, Victorian Section & St Vincent's Hospital, Neuropsychology Unit, Education Seminar. Melbourne, Australia.

**Bigler, E.D.,**  (2005, April 22).  <u>Traumatic Brain Injury and Postconcussion Syndrome.</u>  Invited Presentation: 2005 American Bar Association/American Psychological Association (ABA/APA) National Institute on "Psychological and Neuropsychological Evidence in Personal Injury and Medical Malpractice Cases", ABA Center for Continuing Legal Education. Chicago, Illinois, USA.

**Bigler, E.D.,**  (2005, April 22). <u>Carbon Monoxide Poisoning.</u>  Invited Presentation: 2005 American Bar Association/American Psychological Association (ABA/APA) National Institute on "Psychological and Neuropsychological Evidence in

Personal Injury and Medical Malpractice Cases", ABA Center for Continuing Legal Education. Chicago, Illinois, USA.

**Bigler, E.D.,** (2005, April 20). Neuroimaging, Cognitive Neuroscience and Clinical Neuropsychology: Practice Challenges of the 21st Century. Invited Speaker: Rosalind Franklin Colloquium, Rosalind Franklin University School of Medicine-formerly Finch School of Health Sciences/The Chicago Medical School. Chicago, Illinois, USA.

**Bigler, E.D.,** (2005, April 2). Frontotemporal Pathology: Neuropsychological and Neuroimaging Findings Across Disorders. Invited Presentation: 15th Annual Nelson Butter's West Coast Neuropsychology Conference "Advances in Neuropsychological Assessment in the Differentiation of Neurobehavioral Syndromes." In conjunction with University of California, San Diego, School of Medicine, Department of Psychiatry. Wyndham San Diego Hotel, Emerald Plaza, San Diego California, USA.

**Bigler, E.D.,** (2005, March 30). The Neuropsychology TBI and Anoxia. Presentation for Wasatch Mental Healthcare Providers. Provo, Utah.

**Bigler, E.D.,** (2005, March 3). Premature Aging. Presentation given at 2005 Conference on Brain Injury, Presented by Brain Injury Association of Utah and the Utah Trial Lawyers Association. Red Lion Hotel, Salt Lake City, Utah.

**Bigler, E.D.,** (2005, March 3). Breakthroughs in 21st Century Neuroscience. Presentation given at 2005 Conference on Brain Injury, presented by Brain Injury Association of Utah and the Utah Trial Lawyers Association. Red Lion Hotel, Salt Lake City, Utah.

**Bigler, E.D.,** (2005, February 25) Neuroimaging as a Research Tool in Cognitive Neuroscience, Visiting Professor, Class Lecture, Florida Atlantic University, Davie, FL.

**Bigler, E.D.** (2005, February 24) Cognitive Neuroscience and Human Behavior, Keynote Lecture: Broward Psychology Fair, Florida Atlantic University. Davie, FL.

**Bigler, E.D.,** (2005, February 19). Neuropsychology and Neuroimaging in Criminal Defense or Underdeveloped Brains and Damaged Brains and Why Does it Matter? Presentation, CACJ/CPDA Capital Case Defense Seminar. Monterey Conference Center, Monterey, CA.

**Bigler, E.D.,** Rex Jung (2005 February 2-5) Biological Mechanisms Underlying General Intelligence ("g"). International Neuropsychological Society 33rd Annual Meeting, Discussant. Adam's Mark Hotel, St. Louis, MI.

**Bigler, E.D.,** (2005, January 27). Neuropsychology Seminar for Southern Utah University, Invited Speaker: General University Assembly, Cedar City, Utah.

**Bigler, E.D.,** (2005, January 27). Brain, Behavior and Mental Health. Guest Lecturer for Southern Utah University's (SUU) Convocation Lecture Series. Cedar City, Utah.

**Bigler, E.D.,**  (2004, December 9).  Advances in Neuroimaging and Implications for Treatment and Prognosis.  Invited Speaker for Brain Injury Association of America (BIAA) Winter Symposium "Rehabilitation of Traumatic Brain Injury: The State of the Art". Hotel Washington, Washington, D.C.

**Bigler, E.D.**  (2004, November 4-5).  Neuropsychology.  Invited Speaker for Texas Association of Defense Council "2004 TADC Contemporary Issues In Personal Injury Litigation Seminar."  Westin City Center, Dallas, Texas, USA.

**Bigler, E.D.**  (2004, October 5). Neuroimaging in Neuropsychology, Psychiatry Grand Rounds, Dartmouth Medical School. Hannover, New Hampshire.

**Bigler, E.D.**  (2004, October 7). New Techniques in Imaging in Neuropsychology: Psychiatry Grand Rounds,  Brown Medical School, Providence, Rhode Island.

**Bigler, E.D.**  (2004, September 20). Neuroimaging, Creative Methods of Visualizing Brain Injury. New Scientific Methods. Invited Presentation: The 17th Annual Conference on Medical & Legal Issues in Brain Injury, The North American Brain Injury Society and the International Brain Injury Association (NABIS/IBIA) Medical Legal Conference> Ritz Carlton, Bachelor Gulch, Beaver  Creek, Colorado.

**Bigler, E.D.**  (2004, July 13). Anoxic Brain injury: Neuroimaging and Neuropsychological Assessment.  Special Seminar at the Hampstead Rehabilitation Centre, Northfield, Australia.

**Bigler, E.D.**  (2004, July 12).  Traumatic brain injury: Neuroimaging and neuropsychological assessment.  Special Seminar at the University of Adelaide, Australia.

**Bigler, E.D.**  (2004, May 21).  Neuroimaging and neuropsychology of cognitive and emotional disorders.  Presentation at 'The Neuropsychology of Emotion' Utah Psychological Association seminar, University of Utah Museum of Fine Arts, Salt Lake City, Utah.

**Bigler, E.D.,**  (2004, May 13). Grand Rounds-Neuropsychology: Invited Speaker for Charles Matthews Neuropsychology Lab Annual Lecture, Madison, Wisconsin.

**Bigler, E.D.**  (2004, March 25-28).  The Interface of Neuroimaging with Neuropsychological Assessment in Autism and Other Neurodevelopmental Disorders.  Invited Presentation: 14th annual Nelson Butters' West Coast Neuropsychology Conference.  Hilton San Diego Del Mar, Del Mar, California.

**Bigler, E.D.**  (2004, March 12). Justifying Brain Imaging in Clinical Practice. Invited presentation: The Brain Imaging in Clinical Practice-2004 conference. Ellen Eccles Conference Center, Utah State University, Logan, Utah.

**Bigler, E.D.,**  (2003, October 23-24).  Adverse Effects of Substance Abuse on Brain Injury Outcome.  Invited presentation: 10th Annual Conference Program & Errata On Behavior, Clinical Neuroscience, Substance Abuse and Culture. Radisson Hotel, Los Angeles, California.

**Bigler, E.D.,**  (2003, September 18-20)  Structural and 3D Neuroimaging. Invited presentation: Chairs:  R. D. Vogt, M.D., B. H. Stern, JD; G. O'Shanick, M.D., 16th Annual

Bigler, E. D.     81

Conference on Medical & Legal Issues in Brain Injury, The North American Brain Injury Society (NABIS), The Brain Association of America, and the International Brain Injury Association. Ritz-Carlton Resort, Amelia Island, Florida.

**Bigler, E.D.,** (2003, September 8-12). Invited speaker: The Co-Occuring Disorders Institute Conference on the Effects of Traumatic Brain Injury. Palmer, Alaska.

**Bigler, E.D.,** (2003, July 10-15). Invited Speaker: Sixth IBRO World Congress of Neuroscience. Prague, Czech Republic.

**Bigler, E.D.,** (2003, May 25). Functional Brain Imaging After Acquired Brain Injury (ABI). Invited Presentation: Parallel Session – Functional Imaging and Plasticity after ABI: Chairs: M. Hallet, USA & B. Johansson, Sweden. International Brain Injury Association, 5th World Congress on Brain Injury. Stockholm, Sweden.

**Bigler, E.D.,** (2003, March 27). Breaking Developments in the Treatment and Trial of Brain Injury Cases. Invited speaker at Utah Lawyers' Association, Annual meeting. Red Lion Hotel, Salt Lake City, Utah.

**Bigler, E.D.,** (2003, March 20-23). Neuroimaging and Neuropsychological Correlates of Neurodevelopmental Disorders. UCSD School of Medicine, Department of Psychiatry, La Jolla, California, 13th Annual Nelson Butter's West Coast Neuropsychology Conference (CE accredited for APA, MCEP, AMA, BRN, and MFCC/LCSW). Doubletree Hotel, San Diego, California.

**Bigler, E.D.,** (2003, February 2-4). Neurodevelopmental and Neuroimaging Predictors of Neuropsychiatric Outcome in Child Traumatic Brain Injury. American Neuropsychiatric Association 14th Annual Meeting. Honolulu, Hawaii.

**Bigler, E.D.,** (2003, January 15). Keynote Speaker, University Forum, BYU-Idaho University, Rexburg, Idaho.

**Bigler, E.D.,** (2002, December 6). Psychiatry Grand Rounds—Invited Lecture. University of Texas Southwestern Medical Center, Dallas, Texas.

**Bigler, E.D.,** (2002, October 25). Keynote Speaker. Society for Neuroscience: Intermountain Chapter Fall Meeting. Thanksgiving Point, Lehi, Utah.

**Bigler, E.D.,** (2002, October 24-25). Negative Effects of Substance Abuse on Brain Injury Outcome. Invited Presentation: The Ninth Annual Conference on Behavior, Clinical Neuroscience, Substance Abuse and Culture. The Radisson Hotel Los Angeles International Airport, Los Angeles, CA.

**Bigler, E.D.,** (2002, August 22-25) Relationship of Neuroimaging and APOE Genotype to Neuropsychologic Performance. Invited Symposium Presentation: Genetics, Imaging, and Neuropsychological Contributions to the Prediction of Dementia. Chair: Bondi, M. & Haaland, K. Division 40 APA Annual Convention. McCormick Place, Chicago, IL.

**Bigler, E.D.,** (2002, April 25-28). Forensic Neuropsychology with Adults: Assessment and Interpretation. University of California, San Diego (UCSD) Department of

Bigler, E. D. 82

Psychiatry's "Nelson Butters' West Coast Neuropsychology Conference".  Hyatt Hotel, La Jolla, California.

**Bigler, E.D.**,        (2002, March 9).  Structural, Functional, and Three-Dimensional Neuroimaging In Evaluating Traumatic Brain Injury:  Relationships with Neuropsychological Outcome. Pacific Northwest Neuropsychological Society, 15th Annual Conference. University of Washington Faculty Center: Seattle, Washington.

**Bigler, E.D.**        (2002, February 1).  Structural and Developmental Neuroimaging Findings in Autism. (Session III)  Annual Meeting, Psychiatric Research Society. Park City, Utah.

**Bigler, E.D.**        (2002, January 18) Contemporary Neuroimaging in Assessment of Brain Injury. Keynote Speaker, Hilltop Treatment Program--Building Dedication and Presentation.  Dripping Springs, Texas

**Bigler, E.D.**        (2001, October 4-6).  Contemporary Neuroimaging Methods in the Evaluation of Traumatic Brain Injury, (Keynote Address). 19th Annual Conference, Brain Injury Association of Colorado.  Vail, Colorado.

**Bigler, E.D.**        (2001, May 23).  Forensics and Neuroimaging.  35th Semi-annual Forensic Symposium; Neurobiology in the Courtroom:  A New Frontier.  Institute of Law, Psychiatry and Public Policy, University of Virginia, Richmond, Virginia.

**Bigler, E.D.**        (2001, April 30-May 2).  Volumetric MRI Studies of Autism.  Collaborative Programs of Excellence in Autism (CPEA) Annual Meeting, Yale University, New Haven, Connecticut.

**Bigler, E.D.**        (2000). Neuropsychology and neuroimaging. Distinguished Visiting Professors to Wilford Hall Medical Center.  San Antonio, Texas.

**Bigler, E.D.**        (2000, October 19-20). Brain volumetric changes in substance abuse and traumatic brain injury.  7th Annual Conference on Behavior, Clinical Neuroscience, Substance Abuse, and Culture. Los Angeles, California.

**Bigler, E.D.**        (2000, October 12-15). Neuroimaging or neuropsychologists. Frontiers in Brain-Behaviour Research and Clinical Practice:  Neuropsychology's Challenge for the 21st Century. Kirkton Park Hunter Valley NSW.

**Bigler, E.D.**        (2000, September 14-16). Neuro-imaging:  Creative methods for visualizing brain injury.  Brain Injury Association 14th Annual Conference for Attorneys. Palm Beach, Florida.

**Bigler, E.D.**        (2000, August 25-26). Neuroimaging:  Rehabilitation Outcome in TBI. Brain Injury Association of Texas 18th Annual Conference. Austin, Texas.

**Bigler, E.D.**        (2000, July 29-Aug 1). Neuroimaging of TBI:  Correlates with Neuropsychological Outcome. Brain Injury Association 19th Annual Symposium. Chicago, Illinois.

**Bigler, E.D.**        (2000, June 9).  Neuroimaging and Neuropsychology of Traumatic Brain Injury. Annual Brain Injury Symposium.  Ohio Brain Injury Association. Ohio State University, Columbus, Ohio.

Bigler, E. D.     83

**Bigler, E.D.**          (2000, May 15).  Imaging Studies and Their Impact on Cognitive Function. Hydrocephalus Conference.  Phoenix, Arizona.

**Bigler, E.D.**          (2000, March 22-24).  Neuroimaging and neurophysiological studies in reading disabilities. Rapallo, Italy.

**Bigler, E.D.**          (1999, November 23).  The Brain, Mind and Behavior: Clinical Neuroscience in the New Millennium.  Distinguished Faculty Forum. Brigham Young University, Provo, UT.

**Bigler, E.D.**          (1999, November 19).  Functional Brain Injury–Impact and Treatment.  Mild Brain Injury: The Issues and Controversies.  The Rehabilitation Institute, Kansas City, MO.

**Bigler, E.D.**          (1999, November 12).  The Lesions in Traumatic Brain Injury: Implications for the Practice of neuropsychology.  Distinguished Neuropsychologist Award for Career Contributions.  National Academy of Neuropsychology, San Antonio, TX.

**Bigler, E.D.**          (1999, November 4-5).  Neuroimaging of Traumatic Brain Injury: Relationship to Substance Abuse.  Sixth Annual Conference on Behavior, Clinical Neuroscience, Substance Abuse and Culture.  Crown Plaza Hotel, Los Angeles, CA.

**Bigler, E.D.**          (1999, September 17-19).  Three Dimensional Neuroimaging of the Brain: Relationship to Cognition and Behavior.  NeuroHealth for the New Millennium. The Key to Independence.  An interactive conference focusing on brain injury, presented by Bancroft NeuroHelath.  Wyndham Franklin Plaza, Philadelphia, PA.

**Bigler, E.D.**          (1999, September 16-18).  NeuroImaging–Creative Methods for Visualizing Brain Injury.  Winning Brain Injury Cases: Legal and Medical Issues.  13th Annual Conference for Attorneys.  Arizona Biltmore Resort and Spa, Phoenix, AZ.

**Bigler, E.D.**          (1999, June, 23-26).  Neuropsychology and Neuroimaging: Quantitative and 3-D Analysis, Continuing Education Program.  The International Neuropsychological Society and the South African Clinical Neuropsychology Association 22nd International Conference, "Neuropsychology: Toward the Millennium". Holiday Inn, Durban, South Africa.

**Bigler, E.D.**          (1999, June, 11).  Neuropsychology Aspects of the Mild to Sever Brain Injury. Idaho Trial Lawyer's Association Annual Meeting Seminar.  Elkhorn Resort, Sun Valley, Idaho.

**Bigler, E.D.**          (1999, May 22).  Visualizing the Brain: Health and Disorders.  The Third Annual Claremont Conference on Applied Developmental Psychology: Issues in Development and the Neurosciences.  Claremont Graduate University, Claremont, California.

**Bigler, E.D.**          (1999, August).  Interview with Experts:  Traumatic Brain Injury.  APA Division 16 1998 Conversation Series videotape presentation. Toronto, Canada.

Bigler, E. D.      84

1504

**Bigler, E.D.**     (1998, September 23-24).  Neuro-Imaging and Clinical Outcomes in Childhood Traumatic Brain Injury.  Critical Issues in Child & Adolescent Mental Health: Mood Disorders, Learning Disabilities, & Substance Abuse.  Jointly sponsored by The Center for Pediatric Continuing Education and The Children's Mental Health Institute (CMHI).  DoubleTree Hotel, Salt Lake City, Utah.

**Bigler, E.D.**     (1998, September 18).  General Session: Traumatic Brain Injury Update.  IHC Rehabilitation Services Conference.  Salt Lake City, Utah.

**Bigler, E.D.**     (July, 1998) Quantitative Neuroimaging and Neuropsychological Outcome in Dementia, Traumatic Brain Injury, and Anoxia. Invited Symposium; Annual Meeting of the International Neurological Society (INS). Hotel Atrium Hyatt, Budapest, Hungary.

**Bigler, E.D.**     (1998, June 4-7).  Imaging and Brain Function.  The 22nd Annual Williamsburg Conference.  Cognitive, Neuromedical and Behavioral Aspects of Brain Injury.  Williamsburg, Virginia.

**Bigler, E.D.**     (1998, June 4-7).  Brain Imaging, Quantitative Analysis, and Outcomes.  The 22nd Annual Williamsburg Conference.  Cognitive, Neuromedical and Behavioral Aspects of Brain Injury.  Williamsburg, Virginia.

**Bigler, E.D.**     (1998, May 14 & 15).  Neuroimaging and Neuropsychological Outcome.  Walter Reed Army Medical Center Neuropsychology Service Department of Psychology.  Walter Reed Army Medical Center, Washington D.C.

**Bigler, E.D.**     (1998, April 25).  What is dementia?  Neurology Section of the Texas Medical Association '98.  Austin, Texas.

**Bigler, E.D.**     (1998, April 25).  Alzheimer's disease: Epidemiology/collaborative study.  Neurology Section of the Texas Medical Association '98.  Austin, Texas.

**Bigler, E.D.**     (1997, November 10).  The interface of diagnostic neuroimaging with neuropsychological assessment: The role of quantitative MRI.  Seventeenth Annual National Academy of Neuropsychology Conference.  The Riviera Hotel and Casino, Las Vegas, Nevada.

**Bigler, E.D.**     (1997, October 26).  Neuroimaging: Quantitative analysis.  Braintree Hospital Rehabilitation Network in conjunction with HEALTHSOUTH Neurorehabilitation Conference.  Royal Sonesta Hotel, Cambridge, Massachusetts.

**Bigler, E.D.**     (1997, October 26).  Neuroimaging and outcome.  Braintree Hospital Rehabilitation Network in conjunction with HEALTHSOUTH Neurorehabilitation Conference.  Royal Sonesta Hotel, Cambridge, Massachusetts.

**Bigler, E.D.**     (1997, October 17).  Substance abuse and traumatic brain injury: Neuroimaging.  Fifth Annual Conference on Behavior, Neurobiology, Substance Abuse, and Culture.  Los Angeles, California.

**Bigler, E.D.**     (1997, October).  Brain Injury without the loss of consciousness: Fact or Fiction?.  Park City, UT.

**Bigler, E.D.**          (1997, September 18).  Clinical Correlations and Neurobehavioral Profiles and Recovery.  Shepherd Center Acquired Brain Injury Conference.  Atlanta, Georgia.

**Bigler, E.D.**          (1997, September 18).  Forensic Neuropsychology: The Role of Neuroimaging. Shepher Center Acquired Brain Injury Conference. Atlanta, Georgia.

**Bigler, E.D.**          (1997, May).  Brain Imaging.  Brain Damage Institute.  Seattle, Washington.

**Bigler, E.D.**          (1997, May).  Brain Imaging in Traumatic Brain Injury.  An Educator's Guide for Children with Acquired Brain Injury:  Creating a Collaborative Community of Care.  Buffalo, NY.

**Bigler, E.D.**          (1997, May).  Neuroimaging and Neuropsychological Correlates of Language Disorders.  Utah Speech and Hearing Association.  Salt Lake City, UT.

**Bigler, E.D.**          (1997, April).  Test of Memory and Learning (TOMAL) in Evaluating Child and Adolescent Memory.  Nelson Butter's West Coast Neuropsychology Conference. San Diego, CA.

**Bigler, E.D.**          (1996, November 16).  Chair, Neuropathology of TBI.  Annual Conference of the International Association for the Study of Traumatic Brain Injury, Melbourne, Australia

**Bigler, E.D.**          (1996, November 16).  Chair: Paper Session 5, Neuroimaging, Evoked Potentials and Outcome.  Annual Conference of the International Association for the Study of Traumatic Brain Injury, Melbourne, Australia.

**Bigler, E.D.**          (1996, October 31).  Neuroimaging and Neuropsychological Assessment Update. 16th Annual Meeting, National Academy of Neuropsychology, Inc., New Orleans, LA.

**Bigler, E.D.**          (1996, October 19).  Neuroimaging and Neuropsychological Assessment. Annual Fall Symposium, Philadelphia Neuropsychology Society.  Philadelphia, PA.

**Bigler, E.D.**          (1996, October 18).  Neuroimaging, Neuropsychology and Dementia.  Grand Rounds lecture, Allegheny University of the Health Sciences, Department of Neurology.  Philadelphia, PA.

**Bigler, E.D.**          (1996, October 13).  Meet the Expert:  Erin D. Bigler, Ph.D..  Invited address, American Academy of Physical Medicine and Rehabilitation.  Chicago, IL.

**Bigler, E.D.**          (1996, October 13).  TBI Expert Testimony:  Neuromedical and Neuropsychological Caveats.  Invited address, American Academy of Physical Medicine and Rehabilitation.  Chicago, IL.

**Bigler, E.D.**          (1996, October 12).  Neuroimaging in TBI: Clinical Correlations with Neurobehavior Profiles and Recovery.  Invited address, American Academy of Physical Medicine and Rehabilitation.  Chicago, IL.

Bigler, E. D.     86

**Bigler, E.D.**        (1996, September 20).  Neuropsychology and Neuroimaging.  Invited lecture, UND School of Medicine.  Fargo, ND.

**Bigler, E.D.**        (1996, August 12).  Quantitative Neuroimaging Findings, Traumatic Brain Injury, and Substance Abuse.  Symposium: Neurobehavioral and Neuropsychological Assessment of Drug Abuse, American Psychological Association Convention.

**Bigler, E.D.**        (1996, June).  Magnetic Resonance Imaging of the Brain:  Relationship Between Structure and Functions.  Invited lecture, 4th International Conference on Long-Term Complications of Treatment of Children and Adolescents for Cancer.

**Bigler, E.D.**        (1995).  Kronheim Lecture.  Invited lecture, Undersea and Hyperbaric Medical Society's Annual Scientific Symposium.

**Bigler, E.D.**        (1995, November).  Current Status of Neuroimaging and Neuropsychological Assessment.  Invited lecture, National Academy of Neuropsychology.  San Francisco, CA.

**Bigler, E.D.**        (1995, November).  Neuropsychological Assessment, Neuroimaging and Learning Disabilities.  Learning Disabilities Association of Utah Conference.

**Bigler, E.D.**        (1995, August).  New Directions in Brain Injury Diagnosis Using Imaging Technology.  Texas Head Injury Association, 14th Annual State Conference.

**Bigler, E.D.**        (1995, August).  Long-Term Outcomes.  Texas Head Injury Association, 14th Annual State Conference.

**Bigler, E.D.**        (1994, January).  Damage to Executive Function.  The Mild Brain Injury Case, The Utah Head Injury Association, Salt Lake City, UT.

**Bigler, E.D.**        (1993, October).  National Academy of Neuropsychology.

**Bigler, E.D.**        (1993, August).  Chair, Symposium:  Biological revolution-neuroimaging and neuropsychology.  American Psychological Association, Toronto, Canada.

**Bigler, E.D.**        (1993, August).  Quantitative magnetic resonance imaging and neuropsychological assessment.  Paper presented at the annual conference of the American Psychological Association, Toronto, Canada.

**Bigler, E.D.**        (1993, May).  Neuropsychological assessment and neuroimaging:  A synthesis.  Psychology Grand Rands presented at the University of Missouri.

**Bigler, E.D.**        (1992, November). Learning disabilities in children and evaluation and behavior management of ADHD. Lectures presented at The Child's Brain Conference.  Austin, TX.

**Bigler, E.D.**        (1992, October).  National Academy of Neuropsychology, Pittsburgh, PA.

**Bigler, E.D.**        (1992, September). Neuropsychological function and brainimaging invited address given at the annual Brain Function and Learning Conference at the University of North Texas, Denton, TX.

**Bigler, E.D.**     (1992, May). <u>Neuropsychology of Parkinson's disease</u>. Lecture presented at the Parkinson's Support Group, VA Medical Center, Salt Lake City, UT.

**Bigler, E.D.**     (1992, May). <u>Traumatic brain injury</u>. Invited lecture presented at the Seventh Annual Conference of the Missouri Head Injury Advisory Council, Missouri Division of Special Education, Jefferson City, MO.

**Bigler, E.D.**     (1992, March). <u>Neuroimaging and Neuropsychology</u>. Presidential Address, National Academy of Neuropsychology, November 1, 1990.  Presented again at Neurology/Psychiatry Grand Rounds, University of Texas at San Antonio, February 14, 1991; at the 1991 National Academy of Neuropsychology, Dallas, Texas, November 1, 1991; at The University of Utah Seminar Series, November 18, 1991; and at Rancho Los Amigos Medical Center, University of Southern California, March 11-13, 1992.

**Bigler, E.D.**     (1991, November). <u>Neuroimaging and Electrophysical Techniques</u>. Invited address presented at the Mild to Moderate Head Injury Conference sponsored by the Utah Head Injury Association and Utah State Bar. (1992, November). New dimensions in neuropsychology: strengths and limitations of neuropsychological assessment.

**Bigler, E.D.**     (1991, October). <u>Neuroimaging and Neuropsychological Assessment</u>. Invited keynote at invitational conference, "Cognitive assessment: An interdisciplinary dialogue" sponsored by Dean Jane Stallings' Enhancing Excellence in Education Fund—Chair:  Ernie Goetz, Department of Educational Psychology, Texas A&M University, presented at College of Education, Texas A&M University, College Station, TX.

**Bigler, E.D.**     (1991, August). <u>Neuroimaging and Neuropsychological Assessment in Traumatic Brain Injury in School-aged Children</u>. Invited address presented at The Utah State Office of Education Conference on "Serving students with traumatic brain injury in our schools." Salt Lake City, UT.

**Bigler, E.D.**     (1991, July). <u>The Divine Brain</u>. Brigham Young University Forum address, Provo, UT.

**Bigler, E.D.**     (1989, March). <u>Memory Disorders: Neuropsychological and Anatomical Correlates</u>. Grand Rounds Lecture. University of Texas Health Science Center in San Antonio, Dept. of Psychiatry.

**Bigler, E.D.**     (1988, November). <u>Applications of Brain Imaging Techniques to Clinical Neuropsychology</u>. Invited address/Workshop. National Academy of Neuropsychologists, Orlando, FL.

**Bigler, E.D.**     (1988, October). <u>Current Status of Brain Imaging and Clinical Neuropsychology</u>. Guest lecturer/Invited address at the Eighth Julie McGee Lamberth Conference, Baylor College of Medicine.

**Bigler, E.D.**     (1988, September). <u>Alzheimers Assessment</u>. Texas Department of Mental Health and Mental Retardation - Nursing Education Teleseries.

Bigler, E. D.     88

**Bigler, E.D.**        (1988, September). Visiting Professor, Texas A&M University, Department of Psychiatry. Neuropsychology update Lecture, Scott & White Hospital, Temple, TX.

**Bigler, E.D.**        (1987, April). Neuropsychology of Depression. Fourth Annual update in Psychiatry sponsored by the Department of Psychiatry, University of Texas Health Science Center at San Antonio, November 22, 1986. Colloquium Lecture, Brigham Young University, April 2, 1987.

**Bigler, E.D.**        (1987, March). Neuropsychology of Dementia. Invited lecture series, Edmonton Hospital and University of Alberta, Alberta, Canada.

**Bigler, E.D.**        (1986, December). Neuropsychology of Cerebral Trauma. Invited address/Workshop, Florida State Psychological Association Conference, Fort Lauderdale, FL.

**Bigler, E.D.**        (1985, October). Brain Imaging: Relationship to Clinical Neuropsychological Assessment. Invited address at the National Academy of Neuropsychologists, Philadelphia, PA.

**Bigler, E.D.**        (1983, November). Neuropsychological Diagnosis of Learning Disabilities. Invited address at the 19th Annual Conference of the Texas Association of Children with Learning Disability, Waco, TX.

**Bigler, E.D.**        (1983, October). Neuropsychology and Computerized Tomography. Invited address at The National Academy of Neuropsychologists, Houston, TX.

**Bigler, E.D.**        (1983, May). Neuropsychology Update. Invited address at the Barrow Neurological Institute of St. Joseph's Hospital & Medical Center, Phoenix, AZ.

**Bigler, E.D.**        (1983, May). Neuropsychology Workshop. Brigham Young University, Provo, UT.

**Bigler, E.D.**        (1982). Neuroanatomy and Neuropathology. Invited address at The National Academy of Neuropsychologists Annual Meeting, Atlanta, GA.

**Bigler, E.D.**        (1981). Assessment in Clinical Neuropsychology. Invited address and workshop presented at the annual meeting of the National Association of School Psychologists, Houston, TX.

**Bigler, E.D.**        (1981). Clinical Neuropsychology. Training seminar presented to Psychology Doctoral Interns, Austin State Hospital, 1977, 1978, 1979, 1980, 1981.

**Bigler, E.D.**        (1981). Neuropsychological Evaluation of the Learning Disabled Child. Workshop presented to Region XIII Educational district, Austin, TX, Summer 1979, and Spring 1981.

**Bigler, E.D.**        (1980, November). Current Developments in Neuropsychology of Learning Disabilities. Paper presented as part of symposium on Learning Disability at the annual Texas Psychological Association Meetings, Austin, TX.

**Bigler, E.D.**        (1980, September). Clinical Assessment of Cognitive Deficit in Traumatic and Degenerative Disorders: Brain Scan and Neuropsychologic Findings. Paper read

at the NATO conference on Neuropsychology and Cognition, Medical College of Georgia, Augusta, GA.

**Bigler, E.D.**        (1979, November). <u>Visually Evoked Potentials: Neuropharmacologic Interactions</u>. Invited address read at the 20th annual meeting of the German Democratic Republic Society for Pharmacology and Toxicology, Leipzig, East Germany.

**Bigler, E.D.**        (1977). <u>Bicuculline Potentiation of Photically Evoked After-discharges</u>. Paper read at the Western Pharmacology Society, Victoria, British Columbia, Canada.

**Bigler, E.D.**        (1977). Chairman, Section on Neuropharmacology, Western Pharmacology Society, Victoria, British Columbia, Canada.

**Bigler, E.D.**        (1977). <u>Clinical Neuropsychology</u>. Seminar presented at the Psychologist's meeting of the Texas Department of Mental Health and Mental Retardation, Houston, TX.

**Bigler, E.D.**        (1976). <u>A Reinterpretation of Lateral Geniculate Function in the Rat</u>. Paper read at the Rocky Mountain Psychological Association, Phoenix, AZ.

**Bigler, E.D.**        (1975). <u>Lateral Geniculate Multiple Unit Activity during Metrazol Potentiated Photically Evoked After-discharges in Rats</u>. Paper read at the Society for Neurosciences (Arizona Chapter), Scottsdale, AZ.

**Bigler, E.D.**        (1972). <u>Personalized System of Instruction (PSI): Two Perspectives</u>. Paper read at the Rocky Mountain Psychological Association, Albuquerque, NM.

**Bigler, E.D.**        (1971). <u>Errorless Auditory Discrimination in the Pigeon</u>. Paper read at the Rocky Mountain Psychological Association, Denver, CO.

**Bigler, E.D.,**        & Abildskov, T.J. (2015, August 16). Lecture on Quantitative Image Analysis. Invited Presentation at the Annual Meeting of the Chronic Effects of Neurotrauma Consortium (CENC), Embassy Suites in Fort Lauderdale, Florida.

**Bigler, E. D.**,        Abildskov, T. J., Farrer, T. J., Finuf, C. S., Dennis, M., Taylor, H. G., Rubin, K. H., Gerhardt, C. A., Stancin, T., Vannatta, K., & Yeates, K. O. (2013, February). <u>Voxel-based morphometry of gray and white matter correlates of WASI IQ and WISC-III Processing Speed Index in pediatric traumatic brain injury and orthopedic injury.</u> Poster presented at the annual meeting of the International Neuropsychological Society, Waikiloa, HI.

**Bigler, E.D.,**      Adams, K.M., Stephen, B., Petrauskas, V.M. Gregg, N. (February 7-10, 2007). <u>Testing Neuropsychological Models Across Patient Populations: The Advantages of Examining Measurement Equivalence</u>. Symposium Discussant :  35th Annual Meeting of the International Neuropsychological Society, Hilton Portland & Executive Tower, Portland, Oregon.

**Bigler, E.D.**,      & Robinson, D.N. (1998, September 29). <u>Mind and Brain</u>.  Psychology 390R Forum.  Brigham Young University, Provo, UT.

**Bigler, E.D.,**      Alexander, A.L., Lainhart, J., & Lazar, M. (February 1-4, 2006) Diffusion tensor, structural and volumetric MRI analyses in autism. [Poster]. 34th Annual Meeting of the International Neuropsychological Society, Boston Marriott Copley Place Hotel, Boston, MA, USA, February 1-4, 2006.

**Bigler, E.D.,**      Neeley, E.S., Ozonoff, S., Coon, H., McMahon, W., Lainhart, J.E. (2004, July 7-10).  "Superior temporal gyrus and autism".  Australian Society for the Study of Brain Impairment (ASSBI) & International Neuropsychological Society (INS) Annual meeting 2004.  Brisbane, Australia

**Bigler, E.D.,**      Ryser, D.K., Gandhi, P., Kimball, J., Wilde, E.A. (2004, July 7-10).  <u>Day-of-Injury computerized tomography, rehabilitation status, and long-term outcome as they relate to magnetic resonance imaging findings after traumatic brain injury.</u> Australian Society for the Study of Brain Impairment (ASSBI) & International Neuropsychological Society (INS) Annual meeting 2004.  Brisbane, Australia.

**Bigler, E.D.,**      Sanders, A.D., Neeley, E.S. (2004, July 7-10).  <u>Memory performance in Autism.</u> Australian Society for the Study of Brain Impairment (ASSBI) & International Neuropsychological Society (INS) Annual meeting 2004.  Brisbane, Australia.

**Bigler, E.D.**,      Lai, E.C., Meyer, C. & Winston, J.L. (1998, April 25).  Panel discussion/Questions and answers.  Neurology Section of the Texas Medical Association's Tex Med '98.  Austin, Texas.

**Bigler, E.D.**,      Lowry, C.M., Anderson, C.V., Johnson, S.C., Plassman, B., Brietner, J.C.S., Tschantz, J., Welsh-Bohmer, K.A., & Saunders, A.M. (1997, August). <u>Quantitative Neuroimaging and Dementia</u>.  Chicago, IL.

**Bigler, E.D.**      et al. (1997, June).  <u>Dementia and aging: A population based study of APOE, Alzheimer's disease and quantitative magnetic resonance imaging</u>.  International Neuropsychological Society.  Bergen, Norway.

**Bigler, E.D.**,      Alexander, A.L., Lainhart, J., Lazar, M. (2006, February 1-6). <u>Diffuse Tensor, Structural and Volumetric MRI Analyses in Autism. </u> [Abstract] International Neuropsychological Society, 34th Annual Meeting Program & Abstracts, p.201. Presented at the 34th Annual meeting of the International Neuropsychological Society, Boston Marriott Copley Place Hotel, Boston, Massachusetts, USA.

**Bigler, E.D.**,      Blatter, D.D., & Ryser, D. (1996, November 16).  <u>Clinical and neuroimaging predictors of neurobehavioral outcome following traumatic brain injury</u>.  Paper presented at International Perspectives in Traumatic Brain Injury, Melbourne, Australia

**Bigler, E.D.**,    Hubler, D., Turkheimer, E.A., Cullum, C.M., Paver, S., & Yeo, R. (1984). Volumetric CT Measures and Neuropsychological Performance in Alzheimer's Disease. Paper presented at the XII Annual Meeting of the International Neuropsychological Society (INS), Houston, TX.

**Bigler, E.D.**,    Paver, S., Cullum, C.M., Turkheimer, E., Hubler, D., & Yeo, R. (1984). Ventricular Enlargement, Cortical Atrophy, and Neuropsychological Performance Following Head Injury. Paper presented at the XII Annual Meeting of the International Neuropsychological Society (INS), Houston, TX.

**Bigler, E.D.**    & Eidelberg, E. (1976). Diazepam Suppression of Evoked After-discharges in Rat Lateral Geniculate Nucleus and Visual Cortex. Paper read at the Western Pharmacology Society Meetings, San Francisco, CA.

**Bigler, E.D.**,    Millett, R.L. & Fleming, D.E. (1973). Dorsal Hippocampal Lesions and Unimpaired or Facilitated Conditioned Emotional Response Suppression in the Rat.  Paper read at the Western Psychological Association, Anaheim, CA.

**Bigler, E.D.,**    Abildskov, T.A., Wilde, E.A., Hunter, J.V., Scheibel, R., Newsome, M.R., Hanten, G.R., Li, X., Levin, H.S., (November 8-10, 2007).  How diffuse is brain damage in moderate-to-severe paediatric traumatic brain injury? [Abstract presentation] University of California, San Diego: New Frontiers in Pediatric Brain Injury Conference, November 8- 10, Westin San Diego at Emerald Plaza, San Diego, California.

Adluru, N.,    Hinrichs, C., Chung, M.K., Lee, J.E., Singh, V., **Bigler, E.D.,** Lange, E.D., Lainhart, J.E., Alexander, A.L. (September 4, 2009).  Classification in DTI using shapes of white matter tracts. [Poster/Paper presentation].  31st Annual International IEEE EMBS Conference, Hilton Minneapolis, Minnesota, USA.

Agostino, A.,    Yeates, K.O., Taylor, G.H., **Bigler, E.D**., Rubin, K.H., Vannatta, K., Gerhardt, C.A., Stancin, T., & Dennis, M. (2001, July). Understanding emotional expression and emotive communication in children with traumatic brain injury. Poster presented at the 2nd Annual Symposium on Brain Injury in Children, SickKids Centre for Brain and Behaviour, Toronto.

Allen M.D.,    **Bigler E.D.,** Larsen J., Goodrich-Hunsaker N.J., Hopkins R.O. (November 9, 2007). Functional magnetic resonance imaging (fMRI) evidence for high cognitive effort on the Word Memory Test in the absence of external incentives. [Abstract presentation] University of California, San Diego: New Frontiers in Pediatric Brain Injury Conference, November 8- 10, Westin San Diego at Emerald Plaza, San Diego, California.

Anderson, C.    & **Bigler, E.D.** (1993, October).  Ventricular dilation, cortical atrophy in neuropsychological outcome following traumatic brain injury.  Intermountain Neuroscience Chapter Meeting of the Society for Neuroscience, University of Utah, UT.

Anderson, J.S.,    Druzgal, T.J., Froelich, A., Lange, N., DuBray, M., **Bigler, E.D.,** Lainhart, J.E., Reduced resting state sensorimotor interhemispheric connectivity in autism [Abstract]. Presented at Human Brain Mapping satellite conference, 2009.

Baca, L.            & **Bigler, E.D.** (1996, January).  Violent Assault Resulting in Head Injuries. Domestic Violence: Health Care's Role & Responsibility.  Salt Lake City, UT.

Bartholomew, J.,    Wilde, E.A., Hessel, C.D., Gandhi, P.V., **Bigler, E.D.**, Lowry, C., Ryser, D.K., & Blatter, D.D.  (1998, August 14-18).  Poster Session: Neuropsychology of Head Injury, Medical Disorders, and Psychiatric Disorders.  QMRI of Corpus Callosum in TBI Males: Alcohol Use and Time Postinjury.  106th Annual Convention of the American Psychological Association.  Moscone Center, San Francisco, California, USA.

Blatter, D.D.,      **Bigler, E.D.**, Ryser, D.K., Gale, S.D., Johnson, S.C., Anderson, C.V., Burnett, B.M., McNamara, S., & Bailey, B. (1994, May).  Correlation of The Functional Outcome Measure (FIM) with Quantitative and Semi-quantitative Analysis of MRI Following Traumatic Brain Injury (TBI). American Society of Neuroradiology.

Blatter, D.D.,      Kurth, S.M., **Bigler, E.D.**, Pompa, J., & Ryser, D.K. (1992, August). MRI and CT in traumatic brain injury (TBI): Correlations with quantitative measures of cognitive outcomes. Presented at the meeting of the American Society of Neuroradiology, St. Louis, MO, June, 1992. Presented at the meeting of the Society of Magnetic Resonance in Medicine, Berlin, Germany, August, 1992.

Brickman, A.,       Sullivan, E.D., Jefferson, A., Wilde, E.A., Butters, M., **Bigler, E.D.,** (2007, February)  Not all that matters is gray: The importance of white matter in neuropsychology.  Symposium presentation (E.D. Bigler: Discussant) at 35th Annual Meeting of the International Neuropsychological Society, Portland, Oregon, February 7-10, 2007.

Cato, M.,           Delis, D., Abildskov, T., & **Bigler, E.D.** (2003). Assessing the elusive cognitive deficits associated with orbitofrontal cortex damage:  Case study of a modern-day Phineas Gage [Poster Presentation]. 31st Annual International Neuropsychological Society Conference, Feb 5-8, 2003, Honolulu, Hawaii.

Ciccia, A.,         Taylor, H.G., Rubin, K.H., Dennis, M. **Bigler, E.**, Gerhardt, C., Vannatta, K. & Yeates, K.  (2012, November). Discourse patterns after traumatic brain injury in school-age children. Paper presented at the annual meeting of the American Speech-Language-Hearing Association, Atlanta.

Cleavinger, H.B.,   **Bigler, E.D.,** Wilde, E.A., Hunter, J.V., Li, X., Levin, H. S. (November 15, 2007). Traumatic brain injury, atrophy of the entorhinal cortex and neuropsychological outcome in children [Poster Presentation]. 27th Annual Meeting of the National Academy of Neuropsychology, Scottsdale, AZ.

Cramond, A.,        Woon, F.M., Wu, C., Cannon, P.C., **Bigler, E.D.**, Cleavinger, H.B., Johnson, J.L., Lainhart, J.E. (November15, 2007).  Intellectual function and thalamic volume in autism.  Poster Presentation: 27th Annual Meeting of the National Academy of Neuropsychology, Scottsdale, AZ.

Cullum, C.M.,       & **Bigler, E.D.** (1987, February). Cerebral Lateralization and The MMPI. Paper presented at The International Neuropsychological Society Meetings, Washington D.C.

Delis, D.C.    & **Bigler, E.D.** (2004, March 25-28).  Orbital prefrontal damage: comparison of adult and pediatric cognitive profiles.  Invited Presentation: 14th annual Nelson Butters' West Coast Neuropsychology Conference.  Hilton San Diego Del Mar, Del Mar, California.

Dubray, M.,    Alexander, A., Lee, J.E., Lazar, M.,  Lu, J., Miller, J., McMahon, W., **Bigler, E.D.**, Lainhart, J.E. (2007, May) White matter organization and asymmetry of the superior temporal gyrus and temporal stem in autism. Invited abstract and poster presentation at 6th International Meeting for Autism Research (IMFAR 2007), University of California at Davis, USA.

Farrer, T. J.,    Jivani, S., **Bigler, E. D.**, Dennis, M., Taylor, H. G., Rubin, K., Vannatta, K., Gerhardt, C., Stancin, T., & Yeates, K. O. (2015, February). Chronic MRI findings, ventromedial prefrontal cortex (vmPFC) volume, and behavioral functioning in a pediatric sample with complicated mild traumatic brain injury. Poster presented at the annual meeting of the International Neuropsychological Society, Denver.

Farrer, T. J.,    Jantz, P. B., **Bigler, E. D**., Dennis, M., Taylor, H. G., Rubin, K., Vannatta, K., Gerhardt, C., Stancin, T., & Yeates, K. O. (2014, February). Corpus callosum pathology and processing speed in pediatric traumatic brain injury. Poster presented at the annual meeting of the International Neuropsychological Society, Seattle.

Fearing, M.A.    **Bigler, E.D.,** Norton, M.C., Tschanz, J.T. Hulette, C.M., Leslie, C., Welsh-Bohmer, K.A. (February 7 – 10, 2007).  Confirmed Alzheimer's Disease versus Clinically-Diagnosed Alzheimer's Disease in the Cache County Study on Memory Health and Aging: A Comparison of Quantitative MRI and Neuropsychological Findings. Abstract Presentation: 35th Annual Meeting of the International Neuropsychological Society, Hilton Portland & Executive Tower, Portland, Oregon.

Fearing, M.A.    **Bigler, E.D.,** Norton, M.C., Tschanz, J.T. Hulette, C.M., . Leslie, C., Welsh-Bohmer, K.A. (February 7 - 10, 2007).  Neuroimaging Correlates of the IQCODE in Autopsy-Confirmed Alzheimer's Disease versus Clinically-Diagnosed Alzheimer's Disease: The Cache County Study on Memory Health and Aging. Abstract Presentation: 35th Annual Meeting of the International Neuropsychological Society, Hilton & Executive tower, Portland, Oregon.

Fearing, M.,    Hannan, C.R., White, J., Mortensen, J., Rice, S., Tate, D., and **Bigler, E.D.** (February 5 – 8, 2003).  Dementia, cerebral atrophy, and neuropsychological performance:  Relationship to APOE-$\epsilon$ 4. Poster presented at the 31st Annual International Neuropsychological Society Conference, Feb 5-8, 2003, in Honolulu, Hawaii.

Fleming, D.E.,    & **Bigler, E.D.** (1975). Electroencephalographic Correlates of Sidman Avoidance Responding. Paper read at the Rocky Mountain Psychological Association, Salt Lake City, UT.

Hannan, C.R.,    Fearing M., White J., Mortensen J., Tate D.F, **Bigler, E.D.** (October, 2002).The Mini-Mental State Examination, Temporal Lobe Morphology and Alzheimer's

Bigler, E. D.     94

| | |
|---|---|
| | Disease. Poster accepted for presentation at the 22nd Annual Conference of the National Academy of Neuropsychology, Miami, FL. |
| Hanten, G., | Wilde, E.A., Yallampalli, R., Chu, A., Ramons, M.A., **Bigler, E.D.**, Menefee, D., Vasquez, Li, X., Hunter, J.V., Levin, H.S. (November 7, 2007). The relation between white matter disruption measured by diffusion tensor imaging and decision-making following childhood TBI. Abstract Presentation: University of California, San Diego, New Frontiers in Pediatric Traumatic Brain Injury International Conference, Westin San Diego at Emerald Plaza, San Diego, California |
| Heverly-Fitt, S., | Rubin, K., Ellison, K., Taylor, H. G., Stancin, T., Gerhardt, C., Vannatta, K., **Bigler, E.**, & Yeates, K. O. (2015, March). Examining the relations between social initiations and self-perceptions of social behaviors in children with a TBI. Poster presented as the Biennial Meeting of the Society for Research in Child Development, Philadelphia. |
| Heverly-Fitt, S., | Rubin, K., **Bigler, E.**, Dennis, M., Taylor, H. G., Vannatta, K., Gerhardt, C., Stancin, T., & Yeates, K. O. (2014, February). Investigating a proposed model of social competence in children with traumatic brain injuries. Poster presented at the annual meeting of the International Neuropsychological Society, Seattle. |
| Hopkins, R.O., | McCourt, A., Cleavinger, H., Parkinson, R.B., Victoroff, J., **Bigler, E.D.** (2003, February 5-8). White matter hyperintensities and neuropsychological outcome following traumatic brain injury. Poster presented at the International Neuropsychological Society Thirty-First Annual Meeting, February 5-8, 2003, Sheraton Waikiki: Honolulu, Hawaii. |
| Hopkins, R.O., | Gale, S.D., Pope, D., Weaver, L.K. & **Bigler, E.D.** (2000, February). Ventricular Enlargement in Patients with Acute Respiratory Distress Syndrome. International Neuropsychological Society Twenty-Eighth Annual Meeting. Adam's Mark Hotel, Denver, Colorado. |
| Hopkins, R.O., | Weaver, L.K., Gale, S.D. & **Bigler, E.D.** (1998, May). Neuropsychological Outcome, Brain Perfusion Defects and Quantitative Magnetic Brain Resonance Imaging Following Carbon Monoxide (CO) Poisoning. Undersea and Hyperbaric Medical Society Annual Scientific Meeting, Salt Lake City, UT. |
| Hopkins, R.O., | Weaver, L.K., Gale, S.D., Johnson, S.C., **Bigler, E.D.**, Blatter, D.D., Abildskov, T.J. (1996). Three Dimensional and Quantitative Image Analysis of Neuropathological Changes Following Carbon Monoxide Poisoning. 1996 Undersea and Hyperbaric Medical Society Annual Scientific Meeting, Salt Lake City, UT. |

Hopkins, R.O.,    Weaver, L.K., Gale, S.D., Johnson, S.C., **Bigler, E.D.**, Blatter, D.D., Abildskov, T.J. (1996).  Three Dimensional and Quantitative Image Analysis of Neuropathological Changes Following Carbon Monoxide Poisoning.  1996 Undersea and Hyperbaric Medical Society Annual Scientific Meeting, Salt Lake City, UT.

James, K.,    Pertab, J., **Bigler, E.D** (November 6, 2007). Questionable generalizability for mild traumatic brain injury meta-analysis.  Poster Presentation: 27th Annual Meeting of the National Academy of Neuropsychology, Scottsdale, AZ

Kesler, S.R.,    Foley, H.A. & **Bigler, E.D.** (1998).  Relationships Between Brain Abnormalities and Cognitive-Neurobehavioral Symptoms in Traumatic Brain Injury (TBI) Using Single Photon Emission Computed Tomography  (SPECT), Clinical (MRI) and Quantitative (QMR) Magnetic Resonance.  Twenty-Sixth Annual International Neuropsychological Society Conference, Honolulu, HI.

Kim, J.,    Alexander, A.L., Lainhart, J., McMahon, W., Johnson, M., Lu, J., Jeong, E.K., Lazar, M., **Bigler, E.D.** (June 12 -15, 2005) White matter abnormalities in autistic brain: Diffusion tensor MRI in adolescents and young adults. Abstract Presentation given at Human Brain Mapping Convention, Toronto, Ontario, Canada.

Laatsch, L.K.,    Varney, N.R., Wu, J.C., Hopkins, R.O., & **Bigler, E.D.**  (1998, August 14-18). Symposium: Functional Brain Imaging in Neuropsychology and Rehabilitation. 106th Annual Convention of the American Psychological Association.  Moscone Center, San Francisco, CA.

Lainhart, J.E.    **Bigler, E.D.,** & Alexander, A. (2004, February 11-14).  Neuroimaging in autism: advanced applications and ongoing challenges.  Abstract presented at the Psychiatric Research Society, Park City, UT.

Lainhart, J.,    Johnson, M., Coon, H., McMahon, B., **Bigler, E.D.** &  Tate, D. (2001, February 14-17).  Megalencephaly in autism: A quantitative magnetic resonance imaging study.  Paper presented at Psychiatric Research Society, Park City, UT.

Lee, J.N.,    Alexander, A.L., Lazar, M., **Bigler, E.D.,** Lainhart, J.E. (2008, May) Evaluation of voxel-based analysis methods for DTI studies. Abstract presented at the International Society for Magnetic Resonance in Medicine (ISMRM) 16th Scientific Meeting and Exhibition, Toronto, Ontario, Canada.

Lu, L.,    **Bigler, E.D.** (December, 2000).  Performance of Chinese stroke survivors on Chinese version of Trails B.  Poster session presented at the annual meeting of the National Academy of Neuropsychology, Orlando, Florida.

Merkley, T.,    **Bigler, E.D.** (2009, February 12). Cortical thinning with age progression for traumatically brain injured and typically developing children. [Poster presentation]. Annual Conference of The International Neuropsychological Society, Atlanta Marriott Marquis, Atlanta, Georgia.

Miller, M.J.,    Tate, D.F., Cleavinger, H.B., Rice, S.A., **Bigler, E.D.**, & Victoroff, J. (August 24, 2001).  Exploratory Analyses of Neuroimaging, APOE, and Neuropsychological Performance of Dementia [Abstract].  The Clinical

Bigler, E. D.    96

Neuropsychologist.  Science poster presented at the Annual Meeting Science Program, Division of Clinical Neuropsychology (40) of the American Psychological Association, San Francisco, CA.

Moran, L. M.,    **Bigler, E.**, Dennis, M., Gerhardt, C., Rubin, K., Stancin T., Taylor, H. G., & Vannatta, K. L.., & Yeates, K. O. (2012, February). Relationship between social information processing and perceived social competence in pediatric traumatic brain injury. Paper presented at the annual meeting of the International Neuropsychological Society, Montreal.

Mortensen, J.,    Hannan, C.R., White, J., Fearing M., Tate, D., **Bigler, E.D.** (2003, February 5-8). The Boston Naming Test, dementia, and temporal lobe pathology.  Poster presented at the International Neuropsychological Society Thirty-First Annual Meeting, February 5-8, 2003, Sheraton Waikiki: Honolulu, Hawaii.

Nielson, J.,    **Bigler, E.D.** (2009, February 12).  Subtypes of autism based on corpus callosum microstructure:  A diffusion tensor imaging and neuropsychological study. [Poster presentation]. Annual Conference of The International Neuropsychological Society, Atlanta Marriott Marquis, Atlanta, Georgia.

Orme, S.,    Clark, E., **Bigler, E.D.**, Pompa, J., & Kircher, J.  (1998, August 14-18). Session: Neuropsychological Assessment, Methodological Consideration in Pediatric Traumatic Brain Injury Research.  106th Annual Convention of the American Psychological Association.  Moscone Center, San Francisco, CA.

Piran, N.,    & **Bigler, E.D.** (1981). A Neuropsychological Investigation of the Theory of Schizophrenia. Paper read at the American Psychological Association Meetings, Los Angeles, CA.

Porter, S.,    Anderson, C.V. & **Bigler, E.D.** (1993, October).  A serial study of hippocampal atrophy in neuropsychological outcome of 35 traumatically brain injured patients. Intermountain Neuroscience Chapter Meeting of the Society for Neuroscience, University of Utah, UT.

Ramos, M.A.,    Yallampalli, R., **Bigler, E.D.,** Chu, Z., Hunter, J., Menefee, D., McCauley, S., Levin, H., Wilde, E. (2007, March 29-April 1).  A diffusion tensor imaging study of the cingulate gyrus following traumatic brain injury. Poster presented at the 2007 Biennial Meeting of the Society for Research in Child Development (SRCD), The Sheraton Hotel, Boston, Massachusetts.

Reichman, M.V.,    **Bigler, E.D.**, & Blatter, D.D. (1994, October).  Biomechanics of Cerebral Concussions and Radiographic Considerations.  Medicine in the Intermountain West:  Update 1994, LDS Hospital, Salt Lake City, UT.

Reynolds, C.R.,    **Bigler, E.D.** (1994).  Factor structure, factor indexes, and other useful statistics for interpretation of the Test of Memory and learning (TOMAL). Paper presented at the 1994 annual meeting of the National Academy of Neuropsychology, November, Orlando, Florida.

Rice, S.A,    **Bigler, E.D.**, Lainhart, J., McMahon, W., Coon, H., Ozonoff, S. (2003, February 5-8).  Corpus callosum morphology in autism. Poster presented at the 31st Annual International Neuropsychological Society Conference, Feb 5-8, 2003, in Honolulu, Hawaii.

Bigler, E. D.    97

Rice, S.A.,        **Bigler, E.D.**, Lainhart, J. Tate, D.F., McMahon, W., Coon, H., & Ozonoff, S. (2002, July24-27).  Corpus Callosal Differences in Macrocephalic Autism and Relationship to IQ.  Abstract presented at the International Neuropsychological Society Twenty-Fourth Mid-Year Meeting, July 24-27, 2002, Stockholm City Conference Center: Stockholm, Sweden.

Robinson, K. E.,   **Bigler, E. D.**, Dennis, M., Taylor, H. G., Rubin, K., Vannatta, K., Gerhardt, C., Stancin, T., & Yeates, K. O. (2015, February). <u>Executive function and theory of mind as predictors of social adjustment in childhood TBI: Regional brain injury as a moderator.</u> Paper presented at the annual meeting of the International Neuropsychological Society, Denver.

Robinson, K. E.,   Fountain-Zaragoza, S., Dennis, M., Simic, N., Agostino, A., Taylor, H. G., **Bigler, E.**, Rubin, K., Vannatta, K., Gerhardt, C. A., Stancin, T., & Yeates, K. O. (2013, April).  <u>Cognitive and social-cognitive predictors of social outcome in childhood traumatic brain injury.</u> Poster presented at the National Conference on Child Health Psychology, New Orleans, LA.

Ross, C.,          Hallam, B., Buckwalter, J.G., **Bigler, E.D.**, Brown, W.S. (2003, February 5-8). Regional callosal changes in three forms of dementia.  Poster presented at the International Neuropsychological Society Thirty-First Annual Meeting, February 5-8, 2003, Sheraton Waikiki: Honolulu, Hawaii.

Ryser, D.K.,       Egger, M.J., Horn, S., Handrahan, D., Gandhi, P., & **Bigler, E.D.** (November, 2002).  Predicting changes and length of stay for inpatient rehabilitation after traumatic brain injury. Poster presented at the Annual Meeting of the Academy of Physical Medicine and Rehabilitation in Orlando, Fl. Poster 11, Archives of Physical Medicine and Rehabilitation, 83, p.1647-1648.

Ryser, D.K.,       Johnson, S.C.., Blatter, D.D., Russo, A.A., Barker, L.H., Primus, E., **Bigler, E.D.** (1994, September 25).  Quantitative Analysis of Magnetic Resonance Imaging post TBI: Correlation with the Functional Independence Measure (FIM) on admission and discharge from Rehabilitation.  International Association for the study of Traumatic Brain Injury, St. Louis, MO.

Ryser, D.K.,       & **Bigler, E.D.** (1994, January).  Usefulness of Subjective and Semi-Quantitative Analysis of CT & MR Neuroimaging for Predicting TBI Outcome.  Sheldon Berrol, M.D. Brain Injury Symposium, Salt Lake City, UT.

Shultz, E. L.,     Robinson, K. E., Dennis, M., Taylor, H. G., **Bigler, E. D.**, Rubin, K., Vannatta, K., Gerhardt, C. A., Stancin, T., & Yeates, K. O. (2015, April). <u>The impact of cognitive factors on the relationship between pediatric traumatic brain injury and adaptive functioning outcomes**.** Poster presented at the annual conference of the Society of Pediatric Psychology, San Diego, CA.

Skoog, I.          **Bigler, E.D.,** (August 18, 2003). The Gothenberg Longitudinal Study on Aging. Early life risk factors for dementia. [Abstract Presentation]. 11th Congress of the International Psychogeriatric Association (IPA), Chicago, IL.

Sweet, J.J,      Millis, S.R., Connor, D.J., Hasker, P.D., & **Bigler, E.D.**  (1998, August 14-18). Symposium: Detection of Feigned Cognitive Impairments–Current Issues and Future Approaches.  106th Annual Convention of the American Psychological Association. Moscone Center, San Francisco, California.

Tate, D.F.,      Miller, M.J., Rice, S.A., Cleavinger, H.B., & **Bigler, E.D.** (August 24, 2001). Clinical Significance of Hippocampal Asymmetry in Alzheimer's Disease [Abstract].  The Clinical Neuropsychologist.  Science poster presented at the Annual Meeting Scientific Program, Division of Clinical Neuropsychology (40) of the American Psychological Association, San Francisco, CA.

Tate, D.F.,      Gilbert-Tate, J.J., & **Bigler, E.D.** (February 1998).  Berry's Test of Visual-Motor Integration and the Test of Nonverbal Intelligence: A Comparison Among School Children in India.  Twenty-sixth Annual International Neuropsychological Society Conference, Honolulu, Hawaii.

Taylor, H. G.,      **Bigler, E.**, Dennis, M., Gerhardt, C., Rubin, K., Stancin T., Vannatta, K., & Yeates, K. O. (2012, February). Friendships, acceptance, and social characteristics among children with traumatic brain injury. Symposium paper presented at the annual meeting of the International Neuropsychological Society, Montreal.

Turkheimer, E.      Farace, E., Yeo, R.A., & **Bigler, E.D.** (February 1992). A closer look at gender differences in verbal and performance IQ following unilateral lesions [Abstract]. Journal of Clinical and Experimental Neuropsychology. Poster presented at the annual meeting of the International Neuropsychological Society, San Diego, California.

Weaver, L.K.,      Deru, K., Fearing, M.A., Hopkins, R.O., Foley, J.F., Orrison, W.W., **Bigler, E.D.** (June, 2005) Carbon Monoxide (CO) Poisoning in 12 Young, College-Educated Skiers.  Abstract presented at the Annual Undersea and Hyperbaric Society Meeting, Orlando, Florida.

White, J.,      Mortensen, J., Hannan, C. R., Fearing, M., Tate, D., and **Bigler, E.D.** (Feb 5-8, 2003).Performance on the Logical Memory Measure and Temporal Lobe Atrophy. Poster presented at the 31st Annual International Neuropsychological Society Conference, Feb 5-8, 2003, in Honolulu, Hawaii.

White J.,      Mortensen J., Hannan C.R., Fearing M., Tate D., **Bigler, E.D.** (October, 2002) The Controlled Oral Word Association Measure and Animal Fluency Test and Temporal Lobe Atrophy. Poster accepted for presentation at the 22nd Annual Conference of the National Academy of Neuropsychology, Miami, Florida.

Wilde, E.A.,      **Bigler, E.D.**, (September 27-29, 2007) "Relation of a Composite Fractional Anisotropy Score Using Diffusion Tensor Imaging Tractography to Outcome in Traumatic Brain Injury" Abstract presentation given at NABIS 5th Annual Brain Injury Conference, Westin Riverwalk Hotel, San Antonio, Texas.

Wilde, E.S.,      **Bigler, E.D.**, (September 27-29, 2007). "Glasgow Coma Score Predicts Long-term Cerebral Atrophy in Pediatric Traumatic Brain Injury." Abstract given as an oral presentation at North American Brain Injury Society (NABIS) 5th Annual Brain Injury Conference, Westin Riverwalk Hotel, San Antonio, Texas.

Wilde, E.A.,       Hunter, J.V., Chu, Z., **Bigler, E.D.,** Fearing, M.A., Hanten, G., Li, X., Newsome, M., Scheibel, R., & Levin, H.S., (February 1- 4, 2006) "Diffusion Tensor Imaging in Relation to Cognitive Control in Children Following Moderate to Severe Traumatic Brain Injury".[Abstract] International Neuropsychological Society, 34th Annual Meeting Program & Abstracts, p.201.  Presented at the 34th Annual meeting of the International Neuropsychological Society, Boston Marriott Copley Place Hotel, Boston, Massachusetts, USA.

Wilde, E.A.,       Bartholomew, J., Lowry, C., Ryser, D.K., **Bigler, E.D.,** Gandhi, P.V., Hessel, C.D., Brooks, M., Nielsen, D., & Blatter, D.D.  (1998, August 14-18).  OMRI Correlates With Acute Cognitive and Functional Measures in TBI.  Paper Session: Neuroimaging and Cognition in Traumatic Brain Injury.  106th Annual Convention of the American Psychological Association.  Moscone Center, San Francisco, California.

Wilde, E.A.,       Bartholomew, J., **Bigler, E.D.**, Meyer, K.J., Ryser, D.K., Blatter, D.D., Lowry, C., Brooks, M.P., & Nielsen, D.L.  (1997, August). QMRI and FIM Outcome in Substance-Abusing TBI patients.  Chicago, Illinois.

Wolkowitz, O.M.,   Lupien, S.J., **Bigler, E.D.** (September 8, 2003) The "Post-Steroid Dementia Syndrome":  An Unrecognized Complication of Glucocorticoid Treatment. Poster and Abstract Presentation to be given at the 34th annual congress meeting of The International Society of Psychoneuroendochrinology (ISPNE), Rockefeller University, New York, NY.

Woon, F.M.,        Cramond, A.C., Wu, C., Cannon, P.C., **Bigler, E.D.**, Cleavinger, H.B., Johnson, J.L., Lainhart, J.E. (November 6, 2007). Intelligence scores and amygdala volume in individuals with Autism. [Poster Presentation]. 27th Annual Meeting of the National Academy of Neuropsychology, Scottsdale, AZ.

Wu, C.             **Bigler, E.D.**, Halsey, S., Yallampalli, R., Chu, Z., Li, X, Hunter, J.V., Vasquez, A.C., Levin, H.S., Wilde, E.A.  (2010, February).  Alterations of the cerebral peduncle following severe traumatic brain injury [Poster Presentation]. Annual Conference of The International Neuropsychological Society, Acapulco, Mexico.

Wu, C.,            **Bigler, E.D.,** (2009, February). Longitudinal changes of the corpus callosum pathways subsequent to traumatic brain injury [Poster presentation]. Annual Conference of The International Neuropsychological Society, Atlanta Marriott Marquis, Atlanta, Georgia.

Wu, C.,            Cramond, S., Woon, F.M., Cannon, P.C., **Bigler, E.D.**, Cleavinger, H.B., Johnson, J.L., Lainhart, J.E. (November 6, 2007).  Fusiform gyral volume, intellectual ability and autism [Poster Presentation]. 27th Annual meeting of the National Academy of Neuropsychology, Scottsdale, AZ.

Yallampalli. R.,   Wilde, E.A., **Bigler, E.D.** (September 27-29, 2007). The Relation of Temporal Diffusion Tensor Imaging (DTI) to the Behavior Assessment System for Children (BASC-2) in Traumatic Brain Injury." Poster presentation given at NABIS 5th Annual Brain Injury Conference, Westin Riverwalk Hotel, San Antonio, Texas.

Yeates, K. O.      **Bigler, E.**, Dennis, M., Gerhardt, C., Rubin, K., Stancin T., Taylor, H. G., & Vannatta, K. (2012, February). A heuristic model for the study of social outcomes

Bigler, E. D.      100

in childhood traumatic brain injury. Symposium paper presented at the annual meeting of the International Neuropsychological Society, Montreal.

Yeo, R.A.,          Turkheimer, E., & **Bigler E.D.** (1984). The Influence of Sex and Age on Unilateral Cerebral Lesion Sequelae. Paper presented at the XII annual meeting of the International Neuropsychological Society (INS), Houston, Texas.

## PROFESSIONAL AND HONORARY SOCIETIES:

American Psychological Association
Society for Neuroscience
New York Academy of Sciences
National Academy of Neuropsychologists
Sigma Xi, the Research Society of North America
International Brain Injury Association
International Neuropsychological Society
American Academy of Neurology

## AWARDS AND SCHOLARSHIPS:

Henry Stonnington Award (2015). Award presented by Brain Injury for 1st Place Winner for best review paper in 2014.

President of the International Neuropsychological Society, 2014.

Incoming President of the International Neuropsychological Society, 2013.

Hickman Outstanding Scholar Award:  (2009).  Award presented by Brigham Young University's College of Family Home and Social Sciences to the outstanding scholar of the year.  Award received March 26, 2009 at the 16th Annual Martin B. Hickman Outstanding Scholar Lecture: "The Enchanted Loom: MRI, The Developing Brain and Autism."

Morita Distinguished Fellow (2008).  Presented by the Rehabilitation Hospital of the Pacific, May 21, 2008. "Awarded to international experts in the field of medical rehabilitation and seeks to provide the highest levels of clinical education and training in furthering rehabilitation expertise, primarily for health care providers in REHAB Hospital and in Hawaii."

Award for Scientific Research (2006). North American Brain Injury Society (NABIS), September 15.

Donnette Rachelle White Memorial Award (2006). Brain Injury Association of Utah, October 19, 2006. "for outstanding, dedicated service, and exemplary leadership to the Brain Injury Association of Utah."

Board of Governors, International Brain Injury Association, 2004 – 2006.

Anna Veneri Scientific Award (2003). 5th World Congress, International Brain Injury Association, May 23-26, 2003. Award given for the best scientific poster presentation.  Presented in City Hall, Stockholm, Sweden.  Awarded for the study entitled: "Information processing speed and its relationship to quantitative neuroimaging following moderate and severe traumatic brain injury [Abstract]." by Mathias, J.L., **Bigler, E.D.,** Jones, N.R., Barrett-Woodbridge, M.P., Brown, G.C., Taylor, D.J. Brain Injury, 17, p.136.

Bigler, E. D.      101

President, Intermountain Chapter of Neuroscience, 2002 – 2004.

Treasurer, International Neuropsychological Society, 2001 – 2008.

Karl G. Maeser Distinguished Faculty Lecturer, Brigham Young University, 1999.

Distinguished Clinical Neuropsychologist Award for Career Contributions, National Academy of Neuropsychology, 1999.

Teacher of the Year Award, Department of Psychology, Brigham Young University, 1991-1992.

President, National Academy of Neuropsychologists, 1989-1990.

Outstanding Texas Neuropsychologist: Texas Psychological Association, Healthcare Rehabilitation Center, 1989.

Outstanding Service Award: Texas Association for Education and Rehabilitation of the Blind and Visually Impaired, 1985.

Hogg Foundation Grant (A Neuropsychological contribution to the theory of schizophrenia), 1980-1981.

Dissertation of the Year Award, Department of Psychology, Brigham Young University, 1974-1975.


**EDITORSHIPS, BOARD POSITIONS, ETC.:**

Incoming President of the International Neuropsychological Society

Chair, APA Division 40 Executive Committee, 2006 – 2009

Editorial Board, Neuropsychology, the APA Journal, 2006 – present

Assoc. Editor, Brain Imaging and Behavior Journal, 2006 – present

Treasurer, International Neuropsychological Society, 2001 – 2008

Editor, Texas Psychologist,1978 – 1980

Associate Editor, Journal of the International Neuropsychological Society, 1990 – 2005

Associate Editor: Archives of Clinical Neuropsychology, 1987 – 1998

Consulting Editor, Journal of Clinical and Experimental Neuropsychology, 2000 – Present

Consulting Editor, International Journal of Clinical Neuropsychology, 1978 – 1990

Consulting Editor, Critical Issues in Neuropsychology, Plenum Press, New York, 1984 – 1999

Consulting Editor, Archives of Clinical Neuropsychology, 1986 – 1987

Consulting Editor, Journal of Learning Disabilities, 1986 – 2005

Bigler, E. D.     102

Editorial Board, <u>Neuropsychology Review</u>, 1988 – Present

Consulting Editor, <u>Psychological Assessment,</u> 1990 – 2000

Consulting Editor: <u>Journal of Consulting and Clinical Psychology</u>, 1990 – 1993

Consulting Editor, <u>Neuropsychology,</u> 1993 – Present

Editorial Board, <u>Journal of Psychopathology and Behavioral Assessment</u>, 1998 – Present

Subcommittee Member, (2007). American Academy of Clinical Neuropsychology (AACN) Practice Guidelines for Neuropsychological Assessment and Consultation, <u>The Clinical Neuropsychologist,</u> <u>21</u>(2), 209-231.

Expert Reviewer (2006). Neuroplasticity and brain imaging research: Implications for rehabilitation, <u>Archives of Physical Medicine and Rehabilitation</u>, <u>87</u>(12), Suppl. 2, S1-S93. (This issue sponsored by American Congress of Rehabilitation Medicine.)


**GRANTS (Current and Last 5 years):**

**R01 HD042974 (Tony Simon, Ph.D.)**                                  **10/15/14 – 5/14/15**
NIH/NICHHD                                                                                        ($16,269)
"Visuospatial Cognitive Deficit in Del22q11.2 Syndrome"
The goals of this grant are to identify dysfunctions I the interaction of spatial and temporal processing and masure the resolution of spatiotemporal attentional selection and identify neural substrates of spatiotemporal dysfunction and of hyptergranularity.
Role:  Co-investigator

**1R01HD76885-01 (Keith O. Yeates, Ph.D.)**                            **8/23/13 – 5/31/18**
NICHHD                                                  (Yr 1: $22,180/yr; Yrs 2-5: $66,276/yr)
"Predicting Outcomes in Pediatric Mild Traumatic Brain Injury"
The overall goal of the proposed project is to influence clinical care and extend scientific knowledge of mild TBI in children and adolescents by examining the utility of diagnostic methods commonly used in clinical settings in the prediction of persistent PCS and functional impairments.
Role:  Co-investigator

**W81XWH-13-20095DoD (David Cifu, M.D.)**                            **10/01/13 – 09/30/18**
Virginia Commonwealth University          (Yrs 1-2: $77,679/yr; Yrs 3-5: $174,000/yr)
"Chronic Effects of Neurotrauma Consortium (CENC)"
The Consortium will be focused on basic and preclinical studies to determine the anatomic, molecular, and physiological mechanisms issues with a heavy emphasis on clinical studies to address the comorbidities issues of mild traumatic brain injury (mTBI) sustained by warriors.
Role:  Co-investigator

**1R01HD068432-01A1 (Jeffrey E. Max, MBBC)**                        **09/01/11 – 06/30/16**
DHHS/NIH/Eunice Kennedy Shriver NICHHD                                ($85,585/yr)
"A Psychiatric and Imaging Study of Pediatric Mild Traumatic Brain Injury"
Max, Hesselink, Thompson, Wilde, Bigler
The major goals of this study are to examine the natural history, prediction, and consequences of new-onset psychiatric disorder after mTBI.
Role:  Co-investigator

Bigler, E. D.     103

**Past Research Support**

**R01NS21889 (Harvey Levin, Ph.D.)**                    **02/15/10 – 01/31/14**
NINDS/NIH                              (Yrs 1-2: $8,324; Yr 3: $8.574; Yr 4: $8.831)
"Neurobehavioral Outcome of Head Injury in Children"
Levin, Wilde, Bigler
The major goals of this project are studying changes in cognitive control, motivation, and social cognition in relation to brain regional volumes.
Role:  Co-investigator

**1R01MH080826 (Bigler, Erin D.)**                    **08/01/07 – 07/31/12**
DHHS/NIH/NIMH                                             ($23,010/yr)
"Neuroimaging Analysis of Atypical Neurodevelopment in Autism"
Lainhart, Bigler, Alexander, Lange
The major goal of this longitudinal project is to understand and to identify atypical neurodevelopmental subtypes of autism without associated mental retardation.
Role:  Co-investigator

**1R01HD048946-01A2 (Bigler, Erin D.)**                    **06/01/06 – 05/31/12**
DHHS/PHS                                                  ($80,315/yr)
"Neuroimaging Analysis of Pediatric Traumatic Brain Injury"
Yeates, Bigler, Taylor
The major goal is to do an integrative, multi-level study of the social outcomes of childhood traumatic brain injury.
Role:  Co-investigator 15% (1.8 CM)

Bigler, E. D.     104

# Appendix II

## Background Materials sent to Dr. Erin Bigler

BACKGROUND MATERIALS FOR ERIN BIGLER

Barrett v. USA, US District Court,
Eastern District of Oklahoma Case Nos.
6:04-cr-00115 JHP
6:09-cv-00105 JHP

Federal Defender's Office

January 13, 2017

*These materials were prepared by legal counsel for Kenneth E. Barrett in anticipation of litigation and to facilitate a confidential evaluation by Erin Bigler. These materials are CONFIDENTIAL and are PRIVILEGED as attorney-client confidential communications and/or attorney work product. They may not be divulged without the written prior consent of counsel for Mr. Barrett.*

Joan M. Fisher
Karl Saddlemire
Tivon Schardl
Federal Defender's Office
801 I Street, Third Floor
Sacramento, California 95814
(916) 498-6666

**Index to Materials Provided on CD**

**Pleadings**
1. Tenth Circuit Court of Appeals Remand Order Setting an Evidentiary Hearing on Our Ineffective Assistance of Counsel Claim Due to Failure to Investigate and Present Mitigating Evidence, *U.S. v. Barrett*, 797 F.3d 1207, 1223-31 (10th Cir. 2015)
2. Excerpt from December 4, 2009 Amended 2255 Motion (Social history excerpt from the ineffective assistance of counsel mitigation claim.)

**March 16, 2009 2255 Motion – Exhibits**
3. Declaration of Ada Blount, Exhibit 74
4. Declaration of Brandy Hill, Exhibit 77
5. Declaration of Carl Cook, Exhibit 102
6. Declaration of Carolyn Joseph, Exhibit 78
7. Declaration of Doris Barrett, Exhibit 80
8. Declaration of Ernest Barrett, Exhibit 81
9. Declaration of Gelene Dotson, Exhibit 97
10. Declaration of Gwen Crawford, Exhibit 83
11. Declaration of Issac Barrett, Exhibit 84
12. Declaration of Janice Sanders, Exhibit 85
13. Declaration of Kathy Trotter, Exhibit 86
14. Declaration of Linda Riley, Exhibit 87
15. Declaration of Mark Dotson, Exhibit 98
16. Declaration of Nona Reich, Exhibit 101
17. Declaration of Phyllis Crawford, Exhibit 91
18. Declaration of Roger Crawford, Exhibit 92
19. Declaration of Ruth Harris, Exhibit 93
20. Declaration of Shawn Hill, Exhibit 95
21. Declaration of Steve Barrett, Exhibit 99
22. Declaration of Travis Crawford, Exhibit 45
23. Declaration of Toby Barrett, Exhibit 96
24. Declaration of Warren Dotson, Exhibit 100

**September 25, 2009 Amended 2255 Motion – Select Exhibits**
25. Declaration of Alvin Hahn, Exhibit 75
26. Declaration of Paul Lunsford, Exhibit 90
27. Declaration of Abby Stites, Exhibit 103

**School Records**
28.  Tommie Spear Junior High School & Jay County High School

**Medical Records**
29. Sequoyah Memorial Hospital

30. Eastern State Hospital
31. Saint Francis Hospital
32. Wagoner Community Hospital
33. Bill Willis Community Mental Health Center
34. Miscellaneous Hospital Records
35. State of Oklahoma Disability Determination Unit

**Additional Documents**

36. 2000 Faust Bianco testing
37. 2002 Psychological Evaluation of Bill Sharp, Ph.D.
38. 2003 Faust Bianco's affidavit
39. 2009 Declaration of Bill Sharp, Ph.D.
40. 2009 Declaration of George Woods, M.D.
41. 2009 Declaration of Myla Young, Ph.D.
42. Raw Data from Dr. Young's testing
43. Rescoring of Dr. Young's testing by Dr. Deborah Miora
44. 2005 Psychological Evaluation / Risk Assessment by Dr. J. Randall Price

# Appendix III

## Rule 26 Case List

**DEPOSITIONS OF ERIN D. BIGLER, Ph.D. (Last 4 years, updated January 31, 2017)**

| Date of Deposition | Name of Case | Case # | Attorney Name & Law Firm |
|---|---|---|---|
| January 30, 2017 | Eduardo Narciso v Front Line Concrete Pumping | 14-0406158 | C. Ryan Christensen<br>Siegfried & Jense |
| January 20, 2017 | Robert and Tyanne Crook, as the parents, natural guardians and conservators of Alexander Crook, a Minor; and Alexander Crook, a Minor Child v Scheels All Sports, Inc. | 140400694 | Lynn C. Harris<br>Jones Waldo Holbrook & McDonough |
| November 8, 2016 | Goff v Mountain States et al. | 160500012 | Lloyd R. Jones<br>Petersen & Associates |
| September 20, 2016 | Webb v United Surgical Partners Intl | D-202-CV-2012-04942 | Elicia Montoya<br>McGrinn, Carpenter, Montoya… |
| July 18, 2016 | Feria v Sun City Amusements, Christian Serrano and Joe Reyes | 2014DCV3765 | James Kennedy<br>James Kennedy PLLC |
| July 14, 2016 | McKeen v Schaneman | 110402763 | Gregory Hoole<br>Hoole & King |
| May 12, 2016 | A Legrand Richards and Cindy Richards v Richard Frost and Joann Frost, individually and as Trustees of the Frostwood Family Revocable Trust, Aspen Ridge Management… | 140401719 | Randall K. Spencer<br>Fillmore Spencer |
| April 29, 2016 | Jones v Nichols | C2014-5526 | Patrick E. Broom<br>Russo Russo & Slania, PC |
| March 23, 2016 | Jeff and Amber Lefler v Bloom Recyclers LLC | 110907765<br>Second District Court of Weber County, Utah | Erik M. Ward<br>Gridley Ward & Hamilton |
| March 4, 2016 | Brandon Tueller, an individual and Hope Tueller, an individual and conservator for T.R., on behalf of their minor children, J.T., a minor child, and R.T., a minor child | 140100131 | Tyler Young<br>Young and Kester |
| February 9, 2016 | Cordle v Santos et al. | A-14-701816-C | David A. Cutt<br>Eisenberg Gilchrist & Cutt |
| October 27, 2015 | State of Florida v Jon Herb | 13-1958-CF | Jerry Berry<br>Law Offices of Jerry Berry, PA |
| September 24, 2015 | Kelvin Carr and Krystle Carr v Taylor Industries LLC | 14-5162 | Carson R. Runge |
| September 22, 2015<br>October 28, 2015 | Lance and Lindsay Affleck et al v Hang Time Midvale LLC et al | 140400055 | Rodger M. Burge<br>Parr Brown Gee & Loveless |
| September 16, 2015 | Baudino v Pacificorp et al | 120408020 P1 | Rick Rose<br>Ray Quinney & Nebeker |
| June 29, 2015 | Joe v ANI | D-101-CV-2014-00058 | Scott Borg<br>Barber & Borg |

1530

## DEPOSITIONS OF ERIN D. BIGLER, Ph.D. (Last 4 years, updated January 31, 2017)

| Date of Deposition | Name of Case | Case # | Attorney Name & Law Firm |
|---|---|---|---|
| April 29, 2015 | Rivera v VW and Audi | 2013-CI-00118 | Burgain Hayes<br>Law Offices of Burgain G. Hayes |
| April 27, 2015 | Sindy Leiva, Individually and as Next Friend of Sheila Castillo v Bruce Family Trust, Bruce Robert Booth d/b/a Rundberg West Apartments, Stonewall Property Group, LLC and O'Connor Properties, Inc. | File #8630-43476<br>353rd Judicial District Court of Travis County, Texas | Stephen W. Shoultz<br>Law office of Stephen Shoultz |
| December 10, 2014 | Hoskins v Ogden Auto | 130904254 | Ryan Christensen<br>Siegried & Jensen |
| December 9, 2014 | Romero v Segura | D820-CV-2012-00071 | Nancy Franchini<br>Gallagher Casados & Mann, PC<br>and<br>Pat Shea<br>Rodey Law Firm |
| October 16, 2014 | Albino v Mettler-Toledo LLC | UWY-CV-12-6015169-S | William J. Ronalter<br>Shipman & Goodwin |
| August 14, 2014 | Michael T. Owens v Express B. Trucking aka Express B. Truck aka Express B. an Illinois corporation Nurulla Suleymanov | 14 CV 01 | Don Sullivan<br>Sullivan Law Firm |
| June 19, 2014 | Mychele Reed, as next friend of Tyler Reed, a minor v Jerry Wayne Squire and Strike, LLC, f/k/a Strike Construction LLC | 2013-44914 | John Sloan<br>Sloan Bagley Hatcher & Perry Law Firm |
| April 30, 2014 | Chavez et al v Southern New Mexico Speedway | 04349/0069 | Paul Bishop<br>Butt Thornton & Baehr, PC |
| April 29, 2014 | Elizabeth L. Baker, Mark D. Baker and Jennifer Cannon v Beverly H. Broadbent | 120400664 | Greg Owen<br>Owen Patterson & Owen |
| March 27, 2014 | Gary Bradford Cone v Wayne Carpenter | 97-2312-JPM | Paul Bottei<br>Federal Defenders Office |
| March 11, 2014 | Abdikadir A. Ahmed and Asha Abdi v Gloria Munoz, Nurto S. Osman and Yellow Cab Company | 110409984 | John Holt<br>Winder & Counsel |
| January 14, 2014 and May 27, 2014 | Thomas v Mitsubishi Motors Corp | 110918768 | Jeff Eisenberg<br>Eisenberg Gilchrist & Cutt |
| October 8, 2013 | Jessica S. Sanders, Individually and as Mother, Natural Guardian, and Next Friend of her infant Daughter, Emma Grace Sanders v Eduardo De Los Reyes, M.D.; Larry Patrick Moss, CRNA;; Anesthesia & Pain Specialists of Bowling Green, PLC | 12-CI-00104 | David B. Gazak Ph.D., J.D.<br>Darby & Gazak, PSC |
| August 22, 2013 | Cheryl Ashike; Latanya Yazzie v Mullen Crane and Transport, Inc., Brock Farnworth | 2:12-cv-0011 | Paul Barber<br>Barber & Borg |

**DEPOSITIONS OF ERIN D. BIGLER, Ph.D. (Last 4 years, updated January 31, 2017)**

| Date of Deposition | Name of Case | Case # | Attorney Name & Law Firm |
|---|---|---|---|
| July 3, 2013 | James F. Ebel and Patty Ann Ebel v Joe F. Apache, Turner Enterprises, Inc. a Delaware Foreign Profit Company, Vermejo Park, LLC, a Georgia Limited Liability Company, and Joe Does I through V, inclusive | D-101-CV-2012-01210 | Dan Carvalho<br>Rogers Mastrangelo Carvalho & Mitchell |
| June 24, 2013 | Dylan A. Burrus, by and through his next friend, Hiesha Burrus, et al. v Lear Corporation | 12SL CC00005 | Burgain G. Hayes<br>Hayes, Murphy & Brown |
| June 17, 2013 | Kirkbride v Terex et al | 2:10-cv-660 TC | David R. Olsen<br>Dewsnup King & Olsen |
| March 5, 2013 | Brown v Highland Care Center | 110919494 | George Tait<br>Larson Law |

**TRIAL TESTIMONY OF ERIN D. BIGLER, Ph.D. (Last 4 years, updated January 31, 2017)**

| Date Testified | Name of Case | Case # | Attorney Name & Law Firm | Court Location |
|---|---|---|---|---|
| August 17, 2016 | McKeen v Schaneman | 110402763 | Gregory Hoole<br>Hoole & King | Salt Lake City, UT |
| July 25, 2016<br>and December 6, 2016 | Gary Sampson | | Michael Burt<br>Law Office of Michael Burt | Boston, MA |
| January 13, 2015 | United States v AIC Andrew J. Carroll | Military Court | Capt Roger S. Higgs | Layton, UT |
| September 19, 2013 | Kirkbride v Terex et al | 2:10-cv-660 TC | David R. Olsen<br>Dewsnup King & Olsen | Salt Lake City, UT |

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## PETITIONER'S PROFFER OF EXPERT TESTIMONY

## FROM DR. GEORGE KIRKHAM

**The Florida State University**
Tallahassee, Florida 32306-1127

*College of Criminology and Criminal Justice*

June 8, 2009

Mr. Tivon Scharld
Assistant Federal Defender
Federal Defender's Office
801 1 Street, 3rd Floor
Sacramento, CA 95814

RE:  *United States v. Kenneth Eugene Barrett*

Dear Mr. Scharld:

Pursuant to your request, I would like at this time to submit the following report relative to the above styled matter.

Let me state at the outset that my analysis of the extensive file provided by your office concerning this case discloses extremely serious violations of well established standards and procedures of the law enforcement profession on the part of the Cherokee County Drug Task Force officers who planned and executed the raid on Mr. Barrett's residence which resulted in the shooting death of Oklahoma State Trooper David Eales.

It is my professional opinion as a criminologist and police standards specialist who has evaluated over three hundred law enforcement shooting incidents throughout the nation, and who has also instructed officers and authored widely used training material on police use of force and the handling of critical incidents, that the procedural violations in question resulted in a tragedy which was both foreseeable and preventable. I would like to emphasize that this conclusion remains even if one hypothetically construes all facts in a light most favorable to the Drug Task Force officers who planned and participated in the raid which was conducted just after midnight on September 24, 1999.

In the vast majority of arrest situations, officers know little or nothing in advance about the persons they are seeking to take into custody and usually have no real opportunity to control the circumstances surrounding the encounter. The instant case was very different in this regard. Drug Task Force officers knew well in advance the following important things about Kenneth Barrett which should have resulted in a very different tactical arrest plan than the one which was utilized:

(1) Barrett was thought by officers to be routinely armed and to have often discharged weapons "wildly" on his property during the nighttime hours. One of the firearms in his possession at the time of the raid was believed to be an AR-15 assault rifle, a formidable long range weapon which posed a foreseeable risk of potential harm to officers as well as residents in the immediate area.

1535

(2)

(2) Barrett had a history of antagonistic encounters with law enforcement officers and had reportedly verbalized homicidal threats against the police, including a determination not to be taken alive. He reported "guarded" his residence at all times.

(3) Barrett had a known serious history of methamphetamine use. Individuals under the influence of this substance commonly exhibit paranoid ideation, sleeplessness, high anxiety and mental confusion. They are often fearful of being attacked by others, including rival drug dealers and police. Their potential for violence is accordingly high.

(4) The terrain surrounding Barrett's cabin was extremely exposed and afforded officers poor cover and concealment during an approach. The seemingly arbitrary decision to conduct this operation under conditions of darkness greatly compounded the danger involved.

Despite knowledge of the aforementioned dangerous circumstances, and a realization that the arrest plan was inherently "high risk" in nature, Drug Task Force officers inexplicably orchestrated and executed what can only be characterized as a chaotic midnight raid on Barrett's armed residence, led by a white unmarked Ford Bronco containing the decedent Trooper Eales and Trooper Hamilton, who cut across a field and rapidly drove toward the cabin with their high beams on—an act which elicited a hail of gunfire from Mr. Barrett's AR-15 rifle and an ensuing firefight.

The case record reveals *absolutely no exigent circumstance* which would have justified such an extremely reckless course of police conduct, given the availability of alternative safe methods for taking a person such as Mr. Barrett into custody.

I have personally examined many situations over the years in which police officers shot other officers simply because they didn't realize they were police (indeed, one such fatal incident occurred earlier this week in New York), as well as incidents where offenders discharged weapons at persons they didn't realize were police officers. I have also examined tragic instances involving nighttime gunfire exchanges between law abiding home owners and police officers which resulted in injury or death because residents mistook police for intruders.

It is obviously imperative that law enforcement officers make their purpose and presence clearly known, unless concerns over the destruction of evidence or imminent danger to themselves or others dictate otherwise. Despite the fact that Task Force members were in possession of a "no-knock warrant," any concern about loss of evidence should have been eclipsed by the issue of officer safety, given what was known about Mr. Barrett's possession of firearms and personal instability.

The precipitous decision by the Cherokee County Drug Task Force to rush Kenneth Barrett's house unannounced, under conditions of darkness, using unmarked vehicles in the lead was a grossly reckless action and one foreseeably likely to evoke a violent response from Kenneth Barrett. *The manner in which this arrest operation was conducted renders unanswerable the important question of whether Barrett realized he was under*

(3)

*siege from law enforcement officers, as opposed to narcotics dealers or others whom he believed might do him harm.* Concern for the safety of all involved, including the arresting officers, *should have mandated making every reasonable effort to assure that Mr. Barrett realized this was a law enforcement operation.*

From a tactical standpoint, the arrest plan should have involved *consideration of the potential for a barricaded gunman situation.* This very real possibility would indicate initial establishment of a safe perimeter around the property by members of the O.H.P. tactical team, including snipers, as well as the presence of trained crisis negotiators at the scene prior to any attempt to initiate communication with Barrett. Plans should also have been made to bring to the location resource persons who could be of assistance in persuading Mr. Barrett to surrender should he refuse to do so (e.g., family members, mental health counselors, clergy-- anyone whose presence might be helpful should a crisis situation develop).

Let me represent to you that from a professional police standards and procedures standpoint, the accepted tactical sequence in this type of situation (absent imminent danger to another person) is always:  (1) Talk them out; (2) Force them out (e.g., by cutting power to the residence, use of tear gas projectiles, etc.); (3) Take them out;  It should be noted that entry and confrontation are regarded as a *last resort* because of the obvious danger involved and should be attempted only when negotiations to persuade the person to surrender have clearly been exhausted.

In the case at hand, communication with Mr. Barrett should and could have been initiated from sufficient distance and cover to afford Task Force officers a reasonable degree of safety. Marked patrol cars with their overhead emergency lights operating should have been positioned outside the gate to Barrett's property in a highly visible position. Service of the warrant under daylight conditions would have afforded officers better visibility of the cabin and the area immediately surrounding it, as well as resolving any question as to Barrett's awareness of the presence of law enforcement. Given the fact that Barrett ostensibly had neither a land line nor a cell phone, a patrol car P.A. or bullhorn could have been utilized from a position of cover to announce that officers were there to execute a warrant for his arrest, and to order him to exit the cabin with his hands empty and in view. In this kind of widely employed apprehension scenario, Task Force members would not have needlessly exposed themselves to potential gunfire or risked misidentification, and all communications by police negotiators seeking to persuade Kenneth Barrett to surrender would have been conducted from a safe position. After reviewing the circumstances surrounding this incident, one is led inexorably to ask why the Cherokee County Drug Task Force would not have opted to use a vastly safer method of apprehension.

Caution, patience and a prioritizing of safety are essential elements in the handling of such a potentially dangerous arrest. The passage of time usually works to the advantage of officers, with most such encounters eventually being resolved without serious injury or loss of life to anyone. Unfortunately, the Cherokee County Task Force officers who participated in this raid, including Tactical Team Commander Kerry Pettingill, evidently lacked essential training and experience in the planning and execution of such arrests.

(4)

In conclusion, it is my considered professional opinion that the violations of well established standards and procedures of the police profession discussed in this report were a significant cause of the preventable violence which occurred at Kenneth Barrett's residence on September 24, 1999.

Please do not hesitate to contact me further at this time should you require any additional information or clarification of any of the points made in this report.

Very truly yours,

George L. Kirkham
Professor Emeritus

1538

# Appendix A

## Curriculum Vitae of Dr. George Kirkham



*Dr. George Kirkham and Associates, Inc.*

_____

**Criminal Justice Consultants**

# Professional Vita

### Education

B.A. Criminology, California State University at San Jose
("With Distinction" and "Departmental Honors in Criminology")

M.S. Criminology, California State University at San Jose

D. Crim., University of California at Berkeley

### Present Occupation

Professor Emeritus, College of Criminology and Criminal Justice, Florida State University, Tallahassee, Florida.

### Law Enforcement Consultation

Experience as a private consultant and expert witness for both plaintiff and defense in over 1,500 cases of civil litigation arising from police actions, private security operations and jail and confinement conditions in nearly every state.

Executive Director and Certification Board Member of the National Academy of Police Specialists (N.A.P.S)

Former Associate Member: International Association of Chiefs of Police (l.A.C.P)

Former Member: Police Benevolent Association (P.B.A.)

Certified Police Officer, State of Florida (1973-1992)

Author, with Professor James D. White, of a series of police civil liability training videos and instructional manuals currently in use throughout the United States (See "Publications") in the training of both line officers and administrators.

Past Member, Board of Directors, Americans for Effective Law Enforcement;
A.E.L.E. is a non-profit legal research organization founded by Fred lnbau, John Henry Wigmore Professor of Law Emeritus at Northwestern University; it serves the law enforcement profession through amicus curiae briefs, publications, workshops and research programs.

Member, Board of Directors, International Law Enforcement Stress Association (ILESA).

Director, National Conference on Stress in Policing (Orlando, Florida).

**Served as an instructor, lecturer, or consultant to the following agencies and organizations:**

Callahan Commission, Massachusetts Police Training Council

British Metropolitan Police, Peel Centre

New York City Police Department, Police Benevolent Association

NBC News, for proposed documentary on convicted mass-murderer Theodore Bundy

Detroit Police Officers' Association

Philadelphia Police Department

Pennsylvania State Police

Virginia State Police

Maine State Police

Yonkers, New York, Police Department

Police Officers Association of Michigan

Albuquerque, New Mexico Police Department

Cincinnati, Ohio Police Department

Dayton, Ohio Police Department

Roanoke, Virginia Police Department

Toronto Metropolitan Police

United States Military Police Training Center, Fort McLellan, Alabama

United States Treasury Department, Consolidated Federal Law Enforcement Training Center

Federal Bureau of Investigation, Quantico, Virginia

Northwestern Traffic Institute

International Association of Women Police

North Carolina Law Enforcement Officer's Association

Advisory Council on Sheriff Affairs, Lorain, Ohio

Florida Sheriff's Association

Florida Peace Officer's Association

State of Indiana, Fraternal Order of Police

Southern Police Institute

Law Enforcement Assistance Administration (L.E.A.A.)

Kenosha, Wisconsin Professional Police Association

Ohio Association of Police Chiefs

Western Colorado Peace Officers Association

National Association of State Directors of Law Enforcement Training (N.A.S.D.L.E.T.)

Florida Police Standards and Training Commission

Jacksonville, Florida Police Department

St. Petersburg, Florida Police Department

Tallahassee, Florida Police Department

Office of the State Attorney, 16th Judicial Circuit of Florida (for investigative evaluation of organizational and personnel problems within the Key West, Florida Police Department)

Office of the State Attorney, 15th Judicial Circuit of Florida, Palm Beach County, Florida

Office of the State Attorney, Miami, Florida

Member, Selection Board for Chief of Police for Fort Walton Beach, Florida

New Port Richey, Florida Police Department

National Institute for Occupational Health and Safety, U.S. Department of Health,

Education and Welfare (for police stress research)

Leon County Sheriff's Department

Florida Highway Patrol

National College of District Attorneys

California District Attorneys' Association

Florida Criminal Justice Educators Association

Americans for Effective Law Enforcement (A.E.L.E.), Evanston, Illinois, Past Board Member

Florida Public Defenders Association

Florida Professional Practices Council

State of Utah Peace Officers Association

Columbia, South Carolina Criminal Justice Academy

Wisconsin Department of Justice

Florida Police Task Force, Governor's Committee on Criminal Justice Standards and Goals

Utah League of Cities

**Other Professional Experience**

Research Criminologist, Systems Analysis Division, Stanford Research Institute, Menlo Park, California.

Project Director and Research Associate,The Center for Interdisciplinary Studies, California State University at San Jose

Consulting Editor, Journal of Police Science and Administration

Editorial Consultant, Harper and Row Publishers, Media Division

Graduate, Florida Police Standards and Training Academy

Police Patrolman, City-County of Jacksonville, Florida

Police Officer, City of Tallahassee, Florida

Deputy Sheriff, Leon County, Florida

Agent, Organized Crime Division, Broward County Sheriff's Department under U.S. Department of Justice Grant

Correctional Counselor, California Department of Corrections, Soledad State Prison

Director, National Study of Jail Inmates on Work Release, Santa Clara County Jail, Elmwood Rehabilitation Facility

Doctoral level counseling under supervision of psychoanalyst Bernard L. Diamond, M.D., at Langley Porter Neuropsychiatric Clinic and Mount Zion Hospital Outpatient Psychiatric Clinic

## Published Works:

**Books**

George Kirkham & Leonard Territo, Ivory Tower Cop (Durham: Carolina Academic Press, 2009).

George Kirkham & Leonard Territo, Criminal Investigation Instructor's Manual for Ivory Tower Cop
(Durham: Carolina Academic Press, 2009).

Leonard Territo & George Kirkham, International Sex Trafficking of Women and Children: Understanding the Global Epidemic (New York: Looseleaf Law Publications, 2010).

George L. Kirkham & Laurin Wollan, Introduction to Law Enforcement (New York: Harper and Row, 1979). George L. Kirkham, Signal Zero: The True Story of a Professor Who Became a Cop (New York: J.B. Lippincott, 1976). Selected by Book-of-the- Month Club as November 1976 Alternate. (Motion picture options sold to David Hartman of ABC)

George L. Kirkham, Signal Zero: The True Story of a Professor Who Became a Cop, (New York: J.B. Lippincott, 1976). Selected by Book-of-the-Month Club as alternate.

**Educational Films & Video Tapes**

George L. Kirkham and James D. White, Police Human Relations: Non-Verbal Communication, Parts I, II, & III (Tallahassee, Florida: The Florida State University and the Tallahassee Police Department, Freestyle Productions,(1989)

George L. Kirkham and James D. White, Police Civil Liability: Negligent Operation of Police Motor Vehicles (New York: Harper and Row, 1978)

George L. Kirkham and James D. White, Negligent Use of Police Firearms (New York: Harper and Row, 1978).

George L. Kirkham and James D. White, Police Use of Deadly Force (New York: Harper and Row, 1979).

George L. Kirkham and James D. White, Excessive Force and the Police (New York: Harper and Row, 1979).

George L. Kirkham and James D. White, Police Supervisory Liability (New York: Harper and Row, 1979).

George L. Kirkham and James D. White, Police Officers and the Federal Civil Rights Act (New York: Harper and Row, 1979)

George L. Kirkham, Police: The Human Dimension: "Stress" (New York: Harper and Row, 1976)

George L. Kirkham, Officer Stress Awareness (New York: Harper and Row, 1976)

George L. Kirkham, Internal Adaptations to Stress in Modern Law Enforcement New York: Harper and Row, 1976)

George L. Kirkham, External Reactions to Stress in Policing (New York: Harper and Row, 1976).

George L. Kirkham, The Police Marriage: Personal Issues (New York: Harper and Row, 1976).

George L. Kirkham, Police Children: Issues and Problems (New York: Harper and Row, 1976).

George L. Kirkham, The Police Marriage: Social Pressures Affecting It (New York: Harper and Row, 1976).

George L. Kirkham, Police Authority and Informal Discretion, Part I (New York: Harper and Row, 1976).

George L. Kirkham, Police Authority and Informal Discretion, Part II (New York:Harper and Row, 1976).

George L. Kirkham, Minorities and the Police (New York: Harper and Row, 1976).

* Recipient of the Golden Eagle Award, Council on International Non-Theatrical
* Events: selected to represent the United States in motion picture events abroad.  Also awarded The Chris Plaque, Columbus Film Festival (1976).

George L. Kirkham, Police Ethics: Part I (New York: Harper and Row, 1976).

George L. Kirkham, Police Ethics: Part II (New York: Harper and Row, 1976).

George L. Kirkham, The Police Officer in the Community Part I (New York: Harper and Row, 1976).

George L. Kirkham, The Police Officer in the Community: Part II (New York: Harper and Row, 1976).

**Articles and Professional Papers**

George L. Kirkham, "Police Firearms Accidents," Police (May, 1989), Vol. 12, No.3.

George L. Kirkham and James D. White, "Body Language and Policing: A Training Series," Parts I, II, & Ill  (Tallahassee, Florida: The Florida State University,1990)
George L. Kirkham, Convener, "Death Behind Bars," (Panel Presentation on the problem of suicide in Jails and Prisons), Southern Conference on Corrections, (February, 1989).

George L. Kirkham and James D. White, "A Police Civil Liability Handbook," Harper and Row, 1976).

George L. Kirkham, "The Policeman and the Law: A Changing Perspective," Barrister (December, 1976).

George L. Kirkham, "The Criminologist as Police Officer; A Participant-Observation Study," paper presented to the American Society of Criminology; subsequently published in Donal E.J. MacNamara and Frank Reidel, Police: Problems and Prospects  (New York: Praeger, 1975)

George L. Kirkham, "On the Etiology of Police Aggression in Black Communities," paper presented to the American Society of Criminology (1974).

George L. Kirkham, "Doc Cop," Human Behavior (May, 1975).

George L. Kirkham, "A Professor's Street Lessons," F.B.I. Law Enforcement Bulletin (March, 1974); reprinted as "From Professor to Patrolman: A Fresh  Perspective on the Police," The Journal of Police Science and Administration  (May, 1974): also reprinted by numerous law enforcement journals throughout the world, including Interpol.

George L. Kirkham, "Jail Inmates on Work Furlough," with T. Conway Esselstyn, Ph.D., et. al., Criminologica (November, 1969). Also presented by Dr. Kirkham at the joint annual meeting of the American Society of Criminology and the American Association for the Advancement of Science (1968).

George L. Kirkham, "Evaluating Work Furlough," with Alvin Rudoff, Ph. D., et. al., Federal Probation (March, 1971).

George L. Kirkham, "The Potential Rehabilitative Role of Work Release Programs for Jail and Prison Inmates," paper presented at the First Inter-American Congress on Criminology, San Juan,  Puerto Rico, 1971

George L. Kirkham, "The Utility of lnternships as an Educational Device in the Field of

Criminology," paper  presented (in absentia) at the Second Inter-American Congress of Criminology, Caracas, Venezuela (1971)

"Work Release Programs for Jail Inmates: Their Economic and Rehabilitative Value" with T. Conway Esselstyn, Ph.D. and Alvin Rudoff, Ph.D.

**Research Grants**

"Model Police Interpersonal Communications Training Project," Law Enforcement Assistance Administration

"Training Municipal Police in Community Relations and Emotional Control Skills," Law Enforcement Assistance Administration

"Enrichment of the Criminology Curriculum at Florida State University"

"Training Correctional Personnel in Stress Management Techniques," National Institute of Corrections and Florida Division of Corrections (with Professor James D. White)

**National Recognition and Community Service Awards**

Innovative research and work in the field of law enforcement have been the subject of numerous national media programs and publications, including:

CBS "60 Minutes"

NBC "Tomorrow Show"

ABC "Good Morning America"

Newsweek

U.S. News & World Report

People Magazine

Reader's Digest

J. Edgar Hoover Award ". . . for outstanding contributions to effective law enforcement" (Miami Beach, 1976)

Distinguished Service Award, Reserve Law Officers Association of America

26th Annual Freedom's Foundation at Valley Forge Award for the 1975 article, "What a Professor Learned When He Became A Cop"

"Award of Appreciation in Recognition of Outstanding Service on Behalf of Municipal Police in the State of Ohio," Ohio Association of Chiefs of Police

"Award of Recognition," Toronto Metropolitan Police

Optimist International Award for Outstanding Service to Law Enforcement"

"Award in Recognition of Outstanding Service to Law Enforcement Nationwide," Florida Peace Officers Association

"Award for Outstanding Contributions to Law Enforcement Education and the American Justice System," California Association of Justice Educators

"Award of Recognition," Southern Police Institute, University of Louisville

Listed in "Who's Who in Law Enforcement"

Founder, Officer Ernest Ponce de Leon Memorial Law Enforcement Scholarship at Florida State University College of Criminology and Criminal Justice

# Appendix B

## Rule 26 Case List

# Rule 26 Case List for Dr. George Kirkham

## 2016

ALAIN WILLIAM LOPEZ-CAZORLA V. C & L ENTERPRISES DBA OAKRIDGE CENTER & DON ASHER & ASSOC., INC

ATTY: MELISSA CROWLEY


KEOMANIVONG, ET AL V. THE HOLDER GROUP RED GARTER LLC, ET AL.

CASE # CV-C-13.888

ATTY: PRIYA NAVARATNASINGHAM


JESSE STRONG V. 2825 CENTRAL LLC DBA SUNRISE TOWER APTS & TRIUMPH HOUSING MGMT.

ATTY: DANIELLE BALCZON


MALIKA WEST, ET AL V. EAGLES CRESTE HOUSING PARTNERS, L.P., ET AL.

ATTY: JOHN BEY


JASMINE LANDERS, ET AL V. HIGHLANDS AT EAST ATLANTA, L.P., ET AL.

ATTY: JOHN BEY


ESTATE OF AARON BRUCE CADMAN V. STEPHEN DENNIS POLICE OFFICER, TOWN OF HENNIKER POLICE DEPT. & TOWN OF HENNIKER

CASE # 1:16-CV-00202

ATTY: GEORGE T. CAMPBELL, III


LAWRENCE FAULKENBERRY V. CALDWELL COUNTY, ET AL.

U.S. DISTRICT COURT FOR THE WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

CASE # 1:15-CV-01089

ATTY: TREK DOYLE

2

ESTATE OF BILLY COLLINS, JR. V. LOUISA POLICE DEPT.

U.S. DISTRICT COURT

CASE # 16-CV-00068-HR W

ATTY: MICHAEL J. CURTIS


STATE OF FLORIDA V. JASEN WILLIAMS

CASE # 2015CFR009567AXX

ATTY: MARC SHINER


STATE OF FLORIDA V. RICHARD LUCIBELLA

ATTY: MARC SHINER


MARTINEZ V. CITY OF BUDA & WALMART

ATTY: ROBERT L. RANCO


TERRY, BRIEANNE V. AFFINITY AT WINTER PARK APT. HOMES

ATTY: JAMES T. LYNCH


ESTATE OF KEVIN MATTHEWS

U.S. DISTRICT COURT

CASE # 2:16-CV-13763-GCS-SDD

ATTY: MILTON H. GREENMAN/ERIK L. PROULX


VELAZQUEZ V. BENITES

ATTY: ALEXANDER LANGMO OF ADAM/COOGLER

3

GRAYSON, EDDIE V. FORREST PARK SOUTH

CASE # 2013-CA-024226

ATTY: CHRISTOPHER CURRY


DAWN A. DONIGAN V. PUBLIX SUPER MARKETS, INC.

CASE # 12-000079

ATTY: MATTHEW D. WEISSING


BREAION KING

ATTY: BROADUS A. SPIVEY


CRISP V. CITY OF AUSTIN

ATTY: BROADUS A. SPIVEY


CHERRIE OSBORNE V. BRECK BULLOCK, MCDONALD'S USA, LLC, & VALDES ENTERPRISES, LLC.

CASE # 2015-CP-26-848

ATTY: KEITH GIESE/DAVID SCOTT


DALMATA V. WALMART

ATTY: JOHN K. LAWLOR


BETTY J. ALEXANDER V. CORINE FINKEL GOODSTEIN FKA CORINE FINKEL, AS TRUSTEE, ET AL.

CASE # 2014-CA-011386-0

ATTY: BARRY S. BALMUTH


JAVIER VILA & MARY ISABEL VILA CSC BRAZILIAN, LP – DBA BRAZILIAN COURT HOTEL

CASE # 0326-0072-00

ATTY: DAX DIETIKER

4

MARIA GOMEZ V. EL PALACIO DELA COMIDA, LLC

CASE # GL-15701

ATTY: JAY KELL/HOWARD A. KRIGSMAN


JAMES SIZER V. CITY OF AUSTIN

CASE # 1:15-CV-01143-SS

ATTY: BOBBY R. TAYLOR


ESTATE OF MELFORD J. LITTLE V. TOWN PARK PLAZA NORTH CONDOMINIUM ASSN., INC. ET AL.

CASE # 1:15-006573-CA-01 (21)

ATTY: PHILLIP J. MITCHELL, JR.


ALEXIS DIXON

ATTY: JASON NEUFELD/DAVID KLEINBERG


CHRISTOPHER FRANCOIS V. YOUTH SERVICES INTERNATIONAL, INC.

CASE # 14505.1 DMK

ATTY: DAVID M. KERNER


JOHN MARTIN CRIST V. YOUTH SERVICES INTERNATIONAL, INC.

CASE # 14592.1 DMK

ATTY: DAVID M. KERNER


AREZOUMANDIFAR, ALI E/O V. BOYNTON SHOPPES, LLC, ET AL.

CASE # 20151068

ATTY: EDWARD V. RICCI


5

GILL, RYAN E/O V. THE BACKYARD BOYNTON BEACH

CASE # 20130600

ATTY: ADAM S. HECHT


COREY PATERNOSTER V. TOWN OF STRATFORD, ET AL.

ATTY: TIMOTHY M. RAMSEY


NEILLY, THEODORE V. CITGO

ATTY: LOUIS A. DEFREITAS, JR.


OLOF MARCUS KANGRO

ATTY: WILLIAM R. PONSOLDT, JR.


STEWART/CHAPMAN V. HAMPTON COURT

BROWARD COUNTY COURT

CASE # 502014CA013917XXXXMB

ATTY: JOHN K. LAWLOR


ANDREW TONY V. PIZZA HUT OF AMERICA, INC.

CASE # 16-2014-CA-003210

ATTY: MICHAEL P. MORAN


HENDERSON V. VILLAGE OF TEQUESTA

CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT IN PALM BEACH COUNTY

CASE # 50-2114-CA001124-XXXXMB

ATTY: BARRY BALMUTH


FERGUSON, GLENN V. UNIVERSAL STUDIOS

ATTY: VINCENT M. D'ASSARO

6

DAVIS, CHRIS V. ESTERLINE CONSTRUCTION & EDMONSTON

CASE # 2014-CA-003392

ATTY: RONALD L. HARROP


RONALD HARRISON V. ROBERT BAKER & STATE FARM CLAIM #005404225

ATTY: LAURIE PRIMUS


**2015**


SHAMONI GIBBS ADMINISTRATOR OF THE ESTATE OF WILLIAM C. GIBBS III V. WAFFLE HOUSE STORE1919, LENIOR COUNTY, CHRIS HILL LENOIR COUNTY SHERIFF, DEPUTY JOSEPH HECK, DEPUTY WILLIAM AARON SHAMBEAU

UNITED STATES DISTRICT COURT, EASTERN DISTRICT OF NORTH CAROLINA

CASE # 5:15-CV-00008-BO

ATTY: SEAN WILLIAMS


THOMAS MCCRODEN V. COUNTY OF VOLUSIA, JOEL V. BRESSETT, DENNIS D. PAINTER

FLORIDA MIDDLE DISTRICT COURT

CASE # 6:14-CV01139-GKS-KRS

ATTY: DAVID A. VUKELJA


HOLLY MULVEY, DONALD D. CLARK V. CONTINENTAL PROPERTY SERVICES, INC. D/B/A GOLFVIEW APARTMENT

7TH JUDICIAL CIRCUIT COURT, VOLUSIA COUNTY, FLORIDA

CASE # 2015-3038-CI-CI

ATTY: THOMAS E.N. SHEA


CALVON REID, ET AL. V. COCONUT CREEK POLICE DEPARTMENT

U.S. DISTRICT COURT – COUTHER DISTRICT OF FLORIDA

CASE # 0115-CV62116-FAM

7

1555

ATTY: PATRICK A. QUINLAN


PETE HERNANDEZ V. CITY OF AUSTIN, ET AL.

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

CASE # 1:14-CV-00492LY

ATTY: ROBERT L RANCO


ESTATE OF ARTHUR GREEN V. TAMPA POLICE DEPARTMENT

CASE # 8:15CV226-T-35MHP

ATTY: PAUL W. REBEIN


MECKLER V. OCDC

COURT OF COMMON PLEAS – STATE OF S.C. COUNTY OF ORANGEBURG

CASE # 2011-CP-3862

ATTY: ANDREW J. BROWN


JULIO ISMAEL ORTEGON V. HIS MAJESTY VICTOR SAINT ADAM, TEXAS HILLTOP, LLC D/B/A CLUB MAJESTY

11TH DISTRICT COURT, WEBB COUNTY, TEXAS

CASE # 2013-CVT-001876-D2

ATTY: MALORIE J. PEACOCK


LOUIS MESSINGER, ET AL V. ESTATE OF MICHAEL, ET AL

CASE # 13-001834-CI (SETTLED)

ATTY: GEORGE H. FEATHERSTONE


DIETER HARSTER V. OFF THE HOOKAH

CASE # 2014-CA-006247AI

15TH JUDICIAL CIRCUIT – PALM BEACH COUNTY

8

ATTY: ADAM S. HECHT

JOHN PHARR V. CHRISTOPHER WILLE, ET AL

UNITED STATES DISTRICT COURT, WESTERN DISTRICT OF TEXAS AUSTIN DIVISION

CASE # 1:14-CV-762-LY

ATTY: PAUL A. BATRICE

KING V. CITY OF ATLANTA

CASE # (SETTLED)

ATTY: JAMES D. MCGUIRE

GLENN & SHARON MEADOWS, AS PARENTS AND NATURAL GUARDIANS OF ALLISON LYNN MEADOWS, AND SHARON MEADOWS IN HER OWN RIGHT V. TARGET CORPORATION

CASE # GD-13-017250

ATTY: MICHAEL T. COLLIS

ROSEMARY SULLIVAN V. THE CITY OF ROUND ROCK, TEXAS, RCI HOSPITALITY HOLDINGS, INC F/K/A RICK'S CABARET INTERNATIONAL, INC.

UNITED STATED DISTRICT COURT, WESTERN DISTRICT OF TEXAS, AUSTIN DIVISION

CASE # 1:14-CV-0039-LY

ATTY: BROADUS A SPIVEY

ESTATE OF WENDY LAWRENCE V. CHAD LAVOIE

CASE # 1:14-CV-00570-PB

ATTY: CHARLES G. DOUGLAS, III

MCKENZIE COCHRAN V. NORTHLAND CENTER

CASE # 2014-139084-NI (SETTLED)

9

ATTY: MILTON H. GREENMAN

ANTONIO ADAMS V. KWIK STOP

STATE OF FLORIDA DISTRICT COURT

CASE # 247-3293

ATTY: MICHAEL F. SUTTON

JOHN BRAGDON, EASTPORT PLAZA

STATE OF FLORIDA DISTRICT COURT

CASE #2013-CA-002528

ATTY: ADAM S. DONER

LAIDLAW V. ABFZ, LLC D/B/A/ MIDWAY ARCADE

STATE OF FLORIDA DISTRICT COURT

CASE # 562013-CA-002613

ATTY: STEVEN A MESSER

STATE OF FLORIDA V. LUIS ESTEVANELL

STATE OF FLORIDA DISTRICT COURT

CASE # F12-19150

ATTY: JAMES MCGUIRK

MOSHE V. BERGER

PALM BEACH COUNTY DISTRICT COURT

CASE # C0075313-01

ATTY: JOHN B. MARION, IV

MOHAMED V. DAVID MORGAN, ET AL.

CASE # SETTLED

ATTY: MARIA BOGOMAZ & KATHRYN HEFFNER

10

LILLIE ASHON V. FLORIDA CITY

STATE OF FL – DIV. OF ADMIN HEARINGS – OFFICE OF THE JUDGE OF COMPENSATION CLAIMS – MIAMI DIST OFFICE

CASE # 14-016-37SMS

ATTY: BARRY A PEMSLER


RODNESHA SPARKS V. SUN-BEACH INVESTMENT COMPANY, ET AL.

EIGHTEENTH JUDICIAL CIRCUIT – BREVARD COUNTY

CASE # 05-2012-CA-066337C

ATTY: IAN L. KOVEN


MIRIAM NELIDA GIGENA, INDIVIDUALLY AND AS REP. OF ESTATE OF CRISTHIAN EDUARO CARDOZO, AND AS FRIEND OF CHRISHIAN GEANNY CARDOZO, AND LEANNE PARLA CARDOZO, MINORS V. WAL- MART STORES TEXAS, LLC, ANTONIO DE LA CRUEZ

268TH JUDICIAL DISTRICT COURT OF FORT BEND COUNTY, TEXAS

CASE # 14-DCV-219810

ATTY: ROBERT S. KWOK


TOBY HAMPTON V. MOTEL 6

ATTY: ALEX J BROWN


SHELLEY V. S.C. HIGHWAY CONTROL

RICHLAND COUNTY COURT HOUSE – COLUMBIA, SC

CASE # 2014-CP-3202557

ATTY: LAUREN V. KNIGHT


GIRALDO V. CITY OF HOLLYWOOD, FLORIDA, ET AL

U.S. DISTRICT COURT – SOUTHERN DISTRICT OF FLORIDA

CASE # 2014-6178-CIV

11

ATTY: ANGELA BARBOSA


KELLY DUFAULT V. OAK PARK

9TH JUDICIAL COURT IN OSCEOLA COUNTY, FL

CASE # 2013-CA-002176-ON

ATTY: CAREY N. BOS


DOE V. CATALINA VILLAGE APARTMENTS

165TH DISTRICT COURT OF TEXAS

CASE # 2014-16896-I

ATTY: JARED LEVINTHAL


STATE OF FLORIDA V. NOEL

STATE OF FLORIDA DISTRICT COURT

CASE # 2015-CF-007576-A-O

ATTY: PATRICK LAWLOR


CHRISTIAN BURGWALD V. DONOVAN'S REEF

CIRCUIT COURT – 14TH JUIDICIAL CIRCUIT IN BAY COUNTY, FLORIDA

CASE # 14-368-CA

ATTY: MICHAEL P. DICKEY


## 2014


ESTATE OF MARIO BLANCO V. CARIBBEAN ISLES VILLAS CONDOMINIUM

MIAMI-DADE COUNTY COURT

CASE #: 10-49453CA10

ATTY: BRETT YONON


12

AMY RACHEL VS CITY OF MOBILE, AL AND MICHAEL T. WILLIAMS, ET AL

USDC, SOUTHERN DISTRICT, SOUTHERN DIVISION

CIVIL ACTION NO. 13-522

ATTY: ERIK S. HENINGER


RAMON AND SUSAN TORRES V. HOOTERS OF JACKSONVILLE, LLC

DUVAL COUNTY COURT

CASE #: 098-98-001

ATTY: LINDSAY L. TYGART


JEAN NESCA

PALM BEACH COUNTY SUPERIOR COURT

CASE #: SETTLED

ATTY: BYRNES GUILLAUME


JONATHAN FERRELL V. THE CITY OF CHARLOTTE, COUNTY OF MECKLENBURG

SUPERIOR COURT OF MECKLENBURG COUNTY

ATTY: CHRISTOPHER CHESTNUT


MASTRATA V. WALGREENS

MIAMI-DADE COUNTY SUPERIOR COURT

ATTY: J. P. GONZALEZ-SIRGO


SCOTT ROWE V. BP&P OF NORTHEAST FLORIDA, INC. D/B/A BREWSTER'S PUB & PIT

DUVALL COUNTY SUPERIOR COURT

CASE #: 460-130036

ATTY: HOWARD C COKER AND DANIEL A. IRACKI


SCOTT JONES VS. JAGUARS GOLD CLUB

13

TAYLOR COUNTY SUPERIOR COURT

CASE #: 9837-D

ATTY: GREG ALLEN

JASON CHESSHER V CRESTVIEW POLICE DEPARTMENT

THE CIRCUIT COURT IN OKALOOSA COUNTY, FLORIDA

CASE #: 2011-CF-002248

ATTY: GILLIS E. POWELL, JR

ESTATE OF TORRES V. PELICAN ISLES LIMITED PARTNERSHIP, ET AL.

BREVARD COUNTY SUPERIOR COURT

ATTY: DOUGLAS R BEAM

GREER V. BREVARD COUNTY SHERIFF'S OFFICE, INDIALANTIC POLICE DEPARTMENT

BREVARD COUNTY SUPERIOR COURT

ATTY: DOUGLAS R BEAM

JOHN DOE V. JEFFREY MARK, PROFESSIONAL BOWLERS ASSOCIATION AND STORM

BREVARD COUNTY SUPERIOR COURT

ATTY: DOUGLAS R BEAM

TREAVOR EIMERS VS CITY OF KEY WEST, A FLORIDA MUNICIPALITY, ET AL

COURT: MIAMI-DADE COUNTY

CASE #: SETTLED

ATTY: DAVID W. BRILL

PRINGLE V. CHARLESTON COUNTY, ET AL.

CHARLESTON COUNTY SUPERIOR COURT

14

CASE #: 2013-CP-31-322

ATTY: ROBERT V. PHILLIPS

**2013**

DOUGLAS HOWARD V. MONKEY'S UNCLE TAVERN

24TH JUDICIAL CIRCUIT – DUVALL COUNTY DIVISION CV-G

CASE # 16-2012-CA-0011208

ATTY: DANIEL IRACKI

RUSSELL BUDDIE V. SAVOY

BROWARD COUNTY COURT

CASE # 12-21324

ATTY: AARON FINESILVER

TASHEEN DYER V. CITY OF NEW YORK, ET AL

SOUTHERN DISTRICT FEDERAL COURT, NEW YORK

CASE # 11-CIV-7051 (TPG)

ATTY: JARED R. COOPER

CARLOS CHACON V CITY OF AUSTIN TEXAS, OFFICER ERIC COPELAND AND OFFICER RUSSELL ROSE

U.S. WESTERN DISTRICT COURT – AUSTIN DIVISION

CASE # 1:12-CV-226-SS

ATTY: ERICA L. GRIGG

BUTLER V SCHIRALLI, ET AL

U.S. DISTRICT CURT, NORTHERN DISTRICT OF GEORGIA

CASE # 1:12-CV-0872

ATTY: MICHAEL P CARVALHO

15

ESTATE OF ROBERT LAMBLE V CHARLESTON COUNTY, ET AL

COUNTY OF CHARLESTON, SC

CASE # 2012-CP-10-0983

ATTY: C. CARTER ELLIOTT, JR


ESTATE OF ROBERT LAMBLE V ALBERT BING, ET AL

FEDERAL COURT OF CHARLESTON, SC

CASE # 0:12-CV-02772-SB-PJG

ATTY: C. CARTER ELLIOTT, JR


CENTO V. BRITTANY OF ROSEMONT

CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT IN AND FOR ORANGE COUNTY, FLORIDA

CASE # 2011-CA-012037-0

ATTY: DANIEL P. OSTERNDORF


GEORGE AND MICHAEL HYMAN V. THE GEORGETOWN COUNTY SHERIFF DEPARTMENT

COURT - CURRENTLY AVAILABLE

CASE # 08-CP-22-1413

ATTY: MARION C. FAIREY, JR


NGA PHAM, THUC HUYNH AND TRUC HUYNH, INDIVIDUALLY AND AS PERSONAL REPRESENTATIVES OF THE ESTATE OF HAO HUYNH,

DECEASED VS. ST DEL RIO HOLDINGS, L.P. D/B/A CATALINA VILLAGE APARTMENTS, ET AL

281ST JUDICIAL DISTRICT COURT OF HARRIS COUNTY, TEXAS

CASE # 2012-16150

ATTY: BA M. NGUYEN

16

JANE DOE VS. CARNIVAL CRUISE LINES

U.S. DISTRICT COURT – SOUTHERN DISTRICT OF FLORIDA (MIAMI DIVISION)

CASE # 1:12-CV-22241-CMA

ATTY: JOSEPH RINALDI


RADER V. ESTATE OF MELBOURNE POLICE DEPT

COURT: CURRENTLY AVAILABLE

CASE # ME-27-0051

ATTY: RAYMOND BODIFORD


COBB-SUTHERLAND VS LAURENS COUNTY SHERIFF'S OFFICE

STATE OF SC COUNTY OF GREENWOOD

CASE # 2011-CP-30-903

ATTY: ALBERT V. SMITH


BRENDA MASON, ET AL VS. CITY OF LAFAYETTE, ET AL

U.S. DISTRICT COURT – WESTERN DISTRICT OF LOUISIANA – LAFAYETTE DIVISION

CASE # 6:12-CV-02939

ATTY: LABORDE / SPEER


JAMES RYAN SINGLETARY V. BREVARD COUNTY SHERIFF'S OFFICE

IN THE CIRCUIT COURT OF THE 18TH JUDICIAL CIRCUIT IN AND FOR BREVARD COUNTY, FLORIDA

CASE # 052012-CF-054361-AXXX

ATTY: HANK HORNSBY


AGUAYO, ET AL V. TRUJILLO, ET AL

COURT: CURRENTLY AVAILABLE

CASE # D-101-CV-2012-1489

17

1565

ATTY: MATTHEW L. GARCIA

STATE OF FLORIDA V. BURTSCHIN

SUPERIOR COURT OF PALM BEACH COUNTY

CASE # 2010CF012773A

ATTY: MITCHELL J. BEERS

OBIE DEAN V. CITY OF PRICHARD, ET. AL.

UNITED STATES DISTRICT COURT

CASE # 12-0596

ATTY: THOMAS R. BOLLER

MACK NEIL MYERS V. PAULA RECTOR JACKSON, ET AL

FEDERAL COURT OF CHARLESTON, SC

CASE # 0:12-CV-02526-TMC-PJG

ATTY: C. CARTER ELLIOTT, JR

TYLER V. COMMUNITY FOOD STORES, INC

CASE: SETTLED PRE-SUIT

ATTY: JOSEPH T. KISSANE

PERRATTO V. SHORE RESTAURANTS

MARTIN COUNTY 19TH JUDICIAL CIRCUIT

CASE # 12-CA-1942

ATTY: MARK DICOWDEN

THOMAS EASTERLING V. BURGER KING, ET AL

COURT: CHARLESTON COUNTY

CASE # 2011-CP-10-4348

ATTY: D. ELLIS ROBERTS

18

LAFRETTA WATKINS V. MRB, INC. DBA 50 YARD LINE SPORTS BAR & GRILL

FULTON COUNTY STATE COURT

CASE # 13-EV-017647Y

ATTY: KEENAN R. S. NIX


CAMPBELL V. CITY OF PENSACOLA

UNITED STATES DISTRICT COURT

CASE # 3:13-CV-161

ATTY: CLIFFORD HIGBY


FRANK KISER, II VS. ASHLAND HOSPITAL CORPORATION, ET AL

BOYD CIRCUIT COURT

CASE # 13-CI-407

ATTY: MICHAEL J. CURTIS


MATTHEW TALLEY

COURT: BROWARD COUNTY

CASE # CURRENTLY AVAILABLE

ATTY: TODD MIDDLEBROOKS


STEVEN AGUANNO VS. NOB HILL CONNECTION CORP

15TH JUDICIAL CIRCUIT, BROWARD COUNTY

CASE # CACE-11-031310 (04)

ATTY: PETER A DYSON


MODICA, JONATHAN; MODICA, CHARLES; HILLS, FREDERIC V. JUPITER TIKI D/B/A
THE CORNERS, MICHAEL (KRACKER ) WHITE AND DANIEL BERG

COURT: PALM BEACH COUNTY COURT

CASE # 502012CA019732XXXXMB

19

ATTY: RICHARD D. SCHULER


SHAWANA NEWSON V. STIRLING APTS, ASSOC LTD, ET AL

COURT: PALM BEACH COUNTY

CASE # CURRENTLY AVAILABLE

ATTY: JOHN PATTERSON


TAUNYA LOU STEPHENS JETER, ET AL VS. SOUTH CAROLINA DEPARTMENT OF CORRECTIONS, ET AL

COURT - SETTLED

CASE # 2012-CP-18-1661

ATTY: C. CARTER ELLIOTT, JR


LACY LAMB

COURT: CURRENTLY AVAILABLE

CASE #: CURRENTLY AVAILABLE

ATTY: T. RYAN LANGLEY


EPHRAIM SLATON AND GWENDOLYN TOLLIVER OBO MATTHEW GREEN V. TYRONE JENKINS, ET AL

COURT: CURRENTLY AVAILABLE

CASE #: CURRENTLY AVAILABLE

ATTY: GINO BROGDON, JR


WILKERSON, STEVE VS. KNIGHT'S PUB

COURT: CURRENTLY AVAILABLE

CASE #: CURRENTLY AVAILABLE

ATTY: JOSEPH H. SHAUGHNESSY


DARLENE HERBERT AS REPRESENTATIVE OF THE ESTATE OF JOHN TORRE V. PELICAN ISLES, ET AL

20

COURT: CURRENTLY AVAILABLE

CASE #: CURRENTLY AVAILABLE

ATTY: DOUGLAS R. BEAM


ESTATE OF CHRISTOPHER GREER V. BREVARD COUNTY S. O., ET AL

COURT: CURRENTLY AVAILABLE

CASE # CURRENTLY AVAILABLE

ATTY: DOUGLAS R. BEAM


BROPHY – MILLER V. PROFESSIONAL BOWLERS ASSN V. JEFFREY MARK

COURT: CURRENTLY AVAILABLE

CASE # CURRENTLY AVAILABLE

ATTY: DOUGLAS R. BEAM


REYNOSO V. BUDDHA ENTERTAINMENT ET AL

CLARK COUNTY DISTRICT COURT

CASE # A-13-682896-C

ATTY: BENJAMIN P. CLOWARD


ANGELO KALLAS V. SCOTT YODER, ET AL

COURT: CURRENTLY AVAILABLE

CASE # 13-CV-80979

ATTY: STUART N KAPLAN


KAREN PEREZ VS. 1ST AND 10 SPORTS BAR & GRILL, DEVELOPERS DIVERSIFIED REALTY CORP, PALM BEACH COUNTY SHERIFF'S OFFICE, SHERIFF RICH BRADSHAW, AND DEPUTY MICHAEL SUSZSCYNSKI

COURT: CURRENTLY AVAILABLE

CASE # CURRENTLY AVAILABLE

ATTY: MATTHEW D LEVY

21

BARNEY GILBERT VS. TRIA ADELFI, LLC; OAK KNOLL RENAISSANCE, INC; OAK KNOLL RENAISSANCE LIMITED PARTNERSHIP; AARON SCOTT; ANDRE SCOTT, ANTOINE LYONS

COURT: CURRENTLY AVAILABLE

CASE # 45D11-1105-CT-00108

ATTY: DONALD W WRUCK


BRIAN SIMONS VS WALMART AND BANK OF AMERICA

COURT: CURRENTLY AVAILABLE

CASE # 8:11 CV 03180

ATTY: AARON S. JOPHLIN


SCOTT V. LAKE COUNTY S. O.

COURT: CURRENTLY AVAILABLE

CASE # CURRENTLY AVAILABLE

ATTY: JASON RECKSEIDLER


DAVIS/JOHNSON V. DR. VISTASP KARBHARI, ET AL

COURT: CURRENTLY AVAILABLE

CASE # CURRENTLY AVAILABLE

ATTY: DOUGLAS FIERBERG


ANTHONY NASTROFILIPPO V. BOROUGH OF LITTLE FERRY, ET AL

COURT: CURRENTLY AVAILABLE

CASE # CURRENTLY AVAILABLE

ATTY: LOUIS ZAYAS


WOROSZ V. HELNIA, LLC

COURT: CURRENTLY AVAILABLE

22

CASE # CURRENTLY AVAILABLE

ATTY: MICHELLE ZEIGER

23

# Appendix C

## Fee Policies of Dr. George Kirkham

*Dr. George Kirkham and Associates, Inc.*

_____

**Criminal Justice Consultants**

# Fees & Expense Policies

## Case Preparation

I utilize a flat fee formula for each of my professional services. It is my practice once I have been requested to participate in a case and have agreed to do so to require remittance of a $7,500 retainer. This retainer fee covers in its entirety whatever research and analysis I may have to engage in to effectively evaluate your case and prepare for trial. Specifically, it encompasses the following: my personal analysis and evaluation of all relevant case documents; any specialized research which I may conduct or direct my research assistants to conduct; all conference calls which you may wish to schedule for purposes of discussing the case or obtaining guidance throughout the discovery process, as well as the preparation of any requested written reports, affidavits, or response to expert interrogatories. I encourage you to contact me as often as you wish throughout the development of your case. All telephonic and written communications with regard to substantive issues in your case will always be with me personally. The retainer is non-refundable.

## Other Professional Services

In cases involving premises liability issues, at your request my office will obtain and compile relevant computer assisted dispatch (CAD) records regarding police calls for service on the property in question, as well as law enforcement reports concerning crime at and around the location. My crime statistician will then develop a concise graphic presentation using this data--including appropriate tables, graphs, pie charts and explanatory narrative to facilitate my analysis as a criminologist and for your use as an attorney. This service is included as part of my flat case preparation fee.

For many years I have utilized the off-duty assistance of currently employed and highly experienced police command officers to conduct specialized research at my direction, as well as to keep me apprised of the most recent developments in law enforcement technology and procedures. Each of my police research assistants has a special area of expertise: e.g., security and crime prevention measures; use of force, including firearms and intermediate weapons such as the Taser, ASP and OC spray; SWAT and hostage negotiation; handling crisis calls involving emotionally disturbed persons(EDPs); personnel selection and training standards; criminal investigation protocols; arrest and jail custodial procedures.

My professional resources also include the following:

- A licensed private investigator with extensive experience as a police detective.

- A crime prevention/private security specialist certified to conduct lighting measurements with a calibrated instrument and to diagram the spatial distribution of illumination.

- A certified senior police crime data analyst and statistician.

**Video Teleconferencing**

My office is equipped with a state-of-the-art high definition Polycom HDX 9002 video teleconference system. This enables me to have "face to face" meetings with attorney clients anywhere in the nation at their convenience to discuss case related issues.

**Discovery Depositions**

The Polycom video teleconference system gives attorneys the option of deposing me from their location without incurring the time and expense of traveling to mine. There is no additional charge to either side should you elect to do a video deposition from your location or locations (the HDX 9002 has the capability of tying my office conference site to three other locations simultaneously). I am pleased if requested to make a video recording of any discovery deposition taken at my location and to provide copies of it to all participating attorneys at no charge. If your office does not currently have a VTC capability, you can easily add one to your existing computer or laptop with readily available software; alternatively, you can attend a video deposition either through a VTC equipped law office or Polycom compatible rental site in your area.

In the event that opposing counsel wish to depose me in person, they have the option of doing so at my Palm Beach Gardens office or having me travel to another location. I charge a flat fee of $3,000 for discovery depositions conducted in Palm Beach Gardens. Depositions conducted beyond Palm Beach Gardens involve a flat fee of $6,000 plus travel and per diem expenses. I require that all deposition fees and expenses be paid in full at the time a deposition is taken. I rely upon the firm with which I am working to communicate my Fee & Expense Policies to opposing counsel.

**De Bene Esse Depositions**

It is my practice to charge a flat fee of $6,000 for any video-taped deposition which is intended for use at trial in lieu of my personal appearance.

**Trial Testimony**

In the event that a case is not settled and proceeds to the stage of trial, my fee for expert witness testimony is $6,000 plus whatever travel and per diem expenses are associated with my court appearance. I will provide your firm with a detailed written invoice reflecting this sum. The full invoice amount must be paid prior to my actual courtroom testimony.

ANY OFFICIAL LISTING OR DESIGNATION OF ME AS AN EXPERT IN A CASE WITHOUT MY EXPRESS PERMISSION AND FORMAL RETENTION IS STRICTLY PROHIBITED.

# Appendix D

# Background Materials sent to Dr. George Kirkham

# BACKGROUND MATERIALS FOR DR. GEORGE KIRKHAM

Barrett v. USA, US District Court,
Eastern District of Oklahoma Case Nos.
6:04-cr-00115 JHP
6:09-cv-00105 JHP

Federal Defender's Office

January 11, 2017

*These materials were prepared by legal counsel for Kenneth E. Barrett in anticipation of litigation and to facilitate a confidential evaluation by Dr. George Kirkham. These materials are CONFIDENTIAL and are PRIVILEGED as attorney-client confidential communications and/or attorney work product. They may not be divulged without the written prior consent of counsel for Mr. Barrett.*

Joan M. Fisher
Karl Saddlemire
Assistant Federal Defenders
Federal Defender's Office
801 I Street, Third Floor
Sacramento, California 95814
(916) 498-6666

**Index to Materials Provided on CD**

1.  **Records Sent to Dr. Kirkham in 2009**
    - Photographs
    - Trial Testimony
            Bill Poe
            Chuck Choney
            Clint Johnson
            Daniel Oliver
            Gene Hise
            George Randolph
            John Hamilton
            Kerry Pettingill
            Raymond Greninger
            Rick Manion
            Robert Darst
            Steven Hash
            Terence Higgs
            Toby Barrett
    - Witness Declarations
            Alvin Hahn
            Phyllis Crawford
            Rodney Floyd
            Sylvia Gelene Dotson
            Toby Barrett
    - Affidavit and Search Warrant
    - OSBI Report

2.  **Medical Records**

    - Bill Willis Community Mental Health Center
    - Eastern State Hospital
    - Misc Hospital Records
    - Saint Francis Hospital
    - Sequoyah Memorial Hospital
    - State of Oklahoma Disability Determination Unit
    - Wagoner Community Hospital

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## PETITIONER'S PROFFER OF EXPERT TESTIMONY

## FROM PABLO STEWART, M.D.

## DECLARATION OF PABLO STEWART, M.D.

I, Pablo Stewart declare the following:

1. I am a forensic psychiatrist. My office address is 824 Ashbury Street, San Franciso, California 94117. My qualifications, including my publications, are listed in the *curriculam vitae* included as an appendix to this declaration. My educational background and liensure is described in my C.V. To give you an idea of my training and experience related to the matters contained in this declaration, I am providing some further information. Throughout my professional career, I have had extensive clinical, research and academic experience in the diagnosis, treatment, and prevention of substance abuse and related disorders, including diagnostic, treatment and community care programs for person with Major Depressive Disorder, Bi-Polar Disorder and Posttraumatic Stress Disorder, the management of patients with dual diagnoses and the application of psychotropic medication. I have designed and taught course on the protocol for identifying and treating psychiatric patients with substance abuse histories and have supervised psychiatric residents in teaching hospitals. I have worked closely with local, state and federal governmental bodies to design and present educational programs about psychiatry, substance abuse and preventative medicine.

2. I am currently a Diplomate of, and have served as an Examiner for, the American Board of Psychiatry and Neurology. I am active in several professional associations and have served as the President, Secretary-Treasurer, and Counselor-At-Large of the Alumni-Faculty Association, University of California, San Francisco; and California Association of Drug Court Professionals.

1

1580

3. I have held numerous positions with responsibility for ensuring the quality of clinical services provided by inpatient and community based programs. From 1997-1998, I was Director of Clinical Services for San Francisco Target Cities Project. I also served as Medical Director of the Comprehensive Homeless Center, Department for Veterans Affairs Medical Center in San Francisco, where I had overall clinical and administrative responsibilities for the unit; and the Psychiatrist, Substance Abuse Inpatient Unit, where I provided consultation to the Medical/Surgical Units regarding patients with substance abuse problems. I served as a Physician Specialist to the Westside Crisis Center, San Francisco, from 1984 to 1987, and to the Mission Mental Health Crisis Center from 1983 to 1984, I was the Chief of Psychiatric Services at Haight Ashbury Free Clinic, a position I held from 1991 to 2006.

4. From 1988 to 1989, I was Director, Forensic Psychiatric Services for the City and County of San Francisco, where I had administrative and clinical responsibilities for psychiatric services provided to the inmate population of San Francisco. My duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. From 1985 to 1990, I was Senior Attending Psychiatrist, Forensic Unit, University of California, San Francisco General Hospital where I was responsible for a twelve-bed maximum security psychiatric ward. My duties in that position included advising the San Francisco City Attorney on issues pertaining to forensic psychiatry.

5. I served as psychiatric consultant to the Institution on Crime, Justice and Corrections at George Washing University, which monitored the agreement between the United States and the State of Georgia to improve the quality of that State's Juvenile Justice facilities, critical mental health, medical and educational services and treatment programs. I have also served as a Technical Assistance Consultant to the Center for Substance Abuse Treatment, Substance Abuse

2

and Mental Health Services Administration Department of Health and Human Services; and as Psychiatric Consultant to the San Francisco and Hawaii Drug Courts. I was qualified as a Psychiatric Expert witness in federal court in *Madrid v. Gomez* and *Gates v. Gomez*, concerning the implementation of constitutionally mandated psychiatric care of Pelican Bay State Prison and the California Medical Facility.

6. I have presented numerous papers before mental health professionals, prosecutors and defense attorneys, probation officers, and judges, and have published in professional and peer-reviewed journals on topics including dual diagnosis, mental illnesses, alcohol and drug abuse, and the treatment of substance abuse. These presentations and publications include: "Cultural Considerations in Working with the Latino Patient" (2002); "Psychiatric Complications of the Methamphetamine Abuser" (2001); "The Assessment, Diagnosis, and Treatment of the Patient with Multiple Disorders" (2001); "Co-Occurring Disorders: Substance Abuse Treatment" (2000); "The Dual-Diagnosed Client" (2000); "Mental Illness and Drug Abuse: (1999); "Alcoholism: Practical Approaches to Diagnosis and Treatment" (1999); "Impulse Control Disorders: (1999); "Major Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder" (1999); "Substance Abuse and Major Depressive Disorder" (1998); "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed" (1998); "Assessment of Substance Abuse" (1995); "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues" (1994); and "Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues" (1991).

7. I have been retained as an expert on substance abuse issues on approximately 100 occasions.

1582

8. I have been retained by the Federal Defenders of Eastern District of California and am being compensated at the rate of $350.00 per hour.

9. I have been asked by the attorneys for Kenneth Barrett to serve as an expert on the long term effects, as well as the likely impact of use at or near the time of Mr. Barrett's engagement with law enforcement officials on September 23, 1999 on Mr. Barrett's property shortly after midnight. In that regard, I have been asked to review matters in a document known as Declaration of George Woods. I have been asked to give my professional opinion of the general effects and consequences of intravenous use of the drug methamphetamine.

10. The standard of practice in evaluating the issues for which I was retained includes a face to face interview with Mr. Barrett. Having been denied access to interview Mr. Barrett, however, I am nevertheless, able to render a number of opinions based solely on chart and/or record review but those opinions are qualified due to the lack of face to face interview time with Mr. Barrett.

11. I am providing with this Declaration (1) a complete statement of all the opinions to which I will testify and the basis and reasons for them (contained hereinbelow); (2) the data or other information I considered informing my opinions (Appendix A); (3) my qualifications, including a list of my publications going back ten years (Appendix B); (4) a list of all the cases in which I testified as an expert over the past four years (Appendix C).

12. I have reviewed the documents listed in Appendix A to this report. Psychiatrists typically rely on clinical interviews and a review of documents such as those you gave me when forming opinions about a person's psychiatric history, diagnosis and prognosis, as well as forensic issues. While I was not able to conduct the clinical interview, I am able based on the document review, to render a professional opinion about the likely effects of Mr. Barrett's

4

methamphetamine use on his mental health and his perception, judgment and reaction at the time of the OHP's entry onto Mr. Barrett's property shortly after midnight on September 24, 1999. In addition, at arriving at this conclusion, I have also opined on the likely effects his use of other mind-altering drugs such as hallucinogens had cumulatively had on him up until the time if the incident, and the reasons he turned to drugs to self-medicate, including his family upbringing, his bi-polar disorder and the organic brain damage, however caused, to his prefrontal lobe.

13. Review of Mr. Barrett's History of Drug and Alcohol Use and Abuse reveals the following:

a. Kenneth Barrett has an 8th grade education and a long history of drug and alcohol abuse. Medical and legal documents show that Mr. Barrett began using drugs at 14-15 years old, commencing with alcohol and marijuana. By age 16 he was hooked on PCP, ingesting it about 4 times a day for 2-3 years. In 1986, at 24 years old, while being treated for a self-inflicted gunshot wound to the chest, Ken admitted to having taken LSD 200 to 300 times, as well as having taken mushrooms, downers (depressants) and methamphetamines. He claimed to have been suicidal for the three years immediately preceding the full-out suicide attempt. . He smoked about 10 joints of marijuana a day and took valium with alcohol. Ken admitted to having wielded a weapon and having sold drugs. He was diagnosed with drug abuse, alcohol abuse and a major depressive disorder.

b. In 1995, while under a 28 day psychiatric commitment, Ken was diagnosed with Organic Effective Disorder and Polysubstance Abuse noting amphetamines and cannabis as the drugs of choice. And in 1999, when hospitalized as a result of the gunshot wounds he suffered during the gunfight at his residence, Mr Barrett again self-reported use of Methamphetamine and marijuana, and valium. Mr. Barrett was found to be "drug intoxicat[ed]." A lab report

1584

confirmed that Ken had amphetamines and marijuana in his system at the time of the trooper's death.

c. At the time of his arrest in 1999, Mr. Barrett had never been convicted of a felony. He had been convicted of three misdemeanor driving while under- the-influence charges. He had single felony charge of Delivery of a Controlled Substance pending since 1997, a charge that was later dismissed. Similarly a misdemeanor marijuana and paraphernalia possession charge was dismissed in 2011. A 1986 assault and battery appears on his record with no disposition. He had a single juvenile six-month deferred adjudication for burglary.

d. A report by Jeanne Russell, a state witness retained for the state trials, shows that:

> In preparation for the state trial "He admits to PCP use at the age of 16 with continued use approximately once a week for about one year. He reported he began using heroin in 1997 and used this drug on a daily basis for about one year. In addition to street drugs, he admits to the use of prescription drugs such as Thorazine, Demerol and Morphine.

> Mr_ Barrett reports that he began using cocaine and methamphetamines at the age of 16. He admits to using these substances occasionally gradually increasing to daily use about five years prior to his arrest. Mr. Barrett reported he had been cutting down on drug use prior to his arrest. He explained he was tired of dealing with other people using drugs and was "hassled" by police whenever he went into town."

14. Methamphetamine has changed significantly over the past 15-20 years due to the efforts of the federal government to restrict the availability of the precursor chemicals required to manufacture the drug. In the late 1990's the time frame involved in this declaration, the drug was much more potent than it is today.

15. Methamphetamine, especially when used intravenously over an extended period of time of weeks or months, will result in psychotic symptoms in the user. These effects are consistent with the symptoms by someone in a psychotic state, and are much more likely to occur in someone who uses the drug intravenously, as opposed to taking the drug by other

6

means, such as snorting it. These symptoms include, but are not limited to: auditory and visual hallucinations, paranoid delusions (fear, that is not based in any fact, that some other person is going to cause the user extreme harm that could include being killed), delusional thinking, and "Ideas of reference" (an unfounded feeling that unrelated actions or movements have direct implications to the user. For example, a person addicted to methamphetamine might interpret a turn signal on a car as a sign that they are being watched by government agents).

16. Methamphetamine intoxication lasts for approximately 8–12 hours after injection. This period of intoxication is when the "high" is most prevalent and the drug can be detected in the user's system. However, once the drug actually leaves the user's system, the psychotic symptoms described above remain for weeks or even months after use, even when the user is no longer intoxicated.

17. During periods of intoxication, the user suffers from extreme agitation, rapid cycling of thoughts, and significantly impaired executive functioning. Use of the drug further erodes the user's ability to accurately assess the situation he is in. Long-term users lose a great deal of weight as they lose the desire to eat or sleep for days or even weeks. Noticeable personality changes become greater with use of the drug lasting more than just a few weeks.

18. Methamphetamine is a powerfully addictive psychostimulant. It primarily acts to increase the amount of dopamine in the brain, and also increases the levels of several other neurotransmitters, including norepinephrine, epinephrine, serotonin, and acetylcholine. Unlike cocaine, which increases dopamine levels in the brain primarily by blocking dopamine re uptake, methamphetamine both blocks dopamine re uptake and increases its release, leading to much higher concentrations of the neurotransmitter in the brain's synapses. Dopamine is involved in reward, motivation, the experience of pleasure, and motor function. Dopamine, norepeneph rine

7

1586

and epenephrine are also a fight or flight hormones that cause physiological changes preparing the body for physical activity.

19. The physical effects of methamphetamine include pupillary dilation, increased heart rate, elevated blood pressure and perspiration. Methamphetamine's effects on the central nervous system produce in the user a sense of euphoria, increased energy, alertness, and productivity. Other common effects are elevated self-esteem, increased libido initially, and decreased appetite and need for sleep. While under the influence of methamphetamine, methamphetamine-dependent individuals exhibit poor impulse control and impaired decision-making, engaging in more risky behaviors than nonusers. This response would be especially active in reaction to an unannounced entry onto his property in the middle of the night, made still worse if the intruders were unidentified, and still worse by the speed of the entrants, the presence of Mr. Barrett's son, all followed by an intense and immediate firefight.

20. Effects from smoking or injecting methamphetamine are nearly instantaneous; when snorted, methamphetamine is absorbed more slowly and its effects are not as intense, but effective nonetheless. Tolerance and dependence develop very quickly, within days of using it. Chronic users require increasing doses of methamphetamine to achieve the desired effect. As chronic users develop a tolerance to the drugs pleasurable effects, they often begin to binge, taking continuous, high doses of methamphetamine in a compressed period of time, sometimes lasting several days. This results in a highly elevated concentration of the drug in the blood. Binge users often engage in repetitive, focused, and seemingly pointless tasks.

21. As the binge progresses, the pleasurable effects of the drug are diminished while the toxic side effects are increased. Eventually, the user experiences a phase called tweaking characterized by increased anxiety, irritability, insomnia, and confusion. This may be followed

8

by methamphetamine withdrawal syndrome, the symptoms of which include suicidality, dysphoria, depression, irritability, anxiety, poor concentration, hypersomnia, fatigue, paranoia, akathisia, and drug craving. Chronic methamphetamine abuse can have serious medical and psychiatric consequences. Cardiovascular effects include hypertension, acute aortic dissection, myocardial infarction and ischemic and hemorrhagic strokes. Chronic use can also lead to methamphetamine psychosis, the most common feature of which is paranoia, often accompanied by ideas of reference and well-formed delusional structures, particularly delusions of persecution. This may be accompanied by visual and auditory hallucinations. Methamphetamine-induced psychotic disorder is generally transient, occurring during use or withdrawal and abating within a few days. In some cases of heavy use, however, psychosis may persist for a period of years even after use has ceased.

22. Methamphetamine users often also abuse or are dependent on other sedative, hypnotic or anxiolytic agents, which are taken in an attempt to alleviate the unpleasant aftereffects of amphetamine intoxication, including insomnia and anxiety. When methamphetamine is in combination with these agents, the behavioral effects of a disinhibition, mood lability, and impaired judgment are exacerbated because the stimulant effects of the methamphetamine essentially allow the user to consume more of these without passing out.

23. Methamphetamine is often used to self-medicate for depression. The drug's pleasurable effects of euphoria, increased energy, alertness, and enhanced sense of self-esteem may initially seem to alleviate the symptoms of depression, which include depressed mood, loss of energy, feelings of worthlessness, and difficulty concentrating. When the user crashes after methamphetamine intoxication, however, he will likely experience even more serious depression, often associated with suicidal ideation. Indeed, studies suggest that the neurotoxicity

9

1588

of methamphetamine exacerbates depression in the longrun. In animal studies, chronic and high doses of methamphetamine have been found to deplete dopamine levels, destroy dopamine nerve terminals and reduce other markers of dopamine terminal integrity, and thus may permanently deplete dopamine levels in some areas of the brain.

24. Whether due to a preexisting mood disorder, neurological damage, or some combination thereof, those who are dependent on methamphetamine are at increased risk of depression and suicidal ideation during active use, withdrawal and abstinence.

25. Intravenous drug users of methamphetamine are prone to frenzied actions that can lead to "overkill" behaviors. In other words, the psychotic symptoms and paranoia lead intravenous users of methamphetamine to take actions far in excess of what may be needed under any given circumstance. For instance, and apropos to the circumstances described by the government in the homicide of Trooper David "Rocky" Eales", a person under the influence of methamphetamine, or suffering from the psychotic symptoms caused by long term use, may believe law enforcement officials seeking to serve a warrant are in fact intent on killing the user and will fire a semi-automatic weapon repeatedly in what he may well believe is necessary to defend himself or his son.

26. I have reviewed the self-reporting drug history reflected in the medical and legal documents ranging from 1986 through the date of the homicide in 1999. In my professional opinion, based upon my qualifications stated above, and to a reasonable degree of medical certainty, an individual who has been intravenously injecting Methamphetamine in the manner and for the length of time as Mr. Barrett is addicted to the drug. The psychotic effects of the drug on this individual will last for weeks or months after the user stops taking the drug. In this case, there was methamphetamine in Mr. Barrett's system at the time of the confrontation.

1589

27. Methamphetamine addiction is extremely difficult to beat. Those addicted to methamphetamine will place the need for the drug over all other concerns, including family, food, safety, and obedience to the law.

28. As noted above, drug dependence is a common response to the mental health symptoms and environmental stressors Mr. Barrett experienced, and these were compounded in his case by a genetic predisposition, given his family history of mental health issues including bi-polar, suicides and substance abuse.

29. Mr. Barrett began by the age of 13 or 14 to self-medicate in an attempt to alleviate the symptoms from the traumatic stress he experienced, first with PCP and Acid, later with alcohol, marijuana and methamphetamine. Mr. Barrett was dependent on both methamphetamine and alcohol, probably from his adolescence. The early onset of substance dependence, as with the early onset of any psychiatric disorder, negatively impacts an individual's normal psychological development. In particular, it thwarts the individual's ability to learn to cope with depression, anxiety or stress without having to resort to substance abuse. As an adult, as discussed above, Mr. Barrett was found to be guarded, withdrawn, depressed, anxious, and paranoid.

30. It is my opinion, which I hold to a reasonable degree of medical certainty, that Mr. Barrett suffered from chronic drug dependence; that Mr. Barrett was at one time an alcoholic, as well; that he had a family history which predisposed him to drug and alcohol dependence; that his drug usage began in large part as an effort to self-medicate for the serious depression and extreme anxiety, and stemmed in part from his chaotic upbringing; and that his underlying mood disorder made him particularly vulnerable to the damaging effects of the relentless abuse he experienced, which left him with few resources to cope with those effects. Mr. Barrett's drug

11

usage, however, could ultimately only exacerbate both his underlying mood disorder, paranoia and his other mental health symptoms, including damage to his prefrontal lobe.

31. Had a competent mental health professional with expertise in substance-related disorders been provided with information regarding Mr. Barrett's family background, mental health concerns, and substance abuse history as I have been provided here, such an expert could have provided the opinions expressed herein to the jury that determined Mr. Barrett's sentence.

32. The foregoing information was available in 2004-2005.

33. I hold the opinions stated here to a reasonable degree of psychiatric certainty.

I declare under penalty of perjury under the laws of California and the United States that the foregoing is true and correct.

Dated:  3/2/17

PABLO STEWART, M.D.

12

1591

# Appendix A

## Background Materials Sent to Dr. Pablo Stewart

# BACKGROUND MATERIALS FOR DR. PABLO STEWART

Barrett v. USA, US District Court,
Eastern District of Oklahoma Case Nos.
6:04-cr-00115 JHP
6:09-cv-00105 JHP

Federal Defender's Office

January 11, 2017

*These materials were prepared by legal counsel for Kenneth E. Barrett in anticipation of litigation and to facilitate a confidential evaluation by Dr. Pablo Stewart. These materials are CONFIDENTIAL and are PRIVILEGED as attorney-client confidential communications and/or attorney work product. They may not be divulged without the written prior consent of counsel for Mr. Barrett.*

Joan M. Fisher
Karl Saddlemire
Assistant Federal Defenders
Federal Defender's Office
801 I Street, Third Floor
Sacramento, California 95814
(916) 498-6666

**Index to Materials Provided on Disc**

**Records Sent to Drs. Woods and Young in 2009**
    **A. School Records**
       1. Tommie Spear Jr. High School and Jay County High School

    **B. Medical Records**
       1. Sequoyah Memorial Hospital
       2. Eastern State Hospital
       3. St. Francis Hospital
       4. Wagoner Community Hospital
       5. Bill Willis Community Mental Health Center
       6. Misc Hospital Records
       7. State of Oklahoma Disability Determination Unit

**January 17, 2017**

**Index to Additional Materials Provided on Disc**

**Pleadings**
    1. Tenth Circuit Court of Appeals Remand Order Setting an Evidentiary Hearing on Our Ineffective Assistance of Counsel Claim Due to Failure to Investigate and Present Mitigating Evidence, *U.S. v. Barrett*, 797 F.3d 1207, 1223-31 (10th Cir. 2015)
    2. Excerpt from December 4, 2009 Amended 2255 Motion (Social history excerpt from the ineffective assistance of counsel mitigation claim.)

**March 16, 2009 2255 Motion – Exhibits**
    3. Declaration of Ada Blount, Exhibit 74
    4. Declaration of Brandy Hill, Exhibit 77
    5. Declaration of Carl Cook, Exhibit 102
    6. Declaration of Carolyn Joseph, Exhibit 78
    7. Declaration of Doris Barrett, Exhibit 80
    8. Declaration of Ernest Barrett, Exhibit 81
    9. Declaration of Gelene Dotson, Exhibit 97
    10. Declaration of Gwen Crawford, Exhibit 83
    11. Declaration of Issac Barrett, Exhibit 84
    12. Declaration of Janice Sanders, Exhibit 85
    13. Declaration of Kathy Trotter, Exhibit 86
    14. Declaration of Linda Riley, Exhibit 87

15. Declaration of Mark Dotson, Exhibit 98
16. Declaration of Nona Reich, Exhibit 101
17. Declaration of Phyllis Crawford, Exhibit 91
18. Declaration of Roger Crawford, Exhibit 92
19. Declaration of Ruth Harris, Exhibit 93
20. Declaration of Shawn Hill, Exhibit 95
21. Declaration of Steve Barrett, Exhibit 99
22. Declaration of Travis Crawford, Exhibit 45
23. Declaration of Toby Barrett, Exhibit 96
24. Declaration of Warren Dotson, Exhibit 100
25. Declaration of Alvin Hahn, Exhibit 75
26. Declaration of Paul Lunsford, Exhibit 90
27. Declaration of Abby Stites, Exhibit 103

**Other**
28. 2000 Faust Bianco testing
29. 2002 Psychological Evaluation of Bill Sharp, Ph.D.
30. 2003 Faust Bianco's affidavit
31. 2009 Declaration of Bill Sharp, Ph.D.
32. 2009 Declaration of George Woods, M.D.
33. 2009 Declaration of Myla Young, Ph.D.
34. Raw Data from Dr. Young's testing


**February 17, 2017**

Myla Young's raw data

**March 2, 2017**

Drug History Excerpts
Drug Screen – September 1999

# Appendix B

# Curriculum Vitae of Dr. Pablo Stewart

CURRICULUM VITAE

**PABLO STEWART, M.D.**
**824 Ashbury Street**
**San Francisco, California 94117**
**(415) 264-0237; fax (415) 753-5479; e-mail: pab4emi@aol.com**
**(Updated September 2016)**

| | |
|---|---|
| EDUCATION: | University of California School of Medicine, San Francisco, California, M.D., 1982 |
| | United States Naval Academy, Annapolis, MD, B.S. 1973, Major: Chemistry |
| LICENSURE: | California Medical License #GO50899<br>Hawai'i Medical License #MD-11784<br>Federal Drug Enforcement Administration #BS0546981<br>Diplomate in Psychiatry, American Board of<br>Psychiatry and Neurology, Certificate #32564 |

ACADEMIC APPOINTMENTS:

| | |
|---|---|
| September 2006-Present | Academic Appointment: Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| July 1995 - August 2006 | Academic Appointment:  Associate Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1989 - June 1995 | Academic Appointment:  Assistant Clinical Professor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| August 1986 - July 1989 | Academic Appointment:  Clinical Instructor, Department of Psychiatry, University of California, San Francisco, School of Medicine. |

EMPLOYMENT:

| | |
|---|---|
| December 1996-Present | Psychiatric Consultant<br>Provide consultation to governmental and private agencies on a variety of psychiatric, forensic, substance abuse and organizational issues; extensive experience in all phases of capital litigation and correctional psychiatry. |

1

| | |
|---|---|
| January 1997-<br>September 1998 | Director of Clinical Services, San Francisco Target Cities Project.  Overall responsibility for ensuring the quality of the clinical services provided by the various departments of the project including the Central Intake Unit, the ACCESS Project and the San Francisco Drug Court   Also responsible for providing clinical in-service trainings for the staff of the Project and community agencies that requested technical assistance. |
| February 1996 -<br>November 1996 | Medical Director, Comprehensive Homeless Center, Department of Veterans Affairs Medical Center, San Francisco. Overall responsibility for the medical and psychiatric services at the Homeless Center. |
| March 1995 -<br>January 1996 | Chief, Intensive Psychiatric Community Care Program, (IPCC) Department of Veterans Affairs Medical Center, San Francisco.  Overall clinical/administrative responsibility for the IPCC, a community based case management program.  Duties also include medical/psychiatric consultation to Veteran Comprehensive Homeless Center.  This is a social work managed program that provides comprehensive social services to homeless veterans. |
| April 1991 -<br>February 1995 | Chief, Substance Abuse Inpatient Unit, (SAIU), Department of Veterans Affairs Medical Center, San Francisco. Overall clinical/administrative responsibility for SAIU. |
| September 1990 -<br>March 1991 | Psychiatrist, Substance Abuse Inpatient Unit, Veterans Affairs Medical Center, San Francisco.  Clinical responsibility for patients admitted to SAIU.  Provide consultation to the Medical/Surgical Units regarding patients with substance abuse issues. |
| August 1988 -<br>December 1989 | Director, Forensic Psychiatric Services, City and County of San Francisco.  Administrative and clinical responsibility for psychiatric services provided to the inmate population of San Francisco.  Duties included direct clinical and administrative responsibility for the Jail Psychiatric Services and the Forensic Unit at San Francisco General Hospital. |
| July 1986 -<br>August 1990 | Senior Attending Psychiatrist, Forensic Unit, University of California, San Francisco General Hospital.  Administrative and clinical responsibility for a 12-bed, maximum-security psychiatric ward.  Clinical supervision for psychiatric residents, postdoctoral psychology fellows and medical students assigned to the ward. Liaison with Jail Psychiatric Services, City and County of San Francisco.  Advise San Francisco City Attorney on issues pertaining to forensic psychiatry. |

1598

| | |
|---|---|
| July 1985<br>June 1986 | <u>Chief Resident, Department of Psychiatry, University of California San Francisco General Hospital.</u> Team leader of the Latino-focus inpatient treatment team (involving 10-12 patients with bicultural/bilingual issues); direct clinical supervision of 7 psychiatric residents and 3-6 medical students; organized weekly departmental Grand Rounds; administered and supervised departmental residents' call schedule; psychiatric consultant to hospital general medical clinic; assistant coordinator of medical student education; group seminar leader for introduction to clinical psychiatry course for UCSF second-year medical students. |
| July 1984 -<br>March 1987 | <u>Physician Specialist, Westside Crisis Center, San Francisco, CA.</u> Responsibility for Crisis Center operations during assigned shifts; admitting privileges at Mount Zion Hospital. Provided psychiatric consultation for the patients admitted to Mount Zion Hospital when requested. |
| April 1984 -<br>July 1985 | <u>Psychiatric Consultant, Marin Alternative Treatment, (ACT).</u> Provided medical and psychiatric evaluation and treatment of residential drug and alcohol clients; consultant to staff concerning medical/psychiatric issues. |
| August 1983 -<br>November 1984 | <u>Physician Specialist, Mission Mental Health Crisis Center, San Francisco, CA.</u> Clinical responsibility for Crisis Center clients; consultant to staff concerning medical/psychiatric issues. |
| July 1982-<br>July 1985 | <u>Psychiatric Resident, University of California, San Francisco.</u> Primary Therapist and Medical Consultant for the adult inpatient units at San Francisco General Hospital and San Francisco Veterans Affairs Medical Center; Medical Coordinator/Primary Therapist - Alcohol Inpatient Unit and Substance Abuse Clinic at San Francisco Veterans Affairs Medical Center; Outpatient Adult/Child Psychotherapist; Psychiatric Consultant - Adult Day Treatment Center - San Francisco Veterans Affairs Medical Center; Primary Therapist and Medial Consultant - San Francisco General Hospital Psychiatric Emergency Services; Psychiatric Consultant, Inpatient Medical/Surgical Units - San Francisco General Hospital. |
| June 1973 -<br>July 1978 | <u>Infantry Officer - United States Marine Corps.</u> Rifle Platoon Commander; Anti-tank Platoon Commander; 81mm Mortar Platoon Commander; Rifle Company Executive Officer; Rifle Company Commander; Assistant Battalion Operations Officer; Embarkation Officer; Recruitment Officer; Drug, Alcohol and Human Relations Counselor; Parachutist and Scuba Diver; Commander of a Vietnamese Refugee Camp. Received an Honorable Discharge. Highest rank attained was Captain. |

3

HONORS AND AWARDS:

| | |
|---|---|
| June 2015 | Recognized by the Psychiatry Residents Association of the University of California, San Francisco, School of Medicine, Department of Psychiatry for "Excellence in Teaching" for the academic year 2014-2015. |
| June 1995 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1994/1995. |
| June 1993 | Selected by the class of 1996, University of California, San Francisco, School of Medicine as outstanding lecturer, academic year 1992/1993. |
| May 1993 | Elected to Membership of Medical Honor Society, AOA, by the AOA Member of the 1993 Graduating Class of the University of California, San Francisco, School of Medicine. |
| May 1991 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1990-1991. |
| May 1990 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1989-1990. |
| May 1989 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as the outstanding psychiatric faculty member for the academic year 1988-1989. |
| May 1987 | Selected by the faculty and students of the University of California, San Francisco, School of Medicine as the recipient of the Henry J. Kaiser Award For Excellence in Teaching. |
| May 1987 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. The award covered the period of 1 July 1985 to 30 June 1986, during which time I served as Chief Psychiatric resident, San Francisco General Hospital. |
| May 1985 | Selected by the graduating class of the University of California, San Francisco, School of Medicine as Outstanding Psychiatric Resident. |
| 1985 | Mead-Johnson American Psychiatric Association Fellowship. One of sixteen nationwide psychiatric residents selected because of a demonstrated commitment to public sector psychiatry. Made presentation at Annual Hospital and Community Psychiatry Meeting in Montreal, Canada, in October 1985, on the "Psychiatric Aspects of the Acquired Immunodeficiency Syndrome." |

1600

MEMBERSHIPS:

| | |
|---|---|
| June 2000-<br>May 2008 | California Association of Drug Court Professionals. |
| July 1997-<br>June 1998 | President, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1996 -<br>June 1997 | President-Elect, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1995 -<br>June 1996 | Vice President, Northern California Area, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| April 1995 -<br>April 2002 | Associate Clinical Member, American Group Psychotherapy Association. |
| July 1992 -<br>June 1995 | Secretary-Treasurer, Alumni-Faculty Association, University of California, San Francisco, School of Medicine. |
| July 1990 -<br>June 1992 | Councilor-at-large, Alumni-Faculty Association, University of California, San Francisco, School of Medicine |

PUBLIC SERVICE:

| | |
|---|---|
| June 1992 | Examiner, American Board of Psychiatry and Neurology, Inc. |
| November 1992 -<br>January 1994 | California Tuberculosis Elimination Task Force, Institutional Control Subcommittee. |
| September 2000-<br>April 2005 | Editorial Advisory Board, *Juvenile Correctional Mental Health Report.* |
| May 2001-<br>2010 | Psychiatric and Substance Abuse Consultant, San Francisco Police Officers' Association. |
| January 2002-<br>June 2003 | Psychiatric Consultant, San Francisco Sheriff's Department Peer Support Program. |
| February 2003-<br>April 2004 | Proposition "N" (Care Not Cash) Service Providers' Advisory Committee, Department of Human Services, City and County of San Francisco. |
| December 2003-<br>January 2004 | Member of San Francisco Mayor-Elect Gavin Newsom's Transition Team. |

5

| | |
|---|---|
| February 2004-<br>June 2004 | Mayor's Homeless Coalition, San Francisco, CA. |
| April 2004-<br>January 2006 | Member of Human Services Commission, City and County of San Francisco. |
| February 2006-<br>January 2007;<br>April 2013-<br>January 2015 | Vice President, Human Services Commission, City and County of San Francisco. |
| February 2007-<br>March 2013;<br>February 2015-<br>present | President, Human Services Commission, City and County of San Francisco. |

UNIVERSITY SERVICE:

| | |
|---|---|
| October 1999-<br>October 2001 | Lecturer, University of California, San Francisco, School of Medicine Post Baccalaureate Reapplicant Program. |
| July 1999-<br>July 2001 | Seminar Leader, National Youth Leadership Forum On Medicine. |
| November 1998-<br>November 2001 | Lecturer, University of California, San Francisco, School of Nursing, Department of Family Health Care Nursing.  Lecture to the Advanced Practice Nurse Practitioner Students on Alcohol, Tobacco and Other Drug Dependencies. |
| January 1994 -<br>January 2001 | Preceptor/Lecturer, UCSF Homeless Clinic Project. |
| June 1990 -<br>November 1996 | Curriculum Advisor, University of California, San Francisco, School of Medicine. |
| June 1987 -<br>June 1992 | Facilitate weekly Support Groups for interns in the Department of Medicine.  Also, provide crisis intervention and psychiatric referral for Department of Medicine housestaff. |
| January 1987 –<br>June 1988 | Student Impairment Committee, University of California San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to identify, treat and prevent student impairment. |
| January 1986 –<br>June 1996 | Recruitment/Retention Subcommittee of the Admissions Committee, University of California, San Francisco, School of Medicine.<br>Advise the Dean of the School of Medicine on methods to attract and retain minority students and faculty. |
| October 1986 -<br>September 1987 | Member Steering Committee for the Hispanic Medical Education Resource Committee.<br>Plan and present educational programs to increase awareness of the special health needs of Hispanics in the United States. |

1602

| | |
|---|---|
| September 1983 -<br>June 1989 | Admissions Committee, University of California, School of Medicine.  Duties included screening applications and interviewing candidates for medical school. |
| October 1978 -<br>December 1980 | Co-Founder and Director of the University of California, San Francisco Running Clinic.<br>Provided free instruction to the public on proper methods of exercise and preventative health measures. |

TEACHING RESPONSIBILITIES:

| | |
|---|---|
| September 2016-<br>Present | Evidence-Based Inquiry Facilitator for the *Bridges Curriculum*, University of California, San Francisco, School of Medicine. |
| August 2014-<br>Present | Small Group Facilitator, Foundations of Patient Care, University of California, San Francisco, School of Medicine. |
| July 2003-<br>Present | Facilitate weekly psychotherapy training group for residents in the Department of Psychiatry. |
| January 2002-<br>January 2004 | Course Coordinator of Elective Course University of California, San Francisco, School of Medicine, "Prisoner Health."  This is a 1-unit course, which covers the unique health needs of prisoners. |
| September 2001-<br>June 2003 | Supervisor, San Mateo County Psychiatric Residency Program. |
| April 1999-<br>April 2001 | Lecturer, UCSF School of Pharmacy, Committee for Drug Awareness Community Outreach Project. |
| February 1998-<br>June 2000 | Lecturer, UCSF Student Enrichment Program. |
| January 1996 -<br>November 1996 | Supervisor, Psychiatry 110 students, Veterans Comprehensive Homeless Center. |
| March 1995-<br>December 20002 | Supervisor, UCSF School of Medicine, Department of Psychiatry, Substance Abuse Fellowship Program. |
| September 1994 -<br>June 1999 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine.  Designed, planned and taught course, Psychiatry 170.02, "Drug and Alcohol Abuse."  This is a 1-unit course, which covers the major aspects of drug and alcohol abuse. |
| August 1994 -<br>February 2006 | Supervisor, Psychiatric Continuity Clinic, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Supervise 4th Year medical students in the care of dual diagnostic patients. |
| February 1994 -<br>February 2006 | Consultant, Napa State Hospital Chemical Dependency Program Monthly Conference. |

1603

| | |
|---|---|
| July 1992 - June 1994 | Facilitate weekly psychiatric intern seminar, "Psychiatric Aspects of Medicine," University of California, San Francisco, School of Medicine. |
| July 1991- Present | Group and individual psychotherapy supervisor, Outpatient Clinic, Department of Psychiatry, University of California, San Francisco, School of Medicine. |
| January 1991 | Lecturer, University of California, San Francisco, School of Pharmacy course, "Addictionology and Substance Abuse Prevention." |
| September 1990 - February 1995 | Clinical supervisor, substance abuse fellows, and psychiatric residents, Substance Abuse Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - November 1996 | Off ward supervisor, PGY II psychiatric residents, Psychiatric Inpatient Unit, San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1991 | Group therapy supervisor, Psychiatric Inpatient Unit, (PIU), San Francisco Veterans Affairs Medical Center. |
| September 1990 - June 1994 | Course coordinator, Psychiatry 110, San Francisco Veterans Affairs Medical Center. |
| September 1989 - November 1996 | Seminar leader/lecturer, Psychiatry 100 A/B. |
| July 1988 - June 1992 | Clinical supervisor, PGY III psychiatric residents, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. |
| September 1987 - Present | Tavistock Organizational Consultant. Extensive experience as a consultant in numerous Tavistock conferences. |
| September 1987 - December 1993 | Course Coordinator of Elective Course, University of California, San Francisco, School of Medicine.  Designed, planned and taught course, Psychiatry 170.02, "Alcoholism".  This is a 1-unit course offered to medical students, which covers alcoholism with special emphasis on the health professional.  This course is offered fall quarter each academic year. |
| July 1987- June 1994 | Clinical supervisor/lecturer FCM 110, San Francisco General Hospital and Veterans Affairs Medical Center. |
| July 1986 - June 1996 | Seminar leader/lecturer Psychiatry 131 A/B. |
| July 1986 - August 1990 | Clinical supervisor, Psychology interns/fellows, San Francisco General Hospital. |
| July 1986 - August 1990 | Clinical supervisor PGY I psychiatric residents, San Francisco General Hospital |

8

| July 1986 - August 1990 | Coordinator of Medical Student Education, University of California, San Francisco General Hospital, Department of Psychiatry. Teach seminars and supervise clerkships to medical students including: Psychological Core of Medicine 100 A/B; Introduction to Clinical Psychiatry 131 A/B; Core Psychiatric Clerkship 110 and Advanced Clinical Clerkship in Psychiatry 141.01. |
|---|---|
| July 1985 – August 1990 | Psychiatric Consultant to the General Medical Clinic, University of California, San Francisco General Hospital. Teach and supervise medical residents in interviewing and communication skills. Provide instruction to the clinic on the psychiatric aspects of ambulatory medical care. |

COMMUNITY SERVICE AND PRISON CONDITIONS EXPERT WORK:

| May 2016- Present | Court-appointed monitor in *Ashoor Rasho, et al. v. Director John R. Baldwin, et al.*, No.:1:07-CV-1298-MMM-JEH (District Court, Peoria, Illinois.) This case involves the provision of constitutional mental health care to the inmate population of the Illinois Department of Corrections. |
|---|---|
| June 2015- Present | Senior Fellow, University of California, Criminal Justice & Health Consortium. |
| April 2014- Present | Plaintiffs' expert in *Hernandez, et al. v. County of Monterey, et al.*, No.: CV 13 2354 PSG. This case involves the provision of unconstitutional mental health and medical services to the inmate population of Monterey County Jail. |
| January-December 2014 | Federal Bureau of Prisons: Special Housing Unit Review and Assessment. This was a year-long review of the quality of mental health services in the segregated housing units of the BOP. |
| August 2012-Present | Plaintiffs' expert in *Parsons et al. v. Ryan* et al., (District Court, Phoenix, Arizona.) This case involves the provision of unconstitutional mental health and medical services to the inmate population of the Arizona Department of Corrections. |
| October 2007 -Present | Plaintiffs' expert in 2007-2010 overcrowding litigation and in opposing current efforts by defendants to terminate the injunctive relief in *Coleman v. Brown,* United States District Court, Eastern District of California, Case No. 2:90-cv-00520-LKK-JFM. The litigation involves plaintiffs' claim that overcrowding is causing unconstitutional medical and mental health care in the California state prison system. Plaintiffs won an order requiring the state to reduce its population by approximately 45,000 state prisoners. My expert opinion was cited several times in the landmark United States Supreme Court decision upholding the prison population reduction order. *See Brown v. Plata,* __ U.S. |

9

___, 131 S. Ct. 1910, 1933 n.6, 1935, 179 L.Ed.2d 969, 992 n.6, 994 (2011).

| | |
|---|---|
| July/August 2008-Present | Plaintiff psychiatric expert in the case of Fred Graves, et al., plaintiffs v. Joseph Arpaio, et al., defendants (District Court, Phoenix, Arizona.)  This case involved Federal oversight of the mental health treatment provided to pre-trial detainees in the Maricopa County Jails. |
| February 2006-<br>December 2009 | Board of Directors, Physician Foundation at California Pacific Medical Center. |
| June 2004-<br>September 2012 | Psychiatric Consultant, Hawaii Drug Court. |
| November 2003-<br>June 2008 | Organizational/Psychiatric Consultant, State of Hawaii, Department of Human Services. |
| June 2003-<br>December 2004 | Monitor of the psychiatric sections of the "Ayers Agreement," New Mexico Corrections Department (NMCD).  This is a settlement arrived at between plaintiffs and the NMCD regarding the provision of constitutionally mandated psychiatric services for inmates placed within the Department's "Supermax" unit. |
| October 2002-<br>August 2006 | Juvenile Mental Health and Medical Consultant, United States Department of Justice, Civil Rights Division, Special Litigation Section. |
| July 1998-<br>June 2000 | Psychiatric Consultant to the Pacific Research and Training Alliance's Alcohol and Drug Disability Technical Assistance Project.  This Project provides assistance to programs and communities that will have long lasting impact and permanently improve the quality of alcohol and other drug services available to individuals with disabilities. |
| July 1998-<br>February 2004 | Psychiatric Consultant to the National Council on Crime and Delinquency (NCCD) in its monitoring of the State of Georgia's secure juvenile detention and treatment facilities.  NCCD is acting as the monitor of the agreement between the United States and Georgia to improve the quality of the juvenile justice facilities, critical mental health, medical and educational services, and treatment programs.  NCCD ceased to be the monitoring agency for this project in June 1999.  At that time, the Institute of Crime, Justice and Corrections at the George Washington University became the monitoring agency.  The work remained unchanged. |
| July 1998-<br>July 2001 | Psychiatric Consultant to the San Francisco Campaign Against Drug Abuse (SF CADA). |
| March 1997-<br>Present | Technical Assistance Consultant, Center for Substance Abuse Treatment, Substance Abuse and Mental Health Services Administration, Department of Health and Human Services. |
| January 1996- | Psychiatric Consultant to the San Francisco Drug Court. |

10

June 2003

| | |
|---|---|
| November 1993-<br>June 2001 | Executive Committee, Addiction Technology Transfer Center (ATTC), University of California, San Diego. |
| December 1992 -<br>December 1994 | Institutional Review Board, Haight Ashbury Free Clinics, Inc. Review all research protocols for the clinic per Department of Health and Human Services guidelines. |
| June 1991-<br>February 2006 | Chief of Psychiatric Services, Haight Ashbury Free Clinic. Overall responsibility for psychiatric services at the clinic. |
| December 1990 -<br>June 1991 | Medical Director, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project. Responsible for directing all medical and psychiatric care at the clinic. |
| October 1996-July 1997 | Psychiatric Expert for the U.S. District Court, Northern District of California, in the case of Madrid v. Gomez, No. C90-3094-TEH. Report directly to the Special Master regarding the implementation of constitutionally mandated psychiatric care to the inmates at Pelican Bay State Prison. |
| April 1990 –January 2000 | Psychiatric Expert for the U.S. District Court, Eastern District of California, in the case of Gates v. Deukmejian, No. C1V S-87-1636 LKK-JFM.  Report directly to the court regarding implementation and monitoring of the consent decree in this case. (This case involves the provision of adequate psychiatric care to the inmates at the California Medical Facility, Vacaville). |
| January 1984 -<br>December 1990 | Chief of Psychiatric Services, Haight Ashbury Free Clinic, Drug Detoxification and Aftercare Project.  Direct medical/psychiatric management of project clients; consultant to staff on substance abuse issues. Special emphasis on dual diagnostic patients. |
| July 1981-<br>December 1981 | Medical/Psychiatric Consultant, Youth Services, Hospitality House, San Francisco, CA.  Advised youth services staff on client management.  Provided training on various topics related to adolescents. Facilitated weekly client support groups. |

SERVICE TO ELEMENTARY AND SECONDARY EDUCATION:

| | |
|---|---|
| January 1996 -<br>June 2002 | Baseball, Basketball and Volleyball Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| September 1994 -<br>Present | Soccer Coach, Convent of the Sacred Heart Elementary School, San Francisco, CA. |
| June 1991-<br>June 1994 | Board of Directors, Pacific Primary School, San Francisco, CA. |
| April 1989 - | Umpire, Rincon Valley Little League, Santa Rosa, CA. |

1607

July 1996

| | |
|---|---|
| September 1988 -<br>May 1995 | Numerous presentations on Mental Health/Substance Abuse issues to the student body, Hidden Valley Elementary School and Santa Rosa Jr. High School, Santa Rosa, CA. |

PRESENTATIONS:

1.     San Francisco Treatment Research Unit, University of California, San Francisco, Colloquium #1. (10/12/1990). "The Use of Anti-Depressant Medications with Substance-Abusing Clients."

2.     Grand Rounds. Department of Psychiatry, University of California, San Francisco, School of Medicine. (12/5/1990). "Advances in the Field of Dual Diagnosis."

3.     Associates Council, American College of Physicians, Northern California Region, Program for Leadership Conference, Napa, California. (3/3/1991). "Planning a Satisfying Life in Medicine."

4.     24th Annual Medical Symposium on Renal Disease, sponsored by the Medical Advisory Board of the National Kidney Foundation of Northern California, San Mateo, California. (9/11/1991). "The Chronically Ill Substance Abuser."

5.     Mentoring Skills Conference, University of California, San Francisco, School of Medicine, Department of Pediatrics. (11/26/91). "Mentoring as an Art."

6.     Continuing Medical Education Conference, Sponsored by the Department of Psychiatry, University of California, San Francisco, School of Medicine. (4/25/1992). "Clinical & Research Advances in the Treatment of Alcoholism and Drug Abuse."

7.     First International Conference of Mental Health and Leisure. University of Utah. (7/9/1992). "The Use of Commonly Abused Street Drugs in the Treatment of Mental Illness."

8.     American Group Psychotherapy Association Annual Meeting, San Francisco, California. (2/20/1993). "Inpatient Groups in Initial-Stage Addiction Treatment."

9.     Grand Rounds. Department of Child Psychiatry, Stanford University School of Medicine. (3/17/93, 9/11/96). "Issues in Adolescent Substance Abuse."

10.    University of California, Extension. Alcohol and Drug Abuse Studies Program. (5/14/93), (6/24/94), (9/22/95), (2/28/97). "Dual Diagnosis."

11.    American Psychiatric Association Annual Meeting. (5/26/1993). "Issues in the Treatment of the Dual Diagnosis Patient."

12

1608

12. Long Beach Regional Medical Education Center and Social Work Service, San Francisco Veterans Affairs Medical Center Conference on Dual Diagnosis. (6/23/1993). "Dual Diagnosis Treatment Issues."

13. Utah Medical Association Annual Meeting, Salt Lake City, Utah. (10/7/93). "Prescription Drug Abuse Helping your Patient, Protecting Yourself."

14. Saint Francis Memorial Hospital, San Francisco, Medical Staff Conference. (11/30/1993). "Management of Patients with Dual Diagnosis and Alcohol Withdrawal."

15. Haight Ashbury Free Clinic's 27th Anniversary Conference. (6/10/94). "Attention Deficit Disorder, Substance Abuse, Psychiatric Disorders and Related Issues."

16. University of California, San Diego. Addiction Technology Transfer Center Annual Summer Clinical Institute: (8/30/94), (8/29/95), (8/5/96), (8/4/97), (8/3/98). "Treating Multiple Disorders."

17. National Resource Center on Homelessness and Mental Illness, A Training Institute for Psychiatrists. (9/10/94). "Psychiatry, Homelessness, and Serious Mental Illness."

18. Value Behavioral Health/American Psychiatry Management Seminar. (12/1/1994). "Substance Abuse/Dual Diagnosis in the Work Setting."

19. Grand Rounds. Department of Oral and Maxillofacial Surgery, University of California, San Francisco, School of Dentistry. (1/24/1995). "Models of Addiction."

20. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project. (1/25/95, 1/24/96, 1/13/97, 1/21/98, 1/13/99, 1/24/00, 1/12/01). "Demystifying Dual Diagnosis."

21. First Annual Conference on the Dually Disordered. (3/10/1995). "Assessment of Substance Abuse." Sponsored by the Division of Mental Health and Substance Abuse Services and Target Cities Project, Department of Public Health, City and County of San Francisco.

22. Delta Memorial Hospital, Antioch, California, Medical Staff Conference. (3/28/1995). "Dealing with the Alcohol and Drug Dependent Patient." Sponsored by University of California, San Francisco, School of Medicine, Office of Continuing Medical Education.

23. Centre Hospitalier Robert-Giffaard, Beoupont (Quebec), Canada. (11/23/95). "Reconfiguration of Psychiatric Services in Quebec Based on the San Francisco Experience."

24. The Labor and Employment Section of the State Bar of California. (1/19/96). "Understanding Alcoholism and its Impact on the Legal Profession." MCCE Conference, San Francisco, CA.

25. American Group Psychotherapy Association, Annual Training Institute. (2/13-2/14/96), National Instructor - Designate training group.

26. American Group Psychotherapy Association, Annual Meeting. (2/10/96). "The Process Group at Work."

13

27. Medical Staff Conference, Kaiser Foundation Hospital, Pleasanton, California, "The Management of Prescription Drug Addiction". (4/24/96)

28. International European Drug Abuse Treatment Training Project, Ankaran, Slovenia, "The Management of the Dually Diagnosed Patient in Former Soviet Block Europe". (10/5-10/11/96)

29. Contra Costa County Dual Diagnosis Conference, Pleasant Hill, California, "Two Philosophies, Two Approaches: One Client".  (11/14/96)

30. Faith Initiative Conference, San Francisco, California, "Spirituality: The Forgotten Dimension of Recovery".  (11/22/96)

31. Alameda County Dual Diagnosis Conference, Alameda, California, "Medical Management of the Dually Diagnosed Patient". (2/4/97, 3/4/97)

32. Haight Ashbury Free Clinic's 30th Anniversary Conference, San Francisco, California, "Indicators for the Use of the New Antipsychotics". (6/4/97)

33. DPH/Community Substance Abuse Services/San Francisco Target Cities Project sponsored conference, "Intake, Assessment and Service Linkages in the Substance Abuse System of Care", San Francisco, California.  (7/31/97)

34. The Institute of Addictions Studies and Lewis and Clark College sponsored conference, 1997 Northwest Regional Summer Institute, "Addictions Treatment: What We Know Today, How We'll Practice Tomorrow; Assessment and Treatment of the High-Risk Offender".  Wilsonville, Oregon. (8/1/97)

35. The California Council of Community Mental Health Agencies Winter Conference, Key Note Presentation, "Combining funding sources and integrating treatment for addiction problems for children, adolescents and adults, as well as coordination of addiction treatment for parents with mental health services to severely emotionally disturbed children."  Newport Beach, California.  (2/12/98)

36. American Group Psychotherapy Association, Annual Training Institute, Chicago, Illinois. (2/16-2/28/1998), Intermediate Level Process Group Leader.

37. "Multimodal Psychoanalytic Treatment of Psychotic Disorders: Learning from the Quebec Experience."  The Haight Ashbury Free Clinics Inc., sponsored this seminar in conjunction with the San Francisco Society for Lacanian Studies and the Lacanian School of Psychoanalysis.  San Francisco, California.  (3/6-3/8/1998)

38. "AIDS Update for Primary Care: Substance Use & HIV: Problem Solving at the Intersection."  The East Bay AIDS Education & Training Center and the East Bay AIDS Center, Alta Bates Medical Center, Berkeley, California sponsored this conference. (6/4/1998)

39. Haight Ashbury Free Clinic's 31st Anniversary Conference, San Francisco, California, "Commonly Encountered Psychiatric Problems in Women." (6/11/1998)

40. Community Networking Breakfast sponsored by San Mateo County Alcohol & Drug Services and Youth Empowering Systems, Belmont, California, "Dual Diagnosis, Two Approaches, Two Philosophies, One Patient." (6/17/1998)

1610

41.  Grand Rounds, Department of Medicine, Alameda County Medical Center-Highland Campus, Oakland, California, "Medical/Psychiatric Presentation of the Patient with both Psychiatric and Substance Abuse Problems."  (6/19/1998)

42.  "Rehabilitation, Recovery, and Reality: Community Treatment of the Dually Diagnosed Consumer."  The Occupational Therapy Association of California, Dominican College of San Rafael and the Psychiatric Occupational Therapy Action Coalition sponsored this conference.  San Rafael, California.  (6/20/1998)

43.  "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Los Angeles County Department of Mental Health sponsored conference, Los Angeles, CA. (6/29/98)

44.  Grand Rounds, Wai'anae Coast Comprehensive Health Center, Wai'anae, Hawaii, "Assessment and Treatment of the Patient who presents with concurrent Depression and Substance Abuse."  (7/15/1998)

45.  "Dual Diagnostic Aspects of Methamphetamine Abuse", Hawaii Department of Health, Alcohol and Drug Abuse Division sponsored conference, Honolulu, Hawaii.  (9/2/98)

46.  9th Annual Advanced Pain and Symptom Management, the Art of Pain Management Conference, sponsored by Visiting Nurses and Hospice of San Francisco.  "Care Issues and Pain Management for Chemically Dependent Patients."   San Francisco, CA. (9/10/98)

47.  Latino Behavioral Health Institute Annual Conference, "Margin to Mainstream III: Latino Health Care 2000."  "Mental Illness and Substance Abuse Assessment: Diagnosis and Treatment Planning for the Dually Diagnosed", Los Angeles, CA.  (9/18/98)

48.  Chemical Dependency Conference, Department of Mental Health, Napa State Hospital, "Substance Abuse and Major Depressive Disorder."  Napa, CA.  (9/23/98)

49.  "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", San Mateo County Drug and Alcohol Services, Belmont, CA.  (9/30/98)

50.  "Assessment, Diagnosis and Treatment of the Patient with a Dual Diagnosis", Sacramento County Department of Mental Health, Sacramento, CA.  (10/13/98)

51.  California Department of Health, Office of AIDS, 1998 Annual AIDS Case Management Program/Medi-Cal Waiver Program (CMP/MCWP) Conference, "Triple Diagnosis: What's Really Happening with your Patient."  Concord, CA.  (10/15/98)

52.  California Mental Health Director's Association Meeting: Dual Diagnosis, Effective Models of Collaboration; "Multiple Problem Patients: Designing a System to Meet Their Unique Needs", San Francisco Park Plaza Hotel.  (10/15/98)

53.  Northwest GTA Health Corporation, Peel Memorial Hospital, Annual Mental Health Conference, "Recognition and Assessment of Substance Abuse in Mental Illness." Brampton, Ontario, Canada.  (10/23/98)

54.  1998 California Drug Court Symposium, "Mental Health Issues and Drug Involved Offenders."  Sacramento, CA.  (12/11/98)

55.    "Assessment, Diagnosis and Treatment Planning for the Dually Diagnosed", Mono County Alcohol and Drug Programs, Mammoth Lakes, CA.  (1/7/99)

56.    Medical Staff Conference, Kaiser Foundation Hospital, Walnut Creek, CA, "Substance Abuse and Major Depressive Disorder."  (1/19/99)

57.    "Issues and Strategies in the Treatment of Substance Abusers", Alameda County Consolidated Drug Courts, Oakland, CA.  (1/22/99 & 2/5/99)

58.    Compass Health Care's 12th Annual Winter Conference on Addiction, Tucson, AZ: "Dual Systems, Dual Philosophies, One Patient", "Substance Abuse and Developmental Disabilities" & "Assessment and Treatment of the High Risk Offender."  (2/17/99)

59.    American Group Psychotherapy Association, Annual Training Institute, Houston, Texas. (2/22-2/24/1999).  Entry Level Process Group Leader.

60.    "Exploring A New Framework: New Technologies For Addiction And Recovery", Maui County Department of Housing and Human Concerns, Malama Family Recovery Center, Maui, Hawaii.  (3/5 & 3/6/99)

61.    "Assessment, Diagnosis and Treatment of the Dual Diagnostic Patient", San Bernardino County Office of Alcohol & Drug Treatment Services, San Bernardino, CA.  (3/10/99)

62.    "Smoking Cessation in the Chronically Mentally Ill, Part 1", California Department of Mental Health, Napa State Hospital, Napa, CA.  (3/11/99)

63.    "Dual Diagnosis and Effective Methods of Collaboration", County of Tulare Health & Human Services Agency, Visalia, CA.  (3/17/99)

64.    Pfizer Pharmaceuticals sponsored lecture tour of Hawai'i.  Lectures included: Major Depressive Disorder and Substance Abuse, Treatment Strategies for Depression and Anxiety with the Substance Abusing Patient, Advances in the Field of Dual Diagnosis & Addressing the Needs of the Patient with Multiple Substance Dependencies.  Lecture sites included: Straub Hospital, Honolulu; Maui County Community Mental Health; Veterans Administration Hospital, Honolulu; Hawai'i (Big Island) County Community Mental Health; Mililani (Oahu) Physicians Center; Kahi Mohala (Oahu) Psychiatric Hospital; Hale ola Ka'u (Big Island) Residential Treatment Facility.  (4/2-4/9/99)

65.    "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Mendocino County Department of Public Health, Division of Alcohol & Other Drug Programs, Ukiah, CA.  (4/14/99)

66.    "Assessment of the Substance Abusing & Mentally Ill Female Patient in Early Recovery", Ujima Family Services Agency, Richmond, CA.  (4/21/99)

67.    California Institute for Mental Health, Adult System of Care Conference, "Partners in Excellence", Riverside, California.  (4/29/99)

68.    "Advances in the Field of Dual Diagnosis", University of Hawai'i School of Medicine, Department of Psychiatry Grand Rounds, Queens Hospital, Honolulu, Hawai'i.  (4/30/99)

69.    State of Hawai'i Department of Health, Mental Health Division, "Strategic Planning to Address the Concerns of the United States Department of Justice for the Alleged Civil Rights Abuses in the Kaneohe State Hospital."  Honolulu, Hawai'i.  (4/30/99)

70. "Assessment, Diagnosis and Treatment Planning for the Patient with Dual/Triple Diagnosis", State of Hawai'i, Department of Health, Drug and Alcohol Abuse Division, Dole Cannery, Honolulu, Hawai'i. (4/30/99)

71. 11th Annual Early Intervention Program Conference, State of California Department of Health Services, Office of Aids, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Concord, California. (5/6/99)

72. The HIV Challenge Medical Conference, Sponsored by the North County (San Diego) AIDS Coalition, "Addressing the Substance Abuse and Mental Health Needs of the HIV (+) Patient." Escondido, California. (5/7/99)

73. "Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders", Sonoma County Community Mental Health's Monthly Grand Rounds, Community Hospital, Santa Rosa, California. (5/13/99)

74. "Developing & Providing Effective Services for Dually Diagnosed or High Service Utilizing Consumers", third annual conference presented by the Southern California Mental Health Directors Association. Anaheim, California. (5/21/99)

75. 15th Annual Idaho Conference on Alcohol and Drug Dependency, lectures included "Dual Diagnostic Issues", "Impulse Control Disorders" and "Major Depressive Disorder." Boise State University, Boise, Idaho. (5/25/99)

76. "Smoking Cessation in the Chronically Mentally Ill, Part 2", California Department of Mental Health, Napa State Hospital, Napa, California. (6/3/99)

77. "Alcohol and Drug Abuse: Systems of Care and Treatment in the United States", Ando Hospital, Kyoto, Japan. (6/14/99)

78. "Alcoholism: Practical Approaches to Diagnosis and Treatment", National Institute On Alcoholism, Kurihama National Hospital, Yokosuka, Japan. (6/17/99)

79. "Adolescent Drug and Alcohol Abuse", Kusatsu Kinrofukushi Center, Kusatsu, Japan. (6/22/99)

80. "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Osaka Drug Addiction Rehabilitation Center Support Network, Kobe, Japan. (6/26/99)

81. "Assessment, Diagnosis and Treatment of the Patient with Multiple Diagnoses", Santa Barbara County Department of Alcohol, Drug, & Mental Health Services, Buellton, California. (7/13/99)

82. "Drug and Alcohol Issues in the Primary Care Setting", County of Tulare Health & Human Services Agency, Edison Ag Tac Center, Tulare, California. (7/15/99)

83. "Working with the Substance Abuser in the Criminal Justice System", San Mateo County Alcohol and Drug Services and Adult Probation Department, Redwood City, California. (7/22/99)

84. 1999 Summer Clinical Institute In Addiction Studies, University of California, San Diego School of Medicine, Department of Psychiatry. Lectures included: "Triple Diagnosis: HIV, Substance Abuse and Mental Illness. What's Really Happening to your Patient?"

"Psychiatric Assessment in the Criminal Justice Setting, Learning to Detect Malingering."  La Jolla, California.  (8/3/99)

85.  "Assessment, Diagnosis and Treatment Planning for the Patient with Dual and Triple Diagnoses", Maui County Department of Housing and Human Concerns, Maui Memorial Medical Center.  Kahului, Maui.  (8/23/99)

86.  "Proper Assessment of the Asian/Pacific Islander Dual Diagnostic Patient", Asian American Recovery Services, Inc., San Francisco, California.  (9/13/99)

87.  "Assessment and Treatment of the Dual Diagnostic Patient in a Health Maintenance Organization", Alcohol and Drug Abuse Program, the Permanente Medical Group, Inc., Santa Rosa, California.  (9/14/99)

88.  "Dual Diagnosis", Residential Care Providers of Adult Residential Facilities and Facilities for the Elderly, City and County of San Francisco, Department of Public Health, Public Health Division, San Francisco, California.  (9/16/99)

89.  "Medical and Psychiatric Aspects of Methamphetamine Abuse", Fifth Annual Latino Behavioral Health Institute Conference, Universal City, California.  (9/23/99)

90.  "Criminal Justice & Substance Abuse", University of California, San Diego & Arizona Department of Corrections, Phoenix, Arizona.  (9/28/99)

91.  "Creating Balance in the Ohana: Assessment and Treatment Planning", Hale O Ka'u Center, Pahala, Hawai'i.  (10/8-10/10/99)

92.  "Substance Abuse Issues of Runaway and Homeless Youth", Homeless Youth 101, Oakland Asian Cultural Center, Oakland, California.  (10/12/99)

93.  "Mental Illness & Drug Abuse - Part II", Sonoma County Department of Mental Health Grand Rounds, Santa Rosa, California.  (10/14/99)

94.  "Dual Diagnosis/Co-Existing Disorders Training", Yolo County Department of Alcohol, Drug and Mental Health Services, Davis, California.  (10/21/99)

95.  "Mental Health/Substance Abuse Assessment Skills for the Frontline Staff", Los Angeles County Department of Mental Health, Los Angeles, California.  (1/27/00)

96.  "Spirituality in Substance Abuse Treatment", Asian American Recovery Services, Inc., San Francisco, California.  (3/6/00)

97.  "What Every Probation Officer Needs to Know about Alcohol Abuse", San Mateo County Probation Department, San Mateo, California.  (3/16/00)

98.  "Empathy at its Finest", Plenary Presentation to the California Forensic Mental Health Association's Annual Conference, Asilomar, California.  (3/17/00)

99.  "Model for Health Appraisal for Minors Entering Detention", Juvenile Justice Health Care Committee's Annual Conference, Asilomar, California.  (4/3/00)

100.  "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Humboldt County Department of Mental Health and Substance Abuse Services, Eureka, California.  (4/4-4/5/00)

18

101.   "The Dual Diagnosed Client", Imperial County Children's System of Care Spring Training, Holtville, California.  (5/15/00)

102.   National Association of Drug Court Professionals 6th Annual Training Conference, San Francisco, California.   "Managing People of Different Pathologies in Mental Health Courts", (5/31 & 6/1/00); "Assessment and Management of Co-Occurring Disorders" (6/2/00).

103.   "Culture, Age and Gender Specific Perspectives on Dual Diagnosis", University of California Berkeley Extension Course, San Francisco, California.  (6/9/00)

104.   "The Impact of Alcohol/Drug Abuse and Mental Disorders on Adolescent Development", Thunder Road Adolescent Treatment Centers, Inc., Oakland, California.   (6/29 & 7/27/00)

105.   "Assessing the Needs of the Entire Patient: Empathy at its Finest", NAMI California Annual Conference, Burlingame, California.  (9/8/00)

106.    "The Effects of Drugs and Alcohol on the Brain and Behavior", The Second National Seminar on Mental Health and the Criminal Law, San Francisco, California.  (9/9/00)

107.   Annual Conference of the Associated Treatment Providers of New Jersey, Atlantic City, New Jersey.   "Advances in Psychopharmacological Treatment with the Chemically Dependent Person" & "Treatment of the Adolescent Substance Abuser" (10/25/00).

108.   "Psychiatric Crises In The Primary Care Setting", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service.   (11/1/00, 3/13/01)

109.   "Co-Occurring Disorders: Substance Abuse and Mental Health", California Continuing Judicial Studies Program, Center For Judicial Education and Research, Long Beach, California.  (11/12-11/17/00)

110.   "Adolescent Substance Abuse Treatment", Alameda County Behavioral Health Care Services, Oakland, California.  (12/5/00)

111.   "Wasn't One Problem Enough?"   Mental Health and Substance Abuse Issues.   2001 California Drug Court Symposium, "Taking Drug Courts into the New Millennium." Costa Mesa, California.  (3/2/01)

112.   "The Impact of Alcohol/Drug Abuse and Mental Health Disorders on the Developmental Process."   County of Sonoma Department of Health Services, Alcohol and Other Drug Services Division. Santa Rosa, California.  (3/8 & 4/5/01)

113.   "Assessment of the Patient with Substance Abuse and Mental Health Issues."  San Mateo County General Hospital Grand Rounds.  San Mateo, California.  (3/13/01)

114.   "Dual Diagnosis-Assessment and Treatment Issues."  Ventura County Behavioral Health Department Alcohol and Drug Programs Training Institute, Ventura, California.  (5/8/01)

115.   Alameda County District Attorney's Office 4th Annual 3R Conference, "Strategies for Dealing with Teen Substance Abuse." Berkeley, California.  (5/10/01)

19

116. National Association of Drug Court Professionals 7th Annual Training Conference, "Changing the Face of Criminal Justice." I presented three separate lectures on the following topics: Marijuana, Opiates and Alcohol. New Orleans, LA. (6/1-6/2/01)

117. Santa Clara County Drug Court Training Institute, "The Assessment, Diagnosis and Treatment of the Patient with Multiple Disorders." San Jose, California. (6/15/01)

118. Washington Association of Prosecuting Attorneys Annual Conference, "Psychiatric Complications of the Methamphetamine Abuser." Olympia, Washington. (11/15/01)

119. San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis." (1/14/02)

120. First Annual Bi-National Conference sponsored by the Imperial County Behavioral Health Services, "Models of Family Interventions in Border Areas." El Centro, California. (1/28/02)

121. The California Association for Alcohol and Drug Educators 16th Annual Conference, "Assessment, Diagnosis and Treatment of Patients with Multiple Diagnoses." Burlingame, California. (4/25/02)

122. Marin County Department of Health and Human Services, Dual Diagnosis and Cultural Competence Conference, "Cultural Considerations in Working with the Latino Patient." (5/21/02)

123. 3rd Annual Los Angeles County Law Enforcement and Mental Health Conference, "The Impact of Mental Illness and Substance Abuse on the Criminal Justice System." (6/5/02)

124. New Mexico Department of Corrections, "Group Psychotherapy Training." Santa Fe, New Mexico. (8/5/02)

125. Judicial Council of California, Administrative Office of the Courts, "Juvenile Delinquency and the Courts: 2002." Berkeley, California. (8/15/02)

126. California Department of Alcohol and Drug Programs, "Adolescent Development and Dual Diagnosis." Sacramento, California. (8/22/02)

127. Haight Ashbury Free Clinic's 36th Anniversary Conference, San Francisco, California, "Psychiatric Approaches to Treating the Multiple Diagnostic Patient." (6/6/03)

128. Motivational Speaker for Regional Co-Occurring Disorders Training sponsored by the California State Department of Alcohol and Drug Programs and Mental Health and the Substance Abuse Mental Health Services Administration-Center for Substance Abuse Treatment, Samuel Merritt College, Health Education Center, Oakland, California. (9/4/03)

129. "Recreational Drugs, Parts I and II", Doctor Marina Bermudez Issues In College Health, San Francisco State University Student Health Service. (10/1/03), (12/3/03)

130. "Detecting Substance Abuse in our Clients", California Attorneys for Criminal Justice Annual Conference, Berkeley, California. (10/18/03)

20

131.  "Alcohol, Alcoholism and the Labor Relations Professional", 10th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Pasadena, California.  (4/2/04)

132.  Lecture tour of Japan (4/8-4/18/04).  "Best Practices for Drug and Alcohol Treatment." Lectures were presented in Osaka, Tokyo and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

133.  San Francisco State University, School of Social Work, Title IV-E Child Welfare Training Project, "Adolescent Development and Dual Diagnosis."  (9/9/04)

134.  "Substance Abuse and the Labor Relations Professional", 11th Annual Labor and Employment Public Sector Program, sponsored by the State Bar of California. Labor and Employment Section.  Sacramento, California.  (4/8/05)

135.  "Substance Abuse Treatment in the United States", Clinical Masters Japan Program, Alliant International University.  San Francisco, California. (8/13/05)

136.  Habeas Corpus Resource Center, Mental Health Update, "Understanding Substance Abuse."  San Francisco, California. (10/24/05)

137.  Yolo County Department of Behavioral Health, "Psychiatric Aspects of Drug and Alcohol Abuse."  Woodland, California. (1/25/06), (6/23/06)

138.  "Methamphetamine-Induced Dual Diagnostic Issues", Medical Grand Rounds, Wilcox Memorial Hospital, Lihue, Kauai. (2/13/06)

139.  Lecture tour of Japan (4/13-4/23/06).  "Assessment and Treatment of the Patient with Substance Abuse and Mental Illness."  Lectures were presented in Hiroshima and Kyoto for the Drug Abuse Rehabilitation Center of Japan.

140.  "Co-Occurring Disorders: Isn't It Time We Finally Got It Right?" California Association of Drug Court Professionals, 2006 Annual Conference.  Sacramento, California. (4/25/06)

141.  "Proper Assessment of Drug Court Clients", Hawaii Drug Court, Honolulu. (6/29/06)

142.  "Understanding Normal Adolescent Development," California Association of Drug Court Professionals, 2007 Annual Conference.  Sacramento, California. (4/27/07)

143.  "Dual Diagnosis in the United States," Conference sponsored by the Genesis Substance Abuse Treatment Network.  Medford, Oregon.  (5/10/07)

144.  "Substance Abuse and Mental Illness: One Plus One Equals Trouble," National Association of Criminal Defense Lawyers 2007 Annual Meeting & Seminar.  San Francisco, California.  (8/2/07)

145.  "Capital Punishment," Human Writes 2007 Conference.  London, England.  (10/6/07)

146.  "Co-Occurring Disorders for the New Millennium," California Hispanic Commission on Alcohol and Drug Abuse, Montebello, California.  (10/30/07)

147.  "Methamphetamine-Induced Dual Diagnostic Issues for the Child Welfare Professional," Beyond the Bench Conference.  San Diego, California. (12/13/07)

21

1617

148. "Working with Mentally Ill Clients and Effectively Using Your Expert(s)," 2008 National Defender Investigator Association (NDIA), National Conference, Las Vegas, Nevada. (4/10/08)

149. "Mental Health Aspects of Diminished Capacity and Competency," Washington Courts District/Municipal Court Judges' Spring Program. Chelan, Washington. (6/3/08)

150. "Reflection on a Career in Substance Abuse Treatment, Progress not Perfection," California Department of Alcohol and Drug Programs 2008 Conference. Burlingame, California. (6/19/08)

151. Mental Health and Substance Abuse Training, Wyoming Department of Health, "Diagnosis and Treatment of Co-occurring Mental Health and Substance Abuse." Buffalo, Wyoming. (10/6/09)

152. 2010 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th & 5th, 2010)

153. Facilitating Offender Re-entry to Reduce Recidivism: A Workshop for Teams, Menlo Park, CA. This conference was designed to assist Federal Courts to reduce recidivism. "The Mentally-Ill Offender in Reentry Courts," (9/15/2010)

154. Juvenile Delinquency Orientation, "Adolescent Substance Abuse." This was part of the "Primary Assignment Orientations" for newly appointed Juvenile Court Judges presented by The Center for Judicial Education and Research of the Administrative Office of the Court. San Francisco, California. (1/12/2011, 1/25/12, 2/27/13 & 1/8/14)

155. 2011 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 4th, 2011)

156. 2012 B.E. Witkin Judicial College of California, "Alcohol and Other Drugs and the Courts." San Jose, California. (August 2nd, 2012)

157. Mexican Capital Legal Assistance Program Meeting, "Issues Related to Mental Illness in Mexican Nationals." Santa Fe, New Mexico (10/12/12); Houston, Texas (4/23/13)

158. Los Angeles County Public Defender's Capital Case Seminar, "Mental Illness and Substance Abuse." Los Angeles, California. (9/27/13)

159. "Perspectives on Race and Ethnicity for Capital and Non-Capital Defense Lawyers," conference sponsored by the Administrative Office of the US Courts, New York, NY., September 18-20, 2015.

160. San Francisco Collaborative Courts, Superior Court of California, County of San Francisco sponsored training, "Personality Disorders," February 19, 2016.


PUBLICATIONS:


22

1)   Kanas, N., Stewart, P. and Haney, K. (1988). *Content and Outcome in a Short-Term Therapy Group for Schizophrenic Outpatients*. Hospital and Community Psychiatry, 39, 437-439.

2)   Kanas, N., Stewart, P. (1989*). Group Process in Short-Term Outpatient Therapy Groups for Schizophrenics.* Group, Volume 13, Number 2, Summer 1989, 67-73.

3)   Zweben, J.E., Smith, D.E. and Stewart, P. (1991). *Psychotic Conditions and Substance Use: Prescribing Guidelines and Other Treatment Issues.* Journal of Psychoactive Drugs, Vol. 23(4), Oct.-Dec. 1991, 387-395.

4)   Banys, P., Clark, H.W., Tusel, D.J., Sees, K., Stewart, P., Mongan, L., Delucchi, K., and Callaway, E. (1994). *An Open Trial of Low Dose Buprenorphine in Treating Methadone Withdrawal*. Journal of Substance Abuse Treatment, Vol. 11(1), 9-15.

5)   Hall, S.M., Tunis, S., Triffleman, E., Banys, P., Clark, H.W., Tusel, D., Stewart, P., and Presti, D. (1994). *Continuity of Care and Desipramine in Primary Cocaine Abusers.* The Journal of Nervous and Mental Disease, Vol. 182(10), 570-575.

6)   Galloway, G.P., Frederick, S.L., Thomas, S., Hayner, G., Staggers, F.E., Wiehl, W.O., Sajo, E., Amodia, D., and Stewart, P. (1996). *A Historically Controlled Trial Of Tyrosine for Cocaine Dependence.* Journal of Psychoactive Drugs, Vol. 28(3), pages 305-309, July-September 1996.

7)   Stewart, P. (1999). *Alcoholism: Practical Approaches To Diagnosis And Treatment.* Prevention, (Newsletter for the National Institute On Alcoholism, Kurihama Hospital, Yokosuka, Japan) No. 82, 1999.

8)   Stewart, P. (1999). *New Approaches and Future Strategies Toward Understanding Substance Abuse.* Published by the Osaka DARC (Drug Abuse Rehabilitation Center) Support Center, Osaka, Japan, November 11, 1999.

9)   Stewart, P. (2002). *Treatment Is A Right, Not A Privilege.* Chapter in the book, *Understanding Addictions-From Illness to Recovery and Rebirth,* ed. by Hiroyuki Imamichi and Naoko Takiguchi, Academia Press (Akademia Syuppankai): Kyoto, Japan, 2002.

10)  Stewart, P., Inaba, D.S., and Cohen, W.E. (2004). *Mental Health & Drugs.* Chapter in the book, *Uppers, Downers, All Arounders, Fifth Edition*, CNS Publications, Inc., Ashland, Oregon.

11)  James Austin, Ph.D., Kenneth McGinnis, Karl K. Becker, Kathy Dennehy, Michael V. Fair, Patricia L. Hardyman, Ph.D. and Pablo Stewart, M.D. (2004) *Classification of High Risk and Special Management Prisoners, A National Assessment of Current Practices.* National Institute of Corrections, Accession Number 019468.

12)  Stanley L. Brodsky, Ph.D., Keith R. Curry, Ph.D., Karen Froming, Ph.D., Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D. and Hans Toch, Ph.D. (2005) *Brief of Professors and Practitioners of Psychology and Psychiatry as AMICUS CURIAE in Support of Respondent: Charles E. Austin, et al. (Respondents) v. Reginald S. Wilkinson, et al. (Petitioners), In The Supreme Court of the United States, No. 04-495.*

13)   Stewart, P., Inaba, D.S., and Cohen, W.E.  (2007). *Mental Health & Drugs.*  Chapter in the book, *Uppers, Downers, All Arounders, Sixth Edition*, CNS Publications, Inc., Ashland, Oregon.

14)   Stewart, P., Inaba, D.S. and Cohen, W.E. (2011). *Mental Health & Drugs.* Chapter 10 in the book, *Uppers, Downers, All Arounders, Seventh Edition,* CNS Publications, Inc., Ashland, Oregon.

*15)*   Carl Fulwiler, M.D., Ph.D., Craig Haney, Ph.D., J.D., Pablo Stewart, M.D., Hans Toch, Ph.D. (2015) Brief of *Amici Curiae* Professors and Practitioners of Psychiatry and Psychology in Support of Petitioner: *Alfredo Prieto v. Harold C. Clarke, et al., On Petition For A Writ of Certiorari To The United States Court of Appeals For The Fourth Circuit, In The Supreme Court of the United States, No. 15-31.*

1620

# Appendix C

## Rule 26 Case List

*PABLO STEWART, M.D.*
**Psychiatric Consultant**
**824 Ashbury Street**
**San Francisco, CA 94117**
**(415) 753-0321**
**(Fax) 753-5479**
**E Mail pab4emi@aol.com**

## TESTIMONY/DEPOSITIONS January 2000-Present

1. People versus Juan Duarte Gonzales (Lincoln County, Washington, January 2000)
2. People versus Jerry Lane Davis (Stanislaus County, California, September 2000)
3. James Andrew Melton versus Arthur Calderon, et al. (United States District Court, Los Angeles, California, December 2000)
4. Fremont Unified School District versus James Parks (Deposition taken in San Francisco, California, April 2001)
5. People versus Pablo Lomeli (Douglas County, Arizona, August 2001)
6. Dunlap versus County of Mendocino (Deposition taken in Oakland California, September 2001)
7. Maxwell Hoffman versus A.J. Arave, Warden, et al. (Deposition taken in San Francisco, October 2001)
8. People versus Michelle Michaud (Alameda County, California, April 2002)
9. People versus David Attias (Santa Barbara County, California, May/June 2002)
10. People versus Larry Christopher Graham (Contra Costa County, California, October 2002)
11. People versus Miguel Enrique Diaz (San Mateo County, California, November/December 2002)
12. United States versus Eugene Frederick Boyce, III (District Court, Honolulu, Hawai'i December 2002)
13. People versus Robert Daniel Weston (Stanislaus County, California, April/July 2003)
14. People versus Vincent Sanchez (Ventura County, California, August 2003)
15. Armstrong Petition JW01-6450 (San Francisco Juvenile Court, December 2003)
16. People versus Daniel Mugnolo (San Francisco City and County, December 2003)
17. Brandon Astor Jones versus Frederick Head, Warden (Deposition taken in San Francisco, January 2004)
18. David Perkins versus Frederick Head, Warden (Deposition taken in San Francisco, March 2004)
19. People versus Marino Hernandez (San Mateo County, California, June 2004)
20. Raphael Camargo versus Larry Norris, Director, Arkansas Department of Correction (Deposition taken in San Francisco, July 2004)
21. People versus Ronald Mathews (King County, Washington, August 2004)
22. People versus Huberto Mendoza (Stanislaus County, California, December 2004)
23. People versus James Essick (San Diego County, California, June 2005)

24. People versus Jesse Ignacio Sanchez Gomez (Ada County, Idaho, July/August 2005)
25. People versus Adrian Camacho (San Diego County, California, October 2005)
26. People versus Huberto Mendoza (Stanislaus County, California, November 2005)
27. People versus Paul Speer (Maricopa County, Arizona, January 2006)
28. People versus Mark Thigpen (San Mateo County, California, January 2006)
29. United States versus Tommy Ray Elam (District Court, Los Angeles, California, February 2006)
30. Enrique Arevalo versus Frederick Head, Warden (Deposition taken in San Francisco, March 2006)
31. United States versus Danny Lee Jones (District Court, Phoenix, Arizona, March 2006)
32. People versus Omar Dent, III (Los Angeles County, California, May 2006)
33. People versus Delaney Marks (Alameda County, California, May 2006)
34. People versus Angel Maturino Resendiz (Harris County, Texas, June 2006)
35. People versus Antonio Nicolosi (San Mateo County, California, July 2006)
36. Gregory Paul Lawler versus Frederick Head, Warden (Deposition taken in San Francisco, July 2006)
37. United States versus Todd Sarver (District Court, San Francisco, California, August 2006)
38. United States versus Eugene Frederick Boyce, III (United States District Court, Honolulu, Hawaii, October 2006)
39. Arthur Torlucci versus W.A. Duncan, (District Court, Santa Ana, California, November 2006)
40. Joaquin Enrique Arevalo versus William Terry, Warden, (Butts County, Georgia, December 2006)
41. People versus Jerry Cabonce, (San Mateo County, California, January 2007)
42. People versus Rodrigo Paniagua, (Santa Clara County, California, February 2007)
43. Gregory Paul Lawler versus William Terry, Warden, (Butts County, Georgia, February 2007)
44. United States versus Francisco Rodriguez, (District Court, Santa Ana, California, April 2007)
45. People versus O'Neal Durgin, (San Mateo County, California, June 2007)
46. Sepulveda versus Beard et al., (Bartonsville, Pennsylvania, June 2007)
47. Webster versus Ayers et al., (District Court, Sacramento, California, September 2007)
48. Ronald Deere versus Jeanne Woodford, et al., (District Court, Los Angeles, California, October 2007)
49. People versus Eric V. Hall (Ada County, Idaho, October 2007)
50. Rickey Dale Newman versus Larry Norris, Director, Arkansas Department of Correction (District Court, Fort Smith, Arkansas, November 2007
51. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, December 2007)
52. People versus Matthew Cunningham (Maricopa County, Arizona, January & February 2008)
53. People versus Alfredo Prieto (Fairfax County, Virginia, February 2008)

54. People versus Edward Gutierrez (Santa Clara County, California, May 2008)

55. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants. (Deposition taken in Phoenix, Arizona, July 2008). A supplemental deposition was also taken in July 2008 approximately 2 weeks after the initial deposition.

56. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, August 2008)

57. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Deposition taken in Sacramento, California, September 2008)

58. United States versus Naeem Williams (District Court, Honolulu, Hawaii, November 2008)

59. Ralph Coleman, et al. versus Arnold Schwarzenegger, et al. (Three Judge Panel, District Court, San Francisco, California, December 2008)

60. United States versus Michael Behenna (United States Army Court Marshall, Fort Campbell, Kentucky, February 2009)

61. United States versus Steven Green (District Court, Paducah, Kentucky, May 2009)

62. People versus Francisco Merino (San Mateo County, California, July 2009)

63. Milton Lewis versus State of California (District Court, Sacramento, California, October 2009)

64. People versus Adrian Sedano (San Mateo County, California, November 2009)

65. United States versus Noshir S. Gowadia (District Court, Honolulu, Hawaii, November 2009)

66. Johnny A. Johnson versus State of Missouri (St. Louis, Missouri, December 2009)

67. Martin Kipp versus State of California (District Court, Los Angeles, California, December 2009)

68. David Welch versus State of California (Martinez, California, September 2010)

69. State of Arizona versus Eddy Rose (Phoenix, Arizona, September 2010)

70. State of Delaware versus Gary Ploof (Dover, Delaware, October 2010)

71. State of Arizona versus Steven Ray Newell (Phoenix, Arizona, March 2011)

72. State of Arkansas versus Ricky Lee Newman (Fort Smith, Arkansas, March 2011)

73. People versus Kerri Livingston (San Mateo County, California, March 2011)

74. People versus Alexander Youshock (San Mateo County, California, April 2011)

75. United States versus Francisco Rodriguez (District Court, Santa Ana, California, May 2011)

76. State of Connecticut versus Robert Breton (Hartford, Connecticut, July 2011)

77. United States versus Billie Allen (St. Louis, Missouri, December 2011)

78. People versus Mohammed Ali (San Mateo County, California, February 2012)

79. Clemency Hearing re: Robert Towery (Florence, Arizona, March 2012)

80. United States versus Danny John, Jr. (Prescott, Arizona, March 2012)

81. State of Ohio versus Abdul H. Awkal (Cleveland, Ohio, June 2012)

82. People versus Monica McCarrick (Solano County, California, June 2012)

83. People versus Robert Hall (Ada County, Idaho, October 2012)

84. People versus Alamoti Finau (San Mateo County, California, November 2012)

85. United States versus Merrell Hobbs (District Court, Philadelphia, Pennsylvania, November 2012)

86. Ex Parte Juan Lizcano, W05-59563-S(A) (Dallas, Texas, November 2012)
87. People versus David Vanalstine (San Mateo County, California, December 2012)
88. Sinisterra versus the United States (District Court, Kansas City, Missouri, January 2013)
89. People versus Jing Hua Wu (San Jose, California, February & March 2013)
90. Coleman versus Brown (Deposition taken in San Francisco, California, March 2013)
91. Coleman versus Brown (District Court, Sacramento, CA, June 2013)
92. Tate versus Humphrey (Deposition taken in San Francisco, California, June 2013)
93. Coleman versus Brown (District Court, Sacramento, CA, October 2013)
94. People versus Alegria (Tucson, Arizona, October 2013)
95. Commonwealth v. Michael Pruitt (Reading, PA, November 2013)
96. Coleman versus Brown (District Court, Sacramento, CA, December 2013)
97. Fred Graves, et al., Plaintiffs v. Joseph Arpaio, et al., Defendants (District Court, Phoenix, Arizona, March 2014)
98. Deposition taken in Parsons, et al v. Ryan. March 28, 2014, San Francisco, CA.
99. Evidentiary hearing in State of Arizona v. Albert Martinez Carreon. Phoenix Arizona, April 21 & 22, 2014.
100. United States v. Naeem Williams, (District Court, Honolulu, HI, April 29 & 30, and June 3, 2014
101. Deposition taken in Hernandez v. County of Monterey, San Francisco, CA, July 8, 2014
102. United States v. Thomas Steven Sanders, (District Court, Alexandria, LA, September 22 & 23, 2014)
103. Deposition taken in Kurian David, et al., plaintiffs v. Signal International, LLC, defendant, San Francisco, California, October 2014)
104. People v. Dennis McGraw (Vallejo, California, November 2014)
105. People v. Leticia Serna (San Jose, California, December 2014)
106. Wilridge v. Marshall, (District Court, San Francisco, California, February 2015)
107. People v. Hugo Munguia-Hernandez (Redwood City, California, July 2015)
108. Deposition taken in Goddard v. State of California, et al., San Mateo, California, September 2015.
109. People v. Bryan Thomas (Redwood City, California, October 2015)
110. Carlos Gutierrez v. E.K. McDaniel, Warden, et al. (Reno, Nevada, January 2016)
111. State of Arkansas v. Rickey Dale Newman (Fort Smith, Arkansas, January 2016)
112. Deposition taken in Roscoe Walker v. Ford Motor Company, et al., San Mateo, California, February 2016.
113. People v. Philip Law (Boise, Idaho, May 2016)
114. United States v. Joel Manuel Taylor, (District Court, San Francisco, CA, March 18, April 25 & May 25, 2016)
115. United States v. Henry Cervantes, et al, (District Court, Oakland, CA, June 28, 2016)

116. Manual Camacho v. State of Arkansas, (District Court, Fort Smith, Arkansas, November 8, 2016)
117. The People of Guam vs. Mark Anthony Torre, Jr. (Superior Court of Guam, Agana, Guam, February 22, 2017)

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## PETITIONER'S PROFFER OF EXPERT TESTIMONY

## FROM THOMAS KOSTEN, M.D.

## DECLARATION OF THOMAS KOSTEN, M.D.

I, Thomas Kosten, declare as follows:

1.     My credentials for this review include training as a medical doctor with board certification from the American Board of Psychiatry and Neurology.  I am presently a professor in the Departments of Psychiatry, Pharmacology and Neuroscience at Baylor College of Medicine, Vice-Chair of Psychiatry and founding Director of the Division of Addictive Disorders and Alcoholism. I was previously Professor of Psychiatry and Medicine at Yale University and Chief of Psychiatry for the VA Connecticut Healthcare System.  I am also the past national Director for the VA substance use disorders Quality Enhancement Research Initiative Center, which monitors and sets standards for the quality of VA substance abuse care, and Past President of both the American Academy of Addiction Psychiatry and the College on the Problems of Drug Dependence.  Other credentials include founding Vice-Chair of the Addictions Qualifications Board of the American Board of Psychiatry and Neurology, and Vice-chair of the DSM-3, 4 and 5 addictions committees for deciding the DSM criteria for diagnosing substance use disorders.  I have also edited the most recent textbook for the American Psychiatric Association on amphetamine and methamphetamine pharmacology, abuse and treatment.  A copy of my curriculum vitae is attached hereto as Appendix I.  In it are detailed my internationally recognized credentials as an expert in the diagnosis and treatment of drug dependency, with licensing in both Connecticut and Texas.  In my practice, I have had numerous opportunities to diagnose and treat addicted patients in outpatient, residential, forensic and inpatient settings.  Because of

my education, training and experience, I can provide an expert review of Mr. Barrett's records and that includes, but is not limited to, the diagnosis and effects of amphetamine use disorder.

2.      Over the past several weeks I have been reviewing the materials related to Kenneth Eugene Barrett and his conviction and sentencing to death for his episode with police and possession of amphetamine on September 23, 1999.  The list of materials I have reviewed is attached hereto as Appendix II. Post-conviction counsel requested that I address Mr. Barrett's substance abuse as a mitigating factor in determining his sentence after conviction on murder and the amphetamine charges.  In particular, I was asked what are the effects of chronic and acute amphetamine (or methamphetamine) use in a person with an underlying severe mental illness.  Furthermore, I was asked to address what effects might amphetamine have on a person, when undergoing a covert police confrontation in the middle of the night.

3.      Briefly, my review and opinion of Mr. Barrett's mental state at the time of his arrest depends on three factors:  1. His underlying mental illness of untreated bipolar disorder and learning disability/ADHD from untreated attention deficit hyperactivity disorder (ADHD), 2. The effects of chronic amphetamine and other drug use on his judgement and cognitive abilities, 3. The acute effects of amphetamine.

4.      First, his underlying mental illnesses of untreated bipolar disorder and learning disability/ADHD are evident from the time of his childhood, which occurred in a very disorganized and disruptive environment with an alcoholic and irresponsible mother as a single parent.  Furthermore, his family history strongly suggests a genetic linkage of his

bipolar disorder and substance use disorder (SUD) through his father, mother and other relatives. Bipolar disorder as well as SUD have a strong genetic association within families of over 60% likelihood for inheriting these disorders through affected relatives with bipolar disorder and independently through relatives with SUD. Thus, he was at high risk for SUD based on inheritance of bipolar with SUD and of SUD alone in other relatives. The widespread prevalence of SUD in his immediate and extended family was quite clear from the records. SUD is a brain disease that is not a simple matter of choice or failure of will power, and Mr. Barrett was a very sad victim of this biological disorder of SUD.

5. Statements from several of his relatives and his two psychiatric hospitalizations support Mr. Barrett's manic and depressive behavior over his lifetime. When he was depressed and suicidal in 1986, he was hospitalized and treated with the antidepressants Elavil and Ascendin. While he did not have sustained compliance as an outpatient, the failure of these medications probably also reflects a miss-diagnosis of primary depression rather than bipolar disorder. The treatment of bipolar patients with antidepressants will make them worse by precipitating a manic, irritable state that may have triggered a worsening in his ongoing cycles of depression and manic agitation possibly contributing to a second hospitalization and treatment with Haldol, an antipsychotic agent, in 1995. Again, this treatment with Haldol rather than the indicated medications for bipolar disorder such as lithium, valproate or topiramate was a diagnostic and therapeutic mistake on the part of his treaters. This mistake was further compounded by his mother removing Mr. Barrett from the hospital after only a few days, when inpatient management and stabilization of bipolar patients typically requires 10 to 14 days. She also did not appear to arrange that

Mr. Barrett outpatient care and continuation of medication adjustments. Thus, he had two clearly insufficient episodes of care for his underlying bipolar disorder and these insufficient attempts at rehabilitation were through no fault of Mr. Barrett. In the declaration of Dr. Woods, further evidence of psychotic perceptions are evident in Mr. Barrett's reporting "dirigibles in the sky" spying on his behavior. These psychotic symptoms also may have been enhanced by amphetamine use, as I will address below.

6.     The neuropsychological testing that Mr. Barrett later completed confirmed these mental illnesses and learning disability/ADHD. The testing by Myla Young and its rescoring by Dr. Miora confirmed severe impairments in the areas of cognition necessary for making accurate judgements when under stressful conditions and that are essential for inhibiting strong provoked responses such as self-defense during an attack. Because this testing was done many years after any substance abuse, there is no question that these results reflect inherited psychiatric disorders not the effects of acute or chronic drug abuse. While I later refer to the chronic effects of amphetamine on damaging brain function, these drug-induced deficits have also been show to resolve after several years of abstinence.

7.     Testing by Randall Price similarly showed substantial inherited limitations in self-control that could result in violent responses, particularly under the influence of drugs or alcohol. Mr. Price's interpretation of the PCL-R and his use of the term "psychopathy" are inaccurate and incorrect, however. First, psychopathy is not a psychiatric diagnosis. Second, these tests he was using do not predict violence or inability to control violent impulses. A deficit in executive brain functioning, on which all the various tests and testers agree, does

not correlate with predicting or accounting for past or future violence. Thus, I found his conclusions misleading and incorrect.

8.      A critical point is that these two mental illnesses – bipolar disorder and learning disability/ADHD – can respond to rehabilitation. Mr. Barrett was not previously afforded adequate rehabilitation by means of appropriate pharmacological treatment prior to his incarceration. Appropriate rehabilitation can indeed compensate and lead to recovery from the associated behavioral deficits when this type of patient is placed in an appropriate setting.  One of those settings has been his stay in prison where he has not used drugs nor been provoked by violent encounters.  His behavior in prison has shown minimal problems with impulse control.  He appears to have had one episode in the past 10 years when he painted walls on the range and threw a paint can on the floor in frustration.  However, he has not had any assaults on prison staff or had any indications of interpersonal violence. One of the testing experts, government psychologist J. Randall Price, predicted that such "cyclic violence" would characterize Mr. Barrett as a psychopathic individual.  Instead, Mr. Barrett behavior has demonstrated coping quietly with his mental illnesses and learning disabilities/ADHD even without pharmacological treatment.  This relatively calm acceptance does not characterize a "psychopathic" individual, who is beyond rehabilitation. Furthermore, continuing in a structured institutional environment even with substantially more contact with fellow prisoners rather than just prison guards would be a humane and acceptable disposition for Mr. Barrett rather than execution.

9.      Second, the chronic use of amphetamine can produce significant damage to pre-frontal areas of the brain thereby impairing judgement and rational reactions to what

might be considered life-threatening situations such as occurred on that night of September 23, 1999.  This drug induced brain damage would compound Mr. Barrett's impairments from his substantial and significant mental illnesses, as described above.  Amphetamine damage to brain cells or neurons is well documented in animal and human studies and specifically damages dopamine neurons and decreases N-acetyl-aspartate.  This neuronal damage is similar to many severe brain diseases such as Alzheimer's disease and other dementias, epilepsy, multiple sclerosis, brain tumors and stroke.  These diseases also consistently show decreased N-acetyl-aspartate, and this decrease in the drug users' brains supports neuronal loss or damage as a result of long-term methamphetamine use. The mechanism for amphetamines causing such damage is by releasing large quantities of dopamine in the brain, which is converted by the brain into a neurotoxin – 6 hydroxy-dopamine. The brain forms this toxin in order to kill the neurons that are over-stimulating the other neurons by releasing these vast amounts of dopamine. These brain changes from killing dopamine neurons can take many years to recover.  Animal studies show brain abnormalities persisting four years after amphetamine use stops. In humans, heavy, regular use can cause hallucinations, delusions and feelings of paranoia, which were evident in Mr. Barrett back in September 1999 and appeared to have resolved by the time of his examination in 2009, as might be expected.  Overall, as indicated above, at the times of his multiple examinations in prison he showed no evidence of ongoing paranoia or psychotic effects of his past amphetamine abuse or of violence associated in the literature with SUD.

10. Third, acute amphetamine use produces paranoia as described in the Woods declaration with the specific example of Mr. Barrett seeing "dirigibles over his house" spying

on him.  This self-report is consistent with Mr. Lundsford's evidence for Mr. Barrett using amphetamine a few hours before the police incident and shooting on the night of September 23-24, 1999.  This acute amphetamine use and paranoia at that time would further impair Mr. Barrett's ability to act rationally.  Furthermore, his inherited disability in executive brain functioning would then seriously interfere with his ability to stop firing his gun, when surrounded and attacked by the police in unmarked cars at night.  His perception of defending himself and his son from attack could not be properly modulated due to these dual inherited disorders of bipolar and ADHD and would be very likely to continue even in the face of police later identifying themselves during that night's police assault. Ironically, amphetamine is also the most effective treatment for ADHD, and Mr. Barrett may have discovered this on his own earlier in life.  This self-medication requires relatively modest dose of amphetamine, but most abusers take substantially greater doses than required to ameliorate ADHD and amphetamine will also aggravate bipolar manic disorder, so it is typically not used in these difficult to treat patients with both bipolar and ADHD disorders. Other medications are available for those patients with both disorders, and I might suggest that these other treatment options be considered for Mr. Barrett to help his mental health and the concentration problems that he still has.

11.     In summary, Kenneth Barrett has bipolar disorder and a learning disability/ADHD that both produce behavioral deficits in judgement and on a person's ability to inhibit strong or  impulsive behavioral responses once initiated.  These two brain disorders have been worsened by an amphetamine use disorder of severe intensity that has further damaged his brain in regions essential for emotional control and judgement.  Finally,

amphetamine use at the time of Mr. Barrett's police assault on his home would severely increase his paranoia and inability to rationally respond to the situation and not respond by firing his guns at the police, who were not clearly identified due to their unmarked vehicles and arriving late at night.  All three of these conditions can respond to rehabilitation and have shown evidence of responding in the 10 years of his incarceration.  Thus, his potential for rehabilitation is real and deserves consideration in sentencing him to a typical prison environment where he would interact with other prisoners and be expected to exercise the same level of self-control that he has manifested over this extended period of time with the prison staff.  Furthermore, one of his inherited disorders – ADHD – is typically treated with amphetamines in children and adults with excellent resolution of the behavioral problems that are part of ADHD.  Thus, medications might be very appropriately used in his rehabilitation and even include other non-amphetamine medications for managing ADHD, especially given Mr. Barrett's bipolar disorder which complicates his course of treatment as previously discussed. In my opinion, these three conditions at the time of this incident and his subsequent rehabilitation should serve as mitigating factors in determining the punishment for Mr. Barrett.

12.     I was available to consult with defense counsel and to testify at the time of Mr. Barrett's federal trial. If called to do so, I would have testified consistent with the foregoing.

13.     I am being paid at the rate of $350 per hour for my work on Mr. Barrett's case. My contract caps my compensation at $33,700 without further approval of the Federal Defender's Office.

I declare, under the penalty of perjury, of the laws of the United States of America and the States of Texas and Oklahoma, that this declaration is true and correct and based on my personal review of the information referenced here.

Executed by me this third day of March 2017 in Harris County, Texas.


/s/ Thomas Kosten
THOMAS KOSTEN, M.D.

# Appendix I

## Curriculum Vitae of Dr. Thomas Kosten

# Thomas R. Kosten, MD
## Curriculum Vitae

**I. General Biographical Information**

    **A. Personal**

        1. Thomas R. Kosten, M.D.

            Michael E. DeBakey VAMC

            2002 Holcombe Blvd.

            Research (151), Bldg 110, Rm 229

            Houston, Texas 77030

            Phone: (713) 794-7032

            Fax: (713) 794-8679

            Email: kosten@bcm.edu

        2. USA Citizen by Birth

        3. Education:

            a. B.S. Biophysics, Rensselaer Polytechnic Institute/Troy, NY, 1973

            b. M.A., Yale University/New Haven, CT, 1995
               M.D., Cornell University Medical College/New York, NY, 1977

            c. Postgraduate Training: Medicine Intern at Greenwich Hospital, Greenwich, CT, dates of attendance 1977-1978, Psychiatry Resident at Yale University School of Medicine, New Haven, CT, date of attendance 1979-1981, Robert Wood Johnson Clinical Scholar, Yale University School of Medicine, New Haven, CT, date of attendance 1981-1983

    **B. Academic Appointments**

        1. Current faculty position:

- Jay H. Waggoner Endowed Chair; July 2006-Present
- Vice-Chair, Psychiatry for Research; July 2006-Present
- Director, Division of Alcohol and Addiction Psychiatry; July 2006-Present
- Co-Director, Institute for Clinical & Translational Research; 2010-Present
- Professor, Psychiatry; July 2006-Present
- Professor, Neuroscience; July 2006-Present
- Professor, Pharmacology; July 2007-Present
- Professor, Immunology and Rheumatology: July 2012-Present

        2. Previous:

- Associate Vice President for Research; Baylor College of Medicine, July 2009-Sept 2011
- Research Director, VA National Substance Use Disorders Quality Enhancement Research Initiative (QUERI) July 2006-Sept 2011
- Professor, Psychiatry and Medicine, Yale University, 1995-2006
- Professor, Graduate Program for Clinical Investigation, Yale, 2000-2006
- Chief of Psychiatry, VA Connecticut, 1996-2000
- Director, Division of Substance Abuse, Yale; 1992-1996
- Associate Director, Substance Abuse Treatment Unit, Yale, 1984-1992
- Assistant to Associate Professor of Psychiatry, Yale SOM, 1983-95

Thomas R. Kosten, MD
CV

3. Current courtesy faculty appointments at other institutions:
   • Distinguished Professor of Psychiatry, Peking University, 2007-Present
   • Professor, Chinese National Institute on Drug Dependence, 2008-Present
   • Adjunct Professor of Psychiatry, University of Texas at Houston Medical Center, 2008-Present
   • Adjunct Professor of Epidemiology, UTMD Anderson Cancer Center, 2009–Present

## C.  Other advanced training/experience

1. Formal Sabbatical leave:
   • Baylor College of Medicine, Houston, TX, July 2005-Dec 2005
   • Congressional Fellow, US House of Representatives, House Subcommittee on Human Resources for NIH, FDA, CDC, (C. Shays. Chair), Washington, DC, 1998-1999

2. Other specialized training following academic appointment:
   • Congressional Fellow, US House of Representatives, House of Subcommittee on Human Resources,1998-1999

## D.  Other Information

### 1.  Honors or Awards

| | |
|---|---|
| 2002-on | America's Top Doctors, 1st – Current Edition |
| 2005-on | 60th Diamond Edition of Who's Who in America |
| May 2014 | Distinguished Life Fellow, American Psychiatric Association (APA) |
| 1996-2014 | Distinguished Fellow, American Psychiatric Association (APA) |
| October 2011 | Research Career Award, American Psychiatric Association (APA) for developing addiction vaccines, San Fransisco, California |
| September 2011 | Research Career Award from the Spanish Psychiatric Association (SPA) for developing addiction vaccines, Barcelona, Spain |
| 2000-2011 | Senior Scientist Award, National Institute on Drug Abuse (NIDA) |
| 2008-2013 | Best Doctors in America |
| 2009-2010 | Best Doctors in America, Addiction Psychiatry |
| December 2008 | Founder's Award, American Academy of Addiction Psychiatry, Coronado, CA, |
| 2001-2005 | Top Doctors, New York Metro Area 5th-9th Editions |
| 2000 | Nyswander Award for Research in Opiate Dependence, American Methadone Treatment Association |
| 1987-1996 | Research Scientist Development Award, NIDA |
| 1993 | Joel Elkes International Award for Outstanding Contributions to Psychopharmacology, American College of Neuropsychopharmacology (ACNP) |

1639

Thomas R. Kosten, MD
CV

|  |  |
|---|---|
| 1990 | Joseph Cochin Award, Research in Substance Abuse, Committee on Problems of Drug Dependence (CPDD), ReChartered Committee of National Academy of Science (NAS) |
| 1985 | Travel Fellowship, Committee on Problems of Drug Dependence (CPDD) |
| 1977 | Deithelem Prize for Excellence in Psychiatry, Cornell |
| 1972 | Fellow, in Biophysics, National Science Foundation, Rensselaer |

2. **Board Eligibility/Certifications**

| | |
|---|---|
| 2008-on | Texas medical license M8094 |
| 1984-current | Diplomate, American Board of Psychiatry and Neurology, |
| 1991-current | Diplomate, Added Qualifications in Addiction Psychiatry & American Bd of Psychiatry and Neurology |
| 1978-current | Connecticut Medical License 021140. |

DEA: XAK9572959
DCP Connecticut: 16939

3. **Other non-academic positions**
FDA Advisory Boards for:
Drug Safety and Risk Management
Anesthetics and Addiction Medications
Rheumatology (ad hoc)

II. **Research Information**
   A. **Current Research Support**
      1. Current Support

         a. Technical Title of Project: Alcohol and Substance Abuse Research Program (ASARP) Consortium Award
         b. Name of Funding Agency:  Department of Defense, CDMRP, through a Prime award to RTI (Rick Williams, PI/PD)
         c. Investigator Relationship: Site PI
         d. Dates of Funding: 09/2015 through 09/2020
         e. Annual Direct Costs for Overall Period: $810,162.00
         f. Specify Grant or Contract: Contract

         a. Technical Title of Project: A Phase III study in Opiate Dependent Patients
         b. Name of Funding Agency: Alkermes
         c. Investigator Relationship: Site PI
         d. Dates of Funding: 10/2015-03/2017
         e. Annual Direct Costs for Overall Period: $500,000
         f. Specify Grant or Contract: Contract

Thomas R. Kosten, MD
CV

    a. Technical Title of Project: Initiative for Neuroscience Discovery (MB-MIND)
    b. Name of Funding Agency: Menninger-BCM-McNair
    c. Investigator Relationship: Co-PI
    d. Dates of Funding: 07/2013-06/2016
    e. Annual Direct Costs for Overall Period: $238,000
    f. Specify Grant or Contract: Contract

    a. Technical Title of Project: Doxazosin, Phase II Clinical Trial
    b. Name of Funding Agency: Baylor College of Medicine
    c. Investigator Relationship: PI
    d. Dates of Funding: 07/2014-08/2016
    e. Annual Direct Costs for Overall Period: $100,000
    f. Specify Grant or Contract: Contract

    a. Technical Title of Project: Toomim Fund for Psychiatric Genetics
    b. Name of Funding Agency: Baylor College of Medicine
    c. Investigator Relationship: PI
    d. Dates of Funding: 07/2012-12/2016
    e. Annual Direct Costs for Overall Period: $100,000
    f. Specify Grant or Contract: Contract

    a. Technical Title of Project: Daniel L. Duncan Institute for Clinical and Translational Research (ICTR)
    b. Name of Funding Agency: Daniel L. Duncan Foundation
    c. Investigator Relationship: Co-PI
    d. Dates of Funding: 01/01/2011-12/31/2016
    e. Annual Direct Costs for Overall Period: $3.4 million
    f. Specify Grant or Contract: Grant

    a. Technical Title of Project: 1DP1DA033502 Human Methamphetamine Vaccine: Translational Avante Garde Award
    b. Name of Funding Agency: NIH/NIDA
    c. Investigator Relationship: PI
    d. Dates of Funding: 9/1/2011-8/31/2016
    e. Annual Direct Costs for Overall Period: $500,000
    f. Specify Grant or Contract: Grant

2. **Previous Support** (partial listing of over 40 grants)
    a. Technical Title of Project: P50DA018197 Stimulant pharmacotherapy: Noradrenergic Targets
    b. Name of Funding Agency: NIH/NIDA
    c. Investigator Relationship: PI
    d. Dates of Funding: 7/1/2004-6/30/2015
    e. Annual Direct Costs for Overall Period: $1,613,804

Thomas R. Kosten, MD
CV

    f.    Specify Grant or Contract: Grant

    a.    Technical Title of Project: Phase 2, Double-Blind, Placebo-Controlled, Parallel-Group, Multi-Center Trial Of Nepicastat For Cocaine Dependence
    b.    Name of Funding Agency: NIH/NIDA
    c.    Investigator Relationship: PI
    d.    Dates of Funding:09/01/2012-08/31/2014
    e.    Annual Direct Costs for Overall Period: $232,299
    f.    Specify Grant or Contract: Grant

    a.    Technical Title of Project: R01-DA025223 Collaborative Clinical Trials in Drug Abuse: Cocaine Vaccine
    b.    Name of Funding Agency: NIH/NIDA
    c.    Investigator Relationship: PI
    d.    Dates of Funding:6/1/2008-5/31/2015
    e.    Annual Direct Costs for Overall Period: $335,067
    f.    Specify Grant or Contract: Grant

    a.    Technical Title of Project: Genomic, Neural, Preclinical Analyses for Smoking Cessation
    b.    Name of Funding Agency: Helis Medical Research Foundation
    c.    Investigator Relationship: Co-PI
    d.    Dates of Funding: 04/01/2011-09/30/2014
    e.    Annual Direct Costs for Overall Period:  $330,000
    f.    Specify Grant or Contract: Grant

    a.    Technical Title of Project: 5U01DA023898-02 Developing Immunotherapeutics for Methamphetamine Abuse
    b.    Name of Funding Agency: NIH/NIDA
    c.    Investigator Relationship: PI
    d.    Dates of Funding: 8/1/2009-7/31/2011
    e.    Annual Direct Costs for Overall Period: $449,529
    f.    Specify Grant or Contract: Grant

    a.    Technical Title of Project: PT074384-1 PTSD Intramural Investigator Initiated Research Award: Nepicastat for the treatment of PTSD in OIF/OEF Veterans
    b.    Name of Funding Agency: DOD
    c.    Investigator Relationship: PI/PD
    d.    Dates of Funding: 10/1/2008-9/30/2011
    e.    Annual Direct Costs for Overall Period: $375,000
    f.    Specify Grant or Contract: Research Award

Thomas R. Kosten, MD
CV

a. Technical Title of Project: 5U01MH79639-02 Tropisetron with Risperidone for Schizophrenia
b. Name of Funding Agency: NIH/NIMH
c. Investigator Relationship: PI
d. Dates of Funding:3/1/2007-2/28/2011
e. Annual Direct Costs for Overall Period: $227,271
   (Concurrent with K05 award)
f. Specify Grant or Contract: Grant

a. Technical Title of Project: 7K05DA000454 Comorbidity in Cocaine and Opioid Pharmacotherapy
b. Name of Funding Agency: NIH/NIDA
c. Investigator Relationship: PI
d. Dates of Funding: 9/1/2005-2/28/2011
e. Annual Direct Costs for Overall Period: $117,000
f. Specify Grant or Contract: Grant

a. Technical Title of Project: U19DA021002 Kappa Opioid Antagonist for Cocaine Addiction
b. Name of Funding Agency: NIH/NIDA
c. Investigator Relationship: PI
d. Dates of Funding:9/1/2005-8/31/2010
e. Annual Direct Costs for Overall Period: $312,925
   (Concurrent with K05 award)
f. Specify Grant or Contract: Grant

a. Technical Title of Project: 5R01DA018863 Heroin Addiction Treatment Naltrexone and Adrenergic Agents
b. Name of Funding Agency: NIH/NIDA
c. Investigator Relationship: PI
d. Dates of Funding: 6/10/2005-5/31/2008
e. Annual Direct Costs for Overall Period:$142,227
   (Concurrent with K05 award)
f. Specify Grant or Contract: Grant

a. Technical Title of Project: VA Merit Grant
b. Name of Funding Agency: Biomedical Laboratory, R&D Service Prog. 821
c. Investigator Relationship: PI
d. Dates of Funding: 06/2002-06/2006
e. Annual Direct Costs for Overall Period: $123,000
f. Specify grant or contract: Grant

a. Technical Title of Project: R01DA05626 Pharmacotherapy for Opioid and Cocaine Dependence
b. Name of Funding Agency: NIH/NIDA

1643

Thomas R. Kosten, MD
CV

    c.  Investigator Relationship: PI
    d.  Dates of Funding: 8/1/1988-5/31/2006
    e.  Annual Direct Costs for Overall Period: $319,312
    f.  Specify Grant or Contract: Grant

    a.  Technical Title of Project: R01DA15477 Cocaine Vaccine for Methadone Maintained Patients
    b.  Name of Funding Agency: NIH/NIDA
    c.  Investigator Relationship: PI
    d.  Dates of Funding: 9/27/2002-6/30/2006
    e.  Annual Direct Costs for Overall Period: $350,590
    f.  Specify Grant or Contract: Grant

    a.  Technical Title of Project: U19DA13326 Novel Pharmacotherapy for treatment of Cocaine Addiction
    b.  Name of Funding Agency: NIH/NIDA
    c.  Investigator Relationship: PI
    d.  Dates of Funding: 10/1/2000-9/30/2005
    e.  Annual Direct Costs for Overall Period: $301,527
    f.  Specify Grant or Contract: Grant

    a.  Technical Title of Project: P50-DA12762 Cocaine Pharmacotherapies for Comorbid Populations
    b.  Name of Funding Agency: NIH/NIDA
    c.  Investigator Relationship: PI
    d.  Dates of Funding: 9/30/1999-2/29/2005
    e.  Annual Direct Costs for Overall Period: $688,001
    f.  Specify Grant or Contract: Grant

**B.  National Scientific Participation:**
   1.  **Journal editorial boards, etc.**

| | |
|---|---|
| 2012-Present | Editor, The American Journal on Addictions |
| 2008-Present | Editorial Board, Brain Pharmacology |
| 2002-Present | Editorial Board, Journal on Studies on Alcohol |
| 2006–2011 | Editor-in-Chief, The American Journal of Drug and Alcohol Abuse |
| 2000-2010 | Editorial Board, Science and Practice Perspectives |
| 1988-2008 | Co-Editor, Substance Abuse Guilford Press |
| 1996-2006 | Founding and Senior Deputy Editor, American Journal on Addictions |
| 1990-2006 | Editorial Board, Journal of Nervous and Mental Disease |
| 1988-2006 | Deputy Editor, The American Journal of Drug and Alcohol Abuse |
| 1996-2002 | Editorial Board, Neuropsychopharmacology |
| 1996-2000 | Editorial Board, American Journal of Psychiatry |

Thomas R. Kosten, MD
CV

1992-2000        Editorial Board, Drug and Alcohol Dependence

1990-1996        Consulting Editor, Clinical Advances in the Treatment of Psychiatric Disorders

2. **Review panels, Advisory Boards, etc.**

2015-Present     Expert Opinion – Federal Trade Commission (FTC). Retained as an expert in the evaluation of the efficacy claims of Elimidrol for opiate withdrawal and opiate addiction.

2015-Present     Advisory Board Member – UHDARDP II (R24) External Advisory Board, University of Houston, TX.

2012-Present     Advisory Board Member – K12 DAHRS External Advisory Board, Yale College of Medicine, CT.

2010-Present     Advisory Board Member – NIDA T32 Advisory Board, UT Health Science Center, San Antonio, TX.

2014     Expert Member – Roundtable Discussion of the United States House Energy and Commerce Committee with United States Congressmen Pete Olson and Gene Green – Convened meeting to ensure the United States' continued preeminence in research. Oct 30, 2014. Houston, TX.

2014     Health Services Research and Development (HSR&D) Expert Member – Scientific Merit Review Panel, Department of Veterans' Affairs. Aug 26-27, 2014. Washington, DC.

2014     Expert Member – Advisory Panel: Anesthetic and Analgesic Drug Products Advisory Committee (AADPAC). Food and Drug Administration, FDA/CDER/Office of Drug Evaluation II/Division of Anesthesia, Analgesia and Addiction Products. June 11-12, 2014.Silver Spring, MD.

2014     Expert Member – Advisory Panel, National Institute on Drug Abuse, Division of Pharmacologies and Medical Consequences of Drug Abuse (DPMCDA). April 10-13, 2014. Orlando, FL.

1998-2014     Advisory Board Member – VA National Substance Abuse Advisory Group-QUERI

2011-2012     Expert Member – Committee on Prevention, Diagnosis, Treatment, and Management of Substance Use Disorders in the U.S. Armed Forces – Congressionally Mandated Panel convened by the Institute of Medicine (IOM)

2008-2012     Expert Member – Medication Development Research Subcommittee, NIDA Initial Review Group

2008     Expert Member – Internal Steering Committee, VA Rural Health Research Center

2007     DSMB Member – VA National Cooperative Studies DSMB for Prazosin for PTSD

2007     Expert Member – U.S. FDA, Drug Safety and Risk Management Advisory Committee

2007     DSMB Chair – Probuphine Data Safety Monitoring Board. Titan Pharmaceuticals

2006     Expert Member – The World Federation of Societies of Biological Psychiatry

Thomas R. Kosten, MD
CV

| | |
|---|---|
| 2005 | Expert Member – Advisory Panel, VHA/DOD Clinical Practice Guidelines for Bipolar and Substance Abuse Disorders |
| 2005 | Advisory Panel – National Institute on Drug Abuse Council, Subcommittee on Grant Funding |
| 2004-2005 | Expert Member – NIDA Council, Subcommittee on Medications Development |
| 2004-2005 | Expert Member – NIH Task Force on Clinical Research Training of National Psychiatry Council |
| 2003 | Chair – SAMSHA, Center for Substance Abuse Treatment, National Task Force on Physician Training for Office Based Buprenorphine |
| 2003 | Expert Member – Advisory Group for VA National Center for Education in Substance Abuse Treatment |
| 2003 | Expert Member – American Society of Addiction Medicine-Dual Diagnosis Practice Guidelines and Placement Criteria |
| 2002-2003 | Expert Member – Institute of Medicine, National Academy of Sciences, Committee on Vaccines and Depot Medications for Substance Abuse |
| 2002 | Advisory Board Member – VA VISN 4 Mental Illness Research Educations and Clinical Center |
| 2002 | Expert Member – NIDA Council, Task force on Clinical Trials Network |
| 1999-2002 | Expert Member – Medication Development Initial Review Group, NIDA |
| 2000 | Expert Member – Board of Scientific Counselors, NIDA Intramural |
| 1999 | Chairman – VA National Cooperative Studies Data Safety monitoring Board for Substance Abuse Studies, (#1018, 1019, 1020, 1021) |
| 1999 | Chairman – National Task Force on Physician Training for Office Based Buprenorphine |
| 1998-2000 | Expert Member – VA National Clinical Practice Guidelines for Schizophrenia, Depression, and Substance Abuse |
| 1998 | Advisory Board Member – APA-NIDA Drug Abuse Research Scholars Program in Psychiatry (DARSPP) |
| 1997 | Ad Hoc Reviewer – NIDA Treatment Research IRG |
| 1997 | Consultant – The White House National Drug Control Strategy |
| 1995-1996 | Expert Member – Connecticut Governor's Blue Ribbon Task Force on Addiction Services |
| 1989-1996 | Scientific Advisory Group – Harvard University, Alcohol and Drug Abuse Research Center |
| 1994 | Expert Reviewer – The Wellcome Trust, London, England |
| 1994 | Advisory Member – Advisory Council, NIDA Extramural Programs |
| 1993-1995 | Chairman – Special Review IRG on Neuro-imaging, NIDA |
| 1993-1994 | Consultant – Medical Research Council, Neuroscience and Mental Health Board, Great Britain |

Thomas R. Kosten, MD
CV

| 1992-1994 | Examiner – American Board Psychiatry and Neurology, Part II |
| 1991-2002 | Expert Member – Committee on Certification for Added Qualifications in Addiction Psychiatry, American Board of Psychiatry and Neurology |
| 1991-1993 | Expert Member – Scientific Advisory Group, University of Pennsylvania, Substance Abuse Research Center |
| 1991 | Ad Hoc Reviewer – Clinical and Treatment IRG, NIAAA |
| 1991 | Ad Hoc Reviewer – Epidemiology and Prevention IRG, National Institute of Mental Health |
| 1990-1993 | Member –Board of Scientific Counselors, NIDA Intramural Program, Baltimore |
| 1986-1993 | Reviewer – VHA Research Advisory Group, MERIT Reviews, Fellowship Programs |
| 1986-1992 | Expert Member – Sports Medicine Committee, Drug Testing, US Olympic Committee |
| 1986-1992 | Expert Member – Clinical and Behavioral Research IRG, NIDA |
| 1989-1991 | Consultant – US Senate Committee on Labor and Human Resources, Addiction Pharmacotherapy |
| 1989 | Consultant – Washington, DC, Federal Aviation Administration on Drug Testing for Pilots |
| 1989 | Consultant – Florida State Substance Abuse Services, Cocaine Pharmacotherapy |
| 1987 | Invited Lecturer – International Conference on Drug Abuse, Italian Association of Judges, Naples, Italy, Treatment of Opioid Dependence |
| 1986 | Consultant – Treatment of Drug Dependent Prisoners, Atlanta, GA |
| 1986 | Consultant – Treatment of Drug Dependent Prisoners, Connecticut  Civil Liberties Union |
| 1986 | Ad Hoc Reviewer – Epidemiology and Prevention IRG, NIDA |
| 1986 | Chairman – Epidemiology of Acquired Immunodeficiency Syndrome IRG, NIDA |

**Professional societies, Elected positions, etc.**

| 2007-2011 | CPDD representative – The Physician Clinical Support System Steering Committee |
| 2005-2011 | Member – Human Research Committee, American College of Neuropsychopharmacology (ACNP) |
| 1991-1994 & | Member – Board of Directors, College on Problems of Drug Dependence (CPDD) |
| 2006-Present | Member – Advisory Board Waggoner Alcoholism Research Center, UT Austin |
| 2006-Present & | Fellow – American College of Neuropsychopharmacology (ACNP) |
| 2006 | President –College on Problems of Drug Dependence |
| 2000-2006 | Dependence (CPDD) |
| 2000-Present | Fellow – College on Problems of Drug Dependence (CPDD) |

Thomas R. Kosten, MD
CV

| 2000-Present | Fellow – American Academy of Addiction Psychiatry (AAAP) |
|---|---|
| 1996-Present | Fellow – Collegium Internationale Neuro-Psychopharmacologicum. |
| 1994-Present | Founding Member – American Academy of Addiction Psychiatry (AAAP) |
| 1994-2002 | Board of Directors – American Academy of Addiction Psychiatry (AAAP) |
| 1998-2002 | Vice Chair – Committee on Certification for Addiction Psychiatry, American Board of Psychiatry And Neurology (ABPN) |
| 1998-2000. | President – American Academy of Addiction Psychiatry (AAAP) |
| 1998 | Program Chair – American College of Neuropsychopharmacology (ACNP) |
| 1991-1994 | Vice Chair – Council on Addictions, American Psychiatric Association (APA). |

3. **Invited lectures, presentations, research seminars:**

Select Congressional Testimony:

| 2009 | U.S. Senate Judiciary Committee – Drug Abuse Criminal Sentencing for Crack Cocaine. |
|---|---|
| 2008 | U.S. Congressional Testimony – Vaccines for Addiction. |
| 2006 | U.S. Senate testimony – Buprenorphine for opiate dependence. |
| 1999 | US Congressional testimony – Commerce, Committee; Opiate Regulation of Buprenorphine |
| 1993 | US Congressional testimony – College on Problems of Drug Dependence. |
| 1992 | US Congressional testimony – APA & National Alliance for Mentally Ill, Substance Abuse. |
| 1990 | US Congressional testimony – Bambury Center; Drug Legalization. |
| 1990 | US Congressional testimony – House Committee on Government Operations; Drug Abuse. |
| 1989 | US Senate Judiciary Committee testimony – Applying Medical Research to Drug Abuse. |
| 1985 | US Congressional testimony – House Select Committee on Narcotics Abuse and Control. |

Select National and Local Presentations & Workshops

| 2015 | Evolving Strategies for Substance Use Disorders – Oral Presentation. North American Center for Continuing Medical Education (NACCME), Nov 7 and 14, 2015, San Antonio, TX and Chicago, IL. |
|---|---|
| 2015 | Cocaine Addictions Vaccine – Oral Presentation. Thematic Meeting on Addictions, Oct 28, 2016. Rice University, Houston, TX. |
| 2015 | New Anti-Addiction Medications: Pharmacogenetics and Immunotherapies – Oral Presentation. North American Center for Continuing Medical Education (NACCME). Sep 12, 2015. San Diego, CA. |

Page 11 of 77

Thomas R. Kosten, MD
CV

| | |
|---|---|
| 2015 | Addictions – Oral Presentation. American Society of Clinical Psychopharmacology, Mar 22, 2016. San Diego, CA. |
| 2014 | Pharmacogenetics of Cocaine: Disulfiram and Vaccines – Oral Presentation. American Academy of Addiction Psychiatry Annual Meeting, Dec 5, 2014. Aventura, FL. |
| 2014 | Internet Addiction: Compulsive Internet Use. Advances in Clinical Psychiatry 2014: Addictive Behaviors. Oral  Presentation. Oct 10, 2014. Houston, TX. |
| 2014 | New Anti-Addiction Medications: Pharmacogenetics and Immunotherapies. 27th Annual U.S. Psychiatric & Mental Health Congress Conference, Oral Presentation. Sep 20-23, 2014. Orlando, FL. |
| 2014 | Menninger Mindscape Podcast, "When is Internet Use and Gaming Addictive?" (http://www.youtube.com/watch?v=VB952PxJ11M&feature=youtu.be). Sep 29, 2014. Houston, TX. |
| 2014 | Cocaine and Methamphetamine: Pharmacology to Pipeline Treatments. California Society of Addiction Medicine (CSAM), Oral Presentation. Anaheim, CA. Sep 03-07, 2014. |
| 2013 | Vaccines for Addictions. Fourth Annual UT Psychiatry Update. Oral Presentation. Feb 09, 2013. Houston, TX. |
| 2013 | Ethical Issues Related to Agonist Therapy for Opoid Addictions. Fourth Annual UT Psychiatry Update. Oral Presentation. Feb 09, 2013. Houston, TX. |
| 2012 | Vaccine and Behavioral Approaches to U.S. Health Disparities: Sexually Transmitted Infections (STI) and Addiction. 2012 NIH Science of Eliminating Health Disparities Summit. Oral Panel Presentation. Dec 17-19, 2012. National Harbor, MD. |
| 2012 | Genetic & Immunological Predictors of Treatment Response: Alcohol and Cocaine. Texas Society of Psychiatric Physicians. November 11, 2012. Oral Presentation. Galveston, TX. |
| 2012 | Vaccines for Cocaine and Methamphetamine Addictions, Mass Biologics at the University of Massachusettes Medical School. Oral Presentation. October 17, 2012. Boston, MA. |
| 2012 | Medication Development for Stimulant Dependence. International Society for Clinical Trials Methods (ISCTM). Oral Presentation. October 01-03, 2012, Marina Del Rey, CA. |
| 2012 | Stimulant Addiction; TR Kosten. California Society of Addiction Medicine (CSAM). Oral Presentation.  Sep 5-08, 2012. San Francisco, CA. |
| 2012 | Cocaine Vaccine: Genetic Predictors of Treatment Response; TR Kosten and D Nielsen. College on Problems of Drug Dependence (CPDD). Oral Presentation. June 09-11, 2012. Palm Springs, CA. |
| 2012 | Biologics for Addictions Treatment: Vaccines and Enzymes. Panel Presentation; TR Kosten, Chair. NIH Clinical Drug Evaluation Unit (NCDEU).  Oral Presentation. May 29-June 01, 2012. Phoenix, AZ. |
| 2012 | Addictions Pharmacotherapy. Texas Research to Practice Conference. April 30, 2012.  Oral Presentation.  Dallas, TX. |
| 2012 | Addiction Vaccines. Menninger Symposium: An Agenda for Psychiatry and Neuroscience. Oral Presentation.  April 12, 2012. Houston, TX. |

1649

Thomas R. Kosten, MD
CV

Select International Presentations & Workshops

2012    Pharmacogenetics of Cocaine Vaccine. Summit on Addictions Conference.  September 17-24, 2012, Beijing, China.

2011    Genetics and Biological Markers in Addictions and Dual Disorders. II International Congress on Dual Disorders: Spanish Society of Addictions Meeting, October 05-08, 2011. Barcelona, Spain.

2011    Genetics of the Cocaine Vaccine Response.  NIDA's Biennial Congress, October 27-November 6, 2011. Beijing, China.

2011    3rd Annual World Vaccine Congress.  Advances in Vaccines for Treating Substance Dependence, March 21-27, 2011. Beijing, China.

2010    NIDA's International Society of Addiction Medicine (ISAM), October 04-07, 2010. Milan, Italy.

2010    Pharmacogenitics of Cocaine. October 16-26, 2010. Beijing, China.

2010    Pharmacogenetics of Cocaine Addiction.  Pavlov Institute, International Conference on Psychiatry, June 10-16, St Petersburg, Russia.

2007    Vaccines and other pharmacological alternatives in the treatment of cocaine  addiction: Spanish Society of Addictions Meeting, Feb 23, 2007. Barcelona, Spain.

2007    Innovations in Pharmacotherapy of alcoholism and the treatment of alcohol dependence: United Arab Emitgrates International Conference on Addiction. March 10-14, 2007. Abu Dhabi.

2007    Addressing depression in opioid-maintained patients: Plenary session presented at Safer Options in the Treatment of Opioid Dependence. April 16-19, 2007. Prague, Czech Republic.

2007    Affective dysfunction in substance abuse: Neuroimaging Chaired Symposium at College on Problems of Drug Dependence, June 17-20, 2007. Quebec, Canada.

2007    Cocaine vaccination – a new strategy: The European Association of Addiction Therapy Conference. Sept 10, 2007. Vienna, Austria.

2007    Opioid addiction and pain; common features, receptors and treatment: Chair, session VI: The European Association of Addiction Therapy Conference,  September 10, 2007. Vienna, Austria.

2007    The psychopathology and treatment of addiction; Preclinical and clinical aspects of vaccination for addiction: World Psychiatric Association and Chinese Society of Psychiatry. September 20, 2007. Shanghai, China.

Select Media Interviews

2016    Black Box Warning and Pain Killers. Fox News, Channel 26 News Interview, Houston, TX,  Black Box Warnings. March 24, 2016.

2016    Alcohol Use Disorders. Video Interview by Indivior Pharmaceuticals. March 01, 2016, NYC, NY.

2015    NIDA Notes: Vaccines to Treat Addiction. Video Interview: https://www.drugabuse.gov/news-events/nida-notes/2015/06/dr-thomas-kosten-q-vaccines-to-treat-addiction. June 11, 2015.

1650

Thomas R. Kosten, MD
CV

| | |
|---|---|
| 2015 | NIDA Notes: How Will Anti-Drug Vaccines be Used. Video Interview: https://www.drugabuse.gov/news-events/nida-notes/podcasts/2015/05/dr-thomas-kosten. May 29, 2015. |
| 2015 | A "Hands-On" Guide to Using Naltrexone in Alcohol Addictions. Psychiatric Times Video Interview: http://r.search.yahoo.com/_ylt=A0SO8zi2fORWh84A9JVXNyoA;_ylu=X3oDMTEycTJlODhxBGNvbG8DZ3ExBHBvcwMyBHZ0aWQDQjE3MjVfMQRzZWMDc3I-/RV=2/RE=1457843511/RO=10/RU=http%3a%2f%2fwww.psychiatrictimes.com%2fprintpdf%2f203288/RK=0/RS=Dun8PGY6_faxklGuzpf0YlPXZ6g-. January 12, 2015. |
| 2015 | Personalized Medicine Is Coming to Addiction Treatment. Interview for Substance.com – The Stuff that Hooks Us by Jeanene Swanson. http://www.substance.com/personalized-medicine-is-coming-to-addiction-treatment/18824/. January 15, 2015. |
| 2014 | Pharmacogenetics to Predict Treatment Outcome in Substance Use Disorders. American Academy of Addiction Psychiatry meeting overview by Hussam Jefee-Bahloul, MD. Psychiatric Times. http://www.psychiatrictimes.com/AAAP2014/pharmacogenetics-predict-treatment-outcome-substance-use-disorders#sthash.h2XlzG7k.dpuf. December 04, 2014. |
| 2014 | Substance Abuse. Radio Interview with Garland Robinette with "The Think Tank" on WWL 870AM/105.3FM. http://media.wwl.com/a/94548946/7-16-14-12-10pm-garland-on-substance-abuse.htm?q=kosten. July 16, 2014. |
| 2014 | How a Vaccine Could Halt Heroine Addiction. Radio Interview with Kerri Miller of "The Daily Circuit", Minnesotta Public Radio (MPR). http://www.mprnews.org/story/2014/06/02/daily-circuit-heroin-vaccine. June 02, 2014. |
| 2014 | Cocaine Vaccine Reaches Therapeutic Levels, Improves Treatment Retention And Abstinence Rates, But Does Not Decrease Overall Cocaine Use. Press Release on results of the NIDA-funded cocaine vaccine study. Released by Baylor College of Medicine. April 2014. |
| 2013 | Study Pits BP Meds Against Cocaine Addiction. Television Interview by Christi Myers for HealthCheck, KTRK-13. http://abclocal.go.com/ktrk/story?section=news/health&id=8980325. February 05, 2013. |
| 2013 | High Blood Pressure Drug May Help Cocaine Dependence.  Press Release by MED Houston VA Medical Center. January 23, 2013. |
| 2012 | Avoiding Addiction When It's In Your DNA.  Television Interview by PBS News Hour. http://www.pbs.org/newshour/updates/science/july-dec12/milesaddiction.html. December 13, 2012. |
| 2012 | A Vaccine to Curb Addicts' Highs. Wall Street Journal. Newspaper Interview by Keith Humphreys. November 23, 2012. http://online.wsj.com/article/SB10001424127887324352004578130963934871462.html |
| 2012 | Stimulating Big Pharma to Invest in Medications for Stimulant Addiction. Interview for SameFacts.com by Keith Humphreys. November 26, 2012. |

Thomas R. Kosten, MD
CV

http://www.samefacts.com/2012/11/drug-policy/stimulating-big-pharma-to-invest-in-medications-for-stimulant-addiction/

2012    Unregulated Bath Salts Drugs Becoming More Dangerous. NBC, Channel 2-Houston. Television Interview. June 04, 2012. http://www.click2houston.com/news/Unregulated-bath-salts-drug-becoming-more-dangerous/-/1735978/14470270/-/e1lu03/-/index.html.

2011    Antidrug Vaccines. Psychiatric Times. http://www.psychiatrictimes.com/articles/antidrug-vaccines. April 19, 2011.

2011    A Vaccine for Cocaine Addiction?  Rx in the City. http://houston.culturemap.com/newsdetail/07-07-11-a-vaccine-for-cocaine-addiction-baylor-college-of-medicines-dr-thomas-kosten-is-almost-there/. July 07, 2011.

2011    Quest for Vaccines to Treat Addictions. Wallstreet Journal. Newspaper Interview by Mark Long. May 03, 2011. http://online.wsj.com/article/SB10001424052748704436004576298980739463392.html

2011    High on Cocaine. National Geographic.  Television Interview by Harriet Matthews. January 16, 2011. http://channel.nationalgeographic.com/channel/drugged/galleries/episode-high-on-cocaine/

2009    Shots Help Fight Cocaine Addiction. Associated Press. http://abclocal.go.com/ktrk/story?section=news/health&id=7049306. October 05, 2009.

2008    A Drug to End Drug Addiction. Time, Health and Family section, Interview by Hilary Hylton. January 09, 2008. http://www.time.com/time/health/article/0,8599,1701864,00.html

2007    Methamphetamine Nicotine Cocaine Vaccine. BCM Solutions, vol 3, issue 2, Summer 2007. Interview by Laura Madden-Fuentes. http://www.bcm.edu/solutions/v3i2/cocaine.html

C.  **Publications:**

1.  **Full papers:**

    a.  **Published in peer review journals**

        1.  **Kosten TR**, Astrachan BM. Planning for crisis on a psychiatric research ward: a task analysis. Compr Psychiatry. 1981 May-Jun;22(3):306-11. PubMed PMID: 7238004.

        2.  **Kosten TR**, Jalali B, Kleber HD. Complementary marital roles of male heroin addicts: evolution and intervention tactics. Am J Drug Alcohol Abuse. 1982-1983;9(2):155-69. PubMed PMID: 7171079.

        3.  **Kosten TR**, Rounsaville BJ, Kleber HD. DSM-III personality disorders in opiate addicts. Compr Psychiatry. 1982 Nov-Dec;23(6):572-81. PubMed PMID: 7160176.

        4.  **Kosten TR**, Astrachan, BM, Riordan CE, Kleber HD. The organization of a methadone maintenance program. J Drug Issues. 1982; 12(4): 333-342.

        5.  **Kosten TR**, Rounsaville BJ, Kleber HD. Relationship of depression to psychosocial stressors in heroin addicts. J Nerv Ment Dis. 1983 Feb;171(2):97-104. PubMed PMID: 6822825.

Thomas R. Kosten, MD
CV

6. **Kosten TR**, Rounsaville BJ, Kleber HD. Concurrent validity of the addiction severity index. J Nerv Ment Dis. 1983 Oct;171(10):606-10. PubMed PMID: 6619823.

7. **Kosten TR**, Jalali B, Hogan I, Kleber HD. Family denial as a prognostic factor in opiate addict treatment outcome. J Nerv Ment Dis. 1983 Oct;171(10):611-6. PubMed PMID: 6619824.

8. **Kosten TR**, Rounsaville BJ, Merikangas KR, Prusoff BA, Kleber HD. The relationship of the Maudsley Personality Inventory to depression in addicts. Compr Psychiatry. 1983 Nov-Dec;24(6):535-42. PubMed PMID: 6653096.

9. Jacobs S, **Kosten TR**. Depressive syndromes during acute bereavement: Indications for professional intervention. Yale Psychiatric Quarterly.1983; 6: 4-13.

10. **Kosten TR**, Jacobs S, Mason J, Wahby V, Atkins S. Psychological correlates of growth hormone response to stress. Psychosom Med. 1984 Jan-Feb;46(1):49-58. PubMed PMID: 6701254.

11. **Kosten TR**, Novak P, Kleber HD. Perceived marital and family environment of opiate addicts. Am J Drug Alcohol Abuse. 1984;10(4):491-501. PubMed PMID: 6534181.

12. **Kosten TR**, Kleber HD. Strategies to improve compliance with narcotic antagonists. Am J Drug Alcohol Abuse. 1984;10(2):249-66. PubMed PMID: 6475891.

13. Jacobs S, Mason J, **Kosten T**, Brown S, Ostfeld A. Urinary-free cortisol excretion in relation to age in acutely stressed persons with depressive symptoms. Psychosom Med. 1984 May-Jun;46(3):213-21. PubMed PMID: 6739681.

14. **Kosten TR**, Jacobs S, Mason JW. The dexamethasone suppression test during bereavement. J Nerv Ment Dis. 1984 Jun;172(6):359-60. PubMed PMID: 6544808.

15. Kleber HD, **Kosten TR**. Naltrexone induction: psychologic and pharmacologic strategies. J Clin Psychiatry. 1984 Sep;45(9 Pt 2):29-38. PubMed PMID: 6469934.

16. **Kosten TR**, Rounsaville BJ, Kleber HD. Relationship of depression to clonidine detoxification of opiate addicts. Compr Psychiatry. 1984 Sep-Oct;25(5):503-8. PubMed PMID: 6488761.

17. Jacobs S, Mason J, **Kosten T**, Kasl S, Ostfeld A, Atkins S, Gardner C, Schreiber S. Acute bereavement, threatened loss, ego defenses and adrenocortical function. Psychother Psychosom. 1985;44(3):151-9. PubMed PMID: 3832148.

18. **Kosten TR**, Rounsaville BJ, Kleber HD. Comparison of clinician ratings to self reports of withdrawal during clonidine detoxification of opiate addicts. Am J Drug Alcohol Abuse. 1985;11(1-2):1-10. PubMed PMID: 3904410.

19. Kleber HD, **Kosten TR**, Gaspari J, Topazian M. Nontolerance to the opioid antagonism of naltrexone. Biol Psychiatry. 1985 Jan;20(1):66-72. PubMed PMID: 2981129.

20. Rounsaville BJ, **Kosten T**, Kleber H. Success and failure at outpatient opioid detoxification. Evaluating the process of clonidine- and methadone-assisted withdrawal. J Nerv Ment Dis. 1985 Feb;173(2):103-10. PubMed PMID: 3881558.

1653

Thomas R. Kosten, MD
CV

21. Kleber HD, Riordan CE, Rounsaville B, **Kosten T**, Charney D, Gaspari J, Hogan I, O'Connor C. Clonidine in outpatient detoxification from methadone maintenance. JAMA Psych (Arch Gen Psychiatry). 1985 Apr;42(4):391-4. PubMed PMID: 3977557.

22. **Kosten TR**, Rounsaville BJ, Kleber HD. Ethnic and gender differences among opiate addicts. Int J Addict. 1985 Aug;20(8):1143-62. PubMed PMID: 4077316.

23. **Kosten TR**, Rounsaville BJ, Kleber HD. Parental alcoholism in opioid addicts. J Nerv Ment Dis. 1985 Aug;173(8):461-9. PubMed PMID: 4020363.

24. Jacobs SC, Mason JW, **Kosten TR**, Wahby V, Kasl SV, Ostfeld AM. Bereavement and catecholamines. J Psychosom Res. 1986;30(4):489-96. PubMed PMID: 3761233.

25. **Kosten TR**, Rounsaville BJ, Kleber HD. A 2.5 year follow-up of treatment retention and reentry among opioid addicts. J Subst Abuse Treat. 1986;3(3):181-9. PubMed PMID: 3806731.

26. **Kosten TR**, Gawin FH, Rounsaville BJ, Kleber HD. Cocaine abuse among opioid addicts: demographic and diagnostic factors in treatment. Am J Drug Alcohol Abuse. 1986;12(1-2):1-16. PubMed PMID: 3788892.

27. Jacobs SC, Kasl SV, Ostfeld AM, Berkman L, **Kosten TR**, Charpentier P. The measurement of grief: bereaved versus non-bereaved. Hosp J. 1986 Winter;2(4):21-36. PubMed PMID: 3647919.

28. **Kosten TR**. Diagnosing depression with the DST and TRH in cocaine and opioid abusers. J Subst Abuse Treat. 1986;3(1):47-9. PubMed PMID: 3090273.

29. **Kosten TR**, Kreek MJ, Ragunath J, Kleber HD. Cortisol levels during chronic naltrexone maintenance treatment in ex-opiate addicts. Biol Psychiatry. 1986 Feb;21(2):217-20. PubMed PMID: 3947698.

30. Mason JW, Giller EL, **Kosten TR**, Ostroff RB, Podd L. Urinary free-cortisol levels in posttraumatic stress disorder patients. J Nerv Ment Dis. 1986 Mar; 174(3):145-9. PubMed PMID: 3950596.

31. **Kosten TR**, Hogan I, Jalali B, Steidl J, Kleber HD. The effect of multiple family therapy on addict family functioning: a pilot study. Adv Alcohol Subst Abuse. 1986 Spring; 5(3):51-62. PubMed PMID: 3728193.

32. Rounsaville BJ, **Kosten TR**, Weissmann MM, Kleber HD. A 2.5-year follow-up of short-term interpersonal psychotherapy in methadone-maintained opiate addicts. Compr Psychiatry. 1986 May-Jun; 27(3):201-10. PubMed PMID: 3709134.

33. **Kosten TR**, Kreek MJ, Ragunath J, Kleber HD. A preliminary study of beta endorphin during chronic naltrexone maintenance treatment in ex-opiate addicts. Life Sci. 1986 Jul 7; 39(1):55-9. PubMed PMID: 2941636.

34. Rounsaville BJ, **Kosten TR**, Weissman MM, Kleber HD. Prognostic significance of psychopathology in treated opiate addicts. A 2.5-year follow-up study. JAMA Psych (Arch Gen Psychiatry). 1986 Aug;43(8):739-45. PubMed PMID: 3729668.

35. **Kosten TR**, Rounsaville BJ, Kleber HD. A 2.5-year follow-up of depression, life crises, and treatment effects on abstinence among

Thomas R. Kosten, MD
CV

opioid addicts. JAMA Psych (Arch Gen Psychiatry). 1986
Aug;43(8):733-8. PubMed PMID: 3729667.

36. **Kosten TR**, Rounsaville BJ. Psychopathology in opioid addicts.
Psychiatr Clin North Am. 1986 Sep;9(3):515-32. PubMed PMID:
3774603.

37. Rounsaville BJ, **Kosten TR**, Kleber HD. Long-term changes in
current psychiatric diagnoses of treated opiate addicts. Compr
Psychiatry. 1986 Sep-Oct;27(5):480-98. PubMed PMID: 3757496.

38. **Kosten TR**, Forrest JN. Treatment of severe lithium-induced polyuria
with amiloride. Am J Psychiatry. 1986 Dec;143(12):1563-8. PubMed
PMID: 3538913

39. **Kosten TR**. Combining family therapy with pharmacotherapy in
opioid addicts: Use of naltrexone. International Journal of Family
Psychiatry. 1986; 7: 143-153.

40. Rounsaville BJ, **Kosten TR**, Kleber HD. The antecedents and
benefits of achieving abstinence in opioid addicts: a 2.5-year follow-
up study. Am J Drug Alcohol Abuse. 1987;13(3):213-29. PubMed
PMID: 3687888.

41. **Kosten TR**, Rounsaville BJ, Kleber HD. Predictors of 2.5-year
outcome in opioid addicts: pretreatment source of income. Am J Drug
Alcohol Abuse. 1987;13(1-2):19-32. PubMed PMID: 3687883.

42. **Kosten TR**, Jalali B, Steidl JH, Kleber HD. Relationship of marital
structure and interactions to opiate abuse relapse. Am J Drug Alcohol
Abuse. 1987;13(4):387-99. PubMed PMID: 3687898.

43. **Kosten TR**, Mason JW, Giller EL, Ostroff RB, Harkness L. Sustained
urinary norepinephrine and epinephrine elevation in post-traumatic
stress disorder. Psychoneuroendocrinology. 1987;12(1):13-20.
PubMed PMID: 3588809.

44. Kleber HD, Topazian M, Gaspari J, Riordan CE, **Kosten T**. Clonidine
and naltrexone in the outpatient treatment of heroin withdrawal. Am J
Drug Alcohol Abuse. 1987;13(1-2):1-17. PubMed PMID: 3687878.

45. **Kosten TR**, Rounsaville BJ, Kleber HD. Multidimensionality and
prediction of treatment outcome in opioid addicts: 2.5-year follow-up.
Compr Psychiatry. 1987 Jan-Feb;28(1):3-13. PubMed PMID:
3802797.

46. Jacobs SC, Mason J, **Kosten TR**, Kasl SV, Ostfeld AM, Wahby V.
Urinary free cortisol and separation anxiety early in the course of
bereavement and threatened loss. Biol Psychiatry. 1987 Feb;
22(2):148-52. PubMed PMID: 3814667.

47. **Kosten TR**, Rounsaville BJ, Kleber HD. A 2.5-year follow-up of
cocaine use among treated opioid addicts. Have our treatments
helped? JAMA Psych (Arch Gen Psychiatry). 1987 Mar;44(3):281-4.
PubMed PMID: 3827521.

48. Rounsaville BJ, **Kosten TR**, Williams JB, Spitzer RL. A field trial of
DSM-III-R psychoactive substance dependence disorders. Am J
Psychiatry. 1987 Mar; 144(3):351-5. PubMed PMID: 3826436.

49. **Kosten TR**, Kreek MJ, Swift C, Carney MK, Ferdinands L. Beta
endorphin levels in CSF during methadone maintenance. Life Sci.
1987 Aug 31;41(9):1071-6. Erratum in: Life Sci 1987 Oct
5;41(14):1761. PubMed PMID: 2956475.

1655

Thomas R. Kosten, MD
CV

50. **Kosten TR**, Schumann B, Wright D, Carney MK, Gawin FH. A preliminary study of desipramine in the treatment of cocaine abuse in methadone maintenance patients. J Clin Psychiatry. 1987 Nov;48(11):442-4. PubMed PMID: 3680185.

51. **Kosten TR**, Rounsaville BJ, Babor TF, Spitzer RL, Williams JB. Substance-use disorders in DSM-III-R. Evidence for the dependence syndrome across different psychoactive substances. Br J Psychiatry. 1987 Dec;151:834-43. PubMed PMID: 2901887.

52. **Kosten TR**, Kleber HD. Differential diagnosis of psychiatric comorbidity in substance abusers. J Subst Abuse Treat. 1988;5(4):201-6. PubMed PMID: 3216436.

53. **Kosten TR**, Rounsaville BJ. Suicidality among opioid addicts: 2.5 year follow-up. Am J Drug Alcohol Abuse. 1988;14(3):357-69. PubMed PMID: 3189257.

54. **Kosten TR**, Kleber HD. Rapid death during cocaine abuse: a variant of the neuroleptic malignant syndrome? Am J Drug Alcohol Abuse. 1988;14(3):335-46. Review. PubMed PMID: 3055940.

55. **Kosten TR**, Krystal J. Biological mechanisms in posttraumatic stress disorder. Relevance for substance abuse. Recent Dev Alcohol. 1988;6:49-68. Review. PubMed PMID: 3283864.

56. **Kosten TR**, Kleber HD. Buprenorphine detoxification from opioid dependence: a pilot study. Life Sci. 1988;42(6):635-41. PubMed PMID: 3276999.

57. Mason JW, Giller EL, **Kosten TR**. Serum testosterone differences between patients with schizophrenia and those with affective disorder. Biol Psychiatry. 1988 Feb 15;23(4):357-66. PubMed PMID: 3342266.

58. **Kosten TR**, Rounsaville BJ, Kleber HD. Antecedents and consequences of cocaine abuse among opioid addicts. A 2.5-year follow-up. J Nerv Ment Dis. 1988 Mar;176(3):176-81. PubMed PMID: 3343591.

59. Vining E, **Kosten TR**, Kleber HD. Clinical utility of rapid clonidine-naltrexone detoxification for opioid abusers. Br J Addict. 1988 May;83(5):567-75. PubMed PMID: 3382815.

60. Mason JW, Giller EL, **Kosten TR**, Harkness L. Elevation of urinary norepinephrine/cortisol ratio in posttraumatic stress disorder. J Nerv Ment Dis. 1988 Aug;176(8):498-502. PubMed PMID: 3404142.

61. Frank JB, **Kosten TR**, Giller EL Jr, Dan E. A randomized clinical trial of phenelzine and imipramine for posttraumatic stress disorder. Am J Psychiatry. 1988 Oct;145(10):1289-91. PubMed PMID: 3048121.

62. Jacobs SC, **Kosten TR**, Kasl SV, Ostfeld AM, Berkman I, Charpentier P. Attachment theory and multiple dimensions of grief. Omega: J Death Dying. 1988; 18: 41-52.

63. Wahby V, Ibrahim G, Friedenthal S, Giller E, **Kosten T**, Mason J. Serum concentrations of circulating thyroid hormones in a group of depressed men. Neuropsychobiology. 1989;22(1):8-10. PubMed PMID: 2639287.

64. Kosten TA, **Kosten TR**, Rounsaville BJ. Personality disorders in opiate addicts show prognostic specificity. J Subst Abuse Treat. 1989;6(3):163-8. PubMed PMID: 2795705.

-RAW   Document 376-5   Filed 03/03/17   Page 31 of 94

Thomas R. Kosten, MD
CV

-blind evaluation of the effect of acute amantadine on cocaine craving. Psychopharmacology (Berl). 1989;97(3):402-3. PubMed PMID: 2497490.

66. Kosten TA, Jacobsen LK, **Kosten TR**. Severity of precipitated opiate withdrawal predicts drug dependence by DSM-III-R criteria. Am J Drug Alcohol Abuse. 1989;15(3):237-50. PubMed PMID: 2763981.

67. **Kosten TR**, Rounsaville BJ, Foley SH. Inpatient vs. outpatient cocaine abuse treatments. NIDA Res Monogr. 1989;95:312-3. PubMed PMID: 2640976.

68. Jacobsen LK, **Kosten TR**. Naloxone challenge as a biological predictor of treatment outcome in opiate addicts. Am J Drug Alcohol Abuse. 1989;15(4):355-66. PubMed PMID: 2596440.

69. **Kosten TR**. Advances in clinical research on drug addiction: Opioids and cocaine. Substance Abuse. 1989; 10: 35-42.

70. **Kosten TR**, Morgan CJ, Kleber HD. Buprenorphine treatment of cocaine abuse. NIDA Res Monogr. 1989;95:461. PubMed PMID: 2641031.

71. **Kosten TR**, Kleber HD, Morgan C. Role of opioid antagonists in treating intravenous cocaine abuse. Life Sci. 1989;44(13):887-92. PubMed PMID: 2927249.

72. Southwick S, Mason JW, Giller EL, **Kosten TR**. Serum thyroxine change and clinical recovery in psychiatric inpatients. Biol Psychiatry. 1989 Jan;25(1):67-74. PubMed PMID: 2912510.

73. Gawin FH, Kleber HD, Byck R, Rounsaville BJ, **Kosten TR**, Jatlow PI, Morgan C. Desipramine facilitation of initial cocaine abstinence. JAMA Psych (Arch Gen Psychiatry). 1989 Feb;46(2):117-21. PubMed PMID: 2492422.

74. Mason JW, Kennedy JL, **Kosten TR**, Giller EL Jr. Serum thyroxine levels in schizophrenic and affective disorder diagnostic subgroups. J Nerv Ment Dis. 1989 Jun;177(6):351-8. PubMed PMID: 2723624.

75. Kosten TA, **Kosten TR**. Cocaine abuse and opioid withdrawal. Lancet. 1989 Jul 15;2(8655):165-6. PubMed PMID: 2567937.

76. **Kosten TR**. Pharmacotherapeutic interventions for cocaine abuse. Matching patients to treatments. J Nerv Ment Dis. 1989 Jul;177(7):379-89. Review. PubMed PMID: 2664072.

77. **Kosten TR**, Kleber HD, Morgan C. Treatment of cocaine abuse with buprenorphine. Biol Psychiatry. 1989 Oct;26(6):637-9. PubMed PMID: 2790101.

78. **Kosten TR**, Krystal JH, Charney DS, Price LH, Morgan CH, Kleber HD. Rapid detoxification from opioid dependence. Am J Psychiatry. 1989 Oct;146(10):1349. PubMed PMID: 2675644.

79. Krystal J, **Kosten TR**, Perry B, Southwick S, Mason JW, Giller EL. Neurobiological aspects of post traumatic stress disorder: Review of clinical and pre-clinical studies. Behavior Therapy. 1989; 20: 177-198.

80. Diakogiannis IA, Steinberg M, **Kosten TR**. Mazindol treatment of cocaine abuse. A double-blind investigation. NIDA Res Monogr. 1990; 105:514. PubMed PMID: 1876105.

81. **Kosten TR**, Gawin FH, Morgan C, Nelson JC, Jatlow P. Evidence for altered desipramine disposition in methadone-maintained patients

Page 20 of 77

Thomas R. Kosten, MD
CV

treated for cocaine abuse. Am J Drug Alcohol Abuse. 1990;16(3-4):329-36. PubMed PMID: 2288330.

82. Kosten TA, **Kosten TR**, Rounsaville BJ. Cocaine symptoms are predicted by familial psychopathology. NIDA Res Monogr. 1990;105:603-4. PubMed PMID: 1876139.

83. **Kosten TR**. Current pharmacotherapies for opioid dependence. Psychopharmacol Bull. 1990;26(1):69-74. Review. PubMed PMID: 2196628.

84. **Kosten TR**, Morgan C, Kosten TA. Depressive symptoms during buprenorphine treatment of opioid abusers. J Subst Abuse Treat. 1990;7(1):51-4. PubMed PMID: 2313769.

85. **Kosten TR**, Krystal JH, Charney DS, Price LH, Morgan CH, Kleber HD. Opioid antagonist challenges in buprenorphine maintained patients. Drug Alcohol Depend. 1990 Feb;25(1):73-8. PubMed PMID: 2323312.

86. **Kosten TR**. Neurobiology of abused drugs. Opioids and stimulants. J Nerv Ment Dis. 1990 Apr;178(4):217-27. Review. PubMed PMID: 2156952.

87. **Kosten TR**, Gawin FH, Morgan C, Nelson JC, Jatlow P. Desipramine and its 2-hydroxy metabolite in patients taking or not taking methadone. Am J Psychiatry. 1990 Oct;147(10):1379-80. PubMed PMID: 2400009.

88. **Kosten TR**, Wahby V, Giller E Jr, Mason J. The dexamethasone suppression test and thyrotropin-releasing hormone stimulation test in posttraumatic stress disorder. Biol Psychiatry. 1990 Oct 15;28(8):657-64. PubMed PMID: 2122916.

89. **Kosten TR**, Margolin A. New developments in opioid abuse treatment. Annals Clinical Psychiatry. 1990; 2(4): 245-250.

90. Mason JW, Giller EI, **Kosten TR**, Wahby VS. Serum testosterone levels in post traumatic stress disorder inpatients. J Traumatic Stress. 1990; 3: 449-457.

91. Mason JW, **Kosten TR**, Southwick SM, Giller EL. The use of hormonal profile strategies in post-traumatic stress disorder. J Applied Social Psychology. 1990; 20: 1822-1846.

92. Woods SW, O'Malley SS, Martini BL, McDougle CJ, Price LH, Krystal JH, Hoffer PB, **Kosten TR**. SPECT regional cerebral blood flow and neuropsychological testing in non-demented HIV-positive drug abusers: preliminary results. Prog Neuropsychopharmacol Biol Psychiatry. 1991;15(5):649-62. PubMed PMID: 1956993.

93. Ziedonis DM, **Kosten TR**. Depression as a prognostic factor for pharmacological treatment of cocaine dependence. Psychopharmacol Bull. 1991;27(3):337-43. PubMed PMID: 1775608.

94. Rounsaville BJ, **Kosten TR**, Weissman MM, Prusoff B, Pauls D, Anton SF, Merikangas K. Psychiatric disorders in relatives of probands with opiate addiction. JAMA Psych (Arch Gen Psychiatry). 1991 Jan;48(1):33-42. PubMed PMID: 1984760.

95. Satel SL, **Kosten TR**. Designing drug efficacy trials in the treatment of cocaine abuse. J Nerv Ment Dis. 1991 Feb;179(2):89-96. PubMed PMID: 1990076.

Thomas R. Kosten, MD
CV

96. Mason JW, **Kosten TR**, Giller EL. Multidimensional hormonal discrimination of paranoid schizophrenic from bipolar manic patients. Biol Psychiatry. 1991 Mar 1; 29(5):457-66. PubMed PMID: 2018819.

97. Rosen MI, **Kosten TR**. Buprenorphine: beyond methadone? Hosp Community Psychiatry. 1991 Apr; 42(4):347-9. Review. PubMed PMID: 2050347.

98. **Kosten TR**, Frank JB, Dan E, McDougle CJ, Giller EL Jr. Pharmacotherapy for posttraumatic stress disorder using phenelzine or imipramine. J Nerv Ment Dis. 1991 Jun; 179(6):366-70. PubMed PMID: 2051152.

99. **Kosten TR**, Morgan C, Kleber HD. Treatment of heroin addicts using buprenorphine. Am J Drug Alcohol Abuse. 1991 Jun; 17(2):119-28. PubMed PMID: 1862786.

100. **Kosten TR**, Rounsaville BJ, Kosten TA, Merikangas K. Gender differences in the specificity of alcoholism transmission among the relatives of opioid addicts. J Nerv Ment Dis. 1991 Jul; 179(7):392-400. PubMed PMID: 1869867.

101. Ziedonis DM, **Kosten TR**. Pharmacotherapy improves treatment outcome in depressed cocaine addicts. J Psychoactive Drugs. 1991 Oct-Dec; 23(4):417-25. PubMed PMID: 1813613.

102. Kosten TA, **Kosten TR**. Pharmacological blocking agents for treating substance abuse. J Nerv Ment Dis. 1991 Oct; 179(10):583-92. Review. PubMed PMID: 1919542.

103. **Kosten TR**, Kosten TA, Rounsaville BJ. Alcoholism and depressive disorders in opioid addicts and their family members. Compr Psychiatry. 1991 Nov-Dec; 32(6):521-7. PubMed PMID: 1778079.

104. **Kosten TR**. Medications development and the war on drugs: victims of the Gulf war? Biol Psychiatry. 1991 Mar 15; 29(6):521-3. PubMed PMID: 2054428.

105. Ziedonis D, Richardson T, Lee E, Petrakis I, **Kosten T**. Adjunctive desipramine in the treatment of cocaine abusing schizophrenics. Psychopharmacol Bull. 1992;28(3):309-14. PubMed PMID: 1480735.

106. Krystal JH, McDougle CJ, **Kosten TR**, Price LH, Aghajanian GK, Charney DS. Baclofen-assisted detoxification from opiates. A pilot study. J Subst Abuse Treat. 1992;9(2):139-42. PubMed PMID: 1324986.

107. **Kosten TR**, Rosen MI, Schottenfeld R, Ziedonis D. Buprenorphine for cocaine and opiate dependence. Psychopharmacol Bull. 1992;28(1):15-9. Review. PubMed PMID: 1609037.

108. Kosten TA, Bianchi MS, **Kosten TR**. The predictive validity of the dependence syndrome in opiate abusers. Am J Drug Alcohol Abuse. 1992;18(2):145-56. PubMed PMID: 1562012.

109. Rosen MI, **Kosten T**. Cocaine-associated panic attacks in methadone-maintained patients. Am J Drug Alcohol Abuse. 1992;18(1):57-62. PubMed PMID: 1314016.

110. Stine SM, **Kosten TR**. Use of drug combinations in treatment of opioid withdrawal. J Clin Psychopharmacol. 1992 Jun;12(3):203-9. Review. PubMed PMID: 1629388.

111. McDougle CJ, Price LH, Palumbo JM, **Kosten TR**, Heninger GR, Kleber HD. Dopaminergic responsivity during cocaine abstinence: a

Thomas R. Kosten, MD
CV

pilot study. Psychiatry Res. 1992 Jul;43(1):77-85. PubMed PMID: 1359594.

112. **Kosten T**, Silverman DG, Fleming J, Kosten TA, Gawin FH, Compton M, Jatlow P, Byck R. Intravenous cocaine challenges during naltrexone maintenance: a preliminary study. Biol Psychiatry. 1992 Sep 15;32(6):543-8. PubMed PMID: 1445971.

113. **Kosten TR**, Morgan C, Kreek MJ. Beta endorphin levels during heroin, methadone, buprenorphine, and naloxone challenges: preliminary findings. Biol Psychiatry. 1992 Sep 15;32(6):523-8. PubMed PMID: 1445968.

114. Nigam R, Schottenfeld R, **Kosten TR**. Treatment of dual diagnosis patients: a relapse prevention group approach. J Subst Abuse Treat. 1992 Fall;9(4):305-9. PubMed PMID: 1362227.

115. Chang G, Carroll KM, Behr HM, **Kosten TR**. Improving treatment outcome in pregnant opiate-dependent women. J Subst Abuse Treat. 1992 Fall;9(4):327-30. PubMed PMID: 1479630; PubMed Central PMCID: PMC3677856.

116. **Kosten TR**, Morgan CM, Falcione J, Schottenfeld RS. Pharmacotherapy for cocaine-abusing methadone-maintained patients using amantadine or desipramine. JAMA Psych (Arch Gen Psychiatry). 1992 Nov;49(11):894-8. PubMed PMID: 1444728.

117. **Kosten T**, Gawin FH, Silverman DG, Fleming J, Compton M, Jatlow P, Byck R. Intravenous cocaine challenges during desipramine maintenance. Neuropsychopharmacology. 1992 Nov;7(3):169-76. PubMed PMID: 1388643.

118. **Kosten TR**, Gawin FH, Kosten TA, Morgan C, Rounsaville BJ, Schottenfeld RS, Kleber HD. Six month follow-up of short term pharmacotherapy for cocaine dependence. Am J Addictions. 1992; 1: 40-49.

119. **Kosten TR**, Krystal JH, Giller EL, Frank J, Dan E. Alexithymia as a predictor of treatment response in posttraumatic stress disorder. J Traumatic Stress. 1992; 5: 41-51.

120. **Kosten TR**. Can cocaine craving be a medication development outcome: drug craving and relapse in opioid and cocaine dependence. Am J Addictions. 1992; 1(3): 230-239.

121. Rosen MI, Bridge TP, O'Malley SS, Pearsall HR, Maritini B, O'Connor PG, Brett-Smith H, Thomas HM, van Dyke CH, Woods SW, **Kosten TR**. Peptide T treatment of cognitive impairment in HIV positive intravenous drug users. Am J Addictions. 1992; 1; 332-338.

122. Stine SM, Freeman M, Burns B, Charney DS, **Kosten TR**. The effect of methadone dose on cocaine abuse in a methadone program. Am J Addictions. 1992; 1(4): 294-303.

123. Kosten TA, **Kosten TR**, Gawin FH, Gordon LT, Hogan I, Kleber HD. An open trial of sertraline for cocaine abuse. Am J Addictions. 1992; 1(4): 349-353.

124. **Kosten TR**, Price LH. Commentary on: Phenomenology and sequelae of MDMA use. J Nervous Mental Dis. 1992; 180: 353-354.

1660

Thomas R. Kosten, MD
CV

125. **Kosten TR**. Pharmacological approaches to cocaine dependence. Clin Neuropharmacol. 1992;15 Suppl 1 Pt A:70A-71A. PubMed PMID: 1498999.

126. Margolin A, Chang P, Avants SK, **Kosten TR**. Effects of sham and real auricular needling: implications for trials of acupuncture for cocaine addiction. Am J Chin Med. 1993;21(2):103-11. PubMed PMID: 8237887.

127. Rosen MI, Pearsall HR, McDougle CJ, Price LH, Woods SW, **Kosten TR**. Effects of acute buprenorphine on responses to intranasal cocaine: a pilot study. Am J Drug Alcohol Abuse. 1993;19(4):451-64. PubMed PMID: 8273766.

128. McCance-Katz EF, Price LH, McDougle CJ, **Kosten TR**, Black JE, Jatlow PI. Concurrent cocaine-ethanol ingestion in humans: pharmacology, physiology, behavior, and the role of cocaethylene. Psychopharmacology (Berl). 1993;111(1):39-46. PubMed PMID: 7870932.

129. Kosten TA, Gawin FH, **Kosten TR**, Rounsaville BJ. Gender differences in cocaine use and treatment response. J Subst Abuse Treat. 1993 Jan-Feb;10(1):63-6. PubMed PMID: 8450576.

130. Satel SL, **Kosten TR**, Schuckit MA, Fischman MW. Should protracted withdrawal from drugs be included in DSM-IV? Am J Psychiatry. 1993 May;150(5):695-704. Review. PubMed PMID: 8097618.

131. **Kosten TR**, Schottenfeld R, Ziedonis D, Falcioni J. Buprenorphine versus methadone maintenance for opioid dependence. J Nerv Ment Dis. 1993 Jun;181(6):358-64. PubMed PMID: 8501457.

132. Schottenfeld RS, Pakes J, Ziedonis D, **Kosten TR**. Buprenorphine: dose-related effects on cocaine and opioid use in cocaine-abusing opioid-dependent humans. Biol Psychiatry. 1993 Jul 1-15;34(1-2):66-74. PubMed PMID: 8373940.

133. Sellers EM, Ciraulo DA, DuPont RL, Griffiths RR, **Kosten TR**, Romach MK, Woody GE. Alprazolam and benzodiazepine dependence. J Clin Psychiatry. 1993 Oct;54 Suppl:64-75; discussion 76-7. Review. PubMed PMID: 8262891.

134. Avants SK, Margolin A, **Kosten TR**, Singer JL. Changes concurrent with initiation of abstinence from cocaine abuse. J Subst Abuse Treat. 1993 Nov-Dec;10(6):577-83. PubMed PMID: 8308943.

135. **Kosten TR**, Steinberg M, Diakogiannis IA. A cross-over trail of mazindol for cocaine dependence. Am J Addictions. 1993; 2: 161-164.

136. Rosen MI, Pearsall HR, Price LH, McDougle CJ, Woods SW, **Kosten TR**. Carbamazepine vs. oxazepam for benzodiazepine detoxification in methadone maintained patients. Am J Addictions.1993; 3: 165-168.

137. Stine SM, Satel S, **Kosten TR**. Cocaine precipitation of patient identified opiate withdrawal. Am J Addictions. 1993; 2: 255-258.

138. Leal J, Ziedonis D, **Kosten T**. Antisocial personality disorder as a prognostic factor for pharmacotherapy of cocaine dependence. Drug Alcohol Depend. 1994 Mar;35(1):31-5. PubMed PMID: 8082553.

Thomas R. Kosten, MD
CV

139. Ziedonis DM, **Kosten TR**, Glazer WM, Frances RJ. Nicotine dependence and schizophrenia. Hosp Community Psychiatry. 1994 Mar;45(3):204-6. Review. PubMed PMID: 7910577.

140. Avants SK, Margolin A, **Kosten TR**. Cocaine abuse in methadone maintenance programs: integrating pharmacotherapy with psychosocial interventions. J Psychoactive Drugs. 1994 Apr-Jun;26(2):137-46. Review. PubMed PMID: 7931858.

141. Rosen MI, Wallace EA, McMahon TJ, Pearsall HR, Woods SW, Price LH, **Kosten TR**. Buprenorphine: duration of blockade of effects of intramuscular hydromorphone. Drug Alcohol Depend. 1994 Apr; 35(2):141-9. PubMed PMID: 7519977.

142. McDougle CJ, Black JE, Malison RT, Zimmermann RC, **Kosten TR**, Heninger GR, Price LH. Noradrenergic dysregulation during discontinuation of cocaine use in addicts. JAMA Psych (Arch Gen Psychiatry). 1994 Sep; 51(9):713-9. PubMed PMID: 8080348.

143. Rinder HM, Ault KA, Jatlow PI, **Kosten TR**, Smith BR. Platelet alpha-granule release in cocaine users. Circulation. 1994 Sep; 90(3):1162-7. PubMed PMID: 7522132.

144. Meandzija B, O'Connor PG, Fitzgerald B, Rounsaville BJ, **Kosten TR**. HIV infection and cocaine use in methadone maintained and untreated intravenous drug users. Drug Alcohol Depend. 1994 Oct; 36(2):109-13. PubMed PMID: 7851277.

145. Margolin A, Avants SK, **Kosten TR**. Cue-elicited cocaine craving and autogenic relaxation. Association with treatment outcome. J Subst Abuse Treat. 1994 Nov-Dec;11(6):549-52. PubMed PMID: 7884838.

146. Lago JA, **Kosten TR**. Stimulant withdrawal. Addiction. 1994 Nov; 89(11):1477-81. Review. PubMed PMID: 7841859.

147. Stine SM, **Kosten TR**. Reduction of opiate withdrawal-like symptoms by cocaine abuse during methadone and buprenorphine maintenance. Am J Drug Alcohol Abuse. 1994 Nov; 20(4):445-58. PubMed PMID: 7832179.

148. Oliveto AH, **Kosten TR**, Schottenfeld RS, Ziedonis D, Falcioni J. Cocaine use in buprenorphine vs. methadone maintained cocaine users. Am J Addictions. 1994; 3: 43-48.

149. **Kosten TR**. For Council on Addictions of American Psychiatry Association. Policy—statement on methadone maintenance treatment. Am J Psychiatry. 1994; 151: 792-794.

150. Margolin A, Avants SK, Chang P, Birch S, **Kosten TR**. A single-blind investigation of four auricular needle puncture configurations. Am J Chin Med. 1995;23(2):105-14. PubMed PMID: 7572770.

151. Oliveto AH, Rosen MI, Woods SW, **Kosten TR**. Discriminative stimulus, self-reported and cardiovascular effects of orally administered cocaine in humans. J Pharmacol Exp Ther. 1995 Jan; 272(1):231-41. PubMed PMID: 7815337.

152. Krystal JH, Woods SW, **Kosten TR**, Rosen MI, Seibyl JP, van Dyck CC, Price LH, Zubal IG, Hoffer PB, Charney DS. Opiate dependence and withdrawal: preliminary assessment using single photon emission computerized tomography (SPECT). Am J Drug Alcohol Abuse. 1995 Feb; 21(1):47-63. PubMed PMID: 7762544.

Thomas R. Kosten, MD
CV

153. **Kosten TR**, Rayford BS. Effects of ethnicity on low-dose opiate stabilization. J Subst Abuse Treat. 1995 Mar-Apr; 12(2):111-6. PubMed PMID: 7623388.

154. Avants SK, Margolin A, **Kosten TR**, Cooney NL. Differences between responders and nonresponders to cocaine cues in the laboratory. Addict Behav. 1995 Mar-Apr;20(2):215-24. PubMed PMID: 7484315.

155. Hameedi FA, Rosen MI, McCance-Katz EF, McMahon TJ, Price LH, Jatlow PI, Woods SW, **Kosten TR**. Behavioral, physiological, and pharmacological interaction of cocaine and disulfiram in humans. Biol Psychiatry. 1995 Apr 15;37(8):560-3. PubMed PMID: 7619981.

156. Aronson SC, Black JE, McDougle CJ, Scanley BE, Jatlow P, **Kosten TR**, Heninger GR, Price LH. Serotonergic mechanisms of cocaine effects in humans. Psychopharmacology (Berl). 1995 May; 119(2):179-85. PubMed PMID: 7659765.

157. Avants SK, Margolin A, Chang P, **Kosten TR**, Birch S. Acupuncture for the treatment of cocaine addiction. Investigation of a needle puncture control. J Subst Abuse Treat. 1995 May-Jun; 12(3):195-205. PubMed PMID: 7474027.

158. Satel SL, Krystal JH, Delgado PL, **Kosten TR**, Charney DS. Tryptophan depletion and attenuation of cue-induced craving for cocaine. Am J Psychiatry. 1995 May; 152(5):778-83. PubMed PMID: 7726319.

159. McCance EF, Price LH, **Kosten TR**, Jatlow PI. Cocaethylene: pharmacology, physiology and behavioral effects in humans. J Pharmacol Exp Ther. 1995 Jul; 274(1):215-23. PubMed PMID: 7616402.

160. Stine SM, Krystal JH, **Kosten TR**, Charney DS. Mazindol treatment for cocaine dependence. Drug Alcohol Depend. 1995 Oct; 39(3):245-52. PubMed PMID: 8556974.

161. Oliveto A, **Kosten TR**, Schottenfeld R, Falcioni J, Ziedonis D. Desipramine, amantadine, or fluoxetine in buprenorphine-maintained cocaine users. J Subst Abuse Treat. 1995 Nov-Dec;12(6):423-8. PubMed PMID: 8749726.

162. Margolin A, Avants SK, **Kosten TR**. Mazindol for relapse prevention to cocaine abuse in methadone-maintained patients. Am J Drug Alcohol Abuse. 1995 Nov; 21(4):469-81. PubMed PMID: 8561098.

163. Rosen MI, McMahon TJ, Margolin A, Gill TS, Woods SW, Pearsall HR, Kreek MJ, **Kosten TR**. Reliability of sequential naloxone challenge tests. Am J Drug Alcohol Abuse. 1995 Nov; 21(4):453-67. PubMed PMID: 8561097.

164. Margolin A, **Kosten TR**, Avants SK, Wilkins J, Ling W, Beckson M, Arndt IO, Cornish J, Ascher JA, Li SH, et al. A multicenter trial of bupropion for cocaine dependence in methadone-maintained patients. Drug Alcohol Depend. 1995 Dec; 40(2):125-31. PubMed PMID: 8745134.

165. Carroll KM, Chang G, Behr H, Clinton B, **Kosten TR**. Improving treatment outcome in pregnant methadone maintained women; Results from a randomized clinical trial. Am J Addictions. 1995; 4: 56-59.

1663

Thomas R. Kosten, MD
CV

166. Rao S, Ziedonis DM, **Kosten TR**. The pharmacotherapy of cocaine dependence. Psychiatric Annals. 1995; 25(6): 363-368.

167. O'Connor PG, Meandzija B, Poling J, **Kosten TR**, Fitzgerald B, Rounsaville BJ. HIV vaccine preparedness trials in injection-drug users: Are we prepared? Substance Abuse. 1995; 16(4): 453-467.

168. McCance EF, **Kosten TR**. The role of the human laboratory in drug abuse research. Psychiatric Annals. 1995; 25(11): 689-692.

169. **Kosten TR**, Kosten TA, McDougle CJ, Hameedi FA, McCance EF, Rosen MI, Oliveto AH, Price LH. Gender differences in response to intranasal cocaine administration to humans. Biol Psychiatry. 1996 Jan 15;39(2):147-8. PubMed PMID: 8717615.

170. Rosen MI, McMahon TJ, Hameedi FA, Pearsall HR, Woods SW, Kreek MJ, **Kosten TR**. Effect of clonidine pretreatment on naloxone-precipitated opiate withdrawal. J Pharmacol Exp Ther. 1996 Mar;276(3):1128-35. PubMed PMID: 8786543.

171. Margolin A, Avants SK, **Kosten TR**. Pemoline for the treatment of cocaine dependence in methadone-maintained patients. J Psychoactive Drugs. 1996 Jul-Sep;28(3):301-4. PubMed PMID: 8895115.

172. Rosen MI, McMahon TJ, Woods SW, Pearsall HR, **Kosten TR**. A pilot study of dextromethorphan in naloxone-precipitated opiate withdrawal. Eur J Pharmacol. 1996 Jul 4;307(3):251-7. PubMed PMID: 8836612.

173. Margolin A, Avants SK, **Kosten TR**. Abstinence symptomatology associated with cessation of chronic cocaine abuse among methadone-maintained patients. Am J Drug Alcohol Abuse. 1996 Aug;22(3):377-88. PubMed PMID: 8841686.

174. O'Connor PG, Oliveto AH, Shi JM, Triffleman E, Carroll KM, **Kosten TR**, Rounsaville BJ. A pilot study of primary-care-based buprenorphine maintenance for heroin dependence. Am J Drug Alcohol Abuse. 1996 Nov;22(4):523-31. PubMed PMID: 8911590.

175. Wallace EA, Wisniewski G, Zubal G, vanDyck CH, Pfau SE, Smith EO, Rosen MI, Sullivan MC, Woods SW, **Kosten TR**. Acute cocaine effects on absolute cerebral blood flow. Psychopharmacology (Berl). 1996 Nov; 128(1):17-20. PubMed PMID: 8944401.

176. **Kosten TR**, McCance E. A review of pharmacotherapies for substance abuse. The American Journal on Addictions. 1996; 5(1): 58-59.

177. Avants SK, Margolin A, **Kosten TR**. Influence of treatment readiness on outcomes of two pharmacotherapy trials for cocaine abuse among methadone-maintained patients. Psychology Addictive Behaviors. 1996; 10(3): 147-156.

178. Best SE, Oliveto AH, **Kosten TR**. Opioid addiction: Recent advances in detoxification and maintenance therapy. CNS Drugs. 1996; 6(4): 301-314.

179. Ziedonis DM, **Kosten TR**. Aggiornamento: Dipendenza da nicotina e schizofrenia.1996; anno IV, numero 2-3 (11-12): 44-47.

1664

Thomas R. Kosten, MD
CV

180. Petrakis IL, Satel SL, Stine S, **Kosten TR**, Normanworth SN, Charney DS, Krystal JH. AMPT effects on cue-induced craving for cocaine. The American Journal of Addictions. 1996; 5(4): 313-320.

181. **Kosten TR**, Ziedonis DM. Substance abuse and schizophrenia: editors' introduction. Schizophr Bull. 1997; 23(2):181-6. PubMed PMID: 9165628.

182. van Dyck CH, McMahon TJ, Rosen MI, O'Malley SS, O'Connor PG, Lin CH, Pearsall HR, Woods SW, **Kosten TR**. Sustained-release methylphenidate for cognitive impairment in HIV-1-infected drug abusers: a pilot study. J Neuropsychiatry Clin Neurosci. 1997 Winter; 9(1):29-36. PubMed PMID: 9017526.

183. Silverman DG, **Kosten TR**, Jatlow PI, Gutter V, Fleming J, O'Connor TZ, Byck R. Decreased digital flow persists after the abatement of cocaine-induced hemodynamic stimulation. Anesth Analg. 1997 Jan; 84(1):46-50. PubMed PMID: 8988997.

184. Manji H, Chen G, Potter W, **Kosten TR**. Guanine nucleotide binding proteins in opioid-dependent patients. Biol Psychiatry. 1997 Jan 15; 41(2):130-4. PubMed PMID: 9018382.

185. Rosen MI, Pearsall HR, Woods SW, **Kosten TR**. Effects of gamma-hydroxybutyric acid (GHB) in opioid-dependent patients. J Subst Abuse Treat. 1997 Mar-Apr; 14(2):149-54. PubMed PMID: 9258859.

186. Margolin A, Avants SK, Rounsaville B, **Kosten TR**, Schottenfeld RS. Motivational factors in cocaine pharmacotherapy trials with methadone-maintained patients: problems and paradoxes. J Psychoactive Drugs. 1997 Apr-Jun; 29(2):205-12. Review. PubMed PMID: 9250948.

187. Hameedi FA, Woods SW, Rosen MI, Pearsall HR, **Kosten TR**. Dose dependent effects of yohimbine on methadone maintained patients. Am J Drug Alcohol Abuse. 1997 May; 23(2):327-33. PubMed PMID: 9143642.

188. Warner EA, **Kosten TR**, O'Connor PG. Pharmacotherapy for opioid and cocaine abuse. Med Clin North Am. 1997 Jul;81(4):909-25. Review. PubMed PMID: 9222260.

189. Schottenfeld RS, Pakes JR, Oliveto A, Ziedonis D, **Kosten TR**. Buprenorphine vs methadone maintenance treatment for concurrent opioid dependence and cocaine abuse. JAMA Psych (Arch Gen Psychiatry). 1997 Aug; 54(8):713-20. PubMed PMID: 9283506.

190. Stine SM, Krystal JH, Petrakis IL, Jatlow PI, Heninger GR, **Kosten TR**, Charney DS. Effect of alpha-methyl-para-tyrosine on response to cocaine challenge. Biol Psychiatry. 1997 Aug 1;42(3):181-90. PubMed PMID: 9232210.

191. Avants SK, Margolin A, McMahon TJ, **Kosten TR**. Association between self-report of cognitive impairment, HIV status, and cocaine use in a sample of cocaine-dependent methadone-maintained patients. Addict Behav. 1997 Sep-Oct;22(5):599-611. PubMed PMID: 9347062.

192. O'Connor PG, Carroll KM, Shi JM, Schottenfeld RS, **Kosten TR**, Rounsaville BJ. Three methods of opioid detoxification in a primary care setting. A randomized trial. Ann Intern Med. 1997 Oct 1; 127(7):526-30. PubMed PMID: 9313020.

1665

Thomas R. Kosten, MD
CV

193. **Kosten TR**, Rosen MI, McMahon TL, Bridge TP, O'Malley SS, Pearsall R, O'Connor PG. Treatment of early AIDS dementia in intravenous drug users: high versus low dose peptide T. Am J Drug Alcohol Abuse. 1997 Nov; 23(4):543-53. PubMed PMID: 9366972.

194. **Kosten TR**, McCance E. Una revision de tratamientos farmacologicos para el abuso de substancias. RET, Revista de Toxicomanias. 1997; 11: 5-11.

195. Margolin A, Avants SK, Malison RT, **Kosten TR**. High-and low-dose mazindol for cocaine dependence in methadone-maintained patients: A preliminary evaluation. Substance Abuse. 1997; 18(3): 125-131.

196. Stine SM, **Kosten TR**. Methadone dose in the treatment of opiate dependence. Medscape Mental Health. 1997; 2(11).

197. **Kosten TR**. Pharmacotherapy of cerebral ischemia in cocaine dependence. Drug Alcohol Depend. 1998 Jan 1;49(2):133-44. Review. PubMed PMID: 9543650.

198. Schottenfeld RS, Pakes JR, **Kosten TR**. Prognostic factors in Buprenorphine- versus methadone-maintained patients. J Nerv Ment Dis. 1998 Jan; 186(1):35-43. PubMed PMID: 9457145.

199. O'Connor PG, **Kosten TR**. Rapid and ultrarapid opioid detoxification techniques. JAMA. 1998 Jan 21; 279(3):229-34. Review. PubMed PMID: 9438745.

200. Margolin A, Avants SK, DePhilippis D, **Kosten TR**. A preliminary investigation of lamotrigine for cocaine abuse in HIV-seropositive patients. Am J Drug Alcohol Abuse. 1998 Feb; 24(1):85-101. PubMed PMID: 9513631.

201. Bowers MB Jr, Malison RT, Seibyl JP, **Kosten TR**. Plasma homovanillic acid and the dopamine transporter during cocaine withdrawal. Biol Psychiatry. 1998 Feb 15; 43(4):278-81. PubMed PMID: 9513737.

202. Markou A, **Kosten TR**, Koob GF. Neurobiological similarities in depression and drug dependence: a self-medication hypothesis. Neuropsychopharmacology. 1998 Mar;18(3):135-74. Review. PubMed PMID: 9471114.

203. McCance-Katz EF, **Kosten TR**, Jatlow P. Chronic disulfiram treatment effects on intranasal cocaine administration: initial results. Biol Psychiatry. 1998 Apr 1;43(7):540-3. PubMed PMID: 9547934.

204. Avants SK, Margolin A, DePhilippis D, **Kosten TR**. A comprehensive pharmacologic-psychosocial treatment program for HIV-seropositive cocaine- and opioid-dependent patients. Preliminary findings. J Subst Abuse Treat. 1998 May-Jun;15(3):261-5. PubMed PMID: 9633038.

205. Petrakis I, Carroll KM, Nich C, Gordon L, **Kosten T**, Rounsaville B. Fluoxetine treatment of depressive disorders in methadone-maintained opioid addicts. Drug Alcohol Depend. 1998 May 1;50(3):221-6. PubMed PMID: 9649975.

206. **Kosten TR**, Cheeves C, Palumbo J, Seibyl JP, Price LH, Woods SW. Regional cerebral blood flow during acute and chronic abstinence from combined cocaine-alcohol abuse. Drug Alcohol Depend. 1998 May 1;50(3):187-95. PubMed PMID: 9649971.

1666

Thomas R. Kosten, MD
CV

207. Oliveto AH, McCance-Katz E, Singha A, Hameedi F, **Kosten TR**. Effects of d-amphetamine and caffeine in humans under a cocaine discrimination procedure. Behav Pharmacol. 1998 May;9(3):207-17. PubMed PMID: 9832935.

208. Oliveto AH, Rosen MI, Kosten TA, Hameedi FA, Woods SW, **Kosten TR**. Hydromorphone-naloxone combinations in opioid-dependent humans under a naloxone novel-response discrimination procedure. Exp Clin Psychopharmacol. 1998 May;6(2):169-78. PubMed PMID: 9608349.

209. Malison RT, Best SE, van Dyck CH, McCance EF, Wallace EA, Laruelle M, Baldwin RM, Seibyl JP, Price LH, **Kosten TR**, Innis RB. Elevated striatal dopamine transporters during acute cocaine abstinence as measured by [123I] beta-CIT SPECT. Am J Psychiatry. 1998 Jun; 155(6):832-4. PubMed PMID: 9619159.

210. Malison RT, McCance E, Carpenter LL, Baldwin RM, Seibyl JP, Price LH, **Kosten TR**, Innis RB. [123I]beta-CIT SPECT imaging of dopamine transporter availability after mazindol administration in human cocaine addicts. Psychopharmacology (Berl). 1998 Jun;137(4):321-5. PubMed PMID: 9676890.

211. **Kosten TR**. Addiction as a brain disease. Am J Psychiatry. 1998 Jun;155(6):711-3. PubMed PMID: 9619141.

212. **Kosten TR**. The pharmacotherapy of relapse prevention using anticonvulsants. Am J Addict. 1998 Summer;7(3):205-9. Review. PubMed PMID: 9702288.

213. O'Connor PG, Oliveto AH, Shi JM, Triffleman EG, Carroll KM, **Kosten TR**, Rounsaville BJ, Pakes JA, Schottenfeld RS. A randomized trial of buprenorphine maintenance for heroin dependence in a primary care clinic for substance users versus a methadone clinic. Am J Med. 1998 Aug;105(2):100-5. PubMed PMID: 9727815.

214. McCance-Katz EF, **Kosten TR**, Jatlow P. Concurrent use of cocaine and alcohol is more potent and potentially more toxic than use of either alone--a multiple-dose study. Biol Psychiatry. 1998 Aug 15;44(4):250-9. PubMed PMID: 9715356.

215. McCance-Katz EF, **Kosten TR**, Jatlow P. Disulfiram effects on acute cocaine administration. Drug Alcohol Depend. 1998 Sep 1;52(1):27-39. PubMed PMID: 9788003.

216. Oliveto AH, Farren C, **Kosten TR**. Effect of LAAM dose on opiate use in opioid-dependent patients. A pilot study. Am J Addict. 1998 Fall;7(4):272-82. PubMed PMID: 9809131.

217. Rosenheck R, Harkness L, Johnson B, Sweeney C, Buck N, Deegan D, **Kosten T**. Intensive community-focused treatment of veterans with dual diagnoses. Am J Psychiatry. 1998 Oct;155(10):1429-33. PubMed PMID: 9766776.

218. Rosen MI, Pearsall HR, **Kosten TR**. The effect of lamotrigine on naloxone-precipitated opiate withdrawal. Drug Alcohol Depend. 1998 Oct 1;52(2):173-6. PubMed PMID: 9800147.

219. Druss BG, Rohrbaugh R, **Kosten T**, Hoff R, Rosenheck RA. Use of alternative medicine in major depression. Psychiatr Serv. 1998 Nov;49(11):1397. PubMed PMID: 9826237.

1667

Thomas R. Kosten, MD
CV

220. Avants SK, Margolin A, **Kosten TR**, Rounsaville BJ, Schottenfeld RS. When is less treatment better? The role of social anxiety in matching methadone patients to psychosocial treatments. J Consult Clin Psychol. 1998 Dec;66(6):924-31. PubMed PMID: 9874905.

221. **Kosten TR**. Images in psychiatry. Marie Nyswander, 1919-1986. Am J Psychiatry. 1998 Dec;155(12):1766. PubMed PMID: 9842790.

222. **Kosten TR**, Markou A, Koob GF. Depression and stimulant dependence: neurobiology and pharmacotherapy. J Nerv Ment Dis. 1998 Dec;186(12):737-45. Review. PubMed PMID: 9865811.

223. **Kosten TR**. Images in Psychiatry: Abraham Winkler, MD: 1910-1981. American Journal of Psychiatry. 1998; 155(8): 1109.

224. Avants SK, Margolin A, Sindelar JL, Rounsaville BJ, Schottenfeld R, Stine S, Cooney NL, Rosenheck RA, Li SH, **Kosten TR**. Day treatment versus enhanced standard methadone services for opioid-dependent patients: a comparison of clinical efficacy and cost. Am J Psychiatry. 1999 Jan;156(1):27-33. PubMed PMID: 9892294.

225. **Kosten TR**, Woods SW, Rosen MI, Pearsall HR. Interactions of cocaine with nimodipine: a brief report. Am J Addict. 1999 Winter;8(1):77-81. PubMed PMID: 10189518.

226. Rosen MI, **Kosten TR**, Kreek MJ. The effects of naltrexone maintenance on the response to yohimbine in healthy volunteers. Biol Psychiatry. 1999 Jun 15;45(12):1636-45. PubMed PMID: 10376126.

227. Oliveto AH, Feingold A, Schottenfeld R, Jatlow P, **Kosten TR**. Desipramine in opioid-dependent cocaine abusers maintained on buprenorphine vs methadone. JAMA Psych (Arch Gen Psychiatry). 1999 Sep;56(9):812-20. PubMed PMID: 12884887.

228. McCance-Katz E, Sevarino K, Gottschalk PC, **Kosten T.** Pharmacotherapy of stimulant dependence: one of Japan's greatest public health challenges. Nihon Shinkei Seishin Yakurigaku Zasshi. 1999 Oct;19(4):159-86. Review. PubMed PMID: 10637824.

229. Singha AK, McCance-Katz EF, Heck SA, **Kosten TR**, Oliveto A. Individual differences in humans responding under a cocaine discrimination procedure: discriminators versus nondiscriminators. Exp Clin Psychopharmacol. 1999 Nov;7(4):391-8. PubMed PMID: 10609974.

230. **Kosten TR**. Update on addiction medicine in the State of Connecticut. Connecticut Medicine. 1999; 63(3): 160-161.

231. Gottchalk PCH, Jacobsen LK, **Kosten TR**. Current concepts in pharmacotherapy of substance abuse-the dawn of a new era. Current Psychiatry Reports. 1999; 1(2): 172-178.

232. Winther LC, Saleem R, McCance-Katz EF, Rosen MI, Hameedi FA, Pearsall HR, Jatlow PI, **Kosten TR**, Woods SW. Effects of lamotrigine on behavioral and cardiovascular responses to cocaine in human subjects. Am J Drug Alcohol Abuse. 2000 Feb;26(1):47-59. PubMed PMID: 10718163.

233. Rounsaville BJ, **Kosten TR**. Treatment for opioid dependence: quality and access. JAMA. 2000 Mar 8;283(10):1337-9. PubMed PMID: 10714736.

1668

Thomas R. Kosten, MD
CV

234. Farren CK, Hameedi FA, Rosen MA, Woods S, Jatlow P, **Kosten TR**. Significant interaction between clozapine and cocaine in cocaine addicts. Drug Alcohol Depend. 2000 May 1;59(2):153-63. PubMed PMID: 10891628.

235. Schottenfeld RS, Pakes J, O'Connor P, Chawarski M, Oliveto A, **Kosten TR**. Thrice-weekly versus daily buprenorphine maintenance. Biol Psychiatry. 2000 Jun 15;47(12):1072-9. PubMed PMID: 10862807.

236. George TP, Chawarski MC, Pakes J, Carroll KM, **Kosten TR**, Schottenfeld RS. Disulfiram versus placebo for cocaine dependence in buprenorphine-maintained subjects: a preliminary trial. Biol Psychiatry. 2000 Jun 15;47(12):1080-6. PubMed PMID: 10862808.

237. Jacobsen LK, Staley JK, Malison RT, Zoghbi SS, Seibyl JP, **Kosten TR**, Innis RB. Elevated central serotonin transporter binding availability in acutely abstinent cocaine-dependent patients. Am J Psychiatry. 2000 Jul;157(7):1134-40. PubMed PMID: 10873923.

238. **Kosten TR**, Fontana A, Sernyak MJ, Rosenheck R. Benzodiazepine use in posttraumatic stress disorder among veterans with substance abuse. J Nerv Ment Dis. 2000 Jul;188(7):454-9. PubMed PMID: 10919705.

239. Avants SK, Margolin A, Holford TR, **Kosten TR**. A randomized controlled trial of auricular acupuncture for cocaine dependence. Arch Intern Med. 2000 Aug 14-28;160(15):2305-12. PubMed PMID: 10927727.

240. Jacobsen LK, Staley JK, Zoghbi SS, Seibyl JP, **Kosten TR**, Innis RB, Gelernter J. Prediction of dopamine transporter binding availability by genotype: a preliminary report. Am J Psychiatry. 2000 Oct;157(10):1700-3. PubMed PMID: 11007732.

241. Singha AK, McCance-Katz EF, Petrakis I, **Kosten TR**, Oliveto A. Sex differences in self-reported and physiological response to oral cocaine and placebo in humans. Am J Drug Alcohol Abuse. 2000 Nov;26(4):643-57. PubMed PMID: 11097197.

242. George TP, Ziedonis DM, Feingold A, Pepper WT, Satterburg CA, Winkel J, Rounsaville BJ, **Kosten TR**. Nicotine transdermal patch and atypical antipsychotic medications for smoking cessation in schizophrenia. Am J Psychiatry. 2000 Nov;157(11):1835-42. PubMed PMID: 11058482.

243. Jacobsen LK, Giedd JN, Kreek MJ, Gottschalk C, **Kosten TR**. Quantitative medial temporal lobe brain morphology and hypothalamic-pituitary-adrenal axis function in cocaine dependence: a preliminary report. Drug Alcohol Depend. 2001 Mar 1;62(1):49-56. PubMed PMID: 11173167.

244. Jacobsen LK, Giedd JN, Gottschalk C, **Kosten TR**, Krystal JH. Quantitative morphology of the caudate and putamen in patients with cocaine dependence. Am J Psychiatry. 2001 Mar;158(3):486-9. PubMed PMID: 11229995.

245. Stine SM, Grillon CG, Morgan CA 3rd, **Kosten TR**, Charney DS, Krystal JH. Methadone patients exhibit increased startle and cortisol response after intravenous yohimbine. Psychopharmacology (Berl). 2001 Mar;154(3):274-81. PubMed PMID: 11351934.

1669

Thomas R. Kosten, MD
CV

246. Gottschalk C, Beauvais J, Hart R, **Kosten T.** Cognitive function and cerebral perfusion during cocaine abstinence. Am J Psychiatry. 2001 Apr;158(4):540-5. PubMed PMID: 11282686.

247. D'Souza DC, **Kosten TR**. Cannabinoid antagonists: a treatment in search of an illness. JAMA Psych (Arch Gen Psychiatry). 2001 Apr;58(4):330-1. PubMed PMID: 11296092.

248. Petry NM, Petrakis I, Trevisan L, Wiredu G, Boutros NN, Martin B, **Kosten TR**. Contingency management interventions: from research to practice. Am J Psychiatry. 2001 May;158(5):694-702. PubMed PMID: 11329388.

249. McCance-Katz EF, Kosten TA, **Kosten TR**. Going from the bedside back to the bench with ecopipam: a new strategy for cocaine pharmacotherapy development. Psychopharmacology (Berl). 2001 Jun;155(4):327-9. PubMed PMID: 11441421.

250. Oliveto A, McCance-Katz FE, Singha A, Petrakis I, Hameedi F, **Kosten TR**. Effects of cocaine prior to and during bupropion maintenance in cocaine-abusing volunteers. Drug Alcohol Depend. 2001 Jul 1;63(2):155-67. PubMed PMID: 11376920.

251. Potenza MN, **Kosten TR**, Rounsaville BJ. Pathological gambling. JAMA. 2001 Jul 11;286(2):141-4. PubMed PMID: 11448261.

252. Jacobsen LK, Southwick SM, **Kosten TR**. Substance use disorders in patients with posttraumatic stress disorder: a review of the literature. Am J Psychiatry. 2001 Aug;158(8):1184-90. Review. PubMed PMID: 11481147.

253. Fiellin DA, Rosenheck RA, **Kosten TR**. Office-based treatment for opioid dependence: reaching new patient populations. Am J Psychiatry. 2001 Aug;158(8):1200-4. PubMed PMID: 11481150.

254. Rosenheck R, **Kosten T**. Buprenorphine for opiate addiction: potential economic impact. Drug Alcohol Depend. 2001 Aug 1;63(3):253-62. PubMed PMID: 11418229.

255. McCance-Katz EF, Rainey PM, Friedland G, **Kosten TR**, Jatlow P. Effect of opioid dependence pharmacotherapies on zidovudine disposition. Am J Addict. 2001 Fall;10(4):296-307. PubMed PMID: 11783744.

256. Sernyak MJ, **Kosten TR**, Fontana A, Rosenheck R. Neuroleptic use in the treatment of Post-Traumatic Stress Disorder. Psychiatr Q. 2001 Fall;72(3):197-213. PubMed PMID: 11467155.

257. Gonzalez G, Oliveto A, **Kosten TR**. Treatment of heroin (diamorphine) addiction: current approaches and future prospects. Drugs. 2002;62(9):1331-43. Review. PubMed PMID: 12076182.

258. George TP, Vessicchio JC, Termine A, Sahady DM, Head CA, Pepper WT, **Kosten TR**, Wexler BE. Effects of smoking abstinence on visuospatial working memory function in schizophrenia. Neuropsychopharmacology. 2002 Jan;26(1):75-85. PubMed PMID: 11751034.

259. **Kosten TR**, Rosen M, Bond J, Settles M, Roberts JS, Shields J, Jack L, Fox B. Human therapeutic cocaine vaccine: safety and immunogenicity. Vaccine. 2002 Jan 15;20(7-8):1196-204. PubMed PMID: 11803082.

1670

Thomas R. Kosten, MD
CV

260. **Kosten TR**, George TP, Kosten TA. The potential of dopamine agonists in drug addiction. Expert Opin Investig Drugs. 2002 Apr;11(4):491-9. Review. PubMed PMID: 11922858.

261. **Kosten TR**, Oliveto A, Sevarino KA, Gonsai K, Feingold A. Ketoconazole increases cocaine and opioid use in methadone maintained patients. Drug Alcohol Depend. 2002 Apr 1;66(2):173-80. PubMed PMID: 11906804.

262. Feingold A, Oliveto A, Schottenfeld R, **Kosten TR**. Utility of crossover designs in clinical trials: efficacy of desipramine vs. placebo in opioid-dependent cocaine abusers. Am J Addict. 2002 Spring; 11(2):111-23. PubMed PMID: 12028741.

263. Boutros NN, Gelernter J, Gooding DC, Cubells J, Young A, Krystal JH, **Kosten T**. Sensory gating and psychosis vulnerability in cocaine-dependent individuals: preliminary data. Biol Psychiatry. 2002 Apr 15; 51(8):683-6. PubMed PMID: 11955469.

264. Stine SM, Southwick SM, Petrakis IL, **Kosten TR**, Charney DS, Krystal JH. Yohimbine-induced withdrawal and anxiety symptoms in opioid-dependent patients. Biol Psychiatry. 2002 Apr 15;51(8):642-51. PubMed PMID: 11955464.

265. Gottschalk PC, **Kosten TR**. Isradipine enhancement of cerebral blood flow in abstinent cocaine abusers with and without chronic perfusion deficits. Am J Addict. 2002 Summer;11(3):200-8. PubMed PMID: 12202012.

266. **Kosten TR**, George TP. The neurobiology of opioid dependence: implications for treatment. Sci Pract Perspect. 2002 Jul;1(1):13-20. Review. PubMed PMID: 18567959; PubMed Central PMCID: PMC2851054.

267. George TP, Vessicchio JC, Termine A, Bregartner TA, Feingold A, Rounsaville BJ, **Kosten TR**. A placebo controlled trial of bupropion for smoking cessation in schizophrenia. Biol Psychiatry. 2002 Jul 1;52(1):53-61. PubMed PMID: 12079730.

268. Gottschalk PC, **Kosten TR**. Cerebral perfusion defects in combined cocaine and alcohol dependence. Drug Alcohol Depend. 2002 Sep 1;68(1):95-104. PubMed PMID: 12167555.

269. **Kosten TR**, Biegel D. Therapeutic vaccines for substance dependence. Expert Rev Vaccines. 2002 Oct;1(3):363-71. Review. PubMed PMID: 12901575.

270. **Kosten TR**, Gorelick DA. The Lexington narcotic farm. Am J Psychiatry. 2002 Jan;159(1):22. Erratum in: Am J Psychiatry 2002 Mar;159(3):514. PubMed PMID: 11772684.

271. **Kosten TR**. Commentary: Commitment for substance abuse-Current judicial interventions. The Journal of the American Academy of Psychiatry and the Law. 2002; 30(1): 46-48.

272. Sofuoglu M, Gonzalez G, Poling J, **Kosten TR**. Prediction of treatment outcome by baseline urine cocaine results and self-reported cocaine use for cocaine and opioid dependence. Am J Drug Alcohol Abuse. 2003;29(4):713-27. PubMed PMID: 14713135.

273. George TP, Vessicchio JC, Termine A, Jatlow PI, **Kosten TR**, O'Malley SS. A preliminary placebo-controlled trial of selegiline hydrochloride for smoking cessation. Biol Psychiatry. 2003 Jan 15; 53(2):136-43. PubMed PMID: 12547469.

1671

Thomas R. Kosten, MD
CV

274. Fiellin DA, Rosenheck RA, **Kosten TR**. Coordination of medical care and opioid dependence treatment in primary care: a case report. Subst Abus. 2003 Mar; 24(1):43-6. PubMed PMID: 12652094.

275. **Kosten TR**, O'Connor PG. Management of drug and alcohol withdrawal. N Engl J Med. 2003 May 1; 348(18):1786-95. Review. PubMed PMID: 12724485.

276. Reid MC, Tinetti ME, O'Connor PG, **Kosten TR**, Concato J. Measuring alcohol consumption among older adults: a comparison of available methods. Am J Addict. 2003 May-Jun; 12(3):211-9. PubMed PMID: 12851017.

277. **Kosten T**, Poling J, Oliveto A. Effects of reducing contingency management values on heroin and cocaine use for buprenorphine- and desipramine-treated patients. Addiction. 2003 May;98(5):665-71. PubMed PMID: 12751984.

278. **Kosten T**, Oliveto A, Feingold A, Poling J, Sevarino K, McCance-Katz E, Stine S, Gonzalez G, Gonsai K. Desipramine and contingency management for cocaine and opiate dependence in buprenorphine maintained patients. Drug Alcohol Depend. 2003 Jun 5;70(3):315-25. PubMed PMID: 12757969.

279. Sofuoglu M, Singha A, **Kosten TR**, McCance-Katz FE, Petrakis I, Oliveto A. Effects of naltrexone and isradipine, alone or in combination, on cocaine responses in humans. Pharmacol Biochem Behav. 2003 Jul;75(4):801-8. PubMed PMID: 12957222.

280. Oliveto A, Benios T, Gonsai K, Feingold A, Poling J, **Kosten TR**. D-cycloserine-Naloxone interactions in opioid-dependent humans under a novel-response naloxone discrimination procedure. Exp Clin Psychopharmacol. 2003 Aug;11(3):237-46. PubMed PMID: 12940503.

281. Gonzalez G, Feingold A, Oliveto A, Gonsai K, **Kosten TR**. Comorbid major depressive disorder as a prognostic factor in cocaine-abusing buprenorphine-maintained patients treated with desipramine and contingency management. Am J Drug Alcohol Abuse. 2003 Aug;29(3):497-514. PubMed PMID: 14510037.

282. **Kosten TR**, Gottschalk PC, Tucker K, Rinder CS, Dey HM, Rinder HM. Aspirin or amiloride for cerebral perfusion defects in cocaine dependence. Drug Alcohol Depend. 2003 Aug 20;71(2):187-94. PubMed PMID: 12927657.

283. Haile CN, During MJ, Jatlow PI, **Kosten TR**, Kosten TA. Disulfiram facilitates the development and expression of locomotor sensitization to cocaine in rats. Biol Psychiatry. 2003 Nov 1;54(9):915-21. PubMed PMID: 14573319.

284. Gonzalez G, Sevarino K, Sofuoglu M, Poling J, Oliveto A, Gonsai K, George TP, **Kosten TR**. Tiagabine increases cocaine-free urines in cocaine-dependent methadone-treated patients: results of a randomized pilot study. Addiction. 2003 Nov;98(11):1625-32. PubMed PMID: 14616189.

285. Streltzer J, **Kosten TR**. Methadone maintenance therapy and chronic pain. JAMA. 2003 Nov 12;290(18):2403; author reply 2403-4. PubMed PMID: 14612466.

1672

Thomas R. Kosten, MD
CV

286. **Kosten TR**, O'Connor PG. Current concepts-management of drug withdrawal. New England Journal of Medicine. 2003; 348: 1786-1795.

287. **Kosten TR**. Buprenorphine for opioid detoxification: A brief review. Addictive Disorders & Their Treatment. 2003; 2(4): 107-112.

288. West JC, **Kosten TR**, Wilk J, Svikis D, Triffleman E, Rae DS, Narrow WE, Duffy FF, Regier DA. Challenges in increasing access to buprenorphine treatment for opiate addiction. Am J Addict. 2004;13 Suppl 1:S8-16. PubMed PMID: 15204672

289. **Kosten TR**, Fiellin DA; U.S. National Buprenorphine Implementation Program. Buprenorphine for office-based practice: consensus conference overview. Am J Addict. 2004;13 Suppl 1:S1-7. Review. PubMed PMID: 15204671.

290. **Kosten TR**. Mandatory drug testing needs controlled evaluation. Am J Bioeth. 2004 Winter;4(1):32. PubMed PMID: 15035939.

291. **Kosten TR**, Tucker K, Gottschalk PC, Rinder CS, Rinder HM. Platelet abnormalities associated with cerebral perfusion defects in cocaine dependence. Biol Psychiatry. 2004 Jan 1;55(1):91-7. PubMed PMID: 14706430.

292. Haney M, **Kosten TR**. Therapeutic vaccines for substance dependence. Expert Rev Vaccines. 2004 Feb;3(1):11-8. Review. PubMed PMID: 14761239.

293. **Kosten T,** Falcioni J, Oliveto A, Feingold A. Depression predicts higher rates of heroin use on desipramine with buprenorphine than with methadone. Am J Addict. 2004 Mar-Apr;13(2):191-201. PubMed PMID: 15204669.

294. Gonzalez G, Oliveto A, **Kosten TR**. Combating opiate dependence: a comparison among the available pharmacological options. Expert Opin Pharmacother. 2004 Apr;5(4):713-25. Review. PubMed PMID: 15102558.

295. Browndyke JN, Tucker KA, Woods SP, Beauvals J, Cohen RA, Gottschalk PC, **Kosten TR**. Examining the effect of cerebral perfusion abnormality magnitude on cognitive performance in recently abstinent chronic cocaine abusers. J Neuroimaging. 2004 Apr;14(2):162-9. PubMed PMID: 15095563.

296. Tucker KA, Browndyke JN, Gottschalk PC, Cofrancesco AT, **Kosten TR**. Gender-specific vulnerability for rCBF abnormalities among cocaine abusers. Neuroreport. 2004 Apr 9;15(5):797-801. PubMed PMID: 15073517.

297. Oliveto A, Poling J, **Kosten TR**, Gonsai K. Isradipine and dextromethorphan in methadone-maintained humans under a naloxone discrimination procedure. Eur J Pharmacol. 2004 May 3;491(2-3):157-68. PubMed PMID: 15140632.

298. Sofuoglu M, Mitchell E, **Kosten TR**. Effects of progesterone treatment on cocaine responses in male and female cocaine users. Pharmacol Biochem Behav. 2004 Aug;78(4):699-705. PubMed PMID: 15301924.

299. Carroll KM, **Kosten TR**, Rounsaville BJ. Choosing a behavioral therapy platform for pharmacotherapy of substance users. Drug

Thomas R. Kosten, MD
CV

Alcohol Depend. 2004 Aug 16;75(2):123-34. Review. PubMed PMID: 15276217; PubMed Central PMCID: PMC3668430.

300. Fiellin DA, Kleber H, Trumble-Hejduk JG, McLellan AT, **Kosten TR**. Consensus statement on office-based treatment of opioid dependence using buprenorphine. J Subst Abuse Treat. 2004 Sep;27(2):153-9. Review. PubMed PMID: 15450648.

301. Tucker KA, Potenza MN, Beauvais JE, Browndyke JN, Gottschalk PC, **Kosten TR**. Perfusion abnormalities and decision making in cocaine dependence. Biol Psychiatry. 2004 Oct 1;56(7):527-30. PubMed PMID: 15450790.

302. O'Brien CP, Charney DS, Lewis L, Cornish JW, Post RM, Woody GE, Zubieta JK, Anthony JC, Blaine JD, Bowden CL, Calabrese JR, Carroll K, **Kosten T**, Rounsaville B, Childress AR, Oslin DW, Pettinati HM, Davis MA, Demartino R, Drake RE, Fleming MF, Fricks L, Glassman AH, Levin FR, Nunes EV, Johnson RL, Jordan C, Kessler RC, Laden SK, Regier DA, Renner JA Jr, Ries RK, Sklar-Blake T, Weisner C. Priority actions to improve the care of persons with co-occurring substance abuse and other mental disorders: a call to action. Biol Psychiatry. 2004 Nov 15;56(10):703-13. PubMed PMID: 15556110.

303. **Kosten TR**, Kosten TA. New medication strategies for comorbid substance use and bipolar affective disorders. Biol Psychiatry. 2004 Nov 15;56(10):771-7. PubMed PMID: 15556122.

304. Sofuoglu M, **Kosten TR**. Pharmacologic management of relapse prevention in addictive disorders. Psychiatr Clin North Am. 2004 Dec;27(4):627-48. Review. PubMed PMID: 15550284.

305. McCance-Katz EF, Hart CL, Boyarsky B, **Kosten T**, Jatlow P. Gender effects following repeated administration of cocaine and alcohol in humans. Subst Use Misuse. 2005;40(4):511-28. PubMed PMID: 15830733.

306. Sofuoglu M, **Kosten TR**. Novel approaches to the treatment of cocaine addiction. CNS Drugs. 2005;19(1):13-25. Review. PubMed PMID: 15651902.

307. **Kosten T**, Sofuoglu M, Poling J, Gonsai K, Oliveto A. Desipramine treatment for cocaine dependence in buprenorphine- or methadone-treated patients: baseline urine results as predictor of response. Am J Addict. 2005 Jan-Feb;14(1):8-17. PubMed PMID: 15804873.

308. **Kosten TR**. Future of anti-addiction vaccines. Stud Health Technol Inform. 2005;118:177-85. PubMed PMID: 16301778.

309. Schottenfeld RS, Chawarski MC, Pakes JR, Pantalon MV, Carroll KM, **Kosten TR**. Methadone versus buprenorphine with contingency management or performance feedback for cocaine and opioid dependence. Am J Psychiatry. 2005 Feb;162(2):340-9. PubMed PMID: 15677600.

310. Abi-Saab D, Beauvais J, Mehm J, Brody M, Gottschalk C, **Kosten TR**. The effect of alcohol on the neuropsychological functioning of recently abstinent cocaine-dependent subjects. Am J Addict. 2005 Mar-Apr;14(2):166-78. PubMed PMID: 16019965.

311. Li CS, **Kosten TR**, Sinha R. Sex differences in brain activation during stress imagery in abstinent cocaine users: a functional

1674

Thomas R. Kosten, MD
CV

magnetic resonance imaging study. Biol Psychiatry. 2005 Mar 1;57(5):487-94. PubMed PMID: 15737663

312. Boutros NN, Lisanby SH, McClain-Furmanski D, Oliwa G, Gooding D, **Kosten TR**. Cortical excitability in cocaine-dependent patients: a replication and extension of TMS findings. J Psychiatr Res. 2005 May;39(3):295-302. PubMed PMID: 15725428.

313. **Kosten TR**. What are America's opportunities for harm reduction strategies in opiate dependence? Am J Addict. 2005 Jul-Sep;14(4):307-10. PubMed PMID: 16188710.

314. Martell BA, Mitchell E, Poling J, Gonsai K, **Kosten TR**. Vaccine pharmacotherapy for the treatment of cocaine dependence. Biol Psychiatry. 2005 Jul 15;58(2):158-64. PubMed PMID: 16038686.

315. Oliveto A, Poling J, Sevarino KA, Gonsai KR, McCance-Katz EF, Stine SM, **Kosten TR**. Efficacy of dose and contingency management procedures in LAAM-maintained cocaine-dependent patients. Drug Alcohol Depend. 2005 Aug 1;79(2):157-65. PubMed PMID: 16002025.

316. Sofuoglu M, Mouratidis M, Yoo S, Culligan K, **Kosten T**. Effects of tiagabine in combination with intravenous nicotine in overnight abstinent smokers. Psychopharmacology (Berl). 2005 Sep;181(3):504-10. Epub 2005 Oct 12. PubMed PMID: 15983800.

317. **Kosten T**, Owens SM. Immunotherapy for the treatment of drug abuse. Pharmacol Ther. 2005 Oct;108(1):76-85. Review. PubMed PMID: 16023218.

318. Sofuoglu M, Poling J, Mitchell E, **Kosten TR**. Tiagabine affects the subjective responses to cocaine in humans. Pharmacol Biochem Behav. 2005 Nov;82(3):569-73. Epub 2005 Dec 5. PubMed PMID: 16332385.

319. Sinha R, Lacadie C, Skudlarski P, Fulbright RK, Rounsaville BJ, **Kosten TR**, Wexler BE. Neural activity associated with stress-induced cocaine craving: a functional magnetic resonance imaging study. Psychopharmacology (Berl). 2005 Dec;183(2):171-80. Epub 2005 Nov 9. PubMed PMID: 16163517.

320. Poling J, **Kosten TR**. Risperidone for substance dependent psychotic patients. Addictive Disorders and their Treatment, 2005. 4(1): 1-3.

321. **Kosten TR**. Update on addiction medicine in Connecticut- Getting new treatments into the community. Connecticut Medicine. 2005; 69(4): 222-223.

322. **Kosten TR**. Advances in pharmacotherapy of stimulant dependence: From alcohol antagonists to Xenova vaccines. Clinical Neuroscience Research. 2005; 5: 169-173.

323. Sofuoglu M, Poling J, Gonzalez G, Gonsai K, **Kosten T**. Cocaine withdrawal symptoms predict medication response in cocaine users. Am J Drug Alcohol Abuse. 2006;32(4):617-27. PubMed PMID: 17127550.

324. Poling J, Oliveto A, Petry N, Sofuoglu M, Gonsai K, Gonzalez G, Martell B, **Kosten TR**. Six-month trial of bupropion with contingency management for cocaine dependence in a methadone-maintained

Thomas R. Kosten, MD
CV

population. JAMA Psych (Arch Gen Psychiatry). 2006 Feb;63(2):219-28. PubMed PMID: 16461866.

325. Li CS, **Kosten TR**, Sinha R. Antisocial personality and stress-induced brain activation in cocaine-dependent patients. Neuroreport. 2006 Feb 27;17(3):243-7. PubMed PMID: 16462591.

326. **Kosten TR**, Scanley BE, Tucker KA, Oliveto A, Prince C, Sinha R, Potenza MN, Skudlarski P, Wexler BE. Cue-induced brain activity changes and relapse in cocaine-dependent patients. Neuropsychopharmacology. 2006 Mar;31(3):644-50. PubMed PMID: 16123763.

327. Sofuoglu M, **Kosten TR**. Emerging pharmacological strategies in the fight against cocaine addiction. Expert Opin Emerg Drugs. 2006 Mar;11(1):91-8. Review. PubMed PMID: 16503828.

328. Sofuoglu M, Poling J, Mouratidis M, **Kosten T**. Effects of topiramate in combination with intravenous nicotine in overnight abstinent smokers. Psychopharmacology (Berl). 2006 Mar;184(3-4):645-51. Epub 2006 Jan 24. PubMed PMID: 16432681.

329. Work Group on Substance Use Disorders, Kleber HD, Weiss RD, Anton RF, Rounsaville BJ, George TP, Strain EC, Greenfield SF, Ziedonis DM, **Kosten TR**, Hennessy G, O'Brien CP, Connery HS; American Psychiatric Association Steering Committee on Practice Guidelines, McIntyre JS, Charles SC, Anzia DJ, Nininger JE, Cook IA, Summergrad P, Finnerty MT, Woods SM, Johnson BR, Yager J, Pyles R, Lurie L, Cross CD, Walker RD, Peele R, Barnovitz MA, Gray SH, Shemo JP, Saxena S, Tonnu T, Kunkle R, Albert AB, Fochtmann LJ, Hart C, Regier D. Treatment of patients with substance use disorders, second edition. American Psychiatic Association. Am J Psychiatry. 2006 Aug;163(8 Suppl):5-82. Erratum in: Am J Psychiatry. 2006 Oct;163(10):1843. PubMed PMID: 16981488.

330. Sofuoglu M, Mouratidis M, Yoo S, **Kosten T**. Adrenergic blocker carvedilol attenuates the cardiovascular and aversive effects of nicotine in abstinent smokers. Behav Pharmacol. 2006 Dec;17(8):731-5. PubMed PMID: 17110799.

331. **Kosten TR**, Scanley BE, Tucker K, Oliveto A, Prince C, Sinha R, Potenza MN, Skudlarski P, Wexler BE. Cue-induced brain activity changes and treatment outcome in depressed cocaine dependent patients. Neuropsychopharmacology. 2006; 31: 644-650.

332. Gardner TJ, **Kosten TR**. Therapeutic options and challenges for substances of abuse. Dialogues Clin Neurosci. 2007;9(4):431-45. Review. PubMed PMID: 18286802; PubMed Central PMCID: PMC3202509.

333. Lane SD, Moeller FG, Steinberg JL, Buzby M, **Kosten TR**. Performance of cocaine dependent individuals and controls on a response inhibition task with varying levels of difficulty. Am J Drug Alcohol Abuse. 2007;33(5):717-26. PubMed PMID: 17891664.

334. Haile CN, **Kosten TR**, Kosten TA. Genetics of dopamine and its contribution to cocaine addiction. Behav Genet. 2007 Jan;37(1):119-45. Epub 2006 Oct 25. Review. PubMed PMID: 17063402.

335. J, **Kosten TR**, Sofuoglu M. Treatment outcome predictors for cocaine dependence. Am J Drug Alcohol Abuse. 2007;33(2):191-206. Review. PubMed PMID: 17497542.

Thomas R. Kosten, MD
CV

336. **Kosten TR**. Pharmacotherapy for addictions: partnering with contingency management. Am J Drug Alcohol Abuse. 2007;33(3):341-2. PubMed PMID: 17613962.

337. Brown AE, Pavlik VN, Shegog R, Whitney SN, Friedman LC, Romero C, Davis GC, Cech I, **Kosten TR**, Volk RJ. Association of spirituality and sobriety during a behavioral spirituality intervention for Twelve Step (TS) recovery. Am J Drug Alcohol Abuse. 2007;33(4):611-7. PubMed PMID: 17668347.

338. Calhoun P, Najavits LM, **Kosten T**, Kivlahan D. Substance Use in OIF/OEF Veterans. Substance Use Disorder (SUD) QUERI Initiatives. VA Health Services Research & Devlopment Forum. 2007; 6.

339. Martell BA, O'Connor PG, Kerns RD, Becker WC, Morales KH, **Kosten TR**, Fiellin DA. Systematic review: opioid treatment for chronic back pain: prevalence, efficacy, and association with addiction. Ann Intern Med. 2007 Jan 16;146(2):116-27. Review. PubMed PMID: 17227935.

340. González G, Desai R, Sofuoglu M, Poling J, Oliveto A, Gonsai K, **Kosten TR**. Clinical efficacy of gabapentin versus tiagabine for reducing cocaine use among cocaine dependent methadone-treated patients. Drug Alcohol Depend. 2007 Feb 23;87(1):1-9. Epub 2006 Aug 22. PubMed PMID: 16930857.

341. Guo S, Chen da F, Zhou DF, Sun HQ, Wu GY, Haile CN, Kosten TA, **Kosten TR**, Zhang XY. Association of functional catechol O-methyl transferase (COMT) Val108Met polymorphism with smoking severity and age of smoking initiation in Chinese male smokers. Psychopharmacology (Berl). 2007 Mar;190(4):449-56. Epub 2007 Jan 6. PubMed PMID: 17206495.

342. Sinha R, Kimmerling A, Doebrick C, **Kosten TR**. Effects of lofexidine on stress-induced and cue-induced opioid craving and opioid abstinence rates: preliminary findings. Psychopharmacology (Berl). 2007 Mar;190(4):569-74. Epub 2006 Nov 29. PubMed PMID: 17136399.

343. Kleber HD, Weiss RD, Anton RF Jr, George TP, Greenfield SF, **Kosten TR**, O'Brien CP, Rounsaville BJ, Strain EC, Ziedonis DM, Hennessy G, Connery HS, McIntyre JS, Charles SC, Anzia DJ, Cook IA, Finnerty MT, Johnson BR, Nininger JE, Summergrad P, Woods SM, Yager J, Pyles R, Cross CD, Peele R, Shemo JP, Lurie L, Walker RD, Barnovitz MA, Gray SH, Saxena S, Tonnu T, Kunkle R, Albert AB, Fochtmann LJ, Hart C, Regier D; Work Group on Substance Use Disorders; American Psychiatric Association; Steering Committee on Practice Guidelines. Treatment of patients with substance use disorders, second edition. American Psychiatric Association. Am J Psychiatry. 2007 Apr;164(4 Suppl):5-123. Review. PubMed PMID: 17569411.

344. Zhang XY, Tan YL, Zhou DF, Cao LY, Wu GY, Haile CN, Kosten TA, **Kosten TR**. Disrupted antioxidant enzyme activity and elevated lipid peroxidation products in schizophrenic patients with tardive dyskinesia. J Clin Psychiatry. 2007 May;68(5):754-60. PubMed PMID: 17503985.

Thomas R. Kosten, MD
CV

345. Poling J, Pruzinsky R, **Kosten TR**, Gonsai K, Sofuoglu M, Gonzalez G, Oliveto A. Clinical efficacy of citalopram alone or augmented with bupropion in methadone-stabilized patients. Am J Addict. 2007 May-Jun;16(3):187-94. PubMed PMID: 17612822.

346. Zhang XY, Tan YL, Zhou DF, Haile CN, Cao LY, Xu Q, Shen Y, Kosten TA, **Kosten TR**. Association of clozapine-induced weight gain with a polymorphism in the leptin promoter region in patients with chronic schizophrenia in a Chinese population. J Clin Psychopharmacol. 2007 Jun;27(3):246-51. PubMed PMID: 17502770.

347. Gardner T, **Kosten T**. Dual dependency on cocaine and alcohol in opiate addicts: treatment options. J Clin Psychiatry. 2007 Jul;68(7):1142-3. PubMed PMID: 17685754.

348. Zhang XY, Tan YL, Zhou DF, Haile CN, Wu GY, Cao LY, Kosten TA, **Kosten TR**. Nicotine dependence, symptoms and oxidative stress in male patients with schizophrenia. Neuropsychopharmacology. 2007 Sep;32(9):2020-4. Epub 2007 Jan 17. PubMed PMID: 17228336.

349. Sofuoglu M, Poling J, Gonzalez G, Gonsai K, Oliveto A, **Kosten TR**. Progesterone effects on cocaine use in male cocaine users maintained on methadone: a randomized, double-blind, pilot study. Exp Clin Psychopharmacol. 2007 Oct;15(5):453-60. PubMed PMID: 17924779.

350. Orson FM, Kinsey BM, Singh RA, Wu Y, Gardner T, **Kosten TR**. The future of vaccines in the management of addictive disorders. Curr Psychiatry Rep. 2007 Oct;9(5):381-7. Review. PubMed PMID: 17915077.

351. Hirunsatit R, Ilomäki R, Malison R, Räsänen P, Ilomäki E, Kranzler HR, **Kosten T**, Sughondhabirom A, Thavichachart N, Tangwongchai S, Listman J, Mutirangura A, Gelernter J, Lappalainen J. Sequence variation and linkage disequilibrium in the GABA transporter-1 gene (SLC6A1) in five populations: implications for pharmacogenetic research. BMC Genet. 2007 Oct 17;8:71. PubMed PMID: 17941974; PubMed Central PMCID: PMC2175509.

352. Zhang XY, Tan YL, Zhou DF, Cao LY, Wu GY, Xu Q, Shen Y, Haile CN, Kosten TA, **Kosten TR**. Serum BDNF levels and weight gain in schizophrenic patients on long-term treatment with antipsychotics. J Psychiatr Res. 2007 Dec;41(12):997-1004. Epub 2006 Nov 13. PubMed PMID: 17095017.

353. Wang ZR, Zhou DF, Cao LY, Tan YL, Zhang XY, Li J, Lu L, Wu GY, Kosten TA, **Kosten TR**. Brain-derived neurotrophic factor polymorphisms and smoking in schizophrenia. Schizophr Res. 2007 Dec;97(1-3):299-301. Epub 2007 Sep 14. PubMed PMID: 17869486.

354. Li W, Wei J, Zhou DF, Tan YL, Cao YL, Zhang XY, Wu G, Kosten TA, **Kosten TR**. Lack of association between the BDNF C270T polymorphism and schizophrenia in a Chinese Han population. Schizophr Res. 2007 Dec;97(1-3):297-8. Epub 2007 Jul 31. PubMed PMID: 17669628.

355. Haile CN, Kosten TA, **Kosten TR**. Pharmacogenetic treatments for drug addiction: alcohol and opiates. Am J Drug Alcohol Abuse.

1678

Thomas R. Kosten, MD
CV

2008;34(4):355-81. doi: 10.1080/00952990802122564. Review. PubMed PMID: 18584566.

356. Li SX, Li J, Epstein DH, Zhang XY, **Kosten TR**, Lu L. Serum cortisol secretion during heroin abstinence is elevated only nocturnally. Am J Drug Alcohol Abuse. 2008;34(3):321-8. doi: 10.1080/00952990802013664. PubMed PMID: 18428074; PubMed Central PMCID: PMC3686295.

357. Sofuoglu M, Waters AJ, Mooney M, **Kosten T**. Riluzole and D-amphetamine interactions in humans. Prog Neuropsychopharmacol Biol Psychiatry. 2008 Jan 1;32(1):16-22. Epub 2007 May 18. PubMed PMID: 17714844; PubMed Central PMCID: PMC2259272.

358. Li YQ, Wang XY, Zhai HF, Zhang XY, **Kosten T**, Lu L. Sex- and age-dependent effects of early postnatal sibling deprivation on spatial learning and memory in adult rats. Behav Brain Res. 2008 Jan 10;186(1):138-42. Epub 2007 Jul 27. PubMed PMID: 17765982.

359. Wang F, Xiu MH, Zhou DF, Cao LY, Wu GY, Kosten TA, **Kosten TR**, Zhang XY. The CCR5 32-bp deletion allele is rare in a Chinese population. Schizophr Res. 2008 Apr;101(1-3):341-3. doi: 10.1016/j.schres.2008.01.015. Epub 2008 Mar 4. PubMed PMID: 18295459.

360. Mooney ME, Poling J, Gonzalez G, Gonsai K, **Kosten T**, Sofuoglu M. Preliminary study of buprenorphine and bupropion for opioid-dependent smokers. Am J Addict. 2008 Jul-Aug;17(4):287-92. doi: 10.1080/10550490802138814. PubMed PMID: 18612883; PubMed Central PMCID: h.

361. Sun S, Wang F, Wei J, Cao LY, Qi LY, Xiu MH, Chen S, Li XH, Kosten TA, **Kosten TR**, Zhang XY. Association between interleukin-6 receptor polymorphism and patients with schizophrenia. Schizophr Res. 2008 Jul;102(1-3):346-7. doi: 10.1016/j.schres.2008.04.018. Epub 2008 May 27. PubMed PMID: 18508242.

362. Sun S, Wang F, Wei J, Cao LY, Wu GY, Lu L, Kosten TA, **Kosten TR**, Zhang XY. Association between interleukin-3 receptor alpha polymorphism and schizophrenia in the Chinese population. Neurosci Lett. 2008 Jul 25;440(1):35-7. doi: 10.1016/j.neulet.2008.05.029. Epub 2008 May 15. PubMed PMID: 18547720.

363. Zhang XY, Zhou DF, Wu GY, Cao LY, Tan YL, Haile CN, Li J, Lu L, Kosten TA, **Kosten TR**. BDNF levels and genotype are associated with antipsychotic-induced weight gain in patients with chronic schizophrenia. Neuropsychopharmacology. 2008 Aug;33(9):2200-5. Epub 2007 Nov 7. PubMed PMID: 17987059.

364. Sofuoglu M, Poling J, Waters A, Sewell A, Hill K, **Kosten T**. Disulfiram enhances subjective effects of dextroamphetamine in humans. Pharmacol Biochem Behav. 2008 Sep;90(3):394-8. doi: 10.1016/j.pbb.2008.03.021. Epub 2008 Apr 4. PubMed PMID: 18474395; PubMed Central PMCID: PMC2467515.

365. Orson FM, Kinsey BM, Singh RA, Wu Y, Gardner T, **Kosten TR**. Substance abuse vaccines. Ann N Y Acad Sci. 2008 Oct;1141:257-69. doi: 10.1196/annals.1441.027. Review. PubMed PMID: 18991962; PubMed Central PMCID: PMC2587140.

366. Chen da C, Qi LY, Xiu MH, Cao LY, Wang F, Chen S, Wu GY, Kosten TA, **Kosten TR**, Zhang XY. Elevated serum levels of tumor

1679

Thomas R. Kosten, MD
CV

necrosis factor-alpha in clozapine-associated obesity in chronic schizophrenia. Schizophr Res. 2008 Dec;106(2-3):367-8. doi: 10.1016/j.schres.2008.08.030. Epub 2008 Oct 2. PubMed PMID: 18835132.

367. Xiu MH, Chen S, Wang F, Cao LY, Qi LY, Chen da C, Wu GY, Lu L, Kosten TA, **Kosten TR**, Zhang XY. Altered interleukin-3 serum levels in drug-naïve and neuroleptic-treated schizophrenic patients. Schizophr Res. 2008 Dec;106(2-3):369-70. doi: 10.1016/j.schres.2008.09.001. Epub 2008 Oct 5. PubMed PMID: 18838250.

368. Zhang XY, Cao LY, Song C, Wu GY, Chen da C, Qi LY, Wang F, Xiu MH, Chen S, Zhang Y, Lu L, Kosten TA, **Kosten TR**. Lower serum cytokine levels in smokers than nonsmokers with chronic schizophrenia on long-term treatment with antipsychotics. Psychopharmacology (Berl). 2008 Dec;201(3):383-9. doi: 10.1007/s00213-008-1295-4. Epub 2008 Aug 22. PubMed PMID: 18719893.

369. Castells X, **Kosten TR**, Capellà D, Vidal X, Colom J, Casas M. Efficacy of opiate maintenance therapy and adjunctive interventions for opioid dependence with comorbid cocaine use disorders: A systematic review and meta-analysis of controlled clinical trials. Am J Drug Alcohol Abuse. 2009;35(5):339-49. doi: 10.1080/00952990903108215. PubMed PMID: 20180662.

370. Ren ZY, Zhang XL, Liu Y, Zhao LY, Shi J, Bao Y, Zhang XY, **Kosten TR**, Lu L. Diurnal variation in cue-induced responses among protracted abstinent heroin users. Pharmacol Biochem Behav. 2009 Jan;91(3):468-72. doi: 10.1016/j.pbb.2008.08.023. Epub 2008 Sep 9. PubMed PMID: 18809427.

371. Rohrbaugh RM, Felker B, **Kosten T**. The VA psychiatry-primary care education initiative. Acad Psychiatry. 2009 Jan-Feb;33(1):31-6. doi: 10.1176/appi.ap.33.1.31. PubMed PMID: 19349441.

372. Haile CN, **Kosten TR**, Kosten TA. Pharmacogenetic treatments for drug addiction: cocaine, amphetamine and methamphetamine. Am J Drug Alcohol Abuse. 2009;35(3):161-77. doi: 10.1080/00952990902825447. Review. PubMed PMID: 19462300; PubMed Central PMCID: PMC2754046.

373. Sun HQ, Guo S, Chen DF, Jiang ZN, Liu Y, Di XL, Yang FD, Zhang XY, **Kosten TR**, Lu L. Family support and employment as predictors of smoking cessation success: a randomized, double-blind, placebo-controlled trial of nicotine sublingual tablets in chinese smokers. Am J Drug Alcohol Abuse. 2009;35(3):183-8. doi: 10.1080/00952990902839794. PubMed PMID: 19462302.

374. Shi J, Li SX, Zhang XL, Wang X, Le Foll B, Zhang XY, **Kosten TR**, Lu L. Time-dependent neuroendocrine alterations and drug craving during the first month of abstinence in heroin addicts. Am J Drug Alcohol Abuse. 2009;35(5):267-72. doi: 10.1080/00952990902933878. PubMed PMID: 19591065.

375. Lu L, Wang X, **Kosten TR**. Stereotactic neurosurgical treatment of drug addiction. Am J Drug Alcohol Abuse. 2009;35(6):391-3. doi: 10.3109/00952990903312478. Review. PubMed PMID: 20014906.

Thomas R. Kosten, MD
CV

376. Sofuoglu M, Poling J, Hill K, **Kosten T**. Atomoxetine attenuates dextroamphetamine effects in humans. Am J Drug Alcohol Abuse. 2009;35(6):412-6. doi: 10.3109/00952990903383961. PubMed PMID: 20014909; PubMed Central PMCID: PMC2796580.

377. Lu L, Liu Y, Zhu W, Shi J, Liu Y, Ling W, **Kosten TR**. Traditional medicine in the treatment of drug addiction. Am J Drug Alcohol Abuse. 2009;35(1):1-11. doi: 10.1080/00952990802455469. Review. PubMed PMID: 19152199.

378. Orson FM, Kinsey BM, Singh RA, Wu Y, **Kosten TR**. Vaccines for cocaine abuse. Hum Vaccin. 2009 Apr;5(4):194-9. Epub 2009 Apr 20. Review. PubMed PMID: 19276665; PubMed Central PMCID: PMC2878138.

379. Zhang XY, Zhou DF, Qi LY, Chen S, Cao LY, Chen da C, Xiu MH, Wang F, Wu GY, Lu L, Kosten TA, **Kosten TR**. Superoxide dismutase and cytokines in chronic patients with schizophrenia: association with psychopathology and response to antipsychotics. Psychopharmacology (Berl). 2009 May;204(1):177-84. doi: 10.1007/s00213-008-1447-6. Epub 2009 Jan 13. PubMed PMID: 19139851.

380. Li SX, Shi J, Epstein DH, Wang X, Zhang XL, Bao YP, Zhang D, Zhang XY, **Kosten TR**, Lu L. Circadian alteration in neurobiology during 30 days of abstinence in heroin users. Biol Psychiatry. 2009 May 15;65(10):905-12. doi: 10.1016/j.biopsych.2008.11.025. Epub 2009 Jan 9. PubMed PMID: 19135652.

381. Chen JX, Su YA, Wang SL, Bian QT, Liu YH, Wang N, Yang FD, Haile C, **Kosten TR**, Zhang XY. Aripiprazole treatment of risperidone-induced hyperprolactinemia. J Clin Psychiatry. 2009 Jul;70(7):1058-9. PubMed PMID: 19653986.

382. Shi J, Jun W, Zhao LY, Xue YX, Zhang XY, **Kosten TR**, Lu L. Effect of rapamycin on cue-induced drug craving in abstinent heroin addicts. Eur J Pharmacol. 2009 Aug 1;615(1-3):108-12. doi: 10.1016/j.ejphar.2009.05.011. Epub 2009 May 23. PubMed PMID: 19470385.

383. Stotts AL, Dodrill CL, **Kosten TR**. Opioid dependence treatment: options in pharmacotherapy. Expert Opin Pharmacother. 2009 Aug;10(11):1727-40. doi: 10.1517/14656560903037168. Review. PubMed PMID: 19538000; PubMed Central PMCID: PMC2874458.

384. Zhang XY, Chen da C, Qi LY, Wang F, Xiu MH, Chen S, Wu GY, Kosten TA, **Kosten TR**. Gender differences in the prevalence, risk and clinical correlates of tardive dyskinesia in Chinese schizophrenia. Psychopharmacology (Berl). 2009 Sep;205(4):647-54. doi: 10.1007/s00213-009-1590-8. Epub 2009 Jun 16. PubMed PMID: 19529921.

385. Zhang XY, Chen da C, Xiu MH, Wang F, Qi LY, Sun HQ, Chen S, He SC, Wu GY, Haile CN, Kosten TA, Lu L, **Kosten TR**. The novel oxidative stress marker thioredoxin is increased in first-episode schizophrenic patients. Schizophr Res. 2009 Sep;113(2-3):151-7. doi: 10.1016/j.schres.2009.05.016. Epub 2009 Jun 21. PubMed PMID: 19540723.

386. Qiu HT, Meng HQ, Song C, Xiu MH, Chen da C, Zhu FY, Wu GY, Kosten TA, **Kosten TR**, Zhang XY. Association between monoamine

Thomas R. Kosten, MD
CV

oxidase (MAO)-A gene variants and schizophrenia in a Chinese population. Brain Res. 2009 Sep 1;1287:67-73. doi: 10.1016/j.brainres.2009.06.072. Epub 2009 Jun 30. PubMed PMID: 19573521.

387. Qi LY, Xiu MH, Chen da C, Wang F, Kosten TA, **Kosten TR**, Zhang XY. Increased serum S100B levels in chronic schizophrenic patients on long-term clozapine or typical antipsychotics. Neurosci Lett. 2009 Sep 22;462(2):113-7. doi: 10.1016/j.neulet.2009.06.019. Epub 2009 Jun 17. PubMed PMID: 19539717.

388. Martell BA, Orson FM, Poling J, Mitchell E, Rossen RD, Gardner T, **Kosten TR**. Cocaine vaccine for the treatment of cocaine dependence in methadone-maintained patients: a randomized, double-blind, placebo-controlled efficacy trial. JAMA Psych (Arch Gen Psychiatry). 2009 Oct;66(10):1116-23. doi: 10.1001/archgenpsychiatry.2009.128. PubMed PMID: 19805702; PubMed Central PMCID: PMC2878137.

389. Xiu MH, Hui L, Dang YF, Hou TD, Zhang CX, Zheng YL, Chen da C, **Kosten TR**, Zhang XY. Decreased serum BDNF levels in chronic institutionalized schizophrenia on long-term treatment with typical and atypical antipsychotics. Prog Neuropsychopharmacol Biol Psychiatry. 2009 Nov 13;33(8):1508-12. doi: 10.1016/j.pnpbp.2009.08.011. Epub 2009 Aug 29. PubMed PMID: 19720106.

390. Chen da C, Wang J, Wang B, Yang SC, Zhang CX, Zheng YL, Li YL, Wang N, Yang KB, Xiu MH, **Kosten TR**, Zhang XY. Decreased levels of serum brain-derived neurotrophic factor in drug-naïve first-episode schizophrenia: relationship to clinical phenotypes. Psychopharmacology (Berl). 2009 Dec;207(3):375-80. doi: 10.1007/s00213-009-1665-6. Epub 2009 Sep 29. PubMed PMID: 19787338.

391. Haile CN, **Kosten TR**. The potential of pharmacogenomics to treat drug addiction. Pharmacogenomics. 2009 Dec;10(12):1883-6. doi: 10.2217/pgs.09.146. PubMed PMID: 19958085.

392. Zhao LY, Shi J, Zhang XL, Epstein DH, Zhang XY, Liu Y, **Kosten TR**, Lu L. Stress enhances retrieval of drug-related memories in abstinent heroin addicts. Neuropsychopharmacology. 2010 Feb;35(3):720-6. doi: 10.1038/npp.2009.179. Epub 2009 Nov 4. PubMed PMID: 19890257; PubMed Central PMCID: PMC3055613.

393. Stitzer ML, Polk T, Bowles S, **Kosten T**. Drug users' adherence to a 6-month vaccination protocol: effects of motivational incentives. Drug Alcohol Depend. 2010 Feb 1;107(1):76-9. doi: 10.1016/j.drugalcdep.2009.09.006. Epub 2009 Oct 13. PubMed PMID: 19828264; PubMed Central PMCID: PMC2815120.

394. Kinsey BM, **Kosten TR**, Orson FM. Active immunotherapy for the Treatment of Cocaine Dependence. Drugs Future. 2010 Apr 1;35(4):301-306. PubMed PMID: 21796226; PubMed Central PMCID: PMC3142961.

395. Najavits LM, Norman SB, Kivlahan D, **Kosten TR**. Improving PTSD/substance abuse treatment in the VA: a survey of providers. Am J Addict. 2010 May-Jun;19(3):257-63. doi: 10.1111/j.1521-0391.2010.00039.x. PubMed PMID: 20525033.

Thomas R. Kosten, MD
CV

396. Zhang XY, Xiu MH, Chen da C, Zhu FY, Wu GY, Haile CN, Lu L, Kosten TA, **Kosten TR**. Increased S100B serum levels in schizophrenic patients with tardive dyskinesia: association with dyskinetic movements. J Psychiatr Res. 2010 May;44(7):429-33. doi: 10.1016/j.jpsychires.2009.10.012. Epub 2009 Nov 22. PubMed PMID: 19932492.

397. Liu H, Wang C, Chen PH, Zhang BS, Zheng YL, Zhang CX, Meng HQ, Wang Y, Chen da C, Xiu MH, **Kosten TR**, Zhang XY. Association of the manganese superoxide dismutase gene Ala-9Val polymorphism with clinical phenotypes and tardive dyskinesia in schizophrenic patients. Prog Neuropsychopharmacol Biol Psychiatry. 2010 May 30;34(4):692-6. doi: 10.1016/j.pnpbp.2010.03.026. Epub 2010 Mar 25. PubMed PMID: 20346996.

398. Zhang XY, Li CB, Li M, Zheng YL, Zhang CX, Yan QZ, Liu WZ, Kang YM, Wang F, Chen da C, Xiu MH, **Kosten TR**. Smoking initiation and schizophrenia: a replication study in a Chinese Han population. Schizophr Res. 2010 Jun;119(1-3):110-4. doi: 10.1016/j.schres.2009.11.012. PubMed PMID: 20022218.

399. Oliveto A, Gentry WB, Pruzinsky R, Gonsai K, **Kosten TR**, Martell B, Poling J. Behavioral effects of gamma-hydroxybutyrate in humans. Behav Pharmacol. 2010 Jul;21(4):332-42. doi: 10.1097/FBP.0b013e32833b3397. PubMed PMID: 20526195; PudMed Central PMCID: PMC2911496.

400. Wang Y, Wang JD, Wu HR, Zhang BS, Fang H, Ma QM, Liu H, Chen da C, Xiu MH, Hail CN, **Kosten TR**, Zhang XY. The Val66Met polymorphism of the brain-derived neurotrophic factor gene is not associated with risk for schizophrenia and tardive dyskinesia in Han Chinese population. Schizophr Res. 2010 Jul;120(1-3):240-2. doi: 10.1016/j.schres.2010.03.020. Epub 2010 Apr 14. PubMed PMID: 20395113.

401. Zhou DH, Yan QZ, Yan XM, Li CB, Fang H, Zheng YL, Zhang CX, Yao HJ, Chen da C, Xiu MH, **Kosten TR**, Zhang XY. The study of BDNF Val66Met polymorphism in Chinese schizophrenic patients. Prog Neuropsychopharmacol Biol Psychiatry. 2010 Aug 16;34(6):930-3. doi: 10.1016/j.pnpbp.2010.04.019. Epub 2010 Apr 24. PubMed PMID: 20420877.

402. Kinsey BM, **Kosten TR**, Orson FM. Anti-cocaine vaccine development. Expert Rev Vaccines. 2010 Sep;9(9):1109-14. doi: 10.1586/erv.10.102. Review. PubMed PMID: 20822352; PubMed Central PMCID: PMC2936703.

403. Gao Y, Orson FM, Kinsey B, **Kosten T**, Brimijoin S. The concept of pharmacologic cocaine interception as a treatment for drug abuse. Chem Biol Interact. 2010 Sep 6;187(1-3):421-4. doi: 10.1016/j.cbi.2010.02.036. Epub 2010 Feb 26. PubMed PMID: 20219449; PubMed Central PMCID: PMC2895017.

404. Li SX, Liu LJ, Jiang WG, Sun LL, Zhou SJ, Le Foll B, Zhang XY, **Kosten TR**, Lu L. Circadian alteration in neurobiology during protracted opiate withdrawal in rats. J Neurochem. 2010 Oct;115(2):353-62. doi: 10.1111/j.1471-4159.2010.06941.x. Epub 2010 Aug 25. PubMed PMID: 20738730.

Thomas R. Kosten, MD
CV

405. Zhang XY, Zhang RL, Pan M, Chen da C, Xiu MH, **Kosten TR**. Sex difference in the prevalence of smoking in Chinese schizophrenia. J Psychiatr Res. 2010 Oct;44(14):986-8. doi: 10.1016/j.jpsychires.2010.02.015. Epub 2010 Mar 23. PubMed PMID: 20334878.

406. Zhang XY, Xiu MH, Chen da C, Yang FD, Wu GY, Lu L, Kosten TA, **Kosten TR**. Nicotine dependence and serum BDNF levels in male patients with schizophrenia. Psychopharmacology (Berl). 2010 Oct;212(3):301-7. doi: 10.1007/s00213-010-1956-y. Epub 2010 Jul 27. PubMed PMID: 20661552.

407. Chen da C, Xiu MH, Liu H, Zhang BS, Wang Y, **Kosten TR**, Zhang XY. Reduced status of plasma total antioxidant capacity in schizophrenia with tardive dyskinesia. J Psychiatr Res. 2010 Nov;44(15):1111-2. doi: 10.1016/j.jpsychires.2010.03.008. Epub 2010 Apr 15. PubMed PMID: 20398909.

408. Zhang XY, Xiu MH, Song C, Chen da C, Wu GY, Haile CN, Kosten TA, **Kosten TR**. Increased serum S100B in never-medicated and medicated schizophrenic patients. J Psychiatr Res. 2010 Dec;44(16):1236-40. doi: 10.1016/j.jpsychires.2010.04.023. Epub 2010 May 26. PubMed PMID: 20510426.

409. Shen X, Orson FM, **Kosten TR**. Anti-addiction vaccines. F1000 Med Rep. 2011;3:20. doi: 10.3410/M3-20. Epub 2011 Oct 3. PubMed PMID: 22003367; PubMed Central PMCID: PMC3186043.

410. Oliveto A, Poling J, Mancino MJ, Feldman Z, Cubells JF, Pruzinsky R, Gonsai K, Cargile C, Sofuoglu M, Chopra MP, Gonzalez-Haddad G, Carroll KM, **Kosten TR**. Randomized, double blind, placebo-controlled trial of disulfiram for the treatment of cocaine dependence in methadone-stabilized patients. Drug Alcohol Depend. 2011 Jan 15;113(2-3):184-91. doi: 10.1016/j.drugalcdep.2010.07.022. Epub 2010 Sep 15. PubMed PMID: 20828943; PubMed Central PMCID: PMC3005977.

411. Cao JX, Hu J, Ye XM, Xia Y, Haile CA, **Kosten TR**, Zhang XY. Association between the 5-HTR1B gene polymorphisms and alcohol dependence in a Han Chinese population. Brain Res. 2011 Feb 28;1376:1-9. doi: 10.1016/j.brainres.2010.12.039. Epub 2010 Dec 21. PubMed PMID: 21172311.

412. Chen da C, Zhou MA, Zhou DH, Xiu MH, Wu GY, **Kosten TR**, Zhang XY. Gender differences in the prevalence of diabetes mellitus in chronic hospitalized patients with schizophrenia on long-term antipsychotics. Psychiatry Res. 2011 Apr 30;186(2-3):451-3. doi: 10.1016/j.psychres.2010.07.054. Epub 2010 Aug 24. PubMed PMID: 20797801.

413. Najavits LM, Kivlahan D, **Kosten T**. A national survey of clinicians' views of evidence-based therapies for PTSD and substance abuse. Addiction Research & Theory. 2011; 19(2): 138-147.

414. Dodrill CL, Helmer DA, **Kosten TR**. Prescription pain medication dependence. Am J Psychiatry. 2011 May;168(5):466-71. doi: 10.1176/appi.ajp.2010.10020260. Review. PubMed PMID: 21536702.

415. Li XF, Zheng YL, Xiu MH, Chen da C, **Kosten TR**, Zhang XY. Reduced plasma total antioxidant status in first-episode drug-naive

Thomas R. Kosten, MD
CV

patients with schizophrenia. Prog Neuropsychopharmacol Biol Psychiatry. 2011 Jun 1;35(4):1064-7. doi: 10.1016/j.pnpbp.2011.03.001. Epub 2011 Mar 15. PubMed PMID: 21392552.

416. **Kosten TR**. Stress and addiction. Am J Psychiatry. 2011 Jun;168(6):566-8. doi: 10.1176/appi.ajp.2011.11020180. PubMed PMID: 21642477.

417. Yang FD, Wang XQ, Liu XP, Zhao KX, Fu WH, Hao XR, Zhang XL, Huang GS, Qu SC, Bai JS, Huang XF, **Kosten TR**, Zhang XY. Sex difference in QTc prolongation in chronic institutionalized patients with schizophrenia on long-term treatment with typical and atypical antipsychotics. Psychopharmacology (Berl). 2011 Jul;216(1):9-16. doi: 10.1007/s00213-011-2188-5. Epub 2011 Feb 9. PubMed PMID: 21301815.

418. McIntosh BJ, Zhang XY, **Kosten T**, Tan SP, Xiu MH, Rakofsky J, Harvey PD. Performance-based assessment of functional skills in severe mental illness: results of a large-scale study in China. J Psychiatr Res. 2011 Aug;45(8):1089-94. doi: 10.1016/j.jpsychires.2011.01.012. Epub 2011 Mar 2. PubMed PMID: 21300378; PubMed Central PMCID: PMC3112265.

419. Zhang R, Hao W, Pan M, Wang C, Zhang X, Chen da C, Xiu MH, Yang FD, **Kosten TR**, Zhang XY. The prevalence and clinical-demographic correlates of diabetes mellitus in chronic schizophrenic patients receiving clozapine. Hum Psychopharmacol. 2011 Aug;26(6):392-6. doi: 10.1002/hup.1220. Epub 2011 Aug 8. PubMed PMID: 21826737.

420. Zhang XY, Yu YQ, Sun S, Zhang X, Li W, Xiu MH, Chen da C, Yang FD, Zhu F, Kosten TA, **Kosten TR**. Smoking and tardive dyskinesia in male patients with chronic schizophrenia. Prog Neuropsychopharmacol Biol Psychiatry. 2011 Aug 15;35(7):1765-9. doi: 10.1016/j.pnpbp.2011.06.006. Epub 2011 Jun 23. PubMed PMID: 21723906.

421. Wisner KL, Conley RR, Taylor SF, **Kosten T**, Rapaport MH, Brown LS. Researcher experiences with IRBs: a survey of members of the American College of Neuropsychopharmacology. IRB. 2011 Sep-Oct;33(5):14-20. PubMed PMID: 22043746.

422. Yang YQ, Sun S, Yu YQ, Li WJ, Zhang X, Xiu MH, Chen da C, De Yang F, Liu H, Li C, **Kosten TR**, Zhang XY. Decreased serum brain-derived neurotrophic factor levels in schizophrenic patients with tardive dyskinesia. Neurosci Lett. 2011 Sep 8;502(1):37-40. doi: 10.1016/j.neulet.2011.07.020. Epub 2011 Jul 20. PubMed PMID: 21798311.

423. Shorter D, **Kosten TR**. Novel pharmacotherapeutic treatments for cocaine addiction. BMC Med. 2011 Nov 3;9:119. doi: 10.1186/1741-7015-9-119. Review. PubMed PMID: 22047090; PubMed Central PMCID: PMC3216852.

424. Shen X, **Kosten TR**. Immunotherapy for drug abuse. CNS Neurol Disord Drug Targets. 2011 Dec;10(8):876-9. Review. PubMed PMID: 22229313; PubMed Central PMCID: PMC3634568.

Thomas R. Kosten, MD
CV

425. Shorter D, **Kosten TR**. Vaccines in the Treatment of Substance Abuse. Focus (Am Psychiatr Publ). 2011 Dec 1;2011(9):25-30. PubMed PMID: 23472050; PubMed Central PMCID: PMC3587968.

426. Zhang XY, Chen da C, Xiu MH, Luo X, Zuo L, Haile CN, Kosten TA, **Kosten TR**. BDNF Val66Met variant and smoking in a Chinese population. PLoS One. 2012;7(12):e53295. doi: 10.1371/journal.pone.0053295. Epub 2012 Dec 28. PubMed PMID: 23285275; PubMed Central PMCID: PMC3532294.

427. Haile CN, De La Garza R 2nd, Mahoney JJ 3rd, Nielsen DA, **Kosten TR**, Newton TF. The impact of disulfiram treatment on the reinforcing effects of cocaine: a randomized clinical trial. PLoS One. 2012;7(11):e47702. doi: 10.1371/journal.pone.0047702. Epub 2012 Nov 8. PubMed PMID: 23144826; PubMed Central PMCID: PMC3493584.

428. Zhang XY, Liang J, Chen da C, Xiu MH, He J, Cheng W, Wu Z, Yang FD, Haile CN, Sun H, Lu L, Kosten TA, **Kosten TR**. Cigarette smoking in male patients with chronic schizophrenia in a Chinese population: prevalence and relationship to clinical phenotypes. PLoS One. 2012;7(2):e30937. doi: 10.1371/journal.pone.0030937. Epub 2012 Feb 7. PubMed PMID: 22347412; PubMed Central PMCID: PMC3274516.

429. Ramakrishnan M, Alves De Melo F, Kinsey BM, Ladbury JE, **Kosten TR**, Orson FM. Probing cocaine-antibody interactions in buffer and human serum. PLoS One. 2012;7(7):e40518. doi: 10.1371/journal.pone.0040518. Epub 2012 Jul 10. PubMed PMID: 22859949; PubMed Central PMCID: PMC3409241.

430. Carroll ME, Zlebnik NE, Anker JJ, **Kosten TR**, Orson FM, Shen X, Kinsey B, Parks RJ, Gao Y, Brimijoin S. Combined cocaine hydrolase gene transfer and anti-cocaine vaccine synergistically block cocaine-induced locomotion. PLoS One. 2012;7(8):e43536. doi: 10.1371/journal.pone.0043536. Epub 2012 Aug 17. PubMed PMID: 22912888; PubMed Central PMCID: PMC3422258.

431. Newton TF, De La Garza R 2nd, Brown G, **Kosten TR**, Mahoney JJ 3rd, Haile CN. Noradrenergic $\alpha_1$ receptor antagonist treatment attenuates positive subjective effects of cocaine in humans: a randomized trial. PLoS One. 2012;7(2):e30854. doi: 10.1371/journal.pone.0030854. Epub 2012 Feb 3. PubMed PMID: 22319592; PubMed Central PMCID: PMC3272014.

432. Zhang XY, Chen da C, Xiu MH, Haile CN, Sun H, Lu L, Kosten TA, **Kosten TR**. Cigarette smoking and cognitive function in Chinese male schizophrenia: a case-control study. PLoS One. 2012;7(5):e36563. doi: 10.1371/journal.pone.0036563. Epub 2012 May 3. PubMed PMID: 22570726; PubMed Central PMCID: PMC3343009.

433. Shen XY, Orson FM, **Kosten TR**. Vaccines against drug abuse. Clin Pharmacol Ther. 2012 Jan;91(1):60-70. doi: 10.1038/clpt.2011.281. Epub 2011 Nov 30. Review. PubMed PMID: 22130115; PubMed Central PMCID: PMC3345810.

434. Spellicy CJ, **Kosten TR**, Hamon SC, Harding MJ, Nielsen DA. The MTHFR C677T Variant is Associated with Responsiveness to Disulfiram Treatment for Cocaine Dependency. Front Psychiatry.

Thomas R. Kosten, MD
CV

2013 Jan 14;3:109. doi: 10.3389/fpsyt.2012.00109. eCollection 2012. PubMed PMID: 23335901; PubMed Central PMCID: PMC3544007.

435. Anton RF, Litten RZ, Falk DE, Palumbo JM, Bartus RT, Robinson RL, Kranzler HR, **Kosten TR**, Meyer RE, O'Brien CP, Mann K, Meulien D. The Alcohol Clinical Trials Initiative (ACTIVE): purpose and goals for assessing important and salient issues for medications development in alcohol use disorders. Neuropsychopharmacology. 2012 Jan;37(2):402-11. doi: 10.1038/npp.2011.182. Epub 2011 Sep 7. PubMed PMID: 21900883; PubMed Central PMCID: PMC3242301.

436. Oliveto A, Poling J, Mancino MJ, Williams DK, Thostenson J, Pruzinsky R, Gonsai K, Sofuoglu M, Gonzalez G, Tripathi S, **Kosten TR**. Sertraline delays relapse in recently abstinent cocaine-dependent patients with depressive symptoms. Addiction. 2012 Jan;107(1):131-41. doi: 10.1111/j.1360-0443.2011.03552.x. Epub 2011 Oct 10. PubMed PMID: 21707811; PubMed Central PMCID: PMC3237722.

437. Wu Z, Zhang XY, Wang H, Tang W, Xia Y, Zhang F, Liu J, Fu Y, Hu J, Chen Y, Liu L, Chen da C, Xiu MH, **Kosten TR**, He J. Elevated plasma superoxide dismutase in first-episode and drug naive patients with schizophrenia: inverse association with positive symptoms. Prog Neuropsychopharmacol Biol Psychiatry. 2012 Jan 10;36(1):34-8. doi: 10.1016/j.pnpbp.2011.08.018. Epub 2011 Aug 30. PubMed PMID: 21896300.

438. Zhang XY, Zhou DF, Shen YC, Zhang PY, Zhang WF, Liang J, Chen da C, Xiu MH, Kosten TA, **Kosten TR**. Effects of risperidone and haloperidol on superoxide dismutase and nitric oxide in schizophrenia. Neuropharmacology. 2012 Apr;62(5-6):1928-34. doi: 10.1016/j.neuropharm.2011.12.014. Epub 2011 Dec 30. PubMed PMID: 22227558.

439. Wang F, Fan H, Sun H, Yang F, Luo Y, Liu H, **Kosten TR**, Lu L, Zhang XY. Association between TNF-α promoter -308A/G polymorphism and tardive dyskinesian Chinese Han patients with schizophrenia. Prog Neuropsychopharmacol Biol Psychiatry. 2012 Apr 27;37(1):106-10. doi: 10.1016/j.pnpbp.2011.12.007. Epub 2011 Dec 29. PubMed PMID: 22227290.

440. Sigmon SC, Bisaga A, Nunes EV, O'Connor PG, **Kosten T**, Woody G. Opioid detoxification and naltrexone induction strategies: recommendations for clinical practice. Am J Drug Alcohol Abuse. 2012 May;38(3):187-99. doi: 10.3109/00952990.2011.653426. Epub 2012 Mar 12. Review. PubMed PMID: 22404717.

441. Li WJ, Kou CG, Yu Y, Sun S, Zhang X, **Kosten TR**, Zhang XY. Association of catechol-O-methyltransferase gene polymorphisms with schizophrenia and negative symptoms in a Chinese population. Am J Med Genet B Neuropsychiatr Genet. 2012 Jun;159B(4):370-5. doi: 10.1002/ajmg.b.32038. Epub 2012 Feb 21. PubMed PMID: 22354729.

442. Hui L, Zhang X, Huang XF, Han M, Fernandez F, Yu Y, Sun S, Li W, Chen da C, Xiu MH, **Kosten TR**, Zhang XY. The dopamine b-hydroxylase 19 bp insertion/deletion polymorphism was associated with first-episode but not medicated chronic schizophrenia. J

Thomas R. Kosten, MD
CV

Psychiatr Res. 2012 Jun;46(6):733-7. doi:
10.1016/j.jpsychires.2012.02.016. Epub 2012 Mar 24. PubMed
PMID: 22445279.

443. Zhang X, Guan SL, Wang ZQ, You Y, Sun SL, Hui L, Miao LN, Yu
Y, **Kosten TR**, Zhang XY. No association between the type 2
diabetes mellitus susceptibility gene, SLC30A8 and schizophrenia in
a Chinese population. Hum Psychopharmacol. 2012 Jul;27(4):392-6.
doi: 10.1002/hup.2239. Epub 2012 Jul 9. PubMed PMID: 22778022.

444. Nielsen DA, Utrankar A, Reyes JA, Simons DD, **Kosten TR**.
Epigenetics of drug abuse: predisposition or response.
Pharmacogenomics. 2012 Jul;13(10):1149-60. doi:
10.2217/pgs.12.94. Review. PubMed PMID: 22909205; PubMed
Central PMCID: PMC3463407.

445. Zhang XY, Chen da C, Xiu MH, Yang FD, Haile CN, Kosten TA,
**Kosten TR**. Gender differences in never-medicated first-episode
schizophrenia and medicated chronic schizophrenia patients. J Clin
Psychiatry. 2012 Jul;73(7):1025-33. doi: 10.4088/JCP.11m07422.
PubMed PMID: 22901352.

446. Zhang XY, Chen da C, Xiu MH, Haile CN, Luo X, Xu K, Zhang HP,
Zuo L, Zhang Z, Zhang X, Kosten TA, **Kosten TR**. Cognitive and
serum BDNF correlates of BDNF Val66Met gene polymorphism in
patients with schizophrenia and normal controls. Hum Genet. 2012
Jul;131(7):1187-95. doi: 10.1007/s00439-012-1150-x. Epub 2012
Feb 24. PubMed PMID: 22362486; PubMed Central PMCID:
PMC3671849.

447. Zhang XY, Liang J, Chen da C, Xiu MH, Yang FD, Kosten TA,
**Kosten TR**. Low BDNF is associated with cognitive impairment in
chronic patients with schizophrenia. Psychopharmacology (Berl).
2012 Jul;222(2):277-84. doi: 10.1007/s00213-012-2643-y. Epub 2012
Jan 26. PubMed PMID: 22274000.

448. Liu H, Kang Y, Liang J, Li C, Xiu M, Chen D, Yang F, Wang F, Wu
G, Haile CN, Kosten TA, **Kosten TR**, Zhang XY. Lower serum
interleukin-2 levels in schizophrenic patients with tardive dyskinesia.
Psychiatry Res. 2012 Jul 30;198(2):329-31. doi:
10.1016/j.psychres.2012.01.002. Epub 2012 Mar 13. PubMed PMID:
22417931.

449. Xiu MH, Chen da C, Wang D, Zhang K, Dong A, Tang W, Zhang F,
Liu LJ, Liu JH, Liu HB, Yang FD, **Kosten TR**, Zhang XY. Elevated
interleukin-18 serum levels in chronic schizophrenia: Association with
psychopathology. J Psychiatr Res. 2012 Aug;46(8):1093-8. doi:
10.1016/j.jpsychires.2012.04.026. Epub 2012 May 28. PubMed
PMID: 22647522.

450. Zhang XY, Chen da C, Xiu MH, Tang W, Zhang F, Liu L, Chen Y,
Liu J, Yao JK, Kosten TA, **Kosten TR**. Plasma total antioxidant
status and cognitive impairments in schizophrenia. Schizophr Res.
2012 Aug;139(1-3):66-72. doi: 10.1016/j.schres.2012.04.009. Epub
2012 May 1. PubMed PMID: 22555016.

451. Cui Y, Robinson JD, Versace F, Lam CY, Minnix JA, Karam-Hage
M, Dani JA, **Kosten TR**, Wetter DW, Brown VL, Cinciripini PM.
Differential cigarette-related startle cue reactivity among light,
moderate, and heavy smokers. Addict Behav. 2012 Aug;37(8):885-9.

Thomas R. Kosten, MD
CV

doi: 10.1016/j.addbeh.2012.02.003. Epub 2012 Feb 15. PubMed PMID: 22571920; PubMed Central PMCID: PMC3358408.

452. Nielsen DA, Harding MJ, Hamon SC, Huang W, **Kosten TR**. Modifying the role of serotonergic 5-HTTLPR and TPH2 variants on disulfiram treatment of cocaine addiction: a preliminary study. Genes Brain Behav. 2012 Aug 23. doi: 10.1111/j.1601-183X.2012.00839.x. [Epub ahead of print] PubMed PMID: 22925276; PubMed Central PMCID: PMC3521860.

453. Zhang XY, Liu L, Liu S, Hong X, Chen da C, Xiu MH, Yang FD, Zhang Z, Zhang X, Kosten TA, **Kosten TR**. Short-term tropisetron treatment and cognitive and P50 auditory gating deficits in schizophrenia. Am J Psychiatry. 2012 Sep;169(9):974-81. doi: 10.1176/appi.ajp.2012.11081289. PubMed PMID: 22952075.

454. Zhang XY, Chen da C, Xiu MH, Hui L, Liu H, Luo X, Zuo L, Zhang H, Kosten TA, **Kosten TR**. Association of functional dopamine-beta-hydroxylase (DBH) 19 bp insertion/deletion polymorphism with smoking severity in male schizophrenic smokers. Schizophr Res. 2012 Oct;141(1):48-53. doi: 10.1016/j.schres.2012.07.011. Epub 2012 Aug 4. PubMed PMID: 22871345.

455. Zhang XY, Zhang WF, Zhou DF, Chen da C, Xiu MH, Wu HR, Haile CN, Kosten TA, **Kosten TR**. Brain-derived neurotrophic factor levels and its Val66Met gene polymorphism predict tardive dyskinesia treatment response to Ginkgo biloba. Biol Psychiatry. 2012 Oct 15;72(8):700-6. doi: 10.1016/j.biopsych.2012.04.032. Epub 2012 Jun 12. PubMed PMID: 22695185.

456. Sun H, Guo S, Chen D, Yang F, Zou Y, Di X, Cao Y, **Kosten T**, Lu L, Zhang XY. Association of functional COMT Val108/Met polymorphism with smoking cessation in a nicotine replacement therapy. J Neural Transm. 2012 Dec;119(12):1491-8. doi: 10.1007/s00702-012-0841-8. Epub 2012 Jun 14. PubMed PMID: 22695756.

457. Singh RA, Kosten TA, Kinsey BM, Shen X, Lopez AY, **Kosten TR**, Orson FM. Dose-dependent changes in the locomotor responses to methamphetamine in BALB/c mice: low doses induce hypolocomotion. Pharmacol Biochem Behav. 2012 Dec;103(2):230-6. doi: 10.1016/j.pbb.2012.08.013. Epub 2012 Aug 28. PubMed PMID: 23010423; PubMed Central PMCID: PMC3494772.

458. Han M, Huang XF, Chen da C, Xiu MH, Hui L, Liu H, **Kosten TR**, Zhang XY. Gender differences in cognitive function of patients with chronic schizophrenia. Prog Neuropsychopharmacol Biol Psychiatry. 2012 Dec 3;39(2):358-63. doi: 10.1016/j.pnpbp.2012.07.010. Epub 2012 Jul 20. PubMed PMID: 22820676.

459. Sun H, Wang F, Fan H, Yan Q, Cui K, Yuan W, Zhao F, Zhao L, Yuan J, Yang F, **Kosten TR**, Zhang XY. The interaction of polymorphisms of IL10 and DBH was associated with general symptoms of PANSS with TD in Chinese Han schizophrenic patients. PLoS One. 2013 Aug 7;8(8):e70963. doi: 10.1371/journal.pone.0070963. eCollection 2013. PubMed PMID: 23951054; PubMed Central PMCID: PMC3737228.

460. Han M, Huang XF, Chen da C, Xiu M, **Kosten TR**, Zhang XY. Diabetes and cognitive deficits in chronic schizophrenia: a case-

Thomas R. Kosten, MD
CV

control study. PLoS One. 2013 Jun 20;8(6):e66299. doi: 10.1371/journal.pone.0066299. Print 2013. PubMed PMID: 23840437; PubMed Central PMCID: PMC3688788.

461. Zhang XY, Chen da C, Xiu MH, Yang FD, Tan YL, He S, Kosten TA, **Kosten TR**. Thioredoxin, a novel oxidative stress marker and cognitive performance in chronic and medicated schizophrenia versus healthy controls. Schizophr Res. 2013 Feb;143(2-3):301-6. doi: 10.1016/j.schres.2012.11.017. Epub 2012 Dec 11. PubMed PMID: 23238053.

462. **Kosten TR**, Wu G, Huang W, Harding MJ, Hamon SC, Lappalainen J, Nielsen DA. Pharmacogenetic randomized trial for cocaine abuse: disulfiram and dopamine β-hydroxylase. Biol Psychiatry. 2013 Feb 1;73(3):219-24. doi: 10.1016/j.biopsych.2012.07.011. Epub 2012 Aug 18. PubMed PMID: 22906516; PubMed Central PMCID: PMC3514624.

463. Brown AE, Tonigan JS, Pavlik VN, **Kosten TR**, Volk RJ. Spirituality and confidence to resist substance use among celebrate recovery participants. J Relig Health. 2013 Mar;52(1):107-13. doi: 10.1007/s10943-011-9456-x. PubMed PMID: 21246280.

464. Orson FM, Rossen RD, Shen X, Lopez AY, Wu Y, **Kosten TR**. Spontaneous development of IgM anti-cocaine antibodies in habitual cocaine users: effect on IgG antibody responses to a cocaine cholera toxin B conjugate vaccine. Am J Addict. 2013 Mar-Apr;22(2):169-74. doi: 10.1111/j.1521-0391.2013.00314.x. Epub 2013 Feb 1. PubMed PMID: 23414504.

465. Brimijoin S, Orson F, **Kosten TR**, Kinsey B, Shen XY, White SJ, Gao Y. Anti-cocaine antibody and butyrylcholinesterase-derived cocaine hydrolase exert cooperative effects on cocaine pharmacokinetics and cocaine-induced locomotor activity in mice. Chem Biol Interact. 2013 Mar 25;203(1):212-6. doi: 10.1016/j.cbi.2012.08.015. Epub 2012 Aug 31. PubMed PMID: 22960160; PubMed Central PMCID: PMC3572300.

466. Gao Y, Geng L, Orson F, Kinsey B, **Kosten TR**, Shen X, Brimijoin S. Effects of anti-cocaine vaccine and viral gene transfer of cocaine hydrolase in mice on cocaine toxicity including motor strength and liver damage. Chem Biol Interact. 2013 Mar 25;203(1):208-11. doi: 10.1016/j.cbi.2012.08.006. Epub 2012 Aug 23. PubMed PMID: 22935511; PubMed Central PMCID: PMC3537841.

467. Zhang X, Hui L, Liu Y, Wang ZQ, You Y, Miao LN, Sun SL, Guan SL, Xiang Y, **Kosten TR**, Zhang XY. The type 2 diabetes mellitus susceptibility gene IGF2BP2 is associated with schizophrenia in a Han Chinese population. J Clin Psychiatry. 2013 Apr;74(4):e287-92. doi: 10.4088/JCP.12m07846. PubMed PMID: 23656854.

468. Shen XY, Kosten TA, Lopez AY, Kinsey BM, **Kosten TR**, Orson FM. A vaccine against methamphetamine attenuates its behavioral effects in mice. Drug Alcohol Depend. 2013 Apr 1;129(1-2):41-8. doi: 10.1016/j.drugalcdep.2012.09.007. Epub 2012 Sep 28. PubMed PMID: 23022610; PubMed Central PMCID: PMC3563850.

469. **Kosten TR**, Domingo CB, Hamon SC, Nielsen DA. DBH gene as predictor of response in a cocaine vaccine clinical trial. Neurosci Lett. 2013 Apr 29;541:29-33. doi: 10.1016/j.neulet.2013.02.037. Epub

Thomas R. Kosten, MD
CV

2013 Feb 28. PubMed PMID: 23458673; PubMed Central PMCID: PMC3631430.

470. Zhou N, Yu Q, Li X, Yu Y, Kou C, Li W, Xu H, Luo X, Zuo L, **Kosten TR**, Zhang XY. Association of the dopamine β-hydroxylase 19 bp insertion/deletion polymorphism with positive symptoms but not tardive dyskinesia in schizophrenia. Hum Psychopharmacol. 2013 May;28(3):230-7. doi: 10.1002/hup.2311. Epub 2013 Apr 5. PubMed PMID: 23559427.

471. Zhen YF, Zhang J, Liu XY, Fang H, Tian LB, Zhou DH, **Kosten TR**, Zhang XY. Low BDNF is associated with cognitive deficits in patients with type 2 diabetes. Psychopharmacology (Berl). 2013 May;227(1):93-100. doi: 10.1007/s00213-012-2942-3. Epub 2012 Dec 22. PubMed PMID: 23263460.

472. Cui Y, Versace F, Engelmann JM, Minnix JA, Robinson JD, Lam CY, Karam-Hage M, Brown VL, Wetter DW, Dani JA, **Kosten TR**, Cinciripini PM. Alpha oscillations in response to affective and cigarette-related stimuli in smokers. Nicotine Tob Res. 2013 May;15(5):917-24. doi: 10.1093/ntr/nts209. Epub 2012 Oct 11. PubMed PMID: 23060019; PubMed Central PMCID: PMC3621581.

473. Graham DP, Helmer DA, Harding MJ, **Kosten TR**, Petersen NJ, Nielsen DA. Serotonin transporter genotype and mild traumatic brain injury independently influence resilience and perception of limitations in veterans. J Psychiatr Res. 2013 Jun;47(6):835-42. doi: 10.1016/j.jpsychires.2013.02.006. Epub 2013 Mar 8. PubMed PMID: 23478049; PubMed Central PMCID: PMC3643301.

474. He J, Xie Y, Tao J, Su H, Wu W, Zou S, Zhang J, Zhang J, Zhang H, Yang X, Guo J, Tang W, Zhang F, Liu J, Liu L, Chen Y, Wen N, **Kosten TR**, Zhang XY. Gender differences in socio-demographic and clinical characteristics of methamphetamine inpatients in a Chinese population. Drug Alcohol Depend. 2013 Jun 1;130(1-3):94-100. doi: 10.1016/j.drugalcdep.2012.10.014. Epub 2012 Nov 11. PubMed PMID: 23149112.

475. Shorter D, Lindsay JA, **Kosten TR**. The alpha-1 adrenergic antagonist doxazosin for treatment of cocaine dependence: A pilot study. Drug Alcohol Depend. 2013 Jul 1;131(1-2):66-70. doi: 10.1016/j.drugalcdep.2012.11.021. Epub 2013 Jan 8. PubMed PMID: 23306096; PubMed Central PMCID: PMC3655111.

476. Hui L, Zhang X, Yu YQ, Han M, Huang XF, Chen da C, Wang ZR, Du WL, Kou CG, Yu Q, **Kosten TR**, Zhang XY. Association between DBH 19 bp insertion/deletion polymorphism and cognition in first-episode schizophrenic patients. Schizophr Res. 2013 Jul;147(2-3):236-40. doi: 10.1016/j.schres.2013.04.035. Epub 2013 May 23. PubMed PMID: 23707643.

477. Spellicy CJ, **Kosten TR**, Hamon SC, Harding MJ, Nielsen DA. ANKK1 and DRD2 pharmacogenetics of disulfiram treatment for cocaine abuse. Pharmacogenet Genomics. 2013 Jul; 23(7):333-40. doi: 10.1097/FPC.0b013e328361c39d. PubMed PMID: 23635803.

478. Zhang XY, Chen da C, Xiu MH, Tan YL, Yang FD, Zhang LY, Zhang LY, Haile CN, **Kosten TR**. Clinical symptoms and cognitive impairment associated with male schizophrenia relate to plasma manganese superoxide dismutase activity: a case-control study. J

Thomas R. Kosten, MD
CV

Psychiatr Res. 2013 Aug; 47(8):1049-53. doi: 10.1016/j.jpsychires.2013.03.014. Epub 2013 Apr 20. PubMed PMID: 23611682.

479. **Kosten TR**, Domingo CB. Can you vaccinate against substance abuse? Expert Opin Biol Ther. 2013 Aug;13(8):1093-7. doi: 10.1517/14712598.2013.791278. Epub 2013 Apr 18. Review. PubMed PMID: 23594123.

480. Kosten TA, Shen XY, O'Malley PW, Kinsey BM, Lykissa ED, Orson FM, **Kosten TR**. A morphine conjugate vaccine attenuates the behavioral effects of morphine in rats. Prog Neuropsychopharmacol Biol Psychiatry. 2013 Aug 1;45: 223-9. doi: 10.1016/j.pnpbp.2013.05.012. Epub 2013 Jun 2. PubMed PMID: 23739535; PubMed Central PMCID: PMC3773503.

481. Zhang XY, Tang W, Xiu MH, Chen da C, Yang FD, Tan YL, Wang ZR, Zhang F, Liu J, Liu L, Chen Y, Wen N, **Kosten TR**. Interleukin 18 and cognitive impairment in first episode and drug naïve schizophrenia versus healthy controls. Brain Behav Immun. 2013 Aug; 32:105-11. doi: 10.1016/j.bbi.2013.03.001. Epub 2013 Mar 14. PubMed PMID: 23499732.

482. Zhang XY, Chen DC, Xiu MH, Haile CN, He SC, Luo X, Zuo L, Rosenheck R, Kosten TA, **Kosten TR**. Cigarette smoking, psychopathology and cognitive function in first-episode drug-naive patients with schizophrenia: a case-control study. Psychol Med. 2013 Aug;43(8):1651-60. doi: 10.1017/S0033291712002590. Epub 2012 Nov 13. PubMed PMID: 23149169.

483. Brimijoin S, Shen X, Orson F, **Kosten T**. Prospects, promise and problems on the road to effective vaccines and related therapies for substance abuse. Expert Rev Vaccines. 2013 Mar;12(3):323-32. doi: 10.1586/erv.13.1. Review. PubMed PMID: 23496671; PubMed Central PMCID: PMC3738206.

484. An HM, Tan YL, Shi J, Wang ZR, Li J, Wang YC, **Kosten TR**, Zhou DF, Yang FD, Zhang XY. Extract of Ginkgo biloba is equivalent to vitamin E in attenuating and preventing vacuous chewing movements in a rat model of tardive dyskinesia. Behav Pharmacol. 2013 Aug 29. [Epub ahead of print] PubMed PMID: 23994817.

485. Li W, Zhou N, Yu Q, Li X, Yu Y, Sun S, Kou C, Chen da C, Xiu MH, **Kosten TR**, Zhang XY. Association of BDNF gene polymorphisms with schizophrenia and clinical symptoms in a Chinese population. Am J Med Genet B Neuropsychiatr Genet. 2013 Sep; 162B(6):538-45. doi: 10.1002/ajmg.b.32183. Epub 2013 Jul 7. PubMed PMID: 23832605.

486. Zhang XY, Al Jurdi RK, Zoghbi AW, Chen da C, Xiu MH, Tan YL, Yang FD, **Kosten TR**. Prevalence, demographic and clinical correlates of suicide attempts in Chinese medicated chronic inpatients with schizophrenia. J Psychiatr Res. 2013 Oct; 47(10):1370-5. doi: 10.1016/j.jpsychires.2013.05.024. Epub 2013 Jun 20. PubMed PMID: 23791457.

487. An HM, Tan YL, Shi J, Wang ZR, Li J, Wang YC, Kosten TR, Zhou DF, Yang FD, Zhang XY. Extract of Ginkgo biloba is equivalent to vitamin E in attenuating and preventing vacuous chewing movements in a rat model of tardive dyskinesia. Behav Pharmacol. 2013 Oct;

1692

Thomas R. Kosten, MD
CV

24(7):610-6. doi: 10.1097/FBP.0b013e3283656d87. PubMed PMID: 23994817.

488. Wu JQ, **Kosten TR**, Zhang XY. Free radicals, antioxidant defense systems, and schizophrenia. Prog Neuropsychopharmacol Biol Psychiatry. 2013 Oct 1;46:200-6. doi: 10.1016/j.pnpbp.2013.02.015. Epub 2013 Mar 5. Review. PubMed PMID: 23470289.

489. Krupitsky E, Zvartau E, Blokhina E, Verbitskaya E, Tsoy M, Wahlgren V, Burakov A, Masalov D, Romanova TN, Palatkin V, Tyurina A, Yaroslavtseva T, Sinha R, **Kosten TR**. Naltrexone with or without guanfacine for preventing relapse to opiate addiction in St.-Petersburg, Russia. Drug Alcohol Depend. 2013 Oct 1; 132(3):674-80. doi: 10.1016/j.drugalcdep.2013.04.021. Epub 2013 May 15. PubMed PMID: 23683793; PubMed Central PMCID: PMC3971535.

490. Shorter D, Nielsen DA, Huang W, Harding MJ, Hamon SC, **Kosten TR**. Pharmacogenetic randomized trial for cocaine abuse: disulfiram and α1A-adrenoceptor gene variation. Eur Neuropsychopharmacol. 2013 Nov; 23(11):1401-7. doi: 10.1016/j.euroneuro.2013.05.014. Epub 2013 Jul 10. PubMed PMID: 23849431; PubMed Central PMCID: PMC3818518.

491. Haile CN, **Kosten TR**. Pharmacotherapy for stimulant-related disorders. Curr Psychiatry Rep. 2013 Nov;15(11):415. doi: 10.1007/s11920-013-0415-y. Review. PubMed PMID: 24142188; PubMed Central PMCID: PMC3858902.

492. Nielsen DA, Hamon SC, **Kosten TR**. The κ-opioid receptor gene as a predictor of response in a cocaine vaccine clinical trial. Psychiatr Genet. 2013 Dec; 23(6):225-32. doi: 10.1097/YPG.0000000000000008. PubMed PMID: 23995774; PubMed Central PMCID: PMC3885873.

493. Verrico CD, Haile CN, Newton TF, **Kosten TR**, De La Garza R. Pharmacotherapeutics for substance-use disorders: a focus on dopaminergic medications. Expert Opin Investig Drugs. 2013 Dec;22(12):1549-68. doi: 10.1517/13543784.2013.836488. Epub 2013 Sep 14. Review. PubMed PMID: 24033127.

494. Zhang XY, Chen da C, Tan YL, Xiu MH, Cui J, Hui L, De Yang F, **Kosten TR**. Socio-demographic and clinical characteristics of heavy and non-heavy smokers among schizophrenia inpatients in a Chinese Han population. Psychopharmacology (Berl). 2014 Jan; 231(1):305-14. doi: 10.1007/s00213-013-3239-x. Epub 2013 Aug 21. PubMed PMID: 23963531.

495. Schottenfeld RS, Chawarski MC, Cubells JF, George TP, Lappalainen J, **Kosten TR**. Randomized clinical trial of disulfiram for cocaine dependence or abuse during buprenorphine treatment. Drug Alcohol Depend. 2014 Mar 1; 136:36-42. doi: 10.1016/j.drugalcdep.2013.12.007. Epub 2013 Dec 25. PubMed PMID: 24462581.

496. **Kosten T**, Domingo C, Orson F, Kinsey B. Vaccines against stimulants: cocaine and MA. Br J Clin Pharmacol. 2014 Feb; 77(2):368-74. doi: 10.1111/bcp.12115. PubMed PMID: 23509915; PubMed Central PMCID: PMC4014030.

497. Mancino MJ, McGaugh J, Chopra MP, Guise JB, Cargile C, Williams DK, Thostenson J, **Kosten TR**, Sanders N, Oliveto A.

1693

Thomas R. Kosten, MD
CV

Clinical efficacy of sertraline alone and augmented with gabapentin in recently abstinent cocaine-dependent patients with depressive symptoms. J Clin Psychopharmacol. 2014 Apr; 34(2):234-9. doi: 10.1097/JCP.0000000000000062. PubMed PMID: 24525654; PubMed Central PMCID: PMC4068618.

498. Sun HQ, Chen HM, Yang FD, Lu L, **Kosten TR**. Epidemiological trends and the advances of treatments of amphetamine-type stimulants (ATS) in China. Am J Addict. 2014 May-Jun;23(3):313-7. doi: 10.1111/j.1521-0391.2014.12116.x. PubMed PMID: 24724890.

499. Zhang XY, Chen da C, Xiu MH, Yang FD, Tan Y, Luo X, Zuo L, Kosten TA, **Kosten TR**. Cognitive function, plasma MnSOD activity, and MnSOD Ala-9Val polymorphism in patients with schizophrenia and normal controls. Schizophr Bull. 2014 May; 40(3):592-601. doi: 10.1093/schbul/sbt045. Epub 2013 Apr 15. PubMed PMID: 23588476; PubMed Central PMCID: PMC3984504.

500. Ramakrishnan M, Kinsey BM, Singh RA, **Kosten TR**, Orson FM. Hapten Optimization for Cocaine Vaccine with Improved Cocaine Recognition. Chem Biol Drug Des. 2014 May 6. doi: 10.1111/cbdd.12326. [Epub ahead of print] PubMed PMID: 24803171.

501. Orson FM, Wang R, Brimijoin S, Kinsey BM, Singh RA, Ramakrishnan M, Wang HY, **Kosten TR**. The future potential for cocaine vaccines. Expert Opin Biol Ther. 2014 May 16:1-13. [Epub ahead of print] PubMed PMID: 24835496.

502. **Kosten TR**, Domingo CB, Shorter D, Orson F, Green C, Somoza E, Sekerka R, Levin FR, Mariani JJ, Stitzer M, Tompkins DA, Rotrosen J, Thakkar V, Smoak B, Kampman K. Vaccine for cocaine dependence: a randomized double-blind placebo-controlled efficacy trial. Drug Alcohol Depend. 2014 Jul 1; 140:42-7. doi: 10.1016/j.drugalcdep.2014.04.003. Epub 2014 Apr 16. PubMed PMID: 24793366; PubMed Central PMCID: PMC4073297.

503. Liu S, Green CE, Lane SD, **Kosten TR**, Moeller FG, Nielsen DA, Schmitz JM. The influence of dopamine β-hydroxylase gene polymorphism rs1611115 on levodopa/carbidopa treatment for cocaine dependence: a preliminary study. Pharmacogenet Genomics. 2014 Jul;24(7):370-3. doi: 10.1097/FPC.0000000000000055. PubMed PMID: 24809448

504. Graham DP, Nielsen DA, **Kosten TR**, Davis LL, Hamner MB, Makotkine I, Yehuda R. Examining the utility of using genotype and functional biology in a clinical pharmacology trial: pilot testing dopamine β-hydroxylase, norepinephrine, and post-traumatic stress disorder. Psychiatr Genet. 2014 Aug; 24(4):181-2. doi: 10.1097/YPG.0000000000000039. PubMed PMID: 24983834; PubMed Central PMCID: PMC4080201.

505. Ma L, Steinberg JL, Cunningham KA, Lane SD, Kramer LA, Narayana PA, **Kosten TR**, Bechara A, Moeller FG. Inhibitory Behavioral Control: A Stochastic Dynamic Causal Modeling Study Using Network Discovery Analysis. Brain Connect. 2014 Nov 19. [Epub ahead of print] PubMed PMID: 25336321.

506. Shorter D, Domingo CB, **Kosten TR**. Emerging drugs for the treatment of cocaine use disorder: a review of neurobiological targets

Thomas R. Kosten, MD
CV

and pharmacotherapy. Expert Opin Emerg Drugs. 2014 Nov 26:1-15. [Epub ahead of print] PubMed PMID: 25425416.

507. Ma L, Steinberg JL, Cunningham KA, Lane SD, Bjork JM, Neelakantan H, Price AE, Narayana PA, Kosten TR, Bechara A, Moeller FG. Inhibitory behavioral control: A stochastic dynamic causal modeling study comparing cocaine dependent subjects and controls. Neuroimage Clin. 2015 Mar 24;7:837-47. doi: 10.1016/j.nicl.2015.03.015. eCollection 2015. PubMed PMID: 26082893; PubMed Central PMCID: PMC4459041.

508. Zhang XY, Chen DC, Fan FM, Tan YL, Tan SP, Hu K, Salas R, **Kosten TR**, Zunta-Soares G, Soares JC. Extensive white matter abnormalities and clinical symptoms in first episode and drug-naive schizophrenia: a voxel-based diffusion tensor imaging study. Journal of Clinical Psychiatry. 2015 Jan 8

509. Buda JJ, Ivy Carroll F, **Kosten TR**, Swearingen D, Walters BB. A Double-Blind, Placebo-Controlled Trial to Evaluate the Safety, Tolerability, and Pharmacokinetics of Single, Escalating Oral Doses of JDTic. Neuropsychopharmacology. 2015 Jan 23. doi: 10.1038/npp.2015.27.PubMed PMID: 25628006.

510. Cui Y, Robinson JD, Engelmann JM, Lam CY, Minnix JA, Karam-Hage M, Wetter DW, Dani JA, **Kosten TR**, Cinciripini PM. Reinforcement Sensitivity Underlying Treatment-Seeking Smokers' Affect, Smoking Reinforcement Motives, and Affective Responses. Psychol Addict Behav. 2015 Jan 26. [Epub ahead of print] PubMed PMID: 25621416.

511. Sun Y, Zhao LY, Wang GB, Yue WH, He Y, Shu N, Lin QX, Wang F, Li JL, Chen N, Wang HM, Kosten TR, Feng JJ, Wang J, Tang Y, Liu SX, Deng GF, Diao GH, Tan YL, Han HB, Lin L, Shi J. ZNF804A variants confer risk for heroin addiction and affect decision making and gray matter volume in heroin abusers. Addict Biol. 2015 Feb 24. doi: 10.1111/adb.12233. [Epub ahead of print] PubMed PMID: 25708696.

512. Brewer AJ 3rd, Nielsen DA, Spellicy CJ, Hamon SC, Gingrich J, Thompson-Lake DG, Nielsen EM, Mahoney JJ 3rd, Kosten TR, Newton TF, De La Garza R 2nd. Genetic variation of the dopamine transporter (DAT1) influences the acute subjective responses to cocaine in volunteers with cocaine use disorders. Pharmacogenet Genomics. 2015 Apr 2. [Epub ahead of print] PubMed PMID: 25850966.

513. Christodoulides N, De La Garza R 2nd, Simmons GW, McRae MP, Wong J, Newton TF, Smith R, Mahoney Iii JJ, Hohenstein J, Gomez S, Floriano PN, Talavera H, Sloan DJ, Moody DE, Andrenyak DM, Kosten TR, Haque A, McDevitt JT. Application of programmable bio-nano-chip system for the quantitative detection of drugs of abuse in oral fluids. Drug Alcohol Depend. 2015 May 22. pii: S0376-8716(15)00235-5. doi: 10.1016/j.drugalcdep.2015.04.026.Epub. PubMed PMID: 26048639.

514. Newton TF, Haile CN, Mahoney JJ 3rd, Shah R, Verrico CD, De La Garza R 2nd, Kosten TR. Dopamine D3 receptor-preferring agonist enhances the subjective effects of cocaine in humans. Psychiatry

1695

Thomas R. Kosten, MD
CV

Res. 2015 Jul 29. pii: S0165-1781(15)00533-8. doi: 10.1016/j.psychres.2015.07.073.Epub.PubMed PMID: 26239766.

515. Krupitskiĭ EM, Kibitov AO, Blokhina EA, Verbitskaia EV, Brodianskiĭ VM, Alekseeva NP, Bushara NM, Iaroslavtseva TS, Palatkin VI, Masalov DV, Burakov AM, Romanova TN, Sulimov GI, Kosten T, Nielsen D, Zvartau ÉÉ, Vudi D. [Stabilization of remission in patients with opioid dependence with naltrexone implant: a pharmacogenetic approach]. Zh Nevrol Psikhiatr Im S S Korsakova. 2015;115(4 Vypusk 2 Addiktivnye rasstroistva):14-23. Russian. PubMed PMID: 26288297.

516. Zhang XY, Tan YL, Chen DC, Tan SP, Yang FD, Wu HE, Zunta-Soares GB, Huang XF, Kosten TR, Soares JC. Interaction of BDNF with cytokines in chronic schizophrenia. Brain Behav Immun. 2016 Jan;51:169-75. doi: 10.1016/j.bbi.2015.09.014. Epub 2015 Sep 25. PubMed PMID: 26407757

517. An HM, Tan YL, Shi J, Wang ZR, Li J, Wang YC, Lv MH, Zhou DF, Soares JC, Kosten TR, Yang FD, Zhang XY. Beneficial effects of EGb761 and vitamin E on haloperidol-induced vacuous chewing movements in rats: Possible involvement of S100B mechanisms. Behav Brain Res. 2016 Jan 15;297:124-30. doi: 10.1016/j.bbr.2015.10.004. Epub 2015 Oct 9. PubMed PMID: 26455874.

518. Zhang XY, Fan FM, Chen DC, Tan YL, Tan SP, Hu K, Salas R, Kosten TR, Zunta-Soares G, Soares JC. Extensive white matter abnormalities and clinical symptoms in drug-naive patients with first-episode schizophrenia: a voxel-based diffusion tensor imaging study. J Clin Psychiatry. 2016 Feb; 77(2):205-211. PubMed PMID: 26761708.

519. Zhang XY, Tan YL, Chen DC, Tan SP, Malouta M, Bernard JD, Combs JL, Bhatti S, Davis MC, **Kosten TR**, Soares JC. Serum IL-18 level, clinical symptoms and IL-18-607A/C polymorphism among chronic patients with schizophrenia in a Chinese Han population. Psychoneuroendocrinology. 2016. 68; 140–147

b. **Accepted or In Press**

1. **Kosten TR**. An Opioid for Depression? American Journal of Psychiatry, 173(5), pp. 446–447. 2016. In Press

2. Sharp C, Fowler C, Salas R, Nielsen C, Allen J, Oldham J, **Kosten T**, Matthew S, Madan A, Frueh C, & Fonagy P. Operationalizing NIMH Research Domain Criteria (RDoC) in naturalistic clinical settings. Bulletin of the Menninger Clinic 2016. In Press

3. Verrico C, Haile C, De La Garza R, Grasing K, **Kosten TR**, Newton T. Subjective and Cardiovascular Effects of Intravenous Methamphetamine during Perindopril Maintenance: A Randomized, Double-Blind, Placebo-Controlled Human Laboratory Study. International J of Neuropsychopharmacology 2016. In Press

Thomas R. Kosten, MD
CV

4. An HM, Tan YL, Tan SP, Shi J, Wang ZR, Yang FD, Huang XF, Soares JC, **Kosten TR**, Zhang XY. Smoking and serum lipid profiles in schizophrenia. Neuroscience Bulletin 2016. In Press

5. **Kosten, TR**. An Opiod for Depression. The American Journal of Psychiatry. 2016. In Press

6. Li, X, Shorter, D, **Kosten, TR**. Buprenorphine prescribing: to expand or not to expand. Journal of Psychiatric Press. 2016. In Press.

2. **Other full papers:**
   a. Published without review by peer group:
      1. **Kosten, TR**: Welcome to a New Editorial Generation. *American Journal of Drugs and Alcohol Abuse*. 2006; 32: 487-489.

      2. Gardner TG, **Kosten TR**. Pharmacotherapeutic Environments for Substance Use Disorders. *American Journal of Drugs and Alcohol Abuse*. 2007; 33:627-629.

      3. **Kosten, Thomas R**. Anti-addiction vaccines. *Contrastes*. 2007; No. 50: 141-147.

      4. Gardner TJ, **Kosten TR**. Human laboratory and neuroimaging studies in substance use disorders: developing new treatment approaches. *Am J Drug Alcohol Abuse*. 2007; 33 (6):765-7.

      5. **Kosten TR**, Gardner TJ. New hot topics sections: 1. China's new march forward in addiction treatment: methadone for the masses. 2. Issues in formulating DSM V. *Am J Drug Alcohol Abuse*. 2008; 34 (2):123-6.

      6. **Kosten T**, Bruce J. Rounsaville MD: 1949-2011. *Drug and Alcohol Dependence*. May 2011; 115 (1-2):159. Doi: 10.1016/j.drugalcdep.2011.02.018

3. **Books**:
   a. Complete books written
      1. Stine S, **Kosten TR**, et al., eds. New Treatments for opiate dependence. Substance Abuse Series. New York, NY: The Guilford Press; 1997.

      2. McCance-Katz E, **Kosten TR**, eds., New treatments for chemical addictions. Washington DC/London, England: American Psychiatric Press Inc: 1998.

      3. **Kosten TR**. Office based treatment of opiate dependent patients with buprenorphine. Web-based training course for American Psychiatric Association; 2002.

1697

Thomas R. Kosten, MD
CV

    4.  **Thomas R. Kosten**, Thomas F. Newton, Richard De La Garza II, Colin N. Haile. Cocaine and Methamphetamine Dependence: Advances in Treatment. Arlington, VA: American Psychiatric Publishing. 2012.

  b.  Books edited

    1.  Blane HT, **Kosten TR**, (Series Editors). Collins RL, Leonard KE, Searles JS, eds. Alcohol and the family; Research and Clinical Perspectives. New York, NY; Guilford Press; 1990.

    2.  Blane HT, **Kosten TR**, (Series Editors). Windle M, Searles JS, eds. Children of Alcoholics; Critical Perspectives. New York, NY; Guilford Press; 1990.

    3.  Blane HT, **Kosten TR**, (Series Editors). Khantzian EJ, Haliday KS, McAuliffe WE. Addiction and the Vulnerable self. New York, NY: Guilford Press; 1990.

    4.  Blane HT, **Kosten TR**, (Series Editors). Wilson RJ, Mann RE, eds. Drinking and Driving. New York, NY: Guildford Press; 1990.

    5.  Blane HT, **Kosten TR**, (Series editors) Frances J, Miller SI, eds. Clinical Textbook of Addictive Disorders. New York, NY: Guilford Press; 1991.

    6.  Blane HT, **Kosten TR**, (Series Editors). Sorenson JL, et al., eds. Preventing AIDS with Drug Users and their sexual partners. New York, NY: Guilford Press; 1991.

    7.  **Kosten TR**, Kleber HD, eds. Clinician's guide to cocaine addiction: Theory, Research and Treatment. New York, NY: Guilford Press; 1992.

    8.  Blane HT, **Kosten TR**, (Series Editors). Vogel-Sprott M. Alcohol Tolerance and Social Drinking: Learning the Consequences. New, NY: Guilford Press; 1992.

    9.  Blane HT, **Kosten TR**, (Series Editors). McAuliffe WE, Albert J. Clean Start: An outpatient program for initiating cocaine recovery. New York, NY: Guilford Press; 1992.

    10. Blane HT, **Kosten TR**, (Series Editors). Vannicelli M. Removing the roadblocks: Group psychotherapy with substance abusers and family members. New, NY: Guilford Press; 1992.

    11. Blane HT, **Kosten TR**, (Series Editors). Straussner SLA. Clinical work with substance abusing clients. New York, NY: Guilford Press; 1992.

1698

Thomas R. Kosten, MD
CV

12. Blane HT, **Kosten TR**, (Series Editors). O'Farrell TJ. Treating alcohol problems: Marital and Family Interventions. New York, NY: Guilford Press: 1993.

13. Blane HT, **Kosten TR**, (Series Editors). Thombs DL. Introduction to Addictive Behaviors. New York, NY: Guilford Press 1994.

14. **Kosten TR**, Blane HT (Series Editors). Meyers RJ, Smith JE. Clinical guide to alcohol treatment: The community reinforcement approach. New York, NY: Guilford Press; 1995

15. Blane HT, **Kosten TR**, (Series Editors). Rogers F, Keller DS and Morgenstern J. Treating substance abuse: Theory and Technique. New York, NY: The Guilford Press; 1996.

16. Blane HT, **Kosten TR**, (Series Editors). Introduction and Overview, (Chapter 1). In: Stine SM and **Kosten TR**, eds., New Treatments for opiate dependence. The Guilford Substance Abuse Series. New York, NY: Guilford Press: 1997 pp. 1-12.

17. Blane HT, **Kosten TR**, (Series Editors). Conclusions and future directions in treatment matching (Chapter 14). **Kosten TR**, Stine S, eds 8. Substance abuse series. New York, NY: The Guilford Press 1997: 269-275.

18. Blane HT, **Kosten TR**, (Series Editors). Connors GJ, Donovan DM, DiClemente CC: Substance abuse treatment and the stages of change: Selecting and planning interventions. New York, NY: Guilford Press, 2001.

19. Blane HT, **Kosten TR**, (Series Editors). Clinical work with substance – abusing clients. Second edition (Straussner SLA, ed). Substance Abuse Series. New York, NY: Guilford Press; 2004.

20. Blane HT, **Kosten TR**, (Series Editors). Thombs DL. Introduction to addictive behaviors. Third edition. Substance Abuse Series. New York, NY: Guilford Press; 2006

c. Book chapters written:

1. Rounsaville BJ, **Kosten TR**, Weissman MM, Kleber HD. *Evaluating and Treating Depressive Disorders in Opiate Addicts.* National Institute on Drug Abuse Research Monograph Series, DHHS Pub. No. (ADM) 85-1406. Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1985.

2. **Kosten TR**, Jacobs S, Kasl SV: Terminal illness, bereavement and the family. In: Kerns RD,    Turk DC, eds. *Health, Illness and Families: A Life Span Perspective.* New York: John Wiley & Sons, Inc.; 1985: 311-337.

1699

Thomas R. Kosten, MD
CV

3. **Kosten TR**, Gawin FH, Rounsaville BJ, Kleber HD. Abuse of Cocaine with opioids: Psychosocial aspects of treatment. *Problems of Drug Dependence 1985*. National Institute on Drug Abuse Research Monograph 67. DHHS Pub. No. (ADM) 86-1448. Washington, DC: Supt. of Docs. U.S.Govt. Print. Off.; 1986: 278-285.

4. **Kosten TR**, Kreek MJ, Ragunath J, Kleber HD. Chronic naltrexone effects on cortisol. In: Harris LS, ed. *Problems of Drug Dependence 1985*. National Institute on Drug Abuse Research Monograph 67, DHHS Pub. No. (ADM) 86-1448. Washington, DC: Supt. of Docs., U.S. Govt. Print. Off; 1986: 362-365.

5. **Kosten TR**, Rounsaville BJ. Source of income as predictor in opioid addicts: 2.5 year follow-up. In: Harris LS, ed. *Problems of Drug Dependence 1986*. National Institute on Drug Abuse Research Monograph 76, DHHS Pub. No. (ADM) 87-1508. Washington, DC: Supt. of Docs. U.S. Govt. Print. Off.; 1987: 196-199.

6. **Kosten TR**, Rounsaville BJ, Babor TF, Spitzer RL, Williams JBW. The dependence syndrome across different psychoactive substances: Revised DSM-III. In: Harris LS, ed. *Problems of Drug Dependence 1986*. National Institute on Drug Abuse Research Monograph 76, DHHS Pub. No. (ADM) 87-1508. Washington, DC: Supt. of Docs., U.S. Govt. Print. Off., 1987, pp. 255.

7. O'Malley SS, **Kosten TR**. Couples therapy with cocaine abusers. In Kaslow FW, ed. Couples *Therapy in a Family Context.* Rockville, MD: Aspen Publications; 1988: 121-131.

8. Morgan CJ, **Kosten TR**, Gawin FH, Kleber HD. A pilot trial of amantadine for cocaine abuse. In Harris LS, ed. *Problems of Drug Dependence 1987.* National Institute on Drug Abuse Research monograph 81. DHHS Pub. No. (ADM) 88-1564, Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1988: 81-85.

9. Babor TF, Cooney NL, Hubbard R, Jaffe JH, **Kosten TR**, Lauerman RJ, McLellan AT, Rankin H, Rounsaville BJ, Skinner HA. The syndrome concept of alcohol and drug dependence: Results of the secondary analysis project. In Harris L., ed. *Problems of Drug Dependence1987.* National Institute on Drug Abuse Research Monograph 81. DHHS Pub. No. (ADM) 88-1564, Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1988: 33-39.

10. **Kosten TR**. The symptomatic and prognostic implications of psychiatric diagnoses in substance abusers. In: Harris LS, ed. *Problems of Drug Dependence 1987*. National Institute on Drug Abuse Research Monograph 81. DHHS Pub. No. (ADM) 88-1564, Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1988: 416-421.

1700

Thomas R. Kosten, MD
CV

11. **Kosten TR**, Rounsaville BJ, Kleber HD. A 2.5 year follow-up of abstinence and relapse to cocaine abuse in opioid addicts. In: Harris, LS, ed. *Problems of Drug Dependence 1987.* National Institute on Drug Abuse Research Monograph 81. DHHS Pub. No. (ADM) 88-1564, Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1988: 231-236.

12. **Kosten TR**, Schumann B, Gawin FH. Treating cocaine abusing methadone maintenance patients with desipramine. In: Harris LS, ed. *Problems of Drug Dependence 1987*. National Institute on Drug Abuse Research Monograph 81. DHHS Pub. No. (ADM) 88-1564, Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1988: 237-241.

13. **Kosten TR**, Kleber HD. Substance use disorders: Drug abuse. In: Lazare A, ed. *Outpatient Psychiatry*, Second Edition. Baltimore, MD: Williams & Wilkins, Inc. 1989: 488-510.

14. Kosten TA, **Kosten TR**. The dependence syndrome concept as applied to alcohol and other substances of abuse. In Galanter, M., ed. *Recent Developments in Alcoholism,* Volume 8; 1989: 47-68.

15. **Kosten TR**, Frank JB, Dan E, Giller EL. Treating post-traumatic stress disorder using phenelzine or imipramine. In Giller EL, ed. *Biological Assessment and Treatment of PTSD.* Washington, DC: American Psychiatric Press; 1990: 185-202.

16. Mason JW, Giller EL, **Kosten TR**, Yehuda R. Psychoendocrine approaches to the diagnosis and pathogenesis of PTSD. In Giller EL, ed. *Biological Assessment and Treatment of PTSD.* Washington, DC: American Psychiatric Press; 1990: 65-86.

17. Morgan C, **Kosten TR**. Potential toxicity of high dose naltrexone in patients with appetitive disorders. In L Reid, ed. *Opioids, Bulimia, and Alcohol Abuse and Alcoholism*. New York, NY: Springer-Verlag; 1990: 261-274.

18. Frank JB, **Kosten TR**, Giller EL, Dan E. Antidepressants in the treatment of post-traumatic stress disorder. Wolf ME, Mosnaim AD, eds. *Post-traumatic Stress Disorder: Etiology, Phenomenology, and Treatment*. Washington, DC: American Psychiatric Press; 1990: 170-183.

19. Giller EL, Perry BD, Southwick S, Yehuda R, Wahby V, **Kosten TR**, Mason JW. Psychoendocrinology of post-traumatic stress disorder. Wolf ME, Mosnaim AD, eds. *Post-traumatic Stress Disorder: Etiology, Phenomenology, and Treatment. Wa*shington, DC: American Psychiatric Press; 1990:158-169.

Thomas R. Kosten, MD
CV

20. Kosten TA, **Kosten TR**. Criteria for diagnosis. In: Miller NS, ed. *Comprehensive Handbook of Drug and Alcohol Addiction.* New York, NY: Marcel Dekker Press; 1990: 263-284.

21. **Kosten TR**. Pharmacotherapy for cocaine dependence. In: Miller NS, ed. *Comprehensive Handbook of Drug and Alcohol Addiction.* New York, NY: Marcel Dekker Press; 1990: 1143-62.

22. O'Malley SS, **Kosten TR**, Renner JA. Dual diagnoses: Substance abuse and personality disorders. In: Adler DA, ed. *Treating Personality Disorders.* New York, NY: Jossey Bass Publishers; 1990:15-138.

23. Margolin A, **Kosten TR**. Opioid detoxification and maintenance with blocking agents. In: Miller NS (ed). *Comprehensive Handbook of Drug and Alcohol Addiction.* New York, NY: Marcel Dekker Press; 1990: 1127-1142.

24. **Kosten TR**, Rounsaville BJ, Bryant K. The SCID: A clinical instrument for diagnosis. *Problems of Drug Dependence 1990.* National Institute on Drug Abuse Research Monograph 105, DHHS Pub. No. (ADM) 91-1753. Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1991: 213-219.

25. **Kosten TR**. Client issues in drug abuse treatment: Addressing multiple drug abuse. *Improving Drug Abuse Treatment.* National Institute on Drug Abuse Research Monograp 106, DHHS Pub. No. (ADM) 91-1754. Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1991: 136-151.

26. **Kosten TR**. Pharmacotherapy of cocaine abuse with serotonergic drugs. *Problems of Drug Dependence 1991.* National Institute on Drug Abuse Research Monograph 119, DHHS Pub. No. (ADM) 92-1888. Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1992: 146-149.

27. **Kosten TR**. Matching patients to treatment. In: **Kosten TR**,Kleber HD (eds.) *Clinician's Guide to Cocaine Addiction: Theory, Research, and Treatment.* New York, NY: Guilford Press; 1992: 389 395.

28. Chang G, **Kosten TR**. Emergency management of acute drug intoxication. In: Lowinson JH, Ruiz P, Millman RB, eds. *Comprehensive Textbook of Substance Abuse.* Baltimore, MD: Williams and Wilkins Co.; 1992. *437-445.*

29. **Kosten TR**, Morgan C, Kleber HD. Phase II clinical trials of buprenorphine: Detoxification and induction onto naltrexone. In: Blaine JD, ed. *Buprenorphine: An Alternative Treatment for Opioid Dependence.* National Institute on Drug Abuse Research Monograph 121, DHHS Pub. No. (ADM) 92-1912. Washington, DC: Supt. of Docs., U.S. Govt. Print. Off.; 1992. 101-119.

1702

Thomas R. Kosten, MD
CV

30. Rosen M, **Kosten TR**. Buprenorphine for opioid and cocaine dependence. In: Watson RR, *Alcohol and Drug Abuse Reviews: Drug Abuse Treatment.* Totowa, NJ: Humana Press; 1992: 137-148.

31. Closser M, **Kosten TR**. A comparison of the epidemiology and clinical characteristics of cocaine and alcohol abusers. In Galanter, M., ed. *Recent Developments in Alcoholism,* Volume 10. New York, NY: Plenum Publishing Corpora*tion; 1992: 115-128.*

32. *Ziedonis DM*, **Kosten TR**. Behavioral pathology. Annual Review of Addictions *Research and Treatment.* New York, NY: Pergamon Press Ltd; 1992: 109-123.

33. **Kosten TR**. Clinical and research perspectives on cocaine abuse: The pharmacotherapy of cocaine abuse. In: Tims F, Leukefeld S, eds. *Cocaine Treatment: Research and Clinical Perspectives*. NIDA Research Monograph 135. NIH Publication No. 93-3639, Rockville, MD; 1993: 48-56.

34. McCance-Katz EF, **Kosten TR**. Treatment of cocaine abuse and dependence. In: Michels R, ed. *Psychiatry*. Philadelphia, PA: J.B. Lippincott Company; 1993: 1-23.

35. Schuckit MA, **Kosten TR**, Fischman MW. Protracted abstinence syndromes in alcohol, opioids, and stimulants. In: Widiger TA et al., eds. *DSM-IV Sourcebook*. Washington, D.C.: American Psychiatric Association; 1994: 145-157.

36. Blaine JD, Ling W, **Kosten TR**, O'Brien CP, Chiarello RJ. Establishing the efficacy and safety of medications for the treatment of drug dependence and abuse: Methodological issues. In: Prien R, Robinson E, eds. *Clinical Evaluation of Psychotropic Drugs: Principles and Guidelines*. New York, NY: Raven Press; 1994: 593-623.

37. O'Connor PG, **Kosten TR**. Management of opioid intoxication and withdrawal (Chapter 5). In: *Principles of Addiction Medicine*. Washington, DC: American Society of Addiction Medicine, Section 11; 1994: 1-6.

38. Meandzija B, **Kosten TR**. Pharmacological treatment of opioid addiction. In: *Principles of Addiction Medicine*. Washington, DC: American Society of Addiction Medicine; 1994.

39. **Kosten TR**. Opiate dependence treatment. In: Spitzer R (editor), *DSM-V Treatment Case Book*. Washington, DC: American Psychiatric Press, Inc.; 2004.

Thomas R. Kosten, MD
CV

40. Wallace EA, **Kosten TR**. Treatment types: Pharmacotherapy, an overview. In: *Encyclopedia of Drugs, Alcohol and Addictive Behavior*, First Edition. New York, NY: MacMillan Reference USA; 1995: 1170-1175.

41. **Kosten TR**. Amantadine. In: *Encyclopedia of Drugs, Alcohol and Addictive Behavior*, First Edition. New York, NY: MacMillan Reference USA; 1995: 102.

42. Satel SL, **Kosten TR**. Withdrawal: Cocaine. In: *Encyclopedia of Drugs, Alcohol and Addictive Behavior*, First Edition. New York, NY: MacMillan Reference USA: 1995: 1279-1282.

43. **Kosten TR**. Treatment: Cocaine, pharmacotherapy. In: *Encyclopedia of Drugs, Alcohol and Addictive Behavior*, First Edition. New York, NY: MacMillan Reference USA; 1995: 1092-1095.

44. McCance-Katz EF, **Kosten TR**, Jatlow P. Cocaine, alcohol, cocaethylene: Findings from a repeated dose study. *NIDA Res Monogr;* 162:175, 1995.

45. **Kosten TR**, McCance-Katz, E. New pharmacotherapies. In: Oldham J, Riba M, eds. *Review of Psychiatry*, Vol. 14, Ch. 4. Washington, DC: American Psychiatric Press, Inc.; 1995: 105-126.

46. **Kosten TR**. Experiencia clinica con buprenorfina en la dependencia de heroina en la Universidad de Yale. In: Brugue MC, Fraile MG, Molina LS (Coordinado por) *Avances en Drogodependencias: TratamientosFarmacologicos,* (Chapter 11). De la edicion castellana. Barcelona, Spain: Ediciones en Neurociencias ; 1995: 207-238.

47. Rosen MI, **Kosten TR**. Detoxification and induction onto naltrexone. In: Cowan A, Lewis JW, eds. *Buprenorphine: Combating Drug Abuse With a Unique Opioid.* New York: Wiley-Liss Co.; 1995: 289-305.

48. *Stine SM,* **Kosten TR**. *Complications of ch*emical abuse and dependency. In: Friedman MJ, Charney DS et al., eds. *Neurobiological and Clinical Consequences of Stress: From Normal Adaptation to Post-Traumatic Stress Disorder*. Philadelphia, PA: Lippincott-Raven Publishers; 1995: 447-464.

49. Wallace EA, **Kosten TR**. Pharmacotherapies for cocaine dependence, (Chapter 16). In: CR Schuster & MJ Kuhar, eds. *Pharmacological Aspects of Drug Dependence: Toward an Integrated Neurobehavioral Approach, Handbook of Experimental Pharmacology*, Vol.118. New York: Springer-Verlag; 1996: 627-644.

50. **Kosten TR**, (Assoc. section editor). Generic substance and polydrug use disorders, (Chapter 41). In: Tasman A, Kay J, Lieberman JF, eds.

Thomas R. Kosten, MD
CV

*Psychiatry*, Volume 1, Section V. Philadelphia, PA: W.B. Saunders Company; 1997: 743-754.

51. Kosten TA, **Kosten TR**. The dependence syndrome concept for alcohol and drug abuse, (Chapter 51). In: Bittar EE and Bittar N, eds. *Principles of Medical Biology: Molecular and Cellular Pharmacology*, Vol. 8C. Greenwich, CT: JAI Press; 1997: 995-1002.

52. Chang G, **Kosten TR**. Evaluation and early treatment: Detoxification, (Chapter 36). In: H Lowinson, P Ruiz, RB Millman, JG Langrod, eds. *Substance Abuse: A Comprehensive Textbook*, Third Edition, Section V. Baltimore, MD: Williams & Wilkins; 1997: 377-381.

53. Petrakis I, **Kosten TR**. Clinical efficacy of pharmacotherapy. In: Johnson BA, Roache JD et al., eds. *Drug Addiction and Its Treatment: Nexus of Neuroscience and Behavior.* Philadelphia, PA: Lippincott-Raven Publishers; 1997: 387-401.

54. McCance EF, **Kosten TR**. Psychopharmacological treatments (Chapter 25). In: Frances R, Miller S, eds. *Clinical Textbook of Addictive Disorders*, Second Edition, Section V. New York: NY: Guilford Publications; 1998: 596-624.

55. **Kosten TR**, , Hollister LE. Drugs of Abuse, (Chapter 32). In: Katzung BG, ed. *Basic and Clinical Pharmacology*, 7th Edition. Stamford, CT: Appleton and Lange; 1998: 516-531.

56. Stine SM, Meandzija B, **Kosten TR**. Pharmacologic interventions for opioid addiction: Pharmacotherapies for acute withdrawal maintenance pharmacotherapies, (Chapter 5). In: Graham AW & Schultz TK, eds. *Principles of Addiction Medicine,* 2nd Edition. Chevy Chase, MD: American Society of Addiction Medicine; 1998.

57. O'Connor PG, **Kosten TR**. Management of opioid intoxication and withdrawal. In: Graham AW, Schultz TK, eds. *Principles of Addiction Medicine,* Second Edition. Washington, DC: American Society of Addiction Medicine; Revised 1998: 457-464.

58. **Kosten TR**, Singha A. Stimulants, (Chapter 18). In Galanter M, Kleber H, eds. *Textbook of Substance Abuse Treatment,* Second Edition. Washington, DC: American Psychiatric Press, Inc.; 1999: 207-218.

59. Jacobsen LK, **Kosten TR**. Drug abuse (Chapter). In: Rakel RE, (ed.). *Conn's Current Therapy,* Section 16. Philadelphia, PA: W.B. Saunders Company; 1999: 1121-1126.

1705

Thomas R. Kosten, MD
CV

60. Stine SM, **Kosten TR**. Opioids. In: McCrady BS, Epstein EE, eds. *Addictions: A Comprehensive Guide Book for Practitioners*, Chapter 8. New York: Oxford University Press; 1999: 141-161.

61. Sevarino KA, Oliveto A, **Kosten TR**. Neurobiological adaptations to psychostimulants and opiates as a basis of treatment development. In: Glick SD, Maisonneuve IM, eds. *New Medications for Drug Abuse.* Annals New York Academy of Sciences; 2000 (Vol. 909): 51-87.

62. **Kosten TR**. Drugs of Abuse (Chapter 32 revision). In: Katzung GB, ed. *Basic & Clinical Pharmacology, 8th Edition*. Stamford, CT: Appleton & Lange; 2000: 532-547.

63. Jacobsen LK, **Kosten TR**. Drug abuse (Chapter revised). In: Rakel RE, ed. *Conn's Current Therapy*, Section 16. Philadelphia, PA: W.B. Saunders Company; 2000: 1093-1098.

64. Hart C, McCance-Katz EF, **Kosten TR**. Pharmacotherapies used in common substance     use disorders. In: Tims FM, Leukefeld CG, Platt JJ, eds. *Relapse and Recovery in Addictions,* Chapter 13. New Haven, CT: Yale University Press; 2001: 303-333.

65. **Kosten TR**, Singha AK. Stimulants and related drugs: Stimulants. In: Gabbard GO, ed. *Treatments of Psychiatric Disorders*, Third Edition, Volume I. Kleber HD & Galanter M (Section Editors). Washington, DC: American Psychiatric Press, Inc.; 2001: 723-734.

66. **Kosten TR**. Pathophysiology and treatment of cocaine dependence. In: Davis KL, Charney D, Coyle JT, Nemeroff C, eds. *Neuropsychopharmacology: The Fifth Generation of Progress*. O'Brien C. (Section Editor). Baltimore, MD: Lippincott Williams & Wilkins; 2002: 1461-1473.

67. Blane HT, **Kosten TR**, (series editors). Najavits LM. *Seeking Safety: A Treatment Manual for PTSD and Substance Abuse.* The Guilford Substance Abuse Series. New York, NY: The Guilford Press; 2002: 1-401.

68. **Kosten TR**. Evidence for the choice between methadone, LAAM and buprenorphine (Chapter IV). in: Waal H. & Haga E., eds. *Maintenance Treatment of Heroin Addiction -Evidence at the Crossroads.* Oslo, Norway: Cappelen Akademisk Forlag; 2003: 108-120.

69. **Kosten TR**. General approaches to substance and polydrug use disorders (Chapter 51). In: Tasman A, Kay J, Lieberman JR, eds. *Psychiatry*, 2nd Edition, Vol. 1. John Wiley & Sons: London, England; 2003: 922-935.

Thomas R. Kosten, MD
CV

70. O'Connor PG, **Kosten TR**, Stine SM. Management of opioid intoxication and withdrawal, Section 5, Chapter 4. In: Graham AW, Schultz TK, Mayo-Smith MF, Ries RK, eds. *Principles of Addiction Medicine*, Third Edition. Washington, DC: American Society of   Addiction Medicine. Revised 2003: 651-667; 668-669.

71. de Wit H, Haney M, **Kosten TR**, Walsh SL, Kuhar MJ. Dopamine antagonists and responses to stimulant drugs in humans. *Problems of Drug Dependence 2002*: *64th Annual Scientific Meeting.* NIDA Research Monograph 183, USDHHS, NIH, NIDA, Bethesda, MD; 2003: 50-58.

72. **Kosten TR**. Drugs of Abuse, Chapter 32. In: Katzung BG, ed. *Basic & Clinical Pharmacology*, Ninth Edition. New York, NY: McGraw-Hill; 2004: 517-528.

73. **Kosten TR**, Sofuoglu M. Stimulants (Chapter 16). In: Galanter M, Kleber HD, eds. *Textbook of Substance Abuse Treatment*, Third Edition. Washington, DC: American  Psychiatric Press, Inc.; 2004: 189-197.

74. Owens M, Pentel P, **Kosten TR**. Immunotherapies for substance abuse (Symposium III). In: Dewey WL, ed. *Problems of Drug Dependence 2003*: Proceedings of the 65th Annual Scientific Meeting, The College on Problems of Drug Dependence. NIDA Research Monograph 184. NIH Publication No. 04-5492. Bethesda, MD; 2004: 31-33.

75. **Kosten, TR**, Kranzler H. What will we learn from the FDA clinical trials process and what will we still want to know about immunotherapies and depot medications to treat drug dependence. In: Harwood HJ, Myers TG, eds. *New Treatments for Addiction: Behavioral, Ethical, Legal and Social Questions.* Committee on Immunotherapies and Sustained-Release Formulations for Treating Drug Addiction. Washington, DC: The National Academies Press; 2004: 98-124.

76. Stine SM, Greenwald MK, **Kosten TR**. Pharmacologic interventions for opioid addiction. In: Graham AW, Schultz TK, Mayo-Smith M, Ries RK & Wilford BB, eds. *Principles of Addiction Medicine*, Third Edition. Chevy Chase, MD: American Society of Addiction Medicine; 2004: 735-748.

77. Chang G, **Kosten TR**. Detoxification, Section VI, Chapter 35. In: Lowinson JH, Ruiz P, Millman RB, Langrod JG, eds. *Substance Abuse: A Comprehensive Textbook*, Fourth Edition. Philadelphia, PA: Lippincott Williams & Wilkins; 2005: 579-587.

78. O'Brien CP, Anthony JC, Carroll K, Childress AR, Dackis C, Diamond G, Hornik R,  Johnston LD, Jones R, Koob GF, **Kosten T**, Lerman C, McLellan AT, Moss H, Pettinati H, Spoth R. Substance Use Disorders, Part V, Chapters 17-19. In: Evans DL, Foa EB, Gur RE, Hendin H, O'Brien CP, Seligman MEP, Walsh BT, eds. *Treating and Preventing*

Thomas R. Kosten, MD
CV

*Adolescent Mental Health Disorders: What We Know and What We Don't Know.* New York: Oxford University Press; 2005: 335-426.

79. **Kosten TR**. Cocaine and psychostimulants, Chapter 5. In: Kranzler HR, Ciraulo DA, eds.*Clinical Manual of Addiction Psychopharmacology.* Washington, DC: American Psychiatric Publishing Inc.; 2005: 183-209.

80. **Kosten TR**, George T, Kleber HD. The Neurobiology of Substance Dependence: Implications for Treatment. In: Frances R, Miller S, Mack AH (eds.), *Clinical Textbook of Addictive Disorders*, Third Edition. New York: NY: Guilford Publications; 2005: 3-15.

81. McCance EF, **Kosten TR**. Psychopharmacological treatments, Chapter V. In: Frances R, Miller S *eds*. *Clinical Textbook of Addictive Disorders*, Third Edition. New York: NY: Guilford Publications; 2005: 588-614.

82. O'Malley S, **Kosten TR**. Pharmacotherapy of addictive disorders (chapter). In Miller WR & Carroll KM, eds. *Rethinking Substance Abuse: What the Science Shows and What We Should Do About It.* New York: NY: Guilford Press; 2005: 240-256.

83. **Kosten TR**, Sofuoglu M, Weaver MF, Schnoll SH, Pbert LA, Ockene JK. Chapter 16: Stimulants and Related Drugs: Substance-Related Disorders; Part III, In: GO Gabbard, *Treatments of Psychiatric Disorders.* 4th Edition. American Psychiatric Publishing; 2007. 265-269

84. Sofuoglu M, Agath K, **Kosten TR**. Treatment of Stimulant Dependence. Chapter 19. In: Tyrer P, Silk K, (eds). *Cambridge Textbook of Effective Treatments in Psychiatry.* Cambridge University Press. 2008; 369-380.

85. **Kosten TR**, McQueen K. General Approaches to substance and polydrug use disorders, Chapter 51. In: Tasman A, Kay J, Lieberman J, First MB, and Maj M (eds). *Psychiatry*, third edition. John Wiley & Sons, Chichester, UK, 2008. pp 922-935.

86. Gardner T, **Kosten TR**. Treatment, pharmacological approaches to: Buprenorphine. In: *Encyclopedia of Drugs, Alcohol and Addictive Behaviors* 3. 2008 November. ISBN 13: 978-0-0286-6064-6.

87. Dani JA, **Kosten TR**, Benowitz N. Nicotine and Tobacco: Pharmacology. *Principles of Addiction Medicine, 4th edition.* Kosten (Pharmacology editor), Ries, Fiellin, Miller, Saitz, (General Editors), Lippincott Williams & Wilkins, April 2009. ISBN-10: 0-7817-7477-2.

88. Teng E, **Kosten TR**. Anxiety disorders. In: Rakel RE, (ed). *Conn's Current Therapy.* Philadelphia, PA; W.B. Saunders Company; December 2009. ISBN-13: 978-1-4160-6642-2.

1708

Thomas R. Kosten, MD
CV

89. **Kosten TR**, Davis DE. Comorbidity-Depression. In: Koob GF, Le Moal M, Thompson RF (eds) Encyclopedia of Behavioral Neuroscience, June 2010, vol 1, pp308-316 Oxford: Academic Press. ISBN-13: 978-0-0804-4732-2.

90. Dani JA, **Kosten TR**, Benowitz N. Nicotine and Tobacco: Pharmacology. Principles of Addiction Medicine, 5th edition. Kosten (Pharmacology editor), Ries, Fiellin, Miller, Saitz, (General Editors), Lippincott Williams & Wilkins. 2013.

91. Jin L, Shorter D, Domingo C, **Kosten TR**. Stress and Substance Abuse. In: Case Series DSM-V, First Edition. J. Barnhill, Ed (2013).

92. **Kosten TR**, Haile CN. The Neurobiology of Substance Dependence: Implications for Treatment. In: Clinical Textbook of Addictive Disorders, Fourth Edition. 2013. In Press.

93. Stine, SM, **Kosten T R**. Pharmacologic Interventions for Opioid Dependence (Chapter 48). Principles of Addiction Medicine, Fourth Edition.  R, Reis (editor). 2013. In Press.

94. Domingo CB, **Kosten TR**. The Pharmacology of Nicotine and Tobacco. In: A. Herron, ed. The ASAM Essentials of Addiction Medicine, 2nd ed. Lippincot, Williams & Wilkins. 2014.

95. **Kosten, TR**. and Domingo C. (2015).  *General Approaches to Substance Use Disorders, in Psychiatry, 4*$^{th}$ *ed.* (eds A. Tasman, J. Kay, J. A. Lieberman, M. B. First and M. B. Riba), John Wiley & Sons, Ltd, Chichester, UK. doi: 10.1002/9781118753378.ch71

96. Domingo CB, Shorter D, and **Kosten TR**. Vaccines for Treating Cocaine Use Disorders. In: Montoya ID, (eds.), Biologics to Treat Substance Use Disorders. Bethesda, Maryland: Springer International Publishing; 2015. ISBN: 978-3-319-23149-5.

97. **Kosten TR**, Kosten TA. Vaccines for Methamphetamine Use Disorder. In: Montoya ID, (eds.), Biologics to Treat Substance Use Disorders. Bethesda, Maryland: Springer International Publishing; 2015. ISBN: 978-3-319-23149-5.

4. Other works communicating research results to scientific colleagues
   a. Andry, T. N., Shorter, D., & Kosten, T. R. (2016, May 31). Emerging Treatments and Pharmacogenetics for Cocaine Use Disorder. Retrieved from http://www.psychiatrictimes.com/substance-use-disorder/emerging-treatments-and-pharmacogenetics-cocaine-use-disorder?GUID=5F1CDC00-0422-41BF-A817-C5DC23E2BB33&rememberme=1&ts=06062016

1709

Thomas R. Kosten, MD
CV

     b. Smith, A. W., Kosten, T. R., & Fordis, M. (2016, February 16). Medicines to Treat Alcohol Use Disorder: A Review of the Research for Adults. Prepared by the John M. Eisenberg Center for Clinical Decisions and Communications Science at Baylor College of Medicine. Retrieved from http://www.effectivehealthcare.ahrq.gov/search-for-guides-reviews-and-reports/?pageaction=displayproduct&productID=2162.

     c. Achanta, A., Kosten, T. R., & Fordis, M. (2016, February 16). Pharmacotherapy for Adults with Alcohol Use Disorder (AUD) in Outpatient Settings. Prepared by the John M. Eisenberg Center for Clinical Decisions and Communications Science at Baylor College of Medicine.Retrieved from http://www.effectivehealthcare.ahrq.gov/search-for-guides-reviews-and-reports/?pageaction=displayproduct&productID=2161.

5. Other works communicating research results to general public
None

### III. Teaching Information
#### A. Didactic course work
1. Courses taught at current institution:

| | |
|---|---|
| 2013 – present | Neural Systems: Limbic Systems and Emotion<br>Graduate Studies, Department of Neuroscience<br>Annual Lecture Series |
| 2013 – present | Neural Systems: Addictions<br>Graduate Studies, Department of Neuroscience<br>Annual Lecture Series |
| 2006 – present | Substance Addictions<br>1st, 2nd year medical students,<br>Annual Lecture series in Pharmacology, Therapeutics, and Psychopathology |
| 2006 – present | Substance Abuse Treatments<br>2nd & 3rd year Psychiatry residents, Department of Psychiatry<br>Annual Lecture Series |
| 2006 – 2011 | Neuroscience of Addictions<br>Graduate Studies, Department of Neuroscience<br>Annual Lecture Series |

2. Courses taught at other institutions:
None

#### B. Non-didactic teaching
1. Resident training

1710

Thomas R. Kosten, MD
CV

(i) <u>The New Psychopharmacology of Alcohol and Substance Abuse</u>. Menninger Department of Psychiatry Psychopharmacology Update; Nov 2, 2007, The Houstonian Hotel, Houston, TX (Marangell).

(ii) <u>Affective Dysfunction in substance abuse as shown through neuroimaging</u>. Grand Rounds Broadcast presented at Menninger Psychiatry, BCM, September 12, 2007.

(iii) <u>Depression in Addictions: Suicide in Adolescents</u>. Presented at Menninger Spring Conference, Cullen Auditorium, Baylor College of Medicine, March 30, 2007.

(iv) <u>Substance Abuse</u>. Grand Rounds Broadcast presented at Menninger Psychiatry at Baylor College of Medicine, January 10, 2007.

2. Post-Residency training
   a. Buprenorphine DEA Certification Training for Office-based Use of Buprenorphine, Michael E. DeBakey VA Medical Center, Houston, TX.
      (i) April 07, 2016 – 21 participants
      (ii) April 16, 2015 – 21 participants
      (iii) March 04, 2014 – 9 participants
      (iv) January 01, 2011 – 19 participants
      (v) November 06, 2009 – 22 participants
      (vi) Dec 15, 2008 – 21 participants

3. Research Fellow training
   (i) Hongqiang Sun, MD, PhD. NIDA International Fellow Training Award. Associate Professor, Beijing University, Beijing, China. 2012-2013.
   (ii) Coreen Domingo, DrPH, 2010-11, Clinical Trials Pharmacotherapy and Addictions, Asst Professor, Psychiatry, Baylor College of Medicine, Hou, TX.
   (iii) Anthony Brown, M.D., 2007-2011, Clinical Trials, Asst Professor, Family Med, Baylor College of Medicine, Hou, TX.
   (iv) Grace Wu, M.D., 2006-2010, Pharmacotherapy, Assoc Res Scientist, Baylor College of Medicine, Hou, TX.
   (v) Tracie Gardner, PhD., 2006-2008, Clinical Epidemiology, Asst Professor, Baylor College of Medicine, Hou, TX.
   (vi) Avila Steele, Ph.D., 2006, Clinical Epidemiology, Asst Prof, Psych, Baylor College of Medicine, Hou, TX.
   (vii) Rajita Sinha, Ph.D., 2000-2006, Pharmacotherapy, Prof, Yale School of Medicine, New Haven, CT.

4. Addiction Psychiatry Fellow Training
   (i) Xuefeng Zhang, MD, PhD – 2015-ongoing
   (ii) Ashley Xu, MD – 2015-ongoing
   (iii) Tiffany Andry, MD – Oct, 2015-June 2016
   (iv) Jia Wang, MD – Jan-June 2013
   (v) Deidre Davis, MD – 2007-2008
   (vi) H. Florence Kim, MD - Clinical Scientist Training Program, 2007

Thomas R. Kosten, MD
CV

    5. Graduate Student training:
       a. Young Cui: Thesis PhD Thesis Advisory Committee – 2008-2012.
       b. Prachi Shah, MA - Clinical Scientist Training Program in Research – 2007.

**C. Lectures:**
    1. Select International Lectures:

    2007    Research in Psychopharmacology of Substance Abuse, March, 2007. Abu Dhabi, UAE.

    2. Select National Lectures:

    2011    202X Trends and Perspectives – Goals, Governance, Innovation, Immunization Strategy. Global Vaccines 202X: Access, Equity, Ethics. May 1-2, 2011, Philadelphia, PA.

    3. Select Regional Lectures

    2009    Behavior, Biology, and Chemistry, Translational Research in Addiction, UT Health Science Center, School of Medicine, March, 2009. San Antonio, TX.

    4. Select Local Lectures:

    2008    The Neurobiology & Pharmacotherapy of Stimulant Dependence: Resident Lecture Series, St. Luke's Hospital, June 11, 2008, Houston, TX

    2007    Psychopharmacology, Innovations in Pharmacotherapy of Substance Abuse, Baylor College of Medicine, October 31, 2007, Houston, TX.

**D. Visiting Professorships:**

2007    Pharmacotherapy of Substance Abuse: Tulane University Hospital, Feb 9th, New Orleans, LA.

2006    Distinguished Visiting Professor, Pavlov University, St. Petersburg, Russia

1998    Distinguished Visiting Professor, North Shore University Hospital, Einstein Medical  School, New York.

1995    Visiting Professor, University of Athens, Greece, Department of Psychiatry

1993    Distinguished Professor Universidad Complutense de Madrid, Facultad de Medicina, Madrid, Spain.

1994    Visiting Professor, Department of Toxicology, Medical School of Hospital de la Sta. Creu I Sant Pau, Barcelona, Spain.

1991    Visiting Professor, Beijing Medical University and the Chinese National Institute on Drug Dependence.

1991    Visiting Professor, Departments of Medicine and Psychiatry, Addiction Research Foundation, U of Toronto, Canada.

1990    Visiting Professor, Department of Toxicology, Medical School of Hospital de la Sta. Creu I Saint Pau, Barcelona, Spain.

1989    Visiting Professor, Department of Toxicology, Medical School of Hospital de la Sta. Creu I Saint Pau, Barcelona.

1989    Visiting Professor, Department of Medicine, University of Wisconsin Medical

1712

Thomas R. Kosten, MD
CV

School.

1988        Visiting Professor, Medical Division, U.S. Army, European Command, Heidelberg, Germany.

1987        Visiting Research Professor, Department of Medicine, University of Minnesota.

## IV. Medical & Service Information

### A. Patient care responsibilities

1. **Department-wide:** Vice Chair of Research, Baylor College of Medicine, Special Advisor on Addictions, Chief of Staff Office, Michael E. DeBakey VAMC

2. **Section or Specialty**: Director, Division of Alcohol and Addictive Disorders, Department of Psychiatry and Behavioral Science

### B. Clinical laboratory responsibilities: None

### C. National education or voluntary health organization participation:

2005-06: NIH Research training for residency education taskforce

### D. Administrative assignments

1. Department administration, committees, etc.

| | |
|---|---|
| 2007 | Chair, Research Committee, BCM. |
| 2007-11 | Member, Faculty Appointment and Promotions Committee, BCM. |
| 2006 | Member, Executive Committee, Department of Psychiatry, BCM. |
| 2007-11 | Member, Search Committee, Human Neuroimaging Lab, BCM. |
| 1996-06 | Executive Committee, Division of Substance Abuse, Yale Univ. |
| 1996-01 | Executive Committee, Psychiatry. Yale Univ. |
| 1991-97 | PGY 3 Curriculum Committee, Psychiatry. Yale Univ. |
| 1988-95 | Co-chair, Pharmacy and Therapeutics Committee, Connecticut Mental Health Center |
| 1988-95 | Visiting Lecturer Committee, Psychiatry, Yale Univ. |

2. College, School or University administration, committees, etc.

| | |
|---|---|
| 2010- | Member, MD/PhD Faculty Operating Committee, BCM. |
| 2007- | Member, Faculty Research and Fellowship Support Committee, BCM. |
| 2007- | Member, Substance Abuse Assistance Council, BCM. |
| 2004-06: | Co-chair, IRB Committee, Yale |
| 2001-06: | Human Research Committee (IRM) Yale. |
| 1996-01: | Dean's Committee on appointments and promotions for medical and graduate school. |
| 1991-04: | Medical Advisor, Adolescent Substance Abuse Prevention Program. |
| 1991-94: | American Medical Student Association, Yale University. |
| 1991-94: | Liaison Committee on Medical Education, Self-Study. Task Force, Subcommittee on Clinical Training, Medical School |

### E. Other pertinent information not given above:

Thomas R. Kosten, MD
CV

None

# Appendix II

## Background Materials sent to Dr. Thomas Kosten

BACKGROUND MATERIALS FOR THOMAS KOSTEN

Barrett v. USA, US District Court,
Eastern District of Oklahoma Case Nos.
6:04-cr-00115 JHP
6:09-cv-00105 JHP

Federal Defender's Office

January 13, 2017

*These materials were prepared by legal counsel for Kenneth E. Barrett in anticipation of litigation and to facilitate a confidential evaluation by Thomas Kosten. These materials are CONFIDENTIAL and are PRIVILEGED as attorney-client confidential communications and/or attorney work product. They may not be divulged without the written prior consent of counsel for Mr. Barrett.*

Joan M. Fisher
Karl Saddlemire
Tivon Schardl
Federal Defender's Office
801 I Street, Third Floor
Sacramento, California 95814
(916) 498-6666

**Index to Materials Provided on CD**

**Pleadings**
1.  Tenth Circuit Court of Appeals Remand Order Setting an Evidentiary Hearing on Our Ineffective Assistance of Counsel Claim Due to Failure to Investigate and Present Mitigating Evidence, *U.S. v. Barrett*, 797 F.3d 1207, 1223-31 (10th Cir. 2015)
2.  Excerpt from December 4, 2009 Amended 2255 Motion (Social history excerpt from the ineffective assistance of counsel mitigation claim.)

**March 16, 2009 2255 Motion – Exhibits**
3.  Declaration of Ada Blount, Exhibit 74
4.  Declaration of Brandy Hill, Exhibit 77
5.  Declaration of Carl Cook, Exhibit 102
6.  Declaration of Carolyn Joseph, Exhibit 78
7.  Declaration of Doris Barrett, Exhibit 80
8.  Declaration of Ernest Barrett, Exhibit 81
9.  Declaration of Gelene Dotson, Exhibit 97
10. Declaration of Gwen Crawford, Exhibit 83
11. Declaration of Issac Barrett, Exhibit 84
12. Declaration of Janice Sanders, Exhibit 85
13. Declaration of Kathy Trotter, Exhibit 86
14. Declaration of Linda Riley, Exhibit 87
15. Declaration of Mark Dotson, Exhibit 98
16. Declaration of Nona Reich, Exhibit 101
17. Declaration of Phyllis Crawford, Exhibit 91
18. Declaration of Roger Crawford, Exhibit 92
19. Declaration of Ruth Harris, Exhibit 93
20. Declaration of Shawn Hill, Exhibit 95
21. Declaration of Steve Barrett, Exhibit 99
22. Declaration of Travis Crawford, Exhibit 45
23. Declaration of Toby Barrett, Exhibit 96
24. Declaration of Warren Dotson, Exhibit 100

**September 25, 2009 Amended 2255 Motion – Select Exhibits**
25. Declaration of Alvin Hahn, Exhibit 75
26. Declaration of Paul Lunsford, Exhibit 90
27. Declaration of Abby Stites, Exhibit 103

**School Records**
28.  Tommie Spear Junior High School & Jay County High School

**Medical Records**
29. Sequoyah Memorial Hospital
30. Eastern State Hospital
31. Saint Francis Hospital

32. Wagoner Community Hospital
33. Bill Willis Community Mental Health Center
34. Miscellaneous Hospital Records
35. State of Oklahoma Disability Determination Unit

**Additional Documents**
36. 2000 Faust Bianco testing
37. 2002 Psychological Evaluation of Bill Sharp, Ph.D.
38. 2003 Faust Bianco's affidavit
39. 2009 Declaration of Bill Sharp, Ph.D.
40. 2009 Declaration of George Woods, M.D.
41. 2009 Declaration of Myla Young, Ph.D.
42. Raw Data from Dr. Young's testing
43. Rescoring of Dr. Young's testing by Dr. Deborah Miora
44. 2005 Psychological Evaluation / Risk Assessment by Dr. J. Randall Price
45. BOP Records for Kenneth Barrett
46. Direct Opinion in U.S. v. Barrett, 496 F.3d 1079 (2007)

# Appendix III

## Rule 26 Case List

Thomas Richard Kosten, M.D.
Forensic Experience – depositions or court testimony

2013-2017

2013        Taft v. Ettiene; Robers, Carroll, Feldstein & Peirce Inc.; Providence RI
            Civil action; defense; patient death during detoxification from alcohol
2014        Ternes v. New Freedom Center; Flom Law Office PA; Fargo, ND
            Civil action; defense; patient death following residential addiction treatment
2015        Huff v. Freeman; Fox Galvin; St. Louis, MO
            Civil action; defense; patient death from suicide

1720

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## PETITIONER'S PROFFER OF EXPERT TESTIMONY

## FROM THOMAS REIDY, Ph.D

**DECLARATION OF THOMAS J. REIDY, PH.D., ABPP**

I, Thomas J. Reidy, Ph.D., ABPP, hereby declare, under oath, as follows:

1.      Postconviction counsel for Kenneth Barrett requested that I provide expert consultation and analysis pertaining to: (1) Violence risk assessment: State of the science in 2005; (2) Capital jury vulnerability to error: State of the science 2005; (3) Individualized risk assessment of Kenneth Barrett's risk for prison violence related to his 2005 federal trial; (4) and Individualized risk assessment of Kenneth Barrett's risk for prison violence further encompassing his current imprisonment in BOP within the Special Confinement Unit. This information—excepting his incarceration in the federal BOP which post-dated his federal trial—was readily available and accessible in 2005 and if called to testify about issues of "future danger" I would have informed the jury about this science and analysis.

2.      I am a clinical and forensic psychologist licensed and qualified to practice psychology in the states of California, Idaho, and Illinois (inactive). I have personal knowledge of the facts contained in this affidavit and am competent to testify about them. I received a Master's degree in Psychology from DePaul University in 1973, and a Doctorate degree in Clinical Psychology from DePaul University in 1976. For the past 40 years, I have maintained a private practice in clinical and forensic psychology in Monterey and Salinas, California.  My work history is documented on the attached resume.  (Appendix I)

3.      I was Board Certified in Forensic Psychology in 1995 by the American Board of Forensic Psychology, a specialty board of the American Board of Professional Psychology.  Only 325 psychologists in the United States hold this distinction. This

credential is intended to signify the highest levels of expertise in practice in forensic psychology.  Requirements for Board Certification include extensive education, training, submission of work samples, and a rigorous examination process. I have participated in extensive continuing education in the area of forensic psychology and violence risk assessment methods.

4.      I received the first annual Nelson Butters Award from the National Academy of Neuropsychology for research contributions to the field of neuropsychology in 1993.

5.      I have qualified and testified as an expert witness in state and federal courts across the nation concerning various topics in forensic psychology, and specifically, assessment of prison violence risk, particularly in capital cases.

6.      I have published extensively in the leading forensic journals in my field on violence risk assessment for prison in capital cases.  I co-authored 26 articles in peer-reviewed psychology journals, including 18 scientific articles and two book chapters pertaining to the issues of inmate adjustment and the assessment of violence risk assessment for prison within a capital context.

7.      I have served as an *ad hoc* peer reviewer for journal articles submitted to the following publications: *Journal of Personality Assessment*, *Violence and Victims*, and *Justice Quarterly*.

8.      Materials related to Mr. Barrett's case that I reviewed in forming my opinions are attached hereto as Appendix II.

U. S. v. Kenneth Barrett                                                                 3

## APPROACHES TO UNDERSTANDING VIOLENCE RISK OF CAPITAL

## OFFENDERS: STATE OF THE SCIENCE 2005

9.      Analysis of a defendant's past behavior pattern (in a similar setting) and the application of group statistical data are the two approaches that are most reliable in assessing likelihood of violent behavior in a prison context.

10.     Behavior pattern analysis in violence risk assessment at capital sentencing can be a very reliable method for estimating risk assuming that there is sufficient behavior to form a pattern and the context of prediction is sufficiently similar (Morris & Miller, 1985; Cunningham & Reidy, 1998a, 1999, 2002; Cunningham, Reidy, & Sorensen, 2005). This latter similarity of context is particularly important to attend to if the risk assessment is to be accurate. As studies sponsored by the U.S. Justice Department concluded: a community pattern of violence has not been found to be reliably predictive of violence in prison (Alexander & Austin, 1992; National Institute of Corrections, 1992). This same discontinuity between community violence and prison violence has been confirmed in samples of former death row inmates (e.g., Marquart, Ekland-Olson, & Sorensen, 1989, 1994; Marquart & Sorensen, 1989; Reidy, Cunningham, & Sorensen, 2001) and incarcerated murderers (Sorensen & Pilgrim, 2000). Thus consideration of violent behavior by an inmate housed previously in a similar context, namely jail and prison, can be an important indicator of future aggression.

11.     The application of group statistical data has been repeatedly identified as the most reliable method of assessing violence risk in a prison setting. Because of the fundamental differences between the community and prison settings, violent behavior in the community does not reliably predict violent behavior prison. Forensic scientists and

practitioners, using group statistical methods emphasizing scientific data in estimating violence risk assessment, in contrast to clinical/intuitive methods, have a long history as fundamental to reliable violence risk assessments at capital sentencing (see e.g., Cunningham & Reidy, 1998a, 1999, 2001; Hall, 1987; Marquart et al., 1989; Marquart & Sorensen, 1989; Monahan, 1981; Morris & Miller, 1985; Serin & Amos, 1995; Sorensen & Pilgrim, 2000).

12.     Group statistical data forms the foundation for all violence risk methods and is typically described in terms of the base rate (i.e., frequency of a specific type of violence in a particular group, over a set period of time, and in a specific context). Use of base rates in a relevant group is the single most reliable method for assessing violence risk in the community or in prison (see e.g., Monahan, 1981, 1996; Cunningham & Reidy, 1998a; Harer & Langan, 2001).

13.     In order to scientifically address the question of the likelihood that Mr. Barrett will seriously assault a staff member or another inmate during a capital life term, knowledge and application of the relevant group statistical data are essential. There is no *individualized* assessment of a particular person that does not rest on group data of one sort or another (Cunningham & Reidy, 1998a, 2002).

14.     All scientifically derived (as distinct from personal or experiential) expert knowledge in psychology and psychiatry consists of published observations and research on various groups of individuals, e.g., capital offenders. Scientific evaluation, treatment, or behavioral prediction regarding a specific person relies on these group observations and research data from a specified context rather than unstructured and scientifically inadequate clinical opinion (Cunningham & Reidy, 1998a, 2002).

15.     As consistent results are obtained from research on multiple groups that share a particular characteristic (e.g., capital murder conviction), the individualized application of group scientific data becomes more reliable when applied to the individual.

16.     Group statistical methods have been widely cited as superior to clinical methods in predicting the behavior of individuals (Dawes, Faust, & Meehl, 1989; Grove, Zald, Lebow, Snitz, Nelson, 2000; Meehl, 1954; Monahan, 1981, 1996; Showalter & Bonnie, 1984; Tonry, 1987).

17.     There was a substantial conceptual and research database describing acceptable methods of violence risk assessment available in 2005, the time of Mr. Barrett's federal trial. Some thirty-nine years ago Saleem Shah (1978) wrote what is now considered a seminal article on the assessment of dangerousness and common pitfalls in a forensic context. Faulty methods of risk assessment in capital sentencing associated with unsystematic methods frequently employed by clinicians in their decision-making have been further criticized over the subsequent years (e.g., Ewing, 1983; Monahan, 1981, 1996; Morris & Miller, 1985; Dawes et al., 1989). Also, Serin and Barbaree (1993) reported the unacceptably high false-positive error rate in estimates of future violence with uncritical reliance on simplistic factors. A series of papers published in 1998 were critical of unreliable approaches to violence risk assessment at capital sentencing, and described how scientifically sound methodologies and data could be brought to bear in this testimony (Cunningham & Reidy, 1998a, 1998b). Subsequent research through 2005 has substantially validated and expanded this body of knowledge (e.g., Cunningham & Reidy, 2001; Edens, Petrila, & Buffington-Vollum, 2001; Sorensen & Pilgrim, 2000).

**Importance of Context in Assessing Prison vs. Community Violence**

18.     Context is critically important to understanding violence in a prison setting. A frequently heard proclamation by prosecutors at trials is that "past behavior is the best predictor of future behavior" while citing all manner of community misconduct. However, such statements are only partially correct. The context of prison is fundamentally different than free society. Prison aggression, however, is not solely the function of the individual inmate. Rather, the likelihood of violence involves the interaction of individuals with their environment at a certain time, place and setting and in response to situational factors.

a.     Many of the factors that increase the risk of substance dependence, criminality, and violence in the community are not replicated in prison, are negated by prison security and restrictions, and/or are not predictive of violence in prison.

b.     Although intuitively attractive to lay jurors, perpetrator characteristics such as impulsivity and lack of remorse, manipulative behavior, criminal lifestyle, and/or aberrant personality characteristics are not predictive of serious violence in prison (see e.g., Cunningham & Reidy, 1998a,b & 1999; Edens et al., 2001; Marquart, Ekland-Olsen, & Sorensen, 1989).

**Correlates of prison violence**

19.     Only a small number of factors actually serve to increase or decrease the risk of violence relative to the known base rates of violence (i.e., prevalence of a particular type of violence, over a set period of time, and in a specific context). These correlates of prison violence began emerging in the 1980's with large-scale studies of violent behavior among capital offenders and other related inmate groups (e.g., Marquart

& Sorensen, 1989; Marquart et al, 1989). This research greatly accelerated over the subsequent decade (e.g., Cunningham, Reidy, & Sorensen, 2005a,b; Reidy, Cunningham, & Sorensen, 2001; Edens et al., 2001, 2005; Harer & Langan, 2001).

20.     Large scale group studies of prison violence have routinely demonstrated:

a.     Correlates of prison violence are often counter-intuitive. Predictors considered as "common sense" factors are not reliably predictive of serious prison violence. These factors could include being a convicted murderer or multiple murders, exhibiting antisocial personality features, and serving a life-without-parole sentence (Cunningham & Reidy, 1998a, 1998b, 1999; Edens et al., 2001).

b.     Most capital offenders do not engage in serious prison violence and are not more likely than other high-security inmates to be involved in prison violence (Cunningham et al, 2005a, b; Edens et al., 2005; Marquart et al., 1989; Marquart & Sorensen, 1994; Sorensen & Wrinkle, 1996; Sorensen & Pilgrim, 2000; Reidy et al., 2001).

c.     Rates of serious violence resulting in death or serious injury within prison are quite low, despite a large proportion of prison inmates with significant criminal histories and convictions for felonies. Any factor such as felonious criminal conduct that is pervasively present in a prison inmate population will fail to predict a rare event, with a low base rate, such as serious violence.

d.     Moreover, prison violence does not reliably follow from community behavior (Harer, 1992; Reidy et al., 2001). Studies sponsored by the U.S. Department of Justice (Alexander & Austin, 1992; National Institute of Corrections, 1992) concluded that past community violence is not strongly or consistently associated with prison

violence; current offense and prior convictions are only weakly associated with prison

misconduct; severity of offense is not a good predictor of prison adjustment. Behavioral

continuity from community to prison is neither simple nor intuitively discernible,

depending on the type, recency, and pattern of community criminality. This

determination was true prior to 2005 and has been replicated more recently (Reidy,

Sorensen, & Cunningham, 2012).

> e.      Homicide as the offense of conviction in particular is not a reliable

indicator of prison misconduct or violence (Marquart et al., 1989). Prevalence rates

among capital offenders committing in-prison homicide have varied from 0.002 (one-

fifth of one percent) to 0.01 (one percent) (Cunningham et al., 2005; Edens et al., 2001;

Marquart et al., 1989, 1994; Sorensen & Pilgrim, 2000; Sorensen & Wrinkle, 1996).

> f.      Evidence relating to the violence-potential of death-sentenced inmates was

first gauged over fifty years ago by examining the behavior of those who had been

released from death row through commutation, retrial, or other remedy. This body of

research dates back decades and covers a variety of jurisdiction, but its consistent finding

is that former death row inmates commit serious and violent rule violations at a much

lower rate than the general prisoner population into which they are released (Marquart et

al., 1989, 1994; Sorensen & Wrinkle, 1996). Studies of "violence-predicted" former

death-sentenced inmates found them to have cumulative rates of serious assault (not

prison homicide) below 10% over the course of several years (Edens et al, 2005;

Marquart et al., 1989).

> g.      Antisocial personality disorder (APD) and related traits of impulsivity,

manipulation, lack of empathy, deceptiveness, and lack of remorse, are not predictive of

serious violence in prison (Cunningham & Reidy, 1998b; 2002; Edens et al., 2001; Edens et al., 1999, 2004). Cunningham and Reidy (1998b, 1999) estimated that 75% of inmates in prison meet criteria for APD. The interaction of this high prevalence rate with the low base rate of serious prison violence explains why using APD and related traits do not predict serious violence in a prison setting. Any trait or characteristic that is present in the majority of people in a particular setting will not predict a highly infrequent behavior such as serious assaultive behavior.

h.       Age is <u>inversely</u> related to prison misconduct of all types, including violence, in virtually every study conducted (e.g., Cunningham & Reidy, 1998a,b; Flanagan, 1989, 1995; Hirshi & Gottfredson, 1989; Marquart et al., 1989; Sorensen & Wrinkle, 1996). Research has shown that younger inmates commit most prison infractions, but misconduct and violence rapidly decline as inmates reach their late 20's and 30's. No matter the age when a prisoner enters prison, the rates of violence fall over the course of a capital term. The following graph entitled *Dangerous Rule Violations by LWOP Inmates Decreases with Age* shows results of a federal study that I co-authored in 2008 (Cunningham, Reidy, & Sorensen, 2008) based on federal data from 1991 to 2005. The results clearly detail the declining nature of serious infractions with age no matter the age when an LWOP offender enters federal prison.

U. S. v. Kenneth Barrett                                                          10



i.      Components of the capital offense are not reliably predictive of prison

violence (Marquart & Sorensen, 1989; Marquart et al., 1989; Reidy et al., 2001). Cooper

and Werner (1990) demonstrated that federal Bureau of Prisons psychologists and prison

professionals exhibited extremely low levels of predictive accuracy when emphasizing

current offense, offense severity, and history of violence—none of which were

significantly correlated with actual inmate violence during the first six months of federal

confinement.

j.      The probability of prison violence will vary depending on the type of

violence forecasted. Studies of prison infractions consistently demonstrated that the

prevalence and frequency of violence-related misconduct is inversely related to severity.

For example, a study of 39 former death sentenced inmates in Indiana (Reidy, et al.,

2001) revealed that the prevalence rates (percent of inmates involved) decreased

dramatically depending on the level of harm involved. Consistent with prior research

only a small minority of former death sentenced inmates committed a serious assaultive

offense after sentence commutation. None of these assaults resulted in life threatening

injuries and the greater majority of these assaults were minor in nature. A striking finding

in this study is the low rates of assault, especially serious assaults by a group of inmates

predicted by capital juries to be so violent as to warrant a death sentence. More

specifically, after entering the general prison population, these former death row inmates

committed violent acts at an annual rate of 2.8 per 100 inmates.

### Behavior of Former Death Sentenced Inmates:

21.     Although the conditions of confinement in the SCU are more restrictive

than general population, the available literature is informative about future conduct

should Mr. Barrett be released to the general population of the BOP. Results from studies

in multiple states show that death-sentenced inmates present equivalent, and often lower

rates of serious and violent prison misconduct, relative to other inmates sentenced to life

or a term of years serving time under similar conditions of confinement.

a.      For example, John Edens and colleagues (2005) examined the behavior of

155 inmates sentenced to death after state-sponsored psychiatrists or psychologists

testified that the defendants would pose a "future danger" to society. The retrospective

review of records extended to 2002, including a subsample of 48 who had received relief

from their death sentences and spent an average of nearly 21 years in prison, with the

majority of their tenures being served in the general prison population. Contrary to expert

opinions, only 4.2% of the "violence-predicted" former death-sentenced inmates

committed serious assaults (those resulting in injury requiring more than first aid

treatment) during their combined time on death row and the general prison population.

Six additional studies of former death row inmates since 1907 variously spanning 2 to 53 years of follow-up interval revealed equal (two studies) or lower prevalence (% inmates; four studies) and rates of violence compared to controls.

b.      Perhaps the strongest evidence to date that death-sentenced inmates could safely be managed under less restrictive conditions of confinement comes from Missouri, the only jurisdiction to have fully "mainstreamed" its death-sentenced population (Lombardi, Sluder, & Wallace, 1997). As a result of a consent decree, Missouri Department of Corrections (MDOC) began integrating Capital Punishment (CP) inmates into the general inmate population of Potosi Correctional Center (PCC), a maximum security prison. Since then, all CP inmates in PCC have been eligible for the same programming, activities, and housing as general population inmates. They share cells, meals, recreation, work details, and are subject to the same incentives and sanctions. Other than their sentence, CP inmates in Missouri are subjected to equivalent conditions of confinement, allowing for one of the best "natural" experiments to test the possible influence of their predispositions or sentences on behavior while incarcerated. Three studies with this population (1996, 2005, 2016), including the recent 25 year follow-up investigation (Cunningham, Reidy, Sorensen, 2016), have consistently concluded that CP inmates have committed violent rule infractions at lower or equivalent rates compared with LWOP inmates and both groups were far better behaved and significantly less violent than controls consisting of non-capital murderers.

c.      Another important study examined the behavior of 80 capital offenders in Arizona who obtained relief from their death sentences during 1975 through 2005 (Sorensen & Cunningham, 2009) and averaged 13 years in general population. The study

found that 16.3% of the former death-sentenced inmates committed a serious assaultive

violation while incarcerated in the general prison population during an average time

served of 13.1 years. Only 3.8% (3 of the 80) committed an assault resulting in great

bodily injury or death. Available comparison data showed that maximum custody general

population inmates (N = 2,545 average daily population) committed staff assaults at an

annual rate of 37.6 per 1000 during 2003 through 2008, a rate three times higher than that

of 12.4 per 1000 for staff assaults exhibited by the group of former death-sentenced

inmates while serving time under similar conditions of confinement. Moreover, a death

sentence alone does not indicate whether an inmate presents such a risk. The strongest

correlate of disciplinary misconduct generally and of violence specifically is age (Steiner

*et. al.*, 2014); the correlation however is inverse, and as age increases the risk of

misconduct and of violence decreases. In this Arizona study most relevant to the Barrett

case, age was also found to correlate inversely with violent disciplinary misconduct. Two

other factors were associated with violent misconduct in the general population after

release from death row: prior behavior and time served on death row. Overall, three risk

factors (High Risk being under the age of 25, having served less than 5 years on death

row, and having committed an assaultive violation while on death row) increase the

likelihood that a death row inmate will commit future acts of misconduct and violence in

the prison setting. Low Risk death-sentenced inmates lacked these risk factors –

specifically, having served more than five years on death row, no prior assaultive

behavior on death row, and over the age of 45 – are less likely to commit future

misconduct and violence in a general prison setting. Indeed, Mr. Barrett falls well within

these Low Risk criteria. The following table derived from AZ DOC demonstrates the

rates of serious and assaultive disciplinary infractions by High, Medium, and Low risk groups.

### Rate/100 of Violent Rule Infractions among Former Arizona Death Row Inmates

| Risk Level | Dangerous Violations | Assaultive Violations | Assaults with Serious Injuries |
|---|---|---|---|
| Low | 6.3 | 1.8 | 0.0 |
| Medium | 13.6 | 6.4 | 0.0 |
| High | 23.0 | 5.3 | 1.5 |
| Base Rate | 14.7 | 4.8 | 0.5 |

**Summary: State of the Science in 2005**

22.     The use of group statistical approaches had emerged as the most reliable basis of violence risk assessment at the time of Mr. Barrett's trial in 2005. Numerous authors have discussed this methodology in peer-reviewed publications (Monahan, 1981, 1996; Morris & Miller, 1985; Hall, 1987; Serin & Amos, 1995; Cunningham & Reidy, 1998a, 1999; Cunningham et al., 2005a,b; Edens et al., 2001; Reidy et al., 2001). Studies prior to 2005 produced highly consistent data regarding the low violence rate of capital offenders regardless of victim or weapon features of the murder, the decades of follow-up, the particular prison setting, and the sentence of the convicted capital murderer.  In other words, none of these individual case variables influenced the rate of prison violence for the broad category of murderers sentenced to multiple years of confinement. Similarly, group statistical data from over two decades of research up to 2005 point to

capital offenders, especially older ones serving a life-without parole sentence, as posing

far less of an assault risk than inmates serving shorter sentences and are certainly not a

disproportionate risk for violence. Because these correlates of violence in prison are often

counter-intuitive and the methodology of violence risk assessment largely unknown to

lay jurors, educating the jury about reliable assessments of "probability of criminal acts

of violence" is necessary for reasoned decision-making.

### CAPITAL JURY VULNERABILITY TO ERROR PRIOR TO 2005

23.     Scientific studies published before Mr. Barrett's 2005 trial reliably

demonstrated that capital juries are prone to significantly over-predict the future violence

of capital offenders. Such alarming error rates are influenced by juror susceptibility to

seriously flawed intuitive risk methodologies and clinical approaches. Illusory

correlations—that is, an intuitive but scientifically incorrect belief that capital inmates

would be exceptionally prone to violence based on such factors as the heinousness of the

capital offense and knowledge of other aggravating factors—are unrelated to actual

correlates of prison violence (Cunningham & Reidy, 1998a, b; Cunningham & Reidy,

1999).

24.     Capital jurors are likely to be uninformed about the conceptual and

research literature regarding prison violence risk and violence risk assessments of capital

offenders unless assisted by expert testimony. For example, a capital jury is not likely to

know about the actual rates of prison violence, and the role of inmate characteristics,

criminal histories, prison confinement options, and security procedures on inmate

behavior. They have difficulty incorporating all of the available data and tend to

emphasize variables that are most memorable or most consistent with personal bias,

resulting in faulty weighting. The conceptual and research literature may have significant implications to the trier of fact both in avoiding misconceptions and error, and in approaching the capital sentencing risk assessment task with a greater degree of scientific understanding. In the absence of this knowledge, the jury is quite vulnerable to making faulty assumptions and conclusions regarding violence risk.

25.     The predictive accuracy of capital jurors prior to 2005 has been specifically examined in two studies. (1) Marquart et al. (1989) reported over a 15-year period that only 5% of the violence predicted capital inmates had committed serious assault in prison, which reflected a 95% error rate, but when jurors rejected future violence, the prevalence of serious assaults was exceedingly low at 7.5%. (2) Marquart et al. (1994) using a Texas sample of 421 capital offenders sentenced to death (1974-1988) discovered predictive error rates between 90% or 99.6% depending on the type of violence forecasted. These studies have uniformly demonstrated that the prevalence of serious assaultive behavior in prison is less than 10% among violence predicted capital offenders. Assaults with life threatening injury are even less prevalent (1-2%). Such low base rates of serious violence make it nearly difficult, if not impossible, to predict which inmates are prone to engage in such behavior.

26.     Jury outcome findings related to serious prison violence extend to future homicide. Marquart et al. (1989) point out that of 90 inmates having served an average of 6.3 years in the prison population following release from death row, the annual rate is 1.8 per 1000 inmates. These death row releases, compared to other groups, were not more violent or predatory, or a disproportionate risk to other inmates and prison staff. Similarly, Sorensen and Pilgrim (2000) reported the yearly rate of in-prison homicide by

murderers was determined to be 2 per 1000 or less. Moreover, this rate remained constant when capital murderers sentenced to death were mixed with those serving life without parole in the same general population (Sorensen & Wrinkle, 1996).

27.     The vulnerability of jurors to making errors in violence risk assessment when uninformed by scientific methodology and data was known at the time of Mr. Barrett's penalty trial in 2005 (Shah, 1978; Marquart et al., 1989; Morris & Miller, 1985; Dawes et al., 1989; Serin & Barbaree, 1993; Sorensen & Wrinkle, 1996). Subsequent to Mr. Barrett's trial, Cunningham and Reidy (1999) also cautioned that predictions of future violence are subject to multiple faulty conceptual strategies when such predictions are made from uninformed assessments. These authors identified common errors made by mental health professionals in conducting violence risk assessments in capital sentencing and noted that many of these errors had been described in scientific articles well before 2005.

28.     Capital Jury Project studies funded by the National Science Foundation have determined that jurors find "future danger" a compelling argument for imposing a death sentence (Blume, Garvey & Johnson, 2001; Costanzo & Costanzo, 1994). Research with actual capital jurors and mock jurors has clearly demonstrated that these jurors are prone to make erroneous inferences regarding future violence risk based on illusory correlations that are without predictive validity in assessing actual risk of prison violence (Cunningham & Reidy, 1998a, b; Cunningham & Reidy, 1999). Such errors can include factors as viciousness of the offense, perceived personality pathology, and lack of remorse (Cunningham & Reidy, 1998b; Garvey 1998; Marquart & Sorensen, 1989; Sundby, 1998).

### KENNETH BARRETT: VIOLENCE RISK ASSESSMENT BASED ON SCIENCE AND METHODS AVAILABLE IN 2005

29.     If I had been called to individualize Mr. Barrett's specific risks for "future danger"—better understood as the probability that the defendant would commit future acts of criminal violence—I would have testified consistent with the general state of the science offered in the above sections that are particularized to Mr. Barrett in the following discussion.

30.      Individual factors combined with group statistical approaches have been the most reliable method for conducting a risk assessment (Monahan, 1981; Morris & Miller, 1985; Hall, 1987; Smith, 1993; Serin & Amos, 1995; Cunningham & Reidy, 1998a, 1999). With these two approaches in mind (i.e., past pattern in confinement and group statistical data), there were a number of factors that could have been analyzed regarding Mr. Barrett's likelihood of adjusting to a capital life term in the federal Bureau of Prisons (BOP) without serious violence in 2005. These factors each reflect characteristics for particularizing the assessment to Mr. Barrett. Again, these address either a mitigating factor and/or illuminate the risk-implication of factors intuitively employed by the jury and/or inferred in the State's arguments. These perspectives are specified below.

**Individual Violence Risk Factors for Kenneth Barrett:**

a)     *Age*: Mr. Barrett was 44-years-old (DOB 6/29/61) at the time of the sentencing phase in 2005 and is currently age 55 yrs, 7 months.  Every study of prison violence finds that age at entrance to prison, and progressive aging over a prison term, have consistently been identified as the most powerful predictors of prison disciplinary

infractions and adjustment. Studies show that as inmates age through a life term the general and violent misconduct rates become progressively lower in both state and federal prisons (see for example Cunningham & Reidy, 1998; Cunningham, Reidy, & Sorensen, 2005; Hirschi & Gottfredson, 1989) and assaultive misconduct (Sorensen & Pilgrim, 2000; Reidy, Cunningham, & Sorensen, 2001). Thus, holding other factors constant, Mr. Barrett, at age 44, had a far lower risk of violence in prison than inmates in their 20's or 30's. This low risk was expected to further decrease as Mr. Barrett continued to age across a capital life term.

   b)      *Correctional behavior in the Federal Bureau of Prisons 2006 to date:*

Indeed, while incarcerated in the federal Bureau of Prisons on the SCU for nearly 11 years Mr. Barrett committed eight non-violent infractions involving 6 incidents. All of these violations were minor[1] and no violent behavior of any kind was reported. The following chart shows the percentage of death-sentenced cases involved in serious/violent disciplinary infractions (total sample is 67 inmates) from 1997 to 2016.

---

[1] BOP infractions are categorized with four levels: 100, 200, 300, 400 representing degrees of seriousness. Mr. Barrett compiled 7 infractions within the 300 level for insolence and disobeying orders, and one 208 level infraction for painting walls and cell doors and for painting over a security camera lens.





| | SERIOUS ASSAULT | MINOR ASSAULT |
|---|---|---|
| ■SCU | 10.4 | 31.3 |
| ■Barrett | 0 | 0 |

c)      When comparing Mr. Barrett's disciplinary record in BOP for the years

2009 to 2014 when he was in the SCU, the pattern of results is similar to the expanded

years in the preceding graph.



U. S. v. Kenneth Barrett                                                                          21

d)      This minimal disciplinary history reflected a pattern of generally

cooperative and nonviolent adjustment to incarceration, and pointed to a continuing

nonviolent prison adjustment in the future. Progress reports regarding Mr. Barrett's work

performance during incarceration emphasized his satisfactory to mostly exceptional work

ethic and cooperative behavior. This correctional appraisal is critically important as an

indication of positive behavior adjustment in a context of confinement apart from his

actions in the free community.

e)      *Pre-trial behavior in Oklahoma county jails & Oklahoma DOC:* Since Mr.

Barrett's 1999 arrest, he was in pretrial custody or Oklahoma prison confinement for a

total of 6 years until sentencing on December 19, 2005 on the federal charges (i.e., BOP

Sentence Monitoring Computation data, as of 7-27-15). Specific disciplinary records of

Mr. Barrett's behavior in pretrial or prison confinement were not available to me prior to

the deadline date for this report. However, the testimony from the transcript of the

penalty phase and accompanying exhibits altogether lack any serious violence

disciplinary infractions during that entire time frame for Mr. Barrett. The prosecution

would surely have introduced such incidents at trial if they existed. As evidence of

"future danger" the government introduced jail incidents purportedly indicative of his

potential for prison violence.

      i.   Throwing a potato at the groin of a deputy

      ii.  Involvement in a fracas

      iii. Possession of contraband razors, pens, and threats for going
through his belongings

      iv.  Dropping a food tray in protest and threats to guard

v.   Engaging in sexual activity with two female inmates with

guard acquiescence.

f)      There is no scientific evidence to show that such behavior as listed above

is predictive of serious prison violence. In fact, upwards of 90% inmates commit

infractions in prison but violence rates are extraordinarily low. The jury rightly rejected a

unanimous finding of future dangerousness at the penalty phase of Mr. Barrett's federal

capital murder trial.

g)      *Length of Sentence:* If Mr. Barrett received a sentence of life-without-

parole (LWOP) in the penalty phase of his capital trial in 2006, a substantial body of

research available up to that time revealed that only a minority of capital offenders

serving an (LWOP) is disciplined for serious prison violence. These studies demonstrate

that LWOP offenders are not a disproportionate risk to other inmates whether convicted

capital murderers housed on death row or in the general prison population as a result of a

life sentence at trial or relief from their death sentences. For example, Marquart et al.,

1989 reported on a sample of 107 Texas inmates sentenced to capital life terms after their

juries had rejected the Texas capital sentencing "special issue." Averaging over seven

years in prison, only 12% of these inmates had been disciplined for violent misconduct.

Marquart and Sorensen (1989) reported that among commuted capital offenders the study

found a cumulative prevalence of serious assaults to be 8.6% among 453 commuted

capital murderers over a 16-year follow up period. Similarly Sorensen and Wrinkle

(1996) examined assaultive rates of life sentenced capital murderers  showing they

committed violent rule infractions, including murder/manslaughter, attempted murder,

forcible sexual assault, major assault, and minor assault, at a rate of 6 per 100 inmates

annually. Other studies of inmates receiving relief from death sentences in this era had comparable rates of assaults (Cunningham & Reidy, 1998a; Bedau 1964).

h)      *Prison gang membership:* Prison gangs are associated with a substantial proportion of inmate assaultive misconduct (DeLisi, Berg, & Hochstetler, 2004; Ralph & Marquart, 1992; Sorensen & Pilgrim, 2000). Mr. Barrett has never been involved with street or prison gangs. The absence of gang involvement significantly reduces his risk of violent disciplinary infractions.

i)      *Community violence:* Mr. Barrett has an alleged history of domestic violence with his former wife resulting in multiple protective orders. The penalty phase transcript also notes several witnesses describing "bad acts" in the community over many years that the prosecution alleges are indicative of future danger in prison.

i.   Slowly approaching a checkpoint and driving away followed by a high-speed chase. The prosecutor in this case did not file Assault with a Dangerous Weapon charge.

ii.  Being pulled over for a warrant—later shown to be invalid—but when allowed to drive his car home, he ultimately escaped. Upon returning to his home, he stood in the doorway with a handgun as a reserve deputy reached a locked gate outside; after the reserve deputy called for back up, Mr. Barrett eluded law enforcement. No threats were made and shots were not fired. Mr. Barrett later turned himself in of his own accord.

     iii.  Holding a shotgun to the leg of a female and threatening her when she refused sex with him.

     iv.  As a teenager in custody, Mr. Barrett refused to get off the phone and resisted a deputy who punched him. The deputy had "fractures in the bones of [his] hands" from the incident; Mr. Barrett sustained injuries to his nose, jaw, and collarbone.

     v.  Allegedly made a threat relating to an informant who had supplied information for the 1999 search warrant on his residence. A jail snitch—later shown to be the very informant in question—overheard a phone conversation between Mr. Barrett and an unknown person containing this alleged threat.

j)      While these above incidents, if true, might prove predictive of community maladjustment, no scientific data exists to support the above listed behaviors as being predictive of future prison violence as the context of community violence is far different that the context of confinement. Violence does not reliably follow from community behavior due multiple factors, including differences in context, security features, and other institutional factors (Alexander & Austin, 1992; Harer, 1992; Reidy et al., 2001; Reidy et al., 2012). Again, the jury was right to reject a unanimous finding of future dangerousness based on the incidents alleged, for they altogether lack any scientific foundation.

k)        **Group Base Rate Data applicable to Kenneth Barrett:**

l)        *Group base rate individualizing factors* can be specified in forecasting Mr. Barrett's likelihood of serious violence. I have reviewed scholarly literature and correctional statistics relevant to violence risk assessment at capital sentencing prior to and including 2005. Data from Oregon and other state and federal correctional agencies were a part of this review. Such correctional data is relevant in demonstrating the relationship (or lack of relationship) between commonly asserted predictive factors and actual prison violence. Such data and sources reasonably relied upon by clinical and forensic psychologists, as well as criminal justice scholars, in coming to conclusions on relevant issues in criminology.

m)        *Convicted capital murderer:* Multiple group statistical studies dating back decades (see Cunningham & Reidy, 1998a) indicate that the majority of individuals convicted of capital murder are not cited for violent misconduct in prison. These studies represent national and state samples tracking the frequency of serious violence in the general prison population by inmates convicted of murder, including former death row inmates. Some studies follow murderers sentenced to life-without-parole (LWOP) and/or life-with-parole (LWP). A number of rationales support generalizing from these studies to capital offenders in other correctional settings, including the Federal Bureau of Prisons.

n)        *Former death row inmate status:* Compared to risk factors identified for former death row inmates released from Arizona death row 1975-2005 (Cunningham & Sorensen, 2009) Mr. Barrett falls in the low risk category, that is, having served more than five years on death row, no prior assaultive behavior on death row, and over the age

of 45. Inmates in this category like Mr. Barrett are less likely to commit future misconduct and violence in a general prison setting. Indeed, Mr. Barrett falls well within these Low Risk criteria.

o)      *Preventive measures:* The assessment of risk is not simply a static enterprise.  It also involves consideration of what preventive measures can be undertaken that would modify or reduce the level of violence risk posed by a particular inmate (Serin & Amos, 1995). Accordingly, Heilbrun (1997) identified two broad forensically relevant models of violence risk assessment (a) accurately forecasting the probability of violence, and (b) managing risk to reduce violence incidence. Heilbrun et al. (2000) described the importance of linking violence risk assessment results to intervention planning. In a prison setting, violence risk reduction interventions include medication or treatment for psychological disorders, application of disciplinary contingencies, rehabilitation programming, isolation from co-defendants or fellow gang members, special management provisions, or modified confinement.  Should Federal BOP determine that Mr. Barrett is disproportionately likely to perpetrate serious institutional violence or otherwise pose a risk to inmates or staff, mechanisms are available to confine him under heightened security procedures such as single-celling, application of restraints with any movement, solitary or small group recreation, and other security measures. Under such conditions any opportunity to engage in serious violence is substantially negated.

p)      ***Conclusion***: Scientific data demonstrate that identifying the small percentage of capital offenders that engage in serious prison violence is an extremely unreliable process prone to unacceptable high errors in prediction. Studies consistently demonstrate that serious prison violence is a low base rate event—that is, it occurs

infrequently. As the severity of the forecasted violence increases, the probability of that act dramatically decreases. The more severe the projected prison violence, the increasingly improbable is its occurrence. When violence risk estimates substantially deviate from or ignore these base rates, significant errors in prediction occur. Hence, it is only the assessments of the varying degrees of improbability of prison violence among these offenders that are reliable. Particularizing factors applicable to Mr. Barrett point to him having a risk of prison violence that is below the known base rates of capital, life-sentenced, and/or high-security/general population inmate groups. Based on the above scientifically sound methodology and group statistical data, Kenneth Barrett represents a low risk for future violence if confined to the Bureau of Prisons for a term of life-without-parole. Any competent expert could have presented this information and had I been called, I would have done so.

31. *Institutional misconduct among death sentenced inmates under less restrictive conditions of confinement.* The super-maximum security conditions under which most death-sentenced prisoners are currently housed are not universal. Both historically and in the present day, death-sentenced inmates have been housed in far less restrictive custody than is typical today. These historic and contemporary experiments have found that death-sentenced inmates as a class do not present an especial risk of violence or other serious misconduct in comparison with other inmate populations. Results show that death-sentenced inmates present equivalent, and often lower rates of serious and violent prison misconduct, relative to other inmates. Perhaps the strongest evidence to date that death-sentenced inmates could safely be managed under less restrictive conditions of confinement comes from Missouri, the only jurisdiction to have

fully "mainstreamed" its death-sentenced population (Lombardi, Sluder, & Wallace, 1997). It did so in January 1991, fully integrating the "capital punishment" (CP) inmates into the general inmate population of Potosi Correctional Center, a high security facility. Since then, all CP inmates in PCC have been eligible for the same programming, activities, and housing as general population inmates. They share cells, meals, recreation, work details, and are subject to the same incentives and sanctions. Other than their sentence, CP inmates in Missouri are subjected to equivalent conditions of confinement, allowing for one of the best "natural" experiments to test the possible influence of their predispositions or sentences on behavior while incarcerated. I co-authored one of the most comprehensive studies of this innovative housing arrangement which included the time era 1991 through 2002, and thereby restricted the sample to all 149 "mainstreamed" CP inmates and comparison groups of all 1,054 LWOP inmates, and 2,199 other term-sentenced (TS) inmates who had been transferred to PCC for disciplinary reasons (Cunningham, Reidy, & Sorensen, 2005). Results showed that the annual rate of violent institutional misconduct among CP inmates was similar to LWOP inmates (7.6 and 9.6 per 100 annually), and significantly lower than other TS prisoners housed in PCC, whose rate of violent infractions was 42.5 per 100 annually. Controlling for other relevant variables the LWOP inmates were shown to be about half as likely to commit a violent rule violation in comparison to TS inmates (Cunningham, Reidy, & Sorensen, 2005). In summary, the mainstreaming of capital punishment inmates has not increased the level of threat to the institution from violence committed by death-sentenced inmates and, in fact, the CP inmates presented the lowest level of violent threat to PCC staff and inmates in comparison to the LWOP and TS inmates. A 25 year follow-up published in 2016

revealed similar findings showing that that both death sentenced and life sentenced inmates did not represent a disproportionate risk for violence and were significantly less disruptive than term-sentenced inmates.

32.     *Applicability of study findings to Mr. Barrett:* I have reviewed Mr. Barrett's BOP prison file, including his disciplinary history. He is 55 years at the time of this report and was sentenced to death eleven years ago. His disciplinary record is minimal and includes no discipline for assaultive or violent behavior. These factors and the findings outlined above suggest that if death row inmates were held under less restrictive conditions of confinement, Mr. Barrett's likelihood of committing acts of misconduct and violence would be well below the base rate for the entire cohort of current death row inmates. These factors also suggest that Mr. Barrett would have a low likelihood of committing serious or violent rule infractions relative to the general prison population.

33.     I was available to consult with defense counsel and to testify at the time of Mr. Barrett's federal trial. Had I been called as a witness, I would have testified consistent with the foregoing.

34.     I am being paid $300 per hour for my work on this case. My contract caps my compensation at $29,500 without further approval of the Federal Defender.

I hereby declare that the above statement is true to the best of my knowledge and belief, and that I understand it is made for use as evidence in court and is subject to penalty for perjury.

Signed at Monterey, California, on March 2, 2017.

U. S. v. Kenneth Barrett                                                        30



_____

**Thomas J. Reidy**, Ph.D., ABPP

Board Certified in Forensic Psychology

American Board of Professional Psychology

## References

Alexander, J. & Austin, J. (1992). *Handbook for evaluating objective prison classification systems.* San Francisco: National Council on Crime and Delinquency.

Bedau, H. A. (1964). Death sentences in New Jersey, 1907-1960. *Rutgers Law Review, 19,* 1-64.

Blume, J. H., Garvey, S. P., & Johnson, S. L. (2001). Future dangerousness in capital cases: Always "at issue." *Cornell Law Review, 86,* 387-399.

Cooper, R. & Werner, P. (1990). Predicting violence in newly admitted inmates. *Criminal Justice and Behavior, 17,* 431-477.

Cunningham, M. D., & Reidy, T. J. (1998a). Antisocial personality disorder and psychopathy: Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations. Behavioral Sciences & the Law, 16, 331-351.

Cunningham, M. D., & Reidy, T. J. (1998b). Integrating base rate data in violence risk assessments at capital sentencing. Behavioral Sciences & the Law, 16, 71-95.

Cunningham, M. D. & Reidy, T. J. (1999). Don't confuse me with the facts: Common errors in violence risk assessment at capital sentencing. Criminal Justice and Behavior, 26, 20-43.

Cunningham, M. D. & Reidy, T. J. (2001). A matter of life and death: Special considerations and heightened practice standards in capital sentencing evaluations. Behavioral Sciences & the Law, 19, 473-490.

Cunningham, M. D. & Reidy, T .J. (2002).  Violence risk assessment at federal capital

    sentencing:  Individualization, generalization, relevance, and scientific

    standards.  Criminal Justice and Behavior, 29, 512-537.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2005a). Is death row obsolete? A

    decade of mainstreaming death-sentenced inmates in Missouri. Behavioral

    Sciences & the Law, 23, 307-320.

Cunningham, M. D., Sorensen, J. R., & Reidy, T. J. (2005b). An actuarial model for

    assessment of prison violence risk among maximum security inmates.

    Assessment, 12, 40-49.

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2008). Assertions of "future

    dangerousness" at federal capital sentencing: Rates and correlates of subsequent

    prison misconduct and violence. *Law and Human Behavior*, *32,* 46-63. doi:

    10.1007/s10979-007-9107-7

Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2016). Wasted resources and

    gratuitous suffering: The failure of a security rationale for death row. *Psychology,*

    *Public Policy and Law, 22,* 185-199. doi:10.1037/law0000072

Dawes, R. M., Faust, D., & Meehl, P. E. (1989).  Clinical versus actuarial judgment.

    *Science, 243,* 1668-1674.

DeLisi, M., Berg, M. T., & Hochstetler, A. (2004) Gang members, career criminals and

    prison violence: Further specification of the importation model of inmate

    behavior, *Criminal Justice Studies, 17*, 369-383.

Edens, J. F. (2001). Misuses of the Hare psychopathy checklist-revised in court. *Journal*

    *of Interpersonal Violence, 16*, 1082-1093.

Edens, J.F., Desforges, D., Fernandez, K., & Palac, C. (2004). Effects of psychopathy and violence risk testimony on mock juror perceptions of dangerousness in a capital murder trial. *Psychology, Crime & Law*, *10,* 393-412.

Edens, J. F., Poythress, N. G., & Lilienfeld, S. O. (1999). Identifying inmates at risk for disciplinary infractions: A comparison of two measures of psychopathy. *Behavioral Sciences and the Law*, *17*, 435-443.

Edens, J. F., Buffington-Vollum, J. K., Keilen, A., Ruskamp, P., and Anthony, C. (2005). Predictions of future dangerousness in capital murder trials: Is it time to "disinvent the wheel." *Law and Human Behavior, 29,* 55-86.

Edens, J.F., Desforges, D., Fernandez, K., & Palac, C. (2004). Effects of psychopathy and violence risk testimony on mock juror perceptions of dangerousness in a capital murder trial. *Psychology, Crime & Law*, *10,* 393-412.

Edens, J.F., Petrila, J., & Buffington-Vollum, J.K. (2001). Psychopathy and the death penalty: Can the Psychopathy Checklist-Revised identify offenders who represent "a continuing threat to society?" *Journal of Psychiatry and Law, 29,* 433-481.

continuing threat to society?" *Journal of Psychiatry and Law*, *29*, 433-481.

Ewing, C. P. (1983). "Dr. Death" and the case for an ethical ban on psychiatric and psychological predictions of dangerousness in capital sentencing proceedings. *American Journal of Law & Medicine, 8,* 408-428.

Flanagan, T. J. (1980) Time served and institutional misconduct: Patterns of involvement in disciplinary infractions among long-term and short-term inmates. *Journal of Criminal Justice, 8,* 357-367.

Flanagan, T. J. (1995) (Ed.). *Long term imprisonment: Policy, science, and correctional practice*. Thousand Oaks, CA: Sage Publications.

Garvey, S. P. (1998). Aggravation and mitigation in capital cases: What do jurors think? *Columbia Law Review, 98,* 1538-1576.

Grove, W., Zald, D. Lebow, B. Snitz, B., Nelson, C. (2000). Clinical versus mechanical prediction: A meta-analysis. *Psychological Assessment, 12,* 19-30.

Guy, L.S., Edens, J., Anthony, C., & Douglas, J. (2005). Does psychopathy predict institutional misconduct among adults? A meta-analytic investigation. *Journal of Consulting and Clinical psychology, 73*, 1056-1064.

Hall, H. V., (1987). *Violence prediction: Guidelines for the forensic practitioner*. Springfield. Il: Charles C. Thomas.

Harer, M. (1992). Assaults on BOP staff and inmates: Where and when they occur. *Research Forum, 2,* 1-19.

Harer, M. D., & Langan, N. P. (2001). Gender differences in predictors of prison violence: Assessing the predictive validity of a risk classification system. *Crime & Delinquency, 47,* 513-536.

Heilbrun, K. (1997). Prediction versus management models relevant to risk assessment: The importance of legal decision-making context. *Law and Human Behavior, 21,* 347-359.

Heilbrun, K., O'Neill, M. L., Strohman, L. K., Bowman, Q., & Philipson, J. (2000). Expert approaches to communicating violence risk. *Law and Human Behavior, 24,* 137-148.

Hirschi, T., & Gottfredson, M. (1989). Age and the explanation of crime. *American Journal of Sociology, 89,* 552-584.

Lombardi, G., Sluder, R., & Wallace, D. (1997). Mainstreaming capital punishment inmates: The Missouri experience and its legal significance, *Federal Probation, 61,* 3-11.

Marquart, J. W., & Sorensen, J. R. (1989).  A national study of the Furman-commuted inmates: Assessing the threat to society from capital offenders. Loyola of Los Angeles Law Review, 23, 5-28.

Marquart, J.W., Ekland-Olson, S., & Sorensen, J. R. (1989). Gazing Into the crystal ball: Can jurors accurately predict dangerousness in capital cases? Law & Society Review, 23, 449-468.

Marquart, J.W., Ekland-Olson, S., & Sorensen, J.R. (1994).  *The rope, the chair, & the needle:  Capital punishment in Texas, 1923-1990.*  Austin:  University of Texas Press.

Meehl, P. E. (1954). *Clinical versus statistical prediction.* Minneapolis: University of Minnesota Press.

Monahan, J. (1981). *Predicting violent behavior: An assessment of clinical techniques.* Beverly Hills, CA: Sage.

Monahan, J. (1996). Violence prediction: The past twenty years. *Criminal Justice and Behavior, 23,* 107-120.

Morris, N., & Miller, M. (1985). Predictions of dangerousness.  *Crime and justice: An annual review of  research,* In  M. Tonry & N. Morris (Eds.) (Vol. 6).  Chicago: University of Chicago Press, 1-50.

National Institute of Corrections (1992). *Jail classification system development: A review of the literature* (rev. ed.). Washington, DC: U.S. Department of Justice, National Institute of Corrections.

Ralph, P. H., & Marquart, J. W. (1991). Gang violence in Texas prisons. *The Prison Journal, 71,* 38-49.

Reidy, T. J., Cunningham, M. D., & Sorensen, J. R. (2001). From death to life: Prison behavior of former death row inmates in Indiana. Criminal Justice and Behavior, 28, 62-82.

Reidy, T. J., Sorensen, J. R., & Cunningham, M. D. (2012). Community violence to prison assault: A test of the behavior continuity hypothesis. *Law and Human Behavior, 36*, 356-363. doi:10.1037/h0093934

Serin, R. C. & Amos, N. L. (1995).  The role of psychopathy in the assessment of dangerousness.  *International Journal of Law and Psychiatry, 18,* 231-238.

Serin, R. C., & Barbaree, H. E. (1993). Decision issues in risk assessment. *Forum on Corrections Research, 5,* 22-25.

Shah, S. (1978).  Dangerousness: A paradigm for exploring some issues in law and psychology. *American Psychologist, 33,* 224-238.

Showalter, C. & Bonnie, R. (1984). Psychiatrists in capital sentencing: Risk and responsibilities in a unique legal setting.  *Bulletin of the American Academy of Psychiatry and Law, 12,* 159-167.

Sorensen, J. R., & Cunningham, M. D. (2009). Once a killer always a killer? Prison misconduct of former capital punishment inmates in Arizona. *Journal of Psychiatry and Law*, *37* (2-3), 237-267.

Sorensen, J. R. & Pilgrim, R. L. (2000).  An actuarial risk assessment of violence posed

by capital murder defendants. *Journal of Criminal Law & Criminology, 90*, 1251-

1270.

Sorensen, J. R., & Wrinkle, R. D. (1996). No hope for parole: Disciplinary infractions

among capital punishment and life-without-parole inmates. *Criminal Justice and

Behavior, 23,* 542-552.

Steiner, B., Butler, H. D., & Ellison, J. M. (2014). Causes and correlates of prison inmate

misconduct: A systematic review of the evidence.  *Journal of Criminal Justice,

42,* 462-470. doi: 10.1016/j.jcrimjus.2014.08.001

Sundby, S. (1998). The capital jury and absolution: The intersection of trial strategy,

remorse, and the death penalty. *Cornell Law Review, 83,* 1557-1598.

# Appendix I


## Curriculum Vitae of Dr. Thomas Reidy

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

## Contact Information

| | |
|---|---|
| Address: | 20 Deer Stalker Path, CA  93940 |
| Telephone: | (831) 757-6673 |

## Education

Undergraduate: 1968 BS Biology, Fairfield University, Fairfield, CT

Graduate: 1973 MA Clinical Psychology, DePaul University, Chicago, IL

1976 Ph.D. Clinical Psychology, DePaul University, Chicago, IL

Certification: Board Certified (Forensic), American Board of Professional Psychology, 1995

## Professional Experience

1972-1973: Internship - Singer Mental Health Center & Rockford Memorial Hospital, Rockford, IL

1974-1975: DePaul University Mental Health Center Fellowship

1974-1975: Consultant to House of Good Shepherd for delinquent adolescents

1975-1977: Staff Psychologist - Rehabilitation Institute of Chicago, Evaluation & treatment of brain-injured & physically handicapped adults & children

1977-1980: Community Hospital of the Monterey Peninsula, Staff Psychologist:  Evaluation & treatment of inpatients & outpatients exhibiting a variety of psychological, neuropsychological, & medical diagnoses

1980: Monterey County Office of Education, Consultant to AB Ingham School:  Behavior management of brain damaged and developmentally delayed students

1980-1981: Western Pulmonary Services, Consulting Psychologist

1980-1981: Community Hospital of the Monterey Peninsula Substance Abuse Program, Consulting Psychologist:  Psychological & neuropsychological assessment & treatment

1990-92: Steinbeck Chemical Dependency Treatment Program, Community Hospital of Salinas, Consulting Psychologist

1

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

1985-1994:    US Army, Fort Ord, CA, Consultant

- *Department of Psychology*

- *Trial Counsel (Prosecution)*

- *Defense Counsel*

2007-Present:  US Air Force, Staff Judge Advocate –Forensic Consultant

- *Trial Counsel (Prosecution)*

- *Defense Counsel*

- *Consultations for violence risk, sex offender behavior, child pornography, child physical and sexual abuse, alcohol abuse, dependence & blackouts*

1980-Present:   Independent Practice

- *Forensic psychological assessment of juveniles & adults*

- *Court appointed expert forensic psychologist for Monterey, Santa Cruz & San Benito Counties:*

  - Violence risk assessment

  - Sex offender risk assessment

  - Child sexual abuse and child pornography

  - Mental health factors for sentencing evaluations

  - Competence for trial

  - Criminal responsibility

- *Expert forensic psychologist: Federal and state capital homicide cases*:

  - Violence risk assessment

  - Developmental risk assessment

2

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

1995-Present:   Law Enforcement Psychological Services, Inc.

- *Psychological screening of police & public safety applicants*

2006-2010    South Bay Regional Public Safety Training Consortium

- *Instructor, Background Investigators Course*

2006-Present   Monterey County Sheriff's Office & Soledad Police Dept.

- *Post Shooting Fitness for Duty Evaluations*

## Professional Recognition

1993 *Nelson Butters Research Award*
Presented by the National Academy of Neuropsychology for research contributions to the field of Clinical Neuropsychology

Journal Peer Reviewer: Justice Quarterly, Journal of Personality Assessment, Violence & Victims

## Licensure and Board Certification

California State Psychology License PSY 5575

Idaho State Psychology License PSY 203011

Illinois State Psychology License 0071-002109 (Inactive)

Board Certified 1995 in Forensic Psychology, American Board of Professional Psychology

## Professional Memberships

Fellow of the American Academy of Forensic Psychology

American Psychological Association

- *Law & Psychology Division*

International Association for Correctional & Forensic Psychology

## Community and Teaching Activities

- Forensic psychology lectures at Monterey College of Law

3

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

- Continuing Education for Attorneys: National Legal Aid Association
- Invited Address, California Public Defenders Association, 1995

- Invited Address: Monterey County Public Defenders 2005

- Invited Address, Monterey County Sheriff's Department, 1997 & 1998

- Invited Address, California County Counsel's Association, 1997

- Invited Address, Santa Cruz County Sexual Assault Investigators, 2000

- Invited Address, Monterey County Family Law Attorneys, 2005

- Instructor-Background Investigator's Course: South Bay Regional Public Safety Training Consortium, 2006-11

- Invited Continuing Education Lecture: *What the Forensic Neuropsychologist Needs to Know about Death Penalty Litigation*. American College of Professional Neuropsychology, Las Vegas, NV, 2010

- Invited Address: Nevada Bar Association Annual Meeting, *Born to be Bad? Developmental Pathways to Resilience or Deviance*, Monterey, CA, June 2010

- Invited Continuing Education Lecture: *What the Forensic Neuropsychologist Needs to Know About Death Penalty Litigation: Research, Ethics, and Professional Issues,* National Academy of Neuropsychology, Vancouver, BC, Canada, October 2010

- Invited Address: Staff Judge Advocate Office. *Causes and Correlates: Violence, Domestic Violence, and Stalking*, Tyndall Air Force Base, FL, December, 2011

- Invited Address: *Mass murderers: Mental status of suicide bombers and rampage shooters*. Monterey Institute of International Studies- A Graduate School of Middlebury College. September 11, 2014

- Invited Address: Supermax prison: A clean version of hell for terrorists. Monterey Institute of International Studies- A Graduate School of Middlebury College. March 31, 2015

## Conference Presentations

*Reidy, T., & Tracy, R. (1974, May)*
**The effects of neonatal illness and separation from mothers on subsequent maternal attentiveness.**

4

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Paper presented at the Midwest Psychological Association Annual Convention, Chicago, IL.

*Reidy, T., & Lamb, W. (1976, April)*
**S.O.A.P. System:  A proposed model of parent education.**
Paper presented at the American Personnel and Guidance Association National Convention, Chicago, IL.

*Reidy, T. (1976, April)*
**Child abuse:  A problem in the schools.**
Paper presented at the American Personnel and Guidance Association National Convention, Chicago, IL.

*Reidy, T., McLean, I., & Toerge, J. (1976, November)*
**Motivational factors for selecting the specialty of Physical Medicine and Rehabilitation.**
Paper presented at the American Congress of Rehabilitation Medicine, San Diego, CA.

*Reidy, T. (1977, November)*
**A case study of appropriate eating behavior in a rehabilitation setting.**
Paper presented at the American Congress of Rehabilitation Medicine, San Diego, CA.

*Reidy, T. (1977, May)*
**Accountability in the delivery of psychological services in a pediatric hospital setting.**
Paper presented at the Association for the Care of Children in Hospitals, Detroit, MI.

*Reidy, T. (1978, April)*
**Establishing a behavioral treatment approach in a rehabilitation setting.**
Paper presented at the Western Psychological Association, San Francisco, CA

*Reidy, T. (1979, May)*
**Psychological Child Abuse.**
Paper presented at the Western Psychological Association, San Diego, CA.

*Reidy, T. (1983, June)*
**Forensic applications of psychological principles.**
Paper presented at DePaul University, Department of Psychology and La Rabida Children's Hospital, Chicago, IL.

*Carstens, C., & Reidy, T. (1985, February)*
**Behavior problems discussed in pediatric settings:  Do researchers study the problems pediatricians confront?**

5

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Paper presented at the American Psychological Association Annual Convention, San Francisco, CA.

*Reidy, T., Silver, R., & Carlson, A. (1987, August)*
**Child custody decisions:  A survey of judges.**
Paper presented at the American Psychological Association Annual Convention, New York, NY.

*Reidy, T., Bowler, R.M., Pedroza, G.I., & Rauch, S.S. (1988, August)*
**Neuropsychological sequelae of pesticide exposure.**
Paper presented at the American Psychological Association Annual Convention, Atlanta, GA.

*Rauch, S.S., Bowler, R.M., Reidy, T., & Pedroza, G.I. (1989)*
**Neuropsychological symptoms one year following neurotoxic exposure and after award of compensation.**
Proceedings of the 8th Annual Meeting of the National Academy of Neuropsychology, 4, 152-153.

*Reidy, T. (1989)*
**Reaction time slowing after solvent exposure.**
Paper presented at the American Psychological Association Annual Convention, New Orleans, LA.

*Reidy, T., & Bolter, J. (1990, November)*
**Neuropsychological toxicology of Methylene Diphenyl Diisocyanate.**
Paper presented at the Annual Meeting of the National Academy of Neuropsychology, Reno, NV.

*Reidy, T., & Bolter, J. (1991, August)*
**Long-term outcome after exposure to Methylene Diphenyl Diisocyanate.**
Paper presented at the American Psychological Association Annual Convention, San Francisco, CA.

*Reidy, T. (1997, August)*
**Legal issues in police and public safety fitness for duty evaluations.**
Paper presented at the American Psychological Association Annual Convention, San Francisco, CA

*Reidy, T., Sorensen, J., & Davidson, M. (2015, March)*
**Predictive validity of the PAI for institutional misconduct.**
Poster session, American Psychological-Law Society Conference, San Diego, CA

## Peer Reviewed Professional Publications 1977 - 2016

*Reidy, T. (1977)*
**The aggressive characteristics of abused and neglected children.**

6

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Journal of Clinical Psychology, 33 (40), 1140-1145.

*Reidy, T. (1979)*
**Teaching appropriate eating behavior in a rehabilitation setting:  Case study.**
Archives of Physical Medicine, 60, 226-230.

*Reidy, T., Cotler, S., Tracy, R., & Anderegg, T. (1980)*
**Child abuse and neglect:  Cognitive, social and behavioral correlates.**
In J. Money and G.J. Williams (Eds.), Traumatic Abuse and Neglect of Children at Home.  Baltimore, MD:  John Hopkins University Press.

*Reidy, T., Silver, R., & Carlson, A. (1989)*
**Child custody decisions:  A survey of judges.**
Family Law Quarterly, 23 (1), 75-87.

*Reidy, T., & Carstens, C. (1990)*
**Stability of the Millon Adolescent Personality Inventory.**
Journal of Personality Assessment, 55, 692-697.

*Reidy, T., Bowler, R.M., Rauch, S.S., & Pedroza, G.I. (1992)*
**Pesticide exposure and neuropsychological impairment in migrant farm workers.**
Archives of Clinical Neuropsychology, 7, 85-95.

*Reidy, T., & Hochstadt, N. (1993)*
**Attribution of blame in incest cases:  A comparison of mental health professionals.**
Child Abuse and Neglect, 17, 371-381.

*Reidy, T., Bolter, J., & Cone, J. (1994)*
**Neuropsychological sequelae of methyl bromide:  A case study.**
Brain Injury, 8 (1), 83-93.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Integration of base rate data in violence risk assessment at capital sentencing.**
Behavioral Sciences and the Law, 16, 71-95.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Antisocial personality disorder and psychopathy:  Diagnostic dilemmas in classifying patterns of antisocial behavior in sentencing evaluations.**
Behavioral Sciences and the Law, 16, 333-351.

*Cunningham, M. D., & Reidy, T. J. (1998)*
**Antisocial personality disorder versus psychopathy as diagnostic tools.**

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

Prosecutors Brief, California District Attorneys Association, Vol. XX, No. 4, 9-11.

*Cunningham, M. D., & Reidy, T. (1999)*
**Don't confuse me with the facts:  Common errors in violence risk assessment at capital sentencing.**
Criminal Justice and Behavior, 26, 20-43.

*Reidy, T.J., Cunningham, M. D., & Sorensen, J. R. (2001)*
**From death to life:  Prison behavior of former death row inmates in Indiana.**
Criminal Justice and Behavior, 28, 62-82.

*Cunningham, M.D., & Reidy, T. J.* (2001). **A matter of life or death: Special considerations and heightened practice standards in capital sentencing evaluations.**
Behavioral Sciences and the Law, 19, 473-490.

*Cunningham, M. D., & Reidy, T. J. (2002)*
**Violence risk Assessment in federal capital sentencing: individualization, generalization, relevance and scientific standards.**
Criminal Justice and Behavior, 29, 512-537.

*Cunningham, M. D., Sorensen, J. R. & Reidy, T. J., (2004)*
**Revisiting future dangerousness revisited: Response to DeLisi and Munoz (2003).**
Criminal Justice Policy Review, 15, 365-376.

*Cunningham, M. D., Sorensen, J. R. & Reidy, T. J., (2005)*
**An actuarial model for assessment of prison violence.**
Assessment, 12, 40-49.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R.  (2005)*
**Is death row obsolete: A decade of mainstreaming death-sentenced inmates in Missouri.**
Behavioral Sciences and the Law, 22, 1-14.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R.  (2008)*
**Assertions of "future dangerousness" at federal capital sentencing: Rates and correlates of subsequent prison misconduct and violence.**
Law and Human Behavior, 32, 46-63.

*Cunningham, M.D., Sorensen, J.R., & Reidy, T.J. (2009)*
**Capital jury decision-making: The limitations of predictions of future violence.**
Psychology, Public Policy and Law, 15, 223-256.

8

# THOMAS J. REIDY, Ph.D., ABPP

*Curriculum Vitae*

*Reidy, T.J., Sorensen, J.R., & Cunningham, M.D.* (2012). **Community violence to prison assault: A test of the behavioral continuity hypothesis** Law and Human Behavior, 36, 356-363.

*Reidy, T.J., Sorensen, J.R., & Cunningham, M.D.* (2013) **Probability of Acts of future violence: A test of jury accuracy in Oregon.** Behavioral Sciences and the Law, 32, 286-305.

*Reidy, T., Sorensen, J., & Davidson, M. (2016)* **Testing the Predictive Validity of the Personality Assessment Inventory (PAI) in Relation to Inmate Misconduct and Violence** Psychological Assessment, 28, 871-884.

*Davidson, M., Sorensen, J. R., & Reidy, T. J. (2016)* **Gender responsiveness in corrections: Estimating female inmate misconduct using the Personality Assessment Inventory (PAI)** Law and Human Behavior, 40, 72-81.

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (2016)* **Wasted Resources and Gratuitous Suffering: The Failure of a Security Rationale for Death Row** Psychology, Public Policy, and Law, 22, 185-199.

*Reidy, T. J., & Sorensen, J. R* (In Press) **Prison Homicides: A Multidimensional Comparison of Perpetrators and Victims** Journal of Forensic Psychology Research and Practice

*Sorensen, J. R., & Reidy, T. J. (in press)* **Incapacitation and life without parole.** In Bohm, R. M., & Lee, G. M. (eds.). Routledge Handbook on Capital Punishment. New York: Taylor & Francis

*Cunningham, M. D., Reidy, T. J., & Sorensen, J. R. (in press)* **The failure of a security rationale for death row.** In Acker, J. R., & Toch, H. (eds.). Living on death row

Reidy, T. J., Sorensen, J. R., & Bonner, H. S. (In Review). **Prison homicide: An extension of violent criminal careers?** Violence & Victims

Sorensen, J. R., & Reidy, T. J. (In Review) **Nothing to lose? An Examination of Serious and Assaultive Prison Misconduct among Life-Without-Parole Inmates** Journal of Interpersonal Violence

9

# Appendix II

## Background Materials sent to Dr. Thomas Reidy

# BACKGROUND MATERIALS FOR THOMAS REIDY

Barrett v. USA, US District Court,
Eastern District of Oklahoma Case Nos.
6:04-cr-00115 JHP
6:09-cv-00105 JHP

Federal Defender's Office

January 13, 2017

*These materials were prepared by legal counsel for Kenneth E. Barrett in anticipation of litigation and to facilitate a confidential evaluation by Thomas Reidy. These materials are CONFIDENTIAL and are PRIVILEGED as attorney-client confidential communications and/or attorney work product. They may not be divulged without the written prior consent of counsel for Mr. Barrett.*

Joan M. Fisher
Karl Saddlemire
Tivon Schardl
Federal Defender's Office
801 I Street, Third Floor
Sacramento, California 95814
(916) 498-6666

**Index to Materials Provided on CD**

**Pleadings**
1. Tenth Circuit Court of Appeals Remand Order Setting an Evidentiary Hearing on Our Ineffective Assistance of Counsel Claim Due to Failure to Investigate and Present Mitigating Evidence, *U.S. v. Barrett*, 797 F.3d 1207, 1223-31 (10th Cir. 2015)
2. Excerpt from December 4, 2009 Amended 2255 Motion (Social history excerpt from the ineffective assistance of counsel mitigation claim.)

**March 16, 2009 2255 Motion – Exhibits**
3. Declaration of Ada Blount, Exhibit 74
4. Declaration of Brandy Hill, Exhibit 77
5. Declaration of Carl Cook, Exhibit 102
6. Declaration of Carolyn Joseph, Exhibit 78
7. Declaration of Doris Barrett, Exhibit 80
8. Declaration of Ernest Barrett, Exhibit 81
9. Declaration of Gelene Dotson, Exhibit 97
10. Declaration of Gwen Crawford, Exhibit 83
11. Declaration of Issac Barrett, Exhibit 84
12. Declaration of Janice Sanders, Exhibit 85
13. Declaration of Kathy Trotter, Exhibit 86
14. Declaration of Linda Riley, Exhibit 87
15. Declaration of Mark Dotson, Exhibit 98
16. Declaration of Nona Reich, Exhibit 101
17. Declaration of Phyllis Crawford, Exhibit 91
18. Declaration of Roger Crawford, Exhibit 92
19. Declaration of Ruth Harris, Exhibit 93
20. Declaration of Shawn Hill, Exhibit 95
21. Declaration of Steve Barrett, Exhibit 99
22. Declaration of Travis Crawford, Exhibit 45
23. Declaration of Toby Barrett, Exhibit 96
24. Declaration of Warren Dotson, Exhibit 100

**September 25, 2009 Amended 2255 Motion – Select Exhibits**
25. Declaration of Alvin Hahn, Exhibit 75
26. Declaration of Paul Lunsford, Exhibit 90
27. Declaration of Abby Stites, 103

**School Records**
28.  Tommie Spear Junior High School & Jay County High School

**Medical Records**
29. Sequoyah Memorial Hospital

30. Eastern State Hospital
31. Saint Francis Hospital
32. Wagoner Community Hospital
33. Bill Willis Community Mental Health Center
34. Miscellaneous Hospital Records
35. State of Oklahoma Disability Determination Unit


**Additional Documents**

36. 2000 Faust Bianco testing
37. 2002 Psychological Evaluation of Bill Sharp, Ph.D.
38. 2003 Faust Bianco's affidavit
39. 2003 Psychological Evaluation – Risk Assessment of Jeanne Russell, Ph.D.
40. 2005 Risk Assessment of Jeanne Russell, Ph.D.
41. 2005 Psychological Evaluation / Risk Assessment by Dr. J. Randall Price
42. 2009 Declaration of Bill Sharp, Ph.D.
43. 2009 Declaration of George Woods, M.D.
44. 2009 Declaration of Myla Young, Ph.D.
45. Raw Data from Dr. Young's testing
46. BOP Records for Kenneth Barrett
47. Penalty Phase transcript (Vols. 22-27), Defense exhibits 240-249; Abby Barrett exhibits

# Appendix III

## Rule 26 Case List

Dr. Thomas Reidy - State and Federal Capital Trial Testimony 2012-17

1) Vincent Guarino, AZ, CR2010-120027-001
2) Gary Watland, Federal, 1:11-CR-00038 JLK,
3) Dayton Rogers, OR, CR-8800355,
4) McDonnell, Michael, OR, 08C24379
5) Joshua Turnidge, OR, O8C51758
6) Robert Langley, OR, 88C21624
7) Corey King, CA MA043389
8) Donald Fell, Federal, 5:01-CR-00012
9) Martin Johnson, OR, 06C16178
10) Robert Blurton, MO, 09BE-CR00405
11) Jeffrey Compton, OR, 03C10543
12) David Taylor, OR, 201216842
13) Eric Running, OR, 05C10295

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,                )
                                       )
              Petitioner/Defendant,    )
                                       )
vs.                                    )        Case No. 09-CIV-105-JHP
                                       )
UNITED STATES OF AMERICA,              )
                                       )
              Respondent/Plaintiff.    )

**ORDER**

The purpose of this Order is to advise counsel that this Court is bifurcating the upcoming evidentiary hearing. Clearly established Federal law requires Petitioner to show that his trial counsel's performance was both deficient and caused actual prejudice. *Strickland v. Washington*, 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). While the Court in *Strickland* discussed the performance component of the ineffectiveness claim first, the Court made clear a reviewing court can address these two issues in any order and need not "address both components of the inquiry if the defendant makes an insufficient showing on one." *Strickland*, 466 U.S. at 697, 104 S.Ct. at 2069. *See also*, *Foster v. Ward*, 182 F.3d 1177, 1184 (10th Cir. 1999) ("court may address the performance and prejudice components in any order, but need not address both if [petitioner] fails to make a sufficient showing of one.") No court has ever required that both prongs of the *Strickland* test must be examined simultaneously. *LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998).

Since, "the proper standard for attorney performance is that of reasonably effective assistance," *id*., 466 U.S. at 687, 104 S.Ct. at 2064, this Court finds Petitioner will be

required to prove that his counsel's performance was deficient before this Court will entertain evidence regarding prejudice. As a result, counsel are advised the only evidence which will be heard by this Court in the upcoming hearing scheduled for March 13, 2017, will be "whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health." Any evidence relating to prejudice will not be considered by this Court until this issue has been determined.

It is so ordered on this 3rd day of March, 2017.

James H. Payne
United States District Judge
Eastern District of Oklahoma

2

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO BARRETT'S MOTION TO
SUPPLEMENT HIS RESPONSE TO PARTIAL SUMMARY JUDGMENT**

**COMES NOW** the United States of America, by and through undersigned counsel and

respectfully submits this response in opposition to Barrett's motion to supplement his response to

a motion for partial summary judgment (Doc. 374).

**PROCEDURAL HISTORY**

On appeal from the denial of relief under 28 U.S.C. § 2255, the Tenth Circuit Court of

Appeals remanded this case for an evidentiary hearing to determine whether Barrett's trial

attorneys, Roger Hilfiger and Bret Smith, ineffectively failed to investigate and present evidence

about the defendant's background and mental health. *United States v. Barrett*, 797 F.3d 1207,

1232 (10th Cir. 2015). Based on the disclosure of "trial counsel's files" and the alleged

provenance of those documents, the government moved for summary judgment with regard to

the supposed ineffectiveness of counsel in the investigation and presentation of evidence. Doc.

347. Barrett filed an opposition (Doc. 366), and the government replied (Doc. 372). Barrett

filed the instant motion to supplement (Doc. 374) immediately before this Court ordered a sur-

1

reply regarding Barrett's position on the government's statement of facts (Doc 375).  The instant opposition addresses only the motion to supplement.

## ARGUMENT

### THE COURT SHOULD DENY THE REQUEST TO SUPPLEMENT THE OPPOSITION TO SUMMARY JUDGMENT WITH IRRELEVANT ASSERTIONS

The government moved for partial summary judgment based on recent disclosures about the documents available to trial counsel.  Among the documents was an affidavit authored by Faust Bianco, who indicated that he had performed neuropsychological testing on the defendant and determined he did not suffer from brain damage.  The government argued that the affidavit would have justified a reasonable attorney in ceasing investigation of that line of potential mitigation.  In his motion to supplement, Barrett seeks to dispute the reliability of Bianco's findings.  Doc. 374.  The accuracy of Bianco's findings are not legally assured.  Because counsel could properly rely on the opinion of an expert, the extant correctness of his findings should not impact any assessment of counsel's actions.

As the government argued in its motion for partial summary judgment, "reasonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).  Counsel are generally entitled to rely on the opinions of mental health experts.  *Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002); *see also Bell v. Thompson*, 545 U.S. 794, 809-10 (2005) (suggesting defendant "would have faced an uphill battle" to convince a court the mental health investigation should have continued despite an expert opinion defendant was not mentally ill).  Indeed, counsel may justifiably rely on an expert, though a better strategy becomes available in hindsight.  *Stokley v. Ryan*, 659 F.3d 802, 814 (9th Cir. 2011); *see also Earp v. Cullen*, 623 F.3d 1065, 1077 (9th Cir.

2010) (holding defendants have no constitutional right to the effective assistance of experts); *Hamilton v. Workman*, 217 Fed. Appx. 805, 809-10 (10th Cir. 2007) (agreeing with an analysis that observed that the "Constitution does not entitle a criminal defendant to the effective assistance of an expert witness").

In this case, Echols possessed an affidavit from Bianco that would have justified reasonable counsel in foregoing further investigation of brain damage. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005); *Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002). Had Echols transmitted Bianco's affidavit to Messrs. Smith and Hilfiger, they also would have been justified in forgoing an investigation of brain damage. The fact that subsequent experts have contradicted Bianco's findings is not a fact of any consequence in the assessment of trial counsel's actions. *See Stokley*, 659 F.3d at 814; *Earp*, 623 F.3d at 1075-77 (holding, inter alia, "We cannot fault trial counsel for failing to further investigate potential mitigating evidence of organic brain damage when the thorough defense investigation, that explicitly pursued the possibility of organic brain damage, uncovered no helpful information.").

Given the irrelevance of the newly proffered opinion on brain damage, this Court should disregard it and deny the motion to supplement.

3

1779

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to deny and dismiss

Barrett's request to supplement his opposition to the government's motion for partial summary

judgment.

Dated: March 3, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

1780

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on March 3, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

1781

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:879937@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Supplement
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 3/3/2017 at 2:08 PM CST and filed on 3/3/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09−cv−00105−JHP |
| **Filer:** | |
| **Document Number:** | 381(No document attached) |

**Docket Text:**

**MINUTE ORDER by District Judge James H. Payne: denying [374] Petitioner's Motion to Supplement Response in Opposition to Government Motion for Partial Summary Judgment. (cjt, Deputy Clerk)**

**6:09−cv−00105−JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**REPLY IN SUPPPORT OF GOVERNMENT'S SECOND MOTION TO EXCLUDE PROPOSED WITNESSES**

_____

**COMES NOW** the United States of America, by and through undersigned counsel, and respectfully submits this reply in support of its second motion to exclude witnesses (Doc. 368). The government declines to reiterate the arguments in its motion, but incorporates them by reference.

## PROCEDURAL HISTORY

On appeal from the denial of relief under 28 U.S.C. § 2255, the Tenth Circuit remanded this case for an evidentiary hearing to determine whether trial counsel ineffectively failed to investigate and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015). On January 30, 2017, the government moved to exclude several of the 71 witnesses Barrett had noticed in correspondence. On February 16, 2017, Barrett listed 49 witnesses in the parties' joint statement. On February 24, 2017, the Court partially granted the government's motion to exclude. Doc. 361. Based on the witness list and testimonial summary offered in the joint statement, the government moved to exclude four

1

1783

witnesses: Roger Crawford, Judy House, Gary Nelson, and Iva Hines. Doc. 368. Barrett filed an opposition (Doc. 373), and this reply follows.

## ARGUMENT

### THE COURT SHOULD LIMIT BARRETT TO WITNESSES WHO CAN TESTIFY ABOUT FOREGONE PENALTY PHASE EVIDENCE

In his opposition, Barrett argues that the four witnesses subject to objection will offer relevant testimony. Doc. 373. The government disagrees that Barrett has demonstrated the relevance and admissibility of testimony from Hines, Nelson, House and Roger Crawford.

In his opposition to the motion, Barrett proposes that Crawford will testify about his son, Travis Crawford's, mental health issues; his daughter-in-law, Cindy Crawford's, credibility issues; and his wife, Phyllis Crawford's, current dementia and unavailability as a witness. Doc. 373. While Cindy Crawford testified during the penalty phase of his trial, her credibility is not presently in issue. Likewise, Phyllis Crawford's infirmities have no bearing on the issues at bar.

Apparently, Roger Crawford can offer personal accounts of his relatives' mental health, but the declaration previously used to summarize his putative testimony does not describe such recollections. Doc. 95 Ex. 92. Instead, it summarizes Travis Crawford's thoughts. Though the Federal Death Penalty Act does not categorically bar hearsay mitigation evidence, it excludes information "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." 18 U.S.C. § 3593(c). Roger Crawford's hearsay account of his son's interview is confusing, especially given that Barrett now asserts Roger Crawford can testify to his own observations. On March 2, 2017, Barrett informed the government that Roger Crawford would testify that "Travis Crawford . . . is a blood relative of Kenneth Barrett . . . . Travis also suffers from serious mental health issues. Roger can attest to

2

that familial genetic component, as well as that of other of his progeny and their progeny." Assuming Barrett intends to adduce Roger Crawford's personal observations about mental health issues among his relatives, the government withdraws its objections, but requests a more detailed summary. However, if Barrett seeks to adduce his opinions about genetic risks, the government objects to an apparent lack of expertise. *See* Trl. Tran. 25:5053; Fed. R. Evid. 702(a).

The government objects to the testimony of Judy House and Gary Nelson, concerning the incidence of mental illness among their relatives, because they have an attenuated relationship to Barrett. Barrett argues that his mental health expert relied upon evidence of multi-generational mental illness in assessing the defendant. Doc. 373 at 10. The government does not dispute that the expert considered genetic evidence in support of his diagnosis. Indeed, the expert's declaration indicates he has had the necessary evidence at hand for nearly eight years. *See* Doc. 95 Ex. 117. If Barrett's mental health expert requires further corroboration from distant relations, he may rely on extra-judicial information. *See* Fed. R. Evid. 702. For purposes of this hearing, live testimony about the mental illnesses of distant cousins has no mitigating value or any bearing on the actions of trial counsel.

The government objected to the relevance of testimony offered through Iva Hines, who would provide the Court with a positive character assessment of Barrett. Barrett argues, however, that any testimony admissible at the penalty phase remains admissible at this hearing. But Barrett overstates the scope of this proceeding, which concerns only the alleged omission of mental health and social history evidence. Foregone evidence on other subjects will not assist the Court, as the Tenth Circuit did not remand this case to determine the scope of any other type of foregone evidence. In this regard, the government also objects to the relevance of any

3

character evidence the defense might seek to offer at the evidentiary hearing from Hines, Gary Nelson or any other witness.

Because the testimony of the foregoing witnesses, as described by Barrett, will not assist the Court, it should exclude them from the hearing.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to exclude the testimony of Judy House, Gary Nelson, and Iva Hines, and to limit any testimony from Roger Crawford to his personal observations of mental illness amongst Barrett's relatives, as more fully summarized before the upcoming hearing.

Dated: March 3, 2017:

Respectfully submitted,

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on March 3, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney

5

1787

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

### AMENDED JOINT PRE-HEARING STATEMENT

**COME NOW** the parties to this action and, pursuant to the Scheduling Order issued

herein (Doc. 270) and the Court's Order dated 2/24/2017 (Doc. 361), would submit the following

Amended Joint Pre-Hearing Statement:

A. <u>Counsel who will appear at evidentiary hearing</u>:

    a. Petitioner: David Autry, Attorney; Joan Fisher, Assistant Federal Public Defender; Tivon Schardl, Assistant Federal Public Defender and Karl Saddlemire, Assistant Federal Public Defender.

    b. Respondent: Christopher J. Wilson, Assistant United States Attorney and Jeffrey B. Kahan, Trial Attorney, Capital Case Section

B. <u>Stipulated or uncontested facts</u>:

Petitioner stipulates to the following proposed findings of fact filed this date by the

Respondent:

Paragraphs 2,3,13 and 23.

Respondent stipulates to the following proposed findings of fact filed this date by the

Petitioner.

1

Paragraphs 20,23,25,26,51,83,89,93,94,107(a), (b), (d), (e), (f), (g), 144, 151, 157, 162,163, 203, 252, 287 and 343

C. <u>Contested issues of fact and law</u>:

    a.  Contested Issues of Fact

        Facts to which the parties have not stipulated as indicate in Section B above are contested.  See Findings of Fact and Conclusions of Law filed by the respective parties this date.

    b.  Contested Issues of Law

        Both parties contest the Conclusions of Law proposed by the opposing party, as filed this date.

D. <u>Witnesses to be called at evidentiary hearing, including brief description of their anticipated testimony</u>:

    a.  Petitioner:  The anticipated testimony of the witnesses named below are summarized and identified by previously submitted declarations or documents.  To the extent that no declaration or testimonial summary is in the record, either a brief summary is included or a declaration or statement is attached.

1. George Woods – 6:09-cv-00105, Doc 71, Exh. 117

2. Myla Young, deceased – 6:09-cv-00105, Doc 71, Exh. 44

3. John Echols – 6:09-cv-00105, Doc 71, Exh. 34

4. Jack Gordon – 6:09-cv-00105, Doc 432, Ex 53

5. Jeanne Russell – 6:09-cv-00105, Doc 71, Exh. 56

6. Steve Leedy – 6:09-cv-00105, Doc 71, Exh. 111

7. Roseanne Schaye – 6:09-cv-00105, Doc 403, Ex 118

8. Mark Henricksen – 6:09-cv-00105, Doc 71, Exh. 29

9. Ron Lax  - – 6:09-cv-00105, Doc 71, Exh. 66

10. Gelene Dotson Barrett – 6:09-cv-00105, Doc 71, Exh. 97; Doc 178, Ex 210

11. Steve Barrett – 6:09-cv-00105, Doc 71, Exh. 99

12. Abby Stites – 6:09-cv-00105, Doc 71, Exh. 103; Doc 178, Ex 216

13. Roger Crawford – 6:09-cv-00105, Doc 71, Exh. 92

Roger Crawford will also be called to testify to the following:

(1) Travis Crawford, Roger Crawford's son, is a blood relative of Kenneth Barrett (first cousin).  Travis also suffers from serious mental health issues.  Roger can attest to that familial genetic component, as well as that of other of his progeny and their progeny. (2) Cindy Crawford was called by the government as a witness in aggravation at the penalty phase (Doc 350, FedTr vol.22, pp. 4575-4586). (3) On February 21, 2017, the undersigned counsel met with Phyllis Crawford, mother to Travis Crawford, sister to Gelene Dotson (Mr. Barrett's mother), and wife to Roger Crawford, a witness who lays out in her declaration (Exh 91, Doc 404-3 at 90) her family history and her observations of Petitioner, Gelene Dotson and Ernie Barrett (Petitioner's father). Phyllis Crawford is now suffering from dementia. Undersigned counsel Joan Fisher met with Phyllis and Roger Crawford to discuss their anticipated testimony and to determine Phyllis Crawford's availability to testify personally to the contents of her declarations.  Mrs. Crawford unquestionably appears to be suffering from symptoms consistent with dementia, which are sufficiently debilitating to render her testimony unavailable. Roger Crawford, as her husband, can and will testify to Phyllis Crawford's inability to testify. Roger Crawford is personally aware of the substantive matters relayed by Phyllis Crawford in her declarations.  Roger Crawford witnessed the execution of those declarations and can attest to the fact that Phyllis Crawford signed her declarations.

14. Kathy Trotter – 6:09-cv-00105, Doc 71, Exh. 86

15. Janice Sanders – 6:09-cv-00105, Doc 71, Exh. 85; Doc 178, Ex 215

16. Carolyn Joseph – 6:09-cv-00105, Doc 71, Exh. 78; Doc 178, Ex 213

17. Brandi Hill – 6:09-cv-00105, Doc 71, Exh. 77

18. Gwendolyn Crawford – 6:09-cv-00105, Doc 71, Exh. 83

19. Linda Riley – 6:09-cv-00105, Doc 71, Exh. 87; Doc 178, Ex 214

20. Toby Barrett – 6:09-cv-00105, Doc 71, Exh. 96

21. Mark Dotson – 6:09-cv-00105, Doc 71, Exh. 98; Doc 178, Ex 211

22. Judy House – Attached, not yet filed

23. Nona Reich – 6:09-cv-00105, Doc 71, Exh. 101

24. Gary Nelson – Declaration of Testimony Attached, not yet filed

25. Iva Hines: Thomas and Iva Hines run Thomas Hines Construction. Iva is 60 years old. Ken worked for them for years, dined at their table, been to their house 100s of times. Mrs. Hines will testify that Ken was a good worker, a good guy. They had no right to come in on him like they did. They all would have done the same as him.  She will also testify that her husband and she were never contacted by Mr. Hilfiger and/or Mr. Smith. She does remember speaking to someone from the defense before the first state trial. … She will add that "Ken would do anything for you, give you the shirt off his back." If she had been contacted by his federal lawyers, she would have told them of her potential testimony and would have testified if called. "Kenny got along with everybody.  He had no enemies."

26. Rick Lunsford – 6:09-cv-00105, Doc 71, Exh. 90

27. Doris Barrett – 6:09-cv-00105, Doc 71, Exhs. 80, 105; Doc 178, Exh. 207

28. *Karl Cook, deceased – 6:09-cv-00105, Doc 71, Exh. 102

29. *Warren Dotson, deceased – 6:09-cv-00105, Doc 71, Exh. 100

30. *Ernie Barrett, deceased – 6:09-cv-00105, Doc 71, Exh. 81; Doc 403, Exh. 84

31. *Ada Blount, deceased – 6:09-cv-00105, Doc 71, Exh. 74

32. *Phyllis Crawford, unavailable/dementia – 6:09-cv-00105, Doc 71, Exh. 91; Doc 178, Ex 209

33. *Ruth Harris, unavailable, poor health – 6:09-cv-00105, Doc 71, Exh. 93; Doc 178, Ex 212

34. Petitioner reserves the right to call witnesses identified by the government including Roger Hilfiger and Bret Smith and rely on the government's declarations of each as a summary of their testimony.

   b.  Respondent:

   1.   Roger Hilfiger – On October 25, 2005, Mr. Hilfiger was appointed as co-counsel to John Echols in the case of *United States v. Barrett* (ED Okla. case no. 04-115-P).  He became lead counsel on May 5, 2005, upon Mr. Echols's withdrawal.  After his appointment as lead counsel, Mr. Hilfiger obtained case files maintained by Mr. Echols and the Oklahoma Indigent Defense System.  He believed the materials he received constituted the entire file in the case.  He reviewed the material in the file. Based on his interactions with Barrett, and his interviews with Barrett's relatives, Mr. Hilfiger never had reason to suspect that

4

the defendant suffered from a major mental illness.  Mr. Hilfiger recalls that Dr. Jeanne Russell dissuaded him from calling her as a witness to present mental health evidence, out of concern for the rebuttal it would invite.  Mr. Hilfiger recalls that Barrett repeatedly insisted that he did not want to present a mitigation case that dwelled on his childhood.  Mr. Hilfiger does not have distinct memories of mental health and social history documents in counsel's file, but does recall that he and Mr. Smith made a conscious decision to present a mitigation case based on three principles: Barrett had already been punished for the homicide by the State of Oklahoma, Barrett behaved well in custody, and Barrett was a good enough person that he did not deserve to die for his crime.

2.    Bret Smith - On May 5, 2005, Mr. Smith was appointed as co-counsel to Mr. Hilfiger in the case of *United States v. Barrett* (ED Okla. case no. 04-115-P).  Mr. Smith maintained a good rapport with Barrett and sometimes met with the defendant alone.  Based on his interaction, Mr. Smith found no reason to suspect Barrett suffered from a major mental illness.  Mr. Smith recalls that Dr. Jeanne Russell dissuaded him from calling her as a witness to present mental health evidence, out of concern for the rebuttal it would invite.  Mr. Smith recalls that Barrett repeatedly insisted that he did not want to present a mitigation case that dwelled on his childhood.  Mr. Smith does not have distinct memories of mental health documents from his file, but does recall that the material was developed earlier, during state proceedings.  He recalls a meeting Mr. Echols who did not focus on mitigation evidence.  Mr. Smith further recalls that he and Mr. Hilfiger made a conscious decision to present a mitigation case based on three principles: Barrett had already been punished for the homicide by the State of Oklahoma, Barrett behaved well in custody, and Barrett was a good enough person that he did not deserve to die for his crime.

3.    J. Randall Price, Ph.D. – Dr. Price is a forensic psychologist who evaluated Barrett at the time of trial.  His expert report was filed on the docket case no. 04-115-P and made available to all counsel in the Court's discovery order (§ 2255 Doc. no. 269).  The government believes that Dr. Price will testify in conformity with the findings in his report.  Based on the report, it appears that Dr. Price conducted an evaluation that included the Reynolds Intellectual Assessment System, the Repeatable Battery for the Assessment of Neuropsychological Status, the Personality Assessment Inventory, the Minnesota Multiphasic Personality Inventory (2d ed.), the Structured Inventory of Malingered Symptoms, and the Psychopathy Checklist-Revised.  Dr. Price diagnosed Barrett as a psychopath.  Dr. Price found that Barrett suffered from a learning disorder, polysubstance dependence, dysthymic disorder, and a personality disorder with antisocial, psychopathic and paranoid traits.

4.    Steven E. Pitt, D.O. – Dr. Pitt is a forensic psychiatrist retained by the government to evaluate Barrett on January 19, 2017.  While Dr. Pitt's report of the evaluation remains outstanding, the government anticipates that he will testify that at or around the time of the crime, Barrett had a substance abuse

5

disorder and, at a minimum, maladaptive personality traits, but did not otherwise suffer from any major mental illness.

E.  Exhibits to be presented at evidentiary hearing, noting any objection(s):

a.  Petitioner:

| Number | Exhibit | Where in Record | Objection |
|---|---|---|---|
| 1 | In the Matter of Mental Illness of Billy Dean Maxwell, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982 | Exhibit 26 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 2 | In the Matter of the Sanity of A.J. Barrett, Case Number 141, Lunacy Record, dated August 12, 1918 | Exhibit 27 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 3 | In the Matter of the Sanity of A.J. Barrett, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital | Exhibit 28 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 4 | Declaration of Mark Henricksen | Exhibit 29 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Hearsay |
| 5 | In the Matter of the Sanity of Wallace Dotson, Lunacy Record, Case Number 366, dated May 4, 1948 | Exhibit 32 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 6 | In the Matter of Mental Illness of Kenneth Barrett, Case Number 481, Record of Mental Health Proceeding | Exhibit 33 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 7 | Declaration of John Echols | Exhibit 34 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Hearsay, Speculation, Relevance |

6

| | | | |
|---|---|---|---|
| 8 | Excerpts from Kenneth Barrett's Baby Book | Exhibit 35 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 9 | Letter from Kenneth Barrett | Exhibit 36 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 10 | Declaration of Bill Sharp, Ph.D. | Exhibit 55 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 11 | Declaration of Jeanne Russell, Ed.D. | Exhibit 56 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 12 | Letter from John Echols to Honorable James H. Payne, dated February 28, 2005 | Exhibit 64 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 13 | Letter from Honorable James H. Payne to John Echols, dated February 22, 2005 | Exhibit 65 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 14 | Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008 | Exhibit 66 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 15 | Photographs of Kenneth Barrett's shack | Exhibit 73 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 16 | Declaration of Ada Blount | Exhibit 74 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |

1794

| 17 | Declaration of Brandy Hill | Exhibit 77 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to p. 2, 3 |
|---|---|---|---|
| 18 | Declaration of Carolyn Joseph | Exhibit 78 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 19 | Declaration of Doris Barrett | Exhibit 80 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 20 | Declaration of Ernest Barrett | Exhibit 81 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Motion in Limine (Doc. 292) |
| 21 | Declaration of Gwendolyn Crawford | Exhibit 83 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to last ¶ p. 1 and pp. 2,3 |
| 22 | Declaration of Janice Sanders | Exhibit 85 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to ¶¶3, 5 of p. 1 and pp. 2-4 |
| 23 | Declaration of Kathy Trotter | Exhibit 86 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 24 | Declaration of Linda Riley | Exhibit 87 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 25 | Declaration of Dr. Myla Young | Exhibit 89 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Motion in Limine and Reply (Doc. 289, 336) |

| 26 | Declaration of Paul Rickie Lunsford | Exhibit 90 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
|----|----|----|----|
| 27 | Declaration of Phyllis Crawford | Exhibit 91 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to ¶¶ 3,4 of p. 3 and p. 4 |
| 28 | Declaration of Roger Crawford | Exhibit 92 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance, Hearsay |
| 29 | Declaration of Ruth Harris | Exhibit 93 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to last ¶ of p. 3 |
| 30 | Declaration of Toby Barrett | Exhibit 96 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 31 | Declaration of Sylvia Gelene Dotson | Exhibit 97 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 32 | Declaration of Mark Dotson | Exhibit 98 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 33 | Declaration of Steve Barrett | Exhibit 99 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 34 | Declaration of Warren Dotson | Exhibit 100 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as ¶ 3 of p. 4 |

| 35 | Declaration of Nona Reich | Exhibit 101 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
|----|----|----|----|
| 36 | Declaration of Carl Cook | Exhibit 102 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 37 | Declaration of Abby Stites | Exhibit 103 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 38 | Declaration of Doris Barrett | Exhibit 105 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 39 | Declaration of Steve Leedy | Exhibit 111 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 40 | Declaration of Dr. George Woods | Exhibit 117 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 41 | Educational Records for Kenneth Barrett | Exhibit 136 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 42 | Educational Records for Gwendolyn Barrett | Exhibit 137 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 43 | Educational Records for Ernest Barrett | Exhibit 138 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |

| 44 | Medical Records for Carolyn Joseph | Exhibit 139 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
|---|---|---|---|
| 45 | Medical Records for Kathy Trotter | Exhibit 140 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 46 | Medical Records for Brandy Hill | Exhibit 141 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 47 | Medical Records for Toby Barrett | Exhibit 142 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 48 | Medical Records for Travis Crawford | Exhibit 143 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 49 | Medical Records for Linda Riley | Exhibit 145 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 50 | Medical Records for A.J. Barrett | Exhibit 146 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 51 | Medical Records for Kenneth Barrett | Exhibit 147 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 52 | Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999 | Exhibit 148 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |

11

| 53 | Sylvia Gelene Dotson's Genealogy Memorandum | Exhibit 155 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
|----|----|----|----|
| 54 | Military Records for Travis Crawford | Exhibit 196 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 55 | Educational Records for Kenneth Barrett | Exhibit 200 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 56 | Medical Records for Gwen Crawford | Exhibit 201 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 57 | Medical Records for Carolyn Joseph | Exhibit 202 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 58 | Social Security Records for Travis Crawford | Exhibit 203 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 59 | Supplemental Declaration of Ernie Barrett | Exhibit 206 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 60 | Supplemental Declaration of Doris Barrett | Exhibit 207 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 61 | Supplemental Declaration of Phyllis Crawford | Exhibit 209 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. | Hearsay |

1799

| | | 7/1/2010 | |
|---|---|---|---|
| 62 | Supplemental Declaration of Gelene Dotson | Exhibit 210From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 63 | Supplemental Declaration of Mark Dotson | Exhibit 211 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 64 | Supplemental Declaration of Ruth Harris | Exhibit 212 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 65 | Supplemental Declaration of Carolyn Joseph | Exhibit 213 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 66 | Supplemental Declaration of Linda Riley | Exhibit 214 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 67 | Supplemental Declaration of Janice Sanders | Exhibit 215 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 68 | Supplemental Declaration of Abbie Stites | Exhibit 216 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 69 | Supplemental Declaration of Kathy Trotter | Exhibit 217 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 70 | Supplemental Declaration of Toby Barrett | . Exhibit 218 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |

| 71 | Supplemental Declaration of Toby Barrett | Exhibit 220 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
|---|---|---|---|
| 72 | UNDER SEAL: Billing Records of Roger Hilfiger and Bret Smith | Appendix A - Doc No. 01019206246, 10th Circuit Case No. 12-7086 | |
| 73 | Additional Education Records for Kenneth Barrett | N/A, Attached to email of 1/6/2017 | |
| 74 | Declaration of Judy House | N/A, Attached to email of 1/6/2017 | |
| 75 | All Documents turned over to US Attorney on 12/21/2016 in Compliance with Discovery Order | Submitted to US Attorney on Disc. Specific documents within may be identified as separate exhibits at the appropriate time. | |
| 76 | Medical Records of Kelly Cochran | To be procured. Release of records signed January 4, 2017. | Relevance |
| 77 | Sealed Budget Conference Minutes | 6:04-cr-00115-JHP, 12/9/2004 | |
| 78 | SEALED ORDER by Mag. Judge Steven P. Shreder re: defendant's Ex Parte Motion for Approval of "Pre-Authorization" Budget for the Defense | Doc 38, 6:04-cr-00115-JHP, 1/19/2005 | |
| 79 | SEALED LETTER (copy) from Hon. James H. Payne to defense counsel John David Echols regarding the eight ex parte budget requests | 2/22/2005, 6:04-cr-00115-JHP, | |
| 80 | SEALED LETTER from John David Echols to Hon. James H. Payne in answer to the 2/22/05 letter of Judge Payne regarding ex parte litigation budget requests. | 2/28/2005, 6:04-cr-00115-JHP, | |
| 81 | Minutes: SEALED HEARING: Defense counsel John D. Echols and Roger Hilfiger present. Before Hon. James H. Payne. | 3/22/2005, 6:04-cr-00115-JHP, | |

| | | | |
|---|---|---|---|
| | …Discussion held regarding the Court's order on the budget. | | |
| 82 | SEALED ORDER by District Judge James H. Payne adopting the U.S. Magistrate's SEALED REPORT AND RECOMMENDATION on interim requests for attorneys' fees and costs [106-1], DENYING defendant's NINTH EXPARTE (SEALED) Motion [107-1], GRANTING defendant's motion TENTH EXPARTE (SEALED) and allowing John Echols to withdraw [113-1], DENYING defendant's EXPARTE (SEALED) ELEVENTH Motion [118-1], DENYING defendant's motion for ex parte conference on defense budget and funding [116-1] and [126-1] | Doc 128, 6:04-cr-00115-JHP, 5/5/2005 | |
| 83 | SEALED BUDGET HEARING MINUTES before Honorable James H. Payne | 10/3/2005, 6:04-cr-00115-JHP, | |
| 84 | MINUTES: Further Sealed Hearing regarding budget matters. | 10/20/2005, 6:04-cr-00115-JHP, | |
| 85 | SEALED MINUTE ORDER before District Judge James H. Payne GRANTING defendant's motion to modify order approving budget of 3/18/05 | Doc. 244, 6:04-cr-00115-JHP, 11/4/2005 | |
| 86 | SEALED MINUTE ORDER before District Judge James H. Payne regarding Defendant's Ex Parte Litigation Budget (Henricksen) | Doc 275, 6:04-cr-00115-JHP, 12/15/2005 | |

15

1802

| 87 | Childhood photos of Kenneth Barrett | N/A, Attached to email of 1/6/2017 | |
| 88 | Defendant's Pro Se Motion for Change of Appointed Counsel | Doc 135, 6:04-cr-00115-JHP, 5/23/2005 | |
| 89 | ORDER by District Judge James H. Payne denying defendant Barrett's pro se motion for Change of Appointed Counsel | Doc 137, 6:04-cr-00115-JHP, 5/24/2005 | |
| 90 | Declaration of Bret Smith | Doc 175, Exh. 11, 6:04-cr-00115-JHP, 5/17/2010 | |
| 91 | Declaration of Roger Hilfiger | Doc 175, Exh. 12, 6:04-cr-00115-JHP, 5/17/2010 | |
| 92 | Chart of Trial Counsel File Boxes | Sent to Government under separate cover | Lack of Authentication, Relevance, Competence |
| 93 | List of Roger Hilfiger's Caseload during relevant period | Sent to Government under separate cover | Lack of Authentication, Relevance, Hearsay |
| 94 | Hilfiger Letter to Shreder | Petitioner's Disc. No. 003889-91 | Relevance as to page 3889 |
| 95 | Handwritten Notes | Petitioners Disc. No. 005806-07 | Incomplete, Improper Allocution |

The Petitioner reserves the right to utilize Petitioner's exhibits for impeachment or to refresh recollection.

      b.  Respondent:

      Petitioner has a standing objection to any and all documents contained in trial counsel files of irrelevancy unless the government can establish that trial counsel had personal knowledge of the exhibit prior to Kenneth Barrett's sentencing hearing.

| Number | Exhibit | Where in Record | Objection |
|---|---|---|---|
| 1. | Declaration of Roger Hilfiger | Exhibit 12 to Respondent Answer | |
| 2. | Declaration of Bret Smith | Exhibit 11 to Respondent Answer | |
| 3. | Voluntary statement of Abby of Stites | Exhibit 13 to Respondent Answer | HEARSAY |
| 4. | Eastern State Hospital Report of Contact | Exhibit 14 to Respondent Answer | |
| 5. | Eastern State Hospital Medical | Exhibit 15 to | |

16

| | | History | Respondent Answer | |
|---|---|---|---|---|
| 6. | | Eastern State Hospital Discharge Summary | Exhibit 16 to Respondent Answer | |
| 7. | | St. Francis Chart Print Report | DISC 00382-00416 | |
| 8. | | Wagoner Community Hospital Psychiatric Evaluation | Exhibit 18 to Respondent Answer | |
| 9. | | Bill Willis Community Mental Health Center Referral Form | Exhibit 19 to Respondent Answer | |
| 10. | | Social Security Administration Explanation of Determination | Exhibit 20 to Respondent Answer | |
| 11. | | Sequoyah Memorial Hospital medical record of Kenneth Barrett | DISC 000527-28 | |
| 12. | | Affidavit of Faust Bianco, Ph.D. | DISC 1991 | Standing objection |
| 13. | | Professional Services Invoice from Faust Bianco, Ph.D. | DISC 001820 | Standing objection |
| 14. | | Kenneth Barrett Medical Release to Faust Bianco, Ph.D. | DISC 008298-99 | Standing objection |
| 15. | | John Echols Letter to Judge Payne dated 2/28/2005 | DISC 003743-48 | Standing objection |
| 16. | | Psychological Evaluation of Kenneth Barrett by Bill Sharp, Ph.D. | DISC 006812-19 | Standing objection |
| 17. | | Kenneth Barrett BOP Intake Screening | | Relevance |
| 18. | | Roseann Schaye Memo of Interview of Carolyn Joseph | DISC 001197 | Standing objection |
| 19. | | Roseann Schaye Memo of Interview of Elnora Long | DISC 001205 | Standing objection |
| 20. | | Roseann Schaye Memo of Interview of Sylvia Gelene Dotson | DISC 000966 | Standing objection |
| 21. | | Roseann Schaye Memo of Interview of Kenneth Barrett | DISC 000981-82 | Standing objection |
| 22. | | Roseann Schaye Memo of Interview of Linda Riley | DISC 001208-09 | Standing objection |
| 23. | | Roseann Schaye Memo of Interview of Richard Barrett | DISC 1207 | Standing objection |
| 24. | | Roseann Schaye Memo of Interview of Ruth Harris | DISC 001006 | Standing objection |
| 25. | | Roseann Schaye Memo of Interview of Tracy Swearingen | DISC 001124 | Standing objection |
| 26. | | Declaration of Roseann Schaye | DISC 000880 | Standing objection |
| 27. | | Roseann Schaye State of Arizona Board of Behavioral Health Examiners 2009 Disciplinary Action Record | | Relevance |
| 28. | | John Echols billing records | DISC 003752-60 | |

| 29. | Gelene Dotson memo | DISC 001275 | Standing objection |
|---|---|---|---|
| 30. | Hattie Dotson memo | DISC 001276 | Standing objection |
| 31. | Roger Hilfiger letter to Magistrate Judge Shreder dated 1/17/2006 | DISC 003726-28 | |
| 32. | Roger Hilfiger letter to Magistrate Judge Shreder dated 2/17/2006 | DISC 003890-91 | |
| 33. | Roger Hilfiger letter to Office of Federal Public Defender dated 12/29/2005 | DISC 003892-95 | |
| 34. | Psychological Evaluation – Risk Assessment of Kenneth Barrett by Jeanne Russell, Ed.D. | DISC 006820-30 | Standing objection |
| 35. | Risk Assessment of Kenneth Barrett by Jeanne Russell, Ed.D. | DISC 008227-43 | |
| 36. | Kenneth Barrett Driving Record | DISC 006901-03 | Standing objection |
| 37. | Psychological Evaluation of Kenneth Barrett by Kathy LaFortune, Ph.D. | DISC 001644-48 | Standing objection |
| 38. | Handwritten notes | DISC 007414-36 | Standing objection |
| 39. | Handwritten notes | DISC 000895 | Standing objection |
| 40. | Handwritten notes | DISC 001191-96 | Standing objection |
| 41. | Handwritten notes | DISC 004757-68 | |
| 42. | Steve Leedy Memo | DISC 008304-06 | Standing objection |
| 43. | Letters from Roseann Schaye | DISC 008273-97 | Standing objection |
| 44. | OIDS Expert Service Providers Fee Schedule Table | DISC 002382-420 | |
| 45. | Phyllis Crawford memo | DISC 001264 | Standing objection |
| 46. | Roger Crawford memo | DISC 001265 | Standing objection |
| 47. | OIDS Interoffice Memo re: Tracy Swearingen | DISC 001966) | Standing objection |
| 48. | Tommy C. Sanders memo | DISC 001360 | Standing objection |
| 49. | OIDS Interoffice Memo | DISC 001013-23 | Standing objection |
| 50. | Kenneth Barrett BOP file | | Relevance/ |
| 51. | Psychological Evaluation of Kenneth Barrett by J. Randall Price, Ph.D. | | Standing objection/Motion in Limine Doc * |
| 52. | Psychiatric Evaluation of Kenneth Barrett by Steven E. Pitt, D.O. | | Relevance |
| 53. | Any and all data, notes, or communications with counsel regarding Petitioner's mental health expert witnesses | Pending receipt | Objection as Work Product; no objection to providing raw data to qualified expert |

The Government reserves the right to utilize Petitioner's exhibits for impeachment or to refresh recollection.

18

F.   <u>Anticipated length of evidentiary hearing</u>:

Nine (9) days (March 13-17, March 30, 31, April 1, 3).

Dated: March 3, 2017

Respectfully submitted,

*/s/ David Autry*
DAVID AUTRY, OBA #11600
Attorney at Law
<u>1021 N.W. 16</u><sup>th</sup> Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669
dbautry77@gmail.com

HEATHER E. WILLIAMS
Federal Defender
*/s/ Joan M. Fisher*
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-6656
Joan_Fisher@fd.org

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

*/s/ Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
(918) 684-5175
(918) 684-5150
chris.wilson@usdoj.gov

*/s/ Jeffrey B. Kahan*
JEFFREY B, KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F. Street, NW 6th Fl.
Washington, DC 20530
jeffrey.kahan@usdoj.gov

1806

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on March 3rd, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. Jeffrey B. Kahan at jeffrey_kahan@usdoj.gov

Mr. Christopher J. Wilson at Chris.Wilson@usdoj.gov

/s/ *Joan M. Fisher*
JOAN M. FISHER

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:         dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>          Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>          Respondent. | CASE NO. CV-09-00105-JHP |

**PETITIONER'S SUR-REPLY
TO THE GOVERNMENT'S REPLY
TO PETITIONER'S RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

Pet'r's Sur-reply re Govt. MSJ                              *U.S. v. Barrett*, CV-09-00105-JHP

1808

**TABLE OF CONTENTS**

RESPONSE TO STATEMENT OF MATERIAL FACTS ..........................................................................1

ANALYSIS .........................................................................................................................................21

CONCLUSION ....................................................................................................................................25

CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY ........................................................26

Pet'r's Sur-reply re Govt. MSJ                     i                     *U.S. v. Barrett*, CV-09-00105-JHP

1809

# TABLE OF AUTHORITIES

**Federal Cases**

*Banker v. Gold Res. Corp.*  (*In re Gold Res. Corp. Sec. Litig.*), 776 F.3d 1103 (10th Cir. 2015)  1, 3

*Bishop v. Smith*, 760 F.3d 1070 (10th Cir. 2014)  ................................................................. 2

*Casey v. Frank*, 346 F. Supp. 2d 1000 (E.D. Wis. 2004) ........................................................ 4

*Celotex Corp. v. Catrett*, 477 U.S. 317 (1986) ...................................................................... 22

*City of Erie v. Pap's A.M.*, 529 U.S. 277 (2000) .................................................................... 23

*Green v. New Mexico*, 420 F.3d 1189 (10th Cir. 2005) .......................................................... 3

*Martin v. Rose*, 717 F.2d 295 (6th Cir. 1983) ...................................................................... 4

*Penry v. Lynaugh*, 492 U.S. 302 (1989)  ............................................................................... 6

*Rhodes v. Cain*, 2014 WL 4686809 (E.D. La. Sept. 19, 2014) ............................................. 4

*Rompilla v. Beard*, 545 U.S. 374 (2005) .............................................................................. 23

*Strickland v. Washington*, 466 U.S. 668 (1984)  .................................................................. 25

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) .............................................. *passim*

*United States v. Poindexter*, 492 F.3d 263 (4th Cir. 2007) .................................................. 2

*United States v. Pulido-Jacobo*, 377 F.3d 1124 (10th Cir. 2004) .................................... 6, 25

*Wiggins v. Smith*, 539 U.S. 510 (2003) ........................................................................ 23, 24, 25

**Federal Statute and Rules**

Fed. R. Civ. P. 56(a) ........................................................................................................... 22

Fed. R. Civ. P. 56(c) ...................................................................................................... 3, 16

Fed. R. Civ. P. 56(c)(2) ........................................................................................ 5, 10, 12, 13

Fed. R. Evid. 702 ................................................................................................................ 5

Fed. R. Evid. 801(d)(2) .................................................................................................. 6, 25

28 U.S.C. § 2255 ........................................................................................................... 1, 2, 24

Pet'r's Sur-reply re Govt. MSJ                    ii                    *U.S. v. Barrett*, CV-09-00105-JHP

1810

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,

                Petitioner,

vs.

UNITED STATES OF AMERICA,

                Respondent.

CASE NO. CV-09-00105-JHP

PETITIONER'S SUR-REPLY TO THE GOVERNMENT'S REPLY TO PETITIONER'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION FOR PARTIAL SUMMARY JUDGMENT

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, makes the sur-reply ordered by this Court on March 2, 2017. *See* Doc. 375.

## RESPONSE TO STATEMENT OF MATERIAL FACTS

1.  The fact that John Echols represented Mr. Barrett in state court is neither disputed nor material. Mr. Barrett makes the following three points about Reply Paragraph 1:

    a.  It is frivolous and improper for the government to assert Echols's state-court representation as a material fact and to raise it in a reply given that the fact obviously was available to the government at the time it filed its Motion and Mr. Barrett's response did not raise the issue in his Response. *See Banker v. Gold Res. Corp. (In re Gold Res. Corp. Sec. Litig.)*, 776 F.3d 1103, 1119 (10th Cir. 2015).

    b.  Second, the government makes no attempt to explain how this fact makes it entitled to judgment as a matter of law. This case is here on remand after a higher court determined, *de novo* and as a matter of law, that Mr. Barrett was entitled to an evidentiary hearing under the Rules Governing § 2255 Proceedings. *United States v. Barrett*, 797 F.3d 1207, 1224, 1232 (10th Cir. 2015). "When the district

Pet'r's Sur-reply re Govt. MSJ       1        *U.S. v. Barrett*, CV-09-00105-JHP

1811

court denies § 2255 relief without an evidentiary hearing, the nature of the court's ruling is akin to a ruling on a motion for summary judgment." *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007). Accordingly, the Tenth Circuit has already held that Mr. Barrett's claim cannot be disposed of on summary judgment because he pled and demonstrated an ability prove facts which, if proved, would entitle him to relief. *Barrett*, 797 F.3d at 1224. The government in its Reply does not dispute Mr. Barrett's contention that it must overcome the law of the case in order to prevail on its Motion. Pet'r's Resp. Opp. MSJ (Doc. 366) at 21-22. "[T]he law of the case is subject to three narrow exceptions: (1) when new evidence emerges; (2) when intervening law undermines the original decision; and (3) when the prior ruling was clearly erroneous and would, if followed, create a manifest injustice." *Bishop v. Smith*, 760 F.3d 1070, 1086 (10th Cir. 2014). The fact of Echols's prior representation cannot satisfy any of the exceptions, and the government makes no attempt to argue that it, or any of the Reply's 38 enumerated facts, satisfies an exception. The Tenth Circuit repeatedly referred to Mr. Echols's declaration, and specifically mentioned his work in preparing for the state trials, when it ordered a hearing on precisely the issue the government claims is subject to summary judgment. *Barrett*, 797 F.3d at 1227. Therefore, Reply Paragraph 1 fails to establish a material fact.

c. While a response to a properly pled motion for summary judgment must specifically respond to the factual averments of the motion, LCvR 56.1(c), there is no similar rule for replies and sur-replies. This Court's order directing Mr. Barrett specifically to respond to the government's statement of facts treats the Reply as

Pet'r's Sur-reply re Govt. MSJ                2                *U.S. v. Barrett*, CV-09-00105-JHP

1812

though it were a second motion for summary judgment. The government indicates it intends the enumerated paragraphs to serve as a second motion. Reply 2 n.1. Local Rule 56.1(a) requires leave of court before a party may file a second motion for summary judgment. The government did not request leave to have its Reply treated like a second motion, and the government offered no excuse for its acknowledged failure to comply with Fed. R. Civ. P. 56(c) and LCvR 56.1(b) when it filed the Motion. Reply 2 n.1. The Reply is twice the length of the Motion and barely mentions Mr. Barrett's Response. Due to the newly asserted, although long-available, factual and legal matter in the Reply, *see* ¶ 1.a, *supra*, this Court could not consider the Reply without affording Mr. Barrett an opportunity to respond. *Green v. New Mexico*, 420 F.3d 1189, 1196 (10th Cir. 2005) (citing *Doebele v. Sprint/United Mgmt. Co.*, 342 F.3d 1117, 1139 n.13 (10th Cir. 2003)). This Court could have disregarded the Reply, *ibid.*, or rejected it as improper, *Banker*, *supra*, and, as previously noted, only this Court's Order required Mr. Barrett to respond to each of the government's stated facts, rather than making legal arguments. In light of foregoing points and authorities and (1) the obviousness of the fact and the obvious lack of materiality in Echols's state-court representation and nearly all other enumerated paragraphs in the Reply; (2) the Tenth Circuit's expressed reliance on Mr. Echols's declaration referring to his state-court work when ordering the hearing the government now seeks to escape; (3) Mr. Barrett's prior complaint that the government's non-rule-compliant Motion interfered with his counsel's preparation for the evidentiary hearing, Resp. (Doc. 366) at 1; and (4) this Court's past actions directing Mr. Barrett's counsel to

Pet'r's Sur-reply re Govt. MSJ                    3                    *U.S. v. Barrett*, CV-09-00105-JHP

1813

do work no other similarly situated litigant in this District had previously been required to perform (Ex. G, hereto), Mr. Barrett contends that unless this Court intends to sanction the government for its abusive practices, this Court's Order directing Mr. Barrett to respond to each factual statement serves no legitimate purpose.

2. That Steve Leedy assisted Mr. Echols in state court is not disputed. The fact is material only insofar as trial counsel Roger Hilfiger and Bret Smith were on notice of Mr. Leedy's role in investigating the case and therefore, they knew they should obtain his files. *Cf. Rhodes v. Cain*, 2014 WL 4686809 at \*22 (E.D. La. Sept. 19, 2014) (ordering evidentiary hearing based on allegation post-conviction counsel was deficient for failing to obtain records from predecessor counsel); *Casey v. Frank*, 346 F.Supp.2d 1000, 1014 (E.D. Wis. 2004) ("Counsel's failure to obtain predecessor counsel's investigative reports can also violate the duty to reasonably investigate."); *Martin v. Rose*, 717 F.2d 295, 296-97 (6th Cir. 1983). The foregoing decisions, as well as the Tenth Circuit's decision in this case, precludes the government from demonstrating that the fact of Leedy's role shows it is entitled to judgment in its favor as a matter of law. In addition, the grounds asserted in Paragraphs 1.a through 1.c, *supra*, apply with equal force here, and the legal authorities cited therein are incorporated into this paragraph by specific reference as if fully set forth herein. Mr. Leedy's declaration was part of the record before the Tenth Circuit when it ordered the hearing the Motion seeks to derail.

3. Mr. Barrett makes the following responses to Reply Paragraph 3:

   a. It is undisputed that on June 21, 2002, Mr. Leedy sent Peter Rauch's memorandum to Mr. Echols. It is undisputed that Rauch reviewed records of Mr.

Barrett's mental health history. It is undisputed that the memorandum contains the words quoted in Reply Paragraph 3. However, to the extent Mot. Ex. 7 might be material, there are genuine issues related to it. Mr. Barrett disputes the government's characterization that Rauch "analyzed Barrett's mental health history." The government presents no evidence regarding Rauch's qualifications to analyze records for the purpose of reaching either a clinical or a legal conclusion about whether it is mitigating. It is far past time for the government to endorse Rauch as a witness or provide a report under Fed. R. Evid. 702 and this Court's scheduling order. Accordingly, the government has no admissible evidence supporting the validity or reliability of any opinions Rauch may have offered and therefore it has failed to show the absence of a genuine issue. Fed. R. Civ. P. 56(c)(2).

b. The government fails to show the materiality of the information in Reply Paragraph 3.

c. The government does not contend and presents no evidence that the attorneys whose effectiveness is at issue, Mr. Hilfiger and Mr. Smith, ever saw or relied upon the memorandum from Rauch, or that Mr. Echols relied upon it to reject a mental health evaluation for mitigation purposes, or that Messrs. Hilfiger and Smith relied upon such an opinion held by Echols. On the contrary, the government has presented declarations from both trial attorneys that specifically respond to Mr. Barrett's allegations, and neither attorney mentioned Rauch's memorandum. Rauch's memorandum was in Mr. Hilfiger's possession. Ex. H (Decl. Joan Fisher) at ¶ 2. Given that Mr. Hilfiger and Mr. Smith made their

Pet'r's Sur-reply re Govt. MSJ   5   *U.S. v. Barrett*, CV-09-00105-JHP

1815

declarations for the specific purpose of responding Mr. Barrett's claim of ineffectiveness for failing to pursue mental health evidence, their failures to mention Rauch should be seen as adoptive admissions by silence. *Cf. United States v. Pulido-Jacobo*, 377 F.3d 1124, 1132 (10th Cir. 2004); Fed. R. Evid. 801(d)(2).

d.  There is no evidence that it would be reasonable for an attorney to rely upon Rauch. The government presents no evidence as to who Rauch is, what his qualifications are, and why any capital defense attorney would rely on him when assessing how individual capital jurors in a federal death penalty case would respond to Mr. Barrett's history of mental and emotional problems. Motion Exhibit 3 demonstrates why it would be unreasonable, as a matter of law, for an attorney to rely upon Rauch's "conclusion." The record before the Tenth Circuit showed the Court of Appeals was aware that Mr. Echols had received advice on mental health issues. *Barrett*, 797 F.3d at 1227. The record also shows that Mr. Echols concluded from his experience that Mr. Barrett should be evaluated for an organic brain disorder. Resp. (Doc. 366) at ¶¶ 6.a & 6.b. Rauch's memorandum recounts Mr. Barrett's history which is consistent with the Supreme Court's description of mitigation. *See*, *e.g.*, *Penny v. Lynaugh*, 492 U.S. 302, 319 (1989), *overruled on other grounds by*, *Atkins v. Virginia*, 536 U.S. 304 (2002). There is a handwritten note at the bottom of the memorandum indicating at least one recipient believed that further inquiry was necessary to determine whether Mr. Barrett was "likely to overreact" when intoxicated ("w/ intox"). Mot. Ex. 7 at DISC 008301. The Tenth Circuit concluded that the same records described in

Rauch's memorandum, constituted "evidence that counsel failed to make an effort 'to discover all reasonably available mitigation evidence' despite ample indication of potential mental-health problems." *Barrett*, 797 F.3d at 1227. Consequently, Reply Paragraph 3 and Mot. Ex. 7 establish, at most, that Rauch had a different *legal* opinion about Mr. Barrett's medical records than the Tenth Circuit had. In sum, based on the authorities cited herein and in Paragraph 1.b, *supra*, Reply Paragraph 3 fails to state grounds for rejecting the Tenth Circuit's order.

e. Reply Paragraph 3 demonstrates that both the Motion and Reply are improper and abusive for the reasons stated in the Response and Paragraphs 1.a and 1.c, *supra*. Obviously, the government could have made a specific factual statement based on an exhibit it attached to the Motion, but it merely cited Motion Exhibit 7 in passing. Mot. 5. Equally obviously, this Sur-reply serves only to impede the work of Mr. Barrett's counsel to prepare for the hearing and to enable the Court to rely on the reply, thereby saving the government from the facial deficiencies of its Motion.

f. Mr. Barrett would show through the type of expert that Mr. Echols sought to hire, Doc. 376-1 (Decl. Deborah Miora, Ph.D.) & Doc. 376-2 (Decl. Erin Bigler, Ph.D.), and through trial counsel's available resource counsel, Richard Burr, *see* Resp. (Doc. 366) at ¶ 8, that if trial counsel had brought the resources available to them to bear on Rauch's memorandum, there would have been no strategic reasons not to investigate further. However, this Court has already refused to hear from Mr. Barrett's witnesses, and it ordered this Sur-reply before he could obtain further expert assistance. *See* Doc. 346. For these reasons, in addition to those

cited in the preceding paragraph, the Court's order scheduling this Sur-reply fails to give Mr. Barrett a meaningful opportunity to respond.

4. Mr. Barrett does not dispute that Bill Sharp's report to OIDS contained the things stated in Reply Paragraph 4, as well as other matters that were set out in the Amended Motion to Vacate. In addition, Mr. Barrett states the following:

a. For the reasons stated in Mr. Barrett's Response (Doc. 366), and in Paragraphs 1.a, 1.b, 1.c and 3.c, *supra*, Reply Paragraph 4 is improper and does not present a material fact. The Tenth Circuit specifically cited Sharp's report as evidence of deficient performance. *Barrett*, 797 F.3d at 1227.

b. The following raise a genuine issue about Dr. Sharp and his report:

   i. trial counsel were on notice of Sharp's evaluation because Dr. Russell repeatedly mentioned it;

   ii. Dr. Russell specifically mentioned Dr. Sharp's observation of extreme paranoia in her 2003 report and in her 2005 report to Messrs. Hilfiger and Smith, and the government concedes that being on notice is sufficient to trigger a duty to investigate, Mot. (Doc. 347) at 5-6;

   iii. Mr. Smith stated on the record on September 9, 2005, that he knew he did not have all the mitigation investigative files from predecessor counsel;

   iv. trial counsel were on notice of Mr. Leedy's role in the state case;

   v. trial counsel could have obtained Sharp's report from Mr. Leedy but failed to so;

   vi. Dr. Sharp stated in his declaration, which was before the Tenth Circuit, that in 2005 someone asked him to fax them his report, Doc. 95 Ex. 55 at ¶

16, which was the factual basis for Mr. Barrett's allegation that trial counsel possessed the report.

5. Mr. Barrett does not dispute that on July 13, 2003, Kathy LaFortune drafted a report that stated "no mental health expert is recommended at this time," and that at some time, perhaps in August 2003, the memorandum was faxed to someone, probably Mr. Echols. The government's omission of the phrase "at this time" from the hearsay document has the potential to materially alter the import of the document, if any, and therefore, Mr. Barrett disputes the government's statement to the extent it is intended to support the proposition that LaFortune believed, and caused trial counsel to believe, there would never be a time when it would be reasonably necessary for Mr. Barrett's counsel to seek further expert assistance in preparation for a penalty trial.

    a. For the reasons stated in Paragraphs 1.a, 1.c and 3.c, *supra*, Reply Paragraph 5 is improper.

    b. To the extent the government attempts to show that only Echols possessed LaFortune's memorandum, the government's own declaration from Mr. Hilfiger undermines that contention. Mr. Hilfiger stated in his declaration that he retrieved Mr. Echols's files from Mr. Echols's house. Doc. 174 Ex. 12 at ¶ 4.

    c. In addition, the fact that LaFortune did not recommend a further mental health evaluation at that time is not material, or creates a genuine issue, for the following reasons:

        i. The government has obtained declarations from trial counsel that specifically respond to Mr. Barrett's allegations but those declarations do not mention LaFortune or any opinion the government suggests Mr.

Pet'r's Sur-reply re Govt. MSJ          9          *U.S. v. Barrett*, CV-09-00105-JHP

1819

Echols formed on the basis of LaFortune's memorandum. As stated in Sur-reply Paragraph 3.c, *supra*, their silence should be taken as an adoptive admission. In evidence that was before the Tenth Circuit, Mr. Echols mentioned LaFortune and said he formed the opinion that an expert was needed to investigate Mr. Barrett's organic brain impairments. Resp. (Doc. 366) at ¶ 2.

ii. There is a genuine issue regarding LaFortune's statement that "no mental health expert is recommended at this time." First, her temporal qualification renders the statement ambiguous. The document itself is hearsay and the government has failed to demonstrate an ability to present admissible evidence that would resolve the ambiguity created by the temporal qualifier. Fed. R. Civ. P. 56(c)(2). Second, to the extent she expressed a legal opinion about the mitigating value of Mr. Barrett's mental health history and what it suggests, her opinion is at odds with that of the Supreme Court and Tenth Circuit, as stated in Paragraph 3.b.ii, *supra*. Additionally, the government has not endorsed LaFortune as an expert or provided any reports as required by this Court's scheduling order. Accordingly, the government is unable to prove that LaFortune is a mental health expert and that her opinions are admissible in this case or that it would be reasonable for trial counsel to have relied upon them, if they did. Fourth, in an exhibit that was part of the record before the Tenth Circuit, Mr. Echols stated that LaFortune herself was prepared to testify as a second stage witness for the defense in state court. Doc. 95 Ex. 64 at 2 &

Pet'r's Sur-reply re Govt. MSJ                    10                    *U.S. v. Barrett*, CV-09-00105-JHP

1820

4. From the record it appears LaFortune could have meant no *further* mental health expert was recommended *at that time* because her evaluation would have sufficed for present purposes either because it contained mitigation evidence or because further assistance could be delayed.

d. As stated in Paragraph 3.d, *supra*, this Court's previous orders excluding Mr. Barrett's experts and the scheduling of this Sur-reply undermine Mr. Barrett's ability to make a meaningful response to the Reply.

6. Mr. Barrett does not dispute that Faust Bianco executed an affidavit on October 31, 2003. Motion Exhibit 5 does not establish when Mr. Echols obtained the affidavit, although Mr. Barrett does not dispute that at some time he obtained it and it was in files he provided to Mr. Hilfiger. The government misrepresents the affidavit by omitting the temporal qualification that Dr. Bianco stated "further neurological testing is unwarranted *at this time*." Mot. Ex. 7 (emphasis added). That qualification and the following show there is a genuine issue as to the import of Bianco's affidavit and that the government is not entitled to prevail as a matter of law:

a. Reply Paragraph 6 is improper and interposed for an improper purpose for the reasons stated in Paragraphs 1.a, 1.c and 3.c, *supra*.

b. Either there is a genuine issue regarding Reply Paragraph 6, or it is not material for the reasons stated in the Response and in Paragraph 1.b, 3.b and 5.b, *supra*.

c. Mr. Barrett can establish a genuine issue and the government is not entitled to prevail as a matter of law on the basis of Reply Paragraph 6, either alone on in conjunction with its other paragraphs for the reasons stated in the preceding

Pet'r's Sur-reply re Govt. MSJ                    11                    *U.S. v. Barrett*, CV-09-00105-JHP

1821

paragraph and because Mr. Barrett can show that no reasonable attorney would have relied upon Bianco's affidavit to forego further testing. Those reasons include the following:

i. Rauch's memorandum advised trial counsel to "track down that psychological evaluation that was apparently done by Dr. Bianco," in part because Rauch could not understand why "a report did not appear in his records." Mot. Ex. 7 at DISC 008301. Rauch believed that the history underlying Mr. Barrett's "development of a personality disorder may be useful in mitigation." *Ibid.*

ii. Roseann Schaye vigorously disputed Bianco's conclusions and urged trial counsel to investigate further, and the record shows that concern was communicated to Mr. Hilfiger in writing on February 28, 2005. Doc. 95 Ex. 64 at 2 & 6.

iii. If trial counsel had reviewed Dr. Bianco's affidavit and the opinions of Dr. Sharp, they would have been faced with three conflicting opinions on whether further evaluation was called for at the then-present time. As stated in Mr. Barrett's Response, Mr. Barrett is prepared to present testimony from attorney Richard Burr that prevailing professional norms would have called upon trial counsel to use the funds this Court made available to determine whether Mr. Barrett had a mitigating condition.

iv. As already noted, in evidence that was before the Tenth Circuit, Mr. Echols mentioned Dr. Bianco's evaluation in the course of explaining why he believed an evaluation for organic brain impairments was necessary

Pet'r's Sur-reply re Govt. MSJ                12                *U.S. v. Barrett*, CV-09-00105-JHP

before the federal trial. Doc. 95 Ex. 64 at 2.

    v.  If trial counsel had used the funds this Court made available for a psychological evaluation, they would have learned that Dr. Bianco failed to evaluate Mr. Barrett for the type of impairment that would most obviously be relevant to his case, namely, impaired executive functioning. Doc. 376-1 (Decl. Deborah Miora) at 7-8; Doc. 376-2 (Decl. Erin Bigler) at ¶¶ 13-14. Executive functioning is precisely the area that is alluded to in the handwritten note at the bottom of Rauch's memorandum. *Ibid.*; Mot. Ex. 7 at DISC 008301. In sum, the expert assistance this Court made available to trial counsel would have showed counsel that Dr. Bianco's failure to complete an evaluation of Mr. Barrett's executive functioning renders the third paragraph of his affidavit completely meaningless from both a legal and a neuropsychological perspective.

    vi.  As Rauch noted, Dr. Bianco never produced a report. Bianco's affidavit contains no statement regarding what areas of brain function he evaluated and what areas he did not evaluate, and what his findings were, in neuropsychological terms. As Dr. Bigler notes, Dr. Bianco's raw data lacks the normative scales that even a professional neuropsychologist would need to fully interpret his data. Doc. 376-2 at ¶ 9. There is no evidence that trial counsel had the knowledge of neuropsychological testing and scoring to interpret Bianco's raw data. Trial counsel could not reasonably have relied upon data that were meaningless to them.

  d.  To the extent the government contends that Mr. Echols did not give Mr. Hilfiger

Pet'r's Sur-reply re Govt. MSJ        13        *U.S. v. Barrett*, CV-09-00105-JHP

1823

the files containing Dr. Bianco's raw data, that contention is refuted by Mr. Hilfiger's declaration, Doc. 174 Ex. 12 at ¶ 4, and Ex. H hereto.

7.  For the reasons stated in the Response (Doc. 366), Mr. Barrett disputes the government's misleadingly incomplete characterization of Dr. Russell's 2003 report. For the reasons stated in the Response and herein *supra*, Mr. Echols's receipt of Dr. Russell's 2003 report is not material and does not show the government is entitled to a judgment in its favor as a matter of law. The Tenth Circuit found the information trial counsel had from Dr. Russell supported a finding that they were ineffective. *Barrett*, 797 F.3d at 1227. For the reasons stated in Paragraphs 1.a, 1.c and 3.c, *supra*, Reply Paragraph 7 is improper and the Order requiring a Sur-reply on that paragraph serves no legitimate purpose.

8.  The fact of Mr. Barrett's prior conviction and its date is not in dispute and cannot seriously be considered a material fact in the context of finding an exception to the law of the case. The fact obviously was available to the government at the time it filed the Motion and the Tenth Circuit was aware of this fact when it ordered a hearing. This paragraph demonstrates the frivolous, improper nature of the Reply and the Order requiring Mr. Barrett to respond to the enumerated paragraphs. *See* Paragraphs 1.a-c & 3.c, *supra*.

9.  Same response as Paragraph 8, *supra*.

10. Same response as Paragraph 8, *supra*. Each long-available fact, well-known by the Tenth Circuit adds to the frivolousness of the Reply and the abusiveness of the Order requiring individualized sur-reply paragraphs.

11. Mr. Barrett does not dispute what is apparent from the face of the trial record. Reply Paragraph 11 is improper under the authorities cited in Paragraphs 1.a, 1.c, and 3.c. Either

Pet'r's Sur-reply re Govt. MSJ                    14                    *U.S. v. Barrett*, CV-09-00105-JHP

1824

there is a genuine issue as to the facts stated in Reply Paragraph 11 or the record shows Hilfiger's absence is not material because subsequent to the December 9, 2004, hearing, Mr. Echols informed Mr. Hilfiger in writing that he believed it was necessary to have Mr. Barrett evaluated for organic brain impairments. Resp. (Doc. 366) at ¶ 6; Doc. 95 Ex. 34 at 13-14. This Court later issued an order authorizing the defense to hire a psychiatrist of psychologist and that order was served on Mr. Hilfiger. As stated *supra*, the government has submitted declarations from Mr. Hilfiger and Mr. Smith regarding their failure to obtain a mental evaluation of Mr. Barrett, but those declarations failed to cite any of the information available to them from Mr. Echols. As stated *supra*, those omissions should be treated as adoptive admissions by silence.

12. Mr. Barrett does not dispute the content of the record. For the reasons stated *supra*, because that record was available to the government at the time of the Motion, Reply Paragraph 12 is improper, and because the record was before the Tenth Circuit when it ordered a hearing, it cannot serve as a basis for concluding the Tenth Circuit's order need not be followed. Finally, the record conclusively shows that trial counsel did not ask Dr. Russell to diagnose an organic brain disorder, Mot. Ex. 4, and the Tenth Circuit noted the limitations trial counsel placed on her in its decision. *Barrett*, 797 F.3d at 1225.

13. Same response as Paragraph 12, *supra*.

14. Same response as Paragraph 12, *supra*.

15. As to the trial record, Mr. Barrett gives the same response as in Paragraph 12, *supra*. To further demonstrate the frivolousness and pointlessness of the Reply, the government did not mention Mark Cunningham in its Motion and it does not mention him later in its argument. Neither this Court nor Mr. Barrett can have any idea why Reply Paragraph 15

Pet'r's Sur-reply re Govt. MSJ                    15                    *U.S. v. Barrett*, CV-09-00105-JHP

supposedly states a material fact.

16. Same response as Paragraphs 12 and 15, *supra*. The government fails to present any good faith argument for why Mr. Echols's withdrawal or the reasons for it demonstrate that the Tenth Circuit's order should be disregarded.

17. Same response as Paragraph 16, *supra*, with the additional observation that the Court ordered Mr. Barrett to respond to a paragraph in which the government was too lazy or too indifferent to Fed. R. Civ. P. 56(c) to bother citing the order appointing Mr. Smith.

18. Mr. Barrett disputes the government's characterization of Dr. Russell's 2005 report as reflecting a "new future dangerousness assessment." Both trial counsel at the time of trial, Tr. Sept. 9, 2005, Hr'g at 41, and Dr. Russell in her report and declaration, Mot. Ex. 3 at DISC 008234, which was before the Tenth Circuit, stated that she merely "updated the risk assessment previously conducted on Mr. Barrett in connection with his state case." Doc. 95 Ex. 56 at 3. For the reasons stated above, Dr. Russell's 2005 report was known to the Tenth Circuit and therefore does not establish grounds for rejecting that court's controlling decision on whether Mr. Barrett is entitled to an evidentiary hearing on his trial counsel's failure to pursue mental health mitigation.

19. For the reasons stated in Mr. Barrett's Response, and in the Tenth Circuit's finding that Dr. Russell's reports contained sufficient information to call for further investigation, there is a genuine issue as to what was contained in Dr. Russell's reports and the significance of that information. For the reasons stated in the Response and in Paragraph 1.a, 1.b, and 1.c, *supra*, the government is not entitled titled to judgment in its favor as a matter of law based on Reply Paragraph 18 alone, or in conjunction with other facts. Additionally, Dr. Russell's reports are hearsay and the government's failure to provide

expert reports from her precludes the government from calling her as an expert witness. Therefore, under this Court's scheduling order, the government cannot now or ever show that her description of Mr. Barrett as euthymic at the time of her evaluation means the government is entitled to judgment in its favor as a matter of law.

20. Same response as Paragraph 19, *supra*.

21. Mr. Barrett disputes the government's claim that Mr. Barrett asserted that Dr. Sharp's report was "the reason" trial counsel should have investigated mental health mitigation. *See* Resp. Paras. 1, 6, 7, 8. The Tenth Circuit's decision summarizes some of the evidence Mr. Barrett relied upon to support his allegation of deficient performance. *Barrett*, 797 F.3d at 1225-28. The government's fixation on one sentence in the petition does not establish grounds for failing to hold the hearing ordered by that court.

22. Reply Paragraph 22 accurately summarizes the findings of the Tenth Circuit in ordering the hearing the government seeks to avoid. The paragraph is frivolous in its suggestion that a sentence quoted from part of the record that was before the Court of Appeals could demonstrate the court erred so gravely as to overturn the law of the case.

23. Same response as Paragraph 22, *supra*.

24. Same response as Paragraph 22, *supra*.

25. Same response as Paragraph 22, *supra*. There is a genuine dispute as to whether trial counsel obtained Dr. Sharp's report. Dr. Sharp's declaration indicates he sent it to someone representing Mr. Barrett in 2005. Doc. 95 Ex. 55 at ¶ 16. The government appears to concede in Reply Paragraphs 27 and 28 that there is a dispute on this point, noting Dr. Sharp's declaration. For the reasons stated in Paragraph 1 of the Response, the government's Motion concedes that if Dr. Sharp's report was available to trial counsel

Pet'r's Sur-reply re Govt. MSJ                    17                    *U.S. v. Barrett*, CV-09-00105-JHP

1827

from Mr. Leedy, given that Dr. Russell's report put trial counsel on notice of Mr. Barrett's history of mental problems and his extreme paranoia—which the government's Reply studiously ignores—there is, as the Tenth Circuit held, a genuine issue as to whether trial counsel acted reasonably. Mr. Barrett did not assert before the Tenth Circuit trial counsel had possession of Dr. Sharp's report and the Court of Appeals did not rely upon that as a fact when ordering the evidentiary hearing. Therefore, the government's questioning of the fact does not constitute grounds for ignoring the law of the case.

26. Trial counsel's avowed ignorance of Dr. Sharp is undisputed and material in that it shows trial counsel were so disengaged from Dr. Russell's work that they did not even remember a person mentioned several times in her reports who found their client "extremely paranoid."

27. Mr. Barrett disputes the government's characterization of his reply brief. Mr. Barrett asserted the same facts the government asserts here: trial counsel state they do not recall Dr. Sharp or his report and Dr. Sharp recounts faxing his report to someone in 2005. In any event, for the reasons previously stated, and those stated in Sur-reply Paragraph 28, *infra*, Reply Paragraph 27 is not material to whether this Court may refuse to hold the hearing ordered by the Tenth Circuit.

28. Mr. Barrett does not dispute the contents of the declaration he submitted from Dr. Sharp. The government has succeeded in demonstrating why there is a dispute about whether trial counsel had Dr. Sharp's report. To the extent that is a material issue, *but see Barrett*, 797 F.3d at 1224-28, *and* Response *and* ¶ 25, *supra*, there is a genuine question as to whether Dr. Sharp provided his report to trial counsel but they failed to retain a copy in their files.

Pet'r's Sur-reply re Govt. MSJ                18                *U.S. v. Barrett*, CV-09-00105-JHP

1828

29. Mr. Barrett does not dispute the record of this Court's order. It is frivolous for the government to suggest that the date of this Court's order or the fact that it denied relief is material. The Tenth Circuit was obviously aware of this Court's decision when it overturned that decision.

30. Mr. Barrett does not dispute the contents of the order the Tenth Circuit overturned but, for the reasons stated in the Response and Paragraph 1, *supra*, he contends the contents of an overturned order do not establish facts showing that the higher court erred such that this court may ignore the law of the case. The cited part of the order cites Mr. Hilfiger's declaration, prepared by the government, in which he states that he retrieved Mr. Echols's files from Mr. Echols's house. Doc. 174 Ex. 12 at ¶ 4. This affirmation of fact by the government undermines the government's present conspiracy theory that Mr. Echols did not provide his materials to Mr. Hilfiger. This Court cited Mr. Hilfiger's declaration for the proposition that the "record reflects counsel had . . . investigative materials assembled by the Oklahoma Indigent Defense System (OIDS)." Order (Doc. 214) at 145 & n. 197. However, the "record" cited was the hearsay declaration, not the trial record. In the trial record, Mr. Smith acknowledged that one week before jury selection, defense counsel were aware that they were missing material from the state court mitigation investigation. Tr. Sept. 9, 2005, Hr'g. at 43. The government cites the footnote, but omits the text, in which this Court made the legal conclusion that "Petitioner has failed to show that counsel should have contacted Steve Leedy to obtain additional materials or that counsel's failure to do so was unreasonable." *Ibid.* The omission is telling because it shows, contrary to the implication of the Motion and Reply, that the question whether trial counsel unreasonably failed to contact Mr. Leedy was fairly presented and decided

by this Court. The omission adds to the evidence that the Motion and Reply are frivolous and interposed for an improper purpose.

31. Same response as Paragraph 30, *supra*.

32. Same response as Paragraphs 1, 25, 28, and 30, *supra*. Given the concession that the Tenth Circuit remanded the case on the basis of an argument that presented what the government currently contends are the true facts, the Motion and Reply cannot present grounds for holding the Tenth Circuit was wrong.

33. Same response as Paragraph 32, *supra*.

34. Mr. Barrett does not dispute the content of the record. For the reasons stated in Paragraphs 1, 25, 28, and 30, *supra*, the government fails to establish a fact showing it is entitled to judgment as a matter of law.

35. Reply Paragraph 35 is confusing in that the subjects of the first and second sentences are not the same, but to the extent the government contends Mr. Barrett's counsel sent the government the documents referenced in Reply Paragraph 34, Mr. Barrett does not dispute the fact that he did. For the reasons states in the Paragraph 34, *supra*, that fact is not material and the government has failed to demonstrate that it is entitled to judgment as a matter of law.

36. Mr. Barrett does not dispute the Bates numbers on the pages of the documents. For the reasons states in the Response and Paragraphs 1, 3, 4, 5, 6, 7, 18-20, 25, 28, and 30, the government has failed to demonstrate the absence of a genuine issue on a material fact, or its entitlement to judgment as a matter of law.

37. Mr. Barrett does not dispute that he sent the document containing the table, but he does dispute the government's interpretation of it. As post-conviction counsel has already

explained to counsel for the government, the materials that came from Mr. Echols were in the possession of Mr. Hilfiger, and he, not Mr. Echols, gave them to post-conviction counsel. Ex. H (Decl. Joan Fisher). The government has not produced admissible evidence supporting its interpretation of the table. Trial counsel are in the best position to state what documents they were aware of and relied upon in making their decisions, if any, regarding whether to investigate Mr. Barrett's mental health. For the reasons stated in Paragraph 36, the government's Motion fails.

38. Mr. Barrett does not dispute the record of his own motions. The government fails to put forth any evidence or argument to demonstrate that Mr. Barrett's Motion in Limine is a material fact that calls into question the decision of the Tenth Circuit.

## ANALYSIS

In general, the Response and the foregoing enumerated paragraphs suffice to demonstrate the lack of merit in the government's Motion and Reply. For purposes of clarification, Mr. Barrett addresses some of the statements made in the Argument section of the Reply.

The government claims that Mr. Echols failed to disclose documents to Mr. Hilfiger or Mr. Smith, and that Mr. Barrett admits this. Reply 8, 11, 12. That is not a fact. It is the government's misinterpretation of the chart prepared by Mr. Barrett's counsel. First, the government's own declaration from Mr. Hilfiger states, "After Mr. Echols' withdrawal from the case, I went to his home and took possession of boxes of files that he had amassed during his representation of Mr. Barrett in the State case along with files that he had from the instant federal case." Doc. 174 Ex. 12 at ¶ 4. This is the same paragraph this Court relied upon to assert that Mr. Hilfiger had all of the OIDS materials, a finding the government simultaneously asserts is correct, material, and undisputed. Reply Paras. 30 and 31.

Pet'r's Sur-reply re Govt. MSJ                    21                    *U.S. v. Barrett*, CV-09-00105-JHP

Second, the chart the government relies upon does not state that the materials from Echols were never in Hilfiger's custody. On the contrary, since Mr. Barrett's position has consistently been that Mr. Echols's acts and omissions are not what is being judged for reasonableness, he would have no reason to disclose to the government files that had never been in Mr. Hilfiger's or Mr. Smith's possession.

Third, Echols stated in his declaration, which was before the Tenth Circuit, "I provided Mr. Hilfiger with access to a secure website, which had my state files in Mr. Barrett's case on a computer data base," but Hilfiger never accessed them. Doc. 95 Ex. 34 at 3.

Fourth, post-conviction counsel explained the chain of custody to government counsel over the telephone. Sur-reply Ex. H (Decl. Joan Fisher) at ¶ 2. Thus, everything from the trial record to the government's own evidence contradicts the government's current claim that Echols withheld information from Hilfiger and Smith.

Because the government only focuses on a narrow issue and does not mention the reasons the Tenth Circuit gave for ordering a hearing, it has failed to show "'there is an absence of evidence to support the nonmoving party's case.'" Reply 8 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)). The Response and the enumerated paragraphs of this Sur-reply demonstrate that there are no new facts or law calling into doubt the Tenth Circuit's decision.

The government undermines its Motion when it disputes that Echols put Hilfiger on notice that Leedy could provide OIDS files. Reply 9. It is the movant's burden to *prove* the *absence* of a dispute. Fed. R. Civ. P. 56(a). The government argues there can be no genuine dispute as to whether trial counsel should have sought files from Leedy because "Echols [*sic*] letter [Doc. 95 Ex. 64] only mentioned files from mitigation investigator Roseann Schaye, and would not have given notice that Leedy also possessed Dr. Sharp's mental health report." Reply

Pet'r's Sur-reply re Govt. MSJ                22                *U.S. v. Barrett*, CV-09-00105-JHP

10. To review, trial counsel knew that OIDS did the mitigation investigation. They knew that Leedy was the custodian of at least some of those records. Dr. Russell put trial counsel on notice of Dr. Sharp's evaluation and mentioned Mr. Barrett's extreme paranoia. Trial counsel admitted on the record that they had not retrieved but wanted to and needed to retrieve *all* mitigation files from predecessor counsel. Trial counsel claimed they spoke to state-court penalty phase counsel Jack Gordon, but he disputes this. No one disputes that trial counsel failed to contact Leedy. The government can prevail only if, as a matter of law, trial counsel, contrary to Mr. Smith's own statements on the record, had no duty to contact Leedy. As a matter of law, trial counsel had a duty to conduct a thorough investigation of Mr. Barrett's background. *Barrett*, 797 F.3d at 1223-24. If trial counsel have an independent duty to investigate, it follows that they have a duty to obtain the investigative files prepared by predecessor counsel. *Cf. Williams (Terry) v. Taylor*, 529 U.S. 310, 395-96 (2000) (finding counsel ineffective for failing to take advantage of readily available mitigation).

Although the government's argument falls of its own weight, *Rompilla v. Beard*, 545 U.S. 374 (2005), and *Wiggins v. Smith*, 539 U.S. 510 (2003), demolish the contention that trial counsel must specifically be told to look in a file for mitigation evidence before they have a duty to investigate. In *Rompilla*, as here, there was an obvious, record-based reason to examine a file despite there being no indication that the file contained anything mitigating. *Rompilla*, 545 U.S. at 383-84. In *Wiggins*, trial counsel's actions, reflected in the record, showed they were interested in finding and presenting the type of mitigation evidence they failed to uncover because they stopped looking. *Wiggins*, 539 U.S. at 525-26. Here, the need to contact Leedy and Gordon is reflected in trial counsel's statements to the court on September 9, 2005. The *Wiggins* Court held that trial "counsel chose to abandon their investigation at an unreasonable juncture,

Pet'r's Sur-reply re Govt. MSJ                    23                    *U.S. v. Barrett*, CV-09-00105-JHP

1833

making a fully informed decision with respect to sentencing strategy impossible." *Id.* at 527-28.

Here, trial counsel abandoned their investigation before turning to OIDS's investigator, Leedy, despite knowing they needed everything, that they didn't have it, and that Leedy was a source.

For the foregoing reasons, Mr. Barrett has not been "[d]isarmed of the argument that animated his § 2255 motion—that trial counsel actually possessed Dr. Sharp's report." Reply 10. The government concedes that Mr. Barrett's brief to the Tenth Circuit did not argue that Hilfiger and Smith had Sharp's report. Reply Para. 32. Given that Mr. Barrett prevailed despite this genuinely uncertain issue of fact, he has no reason to feel disarmed. Rather, the government has nothing that could call the Tenth Circuit's decision into question.

As stated *supra*, the government falsely claims that Mr. Barrett "does not dispute the fact that Echols did not provide the Bianco and LaFortune reports to successor counsel." Reply 12. The government never made that representation in its Motion. It merely asserted that Echols had them. As explained *supra*, the government's conspiracy theory is contradicted both by the declaration it provided from Mr. Hilfiger, and its insistence that this Court was correct when it said Mr. Hilfiger obtained all documents from predecessor counsel. Reply Paras. 30 & 31 (citing Doc. 214 at 145 & n.197, in turn citing Respondent Ex. 12 at ¶ 4.)

The twists and turns in the government's conspiracy theory only underscore the need for a hearing. Trial counsel possessed documents that raised numerous questions about Mr. Barrett's mental and emotional problems and how to investigate and present them. What remains undisputed is that neither Mr. Hilfiger nor Mr. Smith has ever said that they were aware of the contents of their own files or that the contents of those files dissuaded them from investigating Mr. Barrett's mental problems for purposes of the penalty phase. Trial counsel's failure to mention Dr. Bianco or Dr. LaFortune in response to Mr. Barrett's specific allegation that they

failed to conduct a psychiatric or neuropsychological evaluation should be viewed as an adoptive admission by silence that neither state-court consultant played any role in trial counsel's decision-making. *Cf. United States v. Pulido-Jacobo*, 377 F.3d 1124, 1132 (10th Cir. 2004); Fed. R. Evid. 801(d)(2).

The government's outrageous argument that Petitioner misled this Court trips over its own desperate, demonstrable falsity. Reply 12. The government's equally desperate contention that knowledge should be imputed to Hilfiger and Smith, Reply 13, flies in the face of the governing law that "requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland v. Washington*, 466 U.S. 668, 689 (1984). Under that context-dependent standard, post-hoc rationalizations constructed from records and inferences are of no weight. *Wiggins*, 539 U.S. at 526-27; *id.* at 532. It follows that if the government must rely on an imputation forbidden by the substantive law, the government is not entitled to judgment in its favor as a matter of that law. Accordingly, the Motion fails.

The foregoing 24+ pages of facts and argument demonstrate that Mr. Barrett's counsel spent considerable time preparing this court-ordered Sur-reply. As with the Response, the two business days the Court allowed for preparing this Sur-reply precluded counsel from doing more. Mr. Barrett's counsel could not speak with all the potentially relevant witnesses in order to obtain declarations that contradict the facts or implications in the Reply. For these reasons and those stated in Paragraph 1, *supra*, Mr. Barrett objects to this Court considering the Reply.

## CONCLUSION

For the foregoing reasons, this Court must deny the government's Motion for Partial Summary Judgment.

DATED:  March 6, 2017

Respectfully submitted,

/s/ *David Autry*
DAVID AUTRY
Attorney at Law

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

 /s/ *Tivon Schardl*
Tivon Schardl
Capital Trial & Habeas Attorney

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 6th day of March 2017, I caused the foregoing Sur-reply to the Government's Reply to Petitioner's Response in Opposition to the Government's Motion for Partial Summary Judgment to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

Pet'r's Sur-reply re Govt. MSJ                    26                    *U.S. v. Barrett*, CV-09-00105-JHP

1836

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,

          Petitioner,

vs.

UNITED STATES OF AMERICA,

          Respondent.

CASE NO. CV-09-00105-JHP

# EXHIBIT G
### TO PETITIONER'S SUR-REPLY
### TO THE GOVERNMENT'S REPLY
### TO PETITIONER'S RESPONSE IN OPPOSITION
### TO THE GOVERNMENT'S MOTION
### FOR PARTIAL SUMMARY JUDGMENT

**CAPITAL HABEAS CASES FILED IN THE EASTERN DISTRICT OF OKLAHOMA
BETWEEN JANUARY 1, 1998 AND MARCH 2009**

| | CASE | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|
| 1 | *Battenfield v. Ward*, 6:98-cv-00036-JHP<br>*Battenfield v. Gibson*, 236 F.3d 1215 (10th Cir. 2001). | 6/15/1998 (Doc. #16); Appendix filed 6/15/1998 (Doc. #17); denied without briefing, argument or hearing of any kind 5/5/1999 (Doc. #28) | No, per counsel, but contained all info req'd by form, contained brief, over 25 pages, appendix included exhibits | Robert Jackson Steve Presson 10-20-09 |
| 2 | *Johnson v. Gibson*, 6:98-cv-00072-FHS-JHP<br>*Johnson v. Gibson*, 10th Cir. Case No. 99-7089, 2000 WL 1158335 (10th Cir. 8/16/2000) | 7/16/98 (Doc. # 11); State court appendix filed separately 5/1/98 (Doc. 8); response filed 9/30/98 (Doc. 18); reply filed 11/2/98 (Doc. 22); petition denied 6/29/99 (Doc. 30) | No, per counsel.  Separate motions for discovery & record expansion.  Denied after reply w/o fact-development. | Randy Bauman, FDP CHU |
| 3 | *Johnson v. Gibson*, 6:98-cv-00331-FHS<br>*Johnson v. Gibson*, 254 F.3d 1155 (10th Cir. 2001) | Minute order of 12/1/98 says "all motions to be filed within petition" (Doc. 11); 2/1/99 petition filed (Doc. 12); brief filed separately 2/1/99 (Doc. 14); 3/23/99 response (Doc. 17); 6/30/99 reply (Doc. 24; 12/9/99 order denying (Doc. 30) [10th Cir. reversed and remanded] | No, per FPD CHU attorneys, no CHU case has been filed on form. | Stephen J. Greubel, FPD CHU |
| 4 | *Humphreys v. Gibson*, 6:98-cv-00568-FHS-JHP<br>*Humphreys v. Gibson*, 261 F.3d 1016 (10th Cir. 2001) | 5/18/1999 (Doc. #11); Order denying filed 3/30/2000 (Doc. #24) after response and reply | No, per counsel, cites cases, 81 pages | Chris Eulberg 405-232-3450 10-21-09 |
| 5 | *Cummings v. Gibson*, 6:99-cv-00447-FHS-KEW<br>*Cummings v. Sirmons*, 506 F.3d 1211 (10th Cir. 2007) | Denied 8/11/2006, 2006 WL 2434462 | Apparently not.  Eulberg said he'd never used the form.  Neither district court opinion nor 10th Cir. opinion mentions. | Chris Eulberg 405-232-3450 10-21-09 |
| 6 | *Snow v. Gibson*, 6:00-cv-00070-FHS<br>*Snow v. Sirmons*, 474 F.3d 693 (10th Cir. 2007) | 7/31/2000 (Doc. #13); with appendix filed same day (Doc. # 14). | No, per counsel.  Not mentioned in 10th Circuit opinion. | Vicki Wernecki 10-20-09 |
| 7 | *Delozier v. Gibson*, 6:00-cv-00102- | 8/31/2000 (Doc. #18), withdrawn and | No, per counsel and docket entries | Randy Bauman |

| | CASE | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|
| | JHP-KEW<br>*Delozier v. Sirmons*, 532 F.3d 1306 (10th Cir. 2008) | supplemented on 10/10/2000 (Doc. # 23); appendix filed 10/10/2000 (Doc. #24); on 10/20/2003 JHP granted motion to amend with recent authority (Doc. ##48, 49) | on legal authority.  Not mentioned in 10th Circuit opinion. | 10-20-09 |
| 8 | *Braun v. Keating*, 6:00-cv-00371-MB-JHP | 7/18/2000 (Doc. #3), appendix filed 7/18/2000 (Doc. 4) [This appears to have been a successor filed under warrant.] | n/a | Benjamin McCullar 405-214-2889 |
| 9 | *Phillips v. Gibson*, 6:01-cv-00045-JHP-KEW | 10/1/2001 (Doc. #18); Mot. Leave to Amend (post exhaustion) (Doc. #37); Order granting leave to amend (Doc. #40); Amendment to Pet. filed 4/15/2004 (Doc. #43) | No, counsel said it was a "brief" | Gregory W. Laird 405-632-6668 10-22-09 |
| 10 | *Taylor v. Workman*, 6:01-cv-00252-JHP-KEW<br>Opinion denying relief:  2007 WL 778043<br>*Taylor v. Workman*, 554 F.3d 879 (10th Cir. 2009). | 11/29/2001 (Doc. #14)[included request for evidentiary hearing]; 3/12/2007 Order denying petition & request for hearing (without briefing) (Doc. #32).  Although District Court opinion notes it was improper under Rule 2 for petitioner to name Attorney General as respondent, there is no other mention of rule or form. 2007 WL 778043 at *1 | No, per Randy Bauman. | Randy Bauman |
| 11 | *Hammon v. Gibson*, 6:01-cv-00253-FHS-KEW | 12/18/2001 (Doc. #18); 12/18/2001 separate mot expand record (Doc. #19); 2/13/2002 response filed; [Case dismissed after petitioner sentenced to life based on *Atkins v. Virginia*] | No, per counsel. | Kristi Christopher, Scott Braden, Vicki Werneke |
| 12 | *Wackerly v. Sirmons*, 6:01-cv-00567-FHS-KEW<br>*Wackerly v. Workman*, 580 F.3d 1171 (10th Cir. 2009) | 5/7/2002 (Doc. #19), appendix filed same day (Doc. #20), mot. expand record filed same day (Doc. #22); 7/15/2002 order granting mot. to expand for purpose of determining whether P entitled to evid hr'g; 8/7/2002 response; 9/13/2002 reply | Not mentioned in opinion 2007 WL 963210, or appeal. | James T. Rowan 405-239-2454 Joseph Wells 405-942-8800 |

| | CASE | FILED DATE & DOC. # | ON FORM | COUNSEL |
|---|---|---|---|---|
| 13 | *Murphy v. Mullin*, 6:03-cv-00443-RAW-KEW | 3/5/1004 (Doc.14); Amended Petition Removing unexhausted claims filed 9/10/2004 (Doc. #34); 2nd Amendment filed 12/28/2005 (Doc. #54) [not on form; includes points and authorities; requests hearing & briefing; is 46 pages long; list of exhibits; no verification]; 8/1/2007 opinion denying relief does not mention form of petitions | No, per counsel | Kristi Christopher |
| 14 | *Duty v. Mullin*, 6:05-cv-00023-FHS-SPS | 7/28/2005 (Doc. #32) | No, per counsel | Randy Bauman |
| 15 | *Ryder v. Mullin*, 6:05-cv-00024-JHP-KEW | 9/13/2005 (Doc. #13); Suppl. Auth filed 3/21/2006 contains argument (Doc. 21) | No, per counsel | Randy Bauman |
| 16 | *Derosa v. Mullin*, 6:05-cv-00213-JHP-SPS | 12/23/2005 (Doc. #17); Attachments filed 12/23/2005 (Doc. #18); Response filed 3/22/2006 with attachments (Doc. #19). | No, per counsel | Patti Palmer Ghezzi (FPD) |
| 17 | *Barrett v. USA*, 6:09-cv-00105-JHP | | Yes, per order of the court. | |

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:       dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:       Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,

      Petitioner,

vs.

UNITED STATES OF AMERICA,

      Respondent.

CASE NO. CV-09-00105-JHP

# EXHIBIT H
**TO PETITIONER'S SUR-REPLY
TO THE GOVERNMENT'S REPLY
TO PETITIONER'S RESPONSE IN OPPOSITION
TO THE GOVERNMENT'S MOTION
FOR PARTIAL SUMMARY JUDGMENT**

**DECLARATION OF JOAN M. FISHER**

I, Joan M. Fisher, a person over eighteen (18) and competent to testify, declare as follows:

1.  I am an Assistant Federal Defender for the Federal Defender's Office of the Eastern District of California.  With attorney David Autry of Oklahoma City, Oklahoma, I represent Movant/Petitioner, Mr. Kenneth Barrett.  I have represented Mr. Barrett since 2009.

2.   The rows in Exhibit 92 of the Amended Joint Pre-Hearing Statement that name Echols as the source for the documents, named him because he was the original source of the documents, not because post-conviction counsel obtained the documents directly from Echols.  As stated in paragraph 4 of Mr. Hilfiger's declaration, he obtained Mr. Echols's boxes from Mr. Echols's house shortly after Mr. Echols withdrew from the case. In a telephone call following the exchange of Exhibit 92, I explained to the government that the "Echols's boxes" came from Mr. Hilfiger.

I declare, under penalty of perjury as provided in the laws of the United States of America, that the foregoing is true and correct and based on my personal knowledge.

Executed by me this 6th day of March 2017 in the City of Sacramento, Sacramento County, California.

1

_/s/ Joan M. Fisher_____
Joan M. Fisher

2

**DAVID AUTRY.** OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile       (405) 521-9669
E-mail          dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | Case No. CIV-0900105-JHP |
| Petitioner, | ) | |
| | ) | **OBJECTION TO COURT'S ORDER** |
| v. | ) | **BIFURCATING THE HEARING,** |
| | ) | **MOTION TO RECONSIDER,** |
| UNITED STATES OF AMERICA, | ) | **AND MOTION TO STAY** |
| | ) | **EVIDENTIARY HEARING** |
| Respondent. | ) | **IN ORDER TO PURSUE APPELLATE** |
| | ) | **REMEDIES** |

Ten days before the evidentiary hearing is to begin, the court has ordered the hearing to be bifurcated. The reason given is because there are two prongs to the *Strickland v. Washington,* 466 U.S. 668 (1984) test – attorney performance and prejudice. Since there are two prongs to the test, the court has divided the hearing into two parts. The first part is to be devoted to the

1

1844

"performance prong" and the second is to address the "prejudice prong," with a Chinese wall erected between the two until the court makes its findings on deficient performance. The court has signaled in its order that if it finds, after the first part of the hearing, that trial counsel's performance was not constitutionally deficient, there will be no hearing on prejudice, and the matter will be concluded.  (Doc. 378).

Petitioner objects and asks the court to reconsider its order. Failing that, Petitioner asks that the hearing be continued to March 30, 2017. This is the date Mr. Hilfiger is set to testify. Since he is an indispensable witness on the question of deficient performance, it would be more efficient to continue the hearing to the time he is available. Otherwise, under the court's order, there will be an inefficient "trifurcated" proceeding, with perhaps the key witness on the question of deficient performance (Mr. Hilfiger) testifying at or near the tail-end.

The court's order bifurcating the hearing violates the Tenth Circuit's remand order. The Tenth Circuit found Mr. Barrett has made a prima facie showing *as to both* the performance and prejudice prongs of the *Strickland* test. The Tenth Circuit remanded the case for an evidentiary hearing based on Mr. Barrett's *unitary claim* of ineffective assistance of counsel*, which obviously encompasses both prongs of the test. *United States v. Barrett,* 797 F.3d 1207, 1223-1232 (10th Cir. 2015) (discussing evidence relating to both performance and prejudice, and stating, at page 1224, that an evidentiary hearing is required where a petitioner's allegations as to both, if true, would entitle him to relief).

Instead, the court has ordered two hearings with the distinct prospect that the court will hear *no evidence* on prejudice if it finds trial counsels' performance was professionally reasonable. This would improperly allow the court to terminate the hearing after only half the story was presented.  But the Tenth Circuit has ordered a single evidentiary hearing for the court

2

to consider evidence bearing on *both prongs* of the *Strickland* test, not a piecemeal approach which would permit the court to hear evidence as to only one prong and then terminate the proceedings if it finds against Mr. Barrett.  The Tenth Circuit neither authorized nor contemplated a bifurcated hearing. *Barrett,* 797 F.3d at 1232 (2015) ("In short, we believe that Defendant presented sufficient evidence of deficient performance *and* prejudice to entitle him to *an* evidentiary hearing. Based on the evidence presented at *a* hearing, the district court can make findings of fact and render its decision, *both* on performance *and* prejudice.") (emphasis added). "An important corollary of the [law of the case] doctrine, known as the "mandate rule," provides that a district court "must comply strictly with the mandate rendered by the reviewing court." *Colorado Interstate Gas Co. v. Natural Gas Pipeline Co. of America*, 962 F.2d 1528, 1534 (10th Cir.1992)." *Ute Indian Tribe of the Uintah & Ouray Reservation v. Utah*, 114 F.3d 1513, 1520 (10th Cir. 1997).  *See also, Zinna v. Congrove,* 755 F. 3d 1177, 1182  (10th Circuit 2014).

The court's order also apparently means that a number of witnesses, such as members of Mr. Barrett's family, would have to testify twice. Under the court's bifurcated approach, the family witnesses would have to appear to testify only to the nature and extent of their exceedingly brief contacts with trial counsel, and to what trial counsel *did not ask them*, without having any opportunity to say what they would have said regarding the significant mitigating evidence they could have offered, but which was omitted from trial due to a failure to investigate. Such an exercise would be largely pointless in light of the fact that *trial counsel's post-conviction affidavits never dispute what Mr. Barrett's family members say* about the perfunctory, last- minute "interviews" they had with trial counsel shortly before taking the stand. (Doc. 175, Exhs. 11, 12). The government has had years to try to refute what these witnesses say about the nature and extent of their contacts with trial counsel, and the mitigating evidence they could have offered on behalf

3

of Mr. Barrett if an effective investigation had been undertaken, but has not done so. Nor could it, based on the post-conviction affidavits of Messrs. Hilfiger and Smith and the declarations of Mr. Barrett's family members. *Barrett,* 797 F.3d at 1225 ("Defendant's trial attorneys also apparently did little to investigate his background and mental health through his family. According to the declarations of family members who testified during the sentencing phase, the trial attorneys' preparation for their testimony consisted more or less of five-minute interviews before going on the stand, and none were asked about Defendant's background, mental health, or family history[,]" and going on to analyze the government's arguments, *none of which* contested the family members' declarations about the nature and extent of their contact with trial counsel).

On the other hand, if the court intends to hear evidence on both prongs of the *Strickland* test and is not contemplating possibly ending the hearing after receiving evidence on deficient performance, then there is no need for bifurcation. The court is required to hear all the evidence in the single, undivided hearing ordered by the Tenth Circuit.

Having Mr. Barrett's family members testify twice in an unnecessary bifurcated proceeding would also work significant hardship on them. Many are elderly and in poor health. Some are employed and would have to re-arrange their work schedules twice. If there is a bifurcated hearing against this objection and motion to reconsider, the hearing will be unnecessarily extended as witnesses are compelled to appear twice instead of being able to tell the whole story once. If a bifurcated hearing is to be held (over objection), with the prospect that the proceeding may be terminated after evidence is heard on only the "performance prong" of *Strickland*, Petitioner asks that he be able to depose witnesses as to "prejudice," in order to get the entirety of the relevant testimony of the witnesses on the record.  This is particularly important with respect to family witnesses who are elderly and have health problems – and whose testimony

4

may never be heard under this Court's current Order.

Mr. Barrett is clearly prejudiced by the arrangement ordered by the court, because he cannot effectively, intelligibly, and persuasively present his case in the kind of hearing the court has directed. Under the court's order, the hearing(s) will frequently be punctuated by one side or the other objecting to whether a question or area of questioning goes to one "prong" or the other, adding an interminable "stop-start" quality to the proceedings. At the least, this is an inefficient use of resources, for all involved. Beyond all this, of course, the order bifurcating the hearing denies Mr. Barrett the hearing the Tenth Circuit ordered.

The Court's Order violates Mr. Barrett's right to Due Process under the Fifth Amendment to the United States Constitution and deprives him of a full and fair evidentiary hearing. The Court should reconsider and rescind its order for a bifurcated hearing.

On this date, Mr. Autry contacted counsel for Respondent regarding their position on this Objection and Motion to Reconsider and Rescind.  Respondent's counsel object to this Motion.

DATED:  March 6, 2017                                  RESPECTFULLY SUBMITTED,

                                                                            */s/ David Autry*
                                                                            DAVID AUTRY

                                                                            */s/ Joan M. Fisher*
                                                                            JOAN M. FISHER

                                                                            Attorneys for Petitioner,
                                                                            KENNETH EUGENE BARRETT

5

1848

**CERTIFICATE OF ELECTRONIC FILING AND SERVICE**

This is to certify that on this 6th day of March, 2017, I caused the foregoing instrument to be filed with the Clerk of the Court using the ECF System for filing, with electronic service being made via CM/ECF to Jeffrey B. Kahan, U.S. Department of Justice, and Christopher J. Wilson, AUSA. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

<div align="center">

*/s/ Joan M. Fisher*
JOAN M. FISHER

</div>

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:880569@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
```
Content−Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 3/7/2017 at 3:29 PM CST and filed on 3/7/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09−cv−00105−JHP |
| **Filer:** | |
| **Document Number:** | 386(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM on 3/8/2017 (Re: [385] Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider, and Motion to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies). (cjt, Deputy Clerk)**

**6:09−cv−00105−JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**SECOND AMENDED JOINT PRE-HEARING STATEMENT**

---

**COME NOW** the parties to this action and submits the following Second Amended Joint Pre-Hearing Statement, which corrects five items in the earlier statement: it substitutes government exhibits 34 and 49 with substantially similar documents, it alters the cited summary of Jack Gordon's testimony, it references the Government's pending objection to the proposed declaration of Judy House, and it notes an objection to the estimated length of hearing:

    A.  <u>Counsel who will appear at evidentiary hearing</u>:

        a.  Petitioner: David Autry, Attorney; Joan Fisher, Assistant Federal Public Defender; Tivon Schardl, Assistant Federal Public Defender and Karl Saddlemire, Assistant Federal Public Defender.

        b.  Respondent: Christopher J. Wilson, Assistant United States Attorney and Jeffrey B. Kahan, Trial Attorney, Capital Case Section

    B.  <u>Stipulated or uncontested facts</u>:

    Petitioner stipulates to the following proposed findings of fact filed this date by the Respondent:

    Paragraphs 2,3,13 and 23.

<center>1</center>

Respondent stipulates to the following proposed findings of fact filed this date by the Petitioner.

Paragraphs 20,23,25,26,51,83,89,93,94,107(a), (b), (d), (e), (f), (g), 144, 151, 157, 162,163, 203, 252, 287 and 343

C.  Contested issues of fact and law:

    a.  Contested Issues of Fact

    Facts to which the parties have not stipulated as indicate in Section B above are contested.  See Findings of Fact and Conclusions of Law filed by the respective parties this date.

    b.  Contested Issues of Law

    Both parties contest the Conclusions of Law proposed by the opposing party, as filed this date.

D.  Witnesses to be called at evidentiary hearing, including brief description of their anticipated testimony:

    a.  Petitioner:  The anticipated testimony of the witnesses named below are summarized and identified by previously submitted declarations or documents.  To the extent that no declaration or testimonial summary is in the record, either a brief summary is included or a declaration or statement is attached.

1.  George Woods – 6:09-cv-00105, Doc 71, Exh. 117
2.  Myla Young, deceased – 6:09-cv-00105, Doc 71, Exh. 44
3.  John Echols – 6:09-cv-00105, Doc 71, Exh. 34
4.  Jack Gordon – 6:09-cv-00105, Doc 95, Exh. 82
5.  Jeanne Russell – 6:09-cv-00105, Doc 71, Exh. 56
6.  Steve Leedy – 6:09-cv-00105, Doc 71, Exh. 111
7.  Roseanne Schaye – 6:09-cv-00105, Doc 403, Exh. 118
8.  Mark Henricksen – 6:09-cv-00105, Doc 71, Exh. 29
9.  Ron Lax – 6:09-cv-00105, Doc 71, Exh. 66

1852

10. Gelene Dotson Barrett – 6:09-cv-00105, Doc 71, Exh. 97; Doc 178, Ex 210

11. Steve Barrett – 6:09-cv-00105, Doc 71, Exh. 99

12. Abby Stites – 6:09-cv-00105, Doc 71, Exh. 103; Doc 178, Ex 216

13. Roger Crawford – 6:09-cv-00105, Doc 71, Exh. 92

Roger Crawford will also be called to testify to the following:

(1) Travis Crawford, Roger Crawford's son, is a blood relative of Kenneth Barrett (first cousin).  Travis also suffers from serious mental health issues.  Roger can attest to that familial genetic component, as well as that of other of his progeny and their progeny. (2) Cindy Crawford was called by the government as a witness in aggravation at the penalty phase (Doc 350, FedTr vol.22, pp. 4575-4586). (3) On February 21, 2017, the undersigned counsel met with Phyllis Crawford, mother to Travis Crawford, sister to Gelene Dotson (Mr. Barrett's mother), and wife to Roger Crawford, a witness who lays out in her declaration (Exh 91, Doc 404-3 at 90) her family history and her observations of Petitioner, Gelene Dotson and Ernie Barrett (Petitioner's father). Phyllis Crawford is now suffering from dementia. Undersigned counsel Joan Fisher met with Phyllis and Roger Crawford to discuss their anticipated testimony and to determine Phyllis Crawford's availability to testify personally to the contents of her declarations.  Mrs. Crawford unquestionably appears to be suffering from symptoms consistent with dementia, which are sufficiently debilitating to render her testimony unavailable. Roger Crawford, as her husband, can and will testify to Phyllis Crawford's inability to testify. Roger Crawford is personally aware of the substantive matters relayed by Phyllis Crawford in her declarations.  Roger Crawford witnessed the execution of those declarations and can attest to the fact that Phyllis Crawford signed her declarations.

14. Kathy Trotter – 6:09-cv-00105, Doc 71, Exh. 86

15. Janice Sanders – 6:09-cv-00105, Doc 71, Exh. 85; Doc 178, Ex 215

16. Carolyn Joseph – 6:09-cv-00105, Doc 71, Exh. 78; Doc 178, Ex 213

17. Brandi Hill – 6:09-cv-00105, Doc 71, Exh. 77

18. Gwendolyn Crawford – 6:09-cv-00105, Doc 71, Exh. 83

19. Linda Riley – 6:09-cv-00105, Doc 71, Exh. 87; Doc 178, Ex 214

20. Toby Barrett – 6:09-cv-00105, Doc 71, Exh. 96

21. Mark Dotson – 6:09-cv-00105, Doc 71, Exh. 98; Doc 178, Ex 211

22. Judy House – Attached, not yet filed

23. Nona Reich – 6:09-cv-00105, Doc 71, Exh. 101

24. Gary Nelson – Declaration of Testimony Attached, not yet filed

25. Iva Hines: Thomas and Iva Hines run Thomas Hines Construction. Iva is 60 years old. Ken worked for them for years, dined at their table, been to their house 100s of times. Mrs. Hines will testify that Ken was a good worker, a good guy. They had no right to come in on him like they did. They all would have done the same as him.  She will also testify that her husband and she were never contacted by Mr. Hilfiger and/or Mr. Smith. She does remember speaking to someone from the defense before the first state trial. … She will add that "Ken would do anything for you, give you the shirt off his back." If she had been contacted by his federal lawyers, she would have told them of her potential testimony and would have testified if called. "Kenny got along with everybody.  He had no enemies."

26. Rick Lunsford – 6:09-cv-00105, Doc 71, Exh. 90

27. Doris Barrett – 6:09-cv-00105, Doc 71, Exhs. 80, 105; Doc 178, Exh. 207

28. *Karl Cook, deceased – 6:09-cv-00105, Doc 71, Exh. 102

29. *Warren Dotson, deceased – 6:09-cv-00105, Doc 71, Exh. 100

30. *Ernie Barrett, deceased – 6:09-cv-00105, Doc 71, Exh. 81; Doc 403, Exh. 84

31. *Ada Blount, deceased – 6:09-cv-00105, Doc 71, Exh. 74

32. *Phyllis Crawford, unavailable/dementia – 6:09-cv-00105, Doc 71, Exh. 91; Doc 178, Ex 209

33. *Ruth Harris, unavailable, poor health – 6:09-cv-00105, Doc 71, Exh. 93; Doc 178, Ex 212

34. Petitioner reserves the right to call witnesses identified by the government including Roger Hilfiger and Bret Smith and rely on the government's declarations of each as a summary of their testimony.

b.  Respondent:

1.  Roger Hilfiger – On October 25, 2005, Mr. Hilfiger was appointed as co-counsel to John Echols in the case of *United States v. Barrett* (ED Okla. case no. 04-115-P).  He became lead counsel on May 5, 2005, upon Mr. Echols's withdrawal.  After his appointment as lead counsel, Mr. Hilfiger obtained case files maintained by Mr. Echols and the Oklahoma Indigent Defense System.  He

4

believed the materials he received constituted the entire file in the case. He reviewed the material in the file. Based on his interactions with Barrett, and his interviews with Barrett's relatives, Mr. Hilfiger never had reason to suspect that the defendant suffered from a major mental illness. Mr. Hilfiger recalls that Dr. Jeanne Russell dissuaded him from calling her as a witness to present mental health evidence, out of concern for the rebuttal it would invite. Mr. Hilfiger recalls that Barrett repeatedly insisted that he did not want to present a mitigation case that dwelled on his childhood. Mr. Hilfiger does not have distinct memories of mental health and social history documents in counsel's file, but does recall that he and Mr. Smith made a conscious decision to present a mitigation case based on three principles: Barrett had already been punished for the homicide by the State of Oklahoma, Barrett behaved well in custody, and Barrett was a good enough person that he did not deserve to die for his crime.

2.      Bret Smith - On May 5, 2005, Mr. Smith was appointed as co-counsel to Mr. Hilfiger in the case of *United States v. Barrett* (ED Okla. case no. 04-115-P). Mr. Smith maintained a good rapport with Barrett and sometimes met with the defendant alone. Based on his interaction, Mr. Smith found no reason to suspect Barrett suffered from a major mental illness. Mr. Smith recalls that Dr. Jeanne Russell dissuaded him from calling her as a witness to present mental health evidence, out of concern for the rebuttal it would invite. Mr. Smith recalls that Barrett repeatedly insisted that he did not want to present a mitigation case that dwelled on his childhood. Mr. Smith does not have distinct memories of mental health documents from his file, but does recall that the material was developed earlier, during state proceedings. He recalls a meeting Mr. Echols who did not focus on mitigation evidence. Mr. Smith further recalls that he and Mr. Hilfiger made a conscious decision to present a mitigation case based on three principles: Barrett had already been punished for the homicide by the State of Oklahoma, Barrett behaved well in custody, and Barrett was a good enough person that he did not deserve to die for his crime.

3.      J. Randall Price, Ph.D. – Dr. Price is a forensic psychologist who evaluated Barrett at the time of trial. His expert report was filed on the docket case no. 04-115-P and made available to all counsel in the Court's discovery order (§ 2255 Doc. no. 269). The government believes that Dr. Price will testify in conformity with the findings in his report. Based on the report, it appears that Dr. Price conducted an evaluation that included the Reynolds Intellectual Assessment System, the Repeatable Battery for the Assessment of Neuropsychological Status, the Personality Assessment Inventory, the Minnesota Multiphasic Personality Inventory (2d ed.), the Structured Inventory of Malingered Symptoms, and the Psychopathy Checklist-Revised. Dr. Price diagnosed Barrett as a psychopath. Dr. Price found that Barrett suffered from a learning disorder, polysubstance dependence, dysthymic disorder, and a personality disorder with antisocial, psychopathic and paranoid traits.

4.      Steven E. Pitt, D.O. – Dr. Pitt is a forensic psychiatrist retained by the government to evaluate Barrett on January 19, 2017.  While Dr. Pitt's report of the evaluation remains outstanding, the government anticipates that he will testify that at or around the time of the crime, Barrett had a substance abuse disorder and, at a minimum, maladaptive personality traits, but did not otherwise suffer from any major mental illness.

E.   Exhibits to be presented at evidentiary hearing, noting any objection(s):

a.   Petitioner:

| Number | Exhibit | Where in Record | Objection |
|---|---|---|---|
| 1 | In the Matter of Mental Illness of Billy Dean Maxwell, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982 | Exhibit 26 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 2 | In the Matter of the Sanity of A.J. Barrett, Case Number 141, Lunacy Record, dated August 12, 1918 | Exhibit 27 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 3 | In the Matter of the Sanity of A.J. Barrett, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital | Exhibit 28 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 4 | Declaration of Mark Henricksen | Exhibit 29 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Hearsay |
| 5 | In the Matter of the Sanity of Wallace Dotson, Lunacy Record, Case Number 366, dated May 4, 1948 | Exhibit 32 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 6 | In the Matter of Mental Illness of Kenneth Barrett, Case Number 481, Record of Mental Health Proceeding | Exhibit 33 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |

6

| 7 | Declaration of John Echols | Exhibit 34 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Hearsay, Speculation, Relevance |
|---|---|---|---|
| 8 | Excerpts from Kenneth Barrett's Baby Book | Exhibit 35 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 9 | Letter from Kenneth Barrett | Exhibit 36 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 10 | Declaration of Bill Sharp, Ph.D. | Exhibit 55 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 11 | Declaration of Jeanne Russell, Ed.D. | Exhibit 56 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 12 | Letter from John Echols to Honorable James H. Payne, dated February 28, 2005 | Exhibit 64 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 13 | Letter from Honorable James H. Payne to John Echols, dated February 22, 2005 | Exhibit 65 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 14 | Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008 | Exhibit 66 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 15 | Photographs of Kenneth Barrett's shack | Exhibit 73 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |

| 16 | Declaration of Ada Blount | Exhibit 74 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| --- | --- | --- | --- |
| 17 | Declaration of Brandy Hill | Exhibit 77 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to p. 2, 3 |
| 18 | Declaration of Carolyn Joseph | Exhibit 78 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 19 | Declaration of Doris Barrett | Exhibit 80 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 20 | Declaration of Ernest Barrett | Exhibit 81 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Motion in Limine (Doc. 292) |
| 21 | Declaration of Gwendolyn Crawford | Exhibit 83 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to last ¶ p. 1 and pp. 2,3 |
| 22 | Declaration of Janice Sanders | Exhibit 85 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to ¶¶3, 5 of p. 1 and pp. 2-4 |
| 23 | Declaration of Kathy Trotter | Exhibit 86 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 24 | Declaration of Linda Riley | Exhibit 87 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |

| 25 | Declaration of Dr. Myla Young | Exhibit 89 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Motion in Limine and Reply (Doc. 289, 336) |
|---|---|---|---|
| 26 | Declaration of Paul Rickie Lunsford | Exhibit 90 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 27 | Declaration of Phyllis Crawford | Exhibit 91 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to ¶¶ 3,4 of p. 3 and p. 4 |
| 28 | Declaration of Roger Crawford | Exhibit 92 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance, Hearsay |
| 29 | Declaration of Ruth Harris | Exhibit 93 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as to last ¶ of p. 3 |
| 30 | Declaration of Toby Barrett | Exhibit 96 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 31 | Declaration of Sylvia Gelene Dotson | Exhibit 97 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 32 | Declaration of Mark Dotson | Exhibit 98 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 33 | Declaration of Steve Barrett | Exhibit 99 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |

1859

| 34 | Declaration of Warren Dotson | Exhibit 100 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance as ¶ 3 of p. 4 |
|---|---|---|---|
| 35 | Declaration of Nona Reich | Exhibit 101 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 36 | Declaration of Carl Cook | Exhibit 102 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 37 | Declaration of Abby Stites | Exhibit 103 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 38 | Declaration of Doris Barrett | Exhibit 105 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 39 | Declaration of Steve Leedy | Exhibit 111 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 40 | Declaration of Dr. George Woods | Exhibit 117 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Admissible for Impeachment and to Refresh Recollection |
| 41 | Educational Records for Kenneth Barrett | Exhibit 136 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 42 | Educational Records for Gwendolyn Barrett | Exhibit 137 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |

| 43 | Educational Records for Ernest Barrett | Exhibit 138 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
|----|------------------------------------------|---------------------------------------------------------------------------------------------|-----------|
| 44 | Medical Records for Carolyn Joseph | Exhibit 139 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
| 45 | Medical Records for Kathy Trotter | Exhibit 140 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 46 | Medical Records for Brandy Hill | Exhibit 141 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 47 | Medical Records for Toby Barrett | Exhibit 142 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 48 | Medical Records for Travis Crawford | Exhibit 143 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 49 | Medical Records for Linda Riley | Exhibit 145 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 50 | Medical Records for A.J. Barrett | Exhibit 146 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 51 | Medical Records for Kenneth Barrett | Exhibit 147 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |

| 52 | Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999 | Exhibit 148 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | Relevance |
|---|---|---|---|
| 53 | Sylvia Gelene Dotson's Genealogy Memorandum | Exhibit 155 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 54 | Military Records for Travis Crawford | Exhibit 196 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 55 | Educational Records for Kenneth Barrett | Exhibit 200 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 56 | Medical Records for Gwen Crawford | Exhibit 201 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 57 | Medical Records for Carolyn Joseph | Exhibit 202 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 58 | Social Security Records for Travis Crawford | Exhibit 203 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 | |
| 59 | Supplemental Declaration of Ernie Barrett | Exhibit 206 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 60 | Supplemental Declaration of Doris Barrett | Exhibit 207 From Doc 178 – Reply to Amended Motion | Hearsay |

12

| | | | |
|---|---|---|---|
| | | 6:09-cv-00105-JHP. 7/1/2010 | |
| 61 | Supplemental Declaration of Phyllis Crawford | Exhibit 209 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 62 | Supplemental Declaration of Gelene Dotson | Exhibit 210From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 63 | Supplemental Declaration of Mark Dotson | Exhibit 211 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 64 | Supplemental Declaration of Ruth Harris | Exhibit 212 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 65 | Supplemental Declaration of Carolyn Joseph | Exhibit 213 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 66 | Supplemental Declaration of Linda Riley | Exhibit 214 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 67 | Supplemental Declaration of Janice Sanders | Exhibit 215 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 68 | Supplemental Declaration of Abbie Stites | Exhibit 216 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 69 | Supplemental Declaration of Kathy Trotter | Exhibit 217 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |

13

| 70 | Supplemental Declaration of Toby Barrett | Exhibit 218 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
|----|------------------------------------------|-------------------------------------------------------------------------------|---------|
| 71 | Supplemental Declaration of Toby Barrett | Exhibit 220 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 | Hearsay |
| 72 | UNDER SEAL: Billing Records of Roger Hilfiger and Bret Smith | Appendix A - Doc No. 01019206246, 10th Circuit Case No. 12-7086 | |
| 73 | Additional Education Records for Kenneth Barrett | N/A, Attached to email of 1/6/2017 | |
| 74 | Declaration of Judy House | N/A, Attached to email of 1/6/2017 | Relevance (Gov. 2nd Motion to Exclude - Doc. 368) |
| 75 | All Documents turned over to US Attorney on 12/21/2016 in Compliance with Discovery Order | Submitted to US Attorney on Disc. Specific documents within may be identified as separate exhibits at the appropriate time. | |
| 76 | Medical Records of Kelly Cochran | To be procured. Release of records signed January 4, 2017. | Relevance |
| 77 | Sealed Budget Conference Minutes | 6:04-cr-00115-JHP, 12/9/2004 | |
| 78 | SEALED ORDER by Mag. Judge Steven P. Shreder re: defendant's Ex Parte Motion for Approval of "Pre-Authorization" Budget for the Defense | Doc 38, 6:04-cr-00115-JHP, 1/19/2005 | |
| 79 | SEALED LETTER (copy) from Hon. James H. Payne to defense counsel John David Echols regarding the eight ex parte budget requests | 2/22/2005, 6:04-cr-00115-JHP, | |
| 80 | SEALED LETTER from John David Echols to Hon. James H. Payne in answer to the 2/22/05 letter of Judge | 2/28/2005, 6:04-cr-00115-JHP, | |

14

| | | | |
|---|---|---|---|
| | Payne regarding ex parte litigation budget requests. | | |
| 81 | Minutes: SEALED HEARING: Defense counsel John D. Echols and Roger Hilfiger present. Before Hon. James H. Payne. …Discussion held regarding the Court's order on the budget. | 3/22/2005, 6:04-cr-00115-JHP, | |
| 82 | SEALED ORDER by District Judge James H. Payne adopting the U.S. Magistrate's SEALED REPORT AND RECOMMENDATION on interim requests for attorneys' fees and costs [106-1], DENYING defendant's NINTH EXPARTE (SEALED) Motion [107-1], GRANTING defendant's motion TENTH EXPARTE (SEALED) and allowing John Echols to withdraw [113-1], DENYING defendant's EXPARTE (SEALED) ELEVENTH Motion [118-1], DENYING defendant's motion for ex parte conference on defense budget and funding [116-1] and [126-1] | Doc 128, 6:04-cr-00115-JHP, 5/5/2005 | |
| 83 | SEALED BUDGET HEARING MINUTES before Honorable James H. Payne | 10/3/2005, 6:04-cr-00115-JHP, | |
| 84 | MINUTES: Further Sealed Hearing regarding budget matters. | 10/20/2005, 6:04-cr-00115-JHP, | |
| 85 | SEALED MINUTE ORDER before District Judge James H. Payne GRANTING defendant's motion to modify | Doc. 244, 6:04-cr-00115-JHP, 11/4/2005 | |

15

| | | | |
|---|---|---|---|
| | order approving budget of 3/18/05 | | |
| 86 | SEALED MINUTE ORDER before District Judge James H. Payne regarding Defendant's Ex Parte Litigation Budget (Henricksen) | Doc 275, 6:04-cr-00115-JHP, 12/15/2005 | |
| 87 | Childhood photos of Kenneth Barrett | N/A, Attached to email of 1/6/2017 | |
| 88 | Defendant's Pro Se Motion for Change of Appointed Counsel | Doc 135, 6:04-cr-00115-JHP, 5/23/2005 | |
| 89 | ORDER by District Judge James H. Payne denying defendant Barrett's pro se motion for Change of Appointed Counsel | Doc 137, 6:04-cr-00115-JHP, 5/24/2005 | |
| 90 | Declaration of Bret Smith | Doc 175, Exh. 11, 6:04-cr-00115-JHP, 5/17/2010 | |
| 91 | Declaration of Roger Hilfiger | Doc 175, Exh. 12, 6:04-cr-00115-JHP, 5/17/2010 | |
| 92 | Chart of Trial Counsel File Boxes | Sent to Government under separate cover | Lack of Authentication, Relevance, Competence |
| 93 | List of Roger Hilfiger's Caseload during relevant period | Sent to Government under separate cover | Lack of Authentication, Relevance, Hearsay |
| 94 | Hilfiger Letter to Shreder | Petitioner's Disc. No. 003889-91 | Relevance as to page 3889 |
| 95 | Handwritten Notes | Petitioners Disc. No. 005806-07 | Incomplete, Improper Allocution |

The Petitioner reserves the right to utilize Petitioner's exhibits for impeachment or to refresh recollection.

  b. Respondent:

    Petitioner has a standing objection to any and all documents contained in trial counsel files of irrelevancy unless the government can establish that trial counsel had personal knowledge of the exhibit prior to Kenneth Barrett's sentencing hearing.

16

| Number | Exhibit | Where in Record | Objection |
|---|---|---|---|
| 1. | Declaration of Roger Hilfiger | Exhibit 12 to Respondent Answer | |
| 2. | Declaration of Bret Smith | Exhibit 11 to Respondent Answer | |
| 3. | Voluntary statement of Abby of Stites | Exhibit 13 to Respondent Answer | HEARSAY |
| 4. | Eastern State Hospital Report of Contact | Exhibit 14 to Respondent Answer | |
| 5. | Eastern State Hospital Medical History | Exhibit 15 to Respondent Answer | |
| 6. | Eastern State Hospital Discharge Summary | Exhibit 16 to Respondent Answer | |
| 7. | St. Francis Chart Print Report | DISC 00382-00416 | |
| 8. | Wagoner Community Hospital Psychiatric Evaluation | Exhibit 18 to Respondent Answer | |
| 9. | Bill Willis Community Mental Health Center Referral Form | Exhibit 19 to Respondent Answer | |
| 10. | Social Security Administration Explanation of Determination | Exhibit 20 to Respondent Answer | |
| 11. | Sequoyah Memorial Hospital medical record of Kenneth Barrett | DISC 000527-28 | |
| 12. | Affidavit of Faust Bianco, Ph.D. | DISC 1991 | Standing objection |
| 13. | Professional Services Invoice from Faust Bianco, Ph.D. | DISC 001820 | Standing objection |
| 14. | Kenneth Barrett Medical Release to Faust Bianco, Ph.D. | DISC 008298-99 | Standing objection |
| 15. | John Echols Letter to Judge Payne dated 2/28/2005 | DISC 003743-48 | Standing objection |
| 16. | Psychological Evaluation of Kenneth Barrett by Bill Sharp, Ph.D. | DISC 006812-19 | Standing objection |
| 17. | Kenneth Barrett BOP Intake Screening | | Relevance |
| 18. | Roseann Schaye Memo of Interview of Carolyn Joseph | DISC 001197 | Standing objection |
| 19. | Roseann Schaye Memo of Interview of Elnora Long | DISC 001205 | Standing objection |
| 20. | Roseann Schaye Memo of Interview of Sylvia Gelene Dotson | DISC 000966 | Standing objection |
| 21. | Roseann Schaye Memo of Interview of Kenneth Barrett | DISC 000981-82 | Standing objection |
| 22. | Roseann Schaye Memo of Interview of Linda Riley | DISC 001208-09 | Standing objection |
| 23. | Roseann Schaye Memo of Interview of Richard Barrett | DISC 1207 | Standing objection |

| 24. | Roseann Schaye Memo of Interview of Ruth Harris | DISC 001006 | Standing objection |
|---|---|---|---|
| 25. | Roseann Schaye Memo of Interview of Tracy Swearingen | DISC 001124 | Standing objection |
| 26. | Declaration of Roseann Schaye | DISC 000880 | Standing objection |
| 27. | Roseann Schaye State of Arizona Board of Behavioral Health Examiners 2009 Disciplinary Action Record | | Relevance |
| 28. | John Echols billing records | DISC 003752-60 | |
| 29. | Gelene Dotson memo | DISC 001275 | Standing objection |
| 30. | Hattie Dotson memo | DISC 001276 | Standing objection |
| 31. | Roger Hilfiger letter to Magistrate Judge Shreder dated 1/17/2006 | DISC 003726-28 | |
| 32. | Roger Hilfiger letter to Magistrate Judge Shreder dated 2/17/2006 | DISC 003890-91 | |
| 33. | Roger Hilfiger letter to Office of Federal Public Defender dated 12/29/2005 | DISC 003892-95 | |
| 34. | Psychological Evaluation – Risk Assessment of Kenneth Barrett by Jeanne Russell, Ed.D. | DISC 008245-55 | Standing objection |
| 35. | Risk Assessment of Kenneth Barrett by Jeanne Russell, Ed.D. | DISC 008227-43 | |
| 36. | Kenneth Barrett Driving Record | DISC 006901-03 | Standing objection |
| 37. | Psychological Evaluation of Kenneth Barrett by Kathy LaFortune, Ph.D. | DISC 001644-48 | Standing objection |
| 38. | Handwritten notes | DISC 007414-36 | Standing objection |
| 39. | Handwritten notes | DISC 000895 | Standing objection |
| 40. | Handwritten notes | DISC 001191-96 | Standing objection |
| 41. | Handwritten notes | DISC 004757-68 | |
| 42. | Steve Leedy Memo | DISC 008304-06 | Standing objection |
| 43. | Letters from Roseann Schaye | DISC 008273-97 | Standing objection |
| 44. | OIDS Expert Service Providers Fee Schedule Table | DISC 002382-420 | |
| 45. | Phyllis Crawford memo | DISC 001264 | Standing objection |
| 46. | Roger Crawford memo | DISC 001265 | Standing objection |
| 47. | OIDS Interoffice Memo re: Tracy Swearingen | DISC 001966 | Standing objection |
| 48. | Tommy C. Sanders memo | DISC 001360 | Standing objection |
| 49. | OIDS Interoffice Memo | DISC 005743-53 | Standing objection |
| 50. | Kenneth Barrett BOP file | | Relevance/ |

18

| 51. | Psychological Evaluation of Kenneth Barrett by J. Randall Price, Ph.D. | | Standing objection/Motion in Limine Doc * |
|---|---|---|---|
| 52. | Psychiatric Evaluation of Kenneth Barrett by Steven E. Pitt, D.O. | | Relevance |
| 53. | Any and all data, notes, or communications with counsel regarding Petitioner's mental health expert witnesses | Pending receipt | Objection as Work Product; no objection to providing raw data to qualified expert |

The Government reserves the right to utilize Petitioner's exhibits for impeachment or to refresh recollection.

F.   Anticipated length of evidentiary hearing:

Nine (9) days (March 13-17, March 30, 31, April 1, 3). [Testimony of Roger Hilfiger

and rebuttal, if any.  See Court's Order of January 11, 2017 at 2 (Doc 283 at 2.)].  In

light of the Court's Order dated February 24, 2017 (Doc. 361 at 14), the Government

objects to Petitioner's estimate.

Dated: March 7, 2017

Respectfully submitted,

/s/ David Autry
DAVID AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669
dbautry77@gmail.com

HEATHER E. WILLIAMS
Federal Defender
/s/ Joan M. Fisher
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-6656
Joan_Fisher@fd.org

MARK F. GREEN
United States Attorney
Eastern District of Oklahoma

/s/ Christopher J. Wilson
CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
(918) 684-5175
(918) 684-5150
chris.wilson@usdoj.gov

/s/ Jeffrey B. Kahan
JEFFREY B, KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F. Street, NW 6th Fl.

19

1869

Washington, DC 20530
jeffrey.kahan@usdoj.gov

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on March 7, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

*/s/ Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney

1870

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| **Respondent.** | ) | |

## GOVERNMENT RESPONSE IN OPPOSITION TO OBJECTION TO COURT'S ORDER BIFURCATING THE HEARING, MOTION TO RECONSIDER AND MOTION TO STAY EVIDENTIARY HEARING TO PURSUE APPELLATE REMEDIES

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and files this response in opposition to Petitioner's objection to court's order bifurcating the hearing, motion to reconsider and motion to stay evidentiary hearing to pursue appellate remedies (Doc. 385).

## PRELIMINARY STATEMENT

Following the affirmance of his convictions for three homicide crimes and the imposition of a death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255.  Docs. 1, 2, 70 & 95.  This Court denied relief (Docs. 214 & 215), and Barrett appealed (Doc. 222).  The Tenth Circuit Court of Appeals affirmed in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and social history.  Doc. 230.  This Court has scheduled the hearing to commence March 13, 2017.  Docs. 246 & 270.

1871

On March 3, 2017, the Court issued a sua sponte order bifurcating the hearing.  Doc. 378.

The order recognized that the operative standard for assessing claims of ineffective assistance

requires Barrett to establish that trial counsel's performance was both deficient and caused actual

prejudice.  Doc. 378 (citing *Strickland v. Washington*, 466 U.S. 668 (1984)).  The order stated

that the Court would not consider evidence of prejudice until Barrett had established deficient

performance.  Doc. 378.  Barrett filed an objection and motion to reconsider (Doc. 385), and this

opposition follows.

### ARGUMENT

### THE COURT SHOULD NOT RECONSIDER ITS ORDER BIFURCATING THE HEARING, EXCEPT FOR THE CONVENIENCE OF LAY WITNESSES

In his motion to reconsider, Barrett argues that this Court lacks the authority to bifurcate

in light of the Tenth Circuit's opinion remanding this case.  Doc. 385.  While the government

disagrees with the legal merits of Barrett's arguments, it agrees that the Court should not insist

on bifurcation to the detriment of lay witnesses.

Courts evaluate motions to reconsider under the same standards governing a motion to

alter or amend judgment under Federal Rule of Civil Procedure 59(e). *See, e.g., United States v.*

*Thompson*, 125 F.Supp.2d 1297 (D. Kan. 2000).  Accordingly, they may grant reconsideration on

three discrete grounds: an intervening change in controlling law, the availability of new

evidence, or the need to correct clear error or prevent manifest injustice.  See Doc. 221 (citing

*Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000).  A motion for

reconsideration "is not a second chance for the losing party to make its strongest case or to dress

up arguments that previously failed." *Voelkel v. Gen. Motors Corp.*, 846 F.Supp. 1482, 1483 (D.

Kan.), *aff'd*, 43 F.3d 1484 (10th Cir.1994).

2

In this instance, Barrett fails to demonstrate any intervening change in law or fact, much less any error in the Court's order. Indeed, the Supreme court has consistently recognized the trial court's broad discretion in regulating its proceedings: "'(T)he judge is not a mere moderator, but is the governor of the trial for the purpose of assuring its proper conduct and of determining questions of law.'" *Geders v. United States*, 425 U.S. 80, 86 (1976) (quoting *Quercia v. United States*, 289 U.S. 466, 469 (1933)). As the Court has further recognized:

> A criminal trial does not unfold like a play with actors following a script; there is no scenario and can be none. The trial judge must meet situations as they arise and to do this must have broad power to cope with the complexities and contingencies inherent in the adversary process. To this end, he may determine generally the order in which parties will adduce proof; his determination will be reviewed only for abuse of discretion.

*Geders,* at 86 (citing *Goldsby v. United States*, 160 U.S. 70, 74 (1895)). The Supreme Court has likewise recognized the discretion of courts to omit consideration of either prong of the *Strickland* test "if the defendant makes an insufficient showing on one." Doc. 378 at 1 (citing, inter alia, *Strickland*, 466 U.S. at 697).

Given the Court's broad authority to regulate proceedings before it, and especially its discretion in the analysis of *Strickland* claims, Barrett cannot show that it lacks the authority to bifurcate the hearing. Likewise, he cannot establish that the Tenth Circuit opinion remanding this case requires a unitary analysis of the *Strickland* issue. First, the Tenth Circuit did not consider the question and its opinion is not authority for a proposition it did not consider. *In re Cox Enterprises*, 835 F.3d 1195, 1212 (10th Cir. 2016) (citing *Planned Parenthood of Kansas & Mid–Missouri v. Moser*, 747 F.3d 814, 830–35 (10th Cir. 2014)). Second, the circuit court has no power to overrule the express command of the Supreme Court's opinion in *Strickland*, authorizing a flexible analysis.

3

While Barrett has not demonstrated any limitation in the Court's authority to bifurcate, the government is sensitive to the burdens the order may impose on lay witnesses. Accordingly, the government encourages the Court to permit testimony on both prongs from lay witnesses who can demonstrate meaningful inconvenience resulting from the possible need to testify twice.

## **CONCLUSION**

Based on the foregoing reasoning and authority, the government respectfully urges this

Court to deny Barrett's motion for reconsideration.

Dated: March 7, 2017,

Respectfully submitted,

MARK F. GREEN
United States Attorney

CHRISTOPHER J. WILSON
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov


*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

1875

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on March 7, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

      Mr. David B. Autry dbautry44@hotmail.com
      Ms. Joan M. Fisher Joan_Fisher@fd.org
      Mr. Tivon Schardl Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

1876

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:880806@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Exclude
Content-Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 3/8/2017 at 12:53 PM CST and filed on 3/8/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 389(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: granting [368] Government's Second Motion to Exclude Proposed Witnesses. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org,
kelly_nolan@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:880808@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Sealed Motion
Content–Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 3/8/2017 at 12:56 PM CST and filed on 3/8/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 390(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: In light of the stipulation of the parties submitted on 3/7/2016, [347] Government's Motion for Partial Summary Judgment is moot. After the submission of testimony herein, the government can reurge its motion if the facts are different than what the parties anticipated at the time of the filing of their proposed findings of fact filed on 2/16/2017. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Christopher J. Wilson
(caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:880810@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Reconsider
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 3/8/2017 at 1:05 PM CST and filed on 3/8/2017

**Case Name:**      Barrett v. USA

**Case Number:**      6:09–cv–00105–JHP

**Filer:**

**Document Number:** 391(No document attached)

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: After consideration of [385] Petitioner's Motion to Reconsider, the motion is granted and this Court will allow the parties to submit all of their evidence in one evidentiary hearing subject to the Federal Rules of Evidence. Pursuant to 28 U.S.C. Section 636(b)(1)(B), the evidentiary hearing is referred to Magistrate Judge Steven P. Shreder for Findings and Recommendation. The evidentiary hearing is continued to 3/27/2017 at 9:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson      Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry      dbautry77@gmail.com

Tivon Schardl      tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan      jeffrey.kahan@usdoj.gov

Joan M. Fisher      joan.fisher@fd.org, brenda_turbeville@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

**DAVID AUTRY**, OBA No. <u>11600</u>
<u>1021 N.W. 16</u>th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
Federal Defender's Office of Eastern District of California
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
Joan_Fisher@fd.org

Attorneys for Petitioner
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S NOTICE OF |
| | ) | AVAILABILITY OF RUTH |
| UNITED STATES OF AMERICA, | ) | HARRIS TO TESTIFY |
| | ) | |
| | ) | |
| Respondent. | ) | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ | ) | |

NOTICE IS HEREBY GIVEN that Ruth Harris, a witness in the evidentiary hearing

scheduled to commence March 27, 2017, will be available to testify at the evidentiary hearing

commencing March 27, 2017.

1

Petitioner's Notice of Availability of
Ruth Harris to Testify                                    *Barrett v. U.S.A.*, No. CV-09-00105-JHP

The Second Amended Joint Pre-Trial Statement filed on March 7, 2017 (Doc. 387) is hereby supplemented and amended to give notice that, despite serious health concerns, Ruth Harris is available to testify.  As indicated in the Second Amended Stipulated Joint Pre-hearing Statement, Ruth Hariis's testimony is summarized in her declaration (6:09-cv-00105, Doc 71, Exh. 93) and supplemental declaration (Doc 178, Exh 212). (Doc. 387 at 4, ¶ D(a)(33)).

DATED: March 14, 2017                    RESPECTFULLY SUBMITTED,

                                         /s/  David Autry
                                         DAVID AUTRY
                                         Attorney at Law

                                         /s/ Joan M. Fisher
                                         JOAN M. FISHER
                                         Assistant Federal Defender

                                         Attorneys for Petitioner
                                         KENNETH EUGENE BARRETT


**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 14th day of March, 2017, I caused the foregoing Petitioner's Notice of Availability of Previously Unavailable Witness: Ruth Harris to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

                                         /s/ Joan M. Fisher
                                         JOAN M. FISHER


2

Petitioner's Notice of Availability of
Ruth Harris to Testify                          *Barrett v. U.S.A.*, No. CV-09-00105-JHP

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669 [fax]
dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
Federal Defender's Office of Eastern District of California
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
Joan_Fisher@fd.org

Attorneys for Petitioner
KENNETH EUGENE BARRETT



FILED
MAR 27 2017
By_____
PATRICK KEANEY
Clerk, U.S. District Court
Deputy Clerk

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | PETITIONER'S NOTICE |
| | ) | OF PRESENTATION OF |
| UNITED STATES OF AMERICA, | ) | ADDITIONAL EXHIBITS |
| | ) | 96-101 |
| Respondent. | ) | |
| | ) | |

NOTICE IS HEREBY GIVEN that Petitioner Kenneth Eugene Barrett offers the following

additional six exhibits, numbered exhibits 96-101, to the Court to be presented at the hearing to

commence March 27, 2017.  These exhibits should be added to the list of Petitioner's exhibits set

forth in the Second Amendment Joint Pre-Trial Statement filed on March 7, 2017 (Doc. 387). The

exhibits are as follows:

1

Petitioner's Notice of Presentation of
Additional Exhibits 96-101

*Barrett v. U.S.A.*, No. CV-09-00105-JHP

| Number | Exhibit |
|--------|---------|
| 96 | American Bar Association – Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases |
| 97 | American Bar Association Standards for Criminal Justice Providing Defense Services |
| 98 | Declaration of Iva Hines |
| 99 | Declaration of Roger Crawford |
| 100 | Declaration of Judy House |
| 101 | Declaration of Gary Nelson |

DATED: March 27, 2017

RESPECTFULLY SUBMITTED,

/s/ David Autry
DAVID AUTRY
Attorney at Law

/s/ Joan M. Fisher
JOAN M. FISHER
Assistant Federal Defender

Attorneys for Petitioner
KENNETH EUGENE BARRETT

### CERTIFICATE OF SERVICE AND DELIVERY

This is to certify that on this 27th day of March, 2017, I hand delivered the foregoing

Petitioner's Notice of Presentation of Additional Exhibits 96-101 to Christopher J. Wilson,

AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.

/s/ Joan M. Fisher
JOAN M. FISHER

2

Petitioner's Notice of Presentation of
Additional Exhibits 96-101

*Barrett v. U.S.A.*, No. CV-09-00105-JHP

1884

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | Case No.    CIV-09-105-JHP |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Date:    3/27/2017 |
| Respondent. | ) | |
| | ) | Time:    9:04 a.m. - 10:56 a.m. |
| | ) | 11:12 a.m. - 12:11 p.m. |
| | ) | 1:01 p.m. - 4:02 p.m. |
| | ) | 4:16 p.m. - 4:45 p.m. |

## MINUTE SHEET - EVIDENTIARY HEARING

Steven P. Shreder, Judge    D. Graham, Law Clerk    K. Sidwell, Reporter
K. Davis, Law Clerk    FTR - Courtroom 4
N. Davis, Deputy Clerk

**Petitioner present with Counsel:**  David B. Autry and Joan M. Fisher
**Counsel for Respondent:** Jeffrey B. Kahan and Christopher J. Wilson

**MINUTES:** Petitioner's evidence. Petitioner requests Rule of Sequestration be invoked. No objection from Government. GRANTED (SPS). Petitioner's evidence continues. ENTERING ORDER continuing hearing to 3/28/2017 at 9:00 a.m. (SPS)

Total Time: 6:21