# U.S. District Court
## Eastern District of Oklahoma (Muskogee)
## CIVIL DOCKET FOR CASE #: <u>6:09−cv−00105−RAW</u>

| | |
|---|---|
| Barrett v. USA | Date Filed: 03/16/2009 |
| Assigned to: Judge Ronald A. White | Date Terminated: 03/28/2019 |
| Case in other court: 10th Circuit, 12−07086 | Jury Demand: None |
| 10th Circuit, 19−07049 | Nature of Suit: 535 Death Penalty − Habeas Corpus |
| ED/OK, 6:04−cr−115 | Jurisdiction: U.S. Government Defendant |
| Cause: 28:2255 Motion to Vacate / Correct Illegal Sentence | |

**Petitioner**

**Kenneth Eugene Barrett**     represented by     **David B. Autry**
1021 NW 16th St
Oklahoma City, OK 73106
405−521−9600
Fax: 405−521−9669
Email: <u>dbautry77@gmail.com</u>
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Carrie L. Ward**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Email: <u>carrie_ward@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Joan M. Fisher**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−5706
Email: <u>joan.fisher@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Karl J. Saddlemire**
Federal Public Defender − Sacramento
801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−6656
Email: <u>karl_saddlemire@fd.org</u>
*ATTORNEY TO BE NOTICED*

**Tivon Schardl**
Federal Public Defender − Sacramento

801 I St, Third Floor
Sacramento, CA 95814
916−498−6666
Fax: 916−498−6656
Email: tim.schardl@fd.org
*TERMINATED: 11/26/2018*

V.

**Respondent**

**USA**                           represented by   **Christopher J. Wilson**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
Email: Chris.Wilson@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Jeffrey B. Kahan**
US Department of Justice − Capital Case
Unit
1331 F St NW, Rm 345
Washington, DC 20530
202−305−8910
Fax: 202−353−9779
Email: jeffrey.kahan@usdoj.gov
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sheldon J. Sperling**
US Attorney (OKED)
520 Denison Ave
Muskogee, OK 74401
918−684−5100
Fax: 918−684−5150
*TERMINATED: 11/24/2010*

| Date Filed | # | Page | Docket Text |
|---|---|---|---|
| 03/10/2009 | 4 | | MOTION to File Exhibits Under Seal and for a Protective Order by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 5 | | ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for a Protective Order (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/11/2009 | 6 | | MOTION to Reconsider (Re: 5 Order Ruling on Motion to Seal Exhibits and for Protective Order) by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| 03/11/2009 | 7 | | AMENDED ORDER by District Judge James H. Payne: granting 4 Defendant's Motion to File Exhibits Under Seal and for Protective Order (Re: 5 Order, 6 Motion to Reconsider) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
|---|---|---|---|
| 03/16/2009 | 1 | | MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett; Responses due by 6/16/2009 (With attachments – **EXHIBITS 1–36; 59–60**)(EXHIBITS 37–58 NOT USED)(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 3 | | EXHIBITS IN SUPPORT OF MOTION **Nos. 61–70, 71–80, 81–99, 100–118** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) by Kenneth Eugene Barrett (With attachments) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 8 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 130, 131, 132, 133, 134 and 135** (Re: 1 MOTION to Vacate and 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 9 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 10 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 11 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 12 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 136D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 13 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 137, 138, 139, 140, 141, 142 and 143** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 14 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 144A, 144B, 145 and 146** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 15 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 16 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 17 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147A3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 18 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate (cjt, Deputy Clerk) |

| | | | |
|---|---|---|---|
| | | | (Entered: 03/18/2009) |
| 03/16/2009 | 19 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 147B2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 20 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147B3** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 21 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 22 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 23 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 24 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 25 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147E2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 26 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147F** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 27 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 147G** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 28 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 148, 149, 150, 151, 152, 153, 154, 155, 156, 157 and 158** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 29 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 159, 160, 161, 162, 163, 164 and 165** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 30 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 166, 167, 168, 169, 170, 171, 172, 173, 174 and 175** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 31 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 32 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |

| | | | |
|---|---|---|---|
| 03/16/2009 | 33 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C1** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 34 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 176C2** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 35 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 36 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 177B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 37 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 178, 179 and 180** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 38 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181A** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 39 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181B** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 40 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181C** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 41 | | SEALED EXHIBITS IN SUPPORT OF MOTION **No. 181D** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 42 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 182, 183, 184 and 185** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/16/2009 | 43 | | SEALED EXHIBITS IN SUPPORT OF MOTION **Nos. 186, 187, 188, 189, 190, 191, 192, 193, 194 and 195** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/17/2009 | 2 | | CORRECTED MOTION to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. Section 2255 by Kenneth Eugene Barrett (corrected to include verification) (Re: 1 Motion to Vacate); Responses due by 6/16/2009(cjt, Deputy Clerk) (Entered: 03/18/2009) |
| 03/18/2009 | 44 | | NOTICE to Government to Respond by **6/16/2009** (Re: 1 MOTION to Vacate, 2 Corrected MOTION to Vacate) (cjt, Deputy Clerk) Modified on 3/19/2009 to change response date to 6/16/09 (cjt, Deputy Clerk). (Entered: 03/18/2009) |
| 03/19/2009 | | | NOTICE of Docket Entry Modification; Error: Wrong date of 3/16/09 given in text; Correction: Correcting response date to 6/16/09 (Re: 44 Notice to Respond) (cjt, Deputy Clerk) (Entered: 03/19/2009) |

| | | | |
|---|---|---|---|
| 05/29/2009 | 45 | | MOTION to Disqualify Judge by Kenneth Eugene Barrett Responses due by 6/15/2009 Replies due by 6/24/2009.(Schardl, Tivon) (Entered: 05/29/2009) |
| 06/03/2009 | 46 | | ATTORNEY APPEARANCE by Christopher J. Wilson on behalf of USA (Wilson, Christopher) (Entered: 06/03/2009) |
| 06/11/2009 | 47 | | First MOTION for Extension of Time to Respond to Motion (Re: 45 MOTION to Disqualify Judge ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/11/2009 | 48 | | First MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment, 1 MOTION to Vacate Order/Judgment ) by USA Responses due by 6/26/2009 Replies due by 7/7/2009.(Wilson, Christopher) (Entered: 06/11/2009) |
| 06/12/2009 | 49 | | MINUTE ORDER by District Judge James H. Payne granting Application for Extension of Time to Respond to Petitioner's Motoin to Disqualify and Recuse United States District Judge James H. Payne from Further Participation in this Matter ( 47 Motion for Extension of Time to Respond to Motion). Accordingly, the respondent has until 7/15/09 within which to file its response to petitioner's motion (Re: 45 MOTION to Disqualify Judge ).(law, Deputy Clerk) (Entered: 06/12/2009) |
| 06/12/2009 | 50 | | MINUTE ORDER by District Judge James H. Payne granting in part and denying in part Application for Extension of Time to Respond to Petitioner's 28 U.S.C. Section 2255 Motion ( 48 Motion for Extension of Time to Respond to Motion ). Respondent has an additional 3 months or until 9/16/09 within which to file its response to petitioner's 28 U.S.C. Section 2255 Motion. (law, Deputy Clerk) (Entered: 06/12/2009) |
| 07/13/2009 | 51 | | RESPONSE in Opposition to Motion (Re: 45 MOTION to Disqualify Judge ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 07/13/2009) |
| 07/24/2009 | 52 | | First MOTION to unseal documents in cr–04–115 by USA Responses due by 8/10/2009 Replies due by 8/19/2009.(Wilson, Christopher) (Entered: 07/24/2009) |
| 08/14/2009 | 53 | | MOTION to File Response to Government's Motion to Unseal Out of Time by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/14/2009 | 54 | | MOTION to File Out of Time *PROPOSED ORDER* by Kenneth Eugene Barrett Responses due by 8/31/2009(Schardl, Tivon) (Entered: 08/14/2009) |
| 08/17/2009 | 55 | | ORDER by District Judge James H. Payne: striking 54 Petitioner's Proposed Order which was filed in error (cjt, Deputy Clerk) (Entered: 08/17/2009) |
| 08/19/2009 | 56 | | MINUTE ORDER by District Judge James H. Payne: Directing Petitioner to supplement 53 MOTION to File Response to Government's Motion to Unseal Out of Time by 5:00 p.m. today, 8/19/09, to include a statement as to whether either Christopher J. Wilson or Jeffrey B. Kahan, counsel for respondent, USA objects to the motion. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 57 | | SUPPLEMENT (Re: 56 Minute Order,,, 53 MOTION to File Response to Government's Motion to Unseal Out of Time ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 08/19/2009) |

| | | | |
|---|---|---|---|
| 08/19/2009 | 58 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/19/2009) |
| 08/19/2009 | 59 | | MINUTE ORDER by District Judge James H. Payne: Striking 58 Petitioner's Response in Opposition to the Government's Motion to Unseal (Re: 52 Government's MOTION to Unseal Documents). (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/19/2009 | 60 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to File a Response to Government's Motion to Unseal out of time (Doc. 53 ) is hereby granted. The Court notes that the Government's objection to Petitioner's request is based upon the impending deadline for the Government to respond to the Petitioner's § 2255 Motion (Doc. # 2) and that the Government's Motion to Unseal (Doc. # 52) indicates the pleadings sought are needed for the Government to be able to prepare its response to the Petitioner's § 2255 Motion. To the extent that any delay in ruling on the Government's Motion to Unseal is directly attributable to Petitioner's failure to timely respond to the Government's Motion to Unseal, this Court will consider that in the event the Government becomes unable to meet their current response deadlines on the § 2255 Motion. Accordingly, Petitioner shall be given until August 26, 2009 to file a Response to the Government's Motion (Doc. 52 ) and the Government shall be given until September 2, 2009, to Reply. (cjt, Deputy Clerk) (Entered: 08/19/2009) |
| 08/26/2009 | 61 | | RESPONSE in Opposition to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by Kenneth Eugene Barrett ;(Schardl, Tivon) (Entered: 08/26/2009) |
| 08/28/2009 | 62 | | REPLY to Response to Motion (Re: 52 First MOTION to unseal documents in cr−04−115 ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 08/28/2009) |
| 09/04/2009 | 63 | | Second MOTION for Extension of Time to Respond to Motion (Re: 2 MOTION to Vacate Order/Judgment ) by USA Responses due by 9/21/2009(Wilson, Christopher) (Entered: 09/04/2009) |
| 09/04/2009 | 64 | | MINUTE ORDER by District Judge James H. Payne: granting 63 Respondent's Motion for Extension of Time to Respond to Motion; Response due by 10/16/2009 (Re: 1 MOTION to Vacate Order/Judgment, 2 Corrected MOTION to Vacate Order/Judgment ) (cjt, Deputy Clerk) (Entered: 09/04/2009) |
| 09/04/2009 | 65 | | RESPONSE to Motion (Re: 63 Second MOTION for Extension to Respond to 2255 Motion) by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 9/8/2009 to change text and change link (dma, Deputy Clerk). (Entered: 09/04/2009) |
| 09/11/2009 | 66 | | ORDER by District Judge James H. Payne: denying 45 Petitioner's Motion to Disqualify and Recuse (cjt, Deputy Clerk) (Entered: 09/11/2009) |
| 09/11/2009 | 67 | | ORDER by District Judge James H. Payne: Granting in part, denying in part and taking under advisement in part 52 Government's MOTION to Unseal, or to Gain Full Access to Motions, Orders, Reports and Proceedings filed Cr−04−115 (cjt, Deputy Clerk) (Entered: 09/11/2009) |

| 09/22/2009 | 68 | | NOTICE of Intention Not to Abandon Claims and REQUEST for Protective Order (Re: 67 Order) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) Modified on 9/23/2009 change text (dma, Deputy Clerk). (Entered: 09/22/2009) |
|---|---|---|---|
| 09/23/2009 | 69 | | ORDER by District Judge James H. Payne (Re: 67 Order, 68 Petitioner's NOTICE of Intent Not to Abandon Claims and REQUEST for Protective Order) (cjt, Deputy Clerk) (Entered: 09/23/2009) |
| 09/25/2009 | 70 | | Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* by Kenneth Eugene Barrett Responses due by 10/13/2009 (With attachments – **EXHIBITS 1–10**)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 71 | | EXHIBIT(S) **11 through 50** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/25/2009 | 72 | | EXHIBIT(S) **51 through 118** (Re: 70 Amended MOTION to Vacate Order/Judgment , *Set Aside or Correct Sentence Pursuant to 28 U.S.C. sec. 2255 and Rule 33 FRCrP* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 09/25/2009) |
| 09/28/2009 | 73 | | OBJECTION to Petitioner's Proposed Protective Order (Re: 68 MOTION for Protective Order) by USA (Wilson, Christopher) Modified on 9/29/2009 to change text (dma, Deputy Clerk). (Entered: 09/28/2009) |
| 09/29/2009 | 74 | | ORDER by District Judge James H. Payne: Show Cause Hearing and Scheduling Conference are set for 10/6/2009 at 02:00 PM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 70 Amended MOTION for Collateral Relief, to Vacate, Set Aside or Correct Sentence and for a New Trial) (cjt, Deputy Clerk) (Entered: 09/29/2009) |
| 09/30/2009 | 75 | | RESPONSE (Re: 69 Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 09/30/2009) |
| 10/02/2009 | 76 | | MOTION to Vacate Order/Judgment *Order Filed September 29, 2009*, MOTION to Continue Hearing(s) *On Order to Show Cause* (Re: 74 Order,, Setting/Resetting Hearing(s), Setting/Resetting Hearing(s),, ) by Kenneth Eugene Barrett Responses due by 10/19/2009 (With attachments)(Schardl, Tivon) (Entered: 10/02/2009) |
| 10/02/2009 | 77 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's emergency motion (Dkt 76 ) to vacate show cause order is denied. The court hereby waives the presence of petitioner's counsel, Tivon Schardl, at the hearing scheduled October 6, 2009, at 2:00 p.m. Lead counsel, David Autry, is required to attend; however, arrangements will be made for lead counsel to speak with co–counsel Tivon Schardl via telephone, if necessary. In addition, the parties should be aware the court intends to conduct a status and scheduling conference to receive the parties' observations and comments as to the time frame necessary for disposition of this matter. (cjt, Deputy Clerk) (Entered: 10/02/2009) |

| | | | |
|---|---|---|---|
| 10/05/2009 | 78 | | MOTION to Continue Hearing(s), MOTION to Recuse, MOTION to Reconsider, MOTION for Leave to Appear *y* (Re: 77 Minute Order,,, Ruling on Motion to Vacate Order/Judgment,,, Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s), Ruling on Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 10/20/2009(Schardl, Tivon) (Entered: 10/05/2009) |
| 10/05/2009 | 79 | | MINUTE ORDER by District Judge James H. Payne: denying 78 Petitioner's Motion to Reconsider; denying 78 Petitioner's Motion to Continue Hearing; finding as moot 78 Motion for Leave to Appear by Telephone pursuant to Minute Order 77 entered on 10/2/09. 78 Petioner's Motion to Recuse was previously denied by Order 66 entered on 9/11/09. (cjt, Deputy Clerk) (Entered: 10/05/2009) |
| 10/06/2009 | 80 | | MINUTES of Proceedings – held before District Judge James H. Payne: Show Cause/Scheduling Hearing held on 10/6/2009 (Court Reporter: K.Sidwell) (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 81 | | SCHEDULING ORDER by District Judge James H. Payne: Amended Motion to Vacate due 11/6/2009; Brief in Support due 1/5/2010; Response due 3/8/2010; Reply due 3/23/2010 (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/07/2009 | 82 | | PROTECTIVE ORDER by District Judge James H. Payne: granting 68 Petitioner's Motion for Protective Order; granting 52 Government's Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 10/07/2009) |
| 10/08/2009 | 83 | | ***Remark: Pursuant to 82 Protective Order entered on 10/7/2009, copies of sealed Doc. Nos. 16, 23, 24, 25, 46, 50, 51, 57, 107, 113, 116, 118, 232, 274, 301 and the sealed letter dated 2/28/2005, all filed in Case No. CR–04–115–JHP, were personally delivered to Asst. United States Attorney Christopher Wilson on 10/8/2009. (cjt, Deputy Clerk) (Entered: 10/08/2009) |
| 10/09/2009 | 84 | | STATUS REPORT by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 10/09/2009) |
| 10/15/2009 | 85 | | TRANSCRIPT of Proceedings (Unredacted) of Show cause/Scheduling Hearing held on 10/6/09 before District Judge James H. Payne (Court Reporter: Ken Sidwell) (Pages: 1–42). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 80 Minutes of Scheduling Conference, Striking/Terminating Deadline(s)/Hearing(s) ) (kns, Court Reporter) (Entered: 10/15/2009) |
| 10/16/2009 | 86 | | MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* by Kenneth Eugene Barrett Responses due by 11/2/2009(Schardl, Tivon) (Entered: 10/16/2009) |
| 10/20/2009 | 87 | | ORDER by District Judge James H. Payne ; denying 86 Motion to Stay (lsa, Chambers) (Entered: 10/20/2009) |
| 10/28/2009 | 88 | | |

| | | | |
|---|---|---|---|
| | | | Unopposed MOTION to Extend Deadline(s) *Established by Order filed October 7, 2009* by Kenneth Eugene Barrett Responses due by 11/12/2009 (With attachments)(Schardl, Tivon) (Entered: 10/28/2009) |
| 11/02/2009 | 89 | | SUPPLEMENT to Unopposed Motion to Continue Filing Schedule 88 by Kenneth Eugene Barrett (Schardl, Tivon) Modified on 11/3/2009 to edit text (cjt, Deputy Clerk). (Entered: 11/02/2009) |
| 11/03/2009 | 90 | | ORDER EXTENDING FILING SCHEDULE by District Judge James H. Payne: granting 88 Petitioner's Unopposed Motion to Continue Filing Schedule (cjt, Deputy Clerk) (Entered: 11/03/2009) |
| 11/04/2009 | 91 | | ORDER from Circuit Court (Re: 86 MOTION to Stay Proceedings Pending Disposition of Mandamus Action 87 Order Denying Motion to Stay) (cjt, Deputy Clerk) (Entered: 11/04/2009) |
| 12/03/2009 | 92 | | MINUTE ORDER by District Judge James H. Payne: Show Cause Hearing is set for 12/15/2009 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne for David Autry to show cause why he has failed to comply with this Court's prior orders regarding submission of CJA vouchers. Only David Autry's appearance is required at this hearing. (cjt, Deputy Clerk) (Entered: 12/03/2009) |
| 12/04/2009 | 93 | | ATTORNEY APPEARANCE by Joan Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified on 12/7/2009 to change text (dma, Deputy Clerk). (Entered: 12/04/2009) |
| 12/04/2009 | 94 | | NOTICE Petitioner's Notice Regarding Amended Petition by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 12/04/2009) |
| 12/04/2009 | 95 | | Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* by Kenneth Eugene Barrett Responses due by 12/18/2009(Fisher, Joan) (Entered: 12/04/2009) |
| 12/14/2009 | 96 | | ORDER from Circuit Court (Re: 87 Order, Ruling on Motion to Stay, 86 MOTION to Stay *Proceedings Pending Disposition of Mandamus Action* ) (With attachments)(law, Deputy Clerk) (Entered: 12/14/2009) |
| 12/15/2009 | 97 | | SEALED MINUTES of Show Cause Hearing (cjt, Deputy Clerk) (Entered: 12/15/2009) |
| 01/08/2010 | 98 | | MOTION to Extend Deadline(s) *for submission of cja voucher* by Kenneth Eugene Barrett Responses due by 1/22/2010(Autry, David) (Entered: 01/08/2010) |
| 01/08/2010 | 99 | | MINUTE ORDER by District Judge James H. Payne: granting 98 Motion to Extend Time for Submittal of CJA Voucher by Petitioner's counsel, David Autry, until 1/11/2010. (cjt, Deputy Clerk) (Entered: 01/08/2010) |
| 01/11/2010 | 100 | | NOTICE of Submission of Matter for In Camera Review by USA (Wilson, Christopher) (Entered: 01/11/2010) |
| 01/11/2010 | 101 | | SEALED LETTER (dma, Deputy Clerk) (Entered: 01/12/2010) |
| 01/12/2010 | 102 | | PROTECTIVE ORDER by District Judge James H. Payne (Re: 101 Sealed Letter) (dma, Deputy Clerk) (Entered: 01/12/2010) |

| 01/13/2010 | 103 | | Unopposed MOTION to Extend Deadline(s) *to File Brief in Support of Amended Petition and Subsequent Briefing* by Kenneth Eugene Barrett Responses due by 1/27/2010 (With attachments)(Schardl, Tivon) (Entered: 01/13/2010) |
|---|---|---|---|
| 01/15/2010 | 104 | | MINUTE ORDER by District Judge James H. Payne: For good cause shown, 103 Petitioner's Motion for Extension of Time to File Brief in Support of Amended Motion to Vacate is granted. Petitioner shall be given until 2/18/2010 to file his brief. No further extensions of time shall be granted. Respondent's answer shall be due 4/19/2010 and Petitioner's reply will be due 5/4/2010. (Re: 95 Amended MOTION to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255) (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 01/15/2010 | 105 | | MINUTE ORDER by District Judge James H. Payne: It is hereby ordered that Petitioner Kenneth Eugene Barrett's CJA 30 DEATH PENALTY PROCEEDINGS: APPOINTMENT OF AND AUTHORITY TO PAY COURT–APPOINTED COUNSEL comes before the Court by David B. Autry. This matter is hereby REFERRED to Magistrate Judge Steven P. Shreder for a fee hearing and Report and Recommendation in accordance with his jurisdiction under the Federal Rules. The Clerk is directed to transmit to the Magistrate said original application and supporting documents. (cjt, Deputy Clerk) (Entered: 01/15/2010) |
| 02/02/2010 | 106 | | MINUTE ORDER by District Judge James H. Payne (Attachments: # 1 1/29/2010 E–Mail) (cjt, Deputy Clerk) (Entered: 02/02/2010) |
| 02/11/2010 | 107 | | Third MOTION to Extend Deadline(s) *Due to Newly Disclosed Evidence* by Kenneth Eugene Barrett Responses due by 2/25/2010 (With attachments)(Schardl, Tivon) (Entered: 02/11/2010) |
| 02/12/2010 | 108 | | MINUTE ORDER by District Judge James H. Payne: Motion Hearing and Status Conference are set for 3/1/2010 at 09:30 AM before District Judge James H. Payne (Re: 107 Petitioner's Third MOTION to Continue Briefing Schedule). Counsel are required to be present at this hearing. Petitioner does not need to be present. (cjt, Deputy Clerk) (Entered: 02/12/2010) |
| 02/18/2010 | 109 | | MOTION Leave to File Oversized Brief in Support of Amended Motion to Vacate, MOTION for Leave to File Brief in Support of Second Amended Motion to Vacate by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 110 | | Unopposed MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 3/4/2010(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 111 | | Amended MOTION for Leave to Exceed Page Limitation by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 112 | | MINUTE ORDER by District Judge James H. Payne: denying 111 Petitioner's Amended Motion for Leave to File Oversized Brief, with written order to follow (finding as moot 109 Petitioner's Motion for Leave to File Oversized Brief) (cjt, Deputy Clerk) (Entered: 02/18/2010) |
| 02/18/2010 | 113 | | MOTION to Reconsider *Order Denying Leave to File Oversized Brief* (Re: 112 Minute Order,, Ruling on Motion for Miscellaneous Relief,, Ruling on |

| | | | |
|---|---|---|---|
| | | | Motion for Leave to File Document(s), Ruling on Motion for Leave to File Document(s), Ruling on Motion to Exceed Page Limitation, ) by Kenneth Eugene Barrett Responses due by 3/4/2010 (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 114 | | REDACTED EXHIBITS **119, 120, 121, 122** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 115 | | REDACTED EXHIBITS **125, 126, 128, 129, 130, 132, 133, 134, 137, 138** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 116 | | REDACTED EXHIBITS **148, 149, 150, 151, 152, 153, 154** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 117 | | REDACTED EXHIBITS **123, 124, 127, 131, 135** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 118 | | REDACTED EXHIBITS **155, 156** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 119 | | REDACTED EXHIBITS **157, 158** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 120 | | REDACTED EXHIBITS **163, 164** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 121 | | REDACTED EXHIBIT **161** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 122 | | REDACTED EXHIBIT **162** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 123 | | REDACTED EXHIBITS **165, 166** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 124 | | |

| | | | |
|---|---|---|---|
| | | | REDACTED EXHIBIT **159 Part a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>125</u> | | REDACTED EXHIBITS **167, 168, 169** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>126</u> | | REDACTED EXHIBIT **159 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>127</u> | | REDACTED EXHIBITS **170, 171** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>128</u> | | REDACTED EXHIBIT **160 Part a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>129</u> | | REDACTED EXHIBIT **160 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>130</u> | | REDACTED EXHIBITS **172, 173** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>131</u> | | REDACTED EXHIBIT **177 Part a** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>132</u> | | REDACTED EXHIBITS **174, 175, 176, 178** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | <u>133</u> | | REDACTED EXHIBIT **177 Part b** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>134</u> | | REDACTED EXHIBIT **177 Part c** (Re: <u>95</u> Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | <u>135</u> | | |

| | | | |
|---|---|---|---|
| | | | REDACTED EXHIBITS **179, 180, 181a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 136 | | REDACTED EXHIBIT **181 Part B1** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 137 | | REDACTED EXHIBITS **182, 183** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 138 | | REDACTED EXHIBIT **181 Part B2** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 139 | | REDACTED EXHIBIT **196 Part a** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 140 | | REDACTED EXHIBITS **184, 185, 186, 187, 188** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 141 | | REDACTED EXHIBIT **196 Part b** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 142 | | REDACTED EXHIBIT **196 Part c** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 143 | | REDACTED EXHIBIT **196 Part d** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/18/2010) |
| 02/18/2010 | 144 | | REDACTED EXHIBITS **189, 190, 191, 192, 193, 194, 195** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 02/18/2010) |
| 02/18/2010 | 145 | | REDACTED EXHIBITS **197, 198, 199, 200, 203, 204, and 205** (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/18/2010) |
| 02/26/2010 | 146 | | |

| | | | |
|---|---|---|---|
| | | | ORDER by District Judge James H. Payne: granting 113 petitioner's Motion to Reconsider; Petitioner's brief due 3/1/10 at 4:30 p.m.; Status Conference RESET for 3/31/2010 at 10:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne; (granting in part 107 Motion to Continue Briefing Schedule; striking 1 Motion to Vacate Order/Judgment; striking 2 Corrected Motion to Vacate Order/Judgment; striking 70 Amended Motion to Vacate Order/Judgment) (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 02/26/2010 | 147 | | ORDER by District Judge James H. Payne: Re: 110 petitioner's Unopposed MOTION to File Exhibits Under Seal; Petitioner's response due 3/12/10 (cjt, Deputy Clerk) (Entered: 02/26/2010) |
| 03/01/2010 | 148 | | STIPULATION *and Order [Proposed] Modified Protective Order* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 149 | | BRIEF in Support of Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/01/2010 | 150 | | MOTION for Evidentiary Hearing (Re: 95 Amended MOTION to Vacate) by Kenneth Eugene Barrett; Responses due by 3/15/2010(Schardl, Tivon) Modified on 3/2/2010 to change text and link (dma, Deputy Clerk). (Entered: 03/01/2010) |
| 03/01/2010 | 151 | | MOTION Expand the Record (Re: 149 Brief in Support of Motion ) by Kenneth Eugene Barrett Responses due by 3/15/2010(Schardl, Tivon) (Entered: 03/01/2010) |
| 03/03/2010 | 152 | | Joint MOTION to Modify Protective Order by all parties Responses due by 3/17/2010(Wilson, Christopher) (Entered: 03/03/2010) |
| 03/05/2010 | 153 | | RESPONSE in Opposition to Motion (Re: 150 MOTION for Hearing ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/05/2010 | 154 | | RESPONSE in Opposition to Motion (Re: 151 MOTION Expand the Record ) by USA ;(Wilson, Christopher) (Entered: 03/05/2010) |
| 03/12/2010 | 155 | | RESPONSE by Kenneth Eugene Barrett (Re: 147 Order) (Fisher, Joan) (Entered: 03/12/2010) |
| 03/25/2010 | 156 | | MINUTE ORDER by District Judge James H. Payne: **TIME CHANGE ONLY** – Status Conference RESET for 3/31/2010 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne. (cjt, Deputy Clerk) (Entered: 03/25/2010) |
| 03/29/2010 | 157 | | ORDER by District Judge James H. Payne: denying 150 Petitioner's Motion for Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/29/2010 | 158 | | MOTION to be Excused from the Status Conference set on March 31, 2010 by USA Responses due by 4/12/2010(Wilson, Christopher) (Entered: 03/29/2010) |
| 03/29/2010 | 159 | | MINUTE ORDER by District Judge James H. Payne: granting 158 Government's Motion to be Excused from Attendance of Status Conference. The Court further grants Government's request for substitute counsel, Douglas |

| | | | |
|---|---|---|---|
| | | | Horn, to appear in lieu of Christopher Wilson for this hearing only. (cjt, Deputy Clerk) (Entered: 03/29/2010) |
| 03/30/2010 | 160 | | MINUTE ORDER by District Judge James H. Payne: The Court directs that Courtroom 1, Room 230, be sealed on 3/31/2010 at 9:00 a.m. for the portion of the Status Hearing pertaining to the Protective Order. The Clerk is directed to post this Minute Order on the Court's bulletin board for public viewing located on the 2nd floor of the United States Courthouse. (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 161 | | ORDER (Re: Exhibits) by District Judge James H. Payne: granting 110 Petitioner's Motion to File Exhibits under Seal; granting 151 Petitioner's Motion to Expand the Record (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 162 | | SEALED EXHIBIT **201** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/30/2010 | 163 | | SEALED EXHIBIT **202** (Re: 95 AMENDED MOTION to Vacate) (Per 161 Order) (cjt, Deputy Clerk) (Entered: 03/30/2010) |
| 03/31/2010 | 164 | | SEALED MINUTES of Proceedings – held before District Judge James H. Payne: Motion/Status Hearing held on 3/31/2010 (Re: 152 Joint MOTION to Modify Protective Order ) (Court Reporter: B.Neil) (cjt, Deputy Clerk) (cjt, Deputy Clerk). (Entered: 04/01/2010) |
| 03/31/2010 | 165 | | MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 03/31/2010 | 166 | | CORRECTED MINUTE ORDER by District Judge James H. Payne: Granting Government's oral motion for extension of time to respond to 95 Amended MOTION to Vacate; Response due by 5/17/2010, Reply due by 7/1/2010. (cjt, Deputy Clerk) (Entered: 04/01/2010) |
| 04/05/2010 | 167 | | SEALED REPORT TO COURT by USA (Re: 152 Joint Motion to Modify Protective Order) (cjt, Deputy Clerk) (Entered: 04/05/2010) |
| 04/08/2010 | 168 | | SEALED ORDER by Judge James H. Payne Re: 152 Joint Motion to Modify Protective Order (cjt, Deputy Clerk) (Entered: 04/08/2010) |
| 04/14/2010 | 169 | | SEALED STATUS REPORT by Kenneth Eugene Barrett (cjt, Deputy Clerk) Modified on 4/20/2010 to add corrected attachment (cjt, Deputy Clerk). (Entered: 04/15/2010) |
| 05/12/2010 | 170 | | Unopposed MOTION for Leave to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief by USA Responses due by 5/26/2010(Wilson, Christopher) (Entered: 05/12/2010) |
| 05/13/2010 | 171 | | ORDER by District Judge James H. Payne: granting 170 Respondent's Unopposed Motion to File Redacted Answer to Petitioner's Second Amended Motion for Collateral Relief (cjt, Deputy Clerk) (Entered: 05/13/2010) |
| 05/14/2010 | 172 | | TRANSCRIPT of Proceedings (Unredacted) of Status Hearing held on 3–31–2010 before District Judge James H. Payne (Court Reporter: Brian P. Neil) (Pages: 1–46). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript |

| | | | |
|---|---|---|---|
| | | | may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s) ) (bpn, Court Reporter) (Entered: 05/14/2010) |
| 05/14/2010 | 173 | | TRANSCRIPT ORDER FORM for Status and Scheduling Conference conducted on 3/31/10 (Re: 164 Minutes of Motion Hearing, Striking/Terminating Deadline(s)/Hearing(s), 172 Transcript of Proceedings – Unredacted) by Kenneth Eugene Barrett (law, Deputy Clerk) (Entered: 05/17/2010) |
| 05/17/2010 | 174 | | Redacted RESPONSE in Opposition to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 05/17/2010) |
| 05/17/2010 | 175 | | SEALED RESPONSE (Re: 174 RESPONSE to Motion; 95 Amended MOTION to Vacate, Set Aside or Correct a Sentence) by USA (dma, Deputy Clerk) (Entered: 05/17/2010) |
| 06/30/2010 | 176 | | Unopposed MOTION for Leave to Exceed Page Limitation *For Reply Brief* by Kenneth Eugene Barrett Responses due by 7/14/2010(Schardl, Tivon) (Entered: 06/30/2010) |
| 06/30/2010 | 177 | | MINUTE ORDER by District Judge James H. Payne: granting 176 Petitioner's Unopposed Motion for Leave to File Oversized Brief (cjt, Deputy Clerk) (Entered: 06/30/2010) |
| 07/01/2010 | 178 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 07/01/2010) |
| 07/23/2010 | 179 | | NOTICE of Filing of Signed Declaration of Toby Barrett (Re: 178 Reply to Response to Motion ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 07/23/2010) |
| 08/13/2010 | 180 | | REPORT AND RECOMMENDATION ON REQUEST FOR EXCESS COMPENSATION by Magistrate Judge Steven P. Shreder (Re: 105 Minute Order Referring CJA 30 Voucher) Objections to R&R due by 8/27/2010(eje, Deputy Clerk) (Entered: 08/13/2010) |
| 09/03/2010 | 181 | | SEALED ORDER by District Judge James H. Payne: Re: 180 Report and Recommendation) (cjt, Deputy Clerk) (Entered: 09/03/2010) |
| 09/03/2010 | | | CJA 30: Authorization to Pay David B. Autry on behalf of Kenneth Eugene Barrett. (JHP 9/3/10)(smg, Deputy Clerk) (Entered: 09/14/2010) |
| 02/07/2011 | 182 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 2/22/2011 (With attachments)(Fisher, Joan) (Entered: 02/07/2011) |
| 02/08/2011 | 183 | | MINUTE ORDER by District Judge James H. Payne: granting 182 Petitioner's Unopposed Motion to Seal. Petitioner is given leave to file the following |

| | | | |
|---|---|---|---|
| | | | documents under seal: Petitioners Motion to Vacate or Modify Protective Order and Request for Hearing; Brief in Support of Motion to Vacate or Modify Protective Order and Request for Hearing; Petitioners Motion for Leave to Conduct Discovery; and Petitioners Brief in Support of Motion to Conduct Discovery. (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 184 | | SEALED MOTION to Vacate or Modify Protective Orders and Request for Hearing by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 185 | | SEALED BRIEF in Support of 184 Petitioner's Sealed Motion to Vacate and/or Modify Protective Order and Request for Hearing (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 186 | | SEALED MOTION for Leave to Conduct Discovery by Kenneth Eugene Barrett; response due by 2/22/2011 (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/08/2011 | 187 | | SEALED BRIEF in Support of 186 Sealed Motion to Conduct Discovery (with attachments) (cjt, Deputy Clerk) (Entered: 02/08/2011) |
| 02/17/2011 | 188 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 186 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 189 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 184 SEALED MOTION ) by USA Responses due by 3/3/2011 (With attachments)(Wilson, Christopher) (Entered: 02/17/2011) |
| 02/17/2011 | 190 | | MINUTE ORDER by District Judge James H. Payne: granting 188 and 189 Government's Motions for Extension of Time to Respond to Motions; Responses due by 3/8/2011 Re: 184 Petitioner's SEALED MOTION to Vacate or Modify Protective Orders and 186 Petitioner's SEALED MOTION for Leave to Conduct Discovery (cjt, Deputy Clerk) (Entered: 02/17/2011) |
| 03/04/2011 | 191 | | Unopposed MOTION to Seal Document by USA Responses due by 3/18/2011(Kahan, Jeffrey) (Entered: 03/04/2011) |
| 03/04/2011 | 192 | | MINUTE ORDER by District Judge James H. Payne: granting 191 Respondent's Motion to File Sealed Oppositions to Sealed Motions (cjt, Deputy Clerk) (Entered: 03/04/2011) |
| 03/08/2011 | 193 | | SEALED RESPONSE in Opposition (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/08/2011 | 194 | | SEALED RESPONSE in Oposition (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by USA (cjt, Deputy Clerk) (Entered: 03/08/2011) |
| 03/18/2011 | 195 | | MOTION to Seal Document by Kenneth Eugene Barrett Responses due by 4/1/2011 (With attachments)(Fisher, Joan) (Entered: 03/18/2011) |
| 03/18/2011 | 196 | | MINUTE ORDER by District Judge James H. Payne: granting 195 Petitioner's Motion to Seal Replies to documents 193 and 194 (cjt, Deputy Clerk) (Entered: 03/18/2011) |
| 03/21/2011 | 197 | | SEALED REPLY to Response (Re: 184 Petitioner's Motion to Vacate or Modify the Protective Orders) by Petitioner (cjt, Deputy Clerk) (Entered: |

| | | | |
|---|---|---|---|
| | | | 03/22/2011) |
| 03/21/2011 | 198 | | SEALED REPLY to Response (Re: 186 Petitioner's Motion for Leave to Conduct Discovery) by Petitioner (cjt, Deputy Clerk) (Entered: 03/22/2011) |
| 03/16/2012 | 199 | | NOTICE of Filing of Declaration of Paul D. Gordon (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) Modified to reflect DVDs for Exhibits 2, 3 and 4 stored in file cabinet in vault on 2nd floor Court Clerk's Office (cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/16/2012 | 200 | | NOTICE of Filing of Declaration of Leonard Post (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 03/16/2012) |
| 03/16/2012 | 201 | | MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255* ) by Kenneth Eugene Barrett Responses due by 3/30/2012 (With attachments)(Fisher, Joan) Modified to reflect CDs of Appendix A and Appendix B stored in file cabinet in vault on 2nd floor Court Clerk's Office(cjt, Deputy Clerk). (Entered: 03/16/2012) |
| 03/19/2012 | 202 | | CERTIFICATE of Service (Re: 199 Notice (Other) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/19/2012 | 203 | | CERTIFICATE of Service (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/19/2012) |
| 03/29/2012 | 204 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 201 Motion to Supplement) by USA; Responses due by 4/12/2012 (With attachments)(Wilson, Christopher) Modified on 3/30/2012 (cjt, Deputy Clerk). (Entered: 03/29/2012) |
| 03/30/2012 | 205 | | MINUTE ORDER by District Judge James H. Payne: granting 204 Motion for Extension of Time to Respond to Motion; Response deadline extended to 4/30/2012 (Re: 201 MOTION to Supplement) (cjt, Deputy Clerk) (Entered: 03/30/2012) |
| 04/27/2012 | 206 | | RESPONSE in Opposition to Motion (Re: 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by USA ;(Wilson, Christopher) (Entered: 04/27/2012) |
| 05/07/2012 | 207 | | REPLY to Response to Motion (Re: 95 Amended MOTION to Vacate Order/Judgment *Motion to Vacate, Set Aside, or Correct a Sentence under 28 U.S.C. sec. 2255*, 201 MOTION to Supplement *the Pending Amended Motion to Vacate, Set Aside or Correct a Judgment, Order and/or Sentence* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/07/2012) |
| 06/18/2012 | 208 | | MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY by Kenneth Eugene Barrett. Responses due by 7/2/2012(Fisher, Joan) (Entered: 06/18/2012) |

| | | | |
|---|---|---|---|
| 06/18/2012 | 209 | | BRIEF in Support of Motion (Re: 208 MOTION TO PRESERVE TESTIMONY OF JUDGE JOHN GARRETT, RETIRED, WITHOUT FURTHER DELAY ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/18/2012) |
| 06/20/2012 | 210 | | ORDER by District Judge James H. Payne denying 201 Motion for Leave to Supplement Pending Motion to Vacate, Set Aside or Correct Judgment, Order and/or Sentence Under 28 U.S.C. Section 2255 (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/20/2012 | 211 | | MINUTE ORDER by District Judge James H. Payne denying 208 Motion to Preserve Testimony of Judge John Garrett, Retired, Without Further Delay (dma, Deputy Clerk) (Entered: 06/20/2012) |
| 06/28/2012 | 212 | | MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* (Re: 210 Ruling on Motion to Supplement ) by Kenneth Eugene Barrett. Responses due by 7/12/2012(Fisher, Joan) (Entered: 06/28/2012) |
| 07/10/2012 | 213 | | RESPONSE in Opposition to Motion (Re: 212 MOTION for Reconsideration *OF COURTS ORDER OF JUNE 20, 2012 (DOC. 210) AND BRIEF IN SUPPORT* ) by USA ;(Wilson, Christopher) (Entered: 07/10/2012) |
| 08/16/2012 | 214 | | OPINION AND ORDER by District Judge James H. Payne: denying 95 Amended Motion to Vacate; denying 184 Sealed Motion; denying 186 Sealed Motion; denying 212 Motion to Reconsider (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 215 | | SEALED ORDER by District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 08/16/2012 | 216 | | JUDGMENT by District Judge James H. Payne entering judgment in favor of USA against Kenneth Eugene Barrett (terminates case) (cjt, Deputy Clerk) (Entered: 08/16/2012) |
| 09/13/2012 | 217 | | MOTION to Alter Order/Judgment *and Brief in Support* (Re: 216 Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider ) by Kenneth Eugene Barrett. Responses due by 9/27/2012 (With attachments)(Fisher, Joan) (Entered: 09/13/2012) |
| 09/27/2012 | 218 | | Unopposed MOTION for Extension of Time to Respond to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA. Responses due by 10/11/2012(Wilson, Christopher) (Entered: 09/27/2012) |
| 09/27/2012 | 219 | | ORDER by District Judge James H. Payne: granting 218 Motion for Extension of Time to Respond to Motion; Responses due by 10/29/2012 (Re: 217 MOTION to Alter or Amend Judgment) (cjt, Deputy Clerk) (Entered: 09/27/2012) |
| 10/29/2012 | 220 | | RESPONSE in Opposition to Motion (Re: 217 MOTION to Alter Order/Judgment *and Brief in Support* ) by USA ; (With attachments)(Wilson, Christopher) (Entered: 10/29/2012) |
| 10/30/2012 | 221 | | OPINION AND ORDER by District Judge James H. Payne: denying 217 Petitioner's Motion to Alter or Amend Judgment (cjt, Deputy Clerk) (Entered: 10/30/2012) |

| | | | |
|---|---|---|---|
| 12/26/2012 | 222 | | NOTICE OF APPEAL to Circuit Court (Re: 216 Judgment, 221 Ruling on Motion to Alter Order/Judgment, 214 Ruling on Motion to Vacate Order/Judgment, Ruling on Sealed Motion,, Ruling on Motion to Reconsider, 215 Sealed Order ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 12/26/2012) |
| 12/27/2012 | 223 | | Transmission of Notice of Appeal and Docket Sheet to Circuit Court with copy of 222 Notice of Appeal, 216 Judgment, 221 Ruling, 214 Ruling and 215 Sealed Order. Preliminary Record transmitted to 10th Circuit Court of Appeals electronically. (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/27/2012) |
| 12/27/2012 | 224 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 12–7086 (Re: 222 Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 12/28/2012) |
| 01/10/2013 | 225 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/10/2013) |
| 01/10/2013 | 226 | | DESIGNATION of Record on Appeal (Re: 222 Notice of Appeal – Final Judgment, ) by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 01/10/2013) |
| 03/06/2013 | 227 | | RECORD on Appeal Sent to Circuit Court (Record includes: Volume 1 – Pleadings 1, 2, 3, 4, 5, 6, 7, 45, 51, 52, 57, 58, 59, 61, 62, 66, 67, 68, 69, 70, 91, 94, 95, 96, 100, 102, 114, 115, 116, 117, 118, 119, 120, 121, 122, 123, 124, 125, 126, 127, 128, 129, 131, 132, 133, 134, 135, 136, 137, 138, 139, 140, 141, 142, 143, 144, 145, 146, 147, 148, 149, 150, 151, 152, 153, 154, 155, 157, 161, 170, 171, 174, 178, 179, 199, 200, 201, 206, 207, 208, 209, 210, 212, 213, 214, 216, 217, 220, 221, 222; Volume 2 – Sealed Pleadings #8, 9, 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 33, 34, 35, 36, 37, 38, 39, 40, 41, 42, 43, 97, 101, 162, 163, 164, 168, 175, 181, 184, 185, 186, 187, 193, 197, 198 and 215; Volume 3 – Transcripts: Show Cause Hearing held 10/6/2009 and Motion/Status Hearing held 3/31/10.) Also included from 04–cr–115–JHP – Volume 1 – Pleadings 1 – 15, 17 –19, 22, 26 – 29, 31 – 36, 38, 41 – 45, 47 – 49, 52 – 56, 58 – 60, 62, 63 – 66, 69 – 82, 85 – 87, 90, 92 – 94, 96, 97, 99, 101, 102, 104 – 106, 114, 115, 117, 120 – 122, 124, 125, 127, 128, 132 – 137, 139 – 142, 145 – 147, 152 – 155, 157, 158, 163 – 167, 169 – 175, 177, 178, 180 – 190, 192 – 194, 199, 201 – 206, 209 – 213, 215 – 218, 226, 228, 229, 231, 239, 240 – 243, 245 – 249, 252, 253, 255 – 258, 260, 263, 267, 268, 276, 279, 280, 282 – 285, 287, 288, 290, 291, 293, 302, 306 – 308, 359 – 367, 374, 382, 384, 387, 390, 391, 397, 400 – 405, 410 – 412, 415, 417 and 421; Volume 2– Sealed Pleadings 23 – 25, 50, 51, 57, 107, 113, 116, 118, 208, 214, 232, 237, 238, 264 – 266, 274, 301, 368 – 371, 375, 377, 379, 380, 383, 392, 394 – 396, 398, 399 and 416; Volume 3 – Sealed Transcripts (5): Budget Hearing held 12/09/04, Ex Parte Hearing held 01/07/05, Motion Hearing held 3/22/05, Telephone Conference held 5/12/05 and Hearing on Governments Motion held 9/13/05; Volume 4 – Sealed Presentence Report; Volume 5 – Transcripts (54): Proceedings held 10/25/04, Arraignment held 11/17/04, Status Conference held 1/07/05, Proceedings held 2/15/05, Status Conference held 3/22/05, Status Conference held 5/18/05, Telephone Conference held 6/02/05, Motion |

| | | | |
|---|---|---|---|
| | | | to Continue held 6/5/05, Status Conference held 7/15/05, Status Conference 8/12/05, Criminal Pretrial held 8/31/04, Telephone Conference held 9/06/05, Status Hearing held 9/9/05, Sealed Hearing 9/12/05, Individual Juror Qualification Stage One Proceedings held 9/12 through 9/16/05, (5 transcripts), Hearing on USA Motion for Order Delaying Production of Witness Names and Protective Order held 9/13/05 – (Vol 1 and 2), Pretrial Hearing held 9/20/05, Courts Rulings on Motions held 9/26/05, Jury Trial (27 Transcripts, Vol 1 through 27) held 9/26/05 through 11/17/05, Ex Parte Budget Hearing held 10/3/05, Partial Transcript of Proceedings dated 11/10/05, Sentencing held 12/19/05; Record on Appeal transmitted to 10th Circuit Court of Appeals electronically. Under separate mailing 03/06/2013, certified #7009–3410–0001–4052–7584 – (Videotape – attachment to Pleading 237) and (Disk – Attachment to Pleading 265). (Re: 222 Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) Modified on 12/1/2016 ***Pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, both filed in CR–04–115–JHP received from 10th Circuit and STORED IN CLERK'S OFFICE 2ND FLOOR VAULT (See 268 LETTER from Circuit Court)*** (cjt, Deputy Clerk). Modified on 5/10/2019 ***to reflect #237 Sealed Psychological Eval with VIDEOTAPE and #265 Sealed Notice with DISK, both filed in CR–04–115–RAW, returned to 10th Circuit (See Pleading 485 LETTER to Circuit Court)*** (cjt, Deputy Clerk). (Entered: 03/06/2013) |
| 03/06/2013 | | | ***Remark: Record on Appeal transmitted to 10th Circuit Court of Appeals electronically. (Re: 227 Appeal Record Sent to USCA, 222] Notice of Appeal – Final Judgment, ) (jcb, Deputy Clerk) (Entered: 03/07/2013) |
| 03/11/2013 | | | ***Remark: Notice of receipt of Record on Appeal by 10th Circuit Court of Appeals (Re: 227 Appeal Record Sent to USCA, 222] Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) (Entered: 03/12/2013) |
| 02/21/2014 | 228 | | ORDER from Circuit Court (Re: 222 Notice of Appeal – Final Judgment) directing Clerk to transmit supplemental record (With attachments) (cjt, Deputy Clerk) (Entered: 02/21/2014) |
| 02/26/2014 | 229 | | SUPPLEMENTAL RECORD on Appeal Sent to Circuit Court (Record includes: Per Order of the 10th Circuit Court of Appeals entered 2/21/14 228 , supplemental record sent to 10th Circuit Court of Appeals consisting of CJA Voucher Forms with attachments (Voucher #060125000010 for period of service from 12/1/05 to 1/10/06; Voucher #051216000002 for period of service from 11/1/05 to 11/30/05; Voucher #051216000001 for period of service from 10/1/05 to 10/31/05; Voucher #051213000016 for period of service from 9/1/05 to 9/30/05; #051213000015 for period of service from 8/1/05 to 8/31/05; Voucher #050922000006 for period of service from 7/1/05 to 7/31/05; Voucher #050922000005 for period of service from 6/1/05 to 6/30/05; Voucher #050715000012 for period of service from 5/1/05 to 5/31/05; Voucher #050516000003 for period of service from 4/1/05 to 4/30/05; Voucher #050506000011 for period of service from 3/1/05 to 3/31/05; Voucher #050506000009 for period of service from 2/1/05 to 2/28/05; and Voucher #050506000008 for period of service from 10/25/04 to 1/31/05. Supplemental record transmitted to 10th Circuit Court of Appeals by Federal Express #8723–8982–6061.) (Re: 222 Notice of Appeal – Final Judgment) (jcb, Deputy Clerk) (Entered: 02/27/2014) |

| | | | |
|---|---|---|---|
| 08/19/2015 | 230 | | DECISION from Circuit Court Reverse and Remand death sentence for evidentiary hearing; Affirm in all other respects, denying motion for certificate of appealability – Decision of the District Court (awaiting mandate) (Re: 222 Notice of Appeal – Final Judgment) (With attachments) (cjt, Deputy Clerk) (Entered: 08/19/2015) |
| 08/19/2015 | 231 | | JUDGMENT from Circuit Court (Re: 230 USCA Decision, 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 08/19/2015) |
| 10/26/2015 | 232 | | MANDATE letter from Circuit Court (Re: 230 USCA Decision, 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 10/28/2015) |
| 11/30/2015 | 233 | | ORDER by District Judge James H. Payne: Evidentiary Hearing set for 6/2/2016 at 09:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 11/30/2015) |
| 12/06/2015 | 234 | | MOTION PERMIT INSPECTION OF THE EXPANDED RECORD by USA. Responses due by 12/21/2015(Kahan, Jeffrey) (Entered: 12/06/2015) |
| 12/08/2015 | 235 | | MINUTE ORDER by District Judge James H. Payne: Directing response by 12/15/2015 (Re: 234 GOVERNMENT'S UNOPPOSED MOTION TO PERMIT INSPECTION OF THE EXPANDED RECORD) (cjt, Deputy Clerk) (Entered: 12/08/2015) |
| 12/14/2015 | 236 | | Unopposed RESPONSE to Motion (Re: 234 MOTION PERMIT INSPECTION OF THE EXPANDED RECORD ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 12/14/2015) |
| 12/17/2015 | 237 | | ORDER by District Judge James H. Payne: denying 234 Government's Unopposed Motion to Permit Inspection of the Expanded Record; striking 233 Order Setting Hearing, including Evidentiary Hearing set for 6/2/2016 at 9:30 AM and all other deadlines set in said order (cjt, Deputy Clerk) (Entered: 12/17/2015) |
| 01/11/2016 | 238 | | NOTICE OF EXTENSION OF TIME TO FILE PETITION FOR CERTIORARI by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/11/2016) |
| 02/16/2016 | 239 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari deadline for filing has been extended to 3/14/2016 (U.S. Supreme Court Case Number: 15A644) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 02/17/2016) |
| 03/16/2016 | 240 | | NOTICE OF FILING OF PETITION FOR CERTIORARI by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/16/2016) |
| 03/17/2016 | 241 | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been filed on 3/14/2016 (U.S. Supreme Court Case Number: 15–8565) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 03/17/2016) |
| 06/24/2016 | 242 | | ORDER from the Tenth Circuit, re: motion for authorization to file second or successive 2255 (dma, Deputy Clerk) (Entered: 06/24/2016) |
| 10/03/2016 | 243 | | |

| | | | |
|---|---|---|---|
| | | | LETTER from Circuit Court stating that the Petition for Writ of Certiorari has been denied (U.S. Supreme Court Case Number: 15–8565) (Re: 222 Notice of Appeal – Final Judgment) (cjt, Deputy Clerk) (Entered: 10/03/2016) |
| 11/07/2016 | 244 | | ORDER from Circuit Court: denying authorization to file the proposed second Sec. 2255 motion (Re: 242 Order) (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/07/2016 | 245 | | ORDER from Circuit Court: denying authorization to file proposed second Sec. 2255 motion (Re: 242 Order, 244 USCA Order) (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/07/2016 | 246 | | ORDER by District Judge James H. Payne: Evidentiary Hearing set for 2/16/2017 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 11/07/2016) |
| 11/10/2016 | 247 | | Unopposed MOTION to Extend Scheduling Order Dates by Kenneth Eugene Barrett Responses due by 11/24/2016(Fisher, Joan) (Entered: 11/10/2016) |
| 11/15/2016 | 248 | | ORDER by District Judge James H. Payne: denying 247 Petitioner's Unopposed Motion to Modify Scheduling Order (cjt, Deputy Clerk) (Entered: 11/15/2016) |
| 11/18/2016 | 249 | | MOTION for Discovery *Leave to Conduct Civil Discovery* by Kenneth Eugene Barrett Responses due by 12/2/2016(Fisher, Joan) (Entered: 11/18/2016) |
| 11/18/2016 | 250 | | MOTION for Discovery *of Counsel's File* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 251 | | MOTION for Discovery *(Deposition of Experts)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 252 | | MOTION for Discovery *(Interrogatories)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 253 | | MOTION for Psychiatric Evaluation of Defendant by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) Modified on 11/22/2016 to edit event and text (dma, Deputy Clerk). (Entered: 11/18/2016) |
| 11/18/2016 | 254 | | MOTION for Discovery *(Subpoena Duces Tecum – Third Parties)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 255 | | MOTION for Discovery *(Subpoena Duces Tecum – Petitioner)* by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 256 | | MOTION to Unseal Document(s) (Report of Dr. Randall Price) (Re: 67 Order) by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/18/2016 | 257 | | MOTION to Unseal Document(s) (Re: 24 Sealed Document, 12 Sealed Document, 16 Sealed Document, 21 Sealed Document, 143 Exhibit(s) in Support of Document(s), 14 Sealed Document, 9 Sealed Document, 20 Sealed Document, 22 Sealed Document, 11 Sealed Document, 19 Sealed Document, 145 Exhibit(s) in Support of Document(s), 8 Sealed Document, 13 Sealed |

| | | | |
|---|---|---|---|
| | | | Document, 17 Sealed Document, 15 Sealed Document, 27 Sealed Document, 42 Sealed Document, 25 Sealed Document, 26 Sealed Document, 18 Sealed Document, 142 Exhibit(s) in Support of Document(s), 141 Exhibit(s) in Support of Document(s), 28 Sealed Document, 43 Sealed Document, 23 Sealed Document, 10 Sealed Document ) by USA (With attachments) Responses due by 12/2/2016(Wilson, Christopher) (Entered: 11/18/2016) |
| 11/23/2016 | 258 | | RESPONSE to Motion (Re: 250 MOTION for Discovery *of Counsel's File* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 259 | | RESPONSE to Motion (Re: 251 MOTION for Discovery *(Deposition of Experts)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 260 | | RESPONSE to Motion (Re: 252 MOTION for Discovery *(Interrogatories)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 261 | | RESPONSE to Motion (Re: 254 MOTION for Discovery *(Subpoena Duces Tecum – Third Parties)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 262 | | RESPONSE to Motion (Re: 255 MOTION for Discovery *(Subpoena Duces Tecum – Petitioner)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 263 | | RESPONSE to Motion (Re: 256 MOTION to Unseal Document(s) *(Report of Dr. Randall Price)* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 264 | | RESPONSE to Motion (Re: 257 MOTION to Unseal Document(s) ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/23/2016 | 265 | | RESPONSE to Motion (Re: 253 MOTION ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 11/23/2016) |
| 11/25/2016 | 266 | | RESPONSE to Motion (Re: 249 MOTION for Discovery *Leave to Conduct Civil Discovery* ) by USA ;(Kahan, Jeffrey) (Entered: 11/25/2016) |
| 11/28/2016 | 267 | | MINUTE ORDER by District Judge James H. Payne: The Court hereby strikes the Evidentiary Hearing set herein on 2/16/2017 at 9:00 AM. The Court will set a new Evidentiary Hearing date as soon as all pending motions have been ruled upon. (cjt, Deputy Clerk) (Entered: 11/28/2016) |
| 11/29/2016 | 268 | | LETTER from Circuit Court with enclosed pleading #237 Sealed Psychological Evaluation/Risk Assessment with VIDEOTAPE, and #265 Sealed Notice with DISK, both filed in CR–04–115–JHP (Re: 222 Notice of Appeal – Final Judgment, 227 RECORD on Appeal Sent to Circuit Court) ***STORED IN CLERK'S OFFICE 2ND FLOOR VAULT*** (cjt, Deputy Clerk) Modified on 5/10/2019 to reflect #237 and #265, with original pleadings, VIDEOTAPE AND DISK, both filed in CR–04–115–RAW, returned to Tenth Circuit (See 485 Letter to Circuit Court) (cjt, Deputy Clerk). (Entered: 11/29/2016) |
| 12/06/2016 | 269 | | ORDER re: DISCOVERY by District Judge James H. Payne: denying 249 Petitioner's Motion to Conduct Discovery; granting 250 Government's Motion to Secure Trial Counsel's Files; denying in part and granting in part 251 Government's Motion to Obtain Discovery from Defense Experts; denying 252 |

| | | | |
|---|---|---|---|
| | | | Government's Motion to Propound Interrogatories; granting 253 Government's Motion for Psychiatric Evaluation of Defendant; denying 254 Government's Motion to Serve Discovery on Third Parties; denying 255 Government's Motion to Serve Subpoenas Duces Tecum; granting 256 Government's Unopposed Motion to Permit Inspection of Expanded Record; denying in part and granting in part 257 Government's Unopposed Motion to Unseal Documents (cjt, Deputy Clerk) (Entered: 12/06/2016) |
| 12/06/2016 | 270 | | SCHEDULING ORDER by District Judge James H. Payne: Evidentiary Hearing set for 3/13/2017 at 09:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (cjt, Deputy Clerk) (Entered: 12/06/2016) |
| 12/12/2016 | 271 | | MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT by Kenneth Eugene Barrett Responses due by 12/26/2016(Fisher, Joan) (Entered: 12/12/2016) |
| 12/13/2016 | 272 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 12/15/2016 (Re: 271 Petitioner's MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT) (cjt, Deputy Clerk) (Entered: 12/13/2016) |
| 12/13/2016 | 273 | | Unopposed MOTION to Continue Hearing(s) by USA (With attachments) Responses due by 12/27/2016(Kahan, Jeffrey) (Entered: 12/13/2016) |
| 12/14/2016 | 274 | | ORDER by District Judge James H. Payne: denying 273 Motion for Continuance of Evidentiary Hearing (cjt, Deputy Clerk) (Entered: 12/14/2016) |
| 12/15/2016 | 275 | | RESPONSE in Opposition to Motion (Re: 271 MOTION FOR ORDER OF ACCESS TO PETITIONER BY MENTAL HEALTH EXPERT ) by USA ; (With attachments)(Kahan, Jeffrey) (Entered: 12/15/2016) |
| 12/15/2016 | 276 | | ORDER by District Judge James H. Payne: denying 271 Petitioner's Motion for Order of Access to Petitioner by Mental Health Expert (cjt, Deputy Clerk) (Entered: 12/15/2016) |
| 12/19/2016 | 277 | | MOTION for Reconsideration *For Order of Access to Petitioner by Mental Health Expert* (Re: 276 Ruling on Motion for Miscellaneous Relief ) by Kenneth Eugene Barrett Responses due by 1/3/2017(Fisher, Joan) (Entered: 12/19/2016) |
| 12/20/2016 | 278 | | RESPONSE in Opposition to Motion (Re: 277 MOTION for Reconsideration *For Order of Access to Petitioner by Mental Health Expert* ) by USA ;(Kahan, Jeffrey) (Entered: 12/20/2016) |
| 12/21/2016 | 279 | | ORDER by District Judge James H. Payne: denying 277 Petitioner's Motion to Reconsider Expedited Motion for Order of Access to Petitioner by Mental Health Expert (Re: 271 MOTION, 276 Order) (cjt, Deputy Clerk) (Entered: 12/21/2016) |
| 01/03/2017 | 280 | | NOTICE of Petitioner's Written Summaries of Anticipated Testimony of Experts (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 01/03/2017) |
| 01/03/2017 | 281 | | MOTION for Reconsideration *of the Court's Order Denying The Government's Unopposed Motion for Reconsideration* (Re: 274 Ruling on |

| | | | |
|---|---|---|---|
| | | | Motion to Continue Hearing(s) ) by Kenneth Eugene Barrett Responses due by 1/17/2017(Fisher, Joan) (Entered: 01/03/2017) |
| 01/03/2017 | 282 | | Unopposed MOTION Order to Transport Petitioner to Personally Attend Evidentiary Hearing (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett Responses due by 1/17/2017(Fisher, Joan) (Entered: 01/03/2017) |
| 01/11/2017 | 283 | | ORDER by District Judge James H. Payne: granting in part 281 Petitioner's Motion for Reconsideration; Evidentiary Hearing as to Roger Hilfiger's testimony ONLY is RESET from 3/31/2017 to 3/30/2017 at 09:00 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK before District Judge James H. Payne (Re: 274 Order) (cjt, Deputy Clerk) (Entered: 01/11/2017) |
| 01/11/2017 | 284 | | MINUTE ORDER by District Judge James H. Payne: granting 282 Petitioner's Unopposed Motion to Transport Petitioner to Evidentiary Hearing. Government is directed to secure Petitioner's presence at said hearing commencing on 3/13/2017 at 9:30 AM in Courtroom 1, Room 230, US Courthouse, 5th & Okmulgee, Muskogee, OK. (cjt, Deputy Clerk) (Entered: 01/11/2017) |
| 01/11/2017 | 285 | | Opposed MOTION FOR ORDER OF ACCESS TO PETITIONER BY GEORGE WOODS, M.D. by Kenneth Eugene Barrett Responses due by 1/25/2017(Fisher, Joan) (Entered: 01/11/2017) |
| 01/12/2017 | 286 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 1/13/2017 (Re: 285 Petitioner's Opposed MOTION FOR ACCESS TO PETITIONER BY GEORGE WOODS, M.D.). (cjt, Deputy Clerk) (Entered: 01/12/2017) |
| 01/13/2017 | 287 | | RESPONSE in Opposition to Motion (Re: 285 Opposed MOTION FOR ORDER OF ACCESS TO PETITIONER BY GEORGE WOODS, M.D. ) by USA ;(Kahan, Jeffrey) (Entered: 01/13/2017) |
| 01/18/2017 | 288 | | ORDER by District Judge James H. Payne: granting 285 Petitioner's Motion for Access to Petitioner by George Woods, M.D. (cjt, Deputy Clerk) (Entered: 01/18/2017) |
| 01/30/2017 | 289 | | MOTION to Exclude Proposed Witnesses by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 01/30/2017) |
| 02/01/2017 | 290 | | MOTION to Exclude a Proposed Witness by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 02/01/2017) |
| 02/01/2017 | 291 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 289 MOTION to Exclude Proposed Witnesses, 290 MOTION to Exclude a Proposed Witness) (cjt, Deputy Clerk) (Entered: 02/01/2017) |
| 02/01/2017 | 292 | | MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone by USA (With attachments) Responses due by 2/8/2017(Kahan, Jeffrey) (Entered: 02/01/2017) |
| 02/01/2017 | 293 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone) (cjt, Deputy Clerk) (Entered: 02/01/2017) |
| 02/01/2017 | 294 | | Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 295 | | MOTION in Limine *to Preclude Post–Hoc Rationalizations, and Supporting Brief* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 296 | | MOTION to Extend Scheduling Order Dates *for Motion in Limine Regarding Dr. Steven Pitt* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 297 | | Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* by Kenneth Eugene Barrett Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 298 | | Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* (Re: 269 Ruling on Motion for Discovery, Ruling on Motion for Miscellaneous Relief, Ruling on Motion to Unseal Document(s) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 299 | | MOTION to Expand the Record with Exhibits 206 through 220 by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 300 | | MOTION for Order Barring Witness Collusion and Brief in Support by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 301 | | MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing (Re: 270 Scheduling Order, Setting/Resetting Hearing(s) ) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 302 | | MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* (Re: 269 Ruling on Motion for Discovery, Ruling on Motion for Miscellaneous Relief, Ruling on Motion to Unseal Document(s)) by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 303 | | MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 304 | | MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* by Kenneth Eugene Barrett; Responses due by 2/8/2017(Fisher, Joan) (Entered: 02/01/2017) |
| 02/01/2017 | 305 | | |

| | | | |
|---|---|---|---|
| | | | MOTION in Limine *to Exclude Testimony by Randall Price* by Kenneth Eugene Barrett (With attachments); Responses due by 2/8/2017(Schardl, Tivon) (Entered: 02/01/2017) |
| 02/03/2017 | 306 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited deadlines as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court*, 296 MOTION for Additional Time to File *Motion in Limine Regarding Dr. Steven Pitt*, 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony*, 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, 299 MOTION to Expand the Record, 300 MOTION for Order Barring Witness Collusion, 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing, 302 MOTION for Reconsideration of Order Denying Deposition of Roger Hilfiger)* (cjt, Deputy Clerk) (Entered: 02/03/2017) |
| 02/03/2017 | 307 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to the Scheduling Order entered on 12/6/2016, the deadlines are as follows: Responses due by 2/8/2017, Replies due by 2/15/2017. (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations*, 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony*, 305 MOTION in Limine *to Exclude Testimony by Randall Price*) (cjt, Deputy Clerk) (Entered: 02/03/2017) |
| 02/08/2017 | 308 | | Unopposed MOTION to Seal Document *Response to Docket Entry 305* by USA (With attachments) Responses due by 2/22/2017(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 309 | | RESPONSE in Opposition to Motion (Re: 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 310 | | RESPONSE in Opposition to Motion (Re: 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 311 | | RESPONSE in Opposition to Motion (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 312 | | RESPONSE in Opposition to Motion (Re: 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing ) by USA ; (With attachments)(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 313 | | RESPONSE in Opposition to Motion (Re: 304 MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* ) by USA ;(Kahan, Jeffrey) (Entered: 02/08/2017) |
| 02/08/2017 | 314 | | RESPONSE in Opposition to Motion (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations, and Supporting Brief* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 315 | | RESPONSE to Motion (Re: 296 MOTION to Extend Scheduling Order Dates *for Motion in Limine Regarding Dr. Steven Pitt* ) by USA ;(Wilson, |

| | | | |
|---|---|---|---|
| | | | Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 316 | | MINUTE ORDER by District Judge James H. Payne: granting 308 Government's Unopposed Motion to Seal Response in Opposition to Motion (Re: 305 MOTION in Limine *to Exclude Testimony by Randall Price*). (cjt, Deputy Clerk) (Entered: 02/08/2017) |
| 02/08/2017 | 317 | | RESPONSE to Motion (Re: 299 MOTION to Expand the Record with Exhibits 206 through 220 ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 318 | | RESPONSE in Opposition to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 319 | | RESPONSE in Opposition to Motion (Re: 302 MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 320 | | RESPONSE in Opposition to Motion (Re: 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* ) by USA ;(Wilson, Christopher) (Entered: 02/08/2017) |
| 02/08/2017 | 321 | | SEALED RESPONSE in Opposition to Motion (Re: 305 MOTION in Limine to Exclude Testimony by Randall Price) by USA (cjt, Deputy Clerk) (Entered: 02/08/2017) |
| 02/08/2017 | 322 | | RESPONSE in Opposition to Motion (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/08/2017) |
| 02/08/2017 | 323 | | RESPONSE in Opposition to Motion (Re: 289 MOTION to Exclude Proposed Witnesses ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/08/2017) |
| 02/15/2017 | 324 | | REPLY to Response to Motion (Re: 298 Opposed MOTION for Reconsideration *Order Denying Discovery of Trial Counsels' Emails, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 325 | | REPLY to Response to Motion (Re: 294 Opposed MOTION for Recusal *and to Disqualify the Court, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 326 | | REPLY to Response to Motion (Re: 301 MOTION to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 327 | | REPLY to Response to Motion (Re: 304 MOTION in Limine *to Exclude Novel Theories of Aggravation, and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 328 | | REPLY to Response to Motion (Re: 295 MOTION in Limine *to Preclude Post−Hoc Rationalizations, and Supporting Brief* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 329 | | REPLY to Response to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by Kenneth Eugene Barrett ;(Fisher, Joan) |

| | | | |
|---|---|---|---|
| | | | (Entered: 02/15/2017) |
| 02/15/2017 | 330 | | REPLY to Response to Motion (Re: 300 MOTION for Order Barring Witness Collusion and Brief in Support ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 331 | | REPLY to Response to Motion (Re: 302 MOTION for Reconsideration *of Order Denying Deposition of Roger Hilfiger* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 332 | | REPLY to Response to Motion (Re: 303 MOTION in Limine *to Rely Upon Declarations for Direct Examination Testimony and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 333 | | REPLY to Response to Motion (Re: 305 MOTION in Limine *to Exclude Testimony by Randall Price* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 334 | | REPLY to Response to Motion (Re: 297 Opposed MOTION for Production *of 18 U.S.C. 3500 Materials Concerning Trial Counsel Testimony and Brief in Support* ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 02/15/2017) |
| 02/15/2017 | 335 | | REPLY to Response to Motion (Re: 292 MOTION to Exclude Evidence of Unavailable Witnesses by Declaration Alone ) by USA ;(Kahan, Jeffrey) (Entered: 02/15/2017) |
| 02/15/2017 | 336 | | REPLY to Response to Motion (Re: 289 MOTION to Exclude Proposed Witnesses , 290 MOTION to Exclude a Proposed Witness ) by USA ;(Kahan, Jeffrey) (Entered: 02/15/2017) |
| 02/16/2017 | 337 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's Motion to Extend Scheduling Order Dates for Motion in Limine regarding Dr. Steven Pitt (Dkt # 296 ) is granted as follows: Expert reports shall be exchanged by 12:00 p.m. Central Standard Time on 3/3/2017. Motions in Limine regarding Dr. Steven Pitt, D.O. and/or Dr. George Woods, M.D. shall be filed by close of business on 3/8/2017. Responses shall be filed by noon on 3/10/2017. (cjt, Deputy Clerk) (Entered: 02/16/2017) |
| 02/16/2017 | 338 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by USA (Kahan, Jeffrey) (Entered: 02/16/2017) |
| 02/16/2017 | 339 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 02/16/2017) |
| 02/16/2017 | 340 | | STIPULATION *Joint Pre−Hearing Statement* by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 02/16/2017) |
| 02/21/2017 | 341 | | MOTION to Extend Scheduling Order Dates by Kenneth Eugene Barrett (With attachments) Responses due by 3/7/2017(Fisher, Joan) (Entered: 02/21/2017) |
| 02/22/2017 | 342 | | Unopposed MOTION to Seal Document *Motion for Partial Summary Judgment* by USA (With attachments) Responses due by 3/8/2017(Kahan, Jeffrey) (Entered: 02/22/2017) |
| 02/23/2017 | 343 | | MINUTE ORDER by District Judge James H. Payne: granting 342 Government's Unopposed Motion to File Sealed Motion for Partial Summary |

| | | | |
|---|---|---|---|
| | | | Judgment. (cjt, Deputy Clerk) (Entered: 02/23/2017) |
| 02/23/2017 | 344 | | Unopposed MOTION to Amend *Joint Statement* (Re: 340 Stipulation ) by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 345 | | Unopposed MOTION Permit Use of Computers in the Courthouse During Hearing by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 346 | | Unopposed MOTION for Authorization to Serve Subpoenas Without Tendering Fees and Mileage by Kenneth Eugene Barrett Responses due by 3/9/2017(Schardl, Tivon) (Entered: 02/23/2017) |
| 02/23/2017 | 347 | | SEALED MOTION for Partial Summary Judgment by USA (With attachments); Responses due by 3/9/2017 (cjt, Deputy Clerk) (Entered: 02/23/2017) |
| 02/23/2017 | 348 | | MINUTE ORDER by District Judge James H. Payne: Petitioner is directed to file an expedited response to Government's SEALED MOTION for Partial Summary Judgment (Re: 347 SEALED MOTION). Said Response is due by Close of Business on 2/27/2017 (dma, Deputy Clerk) (Entered: 02/23/2017) |
| 02/24/2017 | 349 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's 294 Motion to Recuse and Disqualify, pursuant to 28 U.S.C. Section 455, is denied for reasons previously set out in 66 Order filed herein on 9/11/2009. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 350 | | MINUTE ORDER by District Judge James H. Payne: granting 290 Government's Motion to Exclude a Proposed Witness. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 351 | | ORDER by District Judge James H. Payne: granting 292 Government's Motion to Exclude Evidence of Unavailable Witnesses by Declaration Alone (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 352 | | MINUTE ORDER by District Judge James H. Payne: denying 295 Petitioner's Motion in Limine to Preclude Post–Hoc Rationalizations. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 353 | | MINUTE ORDER by District Judge James H. Payne: denying 297 Petitioner's Motion for Production of 18 U.S.C. § 3500 Materials Concerning Trial Counsel Testimony. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 354 | | MINUTE ORDER by District Judge James H. Payne: denying 298 Petitioner's Motion for Reconsideration of Order denying Discovery of Trial Counsel's Emails. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 355 | | MINUTE ORDER by District Judge James H. Payne: denying 299 Motion to Expand the Record with Exhibits 206 through 220 as these documents are already part of the court records in this case. See, Dkt. # 178 . If counsel desires the Court to consider these or any other documents contained within the court record, the documents must be introduced and properly admitted at the evidentiary hearing in accordance with the Federal Rules of Evidence, Rule 1101(e). (cjt, Deputy Clerk) (Entered: 02/24/2017) |

| | | | |
|---|---|---|---|
| 02/24/2017 | 356 | | MINUTE ORDER by District Judge James H. Payne: denying 300 Petitioner's Motion for Order Barring Witness Collusion. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 357 | | MINUTE ORDER by District Judge James H. Payne: 301 Petitioner's Motion to Relieve Parties of Obligation to Submit Findings of Fact and Conclusions of Law in Advance of Hearing is moot. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 358 | | MINUTE ORDER by District Judge James H. Payne: denying 302 Petitioner's Motion for Reconsideration of Order denying the deposition of Roger Hilfiger (Dkt. # 302 ) as the Court has previously indicated it prefers to hear live testimony of counsel, see Dkt. # 246 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 359 | | MINUTE ORDER by District Judge James H. Payne: denying 303 Petitioner's Motion in Limine to Rely upon Declarations for Direct Examination Testimony. While declarations may be admissible, Petitioner will be required to seek permission to admit each declaration at the evidentiary hearing scheduled herein and the Government will be granted an opportunity to object to such admission pursuant to the Federal Rules of Evidence. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 360 | | ORDER by District Judge James H. Payne: denying 304 Petitioner's Motion in Limine to Exclude Novel Theories of Aggravation; denying 305 Petitioner's Motion in Limine to Exclude Testimony from J. Randall Price (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 361 | | ORDER by District Judge James H. Payne: granting in part 289 Government's Motion to Exclude Proposed Witnesses; Amended Joint Pre–Hearing Statement due by close of business on 3/3/2017 (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 362 | | MINUTE ORDER by District Judge James H. Payne: denying 341 Petitioner's Unopposed Motion for Extension of Time to File Expert Report. See, Dkt. # 361 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 363 | | MINUTE ORDER by District Judge James H. Payne: denying as moot 344 Petitioner's Unopposed Motion to Amend Joint Statement. See, Dkt. # 361 . (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/24/2017 | 364 | | MINUTE ORDER by District Judge James H. Payne: granting 345 Petitioner's Unopposed Motion for Authorization to Use Computers in the Courthouse during Evidentiary Hearing. (cjt, Deputy Clerk) (Entered: 02/24/2017) |
| 02/27/2017 | 365 | | MINUTE ORDER by District Judge James H. Payne: granting in part 346 Petitioner's Unopposed Motion for Authorization to Serve Subpoenas Without Tendering Fees and Mileage. Pursuant to 28 U.S.C. § 1825(b) and (c), the court finds witness fees for lay witnesses whose testimony has not been excluded by previous order of the court shall be paid by the United States Marshal as provided by statute. (cjt, Deputy Clerk) (Entered: 02/27/2017) |
| 02/27/2017 | 366 | | RESPONSE in Opposition to Motion (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 02/27/2017) |
| 02/28/2017 | 367 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: Directing expedited reply by close of business on 3/1/2017 (Re: 347 SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk) (Entered: 02/28/2017) |
| 02/28/2017 | 368 | | MOTION to Exclude Witnesses by USA; Responses due by 3/14/2017(Wilson, Christopher) (Entered: 02/28/2017) |
| 02/28/2017 | 369 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM Central Standard Time on 3/2/2017 (Re: 368 Opposed MOTION to Exclude Witnesses). (cjt, Deputy Clerk) (Entered: 02/28/2017) |
| 03/01/2017 | 370 | | Unopposed MOTION to Seal Document *Reply in Support of Motion for Partial Summary Judgment* by USA Responses due by 3/15/2017(Kahan, Jeffrey) (Entered: 03/01/2017) |
| 03/01/2017 | 371 | | MINUTE ORDER by District Judge James H. Payne: granting 370 Government's Unopposed Motion to File Sealed Reply (Re: 347 SEALED MOTION for Partial Summary Judgment). (cjt, Deputy Clerk) (Entered: 03/01/2017) |
| 03/01/2017 | 372 | | SEALED REPLY (Re: 347 SEALED MOTION for Partial Summary Judgment) by USA (cjt, Deputy Clerk) (Entered: 03/01/2017) |
| 03/02/2017 | 373 | | RESPONSE in Opposition to Motion (Re: 368 Opposed MOTION to Exclude Witnesses ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 03/02/2017) |
| 03/02/2017 | 374 | | MOTION to Supplement *Response in Opposition to Government Motion for Partial Summary Judgment* (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett (With attachments) Responses due by 3/16/2017(Schardl, Tivon) (Entered: 03/02/2017) |
| 03/02/2017 | 375 | | MINUTE ORDER by District Judge James H. Payne: The Court hereby directs Petitioner to file a Sur–Reply to 347 Government's SEALED MOTION for Partial Summary Judgment by close of business on Monday, 3/6/2017. Said Sur–Reply shall specifically address whether or not Petitioner contests the 38 facts contained within the Government's Reply. (cjt, Deputy Clerk) (Entered: 03/02/2017) |
| 03/03/2017 | 376 | | EXPERT WITNESS REPORT *Proffered for Excluded Witnesses* by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/03/2017) |
| 03/03/2017 | 377 | | NOTICE of Exchange of Rule 26 Disclosures of George W. Woods, Jr. M.D. (Re: 337 Ruling on Motion to Extend Scheduling Order Dates) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/03/2017) |
| 03/03/2017 | 378 | | ORDER by District Judge James H. Payne: Bifurcating 3/13/2017 evidentiary hearing (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 379 | | MINUTE ORDER by District Judge James H. Payne: Counsel for Petitioner is directed to provide forthwith for use by the Court a bound manual copy of the pleading and/or exhibits as filed. Said manual copies shall be EXACT duplicates of the pleading and/or exhibits AFTER said pleading was filed with the Court, including the case and docket number information at the top of each page. Do not reorganize the document or insert other separately docketed items. If copies of sealed items are hereby ordered by the Court, then said copies shall be a separate and complete submission. (Re: 376 Petitioner's |

| | | | |
|---|---|---|---|
| | | | Proffer of Expert Testimony) (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 380 | | RESPONSE in Opposition to Motion (Re: 374 Opposed MOTION to Supplement *Response in Opposition to Government Motion for Partial Summary Judgment* ) by USA ;(Kahan, Jeffrey) (Entered: 03/03/2017) |
| 03/03/2017 | 381 | | MINUTE ORDER by District Judge James H. Payne: denying 374 Petitioner's Motion to Supplement Response in Opposition to Government Motion for Partial Summary Judgment. (cjt, Deputy Clerk) (Entered: 03/03/2017) |
| 03/03/2017 | 382 | | REPLY to Response to Motion (Re: 368 Opposed MOTION to Exclude Witnesses ) by USA ;(Kahan, Jeffrey) (Entered: 03/03/2017) |
| 03/03/2017 | 383 | | AMENDED Joint Pre–Hearing Statement (Re: 361 Ruling on Motion to Exclude) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/03/2017) |
| 03/06/2017 | 384 | | SURREPLY to Motion (Re: 347 SEALED MOTION ) by Kenneth Eugene Barrett ; (With attachments)(Schardl, Tivon) (Entered: 03/06/2017) |
| 03/06/2017 | 385 | | Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider, and MOTION to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies (Re: 378 Order) by Kenneth Eugene Barrett; Responses due by 3/20/2017(Fisher, Joan). Added MOTION to Stay and edited text on 3/7/2017 (cjt, Deputy Clerk). (Entered: 03/06/2017) |
| 03/07/2017 | 386 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 12:00 PM on 3/8/2017 (Re: 385 Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider, and Motion to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies). (cjt, Deputy Clerk) (Entered: 03/07/2017) |
| 03/07/2017 | 387 | | Second Amended Joint Pre–Hearing Statement (Re: 383 Stipulation) by USA (Wilson, Christopher) (Entered: 03/07/2017) |
| 03/07/2017 | 388 | | RESPONSE in Opposition to Motion (Re: 385 Objection to Court's Order Bifurcating the Hearing, MOTION to Reconsider and MOTION to Stay Evidentiary Hearing in Order to Pursue Appellate Remedies ) by USA ;(Kahan, Jeffrey) (Entered: 03/07/2017) |
| 03/08/2017 | 389 | | MINUTE ORDER by District Judge James H. Payne: granting 368 Government's Second Motion to Exclude Proposed Witnesses. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/08/2017 | 390 | | MINUTE ORDER by District Judge James H. Payne: In light of the stipulation of the parties submitted on 3/7/2016, 347 Government's Motion for Partial Summary Judgment is moot. After the submission of testimony herein, the government can reurge its motion if the facts are different than what the parties anticipated at the time of the filing of their proposed findings of fact filed on 2/16/2017. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/08/2017 | 391 | | MINUTE ORDER by District Judge James H. Payne: After consideration of 385 Petitioner's Motion to Reconsider, the motion is granted and this Court will allow the parties to submit all of their evidence in one evidentiary hearing subject to the Federal Rules of Evidence. Pursuant to 28 U.S.C. Section 636(b)(1)(B), the evidentiary hearing is referred to Magistrate Judge Steven P. Shreder for Findings and Recommendation. The evidentiary hearing is |

| | | | |
|---|---|---|---|
| | | | continued to 3/27/2017 at 9:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (cjt, Deputy Clerk) (Entered: 03/08/2017) |
| 03/10/2017 | 392 | | Unopposed MOTION to Continue Hearing(s) *in Part* by USA Responses due by 3/24/2017(Wilson, Christopher) (Entered: 03/10/2017) |
| 03/10/2017 | 393 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Government's Motion for Partial Continuance of Evidentiary Hearing (Dkt. Entry No. 392 ) is hereby GRANTED. The evidentiary hearing scheduled on March 27, 2017 will proceed as scheduled. The Court will, however, hear testimony from the government's experts (Dr. Randall Price and Dr. Steven Pitt), beginning on June 12, 2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder.(ndd, Deputy Clerk) (Entered: 03/10/2017) |
| 03/14/2017 | 394 | | NOTICE of Availability of Ruth Harris to Testify (Re: 387 Stipulation ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 03/14/2017) |
| 03/21/2017 | 395 | | Unopposed MOTION to Unseal 10/20/05 Budgetary Hearing Transcript (Re: 67 Order) by Kenneth Eugene Barrett; Responses due by 4/4/2017(Fisher, Joan) (Entered: 03/21/2017) |
| 03/21/2017 | 396 | | MINUTE ORDER by District Judge James H. Payne: Petitioner is requesting the court enter an order unsealing the transcript of the "second sealed" hearing on budgetary matters; however, no such transcript was ever filed with the court and, therefore, there is nothing for the court to unseal. Accordingly, 395 Petitioner's Unopposed Motion to Unseal Transcript of 10/20/2005 Hearing is denied. (cjt, Deputy Clerk) (Entered: 03/21/2017) |
| 03/24/2017 | 397 | | NOTICE of Appearance by Kenneth Eugene Barrett [NOTE: Attorney Karl J. Saddlemire added to party Kenneth Eugene Barrett(pty:pet)]. (Saddlemire, Karl) (Entered: 03/24/2017) |
| 03/27/2017 | 398 | | NOTICE of Presentation of Additional Exhibits 96–101 by Kenneth Eugene Barrett (cjt, Deputy Clerk) (Entered: 03/27/2017) |
| 03/27/2017 | 399 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing held on 3/27/2017. (Court Reporter: Ken Sidwell) (ndd, Deputy Clerk) (Main Document 399 replaced on 4/20/2017 to reflect Rule of Sequestration invoked 3/27/17. NEF regenerated) (ndd, Deputy Clerk). (Entered: 03/27/2017) |
| 03/27/2017 | 400 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/28/2017 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 03/27/2017) |
| 03/28/2017 | 401 | | MOTION to Compel *Compliance with Discovery Order* by USA (With attachments) Responses due by 4/11/2017(Kahan, Jeffrey). (Attachments 1–8 and 10 replaced with redacted versions on 4/6/2017 per Docket Entry No. 415; NEF regenerated) (ndd, Deputy Clerk). (Entered: 03/28/2017) |
| 03/28/2017 | 402 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to 28 U.S.C. Section 636(b)(1), the following motion is referred for disposition to Magistrate Judge Steven P. Shreder: 401 USA's MOTION to Compel |

| | | | |
|---|---|---|---|
| | | | *Compliance with Discovery Order.* (cjt, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 403 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day two) held on 3/28/2017. (Court Reporter: Ken Sidwell) (ndd, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 404 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/29/2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder.(ndd, Deputy Clerk) (Entered: 03/28/2017) |
| 03/28/2017 | 405 | | STIPULATION OF FACT. (tls, Deputy Clerk) (Entered: 03/29/2017) |
| 03/28/2017 | 406 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 401 MOTION to Compel Compliance with Discovery Order by USA. Accordingly, any documents currently in custody of Petitioner's counsel, which have not already been produced, shall be provided to the Government forthwith. All non–privileged documents acquired from attorney Jack Gordon relating to Kenneth Eugene Barrett shall be produced no later than 4/21/2017, along with a detailed privilege log pursuant to LCvR 26.2. (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 407 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day three) held on 3/29/2017. (Court Reporter: Karla McWhorter) (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 408 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder setting continuation of Evidentiary Hearing for 3/30/2017 at 10:30 a.m in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 03/29/2017) |
| 03/29/2017 | 409 | | NOTICE of Filing Proffer of Testimony from Richard H. Burr by Kenneth Eugene Barrett (With attachments)(Schardl, Tivon) (Entered: 03/29/2017) |
| 03/30/2017 | 410 | | MINUTES of Proceedings held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day four) held on 3/30/2017. (Court Reporter: Karla McWhorter) (tls, Deputy Clerk) (Entered: 03/30/2017) |
| 04/05/2017 | 411 | | Unopposed MOTION to Seal Document *401, Exhibits 1–8 & 10* by USA Responses due by 4/19/2017(Kahan, Jeffrey) (Entered: 04/05/2017) |
| 04/05/2017 | 412 | | Unopposed MOTION for Leave to File Redacted Substitute Exhibits to Doc. 401 *Exhibits 1 to 8 & 10* by USA (With attachments) Responses due by 4/19/2017(Kahan, Jeffrey) (Entered: 04/05/2017) |
| 04/06/2017 | 413 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 411 Unopposed MOTION to Seal Document 401 , Exhibits 1–8 & 10 by USA. (ndd, Deputy Clerk) (Entered: 04/06/2017) |
| 04/06/2017 | 414 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder continuing Evidentiary Hearing on 6/12/17 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder (dma, Deputy Clerk) (Entered: 04/06/2017) |
| 04/06/2017 | 415 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 412 Unopposed MOTION for Leave to File Substitute Exhibits by USA. |

| | | | |
|---|---|---|---|
| | | | Accordingly, Exhibits 1 to 8 & 10 of Docket Entry No. 401 are hereby ordered replaced with redacted versions. (ndd, Deputy Clerk) (Entered: 04/06/2017) |
| 04/19/2017 | 416 | | Unopposed MOTION to Exclude Expert Witnesses from Court's Order of Sequestration by USA Responses due by 5/3/2017(Wilson, Christopher) (Entered: 04/19/2017) |
| 04/20/2017 | 417 | | MINUTE ORDER by District Judge James H. Payne: Pursuant to 28 U.S.C. Section 636(b)(1), the following motion is referred for disposition to Magistrate Judge Steven P. Shreder: 416 Unopposed MOTION to Exclude Expert Witnesses from Court's Order of Sequestration. (cjt, Deputy Clerk) (Entered: 04/20/2017) |
| 04/20/2017 | 418 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING 416 Unopposed Motion to Exclude Expert Witnesses from Court's Order of Sequestration by USA. (ndd, Deputy Clerk) (Entered: 04/20/2017) |
| 04/21/2017 | 419 | | NOTICE of Petitioner's Privilege Log (Re: 406 Ruling on Motion to Compel,, ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 04/21/2017) |
| 05/02/2017 | 420 | | NOTICE of Petitioner's Fourth Proffer of Testimony by Kenneth Eugene Barrett (With attachments)(Fisher, Joan) (Entered: 05/02/2017) |
| 05/03/2017 | 421 | | Unopposed MOTION to Seal Document *Motion for Copy of Videotape* by Kenneth Eugene Barrett (With attachments) Responses due by 5/17/2017(Schardl, Tivon) (Entered: 05/03/2017) |
| 05/04/2017 | 422 | | MINUTE ORDER by District Judge James H. Payne: granting 421 Petitioner's Unopposed Motion to File Motion and Exhibits Under Seal. (cjt, Deputy Clerk) (Entered: 05/04/2017) |
| 05/04/2017 | 423 | | SEALED Unopposed MOTION for a Copy of the Videotaped Evaluation of Petitioner Conducted by Randall Price on October 13 and 14, 2005 (cjt, Deputy Clerk) (Entered: 05/04/2017) |
| 05/05/2017 | 424 | | Unopposed MOTION for Leave to Appear by Video Conference by Kenneth Eugene Barrett Responses due by 5/19/2017(Fisher, Joan) (Entered: 05/05/2017) |
| 05/09/2017 | 425 | | MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation by Kenneth Eugene Barrett Responses due by 5/23/2017(Schardl, Tivon) (Entered: 05/09/2017) |
| 05/09/2017 | 426 | | MINUTE ORDER by District Judge James H. Payne: denying 424 Petitioner's Motion to Attend Evidentiary hearing June 12–14, 2017 with Counsel by Video Conference. (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/09/2017 | 427 | | MINUTE ORDER by District Judge James H. Payne: Petitioner's 423 Motion for a Copy of the Videotaped Evaluation of Petitioner Conducted by Randall Price on October 13 and 14, 2005 is hereby granted. The Court Clerk is directed to make copies of the videotape, attached to Dkt. # 237 in Criminal Case CR–04–115–JHP, and provide a copy of the same to counsel for both parties. (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/09/2017 | 428 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 5/15/2017 (Re: 425 Petitioner's MOTION to |

| | | | |
|---|---|---|---|
| | | | Exclude Testimony of J. Randall Price). (cjt, Deputy Clerk) (Entered: 05/09/2017) |
| 05/10/2017 | 429 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing held on 3/27/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 1–250). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 399 Minutes of Evidentiary Hearing, ) (kns, Court Reporter) (Entered: 05/10/2017) |
| 05/10/2017 | 430 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing held on 3/28/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 251–514). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 403 Minutes of Evidentiary Hearing ) (kns, Court Reporter) (Entered: 05/10/2017) |
| 05/11/2017 | 431 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: In light of the Court's denial of Petitioner's 424 Unopposed Motion for Leave to Appear by Video Conference, the Government is directed to secure Petitioner's presence at said Evidentiary Hearing commencing on June 12, 2017 at 9:00 a.m. in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (ndd, Deputy Clerk) (Entered: 05/11/2017) |
| 05/11/2017 | 432 | | MOTION to Exclude Witness Steven Pitt by Kenneth Eugene Barrett (With attachments) Responses due by 5/25/2017 (Schardl, Tivon) (Additional attachment(s) added per 434 MINUTE ORDER on 5/12/2017: # 4 Sealed Exhibit A) (cjt, Deputy Clerk). (Entered: 05/11/2017) |
| 05/11/2017 | 433 | | Unopposed MOTION to Seal Document *: Exhibit A to Motion to Exclude Witness Steven Pitt* by Kenneth Eugene Barrett (With attachments) Responses due by 5/25/2017(Schardl, Tivon) (Entered: 05/11/2017) |
| 05/12/2017 | 434 | | MINUTE ORDER by District Judge James H. Payne: granting 433 Petitioner's Unopposed Motion to File Exhibit Under Seal (Re: 432 MOTION to Exclude Witness Steven Pitt) (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 435 | | MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 5/19/2017 (Re: 432 MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 436 | | RESPONSE in Opposition to Motion (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation ) by USA ;(Wilson, Christopher) (Entered: 05/12/2017) |
| 05/12/2017 | 437 | | |

| | | | |
|---|---|---|---|
| | | | MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/19/2017. (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation) (cjt, Deputy Clerk) (Entered: 05/12/2017) |
| 05/12/2017 | 438 | | WAIVER of Presence at Evidentiary Hearing (Re: 431 Minute Order, ) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 05/12/2017) |
| 05/18/2017 | 439 | | REPLY to Response to Motion (Re: 425 Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/18/2017) |
| 05/19/2017 | 440 | | RESPONSE in Opposition to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt ) by USA ;(Kahan, Jeffrey) (Entered: 05/19/2017) |
| 05/19/2017 | 441 | | MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/26/2017 (Re: 432 MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk) (Entered: 05/19/2017) |
| 05/25/2017 | 442 | | REPLY to Response to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/25/2017) |
| 05/25/2017 | 443 | | Corrected REPLY to Response to Motion (Re: 432 MOTION to Exclude Witness Steven Pitt) by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 05/25/2017) |
| 05/30/2017 | 444 | | MINUTE ORDER by District Judge James H. Payne: denying 425 Motion to Exclude Testimony of J. Randall Price Due to Discovery Violation. (cjt, Deputy Clerk) (Entered: 05/30/2017) |
| 05/30/2017 | 445 | | MINUTE ORDER by District Judge James H. Payne: denying 432 Petitioner's Motion to Exclude Witness Steven Pitt. (cjt, Deputy Clerk) (Entered: 05/30/2017) |
| 06/04/2017 | 446 | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on March 29, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 515 – 642). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 407 Minutes of Evidentiary Hearing ) (ksm, Court Reporter) (Entered: 06/04/2017) |
| 06/04/2017 | 447 | | TRANSCRIPT of Proceedings (Unredacted) of Motion Hearing held on March 30, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 643–762). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 410 Minutes of Evidentiary Hearing ) (ksm, Court Reporter) (Entered: 06/04/2017) |

| 06/12/2017 | 448 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day five) held on 6/12/2017. (Court Reporter: Brian Neil) (tls, Deputy Clerk) (Entered: 06/12/2017) |
|---|---|---|---|
| 06/12/2017 | 449 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder, setting continuation of Evidentiary Hearing for 6/13/2017 at 9:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (tls, Deputy Clerk) (Entered: 06/12/2017) |
| 06/13/2017 | 450 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume V held on 6/12/2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Brian Neil) (Pages: 763–944). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 448 Minutes of Evidentiary Hearing ) (bpn, Court Reporter) (Main Document 450 replaced on 6/14/2017) (dma, Deputy Clerk). (Entered: 06/13/2017) |
| 06/13/2017 | 451 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing (day 6) held on 6/13/2017 (Court Reporter: K.Sidwell and B. Neil) (tls, Deputy Clerk) (tls, Deputy Clerk). (Entered: 06/13/2017) |
| 06/13/2017 | 452 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder, setting continuation of Evidentiary Hearing for 6/26/2017 at 10:00 AM in Courtroom 4, Room 420, US Courthouse, 5th & Okmulgee, Muskogee, OK before Magistrate Judge Steven P. Shreder. (tls, Deputy Clerk) (Entered: 06/13/2017) |
| 06/15/2017 | 453 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume VII held on 6/13/2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Brian Neil) (Pages: 1084–1136). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 451 Minutes of Evidentiary Hearing ) (bpn, Court Reporter) (Entered: 06/15/2017) |
| 06/15/2017 | 454 | | TRANSCRIPT of Proceedings (Unredacted) of Evidentiary Hearing – Volume VI held on 6/13/17 before Magistrate Judge Steven P. Shreder (Court Reporter: Ken Sidwell) (Pages: 945–1083). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public terminal. There is no charge to view the transcript at the court public terminal. (Re: 451 Minutes of Evidentiary Hearing ) (kns, Court Reporter) (Entered: 06/15/2017) |
| 06/16/2017 | 455 | | MOTION Leave to Present Additional Witnesses by USA Responses due by 6/30/2017(Kahan, Jeffrey) (Entered: 06/16/2017) |

| | | | |
|---|---|---|---|
| 06/16/2017 | 456 | | MINUTE ORDER by District Judge James H. Payne directing Petitioner to file an expedited Response to Respondent's 455 MOTION to Call Additional Rebuttal Witnesses. Response is due by noon on Monday, 6/19/2017 (dma, Deputy Clerk) (Entered: 06/16/2017) |
| 06/19/2017 | 457 | | RESPONSE in Opposition to Motion (Re: 455 MOTION Leave to Present Additional Witnesses ) by Kenneth Eugene Barrett ; (With attachments)(Fisher, Joan) (Entered: 06/19/2017) |
| 06/19/2017 | 458 | | MINUTE ORDER by District Judge James H. Payne: The Government's Motion to Call Additional Rebuttal Witnesses is referred to Magistrate Judge Steven P. Shreder as it involves matters arising out of the evidentiary hearing previously referred to him on 03/08/2017. (Re: 455 MOTION Leave to Present Additional Witnesses ) (tls, Deputy Clerk) (Entered: 06/19/2017) |
| 06/19/2017 | 459 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: 455 Government's Motion to Call Additional Rebuttal Witnesses is GRANTED IN PART to the extent that the USA may call Dr. Faust Bianco as a rebuttal witness to the testimony of Dr. Miora on Monday, 6/26/2017. Motion is otherwise DENIED. (tls, Deputy Clerk) (Entered: 06/19/2017) |
| 06/21/2017 | 460 | | MOTION for Disclosure , MOTION for Discovery *Report of Faust Bianco's Opinions, the Bases and Reasons Therefor* by Kenneth Eugene Barrett (With attachments) Responses due by 7/5/2017(Schardl, Tivon) (Entered: 06/21/2017) |
| 06/21/2017 | 461 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: Since the Petitioner has indicated that Dr. Miora will not implicate Dr. Bianco's testimony, it appears Dr. Bianco will not testify at the hearing set for Monday, June 26, 2017, at 10:00 a.m. Consequently, Petitioner's Motion For Immediate Production Of Report From Expert Witness (Docket No. 460 ) is hereby DENIED. (tls, Deputy Clerk) (Entered: 06/21/2017) |
| 06/23/2017 | 462 | | Third Amended EXHIBIT LIST by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 06/23/2017) |
| 06/26/2017 | 463 | | MINUTES of Proceedings – held before Magistrate Judge Steven P. Shreder: Evidentiary Hearing held on 6/26/2017. (Court Reporter: Karla McWhorter) (Attachments: # 1 Petitioner's Witness List, # 2 Petitioner's Exhibit List, # 3 Government's Witness List, # 4 Government's Exhibit List)(tls, Deputy Clerk) (Main Document 463 replaced on 6/30/2017 to reflect correct dates hearing held; NEF regenerated) (tls, Deputy Clerk). (Exhibit Lists replaced on 7/10/2017 to reflect admitted date; NEF regenerated) (tls, Deputy Clerk). Modified on 4/15/2019 ***Pursuant to Dkt. #482, all Exhibits from these evidentiary hearings are maintained by the Clerk and located in the Clerk's Office, 2nd Floor Vault.*** (cjt, Deputy Clerk). (Entered: 06/27/2017) |
| 07/13/2017 | 464 | | TRANSCRIPT of Proceedings (Unredacted) of Motions Hearing Volume VIII held on June 26, 2017 before Magistrate Judge Steven P. Shreder (Court Reporter: Karla McWhorter) (Pages: 1137–1366). A party must file a Transcript Redaction Request within 21 calendar days. If a party fails to request redaction, this unredacted transcript may be made electronically available to the public without redaction after 90 calendar days. Any party needing a copy of the transcript to review for redaction purposes may purchase a copy from the court reporter or may view the transcript at the court public |

| | | | |
|---|---|---|---|
| | | | terminal. There is no charge to view the transcript at the court public terminal. (Re: 463 Minutes of Evidentiary Hearing) (ksm, Court Reporter) (Entered: 07/13/2017) |
| 07/31/2017 | 465 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by Kenneth Eugene Barrett (Schardl, Tivon) (Entered: 07/31/2017) |
| 07/31/2017 | 466 | | PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW by USA (Kahan, Jeffrey) (Entered: 07/31/2017) |
| 08/10/2018 | 467 | | REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder (Re: (391) Minute Order by District Judge James H. Payne referring Evidentiary Hearing to Magistrate Judge Steven P. Shreder for Findings and Recommendation). Objections to R&R due by 8/24/2018. (ndd, Deputy Clerk) (Entered: 08/10/2018) |
| 08/20/2018 | 468 | | MOTION to Extend Deadline to File Objection to Magistrate Judge's Report and Recommendation by USA Responses due by 9/4/2018(Wilson, Christopher) (Entered: 08/20/2018) |
| 08/21/2018 | 469 | | ORDER by District Judge James H. Payne: granting 468 Government's Motion for Extension of Time to Object to Magistrate's Report and Recommendation; Objections to R&R due by 10/23/2018; Responses to Objections due by 11/26/2018 (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder) (cjt, Deputy Clerk) (Entered: 08/21/2018) |
| 10/12/2018 | 470 | | OBJECTION to Report and Recommendation (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/12/2018) |
| 10/23/2018 | 471 | | OBJECTION to Report and Recommendation (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder ) by USA (Kahan, Jeffrey) (Entered: 10/23/2018) |
| 11/26/2018 | 472 | | RESPONSE (Re: 467 REPORT AND RECOMMENDATION and 470 Objection to Report and Recommendation) by USA (Kahan, Jeffrey) Modified on 11/27/2018 to edit text and add links (dma, Deputy Clerk). (Entered: 11/26/2018) |
| 11/26/2018 | 473 | | NOTICE of Substitution and Appearance of Counsel by Joan M. Fisher on behalf of Kenneth Eugene Barrett (Fisher, Joan) Modified text on 11/27/2018 (cjt, Deputy Clerk). (Entered: 11/26/2018) |
| 11/26/2018 | 474 | | RESPONSE (Re: 467 REPORT AND RECOMMENDATION by Magistrate Judge Steven P. Shreder, 471 Objection to Report and Recommendation ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 11/26/2018) |
| 12/10/2018 | 475 | | REPLY (Re: 471 Objection to Report and Recommendation ) by USA (Kahan, Jeffrey) (Entered: 12/10/2018) |
| 12/10/2018 | 476 | | REPLY (Re: 472 Response ) by Kenneth Eugene Barrett (Ward, Carrie) (Entered: 12/10/2018) |
| 01/31/2019 | 477 | | MINUTE ORDER by Court Clerk: Pursuant to the recusal of Judge James H. Payne and at the direction of the Court, this case is reassigned to Judge Ronald |

| | | | |
|---|---|---|---|
| | | | A. White. All documents filed in this case in the future shall reflect the new case number CIV–09–105–RAW. (cjt, Deputy Clerk) (Entered: 01/31/2019) |
| 03/28/2019 | 478 | | OPINION AND ORDER by Judge Ronald A. White: affirming in part and denying in part 467 Report and Recommendation; Petitioner's 2255 motion is denied as it relates to his claim of ineffective assistance of counsel during the penalty phase of trial; Certificate of Appealability granted. dismissing/terminating case (case terminated) (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 03/28/2019 | 479 | | JUDGMENT by Judge Ronald A. White entering judgment in favor of USA against Kenneth Eugene Barrett on his challenge to the legality of his sentence. (tls, Deputy Clerk) (Entered: 03/28/2019) |
| 04/10/2019 | 480 | | MINUTE ORDER by Magistrate Judge Steven P. Shreder: It is ordered that each party is directed to withdraw their respective exhibits offered and admitted into evidence at the evidentiary hearings conducted on 3/27/2017, 3/28/2017, 3/29/2017, 3/30/2017, 6/12/2017, 6/13/2017 and 6/26/2017, the same to be kept and maintained for possible appeal purposes. (cjt, Deputy Clerk) Modified on 4/15/2019 ***VACATED per Dkt #482 Minute Order*** (cjt, Deputy Clerk). (Entered: 04/10/2019) |
| 04/11/2019 | 481 | | Unopposed MOTION to Vacate Minute Order and Hold Exhibits Pending Transmittal to the Circuit Court of Appeals (Re: 480 Minute Order) by Kenneth Eugene Barrett; Responses due by 4/25/2019(Fisher, Joan) Modified text on 4/12/2019 (cjt, Deputy Clerk). (Entered: 04/11/2019) |
| 04/15/2019 | 482 | | MINUTE ORDER by Judge Ronald A. White: granting 481 Petitioner's Unopposed Motion to Vacate Minute Order and Hold Exhibits Pending Transmittal to the Circuit Court of Appeals. The Clerk is directed to maintain the exhibits until further order of the Court. (Re: 480 Minute Order) (cjt, Deputy Clerk) (Entered: 04/15/2019) |
| 04/24/2019 | 483 | | MOTION to Alter or Amend Judgment and Brief in Support (Re: 479 Judgment, 478 Ruling on Report and Recommendation, Granting Certificate of Appealability) by Kenneth Eugene Barrett Responses due by 5/8/2019(Fisher, Joan) (Entered: 04/24/2019) |
| 05/07/2019 | 484 | | RESPONSE to Motion (Re: 483 MOTION to Alter Order/Judgment ) by USA ;(Kahan, Jeffrey) (Entered: 05/07/2019) |
| 05/09/2019 | 485 | | LETTER to 10th Circuit Court of Appeals returning pleadings, videotape and disks included in the Record on Appeal 222 Notice of Appeal and 227 Record on Appeal (With attachments)(jcb, Deputy Clerk) (Entered: 05/09/2019) |
| 05/17/2019 | 486 | | REPLY to Response to Motion (Re: 483 MOTION to Alter Order/Judgment ) by Kenneth Eugene Barrett ;(Fisher, Joan) (Entered: 05/17/2019) |
| 06/11/2019 | 487 | | ORDER from Circuit Court denying authorization to file second or successive 2255 motion (See Dkt. #451 in CR–04–115–RAW and Dkt. #3 in CIV–19–152–RAW) (cjt, Deputy Clerk) (Entered: 06/13/2019) |
| 08/13/2019 | 488 | | ORDER by Judge Ronald A. White: denying 483 Petitioner's Motion to Alter or Amend Judgment, with the exception of the clarification described in the Order (cjt, Deputy Clerk) (Entered: 08/13/2019) |

| 10/07/2019 | 489 | | NOTICE OF APPEAL to Circuit Court (Re: 479 Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/07/2019) |
|---|---|---|---|
| 10/08/2019 | 490 | | Transmission of Notice of Appeal and Docket Sheet to U.S. Court of Appeals (Re: 489 Notice of Appeal – Final Judgment ) (With attachments)(jcb, Deputy Clerk) (Main Document 490 replaced on 10/10/2019) (jcb, Deputy Clerk). (Entered: 10/08/2019) |
| 10/08/2019 | 491 | | APPEAL NUMBER INFORMATION from Circuit Court assigning Case Number 19–7049 (Re: 489 Notice of Appeal – Final Judgment ) (jcb, Deputy Clerk) (Entered: 10/08/2019) |
| 10/21/2019 | 492 | | TRANSCRIPT ORDER FORM (Transcripts are not necessary or are already on file ) (Re: 489 Notice of Appeal – Final Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/21/2019) |
| 10/21/2019 | 493 | | DESIGNATION of Record on Appeal (Re: 489 Notice of Appeal – Final Judgment ) by Kenneth Eugene Barrett (Fisher, Joan) (Entered: 10/21/2019) |

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT ⟩
⟩
    **Petitioner,** ⟩
⟩    Case No. 09-CV-00105-JHP
 v. ⟩
⟩
UNITED STATES OF AMERICA, ⟩
⟩
    **Respondent.** ⟩

## GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S DISCOVERY ORDER

**COMES NOW** Respondent, United States of America, by and through undersigned counsel, and files this motion to compel discovery in compliance with this Court's discovery order (Doc. 269).  Undersigned counsel conferred in person with counsel for Barrett who oppose this motion.

### PRELIMINARY STATEMENT

Following the remand of this matter for an evidentiary hearing regarding allegations of ineffective assistance of counsel, the government moved for Barrett to disclose his trial counsel's files to the government.  Doc. 250.  In determining that the government had shown "good cause" for the requested discovery, the Court observed that Barrett's claims of ineffective assistance of counsel "impliedly waive[d] attorney-client privilege with respect to communications with his attorney necessary to prove or disprove his claim."  Doc. 269 at 9-10 (citing *United States v. Pinson*, 584 F.3d 972, 977-78 (10th Cir. 2009)).  Finding that Barrett had placed trial counsel's penalty phase effectiveness  "directly in issue," the Court ordered disclosure of "all of

1

petitioner's defense attorneys' files and records which could in any way be considered impacting their representation of Petitioner during the penalty phase of his trial."

On December 20, 2016, Barrett's current counsel transmitted to each attorney for the government a DVD containing four .pdf files.  The discs were accompanied by a cover letter that stated, "Enclosed please find . . . disclosure of [Mr. Barrett's] trial attorneys' files and records concerning their representation of him during the penalty phase of his trial."  Those files contained multiple copies of reports authored by an investigator named Roseanne Schaye, which the government has marked as Exhibits 18 through 25, inclusive, for purposes of the ongoing evidentiary hearing.

On the first day of the hearing, Barrett called as a witness Jack Gordon, a criminal defense attorney who represented the defendant during state proceedings arising from the same homicide at issue in this case.  During his testimony, Mr. Gordon stated that he had previously refreshed his recollection with, among other things, a set of investigative reports authored by Roseanne Schaye.  Exs. 1 to 10.  The reports concern Barrett's social history and mental health and were patently prepared in anticipation of a possible penalty phase trial.  *See id.*  Mr. Gordon stated that he had received the reports from Barrett's current counsel, and the Court granted the government's motion for copies of the material.  *See* <u>Fed. R. Evid. 612</u>.  After comparing the documents with those received in Barrett's discovery disclosure, it appears that the government never received nine of the reports disgorged through Mr. Gordon.  Exs. 1-9.

Mr. Gordon testified that he continues to maintain a file from his representation of the defendant.  He also stated that Barrett's federal trial attorneys, Bret Smith and Roger Hilfiger never contacted him to request that material.  However, Mr. Smith previously declared that he contacted Mr. Gordon before the federal trial in an effort to obtain his files.  Doc. 174 Ex. 11 at ¶

2.  According to Mr. Smith, "Mr. Gordon said that he had no materials because he had turned over all of his records to his state court co-counsel, John David Echols." *Id.*  Given the discrepancy over the documents available to Mr. Smith, the government orally sought an order requiring Mr. Gordon to disclose his file.  Barrett responded that the implied waiver of privilege found in the discovery order did not embrace the requested materials because Mr. Gordon did not represent the defendant during his federal trial and is, as a result, was not subject to the claim of ineffectiveness.

The government now moves to compel full compliance with this Court's discovery order, including disclosure of Mr. Gordon's file, should it exist.

## ARGUMENT

### THE COURT SHOULD COMPEL THE DEFENSE TO DISCLOSE ALL DOCUMENTS EMBRACED BY THE EXISTING DISCOVERY ORDER, INCLUDING THOSE POSSESSED BY MR. GORDON

Given that Barrett provided documents to Mr. Gordon that should have been disclosed in discovery, the government moves to compel discovery consistent with this Court's existing order.  The government has previously satisfied this Court that it has good cause for the disclosures of trial counsel's file.  *See* Doc. 269.  Based on the documents received through Mr. Gordon, it now appears that Barrett's current attorneys have failed to comply with the standing discovery order.

Accordingly, the government requests that this Court order Barrett to identify, by Bates number, the location of the Exhibits 2 through 10 in the existing discovery files.  If Barrett cannot demonstrate that the reports were disclosed to the government, this Court should order Barrett's counsel to reexamine all of their files so that they can provide assurances of full compliance with their discovery obligations.  If need be, the Court should permit the government

3

to call additional witnesses at the hearing after Barrett has disclosed all the documents contemplated by the current discovery order.

Furthermore, the Court should order Jack Gordon to disclose the contents of his file, which clearly relates to the Schaye investigative reports.  By his own admission, Gordon relied on those reports to refresh his recollection.  During his testimony, he indicated which reports contained information previously known to him.  Accordingly, Barrett, his current counsel, and Gordon all appear to believe that Schaye's reports bear on the witness's memory of the events.

The Court should not permit Barrett to maintain that he did not waive any privilege as to Gordon because the attorney did not represent him in the federal trial.  Barrett waived his privilege by calling Gordon to testify about his work product.  Criminal defendants waive attorney-client privilege by failing to object to the testimony of former attorneys.  *United States v. King*, 484 F.2d. 924, 927-28 (10th Cir. 1973).  The client holds the privilege and decides whether to claim or waive it.  *Holder v. Gold Fields Mining Corp.*, 239 F.R.D. 652, 656 (N.D. Okla. 2005).  If the client permits his attorney to testify as to privileged communications, the privilege is deemed waived.  *Id.*  Merely indicating an attorney will testify may provide sufficient grounds for a waiver of privilege.  *Id.* (citing *Rutgard v. Haynes*, 185 F.R.D. 596, 601–02 (S.D. Cal. 1999); *Dion v. Nationwide Mut. Ins. Co.*, 185 F.R.D. 288, 295–96 (D. Mont. 1998).  Likewise, a witness cannot offer testimony based on documents that he simultaneously claims are protected work product.  *Id.* (citing *United States v. Nobles*, 422 U.S. 225, 239-40 (1975)).

In this case, Barrett waived his attorney-client privilege and work-product privilege when he called Jack Gordon to testify about his files and trial strategies.  The government did not seek to place any of this information in question, Barrett did.  Barrett first presented Gordon's declaration as to his motion for § 2255 relief.  Doc. 95 Ex. 82.  Barrett than presented Gordon as

4

49

a witness.  Having placed Gordon's work, strategies and opinions at issue, the defendant cannot now resort to a claim of privilege to obscure the scope of information and documents controlled, and potentially disseminated, by the witness.

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this Court to grant the motion to compel.

Dated: March 28, 2017,

Respectfully submitted,

DOUG HORN
Acting United States Attorney

*/S/ Christopher J. Wilson*
CHRISTOPHER J. WILSON
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov


*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 345
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on March 28, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT     )

     )

   Petitioner,     )

     )     Case No. 09-CV-00105-JHP

 v.     )

     )

UNITED STATES OF AMERICA,     )

     )

   Respondent.     )

## GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S DISCOVERY ORDER

Exhibit 1

(Redacted)

<u>**CONFIDENTIAL ATTORNEY WORK PROJECT**</u>

**To:**    Kenneth Barrett file
**From:** Roseann Schaye
**Date:**  August 22, 2000
**Re:**              T████W████ B████
**DOB:**
**SSN:**
**Address:**

**Phone:**

Following a telephone call to T████, he agreed to meet with me at my hotel room. He was dressed casually and neatly. He seemed eager to talk with me and spent at least an hour discussing his family. The following are my impressions of this visit.

T████ was very forthcoming in talking about his family and his life. He was educated in the public school system in Sallisaw, OK. His mother had him held back in the first grade. He continued through the 11th grade, but dropped out rather than finishing high school. He is aware that he can focus better now than he could while he was in school and talked about getting his GED and even attending junior college. He is no longer using drugs for which he seemed proud.

T████ talked at length about his father and that he has a great deal of love for him. He also discussed how strenuous it was living with his father. T████ was glad when his parents divorced when he was about 14 years old. His father was often very difficult to understand. T████ described a man who has dramatic mood fluctuations and who showed behaviors consistent with an individual who has severe emotional responses to child abuse. His father was very unpredictable. T████ believes that his father may have some type of chemical imbalance. T████ mentioned that his father was a patient at the state psychiatric facility on two occasions.

During the interview, T████ said that he understood that his father's childhood was quite unhappy. Kenneth's father disciplined him severely. T████ thinks that may be part of the reason that Kenneth is so unpredictable. T████ said that it is possible that Kenneth's father is so involved now, as he wants to try to overcome earlier problems in their relationship and perhaps guilt.

53

54

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 2

(Redacted)

1

55

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:      Kenneth Barrett file
From:   Roseann Schaye
Date:    August 23, 2000
Re:                 Kenneth E. Barrett
DOB:    ███.
SSN:     ████████.

Kenny Barrett remains in the Sequoia County Jail. I visited him there for 3 hours. We were taken to a small courtroom and were seated at a table there. A guard was in the room with us and remained there throughout the interview. He was within hearing distance, which definitely had an effect on the interview. Kenny did discuss some of his life with me during that visit.

In 2nd grade, the principal whipped Kenny. Even so, he liked school until about 5th or 6th grade. Kenny was also whipped as punishment by both of his parents. His father's whippings left more of an impression and he feared his father more. After he completed 9th grade in Indiana, he came back to Sallisaw, but not to school. He began working and continued using drugs. It was when Kenny was 16 or 17 that he began to use methamphetamine. He continued working and started repairing cars for friends.

When Kenny was about 13 or 14, he began using drugs both in Sallisaw and in Dunkirk where he lived for a year with his father and stepmother. Kenny said that he had to repeat the 8th grade here and was placed in a LD class and was whipped frequently by the principal. After that year, Kenny went to Indiana for 9th, and to live with his dad. He would smoke marijuana daily and drink alcohol on weekends. He thought that he began using drugs to cope better, and avoid feelings of irritability. He also was less aggravated with people. At the time, he thought drugs helped him with his short temper. He does say that currently, his sobriety is positive. He now believes a major difference in being high and being sober is that his temper is more controlled when he is sober.

As a youth, Kenny described a typical day as being awakened by his mother. He has no clear memory but thinks that she probably made breakfast for him and his brothers. He shared a room with Richard. They took the bus to school and would get there early enough to play basketball outside with other boys. After school, he walked home with two friends, Tommy Taylor and James Rowe. Mother was not at home when Kenny got there. The only teacher that Kenny recalled was his auto mechanics teacher in Indiana. During his 9th grade year in Indiana, Kenny had difficulties getting along with his stepmother, Dianne. He found her too controlling. He says that he was raised around guns and hunted with his father. He has continued to hunt and enjoys it. He missed his father when his father left the family. It was very difficult because his father hardly visited. Recently, Kenny did not see his father for 5 or 6 years before his arrest. He is aware that he harbors some resentment toward his father.

When Kenny was 16 or 17, he was arrested for a traffic-related offense and taken to the sheriff's office. He was making a phone call and ended up getting beaten by the police and deputies. Apparently the beating was very bad and his mother called the FBI to investigate. There were two people that were helpful and forthcoming about this: Mike Brewer, a medic and Meredith Chase, a dispatcher. Kenny believes they may have lost their jobs over this.

Kenny married Abby when he was 18 and they remained married for 14 years, but the relationship was fraught with problems. He believes that they were both too young, but she was pregnant with T███ He was unfaithful to Abby and she would leave him. Then he would beg her to return. It was during this time when Kenny tried to kill himself and nearly succeeded. He was intoxicated and went to his mother's and got a rifle. He put it to his chest and leaned on it and fired. He was placed in a psychiatric facility after he recovered physically but it was a short stay. They placed him on Elavil for a while. Kenny stated that he was not sure why he tried suicide. He was intoxicated at the time and tended to have a very depressed type of anger when he drank. Soon after this, Kenny left Abby again. Finally she refused to have him return

and he moved in with his mother.  T█████ came to visit on and off.  Abby and Kenny were married 14 years when they were divorced.  Kenny stopped drinking alcohol following the divorce.

According to Kenny, he was hospitalized in psychiatric facilities two additional times.  Once he was court ordered into Eastern State Hospital in Venita, Oklahoma.  Another time, he felt totally overwhelmed and was fearful of what he might do.  He went for help in Wagner, Oklahoma at the hospital there.

When T███ was 18, he wanted to drop out of school.  Kenny and Abby agreed that T███ could move out to his father's if he agreed to finish his senior year.  At that time, Kenny was a recluse as he felt harassed by the police.  He said that whenever he would be seen in town, the police would pull him over and put him up against the car.  Kenny decided to remain at home and friends would bring him what he needed.  He built the little house that he lives in with materials he found laying around as he was not going to be caught in town again.

Kenny said that the police wanted him to make some buys from his friends which he refused to do.  An hour or so before the shooting, Tony Sells brought him some red phosphorous.  Earlier in the week, a special investigator from the District Attorney's Office went to Kenny's house and subpoenaed him for a delivery charge and told him he was going for arraignment.  That is why he is so shocked that the police served the warrant in such a violent manner since they knew where he was.

56

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 3

(Redacted)

1

57

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**      Kenneth Barrett file
**From:**   Roseann Schaye
**Date:**   August 23, 2000
**Re:**                  Sylvia Gelene Dotson
**DOB:**
**SSN:**
**Address:**

**Phone:**

Sylvia "Gelene" Dotson is the mother of Kenneth Barrett. She agreed to be interviewed in her home which is just next door to Kenneth's house. The home is about 10 miles outside of the town of Sallisaw. She lives in a trailer that appeared to be very neatly kept. The following are impressions of that visit.

Gelene was born in Sallisaw and began and ended school in Sallisaw. The family moved frequently. She attended 1st and 2nd grades at Dwight Mission School. Stronghurst School in Albuquerque was where she attended 3rd grade. The family was in Farmington, Missouri while she was in 4th and 5th grades. She attended 4 different schools during her 6th grade year in Missouri and then Maricopa and Bakersfield, California. The family stayed at the latter through the beginning of 9th grade until they returned to Sallisaw. This is where she met her first husband. Gelene married Ernest Barrett on July 8, 1960 in Stillwell, Oklahoma. Soon after, Ernest found a job in Joliet, Illinois where the couple moved. Gelene said that while she was pregnant with Kenneth he was most active baby. She said that he never stopped moving. Kenneth was born in Joliet and was a very difficult baby. Not only was he colicky, but he was extremely active. This intense level of activity continued throughout Kenneth's childhood. As a toddler, he had to go to the hospital for several different incidences. His stomach was pumped twice when each time, he managed to climb to a top cabinet and ingest baby aspirins once and ex-lax the second time. Gelene also rushed him to the hospital when he pulled a bag of groceries off of the table and a large can fell on his head.

From the outset of Gelene's marriage to Ernest, he was unfaithful to her. This caused Gelene to leave him frequently. From Kenneth's 3rd year until his 5th, they were separated. Gelene and the boys lived with another woman who had 2 boys of her own. The parents got back together about the time that Kenneth began school. Gelene stated that he did well in kindergarten and first and he knew how to read prior to beginning school. In second grade, though when the other children were learning to read, they taught phonics and Kenneth never grasped it. He continued in school but never did as well as he had in the early years. The family moved to Stanhope, New Jersey for a few months and then to Lake Hopatcong, New Jersey when Kenneth was 8 or 9. During this time, Gelene and Ernest had an extended separation when Ernest lived with another woman. Whenever they separated, Gelene would come back to Sallisaw. The two were finally divorced in 1972 or 1973 on the grounds of adultery. Gelene and her boys returned to Sallisaw. Kenneth seemed to have a very difficult time when his parents divorced, as he wanted so much to be with his father. Unfortunately, his father had very little contact with him during that time.

Gelene believes that Kenneth became a follower with the wrong crowd in 8th grade. He lost interest in school. He failed the 9th grade. To repeat that year, he went to live with his father and stepmother in Dunkirk, Indiana. It is unclear whether or not he passed the year. When he returned from his father's, he was very rigid and unwilling to participate in the family structure. He enrolled in school but perhaps because he did not understand social cues, did not fit in. Gelene then told him he had to get a job, which he did at the local racetrack. He stopped working there as soon as school got out.

Something quite traumatic happened to Kenneth, according to his mother, when he was 16 or 17. He was arrested for "hot rodding" and while in jail, was severely beaten by the police. He was never taken to a doctor, however the mother reported this to the FBI. She believes some of those trying to help Kenneth lost their jobs over the incident.

CONFIDENTIAL Attorney Work Product
Sylvia "Gelene" Dotson

By the time Kenneth was 18, he was working on pipelines and oil rigs and seemed to keep these jobs more readily then he later would. He impregnated and married Abby at this time. Gelene knows little about their marriage, but she believes that it was very unhappy. On one occasion, Kenneth became so filled with despair over Abby leaving him again, that he tried to kill himself and nearly succeeded. He shot himself just missing his heart. Gelene blames Ernest for this as he allowed their youngest son, Stephen to have a gun at her house which was generally not allowed. She believes that if no gun were there, none of this would have happened. Gelene does find Kenneth to have intense emotions and dramatic mood fluctuations. Most of the time when Abby and Kenneth would separate, he would return to Gelene's home.

Gelene is currently working as a Habilitation Trained Specialist for People Incorporated. She took this part time job after Kenneth was arrested because she could not keep her mind on her work. She has no significant other in her life, however she has had two additional serious relationships. She married Paul Dudley in 1982 or 83, but the marriage only lasted 3 years. Following their divorce, he was murdered in Las Vegas.

Most of Gelene's family lives nearby. Her father died 3 or 4 years ago. Her mother is still living in a nearby trailer. Gelene has family members who have a history of mental illness and are currently medicated. Gelene's father was a very heavy drinker and may have been an alcoholic.

2

59

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 4

(Redacted)

1

60

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**    Kenneth Barrett file
**From:**  Roseann Schaye
**Date:**   August 24, 2000
**Re:**     █████████████████████████

**DOB:**   ███████████████████████████
**SSN:**   

Ernie Barrett and I met in his mobile home, which was very attractive and extremely well kept. He had been using his weight bench outside when I arrived and asked if I could interview his wife first, which I did. Ernie brought us both iced teas at the onset of that interview. When Doris and I had completed our interview, Ernie then came in and we talked. The following are my impressions of that interview.

When Kenny was born, Gelene worked at Walgreen's and a neighbor cared for Kenny. Gelene stopped working after a couple of years and stayed home. As a child, Kenny was extremely hyperactive and into everything. Ernie described him as a beautiful child who was intelligent but never was interested in school. When Kenny was in elementary school in New Jersey, a teacher spanked Kenny so often that Gelene went to the school to protest. Kenny was a fearless child. He was also moody and would take his model cars and destroy them. Kenny was very interested in guns as is Ernie. He taught the boys to shoot when they were very young. Ernie believes that Kenny is the finest shot in the county as is Ernie. He and the boys would go hunting and fishing whenever they had a chance. Ernie taught Kenny to swim by throwing him in deep water.

Regarding discipline, Ernie said that Gelene was the primary disciplinarian. She would whip the boys with a belt and usually because she was mad, rather than as a consequence. He describes Gelene as having a very bad temper and that she yelled a lot. He thinks that she is bitter and resentful. Ernie could not recall disciplining the boys but imagines he probably spanked them. Ernie admits that he was not faithful to Gelene and that he gambled a lot, however still was responsible. When Gelene joined the Jehovah's Witnesses, Ernie said he was driven away from her. He does admit slapping her twice which blackened both of her eyes and broke her nose.

They were separated several times and Gelene would return to Sallisaw to her family. The divorce totally devastated Kenny. He and Gelene had separated many times previously. Ernie believes that the way that the boys found out that their parents were divorcing was that Gelene never went back to Ernie. Ernie would take the boys deer hunting and fishing after the divorce during his visitation. Ernie admits he had a problem with alcohol. He says that he drank at bars and would go home to sleep. He is aware that this may have had some impact on the boys. Ernie believes that the boys' maternal grandfather started them on mescaline, which was their first hallucinogen.

Kenny lived with Ernie and his wife at the time, Diana Kay Wilson Barrett, who was a teacher. Kenny did well that year. Stephen would stay with Ernie during the summers regularly. Kenny didn't live with his father again until he was an adult. The first time Kenny separated from Abby, he asked his dad if he could live with him and if Ernie would help get him a job. Ernie got Kenny a job in the glass plant where Ernie was working. Kenny was a very good worker, but worked for only two months and quit during the middle of the shift to return to Sallisaw. He did this on another occasion as well. Ernie and Kenny had a rift in their relationship, partly because of Kenny's lifestyle. Ernie made it clear that if Kenny were sober, he would be happy to have a relationship. This didn't occur until Kenny was arrested. The way Ernie and Doris found out about the shooting was by a neighbor calling them when it was being televised on the news.

61

Ernie Barrett
Page 2

Ernie spoke briefly about his own childhood. He was pulled out of school to go to work. His father was a violent drunk. Ernie left home at age 16 because his father came home one night and picked up a heavy file and laid Ernie's shoulder open with it. Ernie is the oldest child although his parents lost 3 children at birth prior to Ernie. The next child is Ike, then Linda (Riley) and Gary. Other than the alcohol, he recalls no other substance abuse or mental illness in his family. He believes that Gelene's sister, Carolyn has had some mental problems.

63

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 5

(Redacted)

1

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**      Kenneth Barrett file
**From:**  Roseann Schaye
**Date:**   September 4, 2000
**Re:**          Phyllis Crawford
**DOB:**
**SSN:**
**Address:**

**Phone:**

On August 23, 2000, I interviewed Phyllis Crawford, Kenneth's maternal aunt. Her husband Roger was present during the interview. They invited me into their trailer, which is nicely kept and appeared to be in good repair. It was obvious that they took very good care of their home. The following are impressions of my visit.

Phyllis said that she and her siblings were raised on the property where they currently live. She recalled that her father was a heavy drinker and generally wanted to fight when he was inebriated. The father's relatives were drinkers as well. According to Phyllis, her paternal uncle had a nervous breakdown, just as two of her sons have had. One of her sons uses drugs and the other has struggled with a drinking problem.

According to Phyllis, her mother raised her children to be very closed. They rarely discussed their lives with others. Although Phyllis says that much of this rearing does apply to her life, she also believes that she has overcome much of it. Her mother disapproved of her father's drinking which he would hide from her. One of the mother's cousins suffered a brain tumor. Phyllis recalls no other mental problems on that side of the family.

In describing Kenneth as a child, Phyllis said that he was extremely hyperactive. She believes that his parent's divorce was very difficult for Kenneth. She thinks that Kenneth wanted to be very close to his father, that he needed his father. Unfortunately, the father was rarely available and Kenneth missed him a great deal. Phyllis said that Kenneth still affects her as an 11-year-old boy. He would always act as though he was very tough, but would break down and cry easily. She has never been afraid of Kenneth. Her belief is that Kenneth's interest in guns is due to his father who is also a gun collector. She also believes that Kenneth is an excellent mechanic, another shared interest with his father.

In regards to the night of the shooting, Phyllis and her husband were roused by the police and ordered out of their home with their hands raised. Phyllis was told to call Gelene and tell her to also come out with her hands raised. They would not give them information about either Kenneth or T███. They soon found out that T███ was safe. They also told me that the police beat Kenneth following the shooting, mostly kicking him in the head. They said that he looked terrible following the beating.

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF OKLAHOMA**

|  |  |  |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S**
**DISCOVERY ORDER**

Exhibit 6

(Redacted)

1

65

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:** Kenneth Barrett file
**From:** Roseann Schaye
**Date:** October 5, 2000
**Re:** Kenneth E. Barrett

████████████████████████████

Kenny Barrett is still being held in the Sequoyah County Jail. We were allowed a two-hour meeting in the small courtroom. A guard was present and within hearing distance throughout the interview. Kenny was dressed in the usual jail attire. He looked very pale, almost pasty. This is likely the result from being denied any daylight for the 14 months he has been imprisoned here. The following are my impressions of that visit.

Kenny's memory is poor, but I asked him to recall what he could, that might be helpful to his case. He recalled a few teachers' names from his schooling in Sallisaw. They are Miss Dodson who taught him 8th grade, Dale Brown who was a PE teacher and Butch Bagley who was his study hall teacher. Kenny believes his mother may recall more names of school personnel that might remember Kenny.

Kenny talked again about his beating when he was about 17 or 18 year of age and held at the Sequoyah County Jail. He remembers that a woman named Duanna White saw him after the beatings.

Some memories that Kenny has of his parents when they were together was of them fighting. Kenny believes they were fighting about his mother's drinking. He also recalls that once his mother left his father for good, they struggled because they were very poor. That made it difficult in school, as he looked different from other children, as did his brothers. He said that his mother was a hard worker, but with 3 sons, it was very difficult to make ends meet.

When Kenny was about 15, he stayed with his Aunt Elnora Long for about a year. He remembers getting along very well there. After his stay with her, however, he was locked up for 3 months. Unfortunately, Kenny's memories are minimal of that time including why he was staying with her to begin with.

Kenny suggested that I get in touch with Thomas Hines who is a builder. Kenny worked for him for a few years and he might be a helpful source of information.

Kenny is still struggling with a skin rash that he believes is caused by a bullet in his hip. According to Kenny, several doctors have said that it needs to come out. Kenny also wants a bond hearing.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 7

(Redacted)

1

67

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**      Kenneth Barrett file
**From:**   Roseann Schaye
**Date:**   October 5, 2000
**Re:**                 Sylvia Gelene Dotson
**DOB:**
**SSN:**
**Address:**

**Phone:**

Gelene agreed to meet with me a second time. We met in her neatly kept trailer home. This is located well outside the Sallisaw town limits and next door to Kenny's home. Phyllis Crawford lives on the other side of her trailer. The following are my impressions of that visit.

Gelene told me that all of the boys were born in Joliet, Illinois. When Gelene was pregnant with Kenny, she worked at Walgreen's as a waitress. This continued after Kenny's birth. Lily Garrison cared for Kenny when Gelene was working. Gelene did smoke cigarettes and she drank alcohol in moderation during her pregnancy. Kenny began grade school in Culbertson Elementary in Joliet. He completed 1st and 2nd grades in Plainfield, Illinois at Plainfield Elementary School. The family moved to New Jersey and Kenny did his 3rd grade at Stanhope Elementary in Stanhope, New Jersey. Kenny attended 4th, 5th and part of 6th grades at Lake Hopatcong, New Jersey before returning to Sallisaw.

When Gelene was raised, the family moved a lot. She remembers when her mother was pregnant with Carolyn and the other girls were babies. Gelene was a caretaker of Carolyn and shared a bed with her as they were growing up.

When Gelene was 6 years old, the family moved from Sallisaw into Dwight Mission where her father was the caretaker. There she attended kindergarten through 2nd grade. The school had 6 grades in 1 room and 2 grades in another. The family then moved to Albuquerque, New Mexico where Gelene attended Stronghurst Elementary for the 3rd grade. The family moved again when the father became the caretaker for Presbyterian Orphanage in Farmington, Missouri. Gelene's family lived on a farm at the orphanage and she attended school there from 4th grade through 6th. The family then moved three times in Gelene's 6th grade year. She went to school in Blunt, Oklahoma, Shafter and Maricopa Schools near Bakersfield, California. They remained in Maricopa from the end of 6th through half of 9th when they returned to Sallisaw. Gelene graduated from Sallisaw in 1958. Even with the moves, Gelene always liked school and did well. She remembers playing after school with the girls who lived in the facilities where her father worked. She recalled playing with Lucy Smith at Dwight Mission School.

The children all had chores, but there was no hard work. They helped on the farm. Father disciplined by spanking with a belt and then apologizing after.

68

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 8

(Redacted)

1

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:    Kenneth Barrett file
From:  Roseann Schaye
Date:  October 6, 2000
Re:      Ernie Barrett

DOB:
SSN:

I met with Ernie for a second visit at his home in Salpulpa. He was home alone so that we had a private interview. Ernie is hard of hearing and reminded me of that at the beginning of our conversation. The following are my impressions of that visit.

Ernie gave me a brief family history of his side of the family. He talked of being very poor when he was young, sometimes going without shoes. Ernie's father was a violent alcoholic who frequently went after family members. Ernie remembers his father trying to stab him on a couple of occasions. The children would run out of the house and hide in the field behind. His father would dry out for 2 or 3 months and then he'd binge for days. Ernie said that his father had only a 3rd grade education and probably drank in an attempt to escape his responsibilities. Ernie's mother stayed home with the children while Ernie was growing up.

Ernie was born near Sallisaw. Soon after the family moved to Marble City where he went to kindergarten and 1st or 2nd grade. Then the family moved to Aikins where Ernie attended 3rd through 8th grade. The family moved 4 different times during this time period, but Ernie remained in the same school. He attended the beginning of his freshman year at Central High School in Akins and then transferred to Sallisaw where he went through the 11th grade. He met his first wife, Gelene in high school. Ernie said that he was very athletic in school and good academically. He even won awards in history and math. After the 11th grade, Ernie moved to Tulsa and learned cabinet making prior to joining the Marines. Following his armed services career, he worked in a glass factory. He was exposed to arsenic and asbestos daily for many years.

Ernie's relationship with Gelene was fraught with difficulties. Gelene drank heavily, much like his father had. They argued about this. Ernie admits that he was unfaithful. He saw his relationship as increasingly troubled. He admits that one time he hit Gelene so hard that he blackened both of her eyes. This was after she had thrown knives at Ernie and cut the front of his shirt. Ernie also became very upset with Gelene when she refused to allow Stephen to have a blood transfusion that was needed following his birth. This was due to her religion, Jehovah's Witness. Ernie felt that she would lose her son for this. The religion definitely got in their way. When Ernie married Doris, Gelene gave Ernie Stephen's birth certificate. She had stricken her own name and wrote Doris' in its place.

Ernie recalled that Kenny would take new toys apart and put them back together when he first received them. He was a good child. There was one time that Kenny stole a real silver dollar daily from Ernie for candy. That is the only time Ernie recalls Kenny doing something bad. Kenny did live with Ernie for a year, which allowed them to have more time together. When Kenny got involved in drugs and alcohol, Ernie was fearful. He told Kenny that as long as he was using, Kenny was no longer welcome in his home. Asked why he is involved now, he said it was his conscience that got him involved.

70

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 9

1

71

72

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**     Kenneth Barrett file
**From:**  Roseann Schaye
**Re:**     Ike Barrett

After some hesitation, Ike agreed to meet with me on 2/14/01. We met at Lesslie's Café in downtown Sallisaw at his request. We were able to be in a large room, but alone so we had privacy. Still, it was somewhat difficult to hear each other. The following are my impressions of that visit.

Ike has spent most of his life in and around Sallisaw. He is a rancher and has a cement business. Ike is one of Ernie's younger brothers. He says that when they were young, Ernie was abusive to him and the other siblings, that he had a mean streak. He would hurt his siblings and then laugh about it. Until recently, Ike did not like the person that Ernie had become.

When the Ernie's boys were young, Ike said that both parents cared only about themselves. The children were often left on their own when they were really too young to fend for themselves. After Ernie's divorce from Gelene, Ernie drove a corvette while his own children had holes in their clothing and shoes. If the boys begged for something from Ernie, he would either tell them to "shut up", or if Ernie was in a bad mood, he would be violent with them. Ernie didn't discipline so much as take his anger out on his boys. As a role model, Ernie was very poor. Ike said that he was dishonest and used women. From Ike's perspective, he saw Gelene as a heavy partier. He believes she spent Ernie's child support on her partying. Ike believes that Gelene is lazy.

Now that Ernie has come around to helping Kenny, Ike believes that it is too little too late. He wonders about Ernie's commitment to Kenny as Ernie has always been an opportunist.

Ike has concerns about getting involved in any way in this case. He is not sure that Kenny can get a fair trial in Sequoyah County. Ike was asked to sign release forms so that I could get records on him to help build a thorough social history for Kenny. He agreed to take the forms with him and think about sending them. As yet, he has not returned them.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 10

(Redacted)

1

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**      Kenneth Barrett file
**From:**   Roseann Schaye
**Date:**   October 4, 2000
**Re:**          Linda Riley
**DOB:**
**SSN:**
**Address:**

**Phone:**

I met with Linda Riley, Ernie's youngest and only living sister, in Ft. Smith, Arkansas. We met in her home which was a very nicely kept middle class house. The neighborhood was also well-kept and very attractive with flowers on a boulevard, etc. Linda was very forthcoming and the following is my assessment of the interview.

Linda was very involved with Kenny the first time that Gelene left Ernie and came back to Sallisaw. Gelene and the two boys lived with Kenny's paternal grandparents. Gelene was extremely depressed at that time, according to Linda. She said that Gelene was unable to get out of bed for the entire winter. Richard was about 9 months old at that time. He would stay in bed with his mother all day. Often, no one changed his diapers. Kenny wandered around the house being mostly on his own. According to Linda, her father was a terribly abusive drunk who spent many days passed out. He was at his worst when Kenny lived there. Sometimes the grandfather wouldn't put any wood in the stove so the house would be very cold and the grandfather would be asleep all day. Kenny's paternal grandmother was away at work all day. Kenny would try and make cereal for himself and he was only 3 years old at the time. Linda described Kenny as being very sad and lonely, even pitiful. She thinks that even then, Kenny felt he was disposable.

Kenny was underweight and Linda's mother took him to a doctor. They discovered a heart murmur. The doctor had her change his diet and Kenny started to do better. Unfortunately the grandfather was verbally abusive toward his wife in front of Kenny. He would tell her that he was going to kill her; that he would cut her head off, and he would do some things such as puncture her tires on her car. Kenny heard this abuse on a deadly basis.

Oftentimes, Linda would come and take Kenny to her house and bathe him and cut his fingernails and toenails as no one else did. She would wash his clothes. She would occasionally keep him overnight. Linda wondered if Gelene even knew that he was gone. Linda also would change Richard's diaper which clearly needed changing. Linda's younger brother Gary was still living at home at that time. He stayed away as much as possible. Most outstanding to Linda was how much this little 3 year old boy missed his father. Kenny would stand on a kitchen chair because he could see out the window. He would tell Linda that his daddy was going to come and get him. Eventually Ernie came and took Gelene and the boys back to Illinois.

When Gelene came back the next time, she would take time to do projects with the boys. She did scream at them a lot, according to Linda. When Ernie and Gelene were together, they screamed at each other in front of the children. Gelene would not follow through on her threats. Kenny was much more distant when the family came back the next time (without Ernie). He was also rowdy at that time.

Linda remembers that Kenny had his own room and would proudly display his models that he made. Stephen, who was just a toddler would come into Kenny's room and destroy them. Kenny would ask his mother to get Stephen out of his room. She'd yell at Stephen but take no action. Linda never saw Kenny as mean or aggressive. She could not recall a time when Kenny took anything away from his brothers. Linda thinks now that Kenny had no control over anything. Kenny wanted to live with his father who didn't want him. Kenny could never live up to Ernie's expectations. She believes that is probably why he

74

**Confidential Attorney Work Project**
Linda Riley

got involved in drugs. It gave him a sense of control. She remembers that he would sometimes destroy his own models with a hammer. She believed that this too, was to master some control in his life.

Gelene became a Jehovah's Witness prior to Stephen's birth. Because of her beliefs, Gelene refused to sign paperwork for Stephen to get a transfusion although he was Rh factor. Linda thinks that finally destroyed the marriage of Ernie and Gelene as Ernie believed that she would sacrifice her own child rather than get him the medical care he needed. Yet Ernie left the boys in Gelene's care. Ernie would return to Sallisaw and sometimes not see the boys. Linda thinks that the boys knew he was there. Ernie did always pay child support, although sometimes late. Gelene would give the boys each a few dollars when she got Ernie's check so that they could buy whatever they wanted. The boys knew that Ernie was paying support. Gelene did try to stop the boys from getting Christmas gifts but Linda told her that the family members were going to give the boys gifts.

When Kenny was a young teenager, he was very difficult to control. As a result, Gelene refused to have him live in her home. For a few months, Kenny lived with his great aunt, Elnora Long. She is Linda's mother's half sister. Even then, Ernie did not take Kenny.

When Linda's mother died, all hope for the boys died too, as far as Linda is concerned. The paternal grandmother was the best advocate the boys had. After Linda's mother died, she was out of touch with her brothers for awhile. Linda describes her father as having mental problems. He was a very mean man.

Linda and Gelene were good friends during the times that they both lived in Sallisaw. Gelene liked to party. They had a lot of fun together. When Linda moved to Ft. Smith she returned only one time to see Gelene. Linda feels very uncomfortable in Sallisaw. She believes that there is too much dishonesty at high levels.

When Ernie got involved with Doris, she pushed her own children on Ernie, and pushed his away. When Kenny was using heroine, instead of being there to help him, Ernie kicked Kenny out of his life at that time. This was probably not the first time that Kenny felt that he had been kicked out of his father's life. Linda believes that Kenny never thought that Ernie loved him. Additionally, Richard was Gelene's clear favorite and she often scape-goated Kenny.

2

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**    Kenneth Barrett file
**From:**  Roseann Schaye
**Date:**  May 24th & 25th, 2000
**Re:**                    Kenneth E. Barrett
**DOB:**   ██████████████
**SSN:**

On both May 24th and 25th, I was allowed private visits with Kenny. Initially, we began our first interview in the large courtroom, but were interrupted by a meeting and moved to one of the small courtrooms. The second day we met again in the small courtroom. Kenny was wearing the usual jail attire. During these interviews, the jailer stood outside the room with the door closed. The following are my impressions of those visits.

Kenny is very anxious to get going on his trial. He does not understand why nothing seems to be happening. On one level, he seems to understand that the length of time is helping him, however on another level, he thinks he should be out of jail and is afraid he has been forgotten. Part of the problem for Kenny is that his father has told him that both the search warrant and the no knock warrant were ruled illegal. He doesn't understand how he could still be held. He still feels quite sure that his bullet is not the one that killed the DPS officer. He has read the law books available to him at the jail and it is clear to him that in no way does his shooting constitute murder, even if it was his bullet that killed the officer. He is holding himself together by the positive belief that he will get out of jail and not serve any prison time.

We discussed who might be the snitch that the sheriff's department is covering. There were only three people at his house the night before the shooting. One was Debby Thompson who is currently in McCloud. Kenny said that he was told that she was going to set him up, but he really does not believe that it was she. He did say that she might have hidden some syringes in his house, because he was quite sure he had gotten rid of the ones that were there previously. Donna Johnson was also there and she is also in the Oklahoma Prison System, although Kenny does not know where. Finally, Scotty Spear was also there and Kenny does not know him well so there is some potential with Scotty. Kenny really wonders if there is a snitch at all. It seems to him that if there was, the police would have been more careful because they would have known that T███ was living there.

Kenny did talk about growing up and his problems with his mother. He is quite sure that she has always favored Richy. Kenny gave many examples about doing helpful things for her throughout a day, and that same night she was in his face about how he never did anything for her. Richy has, in the past, held a gun to his mother's head, but he can still do no wrong. Kenny said that his relationship with his mother has always been filled with turmoil. He believes that she resents him but is not sure why. His mother is a heavy drinker and by evening, she is an angry person. She turns her anger toward Kenny. He has had trouble with this since he was young. He recalls arguments his parents had about his mother's drinking. When Kenny was 13 or 14 years old, his mother would frequently come home after partying and awaken Kenny. She'd ask him to roll her and her boyfriend a joint and smoke it with them. They frequently got high together. Gelene came home with men but there were only a few boyfriends that she would bring home.

Kenny admitted that he would go into his room and destroy things because it gave him some sense of control. His brother Stephen was much younger and would get into Kenny's things, breaking them. Kenny would just finish the job. It also gave him some release when there was nothing else he could do. He doesn't remember ever hitting his brothers. He would break models that he built instead. It seems that there was very little structure in his life. His mother took virtually no control after his father left. Prior to that, Kenny said things were very different. His father did have control and there was structure, primarily because the boys were fearful of their father, so they followed the rules. Kenny knows that he was very hyper and constantly needed to be doing something. That's why he loves it outdoors; there is always something to do. He has always loved hunting and fishing and has been doing it as long as he can remember. These were activities that his father taught him.

Kenny is also a self-taught mechanic and says that he can fix anything – not just cars. When he was little and would get a new toy, the first thing he would do was to take it apart and see how it worked. Then he'd put it back together. Kenny said that his reputation in town is that if something can't be fixed, take it to Kenny and he probably can fix it. He has always been good with his hands. Even his house, which is not finished, was built with whatever materials were available, but it was built correctly.

We talked about the early abuse that Kenny experienced at the hands of the sheriff and that I had reached Meredith Chase. She was the dispatcher at the jail at that time, but has no recollection about the beating. Kenny believes that she just doesn't want to get involved. He gave me other names of people to find who did see him following the beating and will remember it.

We discussed what Carolyn Joseph had told me about trying to get help for Kenny. He says that she is remembering things that did not happen. He believes that she is "crazy" and told me that she has been hospitalized at Sparks.

Kenny's first experience with liquor was when his father brought home a bottle of Jack Daniels whiskey and cigarettes and cigars. Richard had been smoking cigarettes and Ernie thought that both boys had been smoking. In an effort to teach them a lesson, he had them drink and smoke. Kenny got high, but Richard got sick. Even so, Kenny didn't drink again for a long time. He knows that his problems with Abby were all liquor related. Kenny takes full responsibility for the demise of his relationship with Abby. He treated her badly when he was drunk. He would go out to get bread and not come back for 10 days. When he and his mother were both drinking, things would rapidly deteriorate. After he and Abby had broken up, he stopped drinking and has not had any liquor since. His methamphetamine use began as a crutch to get over Abby. The break up of their relationship was incredibly painful to Kenny. During the time of the break up, Kenny began using many drugs. Friends would help him when he was using too much.

Kenny stopped going into town because he was embarrassed by the constant harassment by the police. He was always stopped and paraded in front of oncoming traffic so that people could see that it was Kenny who had been stopped. This occurred whether or not he was the driver. When he had enough of this treatment, he withdrew and people would come to see him. The police would set up roadblocks in an effort to get Kenny, even when he had stopped going to town. Things became very bad when Kenny refused to "rat out people", which the county attorney's office had asked him to do. Kenny believes that is when the law became very angry and went after him.

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:       Kenneth Barrett file
From:   Roseann Schaye
Date:    May 23, 2001
Re:                      Sylvia Gelene Dotson
DOB:
SSN:
Address:

Phone:

This was the third interview that I had with Gelene Dotson. We met once again at her trailer outside the town of Vian. She is caring for her great nephew who is developmentally delayed. He was asleep throughout the interview. The following are my impressions of our visit.

Gelene was very frustrated that Richard had been arrested a few days prior. He was charged with possession of drugs and altering a VIN number. He does not own a vehicle, however and neither she nor Richard understand this charge. She said that the drug enforcement police came to Kenny's house and surrounded it. They had a search warrant so they went inside. After just a couple of minutes they came out and told Gelene and Richard that they had found what they wanted. Richard swears up and down that he had no drugs or paraphernalia whatsoever. Gelene implied to the police that they planted any drugs they had there. Richard had apparently thought he would be arrested on some warrants from Osage County. These address child support and visitation with his daughter. When he realized the police were after something else, he ran, but was apprehended. During our visit, Richard called Gelene to tell her that his bond was now set at $150,000. Gelene said that the article in the paper mentioned Kenny. She thinks that the reason for that is to smear the Barrett name before potential jurors for Kenny's trial.

Gelene said that she has been thinking about Kenny's early life. She recalls that he was born with some kind of bump on his head. The doctor told her that it was nothing to worry about and would be gone in a year. She couldn't recall what he had called it. She said it was gone in a year or two. She said that I might be able to get help with records by contacting her cousin, Nelda Casey who still lives in Illinois. They both used the same pediatrician so Nelda may know where to locate the doctor. Gelene also stated that she believes that Kenny is a hypochondriac. This likely is a manifestation of his need to be important with her.

Gelene told me that her great grandfather was murdered in Sequoyah County. She said that there is an article in the local newspaper that I agreed to try and locate. She said it happened in July 1925. Gelene believes that violence follows her.

Gelene said that Ernie was only violent one time with her, which was mentioned in previous reports when Kenny was about 2 years old. She does not believe that Ernie is a violent man. She said that when Ernie left her, right after Richard was born, he moved in with another woman and stayed with her for two or three years. That is when she brought Kenny and Richard to Sallisaw and stayed for 10 months. Kenny had an extremely difficult time living without his father. During the time that Ernie was living with the other woman, he continued to see the boys once they moved back to Illinois. Gelene said that Ernie could never see the boys without a woman present. If he didn't bring someone with him, he would badger her into going along.

Gelene spoke to Stephen about why he thought he was so different from Kenny and Richard. Stephen mentioned to her that they are all from the same broken home. Gelene realized that although that was true, Stephen was really not living in the family when the marriage was bad. Kenny and Richard lived through all of the stress and arguing, as well as Ernie moving out and back. Stephen grew up in a single parent household with visits to his father. Ernie did help Stephen with college, but required Stephen to pay him back. Gelene said that Ernie spends a great deal of money, mostly on himself. She believes that Ernie will always live beyond his means.

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:** Kenneth Barrett file
**From:** Roseann Schaye
**Date:** October 6, 2000
**Re:** Tracy Swearingen

Tracy Swearingen is a friend of Kenny Barrett's. She was interviewed in her trailer just outside of Sallisaw. Two friends of hers and Kenny's were present at the time. They are Kenny Howell and Valencial Reed. The following are my impressions of that visit.

Tracy had some knowledge of Kenny's life. She said that he and his brothers were left alone a lot. They were very poor and at one time went without shoes. At the same time, their father drove a corvette. Tracy believes that Kenny felt abandoned by his father who didn't want to be bothered with his sons.

When Tracy became involved with Kenny, she tried to help him work his way back into society and out of his depression. Kenny had no world outside of his front gate. His belongings were everything to him, the only things that he had. His family identified Kenny as the black sheep. His mother clearly favored Kenny's brother, Richard. Tracy helped Kenny get a job with Thomas Hines. She helped him get his driver's license and improve his relationship with T█████ She believes that Kenny's self-esteem was improving just before all of this happened.

Tracy, Kenny Howell and Valencial Reed all describe Kenny as someone who was withdrawn into himself. He has always been a very good friend, however. Kenny kept his things extremely neatly. They all resent Richard who they say wants Kenny out of the way so that he can take over Kenny's life.

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**     Kenneth Barrett file
**From:**  Roseann Schaye
**Re:**              Carolyn Joseph

██████████████████████

**DOB:**   ████████████████████
**SSN:**

On 2/14/01, I met with Carolyn Joseph at her home in Sallisaw. The home is in a quiet neighborhood. Carolyn is getting ready to sell her home and wants to move into the country so many of her belongings were in boxes. She had been working all day and we met in the evening. The following are my impressions of that visit.

Carolyn stated that she is very concerned about her mother who is now living with her sister Grace. Carolyn had moved into her mother's home until recently but it didn't work out because of her work schedule. Her mother could not be left alone. Grace's home is where her mother chose to live and Grace does not work outside of her home so things will work out well. Her mother will come and visit as much as she likes.

Carolyn has been very worried about Gelene. She says that Gelene drinks too much and she believes that Gelene is an alcoholic. Carolyn and her sisters have all confronted Gelene who refuses to listen. Carolyn was also surprised that during the several months that she lived with her mother, Gelene did not once come to visit. Phyllis did not visit either, but she is clearly very upset about her mother's condition. Carolyn does not understand why Gelene never stopped by.

Some time ago, Carolyn became concerned about Kenny and his drug use. Carolyn offered that she suffers with bipolar disorder and recognized some symptoms in Kenny. She said that she and Gelene met with Kenny in Carolyn's kitchen to confront him about drugs. This did not help. They called the sheriff, asking for help but received none. Carolyn is sure that Kenny did hallucinate and believed that he was constantly under surveillance. Carolyn believes this is due to his drug use and lack of help they received when they called the law enforcement for assistance. According to Carolyn, her daughter, Meredith Lawson wrote a letter to the editor of the Sequoyah Times regarding Kenny following the shooting. It will be important to get a copy of that letter. Carolyn says that it spells out how many times Kenny's family tried to get him help.

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**     Kenneth Barrett file
**From:**  Roseann Schaye
**Date:**  September 4, 2000
**Re:**        Richard Barrett
**DOB:**
**SSN:**

On August 23, 2000, I interviewed Richard Barrett, Kenneth's younger brother.  We met at Kenneth's home, which is a tiny place.  On the outside it looks like a shack, but inside it has several rooms, is carpeted and air-conditioned.  The electricity comes from Gelene Dotson's house, and there is no plumbing.  The following are my impressions of that visit.

Richard was not too forthcoming during our talk.  He described his family as one with virtually no problems.  He described Kenneth as being adventurous and liking trucks and motorcycles.  Richard said his mother disciplined by yelling or whipping and eventually, used grounding to manage the boys' behavior.  Richard said that he and Kenneth had physical fights on a daily basis when they were children.

Richard did admit that he himself had legal problems.  He was held at a maximum-security facility for 3½ months for 2 assaults with a deadly weapon, incurring forfeiture of bail, and 1st degree burglary.  Richard is very bitter about that, as he believes he was arrested for breaking into his own home.  Apparently his estranged wife was living in the house and would not let him in.  He said that he used his own key to get in.  He was released July 31, 1999.

Richard was married at 21, however he left home at 17 for Tulsa.  He worked and lived with his father until and following his marriage.  He returned to Sallisaw 3 years ago.  He was a truck driver for several years.  Richard and his ex-wife have a daughter who Richard claims was living with him when he got arrested.  He now cannot find her.

As far as his relationship with his brothers, Richard hasn't seen his younger brother in 3 to 5 years.  He does not go to visit Kenneth.  He sees his mother daily, as she lives just next door.  He and his father are currently on poor terms.

82

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**     Kenneth Barrett file
**From:**  Roseann Schaye
**Re:**     Elnora Long

On 2/15/01, I met with Elnora Long who is Kenny's great aunt on his paternal side. She lives in the country outside of Sallisaw in a beautiful area. Her home is brick and decorated with a Western theme. We met for a couple of hours and the following are my impressions of that visit.

Kenny came to live with Elnora when he was 16 or 17. This was just after Kenny had been so badly beaten by the sheriff's officers. Elnora said that she got a call to come to the courthouse. Apparently Kenny was in court and neither parent had appeared. Elnora was furious with Ernie and called him to see that he came to court. It was apparent to Elnora that neither parent wanted Kenny. The judge spoke to Kenny privately and then told Elnora that Kenny had asked to come and live at her house. Elnora agreed and Kenny went to live with herself and her two children. On one occasion, Kenny's mother came to visit him. Kenny became very angry with her and was sent to his room. Other than that, Elnora found him to be respectful.

Kenny did not want to go to school so Elnora helped him get a job with the Cherokee Nation's youth program. Kenny cleaned the jail. He did well and was a good worker until he talked his mother into buying him a truck. Once he was no longer relying on Elnora for transportation, he stopped going to work at the jail. Elnora couldn't remember how long Kenny stayed with her, whether it was several months or a year. Once he got the truck, she could no longer handle him and he was taken to the sheriff.

Elnora is very irritated with Ernie. She said that when the boys were young, Ernie would come to her house and stay for a visit. He would call the boys and tell them he was coming to get them and never show up for the visit. Sometimes when Ernie visited, he would not even contact the boys. Elnora believes that Gelene often sent the boys to stay with others so that she could go out and party.

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Karl J. Saddlemire (karl_saddlemire@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net),
Christopher J. Wilson (caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), District Judge James
H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov), Intake
(cm-ecfintake_oked@oked.uscourts.gov)
--No Notice Sent:

Message-Id:884866@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html
```

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 3/28/2017 at 1:14 PM CDT and filed on 3/28/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 402(No document attached) |

**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: Pursuant to 28 U.S.C. Section 636(b)(1), the following motion is referred for disposition to Magistrate Judge Steven P. Shreder: [401] USA's MOTION to Compel** *Compliance with Discovery Order.* **(cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire     karl_saddlemire@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | Case No.    CIV-09-105-JHP |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Date:    3/28/2017 |
| Respondent. | ) | |
| | ) | Time:    9:02 a.m. - 11:00 a.m. |
| | ) | 11:17 a.m. - 12:11 p.m. |
| | ) | 1:20 p.m. - 3:20 p.m. |
| | ) | 3:33 p.m. - 4:57 p.m. |

**MINUTE SHEET - EVIDENTIARY HEARING**

| | | |
|---|---|---|
| Steven P. Shreder, Judge | D. Graham, Law Clerk | K. Sidwell, Reporter |
| | K. Davis, Law Clerk | FTR - Courtroom 4 |
| | N. Davis, Deputy Clerk | |

**Petitioner present with Counsel:** David B. Autry, Tivon Schardl, and Joan M. Fisher
**Counsel for Respondent:** Jeffrey B. Kahan and Christopher J. Wilson

**MINUTES:** Petitioner's evidence continues. Court addresses Government's Motion to Compel (Dkt. Entry #401). Government reurges motion; Petitioner's Response; Court GRANTS Motion to Compel (Dkt. Entry #401). Petitioner directed to obtain files forthwith and produce any unprivileged documents; Petitioner to prepare detailed privilege log as to all remaining documents.

Petitioner's counsel, Tivon Schardl, advises Court that files discussed during examination of Dr. George Woods, that were obtained from Dr. Faust Bianco, have been provided to Government on Government's request.

Court inquires as to whether documents provided to Government during examination of Jack Gordon on 3/17/17 were previously produced. Court directs Petitioner to provide any unproduced Roseann Schaye reports to Government.

Government presents for Court's consideration a Stipulation of Fact relating to Peter Rausch's Ph.D. Court accepts stipulation and directs it be filed of record.

ENTERING ORDER continuing evidentiary hearing until 3/29/2017 at 9:00 a.m. (SPS)

Total Time: 6:16

85

FILED

MAR 2 8 2017

PATRICK KEANEY
Clerk, U.S. District Court
By _____
Deputy Clerk

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT      )
                            )
     Petitioner,            )
                            )      Case No. 09-CV-00105-JHP
v.                          )
                            )
UNITED STATES OF AMERICA,   )
                            )
     Respondent.            )

## STIPULATION OF FACT

For purposes of the evidentiary hearing scheduled to commence on March 27, 2017, in the above-captioned case, the parties, by and through undersigned counsel, hereby stipulate as follows:

1

86

## STIPULATION

Peter Rausch, Ph.D. is a forensic psychologist.  After completing his graduate school classwork at the University of Western Michigan, but before finishing his doctoral dissertation, he worked as an intern with Oklahoma Indigent Defense System.  During that internship, he prepared the memorandum identified as Government's Exhibit 42.

Respectfully submitted this 28th day of March, 2017:

DAVID AUTRY, OBA #11600
Attorney at Law
1021 N.W. 16th Street
Oklahoma City, OK 73106
(405) 521-9600
(405) 521-9669
dbautry77@gmail.com

HEATHER E. WILLIAMS
Federal Defender

JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
(916) 498-6666
(916) 498-6656
Joan_Fisher@fd.org

DOUGLAS A. HORN
Acting United States Attorney
Eastern District of Oklahoma

CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
(918) 684-5175
(918) 684-5150
chris.wilson@usdoj.gov

JEFFREY B, KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F. Street, NW 6th Fl.
Washington, DC 20530
jeffrey.kahan@usdoj.gov

2

87

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Karl J. Saddlemire (karl_saddlemire@fd.org), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:885418@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Compel
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 3/29/2017 at 4:13 PM CDT and filed on 3/28/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 406(No document attached) |

**Docket Text:**
 **MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING [401] MOTION to Compel Compliance with Discovery Order by USA. Accordingly, any documents currently in custody of Petitioner's counsel, which have not already been produced, shall be provided to the Government forthwith. All non–privileged documents acquired from attorney Jack Gordon relating to Kenneth Eugene Barrett shall be produced no later than 4/21/2017, along with a detailed privilege log pursuant to LCvR 26.2. (ndd, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire      karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

90

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| v. | ) | |
| | ) | Case No.   CIV-09-105-JHP |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Date:   3/29/2017 |
| Respondent. | ) | |
| | ) | Time:   9:13 a.m.  - 11:27 a.m. |
| | ) | 11:49 a.m. - 12:06 p.m. |
| | ) | 1:02 p.m.  -  2:30 p.m. |
| | ) | |

**MINUTE SHEET - EVIDENTIARY HEARING**

Steven P. Shreder, Judge        D. Graham, Law Clerk        K. McWhorter, Reporter
                                K. Davis, Law Clerk         FTR - Courtroom 4
                                N. Davis, Deputy Clerk

**Petitioner present with Counsel:**  David B. Autry, Tivon Schardl, and Joan M. Fisher
**Counsel for Respondent:** Jeffrey B. Kahan and Christopher J. Wilson

**MINUTES:** Petitioner's evidence continues.

Government provides additional exhibits to Petitioner and Court; Government's exhibits #'s 54-62.

Petitioner's counsel, David Autry, advises Court that Petitioner's witness, Jeanne Russell, is ill and requests that her testimony be continued to the June evidentiary hearing.  No objection from Government.  Court approved the resetting of Jeanne Russell's testimony to June, 2017 evidentiary hearing.

ENTERING ORDER continuing evidentiary hearing until 3/30/2017 at 10:30 a.m. (SPS)

Total Time: 3:59

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Capital Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | **PETITIONER'S PROFFER OF EXPERT TESTIMONY FROM RICHARD H. BURR** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, hereby proffers

the qualifications, opinions, reasons and bases therefor, rendered in this case by attorney Richard

H. Burr. This Court previously excluded Mr. Burr's testimony, Order (Doc. 361), and denied Mr.

Barrett's unopposed motion for additional time to submit Mr. Burr's report pursuant to Fed. R.

Civ. P. 26(a)(2). Min. Order (Doc. 362).

The attached declarations are a proffer of the testimony Mr. Barrett would present if he were given an opportunity to conduct a direct examination of Mr. Burr in his case in chief. Mr. Barrett reserves the right to proffer rebuttal testimony from Mr. Burr based on any testimony from trial counsel that differs from their previously filed declarations, or other evidence presented by the government that departs from the theory it presented to the Tenth Circuit. *See United States v. Barrett*, 797 F.3d 1207, 1225-29 (10th Cir. 2015).

Mr. Burr's declarations demonstrate that he has relevant first-hand knowledge of trial counsel's acts, omissions, and the information that was before them at the time in question and that he is qualified to offer an opinion on the issue of deficient performance. More specifically, Mr. Burr's testimony would have provided the following material evidence:

- case-specific explanations as to how the prevailing professional norms of defense practice in federal death penalty cases tried in 2005 apply to the circumstances faced by Mr. Barrett's counsel;

- evidence showing how defense attorneys trying federal death penalty cases in 2005 viewed their roles;

- evidence of how prevailing norms would call upon counsel to respond to specific information that was available to trial counsel in this case;

- fact-specific descriptions of the techniques of capital defense practitioners commonly used to combat the government's penalty phase theme in this case, and a demonstration of trial counsel's failure even to recognize the government's strategic goal;

- fact-specific descriptions of common techniques used by capital defense counsel in 2005 if and when a client expressed reticence about mitigation evidence, as the government alleges occurred in this case.

Mr. Burr's evidence would "assist the trier of fact to understand the evidence or to determine a fact in issue," Fed. R. Evid. 702, namely, whether specific acts and omissions of trial counsel in this case were consistent with prevailing professional norms, not merely as a matter of law, as the District Court presumed, but based on the resources and techniques available to trial counsel and commonly employed in federal death penalty cases in 2005. "The general approach of the Rules is to relax traditional barriers to expert opinion testimony. The presumption under the Rules is that expert testimony is admissible." 4 Joseph M. McLaughlin, ed., *Weinstein's Federal Evidence* § 702.01 at p. 702-6 (2d ed. 2002). "The intent of the Rule is to liberalize the admissibility standards for expert testimony . . . all that is required is that expert testimony on the subject matter will assist the factfinder." S. Saltzburg, *et al.*, 3 *Federal Rules of Evidence Manual* § 702.02[1] (9th ed. 2006), citing, *e.g.*, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993).

In this Circuit, "expert legal witnesses have not been barred from testifying . . . about claims of ineffective assistance of counsel." *Duckett v. Mullin*, 306 F.3d 982, 999 (10th Cir. 2002) (discussing Tenth Circuit law and practice). *See also Bryan v. Mullin*, 335 F.3d 1207, 1223 nn. 22 & 24 (10th Cir. 2003); *Fisher v. Gibson*, 282 F.3d 1283, 1309 (10th Cir. 2002); *Hooks v. Ward*, 184 F.3d 1206, 1212 (10th Cir. 1999); *Stafford v. Saffle*, 34 F.3d 1557, 1563 (10th Cir. 1994); *Dutton v. Brown*, 788 F.2d 669, 671 (10th Cir. 1986). In other jurisdictions, "[i]t is well settled that in the prosecution of a lawyer for conduct stem[ing] from his or her representation of a client, expert testimony on the lawyer's ethical obligations is relevant to establish the lawyer's

intent and state of mind." *United States v. Kellington*, 217 F.3d 1084, 1098 (9th Cir. 2000).

Thus, it is not surprising that this Court and many others have admitted testimony from attorney

experts in evidentiary hearings on ineffective-assistance claims. *See*, *e.g.*, *Marshall v. Cathel*,

428 F.3d 452, 468 (3rd Cir. 2005); *Burdine v. Johnson*, 262 F.3d 336, 371 n.16 (5th Cir. 2001);

*Sowell v. Bradshaw*, 372 F.3d 821, 828 (6th Cir. 2004); *Jones v. Delo*, 258 F.3d 893 (8th Cir.

2001); *Middleton v. Dugger*, 849 F.2d 491, 494 (11th Cir. 1988).  *See also Johnson v. United

States*, 860 F. Supp. 2d 863, 881 (N.D. Iowa 2012) (noting role of Richard Burr in case).

DATED this 29th day of March 2017.

        RESPECTFULLY SUBMITTED,

        /s/ *David Autry*
        DAVID AUTRY

        HEATHER E. WILLIAMS
        Federal Defender

        /s/ *Joan M. Fisher*
        JOAN M. FISHER
        Assistant Federal Defender

        /s/ *Tivon Schardl*
        TIVON SCHARDL
        Trial & Habeas Counsel

        Attorneys for Petitioner,
        KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 29th day of March 2017, I caused the foregoing Petitioner's Proffer Richard Burr's Expert Testimony to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

**DECLARATION OF RICHARD H. BURR**

Richard H. Burr, under penalty of perjury, declares the following:

1.       I have been asked by counsel for the Petitioner, Kenneth Eugene Barrett, to serve as an expert witness on ineffectiveness of trial counsel in connection with the penalty phase of Mr. Barrett's capital trial.  In this declaration, I will first recount my qualifications to serve as an expert in this capacity, then explain what materials I have reviewed, and then provide my opinion and the basis for my opinion.

*Experience and Qualifications*

2.       I graduated from the University of Kentucky law school in 1976.  Thereafter, I was admitted to the bar in Kentucky (1976), New York (1977), Florida (1984), and Texas (1996).  Because I no longer practice in the courts of Kentucky, New York, and Florida, I have recently retired from the bars in those states.

3.       I began my career as a death penalty defense lawyer in 1979 with a non-profit legal organization with offices in Nashville, Tennessee, and New Orleans, Louisiana, called Southern Prisoners Defense Committee (which in the 1980's moved to Atlanta, Georgia, and became the Southern Center on Human Rights).  I then served as an assistant public defender in West Palm Beach, Florida, from 1981 to 1986, working exclusively on death penalty state post-conviction and federal habeas cases.  From late 1986 to 1994, I served as the director of the capital punishment project for the NAACP Legal Defense and Educational Fund in New York City.  From 1994 through 1995, I served as the litigation director of the Texas Appellate Practice and Educational Resource Center (a federally funded community defender for federal capital habeas clients in Texas).  From 1996 through the present, I have been in a private practice with Mandy Welch devoted entirely to the defense of capital clients.  As a contractor through my

private practice, I served from 1997 through 2014 as a member of the Federal Death Penalty Resource Counsel project, initiated by the Defender Services Committee of the Judicial Conference of the United States to recruit, train, and provide assistance to defense counsel appointed in federal capital prosecutions.  Again as a contractor through my private practice, I have served from 2010 through the present as a member of the Texas Habeas Assistance and Training Counsel project, also initiated by the Defender Services Committee, to recruit, train, and provide assistance to defense counsel appointed in federal capital habeas proceedings in Texas.

4.      In addition to consulting in approximately 300 capital cases over the course of my career, I have served as counsel for more than 100 capital clients in twelve states and in the federal courts during this time.  Although my work has been heavily oriented toward post-conviction and habeas corpus proceedings, I have been trial counsel in three capital prosecutions, including *United States v. Timothy James McVeigh*, No.  96-CR-68 (D. Colo.) (the Oklahoma City bombing case), where I was lead counsel for the penalty phase and for penalty-related work. I have argued two capital cases in the Supreme Court of the United States, *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Selvage v. Lynaugh*, 494 U.S. 108 (1990), and served as co-counsel on two others, *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Tennard v. Dretke*, 542 U.S. 274 (2004).

5.      In addition to representing capital clients continuously since 1979, and consulting on capital cases since the 1980's, I have also played a role in teaching colleagues in capital defense seminars.  I have participated regularly as a faculty member in numerous national conferences and meetings sponsored by the American Association on Mental Retardation (now American Association on Intellectual and Developmental Disabilities), the NAACP Legal

2

Defense and Educational Fund, the National Legal Aid and Defender Association, Capital Resource Centers, Federal Public Defenders, and the National Association of Criminal Defense Attorneys.  I have also taught in state and local death penalty defense conferences and seminars in numerous states, including Georgia, South Carolina, North Carolina, Tennessee, Kentucky, Pennsylvania, New York, Massachusetts, Indiana, Illinois, Louisiana, Texas, New Mexico, Nevada, Oregon, Arizona, California, Florida, Alabama, and Missouri.  The subjects of my presentations have included Supreme Court case review, emerging constitutional issues, federal habeas corpus practice, investigation and development of post-conviction/habeas issues, mental illness/mental retardation/brain damage (investigation, utilizing experts, presentation of evidence), investigating and litigating racism, investigating and presenting mitigation, and defense-initiated victim outreach.

6.      Over the course of my career, I have written five law review articles related to various aspects of death penalty defense and helped write and edit two litigation guidebooks concerning intellectual disability and mental illness, *A Practitioner's Guide to Defending Capital Clients Who Have Mental Disorders and Impairments* (2008), and *A Practitioner's Guide to Defending Capital Clients Who Have Mental Retardation* (1st ed. 2004, 2nd ed. 2006, 3rd ed. 2010).

7.      From 2012 to 2015, I served as the death penalty defense lawyer member of the American Bar Association's Task Force on Criminal Justice Mental Health Standards.  *See* Slobogin, C., *The American Bar Association's Criminal Justice Mental Health Standards: Revisions for the Twenty-First Century*, 44 Hastings Const. L. Qtly. 1, 2 nn. 5, 6 (2016).

*Familiarity with the Case and Materials Reviewed*

8.      I am familiar, in part, with Mr. Barrett's case, because I served as the member of the Federal Death Penalty Resource Counsel project who consulted with defense counsel in Mr. Barrett's case.  That consulting relationship, however, covered only the part of Mr. Barrett's case in which John Echols was lead counsel.  During that time, I consulted regularly with Mr. Echols but had no contact with his co-counsel Roger Hilfiger.  After Mr. Echols was allowed to withdraw as counsel, I had no consulting contact with Mr. Hilfiger or Bret Smith.  I offered to continue consulting with Mr. Hilfiger but never heard back from him.

The materials I have reviewed are the following:

Second Amended Motion to Vacate, Set Aside, or Correct a Sentence By a Person in Federal Custody [hereafter, "2255 Motion"], filed 12/4/09, Doc. No. 95

Exhibits 1-118 to the 2255 Motion

Sealed Exhibits 119-205 to the 2255 Motion

Government's Answer in Opposition to Second Amended Motion to Vacate, Set Aside, or Correct a Sentence by a Person in Federal Custody, filed 5/17/10, Doc. No. 174, with Attachments 1-4 and Exhibits 1-2, 4-8, 11-13, and 15-19

Movant's Reply to United States' Response to Second Amended § 2255 Motion, filed 7/1/10, Doc. No. 178, with Exhibits 206-219

Volumes 22-27, Transcript of Proceedings, *United States v. Kenneth Eugene Barrett*, No. CR-04-115-P (E.D.Ok.)

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015)

***Opinion and Basis for Opinion***

I am of the opinion that trial counsel, Roger Hilfiger and Bret Smith, provided ineffective assistance by failing to reasonably investigate Mr. Barrett's life history and mental health in

preparation for the penalty phase of his trial.  The basis for my opinion is as follows.

**1.     In preparing for the penalty phase of a capital trial, defense counsel must understand the competing narratives underlying the penalty phase.**

Prosecutors know that jurors, in fact most people, are deeply reluctant to kill another person.  Thus, to be able to persuade jurors to condemn the defendant in a capital trial, prosecutors know that they have to overcome jurors' innate reluctance to kill.  Prosecutors do this by seeking to define the defendant as nothing more than a murderer, who for that reason, no longer deserves to live.  To do this prosecutors develop a narrative that, in every way possible, de-humanizes the defendant – to have him seen as not only violent at his core, but also unrepentant, manipulative, self-centered, without empathy and compassion, unable to feel or express love, aggressive, unkind, quick to take offense, without industriousness or perseverance, and disrespectful of and not feeling bound by prevailing social norms and ethics.  In short, prosecutors seek to demonstrate that the capital defendant is the personification of all the traits we think of when we consider a person evil.

The essence of the prosecution's narrative for the penalty phase of a capital case has been eloquently captured in a poem by Sam Keen, "To Create an Enemy," in a book by Mr. Keen, *Faces of the Enemy* 9 (Harper Collins 1991):

> Start with an empty canvas.
> Sketch in broad outline the forms of
> men, women, and children.
>
> Dip into the unconscious well of your own
> disowned darkness
> with a wide brush and
> stain the strangers with the sinister hue
> of the shadow.
>
> Trace onto the face of the enemy the greed,

5

hatred, carelessness you dare not claim as
your own.

Obscure the sweet individuality of each face.

Erase all hints of the myriad loves, hopes,
fears that play through the kaleidoscope of
every finite heart.

Twist the smile until it forms the downward
arc of cruelty.

Strip the flesh from bone until only the
abstract skeleton of death remains.

Exaggerate each feature until man is
metamorphosed into beast, vermin, insect.

Fill in the background with malignant
figures from ancient nightmares–devils,
demons, myrmidons of evil.

When your icon of the enemy is complete
you will be able to kill without guilt,
slaughter without shame.

The thing you destroy will have become
merely an enemy of God, an impediment
to the sacred dialectic of history.

The defense in the penalty phase of a capital trial must develop a narrative to counter this narrative.  It is one that must fully humanize the defendant.  In Keen's words, it must be a narrative that *brings into sharp focus*, "... the sweet individuality of each face... [and] ... the myriad loves, hopes, fears that play through the kaleidoscope of every finite heart."  And it is a narrative that draws jurors into understanding that "the greed, hatred, carelessness you dare not claim as your own," is in fact a set of characteristics that, sometimes in our lives, we all manifest and thus do not distinguish a capital defendant from any of the rest of us.

This essential defense narrative has its constitutional foundation in *Woodson v. North*

6

*Carolina*, <u>428 U.S. 280</u> (1976), where a plurality of the Supreme Court overturned a statute that required the imposition of a death sentence on conviction of a capital crime.  The constitutional flaw that the Court found in such a mandatory-death statute amounted to a clarion call to capital defense lawyers to individualize and humanize their clients in the capital sentencing proceeding:

> A process that accords no significance to relevant facets of the character and record of the individual offender or the circumstances of the particular offense excludes from consideration in fixing the ultimate punishment of death the possibility of compassionate or mitigating factors stemming from the diverse frailties of humankind.  It treats all persons convicted of a designated offense not as uniquely individual human beings, but as members of a faceless, undifferentiated mass to be subjected to the blind infliction of the penalty of death.

*Id*. at 304 (plurality opinion).  To present the "relevant facets of the character and record of the individual offender" that constitute "compassionate or mitigating factors stemming from the diverse frailties of humankind," *id*., defense counsel must investigate their clients' lives deeply and broadly.  Only with such investigation can the defense be in a position to persuade capital juries to treat their clients as "uniquely individual human beings," instead of the stereotype of the enemy that prosecutors portray them to be.

The penalty phase of Mr. Barrett's trial reveals starkly that the prosecution understood and presented its narrative with chilling effectiveness.  It also revealed that the defense failed miserably to develop and present the essential counter narrative.  The reason was that the defense failed to conduct the kind of mitigation investigation called for by the Supreme Court's application and interpretation of the Eighth Amendment, from *Woodson* forward.

> **2.      The prosecution's penalty phase narrative portrayed Mr. Barrett as an enemy, whom the jury would "be able to kill without guilt, slaughter without shame."  The narrative of the defense did nothing to counter this narrative**.

The government began building its penalty phase narrative in its penalty phase case-in-

chief, then continued to do so in the defense case, turning the superficiality of the defense case to its advantage, then put the narrative together in closing arguments.

The government initially introduced the theme that others were afraid of Mr. Barrett. Calling Sequoyah County Deputy Sheriff Larry Lane to testify about Mr. Barrett's having abruptly sped through a traffic checkpoint, the government first introduced the idea that law enforcement had been trying surreptitiously to gather information about Mr. Barrett prior to this incident:

Q        Had you endeavored by virtue of your duties as a Sequoyah County Deputy to obtain certain information on [Barrett]?

A        Yes, I did.

Q        Had you endeavored to have people visit him undercover?

A        Yes....

Q        .... Have you been successful in running anyone into his house?

A        No, I had not.

Q        Why not?

A        They were – they feared him.  They were scared of him.

Transcript of Proceedings, Vol. 22: 4593 (hereafter set forth as "Tr. 22:4593").

Thereafter, Mr. Lane and the next witness Shannon Smith recounted the incident concerning the traffic checkpoint, emphasizing Mr. Barrett's disdain for and indifference to the well-being of police officers.  Mr. Lane described Mr. Barrett's mean-spirited demeanor and wanton disregard for the officers:

Q        .... What did you see the Defendant do as he approached you?

A        He looked at me and smiled and then accelerated.

8

Q      All right.  When you say smiled, please describe the smile.

A      More of a smirk.

Q      As he did so, what did he then do?

A      He accelerated the truck and fled from us.

Q      When you say accelerated the truck, at what rate of speed did he accelerate away from you?

A      Very high rate.  I would say he floor boarded the truck.

Tr. 22:4597.  Shannon Smith then described the danger that Mr. Barrett's behavior created for other checkpoint officers.  Mr. Barrett's truck was "fish tailing" due to his sudden acceleration, coming within 5 inches to 1 foot of hitting two officers who had to jump across a ditch to avoid being hit.  *Id*. at 4617-18.

Continuing with the examination of Mr. Smith, the government began fleshing out the violence, anger, and dangerousness of Mr. Barrett.  Seventeen years before the traffic checkpoint incident, Mr. Smith, who was then eighteen years old, saw Mr. Barrett attacking his then-wife Abby Keyes:

Q      What was [Barrett] doing?

A      He was slapping his wife at the time[,] ... Abby Keyes....

Q      As you drove by, what was the Defendant's position with regard to Abby?

A      He had a hold of one of her arms.

Q      What was he doing?

A      He was slapping her ... [with an] [o]pen [hand].

Tr. 23:4632.  Mr. Smith stopped, *id*., and "told him he needed to stop what he was doing."  Tr. 23:4633.  Mr. Barrett responded with anger, yelling at Mr. Smith that "he was going to go in his

9

house and get a gun and shoot me." *Id.* Ms. Keyes was crying and told Mr. Smith "I needed to get in my truck and leave." *Id.* Mr. Smith then left, having no question in his mind that "[Barrett] was very serious." *Id.*

In its penalty phase case, the defense began by informing the jury that Mr. Barrett had already been convicted in the state court of Manslaughter in the First Degree and sentenced to 20 years for the killing of Rocky Eales, and convicted of Assault and Battery with a Dangerous Weapon and sentenced to 10 years, to run consecutive to the 20-year sentence. Tr. 24:4724-25. The defense then explained that, even though Mr. Barrett was eligible based on the prison classification process for confinement in a minimum security prison, *id.* at 4818-24, because he was convicted of highly publicized crime, he was administratively assigned to confinement in a maximum security prison. *Id.* at 4808-16.

The defense then focused on the prison system's assessment of Mr. Barrett's history of drug use and his needs for treatment. Starting with a form assessing "mental health history," there was "none listed ... no mental health [history]" for Mr. Barrett. Tr. 24:4830. The form did note "drug health" problems, *id.*, which included use of "marijuana, meth, heroin, other obituates [sic], tranquilizers...," *id.* at 4844, resulting in the determination that he had a "moderate" history of substance abuse. *Id.* at 4843. With that history, he would be required to be in "a substance abuse treatment program" that would "[h]opefully" lead to his not "us[ing] drugs again." *Id.*

On cross-examination, the government immediately drew into question the likelihood of success of any drug treatment program for Mr. Barrett. The Oklahoma Department of Corrections (DOC) witness called by the defense conceded the likelihood of success for any prison-based drug treatment program is "not very good." Tr. 24:4846. And, for "people who have used a variety of drugs over the[ir] adult life, as this Defendant acknowledged," *id.*, the

10

witness agreed that "the likelihood of success in drug treatment is really, really small...." *Id*.

The government then demonstrated with this DOC witness that the sentences Mr. Barrett received in state court were likely to result in a much shorter term of incarceration than the 30 years his consecutive sentences called for because of the various ways in which Mr. Barrett could accumulate good time credits:

> Q    .... By the way, in DOC custody, 20 years doesn't mean 20 years, does it?
>
> A    No, sir.
>
> Q    Twenty years could mean lots less than that, correct?
>
> A    Less than ten.
>
> Q    And in fact, you have testified about the various rate [sic] at which the Defendant was accumulating credits at OSP McAlester, correct?
>
> A    Correct.
>
> Q    That rate could be very significantly accelerated, couldn't it?
>
> A    Yes, sir.  If he got a job, he'd be on level four, earning 44 days a month, plus the day[s] he does.
>
> Q    Okay.
>
> A    And not for – less than half.

Tr. 24:4851-52.  The government then got the DOC witness to agree that there is at least a possibility that Mr. Barrett's "highly publicized case" administrative classification to maximum security could change, which could, along with other program activities Mr. Barrett might then become involved in, allow him to accumulate even more good time credits and get out even sooner.

The government then closed its cross-examination of the DOC witness with a warning to the jury about the distinct possibility that Mr. Barrett could easily escape if his administrative

11

classification were changed to allow him to be placed in the minimum security facility that he qualified for on the basis of the DOC's classification assessment when he entered the DOC:

Q      And at that minimum security prison, there are no fences to speak of, are there?

A      None.

Q      In fact, the ability to walk away is dependent on the Defendant's will or motive or interest in walking away, isn't it?

A      Correct.

Q      No guard towers?

A      None.

Q      No electrical fences?

A      No.

Q      No ankle bracelets around prisoners' legs?

A      No, sir.

Q      Nothing that would indicate when a prisoner has strayed?

A      No.

Tr. 24:4861.

The next witness the defense called was Abby Stites, Mr. Barrett's former wife. Abby was 15 years old, and Kenny, 18, when she and Kenny married in 1980. Tr. 24:4878. They remained married for fourteen years. *Id*. Asked if "the marriage was not a regular domestic marriage in the sense of you getting along the whole 14 years," Abby responded, "we had our ups and downs, just like everybody else." *Id*. 4878-79. She also acknowledged that she and Kenny had confrontations with each other that involved "physical violence" on "[m]aybe a few occasions." *Id*. at 4879. Asked if these altercations were "one-sided" or whether "both of you

12

sort of got into physical violence," she said, "[b]oth." *Id*. Asked if she ever filed charges against Kenny for any of these incidents, Abby recalled that she had done that once and that "a couple of times maybe" she had "called the cops on him." *Id*. 4880. Abby also acknowledged that the prosecutor talked to her about "certain domestic abuse charges or ... protective order charges." *Id*. at 4881. Explaining further, she testified that the prosecutor "talked about a lot of things I guess people told him that wasn't true." *Id*. Abby then did acknowledge that she was "sometime, maybe" concerned about Kenny's violence. Asked if she was "concerned about his violence against anybody else other than you," she testified, "No. I'm the only one he basically probably ever hurt or, you know, would get mad at." *Id*. at 4883. Acknowledging that Kenny was "always ... running his mouth [and talking tough], but he never went through with it ... usually," *id*., Abby said that his being "mouthy" was mostly directed toward her. *Id*. at 4883-84.

The defense then asked Ms. Stites to talk more about her marriage to Mr. Barrett. She testified that "[w]e were probably separated more than we were together.... We'd split up and we'd go back together quite a bit." Tr. 24:4885. Asked again if she filed charges against Kenny for domestic abuse, Abby acknowledged, "Well, every time I got mad, I would go – you know, if he wouldn't leave me alone or call me and aggravate me, I'd just call and tell them, you know." *Id*. at 4889. Counsel then went over the record of four domestic abuse-relate charge Abby made against Kenny, which she acknowledged but could not recall in any detail. *Id*. ay 4889-92. She then described an incident in March, 1986, that led her to have Kenny committed to Eastern State Hospital, "because I felt like he was ... he had mental problems and he needed some help...." *Id*. 4893. Following Kenny's release from the hospital, they got back together. "[H]e did pretty good when he got out – they got him on some medi[c]ation and he did pretty good for awhile. Then he quit taking it." *Id*. Not long thereafter, they divorced. *Id*.

13

On cross-examination, the government brought out more details of the abuse Mr. Barrett inflicted on Ms. Stites.  In 1995, prior to the divorce, Abby was living separately from Kenny because "I didn't feel like fighting with him[any more]."  Tr. 24:4903.  During this time, Kenny called Abby and told her that she "ought to go check [her] trailer because everything in it was destroyed."  *Id*. at 4903-04.  She returned to her trailer and found that her large aquarium filled with fish was "busted" and all the fish were dead, and that all the new furniture she had gotten "was tore up."  *Id*. at 4904.  A few months later, Kenny confronted Abby in a grocery store and wanted to talk with her.  She told him to leave and that if he did not, "I was calling the cops, and he left."  *Id*. at 4907.  The government asked about another incident in which Abby went to Kenny's house because she thought he had taken some car keys.  "We got into a fight," then "[h]e got me in the truck with him and we went to Webber Falls and that's where we got into it again and I got out of the truck and called the police on him."  *Id*. at 4912-13.  Asked why Kenny was taking her to Webber Falls, this colloquy followed:

> A       Cause he wanted to discuss getting back together and I told him that we were not getting back together and he begged me to just get a motel and just talk to him and just try to discuss things and work things out and I told him no.
>
> Q       Was it easy to get away from him in Webbers?
>
> A       Yeah, because when he went to get the room I left.
>
> Q       Where did you go?
>
> A       I went to somebody's door, knocked on the door and called the cops.

*Id*. at 4913.  Finally, the government asked more about the fights Abby and Kenny had and what happened to her in the fights:

> Q       .... He hit you, didn't he?
>
> A       Yes.

14

109

Q       A bunch, didn't he?

A       When we were fighting, yes.

Q       He hit your hard, didn't he?

A       Yes.

Q       And in fact, you had to get medical attention on occasion, didn't you?

A       No.

Q       Never got any – did you have any bloody noses?

A       Well, yes, I take that back.  I had a fractured nose.

*Id*. at 4909-10.

Despite the revelation of frequent, serious violence that Mr. Barrett inflicted upon Ms. Stites, the defense did nothing to put it into the context of Mr. Barrett's life – no effort to connect it to difficulties he was having in his life, no effort to explore and examine the significance of Abby's belief that Kenny suffered mental illness and that Eastern State Hospital apparently found that he did, no explanation about the medication he was taking that seemed to help, no probing of the deep feelings of love and need for companionship that Kenny had for Abby and that produced good times for them as well as fueling his obsessive need to get back together whenever their relationship fell apart.

The first witness in Mr. Barrett's immediate family that the defense called was Mr. Barrett's younger brother Steven.  The superficiality of information elicited from Steven was typical of all the witnesses the defense called.  In response to being asked what kind of relationship he had with his brother while growing up, Steve testified it was "a normal relationship, older brother.  Got picked on a little bit, but I would consider it normal."  Tr. 25:5031.  Steve was asked if Kenny had "any kind of violent actions ... toward outsiders," and

15

Steve remembered only one incident in which got into "a hand to hand" quarrel with someone over automotive parts, *id*. at 5032, though he heard from others about other fights Kenny was involved in. *Id*. at 5036-37. With respect to Kenny's and Abby's marriage, Steve remembered, "It was good at times and they struggled at times." *Id.* at 5033. Steve recalled that they had "physical fights," *id*., but only observed one, in which Kenny "grabbed her from the back [while she was sitting at the dining table] and pulled her to the ground." *Id*. at 5034. The defense made no effort to probe the "good times" or the "struggle[s]" in Kenny's and Abby's marriage. Steve left the area in 1989 to pursue a college education and become an educator and school principal, and did not have much contact with Kenny in the ensuing ten years (when Kenny was arrested for the killing of Trooper Eales in 1999). *Id*. at 5035, 5043-45. He had "basic conversations" with his parents during this time and learned of their "slight concern" that Kenny had drug problems, but he never discussed this with Kenny. *Id*. at 5039-40.

The defense concluded the direct examination of Steve by asking, during the time Steve was growing up in their parents' home, "what kind of person ... Kenny Barrett [was] as far as getting along with other people." *Id*. 5040. Steve's answer raised more questions than it answered:

> A    I would say that he's fairly antisocial.
>
> Q    Antisocial – he's a loner?
>
> A    Yes.
>
> Q    Wants to be by himself, isn't that right?
>
> A    Yes.

Tr. 25: 5040.

On cross-examination, the government contrasted Steve Barrett's life with the life of his

16

111

brother, emphasizing that they both "grew up in the same household."

> Q      Shortly after that , Kenny made choices in his life that took him in a different direction than the choices you made in your life?
>
> A      Yes.
>
> Q      You all grew up in the same household?
>
> A      Yes .
>
> Q      Same parents?
>
> A      Yes.
>
> Q      Kenny dropped out of school when he was in the ninth grade, didn't he?
>
> A      Yes.
>
> Q      And you didn't make that same decision, did you?
>
> A      No.
>
> Q      You completed high school?
>
> A      Yes.
>
> Q      And then went to Tulsa after the completion of high school?
>
> A      Yes....
>
> Q      What did you do in Tulsa, sir?
>
> A      I worked for a year and went to junior college....  I think I got somewhere around 36 hours and then transferred to OU.
>
> Q      ... and got your degree at the University of Oklahoma?
>
> A      That's correct.

Tr. 25:5042-43.  The prosecutor then established that Steve's bachelor's degree was in science education, that he worked in the Norman, Oklahoma school system for ten years, that he then got a master's degree in educational administration, and eventually became a school principal. *Id*. at

17

5044-45.

The defense made no effort to try to answer the fundamental question raised by the prosecution through their cross-examination of Steven Barrett: Why would two kids raised in the same family turn out so differently? The implied answer raised by the government's question – because Kenny was a bad actor and not a good person – was left hanging by the defense, but was undoubtedly filled in by the jury.

The defense also called one of Mr. Barrett's uncles, Roger Crawford. The shallowness of the information elicited from Mr. Crawford was forecast by the following colloquy with defense counsel:

Q      Now, how long have you been around Kenny Barrett?

A      I don't know. Approximately the last 15 years maybe.

Q      You feel like you know quite a bit about him?

A      Not a whole lot, but some.

Tr. 25:5054. Thereafter, the defense elicited information from Mr. Crawford that was positive but was not amplified by stories or incidents that would have deepened the jury's understanding of Mr. Barrett as a person. Moreover, it was in conflict in important respects with the testimony of Abby Stites, Kenny's former wife, raising even more questions about what Mr. Crawford knew about Kenny:

Q      What sort of qualities do you think in Kenny are admirable?

A      I think Kenny's a good person. He could help people if they needed help. He's always been good at that. He's got a wife – I mean, a son, and an ex-wife that need him.

Q      Have you seen him interact with his mother, Gelene?

A      Yes, sir.

18

Q      Is he helpful to Gelene?

A      Yes, sir.

Q      Have you seen him interact with his son, Toby?

A      Yes, sir.

Q      What sort of relationship do they have?

A      They had a good relationship.

Q      Would you – how would you characterize in terms of father/son relationship?

A      I think it was good.

*Id*. at 5063.

Similarly superficial testimony was evoked from Mr. Barrett's mother, Gelene Dotson.

Tr. 25:5071-5105.  Tellingly, the defense stumbled onto signs of one of the mental illnesses Mr.

Barrett suffered with the following colloquy:

Q      Were there ever indications that [Kenny] had been using drugs by his actions or anything like that that you could tell?

A      It was kind of hard to tell.  I told you that Kenny was always a real, real hyper person and sometimes kind of moody – his moods changed.  But I couldn't really say – pinpoint that there was difference at that time.

*Id*. at 5082.  Apparently unprepared to develop this information, defense counsel went on to a

different subject and never in the course of the penalty phase returned to the signs of Mr.

Barrett's mental illness that his mother had observed and was clearly able to recount.

On cross-examination, the prosecution continued its unrelenting effort to trivialize and

discount any struggles and difficulties – "the diverse frailties of humankind," *Woodson v. North*

*Carolina* – that Kenny had in his life:

Q      Kenny quit school because he didn't wan to get a haircut?

19

114

A       Well, that wasn't the only thing.  It was just –

Q       Just what?

A       You would – you would have to talk to his – the superintendent to find out what all the reasons were.  We tried and we tried to get him to go and it wouldn't work.

Q       Kenny have other difficulties in school?

A       No.

Q       So the only difficulty you can point to at school that caused him to quit was because he refused to get a haircut?

A       That was the excuse that he – that he gave at that time but there were other things.

Tr. 25:5093.  Clearly, Kenny's mom had more insight and knew there were other difficulties in her son's life then, but the defense was too uninformed to help her tell her story about Kenny.

The government's closing arguments pulled all of these pieces together to tell the story of Kenny Barrett as the government perceived him – as violent from his teenage years on, as particularly violent with his wife, as contemptuous of and holding grudges against law enforcement officers, as violent toward anyone who did not give him what he wanted, as intolerant of others even in small ways, as not even feeling or expressing love and empathy, as having no genuine remorse for what he had done to Rocky Eales and his family, as having all the family-of-origin benefits that his brother Steven had yet choosing a far different course for his life – in short, as no longer worthy of living among us.

Several excerpts from the government's closing arguments show how vividly the government told their story of Mr. Barrett:

In Cherokee County we say fool me once, shame on you, fool me twice shame on me.  The best predictor of human behavior is past human conduct.  And I submit to you that when you examine past human behavior as it relates to that man he is

20

115

a future danger.

> Consider first, 17 years old and Johnny Philpot arrests him and he's ordered by a judge to take him to jail....  And as they do, this man is fighting and struggling as they're going up a narrow stairway with a wooden banister and Johnny Philpot pops him in the nose.  Hard enough to break his hand.  Is it an overreaction?  Don't know.  I do know that Mr. Philpot testified the FBI examined it and cleared him of it....   We hear from the defense well Mr. Philpot held a grudge.  Wait a minute, folks.  Who held the grudge?  Who – 18 – no, 21 years – pardon my math – who, 21 years later wanted to kill Johnny Philpot?

Tr. 27:5345.

> His marriage to Abby Stites, then Abby Barrett, was a marriage filled with violence.  Seventeen years ago, Stanley – or Shannon Smith observed this man in the front yard of the residence holding her by the arm, slapping her around with an open hand.  Seven different cases of domestic abuse or violation of domestic abuse in the court of Sequoyah County as to this man against his former wife.

> He broke into her trailer and destroyed – broke her aquarium, flooded the trailer, killed her exotic fish and slashed up her furniture.  He abducted her, took her to Webbers Falls.  He broke her nose.  And what was their response?  On redirect they got Abby to admit that, yeah, after he hit me I hit him back.  After he struck me, I returned blows.  This man's history establishes violence is how he responds to someone who does not do as he wishes.

Tr. 27:5346.

> Consider his recent behavior.  The road block incident.  He slows down and then floors it, just missing Cindy Smith and Michael Readner, who have to jump over a ditch to avoid being hit.  And then goes through the county at speeds in excess of 100 miles an hour for a couple of miles until he ditches the car in a ditch to escape....  Is this man just idle threats?  Certainly law enforcement didn't think so.  Johnny Philpot told his deputies don't go out there by yourself because I fear a shootout, a gunfight and he proved him right.

> Consider Karen Real.  When unknown persons came up he would retrieve his gun until he knew who they were.

Tr. 27:5347-48.

> Cindy Crawford testified that when she refused his sexual advances – when she wouldn't put out and started to leave with his brother Richie, he grabbed the shotgun, stuck it to her leg and said never come back here, I'll blow your leg off.

Tr. 27-5348.

> He thumped a prisoner, Donald ... Fear, [who] is characterized as a cold blooded killer.  And, yeah, he was.  But Kenneth Barrett thumped him, popped his head against the wall hard enough that a jailer on the other side heard it.  And why?  Because he was a cold blooded – because Donald Fear was a cold blooded killer?  Was it because of Kenneth Barrett's repulsion at his acts?  No.  He cut his toenails one too many times.

Tr. 27:5349.

> The government then responded to and pointed to the flaws in the mitigating factors

argued by the defense:

> He is a father.  And do you know what's missing?  There's no adjective.  He's not described as a loving father, a carrying [sic] father, a nurturing father, a good father.  He is a father.  That, folks, describes nothing more than a biological process....

> A loved son and stepson.  That is their feelings for Kenneth Barrett.  Notice what's missing?  Any feelings they receive back.

Tr. 27:5355.

> Good neighbor, good friend?  The only testimony there is he fixed cars cheap.  Death would impact his child, his friends and his family.  And there was no testimony of impact upon his child.  No testimony of what impact his death would have upon his friends.  And the only impact coming from his family was his stepmother who said that I could no longer have my relationship with him in jail.  I'm sorry.  I submit that that mitigating factor does not exist.

Tr. 27:5356.

> He expressed remorse.  How?  When?  Well, he  told his mom he wished it could have been different.  Yeah, like not get caught.  Yeah, like kill more of the bastards like I intended to.  Where's the remorse?  He told his dad that, well, I 'm sorry that two children had lost their daddy.  What are you going to say to your dad?  Damn, Dad, I wanted to kill more than that.  I didn't do a good enough job.  Come on.

*Id.*[1]

The government then drew the direct comparison between Kenny Barrett and his brother

Steven that had been suggested by their cross-examination of Steven and reduced the differences

between them to a simple conclusion – choices:

> [Compare] Kenneth Barrett with his brother, the defense witness Steven Barrett.
> Kenneth Barrett dropped out of school because he didn't want to get a haircut.
> Steven Barrett chose to remain in school and graduate[] and go to college and get
> a masters.  Kenneth Barrett chose drugs.  Steven Barrett chose football and an
> education.  Kenneth Barrett's life revolved around cooking, making and using
> dope.  Steven Barrett's life revolved around educating and nurturing our children.
> Same house, same circumstances, same parents, same conditions.  The difference
> is choices made.  Choices made by Steven Barrett versus choices made by
> Kenneth Eugene Barrett.  And you saw where Steve Barrett's choices have taken
> him.  And you have seen in this trial the choices Kenneth Barrett continually
> made through his lifetime and where it has taken him.

---

[1]The government's lack of remorse argument was fueled by a response that defense counsel ineffectively invited on cross-examination of Rocky Eales' widow, Kelli Eales:

> Q   And when Mr. Barrett was convicted for the death of Mr. Eales in another proceeding you weren't happy with the result, were you?
>
> A   I'm not happy.  I don't think he's remorseful.  He's never told me he's sorry through his mouth, through a letter, through his family.  He has never gotten up on the stand and said he didn't mean to.  He has never said I'm sorry.  I don't think he is.
>
> Q   Mr. Barrett has never been on the stand, has he, ma'am?
>
> A   No.
>
> Q   He's never had an opportunity in an official proceeding to say anything to you?
>
> A   He's had the opportunity.  He's chosen in my opinion to be a coward and not stand up and say why he did what he did.

Tr. 23:4691.  While this testimony is not mentioned to divert the Court into another aspect of trial counsel's ineffectiveness, it must be noted that defense counsel's ill-planned questions invited the very kind of victim impact testimony that the Supreme Court has refused to allow. *See Payne v. Tennessee*, 501 U.S. 808, n.2 (1991) (explicitly not overruling the holding in *Booth v. Maryland*, 482 U.S. 496 (1989), "that the admission of a victim's family members' characterizations and opinions about the crime, the defendant, and the appropriate sentence violates the Eighth Amendment").

Tr. 27:5358.

And finally, the government distilled their narrative about Mr. Barrett to two elements – choices and a complete lack of empathy for other people, which in keeping with Sam Keen's insight in the poem, "To Create an Enemy," led the government to argue that Mr. Barrett "lacked an essential[] ingredient of the community of people," Tr. 27:5411:

> The Defendant elected to suppress his conscience.  He chose a criminal path in this case.  His murderous actions were conscious, knowing, intentional, deliberate and a premeditative result of thoughtful choice.  You know, he lacked an essentially [sic] ingredient of the community of people. He doesn't have empathy for other people.

*Id.*

The defense had no narrative about Mr. Barrett to counter this narrative from the government.  They argued, instead, impersonal, non-individualizing, non-humanizing matters. They argued that the federal government was unfair to pursue more severe punishment for Mr. Barrett than the state court had already imposed, Tr. 27:5366-76, 5382, summed up by Mr. Hilfiger as follows:

> It is impossible to be just if one is not generous.  Be just and generous, ladies and gentlemen. Sentence Kenneth Barrett to a term of imprisonment for the federal portion of the crimes he has not already been punished for.

Tr. 27: 5382.  They argued against the substantial planning and premeditation aggravating factor by re-arguing the crime scene facts and the credibility of the government's snitch witnesses.  *Id*. at 5361-66, 5383-84.  They argued against future dangerousness by trying to minimize the recurring acts of violence that threaded through Mr. Barrett's life – the "scuffle" with the Sheriff when Mr. Barrett was 17, the road block incident, the threatening warning sign Mr. Barrett posted on his property, Mr. Barrett's taping bullet clips together, Mr. Barrett's assaults on and threats against jail guards.  *Id*. 5676-77, 5385-89.  They not only tried to minimize but also tried

24

to normalize the incidents of violence within Mr. Barrett's marriage:

> But that [violence within the marriage] is the instance of violence that they want to bring in to you and say this is a dangerous guy over here. That's a bunch of hog wash.
>
> Protective order violations.  You all aren't expected nor required to check in your common sense at the door.  You know people that have been in divorces.  You know people that have brought protective orders.  You know people who have been accused of protective order violations.  Put that evidence in the context in which it should be in.

*Id*. at 5385.  They dismissed the government's arguments that Mr. Barrett would be sent to a

minimum security facility or released as "scare tactics."  *Id*. at 5380.

In the only two pages of transcript in which the defense mentioned mitigating factors,

they focused primarily on two factors that were ambiguous and without much mitigating weight,

because they were not revelatory of Mr. Barrett as a human being with the "myriad loves, hopes,

fears that play through the kaleidoscope of every finite heart," Keen, "To Create an Enemy,"

*supra*, or whose difficulties in life "stemm[ed] from the diverse frailties of humankind,"

*Woodson*, 428 U.S. at 304.  Mr. Smith addressed the mitigating factors as follows:

> The mitigating factors and there's several of them and it was pointed out [by the government] th[e] reasons why you shouldn't give them heed.  Well, I want to go back through a couple of them and one is the very first one about acceptance of responsibility from the previous conviction.  They say, well, if he appealed it and its overturned and he come [sic] back for trial and he might get life for manslaughter.  Yeah, he could get death.  Yeah, he could get acquitted.  There's all sorts of things that could happen.  You weren't told whether or not there were any appealable issues in that case.  You don't know.  But what you do know is that Mr. Barrett accepted that verdict and was doing his time....
>
> How about the no prior felony convictions?  They say, well, he ran from that case. He didn't stand prosecution.  Oh, he stood prosecution.  He had a lawyer.  The lawyer withdrew.  The bondsman knew that there was a bench warrant, but he never came out to get him, never notified him of it.  That was Marty Daggs that told you that.
>
> The bottom line is whatever the circumstances of that '97 case is [sic], that the

25

120

question is not did he run from prosecution.  The question is had he ever been convicted of a felony.  Well, ladies and gentlemen, that's a slam dunk. Because you know if he had, you'd have heard about it.  The Defendant is a father. There's no question about that, a loved son and a stepson.  All these mitigating factors you can find.  And I suggest that you will find.

Tr. 27:5397-98, 5399.

> **3.     Defense counsel did not understand what the requirements were for providing effective assistance of counsel to a client in connection with the penalty phase of a capital trial, or if they did understand them, were indifferent to them.  In any event, Mr. Barrett's counsel's investigation of mitigation was grossly deficient.**

In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court articulated the axiomatic principle for assessing the performance of defense counsel in connection with a claim of ineffective assistance: whether counsel's performance falls "below an objective standard of reasonableness" in light of "prevailing professional norms." 466 U.S. at 686 (1984) (quoting *McMann v. Richardson*, 397 U.S. 759, 771, n. 14 (1970)).  In determining the applicable "prevailing professional norms," the Court explained:

> Prevailing norms of practice as reflected in American Bar Association standards and the like, *e.g.*, ABA Standards for Criminal Justice 4- 1.1 to 4-8.6 (2d ed. 1980) ("The Defense Function"), are guides to determining what is reasonable, but they are only guides.  No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.

*Id*. at 688-89.

While continuing to note that no statement of prevailing professional norms is definitive, the Supreme Court has at the same time utilized the ABA standards for various criminal defense functions as important benchmarks for determining the reasonableness of counsel's performance. Thus, in *Williams v. Taylor*, 529 U.S. 362 (2000), the Court, relying on the ABA Standards for Criminal Justice 4-4.1, commentary, p. 4-55 (2nd ed. 1980), held that counsel's failure to

26

investigate the client's life history "demonstrate[d] that trial counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."  529 U.S. at 396 (citing the ABA Standards).  Thereafter, in *Wiggins v. Smith*, 539 U.S. 510 (2003), the Court explained that

> [o]ur opinion in *Williams v. Taylor* is illustrative of the proper application of these standards.  In finding Williams' ineffectiveness claim meritorious, we applied *Strickland* and concluded that counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not "fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background."  529 U.S. at 396 (citing 1 ABA Standards for Criminal Justice 4-4.1, commentary, p. 4- 55 (2d ed.1980)).

529 U.S. at 522.

Drawing upon the 1989 ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases, the Supreme Court went on to note:

> Counsel's conduct similarly fell short of the standards for capital defense work articulated by the American Bar Association (ABA)—standards to which we long have referred as 'guides to determining what is reasonable.'  *Strickland*, *supra*, at 688; *Williams v. Taylor*, *supra*, at 396.  The ABA Guidelines provide that investigations into mitigating evidence 'should comprise efforts to discover all reasonably available mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'  ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C), p. 93 (1989) (emphasis added).  Despite these well-defined norms, however, counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources.

*Wiggins v. Smith*, 539 U.S. at 524 (emphasis in original).

Thus, by the time Roger Hilfiger and Bret Smith became Mr. Barrett's counsel, the constitutional duty to "to conduct a thorough investigation of the defendant's background" was well-established.  Moreover, a thorough investigation of the defendant's background meant making "efforts to discover all reasonably available mitigating evidence and evidence to rebut

any aggravating evidence that may be introduced by the prosecutor." Mr. Hilfiger and Mr.

Smith not only failed to conduct any such investigation, they rejected the need to do so.

Neither Mr. Hilfiger nor Mr. Smith had any meaningful experience representing clients

in a capital case that had gone to trial. Despite this, they rejected efforts by more learned

counsel to help them learn what they needed to do. John Echols was the first such lawyer to

offer guidance. When Mr. Echols was allowed to withdraw as learned counsel, he provided the

necessary guidance to Mr. Hilfiger:

> At the time I withdrew from the case, I advised Mr. Hilfiger that he needed to immediately undertake extensive investigation and preparation for a possible penalty phase. I explained to him that the work performed by Roseann Schaye, the mitigation investigator in the state case, was very preliminary in nature and far from complete. Ms. Schaye's investigation, and preliminary consultation with mental health experts prior to the state court trial[,] had identified, but not developed, several potentially fruitful areas to pursue, including Mr. Barrett's mental illness and prior suicide attempt. In particular, the expert advice included seeking assessment of neurological damage and conducting an investigation of family mental illness....
>
> I therefore stressed to Mr. Hilfiger the importance of completing a mitigation investigation so that he would be able to make informed decisions and able to advise Mr. Barrett of possible defenses.
>
> After I withdrew from the federal case and gave Mr. Hilfiger this report on the status of the prior investigation, he never again consulted me on the legal and factual issues surrounding Mr. Barrett's case.

2255 Motion, Exhibit 34 at 13, 14-15.

I was the second learned counsel whose assistance Mr. Hilfiger declined to accept. I was

then a part of the Federal Death Penalty Resource Counsel project, created by the Defender

Services Committee of the Judicial Conference of the United States to provide the very kind of

assistance to counsel appointed in federal death penalty cases that Mr. Hilfiger and Mr. Smith

needed. The work of our project was described in a report by the Subcommittee on Federal

Death Penalty Cases of the Committee on Defender Services of the Judicial Conference,

FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY

OF DEFENSE REPRESENTATION (May, 1998) – which was adopted by the Judicial Conference – as

"essential to the delivery of high quality, cost-effective representation in death penalty cases...."

*Id*. at 50.

At the outset of the case, I reached out to both Mr. Echols and Mr. Hilfiger, but heard

back only from Mr. Echols.  Thereafter I had extensive consultation with Mr. Echols until he

withdrew as counsel.  *See* 2255 Motion, Exhibit 118.  Despite my offer of assistance at the

beginning of the case and after Mr. Echols withdrew, Mr. Hilfiger never responded.

In section 2 of my declaration, *supra*, I have detailed the extraordinarily deficient quality

of the representation of Mr. Barrett by Mr. Hilfiger and Mr. Smith in the penalty phase of the

trial as evinced solely by the record of the trial itself.  Looking past the record itself, it is quite

apparent that Mr. Hilfiger's and Mr. Smith's deficient representation stemmed either from

ignorance about their duties in representing a capital client in connection with the penalty phase

of his trial or deliberate indifference.

Mr. Hilfiger and Mr. Smith have suggested in their declarations that Mr. Barrett

discouraged their investigation of mitigation by not wanting the outcome of the case to depend

on sympathy for him and by wanting to minimize the testimony from close relatives and his

former wife.  *See* Government's Answer in Opposition to Second Amended Motion to Vacate,

Set Aside, or Correct a Sentence by a Person in Federal Custody, Exhibits 11 and 12.  The short

answer to this concern – if it is accurate that Mr. Barrett even expressed such a concern – is that

this is no reason to diminish the effort to investigate mitigation.  Several months before Mr.

Barrett's trial, the Supreme Court made clear what prevailing professional norms had long made

29

clear:  The constitution requires a thorough investigation of mitigation even if a capital client is "uninterested in helping" or "even actively obstructive," *Rompilla v. Beard*, <u>545 U.S. 374, 381</u> (2005), so long as there are avenues available for mitigation investigation.  My declaration of June 27, 2010, submitted as Exhibit 219 to Movant's Reply to United States' Response to Second Amended § 2255 Motion, fully addresses this issue and is incorporated as if fully set forth herein.

The truth is Mr. Hilfiger and Mr. Smith did nothing to investigate mitigation in Mr. Barrett's case.  Required under the Sixth Amendment to conduct a "thorough investigation" of mitigation, they conducted none.  They failed to use the services of a mitigation specialist to help them investigate mitigation even though the services of such an investigation firm had been approved by the Court.  *See* 2255 Motion, Exhibit 34 and Exhibit 66.   When they apparently realized approximately one month before trial commenced that they needed mitigation investigation, they attempted to persuade Dr. Jeanne Russell to conduct such an investigation.  2255 Motion, Exhibit 56.  She told counsel "there was not time to complete a mitigation investigation, and as a doctor of education and not a mitigation investigator I was not in a position to perform that role."   She also observed in this Court, "Based on Mr. Smith's comments and his description of materials he had, it is my belief that he did not have access to much of the material, including interviews of background witnesses that had been done in connection with the state prosecution." *Id*.  She did not know, of course, that counsel did have access to those materials.

The most telling evidence of trial counsels' indifference to investigating mitigation has been provided by the very people that counsel should have been interviewing or had a mitigation specialist interviewing – the potential mitigation witnesses.  Every one of them who testified

30

recounts that trial counsel met with them only briefly before their testimony and never asked

anything about Mr. Barrett's life history.   Most of the potential mitigation witnesses, however,

were not called to testify and never had any contact with the trial defense team.  Those who did

have contact provide accounts of trial counsels' stark indifference to even learning about matters

in mitigation.

Thus, for example, Carolyn Joseph, one of Mr. Barrett's maternal aunts, recounts the

following:

> Kenny's trial attorney only met me for a few minutes.  He asked me about Kenny
> threatening to burn down Janice's house.  I confirmed that I heard the threat, and
> the attorney did not ask me any other questions so he never learned that no one
> believed it for a second.  He never gave me a chance to tell him.  The attorney just
> told me my testimony would not be required.  The attorney never asked whether
> Kenny had attempted to carry out the threat or whether anyone believed that he
> would.  My answer would have been no.  Kenny never had done anything to
> anyone.  The attorney did not ask anything about what Kenny was like as a
> person, what kind of life he had growing up, or what kind of mental illness runs in
> our family.  I would have answered any questions the attorneys asked and I would
> have answered them truthfully.

2255 Motion, Exhibit 78 at 5.  And Doris Barrett, Kenny's stepmother, recounts:

> I had some contact with Kenny's lead federal lawyer, Roger Hilfiger, before and
> during Kenny's trial, but we never discussed Kenny's family life or history.
> Mostly, he just outlined the day for me, told me who was going to testify that day.
> In fact, he only told my husband Ernie and me that we were going to testify on the
> day we testified in the penalty phase of Kenny's trial.  He did not even tell Ernie
> or me what questions he was going to ask us.  No investigator or investigators
> working for the defense in Kenny's federal case spoke with us.

2255 Motion, Exhibit 80 at 1.

Steve Barrett, Kenny's brother, even warned trial counsel about how the prosecutor

might try to compare his life to Kenny's and use that as a way of further demeaning Kenny –

which is of course exactly what happened.  However, counsel were not interested in anything

about Kenny's life history or any of Steve's insight into his brother:

31

> Kenny's trial attorney, Mr. Hilfiger, spoke to me briefly, maybe for five minutes, on the day I testified.  I tried to tell Mr. Hilfiger my concern that the jury would likely wonder how if Kenny and I grew up in the same home I turned out so well.  Mr. Hilfiger and Mr. Smith, Kenny's other attorney, just told me they were going to ask me some questions.  They did not ask about our family history, about any insight I may have into why Kenny and I led such different lives, or about significant events in our lives.  They never asked me about Kenny's mental and emotional problems or what steps could have been taken to avoid the tragic loss of the police officer's life that night at Kenny's.  I know that if law enforcement officers were concerned about Kenny's reaction to being arrested they could have approached him, my Aunt Phyllis, or other family members and been assured he would follow the law and turn himself in peacefully.  The brief conversation I had with the attorneys prior to my testimony afforded me no opportunity to talk with them about my concerns.  The conversation was very perfunctory and unsettling, but I had no idea if the story of Kenny's life was relevant, and, if it was relevant, how to get it before the jury for their consideration.

2255 Motion, Exhibit 99 at 7-8.

Finally, Abby Stites, Kenny's former wife, also tried to provide insight into Kenny's life but was also rebuffed by counsel:

> Mr. Hilfiger and Mr. Smith were interested in my stay-away orders and in my marriage, but not in the underlying issues of Kenny's mental health, at least not from anything they ever talked to me about. They did not ask me anything about his family history either....

> I knew the prosecution didn't call me to talk about Kenny's problems.  I knew they only wanted to talk about the restraining orders.

> That was all Mr. Hilfiger wanted to talk about too.  I wanted to talk to him about Kenny's problems, but he said he didn't want to hear about it.  I thought Kenny s problems were important to the case and I tried to tell him.  I tried to bring up Vinita, the mental hospital which I had pick up Kenny once because the doctor at Bill Willis thought Kenny might hurt himself.  They kept Kenny two weeks and would have kept him longer, but his mother came and got him.  If she had let him stay, he might have gotten better.  He was doing real good.

2255 Motion, Exhibit 103 at 4; Movant's 2255 Reply, Exhibit 216 at 1-2.

The evidence of trial counsels' failure to investigate mitigation is thus stark.  They did not investigate mitigation and were indifferent to mitigation when potential mitigation witnesses

<div align="center">32</div>

tried to give them mitigating information.  Thus, defense counsel failed to learn the "myriad loves, hopes, fears that play[ed] through the kaleidoscope of" Kenny Barrett's heart, and failed to learn that the difficulties in his life and the difficulties that he sometimes created for others "stemm[ed] from the diverse frailties" readily apparent in his life.  These are the reasons the defense failed so completely to rebut the prosecution's narrative about Mr. Barrett and allowed him to be presented to the jury as "merely an enemy of God, an impediment to the sacred dialectic of history."  Keen, "To Create an Enemy."

> 4.     **The defense had the potential to counter the prosecution's narrative and to persuade the jury to impose a life sentence if counsel had conducted the kind of investigation the Sixth Amendment required them to conduct.**

The 2255 motion has attached to it the declarations of people that the defense could have interviewed had counsel conducted a mitigation investigation.  None of these people was difficult to find or interview.  All knew Kenny Barrett quite well and had much insight into his life – his traumatic upbringing, his sweet and kind nature alongside his fearful and paranoid and impulsive nature, his kindness and generosity, his love for his wife and son despite his inability to be a steady and good husband and father, the mental illness that afflicted him from the time he was a toddler.  All could have humanized Kenny and shown that the government's effort to reduce him to a violent non-empathetic person who chose only to meet his own desires was false.  Highlighted below are the witnesses that counsel should have interviewed and the life-affirming narrative that these witnesses could have helped defense counsel tell.

Kenny's father, Ernie Barrett, would have been able and willing to testify "about the family history of mental problems, about myself, my marriage to Gelene, and Kenny and me ... so the jury could understand the role I played in Kenny's life."  Movant's 2255 Reply, Exhibit 206 at 2.  Mr. Barrett "assumed that was why [Kenny's trial counsel] called me to testify, but it

wasn't." *Id*., at 2-3.  Had he been interviewed with the goal of trying to understand his son, Mr.

Barrett would have recounted the following:

> My family had some pretty serious mental problems that folks whispered about back in those days.  My father, A.J. (Andrew Jackson), had enormous moods swings from being an alright guy to being totally out of control where nothing could stop him from attacking us.  He was sent to the mental hospital in Vinita for a month and was in and out of jail in Sequoyah County for public drunkenness. My father's father, Isaac Clifford Barrett, managed a big ranch until he committed suicide by taking cow black leg medicine.  My brother Ike and my sister Linda also have mental problems.

2255 Motion, Exhibit 81 at 3.  As to himself and his marriage to Gelene, Mr. Barrett would have

recounted:

> At the time I married Gelene, even before we had children, I almost immediately started running around with other women.  When Gelene and I started having children, I did not give much thought to fatherhood and I was mostly an absent father....

> I did pretty much whatever I wanted to and did not think about Gelene or, later on, the boys, other than working and supporting them.  I would go out, drink as much as I wanted, and chase women.  I kept that up for years until I met Doris, my third wife in 1985.

*Id*. at 1, 5.

> Mr. Barrett then explained how Gelene was in their marriage and how he responded:

> Marriage brought out the worst in Gelene.  She drank right from the beginning of the marriage and straight through when she was pregnant.  She was miserable and complained constantly about how unhappy she was.  She got mad over any little thing and had foul moods.  When she got pregnant, she was miserable.  Her bickering was constant.  I stayed away from home as much as I could, working 16 hours [sic] shifts....  I preferred staying at the plant rather than facing Gelene and her drinking.

*Id*. at 5.

These patterns continued throughout their marriage.  A times, Mr. Barrett left to live with

another woman, for two years one time, and though he "felt bad about leaving my two boys,

34

129

Kenny and Richie, ... I could not take Gelene anymore." *Id*. at 7.  Drawn back to his marriage by his boys, "neither Gelene nor I had changed any.  We both drank as much as we could, and I still stayed away from home." *Id*.  Thereafter, they moved to New Jersey, but Mr. Barrett "kept up drinking, fighting, and running around with women, staying gone from home two or three days at a time." *Id*.

> Recalling Kenny's early years, Mr. Barrett recounted:

> I was not around the house much when Kenny was a little baby but I heard all about how hard it was to sooth him.  He was colicky and cried all the time.  When he got a little bigger, he could not sit still.  Even if I could get him to watch television, his feet were always moving, and he was bouncing.  I cannot sit around either, but I am not as bad off as Kenny was.  Even though he was a handful, he was a beautiful little boy.

*Id*. at 6.  By the time Kenny was 10 or 11 years old, "Gelene left me for good [when they lived in New Jersey]....  She was at the end of her rope, but I did not much care."  *Id*. at 7.  "Kenny kicked and screamed to stay with me ... and did not want to go back with his mother to Oklahoma." *Id*. at 8.  But he did.  And by this point, Gelene

> used to whip the boys over any little thing and whipped them all the time.  She had a bad habit of saying cruel things not just to me but to the boys, too.  Kenny was always upsetting her because he could not sit still and was always into everything.

*Id*. at 7.

> Along the way, Ernie Barrett took note of Kenny's vulnerabilities:

> I liked taking Kenny with me hunting.  Sometimes his little legs would give out and I had to carry him on my shoulders.  Boy, he loved that.  Kenny was fearless, but ... he was a sensitive little boy too who cried if you hurt his feelings.

*Id*. at 6.  Kenny was drawn to his father even though being with him often led to Kenny being hurt:

> Kenny always wanted to live with me.  I let him come three times after the

divorce, the first time in Dunkirk, Indiana, where Kenny completed ninth grade. Kenny resented my wife Diane and it got the best of me. I lost control when he sassed her, and I hit him pretty hard in the chest. He went flying slamming against the wall. One time I overheard Kenny and some boys talking about running from a fight. I told Kenny, "That's not the way to live your life. If you want, I'll teach you how to fight." Kenny did not show any interest in learning to fight or any interest in fighting. Kenny was not much of a fighter. Now his brother Steve, he was different. He would have taken your lights out. Kenny went back to Sallisaw after that summer and soon quit school for good. He had a hard time with lessons but could do anything with his hands.

*Id.* at 8-9. As an adult, Kenny's father continued to see Kenny's vulnerabilities, which caused

him to be depressed, then manic, and always deeply dependent on others to help him live:

Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic, always on the go and upbeat. Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it. In 1986, when Kenny was separated from Abby and was very depressed, he stayed with Doris and me. I got him a job with Kerr Glass and he was making real good money. Kenny had a truck. He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running. Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his youngest brother Steve. Kenny worked hard when he worked, but he never seemed to be able to live on his own. He lived with his wife and lots of times they lived with Gelene, he lived with me, or he lived right next to Gelene. He was not an independent person and had to be close to home.

*Id.* at 9-10.

The themes articulated by Ernie Barrett resonated in the accounts and insights Kenny's

mom, Gelene Dotson, could have provided to the jury. She would have recounted the same

continuous infidelity by Ernie and absence as a father that he recounted. 2255 Motion, Exhibit

97 at 7-8. She acknowledged drinking alcohol through her pregnancy with Kenny, and lamented

not "know[ing[ then what we know now about how having just a little beer can affect your

baby...." *Id.* at 8. Echoing Ernie's account of Kenny being a difficult baby who could not be

comforted, Gelene said that "[a]t first I thought all babies must be like this, but after I had my

36

other two sons I realized something was wrong with Kenny.  He was very, very active and moved around without thinking about what he was doing." *Id*.  As Kenny developed, Gelene later came to recognize other differences – an inability to be still and easily being upset – between Kenny and her other sons:

> When he was a toddler, he had to go to the hospital for several different accidents. He got into everything....  He could not be still.  Any little thing could upset him, but it took a lot to calm him.  I know that babies falling and hitting their heads is not so uncommon, but Kenny had far more than his share of accidents no matter how hard I tried to protect him.  This was not true with my other boys.

*Id*. at 8-9.

As Kenny grew into childhood, Kenny was especially vulnerable to his father's neglect. "Kenny really loved his dad and missed him a lot when we were separated....  He really missed his dad, but his dad did not show him any affection." *Id*. at 9, 12.  Ernie's infidelity, absences, and neglect led to "some pretty bad fights [with Gelene]....  There were terrible scenes with us screaming at each other, Kenny and his brothers crying and scared and not knowing how to make us stop fighting, and then the time he hit me ... [and] gave me two black eyes and split my lip." *Id*. at 10-11.

Ernie's essential abandonment of Gelene and their boys led Gelene to treat her boys harshly, but this was especially true for Kenny because of his hyperactivity and emotional instability:

> When Kenny and his brothers were growing up, I had my hands full with three boys and basically no husband.  A woman is not cut out for discipline, and it is not a good role for a woman to play....  I had to make up for the discipline Ernie would not give the boys.  I had to be especially hard on Kenny because he went from one thing to the next, was never still, and almost drove me crazy.  He was more than hyper.  He was emotional about things that did not matter.  He would cry and scream like there was no tomorrow.

*Id*. at 11-12.

In the meantime,

> Kenny had a difficult time in school and was in Special Ed classes part of the time. He failed reading and arithmetic in the first grade and had a hard time keeping up with the other kids. It was very difficult for him to read. In the second grade, when they taught phonics he never grasped it. He never did well in school and he finally gave up. I didn't know what I could do.

*Id*. at 10.

As Gelene was describing Kenny's growth into adulthood, she recalled the details of an incident with Sheriff Johnny Philpott, who had testified briefly about the same incident at trial. Tr. 22: 4566-68. The prosecutor used this incident in closing argument as showing the beginning of Kenny's life of violence and dangerousness. Tr. 27:5345. Gelene saw this incident from a much different perspective. She saw the incident as having made Kenny fearful of law enforcement officers from that point on:

> When he was 16 or 17, Kenny was beaten up by police officer John Philpot who broke his own hand while breaking my boy's face after Kenny was arrested for squealing his tires. The FBI investigated the whole thing. Kenny always loved working on cars. They were his pride and joy. He was out driving one of his souped-up cars and got arrested, taken to jail, and beaten all over his face. His nose was bloodied, and his jaw and collarbone broken. A highway patrolman held my son's head back by the hair while John Philpot beat him. An assistant district attorney said he just stepped out of the room and missed what happened. Everyone in law enforcement interviewed by the FBI gave a different story. You should have seen the pictures of his face, made you so mad and want to cry at the same time. I think they would have brought a case, but Kenny wanted the FBI to drop it he was so afraid. It was a big thing in Kenny's life and really traumatized and terrified him.

*Id*. at 12-13.

Gelene then provided an insightful account into Kenny's and Abby's marriage, which she summed up in the following terms:

> Kenny met and fell in love with Abby Stites, a wonderful girl. I love her like a daughter to this day. Kenny was 19 and Abby was 16 when they married in 1980. Kenny and Abby's marriage was always rocky, though, and they were

38

133

> more unhappy than happy even though they loved each other.  They were too young and Kenny was far too mentally unstable.

*Id*. at 13.  Gelene then provided more detail of the marital problems stemming from Kenny's mental instability:

> Kenny had terrible mood swings and periods of depression that lasted for days. He withdrew – anything upset him – and he was paranoid about everything. Abby tried to stay with him, but he needed help for his mental problems and she could not figure out what to do for him.  She begged him to go to doctors, and he tried it a time or two, but he went downhill further and further.
>
> He tried to kill himself in January 1986 in my front yard.  He came right into the house, got Steve's shotgun, went back to the front yard by his truck and shot himself.  We all ran out of the house and thought we had lost him for sure.  He almost died in the hospital but he survived and returned home after losing a lung and suffering other internal damage.  Abby had him committed to a psychiatric hospital in early October 1986 to try and get him help, and for a while he did better, but he could never hold on to happiness.  Abby and Kenny wanted the marriage to work for the sake of their son, but Abby finally ended the marriage in the fall of 1995.  Kenny never recovered.

*Id*. at 13-14.

Echoing Ernie's realization that Kenny could not live independently, Gelene recalled how Kenny's life devolved after the divorce:

> Kenny was not able to live on his own.  When he and Abby would separate, Kenny always came home to me.  After he and Abby broke up for good, he moved back home.  He was a lost soul. Nothing in his life ever mattered but Abby and Toby.  Sometimes I could see how hard he was trying to hold it together for them, but he couldn't do it.  He just couldn't do it no matter how hard he tried.  It was so sad, so he came home to me.

*Id*. at 14.  Thereafter, Kenny's life revolved around being near his mom.  He got permission from his grandfather to build a place to live on land next to his mom.  *Id*.  And,

> With $150.00 and whatever scraps he could find, he built himself a little shack. He was so proud.  He showed it off to everybody, but it was nothing much, pretty bare, three tiny rooms and an attic space for sleeping.  It had no water, or toilet, or electricity.  He put a porch on it though.

> He ran an electrical cord from my trailer to his shack for electricity, and he ate his meals and showered at my trailer.

*Id*. at 14-15.  Thereafter, he withdrew deeper and deeper into his life in his shack:

> He became more and more reluctant to leave our family's property and he became more and more paranoid, although plenty of friends visited him so you could never call him a loner....

> Friends brought him food and went grocery shopping for him.

*Id*. at 15.

Gelene profoundly believed – as did many other family members – that the incident in which Rocky Eales was killed never needed to happen, because Kenny's family would have helped Kenny turn himself in if they had known the police had a warrant for his arrest:

> I never believed there would come a time when the police would come in the middle of the night to arrest him.  If they had told me or my other family members or even Kenny, we would have brought him to the jail or the police could have come out and taken him to the jail without any trouble at all.  They had come on his property before and sat on his porch talking to him and inspected his rifles, which were legal, and Kenny never gave them any trouble.

*Id*.

Kenny's former wife, Abby Stiles, understood Kenny better than anyone and saw the struggle in him between mental illness and a very kind, good hearted nature:

> I learned in my marriage to Kenny that Kenny had mental problems.  He would do bad things and then have remorse.  He did things on impulse and then regretted them....

> Kenny was like a manic depressive, hot one minute and depressed and even immobile the next.  He would work hard and then sleep all the time.  I don't know if he was doing drugs then, but I think he did the drugs to make himself feel better, because otherwise he would just sleep.  Kenny did not act the way normal people act.  Kenny took good care of his own stuff, but then he would destroy it too when he just got swept away in his emotions.

2255 Motion, Exhibit 103 at 2.

40

135

Kenny's and Abby's relationship was defined by his mood swings:

> I spent 14 years trying to keep up with his mood swings.  There were times he
> could be good, but every time I got a new car he would tear it up; every time I got
> new furniture he would tear it up.  He would get very upset over any little thing,
> but then he would try so hard to be good.  He would mow the lawn and take care
> of things and fix things and it would last for two months....

*Id*. at 2-3.  But despite these swings and their painful consequence, Abby continued to love

Kenny:

> I got the stay-away orders, not to just keep him from trying to come back, but to
> keep me from going back.  He would come back crying, begging me to take him
> back, so remorseful.  He could be good as he could be – he would go the extra
> mile, trim the tree if it meant my taking him back, but he could not keep it up.

*Id* at 3.

Reiterating Gelene's and Ernie's observations about Kenny's inability to live

independently and how difficult life was for Kenny, Abby summed up hers and Kenny's

relationship:

> The whole 14 years we were together, I was always trying to help Kenny.  I felt
> like we were more like brother-sister than wife and husband because I was always
> bailing him out of trouble and taking care of him.  He was never able to take care
> of me....
>
> I was the only stable thing he ever had in his life.  I kept him together.  Without
> me, he could not function.

*Id*. at 2, 4.  This last observation, that Abby was "the only stable thing he had in his life," has

even more meaning in light of Abby's observation about Gelene: "Gelene was always cussing

Kenny and had a terrible relationship with him.  I never saw Gelene treat her other sons the way

she treated Kenny."  And yet, after Abby's and Kenny's divorce, Kenny had only his mom to

return to for the support he so desperately needed just to live from one day to the next.

Ernie, Gelene, and Abby have identified the threads that ran through Kenny's life – the

suffering he experienced as an infant that went beyond normal, the profound neglect of his father and his mother, the cruelty of his mother especially directed toward him, the sweetness that he embodied and expressed to others, his extreme restlessness and activity, his emotional sensitivity, his sudden and extreme mood shifts, his paranoia and fear, his struggle to understand life, his dependence on others to help him day-to-day and to help him know what to do. Together, these threads revealed the "sweet individuality of [his] face," *To Create an Enemy*, and the "myriad loves, hopes, fears that play[ed] through the kaleidoscope of [his] heart." *Id.* These threads were seen and noted by many others in Kenny's life, each of whom could have helped the jury understand that Kenny Barrett was far better, and far more deserving of compassion, than the violent, dangerous, non-empathetic person portrayed by the prosecution.

Kenny's maternal aunt, Phyllis Crawford, says that her sister Gelene, Kenny's mom, is "a bona fide alcoholic, although she denies it." 2255 Motion, Exhibit 91 at 2.

> Gelene, who is three years older than I am, started drinking in high school. She used to beat me up with her fists. Now, Gelene drinks beer from the time she gets up until she goes to bed. She screams all the time, and I can hear it in my house after it's gone through her walls and across our yards. She cannot control her emotions. Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated.

*Id*. Gelene also suffered from depression during Kenny's early childhood and neglected him when he needed her the most. As recounted by Kenny's paternal aunt, Linda Riley,

> In 1964, when Gelene left Ernie for the first time, she brought the two babies back to Oklahoma. It was the winter and she moved in with my mom and dad.
>
> Mom worked and daddy would go squirrel hunting every day. Gelene would stay in bed all day with Richie, every day. She did not get out of bed until my mother had dinner on the table. Kenny was three and a half. He would cry when my mother went to work. My mother showed Kenny so much love and tenderness. Kenny would just wander around in the cold house alone without a wood fire to warm the place....

> Gelene was depressed.... She ignored Kenny. He was neglected. I would come out there and find him with a cold fried egg in his hand. I would take him to my apartment and run the tub – he was filthy. He would play with the Ivory soap like it was a boat. I got him a haircut. Kenny had nothing to eat. Gelene would not even get out of bed to feed him.

*Id*., Exhibit 87 at 5.

Together, Gelene's alcoholism, depression, and betrayals by Ernie led her to take out her frustrations and emotions on Kenny. "Kenny was just yelled at by Gelene. Kenny's whole life she screamed at him." *Id*. at 6. As Phyllis Crawford observed,

> Gelene never gave Kenny a kind word, and she screamed at him over anything. When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room. My husband Roger and I went over to their house and talked to Kenny. Kenny told us that he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream.

*Id*., Exhibit 91 at 1-2. Gelene's younger brother, Mark Dotson, saw the same thing:

> Gelene was constantly bickering with Kenny, which must have been humiliating for him. He stayed away from the house a lot just to stay away from Gelene. My dad said sometimes when Gelene would get going he would put a hand over her mouth to shut her up. She was the worst with Kenny.
>
> .... Gelene clashed with Kenny and took her frustrations with life and with Ernie out on Kenny. She put him down over insignificant things. Gelene was always lit up from alcohol. When she got going and her face got red, you had better watch out. It was extremely unpleasant, especially because she always targeted Kenny.

*Id*., Exhibit 98 at 2. The long term consequences for Kenny were concisely summed up by his maternal aunt, Carolyn Joseph:

> Kenny had low self-esteem. He would duck his little head a lot and act like he was not as good as those around him. His mother put him down a lot rather than build him up and make him feel good about himself. I do not think you should condemn a child and Kenny had a lot of that....
>
> Kenny did not have much of a chance. Gelene always took out on him the frustrations she had about Ernie. Kenny was defenseless. The damage gets done and there's not much to do about it. A child should not have to be raised like that.

43

*Id.*, Exhibit 78 at 3.

While Kenny's mom actively hurt Kenny emotionally over many years, the absence of Kenny's father also scarred Kenny. Kenny's paternal grandmother, Ada Mae Barrett, is often thought of as the adult within Kenny's family who loved him the most. She took care of him as a child when his mom went out to party. *Id.*, Exhibit 86 (Declaration of Kenny's paternal cousin Kathy Trotter) at 2. As Linda Riley, Kenny's paternal aunt, explained, "[Kenny] didn't have anybody looking out for him after my mom [Ada Mae Barrett] died." *Id.*, Exhibit 87 at 6. The consequences of Ada Mae Barrett's death were thus devastating for Kenny:

> Kenny's grandmother, Ada Mae, adored him. When she died in 1976 Kenny was just 14. It was as if the only adult who ever cherished him had gone. The family split apart when she died, but for Kenny it was worse because his father had recently deserted him at the age he most needed direction.

*Id.*, Exhibit 86 at 3. The pain of Ernie's desertion was captured poignantly by Ernie's brother Isaac Barrett:

> Once when Ernie came to visit after his divorce from Gelene, Ernie was driving a new Corvette and he passed his children on the street. I was riding with him. The children were wearing worn, ragged clothes. I said, 'Let's stop; there's your kids." He refused to stop and said, "All they want out of me is money." I think Kenny was 15 or 16 then. It was right pitiful. The less Ernie wanted Kenny, the more Kenny worshipped [sic] him.

*Id.*, Exhibit 84 at 5.

The familial environment in which Kenny was raised was one that would have been hard for anyone to survive intact. However, Kenny had a special vulnerability – he was at once extremely hyperactive and emotionally sensitive. As his aunt Phyllis Crawford recounted,

> We knew that Kenny was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily.

44

139

*Id.*, Exhibit 91 at 1.  Kenny's aunt Carolyn Joseph described the same little boy fluctuating between two extremes:

> Kenny was more than a hyper child.  I think he had ADD or something; you could not pin that boy down.  He was the most hyper kid I have ever seen.  I remember when he was little, he was so loving.  He would climb up on you and put his arm around your neck and say, "I love you."  He was the sweetest little boy, and then he would change to being loud and kicking for no reason I could see.

*Id.*, Exhibit 78 at 2.

This "hyper child" who was also "the sweetest little boy" grew into a man whose life was also defined by extremes.  As Abby Stites explained, he was "hot one minute and depressed and even immobile the next."  *Id.*., Exhibit 103 at 2.  "He would get very upset over any little thing, but then he would try so hard to be good."  *Id.* at 2-3.  As Gelene explained, "Kenny had terrible mood swings and periods of depression that lasted for days.  He withdrew – anything upset him – and he was paranoid about everything."  *Id.*, Exhibit 97 at 13-14.  His paranoia included a belief that "satellites were watching him."  *Id.*, Exhibit 75 (Declaration of Kenny's neighbor Alvin Hahn).  Insight into how helpless it felt to be Kenny Barrett could have been provided by his maternal second cousin Brandy Hill, who also suffers mood swings:

> My mood swings make it hard on my husband.  I used to attack him, kind of the way Kenny and Abby fought.  Kenny told me to stop beating on Shawn because it was embarrassing.  On more than one occasion, I took all of Shawn's belongings, piled them outside, and burnt them.  This parallels Kenny's behavior toward Abby, both to lesser and greater degrees.  My husband understands now that my mood swings control me more than I control them.

*Id.*, Exhibit 77 at 1.

Notwithstanding Kenny's mental illness and the deep emotional trauma that has scarred his life, Kenny Barrett is not at all without empathy, kindness, and generosity.  As Linda Riley recalls, "Kenny was the cutest boy.  He had the sweetest smile.  He loved everybody."  *Id.*,

Exhibit 87 at 6.  As Kathy Trotter recalls, "[Kenny] could be very kind and generous and he could be very agitated and mischievous.  I had to be a tough girl to hang with him, but it was something I wanted to do.  I love Kenny; I care about him."  Kenny's maternal cousin and neighbor, Janice Sanders, recounts two stories that reveal Kenny's profound empathy and concern for others' well-being:

> Kenny would never hurt anyone or anything.  In fact, one of Kenny's dogs once attacked a poodle I owned and Kenny put his own dog down for doing it although he loved that dog, and he couldn't have been more apologetic.  The vet fixed my dog up fine, but Kenny often asked about the dog and never stopped saying how sorry he was that it happened.[ ]

> About two weeks before the raid, Kenny drove up to everybody's property in the area and told them that he had lost a gun while riding in a pasture on his four-wheeler.  He was warning folks to keep their children out of that pasture until he found his gun so that they would not pick it up and accidentally hurt themselves.

*Id.*, Exhibit 85 at 1-2.  Kenny's aunt Phyllis Crawford described Kenny succinctly but with the insight into him that many others had: "Kenny tried to stay close to home, always worked hard and took pride in his work.  He would give you the shirt off his back if you needed it."  *Id.*, Exhibit 91 at 3.  Capturing Kenny's pride in and the quality of his work – coupled with the poignant insight that even in his adulthood Kenny's mother could not see him in a positive light – Kenny's maternal uncle Mark Dotson observed, "Kenny was the best shade tree mechanic you can find, but you would never know it from Gelene."  *Id.*, Exhibit 98 at 2.

Another side to Kenny that the defense and the government never helped the jury understand was that, like many of us, Kenny searched for meaning in his life.  Nona Reich Kenny's paternal second cousin, captured both Kenny's search for meaning and his genuine gratitude for another person's wise counsel with the following story:

> The last conversation I had with Kenny was in 1995-96 when my husband at the

time and I visited Gelene. Kenny came by to visit. It was clear to me that Kenny was studying life and thinking deeply, trying to figure things out. I remember he said, "Aunt Nona, how do you know there's a God?" I took him to the window and said, "See how beautiful that is." He agreed but asked me "Why can't we see God?" I tried to explain to him that the Bible says that if we worship God in spirit that we will see His truth. I explained God was just like the wind. We can see the leaves blowing in the wind but we cannot see the wind. God is the same thing as the wind in those leaves. Kenny told me that no one had ever explained it that way to him before, in a way that he could understand it. He thanked me.

*Id.*, Exhibit 101 at 2-3.

Recalling that his father was helping him work on his car the night of the police raid because "[h]e wanted me to return to school," *id.*, Exhibit 96 at 1, Toby Barrett – Abby's and Kenny's son – put his father's mental illness, traumatized childhood, and humanity into perspective:

My father was too much of a mess to raise me, and I felt resentful toward him for a while, but I do not anymore. I know he has some problems inside his head.... When I was a teenager, before the incident, I knew something was wrong with him because he had mood changes that were not normal. Looking back over the years, I can see he was not dealing with a full deck. My dad could be in the best of moods one minute, then the worst.

Dad was a very paranoid person. He was also a very scared person – he always thought people were out to get over on him and, of course, the police out here were crooked.... Dad stopped leaving his property and we had to bring things to him. Even though he was scared, he was not dangerous and I was not afraid of him. Dad did the best he could. I have a lot of fond memories of being with Dad, going canoeing, and helping him work on cars. He had a tender side to him. These memories help offset the pain of having a dad with mental problems.

*Id.* at 2.

A reasonable mitigation investigation would have led trial counsel to discover the foregoing thoroughly humanizing information about Kenny Barrett – which on its own, without more, would have fully countered the government's death penalty narrative, and with reasonable probability led to the imposition of a life sentence. However, the foregoing information would

47

142

also have called for mental health evaluation of Mr. Barrett.  That evaluation would have provided an even greater understanding of the difficulties that Kenny encountered in daily life and a particularly helpful understanding of why he reacted as he did when felt threatened by the raid against him.

The evaluation by Dr. George Woods, 2255 Motion, Exhibit 117, relying on and incorporating the neuropsychological assessment by Dr. Myla Young, *id*., Exhibit 89, would have allowed the defense to establish that Kenny suffered from

a.      Bipolar Disorder, for which he was genetically vulnerable due to a long history of Bipolar Disorder in both his mother's and father's families, *id*., Exhibit 117 at 7-11;

b.      Post-Traumatic Stress Disorder (PTSD), due to severe neglect and abuse by his alcoholic and mentally ill parents, *id*., at 11-12, a severe beating by the police when he was 17 years old, and a near-death experience by shooting himself in the chest with a shotgun; and

c.      damage to the frontal cortex of his brain resulting in a Dysexecutive Syndrome, *id*., 24, due to exposure *in utero* to his mother's use of alcohol, his mother's "unpredictable beatings and his parents frequent domestic disputes that were known to end in violence," numerous head injuries in which he lost consciousness, and the use of alcohol, marijuana, and other drugs beginning at the age of 11 or 12 when the frontal lobe development of the brain is just beginning,  *id*., at 12, 14, 15.

Clinically, these disorders presented as "cognitive functioning and behavior that is severely compromised by overlapping symptoms of depression and mania – diagnostic of Bipolar and secondary to PTSD – and impairments in higher cortical regions necessary for inhibition, reasoning and judgment."  *Id*.

These overlapping disorders fully explained all the difficulties Kenny experienced in his

48

143

developmental period, early adulthood, and later adulthood – in learning and keeping up in

school, being married, keeping a job, and living independently, as well as the acute mental health

crises that led him to be hospitalized twice. *Id*. at 16-18. "In the years and months preceding the

commitment offense," *id*., at 19, these disorders accounted for Kenny's growing difficulties and

turning inward as he

> expressed increasingly paranoid thoughts, experienced intolerable irritation at
> perceived surveillance and harassment by law enforcement authorities and felt
> threatened by illicit drug users and dealers, some of whom he suspected of being
> police informants. He disclosed to others his belief that he was being monitored
> by satellites and became increasingly withdrawn until he stopped leaving his
> mother's property. He relied on others to shop and run errands in the nearby town
> for him. At other times, he believed the unidentified aircraft "hovering" over his
> property were "dirigibles," similar to "the ones the U.N. uses," and reinforced
> with "steel plates on their bottoms." He described shooting at one and causing it
> to flee.

*Id*., at 19.

> These overlapping disorders also explained how and why the capital crime took place:
>
> Mr. Barrett's chronic PTSD became acutely activated by the event leading to his
> arrest. As previously noted, Mr. Barrett had multiple individual stressors which
> qualified for a stressor that was life threatening. Over the course of his life, he
> had been beaten multiple times by his caregiver and the police. He had shot
> himself in the chest, at close range, almost losing his life.
>
> He was hypervigilant, having put up a sign warning people to stay away. He was
> extremely anxious and paranoid. Delusional thinking and perceptual disorders,
> beliefs that helicopters were hovering, watching him, eroded Mr. Barrett's reality,
> raising his traumatic thinking to a psychotic level.
>
> Mr. Barrett's paranoid ideation, hyperreactivity, and affective dysregulation
> primed his inability to accurately perceive the nature of the police officers'
> assault on his property, particularly the inability to recognize the action as a
> police action and to gauge his reaction to unfolding events.
>
> Studies of the acutely traumatized have found that those individuals who are at
> increased risk for chronic PTSD are relatively more likely to experience a more
> severe acute emotional reaction. This includes not only the intensity of emotions
> such as fear, anxiety, and/or despair, but also dissociative experiences and

cognitive disruption.

Mr. Barrett's chronic PTSD had now become acute, faced with a new stressor. Acute symptoms of increased startle response, hyperreactivity, fight or flight, impaired judgment, and ruminative thinking, and affective dysregulation all came into play; and were compounded by his psychiatric disorder.

Mr. Barrett's bipolar disorder was, at this point in his life, at its most extreme.  He was profoundly depressed, and had been in a particularly steep downward spiral since his divorce.  Mr. Barrett had become increasingly withdrawn, by everyone's account.  He reported to me that the years from his divorce and the raid on his home were the darkest of his life.  He was self medicating more heavily than ever before.

Mr. Barrett's flight of ideas, racing thoughts, irritable mood, and paranoid ideation augmented his affective dysregulation, hyperreactivity, and exaggerated startle response, setting the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer.

*Id*., at 26-27.

The effect of all these disorders on Kenny were distilled in an incident that occurred about two years before the raid.  As recounted by his aunt Phyllis Crawford,

Kenny was never able to be independent as a grown man.  His emotions got in the way of his being able to live too far from home.  As an example, a couple of years before the incident, Kenny had run to my house in tears, crying, "The laws are after me.  They're coming!  What should I do?"  I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did.  Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.

2255 Motion, Exhibit 91 at 2-3.

Because they knew Kenny, understood him, and had compassion for him, Kenny's mom and her sisters tried to help him not long before the raid, worried that something unfortunate might soon happen.  As Carolyn Joseph recounted, however, their efforts went unheeded:

Kenny was going downhill, and because I have experience with bipolar disorder I recognized some symptoms in Kenny.  I thought if he stopped using drugs, he

50

145

could improve.  Gelene and I met with Kenny in my kitchen to talk about how to get him help.  We called the sheriff, asking for help but received none.  I am sure that Kenny hallucinated and believed that he was constantly under surveillance.  I called the authorities because I thought they could get Kenny off the drugs, that they would get him help.  I wanted them to get him in a drug program.  I did not want them to hurt him.  They would not do anything to help.  I made my last call to OSBI just days before the raid on Kenny's property, but I never got past a dispatcher.

*Id*., Exhibit 78 at 4.  As reiterated by his aunt Phyllis, who had helped Kenny peacefully be arrested when he was in a panic two years earlier,

This whole tragedy with the police officer did not have to happen.  Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house and told him that he had to come with me and be arrested and he would have come.

*Id*., Exhibit 91 at 3.  And as his aunt Ruth Harris observed,

This entire tragedy could have been avoided if the police had let the family know they needed to arrest Kenny.  Kenny is a very kind person who does not want to bring harm to others.

*Id*., Exhibit 93 at 3.

Finally, had defense counsel conducted a reasonable mitigation investigation, they would have removed one of the most dehumanizing tools in the government's arsenal – the devastating comparison of Kenny to his successful brother Steve, who grew up in the same household.  Steve himself could have provided much information as to how he was far more fortunate than Kenny:

The biggest factor missing in Kenny's life that was present in mine is I benefitted from the guidance, support, and structure of an extended family that Kenny never experienced in his developmental period.  Kenny's developmental period was filled with chaos, instability, and neglect, the natural result of two parents who were alcoholic and who put their own needs and wants ahead of their children....  I was literally surrounded by aunts, uncles, cousins, and most importantly for me, my maternal grandparents, Hugh and Hattie Dotson.

Another critical factor is that our father walked out and abandoned Kenny when Kenny most needed him.  Kenny idolized Ernie, while I barely knew him.  My parents divorced when I was two, and my two brothers and I stayed with our

mother.  I could tell when Ernie visited how much Kenny missed him, that Kenny
was enamored.  Kenny made sure to stay in close proximity, while I would
wander off.  Ernie was a god to Kenny.  I have no recollections of being close to
my father in childhood....  My father's absence in my childhood and adolescence
was replaced by attentive older men and women relatives who rooted me in their
love and guidance.

Finally, while I was able to succeed academically, Kenny had great difficulty with
his education. Kenny failed in school, but I was one of those lucky students who
was always good at school and a decent athlete.

*Id.*, Exhibit 99 at 1-2.

Both Abby Stites and Kenny's aunt Carolyn Joseph could have added another extremely

important distinction: Kenny was subject to far greater abuse from Gelene than were her other

sons.  As Abby recounts, "Gelene was always cussing Kenny and had terrible relationship with

him.  I never saw Gelene treat her other sons the way she treated Kenny."  *Id.*, Exhibit 103 at 1.

Similarly, Ms. Joseph recalls:

Kenny did not have much of a chance.  Gelene always took out on him the
frustrations she had about Ernie.  Kenny was defenseless....  It was easier for
Steve because Gelene treated him better than Kenny.  She babied him when he
was little, spoiled him rotten, even in high school.  She took him and gave him
whatever he wanted.

*Id.*, Exhibit 78 at 3.

The differential toll that the differential treatment of Kenny and Steve exacted on Kenny

is also reflected in the seriousness of the mental disorders that afflicted Kenny – all in some way

arising from or exacerbated by the unique ways in which Kenny was treated.

### *Conclusion*

For these reasons, my opinion is that Mr. Barrett's trial counsel failed not only to conduct

a reasonable investigation of mitigation, they failed altogether to conduct any mitigation

investigation of the "relevant facets of the character and record of the individual offender" that

52

147

constitute "compassionate or mitigating factors stemming from the diverse frailties of humankind." *Woodson v, North Carolina*, <u>428 U.S. at 304</u>. As such, their performance was constitutionally deficient. Had they conducted a constitutionally adequate investigation, they would have found an abundance of evidence with which to rebut the government's efforts to dehumanize Mr. Barrett and to move the jury to sentence Mr. Barrett to life.

Under penalty of perjury, I declare the foregoing to be true, this 25th day of March, 2017.

_____

Richard H. Burr

149

# EXHIBIT 219

Case 6:09-cv-00105-09P-cv-00105-RAW 7B-15umeFil409n2USFIDeEd3/29/17 07/01/201013 Page 1 of 13

**DECLARATION OF RICHARD H. BURR**

Richard H. Burr, under penalty of perjury, declares the following:

*Qualifications and Experience of Declarant*

1.      I am an attorney in private practice in Houston, Texas.  My practice has been devoted entirely to the trial, appellate, and post-conviction representation of defendants in capital cases since 1979.  I have represented persons in well over one hundred capital cases in twelve states and in the federal courts during this time.  Although my work has been heavily oriented toward post-conviction and habeas corpus proceedings, I have been trial counsel in three capital prosecutions, including *United States v. Timothy James McVeigh*, No.  96-CR-68 (D. Colo.) (the Oklahoma City bombing case), where I was lead counsel for the penalty phase and for penalty-related work.  I have argued two capital cases in the Supreme Court of the United States, *Ford v. Wainwright*, 477 U.S. 399 (1986), and *Selvage v. Lynaugh*, 494 U.S. 108 (1990), and served as co-counsel on two others, *Hitchcock v. Dugger*, 481 U.S. 393 (1987), and *Tennard v. Dretke*, 542 U.S. 274 (2004).

2.      Because of my experience, I have been retained by the Office for Defender Services of the Administrative Office of the United States Courts, along with eight other similarly experienced attorneys, to serve through the Federal Death Penalty Resource Counsel project as an advisor and consultant to court-appointed and federal defender attorneys engaged in the defense of capital cases in the federal courts.  Through this project, I work extensively with counsel appointed to represent people charged in federal capital cases.  In a report by the Subcommittee on Federal Death Penalty Cases of the Committee on Defender Services of the Judicial Conference of the United States, FEDERAL DEATH PENALTY CASES: RECOMMENDATIONS CONCERNING THE COST AND QUALITY OF DEFENSE REPRESENTATION (May, 1998) (hereinafter

"Judicial Conference Recommendations") – which was adopted by the Judicial Conference – the work of our project was found to be "essential to the delivery of high quality, cost-effective representation in death penalty cases...." *Id.* at 50.

3. I have submitted several other declarations to the Court regarding Mr. Barrett's case. In the declaration dated March 3, 2009, I recounted my contact with trial counsel for Mr. Barrett in my role as resource counsel.

### *Referral Questions and Response*

4. Mr. Barrett's current attorneys have asked me to address the government's assertion that defense counsel in this case were not under a duty to investigate or present mitigation evidence. Mr. Barrett's current counsel informed me that Roger Hilfiger and Bret Smith have made the following statements in relation to the penalty phase of the trial:

> Mr. Barrett did not want the defense to "beg for his life" during the penalty phase of the trial. He did not want the outcome of the case to hinge on personal sympathy for him.

> Mr. Barrett did not want the mitigation case to dwell on his childhood. He also wanted to minimize the amount of testimony elicited from his relatives, particularly his son, mother and ex-wife, though he understood that decision could work to his detriment.

Mr. Barrett's current counsel have asked me whether I was aware of Mr. Barrett's counsel ever having similar concerns at the time of trial, and how I would have advised trial counsel if they had asked me for assistance regarding this alleged position of Mr. Barrett.

5. As I stated in my previous declaration in this case, I spoke with John D. Echols about this case beginning in October 2004. At the time Mr. Echols was emphatic about the need to secure enough mitigation investigative and expert resources to develop mitigation fully. I communicated on the phone and through e-mail with Mr. Echols on several occasions from

<center>2</center>

October 2004 through April 2005. The topics of those discussions included the need to investigate Mr. Barrett's background and mental health issues. Mr. Echols never indicated that Mr. Barrett disapproved of any form of mitigation investigation.

6.      As I said in my previous declaration, neither Mr. Hilfiger nor Mr. Smith ever approached me for assistance as resource counsel in Mr. Barrett's case. My only contact with Mr. Hilfiger after Mr. Echols was relieved was in late August 2005. I sent an email to a federal death penalty defense list serve requesting information on turnaround time for payment of CJA 30 and CJA 31 vouchers. On August 29, 2005, Mr. Hilfiger responded with information concerning his experience on such time. I emailed him back asking him to bring me up to date on the case and offering my assistance. However, I never heard back from Mr. Hilfiger.

7.      If Mr. Hilfiger or Mr. Smith had contacted me and made the statements quoted above, I would have told them clients often express concerns like that at some point in time, and they most often get over it. While the statements attributed to Mr. Barrett would have confirmed my concerns that Mr. Hilfiger and Mr. Smith lacked the death penalty experience and history of quality work that is called for in federal death penalty trials, reaching out to me for help in working with Mr. Barrett would have been a sign of dedication. However, in the context of what occurred earlier in the case, and later, the quoted statements tend to confirm the concerns Mr. Echols expressed to me regarding Mr. Hilfiger's lack of involvement in the work on the case that was ongoing prior to his withdrawal.

8.      If Mr. Hilfiger or Mr. Smith had contacted me regarding the statements in their declarations, I would have advised them, if the statements were made prior to or during the investigation, that Mr. Barrett should be advised that the first step is to learn what his family knows about his history. After we learn from them, a decision can be made about who should

3

152

testify. It may be unnecessary for specific family members to testify. Such an explanation often satisfies the client's concerns sufficiently to enable the investigation to move forward. In this case, it appears from Mr. Hilfiger's declaration that he had the cooperation of Mr. Barrett's family, and he had "Mr. Barrett's medical, educational and mental health records." That is, Mr. Hilfiger appeared to have the ability to conduct an investigation that would allow him to explore various options for trial and explain those options to Mr. Barrett so that he could make an informed decision. If Mr. Hilfiger had responded to my offer of assistance, I would have advised him that he should follow the leads he had. I also would have noted that early in 2005, in *Rompilla v. Beard*, 545 U.S. 374 (2005), the Supreme Court found ineffective assistance of counsel where the defendant at times had been "uninterested in helping" and "even actively obstructive," 545 U.S. at 381, but a wealth of mitigation evidence was available from another source the defense attorneys failed to explore, 545 U.S. at 390-93.

9. If Mr. Barrett's trial counsel had informed me that Mr. Barrett's statements were made after the investigation, and before the presentation of evidence, I would have asked them what other avenues they explored for presenting Mr. Barrett's life history, such as the use of a mitigation specialist with qualifications to testify as an expert or the use of a mental health professional. I also would have asked whether the attorneys had presented these possibilities to Mr. Barrett. The declarations of trial counsel do not suggest they took any of these steps.

10. When Mr. Barrett's current counsel informed me about the statements of trial counsel, my initial reaction was, "that's death penalty defense 101." By this I meant that every experienced capital defense attorney knows defendants sometimes express feelings like those attributed to Mr. Barrett. The ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases that were revised in 2003 specifically refer to the phenomenon suggested

4

in the statements counsel attribute to Mr. Barrett. The Commentary on Guideline 10.5 offers a variety of responses to such concerns. I will address those responses in later paragraphs. At the outset, it is essential that counsel must assure his client that his views count, and will be considered, but that the first priority is to investigate, to learn what the story is, and later to decide who will testify and what the mitigation case will be.

11. This common-sense practice is codified in Defense Standard 4-5.1(a) of the ABA Criminal Justice Standards which provides that a defense attorney should discuss the risks of different strategies only "[a]fter informing himself or herself fully on the facts and the law." Standard 4-5.2 explains that decisions about what evidence should be presented are for the attorney to make.

12. While reports of capital defendants not wanting certain types of mitigation to be investigated or presented are not uncommon, it is uncommon for an experienced or skilled capital defense attorney to feel the scope of his work must be limited by statements like those attributed to Mr. Barrett. As the commentary to ABA Guideline 10.5 says, "Often, so-called 'difficult' clients are the consequence of bad lawyering – either in the past or present. Simply treating the client with respect, listening and responding to his concerns, and keeping him informed about the case will often go a long way towards eliciting confidence and cooperation." I do not mean to imply that Mr. Barrett was a "difficult" client. Nothing from my experience working with Mr. Echols suggested Mr. Barrett was difficult, and the statements attributed to him by Mr. Hilfiger and Mr. Smith do not suggest he was difficult to work with. On the contrary, both Mr. Hilfiger and Mr. Smith stated in their declarations that Mr. Barrett "was very involved in his defense," and cooperated with them.

13. The statements attributed to Mr. Barrett are more indicative of a problem with

5

counsel than a defendant who is opposed to mitigation evidence. Defense counsel who are familiar with mitigation explain to their clients early on that mitigation does not involve begging for the defendant's life or relying on sympathy. Begging for mercy is not allowed in federal death penalty cases and a "generic" plea for mercy has been found by the Supreme Court to be evidence of ineffective assistance of counsel. *See Williams v. Taylor*, 529 U.S. 362, 369 n.2, 397-98 (2000) (majority opinion quoting closing argument and mitigation evidence not presented); *id.* at 415 (O'Connor, J., concurring) ("The consequence of counsel's failure to conduct the requisite, diligent investigation into his client's troubling background and unique personal circumstances manifested itself during his generic, unapologetic closing argument, which provided the jury with no reasons to spare petitioner's life").

14. The *Williams* decision reflects a capital defendant's common misunderstanding of mitigation evidence that can be, and routinely is, dispelled by investigation, thereafter allowing counsel to present the evidence, even in cases where a defendant expresses reluctance to "beg" for "sympathy" or rely upon his family to get sympathy from jurors. Mitigation evidence involves humanizing the defendant, making his life experiences familiar to jurors, and helping jurors to see that the life they are being asked to end amounts to more than the crime of conviction. Mitigation also involves offering the jury an explanation for the defendant's actions. Nearly every initially-reluctant capital defendant allows this evidence to be presented.

15. It is not necessary for the jury to see either the defendant's background or an explanation of his actions as grounds for sympathy. Experienced capital defense counsel know it is not even desirable to present mitigation as a basis for sympathy because such a strategy is likely to be ineffective or backfire by causing jurors to weigh sympathy for the victim against sympathy for the man who took his life. Both the experience of capital trial attorneys and

scientific studies of how capital jurors decide whether to vote for life or death show that mitigation succeeds when jurors are able to identify with the defendant because of something in his background, or to understand his actions as something other than the product of a will to do harm. *See*, *e.g.*, Stephen P. Garvey, *Aggravation and Mitigation in Capital Cases: What Do Jurors Think?*, 98 Colum. L. Rev. 1538 (1998); Garvey, *The Emotional Economy of Capital Sentencing*, 75 N.Y.U. L. Rev. 76 (2000).

16. Defendants to whom mitigation has been explained do not object on grounds of "begging" or "sympathy" because they understand, if they have the capacity to understand, that mitigation is mostly telling their story. The statements attributed to Mr. Barrett about dwelling on his childhood and not relying on members of his family reflect a similar lack of insight into capital defense norms of practice particularly in that Mr. Hilfiger and Mr. Smith do not indicate that they made any effort to correct the misunderstanding. Dwelling on a defendant's childhood could be seen as a plea for sympathy. That kind of one dimensional penalty phase case is not the norm in federal death penalty cases. Presenting the defendant's childhood experiences as a reason for his later use of drugs, or a contributing factor in a mental disorder, enables jurors to understand his criminal behavior as more than the isolated decision of the defendant not to comply with social norms. That kind of multi-dimensional understanding of mitigation is fundamental to death penalty defense practice.

17. The norm in federal death penalty cases tried in 2005 was to follow the 2003 ABA Guidelines and employ a mitigation specialist to gather information about a defendant's family history over several generations, review that information with experts qualified to identify facts relevant to mitigation, and integrate the themes developed through that process into a consistent strategy for both phases of trial. The process of developing a trial strategy includes

taking into account the client's concerns. However, as noted, advising a defendant without conducting an investigation is unprofessional conduct.

18.    Recognizing that appeals to sympathy, relying solely upon family witnesses, and dwelling on a bad childhood are ineffectual strategies, the ABA Guidelines codified the norm in capital defense practice of involving experts in the process of gathering background information, interpreting it, and presenting it to jurors. Mitigation specialists are trained and experienced at avoiding problems like those implied in the statements attributed to Mr. Barrett. In 1998, the Subcommittee on Federal Death Penalty Cases, Committee on Defender Services for the Judicial Conference of the United States, published recommendations including the use of a mitigation specialist. The Subcommittee recognized that mitigation specialists have the training and knowledge necessary to perform "work which otherwise would have to be done by a lawyer, rather than an investigator or paralegal." (Judicial Conference Recommendations.)

19.    Mitigation specialists can explain the different purposes of mitigation evidence, and, as the Subcommittee found, they are relied upon in some cases to testify about family history, educational records, work and military records. The Commentary to ABA Guideline 4.1 (The Defense Team and Supporting Services) adds the following:

> Mitigation specialists possess clinical and information-gathering skills and training that most lawyers simply do not have. They have the time and the ability to elicit sensitive, embarrassing and often humiliating evidence (e.g., family sexual abuse) that the defendant may have never disclosed. They have the clinical skills to recognize such things as congenital, mental or neurological conditions, to understand how these conditions may have affected the defendant's development and behavior, and to identify the most appropriate experts to examine the defendant or testify on his behalf. [¶] Perhaps most critically, having a qualified mitigation specialist assigned to every capital case as an integral part of the defense team insures that the presentation to be made at the penalty phase is integrated into the overall preparation of the case rather than being hurriedly thrown together by defense counsel still in shock at the guilty verdict.

8

157

20.     "Without exception, the lawyers interviewed by the Subcommittee stressed the importance of a mitigation specialist to high quality investigation and preparation of the penalty phase. Judges generally agreed with the importance of a thorough penalty phase investigation, even when they were unconvinced about the persuasiveness of particular mitigating evidence offered on behalf of an individual defendant." (Judicial Conference Recommendations.)  I am aware that Mr. Echols requested funding for a mitigation specialist in this case, and Judge Payne authorized some funds.  If Mr. Hilfiger and Mr. Smith did not make use of those funds, they missed an opportunity to avoid the problem they seem to be attributing to Mr. Barrett.

21.     Misunderstandings, or a lack of understanding, like what Mr. Hilfiger and Mr. Smith have stated Mr. Barrett expressed, were seen often enough in cases that the ABA provided guidance for counsel faced with clients who truly oppose the presentation of mitigation evidence.  The Commentary on Guideline 10.5 (Relationship with the Client) provides the following advice:

> Some clients will initially insist that they want to be executed as punishment or because they believe they would rather die than spend the rest of their lives in prison; some clients will want to contest their guilt but not present mitigation. It is ineffective assistance for counsel to simply acquiesce to such wishes, which usually reflect overwhelming feelings of guilt or despair rather than a rational decision.  Counsel should initially try to identify the source of the client's hopelessness.  Counsel should consult lawyers, clergy or others who have worked with similarly situated death row inmates.  Counsel should try to obtain treatment for the client's mental and/or emotional problems, which may become worse over time.  One or more members of the defense team should always be available to talk to the client; members of the client's family, friends, or clergy might also be enlisted to talk to the client about the reasons for living; inmates who have accepted pleas or been on death row and later received a life sentence (or now wish they had), may also be a valuable source of information about the possibility of making a constructive life in prison.

These guidelines and advice to counsel suggest a much more serious problem than what trial counsel imply in the statements they attribute to Mr. Barrett.  Even so, it does not appear that

9

Mr. Hilfiger or Mr. Smith took any of the recommended steps that are commonly used by capital defense counsel in similar situations.

22.     As I have already indicated, neither Mr. Hilfiger nor Mr. Smith contacted me to seek assistance with the problem they are alleging in their declarations. Assuming their statements are true, and inferring that the statements they attribute to Mr. Barrett influenced their investigation or trial strategy, their decision not to seek assistance confirms the sense I had in 2005 that Mr. Hilfiger was not interested in obtaining assistance from resource counsel.

23.     I am aware that Mr. Echols received some funding for a psychiatrist or psychologist to be employed as part of the mitigation investigation. Mr. Hilfiger's declaration suggests that he did not retain a mental health professional either to talk with Mr. Barrett about the penalty phase, or to testify in mitigation. Mental health professionals, like those I recommended to Mr. Barrett's trial counsel, can advise counsel about what is significant in records or the accounts of family members, and rely upon hearsay when testifying to their opinions. Experienced capital defense counsel understand, and are able to explain to their clients, that dwelling on the past is not the point, and the accounts of family members can be presented through experts who, in any case, are able to place a traumatic or disadvantaged background in an objective context.

24.     Reliable information about a defendant's family, medical, and social history is one aspect of the forensic mental health evaluation typically carried out in a capital case. *See* Liebert and Foster, *The Mental Health Evaluation in Capital Cases: Standards of Practice*, 15 AM. J .FORENSIC PSYCHIATRY 43 (1994). Mr. Hilfiger's declaration indicates that he had access to information about Mr. Barrett from family members and records gathered during Mr. Echols' representation, but he does not indicate that he provided those records to any experts, or

10

explained to Mr. Barrett that expert testimony was available.

25.    I also read in the declarations of Mr. Hilfiger and Mr. Smith that they felt they had a good rapport with Mr. Barrett, and that they met with several members of Mr. Barrett's family.  The declarations do not indicate that Mr. Hilfiger or Mr. Smith spoke with Mr. Barrett or his family about the penalty phase, or any concerns they had that Mr. Barrett's views would be detrimental to their efforts.  As the commentary above states, an attorney who feels his client is reluctant to allow mitigation evidence to be investigated or presented should speak with family members about the problem.

26.    In conclusion, if Mr. Barrett told his attorneys not to present his background to the jury because it would involve begging, dwelling on his childhood, placing his family in a vulnerable position, or an appeal to sympathy, that suggests Mr. Hilfiger and Mr. Smith either did not understand the nature or purpose of mitigation evidence, or the various methods of presenting it, or they allowed Mr. Barrett to harbor an inaccurate understanding of the penalty phase.  The declarations from Mr. Hilfiger and Mr. Smith indicate that they took none of the actions commonly taken in similar situations.  They did not speak with more experienced counsel, a mitigation specialist, a mental health professional, the court, family members, or anyone else who could have explained the process of developing mitigation evidence in a way that diffused the alleged concerns.  The declarations also do not offer any reason for failing to take the steps outlined in the ABA Guidelines including those that were available under the court's March 2005 funding order.

Under penalty of perjury, I declare on June 27, 2010, that the representations made in the foregoing declaration are true and correct.

11

Richard H. Burr

161

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner, | ) | |
| **v.** | ) | |
| | ) | Case No.   CIV-09-105-JHP |
| UNITED STATES OF AMERICA, | ) | |
| | ) | Date:   3/30/2017 |
| Respondent. | ) | |
| | ) | Time:   10:35 a.m. -  12:12 p.m. |
| | ) | 1:06 p.m.  -  2:53 p.m. |
| | ) | 3:15 p.m.  -  3:21 p.m. |
| | ) | |

## MINUTE SHEET - EVIDENTIARY HEARING

| Steven P. Shreder, Judge | D. Graham, Law Clerk | K. McWhorter, Reporter |
|---|---|---|
| | K. Davis, Law Clerk | FTR - Courtroom 4 |
| | T. Stephens, Deputy Clerk | |

**Petitioner present with Counsel:**  David B. Autry, Tivon Schardl, and Joan M. Fisher
**Counsel for Respondent:** Jeffrey B. Kahan and Christopher J. Wilson

**MINUTES:** Government's evidence commences. Petitioners evidence to resume in June 2017.

ENTERING ORDER continuing evidentiary hearing until 6/12/2017 at 9:00 a.m. (SPS)

Total Time: 3:30

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

### GOVERNMENT'S UNOPPOSED MOTION TO SEAL EXHIBITS

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order sealing exhibits 1 through 8 and 10 of its Motion to Compel (Doc. 401).

### PROCEDURAL HISTORY

Following the denial of § 2255 relief in this capital case, the Tenth Circuit Court of Appeals denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to determine whether trial counsel ineffectively failed to investigate and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015). During the course of the hearing, which commenced on March 27, 2017, the government received several reports that had been sent by the defense to a witness to refresh his recollection. The reports prompted the government to file a motion to compel discovery (Doc. 401), and it attached the documents as exhibits.

On April 5, 2017, a Court employee notified the government that the exhibits to the motion contained personal data identifiers that should have been redacted. The government now

1

moves to seal the offending exhibits – numbers 1 to 8 and 10.  It will move, under separate cover, to file substitute exhibits with appropriate redactions.

When reached by e-mail, Barrett's attorneys did not opposed this motion.

## **ARGUMENT**

### **THE COURT SHOULD SEAL THOSE UNREDACTED EXHIBITS THAT VIOLATE THE PRIVACY POLICY**

As noted, the government erroneously attached nine exhibits to its motion to compel that included personal identifying information of certain individuals.  In view of the Court's prohibition on such public filings, the government now moves to seal the documents.

Local Civil Rule 5.3 requires litigants to "refrain from including, or shall partially redact where inclusion is necessary . . . personal data identifiers."  Having inadvertently violated the rule, the government seeks to remedy the situation and respectfully urges the Court to seal those exhibits to Docket entry 401 that contain personal identifying information.  The government will offer substitute exhibits with appropriate redactions under separate cover and apologizes for an inconvenience occasioned by its oversight.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to grant the

unopposed motion to seal exhibits.

Dated: April 5, 2017:

> Respectfully submitted,
>
> DOUGLAS A. HORN
> Acting United States Attorney
> Eastern District of Oklahoma
>
> /S/ *Christopher J. Wilson*
> CHRISTOPHER J. WILSON, OBA # 13801
> Assistant United States Attorney
> 520 Denison Avenue
> Muskogee, OK 74401
> Telephone: (918) 684-5100
> FAX: (918) 684-5150
>
> /S/ *Jeffrey B. Kahan*
> JEFFREY B. KAHAN, PaBN #93199
> Trial Attorney, Capital Case Unit
> U.S. Dept. of Justice
> 1331 F Street, NW; 6th Fl.
> Washington, DC 20530
> Telephone: (202) 305-8910
> FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on April 5, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit

4

166

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S UNOPPOSED MOTION TO FILE SUBSTITUTE EXHIBITS**

---

**COMES NOW** the United States of America, by and through undersigned counsel and respectfully moves this Court to issue an order filing the redacted attachments to this document as substitutes for exhibits 1 through 8 and 10 of the Motion to Compel (Doc. 401).

**PROCEDURAL HISTORY**

Following the denial of § 2255 relief in this capital case, the Tenth Circuit Court of Appeals denied relief as to all guilt-phase issues, but remanded for an evidentiary hearing to determine whether trial counsel ineffectively failed to investigate and present evidence about Barrett's background and mental health.  *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).  During the course of the hearing, which commenced on March 27, 2017, the government received several reports that had been sent by the defense to a witness to refresh his recollection. The reports prompted the government to file a motion to compel discovery (Doc. 401), and it attached the documents as exhibits.

On April 5, 2017, a Court employee notified the government that the exhibits to the motion contained personal data identifiers that should have been redacted.  The government

1

167

separately moved to seal the offending exhibits – numbers 1 to 8 and 10 – and now moves to file substitute exhibits with appropriate redactions.

When reached by e-mail, Barrett's attorneys did not oppose this motion.

**ARGUMENT**

**THE COURT SHOULD PERMIT THE FILING OF SUBSTITUTE EXHIBITS THAT COMPLY WITH THE PRIVACY POLICY**

As noted, the government erroneously attached nine exhibits to its motion to compel that included personal identifying information of certain individuals.  In view of the Court's prohibition on such public filings, the government now moves to file substitute exhibits that comply with the local rule.

Local Civil Rule 5.3 requires litigants to "refrain from including, or shall partially redact where inclusion is necessary . . . personal data identifiers."  Having inadvertently violated the rule, the government seeks to remedy the situation and respectfully urges the Court to permit the filing of the redacted documents attached to this motion as substitutes for those in those appended to the motion to compel that include personal identifying information (Exhibits 1 to 8 and 10).

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to grant the unopposed motion to file substitute exhibits.

Dated: April 5, 2017:

Respectfully submitted,

DOUGLAS A. HORN
Acting United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on April 5, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit

4

170

171

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 1

(Redacted)

CONFIDENTIAL ATTORNEY WORK PROJECT

To:      Kenneth Barrett file
From:  Roseann Schaye
Date:   August 22, 2000
Re:                   T█ W█ B█
DOB:
SSN:
Address:

Phone:

Following a telephone call to T██, he agreed to meet with me at my hotel room. He was dressed casually and neatly. He seemed eager to talk with me and spent at least an hour discussing his family. The following are my impressions of this visit.

T██ was very forthcoming in talking about his family and his life. He was educated in the public school system in Sallisaw, OK. His mother had him held back in the first grade. He continued through the 11th grade, but dropped out rather than finishing high school. He is aware that he can focus better now than he could while he was in school and talked about getting his GED and even attending junior college. He is no longer using drugs for which he seemed proud.

T██ talked at length about his father and that he has a great deal of love for him. He also discussed how strenuous it was living with his father. T██ was glad when his parents divorced when he was about 14 years old. His father was often very difficult to understand. T██ described a man who has dramatic mood fluctuations and who showed behaviors consistent with an individual who has severe emotional responses to child abuse. His father was very unpredictable. T██ believes that his father may have some type of chemical imbalance. T██ mentioned that his father was a patient at the state psychiatric facility on two occasions.

During the interview, T██ said that he understood that his father's childhood was quite unhappy. Kenneth's father disciplined him severely. T██ thinks that may be part of the reason that Kenneth is so unpredictable. T██ said that it is possible that Kenneth's father is so involved now, as he wants to try to overcome earlier problems in their relationship and perhaps guilt.

172

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 2

(Redacted)

1

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:      Kenneth Barrett file
From:   Roseann Schaye
Date:    August 23, 2000
Re:              Kenneth E. Barrett
DOB:     ▆▆▆▆.
SSN:     ▆▆▆▆▆▆▆.

Kenny Barrett remains in the Sequoia County Jail. I visited him there for 3 hours. We were taken to a small courtroom and were seated at a table there. A guard was in the room with us and remained there throughout the interview. He was within hearing distance, which definitely had an effect on the interview. Kenny did discuss some of his life with me during that visit.

In 2nd grade, the principal whipped Kenny. Even so, he liked school until about 5th or 6th grade. Kenny was also whipped as punishment by both of his parents. His father's whippings left more of an impression and he feared his father more. After he completed 9th grade in Indiana, he came back to Sallisaw, but not to school. He began working and continued using drugs. It was when Kenny was 16 or 17 that he began to use methamphetamine. He continued working and started repairing cars for friends.

When Kenny was about 13 or 14, he began using drugs both in Sallisaw and in Dunkirk where he lived for a year with his father and stepmother. Kenny said that he had to repeat the 8th grade here and was placed in a LD class and was whipped frequently by the principal. After that year, Kenny went to Indiana for 9th, and to live with his dad. He would smoke marijuana daily and drink alcohol on weekends. He thought that he began using drugs to cope better, and avoid feelings of irritability. He also was less aggravated with people. At the time, he thought drugs helped him with his short temper. He does say that currently, his sobriety is positive. He now believes a major difference in being high and being sober is that his temper is more controlled when he is sober.

As a youth, Kenny described a typical day as being awakened by his mother. He has no clear memory but thinks that she probably made breakfast for him and his brothers. He shared a room with Richard. They took the bus to school and would get there early enough to play basketball outside with other boys. After school, he walked home with two friends, Tommy Taylor and James Rowe. Mother was not at home when Kenny got there. The only teacher that Kenny recalled was his auto mechanics teacher in Indiana. During his 9th grade year in Indiana, Kenny had difficulties getting along with his stepmother, Dianne. He found her too controlling. He says that he was raised around guns and hunted with his father. He has continued to hunt and enjoys it. He missed his father when his father left the family. It was very difficult because his father hardly visited. Recently, Kenny did not see his father for 5 or 6 years before his arrest. He is aware that he harbors some resentment toward his father.

When Kenny was 16 or 17, he was arrested for a traffic-related offense and taken to the sheriff's office. He was making a phone call and ended up getting beaten by the police and deputies. Apparently the beating was very bad and his mother called the FBI to investigate. There were two people that were helpful and forthcoming about this: Mike Brewer, a medic and Meredith Chase, a dispatcher. Kenny believes they may have lost their jobs over this.

Kenny married Abby when he was 18 and they remained married for 14 years, but the relationship was fraught with problems. He believes that they were both too young, but she was pregnant with T▆▆▆  He was unfaithful to Abby and she would leave him. Then he would beg her to return. It was during this time when Kenny tried to kill himself and nearly succeeded. He was intoxicated and went to his mother's and got a rifle. He put it to his chest and leaned on it and fired. He was placed in a psychiatric facility after he recovered physically but it was a short stay. They placed him on Elavil for a while. Kenny stated that he was not sure why he tried suicide. He was intoxicated at the time and tended to have a very depressed type of anger when he drank. Soon after this, Kenny left Abby again. Finally she refused to have him return

and he moved in with his mother. T█████ came to visit on and off. Abby and Kenny were married 14 years when they were divorced. Kenny stopped drinking alcohol following the divorce.

According to Kenny, he was hospitalized in psychiatric facilities two additional times. Once he was court ordered into Eastern State Hospital in Venita, Oklahoma. Another time, he felt totally overwhelmed and was fearful of what he might do. He went for help in Wagner, Oklahoma at the hospital there.

When T████ was 18, he wanted to drop out of school. Kenny and Abby agreed that T████ could move out to his father's if he agreed to finish his senior year. At that time, Kenny was a recluse as he felt harassed by the police. He said that whenever he would be seen in town, the police would pull him over and put him up against the car. Kenny decided to remain at home and friends would bring him what he needed. He built the little house that he lives in with materials he found laying around as he was not going to be caught in town again.

Kenny said that the police wanted him to make some buys from his friends which he refused to do. An hour or so before the shooting, Tony Sells brought him some red phosphorous. Earlier in the week, a special investigator from the District Attorney's Office went to Kenny's house and subpoenaed him for a delivery charge and told him he was going for arraignment. That is why he is so shocked that the police served the warrant in such a violent manner since they knew where he was.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 3

(Redacted)

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**    Kenneth Barrett file
**From:**  Roseann Schaye
**Date:**  August 23, 2000
**Re:**        Sylvia Gelene Dotson
**DOB:**
**SSN:**
**Address:**

**Phone:**

Sylvia "Gelene" Dotson is the mother of Kenneth Barrett. She agreed to be interviewed in her home which is just next door to Kenneth's house. The home is about 10 miles outside of the town of Sallisaw. She lives in a trailer that appeared to be very neatly kept. The following are impressions of that visit.

Gelene was born in Sallisaw and began and ended school in Sallisaw. The family moved frequently. She attended 1st and 2nd grades at Dwight Mission School. Stronghurst School in Albuquerque was where she attended 3rd grade. The family was in Farmington, Missouri while she was in 4th and 5th grades. She attended 4 different schools during her 6th grade year in Missouri and then Maricopa and Bakersfield, California. The family stayed at the latter through the beginning of 9th grade until they returned to Sallisaw. This is where she met her first husband. Gelene married Ernest Barrett on July 8, 1960 in Stillwell, Oklahoma. Soon after, Ernest found a job in Joliet, Illinois where the couple moved. Gelene said that while she was pregnant with Kenneth he was most active baby. She said that he never stopped moving. Kenneth was born in Joliet and was a very difficult baby. Not only was he colicky, but he was extremely active. This intense level of activity continued throughout Kenneth's childhood. As a toddler, he had to go to the hospital for several different incidences. His stomach was pumped twice when each time, he managed to climb to a top cabinet and ingest baby aspirins once and ex-lax the second time. Gelene also rushed him to the hospital when he pulled a bag of groceries off of the table and a large can fell on his head.

From the outset of Gelene's marriage to Ernest, he was unfaithful to her. This caused Gelene to leave him frequently. From Kenneth's 3rd year until his 5th, they were separated. Gelene and the boys lived with another woman who had 2 boys of her own. The parents got back together about the time that Kenneth began school. Gelene stated that he did well in kindergarten and first and he knew how to read prior to beginning school. In second grade, though when the other children were learning to read, they taught phonics and Kenneth never grasped it. He continued in school but never did as well as he had in the early years. The family moved to Stanhope, New Jersey for a few months and then to Lake Hopatcong, New Jersey when Kenneth was 8 or 9. During this time, Gelene and Ernest had an extended separation when Ernest lived with another woman. Whenever they separated, Gelene would come back to Sallisaw. The two were finally divorced in 1972 or 1973 on the grounds of adultery. Gelene and her boys returned to Sallisaw. Kenneth seemed to have a very difficult time when his parents divorced, as he wanted so much to be with his father. Unfortunately, his father had very little contact with him during that time.

Gelene believes that Kenneth became a follower with the wrong crowd in 8th grade. He lost interest in school. He failed the 9th grade. To repeat that year, he went to live with his father and stepmother in Dunkirk, Indiana. It is unclear whether or not he passed the year. When he returned from his father's, he was very rigid and unwilling to participate in the family structure. He enrolled in school but perhaps because he did not understand social cues, did not fit in. Gelene then told him he had to get a job, which he did at the local racetrack. He stopped working there as soon as school got out.

Something quite traumatic happened to Kenneth, according to his mother, when he was 16 or 17. He was arrested for "hot rodding" and while in jail, was severely beaten by the police. He was never taken to a doctor, however the mother reported this to the FBI. She believes some of those trying to help Kenneth lost their jobs over the incident.

CONFIDENTIAL Attorney Work Product
Sylvia "Gelene" Dotson

By the time Kenneth was 18, he was working on pipelines and oil rigs and seemed to keep these jobs more readily then he later would. He impregnated and married Abby at this time. Gelene knows little about their marriage, but she believes that it was very unhappy. On one occasion, Kenneth became so filled with despair over Abby leaving him again, that he tried to kill himself and nearly succeeded. He shot himself just missing his heart. Gelene blames Ernest for this as he allowed their youngest son, Stephen to have a gun at her house which was generally not allowed. She believes that if no gun were there, none of this would have happened. Gelene does find Kenneth to have intense emotions and dramatic mood fluctuations. Most of the time when Abby and Kenneth would separate, he would return to Gelene's home.

Gelene is currently working as a Habilitation Trained Specialist for People Incorporated. She took this part time job after Kenneth was arrested because she could not keep her mind on her work. She has no significant other in her life, however she has had two additional serious relationships. She married Paul Dudley in 1982 or 83, but the marriage only lasted 3 years. Following their divorce, he was murdered in Las Vegas.

Most of Gelene's family lives nearby. Her father died 3 or 4 years ago. Her mother is still living in a nearby trailer. Gelene has family members who have a history of mental illness and are currently medicated. Gelene's father was a very heavy drinker and may have been an alcoholic.

2

178

179

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT     )
    )
      Petitioner,          )
    )       Case No. 09-CV-00105-JHP
   v.              )
    )
UNITED STATES OF AMERICA,    )
    )
      Respondent.       )

## GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S DISCOVERY ORDER

Exhibit 4

(Redacted)

1

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**    Kenneth Barrett file
**From:**  Roseann Schaye
**Date:**  August 24, 2000
**Re:**    ███████████████████████████


**DOB:**  █████████████████████████
**SSN:**  

Ernie Barrett and I met in his mobile home, which was very attractive and extremely well kept. He had been using his weight bench outside when I arrived and asked if I could interview his wife first, which I did. Ernie brought us both iced teas at the onset of that interview. When Doris and I had completed our interview, Ernie then came in and we talked. The following are my impressions of that interview.

When Kenny was born, Gelene worked at Walgreen's and a neighbor cared for Kenny. Gelene stopped working after a couple of years and stayed home. As a child, Kenny was extremely hyperactive and into everything. Ernie described him as a beautiful child who was intelligent but never was interested in school. When Kenny was in elementary school in New Jersey, a teacher spanked Kenny so often that Gelene went to the school to protest. Kenny was a fearless child. He was also moody and would take his model cars and destroy them. Kenny was very interested in guns as is Ernie. He taught the boys to shoot when they were very young. Ernie believes that Kenny is the finest shot in the county as is Ernie. He and the boys would go hunting and fishing whenever they had a chance. Ernie taught Kenny to swim by throwing him in deep water.

Regarding discipline, Ernie said that Gelene was the primary disciplinarian. She would whip the boys with a belt and usually because she was mad, rather than as a consequence. He describes Gelene as having a very bad temper and that she yelled a lot. He thinks that she is bitter and resentful. Ernie could not recall disciplining the boys but imagines he probably spanked them. Ernie admits that he was not faithful to Gelene and that he gambled a lot, however still was responsible. When Gelene joined the Jehovah's Witnesses, Ernie said he was driven away from her. He does admit slapping her twice which blackened both of her eyes and broke her nose.

They were separated several times and Gelene would return to Sallisaw to her family. The divorce totally devastated Kenny. He and Gelene had separated many times previously. Ernie believes that the way that the boys found out that their parents were divorcing was that Gelene never went back to Ernie. Ernie would take the boys deer hunting and fishing after the divorce during his visitation. Ernie admits he had a problem with alcohol. He says that he drank at bars and would go home to sleep. He is aware that this may have had some impact on the boys. Ernie believes that the boys' maternal grandfather started them on mescaline, which was their first hallucinogen.

Kenny lived with Ernie and his wife at the time, Diana Kay Wilson Barrett, who was a teacher. Kenny did well that year. Stephen would stay with Ernie during the summers regularly. Kenny didn't live with his father again until he was an adult. The first time Kenny separated from Abby, he asked his dad if he could live with him and if Ernie would help get him a job. Ernie got Kenny a job in the glass plant where Ernie was working. Kenny was a very good worker, but worked for only two months and quit during the middle of the shift to return to Sallisaw. He did this on another occasion as well. Ernie and Kenny had a rift in their relationship, partly because of Kenny's lifestyle. Ernie made it clear that if Kenny were sober, he would be happy to have a relationship. This didn't occur until Kenny was arrested. The way Ernie and Doris found out about the shooting was by a neighbor calling them when it was being televised on the news.

Ernie Barrett
Page 2

Ernie spoke briefly about his own childhood. He was pulled out of school to go to work. His father was a violent drunk. Ernie left home at age 16 because his father came home one night and picked up a heavy file and laid Ernie's shoulder open with it. Ernie is the oldest child although his parents lost 3 children at birth prior to Ernie. The next child is Ike, then Linda (Riley) and Gary. Other than the alcohol, he recalls no other substance abuse or mental illness in his family. He believes that Gelene's sister, Carolyn has had some mental problems.

**IN THE UNITED STATES DISTRICT COURT FOR THE**
**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT )
                            )
     **Petitioner,** )
                            )      Case No. 09-CV-00105-JHP
 **v.** )
                            )
**UNITED STATES OF AMERICA,** )
                            )
     **Respondent.** )

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S**
**DISCOVERY ORDER**

Exhibit 5

(Redacted)

1

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:       Kenneth Barrett file
From:   Roseann Schaye
Date:    September 4, 2000
Re:                  Phyllis Crawford
DOB:
SSN:
Address:

Phone:

On August 23, 2000, I interviewed Phyllis Crawford, Kenneth's maternal aunt. Her husband Roger was present during the interview. They invited me into their trailer, which is nicely kept and appeared to be in good repair. It was obvious that they took very good care of their home. The following are impressions of my visit.

Phyllis said that she and her siblings were raised on the property where they currently live. She recalled that her father was a heavy drinker and generally wanted to fight when he was inebriated. The father's relatives were drinkers as well. According to Phyllis, her paternal uncle had a nervous breakdown, just as two of her sons have had. One of her sons uses drugs and the other has struggled with a drinking problem.

According to Phyllis, her mother raised her children to be very closed. They rarely discussed their lives with others. Although Phyllis says that much of this rearing does apply to her life, she also believes that she has overcome much of it. Her mother disapproved of her father's drinking which he would hide from her. One of the mother's cousins suffered a brain tumor. Phyllis recalls no other mental problems on that side of the family.

In describing Kenneth as a child, Phyllis said that he was extremely hyperactive. She believes that his parent's divorce was very difficult for Kenneth. She thinks that Kenneth wanted to be very close to his father, that he needed his father. Unfortunately, the father was rarely available and Kenneth missed him a great deal. Phyllis said that Kenneth still affects her as an 11-year-old boy. He would always act as though he was very tough, but would break down and cry easily. She has never been afraid of Kenneth. Her belief is that Kenneth's interest in guns is due to his father who is also a gun collector. She also believes that Kenneth is an excellent mechanic, another shared interest with his father.

In regards to the night of the shooting, Phyllis and her husband were roused by the police and ordered out of their home with their hands raised. Phyllis was told to call Gelene and tell her to also come out with her hands raised. They would not give them information about either Kenneth or T███. They soon found out that T███ was safe. They also told me that the police beat Kenneth following the shooting, mostly kicking him in the head. They said that he looked terrible following the beating.

# IN THE UNITED STATES DISTRICT COURT FOR THE
# EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S DISCOVERY ORDER

Exhibit 6

(Redacted)

1

185

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:     Kenneth Barrett file
From:   Roseann Schaye
Date:   October 5, 2000
Re:            Kenneth E. Barrett

███████████████████████████████████████

Kenny Barrett is still being held in the Sequoyah County Jail. We were allowed a two-hour meeting in the small courtroom. A guard was present and within hearing distance throughout the interview. Kenny was dressed in the usual jail attire. He looked very pale, almost pasty. This is likely the result from being denied any daylight for the 14 months he has been imprisoned here. The following are my impressions of that visit.

Kenny's memory is poor, but I asked him to recall what he could, that might be helpful to his case. He recalled a few teachers' names from his schooling in Sallisaw. They are Miss Dodson who taught him 8th grade, Dale Brown who was a PE teacher and Butch Bagley who was his study hall teacher. Kenny believes his mother may recall more names of school personnel that might remember Kenny.

Kenny talked again about his beating when he was about 17 or 18 year of age and held at the Sequoyah County Jail. He remembers that a woman named Duanna White saw him after the beatings.

Some memories that Kenny has of his parents when they were together was of them fighting. Kenny believes they were fighting about his mother's drinking. He also recalls that once his mother left his father for good, they struggled because they were very poor. That made it difficult in school, as he looked different from other children, as did his brothers. He said that his mother was a hard worker, but with 3 sons, it was very difficult to make ends meet.

When Kenny was about 15, he stayed with his Aunt Elnora Long for about a year. He remembers getting along very well there. After his stay with her, however, he was locked up for 3 months. Unfortunately, Kenny's memories are minimal of that time including why he was staying with her to begin with.

Kenny suggested that I get in touch with Thomas Hines who is a builder. Kenny worked for him for a few years and he might be a helpful source of information.

Kenny is still struggling with a skin rash that he believes is caused by a bullet in his hip. According to Kenny, several doctors have said that it needs to come out. Kenny also wants a bond hearing.

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

Exhibit 7

(Redacted)

1

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**    Kenneth Barrett file
**From:**  Roseann Schaye
**Date:**  October 5, 2000
**Re:**          Sylvia Gelene Dotson
**DOB:**
**SSN:**
**Address:**



**Phone:**

Gelene agreed to meet with me a second time. We met in her neatly kept trailer home. This is located well outside the Sallisaw town limits and next door to Kenny's home. Phyllis Crawford lives on the other side of her trailer. The following are my impressions of that visit.

Gelene told me that all of the boys were born in Joliet, Illinois. When Gelene was pregnant with Kenny, she worked at Walgreen's as a waitress. This continued after Kenny's birth. Lily Garrison cared for Kenny when Gelene was working. Gelene did smoke cigarettes and she drank alcohol in moderation during her pregnancy. Kenny began grade school in Culbertson Elementary in Joliet. He completed 1st and 2nd grades in Plainfield, Illinois at Plainfield Elementary School. The family moved to New Jersey and Kenny did his 3rd grade at Stanhope Elementary in Stanhope, New Jersey. Kenny attended 4th, 5th and part of 6th grades at Lake Hopatcong, New Jersey before returning to Sallisaw.

When Gelene was raised, the family moved a lot. She remembers when her mother was pregnant with Carolyn and the other girls were babies. Gelene was a caretaker of Carolyn and shared a bed with her as they were growing up.

When Gelene was 6 years old, the family moved from Sallisaw into Dwight Mission where her father was the caretaker. There she attended kindergarten through 2nd grade. The school had 6 grades in 1 room and 2 grades in another. The family then moved to Albuquerque, New Mexico where Gelene attended Stronghurst Elementary for the 3rd grade. The family moved again when the father became the caretaker for Presbyterian Orphanage in Farmington, Missouri. Gelene's family lived on a farm at the orphanage and she attended school there from 4th grade through 6th. The family then moved three times in Gelene's 6th grade year. She went to school in Blunt, Oklahoma, Shafter and Maricopa Schools near Bakersfield, California. They remained in Maricopa from the end of 6th through half of 9th when they returned to Sallisaw. Gelene graduated from Sallisaw in 1958. Even with the moves, Gelene always liked school and did well. She remembers playing after school with the girls who lived in the facilities where her father worked. She recalled playing with Lucy Smith at Dwight Mission School.

The children all had chores, but there was no hard work. They helped on the farm. Father disciplined by spanking with a belt and then apologizing after.

# IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

## GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S DISCOVERY ORDER

Exhibit 8

(Redacted)

1

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:     Kenneth Barrett file
From:   Roseann Schaye
Date:   October 6, 2000
Re:          Ernie Barrett

DOB:
SSN:

I met with Ernie for a second visit at his home in Salpulpa. He was home alone so that we had a private interview. Ernie is hard of hearing and reminded me of that at the beginning of our conversation. The following are my impressions of that visit.

Ernie gave me a brief family history of his side of the family. He talked of being very poor when he was young, sometimes going without shoes. Ernie's father was a violent alcoholic who frequently went after family members. Ernie remembers his father trying to stab him on a couple of occasions. The children would run out of the house and hide in the field behind. His father would dry out for 2 or 3 months and then he'd binge for days. Ernie said that his father had only a 3rd grade education and probably drank in an attempt to escape his responsibilities. Ernie's mother stayed home with the children while Ernie was growing up.

Ernie was born near Sallisaw. Soon after the family moved to Marble City where he went to kindergarten and 1st or 2nd grade. Then the family moved to Aikins where Ernie attended 3rd through 8th grade. The family moved 4 different times during this time period, but Ernie remained in the same school. He attended the beginning of his freshman year at Central High School in Akins and then transferred to Sallisaw where he went through the 11th grade. He met his first wife, Gelene in high school. Ernie said that he was very athletic in school and good academically. He even won awards in history and math. After the 11th grade, Ernie moved to Tulsa and learned cabinet making prior to joining the Marines. Following his armed services career, he worked in a glass factory. He was exposed to arsenic and asbestos daily for many years.

Ernie's relationship with Gelene was fraught with difficulties. Gelene drank heavily, much like his father had. They argued about this. Ernie admits that he was unfaithful. He saw his relationship as increasingly troubled. He admits that one time he hit Gelene so hard that he blackened both of her eyes. This was after she had thrown knives at Ernie and cut the front of his shirt. Ernie also became very upset with Gelene when she refused to allow Stephen to have a blood transfusion that was needed following his birth. This was due to her religion, Jehovah's Witness. Ernie felt that she would lose her son for this. The religion definitely got in their way. When Ernie married Doris, Gelene gave Ernie Stephen's birth certificate. She had stricken her own name and wrote Doris' in its place.

Ernie recalled that Kenny would take new toys apart and put them back together when he first received them. He was a good child. There was one time that Kenny stole a real silver dollar daily from Ernie for candy. That is the only time Ernie recalls Kenny doing something bad. Kenny did live with Ernie for a year, which allowed them to have more time together. When Kenny got involved in drugs and alcohol, Ernie was fearful. He told Kenny that as long as he was using, Kenny was no longer welcome in his home. Asked why he is involved now, he said it was his conscience that got him involved.

189

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA


KENNETH EUGENE BARRETT      )
                            )
      Petitioner,           )
                            )      Case No. 09-CV-00105-JHP
  v.                        )
                            )
UNITED STATES OF AMERICA,   )
                            )
      Respondent.           )


**GOVERNMENT'S MOTION TO COMPEL COMPLIANCE WITH THIS COURT'S
DISCOVERY ORDER**

_____


Exhibit 10

(Redacted)


1

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**      Kenneth Barrett file
**From:**   Roseann Schaye
**Date:**    October 4, 2000
**Re:**            Linda Riley
**DOB:**
**SSN:**
**Address:**

**Phone:**

I met with Linda Riley, Ernie's youngest and only living sister, in Ft. Smith, Arkansas.  We met in her home which was a very nicely kept middle class house.  The neighborhood was also well-kept and very attractive with flowers on a boulevard, etc.  Linda was very forthcoming and the following is my assessment of the interview.

Linda was very involved with Kenny the first time that Gelene left Ernie and came back to Sallisaw. Gelene and the two boys lived with Kenny's paternal grandparents.  Gelene was extremely depressed at that time, according to Linda.  She said that Gelene was unable to get out of bed for the entire winter. Richard was about 9 months old at that time.  He would stay in bed with his mother all day.  Often, no one changed his diapers.  Kenny wandered around the house being mostly on his own.  According to Linda, her father was a terribly abusive drunk who spent many days passed out.  He was at his worst when Kenny lived there.  Sometimes the grandfather wouldn't put any wood in the stove so the house would be very cold and the grandfather would be asleep all day.  Kenny's paternal grandmother was away at work all day. Kenny would try and make cereal for himself and he was only 3 years old at the time.  Linda described Kenny as being very sad and lonely, even pitiful.  She thinks that even then, Kenny felt he was disposable.

Kenny was underweight and Linda's mother took him to a doctor.  They discovered a heart murmur.  The doctor had her change his diet and Kenny started to do better.  Unfortunately the grandfather was verbally abusive toward his wife in front of Kenny.  He would tell her that he was going to kill her; that he would cut her head off, and he would do some things such as puncture her tires on her car.  Kenny heard this abuse on a deadly basis.

Oftentimes, Linda would come and take Kenny to her house and bathe him and cut his fingernails and toenails as no one else did.  She would wash his clothes.  She would occasionally keep him overnight. Linda wondered if Gelene even knew that he was gone.  Linda also would change Richard's diaper which clearly needed changing.  Linda's younger brother Gary was still living at home at that time.  He stayed away as much as possible.  Most outstanding to Linda was how much this little 3 year old boy missed his father.  Kenny would stand on a kitchen chair because he could see out the window.  He would tell Linda that his daddy was going to come and get him.  Eventually Ernie came and took Gelene and the boys back to Illinois.

When Gelene came back the next time, she would take time to do projects with the boys.  She did scream at them a lot, according to Linda.  When Ernie and Gelene were together, they screamed at each other in front of the children.  Gelene would not follow through on her threats.  Kenny was much more distant when the family came back the next time (without Ernie).  He was also rowdy at that time.

Linda remembers that Kenny had his own room and would proudly display his models that he made. Stephen, who was just a toddler would come into Kenny's room and destroy them.  Kenny would ask his mother to get Stephen out of his room.  She'd yell at Stephen but take no action.  Linda never saw Kenny as mean or aggressive.  She could not recall a time when Kenny took anything away from his brothers. Linda thinks now that Kenny had no control over anything.  Kenny wanted to live with his father who didn't want him.  Kenny could never live up to Ernie's expectations.  She believes that is probably why he

**Confidential Attorney Work Project**
Linda Riley

got involved in drugs. It gave him a sense of control. She remembers that he would sometimes destroy his own models with a hammer. She believed that this too, was to master some control in his life.

Gelene became a Jehovah's Witness prior to Stephen's birth. Because of her beliefs, Gelene refused to sign paperwork for Stephen to get a transfusion although he was Rh factor. Linda thinks that finally destroyed the marriage of Ernie and Gelene as Ernie believed that she would sacrifice her own child rather than get him the medical care he needed. Yet Ernie left the boys in Gelene's care. Ernie would return to Sallisaw and sometimes not see the boys. Linda thinks that the boys knew he was there. Ernie did always pay child support, although sometimes late. Gelene would give the boys each a few dollars when she got Ernie's check so that they could buy whatever they wanted. The boys knew that Ernie was paying support. Gelene did try to stop the boys from getting Christmas gifts but Linda told her that the family members were going to give the boys gifts.

When Kenny was a young teenager, he was very difficult to control. As a result, Gelene refused to have him live in her home. For a few months, Kenny lived with his great aunt, Elnora Long. She is Linda's mother's half sister. Even then, Ernie did not take Kenny.

When Linda's mother died, all hope for the boys died too, as far as Linda is concerned. The paternal grandmother was the best advocate the boys had. After Linda's mother died, she was out of touch with her brothers for awhile. Linda describes her father as having mental problems. He was a very mean man.

Linda and Gelene were good friends during the times that they both lived in Sallisaw. Gelene liked to party. They had a lot of fun together. When Linda moved to Ft. Smith she returned only one time to see Gelene. Linda feels very uncomfortable in Sallisaw. She believes that there is too much dishonesty at high levels.

When Ernie got involved with Doris, she pushed her own children on Ernie, and pushed his away. When Kenny was using heroine, instead of being there to help him, Ernie kicked Kenny out of his life at that time. This was probably not the first time that Kenny felt that he had been kicked out of his father's life. Linda believes that Kenny never thought that Ernie loved him. Additionally, Richard was Gelene's clear favorite and she often scape-goated Kenny.

2

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:      Kenneth Barrett file
From:    Roseann Schaye
Date:    May 24th & 25th, 2000
Re:                Kenneth E. Barrett
DOB:     ███████████████
SSN:

On both May 24th and 25th, I was allowed private visits with Kenny. Initially, we began our first interview in the large courtroom, but were interrupted by a meeting and moved to one of the small courtrooms. The second day we met again in the small courtroom. Kenny was wearing the usual jail attire. During these interviews, the jailer stood outside the room with the door closed. The following are my impressions of those visits.

Kenny is very anxious to get going on his trial. He does not understand why nothing seems to be happening. On one level, he seems to understand that the length of time is helping him, however on another level, he thinks he should be out of jail and is afraid he has been forgotten. Part of the problem for Kenny is that his father has told him that both the search warrant and the no knock warrant were ruled illegal. He doesn't understand how he could still be held. He still feels quite sure that his bullet is not the one that killed the DPS officer. He has read the law books available to him at the jail and it is clear to him that in no way does his shooting constitute murder, even if it was his bullet that killed the officer. He is holding himself together by the positive belief that he will get out of jail and not serve any prison time.

We discussed who might be the snitch that the sheriff's department is covering. There were only three people at his house the night before the shooting. One was Debby Thompson who is currently in McCloud. Kenny said that he was told that she was going to set him up, but he really does not believe that it was she. He did say that she might have hidden some syringes in his house, because he was quite sure he had gotten rid of the ones that were there previously. Donna Johnson was also there and she is also in the Oklahoma Prison System, although Kenny does not know where. Finally, Scotty Spear was also there and Kenny does not know him well so there is some potential with Scotty. Kenny really wonders if there is a snitch at all. It seems to him that if there was, the police would have been more careful because they would have known that T█████was living there.

Kenny did talk about growing up and his problems with his mother. He is quite sure that she has always favored Richy. Kenny gave many examples about doing helpful things for her throughout a day, and that same night she was in his face about how he never did anything for her. Richy has, in the past, held a gun to his mother's head, but he can still do no wrong. Kenny said that his relationship with his mother has always been filled with turmoil. He believes that she resents him but is not sure why. His mother is a heavy drinker and by evening, she is an angry person. She turns her anger toward Kenny. He has had trouble with this since he was young. He recalls arguments his parents had about his mother's drinking. When Kenny was 13 or 14 years old, his mother would frequently come home after partying and awaken Kenny. She'd ask him to roll her and her boyfriend a joint and smoke it with them. They frequently got high together. Gelene came home with men but there were only a few boyfriends that she would bring home.

Kenny admitted that he would go into his room and destroy things because it gave him some sense of control. His brother Stephen was much younger and would get into Kenny's things, breaking them. Kenny would just finish the job. It also gave him some release when there was nothing else he could do. He doesn't remember ever hitting his brothers. He would break models that he built instead. It seems that there was very little structure in his life. His mother took virtually no control after his father left. Prior to that, Kenny said things were very different. His father did have control and there was structure, primarily because the boys were fearful of their father, so they followed the rules. Kenny knows that he was very hyper and constantly needed to be doing something. That's why he loves it outdoors; there is always something to do. He has always loved hunting and fishing and has been doing it as long as he can remember. These were activities that his father taught him.

194

Kenny is also a self-taught mechanic and says that he can fix anything – not just cars. When he was little and would get a new toy, the first thing he would do was to take it apart and see how it worked. Then he'd put it back together. Kenny said that his reputation in town is that if something can't be fixed, take it to Kenny and he probably can fix it. He has always been good with his hands. Even his house, which is not finished, was built with whatever materials were available, but it was built correctly.

We talked about the early abuse that Kenny experienced at the hands of the sheriff and that I had reached Meredith Chase. She was the dispatcher at the jail at that time, but has no recollection about the beating. Kenny believes that she just doesn't want to get involved. He gave me other names of people to find who did see him following the beating and will remember it.

We discussed what Carolyn Joseph had told me about trying to get help for Kenny. He says that she is remembering things that did not happen. He believes that she is "crazy" and told me that she has been hospitalized at Sparks.

Kenny's first experience with liquor was when his father brought home a bottle of Jack Daniels whiskey and cigarettes and cigars. Richard had been smoking cigarettes and Ernie thought that both boys had been smoking. In an effort to teach them a lesson, he had them drink and smoke. Kenny got high, but Richard got sick. Even so, Kenny didn't drink again for a long time. He knows that his problems with Abby were all liquor related. Kenny takes full responsibility for the demise of his relationship with Abby. He treated her badly when he was drunk. He would go out to get bread and not come back for 10 days. When he and his mother were both drinking, things would rapidly deteriorate. After he and Abby had broken up, he stopped drinking and has not had any liquor since. His methamphetamine use began as a crutch to get over Abby. The break up of their relationship was incredibly painful to Kenny. During the time of the break up, Kenny began using many drugs. Friends would help him when he was using too much.

Kenny stopped going into town because he was embarrassed by the constant harassment by the police. He was always stopped and paraded in front of oncoming traffic so that people could see that it was Kenny who had been stopped. This occurred whether or not he was the driver. When he had enough of this treatment, he withdrew and people would come to see him. The police would set up roadblocks in an effort to get Kenny, even when he had stopped going to town. Things became very bad when Kenny refused to "rat out people", which the county attorney's office had asked him to do. Kenny believes that is when the law became very angry and went after him.

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:       Kenneth Barrett file
From:     Roseann Schaye
Date:     May 23, 2001
Re:                    Sylvia Gelene Dotson
DOB:
SSN:
Address:

Phone:

This was the third interview that I had with Gelene Dotson. We met once again at her trailer outside the town of Vian. She is caring for her great nephew who is developmentally delayed. He was asleep throughout the interview. The following are my impressions of our visit.

Gelene was very frustrated that Richard had been arrested a few days prior. He was charged with possession of drugs and altering a VIN number. He does not own a vehicle, however and neither she nor Richard understand this charge. She said that the drug enforcement police came to Kenny's house and surrounded it. They had a search warrant so they went inside. After just a couple of minutes they came out and told Gelene and Richard that they had found what they wanted. Richard swears up and down that he had no drugs or paraphernalia whatsoever. Gelene implied to the police that they planted any drugs they had there. Richard had apparently thought he would be arrested on some warrants from Osage County. These address child support and visitation with his daughter. When he realized the police were after something else, he ran, but was apprehended. During our visit, Richard called Gelene to tell her that his bond was now set at $150,000. Gelene said that the article in the paper mentioned Kenny. She thinks that the reason for that is to smear the Barrett name before potential jurors for Kenny's trial.

Gelene said that she has been thinking about Kenny's early life. She recalls that he was born with some kind of bump on his head. The doctor told her that it was nothing to worry about and would be gone in a year. She couldn't recall what he had called it. She said it was gone in a year or two. She said that I might be able to get help with records by contacting her cousin, Nelda Casey who still lives in Illinois. They both used the same pediatrician so Nelda may know where to locate the doctor. Gelene also stated that she believes that Kenny is a hypochondriac. This likely is a manifestation of his need to be important with her.

Gelene told me that her great grandfather was murdered in Sequoyah County. She said that there is an article in the local newspaper that I agreed to try and locate. She said it happened in July 1925. Gelene believes that violence follows her.

Gelene said that Ernie was only violent one time with her, which was mentioned in previous reports when Kenny was about 2 years old. She does not believe that Ernie is a violent man. She said that when Ernie left her, right after Richard was born, he moved in with another woman and stayed with her for two or three years. That is when she brought Kenny and Richard to Sallisaw and stayed for 10 months. Kenny had an extremely difficult time living without his father. During the time that Ernie was living with the other woman, he continued to see the boys once they moved back to Illinois. Gelene said that Ernie could never see the boys without a woman present. If he didn't bring someone with him, he would badger her into going along.

Gelene spoke to Stephen about why he thought he was so different from Kenny and Richard. Stephen mentioned to her that they are all from the same broken home. Gelene realized that although that was true, Stephen was really not living in the family when the marriage was bad. Kenny and Richard lived through all of the stress and arguing, as well as Ernie moving out and back. Stephen grew up in a single parent household with visits to his father. Ernie did help Stephen with college, but required Stephen to pay him back. Gelene said that Ernie spends a great deal of money, mostly on himself. She believes that Ernie will always live beyond his means.

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:**    Kenneth Barrett file
**From:**  Roseann Schaye
**Date:**   October 6, 2000
**Re:**    Tracy Swearingen

Tracy Swearingen is a friend of Kenny Barrett's. She was interviewed in her trailer just outside of Sallisaw. Two friends of hers and Kenny's were present at the time. They are Kenny Howell and Valencial Reed. The following are my impressions of that visit.

Tracy had some knowledge of Kenny's life. She said that he and his brothers were left alone a lot. They were very poor and at one time went without shoes. At the same time, their father drove a corvette. Tracy believes that Kenny felt abandoned by his father who didn't want to be bothered with his sons.

When Tracy became involved with Kenny, she tried to help him work his way back into society and out of his depression. Kenny had no world outside of his front gate. His belongings were everything to him, the only things that he had. His family identified Kenny as the black sheep. His mother clearly favored Kenny's brother, Richard. Tracy helped Kenny get a job with Thomas Hines. She helped him get his driver's license and improve his relationship with T██ She believes that Kenny's self-esteem was improving just before all of this happened.

Tracy, Kenny Howell and Valencial Reed all describe Kenny as someone who was withdrawn into himself. He has always been a very good friend, however. Kenny kept his things extremely neatly. They all resent Richard who they say wants Kenny out of the way so that he can take over Kenny's life.

196

**CONFIDENTIAL ATTORNEY WORK PROJECT**

**To:** Kenneth Barrett file
**From:** Roseann Schaye
**Re:** Carolyn Joseph

**DOB:**
**SSN:**

On 2/14/01, I met with Carolyn Joseph at her home in Sallisaw. The home is in a quiet neighborhood. Carolyn is getting ready to sell her home and wants to move into the country so many of her belongings were in boxes. She had been working all day and we met in the evening. The following are my impressions of that visit.

Carolyn stated that she is very concerned about her mother who is now living with her sister Grace. Carolyn had moved into her mother's home until recently but it didn't work out because of her work schedule. Her mother could not be left alone. Grace's home is where her mother chose to live and Grace does not work outside of her home so things will work out well. Her mother will come and visit as much as she likes.

Carolyn has been very worried about Gelene. She says that Gelene drinks too much and she believes that Gelene is an alcoholic. Carolyn and her sisters have all confronted Gelene who refuses to listen. Carolyn was also surprised that during the several months that she lived with her mother, Gelene did not once come to visit. Phyllis did not visit either, but she is clearly very upset about her mother's condition. Carolyn does not understand why Gelene never stopped by.

Some time ago, Carolyn became concerned about Kenny and his drug use. Carolyn offered that she suffers with bipolar disorder and recognized some symptoms in Kenny. She said that she and Gelene met with Kenny in Carolyn's kitchen to confront him about drugs. This did not help. They called the sheriff, asking for help but received none. Carolyn is sure that Kenny did hallucinate and believed that he was constantly under surveillance. Carolyn believes this is due to his drug use and lack of help they received when they called the law enforcement for assistance. According to Carolyn, her daughter, Meredith Lawson wrote a letter to the editor of the Sequoyah Times regarding Kenny following the shooting. It will be important to get a copy of that letter. Carolyn says that it spells out how many times Kenny's family tried to get him help.

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:      Kenneth Barrett file
From:  Roseann Schaye
Date:   September 4, 2000
Re:                      Richard Barrett
DOB:   ██████████████████
SSN:

On August 23, 2000, I interviewed Richard Barrett, Kenneth's younger brother. We met at Kenneth's home, which is a tiny place. On the outside it looks like a shack, but inside it has several rooms, is carpeted and air-conditioned. The electricity comes from Gelene Dotson's house, and there is no plumbing. The following are my impressions of that visit.

Richard was not too forthcoming during our talk. He described his family as one with virtually no problems. He described Kenneth as being adventurous and liking trucks and motorcycles. Richard said his mother disciplined by yelling or whipping and eventually, used grounding to manage the boys' behavior. Richard said that he and Kenneth had physical fights on a daily basis when they were children.

Richard did admit that he himself had legal problems. He was held at a maximum-security facility for 3½ months for 2 assaults with a deadly weapon, incurring forfeiture of bail, and 1st degree burglary. Richard is very bitter about that, as he believes he was arrested for breaking into his own home. Apparently his estranged wife was living in the house and would not let him in. He said that he used his own key to get in. He was released July 31, 1999.

Richard was married at 21, however he left home at 17 for Tulsa. He worked and lived with his father until and following his marriage. He returned to Sallisaw 3 years ago. He was a truck driver for several years. Richard and his ex-wife have a daughter who Richard claims was living with him when he got arrested. He now cannot find her.

As far as his relationship with his brothers, Richard hasn't seen his younger brother in 3 to 5 years. He does not go to visit Kenneth. He sees his mother daily, as she lives just next door. He and his father are currently on poor terms.

**CONFIDENTIAL ATTORNEY WORK PROJECT**

To:     Kenneth Barrett file
From:   Roseann Schaye
Re:     Elnora Long

On 2/15/01, I met with Elnora Long who is Kenny's great aunt on his paternal side. She lives in the country outside of Sallisaw in a beautiful area. Her home is brick and decorated with a Western theme. We met for a couple of hours and the following are my impressions of that visit.

Kenny came to live with Elnora when he was 16 or 17. This was just after Kenny had been so badly beaten by the sheriff's officers. Elnora said that she got a call to come to the courthouse. Apparently Kenny was in court and neither parent had appeared. Elnora was furious with Ernie and called him to see that he came to court. It was apparent to Elnora that neither parent wanted Kenny. The judge spoke to Kenny privately and then told Elnora that Kenny had asked to come and live at her house. Elnora agreed and Kenny went to live with herself and her two children. On one occasion, Kenny's mother came to visit him. Kenny became very angry with her and was sent to his room. Other than that, Elnora found him to be respectful .

Kenny did not want to go to school so Elnora helped him get a job with the Cherokee Nation's youth program. Kenny cleaned the jail. He did well and was a good worker until he talked his mother into buying him a truck. Once he was no longer relying on Elnora for transportation, he stopped going to work at the jail. Elnora couldn't remember how long Kenny stayed with her, whether it was several months or a year. Once he got the truck, she could no longer handle him and he was taken to the sheriff.

Elnora is very irritated with Ernie. She said that when the boys were young, Ernie would come to her house and stay for a visit. He would call the boys and tell them he was coming to get them and never show up for the visit. Sometimes when Ernie visited, he would not even contact the boys. Elnora believes that Gelene often sent the boys to stay with others so that she could go out and party.

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Karl J. Saddlemire (karl_saddlemire@fd.org), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:887178@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Seal
Document(s)
Content–Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 4/6/2017 at 1:14 PM CDT and filed on 4/6/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 413(No document attached) |

**Docket Text:**
 **MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING [411] Unopposed MOTION to Seal Document [401], Exhibits 1–8 & 10 by USA. (ndd, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire    karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Karl J. Saddlemire (karl_saddlemire@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net),
Christopher J. Wilson (caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), District Judge James
H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:887226@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion for Leave to
File Document(s)
Content-Type: text/html
```

<div align="center">

### U.S. District Court

### Eastern District of Oklahoma

</div>

## Notice of Electronic Filing

The following transaction was entered on 4/6/2017 at 2:21 PM CDT and filed on 4/6/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 415(No document attached) |

**Docket Text:**
**MINUTE ORDER by Magistrate Judge Steven P. Shreder GRANTING [412] Unopposed MOTION for Leave to File Substitute Exhibits by USA. Accordingly, Exhibits 1 to 8 & 10 of Docket Entry No. [401] are hereby ordered replaced with redacted versions. (ndd, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire     karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | **CAPITAL CASE** |
| | ) | |
| Movant/Petitioner, | ) | CASE NO. CV-09-00105-JHP |
| | ) | |
| vs. | ) | **PETITIONER'S PRIVILEGE LOG** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

Comes now Movant/Petitioner, KENNETH E, BARRETT, by and through his

undersigned counsel, and respectfully submits this log of materials that were not produced in

discovery ordered under Minute Order Doc 406, and the reasons therefor.

The following document has been withheld because (a) it is beyond the scope of discovery authorized, and (b) it contains material protected by the attorney-client and work product privileges as to which there has been no waiver:

- DISC2 page 0088 is a postconviction email from Mr. Barrett's 2255 counsel Tivon Schardl to former second state trial counsel Jack Gordon dated March 3, 2009 regarding with a declaration ultimately filed in the 2255 Motion and is not disclosed because (a) it is beyond the scope of discovery authorized, and (b) it contains material protected by the attorney-client and work product privileges as to which there has been no waiver.

- DISC2 page 0091 is a cover letter from Mr. Gordon to Mr. Barrett's investigator Leonard Post dated April 13, 2016 regarding handwritten notes from the trial related to witness Higgs received during the investigation related to the preparation of a declaration to support the Application for Permission to File a Successor on May 11, 2016 [See *United States v. Barrett,* 04-cr-0115, Doc 435-12] and as such (a) it is beyond the scope of discovery authorized, and (b) it contains material protected by the attorney-client and work product privileges as to which there has been no waiver.

DATED this 21st day of April, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

PETITIONER'S PRIVILEGE LOG

*Barrett v. United States,*
OK-ED No. 6:09-cv-00105-JHP

2

205

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 21 st day of April 2017, I caused the foregoing Privilege Log to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street Oklahoma City, OK 73106
Telephone:        (405) 521-9600
Facsimile:        (405) 521-9669
E-mail:           dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor Sacramento, CA 95814
Telephone:        (916) 498-6666
Facsimile:        (916) 498-6656
E-mail:Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>             Petitioner,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>             Respondent. | CASE NO. CV-09-00105-JHP<br><br>**PETITIONER'S FOURTH**<br>**PROFFER OF TESTIMONY** |

Petitioner, Kenneth Eugene Barrett, by and through undersigned counsel, hereby proffers

the declarations of Julia O'Connell, Paul Gordon, Iva Hines, Roger Crawford, Issac "Ike"

Barrett, Judy House, and Gary Nelson. This Court previously excluded their testimony.  Order,

Doc. 361 at 10 (Gordon), 11 (Issac "Ike" Barrett), 12 (O'Connell); *see also* Docs. 368 (Motion to

Exclude Hines, Crawford, House and Nelson) with 389 (Minute Order granting the same).  Mr.

Barrett further proffers the testimony of Roseanne Schaye by declaration in lieu of live testimony

PET'R'S FOURTH PROFFER
OF TESTIMONY                              1              *Barrett v. U.S.*, CV-09-00105-JHP

because Ms. Schaye's residence in the state of Oregon is outside the reach of a subpoena.  See

Fed. R. Civ. Proc. 37(c).

The attached exhibits demonstrate that Mr. Barrett was prepared to comply with this

Court's scheduling order (Doc. 270) and minute order (Doc. 359) by presenting the witnesses'

testimony live at the hearing ordered by the Tenth Circuit.

The testimony of Julia O'Connell is relevant to the question of whether trial counsel hired

a mitigation specialist, and if so, when. *See United States v. Barrett*, 797 F.3d 1207, 1225 (10th

Cir. 2015).  During the hearing, the government adduced evidence from Roger Hilfiger

indicating that on June 29, 2005, he discussed with someone the subject of a mitigation

specialist. Mr. Hilfiger could not remember the content of the conversation memorialized in his

billing records. Federal Defender O'Connell was prepared to testify that on June 30, 2005, she

received a voice-mail message from Mr. Hilfiger in which he asked if he could consult her

mitigation specialist. To the extent the government intends to argue, based on Mr. Hilfiger's

testimony, that his billing records demonstrate that he was reasonably focused on obtaining

mitigation evidence in late June 2009, Ms. O'Connell's testimony is probative. Whereas Mr.

Hilfiger was unable to describe the content of the communication referenced in his billing

records, Ms. O'Connell could have testified that it came to nothing. Her testimony makes it more

likely that Mr. Hilfiger's conduct was unreasonable in that he did not again pursue any expert

assistance on mitigation until late August, and that was limited to rebutting future dangerousness.

*Barrett*, 797 F.3d at 1225.

If presented, Oklahoma Highway Patrol Internal Affairs Investigator assigned to

investigate the assault on Mr. Barrett's home on September 24, 1999, now retired 2d Lt. Paul

Gordon would have testified to significant factual matters including that the emergency or any

PET'R'S FOURTH PROFFER
OF TESTIMONY                                    2                    *Barrett v. U.S.*, CV-09-00105-JHP

other lights likely to have identified the intruders as law enforcement were not activated and that the Tact Team did not follow established protocol in the execution of the raid, making it likely that Mr. Barrett did not know that the vehicles invading his property were carrying law enforcement officers, an unquestionably mitigating factor that was not offered to support a sentence less than death. The testimony would have been mitigating in both as showing that the circumstances on the night of the warrant execution created by the OHP Tact Team's unprofessional and overzealous conduct, and to show that, in light of Mr. Barrett's personal background and mental health, Mr. Barrett's ability to perceive, understand, and exercise judgment was seriously compromised.

Trial counsel admitted at the hearing that he was unaware that lingering doubt was a mitigating factor.  See e.g., *Franklin v. Lynaugh*, 487 U.S. 164, 174 (1988) (finding no error in denying instruction on residual doubt, in part, because Petitioner *was allowed to introduce evidence and argue it without limitation*;) *United States v. Jackson,* 549 F.3d 963, 981 and  n.24 (5th Cir. 2008) (same).  The testimony of Paul Gordon, if presented, at a minimum, would have raised a lingering doubt as to the merits of Mr. Barrett's intention as well as his self-defense claim.

The declarations of Roger Crawford, Ike Barrett, Judy House and Gary Nelson include evidence of Mr. Barrett's genetic predisposition to mental illness and substance abuse.   The declarations of Roger Crawford and more particularly Ike Barrett show that they would have presented substantial credible evidence that Mr. Barrett's personal background and mental health was significantly impacted by parental alcoholism, neglect, abandonment and abuse.  The testimony of Iva Hines would have shown that, despite his deficits and upbringing, Mr. Barrett was a kind, generous and trusted employee.

PET'R'S FOURTH PROFFER
OF TESTIMONY                             3                    *Barrett v. U.S.*, CV-09-00105-JHP

Roseanne Schaye is a mitigation investigator hired during the state court proceedings who interviewed numerous family members and acquaintances of Mr. Barrett and discovered evidence credible leads to evidence of mitigating circumstances that would have led to a far different case in mitigation, leading in all probability to far different results. Unlike the other witnesses whose testimony is proffered here, Ms. Schaye's testimony has not been excluded by court order at the request of the government. Indeed the government seeks to rely on the fact Ms. Schaye's reports were in the defense file. Mr. Barrett proffers the declaration in lieu of live testimony of Ms. Schaye, however, because the witness is currently resides outside the reach of a subpoena. See Fed. Rule Civ. Proc. 37(c).

Ms. Schaye's proffered testimony is relevant to demonstrating (a) that Mr. Barrett fully cooperated with the mitigation investigation performed in state court, *see Barrett*, 797 F.3d at 1227-28, (b) that the fruits of that state-court investigation were fully available to federal trial counsel (as Mr. Hilfiger and Bret Smith testified), and (c) therefore, trial counsel possessed, knowingly or not, a wealth of information that could have been presented in the penalty phase. The information was completely consistent with trial counsel's so-called strategy, *see Barrett*, 797 F.3d at 1228-29, and would not have raised the currently alleged tactical concerns trial counsel mentioned in their testimony. Because Ms. Schaye was available to testify to the information contained in her reports, it would have minimized the need to call the family members as witnesses. *Barrett*, 797 F.3d at 1227. Many of Ms. Schaye's reports were admitted as evidence at the hearing. Her testimony would have explained how the information in the reports was obtained and what steps could have been taken to present the information into a persuasive penalty phase case resulting in a sentence of less than death.

The evidence proffered demonstrates that the witnesses' excluded testimony would have been admissible under the Fifth and Eighth Amendments to the United States Constitution and 18 U.S.C. § 3593(c) to show that Mr. Barrett suffered from mental and emotional problems that made him less culpable and therefore supported a sentence of less than death, or even less than life. Under the same provisions, the information would have rebutted the government's evidence in aggravation, including its evidence of future dangerousness and intent. *See*, *e.g.*, *Lockett v. Ohio*, 438 U.S. 586 (1978); *Woodson v. North Carolina*, 428 U.S. 280, 303 (1976) (invalidating mandatory death-sentencing law before *Lockett* due to its "failure to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death"); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982) ("the sentencer in capital cases must be permitted to consider any relevant mitigating factor"); *Skipper v. South Carolina*, 476 U.S. 1 (1986) (jury must be permitted to consider positive adjustment to jail after arrest); *Hitchcock v. Dugger*, 481 U.S. 393 (1987) (unanimously invalidating death sentence where jury was precluded by instruction from considering aspects of defendant's background that he offered in mitigation); *McCoy v. North Carolina*, 494 U.S. 433 (1990) (invalidating State's requirement that mitigating circumstances must be found unanimously); *id.* 494 U.S. at 442 ("The Constitution *requires* States to allow consideration of mitigating evidence in capital cases. Any barrier to such consideration must therefore fall.") (emphasis in original); *Tennard v. Dretke*, 542 U.S. 274, 284 (2004) (overturning Fifth Circuit standard for "constitutional relevance" of mitigation evidence on grounds it "has no foundation in the decisions of this Court"); *ibid.* (when Court has "addressed directly the relevance standard applicable to mitigating evidence in capital cases . . . [the Court] spoke in the most expansive terms"); *Smith v. Texas*, 543 U.S. 37, 44-45 (2004) (*per curiam*) (rejecting

"Texas nexus" requirement that mitigation be causally related to the offense); *Abdul-Kabir v. Quarterman*, 550 U.S. 233, 246 (2007) ("sentencing juries must be able to give meaningful consideration and effect to all mitigating evidence that might provide a basis for refusing to impose the death penalty on a particular individual, notwithstanding the severity of his crime or his potential to commit similar offenses in the future"). The use of these witnesses' accounts would have been consistent with Mr. Hilfiger's attested-to desire to present mitigation evidence that would avoid an examination of Mr. Barrett by a government mental health professional. Accordingly, the witnesses' excluded testimony is relevant to assessing deficiency and prejudice from trial counsel's unreasonable errors. *Strickland v. Washington*, 466 U.S. 668, 695 (1984).

The proffered testimony is relevant to both deficient performance and prejudice. *See Barrett v. United* States, 797 F. 3d 1207, 1225-26, 1229 (10th Cir. 2015).

DATED this 2nd day of May, 2017

<div align="right">

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

/s/ *Joan M. Fisher*
JOAN M. FISHER

/s/ *Tivon Schardl*
TIVON SCHARDL

/s/ *Karl Saddlemire*
KARL SADDLEMIRE

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

</div>

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 2nd day of May 2017, I caused the foregoing

Petitioner's Proffer of Testimony to be filed with the Clerk of the Court using the ECF System

for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B.

Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge,

there are no non- ECF registrants who are counsel in this case.


/s/ *Joan M. Fisher*
JOAN M. FISHER


PET'R'S FOURTH PROFFER
OF TESTIMONY                                    7                      *Barrett v. U.S.*, CV-09-00105-JHP

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**PETITIONER'S PROFFER OF TESTIMONY**

**DECLARATION OF JULIA O'CONNELL**

215

## DECLARATION OF JULIA O'CONNELL

I, Julia O'Connell, declare the following:

I am currently the Federal Defender for the Northern and Eastern Districts of Oklahoma. I am licensed to practice law in the State of Oklahoma, the various federal district courts in Oklahoma, and the United States Court of Appeals for the Tenth Circuit.

I am familiar with issues surrounding the appointment of counsel for Kenneth Eugene Barrett in his federal capital trial in the Eastern District of Oklahoma. At the time Mr. Barrett was charged, I was an Assistant Federal Defender. Paul Brunton was the Federal Defender for the Northern and Eastern Districts. When Mr. Barrett was initially charged, we received notice that the Court intended to appoint our office to represent him. Mr. Brunton and I met with Judge Payne regarding Mr. Barrett's representation, because we did not feel our office could effectively represent Mr. Barrett, due to the fact that our office was very small and we were already appointed in another death penalty case that we were preparing for trial. *United States v. Edward Leon Fields,* No. CR-03-73-RAW. The *Fields* case was taxing our office resources and I was the only trial lawyer in the office with death penalty trial experience. We explained to Judge Payne that we did not feel it was feasible for our office to effectively represent Mr. Barrett because I was already representing Mr. Fields in his pending capital case.

Mr. Brunton and I asked that John Echols— who represented Mr. Barrett throughout his state court prosecution and had already effectively tried the case (twice)—

1

and Rob Nigh of Tulsa-- who had federal death penalty experience in the Timothy McVeigh case-- be appointed to represent Mr. Barrett.  Both Mr. Echols and Mr. Nigh are highly qualified capital attorneys.  Based on discussions Mr. Brunton and I had with these two lawyers, we knew they were willing to represent Mr. Barrett. We asked Mr. Echols and Mr. Nigh if they would accept appointment in the Barrett case because we knew that the government would likely seek the death penalty against Mr. Barrett, and we knew our office could not accept the case because of the other pending capital case.  Thus, we wanted to get commitments from well-qualified lawyers who were willing to be appointed for Barrett's federal capital trial, so that we could assist the Court by recommending attorneys we felt the judge could rely on to try the case effectively as an alternative to the Federal Public Defender.

Judge Payne initially indicated that he wanted our office appointed, but Mr. Brunton told him that I was the only attorney in the office with capital trial experience and that I could not effectively handle two capital trials scheduled so closely to one another.  This led to a discussion of the statutory requirement to appoint "learned counsel" as first chair.  Judge Payne or his staff had evidently researched the issue, and the Judge explained that he felt "learned counsel" was not defined in the materials he had reviewed.  Judge Payne further explained that it seemed that the federal death penalty cases that were being filed in Oklahoma were being prosecuted in the Eastern District, and he expressed the idea that if counsel from the Eastern District were appointed, that

2

lawyer or lawyers could then take other death penalty cases filed in the Eastern District in the future.

My recollection is that Judge Payne did not appoint Mr. Nigh to represent Mr. Barrett.  Instead, he appointed John Echols and Roger Hilfiger, the former United States Attorney for the Eastern District, as Mr. Barrett's lawyers.  Mr. Echols eventually withdrew from the case.  Judge Payne elevated Roger Hilfiger to first chair and appointed Bret Smith second chair.  To my knowledge, Mr. Smith had no capital experience.

On June 21, 2005, I forwarded copies of orders the district court had issued in *United States v. Fell,* No. 2:01-CR-12-01 from the District of Vermont regarding fact-specific voir dire in capital cases to Mr. Hilfiger.  I sent these orders to him hoping it would impress upon him the importance of mitigation in a capital case, because I suspected that the Barrett trial attorneys were not fully versed on how to investigate and utilize mitigation evidence.   At the time I sent the e-mail, neither of the Barrett attorneys had consulted with me regarding the case.

Mr. Hilfiger called my office on June 30, 2005.  I was away from the office , so he left me a voice message, asking if my mitigation specialist was going to be in Muskogee in the future and whether she would be willing to meet with him to discuss mitigation. Although I do not remember the exact wording of his message, I remember that it alarmed me.  I got the distinct impression that Mr. Hilfiger did not know what was expected from a defense lawyer during the punishment phase of a federal capital trial.

3

The message led me to believe Mr. Hilfiger thought "mitigation" merely entailed a short meeting with my mitigation specialist (who was in no way involved in or familiar with his client's case) within a few weeks of commencement of trial. I suspected that Mr. Hilfiger did not understand the nature, value or extent of adequate, effective death penalty mitigation. I was taken aback by Mr. Hilfiger's inquiry, because Mr. Barrett's trial was imminent, and there was not sufficient time to do an adequate mitigation investigation. At a minimum, in my opinion, it would take a mitigation investigator or investigators at least six months to conduct an adequate penalty phase investigation.

I responded by e-mail on July 3, 2005, when I returned to the office and received his message. My e-mails to Mr. Hilfiger are attached to this declaration. In my July 3 e-mail response to Mr. Hilfiger, I gave him contact information for Dick Burr, one of the federal capital resource attorneys. I gave him Mr. Burr's contact information because I knew Mr. Burr to be an extremely competent lawyer in the area of death penalty cases, and knew that he was willing to help every lawyer who sought his assistance. I do not know whether Mr. Hilfiger ever contacted Mr. Burr or any other capital resource counsel regarding a mitigation specialist. In any event, as mentioned above, since Mr. Barrett's trial was to commence shortly, there was no time for an adequate second stage investigation if it hadn't been substantially completed on June 30, even if Mr. Hilfiger had been able to secure the services of a mitigation investigator or investigators at that late date.

4

I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed by me this _28_ day of ___February___, 2009, in

___Tulsa___ County, Oklahoma.

_Julia L. O'Connell_
Julia O'Connell

5

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## PETITIONER'S PROFFER OF TESTIMONY

## DECLARATION OF PAUL GORDON

## DECLARATION OF PAUL D. GORDON

Paul D. Gordon, a person over eighteen (18) years of the age and competent to testify and mindful of the penalties of perjury, deposes and says as follows:

1.      I am currently a Senior Instructor at SOR Training Center, and conduct CLEET re-certification and certification training for security officers and investigators.

2.      I am retired from the Oklahoma Highway Patrol ["OHP"].  I was assigned to the OHP Internal Affairs Division on April 1, 1999.  On September 24, 1999, I was the on-call lead investigator and was assigned to investigate the shooting incident which resulted in Trooper Rocky Eales's death and charges of murder against Kenneth Barrett.

3.      At the time of the call to the shooting event, I lived in the Wellston area, which is approximately 25 miles northeast of Oklahoma City on I-44, or the Turner Turnpike.

4.      My experience and qualifications to conduct investigations for Oklahoma Highway Patrol Internal Affairs Division in September of 1999 are set out in my resume, which is attached hereto, Exhibit 1, and includes but is not limited to the following:

      a.      I was employed with the Oklahoma Highway Patrol from February 1, 1984 until my retirement in 2000.  My primary duties in that employ included Supervisor of Firearms and Defensive Tactics for the State of Oklahoma and the training of the Governor's protective detail in a fifty (50) hour basic protection school and advanced protective efforts by solo officers.

      b.      Vocational Training during my tenure with the Oklahoma Highway Patrol

**DECLARATION OF PAUL D. GORDON -1**            PDG

included:  the Oklahoma Highway Patrol Academy; Booby Trap Devices Recognition; Semi-Automatic Pistol Transition Course; Advanced Shooting Skills; Instructors Orientation Course; Hazardous Materials Awareness Training;  CLEET Security Instructor Certification; Criminal Investigation Academy; Police Survival Course; CLEET Firearms Instructor School; Protective Security Operations Training Program; Bomb Threat Management; Narco-Terrorism Executive Protection Course; Incident Management Training; Defensive Tactics Instructor Training; C.E.R.T. Training, TTT, Sniper School; Hazardous Material Awareness; Advanced Material Awareness; Hazardous Materials- Operations; Hazardous Materials - Incident Commander; Physical Security Specialist Training Program; Fugitive Investigator Training Program.

5.      On the morning of the shooting on September 24, 1999, I took the call for 1st Lt. George Randolph, also of Internal Affairs. At approximately 0130, I received a call from the DPS Com Center in Oklahoma City. The Com Center dispatcher advised that there were two troopers down in a shooting incident in Sequoyah County.  Both troopers were members of the Tactical (or Tact) Team, but it was unknown why they were at the location of the incident.

6.      At approximately 02:00, while driving to the location, Bob Ricks, the Highway Patrol Commissioner, called and told me that the Tact Team had been set up and he wanted me to go over the entire scene and find out exactly what happened.

7.      Upon arrival to the location I conducted several on-scene interviews that were

**DECLARATION OF PAUL D. GORDON -2**                    $PDG$

limited in nature and observed the scene as it was at the time of the event, as well as, much of the physical evidence that would later be collected.

8.      When I arrived on the scene, I initially spoke to Lt. Kerry Pettingill, who was responsible for the mission.  Pettingill advised me that when everything started he thought it was his men who started shooting at the Barrett cabin as they rolled up on it.

9.      At the scene that morning, I was the fourth trooper to enter the Barrett cabin after the event and made a videotape recording of the scene and the interior of Mr. Barrett's cabin with my personal video camera because the OHP camera did not work.  I have reviewed that videotape to refresh my recollection.

10.      During the course of my investigation of this incident, three things were made clear to me:  (1) that the East Tact Team of the Oklahoma Highway Patrol had failed to follow appropriate protocol in the execution of the warrants at the residence of Kenneth Barrett on September 24, 1999; (2)  that neither the Oklahoma Highway Patrol nor the Oklahoma State Bureau of Investigation ["OSBI"] desired or pursued a thorough objective investigation of the incident and events following the incident; and, (3) my efforts to conduct a thorough objective investigation resulted in attempts by the State of Oklahoma to undermine that investigation and my ability to credibly conduct and report the same.

The facts supporting these conclusions are set out below.

11.      There were a number of things that happened in my investigation which were not the usual Internal Affairs's investigatory practices.

**DECLARATION OF PAUL D. GORDON -3**

a.      First, I was not permitted to attend Rocky Eales's funeral by order of my captain.  Captain Burris advised me that my attitude concerning the Eales's shooting investigation had caused bad feelings so I needed to stay in Oklahoma City and watch the office.

b.      Secondly, I was not allowed to talk to any of the Tact Team members involved for ten (10) days, even though the usual practice was 72 hours.  This directive came from the top of the Highway Patrol per Captain Burris.  By the time I was able to talk to the troopers involved, they had already met with a "counselor" and had legal counsel, Gary James, the Trooper's Association counsel.

c.      OHP brought the Troopers' Association legal counsel, Gary James, to the shooting scene.

d.      On the afternoon of September 24, 1999, with the exception of Trooper Ricky Manion who shot Barrett, all of the involved troopers denied firing their weapons and none were willing to give up their state-issued weapons for analysis and testing, despite being routine in any officer-involved shooting.  The troopers ultimately had to be ordered to comply and surrender their weapons for analysis.

12.     I did not interview Mr. Barrett; I was advised, however, that 1st Lt. Randolph did interview Mr. Barrett at St. Francis Hospital in Tulsa, Oklahoma where Mr. Barrett was taken after the shooting for gunshot wounds and apparent injuries sustained in a beating by later-identified law enforcement officers at the scene.  In the course of my investigation, I asked Lt. Randolph for the Barrett interview tapes and any notes he might have taken during the interview but Lt. Randolph ignored my request.  I was never given the information, recordings or notes.

**DECLARATION OF PAUL D. GORDON -4**                    PDG

Recording interviews and taking notes is called "locking them into their statement," and was standard practice for Internal Affairs.

13. When I arrived at the scene on the morning of the shooting, I interviewed or attempted to interview DA Diane Barker-Harold, who was among the group of dignitaries or observers that tagged along with the Tact Team. I asked her who the informant on the warrant was to which she replied that "we" know the identity of the informant, but she was not going to disclose this to me. I did not expressly inform DA Barker-Harold that I was tape recording the interview; however, as I spoke to her, I was holding the tape recording device in my hand without trying to hide it.

14. I routinely used a recorder in all of my investigations with the full knowledge and approval of my supervisors. Despite that fact, I was advised by my superior, Captain Burris that Ms. Barker-Harold had filed a complaint against me for recording her and that I should not have used the recorder. Captain Burris told me to give him the tape recording of Barker-Harold. I refused, stating the recorder was an accepted investigation tool and that it was part of my investigation. Burris forbade me from any further contact with Dianne Barker-Harold or other local law enforcement who filed complaints against me because no contact is to be attempted by the trooper to the complaining party until the complaint was resolved. I never saw any written complaint and I was never advised to address the complaint in writing which would have been the first step in the complaint process. The original of the tape recording of Dianne Barker-Harrold and tapes of interviews of other parties involved in the Barrett shooting were given to Lt. George Randolph when I retired from the patrol under pressure in 2000.

**DECLARATION OF PAUL D. GORDON -5**

PDG

225

15.     At the shooting site on September 24, 1999, I asked Lt. Pettingill and others on the scene who was responsible for the planning of the mission. I was admittedly vocally critical of the lack of appropriate surveillance and planning before attempting to execute a High Risk Fugitive warrant. As a result, I was advised by Captain Burris and several others there that I was not a "team player" and that I should adjust my attitude.

16.     Despite the fact that as the primary investigator I was responsible for the investigation, I was denied any access to the state troopers on the morning of the shooting. The troopers had written statements which were collected by the Troopers Association attorney Gary James. I was never given access to those statements from me throughout my investigation.

17.     I was not given any access to the troopers for a number of weeks. When I was given access to them, I was permitted to ask only questions which were pre-screened and approved by Lt. George Randolph. Those questions are reflected in the recorded statements which I provided to Mr. Barrett's counsel identified below.

18.     In interviewing the troopers who were involved in the shooting incident, I was prevented from asking questions which would have been routine in any officer-involved shooting incident, specifically a drug or fugitive warrant service like the Barrett raid. Those questions are set out below and are questions which I specifically remember wanting to ask and others which are found in the 1988 U.S. DEPARTMENT OF JUSTICE DRUG ENFORCEMENT HANDBOOK that I had received in a class prior to the shooting incident and which I would normally have consulted in preparation for the interviews.

 a. Number of suspects confirmed by real time eyes on surveillance
 b. The group makeup of persons involved (male or female)

**DECLARATION OF PAUL D. GORDON -6**

*PDG*

    c. Were children at the arrest site?

    d. What were the approximate ages of the occupants?

    e. Did you have current photographs of your target?

    f. Number of suspects at the targeted location at any given time.

    g. The full name and background of the target.

    h. The capabilities of the suspect, considering the following:

        *i.* What type of criminal violations had Barrett committed?

        *ii.* What target classification did the OHP Tact team assign to Barrett?

        *iii.* What was Barrett's previous police record involving physical violence?

        *iv.* Likelihood of resistance by Barrett;

        *v.* Physical and mental condition of Barrett;

        *vi.* Was Barrett a user of drugs?

        *vii.* Was Barrett suffering from mental problems?

        *viii.* Was Barrett known to assault police?

        *ix.* Did Barrett have a record of resisting arrest or using firearms against law enforcement?

        *x.* Was Barrett usually armed at all times and if so, with what kind of weapon

        *xi.* Did Barrett have a military background?

        *xii.* Was Barrett knowledgeable about explosives?

        *xiii.* What was Barrett's mode of transportation?

    i. What type of safety equipment were you provided with?

    j. What was the exact geographical location of the Barrett Cabin?

    k. Who provided the interior layout of Barrett's cabin?

    l. Please provide me with a picture of the cabin or sketch of the property?

    m. How were the doors and windows of the cabin secured?

    n. Please provide me with an aerial map with the Barrett cabin marked on it?

    o. What was your primary and secondary approach and escape routes to and from Barrett's cabin?

    p. What type of material is Barrett's cabin constructed of?

    q. What type of alarm systems were present?

    r. What type of guard animals were on the property?

    s. What type of utilities were at the Barrett cabin?

    t. What were the written rules of engagement?

    u. What was the mission abort signal?

19.    The trooper interviews which were ultimately permitted took place in late October to early November of 1999 in my office. They were recorded and followed the script which was required and pre-approved by Captain Burris. Even then, if any trooper had a complaint about

**DECLARATION OF PAUL D. GORDON -7**

the manner in which I handled the investigation, he could go directly to my superior, Captain Burris and file a complaint. I am unaware of any complaints.

20. One of the routine steps I took in this investigation was to try to acquire the procedural handbook for the East and West Tact Teams. When I asked for the handbook from Lt. Kerry Pettingill at his office, he told me it was not available. I told him if it needed to be printed I would come back and pick it up. He then told me "you'll never see this book." At that time, I went to my supervisor Captain Burris and advised him of Lt. Pettingill's statement. Burris told me he would get a copy of the Tact Team manual or handbook for me. About twenty minutes later, Burris refused to get me a copy of the manual, telling me it was a restricted document. About an hour later, Asst. Chief Jerry Cason walked into my office and asked me why I wanted the Tact Team book. I told him it was investigative protocol to obtain whatever manual was being used by the officer or unit at the time of the event. Cason told me I would never see the book as it was a restricted document. The lack of cooperation within the OHP upper ranks made the Internal Affairs investigation difficult, to say the least.

21. Within a few days of the refusal to give me the manual, however, when I went to my office, IASI secretary Carol Rawlings told me that there was a bunch of papers lying on the floor inside my office. When I went into my office, I found the papers and among them was the Tact Team handbook that Pettingill had refused to give me. I asked Carol who had been in my office. She said she did not know; that the papers were there when she put a message on my desk.

**DECLARATION OF PAUL D. GORDON -8**

PDG

22. The manual recited that when a raid was being conducted on a suspected drug house, the Tact Team was not to conduct the raid without clearly identifying themselves as law enforcement officers. Otherwise, the suspected drug dealer would think that he was being "ripped off," setting the stage for a violent confrontation. The copy of the Tact Team Manual which appeared mysteriously in my office was left with Lt. Randolph when I retired.

23. My investigation made clear that the OHP East Tactical Team failed to follow the handbook protocol, at the very least, in this regard: the Broncos were unmarked and the troopers did not activate their emergency lights to warn Barrett he was dealing with the police. When I arrived at the shooting scene on September 24th, the vehicle that was fired upon had its visor flip and emergency lights in the up position as were Lt. Pettingill's, the team leader. When I talked to Trooper Hamilton later, I asked him specifically about the lights. At first, Hamilton said the emergency lights were down. I told him that the flip lights would have been shot up if they had been down. After the recording had been turned off, Hamilton admitted to me that did not activate the lights; in fact, that they did not have any lights on at all. Under the circumstances admitted to me and observed by me, Mr. Barrett would not have known the incoming vehicles were law enforcement.

24. Among other things, my investigation also revealed the following:

a. On the night of the shooting, there was good visibility because there was a full moon with no clouds of any kind.

b. Mr. Barrett's residence was a homemade cabin with no electricity and no running water, undermining any fear of destruction of evidence by announcing law

**DECLARATION OF PAUL D. GORDON -9**

PDX

229

enforcement's presence. Mr. Barrett did run an electric cord from his mother's residence which was next door to both his garage and cabin.

     c.     There had been a "drive by" earlier in the day, with four troopers participating. The troopers used one of their unmarked tactical vehicles. The tell-tale antennas, which could identify the vehicles as law enforcement vehicles, had been removed.

     d.     At the time of the drive-by, Mr. Barrett and an unknown individual were standing in the yard and reportedly witnessed by the drive-by troopers. Because the road fronting Mr. Barrett's property dead-ended to the east, the vehicles had to turn around and drive back past the property. There was nothing about the vehicles to convey to Mr. Barrett or anyone else present that the vehicle was law enforcement.

     e.     There had been a fly-over of the property, which only lasted 15-20 seconds the day before the execution of the warrant.

     f.     No real time surveillance had been conducted up to the start of the raid to ensure intelligence integrity of the mission.

     g.     The gate to Mr. Barrett's property was open at the time of the drive-by but on the night of the raid, the gate was closed and locked.

     h.     Earlier in the night before the raid, Mr. Barrett and his son, Toby, had reportedly been working on a vehicle in the garage on the property. In my professional opinion, if proper real time surveillance had been conducted, Mr. Barrett could have been approached and taken by surprise at that time and taken into custody without incident.

     i.     The information relayed to the troopers prior to the execution of the

**DECLARATION OF PAUL D. GORDON -10**

warrant regarding Mr. Barrett's dangerousness was that Mr. Barrett's likely response to law enforcement was to run away. Among other things, this was supported by Trooper Manion's interview, Mr. Hise's interview and the placement of OHP manpower at the two adjoining residences to prevent Mr. Barrett's safe escape to either residence.

25.     Based on my observations at the Barrett residence the night of the incident, review of the physical evidence, and interviews with the surviving troopers and other people present or in the area, it was clear that none of the vehicles which approached the residence were driving with their emergency lights activated but that they had, in fact, rolled in dark, not even using headlights initially because of the full moon.

26.     The task force investigator, identified to me at the scene as Frank Lloyd, who was in the lead vehicle of the caravan of state agents, which was supposed to arrive after the state troopers secured the scene, stated that as they approached the scene, Lloyd could see the Tact Team's brake lights when they turned into the Barrett drive. Mr. Lloyd did not mention to me at the scene that morning seeing overheads, rear deck lights or any emergency lighting as they came on the scene which was over by the time they arrived.

27.     The physical evidence supported the conclusion that the officers did not have their emergency vehicle lights on. For example, Hamilton's unmarked Bronco's windshield was damaged by bullets but the emergency lights, which if in use would have been in the line of fire were undamaged.

28.     Though Trooper John "Buddy" Hamilton, who was driving the lead vehicle, initially advised me that his emergency lights were on, when confronted with the physical

DECLARATION OF PAUL D. GORDON -11                                        _PDX_

231

evidence, he admitted to me that he was not running his lights.  Though the admission came after I turned the tape recorder off, it would most likely be reflected in my notes of the interview. Those notes were left with Lt. Randolph.

29.     Trooper Hash, who was in a marked unit, also claimed he drove onto the property with his lights and his flashing bar on, but ultimately admitted that somebody just flipped the lights on after the shooting to give needed light during the wounded troopers' evacuation.  I have a clear recollection of Trooper Hash's admission regarding the emergency lighting to me, which came after I turned the tape recorder off and Trooper Hash continued to talk.  The statement is likely reflected in my notes of the interview which were left with Lt. Randolph when I retired.

30.     Lt. Pettingill's lights, which if activated would have been obvious to Barrett if he looked in that direction, were, in my professional opinion, in the up position because the flipped down lights would have impaired Assistant Team Leader McBride's vision for observation of the raid from their vantage point in the yard next door, which was Kenny Barrett's mother's home.

31.     Mr. Barrett would not have seen the other vehicles approaching from the side in any case, because even when he reportedly was outside the residence, he was on the porch looking where his son was yelling for help. Troopers Darst and Hise had tackled the son in the yard by the garage after they came across the gate in the dark.

32.     The physical evidence and interviews made it clear that Mr. Barrett never left the porch and never went into the yard and that he only responded to the first tactical vehicle when it was accelerating towards the front of the residence, after making a circle in the yard from the side of the cabin.

**DECLARATION OF PAUL D. GORDON -12**                                     PDG

33.    When Trooper Hamilton was driving up to the cabin after turning off the main road, he bottomed out hard in a depression on the east side of the cabin, an incident which would have made considerable noise and made him slow down and then gun the vehicle to get out of the deep depression.

34.    The vehicle then ran or slid into the front of Mr. Barrett's cabin, stopping with engine still running.  Barrett was on the porch, shooting at the vehicle from a 45 degree angle, slightly elevated position and hit the vehicle's transmission lines which, under engine power, caused a major transmission fluid leak that emptied the transmission fluid onto the ground exactly where the vehicle originally stopped and the shooting occurred.

35.    With appropriate expert testing, this transmission fluid may still be detectable on the Barrett property and able to establish the precise location of the lead Bronco during the shooting incident.

36.    According to Lt. Pettingill, the Hamilton vehicle was backed out away from the house to be used to transport Trooper Eales.  Because the vehicle would not drive forward due to transmission fluid loss, another vehicle was selected for the transport.

37.    As a result, on the evening of September 24th, OSBI with the assistance of OHP Vernon Phillips, inappropriately processed the Eales /Hamilton vehicle at the place where the vehicle had been moved, rather than where it had been positioned during the shooting.

38.    I advised my supervisors Lt. George Randolph and Captain Rodney Burris that the vehicle was being processed in the wrong place and would give the wrong evidentiary information about location and bullet angle.  They both advised me this was an OSBI

**DECLARATION OF PAUL D. GORDON -13**                              PD)

investigation and to stay out of it.  I filmed the process showing where the processing effort took place for further review.

39.     My recollection of these events are substantiated by the statements of the surviving troopers that when Trooper Eales exited his vehicle with the ballistic shield he turned towards Barrett and then turned and walked to the rear of the vehicle where he collapsed.  The troopers retrieved the trauma kit by knocking out the rear window of the vehicle and cared for Eales at the rear of the vehicle where he had collapsed.  The troopers and others then loaded Eales into the vehicle and moved the vehicle back to where OSBI later processed it.

40.     The video clearly shows that the Hamilton vehicle is behind the ballistic shield and trauma kit, indicating an obvious movement.

41.     When I first arrived on the scene in the early morning hours of September 24, 1999, 1st Lt. Pettingill told me that everything was laying where it was dropped during the event including the transmission fluid in front of the porch.

42.     Trooper Hamilton claimed to me that his brakes failed, but when I had the brakes tested at the DPS garage, they were found to be in good operating order and that nothing was lodged under them.

43.     Since the vehicle was unmarked and no other vehicles were running their lights, and without any announcement that law enforcement was on the property, Mr. Barrett, or any person like Mr. Barrett, who was paranoid as a result of his-off-the-grid lifestyle, would reasonably have believed that he was shooting at criminal intruders.

44.     Most of the rounds fired by Mr. Barrett were fired from inside the house which are

**DECLARATION OF PAUL D. GORDON -14**

234

also visible in the video I made that morning. Trooper Manion shot Mr. Barrett in the legs in the residence.

45.     When the shooting stopped, Mr. Barrett was handcuffed behind his back in the house and dragged out onto the porch by Trooper Hamilton and searched by Trooper Manion for weapons. Mr. Barrett was searched at least a total of two times while at the scene, once by Trooper Manion and again when taken into custody by the Sheriff. His clothing would have been thoroughly searched at that time. Neither Trooper Manion nor the sheriff reported that anything other than the S&W semi-automatic handgun was found on Mr. Barrett's person found by Trooper Manion.

46.     I know that Sheriff Philpot and his deputies searched Barrett before they beat him as a result of my interview with the sheriff. I observed the sheriff walking across the Barrett yard on the morning of the 24th. I asked him who he was and he told me that he was the sheriff. I asked him if he had any contact with Barrett and he advised me that he and his deputies searched Barrett when they took custody of him. I asked the sheriff specifically at that time if they found any guns or anything else dangerous on Barrett and he said no.

47.     Every trooper, and certainly drug task force members, would have answered the question of whether anything dangerous had been found would have responded "yes" if Barrett had red phosphorus on his person because of the inherent dangers of inhalation, absorption and ingestion associated with red phosphorous, not to mention flammability problems.

48.     At the time of our conversation, outside of my OHP vehicle, I asked the sheriff if he would let me conduct a formal interview while we were there at the scene and he consented.

**DECLARATION OF PAUL D. GORDON -15**

During this tape-recorded interview inside my OHP vehicle on September 24, 1999, Sheriff Philpot admitted to me on tape that he and his deputies beat Barrett badly, saying they had done all they could and would have done more if there had not been so many people around. Sheriff Philpot never mentioned red phosphorus to me at that time or I would have notified all of the troopers involved to take necessary decontamination procedures. Anyone with any understanding of red phosphorous who found anything which had come into contact with red phosphorous would immediately have reported it because of the danger of contact transfer from hands to your face within 5 minutes and in your eyes requiring immediate medical attention. Sheriff Philpot did not mention either the pill bottle or the baggie in the pill bottle with red phosphorous residue in it.

49.     The tape of this interview was kept with all of my investigative tapes related to this matter and turned over to Lt. Randolph when I retired.

50.     OHP divides the state into Western and Eastern Tact Teams; the raid on Mr. Barrett's property was undertaken by the East Tact Team. Assistant Team Leader Lt. McBride, who was assigned to the West Tact Team, was temporally assigned to the East Tact Team. I interviewed Lt. McBride. After the formal approved questions had been asked and answered and the tape recorder turned off, Mr. McBride became very emotional and told me that he had recommended that East Tact Team abort the mission because the raid was going to be undertaken with inadequate information and planning and no real surveillance had been conducted, but his advice was not taken. McBride was advised by the East Team to go back to the West Team if he did not want to participate. McBride was so upset over what happened that he began crying by

DECLARATION OF PAUL D. GORDON -16

236

the end of the interview. Though the recording does not reflect this portion of the conversation, my notes would most likely reflect it. Those notes were given to Lt. Randolph when I retired.

51.     Mr. Barrett's property was thoroughly searched the morning of the shooting. This included agents going layer by layer through the ashes in his burn barrel behind the cabin. There was nothing found that I observed which indicated drug activity nor was I ever advised that anything had been found by anyone.

52.     I was never advised that there was any information to support an anticipated finding of drug manufacturing at Barrett's residence but rather was informed that Mr. Barrett was believed to be an enforcer, *i.e.,* he facilitated sales of drugs between buyers and sellers who might not want to deal directly with each other.

53.     There was no air monitoring device at the scene and I did not see any of the investigators wearing special gear consistent with an active meth lab.

54.     Prior to entering the premises to videotape the inside of the cabin, the property was cleared by Vernon Phillips, who was also an OHP Tact Team member and Explosive Ordinate Disposal ["EOD"] expert and per meth lab requirements, would have alerted everyone to any possibility of booby traps or dangerous drug activity in the residence.

55.     I entered the premises without any special personal protective equipment, such as eye protection, vinyl rubber gloves, special protective clothing, or rubber boots. Where exposure levels are unknown, persons entering a potentially dangerous area would wear a full-face, positive-pressure, and air-supplied respirator. I was not instructed to discard contaminated clothing or shoes, which would have been the case if a meth lab was present in any one of its

**DECLARATION OF PAUL D. GORDON -17**



three forms: boxed; set-up not functional; or, set up functional cooking.

56.     The Manual and Training Videos available to the East Tact Team at the time make clear that on September 24, 1999, the manner of serving or executing the High Risk Warrant/s on Kenneth Barrett was against protocol, grossly unprofessional and created far greater risk of injury or death than the situation would have presented if appropriate planning and measures had been taken.   I have provided these videotapes to Mr. Barrett's counsel and can attest that they were available to the East Tact Team for training prior to the execution of the warrant at Mr. Barrett's residence on September 24, 1999.  Exhibit 2 (DEA Dangers of Drug Labs), Exhibit 3 (The Meth Lab), Exhibit 4 (Kitchens of Death).  In 1989, three sections of Exhibit 4 "Kitchens of Death" were required viewing by the OHP.

57.     As my investigation continued, I was advised by at least two state troopers to watch my back and that the Highway Patrol was after me.

58.     At one point in my investigation, Lt. Randolph, Captain Burris, and Jerry Cason came into my office with others, whose identity I do not recall, and aggressively accused me of putting the wrong serial number for Rocky Eales' gun in my report.  I was told that the Widow Eales had noticed it and brought it to their attention while she was reading my un-released report. I told them that I had taken the number from the OSBI report and pulled that report out to show them that OSBI had recorded the number incorrectly.  I corrected the serial number on the report. More importantly, I inquired, why anyone from outside the division had access to my on-going investigation.  I was advised that they wanted to nominate Rocky for a medal of honor and had sent the report to Dallas and that they had let Mrs. Eales review the report.  I again pointed out

**DECLARATION OF PAUL D. GORDON -18**

that the investigation summary report was taken from my computer without my permission, authorization or even notification. I told them that my office had been locked on a weekend when no one was present to allow access to the report. They told me I needed to relax; that we all needed to be on the same team. At that point, I became very concerned about what was happening in the Internal Affairs Division and began to make copies of some of the recordings I had made. I did not have access to all of my recordings at that time.

59. Because I believed the work environment to be hostile, in February of 2000, I began the employment process with Dyn Corps, a private overseas contractor, with the intent to vest my retirement and get away from the problems which I felt were only going to worse. I was contacted in March by DYN Corps and advised that I was good to go for a mission in Bosnia with processing classes forming in May and June. I advised them I needed to talk with my wife and give them a firm answer by May.

60. In April, 2000, I attended a High Risk Fugitive training course given by the U.S. Marshals' Service at FLETC in Georgia. While there, I discussed the manner in which the Barrett raid had been conducted and was advised that it was everything that shouldn't happen.

61. When I returned from the training, I decided to go ahead and vest my retirement from the Highway Patrol rather than to continue in the openly hostile work environment. I knew that as soon as I took the stand in the Barrett case, I would be in a position adverse to the Highway Patrol and thus, decided to retire from the Patrol and wait to see what happened in the Barrett case.

**DECLARATION OF PAUL D. GORDON -19**

62.     In June of 2000, I took a position with DYN Corps, an International Police Task Force, as CO-locator and patrol officer in small villages in and around Sarajevo, Bosnia, where my assignment was expanded to assist in Haz Mat training and evaluating Tactical Teams in controlled use of force in training situations.

63.     While in Bosnia, my wife, Susan Gordon received subpoenas for records from the Oklahoma Attorney General's Office.  I was investigated for, and later charged with, what amounted to misappropriation of state funds and property for taking "unapproved" comp time and for using a state telephone while working on the side as a private investigator.

64.     I was advised by the Attorney General's Office that if I did not return to face the charges, they would come and get me.

65.     The comp time and use of the state phone and other equipment had been explicitly approved by my superiors, Lt. Randolph and Captain Burris when I was assigned to the Internal Affairs Unit.  While I was assigned to the Internal Affairs Division, there existed a "hidden 32-hour comp time" policy which applied to everyone assigned to Internal Affairs.  If you were on-call, you automatically got 32 hours comp time, whether or not you were called out.  A person was on-call for two weekends and thus was supposed to claim sixteen hours comp time for each weekend.

66.     In the investigation of the charges against me, which were primarily the abuse and/or misuse of government property, services and compensation investigation, Burris and Randolph gave false statements to the Attorney General's office investigator, Larry Andrews,

DECLARATION OF PAUL D. GORDON -20

when they told him that they did not get comp time as a result of their job responsibilities which included being "on call." They also gave false statements to the grand jury.

67.     While the charges were pending against me, I was advised by Lt. John Matlock that he had been requested to perform an internal audit by Commissioner Bob A. Ricks, as suggested by the Grand Jury, and the audit revealed that the policies regarding comp time and use of state property for personal business were not clearly set out and that it was clear that Captain Burris and Lt. Randolph had misrepresented the fact that they, too, claimed comp time for weekend on-call time.

68.     Lt. Matlock told me that he advised both OHP Commissioner Bob Ricks and his Captain Jerry Simpson of the audit teams findings and  that he had heard recorded telephone conversations with me and agency personnel, including Assistant OHP Chief Jerry Cason, who complained about the leadership of the agency, and defended use of the 32 hours on-call comp time as a standard practice.  Cason confirmed to Matlock that I was entitled to the comp time like everybody else and that he expected subordinates to drive their units all the time to enable immediate response to investigations.  Cason stated he would testify for me. I also allowed Matlock to hear tapes of Captain Burris stating that recording on-call time as comp time had been approved and was standard practice. Burris gave me permission on many occasions to leave DPS because I had "lots of comp time" coming.  On those occasions, I was expected to drive my unit and was assured by Burris that I shouldn't worry because he "had my back."

69.     According to Lt. John Matlock, one of the OHP troopers assigned to conduct an audit of comp time policies in Internal Affairs, Diana McKnight, the Deputy Attorney General

**DECLARATION OF PAUL D. GORDON -21**

who prosecuted my case, became aware in the course of the investigation that Randolph and Burris committed perjury in the grand jury proceeding and advised OHP auditors that both Burris and Randolph compromised themselves in the grand jury. John Matlock also told me that Deputy AG McKnight advised Lt. Don Stockton, a member of the OHP audit team, that I was the only trooper to be prosecuted. When Ms. McKnight discovered that Lt. Stockton kept notes of the meeting with McKnight, she requested that he give her all of the notes concerning the grand jury testimony.

70.    Deputy AG McKnight nonetheless vigorously pursued the prosecution in my case after being told about Burris and Randolph and the hidden illegal 32 hours of comp time by OHP auditors.

71.    In my criminal case, I was represented by attorney Miles Zimmerman. Deputy AG McKnight did not notify Mr. Zimmerman that Burris and Randolph committed perjury in the grand jury. She did not advise him of the results of the audit which showed that the accumulation of comp time in the manner for which I was being prosecuted was an approved method used by all Internal Affairs personnel or that I was the only person being prosecuted for it.

72.    Mr. Zimmerman worked out a plea deal where I could keep my retirement. I was allowed to enter a plea of *nolo contendere* to misuse of a state telephone, and received a five (5) year deferred sentence which has now been expunged after successful completion of the sentence. After the agreement to permit a *nolo* plea had been made, Ms. McKnight advised Mr. Zimmerman that they would only accept a guilty plea. Mr. Zimmerman asked to talk with

**DECLARATION OF PAUL D. GORDON -22**

someone else, and Mrs. Goodspeed, who was McKnight's supervisor, approved the original agreement for a *nolo* plea which preserved my retirement.

73.     I entered the plea on August 16, 2001 because I was tired and extremely paranoid of the prosecution which was occurring.  I was out of money and every effort to subpoena material witnesses was being quashed.  I knew that the Commissioner of the Department Of Public Safety, Bob Ricks, was advised by the audit team about the conspiracy but had decided not to intervene or take any action against any of my superiors other than to transfer them to other units.  He did not refer their conduct to the AG's office for review even though both Burris and Randolph committed a felony when they blatantly lied to the Attorney General investigator, Larry Andrews.  Both officers then attempted to keep the investigation on me in the Internal Affairs unit so attention was not called upon them.

74.     The audit, the results of which were not disclosed to me prior to my plea, shows that I did not engage in any act which had not been specifically authorized by my superiors and which was not common practice in the division.

75.     Despite having entered a specific plea agreement, the terms of my probation were constantly changed by the prosecuting deputy attorney general, Diana McKnight, in significant ways, changing the conditions of my probation and making it more and more difficult to comply with those conditions. Additionally my police certification was revoked by the Council on Law Enforcement Education and Training despite the plea agreement to suspend the certification for the deferred sentence and not to contest my re-certification as a peace officer once my deferment was set aside.

**DECLARATION OF PAUL D. GORDON -23**

243

76.     After the plea, and while I was on probation pursuant to a deferred adjudication, I received from Lt. John Matlock a copy of the Report on the Multi-County Grand Jury, Partial Report SC-99-56 prepared for Commissioner Bob A. Ricks, dated September, 2001.  A true and correct copy of the Internal Audit including the Response to the Chief's Inquiry which I received from Lt. John Matlock is attached hereto and marked Exhibit 5.

77.     In that report, findings included a response to the Chief's Inquiry which had downplayed the significance of the audit requested by the Grand Jury.

78.     Included in the Internal Audit completed by OHP Auditors John Matlock, Jerry Simpson and Don Stockton is a section entitled "Audit's Response to Chief's Inquiry Re: OIA-01-04."  The audit team attempted to resolve "some disturbing discrepancies found in the Internal Affairs and Special Investigation Units handling of the case involving 2d Lt. Paul Gordon that were not explained or addressed in the Chief's Inquiry."  That response points out that when the investigation resulting in the felony charges against me were referred to the Attorney General's Office, "no mention was made of the application or accrual of comp time or the fact that [I] was or may have been authorized comp time when [I] was alleged to have been working for the State Insurance Fund."  The report concluded that had that fact or an internal memo or other notice of the accrual of comp time and its use inside IASI been made, "it is highly likely this incident would have never escalated beyond that point.  Failing to do so casts a dim light on the motivation to omit that information by the management of IASI."  Exhibit 5.

79.     Additionally the Response found that the DPS and IASI management "violated a basic rule of ethics and segregation of duties by proceeding with an investigation of serious

**DECLARATION OF PAUL D. GORDON -24**



wrongdoing by an employee within that division, a decision which casts doubt upon the objectivity of the investigator and his motives for not referring the matter to outside investigators." Exhibit 5.

80.     After addressing other matters including the calculations of comp time taken by both Burris and Randolph, the Response concluded that the circumstances . . .

> . . . imply that conspiracy to commit fraud has been perpetrated by certain individuals who were over-reporting time worked. In the course of concealing their behavior, they withheld information regarding the accrual and usage of compensated time and provided a misleading report to the Commissioner and Attorney General's Office. The individuals continued the practice even after a fellow trooper resigned [footnote omitted] and was subsequently indicted by a multi-county grand jury. There were no indications they would have stopped until the practice was revealed by an audit."

Exhibit 5.

81.     Shortly after I entered the plea *nolo contendere* and received the 5-year deferred sentence, I was contacted at my residence by Lt. John Matlock. He asked me if I had read the newspaper articles about the testimony being given by the state troopers against Mr. Barrett in his state trial which, if reported correctly, was a lie. I contacted Mr. Barrett's state trial counsel, John Echols by telephone and voiced my concern. I answered all of the questions he had about the ill-fated execution of the warrant on Mr. Barrett and the investigation of it.

82.     The felony charges against me were career-ending and I was emotionally distraught and suffering from a high degree of anxiety as a result of the prosecution against me. Though subpoenaed for both state trials and willing (though nervous) to honor those subpoenas, I did not testify for either the state or the defense.

**DECLARATION OF PAUL D. GORDON -25**

83.     At some point, while the Barrett state court proceedings were ongoing, a second copy of the Tact Team manual was anonymously hand-delivered to me through the mail slot at my school in Moore, Oklahoma.   The first copy had been left with Randolph and reportedly was no longer in existence.  I contacted by telephone Oklahoma Indigent Defense Services ("OIDS") investigator Jack Stringer and informed him that I had received another copy of the Manual.  I was asked to bring the manual to Judge Garrett's chambers.  I met with Judge Garrett, Mr. Echols, the prosecutor, and representatives of OSBI.  When Judge Garrett asked me what was important about the manual, I related the critical passage about the Tact Team protocol  when serving a drug search/arrest warrant requiring positive identification as law enforcement to avoid the suspect from believing he was being ripped off, procedures which were not followed in this case.  I gave the manual delivered to me to Judge Garrett and did not make a copy for myself.

84.     I was subpoenaed by both the Government and the Defense for the federal trial. One of the federal prosecutors, who I believe is Mr. Littlefield, called me and was very aggressive, threatening and intimidating.  He basically told me that he was going to tear me up on the witness stand over the deferred sentence I received and challenged my credentials because I was not a SWAT officer and was in no position to second-guess the Tact Team.  I told my wife about the conversation and she reminded me that I had been trained by the U.S. Marshalls's Service on how to execute high risk warrants.  I called the prosecutor back and left a message about this training because I did not want him to think I was sandbagging him.  The prosecutor called my residence the next morning and left a message with my wife, Susan, that I did not need to come to Muskogee to testify at the federal trial.

**DECLARATION OF PAUL D. GORDON -26**

246

85.     I talked to defense counsel in the federal case, who I believe to be Roger Hilfiger, only once on the telephone for a very short period of time in a call initiated by me because I had been subpoenaed and wanted to know the questions he was going to ask. I believe an investigator from the defense did make a short visit before that but I do not specifically recall the details of the conversation other than that the investigator did not ask me any substantive questions. Defense counsel told me that it was his understanding that I had a relationship with Mr. Barrett. I advised him that there was no such relationship and told him that if called to testify, I would simply tell the truth. I emphasized a couple of times during the interview that I had no affection for Mr. Barrett because he killed a state trooper but that if he asked me the questions, I would give him the answers. I told him that it depended on the questions he asked whether or not my testimony would help Mr. Barrett. Hilfiger did not ask me any questions and I was not called to testify. If called and asked the questions, I would have testified to everything to which I attest herein.

86.     I was interviewed on this matter by Mr. Barrett's present counsel, Assistant Federal Defender Joan Fisher, Attorney David Autry and the Federal Defender's investigator, Paul Mann on November 3, 2011. Since that time, I have cooperated with them, answering any questions posed and attempting to provide whatever documentation or recordings I have been able to locate to support the truth of this Declaration.

87.     After my discussion with the attorneys and investigator for Mr. Barrett, I remembered that once I became aware of the removal of my report from my computer and was worried for my professional security, I began making copies of interviews that were then

**DECLARATION OF PAUL D. GORDON -27**                          PDG

available to me. I put the copies in a box and took them to my mother-in-law's residence where they remained until she died. Prior to my mother-in-law's death, I was responsible for cleaning her house and removing her property so the house could be sold. While removing the property, I came across the box of tapes which was then put in storage at my school in Moore, Oklahoma. After talking with Barrett's defense team, I searched for them and gave copies of those tapes that I have been able to find to Ms. Fisher and Mr. Autrey on December 8, 2011.

88. I did not advise either Mr. Echols or Mr. Hilfiger that I had these recordings because I did not remember that I had them and nothing in the my conversations with them reminded me of them.

89. I also had copies of training videos which I later copied and sent to Ms. Fisher.

90. Among the documents upon which I have relied to refresh my recollection and to support my assertions which I have provided to counsel are the following:

      a.     Memorandum for 27th District Attorney Richard Gray regarding the Subpoena;

      b.     The Subpoena issued by the prosecutor;

      c.     Release from the subpoena dated September 19, 2002;

      d.     May 7, 2001 Request by John Matlock "for monthly time sheets for the last three years or while assigned to IASI of Captain Rodney Burris, Captain Rick Adams, 1 Lt. Eddie Davenport, 1 Lt. George Randolph, 2 Lt. Paul Gordon, 2 Lt. Leanne Spears, 2 Lt. Deryckere;"

      e.     State of Oklahoma Office of Attorney General Grand Jury Investigation

**DECLARATION OF PAUL D. GORDON -28**               PDG

248

Unit, June 9, 2000 report by Larry W. Andrews regarding interviews with Captain Rodney Burris and Lt. George Randolph;

f.      October 16, 2001 statement by 1 Lt. John Matlock #44 regarding an April 17, 2001 meeting with 1 Lt. Don Stockton, Capt. Jerry Simpson #18, Asst. Atty. Gen. Diana McKnight and B. J. Schmidt wherein McKnight stated that 1 Lt. Randolph and Capt. Burris of Internal Affairs compromised themselves testifying in front of the Grand Jury to events regarding Paul Gordon;

g.      Correspondence between Miles C. Zimmerman to Diana McKnight, Assistant Attorney General, dated April 21, 2001;

h.      Report on Multi-County Grand Jury Partial Report SC-99-56 (September 2001), including comparative comp days claimed, taken and calculated cost by Burris and Randolph in 1999;

i.      October 21, 2001 leave Request by 1 Lt. Matlock to Captain Jerry Simpson resulting from treatment in response to his efforts in conducting the Internal Audit "[a]long with [his] knowledge of Atty General Behavior and DPS involvement".

j.      OSCN copy of the Docket Sheet in State of Oklahoma vs. Paul D. Gordon, Oklahoma County No. CF 2001-2226

k.      Application for Clarification of Terms and Conditions of Probation, State v. Gordon, Case No. CF 2001-2226;

**DECLARATION OF PAUL D. GORDON -29**                    PDG

l.  Order of Expungement and Vacation of Previously Entered Plea dated 13th day of October 2006, filed October 18, 2006 in State v. Gordon, Case No CF-2001-2226

m.  Current Resume of Paul Donahue Gordon (Exhibit 1)

91.  Among the recorded statements upon which I have relied to refresh my recollection and to support my assertions which I have provided to Mr. Barrett's counsel are the following:

a.  Tape by Paul Gordon - 09/24/1999

b.  TRP Eales Shooting - 09/24/1999

c.  Danny Oliver [mislabeled Scott Jenkins]- 09/24/1999

d.  Gene Hise - 11/08/1999

e.  Rick Manion - 11/09/1999

f.  John Matlock  - 07/21/2001

g.  Matlock - 08/01/2001

h.  Terry Morris- 06-24-03

i.  Steve Hash - November 19, 1999

j.  Training Videos

  i.  DEA- DANGERS OF DRUG LABS (EXHIBIT 2).

  ii.  THE METH LAB (EXHIBIT 3)

  iii.  COPS SURVEILLANCE "DRUGS"

  iv.  KITCHENS OF DEATH  (EXHIBIT 4)

**DECLARATION OF PAUL D. GORDON -30**

*v..*    RAID PLANNING

92.    After I spoke with Mr. Barrett's counsel and before signing this Declaration, Ms. Fisher provided me with copies of the typewritten transcripts of the interviews I conducted with Troopers Darst (Exhibit 6), Greninger (Exhibit 7), Hamilton (Exhibit 8), Hash (Exhibit 9), Hise (Exhibit 10), McBride (Exhibit 11), Manion (Exhibit 12), and Poe (Exhibit 13), as well as, Lt. Pettingill (Exhibit 14) and DEA Liaison Danny Oliver (Exhibit 15).  I reviewed those transcripts and they confirmed my recollection of the those interviews.

93.    Prior to and during the federal capital trial of Kenneth Barrett, I was able and willing to testify under oath to all of the matters discussed in this Declaration including the statements made to me in all of the interviews indicated above as well as to the conversations with the interviewees which occurred after I completed the scripted interviews and turned the recorder off.  I am willing to testify to same now.

94.    I declare under penalty of perjury that, to the best of my recollection as refreshed in part by my  review of the documents identified above, the foregoing twenty-nine  (31) page declaration is true and correct.

Executed by me this _14_ day of March, 2012 in _LiNCoLN_____County, Oklahoma.


_____
Paul D. Gordon

**DECLARATION OF PAUL D. GORDON -31**                          _____

251

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## PETITIONER'S PROFFER OF TESTIMONY

## DECLARATION OF IVA HINES

Pet'r's Proffer Testimony                                    *Barrett v. U.S.*, CV-09-00105-JHP

## DECLARATION OF IVA HINES

I, Iva Hines, a person over the age of eighteen (18) and competent to testify, deposes and says as follows:

I am the wife of Thomas Hines who is the owner of Thomas Hines Construction, a company for which I kept the books and did payroll at the time that we employed Kenneth Barrett for approximately two years in the mid-1990s.

At that time, we built two-story tract townhouses, mainly in Arkansas, including Fort Smith, Conway Fayetteville and Benton. Ken had supervisory responsibilities although there was a foreman over him and my husband over both of them.

Ken, mainly framed houses, which included marking the slabs for where the walls would go, using the architect's drawings,

Ken was the hardest worker we ever had. He was a trusted employee, so much so that he was a guest at my family's table on many occasions.

I was contacted by an investigator for Ken's defense, a woman, I would guess around 2000 and I told the gist of the facts contained in this declaration.

I was never contacted by anyone form Ken's federal trial.  I do not recognize the name roger Hilfiger or Bret Smith.  Had I been asked to testify, I would have testified to the facts contained in this declaration.

I declare under penalty of perjury that the foregoing is true and correct.

Exceuted this _____ of March 2017, in Sequoyah County, Oklahoma.

_____
Iva Hines

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

|  |  |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**PETITIONER'S PROFFER OF TESTIMONY**

**DECLARATION OF ROGER CRAWFORD**

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:    (405) 521-9600
Facsimile:    (405) 521-9669
E-mail:        dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar # 2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, California  95814
Telephone:    (916) 498-6666
Facsimile:    (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

|  |  |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>                    Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>                    Respondent. | CASE NO. CV-09-00105-JHP<br><br>**DECLARATION OF ROGER CRAWFORD** |

I, Roger Crawford, a person over eighteen and competent to testify, mindful of the penalties of perjury, testify to the following:

1.      I am Kenneth Eugene Barrett's uncle by marriage.

2.      If permitted to testify at the evidentiary hearing for Kenneth Barrett scheduled to begin March 27, 2017, I would testify, and do hereby testify, to the following:

*RC*255

3.      I am married to Kenny's maternal aunt Phyllis Crawford. I have been married to Phyllis for 57 years.

4.      We live next door to Kenneth's mother, Gelene Dotson and have lived there for approximately 25 years. Gelene is Phyllis's sister.

5.      I have previously submitted three declarations in Kenny's case. They are attached hereto and marked exhibits A, B and C respectively.

6.      I am also the father of Travis Crawford [Travis] who, though he later recanted, testified for the prosecution in Kenny's federal case. Travis is Kenneth Barrett's first cousin.

7.      Travis suffers from serious mental health issues, including a severe anxiety disorder as reflected in his medical records, which are attached as Exhibit D.

8.      I also know Cindy Crawford because she was my daughter-in-law. Cindy Crawford was called by the government as a witness in Kenny's case twice, including at the penalty phase. If I had been asked I could have told the jury that Cindy Crawford was a liar and a thief and that this fact was known to me, our family and to the community.

10.     I accompanied my wife to federal court when she was subpoenaed to testify at Kenny's federal trial. At the last minute Ken's lawyers asked me to substitute for my wife because she was too nervous to testify.

11.     I did not talk with Kenny's defense attorneys until just before they called me to the stand. I did not know what they were going to ask me or why I was being called as a witness.

12.     I was present when my wife Phyllis talked with Kenny Barrett's investigator and when she read and signed the declarations attached as Exhibits E and F. I am also familiar with the contents of the declarations regarding Kenneth Barrett's family history and Phyllis's observations of Kenny, his mother Gelene Dotson and his father Ernie Barrett.

13.     I am personally familiar with the matters discussed in my wife's declarations and was present when she read and signed the same under penalty of perjury.  (Exhibits E, F.)

14.     My wife Phyllis Crawford is now suffering from dementia and is unable to testify. At the request of Kenny's investigator, I asked Phyllis's doctor for a letter regarding her health and inability to testify.  It is attached to this declaration as Exhibit G.

I declare under penalty of perjury that this declaration is true and correct to the best of my knowledge.

Executed this 24 day of March 2017 in _Sequoyah_ County, Vian Oklahoma.

_Roger Crawford_
Roger Crawford

# Exhibit A

## DECLARATION OF ROGER CRAWFORD

I, Roger Crawford, declare the following:

I am Kenny Barrett's uncle by marriage. I am married to Phyllis, who is the sister of Gelene Dotson, Kenny's mother. We live next door to Gelene, and Kenny lived next to Gelene on the other side of her house.

My son is Travis Crawford. He is married to Cindy Crawford. I have known Cindy for years. I don't like to talk bad about anyone, but Cindy is a very dishonest person, and has been dishonest and untrustworthy for as long as I have known her. Cindy basically lies about anything and everything, especially if it means she can get something for herself. It is not only my personal opinion that Cindy is very dishonest, but I know that she has that reputation in the community. Cindy has gotten victim protective orders against people that were based on false information, and has even falsely informed on her own family members through the state Department of Human Services.

I am aware that Cindy has worked as an informant for the local police around here to avoid getting into trouble herself for things she has done. When Cindy testified against Kenny Barrett at his federal trial, I believe she was in some type of trouble, as she has been afterwards, but never had to serve a day in jail. My son Travis was also in legal trouble at the time he testified against Kenny Barrett, but he never had to do any jail time, either. I believe that is also true of the other informant witnesses who testified against Kenny.

At the time of Kenny's federal trial, his lawyers did not ask me about my

Page 1 of 6

*RC*

259

knowledge of Cindy Crawford's dishonesty and reputation for dishonesty. Had they asked, I would have told them the things I said above and would have testified to her dishonesty.

An investigator named Leonard Post interviewed my son Travis on December 11, 2008 at my residence. My wife Phyllis and I were present when Mr. Post interviewed Travis. I recall that Travis told Mr. Post the following during the interview:

Travis told Mr. Post that he is Kenneth Barrett's first cousin on his mother's side of the family.

Travis related to Mr. Post that he and Kenny Barrett used to hunt and fish together, and were close. Travis said he was at Kenny's home practically every day. Travis told Mr. Post that Kenny was very generous to him, and would do anything in the world for him. Travis told Mr. Post that Kenny Barrett liked to help people and rarely left his property. Kenny would eat meals at his mother's house, and sometimes friends would bring him food.

Travis told Mr. Post that he had had a long struggle with drugs and has anxiety and panic attacks. He told Mr. Post that his mind does not work that well. Travis gave the example of going out to his truck to get something, and by the time he gets there, he will have forgotten what it was he was going to get. Travis told Mr. Post that when he gets problems with anxiety, he gets so nervous that he just does whatever it is that comes to mind. Travis told Mr. Post that he was like this as a child as well. As Travis told Mr. Post, and as I know, he is under a doctor's care and is trying to be healthy. Travis told

Page 2 of 6

*RC*

Mr. Post that he was a long term methamphetamine user, and he thinks he would die if he used drugs again. As I am also aware, and as Travis told Mr. Post, Travis was told by his doctor that if he ever shot up drugs again, it would likely kill him.

Travis told Mr. Post that he is aware that his drug use was caused by psychological problems that he has and that he does not understand. Travis told Mr. Post that psychological problems run in his mother's side of the family, something I am also aware of. Travis told Mr. Post that he has three children (our grandchildren), one daughter and two sons. Travis talked about how his oldest child is a grown woman who suffers from bipolar disorder. Travis stated to Mr. Post that in his opinion, one of his sons seems a little slow and is having a hard time. Travis said that his other son, however, is a straight-A student, and Travis hopes that he will turn out alright.

Travis told Mr. Post that he had problems in school and joined the United States Army, trying to straighten himself out. Travis said that he was not able to handle Army life and spent two months in the brig. Travis said he just couldn't keep up with all the rules and was late to formation. It made him feel terrible when people he trained with in the Army made fun of him when they marched by the stockade. Travis told Mr. Post that he got a less than honorable discharge from the Army.

Also when Travis was talking to Mr. Post in front of me and his mother, Travis said that he testified falsely in Kenny Barrett's trial. Travis told Mr. Post that at the time he testified, he was living in so many places and was so strung out, that he did whatever he was told in order to keep out of trouble. Travis told Mr. Post that for several years

*RC*

before Kenny was arrested for shooting the trooper, through Kenny's two state trials and federal trial, and up until about four months before Mr. Post came to talk to him, he had been doing methamphetamine all day, every day. Travis told Mr. Post that when he testified against Kenny Barrett, he was high on meth. He also told Mr. Post that all of the snitches who testified against Kenny Barrett were on dope and high when they testified. Travis stated that he and the other snitches were also high on drugs when they were interviewed by prosecutor Mike Littlefield. Travis told Mr. Post that anybody who had been around drug addicts would have known that. Travis told Mr. Post that when John Philpot took him to see Mike Littlefield, he was sure Mr. Philpot knew he (Travis) was stoned. Travis told Mr. Post that at the time he was interviewed by Mike Littlefield, he felt as though he was already under arrest, and "didn't know if he was ever going to come back home."

Travis told Mr. Post that when Mr. Littlefield interviewed him about Kenny Barrett, he was scared to death of losing his freedom and said whatever he thought Littlefield wanted him to say. Travis said that when Mr. Littlefield asked him if Kenny Barrett said that he (Kenny) "was going down in a blaze of glory," before Travis could answer, Mike Littlefield told him all the bad things that would happen to him if he "lied." Travis told Mr. Post that he was so scared that he said, "yes," that Kenny Barrett would go down in a blaze of glory if the cops came to his residence. Travis said that when he gave this answer, he was panicking because he was afraid. Travis told Mr. Post that Mr. Littlefield told him he knew things about him. Travis repeated that he was extremely

Page 4 of 6

*RC*

scared during his interview with Mr. Littlefield and said whatever it was Mr. Littlefield indicated he wanted Travis to say. Travis told Mr. Post that he never heard Kenny Barrett state that he was "going down in a blaze of glory" or anything like that.

Travis admitted to Mr. Post that he had testified against somebody before he testified in Kenny's case. That time, Travis said that he had been arrested for bad checks and was afraid of going to jail. Travis said the prosecution at the time of that case let him work for them so he would not get charged in the check case. Travis told Mr. Post that he wore a wire and made four or five drug buys. Travis said to Mr. Post that he believes he could have been killed while working for the police. Travis related that he had to testify against the person he bought drugs from, even though the police lied to him and told him he would not have to testify.

Travis stated to Mr. Post that he was aware John Philpot was at Kenny's residence just two weeks before the raid that led to the trooper getting killed. Travis said that when Mr. Philpot went to Kenny's place two weeks before the raid, Mr. Philpot had inspected Kenny's guns without any problem. Travis told Mr. Post that Kenny told him the local police had a drug case against him (Kenny), but it was not serious. Travis said to Mr. Post that Kenny Barrett never told him anything about an outstanding warrant for Kenny's arrest. Travis said to Mr. Post that at the time he testified against Kenny, he thought having a warrant and having a case were the same thing, but he now knows they are two different things.

Mr. Post asked Travis about the sign Kenny put on his fence. Travis told Mr. Post

Page 5 of 6

*RC*

that Kenny put a sign on his fence just a couple of days before the police raided Kenny's property and Trooper Eales was killed. Travis told Mr. Post the sign was not directed at the police, but it was meant for anybody. According to what Travis told Mr. Post, the sign was to scare people away from trespassing on Kenny's property and stealing his stuff.

As I said before, I was interviewed by investigators working on Kenny's case, and my wife and I were present when Travis was interviewed. After the interviews, I was shown this declaration and was asked if it is accurate about what I told the investigators and what I heard Travis tell Mr. Post. I have read this declaration carefully and it says what I told the investigators and what I heard Travis say.

I declare, under penalty of perjury, that the foregoing 6-page declaration is true and correct.

Executed by me this 22 day of FEBRUARY, 2009, in

SEQUOYAH County, Oklahoma.

Roger Crawford

Page 6 of 6

RC

264

# Exhibit B

# ROGER CRAWFORD

## SUPPLEMENTAL DECLARATION

I, Roger Crawford, a person over eighteen years of age and competent to testify, declare the following:

1. I am Kenneth Eugene ("Kenny") Barrett's uncle by marriage. I am married to Phyllis, who is the sister of Gelene Dotson, Kenny's mother. We live next door to Gelene, and Kenny lived next to Gelene on the other side of her house.

2. Just days before the raid on Kenny's house by the Oklahoma Highway Patrol, in September 1999, I observed Sheriff John Philpot drive onto Kenny's property. I came back into my house about five minutes later and he hadn't left yet so I can't say how much longer he stayed. I didn't see what transpired because I can't see Kenny's cabin from my porch.

3. I later learned from my son Travis that Sheriff Philpot had come to inspect Kenny's weapons. I'm not sure how Travis learned the reason for the sheriff's visit.

4. I told this to Leonard Post, who came to see my wife Phyllis and I on December 10, 2014. He asked me if I could swear to that. I said I could because it was true, that I saw it with my own eyes.

I declare, under penalty of perjury, that the foregoing two-page declaration is true and correct.

Declaration of Roger Crawford                    Page 1

Executed by me this _20_ day of _December_ , 2014, in Sequoyah County, Oklahoma.

_Roger Crawford_
Roger Crawford

---

**Declaration of Roger Crawford**          **Page 2**          _RC_

# Exhibit C

## SUPPLEMENTAL DECLARATION OF ROGER CRAWFORD

I, Roger Crawford, a person over the age of eighteen and competent to testify declare as follows:

1. I am Kenneth Eugene ["Kenny"] Barrett's uncle by marriage. I am married to his maternal aunt, Phyllis Crawford. We live next door to Kenny's mother, Gelene Dotson.

2. In the early morning hours of September 24, 1999, I heard the first shot fired during the Oklahoma Highway Patrol's raid on Kenny's house in September of 1999.

3. The shots came from the far east side of Kenny's cabin. I'm sure of this because I have hunted all my life and can tell where a shot comes from.

4. I told this to Leonard Post on November 22, 2015 when he visited me at my home.

I declare under penalty of perjury that the foregoing declaration is true and correct.

Executed by me this 26th day of February 2016, in Sequoyah County, Oklahoma.

_Roger Crawford_
Roger Crawford

1

269

# Exhibit D

SEQUOYAH MEMORIAL HOSPITAL

EMERGENCY ROOM RECORD

Admit Date: 10/20/2008   Admit Time: 12:40

T# 042461   ADMIT# 603356

Patient CRAWFORD, TRAVIS D   Mar.Status MARRIED   Sex M   DOB 1/20/1964   Age 44

Pt's Addr RT 2 BOX 92 8   City VIAN   St OK   Zip 74962-9235   Phone: (918)775-2509

ative CRAWFORD, ROGER   Addr XXX   City SALLISAW   St OK   Zip 74955   Ph# (918)775-2509

Pt's Empl UNEMPLOYED   Addr   City   St   Zip   Ph#

Ins. Company MEDICAID   Cert# 005229406   Grp#   Pt's SSN 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

Ins.Co. Addr STATE OF OK DHS   City OKLAHOMA CITY   St OK   Zip 73154

Secondary In

Family Dr. LOFTIN, TERESA   Notified?   Brought By Self / Rel.   PD   AMB   Other

ER Dr.  ROBLEY, FRED   Advance Directive N   Organ Donor N   Clerk ANDREAC

CHIEF COMPLAINT: i.e. describe illness. If accident state where, when, how injured, height of fall

PAIN SCALE (0-10)

ALLERGIES: ☐Food ☐Medications ☐Latex ☐Chemical

ALLERGIES: CODEINE

Describe your allergy (circle)   rash,   swelling,   hives,   shock,   itching, upset stomach/nausea,   tongue swelling,   breathing problems,   arrest, other:

Past Medical Hx

Current Medications   ☐SEE LIST

Social Hx

| Height | Weight | LMP | Tetanus | OTHER |
|--------|--------|-----|---------|-------|
|        |        |     |         |       |

| TIME | TEMP | PULSE | RESP | BP | O₂SAT | Time | By | Nursing Narrative: Tx/Rx Response | CHECK TO ORDER |
|------|------|-------|------|----|----|------|----|------------------------------------|----------------|
|      |      |       |      |    |        |      |    |                                    | OLD RECORDS ☐ |
|      |      |       |      |    |        |      |    |                                    | CBC ☐ |
|      |      |       |      |    |        |      |    |                                    | CHEM ☐ |
|      |      |       |      |    |        |      |    |                                    | UA ☐ |
|      |      |       |      |    |        |      |    |                                    | CARDIAC PANEL ☐ |

**PHYSICIANS ORDER(S)**

PREG TEST ☐

DRUG SCREEN ☐

CXR ☐

ABG ☐

EKG ☐

OTHER

OTHER

PETITIONER'S EXHIBIT 48
tabbies

Physician Signature   Nurse Signature

CONDITION ON DISCHARGE ☐REPORT DICTATED   Mode of Exit ☐RECORDS FORWARDED   ☐ O₂
☐GOOD   ☐POOR   ☐DISCHARGE ☐EXPIRED ☐ADMIT   ☐WALKED   ☐TRANSFER/COBRA   ☐ ♥ MONITOR
☐FAIR   ☐CRITICAL   ☐TRANSFERRED   ☐GURNEY ☐W/C   FORM(S)COMPLETED
☐UNSTABLE ☐STABLE   DEPART TIME:   RM#   ☐CARRIED   ☐ SEE STRIPS

271

## Sequoyah Memorial Hospital
## ED Triage Nurses Notes

CRAWFORD
FR-AB: 042461-6?          MRN: ?????
DOB:01/20/1964 AGE YRS:044 MOS:09 SEX:M
ADM DATE: 10/20/2008
HUBLEY          FRED
PAT SEX: M
SSN: 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

| | | |
|---|---|---|
| Date: 10/20/08 | Triage Time: 1350 | Arrival Mode: ☒Walk ☐W/C ☐Carried ☐Stretcher ☐EMS ☐Police ☐Encode trauma |

Tx in Progress: O₂ @ _____ L/min ☐ Mast ☐ C-Collar ☐ CPR ☐ Backboard ☐ Splint   IV: Size _____ Site _____ Fluids _____

**Complaint:** Pt C/o "pulled somethin in back" this am while pickn up rebar. Pt C/o'd back pain occurred 1012 this am. Pt states back pain is making head hurt

Advanced Health Care Directive: ☐ Yes ☐ No ☐ Copy to Chart

Wt: 200   Ht: 5'7"   Tetanus

**Visual Acuity**
OS __/__   OD __/__   OU __/__

V/S: T 97.9   P 57   R 20   BP 134/80   O2Sat 97 %   Pain Scale 10 (1-10 scale)   Primary Physician: Loftin

Medications: (Rx and OTC) ☐ See List
Vinax 8mg B.I.D
Quinapril 40mg Y. Daily
amlodipine 5mg Y. Daily

Allergies: NKDA
Reaction: _____
Latex Allergy: ☒No ☐ Yes   Reaction: _____

| MEDICAL HISTORY | SURGICAL HISTORY | Social Hx: |
|---|---|---|
| ☐ None ☐ Diabetes ☐ Seizures | ☒ Appy ☐ Tubal | ☐ Smoke PPD ②|
| ☐ Ulcer ☐ Asthma ☐ Cardiac | ☐ GB ☐ Hyst | ☐ Quit x ___ yrs |
| ☐ Back Pain ☐ CVA ☐ COPD | ☐ Cardiac ☐ Back Surg | ☐ Chew/Dip Tobacco |
| ☒ HTN ☐ Headaches Type ___ | Other: | ☐ Use Alcohol; Freq ∅ |
| ☐ Cancer Type ___ | | ☐ Use Drugs; Type ∅ |
| ☐ Other: Anxiety | | |

### Psychosocial Behavioral
**Age/Devel. Appropriate**
☒ Yes ☐ No
**Eye Contact**
☒ Yes ☐ No
**Affect**
☒ Normal ☐ Abnormal
**Motor Behavior**
☒ Cooperative
☐ Restless ☐ Agitated
**Speech**
☒ Normal ☐ Abnormal
**Support System**
☐ Lives alone
☒ Family/Significant Other
☐ NH ☐ Assisted Living
☐ Other
**Language Barrier**
☒ No ☐ Yes
**Ideations**
☒ None
☐ Harmful to Self
☐ Harmful to others

### Skin
☐ Intact ☐ Lesions
☒ Warm ☒ Dry
☐ Cool ☐ Diaphoretic
**Turgor**
☒ Normal ☐ Decreased
**Edema**
☒ Absent ☐ Present
☐ Site/Degree: ___
**Color**
☒ Normal ☐ Pale
☐ Cyanotic ☐ Mottled
☐ Jaundice ☐ Flushed
**Mucus Membranes**
☒ Moist ☐ Dry

☐ N/A   Ortho ☐ Pain in back
☒ Swelling ☐ Deformity area
☐ Limited movement
Site: ___ Color: ___
Sensation: ___
ROM: ☐ Limited ☐ Full

### Respiratory
☒ Normal ☐ Denies any problems
☐ Dyspnea
☐ Retractions
☐ Stridor
☐ Cough
  ☐ Non-productive
  ☐ Productive
  ☐ Color: ___
☐ Using Accessory Muscles
☐ Expiratory Grunt

**Breath Sounds**
| | R | | L |
|---|---|---|---|
| | ☐ | Clear | ☐ |
| | ☐ | Crackles | ☐ |
| | ☐ | Wheezing | ☐ |
| | ☐ | Diminished | ☐ |
| | ☐ | Absent | ☐ |

### Neurological
☒ Alert
☒ Oriented
☐ Disoriented
☐ Drowsy
☐ Confused
☐ Lethargic
☐ Unresponsive
☐ Combative
☐ Uncooperative
☐ Fontanelle
  ☐ Flat
  ☐ Depressed
  ☐ Bulging
☐ Crying
☐ Age Appropriate
**Responsive to Stimuli**
☐ Verbal ☐ Painful
**Pupils**
☐ N/A ☐ Equal ☐ Unequal
☐ Reactive ☐ Non-Reactive

### Cardiac
☒ N/A ☐ CP
**Onset** ___
☐ Constant
☐ Intermittent
☐ Resolved
☐ Palpitations
☐ Non-Radiating
☐ Radiating
Arm ☐ R ☐ L
☐ Back
☐ Neck/Jaw
☐ Pain Scale (1-10) ___
**Heart Rhythm**
☐ Normal/Regular
☐ Irregular
**Pulses**
Radial ☐ R ☐ L
Femoral ☐ R ☐ L
Pedal ☐ R ☐ L
**Capillary Refill**
☐ Normal ☐ Slow
(2 secs) (>2 secs)

### G.I.
☒ N/A ☐ Denies
**Abdomen**
☐ Normal ☐ Distended
☐ Guarding ☐ Rigid
**Tenderness**
☐ RUQ ☐ LUQ
☐ RLQ ☐ LLQ
☐ Epigastric
**Bowel Sounds**
☐ Present ☐ Absent
☐ Hyper ☐ Hypo
☐ Last BM ___
☐ Nausea
☐ Vomiting ___
☐ Diarrhea ___
☐ Blood in Stool

### G.U.
☒ N/A ☐ Denies
☐ Flank Pain ☐ L ☐ R
☐ Dysuria
☐ Hematuria
☐ Frequency
☐ Oliguria ☐ Retention

### Glasgow Coma Score
| Eye Opening (E) | Verbal Response (V) | Motor Response (M) |
|---|---|---|
| 4=Spontaneous | 5=Normal conversation | 6=Normal |
| 3=To voice | 4=Disoriented conversation | 5=Localizes to pain |
| 2=To pain | 3=Words, but not coherent | 4=Withdraws to pain |
| 1=None | 2=No words...only sounds | 3=Decorticate posture |
| | 1=None | 2=Decerebrate |
| | | 1=None |

Total = E+V+M _____   GCS: _____

### Gyn/Pregnancy
☒ N/A ☐ Denies ☐ LMP ___ ☐ Gest: ___ ☐ EDC ___   Grav ___ Para ___ Ab ___
☐ FHT ___ Contractions ☐ Yes ☐ No   Onset ___ Freq ___ Intensity ___
☐ Spotting ☐ Bleeding ___ No. Pads per hour ___
☐ Cramping ___ Membranes: ☐ Intact ☐ Ruptured When? ___ Color of Fld ___ Odor ☐ Yes ☐ No
☐ Clots: ☐ Small ☐ Medium ☐ Large
☐ Discharge ___ Type ___ Diff w/pregnancy ___

| To Treatment Room: | Time: | Initial | NURSE SIGNATURE / TITLE |
|---|---|---|---|
| H2 | 1508 | am | CM ___ / B ___ |

R⌐ 272

CRANFORD , DAVIS G
PH-C 2461-598504 HRN: 000000
DOB: /1964 AGE YRS:044 MOS:07 SEX:M
ADM DATE: 09/17/2008
MCGUIRE , ANGELA CP 1: 300792
PAT SEX: M
SSN: 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

## Sequoyah Memorial Hospital
## ED Triage Nurses Notes

**Date:** 9/17/08 **Triage Time** 1930 | **Arrival Mode:** ☑Walk ☐W/C ☐Carried ☐Stretcher ☐EMS ☐Police ☐Encode trauma

Tx in Progress: O₂@___ L/min ☐ Mast ☐ C-Collar ☐ CPR ☐ Backboard ☐ Splint | IV: Size___ Site___ Fluids___

**Complaint:** Seen ER 3 dys ago for abcess on ® cheek now Bigger

**Advanced Health Care Directive:** ☐ Yes ☐ No ☐ Copy to Chart
Wt:___ Ht:___ Tetanus___

**Visual Acuity**
OS __/__ OD __/__ OU __/__

**V/S:** 98² **P** 61 **R**___ **BP** 129/71 **O2Sat** 97 % **Pain Scale**___ (1-10 scale) | **Primary Physician:**___

**Medications:** (Rx and OTC) ☐ See List
Bactrim

| MEDICAL HISTORY | SURGICAL HISTORY | Social Hx: |
|---|---|---|
| ☐None ☐Diabetes ☐Seizures | ☑Appy ☐Tubal | ☐Smoke PPD___ |
| ☐Ulcer ☐Asthma ☐Cardiac | ☐GB ☐Hyst | ☐Quit x___yrs |
| ☐Back Pain ☐CVA ☐COPD | ☐Cardiac ☐Back Surg | ☐Chew/Dip Tobacco |
| ☑HTN ☐Headaches Type___ | Other: | ☐Use Alcohol; Freq___ |
| ☐Cancer Type___ | Kidney Stone | ☐Use Drugs; Type___ |
| ☐Other: Anxiety | | |

**Allergies:** Codeine
**Reaction:**___
**Latex Allergy:** ☐ No ☐ Yes Reaction:___

**Psychosocial Behavioral**
Age/Devel. Appropriate ☐Yes ☐No
Eye Contact ☑Yes ☐No
Affect ☑Normal ☐Abnormal
Motor Behavior ☐Cooperative ☐Restless ☐Agitated
Speech ☑Normal ☐Abnormal
Support System ☐Lives alone ☐Family/Significant Other ☐NH ☐Assisted Living ☐Other
Language Barrier ☑No ☐Yes
Ideation ☑None ☐Harmful to Self ☐Harmful to others

**Skin** cheek
☑Intact ☐Lesions
☑Warm ☐Dry
☐Cool ☐Diaphoretic
Turgor ☑Normal ☐Decreased
Edema ☑Absent ☐Present ☐Site/Degree:___
Color ☑Normal ☐Pale ☐Cyanotic ☐Mottled ☐Jaundice ☐Flushed
Mucus Membranes ☑Moist ☐Dry

Ortho ☑N/A ☐Pain ☐Swelling ☐Deformity ☐Limited movement Site:___ Color:___ Sensation:___ ROM: ☐Limited ☐Full

**Respiratory**
☑Normal ☐Denies any problems
☐Dyspnea ☐Retractions ☐Stridor ☐Cough ☐Non-productive ☐Productive ☐Color:___ ☐Using Accessory Muscles ☐Expiratory Grunt

**Breath Sounds**
| R | | L |
|---|---|---|
| ☐ | Clear | ☐ |
| ☐ | Crackles | ☐ |
| ☐ | Wheezing | ☐ |
| ☐ | Diminished | ☐ |
| ☐ | Absent | ☐ |

**Neurological**
☑Alert ☑Oriented ☐Disoriented ☐Drowsy ☐Confused ☐Lethargic ☐Unresponsive ☐Combative ☐Uncooperative ☐Fontanelle ☐Flat ☐Depressed ☐Bulging ☐Crying ☐Age Appropriate
Responsive to Stimuli ☐Verbal ☐Painful
Pupils ☐N/A ☐Equal ☐Unequal ☐Reactive ☐Non-Reactive

**Cardiac**
☑N/A ☐CP
Onset___ ☐Constant ☐Intermittent ☐Resolved ☐Palpitations ☐Non-Radiating ☐Radiating Arm ☐R ☐L ☐Back ☐Neck/Jaw ☐Pain Scale (1-10)___
Heart Rhythm ☐Normal/Regular ☐Irregular
Pulses Radial ☐R ☐L Femoral ☐R ☐L Pedal ☐R ☐L
Capillary Refill ☐Normal (2 secs) ☐Slow (>2 secs)

**G.I.**
☑N/A ☐Denies
Abdomen ☐Normal ☐Distended ☐Guarding ☐Rigid
Tenderness ☐RUQ ☐LUQ ☐RLQ ☐LLQ ☐Epigastric
Bowel Sounds ☐Present ☐Absent ☐Hyper ☐Hypo ☐Last BM___ ☐Nausea ☐Vomiting___ ☐Diarrhea___ ☐Blood in Stool

**G.U.**
☑N/A ☐Denies
☐Flank Pain ☐L ☐R ☐Dysuria ☐Hematuria ☐Frequency ☐Oliguria ☐Retention

**Glasgow Coma Score**

| Eye Opening (E) | Verbal Response (V) | Motor Response (M) |
|---|---|---|
| 4=Spontaneous | 5=Normal conversation | 6=Normal |
| 3=To voice | 4=Disoriented conversation | 5=Localizes to pain |
| 2=To pain | 3=Words, but not coherent | 4=Withdraws to pain |
| 1=None | 2=No words......only sounds | 3=Decorticate posture |
| | 1=None | 2=Decerebrate |
| | | 1=None |

| Total = E+V+M | GCS: |
|---|---|

**Gyn/Pregnancy**
☑N/A ☐Denies ☐LMP___ ☐Gest:___ ☐EDC___ Grav___ Para___ Ab___
☐FHT___ Contractions ☐Yes ☐No Onset___ Freq___ Intensity___
☐Spotting ☐Bleeding No. Pads per hour___
☐Cramping Membranes: ☐Intact ☐Ruptured When?___ Color of Fld___ Odor ☐Yes ☐No
☐Clots: ☐Small ☐Medium ☐Large
☐Discharge Type___ Diff w/pregnancy___

**To Treatment Room:**___ **Time:**___ **Initial** RT **NURSE SIGNATURE / TITLE** RTerrell LPN

273

Time Seen: _1930_   Room # _____    EMS Direction _____

Historian: ☑ Patient   ☐ Spouse   ☐ Family         ☐ NH Nurse   ☐ EMS   ☐ Other_____

**Chief Complaint:** _C/o spider bite on face_

## HISTORY

**HISTORY OF PRESENT ILLNESS:**

**Limited By:** ☐ Altered Level of Consciousness ☐ Dementia ☐ ETT ☐ Distress ☐ Intoxicated 9/13/04

**Started:** ☐ Today / Date _9/13/04_ ☐ Time _____

**Onset:** ☐ Sudden   ☐ Gradual

**Severity:** ☐ Mild   ☐ Moderate   ☑ Severe

**Course:** ☐ Continuous   ☐ Intermittent

**Episodes Last** ☐ Seconds___ ☐ Minutes___ ☐ Hours___ ☐ Days___

**Context:** _arose & ask on left thigh Right_

**Location:** ☐ see anatomic diagram

**Radiation:** ☐ see anatomic diagram

**Quality:** ☐ Sharp ☐ Dull ☐ Burning ☐ Crampy ☐ Achy ☐ Throbbing

**Associated Symptoms:** ∅

☐ see Review of Symptoms ☐ see Contact

**Exacerbating Factors:** ☐ Position ☐ Meals ☐ Movements ☐ Inspiration ☐ Exertion

**Alleviating Factors:** ☐ Rest ☐ Medications _____

**Previous Episodes:** _____

**Sequoyah Memorial Hospital**
PO Box 505  Sallisaw, OK 74955

**Past Medical History**

☐ Coronary Artery Disease   ☐ MI   ☐ CHF   ☐ COPD
⊙ HTN  ☐ CVA: Residual _____
☐ Seizures ☐ Asthma ☐ DM Type_____
☐ Insulin? ☐ Yes / ☐ No ☐ Cancer_____

_Anxiety_

**Surgeries:** ☐ Appendectomy ☐ Cholecystectomy
☐ Hysterectomy ☐ T & A ☐ Total abd. hysterectomy/BSO
☐ CABG ☐ BTL ☐ Bladder Repair/Suspension ☐ TURP
☐ Angioplasty   **Medications:** ☐ see nurses notes ☐ Reviewed

**Allergies:** ☐ see nurses notes ☐ Reviewed
☐ Prior medical records reviewed ☐ Pertinent findings

_Kidney stones_

**Family History:** ☐ CVA ☐ CAD ☐ DM ☐ HTN ☐ Seizures
☐ Asthma ☐ Cancer _____

**Social History:** ☐ Lives alone  Lives with: ⊙ Spouse ☐ Father
☐ Mother ☐ Other_____
☐ Smoker ☐ Non-smoker ☐ Quit ___Yrs. Ago
☐ ETOH ☐ Rarely ☐ Occasionally ☐ Daily ⊙ None
Drugs ⊙ None ☐ Type_____

274

# SEQUOYAH MEMORIAL HOSPITAL

## EMERGENCY ROOM RECORD

Admit Date: 8/08/2007   Admit Time: 4:47   PT# 042461   ADMIT# 528639

Patient CRAWFORD, TRAVIS D   Mar. Status MARRIED   Sex M   DOB 1/20/1964   Age 43

Pt's Addr 411 S ASH APT A   City SALLISAW   St OK   Zip 74955-5601   Phone: (918)235-0926

Relative CRAWFORD, ROGER   Addr XX   City SALLISAW   St OK Zip 74955   Ph# (918)775-2509

Pt's Empl JASON BROOKS CONCRETE   Addr NORMAN GREEN 775-9652 H   City SALLISAW   St OK Zip 74955   Ph# (918)315-0479

Ins. Company MEDICAID   Cert# 005229408   Grp#   Pt's SSN 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

Ins.Co. Addr STATE OF OK DHS   City OKLAHOMA CITY   St OK   Zip 73154

Secondary Ins

Family Dr. LOFTIN, TERESA   Notified? ___   Brought By Self ___   Rel. ___   PD ___ AMB ___   Other ___

ER Dr. BRADEN, JOSEPH A   Advance Directive N   Organ Donor N   Clerk LYNDSAY

CHIEF COMPLAINT: i.e. describe illness. If accident state where, when, how injured, height of fall

c/o migraine x 2 days
UTI passed out

PAIN SCALE (0-10)

ALLERGIES: ☐Food ☐Medications ☐Latex ☐Chemical

ALLERGIES: CODEINE

Describe your allergy (circle)   rash, swelling, hives, shock, itching, upset stomach/nausea, tongue swelling, breathing problems, arrest,

other:

Past Medical Hx HTN, Depression, Kidney Stones ∅

Social Hx ∅

Current Medications ☐SEE LIST
Xanax, Quinapril

| Height | Weight | LMP | Tetanus | OTHER |
|---|---|---|---|---|
| | | | | |

| TIME | TEMP | PULSE | RESP | BP | O₂SAT |
|---|---|---|---|---|---|
| 0455 | 97⁴ | 51 | 22 | 153/99 | 99 |
| | | | | | |
| | | | | | |
| | | | | | |

## PHYSICIANS ORDER(S)

Toradol 60mg IM
Vistaril 50mg IM
V.D./Stadol 2mg IM

| Time | By | Nursing Narrative: Tx/Rx Response |
|---|---|---|
| 0515 | TS | Toradol 60mg IM to (R) hip |
| 0518 | TS | Vistaril 50mg IM to (R) hip. |
| 0600 | M | Stadol 2mg IM RDB |

### CHECK TO ORDER

OLD RECORDS ☐
CBC ☐
CHEM ___ ☐
UA ☐
CARDIAC PANEL ☐
PREG TEST ☐
DRUG SCREEN ☐
CXR ☐
ABG ☐
EKG ☐   OTHER
CT head   OTHER

Physician Signature _____   Nurse Signature M Jasso RN _____

IF

CONDITION ON DISCHARGE ☐REPORT DICTATED
☐GOOD ☐POOR ☐DISCHARGE ☐EXPIRED ☐ADMIT
☐FAIR ☐CRITICAL ☐TRANSFERRED
☐UNSTABLE ☐STABLE   DEPART TIME: 0605 RM# M

Mode of Exit   ☐RECORDS FORWARDED
☐WALKED   ☐TRANSFER/COBRA
☐GURNEY ☐W/C   FORM(S) COMPLETED
☐CARRIED

☐ O₂
☐ ♥ MONITOR
☐ SEE STRIPS

R275

CRAWFORD , TRAVIS D
P#-A#: 042461-528639   MRN: 000000
DOB: 01/20/1964 AGE YRS:043 MOS:06 SEX:M
ADM DATE: 08/08/2007
BRADEN , JOSEPH   DR 1: 000951
PAT SEX: M
SSN: 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

Time Seen: _____

Room # _____

EMS Direction _____

**Historian:** Patient    Spouse    Family _____   N.H. Nurse    EMS    Other

**Chief Complaint:**
HA

**FAMILY HISTORY:** CAD   CVA   DM   Cancer _____

**SOCIAL HISTORY:** Lives Alone / with   Spouse   Father   Mother
Other _____

**Habits:** Non-smoker   Smoker   Quit _____ Yrs ago
Chews Tobacco

**Alcohol:** Rarely   Occasionally   Daily   None

**Drugs:** _____

### HISTORY
**HISTORY OF PRESENT ILLNESS:**
**Limited By:** ALOC   Dementia   Intox   ETT   Distress
**Started:** Today / Date 8/6   Time _____
**Onset:** Sudden   Gradual
**Severity:** Mild   Moderate   Severe
**Course:** Continuous   Intermittent
**Episodes Last:** Seconds___ Minutes___ Hours___ Days___
**Context:**
Pt. c/o severe HA & (L)
temporal region in pattern
similar to prior migraines

**Location:** see anatomic diagram

**Radiation:** see anatomic diagram

**Quality:** Sharp   Dull   Burning   Crampy   Achy
Throbbing

**Associated Symptoms:**

see ROS          see Context

**Exacerbating Factors:** Position   Meals   Movements
Inspiration   Exertion
**Alleviating Factors:** Rest   Meds _____

**Previous Episodes:** _____ migraine headaches

**PAST MEDICAL HISTORY:** CAD / MI   CHF   COPD   HTN
CVA   Seizures   Asthma   TypeI DM/TypeII DM   Insulin Yes/No
Cancer _____ kidney stones depression
  **Surgeries:** Appendectomy   Cholecystectomy   Hyst
  T & A   TAH / BSO   Angioplasty   CAB G   BTL
  **Medications:** See Nurses Notes/Reviewed ☒
  **Allergies:** See Nurses Notes/Reviewed ☒
  Prior Medical Records Reviewed ☐
  Pertinent Findings ☐

**REVIEW OF SYSTEMS:** Check box if reviewed, (all negative or normal unless circled)

**Constitutional:** ☒ Appetite   Fever   Chills   Weakness   Weight Loss
**Eyes:** ☒ Blurred Vision   Visual Acuity   Pain   Discharge
   Photophobia   Diplopia
**ENT:** ☒ Rhinorrhea   Sinus Congestion   Earache   Sore Throat
   Tinnitus
**CV:** ☒ Chest Pain   SOB   Diaphoresis   DOE   Orthopnea
**Respiratory:** ☒ Cough   Night Sweats   Sputum   Hemoptysis
**GI:** ☒ Abdominal Pain   Nausea   Vomiting   Diarrhea
   Constipation   Melena   Hematemesis   Hematochezia
**Urinary:** ☒ Dysuria   Frequency   Hematuria
**GYN:** ☐ LMP nml / abn   Discharge   Bleeding   BC   (None)
   G P A
**Skin:** ☒ Wound   Rash   Bite
**MS:** ☒ Pain   Swelling   Deformity
**Neuro:** ☒ Headache   Numbness   Weakness   Syncope
   Lightheadedness   Ataxia   Vertigo
**Psych:** ☒ Stress   Anxiety   Depression   Suicidal Ideation
   Homicidal   Ideation
☐ All other systems reviewed and negative.

**Sequoyah Memorial Hospital**
PO Box 505  Sallisaw, OK 74955

ED 108  (11/04) Rev: 06/05    Documentation    page 1 of 2

© Copyright Berry E Winn, PLLC 2003

276

FORD          TRAVI
PH-AH: 042461-432797        001: 000000
DOB:01/20/1964 AGE YRS:042 MOS:11 SEX:M
ADM DATE: 01/17/2007
RAY          , TRISZA          OR 1: 000885
PAT SEX: M
SSN: 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

Time Seen: _____

Room # _____

EMS Direction _____

**Historian:**   Patient          Spouse          Family _____          N.H. Nurse          EMS          Other

**Chief Complaint:** Shoulder pain

**FAMILY HISTORY:**   CAD   CVA   DM   Cancer _____

**SOCIAL HISTORY:**   Lives Alone/with   Spouse   Father   Mother
Other _____

**Habits:**   Non-smoker   Smoker   Quit _____ Yrs ago
Chews Tobacco

**Alcohol:**   Rarely   Occasionally   Daily   None

**Drugs:** _____

## HISTORY

**HISTORY OF PRESENT ILLNESS:**

**Limited By:**   ALOC   Dementia   Intox   ETT   Distress

**Started:**   Today / Date >5 days   Time _____

**Onset:**   Sudden          Gradual

**Severity:**   Mild   Moderate   Severe

**Course:**   Continuous          Intermittent

**Episodes Last:**   Seconds___   Minutes___   Hours___   Days___

**Context:** Has hx of bursitis in (L) shoulder. Out of lorcet and xanax. Denies injury.

**Location:** see anatomic diagram

**Radiation:** see anatomic diagram

**Quality:**   Sharp   Dull   Burning   Crampy   Achy
Throbbing

**Associated Symptoms:**

see ROS          see Context

**Exacerbating Factors:**   Position   Meals   Movements
Inspiration   Exertion

**Alleviating Factors:**   Rest   Meds _____

**Previous Episodes:** _____

**PAST MEDICAL HISTORY:**   CAD / MI   CHF   COPD   HTN
CVA   Seizures   Asthma   TypeI DM/TypeII DM   Insulin Yes/No
Cancer _____ Bursitis, Insomnia
  **Surgeries:**   Appendectomy   Cholecystectomy   Hyst
  T & A   TAH / BSO   Angioplasty   CAB G   BTL
  **Medications:**   See Nurses Notes/Reviewed ☑
  **Allergies:**   See Nurses Notes/Reviewed ☑
    ior Medical Records Reviewed ☐
  Pertinent Findings ☐

**Sequoyah Memorial Hospital**
PO Box 505 Sallisaw, OK 74955

ED 108  (11/04)  Rev: 08/05   Documentation   page 1 of 2

**REVIEW OF SYSTEMS:** Check box if reviewed, (all negative or normal unless circled)

**Constitutional:**  ☐ Appetite   Fever   Chills   Weakness   Weight Loss

**Eyes:** ☐   Blurred Vision   Visual Acuity   Pain   Discharge
  Photophobia   Diplopia

**ENT:** ☐   Rhinorrhea   Sinus Congestion   Earache   Sore Throat
  Tinnitus

**CV:** ☒   Chest Pain   SOB   Diaphoresis   DOE   Orthopnea

**Respiratory:** ☐   Cough   Night Sweats   Sputum   Hemoptysis

**GI:** ☒   Abdominal Pain   Nausea   Vomiting   Diarrhea
  Constipation   Melena   Hematemesis   Hematochezia

**Urinary:** ☐   Dysuria   Frequency   Hematuria

**GYN:** ☐   LMP   nml / abn   Discharge   Bleeding   BC   (None)
  G P A

**Skin:** ☐   Wound   Rash   Bite

**MS:** ☒   Pain   Swelling   Deformity

**Neuro:** ☐   Headache   Numbness   Weakness   Syncope
  Lightheadedness   Ataxia   Vertigo

**Psych:** ☐   Stress   Anxiety   Depression   Suicidal Ideation
  Homicidal   Ideation

☐ All other systems reviewed and negative.

© Copyright Berry E Winn, PLLC 2003

277 RL

# SEQUOYAH MEMORIAL HOSPITAL

## EMERGENCY ROOM RECORD

Admit Date: 4/22/2006   Admit Time: 7:25

PT# 042461   ADMIT# 449720

Patient CRAWFORD, TRAVIS D   Mar. Status MARRIED   Sex M   DOB 1/20/1964   Age 42

s Addr RT 2 BOX 92 8   City VIAN   St OK   Zip 74962   Phone: (918)775-2509

Relative CRAWFORD, ROGER   Addr xx   City SALLISAW   St OK Zip 74955   Ph# (918)775-2509

Pt's Empl JASON BROOKS CONCRETE   Addr NORMAN GREEN 775-9652 H   City SALLISAW   St OK Zip 74955   Ph# (918)316-0479

Ins. Company ___   Cert# ___   Grp# ___   Pt's SSN 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

Ins. Co. Addr ___   City ___   St ___ Zip ___

Secondary Ins ___

Family Dr. ___   Notified? ___   Brought By Self ___ Rel. ___ PD ___ AMB ___ Other ___

ER Dr. CAMPBELL, JAMES D   Advance Directive N   Organ Donor N   Clerk NICOLE

**CHIEF COMPLAINT:** i.e. describe illness. If accident state where, when, how injured, height of fall

Pt had "5 teeth extracted th's am" 0530 by Dr. Mllegett Pt c/o pains to sites "Numbness has worn off" Bottom Jaw.

PAIN SCALE (0-10) 10

**ALLERGIES:** ☐Food ☐Medications ☐Latex ☐Chemical

ALLERGIES: CODEINE

Describe your allergy (circle)   rash, swelling, hives, shock, itching, upset stomach/nausea, tongue swelling, breathing problems, arrest, other

Past Medical Hx seen Dr. Mllegett, HTN, appendecting

**Current Medications** ☐SEE LIST

Received RX for lorcet Pharmacy not open yet.

Social Hx ___

Height 5'2   Weight 210lbs pt std   LMP ___   Tetanus ___   OTHER ___

| TIME | TEMP | PULSE | RESP | BP | O2 SAT |
|---|---|---|---|---|---|
| 0735 A | 95.4 | 52 | 20 | 178/103 | 97% |
| | | | | | |
| | | | | | |
| | | | | | |

| Time | By | Nursing Narrative: Tx/Rx Response |
|---|---|---|
| 0752 am | | Pt left without signs, AMA. |
| | | |

**CHECK TO ORDER**

OLD RECORDS ☐
CBC ☐
CHEM ___ ☐
UA ☐
CARDIAC PANEL ☐
PREG TEST ☐
DRUG SCREEN ☐
CXR ☐
ABG ☐
EKG ☐
OTHER
OTHER

## PHYSICIANS ORDER(S)

While talking to pt. abt Pharmacy opening in 15-20m Pt. got upset + left before start of exam

IF 8 ☐ I ☐

Physician Signature ___   4/22/06   Nurse Signature ___

CONDITION ON DISCHARGE ☐REPORT DICTATED
☐GOOD ☐POOR ☑DISCHARGE ☐EXPIRED ☐ADMIT
☐FAIR ☐CRITICAL ☐TRANSFERRED
☐UNSTABLE ☐STABLE   DEPART TIME: ___ RM# ___

Mode of Exit ☑WALKED ☐GURNEY ☐W/C ☐CARRIED
☐RECORDS FORWARDED
☐TRANSFER/COBRA FORM(S) COMPLETED

☐ O2
☐ ♥ MONITOR
☐ SEE STRIPS

278

Time Seen: 0825

Room # H-1

EMS Direction _____

Historian: (Patient)   (Spouse)   Family _____   N.H. Nurse   EMS   Other

Chief Complaint: Rt Elbow pain

**FAMILY HISTORY:** CAD   CVA   DM   Cancer

**SOCIAL HISTORY:** Lives Alone/with   (Spouse)   Father   Mother
Other _____
Habits: Non-smoker   (Smoker)   Quit ____ Yrs ago
Chews Tobacco
Alcohol: Rarely   Occasionally   Daily   None
Drugs: _____

## HISTORY

**HISTORY OF PRESENT ILLNESS:**

Limited By:   ALOC   Dementia   Intox   ETT   Distress

Started:   Today / Date ___ 10 days

Onset:   Sudden   Gradual

Severity:   Mild   Moderate   Severe

Course:   Continuous   Intermittent

Episodes Last:   Seconds__   Minutes__   Hours__   Days__

Context: Pt works c concrete + its repetition extent of Rt elbow — Can't sleep @ night

Location: (see anatomic diagram)

Radiation: see anatomic diagram

Quality: (Sharp)   Dull   Burning   (Crampy)   Achy
Throbbing

Associated Symptoms:

see ROS        see Context

Exacerbating Factors:   (Position)   Meals   (Movements)
Inspiration   Exertion

Alleviating Factors:   Rest   Meds _____

Previous Episodes: _____

**PAST MEDICAL HISTORY:**   CAD / MI   CHF   COPD   HTN
CVA   Seizures   Asthma   IDDM / NIDDM   Cancer _____
Recent Kidney Stone
Surgeries:   Appendectomy   Cholecystectomy   Hyst
T & A   TAH / BSO   Angioplasty   CAB G   BTL

Medications:   See Nurses Notes/Reviewed

Allergies:   See Nurses Notes/Reviewed

**Sequoyah Memorial Hospital**
**PO Box 505 Sallisaw, OK  74955**

**REVIEW OF SYSTEMS:** Check box if reviewed, (all negative or normal unless circled)

**Constitutional:** ☑ Appetite   Fever   Chills   Weakness   Weight Loss

**Eyes:** ☑ Blurred Vision   Visual Acuity   Pain   Discharge
Photophobia   Diplopia

**ENT:** ☐ Rhinorrhea   Sinus Congestion   Earache   Sore Throat
Tinnitus

**CV:** ☑ Chest Pain   SOB   Diaphoresis   DOE   Orthopnea

**Respiratory:** ☑ Cough   Night Sweats   Sputum   Hemoptysis

**GI:** ☑ Abdominal Pain   Nausea   Vomiting   Diarrhea
Constipation   Melena   Hematemesis   Hematochezia

**Urinary:** ☐ Dysuria   Frequency   Hematuria

**GYN:** ☐ LMP   nml / abn   Discharge   Bleeding   BC   (None)
G P A

**Skin:** ☑ Wound   Rash   Bite   Rt-Elbow

**MS:** ☑ Pain   (Swelling)   Deformity

**Neuro:** ☐ Headache   Numbness   Weakness   Syncope
Lightheadedness   Ataxia   Vertigo

**Psych:** ☐ Stress   Anxiety   Depression   Suicidal Ideation
Homicidal   Ideation



PHYSICAL EXAM: (all negative or normal unless circled) Check ☑ if examined

Appearance: ☐ Well Developed

    Appearance consistent with reported age

    Distress / Comfort   Backboard

Calvarium: ☐ Normocephalic  Atraumatic  Scalp

Eyes: ☐ Pupil Reactivity  Discharge  Conjunctivae

ENT: ☐ Nose  TMS  EAC  Throat  Face  Membranes

Neck: ☑ C-Collar  Tenderness  Masses    Bruits

    Swelling    ROM

HT: ☑ Rate  Rhythm  Murmurs  Gallops  Rubs  PMI

Lungs: ☑ Breath sounds  Rales  Rhonchi  Wheezes

Abdomen: ☑ Soft  Tenderness  Bowel sounds  Masses

GU: ☑ Tenderness  Masses  Discharge  Bleeding

Back: ☑ Tenderness  Swelling  Discoloration  Crepitus

EXT: ☐ Tenderness  Swelling  Edema  Pulses  ROM

Skin: ☐ Color  Lesions  Temperature

Neuro: ☐ Alert & Oriented x 4 (or appropriate for age)

    CNS2-12 intact  Motor  Sensation  DTRS

    Coordination

Nurses Notes Reviewed:  VSS  Afebrile  Normal SaO₂ or Hypoxic

Recheck:  time    pt.  better  worse  same  pain resolved
Recheck:  time    pt.  better  worse  same  pain resolved
Consultants:  Dr.     Time  Time    Dr.     Time  Time
    Paged  Call Returned    Paged  Call returned

    Assumed Care        Assumed Care
Admit to floor  Telemetry  ICU
Dx.

Discharge  (1) off work/school    (2) work / school restrictions    (3) Medications

    (4) habits    (5) activity

    (6) Follow-up with Dr. / Clinic    in  3 ~ day(s) only if not better / without fail

    (7) If worse immediately call your doctor or return to Emergency Department.

    (8) Admit    (9) Transfer to

Emergency Physician Signature        MD DO       PA Date: 2/4/06

**Sequoyah Memorial Hospital**
**PO Box 505 Sallisaw, OK  74955**

ED 108  (9/04)    Documentation    page 2 of 2    © Copyright Barry E Winn, PLLC 2003

# Exhibit E

### Declaration of Phyllis Crawford

I, Phyllis Crawford, declare the following:

I am Kenneth Barrett's maternal aunt; Gelene Dotson, who is Kenny's mother, is my sister. I live with my husband, Roger. My son, Travis Crawford, has lived here on and off for many years. Our home is adjacent to Gelene's home and in front of Mark Dotson's home. I can see Kenny's old shack from my home. My family grew up on this land, and many of us still live around here.

We are a close knit family and, like all families, have our quarrels and disputes, but we try hard to help each other out. We feel guilty that we did not do more for Kenny. We did not do anything to get him the kind of mental health treatment he needed, even though our family has had to deal with mental illness for a long time.

Neither Gelene nor Ernie was ready to be a parent. I lived with Gelene and Ernie in Joliet for a few months when Roger was in the service at Ford Ord. Gelene was four months pregnant with Kenny. Even at that time, Gelene drank from the moment she woke up until she went to bed. When Ernie came home from work, Gelene immediately started in on him. Often, he would turn around and leave. I had intended on staying longer, but I could not stand it.

We knew that Kenny was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily.

Kenny had a very difficult relationship with both his parents, but he loved them dearly. Gelene never gave Kenny a kind word, and she screamed at him over anything.

Page 1 of 4

When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room. My husband Roger and I went over to their house and talked to Kenny. Kenny told us that he could not get his mom's voice out of his head. The only time Gelene talked to him was to scream. That is so sad.

Gelene had a lot of problems, especially with alcohol and men, that affected Kenny badly. Gelene had different men in the house all the time right when Kenny was entering his teenage years, and it was very confusing for him.

Gelene was and is a bona fide alcoholic, although she denies it. Gelene, who is three years older than I am, started drinking in high school. She used to beat me up with her fists. Now, Gelene drinks beer from the time she gets up until she goes to bed. She screams all the time, and I can hear it in my house after it's gone through her walls and across our yards. She cannot control her emotions. Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated. My dad's relatives were drinkers as well.

Ernie, Kenny's father, was also a drinker. He hardly had anything to do with him after the divorce, and everyone could see how much it hurt Kenny. Ernie used to come to town once a year, and I remember him coming by to show off his new Corvette when his children did not have shoes or decent clothes to wear.

Kenny was never able to be independent as a grown man. His emotions got in the way of his being able to live too far from home. As an example, a couple of years before the incident, Kenny had run to my house in tears, crying, "The laws are after me. They're coming! What should I do?" I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did. Kenny had been

283

afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail. I have never been afraid of Kenny.

Kenny tried to stay close to home, always worked hard and took pride in his work. He would give you the shirt off his back if you needed it. Kenny was crazy about Abby, his wife. They married young and had a little boy in no time. After Kenny married, he and his wife lived off and on with his mother, and after his divorce he moved back home, building a little shack next door to this mother's. His suicide attempt tells it all. A friend and I witnessed it right from my front window. I almost passed out. Kenny pulled his truck into his mother's driveway, went in her house and got Steve's gun, came outside and shot himself. We rushed over to him, and heard him mumbling and not making any sense. An ambulance came and took him to the hospital where he stayed almost two weeks.

We have learned a lot about depression and mental illness as our children grew up. It runs in our family. I have depression and I get treated for it. My daughter Gwen is bipolar, and her son has a rare disorder that makes him unable to talk or mature; he is like a little child. My son Travis also has to have psychiatric treatment for anxiety and panic attacks and lives with me and my husband.

This whole tragedy with the police officer did not have to happen. Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house and told him that he had to come with me and be arrested and he would have come.

I know that my son Travis testified in the federal trial against Kenny. I was here in December 2008 when an investigator working on Kenny's case listened to what Travis



284

had to say about his testimony.  My husband, Roger, was here and listened to the

conversation, too.  I have read the part of Roger's declaration where he talks about what

Travis told the investigator, and I agree that is what Travis told him.

This declaration I am giving includes what I told the investigator when he asked

me about Kenny, our family, Kenny's upbringing, and his interview with Travis.  I did

not write the declaration myself, but it says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 4-page declaration is true

and correct.

Executed by me this __22__ day of 2009, in _____ County,

Oklahoma.

Phyllis Crawford

Page 4 of 4

285

# Exhibit F

**Supplemental Declaration of Phyllis Crawford**

I, Phyllis Crawford, declare the following:

I am Kenneth Barrett's maternal aunt. On June 4th, I received a phone call from an investigator who I had met with many times before I signed my previous declaration. He asked me several questions. In response, I told him that other than him and family, nobody had ever come out here to my house to talk to me about Kenny or about anything having to do with Kenny's state trials or his federal trial. Then he asked me specifically about Roger Hilfiger, John Echols, a man named Smith, a man named Gordon and a woman named Schaye. I told him again that nobody had come out here and that I didn't remember anyone calling.

Since it has been 10 years, I checked with my husband Roger to see if he remembered anyone calling or coming to our house. He said no, that no one had come out here or called to talk about Kenny.

I did go over to my sister Gelene's shortly before Kenny's federal trial. My sister Carolyn and my cousin Janice were there with Mr. Hilfiger and Mr. Smith, I think that was his name, a short heavy guy. Mr. Hilfiger sat on the couch and Mr. Smith sat in a chair. That's about all I can remember.

I didn't see Kenny when he was in jail. I did see him when we went to court, but there was no chance to talk. He never called to tell me, or ever told me, that he didn't want me or the family involved in his case. I live next door to his mother. She never told me that Kenny told her that he didn't want the family involved in his trial or that he didn't want our help or her help.

I recently got a really nice letter from Kenny and wrote him back.

PC

Page 1 of 2

287

This time the investigator interviewed me entirely over the telephone. He then wrote up what I said and called me again to read it to me. I told him what he read is what I had told him and that I would sign it. He mailed it to me and I read it. It says what I told the investigator.

I declare, under penalty of perjury, that the foregoing 2-page declaration is true and correct.

Executed by me this ___17th___ day of June 2010, in Sequoyah County, Oklahoma.

_Phyllis Crawford_
Phyllis Crawford

PC

# Exhibit G

**THE**
*family clinic*
**555 West Ruth**
**Sallisaw, OK 74955**
**(918) 774-0147**
**(918) 774-0286 fax**

To whom it may concern,

Phyllis Crawford has a history of significant dementia, and would be unsuitable to testify in court proceedings.

Please let me know of I can be of further assistance in this matter.

Sincerely,

Jennifer C. Scoufos, D.O.

290

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

### PETITIONER'S PROFFER OF TESTIMONY

### DECLARATION OF ISSAC BARRETT

Pet'r's Proffer Testimony                                        *Barrett v. U.S.*, CV-09-00105-JHP

**Declaration of Issac Barrett**

I, Issac Barrett, declare the following:

I am Kenneth Barrett's uncle on his father's side of the family. Ernie Barrett, Kenny's father, is my brother.

My wife, Oleta, and I lived on a nice little ranch in Akins, Oklahoma, on land that was inherited by various members of my family. We have a few horses, a few head of cattle, a good dog, and six cats that are self-taught copperhead killers. We also have cougars, coyotes, and bear around here, and we have to keep an eye out for them. I used to hunt but don't care about it anymore. Oleta and I feed deer and wild turkeys all winter, always at the same time of day. If we're late, the deer make a sound and let us know it. Our property is surrounded by woods, and lots of people would think it is pretty idyllic. My grandfather owned 1/3 of this land by himself and 2/3 of this land, twenty acres, with my Uncle John. They died intestate as did my parents. Uncle John's only child Elnora Long, my half-aunt and half cousin, got John's ten acres, which I bought from her. The remaining 20 acres was divided among my grandfather's and Uncle John's grandchildren. We each got 11/144. I bought out most of my family and paid better than the appraised value, and traded for the rest or acquired it by quiet title. Before I bought it, it had lain dormant from 1962-1980; no one lived on it or worked it.

We are able to enjoy life now because we worked hard for it; Barretts are hard working people. Busted my leg twice and my collarbone once. I drive a construction truck for a small outfit now. Before that, I was a production supervisor for 10 years at an open pit, strip surface mine, in Huntington, Arkansas. My job at the mine eventually became a union job. I spent two years in college at West Arkansas College. When I was

−1−


292

growing up, I worked on ranches.  When I was 15 or 16, I broke horses for $15.00 a horse.  I rode a horse every day for six weeks, and if the horse got broken in, I got paid.

From 1917 to 1943, my grandfather and namesake, Isaac Clifford Barrett, managed a 20,000-acre ranch owned by a Kansas doctor, B.B. Ralph. The ranch has since been carved up some, but much of it is a hunting preserve.

My family goes back a ways around here, and we heard interesting stories about them.  My grandfather Isaac married Mary Ellen Maxwell whose mother was Mattie Newby. Mattie married William Maxwell.  Mattie and William had nine other children besides my grandmother Mary: Hazel, Opal, Ivy Harold, Howard, Jim, a boy named Ann, Sam and Albert.  Isaac didn't like to ride in cars. He used a wagon and a team of mules. He was a walker most of all. He didn't have much to say. He chewed tobacco. We called him Papa. We always had a big garden.

Isaac was a fair man.  When I was three or four Isaac told me, "I'm going to take Mr. Rogers some green beans, radishes and new potatoes—he's been sick, bad off— he's our neighbor; we need to share with him." "Please let me go!" I asked. At first he said no because the grass was so high and he was carrying two large buckets. I begged him, "Please!" Isaac agreed and said, "All right, but you have to keep up with me," and I did.  Coming home, we passed a pear orchard and I asked if we could pick one. He said, "No, they're not our pears."  I tried to argue with him and pointed out that he just gave Mr. Rogers all that food, but he explained, "That's because we have plenty—that doesn't entitle us to these pears." That's the way he was.

Isaac sure had his burdens to carry after he married into Mary Maxell's family. She walked around the yard talking to herself.  At night, she would wake up, wash jars,

<p style="text-align:center">–2–</p>

293

and think she was canning. Mary's brother, Howard Maxwell, who worked for Douglas Aircraft in Tulsa, was Loony Tunes and his son Dean Maxwell put a gun to his head and pulled the trigger about 10 to15 years ago. Dean is buried in Akins Cemetery.

Papa (Isaac) committed suicide by ingesting a remedy for black leg cattle disease. My mother told me he killed himself because he had a broken heart. The range was open in Isaac's day. Isaac eventually assembled a small herd, and was cow rich. His son Wilson, they called him Barney, hounded him to sell the herd and invest the money. Finally, Isaac gave in. He sold the herd and never saw the money again after giving it to his son. Took away Isaac's way of life. He had nothing left. He killed himself November 24, 1952, and is buried in Akins cemetery. My grandmother died a little more than ten years later, on December 25, 1963.

Whatever good Isaac had in him, and there was plenty of it, did not pass down to his son, A.J., who was my father. A. J. married my mother, Ada Mae Hatter. I loved my father because he was my father, but as a person he was the sorriest man I ever met in my life. I was born in Marble City, Oklahoma, and then my family moved to Akins, Oklahoma. Both are in Sequoyah County. We lived a hard life. I had three other brothers who died at or near childbirth; the oldest was two weeks old. Two are buried in Akins cemetery. The stillbirth is buried back in the mountains.

The cabin we lived in had no electricity or running water. Our well water was not usable for humans, although it was all right for animals and crops. We had to haul our water. My parents got electricity in 1957. Six years later, they got water and a drain. The entire family had to work in the fields traveling from one crop to the next. We worked strawberry crops, and one time we went to California to pick potatoes.

–3–

294



My father was an abusive alcoholic and a bully who only cared about himself.  He mortgaged cattle that he didn't own and left it to us kids, every one of us, to pay the debt off by picking cotton and green beans. His mom and dad once bought him a pair of shoes—we were so poor—he didn't like them so he threw them in the fireplace. He would destroy his own stuff. His attitude was always, "I'm bigger than you—the hell with you." My brother Ernie is a lot like my father.

If my father was in a bad mood, he hit me or the other kids with any damn thing, belt, club, board, or limb.  He hit all of us and my mother. I never knew from one day to the next what was going to happen.  He was drunk for two weeks at a time. I could never bring my friends around. Sometimes he was away, working pipeline or the lime quarry. Nobody wanted him to be at home because of the crazy things he did.  He raped and impregnated one of my sisters, Margaret.  He beat her bad if she came home from a date late, and once she said, "Beat me some more, I don't care; you've done everything else." I didn't know what she meant at the time, but now I do. My sister went to New Orleans, had the baby, and gave it up for adoption. My father went to Vinita to the state mental hospital but came back after a month.  He was constantly messing around with other women, and rumors flew around that he fathered another child.

When I turned 14, I had had enough of him beating my mother and us kids.  The next time he hit my mother, I hit him back with a fireplace poker that opened a five-inch gash.  I knocked him out cold. When he came to, I said, "You touch my mother again and I'll kill you." I think he knew I would.  He never hit her again when I was around, but he hit her plenty when I wasn't there, busting her eardrum one time when he slapped her. As I got older, I just stayed away from him.

-4-

Some of my family had some pretty serious problems as they grew up. Kids in school called my brother Ernie "Loco" because of the way he acted, and he never completely straightened out. Ernie was pretty cruel and treated us kids pretty rough. When he made us cry, he thought it was funny. He would destroy what little things we might have. My sister Linda is not mentally stable and has treatment by a psychiatrist. My other sister Margaret left home, moved to Bloomington, Illinois, married Morris Cochran and had three boys with him (Kurt, Kent, and Kelly). She died from cancer in 1995. My brother Gary seems to be doing pretty well, but he struggles with a dark side he keeps hidden pretty well.

Ernie married Gelene, and I felt sorry for her. Ernie was Mr. Playboy and good for that one thing only--to use and to walk on women. He botched his marriage. He was always flashing dollars, but he didn't mind taking money from others, even our poor mother. In the Marine Corps, he got in trouble and was going to go to jail unless Mama sent him $1,000. She borrowed it. We picked cotton to pay it back. In 1969 when dad died, mama had to send Ernie money so he could come home for the funeral, but he always acted like Mr. Big.

My mother knew there was something wrong in the head with Ernie, but she covered up as best she could. Ernie would roll dad if he was drunk and passed out and dad had any money. Once when Ernie came to visit after his divorce from Gelene, Ernie was driving a new Corvette and he passed his children on the street. I was riding with him. The children were wearing worn, ragged clothes. I said, "Let's stop; there's your kids." He refused to stop and said, "All they want out of me is money." I think Kenny was 15 or 16 then. It was right pitiful. The less Ernie wanted Kenny, the more Kenny

296


worshipped him.

Gelene had something wrong with her, too. I would come over and some new boyfriend would just be getting out of bed—you never had any idea who was going to be there in the morning. My mother used to keep Kenny and Richie. When Gelene was at Mama's she did not drink, but when she had money, Mama would not see her again until she drank it up. Gelene was a drunk when she was in high school. I met a man who said that when Gelene worked in Walgreens in Joliet right after high school, before she met Ernie, she would get drunk with him, strip for him, and sleep with him. Gelene had two extremes—alcoholic and Jehovah's Witness—and she was definitely in the alcoholic mode when she begat Kenny.

Gelene's dad, Hugh Dotson, was a strange duck. He could not sit down and talk, like he was paranoid, looking around all the time.

There was a pattern in my family that went right down the line—the two suicides and Kenny's attempted suicide—mental illnesses of one kind or another that showed itself in so many ways. The dots connect. Look at Ernie, our father, grandfather and great grandfather. Ellie Long, who is my grandmother's daughter, but is so close to our age we called her "Sis," has serious mental problems. She's a nut out. Where I'm going with this is that I think Kenny was a very paranoid person. Something was wrong with him even when he was a little one. As he got older, Kenny's moods were all over the place.

I was aware that my nephew Kenny Barrett was tried in federal court in 2005. Before or during his trial, no lawyer or investigator working on Kenny's case contacted me. Had I been contacted, I would have provided the information in this declaration and would have testified if asked to do so.

-6-

297

An investigator currently working on Kenny's case asked me to tell him about my family. I did not write the declaration myself but I have read it carefully and it says what I told the investigator when he asked me.

I declare, under penalty of perjury, that the foregoing 7-page declaration is true and correct.

Executed by me this ⟨2⟩ day of March, 2009, in ⟨Sequoyah⟩ County, Oklahoma.

Issac C. Barrett

–7–

299

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:          dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:          Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>    Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>    Respondent. | CASE NO. CV-09-00105-JHP |

## PETITIONER'S PROFFER OF TESTIMONY

## DECLARATION OF JUDY HOUSE

## DECLARATION OF JUDY HOUSE

I, Judy House, a person over the age of eighteen (18) and competent to testify, depose and say, as follows:

I am Ken Barrett's second cousin. My father was Warren Dotson, the brother of Ken's maternal grandfather Hugh Dotson.

There is a lot of mental illness on the Dotson side of the family. For example, my son Steve Kitterman has been diagnosed with manic depression.

I have attached his medical records as Exhibit A to this declaration.

My nephew, Gary Nelson, has an anxiety disorder. My daughter, Starla Willingham, has been diagnosed with manic depression and schizophrenia. My nephew Marty Luper is very mentally ill. My first cousin Sue Raby has two sons who also have serious mental health issues.

Sue's dad was John E. Dotson, brother to Warren and Hugh Dotson. Sue also has a brother named David Dotson who has mental health issues. Sue had a brother, Richard Dotson, who was a doctor in Poteau, Oklahoma that shot and killed himself a few years back.

I declare under penalty of perjury that, to the best of my recollection, the foregoing is true and correct.

Executed this _12_ day of September, 2016, in Kellyville, Creek County, Oklahoma.

Judy House
Judy House

Fri, 22 Jul 16  1417                                                    Page    20 of 35

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: X/All Radiology
Wed, 07/18/2007 10:01      T Forearm      X/All Radiology
    Right Forearm Routine

    Accession #:      9687528                    Result Time: 18 Jul 07  1022


    DOB            : 28 Aug 68  0000
    MRN            : 10626549
    Type           :  Routine
    Body Side      :  Right
    Area           : entire forearm
    Reason         : admit diagnosis
    Clinical History: fell off bridge
    Allergies      : not obtainable
    Performed By   : Matthew S Jarvis, RT(R)
    Films Used     : 2 digital image(s) no repeat films
    Location       : SFH-Rad-Trauma Room 2
    Read By        : Anil A Kilpadikar, MD
    Dictation Date : 18Jul2007 1022
    Transcribed By : Elizabeth A. Podolak
    Date Transcribed: 18Jul2007 1022
    Resulted       : Interpreted
    Final Report   : RIGHT FOREARM, ANTEROPOSTERIOR (AP) AND LATERAL

                     DATE:  07/18/07

                     HISTORY:  Fell off bridge.

                     FINDINGS
                     No acute displaced fractures or dislocations are identified.

                     DICTATED BY:  Anil A. Kilpadikar, MD
    ----------------------------------------------------------------------
         Electronic Signature by: Anil A Kilpadikar, MD

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: X/All Radiology -- continued
Wed, 07/18/2007 10:04      T Complete S  X/All Radiology
   Complete Spine

   Accession #:      9687529              Result Time: 18 Jul 07  1025


   DOB             : 28 Aug 68  0000
   MRN             : 10626549
   Type            :  Routine
   Area            : all
   Reason          : Trauma
   Clinical History: fell off brigde
   Allergies       : not obtainable
   Performed By    : Matthew S Jarvis, RT(R)
   Films Used      : 9 digital image(s) no repeat films
   Location        : SFH-Rad-Trauma Room 2
   Read By         : Anil A Kilpadikar, MD
   Dictation Date  : 18Jul2007 1023
   Date Transcribed: 18Jul2007 1023
   Resulted        : Interpreted
   Final Report    : COMPLETE SPINE

              DATE:  07/18/07

              HISTORY:  Fell off bridge.

              FINDINGS
              Cervical spine:  No acute compression deformities or disalignments are
              seen.  Rudimentary bilateral cervical ribs are noted.  The odontoid
              process and the C1-C2 junction appear unremarkable.

              IMPRESSION
              1.  No acute abnormality seen within the cervical spine.
              2.  Bilateral rudimentary cervical ribs.

              Thoracic spine, anteroposterior (AP) and lateral:  No acute compression
              deformities or disalignments seen.

              Lumbar spine, AP and lateral:  No acute compression deformities or
              disalignments seen.

              DICTATED BY:  Anil A. Kilpadikar, MD
-----------------------------------------------------------------------------------
      Electronic Signature by: Anil A Kilpadikar, MD

Printed on 07/22/2016 by Vang,Lili X              Requested by:
   THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
      LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429      MR#:10626549   CPPnl

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: X/All Radiology -- continued
Wed, 07/18/2007 10:05        T Hip        X/All Radiology
   Right Hip Routine

   Accession #:      9687742                    Result Time: 18 Jul 07   1022


   DOB             : 28 Aug 68   0000
   MRN             : 10626549
   Type            : Routine
   Body Side       : Right
   Area            : entire hip
   Reason          : trauma
   Clinical History: fell off bridge
   Allergies       : not obtainable
   Performed By     : Sharon K Hill, RT(R)
   Films Used      : 2 digital image(s) no repeat films
   Location        : SFH-Rad-Trauma Room 2
   Read By         : Anil A Kilpadikar, MD
   Dictation Date  : 18Jul2007 1020
   Transcribed By   : Elizabeth A. Podolak
   Date Transcribed: 18Jul2007 1020
   Resulted        : Interpreted
   Final Report    : RIGHT HIP, ANTEROPOSTERIOR (AP) AND LATERAL

                    DATE:   07/18/07

                    HISTORY:   Fell off bridge.

                    FINDINGS
                    Fracture involving the proximal right humerus is seen which involves
                    the intertrochanteric ridge.   Fracture of the inferior pubic ramus is
                    also noted.

                    IMPRESSION
                    1.   Fracture of proximal shaft of the femur involving the
                    intertrochanteric portion of the femoral neck.
                    2.   Fracture right inferior pubic ramus.

                    DICTATED BY:   Anil A. Kilpadikar, MD
   -------------------------------------------------------------------------------
        Electronic Signature by: Anil A Kilpadikar, MD

Printed on 07/22/2016 by Vang,Lili X                  Requested by:
    THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
       LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429        MR#:10626549     CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

```
      Chart Group: X/All Radiology -- continued
Wed, 07/18/2007 12:05       T CT Head     X/All Radiology
   CT Head Routine

   Accession #:      9688981              Result Time: 18 Jul 07  1321


   DOB              : 28 Aug 1968
   MRN              : 10626549
   Type             :      Plain
   Sedation Used?   :
   Body Side        : Not Applicable
   Area             : entire brain
   Reason           : trauma
   Clinical Hx      : FALL
   Allergies        : verified
   Contrast?        : no contrast
   Exam Info        :
   Locations        : SFH-Rad-CT Rm 1
   Supplies         : (not used)
   Radiologist      : Michael E. Clouser, MD
   Dictation D/T    : 18Jul2007 1318
   Transcribed By   : Joey D Smith
   Transcribed D/T  : 18Jul2007 1318
   Resulted         : Interpreted
   Final Report     : HEAD CT; July 18, 2007; 1205 hours

                     ORDERING:  Dr. Wayland.

                     HISTORY:  Fell.

                     FINDINGS
                     Plain brain CT shows some metallic artifact in dental work.  Insofar
                     as visualized brain density within normal limits.  No obvious
                     hemorrhage, edema, mass effect, or extraaxial fluid collection
                     intracranially.  Ventricles and cisterns normal.  Bone windows show
                     middle ears pneumatized.  No basilar fracture.  The calvarium is
                     intact.  The sinuses look clear and no definite facial fracture
                     delineated.

                     IMPRESSION:  No acute process.


                     DICTATED BY:  Michael E. Clouser, MD
   ---------------------------------------------------------------------------
      Electronic Signature by: Michael E. Clouser, MD
```

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

---

Chart Group: X/All Radiology -- continued
Wed, 07/18/2007 12:34      T CT Abdomen  X/All Radiology
     CT Abd/Plvs Routine

     Accession #:       9688982                    Result Time: 18 Jul 07  1324


     DOB              : 28 Aug 1968
     MRN              : 10626549
     Type             : Abd w/ IV Contrast & Pelvis w/ IV Contrast
     Sedation Used?   :
     Body Side        : Not Applicable
     Area             : entire abdomen
     Reason           : trauma
     Clinical Hx      : FALL
     Allergies        : verified
     Contrast?        : med rad
     Pressure Inj     : Inj Site:PT IV Flow Rate:2.0  cc/sec Contrast Amount:97 cc PSI:41  PSI
                        Delay Time:65 sec (1.1 min)
     Contrast Used    : NI Media 320, 100cc  used:    1
     Total Dosage     : 97 cc (97 mL)
     Exam Info        :
     Locations        : SFH-Rad-CT Rm 1
     Supplies         : Tubing Extension K50 used:    1
     Radiologist      : Michael E. Clouser, MD
     Dictation D/T    : 18Jul2007 1318
     Transcribed By   : Elizabeth A. Podolak
     Transcribed D/T  : 18Jul2007 1318
     Resulted         : Interpreted
     Final Report     : CT ABDOMEN AND PELVIS

                        DATE:  July 18, 2007, 1234 hours.

                        HISTORY:  Fell.

                        PROCEDURE/FINDINGS
                        Contrast injection shows normal heart size.  Lung bases clear as
                        visualized.  I cannot exclude a tiny left adrenal mass of 10 mm on
                        image 29, probably a small adenoma.  This could be evaluated
                        electively if desired later with adrenal workup in thin cuts.  Liver,
                        spleen, pancreas, right adrenal, kidneys normal.  No aneurysm or
                        adenopathy.  No organ laceration.  No evidence of bowel contusion.  No
                        free air or free fluid.

                        The pelvis shows a catheter in the urinary bladder.  No pelvic
                        adenopathy or fluid.  There are pelvic fractures.  There is a
                        nondisplaced fracture in each of the superior pubic rami.  There is a
                        minimally displaced fracture of the right femur in the
                        intertrochanteric region with separation of the greater trochanter.
                        The fracture extends from the greater trochanter area back to the
                        neck.  The lesser trochanter also is fractured and avulsed with
                        multiple fragments generated in the intertrochanteric portion of the
                        fracture.  Fracture of both inferior pubic rami.  Fracture left
                        acetabulum medially and anteriorly, image 88, at the base of the
                        superior labrum.  Fracture right sacrum through the right sacral ala
                        starting superiorly and going down through the strut.  Some asymmetry
                        of the muscles in the right thigh proximally as there is an offset
                        fracture of the proximal femur with comminution.  There is edema in
                        the muscular layers here.  Piriformis muscle asymmetry, right greater
                        than left, consistent with contusion.  I do not see definite active
                        bleeding here.  This is adjacent to the sacral fracture.

                        IMPRESSION
                        No organ laceration.  Multiple pelvic fractures and right femoral
                        fractures.  Contusion right piriformis.

                        DICTATED BY:  Michael E. Clouser, MD
---------------------------------------------------------------------------------

Printed on 07/22/2016 by Vang,Lili X               Requested by:
  THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
     LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                       Visit#:951620429      MR#:10626549

Fri, 22 Jul 16  1417                                          Page    25 of 35

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: X/All Radiology -- continued
          Electronic Signature by: Michael E. Clouser, MD

Fri, 22 Jul 16  1417                                                    Page    1 of 35

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

**Patient Name:** Kitterman,Steve W               **DOB:** 08/28/1968 **Age:** 47Y  **Sex:** M
**Visit #:** 951620429                            **Attending Physician:** Swenning,Todd A
**MR#:** 10626549                                 **Admission Date/Time:** Wed, 07/18/2007 1317
**Visit Type:** IP  **Bed:** TEC                  **Discharge Date/Time:** Mon, 07/23/2007 1600

---

Chart Group: Q/Discharge Summary
Mon, 09/24/2007 17:47      T Discharge   Q/Discharge Summary
     Discharge Summary
     Event Time: Mon, 24 Sep 07  1747

     Sat, 29 Sep 07  1335

     Physician      : Todd A Swenning, MD
     Dictation D/T  : Mon, 24 Sep 2007  1747
     Report         :
                      ADMIT DATE:  07/18/2007
                      DISCHARGE DATE:  07/22/2007

                      CHIEF COMPLAINT/HISTORY OF PRESENT ILLNESS:
                      Right subtrochanteric intertrochanteric femoral fractures, right sacral
                      fracture and superior and inferior renal fractures.

                      Please admission history and physical.

                      SECONDARY DIAGNOSES:
                      1.   Bipolar disease.
                      2.   Drug and alcohol withdrawal.

                      HOSPITAL COURSE:
                      The patient underwent intramedullary nailing and exam under anesthesia
                      of his pelvis on July 18, 2007.  He tolerated his postop course
                      relatively well.  He did have some mild episodes of fever but it was
                      felt by the consultants that this was, most likely, secondary to his
                      drug withdrawal.

                      DISCHARGE INSTRUCTIONS:
                      1.   He was discharged to the Veterans Administration in stable
                      condition on July 22, 2007.
                      2.   On oral pain medications.
                      3.   He is to maintain foot-flat to nonweightbearing in his right lower
                      extremity for a period of three months secondary to his pelvis.
                      4.   I will see him back in the office in two weeks.


                      Dictated By:  Todd A Swenning, M.D.



                      Job #: 98191
                      TR: 98240
                      Template: 1

                      Name:  Kitterman, Steven
                      MR#:   10626549
                      Visit #:
                      Room #:
                      Date of Admission:  07/18/2007
                      Date of Discharge:  07/22/2007
                      Physician:  Todd A Swenning, M.D. 505467
                      Report:  Discharge Summary DS1

     ----------------------------------------------------------------------------
         Electronic Signature by: Todd A Swenning, MD

Printed on 07/22/2016 by Vang,Lili X              Requested by:
   THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
        LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                         Visit#:951620429        MR#:10626549     CPPnl

Fri, 22 Jul 16  1417                                                      Page     2 of 35

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

___Chart Group: Q/Discharge Summary -- continued_____

Printed on 07/22/2016 by Vang,Lili X                    Requested by:
    THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
        LAW.  UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429          MR#:10626549      CPPnl

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: Q/H&P
Wed, 07/18/2007 11:23      T History an  Q/H&P
   Unscheduled History and Physical
   Event Time: Wed, 18 Jul 07  1123

   Wed, 18 Jul 07  1147

   Physician        : Todd A Swenning, MD
   Dictation D/T    : Wed, 18 Jul 2007  1123
   Report           : DATE OF ADMISSION:  7/18/07

CHIEF COMPLAINT/HISTORY OF PRESENT ILLNESS
This is a 38-year-old gentleman who is a disabled veteran with bipolar
disease and post-trauma stress disorder that was racing his cars last
night.  One of his cars broke down, and he apparently fell off of a
bridge thereafter.  It was about eight to ten feet.  Since his initial
evaluation by emergency medical services he has been not exactly
combative but very agitated and apparently tweaking from rather
extensive methamphetamine use.

PAST MEDICAL HISTORY
Significant for bipolar disorder, obsessive-compulsive disorder (OCD),
post-trauma stress disorder, hyperlipidemia.

MEDICATIONS:  Trazodone, Celexa, Lipitor, Klonopin.

ALLERGIES:  CODEINE.

HISTORY
He is a smoker and moderate drinker that does use methamphetamines.  He
is currently disabled secondary to his post-trauma stress disorder.

REVIEW OF SYSTEMS
Somewhat difficult to obtain secondary to his agitated state.  He
complains primarily only of musculoskeletal complaints around his right
hip.  Denies constitutional, ENT, ocular, cardiac, respiratory,
gastrointestinal (GI), genitourinary (GU), dermatologic, neurological
or hematological complaints.

PHYSICAL EXAMINATION
VITAL SIGNS:  Temperature 36.5, pulse 88, respirations 20, blood
pressure 138/88.
HEAD:  Normocephalic and atraumatic.  His teeth are in fair dentition.

NECK:  Supple.
CHEST:  Clear.
HEART:  Regular.
ABDOMEN:   Soft.
MUSCULOSKELETAL:  He does have pain with anteroposterior (AP) and
lateral compression of his pelvis; however, it feels stable.  His right
hip was not stressed as he has known comminuted intertrochanteric
subtrochanteric fracture of the right hip.  His extensor hallucis
longus, dorsal and plantar sensation are all intact on his right lower
extremity.  Dorsalis pedis is 2+ and symmetric with the contralateral
side.

DIAGNOSTIC DATA
X-rays reveal superior and inferior ramal fractures bilaterally.  He
also has right subtrochanteric intertrochanteric femur fracture.  His
spine series otherwise is without significant abnormality.

IMPRESSION
1.  Subtrochanteric femur fracture.
2.  Anterior pelvic ring injury.

PLAN
The patient does have his long methamphetamine history, and his
potassium is 2.8.  I am going to consult the medical service for

Printed on 07/22/2016 by Vang,Lili X              Requested by:
   THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
      LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429        MR#:10626549     CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: Q/H&P -- continued
Unscheduled History and Physical -- cont'd
clearance for surgery.  Will keep him nothing by mouth and hopefully
fix his hip today.  Risks, benefits, alternatives and complications
were discussed with family members.  They understand and wish to
proceed.  The patient is somewhat agitated, and I question his ability
to give informed consent at this point, and we did discuss this with
his family.

DICTATED BY:  Todd Swenning, MD
----------------------------------------------------------------------
Electronic Signature by: Todd A Swenning, MD

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: Q/Consults
Wed, 07/18/2007 12:04       T Internal M  Q/Consults
    Unscheduled Internal Medicine Consult
    Event Time: Wed, 18 Jul 07  1204

    Fri, 20 Jul 07  0753

    Physician      : J. Damon Smith, DO
    Dictation D/T  : Wed, 18 Jul 2007  1204
    Report         :
                     DATE OF CONSULT:  07/18/2007

                     REFERRING PHYSICIAN:  Todd A Swenning, M.D.

                     PRIMARY CARE PHYSICIAN: Veterans Administration.

                     TIME: 1200 hours.

                     REASON FOR CONSULTATION:
                     Preoperative medical evaluation and management of hypokalemia.

                     IMPRESSION:
                     1.   Femur/pelvic fracture due to motor vehicle accident.
                     2.   Methamphetamine intoxication.
                     3.   Posttraumatic stress disorder.
                     4.   Polysubstance abuse.
                     5.   Hypokalemia.

                     RECOMMENDATIONS:
                     1.   We will replace his potassium intravenously.
                     2.   We find no preclusion to his proceeding to surgery at Dr.
                     Swenning's discretion although anesthesia may prefer that he have a few
                     more hours to detoxify the offending substance as it may make their job
                     easier.

                     DISCUSSION:
                     Dr. Swenning, we appreciate the opportunity to assist in the care of
                     this patient.  Mr. Kennerman is a 38-year-old gentleman who apparently
                     was racing his car last night when he fell off of a bridge onto an
                     embankment approximately 10 feet below, suffering a femur a pelvic
                     fracture. You are familiar with the details behind this and we will not
                     reiterate them here. We have been asked to provide perioperative
                     medical assessment, in particular in regard to some hypokalemia as well
                     as his methamphetamine intoxication and are happy to do so.

                     The patient is seen in the trauma emergency center (TEC) and is noted
                     to be quite aphthotic and manic if you will, i.e., tweaking, from his
                     methamphetamine but otherwise appears to be in no particular distress.
                     He will occasionally complain of pain to his right leg, but we are
                     really unable to get any other coherent history or other information
                     from him. His sister is in the room, from whom we obtained all of the
                     remainder of the historical data not gained from his chart.

                     PAST MEDICAL HISTORY:
                     Past medical history is remarkable for posttraumatic stress disorder
                     and obsessive-compulsive disorder and hyperlipidemia.

                     PAST SURGICAL HISTORY: Negative to the best of our knowledge.

                     SOCIAL HISTORY:
                     The patient is a smoker and also does consume alcohol fairly regularly
                     and obviously is a substance abuser as well.

                     CURRENT MEDICATIONS:
                     1.   Pravachol.
                     2.   Lipitor.
                     3.   Trazodone.
                     4.   Celexa.

THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
     LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429      MR#:10626549    CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: Q/Consults -- continued
Unscheduled Internal Medicine Consult -- cont'd
      5.  Klonopin.
      6.  Valproic acid.

ALLERGIES:
He apparently has an allergy to CODEINE, which causes itching.

REVIEW OF SYSTEMS:
Review of systems is really unobtainable in his current state, but conversation with his sister indicates that he typically does not have any particular cardiovascular, pulmonary, or gastrointestinal or genitourinary symptoms. He is an otherwise healthy fellow.

PHYSICAL EXAMINATION:
VITAL SIGNS: Blood pressure 138/88, pulse 88, respirations 20. He is afebrile.
GENERAL: He is a well-developed, well-nourished male who appears a big younger than his stated age. He is not in so much distress as he is just agitated from his methamphetamine, fidgeting and almost athetotic.
HEENT:  Head is normocephalic, atraumatic.  Conjunctivae and sclerae are clear. Oropharynx is moist without erythema or exudate. Nares are patent bilaterally. Pinnae are symmetric bilaterally. He does have a lot of dirt and other debris throughout his hair and in his ears.
NECK: Supple. Without lymphadenopathy, bruits, jugular venous distention (JVD), or goiter.
HEART: Regular rate, and rhythm. Without murmurs.
LUNGS: Clear to auscultation.
ABDOMEN: Soft with positive bowel sounds.  Nontender to palpation without organomegaly or masses or bruits.
EXTREMITIES:  No pretibial edema. The right lower extremity is rotated externally and a bit foreshortened. There are palpable dorsalis pedis pulses bilaterally.
NEUROLOGICAL: The patient moves all extremities with the exception of his right leg. The examination is nonfocal to the extent that he will cooperate.
PSYCHIATRIC: Again, he is visibly intoxicated.

LABORATORIES:
White count 12.6, hemoglobin 13.8, platelet count 321.

Potassium is 2.8, total bilirubin 1.7.

Urine drug screen is positive for amphetamines and cannabis.

Otherwise laboratories are unremarkable.

Radiographic study reports are reviewed and are consistent with his above diagnosis.

Again, Dr. Sweening, we appreciate the opportunity in the care of this patient.  Our impressions and recommendations are noted above. We will continue to follow along and provide assistance as we can.


Dictated By:  J Damon Smith, D.O.



Job #: 991
TR: 98813
Template: 1



Name:  Kitterman, Steve
MR#:  10626549
Visit #:

Printed on 07/22/2016 by Vang,Lili X                    Requested by:
THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                        Visit#:951620429          MR#:10626549    CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: Q/Consults -- continued
Unscheduled Internal Medicine Consult -- cont'd
                    Room #:
                    Date of Consultation:  07/18/2007
                    Physician:  J Damon Smith, D.O. 16176
                    Report:

----------------------------------------------------------------------------
        Electronic Signature by: J. Damon Smith, DO

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: Q/OP Reports
Mon, 09/24/2007 17:40       T Orthopedic   Q/OP Reports
    Unscheduled Orthopedic Surgery
    Event Time: Mon, 24 Sep 07  1740

    Sat, 29 Sep 07  1333

    Surgeon        : Todd A Swenning, MD
    Dictation D/T  : Mon, 24 Sep 2007  1740
    Report         :
                     DATE OF SURGERY:  07/18/2007

                     PREOPERATIVE DIAGNOSES:
                     1.  Right intertrochanteric subtrochanteric hip fracture.
                     2.  Pelvic ring injury.

                     POSTOPERATIVE DIAGNOSES:
                     1.  Right intertrochanteric subtrochanteric hip fracture.
                     2.  Pelvic ring injury.

                     PROCEDURES PERFORMED:
                     1.  Intramedullary nailing, right femur.
                     2.  Examination under anesthesia, anterior pelvic ring.

                     SURGEON:  Todd A Swenning, M.D.

                     ANESTHESIA:  General endotracheal.

                     DESCRIPTION OF PROCEDURE:
                     After appropriate general endotracheal anesthesia had been obtained the
                     patient's right lower extremity was placed in traction.  The right
                     lower extremity was prepared and draped in the usual sterile manner.

                     A small incision was made proximal to the tip of the greater
                     trochanter.  A combination of sharp and blunt dissection and dissection
                     was carried down through the subcutaneous tissues to the tip of the
                     greater trochanter.  A guidewire was inserted through the tip of the
                     greater trochanter into the proximal femur and the proximal femur was
                     reamed.  A ball-tipped guidewire was inserted down to the level of the
                     physeal scar of the distal femur.  The femoral diaphysis was reamed
                     sequentially until a 12-mm reamer passed without difficulty.  A long
                     trochanteric fixation nail was then inserted through the tip of the
                     greater trochanter without difficulty.  The helical blade was inserted
                     into the center-center portion of the femoral head.  There was noted to
                     be a slight amount of displacement and trumpeting of the proximal
                     aspect of the femur, but there was very good alignment of the neck,
                     shaft and relation distally and therefore this was accepted.  The
                     femoral neck was reamed and the helical blade was inserted and locked
                     using a set screw.  A single distal locking screw was placed using
                     perfect-circle technique.

                     The wounds were copiously irrigated and closed using 0 Vicryl, 2-0
                     Vicryl and staples.  A sterile dressing was applied and the patient was
                     taken out of traction and assessed.  Length and rotation were found to
                     be symmetric.  The pelvis was then stressed fluoroscopically and found
                     to be without significant diastasis at the fractures.  As his right
                     sacral and ramal fractures were found to be stable and he was to be
                     non-weightbearing on his right femur anyway, it was felt he would do
                     well with nonoperative management of his pelvis.  He was therefore sent
                     to the recovery room in stable condition.

                     ESTIMATED BLOOD LOSS:  200 mL.

                     FLUIDS:  2 liters crystalloid.

                     Dictated By:  Todd A Swenning, M.D.

Printed on 07/22/2016 by Vang,Lili X              Requested by:
    THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
       LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429      MR#:10626549    CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: Q/OP Reports -- continued
Unscheduled Orthopedic Surgery -- cont'd


Job #: 98189
TR: 98262
Template: 1

Name:  Kitterman, Steven
MR#:  10626549
Visit #:
Room #:
Date of Surgery:  07/18/2007
Physician:  Todd A Swenning, M.D. 505467
Assistant:
Report:

-----------------------------------------------------------------------------
      Electronic Signature by: Todd A Swenning, MD

   THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
      LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                        Visit#:951620429        MR#:10626549    CPPnl

315

Fri, 22 Jul 16  1417                                                    Page    10 of 35

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: L/All Laboratory
Wed, 07/18/2007 10:20
    Whole Blood Creatinine Level {POCT}                        Status: complete
            Collection Time: 18 Jul 07  1020
            Specimen        : Plasma(9687504)

            Creatinine (mg/: 1.3        (0.7 - 1.5)
            GFR, African-Am: >=60       (>=60
                                        Calculated GFRs less than
                                        60mL/min/1.73m2 may indicate the
                                        presence of Chronic Kidney Disease
                                        when present for 3 or more months.
                                        (National Kidney Foundation))
            GFR, non-Africa: >=60       (>=60
                                        Calculated GFRs less than
                                        60mL/min/1.73m2 may indicate the
                                        presence of Chronic Kidney Disease
                                        when present for 3 or more months.
                                        (National Kidney Foundation))
        Electronic Signature by: Kathleen A. Kleopfer

Wed, 07/18/2007 10:20
    Alcohol Level                                              Status: complete
            Collection Time: 18 Jul 07  1020
            Specimen        : Plasma(9687503)

            Alcohol (mg/dL): negative     (0 - 12)
        Electronic Signature by: Rahini S. Sundaramoorthy

Wed, 07/18/2007 10:20
    Blood Bank Specimen                                        Status: complete
            Collection Time: 18 Jul 07  1020
            Specimen        : Blood(9687503)

            BB Specimen     : This event is used for specimen collection only.  Please refer to
                              other events for Blood Bank results.
        Electronic Signature by: Mary Jane Matthews

Wed, 07/18/2007 10:20
    Hold Blue Tube                                             Status: complete
            Collection Time: 18 Jul 07  1020
            Specimen        : Plasma(9687503)

            Note:           : this event is used to track the "hold tube" request.
        Electronic Signature by: Patricia L. Elliott

Wed, 07/18/2007 10:20
    Hemogram                                                   Status: complete
            Collection Time: 18 Jul 07  1020
            Specimen        : Blood(9687503)

            WBC   (K/cmm)   : 12.6     (3.9 - 10.1)
            RBC   (M/cmm)   : 4.17     (4.30 - 5.94)
            Hgb   (g/dL)    : 13.8     (13.5 - 16.4)
            Hct     (%)     : 38.7     (40.5 - 51.0)
            MCV (cu mic)    : 92.8     (82.3 - 97.4)
            MCHC  (g/dL)    : 35.7     (31.2 - 34.2)
            RDW     (%)     : 11.9     (10.2 - 14.2)
            Plt   (K/cmm)   : 321      (151 - 361)
            MPV (cu mic)    : 7.2      (7.0 - 10.0)
        Electronic Signature by: L Owen Biddle

Printed on 07/22/2016 by Vang,Lili X                    Requested by:
THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
    LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                              Visit#:951620429      MR#:10626549      CPPn1

Fri, 22 Jul 16  1417                                          Page    11 of 35

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: L/All Laboratory -- continued
Wed, 07/18/2007 10:20
    Amylase                                              Status: complete
            Collection Time: 18 Jul 07  1020
            Specimen       : Plasma(9687503)

            Amylase (U/L)  : 38        (34 - 122)
        Electronic Signature by: Lisa G. Russell


Wed, 07/18/2007 10:20
    Comprehensive Metabolic Panel                        Status: complete
            Collection Time: 18 Jul 07  1020
            Specimen       : Plasma(9687503)

            Gluc      (mg/dL): 145      (70 - 110)
            BUN       (mg/dL): 14       (5 - 25)
            Creat     (mg/dL): 1.2      (0.7 - 1.5)
            CO2       (mmol/L): 18      (21 - 32)
            Cl        (mmol/L): 107     (96 - 112)
            Na        (mmol/L): 137     (135 - 146)
            K         (mmol/L): 2.8     (3.5 - 5.0)
            Ca        (mg/dL): 9.3      (8.5 - 10.7)
            TP        (g/dL): 7.5       (6.2 - 8.2)
            Alb       (g/dL): 5.2       (3.7 - 5.1)
            T Bili    (mg/dL): 1.7      (0.1 - 1.2)
            Alk Phos  (U/L): 58         (39 - 139)
            GOT (AST) (U/L): 39         (8 - 42)
            GPT (ALT) (U/L): 37         (7 - 40)
            GFR, African-Am: >=60       (>=60
                                        Calculated GFRs less than
                                        60mL/min/1.73m2 may indicate the
                                        presence of Chronic Kidney Disease
                                        when present for 3 or more months.
                                        (National Kidney Foundation))
            GFR, non-Africa: >=60       (>=60
                                        Calculated GFRs less than
                                        60mL/min/1.73m2 may indicate the
                                        presence of Chronic Kidney Disease
                                        when present for 3 or more months.
                                        (National Kidney Foundation))
        Electronic Signature by: Patricia L. Elliott

Wed, 07/18/2007 10:20
  CK                                                     Status: complete
            Collection Time: 18 Jul 07  1020
            Specimen       : Plasma(9687503)

            CK (U/L)       : 1160      (<=225)
        Electronic Signature by: Lisa G. Russell

Printed on 07/22/2016 by Vang,Lili X          Requested by:
       THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
          LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429      MR#:10626549    CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: L/All Laboratory -- continued
Wed, 07/18/2007 10:39
    Urinalysis w/Culture, if Indicated                    Status: complete
          Collection Time: 18 Jul 07  1039
          Specimen       : Urine(9687502)

          Color          : amber
          Clarity        : clear
          Glucose        : negative    (negative)
          pH             : 6.0         (5.0-8.5)
          Ketones        : 3+          (negative)
          Protein        : 1+          (negative)
          Bilirubin      : negative    (negative)
          Blood          : 1+          (negative)
          Urobilin       : 1.0         (<1.0)
          Sp Grav        : 1.027       (1.005-1.030)
          LE             : negative    (negative)
          Nitrite        : negative    (negative)
          WBC   (avg/hpf): 8           (0 - 4)
          RBC   (avg/hpf): 15          (0 - 4)
          Sq Epi  (/hpf) : trace
          Hy Casts(/hpf) : 2-5         (0-2)
          Other          : 3+ mucous
          Comment        : culture to follow
       Electronic Signature by: Karen S. Deibel


Wed, 07/18/2007 10:39
    Drug Screen, 6 Drugs of Abuse - Urine                 Status: complete
          Collection Time: 18 Jul 07  1039
          Specimen       : Random(9687501)

          Amphetamines   : positive   (negative)
          Amphet Comment : High levels of structurally related amines may cross react with
                           the amphetamine/methamphetamine test.  If confirmation of
                           amphetamine is desired, please contact laboratory. Date of
                           original testing must be provided.  All specimens are held for 7
                           days.
          Barbiturates   : negative    (negative)
          Benzodiazepines: negative    (negative)
          Cannabinoids   : positive    (negative)
          Cocaine        : negative    (negative)
          Opiates        : negative    (negative)
          Comment        : Results are unconfirmed and should be used for medical purposes
                           only.
       Electronic Signature by: Rahini S. Sundaramoorthy


Wed, 07/18/2007 10:39
    Culture, Urine                                        Status: complete
          Collection Time: 18 Jul 07  1039
          Specimen       : Urine(9688617)

          Specimen Type  : Urine (URNCND)
          Nitrite        : Culture indicated by urinalysis
          Leuk Est       : Culture indicated by urinalysis
          Final ID       : No growth - final
       Electronic Signature by: Cochanna Turner


Wed, 07/18/2007 11:22
    ABO/Rh/Antibody Screen                                Status: complete
          ABO/Rh         : O Positive
          Antibody Scrn  : Negative


Printed on 07/22/2016 by Vang,Lili X              Requested by:
   THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
      LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                         Visit#:951620429      MR#:10626549      CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: L/All Laboratory -- continued

Wed, 07/18/2007 13:52
    K (Potassium Level)                                      Status: complete
        Collection Time: 18 Jul 07  1352
        Specimen       : Plasma(9689709)

        K (mmol/L)     : 3.5   (3.5 - 5.0)
    Electronic Signature by: Lisa G. Russell

Wed, 07/18/2007 14:39
    Prothrombin Time with INR                                Status: complete
        Collection Time: 18 Jul 07  1439
        Specimen       : Plasma(9689065)

        INR            : 1.34   (<=1.12)
    Electronic Signature by: Jameka N Warrior

Wed, 07/18/2007 14:39
    Partial Thromboplastin Time                              Status: complete
        Collection Time: 18 Jul 07  1439
        Specimen       : Plasma(9689065)

        PTT  (sec)     : 22.6   (24.1 - 33.3)
    Electronic Signature by: Jameka N Warrior

Wed, 07/18/2007 19:33
    CBC with Differential                                    Status: complete
        Collection Time: 18 Jul 07  1933
        Specimen       : Blood(9691375)

        WBC  (K/cmm)   : 13.7   (3.9 - 10.1)
        Abs Neut       : 11.8   (1.4 - 6.5)
        RBC  (M/cmm)   : 3.51   (4.30 - 5.94)
        Hgb  (g/dL)    : 11.6   (13.5 - 16.4)
        Hct  (%)       : 33.6   (40.5 - 51.0)
        MCV  (cmic)    : 95.9   (82.8 - 97.4)
        MCHC (g/dL)    : 34.5   (31.2 - 34.2)
        RDW  (%)       : 12.1   (10.2 - 14.2)
        Plt  (K/cmm)   : 272    (151 - 361)
        MPV  (cmic)    : 6.9    (7.0 - 10.0)
        Lymph (%)      : 8      (13 - 49)
        Mono  (%)      : 6      (4 - 12)
        Gran  (%)      : 86     (38 - 76)
        Eos   (%)      : 0      (0 - 5)
        Baso  (%)      : 0      (0 - 2)
        Bands          : No Band Flag
    Electronic Signature by: Carol L Lindley

THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                        Visit#:951620429      MR#:10626549      CPPn1

319

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

```
      Chart Group: L/All Laboratory -- continued
Wed, 07/18/2007 19:33
    Basic Metabolic Panel                                  Status: complete
            Collection Time: 18 Jul 07  1933
            Specimen        : Plasma(9691375)

            Gluc    (mg/dL): 144        (70 - 110)
            BUN     (mg/dL): 11         (5 - 25)
            Creat   (mg/dL): 1.2        (0.7 - 1.5)
            CO2     (mmol/L): 21        (21 - 32)
            Cl      (mmol/L): 111       (96 - 112)
            Na      (mmol/L): 140       (135 - 146)
            K       (mmol/L): 3.4       (3.5 - 5.0)
            Ca      (mg/dL): 7.9        (8.5 - 10.7)
            GFR, African-Am: >=60       (>=60
                                        Calculated GFRs less than
                                        60mL/min/1.73m2 may indicate the
                                        presence of Chronic Kidney Disease
                                        when present for 3 or more months.
                                        (National Kidney Foundation))
            GFR, non-Africa: >=60       (>=60
                                        Calculated GFRs less than
                                        60mL/min/1.73m2 may indicate the
                                        presence of Chronic Kidney Disease
                                        when present for 3 or more months.
                                        (National Kidney Foundation))
        Electronic Signature by: Barbara S Rose

Wed, 07/18/2007 23:34
    PT with INR (Prothrombin Time with INR)                Status: complete
            Collection Time: 18 Jul 07  2334
            Specimen        : Plasma(9691919)

            INR           : 1.48    (<=1.12)
        Electronic Signature by: Brian V. Toussaint

Wed, 07/18/2007 23:34
    PTT (Partial Thromboplastin Time)                      Status: complete
            Collection Time: 18 Jul 07  2334
            Specimen        : Plasma(9691919)

            PTT   (sec)   : 22.0    (24.1 - 33.3)
        Electronic Signature by: Brian V. Toussaint

Thu, 07/19/2007 03:09
    CBC with Differential                                  Status: complete
            Collection Time: 19 Jul 07  0309
            Specimen        : Blood(9692249)

            WBC (K/cmm)   : 9.1      (3.9 - 10.1)
            Abs Neut      : 7.3      (1.4 - 6.5)
            RBC (M/cmm)   : 2.84     (4.30 - 5.94)
            Hgb  (g/dL)   : 9.6      (13.5 - 16.4)
            Hct     (%)   : 27.3     (40.5 - 51.0)
            MCV  (cmic)   : 96.0     (82.8 - 97.4)
            MCHC (g/dL)   : 35.2     (31.2 - 34.2)
            RDW     (%)   : 12.0     (10.2 - 14.2)
            Plt (K/cmm)   : 263      (151 - 361)
            MPV  (cmic)   : 7.5      (7.0 - 10.0)
            Lymph   (%)   : 12       (13 - 49)
            Mono    (%)   : 8        (4 - 12)
            Gran    (%)   : 80       (38 - 76)
            Eos     (%)   : 0        (0 - 5)
            Baso    (%)   : 0        (0 - 2)
            Bands         : No Band Flag
        Electronic Signature by: Sarah J Thomas
```

Printed on 07/22/2016 by Vang,Lili X                 Requested by:
   THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
     LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429        MR#:10626549      CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

```
    Chart Group: L/All Laboratory -- continued
Thu, 07/19/2007 03:09
    Comprehensive Metabolic Panel                          Status: complete
         Collection Time: 19 Jul 07  0309
         Specimen       : Plasma(9692249)

         Gluc     (mg/dL): 137       (70 - 110)
         BUN      (mg/dL): 12        (5 - 25)
         Creat    (mg/dL): 1.1       (0.7 - 1.5)
         CO2      (mmol/L): 23       (21 - 32)
         Cl       (mmol/L): 111      (96 - 112)
         Na       (mmol/L): 139      (135 - 146)
         K        (mmol/L): 3.7      (3.5 - 5.0)
         Ca       (mg/dL): 7.6       (8.5 - 10.7)
         TP       (g/dL): 5.1        (6.2 - 8.2)
         Alb      (g/dL): 3.6        (3.7 - 5.1)
         T Bili   (mg/dL): 0.6       (0.1 - 1.2)
         Alk Phos (U/L): 36          (39 - 139)
         GOT (AST) (U/L): 43         (8 - 42)
         GPT (ALT) (U/L): 28         (7 - 40)
         GFR, African-Am: >=60       (>=60
                                     Calculated GFRs less than
                                     60mL/min/1.73m2 may indicate the
                                     presence of Chronic Kidney Disease
                                     when present for 3 or more months.
                                     (National Kidney Foundation))
         GFR, non-Africa: >=60       (>=60
                                     Calculated GFRs less than
                                     60mL/min/1.73m2 may indicate the
                                     presence of Chronic Kidney Disease
                                     when present for 3 or more months.
                                     (National Kidney Foundation))
    Electronic Signature by: Amber N Guinn


Fri, 07/20/2007 04:59
    Sputum Cult                                            Status: complete
         Collection Time: 20 Jul 07  0459
         Specimen       : Sputum(9698675)

         Specimen Type  : Sputum
         Gram Stain     : >25 WBC's/LPF, gram positive cocci pairs
         Usual flora*   : Usual flora for respiratory tract present.
         Final ID       : No pathogens
    Electronic Signature by: Nu L. Kwok


Fri, 07/20/2007 08:17
    Cath UA                                                Status: complete
         Collection Time: 20 Jul 07  0817
         Specimen       : UrinCath(9699188)

         Color          : yellow
         Clarity        : clear
         Glucose        : negative   (negative)
         pH             : 6.5        (5.0-8.5)
         Ketones        : trace      (negative)
         Protein        : 1+         (negative)
         Bilirubin      : negative   (negative)
         Blood          : trace      (negative)
         Urobilin       : 1.0        (<1.0)
         Sp Grav        : 1.017      (1.005-1.030)
         LE             : 1+         (negative)
         Nitrite        : negative   (negative)
         WBC  (avg/hpf) : 4          (0 - 4)
         RBC  (avg/hpf) : 1          (0 - 4)
         Sq Epi  (/hpf) : trace
         Hy Casts(/hpf) : rare       (0-2)
    Electronic Signature by: Wesley E Huber
```

Printed on 07/22/2016 by Vang,Lili X              Requested by:
THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
    LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                    Visit#:951620429      MR#:10626549

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: L/All Laboratory -- continued
Fri, 07/20/2007 08:30
   Peripheral Blood Cult                                    Status: complete
          Collection Time: 20 Jul 07  0830
          Specimen        : Bld Cult(9699131)

          Specimen Type  : Blood Cult - Adult, Peripheral stick
          Remark         : Spec #9699131: 20 Jul 07  0830
          Final ID       : No growth 5 days - final
       Electronic Signature by: Alexander O Hickman

Fri, 07/20/2007 08:54
   Basic Metabolic Panel                                    Status: complete
          Collection Time: 20 Jul 07  0854
          Specimen        : Plasma(9697905)

          Gluc    (mg/dL): 147        (70 - 110)
          BUN     (mg/dL): 6          (5 - 25)
          Creat   (mg/dL): 1.1        (0.7 - 1.5)
          CO2     (mmol/L): 25        (21 - 32)
          Cl      (mmol/L): 108       (96 - 112)
          Na      (mmol/L): 137       (135 - 146)
          K       (mmol/L): 3.3       (3.5 - 5.0)
          Ca      (mg/dL): 7.8        (8.5 - 10.7)
          GFR, African-Am: >=60       (>=60
                                      Calculated GFRs less than
                                      60mL/min/1.73m2 may indicate the
                                      presence of Chronic Kidney Disease
                                      when present for 3 or more months.
                                      (National Kidney Foundation))
          GFR, non-Africa: >=60       (>=60
                                      Calculated GFRs less than
                                      60mL/min/1.73m2 may indicate the
                                      presence of Chronic Kidney Disease
                                      when present for 3 or more months.
                                      (National Kidney Foundation))
       Electronic Signature by: Patricia L. Elliott

Fri, 07/20/2007 11:14
   Peripheral Blood Cult                                    Status: complete
          Collection Time: 20 Jul 07  1114
          Specimen        : Bld Cult(9699132)

          Specimen Type  : Blood Cult - Adult, Peripheral stick
          Remark         : Spec #9699132: 20 Jul 07  1114
          Final ID       : No growth 5 days - final
       Electronic Signature by: Alexander O Hickman

Printed on 07/22/2016 by Vang,Lili X              Requested by:
THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
   LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                         Visit#:951620429      MR#:10626549    CPPn1

Fri, 22 Jul 16  1417                                      Page    17 of 35

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

Chart Group: L/All Laboratory -- continued
Fri, 07/20/2007 11:15
    CBC with Differential                              Status: complete
        Collection Time: 20 Jul 07  1115
        Specimen        : Blood(9699130)

        WBC (K/cmm)     : 6.2      (3.9 - 10.1)
        Abs Neut        : 4.2      (1.4 - 6.5)
        RBC (M/cmm)     : 2.51     (4.30 - 5.94)
        Hgb  (g/dL)     : 8.6      (13.5 - 16.4)
        Hct      (%)    : 23.9     (40.5 - 51.0)
        MCV  (cmic)     : 95.2     (82.8 - 97.4)
        MCHC (g/dL)     : 35.8     (31.2 - 34.2)
        RDW      (%)    : 11.7     (10.2 - 14.2)
        Plt (K/cmm)     : 200      (151 - 361)
        MPV  (cmic)     : 7.6      (7.0 - 10.0)
        Lymph   (%)     : 23       (13 - 49)
        Mono    (%)     : 8        (4 - 12)
        Gran    (%)     : 68       (38 - 76)
        Eos     (%)     : 0        (0 - 5)
        Baso    (%)     : 0        (0 - 2)
        Bands           : No Band Flag
    Electronic Signature by: Donald L Terry, MT

Sat, 07/21/2007 02:28
    CBC with Differential                              Status: complete
        Collection Time: 21 Jul 07  0228
        Specimen        : Blood(9703851)

        WBC (K/cmm)     : 5.7      (3.9 - 10.1)
        Abs Neut        : 3.8      (1.4 - 6.5)
        RBC (M/cmm)     : 2.55     (4.30 - 5.94)
        Hgb  (g/dL)     : 8.6      (13.5 - 16.4)
        Hct      (%)    : 24.5     (40.5 - 51.0)
        MCV  (cmic)     : 95.9     (82.8 - 97.4)
        MCHC (g/dL)     : 35.1     (31.2 - 34.2)
        RDW      (%)    : 11.8     (10.2 - 14.2)
        Plt (K/cmm)     : 227      (151 - 361)
        MPV  (cmic)     : 7.5      (7.0 - 10.0)
        Lymph   (%)     : 23       (13 - 49)
        Mono    (%)     : 9        (4 - 12)
        Gran    (%)     : 67       (38 - 76)
        Eos     (%)     : 2        (0 - 5)
        Baso    (%)     : 0        (0 - 2)
        Bands           : No Band Flag
    Electronic Signature by: Stephanie L Vasquez

Printed on 07/22/2016 by Vang,Lili X              Requested by:
THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
    LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                        Visit#:951620429        MR#:10626549    CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

```
     Chart Group: L/All Laboratory -- continued
Sat, 07/21/2007 02:28
     Basic Metabolic Panel                                 Status: complete
           Collection Time: 21 Jul 07   0228
           Specimen      : Plasma(9703851)

           Gluc     (mg/dL): 109       (70 - 110)
           BUN      (mg/dL): 5         (5 - 25)
           Creat    (mg/dL): 0.9       (0.7 - 1.5)
           CO2      (mmol/L): 24       (21 - 32)
           Cl       (mmol/L): 109      (96 - 112)
           Na       (mmol/L): 141      (135 - 146)
           K        (mmol/L): 3.6      (3.5 - 5.0)
           Ca       (mg/dL): 7.9       (8.5 - 10.7)
           GFR, African-Am: >=60       (>=60
                                       Calculated GFRs less than
                                       60mL/min/1.73m2 may indicate the
                                       presence of Chronic Kidney Disease
                                       when present for 3 or more months.
                                       (National Kidney Foundation))
           GFR, non-Africa: >=60       (>=60
                                       Calculated GFRs less than
                                       60mL/min/1.73m2 may indicate the
                                       presence of Chronic Kidney Disease
                                       when present for 3 or more months.
                                       (National Kidney Foundation))
        Electronic Signature by: Patricia L. Wicks

Sun, 07/22/2007 03:57
     Hemogram                                              Status: complete
           Collection Time: 22 Jul 07   0357
           Specimen      : Blood(9706215)

           WBC   (K/cmm)  : 4.4       (3.9 - 10.1)
           RBC   (M/cmm)  : 2.70      (4.30 - 5.94)
           Hgb   (g/dL)   : 8.8       (13.5 - 16.4)
           Hct      (%)   : 26.0      (40.5 - 51.0)
           MCV (cu mic)   : 96.2      (82.8 - 97.4)
           MCHC  (g/dL)   : 33.8      (31.2 - 34.2)
           RDW      (%)   : 11.8      (10.2 - 14.2)
           Plt   (K/cmm)  : 308       (151 - 361)
           MPV (cu mic)   : 7.5       (7.0 - 10.0)
        Electronic Signature by: Barbara J Gustafson
```

Printed on 07/22/2016 by Vang,Lili X                  Requested by:
THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429        MR#:10626549   CPPn1

Saint Francis Hospital
6161 South Yale Avenue
Tulsa, OK 74136

_____
    Chart Group: C/All Cardiology
Wed, 07/18/2007 22:02        T Electrocar   C/All Cardiology
  EKG EKG
  Event Time: Wed, 18 Jul 07  2202                        supplemental

  Thu, 19 Jul 07  1600

  Type           : ECG, Routine
  Interpreting Phy: Pirzada A. Majid, MD
  Interpretation  :
                   Normal sinus rhythm
                   Normal ECG
-------------------------------------------------------------------------------

Printed on 07/22/2016 by Vang,Lili X                Requested by:
    THIS CONFIDENTIAL AND PRIVILEGED DOCUMENT/INFORMATION IS PROTECTED BY FEDERAL AND STATE
        LAW. UNAUTHORIZED DISCLOSURE, DISSEMINATION OR DUPLICATION IS PROHIBITED.
Kitterman,Steve W                          Visit#:951620429        MR#:10626549        CPPn1

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## PETITIONER'S PROFFER OF TESTIMONY

## DECLARATION OF GARY NELSON

## DECLARATION OF GARY NELSON

I, Gary Nelson, a person over the age of eighteen (18) and competent to testify, deposes and says as follows:

I am the second cousin once removed from Kenneth Barrett. My late mother Karen was the daughter of Warren Dotson.

I have known Kenny all my life. I know him to be kind, honest, and compassionate. Ken is direct, but I have never seen him violent.

I have personal knowledge that several of my cousins suffer from various forms of mental illness, mostly anxiety and manic depression, but other things as well. You could pretty much throw a rock at any member of my family and hit someone who is mentally ill. Unfortunately, I am one who suffers from a disabling mental illness. I have been diagnosed with severe panic anxiety and PTSD. My psychiatric records are attached to this declaration as Exhibit A.

About nine months before the raid on Kenny's, I went to a bar with him in Sequoyah County on 59 Highway between the racetrack and Vian. Another friend named Dwayne came with us. While we were in the bar, a uniformed deputy sheriff came in. He had brown hair, a moustache, was about 5'10" tall and weighed about 180 pounds. He wore a ball cap. He came up to Kenny and he and Kenny stepped away from us so that I could not hear the conversation, except for the last words in which Ken told him to "F" himself. The officer then left. If Ken knew at that time that there was a warrant out for his arrest he never told me, but if there was it sure would have been easy to arrest Ken right then and there, but the sheriff didn't.

About six months before the raid, I had come down from Sapulpa, where I lived, to visit my mother who lived in Bunch. I went by Kenny's while I was down. I was in his garage, where he worked on cars. A man drove through the gate onto Kenny's property. He wore a long-sleeve shirt and blue jeans. Kenny said an expletive when he saw him and then walked over toward his cabin to meet him in the driveway where they talked for about five minutes. Then the man got in his car and left. Ken came back to the garage, and said that it was "F-in" Philpot. Since I don't know the Philpots I couldn't tell you which one it was. If there was a warrant out for Ken and Ken knew about it he never said, but Mr. Philpot did not arrest Ken.

I declare under penalty of perjury that, to the best of my recollection, the foregoing is true and correct.

Executed this _16th_ day of ~~August, 2016,~~ January, 2017 in Kellyville, Creek County, Oklahoma.

_Gary Wayne Nelson_
Gary Nelson

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

**PETITIONER'S PROFFER OF TESTIMONY**

**DECLARATION OF ROSEANN SCHAYE**

## DECLARATION OF ROSEANNE SCHAYE

I, Roseanne Schaye, a person over the age of eighteen (18) years and competent to testify, deposes and says as follows:

I was employed by John Echols as a mitigation investigator for Kenneth Barrett.

In the course of my employment, I conducted many initial interviews with Mr. Barret's family members.

In the course of my family interviews and my interviews with Mr. Barrett, I uncovered many indications of severe familial mental health issues that seemed to pervade the Barrett and Dotson families, which required further investigation by me and by mental health experts. I sent Mr. Echols copies of these reports and repeatedly tried to get his attention so that I could get additional funding to continue my investigation. For reasons I never understood, he never responded and so I withdrew from the case after notifying both the client and the court.

In particular, my interviews with Carolyn Joseph, Phyllis Crawford, Abby Stites, Linda Reilly and Toby Barrett all point to Ken's mental illness and/or the genetic components of it. Gelene Dotson's interview speaks to her in-utero use of alcohol when she was carrying Ken. I have initialed these reports, which are labeled Exhibits A-F.

I was never contacted by anyone from Ken's federal trial. Had I been, and if they had asked for my assessment of Ken, I would have told them that from the limited investigation, I believed that Ken had mental health issues, that he was genetically predisposed to mental illness, and that his illness was likely exacerbated by his meth use. I also felt that he was also learning disabled and had Attention Deficit Disorder. I would

1                                                      _____

330

have suggested that they do a full mitigation investigation and that they engage experts to delve further into Ken's mental illness and the genetic components of it.

Had I been asked to testify at the federal trial, I would have testified to the facts contained in my reports and to my opinions as contained herein.

I also thought that Ken was a decent guy and was impressed by his resourcefulness.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this ___14th___ of March  2017, in Medford, in Jackson County, Oregon.

___Roseanne Schaye___
Roseanne Schaye

2

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | **PETITIONER'S UNOPPOSED MOTION TO FILE MOTION AND EXHIBITS UNDER SEAL** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

Petitioner Kenneth Eugene Barrett, by and through undersigned counsel, pursuant to

LCvR 79.1, moves this Court to enter the attached proposed order directing the Clerk of Court to

file under seal Petitioner's Unopposed Motion for Access to Videotape and the exhibits offered

in support of that motion. Mr. Barrett states the following as good cause for granting this Motion:

Mot. File Under Seal Pet'r's Mot. Copy Price Video      1            *Barrett v. U.S.*, CV-09-00105-JHP

Mr. Barrett seeks to file under seal a motion in which he requests a copy of the videotape created by Dr. J. Randall Price during his evaluation of Mr. Barrett on October 13 and14, 2005. This Court has retained Dr. Price's report and the videotape under seal, although it has given counsel for the parties access to both. Access to the videotape is limited to the courthouse. Order (Doc. 269) at 17. (On September 29, 2005, this Court entered an order directing that the report of the government's expert be maintained under seal. Order (Doc. 216) at 6 in Case No. 6:04-cr-00115-P.)

Although this Court released Dr. Price's report to counsel for each party in this proceeding, it has not unsealed that report. Because Mr. Barrett's motion for a copy of the videotape describes the contents of the report, the report is Exhibit A to the motion, and Exhibit B to the motion further describes the contents of the report, the motion and its exhibits should be sealed in accordance with previous orders.

Mr. Barrett's counsel will serve the motion and exhibits on counsel for the government.

On May 3, 2017, Mr. Barrett's counsel conferred by email with counsel for the government who stated that the government does not oppose this motion to seal.

WHEREFORE, Mr. Barrett respectfully requests this Court direct the Clerk of Court to file under seal Petitioner's Motion for Copy of Videotape and the two exhibits appended thereto.

///

///

///

///

///

///

334

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

/s/ *Tivon Schardl*
TIVON SCHARDL
Trial & Habeas Counsel

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 3rd day of March 2017, I caused the foregoing Petitioner's Motion to File Motion Under Seal to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>          Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>          Respondent. | CASE NO. CV-09-00105-JHP<br><br>**[PROPOSED] ORDER** |

Before the Court is Petitioner's Motion to File Under Seal his motion for a copy of the videotaped examination conducted by J. Randall Price in October 2005. This Court directed that Dr. Price's report and the videotape of his examination be maintained under seal. Although the Court has released the report and given counsel access to view the videotape at the courthouse, both the report and videotape remain under seal. Petitioner's motion quotes and references

<div align="center">1</div>

*Barrett v. U.S.*, CV-09-00105-JHP

contents of the report, the report is an exhibit to the motion, and a declaration from counsel in support of the motion also refers to the report's contents. The government does not oppose sealing the motion and exhibits. This Court, being fully informed in the matter, finds the grounds for sealing the report remain compelling and, therefore, the motion exhibits should be sealed. The motion to seal is GRANTED.

        IT IS SO ORDERED.

DATED:        May ___, 2017.

                                            _____
                                            HON. JAMES H. PAYNE
                                            UNITED STATES DISTRICT JUDGE

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Karl J. Saddlemire (karl_saddlemire@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net),
Christopher J. Wilson (caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), District Judge James
H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:893103@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Seal
Document(s)
Content-Type: text/html
```

## U.S. District Court

### Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 5/4/2017 at 1:03 PM CDT and filed on 5/4/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 422(No document attached) |

**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: granting [421] Petitioner's Unopposed Motion to File Motion and Exhibits Under Seal. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire     karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | CASE NO. CV-09-00105-JHP |
| Petitioner, | |
| vs. | **PETITIONER'S MOTION TO EXCLUDE EXPERT TESTIMONY FROM J. RANDALL PRICE BASED ON FAILURE TO DISCLOSE OPINIONS, REASONS AND BASES THEREFOR** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

COMES NOW Petitioner, KENNETH EUGENE BARRETT, by and through

undersigned counsel, who moves this Court pursuant to its scheduling order and Fed. R. Crim. P.

16(d)(2)(C), to enter an order excluding the testimony of J. Randall Price, Ph.D. This motion is

based on the files and records in this case, the attached exhibits, and the following points and

authorities. Together they show the government has failed to submit a report of Dr. Price's

Pet'r's Mot. Exclude Price for Disc. Violation          1          *Barrett v. U.S.*, CV-09-00105-JHP

opinions regarding the mitigation evidence presented by Mr. Barrett in these post-conviction proceedings, and the reasons and bases for why Dr. Price holds whatever opinions he holds about that evidence.

The issue before this Court is whether Mr. Barrett suffered prejudice from his trial counsel's unreasonable failure to conduct a thorough investigation for mental health mitigation. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015), *cert. denied*, ___ U.S. ___, 137 S. Ct. 36 (2016); Order (Doc. 248) at 3; Order (Doc. 269) at 2. The government intends to offer the testimony of Dr. Price to rebut the evidence presented by the only expert this Court would allow from Mr. Barrett, psychiatrist George Woods, M.D. *See Barrett*, 797 F.3d at 1232. As the Tenth Circuit indicated, and as the record shows, at the time the case was remanded to this Court, Mr. Barrett had not been shown the report Dr. Price prepared in 2005. *Ibid.*

In 2005, pursuant to Federal Rule of Criminal Procedure 12.2(c)(1), this Court permitted the government to have Dr. Price examine Mr. Barrett so that the government could prepare rebuttal to the opinions of Dr. Jeanne Russell. Order (Doc. 216) in Case No. 6:04-cr-00105-P (hereinafter "Crim. Doc."). Because Mr. Barrett's trial counsel did not present Dr. Russell, pursuant to Rule 12.2(c)(2), Dr. Price's report was not disclosed to Mr. Barrett. *See* Order (Crim. Doc. 216) at 6; Crim. Doc. 237; Order (Doc. 269) at 13-14, 16-17.

The order authorizing Dr. Price's evaluation specified that the "sole purpose of the government's examination shall be to confirm or rebut mental health evidence presented by the defendant." Order (Crim. Doc. 216) at 5; Order (Doc. 269) at 13. The sole source of "mental health evidence" the government had from Mr. Barrett was the risk assessment conducted by Dr. Russell in 2003 and updated in 2005. As the Court of Appeals correctly found, "Dr. Russell's

Pet'r's Mot. Exclude Price for Disc. Violation          2          *Barrett v. U.S.*, CV-09-00105-JHP

341

work was restricted to an assessment of Defendant's future dangerousness," *Barrett*, 797 F.3d at 1225, an issue the government presented in its case in chief, *id.* at 1224.

On December 6, 2016, this Court directed the parties to this § 2255 proceeding to exchange expert reports no later than March 3, 2017. Order (Doc. 270) at 2. This Court also specified that the government's expert would be limited to "providing rebuttal testimony as contemplated by the Federal Rules of Criminal Procedure." Order (Doc. 269) at 11.

The purpose of the disclosure required by Rule 12.2(b) is to give the government notice "sufficient to allow the government to find mental health experts from the same field . . . ." *United States v. Lujan*, 530 F. Supp. 2d 1224, 1239 (D. N.M. 2008). This Court has found Dr. Price is not from the same field as Dr. Woods. Order (Doc. 269) at 13.

Rule 16(a)(1)(G) requires that "the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition." Fed. R. Crim. P. 16(a)(1)(G). Rule 16(a)(1)(G) specifies that the report "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Ibid.* This Court's scheduling and discovery orders plainly required the exchange of such a report. Order (Doc. 269) at 11. Under the circumstances of this case, then, Rule 16(c) of the Federal Rules of Criminal procedure required the government to promptly disclose "additional evidence or material" that it discovered after its initial disclosures.

The only report Mr. Barrett's counsel have received from Dr. Price is the report that was filed with this Court under seal in 2005. That report addresses the specifics of Dr. Russell's risk assessment, something that Mr. Barrett has not offered in evidence. The report does not summarize any opinions regarding the mental health mitigation evidence that Mr. Barrett has

Pet'r's Mot. Exclude Price for Disc. Violation          3          *Barrett v. U.S.*, CV-09-00105-JHP

342

proffered in these post-conviction proceedings. Dr. Price's report also contains no statement of the reasons or the bases for any opinions he may have in rebuttal to the mental health evidence presented in these post-conviction proceedings, a matter this Court has previously found. Order (Doc. 269) at 13.

Just as this Court's 2005 order stated, rebuttal testimony offered in a federal capital sentencing trial must respond to the evidence proffered by the opponent. *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001). *See also United States v. Fell*, 537 F.3d 197, 227 (1st Cir. 2008) ("sensible" for trial court to defer ruling on scope of mental health rebuttal until after defense presented mental health mitigation). A trial court appropriately excludes "rebuttal" testimony where the party offering it has long had notice of the opponent's position, and yet fails to present its expert's opinion in its case in chief. *Koch v. Koch Industries, Inc.*, 203 F.3d 1202, 1224-25 (10th Cir. 2000) (affirming trial court's exclusion of rebuttal evidence where plaintiffs were reasonably on notice of defense case). Here, the government was on notice of Mr. Barrett's experts' opinions in 2009, was under an obligation to provide expert disclosures by March 3, 2017, and submitted nothing with regard to Dr. Price that puts Mr. Barrett on notice of how Dr. Price will purport to rebut the opinions of Dr. Woods.

Dr. Price's 2005 report contains no proper rebuttal because he never mentions the evaluation done by Dr. Woods or Dr. Myla Young and it relates to the central issue presented in the government's case in chief, *viz.* future dangerousness. There is no opinion that anything in Dr. Price's report undermines the evaluations considered by the Tenth Circuit. *See Boles v. United States*, 2015 U.S. Dist. LEXIS 42332 (M.D. N.C. Apr. 1, 2015) (excluding as improper rebuttal testimony about psychopathy where not responsive to other party's case).

Pet'r's Mot. Exclude Price for Disc. Violation          4          *Barrett v. U.S.*, CV-09-00105-JHP

343

Presumably, because the government has been in communication with Dr. Price, *see* Doc. 392, the government had the ability, over the past eight years of litigation, to have Dr. Price consider and opine on the opinions of Dr. Woods or state the reasons and bases for how his earlier opinions rebut Dr. Woods, if they do. Had the government done so, it was required by this Court's Order (Doc. 270) at 2, and Rules 12.2(c) and 16(c) of the Federal Rules of Criminal Procedure to update Dr. Price's report no later than March 3, 2017. The government has not submitted any supplemental disclosure from Dr. Price.

The government's failure to provide meaningful, timely disclosures precludes it from presenting testimony from Dr. Price that would purport to be rebuttal of Dr. Woods. Due to the extraoridinary amount of time the government has had to comply with the rule, and this Court's often expressed view that the issues remanded for hearing are narrow and should be resolved quickly, the appropriate remedy is exclusion. *Cf. United States v. Ivy*, 83 F.3d 1266, 1280-81 (10th Cir. 1996); *United States v. Red Elk*, 2005 WL 5327776 (W.D. Ok. Oct. 18, 2005).

The Government acknowledged in its Motion for Mental Examination by Dr. Pitt, that at most Dr. Price "had the opportunity to obtain a neuropsychological evaluation of the defendant." Mot. (Doc. 253) at 2.[1]  The delay in presenting Dr. Price's testimony has given the government an extraordinary amount of time, far more than that available to Mr. Barrett, to supplement its disclosures as required by Rule 16(c). Yet, this Court has said its goal in these proceedings is to recreate the conditions that obtained at the time of trial. Order (Doc. 269) at 12-13. The government's failure to play fair and take advantage of the extraordinary amount of time it had to

---

[1] Mr. Barrett does not imply or concede that Dr. Price conducted a neuropsychological evaluation. He administered a neuropsychological screening instrument. No credible neuropsychologist would characterize that as an examination comparable to Dr. Young's. Furthermore, the government's statement was false and misleading. This Court's order in the criminal case authorized the government to have Mr. Barrett "examined by a psychiatrist or other mental health professional(s) selected by the government, if the government chooses to do so." Order (Crim. Doc. 216) at 4.

Pet'r's Mot. Exclude Price for Disc. Violation          5          *Barrett v. U.S.*, CV-09-00105-JHP

344

supplement Dr. Price's report, merits a heavy sanction given this Court's many expressions of frustration with the time this case has gone on. *See*, *e.g.*, Order (Doc. 246).

This motion is different than Mr. Barrett's earlier motion to exclude Dr. Price. That motion was due before the deadline for expert reports. In that motion, Mr. Barrett put the government on notice that he would object to Dr. Price testifying that his evaluation could rebut the conclusions of Mr. Barrett's expert. See Mot. (Doc. 305) at 6, 13-15; Mot. Ex. B (Decl. Thomas Reidy) (Doc. 305-2) at ¶¶ 23-24; Mot. Ex. C (Decl. Deborah Miora) (Doc. 305-3) at 2-3. Now that the deadline for the government to supplement disclosures has passed, and the government submitted no supplemental report from Dr. Price, Mr. Barrett objects that he cannot prepare to cross-examine Dr. Price on any undisclosed opinions, reasons or bases at this late date.

Any disclosure at this late date will jeopardize the hearing schedule. Mr. Barrett will not have time to present any supplemental report to his experts. Mr. Barrett is already prejudiced by the Court not allowing him to have a copy of Dr. Price's videotape even though it contains impeachment material.

Pursuant LCvR 7.1, Mr. Barrett's counsel conferred with counsel for the government in an effort to resolve this matter informally. Mr. Barrett's counsel advises the Court that the government intends to file an opposition to this Motion.

WHEREFORE, this Court should enter an order precluding the government from presenting any testimony from Dr. Price as to how his opinions rebut those of Mr. Barrett's experts, and, since that is the only issue before this Court, the order should preclude him from offering any opinion testimony at all.

///

Pet'r's Mot. Exclude Price for Disc. Violation        6        *Barrett v. U.S.*, CV-09-00105-JHP

345

DATED:      May 9, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

/s/ *Tivon Schardl*
TIVON SCHARDL
Trial & Habeas Counsel

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Pet'r's Mot. Exclude Price for Disc. Violation       7       *Barrett v. U.S.*, CV-09-00105-JHP

346

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 9th day of May 2017, I caused the foregoing Petitioner's Motion to Exclude Expert Testimony by J. Randall Price Due to Discovery Violation to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

Pet'r's Mot. Exclude Price for Disc. Violation          8          *Barrett v. U.S.*, CV-09-00105-JHP

347

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Karl J. Saddlemire (karl_saddlemire@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net),
Christopher J. Wilson (caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), District Judge James
H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:894127@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Sealed Motion
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 5/9/2017 at 2:05 PM CDT and filed on 5/9/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 427(No document attached) |

**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: Petitioner's [423] Motion for a Copy of the Videotaped Evaluation of Petitioner Conducted by Randall Price on October 13 and 14, 2005 is hereby granted. The Court Clerk is directed to make copies of the videotape, attached to Dkt. # 237 in Criminal Case CR–04–115–JHP, and provide a copy of the same to counsel for both parties. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire    karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Karl J. Saddlemire (karl_saddlemire@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net),
Christopher J. Wilson (caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), District Judge James
H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:894138@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content–Type: text/html

### U.S. District Court

### Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 5/9/2017 at 2:35 PM CDT and filed on 5/9/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 428(No document attached) |

**Docket Text:**

**MINUTE ORDER by District Judge James H. Payne: Directing expedited response by close of business on 5/15/2017 (Re: [425] Petitioner's MOTION to Exclude Testimony of J. Randall Price). (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire    karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,           )
                                  )
          Plaintiff,              )
                                  )
     -vs-                         ) No. CIV-09-105-JHP
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Defendant.              )


                    *  *  *  *  *


              TRANSCRIPT OF EVIDENTIARY HEARING
                        VOLUME I
        **BEFORE THE HONORABLE STEVEN P. SHREDER**
             UNITED STATES MAGISTRATE JUDGE

                    MARCH 27, 2017

                    *  *  *  *  *


                 A P P E A R A N C E S

     MR. DAVID B. AUTRY, 1021 Northwest 16th Street,
Oklahoma City, Oklahoma, 73106, and,
     MS. JOAN M. FISHER, Federal Public Defender,
Sacramento, 801 I Street, Third Floor,
Sacramento, California, 95814, Attorneys on behalf of the
Defendant;

     MR. CHRISTOPHER WILSON, 520 Denison Avenue, Muskogee,
Oklahoma, 74401, Assistant United States Attorney, and,
     MR. JEFFREY B. KAHAN, U.S. Department of Justice,
Capital Case Unit, 1331 F Street Northwest, Room 345,
Washington, D.C., 20530, attorneys on behalf of the
Plaintiff;


REPORTED BY:              KEN SIDWELL, CSR-RPR
                          United States Court Reporter
                          P.O. Box 3411
                          Muskogee, Oklahoma  74402

I N D E X

WITNESS                                                    PAGE

**Ruth Harris**
    (Direct Examination by Ms. Fisher)          41
    (Cross-Examination by Mr. Kahan)            47

**Mark Dotson**
    (Direct Examination by Ms. Fisher)          53
    (Cross-Examination by Mr. Wilson)           65
    (Redirect Examination by Ms. Fisher)        76

**Stephen Wayne Barrett**
    (Direct Examination by Mr. Autry)           78
    (Cross-Examination by Mr. Kahan)           107
    (Redirect Examination by Mr. Autry)        118
    (Recross-Examination by Mr. Kahan)         122

**Doris Barrett**
    (Direct Examination by Ms. Fisher)         123
    (Cross-Examination by Mr. Kahan)           133
    (Redirect Examination by Ms. Fisher)       140

**Jack E. Gordon, Jr.**
    (Direct Examination by Mr. Autry)          145
    (Cross-Examination by Mr. Kahan)           159
    (Redirect Examination by Mr. Autry)        171

**George Woods, M.D.**
    (Direct Examination by Mr. Autry)          176

MARCH 27, 2017 PROCEEDINGS

*(On the record at 9:04 a.m.)*

THE COURT:  Call case number CIV-09-105-JHP, Kenneth Eugene Barrett versus United States of America. Would the attorneys enter their appearances for the record, please?

MR. WILSON:  Christopher Wilson and Jeff Kahan for the United States, Your Honor.

MS. FISHER:  Joan Fisher, David Autry for the movant, Mr. Barrett.

THE COURT:  Very well.  We're set for hearing today on Mr. Barrett's petition for post conviction relief. The government ready to proceed?

MR. WILSON:  Government's ready, Your Honor.

THE COURT:  Is Mr. Barrett ready to proceed?

MS. FISHER:  Mr. Barrett's ready, Your Honor.

THE COURT:  Go ahead and call your first witness then.

MS. FISHER:  Your Honor, we'd like to start with a proffer of the unobjected-to exhibits if I may.

THE COURT:  Okay.

MS. FISHER:  Your Honor, at this time, Mr. Barrett would offer Exhibit Number 1, which is a document In the Matter of Mental Illness of Billy Dean Maxwell, case number MH8212, record of the mental health proceeding dated May

5th, 1982.

THE COURT:  Is there any objection?

MR. WILSON:  No objection, Your Honor.

THE COURT:  Very well.  That one's admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 3, In the Matter of the Sanity of A.J. Barrett, case number 709, mental health record and petition for order of admission to state hospital.

MR. WILSON:  No objection.

THE COURT:  Very well.  It's admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 5, in the matter of the sanity of Wallace Dotson, lunacy record, case number 366, dated May 4th, 1948.

MR. WILSON:  No objection.

THE COURT:  Plaintiff's Number 5 is admitted.

MS. FISHER:  Mr. Barrett offers In the Matter of Mental Illness of Kenneth Barrett, case number 481, record of mental health proceeding.

MR. WILSON:  No objection.

THE COURT:  It's admitted.

THE CLERK:  What exhibit number?

MS. FISHER:  That was Exhibit 6.  Mr. Barrett would offer Exhibit Number 8, which are excerpts from Mr. Barrett's baby book.

MR. WILSON:  No objection, Your Honor.

THE COURT:  Number 8's admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 12, a letter from John Echols to The Honorable James H. Payne dated February 28th, 2005.

MR. WILSON:  No objection.

THE COURT:  Number 12 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 13, a letter from the Honorable James H. Payne to John Echols dated February 22nd, 2005.

MR. WILSON:  No objection.

THE COURT:  Number 13 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 14, a letter from Ronald Lax to Tivon Schardl dated September 24th, 2008.

MR. WILSON:  No objection.

THE COURT:  Number 14 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 41, educational records for Kenneth Barrett.

MR. WILSON:  No objection.

THE COURT:  Number 41 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 45, medical records of Kathy Trotter, a relative of Mr. Barrett's.

MR. WILSON:  No objection, Your Honor.

THE COURT:  Number 45 is admitted.

MS. FISHER:  46.  Mr. Barrett would offer -- Mr. Barrett would offer Exhibit Number 46, medical records of Brandy Hill, a relative of Mr. Barrett.

MR. WILSON:  No objection.

THE COURT:  Is that Number 46, is that what it was?

MS. FISHER:  Yes, Your Honor.

THE COURT:  That one's admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 47, the medical records of Toby Barrett.

MR. WILSON:  Also no objection.

THE COURT:  Number 47 is admitted.

MS. FISHER:  Mr. Barrett would offer the medical records for Travis Crawford, cousin to Mr. Barrett.

MR. WILSON:  No objection.

THE CLERK:  What number is that?

MS. FISHER:  I'm sorry.  It's Exhibit Number 48.

THE COURT:  Number 48 is admitted.

MS. FISHER:  Number 49, Mr. Barrett would offer the medical records of Linda Riley, Mr. Barrett's aunt.

MR. WILSON:  No objection.

THE COURT:  Number 49 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 50, the medical records of A.J. Barrett, Mr. Barrett's grandfather.

MR. WILSON:  No objection.

THE COURT:  Number 50 is admitted.

MS. FISHER:  Mr. Barrett offers medical records for Kenneth Barrett, Exhibit Number 51.

MR. WILSON:  No objection.

THE COURT:  Number 51 is admitted.

MS. FISHER:  Mr. Barrett offers Exhibit 53, Sylvia Gelene Dotson's genealogy memorandum.

MR. WILSON:  No objection, Your Honor.

THE COURT:  Number 53 is admitted.

MS. FISHER:  Mr. Barrett offers Exhibit Number 54, the military records for Travis Crawford, Mr. Barrett's cousin.

MR. WILSON:  No objection, Your Honor.

THE COURT:  Number 54 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 55, the educational records for Kenneth Barrett.

MR. WILSON:  No objection.

THE COURT:  Number 55 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 56, the medical records of Gwen Crawford, Mr. Barrett's cousin.

MR. WILSON:  Judge, the government has no objection.  I just want to make sure that we're talking about the same person.  Gwen Crawford also be Gwen Holt; is

that correct?

MS. FISHER:  Yes.

MR. WILSON:  No objection.

THE COURT:  Number 56?

MS. FISHER:  56, Your Honor.

THE COURT:  That's admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 57, the medical records of Carolyn Joseph, Mr. Barrett's aunt.

MR. WILSON:  No objection.

THE COURT:  Number 57 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 58, Social Security records for Travis Crawford.

MR. WILSON:  No objection.

THE COURT:  Number 58 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 72, which are the billing records of Roger Hilfiger and Bret Smith.

MR. WILSON:  No objection.

THE COURT:  Very well.  Number 72 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 73, the additional education records for Kenneth Barrett.

MR. WILSON:  No objection.

THE COURT:  Number 73 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 77, sealed budget conference minutes.

MR. WILSON:  No objection.

THE COURT:  Number 77 is admitted.

MS. FISHER:  Mr. Barrett would offer Exhibit Number 78, sealed order by Magistrate Judge Steven Shreder regarding the defendant's ex parte motion for approval of preauthorization budget for the defense.

MR. WILSON:  Your Honor, government has no objection.  I think maybe we can streamline this a little bit if you want to do this as a group, counsel.

MS. FISHER:  On the sealed budget orders?

MR. WILSON:  That's correct.

MS. FISHER:  Mr. Barrett would offer the following exhibits:  78, 79, which is letter from James Payne to Mr. Echols; 80, which is a letter from Mr. Echols to Mr. Payne -- to Judge Payne; 81, 82, 83, all of which are sealed budget hearing minutes; 84, 85, 86, which are also sealed minute orders.

MR. WILSON:  The government has no objection to those -- those exhibits.

THE COURT:  Those exhibits are admitted.

MS. FISHER:  Mr. Barrett would offer into evidence Exhibit Number 87, childhood photos of Kenneth Barrett.

MR. WILSON:  No objection.

THE COURT:  Number 87 is admitted.

MS. FISHER:  Mr. Barrett would offer into evidence the defendant's pro se motion for change of appointed counsel filed in the trial of the underlying matter.

MR. WILSON:  No objection.

THE COURT:  Is that Number 88?

MS. FISHER:  That is Number 88, Your Honor.

THE COURT:  Number 88's admitted.

MS. FISHER:  Exhibit Number 89, Mr. Barrett would offer into evidence, which is the order by Judge James Payne denying Mr. Barrett's pro se motion for change of appointed counsel.

MR. WILSON:  No objection.

THE COURT:  Number 89 is admitted.

MS. FISHER:  Following that, Your Honor, Mr. Barrett would offer into evidence Exhibit Number 16, the declaration of Ada Blount.  And I'd ask that, Your Honor, for the opportunity to read that declaration into the record.

THE COURT:  Is there any objection?

MR. WILSON:  I'm sorry, Judge.  I was looking down at my notes.

THE COURT:  She's offered Number 16, which is the declaration of Ada Blount.

MR. WILSON:  Your Honor, as to the remaining

declarations, it's the government's position that they are admissible for this hearing so long as they comply with the provisions of 3593.  Other than that, the government would object to any statements in those declarations which do not fall within the parameters of 3593.

MS. FISHER:  And it's our position, Your Honor, that the declarations that I would like to read into the record do, in fact, comply with the statutory requirements for admission of exhibits or evidence into a capital phase capital sentencing.

THE COURT:  Well, I'm going to go ahead and allow you to do that, and if there's anything in particular the government objects to, let me hear about it then.

MS. FISHER:  Thank you, Your Honor.

MR. WILSON:  Just for -- sorry.  Excuse me, counsel.  For clarification, do you want me to make those contemporaneous objections, Judge?

THE COURT:  Yes.

MR. WILSON:  Okay.

MS. FISHER:  Declaration of Ada Blount, Petitioner's Exhibit 16.  I, Ada Blunt, declare as follows: I am Kenneth Barrett's maternal great aunt.  My sister is Gelene Dotson's mother.  I live with my daughter, Janice Sanders.  Kenny was a hyper little boy who could not sit still.  He grew up and built a shack next to his mother's

and tried to make a living fixing cars.  I never felt threatened by Kenny.  He did not bother me any, but I worried about him because I thought drugs made him do things he wouldn't do otherwise.  He was living by himself and got mad at himself sometimes.  Once he shot himself.  Kenny never had much of a father.  Never had any guidance.  We all still love him very much.  An investigator working on Kenny's case asked me to provide this declaration.  I did not write the declaration myself but I have read it carefully and it says what I told the investigator during our meeting.  I declare under penalty of perjury that the foregoing one page declaration is true and correct. Executed on the 27th day of February of 2009 in Sequoyah County, Oklahoma.  Signed by Ada Blount.  For the record, Your Honor, Ms. Blount is deceased.

THE COURT:  Is there any objection?

MR. WILSON:  No, Your Honor.

THE COURT:  Number 16 is admitted.

MS. FISHER:  We offer into evidence Petitioner's Exhibit Number 20, Declaration of Ernest Barrett.  For the record, Your Honor, Mr. Barrett, Kenneth Barrett's father is now deceased.  Declaration of Ernest Eugene Barrett.

I, Ernest Eugene Barrett, declare as follows: I am the father of Kenneth Edward Barrett -- Kenneth Edward Barrett, the oldest of three sons born to me and Gelene

Dotson Barrett during our marriage.  At the time I married Gelene, even before we had children, I almost immediately started running around with other women.  When Gelene and I started having children, I did not give much thought to fatherhood and I was mostly an absent father.  Today, these many years later, I wish I could take it back and do for my children what they needed and be the kind of parent they deserve.

MR. WILSON:  Judge, going to object to that particular statement.  And, Your Honor, there are about -- about the first four and a half pages of this particular declaration, it's the government's position, fall outside the parameters of 3593.  And I guess I'm asking the Court, for purposes of judicial economy and time, I would just ask the Court to consider these declarations only -- only what the Court believes is admissible under 3593.  Because it's going to take all week if we're going to sit here and just read through each one of these and I have to contemporaneously object to every sentence.  I'm just asking the Court for some guidance on this particular issue.

THE COURT:  Is there any reason why we have to read them if I admit them all into evidence?

MS. FISHER:  There is, Your Honor.  The purpose of that is because of two reasons.  One, you have to make a decision as to whether or not counsel were ineffective, and

part of that is the prejudicial effect.  It's much too easy to pile in -- and especially given the number of exhibits that we have -- to pile in what is testimonial in nature into the exhibit category.

And to Mr. Wilson's objection I would simply state that all of the declarations deal with the background, personal history, and mental history and have an impact on Mr. Barrett's growing up and his mental health.  And, thus, we would content are fully admissible under the statute.

THE COURT:  Well, I'm going to admit the declarations for the purpose of the hearing.  I am going to bear in mind the strictures of Section 3593 as I consider them.  And we can go ahead and read them if you want to read them.  I promise you, though, that I will review all of them in preparing findings and recommendations.  So if it's possible to dispense with the reading in open court, I'd like to do that.

MS. FISHER:  Your Honor, I'm not going to read every declaration that we filed in this matter, but there are four that I would like to read at this point.

THE COURT:  Go ahead then.

MS. FISHER:  Thank you, Your Honor.

Today, these many years later, I wish I could take it back and do for my children what they needed and be the kind of parent they deserved.  At the time, though, I

had my mind set on doing whatever I wanted as long as I was working.  I always worked -- excuse me -- I was -- this may cut the reading short.  I always -- excuse me.  I always worked and was determined not to live in the kind of poverty I knew as a child growing up.  I went into the glass business and worked myself up from pushing brooms to production superintendent.  When I retired, I was earning about $76,000 a year and had a good life.  It was a far cry from the way I lived as a youngster.  I grew up dirt poor in a log cabin with a dirt floor and no running water and an outhouse in Akins, Oklahoma outside of Sallisaw.  We had a wood stove for heat and a wood cook stove.  We all worked and barely scratched out a living -- thank you -- barely scratched out a living for my mother, father, two brothers, and two sisters.  I was the oldest child who survived and was born August 8th, 1938.  Three other babies were born but they died.  The next oldest who survived, Margaret, was born December 26th, 1941.  She died from cancer in 1995.  After Margaret, there was Ike, born May 31st, 1944, Linda, born May 30, 1946, and then came Gary, who was born January 23rd, 1948.

One of my earliest memories is being taken out of school to work in the fields alongside my parents. As my brothers and sisters got big enough to walk and carry a load, they joined us in the field.  Every year we pulled

cotton in western Oklahoma, picked strawberries in Stilwell, and picked beans in Moffitt, Oklahoma.  It was back breaking work, even for little children because we had to stoop, bend and carry our loads up one long row and down the next from sun up to sundown.  It was hot, tiring labor that took every ounce of strength we had, but we did not have any choice in it.  When cotton season came, we worked or we starved.  When we went back home after cotton season, we ate mostly beans potatoes and commodities that were handed out as public assistance to farm families.

In those days, school was a luxury that came only after work was done.  I went to school when I could during the times when my family came back to Akins from working cotton and other crops.  I went to school off and on through the eighth grade in Akins, and then started high school.  High school was different for me than for most of the other students.  I met Gelene in high school before I had to quit after finishing the eleventh grade.  We sort of dated twice, but I did not have any money to date and my family lived a good 12 miles from town in the country.  I made the football team but had to quit because I could not get to -- get to it after school practices.  We lived far out in the country and no one could pick me up and drive me back and forth.  Lots of students came from poor families, but my family had it even tougher.  Other students made fun

of me and laughed at me because of the way I dressed.  I wore shoes and clothes until they were worn out and then we had to patch them up and keep wearing them.  I figure I had to fight every boy in high school class to hold any respect.

My family had some pretty serious marital -- mental problems that folks whispered about back in those days.  My father A.J. Andrew Jackson had enormous mood swings from being an out -- an all right guy to being totally out of control where nothing could stop him from attacking us.  He was sent to the mental hospital in Vinita for a month and was in and out of jail in Sequoyah County for public drunkenness.  My father's father, Isaac Clifford Barrett, managed a big ranch until he committed suicide by taking cow black leg medicine.  My brother Ike and my sister Linda also have mental problems.

As the oldest boy in the family, I tried to protect my mother and the other children, but I was no match for my father until I was half grown.  My father beat my mother and us children with his fists and with anything he could get his hands on.  I tried to get between him and my mother when he attacked her.  I got beaten more than the other children and learned never to cry when my father -- my father hit me.  I figure I have a very high pain threshold because I do not remember feeling a hell of a lot.  Gary was the only child to hit my father back and that happened when

Gary got bigger than dad.  My father was five-foot-eleven, weighed 185.  Gary was five-foot-eleven and weighed 270.  Gary's nickname was Hoss.

I was three months short of 17 the last time I stepped between my father and mother to try and protect her.  My father hit me across the shoulder with a 19 inch metal file that busted my shoulder wide open.  My father *(sic)* still has a scar.  I left home that day just running because I knew that if I stayed home I would have to kill my father to protect the others.  I was six-foot-three and weighed 187 -- 187 pounds.  My mother stayed with him all those years and put up with his abuse but I could not.  My mother, Ada, was churchgoing and devout.  She did not believe in leaving a marriage no matter how bad it was.  Plus, my father was difficult to figure because he also a decent guy when he was sober.  He worked on a pipeline for two to three weeks and then came home, went on a bender, and just went crazy.  There was no stopping him.  He died at the age of 52 sitting on the back porch with a cup of coffee in his hand.  He just laid his head back and died.  The coffee didn't spill.

When I left home, I knew what hard work was and was not afraid of it.  I moved to Tulsa where I got a room in a house and got a job in the Hartley Cabinet Shop in May 1955.  In March 1957, I lost my job because of a

recession and had to return home for two months.  I joined the Marine and got my first lesson in drinking and chasing women.  I was in such good physical shape that basic training was a walk in the park for me.  I'd been tossing hay bales since I was 12.  I got an honorable discharge in 1960 and met up with my family in Clinton, Oklahoma where they were picking cotton.

After I came home, I saw Gelene in Sallisaw.  She was back home for a visit and had been living with her aunt and uncle in Joliet, Illinois.  They had helped her get a job at Walgreens.  I had been planning to apply for a job at Oklahoma Highway Patrol, a civil service job, when I ran into her.  She had dark brown hair and dark brown eyes and because I didn't just fall off a cabbage wagon, I knew she had had a lot of experience with men.  I was swept away with how beautiful she was.  Gelene called her aunt and uncle in Joliet and they talked me into coming to Joliet.  They told me I could make a lot of money and Kerr Glass and they could get me a job.

When we got married, I was a physical supernatural.  I could work eight hours, go to a bar, get into as many brawls as there were, come home, sleep, and go back to work.  I was strong as a bull and would fight anybody that wanted to fight.  I did not beat them up so that they couldn't work.  Once I knocked them down I did not

kick them in the head or anything.

I did pretty much whatever I wanted to and did not think about Gelene or, later on, the boys, other than working and supporting them.  I would go out, drink as much as I wanted, and chase women.  I kept that up for years until I met Doris, my third wife, in 1985.  I tried to keep my drinking away from the house and in bars.  I was a Canadian Club whiskey straight with a water chaser drinker and drank a fifth at a time.  Marriage brought out the worst in Gelene.  She drank right from the beginning of the marriage and straight through when she was pregnant.  She was miserable and complained constantly about how unhappy she was.  She got mad over every little thing and had foul moods.  When she got pregnant, she was miserable.  Her bickering was constant.  I stayed away from home as much as I could, working 16 hours shifts.  I'd rather work a straight 16 hours than listen to her.  I was a trouble shooter at the plant and could memorize machinery blueprints.  At the end of seven years, I was a supervisor, spurred on by never wanting to be as poor as I was growing up.  I preferred staying at the plant rather than facing Gelene and her drinking.  I was not around the house much when Kenny was a little baby but I heard all about how hard it was to sooth him.  He was colicky and cried all the time. When he got a little bigger, he could not sit still.  Even

if I could get -- get him to watch television -- television, his feet were always moving and he was bouncing.  I cannot sit around either, but I'm not as bad off as Kenny was. Even though he was a handful, he was a beautiful little boy.

When the boys got older, I took the boys with me when I hunted and fished.  I liked taking Kenny with me hunting.  Sometimes his little legs would give out and I had to carry him on my shoulders.  Boy, he loved that.  Kenny wags fearless, but then he was a sensitive little boy who cried if you hurt his feelings.

When I went home, I never know which Gelene I would get, what condition she would be in.  I did not want to turn into my father and beat my wife and children.  One time Gelene cut up the front of my shirt with a knife when I was wearing it.  I slapped her twice and messed up her nose pretty good, gave her two black eyes and split her lip open. It was around 1963 or 1964.

I discovered women when I was in the Marines and I just thought I had to be with different women until I finally met up with Doris in 1985.  When I was married to Gelene, I stayed away from home every few months for a night or two with other women.  Once, in 1966, I moved in with a woman for a couple of years and left Gelene and the two boys.  Gelene was always running back to Sallisaw where she was her daddy's number one girl.

I felt badly about leaving my boys, Kenny and Richie, but I could not take Gelene anymore. I was still young and immature myself so I wasn't much of a husband either. I just put the boys out of my mind as much as I could. After a couple of years I could not keep the boys out of my mind and I went back with Gelene in 1967. We moved into the same mobile home I had been living in with my girlfriend. Even though we were back together, neither Gelene nor I had changed any. We both drank as much as we could and I still stayed away from home. I was arrested time after time and went before the same judge for drunk and disorderly conduct and fighting. The judge told me if he ever saw me again, he was going to jail me for over a year. It was my nature and I was out of control and when it came -- when it came to fighting and drinking.

I called a friend in New Jersey he knew where I could get a job. I left Kerr Glass and moved my family to New Jersey. My new job was at a plant in Wharton, New Jersey, and we lived in Stanhope first and then pretty soon moved to Lake Hopatcong. I kept up drinking, fighting, and running around with women, staying gone from home for two or three days at a time. Gelene left me for good in Lake Hopatcong. She was at the end of her rope, but I did not much care. She used to whip the boys over any little thing whipped them all the time. She had a bad habit of saying

cruel things not just to me but to the boys too.  Kenny was always upsetting her because he could not sit still, and was always into everything.  He loved my tools he was always getting into them.  I would find them all over the yard and in the woods.  It made me pretty mad.  Kenny always had a mechanical aptitude that was out of this world.

When Gelene left me, Kenny wanted to stay with me but I was not set up to take care of him and work.  Besides Gelene would never hear of it.  Kenny kicked and screamed to stay with me.  He was 10 or 11 years old and did not want to go with his mother back to Oklahoma.  The day Gelene left, she took my paycheck, two of my friends' paychecks that I had won in a draw poker game which she returned to their wives and left me with 47 cents.

I stayed single for five years before I married my second wife, and then for six years before I married Doris.  I was married to Diane Kay Wilson from 1977 to 1979 and we lived in Dunkirk, Indiana.  I paid Gelene child support, $150 per month until each reached 18, and also gave Gelene extra money for the childrens' school -- school clothes every fall.

MR. WILSON:  Judge, just for the record, I believe that should read $150 per child until each reached 18, instead of $150 per month.

MS. FISHER:  Thank you.  I does say that.

24

THE COURT:  Go ahead.

MS. FISHER:  I also paid their medical, dental and life insurance but Gelene told the children I never gave her any money.  Years later I showed Kenny cancelled checks to prove I had paid because he did not believe me.  I came back to Sallisaw at least once a year for a week to spend time with the boys.

Kenny always wanted to live with me.  I let him come three -- three times after the divorce, the first time in Dunkirk, Indiana where Kenny completed ninth grade.  Kenny resented my wife Diane and it got the best of me.  I lost control when he sassed her and I hit him pretty hard in the chest.  He went flying slamming against the wall.  One time I overheard Kenny and some boys talking about running from a fight.  I told Kenny that's not the way to live your life.  If you want, I'll teach you how to fight.  Kenny did any interest in learning to fight, or any interest in fighting.  Kenny was not much of a fighter.  Now his brother Steve, he was different.  He would have taken your lights out.  Kenny went back to Sallisaw after that summer and soon quit school for good.  He had a hard time with lessons but could do anything with his hands.

Diane and I moved to Sand Springs, Oklahoma around 1979.  I was still drinking but no longer getting drunk or getting into fights at bars.  I worked and made a

decent living.  We got Kenny a job and made down payment on a Camaro for him.  Kenny did all right for two or three months but he could not stay away from Sallisaw.  Kenny quit his job and went home.  I had to take the Camaro back when Kenny could not meet the payments.  It hurt Kenny that I took the car back.  Diane and I divorced and I lived by myself a while until Doris moved in with me in Sand Springs around 1985.  Doris and I married in Fort Smith, Arkansas on December 28th, 1990.

Kenny had bouts of depression and did things that did not make any sense.  Sometimes he would be very down but other times he would be manic, always on the go and upbeat.  Kenny cried a lot when he and Abby were separated. He bawled like a baby when he talked about it.  In 1986 when Kenny was separated from Abby and was very depressed, he stayed with Doris and me.  I got him a job with Kerr Glass and he was making real good money.  Kenny had a truck.  He worked about three months and then left in the middle of a shift, just walked away from a $200,000 machine that he left running.  Soon after that, he tried to kill himself by shooting himself in the chest with a shotgun I had lent his young brother Steve.  Kenny worked hard when he worked but he never seemed to be able to live on his own.  He lived with his wife and lots of times they lived with Gelene.  He lived with me or he lived right next to Gelene.  He was not

an independent person and had to be close to home.

My father died in 1969 and my mother died in 1977.  She was as good a woman as there is, but she had a hard life between my father being half crazy and always poor.  I believe in calling a spade a spade and I would never call myself a good father.  I still kick myself over the way I lived my life and the way I treated my children.  I can't help but -- I can't help but ask myself if I had been a good father or if I had stayed with Gelene if Kenny would be where he is.  I've tried to make it up to him by standing by him since all this trouble.  I went to both state trials every day.  I had just started a new job when the federal trial happened so I could only go that -- go to that once or twice a week.

The next paragraph I believe the judge granted a motion in limine on, which is -- so I won't read it, Your Honor --

THE COURT:  Very well.

MS. FISHER:  -- into the record.  An investigator working on Kenny's case asked me to provide declaration.  I did not write the declaration but I read it carefully and it says what I told the investigator when we talked.  I declare under penalty of perjury that the foregoing ten page declaration is true and correct.  Executed by me this 10th day of 2009 in Creek County, Oklahoma.  Ernest E. Barrett.

For the record, Your Honor, Petitioner's Exhibit 20 actually does have that one paragraph redacted.

THE COURT:  Very well.

MS. FISHER:  Mr. Barrett would offer into evidence declaration of Carl Cook, Exhibit Number 36, which I'd like to read into the record.

I, Carl -- did you want me to wait, Mr. Wilson?

MR. WILSON:  Judge, it would just be the government's same objection.

THE COURT:  Go ahead.

MS. FISHER:  I, Carl Cook, declare the following: I married into the Dotson family on December 31st, 1939 when Christine Dotson became my bride.  We were married 61 years before her death March 31st, 2001.  Christine was Hugh Dotson's sister and Hugh was Gelene Dotson's father, so that makes me Gelene Dotson's uncle and Kenny Barrett's great uncle.  Through the years I learned the Dotson family history.

The Dotson family history was passed down to the generations orally.  I was naturally interested in history so I paid attention to it.  I am telling it now because an investigator who is working for the attorneys on Kenneth Barrett's behalf asked me to tell what I knew of the family history.  I should start with something of my own

history however as it explains how I came to meet and marry Christine.

I was born on October 8, 1918 in Sequoyah County, Oklahoma.  My mother was a Latimer and my father was a Cook.  One of my mother's ancestors was a colonel in the Revolutionary War.  Some of her family fought for the Confederacy in the Civil War.  After the Civil War, they were allotted land.  My father, Lewis Cook, died in 1928.  He was gassed in World War I, got TB, went to Arizona to recuperate where he died.  I followed the military tradition of my family and served in World War II.  I fought under General Patton in Czechoslovakia and liberated several concentration camps.  The most horrible thing I ever saw was a flat car piled high with dead bodies.  I was saved by Jesus in Le Havre, France during the war and credit Jesus with my long life.  I do not look down on people who are not saved but I cannot help but feel sorry for those who have not found salvation.

The Dotson family history goes -- also goes back to the Civil War.  The Dotsons moved from North Carolina to Arkansas, south of Huntsville in 1835.  Their old grandma at the time claimed to have been a friend of Davey Crockett's.  They learned the town, now Huntsville, the money to incorporate.  They loaned the town, now Huntsville, the money to incorporate.  According to family

lore, the Dotsons were money -- moneyed slaveholders.  The head of the Dotson clan and his two sons fought for the Confederacy leaving the youngest boy at home with his mother.  Towards the end of the war, a gang of scalawags showed up at the Dotsons to rob the defenseless woman.  She had buried the family savings but told the scalawags she was penniless.  They hung her two different times but still she denied having any money.  Then they drug her behind a horse through the creek and her son begged her to tell them where the money was hidden.  She relented and they took the entire Dotson fortune.  The Dotsons came to Oklahoma in 1900.  Imagine they were poor.  They moved to Marble City.  It was wild territory back then, still Indian.  The area was riddled with bank robbers and it was a profession many took to.  Even I had an uncle who did ten years for bank robbery, Monroe Cook from Muldrow.  The Dotsons were tenant farmers.  Christine and Hugh's dad, Abe, was killed in 1925.  He was shot by a man in a fight over a woman they were both seeing even though both of the men were married.  Abe's wife, Minnie, could not raise her six children alone.  There was no welfare back then.  Minnie put four of her children, including Hugh and Christine, in the Dwight Mission school, a Presbyterian school established by missionaries in 1820 in Indian Territory.  I think the school went up to the eighth grade.  People at the school told Minnie not to visit her

children once she left them at the mission because it would make them want to come home. The four children were Hugh, Christine, John E. and Eleanor. Mattie kept the other two children, Warren and a girl. Minnie never came around to the school. It turned out children against Minnie because they felt in the back of their minds that Mattie deserted them. Eventually all the siblings connected up. I liked all of them. John E. was an alcoholic and Hugh drank quite a bit when he was young. Hugh raised his four kids, one of them, Gelene, is Kenny's mother. They were dirt poor and had to work in the fields all the way out to California and back. Hugh had a fairly close family and we visited quite a bit. Hugh loved to tease and so did I. We got along good. You could depend on what he said. He told the truth, quite an attribute now. Now you don't know what people are thinking. When Hugh first brought his family back, they bought a farm as I recall, but the farm didn't support the family. Hugh had some cattle like everybody did. People farmed everywhere then. Most of it was arable, even in the mountains. Someone told me that it was a fact that there was corn raised in Sequoyah County in 1920 than in the county in the -- than any county in the United States, although I have never checked it out. Hugh was forced by finances to get a job as a laborer in a creosote plant in Sallisaw. He kept that job until they closed the plant in

the early 1990s.  I think what Kenny got, what affected him more than anything, was their mother.  I don't think Gelene knew how to raise a child.  As far as I know, Ernie wasn't a father.  I blamed him for a lot of it.  I know Gelene was a drinker.  It's hard on children not to have a father, but when their mother is a drinker too, it takes a toll on them.  After I told the investigator working on Kenny's case about my family, he came back to me with the declaration.  I've read this declaration over carefully and it says what I told the investigator during our meetings.  I would have testified to these things at Kenny's trial if anyone had asked me to.

MR. WILSON:  Judge, I'm going object to that last sentence specifically.

THE COURT:  Overruled.

MS. FISHER:  The next exhibit Mr. Barrett offers into evidence is Petitioner's Exhibit 27, which is declaration of Phyllis Crawford.  For the record, Ms. Crawford now suffers from dementia.  It's my understanding that government does not object to the fact of her unavailability.

MR. WILSON:  That's correct, Your Honor.

THE COURT:  Good.

MS. FISHER:  I, Phyllis -- I, Phyllis Crawford, declare the following:  I am Kenneth Barrett's maternal

aunt.  Gelene Dotson, who is Kenny's mother, is my sister. I lived with my husband Roger.  I live with my husband, Roger.  My son, Travis Crawford, has lived here on and off for many years.  Our home is adjacent to Gelene's home and in front of Mark Dotson's home.  I can see Kenny's old shack from my -- from my home.  My family grew up on this land and many of us still live around are here.  We are a close knit family and like all families have our quarrels and disputes, but we try hard to help each other out.  We feel guilty that we did not do more for Kenny.  We did not do anything to get him the kind of mental health treatment he needed even though our family has had to deal with mental illness for a long time.  Neither Gelene nor Ernie was ready to be a parent.  I lived with Gelene and Ernie in Joliet for a few months when Roger was in the service at Fort Ord.  Gelene was four months pregnant with Kenny.  Even at that time Gelene drank from the moment she woke up until she went to bed.  When Ernie came home from work Gelene immediately started in on him.  Often he would turn around and leave.  I had intended on staying longer but I could not stand it.  We knew that Kenny was different because he needed so much more attention as a child than the other children.  He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man.  He was always hyperactive, on the go, into everything, and could

33

not sit still.  He would break down and cry easily.  Kenny had a very difficult relationship with both his parents, but he loved them dearly.  Gelene never gave Kenny a kind word and she screamed at him over everything.  When Kenny was about 11, Gelene called me because Kenny was crying and would not come out of his room.  My husband, Roger, and I went over to their house and talked to Kenny.  Kenny told us that he could not get his mom's voice out of his head.  The only time Gelene talked to him was to scream.  That is so sad.  Gelene had a lot of problems, especially with alcohol and men, that affected Ken badly.  Gelene had different men in the house all the time when Kenny was entering his teenage years and it was very confusing for him.  Gelene was and is a bona fide alcoholic although she denies it. Gelene, who is three years older than I am, started drinking in high school.  She used to beat me up with her fists.  Now Gelene drinks beer from the time she gets up until she goes to bed.  She screams all the time and I can hear it in my house after it's gone through her walls and across our yards.  She cannot control her emotions.  Gelene takes after our father, who was also a heavy drinker who generally wanted to fight when he was inebriated.  My dad's relatives were drinkers as well.  Ernie, Kenny's father, was also a drinker.  He hardly had anything to do with him after the divorce and everyone could see how much it hurt Kenny.

Ernie used to come to town once a year and I remember him coming by to show off his new Corvette when his children did not have shoes or decent clothes to wear.  Kenny was never able to be independent as a grown man.  His emotions got in the way of his being able to live too far from home.  As an example, a couple of years before the incident, Kenny had run into my house in tears crying, the laws after me, they're coming, what should I do.  I told him we were going to walk out of the house and that he was going to get in the police car and that's just what he did.  Kenny had been afraid to go to jail because at that time the papers had said someone had been beaten to death at the jail.  I have never been afraid of Kenny.  Kenny tried to stay close to home, always worked hard and took pride in his work.  He would give you the shirt off his back if you needed it. Kenny was crazy about Abby, his wife.  They married young and had a little boy in no time.  After Kenny married, he and his wife lived off and on with his mother.  And after his divorce, he moved back home building a little shack next door to his mother's.  His suicide attempt tells it all.  A friend and I witnessed it from my front window.  I almost passed out.  Kenny pulled his truck into his mother's driveway, went in her house, got Steve's gun, came outside and shot himself.  We rushed over to him and heard him mumbling and not making any sense.  An ambulance came and

took him to the hospital where he stayed almost two weeks. We have learned a lot about depression and mental illness as our children grow up.  It runs in our family.  I have depression and I get treated for it.  My daughter, Gwen, is bipolar, and her son has a rare disorder that makes him unable to talk or mature.  He's like a little child.  My son, Travis, also has to have psychiatric treatment for anxiety and panic attacks and lives with me and my husband. This whole tragedy with the police officer did not have to happen.

MR. WILSON:  Objection, Your Honor.  Objection to this whole next paragraph.  There's no relevance under the factors under the 3593.  Specifically, the definition there of what mitigation is.

MS. FISHER:  The paragraph goes on which does tie into mitigation, Your Honor.  She said, Instead of raiding Kenny's house in the middle of the night, all they had to do was come to me and I would have walked over to his house, told him that he had to come with me, be arrested, and he would have come.  I know that my son Travis -- that paragraph probably doesn't have anything to do with -- well, I know that my son Travis testified in the federal trial against Kenny.  I was here in December 2008 when an investigator working on Kenny's case listened to what Travis had to say about his testimony.  My husband Roger was here

and listened to the conversation too.  I have had part of Roger's declaration -- I have read part of Roger's declaration where he talks about what Travis told the investigator, and I agree that is what Travis told him.

This declaration I am giving includes what I told the investigator when he asked me about Kenny, our family, Kenny's upbringing, and his interview with Travis. I did not write the declaration myself but it says what I told the investigator.  I declare under penalty of perjury that the foregoing four page declaration is true and correct, executed by me on this 22nd day of February in Sequoyah County, Oklahoma.

THE COURT:  I'm going to admit all of that, but --

MS. FISHER:  Thank you, Your Honor.

THE COURT:  I may very well determine that some of it is irrelevant under Section 3592.

MS. FISHER:  If I can have a moment, Your Honor?

THE COURT:  Yes.

MS. FISHER:  This is the last declaration, Your Honor, for the moment.  Petitioner offers into evidence Exhibit Number 34, the declaration of Warren Dotson.

I, Warren Dotson, declare as follows:  I am Hugh Dotson's younger brother which makes me Gelene Dotson's uncle and Kenneth Barrett's maternal great uncle.  An investigator for Kenny asked me to tell him about myself and

the family.  He wrote this declaration of what I told him. I have read it carefully and it says what I told the investigator during our meeting.  I am ordained evangelical minister in the First Baptist Church in Kellyville but I do not believe in denominations.  I was saved when I was 34 years old.  I live with my daughter Nona in Kellyville, Oklahoma about 25 miles outside of Tulsa in a house my wife -- in a house my wife -- my wife and moved into in 1965.  Another daughter, Linda Rogers, lives several miles away.  Linda is my only daughter to have married just once. She married Rodger Dan Rogers.  The family refers to him as Rodger Dan the mountain man because Dan is something of a recluse.  He likes to hunt and trap.  My family is very fond of Dan.  Nona has been married five times but is single now and after my wife died two years ago, Nona moved in with me. I have four daughters who are all good women but too often pick the wrong men to marry.  I've been married twice.  My first marriage was to Lela Warren whose father was a U.S. marshal.  The Dotsons and Morgans are mentioned in a book, The Outlaws of Cooks and Hill.  Lela divorced me around 1939 or 1940 when I was in the Army before the war.  I was in the 69th infantry and stationed at Camp Roberts in California. I spent most of my time in the guard house for hitting a lieutenant.  I had been leading the company in the rifle prize for the best shot I had -- best shot.  I had 13 bulls

38

eyes but I only fired ten shots. The soldier who stood next to me had missed his own target but the captain counted them. However I had tripped on the way to the range and hurt my hip. I could hardly walk. When I had to shoot from a kneeling position, I could not do it. I got mad at myself. They took me to the hospital and x-rayed me. I was designated for limited service. I could never be sent overseas. Took years to heal completely. My second wife, Ruby Elizabeth Fogle, stood by me for 61 years. She loved me and I didn't have sense enough to know it when we were first married in Muskogee in 1945. She died January 7, 2007. The Dotsons originally came from Tennessee and were slaveholders. William Abraham Mark Dotson was off with two -- with his two oldest sons fighting for the Confederacy. Carpetbaggers came to the plantation right after the war before the men had come home. They drug Clarisse Cook Dotson, William's wife, through the creek until they killed her because she would not tell where the money -- where the family money was hidden. They killed her youngest boy, too, my granddad's brother. My father was killed by gunfire in circumstances that vary depending on who is telling the story. The newspapers accounts reports that dad was drunk and pulled a knife. The other man grabbed his shotgun and fired. When the first round did not kill dad, the man pumped in a second. I heard it as the way

the sheriff had come to the house looking for stolen bridles that dad knew and none was found. Dad later found them hidden in his barn and turned them into the feds. Mama always thought he was killed over the bridles and that he knew more about those bridles than he told. Dad's death left mama with six children to raise. She gave four of the to Dwight Mission School to raise. Hugh, Elnora who later married Gene Masterson, John E. who later married Jackie Morgan, and then Christine who married Carl Cook. Mama kept me and my sister Lela, but she was not able to keep us long. I was only four years old and Lela was two. Mama had to give me to her sister Francis Stites who was married to Andrew Payne. They lived in Muskogee. When I was 14 I went out on my own. Lela was first given -- was first given to welfare people and then to uncle George Dotson my dad's brother who was married to Nancy Kennedy. Lela was married at 15 to Jack Combs and later to Thomas McClendon. I was never mad at my mother. What choice did she have? If I had to forgive her, that would be a wrong way of thinking. It hurts to lose your family. I remember crying when I saw her so many years later because she was a stranger. I worked my whole life. I was a welder and factory repairman and learned never to stay at a job for more than a few years. I found a company that would pay me more I went there. If management insulted me, I would move even if it was less

money.  I worked as a helper for four years in Muskogee for 75 cents an hour.  I then hired on as an acetylene welder and later working welding gas and steam lines.  I also have done heavy maintenance work that involved welding.  I went where I could -- where I could make better.  Nobody paid overtime.  My brother Hugh was a shy man who liked to hunt and fish.  I was at Hugh's bedside when he died.  Hugh worked all his life so he could buy land and have something to leave his children.  They live on land he left them. Kenny, Hugh's grandson, lived out there on Hugh's land. Kenny was a good worker and was never disrespectful.  My daughters took care of him after he got out of the mental hospital.  The law did not have to go to Kenny's place in the middle of the night to arrest him.  Our people live around Kenny's place and know that he was not dangerous. Breaks my heart what happened out there that night.  I declare under penalty of perjury that the foregoing four page declaration is true and correct best of my knowledge.

MR. WILSON:  Judge, just specifically, the government would object to that last paragraph about the law did not have to go out to Kenny's place.

THE COURT:  Very well.  Overruled.

MS. FISHER:  At this time, Your Honor, we'll call our first witness.  May I have a moment, Your Honor?

THE COURT:  Yes.

MS. FISHER:  Your Honor -- oh.  Your Honor, I don't know that it's a concern, but we would ask that the Rule be invoked.

MR. WILSON:  Just going to do the same thing, Judge.  No objection.

THE COURT:  Very well.  Rule has been invoked.  Is there anyone in the courtroom who's going to be a witness in this proceeding?  Good.  I'll count on counsel to keep me apprised if you see anybody coming in that you think is going to be a witness.

MS. FISHER:  I will, Your Honor.

THE COURT:  Very well.

MS. FISHER:  We'll call Ruth Harris.

THE CLERK:  Ma'am, step up to the box.  Raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  Yes.

THE CLERK:  Please be seated.

RUTH HARRIS,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MS. FISHER:

Q.  Would you state your, please?

A.  Ruth Harris.

Q.   Will you spell your last name for the record?

A.   H-a-r-r-i-s.

Q.   Ms. Harris, do you know Kenny Barrett?

A.   Yes.

Q.   How do you know him?

A.   He's my nephew.

Q.   And on paternal or maternal side?

A.   What do you --

Q.   How are you related to Kenny, through his mother or father?

A.   His -- his mother is my sister.

Q.   So Gelene is your sister?

A.   Yes.

Q.   And where are you in the family?  Can you -- can you describe the family order of children?

A.   Gelene is the oldest, then Phyllis, then me, then Carolyn, then Mark.

Q.   How much -- what's the age difference -- what's your age?

A.   I'm 72.

Q.   Do you know how old Gelene is?

A.   She'll be -- she's 76.

Q.   And Phyllis?

A.   Seventy-four.  And Carolyn is 70.  And Mark is 53.

Q.   Can you describe growing up?  Or let me ask you this.

Can you describe the marriage of your mother and father?

A.   Very good.

Q.   And what were their names?

A.   Hugh and Hedy Dotson.

Q.   And did your father drink?

A.   Yes.

Q.   A lot?

A.   He -- he didn't get drunk.  He just kind of drank a lot.
He kind of hid it in the barn.

Q.   Did it impact the family at all?

A.   No.  Well, he -- he held down his job and he had cattle.
And he just kind of drank on weekends.  And you never
noticed him being drunk.

Q.   So you don't know what impact the amount of alcohol that
he drank had on him?

A.   Had on him?  He was very cranky.

Q.   And your mother, did she drink?

A.   No, not at all.  I don't think she ever drank a beer.

Q.   Can you describe growing up with Gelene?

A.   Well, it was pleasant.  We were the four girls, grew up
together.

Q.   What kind of person was Gelene growing up?

A.   Just fine, you know.

Q.   Okay.  Well, let's start here.  Are you married or
single?

A.   Married.

Q.   To whom are you married?

A.   Jerry Harris.

Q.   And how long have you been married to Mr. Harris?

A.   Will be 54 years.

Q.   During the -- during the time -- well, have you been around Gelene since she was an adult?

A.   Yes.

Q.   And did you -- were you around Gelene after she had Kenny?

A.   Yes.

Q.   Can you describe what you observed about the relationship between Gelene and Kenny?

A.   No, not really.

Q.   Do you know Ernie Barrett?

A.   Yes.

Q.   Can you describe Ernie Barrett?

A.   I really don't know what to say about him.

Q.   Let me ask you this:  What kind of -- did you -- did you have opportunity to observe Gelene and Ernie with Kenny?

Can you describe what kind of -- let me ask you, did you have an opportunity to talk with an investigator and submit a declaration in this case?

A.   Yes.

Q.   All right.  And in talking with that investigator, do

you remember discussing what you -- what Ernie Barrett, as a father?

A.   Well, Ernie wasn't there.  So when they divorced and Ernie wasn't around, and Kenny -- really hurt Kenny when he left, when they divorced.

Q.   And how did you observe -- or what did you observe as far as Kenny being hurt insofar as Gelene and Kenny's relationship was concerned?

A.   Gelene was -- had three boys, and they were all hyper.  Well, Kenny was very hyper and Steve and Richie wasn't.  But Gelene had to work and she was so busy, and handling the boys, it was just really hard.

Q.   So she had a difficult time raising the children --

A.   Yes.

Q.   -- by herself?

A.   Yes.

Q.   And when you say that Kenny was hyper, what do you mean by that?

A.   Kenny was probably the most hyper child I had ever seen when he was very little.  I was real crazy about him.  I kept him a little bit in Illinois.  He was really sweet, but he was so hyper.  Like he came -- they came to see me one day, and after they left, I didn't have any curtains on the wall, there was nothing in any drawer, no pictures.  That's just -- he was just all over the place.  But he was really

sweet.

Q. Did you, at that time, think there was anything wrong with him?

A. Well, I thought -- you know, later in life I noticed kids, that they give them something when they're hyper like that. But at that time, they didn't. And he just had more energy than any -- any little child I'd ever seen.

Q. In the -- did Gelene provide structure and support for the boys?

A. Gelene didn't have time.

Q. That would be no?

A. She tried.

Q. Did she drink?

A. Yes.

Q. A lot?

A. Sometimes.

Q. What else can you tell the Court about Kenny?

A. Well, I love Kenny very much, and I -- I just wanted him to have the best. And I feel that he didn't get a chance mainly because of the situation. And I always felt he had a sweet heart.

Q. And would you have come to testify in his behalf had you been called?

A. I didn't hear you.

Q. Would you have come to testify -- when Kenny was

sentenced in this case, would you have come to the sentencing hearing to testify for Kenny?

A.   Would I have?  I wasn't asked.

Q.   Right.  But had you been asked, would you have?

A.   Yes.

        MS. FISHER:  Thank you, Ms. Harris.  That's all I have, Your Honor.

        THE COURT:  Cross-examination.

        MR. KAHAN:  Thank you, Your Honor.

        THE COURT:  Mr. Kahan.

                    CROSS-EXAMINATION

BY MR. KAHAN:

Q.   Good morning, Ms. Harris.

A.   Good morning.

Q.   Ma'am, isn't it true that you avoided Mr. Barrett's family during his upbringing?

A.   We weren't around each other.

Q.   Okay.

A.   We kind of had our own life.

Q.   All right.  In fact, you lived in -- in Fort Smith, Arkansas, didn't you?

A.   Yes.

Q.   Okay.

A.   Well, we lived in Sallisaw at that time.

Q.   Okay.  Mr. Barrett's family actually lived out of state

until he was about 11; is that correct?

A.   He was nine I think when he came back.

Q.   Okay.  So during that time, that is from his birth until 11, you didn't go visit him out of state, did you?

A.   No.

Q.   Okay.  And when his family returned to Oklahoma, you actually avoided your sister, didn't you?

A.   No.

Q.   No?

A.   I've always been close to my sister.

Q.   Could I ask -- well, let me ask you this:  You recall writing a declaration, do you not?

A.   Yes.

Q.   Okay.  And do you recall writing, "Jerry and I are deeply religious and are Jehovah's Witnesses.  We raised our children in the faith, and they are raising their children in the congregation.  Jerry and I protected our family from being around those who are not Jehovah's Witnesses, so we were not around our sisters and their families very much when our children are growing up.  Bad associations spoil useful habits.  If we were around people who are cursing and doing bad influence of us, peer pressure can make children do bad things, and I tried to keep my children from that."  Did you -- do you recall writing that?

A.   Yes.

Q.   Okay.   So did you, in fact, then avoid your sister and her children growing up?

A.   One of the things that just didn't fit in, our life was busy and theirs was busy, so we weren't together.   The boys had their friends and our children had theirs.

Q.   So before, on direct examination, when you were discussing your sister's drinking, is that something you actually observed?

A.   Yes.   We went on trips, the family did.

Q.   How frequently was that?

A.   Usually just once a year.

Q.   And how long were those trips?

A.   How long did they last?

Q.   Yes.

A.   Maybe four or five days, three days.

Q.   So then, in truth, you saw your sister approximately once a year?

A.   Maybe more.   I would go to my mother's, she would be there.

Q.   Now, I believe you stated on direct that you have always thought highly of Mr. Barrett; is that correct?

A.   Yes.

Q.   Do you recall talking to a newspaper reporter around the time of the crime?

A.   I don't remember.

MR. KAHAN:  Your Honor, Can I approach the witness --

THE COURT:  Yes.

MR. KAHAN:  -- to refresh recollection?

Q.  (BY MR. KAHAN)  I'll ask you -- you can look that over. But what I'm interested in is on the third page of that document.

A.  Where?

Q.  On the third page in the second column, did you tell the reporter it was a decent neighborhood until Kenny put up that shack next to his mother's place?  It says, when asked, identified herself only as Ruth?

A.  I don't remember that.

Q.  And do you recall telling the reporter that your sister had tried several times to sell her trailer just to get away from him, but every time a prospective buyer showed up, Kenny run them off?

A.  I don't remember that.

Q.  Do you recall talking to the reporter?

A.  I think I do.  I don't know where.

Q.  Is it possible you talked to her in -- or him in your sister's home?

A.  It might have been.

Q.  Okay.  And do you recall, when you spoke to the reporter, having any reason to lie?

A.   I don't remember this.   I don't remember this.

Q.   But you can't think of any reason why you would have made that up, can you?

A.   No.

Q.   Now, you wrote in the declaration that was filed in 2010, so this is the second declaration, do you recall stating that no one from the legal team ever came to visit you?

A.   Yes.

Q.   Now, as you sit here today, do you recall at any point being interviewed by a woman named Roseann Schaye?

A.   No.

Q.   No?   If I could ask Government's Exhibit 24?

THE CLERK:   24?

A.   I don't remember this, but looks like something I said.

Q.   (BY MR. KAHAN)   It does appear to you to be an accurate statement of things that --

A.   Yes.

Q.   -- you would have said?

A.   Uh-huh.

Q.   In looking at this, you don't recall an interview in your own home?   You don't recall an interview --

A.   No.

Q.   -- in your home with Ms. Schaye?   But you would agree that the statements contained in here are an accurate

representation of what you believed at the time?

A.   I guess.

        MR. KAHAN:   Could I have a moment, Your Honor?

        THE COURT:   Yes.

Q.   (BY MR. KAHAN)   If I could, ma'am, at the top of this document, there's an address, Route 1, Box 238, Arkoma, Oklahoma.   Is that accurately your address as of May 24th, 2001?

A.   It was Arkoma.   It wasn't a route.   It was a street.

Q.   Okay.   That is your Social Security Number, though, at the top?

A.   Yes.

Q.   Okay.   And do you happen to recall, was that your phone number at the time?

A.   Yes.

        MR. KAHAN:   With that, Your Honor, I have nothing further at this time.

        THE COURT:   Any redirect, Ms. Fisher?

        MS. FISHER:   Your Honor, at this time we proffer Government's Exhibit Number 24.

        THE COURT:   I assume there's no objection.

        MR. KAHAN:   No, Your Honor.

        THE COURT:   Government's Number 24 is admitted.

        MS. FISHER:   We have no further questions, Your Honor.

THE COURT:  Is there anything further?

MS. FISHER:  We have no further questions of Ms. Harris, Your Honor.

THE COURT:  Ms. Harris, you can step down.  Thank you.

MS. FISHER:  Call Mark Dotson.

THE CLERK:  Sir, if you'll step up to the box. Raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Please be seated.

MARK DOTSON,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MS. FISHER:

Q.  Please state your name, spelling your last name for the record, please.

A.  Mark Dotson.  D-o-t-s-o-n.

Q.  Where do you currently live, Mr. Dotson?

A.  In Vian, Oklahoma.

Q.  Are you married or divorced?

A.  Married.

Q.  Married or single.  I don't know why I -- and are you related to Gelene Dotson?

A.   Yes.

Q.   In what manner?

A.   Her brother.

Q.   And you are what relationship to Mr. Kenneth Barrett?

A.   His uncle.

Q.   Do you currently have any children?

A.   Yes.

Q.   How many children?

A.   Three.

Q.   And can you describe your children?

A.   The oldest is my daughter, 28.  She's a nurse.  Middle one is Caleb, and he's 25.  He's a manager at Taylor Rental. And my youngest is 19, and he's in college right now.

Q.   And how are you employed, sir?

A.   Through the Mercy Health Care.

Q.   And is your wife employed?

A.   Yes.

Q.   And how is she employed?

A.   She's a -- has a private practice as a dentist.

Q.   What is your profession with Mercy?

A.   Podiatrist.

Q.   Do you -- are you aware of any mental illness or mental health issues among your sisters?

A.   The youngest has, I guess, clinical depression.

Q.   And what is her name?

A.   Carolyn.

Q.   And Gelene, does she have any serious impairment?

A.   I don't think it's ever, as far as I know, not been medically stated.  But I think she's had some problems with alcohol.

Q.   And mood swings?

A.   Yes.

Q.   Can you describe her behavior as you observed it?

A.   It would be, at times she would be pleasant, and at other times she would be sort of frustrated-acting and didn't -- seem to be zoned-out sometimes.

Q.   And when you say frustrated-acting, how would you describe that behavior?

A.   I guess just not in a good mood.

Q.   Would you have referred to her as unpredictable and unpleasant?

A.   At times.

Q.   Did you know Kenny when he was a child?

A.   Yes.

Q.   And what is the age relationship between you and Mr. Barrett?

A.   I think Kenny is two years older than I am.

Q.   You are how much younger than Gelene?

A.   Twenty -- 23.

Q.   Can you describe Kenny as a child, if you recall?

A.   He's -- he was hyper.  Of course I was younger, and a lot of my memories are as we were older.  I don't -- I don't remember too much when we were real young.

Q.   Do you remember him joining in with you and doing any activities with you?

A.   Not that much.  By the time we were teenage, he had sort of doing his own thing, and, no, we didn't do a lot.  I mean, we did some, but not -- not as much probably as some of my other nephews, like my second sister's sons.

Q.   Would you describe Kenny as a person who stayed to himself?

A.   Yes, I would say it's true.

Q.   In your observations of three boys -- Gelene had three boys; correct?

A.   (Witness nodded head.)

Q.   Kenny was the oldest?

A.   Yes.

Q.   And then came Richie?

A.   Yes.

Q.   And then came Steve?

A.   (Witness nodded head.)

Q.   In observing the behavior of the three boys, how would you describe it?

          MR. WILSON:  Objection, Your Honor, unless we can set sort of a time frame when we're talking about.

THE COURT: Can you do that?

MS. FISHER: I will, Your Honor.

Q. (BY MS. FISHER) Well, let me ask you this: Were you around them when they were in their -- when were you around the boys?

A. Probably from the age of -- with Kenny probably from -- some when he was very young, and then back -- when they moved back from -- from New Jersey, I would say he was probably around 10 or 12 I'm guessing, from there on up.

Q. And do you know how old that would make Richie?

A. Richie probably was about eight or nine.

Q. And Steve?

A. Steve was young, probably around five or six.

Q. Did you ever observe Kenny have difficulty figuring out social situations?

MR. WILSON: I'm going to object to that question, Your Honor. It's so expansive. Social situations. I'm going to object to the form of the question.

THE COURT: Overruled.

A. I -- I thought he was -- like, he stayed to himself a lot. But -- but I didn't know if it was because he was older than me, and you know how sometimes the older will -- don't want to hang out with the younger ones because maybe it's not cool. But he was -- he stayed to himself. And I guess Richie -- Richie -- sort of the same way with Richie.

You know, he was older than us.

Q. (BY MS. FISHER)  Do you recall ever watching Andy Griffith with Kenny?

A. Uh-huh.  Yeah.

Q. And did you make any observations of Kenny's reaction to that show that relates to his perception of social situations?

A. Well, I -- I just recall the situation with Barney as the deputy and how he was inept at his job and -- and you find -- we found humor in that, how the show was revolved around him.  And I think Kenny -- to Kenny, it frustrated him, and he couldn't quite understand the humor I don't think with Barney Fife.

Q. Did you observe Gelene relationship with Kenny?

A. Yes.

Q. And how would you describe it?

A. They -- they had -- you know, it was -- they would -- they would argue a lot.

Q. And when you say argue, what do you mean?

A. I think it was more she would sort of pick at him just -- and start an argument and keep going at it, and she would never let up on him.

Q. Were you aware of whether or not Kenny's mother drank?

A. Yes.

Q. And did she?

A.   Yes.

Q.   To any particular degree?

A.   She would get -- you know, as beer.  I don't think she ever drank anything harder than that.  But she would start drinking probably fairly early, and by the end of the day, she had quite a few.

Q.   Were you aware of Gelene's social habits with men?

A.   It was hearsay.  I -- you know, I wasn't there, I didn't see that.  But it was hearsay.  Yes.

Q.   And what was that?

MR. WILSON:  Objection.

THE COURT:  Sustained.

MS. FISHER:  Your Honor, if I might, the ordinary rules of the admissibility do not apply to this particular aspect of a capital sentencing so that he could testify to information that he'd heard.

THE COURT:  Well, is he going to tell us where he heard it and give us some indication of reliability?

MS. FISHER:  I can ask him, Your Honor.

THE COURT:  Well, let's hear it then.

Q.   (BY MS. FISHER)  From where did you hear the information about her social habits with men?

A.   I guess I would hear it from my youngest sister, Carolyn.

Q.   And where does Carolyn live in relationship to Gelene?

A.   She -- well, they were neighbors for a long time.

Q.   And would she be in a position to observe the activity?

A.   Yes.

Q.   And to your knowledge, was Carolyn -- were Carolyn and Gelene in contact with each other?

A.   Yes.

Q.   And what had you heard?

MR. WILSON:   Judge, same objection, Your Honor. 3593 allows expansive evidentiary rules, but it has to be specifically relating to the defendant.   And this is talking about the defendant's mother and some behavior of his mother, so I think that that's not admissible in this particular hearing.

MS. FISHER:   If I could respond, Your Honor.   A mother's behavior with a minor -- while a minor child is in the home is particularly relevant to the child's ultimate character and mental health.

THE COURT:   Well, we haven't narrowed it down to behavior while Mr. Barrett was at home.   Just kind of general what does he know about her relationship with men. So if you can confine it to that period, maybe this witness knows something about that, and maybe he doesn't, but --

Q.   (BY MS. FISHER)   In the information that you've received, was there any reason to believe that Kenny was in

the home at the time that Gelene was engaging in the social activities of which you heard?

A.   I really don't know on that.  Couldn't say.

Q.   So when you put in your declaration that Kenny's home life was a mother drinking a lot and having men in and out, you had no knowledge of that?

A.   It was from my sister.

Q.   Do you know when Kenny lived in the home?

A.   Up until he was 16, 17.

Q.   Are you aware of any mental health issues in Phyllis' family, Phyllis being your sister, Kenny's aunt?

A.   Her son, Travis --

MR. WILSON:  Judge, I'm going to object again. We're talking about -- unless counsel can establish independent knowledge of this and this particular witness's competence and ability to diagnose mental illness.  This is all, sounds to be, based upon hearsay and beyond the competence of this witness.

THE COURT:  Well, to the extent that it is hearsay, we do need to hear from him how he knows about this to at least establish some base line for reliability.

Q.   (BY MS. FISHER)  And given the information that you know, how do you know that?

A.   I think he has been clinically diagnosed with attention deficit disorder.

62

Q.   Do you know Travis?

A.   Yes.

Q.   And how would you describe him?

A.   That describes him pretty well.

Q.   Thank you.  Do you know of any other of Phyllis' sons that have been similarly diagnosed?

A.   The youngest one, Monty, is similar.  But, now, I don't know if he's been clinically diagnosed with that.

Q.   Do you know if your sister, Phyllis, has required any sort of psychological treatment?

A.   I don't think so.

Q.   Do you recall signing a declaration in March of 2009 in Sequoyah County?

A.   Vaguely.

Q.   And would reviewing that declaration refresh your recollection?

A.   It could.

Q.   Can you put Petitioner's Exhibit 32?

A.   Are you referring to this Ruth and Phyllis, that one?

Q.   Referring -- I was specifically referring to Page 3, last sentence of the -- the paragraph that begins on Page 2.

A.   Well, we've got a contradiction here because, on that, we've got Phyllis' psychological problems that required treatment.  And then up here at the front on Page 1, we've got two of my sisters, Ruth and Phyllis, had been relatively

mentally healthy.

Q.   Would you -- would you say that everyone who requires psychological treatment is, by definition, not relatively mentally healthy?

A.   Yes.

Q.   You would?  Here's what I'm asking you, Mr. Dotson. In -- in submitting the declaration at the time, was there any reason for you to believe that because Phyllis, at one time, required psychological treatment, that she was not, in fact, relatively mentally healthy?

      MR. WILSON:  Objection, Your Honor, unless we can establish, once again, some basis for his knowledge of information about Phyllis.  And now he admits he has a contradiction within his own declaration.

      THE COURT:  Well, I think she's trying to get him to explain the apparent conflict that we have here, so objection is overruled.

      MS. FISHER:  Thank you, Your Honor.

A.   She had some depression, and that may be what I was referring to.  But whether or not she actually had medical treatment for that, I don't know.

Q.   (BY MS. FISHER)  And how about your sister, Carolyn?

A.   She's several times had some depression problems.

Q.   And do you know anything about your nieces, Carolyn's two daughters?

A.   As far as I know, the youngest one I think has had to have treatment for depression.

Q.   You have a history of alcoholism in your family?

A.   Uh-huh.  Yes.

Q.   Can you describe that to any extent?

A.   Well, as far back as I know, it goes to my grandfather. I was told he drank pretty heavily.  And my father I think had a tendency for that.

Q.   Do you recall -- when were you married?

A.   1986.

Q.   Did Ruth attend your marriage -- your wedding?

A.   No.

Q.   Did anyone from the family attend your wedding?

A.   I believe Carolyn and Phyllis did.  And -- and Travis and Kenny was there.

Q.   And did it surprise you when Kenny was there?

A.   Yeah, a little bit.  Yeah.

Q.   And did it mean anything to you when Kenny came?

A.   Yeah, it did.  It did.

Q.   What?

A.   I was glad to see him there.

Q.   Are you aware of Kenny's abilities as a mechanic?

A.   Yes, he's very, very good, especially for being sort of self-trained.  He's got a natural talent for it.

Q.   Did Kenny ever help you or your family out with his

skill?

A. Yes, he did.  One instance, my wife was -- had to -- she was driving back and forth to Tulsa, and she had car problems.  And he called and got a part and had it put on and had her ready to go.

Q. Did you -- did you interact with Kenny a lot during that period of time?

A. Sort of -- sort of occasional at that time.

Q. Did anyone from the defense during the trial of this case talk with you, of the federal case?

A. I don't recall that.

Q. And if they had talked with you, would you have -- and asked you to testify on behalf of Mr. Barrett at sentencing, would you have done so?

A. Yes.

        MS. FISHER:  I have no -- I'll pass the witness, Your Honor.

        THE COURT:  Cross-examination, Mr. Wilson.

                CROSS-EXAMINATION

BY MR. WILSON:

Q. Good morning, Mr. Dotson.  My name is Chris Wilson.  I'm going to ask you a few questions.  It's true, Mr. Dotson, that you're a podiatrist; is that right?

A. Yes.

Q. How long have you been practicing in the field of

podiatry?

A.   Almost 30 years.

Q.   And you're about two years younger than the defendant; is that correct?

A.   Correct.

Q.   And how close in relation, as far as distance-wise, did you grow up from the defendant?

A.   Eight miles.

Q.   And did you spend a lot of time at the defendant's home?

A.   Not a lot.

Q.   Okay.

A.   Occasional.

Q.   And you would agree with me that basically you spent most of your time with Steve; correct?

A.   No.  No, I can't say that's true, either.

Q.   Did you spend most of your time with Mark?  I mean -- excuse me -- not Mark, but --

A.   Richie.

Q.   -- Richie?

A.   Probably out of the three, it would be between him and Kenny.

Q.   You don't suffer from any mental illness; is that correct?

A.   No.

Q.   And you'd would agree with me that your wife does not?

A.   No.

Q.   Nor do any of your three children?

A.   No.

Q.   You considered Kenny to be a hyper child; is that correct?

A.   Yes.

Q.   And that's based upon your looking back now; is that correct?

A.   Yes.

Q.   Hard for you to judge that when you were -- when you first knew him when you all were first were very, very small; right?

A.   Right.

Q.   And I believe you said, when you were teenagers, Kenny the defendant, spent most of his time to himself.  You didn't have a lot of contact with him; is that right?

A.   Right.  Right.

Q.   Was he still hyper then when he was a teenager and you were a teenager, or do you know?

A.   I wouldn't say, no.  He wasn't any more than I was.

Q.   As a matter of fact, I believe you thought Steve was even more hyper even than your brother, Kenny; isn't that right?

A.   Yeah, Stevie could take it to a whole nother level.

Q.   And Steve was, I believe, a number of years younger than Kenneth Barrett; correct?

A.   Right.  Right.

Q.   As a matter of fact, I believe you said you thought Steve was retarded, didn't you?

A.   I don't know if I said quite that harsh, but he --

Q.   Would you like to look at your declaration?

A.   -- he had -- he had no fear of getting hurt as a young kid.  I remember that.

Q.   Look at the Defense Exhibit Number 32.  Specifically look at Page Number 2.  Did you say, at the top of that page, "Grandma used to" -- "Grandpa used to say, if there was a knob, they would turn it.  I thought Steve was retarded, but he turned out not to be and he is now a principal."  Is that your declaration?

A.   Yes.

Q.   So you agree with me that your original assessment of Steve was wrong; right?

A.   By far.  He's extremely intelligent.

Q.   But you still believe that he was even more hyper than his brother Kenneth; correct?

A.   Uh-huh.  I do.

Q.   Is that a yes?

A.   Yes.  But can I say something on that, too, though?  That may be the fact that I was older than -- than him, and

observing him as, you know, an older child.  And then the opposite with Kenny.  I'm the younger observing him.

Q.  All right.  Did you know or were you aware that -- back up.  Let me strike that for a second, Judge.

You said that Steve was very intelligent; is that correct?

A.  Yes.

Q.  Became a football coach and then an administrator at the school; is that correct?

A.  Right.  Yes.

Q.  Were you aware that Steve also had problems with illegal drugs?

A.  No.

Q.  Weren't aware of that?

A.  I was not aware of that.

Q.  Didn't know that he overdosed when he was a teenager?

A.  No.

Q.  Would you agree with me that Steve made some good choices in his life eventually; correct?

A.  Yes.

Q.  Were you aware that Steve spent time with his father, Ernie, and worked at the glass plant?

A.  Yes.  I did -- well, I don't know if he worked at the glass plant.  I was thinking that was Richie.  But I thought Stevie had spent some time with Ernie.

70

Q. Did you know that his father helped with his tuition?

A. No. I didn't know that.

Q. But you agree with me that Steve chose to further his education?

A. Yes.

Q. And if, in fact, the evidence is that Steve also had a problem with drugs and overdosed, that he obviously made some different choices about how to use drugs and whether to use drugs or not use drugs?

A. Yes.

Q. Would you agree with that?

A. Yes.

Q. Were you aware that the defendant, Mr. Barrett, had a problem with narcotics?

A. Yes, but I -- I can't say I ever saw him -- I never saw him do drugs.

Q. Did you ever go to his house? And when I'm talking about his house, I'm talking about the cabin next to his mother's place.

A. No.

Q. The defendant shot and killed a trooper in September of 1999. Are you aware of that?

A. Yes.

Q. Prior to that date, when was the last time you had been to either Gelene's trailer or that particular area?

A.   Four months.  But that's -- that's -- I couldn't say for sure.  Four months maybe.

Q.   So it was within a year?

A.   Yes.

Q.   And did you go to Gelene's place, or where specifically did you go?

A.   It would be Gelene's.

Q.   So you didn't go to Kenny's cabin?

A.   I don't -- I don't think I've ever been in the cabin.

Q.   Was the cabin there?

A.   Yes.

Q.   Was Kenny, the defendant, was he at his mom's place when you were visiting?

A.   No.

Q.   So when was the last time before September of 1999 when you actually had contact with the defendant?

A.   I guess the last time I recall was my wife actually helped Kenny with one of his -- with a dental problem, and that that was probably eight months previous maybe to that incident.

Q.   And you saw him that time?

A.   Yes.

Q.   Well, it's interesting that -- would you agree with me that you never mentioned in this -- in this declaration anything about Kenneth Barrett's drug use?

A.   If I didn't, I don't -- I wouldn't -- I don't know why.
Maybe it wasn't asked.  I don't know.

Q.   Do you have any specialized training in the field of
psychiatry or psychology?

A.   I do not.

Q.   So your testimony about persons in your family having
mental problems, that's not based upon any specialized
training, is it?

A.   No.

Q.   As a matter of fact, you've not consulted with any
physicians regarding any of your family members and their
mental health condition; is that correct?

A.   That's correct.

Q.   Now, in your declaration, you mentioned or mention Ruth,
and was that Ruth Harris?

A.   Yes.

Q.   Is that the same Ruth Harris who testified in this
courtroom just a few minutes ago?

A.   Yes.

Q.   And I believe you, as part of your declaration,
indicated that, at some point, Ruth actually had contact
with the defendant regarding changing his lifestyle; isn't
that correct?

A.   Yes.

Q.   Now, when you say changing his lifestyle, were you

referring to his use of illegal drugs?

A.   Yes.

Q.   It had gotten so bad that his own family was scared of him; isn't that correct?

A.   Well, I think Ruth -- Ruth cared a lot about Kenny and wanted to try to help him.  And I think she sat down with him, talked to him, was concerned.

Q.   Because he had become real paranoid; is that right?

A.   Well, you know, his -- his life was -- just seemed to be a little chaotic.  You know, he didn't -- I don't think he was working at that time.  And his -- just his general lifestyle, she was concerned about him.

Q.   And when was that in relationship to the shooting and killing and the murder of the trooper?

A.   I think it was probably within a year of that time, close to it.

Q.   And you agree with me that, obviously, Mr. Barrett did not change his lifestyle?

A.   I'd say no.

Q.   You would agree with me that, when she spoke with him, it wasn't you need to go to a mental hospital; isn't that correct?

A.   I don't know the specifics, but I don't think that was her -- her suggestion to him.  I think it was just more, you know, counseling trying to -- to -- I think mainly just to

convey that we -- that we cared about him.

Q. And that he had a significant drug problem, he needed to get off -- get off the drugs; is that right?

A. Yes.

Q. Are you aware of the effects which methamphetamine has on the human body?

A. Very well.

Q. It causes significant dental problems; isn't that correct?

A. Uh-huh.  Yes.

Q. It also causes problems with paranoia; is that correct?

A. I believe so.

Q. It can cause persons to go many, many hours without sleep; isn't that correct?

A. Correct.

Q. Even into the days.  Would you agree with that?

A. Yes.

Q. And were you aware that Mr. Barrett, Kenneth Barrett, was, in fact, using methamphetamine on the day of the murder?

A. I don't know -- I don't know that to be true.

Q. You testified in direct that the defendant and his mother argued a lot; is that correct?

A. Yes.

Q.   And what time frame are we talking about when you made these observations?  What was the age of Mr. Barrett, Kenneth Barrett at that time?

A.   The teenage years mainly.

Q.   And was he still in school at that time, or had he already dropped out of school at that time?

A.   He was still in school.

Q.   And was that when he was living in the Sallisaw, Vian area?

A.   Yeah, Sallisaw.

Q.   In your declaration, you comment that you wanted to stay away from the family because of your sister, Gelene; is that correct?

A.   Yeah, I guess there's, yeah, some truth to that, yes.

Q.   There's some truth to that?

A.   Yeah.  Well, you know, she's my sister.  But at the same time, she was -- she -- she could get hard to get along with.

          MR. WILSON:  May I have just one moment, Your Honor?

          THE COURT:  Yes.

Q.   (BY MR. WILSON)  So just so I'm clear, when you were very young, you did not live with Mr. Barrett up in Illinois; is that correct?

A.   Correct.

Q.   And so the only -- any contact you would have with him when you were very young is when they would come to visit?

A.   Correct.

Q.   And then he moved back here, and I believe your testimony was 10, 12 years old; is that correct?

A.   Somewhere in that, yes.

Q.   And that he began to basically stay by himself quite a bit; is that correct?

A.   Yes.  But, you know, again, that he was older than I was, and I lived out in the -- in the country and they were living in town.  So back then, we didn't have as much contact.

MR. WILSON:  Okay.  I believe that's all I have. Pass the witness, Your Honor.  Thank you.

THE COURT:  Any redirect?

MS. FISHER:  Yes, Your Honor.  Very quickly.

REDIRECT EXAMINATION

BY MS. FISHER:

Q.   Mr. Dotson, are you aware when you -- when you say that methamphetamine causes a person to be paranoid, are you aware that when a person is paranoid, they can misconstrue a situation that arises in the middle of the night?

A.   Yes.

Q.   Are you familiar with the concept of self-medication?

A.   No.

Q.  So have you -- have you never understood that a person who is suffering from a mental illness might take drugs in order to take care of himself because he doesn't understand what's happening to him?

A.  I guess I could see that, yeah.

Q.  And as you indicated, you're not an expert in the effects of methamphetamine, are you?

A.  No.

Q.  You would defer to any expert that could more readily explain the effects of methamphetamine on an individual; would you not?

A.  Oh, yes.

Q.  And, finally, do you wish you had been able to better help Kenny?

A.  Yes.

MS. FISHER:  I have no further questions, Your Honor.

THE COURT:  Mr. Dotson, you can step down.  Thank you, sir.  Let's take a 15 minute break.

*(Off the record at 10:56 a.m.)*

*(Back on the record at 11:13 a.m.)*

THE COURT:  Ms. Fisher, call your next witness.

MR. AUTRY:  Steve Barrett.

THE COURT:  Mr. Autry.

THE CLERK:  Sir, raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  Yes, sir.

THE CLERK:  Please be seated.

STEPHEN WAYNE BARRETT,

being first duly sworn to testify the truth, the whole

truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.   Could you state your name for the Court, please, sir?

A.   Stephen Wayne Barrett.

Q.   Where do you live, Mr. Barrett?

A.   I live in Noble, Oklahoma.

Q.   And how long have you lived there?

A.   Approximately eight years.

*(Reporter Interruption)*

THE WITNESS:  S-t-e-p-h-e-n.

Q.   (BY MR. AUTRY)  And what do you do for a living, sir?

A.   I'm the high school principal in Noble.

Q.   Is that Noble High School?

A.   Yes, sir.

Q.   And how long have you been the principal there?

A.   I've been the head principal for about three years, but

I've been with the district for about 15.

Q.   All right.  Before you were the head principal of the

high school, what did you do in the previous years for the

school district in Noble?

A.   Assistant principal at the high school.  Head middle school principal.  Before that, taught chemistry and physics and coached football.

Q.   Okay.  Was that at Noble High School?

A.   Yes, sir.

Q.   Before that, did you -- did you go directly into education after you went to college, or did you have any other kind of jobs --

A.   No.

Q.   -- before you started in the education field?

A.   I worked in a factory for a year before I started school.

Q.   All right.  And could you tell the Court what your education consists of, sir?

A.   Obviously graduated high school.  Went to junior college for a little bit at Tulsa Junior College, and transferred to OU.  I think I got my bachelor's from University of Oklahoma in '93, and my master's in '05 I believe.

Q.   What was your undergraduate degree in?

A.   Science education.

Q.   And what did you get your master's degree in?

A.   Educational administration.

Q.   Do you have any military experience?

A.   Spent 11 years in the Army National Guard.

Q.   Are you married?

A.   Yes.

Q.   How long have you been married?

A.   Five years.

Q.   Do you have any children?

A.   Two.

Q.   How old are they?

A.   They're from my previous marriage.  I have an oldest boy that's 23 and a younger one that's 21.

Q.   Okay.  Do you know Kenneth Barrett?

A.   Yes, sir.

Q.   How do you know him?

A.   He's my brother.

Q.   Is he an older brother?

A.   Yes, sir.

Q.   About how much older is Ken than you are, Mr. Barrett?

A.   Seven years.

Q.   Did you have the same parents?

A.   Yes, sir.

Q.   What's your mother's name?

A.   Sylvia Gelene Dotson.

Q.   And what was your father's name?

A.   Ernest Eugene Barrett.

Q.   Is your father now deceased?

A.   Yes, sir.

Q.   Do you have any other brothers or sisters besides Kenneth Barrett?

A.   There's a middle brother, Richard, that's five years older than me.

Q.   All right.  Let me ask you a general question, and then we'll try to break it down more specifically.  Based on what you know growing up with the family, was Kenneth Barrett raised in an environment that was different from yours growing up?

A.   The same early, but adolescent years were drastically different.

Q.   Okay.  Can you describe that?

A.   When I got to be an adolescent, we had moved to the country and basically the family land that belonged to my grandfather, and I lived in an area probably with, you know, five relatives houses within a, you know, quarter mile proximity.

Q.   And can you describe what kind of environment, to your knowledge, Kenneth had when he was growing up?

A.   I can't say the early parts before we moved back to Oklahoma.  I would describe the years, especially probably late '70s when we lived on Meadowlark as being very unstable.

Q.   Okay.  Could you explain that to the Court, or describe the instability you're talking about?

A.   Well, I think my mother had just gotten divorced, was struggling herself, and I think trying to raise three boys. And I think that, you know, there was a lot of, you know, I'd say family drama within the house, you know, on different occasions.

Q.   All right.  When you say family drama, what do you mean exactly?

A.   It could range anywhere from verbal arguments to, you know, physical altercations.

Q.   And who would the verbal arguments be between?

A.   Typically, it would be Kenny and mom, or even Richie. He was close enough in age.  So those three.

Q.   And what would they argue about?

A.   It may be simple things.  It may be dinner.  It may be what someone said to the other one.  It was really typically wasn't a specific topic.

Q.   Do you know who generally instigated the arguments?

A.   I can't remember.

Q.   Okay.  Is your mother an alcoholic?

A.   Yes.

Q.   I'm going to be asking you some questions, some personal questions about your family.  Do you understand why we're doing that?

A.   Yeah.

Q.   And when did it become evident to you that your mother

had a drinking problem?

A.  I don't think I -- you necessarily perceive that when you're younger, but --

Q.  Yes, sir.

A.  -- I can't remember a time that there wasn't alcohol involved growing up.

Q.  And could you describe generally her drinking habits, your mother's drinking habits?

A.  She drank beer on a regular basis.  But, I mean, obviously weekends were spent -- a lot of times she came home late at night, so she would -- she frequented the bar scene I would say.

Q.  And how old were you at that time?

A.  It would have been late '70s, so I'm eight or nine.

Q.  All right.  And Ken would have been a teenager at that time?

A.  Yes.

Q.  Do you know, based on what you know about the family, whether that was a problem with your mother while Ken was a young child growing up?

A.  I can't -- I don't have any memories of that.  I don't remember.  I was born in Illinois and then we moved to New Jersey, so I don't -- but I don't remember any part of that part of our life.

Q.  Okay.  How did drinking affect your mother?

A.   She's a very boisterous individual, opinionated.  So as she drank, it became -- she was more overt in her -- in her verbiage.

Q.   Okay.  What do you mean by that exactly?

A.   Argumentative, or she would -- and if it was a conversation, she would chime in and she'd seem to have, you know, strong opinions about particular things, whatever it may be.

Q.   All right.  Did she confront Ken a lot with her strong opinions, as you put it, after she had been drinking?

A.   Yeah.  I can't recall that she was drinking every occasion.  I know there was a lot of arguments about -- you know, I would say arguments where she was trying to control his behavior.

Q.   All right.  Do you think your mother's drinking habit adversely affected your brother, Ken, and you to some degree?

        MR. KAHAN:  Objection as to speculation, Your Honor.

        THE COURT:  Overruled.

A.   I think in any case like that where there's heavy drinking, the absence of the parent is going to have some form or effect on kids.  I felt it.  I'm sure that Kenny did.

Q.   (BY MR. AUTRY)  All right.  How did you feel it?

A.   Had to rely heavily on other people as far as school activities, you know, as far as to and from transportation, trips from sports.  So that was, I felt, neglectful.

Q.   Do you know how it affected your brother, Ken?

A.   No, I think it's probably a question for him.  Obviously it was trying times.  Dad wasn't there, so --

Q.   All right.  Well, let me ask you about that.  How old were you when your parents divorced?

A.   I believe I was two.

Q.   And Ken would have been about nine?

A.   Yes, sir.

Q.   So did you ever -- were you ever really raised with or around your father?

A.   No, sir.

Q.   Okay.  And what kind of relationship did Ken have with his father?

A.   I would think very close, you know, from my perspective, especially, you know, when we would see dad in the late '70s, Kenny would always stay close to dad.

Q.   All right.

A.   Very fixated on dad.

Q.   Were you fixated on your father the same way Ken was?

A.   No, I don't believe so.  I mean, just because I -- that absence was always there for me, so it was the norm basically for me.

Q. Did Ken miss his father a great deal?

MR. KAHAN: Objection as to speculation.

THE COURT: If he knows.

Q. (BY MR. AUTRY) Do you know -- well, I'll just ask you. Mr. Barrett, did your brother, Ken, have problems because your father wasn't around?

A. I would say yes.

Q. Okay. Can you describe those a little bit?

A. I think that in us growing up, anything that was associated with dad, Kenny was fixated on. I can remember distinctly a dog that we got.

Q. Did your father have a drinking problem?

A. Not that I'm aware of. I mean, he drank on occasion, I'd seen him at times, but that was when I was older.

Q. Okay. Do you think your mother had or has mental or emotional problems?

A. It's my opinion, yes.

Q. Okay. Can you describe that or explain that a little bit?

A. Well, being in the house, I think that, you know -- or the mood swings would go from extreme. I've seen her extremely happy, I've seen her crying and depressed, withdrawn, so -- and then -- and then anger also. So I saw -- it was a roller coaster per se.

Q. Would it be fair to say that she had some pretty

significant mood swings?

A.   I think that would be -- categorize it correctly.

Q.   And you experienced those, or you were around when those kind of things --

A.   Yes.

Q.   -- were going on with your mom?  And was Ken also around to see that kind of stuff?

A.   Especially -- I mean, I'm speaking from my reference point.

Q.   Yes.

A.   The Meadowlark years probably more than anything.

Q.   Did those kind of problems that you thought she had affect her behavior in any other way that you can think of, other than what you've already described?

A.   No.  She was functioning in some, you know, I guess aspects.  She always maintained employment.  She worked. She got up every day and went to work.

Q.   Would she -- was she a daily drinker?

A.   Yes.

Q.   Seven days a week?

A.   Yes.

Q.   Would she drink to excess every day?

A.   No.

Q.   Okay.

A.   Mainly weekends.

Q.   So it was usually drink to excess on the weekends, but drink throughout the week?

A.   Yes.

Q.   Do you know, sir, whether or not there's a history in your family of mental or emotional problems?  I'm talking about not just the immediate family, but the wider family as well.

A.   None that I've personally seen or been aware of.

Q.   Okay.

A.   It's just information I may have gained from the investigated -- you know, from Mr. Post.

Q.   Do you have any opinion as to whether or not your brother, Ken, has any kind of emotional or mental problems?

        MR. KAHAN:  Objection.  Foundation.

        THE COURT:  Sustained.

Q.   (BY MR. AUTRY)  Based on your observations of your brother, Ken, growing up, did you think he had special needs?

        MR. KAHAN:  Again, objection.  Foundation.

        THE COURT:  Overruled.

A.   Based on my experience in the job that I do --

Q.   (BY MR. AUTRY)  Yes, sir.

A.   -- I see very similar behavioral patterns from Kenny's early years to the students that I deal with on a daily

basis.

Q. Can you describe that a little bit?

A. Impulsive behavior.  Act out physically over maybe small things.  Inability to moderate themselves, to identify triggers and refrain from behavior that causes more damage.

Q. And what do you attribute that to?

A. I don't -- I don't know the answer to that.

Q. But you see that in students that you've had in high school that you've taught, or that are in your school while you've been the principal?

A. I deal with it daily.

Q. And what kind of -- what kind of help do you try to give the students in your school that had those kind of problems?

A. Of course it depends on the disability, you know, but we basically work out individualized plans and kids that have, you know, anger issues or are dealing with -- you know, we have a lot of kids that are in counseling, you know, on a weekly basis.  And then we basically make strategic plan to how they can manage their day and how they can get through the day and still be successful in school, whether it be identifying triggers or give them a safe place to go relax for a little bit and then re-enter into the population of the school.  So there's varied strategies.

Q. Okay.  Do you know if Ken got that kind of help or that

kind of assistance when he was growing up?

A.   Not that I'm aware of.

Q.   All right.   Now, you did well in school; is that correct?

A.   I had my moments, but, yeah, I made it.

Q.   All right.   And you were an athlete in school?

A.   Yes, sir.

Q.   You played football in high school?

A.   Yes, sir.

Q.   Okay.   Do you know what kind of experience your brother, Ken, had during his school years?

A.   I don't recall.   I mean, I know he dropped out in ninth grade.   I think it was ninth, so -- but other than that, I don't know any of the experiences he had as far as school.

Q.   Okay.   Now, you did a declaration back in 2009; is that correct, sir?

A.   Yes, sir.

Q.   You were talked to by an investigator for Ms. Fisher and I back then?

A.   Yes, sir.

Q.   Do you remember stating in that declaration that Ken failed at school?

A.   Yes.

Q.   Is that accurate?

A.   Yes.

Q.  Do you know why he failed?

A.  I don't know specifically.  I mean -- I mean, I have my opinions.

Q.  What -- well, tell us.

A.  Well, I just -- I think probably he was reeling from the -- you know, from the breakup of the family, and had some -- needed some help, and help he never got as far as from a counseling perspective or from a special needs perspective.  There might have been some interventions could have been done to help him stay in school.

Q.  How did your parents' divorce affect Kenny?

A.  I can just speak from me seeing visual things far as he very emotional, distraught at times, angry at times.

Q.  Did you see in Ken the type of mood swings maybe you saw in your mom as you all were growing up?

A.  I'd say there's some similarities, yes.

Q.  Would Ken's moods change radically or frequently or unpredictably, anything like that?

A.  I don't remember specifically.  I mean, obviously I remember outbursts from a violent standpoint.

Q.  I'm sure the prosecutor is going to ask you this.  You turned out to be successful.  You went to college.  You had two college degrees.  You're a high school principal.  And you're aware of Ken's problems with the law and why we're here today; correct?

A.   Yes, sir.

Q.   Do you have an explanation that you can give to the Court as to why you think you turned out the way you did versus the way Ken turned out?

MR. KAHAN:   Object to --

Q.   (BY MR. AUTRY)   Or the problems he's had?

MR. KAHAN:   Objection as to speculation, Your Honor.

THE COURT:   Overruled.

Q.   (BY MR. AUTRY)   You can answer.

A.   I think my brother had psychological issues growing up. I think part of those were due to the absence of a father. And I think that he made some choices, you know, as far as drugs and alcohol are concerned that compounded those, in which, you know, I commonly see in some of the families I deal with.

Q.   Okay.   And you've had some history with drug use yourself; is that correct?

A.   Late adolescent, yes.

Q.   Okay.   And how were you able to overcome that?

A.   Well, I think partly I was -- I was getting promoted pretty rapidly in the military, so there's certain guidelines you have to follow in order to maintain.   You know, it's not -- once you become a noncommissioned officer, you can't be -- obviously you can't test positive for

anything.  And now I think the change in geography helped me immensely.  I moved from Sallisaw to Tulsa.

Q.  Okay.  Were you aware that your brother, Ken, at some point started using drugs?

A.  I learned that in the first trial at least.  I mean, I always knew that he had experimented with marijuana growing up, but I only learned of the other drug use once -- in the first trial.

Q.  Okay.  Was there a difference between you and Ken when you were growing up with respect to the structure you had within the larger family, or the wider family, and the structure he had when he was growing up?

A.  No.  Obviously I had lots of relatives in close proximity.  I spent a lot of time with my grandfather and my uncle Mark and Phyllis and Roger, and my uncle Tom and Janice.  I spent, you know, cases where I would, you know, spend my days with them as opposed to being in the home.  So I think that helped me.  And I had some cousins that were, you know, very close in age, so we were able to spend a lot of time together, and our actives were more hunting and fishing and outdoor activities.

Q.  Okay.

A.  Which I think the time that Kenny struggled the most, we were living in town at Meadowlark, and I think that he didn't have access to the same people and the same

activities.

Q.  Okay.  And what kind of effect did that have on him, if you know?

A.  I don't know.

Q.  Let me go back and ask you a couple of more questions, Mr. Barrett, about your mother.  How would you describe her parenting abilities?

A.  I think she struggled.  Which, you know, I don't blame her per se.  You know, I think in small town Oklahoma and you're a divorced mother of three, I think she struggled.  Struggled to establish -- you know, to fill the role of both mom and dad, which is common I would think.

Q.  Did she get kind of overwhelmed with all the responsibilities and things like that?

A.  I would I think so.  She had moments where she broke down, yes.

Q.  Do you know whether or not she singled your brother, Ken, out for discipline?

A.  I wouldn't say singled out necessarily, but he was the oldest and he was exhibiting, you know, behavior patterns that were defiant, and I think she struggled to try to get a hold on that.  I think that's why she tried to rely on, you know, Ruth's husband, Jerry.  I think there was some -- she tried to intervene, but I think it may have been a little too late.

Q.   Do you know of any instances or any experiences where your mother lost control?

A.   Well, I mean, what do you mean, lost control?

Q.   Lost control.  Just kind of flipped out as far as discipline or yelling at the kids or anything like that.

A.   Yes.  I've seen my mother and Kenny in a physical altercation.

Q.   Okay.  When was that, approximately?

A.   We were living on Meadowlark.  I don't know specifically what year it was --

Q.   Okay.

A.   -- but we were fixing to go out to eat, and they had gotten into an argument and ended up in a wrestling match on the floor.

Q.   Okay.  Would you describe your brother as being hyperactive when he was growing up?

A.   Yes, sir, much so.

Q.   You were probably hyperactive yourself, weren't you?

A.   Unfortunately, yes.

Q.   Okay.  Would it be fair to say that Ken grew up in a dysfunctional immediate family?

A.   I would think during the adolescents years, yes.

Q.   And is that based on the stuff you've already talked about or described to the Court, or is there anything else?

A.   I mean, I have different instances -- I mean, specific

instances at the Meadowlark house.  But I would say it was a very volatile time.

Q.  Did your mother suffer from depression, in your opinion?

A.  Yes.

Q.  How severe?

A.  Well --

MR. KAHAN:  Objection, Your Honor.  It's well beyond this witness's --

THE COURT:  Are you asking for a clinical opinion?

MR. AUTRY:  No, sir.  I can rephrase it, Your Honor.

THE COURT:  Please do.

Q.  (BY MR. AUTRY)  Did your mother, in your experience from observing her, seem to have a depressed or sad mood a lot of the time?

A.  Not a lot of time, but she struggled with depression.  She would come in my room late at night and cry.  And then I found some writings of hers years later.

Q.  And what did those consist of?

A.  Basically she wanted to die.

Q.  Did you try to help her with that?

A.  No.

Q.  How often would she be in these kind of moods where she was very sad and, I guess, depressed?

A.   I don't -- I don't remember specifically, you know.   I just know she had moments.

Q.   Do you remember how old Ken was when he left home?

A.   I'm guessing 19 maybe when him and Abby moved out of the house.

Q.   All right.   And at that time, was your mom married to a gentleman named Paul Dudley?

A.   Not yet.

Q.   That was afterwards?

A.   That was afterwards.

Q.   What did you think of Mr. Dudley?

A.   He compounded the issue.   Massive alcoholic.   So that caused issues in the house.

Q.   Did your brother, Ken, after he left home, did he work?

A.   Kenny worked, at least mechanic stuff.   He worked for my dad for quite a while.

Q.   Okay.

A.   And then moved back to Sallisaw.

Q.   Did you two ever work together anywhere?

A.   We did, as I got -- I think probably right as I was right out of high school.

Q.   And where did you work at that time?

A.   We were packing stalls at the local race track.

Q.   Blue Ribbon Downs?

A.   Yes, sir.

Q.   Okay.  And how long did you all do that for?

A.   I think that was really just about a week, two week stint.

Q.   Okay.  And did you ever work with Ken after that particular job?

A.   No.

Q.   Did Ken try to work pretty steadily?

A.   I mean, once I left Sallisaw, I really -- I don't know.

Q.   Okay.

A.   I don't, because we didn't -- I didn't stay in touch that well.

Q.   Was Ken, based on your knowledge and your experience with him, was he able to live on his own or live independently for significant stretches of time?

A.   I wouldn't say any extended times.  I think he was fairly mobile.  I think there were -- would be long periods where he would be stable and working and something would happen, and then there would be a change in the environment or he would have to move.

Q.   Okay.  Do you remember when your brother, Ken, tried to kill himself?

A.   Yes, sir.

Q.   Can you describe to the Court what happened when that occurred?

A.   He came in and asked to borrow my shotgun.

Q.   And where was this, by the way?

A.   At my mother's trailer, which is next door to the property where Kenny lived after the fact.

Q.   Okay.

A.   Him and -- what I could tell, him and Abby were having problems.  It was early in the morning.  He came in, borrowed my shotgun.  I looked outside and saw him leaning on the truck, but I didn't see the weapon.  And then, of course, he pulled the trigger.  And my cousin, Roger, and Monty were outside, so they came over, and then I ran and got mom.  And we got out there to him.  And my aunt was there to -- her friend is a nurse, and so we just kept a blanket on him and waited for the ambulance to get there.

Q.   Okay.  And do you know why he attempted suicide?

         MR. KAHAN:  Objection.  Calls for speculation.

         MR. AUTRY:  If he knows.

         THE COURT:  If you know.

A.   He never told me why.

Q.   (BY MR. AUTRY)  Do you know what kind of mood he'd been in, or how his mood was or his affect was preceding the suicide attempt?

A.   No, I can't.  He -- there wasn't a lot of verbiage that morning.  He came in and I was watching a TV show, and he just came in and asked me to use it, and went back to my

bedroom and retrieved it.

Q.  Okay.  And he had been having problems with his wife, Abby?

A.  I believe they were split up at the time.

Q.  Okay.  Were they divorced yet, or did the divorce come later on?

A.  I don't -- I do not remember.

Q.  Do you know how the divorce affected Ken?

A.  Obviously he tried to kill himself, so I think greatly.

Q.  How long was he in the hospital, if you know, after the suicide attempt?

A.  I want to say about ten, eleven days maybe.

Q.  When is it that you left home and moved away?

A.  It would have been around 1988.

Q.  How old were you at that time?

A.  Nineteen.

Q.  And is there any particular reason that you moved away?

A.  Well, I still wanted to go to school.  And then my father invited me to come live with him, so I took him up on the offer.

Q.  And where was your father living then?

A.  Prattville, which is just across the river from Sand Springs, Oklahoma.

Q.  Was it something of a relief for you to leave the --

that environment out there when you finally left home at 19?

A.   Well, obviously that was the same point in which I was exhibiting some risky behavior, so it really stabilized me a lot.  I got enrolled in school at Tulsa Junior College.  And the household -- my father had remarried, and so it was pretty -- his wife stayed home as a housewife, and that provided me some good stability.  It helped me get through that first year and a half of college.

Q.   Now, let me ask you, Mr. Barrett, about your contact with lawyers for your brother, Ken, during the federal trial that was back in 2005.  Do you recall testifying at the trial?

A.   Yes, sir.

Q.   And do you recall testifying in the penalty phase after Ken had been found guilty and they were -- the jury was going to decide punishment?

A.   Yes, sir.

Q.   All right.  Do you recall how you were contacted by the federal defense lawyers or anybody working for them to testify in the penalty phase?

A.   No face-to-face meetings.  I think I got a phone call telling me where to be and what day to be there.  And then obviously I got subpoenaed, so --

Q.   Okay.  And had you been interviewed by the federal trial

lawyers before you went to the courthouse, this courthouse here to testify back in 2005?

A.   No, sir.

Q.   How soon before you came to the courthouse to testify did you get the call that you talked about a minute ago?

A.   It was a few weeks before maybe.  I don't recall specifically.

Q.   And kind of describe what happened when you got to the courthouse on the day you were going to testify.

A.   We were taken to a room similar to today, and placed with other witnesses.  And basically they told us the order that we would testify in.  And, you know, I just came in when they called my name.

Q.   Did they tell you what kind of questions they were going to ask you?

A.   No.

Q.   Did they interview in any kind of depth about your background, your brother's background, your family background, or anything else like that?

A.   No, sir.

Q.   How long were you on the stand do you think?

          MR. KAHAN:  Objection, Your Honor.  The record speaks for itself.

          THE COURT:  Overruled.

A.   Maybe 15 to 30 minutes.

Q.   (BY MR. AUTRY)   Do you remember what you testified about?

A.   Yes, sir.

Q.   What did you testify about?

A.   Asked questions similar to today as far as my educational background and the environment I grew up in. They asked some specifics about some incidences of violence with Kenny and Abby.

Q.   Okay.   Did they ever interview you or ask you about any problems Ken had based on your parent's divorce?   Did they talk to you about that at all?

A.   No, sir.

Q.   Did they talk to you about your mother's drinking?

A.   No, sir.

Q.   Did they talk to you about the effect on Ken when your father left the house?

A.   No, sir.

Q.   Did they talk to you about the effect your mother's drinking had on her and the environment in the home?

A.   No, sir.

Q.   Did they ask you anything about your mother's emotional problems or mood problems, or any kind of behavioral anomalies, or anything like that?

A.   No, sir.

Q.   Did they interview you about any kind of history of

mental illness in the family or emotional problems in the family?

A.   No, sir.

Q.   The kind of questions that we've been going over here today, Mr. Barrett, did they ask you anything really about any of that kind of stuff?

A.   No.

Q.   Do you think your testimony in the federal trial was helpful to your brother, Ken?

MR. KAHAN:   Objection, Your Honor.

THE COURT:   Sustained.

Q.   (BY MR. AUTRY)   Now, in 2009, were you interviewed -- and I think we've kind of alluded to this before.  Were you interviewed by an investigator working for Ms. Fisher and I?

A.   Yes, sir.

Q.   Okay.  And did he go into a lot greater depth about your background and history and the family background and history and your brother Ken's background and history than the federal trial lawyers did?

A.   Definitely.

Q.   Did you have any difficulty discussing those matters with him?

A.   At times.  I mean, obviously some of these situations are very emotional, but -- and I learned a lot, that there

was some -- a lot of family history I was unaware of.

Q.   Okay.  And you signed a declaration I believe back then in 2009?

A.   Yes, sir.

Q.   Have you had a chance to review that in preparation for your testimony today?

A.   I read through it.

Q.   Okay.  Is it -- is it accurate?

A.   Yes, sir.

Q.   Now, if the -- if the federal trial lawyers had asked you the type of questions you were asked back then by our investigator and the type of questions I've asked you here today, would you have told them about all that?

A.   Yes, sir.

Q.   Okay.  Did they ask you any of those kinds of questions?

A.   No, sir.

Q.   Okay.

MR. AUTRY:  Can I have just a second, Your Honor?

THE COURT:  Yes.

Q.   (BY MR. AUTRY)  Would it be fair to say that when you were growing up, Mr. Barrett, you were able to stay with an extended group of family and friends to get some more structure than you had had there in the immediate family with your mom?

A.  Yes, sir.

Q.  Okay.  And did Ken have that opportunity?

A.  Not from the years, you know -- you know, like I spoke to before, the adolescent years.

Q.  Okay.  And when you were staying with kind of the extended family and friends, you would not be in the home environment obviously with your mom and all that kind of deal; correct?

A.  Correct.

Q.  Go ahead.  I'm sorry.

A.  I was just going to say I relied on -- I had good a friend base also of good family, stable family, so I stayed not only with my relatives, but I had a good peer group.

Q.  Okay.  Was the same true for Ken so far as you know?

A.  I don't know.  I mean, I can only speak of what I saw in those early years.

Q.  Okay.  Now, I asked you this a little bit before, and I'm sorry to bounce around but somebody reminded me of something so that's why I'm going back.

We talked about how you were an athlete in high school.  You played football; right?

A.  Yes, sir.

Q.  Did you also -- were you also on the track team?

A.  Yes, sir.

Q.  Did your mom come to many of your athletic events?

A.   No.   She -- I think I spoke about this in the first trial where I'd started last -- my junior and senior year every game, and I think she came to two games my entire career.   I was a top hurdler on the east side of the state my senior year.   She finally came to the state track meet, but that was the only one.

Q.   Okay.   Do you know why she stayed away?

A.   Yeah.   At that point, in my latter years of high school, she and Paul were married, so they owned a bar, so she worked at the bar most nights.   And so, you know, it just became common that she wasn't there, so I didn't -- I didn't fish for -- I was surprised she showed up when she did, so in those kind of cases, you just take what you can get.

         MR. AUTRY:   Okay.   All right.   Could I have just one second, Your Honor?

         THE COURT:   Yes.

         MR. AUTRY:   That's all.   No further questions, Your Honor.

         THE COURT:   Cross-examination, Mr. Kahan.

         MR. KAHAN:   Thank you, Your Honor.

                    CROSS-EXAMINATION

BY MR. KAHAN:

Q.   Mr. Barrett, if I could refer you for a moment to your declaration, the one you signed in 2009.   I noticed you had a comment in there.   You stated that you were lucky because

you were always good in school.  Do you recall that statement?

A.  I remember that.

Q.  Would you agree with me that, based on your own career as an educator, luck actually has very little to do with academic success?

A.  Well, I think, in that particular case, I was alluding to the fact that I was -- I felt like I was fairly intelligent and school became -- it was easy for me.  I felt fortunate to be, you know, fairly smart in at least that school's concerned.

Q.  Okay.  But at some point, you went on in your education; correct?

A.  Yes, sir.

Q.  And I gather that you had to apply yourself; is that correct?

A.  Yes, sir.

Q.  And is that, would you agree, the same advice you would give any student who was struggling in school?

A.  Yes, sir.

Q.  Now, you've already stated you and the defendant had the same parents; is that correct?

A.  Yes, sir.

Q.  And I noted that, in your declaration, you also pointed out that, I believe the verb you used was whipped.  Your

mother whipped both you and your brothers; is that correct?

A.   Corporal punishment was normal in the house, yes.

Q.   And you've also said that your mother's parenting abilities were compromised by her alcohol; is that correct?

A.   I think they had an effect, in my opinion.

Q.   And by her mood swings; is that correct?

A.   Yes, sir.

Q.   So she was not a model parent for you, was she?

A.   No.

Q.   Did your mother encourage your education?

A.   There was very little talk of that.  I mean, it's -- it was more day-to-day survival stuff I would say.

Q.   Okay.

A.   I never received any counseling or anything like that about which direction I should go.  She was -- she was upset that I was joining the military.  She's Jehovah Witness so she didn't believe in it, so I had to press her a little bit on that, but she gave in.

Q.   And after your brother left the house, your mother became involved with Paul Dudley.  Do I have that chronology correct?

A.   Yes, sir.

Q.   Okay.  And I believe you stated in your declaration that

you saw Paul Dudley assault your mother with a firearm; is that correct?

A.   Held it to her head.   He never punched her or anything. I never saw him hit her.   Had another case where they were in the kitchen and were squaring off.   She had a knife and she was at the phone, and then he end up leaving without an incident taking place.

Q.   But at this time, your brother was out of the house?

A.   That's correct.

Q.   But you were -- you were still living at home as an adolescent?

A.   Yes, sir.

Q.   Now, you've also mentioned, both in your declaration and here, that you believe that you had a better outcome than your brother because of your access to extended family.   Is that true?

A.   I think that was assistive to me, yes.

Q.   All right.   And in your declaration, and I don't think this came up here, you mentioned a particularly close relationship with Phyllis Crawford?

A.   Yes, sir.

Q.   Were you aware that she has at least stated that she suffered from clinical depression?

A.   She didn't speak to me about it, and I'm not aware of it.

Q.   So it didn't affect your relationship with her?

A.   Not in my interactions with her, no.  She -- you know, in those kind of cases like that, you know, I felt like -- always like she baked cookies and she was a good cook, so, I mean, it was simple things that maybe I didn't have before that there was always something to eat there.  So it wasn't necessarily my interaction with Phyllis.  I mean, I interacted mainly with my cousins.  But she was very supportive, at least from a housewife standpoint.

Q.   And one of those cousins was Travis, Travis Crawford?

A.   Travis.  I think he may be -- he's the oldest boy.

Q.   Were you ever told that Travis had mental health issues?

A.   No.  I know, just by talking to the family, he had some issues later.  But when we were growing up, I didn't notice anything.  I was -- I was -- Roger, the middle boy, and I were -- he was probably my closest friend through high school.  One of my closest.

Q.   So nothing about Travis' alleged mental health issues affected your relationship with him?

A.   Not with him.

Q.   And would actually appreciate some clarification.  My understanding is that your mother moved you and your brothers to Oklahoma when the defendant was about 11 years old; is that correct?

A.   I think that's fairly -- I remember that I was just -- I was in kindergarten.  I attended kindergarten at Sallisaw, so we had moved prior to me going into kindergarten.

Q.   I'm sorry, what was that?

A.   I'm saying I went to kindergarten at Sallisaw, so I know we moved -- I'm not dead certain on the timing before, but I think it was fairly close to the time I was to start school.

Q.   You made a reference earlier coupled to the Meadowlark years.  Is that Meadowlark Street?

A.   Meadowlark Street.  We had -- we'd lived off South Wheeler and, you know, I'm just -- I'm going off what my mom told me, that my grandpa had loaned her some money and she was able to get a brick home, three bedroom home in a new neighborhood.  It was a small house.  But we stayed there until, well, Kenny left, and then, you know, Richie left thereafter.  And then we moved -- that's when we moved -- we actually moved into an apartment in town, and then we ended up moving out into the country.

Q.   Okay.  So I had Wheeler and I had the apartment.  Where is Meadowlark in there?

A.   Meadowlark's in the middle.  After we moved, we stayed in a couple of houses when we came from New Jersey.  And after that, she purchased the home and we stayed in that until the early '80s.

Q.   And your brother would have moved out then while you were still living in Meadowlark?

A.   Yes.  His -- you know, Abby got pregnant with Toby, and that would have been around 1980.  And then they moved out, tried to get their own place and be a husband and wife I would assume.

Q.   Now, how far is the, as you refer to it, the country -- let me back up.  The country we're referring to, you're talking about the area where your brother was living at the time of the murder?

A.   Yes, sir.

Q.   And how far is that from Sallisaw?

A.   I'd say approximately nine miles maybe.

Q.   How frequently were you visiting that area as a --

A.   Prior to moving out there, not -- not very much.

Q.   Now, were you under the impression that your relatives had -- by relatives, I mean your extended relatives -- they didn't reject your brother, did they?

A.   I -- I never saw anything that would allude to that.

Q.   Were you aware that your brother had the opportunity to live with your Aunt Ruth for a period of time?

A.   I remember a little bit about that move.  I think Uncle Jerry -- Jerry Paul was -- he's a bigger man in stature, so I think my mom felt his physical nature would -- would be able to control Kenny.

Q.  But it was your brother who rejected that opportunity; isn't that true?

A.  I don't know.  I mean, he obviously came back in the home, so --

Q.  Do you recall a time when Kenny Barrett went to live with another relative, Eleanor Long, in his teens?

A.  I don't remember that specifically.  We spent -- I mean especially when my dad would come down, we would spend extended amounts of time with Eleanor.

Q.  Now, when you testified at the trial, you testified that you were unaware of the extent of your brother's drug use. Do you recall that?

A.  Yes, sir.

Q.  Does that remain true today?

A.  I mean, only from the information I got from the report that they showed from the, I believe it was Lexington intake center.

Q.  So based on what you now know, his drug use was actually very extensive, wasn't it?

A.  According to the document, yes, it was during that time.

Q.  And you'd agree with me that drug use does interfere with making positive life choices, doesn't it?

A.  Yes, sir.

Q.  All right.  Like studying?

A.   Can, yes.

Q.   Athletic practice as well?

A.   Yes, sir.

Q.   All right.  I understand you're a conditioning coach; is that correct?

A.   I'm nationally certified, yes.

Q.   And going to guess that you would not encourage your students to use illegal drugs; that fair?

A.   That's fair.

Q.   All right.  But at some point, and I know the defense alluded to this, you, yourself, had a drug problem; is that right?

A.   I experimented, yes.  I was never -- I was never habitually addicted to anything.

Q.   You did, as I understand it, experience an overdose; is that right?

A.   I -- I never lost consciousness or anything.  I just -- and I was the one that requested that I go to the hospital.  So --

Q.   And is it fair to say that that was a decision point for you?

A.   It was a turning point, yes.

Q.   And you made the choice to change direction in your life; is that right?

A.   I made the choice to remove myself from being around

drugs, yes.

Q. All right. So while you did maintain close relationships to the extended family, none of that actually prevented you personally from getting involved in illegal drugs for a period of time. Is that -- is that fair to say?

A. It was. But I felt like my -- it never was with my immediate family. I mean, we drank some beer in high school, but never any drug use as far as my family members were concerned.

Q. Now, you've observed here that your brother was capable of hard work; correct?

A. Yes, sir.

Q. And in the time that you -- you left to go first to Tulsa, and then on to OU, your brother remained in the Sallisaw area; is that correct?

A. As far as I know, yes.

Q. And you're not aware of anything that prevented him from developing any positive relationships with your extended family, are you?

A. I wouldn't know.

Q. And certainly no one prevented your brother from quitting drugs; correct?

A. I think that would be true for anyone.

Q. Now, you made a comment during your direct examination

about you recalled your brother's outburst from a violent perspective.  Could you elaborate on that?

A.  I don't know which year it was.  I mean, it was a case where, you know, I saw explosive kind of behavior where, me personally, two particular incidents.  One, I want to say it was my fourth grade picture.  It was we got in an argument and my head was put into a dresser, and so eye was swollen shut and I still got scar from it.  And then other instance where we got in an argument and he exploded and pushed me into a bed post, and I had to get stitches in the back of my head.  So I think those -- those all occurred at Meadowlark.  I think those were, to me in retrospect, my opinion, were the most critical years where I think he could have got some intervention that might have worked.

Q.  Now, you mention that you did not have extensive interview with your brother's attorneys prior to testifying in the federal trial; correct?

A.  Yes, sir.

Q.  All right.  But you don't know the extent of whatever investigative materials were available to them, do you?

A.  No.

Q.  And you don't know what your brother told them about his life growing up with you, do you?

A.  No, sir.

MR. KAHAN:  Pass the witness, Your Honor.

THE COURT:  Any redirect, Mr. Autry?

MR. AUTRY:  Yes, Your Honor.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q.  Mr. Barrett, you talked about these two incidents of violence, I guess, with your brother, Ken; correct?

A.  Yes, sir.

Q.  And that was during what you termed the Meadowlark years?

A.  Yes, sir.

Q.  And what was going on in the household during that period of time?  What was the environment like?

A.  Well, I just think that was -- it was common to see -- you know, to have an explosive incident where either mom or Kenny got into it.  I think that was a real pivotal time where she was struggling to maintain some type of discipline over the household with three boys.

Q.  And you made the remark when you were discussing that, that this would have been an important time or pivotal time for some kind of help or some type of intervention?

A.  I see that.  I mean, I can give -- obviously I can't give any information, but, you know, I have several cases working right now where I'm trying to get kids that's -- you know, as far as manage their behavior, some of which have already entered, you know, Office of Juvenile Affairs.  And,

you know, it's my job, I feel like, to get those kids strategies that they could use so they can be productive citizens. Because in a lot of cases, once that -- especially if there's any mental illness involved, once they leave that school, it's -- they're not going to receive the same benefit, not going to receive those same interventions when they get out in the real world. Which I will say that it's very difficult from a police standpoint I would say. It's easy for me because if I know the background on a kid, and I go in to discipline a kid, I know certain techniques I can use to get that kid in a better place. But that's not always the case with -- you know, I don't think the law enforcement's offered that, you know, benefit.

Q. Was there ever any intervention or help given to Ken during this period of time, outside help?

A. Not that I'm aware of. I don't remember any counseling or anything. I don't know what took place from his school perspective. But I just know about the behavior that took place in the home.

Q. All right. Did you get along with him generally pretty good in the home?

A. Oh, Kenny and I are very similar in nature, at least from work ethic and the way we think. But obviously there's some differences, too.

Q. Okay. Based on your experience as a high school

principal -- they asked you about choices, people making choices, choosing whether to use drugs, choosing whether to do this or that.  In your experience as a high school principal, is the ability to make a choice, does that differ with different individuals?

A.   Yes, sir.

Q.   And can you explain that a little bit?

A.   Well, I think once you get into special services, which is, at least in my case, about ten percent of my population, there's -- there's other factors that may affect.  If the kid's autistic, depending on the disorder they have, they might -- you know, may not have that same ability to make positive choices.

Q.   All right.  And as someone who has an underlying emotional problem, for example?

A.   Those are probably my most difficult to deal with at school.

Q.   Okay.  Or somebody who has an underlying mental health issue?

A.   Depending on what it is, yes, it can be very bad.

Q.   That can affect the ability to make a choice or make choices?

A.   Yes, sir, in my opinion.

Q.   You spoke a little bit, both on direct and cross-examination about Paul Dudley.  Do you remember

that?

A.   Yes, sir.

Q.   When you were growing up, were there a lot of men in and out of the house with your mom?  Did she bring a lot of men in and out?

A.   She had some consistent relationships.  But, you know, like I had alluded to before, she would spend weekends at the bar, so there were, you know, many occasions where I woke up and there was a man in the house, yes.

Q.   Okay.  Do you know whether or not your brother, Ken, had a real hard time due to the fact that your father wasn't around anymore after the divorce?

A.   Oh, I think he missed him greatly.

Q.   What kind of impact did that have on him?

MR. KAHAN:  Objection.  Speculation.

MR. AUTRY:  If you know.

THE COURT:  From your observation.

A.   From my observation, just what I saw, I had mentioned to it earlier which I kind of choked up a little bit, but we had received a dog from dad.  It was a German Shepherd he got from the Chicago area.  And I remember Kenny was -- I think it was one of those deals where it was an attachment link to dad, and he really -- I know that they were coming home one day, and they were out walking on the highway north of town and the dog got hit and killed.  And I know he

didn't go to school for at least a couple of days, so I think it had a very emotional effect.

Q.   (BY MR. AUTRY)   Okay.   Obviously since he was older, would it be fair to say that Ken had a deeper attachment to your father than you did?

A.   I only knew my dad through the intermittent contacts I had growing up.

Q.   Okay.

MR. AUTRY:   Thank you, Mr. Barrett.

THE COURT:   Anything further from this witness?

MR. KAHAN:   Very briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. KAHAN:

Q.   Mr. Barrett, did you attend the same high school as your brother?

A.   Well, I think it was the junior high we would have, but he quit in ninth.   So our high school was 10 through 12, so same school system though.

Q.   Okay.   Based on your experience then, did you feel that they were negligent in their outlook toward their students?

A.   No.   From my experience, I -- I had a positive experience.

Q.   And your brother elected to drop out on his own, didn't he?

A.   I don't know the circumstances around it, but obviously he chose to quit.

Q.   And you've mentioned that mental health can affect the ability of a student to make choices; correct?

A.   Yes, sir.

Q.   But that's also true of drug abuse, too; isn't it?

A.   Yes, sir.

           MR. KAHAN:   Pass the witness, Your Honor.

           THE COURT:   Mr. Barrett, you can step down.   Thank you, sir.

           THE WITNESS:   Thank you.

           THE COURT:   Let's see.   Why don't we go ahead and take our lunch break before we get on with that next witness.   Let's say be back at 12:45.

                    *(Off the record at 12:11 p.m.)*

                    *(Back on the record at 1:01 p.m.)*

           THE COURT:   Plaintiff's call next witness.

           MS. FISHER:   Mr. Barrett calls Doris Barrett.

           THE CLERK:   Ma'am, if you'll raise your right hand.

           *(The witness was duly sworn by the Clerk.)*

           THE WITNESS:   I do.

           THE CLERK:   Please be seated.

                         DORIS BARRETT,

being first duly sworn to testify the truth, the whole

124

truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MS. FISHER:

Q.   Will you state your name, please?

A.   Doris Barrett.

Q.   Mrs. Barrett, are you married?

A.   I'm widowed, yes.

Q.   To whom were you married?

A.   Yes.

Q.   And to whom were you married?

A.   Ernie Barrett.

Q.   And is Ernie Barrett -- do you know Mr. Kenneth
Barrett?

A.   Yes.

Q.   How do you know him?

A.   He's my stepson.

Q.   Where do you currently reside, Mrs. Barrett?

A.   I live in Sapulpa, Oklahoma.

Q.   And how long have you lived there?

A.   Twenty-five years, or more.

Q.   When did Kenny's dad die?

A.   June the 4th, 2012.

Q.   And how long had you and Ernie been married?

A.   A little over 28 years.

Q.   During that time, did you come to know about the Barrett

family, about Kenny and his relationship with his dad?

A.  Yes.

Q.  And can you describe that?

A.  Yes.  They had an on and off relationship.  It was -- you know, after this all happened, it was I think probably a better relationship.  Ernie visited with Kenny every weekend that we could make it down here.  I think -- I think they ultimately had a really good relationship.

Q.  So breaking it down a little bit, when -- when did you meet Ernie Barrett?

A.  1985.

Q.  And from 1985 to the date of the incident, which is September 24th, 1999, how much contact did you have with Kenny?

A.  I didn't have a lot at the beginning.  He lived in Sallisaw, we lived in Sand Springs.  I had more contact with him after -- after this happened.

Q.  And did you observe the relationship between Kenny and his dad before this happened?

A.  Some.  Yes.

Q.  And would you describe it as good or bad, or what?

A.  It was good and bad.

Q.  Did you become acquainted with Kenny's mom?

A.  Yes.

Q.  Did you have a good relationship with her?

A.   No.

Q.   How did you and Ernie come to know about the incident?

A.   We heard it on the TV.  Actually my niece called me and told me I needed to turn the TV on.

Q.   And describe, if you would, your interaction with Kenny after the incident.

A.   I think we had a really good relationship.  We talked almost every night.  I was in -- you know, he called me for anything he needed.  I think we had a really good relationship.

Q.   Be fair to say that you came to know Kenny following the incident much better than you knew him before?

A.   Yes.

Q.   And how about Ernie's relationship with Kenny, did you notice, were there any noticeable changes before and after the incident?

A.   Yes.

Q.   And can you describe those?

A.   Yes.  I think, after the incident, that the times that they got to sit down and talk, I think they become closer. I think they learned more about each other and their relationship with each other.

Q.   Did Ernie ever express regret for the type of father that he'd been?

A.   Always.

Q. Did you or Ernie visit with Kenny during the -- after the incident in jail?

A. After the incident?

Q. Yeah, in jail.

A. Yes.

Q. Did you ever visit with Kenny in jail?

A. Yes.

Q. And would you visit with him or would Ernie?

A. Ernie.

Q. Did you come to know Mr. Barrett -- well, Mr. Barrett was tried twice in state court?

A. Yes.

Q. And did you come to know his attorneys in state court?

A. Yes.

Q. And they were whom?

A. John Echols and Jack Gordon in one trial, and John Echols and Geoffrey Standing Bear.

Q. And can you describe the relationship that you had with the attorneys in the state court trials?

MR. KAHAN: Objection as to relevance, Your Honor.

THE COURT: What is the relevance as to this testimony?

MS. FISHER: Well, Mr. -- Mr. Echols continues into federal trial, Your Honor, so it does go to the issue

of ineffective assistance of counsel, and how the case progresses. Most of -- I will say that, on appeal, on the guilt-innocence issue, most of the Mr. Hilfiger's and Mr. Smith defense to the failure to do anything was based on the fact that they followed Mr. Echols' floorplan for the trial. And so obviously -- and they -- obviously it becomes relevant how he's represented in state trial as compared to federal trial from Mrs. Barrett's point of view.

THE COURT: I'm not sure I see the connection.

MS. FISHER: I can try to confine it, Judge.

THE COURT: Okay.

Q. (BY MS. FISHER) Were you able to observe Kenny's relationship with his attorneys in state trial?

A. Yes.

Q. And how would you describe that?

A. They were very close. They -- I think he communicated with him all the time.

Q. Describe for me, did you have any -- did you have any involvement in the federal trial?

MR. KAHAN: Objection, Your Honor, as to relevance.

THE COURT: Overruled.

A. Yes.

Q. (BY MS. FISHER) And what was that?

A. Well, I would just go pick up paperwork sometimes for

Mr. Hilfiger.  I never really associated much with Mr. Hilfiger.

Q.  Did you observe the federal trial?

A.  Yes, I was here every day.

Q.  Did you testify at the federal trial?

A.  Yes.

Q.  When you testified at the federal trial, were you interviewed by Mr. Hilfiger at all?

A.  No.

Q.  Based on your -- you say that you were at the trial every day.  Based on the fact that you were there every day and obviously spoke with him, did you -- had he ever talked with you about Kenny's life?

A.  No.

Q.  Were you aware of the interaction that your husband, Ernie, had with Mr. Hilfiger?

MR. KAHAN:  Objection as to hearsay, Your Honor.

THE COURT:  Overruled.

A.  Would you repeat that?

Q.  (BY MS. FISHER)  Were you aware of the -- of any interaction that Mr. Hilfiger had with your husband?

A.  He didn't have any.

Q.  Did your husband testify at trial?

A.  Yes.

Q.  Did you have -- did Mr. Hilfiger interview your husband

before he put him on the stand?

A. No.

Q. Did you have any idea when you went on the stand as to what you or your husband would be called to do?

A. No.

Q. Did you have any interaction with co-counsel, Bret Smith?

A. Yes.

Q. What was the nature of -- describe that relationship.

A. Well, my husband and I would -- we would have some questions as to some things that we would want Mr. Hilfiger to bring up, and I would go to Mr. Smith with it, and he would take my concerns to Mr. Hilfiger.

Q. Did you observe the relationship between Kenny Barrett and Bret Smith during the hearing at all?

A. Yes.

Q. And how would you describe that?

A. I really couldn't say. I mean, I could just see them talking, yeah.

Q. Did you -- when you talked with Kenny when you visited with Kenny, approximately how long a period of time did that -- and talk with him on the phone when you visited -- observed him at trial, how long a period of time did that cover?

A. Well, I talked to Kenny several times a week. He would

call.

Q.   And that began in 1999?

A.   Yes.

Q.   And it continued through the federal trial?

A.   Yes.

Q.   Which was -- and ended in 2005, 2006?

A.   Yes.

Q.   Did you notice any growth or any change in Kenny during that period of time?

A.   No, not --

Q.   When you talked with him, did you --

A.   Well, I think he -- you know, during the federal trial, he had several concerns that he would bring to me to bring up with Mr. Hilfiger.

Q.   So was -- so was your relationship with Kenny during that period of time mostly just about the trial, or was there a personal relationship?

A.   It was mostly about the trial.

Q.   Okay.  So you didn't observe any changes in his attitude towards Ernie?

A.   Well, just, you know, because of Ernie, you know, talking to me, how he felt like he had gotten closer to Kenny.

Q.   So most of the relationship was between Ernie and --

A.   Yes.

Q.  -- Ernie and Kenny?

A.  Yes.

Q.  And so you -- do you have any doubt that, had Mr. Hilfiger spoken with Ernie about his parenting or about Kenny's childhood, that Ernie would have been cooperative in that effort?

MR. KAHAN:  Objection.  Speculation, Your Honor.

THE COURT:  Can you get her to answer based on some personal knowledge she has rather than just speculating on his state of mind?

MS. FISHER:  I will, Your Honor.

THE COURT:  Okay.

Q.  (BY MS. FISHER)  Did you and Ernie discuss matters during this incident -- or during the trials following the incident?

A.  Yes.

Q.  And did Ernie ever express to you whether or not he was willing to help Kenny?

A.  Always, yes.

Q.  And did he have any concerns about testifying in the federal trial?

A.  No.  Other than the fact that he didn't -- you know, we were unprepared.

Q.  So he was concerned --

A.  Yes.

Q.  -- about being unprepared?

A.  Yes.

Q.  And do you have any doubt that had either Mr. Hilfiger or Mr. Smith discussed with Ernie the failing -- his failings as a father, or Kenny's early life, that Ernie would have been cooperative based on your knowledge of Ernie?

A.  Oh, yes, he would have been cooperative.

MS. FISHER:  I have no further questions, Your Honor.

THE COURT:  Cross-examination, Mr. Kahan.

MR. KAHAN:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. KAHAN:

Q.  Good afternoon, Ms. Barrett.

A.  Good afternoon.

Q.  Ms. Barrett, you've described a fairly distant relationship with Mr. Hilfiger; is that correct?

A.  Yes.

Q.  And you generally found him less talkative than Mr. Echols; is that correct?

A.  Yes.

Q.  Okay.  Mr. Hilfiger at no point in time invited you to his planning meetings, did he?

A.  No.

Q.   Nor I'm assuming did he invite you to his private conversations with Mr. Smith, did he?

A.   No.

Q.   Or his conversations with Mr. Echols?

A.   No.

Q.   Or, frankly, his conversations with your stepson; correct?

A.   Correct.

Q.   Okay.   So when you stated in your declaration that Mr. Hilfiger, in your opinion, did not have strategy for this trial, that is simply your speculation, isn't it?

A.   Yes.

Q.   Now, you've mentioned that you testified at trial; correct?

A.   Yes.

Q.   And you pointed out that you did not have any particular preparation with Mr. Smith or Mr. Hilfiger; correct?

A.   Correct.

Q.   Okay.   And you've even gone so far as to say in your declaration that you were nervous; is that correct?

A.   Yes.

Q.   By the same token, did you have any difficulty answering Mr. Hilfiger's questions on the stand?

A.   No.

Q.   You didn't, at any point, ask to refresh your

recollection while you were on the stand, did you?

A. No, I didn't.

Q. And you never had to ask for a break?

A. No, sir.

Q. Now, you made a comment in your declaration about Mr. Hilfiger asking you to help convince Kenneth Barrett to testify on those -- on his own behalf. Do you recall that?

A. In my declaration?

Q. Yes. Do you -- or let's make it simpler. Do you recall that Mr. Hilfiger asked for your assistance in asking Kenneth Barrett to testify at trial?

A. Yes.

Q. And am I correct in my understanding that you refused to do so?

A. Yes.

Q. Okay. And are you aware for what reason Mr. Hilfiger wanted Kenneth Barrett to testify?

A. No.

         MR. KAHAN: Your Honor, at this point I would like to play what the government has marked as Exhibit 53, which are three recordings of phone calls.

Q. (BY MR. KAHAN) Ms. Barrett, I'm going to ask you to listen to these three calls.

A. Sure.

*(Government's Exhibit 53 played)*

Q.   (BY MR. KAHAN)   Ms. Barrett, do you recognize the voices on that recording?

A.   Yes.

Q.   Whose are they?

A.   Kenny and mine.

Q.   And when you say Kenny, you're referring to the defendant, Kenneth Barrett?

A.   Yes.

Q.   And do you recall that conversation?

A.   Yes.

Q.   Okay.   And is that a true and accurate recording of that conversation?

A.   Yes.

*(Government's Exhibit 53 played)*

Q.   (BY MR. KAHAN)   Ma'am, once again, do you recognize voices on that recording?

A.   Yes.

Q.   Were those, again, yours and defendant's?

A.   Yes.

Q.   Okay.   And do you recall the conversation?

A.   Yes.

Q.   And is that a true and accurate recording of the complete conversation?

A.   Yes.

*(Government's Exhibit 53 played)*

Q. (BY MR. KAHAN)  Ms. Barrett, with regard to the conversation you just heard, do you recognize the voices there?

A. Yes.

Q. And, again, are those your own voice and that of the defendant, Kenneth Barrett?

A. Yes, sir.

Q. And do you recall that conversation?

A. Yes, sir.

Q. Is that a true and accurate recording of that conversation?

A. Yes, sir.

Q. Now, in that set of recordings, you refer to a gentleman, John.  Am I correct in my understanding of that as John Echols?

A. Yes, sir.

Q. You also mention that you spoke to Roger regarding appeals.  Do you recall that?

A. Hearing it, I guess.  I don't remember.

Q. You recall hearing that --

A. Yes.

Q. -- is that right?  Do you recall having conversation with Mr. Hilfiger regarding appeals?

A. To tell you the truth, I don't.

Q. Okay. You have no reason to doubt that the -- your 2005 you had those conversations?

A. No, I have no -- no doubts, no.

Q. Okay. You also made mention, do you recall in that conversation, about conversation with Mr. Hilfiger regarding manslaughter instructions. Do you recall that?

A. Yes.

Q. Do you recall that conversation?

A. I really don't. Today I don't.

Q. But, again, you have no reason to doubt that you would have misrepresented that --

A. No, I --

Q. -- in that conversation?

A. No.

Q. There was also a discussion in the very first phone call, a comment I believe Mr. Barrett made about Bret saying, "Where's the dope?" Do you recall that comment?

A. Yes.

Q. Do you recall, was that a conversation that you were present for with -- with Mr. Barrett and Mr. Smith?

A. No.

Q. In the second phone call, there was an interchange with Mr. Barrett regarding his preference for the death penalty. Do you recall that?

A. Yes.

Q.   Do you recall that conversation?

A.   Yes.

Q.   And it certainly sounds like that was not the first time you had heard that comment; is that correct?

A.   That's correct.

Q.   Okay.  So you heard that more than once?

A.   Yes, sir.

Q.   Okay.  Do you recall, prior to the federal trial, a conversation you had with an investigator named Steve Leedy?

A.   I don't.  Sorry.

Q.   If I could ask to show the witness Government's Exhibit 49.  If I could, I would like to turn your attention to Page 5748 at the bottom.

A.   Yes.

Q.   Okay.  And reading that, does that help you recall a conversation you might have had with an investigator?

A.   I don't remember this conversation.  I'm sorry.

MR. KAHAN:  Quite all right.  Your Honor, the government would move Exhibit 53 into evidence.  Apart from that, I would pass the witness.

THE COURT:  Is there any objection to Government's Number 53?

MS. FISHER:  No objection, Your Honor.

THE COURT:  Very well.  The Government's 53 is

admitted.  Ms. Fisher, you have redirect?

MS. FISHER:  I do, Your Honor.

REDIRECT EXAMINATION

BY MS. FISHER:

Q.  Mrs. Barrett, you were -- you were asked whether it was just speculation that Roger Hilfiger had no strategy -- that you thought he had no strategy.

A.  Correct.

Q.  And you answered yes.  Did you have any reason to -- to make the statement that he had no strategy?

A.  Yes.  I -- excuse me.  I just felt like he was all over the place with -- you know, I would ask him -- I would ask Bret to ask him, you know, different things that we wanted brought out in the trial, and they would always come back and tell us that -- or Bret would say no, he brought it to Mr. Hilfiger but he didn't want to do it.

Q.  Well, when did you come to learn that the role that strategy plays in a trial?

A.  Probably right from the beginning -- beginning of the federal trial.

Q.  Did you -- did you, at any time, observe the strategy in the state trials?

A.  Oh, yes.

Q.  Would it be -- would it be fair to say that it wasn't speculation, but it was a comparison of the two trials where

you saw strategy in one and no strategy in the other?

A.   Yes.

Q.   In the first recording that Mr. Kahan asked you to refer to, it seemed as though you and Mr. Barrett were quite happy?

A.   Yes.

Q.   Had something happened in the trial?

A.   We just felt like that, that day, we had had a good day at trial.

Q.   And what happened that made you think it was a good day?

A.   I can't remember.

Q.   Would that have been the day that Mark Sanders testified that he hadn't been there?

A.   Yes.

Q.   Was that based on Mark Sanders' --

A.   Yes.

Q.   -- testimony?

A.   Yes.

Q.   And is that what Bret meant when he said, "Where's the dope?"

A.   Yes.

Q.   Did -- to your knowledge, did Mr. Hilfiger ever follow up on that particular issue?

A.   No.

MR. KAHAN:  Objection, Your Honor.  It's in the record.

MS. FISHER:  Well --

THE COURT:  Isn't this cumulative of what's in the record?

MS. FISHER:  No, Your Honor.  It's based on the motion to -- it probably is.  I'll go to a different -- it may be.

THE COURT:  Okay.

Q.  (BY MS. FISHER)  Have you since come to learn Mark Sanders has recanted his testimony?

MR. KAHAN:  Objection, Your Honor.  Relevance.

THE COURT:  Overruled.

A.  I didn't know that, no.

Q.  (BY MS. FISHER)  You didn't know that Mark Sanders recanted his testimony?

A.  No.

Q.  Okay.  In the second conversation -- let me go back for just a moment.  Did you, at any time in your dealings with Mr. Hilfiger or Mr. Smith, learn that Mr. Hilfiger or Mr. Smith went to interview Mr. Sanders at any time?

A.  I don't recall that.

Q.  Okay.  In your second conversation -- if I could find what that conversation -- that was about taking the stand, did -- did Mr. Hilfiger ask you to persuade Kenny to take

the stand?

A.   Yes.

Q.   And did you do that?  I mean, did you attempt to do that?

A.   Yes.

Q.   Did you -- is there -- and at the end of that conversation, Kenny seemed agreeable at that point; wasn't that true?

A.   That's true.

Q.   And, in fact, one of the reasons that you gave him for taking the stand was because, if they had to understand that the snitches -- the seven snitches that came in at the last minute were rehabilitatable because of drugs, that Kenny too, was rehabilitatable?  Is that --

A.   Yes, that's exactly what I told him.

Q.   The third conversation I believe is the one where Kenny sounds depressed.  Is that the one that he's depressed?  I'm a little confused on the conversation.

A.   Yes.

Q.   And that's based on his interaction with Mr. Hilfiger as far as you can tell?

A.   Yes.

Q.   And Mr. Hilfiger doesn't encourage him on the appeal or on sentencing?

A.   No.

Q. Did, at any time following any time -- I think you testified that Kenny -- it was not -- that you had heard it before, that Kenny would sometimes get depressed and say he wanted death over life?

A. Yes.

Q. And there would be other times when it was clear that he was willing -- willing to fight for life?

A. Yes.

Q. Did Kenny ever tell you or Ernie not to testify or not to help him at sentencing?

A. No.

MS. FISHER: I have no further questions.

THE COURT: Anything further from this witness?

MR. KAHAN: No, Your Honor.

THE COURT: If not, Ms. Barrett, you can step down. Thank you.

THE WITNESS: Thank you.

MR. AUTRY: Jack Gordon, Your Honor.

THE COURT: Very well.

THE CLERK: Sir, if you'll step into the box, raise your right hand.

THE WITNESS: Sorry, I came with too much gear.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS: I do.

THE CLERK: Please be seated.

THE WITNESS:  Thank you.

JACK E. GORDON, JR.,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.  Could you state your name for the Court, please, sir?

A.  My name is Jack, middle initial E, Gordon, Junior.

Q.  Where do you live?

A.  Claremore, Oklahoma.

Q.  What do you do for a living?

A.  I'm a criminal defense lawyer.

Q.  How long have you been a lawyer?

A.  I'm four days short of 45 years of practice.  And graduated in 1969, so add two and a half years in the United States Army.

Q.  Okay.  And where did you go to law school?

A.  University of Arkansas.

Q.  Have you always practiced criminal defense law during your 45 years?

A.  Oh, no, sir.  I did a variety of things over the years to make a living.  Claremore is a little town.

Q.  Yes, sir.  When you say that you have an extensive and have had an extensive criminal practice?

A.  It's been since 1984 is when I took my first death

penalty case, and that led me into criminal defense.

Q. Okay. How many death penalty cases have you handled over the years?

A. Ten.

Q. How many of those went to trial?

A. Nine.

Q. Do you know Kenneth Barrett?

A. I do. Know him well.

Q. And how do you know Mr. Barrett?

A. I defended Kenny at his second trial. I think it was in 2004.

Q. Is that in state court?

A. Yes.

Q. In Sequoyah County?

A. Yes.

Q. Had there been a previous trial to the one you were involved with?

A. There had.

Q. And what was the result of that trial?

A. Result of that was a hung jury and a mistrial.

Q. Who was the lead counsel in that trial?

A. John Echols.

Q. Do you know who he was assisted by in that first trial in state court?

A. A fellow from Pawhuska whose name now escapes me, but I

think he's now the chief of the Osage Nation.

Q.   Geoffrey Standing Bear?

A.   Yes.

Q.   Does that ring a bell?

A.   Thank you.

Q.   And were you appointed to assist Mr. Echols in the second state trial?

A.   Yes, I was.

Q.   And what was your duty supposed to be, or what was your concentration or job supposed to be with respect to the second state trial?

A.   I was marshalling mitigating evidence.

Q.   Okay.  What -- what type of investigation are you supposed to do, in your opinion, to develop mitigating evidence in a capital case?

A.   First thing you do is you gather up all the records that exist concerning your client.  You do that with an investigator, specifically a mitigating investigator -- mitigating evidence investigator.  You start with birth records if you can get them, then you go to school records, then you go to mental health records, then you go to DHS records, and get every bit of written evidence that ever -- written material that you can find.

Q.   Do you look into the defendant's upbringing and background and his family history?

A.   Well, after you gather up all the -- all that written evidence --

MR. KAHAN:  Your Honor, if I may, if the witness could constrain himself to what he did in this case as opposed to what should be done generally.

MR. AUTRY:  Okay.  That's fine.  I'll move on specifically to this case.

Q.   (BY MR. AUTRY)  In this particular case, Mr. Gordon, had there been an investigator or mitigation investigator on the case before you were appointed on the case?

A.   Yes, there was.

Q.   And do you know who that was?

A.   A lady named Roseann Schaye.

Q.   And what did she do, to your knowledge?

A.   She interviewed family, interviewed Kenny, getting background on his life.

Q.   Do you recall what kind of -- what kind of interview she did and what kind of information she got in the interviews that she did with Mr. Barrett and his family?

A.   She was looking for how he was reared by his mother and father.  What she found was that he had an abusive father, had a drunk mother.  Sometimes the father got drunk.  They had an abusive relationship.  Kenny was in the middle of it and was influenced dramatically by what he saw and what he heard.

Q.   Now, the second state trial did not go to a penalty phase; is that correct?

A.   That's right.

Q.   What was the result of the first stage?

A.   Kenny -- the jury put the murder -- murder was off the board very quickly, or the death penalty murder was off the board very quickly as I understand it.  And the jury ended up giving him 30 years on first degree manslaughter, and ten years on something, shooting with intent to kill or assault with a dangerous weapon or something.

Q.   All right.  Now, had the case gone into a penalty phase, were you going to put on the type of evidence you just spoke about a moment ago that Roseann Schaye had discovered?

A.   I was going to put on that and a lot more.

Q.   Okay.  What else were you planning to put on?

A.   I would have put on Kenny's mother.  I would have made her tell that jury that she'd bring men -- she'd bring men home and make him get up and do drugs and drink with them.

Q.   Okay.  What else?

A.   That she was abusive.  She beat on him.  That at one point, he got arrested for something when he was 16 or 17 and was severely beaten at the police station by police officers which traumatized him awfully.  That he suffered PTSD.  He became more and more withdrawn.  I'm sorry, this brings back a lot of memories.

THE COURT:  Just take your time.

A.  There was so much mitigating evidence in this case.

Q.  (BY MR. AUTRY)  Were you aware that Mr. Barrett had a mental health history?

A.  Oh, yes.  He had been in three separate mental institutions.  We didn't have any of those records.

Q.  Now, were you planning to put on evidence related to any kind of mental health history or contacts with mental health system --

A.  Yes.

Q.  -- Mr. Barrett may have had?  Okay.  Do you know a lady named Jeanne Russell?

A.  I do.

Q.  And who is she?

A.  She's a psychologist.  Worked for a long time for the Department of Corrections.

Q.  And what was her role in this case?

A.  Her role was, as a psychologist, she did -- John asked her to do a risk assessment, and I asked her to go further and go into Kenny's background.  She -- she understands that very well and could convey that to a jury.

Q.  Had the case gone to a second stage, were you planning to call Dr. Russell to testify to the results of the risk assessment she did?

A.  Absolutely.

Q.   Do you recall what her findings were with respect to whether Mr. Barrett posed some kind of risk, in a prison environment in particular?

A.   She -- she was -- would have testified that he was not psychopathic, and that he was minimum risk had he been put in a prison population.

Q.   Okay.

A.   A minimum risk to do something bad.

Q.   Were you aware that, in 1986, Mr. Barrett attempted to commit suicide?

A.   Yes, sir.

Q.   And were you planning to do anything with that in any penalty phase that might have occurred in the state case?

A.   We would talk -- we would have talked about that in relationship to his reclusive personality, his paranoia, his sense of failure in everything that he did.

Q.   Okay.  You were aware, of course, that Mr. Barrett had a history of drug abuse?

A.   Yes, sir.  That added a lot to the paranoia.

Q.   Were you planning on trying to present to the jury in the state case a mitigating explanation for Mr. Barrett's drug use?

A.   Well, yes, sir.  Yes, you -- that all has to be explained.

Q.   All right.  And do you think you would have been able to

explain why Mr. Barrett became a drug user --

MR. KAHAN:  Objection as to what he thinks, Your Honor.

MR. AUTRY:  I'm sorry, what was the objection?

MR. KAHAN:  Objection as to what he thinks.

Q.  (BY MR. AUTRY)  Okay.  Would you have put on evidence to try to help explain Mr. Barrett's drug use and why he became a drug user to the jury?

A.  I would anticipate that any psychologist could have put that testimony on in spades in this case.

Q.  Now, was Mr. Barrett cooperative with you when you and Mr. Echols represented him in the state case?

A.  Absolutely.

Q.  Did he ever tell you I don't want any kind of investigation into mitigating evidence?

A.  Certainly not.

Q.  Did he ever tell you I don't want you to talk to my family and I don't want you to go into my family background?

A.  No.  He encouraged it.

Q.  Did he ever tell you I don't want -- if it gets to a second stage, I don't want any evidence put on, just give me the death penalty?

A.  Answer is no.

Q.  Did he ever tell you that, if it came down to it, he'd

rather have a death sentence than a life sentence?

A.   No, sir.

Q.   Okay.  Did he ever prevent you or discourage you or Mr. Echols from developing the types of mitigating evidence that we've talked about here a little bit today, Mr. Gordon?

A.   No.

Q.   Okay.  Do you know who Steve Leedy is?

A.   Yes, sir.

Q.   What was his role in the second trial in the state case?

A.   Steve had to become a mitigating investigator, which is not his -- not his forte.

Q.   What was Mr. Leedy's primary role before he was thrust into that particular role in this case?

A.   He was a fact investigator.

Q.   Do you know what his professional background is?

A.   He's a policeman.

Q.   Had he been trained to be a mitigation investigator, somebody who was adept at putting together a case in mitigation in the second stage?

A.   No.  The OIDS has a fellow named Dale Anderson that is a mitigating expert.

Q.   Was Mr. Anderson available to work on Mr. Barrett's case?

A.   No, sir.  He had two or three other cases going and

couldn't get there.

Q. Okay. Would you say that the development of the mitigation case in the state case still had some work to be done?

A. Oh, yeah.

Q. Okay. And can you explain that a little bit more?

A. I can't remember when I got in the case, but it was late. I couldn't get Dale Anderson because he was busy. I've worked with Dale on five of these cases. He's the best I've -- you've ever seen. And so had to work with Steve to get him all facts and into gathering up evidence -- mitigating evidence.

Q. So would it be fair to say, you tell me, was the second stage investigation at the time he went to trial in the second state case complete?

A. No.

Q. All right.

A. But it would have been.

Q. And that brings up a good point. Do you know what Judge Garrett, who tried the state case, was going to do about when you were going to have to start the penalty phase if there was a first degree murder conviction?

A. I think he said two weeks or three weeks.

Q. Okay. Would that have given you additional time to put together the remainder of the mitigation case?

A.   Yes, it would have.

Q.   Now, notwithstanding the fact that the investigation was incomplete, did you still have what you considered to be significant mitigating evidence to put on on Mr. Barrett's behalf had he been convicted of first degree murder?

A.   I could have started that afternoon and gone on for a long time.

Q.   Okay.  Thank you, sir.  Now, after Mr. Barrett's state case concluded, did you become aware that he was charged in federal court?

A.   I did.

Q.   And how soon do you think you learned that he had been charged in federal court after the state case was completed?

A.   John Echols called me, I think.

Q.   And did Mr. Echols have any involvement in the federal case?

A.   I think he was appointed lead counsel.  I was kind of disappointed that I didn't get asked to be mitigating evidence person, but I wasn't.  I didn't have any federal experience in death penalty, and they wanted Rob Nigh.  And Paul Brunton was the chief federal defender at that time.

Q.   Was -- I'm sorry.  Go ahead.  I interrupted you.  I'm sorry.

A.   I'm finished.

Q.   Okay.   Was Mr. Nigh appointed to assist Mr. Echols in the federal case, to your knowledge?

A.   The answer is no.

Q.   Do you know who was appointed?

A.   Steve somebody or other.

Q.   Does the name Roger Hilfiger ring a bell?

A.   Roger Hilfiger.

Q.   Okay.   Did you have any involvement at all in the state case?

A.   Federal case?

Q.   The federal case.   I'm sorry.

A.   No.

Q.   Did you become aware at some point that Mr. Echols withdrew from representing Mr. Barrett in the federal case?

A.   He called me and told me.

Q.   Did he indicate why he was getting out of the trial?

A.   Got sick of it.

Q.   Okay.   And was there any other -- was there any reason in particular that he was sick of it?

A.   He couldn't get anything from -- he couldn't get any financial support from the court to do the things that he needed to do to get the federal case ready to go to trial. He got frustrated with the system.

Q.   Okay.   After Mr. Hilfiger was elevated to first chair in

the federal case, did he ever contact you?

A.   No.

Q.   Do you know a lawyer from Muskogee named Bret Smith?

A.   No.

Q.   Did a lawyer named Bret Smith, to your recollection, ever contact you about Mr. Barrett's state case?

A.   No.

Q.   Did any representative of Mr. Hilfiger or Smith ever retrieve from you any files you had in the state case?

A.   No.

Q.   Do you know where the investigative file in the state case was kept?

A.   Which one?

Q.   Mitigating evidence.

A.   My files in my storage bin.

Q.   Okay.  Do you know whether or not there was ever an investigative file at the OIDS office in Sapulpa?

A.   John had extensive files.  I don't know what happened to those.

Q.   Okay.

A.   I would assume they went to Sapulpa, but I don't know.

Q.   You just don't know; is that correct?

A.   I don't know.

Q.   At any rate, you never heard from anybody on the federal case after Mr. Echols withdrew?

A.   No.

MR. AUTRY:   Could I have just a second, Your Honor?

THE COURT:   Yes.

Q.   (BY MR. AUTRY)   Mr. Gordon, did anybody ever discuss with you the ballistics evidence that had been presented in Mr. Barrett's state court trials?

A.   We talked about it a lot in the state court.

Q.   And what was -- what was the focus there?

MR. KAHAN:   Your Honor, objection as to relevance.

THE COURT:   What is the relevance of this testimony?

MR. AUTRY:   Well, Your Honor, I think it goes to the circumstances of the offense, which can be mitigating under *Lockett vs. Ohio* and the succeeding Supreme Court cases.   The circumstances of the offense can mitigate the punishment.

MR. KAHAN:   Your Honor, the case was remanded for specific fact finding as to a different theory of mitigation, not as to ballistics.

THE COURT:   Yeah.   Objection sustained.

Q.   (BY MR. AUTRY)   Mr. Gordon, had either Mr. Hilfiger or Mr. Smith contacted you and asked to look at your files, or sit down with you to talk about what you all were going to

present in the second stage of the state case had you gotten there, would you have been more than happy to talk to them?

A.  You bet.

Q.  Okay.  And give them whatever they needed, whatever materials, whatever guidance, answer all their questions?

A.  You bet.

Q.  But that never happened?

A.  No, sir.

MR. AUTRY:  Okay.  Thank you, sir.

THE COURT:  Cross-examination, Mr. Kahan.

CROSS-EXAMINATION

BY MR. KAHAN:

Q.  Good afternoon, Mr. Gordon.  Mr. Gordon, fair to say you take capital -- capital defense seriously, isn't it?

A.  I certainly do.  It scares me sometimes.

Q.  Now, during your preparations for the second state trial, you told us you were in contact with a psychologist named Jeanne Russell; is that correct?

A.  That's right.

Q.  And did she prepare a report for you?

A.  She did.

Q.  Okay.  If I could ask you to take a look at Government's Exhibit 34.

A.  Is that what's in front of me?

Q.   I hope so.

A.   I have it, sir.

Q.   Pardon?

A.   I have it.

Q.   You have seen it?

A.   I've seen it.

Q.   Is that a true and correct copy of the report Dr. Russell provided to you?

A.   It appears to be.

Q.   And do you recall you and I had a conversation by phone a few weeks ago?

A.   Yes.

Q.   And at that time you told us that Jeanne Russell was your sole mental health witness; is that correct?

A.   At -- whenever we went to trial, yes.  There was one other guy that I -- that I liked that I thought could put some of this -- some of this together to make sense to a jury.

Q.   Okay.  But, in fact, you had other mental health reports, didn't you?

A.   I did.

Q.   Okay.  If I could ask you, please, to turn to Tab 37.

A.   All right, sir.

Q.   Now, is this a report you received from Kathy LaFortune at OIDS?

A.   I didn't receive it.

Q.   You're not familiar with this report?

A.   But I know about the report.

Q.   You do know about the --

A.   I didn't receive it.

Q.   Okay.  How do you know about the report?

A.   Because I read it.

Q.   You read it but did not receive it?

A.   John Echols got it.  I didn't get it.  I didn't ask for it.

Q.   So -- but you did read the report?

A.   Yes, sir.

Q.   Now, did you receive the report at Tab 42?  Oh, and before I go there.  Based on your reading of this report, is this a true and accurate copy of the report you read in John Echols' files?

A.   It was.

Q.   Okay.  Move on to Tab 42.

A.   Okay.

Q.   Is this a report you received?

A.   You know, I don't remember this one.

Q.   You don't recall this?

A.   No.

Q.   John Echols never showed you this report?

A.   I didn't say that.

Q.   Okay.

A.   I said I don't recall it.

Q.   Okay.  Now, when we spoke a few weeks ago, you told me that you did not recall Roseann Schaye.  Do you remember that?

A.   Yes.

Q.   Okay.

A.   Since that time, I've read her reports.

Q.   Okay.  So why don't we, if you will, check to see that we're talking about the same reports.  If you could turn to Tab 18.

A.   May I look at some notes that I made, what I have reviewed for this testimony?

Q.   I'm assuming we get a copy of those?

A.   I don't know that --

THE COURT:  If you're going to use it to refresh your memory, you do need to make it available to them.

THE WITNESS:  Certainly.  I just --

THE COURT:  Go ahead.

THE WITNESS:  Would you like to make --

THE COURT:  No, you can go ahead and go ahead and use it, and then give them a copy.

A.   I got a -- I read a copy of Roseann Schaye's report dated 7-23-2000, and 9-4-2000.  And I think your Exhibit 18 is probably -- the information is contained in one those

reports.

Q. (BY MR. KAHAN)  This is contained in the report that you have.  Now, the notes that you're referring to, those -- what do those refer to, the yellow notes in your hand?

A. Reports from Roseann Schaye that were submitted to Mr. Echols.

Q. Okay.  And where do those exist?  Apparently since I spoke to you about a month ago, you've reviewed these reports.  I'd like to know where the reports are.  Where?

A. I don't know.

MR. AUTRY:  I sent them to him to refresh his recollection.

Q. (BY MR. KAHAN)  Okay.  So these are documents that you received from Mr. Barrett's current lawyers?

A. Yes.

Q. Okay.  So sitting here today, do you have an independent recollection of the information contained in Government's Exhibit 18 as information you received from Roseann Schaye?

A. I believe there's a synopsis of this in one of those reports that I received from Mr. Autry.

Q. I'm sorry, that you received from Mr. Autry?

A. Mr. Autry, yes.

Q. Okay.  Do you recall receiving this document prior to Mr. Barrett's second state trial?

A.   No.   No, I do not recall.

Q.   Okay.   Exhibit 19.

A.   I do not recall seeing anything about your Exhibit 19.

Q.   Okay.   And when you say you don't recall, you don't recall receiving that prior to Mr. Barrett's second state trial?

A.   The answer is yes, I do not recall.

Q.   Exhibit 20, please.

A.   I have not seen this.

Q.   Okay.   So you've never seen this document ever?

A.   Ever.

Q.   Exhibit 21, please.

A.   The information contained in that is contained in one of the reports that I read from Dr. Schaye.

Q.   Okay.   And you recall seeing this information prior to Mr. Barrett's second trial?

A.   I'm sure I did.   I don't have an independent recollection of that.   I read a lot of stuff.

Q.   I understand.   If I could ask you to look at Exhibit 22.

A.   Some of this information is contained in a report from Dr. Schaye.   Not all of it.

Q.   Okay.   So when you refer to that report, is that the report you recently obtained from Mr. Autry?

A.   Yes.

Q.   Okay.   Do you have any independent recollection of

receiving this information prior to Mr. Barrett's second state trial?

A.   No.

Q.   Turn to Tab 23, please.

A.   I don't remember seeing that report.

Q.   You don't recall ever seeing the information contained in this report?

A.   No.

Q.   All right.   If I could ask you to turn to Tab 24.

A.   The contents of that report are contained in one of the reports that Mr. Autry gave me.

Q.   But do you recall receiving this information --

A.   I did not receive this specific document.

Q.   Do you recall receiving the information contained within this document?

A.   That which is contained in Roseann Schaye's report -- two reports actually.

Q.   If you will, did you obtain this information while you were representing Mr. Barrett during the second state trial?

A.   I don't recall.

Q.   Okay.   Finally, ask you to take a look at Tab 25.

A.   I have not seen that report, and I don't believe that report -- the information contained in that report -- in that report is in either of the reports that I received from

Mr. Autry.

Q. Okay. Now, you'll agree with me, about a month ago, you do not remember Ms. Schaye at all; is that correct?

A. That's correct.

Q. Okay. And as you sit here today, you do not recall any of the reports that I've shown you purporting to be Ms. Schaye's work product. Is that also correct?

A. Yes.

Q. Okay. Could you please turn to Tab 29?

A. Okay.

Q. Is this a report you received from Steve Leedy?

A. I don't recall whether I did or not.

Q. Okay. Do you recall whether you received this information from Mr. Leedy?

A. I know the information that's contained in it, I've -- I know personally, so, therefore, I must have seen it.

Q. If you'd turn to Tab 30. Is this a report that you received from Steve Leedy?

A. I haven't seen this. No reason to, actually.

Q. Pardon?

A. I've -- I haven't seen it.

Q. Okay. Had you received this information in any form or fashion through Mr. Echols from Mr. Leedy?

A. No.

Q. Okay.

A. I was not involved in the case in 2001.

Q. If I could ask you to look at Tab 45.

A. I haven't seen that.

Q. This is a document that you -- you don't -- you don't recall or you never have seen before?

A. I haven't seen this.

Q. Okay. And is that true of Tab 46 as well?

A. I haven't seen any of those.

Q. Okay. What about Tab 47?

A. I haven't seen that. I know the contents are true.

Q. And how do you know that the contents are true?

A. My -- one of my investigation that Steve Leedy did.

Q. Okay. So this information was imparted to you by Mr. Leedy?

A. Yes.

Q. Tab 48, is this a report you received from Mr. Leedy?

A. No.

Q. Are you familiar with any of the information in it?

A. Familiar with every bit of it.

Q. Okay. And how are you familiar with it?

A. Mr. Leedy told me.

Q. If you could turn to Tab 49, please. Is this a report you received from Steve Leedy?

A. No.

Q. No, you've -- you've been through the entire thing?

A.   I haven't seen it.

Q.   And you're not familiar with any of the information?

A.   I'm familiar with some of the information, but I haven't seen this report.

Q.   Now, you intended to present some of Mr. Barrett's relatives during any necessary penalty phase trial in state court; is that correct?

A.   Those which -- who could relate the information necessary to get some penalty other than death.

Q.   Understood.  And was one of the facts you intended to adduce from those witnesses that, in their opinion, Mr. Barrett was not a dangerous person?

A.   No.

Q.   No?  That is not a thing you told me when we spoke a month ago?

A.   Put me -- I'm sorry.  Put it in context.  Do I think Kenny Barrett is a dangerous person?

Q.   No.

A.   That's not your question?

Q.   That is not my question.

A.   What is your --

Q.   My question is:  Did you intend to try and prove that Kenny Barrett was not a dangerous person?

A.   Yes, but not quite like that.

Q.   Now, did you tell me, am I remembering this correctly,

that you did not, at any point in time, share your files with Mr. Echols?

A.  Well, I didn't -- they were right there if he wanted something.

Q.  Okay.  But there was never a point in time when you said I produced this investigative report, here's a copy; is that correct?

A.  Yes.

Q.  You did not freely share the information that you --

A.  Wrong.  We freely shared everything.

Q.  Okay.  Did you provide him with copies of -- let's back up.  What did you provide him with copies of?

A.  Anything he wanted.

Q.  Okay.  What was that?

A.  I don't have any idea.

Q.  Do your files in this case exist today?

A.  They do.

Q.  They do?

A.  Or I think they do.  I think they are in my storage shed.

Q.  Okay.  You did not tell me a month ago -- did you not tell me a month ago that they did not exist?

A.  The answer is no.

Q.  The answer is -- okay.

A.  I think I keep all my death penalty cases forever.

Q.   Okay.

A.   Now then, have I laid my eyes on the file?  I can't tell you that I haven't, but I didn't go look.  Just my -- it's my custom and habit.  Well, not only death penalty cases, all my murder cases, and I've tried a lot, I try to keep those files because something might come up at some point or another.

        MR. KAHAN:  Could I have a moment, Your Honor?

        THE COURT:  Yes.

Q.   (BY MR. KAHAN)  Mr. Gordon, are you familiar with a computer database that Mr. Echols maintained in which he kept his defense files?

A.   Yes.

Q.   You are?

A.   He did everything on the computer.  It was -- he's quite computer literate.  I'm not.

Q.   Okay.  Did he provide you with access to that?

A.   Yes, but I didn't know how to do it.  If I needed something, I asked him for it.

Q.   Okay.

A.   I had much of the hard copy.  I'm a paper man, okay?  I like paper.  This thing makes me nuts.  I'm old.  Look, I can't help it.  So I -- I got a lot of the stuff on paper that he had on computer.  He could -- he could access his a lot quicker than I could access my paper, but that's what we

did.

Q. And at the end of your participation in the second trial, you do not recall providing your files to Mr. Echols; is that correct?

A. I do not think I did. I believe I kept my personal files. He had his on a thumb drive, I assume. I don't know.

MR. KAHAN: Pass the witness, Your Honor. Thank you.

THE COURT: Redirect, Mr. Autry.

MR. AUTRY: Yes, briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q. Mr. Gordon, how many years have passed now since you participated in Mr. Barrett's second state trial?

A. Sixteen, seventeen, fifteen. Something. Long time.

Q. Over ten years?

A. Yes.

Q. Okay. And you've been pretty busy during that period of time I guess; correct?

A. That's right.

Q. And you think you still have your file, but you haven't reviewed your file; is that correct?

A. I have not.

Q. And you were asked a series of questions by Mr. Kahan

when he went through various reports saying did you receive this, did you have access to it, etc.  I sent you some materials; right?

A.   That's right.

Q.   And do you know why I sent those to you?

A.   For my review.

Q.   Okay.  Do you know why I wanted you to review them?

A.   To see if I could recall having that same information in my own database.

Q.   All right.  So regardless of what the source was for the information you had, you had information about the types of mitigating evidence that you were going to present for Kenneth Barrett from one source or another.  Is that fair to say?

A.   That's right.

Q.   Whether it be a report from Roseann Schaye, a report from Steve Leedy, Jeanne Russell, whoever it was?

A.   Doesn't make any difference, I had them -- I had the information.

Q.   All right.  With respect to whether you have a specific report or a specific piece of paper, due to the passage of time, do you have a clear recollection --

A.   I do not.

Q.   -- of that?  What you do recall is the information that you had?

A.   The information I had -- with the information I had, I was going to present a very good mitigating case.

Q.   Okay.  And we discussed those facts on direct examination?

A.   Yes.

MR. AUTRY:  Okay.  Thank you, sir.

THE COURT:  Mr. Gordon, you can step down.  Thank you.

THE WITNESS:  Thank you, Judge.

MR. KAHAN:  Your Honor, the government would ask that Mr. Gordon supply not only a copy of the notes, but also any documents that were provided by Mr. Autry to refresh his recollection.

THE COURT:  Yes, we need to do that, Mr. Gordon.

MR. AUTRY:  Your Honor, I can send the email that I sent to Mr. Gordon that has the attachments that I sent to him if that would be --

THE COURT:  That will help.  And if you would, just let Nick take that little note you refreshed with and we'll make a copy of it.

THE WITNESS:  And I apologize, the writing on that is not very good.  I had carpal tunnel surgery and this is the hand that works.  Doesn't work very well with a pen anymore.  Knock on wood, whenever this is over, it will again.  I'd like to be able to shake hands with my old

client.

THE COURT:  Mr. Gordon, you do have an extra copy of those things that Mr. Autry sent you?  Perfect.

THE WITNESS:  Let me see -- be sure there's everything in there that you need that I got.  Yes, sir.

THE COURT:  Okay.

MR. KAHAN:  Your Honor, as long as I'm asking for things, could we please have him ordered to produce the file that's in Mr. Gordon's possession?

MR. AUTRY:  We would object to that on the grounds of attorney/client privilege and attorney work product privilege if they're asking him for his old file from the state case from ages ago.  Privilege still applies.

MR. KAHAN:  Well, I believe the privilege is waived with regard to second stage.  We're trying to establish what federal counsel knew and where they got it from.  And there is a dispute over whether or not Mr. Gordon provided the documents in his file to Mr. Echols that would have flowed to Mr. Hilfiger and Mr. Smith.

MR. AUTRY:  The privilege isn't waived, Your Honor, because Mr. Barrett has not attacked the effectiveness of Jack Gordon.  He's attacked the effectiveness of Mr. Hilfiger and Mr. Smith.  To that extent, his attorney/client privilege with Mr. Hilfiger and Mr. Smith has been breached.  But there's been no waiver of

either the work product privilege or the attorney/client privilege with respect to Mr. Barrett and Mr. Gordon from the state case.

THE COURT:  Has Mr. Echols produced his file in this case?

MR. AUTRY:  Produced it?

THE COURT:  For the government.  Yes.

MS. FISHER:  I can answer that, Your Honor.  There was a discovery order, and it limited disclosure to the government of any penalty related.  But Mr. Echols was counsel for federal trial.  And the only files of Mr. Echols that flowed through that discovery order were files that had gone from Mr. Echols to Mr. Hilfiger, so they were actually Mr. Hilfiger's files at that point.

THE COURT:  Okay.  Well, I'm going -- I'm going to deny the request at this time.  We can think about it between now, and maybe revisit before we get back together in June.

MR. KAHAN:  Thank you, Your Honor.

THE COURT:  You got everything back you came with, Mr. Gordon?

THE WITNESS:  No, sir.

THE COURT:  Just give him back his original.

THE WITNESS:  I got the original yellow paper.

THE COURT:  Okay.  Great.  You're free to go then.

THE WITNESS:  May I say hello to my client before I leave?

THE COURT:  From right there.

THE WITNESS:  I love you, Kenneth.

THE DEFENDANT:  Appreciate you.

THE WITNESS:  Thank you, sir.

THE COURT:  Thank you, Mr. Gordon.

THE WITNESS:  You need me any longer?

MR. AUTRY:  No, sir.  Thank you, Jack.

THE WITNESS:  Free to go from everybody?

THE COURT:  Yes.

MR. AUTRY:  Dr. George Woods, Your Honor.

THE CLERK:  Raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Please be seated.

GEORGE WOODS, M.D.,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.  Could you state your name, sir, for the Court, please?

A.  Yes, if you could just give me one moment to -- my name is George Woods.  G-e-o-r-g-e.  W-o-o-d-s.

Q.  And where do you live?

A.   Oakland, California.

Q.   How long have you lived there?

A.   Since -- off and on since 1968.

Q.   And what do you do for a living, sir?

A.   I'm a physician specializing in psychiatry and
neuropsychiatry.

Q.   And how long have you done that?

A.   I graduated from medical school in 1977.  I started my
practice in 1983.

Q.   Can you tell the Court where you got your undergraduate
degree from?

A.   Sure.  Westminster College in Salt Lake City, Utah.

Q.   And what year was that?

A.   1969.

Q.   And where did you receive your medical degree from,
Doctor?

A.   May I put this aside?

Q.   Yes, sir.

A.   Okay.  The University of Utah Medical Center in Salt
Lake City, Utah.

Q.   And what year was that?

A.   1977.

Q.   And you're a psychiatrist?

A.   That's correct.

Q.   Are you also a neuropsychiatrist?

A. That's correct.

Q. What's the difference between a psychiatrist and a neuropsychiatrist, if any?

A. Neuropsychiatry is a subspecialty of psychiatry. And in neuropsychiatry, we focus more on the relationship between brain behavior -- brain and behavior, brain functioning and behavior, brain anatomy and behavior.

Q. And did you receive -- well, let me ask you some more about your qualifications. Did you do a residency in psychiatry?

A. I did.

Q. And where was that?

A. At Pacific Medical Center in San Francisco, California.

Q. And did you receive specialized training in neurological matters either there or somewhere else?

A. Yes. I took special electives at -- they were part of the residency at the Kaiser Permanente Hospital in both Oakland and San Francisco, California.

Q. All right. And did you have any fellowships or anything during your training as a psychiatrist?

A. Yes. I did a fellowship with the National Institute of Mental Health and the American Psychiatric Association in geriatric psychopharmacology.

Q. Have you had any hospital appointments?

A.   Yes.

Q.   Could you describe those for the Court, please?

A.   Yes.   I've been -- I've been practicing at Doctors' Hospital in California, and I've also practiced at East Bay Hospital.   I've also practiced at Goodwin Hospital in Oakland, California.   Those have been -- I was chief of staff at all three of those hospitals at one time or another.

Q.   All right.   Does your specialty of neuropsychiatry have any significant -- have any special significance I guess with respect to your examination of Kenneth Barrett?

A.   Yes.

Q.   And could you explain that briefly?

A.   Well, over the last 25 years, we've come to understand that many psychiatric disorders have neurological components.   At one time we thought that there was this clear kind of brain-body dichotomy, and that psychiatric disorders did not really -- did not have a template of brain functioning.   Now we know that's not true.   In certain, we've known that for the last 20 years, where the brain is very relevant in the manifestation of symptoms of psychiatric disorders, as well as ongoing brain -- just regular brain neurological disorders.

Q.   All right.   And I should have asked you this first.   Do you know Kenneth Barrett?

A.   Yes, I do.

Q.   Okay.   And how do you know him?

A.   I was retained to examine Mr. Barrett in 2009.   I examined him on two occasions at that time, and again this year.

Q.   All right.   And we'll talk about the specifics of that here in a minute.   But let me ask you some more about your experience and qualifications.

A.   Sure.

Q.   Do you have any experience working in drug abuse or chemical dependent centers, or things of that nature?

A.   Yes.   I was the clinical director of the New Beginnings Clinical Dependency Program in the mid 1990s.   This was what was briefly called a dual diagnosis program.

Q.   Okay.   And what is a dual diagnosis?

A.   Most chemical dependent persons -- many chemical dependent persons have an underlying psychiatric disorder. And many psychiatric disorders have what we call comorbid or co-occurring disorders where there's a chemical dependency component as well as a psychiatric or neurological component.   So this program was one of the first programs in California to really look at both the chemical component -- chemical dependency component as well as the psychiatric component in order to try to parse those out and to see what that relationship was all about.

Q. All right. With respect to your examination or evaluation of Mr. Barrett, did your experience in that program have any special significance?

A. Well, it was particularly relevant in Mr. Barrett's case because he has a long history of chemical dependency, as well as a long history of psychiatric disorders, as well as a long history of cognitive impairment. So it was absolutely necessary to try to gain some understanding of how those related.

Q. All right. Are you board certified?

A. Yes, I am, in psychiatry.

Q. All right. And what does board certification entail?

A. I'm sorry?

Q. I'm sorry, I should speak into this microphone. What does board certification, what does that mean specifically?

A. Okay. Board certification is a specialized voluntary testing that one can do that's primarily important certainly in academic areas if you're going to teach in an academic setting. But you can become board certified in specific areas. For example, the certification for psychiatry is really held by the American Board of Psychiatry and Neurology. And on that particular test, it's about -- if you're going to become board certified in psychiatry, it's about 70 percent psychiatry, 30 percent neurology. If

you're going to become board certified in neurology, it's about 70 percent neurology, 30 percent psychiatry. So it's a combination of psychiatry and neurology. And you have to pass that in order to have the certification.

Q. All right. Do you have any faculty appointments at any medical schools?

A. Currently?

Q. Currently.

A. Yes.

Q. And what are those, please?

A. I am teaching at Morehouse College of Medicine in Atlanta, Georgia. I'm currently on sabbatical for another reason that I'll talk about at another time. I've been teaching there since 2000. I teach two classes, introduction to forensic psychiatry, and introduction to geriatric psychiatry.

Q. All right. Any others in the past?

A. Yes. I -- in terms of medical schools, I've taught at the University of Washington in Bothell. I've taught at the University of California, Davis. In the University of California, I taught in the department of forensic psychiatry. At the University of Washington, I taught a course, again, on mental health and the law. But it was not within the forensic fellowship.

Q. Could you describe briefly for the Court the nature of

your current medical practice?

A.   Sure.   Part of my practice is -- part of my medical practice is, again, teaching.  I teach at the University of California, Berkeley, in the department of -- in the law school.  And there I teach a course on mental health and the law.  I also have a clinical practice where I see patients, primarily patients that we describe as having neurodevelopmental disorders, patients that suffer from fetal alcohol, from Fragile X Syndrome, from other type -- Marfans Syndrome.  M-a-r-f-a-n-s.  Other types of syndromes that really typically develop in the -- in the gestation period, the period of pregnancy, or early acquired disorders.

Q.   Okay.   What percentage of your practice, Doctor, is devoted to forensic evaluations or examinations?

A.   I'd say about 60 to 65 percent of my practice is devoted to forensic examinations, and about 35 percent to clinical practice.

Q.   And when you say clinical practice, does that mean seeing and treating patients?

A.   Yes, I see patients.

Q.   Have you testified as an expert witness before in court?

A.   Yes, I have.

Q.   Does that include state and federal court?

A.   Yes, I have.

Q.   Have you testified as an expert witness previously in capital cases?

A.   Yes, I have.

Q.   And have you testified previously as an expert witness in capital cases in Oklahoma?

A.   Yes, I have.

Q.   All right.   And who retained your services in this case?

A.   The federal defender's office here.

Q.   In Sacramento?

A.   In Sacramento, yes.

Q.   All right.   And you understand that they represent -- that office represents Mr. Barrett in this case?

A.   That's correct.

Q.   Now, are you paid for your time?

A.   Yes, I am.

Q.   Okay.   And what's your rate?

A.   $350 an hour.

Q.   Okay.   Now, Doctor, what were you asked -- just let me ask you briefly.   What were you asked to do in this case back in 2009?

A.   I was asked to examine Mr. Barrett, and to determine -- looking at a variety of materials, to determine Mr. Barrett's cognitive functioning, if there, in fact, were psychiatric disorders that were relevant.   And if either of

the -- of his cognitive functioning or other psychiatric disorders that he may have would be relevant at the time of the offense, and also during the course of his legal proceedings.

Q.   All right.  Did you perform what could be termed a comprehensive psychiatric examination of Mr. Barrett?

A.   Yes.

Q.   And when was that done?

A.   There were two days in 2009.  And I saw Mr. Barrett again earlier this year.

Q.   And where did these examinations or evaluations take place?

A.   At Terre Haute, Indiana.

Q.   Is that the federal prison there?

A.   That's correct.

Q.   Where Mr. Barrett has been on death row?

A.   That's correct.

Q.   Okay.  Now, let me ask you this, Doctor:  Based on your view of records and materials in this case, before you examined Mr. Barrett in 2009, had there ever been a comprehensive psychiatric examination of him by anybody, to your knowledge?

A.   In my professional opinion, no.

Q.   Why do you say that?

A.   There have been risk -- limited risk assessment

evaluations. There have been limited what we call psychometric examinations where there had been personality testing, MMPI, that type of thing. There had really not been a comprehensive neuropsychological examination, although there had been neuropsychological screening instruments had been provided. And I think most relevantly, a comprehensive understanding of his social history had not been developed. And social history is really the most scientific tool one has in understanding both medical and psychiatric disorders.

Q. All right. Can you give the Court an idea of what types of records you reviewed in aid of your examination of Mr. Barrett in 2009, and I guess this year in 2017 --

A. Sure.

Q. -- when you went back to see him?

A. I reviewed material of Dr. Russell's, of Dr. Sharp's, of Dr. Price's, his neuropsychological -- neuropsychological screening instrument report. Of Dr. Bianco. I reviewed medical records of Mr. Barrett, as well as his family over multiple generations. I've reviewed declarations that were available from his family. I reviewed records of the -- of offense itself from police records, etc. I reviewed the neuropsychological testing of Dr. Myla Young.

Currently, I reviewed other neuropsychological testing and critiques of other doctors,

Dr. Erin Bigler, Dr. Deborah Miora.  I reviewed medical records of Mr. Barrett's hospitalization on the three various hospitalizations.  I reviewed his early medical records.  I reviewed his academic records, his school records that were available.  I may be missing something, but I think that's the broad spectrum of things that I looked at.

Q.   And I think you said some of the records -- or some of the materials you reviewed went to Mr. Barrett's background and upbringing and family history?

A.   That's correct.

Q.   All right.  Now, why is that important to look at in doing a psychiatric evaluation?

A.   Because psychiatric evaluations -- psychiatric disorders are very similar to medical disorders in that they are familial, and often we know, certainly for the last 15 years or so, that there can be a genetic component of that as well.  So apples don't fall far from the tree, and over time you're able to look back and see symptoms, and occasionally diagnosis, but certainly symptoms and behaviors in families that give you a real understanding of what may be occurring with the person that you are examining.  That's number one.

Number two, similarly, you may be able to look at patterns of behavior and patterns of symptoms such as multigenerational chemical dependency or multigeneration

hypersexuality that, again, gives you a much better clue as to what may be going on.  So when you gather scientific information, like neuropsychological testing for example, it has more relevance.

Q.   In looking at the medical records and other materials you were given to review regarding Mr. Barrett's family history, was there anything significant that struck you in looking at all that kind of material?

A.   Yes.

Q.   Can you explain that to the Court, please?

A.   When one looks at Mr. Barrett's history, family history, one sees what's called an affectively-laden family.

Q.   What does that mean?

A.   What Schultz really describes is the best of this, is a family that has generations of symptoms and behaviors that are consistent with psychiatric disorders.

When one looks at to make a psychiatric diagnosis or to look at psychiatric symptoms, you want to look at the family history because if you see these symptoms, for example in this case, bipolar disorder or chemical dependency or mood disorders, you -- if you see symptoms of those behaviors in family members, that really gives you clues to the potential of those -- of those occurring within your -- the client that you're seeing.

For example, Mr. Barrett's family has a long

189

family history of suicidal behavior and actually completed suicides that goes back three or four generations.  He has a family history of diagnosed bipolar disorder which is a significant mood disorder that, again, goes back three or four generations.  He has a history dating back at least from 1918 of family members that have been hospitalized.  At that time it was called lunacy.  And at least two family members that were, in fact, certified and hospitalized within the psychiatric hospitalization for behaviors that are very, very consistent with the types of difficulties we see with Mr. Barrett.  Difficulty with sleeping for long periods of time, problems with mood swings, problems with mood, what we call lability.  Reactive violence.  And so being able to look at this family history, he has paternal aunts that have children, both of whom have been diagnosed with bipolar disorder.  He has other aunts and grandparents that have been diagnosed with depression.  We see a long history of hypersexual behavior.

And we also see a lack of what we call perceptual disorders, auditory hallucinations, sensory misperceptions.  So that allows you to not think as much about schizophrenia, for example, but perhaps to think more about mood disorders, things that disrupt one's mood.  So this family history is very, very rich.

And it's the same way that one would look for

a family history of diabetes or a family history of hypertension.  All of these are -- all these disorders are what are called heterogeneous disorders.  These are disorders that are on multiple genetic islands.  And as time goes by, you can look at those different islands and put them together and really make a good sense of what you're seeing in front of you.

Q.  All right.  Is there a significance -- for example, in bipolar disorder, is there -- is there a genetic component to that?

A.  Yes.  And maybe I should take a moment and describe what bipolar --

Q.  Sure.  I was going to ask you that.  Could you describe briefly for the Court what's bipolar disorder, and what kind of effect does it have on somebody?

A.  Sure.  A bipolar disorder is a disorder of mood.  It's a disorder where someone's ability to control their mood, their feelings of anxiety, of depression, sometimes of being elated are problematic, are really pathological, and can cause problems that can disrupt a person's life.

Bipolar disorder historically, meaning in the 1920s and 1930s, was really thought of having this classic up and down picture.  People -- a person would become elevated, what we call euphoric, and then a person might become depressed.  And it was thought that it was just that

up and down pattern.  We now have known since about 1947 that that's not really the classic pattern of bipolar disorder.  That bipolar disorder actually shows up more with irritability than mania.  That -- and it can be significantly disruptive to one's life.  By definition, it has to be significantly disruptive to one's life to be -- to be termed a psychiatric disorder.

One of the other things that we know is that, over the course of a person's life that suffers from bipolar disorder, they will meet the criteria for chemical dependency.  About 65 percent of people that have -- carry a diagnosis of chemical dependency of one substance or another also meets the diagnosis of bipolar disorder.  So they go hand in hand.

Q.  Is there a genetic component to both bipolar disorder and substance abuse disorder?

A.  There's a greater genetic component to bipolar disorder.  If -- and it's not just to bipolar disorder.  It's also to depression.  So if a family member has any mood disorder -- typically nuclear families, but you can have both second and third generation families.  If there's an incidence of a recognition of a mood disorder within the family, that increases the potential of a child inheriting some aspect of that mood disorder.

Q.  And is bipolar disorder -- I think you indicated this

earlier.  Do you see indications or diagnoses of bipolar disorder in Mr. Barrett's wider family --

A.  That's correct.

Q.  -- or within generations of the family on both sides --

A.  That's correct.

Q.  -- of the family?

A.  I'm sorry.

Q.  Is the same true for substance abuse disorder?

A.  Certainly substance abuse.  And --

Q.  With respect to his family history?

A.  Yes.  I can't say necessarily that the diagnosis of substance abuse disorder has been made, and when we're looking at records from 1919, 1930s, we didn't have the classification systems that we have now.  But what we do see are serious drinkers that destroy their lives.  And that's what substance abuse is about.  We see pictures of serious drinkers that were very successful.  Andrew Jackson Barrett, for example, who was a very successful man, yet at the same time, over time, drinking and hypersexuality undermined his life and destroyed his life.

So that's what you're looking for.  You're looking for not just is someone a drinker, is someone a heavy drinker, but are they drinking -- are they using to the point where it undermines their functioning.  And we see that -- it's replete in his family history, including his

mother and father.

Q.  All right.  Was Mr. Barrett genetically predisposed to developing a mood disorder?

A.  Yes.

Q.  I'm going to get into this a little bit more detail later, but have you diagnosed Mr. Barrett as suffering from bipolar disorder?

A.  Yes, I have.

Q.  Okay.  Along with the genetic predisposition to that, is the way a person is raised or the way their background unfolds, does that have any relevance at all to developing bipolar disorder or mood disorder or any other mental illness?

A.  Yes, it does.

Q.  Okay.  And what can you tell the Court about what you learned about Mr. Barrett's background, his upbringing, and things of that nature?

A.  Mr. Barrett -- if I could perhaps just kind of describe --

Q.  Sure.

A.  -- this relationship for a moment before I become specific --

Q.  Yes, sir.

A.  -- about Mr. Barrett.  There is a wonderful book called Formative Experiences, and it talks about childhood

development.  And one of the things that it talks about in childhood development is that, when a child's brain -- when a child is born, about 40 percent of their brain is really ready to roll.  As opposed to a cat's brain who's about 65 percent.  An ant's brain is about 95 percent ready to function in every way.  And one wonders why a child's brain -- a human child's brain is so unready.  And one of the reasons that the geneticists believe is because a child's brain has so much to do.  It has to learn language.  It has to learning coping skills.  It has to learn how to function within a family environment.  It has to develop academic skills.  And so it has -- it has to do a number of things that, in fact, other species do not.

That can work either way.  So if you are -- if you are born into a family that is supportive and active and helpful and try to help you do those things and make a difference, that really makes your brain grow.  That really changes the way your brain works.  However, if you're born into a family, as Mr. Barrett was, where even before he was born, he was subjected to alcohol abuse within the -- within the womb --

Q.   Okay.  Let me stop you there, Doctor.  Do you have -- do you have information that, during the period of time Mr. Barrett's mother was pregnant with him, she drank?

A.   Yes.

Q.   All right.

A.   And -- and continued to drink.  That in itself is a neurological insult.  And then you have the environment of Mr. Barrett's father who was a violent man, who was violent to Mr. Barrett, who struck Mr. Barrett, who hit Mr. Barrett, who created a violent environment.  His mother describes being beaten by Mr. Barrett, Senior.  And occasionally the children would try to break into that violence.  They were unsuccessful at doing -- at doing so.

And so what you have here is an environment that is not conducive to the best development of brain functioning, to the best development of coping mechanisms that really allow you to -- for your child to do well.

Q.   Let me kind of cut to the chase a little bit.  You've mentioned earlier -- and I asked you kind of a general question about whether you diagnosed Mr. Barrett with bipolar disorder, you said yes?

A.   Yes.

Q.   Can you tell the Court briefly what you base that diagnosis on?

A.   Sure.  First of all, I base it on Mr. Barrett's own description of a lifetime history of depression and suicidal ideation.  He's told me, as well as other experts, that he's had a lifetime history of being suicidal.  And we know that he's had at least one significant suicide attempt.  We also

know that Mr. Barrett has had at least three psychiatric hospitalizations, the first in 1986 where he attempted to shoot himself -- he did shoot himself in the chest with a shotgun.  In 19 -- later in 1995 where he was hospitalled again -- hospitalized again on two occasions, in 1994, and I believe in 1995.  The hospitalization in 1995, he was actually diagnosed with bipolar disorder and was started with psychiatric -- on psychiatric medications, a very -- he was started on Haldol which --

Q.   What is Haldol?

A.   Haldol is an antipsychotic medication.  And it can be used for the most extreme presentation of bipolar disorder, but it most commonly is not the direct medication that one would use for psychiatric -- for bipolar disorder.

The importance of these three hospitalizations, besides the fact in each one -- the first one he was described as having a depressive neurosis with psychosis.  The second one he was, again, hospitalized.  The third one he captured the bipolar disorder.  Is that he was also using substances during these times.  And even, in spite of the fact that he was using substances during these times, we see that he -- they made psychiatric diagnoses.  They didn't just say, oh, well, he was using, so it must not be seriously psychiatric.  In each case, they took it very seriously and they prescribed him psychiatric medications.

The second time they prescribed him antidepressants, Asendin I believe, and -- A-s-e-n-d-i-n.  And the third time they again prescribed him antipsychotic medications.  So, clearly, during that period of time, they saw him as having a psychiatric disorder and they attempted to treat that psychiatric disorder.

Q.  So they didn't just see it as a function of Mr. Barrett being a drug user or a drug addict, and that's his only problem?

A.  That's correct.

Q.  And what else do you base your diagnosis of Mr. Barrett having bipolar disorder on besides what you just discussed?

A.  I base -- as I've already described, I base it on the family history, bipolar disorder, and the symptoms that one sees as you look through those records.  There are code words like lability.  Mood lability is a term of art that is used when describing bipolar disorder.  And it describes this swinging of mood that one often sees.  This was described in family members of him.  We also see that -- I saw that with Mr. Barrett.

There's also another symptom that is pretty classic called pressured speech.  Pressured speech is a type of talking that it -- most people think of it as rapid speech, but that's not really it.  It's a type of talking

that one has to break into.  Mr. Barrett will start and he'll continue and he'll continue and he'll continue, and one feels as though you have to kind of break into it. There are multiple types of speech, but we see that as being consistent with bipolar disorder.

And then we see the history of his significant drug use, a drug use that started at 10 or 11, that continued his entire life.  Primarily methamphetamines, but he used a number of other -- of other drugs as well. And, again, that's what we see.

So certainly the mental status that I performed is consistent with bipolar disorder.  The diagnoses of psychiatric professionals at a time when he was not at all involved in the criminal justice system are diagnostics of a mood disorder.  They treated him for a mood disorder.  A family history of mood disorders, multiple generations, these are all internally consistent with bipolar disorder.

Q.   How can you distinguish between Mr. Barrett having bipolar disorder as an underlying mental illness rather than just exhibiting symptoms that might be indicative of bipolar disorder --

A.   Yes.

Q.   -- through being habituated to using drugs?

A.   Yes.  Any psychiatric disorder has to undermine your

ability to function.  Any of us can have certain symptoms. Lots of people throw around terms like narcissistic, etc., but if it doesn't undermine your ability to function then, you know, it doesn't really speak to a psychiatric disorder.

And what we see with Mr. Barrett over time with his ex-wife Abby, you know, examples of hypersexuality. He describes, and she described him having multiple partners that destroyed their relationship.  We -- we see other people describe him -- lay people describing him as having mood swings.  And we see this chronic irritability, and this -- an irritability that is really classic.  If you were to -- I think the foremost source would be Kaplan and Sadock's Comprehensive Textbook of Psychiatry.  If you were to look at the chapter that talks about bipolar disorder, they talk about irritability is really the foremost symptom that one sees in bipolar disorder.

However, we also -- and this has only been true probably since 1996 or 1997.  We also know that there are ways in which the brain does not work well in bipolar disorder.  People have difficulty weighing and deliberating effectively.  People have difficulty understanding context, the context of a situation.  They have problems effectively picking up cues.  And this is because we now know that bipolar disorder affects that front part of the brain in the same way that other neurological conditions do.

Q.   And did you see that in Mr. Barrett?

A.   Yes, I did.

Q.   You probably already answered my question, but can you distinguish between Mr. Barrett having bipolar disorder and just being a drug abuser?

A.   Yes.

Q.   Okay.

A.   The -- the distinction really has to do with certain types of symptoms that are consistent with a mood disorder that aren't necessarily consistent with drugs.  For example, pressured speech is not a symptom of really any --

Q.   What is pressured speech by the way?

A.   Pressured speech is this rapid ongoing type of speech that is very, very rush, rush, rush.  It's not fast speech, but it's rushed.  And you have to enter -- you have to intervene.  If one reviews some of the other reports and transcripts, you see that other experts have had to stop Mr. Barrett and say hold it, hold it, you know, let me -- let me -- let me get my point across.  Because that pressured speech continues to roll and continues to roll.

And the same thing is true in terms of the significant depression that one has.  Now, it's true that depression and chemical dependency can go hand in hand.  But what we see with Mr. Barrett is a depression that -- I was going to say borders on -- but actually it results in kind

of a chronic suicidality.  He describes to myself and other experts being suicidal most of his life, and having not only the one known suicidal attempt, but other times that he's tried to overdose on drugs with the intent to -- to kill himself.  Well, those really distinguish you -- a person with a mood disorder.  And there are others, but -- and then the family history, of course, from just chemical dependency.

Q.  All right.  In any of Mr. Barrett's previous contacts before the offense was committed in 1999, previous contacts with the mental health system, whether it be at Eastern State Hospital, the Bill Willis mental health facility, Wagoner Hospital, was he ever diagnosed by any doctors who saw him in those settings as having antisocial personality disorder?

A.  No, he was not.

Q.  All right.  And was he treated with some of these medications -- some of these antidepressants when he was seen at these facilities in a manner that exacerbated his problem with bipolar disorder?

A.  There is that potential, Mr. Autry.  He was, in his second hospitalization, treated with antidepressants.  And antidepressants can really cause problems and with people that are bipolar.  And if I could just take a moment to --

Q.  Sure.

A.   -- explain that.  Sure.  Because there are two poles, the depressive pole and the manic pole.  Many people present with a depressive pole.  They present as depressed.  And yet, if you give that person antidepressants, about 30 percent of them can develop what's called the manic switch.  It will actually flip them into a state of mania or certain irritability.

If you look on the black box -- or the black box warning on many antidepressants, it warns about this.  It warns about watching for this manic switch which occurs in about 30 percent of people that are bipolar.  Mr. Barrett describes that sense of increased irritability.  Even within the current facility at Terre Haute, he has been very hesitant to take antidepressant medications because they have not been a benefit.  If anything, they may have undermined his mood.

Q.   All right.  If somebody's got bipolar disorder, is that something that affects their day-to-day life and their daily living?

A.   It certainly can.  And in order to make the diagnosis, it can.  It depends upon the environmental -- the environment in which they're in.  If someone is in, for example, a much more closed environment, they can do better.

Up until 1937 we didn't have psychiatric medications, and people did better when they were in

cloistered environments. But, by definition, you should look for irritability, reactivity, intrusive behavior, impulsiveness, snatching defeat from the jaws of victory.

Q. And did you see those things in your evaluation of Mr. Barrett and in looking at all the records you looked at?

A. I think it was a fairly consistent pattern, not only after 1999, but when you look at his academic record, he did very poorly in school. He failed the first grade. He dropped out in the eighth grade. He did poorly in math. He did poorly in reading. His academic record was -- was not good.

Q. Do you attribute that to anything, the fact that he did poorly in school?

A. Well, certainly, when we look at his brain functioning, we see that those parts of the brain, the temporal lobes particularly, that monitor and control academic functioning were -- are impaired. However, when you think about the math -- particularly the math learning disability -- and I believe it was Dr. Sharp that identified him with a learning disability as well. When you think about the math learning disability, about 42 percent of folks that have fetal alcohol spectrum disorder -- and I did not make that diagnosis -- but about 42 percent of people that have impaired brain secondary to drinking by the mother also have

specific math disabilities.  So that -- those could be related.

Q.  Are there indications that Mr. Barrett has ADD or ADHD?

A.  There are indications that Mr. Barrett has attentional problems --

Q.  Okay.

A.  -- which is different than ADD or ADHD.  ADD is attention deficit disorder.  ADHD is attention deficit hyperactivity disorder.  He was certainly described as hyperactive as a child.  However, the neuropsychological testing --

Q.  I'm going to get to that --

A.  Okay.

Q.  -- here in a minute.

A.  I'm sorry.  Okay.

Q.  Well, let me just ask you this:  Somebody with an attention deficit disorder or people who are on that spectrum or have ADHD, is methamphetamine used to treat -- or not methamphetamine -- but are amphetamines or uppers, I guess, used to treat that sort of -- that sort of disability?

A.  Yes, it's one of these long-term treatments of amphetamine salts.  Amphetamines have been used to treat that, yes.

Q.   Okay.   Are you familiar with the concept of self-medication?

A.   Yes.

Q.   And what does that mean briefly?

A.   Self-medication -- thank you.

Q.   I'm not --

A.   I got you.

Q.   I'm not trying to cut you off.

A.   I got you.

Q.   Okay.

A.   Okay.   Self -- self-medication is really the use by people that have chemical dependency that would have psychiatric disorders to medicate their symptoms.

Q.   Did you find that to be true in Mr. Barrett's case, that he self-medicated his psychiatric symptoms through drug use?

A.   His description of his chemical dependency, both in quality and quantity, would be consistent with self-medication.

Q.   Is that something that you see frequently in your practice?

A.   Oh, yes.   Because psychiatric -- psychiatric medications don't really do the job --

Q.   Okay.

A.   -- so you do see that often.

Q.   All right.   Is there anything else about what you've diagnosed as Mr. Barrett's bipolar disorder that you think the Court needs to hear about or you think is significant?

A.   No.   Your Honor, I think that that pretty much covers it.

Q.   All right.   Did you also look to -- look at Mr. Barrett to see whether or not he suffered from posttraumatic stress disorder?

A.   I did not look to see whether he did, but his --

Q.   That was bad.   I didn't phrase it correctly, so please -- please correct me.

A.   Sure.   But in reviewing his symptoms and reviewing his history, it was a symptom pattern and an environmental pattern that was consistent with posttraumatic stress disorder.

Q.   And why do you say that?

A.   Again, we see a family history of pretty significant violence by the father that lasted up until about the age of 13.   But we also see another pattern that is consistent in posttraumatic stress disorder, and that is, sadly, neglect by the mother.   The mother was unavailable.   She was a heavy drinker.   She continued to drink throughout his life and -- and just, on a consistent basis, was not available, really providing a lack of coping resources that one sees in posttraumatic stress disorder.

Q.   Okay.   Now, let me ask you, Doctor, about Mr. Barrett's neuropsychiatric or neuropsychological profile.   Do you know who Myla Young was?

A.   Yes, I do.

Q.   Okay.   Could you tell the Court who she was?

A.   Dr. Myla Young was a board certified neuropsychologist. She was a -- about 20 years, she was the chief psychologist for the Vacaville State Prison in California where she did hundreds, if not thousands of neuropsychological examinations over the course of her 20 year career.   She was also certified in the -- in the administration of the Hare Psychopathy Index.

Q.   All right.   And was she a competent neuropsychologist?

A.   She was one of the few board certified neuropsychologists in the country.   They are rare.   About less than ten percent of the neuropsychologists in the United States are actually board certified.

Q.   Now, in connection with, or in conjunction with your psychiatric examination of Mr. Barrett, did Dr. Young do a neuropsychological battery or neuropsychological tests --

A.   Yes, she did --

Q.   -- on Mr. Barrett?

A.   -- a battery of tests, yes.

Q.   Okay.   And based on what you know, were the tests that she administered to Mr. Barrett appropriate?

A.   Yes.   Dr. Young gave the Halstead-Reitan Battery, which was first developed in 1984 -- I mean, 1948.   She then gave a series of tests from Delis-Kaplan Executive Battery, as well as some other separate tests.

Q.   Okay.   And did you find her results to be valid and reliable in reviewing them?

A.   Yes.

Q.   Now, you're not a neuropsychologist yourself; is that correct?

A.   That's correct.

Q.   You don't administer the battery of tests that a neuropsychologist administers; correct?

A.   That's correct.

Q.   Okay.   Can you interpret the results and look at the results to see if they're valid?

A.   Yes.

Q.   All right.   And you're familiar with -- enough with the field, certainly, to do that sort of thing?

A.   Oh, yes.   I've taken courses in all of the neuropsychological tests that she administered.

Q.   All right.   And based on the testing that Dr. Young did on Mr. Barrett, can you tell the Court what her findings were with respect to any neuropsychological deficits?

A.   Yes.   Doctor -- first of all, Dr. Young found her testing of Mr. Barrett to be -- as she said, Mr. Autry, to

be reliable and valid.  Reliability means if you were to give that testing to another neuropsychologist, there's an excellent chance that they would agree with her findings. Valid means that it's true.

So in both cases, her testing was reliable, meaning you could pass it on, and valid, meaning it was an accurate representative of Mr. Barrett's neurological functioning.

She found two areas of weakness, and both of those were on the left side of his brain.  The -- the orbital, over the eye, frontal part of the frontal lobe had significant impairments.  This is an area that grows late in life after -- usually after about 10 up until the age of 25. It's an area that is a seat for what we call executive functioning, being able to weigh and deliberate, meaning you could sequence one's behavior being able to pick up cues in social situations, being able to understand the context of situations.  And the other part of that was impaired was the left temporal lobe.  The temporal lobe is really -- one of the things that is the seat of the temporal lobe is academic functioning, being able to read effectively.  Not that you can't read, but being able to read effectively.  Being able to do math effectively.  These are all part of the functioning of the left temporal lobe.

Now, at the same time, she found that

Mr. Barrett's right parietal lobe functioned very well.  And the right parietal lobe is really the part of the brain that we kind of put things together.  It's the part of the brain that would make Mr. Barrett able to function as a mechanic. It was a part of the brain that would allow him to fix things.  And consistent with his history, we see that part of the brain actually working pretty well.

Q.   What is executive functioning?  What is that?

A.   Executive functioning is -- if I could just maybe tell a quick story?

Q.   Sure.

A.   I don't know if any of you have had the opportunity to watch this television show, Are You Smarter Than a Fifth Grader.  I admit that I do watch it and fail fairly often at the questions, but it's -- it looks to be a test -- kind of an educational test.  But interestingly enough, it's a test of how your brain works.  Because before -- before the fifth grade, before you're, say, nine or ten years old, you're given these rote questions, what's the capital of Oklahoma, what -- what's the -- how many states and what are the -- what are those states.  You're given these very rote questions, and that's what your brain can handle until that time.  But after about nine or ten, your brain, and particularly this frontal part of your brain, starts to grow and you start to develop executive functioning.

And so, instead of these kind of rote questions, you get abstractions. If you've got one car coming at 40 miles an hour and another car coming -- going at 60 miles an hour, when are they going to meet, and this requires working memory, can you remember the problem, processing speed, how quickly does it work, weighing and deliberating, one car is coming at one speed, one car is coming at another. And so executive functioning is really what allows us to abstract. It's what allows us to effectively figure things out. It allows us to understand the context of a situation and say, wow, I probably shouldn't say that in this situation, or I probably shouldn't do that in this situation. It allows us to pick up social cues so that we know that certain behaviors may not be appropriate. And that's why it's called executive.

Q. Was it found by Dr. Young in her testing that Mr. Barrett had what's termed dysexecutive syndrome?

A. Yes.

Q. What is that?

A. Dysexecutive syndrome are problems in those areas. And it does not mean that you can't do those things at all. But it does mean that you have problems in those areas. And the -- really the guru of executive functioning, Godefory, G-o-d-e-f-o-r-y, really talks about those problems occurring most commonly in new and novel and stressful situations.

Q.  All right.

A.  Right.  So what you see in the neuropsychological testing is tests of those areas, and particularly two tests, the Wisconsin Card Sorting Test and the Category Test, that Mr. Barrett did extremely poorly in.

Q.  Would it be fair to say that Mr. Barrett has significant dysfunction in his prefrontal lobes, or at least one of his prefrontal lobes?

A.  Yes.

Q.  All right.  And does that cause an inability to inhibit stimuli or react appropriately to stimuli or to accurately take in information as it's happening?

A.  It can.  And I'm not trying to imply -- and I think Dr. Young said this, it doesn't mean that it can't happen at all.

Q.  Sure.

A.  It doesn't mean that.  But it does mean that, particularly in stressful situations, in novel situations, those skills are undermined.

Q.  Does dysexecutive syndrome or a problem with executive functioning impair somebody's ability to engage in reasoned and goal-directed behavior?

A.  It can, yes.

Q.  Now, were there indications in Mr. Barrett's history that would explain, or help to explain the damage to his

frontal lobes?

A.   Yes.

Q.   All right.  Can you talk about those briefly, Doctor?

A.   Well, there are two, Mr. Autry.  I think the first one that we would have to consider is his mother's drinking.  Drinking can impact the brain in every trimester.  It impacts the brain in the first trimester.  I'm sorry.  Drinking can impact the body in every trimester.  It can impact the brain.  Usually from the neck up.  The first trimester from the neck through the genitalia.  In the -- or to the stomach in the second trimester.  And then the genitalia, legs in the third trimester.  And it doesn't take a lot of drinking.  I mean, it doesn't take just a lot of drinking.  And so we know that Ms. Barrett was a regular drinker during the pregnancy and, actually, during her entire life.

However, we also know Mr. Barrett had a series of head injuries.  When he was very young, he was hit in the head with a steel ball.  He had several assaults, physical assaults where he was taken to the hospital.  On two of these occasions, he actually had a loss of consciousness.  You don't have to have a loss of consciousness in order to suffer concussions or that type of injury.  But in his particular case, he did.  And so what we see are a series of potentially acquired head injuries, as

214

well as a potential vulnerability of brain impairment during the pregnancy period.

Q.   Let me ask you about a couple of these neuropsychological tests you talked about that Dr. Young gave to Mr. Barrett.  One of them was this Wisconsin Card Sorting Test.  What is that exactly?

A.   The Wisconsin Card Sorting Test is a test where you have a series of cards.  Each card -- there are ten of them.  There are six sets of ten cards.  And each card has an image on it, like a star or a diamond.  There are multiple card sorting tests, but this particular one a star or diamond.  And the idea is -- and I might add, too, that the Wisconsin Card Sorting Test is normed such a way that a ten-year-old should be able to do this test very easily.

So you turn over a card.  And the -- if it has the image that the examiner wants you to think about, like a diamond, they will say yes.  And so then you'll turn over another card, and let's say that card has a star.  They'll say no.  And so then you turn over another card and there's diamond.  They'll say yes.  So you've got the pattern now, so there's something about diamonds that are important.  You'll go through ten of those diamonds, and then the examiner changes the orders so that, the next time you turn over a diamond, they'll say no.  You've got to figure out what the next set is.  So it may be you have to

go through all the diamonds, all the stars, all the squares. And once you get it, it's pretty straightforward and you go through these six sets of cards.

And it's really a test of can you switch your thinking, can you pick up the idea, can you respond to cues effectively, can you understand what the directions are, and can you change your thinking in the process of doing a task.

Q.   And how did Mr. Barrett do on that?

A.   Mr. Barrett was -- 99 percent of those that were normed did better than Mr. Barrett on this particular test.  He not only what we call perseverated, in that he got stuck.  He kept doing the same thing over and over in spite of getting cues to do something differently.  But he also exhibited what's called a failure to learn.  Meaning even after he got one or two of the -- of the stages, he lost it.  He didn't -- he couldn't get the other one.  So he did very poorly on that test.

Q.   And I think you mentioned another one of the tests that Dr. Young gave, and I'm not bringing it to mind.

A.   The Category Test.

Q.   The Category Test.

A.   Right.

Q.   What is that a test of, or what is that designed to discover or reveal?

A.   Sure.   The Category Test, again, is a test of executive functioning, of left frontal lobe functioning.   And it's very important because, in the Category Test as opposed to the Wisconsin Card Sorting Test, you go down into layers of complexity.   You have -- the first things that you do are relatively easy.   However, as time goes by, they become more difficult.   The cutoff for norm, what we would say normal is about 35.   Mr. Barrett had 54 errors on this test, which put him into the mild to moderately impaired area.

The other thing that's important about those tests is that both of those tests look at the same area.   So this gives you an opportunity to kind of really hone in on specific areas where a person may have difficulty, as opposed to other areas where they may have some strengths.

Q.   All right.   Did Mr. Barrett's neurological deficits that you discussed and that Dr. Young found, and his psychiatric illnesses, the bipolar and the PTSD that you've discussed, did those predate the offense in this case which occurred in 1999?

A.   There's no indication, Mr. Autry, of any illness, any head injury, any type of difficulty that would -- since that time that would speak to this type of specific head injury problem.   And the kinds of problems that one gets with this kind of brain difficulty are the kinds of problems that others have described about Mr. Barrett his entire life,

including his academic record.  When we look at that left temporal lobe, you know, we're talking about math and reading.  When we look at his hyperactivity, his difficulty in school, we're talking about that executive functioning. So we see these occurring long before the offenses for which he was tried and convicted.

Q.   All right.  And did your conclusion change from 2009 when you saw Mr. Barrett again earlier this year in January of 2017?

A.   No, sir, it did not.

Q.   All right.  Now, are you familiar, Doctor, generally with what the facts of this case are as to how the offense was committed, under what circumstance it was committed, and things of that nature?

A.   Yes, sir.

Q.   You understand that there was a raid on Mr. Barrett's property by the TAC team or the SWAT team of the Oklahoma Highway Patrol to serve a warrant?

A.   Yes, sir.

Q.   And that they came on his property around midnight, or in the middle of the night?

A.   Yes, sir.

Q.   And there were multiple vehicles involved?

A.   Yes, sir.

Q.   Okay.  And one of the vehicles I think even ran into the

front of the little cabin he built there on the family property?

A.  I -- I believe so, yes.

Q.  All right.  And shots were fired?

A.  Yes, sir.

Q.  Trooper Eales was killed?

A.  Yes, sir.

Q.  There was an exchange of gunfire.  Mr. Barrett himself was shot?

A.  Yes, sir.

Q.  Okay.  Now, keeping that in mind, that this is a sudden event that occurred where the police -- or the Oklahoma Highway Patrol run up on his property to serve a warrant?

A.  Yes, sir.

Q.  What sort of effect or impact do Mr. Barrett's neurological deficits and his psychiatric illnesses have in his ability to perceive and react to that kind of situation?

A.  I -- I think the first thing we have to take into consideration, Mr. Autry, is that these symptoms of psychiatric and neurological disorder are comorbid.  And what that means is that they interact with each other, and they undermine each other so that his brain impairments really do a job on his psychiatric disorder.  And vice versa.  And they create circumstances that, at thinking,

that is even worse than would be from day-to-day.

The idea of a hyperreactive response is completely consistent with both his history, his mood disorder, as well as what we would see in someone that have these kinds of brain impairments, this misperception of -- of the circumstances.  Once again, we talk about executive functioning, being able to weigh and deliberate -- effectively weigh and deliberate.  And this clearly was an example of misperceiving and not being able to effectively weigh and deliberate.

Q.   Do you hold, to a reasonable degree of medical certainty, that Mr. Barrett has bipolar disorder?

A.   I do.

Q.   Do you hold, to a reasonable degree of medical certainty, that Mr. Barrett has PTSD?

A.   I do.

Q.   Do you believe, to a reasonable degree of medical certainty, that Mr. Barrett has neurocognitive or neuropsychological problems and deficits with his frontal lobes?

A.   I do.

Q.   Okay.  Now, from what you've learned in speaking to people about what Mr. Barrett's life was like back around the time the offense was committed in 1999, what kind of mental state was he in, generally?  Was he barely stable for

him, was he spiraling downward, was he getting better?
What?

A.   There appears to be a deterioration in his mental state in the -- in the weeks and perhaps the days before this event in 1999.  He had become increasingly withdrawn.  It was noted that he was actually not leaving his mother's property where the home that he had created was -- was located.  That other people are going into town for different types of, you know, errands and that kind of thing.  He had become increasingly isolated.  And Mr. Barrett had always had a quality of paranoia that was significant.  And it appears as though that paranoia had increased during this period of time.

Q.   Did he believe that his actions on the night Trooper Eales was killed were justified?

A.   That is Mr. Barrett's belief.

Q.   All right.  Would Mr. Barrett's paranoia and hyperreactivity, in your opinion, stem solely from the fact that he was a methamphetamine user?

A.   No.

Q.   And why not?

A.   Because we have seen those same symptoms with Mr. Barrett actually get him hospitalized.  We've seen those same symptoms take him -- have him try to kill himself.  We've seen those same symptoms being described in

psychiatric hospitalizations.  We see his high level of paranoia being described in psychiatric hospitalizations. We see his high level of paranoia being described after he was arrested and had been sober for a significant period of time with Dr. Sharp's evaluation.  We saw Mr. Barrett as being significantly paranoid.  So many of the symptoms that we see with Mr. Barrett were there regardless of whether he had been using drugs or not.

Q.  All right.  And did Dr. Sharp preliminarily find, anyway, that Mr. Barrett had what appeared to be neurocognitive or neuropsychological deficits that led him to suggest that further testing be done?

A.  That's correct.

Q.  And the further testing of the sort that Dr. Young did --

A.  That's exactly right.

Q.  -- for example?

A.  That's correct.

Q.  You mentioned earlier in your testimony a Dr. Miora and Dr. Bigler.  Who are they?

A.  Dr. Deborah Miora is a neuropsychologist in California. And Dr. Erin Bigler is a neuropsychologist and head of the brain behavior program at Brigham Young University in Provo -- not Salt Lake -- in Provo, Utah.

Q.  Did they review Dr. Young's testing protocol and the

testing that she gave to Mr. Barrett back in 2009?

A.   Yes, they did.

Q.   And what did they say about the testing done by Dr. Young?

MR. WILSON:   Objection as to this witness's testifying about these other persons' evaluations that does not enter into his evaluation or his opinions in this particular case.

THE COURT:   Is it going to be the basis for some opinion he renders in this case?

MR. AUTRY:   Well, Your Honor, doctor -- Dr. Woods examined Mr. Barrett in 2009 and 2017.  Dr. Bigler and Dr. Miora did record reviews of Dr. Young's testing, and they also looked at some of the testing done by other people. They concluded that she gave valid tests, the results were valid.  I mean, he's not basing his opinion on that because he's basing it on what he sees or saw for himself that Dr. Young did in 2009.  But it's further corroboration for the fact that she did valid tests.  Now, so that's why I'm asking him about it.  He's familiar with what their findings are, and I think an expert can rely on other experts regardless of where they come down the line or at what time to give testimony or render an opinion.

THE COURT:   Well, objection sustained.

MR. AUTRY:   All right.

Q.   (BY MR. AUTRY)   What is malingering, Doctor?

A.   Malingering is the manufacturing or exaggeration of symptoms for secondary gain.

Q.   Okay.   In other words, let's say that I'm -- somebody is faking an illness, for example?

A.   It's faking, yeah.

Q.   Did you find in your examination of Mr. Barrett that he was trying to exaggerate facts, exaggerate symptoms, or fake some sort of mental illness or neurological impairment?

A.   I'm -- I'm less able to speak to the facts as I am able to speak to the psychological testing and the neuropsychological testing.

Q.   Okay.

A.   There's obviously a convergent set of facts.

Q.   Say that again.   I'm sorry?

A.   I say there's obviously a convergent set of facts.

Q.   Yes, sir.   Okay.   So you didn't find him to be faking or malingering?

A.   That's correct.

Q.   All right.   Would it be fair to say that Mr. Barrett's drug use, if anything, exacerbated or made worse the symptoms of his mental illness and neurocognitive deficits?

A.   It couldn't have helped.

Q.   All right.

A.   Yes.   It couldn't have helped.

Q.  But you don't find that the basis for his neurocognitive problems or his bipolar or PTSD is drug use; correct?

A.  Well, I couldn't, Mr. Autry, because what we see is that a period of time recently, 2009 when he did the neuropsychological testing, we see that these symptoms still were present.  I certainly saw them in my examination; the pressured speech, the flight of ideas, etc.  We certainly saw them in 2017 as well.  And we see them when he was a kid, you know.  And so before he's -- even before he started using.  So are they relevant?  Yes.  Are they the basis? No.

Q.  Okay.  Are you familiar with the testimony that was had in Mr. Barrett's federal trial back in 2005 with respect to the mitigating evidence that was put on?

A.  Yes.

Q.  Are you familiar with that?

A.  Yes.

Q.  Was any evidence put on in 2005 regarding Mr. Barrett's bipolar disorder?

A.  No.

Q.  Was any evidence put on in 2005 regarding Mr. Barrett's PTSD?

A.  No.

Q.  Was any evidence put on at the federal trial in 2005 about Mr. Barrett's neurological problems or brain damage?

A.   No, sir.

Q.   Was any evidence put on at the federal trial in 2005 about his, what I would term a chaotic and dysfunctional and abusive background in the immediate family?

A.   I think that's an accurate characterization.  And no, sir.

Q.   And was anything put on, to your recollection from reading the record, about Mr. Barrett's family history of mental illness, suicidality, drug and alcohol abuse, and in a multigenerational sense?

A.   No, sir.

Q.   All right.  Do you know a Dr. Steven Pitt?

A.   Yes, sir.

Q.   Okay.  Have you looked at a report that Dr. Pitt did of his examination of Mr. Barrett?  I think it was on January the 19th of 2017.

A.   Yes, sir.

Q.   All right.

A.   And I -- I also had the opportunity to review his transcript.

Q.   All right.  The transcript of the interview?

A.   Yes.

Q.   All right.  Dr. Pitt I guess videotaped his interview with Mr. Barrett?

A.   That's correct.

Q.   Is there a debate or a dispute in the psychiatric and psychological community about the efficacy or the appropriateness of the video or audiotaping psychiatric evaluations or interviews?

A.   Yes, sir.

Q.   And could you explain what that is, what the debate or the dispute is?

A.   The concern -- and it really started about 2002, McLehr, M-c-L-e-h-r, and Roney, R-o-n-e-y, are the primary proponents of -- for the third party -- and audiotaping and videotaping is considered to be a third party -- potential third-party intrusion.  Whether it changes the quality of the interaction between the examiner and the examinee, it's a debate that is still going on and has not been resolved.

Q.   All right.  Is that similar to like the effect cameras in the courtroom might have?

A.   That's exactly correct.

Q.   Okay.  Instead of being yourself, you might tend -- some people, anyway, might tend to become actors and actresses or be self-conscious about being recorded --

A.   That's correct.

Q.   -- in some way?  Okay.  Now, in your review of Dr. Pitt's report, does he seem to agree that, from all the evidence and all the accounts, that Mr. Barrett had a dysfunctional, neglectful, and traumatic upbringing?

A.   Dr. Pitt certainly agrees that it was dysfunctional and chaotic.

Q.   Okay.  Did Dr. Pitt agree that it was likely that Mr. Barrett was subjected to adverse prenatal effects by his mother's drinking?

A.   Yes.

Q.   Did Dr. Pitt in any way question the effect Mr. Barrett's head injuries might have on him, or the fact that he's received head injuries throughout his life?

A.   He certainly acknowledged that he had received, and documented that he had received head injuries.

Q.   Okay.  Would it be fair to say that Dr. Pitt does not question that, on both sides of Mr. Barrett's family, there's a history of major psychiatric illness, including mood disorders?

A.   Dr. Pitt documented that -- much of that history in his report.

Q.   All right.  And would it be fair to say that, in Dr. Pitt's report, he does not question or seem to question that Mr. Barrett has learning disabilities as reflected by his school performance?

A.   He -- again, Dr. Pitt did not -- did document Mr. Barrett's failure of the first grade and dropping out of school in eighth grade, and having problems with math and reading.

Q.   Okay.   Does Dr. Pitt say in his report that he does not contest the findings of the neuropsychologists that looked at Mr. Barrett?

A.   He actually referred that to -- he said that he referred that to the neuropsychological expert.

Q.   All right.   Even though there may be some disagreement or dispute among them potentially?

A.   Well, there's going to be because there hasn't been done a comprehensive neuropsychological battery except for Dr. Young's.

Q.   All right.   And you're talking about anybody who looked at Mr. Barrett during the state case, such as Dr. Bianco?

A.   That's right.

Q.   Okay.   And Dr. Bianco failed to give complete neuropsychological testing; is that correct?

A.   That's correct.

Q.   And he failed to give a complete test that would gauge or measure Mr. Barrett's executive functioning; is that correct?

A.   Among other areas, but certainly his executive functioning.

Q.   Okay.   And did you see any other problems with Dr. Bianco's testing of Mr. Barrett?

A.   Well, Dr. Bianco -- it's not clear that Dr. Bianco's testing was complete, even the -- even the testing that he

did because we don't have the raw data for that testing. And, also, Dr. Bianco did not describe what we call the normative sample. He did not describe that group of persons by which you compare your examinee to make sure that you're comparing apples to apples and oranges to oranges.

Q. And if you don't have this normative sampling or normative comparison group, can you really draw any validity or any conclusions from the testing?

A. It's very difficult.

Q. All right.

A. It's very difficult.

Q. Did Dr. Bianco seem to ignore evidence of Mr. Barrett's previous head injuries?

A. Mr. Autry, I can't say that he ignored because I don't know if he had it.

Q. All right.

A. But he certainly didn't present it.

Q. Okay. Did Dr. Bianco mention anything about Mr. Barrett's background and upbringing and the character of that?

A. Not to my recollection, sir.

Q. Do you recall whether or not he said, based on Mr. Barrett's self-report, that he had no problems growing up, or something like that?

A. That's correct.

Q. Are self-reporting instruments -- this is a little off track. But are these self-reporting instruments the most reliable means of determining whether somebody's got some kind of psychiatric or psychological problem or illness?

A. Self-reporting instruments are difficult because people both -- there's a broad area called dissimulation, and dissimulation is inaccurate reporting. And you can dissimulate both by saying too little and saying too -- or exaggerating. So self-reporting instruments are difficult. You want to make sure that, if you are giving self-reporting instruments, you have a comprehensive social history and you have other types of testing that allows you to judge the value of that self-report finding.

Q. Okay.

THE COURT: Mr. Autry.

MR. AUTRY: Yes, sir.

THE COURT: How much longer do you think you have?

MR. AUTRY: Another 10, 15 minutes maybe.

THE COURT: Okay. Well, let's go ahead and take a brief recess.

THE WITNESS: Thank you.

THE COURT: And be back here at 4:15.

MR. AUTRY: Thank you, Your Honor.

*(Off the record at 4:02 p.m.)*

*(Back on the record at 4:17 p.m.)*

THE COURT:  Go ahead, Mr. Autry.

MR. AUTRY:  Thank you, Your Honor.

Q.  (BY MR. AUTRY)  Dr. Woods, did Dr. Young take into account Dr. Bianco's testing and any records that he generated in her analysis of Mr. Barrett or her examination of Mr. Barrett?

A.  I believe so, yes.

Q.  All right.  And are you aware that Dr. Bianco concluded that Mr. Barrett suffered from no significant neuropsychological deficits, and that further testing was unnecessary?

A.  Yes.

Q.  Did Dr. Young, even taking his testing into account, agree or disagree with that?

A.  Well, she obviously disagreed.  She did a comprehensive battery with multiple tests looking at multiple areas.  I think -- I think that may have been the difficulty with Dr. Bianco's testing is that, having done such a sparse battery, he probably captured strengths and didn't capture the significant weaknesses that we see.

Q.  Okay.  Do you know whether or not Dr. Bianco in his testing took into account Mr. Barrett's previous contacts with the mental health system?

A.  I don't believe that he did.

Q.  All right.  Do you know whether or not he ignored

certain parts of testing he did do that indicated neurological problems or neuropsychological deficits?

A. Again, I can't say that he ignored them, but it certainly did not -- it was not reflected in his comments on his testing.

Q. All right. Now, I don't think I made this clear earlier. Dr. Steven Pitt is a psychiatrist who was retained by the government to examine Mr. Barrett back in January. Is that your understanding?

A. That's correct.

Q. Okay. Do you recall Dr. Pitt saying in his report that any neuropsychological deficits or problems Mr. Barrett had played no role in the offense, and that Mr. Barrett was still perfectly capable of making choices?

A. Yes.

Q. Do you agree or disagree with that?

A. Well, it's -- it's a difficult -- it's hard for me to quite understand Dr. Pitt's findings given that he deferred any comment on the neuropsychological testing. So by not really understanding what the neuropsychological testing meant, how can you say, in fact, that it had no role?

Q. All right. Are the types of neuropsychological problems that Mr. Barrett has, are they something that affects a person who has them in their day-to-day functioning and in their day-to-day lives?

A.   The answer is yes and no.  Yes --

Q.   Okay.

A.   -- they do affect -- affect you in your day-to-day life.
However, they are more significant in stress situations, new
situations, unusual situations.

Q.   Such as the raid on Mr. Barrett's property?

A.   That would be a very good example.

Q.   All right.  Now, Dr. Pitt does not diagnose Mr. Barrett
with antisocial personality disorder, does he?

A.   No, he does not.

Q.   Okay.  And do you know why that is, based on his
report?

A.   Because in order to make the diagnosis of antisocial
personality disorder, you have to meet the criteria for
conduct disorder typically before the age of 15.  And Mr. --
Dr. Pitt felt, appropriately so, that Mr. Barrett did not
meet that criteria.

Q.   All right.  Dr. Pitt states that, while Mr. Barrett does
not have -- or he doesn't diagnose him with antisocial
personality disorder, that he has committed or engaged in
antisocial acts; is that correct?

A.   That's correct.

Q.   Is there a significant incidence of people with bipolar
disorder engaging in antisocial behavior?

A.   Unfortunately, yes.  Antisocial behavior can lend itself

to impure judgment, can lend itself to grandiosity by definition. And you see people with bipolar disorder that really get themselves into trouble, both in terms of criminal and civil legal proceedings.

Q. Okay. Is it true or untrue that drug use or drug addiction, in and of itself, cannot lead to a diagnosis of antisocial personality disorder?

A. That's correct.

Q. All right. Now, even though Dr. Pitt acknowledges that Mr. Barrett had a troubled childhood, or a somewhat chaotic childhood and a dysfunctional upbringing, he concludes that Mr. Barrett does not suffer from PTSD because Mr. Barrett made no such complaints during the psychiatric interview that Dr. Pitt did with Mr. Barrett. Do you recall reading that --

A. Yes.

Q. -- in his report? What's your reaction or response to that, if any?

A. Well, again, it goes back to what we talked about in terms of self-report. And it's why the psychiatric evaluation of the person in a forensic setting is often of -- is not as valuable as being able to have other corroborating information. Mr. Barrett minimized to Mr. -- to Dr. Pitt this history until Dr. Pitt started asking him more specific questions about how did -- how did his father

hit him, and where did his father hit him, and how much did his mother drink.  And once he started asking those questions, actually answers that would be consistent with traumatic stress were irrelevant, but they are -- they're clearly relevant in the history.

Q.  Okay.  Correct me if I'm wrong, but what I got from reading Dr. Pitt's report was that, basically, any problems Mr. Barrett had or has stem pretty much exclusively from drug use and abuse rather than an underlying mood disorder, and that he concludes Mr. Barrett does not have bipolar disorder.  Am I accurately summarizing what he said?

A.  Yes, sir.

Q.  And I take it you disagree with that?

A.  I would have to disagree with that.

Q.  Okay.  For the reasons you've already stated, or is there anything else?

A.  Well, certainly for the reasons that I already stated.  But I also would suggest that, within the context of the interview itself, you see problems with pressured speech, you see problems with flight of ideas.  You see Dr. Pitt having to repeatedly stop Mr. Barrett and say, hold on, let me get this idea, let me -- let me finish my thought.  So as you look at the transcript, you're actually looking at symptoms.

Q.  Okay.  I guess Dr. Pitt's order concludes that

236

Mr. Barrett doesn't have any underlying mental illness that was exacerbated by drug use or drug dependence because there's nothing to indicate the symptoms of bipolar disorder before the onset of his drug use?

A.   That's correct.

Q.   Okay.  Do you agree or disagree with that, and if you disagree, why do you disagree?

A.   I'd have to respectfully disagree --

Q.   Okay.

A.   -- with Dr. Pitt.  And, to me, the proof is really in the hospital -- the three hospital settings where clearly these are after the onset of his drug use.  They clearly -- he was there for 28 days on at least two occasions, I believe, and they made psychiatric diagnoses.  They had the opportunity to say, look, you know, this is all drugs, he cleared up.  He's been here a couple of days, he's been here a week, he's cleared up, he's doing better.  Or they could have said, let's just way wait and see.  It could be chemical dependency, it could be psychiatric.  Let's not treat him.  Let's just kind of wait and see what happens and see how he clears up.  And what we see on at least two of the three circumstances is they treated him, and they treated him with very, very powerful psychiatric drugs, antidepressants the second time, antipsychotics the third time.  And they treated him and recommended that he continue

these -- these medications. So this is someone that's outside of the forensic setting. It's in that period of time when there are both drugs -- he was both using drugs, and he presented with psychiatric diagnoses. And they did not make the call that this was purely a chemical dependency issue.

Q. All right. Even though Dr. Pitt acknowledges a history of mental illness and mood disorders in Mr. Barrett's family, both immediate and his extended family, does he take sufficient account of that kind of genetic influence in his conclusions in your opinion?

A. Dr. Pitt actually focuses on only the nuclear family. He really speaks only to that first generation nuclear family, which is genetically not correct. And the literature doesn't support that you can only look at one family. I mean, you look at grandparents and great grandparents. You look back as far -- you look at cousins. You look back as far as you can. And -- but even within that family, you see depression with his mother. You see drug use and hypersexuality with his father. So I respectfully understand what Dr. Pitt is saying, but I have to disagree with him.

Q. Okay. Do you think Dr. Pitt took into sufficient account how Mr. Barrett's upbringing might have influenced or been a contributing factor to the mental illness that you

diagnosed him as having?

A.   No.

Q.   Okay.   And why is that?   Just because it's not in the report or not discussed, or why?

A.   Well, Dr. Pitt makes a very good point in his report that his report does not capture the entirety of his findings, and so he strongly recommends that you review that 325 page transcript of the interview.   So when you actually review the transcript of the interview, you have the opportunity to see the conversation between the two of them, and you -- it really gives you a chance where Dr. Pitt is actually fleshing out what's going on at home.   How did your father beat you, you know, how did your mother -- what impact did her drinking have on you, and other -- and his two other brothers as well.   So I think if you look at the transcript, you really get a much broader picture of Dr. Pitt's and his -- and his examination of the family.

Q.   Do you think Dr. Pitt took sufficient account of Mr. Barrett's past hospitalizations and contacts with the mental health system in arriving at his conclusions?

A.   No, sir, I don't.

Q.   And is that because you don't see it emphasized or discussed at any length in his report?

A.   Well, I don't see what we described as the differential diagnosis.   I don't see where, if Dr. Pitt felt as though

the findings in those three hospitalizations were erroneous, or that somehow them describing Mr. Barrett as having labile mood or being significantly irritable, or making the diagnosis of bipolar disorder, or treating him with medications that are for mood disorders, I don't see the analysis that says, well, you know, I think they were wrong there, and this is where I think -- I think this is where -- this is where I think they probably missed it.

Q.   Okay.   One of Dr. Pitt's conclusions is that Mr. Barrett, in his opinion, doesn't have either bipolar disorder or PTSD because the institutional records in the Federal Bureau of Prisons do not indicate that any mental health person within the Bureau of Prisons ever diagnosed him with any of that.   Do you recall that statement in his report?

A.   I do.   And I've had the opportunity to review those records as well.

Q.   All right.   Was Mr. Barrett, within the Bureau of Prisons, ever given a comprehensive neuropsychological battery or a comprehensive psychiatric evaluation or examination?

A.   The records are voluminous, and I apologize, but I don't recall.   I certainly know there was no neuropsychological evaluation.   I also don't recall a psychiatric -- a comprehensive psychiatric evaluation.   Dr. Pitt and

Mr. Barrett talked about that, in fact, in the -- in the transcript.

Q.  Okay.  Would it be fair to say that -- well, in your opinion, would anything in the Bureau of Prisons records about Mr. Barrett's mental state be dispositive as to whether or not he has bipolar neurological damage, or any of that?

A.  Well, if there was -- if there were anything there, it would be helpful.  It could help.  I mean, everything is helpful.

Q.  Sure.

A.  So it could be useful for us to get some understanding of how he looked in a confined, very restricted environment. As I said earlier, you know, before we had medications, that's how we treated people were in confined, restricted environments.  But that has not been the case.  And Mr. Barrett has not -- as he said, Dr. Barrett -- I mean, Dr. Pitt when he asked him, well, you know, what about your symptoms in here?  And Mr. Barrett said, well, you know, I'm in a cage so it's hard to know what my symptoms are because I'm in a cage.

Q.  All right.  Is there a high incidence -- I don't know if you know this or not, so let me just ask you.  Is there a high incidence of undiagnosed and untreated mental illness among inmates in the prison system?

A.   Well, I can only go excluding my personal experience, we now know that the three largest psychiatric facilities in the United States are the Los Angeles County Jail, Rikers Island, and Cook County.  We also know that, according to the Department of Justice newsletter, 2009, greater than 50 percent of the prisoners in the federal, state, and local prison system suffer from symptoms of mental illness.  And just three weeks ago, the Center for Disease Control came out with a monograph on traumatic brain injury, as well as mental illness.  And in that monograph, they identified three vulnerable populations; geriatric population, the pediatric population, and the incarcerated population.  And their statistics state that approximately 60 percent of those that are within our prison walls have a history of traumatic brain injury.  So I think the literature is pretty solid that the population -- the current incarcerated population is one with significant mental illness, and also significant cognitive impairment as well.

Q.   All right.  Now, I've asked you this series of questions about Dr. Pitt's examination and the conclusions he's drawn. Is there anything else, as you sit here today, that stands out to you as being problematic in Dr. Pitt's conclusions?

A.   No, I think that we've covered them.

Q.   All right.  Are you familiar with a Dr. Randall Price?

A.   Yes, I am.

Q.  Are you familiar with the fact that, during the pendency of the federal case against Mr. Barrett, Dr. Price examined him?

A.  Yes.

Q.  Okay.  And is Dr. Price a psychologist?

A.  He's a neuropsychologist.

Q.  Neuropsychologist.  And are you familiar with the PCL-R?

A.  Yes.

Q.  Is that one of the tests that Dr. Price gave to Mr. Barrett?

A.  The Hare Psychopathy Index is actually not a test.

Q.  Okay.

A.  Okay.  I just wanted to --

Q.  I apologize.

A.  Okay.  It is not a test.  It is an interview that is used to look at the construct of psychopathy.

Q.  All right.  Is psychopathy even recognized as a diagnosis in the Diagnostic and Statistical Manual?

A.  It's not -- it's not a diagnosis.  It's a construct. It's not even a syndrome.  It's a construct that has been trying to get into the DSM for several iterations, probably starting since 1983.

Q.  Okay.  Does Dr. Price's diagnosis of psychopathy conflict with the records of Mr. Barrett's previous contacts

with the mental health system?

A.   Well, first, Mr. Autry, and I --

Q.   I apologize.

A.   -- is that it's not a diagnosis.

Q.   Right.  This is a designation or a labeling, I guess?

A.   That's correct.

Q.   Okay.

A.   That's correct.

Q.   Does that conflict with what previous mental health professionals who've looked at Mr. Barrett in the community before this offense found?

A.   Well, he has never been labeled as a psychopath before. He's been given the Hare Psychopathy Index before.  But certainly, in clinical settings, he was not labeled a psychopath.

Q.   And is psychopathy kind of a harder-edged term for antisocial personality disorder?

A.   Well, the history of psychopathy is very interesting because when Robert Hare versus developed the Hare Psychopathy Index around 1970 -- 1974, he and Reid Meloy -- Dr. Reid Meloy at the University of San Diego said that it was not antisocial personality at all.  That they were actually very, very separate.  Over the years, Dr. Hare and Dr. Meloy have reconsidered that and have thought that perhaps they are, in fact, more closely aligned.  However,

when you look at the studies on the Hare Psychopathy Index, as well as studies on antisocial personality disorder, they are among the lowest in what we call inter-rater reliability.

Q.   What is that?

A.   That means that people don't agree when they -- when they see the same set of symptoms, they don't agree.

Q.   All right.  And in this particular case, are you familiar with the fact that Dr. Jeanne Russell also administered this Hare Psychopathy Interview to Mr. Barrett during the state case?

A.   Yes.

Q.   Were her conclusions consistent with Dr. Price's at all?

A.   They were actually very, very different.  They were actually 19 points different on a scale that you can only get 24 points different.

Q.   Oh, really?  So Dr. Russell, no psychopathy; is that correct?

A.   That's correct.

Q.   Dr. Price, psychopath?

A.   That's correct.

Q.   All right.  Are you aware of any studies that have been done showing that the Hare Psychopathy Index is not a reliable predictor of future dangerousness or violence in

prison --

A. Yes.

Q. -- in a prison setting?

A. That's correct.

Q. And what do those -- what do those studies say basically?

A. The best studies were completed in 2000 to 2007 and 2008. They came out of Michigan State, although there were some really excellent studies that came out of Norway. And those were studies that really talked about the -- because the Hare Psychopathy Index was normed on a correctional setting, but not --

MR. WILSON: Judge, I'm -- I need to object. The witness is talking about some findings which took place in 2007 and 2008. We're talking about a trial which occurred back in 2005. I believe that would be the relevant time period that we're talking about. And so I would object to this -- this line of questioning and this answer.

THE COURT: What would the relevance be if it postdates the trial we're talking about?

MR. AUTRY: The relevance would be that, to any extent that it would seem to have any validity at all in predicting future dangerousness in a population that's incarcerated, that validity has been dissipated or disproved by subsequent studies. And it's now 2017 and we're here.

So I think that the validity of Dr. Price's conclusions is subject to attack because the question here would be to the jury, and the jury rejected the continuing danger or the continuing threat aggravating circumstances as to Mr. Barrett.  But the question is, is somebody liable to be violent in the community versus whether they're going to be violent in a maximum security prison setting serving a life without parole sentence, which is the only alternative to the death penalty -- or life without release, excuse me, which is the only alternative to the death penalty in this federal case.  So that's what I'm trying to get at, is whether or not Dr. Price, who we haven't heard from yet of course, whether his testing or whether this Hare Psychopathy Index has any kind of predictive value in a maximum security prison setting.

THE COURT:  Well, to the extent that we're -- you're trying to criticize Dr. Price's conclusions, I guess I'm going to go ahead and allow it.  But in terms of what, if any, impact it would have had if it had been presented at the trial, it's minimal at best.

MR. AUTRY:  I understand, Your Honor.

THE COURT:  Very well.  Go ahead.

Q.  (BY MR. AUTRY)  Let me just cut to -- cut to the bottom line here, Doctor.  Have the studies that have been done in recent years, over the last decade or so, indicated that the

Hare Psychopathy Index is not a valid predictor of violence in a maximum security prison setting?

A.   The studies that have been done in the last 10 to 12 years cast out upon the Hare Psychopathy Index being able to make those predictions at anything better than chance.

Q.   All right.  Did Dr. Price do a full psychological or mental health examination of Mr. Barrett?

A.   No, he did not.

Q.   All right.  Do you know whether or not Dr. Price took into account Mr. Barrett's family history of mental illness and family history of substance abuse and that sort of thing?

A.   There are no indications that he did.

Q.   Does Dr. Price acknowledge, at least to a limited degree, that Mr. Barrett has some neuropsychological or neurological deficits?

A.   Yes.

Q.   Okay.  Do you know whether or not the PCL-R often mistakes indicators of bipolar disorder or other significant mood disorders for what's termed psychopathy?

A.   Absolutely.

Q.   Okay.  And is that -- is that established in the relevant literature -- the relevant medical literature?

A.   Yes.

Q.   Would you agree or disagree with this statement, Doctor,

that the most reliable predictor of whether or not somebody is going to be a violent inmate or violent in prison, and present a threat to other inmates or staff is the person's behavior in prison?

MR. WILSON:  Objection to this particular witness's competence to answer that question, Judge.

THE COURT:  Sustained.

MR. AUTRY:  Okay.

Q.  (BY MR. AUTRY)  Doctor, had Mr. Barrett been examined back in 2005 -- 2004, 2005 during his federal trial in the manner you examined him in 2009, in the manner Dr. Young examined him in 2009, could the information that you've given the Court here today had been imparted to the jury?

A.  Absolutely.

Q.  Okay.  Do you ever do any work with police departments?

A.  Yes, sir.

Q.  Okay.  And what -- what is that exactly?

A.  I teach in San Francisco and Alameda County in the critical incident training program.  I teach usually officers that have just completed their training in the academy trauma, and also brain -- kind of a primer on brain functioning.

Q.  All right.  And how long have you done that for?

A.  About two years.

MR. AUTRY:  All right.  Could I have just a

second, Your Honor?

THE COURT:  Yes.

Q.  (BY MR. AUTRY)  Doctor, is there anything I haven't asked you that you find to be significant with respect to Mr. Barrett's neuropsychological makeup or his mental illnesses?

A.  No, sir.

MR. AUTRY:  Okay.  Thank you, Doctor.

THE WITNESS:  Thank you.

MR. AUTRY:  No further questions.

THE COURT:  Mr. Wilson, how long do you anticipate cross-examination will take?

MR. WILSON:  Longer than 15 minutes, Judge.

THE COURT:  Yeah.  Longer than -- longer than 30 minutes?

MR. WILSON:  I would expect, yes.

THE COURT:  Yeah.  So I think we probably should just pick this up first thing in the morning at 9:00 o'clock.  Anything further I'll want to consider tonight?

MS. FISHER:  Not from the movant, Your Honor.

MR. WILSON:  I don't believe so at this time, Your Honor.  Thank you.

THE COURT:  Very well.  We're in recess.

*(Off the record at 4:45 p.m.)*

CERTIFICATE

I, Ken Sidwell, Certified Shorthand Reporter for the Eastern/Northern Districts of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in the above-captioned case.

I further certify that I am not employed by nor related to any party to this action, and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 9th day of May, 2017.

s/Ken Sidwell
Ken Sidwell, CSR-RPR
United States Court Reporter

251

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,        )
                               )
          Plaintiff,           )
                               )
       -vs-                    ) No. CIV-09-105-JHP
                               )
UNITED STATES OF AMERICA,      )
                               )
          Defendant.           )


                  *  *  *  *  *


           TRANSCRIPT OF EVIDENTIARY HEARING
                     VOLUME II
       **BEFORE THE HONORABLE STEVEN P. SHREDER**
            UNITED STATES MAGISTRATE JUDGE


                  MARCH 28, 2017

                  *  *  *  *  *


                A P P E A R A N C E S

     MR. DAVID B. AUTRY, 1021 Northwest 16th Street,
Oklahoma City, Oklahoma, 73106, and,
     MS. JOAN M. FISHER and MR. TIVON SCHARDL, Federal
Public Defender, Sacramento, 801 I Street, Third Floor,
Sacramento, California, 95814, Attorneys on behalf of the
Defendant;

     MR. CHRISTOPHER WILSON, 520 Denison Avenue, Muskogee,
Oklahoma, 74401, Assistant United States Attorney, and,
     MR. JEFFREY B. KAHAN, U.S. Department of Justice,
Capital Case Unit, 1331 F Street Northwest, Room 345,
Washington, D.C., 20530, attorneys on behalf of the
laintiff;


REPORTED BY:                   KEN SIDWELL, CSR-RPR
                               United States Court Reporter
                               P.O. Box 3411
                               Muskogee, Oklahoma  74402

252

I N D E X

WITNESS                                                    PAGE

**George Woods**
     (Cross-Examination by Mr. Wilson)              253
     (Redirect Examination by Mr. Autry)           330
     (Recross-Examination by Mr. Wilson)           359
     (Redirect Examination by Mr. Autry)           369

**Steve Leedy**
     (Direct Examination by Mr. Autry)             379
     (Cross-Examination by Mr. Wilson)             384
     (Redirect Examination by Mr. Autry)           424

**John Echols**
     (Direct Examination by Mr. Autry)             426
     (Cross-Examination by Mr. Wilson)             470
     (Redirect Examination by Mr. Autry)           497
     (Recross-Examination by Mr. Wilson)           510

**United States District Court**

253

MARCH 28, 2017 PROCEEDINGS

*(On the record at 9:02 a.m.)*

THE COURT:  Call case number CIV-09-105-JHP, Kenneth Eugene Barrett versus United States of America. Attorneys enter their appearances for the record, please.

MR. WILSON:  Christopher Wilson and Jeffrey Kahan for the United States.

MR. SCHARDL:  Good morning, Your Honor.  Tivon Schardl from the federal defender office, Eastern District of California for Mr. Barrett.

MR. AUTRY:  David Autry for Mr. Barrett, and also Joan Fisher is seated in the spectator section, Your Honor.

THE COURT:  Very good.  Parties ready to proceed?

MR. WILSON:  Yes, Your Honor.

MR. AUTRY:  Yes, sir.

THE COURT:  Excellent.  You may cross-examine, Mr. Wilson.

MR. WILSON:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. WILSON:

Q.  Good morning, Dr. Woods.

A.  Good morning, Mr. Wilson.  How are you?

Q.  I'm fine.  Thank you.  And you?

A.  I'm good.

254

Q.   Good.   Dr. Woods, you're a neuropsychiatrist; is that correct?

A.   Yes.

Q.   And are you board certified in forensic psychiatry?

A.   No, I'm not.

Q.   That requires some additional testing; is that correct?

A.   One additional test, yes.

Q.   Okay.   But you are board certified in psychiatry?

A.   That's correct.

Q.   All right.   And you would agree with me that neuropsychiatry is a field that studies psychiatry, but also the neurological effects and neurological disorders; is that correct?

A.   That's correct.

Q.   All right.   And, specifically, I guess you would agree with me that you focus on the links between neuroscience and any behavior in a patient; is that correct?

A.   Yes.

Q.   Now, you would also agree with me that neuropsychiatrists and/or psychiatrists or psychologists can disagree or have differing opinions about a diagnosis of a patient; is that correct?

A.   Sure.

Q.   Happens routinely; isn't that correct?

A.   Yes.

Q.   Are you familiar with an organization known as the American Academy of Psychiatry and Law?

A.   Yes, I am.

Q.   Have you ever been a member of that?

A.   I am a member of it.

Q.   You are a member of that organization?

A.   Yes.

Q.   And being a member of that organization, I'm sure you're familiar with the ethical guidelines that govern that particular organization?

A.   I've read it, and I've obviously seen it in court here on a number of occasions.

Q.   Okay.  And you'd agree with me that, when psychiatrists function as experts within the legal process, they should adhere to principles of honesty and objectivity; is that correct?

A.   Yes, I do.

Q.   Okay.  And you would agree that that's what the guidelines for that particular organization set forth; is that correct?

A.   Yes.

Q.   And you would agree with me that, being retained by one side or the other, can give rise for the potential that a person's objectivity could be compromised.  Would you agree

256

with that?

A.   Potentially.

Q.   And you'd also agree with me that, in order to minimize that potential, that it's important to examine all the available data when you're performing your evaluation and review of a particular patient?

A.   Well, that's one part.  The other part, of course, is to understand what's going on clinically, as well as to understand the literature that's available.  So often what happens is, it gets focused on the forensic issue, and people don't treat the client in a forensic setting like they would their patient.

Q.   And so a part of that process is to take a complete social history; correct?

A.   Yes.

Q.   You also will examine other evaluations performed on that particular person in the past; isn't that correct?

A.   Yes.

Q.   You'll look at medical history which is available to you; is that correct?

A.   Yes.

Q.   You'll interview family members, if that's possible; is that correct?

A.   Yes.

Q.   Or you'll examine or review declarations or statements

257

of family members; is that correct?

A.   Yes.

Q.   In addition to that, you'll actually perform, as you did in this particular case, an in-person interview or evaluation of the patient; is that correct?

A.   Yes.  I think those are certainly some components. There are other components, but those are some of them.

Q.   Okay.  Thank you.  And when you evaluate a particular patient, it's important to consider the environment in which that evaluation takes place; is that correct?

A.   Yes.

Q.   Because that can have an impact on the current status of that patient at the time that you're evaluating them; is that correct?

A.   Yes.

Q.   For instance, it might be different of a person who is incarcerated versus a person who is not incarcerated?

A.   That's true.

Q.   And you'll agree with me that there are certain stressors that involve incarceration which are not typically present outside incarceration?

A.   That's correct.

Q.   And you would agree with me that someone who is on death row, there are additional stressors in that person's life that are not present in a person who's not on death row.

258

Would you agree with that?

A.   I would agree with that.

Q.   Okay.   Thank you.

A.   Okay.

Q.   Now, in this particular case, Dr. Woods, you reviewed a number of documents; is that correct?

A.   Yes.

Q.   You reviewed declarations of family members in this particular case; is that correct?

A.   Yes.

Q.   And do you recall all of the declarations that you reviewed?

A.   I don't recall all of them.   I know there were his mother.   I know there are other family members.   I don't recall all the declarations.

Q.   And those are documents that are provided to you by Mr. Barrett's counsel; is that correct?

A.   That's correct.

Q.   Because you were hired by Mr. Barrett's counsel; isn't that correct?

A.   That's correct.

Q.   And you are charging, I believe you testified yesterday, $350 an hour for your services --

A.   Yes.

Q.   -- is that correct?   Does that include your testimony?

259

A.   Yes.

Q.   And it's the same flat fee of $350 per hour regardless of what you're doing --

A.   That's correct.

Q.   -- is that your testimony?

A.   Yes.

Q.   Okay.  And, currently, how much have you made in this particular case?

A.   Oh, I don't know.  I'd say that I probably billed over the course of the last 17 or 18 years -- I mean, let's see.  2009.  So that's seven or eight years.  I probably have billed at least 60 hours, 70 hours, at least.  I would probably say more than that.

Q.   Okay.  Dr. Woods, you've never testified for the government, have you?

A.   I've only recently testified for a county case in Alameda County in the last month.  But I -- and that was a county case.

Q.   But you've never testified for the federal government; is that --

A.   I've never been asked to.

Q.   Okay.  You've testified, I believe, roughly 80 or 90 times for the defense, is that correct --

A.   Yes.

Q.   -- in capital cases?

A.   That's correct.

Q.   Now, in addition to the documents that you -- as far as the declarations that you reviewed, I believe you testified earlier that you reviewed medical reports; correct?

A.   Yes.

Q.   And you received -- you reviewed medical history of the defendant, Mr. Barrett; is that correct?

A.   Yes.

Q.   Did you review medical history of other family members that were provided to you by counsel?

A.   I certainly saw records of his great-great-grandparents, just records of where they had talked about his lunacy.

Q.   Let's talk about that one just for a second.  In your report, you reference a 1918 lunacy certificate of great-great-grandfather A.J. Barrett; is that correct?

A.   I believe that's correct.

        MR. WILSON:  And, Your Honor, I'd ask the witness be provided -- this would be defendant's exhibit or movant's exhibit number -- need to make sure I've got the number right.  I apologize, Your Honor.  There's so many different numbers in this particular case, I'm trying to keep them all straight.  Judge, it might be easier if I just -- may I ask, may I approach the witness?

        THE COURT:  If you can just tell us what it is, maybe we can find it.

MR. WILSON: Well, it is the -- what's purported to be the August 12, 1918 lunacy record of A.J. Barrett. And in the original petition -- the amended petition, it was Exhibit Number 27 back at that time, but there's been a different -- a number of different numbers, and so I'm trying to cross-reference in my mind, Judge, which one that particular is, and I apologize.

THE COURT: Okay. Is it in Number 50?

MR. WILSON: Judge, it is actually Movant's Exhibit Number 2. Thank you.

THE COURT: Okay.

Q. (BY MR. WILSON) Dr. Woods, have you had an opportunity to take a look at Movant's Number 2?

A. Yes.

Q. And is that the document that you refer to in your report of the lunacy record of great-great-grandfather A.J. Barrett?

A. I believe so. It's been a while, but I believe that is correct.

Q. Would you agree with me, Dr. Woods, that this document says absolutely nothing about an admission or a discharge?

A. Well, no, I would disagree. It notes here on the right side, order of admission, it says, received at hospital by medical superintendent, so I would assume that that would be when he was received at the hospital.

262

Q.   Are you looking at the Petitioner's Number 2?

A.   Yes, lunacy record in the matter in the sanity of A.J.

Barnett, State of Oklahoma, County of Sequoyah, Number 141,

order on the right -- left side, it says petition.  On the

right side, it says order of admission, received at hospital

by medical superintendent.  It has the --

     MR. WILSON:  Judge, may I approach, because maybe

I just have a poor copy because I can't read -- there's

nothing on my copy.

     THE COURT:  Go ahead.

     MR. WILSON:  Thank you.

     THE WITNESS:  Received at hospital by medical

superintendent.  It has two physicians appointed.

     MR. WILSON:  Hold on.  Let me get back to --

     THE WITNESS:  Okay.

     MR. WILSON:  -- podium before you start talking.

     THE WITNESS:  Oh, okay.  I'm sorry.

     MR. WILSON:  Judge, may I inquire from here just

for a moment?

     THE COURT:  That's fine.

     MR. WILSON:  Thank you.

Q.   (BY MR. WILSON)  Now, Dr. Woods, we were both looking at

Petitioner's Exhibit Number 2; correct?

A.   Yes.

Q.   And you're referring to the right-hand side of this

263

particular document under the heading of order of admission;

is that correct?

A.   Correct.

Q.   And you would agree with me that this appears to be a

preprinted form document; correct?

A.   That's correct.

Q.   And the language that you're referring to, received at

hospital by medical superintendent, is part of the

preprinted form, is it not?

A.   That's correct.

Q.   And it has no date of any admission; isn't that

correct?

A.   That's correct.

Q.   It has no date -- or any notes at the bottom, does it?

A.   No.

Q.   No minutes of the proceedings; correct?

A.   Not on this record, no.

Q.   So in this particular record, there is nothing to show

that A.J. Barrett was ever admitted for any type of lunacy

in 1918; isn't that correct?

A.   It only shows it is petition, that's correct.

Q.   So that petition very well could have been denied; isn't

that correct?

A.   There is that possibility.

        MR. AUTRY:   Your Honor, I'm going to object.   He's

264

misleading.  If he looks at Exhibit Number 3, it talks about an admission at Eastern State, Vinita.  And then it goes on to have journal entries regarding Mr. A.J. Barrett.

MR. WILSON:  Okay.  Judge, in response to that, counsel is mistaken.  His own exhibit --

THE COURT:  Excuse me.  Excuse me, Mr. Wilson. You can do your cross the way you want and you can do redirect.

MR. AUTRY:  I apologize, Your Honor.

THE COURT:  Very well.  No problem.  Go ahead.

MR. WILSON:  Okay.  Thank you.

Q.  (BY MR. WILSON)  All right.  So you would agree with me that this particular record, Petitioner's Exhibit Number 2, there's nothing on here referring or referencing any admission; is that correct?

A.  On that particular record, that's correct.

Q.  Thank you.  And so you're basing the fact that great-grandfather A.J. Barrett was admitted to some facility for lunacy based upon what you've been told by the family; isn't that correct?  Because this document does not say it, does it?

A.  That particular document, that's correct.

Q.  Okay.  Now, let's talk about the document which counsel was referring to just a few moments ago as Petitioner's Exhibit Number 3.

265

A.   Sure.

Q.   Now, this is a mental health record.  Would you agree with that?

A.   Yes.

Q.   But it's from 1966; correct?

A.   That's correct.

Q.   And it's from another A.J. Barrett.  That would be granddad, not great-granddad; correct?

A.   That's correct.

Q.   And on this particular one, there are, in fact, at the bottom -- bottom of the page, minutes of the proceedings, is that correct, in handwritten notes?

A.   That's correct.

Q.   And it shows the fact that there was an admission and a discharge; correct?

A.   That's correct.

Q.   So we have a complete record and we can say that, in fact, in 1966, granddad was admitted to Eastern State; is that correct?

A.   That's correct.

Q.   You would agree with me that, if family information is inaccurate, that can have an impact on your evaluation, isn't it?

A.   Well, it depends upon the inaccuracy.  For example, in this particular --

266

Q.  I didn't ask you that.  I asked you --

A.  You asked me --

Q.  -- isn't it true, sir, that that can make a difference --

A.  And I --

Q.  -- yes or no?

A.  No.  That I'm responding to exactly what you asked.

MR. WILSON:  Okay.  May I rephrase the question, Judge?

A.  No.  I mean, maybe have it re-read, because that's exactly what you asked and I was answering your question. May I finish?

THE COURT:  Go ahead and restate your question, please.

Q.  (BY MR. WILSON)  Dr. Woods, relying upon inaccurate information from family can affect your diagnosis; true or false?

A.  It may.  That's not a true or false question, sir.

Q.  Okay.  Thank you.

A.  No, wait.  I'm sorry, I'm not finished with my answer.

Q.  Sir, I asked you a question, you answered it.  Thank you.

A.  But I didn't complete my answer.

MR. AUTRY:  Can he answer the question, Your Honor?

THE COURT:  Well, if that's an objection, it's overruled.  We can -- we can allow your explanation when somebody asks you for an explanation.

THE WITNESS:  Thank you, Your Honor.  Okay.

Q.  (BY MR. WILSON)  Now, getting back to Petitioner's Exhibit Number 3, which is what we've agreed is the lunacy record of granddad, A.J. Barrett; correct?

A.  Correct.

Q.  Now, you reference that particular record in your report, do you not?

A.  Yes.

Q.  And that would be specifically in Paragraph 27 of your report; is that correct?

A.  I'm not sure.  That may well be.  Let me look and see.

Q.  Okay.  So do you have it with you?

A.  Yes.

Q.  Okay.  And I'm referring to the report which you created as a result of your evaluation in 2009.

A.  Sure.  Yes.

Q.  All right.  And specifically at the latter portion of Paragraph 27, when you're talking about this particular commitment, you refer to the fact that the psychiatric symptoms documented in his -- referring to grandfather A.J. Barrett -- in his certificate of lunacy, contemporaneously with his commitment to a state psychiatric hospital, include

268

auditory hallucinations; is that correct?

A.   Yes.

Q.   Now, I want you to look, if you will, at the document that you're referring to, and that would be Page 2 of Petitioner's Number 3; correct?

A.   That's correct.

Q.   And can you show me where, on this particular document, there's a reference to auditory hallucinations?

A.   I don't see it here.

Q.   So let's -- so you have included in your report, which is going to be provided to counsel and ultimately provided to the Court, something which is inaccurate; is that correct?

A.   In that particular -- yes, sir.

Q.   Thank you.  Now, yesterday you testified that Mr. Barrett has a history of auditory hallucinations; isn't that correct?

A.   Yes.

Q.   Isn't it true, Doctor, that that has never been documented by anyone that he has auditory hallucinations?

A.   He has both told me and -- excuse me -- and Dr. Pitt that, at times, he has had auditory hallucinations.  It's been rare.

Q.   Okay.  So in your 2009 evaluation, this gentleman seated here in the orange --

269

A.   Yes.

Q.   -- told you that he had auditory hallucinations?

A.   As a child, yes.

Q.   But you'd agree with me that, in reviewing all of the previous medical records of all the other admissions that you testified about yesterday, there's no mention of auditory hallucinations?

A.   That's correct.

Q.   So evaluations done in 2002, 2000, roughly 2003 all denying that, are you saying those are inaccurate?

A.   No.   No, I'm not saying they're inaccurate.

Q.   So what Mr. Barrett now tells you in 2009 is in addition to what he was telling the providers at the time of the crime; correct?

A.   That's correct.

Q.   And, once again, if you rely upon inaccurate information, that can, yes or no, impact your evaluation?

A.   It can.

Q.   Thank you.   And in providing information in a report which is incorrect can also impact how people review your report; isn't that correct?

A.   That's correct.

Q.   Now, you testified just a moment ago, and you correct me if I'm wrong, I believe you said that the defendant told Dr. Pitt that he experienced auditory hallucinations?

270

A.   When he was young, yes, correct.

Q.   Isn't it true -- and you've reviewed his report, did you
not?

A.   Yes.

Q.   And you reviewed the transcript of the interview of
Mr. Barrett; isn't that correct?

A.   That's correct.

Q.   Isn't it true, sir, that in the interview, which is
transcribed and videotaped --

A.   Yes.

Q.   -- that the defendant said, no, I've never -- I've never
heard voices I don't think?

A.   That's correct.  However, if you will also go through
the transcript, he talked about being younger and hearing
things.  Not voices.  But hearing things and seeing
things.

Q.   So that's a difference in your mind, hearing things
versus hearing voices?

A.   Yes.  They were both auditory hallucinations.

Q.   But, again, that would be the first time, to you in
2009, that any reference to auditory hallucinations;
correct?

A.   Correct.

Q.   And that's after he's been convicted of murder;
correct?

271

A.  Yes.

Q.  That's after he'd been sentenced to death?

A.  Yes.

Q.  And that's after he has new counsel that are trying to find reasons to set aside that death verdict; isn't that correct?

A.  And after there was no evidence of malingering in any of his testing.

Q.  But adding additional information is evidence that you're potentially lying; correct?  Isn't embellishment a factor which is considered in whether or not someone is being truthful?

A.  And, in fact, it was taken into consideration, and he's never been found to malinger, including with Dr. Pitt, including with Dr. Sharp.

Q.  My question, sir, is this:  Isn't it true that adding additional information, embellishing, is a factor which is considered in determining whether someone is being honest with you?

A.  It could be if it's found.

Q.  Thank you.  Speaking of embellishments, you talk with the defendant about previous medical problems that he had encountered in his life; is that correct?

A.  That's correct.

Q.  And specifically you had a discussion with him about

head injuries; correct?

A.   Yes.

Q.   And did he report -- and I say he, the defendant --

A.   Sure.

Q.   -- did he report to you potential -- or past head injuries?

A.   Yes.

Q.   Now, what head injuries did he tell you that he had experienced?

A.   He told me about getting hit in the head with a steel ball.

Q.   Let's talk about that one for a second.

A.   Okay.

Q.   When did he say that took place?

A.   It was when he was very young.  I don't recall exactly, but it was when he was very young.

Q.   And where did it take place?

A.   I don't recall.  I think it was in his home, or perhaps -- I think it may have involved his brother.  I don't recall exactly.

Q.   Okay.  Well, I think both of those would be incorrect. I think it was at school.

A.   Okay.

Q.   Is that correct?  Do you recall that now?

A.   It may have been.  I don't recall.

Q.   He reports that he was hit in the head by another kid throwing a steel ball on the playground.  Does that ring a bell?

A.   If you could show me that.  I don't recall that exactly.

MR. WILSON:  Judge, may I approach?

THE COURT:  Yes.

Q.   (BY MR. WILSON)  For the record, Dr. Woods, you're looking at a copy of your 2009 report; is that correct?

A.   Yes.

Q.   And specifically what paragraph did I refer you to?

A.   41.

Q.   Take a moment if you will and just take a look at that language in Paragraph 41.

A.   Sure.

THE COURT:  Is that an exhibit?

MR. WILSON:  It is.  I'm not sure if it's been admitted yet.

MR. AUTRY:  It hasn't.

A.   Sure.

Q.   (BY MR. WILSON)  Does that refresh your memory?

A.   Yes.

MR. WILSON:  Sometimes these screens have to warm up I think, Judge.

THE COURT:  I've got it.

Q.   (BY MR. WILSON)  All right.  Dr. Woods, would you agree

274

with me that what's being displayed on the monitor to your left is a portion of Paragraph 41 of your report?

A. Yes.

Q. And it says, "In a playground accident that occurred when Mr. Barrett was eight or nine, he was struck in the head by what he describes as a steel ball with indicated loss of consciousness"?

A. Yes.

Q. Does that refresh your memory about what the defendant said took place?

A. Yes. I think I was correct about the age. I was wrong about the location.

Q. Okay. And I think you were also incorrect that it was involving his brother?

A. Yes.

Q. And that it didn't take place at home?

A. That's correct.

Q. Would you agree with me that there's absolutely no medical records to support that allegation?

A. Sure.

Q. And I believe he told you that he lost consciousness; correct?

A. He remembers waking up, yes.

Q. And he told you that he woke up with his -- he recalls only waking up as he was being lifted off the ground after

being struck?

A.   Yes.

Q.   Is that correct?

A.   Yes.

Q.   Now, you also reviewed, again, the transcript of Dr. Pitt and his interview of same person, the defendant; correct?

A.   Yes.

Q.   And you recall -- or do you recall what the defendant told Dr. Pitt about this steel ball incident?

A.   I don't recall.  I do recall he described it to him, but I don't recall the specifics.

Q.   Isn't it true that he -- he described it taking place and that waking up in the doctor's office with the doctor testing his reflexes?

A.   If you could show that to me, I'd appreciate it.

        MR. WILSON:  May I just use the projector, Judge?

        THE COURT:  That's fine.

        MR. WILSON:  Thank you.

Q.   (BY MR. WILSON)  Dr. Woods, in order to kind of get a context of what we're talking about, would you agree that, just looking at this document, this appears to -- let me zoom out a little bit so you can see more of the page.  You would agree with me that this is a transcript of the forensic psychiatric evaluation of Mr. Barrett which was

conducted in January of 2017 by Dr. Pitt; correct?

A.   Yes, sir.

Q.   And you'd agree, by looking at this, you recognize this as being transcript of the interview of the defendant, Kenneth Barrett?

A.   Yes, sir.

Q.   Now, specifically, at Line 15 of this transcript, there's a heading which says head injuries.  Would you agree with that?

A.   Yes.

Q.   Now, I want you to direct your attention -- and I'm going to flip the page over.  Now we're looking at Page 163. Do you see that?

A.   Yes.

Q.   And I want to direct your attention to specifically beginning at Line 7.  I'm going to ask you if you'd just take a moment and read Line 7 through 25.

A.   Sure.

Q.   Did you have a chance to look at it?

A.   Yes.

Q.   Does that refresh your memory of your review of Dr. Pitt's report?

A.   Yes.

Q.   And you'd agree with me that -- that when Mr. Barrett was telling Dr. Pitt about this same alleged incident, that

it took place on the playground when someone had throwed a steel one, speaking of a ball, one of those big steel balls and it hit me in the head.  Is that right?

A.   Yes.

Q.   And he says, "I woke up in the doctor's office.  My dad had picked me up and they were -- they had to -- when I woke up, they had the hammer on me"?

A.   That's correct.

Q.   That's not what he told you.

A.   Well, that's not what he told me in terms of waking up.

Q.   Thank you.  That's not what he told about the terms of waking up; correct?

A.   Yes, correct.

Q.   And, again, this is something which shows up in no medical records; correct?

A.   Correct.

Q.   Before we leave this particular area of head injuries, you used -- strike that.  As part of your testimony here yesterday, and as part of your report that you generated in '09 and in '17, you looked at testing performed by Dr. Myla Young; is that correct?

A.   That's correct.

Q.   And Dr. Young used the history of head trauma as a basis of part of her evaluation; correct?

A.   She certainly referred to it.

Q.   And you did, too; correct?

A.   As a basis of part of my evaluation, I would say that. But she certainly referred to it.   And I think it's relevant.

Q.   Okay.   Thank you.   But if the steel ball never -- incident never happened, that would impact the validity of that evaluation; isn't that correct?

A.   I'm not sure what you mean by validity of the evaluation.

Q.   All right.

A.   Do you mean would it change the neuropsychological testing?

Q.   Let me just move on.

A.   Okay.

Q.   You would agree with me that Ernie Barrett never reported this incident; is that correct?

A.   As far as I know.

Q.   Gelene Dotson Barrett never reported this steel ball incident; isn't that correct?

A.   As far as I know.

Q.   As a matter of fact, no family member, other than the defendant himself, ever reported a steel ball incident?

A.   As far as I know, that's correct.

Q.   Which would be a traumatic event; correct?

A.   It would be a traumatic event.

Q.   You've got a child on a school playground getting hit in the head with a steel ball, losing consciousness, being taken to the hospital -- to the doctor; correct?

A.   Yes.

Q.   But when discussions are being made by investigators with the family, there's never a mention of this incident; correct?

A.   Not that I recall.

Q.   Thank you.  But in addition to that, what additional head injuries, other than the steel ball, did you consider as part of your evaluation?

A.   Well, he had said that he had been in fights.  He had said he had been assaulted by the police.  Those are the ones that I considered.

Q.   You also considered a traffic accident; correct?

A.   Correct.

Q.   Did you consider the traffic accident in his medical where he got hit from behind?

A.   I don't recall him getting hit from behind.

Q.   You're not -- are you saying that didn't happen or you just don't recall?

A.   I'm saying I don't recall.

Q.   Well, did you consider a head injury that the defendant reported to Dr. Woods about having his head crushed by a

280

car?

A.   You mean Dr. Pitt?

Q.   I'm sorry.  You're Dr. Woods.  Sorry.  Dr. Pitt.

A.   I don't recall him taking that into consideration.

Q.   Well, you'd agree with me that the defendant, that gentleman seated right there, never told you about having his head crushed by a car?

A.   I don't recall that.

Q.   And that would be important; right?

A.   It could be, yes.

Q.   I mean, if you're talking about significant head injuries?

A.   Sure.

Q.   But do you recall the defendant telling Dr. Pitt that he had a vehicle, a tire, land on his head and crush his head into the dirt?

A.   I do recall that.

Q.   So that would be in addition to what he told you?

A.   Yes.

Q.   That would be in addition to what he's told everybody else in the past; isn't that correct?

A.   Yes.

Q.   And this particular evaluation was done after -- well, we're in 2017 -- like many years after the crime; correct?

A.   That's correct.

281

Q.   Many years after your evaluation; correct?

A.   Sure.

Q.   Just a few months before this evidentiary hearing; correct?

A.   Yes.

Q.   Dr. Woods, you -- and as part of your evaluation in this particular case, we were talking about things that you considered?

A.   Yes.

Q.   And in your reports, you -- you made a list of the -- not itemized list but in generalities, the documents that you reviewed; is that correct?

A.   That's correct.

Q.   And in that report, you reference the fact that you considered the declaration of Myla Young?

A.   Correct.

Q.   That you looked at Mr. Barrett's institutional records; correct?

A.   Yes.

Q.   Now, when you say institutional records, what are you referring to?

A.   I was referring primarily to the records that -- well, it depends upon the year.  If we're looking at 2007, some of those were Bureau of Prison records.  If we're looking earlier, those were the jail records.  The jail records of

282

the -- of the -- while he was incarcerated.

Q.  Okay.  So regardless of the time frame, we're talking about records when he was incarcerated?

A.  Yes.

Q.  And you would agree with me that there are no records during incarceration, as far as of the facility, which indicates that the defendant is suffering from a mental disease?

A.  That's correct.

Q.  Now, you also said that you -- you reviewed available academic records?

A.  Yes.

Q.  And I believe that in your report you reference the fact that the defendant failed the first grade --

A.  Yes.

Q.  -- in one area.  Reading?

A.  Correct.

Q.  But you saw in his second grade that he was all satisfactory in the second grade year; right?

A.  That's correct.

Q.  And as a matter of fact, the educational records reviewed -- prepared and that you reviewed -- I'm sorry --

A.  Yes.

Q.  -- indicated that -- well, let me just look at them for a second.

283

MR. WILSON:  Got too many notebooks, Judge. Sorry.

Q.  (BY MR. WILSON)  All right.  Let's look, first of all, at, I believe it's going to be Petitioner's -- or Movant's Exhibit Number 41.

A.  Thank you.

Q.  Have you had a chance to look at that, Dr. Woods?

A.  Yes.

Q.  And do you recognize that as being one of the documents that you -- that you reviewed as part of your evaluation of the defendant in this particular case?

A.  Yes, sir.

Q.  And you would agree with me that, on Page 1, this appears to be a record from Portland, Indiana.

A.  That's correct.

Q.  Jay County High School; is that correct?

A.  Yes, sir.

Q.  And this would be Mr. Barrett's ninth grade year in the year 1976-1977; is that correct?

A.  Correct.

Q.  Mr. Barrett made an A in first semester in math that year, didn't he?

A.  Yes, he did.

Q.  Made a B the second semester; correct?

A.  Yes, sir.

Q.   As a matter of fact, he made Cs and Bs and made one D; correct?

A.   That's correct.

Q.   Now let's look at another one very quickly.  That would be Movant's -- or Petitioner's Number 55.  It's in another book.

A.   Thank you.

Q.   And, Dr. Woods, I'm going to direct your attention specifically to Page 3 of that exhibit.  And you'd agree with me, Dr. Woods, that this is, in fact, what appears to be an official transcript from Sallisaw High School; correct?

A.   Yes, sir.

Q.   And would you agree with me that this indicates a transfer of records from the document we just looked at, from Jay County High School up in Indiana?

A.   Yes, sir.

Q.   And it reflects the same ninth grade year and the same grades that the defendant received back up in Indiana; is that correct?

A.   That's correct.

Q.   Now, I believe it's your testimony, and I believe it's been the history that this same grade year, the ninth grade, is when the defendant dropped out?

A.   That's correct.

Q.   He didn't fail out, did he?

A.   He achieved those grades, that's correct.

Q.   Okay.  As a matter of fact, there's not a failing grade on that transcript, is there?

A.   Not on that transcript, that's correct.

Q.   He dropped out because superintendent told him to cut his hair and he refused; correct?

A.   I don't recall that, sir.

Q.   Did you not look at the transcript of the -- of the trial in this case?

A.   I did, but I don't recall that statement.  I'm sorry.  I may be wrong.  If you could show that to me.

Q.   Well, I believe -- I'll see if I can help refresh your memory.  Do you recall Gelene Dotson testifying in the second stage?

A.   I believe so.

Q.   And she was asked about why the defendant dropped out. Do you recall that?

A.   If you could refresh my -- if you could show that to me. I don't recall it.

Q.   Well, let me just ask you this:  If the transcript reveals that Ms. Dotson testified that her son dropped out because he didn't -- refused to cut his hair, do you have any reason to doubt that?

A.   You mean that the principal --

Q.   That that's what she testified to.

A.   That the principal told him to cut his hair and he didn't?

Q.   My question is:  Do you have any reason to doubt that Gelene Dotson testified that way in the second stage?

A.   I don't have any reason to doubt that she testified that way.

Q.   And you would agree with me that she was there with him at that time --

A.   Sure.

Q.   -- correct?  One other education record I just want to refer your attention to, and, quite frankly, I don't know that I can find it in the petitioner's exhibits.  But let me see if -- I'm just going to display it to you and see if you recognize it.  And counsel may be able to direct me to where this is, and I apologize.  Let me zoom in to the top so you can kind of get a reference of what we're talking about. Top right-hand corner appears to be from Plainfield, Illinois.  Do you see that?

A.   Yes.

Q.   W.G. Nighow, superintendent.  That would be from a school system up in Illinois; correct?

A.   That's correct.

Q.   And you'd agree with me, in the top left-hand corner of this document, this is the educational record of Kenneth

287

Eugene Barrett; correct?

A. Correct.

Q. And it shows that he entered school in September of 19 -- excuse me -- 1967 in the first grade, and he withdrew in June of 1969; correct?

A. Yes.

Q. And at the bottom of that document, and I believe this may be where you were getting the information regarding his first grade achievement, indicates that, in the first grade, he received an F in arithmetic; correct?

A. And in reading.

Q. And in reading; correct?

A. That's correct.

Q. But it also shows that he was promoted on to the second grade; correct?

A. Yes.

Q. And then in his second grade year, satisfactory across the board; isn't that correct?

A. That's correct.

Q. Let me show you another document, and this appears to be from the Tommie Spear Junior High in Sallisaw, Oklahoma; is that correct?

A. Yes, sir.

Q. And this would be, once again, Kenny Barrett. That would be the defendant --

288

A.   Yes.

Q.   -- his educational record; correct?

A.   Yes.

Q.   And does this appear to be a document that you reviewed as well as part of your evaluation?

A.   Yes.

Q.   And this would be from his eighth grade year; correct?

A.   That's correct.

Q.   And that would be the year before he went back up to Indiana for a period of time; correct?

A.   Correct.

Q.   And in this particular record, it shows he had an English class of learning disability; is that correct?

A.   That's correct.

Q.   And he made straight As in that environment; correct?

A.   In the learning disability environment, which, of course as you know, from an academic point of view, is not graded in the same way that normal schools are graded.

Q.   I appreciate that.  But in this particular document, he received an A; correct?

A.   Yes, in the learning disability class.

Q.   And then you would agree with me that he had a C in science, and then a D-plus in science; correct?

A.   That's correct.

Q.   Had a couple of Ds, one in math and one in social

science and brought those up to Cs the second semester;

correct?

A.   That's correct.

Q.   And he got a C in PE?

A.   Yes.

Q.   Didn't fail out of the eighth grade; correct?

A.   I'm not sure what happened in the eighth grade.  He got

those grades.

Q.   Does it show that he had to repeat the eighth grade?

A.   It does not show that he had to repeat the eighth grade.

Q.   As part of your -- the information which you reviewed,

Dr. Woods, you also looked at medical -- and we've already

talked about some medical records; correct?

A.   Yes, sir.

Q.   And you looked at custodial records?

A.   Yes.

Q.   When you refer to custodial records, is that something

different from his institutional records?

A.   No.

Q.   So that would be a duplication?

A.   Yes.

Q.   And I believe it says that you reviewed -- and we talked

about this a minute ago -- declarations and/or medical and

social records of various family members; correct?

A.   That's correct.

290

Q.   And you list including Ernie Barrett, his father, and his mother, Gelene Dotson, and his former wife, Abby Stites; correct?

A.   Yes.

Q.   Now, as part of your initial evaluation, did you have an occasion to review the examination of a doctor by the name of Faust Bianco?

A.   I believe I did.  I certainly know that I saw records of Dr. Bianco.  Whether I reviewed the transcript, I don't recall.  But I certainly do recall seeing records of Dr. Bianco.

Q.   And do you recall specifically what records you reviewed of Dr. Bianco?

A.   Certainly I must have reviewed records of his testing. It may have been his testimony in which he described that. I don't recall raw data of his particularly.  I just recall there was limited testing.

Q.   So you reviewed more than just a single page affidavit saying that the defendant does not have any mental disease. Would you agree with that?

A.   I recall that, yes.

Q.   Did you review more documents than just the one page affidavit?

A.   I'm just saying I seem to recall looking at more documents than that.

MR. WILSON: Your Honor, at this time the government would make a request of counsel for Mr. Barrett to provide any additional documents from Dr. Bianco which has not been previously provided to the government.

MR. AUTRY: I don't know of any documents that haven't been provided to the government with respect to Dr. Bianco.

THE COURT: If you find any, will you hand them over?

MR. AUTRY: Yes, sir.

THE COURT: Thank you.

Q. (BY MR. WILSON) And the reason I ask that question, Dr. Woods, is because yesterday during your testimony you criticized the findings of Dr. Bianco; isn't that correct?

A. Yes.

Q. And you wouldn't have criticized his findings if all you looked at was just the single page affidavit; correct?

A. I'm not sure what the affidavit said, and I'm not sure what the transcript said -- his testimony said.

Q. I want to direct your attention -- and I apologize to the clerk, but I need to have you look at Government's Number 12.

A. Thank you.

Q. Doctor, have you had a moment to look at Government's Exhibit Number 12?

A.   Yes.

Q.   Do you recognize that, sir?

A.   Yes.

Q.   And is that one of the documents that you reviewed in reference to Faust Bianco, Ph.D.?

A.   Yes.

Q.   And do you recall seeing additional documents other than this one page affidavit?

A.   I may be incorrect, sir, but I also thought that I had access to Number 14 as well, but I may -- I may be incorrect about that.

Q.   And are you referring to an authorization for release of confidential information and records?

A.   No, I'm --

Q.   And then a second page with some questions and some numbers?

A.   No, sir.  I'm referring to 14, which has a list of testing on the right-hand side.  And some -- what test did you give to match your memory and impairment index.

Q.   You're talking about Page 2 of Government's Number 14; correct?

A.   I believe so.

Q.   So you believe you may have reviewed that as well?

A.   I may have, yes, sir.

Q.   Do you recall any other documents that you may have

received in reference to Dr. Bianco?

A.   No, I'm not actually -- I don't -- I'm not sure of this, but I seem to recall this particular document.  But I don't recall any others that I -- right off the bat, no.

Q.   But for purposes of today at this point, we've established that you, in fact, did review the affidavit, which is Government's Number 12; correct?

A.   That's correct.

MR. WILSON:  Move for admission of Government's Number 12.

THE COURT:  Any objection?

MR. AUTRY:  I don't object.  No objection.

THE COURT:  Government's Number 12 is admitted.

MR. AUTRY:  Well, Your Honor, let me -- let me amend that.  It's not a report, so we object to the characterization that it's a report.

THE COURT:  It's an affidavit.  But with that objection noted, it's admitted.

MR. AUTRY:  Thank you.

Q.   (BY MR. WILSON)  Dr. Woods, just for a moment, let's talk briefly about Number 14 again.

A.   Sure.

Q.   So I'm clear, you don't know whether or not you reviewed this or not?

A.   I'm not sure that I am, but given the array of testing

and my discussion of this testing, I would say that I reviewed this document as well.

Q. And so based upon your review of this document, you would agree that Dr. Bianco issued a series of tests to Mr. Barrett; correct?

A. That's correct.

Q. And I believe you testified yesterday that those tests were not -- were not complete?

A. That's correct.

Q. So, in fact, you did base your opinion and your testimony yesterday on the results of Government's Exhibit Number 14; correct?

A. I'm not sure. But I -- but because I don't recall exactly the data that I had of Dr. Bianco. But I certainly know that that one paragraph didn't include any of the discussions. It would not give you opportunity to say that whether it was complete or not. And looking at -- looking at 14, it's clear to me that this is a type -- this is also an incomplete battery of testing. And so -- and it was a type of discussion that I -- I made, and so I'm assuming that I looked at this document as well.

Q. All right. You would agree that -- even though you criticize the incomplete testing of Dr. Bianco, you would agree that Dr. Bianco, in an affidavit, stated that, "It is my opinion that any further neurological testing is

unwarranted at this time"?

A.   That's correct.

Q.   And that that took place as a result of an evaluation in around 2000, 2001; is that correct?

A.   I believe so, yes, sir.

Q.   That would be significantly closer in time to when you evaluated the defendant; correct?

A.   It would be closer in time.  I'm not sure what you mean by significantly closer.

Q.   Okay.

A.   Sure.

Q.   Thank you.  Now, I notice in your report that you didn't refer to that, reviewing Dr. Bianco's, but you also didn't refer to the fact that Mr. Barrett, the defendant, was evaluated by a Dr. Kathryn LaFortune; is that correct?

A.   That's correct.

Q.   And did you review Dr. LaFortune's report as part of your 2009 evaluation?

A.   I don't recall Dr. LaFortune.

Q.   I direct your attention to what's going to be labeled as Government's Exhibit Number 37.

A.   All right.

Q.   Take a moment if you will, look at that and see if you recognize that document.  I believe it should be five pages in length.

A.   I do recall this, yes.

Q.   Okay.  So you did review this?

A.   Yes.

Q.   And you'll agree with me, sir, that at the time of this particular evaluation, there was a discussion about posttraumatic stress; correct?

A.   Yes.

MR. AUTRY:  Your Honor, I'm sorry, I guess I didn't hear.  I didn't hear whether or not Dr. Woods had actually seen this document and relied on it.  I don't know if they --

MR. WILSON:  I can ask the question again.

Q.   (BY MR. WILSON)  I believe -- Dr. Woods, I believe you testified that he did -- that you did, in fact, look at this document; is that correct?

A.   That's correct.

MR. AUTRY:  Okay.  Thank you.

Q.   (BY MR. WILSON)  And you'll agree with me that there was a discussion regarding posttraumatic stress disorder?

A.   Yes.

Q.   And would you agree with me that, in this evaluation, it was determined that Mr. Barrett was not suffering from posttraumatic stress?

A.   Well, I would -- I would say that she -- no, I would not agree with that.

Q.   Okay.  Would you agree with me it says, and on the last page, Page 5, in the third paragraph of the summary, "He did report difficulties with concentration, but because he endorsed no other symptoms related to posttraumatic stress disorder, it is likely that his trouble concentrating has other causes"?

A.   That's part of what it says, yes.

Q.   Thank you.  Isn't it true, Dr. Woods, that no other psychiatrist or psychologist has diagnosed Mr. Barrett with posttraumatic stress?

A.   I don't recall whether Dr. Young did or not.  But other than Dr. Young, I think you're -- that's correct.

Q.   So are you saying Dr. Young did?

A.   No.  I'm saying I don't recall whether she did or not, but I'm saying --

Q.   Well, you relied upon her findings, did you not?

A.   Yes.

Q.   So you don't remember whether she found he had posttraumatic stress?

A.   I don't recall whether she -- I think that's what I said was I don't recall whether she did or not.  But other than her, I don't -- I don't remember anyone else.

Q.   And you would agree with me that you made no reference to Dr. LaFortune's report in your report; correct?

A.   That's correct.

Q.  You testified, I believe, yesterday being familiar with a Dr. Jeanne Russell?

A.  Yes.

Q.  And you reviewed some reports from Dr. Russell; correct?

A.  That's correct.

Q.  And that would include a 2003 psychological evaluation risk assessment; correct?

A.  Yes.

MR. WILSON:  And, Your Honor, for the record and for counsel, this is Government's Exhibit Number 34.  I'd ask the witness to look at that.

Q.  (BY MR. WILSON)  Have you had an opportunity to look at that, Dr. Woods?

A.  Yes, sir, I have.

Q.  And do you recognize that particular document?

A.  I do.

Q.  And is that a document that you reviewed as part of your evaluation in this particular case?

A.  Yes, it is.

MR. WILSON:  Move for admission of Government's Exhibit Number 34.

MR. AUTRY:  No objection.

THE COURT:  Government's Number 34 is admitted.

Q.  (BY MR. WILSON)  Now, Dr. Woods, I would direct your

attention to Page 9 of that report, sir.

A.  Yes.

Q.  And the top of the page, you'll agree with me that there's a heading which says personality assessment; correct?

A.  That's correct.

Q.  And you would agree with me, as part of this report, Dr. Russell found that, at the present time, and that being specifically December the 15th of 2003; correct?

A.  Correct.

Q.  That Mr. Barrett is not exhibiting symptoms of a major mental illness, and puts in parenthesis, schizophrenia, schizoaffective disorder, bipolar disorder, or major depression?

A.  That's what that first line says, yes.

Q.  Thank you.  And you'd agree with me that Dr. Russell, as part of her evaluation, reviewed the mental health admissions that you testified about yesterday?

A.  Yes.

Q.  And you'll agree with me that Dr. Woods -- excuse me -- that Dr. Russell did not diagnose the defendant with bipolar disorder; isn't that correct?

A.  Although she described history of symptoms of bipolar, she did not make that diagnosis, you're correct.

Q.  Thank you.  Nor did Dr. Bianco, correct?  He didn't

300

diagnose the defendant with bipolar; correct?

A.   He didn't diagnose with anything, that's correct.

Q.   Dr. LaFortune, no diagnosis of bipolar; is that correct?

A.   That's correct.

Q.   And, again, you -- the Bureau of Prison records, there's no diagnosis in the Bureau of Prisons of bipolar; correct?

A.   That's correct.

Q.   No treatment for bipolar in BOP; correct?

A.   That's correct.

Q.   Bipolar.  You'd agree that bipolar is not a condition which just simply comes and goes; is that correct?

A.   Well, it does come and go.

Q.   I mean, it manifests itself in episodes; correct?  But you don't have it today and don't have it tomorrow, and then have it Thursday and don't have it next Sunday; correct?

A.   Well, no, you don't not have it, but that doesn't mean that it doesn't manifest itself or not manifest itself.

Q.   So a person has it, but it just may not be apparent by manifestation at a particular time; correct?

A.   Yes.  Particularly in a prison setting as you mentioned.

Q.   And is it your testimony that, in a prison setting, it's less likely that a person will manifest bipolar characteristics?

A.   No.   What I'm -- what I'm saying --

Q.   I believe you testified yesterday that --

A.   May I --

          MR. AUTRY:   Excuse me.

          MR. WILSON:   I'm sorry, Judge.

          THE COURT:   Yeah, let him finish answering, please.

          MR. WILSON:   Sorry, Mr. Sidwell.

A.   No, what I'm saying is that, within a prison setting, you often may not see the symptoms manifest themselves as significantly or at all because you're in a much more structured setting.

Q.   (BY MR. WILSON)   Well, doesn't bipolar -- or, excuse me -- isn't bipolar triggered by stressors many times?

A.   It can be, yes.

Q.   And you'd agree with me that, being in a death penalty -- death row, that is a significant stressing situation; correct?

A.   Well, I agree with you because you didn't let me complete my question.   The answer is that's correct. However --

Q.   Thank you.   I didn't ask you for an explanation, sir. Did you agree with me?

A.   Okay.   Well, then yes.

Q.   Thank you.

A.   Okay.

Q.   And so is it your testimony that Mr. Barrett is not exhibiting characteristics of bipolar because he's on death row?

A.   No.   What I'm saying is that the symptoms --

Q.   I didn't ask you what you're saying.   My question is: Did you say that?

MR. AUTRY:   Your Honor, could he answer the question?

THE COURT:   He answered the question no.   That's good enough.   Let's get on with it.

MR. AUTRY:   Thank you.

Q.   (BY MR. WILSON)   Dr. Woods, you're not claiming that being incarcerated on death row is a treatment for bipolar, are you?

A.   I can't answer that question yes or no.   I'd have to explain it.

Q.   Dr. Woods, I believe that your testimony in this particular case, that you believe that the defendant, back in 1999 and as recent as 2017 when you evaluated Mr. Barrett, that he is suffering from bipolar disorder; correct?

A.   Yes.

Q.   Dr. Woods, you would also agree with me, sir, that as part of the diagnosis, it's important to eliminate other

possible causes of behavior; correct?

A.   Sure.

Q.   And do we refer to that as differential diagnosis?

A.   Yes.

Q.   And I believe that, specifically in your report, it's your belief that Mr. Barrett meets the diagnostic criteria for bipolar disorder, severe, 296.4x from the DSM-IV; correct?

A.   Correct.

Q.   DSM-IV-TR?

A.   Yes.

Q.   Would you agree with me, Dr. Woods, that in order to reach a primary -- and is that a primary diagnosis of Bipolar 1?

A.   I'm not sure what you mean by primary.

Q.   Well, isn't it true that, in order to reach a primary diagnosis of bipolar disorder, it must be established based on symptoms that remain once substances such as methamphetamine or cocaine or any other substances are no longer being used?

A.   I would like to see that, sir.  I don't recall no longer being used.

MR. WILSON:  And, Judge, may I approach?

THE COURT:  Yes.

Q.   (BY MR. WILSON)  Are you familiar with the DSM-5?

304

A.   Yes.

Q.   And what, for the record, is the DSM-5?

A.   The Diagnostic and Statistical Manual Fifth Edition, which is classification system for looking for what we call inter-rater reliability.  It is not comprehensive textbook of psychiatry.

Q.   I appreciate that, Doctor.  But you referred to the DSM-IV-TR in your report; correct?

A.   Correct.

Q.   And it's a reference which is used throughout the neuropsychiatry community; correct?

A.   It is used, yes.

Q.   And it's used to diagnose mental illnesses; correct?

A.   From a reliability point of view, yes.

Q.   Thank you.

A.   Is that the DSM-IV-TR?

Q.   I'm going to show you the 5 first, okay?

A.   Okay.

        MR. WILSON:  May I inquire from here, Judge, for a moment?

        THE COURT:  Yes.

        MR. AUTRY:  Judge, I'm going to object on relevance grounds to the use of DSM-5 which postdates Dr. Woods' examination of Mr. Barrett in 2009.

        THE COURT:  Yeah, why were we looking at this

edition?

MR. WILSON:  I'm going to go to that one, and I'm going to go to the IV, Judge, if you'll just give me a moment.

THE COURT:  Okay.

THE WITNESS:  Yes.

Q.  (BY MR. WILSON)  Do you -- did you have an opportunity to look at that?

A.  I did.

Q.  And would you agree with me that's from the DSM-5?

A.  That's correct.

Q.  And that's from the DSM-5 dealing with bipolar?

A.  That's correct.

Q.  And talking about differential diagnosis; correct?

A.  Yes, sir.

Q.  Talking about specifically substance/medication induced bipolar disorder?

A.  Yes.

Q.  And is that what you believe that --

A.  I'm sorry --

Q.  -- Mr. Barrett has?

A.  -- that's not correct.  That's a no.  Can I have that again, please?  Thank you.  That's correct.  Yes.

Q.  So it is correct?

A.  Yes.

Q.   And, again, will you agree with me that DSM-5 says a primary diagnosis of bipolar disorder must be established based on symptoms that remain once substances are no longer being used?

A.   Yes.

Q.   Now, counsel mentioned another version of the DSM. There's been a number of versions over the years of DSM; correct?

A.   There have been five.  There have been seven.

Q.   Because there was a IV, and then a IV-TR --

A.   That's correct.

Q.   -- specifically; correct?

A.   And a III and a III-R.

Q.   Now, I'm looking at the DSM-IV-TR.

A.   Yes.

Q.   And would you agree with me that that's, in fact, the document or the manual that you referenced in your report back in 20 -- 2009?

A.   That's correct.

Q.   And would you agree with me, from the -- from the DSM-IV-TR, that when a substance -- when the substance use or medication is judged not to fully account for the episode, for example, the episode continues for a considerable period autonomously after the substance is discontinued, the episode would count toward a diagnosis of

bipolar 1 disorder?

A.   That's correct.

Q.   And that's straight from --

MR. WILSON:  May I approach again, Judge?

THE COURT:  Yes.

THE WITNESS:  Thank you.  Appreciate that.

Q.   (BY MR. WILSON)  And just so we're clear, you would agree with me that the part we just talked about is from the DSM-IV-TR under bipolar disorders; correct?

A.   Correct.

Q.   And specifically under the same heading of differential diagnosis; correct?

A.   That's correct.

Q.   And under the same subheading of substance induced mood disorder; correct?

A.   That's correct.

Q.   So in essence -- I mean, not in essence, but do you agree with me that, in order to make a diagnosis of bipolar, a person has to be separate from the use of substances for a period of time?

A.   Yes.

Q.   But you would agree with me that the defendant was not separate from the use of substances at the time back in 1999?  He was on methamphetamine daily at the time of this murder; isn't that correct?

A.   Well, that is what he reports, but that certainly isn't what his testing in the -- if you look at the medical records from his hospitalizations, you will find that, even though even then he reported, his toxicology screens were negative for methamphetamines.  They were positive for cannabis, but they were negative for methamphetamines even when he reported being on -- being on methamphetamine.

Q.   What about his hospitalization in 1986?

A.   Yes, if you look at -- and I think that's one particularly.  If you look at -- if you look at his hospitalization in 1986, what you see is there's one urine test that is positive for methamphetamines.  A urine toxicology means that it's a presence, but you're not under the influence.  If you look at his blood urine test, they are all negative for methamphetamines.

Q.   Dr. Woods, are you trying to tell this Court that, in 2000 -- excuse me -- in 1999, the defendant was not using methamphetamine?

A.   Well, you were just asking about 1986, sir.

Q.   Well, you said, in 1999, looking at the medical records, he was not using methamphetamine?

A.   No, what I said was --

Q.   I'm sorry.  In 1999 at the time of the crime.

A.   You asked me about 1986.

Q.   The last series of questions was about '86.

A.  Right.

Q.  But I believe you testified, at the time of the murder --

A.  Right.

Q.  -- which was in September of 1999; correct?

A.  Correct.

Q.  That you testified that the medical records show that he was not using methamphetamine?

A.  I did not see a toxicology report for the 1999 medical records.  If you could show me that, I'd appreciate it.

Q.  I apologize, maybe I just missed something.  Did you not just testify a few moments ago that the medical records did not show that the defendant was using methamphetamine in 1999?

A.  No, you asked me about 1986.  We talked about the hospitalization in 1986.  Then you switched to 1999.  We did not talk about whether he was on methamphetamines in 1999.  He said that he was on methamphetamines also in 1986 and 1995.  When you look at the toxicology panel, there was no methamphetamines that were found in his blood during that time, and only once in 1986 was it found in his urine.  I did not find toxicology panels for 1999, so I don't know --

Q.  Okay.

A.  -- in fact if he was using methamphetamines during that time.

Q.   Isn't it true that in the medical history in 1999, the defendant says, "I was using methamphetamine daily"?

A.   And he told me that.

Q.   Okay.   You have no reason to doubt that, do you?

A.   In fact, the records -- the records do not reflect that. That's the point I'm trying to make.

Q.   You looked at Dr. Woods --

A.   I'm sorry, I am Dr. Woods.

Q.   I'm sorry.   Long morning already.   Long night.

A.   I understand.

Q.   Dr. Pitt, you looked at his evaluation; correct?

A.   Yes.

Q.   And the transcript; correct?

A.   Yes.

Q.   And you agree with me the defendant told Dr. Pitt numerous times there was never a time I wasn't using methamphetamine?

A.   And he told me the same thing.   However, when you look at the toxicology panels, that's not accurate.

Q.   And the toxicology pattern in 1999, what does it say?

A.   There is no toxicology panel so we can't tell.

Q.   So if there's not a record that you looked at, you did not rely upon Mr. Barrett's own admission he was using methamphetamine daily?

A.   Well, I'm caught in the same situation that you present

311

before -- before Mr. Wilson. I can't rely upon it sometime and not rely upon it other time. To the degree that I can, I've got to look at the records.

Q. Dr. Woods, look at Government's Exhibit Number 11 for me, please.

A. Sure.

Q. Do you recognize that, sir?

A. Yes, I do.

Q. Would you agree with me that that's a record that you reviewed as part of your evaluation in this case?

A. Yes, sir.

Q. And you'd agree with me that this is an emergency room report from Sequoyah Memorial Hospital back in January of 1995?

A. I absolutely do.

Q. And that this is a situation where the defendant showed up with his mom saying, "I'm losing my mind"; correct?

A. That's correct.

Q. And there was a -- there was a drug screen that day; correct?

A. Urine drug screen.

Q. That's correct?

A. Correct.

Q. And the findings of that's on Page 2; correct?

A. Right.

312

Q.   And it shows positive for amphetamine; correct?

A.   On the first of the urine drug screen --

Q.   Thank you.

A.   -- that's correct.

Q.   Did you find any other drug screens which were --

A.   Yes.

Q.   -- which were --

A.   There was a blood drug -- there was a blood drug screen that followed this urine drug screen which, in fact, showed cannabinol but no methamphetamine.  So what we see is a urine drug screen which doesn't talk about being under the influence.  A blood drug screen only speaks to being under the influence.  A urine drug screen only speaks to the presence of methamphetamines.  It does not speak to being under the influence.  And so we see that.  And particularly, with amphetamines, which is a drug that will last sometimes for weeks in a system.  So you're absolutely correct that he was -- there was a presence of methamphetamines there.  But when you look at the blood, which was within the next couple of pages, you'll see that the blood drug screen was negative.  It was only cannabinol.  There was no evidence of methamphetamine in his blood.

Q.   And you'd agree with me, in 1995, there was no diagnosis of bipolar; correct?

A.   That's correct.  But there were symptoms of bipolar but

no diagnosis.

Q.   As a matter of fact, the doctor found it was substance abuse disorder; correct?

A.   There were two.  Dr. Herndon noted that it was -- the person that admitted him said that it was major depressive disorder with a high potential for suicidal diagnosis.  Dr. Ramirez described it as a marital problems and a mixed substance abuse.  However, if you look at, in fact, the -- they looked at both drug and medical, but they treated him for -- with Haldol, which is an antipsychotic, which is not used for chemical dependency.  And they describe symptoms of bipolar disorder.  So you're right, there's no diagnosis even though there was symptoms.

Q.   And he was discharged with no medications; correct?

A.   After the Haldol, that's correct.

Q.   So is it your testimony that, based upon your review, that in 1986 Mr. Barrett was, in fact, suffering from bipolar disorder?

A.   It's my testimony absolutely.

Q.   And you made that finding understanding that there needs to be a period of time where there is no -- there is no drug or substance affecting that diagnosis; isn't that correct?

A.   That's part of the differential diagnosis, that's correct.  There are other aspects of it that make it very clear that he was suffering from a bipolar disorder and I'm

314

sure -- and we can talk about those if you like.

Q. As part of your evaluation, you also discuss looking at a report from Dr. Sharp; is that correct?

A. Correct.

Q. And would you agree with me that, at the time that Dr. Sharp was evaluating Mr. Barrett, that he was still using illegal drugs?

A. I'm not clear.

Q. Are you aware that that's what the defendant reported to Dr. Pitt?

A. I am aware of that, yes.

Q. Now, as part of your report, Dr. Woods, you also made a finding that Mr. Barrett could not rationally assist his attorneys in the preparation of his defense; isn't that correct?

A. In my 2009 report, that's correct.

Q. Did you interview John Echols as part of your evaluation?

A. Yes.

Q. And did Mr. Echols report to you that his -- his client could not rationally assist him?

A. He did not report that to me, no.

Q. Did you interview Geoffrey Standing Bear?

A. No, I did not.

Q. He was also Mr. Barrett's counsel back in early 2000s;

correct?

A.   Yes.

Q.   Did you interview Jack Gordon?

A.   No, I did not.

Q.   Did you interview Roger Hilfiger?

A.   No, sir, I did not.

Q.   Did you interview Bret Smith?

A.   No, I did not.

Q.   And despite the fact that you didn't interview all but one of his lawyers, it's your opinion that he was unable to rationally assist his lawyers in the preparation of his defense; is that correct?

A.   That's correct.  That was the finding I made in 2009.

Q.   And you still stand by that finding; is that correct?

A.   If you notice in my second addendum, I didn't add that in my second report.  I -- you know --

Q.   That's exactly right.  That's why I'm asking that question.  And for the record, there was a long pause before you answered; is that correct?

A.   Yes.  Yes.

Q.   Question again:  Do you still stand by your 2009 report that the defendant was unable to rationally assist his attorneys in the preparation of his defense?

A.   Yes, that's my belief.

Q.   Now, you understand, Dr. Woods, and you've done -- been

316

involved in capital cases in the federal system for a number of years; correct?

A.  Yes.

Q.  And non-capital cases in the federal system for a number of years; correct?

A.  That's correct.

Q.  Have you been involved in state cases in the state of Oklahoma?

A.  I don't -- I don't know that I have.

Q.  Okay.  Well, let's exclude those for a second.  But you understand that, under the law in the federal system, that if an attorney believes that his client is unable to assist him, there's a mechanism where the attorney can file a motion for determination of competency in that particular case.  Are you aware of that?

A.  Yes.

Q.  And that can be done by the defense counsel?

A.  Yes.

Q.  It can be done by the government; correct?

A.  Yes.

Q.  It can be done by the court in the court's own observations; correct?

A.  That's correct.

Q.  And you'd agree with me that Mr. Echols never filed any motion for determination of competency in this case, did

he?

A.  No.  That's correct.

Q.  Mr. -- Mr. Smith never filed one; correct?

A.  That's correct.

Q.  Mr. Hilfiger never filed one; correct?

A.  That's correct.

Q.  Now, I know you testified that you're not familiar necessarily with the state system, but in the state system here in Oklahoma, the same basic procedure applies.

A.  Sure.  I understand.

Q.  Okay.  And based upon your review, you would agree with me that Mr. Echols did not file one either in the state case or in the federal case; correct?

A.  That's correct.

Q.  Nor did Mr. Gordon or Mr. Standing Bear; correct?

A.  That's correct.

Q.  Now, you also, as part of your report in 2009, believe that, at the time, the defendant believed his actions were right?

A.  Yes.

Q.  And I believe you also find that Mr. Barrett could not understand the difference between right and wrong on September -- in September of -- excuse me -- of 1999; isn't that correct?

A.  And again there's a long pause.  I certainly believe

that he believed his actions were right, that's correct.

Q.  Well, I want to direct your attention to your own report.

A.  Sure.

Q.  And I want to direct your attention to specifically Paragraph Number 78.

A.  That's correct.  Yes, sir.

Q.  So you would agree with me that, in your report, you say that you believe he did not understand the difference between right and wrong?

A.  Correct.  Because he thought that his actions were right.

Q.  And I assume you're aware that Mr. Barrett, to this day, contends he didn't actually shoot Trooper Eales; isn't that correct?

A.  I'm aware that he knows that he shot, but I'm not clear that differentiating that he shot Trooper Eagles *(sic)*.  He acknowledges that he shot, but he doesn't believe that he -- I guess that would be correct -- that he shot Trooper Eagles, that's correct.

Q.  As a matter of fact, he told Dr. Pitt that just recently, that he didn't -- he didn't shoot -- actually shoot the trooper, Trooper Eales; isn't that correct?

A.  I'm sorry, Mr. Wilson, I'm struggling with that because I know that he says that he shot -- that he acknowledges

that he shot.  I don't recall him saying specifically that he doesn't -- doesn't believe he shot Trooper Eagles.  It's the specificity of it that I'm not clear about.

MR. WILSON:  Have just one moment, Your Honor?

THE COURT:  Yes.

MR. WILSON:  Thank you.

Q.  (BY MR. WILSON)  Dr. Woods, we've been talking about, again, your report.  I want to direct your attention back to Paragraph 22 at this point.

A.  Yes, sir.

Q.  A significant portion of your report and also your testimony yesterday dealt with genetic loading?

A.  Yes, sir.

Q.  And the, if you will in my terms, genetic predisposition, if you will, to certain both substance related abuse and also bipolar or mood disorder; correct?

A.  Yes, sir.

Q.  And as a matter of fact, in your report you spend a number of paragraphs setting forth some of the family history of mood disorders and depression, anxiety, and possible bipolar; correct?

A.  Yes.

Q.  And then at the bottom of page -- excuse me -- on the latter portion of Paragraph 22, you make a statement, "These factors likely potentiated Mr. Barrett's genetic

320

predisposition for the development of mental disorders and chemical dependency, as well as exposing him to risk of increased compromise of his neurocognitive development and functioning"; is that correct?

A.   Yes, sir.

Q.   And you still stand by that belief; is that correct?

A.   Absolutely.

Q.   Now, you would agree with me that that same genetic predisposition would apply to Stephen Barrett?

A.   Potentially, yes.

Q.   When you say potentially, that would indicate some qualifications of your response; correct?

A.   Well, yes.

Q.   He's the brother; correct?

A.   Correct.

Q.   And he has the same father, same mother?

A.   Yes.

Q.   But we understand genetics, not everyone is exactly the same; correct?

A.   Well, and particularly when you're talking about these are -- and I think I said this yesterday -- these are the types of disorders that are, when we have a heterogeneous distribution like this, like diabetes.  So one family member may have full-blown type 1 diabetes, another family may have type 2, another family member may not have diabetes at

321

all.

Q.   But the potential was there for Stephen to have the same predisposition; correct?

A.   There's that potential, yes.

Q.   But you understand that Stephen testified here yesterday; right?

A.   Yes.

Q.   And you weren't in the courtroom at that time, were you?

A.   That's correct.

Q.   But you've -- have you reviewed any statements of Mr. Barrett?  And I'm referring to Mr. Barrett, Stephen Barrett?

A.   I think so, but I have some understanding of who he is and how well he's done, etc.

Q.   Okay.

A.   Sure.

Q.   And you agree with me that Stephen went to college?

A.   Yes.

Q.   Got a degree and a master's; correct?

A.   Yes.

Q.   Became a football coach and a school administrator; correct?

A.   That's correct.

Q.   He had an episode in his life regarding narcotics, too;

correct?

A.   Yes.

Q.   Almost or -- almost overdosed; correct?

A.   I think so.  I don't -- I don't recall exactly, but I know he did have a period of time of both heavy drinking and narcotics, yes.

Q.   Yesterday when you were testifying about the previous medical actual in-patient treatments that Mr. Barrett has had in his past --

A.   Yes.

Q.   -- I believe one of the items that you talked about was the fact that the facilities prescribed him certain medications which were consistent with treating the effects of bipolar; correct?

A.   Of a mood disorder.

Q.   A mood disorder?

A.   Yes.  In fact, I said they were not consistent with bipolar.  We talked about the manic switch.

Q.   And so it's your testimony that they just -- they missed it; right?

A.   They didn't have all the data that I had.

Q.   And each time you would agree with me that every one of those diagnosis contained substance abuse; isn't that correct?

A.   Oh, as they should.  As they -- in terms of their

differential diagnosis, absolutely.

Q.  And I believe you agree with me that, after the '95 discharge specifically, there was no medications prescribed to the defendant; is that correct?

A.  As I recall, he left involuntarily and -- and of course that you would not prescribe medications if someone were to leave.  His mother came and picked him up.  So that's correct.

MR. WILSON:  Almost done I believe, Judge.  May I have just a moment?

THE COURT:  Yes.

Q.  (BY MR. WILSON)  Just one thing I want to make sure that I'm clear on, Dr. Woods.  You testified that you are not aware of any testing regarding -- or strike that.  On the 1999 event --

A.  Yes.

Q.  -- the shooting --

A.  Yes.

Q.  -- Mr. Barrett himself was shot; correct?

A.  Correct.

Q.  And he was hospitalized; correct?

A.  Yes.

Q.  And you would agree that there was a urine sample taken at that time?

A.  I would assume there was.  And, in fact, I looked and

324

there was a tox -- a sheet that said tox panel. I was not able to find the results of that tox panel.

MR. WILSON: May I approach, Judge?

THE COURT: Yes.

Q. (BY MR. WILSON) Well, better yet, just turn to Government's Exhibit Number 7.

A. Sure.

Q. And specifically I'd direct your attention -- it's a multipage exhibit, so look at Page Number 28, which is also DISC 000409. And would you agree with me, Dr. Woods -- well, I'm sorry. Go ahead and take a look at that.

A. Yes, I see it right here.

Q. Now, would you agree with me that this is a report from Saint Francis Hospital?

A. That's correct.

Q. And Saint Francis is the treating facility for Mr. Barrett's gunshot wounds; correct?

A. Yes, sir.

Q. And you would agree with me that is a report of a urine sample screening; correct?

A. That's correct.

Q. And which shows positive for amphetamines; correct?

A. And cannabinoids, that's correct.

Q. And cannabis?

A. That's correct.

325

Q.  But it also specifically says high levels of structurally related amines may cross-react with the amphetamine/methamphetamine test; correct?

A.  Correct.

Q.  So a urine screen done on day of the shooting --

A.  Yes.

Q.  -- or maybe actually the next day, early morning hours --

A.  Right.

Q.  -- positive for methamphetamine; correct?

A.  That's correct.

Q.  So now having shown you that, does that change your opinion that Mr. Barrett was, in fact, using methamphetamine as he told you on a daily basis on the day of the shooting?

A.  Well, what it tells me is that he was using it on that day.  That's a -- that's a urine test, so you're correct.

Q.  And he told you that he had been using it every day consistently; isn't that correct?

A.  Well, he said he had been using it all his life, and we know better now.

Q.  All right.  I would agree with that.  But he told you that, at the time of this shooting, he was daily using methamphetamine; correct?

A.  Yes.

Q.   And despite that, you're still testifying in this court that, on that day, he was, in fact, bipolar?

A.   Of course.  Of course.  People --

Q.   And you're making that diagnosis even though, according to the DSM-IV and the DSM-5, there needs to be a period when substances are not present; isn't that correct?

A.   When the diagnosis is made.  But people that are bipolar also use drugs.  That's what chemical -- that's what substance -- dual diagnosis is all about.

Q.   And again --

A.   If I may finish.

Q.   Thank you.

A.   So the idea that someone is using drugs and is not bipolar is -- just doesn't make sense.

Q.   And, again, you're the first person to do a discharge summary diagnosis of bipolar?

A.   But not the first person to see the symptoms.

Q.   Thank you.  But my question again -- do you understand my question?

A.   I got the question.  I hope answered it correctly.

Q.   All right.  And so my question is yes or no.  Yes or no, you are the first person to diagnose that gentleman seated there with bipolar?

A.   Yes.

Q.   And you would agree with me that the other persons who

evaluated him in 1986, 1986, 1995, 2000, 2002, and 2003 were all much -- were all closer in time to your 2009 evaluation?

A.   With less data, that's correct.

Q.   Thank you.

A.   Thank you.

Q.   And you agree with me, Doctor, that you don't base your diagnosis on what another medical provider prescribed; isn't that correct?

A.   I'm not sure -- I'm not sure what you mean.

Q.   You testified yesterday that you looked at what the other doctors prescribed back in 1986 and 1995 to determine he had bipolar.  Isn't that what you testified in here yesterday?

A.   No, because they didn't treat him for bipolar.

Q.   But you said that you looked at that as the basis of saying this guy was obviously suffering from bipolar because they gave him those prescriptions.  Isn't that what you testified to yesterday?

A.   Because they treated his mental illness rather than his chemical dependency.

Q.   And so you base your diagnosis --

A.   Wait, wait, wait.  Let --

         THE COURT:  Let him finish.

         MR. WILSON:  Sorry, Judge.  Thank you.

A.   Because they gave him psychiatric medications rather than the kinds of medications that you would give someone that was, say, in a drug-induced psychosis, or that was withdrawing from medication.   They didn't give him any antabuse.   They didn't give him the kinds of drugs that you would give someone that was chemically dependent only and treating the chemical dependency only.   You would never give someone that was chemically dependent only Haldol.   You would never give someone that was chemically dependent only Asendin.   You would never give someone that was chemically dependent only any antidepressants.   So the idea that they would treat this person with medications that are used in a psychiatric setting says that they spoke to the psychiatric disorder that he had.   And if you look, sir, through all of these records, the symptoms that they -- they discuss are symptoms of bipolar disorder that are inconsistent with chemical dependency.

Q.   And each time the doctors, when they looked at him, they determined it was a personality disorder; correct?

A.   Not each time.   That's not correct.   In 1986, they -- they rule out was a mixed personality disorder.   And if you look at the discharge diagnosis, the -- on that particular, the toxicology panel was negative at the time that they were making the diagnosis of a mixed substance abuse.

Q.   So this missed the diagnosis?

A.   They didn't have all the data that we have.  That's the difference.

Q.   And even though he reported on daily using drugs at this time?

A.   He obviously didn't.

Q.   And he was exhibiting behavior consistent with someone who was high on methamphetamine or other substance; correct?

A.   And that's the point, Mr. Wilson.  The behaviors that are described in 1986, in 19 -- in 1995 are not the behaviors that are consistent with someone that's high on methamphetamines.  If you recognize the symptoms of methamphetamines, they don't include mood lability, they don't include mood swings, they don't include rapid thinking, exactly the kinds of symptoms that they described in those hospitalizations.

Q.   But despite that, all of these other physicians didn't diagnose him with bipolar; correct?

A.   That's correct.  They didn't have the data.

     MR. WILSON:  I have no further questions.  Pass the witness, Judge.

     THE WITNESS:  Thank you, sir.

     THE COURT:  Dr. Woods, we've been going a long time.  Would you like to take a break before we go to redirect?

     THE WITNESS:  I need to take a break.

THE COURT:  We'll take 15 minutes.

*(Off the record at 11:00 a.m.)*

*(Back on the record at 11:17 a.m.)*

THE COURT:  Mr. Autry, you may redirect.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q.  Dr. Woods, toward the end of Mr. Wilson's cross-examination and other parts of his cross-examination, he asked you repeatedly whether or not you were the only doctor or mental health professional ever to diagnose Mr. Barrett with bipolar disorder.  Do you remember those questions?

A.  Yes.

Q.  Could you look at Government's Exhibit Number 9.  Do you have that, sir?

A.  Yes, sir.

Q.  What is that?

A.  This is the Bill Willis Community Mental Center referral form.

Q.  Is that a record that you're familiar with?

A.  Yes, sir.

Q.  And is that a record that you reviewed --

A.  Yes, sir.

Q.  -- in preparation for your reports and etc.?

A.  That's correct.

Q.   Could you look where it says provisional diagnosis?

A.   Yes, sir.

Q.   What does it say as to Axis I?

A.   Bipolar.

Q.   That's from the Bill Willis Community Mental Health Center 1-20-95; is that correct?

A.   That's correct.

Q.   All right.  Could you look at the reason for referral?

A.   Yes.  Client was brought into the ER at Sequoyah Memorial by his mother.  He reportedly is complaining of he is, quote, losing his mind.  He denies being suicidal, homicidal, but relates he doesn't know what he might do. Extremely agitated.  Came in, was given Haldol.

Q.   And Haldol is an antipsychotic?

A.   That's correct.

Q.   So Mr. Wilson was incorrect when he said to you that you're the only doctor or mental health professional ever to diagnose Mr. Barrett with bipolar; is that correct?

A.   That's correct.

Q.   You were asked about Dr. Sharp --

A.   Yes.

Q.   -- do you remember that?

A.   Yes.

Q.   Asking whether or not, in Dr. Sharp's report, Mr. Barrett indicated to him that he was still using

332

drugs?

A.   Yes.

Q.   Do you recall that?

A.   Yes.

          MR. AUTRY:   Could you turn to -- well, excuse me. First of all, Your Honor, we would move to introduce into evidence Government's Exhibit Number 9, the Bill Willis Community Health Center referral form.

          MR. WILSON:   No objection, Your Honor.

          THE COURT:   Government's Number 9 is admitted.

          MR. AUTRY:   Thank you.   And I apologize I got a little out of order.

Q.   (BY MR. AUTRY)   Could you turn, Doctor, to Government's Exhibit 16?

A.   Yes, sir.

Q.   What is that?

A.   This is the report of Mr. -- of Dr. Sharp, assessment dated September 28, 2002.

Q.   All right.   Could you turn to Page 7 of that report?

A.   Yes.

Q.   Do you have that?

A.   Yes, I do.

Q.   Under Section 6, Diagnostic Impressions, Axis I, do you see that?

A.   Yes, sir.

333

Q.   What does it say with respect to amphetamine

dependence?

A.   Sustained full remission in a controlled environment.

Q.   What does that mean?

A.   That means that he was not using methamphetamines and

his methamphetamine disorder had been -- it's under

remission, it was gone in a sustained environment.

Q.   All right.  And does it say the same with respect to

cannabis dependence, alcohol dependence?

A.   That's correct.

Q.   All right.  And if you could turn back to the first page

of Government's 16.

A.   Yes.

Q.   What's the date of the assessment?

A.   September 28, 2002.

Q.   Was Mr. Barrett in custody at that time?

A.   That's correct.

Q.   Was Mr. Barrett in custody since Trooper Eales was

killed in September of 1999?

A.   That's correct.

Q.   Okay.  So when Mr. Wilson asked you about Mr. Barrett's

drug use at the time Dr. Sharp examined him, his finding was

full remission because he's in custody?

A.   That's correct.

Q.   All right.

334

MR. AUTRY:  We would move for the admission of Government's Exhibit 16.

MR. WILSON:  No objection, Your Honor.

THE COURT:  Government's 16 is admitted.

Q.  (By MR. AUTRY)  You were asked a series of questions about this steel ball incident where Mr. Barrett was struck in the head when he was in elementary school?

A.  Yes.

Q.  And it was emphasized to you on cross-examination that there was no medical report indicating that this event occurred; is that correct?

A.  That's correct.

Q.  Does the absence of a medical report indicate that the incident Mr. Barrett described never occurred?

A.  No.

Q.  Okay.  He told you about it; right?

A.  That's correct.

Q.  He told Dr. Pitt about it?

A.  Yes.

Q.  He told Dr. Price about it?

A.  Yes.

Q.  He told Dr. LaFortune about it?

A.  Yes.

Q.  Did he tell Dr. Russell about it?

A.  I don't recall.

Q. Okay.  Could you look at Government's Exhibit 34?

A. Yes.

Q. And what is that?  What is government's --

A. This is the evaluation of Dr. Russell.

Q. All right.

A. Dated December 16th, 2003.

Q. See if I can find it here.  Would you look at page -- at page -- let's see here -- Page 5 of that report --

A. Yes.

Q. -- where it says medical --

A. Yes.

Q. -- at the bottom of the page, do you see that?

A. Yes.

Q. Could you read the first sentence of --

A. Mr. Barrett reported having a head injury while in grade school when he was knocked unconscious after being hit by a steel ball.

Q. All right.  So pretty much every mental health professional or doctor that he's talked to after his arrest in this case, he gave the same information about his head injury?

A. Yes.

Q. Are you also aware that Mr. Barrett reported head injuries when he was about 16 or 17 years old when he was beaten by the police and had his jaw broken?

A.   That's correct.

Q.   Is that a head injury?

A.   Yes.

Q.   Now, Dr. Young found that Mr. Barrett had neuropsychological deficits; correct?

A.   That's correct.

Q.   Brain damage?

A.   That's correct.

Q.   Damage to the frontal lobes of his brain?

A.   And to the temporal lobes.

Q.   All right.  Did Dr. Price find neurological deficits in Mr. Barrett?

A.   Yes.

Q.   And part of what Dr. Young relied upon in making that finding was Mr. Barrett's history of previous head injuries; is that correct?

A.   She relied upon that, yes.

Q.   All right.  Did the results speak for themselves with respect to Dr. Young's neuropsychological and neurological findings with respect to Mr. Barrett?

A.   Well, they don't necessarily speak to the steel ball being true or not.

Q.   Sure.

A.   But what they do speak to is that he clearly has neurological impairments that are consistent with the type

337

of head injuries that he describes.

Q.   Okay.   Thank you.   You were asked about Mr. Barrett's school records.   Do you recall those questions?

A.   Yes.

Q.   Okay.   Did Dr. Sharp find that learning disorder or learning disability was a rule-out that required further testing in his opinion?

A.   Yes.

Q.   Did Dr. Price, one of the government's own doctors, find that Mr. Barrett had a learning disorder not otherwise specified?

A.   That's correct.

Q.   Did Dr. Young find that Mr. Barrett had a learning disorder or learning disabilities?

A.   That's correct.

Q.   Okay.   Has there been any doctor, really, who's looked at Mr. Barrett since this case started back in 1999 who has said that he has no learning disabilities?

A.   I think the only one would be Dr. Bianco, who did an incomplete battery in my opinion.

Q.   All right.   Speaking of Dr. Bianco, I asked you some questions about him yesterday; correct?

A.   Yes.

Q.   And you're familiar with the fact that Drs. Myora and Bigler have looked at Dr. Bianco's testing; is that

correct?

A.   That's correct.

Q.   And they found that his testing was incomplete, didn't they?

MR. WILSON:   Objection to what these other doctors found.

THE COURT:   Well, we got -- we have the record, so the record speaks for itself.  Objection sustained.

MR. AUTRY:   All right.

Q.   (BY MR. AUTRY)  You were asked some questions, Dr. Woods, about the DSM-IV-TR versus the DSM-5?

A.   DSM-IV-TR, correct.

Q.   Okay.  TR?

A.   Yes.

Q.   Is there a difference between the DSM-IV-TR and the DSM-5 with respect to what's known as a manic shift?

A.   I believe the DSM-5 used -- subsumes that under the area that doctor -- that Mr. Wilson was describing in terms of the medication or substance induced bipolar disorder.

Q.   All right.  Now, what's the distinction there between the IV-TR or the TR-IV and the 5?

A.   Well, the distinction is that -- and the distinction is that the substance induced medication -- medication bipolar disorder refers to substance that it can, in fact, induce symptoms that are consistent with a bipolar disorder.

Q.  All right.

A.  Methamphetamine is not a substance that can induce symptoms consistent with a bipolar disorder.  It can induce symptoms of paranoia, which everyone has acknowledged Mr. Barrett to have had, even when he was incarcerated, that he continues to have.  And it's also consistent with the -- the anger and reactivity.  But methamphetamine doesn't fit under that medication substance induced because it doesn't induce symptoms that are consistent with a bipolar disorder.

Q.  All right.

A.  It doesn't induce mood lability.  It doesn't induce pressured speech.  It doesn't induce the kind of mood swings that are described by family members in Dr. Russell's report, and other situations where, in fact, they had no idea of bipolar disorder.

Q.  All right.  Could you just summarize, if you could, what you found in Mr. Barrett's medical records and the reports of analysis by various doctors that indicate symptoms of bipolar disorder in Mr. Barrett?

A.  Sure.  If we look at Exhibit 34, Page 9 for doctor -- this is a -- this is Dr. Russell, she notes under personality assessment, even though as doctor -- Mr. Wilson said, at this first sentence says, at the present time Mr. Barrett is not exhibiting symptoms of a major mental

illness.  She goes on to note, persons close to Mr. Barrett at different times in his life report observing symptoms of what they believe to be mental illness.  For example, his ex-wife described him as too emotional and believed he had marital problems due to his mood swings.  She --

Q.  Does that say mental problems or marital problems?

A.  Mental.  I'm sorry.  Mental problems due to his mood swings.  She further described him as suffering deep depressions during which time he couldn't work.  His son, Toby, described him as having dramatic mood fluctuations and believed he was -- he has some type of chemical imbalance.  Mr. Barrett's mother also described her son as having intense emotions and dramatic mood fluctuations.

Again, these are family members, but these are family members that describe specific symptoms that are consistent with bipolar disorder that one does not see in methamphetamine -- in a methamphetamine use.  And so they are completely different than one might think.  You can't just say all drugs create symptoms.  We are talking about specific types of symptoms.

Q.  Okay.

A.  If you look at the -- and, I'm sorry, I don't -- I've got the page numbers here, but I don't have the exhibit.  I think it's Exhibit 51, perhaps, of the medical records.

Q.  Is that petitioner's exhibit or --

341

A.  I believe it is.  It's the records that I had.  It's the medical records from the hospitalizations.

Q.  Okay.  51 Petitioner's.

A.  Thank you.  This is it.  Got it.  Okay.  I apologize. Try to find these.  On page -- these are not paginated. Well, let me just review these records.

Q.  Okay.

A.  In the 19 -- I'm sorry.  In the records for 1995, it's noted that he was not sleeping for a few days.  He had lack of concentration.  He had rapid thought -- rapid thought responses.  Again, yesterday I talked about the pressured speech and the flight of ideas that are part of a bipolar disorder.  This was at a time when his urine tox panel was negative.  And, again, in 1995 they talk -- his mother, on the admission, talks about classic symptoms of bipolar, mood swings, etc.  He's described, again, as a drug abuser. However, a major depression.  Emotionally labile.  We see those terms of art, emotionally labile, in the January 20 -- I mean, January 20, 1995.  We also see a consent for drug therapy and depression.  So what we see, in fact, is a doctor in 1995, and through today, you have to have a patient sign in order to give them medications, and you have to tell them what the risks and benefits of those medications are, of what use those medications will be.  You have to identify the medications they are given.  And what

342

we are seeing is that he's given medications for a mood disorder.  He's not given medications for methamphetamine withdrawal.  He's not given medication for the type of paranoia or reactivity that you might see in methamphetamines.  Again --

THE COURT:  Excuse me, Dr. Woods.  What is that you're reading from there?

THE WITNESS:  I'm reading from notes that I took on the medical records, Your Honor.

THE COURT:  When did you take those notes?

THE WITNESS:  I took these notes last night.

THE COURT:  Okay.

MR. AUTRY:  Can he continue, Your Honor?

THE COURT:  Yes.

MR. AUTRY:  Okay.  Thank you, sir.

THE COURT:  Go ahead.

A.  Okay.  Again, when he was hospitalized in 1985, he was described as having a depressive neurosis with suicidal potential that was extremely high.  If you look at the discharge summary of that 28 day, Dr. Ramirez does say that he diagnosed him with a mixed substance abuse and marital problems.  But also within that, with the discharge summary, the tox screen was negative.

So what we're seeing and what I think was a bit confusing when we talked about the DSM and that

substance induced medication symptoms, it has to be a medication or a drug that, in fact, creates symptoms that are consistent with a bipolar disorder.  If the symptoms aren't consistent with a bipolar disorder, that helps you differentiate whether the drugs or the -- whether the drugs that are perhaps being taken are the cause for the behaviors that you're seeing.  And the part that was confusing in my colloquy with Mr. Wilson was that it's not that any drug can -- has to be eliminated.  It has to be a drug that creates those symptoms of bipolar disorder.  And, in fact, methamphetamines do not create the constellation of symptoms that are described from 1986 on two occasions, in 1995, and can -- even through Dr. Russell's report, Dr. Sharp's report that are consistent with bipolar disorder.

Q.   (BY MR. AUTRY)  All right.

A.   The important thing to me is for 1986, 1995, even 2003, you may have -- and in 1986 and 1995, these are captured in the medical records.  But in 2003 when Dr. Russell describes, very clearly, the symptoms of -- that his son, his ex-wife, and his mother described, this is at a time when, again, bipolar disorder was not considered.

Q.   Okay.  I think one of the points Mr. Wilson was trying to make with those questions and that series of questions is if you had somebody who is a drug user, okay?

A.   Yes.

344

Q.   According, I guess, to the DSM-5 -- and I'm probably butchering this -- you had somebody is a drug user, you can only make a diagnosis, or a proper diagnosis of bipolar disorder, for example, when the person is not on drugs.   Is that --

A.   That's an incorrect reading of it.

Q.   All right.   Well, let me ask you this:   In 2009 you examined Mr. Barrett; correct?

A.   Yes.

Q.   And you concluded that he had bipolar disorder?

A.   That's correct.

Q.   And Mr. Barrett was on federal death row at the United States penitentiary in Terre Haute, Indiana; correct?

A.   That's correct.

Q.   And he had been there since 2006 at least --

A.   That's correct.

Q.   -- correct?   And he had been incarcerated preceding that beginning in 1999; correct?

A.   That's correct.

Q.   And there was no evidence that he was on methamphetamine or any other drugs in 2009 and for the preceding years when you examined him --

A.   That's correct.

Q.   -- is that correct?

A.   That's correct.

345

Q.   So when you examined Mr. Barrett in 2009, concluded that he had bipolar disorder, he was free of drugs; correct?

A.   That's correct.

Q.   Now, is that significant?

A.   Of course it is.  I mean, that's -- that's another circumstance in that he had been incarcerated for a significant period of time, he was free of drugs, and he manifested symptoms that he had manifested before; mood lability, pressured speech.  He had manifested those symptoms before.  However, that doesn't speak to the point that Mr. Wilson was trying to make.  The point that Mr. Wilson was trying to make is, that differential diagnosis doesn't mean that person has to be on no drugs. That differential diagnosis means that person has to be on a drug that causes those symptoms.

Q.   All right.

A.   If the drug doesn't cause those symptoms, then that's not what the differential is really about.

Q.   All right.  And isn't it true that a high percentage of people who have bipolar disorder -- who have been diagnosed as having bipolar disorder are drug users?

A.   Sixty-five percent of people that carry the diagnosis of bipolar disorder will also meet the diagnosis of a substance abuse disorder sometime in their life.

Q.   All right.

346

A.   It's the highest -- along with PTSD, it is the highest comorbid diagnostic category.

Q.   All right.  Let me ask you about PTSD since you mentioned it.  You were asked by Mr. Wilson about Dr. LaFortune?

A.   Yes.

Q.   And I believe that was Government's Exhibit 37?

A.   Do I have that here?  Okay.  Thank you.

Q.   Do you have that?

A.   Yes, I do.

Q.   Is that Dr. LaFortune's report, Doctor?

A.   Yes, it is.

Q.   Dated July 13th, 2003?

A.   That's correct.

Q.   Okay.  Could you look at the fifth page -- the fifth and final page of that report?

A.   Yes.

Q.   Okay.  It says Lisa Sneddon or Sneddon, psychology intern next to Dr. LaFortune's name; correct?

A.   Yes.

Q.   Okay.  Do you know on who wrote this report?

A.   Ms. Sneddon, I believe.

Q.   Okay.  And did this report rule out PTSD in Mr. Barrett?

A.   It notes that it is unlikely that these events have

caused trauma leading to posttraumatic disorder -- stress disorder as Mr. Barrett endorsed few symptoms related to this disorder.  However, that first sentence notes Mr. Barrett reported several -- experiencing several stressful life events such as being beaten by police and having relatives die.  Those, which of course are the criteria A for posttraumatic stress disorder.  Although he reported these experiences as traumatic on a psychological test, he did not report these events during the clinical interview when asked about traumatic experiences in his life.  He did report difficulties with concentration.  But because he endorsed no other symptoms related to PTSD, it is likely his trouble concentrating has other causes.

Q.  All right.  Now, what kind of testing was done by Ms. Sneddon and Dr. LaFortune that went into this report?

A.  The testing was a self-report test.  Actually, the way it's described is an unpublished instrument to assess posttraumatic stress.

Q.  All right.  And what other testing was done?

A.  A personality assessment inventory and an unpublished -- it looks like a Hare Psychopathy Index.

Q.  Is PCLP unpublished?

A.  That's correct.

Q.  Okay.  And also a personality assessment inventory?

A.  That's correct.

Q.   Are these all self-reporting tests?

A.   They are different, yes.  They are all self-reporting. Obviously two of these are unpublished tests which haven't been subjected to any kind of norming circumstance.  The personality assessment inventory is a very well-known, well-normed psychometric test, test of personality assessment.

Q.   Okay.  Was there are a comprehensive psychological or psychiatric examination done by Dr. LaFortune and Ms. Sneddon?

A.   No, those are the only two tests that were given.  Those are the only two tests that were -- I mean, besides the personality assessment inventory.  It might be noted, however, that the personality assessment inventory is a well-normed test that found him not malingering.

Q.   Okay.  Let me ask you about what Mr. Wilson asked you about with respect to Mr. Barrett's brother, Stephen Barrett.  Do you remember that series of questions on cross-examination?

A.   Yes.

Q.   He was asking you to differentiate, or asking how you could differentiate Stephen Barrett from Kenneth Barrett?

A.   Sure.

Q.   Okay.  Does the fact that Stephen Barrett is a successful person who's a high school principal, went to

college, has a master's degree, had the same parents -- the same genetic parents, does that mean that the lack of those things in him has some kind of a qualifying effect on your diagnosis of Mr. Barrett, Kenneth Barrett?

A.   It has -- it has no type -- it has no meaning at all to the development of symptoms in Mr. Barrett.  As I said before, psychiatric disorders are heterogeneous, and they can appear in families.  We know of many, many families that are not in legal situations where one person in the family may have a significant psychiatric disorder and others may not.

Q.   All right.  Now, the way somebody is raised and the environment they grow up in could have an effect on the development of a mental disorder such as bipolar; is that accurate?

A.   Sure.

Q.   Are you aware of information from Mr. Stephen Barrett's declaration that the environment in which he was raised differed significantly from the environment in which Kenneth Barrett was raised with respect to structure, support, and things of that nature?

A.   I do -- I do recall that.  I don't recall the specifics, though, but I do recall that, yes.

Q.   All right.  Can that make a difference?

A.   Of course.  And we talked about that.

Q.   All right.  I'm sorry to skip around --

A.   That's quite all right.

Q.   -- but let me ask you about the questions Mr. Wilson put to you regarding Mr. Barrett's competency.

A.   Yes.

Q.   Okay.  And could you explain why you found that Mr. Barrett could not rationally assist his lawyers?

A.   First of all, Mr. Barrett has bipolar disorder.  A diagnosis in and of itself does not meet competency.  He also has -- and we didn't talk about this -- he has significant brain impairments.  And I said before that both of those impair his ability to weigh and deliberate effectively, to understand content -- context effectively.  And, also, to -- he has a tendency to get stuck.  And the neuropsychological testing reinforced it, reinforced that tendency to get stuck.

Q.   All right.

A.   It's very clear that Mr. Barrett has that tendency.  And that tendency was clear at the time of the offense and during the legal proceedings as well.

Q.   All right.  And related to that -- not identical, but related, you were asked a series of questions by Mr. Wilson about whether Mr. Barrett could distinguish right from wrong.  And I think the bottom line of your testimony with respect to that area of questioning was that he believes

351

that he was in the right, or was right -- doing right at the time Trooper Eales was shot and killed?

A.   That's right.

Q.   That he was defending himself and defending his son?

A.   That's correct.

Q.   Okay.   So is that the basis of your opinion about right-wrong?

A.   Yes, sir.

Q.   Okay.   Just going back to Dr. Bianco briefly.   I think I asked you this yesterday.   Does Dr. Young's declaration where she sets forth her examination of Mr. Barrett and her conclusions refer to the fact that she relied on, or looked at what Dr. Bianco had done previously?

A.   Yes.

Q.   Okay.   The fact that Dr. Bianco did not find Mr. Barrett to be bipolar, does that have any meaning since he only did incomplete neuropsychological tests?

A.   Well, actually, Mr. Autry, I think that the neuropsychological testing is only a part of it.

Q.   Sure.

A.   It doesn't appear as though he had the comprehensive family history or medical records that I -- that I did.

Q.   Okay.   And Dr. Russell's examination and her testing, was that primarily in the form of a risk assessment?

A.   That's correct.

352

Q.   Okay.   But she notes symptomatology of bipolar disorder?

A.   That's correct.

Q.   And she also notes indications of head injuries and neuropsychological deficits?

A.   That's correct.

Q.   Okay.   And Dr. Sharp indicated that he found evidence of neuropsychological deficits?

A.   A learning disability -- rule out learning disability, that's correct.

Q.   All right.   You were asked about the report of hallucinations -- auditory hallucinations --

A.   Yes.

Q.   -- on the part of Mr. Barrett?

A.   Yes.

Q.   And he talked about -- what did he say exactly?   Not just hearing voices, but hearing things?

A.   Yes, as a child, that's correct.

Q.   Okay.   And does that qualify?

A.   Of course.

Q.   All right.   You also had indications in the materials you've reviewed that Mr. Barrett believed he was being surveilled by dirigibles or blimps --

A.   That's correct.

Q.   -- or things of that nature?

A.   That's correct.

Q.   Does that speak to some sort of paranoia or an inability to accurately perceive information?

A.   Yes.  And that's what I think was so relevant.  Because those are kinds of symptoms that one might see in methamphetamines, but not necessarily see in a bipolar disorder.  And when you look through his hospitalizations, he doesn't describe those.  In those times when he is treated with psychiatric medication, he doesn't describe those.  He's always been described as suspicious or paranoid.  But when you really differentiate what one sees, it's not like all drugs commit all kinds -- create all kinds of symptoms.  The symptoms that got Mr. Barrett consistently hospitalized were symptoms of a mood disorder and some -- and some paranoia, but mostly the kinds of symptoms that you do not see with a methamphetamine induced psychosis and mental illness.

Q.   All right.  You were asked by Mr. Wilson whether or not the fact that you examined Mr. Barrett in the setting of a maximum security federal prison while he was on death row skewed the results or led to an inaccurate finding.  Did the fact that this was in a prison environment invalidate what you were doing?

A.   It certainly did not -- it certainly did not invalidate it, but it -- it may have minimized the presentation of

354

symptoms that were seen in the community.

Q.   Okay.

A.   Certainly it would have minimized the symptoms that you would have seen, say, during the things that got him hospitalized.  But it did not -- but he still presented with those personal symptoms that one could continue to see.

Q.   And every other mental health professional, including Dr. Pitt, Dr. Price, Dr. Russell, Dr. Sharp, and etc., who examined Mr. Barrett examined him in a correctional setting after he was charged in this case; correct?

A.   That's correct.

Q.   Whether state or federal?

A.   That's correct.

Q.   Okay.  You were asked whether or not you had ever testified for the government before?

A.   Yes.

Q.   And you said they'd never asked?

A.   That's correct.

Q.   You testified for the defense in some 80 death penalty cases?

A.   Yes.

Q.   Or was that -- okay.  And do you know why people representing people charged with capital crimes hire you?

A.   I hope it's because I'm a good clinician.

Q.   All right.  Have you ever had a case where you were

asked to examine a defendant in a case and said, look, I can't help you?

A.   I actually only testify in about eight percent of the cases that I'm consulted on.

Q.   Eight percent?

A.   Eight percent.

Q.   All right.  So there's 92 percent of the time you're retained or hired by defense counsel to examine a defendant, whether they are charged with capital murder or some other criminal offense, okay?

A.   That's correct.

Q.   And you say, hey, man, I looked at this guy, there's nothing wrong with him, I can't help you.  He doesn't have major mental illness.  He doesn't have neuropsychological deficits.  He's not bipolar, schizophrenic, whatever. Correct?

A.   More commonly, my findings -- I may have findings, but they feel as though they aren't helpful.

Q.   Okay.

A.   In my civil practice, I testify for both plaintiff and defense.

Q.   All right.  So the fact that somebody hires you, or one side hires you, that doesn't influence the way you examine somebody, and that doesn't influence the results that you come up with.  Would that be fair?

356

A.   I try to examine someone the same way I would in my clinical practice.

MR. AUTRY:   All right.   Could I have just a second, Your Honor?

THE COURT:   Yes.

Q.   (BY MR. AUTRY)   I forgot to ask you this, Doctor.   We were talking about head injuries with the steel ball.

A.   Yes.

Q.   You're also aware, and you discussed this yesterday, that Mr. Barrett attempted suicide in 1986 by shooting himself in the chest with a shotgun; correct?

A.   That's correct.

Q.   Can that cause a closed head injury?

A.   Oh, absolutely.

Q.   Okay.   Could you explain that?

A.   Closed head injuries are -- closed head injuries are -- what we call contrecoup injuries are injuries where the head goes forward and backwards, and the brain goes forward and backwards.   The brain sits inside the skull.   And when you have any kind of forward and backward movement, you can have that type of injury to the brain.   And that's why you separate out impairment from damage, because you can have a brain that's impaired and it not really show any physical damage at all.   You can have a brain that's impaired without having a concussion.   So that's the kind of injury that

could possibly cause that forward and backward.  We don't know what caused his injuries.  What we do know, however, is that, when we're talking about prenatal injury to the brain perhaps with alcohol, that's in the middle of the brain.  That's not consistent with the frontal injury that we're talking about.

Q.   And that's consistent with the history that's been reported, that Mr. Barrett's mother drank while she was pregnant?

A.   That's correct.

Q.   Bottom line is Dr. Young found that he had neuro -- significant neuropsychological deficits; correct?

A.   Yes.

Q.   Can you fake that?

A.   You can try to fake it.  But what we see with Dr. Young's testing is, again, Mr. Barrett did very well in certain areas.  But the test that tested these particular areas are the tests where he did not do well.  The test where -- the test where you look at his academics, for example, Mr. Barrett, regardless of his grades, has not been able to pass the GED.  He has taken the GED in the past.  He's taken the GED on several occasions.  So we see in that area of the brain, the temporal lobe and the frontal lobe, those specific areas, the test that test those specific areas are consistent.  Testing other areas show that he does

very well.  You would have to be a Ph.D. in neuroanatomy and a Ph.D. in test construction in order to just isolate those areas as being the only ones that are injured.

Q.  All right.  And you, Dr. Young, Dr. Pitt, everybody who's looked at Mr. Barrett since this case began back in 1999, would it be correct to say, found that, on any testing that they did, that he was not malingering?

A.  That's correct.

Q.  All right.  Does the fact that Mr. Barrett made decent grades in some subjects and some classes over his educational career rule out learning disability or neurological damage?

A.  Obviously it doesn't.  He was -- it was captured that he was learning disabled in school in certainly that one particular class.  We don't know what those grades mean.  We do know what his academic testing that Dr. Young did.  We do know what his neuropsychological testing that he -- that Dr. Young did.  We do know that Dr. Sharp even described him as being learning disabled and recommended the type of testing that Dr. Young did to further clarify what his -- what his impairments were.

MR. AUTRY:  Okay.  Thank you, Doctor.  Thank you. No further questions.

THE COURT:  Mr. Wilson, I don't want to replow any old ground.

359

MR. WILSON:  Absolutely, Judge.

THE COURT:  And I want to confine it anything that may have been raised on redirect.

MR. WILSON:  Absolutely.

THE COURT:  Very well.

RECROSS-EXAMINATION

BY MR. WILSON:

Q.  Dr. Woods, counsel was asking you about the question that I posed to you about -- and I believe my question was, isn't it true that no final diagnosis or discharge diagnosis that had been given to Mr. Barrett was for bipolar?

A.  I don't think that was your question, sir.  Is that your question now?

Q.  And I apologize if -- that is my question now.

A.  Okay.  I'm not clear in terms of the final diagnosis for 1995.  But, otherwise, I believe it was organic affective disorder was the diagnosis.

Q.  So, and the point I'm making is, the document which counsel brought to your attention, Government's Exhibit Number 9, that was a provisional diagnosis when the person first appeared at the facility; isn't that correct?

A.  Yes.

Q.  And then after -- and that took place in January the 20th of 1995; correct?

A.  Yes.

Q.   Does that sound about right?

A.   That's correct.

Q.   And you'll agree with me that was at Bill Willis

Community Hospital; correct?

A.   That's correct.

Q.   Mental Health Center?

A.   Yes.

Q.   And that particular hospitalization, was it -- there was

a discharge on February the 13th of 1995?

A.   Yes.

Q.   And at the discharge, the summary at the time of the

discharge, the final discharge diagnosis was not bipolar;

correct?

A.   I don't recall.

          MR. WILSON:   May I approach, Judge?

          THE COURT:   Yes.

A.   Oh, that's correct.  Yes.  Organic affective disorder,

yes.

Q.   (BY MR. WILSON)  And so the final diagnosis, organic

affective disorder, polysubstance abuse, marital conflict --

A.   Yes.

Q.   -- correct?  And so I apologize if I was misleading.  I

didn't intend to be.

A.   Oh, no, no.  I'm sure.  I understand.

Q.   So you would agree with me that there have been no

final, at the time of someone's discharge from a facility, of a diagnosis of bipolar?  Not in -- you would agree with me, not in 1986; correct?

A.  Right.  Well, let me -- let me just -- the reason I'm just thinking about an organic affective disorder -- and you may want to look at this in 1995 -- really subsumes a mood disorder.  What they really capture there, it's an excellent diagnosis, because what they are saying is, this person has an organic brain problem and they have a mood disorder.  So the question of whether it's bipolar or not is very, very -- it's still up in the air.  It's not like they moved away from bipolar disorder.  What they actually did was they're saying, look, this person has a mood disorder and there's something wrong with their brain.  So it's, in fact, more accurate diagnosis than even bipolar.

Q.  All right.  Thank you.  In reference to the questions that counsel was asking you about the evaluation done by Dr. Sharp?

A.  Yes.

Q.  The report of Dr. Sharp, his diagnosis was, is that substance abuse was in remission --

A.  Yes.

Q.  -- is that correct?

A.  Correct.

Q.  However, that would be inconsistent with the defendant's

reporting to Dr. Pitt that the fact that he was, in fact, still using illegal substances at the time?

A.   Once again, that's correct.

Q.   And in reference to counsel's asking you questions about no medical reports regarding the steel ball incident?

A.   Yes.

Q.   Okay.   There's no -- there were no MRIs done, correct, to your knowledge of the brain?

A.   I'm trying -- I'm trying -- if he were eight years old, the MRIs weren't developed until 1978, so there probably would not have been any MRIs done.

Q.   Got me there.   Thank you.   No MRI done in 2009?

A.   That's correct.

Q.   No CT scan done in 2009?

A.   That's correct.

Q.   No CT scan done, to your knowledge, in this case; correct?

A.   And shouldn't have been.

Q.   Okay.   I appreciate that.   My question:   There was not one done?

A.   That's correct.

Q.   Now, you were asked about the section from the DSM-IV-TR and the DSM-5 that I talked with you about --

A.   Yes.

Q.   -- about differential diagnosis?

A.   Yes, sir.

Q.   And the particular section we were looking at was under substance induced bipolar; correct?

A.   Yes.

Q.   But is it not still true that, when you're going to make a diagnosis of a mood disorder, specifically bipolar --

A.   Yes.

Q.   -- that you need to consider the substance -- or the use of other substances; correct?

A.   The use of other substances specific to the presentation of symptoms, yes.

Q.   Okay.  What other substances, based upon your expertise, would manifest themselves in behaviors consistent with bipolar?

A.   Primarily antidepressants, steroids, inhalers.  There are certain oncological drugs, heavy drugs that could do that.  Occasionally PCP might do that.  But not amphetamine based.  In fact --

Q.   What about cocaine?

A.   Not really.  See -- and, see, because when you look at the biological -- biochemical structure of drugs like cocaine and methamphetamines, what you get is the paranoia, and you might get the psychosis, but you don't get the mood lability.  You don't get the rapid -- you don't get the mood swings.  You don't get the pressured speech.

364

Q.   And the mood swings --

A.   Yes.

Q.   -- you would agree with me that, during your evaluation in 2009 and in 2017, Mr. Barrett wasn't exhibiting mood swings; correct?

A.   At that time?

Q.   That's correct.

A.   Yeah, I would agree with that.

Q.   Your diagnosis was -- on your personal evaluation was based upon pressured speech; correct?

A.   And flight of ideas.

Q.   Flight of ideas.

A.   And grandiosity.   And -- oh, okay.   You're just talking about at 2009 and 2017?

Q.   That's correct.

A.   Okay.

Q.   In addition to the drugs you've talked about, mushrooms, would that --

A.   No.

Q.   Okay.   Just asking.   Thank you.

A.   I understand.   But absolutely not.

Q.   Because Mr. Barrett reports basically a litany of different substances he was taking; correct?

A.   Yes, that's correct.

Q.   What all substances did he say he was taking?

A.   Well, he certainly talked about Xanax and other types of barbiturates.   Toluene.   He's talked about, at one time or another, taking -- drinking, but he said he didn't really -- he kind of stopped drinking.   Talked about cannabis.   Talked about cocaine.   I don't recall heroin.   But as you said, he talked about the psychedelics.

Q.   And none of those, according to your testimony, would manifest themselves in characteristics of mood swings?

A.   Absolutely not.

Q.   Okay.   How about pressured speech?

A.   Not -- rapid speech, yes.   Pressured speech, no. Pressured speech -- pressured speech, flight of ideas, mood lability are terms of art that one really looks at when you think about bipolar disorder.   There are drugs that certainly can cause paranoia.   In fact, amphetamines were the chemical equivalent of schizophrenia for many years starting about 1956.   So certainly there are drugs that can create those.   Even in his hospitalization, we didn't find any of those other drugs.   You know, we found the methamphetamines on urine but not in blood.   Found primarily cannabis.   Cannabis is not one that would create those kinds of symptoms, and methamphetamine certainly would not, either.

Q.   And you said cocaine wouldn't do it?

A.   That's correct.   Cocaine would be very similar to

methamphetamine.

Q.   Xanax wouldn't do it?

A.   Xanax is a downer.   It would be just the opposite.

Q.   All right.   Now, counsel asked you about your report finding that the defendant was unable to rationally assist your -- his attorneys, and I believe you said it's because he was getting stuck?

A.   Yes.

Q.   Having problem getting stuck?

A.   Yes.

Q.   A person that can discuss with his counsel the difference between murder and manslaughter, would that that be someone that cannot rationally assist their attorney?

A.   It could well be, because what you're -- what you're describing is really looking at one of the prongs, which is do they understand the nature and consequences of their action, do they understand what they are being charged with, you know what I mean?   So perhaps.

Q.   Okay.   I believe counsel asked you about your finding that the defendant didn't know the difference between right and wrong?

A.   Right.

Q.   I believe that's what your report said, he didn't know the difference between right and wrong?

A.   Understand.

367

Q.   Didn't understand the difference between right and wrong.  But you agree with me that, when the defendant was discussing that particular set of questions with Dr. Pitt, that Dr. Pitt asked him, do you understand it was wrong to shoot a trooper?

A.   Yes.

Q.   And he said what?

A.   Yes.

Q.   He understood it was wrong?

A.   That's correct.

Q.   He understood it in wrong to sell or to manufacture methamphetamine; correct?

A.   Absolutely.

Q.   And you agree with me, at the time of this particular -- and I don't want to make light of the facts of the particular event -- but Mr. Barrett didn't throw a pizza at the troopers?

A.   No.

Q.   He didn't shoot him with a cap gun?

A.   No.

Q.   He didn't display psychotic behavior at the time of the event?

A.   That's an interesting question.  You said psychotic behavior as opposed to psychotic thinking.  Certainly his behavior was -- I'm not sure what you mean by psychotic

behavior.

Q.   Okay.  And I guess I go back to he didn't throw a pizza at them?

A.   Oh.  No.

Q.   As a matter of fact, he had secured the gate to his property; correct?

A.   Prior, yes.

Q.   And posted signs to stay away from his property; correct?

A.   I believe that was the -- was a term -- I never saw the signs or never saw -- but I -- I do know that it was said that he had -- he had either told people or posted signs.

Q.   And that he fired multiple rounds into vehicles approaching his house; correct?

A.   Yes.

Q.   Counsel asked you about the times when you did not testify for the government.  You're not testifying today that 92 --

A.   I've never testified for the government.  I've never been asked to testify for the government.

Q.   Okay.  Thank you.  You're not saying that 92 percent of the time you tell defendants that I can't help you, are you?

A.   What I'm saying is that I testify in eight percent of the cases that I'm asked to consult on.  Now, that doesn't

mean that every case I do a complete, thorough comprehensive examination, because often I don't have to do that.

Q.   And, again, what I'm saying is 92 -- you're not saying that 92 percent of the time you find that, when the defense calls you, that you're saying, I'm sorry, I can't help you?

A.   I don't have to.

Q.   You're not saying that?

A.   I don't have to.  I can often look at the records and tell that there's nothing I can do to help.

MR. WILSON:  Okay.  That's all I have.

THE WITNESS:   Thank you.

THE COURT:  Anything further from Dr. Woods?

MR. AUTRY:  Could I ask one question, Your Honor?

THE COURT:  Yes.

MR. AUTRY:  And I promise, just one.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q.   Doctor, is a neuropsychological battery of tests more sensitive than like an MRI or these scans and showing what the effects of neurological deficits on behavior are?

A.   According to the American Academy of Neurology, neuropsychological testing is the gold standard of brain function.

MR. AUTRY:  All right.  Thank you, sir.

THE COURT:  Dr. Woods, you can step down.  Thank you, sir.

THE WITNESS:  Thank you very much.

THE COURT:  Let's go ahead and break for lunch. Come back at 1:00 o'clock.

*(Off the record at 12:11 p.m.)*

*(Back on the record at 1:20 p.m.)*

THE COURT:  Okay.  Before we move on to the next witness, I'd like to take up the government's motion to compel just filed and just referred to me by Judge Payne.

My understanding, if my understanding is correct, the basis of your motion is you received some documents yesterday that were represented to have been given to Mr. Gordon by Mr. Autry, and those are documents that you feel like should have been already produced and haven't been, and so you want to know if there's any more.

MR. KAHAN:  That is the long and short of it I'm afraid.  Yeah, obviously we're, generally speaking, unaware of what's in trial counsel's file.  And we believed, until yesterday, that we had seen clients.  Now, if there was some other source for those documents or if we just failed to find them in 8,000 pages, we would understand that as well. But we'd like a little direction here.

THE COURT:  Mr. Autry.

MR. AUTRY:  Yes, Your Honor --

THE COURT:  The records that got produced yesterday came from your file; is that correct?

MR. AUTRY:  They came from a defense file from the state case is where they came from.  I mean, we did not obviously generate it because it was reports from Ms. Schaye back in 2000, 2001.

THE COURT:  And it's your position that none of that is responsive to the discovery order that was entered in this case?

MR. AUTRY:  Your Honor, we turned over everything that we had that was in trial counsel's file.  We also turned over what was in a file -- an investigative file that was kept at OIDS that Mr. Hilfiger and Mr. Smith never picked up.  I picked that up in 2008.  So back when I was getting ready for this hearing, I asked the people at the Eastern District of California to send me all the Roseann Schaye reports.  I forwarded those to Mr. Gordon so he could refresh his recollection.  I mean, I'm happy to give them -- we're happy to give them everything, and we certainly weren't holding anything back.  But there's a lot of documents in this case, and there's been, I guess, some small degree of confusion.  But I apologize if they didn't get all of her reports earlier, but we can certainly produce those.

We do object to the motion.  Beyond that, we

object to the motion.  They raised this issue yesterday when Mr. Gordon was on the stand asking that we be compelled to do -- to turn things over.  The Court denied it.  So we re-urge that objection.  I don't know if you want us to file a written response to their motion, which we can certainly do.

THE COURT:  I don't need --

MR. AUTRY:  And I think we've been in compliance with discovery.

THE COURT:  Well, the thing you just told me you're willing to produce, I want you to produce.

MR. AUTRY:  Okay.

THE COURT:  Okay.  Now, with regard to Gordon's file.

MR. AUTRY:  That we do object to.

THE COURT:  Okay.  And tell me again why you object.

MR. AUTRY:  Because there's an attorney/client privilege that still exists between Mr. Barrett and Mr. Gordon.  There's attorney work product privilege that pertains to Mr. Gordon.  I have not gotten Mr. Gordon's file.  We have not got Mr. Gordon's file.  He thinks it's in storage somewhere.  But we don't see the necessity for turning it over based on those two grounds of privilege.

THE COURT:  Well, trial counsel is being

criticized for not doing as good a mitigation investigation as Mr. Gordon did, no?

MR. AUTRY:  Well, that's -- that's --

THE COURT:  I mean, he showed up here yesterday criticizing them for not doing as good a job as he did.

MR. AUTRY:  Well, they're being criticized for not getting the state file -- the state investigative file following the leads that were developed in the state case, even though the state mitigation investigation was incomplete.

THE COURT:  Well, in which case, why don't they have a right to look at that?

MR. AUTRY:  Well, Your Honor, we'll stand on our objection and let the Court rule.

THE COURT:  What's it -- what's it going to take to get those files from Mr. Gordon?  Do you all have the ability to make him do that, or is it going to take a subpoena?

MR. AUTRY:  I can call him, see what the deal is.

THE COURT:  Okay.

MR. AUTRY:  I don't know whether he's going to want a subpoena or not.  They are his files, and I feel a little uncomfortable speaking on his behalf --

THE COURT:  I understand.

MR. AUTRY:  -- with respect to that.

THE COURT:  I understand.  Well, I'm going to grant -- I'm going to grant the motion.  I want you to see if we can get him to do it cooperatively.  And if he won't, then we'll just have to do it with a subpoena, I mean, because he is a third party.  He's not party to this lawsuit.

MR. AUTRY:  Right.

MS. FISHER:  Your Honor, I wonder if I might be heard just for a moment?  Our -- part of our objection goes to Judge Payne's order was not an order of production of the trial counsel files.  It was an order that, once it's produced to us, and that's -- you know, we'll try to get Mr. Gordon's file.

THE COURT:  I don't think Mr. Gordon's file was covered by the discovery order in this case.  I mean, he's a third party, and so I'm not faulting you all for that.  But having found out we've got some files here that are relevant to the testimony we heard yesterday, I think they do have a right to have them.

MS. FISHER:  Well, Judge, the problem is we don't know what's in the file and not every document in trial counsel's files is discoverable.

THE COURT:  But you're criticizing -- you're criticizing the trial counsel in this case for not getting those from him, so we need to know what they missed by not

375

getting them, no?

MS. FISHER:  No, Your Honor.

THE COURT:  Why not?

MS. FISHER:  Because constitutionally, the only -- there's a limit on the discoverability of defense counsel's files because they are, by nature, privileged.  So we have weighed only to the extent of the penalty phase.  We don't know what's in Mr. Gordon's file.  What I'm asking, or we're asking is to be able -- we'll attempt to produce that file to us.  We will then indicate to the Court whether or not there are discoverable documents.  Certainly we will turn over any discoverable documents that relate to penalty phase, but we can't turn over the file carte blanche because there could be all sorts of communications in there that are not covered by the allegations made.

THE COURT:  If -- if before this case got tried in federal court Mr. Hilfiger Mr. Smith had asked for those files, they would have turned them over, no?

MS. FISHER:  They would turn them over to Mr. Hilfiger just as I'm sure Mr. Gordon will turn them over to us.

THE COURT:  All right.

MS. FISHER:  But then, following that, when we got Mr. Hilfiger's files on an allegation of ineffective assistance of counsel, we would not turn over those files

without having first pulled out those documents that remain constitutionally protected under the attorney/client privilege.

THE COURT:  Well, they are not constitutionally protected.

MS. FISHER:  They are, Your Honor.

THE COURT:  Privilege is a matter of statute, it's not a matter of constitutional law.

MS. FISHER:  Well, the Sixth Amendment protects those files, Your Honor.

THE COURT:  Not under the circumstances of this case as I understand it.

MS. FISHER:  Your Honor, a waiver and an ineffective assistance of counsel claim is limited to the claim, it's not a carte blanche opening of all of the communications between counsel and his client or her client.

So it's -- I mean, I'm not -- you know, I agree we should -- you know, that Mr. Gordon should produce his files if there are documents, and it sounded from the testimony that there are indeed documents that relate to penalty phase preparation.

THE COURT:  All right.  All right.  If you want to do it that way, this is how we're going to do it.  You guys are going to get that stuff forthwith.  You're going to look through it.  You're going to produce what you think is

produceable, and you're going to prepare a detailed privilege log as to everything else.  That's how you do that sort of thing.  And a privilege log is going to have to be, according to our rules, detailed enough so that we can evaluate your claim of privilege with whatever you don't produce.  Now, that's a lot of work, isn't it?

MS. FISHER:  It's a lot of work, Your Honor, but it's worth protecting the defendant's rights.

THE COURT:  Okay.  Well, that's how we're going to do it then.  Motion is granted to the extent we discussed here.  We have any idea how long any of this will take?

MS. FISHER:  We'll try to contact Mr. Gordon right now.

THE COURT:  If nothing else, I guess it will be in time for the government to have looked at everything before we come back together in June at least, right?

MS. FISHER:  That's correct, yes.

THE COURT:  Okay.  Very good.

MR. SCHARDL:  May I address one other matter, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  I just wanted -- during the examination of Dr. Woods, there was a question about files he obtained from Dr. Bianco.  I just wanted to state for the record, the Court asked for those -- or counsel asked for

those, and I gave them to him.

THE COURT:  Okay.  Great.

MR. WILSON:  That is correct, Your Honor.

THE COURT:  Great.  One other thing just as long as we're talking about this.  The stuff that was produced yesterday by Mr. Gordon that you all provided to him, those weren't things that have been previously provided to the government?

MR. AUTRY:  I was under the understanding that they had all these Roseann Schaye reports.

THE COURT:  Oh, okay.

MR. AUTRY:  There were a couple that I think Mr. Wilson said they did not have or did not recognize.  I've got them all right here in this notebook.

THE COURT:  If you can figure that out by referring them to a Bates document that you've already produced, then you don't have to produce it again obviously.  But talking about things that haven't been previously produced, you'll need to produce them I guess.

MR. AUTRY:  Okay.  My copies here are not Bates stamped.  I'll try to find out if any are Bates stamped.  And I've got all of her reports right here.

THE COURT:  Okay.

MR. AUTRY:  And they're welcome to them.

THE COURT:  Good.  Plaintiffs, call your next

379

witness.

MR. AUTRY:  Steve Leedy.

THE CLERK:  Sir, if you'll raise your right hand.

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Be seated.

STEVE LEEDY,

being first duly sworn to testify the truth, the whole

truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.  State your name for the Court, please, sir.

A.  It's Steve Leedy.

Q.  Where do you live?

A.  Tulsa.

Q.  What do you do for a living?

A.  An investigator for the Indigent Defense System.

Q.  Is that Oklahoma Indigent Defense System?

A.  Yes.

Q.  Where is your office located?

A.  Sapulpa.

Q.  And how long have you worked as an investigator for the

Indigent Defense System?

A.  About 25 years.

Q.  All right.  Now, do you know Kenneth Barrett?

380

A.   I do.

Q.   How do you know him?

A.   We represented him in a case early 2000.

Q.   All right.  And what was your assigned role in Mr. Barrett's state case?

A.   It was investigation.  It varied from first stage to second stage matters depending on what happened.  I collected the information for Mr. Echols if he needed.

Q.   All right.  And did you maintain an investigative file?

A.   We kept a file at the office, and that would be the one that we had.

Q.   All right.  Now, what kind of materials would that file contain?

A.   The best of my recollection, it would be memorandums and items like that.

Q.   All right.  Would there be reports of investigation such as you did or you conducted?

A.   There should be, yes.

Q.   All right.  Would there be reports of investigation going to potential mitigating witnesses or mitigating evidence?

A.   I -- there should be, yes.

Q.   All right.  Do you remember executing a declaration, Mr. Leedy, back in 2009 -- March 12th of 2009?

A.   Not until you came -- called me about a month ago --

Q.   All right.

A.   -- and said, remember this, and I --

Q.   All right.  Have you reviewed that in preparation for your testimony?

A.   I looked over it the day we were with -- together.

Q.   Okay.  Could you hand Mr. Leedy -- it would be Petitioner's Exhibit 39.  Do you have that in front of you, sir?

A.   Yes.

Q.   Okay.  Could you read to yourself the first paragraph.

A.   Okay.  That's the first paragraph.

Q.   Yes, sir.  Could you go to Page 2 and read the, I guess, the first paragraph of Page 2?

A.   To myself or out loud?

Q.   Yes, sir.

A.   Okay.

Q.   All right.  Can you describe briefly to the Court what the investigative file that you had at OIDS contained in Mr. Barrett's case?

A.   The file at that time consisted of -- based on my -- my note here, that it had like Roseann Schaye, she did mitigation work, myself and another investigator doing information -- collecting information on the case, as well as some historical things like Bill Willis Mental Health I believe it referred to.  Or, I'm sorry, Willis Community

382

Health Center.  And so it was hospital records -- some hospital records, things like that.

Q.  All right.  And where was that file maintained?

A.  It was maintained somewhere at our office.  I didn't -- I don't remember -- or I don't recall maintaining the file after we finished with -- when I finished the state case, it may have gone into storage somewhere or something.

Q.  All right.  Okay.  Now, were you aware that Mr. Barrett, after his state case was concluded, was charged in federal court?

A.  That was brought to my attention.

Q.  Okay.  Do you know who initially represented him as lead counsel in federal court?

A.  John Echols.

Q.  Did you become aware at some time that Mr. Echols withdrew from the representation of Mr. Barrett in his federal case?

A.  I had heard that, yes.

Q.  Did you become aware of who was then made first chair counsel for Mr. Barrett in the federal case?

A.  Mr. Hilfiger.

Q.  All right.  Do you know Mr. Hilfiger?

A.  It's been many years since I've seen him.

Q.  Okay.  Did you ever become aware that a lawyer here in Muskogee named Bret Smith was appointed to represent Mr.

Barrett as second chair to Mr. Hilfiger after Mr. Echols was allowed to withdraw?

A.   I don't remember that.

Q.   Okay.  Well, let me ask you this, Mr. Leedy:  Did either Mr. Hilfiger or Mr. Smith ever contact you, while they represented Mr. Barrett in the federal case, to acquire any materials or any files you had in the case?

A.   As stated in this, I -- I don't recall being contacted by them.

Q.   All right.  Were you ever contacted by me?

A.   Yes.

Q.   Okay.  And that would be back in 2008?

A.   Or whenever this was done.

Q.   Do you recall that, back in 2008, I went to your office in Sapulpa and retrieved the investigative file, the contents of which you described earlier?

A.   And as I explained to you before, I -- when we met four -- three, four weeks ago, I had asked you what become of that file --

Q.   Right.

A.   -- and you explained to me that I had given it to you. I had totally forgot that I had given it to you.

Q.   Well, does your declaration that you signed back in 2009 reflect that in 2008 -- well, it says this file was retrieved in, I believe, 2008 by David Autry, one of Mr.

Barrett's current lawyers. Is that accurate?

A. Yes.

Q. Okay. But the only person you ever gave the file to after the state case was over would have been me, not Mr. Hilfiger, not Mr. Smith?

A. Yes.

Q. You have no recollection of ever being contacted by either Mr. Hilfiger or Mr. Smith?

A. No.

MR. AUTRY: Okay. Thank you, sir.

THE COURT: Cross-examination, Mr. Wilson.

MR. WILSON: May I proceed?

THE COURT: Yes.

MR. WILSON: Thank you.

CROSS-EXAMINATION

BY MR. WILSON:

Q. Good afternoon, Mr. Leedy. My name is Chris Wilson. How are you?

A. Fine, thank you.

Q. Mr. Leedy, I understand that you -- are you currently employed with OIDS?

A. Yes.

Q. Is that correct?

A. Yes.

Q. And I'm sorry, I'm having a hard time hearing you.

385

A.   Yes.

Q.   Very good.  Thank you.  And, Mr. Leedy, it's my understanding that, prior to your work with OIDS, you were a police officer; is that correct?

A.   I was a deputy.

Q.   A deputy?

A.   Uh-huh.

Q.   Okay.  And where was that?

A.   In Tulsa County.

Q.   Okay.  And you've been working for OIDS and -- excuse me -- were working with OIDS back in 1999, 2000 range; is that right?

A.   Yes.

Q.   And specifically at the time that Mr. Echols was representing the defendant, Kenneth Barrett, in two state trials; is that right?

A.   Yes.

Q.   And I believe you testified a moment ago that, as part of your duties with OIDS, you were tasked to perform certain roles of investigation to assist Mr. Echols; is that correct?

A.   Yes.

Q.   Isn't it true that, at that time, Mr. Echols was not employed by OIDS; right?

A.   At -- yes.  I just don't know the mechanics of when he

wasn't an employee and things like that.

Q.   But he was representing the defendant on an indigent contract; correct?

A.   As far as I know.   I -- I don't have any information about the contracts or anything.

Q.   And there's no issue about the fact that you were allowed to work with him to assist him; correct?

A.   As far as I know, there wasn't.

Q.   Very good.   And I believe you testified that, as part of your duties, you collected information for both the guilt phase, but also the punishment phase in the state trials; correct?

A.   Yes, sir.

Q.   And you agree with me, isn't it true that there were actually two state trials?

A.   Yes, sir.

Q.   And that your role was involving both the first trial and the second trial; correct?

A.   Yes, sir.

Q.   And it's my understanding that, part of your duties, you came to know a person by the name of Roseann Schaye; isn't that correct?

A.   I had had conversations with her on the phone.

Q.   And was that while she was working for Mr. Echols as well?

387

A.   It's my understanding that they had some kind of problem, and I don't know what the specifics of it were.

Q.   Okay.  So --

A.   And so -- I'm sorry.  Go ahead.

Q.   That's all right.  So it's my understanding then that that your involvement with Ms. Schaye was after her separation from the defense team; correct?

A.   I believe so.

Q.   All right.  And it's my understanding that that separation took place before the first state trial; correct?

A.   That's my recollection.

Q.   And you were tasked with contacting her to get the information that she had generated herself; isn't that correct?

         MR. AUTRY:  Your Honor, just for the record, I want to enter an objection to this line of cross-examination being beyond the scope of direct.

         THE COURT:  Overruled.  Go ahead.

Q.   (BY MR. WILSON)  Do you remember the question?

A.   No.  Please repeat.

Q.   That's fine.  I'll try to repeat it.  Isn't it true that you were asked by Mr. Echols to contact Ms. Schaye to obtain the information that she had accumulated as part of her mitigation investigation?

388

A.   It's either I did or Mr. Echols did.  I just don't remember if I specifically -- I may have.  I may have.  I just don't -- I don't specifically remember making the call.

Q.   Do you recall receiving a fax from Ms. Schaye indicating about this conversation that you had had with her?

A.   If -- if there is a fax, I don't recall it.

Q.   And would looking at a letter -- a fax letter, would that help refresh your memory?

A.   Probably.

MR. WILSON:   Your Honor, I'm going to be providing a document to the witness.  It's from Government's Exhibit Number 43, and I'd ask if the witness can look at Government's Exhibit Number 43, please.

Q.   (BY MR. WILSON)  Mr. Leedy, if you'll look at Tab Number 43, and then flip over to what -- there's some numbers circled in the bottom right-hand corner, the number, Page Number 6.

A.   Okay.

Q.   And do you see that, sir?

A.   Yes, sir.

Q.   And you'd agree with me that there's an indication at the top of the page that this particular letter had been faxed; is that correct?

A.   Yes.

MR. AUTRY:  Your Honor, I'm going to object to this.  This is a letter, I guess, from Ms. Schaye to Mr. Echols.  It's not anything that was authored by or sent to Mr. Leedy.

MR. WILSON:  Page 6, counsel.

MR. AUTRY:  Oh, Page 6.  Okay.  Thank you.  I'm sorry, I was looking at the wrong page.  I apologize.

MR. WILSON:  May I proceed, Judge?

THE COURT:  Yes.

Q.  (BY MR. WILSON)  Looking at Page 6, this is a letter that was addressed to Steve Leedy; is that correct?

A.  Yes.  It is.

Q.  And it has indication that it was faxed.  And are you familiar with the numbers at the top of that page?

A.  I'm looking for an Oklahoma fax number, and I don't see that it's just a 420 number, which, apparently, is the same as the bottom of the page there from Ms. Schaye.

Q.  Okay.  But do you recall receiving this fax letter?

A.  Independent recollection, no.

Q.  Okay.

A.  But I -- it's the best I can do.  I can't --

Q.  I appreciate that.  But would you agree with me, sir, that as a result of some communication you had with Ms. Schaye, you actually received some documents from her; isn't that correct?

390

A.   Yes.

Q.   And, Mr. Leedy, can you tell the Court what documents that you received from the investigator, Roseann Schaye?

A.   Because she's a mitigation investigator, I'm going to assume it had everything to do with mitigation investigation that she conducted.

Q.   When you were looking down at something, are you looking at your declaration?

A.   No, sir.  I was looking at your Page 6.

Q.   Okay.  Well, if you'll flip over to Page 7 for me, please.  Okay.  This appears to be a fax transmission sheet from you; correct?

A.   Yeah, it's going to be from me.  I didn't write it, but it's from me.

Q.   Okay.  And it's to John Echols; correct?

A.   Right.  Correct.

Q.   And what was the purpose of this fax transmission?

A.   Received this letter from Ms. Schaye today, copies to Nina, or I'm not sure what that -- I can't read that writing.  Anyway, to our -- to us.  Please call her. Okay.

Q.   Okay.  Do you have any independent recollection of that fax?

A.   Sorry, I don't.

Q.   That's fine.  It's been a number of years ago.  Would

391

you agree with me that this appears to be faxing over to

Mr. Echols the letter that you received from Roseann Schaye?

A.   It appears that way.

Q.   Now, I know you testified a moment ago that you're not for certain the documents that you received, but likely they were mitigation related; correct?

A.   Yes.

Q.   Did you assist -- and I think I know the answer to this. But did you assist Ms. Schaye in any of the investigation that she did on her own?

A.   No.

Q.   Okay.  You didn't go with her or anything like that?

A.   No.

Q.   Didn't set up any of the interviews?

A.   Don't recall doing that, either.

Q.   Okay.  But as part of this mitigation information, I believe you testified that it would likely be interview summaries; is that correct?

A.   I would think it would be -- I would think it would be interview summaries and either documentation from facilities, hospitals, schools maybe.

Q.   Okay.  Now, you specifically put in your declaration Eastern State Hospital, Bill Willis Community Health Center, the Wagoner Community Hospital.  You specifically itemize those; is that correct?

392

A.   That is correct.

Q.   And how is it that you were able to itemize those at the time you created this declaration?

A.   The only thing I can think of is that it was something that we had generated ourselves, not through Ms. Schaye.

Q.   Okay.

A.   I -- that's the only thing I can think of, just as kind of --

Q.   Let me ask you this:  Do you know why Mr. -- or how Mr. Autry knew to call you?  Did you have any discussion with him?

A.   If I -- if he did, I don't remember -- I don't remember why he contacted me back in 2008, '9.

Q.   Well, at the time that he contacted you, did you create an inventory of the investigative file?

A.   If I did, I don't know where it's at.  I -- I just -- I think he asked the same question, do you have a copy of what was taken or given or anything like that, and I don't recall generating one.  I'm not saying -- I just don't recall.

Q.   Have you had an opportunity to look?

A.   I wouldn't even know where to look.

Q.   So to your knowledge, there is no inventory?

A.   To my -- yes, to my knowledge, I can't say that there is.

Q.   Now, are you saying, Mr. Leedy, that the information in

your investigative file at Sapulpa was never given over to Mr. Echols?

A.   No.   I think he should have it.

Q.   He should have everything in that file, shouldn't he?

A.   I would think so.

Q.   You provided everything you received from Roseann Schaye; correct?

A.   Yes.

Q.   You provided him copies of all the interviews, summaries that you performed; correct?

A.   Yes.

Q.   You provided him all the copies of all the medical records that you accumulated; correct?

A.   It was -- yes.

Q.   And did you have an occasion to also consult with Geoffrey Standing Bear during the first trial?

A.   Yes.   Yes.

Q.   Provided him documents, too; correct?

A.   I'm not sure if he relied on documents from Mr. Echols or -- I just don't know.

Q.   You don't know whether you provided him documents or not?

A.   Right.

Q.   You agree that Mr. Standing Bear was on the first trial?

394

A.   Yes.

Q.   And that Mr. Gordon, Jack Gordon was the second stage attorney for the second trial; correct?

A.   Yes.

Q.   And did you provide Mr. Gordon documents?

A.   Again, if I did --

Q.   Don't know?

A.   -- I don't recall.  And I apologize.

Q.   You don't need to apologize.  You could have or maybe you didn't --

A.   I just can't --

Q.   -- fair enough?

A.   I don't recall.

Q.   Were you going to testify in the second stage, if there would have been a second stage of the second state trial?

A.   I have no knowledge that that was a plan.

Q.   And I'm going to tell you up front this may be an exercise in futility, but I'm going to go through some documents with you, okay?

A.   Okay.

Q.   We're going to start with that notebook that you're looking at.  I'm going to start with Tab Number 3.

A.   Is it a copy of a copy of something?

Q.   Looks like it to me.  Looks like a voluntary statement attached to a peace officer's affidavit.  Do you see that?

395

A.   Yes.

Q.   Do you recognize that document?

A.   Not from outside -- I don't -- I don't recognize it from anywhere else.

Q.   Do you recognize it as part of this investigation?  Have you ever seen it?

A.   Sir, I wish I could recall, I really do.  I just don't recall if it is or not.

Q.   Let's go to Tab Number 4.  This appears to be part of some medical records from Eastern State Hospital in Vinita from October the 8th of 1986.  Do you see that?

A.   Yes, sir.

Q.   Do you recognize that being any of the documents that you obtained that were in your investigative file?

A.   I don't recognize the documents.  I don't remember them. I'm sorry.

Q.   How about Tab Number 5?  Also from Eastern State Hospital in Vinita, same date, October 8th of -- excuse me -- of 1986.  Recognize that document?

A.   Not independently, no.

Q.   But you did receive documents from Eastern State Hospital?

A.   That's the best I can tell you is that, based on that -- what I read from Ms. Schaye and from the affidavit that I -- that obviously there was something from Eastern State.  I

just don't know specific what it was.

Q.   All right.  Once again, quickly, Tab Number 6.  A discharge summary from Eastern State Hospital, October of 1986, two page document.  Do you recognize that as being the records -- any of the records that you obtained?

A.   Again, I cannot.

Q.   Tab Number 7.  And I will say that this is a rather lengthy exhibit.  It's 35 pages in length.  But it is a number of records from Saint Francis Hospital from 1999, the date of the -- Mr. Barrett's hospitalization after the shooting incident.  Are you familiar with these particular records?

A.   No.  I'm not sure how we obtained them if -- I don't recall.  I'm sure it was through a release or something.  I'm not sure.  But I don't recognize them independently, no.

Q.   Tab Number 8, two page document.  Actually, three page document.  This being from -- the first two pages being from the Wagoner Community Hospital.  Do you see that?

A.   Yes.

Q.   Do you recognize those as being documents that you received as part of your investigation?

A.   No.

Q.   But as part of your declaration, you do say that you collected documents from Wagoner Hospital; correct?

A.   That is, again, the -- I can tell you that, based on the declaration, that there were documents obtained, but what those documents were, I haven't a clue.  I don't recall.

Q.   Fair enough.  And Page 3 of that same exhibit is a document from Bill Willis.  And, again, you can't say whether this is a document you received or not; is that correct?

A.   That is correct.

Q.   The same hold true for Tab Number 9, which is another document from Bill Willis Community Mental Health Center?

A.   Yes, sir.

Q.   This is a document -- Tab Number 10.  This is a document from the Social Security Administration involving Mr. Barrett.  Do you know whether or not you received this information from Ms. Schaye or from your own investigation?

A.   I don't.

Q.   Do you recall receiving information from the Social Security Administration regarding Kenneth Barrett?

A.   Independently from -- no.

Q.   So you can't say it was in your investigative file or not?

A.   I cannot.  I don't know what I -- I don't recall.

Q.   But, again, if it was, you would have provided that to Mr. Echols; correct?

398

A.   Absolutely.

Q.   Tab Number 11, would that be the same, the documents from the Sequoyah Memorial Hospital, do you recognize those?

A.   No, not independently, no.

Q.   Now, that's from January of 1995.  You didn't include, I don't believe, in your declaration documents from Sequoyah Memorial Hospital?

A.   May have been received by someone else other than myself.  I don't --

Q.   Could it be an oversight in your declaration?

A.   Either that, or somebody else obtained it.

Q.   Did you prepare this declaration yourself, sir?

A.   Mr. -- the attorney did.

Q.   Mr. Autry?

A.   Yes.

Q.   And so there very well could have been Sequoyah Memorial Hospital records in your information.  You just don't know?

A.   Correct.

Q.   Tab Number 12 is an affidavit from a Dr. Faust Bianco, Ph.D.  Do you see that?

A.   Yes.

Q.   Do you know who that is, Faust Bianco?

A.   I am familiar with Mr. Bianco.

Q.   As a matter of fact, Dr. Bianco does evaluations

routinely for OIDS; is that correct?

A.   He used to, yes.

Q.   Okay.  And do you recall if this particular document was part of your investigative file?

A.   I would -- I would think it would be, but I can't say for sure -- for certain today.  I mean, just -- I met with Dr. Bianco on multiple cases.

Q.   Did you -- do you recall meeting him specifically about the defendant, Kenneth Barrett?

A.   I don't -- I can't -- I'll confuse cases if I do that.  I can't say one way or the other if it was Mr. Barrett or anybody else.

Q.   Flip over to Tab Number 14, please.  This appears to be a release of records to Mr. -- or to Dr. Bianco from Mr. Barrett.

A.   Okay.

Q.   Do you recognize either of the pages of that particular exhibit?

A.   No.  Somebody else had to get this because this is not my handwriting.

Q.   So you don't recognize it; is that correct?

A.   Yes.

Q.   And you don't -- you do not, of your independent knowledge, know whether this document was in your investigative file?

A.   I do not.

Q.   Now flip over to Tab Number 49 for me, please.

A.   Okay.

Q.   Take a moment if you will.  I know this is a rather lengthy document, 11 pages.  But take a moment and just thumb through that and see if you recognize it, please.

A.   Okay.

Q.   All right.  Having an opportunity to look at that, do you recall this interoffice memo?

A.   I'm trying to figure out how to phrase this correctly. I had forgotten about this memo until David had -- the attorney had shown me is this -- you know, asked me this, that it appears to be with my name on it.  I mean, I -- I just don't remember creating it.

Q.   Okay.  So according to your testimony, counsel for Mr. Barrett, David Autry, sent this to you and asked you to look at it?

A.   Yes.

Q.   Asked you if you remember it?

A.   Yes.

Q.   And I guess you told him the same thing you told us today, independently I don't remember it; is that right?

A.   Pretty much, yes.

Q.   Well, do you remember conducting a number of interviews of people and collecting a summary of those interviews and

401

providing that to JDE?  First of all, who is JDE?

A.   Mr. Echols.

Q.   Would you agree this appears to be a memo that you created?

A.   Yes.

Q.   And this would be, in fact, in the case of the State of Oklahoma versus Kenneth Barrett; correct?

A.   Yes.

Q.   And it's dated September of 2002; correct?

A.   Yes.

Q.   Specifically 11th?

A.   Yes.

Q.   Would this particular docket -- document had been in your investigative file?

A.   I would -- I would believe it would have been because Mr. Autry gave it to me.  And I assume that that's where it came from.

Q.   You're making that assumption; correct?

A.   Yes.

Q.   All right.  But obviously this is something you provided to John David Echols; correct?

A.   Yes.

Q.   Now, if I understand it correctly, looking --

          MR. WILSON:  First of all, move for admission of Government's Exhibit Number 49, Your Honor.

THE COURT:  Mr. Autry, is there any objection?

MR. AUTRY:  To 49, Your Honor?

THE COURT:  Yes.

MR. AUTRY:  No.  No objection.

THE COURT:  Government's 49 is admitted.

Q.  (BY MR. WILSON)  Since you've had an opportunity to look at it, would you agree with me, sir, that this appears to be a memo outlining a number of interviews that you performed?

A.  Either myself or stated by Ms. Schaye from her memos, and I combined the two.

Q.  And specifically, if you're looking at Page 8 of that document, you set forth a list of particular interviews that Ms. Schaye performed herself; correct?

A.  Yes.

Q.  That would be Richard Barrett, Linda Riley, Elnora Long, Carolyn Joseph, Mark Dotson, and Tracy Swearingen?

A.  Yes.

Q.  Now, I'm going to ask you do a little bit of gymnastics for me, okay?

A.  Okay.

Q.  I want you to hold the tab there at 49, but I want you to flip back over beginning to Tab Number 18, because we're going to look at a number of additional documents.  All right.  Are you at 18?

A.   Yes, sir.

Q.   Do you recognize what Number 18 is, sir?

A.   It's a report by Roseann Schaye.

Q.   And do you recognize that being a report that you received from Roseann Schaye, the former mitigation specialist?

A.   Again, I couldn't tell you if it came from Ms. Schaye or not.  I just -- you know, I just don't recall.  I mean, it's been very -- a long time.  And I -- I just don't recall independently from --

Q.   I understand that, sir.  But you did receive documents from Roseann Schaye?

A.   I did -- I can -- yes, I did.  I do recall that.

Q.   And you do recall receiving actual memorandums of interviews that she conducted; correct?

A.   The reason that I -- this is going to sound -- that little diagram thing that she uses on her reports sparked my memory that, yes, those came from her.

Q.   And I'm not sure what diagram you're talking about, but is it on this document?

A.   It's not on this document, but it was on other documents we had spoken of.  It looks like some kind of southwest design.

Q.   On the letterhead?

A.   Yes.

404

Q.   Okay.

A.   Yeah.

Q.   The Government's Exhibit Number 18 appears to be an interview of a Carolyn Joseph; is that correct?

A.   Yes.

Q.   And would this interview of Carolyn Joseph have been in your investigative file, if you know?

A.   I would hope.  I just -- I don't know.  I just don't know.

Q.   But you would also agree with me that, if you received this document from John Echols, you would have provided that to Mr. Echols; correct?

A.   If I had received it from Ms. Schaye?

Q.   I'm sorry.  From Ms. Schaye, you would have provided it to Mr. Echols?

A.   Yes.

Q.   And based upon your knowledge, do you know who Carolyn Joseph was?

A.   I do not.  I can't recall.

Q.   Tab Number 19 appears to be another memo of an interview conducted by Roseann Schaye of a person by the name of Elnora Long.  Do you see that?

A.   Yes.

Q.   Do you remember receiving this particular document from Ms. Schaye?

405

A.   Not independently.

Q.   And so you cannot say whether or not that was in your investigative file?

A.   I don't recall.  I really just don't recall.

Q.   But you would agree with me, sir, that if you received this document from Ms. Schaye, you would have surely turned it over to Mr. Echols?

A.   Yes.

Q.   Number 20 purports to be an interview -- a third interview of Gelene Dotson.  Do you see that?

A.   Yes.

Q.   Conducted by Ms. Schaye?

A.   Yes.

Q.   And do you recall who Gelene Dotson was, or is?

A.   I think it's his mom.

Q.   The defendant's mom; correct?

A.   I'm sorry.  Yes.

Q.   All right.  Do you, of your independent knowledge, remember receiving this particular document from Ms. Schaye?

A.   No.

Q.   Yesterday we received some additional information we had not received before of some additional interviews of Gelene Dotson, two additional ones.  Do you have any independent recollection of those?

A.   Unless one of them -- I may -- I'm thinking I may have interviewed her at one time, but I just don't recall. That's -- I just don't recall.

Q.   We'll get to that.

A.   Okay.

Q.   I believe you did, actually.

A.   Okay.

Q.   But if there's two additional interview summaries from Ms. Schaye of Gelene Dotson, you don't know whether or not they were in your investigative file?

A.   I do not.  I can't say.

Q.   But, again, if you would have received those, you would have given those to Mr. Echols; correct?

A.   Yes.  Yes.

Q.   You would have given those to Mr. Gordon; is that correct?  Is that right?

A.   I gave everything to Mr. Echols --

Q.   Okay.

A.   -- is the best of my recollection.

Q.   Number 21, another document appears to be a summary of an interview conducted by Ms. Schaye of the defendant, Kenneth Barrett.  Do you see that?

A.   Yes.

Q.   Do you recognize that document?

A.   It's -- I have the same answer.  I don't independently

from seeing it, other than this, know if it was in the group of things that Ms. Schaye gave us or not.

Q.   Okay.   Were you aware that Ms. Schaye interviewed Kenneth Barrett multiple times?   Do you recall that?

A.   I don't recall.

Q.   And if we received additional documents yesterday of other -- another interview, you have no reason to -- your answer would be any different; correct?

A.   Correct.

Q.   But if you would have received those, you would have given them to Mr. Echols?

A.   Yes.

Q.   They wouldn't have just been in your investigative file only?

A.   I would think so.

Q.   I'm sorry?

A.   I would think that that's correct, I would have given them and he would have been familiar with them.

Q.   Let me tell you this -- or let me ask you this.   Well, we'll move on, then I'll come back to that.

22, I expect I know what the answer is going to be, but same answers?

A.   Yes, sir.

Q.   23, would that be the same?

A.   Yes, sir.

408

Q.   And for the record, 22 was an interview of Linda Riley; is that right?

A.   Number 22?

Q.   I'm sorry, yes, 22.

A.   Yes.

Q.   And 23 was an interview of Richard -- Richard Barrett -- Richie Barrett, the defendant's brother; correct?

A.   Yes.

Q.   24, an interview of Ruth Harris by Ms. Schaye?

A.   Yes.

Q.   And were you here yesterday, sir?

A.   No.

Q.   Okay.  So the Ruth Harris who testified yesterday, you don't know whether that's the same person or not?

A.   I wasn't here.

Q.   Okay.  Would the answer still be the same, you don't know whether you got this document or not?

A.   Oh, I -- I don't know if it was in that file or not.

Q.   But you would have given it to Mr. Echols; correct?

A.   Yes.

Q.   Tab Number 25.

A.   Yes.

Q.   This would be interview of Tracy Swearingen.  Do you recall that document?

A.   Same answer.

409

Q.   Same answer.   Tab Number 26 is a declaration of Roseann Schaye.   Have you ever seen that document before?

A.   I don't recall it.   I -- I don't recall it.

Q.   Now, let's go back to 49, and we're going to talk a little bit about your interviews that you conducted yourself.

A.   Okay.

Q.   Earlier you said, I think I might have -- I might remember interviewing Gelene Dotson?

A.   I think I did.   I think I --

Q.   This memo, Page 1.

A.   Yes.

Q.   First person listed, Gelene Dotson.   Did that indicate that you interviewed her?

A.   I don't know if this came from something that Mr. Schaye had written or I had written.   I -- I can't -- I can't say.

Q.   All right.   But you would agree with me, sir, that in this particular document, it contains information that was obtained from Gelene Dotson; is that correct?

A.   Apparently so, yes.

Q.   And you'd agree with me that, at the time it was created in September the 11th of 2002, that Ms. Dotson had told either you or some other investigator working on the case that she drank while Mr. Barrett -- while she was pregnant with Kenneth Barrett?

A.   It appears that, yes.

Q.   That he had a knot on his head at the time of his birth?

A.   That's what it says.

Q.   That he was a hyper child?  Fifth line down, KB was always hyper and displayed a temper.  Do you see that?

A.   Yes.

Q.   That the separation that she had with Ernie Barrett affected KB, which is Kenny Barrett.  Sorry.  Correct?

A.   What line was that?

Q.   The next line down, numerous separations of parents had effect on KB.

A.   Yes.

Q.   That after second grade he had trouble in school, had reading problems; is that correct?

A.   That's what it says.

Q.   And mentions the fact that Gelene's sister has been suffering from bipolar disorder, next to the last sentence in the interview?

A.   Yes.

Q.   And that KB suffers from hypochondria?

A.   Yes.

Q.   All that information was obtained by the investigation in September of 2002; correct?

A.   I don't know if it was actually obtained that day or --

411

Q.   You already had it by that time?

A.   -- it was generated that day.  That the report was just generated that day.  But either myself or Ms. Schaye or -- may have been persons who --

Q.   And all that information was turned over to Mr. Echols; correct?

A.   Yes.  Yes.

MR. WILSON:  And, Judge, I'm going to try to speed this up.  I apologize.

THE COURT:  Yeah, I don't know why we need to go through everything that's in here if he doesn't remember specifically.

MR. WILSON:  Absolutely, Judge.

Q.   (BY MR. WILSON)  Would you agree with me that all this information of all these particular witnesses was available to Mr. Echols in September of 2002?

A.   Yes.

Q.   And it was an interview of Ms. Dotson, of Gwen Holt, who was a cousin; is that correct?

A.   I -- let me -- does it say that she's a cousin?  I don't --

Q.   Yeah, right there -- right there next to her name.

A.   Oh, cousin.  Okay.  Sorry.

Q.   And if you move on down to Page Number 6, Doris Barrett.  Page Number 6 lists Ruth Harris.  Page Number 7, Abby

412

Stites; correct?

A.   Yes.

Q.   Page Number 10 being Toby Barrett, and Page Number 11 being Phyllis Crawford; correct?

A.   Yes.

Q.   And this was all information that was done as part of the mitigation before the state trial; correct?

A.   I believe so.

Q.   And all this information was provided to Mr. Echols?

A.   That's my knowledge, yes.

Q.   Mr. Leedy, as part of your duties at OIDS, do you know a person who formerly was intern -- a psychological intern, a guy by the name of Peter Rausch?

A.   Yes.

Q.   Dr. Peter Rausch?

A.   Yes.

Q.   And Dr. Rausch now is -- now works for the Oklahoma Forensic Center up in Vinita; correct?

A.   Yes.

Q.   He's on staff there; correct?

A.   Yes.

Q.   And are you aware that Peter Rausch was -- reviewed some documentation in this particular case regarding Mr. Barrett?

A.   No, I wasn't.  I was told that there was a report by him

413

by Mr. Autry, but I've not seen it, so I don't -- I can't
attest one way or the other.

Q.   Turn to Tab Number 42, please.   I believe it's actually
three pages in length; correct?

A.   Yes.

Q.   And do you recognize this memo that was from Peter
Rausch to Steve Leedy?

A.   I don't independently recognize it, but I'm sure this is
something Peter wrote to me.

Q.   And do you have any independent recollection of the
circumstances upon which Peter Rausch, now Dr. Peter Rausch
prepared this document?

A.   It appears that I had requested him -- he reviewed the
record and attached a summary.

Q.   At the bottom of page -- of that first page, there
appears to be some handwritten words.   Do you see that?

A.   Yes.

Q.   And do you recognize that handwriting?   Is that yours?

A.   It appears to be.

Q.   So that appears to be your own handwriting; correct?

A.   Yes.   It -- I'm trying to -- I don't know what PA style
is.   But it appears to be similar to my handwriting.

Q.   Okay.   Do you know whether this particular document was
in your investigative file?

A.   I do not independently.   I don't recognize.   I would

assume that, since it's here, it was.  But I don't -- I don't know.

Q.  Okay.  Now, you correct me if I'm wrong, but it's my understanding that you were taking orders from Mr. Echols, who was the lead counsel in the case; correct?

A.  Well, yes.

Q.  And he asked you to reach out to Peter Rausch; is that correct?

A.  I don't recall the circumstances as to why I did this or made this request.  I don't know if it was on the behalf of someone.  I just don't know.

Q.  Do you know whether or not you provided this information -- if it was in your investigative file, if you provided this to Mr. Echols?

A.  If it was in a file at our office, it should have been given to Mr. Echols.

MR. WILSON:  Move for admission of Government's 42.

MR. AUTRY:  Your Honor, to the extent that nobody has shown yet -- I'm sorry.  To the extent that nobody has shown yet that either Mr. Hilfiger or Mr. Smith were aware of this document and relied on it, we object on the grounds of relevance, at this time anyway.

THE COURT:  Are you going to be able to connect that up?

415

MR. WILSON:  We'll see, Judge.  I'm just trying to see what persons knew about this particular document in the chain.

THE COURT:  Well, and you've asked him about all that, but why -- why are we admitting it if --

MR. WILSON:  I can ask to admit it later, Judge.

THE COURT:  Okay.

MR. WILSON:  Thank you.

Q.  (BY MR. WILSON)  In reference to what's at this point labeled as Government's Exhibit Number 42, do you recall having discussion with Peter Rausch about his findings from his evaluation -- or his review of the records?

A.  I don't recall if I did or didn't have a conversation on what he discovered or wrote, or anything like that.

Q.  But he prepared this memo for you; correct?

A.  He did.  Apparently he did.

Q.  And he told you --

A.  Some --

Q.  -- that, as far as he knows, this information wouldn't be helpful to the defense; isn't that correct?

MR. AUTRY:  Going to object to hearsay, Your Honor.

MR. WILSON:  Judge, this --

THE COURT:  He doesn't recall any of this, Mr. Wilson.  I mean, you're asking him to say what does the

memo say, and we can see what the memo says.

MR. WILSON:  Fair enough.  I'll move on.  Thank you, Judge.

Q.  (BY MR. WILSON)  Do you know a person by the name of Jeanne Russell?

A.  I am familiar with Ms. Russell.

Q.  And how are you familiar with Jeanne Russell?

A.  She has contracted with our agency multiple times to represent multiple clients in the field of psychology.

Q.  And as part of your duties in the mitigation investigation, do you have an occasion to assist Ms. Russell in any way, to your recollection?

A.  The only way I would assist her is to provide any records that we have obtained from someone, or from an entity like a hospital or jail or whatever.

Q.  And so you would have provided her records; is that correct?

A.  Either my office would have or I would have.  I mean, it -- sometimes they just call and say -- you know, there was an arrangement.  I'm not even too sure at this time if we had a gatekeeper.  I don't know if the gatekeeper at that time was arranging some of these records and stuff, so I just don't know.

Q.  Do you recall Jeanne Russell interviewing you as part of the preparation of her report?

417

A.   I do not recall -- have an independent recollection of that.

Q.   If her report reflects that, you have no reason to doubt that?

A.   Correct.

Q.   Now, you mentioned earlier that you were aware of Jack Gordon, that he was the mitigation second chair -- or handled mitigation for the second trial.  I'm sorry.  Is that correct?

A.   I'm not sure how it broke down.  I knew he was participating in the second trial.  I -- I want to say that he probably did -- was preparing some of the mitigation. But as far as what records he had obtained or how he had obtained them, I -- I'm not sure.

Q.   All right.  You would agree with me that there was a state trial, that it resulted in a hung jury; correct?

A.   Yes.

Q.   Then there was a second state trial that actually went through a verdict; correct?

A.   Yes.

Q.   But no second stage; is that correct?

A.   Correct.

Q.   So you didn't have to testify in either one of those cases; correct?

A.   I did not.

418

Q.   At the completion of the state case, obviously your involvement was done at that point; correct?

A.   That is correct.

Q.   Now, counsel asked you during direct about the fact that you were aware that the defendant was indicted here in federal court for crimes arising from the shooting of and killing of the trooper; is that correct?

A.   Yes.

Q.   And also crimes involving shooting of another trooper; is that correct?

A.   All I remember is that he was indicted for federal crimes resulting -- the specifics of the indictment, I have no clue.

Q.   And isn't it true that Mr. Echols contacted you and asked for your assistance in conducting investigation for him in the federal case; isn't that correct?

A.   And I told him I couldn't.

Q.   That you were too busy.  And that you referred -- gave him some names of other people to seek out; is that correct?

A.   That is correct.

Q.   At the time that Mr. Echols contacted you, I'm sure that you told him, Mr. Echols, I have this investigative file, you come get it?

A.   I can't say that I did or didn't make that comment.

I -- I would -- again, the file itself would have probably been a -- just a file, not necessarily an investigative file, but a file.  Those documents would have been in there, I guess.  But I don't know -- I don't recall having any conversations about that with Mr. Echols.

Q.  Well, and the reason I'm using the word investigative file, that's coming from your declaration.

A.  That's what I referred to it as because that's the best of my recollection was.

Q.  And I guess I'm going to talk about the white elephant in the room here.  When we say investigative file, are we talking about ten boxes, are we talking about a file folder like this?  What are we talking about?

A.  I think that it was just one -- one box if my -- I think there was only one box.  Again, I -- and that's a guess more than --

Q.  I don't want you to guess.  I want you, of your independent knowledge, what did you turn over to David Autry?

A.  Well, based on the information from Mr. Autry about the box, I had assumed that there was just one box.

Q.  And when we say a box, are we talking --

A.  A legal box.

Q.  -- a regular file box?

A.  Yes.

Q.   And was that box completely full, or did it have just five or six pieces of paper in it?

A.   I don't have -- I don't have independent knowledge, and I apologize.

Q.   You were also aware that Mr. Echols withdrew from the representation of the defendant, Kenneth Barrett, in the federal case; isn't that correct?

A.   I had heard that.

Q.   And you testified that you became aware that Roger Hilfiger became lead counsel for the defendant; isn't that right?

A.   I'd heard that.

Q.   When did you hear that?

A.   After it occurred.  Probably -- I don't know if it was in a newspaper.  I don't know if it was something Mr. Echols had mentioned.  I just don't recall.

Q.   Okay.  But it wasn't before -- it was before the trial, correct, the federal trial?

A.   Oh, yeah.  Oh, yes.

Q.   It wasn't after the conviction?

A.   I don't believe it was.

Q.   And you had a box of important information; correct?

A.   Apparently so.  I had -- I had a box of reports and things, yes.

Q.   And you didn't call Roger Hilfiger?

A.   No.

Q.   Didn't call Bret Smith?

A.   No.

Q.   Didn't call John Echols?

A.   Not that I recall.  I don't -- I don't remember -- I don't recall independently having conversations with any of those three about a box.

Q.   Quite frankly, I believe you testified on direct you didn't even know where the box was?

A.   I had forgotten that I had provided it to Mr. Autry when he asked -- we talked about it, and I said where is the box? And he said, you gave it to me back in 2000 whatever it was.

Q.   Look at Tab Number 16 for me, please.

A.   Okay.

Q.   Do you recognize that particular document, sir?

A.   Is this a Bill Sharp, Ph.D. document?

Q.   Absolutely.  That's correct.  Do you know who Bill Sharp, Ph.D. is?

A.   He is a doctor that has been used when it comes to areas -- different areas of --

Q.   And when you say used, used by OIDS?

A.   Hired by OIDS to provide information as far as evaluations and things like that.

Q.   Of your independent knowledge, do you recall this particular document?

422

A.   Again, I -- independently, no.  I mean, I just don't.

Q.   Can you say whether or not it was in your investigative file?

A.   I cannot.  I would hope it would have been, but I can't say.

Q.   All right.  Fair enough.  Mr. Leedy, you'd agree that Mr. Hilfiger was not part of the state trial?

A.   No.

Q.   And, again, your interaction with Mr. Autry in giving him this -- this investigative file was not initiated by you?

A.   No.

Q.   It was initiated by Mr. Autry?

A.   To the best of my knowledge, it is to what I can recall. I -- as I said, I didn't -- I didn't recall the whereabouts of the box until he reminded me I had given it to him.

Q.   I want to show you one other document and then I'm finished.  Government's Number 29.

A.   Intentionally kills or counsels.

Q.   It should say in bold at the top Gelene Dotson.

A.   Oh.  Okay.

Q.   Okay.  Do you see that?

A.   Yes.

Q.   Do you recognize what that is?

A.   Have no idea where this came from.  I don't -- it's

nothing that I think I -- there's some fonts in here that I don't think are familiar with my computer.

Q. Okay. I appreciate that. Thank you.

MR. WILSON: May I have just one moment, Your Honor?

THE COURT: Yes.

MR. WILSON: Apologize, Judge. I have to look at one more document.

Q. (BY MR. WILSON) Go back to 49 very quickly.

A. Okay.

Q. Earlier you testified, when I showed you this document, that these interview -- these summaries are either -- you said they're either mine or another investigators or maybe Roseann Schaye. Is that what your testimony was?

A. And the reason I said that was, is because the information of these crude outlines are from my interviews unless otherwise noted.

Q. Well, unless otherwise noted in this document --

A. Right.

Q. -- would be from your interview; correct?

A. Yeah. And I'm not sure if I used the correct explanation when I sent this to Mr. Echols either. I can't say. But I would assume that they would be if I said that.

Q. Because there are certain persons that are identified as being interviewed by Ms. Schaye?

A.   Yes.  And it could be -- it could be a mistake on my part from that.  I just don't recall.

MR. WILSON:  Okay.  That's all I have.  Thank you, Judge.

THE WITNESS:  Thank you.

THE COURT:  Redirect, Mr. Autry?

MR. AUTRY:  Just briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q.   Mr. Leedy, as an investigator, when you put together information through interviews or the acquisition of records or whatever it was, it goes to the lawyers; correct?

A.   Correct.

Q.   And that would be true of Ms. Schaye in working with Mr. Echols; correct?

A.   I would think so, yes.

Q.   All right.  You just don't keep a box to yourself or a file to yourself of your investigative work in the case and not share it with the lawyers; correct?

A.   Correct.

Q.   All right.  Now, did Mr. Echols maintain a computerized file that was accessible via the Internet of the materials in Mr. Barrett's case?

A.   He may have back then.  He's pretty computer-oriented, so he may have.  I don't recall if he had a network set up

then or not.

Q. All right. And had Mr. Hilfiger or Mr. Smith called you, you would have been happy to let them have whatever you had; correct?

A. Yes.

Q. And Mr. Echols would have done the same, wouldn't he?

A. Again, I would assume so, but you'd have to ask him.

Q. Well, you've known him for a long time; right?

A. I would think so, yes.

Q. All right. You don't have any reason to believe that he would hold back or hold back information from lawyers who succeed him in the case, do you?

A. No, I do not.

MR. WILSON: Calls for speculation, Judge.

MR. AUTRY: Well, he's been speculating now for an hour and a half under cross-examination.

THE COURT: Well, he wasn't speculating about somebody else's motives.

MR. AUTRY: All right. Thank you, Your Honor.

Q. (By MR. AUTRY) So any information you had, whether it's generated by Ms. Schaye, whether you generated it, whether you acquired it via record, the lawyers in the case you are working on would have access to it and would have it; right?

A. Yes, that is correct.

MR. AUTRY: No further questions.

MR. WILSON:  Nothing further, Judge.

THE COURT:  Mr. Leedy, you can step down.  Thank you, sir.

THE WITNESS:  May I be excused?

THE COURT:  Yes.

THE WITNESS:  Thank you.

THE COURT:  Defendant, call your next witness -- I mean, plaintiffs, call your next witness.

MR. AUTRY:  John Echols, Your Honor.

THE CLERK:  Sir, if you'll raise your right hand.

*(The witness was duly sworn by the Clerk)*

THE WITNESS:  I do.

JOHN ECHOLS,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.   State your name for the Court, please.

A.   John Echols.

Q.   What do you do for a living?

A.   I'm an attorney.

Q.   How long have you done that?

A.   Since 1978.

Q.   What does your practice primarily consist of?

A.   Almost exclusively criminal defense.  Some personal

injury and some civil rights.

Q.   All right.  Do you know Kenneth Eugene Barrett?

A.   Sure do.

Q.   How do you know him?

A.   I represented him for several years.

Q.   Was that in -- initially in state court?

A.   Yes.

Q.   And what was he charged with in state court?

A.   Murder and assault with a deadly weapon and shooting with intent to kill, two counts.

Q.   All right.  And how many trials were there in Mr. Barrett's state case?

A.   Two.

Q.   What was the result of the first trial?

A.   It was a hung jury.

Q.   How about the second trial?

A.   Mr. Barrett was acquitted of first degree murder, acquitted of second degree murder, convicted of manslaughter and got a 20-year sentence.  He was acquitted of assault with a deadly weapon, and convicted of a lesser offense.  I don't recall the precise name of it.  And then there were two counts of shooting with intent to kill that he was acquitted on both counts.

Q.   All right.  Was the State of Oklahoma seeking the death penalty in that case?

A.   Yes.

Q.   And suffice it to say, due to the verdict in the second state trial, you never went to a penalty phase?

A.   That's correct.

Q.   All right.  Was a mitigating investigation done in preparation for any potential second stage in the state case?

A.   Yes.

Q.   Was it complete or incomplete?

A.   I'd say it was -- it was incomplete.

Q.   And why do you say that?

A.   The first trial it was hampered by a change in investigators and by some decisions made by the indigent defense system.

Q.   All right.  Did you have a mitigation investigator before the first state trial?

A.   Yes.  And I -- it's hard for me to keep in my mind the differences between the two trials --

Q.   Yes, sir.

A.   -- but I believe Roseann Schaye was before the first trial.

Q.   All right.  How did you find her to help you work on the case?

A.   She was recommended by one of the prominent national mitigation investigator specialists.

429

Q.   All right.   And did she complete her work -- her mitigation work for the state case?

A.   No.

Q.   And did she leave the state case at some point?

A.   Yes.

Q.   Do you know why?

A.   She was unhappy with me and said so, and wrote a letter to the judge and he put the letter in the file.

Q.   All right.   Now, during the time she did work on the state case, had she interviewed various witnesses who could potentially testify in the penalty phase?

A.   Yes.   She'd interviewed I think most of Mr. Barrett's relatives who lived in the area in Oklahoma.

Q.   And did she also interview Mr. Barrett?

A.   Yes.

Q.   What kind of things did she find out in her interviews, just generally, if you can recall?

A.   Well, Mr. Barrett's mother and father had divorced under less than ideal circumstances.   Mr. Barrett had remarried. I don't recall whether Ms. Dotson had remarried or if that was her maiden name.   But he had some -- his relatives and acquaintances expressed their opinions about his mental state.

Q.   All right.   Was there evidence regarding, to your recollection, Mr. Barrett's mother drinking while she was

430

pregnant?

A. Yes.

Q. Was there evidence regarding domestic discord in the home between Mr. Barrett's parents?

A. Yes.

Q. Was there evidence regarding physical and emotional abuse of Mr. Barrett by one or more of -- one or both of his parents?

A. I don't recall about his mom, but there was as to Mr. Barrett, Senior.

Q. All right. To summarize it, was there evidence of a turbulent and chaotic upbringing?

A. Yes.

Q. All right. And was that according to both the parents and other relatives of Mr. Barrett?

A. Yes, there was a consistent picture painted of the family.

Q. And was there also a consistent picture painted of the family that there had been mental problems, or suspected mental problems in the family -- in the wider family?

A. Yes. I don't -- I don't recall the specifics, but that's my -- that's the impression I have.

Q. All right. Is that the kind of evidence you would want to develop and put on if you got to the second stage of the capital case?

431

A.   Yes.

Q.   Okay.   Now, did Ms. Schaye do reports of her interviews?

A.   Yes.

Q.   Did you have access to those reports?

A.   Yes.   I think they were mailed to me or emailed to me.

Q.   And so you possessed the reports; is that correct?

A.   I mean, I've seen them, so I possessed them at some point.

Q.   Okay.   And after Ms. Schaye left the case during the pendency of the first trial, what happened with the mitigation investigation at that point?

A.   Best I can recall, it was taken over by Steve Leedy.

Q.   All right.   And who was Mr. Leedy?

A.   He was a -- formerly a Tulsa County sheriff's deputy who been assigned to the Drug Enforcement Administration and had been active in prosecuting or apprehending drug offenders, and then had become an investigator for the indigent defense system.   I think back when there was a -- in 1990 or '91, there was a state-wide capital trial defense team that was assembled, and I believe Mr. Leedy joined that group.   And then he was working with OIDS when I represented Mr. Barrett.

Q.   All right.   Was he primarily a first stage investigator?

432

A.   He had been, yes.

Q.   All right.  Do you know how much training he had as a mitigation investigator?

A.   I would say that Mr. Leedy was unusually receptive to the idea of mitigation investigation.  Some former police officers don't really take to that side of the -- of the investigation, and Mr. Leedy was always open to it.

Q.   Okay.  Let me ask you this:  At the time of the state trial, I think you indicated a little bit earlier that the mitigation investigation had not been completed; is that correct?

A.   Correct.

Q.   All right.  And what was -- have I asked you what was left to be done?

A.   No.  I think -- again, I'm trying to separate the two trials.

Q.   Yes, sir.

A.   My recollection is that we just hadn't assembled the information and we just didn't have a good handle on it when we were coming up to the first trial.  And my recollection is that I revealed that to Judge Garrett and to Darrell Dowty.  And that that was when -- I believe that's when Judge Garrett said that we would -- if there was a conviction on the capital offense, that we would then have a pause before we -- on the order of two weeks or more before

433

the second stage would begin.

Q.  All right.  Well, let me ask you if you can remember any specifics about this.  At the time you went to trial, and I know that he was going to give you a continuance to complete the mitigation investigation or attempt to complete it, do you know whether or not a complete multigenerational family history, including mental history of the family going back some generations had been done in Mr. Barrett's case to that point?

A.  I know it had not been done.

Q.  All right.  Had a comprehensive mental health workup, comprehensive neurological workup, and a comprehensive psychological and psychiatric workup been done of Mr. Barrett to that point?

A.  No.  The agency -- the agency was unwilling to do that.

Q.  All right.  When you say the agency, what are you referring to?

A.  The indigent defense system.  Oklahoma Indigent Defense System, which I call OIDS.

Q.  Okay.  And why were they unwilling to do that?

A.  And I don't have a recollection of this but I've seen documents that refer to these things.  There was a psychologist and also -- who also has a J.D. named Kathy LaFortune, and she had interviewed Mr. Barrett I believe before the first trial, and had recommended that we not

pursue further psychological evaluations.  That may have been after I received an opinion from a psychologist named Faust Bianco.

Q.  Okay.  Did Kathy LaFortune sort of have a gatekeeper role at OIDS in terms of expending funds for expert witnesses and the like?

A.  Yes.

Q.  All right.  Do you know if she ever did a comprehensive evaluation of Mr. Barrett?

A.  I know that she interviewed him.  I assume that she gave him some tests, you know, that psychologists use, but I don't -- I don't recall what precisely.

Q.  You mentioned Faust Bianco a minute ago, Mr. Echols.

A.  Yes.

Q.  Who was he exactly?

A.  He was a -- I believe a -- either a forensic or a neuro psyche that we retained to form an opinion about Mr. Barrett's mental state.

Q.  All right.  Did he, to your recollection, do neuropsychological tests or neuropsychological screening?

A.  I don't recall what he did.

Q.  All right.

A.  I know he called me and told me his opinion.

Q.  Okay.  Is he somebody you chose, or is he somebody that OIDS told you you were going to use -- going to have to use?

A.   I think it's unlikely that I picked him out.

Q.   Why is that?

A.   Well, I just don't have a recollection of it.  But I -- if I had been selecting, I might have gone elsewhere.

Q.   All right.  What was your impression of the work that he did on Mr. Barrett's case, if you can recall?

A.   He was -- I believe I only talked to him once or twice on the phone, and he had a very deep voice and was sort of a stentorian manner, and he was convinced that Mr. Barrett didn't need any further evaluation because he felt that Mr. Barrett was not suffering from any relevant illness or factor -- psychological factor, personality factor.

Q.   When you made expert requests -- now, let me back up just a minute.  After the state case, Mr. Barrett was charged in federal court?

A.   Correct.

Q.   And were you initially appointed?  And we're going to talk about that a little bit here in a moment --

A.   Yes.

Q.   -- but were you initially appointed lead counsel in the federal case?

A.   Yes.

Q.   Did you make requests in the federal case for funding for a psychologist and a psychiatrist?

A.   Yes, I -- yes.

Q.  Okay.  Were you guided in any sense in making those requests by anything that Dr. Bianco had found?

A.  No.

Q.  All right.  Why not?

A.  Well, Dr. Bianco was -- like I said, he was very dismissive and he saw no -- no reason to do anything.

Q.  Okay.  And did you have a different view, based on your knowledge of Mr. Barrett and your association with him in representing him?

A.  Well, I had a good relationship with Mr. Barrett.  But, for instance, I knew that Mr. Barrett had attempted suicide earlier.  And from the training that I had received, I know or knew that oftentimes there are organic brain difficulties that have to be diagnosed by specialists that may have a bearing on mitigation evidence.

Q.  All right.  Now, when you made the request in federal court for a psychiatrist and a psychologist, what were you looking for or looking to develop?  What kind of evidence were you looking to develop?

A.  Well, it -- I mean, I don't think I would put it that way.

Q.  Okay.

A.  What I wanted was them to use their expertise and tell me what needed to be developed.

Q.  All right.

A.   Particularly I -- I -- again, I don't recall the circumstances directly from memory, but I've looked at the budget requests and things that I made, and I know that we were interested in finding someone who could evaluate Mr. Barrett to determine whether or not there was reason to believe that there might be some organic brain dysfunction that would relate to mitigation.

Q.   Okay.  Do you recall a gentleman named Dr. Bill Sharp?

A.   Yes.

Q.   Did he look at Mr. Barrett in connection with the state case?

A.   In connection with the second trial, I believe.

Q.   All right.  Do you recall whether he suggested that further testing be done?

A.   Yes.  My recollection is that Mr. Leedy and I met with him I think in his -- in his home in Oklahoma City and discussed the case with him.  And he -- he believed that there was evidence of psychological in his -- I believe his principal concern was that Mr. Barrett exhibited paranoid symptoms, and he thought that that might be an area to further investigate.

Q.   Okay.  Do you recall whether or not his report indicated that Mr. Barrett suffered from avoidant personality disorder as well as paranoid personality disorder?

A.   I don't -- I don't recall, but if that's what they say,

that's what they say.

Q.   Okay.  Do you know whether or not Dr. Sharp found any neurological deficits that he thought merited further -- further study or further testing?

A.   I don't recall.

Q.   All right.  Let's see here.

A.   I believe he gave us a written report.

MR. AUTRY:  Could you give Mr. Echols Government's Exhibit 16, please?  It's been admitted.

Q.   (BY MR. AUTRY)  Do you have that, Mr. Echols?

A.   Yes, I do.  I'm sorry.

Q.   Take a second to look over that.

A.   Well, it's eight pages, single spaced.

Q.   Let me get my copy and see if I can orient you to the precise page.  Could you go to Page 7 of Government Exhibit 16.

A.   Okay.

Q.   Do you see on Axis I where Dr. Sharp recommends ruling out learning disorder not otherwise specified?

A.   All right.  That's still on Axis I.  Yes, I do.

Q.   Yes, sir.  And attention deficit hyperactivity disorder, predominantly hyperactive impulsive type --

A.   Yes, I see that.

Q.   -- to rule it out?  Axis II, avoidant personality disorder?

439

A.   Yes.

Q.   Paranoid personality disorder?

A.   Yes.

Q.   Axis III, rule out organic impairment relative to tremor and long-term memory difficulty?

A.   Yes, I see that.

Q.   Okay.  Did Dr. Sharp's report indicate to you, thinking back on it now, that in the federal case you needed to further examine Mr. Barrett's mental state?

A.   Yes.  I believe this was prior to the second trial, though.

Q.   Prior to the second state trial?

A.   Second state trial, yes.

Q.   Is Dr. Sharp somebody you might have used in mitigation of punishment in the second state trial had it gone that far to the second stage?

A.   Yes.

Q.   Okay.  Now, I'm kind of jumping around here a little bit, but when you were on the federal case, who was your second chair?

A.   Roger Hilfiger.

Q.   Okay.  Did Mr. Hilfiger ever ask you anything about Dr. Sharp?

A.   I don't recall.

Q.   Okay.  Did you ever discuss Dr. Sharp with him?

A.   I don't believe I ever did discuss Dr. Sharp with him.

Q.   All right.  How about Dr. Bianco?

A.   I have no recollection of talking with him about Dr. Bianco.

Q.   Or, for that matter, Dr. LaFortune?

A.   Same answer.

Q.   Okay.  Do you know who Jeanne Russell is?

A.   Yes.

Q.   Who is she?

A.   She's former, I think head of one of the departments at what was once known as Eastern State Hospital, and has been in private practice as a psychologist for many years.

Q.   All right.  Did she do a risk assessment of Mr. Barrett before the second state trial?

A.   Yes.

Q.   And what was the purpose of her doing that?

A.   Well, one of the aggravators -- I don't want to discuss the law of capital cases -- but one of the aggravators that is involved is future dangerousness, and it's a very slippery subject.  And this -- it was an attempt to gain some evidence that could be used to counter any claim that Mr. Barrett represented a threat to anyone.

Q.   Okay.  And do you recall what the nature of her report was to you?

A.   Generally speaking, I recall that her report was

441

favorable.  That is, that if Mr. Barrett was in prison, and there wouldn't be a second stage without a conviction and a minimum sentence being life, that if Mr. Barrett was in prison, that he would adjust to life in prison and not be a threat.

Q.  Okay.  Is it your recollection that she determined he was not a, quote-unquote, psychopath?

A.  I think that would be part of the same -- I don't recall that specifically, but that that would be consistent with what I do recall.

Q.  Okay.  Could you look at State's Exhibit 34?  It's in that book.  I believe it is.

A.  Yes.

Q.  Is that Dr. Russell's 2003 risk assessment report on Mr. Barrett?

A.  It appears to be.

Q.  Could you go to Page 4?

A.  I assume you mean the numbers that are sort of written on?

MR. AUTRY:  Could I approach the witness, Your Honor?

THE COURT:  Yes.

THE WITNESS:  Discovery Bates is 8248.

MR. AUTRY:  Okay.  No, sir.

THE WITNESS:  Oh, okay.  Up here.  I'm sorry.

MR. AUTRY:   I'm sorry.

THE WITNESS:   I was looking at the wrong end of the document.

Q.   (BY MR. AUTRY)   Well, I oriented you to the wrong page. If you could turn back one page to Page 3.  Do you see, at the bottom of the page, where it talks about family history?

A.   Yes.

Q.   Now going over to Page 4, is that the information from Mr. Barrett that was given to Dr. Russell where he talks a little bit about his background?

A.   Yes.  I mean, she certainly received the information, yes.

Q.   Okay.  And it talks about a series of separations from his father when his mother would simply move him and his siblings back to Oklahoma with no warning?

A.   Yes.

Q.   And reports that his father ran around with other women, and his mother drank a lot, and he thinks she still continues to drink a lot?

A.   Yes.

Q.   Okay.  He describes his mother drinking on a daily basis, and reported she was often hateful when drinking?

A.   Yes.  And smoked marijuana and used drugs with him.

Q.   All right.  Had a very permissive home life.  He never

443

had to lie to her because she really didn't care what he did?

A.   Well, haven't read that specifically here, but if it's here, I don't have any disagreement with that.

Q.   All right.   Were you aware from various reports in the investigation done in the state case that Mr. Barrett had some educational difficulties?

A.   Yes, but my recollection of that is very vague.

Q.   Okay.   If you could go down on Page 4 of Dr. Russell's report where it says education.

A.   Yes.

Q.   Dr. Russell reports that Mr. Barrett describes himself as having a short attention span, which is confirmed by statements made by other relatives who were around him as a child?

A.   I see that, yes.

Q.   Okay.   Denies being a troublemaker in school?

A.   Correct.

Q.   And in the second paragraph, second sentence says he had average grades, and records show he attended learning disabled classes?

A.   Yes.

Q.   Okay.   Could you go to Page 5?   At the top of the page, does that talk about the suicide attempt in 1986 that you spoke of a bit ago?

A.   At the top of the page?

Q.   Page 5.

A.   It -- yeah, I think it begins -- pardon me.  Yes, I think it begins at the bottom of Page 4.

Q.   Okay.  I'm sorry about that.  And at the bottom of Page 5, does it talk about a medical history involving head injuries?

A.   Yes.

Q.   Going over to Page 7, does it talk about Mr. Barrett's mental health treatment, previous contacts with the mental health system, hospitalizations and such?

A.   Excuse me a moment.  Forgive me.  I believe that that information is, for the most part, on Page 6.

Q.   Page 6.  I'm sorry.  Yes, sir.

A.   Yes, sir.  There's a reference to his self-reporting to the Sequoyah Memorial emergency room.

Q.   And does it also talk about contact with Bill Willis and other mental health providers?

A.   I haven't spotted Mr. Willis' name here yet, but I'm sure it does.

Q.   All right.  It's in the records, so I'm not going to belabor it any further.  But let me ask you this:  Did Jeanne Russell conduct a comprehensive mental health assessment of Mr. Barrett in the state case?

A.   No.

Q.  All right.  Was she the mitigation investigator on the state case?

A.  No.

Q.  Okay.  Is she a mitigation investigator?

A.  Not to my knowledge.

Q.  Okay.

A.  I mean, she works in the mitigation area in capital cases, but she's not an investigator.

Q.  All right.  When you talk about works in the mitigation area, do you mean, as a doctor of education, someone who can give risk assessments and give other psychological tests?

A.  Yes.  And then, I think also, based on her background as having been one of the leaders at least in the treatment program at Eastern State Hospital.

Q.  All right.  Had the state case gone to a penalty phase, would you have used the type of information Dr. Russell developed in mitigation of punishment?

A.  Yes.

Q.  Okay.  Now, you represented Mr. Barrett for a number of years --

A.  Yes.

Q.  -- from I guess 1999 or 2000 until the conclusion of the state case in approximately 2004; is that correct?

A.  Correct.  And then through the spring of the next year.

Q.  All right.

A.   Or to the spring of the next year.

Q.   And that would be in the federal case?

A.   That's correct.

Q.   Now, during that period of time, did Mr. Barrett ever say I'm not going to cooperate with you in the development of mitigating evidence?

A.   Not -- I have -- I have -- I want to say no.   And of course I can't recall anything like that ever being said, and that would surprise me.

Q.   All right.

A.   We had complete cooperation from Mr. Barrett.

Q.   Did he ever foreclose any attempts by you to develop evidence regarding his mental health?

A.   No.

Q.   Did he ever foreclose any attempts by you or Mr. Gordon or Mr. Standing Bear, or anybody else, to develop evidence relative to his background and upbringing?

A.   No.

Q.   Okay.   Did he ever tell you that he didn't want family members to testify for him if the case got to a penalty phase?

A.   I don't recall him ever saying anything like that.

Q.   All right.   Did you ever have any resistance from him about any kind of lines of investigation or strategies that you might have wanted to pursue or did pursue in either the

state or the federal case?

A.   We had a close relationship, and he was -- he was actively interested in his case and we talked about it at length.

Q.   Okay.

A.   I don't remember specifics of our conversations.

Q.   Sure.  I know it's been a lot of years.  Let me ask you how it was you came to be appointed in the federal case for Mr. Barrett?

A.   I received a phone call from the chief public defender in Northern District of Oklahoma, Paul Brunton, and he asked me to meet him at a restaurant.

Q.   All right.  And he asked you to accept an appointment to represent Mr. Barrett in federal court?

A.   Yes.  He and Rob Nigh and I had lunch, and we discussed the case and discussed what could be done to defend the case on legal grounds, and then what could be done to defend the case in the normal way that you would defend a case.

Q.   All right.  And what happened after that with respect to your appointment?

A.   I was --

        MR. WILSON:  Objection, Your Honor.  This calls for a narrative.

        THE COURT:  Overruled.

A.   I was appointed.

448

Q.   (BY MR. AUTRY)   All right.   Were you appointed lead counsel?

A.   Yes.

Q.   Who did the federal public defender want to be appointed as second chair counsel?

A.   Rob Nigh.

MR. WILSON:   Objection to relevance, Your Honor.

THE COURT:   Overruled.

Q.   (BY MR. AUTRY)   Go ahead and answer.

A.   Rob Nigh.

Q.   Okay.   Why did they want that?

A.   Mr. Nigh had just completed the defense of Mr. McVeigh and was available.   He, I think, had gone to work for Clark Brewster in Tulsa by that time.

Q.   Okay.

A.   And his -- his extensive experience in the McVeigh case was a good fit with my experience.

Q.   Was Mr. Nigh appointed?

A.   No.

Q.   Why not?

A.   Well, my -- I was informed that Judge Payne believed that it was important to develop a capital defense bar.

MR. WILSON:   Object, Your Honor, to the relevance of this as to why Mr. -- somebody else other than Mr. Nigh was appointed.

THE COURT:  What is the relevance?

MR. AUTRY:  The relevance of this is that I think I'm going to try to develop through Mr. Echols various limitations and restrictions in terms of funding, time, etc., that were placed on him by the federal court here in representing Mr. Barrett.  And I think that ties in, or is relevant to the development of the mitigation case that was ultimately not done by counsel that did wind up representing Mr. Barrett at trial.  It's all a continuum.

THE COURT:  Well, what does that have to do with whether or not the representation fell below the standard applicable -- go ahead.

MR. AUTRY:  Not given the resources, not given the time basically.

THE COURT:  Well, that wouldn't be malpractice on the attorney's part, would it?

MR. AUTRY:  No, it wouldn't be.  But there's also court-induced ineffective assistance of counsel.  And I think what we have here in play is an interplay between court-induced ineffective assistance of counsel in terms of the funding that was allowed and counsel's own efforts.  So that's our argument.

THE COURT:  Well, I'll give you a little bit of latitude on it.

MR. WILSON:  Judge, just so I could say for the

450

record, that particular issue was raised, an Eight claim. That's been denied by this court and by the circuit.

THE COURT:  Right.  I understand.  Go ahead, Mr. Echols -- or, I'm sorry, go ahead Mr. --

THE WITNESS:  Echols is right.

Q.  (BY MR. AUTRY)  I'm sorry.  Do you remember the question?

A.  Yes.

Q.  Okay.  Go ahead.

A.  I was -- I was told that Judge Payne thought it was important that he develop a capital qualified defense bar in this district, in the Eastern District, and that he wanted to -- for that reason, he chose to appoint Mr. Hilfiger as second chair.

Q.  All right.  And what was the division of labor in Mr. Barrett's federal case going to be between you and Mr. Hilfiger?

A.  We -- Mr. Hilfiger and I never really reached a division of labor.  Mr. Nigh and I had talked about one, but Mr. Hilfiger and I never really had an agreement.

Q.  Okay.  How much contact did you have with Mr. Hilfiger during the time you represented Mr. Barrett in federal court?

A.  I would say not a lot of contact.  It was intermittent. Mr. Hilfiger was -- if I recall correctly, was involved in

451

some church mission work in Central America and was out of -- out of the country on one or more occasions during the time from -- I guess, what are we talking about, October or November?

Q.   Yes, sir.  October of 2004 until you withdrew in April of 2005.

A.   In April.  Yeah, my recollection is Mr. Hilfiger had a couple of trips out of the country and that we -- we never really had a time when we sat down and discussed things.  I just -- I did most of the work.

Q.   All right.  How much work, during the time you and Mr. Hilfiger were on the case, did he do on the first stage part of the case, to your knowledge?

A.   I believe he -- I believe there was an occasion when I was out of town and he presented a motion to the court.  I believe he had -- it seems to me that he had some success on a motion directed towards suppression of evidence.  He was not a regular contributor on the other work that took place.

Q.   Okay.  How much work was he doing during the period of time you both worked together on the federal case on the penalty phase?

A.   I'm not aware of any work that he was doing on the penalty phase.

Q.   In terms of percentage of work on the case while you and

Mr. Hilfiger were together on the case, what percentage of the work were you doing on the case as opposed to Mr. Hilfiger?

A.  I was doing, I mean, I would say virtually all the work. I was doing a high percentage of the work.

Q.  All right.  Were you also doing the administrative work in the case?

A.  Yes, that was a big part of the work in the case.

Q.  And what did that consist of?

A.  The federal rules require that, if you're going to have a budget of more than, I think, at that time was $7,500 or $10,000, that the budget had to not only be approved by the judge before whom you're practicing, but also the chief judge in the circuit.  And so in order to facilitate that, we filed numerous motions ex parte -- ex parte motions addressing the securing experts and other services for the defense.

Q.  Okay.

A.  And then also attorneys fees.  Judge Payne felt that that it was my responsibility, or our responsibility to -- to predict with some degree of precision the different activities that would be -- that would -- that attorneys would be involved in over the course of the case.

Q.  All right.  Do you recall how much time on the case you had to devote to administrative matters?

A.   At the beginning, it was a lot.  The two big issues for me were the administration of the case, and then researching the death penalty, double jeopardy, and the Department of Justice policy known as the Petite Policy.

Q.   All right.  How many different budgets did you have to submit?

A.   I never got one approved.  I submitted five or six budgets for experts.  Ultimately I broke the attorneys budget out from the experts in the hopes that we could get approval of our expert budget and consultant budget in anticipation of trial.

Q.   Why does budgeting -- or why did budgeting in this particular case use up so much time, in your opinion?

        MR. WILSON:  Objection, Your Honor, to relevance, once again, to this determination for this Court.

        THE COURT:  Sustained.

Q.   (BY MR. AUTRY)  Let me get -- I'll ask you maybe something about the budgeting and the administrative work here in a little bit, but let me switch gears for a second.

        What kind of files did you maintain on Mr. Barrett's state case?

A.   Well, I had most of -- almost everything that I had been involved with was in computer form.  And then we also had a dozen boxes of paper.

Q.   All right.

A.   Various printed -- exhibits that had been printed out and were file stamped and other things.

Q.   And did you maintain those files, both the computer files and the printed files, after you were appointed in the federal case?

A.   I didn't have the paper files.  They -- those had been surrendered to OIDS.

Q.   All right.  And why did you surrender the paper files to OIDS?

A.   I didn't want them.

Q.   All right.  Would that include the state investigative file that would --

A.   Everything -- everything that was not reflected in a computer -- on a computer.

Q.   All right.  And would that include mitigating evidence in the mitigation file in the state case?

A.   I think it's likely that those files, for instance the Roseann Schaye files?

Q.   Yes, sir.

A.   I think it's likely that those existed both in the computer and then also in paper form.  I scanned everything that I --

Q.   Okay.

A.   -- could get a hold of.

Q.   And the paper form, the paper files would have been at

455

the OIDS office?

A.  Right.  And when we retrieved them, they were mixed, you know, jumbled.  There was no rhyme or reason to them.  Or no -- there was no consistent rhyme or reason to them.

Q.  All right.  When you say you retrieved them, what are you talking about?

A.  I believe Mr. Leedy went to Norman and physically took the files and brought them to my house.

Q.  All right.  Is that when you were on the federal case?

A.  That would have happened once I was appointed to the federal case.

Q.  All right.

A.  I guess Mr. Leedy might not have done that.  Perhaps I did it myself.  I don't recall how I got them back.

Q.  Okay.  So at some point during the federal case, you had paper files from OIDS that had been commingled?

A.  Correct.

Q.  Okay.  You also had files on a computer database; is that right?

A.  Yes.

Q.  And who had access to the computer database while you were on the federal case?

A.  I did.  Mr. Hilfiger did.

Q.  Okay.

A.  And we may have -- I don't think we ever gave access to

anyone else.

Q.  All right.  Could you --

A.  Ultimately I gave access to Bret Smith who was Mr. Hilfiger's second chair after I was -- after I withdrew from the case.

Q.  All right.  And is there a way that you could track who looked at the computer files in Mr. Barrett's case?

A.  The computer files were kept on a secure web server, and the system was designed, and it was my design, I had a coded system, and it was -- it would send me an email when someone accessed a file and say this file has been accessed on such and such date, and it would give the time.  So I was paranoid about security and I wanted to know whenever files were being accessed by anyone other than me.

Q.  Okay.  And how many times did Mr. Hilfiger access the computer database?

A.  At most -- I mean, I remember none.  But at most, I would say just one or two.

Q.  All right.

A.  Very minimal.

Q.  Did Mr. Hilfiger have copies of the files, the paper files, that you got from OIDS after you got appointed in the federal case, before your withdrawal anyway?

A.  I don't -- I don't believe he ever copied them.  And I know I had them at the time that Mr. Smith picked them up at

my house.

Q.   All right.   Do you recall when it was that Mr. Smith picked the paper files up from your house?

A.   It would have been after I was allowed to withdraw and after his appointment.

Q.   Okay.   Is it your recollection that you withdrew in April of 2005?

A.   Yes.

Q.   Would it be fair to say that Mr. Smith picked up the paper files from your house sometime in mid May to late May of 2005?

A.   That's -- I don't have any reason to believe that that's not correct.

Q.   Is that -- does that sound about right to you?

A.   Right.   He drove his car right up to my front door and we loaded them out.

THE COURT:   Mr. Autry, let's break right there for about 10 minutes.

MR. AUTRY:   Yes, sir.   Thank you.   Sorry.   Thank you, Your Honor.

*(Off the record at 3:20 p.m.)*

*(Back on the record at 3:34 p.m.)*

THE COURT:   Go ahead, Mr. Autry.

MR. AUTRY:   Thank you, Your Honor.   Sorry.

Q.   (BY MR. AUTRY)   Mr. Echols, I think, when we left off,

we were talking about the files in the case, both the computerized file and the paper files. And I believe you indicated that, after Bret Smith was appointed to assist Mr. Hilfiger after you withdrew, that you gave him access to the secured website that had the computerized files; is that correct?

A.   Right.  It would need a user name and password to --

Q.   All right.

A.   -- access it.  It's encrypted in transmission.

Q.   All right.  How many times, to your recollection, did Mr. Smith access the secured website that had Mr. Barrett's files on it?

A.   I don't recall either he or Mr. Hilfiger doing so.

Q.   All right.  Now, when you received the paper files, did that include investigative files that had reports of interviews that Ms. Schaye did or Mr. Leedy did or any other investigator did in the case?

A.   Yes.

Q.   All right.  And when Mr. Smith came and picked up the files in May of 2005, was every file you had given to him?

A.   Yes.

Q.   Do you know whether or not OIDS maintained a copy of the investigative file at the Sapulpa office?

A.   I don't -- I don't believe they did.

Q.   All right.  My question really -- let me get to the

bottom line -- is this.  Did you ever withhold, after you withdrew from the case, any paper files that you had on Mr. Barrett's case from either Mr. Smith or Mr. Hilfiger?

A.   No.

Q.   They got everything?

A.   Yes.

Q.   Okay.  I asked you earlier, Mr. Echols, whether or not you had requested a psychiatrist and a psychologist be appointed to assist the defense in Mr. Barrett's federal case.  Do you remember me asking you that before we broke?

A.   Yes.

Q.   And what was the result of your request, or what happened to your request?  Do you recall?

A.   Ultimately Judge Payne entered an order.  He didn't reject our budget.  He entered an order specifying what he would permit.

Q.   Okay.  And did he permit you both a psychologist or a psychiatrist, or just one?

A.   Again, I -- of course his order speaks for itself, but my recollection is just a psychiatrist.

Q.   Okay.

A.   Or a psychologist.  I just -- I just don't remember.

Q.   Was it an either-or situation, you can have one or not both, to your recollection?

A.   Yes.  And I think the -- I think the funding was at a

level which would indicate more psychologist than psychiatrist.

Q.   Do you recall whether or not the number of hours that were approved by Judge Payne for either a psychiatrist or a psychologist was 40 hours?

A.   I don't recall that, but I think that's -- that's consistent with my recollection.

Q.   All right.  Did you consider -- however many hours that were approved, did you consider the number of hours that were approved to be adequate to the task?

A.   I didn't, no.

Q.   Why not?

A.   Because what I was interested in was finding someone who could determine whether or not additional testing was needed for organic brain damage, and whether or not other testing was needed, someone who could explore the fetal alcohol and other things.  And I thought that that was a larger undertaking than the court did.

Q.   All right.  Did you ask for a mitigation investigator?

A.   Yes.

Q.   And do you recall approximately how many hours you asked for a mitigation investigator?

A.   It was a company on the east coast and I -- 200 seems right, but whatever the documents show.

Q.   Okay.

A.   I mean, I think we can resort to these documents and determine just exactly what I asked for.

Q.   Sure.  Do you recall how many hours were approved for a mitigation investigator by Judge Payne?

A.   I -- I've looked at the order since -- since I became aware of this hearing, and I believe he approved a higher rate than I had requested, and for a smaller number of hours -- a correspondingly number of or hours.

Q.   Does 100 hours sound accurate?

A.   Yes.

Q.   Okay.  And what rate did you ask for?

A.   I think my -- the original request I made was probably for $125 an hour.  But ultimately I -- Julie O'Connell, I believe is her name, a lady who's a federal defender in Tulsa had worked with a company on the east coast, and she referred that company to me.  And they requested only $75 an hour.

Q.   All right.  And was any provision made in the order Judge Payne made for expenses for the mitigation investigator?

A.   I don't believe so.

Q.   Were any -- was any provision made for either a psychologist or a psychiatrist for their expenses in the order that Judge Payne issued?

A.   I don't recall any such provision.

462

Q.   All right.  Now, you entered Mr. Barrett's federal case shortly after he was charged in October of 2004.

A.   I think it probably would have been several weeks, but --

Q.   All right.  Do you recall whether or not the budget -- the order on the budget came out somewhere around March 18th, 2005?

A.   Are you speaking of Judge Payne's order?

Q.   Yes, sir.  I'm sorry.

A.   Yes.

Q.   All right.  And at that time, do you recall when the trial was set to begin?

A.   In July I believe.

Q.   And did that create time problems for you?

A.   Yes.

Q.   Could you explain those?

A.   Well, the -- we had been in the case since the late fall of the previous year, and until the funding was approved by Judge Payne, it couldn't be sent to the circuit for the circuit's approval.  And until the circuit approved it, we couldn't actually expend any funds.  So it wasn't a case where you could say to somebody, go ahead and start working now.  We were being held at the starting gate.

Q.   All right.  Even after there was some kind of approval of some funds in March of 2005, had any mitigation

463

investigator done any work on the federal case?

A.   No.   I'm trying to remember the name of the company.

Q.   Inquisitor, Inc.?

A.   That's correct.

Q.   Had Inquisitor, Inc. or any other mitigation investigator done any work on the federal case as of March 18th?

A.   Nothing other than talking to me about their -- you know, the expectations and fees.

Q.   All right.   And had any psychologist or psychiatrist actually been retained to examine Mr. Barrett as of March of 2005?

A.   No.

Q.   All right.   Now, at some point, Mr. Echols, did you move to withdraw from representing Mr. Barrett in the federal case?

A.   Yes, I did.

Q.   Okay.   And why did you move to withdraw?

A.   I was -- I wasn't getting anything -- I wasn't accomplishing anything.   And I was concerned that -- I was concerned that the case was not going to be permitted to be aggressively presented.

Q.   All right.   Did you consult with anybody about your motion to withdraw before you filed it?

A.   Yes.

464

Q.   Who?

A.   I consulted with Paul Brunton, the chief federal public defender in Tulsa.  I consulted with Richard Burr, who is one of several capital defense resource counsel provided to attorneys -- appointed attorneys in capital cases in the federal system.  And I consulted with Mr. Hilfiger.  And I probably consulted with a gentleman whose name I want to think is Kevin Nally.

Q.   McNally?

A.   Is it McNally?  I may have -- I may have talked with him or he may have sent word through Richard Burr.  I consulted with Richard Burr on a regular basis.

Q.   Okay.  And what did Mr. Burr tell you with respect to your motion to withdraw or whether you should even file one?

MR. WILSON:  Objection, Your Honor, as to hearsay and relevance of this inquiry.

THE COURT:  What is the relevance of it?

MR. AUTRY:  It explains what he did and why he did it with respect to the withdrawal.

THE COURT:  What does all that have to do with what we're here to address, which is performance by the trial counsel?

MR. AUTRY:  Your Honor, I think it's relevant to the performance of trial counsel, and I think I'll be able

to link it up.  But because of all the restrictions that were placed on the budgeting and the time crunch and all that, that obviously, in our view, had an effect on the representation that was ultimately given to Mr. Barrett in the second stage of the trial.

THE COURT:  But what does what somebody told him about withdrawal have to do with that?

MR. AUTRY:  Okay.  Well, I can move on.

THE COURT:  Okay.  Go ahead then.

Q.  (BY MR. AUTRY)  Okay.  What did Mr. Hilfiger say to you with respect to the motion to withdraw?

A.  He was opposed to it.

Q.  Why?

A.  Well, I can't say why he was opposed to it.  He felt that it was -- it was not necessary for him.  I had asked him to join in the motion, and he did not -- he chose not to do so.

Q.  Okay.  At the time you asked for or got approval for 100 hours of work by a mitigation investigator, in your opinion what was left to be done insofar as the mitigation case was concerned?

A.  Just -- just about everything.  The -- in consultation with the capital resource counsel, I became more fully aware --

MR. WILSON:  Objection, Your Honor, as to that

consultation. Counsel was asked what did he believe needed to be done, and they're going into some consultation with someone else. And so I'm going to object to hearsay, and also relevance.

THE COURT: Overruled.

Q. (BY MR. AUTRY) Go ahead.

A. I consulted with -- primarily with Richard Burr, and he provided me with information and case law that left no doubt in my mind that mitigation investigation that we had actually completed in state court was insufficient for meeting the standard of representation in a capital case.

Q. All right. At the time you moved to withdraw, or earlier during your representation of Mr. Barrett in the federal case, was the court, Judge Payne, made aware that the mitigation investigation from the state case was incomplete?

A. Well, I -- I believe he was made aware of it, yes.

Q. All right. What about Mr. Hilfiger, was he aware of that?

A. I just do not recall ever having a conversation about mitigation with Mr. Hilfiger while he and I were both counsel.

Q. All right. When you filed your motion to withdraw, what happened on it?

A. Judge Payne granted it.

467

Q.   Okay.  And what happened after that?  Who was appointed lead counsel?

A.   Mr. Hilfiger was given the lead counsel position and Mr. Smith was appointed as second chair.

Q.   All right.  At the time you left the case in April of 2005, how much work had Mr. Hilfiger done on the case overall?

A.   Again, in my opinion, very little.

Q.   Had he ever discussed with you a mitigation investigation, or strategy for a mitigation investigation?

A.   Prior to my withdrawal?

Q.   Yes, sir.

A.   Again, I don't -- I don't recall.

Q.   All right.  Between the two of you in the federal case, who was supposed to be in charge of doing the work to develop any mitigation case that would have to be presented?

A.   Well, I was in charge of everything.

Q.   All right.  And why is that?

A.   I was lead counsel.

Q.   Okay.  At the time you left the case in April of 2005, did you think it was ready to go to trial relatively soon --

A.   No.

Q.   -- as to the first stage?

A.   No.  I didn't think it was -- no.  The answer is no.

468

Q.   Why not?

A.   The federal trial was different in character -- or the anticipated federal trial was different in character from the state court trials.

Q.   Okay.  And what about the penalty phase?

A.   It was not ready any more than it had been in either of the state court trials.

Q.   All right.

        MR. AUTRY:  Could I have just a second, Your Honor?

        THE COURT:  Yes.

Q.   (BY MR. AUTRY)  Could you look at Government's Exhibit 37, Mr. Echols?

A.   Yes.

Q.   Okay.  And what is that?

A.   It's a psychological evaluation from 2003.

Q.   Okay.  And who did that particular evaluation?

A.   Kathy LaFortune.

Q.   Okay.  And what's the date of the report?

A.   July 8, 2003.  I'm sorry, that's the date of the evaluation.  The date of the report is July 13, 2003.

Q.   All right.  And could you look at Exhibit 34, please?

A.   Yes.

Q.   What is that?  Is that Dr. Russell's risk assessment?

A.   Yes, it is.

469

Q.   What's the date on that?

A.   December 15, 2003.

Q.   All right.  Could you look at Government Exhibit Number 16?

A.   Yes.

Q.   And what is that?

A.   It's a psychological evaluation by Bill Sharp.

Q.   And what's the date on that?

A.   The assessment date is September 28, 2002.  I don't know if it has a date of report.  Report is signed on October 3rd, 2002.

Q.   Okay.  Is it your recollection that Dr. Bianco looked at Mr. Barrett in connection with the state case in 2000?

A.   It was in connection with the first trial, I believe.

Q.   Yes.  Okay.  Now, when was the case tried the second time, the second state trial?

A.   2004.

Q.   And when was the first state trial?

A.   I believe 2002.

Q.   See if I can find something here real quick.  I asked you this earlier, or alluded to it, Mr. Echols.  Was it your view that Kathy LaFortune was there sort of as a keeper of the purse for the indigent defense system?

A.   She was what might be the equivalent of a triage type person.  The agency had little funding, and she was sort of

a choke point on funding.  The OIDS of course all dealing -- the office I worked in was always dealing with murder cases, and psychological issues are always present in murder cases.

Q.   Okay.  When you say choke point, do you mean choke it off, choke off the funding, or what do you mean exactly?

A.   Well, I mean that there's only so much money to be distributed, and I believe she made her decisions in aid of preserving those funds.

Q.   All right.  And was her -- she's a psychologist; is that correct?

A.   And also a J.D.

Q.   And a J.D.  So would it be her job to do an initial screening, or some kind of screening test short of any kind of comprehensive evaluation, and then say yea or nay as to whether additional experts could be hired with any funding available to OIDS?

A.   After -- after I left the federal case, later that same year, I went back to work for OIDS in the Sapulpa office where she worked, and that was the role that she played.

        MR. AUTRY:  All right.  Okay.  Thank you, Mr. Echols.

        THE COURT:  Cross-examination, Mr. Wilson.

                CROSS-EXAMINATION

BY MR. WILSON:

471

Q.   Mr. Echols, you have been involved in capital litigation for how many years?

A.   The first case I ever tried was a first degree murder case.

Q.   And that was in what year?

A.   Probably 1979 or '80.

Q.   All right.  And you -- and I believe your previous testimony was you've been involved and was part of a specialized unit that only handled capital cases; is that correct?

A.   I've done that twice.

Q.   During your representation of Mr. Barrett, isn't it true that you never -- you never asked the court to authorize an evaluation of Mr. Barrett for purposes of determining his competency to assist you; isn't that correct?

A.   That's correct.

Q.   You had no concerns that Mr. Barrett was -- that he was not rationally able to assist you in your defense; isn't that correct?

A.   I may have had concerns, but never to the point that I felt that it was something that I had to address.

Q.   Because if you did, then, under the state system, there was a procedure where you could have filed a motion asking the court for an evaluation; correct?

A.   That's correct.

472

Q.   And the same holds true in the federal system; right?

A.   I don't -- I'm not sure.  I don't know.

Q.   Okay.  Well, if you -- I assume that when you represented Mr. Barrett in the federal side, if you would have had some concerns, you would have done the research to find that provision which allowed a motion to be filed to determine competency.  Would you agree with that?

A.   Sure.

Q.   Okay.  Because I believe you believed and considered Mr. Barrett, and I'm sure you do to this day, that Mr. Barrett is a bright man?

A.   Mr. Barrett has -- has, I think, a very good mind in many areas, yes.  I think he was interested in his case. Mr. Barrett demonstrated recall to me, for instance.  We would be sitting discussing this case and he would remember something that a witness had said, and I think, my experience was, he was invariably correct.

Q.   I believe you told the Court that exact same thing; correct?  That he wasn't an educated man but a bright man; is that correct?

A.   Yes.  I think his skill sets may have been more narrow than some others with a high intellect.  But Mr. Barrett was always -- I was always able to talk to him.

Q.   And as you said, while you were representing him in the first trial and the second state trial, he had amazing

recall of previous testimony of witnesses, and would draw your attention to that and you would check it and, sure enough, he was right; is that correct?

A.   I don't think I said amazing recall.  I think what I said was that invariably, when he did bring something up, it was -- it was good insight into the case.

Q.   All right.  And so when Dr. Sharp evaluated him and said that he noticed a problem with Mr. Barrett's being able to recall information, that would be inconsistent with your personal dealings with Mr. Barrett; correct?

A.   It would depend on what information he was being asked to recall.

Q.   Fair enough.  But information that was relevant to this particular investigation, he was able to recall it?

A.   He was able to recall the events that occurred in court when we were together.  He was able to recall those, had a good handle on those.  He was interested in his case.  He wanted to participate in his case.

Q.   He was able to recall events of the evening of September of 1999; is that correct?

A.   I don't know to what degree I'm required or permitted to discuss my private conversations with Mr. Barrett on -- in specifics.

Q.   Mr. Barrett has raised an issue regarding ineffective assistance of counsel, and you've been called as a witness

on behalf of Mr. Barrett; is that correct?

A.   Yes.

MR. WILSON:   Your Honor, I'd ask the witness to answer the question.

MR. AUTRY:   And we object, Your Honor, because any waiver of the privilege goes to questions of ineffective assistance of counsel in the second stage with respect to Mr. Hilfiger and Smith.  Not necessarily to Mr. Echols' attorney/client relationship with Mr. Barrett.

THE COURT:   What was the question again?

MR. WILSON:   I was asking about his -- Mr. Barrett's recollection of the events of the crime.

THE COURT:   You're not asking him for the substance of my communications I take it?

MR. WILSON:   No.

THE COURT:   Okay.  It's overruled.

Q.   (BY MR. WILSON)  Was he able to recall the events?

A.   He was able to recall events that were not associated with being under the influence of drugs, yes.

Q.   I'm not sure that I quite understand that answer.

A.   Well, I -- may I amend my answer, and I'll just say he was able to recall the events that -- relevant events relating to the charges against him, yes.

Q.   Thank you.  Prior to your representation of Mr. Barrett in the federal system, you would agree with me that you had

no previous federal capital litigation experience; correct?

A.   That's correct.

Q.   Mr. Hilfiger, who was appointed your second chair, had been involved in a previous capital litigation case in federal court; is that correct?

A.   He had prosecuted a case in federal court.

Q.   Was involved in a litigation?

A.   Yes.  Yes.

Q.   Now, there's been some testimony about staff that was at your disposal or that you could use to assist you in the -- excuse me -- in the defense in the state cases.  You had a co-counsel the first case, that being Mr. Standing Bear; correct?

A.   That's correct.

Q.   And you had -- I believe you testified about Steve Leedy who did some investigative work for you; is that correct?

A.   That's correct.

Q.   You had retained the services of Roseann Schaye?

A.   Yes, sir.

Q.   You okay?

A.   Yes.

Q.   Okay.  And you obtained her services specifically for the purpose of gathering mitigation information; correct?

A.   Yes.

Q.   And isn't it true that Ms. Schaye went through her budget and wanted an additional $100,000 to complete her investigation?

A.   I don't remember what the -- what the money was.  She -- she burned through the budget that I had available for her, and her position was that she needed to do tremendous amount of additional work and needed to travel to meet with various relatives to form one of these multigenerational assessments of the family history.

Q.   And I believe the expression you used in dealing with the court was that she bailed out?

A.   Well, she -- she was unhappy with me.  She wrote a letter to the judge and said I -- you know, I have never quit before, but I'm quitting now.  And as I recall, there was a cover letter that said please don't put this in the court file, and of course that's where it went.

Q.   But at the time that she had -- that she ended her services with you -- we've gone through a number of documents with other witnesses that were generated by Ms. Schaye --

A.   Yes.

Q.   -- and are you aware that she did conduct a number of different -- excuse me -- interviews of family members?

A.   Yes.

Q.   Conducted multiple interviews of your client,

477

Mr. Barrett?

A.   Yes.

Q.   And she provided you all that information?

A.   Yes, either to me or there was -- there was some controversy about money being owed to her and her retaining the files for a period of time.  Ultimately, I -- I received everything that -- I believe I received everything that she had done.

Q.   Okay.  As a matter of fact, I believe you had to have Steve to contact her, Steve Leedy, and ultimately you did get the stuff; correct?

A.   As far as I know, it was Steve who retrieved the -- I don't know whether she was ever paid any additional money or not.

Q.   And the information that you received from her would also be medical records that were obtained; correct?

A.   No, I don't -- I don't recall her -- I know when -- I just don't recall what was done about obtaining medical records then.  I don't recall whether that was something she did, or whether that was something being done by the staff at OIDS.

Q.   Okay.  But someone did it; right?

A.   Yes.

Q.   I mean, you were aware of the 1986 suicide attempt?

A.   Yes.

Q.   You were aware of the 1986 commitment in October for a mental health evaluation or treatment; correct?

A.   A separate incident, yes.

Q.   Yes.  You were aware of another incident in 1995, another hospitalization for mental health treatment; correct?

A.   Yes.  I couldn't tell you the details of those now. But, yes, I was generally -- I recall generally that Mr. Barrett had had multiple encounters with the mental health system.

Q.   And I believe Mr. Leedy, who testified a few minutes ago -- actually more than a few minutes -- but earlier today, talked about additional interviews that he performed after Ms. Schaye's services were ended with you?

A.   Yes.

Q.   And you requested he to do that; correct?

A.   Yes.

Q.   And I believe you said that he was -- he was welcoming of the opportunity to help out with mitigation; correct?

A.   He's -- he was then and is now open to the idea of a mitigation investigation as opposed to a first stage fact investigation.

Q.   And you went to trial on the first time, and not knowing that there was going to be a hung jury.  You would agree with that?

A.   Absolutely.

Q.   There was a possibility that there could have been a conviction and a second stage; correct?

A.   And an acquittal, yes.

Q.   But going into that trial, it was your understanding from Judge Garrett that you were going to get two weeks, roughly, before the second stage began; correct?

A.   Yes.

Q.   Now, Mr. Echols, you're not telling us that, in that two week period, you were going to retain a psychologist, you were going to do a full battery of tests, and you were going to do more testing of Mr. Barrett to begin the second stage? You're not telling us that, are you?

A.   No.  What I'm describing is we weren't ready -- we weren't ready to present the second stage.  It wasn't organized.  We didn't have our witnesses lined up.  We didn't -- we couldn't present the case that we had on the day of trial.  And rather than postpone the entire trial, the result -- the agreement was that we would -- we would try the case, and, if necessary, I would be given additional time to manage that part of the presentation.  We didn't, for instance, settle jury instructions for the second stage.

Q.   Okay.  But what I'm asking is, you weren't going to be able to hire --

480

A.   Of course not.

Q.   -- someone to evaluate and do all that in two weeks; correct?

A.   That's correct.

Q.   So if there had been a conviction, you were going to go in with what you had?

A.   I would be in Mr. Hilfiger's shoes.

Q.   Okay.

A.   I would have done an inadequate job.

Q.   Based upon your belief; correct?

A.   Based upon my -- my continuously evolving understanding of what's necessary in such a case, yes.

Q.   Well, you're talking about your continued involvement and understanding of a federal case; right?

A.   No, I'm talking generally.  I mean, I have -- I think like a lot of lawyers, there was a time when mitigation wasn't on the front burner with me either.

Q.   I understand that.  Was that the case in 2000?

A.   Looking back, I think it was, yes.

Q.   Okay.  Well, there's a second trial; correct?

A.   Correct.  Yes.

Q.   The only thing that was done differently between the first trial and the second trial was Roseann -- was Jeanne Russell; correct?

A.   No, that's not correct.

481

Q.   Okay.   You had hired a psychologist?

A.   I'm pretty sure Bill Sharp's opinion came in after the first trial.

Q.   But then you had Kathryn LaFortune after Bill Sharp saying that he doesn't -- you don't need anything else; correct?

A.   You know, I didn't read these exhibits.   I was just asked when they were -- when they were given.

Q.   Well, isn't it true you never mentioned Bill Sharp to the court when you were asking for additional funding in the federal system; is that correct?

A.   I -- I would have to go back and look, but I think that's correct.   I think what I asked for is the position to be filled by someone, and that person would then be able to rely on what had been done previously.

Q.   So just so I'm sure on the time line, the crime took place in September of '99; correct?

A.   You want me to say it's a crime?   We argued it was self-defense.

Q.   He was convicted in the state system; correct?

A.   That's correct.

Q.   He was convicted in the federal system; correct?

A.   Yes.

Q.   Would you agree that there was a crime committed?

A.   The jury found that a crime was committed, that's

482

correct.

Q.   Thank you.   The Faust Bianco evaluation took place in August of 2000.   Do you have any reason to doubt that?

A.   No.

Q.   The first state trial was in September of 2001; is that correct?

A.   I thought it was 2002, but you may be right.

Q.   Dr. Sharp's evaluation was in September of 2002; right?

A.   Yes.

Q.   Kathryn LaFortune's was in July of 2003; correct?

A.   Yes.

Q.   Jeanne Russell's risk assessment was done in December of 2003; correct?

A.   Yes.

Q.   And the second trial was in January of 2004; correct?

A.   I'm sure.

Q.   And you went into that second trial, and you said things were different on the second stage; is that right?

A.   Yes.   I think we had additional interviews.   I think we were -- I think we were in better shape the second trial than we were the first trial.

Q.   Mr. Echols, I'm not going to go through all of the information that you had, but as counsel asked you in direct, you were aware of Mr. Barrett's family history prior

483

to the first state trial; correct?

A.   Yes.

Q.   You were aware of allegations of mental disorders in the family prior to the first state trial; correct?

A.   I don't recall, as I sit here, mental disorders in the family.

Q.   Were you aware of that before the second trial?

A.   I don't recall.  Same answer.  I know there was a lot of drug abuse and violence and neglect.

Q.   And you were aware that there was a lot of drug abuse on behalf of Mr. Barrett; correct?

A.   Yes.

Q.   That he was evaluated in '86 and in '95, and he admitted drug use during those times; is that correct?

A.   Certainly.

Q.   And when we say drug abuse, multiple different drugs; methamphetamine, heroin, marijuana, cocaine?

A.   I don't remember anything about heroin, but it may have been.

Q.   Okay.  And all that information, according to your testimony, was in your database?

A.   I don't know if it was all in my database.  The information was available to me, yes.

Q.   And when you say it was available to you --

A.   Right.

484

Q.   -- either in hard copy or in your database, is that what your testimony is?

A.   Yes.

Q.   And when you retained Jeanne Russell prior to the second trial, counsel referred you to her report, and that would be Government's Number 34, Mr. Echols?

A.   Yes.

Q.   You would agree with me that Ms. Russell determined that, at the present time, Mr. Barrett was not exhibiting symptoms of a major mental illness; isn't that correct?

A.   I'd have to read her report to see whether that's what she said or not.

Q.   If it's in her report, you wouldn't have any reason to doubt that?

A.   No, I don't -- I don't quarrel with the documents. You're asking me if I recall that, and I don't.

Q.   Okay.  Fair enough.  Thank you.  Now, we talked about Mr. Standing Bear being your co-counsel in the first trial. Jack Gordon was your co-counsel in the second state trial; correct?

A.   That's correct.

Q.   And Mr. Gordon was in charge of the mitigation, the second stage; isn't that correct?

A.   That's my recollection.  Jack and I were -- Mr. Standing Bear and I, and then, in the second trial, Jack and I were

in regular communication, and I certainly shared responsibility for everything.

Q.   And how is it that you provided information to Mr. Gordon as far as the documents for the -- from the file? Did you give him access to your database?

A.   I don't recall.

Q.   You don't recall whether you made him hard copies?  Just don't know -- remember how that happened?

A.   I just don't recall.

Q.   But you would provide him the mitigation interviews that Roseann Schaye conducted; correct?

A.   I mean, if he -- if that's what he was doing.  I don't recall an agreement that he was going to be the second stage and I was going to be the first stage.  But if he -- if that's -- if that was our agreement, then certainly I'm sure he acquired the documents somehow.

Q.   Okay.  Well, if he testified that that was his understanding, that he was in charge of the second stage, any reason to doubt that?

A.   No, no.  No, not at all.

Q.   Okay.  You testified that, at the time of your employment as lead counsel in the federal case, that there was some discussion about Rob Nigh being involved as well; is that correct?

A.   That's correct.

486

Q.   Okay.   And you would agree with me that Rob Nigh had a conflict?   He couldn't be involved?

A.   I'm not -- I don't know.

Q.   You're not aware of that?

A.   No, I'm not aware of that.

Q.   Okay.   But, Mr. Echols, would you agree with me that you weren't in agreement that Mr. Hilfiger should be the second chair?

A.   I was not in agreement.   That if Mr. Nigh was not going to be second chair, I would have rather had input into selecting the second chair.   Perhaps Mr. Brunton.

Q.   Okay.   And did that affect your relationship with Mr. Hilfiger?

A.   I suppose, in one sense, it necessarily has an effect on it.   My relationship with Mr. Hilfiger was always cordial. We just didn't agree in some areas.

Q.   All right.   Ultimately you filed a motion to withdraw; correct?

A.   Yes.

Q.   And Mr. Hilfiger didn't enter into that?

A.   That's correct.

Q.   And you can disagree with my characterization.   But I characterize that motion as more of -- it was a power play.

A.   Well --

Q.   Would you agree or disagree with that?

A.   It certainly wasn't a successful power play.

Q.   I'll give you that.

A.   Our feeling was -- and this is -- earlier I was talking about Richard Burr and Paul Brunton when we discussed this. Our feeling was that we had a train wreck heading down the track, and that, if the motion to withdraw were denied, that we could seek a review in the circuit court about the level of compensation for counsel and the level of budgeting for experts.  That was the -- we were trying to figure out a mechanism by which we could gain appellate review before trial.

Q.   And that didn't work out the way you had hoped; correct?

A.   It did not work out.  My preference would have been for the court to deny the motion and for us to take the matter to the circuit.

Q.   And when the motion was denied, then Mr. Hilfiger became lead counsel; correct?

A.   Yes.

Q.   And I believe it was your testimony that Bret Smith became second chair; correct?

A.   Yes.

Q.   And that Bret Smith came to your house and picked up all the files; correct?

A.   Yes.

488

Q.   And in anticipation of Mr. Smith coming to get those files, I assume that you made sure that everything that was on your database was in a copy -- in hard copy so that Mr. Smith and Mr. Hilfiger could have them?

A.   No.  No, I didn't make that effort.

Q.   You knew that Mr. Hilfiger was not computer -- didn't have computer savvy; correct?  Kind of same way Jack Gordon didn't?

A.   Well, Jack Gordon is a -- is a unique individual.  Mr. Hilfiger, I believe, had -- was capable of acquiring information from a computer.

Q.   Okay.  Did you ever talk about that?

A.   We talked about giving him access to everything that was on there.  Showed him how to do it.  We gave him all the paper files, yes.

Q.   So do you know what was in your database that was not in hard copy at the time that you provided those records to Bret Smith?

A.   There would be a good deal of information related -- for instance, there would be a page or a card, or whatever metaphor you want to use to describe it.  There would be a place where information about a certain person would be kept.  And that's where any notes that I had taken or put in anything, anything that I had done, that would be associated with that page.

489

Q.   For instance, look at Government's 29, that tab, Mr. Echols.

A.   Yes.   That's a printout of -- from my -- my computer.

Q.   And so is this what you're talking about?   In your database, there would be a listing of a witness, and then how that witness applies to this particular case?

A.   Yes.

Q.   All right.   Now, you would agree with me that this is in paper form?

A.   Yes.

Q.   Do you know how it got from your database into a paper form?

A.   There's --

Q.   Push print?

A.   It -- it creates a PDF document rather than just printing to a printer.   And then the PDF document would be printed.

Q.   Okay.   And so at the time that you provided your files to Mr. Hilfiger and Mr. Smith, did you create those PDF documents and print them out?

A.   I don't believe so.

Q.   Did you do that at the request of Mr. Autry or any subsequent counsel representing the defendant, Mr. Barrett?

A.   No.   I think I gave them access to the computer files.

I don't believe I ever supplied any of his current counsel with paper documents.

Q.   After you were allowed to withdraw and Mr. Hilfiger was appointed -- well, back up.  I believe you testified that, prior to your motion to withdraw, that you and Roger did not have any specific discussion of your recollection regarding mitigation?

A.   I just don't -- I have no recollection of talking with him prior to -- to withdrawing, that's correct.

Q.   Does that mean it didn't happen or you just don't recall?

A.   It means I don't recall it.

Q.   Okay.  So it could have?

A.   It may have been.  I certainly -- I'd certainly be happy if there was some.

Q.   Okay.  After you were allowed to withdraw, do you have an independent recollection of any conversation you had regarding mitigation?

A.   I spoke with Roger and with Bret and described for them what I thought still needed to be done and what I thought the path would be to bring in a case to trial.

Q.   And specifically what did you tell Mr. Hilfiger and Mr. Smith that needed to be done?

A.   Well, that they needed to complete the budgeting process.  They needed to retain the experts.  They needed to

491

have the experts go to work immediately.

Q.   And did you say specifically what experts should be retained?

A.   I don't -- I don't believe I did.  I mean, I don't -- I don't recall the details of the conversation.

Q.   Okay.  Now, in reference to the request to have an expert hired to evaluate the defendant regarding organic brain issues --

A.   Correct.

Q.   -- I believe you testified that that was one of the things that you made a request for in the federal case; correct?

A.   Yes.

Q.   And I believe that you did that, isn't it true, because you wanted to just -- you wanted to touch that base; is that correct?

A.   No.  I did it because I have been taught and have, through discussions with other lawyers, come to believe that juries, given life or death choices over an individual, are frequently persuaded by something that can be shown on a screen or handed to someone, something that can be seen or evaluated, or a doctor who says this part of the brain is functioning this way and that's why this individual behaves that way.

Q.   And I appreciate that, Mr. Echols.  And the reason I ask

492

that question specifically is, do you recall in a hearing with this Court, with Judge Shreder, making the comment, "I would like to at least be able to touch that base"?

A.   Yes.   I mean, I don't recall making the comment, but I -- I adopt the comment.   If that's -- that's something that needs to be done in order to exclude the possibility that Mr. Barrett would go to trial and no one would have discovered something that would have been useful.

Q.   Isn't it true that you had a full discussion with the Court about what had taken place on the state side, and that Kathy LaFortune wouldn't allow you to do it, and you asked her to get an affidavit from Dr. Bianco just to cover yourself?   Isn't that right?

A.   Well, when you say just to cover yourself, I think -- I don't -- I don't adopt that -- that point of view.   I may have said those words, but I think, in the context, I would -- I would be describing the responsibility I have to look at all of the things that are known to be effective in capital litigation.

Q.   Well, I don't want to characterize that you made that comment.   Specifically do you remember saying, "Kathryn LaFortune said, based upon -- based on that, we are not going to give you any further testing.   Of course he had tested Barrett before the first trial.   There wasn't anything new.   Instead of arguing with them, I made her get

an affidavit from him that said that, so that when I was challenging the habeas after Mr. Barrett's conviction and death sentence, when they said, you know, why in God's name didn't you have his brain checked as a mitigator, and I just didn't go any farther with it -- with that -- I probably should have, I think -- I would like at least to be able to touch that base"?

A.   I think that's an accurate statement.  I don't recall the word for word.  But Judge Shreder and I had several discussions about this, and --

Q.   But at the time that you made those requests, Dr. Bianco had rendered an opinion saying that Mr. Barrett didn't suffer from any mental illness; correct?

A.   I don't know what he was evaluating Mr. Barrett for specifically, but his -- his report to me was negative in the sense that there's nothing I have to say that can be useful to you in defending Mr. Barrett.

Q.   In addition to that, you had Dr. Sharp who said he had problems with memory?

A.   And said -- also indicated the possibility of organic brain dysfunction.

Q.   Okay.  But then you had a subsequent evaluation by Kathy LaFortune saying no other experts needed; correct?

A.   Yes.  I mean, I see the documents here.

        MR. WILSON:   May I have just a moment, Your Honor?

494

THE COURT:  Yes.

Q.  (BY MR. WILSON)  Mr. Echols, just so I'm clear, I want you to look at, for instance, Government's 22.

A.  Yes.

Q.  And do you recall -- by just looking at that document, do you recall that document specifically?

A.  I don't know what you mean when you say do I recall this document specifically.

Q.  Do you remember seeing that document before?

A.  I don't know that I've ever seen it before.  It looks familiar to me.  It looks to me as though it's one of Roseanne Schaye's reports.

Q.  And the format in which it's currently in, is that a format that she prepared, or is that something your database would have prepared?

A.  This would have been prepared on her format.

Q.  And so in order for it to get into your database, it would be scanned in and put into your database?

A.  If it's in the database.  I don't know that it is.

Q.  So you don't know whether it is or not; correct?

A.  Right.  I would have to look to see.

Q.  And you can't say if it was in the boxes given to Mr. Smith?

A.  That's correct.  I mean, I -- we gave -- I gave Mr. Smith everything that I had that was in paper form.

Q.   And are you aware of anything at OIDS that was in addition to what you gave Mr. -- Mr. Smith?  Any additional investigative files or anything?

A.   I asked them to provide everything that these -- these paper files had been in my possession at the end of the second trial.  They were boxed up and sent to OIDS and OIDS retained them.  And then, when the federal case was filed, they came back to me.

Q.   And those same boxes, then you loaded up into Bret Smith's car when he pulled up in front of your house?

A.   That's -- that's correct.

Q.   Government's Exhibit Number 26 is a declaration of Roseann Schaye.  Would you mind looking at that that for me, please?

A.   Yes.

Q.   Do you know -- excuse me.  Do you know the circumstances about which this particular document was created?  Did you ask her to prepare a declaration?

A.   I don't believe so.

Q.   And so any of the exhibits that -- or documents that we -- when I say we, myself and Mr. Kahan -- have reviewed that look like the one that we talked about earlier that has the heading of the witness and has, at the top, do not duplicate, confidential attorney work product, and has your name, John David Echols, that would be a document which was

generated --

A. What was that number?  I just want to look at it again and I can tell you what I recognize as.

Q. I'm looking at Number 30.

A. 30. All right. I recognize that as a document that is generated by my computer. It's a content management system. There will be a field in there that says what the file is, and that will be 2001, Kenny Barrett. And there will be a field in there that which lists issues, and 001, family and friends. And then there would be a summary field. And then there would be other fields, more than one normally, that would be different inputs into the database. When the -- what the computer does is it draws them out and then adds, for instance, the little, what, eight slashes in front of the word summary, and prints the word summary in bold face, etc. That's all done -- that's all generated by the computer. And if it says do not -- the heading across the top, do not duplicate, confidential attorney work product, and a copyright, that is -- I recognize that as being generated by my computer.

Q. So any document that we have reviewed -- that government's reviewed that looks like this that has the heading on it, that would have been generated by your database?

A. Unless -- unless somebody tried to fabricate one, but I

have no reason to believe that that would be the case.

Q.   Okay.   To your knowledge, did Mr. Gordon, your co-counsel in the state case -- second state case, did he accumulate any information that was not shared with you or that he kept on his own?

A.   I wouldn't know, obviously.

Q.   For instance, would he say, well, I've got some information over here that I'm keeping that --

A.   I don't recall anything like that.

Q.   Okay.   So you would think that, anything he had in his files, he would provide you a copy?

A.   Well, I don't -- I mean, I don't know what files he kept personally.

MR. WILSON:   Pass the witness, Your Honor.   Thank you.   Thank you, Mr. Echols.

THE WITNESS:   Yes, sir.

THE COURT:   Redirect, Mr. Autry?

MR. AUTRY:   Thank you, Your Honor.

                    REDIRECT EXAMINATION

BY MR. AUTRY:

Q.   Mr. Echols, do you know if OIDS was in the habit of keeping duplicate paper files on a capital case?

A.   OIDS kept duplicate files of -- I mean, on top of duplicate files.   There were -- that was a problem until they switched to scanning.

498

Q.   All right.   You were asked about your request for expert assistance -- mental health expert assistance in the federal case and conversations you had with Judge Shreder.   And the way Mr. Wilson was trying to make it sound is that you were only requesting mental health expert assistance for Mr. Barrett in the federal case as a CYA maneuver.

A.   I heard it.

Q.   Okay.   Is that what you were doing?

A.   No.   I was -- I was representing Mr. Barrett.

Q.   And this is a person you knew who had attempted to commit suicide in 1986 by shooting himself in the chest; correct?

A.   I thought it was the abdomen, but --

Q.   Somewhere -- well, he shot himself with a shotgun?

A.   It was with a shotgun.   Leaned over a shotgun and pulled the trigger.

Q.   All right.   And somebody who had been committed to mental health hospitals in the past; correct?

A.   Yes.

Q.   Somebody who had significant contact with the mental health system in the past; correct?

A.   Yes.   And I think it's -- from the point of view of litigating his defense, we're talking about what was his state of mind as of the night that all of this occurred, the night that Mr. Eales died.   After that time, Mr. Barrett was

no longer able to acquire the drugs that had -- he habituated previously. And I think, as this went on, we were trying to look back into his state of mind back at that time.

Q. And you were also trying to develop, if you could, mitigating evidence that went to his overall mental state, whether he had mental illness, neurological damage, and any of that sort of thing. Would that be correct?

A. Yes.

Q. And this is a person who, during prior mental health contacts, based on the records, had been prescribed --

MR. WILSON: Objection, Judge, as a leading question.

THE COURT: Sounding a lot like argument at this point, Mr. Autry.

MR. AUTRY: I'm sorry, Your Honor. I was just trying to -- I was trying to save time, but I'll rephrase it.

Q. (BY MR. AUTRY) Do you recall whether or not the medical records for Mr. Barrett indicated he had been placed on antidepressants in the past?

A. Yes.

Q. Do you recall whether or not his mental health records indicated whether he had been prescribed antipsychotic medication in the past?

A.   I believe both.

Q.   All right.  Could you look at Exhibit 34, Mr. Echols, in the government's book?

A.   Yes.

Q.   And it would be Page 9 of Dr. Russell's report.

A.   Yes.

Q.   Do you see the heading, personality assessment?

A.   Yes, I do.

Q.   And Mr. Wilson asked you about the first sentence where it says, "At the present time, Mr. Barrett is not exhibiting symptoms of a major mental illness, i.e. schizophrenia, schizoaffective disorder, bipolar disorder, or major depression."  Do you see that?

A.   Yes.

Q.   And it goes on to say, "Although he is anxious and concerned about his current situation, he remains logical and focused on the events around him.  Persons close to Mr. Barrett at different times in his life report observing symptoms of what they believe to be mental illness.  For example, his ex-wife described him as too emotional and believed he had mental problems due to his mood swings.  She further described him as suffering deep depressions during which time he couldn't work.  His son, Toby, described him as having dramatic mood fluctuations and believed that he had some type of chemical imbalance.  Mr. Barrett's mother

501

has also described her son as having intense emotions and dramatic mood fluctuations. As described previously, Mr. Barrett completed one serious suicide attempt in 1986." Is that kind of information a red flag that you would want to investigate further through the use of a mental health expert?

A. Certainly.

Q. All right. And the paragraph after that --

A. And also through a mitigation investigator because the -- what you're trying to document is the impressions that family members and friends and relatives, both local and distant, have about the person.

Q. Yes, sir. And the paragraph after that talks about records indicating paranoia?

A. Yes.

Q. And it talks about Dr. Bill Sharp?

A. Yes.

Q. Where Dr. Sharp described Mr. Barrett as being extremely paranoid during his initial interview?

A. Yes, I recall that.

Q. And, also, that prior hospital records indicate that Mr. Barrett had at least some evasiveness while talking to doctors?

A. Yes, I see that.

Q. And that he had isolating behaviors before his arrest

indicating he rarely left his home and would ask family members to pick up needed items in town?

A.   Yes.

Q.   Is that something you would want to investigate further through a mental health expert and a mitigation investigator?

A.   Yes.   And it related also to the -- to what I would call the first stage defenses, too.

Q.   Okay.   And how so?

A.   Because the state of mind that he was in when his home was assaulted by the TAC team would be affected by these things.

Q.   Okay.   And could you look at Government's Exhibit 16 again?

A.   I have it.

Q.   Go to the last page, Page 8.

A.   Yes.

Q.   Under C -- this is Dr. Sharp's report; is that correct?

A.   Yes, it is.

Q.   Under C, does it say, "It is recommended that the client", meaning Mr. Barrett, "seek information and/or assessment and referral services regarding the possibility of organic neurological damage"?

A.   Yes.   I don't recall whether Dr. Sharp is a

503

neuropsychologist or not.

Q.   Okay.   Do you know whether -- well, it's an exhibit that's been admitted.   Do you recall whether he did any kind of neuropsychological test or found any indications of --

A.   I don't believe he's a neuropsyche.   He says here, licensed clinical psychologist.

Q.   Yes, sir.   Okay.   And D, also on Page 8 of Dr. Sharp's report, talks about a recommendation that Mr. Barrett seek mental health services in order to address the existence of obstructive personality related issues and/or family and origin related issues?

A.   I see that.

Q.   Okay.   And does that go along with some of the things Dr. Russell talked about in her report that would be worthy of further investigation?

A.   I think it's -- it's consistent with that, yes.   I'm not sure what a family of origin related issues are unless they describe his nuclear family.

Q.   Okay.   Now, just because a mental health professional might diagnose or not diagnose somebody with an Axis I disorder, does that mean that there's not mitigating evidence that can be developed based on somebody's mental state or potential mental problems?

A.   It does not mean that.   It does not foreclose.   One opinion does not, in my mind, foreclose the possibility that

504

a different professional might have a different view.

Q.   Okay.   In the extensive budgeting process you went through in the federal case, did you lay out in detail what you thought needed to be done and what services were necessary to properly represent Mr. Barrett?

A.   Yes.

Q.   And --

A.   Although I think the list was incomplete.  It would have had to develop as we received information back from those people.

Q.   Yes, sir.  But you talk about the need for a mitigation investigator; correct?

A.   Yes.  Of course.

Q.   And you talk about the need for expert assistance from a mental health professional because you're requesting funds for that?

A.   Yes.

Q.   And Mr. Hilfiger certainly would have been privy to or aware of what the budget requests in the case in which he was a lawyer were?

A.   Yes.  He received copies of everything I wrote.

Q.   Do you recall filing a motion for an expert on organic brain disorders because Mr. Barrett is known to have suffered significant head injuries during his life?

A.   Yes, that's a reference back I think to when he was hit

505

by, it was like a steel ball or something like that, a steel bat.  Something.

Q.   Okay.  And would that be an ex parte budget request that you made in this particular case that was referred to Judge Shreder?

A.   I would have to look at it to see.  But the requests that I filed were generally referred to Judge Shreder initially.

Q.   Okay.

A.   And then his recommendations were I think, generally speaking, approved by Judge Payne.

Q.   Okay.  Now, you filed a declarations for Mr. Burr in this case; is that correct?

A.   Several.

Q.   And why did you do that?

A.   Well, again, Richard Burr was a tremendous asset.

         MR. WILSON:  Judge, I'm going to object.  This is well beyond my cross-examination.

         THE COURT:  I would agree.  Why are we going into new territory now?

         MR. AUTRY:  Because it goes to what Mr. Echols understood the standard of care as a lawyer representing a defendant in a capital case was as to why he was asking for what he was asking.

         THE COURT:  Well, what does his understanding of

that matter with regard to the counsel that we're looking into here?

MR. AUTRY:  Pardon?

THE COURT:  Well, what he thinks about it is irrelevant, isn't it?

MR. AUTRY:  Well, I think that it's -- it's relevant to the extent that he's talking about an overall standard of care for a capital defense practitioner that would apply across the board as to what the minimum required is, but --

THE COURT:  The objection is sustained.  I'd like to see you get back to covering what's been raised in cross.

MR. AUTRY:  Yes, sir.  I apologize.

Q.  (BY MR. AUTRY)  Now, you were asked about whether or not you copied everything on your database for Mr. Hilfiger and Mr. Smith after you withdrew.  Do you remember Mr. Wilson asking you about that?

A.  Yes, I do.

Q.  Why did you feel it was unnecessary to copy each and every page from your computerized database or the secured website for either Mr. Hilfiger or Mr. Smith?

A.  Because the user is able to re-format and print by pushing a button.

Q.  Okay.  Now, was this some kind of really elaborate

507

complicated deal that only a computer genius could figure out how to access your website or read the material on it, or hit a button to print off a written copy of what's reflected on it?

A.   It's a -- it's a website that has several choices.  One choice is index that gives you a list of all the people.  Then below that, a list of all the places.  And below that, a list of all the things, and then others.  And then there's another category -- five categories of things.  It has a, what we called on the Internet in the old days, a blog section, so there are recordings of -- and that can all be printed out.

Q.   Okay.

A.   You can print it off the screen just by doing a screen capture.  But if you want to print it out with the little notation that says do not duplicate, etc., then it's printed out from the interior of the program.

Q.   All right.  And you have files on there that include reports -- police reports, investigative reports, things of that nature; correct?

A.   There's a section for documents, and some documents would be there.  I'm sure the Clint Johnson warrant would be there, etc.

Q.   All right.  So when you take the computer file you had on the secured website, plus the paper files that you got,

508

would that encompass everything in the case?

A.   I hope so.

Q.   All right.  And that was --

A.   That was -- that was the intent.

Q.   All right.  So somebody should be able to fairly easily use the computer database or the secured website.  If you can use the Internet, could you use it?

A.   Well, yes.  But all Roger would have had to do would be to call me on the phone or send me an email, or Bret could have called me on the phone and sent me an email and I would have printed it out for them.

Q.   Okay.  You were asked about Dr. Sharp -- or you were asked about whether or not Mr. Barrett had a good memory, and you talked about how he could relate things that had been said in court and he was invariably correct when he talked to you about those things?

A.   Yes, that's my experience.

Q.   Do you recall whether or not Dr. Sharp stated in his report that Mr. Barrett had problems with long-term as opposed to short-term memory?

A.   I don't recall that, but that's consistent with what Dr. Sharp's report says.

Q.   All right.  Now, you never filed, either in state or federal court, any kind of motion challenging Mr. Barrett's competency; correct?

509

A.   That's correct.

Q.   Okay.  You said I think, and correct me if I'm wrong, when Mr. Wilson was asking you about that, that you might have had concerns about it?

A.   Well, I think at the outset -- you know, when I first met Mr. Barrett, he was still suffering from his gunshot wounds --

Q.   Yes, sir.

A.   -- in a city jail in Sallisaw.  And I certainly would have been concerned at the outset of the case.  And after working with Mr. Barrett and after -- after establishing a relationship with him, I think he and I had a solid relationship, and I was not concerned with his ability or desire to assist me in defending him.

Q.   All right.

A.   He wanted to be defended.

Q.   Sure.  You understand there's a difference between competency -- evidence that would go to competency and evidence that can mitigate punishment?

A.   Yes.

Q.   Okay.  Were you looking, if you could find one, for a mitigating explanation for Mr. Barrett's drug use?

A.   Yes.

Q.   All right.  Were you dissuaded in any sense by anything Dr. Bianco did or Dr. LaFortune did in further trying to

860

510

pursue evidence regarding Mr. Barrett's mental health or mental state?

A.   No.

Q.   Why not?

A.   I don't -- my job -- you know, my job is to defend Mr. Barrett.  And I don't -- I don't concede -- certainly with Faust Bianco, I don't concede his expertise.  And Ms. LaFortune was involved with the agency.

Q.   All right.  Ms. LaFortune had sort of a dual role, both as a screener and a keeper of the purse.  Would that be accurate?

A.   I don't know when she started.  She was -- she was working full-time for OIDS when I went to work there at the end of 2005.

Q.   All right.

MR. AUTRY:  Could I have just a second, Your Honor?

THE COURT:  Yes.

MR. AUTRY:  Okay.  Thank you, Mr. Echols.

THE WITNESS:  Thank you.

THE COURT:  Let's keep it on redirect.

MR. WILSON:  Absolutely.

RECROSS-EXAMINATION

BY MR. WILSON:

Q.   Mr. Echols, counsel asked you about Dr. Sharp's report,

511

and I believe you testified that you did not talk with Mr. Hilfiger or Mr. Smith about Dr. Sharp's report; isn't that correct?

A.   I said -- I think I said I don't recall talking with him about that.

Q.   So you don't know whether he did or not?  You're not saying your testimony is I didn't, you just don't remember?

A.   No, I don't have a categorically accurate memory of the things that occurred there, so I can't say it didn't happen. I don't have any recollection of discussing it with him.  I would have been happy to discuss it with him if he had brought it up.

Q.   But it's not your testimony today that you had a discussion with them and told them about Dr. Sharp's report and pointed out the deficits which Dr. Sharp found?  That's not your testimony; correct?

A.   That's not my testimony.  My testimony is I don't recall whether or not such a conversation occurred.

Q.   And the database that you have, I take it that still exists?

A.   Yes.  It's gone through many, many iterations, and one of the things, it's something that I program myself, and it's -- the version of it that existed back in 2005 is largely broken now when it's put up against the current

512

state of the CMS system.  But the data remains, yes.

Q.  And all of the information in your database was provided to Mr. Barrett's current counsel?

A.  They've had access to the website since -- I think Tim was probably the first one to get it.

Q.  You're referring to Mr. Schardl?

A.  Yes.  I have trouble with his last name.  I'm sorry.  I apologize.  I didn't mean to be informal.  Yes, that's who I was referring to.

MR. WILSON:  That's all I have.  Thank you, Judge.

THE COURT:  Mr. Echols, you can step down.  Thank you, sir.

THE WITNESS:  Am I -- I have a subpoena from the government also.  Am I excused?

MR. WILSON:  Yes, Your Honor.

THE COURT:  You are excused.

THE WITNESS:  All right.  Thank you, Judge.  Good to see you again, Judge.

THE COURT:  Good to see you.

THE WITNESS:  Thank you, Your Honor.

THE COURT:  Thank you.  I think we're going to go ahead and break for the day.  Anything we want to take up before we close for the day?

MR. WILSON:  May I have just a moment, Your Honor?

THE COURT:  Yes.

MR. WILSON: Judge, the only thing is, prior to beginning of this hearing, the government prepared a stipulation, and both counsel have signed off on that. I would present that to the Court for consideration. It deals with the -- with Peter Rausch, Ph.D. that there's been some testimony. I would just ask the Court to consider the stipulation.

THE COURT: Very well.

MR. WILSON: And I think that's all the government has at this time.

THE COURT: Okay. All right. I accept the stipulation. And we're in recess until 9:00 a.m.

*(Off the record at 4:57 p.m.)*

514

C E R T I F I C A T E

I, Ken Sidwell, Certified Shorthand Reporter for the Eastern/Northern Districts of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in the above-captioned case.

I further certify that I am not employed by nor related to any party to this action, and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 10th day of May, 2017.

s/Ken Sidwell
Ken Sidwell, CSR-RPR
United States Court Reporter

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**IN THE UNITED STATES DISTRICT COURT**

**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | **PETITIONER'S UNOPPOSED MOTION TO FILE EXHIBIT UNDER SEAL** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

Petitioner Kenneth Eugene Barrett, by and through undersigned counsel, pursuant to LCvR 79.1, moves this Court to enter the attached proposed order directing the Clerk of Court to file under seal Exhibit A to Petitioner's Motion to Exclude Witness Steven Pitt. Mr. Barrett states the following as good cause for granting this Motion:

Mr. Barrett seeks to file under seal the report authored by Steven Pitt, D.O., which is Exhibit A to his Motion to Exclude Witness Steven Pitt. This Court authorized Dr. Pitt's examination pursuant to Rule 6(a) of the Rules Governing § 2255 Proceedings and Fed. R. Crim. P. 12.2(c). Under the latter rule the report of the examination would be sealed. As an additional ground for sealing, Dr. Pitt's report quotes at length from a confidential report that was taken from the files Mr. Barrett's trial counsel. Dr. Pitt's report also quotes at length from the report of Dr. J. Randall Price, which this Court has ordered remain under seal. Dr. Pitt's report also quotes and describes parts of Mr. Barrett's prison files, including confidential mental health files which are confidential.

At this point, Dr. Pitt's report is a discovery document. Whether he will be permitted to testify has yet to be determined.

Mr. Barrett's counsel will serve the exhibit on counsel for the government when he submits the proposed order granting this motion.

On May 11, 2017, Mr. Barrett's counsel conferred by email with counsel for the government who stated that the government does not oppose this motion to seal.

WHEREFORE, Mr. Barrett respectfully requests this Court direct the Clerk of Court to file under seal Exhibit A to Petitioner's Motion to Exclude Witness Steven Pitt.

DATED: May 11, 2017

<div style="margin-left:40%;">

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

</div>

868

/s/ *Tivon Schardl*
TIVON SCHARDL
Trial & Habeas Counsel

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 11th day of May 2017, I caused the foregoing Petitioner's

Motion to File Exhibit Under Seal to be filed with the Clerk of the Court using the ECF System

for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B.

Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there

are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | **[PROPOSED] ORDER** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

Before the Court is Petitioner's Motion to File Under Seal Exhibit A to his motion to

exclude witness Steven Pitt. Specifically, Mr. Barrett seeks to have sealed Dr. Pitt's report. This

Court authorized Dr. Pitt's examination pursuant to Rule 6(a) of the Rules Governing § 2255

Proceedings and Fed. R. Crim. P. 12.2(c). Under the latter rule the report of the examination

would be sealed. Dr. Pitt's report also quotes at length from a confidential report that was part of

1                                   *Barrett v. U.S.*, CV-09-00105-JHP

Mr. Barrett's trial counsel's files and from other reports that are under seal. It also quotes and describes parts of Mr. Barrett's prison files, including confidential mental health files. The government does not oppose sealing the exhibit. This Court, being fully informed in the matter, finds the grounds for sealing the report are compelling and, therefore, the motion exhibits should be sealed. The motion to seal is GRANTED.

   IT IS SO ORDERED.

DATED:      May ___, 2017.

 

_____
HON. JAMES H. PAYNE
UNITED STATES DISTRICT JUDGE

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Karl J. Saddlemire (karl_saddlemire@fd.org), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:894861@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Seal
Document(s)
Content-Type: text/html

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 5/12/2017 at 9:30 AM CDT and filed on 5/12/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |

**Document Number:** 434(No document attached)

**Docket Text:**
**MINUTE ORDER by District Judge James H. Payne: granting [433] Petitioner's Unopposed Motion to File Exhibit Under Seal (Re: [432] MOTION to Exclude Witness Steven Pitt) (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire    karl_saddlemire@fd.org

**6:09–cv–00105–JHP** Notice has not been electronically mailed to:

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Karl J. Saddlemire (karl_saddlemire@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net),
Christopher J. Wilson (caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), District Judge James
H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:894892@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content–Type: text/html

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 5/12/2017 at 10:23 AM CDT and filed on 5/12/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 435(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: Directing expedited response by 5/19/2017 (Re: [432] MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire    karl_saddlemire@fd.org

**6:09–cv–00105–JHP Notice has not been electronically mailed to:**

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT            )
                                   )
        Petitioner,                )
                                   )         Case No. 09-CV-00105-JHP
v.                                 )
                                   )
UNITED STATES OF AMERICA,          )
                                   )
        Respondent.                )

**GOVERNMENT RESPONSE IN OPPOSITION TO MOTION TO EXCLUDE EXPERT
TESTIMONY FRM J. RANDALL PRICE BASED ON FAILURE TO DISCLOSE
OPINIONS, REASONS AND BASES THEREFOR**

**COMES NOW** Respondent, United States of America, by and through undersigned

counsel and files this response in opposition to Petitioner's motion to exclude expert testimony

from J. Randall Price based on failure to disclose opinions, reasons and bases therefor (Doc.

425).

**PRELIMINARY STATEMENT**

Just prior to trial in this capital case, Barrett gave notice of expert evidence of a mental

condition.  Trl. Doc. 206.  In response, the government sought authorization to conduct a mental

health exam of the defendant.  Trl. Doc. 214.  This Court granted the government's request, but

required that the government's "fire-walled" counsel receive all mental health documents

regarding Barrett.  Trl. Doc. 216.  The order prohibited fire-walled counsel from disclosing the

mental health records unless Barrett was convicted of a capital crime and confirmed his intent to

offer mental health evidence during sentencing proceedings.  *Id*.  Following conviction, Barrett

1

declined to give notice of his intent to offer mental health evidence, and eventually received the death penalty for a single count of homicide.

Following the affirmance of his death sentence, Barrett sought collateral relief under 28 U.S.C. § 2255. Docs. 1, 2, 70 & 95. He appended to those filings, as Exhibits 89 and 117, declarations from two mental health experts, Myla Young and George Woods. Both experts opined that Barrett's alleged mental illnesses played a role in his commission of this murder. *See e.g.* Doc. 95 Ex. 89 at 24; Ex. 117 at 27. In light of those exhibits, the government sought access to the "firewalled" mental health report submitted by neuropsychologist J. Randall Price. Doc. 52. Barrett opposed the motion (Docs. 61 at 8-15; 65), and the Court denied it, holding that "because Petitioner did not introduce evidence of his mental condition at trial, Rule 12.2(c)(2) prevents the disclosure of the evaluation." Doc. 67 at 14.

This Court subsequently denied § 2255 relief, relying in part on Dr. Price's report. *See* Doc. 214 at 91 n.159 & 189 (citing Trl. Doc. 237). On appeal from the denial of § 2255 relief, the Tenth Circuit affirmed in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and social history. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015). In its opinion, the appellate panel observed that this Court had relied on Dr. Price's report, and noted that his testimony was potentially "devastating" to Barrett's claim. *Id.* On October 26, 2015, the Tenth Circuit issued its mandate. Doc. 232.

On November 30, 2015, this Court issued an order scheduling the evidentiary hearing, and directing the parties to file any motions for discovery by December 30, 2015. Doc. 233. On December 6, 2015, the government filed an unopposed motion for access to Dr. Price's report. Doc. 234. However, after Barrett filed a response formally expressing his intent to seek Supreme

2

Court review of the Tenth Circuit's decision (Doc. 236), this Court vacated the evidentiary hearing and denied the motion for access to the Price report (Doc. 237).

On October 3, 2016, the Supreme Court denied Barrett's petition for writ of certiorari. Doc. 243. On November 7, 2016, this Court scheduled the evidentiary hearing to commence on February 16, 2017, and gave the parties 11 days in which to file any requests for discovery. Doc. 246.[1] On November 18, 2017, the government filed a series of discovery motions, including an unopposed request for access to Dr. Price's report and an opposed motion for a psychiatric evaluation by Dr. Pitt. Docs. 253 & 256. On December 6, 2017, the Court granted the government's motions. Doc. 269. Dr. Price's report sets forth a finding that Barrett is not brain damaged but is a psychopath. *See. id.*

Barrett filed the instant motion to exclude the testimony of Dr. Price (Doc. 425), and this opposition follows. The government observes that Barrett filed the motion out of time (*see* Doc. 270), but fully responds in order to rebut its specious assertions of misconduct.

## ARGUMENT

### THE COURT SHOULD PERMIT DR. PRICE'S TESTIMONY AS REBUTTAL, FOR WHICH THE GOVERNMENT HAS PROVIDED ADEQUATE NOTICE

Barrett claims that Dr. Price's report does not directly contradict the findings of his experts and therefore does not constitute proper rebuttal. Furthermore, he speculates that the government has, over the course of the last eight years, ignored the firewall and engaged in substantive discussions with Dr. Price, eliciting from him opinions that contradict the defense experts. Barrett further asserts that the government has suppressed Dr. Price's new findings from its pre-hearing disclosures. On the basis of this imagined misconduct, Barrett contends that this

---

[1] The Court subsequently continued the hearing to March 27, 2017. Docs. 270 & 414.

Court should bar Dr. Price from testifying.  Doc. 426.  In truth, the government remained almost entirely blind to Dr. Price's findings until after the deadline for discovery requests had passed. But within the context of this § 2255 case, in which the Court has admitted expert testimony under standards set forth in the Federal Death Penalty Act (18 U.S.C. § 3593(c) ("FDPA")), Dr. Price's report reflects proper, admissible rebuttal of Barrett's evidence.

The FDPA, not the Rules of Evidence control the admission of evidence in capital penalty hearings.  18 U.S.C. § 3593(c); *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001). During the penalty phase, a court may exclude evidence only "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury." *Id*.  "[R]ebuttal evidence must be reasonably tailored to the evidence it seeks to refute. Rebuttal evidence is defined as 'evidence given to explain, repel, counteract, or disprove facts given in evidence by the opposing party.  That which tends to explain or contradict or disprove evidence offered by the adverse party.'"  *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001) (quoting BLACK'S LAW DICTIONARY 1267 (6th ed.1990)).  Furthermore, "there must be a nexus between the purported rebuttal evidence and the evidence that the purported rebuttal evidence seeks to rebut."  *Id*. (citing *United States v. Curry*, 512 F.2d 1299 (4th Cir.1975)).

Under the FDPA's liberal evidentiary standard, the government may elicit on cross-examination of a defense expert evidence of the defendant's psychopathy, even if the witness did not testify about such a condition on direct.  *See Lee*, 274 F.3d at 495.  In fact, the FDPA's evidentiary standard generally permits the introduction of alternative mental health theories when the defendant introduces psychological evidence: "By introducing a mental health expert in defense, Lee opened the door to testimony concerning psychological diagnosis. Moreover, the FDPA provides for a broad scope of evidence at the penalty phase in a capital case."  *Id*.

In this case, the government intends to call Dr. Price to testify to, among other things, his diagnosis of Barrett as a psychopath.  Barrett opened the door to the psychopathy testimony by offering expert evidence of a mental illness.  *See Lee*, 274 F.3d at 495.  As Barrett observes, the psychopathy diagnosis does not directly contradict the findings of his experts, nor could it, as Dr. Price evaluated the defendant several years before Drs. Young and Woods.  Nonetheless, his findings "counteract" those of Young and Woods.  Not only did Dr. Price rule out brain damage with a screening test, his psychopathy finding provides alternative mental health explanation for the defendant's violence.  Dr. Price's testimony tends to demonstrate that any omission by Barrett's trial attorneys did not prejudice the defense, for purposes of this § 2255 case.  Additionally, Dr. Price's findings support those of the government's other mental health expert, Dr. Pitt, who relied on the 2005 report as part of his evaluation of the defendant.

Furthermore, the government has remained entirely aboveboard in its avoidance of firewalled evidence and its disclosures of Dr. Price's findings.  In keeping with this Court's orders barring access to Dr. Price's reports, government counsel have assiduously avoided any substantive discussion with the witness until December of this year, when his report became available.[2]  By the time government counsel had access to Dr. Price's report, the time for requesting any further evaluation had already passed.  *Compare* Doc 269 at 17 (granting access to the Price report on December 6, 2017); *with* Doc. 246 (setting a November 18, 2016 deadline for discovery motions).  Accordingly, government counsel had no updated findings to disclose because it rigorously honored its obligations, not because it violated them.

---

[2] Since 2009, undersigned counsel Jeffrey Kahan has attended two professional conferences at which Dr. Price was a speaker.  On one such occasion, Mr. Kahan introduced himself as an attorney involved in this case and that of Edward Fields (at whose trial Dr. Price testified), but avoided any discussion of this litigation in view of the then-existing firewall.

5

In an effort to maintain his position that the government engaged in misconduct, Barrett may argue that firewall counsel could have moved to update Dr. Price's report, even if government counsel remained ignorant of a basis for making the request.  Of course, the record is devoid of any filing by any attorney employed by the United States seeking access to Barrett for purposes of further neuropsychological testing, forestalling any argument that government counsel on either side of the firewall asked Dr. Price to engage in any updates.  Moreover, during the 11-day window in which the parties were permitted to file discovery requests, government counsel had no reason to ask the firewall attorney to seek an update of admissible findings that the Tenth Circuit had already described as potentially "devastating."  797 F.3d at 1232.

Given that the government has committed no misconduct, and intends to offer Dr. Price for wholly proper purposes, this Court should deny Barrett's motion.

6

880

**CONCLUSION**

Based on the foregoing reasoning and authority, the government respectfully urges this Court to deny Barrett's motion to exclude Dr. Price's testimony.

Dated: May 12, 2017,

Respectfully submitted,

DOUGLAS A. HORN
Acting United States Attorney

CHRISTOPHER J. WILSON
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov

*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 656
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on May 12, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/c/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney

8

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Karl J. Saddlemire (karl_saddlemire@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net),
Christopher J. Wilson (caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), District Judge James
H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:894926@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content−Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 5/12/2017 at 12:47 PM CDT and filed on 5/12/2017

**Case Name:**      Barrett v. USA
**Case Number:**     6:09−cv−00105−JHP
**Filer:**
**Document Number:** 437(No document attached)
**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/19/2017. (Re: [425] Opposed MOTION to Exclude Testimony of J. Randall Price Due to Discovery Violation) (cjt, Deputy Clerk)**


**6:09−cv−00105−JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire     karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has not been electronically mailed to:**

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | CASE NO. CV-09-00105-JHP<br><br><br>**PETITIONER'S REPLY TO THE GOVERNMENT'S RESPONSE TO PETITIONER'S MOTION TO EXCLUDE EXPERT TESTIMONY FROM J. RANDALL PRICE BASED ON FAILURE TO DISCLOSE OPINIONS, REASONS AND BASES THEREFOR** |

Petitioner KENNETH EUGENE BARRETT, by and through undersigned counsel, makes

the following Reply to the government's Response in Opposition to Motion to Exclude Expert

Testimony from J. Randall Price Based on Failure to Disclose Opinions, Reasons and Bases

Therefor ("Response" or "Resp."). Mr. Barrett's Motion, filed May 9, 2017, is Doc. 425. The

government's timely filed Response, pursuant to this Court's Order shortening time, Doc. 428, is Doc. 436. For the reasons that follow, the Response raises more problems for the government than it resolves. In sum, the Response demonstrates that the government intends to rely upon Dr. Price for opinions that were not summarized in his report and that are not legitimate rebuttal in that Dr. Price will be used to rebut neuropsychological evidence that this Court excluded at the government's request.

The issue presented in Mr. Barrett's Motion to Exclude is straightforward. Rule 16(a)(1)(G) provides that "the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence as evidence at trial on the issue of the defendant's mental condition." Fed. R. Crim. P. 16(a)(1)(G). Rule 16(a)(1)(G) specifies that the report "must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications." *Ibid.* It is undisputed that this Court's scheduling and discovery orders required the exchange of such a report. Order (Doc. 269) at 11. The government concedes that the current prosecutors received Dr. Price's 2005 report on or about December 6, 2016. Resp. 3. If the government intends to offer at the hearing any opinions from Dr. Price about how his 2005 evaluation rebuts Mr. Barrett's post-conviction experts, Rule 16(c)(2) of the Federal Rules of Criminal Procedure and this Court's discovery and scheduling orders required the government to obtain those opinions from Dr. Price and supplement his previous report with, at least, a summary of his new opinions and the bases and reasons for them.

The government responds to this straightforward proposition with a study in obfuscation. Mr. Barrett will not further waste the Court's time with the government's feigned protestations about being accused of misconduct. Suffice it to say, this Court's objective has been to recreate

conditions that would have obtained at the time of trial, Order (Doc. 269) at 12, and the government has had far more time to obtain a supplemental report from Dr. Price than it had to obtain his original report. The government has had more time to obtain a supplemental report from Dr. Price than it took the government's other expert, Steven Pitt, D.O., to produce a 76-page report purportedly based on thousands of pages of background material. Thus, the government's Response provides no basis for this Court to find good cause or excusable neglect for any delay. The government has simply rejected the idea that it should have to supplement Dr. Price's report.

The government claims Mr. Barrett filed his motion out of time, then waives that objection. Resp. 2. The government's waived objection is mistaken. Mr. Barrett's Motion is predicated on Fed. R. Crim. P. 16(c)(2), Mot. (Doc. 425) at 1, 3, 5, which expressly requires the government to "promptly disclose" "additional evidence or material" at any time "before trial" if "the other party requested, or the court ordered, its production." As stated in the Rule's title, the government is under a "Continuing Duty to Disclose." Mr. Barrett's Motion gave the government the benefit of forewarning about an objection Mr. Barrett could have waited to raise until the *voir dire* of Dr. Price. Each day that goes by without supplemental disclosures the violation continues and Mr. Barrett is more gravely prejudiced by an ever-shrinking ability to prepare to cross-examine or rebut opinions about which he has no notice. The motion is timely and will remain so through the hearing. *See United States v. Mackin*, 793 F.3d 703, 707-708 (7th Cir. 2015) (finding violation of Rule 16 prejudicial where report not provided until trial).

When fashioning a remedy for the government's failure to disclose Dr. Price's opinions, and the bases and reasons therefor, this Court must consider the degree of prejudice, what is necessary to remedy the situation and "the government's willfulness . . . and its willingness to

own up to it."[1] *United States v. Kojayan*, 8 F.3d 1315, 1318 (9th Cir. 1993); *United States v. Ivy*, 83 F.3d 1266, 1280-81 (10th Cir. 1996). The Response sets forth the government's willfulness.

The government concedes that nothing in Dr. Price's report "directly contradict[s]" the findings of Mr. Barrett's experts. Resp. at 5. The government also concedes that in order for Dr. Price's findings to be proper rebuttal, "'there must be a nexus between the purported rebuttal evidence and the evidence that the purported rebuttal evidence seeks to rebut.'" Resp. 4 (quoting *United States v. Stitt*, 250 F.3d 878, 897 (4th Cir. 2001)). Then the government engages in a little sleight of hand. It protests that Dr. Price's 2005 report could not have contradicted Mr. Barrett's post-conviction experts. Resp. 5. That is precisely why the government was required to determine, if it could, whether there is a nexus between Dr. Price's 2005 evaluation and the findings of Mr. Barrett's post-conviction experts and, if there is, to supplement his report as required by Rule 16(c)(2).

The government contends Dr. Price's testimony is proper rebuttal because "his findings 'counteract' those of Young and Woods." Resp. 5 (quoting one carefully excerpted word from *Stitt*, 250 F.3d at 897). There are at least three problems with the government's extremely weak theory of rebuttal. First, that is not what this Court authorized in 2005. Second, and relatedly, the government *concedes* that *in addition* to having a tendency to "'counteract . . . facts given in evidence by the opposing party,'" "'rebuttal evidence must be *reasonably tailored* to the evidence it seeks to refute,'" such that there is, at least, "'a nexus'" between the two. *Ibid.* (emphasis added). Third, Mr. Barrett has an absolute right to a timely statement of the bases and

---

[1] Mr. Barrett omits the word "misconduct" from the quotation in the text, because, despite the government's protestations, Mr. Barrett had not accused the government of willful misconduct. The government is being willful, but willful ignorance is the strongest charge supported by the currently available evidence. Mr. Barrett reserves the right to amend his allegations if it turns out that the government has asked Dr. Price to opine about the findings of Mr. Barrett's experts but to withhold his opinions until he testifies. If that turns out to be the case, Mr. Barrett will seek more severe sanctions.

reasons why Dr. Price believes his findings "counteract" those of Mr. Barrett's experts—i.e. how his 2005 opinions could be considered a reasonably tailored refutation—if, in fact, he holds such a belief.

This Court's 2005 Order was consistent with the requirement that the government's evaluation be reasonably tailored to Mr. Barrett's evidence. The Order stated that the "sole purpose of the government's examination shall be to confirm or rebut mental health evidence presented by the defendant." Order (Crim. Doc. 216) at 5; Order (Doc. 269) at 13. This Court expressly gave Mr. Barrett an opportunity to "object[] to use [*sic*] of an expert, or to a particular test," and if that objection was not resolved informally, this Court said it would "set the matter for hearing." *Id.* at 5. After he obtained Dr. Price's report, Mr. Barrett timely objected to the government's proposed use of the Psychopathy Checklist-Revised ("PCL-R") to rebut the findings of the post-conviction experts. Mot. Exclude J. Randall Price (Doc. 305). Mr. Barrett specifically objected, and presented *undisputed* evidence to prove, that there is no nexus between what the PCL-R measures and the diagnoses of Mr. Barrett's experts. Mot. (Doc. 305) at 5-6 & n.2; *id.* at 11; *id.* at 12-13; Mot. Ex. B (Doc. 305-2) at 18-19; Mot. Ex. C (Doc. 305-3) at 3. Mr. Barrett incorporates by this specific reference all averments and arguments made in that motion and all facts set forth in its exhibits as if fully set forth herein. Although this Court has stated that these proceedings should recreate the conditions from 2005, this Court declined to hold a hearing on Mr. Barrett's motion.

When the government moved this Court for authorization to have Dr. Pitt examine Mr. Barrett, it stated that Dr. Pitt's examination was necessary in light of Dr. Woods's psychiatric opinion because, at most, Dr. Price "had the opportunity to obtain a neuropsychological evaluation of the defendant." Mot. (Doc. 253) at 2. The government did not mention that the

"psychopathy" finding would provide an "alternative mental health explanation" to Dr. Woods's explanation for Mr. Barrett's actions, as the government now contends. Resp. 5. On the contrary, by mentioning only the neuropsychological screening, and omitting psychopathy, the government strongly implied that it could not "counteract" Dr. Woods with Dr. Price's opinion about psychopathy. If the government knew at the time of its motion for the Pitt examination that it would rely on Dr. Price's opinion to "counteract" Dr. Woods, such that it strategically omitted that fact from the Pitt motion, then the government knew enough at that time to trigger the continuing duty to disclose under Rule 16(c)(2).

The record as it now stands leaves no doubt that the government has been playing fast and loose and denying Mr. Barrett notice of how, if at all, Dr. Price's opinions refute those of Dr. Woods. The evidence is in three forms: (1) the government's strategic omission from its motion to have Dr. Pitt examine Mr. Barrett that it intended to use of Dr. Price to rebut Dr. Woods's psychiatric opinion; (2) the undisputed evidence that there is no accepted scientific nexus between the PCL-R or "psychopathy" and Dr. Woods's conclusions; (3) the government's statement in the instant Response that it intends to offer Dr. Price's "psychopathy finding [as an] alternative mental health explanation for the defendant's violence" to that offered by Dr. Woods and Dr. Young. Resp. 5.

The government betrays the implausibility of its "counteracting" rebuttal theory when it states, in the same paragraph, that Dr. Price's 2005 report does not "directly contradict" Mr. Barrett's experts, but "his psychopathy finding provides alternative mental health explanation [sic] for the defendant's violence." Resp. at 5. In the context of psychology or psychiatry, an "alternative mental health explanation" is the same thing as a contradiction. Mental health professionals employ the process of differential diagnosis: the presence of one set of symptoms

confirms one diagnosis and disconfirms another. *See generally* American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders, Fourth Edition, Text Revision* (2000); *Comer v. Stewart*, 230 F. Supp. 2d 1016, 1031 (D. Ariz. 2002) (faulting psychiatrist for failing to consider differential diagnosis in DSM). Or, as in the case of psychopathy, which is not accepted as a differential diagnosis, it doesn't. As stated in Mr. Barrett's motion, and as the government concedes, nothing in Dr. Price's report suggests his opinion is that "psychopathy" is an "alternative mental health explanation" to Bipolar Disorder of Post-Traumatic Stress Disorder, the diagnoses that Dr. Woods testified to. If Dr. Price will testify that his opinion is a valid psychological alternative to Dr. Woods's, Mr. Barrett is entitled to a statement of the bases and reasons for that opinion. Fed. R. Crim. P. 16(a)(1)(G), 16(c)(2).

As to Dr. Young's findings, except as support for Dr. Woods's findings, Mr. Barrett was prevented from presenting her evaluation when this Court granted the government's motion to exclude any testimony from Deborah Miora, Ph.D. or Erin Bigler, Ph.D. Mot. Exclude Witnesses (Doc. 289) at 8-10; Order (Doc. 361) at 10-11. Assuming for the sake of argument the government has the right to rebut excluded evidence, Dr. Price's own report demonstrates that the government is playing fast and loose. If "psychopathy" provided an "alternative mental health explanation" to brain damage, Dr. Price certainly never said so. On the contrary, if psychopathy ruled out brain damage, or vice versa, there would have been no reason for Dr. Price to examine Mr. Barrett for both. But, as the government concedes, that is exactly what he did. The government contends Dr. Price both "rule[d] out brain damage with a screening test" and used the PCL-R to evaluate "psychopathy." Resp. 5.

All of this indicates that if Dr. Price's opinion is that his finding of "psychopathy" is a psychologically valid "alternative mental health explanation" to Bipolar Disorder or Post-

Traumatic Stress Disorder, the bases and reasons for him holding that opinion is an issue for extensive cross-examination. Under Rule 16, Mr. Barrett is entitled to notice of those bases and reasons so that he can prepare to test them. The government's Response indicates the government has no intention of providing that notice.

With regard to Mr. Barrett's neuropsychological impairments, similar arguments apply. The government concedes in its Response that Dr. Price only "screened" Mr. Barrett for neuropsychological problems. Resp. 5. The government contends it will offer the results of this screening to rebut Dr. Young's findings. However, this Court granted the government's motion to exclude testimony about Dr. Young's findings and how she reached them. Mot. Exclude Witnesses (Doc. 289) at 8-10; Order (Doc. 361) at 10-11. This Court's orders state that the government may present at the evidentiary hearing only the evidence it could have presented at trial. Order (Doc. 269) at 9. The government is only allowed to rebut evidence actually presented in the sentencing hearing. 18 U.S.C. § 3593(c). Mr. Barrett was precluded from presenting Dr. Young's findings on specific tests and evidence as to why those tests are reliable and how they measure what they measure. Under the Federal Death Penalty Act, the government would have no right to "rebut" with Dr. Price's screening instrument information the jurors could not hear.

The existing process is doubly biased against Mr. Barrett. First, this Court granted the government's motion to exclude testimony from a neuropsychologist about the tests and procedures that produced the findings the Tenth Circuit found "[m]ost important." *United States v. Barrett*, 797 F.3d 1207, 1230 (10th Cir. 2015), *cert. denied*, ___ U.S. ___, 137 S. Ct. 36 (2016). Mr. Barrett could have presented testimony from a neuropsychologist about the extent and validity of Dr. Young's testing and how her scores interrelate. Proffer of Dr. Deborah Miora (Doc. 376-1). This Court also granted the government's motion to exclude testimony Mr. Barrett

could have presented about the relative weakness of the screening instrument Dr. Price used, compared with the complete battery used by Dr. Young. Proffer of Dr. Erin Bigler (Doc. 376-2). Second, the government fails to provide the required notice of Dr. Price's bases and reasons for believing, if he does, that the screening instrument he used rebuts the full battery of tests Dr. Young used. As things stand, unless this Court grants the instant Motion, the government will be able to rebut testimony Mr. Barrett was precluded from presenting while simultaneously withholding notice of what the government's testimony will be thereby curtailing both Mr. Barrett's case in chief and his ability to cross-examine the government's expert.

Lastly, the government cannot present Dr. Price's findings and then *argue* that they "counteract" those of Mr. Barrett's experts. First, the undisputed evidence before this Court is that the PCL-R and psychopathy do not provide alternative mental health explanations to any of the conclusions of Mr. Barrett's experts. If the government is allowed to present testimony to that effect, that evidence will be subject to being stricken due to the lack of notice. In the absence of evidence of a nexus between Price's findings and those of Mr. Barrett's experts, the government's argument would be lacking an evidentiary basis, at best, and misleading at worst. It is misconduct for a prosecutor to argue conclusions without factual support in the record.[2]

---

[2] *See*, *e.g.*, *Land v. Allen*, 573 F.3d 1211, 1219-20 (11th Cir. 2009) (where no direct evidence of events at victim's home, improper for prosecution to invite the jurors to speculate on interactions between defendant and victim; "The prosecutor exceeded the bounds of appropriate conduct by claiming to describe exactly what happened, and particularly what was said, with such specificity."); *Bland v. Sirmons*, 459 F.3d 999, 1028-29 (10th Cir. 2006) (because jury did not convict defendant of felony-murder charged, predicated on robbery, improper for the prosecution to argue that the homicide was committed in the course of a robbery during penalty-phase summations); *Le v. Mullin*, 311 F.3d 1002, 1020 (10th Cir. 2002) (prosecution improperly misstated the evidence, arguing that defendant laughed after the homicide; "The Assistant District Attorney's comment was erroneous in that it mischaracterized trial testimony in order to show that [defendant] was either remorseless or actually made light of the tragic events of that day. No evidence supports this characterization of the . . . testimony."); *Miller v. Lockhart*, 65 F.3d 676, 682 (8th Cir. 1995) (prosecutor suggests without support in evidence that defendant escaped from jail before); *Tucker v. Kemp*, 762 F.2d 1496, 1507 (11th Cir. 1985) (en

And, "[i]t is unprofessional conduct for the prosecutor intentionally to . . . mislead the jury as to the inferences it may draw." *United States v. Young*, 470 U.S. 1, 8 n.5 (1985) (citation and internal quotation marks omitted); *see also United States v. Mendoza*, 522 F.3d 482, 491 (5th Cir. 2008); *United States v. George*, 201 F.3d 370, 373-74 (5th Cir. 2000).

The government has had at least six months to have Dr. Price consider and opine on the opinions of Dr. Woods and Dr. Young and to state the reasons and bases for how his earlier opinions rebut their findings, if they do. Had the government done so, it was required by this Court's Order (Doc. 270) at 2, and Rules 12.2(c) and 16(c) of the Federal Rules of Criminal Procedure to update Dr. Price's report. The government has not submitted any supplemental disclosure from Dr. Price, and it has no intention of doing so. Consequently, Mr. Barrett lacks notice of any relevant opinions, the bases and reasons therefor, and his counsel cannot adequately prepare to cross-examine him. Accordingly, his testimony should be excluded.

WHEREFORE, this Court should enter an order precluding the government from presenting any testimony from Dr. Price as to how his opinions rebut those of Mr. Barrett's experts, and, since that is the only issue before this Court, the order should preclude him from offering any opinion testimony at all.

///

///

///

///

///

///

---

banc) (although prosecution may argue reasonable inferences from the evidence adduced at trial, prosecution's closing argument that defendant forced the victim to engage in oral sex was a "gratuitous and unsupported charge" and, therefore, "serious professional impropriety").

DATED:        May 18, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

/s/ *Tivon Schardl*
TIVON SCHARDL
Trial & Habeas Counsel

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 18th day of May 2017, I caused the foregoing Petitioner's Reply to the Government's Response in Opposition to Petitioner's Motion to Exclude Expert Testimony by J. Randall Price Due to Discovery Violation to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

<div align="right">

/s/ *Tivon Schardl*
TIVON SCHARDL

</div>

896

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT** | ) | |
| | ) | |
| **Petitioner,** | ) | |
| | ) | Case No. 09-CV-00105-JHP |
| **v.** | ) | |
| | ) | |
| **UNITED STATES OF AMERICA,** | ) | |
| | ) | |
| **Respondent.** | ) | |

**GOVERNMENT RESPONSE IN OPPOSITION TO MOTION TO EXCLUDE WITNESS
STEVEN PITT**

DOUGLAS A. HORN
Acting United States Attorney

CHRISTOPHER J. WILSON
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov


JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 656
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

**TABLE OF CONTENTS**

**PRELIMINARY STATEMENT** ................................................................................. **1**

**ARGUMENT**.......................................................................................................... **4**

   I.  THE COURT SHOULD PERMIT DR. PITT'S RETROSPECTIVE OPINION
TESTIMONY, WHICH NECESSARILY RELIES ON POST-TRIAL EVIDENCE................ 4

     A.  The Government Complied with this Court's Orders ....................................... 4

     B.  The Government, Like the Defense Before it, Can Rely on Post-Trial Information ....... 7

     C.  The Government has not Taken Inconsistent Positions in this Case............................... 9

   II.  DR. PITT'S TESTIMONY IS MORE PROBATIVE THAT PREJUDICIAL ................... 12

**CONCLUSION** ...................................................................................................... **15**

i

# TABLE OF AUTHORITIES

**Cases**

*Cooper Indus., Inc. v. Aviall Svcs., Inc.*, 543 U.S. 157, 170 (2004) ........................................5

*Davis v. Wakelee*, 156 U.S. 680, 689 (1895) ...............................................................................9

*Free v. Peters*, 12 F.3d 700, 703 (7th Cir. 1993) ......................................................................12

*Gardner v. Florida*, 430 U.S. 349, 362 (1977) ..........................................................................14

*Johnson v. Lindon City Corp.*, 405 F.3d 1065, 1069 (10th Cir. 2005) .....................................10

*LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998) .......................................................14

*Skipper v. South Carolina*, 476 U.S. 1, 5 (1986) ......................................................................14

*Teague v. Lane*, 489 U.S. 288, 310 (1989) ................................................................................11

*Thompson v. Weyerhaeuser Co.*, 582 F.3d 1125, 1129 (10th Cir. 2009).................................5, 6

*United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007)............................................................1

*United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015)..................................................2

*United States v. Frady*, 456 U.S. 152, 164 (1982)....................................................................11

*United States v. Hardy*, 762 F. Supp. 2d 849, 881 (E.D. La. 2010)...........................................8

*United States v. Johnson*, 988 F.2d 941, 945 (9th Cir.1993) ....................................................11

*United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001)...........................................................13

*United States v. Villargrana-Flores*, 467 F.3d 1269, 1278 (10th Cir. 2006)..................9, 10, 11

*United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994) ....................................................11

*United States v. West-B*ey, 188 F. Supp. 2d 576, 584-86 (D. Md. 2002) ....................................8

*United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000) .................................................11

**Statutes**

18 U.S.C. § 3593.......................................................................................................................8, 13

28 U.S.C. § 2255...................................................................................................................passim

**Rules**

Fed. R. Evid. 401 ...........................................................................................................................8

Fed. R. Evid. 403 ...................................................................................................................12, 14

Fed. R. Evid. 801 .........................................................................................................................12

Fed. R. of Civ. Proc. 26 .................................................................................................................2

ii

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT          )
                                )
        Petitioner,             )
                                )        Case No. 09-CV-00105-JHP
v.                              )
                                )
UNITED STATES OF AMERICA,       )
                                )
        Respondent.             )

## GOVERNMENT RESPONSE IN OPPOSITION TO MOTION TO EXCLUDE WITNESS STEVEN PITT

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and files this response in opposition to Petitioner's motion to exclude expert testimony from Steven Pitt (Doc. 432).

## PRELIMINARY STATEMENT

Barrett was convicted of three homicide offenses he committed when a state police tactical unit attempted to serve a warrant at his home. The trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed the judgment on appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008).  Barrett sought collateral relief under 28 U.S.C. § 2255.  Docs. 1, 2, 70 & 95.

Barrett appended to his motions to vacate, as Exhibits 89 and 117, declarations from two mental health experts, Myla Young and George Woods.  Based on evaluations conducted after trial, the putative experts retrospectively opined that Barrett's alleged mental illnesses played a role in his commission of this murder. *See e.g*. Doc. 95 Ex. 89 at 24; Ex. 117 at 27.  Dr. Woods's declaration specified only a single record that he reviewed – Dr. Young's declaration –

1

and otherwise provided generic descriptions of the material he considered in assessing the defendant.  Doc. 95 Ex. 117 at 5 ¶ 14 ("I also reviewed and considered the declaration of neuropsychologist, Myla Young, PhD; Mr. Barrett's institutional records, to include available academic, medical and custodial records").  Dr. Woods declared, among other things, that "Barrett, as a function of a mental disorder, believed his actions were right at the time of the police action on his property. This distorted belief was further augmented by the symptoms of his bipolar disorder, his profound depression, isolation, impaired judgment, irritable mood, and paranoid ideation."  Doc. 95 Ex. 117 at 27.  Dr. Woods further remarked that Barrett "could not understand the difference between right and wrong."  *Id*. at 27.

This Court denied § 2255 relief.  Doc. 214.  The Tenth Circuit affirmed the denial in part, but remanded the case for an evidentiary hearing regarding an allegation that trial counsel ineffectively investigated and presented evidence of Barrett's mental health and social history. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).  After returning to this Court, the government filed eight discovery motions, including a request for a psychiatric evaluation by Dr. Steven Pitt.  Doc. 253.  On December 6, 2017, the Court granted the government's motions in part, including the request for a psychiatric evaluation.  Doc. 269.  In the same order, the Court denied a government motion to subpoena all of Barrett's records from courts, schools, employers, penal institutions, medical providers, mental health professionals, and the Social Security Administration.  *Id*. at 16 (denying Doc. 255).  The Court also denied a government motion for Barrett to provide expert reports under Federal Rule of Civil Procedure 26.  *Id*. at 10-11 (denying Doc. 253).

In view of the upcoming interview by Dr. Pitt, the defense sought permission for Dr. Woods to reevaluate Barrett, in order to, "determine the impact of continued structured

2

institutionalization on Mr. Barrett's mental health as it relates to his 2009 state of mental health." Doc. 288 (granting Doc. 285). The order expressed a concern that the government might secure an unfair advantage if its expert could comment on present-day behavior that Dr. Woods had not observed. *Id*. at 2-3. The Court, nonetheless cautioned the parties, "the focus of any mental health testimony at the upcoming evidentiary hearing should be Mr. Barrett's background and mental health at the time of his criminal trial before this Court in late 2005 as opposed to his mental health in 2017." *Id*. at 3.

In anticipation of Dr. Pitt's evaluation of Barrett, the government transmitted a letter, asking him to respond to three specific concerns:

1.    At or around the time of the crime, did Barrett . . . suffer from any serious mental illness or defect?

2.    Please comment on whether any mental illness or defect diagnosed in response to question 1 was a byproduct of substance abuse.

3.    At or around the time of the crime, could Barrett distinguish right from wrong?

Doc. 432 Ex. C. The letter also stated that the government would "seek to rebut or impeach the defense's proffered evidence" and asked Dr. Pitt to provide "impressions and/or criticisms of the mental health findings and evaluations submitted by Barrett in this case." *Id*. Dr. Pitt authored a report, listing 77 sources of information and finding that at the time of the murder Barrett had "features of an Antisocial Personality," that he was abusing drugs, and that he "[e]xperience psychiatric symptoms that were the byproduct of substance use and *not* the result of a mental disease or defect." *See* Doc. 432 Ex. A at 6-19, 74 (emphasis original). The report also noted Dr. Pitt's finding that Barrett could distinguish right from wrong at the time of the crime. *Id*. at 73.

3

Barrett filed this motion to exclude the testimony of Dr. Pitt (Doc. 432), and this opposition follows.

### ARGUMENT

### I. THE COURT SHOULD PERMIT DR. PITT'S RETROSPECTIVE OPINION TESTIMONY, WHICH NECESSARILY RELIES ON POST-TRIAL EVIDENCE

In a series of arguments, Barrett asserts that this Court should not permit Dr. Pitt to testify because he relied on information that was unavailable to the government at the time of trial. Barrett claims the government violated court orders by providing post-trial information to Dr. Pitt, and claims any opinion premised on post-trial evidence is irrelevant. Barrett also contends the government has previously taken positions inconsistent with its intent to elicit Dr. Pitt's retrospective opinion, and that the doctrine of judicial estoppel should therefore preclude his testimony. Mtn. 1-17. Barrett's arguments find no support in the law or the record, and the government responds to them in turn.

A. The Government Complied with this Court's Orders

Barrett claims that the government violated this Court's orders by providing its expert with information that was unavailable at the time of trial. He states that the government's actions ran afoul of an order denying a request to subpoena records from prisons and mental health records. Doc. 432 at 3 (citing Doc. 255). He also asserts that the government violated an order granting a defense request for a second evaluation of the defendant in which the Court remarked "that the focus of any mental health testimony at the upcoming evidentiary hearing should be Mr. Barrett's background and mental health at the time of his criminal trial." *Id.* at 2 (citing doc. 288). Apart from arguing that the orders should have limited Dr. Pitt's consideration of post-trial evidence, Barrett also contends they should have precluded the expert from relying on the current edition of the DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS

4

(DSM-V), which was published in 2013. Doc. 432 at 1-4. In truth, government has not violated the letter or spirit of any order, and Barrett does not establish otherwise by citing out-of-context dicta. While the government provided Dr. Pitt with information that was unavailable during trial, it sought retrospective mental health findings consistent with the issues pending before this Court.

Judicial opinions are not authority for unconsidered propositions: "Questions which merely lurk in the record [of earlier cases], neither brought to the attention of the court nor ruled upon, are not to be considered as having been so decided as to constitute precedents." *Cooper Indus., Inc. v. Aviall Svcs., Inc*., 543 U.S. 157, 170 (2004). Statements and comments in an opinion concerning matters that are not essential to the decision amount to non-controlling dicta. *Cf. Thompson v. Weyerhaeuser Co*., 582 F.3d 1125, 1129 (10th Cir. 2009).

As Barrett observes, this Court denied a government request to serve wide-ranging subpoenas. Doc. 269 at 15. The government did not serve any subpoenas and therefore did not violate the order. The decision did not bar the government from providing its expert with the fruits of other investigative tools, and Barrett made no effort to secure such a ruling. Barrett should not succeed in attempting to transmogrify an order denying a request for subpoenas into one that cabined the bases of Dr. Pitt's opinion. *See generally Cooper*, 543 U.S. at 170.

Aware that Dr. Woods had relied on "custodial records" (Doc. 95 Ex. 117 at 5 ¶ 14), the government obtained Barrett's Bureau of Prisons ("BOP") central file by request and transmitted it to Dr. Pitt. Given that Barrett successfully resisted a request for Dr. Woods to provide a complete report of the material he considered (Doc. 259), the defense can hardly complain that the government was left to speculate as to the universe of information its expert might have to rebut. The government had no reason to suspect that the BOP files were unavailable to the

5

defendant, especially given Dr. Woods' elliptical reference to custodial records. In any event, the government provided a copy of the files to Barrett's counsel prior to Dr. Pitt's evaluation, ensuring that the defense was not placed at a disadvantage.

The government likewise heeded the Court's subsequent admonition to obtain mental health evaluations focused on the time of trial. *See* Doc. 288. The Court's dictum regarding the focus of the hearing appeared in an order that granted a defense request for a 2017 reevaluation of Barrett. *Id.* The government could have violated the order only by taking some affirmative step to block Dr. Woods's access to the defendant, and it did not do so. *Cf. Thompson*, 582 F.3d at 1129.

The order permitting a reevaluation necessarily contemplated that experts could and would rely on facts unavailable at the time of trial – the fruits of an interview of Barrett conducted more than a decade after the verdict. Barrett cannot maintain that the order barred an expert from considering post-trial evidence, given that it granted his request to collect precisely such information. By extension, he cannot show that the order limited the pool of evidence available to the government's expert. Regardless of any inference drawn from the order, the government directed its expert to focus on Barrett's mental health at the time of the crime, so it could directly respond to Dr. Woods's opinion. *Compare* Doc. 432 Ex. C; *with* Doc. 95 Ex. 117. The direction to Dr. Pitt was consistent with this Court's focus.

Not only was the Court silent as to the factual bases available to the experts, it made no effort to limit the analytical bases of their opinions. As such, the government did not violate any ruling when it transmitted an expert report that cites the DSM-V, rather than the DSM-IV-TR which was published just prior to trial. The portions of the DSM-V cited by Dr. Pitt concern bipolar disorder, antisocial personality disorder, and post-traumatic stress disorder ("PTSD"). As

6

905

Dr. Pitt will explain, with the exception of PTSD, the current edition of the DSM does not substantively alter the criteria for the aforementioned conditions from those set forth in the DSM-IV-TR.  Significantly, both editions of the DSM state that evidence of substance use can foreclose a diagnosis of bipolar disorder, and Dr. Pitt will explain that Dr. Woods's failure to heed that limitation undermines the reliability of his opinion.  As to PTSD, the DSM-V expands the definition of that condition – a change that presumptively benefits the defendant.  Having omitted to show that Dr. Pitt's references to the DSM-V have prejudice him in any way, Barrett's argument concerning diagnostic criteria should likewise fail.

Indeed, Barrett has not shown that the government violated any aspect of any ruling by this Court, and his unsupportable allegations do not provide a basis for the exclusion of Dr. Pitt.

B.  The Government, Like the Defense Before it, Can Rely on Post-Trial Information

Barrett claims that Dr. Pitt's opinion is irrelevant and inadmissible because it relies, in part, on information that did not exist, or that the government could not have obtained, at the time of trial.  He premises his position on an excerpt of an order denying a continuance, in which the Court noted Barrett's intent to have Dr. Woods perform a new interview.  The Court remarked: "The evidentiary hearing herein is not to decide what evidence could be presented about Mr. Barrett's mental health today. Rather, the sole purpose is to determine what evidence could have been presented at the sentencing phase of Petitioner's trial in 2005 and whether Petitioner was prejudiced." Doc. 432 at 4-6 (citing Doc. 248).  While the Court's dictum noted a focus on evidence of the defendant's mental health in 2005, it did not purport to limit the factual bases of any expert opinions and does not establish the irrelevance of any retrospective mental health opinion.

7

Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the [information]." Fed. R. Evid. 401.  The standard applies regardless of whether the evidence is offered under the Rules of Evidence or the Federal Death Penalty Act, 18 U.S.C. § 3593(c) ("FDPA"), like information adduced in a penalty phase trial.  *United States v. Lujan*, 603 F.3d 850, 854 (10th Cir. 2010).

Barrett cannot rely on dicta from an order denying a continuance to establish relevance. Barrett has never sought to exclude mental health opinions that draw upon post-trial evidence, nor could he plausibly do so, having premised his claim of § 2255 relief on such views.  See Doc. 95 Ex. 89 & 117.  In fact, Barrett recently secured the Court's permission to have Dr. Woods perform a re-evaluation, permitting the psychiatrist to collect yet more post-trial evidence.  Doc. 288.  Had this Court, or the Tenth Circuit, barred the experts' reliance on evidence that did not exist at the time of trial, Barrett would have had to have based his claim on interviews and testing done in 2005 or before.  But the courts have never required such opinions, and the defense has never previously indicated any intent to provide them.  Courts throughout the country have, however, generally demonstrated a willingness to consider retrospective mental health opinions.  *See e.g. United States v. Hardy*, 762 F. Supp. 2d 849, 881 (E.D. La. 2010) (acknowledging the need for retrospective diagnoses of mental retardation in death penalty cases); *United States v. West-B*ey, 188 F. Supp. 2d 576, 584-86 (D. Md. 2002) (collecting cases regarding retrospective competency evaluations and holding "The absence of [contemporaneous medical evidence] does not compel a decision that the Court may not conduct a meaningful nunc pro tunc hearing.").  Thus, the law does not bar the type of opinion Dr. Pitt will offer, and this Court has said nothing to call its relevance into question.

8

907

Given that Barrett based his § 2255 motion on retrospective evaluations, the government had little choice other than to respond in kind.  The government's expert has reached conclusions that have a tendency to make the existence of Barrett's alleged mental health issues less probable.  As such, this Court should admit them as relevant evidence.

C.  The Government has not Taken Inconsistent Positions in this Case

Citing the rule of judicial estoppel, Barrett contends the government has taken inconsistent positions in this case.  He observes that the government previously argued that the Court should not permit him to present new mental health theories.  By extension, he asserts the Court should now bar the government from presenting any mental health opinion testimony premised on new evidence.  Doc. 432 at 6-17.  While Barrett seeks to bar retrospective opinion testimony, the government has never claimed the existence of such a prohibition.  Rather, it successfully argued that the Court should not allow Barrett to present theories that are new to the case, not those based on new information.

Under the doctrine of judicial estoppel courts have discretion to prevent a party that successfully assumed a position in a proceeding from later taking a contrary position, "especially if it be to the prejudice of the party who has acquiesced in the position formerly taken by him." *United States v. Villargrana-Flores*, 467 F.3d 1269, 1278 (10th Cir. 2006) (citing *Davis v. Wakelee*, 156 U.S. 680, 689 (1895)).  Courts consider three factors in applying the doctrine:

> First, a party's later position must be clearly inconsistent with its earlier position. Moreover, the position to be estopped must generally be one of fact rather than of law or legal theory.  Second, whether the party has succeeded in persuading a court to accept that party's earlier position, so that judicial acceptance of an inconsistent position in a later proceeding would create the perception that either the first or the second court was misled.... Third, whether the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.

9

*Id*. at 1278-79 (quoting *Johnson v. Lindon City Corp*., 405 F.3d 1065, 1069 (10th Cir. 2005)).

Judicial estoppel  is "a discretionary remedy courts may invoke to prevent improper use of

judicial machinery." *Johnson*, at 1068 (internal quotes omitted).

The government's intent to elicit a retrospective opinion from Dr. Pitt is consistent with

the government's earlier positions in this case.  Furthermore, arguments that Barrett has

erroneously identified as inconsistent with the government intent to call Dr. Pitt were not

persuasive to the Court, nor did they prejudice the defense.

When Barrett moved for an evaluation by a mental health professional who had not

previously participated in this case, the government argued that the Court should bar the defense

from introducing a novel theory.  Doc. 275 (including the point heading "THE GOVERNMENT

OBJECTS TO A MENTAL HEALTH EVALUTION DESIGNED TO INTRODUCE A NEW

THEORY INTO THIS CASE").  In its ruling, the Court did not squarely address the

government's concern about novel issues, and held "the testing and examination of Petitioner

which has occurred over the past fourteen (14) years is more than sufficient to adequately

address the issues in the upcoming evidentiary hearing. Therefore, Petitioner's motion is

denied."  Doc. 276.

Consistent with the aforementioned brief, the government later argued in a motion to

exclude witnesses that the Court should bar Barrett from presenting the testimony of experts who

were not only unavailable to trial counsel but never previously identified as a basis for collateral

relief.  Doc. 289 at 8 (stating "The proposed witnesses will offer testimony about present-day

evaluations and opinions that Barrett has never claimed were available to trial counsel or

constitutionally necessary for his case").  In keeping with its concern about novel theories, the

government argued the Court should not undertake the proceeding as a dress rehearsal for an

10

entirely new penalty phase trial. *Id*. at 9. The government also quoted an earlier statement by the Court regarding the apparent irrelevance of contemporaneous mental health evaluations. *Id*. at 9 (quoting Doc. 279 at 3). The government understood the quote as one of several that focused the parties on the defendant's mental health at the time of trial, but not as a bar on retrospective evaluations. In granting the motion, the Court noted that the Tenth Circuit had already made a "finding regarding the mental health evidence which was available to trial counsel," and excluded the proposed witnesses as cumulative. Doc. 361 at 10-111. The Court did not address the argument regarding the introduction of novel claims.

Thus, the government has never urged any bar on the presentation of retrospective mental health evidence, nor has the Court issued such a ruling on its behalf. Accordingly, Barrett should fail in his effort to assert judicial estoppel. *See Villargrana-Flores*, 467 F.3d at 1278-79.

Even if the Court were inclined to find that the government had successfully implied the existence of a bar on the defense's use of retrospective mental health opinions, it should not exercise its discretion to hold that arguments estop the United States from urging a different rule for itself. In § 2255 proceedings, the petitioner and government occupy fundamentally different positions: "Once the defendant's chance to appeal has been waived or exhausted, ... we are entitled to presume he stands fairly and finally convicted." *United States v. Johnson*, 988 F.2d 941, 945 (9th Cir.1993) (quoting *United States v. Frady*, 456 U.S. 152, 164 (1982)). Accordingly, the law generally restricts the avenues available for collateral relief. *See e.g,* 28 U.S.C. § 2255(f) & (h) (barring belated or successive claims); *Teague v. Lane*, 489 U.S. 288, 310 (1989) (barring reliance on new rules of law); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000) (noting the statutory one-year period of limitations); *Frady*, 456 U.S. at 165 (barring habeas claims omitted on appeal); *United States v. Warner*, 23 F.3d 287, 291 (10th Cir. 1994)

(barring previously litigated claims).  But the law does not likewise restrict the government's response.  Section 2255 does not impose time limits on the government's response, and it does not tie the government to any previously-litigated position.   Likewise, the courts treat the *Teague* bar on new rules as "a one-way street."  *Free v. Peters*, 12 F.3d 700, 703 (7th Cir. 1993).

Given the limited non-reciprocal limitations on the litigation of habeas cases, it would not make sense for the Court to limit the type of evidence the government could rely on to rebut Barrett's claim.  In fact, even if § 2255 petitioners were limited to contemporaneous mental health evidence, their claims would frequently place the government in the position of seeking retrospective evaluations.  Absent such latitude, the government would have little ability to rebut previously-undisclosed mental health opinions in § 2255 proceedings.

For all the foregoing reasons, this Court should reject Barrett's appeal for a discretionary invocation of judicial estoppel.

## II.  DR. PITT'S TESTIMONY IS MORE PROBATIVE THAT PREJUDICIAL

Barrett claims that the Court should exclude Dr. Pitt's testimony as more prejudicial than probative.  He argues that Dr. Pitt's testimony is cumulative of an opinion rendered at the time of trial by a government retained neuropsychologist, J. Randall Price.  He also contends that Dr. Pitt's reliance on certain facts will require a hearing about their veracity.  He further asserts that the Court has already announced a bar on retrospective mental health opinions, and he further states that Dr. Pitt's opinion concerns sanity rather than mitigation and therefore fails to inform the issues before the Court.  Doc. 432 at 17-19.  As with Barrett's earlier arguments, this one should fail for lack of factual or legal support.

The Rules of Evidence generally apply to evidentiary hearings under § 2255.  *See* Fed. R. Evid. 801.  Under Rule 403 of the Rules of Evidence, a court must exclude evidence if its

12

911

probative value is substantially outweighed by the danger of unfair prejudice.  To the extent evidence is offered in a penalty phase trial, the FDPA controls its admission.  18 U.S.C. § 3593(c); *United States v. Lee*, 274 F.3d 485, 494 (8th Cir. 2001).  During the penalty phase, a court may exclude evidence only "if its probative value is outweighed by the danger of creating unfair prejudice, confusing the issues, or misleading the jury."  § 3593(c).

Barrett incorrectly argues that Dr. Pitt's testimony is cumulative to that offered by Dr. Price.  The two professionals have different specialties, conducted different assessments and reached different conclusions.  Dr. Price is a neuropsychologist who conducted a battery of testing on the defendant and determined, among other things, that Barrett was a psychopath.  Dr. Price's assessment predated by several years the evaluations presented in support of the § 2255 motion and do not purport to refute them.  In contrast, Dr. Pitt is a forensic psychiatrist who conducted an evaluation aimed at determining the reliability of Dr. Woods's diagnoses that Barrett suffered from bipolar disorder, that he suffered from post-traumatic stress disorder, and that his mental illnesses prevented him from understanding the difference between right and wrong.  Dr. Pitt premised his conclusions on record review and an in-person interview of Barrett.

While Drs. Pitt and Price offer a harmonious view of the defendant, their testimony is not cumulative.  Unlike Dr. Price, Dr. Pitt specifically refutes the findings of Dr. Woods.  For his part, Dr. Price offers an alternative mental health explanation for Barrett's conduct that suggests the presentation of defense mental health evidence was fraught with peril.

Barrett also suggests that Dr. Pitt's consideration of facts found in the defendant's prison record will require the Court to afford him an opportunity to rebut the claimed facts, presumably resulting in otherwise unnecessary mini-trials over ancillary facts.  Barrett, however, fails to cite any authority concerning his right of rebuttal in § 2255 evidentiary hearings.  *See* Doc. 432 at 18

13

(citing, inter alia *Gardner v. Florida*, 430 U.S. 349, 362 (1977) and *Skipper v. South Carolina*, 476 U.S. 1, 5 (1986)).  The upcoming hearing concerns only Barrett's right to collateral relief, not the presentation of aggravating and mitigating factors to a jury and does not implicate the right of rebuttal cited by the defense.  *See generally LaGrand v. Stewart*, 133 F.3d 1253, 1270 (9th Cir. 1998) (committing the scope of a § 2254 evidentiary hearing to the discretion of the court).  Moreover, Barrett has not shown that Dr. Pitt's opinion necessarily relies on the facts he would seek to rebut.  As such, Barrett has failed to demonstrate any right of factual rebuttal that should concern this Court.

To the extent Barrett argues that this Court has already announced a prohibition on retrospective mental health opinions that would bar Dr. Pitt's testimony, that contention fares no better under Rule 403 or the FDPA than it does on its own.  For the reasons argued in the first section of this brief, that contention should fail here.  *See, supra*, Arg. I.

Finally, Barrett unpersuasively argues that Dr. Pitt mistakenly focused his evaluation to a question of criminal insanity.  The government directed Dr. Pitt to determine Barrett's capacity to understand right and wrong because Dr. Woods had opined on precisely that subject matter.  *See* Doc. 95 Ex. 117.  The probity of Dr. Pitt's opinion is not undermined by the fact that speaks to criminal sanity, as it squarely refutes the opinion Barrett offered on his own behalf.  In any event, Dr. Pitt does not merely comment on Barrett's ability to perceive right and wrong.  He explains the errors in Dr. Woods's evaluation and a basis for rejecting the defense expert's unsound opinion.

Accordingly, Barrett has failed to identify any legal or factual basis for this Court to exclude Dr. Pitt's testimony as unduly prejudicial.

914

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this

Court to deny Barrett's motion to exclude Dr. Pitt's testimony.

Dated: May 19, 2017,

Respectfully submitted,

DOUGLAS A. HORN
Acting United States Attorney

CHRISTOPHER J. WILSON
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov


*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 656
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on May 19, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

16

915

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Karl J. Saddlemire (karl_saddlemire@fd.org), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:895912@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content-Type: text/html
```

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 5/19/2017 at 10:09 AM CDT and filed on 5/19/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 441(No document attached) |

**Docket Text:**

**MINUTE ORDER by District Judge James H. Payne: In the event Petitioner chooses to file a Reply, it shall be filed by 5/26/2017 (Re: [432] MOTION to Exclude Witness Steven Pitt). (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire    karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has been delivered by other means to:**

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, <br><br> Petitioner, <br><br> vs. <br><br> UNITED STATES OF AMERICA, <br><br> Respondent. | CASE NO. CV-09-00105-JHP <br><br> **PETITIONER'S REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER'S MOTION TO EXCLUDE WITNESS STEVEN PITT** |

Petitioner Kenneth Eugene Barrett, by and through undersigned counsel, makes the following Reply to the Government's Response in Opposition to Mr. Barrett's Motion to Exclude Witness Steven Pitt. Mr. Barrett's Motion, which is Doc. 432, was filed May 12, 2017. The government's Response, Doc. 440, was timely filed May 19, 2017. For the reasons previously stated, and set forth *infra*, Dr. Pitt's opinions are not relevant because they are based

Reply Opp. Mot. Exclude Pitt                    1                    *Barrett v. U.S.*, CV-09-00105-JHP

918

on information that was not available at the time of trial. In keeping with this Court's prior orders and the government's many filings, the government is estopped from relying upon Dr. Pitt, and, under Fed. R. Evid. 403, his testimony must be excluded as cumulative, misleading, and entailing wasted time.

### 1.   The Government Continues to Ignore the Plain Language of This Court's Orders

The essential facts are undisputed: the government's expert, Steven Pitt, D.O., based his opinions on documents and diagnostic criteria that were not available at the time of trial. Specifically, Dr. Pitt inferred that Mr. Barrett was not mentally ill in 1999 because the Bureau of Prisons ("BOP") has not treated Mr. Barrett for a mental illness since he was committed to its custody in 2006. [1] Sealed Mot. Ex. A at 60, 67. In defining the scope of his inquiry and conclusions, Dr. Pitt exclusively relied upon diagnostic criteria that were not published until 2013.[2] *Id.* at 62-64, 67-68. It also is undisputed that Mr. Barrett's experts exclusively relied upon documents, testing and diagnostic criteria that were contemporary with the trial.[3] *See* Mot. Ex. D at ¶¶ 3-4.

---

[1] It is undisputed that Dr. Pitt also relied upon other materials that were not available at the time of trial, including privileged materials that the government had no right to disclose. *See* Mot. (Doc. 432) at 2-3. Mr. Barrett focuses on the BOP records because Dr. Pitt expressly and most extensively relied upon them as bases for his conclusions. *See* Sealed Ex. A (Doc. 432-1) at 11, 31, 60, 63-64, 67.

[2] The government avers that Dr. Pitt will explain away differences between the criteria he relied upon and those available at the time of trial. Resp. (Doc. 440) at 6-7. At best, the averment is hearsay that is not supported by any evidence. If the government has asked Dr. Pitt to reconsider his opinions in light of the appropriate diagnostic criteria (a) the government has acknowledged, at least to itself, that it erred, and (b) the government is withholding notice of Dr. Pitt's opinions as required by Fed. R. Crim. P. 16(c)(2) and this Court's prior orders. The government's averment, if true, therefore provides additional grounds for excluding Dr. Pitt's testimony. Fed. R. Crim. P. 16(g).

[3] The government seems to argue that it was somehow induced into asking Dr. Pitt to rely upon non-contemporaneous evidence. Resp. 5-6. The government's problem is entirely of the government's own making. First, the extensive record cited in the Motion demonstrates that if

Three conclusions follow axiomatically from these undisputed facts. First, the opinions of Mr. Barrett's experts were available in 2005. Second, the government could not have presented Dr. Pitt's opinions in 2005 to rebut the opinions of Mr. Barrett's experts. Third, the government exceeded the scope of this Court's Order authorizing Dr. Pitt's examination. That Order specifically stated that the purpose of Dr. Pitt's examination was to enable the Court to "hear[] the evidence which the government *would have* brought forward to rebut the evidence which will be offered by petitioner" at the evidentiary hearing. Order (Doc. 269) at 14 (emphasis added). *See also id.* at 14 n.6 (rejecting objection on grounds that Court is attempting to "hear[] how Petitioner's mitigating evidence *would have been* rebutted") (emphasis added).

Tellingly, the government's Response entirely ignores the language this Court used when authorizing Dr. Pitt's examination. Instead, in a transparent act of chutzpah and desperation, the government repeatedly and falsely asserts that Mr. Barrett exclusively relies on different orders in which this Court's statements about the scope of the hearing are mere dicta. Resp. (Doc. 440) at 5, 6, 7, 8. Although this Court's prior orders speak for themselves and create an absolutely clear record, one of the the government's attempts at revisionism merits a separate reply. The government falsely equates this Court's Order allowing Petitioner's expert, George W. Woods, M.D., to re-examine Mr. Barrett with Dr. Pitt's extensive reliance upon post-trial evidence. Resp. 7-8. A more honest and complete account of the record belies the government's argument.

This Court's Order identified three grounds from Mr. Barrett's motion to have Dr. Woods see him again. To wit:

> [1] to refresh his memory regarding an evaluation he conducted approximately seven (7) years ago, [2] "to determine the impact of

the government had believed Mr. Barrett's experts relied upon post-judgment prison records, the government would have sought to exclude them on that basis. Second, if the government was in doubt, all it had to do was ask. (There is a difference between asking what an expert relied upon and asking for the materials themselves.)

> continued structured institutionalization on Mr. Barrett's mental health as it relates to his 2009 state of mental health and [3] to prepare for rebuttal testimony, if necessary, to the government's named experts, particularly Dr. Steven Pitt . . . . . . . ."

Order (Doc. 288) at 1. The Court said that in its Opposition to the Motion, "the government correctly identifies the reason the Court authorized the government to conduct a mental health evaluation of the defendant, *i.e.* to rebut defendant's mental health evidence pursuant to Fed.R.Cr.P. 12.2." *Ibid.*

In granting Dr. Woods a second interview, this Court accepted the first and third of the three grounds asserted in Mr. Barrett's motion—*viz.*, Dr. Woods's need to refresh his recollection and prepare to rebut Dr. Pitt—and rejected the second, the need to assess how instituitionalization has affected Mr. Barrett. This Court wrote,

> If the government had been provided notice of Dr. Woods proposed testimony, at the time of trial, the government would have had an opportunity to examine the defendant with a similarly qualified expert. After the government's proposed expert examined the defendant, the defendant's expert would not have needed an additional examination because the two examinations would have occurred close in time such that each expert would have hopefully observed the same behaviors regardless of how those behaviors were characterized by the respective experts. Asking Dr. Woods to remember his prior evaluation of Mr. Barrett approximately eight (8) years after his examination such that he can explain his prior evaluation is not realistic. As a result, this Court hereby grants Petitioner's motion to allow Dr. Woods to re-interview Mr. Barrett. Both parties, however, are reminded that the focus of any mental health testimony at the upcoming evidentiary hearing should be Mr. Barrett's background and mental health at the time of his criminal trial before this Court in late 2005 as opposed to his mental health in 2017.

Order (Doc. 288) at 2-3.

This Court's Order undermines the government's position in at least two ways. First, in language the government now claims it was free to ignore as dicta, this Court specifically advised the government that the focus of Dr. Pitt's testimony should be on "Mr. Barrett's

*background and mental health at the time of his criminal trial* before this Court in late 2005."

Second, the Court contemplated that at the hearing, as at a penalty trial conducted pursuant to 18 U.S.C. 3593(c), Mr. Barrett would have the right to rebut Dr. Pitt. The government's Response asserts Mr. Barrett has no right to rebuttal at the evidentiary hearing. Resp. 13-14.

**2. Dr. Pitt's Novel Theories Based on Unavailable Information are Not Relevant and Are Inconsistent with the Government's Prior Positions**

The government attempts to evade the difference between Dr. Pitt's reliance upon post-trial information and Dr. Woods's reliance only on information that was available at the time of trial by labeling all the evaluations "retrospective." Resp. 1, 4, 5, 7, 8, 9, 10, 11. The government's claim that Dr. Pitt's examination is the same as those of Mr. Barrett's experts because both are retrospective is as "objectively baseless [as] a claim by an apple farmer that he is entitled to subsidies allotted to growers of oranges because apples and oranges both are fruits." *N.L.R.B. v. Allied Mechanical Services, Inc.*, 734 F.3d 486, 498 (6th Cir. 2013). Unless the crime happened to have occurred during a mental health evaluation, all opinions about a defendant's mental state at the time of the offense are retrospective.[4] Nevertheless, this Court's orders and a long line of Supreme Court precedent cited in the Motion establish that there is a big difference between evidence that was available at the time of trial to support a retrospective opinion and evidence that was not available at the time of trial.

The only cases the government cites in support of its position on relevance are not only distinguishable but utterly inapposite. Whereas Mr. Barrett has referred this Court to a long line of Supreme Court cases deciding ineffective-assistance claims, Mot. (Doc. 432) at 3-4, 5 n.2, the government cites to one ineffectiveness case that contradicts the government's position. One of

---

[4] As evidence of the government's internally inconsistent argument, consider that the government argues both that all the mental health opinions in this case are the same because they are retrospective, and that Mr. "Barrett seeks to bar retrospective opinion testimony." Resp. 9.

the government's two cases is a district court decision on determining intellectual disability. Resp. 8 (citing *United States v. Hardy*, 762 F. Supp. 2d 849, 881 (E.D. La. 2010)). That case does not involve an ineffectiveness claim. The other is a district court decision on determining competence to stand trial where the allegation is that trial counsel was ineffective for failing to assert that the defendant was incompetent. *Id.* (citing *United States v. West-Bey*, 188 F. Supp. 2d 576, 584-86 (D. Md. 2002)). *West-Bey* contradicts the government's position here insofar as the court there noted that courts accept retrospective competency determinations *when they are supported by contemporaneous evidence*. 188 F. Supp. 2d at 584-85.

In response to Mr. Barrett's assertion of judicial estoppel, the government attempts to evade its prior arguments by claiming they were directed solely at excluding a "novel theory," not non-contemporaneous evidence. Resp. 10-11. The argument is contradicted by the record set forth in the Motion. Moreover, the argument only deepens the government's problem because Dr. Pitt's theory is novel. No other expert in this case has relied upon the absence of treatment in post-trial prison records to infer Mr. Barrett's condition in 1999.

The government also dug itself deeper into a hole in its Response to Mr. Barrett's Motion to Exclude J. Randall Price which adds to the inconsistent positions the government has taken in this case. In its motion for authorization to have Dr. Pitt examine Mr. Barrett, the government averred that at most Dr. Price "had the opportunity to obtain a neuropsychological evaluation of the defendant." Mot. (Doc. 253) at 2. But in responding to Mr. Barrett's motion to exclude Dr. Price, the government stated that Dr. Price would testify that his "psychopathy" finding would provide an "alternative mental health explanation" to Dr. Woods's testimony about Mr. Barrett's actions. Resp. (Doc. 436) at 5. By mentioning only Dr. Price's neuropsychological screening in the Pitt motion, and omitting any mention of his psychopathy opinion, the government strongly

implied that it could not rebut Dr. Woods with Dr. Price's opinion about psychopathy as it now says it can and will.

Betraying the weakness of its position on whether it took inconsistent positions, the government relies upon inapposite rules such as the anti-retroactivity rule of *Teague v. Lane*, 489 U.S. 288 (1989), to argue that this Court should not apply judicial estoppel. Resp. 11-12. None of the cited cases even remotely support the government's position. One of the cases the government relies upon is *United States v. Frady*, 456 U.S. 152 (1982). Resp. 11, 12. To restate the obvious, this is an ineffective-assistance case. In *Strickland v. Washington*, 466 U.S. 668 (1984), the Supreme Court specifically stated that concerns such as those expressed in *Frady* are weakest in ineffectiveness cases and therefore limitations like those the government relies upon have no place in collateral proceedings on ineffective-assistance claims:

> The principles governing ineffectiveness claims should apply in federal collateral proceedings as they do on direct appeal or in motions for a new trial. As indicated by the "cause and prejudice" test for overcoming procedural waivers of claims of error, the presumption that a criminal judgment is final is at its strongest in collateral attacks on that judgment. *See United States v. Frady*, 456 U.S. 152, 162–169 (1982); *Engle v. Isaac*, 456 U.S. 107, 126–129 (1982). An ineffectiveness claim, however, as our articulation of the standards that govern decision of such claims makes clear, is an attack on the fundamental fairness of the proceeding whose result is challenged. Since fundamental fairness is the central concern of the writ of habeas corpus, see *id.*, at 126, no special standards ought to apply to ineffectiveness claims made in habeas proceedings.

*Strickland*, 466 U.S. at 697-98. Applying the government's erroneous legal theory rather than estoppel would be an abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990) ("district court would necessarily  abuse its discretion if it based its ruling on an erroneous view of the law"); *Cartier v. Jackson¸* 59 F.3d 1046, 1048 (10th Cir. 1995).

Judicial estoppel "'is intended to prevent improper use of judicial machinery,'" and "'to protect the integrity of the judicial process.'" *Eastman v. Union Pacific R. Co.*, 493 F.3d 1151,

1156 (10th Cir. 2007) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)). The record in this case includes too many filings by the government and orders from this Court rejecting evidence that was unavailable at the time of trial for this Court to allow Dr. Pitt's opinions and maintain integrity. The record shows, *inter alia*,

(a) the government withheld material information about how it intended to use Dr. Price when it obtained authorization for Dr. Pitt's evaluation;

(b) the government disregarded the plain language of the order authorizing Dr. Pitt's evaluation which stated its purpose was to gather "the evidence which the government *would have* brought forward to rebut the evidence which will be offered by petitioner," and the obvious implications of the same order refusing to allow the government to subpoena evidence that was not available at the time of trial; and,

(c) the government is continuing to make improper use of the judicial machinery by misrepresenting the record and the law in the instant Response.

### 3.  Dr. Pitt Must be Excluded under Fed. R. Evid. 403 and this Court's Prior Orders

The government argues that the Federal Rules of Evidence govern here, and not the Federal Death Penalty Act's provisions regarding the information that may be presented in a penalty trial. Resp. 12-13. Mr. Barrett replies that where the issue is prejudice, *Strickland* expressly requires this Court to apply the law applicable in a capital sentencing proceeding. *See*, *e.g.*, *Strickland*, 466 U.S. at 695; *Sears v. Upton*, 561 U.S. 945, 950 & n. 6 (2010). Thus, the government's attempt to distinguish the rebuttal requirement of 18 U.S.C. § 3593(c), Resp. 13-14, fails. Consequently, the government also fails to counter Mr. Barrett's argument that Dr. Pitt's reliance upon the BOP records will require a collateral trial on the reliability of the BOP's mental health services at USP Terre Haute from 2006 to the present.

This Court has applied Fed. R. Evid. 403 to exclude Mr. Barrett's experts, and it should apply the same rule to exclude Dr. Pitt. Mr. Barrett and the government are not similarly situated. The Due Process Clause and the Eighth Amendment require courts to admit and sentencers to consider all available mitigation evidence, and the Supreme Court has expressly applied that rule to ineffective-assistance cases. *Porter v. McCollum*, 558 U.S. 30, 42 (2009) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)); *Sears*, 561 U.S. at 950 n. 6. There is no correlative right of the government to present any and all "rebuttal" either in a § 2255 proceeding or in a capital sentencing hearing. To be sure, the government would have had a right to attempt to rebut Mr. Barrett's experts in 2005. But that right was not absolute. The government's ability to present rebuttal obviously was limited to information then available, and by the constraints of this Court's order authorizing the evaluation, and by the government's compliance with other rules, such as Fed. R. Crim. P. 16.

Without acknowledging that it withheld information from this Court when it sought Dr. Pitt's evaluation, the government contends the opinions of Dr. Price and Dr. Pitt are "harmonious" but "not cumulative." Resp. 13. The government in particular points out that they conducted different types of evaluations. *Ibid.* The same arguments apply to Mr. Barrett's experts that this Court excluded at the government's request. Therefore, the government is adding to the inconsistent positions appearing in the record. The government points out that Dr. Price is a neuropsychologist who administers tests, and Dr. Pitt, like Dr. Woods, is a psychiatrist who does not. Resp. 13. Dr. Young was a neuropsychologist completed a battery of tests on Mr. Barrett, but this Court barred Mr. Barrett from presenting any neuropsychologist who could testify about that testing. This Court found testimony about Dr. Young's evaluation cumulative and excluded it. Order (Doc. 361) at 10-11. The government's newly acknowledged intentions

regarding Dr. Price mean there is no principled way to admit Dr. Pitt's opinions after excluding testimony about Dr. Young's testing.

This Court's prior orders plainly and repeatedly stated that the Court saw little to no probative value in opinions based on information that was not available at the time of trial. Whatever difference there might be between "harmonious" and "cumulative" testimony, the government has failed to describe it or demonstrate that Drs. Price and Pitt represent the former and not the latter. The government has completely failed to demonstrate that Dr. Pitt's reliance upon BOP records will not necessitate a mini-trial on the reliability of those records. The government's only argument on this issue—that Mr. Barrett in these § 2255 proceedings does not have the right of rebuttal he would have under § 3593(c)—is a misstatement of the law. Therefore, admitting Dr. Pitt's testimony under the government's theory would be an abuse of discretion.

DATED: May 25, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

/s/ *Tivon Schardl*
TIVON SCHARDL
Trial & Habeas Counsel

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 25th day of May 2017, I caused the foregoing Petitioner's Reply to the Government's Response in Opposition to Petitioner's Motion to Exclude Witness Steven Pitt to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:          dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:          Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | CASE NO. CV-09-00105-JHP |
| Petitioner, | |
| vs. | **PETITIONER'S *CORRECTED* REPLY TO THE GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER'S MOTION TO EXCLUDE WITNESS STEVEN PITT** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

Petitioner Kenneth Eugene Barrett, by and through undersigned counsel, makes the

following Reply to the Government's Response in Opposition to Mr. Barrett's Motion to

Exclude Witness Steven Pitt. Mr. Barrett's Motion, which is Doc. 432, was filed May 12, 2017.

The government's Response, Doc. 440, was timely filed May 19, 2017. For the reasons

previously stated, and set forth *infra*, Dr. Pitt's opinions are not relevant because they are based

Reply Opp. Mot. Exclude Pitt                    1                    *Barrett v. U.S.*, CV-09-00105-JHP

on information that was not available at the time of trial. In keeping with this Court's prior orders

and the government's many filings, the government is estopped from relying upon Dr. Pitt, and,

under Fed. R. Evid. 403, his testimony must be excluded as cumulative, misleading, and

entailing wasted time.

### 1. The Government Continues to Ignore the Plain Language of this Court's Orders

The essential facts are undisputed: at the government's request, putative witness Steven

Pitt, D.O., based his opinions on documents and diagnostic criteria that were not available at the

time of trial. Specifically, Dr. Pitt inferred that Mr. Barrett was not mentally ill in 1999 because

the Bureau of Prisons ("BOP") has not treated Mr. Barrett for a mental illness since he was

committed to its custody in 2006. [1] Sealed Mot. Ex. A at 60, 67. In defining the scope of his

inquiry and conclusions, Dr. Pitt exclusively relied upon diagnostic criteria that were not

published until 2013. [2] *Id.* at 62-64, 67-68. It also is undisputed that Mr. Barrett's experts

exclusively relied upon documents, testing and diagnostic criteria that were contemporary with

the trial. [3] *See* Mot. Ex. D at ¶¶ 3-4.

---

[1] It is undisputed that Dr. Pitt also relied upon other materials that were not available at the time of trial, including privileged materials that the government had no right to disclose. *See* Mot. (Doc. 432) at 2-3. Mr. Barrett focuses on the BOP records because Dr. Pitt expressly and most extensively relied upon them as bases for his conclusions. *See* Sealed Ex. A (Doc. 432-1) at 11, 31, 60, 63-64, 67. However, all of the unavailable information constitutes grounds for exclusion.

[2] The government avers that Dr. Pitt will attempt to explain away differences between the criteria he relied upon and those available at the time of trial. Resp. (Doc. 440) at 6-7. At best, the averment is hearsay that is not supported by any evidence. If the government has asked Dr. Pitt to reconsider his opinions in light of the appropriate diagnostic criteria (a) the government has acknowledged, at least to itself, that it erred, and (b) the government is withholding notice of Dr. Pitt's opinions as required by Fed. R. Crim. P. 16(c)(2) and this Court's prior orders. The government's averment, if true, therefore provides additional grounds for excluding Dr. Pitt's testimony. Fed. R. Crim. P. 16(g).

[3] The government seems to argue that it was somehow induced into asking Dr. Pitt to rely upon non-contemporaneous evidence. Resp. 5-6. The government's problem is entirely of the

Three conclusions follow axiomatically from these undisputed facts. First, the opinions of Mr. Barrett's experts were available in 2005. Second, the government could not have presented Dr. Pitt's opinions in 2005 to rebut the opinions of Mr. Barrett's experts. Third, the government exceeded the scope of this Court's Order authorizing Dr. Pitt's examination. That Order specifically stated that the purpose of Dr. Pitt's examination was to enable the Court to hear at the evidentiary hearing "the evidence which the government *would have brought* forward to rebut the evidence which will be offered by petitioner." Order (Doc. 269) at 14 (emphasis added). *See also id.* at 14 n.6 (rejecting objection on grounds that Court is attempting to "hear[] how Petitioner's mitigating evidence *would have been* rebutt*ed*") (emphasis added).

Tellingly, the government's Response entirely ignores the language this Court used when authorizing Dr. Pitt's examination. Instead, in a transparent act of chutzpah and desperation, the government repeatedly and falsely asserts that Mr. Barrett exclusively relies on different orders in which this Court's statements about the scope of the hearing are mere dicta. Resp. (Doc. 440) at 5, 6, 7, 8. Although this Court's prior orders speak for themselves and create an absolutely clear record about what this Court considers relevant, one of the the government's attempts at revisionism merits a separate reply. The government falsely equates this Court's Order allowing Petitioner's expert, George W. Woods, M.D., to re-examine Mr. Barrett with Dr. Pitt's extensive reliance upon post-trial evidence. Resp. 7-8. A more honest and complete account of the record belies the government's argument.

This Court's Order identified three grounds from Mr. Barrett's motion to have Dr. Woods see him again. To wit:

---

government's own making. First, the extensive record cited in the Motion demonstrates that if the government had believed Mr. Barrett's experts relied upon post-judgment prison records, the government would have sought to exclude them on that basis. Second, if the government was in doubt, all it had to do was ask. (There is a difference between asking what an expert relied upon and asking for the materials themselves.)

> [1] to refresh his memory regarding an evaluation he conducted approximately seven (7) years ago, [2] "to determine the impact of continued structured institutionalization on Mr. Barrett's mental health as it relates to his 2009 state of mental health and [3] to prepare for rebuttal testimony, if necessary, to the government's named experts, particularly Dr. Steven Pitt . . . . . . . ."

Order (Doc. 288) at 1 (quoting Mot. (Doc. 285) at ¶ 3). The Court said that in its Opposition to the Motion, "the government correctly identifies the reason the Court authorized the government to conduct a mental health evaluation of the defendant, *i.e.* to rebut defendant's mental health evidence pursuant to Fed.R.Cr.P. 12.2." *Ibid.*

In granting Dr. Woods a second interview, this Court accepted the first and third of the three grounds asserted in Mr. Barrett's motion—*viz.*, Dr. Woods's need to refresh his recollection and prepare to rebut Dr. Pitt—and rejected the second, the need to assess how instituitionalization has affected Mr. Barrett. This Court wrote,

> If the government had been provided notice of Dr. Woods proposed testimony, at the time of trial, the government would have had an opportunity to examine the defendant with a similarly qualified expert. After the government's proposed expert examined the defendant, the defendant's expert would not have needed an additional examination because the two examinations would have occurred close in time such that each expert would have hopefully observed the same behaviors regardless of how those behaviors were characterized by the respective experts. Asking Dr. Woods to remember his prior evaluation of Mr. Barrett approximately eight (8) years after his examination such that he can explain his prior evaluation is not realistic. As a result, this Court hereby grants Petitioner's motion to allow Dr. Woods to re-interview Mr. Barrett. Both parties, however, are reminded that the focus of any mental health testimony at the upcoming evidentiary hearing should be Mr. Barrett's background and mental health at the time of his criminal trial before this Court in late 2005 as opposed to his mental health in 2017.

Order (Doc. 288) at 2-3.

This Court's Order undermines the government's position in at least two ways. First, in language the government now claims it was free to ignore as dicta, this Court specifically

advised the government that the focus of Dr. Pitt's testimony should be on "Mr. Barrett's *background and mental health at the time of his criminal trial* before this Court in late 2005." Second, the Court contemplated that at the hearing, as at a penalty trial conducted pursuant to 18 U.S.C. 3593(c), Mr. Barrett would have the right to rebut Dr. Pitt. Conversely, the government's Response asserts Mr. Barrett has no right to rebuttal at the evidentiary hearing. Resp. 13-14.

### 2. Dr. Pitt's Novel Theories Based on Unavailable Information are Not Relevant and Are Inconsistent with the Government's Prior Positions

The government attempts to evade the difference between Dr. Pitt's reliance upon post-trial information and Dr. Woods's reliance only on information that was available at the time of trial by labeling all the evaluations "retrospective." Resp. 1, 4, 5, 7, 8, 9, 10, 11. The government's claim that Dr. Pitt's examination is the same as those of Mr. Barrett's experts because both are retrospective is as "objectively baseless [as] a claim by an apple farmer that he is entitled to subsidies allotted to growers of oranges because apples and oranges both are fruits." *N.L.R.B. v. Allied Mechanical Services, Inc.*, 734 F.3d 486, 498 (6th Cir. 2013). Unless the crime happened to have occurred during a mental health evaluation, all opinions about a defendant's mental state at the time of the offense are retrospective.[4] Nevertheless, this Court's orders and a long line of Supreme Court precedent cited in the Motion establish that there is a big difference between evidence that was available at the time of trial to support a retrospective opinion and evidence that was not available at the time of trial.

The only cases the government cites in support of its position on relevance are utterly inapposite. Whereas Mr. Barrett has referred this Court to a long line of Supreme Court cases deciding ineffective-assistance claims, Mot. (Doc. 432) at 3-4, 5 n.2, the government cites to one

---

[4] As evidence of the government's internally inconsistent argument, consider that the government argues both that all the mental health opinions in this case are the same because they are retrospective, and that Mr. "Barrett seeks to bar retrospective opinion testimony." Resp. 9.

ineffectiveness case that contradicts the government's position. One of the government's two cases is a district court decision on determining intellectual disability. Resp. 8 (citing *United States v. Hardy*, 762 F. Supp. 2d 849, 881 (E.D. La. 2010)). That case does not involve an ineffectiveness claim. The other is a district court decision on determining competence to stand trial where the allegation is that trial counsel was ineffective for failing to assert that the defendant was incompetent. *Id.* (citing *United States v. West-Bey*, 188 F. Supp. 2d 576, 584-86 (D. Md. 2002)). *West-Bey* contradicts the government's position here insofar as the court there noted that courts accept retrospective competency determinations *when they are supported by contemporaneous evidence*. 188 F. Supp. 2d at 584-85.

In response to Mr. Barrett's assertion of judicial estoppel, the government attempts to evade its prior arguments by claiming they were directed solely at excluding a "novel theory," not non-contemporaneous evidence. Resp. 10-11. The argument is contradicted by the record set forth in the Motion. Moreover, the argument only deepens the government's problem because Dr. Pitt's theory is novel. No other expert in this case has relied upon the absence of treatment in post-trial prison records to infer Mr. Barrett's condition in 1999.

The government also dug itself deeper into a hole in its Response to Mr. Barrett's Motion to Exclude J. Randall Price which adds to the inconsistent positions the government has taken in this case. In its motion for authorization to have Dr. Pitt examine Mr. Barrett, the government averred that at most Dr. Price "had the opportunity to obtain a neuropsychological evaluation of the defendant." Mot. (Doc. 253) at 2. But in responding to Mr. Barrett's motion to exclude Dr. Price, the government stated that Dr. Price would testify that his "psychopathy" finding would provide an "alternative mental health explanation" to Dr. Woods's testimony about Mr. Barrett's actions. Resp. (Doc. 436) at 5. By mentioning only Dr. Price's neuropsychological screening in

the Pitt motion, and omitting any mention of his psychopathy opinion, the government strongly

implied that it could not rebut Dr. Woods with Dr. Price's opinion about psychopathy as it now

says it can and will. Resp. 13.

Betraying the weakness of its position on whether it took inconsistent positions, the

government relies upon inapposite rules such as the anti-retroactivity rule of *Teague v. Lane*, 489

U.S. 288 (1989), to argue that this Court should not apply judicial estoppel. Resp. 11-12. None of

the cited cases even remotely support the government's position. One of the cases the

government relies upon is *United States v. Frady*, 456 U.S. 152 (1982). Resp. 11, 12. To restate

the obvious, this is an ineffective-assistance case. In *Strickland v. Washington*, 466 U.S. 668

(1984), the Supreme Court specifically stated that concerns such as those expressed in *Frady* are

weakest in ineffectiveness cases and therefore limitations like those the government relies upon

have no place in collateral proceedings on ineffective-assistance claims:

> The principles governing ineffectiveness claims should apply in federal
> collateral proceedings as they do on direct appeal or in motions for a new
> trial. As indicated by the "cause and prejudice" test for overcoming
> procedural waivers of claims of error, the presumption that a criminal
> judgment is final is at its strongest in collateral attacks on that judgment.
> *See United States v. Frady*, 456 U.S. 152, 162–169 (1982); *Engle v. Isaac*,
> 456 U.S. 107, 126–129 (1982). An ineffectiveness claim, however, as our
> articulation of the standards that govern decision of such claims makes
> clear, is an attack on the fundamental fairness of the proceeding whose
> result is challenged. Since fundamental fairness is the central concern of the
> writ of habeas corpus, see *id.*, at 126, no special standards ought to apply to
> ineffectiveness claims made in habeas proceedings.

*Strickland*, 466 U.S. at 697-98. Applying the government's erroneous legal theory rather than

estoppel would be an abuse of discretion. *See Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384,

405 (1990) ("district court would necessarily abuse its discretion if it based its ruling on an

erroneous view of the law"); *Cartier v. Jackson¸* 59 F.3d 1046, 1048 (10th Cir. 1995).

Judicial estoppel "'is intended to prevent improper use of judicial machinery,'" and "'to protect the integrity of the judicial process.'" *Eastman v. Union Pacific R. Co.*, 493 F.3d 1151, 1156 (10th Cir. 2007) (quoting *New Hampshire v. Maine*, 532 U.S. 742, 749-50 (2001)). The record in this case includes too many filings by the government and orders from this Court rejecting evidence that was unavailable at the time of trial for this Court to allow Dr. Pitt's opinions and maintain integrity. The record shows, *inter alia*,

> (a) the government withheld material information about how it intended to use Dr. Price when it obtained authorization for Dr. Pitt's evaluation;

> (b) the government disregarded the plain language of the order authorizing Dr. Pitt's evaluation which stated its purpose was to gather "the evidence which the government *would have brought* forward" in rebuttal in the past, and the obvious implications of the same order refusing to allow the government to subpoena evidence that was not available at the time of trial; and,

> (c) the government is continuing to make improper use of the judicial machinery by misrepresenting the record and the law in the instant Response.

## 3. Dr. Pitt Must be Excluded under Fed. R. Evid. 403 and this Court's Prior Orders

The government argues that the Federal Rules of Evidence govern here, and not the Federal Death Penalty Act's provisions regarding the information that may be presented in a penalty trial. Resp. 12-13. Mr. Barrett replies that where the issue is prejudice, *Strickland* expressly requires this Court to apply the law applicable in a capital sentencing proceeding. *See*, *e.g.*, *Strickland*, 466 U.S. at 695; *Sears v. Upton*, 561 U.S. 945, 950 & n. 6 (2010). Thus, the government's attempt to distinguish the rebuttal requirement of 18 U.S.C. § 3593(c), Resp. 13-14, fails. Consequently, the government also fails to counter Mr. Barrett's argument that Dr.

Pitt's reliance upon the BOP records will require a collateral trial on the reliability of the BOP's mental health services at USP Terre Haute from 2006 to the present. Dr. Pitt's inference is only as reliable as the opinions underlying the post-judgment records he relied upon when drawing that inference. Mr. Barrett's counsel are gathering voluminous evidence that the mental health services at USP Terre Haute failed to diagnose or treat other inmates whom other experts agree have mental impairments.

This Court has applied Fed. R. Evid. 403 to exclude Mr. Barrett's experts, and it should apply the same rule to exclude Dr. Pitt. Mr. Barrett and the government are not similarly situated. The Due Process Clause and the Eighth Amendment require courts to admit and sentencers to consider all available mitigation evidence, and the Supreme Court has expressly applied that rule to ineffective-assistance cases. *Porter v. McCollum*, 558 U.S. 30, 42 (2009) (quoting *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982)); *Sears*, 561 U.S. at 950 n. 6. There is no correlative right of the government to present any and all "rebuttal" either in a § 2255 proceeding or in a capital sentencing hearing. To be sure, the government would have had a right to attempt to rebut Mr. Barrett's experts in 2005. But that right was not absolute. The government's ability to present rebuttal obviously was limited to information then available, and by the contraints of this Court's order authorizing the evaluation, and by the government's compliance with other rules, such as Fed. R. Crim. P. 16.

Without acknowledging that it withheld information from this Court when it sought Dr. Pitt's evaluation, the government contends the opinions of Dr. Price and Dr. Pitt are "harmonious" but "not cumulative." Resp. 13. The government in particular points out that they conducted different types of evaluations. *Ibid.* The same arguments apply to Mr. Barrett's experts that this Court excluded at the government's request. Therefore, the government is

adding to the inconsistent positions appearing in the record. The government points out that Dr. Price is a neuropsychologist who administers tests, while Dr. Pitt, like Dr. Woods, is a psychiatrist who does not. Resp. 13. Dr. Young was a neuropsychologist who completed a battery of tests on Mr. Barrett, but this Court barred Mr. Barrett from presenting any neuropsychologist who could testify about that testing on grounds that the testimony would be cumulative. Order (Doc. 361) at 10-11. The government's newly acknowledged intentions regarding Dr. Price mean there is no principled way to admit Dr. Pitt's opinions after excluding testimony about Dr. Young's testing.

This Court's prior orders plainly and repeatedly stated that the Court saw little to no probative value in opinions based on information that was not available at the time of trial. Whatever difference their might be between "harmonious" and "cumulative" testimony, the government has failed to describe it or demonstrate that Drs. Price and Pitt represent the former and not the latter. The government has completely failed to demonstrate that Dr. Pitt's reliance upon BOP records will not necessitate a mini-trial on the reliability of those records. The government's only arguments on this issue—that Mr.Barrett in these § 2255 proceedings does not have the right of rebuttal he would have under § 3593(c)—is a misstatement of the law. Therefore, admitting Dr. Pitt's testimony under the government's theory would be an abuse of discretion.

## 4. Conclusion

For the foregoing reasons, and those presented in Mr. Barrett's Motion to Exclude Witness Steven Price, this Court should enter an order precluding the government from calling Dr. Price as a witness during the evidentiary hearing.

///

DATED: May 25, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

/s/ *Tivon Schardl*
TIVON SCHARDL
Trial & Habeas Counsel

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 25th day of May 2017, I caused the foregoing Petitioner's Reply to the Government's Response in Opposition to Petitioner's Motion to Exclude Witness Steven Pitt to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Karl J. Saddlemire (karl_saddlemire@fd.org), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:897866@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Exclude
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 5/30/2017 at 4:04 PM CDT and filed on 5/30/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 444(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying [425] Motion to Exclude Testimony of J. Randall Price Due to Discovery Violation. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson      Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry      dbautry77@gmail.com

Tivon Schardl      tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan      jeffrey.kahan@usdoj.gov

Joan M. Fisher      joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire      karl_saddlemire@fd.org

**6:09–cv–00105–JHP Notice has been delivered by other means to:**

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Karl J. Saddlemire (karl_saddlemire@fd.org), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:897868@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion to Exclude
Content-Type: text/html

# U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 5/30/2017 at 4:06 PM CDT and filed on 5/30/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 445(No document attached) |

**Docket Text:**
 **MINUTE ORDER by District Judge James H. Payne: denying [432] Petitioner's Motion to Exclude Witness Steven Pitt. (cjt, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire     karl_saddlemire@fd.org

**6:09–cv–00105–JHP Notice has been delivered by other means to:**

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )

      Plaintiff,            )

VS.                                )          NO. CIV-09-105-JHP

UNITED STATES OF AMERICA,          )

      Defendant.            )

\*     \*     \*

MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

MARCH 29, 2017

\*     \*     \*

A P P E A R A N C E S:

FOR THE PETITIONER:  MR. DAVID B. AUTRY, Attorney at Law, 1021 NW 26th Street, Oklahoma City, Oklahoma 73106

FOR THE PETITIONER:  MS. JOAN M. FISHER and MR. TIVON SCHARDL, Federal Public Defender - Sacramento, 801 I St. Third Floor, Sacramento, California 95814

FOR THE RESPONDENT:  MR. CHRISTOPHER J. WILSON, Assistant United States attorney, 520 Denison Avenue, Muskogee, Oklahoma 74401

FOR THE RESPONDENT:  MR. JEFFREY B. KAHAN, US Department of Justice – Capital Case Unit, 1331 F St NW, Room 345, Washington, DC 20530

COURT REPORTER:                KARLA S. McWHORTER, CSR-RPR
                               United States Court Reporter

516

I N D E X

PAGE

WITNESS CALLED ON BEHALF OF THE PETITIONER:

BRET SMITH

Direct Examination by Mr. Schardl . . . . . . . . . .   518

Cross Examination by Mr. Kahan . . . . . . . . . . . .   593

Redirect Examination by Mr. Schardl . . . . . . . . .   624

Recross Examination by Mr. Kahan  . . . . . . . . . .   636

Recessed until March 30, 2017 . . . . . . . . . . .   642

517

COURT IN SESSION

(9:13 a.m.)

THE COURT: Morning, everybody. Call case number CIV-09-105-JHP, Kenneth Eugene Barrett versus United States of America. The attorneys enter their appearances for the record, please.

MR. KAHAN: Your Honor, Jeff Kahan and Chris Wilson for the government.

MR. SCHARDL: Morning, Your Honor. Tivon Schardl from the Federal Defender's office, with Joan Fisher and David Autry for Mr. Barrett.

THE COURT: Very well. Are the parties ready to proceed?

MR. KAHAN: We are, Your Honor.

MR. SCHARDL: Yes, Your Honor.

THE COURT: Go ahead and call your next witness then.

MR. SCHARDL: All right. The petitioner calls Bret Smith.

BRET SMITH, PETITIONER'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. SCHARDL:

Q    Good morning, Mr. Smith.

A    Good morning.

Q    I bet you never get to spell your name for the record.

518

A       B-R-E-T, Smith, S-M-I-T-H.

Q       There's a first for everything.  How are you employed, sir?

A       Self-employed as an attorney.

Q       How long have you been doing that work?

A       27 years.

Q       And were you acting as a lawyer -- what kind of lawyer were you practicing -- what kind of law were you practicing in 2005?

A       I have a general practice of law, personal injury work, criminal defense work.

Q       And what's your relationship to this case?

A       I was one of Kenny Barrett's attorneys.

Q       Do you recall when you were appointed to this case?

A       I believe in May of 2005, would be my guess, around in there.

Q       Do you recall the circumstances that led to your appointment?

A       I do.  I was pulling into a restaurant and I received a call from Judge Payne's office, it was his secretary and she said that he would like to meet with me.  She indicated he was available then, so I turned around and came to the courthouse and had a meeting with him.

Q       And prior to your appointment to this case, had you worked on any capital cases?

519

A      No, sir.

Q      In state court?

A      No, sir.

Q      In federal court?

A      No, sir.

Q      Had you worked on any homicide cases in federal court?

A      No, sir.

Q      Had you worked with Roger Hilfiger before?

A      I have.

Q      As a co-counsel?

A      Yes.

Q      What were the circumstances of that case?

A      We represented a fellow in the first carjacking case that was filed in the Eastern District of Oklahoma.

Q      So just that one case?

A      I worked with a fellow, Bill Haworth, and Roger performed a lot of or a some legal services for Bill.  So I would have interaction with him due to that relationship and I want to say that there were cases that we mutually worked on then.

Q      Had you had any training in capital litigation before your appointment to this case?

A      No, sir.

Q      During your meeting with Judge Payne did you discuss your training and experience with capital cases?

520

A    We would have discussed that I had not been involved in a capital case to that point.

Q    Did you express any reservations about your appointment due to that lack of experience?

A    No, sir.  I was honored that Judge Payne would consider me to be appointed in a case that he knew was very difficult and that I knew would be very difficult.

Q    Now, let me just preface, I am going to ask you a lot of questions about your knowledge of the law and the facts at the time.  If I ever forget to say at the time of your work on this case, I hope you will understand that that is what we are focused on here, your knowledge of the circum-stances at the time of your representation of Kenneth Barrett in this case.

A    Yes, sir.

Q    At the time of your representation of Kenneth Barrett, were you familiar with the work of the Capital Jury Project?

A    I don't recall, I don't recall that name.

Q    Were you familiar at the time of your work on this case with the Supreme Court's case law concerning mitigation circumstances?

A    I reviewed a lot of materials in the very beginning of my appointment that would have included case law, as well as ABA guidelines for capital defense work.

Q    When did you review the ABA guidelines?

521

A     Maybe the evening of my conversation with Judge Payne. It wouldn't have been -- because I think it was a day or two before I was actually appointed after my conversation with him, but it would have been in the very beginning of my representation.

Q     At the time you were appointed do you recall what the trial date was in this case?

A     I believe it was in July, in a couple of months.

Q     Did that raise any concerns for you?

A     Sure it did.

Q     Were you concerned about whether you had enough time to get ready for trial?

A     Yes.

Q     At the time of your work on this case were you familiar specifically with the Supreme Court's decision in Green versus Georgia?

A     I can't tell you whether I had reviewed that or not because it has been so long ago.

Q     The same question with regard to the Supreme Court's decision in Woodson versus North Carolina.

A     Specifically I couldn't tell you, no, sir.

Q     What about the -- without asking about the specifics of the case, does the phrase the "frailties of humankind," does that ring a bell with you?

A     Specifically I can't recall.  It has been too long ago.

Q    Did you agree to accept the appointment at the time of that first meeting with Judge Payne?

A    Yes, sir.

Q    So had you talked with Mr. Hilfiger before you agreed to take the case?

A    No.

Q    When do you believe you first met with Mr. Hilfiger to discuss the case?

A    It would have been probably the next day after I was appointed or the day I was appointed.  It would have been very quickly, I would have thought.

Q    Do you recall what you discussed in that meeting?

A    That we had a lot of work ahead of us.

Q    Did Mr. Hilfiger lay out a strategic plan for the case at that time?

A    I am sure that we had discussed the posture that the case was in and the approach that he and Mr. Echols had been taking prior to my appointment.

Q    But as you sit here, do you recall him saying this is our strategy for the case?

A    This case had been tried before and it was heavily publicized.  I don't think a strategy -- there was surely -- that there was going to be a new strategy per se.

Q    It had been successfully litigated in state court?

A    That's correct.  There wasn't the drug allegations,

523

which changed some strategy, and there was not a second phase in those cases, which obviously demanded a strategy.

Q    Specifically with regard to the second phase, --

A    Yes, sir.

Q    -- did Mr. Hilfiger lay out for you a strategic vision for the second phase of trial at that first meeting?

A    I wouldn't go so far as to call it a strategic vision. I had mentioned to Mr. Hilfiger at our first meeting that, among other things, a mitigation specialist was required from my reading of the guides.  And from my understanding, he was relying on work that had been prepared by Mr. Echols in both the first two trials and what they had done up until Mr. Echols' departure and my appearances.

Q    With regard to the guidelines, --

A    Yes, sir.

Q    -- did you accept them as a statement of the prevailing professional norms that would apply to your work in this case?

A    I took them for what they were called, guidelines.

Q    And having had no experience yourself with capital litigation, did you look to them as a source of ideas for what you would need to do to prepare for trial?

A    I looked to them to understand that at a minimum this case required two trial lawyers, an investigator and a mitigation specialist.  Beyond that how much I turned to the

524

ABA guides for guidance, I can't tell you.  I had mounds of -- and volumes of paperwork to get through.  So I am going to say my focus shifted pretty close to the facts of this case.

Q    At that first meeting with Mr. Hilfiger did you all discuss what your role in the case would be?

A    I was there to assist him.  I was not there to develop a strategy.  I was not there to fix something that was broke.  I was there to help him in whatever direction or area he felt like that he needed assistance in.

Q    Did he assign you general responsibility for the penalty phase, should there be one?

A    I don't know that I can answer as to a general responsibility.  I was shown that I gave the opening state-ment from the penalty phase.  I didn't have any recollection of that at all until I read recently the transcript that I think you provided to me.

Q    So when you say you were shown that, you were shown that recently, not -- it is not -- you are not saying that Mr. Hilfiger said on -- whatever date that was -- May 18th of 2005, you are going to do the opening for the penalty phase?

A    I imagine that after we closed the first phase of trial -- I know we both needed a -- some time to reflect.  We probably took a day or two to do that before we met

525

again.  I don't know when it would have been decided that it was helpful for him for me to take over the opening state- ment, but Roger and I would meet at a minimum of once weekly and he would delegate tasks to me then and I had quite a bit of responsibility in terms of the trial in general.  He allowed me to participate often.  So I can only imagine that this opening statement bit would have been why don't you take that over, that would help me, I could focus on something else, so I did it.

Q     And to the best of your recollection, that conversation occurred after the verdict in the first phase of trial?

A     I don't know.  That probably occurred a week before the beginning of the second phase.

Q     Now, do you recall an issue arising in the course of the case with regard to your billing to the Court?

A     Judge Payne had a couple of conversations with me about my billing.  One was I needed to submit it and I think it was probably August when he told me that.  Then after I did submit it, I think he told me he wanted more detail, but that's about all I remember about it.

Q     Do you recall a conference with you and Mr. Hilfiger regarding budgeting that took place on -- I believe it was October 3rd of 2005?

A     No.  And I've seen in my notes that I have a notation about a conversation regarding budget, but I don't recall

526

ever seeing a budget for this case.  Those are my notes, it's my handwriting, but I don't have any independent recollection of what that would have been about.

Q     When you got into the case did you ask Mr. Hilfiger or did you go to the files to look at the budget that Judge Payne had approved for litigating the case?

A     I don't know that I ever saw a budget.  With the work I had in front of me, that wouldn't have been my concern.

Q     You mentioned earlier, I believe, if I have your testimony correct, that when you brought up the idea of retaining a mitigation specialist, Mr. Hilfiger brought up the work that Mr. Echols had done previously.  Is that correct?

A     I would have -- his comment definitely was not, yes, we need to hire a specialist, go find one today.  That didn't happen.  I do think it was I think that area has been worked up and -- not that he was dismissive of it, but that he felt confident that those materials could be taken from what Echols had done and whipped into shape for trial. That's the impression that I have certainly today.

Q     Did you go and look at the budget requests -- not the order, but the requests that Mr. Echols and Mr. Hilfiger had filed before you got into the case?

A     No.  Really the only thing I remember about budget and experts that may have not been approved had something to

527

do with a ballistics expert.

Q    Did Mr. Hilfiger mention to you that the Court had approved for the defense to hire a mitigation specialist?

A    I don't recall that conversation.

Q    At the time of your work on this case did you know that funds were available for the defense to hire a mitigation specialist?

A    I don't know that I did.  I don't know that I didn't. I just don't have a recollection of that.

Q    Is the name Ron Lax, R-O-N L-A-X, familiar to you?

A    No, sir.

Q    Is the name Inquisitor, Inc. familiar to you?

A    Only from information I have recently read.

Q    Recently meaning since this evidentiary hearing was scheduled?

A    Yes.

Q    So at the time you were appointed in mid-May, the case is scheduled to go to trial at that point in late July, I believe.  What did you set about doing first to get ready?

A    Reading the first trial transcripts.

Q    How much of your time would you say from that date of appointment until the start of jury selection -- if you could break it into percentages, how much of that was devoted to the first stage of trial versus the second stage of trial?

A    The majority of my work, certainly in the beginning,

would have been getting ready for trial, the first phase of trial. We've got to get that covered, you know. As far as percentages of time, I can't tell you. I know I worked a lot of long days, but my division of labor between those two, I can't tell you.

Q    Well, would you say it was -- you say the majority. Do you think it was roughly, you know, 51 percent of your time was getting ready for the first stage or something closer to 75 percent?

A    I was not the mitigation guy. Okay? I was not tasked with developing this mitigation case; the same that Roger wasn't I'm just the first stage guy. We -- he would divide the work up and then I would do what I was assigned. So when the -- when that work was done on the second stage, it did not begin in the beginning of our conversation. You know, the conversation about the mitigation specialist did, but as far as the work that I was involved in, I don't recall doing that in the beginning.

Q    Were you familiar -- let me give you a time frame. From the date of your appointment until the start of jury selection, focusing in on that time of preparing for trial --

A    Yes, sir.

Q    Were you familiar with the work that had been done by Rosanne Shay?

A    I don't know when I became aware of Ms. Shay, if it was

529

then or if it was fairly recently or if it was at the meeting with Ms. Russell.  I don't know.

Q     When you say Ms. Russell, are you referring to Jeannie Russell?

A     Correct.

Q     At the time you started work on the case did Mr. Hilfiger or anybody mention to you the availability of the Federal Death Penalty Resource Counsel Program?

A     I don't recall.

Q     Are you familiar or at the time of your work on this case were you familiar with an attorney named Richard Burr?

A     No.

Q     Mr. Hilfiger never mentioned Mr. Burr to you?

A     I am not going to say that.  It has been a long time. I know that we reached out -- Roger reached out to the Northern District Public Defender's office for help on mitigation and it is my belief from that that they referred him to some other resources because their office was involved in another capital case that was going on then or fixing to start.  So was that Dick Burr?  I can't tell you, but I know that he had some resources then that they had referred him to.

Q     Did you at the time of your appointment in this case meet with -- and again I am focusing on that period of time in May of 2005.  Did you get together with Mr. Echols?

530

A     Yes.  Roger and I went to, I believe, Sapulpa and met at his office.

Q     Did you collect his files there?

A     Roger had his files from my understanding.  We may have brought some other things back, but Roger had a library full of files, banker boxes of files and transcripts.

Q     And it was your understanding that those had come from Mr. Echols?

A     Well, they were regarding Kenny's first two trials and trial materials, so I've got a -- I mean, I don't know where they came from, but Echols was involved in those, so...

Q     Fair enough.  The work that Mr. Echols did, did you understand or did you know at the time whether he was assisted by the Oklahoma Indigent Defender System?

A     I think that is -- that he performed work for them.

Q     Like under a contract or something like that?

A     I would think so.

Q     At the beginning of your work on the case did you reach out to -- I say OIDS.  I don't know if that is like offensive to folks around here, but is that like an okay way to refer to the defender --

A     Yes, sir, it is.  That is how it is commonly known.

Q     Okay.  So at the time that you got into the case did you reach out to OIDS to see what materials they had available to you from the state trials?

531

A     Not that I recall.

Q     Was it your understanding that Mr. Hilfiger had the materials from their work on the case?

A     My understanding was that Mr. Hilfiger had -- I can't say all of the materials, but I don't remember us searching for things that should have been there that weren't.

Q     So let me ask you just a few questions about -- more questions about where you were at in your training and exper- ience at the time you were appointed to this case.

A     Yes, sir.

Q     At the time of your appointment did you have training or experience in how to speak to witnesses, how to ask witnesses about things like childhood abuse?

A     Specific training?  I don't know that I ever had a class that -- you know, you have a law school class about interviewing people, but I was a political science major for my Bachelor's degree, then your training as a lawyer, but as far as my practical experience, it is what I do every day.

Q     Ask people about things like that?

A     Well, you are learning about the backgrounds of their case and the facts and circumstances surrounding their case and the defense that you need to provide them.

Q     And I think you said before as far as presenting a penalty case in a capital case, that is not something you had done before?

A     No, sir.

Q     I want to ask you about the declaration that you gave previously in this case.  Do you recall that?

A     If I see it, I may.

Q     Let me ask you some questions and if you need to refresh your recollection, I am happy to give that to you.

A     Sure.

Q     At the time of your work on this case was it your understanding that the standard for competence to stand trial was the same as the standard for determining whether mental health problems could be used in mitigation?

A     Might I answer that this way.  Kenny had stood trial twice.  I had no reason to question whether or not he was competent.  Surely Mr. Echols would have covered that bridge in those two previous trials.  I had volumes of work to get through to re-strategize, so to speak.  So I don't know that I ever entered into that mental gymnastics of competence versus what otherwise may be mitigating type events.

Q     So if you did not have a reason to questions his competence, are you saying that if there was no reason to question his competence, then there was no reason to investigate mental problems as a mitigating circumstance?

A     I am not saying that.  As it relates to comparing the two and whether or not there should be a question of his competence for trial, that had already been decided.  And

533

from my perspective, just because -- heck, he had the best lawyer in Oklahoma in his state case. I mean, surely that was explored.

Q    So if there is no reason to question his competence to stand trial, that wouldn't mean there is no reason to investigate his mental state or his mental condition for purposes of a penalty phase?

A    Surely everybody didn't wait until May of 2005 for Bret to get appointed in this case to begin investigating Kenny Barrett's mitigation factors. You know, surely that didn't happen.

Q    And you -- at the time did you go through the files that Mr. Hilfiger had to determine the extent of the investigation that had gone on previously?

A    On mitigation?

Q    Yes, sir.

A    I was not tasked with mitigation per se. I was given some specific duties, like contacting Jack Gordon, who was Echols' second phase attorney, to find his materials, if any. I was asked to contact Ms. Russell. I probably set up the meeting with Echols. And then I was given specific tasks like preparing the opening statement for the second phase, but as far as Bret being the mitigation guy, I was not that guy.

Q    With regard to Mr. Gordon, do you recall when you

534

contacted Mr. Gordon to get his files on the case?

A     Probably June, July, somewhere in there.  I knew it took some attempts to get a hold of him.

Q     Do you recall a hearing before Judge Payne on the Friday before the start of jury selection?

A     Not specifically I don't.

Q     Do you think it might refresh your recollection to review a transcript?

A     Sure.

MR. SCHARDL:  With the Court's permission, I would like to approach the witness and show him the transcript of the status hearing that was held in this case on September 9th, 2005.  And specifically to ask him to look at Pages 42, Line 16 through Page 43, Line 17.

THE COURT:  Is that an exhibit or...

MR. SCHARDL:  It is a part of the record in the case, Your Honor.

THE COURT:  That's fine.  You can approach.

MR. SCHARDL:  Thank you, Your Honor.

MR. KAHAN:  I am sorry.  Do you want to read the...

MR. SCHARDL:  Well, it is the record.

MR. KAHAN:  I appreciate that, but I -- I even have -- I just want --

MR. SCHARDL:  Sure.  Page 42 --

THE COURT:  Guys, you need to pull that microphone

in so we can catch what you are talking about, if you want it on the record.

MR. SCHARDL:  Oh, sorry about that.

MR. KAHAN:  42 to 43?

MR. SCHARDL:  Yes, Line 16 to Line 16.

(PAUSE)

THE WITNESS:  16 to 16?

MR. SCHARDL:  Yes.

THE WITNESS:  Okay.

(PAUSE)

THE COURT:  Is that a docket item in 0415?

MR. SCHARDL:  Yes, Your Honor, it is.

THE COURT:  What is the docket number you have?

MR. SCHARDL:  Well, I gave up the transcript, so I can't...

THE COURT:  It has got the docket stamp, I guess?

DEPUTY CLERK:  There is not, Your Honor.

THE COURT:  Okay.  Well, when you figure it just let us know.

MR. SCHARDL:  Yes, I apologize.  It does not have the CMECF stamp on that.

THE COURT:  That's fine.

BY THE WITNESS:

A    I have reviewed those materials.

BY MR. SCHARDL:

Q    Mr. Smith, does that refresh your recollection at all as to when you met with Mr. Gordon?

A    Well, I think that was consistent with what I had said. I would assume it was July or so of -- prior to the start of the trial.

Q    Does that refresh your recollection as far as how much material you had found in the files of prior counsel as far as the work that had been done in state court on the mitigation case?

A    I don't know why I was the one addressing the Court specifically. I would have to probably read the whole thing and reflect on it for a while, but I don't remember undertaking a search to find Echols' material. I think that's something Roger may have told me, "I'm having a hard time, can you run this down" or something like that. And then because I -- I am assuming this is referencing Ms. Russell when we are talking about she and previous work product. I don't know because her name is never mentioned. It just says she, but if that's the case, then we would have been addressing whether or not her report was going to be available in time for the government to have time to react to it basically.

Q    So do you believe that your representations to the Court in that transcript on September 9th, 2005, do you think that would be a better reflection of your understanding

537

of where things were at that time than your recollection is today?

A    Sure, you bet.

Q    So if you told the Court on September 9th, 2005, that y'all had found very little on mitigation to that point, that you believe that that would have been an accurate representation?

A    Sure.

Q    Was it your plan to review the work that had been done in preparation for the state trials and to use that as a sort of jumping off point for what you would need to do to get ready for the second stage of the federal trial?

A    Yes, build on information that had already been compiled.

Q    Was it your belief that you and Mr. Hilfiger had no independent duty to develop a mitigation case for the federal trial, that is, independent of what had been done in state court?

A    No, that's not my belief.

Q    You mentioned Ms. Smith and you're correct that the hearing on September 9th, 2005, was about the production of her report.  Do you have any recollection now of a dispute that arose about whether you needed to produce a report pursuant to Federal Rule of Criminal Procedure 12.2?

A    So the record is clear, I think you are referring to

538

Ms. Russell because you said Ms. Smith?

Q    Oh, did I say Ms. Smith?

A    Just so the record is clear.

Q    I am sorry.

A    And just so I can make sure we are on the same page.

Q    I'm sorry.

A    There was concern, yes, that we had to be in compliance with Rule 12.  There is no doubt about that.  I think we were trying to comply, particularly to avoid the court having to postpone matters because we were waiting to finish our work to be able to comply with Rule 12.  That's my recollection.

Q    And do you recall addressing the government's request for a report at this hearing?  Do you recall a colloquy between yourself and Judge Payne about it?

A    I don't.  I read a moment ago that it referenced that they should have had that from previous litigation, but that's -- but I don't have any independent recollection other than what I just read that you showed me.

Q    In this transcript the record will reflect that Mr. Sperling referred to that date, September 9th, as the eleventh hour because jury selection was about to start.  Would you agree or disagree with that characterization?

A    I don't know in what context he was referring to.  Are you talking about was this on the eve of trial?

539

Q     It was the Friday before the start of death qualification.

A     I could agree on that.

Q     Do you recall what position the defense took with regard to whether Dr. Russell's work fell within the scope of Rule 12.2?

A     I don't know.

Q     Let me ask you to review --

MR. SCHARDL:  If I may approach the witness, Your Honor, and ask him to review Page 41 and specifically Lines 17 to 23.  I will wait to allow Mr. Kahan an opportunity to bring up that page of the transcript.

THE COURT:  Is it the same transcript you showed him a minute ago?

MR. SCHARDL:  Yes, Your Honor.  This is the transcript of the September 9th, 2005, hearing.

THE COURT:  Okay.

MR. SCHARDL:  Mr. Kahan, is it --

MR. KAHAN:  I have it.

MR. SCHARDL:  Okay, thank you.

BY THE WITNESS:

A     17 TO 23?

BY MR. SCHARDL:

Q     Yes, sir.

                              (PAUSE)

BY THE WITNESS:

A      I've reviewed it.

BY MR. SCHARDL:

Q      Does that refresh your recollection as to the defense's position on whether Dr. Russell's work fell within the scope of Rule 12.2?

A      It doesn't refresh my recollection.  I can read what the transcript says, but I don't have any independent recollection of this conference, to be honest with you.

Q      If you said at the time that Dr. Russell had not done an examination of Mr. Barrett for purposes of mental health as -- or mental health mitigation as defined in Rule 12.2, would you fall back on what you said at the time?

A      Sure.

MR. SCHARDL:  May I approach and retrieve the transcript?

THE COURT:  Yes.

BY MR. SCHARDL:

Q      Do you have a recollection as you sit here today of when you first contacted Dr. Russell in this case?

A      I don't know.

Q      Do you think it might help to look at her billing records to refresh your recollection?

A      I would say August, but I don't -- that would be my recollection.

541

Q     Sometime in August of 2005?

A     I would think so.  I remember it was summer and hot, so...

Q     At the time of your work on this case were you familiar with the ABA guidelines regarding developing a consistent defense strategy for both phases of the capital trial?

A     My recollection has probably been tainted by my recent work because -- I mean, it only makes sense that you are going to have a consistent theme from first stage to second stage, but I have read some materials recently, which has probably contaminated my memory as it relates to 2005.

Q     Do you recall meeting with Mr. Hilfiger to discuss sort of what the guidelines recommend, having a consistent theory or theme that would carry you through both stages of the trial?

A     No, I don't have a recollection of that.

Q     If on September 9th, 2005, y'all were still gathering the mitigation case that had been prepared in state court and that was going to be your jumping off point for completing whatever investigation you all needed to do for the federal trial and jury selection, death qualification, was starting on the 12th to be immediately followed by opening statements, would it be fair to say that the time to have developed that strategy, the two stage strategy, had passed?

542

A     There was a strategy and that was developed with Ms. Russell at that meeting that we had in her office with myself, Mr. Hilfiger and Earnst (sic).

Q     There was a strategy for the penalty phase?

A     Correct.

Q     Do you recall the date of that meeting?

A     I think it was August whenever we met with her.  I don't know.  It was in her office.  I think we only went up there one time.

MR. SCHARDL:  May I have just a moment to locate something, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  Thank you.

(PAUSE)

BY MR. SCHARDL:

Q     Mr. Smith, do you recall whether you and Mr. Hilfiger asked Dr. Russell to assist you with anything else in the case besides whatever work she did toward the penalty phase?

A     I remember her offering her help on a prosecution witness that dealt with memory, memory and recall, as it relates to these troopers that were involved in the shooting and the actual incident.

Q     Would that be Mr. Horn?  Is that the witness?

A     That sounds familiar, but...

MR. SCHARDL:  Your Honor, may I ask Mr. Davis to

543

show the witness Government's Exhibit Number 33?

THE COURT:  Yes.

BY MR. SCHARDL:

Q    Looking first at the first page of that exhibit, Mr. Smith, do you recognize that letter?

A    No, this is a letter written by Mr. Hilfiger.  I don't know that I ever saw this.

Q    Could I ask you to turn a couple of pages to -- there is a little 3 with a circle around it in the bottom right-hand corner.

A    Yes, sir.

Q    Okay.  That is what purports to be a statement from Dr. Russell addressed to you; correct?

A    Yes.

Q    Do you recall having seen that document before?

A    No, sir.

Q    Could I ask you to please review those two pages of records and see if they refresh your recollection as to the work you did with Dr. Russell?

(PAUSE)

A    It doesn't help me recollect anything.  I guess it confirms my belief that we initially met with her in August. I see in here there are different notations where she consulted with the lawyers.  It says with "attorney," but I don't have any independent recollection of those meetings

544

with her.

Q    How many times do you recall meeting in person with Dr. Russell?

A    I recall meeting with her once.

Q    And was Mr. Hilfiger present at that meeting?

A    Yes.

Q    And is that the meeting you were referring to before where a defense strategy for the penalty phase was discussed?

A    Yes.

Q    And so the first consultation that is referenced in Government's Exhibit Number 33, that would -- that you mentioned, I think, in August, that was dated August 29th?

A    Correct, two hour meeting.

Q    As best you can recall, do you believe that was an in-person meeting --

A    Yes.

Q    -- or a telephone consultation?  Because it says "consult."

A    I had contacted Dr. Russell to set up a meeting for me, Mr. Hilfiger, and for Dr. Russell at her office in Tulsa. So I think this was that meeting.

Q    You think that was that meeting?

A    Yes, sir.

Q    On August 29th, 2005?

545

A    Correct.

Q    And then y'all agree with me that the record reflects that on September 9th, 2005 -- and I would say how many days that is, but I don't remember how many days there are in August, but whatever, eleven, twelve days later, the defense had not produced the report from Dr. Russell to the government; correct?

A    Well, if you are asking me on the basis of what I see on Page 3 here, I can't tell that.

Q    No, I was referring back to the transcript that we were discussing earlier.

A    Oh, we didn't have -- if we would have had that report, I wouldn't have told Judge Payne that we didn't.

Q    Could I ask you to turn to the next page of Government's Exhibit Number 33?

A    Yes, sir.

Q    And you will see that the billing record reflects two consultations with attorney or -- no, I am sorry -- three consultations with attorney, one on the 19th of September -- oh, I am sorry, four -- the 25th of September, the 4th of October, and the 11th of October; correct?

A    I see the 19th, the 25, the 4th, and October the 11th, yes, sir.

Q    But as far as you recall, you only met with Dr. Russell one time?

546

A    That's all I recall, but I would think that second entry on Page 4, the September 25th entry, I would have probably met with her because she was -- I am the one that wound up cross examining, if it was Horn, and that's what those materials were referencing.  Now, it would make sense that I met with her, but I -- I have an independent recollection of meeting with her that initial time in her office with Mr. Hilfiger.

Q    Turning back to the issue of strategy in the penalty phase, was your strategic objective in the penalty phase to get a sentence less than death?

A    Well certainly.

Q    Is that the context in which we should understand the statement in your declaration when you said, "Mr. Barrett impressed me as among the most cooperative criminal defendant -- defense clients I've ever had?"

A    I think that would go more towards his competence.

Q    That's what you were referring to in that statement?

A    I think so, just his general mental state.  The guy was -- you've seen his notes.  He was very helpful during the trial to me.  He knew as much about it as I did.

Q    Did Mr. Barrett ever try to prevent you from carrying out an investigation towards the penalty phase?

A    I have a belief that Mr. Barrett did not want his family members begging for his life.

547

Q     Let me stop you there.  Were you familiar with case law that precluded witnesses in a penalty phase from expressing any opinion about the appropriate sentence?

A     I don't recall that.

Q     Were you familiar with case law that said penalty witnesses/defense witnesses begging for a client's life or the defendant's life would fall within that prohibition?

A     I don't have an independent recollection of that.

Q     Did Mr. Barrett ever tell you that he did not want you to pursue a -- the best possible sentence that he could get?

A     I attempted to broker a life sentence for Mr. Barrett.

Q     Let me ask you, do you agree or disagree with the ABA Criminal Justice Standards regarding -- well, I'll read it to you --

        MR. KAHAN:  Objection as to relevance, as to whether he agrees with the ABA guidelines.

        THE COURT:  Overruled.

BY MR. SCHARDL:

Q     I am going to read to you, Mr. Smith, from the ABA Criminal Justice Standards.  And for the record, I am not reading from the guidelines for the performance of counsel in death penalty cases, but rather from the Criminal Justice Standards Defense Function Standard 4-5.2B.

     Quote:  "The decision on what witnesses to call, whether and how to conduct cross examination, what jurors to accept

548

Case 6:09-cv-00105-RAW   Document 446   Filed 06/04/17   Page 35 of 128

or strike, what trial motions should be made, and all other strategic and tactical decisions are the exclusive province of the lawyer after consultation with the client."

Would you agree with that statement?

A    I mean, I don't recall reading it before, so I don't know what the context -- I understand what you read to me. Do I agree that that's the standard?  I don't know.  I don't know that I -- I can't recall having read that before, but it only makes sense to me.

Q    It makes sense to you as a criminal defense lawyer, that's the way it has to be?

A    I mean, it's -- you would hope that your client trusts that you have his best interest at heart and you are doing the best for him and that he is going to let you do your job. And, you know, I think that's what that says.  The lawyer is the professional.

Q    You said in your declaration that during your initial meeting with Mr. Barrett he was suspicious of your identity, but over the course of your initial few meetings you found it easy to build a rapport with him.  Do you stand by that?

A    Sure, I do.  Our first meeting was not the most pleasant for either one of us.

Q    Specifically referring to what you said about him being suspicious of your identity, what did you mean by that?

A    Kenny had a relationship, I believe from what I've

549

gathered, with Mr. Echols and Echols had recently departed the case and now walks in somebody that he doesn't know.  He has never heard of me before, I presume, and I'm telling him I'm one of your new lawyers.  I think it took a while for that to sink in to him, you know, the fact that Echols is gone and look what he has been replaced with.

Q    Well, I'm sure at this first meeting he didn't look at you say look what I've been -- look what Echols has been replaced with, but that being said --

A    No, but I think that's what -- I think that's what the theme was, you know.  I've lost a guy that has all of this momentum in my case.  For two years he has tried or for two different trials he has put my case on.  He knows all of the nuances and now I get a guy that all he knows is what he has read in the newspaper about it.  I mean, I think that was -- that was the meeting that we had.

Q    So when you said in your declaration that he was suspicious of your identity, that's what you were referring to, that he was --

A    Well, I mean, he is going to want to know that I am not some agent, I suppose, you know.  I've got a Bar card and a driver's license and I tell him who I am, but I -- I'm sure we went through that.  Here, let me prove to you who I am. You don't know me from any previous contact.  And with what was at stake for Mr. Barrett, he would rightfully demand

that.

Q    The fact is as criminal defense lawyers, we often wish our clients were a little more paranoid --

A    Yes, you --

Q    -- of people who approach them in the jail?

A    You bet you, you bet you.

Q    But you were able to, after some time, develop a rapport with him?

A    Yes.

Q    But immediately his initial reaction to you was guarded and suspicious?

A    I think he filed a motion to fire me.

Q    Did that occur after the meeting?

A    I'm sure because he didn't know anything about me until I met with -- I'm sure I met with him in the very beginning upon learning of my appointment.  I mean, I don't think I probably delayed much.

Q    So his initial reaction to you again was one of suspicion and guarded?

A    Yes.

Q    Let me ask you about that.  So about how much time would you say it took before that suspicion subsided and you had this rapport?

A    Not long.

Q    Not long?

A    Not long at all.

Q    Days?

A    Probably the second meeting we began on a different track and I would say that it just improved -- I had a better relationship with Mr. Barrett than Mr. Hilfiger did.  And when I say that, Kenny and I could communicate more easily than him and Mr. Hilfiger could.

Q    In your declaration you also state that through your interactions with Mr. Barrett you were, quote, "...unaware of any symptom that suggested he suffered from any significant mental health condition."

A    I think that would be true.

Q    Now, was that just based on your interactions with him?

A    Yes, yes.

Q    And at the time did you consider yourself to be qualified by training or experience to screen individuals for the presence of mental or psychological disorders or impairments?

A    You kind of know it if you see it, sort of deal, was what I am getting at in that declaration.  I've got a guy that's got good recall, a guy that's got a lot of details about his case that I'm interested in hearing.

Q    Okay.  But let me ask you again...

A    Sure.

Q    At the time did you consider yourself to be qualified

552

by training and experience to screen individuals for the presence of mental or psychological disorders or impairments?

A    I just have on-the-job training as a lawyer in doing what you are asking me about.  I don't have -- I had a basic psychology class in college, so I am not a mental health expert.

Q    I understand that.

A    So, no, I don't have special training in that area. I've got on-the-job training dealing with people every day for -- you know, for the purpose of what I do.

Q    I understand that and I don't mean to embarrass you or belabor the point, but I have to ask you --

A    I don't feel embarrassed.

Q    Fair enough.  Did you know at the time the diagnostic criteria for bipolar disorder, for example?

A    No.

Q    Did you know at the time the diagnostic criteria for post-traumatic stress disorder?

A    No.

Q    Did you know at the time how to identify impairments in neuro cognitive functioning?

A    Other than something that would be obvious to you just from visiting with somebody, no.

Q    So you said in your declaration that Mr. Barrett did not demonstrate signs of irrational suspicion or an abnormal

553

degree of paranoia.  Do you recall that?

A      I think that was true.

Q      Is that referring back to what you were saying before, that you kind of hope your criminal defense clients have some rational suspicion of people who approach them in the jail?

A      Yes.

Q      Did you intend for that statement to be taken as an indication that you were ruling out the possibility that Mr. Barrett experienced paranoia that could be a problem for him?

A      No, I didn't mean it to -- I meant that -- just based on what it said, based on my interaction with Kenny that him and I were able to converse and education ourselves about his case.

Q      Now, when you said in your declaration that you were unaware of any symptom that suggested Mr. Barrett suffered from any significant mental health condition, could you -- well, let me ask you before I get into the meaning of that.  Did you offer that language to the government or did the government offer that language to you?

A      It has been my experience in this process usually that's -- those declarations are offered to you after an interview.

Q      Is that what happened in this case?

554

A    I am going to guess it probably did.

Q    So the phrase significant mental health condition, do you recall having used that phrase yourself when you communicated to the government?

A    It almost seems a little lofty for a guy from Wainwright, you know.

Q    And a guy from Tallahassee, Florida, to be honest.

A    But what I mean by what I wrote is we deal with people often times that have serious mental health problems and I never experienced that with Mr. Barrett.  So I don't know that you can read more or less into that declaration than that.

Q    Fair enough.  So if I -- it would be wrong then to read into it that you believed based on your interactions with him that he had no mental or emotional problems that could stand as a mitigating circumstances?

A    I don't think that offers an opinion on his background. I think that offers an opinion on my interaction with him.

Q    Do you recall how you first learned about Dr. Russell's work in state court?

A    No, I don't know.

Q    Now, in your declaration you also said that you were unfamiliar or not familiar with Dr. Bill Sharp at the time of your work on the case.  Do you stand by that?

A    I am still not familiar with him.

555

Q     You are still not familiar with him.  Let me -- so if you had known anything about Dr. Sharp at the time of your work on this case -- are you saying that your memory of that has lapsed or you never had a knowledge of Dr. Sharp?

A     I don't know which of those two avenues would be more accurate.  I don't have knowledge of Sharp and I don't believe it is a situation that I just can't recall.

MR. SCHARDL:  Could I ask Mr. Davis to please show the witness Government's Exhibit Number 34?

THE COURT:  Yes.

(PAUSE)

BY MR. SCHARDL:

Q     Let me know when you've had a chance to look through it.

A     I've looked through it.

Q     Okay.  Do you recognize that document, sir?

A     I don't have an independent recollection of it.  I doubt that this is the first that I've seen it, but I don't have an independent recollection of it.

Q     So let me ask you to turn to Page -- it would be good if I knew -- well, let's go with Page 9.

A     Yes, sir.

Q     Oh, wait, I am sorry, I'm wrong.  Strike that.  Could you please look at Page 2 of that document?  And about half-way down Page 2, do you see above the word "interviews" that

556

is underlined and in italics?  And then going up three lines there is a reference to interview reports by Rosanne Shay?

A    Yes, sir, I see that.

Q    Do you recall having reviewed interview reports by Rosanne Shay?

A    No.

Q    Do you just not recall it or do you believe you didn't review them?

A    I believe that that was Mr. Hilfiger's area that he was working on.  I don't know what I duplicated efforts with him on reviewing psychological records on Mr. Barrett.

Q    Do you recall the name Steve Leady in relation to this case?

A    No, sir.

Q    So looking at the next line below the reference to Rosanne Shay, do you see that you recall having reviewed any interview reports by Steve Leady?

A    No, sir.

Q    Do you have any contact with Steve Leady?

A    No, sir.

Q    Do you, as you sit here today, know Steve Leady?

A    I couldn't pick him out of a line-up of two.

Q    Then looking at the next line below that where it says psychological evaluation completed by Dr. Bill Sharp, do you have any recollection of having read this or becoming aware

557

of that evaluation prior to trial?

A    No, sir.

Q    Looking at this document as a whole, Government's Exhibit Number 34, you don't have an independent recollection of this right now?

A    No.  When I scan through it there are some things that I seem to remember about Mr. Barrett, whether or not it came out of this or not, but like his references to school and things he liked and didn't like.  I mean, there are some -- the more I worked with it, I am sure I would -- I don't know that I could tie it to this or not, but there are some things that seem familiar to me.

Q    Do you recall whether you asked Dr. Russell to provide you with a copy of this document?

A    Either myself or Mr. Hilfiger.

Q    Asked for this?

A    During that first meeting.  I mean, we discussed with her at that first meeting, from what I believe, what had been done, what needed to be done, and what she was willing to do. And certainly her report -- because I don't believe I had this report prior to meeting with her and I don't know that Mr. Hilfiger did.

Q    And do you recall asking Dr. Russell or whether you asked Dr. Russell to update this report for purposes of the federal trial?

558

A    When I say a strategy was developed, I don't mean to say that there was a new strategy.  I don't want you to take my testimony as that.  But when we met with her, her and Mr. Hilfiger had the majority of the conversation because they both are the most familiar with the materials.  I set up the meeting.  I am there learning what I can, but the things that they were talking about I didn't have familiarity with.  So what I remember about that meeting is this strategy being conducted that would limit the government's intrusion into Kenny's past and their exploitation of that and proceeding along the lines of dangerousness as opposed to a full-blown mitigation strategy.  And all of that was done, from my recollection, at that meeting with Dr. Russell saying this is what I'm trained to do, this is what I can do, this is what I have done in the past, and this is what I can do going forward.

Q    And that would be the meeting on August 29th, 2005?

A    Yes, building off of what had been done previously with Echols and Mr. Hilfiger while he was affiliated with Mr. Echols.

Q    So you said a second ago -- and I want to be sure I understood that --

A    Yes, sir.

Q    -- that you made a distinction between focusing on future danger and a full-blown mitigation case.  Is that

559

correct?

A    That's my recollection of what her and Mr. Hilfiger were zeroing in on, yes, sir.

Q    Do you recall anything about Judge Payne having limited the defense case in the penalty phase to a rebuttal of future dangerousness?

A    I don't have a recollection of that.

Q    Do you recall any conversations with Mr. Hilfiger along those lines?

A    I don't recall.

Q    Let me ask you, if you still have the binder there, to look at Government's Exhibit Number 32.  First of all, have you ever seen that document before?

A    If you would give me a moment to review it...

(PAUSE)

A    I've reviewed it.

Q    Do you recall whether you've ever seen that document before?

A    No.

Q    Looking at Page 2 of that document, does it reflect or -- I am sorry.  Does it refresh your recollection at all as to whether the defense in this case believed there were limitations on the mitigation testimony that could be presented?

A    Mr. Hilfiger wrote this without my participation, so

560

I can't tell you whether what's in here is accurate or not. I don't have any independent recollection of restrictions that Judge Payne put on us as it relates to mitigation.

Q    There is a phrase used in this correspondence which is mitigation expert.

A    Yes, sir.

Q    Did you view --

MR. KAHAN:  Your Honor, I am going to object to further questions on this.  The witness made it clear that this is not his letter.

THE COURT:  Well, what is it you are looking for from this witness with regard to this letter?

MR. SCHARDL:  I can rephrase the question.

THE COURT:  I understand -- I mean, I don't think there is anything wrong with taking him through...were you aware of this, were you aware of that, but unless it is something along those lines, there is really not a whole lot he can tell us about this, is there?

MR. SCHARDL:  About the letter?  That's fine, Your Honor, that's fine.

THE COURT:  Okay.

BY MR. SCHARDL:

Q    Mr. Smith?

A    Yes, sir.

Q    The phrase mitigation expert, what does that signify

561

to you or what -- I am sorry.  What did it signify to you at the time of your work on this case?

A    I think it is self-explanatory, that it's a person who is an expert in mitigation.  They hold themselves out as such.

Q    Did you equate that at the time of your work on this case with mitigation specialist as we have been using that term previously in your examination?

A    If you ask me what I think a mitigation specialist is, I think that is a person that is trained specifically to provide those services.  So that may differ from what I'm talking about generally in terms of mitigation, if that makes sense.

Q    So what services would a mitigation specialist provide?

A    They would interview the defendant and family members to ascertain mental health histories, backgrounds, education, hospitalization records, school records, everything about the background of that individual, his family, his extended family, great-grandparents, maybe great-great-grandparents. It goes -- from what I understand, the tentacles are pretty deep on what they do, how far they search.

Q    And what is the purpose of that investigation?

A    Well, in a case like this ultimately you hope it is used to save a fellow's life.

Q    So it is used to gather whatever information might be

562

presented in a penalty phase?

A    Correct.

Q    Dr. Russell?

A    Yes, sir.

Q    Do you recall what the scope of her work was on this case?

A    Yes, it was limited.

Q    To?

A    Dangerousness.  She -- I have seen her declaration. I don't remember her saying during our meeting she is not a mitigation specialist.  I don't remember her saying that during our meeting.  It has been too long ago.  I know that she has maintained that in a declaration that you've shown me.  I do know that she told us she didn't have time to prepare on the eve of trial work that otherwise might be done by a mitigation specialist.  And that's when -- in talking about this strategy that was then further developed between her and Mr. Hilfiger about what makes sense with the time that we had, with the information that has previously been gathered, and in light of trying to protect the government from exploiting Kenny's past.  I think there were several moving parts in that equation, but I don't think anybody had an idea when we left that meeting that she was our mitigation specialist.  This letter reads a little different than that, but I am not -- I don't know Mr. Hilfiger's

563

thinking as he wrote that because it is all in the area of mitigation. So that's the distinction that I draw between my conversation about mitigation and a mitigation specialist. Fair enough?

Q    Fair enough. Thank you, sir. And I think we covered this before but just to be sure, if you told the Court on September 9th, 2005, that Dr. Russell's work on this case would not involve an examination of the defendant, that -- would that have been the best recollection we have available as to the scope of her work?

A    Knowing what happened, I don't know that that statement is accurate. It may have been accurate when it was made, but I know that she was going to go back and re-interview Kenny. We knew that whenever we met with her or I believe we did anyway at the end of September or -- excuse me -- at the end of August. But it is also my recollection that that interview was going to be to update her records with what she had done and she -- she hadn't seen him in a while.

Q    Mr. Smith, let me ask you to turn in that binder to Government's Exhibit Number 33. Specifically, sir -- I am sorry, Page 4 of Government's Exhibit Number 33.

A    Yes, sir.

Q    I'll direct your attention to the last entry on that table there for October 11th, 2005.

A    Yes, sir.

564

Q    Do you believe that was the interview that Dr. Russell did with Mr. Barrett?

A    Yes.

Q    Okay.  And do you recall the date on which you disclosed her report to the government in this case?

A    I don't know.  Let me ask you to turn back to Page 3 of Government's Exhibit 33.  Looking at the last three lines there -- well, we know from the record it was after September 9th, 2005, correct, that she gave her report to the government?

A    Based on what you've shown me with that previous testimony, yes, sir.

MR. SCHARDL:  Excuse me one moment.

(PAUSE)

BY MR. SCHARDL:

Q    Could I ask you to turn to Government's Exhibit Number 35, please, and specifically to Page 7 of that Exhibit Number 35.  Have you got that?

A    I do.

Q    Do you see the date of the report is September 15th, 2005?

A    Yes, sir.

Q    Do you have any reason to question that that is the date that she prepared this report?

A    I don't know.  I don't have any reason to question

565

what's on there, but I don't have any independent recollection of it.

Q    Okay.  So if her billing records reflect that she evaluated or -- I don't want to say evaluated.  Strike that. If she met with Mr. Barrett on October 11th of 2005 and she submitted her report on September 15th of 2005 -- your statement to the Court on September 9th of 2005, was that the work you would be offering pursuant to Rule 12.2 did not involve an examination of the defendant; correct?

A    You know, it has been a while since I've reviewed Rule 12.2.  So I --

Q    Well, I --

A    And when I say that, I context that in terms of my answer.  I know that she wanted to update the records and visit with Kenny.  Whether or not that was going to involve an examination that implicated 12.2, I can't tell you sitting here today.  I think my statement that I made to Judge Payne on September 9th was accurate as it states.  I don't have any reason -- and I won't mislead you or the Court.  What she did in October as it relates to an examination or not, I don't -- I don't know if it -- and the way it implicates Rule 12.2, I just can't tell you sitting here right now.

Q    Do you believe that you had any communications with Dr. Russell after October 11th, 2005?

A    If you would let me see her billing record?  What

566

exhibit was that, 33?

Q    I think so.  That sounds correct.

A    You want to know whether I had contact with her after September --

Q    Well, after her meeting, I guess, with --

A    Mr. Barrett?

Q    Yes, Mr. Barrett.

A    Well, she visited with a lawyer on October 11th --

Q    Well -- and just to avoid any hearsay problems --

A    Yes, sir.

Q    This document purports to represent that she interviewed Mr. Barrett on October 11th; correct?

A    Yes, sir, and interviewed with a lawyer then to --

Q    Met with an attorney --

A    -- or met with a lawyer.

Q    Do you recall meeting with her at that time?

A    I want to believe that was Mr. Hilfiger because I don't have a recollection of that.

Q    Thank you.

                              (PAUSE)

BY MR. SCHARDL:

Q    Turning back to your declaration, Mr. Smith, do you recall stating in there that Dr. Russell never, quote, "...suggested anything to me that indicated she believed that Mr. Barrett suffered from a significant mental health

567

condition?"

A      I remember reading that in my declaration and I guess it is two degrees as to how you want to interpret that.  To me Kenny was higher functioning than most criminal defendants that I run across.  So from that context, I think that is accurate.  I don't think it excludes the fact that he may have had some mental health issues certainly in his past and maybe that he was struggling with, but they certainly were not obvious to me or in a conversation with her that we had that they were patently obvious.

Q      Do you recall -- you said previously that you don't recall her 2003 report; is that correct?

A      No.

Q      So in that statement in your declaration did you intend for it to be taken as representing that there was nothing in her report that suggested to you that she believed there was no mental health condition that could be presented in mitigation?

A      No.

Q      It did not?

A      No.

Q      You are saying that you did not intend to mean that your -- that her report never suggested the possibility of a mental health condition that could be presented in mitigation?

568

A      I think that language was a politer way of saying nothing in our conversations indicated to me that Kenny is nuts, you know, as we take it -- as we relate to people whether it is on the street or professionally.  It doesn't exclude the fact that he may have some underlying mental health issues that meet these psychological criteria that you asked me about earlier.

Q      Thank you.  I apologize.  I am just looking for something.  (PAUSE)  Going off of what you just were talking about, at the time of your work on this case I assume that you had worked with mental health professionals in the past?

A      Some.

Q      Some.  Do you mean by that that your work with mental health professionals in the context of criminal defense work was limited?

A      I would say that my work with mental health profession-als professionally would be related primarily to competence.

Q      To competence?

A      Whether a defendant is competent to stand trial.

Q      In the course of that work --

A      Yes, sir.

Q      I am sorry?

A      Yes, sir, I am listening.

Q      Did you have an understanding of the difference, if any, between a mental status exam and an evaluation of the

defendant's condition over time?

A    I would think one would be how are you doing today and the other is let's take a look at your life history and see what that indicates.

Q    Would you agree with me that competence is sort of a snapshot of the defendant's mental condition at the time he is being evaluated?

A    Yes.

Q    And would you agree that when we are talking about mitigation, we are talking about looking back over somebody's life at how a mental or emotional condition may have affected their behavior in the past?

A    Their life and their family history.

Q    Let me ask you about some specific things, facts about Mr. Barrett's life and history.  Do you recall whether prior to trial you were aware that he had repeated the eighth grade?

A    I don't know if I knew then or not.  I mean, I know I've read that since.  So my recollection, I am sure, has been tainted.  I am not going to tell you that, oh, yeah, I knew that then.  I don't know why I wouldn't, but I know my memory has been tainted from recent readings.

Q    Do you know whether you knew prior to trial that he had been in a class for children with a learning disability?

A    I can't tell you.  I don't know.

570

Q    Prior to trial what did you know about Mr. Barrett's home life as he was growing up?

A    I knew that him and his mother were very close.  He lived next door to his mother.  I knew that he had a step-mother who was involved in his cases in terms of communicating with his father.  I can't tell you why she was the point person as it relates to his father, but...you know, Kenny's house is not very far from his mother's.  That indicates to me he has a close relationship with his mother and I don't know that she ever indicated differently to me.

Q    So do you know whether you knew at the time of trial the circumstances of him owning that property and building that cabin?

A    I am sure we talked about that.  That's one of the first things I wanted to do, was go lay eyes on this crime scene.

Q    And you did, in fact, go out to look at the crime scene?

A    More than once.

Q    Did you speak with Mr. Barrett's mother when you were out there?

A    Yes.

Q    What was the purpose of those conversations?

A    It would change over time.  Initially it would be an introduction.  This location was very rural and you didn't

571

pull into that area unnoticed and they had heard by the time that I had gone out there that I was involved in the case. So there was some eagerness and apprehension, I am sure, on my part and their part to meet each other and to do the work that I had to do.

Q    Did you meet with other members of Mr. Barrett's family over the course of your representation?

A    Sure I did.

Q    In the course of those meetings did you ask the kinds of questions that you described earlier that a mitigation specialist would ask?

A    I certainly did not go into the depth that those people do and how they are trained to get responses on a subject matter that most people don't want to talk about.  I guarantee you Kenny's mother did not want to talk about her past of drinking too much.

Q    That's the sort of topic that you would have deferred to a mitigation specialist, a person trained to get into that sort of thing?

A    My understanding is that is what they are experts at.

Q    And you are not?

A    No.

Q    Prior to trial did you know or were you aware of how much the Barrett family during his childhood had either been stable in one place or had moved around?

572

A      I remember the -- and I've read it here recently just reviewing those records that-- the Joilet, Illinois farm stuff.  I mean, that's something that Kenny and I would have talked about.  You know, how long have you been in Sallisaw, what all have you done, what's your background, you know, what are you -- so in some regards -- I mean, we more than just touched on it.  Heck, I want to know about him like you do with your criminal defendants in general.

Q      So did you then communicate that information about the family moving around to somebody who could tell you whether it could have affected him, his development, his sense of place in the world, anything that could have served as a mitigating circumstance?

A      No, and I reference what I said earlier.  Surely it is not in May of 2005 that we are developing mitigation.

Q      And yet in September of 2005, you were telling the Court that you were surprised that there wasn't much in the way of mitigation in the files that you had from Mr. Echols?

A      And what Mr. Hilfiger had from Mr. Echols.  They were working together.  I mean, I was making those statements to the Court, but it's, it's -- I can't believe those two didn't discuss what had been done prior whenever they get together in January or December, whatever it was, of 2004.

Q      You raised a point that I think we should clarify.  The files that Mr. Hilfiger got from Mr. Echols, who had physical

573

custody of those during the course of your representation?

A     Mr. Hilfiger has a library at this office.  The same location he offices today.  Those boxes were lined up along the wall in his library and I would go to his office and would have that meeting and I would take what materials that I needed to work on.

Q     You would make a copy of them or you would just take physical possession of the documents?

A     Just take them.

Q     And then presumably return it?

A     That's correct.

Q     Prior to trial did you know whether Mr. Barrett had worked construction at any time?

A     I've read that, read it recently, so I can't --

Q     You can't discriminate between what you've learned and --

A     Correct.

Q     I see.  Do you recall ever trying to contact any of his past employers to be witnesses?

A     It is my impression that Mr. Barrett had gone through a period of time where he primarily stayed at the house and worked as a mechanic, self-employed.

Q     Before that however, were you familiar with his employment history before the period when he was working as a mechanic there at the cabin?

574

A     You know, I want to say that I was or would have been, but I don't have any independent recollection of that.

Q     I believe you said that Mr. Barrett had a good ability to recall things that had happened in the past in the case.

A     Yes, sir, and previous trials, that's right, and the incident itself I felt like.

Q     Did Mr. Barrett ever tell you not to contact Dr. Russell?

A     Not that I recall.

Q     Did Mr. Barrett ever tell you that he didn't want Dr. Russell to testify?

A     I don't have any recollection of that.

Q     That decision was made independently?

A     I'm not going to say that either.  We had -- Kenny was a participant in his case and anything of significance would be discussed with Mr. Barrett.  I would think that would be significant.

Q     You also said that the strategy for the penalty phase was decided at that August 29th meeting; correct?

A     Based on the work that had previously been done and in the timing that was remaining.

Q     And that is also the meeting at which you obtained Dr. Russell's report?

A     I don't know that.

Q     You may have obtained the report sometime before then?

575

A      Or after, I don't know.  And I don't know when Mr. Hilfiger may have received it.  I just don't know.

Q      Now, with regard to your declaration again, you -- do you recall saying in there that Mr. Barrett wanted to minimize the amount of testimony elicited from his relatives, particularly his son, mother and ex-wife?

A      Yes, sir.

Q      Do you recall whether you and Mr. Hilfiger called his ex-wife and mother as witnesses?

A      I didn't have a recollection of that until I read what was in my opening statement, that I would have absolutely argued with you as to whether or not I prepared that presentation.

Q      Did you and Mr. Hilfiger investigate ways to present information about Mr. Barrett's family background through witnesses other than his relatives?

A      Well, we had other witnesses testify.  So...

Q      Fair enough.  Specifically did you do any legal research, for example, on the ability to present a mitigation specialist as a witness on family history in lieu of presenting the relatives themselves?

A      I don't recall that.

Q      Did you recall having any discussions with Mr. Hilfiger about using a psychologist to present evidence about family history in lieu of having the family members themselves

describe events?

A    Well, that's what Dr. Russell is and was.  So...

Q    Well, I think you testified earlier that her role in the case was to redo the risk assessment that she had done in state court; is that correct?

A    It was to discuss our alternatives that we believe existed at that time and I would think certainly we discussed whether or not she would be a witness that would testify then.  And when I say then, I mean on that August 29th date. I think that was encompassed within that when I say we were fine tuning that strategy.

Q    Of course, by then she had already done the risk assessment requested by Mr. Barrett's state court counsel.

A    Had done one previously, yes, sir.

Q    So whatever -- I am trying to find a more eloquent word than baggage, but you get my meaning.  Whatever baggage she came with, you had to take that into consideration when you discussed using her as a witness who could bring in that family information without the family members testifying; correct?

A    You are slicing and dicing things here pretty finely and I -- and I can't sit and tell you that we had that specific conversation about her testimony versus family members.  But I can tell you that when we had that initial meeting with her, it was discussed what she would be willing

577

to do and what she could do and what she had done in the past and how all of this would work in the best strategy to help Kenny.

Q    Well, let me ask you, Dr. Russell was not the only psychologist doing forensic work in this area?

A    That's correct.

Q    Were you aware prior to your meeting with Dr. Russell that Mr. Echols and Mr. Hilfiger had asked Judge Payne for resources to hire an expert in organic brain dysfunction?

A    I don't know that.

Q    You don't know whether you were aware or you don't think you were aware?

A    I don't think that I was aware of that.

Q    Do you know whether you knew at the time of trial that Mr. Barrett had reported significant head injuries?

A    I don't know.  I mean, I -- what reports had been generated and then the specifics that are contained within those, I am sure that we reviewed them, but so much time has gone by.  Did Kenny ever tell that to me?  I certainly don't have any recollection of that.  Has he told it to others?  I think there is evidence that he has.

Q    Did you know that he had shot himself in the chest with a shotgun in 1986?

A    I think I had forgotten that detail and I became aware of it again, I think, whenever I reviewed the Court's opinion

when there's reference to it.

Q    But you think you did know it at the time of trial?

A    Yeah, I -- yes, certainly.

Q    Did you yourself come to the conclusion that there was no reason to have somebody evaluate Mr. Barrett for organic brain dysfunction?

A    I didn't make that determination one way or another.

Q    Did you have any conversations with Mr. Hilfiger about whether that should be done?

A    No, sir.

Q    Going back to your declaration in this case, you said -- I apologize, I'm trying to find it.  You said that Mr. Barrett did not want the outcome of the case to hinge on personal sympathy for him; is that correct?

A    I believe so.  I believe that is what is in the declaration and I think that's consistent with Kenny's wishes at the time.

Q    Now, did you yourself believe that an appeal to sympathy for a convicted murderer would be an effective mitigation strategy?

A    You know, what we had to weigh is knowing or having a belief that we had a very conservative jury, we had a victim who was as all American guy as you can get, you know.  That in and of itself presents a difficult circumstance in which to gain sympathy for a fellow when the jury has been told of

drug use and abuse and other acts committed, say, against Abby. So you are trying to weigh all of that and it is not in a vacuum and that's what we were wrestling with.

Q    Do I understand you correctly to say that you are saying that a raw appeal to sympathy for Mr. Barrett, especially after the government's case on victim impact, that that was going to be, in basketball terms, a low percentage play?

A    It is very, very difficult and you have got to be very careful in how you proceed.

Q    Is it your understanding that the goal of presenting a social history in a penalty phase is to engender a sense of sympathy for the defendant?

A    I think that is one strategy, yes, sir.

Q    That is a strategy or that is the point?

A    I think that I would have to say there is a certain strategy to showing the troubled life that a defendant has had and if he does have some sort of organic brain injury, maybe he has difficulty in discerning between right and wrong or making impulsive decisions. So sympathy, does it come into that family -- his life, his upbringing, his parents' treatment of him? I mean, that's to me where that comes in. I think that is a definite strategy.

Q    Were you prior to your -- at the time of your work on this case, were you familiar with the idea of mitigation as

580

humanizing the defendant?

A    Yes.

Q    Do you make any distinction between humanizing the defendant and an appeal to sympathy?

A    I can't answer that.

Q    Could I ask you to hand Mr. Davis that binder?

A    Certainly.

Q    And may I ask Mr. Davis, after he has dealt with that, to hand you Petitioner's Exhibit Number 95?  (PAUSE)  Do you have the document, sir?

A    I do have.

Q    Mr. Smith, do you recognize this document?

A    No, but based on my review of my notes, I would -- it looks like Kenny's writing to me.

Q    The handwriting appears to be Mr. Barrett's handwriting?

A    Yes.

Q    So let me ask you, do you have any recollection, as you sit here, of Mr. Barrett ever offering suggestions to you or Mr. Hilfiger about closing arguments in the penalty phase?

A    I don't know.

Q    Do you think it might refresh your recollection to review a document from that time?

A    Certainly.

Q    Okay.  Have you read Exhibit 95?

581

A    I've scanned through it, yes, sir.

Q    Let me ask you to read that just to see if it refreshes your recollection as to any advice that Mr. Barrett offered you for the penalty phase closing argument.

(PAUSE)

A    This doesn't trigger an old memory.  Okay?

Q    Okay.  So you don't recall having seen that before or receiving advice to the effect of what is presented in this document?

A    I think this is consistent with what we presented, but do I remember Kenny giving me that, no, but I think that's his handwriting.  I think he wrote that.

Q    As you were preparing for the penalty phase in this case, did you consult any expert in capital defense work regarding the problem that you were articulating a few minutes ago, how to present a mitigation case without a raw appeal to sympathy?

A    We had a conversation with Mr. Echols and I was trying to be like a sponge because there was so much information that he had that -- and I know this prosecution had changed and we now had death on the table.  So how much of that was discussed with Echols?  I've got to think probably some.  How much I discussed it with Donny Baker here I have lunch with fairly frequently and talk about cases that we had, the difficulties to overcome in those cases?  I mean, those are

certainly two guys that I would call experts in that area. As far as some other panel or resource group or anything like that, no.

Q    I want to be sure I understood what you said.

A    Yes, sir.

Q    You said you spoke with Mr. Echols because we now had death on the table.  Did you mean that that conversation occurred after the verdict in the first stage?

A    No, sir.  The first meeting we had with him.  I only remember meeting with Echols one time.

Q    One time?

A    And just like with Dr. Russell, a lot of that conversation was between him and Roger because Roger is now stepping into his shoes and they know a lot more about it than I do.  They weren't there -- Echols wasn't there -- I didn't go there expecting him to educate me, but I'm there to learn as much as I can from him about this case.  Part of it was the -- in stage one, the drug evidence that was going to be encountered that they didn't have to deal with before, which was a different prosecution.  And then the fact that death was on the table, I'm going to have to deal with those challenges, you know.

Q    And as best you can recall, that conversation with Mr. Echols took place early in your representation?

A    May, the first part of June.

583

Q    May, the first part of June?

A    Yes, sir.

Q    Would it be fair to say, sir, that a part of your case in the first stage of trial was to ask the jury in some way to sympathize with Mr. Barrett's position as it stood that night in September of 1999 when he was attacked?  Is that fair to say?

A    Yes.

Q    And that was a strategy with which Mr. Barrett agreed?

A    It was the strategy which was employed during his first trial.

Q    Successful?

A    Yes.

Q    Did you discuss either -- well, did you discuss with Mr. Hilfiger how you might present mitigation evidence that was consistent with that first stage strategy of Mr. Barrett having been taken by surprise in the middle of the night when an unmarked vehicle drove at speed toward his cabin?

A    I can't recall that specifically.  I mean, the theme I don't think verified from the first stage to the second stage.  It is not like, oh, well now that you've found us guilty we have got to change our direction.  That certainly never occurred.  So -- but I can't tell you that I remember having a specific conversation.  I just can't recall that or not.

Q     So there was no conversation that you can recall between yourself and Mr. Hilfiger that excluded the possibility of presenting mental health evidence that would have supported that first stage theme of him being taken by surprise and responding to what he perceived as an assault on him and his son?

A     I don't know that I understand what you are asking me.

Q     Okay.  Well, let me try to rephrase it.

A     Okay.

Q     Well, let me ask you this.  In that meeting with Dr. Russell --

A     Yes, sir.

Q     Do you recall any discussion of whether anything that she saw in Mr. Barrett's background or records could be presented in a way that would be consistent with your first stage strategy?

A     And I think we did that the best that we could.  When we talked about Kenny Barrett being a mechanic and a good neighbor and a good son and living out there remotely and not bothering people and he was in the sticks --

Q     I mean, specifically mental health conditions.  Any mental health condition that --

A     I can't recall that, no.

Q     You don't recall a conversation along those lines?

A     Well, when you are talking about him being a good

585

friend and a good father and -- I mean, I think that's what we are talking about or that's what -- you know, I think we developed that through those witnesses that were called in the second stage.

Q      Thank you.

MR. SCHARDL:  May I have just a moment to confer, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. SCHARDL:  Your Honor, we have been at it for several hours.  May I request we take at least a brief recess, if not the lunch recess, so that I can sort of figure out where I am at and how much more time there is to go in the direct?

THE COURT:  Sure.  Let's take a 15 minute recess.

MR. SCHARDL:  Thank you, Your Honor.

(11:27 a.m.)

(SHORT RECESS)

(11:50 a.m.)

THE COURT:  Mr. Schardl, what did you all decide about how much longer?

MR. SCHARDL:  I think probably 15 or 20 minutes to finish the direct.  It should take us just past the noon hour.  And I wanted to say that over the course of the break, my colleagues were kind of enough to provide me the docket

586

number of that transcript in the criminal case. So I think -- and I think probably Mr. Davis was on top of that, but it is Docket Number 419.

THE COURT: He is, in fact. He handed me a note probably an hour ago. He is all over it.

MR. SCHARDL: And I am very longwinded, so I gave him plenty of opportunity.

THE COURT: Go ahead.

MR. SCHARDL: Okay.

<u>DIRECT EXAMINATION CONTINUED</u>

BY MR. SCHARDL:

Q     I want to return, Mr. Smith, to your declaration, if I may. Turning to, I believe, the final paragraph -- we will all be happy to hear -- you said in your declaration that you did not want to premise your case in mitigation on Mr. Barrett's drug use because you did not believe that the jury would be sympathetic to such a strategy. Do you recall saying that?

A     Yes.

Q     So let me ask you again, was that something that you offered to the government or that the government offered to you as an explanation for your activities?

A     I believe the government prepared that after an interview with me, but I think it is consistent with our theme. I don't think it is inaccurate by any means.

587

Q    Okay.  Did you prior to trial conduct any investigation aimed at understanding why Mr. Barrett used drugs?

A    No.

Q    You understood that the jury was going to hear evidence that he was a drug user; correct?

A    Yes.

Q    In fact, as you said earlier, one of the differences between this case and the state case was that the government was trying to convict him of a drug trafficking crime.

A    Correct.

Q    So would it be fair to say that if you did not conduct an investigation into why Mr. Barrett used drugs, you were not in a position to say whether the circumstances of his life after he started using drugs were premised on that drug use or premised on some offense that preceded his drug use, is that correct, or was that just too elliptical of a sentence for anybody to understand it?  Let me try that again.

A    Okay.

Q    Were you familiar with the term comorbidity as it is used in the medical or psychiatric literature at the time you were working on this case?

A    The term again, please?

Q    Comorbidity.

A    No.

Q    Did you consult any experts about whether Mr. Barrett's

588

drug use might be a response to an underlying mental or emotional problem that he had?

A      No.

Q      Did you consult any experts to determine whether Mr. Barrett's drug use was a response to any traumatic experiences he had had earlier in his life?

A      No.

Q      Prior to trial did you conduct any investigation into whether somebody with a learning disability might turn to illegal drugs?

A      No.

Q      Prior to trial did you know whether family members described Mr. Barrett as a hyperactive child?

A      I can't recall that, whether they did or not.

Q      Is that something that you inquired into as far as you recall when you were meeting with his parents?

A      I don't know, I don't recall.

MR. SCHARDL:  Your Honor, before court today, I had my paralegal print out some pages from Petitioner's Exhibit Number 75.  So 75 is all of the materials that Mr. Barrett's counsel has provided to the government in discovery, and more specifically it is the contents of Mr. Smith's file and Mr. Hilfiger's file, which includes the files that Mr. Hilfiger got from Mr. Echols.  So what I did prior to the start of court today is provide some copies of bates numbered

pages from Exhibit 75.  So I -- I am not sure if the Court has all of that printed out, but what I would like to do is show the witness some of those printed out pages and I have extra copies of those excerpts for the Court.  Would that suffice to give you a reference?

THE COURT:  Sure.  Do you have one to give to the defense as well?

MR. SCHARDL:  To Mr. Kahan, yes, I have, Your Honor.

THE COURT:  Okay, then that's fine.

MR. SCHARDL:  Your Honor, if I may, I would like to approach the witness and present him with a packet of papers from Exhibit 75 consisting of bates numbers DISC-008273 through DISC-008299.

THE COURT:  Okay.

MR. SCHARDL:  Thank you, Your Honor.  And for the record, I am going to hand Mr. Davis a copy so that Your Honor has something to refer to.

THE COURT:  Okay.

BY MR. SCHARDL:

Q     Mr. Smith, if you would, leaf through those pages and tell me when you've had a chance to finish that.

(PAUSE)

A     I've had a chance to review these records.

Q     Thank you, sir.  Are they familiar to you?

590

A      No.

q      Do you recall whether you looked at those documents prior to the trial in this case?

A      I don't believe I've ever seen them.

Q      I am going to hand you --

MR. SCHARDL:  If I may approach, Your Honor?

THE COURT:  Yes.

BY MR. SCHARDL:

Q      -- another group of documents.  This is, for the record, from Petitioner's Exhibit 75.  This is DISC-008300 through DISC-008314, obviously inclusive.  And I am going to hand a copy to Mr. Smith and a copy to Mr. Davis.  Same thing, Mr. Smith, please look through those and let me know what you think.

(PAUSE)

A      I've had a chance to review those.

BY MR. SCHARDL:

Q      Sir, are those documents familiar to you?

A      No, sir.

Q      Do you recall ever having seen those documents before?

A      No, sir.

Q      I'll just retrieve those, for the record.  Mr. Smith, at the time of your work in this case were you familiar with the phrase executive functioning as it is used in the field of neuropsychology?

591

A    I think I am.  I mean, it has a meaning to me.

Q    And do you know whether it did at the time?

A    Sure.

Q    Did you have any sense, at the time of your work in this case, of how a defendant's -- a murder defendant's executive functioning might be relevant to either a defense or a case in mitigation?

A    Specifically, no.  I think that intertwines though with -- you know experts, particularly in this case psychological experts, put a label on something that otherwise we may recognize as a guy functioning at a level that you deem as sufficient.  So a lawyer is not trained to put those labels, as you are asking me, or certainly I haven't been.

          MR. SCHARDL:  Can I have just one moment to confer, Your Honor?

          THE COURT:  Yes.

                    (PAUSE)

          MR. SCHARDL:  Thank you, Your Honor.  I appreciate the forbearance and with that, I will pass the witness.  Thank you, Mr. Smith.

          MR. SMITH:  Yes, sir.

          THE COURT:  Well, that was a brief session, but we might as well go ahead and break for lunch considering what time it is.  Let's be back at 1:00.

                    (12:06 p.m.)

(LUNCH RECESS)

(1:02 p.m.)

COURT IN SESSION

THE COURT: Mr. Kahan, are you ready to cross examine?

MR. KAHAN: I am. Thank you, Your Honor.

THE COURT: Go ahead.

CROSS EXAMINATION

BY MR. KAHAN:

Q    Good afternoon, Mr. Smith.

A    Good afternoon, sir.

Q    I believe you stated on direct that you've been an attorney for 27 years; is that correct?

A    I think that's correct.

Q    And you indicated that you had a general practice at this point; is that right?

A    Correct.

Q    Now, about what percentage of that, do you think, has been criminal law over the years?

A    Criminal law has probably comprised half of what I do, maybe a little more.

Q    Is it fair to say it is 2017 right now, so you would have started practicing in 1990?

A    Somewhere in there, '90, '91, yes, sir.

Q    So about the time you got involved with this particular

593

case, you had been practicing about 15 years?

A    Correct.

Q    Okay.  Up to that point was it still true that you --
that about 50 percent of your practice was dedicated to
criminal law?

A    I'm sure it has changed over the years, but I would say
primarily half has always been a criminal practice.

Q    Would you agree with me that pretty much everybody who
has ever done a second death penalty trial did a first one?

A    That's exactly correct.  You've got to start somewhere.

Q    And here in Oklahoma it is my understanding that in a
state court practice you have jury sentencing; is that
correct?

A    That's correct.  The jury recommends, the judge
sentences.

Q    Well, as a part of that practice presenting before a
jury with regard to sentencing in non-capital cases -- and I
am speaking about non-capital cases.

A    Yes, sir.

Q    You would have had some experience in eliciting
testimony from witnesses that would have concerned
sentencing.  Am I correct in that understanding as well?

A    Ask that again for me, please.

Q    You would have elicited evidence in court in non-
capital cases with regard to sentencing.  Is that --

594

A      Sure.

Q      Okay.  And is it fair to say you would have done that more than once?

A      Yes.

Q      Any estimate how many jury trials you might have been involved in by 2005?

A      Criminal cases?  It would just be a guess.  I don't know if it would be 20, 25, I don't know.  That would just be a wild guess.

Q      Okay.

A      We are talking to a conclusion of jury trial.

Q      Right.  And for many, if not all of those, you would have been responsible for sentencing as well as any concern with regard to guilt.  Is that right?

A      Yes, sir.  There are not many occasions that I've had co-counsel.

Q      Now, along the way, as between your criminal and civil practice -- I know you mentioned that you've had some experience interviewing witnesses.

A      Correct.

Q      How much of your day-to-day practice would you say involves interviewing witnesses?

A      Well, when you include my client in that category, it is probably half of what I do during the day.

Q      And is every one of those conversations a walk in the

595

park?  Are they all easy?

A       No.

Q       Do you sometimes talk about difficult subjects?

A       Yes, sir.

Q       Fair to say that most people by the time they are in court, they are dealing with some sort of difficulty in their lives; is that right?

A       Few of my clients come to me because they have got a great deal to discuss.

Q       So you have -- you had had a -- you have had some time getting information out of people when they did not want to give it; is that fair?

A       Yes, sir, you bet.

Q       Now, when Judge Payne assigned you to this case did he provide you with any specific role?

A       No, sir.

Q       Were you led to believe at any point in time that you were going to be solely responsible for this case?

A       No.  I mean, the role that I was delegated to was co-counsel, second chair to Mr. Hilfiger who had assumed Mr. Echols first chair position.  I mean, that role, yes, but I --

Q       And that was consistent with your understanding with Judge Payne?

A       That's what we had discussed.  He wasn't putting me in

place to be the lead dog.

Q    And that was also consistent with your understanding with Mr. Hilfiger, as I understand it?

A    Oh, yes, most definitely.

Q    At some point did Mr. Hilfiger ask you to obtain any records from any prior attorney in this case?

A    Yes.

Q    And who was that?

A    Jack Gordon.

Q    And what did you do in an effort to obtain those records?

A    Excuse me, sir?

Q    What did you do in an effort to obtain records from Mr. Gordon?

A    Contacted him.

Q    By phone?

A    Yes, sir.

Q    All right.  And were you able to actually reach him?

A    Yes, sir, I did.

Q    Okay.  And what did he tell you about records when you asked him for them?

A    He advised that he didn't have any records, that what he had had been turned over, my recollection is, to Echols. I saw something earlier in a transcript that referenced Mr. Woods, who was the court reporter for Judge Garrett in

597

the state case.  I tend to question that.  I don't know what the reporter would do with -- why he would have mitigation records in a case that didn't go to a second stage, but nonetheless I saw that in the transcript that counsel had me read earlier.

Q     Okay.  In either event, Mr. Gordon was clear with you that he did not have any records to provide to you?

A     That's correct.

Q     And were you aware of what role Jack Gordon might have played in his prior representation of Kenny Barrett?

A     My understanding was that he was Echols mitigation guy, that he did not participate or have responsibilities in the case-in-chief.

Q     And I think you've already testified that it was your understanding that any records that had been in the possession of Mr. Echols had been previously provided to Mr. Hilfiger when he became a part of this case.  Is that what you --

A     That's correct.

Q     Now, Mr. Schardl asked you a few questions about the Oklahoma Indigent Defense System.

A     Yes, sir.

Q     I believe I am getting that right.  Otherwise known as OIDS.

A     That's correct.

598

1026

Q    And you are not employed by OIDS; is that correct?

A    No, sir.

Q    And have you ever been?

A    No, sir.

Q    Are you familiar with the staff there?

A    Yes, sir.

Q    You are?

A    The executive director is a friend of mine.  He has recently retired, but he was a friend of mine.

Q    Were you led to believe that at any point in time that there were records related to Kenny Barrett's state case --

A    No, sir.

Q    -- in the possession of OIDS?

A    I am sorry.  No, sir.

Q    And you had no reason to suspect that they would have possession of such records; is that correct?

A    No, I would have thought Echols would have had everything.

Q    Now, ultimately the universe of records that was available to you, it sounds like, resided largely with Mr. Hilfiger.  Am I understanding that correct?

A    I don't know when he obtained them, but, yes, that's where I went to retrieve the documents.

Q    And do you know the complete contents of those files?

A    No.  I mean, obviously we had trial transcripts from

the first trial and we had partial transcripts from the second trial and then a host of other materials.

Q    Now, I know there were some questions about your relationship with the defendant.  I would like to follow up on that a bit.  Who, between you and Mr. Hilfiger, communicated for the most part with Mr. Barrett?

A    Once I got in the case I probably visited with Kenny more than Mr. Hilfiger did, particularly at the jail.  I mean, in the courtroom he would sit in between us, so we would both visit with him, but if we needed to go discuss something with him after hours, it would probably be me that would go do that primarily.

Q    And did you generally have an easy time talking to him?

A    Sure.

Q    Did he also communicate with you by way of notes?

A    During trial?  Yes, sir.

MR. KAHAN:  If I may ask the clerk, please show Mr. Smith a copy of Tab 38.  I want him to take a look at Number 38, Government's 38 and 39.

BY MR. KAHAN:

Q    Have you had a chance to take a look at those?

A    I'm thumbing through them now.

(PAUSE)

A    Some I remember.  It is Kenny's notes.

Q    And have you looked at both 38 and 39 or...

A     No, sir, 38.  Let me go to 39.

                              (PAUSE)

A     Yes, sir.

Q     And would you agree with me, certainly it is my understanding that these are notes written by the defendant during the course of trial.  Is that fair to say?

A     It has been a long time, but some of these particular notes I remember whenever they were passed to me.

Q     And in your recollection of the events, were these notes generally responsive to what was going on in court at the time?

A     Kenny would take notes during the trial and that's where I think these were generated.

Q     Normally I would ask you if these were a complete set of notes and -- and I will.  As far as you know, is this all of the notes written to you during the course of trial?

A     I don't know.  It's -- I had forgotten -- if I may -- I had forgotten that -- Kenny would give me his notes at the end of the day.  I would have to bring him something to write on and they had a special type of pen they wanted him to use, a felt type pen.  And when -- I think Ms. Fisher was asking me about Kenny's notes and insisted that I had them.  It really surprised me and sure enough I located a file with my notes and Mr. Barrett's.  So to the extent that what was in my possession is a complete copy, yes.  But is that every

601

note that Kenny took? I don't know.

Q But all of those notes in these two exhibits were passed to you by the defendant during the course of the trial?

A Well, I can't say that, but...

Q Would it be fair to say then to say that all of those notes were passed to you by the defendant at some point during the course of your representation of him?

A His notes would be in general, yes. Whether this is all or what, I don't know, but...

Q Okay. Did you find some of those during the course of trial were of occasional assistance to you?

A Yes.

Q And I don't want to be unfair to you, but I am wondering if any in particular stand out to you? I know you mentioned one or two seemed to spark a memory.

A I think it would be fair to say that some testimony might have particularly affected Kenny in a way that he would write a note to me to maybe question what was being said and through better judgment I wouldn't ask that question. I hope we don't get into those, but I think the references in there are obvious. Those are the bad. The good are he is taking -- making note of things that are positive and helpful. I think there is both in there, but mainly positive.

Q Kind of change course here for a moment. I am going to

pick on the declaration.  I know it has been picked over pretty well here today.  There was some discussion about your declaration and there are some remarks regarding competence. More to the point -- well, let me back up, if I could.

There is a comment that you made in the declaration about Kenneth Barrett believing he was being unfairly targeted by the government.  Do you recall that?

A    I recall it being in the declaration.  I would have to think a little bit more about the context in which it --

Q    Well, if it would help you to refresh your recollection, turn to Tab 2, Government's Exhibit 2.  I would point you to Paragraph 5.

A    Yes, sir.

Q    Was it your understanding in that declaration that Mr. Barrett felt unfairly targeted by the government and that remark referred to his feelings about having to stand trial repeatedly for a crime for which he had been convicted in state court?

A    Yes.

Q    And did it in a sense reflect Mr. Barrett's understand-ing of the principle of double jeopardy?

A    His and mine at the time.

Q    He was not expressing any concern about imaginary forces and it wasn't an irrational response to things you were unaware of, it was simply his response to the

circumstances; is that fair?

A     Yes.

Q     So there was nothing about his emotional state in that regard that led you to believe that he was unduly paranoid; is that fair to say?

A     No, I think this was a feeling about the subsequent prosecution in federal court.

Q     Did any of Mr. Barrett's beliefs with regard to this subsequent prosecution lead you to question his competence to stand trial?

A     No.

Q     Did any of his other beliefs lead you to believe that he was incompetent to stand trial?

A     No.

Q     Did any of his behavior lead you to believe that he was incompetent to stand trial?

A     No.

Q     Now, at that point you had been practicing law, as you said, for about 15 years.

A     Yes, sir.

Q     Had you ever at that point dealt with a defendant who you suspected of being incompetent?

A     You know, it is -- yes, I am sure I have, but that standard is so easily overcome that it -- sometimes it almost seems pretty meaningless, you know.

604

Q    I want to opine on that.  My question is more to your experience in the court system representing defendants when you believed there was a question of competence.  That had occurred?

A    Yes.  When I say that, what I mean is -- and I said it earlier.  I think you know it when you see it, particularly when you apply the standard for competence to stand trial.  It is a pretty low hurdle to jump over.

Q    Was that -- I won't call it a gut sense of competency formed at all by your experience in representing people in the criminal justice system and then going through the process of referring them to mental health experts and learning from what they told you about your clients?

A    Yes, sir.

Q    Now, the defense pointed out that your declaration refers to competence; correct?

A    I don't know.  I mean, I am not staring at it, but --

Q    I believe it was discussed at some length on direct the extent to which this declaration refers to competence to stand trial.

A    Right.

Q    It also refers more generally to your sense of Mr. Barrett's general mental health; correct?

A    Yes.

Q    Now, at the time you executed this declaration, did

605

you understand the procedural posture this case was in?

A    I'm sure I did then.  I don't know that I could necessarily repeat it to you now, but...

Q    Fair.  I would be happy to.

A    No, I am saying that I don't know that I could.

Q    Do you recall that at the time the government had not answered Mr. Barrett's pending 2255 motion and that Mr. Wilson and I reached out to you to discuss your recollections in regard to a series of subjects.

A    And I am not trying to be evasive, but I have had a couple of conversations with your office and I don't know when that declaration -- I don't have it in front of me, so I don't know when that was executed.

Q    Okay.  Well, I would ask you to turn to Tab 2 again on the second page.

A    All right.  Yes, that would be my understanding, this was during the 2255 response.

Q    And is it -- do you have any recollection of your meeting with Mr. Wilson and me prior to the preparation of this declaration?

A    Yes.

Q    And do you recall that we did, in fact, discuss kind of a wide range of subjects?

A    Sure.

Q    And we didn't necessarily make all of our reasons for

606

that known to you, did we?

A     Well, I wouldn't think so.  I mean...

Q     So the fact that you may have mentioned one subject versus another, that doesn't reflect on the accuracy of the statements in your declaration, does it?

A     If I didn't think something was accurate and certainly at the time that I signed this, I wouldn't have signed it.

Q     Now, at some point in your repetition of Mr. Barrett, it is my understanding that you contacted a psychologist named Jeannie Russell?

A     That's correct.

Q     And do you recall now how you came to speak to Dr. Russell?

A     I don't know how I became aware that she was involved in the state prosecutions.

Q     But at some point you did become aware and as I under-stand it, I believe you mentioned on direct that Mr. Hilfiger asked you to contact Dr. Russell; is that correct?

A     Yes.  I located her and contacted her by telephone.

Q     And about how much prior to your meeting which you said was August 29th -- do you know how much time passed there?

A     I don't, maybe a week.  I don't -- it would have taken a few days to coordinate three folks' schedules.

Q     If I could ask you to turn to Tab 34...

A     Yes.

607

Q      I know Mr. Schardl asked you a good bit about this document.  Do you recall that?

A      Yes, sir.

Q      And I think you mentioned you really did not have much memory of it.  Does that remain the case?

A      That's correct, yes, sir.

Q      Do you have a general recollection that Dr. Russell provided you with a report of her findings for purposes of the state trial?

A      I don't have an independent recollection of that, but I am sure she did.  And I say that, Mr. Kahan, but I don't know that it wasn't produced -- I can't tell you that I showed up at her office with Mr. Hilfiger with it in hand, but if not, it may have been produced then.

Q      At that meeting?

A      It may have been, yes.  I mean, there wouldn't be any reason for it not to be if I didn't have it.

Q      I'm just saying, do you think there is much likelihood that you would have had a meeting with Dr. Russell and not left without a copy?

A      Right.

Q      Okay.  Now, during the status conference on September 9th, 2005, --

A      Yes, sir.

Q      -- you made reference to a report.

608

1036

A     Yes, sir.

Q     I would ask you to look at Tab 35.  The report there also purports to be authored by Dr. Russell.  Is it this update that you were referring to during that September 9th hearing?

A     Yes, sir.

Q     And it was your belief at that time that Dr. Russell was going to address largely the question of future dangerousness were she to testify; is that correct?

A     I didn't hear that last part.

Q     Would you agree with me that as of September 9th that it was your plan if Dr. Russell were going to testify she would principally address the question of future dangerousness?

A     I believe it was the plan, not my plan, and the plan probably would have involved her not testifying is my recollection.

Q     And why is it your recollection that she would not testify?

A     It seemed that she was -- my recollection is it seemed that she was trying to have a limited role, to be the most effective that she could on behalf of Mr. Barrett, incorporating what she had previously done, and also as a part of the plan to help minimize the government's ability to exploit Kenny Barrett's mental health background.

609

Q    When you say the government's ability to exploit, is that a concern that you raised or a concern that Dr. Russell raised?

A    I think that's a conversation that her and Mr. Hilfiger had because they were the most informed on Mr. Barrett's previous evaluations.

Q    Looking back on that conversation, was there anything in particular that Dr. Russell was focused on?

A    I can't recall.  I know there was a conversation about it and we weighed the good and the bad, so to speak.

Q    Did you ever at any point in time in your interaction with Dr. Russell and Mr. Hilfiger discuss a concern about the possible testimony of a government expert named Dr. Price?

A    Yes.

Q    And what was the concern with regard to Dr. Price?

A    That he was going to be a dangerous witness.

Q    And was that your concern or was that the concern of someone else?

A    I had no independent knowledge of Dr. Price.  I don't know -- I can't recall how much Mr. Hilfiger had, but it is my belief that Dr. Russell was familiar with him.  So couple that with what she knew about Kenny's background from her previous work, I think is what led us to shift away from presenting a mental health expert, so to speak.

610

Q      And in fairness, you were aware that future dangerousness was one of the allegations that the government had made against your client; correct?

A      Yes.

Q      Now, at the time of the September 9th hearing, jury selection was -- I think you said a week, a week and a half away?

A      I don't know.

Q      Do you recall when the penalty phase actually started?

A      My guess is November, maybe the middle of November, November 9th or -- I don't know, sometime in November, I believe.

Q      And the government actually put on a case in aggravation before the defense was able to present its evidence; correct?

A      Yes.

Q      Have you ever had the opportunity during any of your trial practice to have investigated or continued an investigation while testimony was going on?

A      Often times.

Q      So while close to jury selection may be last minute, it is not necessarily without any time at all to continue an investigation.  Is that fair?

A      I don't -- we had an investigator Lloyd Cobb hired. There was work that was done in this case, I think,

throughout the whole -- both stages of it.

Q      Looking back to Tab 35, do you have an independent memory of this document?

A      No.

Q      Now, in Dr. Russell's billing there was a notation about her meeting with the defendant; correct?

A      Yes, sir.

Q      Okay.  And there was also a note on the same line item about a meeting with an attorney.  I believe you testified you thought that had probably occurred between Dr. Russell and Mr. Hilfiger.  Is that also correct?

A      Yes, sir.

Q      Did Mr. Hilfiger at any point in time tell you of some change in mental status that Dr. Russell had observed in your client?

A      Not that I can recall.

Q      Now, given the government's case going into this trial, how did you want to -- in portraying the defendant to the jury, did you want to focus on his drug use?

A      Did I want to focus on drug use?

Q      Yes, sir.

A      No, sir.

Q      Did you want to avoid any focus on his volatility?

A      Certainly.

Q      And was that in part a response to the fact that the

612

government had alleged that Mr. Barrett was a future danger?

A     Yes.

Q     Going into the penalty phase, is it fair to say that one of your goals was to establish what the defense thought of as the unfairness of this subsequent prosecution?

A     Certainly.

Q     You also wanted to demonstrate Mr. Barrett's lack of dangerousness?

A     Correct.

Q     And did you, in fact, in service of that, aim to adduce evidence of his good conduct while in custody?

A     Yes.

Q     And I think -- as you've said, we have had a couple of meetings.  Did you at one point say to me one of your goals was also to show that Mr. Barrett was a decent enough person not to execute?

A     That's correct.

Q     Now, you stated on direct that this was a conservative jury panel; is that right?

A     Yes, sir.

Q     Do you recall that there were three charges in this indictment?

A     Yes.

Q     And one of them was for a Title 21 offense, right, a drug enterprise count; is that correct?

613

A     Yes, sir.

Q     And there were two others that were charged under 18 USC 924; is that correct?

A     Yes, sir.

Q     And those were firearm charges; right?

A     Right.

Q     Do you recall as you are sitting here today which if any of those -- well, obviously one of those charges -- which of those charges the jury returned a death verdict on?

A     Count 3.

Q     Which was...

A     The drug enterprise.

Q     And they, in fact, returned life sentences for the 924 counts; is that correct?

A     That's correct.

Q     So when Mr. Schardl asked you about -- the question of comorbidity, do you have any experience with comorbidity between drug use and mental health issues?

A     That term is not familiar to me.

Q     Have you ever encountered in your criminal law practice a defendant who you suspected of taking illicit drugs or even licit drugs -- well, no, no, let's limit this to elicit drugs to medicate his or her own mental health issues?

A     Yes, sir.

Q     Could you distinguish in your own mind that client from

614

Mr. Barrett?

A      Yes, sir.

Q      What did that client say to you?

A      I am not accustomed to telling the government what my client says to me.

Q      Would it be fair to say --

A      And I don't know --

MR. SMITH:  Judge, I am not trying to overstate my bounds, but I think there is some privilege that still exists with my other client as it relates to what was said.

THE COURT:  I agree.  Is there some way to get at what you are doing that --

MR. KAHAN:  I think so.

BY MR. KAHAN:

Q      Was that client involved with multiple substances or simply one?

A      Methamphetamine.

Q      And no other?

A      Not that I can recall, no, sir, and I just had contact with him recently on the same case.  He was back for a probation violation.

Q      Now, you stated in your declaration, correct, that Mr. Barrett did not want the defense to dwell on this child-hood.  Do you recall that?

A      Yes, sir.

615

1043

Q     And do you still have an independent recollection of his sentiments in that regard?

A     Yes, I do.

Q     Can you elaborate a bit on what Mr. Barrett said to you in that regard?

A     I think it fits with the general theme of this case and your belief in it is going to depend on whether you are, you know, on the prosecution side or the defense side, but certainly Mr. Barrett's theme and position was that he was a private individual who, in the middle of the night, was confronted with an unexpected and -- an unexpected threat that he could not ascertain who it was and that his son was in the vicinity of his home, he was outside, and he acted to protect himself and his family.  That's the theme that -- and an unfortunate -- and it's unfortunate that such a wonderful person had died in this incident, but I don't -- I think from Kenny Barrett's perspective it wasn't him versus Mr. Eales or him versus the tact team.  I think it was him confront a threat that presented itself in the middle of the night from the east end of his property across a ditch.

Q     And that was the case he was interested in presenting; is that correct?

A     Yes.  I think that's consistent with his state trials and what we intended to present in the federal case.

Q     Mr. Barrett wanted to avoid putting his parents in a

616

bad light?

A    He didn't want to put anybody in a bad light.

Q    Did he say that to you specifically?

A    Yes.  He was concerned about Abby, his ex-wife.  The last thing he wanted to do was bring her back into this.

Q    You mentioned on direct that you attempted to broker a life sentence for Mr. Barrett; is that correct?

A    That's correct.

Q    Was Mr. Barrett interested in that?

A    No, sir.

Q    Mr. Barrett ever say to you that he would prefer the death penalty?

A    It was all or nothing.

Q    Did you ever visit the crime scene?

A    Yes, sir, more than once.

Q    I think you mentioned that several of Mr. Barrett's relatives live in the vicinity; correct?

A    Yes, sir.

Q    Did you find them generally welcoming?

A    Not at first.

Q    Did they volunteer a great deal of information on --

A    Not at first.

Q    Isn't it true that one of Mr. Barrett's cousins who lived out in that area testified against him?

A    Yes.

617

Q      Now, as an attorney, you agree with me you make judgments about potential witnesses?

A      All of the time.

Q      You decide who will and will not be persuasive?

A      That's correct.

Q      You agree with me also that persuasiveness is extremely important in a death penalty phase witness?

A      Crucial.

Q      You interview Mr. Barrett's family members?

A      Yes.

Q      Would you say more than once?

A      Yes.

Q      Would you also agree with me you can -- you can make a witness come to trial, correct, you can subpoena a witness?

A      Yes, sir.  I can subpoena them.

Q      Yes.

A      I can't make them do a thing.

Q      Would you agree with me you can make them answer questions, you can make them sit in the witness stand and answer questions?

A      I've had a federal trial here where a guy was subpoenaed and we couldn't do anything about it and my guy got convicted I felt because of it, you know.  So I can't -- I can subpoena them, but that's all I can do.

Q      So it sounds like -- we would agree then that you can

618

not force a witness to be persuasive?

A     Oh, no.

Q     Mr. Schardl asked you a few questions about social history.

A     Yes, sir.

Q     Is it your understanding that the defendant's social history can be used during a penalty phase trial to establish facts that might connect to the crime?

A     Yes.

Q     But we both agree then that that is not the only necessary use for social history; correct?

A     Correct.

Q     All right.  Social history in a penalty phase trial could be used largely to elicit sympathy; correct?

A     That's correct.

Q     Not necessarily, but likely?

A     That is a reason to use it, yes, sir.

Q     And you understood that to be the case in 2005; is that fair to say?

A     Yes, sir.

Q     All right.

        THE COURT:  I have, Your Honor, the -- in view of the Court's forbearance, I understand the limitations of Mr. Smith's memory at this point, but I would like to go through some of these documents marked.

619

BY MR. KAHAN:

Q    I would ask you to look at Tab 37, Government's 37.

(PAUSE)

A    I have reviewed it.

Q    Do you have any independent memory of this document?

A    No, sir.

Q    Okay.  Are you familiar with Cathy LaFortune?

A    No, sir.

Q    I know you mentioned you had a friend at OIDS.  Do you know what role Cathy LaFortune might have played at OIDS?

A    No.

Q    Can you say, as you sit here today, that you did not -- that you were unaware of this document in 2005?

A    I don't recall.  I haven't seen this document previously.

Q    If I could ask you to look at Government's 42...

(PAUSE)

A    I've reviewed it.

Q    Is this a document that you recognize?

A    No, sir.

Q    And you can't say, as you sit here today, whether you were familiar with this document in 2005?

A    Yeah, one way or another I can't say.

Q    Okay.  Just to speed us along, would you, please, look at the group of documents marked from Tab 18 to Tap 25.  And

620

I think Mr. Schardl probably showed you the majority of these documents under a separate cover.

(PAUSE)

A     I've reviewed them, sir.

Q     Do you have any independent memory of that group of documents?

A     No, sir.

Q     Since they are contiguous, would you please take a look at Tabs 29 and 30.

(PAUSE)

A     I've reviewed them.

Q     Do you have any memory of these two documents?

A     No.

Q     There was -- were you familiar with Mr. Echols secure web site?

A     I understand that he had one.  I don't know that I was ever given access to it.  I don't know that I -- Mr. Hilfiger though had access.  I remember talking about it with him.

Q     You don't recall a meeting at which you were provided with access to that web site?

A     No, sir.

Q     And I don't mean to imply that I was denied access. I am just --

A     As you sit here today, is it fair to say you just simply don't remember?

A     Yeah.  I mean, I don't think I ever accessed it.

Q     And finally, I would ask you to take a look at Tabs 45 through 49.

                    (PAUSE)

A     I've reviewed them.

Q     Do you have any independent recollection of that group of documents?

A     No, sir, I don't.

Q     Is it fair to say that your memory has faded over the last 12 years?

A     Yes, there's no doubt about that.  It has been a long time.

Q     Would you say you had a better memory of this case when you signed that declaration than you do now?

A     I had a better recollection when I signed the declaration, but I -- if I can offer this, because I don't want the record to seem like I've got a memory problem.

Q     Please.

A     On the first stage issues I read trial transcripts of the first trial, partial transcripts of the second trial, was aware of what was in the newspapers and the reporting of that, and then when I got involved to do the work to prepare for Kenny's trial on the testimony that was had.  Just through the repeat process of that testimony and that -- that is burned fresher in my mind than it is the second stage that

622

occurred over a couple of weeks that there wasn't a prior presentation on.  There wasn't -- you know, I might have read psychological reports, but there was not the repetition that you had with the first stage.  So I distinctly have a better recollection of what happened on the first -- on the front end of this case.

Q     So when you say psychological reports, you are referring to some of the reports in the government's exhibits; is that correct?

A     I am sure.  I can't believe, you know, that we didn't -- that we had access to those things, but sitting here telling you today, some of that stuff just doesn't ring a bell.

MR. KAHAN:  May I have a moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. KAHAN:  Thank you, Your Honor.  We pass the witness.

THE COURT:  Redirect, Mr. Schardl?

MR. SCHARDL:  Yes, Your Honor.  May I have just a minute?

THE COURT:  Yes.

(PAUSE)

MR. SCHARDL:  May I proceed, Your Honor?

THE COURT:  Yes.

MR. SCHARDL: Thank you.

<center>REDIRECT EXAMINATION</center>

BY MR. SCHARDL:

Q   Mr. Smith, are you familiar with the changes to capital trial proceedings that were brought about by the Supreme Court's decision in Furman versus Georgia?

A   Sitting here today, I can't discuss that with you unless I read that opinion again, you know.

Q   Well, if I asked you whether -- to the best of your recollection, was one of the changes brought about by Furman that capital sentencing was made different from non-capital sentencing in that there was the advent of a penalty trial?

A   I understand the second phase was created, yes, for that purpose.

Q   And are you familiar with the arguments that went into why it was necessary to have a second stage trial as opposed to the way non-capital sentencing is conducted.

MR. KAHAN: I am going to object as to relevance, Your Honor.

MR. SCHARDL: I believe the questioning on cross examination was whether the witness had done non-capital jury sentencing trials.

THE COURT: Overruled.

BY THE WITNESS:

A   It would be helpful for me to read that opinion. If we

<center>624</center>

are going to have a conversation about a case that it has been years ago since I've read it, I'm a little bit at a disadvantage.

BY MR. SCHARDL:

Q     You certainly are, sir, and I wouldn't want to inflict that on you.  Until recently I believe it was the longest opinion from the Supreme Court in the history of the Republic and there are nine separate opinions, so I wouldn't do that to you.

      Suffice it to say, that from the perspective of a criminal defense lawyer, when you conduct a trial in which the jury makes a sentencing recommendation and it is a one shot deal, it is a one page trial, you are, as a defense attorney, at a certain disadvantage; is that not correct?

A     Why sure.

Q     And that disadvantage is what?

A     One, you are fighting both the guilt or innocence and then at the same time you've got to try to -- how do you present mitigation whenever you are claiming you are innocent?  I mean...

Q     And when you are presenting a case to a jury, the integrity that you present as a lawyer is important?

A     Sure.  You can't undermine your own defense.

Q     So in your non-capital criminal practice here, your trial practice prior to 2005, how often did you get up in

625

front of juries, would you say, and concede guilt and put on a case that was focused on penalty?

A     I don't know that I've ever done that.

Q     You were asked some questions about your experience in interviewing witnesses, not just in your criminal case work but in your civil cases.  Does that line of questioning change any of your responses on direct regarding the use of a mitigation specialist in a capital case?

A     No, sir.

Q     In Oklahoma law when you have jury sentencing in the non-capital context, does that sentencing recommendation have to be unanimous?

A     Yes, in felony cases and it is jury recommendation, judge sentencing.

Q     And in a federal capital trial, the verdict for death, does that have to be unanimous?

A     It has been 12 year since I've looked at that, so I don't want to make an inaccurate statement.

Q     Fair enough.  With regard to investigation and you spoke of your skill and your experience of interviewing witnesses, is it your sense of -- was it your sense in 2005 that your duty to investigate was contingent upon somebody coming up to you and saying, hey, Bret, you better go over there and look over there because that's where the evidence is?

A    I am a lawyer and I was hired to represent Mr. Barrett and I had a -- and I have a responsibility towards him.  So I don't mean to -- by any of my comments today to take away from my responsibility as his advocate.  Okay?  I was involved in a case that involved numerous documents and I was given a task to complete.  Does that mean that there were some tasks that could have been done better or maybe I should have taken on my own?  You know, we can all second guess, but this fellow came out on the short end of this trial and don't think that I haven't lost a lot of sleep over the fact that -- thinking that there is probably something else I could have done.

Q    You were asked whether Mr. Barrett felt that he was being treated unfairly by being prosecuted after he was acquitted of first degree murder, acquitted of second degree murder in state court.  Did you share that feeling that he was being treated unfairly by being prosecuted after that?

A    Yes.

Q    You were asked some questions about your declaration and how it was prepared.  Am I right that, just as Mr. Kanan said, you didn't know all of the information that the government knew necessarily and you also didn't know the purposes for which the government would use your declaration?

A    I think that's fair.

Q    You said during your cross examination that there was

627

concern that the government might exploit Mr. Barrett's mental health at sentencing.

A    Correct.

Q    Do you recall any specifics regarding how his mental health could be exploited by the government at sentencing?

A    The more that the government talked about Kenny's violent past, the more that I felt like it would have undermined his defense and presentation.

Q    And did you at that time have a mental health evaluation independent of the risk assessment that was performed by Dr. Russell?

A    When you say "I"...

Q    That's a fair comment.  Did the defense, did the team...

A    I mean, I've seen records through this proceeding that go back to Echols' first involvement in 2003 that address a mental health history.  So I...

Q    Well, let me rephrase that.

A    Okay.

Q    Was the discussion that you were referring to a discussion of mental health evaluations other than Dr. Russell's?

A    In reference to what?  I may have lost you here.

Q    I am sorry, that's fair.  Okay.  So you were asked some questions about the meeting with Dr. Russell and Mr.

628

Hilfiger.

A    Yes, sir.

Q    I think I said mental health evaluation in relation to Dr. Russell.  I stand corrected.  She did a risk assessment, but in that conversation that you had with Dr. Russell and Mr. Hilfiger, on cross examination you were asked if in the course of that conversation there was concern about minimizing the extent to which the government might exploit Mr. Barrett's mental health background.

A    Sure, I remember that.

Q    Okay.  So my question is, in that conversation were you talking about any evaluation other than Dr. Russell's?

A    Yes.

Q    What evaluation?

A    I don't know.  I can't recall and, as I said earlier, I was the least informed of the three as to Kenny Barrett's past mental health workup.

Q    Okay.  You were asked some questions on cross about your experience in non-capital cases, that sometimes you don't have discovery prior to trial, things come out at trial, you scramble, you do investigations after court, over the weekends.  Do you recall that line of questioning?

A    Yes.

Q    In this case did an issue arise shortly before the trial, the start of the trial proper, that required a great

629

deal of the defense's investigative resources?

A      Sure.

Q      What was that?

A      The snitches.

Q      And specifically you are referring to the delayed identification of the seven snitches who were new to the federal trial?

A      And who would not interview with us.  One did at the U.S. Attorney's office.  The others chose not to.

Q      All of the other investigation that you and Mr. Hilfiger, the defense, did regarding their testimony, had to be something that y'all scrambled to do after you learned the identity of those witnesses?

A      Certainly.  Their identities were kept from us, as well as their locations, and from what I remember, a lot of the cross was developed through their prior criminal histories, which were provided to us by the government, which were extensive.  There was plenty of impeachment material, but it would have been kind of nice to have had a private conversation with those folks like Mr. Littlefield did.

Q      And the investigator that you had retained prior to trial, was he tasked with investigating those snitches after you received notice of them?

A      I am sure.  He was tasked with a lot of different things.

630

Q      Do you recall whether you ever -- you personally ever saw the report of Dr. Price?

A      No.

Q      Do I understand your testimony to be that the discussion of Dr. Price that took place between Dr. Russell and Mr. Hilfiger, that took place on August 29th, 2005?

A      I believe so.  I could be mistaken, but there was -- whether it was Price specific or not, I know that it was an area that we were concerned about.  There is no doubt as to that.

Q      I apologize.  I think this is like a slightly unfair question given some of your previous responses, but I just need to ask it so that the record is clear.  Were you aware that Mr. Echols had sought to retain a different expert on future dangerousness than Dr. Russell?

A      No, sir.

Q      At the time of your work on this case were you familiar with the name Mark Cunningham?

A      I don't know.

Q      Did you ever have -- to the best of your recollection today, did you ever have any discussions with Mr. Hilfiger about Mark Cunningham?

A      About that time I represented a fellow by the name of Cunningham.  So with the time that has gone by, I, I, I -- I accurately cannot say.

631

Q    At the penalty phase you presented evidence of Mr. Barrett's conduct while in custody.

A    Yes, sir.

Q    For the purposes of showing that he would not be a future danger in custody?

A    That he could exist behind prison walls safely.

Q    And would you say that that went as planned, that testimony?

A    I -- I think with the prison employees it definitely did or the employee.  I can't remember if it was more than one.  I can think of a couple of Sequoyah County deputies or jailers that -- I think there was testimony about one getting hit with a potato that I thought was pretty silly, but yet there was a lot made of it.  And the other one was that Kenny Barrett tried to grab him and I thought that was kind of silly.  So outside of those two -- and that wasn't during our case, I think that was during Mr. Sperling's --

Q    Rebuttal?

A    Yeah, but I -- I think all and all we achieved what we wanted to as it relates to his ability to exist safely behind the walls.

Q    You were asked a question about other clients who you thought were using illicit drugs as a response to their pre-existing mental health issues.  Do you recall that?

A    I have one in particular that I -- that I made an

632

argument to the court about that very fact.  The fellow was self-mediating with methamphetamine.

Q    Now, if Mr. Barrett didn't look exactly like that other client, was it your testimony that you would not have any concerns about whether he had done something like that?

A    I don't particularly understand --

Q    Let me --

A    My other client expressly discussed with me the effects that methamphetamine had on him and how he was without and how he was with it and why he took it even though he knew it was against the law.  Mr. Barrett and I never had that kind of discussion.

Q    And you were asked -- I think you said that Mr. Barrett did not want his ex-wife Abby to testify, he didn't want her dragged into it.

A    I think he felt sorry about their past and she had moved on with her life, had a new family, and the last thing he wanted to do was bring embarrassment upon her and involve her in any of his dealings.  That was my impression of what he was concerned about.

Q    And the defense called her as a penalty phase witness?

A    Yes, sir.

Q    You were asked whether Mr. Barrett's family was welcoming when you first showed up out there -- the area where his family lived and where he had lived.  Do you recall

633

that?

A    I don't think it had anything to do about them in particular as it had to do with Eastern Oklahoma.  You don't just go pulling into somebody's place and get greeted with a "How are you doing."

Q    Did his family become welcoming to you as they got to know you in the course of the case?

A    Yes, yes, sir, they did.

Q    You were asked some questions about when family members or any witness are subpoenaed to court and you said you can't make a witness testify and you certainly can't make them testify well.

A    Correct.

Q    Again, referring back to the direct examination did you and Mr. Hilfiger ever discuss the possibility of using a mitigation specialist to present information about Mr. Barrett's family rather than having the family members themselves testify to that information?

A    I can't tell you the specifics of the conversations we had regarding mitigation specialists.  I know in my notes, as you found, that I had that circled as one of our topics to discuss, but that's me saying I am aware this is our obligation and duty and it was a topic to be discussed.  I never felt like it was my -- I was there to assist.  I wasn't there to lead.

634

Q    And just again asking solely about your recollection of what was discussed, did you -- do you recall any conversations about, say, bringing in a licensed social worker to testify about family background?

A    I can't recall specifics of those conversations or I certainly can't be accurate about it.

Q    So are you saying there were conversations, you just don't recall the specifics of them or you don't recall whether there was a conversation?

A    Yes, we didn't ignore mitigation.

Q    So specifically with regard to whether you could have a social worker testify, do you recall there being any discussion about that?

A    No.

Q    Towards the end of your cross examination, you were describing how you had gone over the testimony from the first state trial and what you could obtain of the testimony from the second state trial.  Did you also compare the testimony of, say, the troopers between the two trials and for --

A    Yes.

Q    I am sorry.

A    I cut you off.  You finish your question, please.

Q    Did you compare their testimony?

A    Certainly.

Q     And is that the process of reading and re-reading, in part, that you were describing earlier?

A     Exactly.

Q     And would you say that that consumed much of your time preparing for the trial in this case?

A     Yes.  In some regards it may have been easier to try this case if there hadn't of been two other proceedings, other than a strategy had been developed that apparently worked in the first two.

        MR. SCHARDL:  May I have just a moment to confer, Your Honor?

        THE COURT:  Yes.

                        (PAUSE)

        MR. SCHARDL:  At this point, Your Honor, I have nothing further on redirect.

        THE COURT:  Very well.  Anything further from Mr. Smith?

        MR. KAHAN:  Very briefly, Your Honor.

        THE COURT:  All right.

                    RECROSS EXAMINATION

BY MR. KAHAN:

Q     Mr. Smith, you were asked why -- well, you were asked whether the defense called, I believe, Abby Stites to the stand.  Do you recall that?

A     Yes, sir.

636

Q    Do you recall what your strategy was, for what reason you might have called Ms. Stites?

A    First off, I don't believe I ever visited with Abby Stites.  Okay?  Mr. Hilfiger would have, I think, had all of the contact with Abby.  He would best know the reason why he wanted to call her, but she was the mother of their son, Toby, who was present during this incident and to help humanize Mr. Barrett.

Q    Was there also evidence adduced by the prosecution during the course of the trial about incidents of domestic violence?

A    Yes.

Q    Was there some effort on your part to neutralize that by calling Abby Stites?

A    Yes.

Q    And was that effort to show that she was a mutual combatant?

A    It has been a while, but that would certainly seem logical.

Q    And is it fair to say that placed in the position where you were going to present that evidence, it would have either had to come from Abby Stites or their son, Toby?

A    Correct.

Q    You were also asked about the liability of witnesses, the persuasiveness of witnesses.  Do you agree with me that

637

you don't instruct your witnesses what to say; is that correct?

A    No, sir, not at all.

Q    You ask your witnesses to tell the truth?

A    Always.

Q    Do you recall that the defendant's mother testified?

A    I don't have an independent recollection of her testimony, but I would -- but I believe she testified, yes.

Q    Do you recall the defendant's mother was asked about the defendant's childhood?

A    I am sure she was, but I don't have any -- it has just been too long and I haven't seen any transcripts that relate to that.  So --.

Q    Fair.

A    -- I would be assuming something.

Q    Okay.  But is it fair to say that neither you, nor Mr. Hilfiger, instructed the witness how to testify?

A    No.

Q    And regardless of the date, did Dr. Russell express to you some concern about government rebuttal to her potential testimony?

A    Yes.

Q    And would you agree with me that at the end of the trial presentation and the jury's verdict, the jury rejected the government's future dangerous allegation?

638

A        That's my understanding.

MR. KAHAN:  I have nothing further of this witness.

THE COURT:  Anything further?

MR. SCHARDL:  No, Your Honor.  Thank you.

THE COURT:  If not, Mr. Smith, you can step down.  Thank you.

THE WITNESS:  Thank you.

MR. SCHARDL:  So, Your Honor, I think at this point the next witness we would be calling is Dr. Jeannie Russell.  However, in a way that Mr. Autry is more familiar with than I am, she is unavailable due to an illness and I believe there have been some consultations with the government about deferring her testimony until June.  Other than that, we have proffers of a number of witnesses, which we can handle electronically by filing them.  They are all in declaration form and they include the declarations of Richard Burr and a number of family members, who have -- and with regard to Mr. Burr, he was excluded by Judge Payne and I believe some of these other family members were or are otherwise unavailable.

THE COURT:  And all of the proffers would be for -- in the nature of an Offer of Proof or...

MR. SCHARDL:  Yes, Your Honor.  And there is, you know, an accompanying argument as to their relevance and so forth.

639

THE COURT:  Okay.  Is the government ready to present any witnesses today?

MR. WILSON:  Your Honor, the government listed four witnesses, Mr. Hilfiger, Mr. Smith, and two experts, and we have previously addressed the issue regarding the two experts.

THE COURT:  Are you done with Mr. Smith?

MR. WILSON:  Yes, Mr. Smith -- the government has no reason to call Mr. Smith back as a witness.

THE COURT:  And Mr. Hilfiger is not available until tomorrow in any event; right?

MR. WILSON:  That is my understanding, Your Honor.

THE COURT:  So is there any reason we shouldn't just recess for today and start in the morning with Mr. Hilfiger?

MR. WILSON:  The government has no reason to continue this -- any more evidence today.

MR. SCHARDL:  Nothing from Mr. Barrett.

THE COURT:  And when will know whether Dr. Russell is going to have to come in June rather than -- can you address that, Mr. Autry?

MR. AUTRY:  Yes, Your Honor.  Sunday afternoon, after I got into town, early Sunday afternoon, a friend of Dr. Russell's called me and said that she had taken Dr. Russell to the hospital, that they were at the emergency

room, and that she would not be available Monday when she was originally supposed to be here.  I have called Dr. Russell's phone number every day, Monday through today, to see if I can get ahold of her.  I have not been able to get ahold of her.  She is always really good about calling me back.  I can only presume she is in the hospital.

When I talked to her on the telephone last week, preceding the phone call I got by several days from a friend, she was very ill at that time.  It was obvious that her breathing was very labored.  She said she was sick.  She was driving to do something with her work, and then I got that call Sunday.  I've not heard from her.  So we would ask that her testimony be moved to June because I can only assume or presume that she is in the hospital or very ill. Otherwise, she would have called me back.

THE COURT:  Well, that's fine with me.  I mean, we have to come back to take that testimony in June anyway.  So we will just do Mr. Hilfiger tomorrow and then I guess we will recess until June.

MR. AUTRY:  Thank you, Your Honor.

MR. WILSON:  Judge, one other matter, if I may. Obviously Mr. Hilfiger has been in South Africa for the last two weeks and my office -- Ms. Speaker has contacted Mr. Hilfiger's office and been advised that he will be available in the morning.  So I am hopeful that is the case.  I have

not had an opportunity to visit with him since he has been back in the country, but so far as I know, we will be ready for him in the morning.

THE COURT:  Well, we can start a little later, if you think you need some time.

MR. WILSON:  Well, Judge, that would be helpful, if we could.  If we could start at 10:00 or 10:30, that would be great.

THE COURT:  Well, let's make it 10:30.

MR. WILSON:  Thank you, Judge.

THE COURT:  I wouldn't imagine that he will take more than the rest of the day, would he?  No promises, I know, but...

MR. WILSON:  It will take a while, I expect.

THE COURT:  Right.  Okay, very well.  Then we are in recess until tomorrow morning at 10:30.

MR. SCHARDL:  Thank you, Your Honor.

MR. WILSON:  Thank you, Your Honor.

(RECESSED UNTIL MARCH 30, 2017)

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )

       Plaintiff,                  )

VS.                                )            NO. CIV-09-105-JHP

UNITED STATES OF AMERICA,          )

       Defendant.                  )


\*    \*    \*

MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

MARCH 30, 2017

\*    \*    \*

A P P E A R A N C E S:

FOR THE PETITIONER:  MR. TIVON SCHARDL & MS. JOAN M. FISHER, Federal Public Defender - Sacramento, 801 I St., Third Floor, Sacramento, California 95814

FOR THE PETITIONER:  MR. DAVID B. AUTRY, Attorney at Law, 1021 NW 16th Street, Oklahoma City, Oklahoma 73106

FOR THE RESPONDENT:  MR. CHRISTOPHER J. WILSON, Assistant United States Attorney, 520 Denison Avenue, Muskogee, Oklahoma 74401

FOR THE RESPONDENT:  MR. JEFFREY B. KAHAN, US Department of Justice - Capital Case Unit, 1331 F St. NW, Rm 345, Washington, DC 20530

COURT REPORTER:            KARLA S. McWHORTER, CSR-RPR
                           UNITED STATES COURT REPORTER

644

I N D E X

PAGE

WITNESS ON BEHALF OF THE RESPONDENT:

ROGER HILFIGER

Direct Examination by Mr. Wilson  . . . . .  647

Recessed until June 12, 2017  . . . . . . . . . . . . .  762

E X H I B I T S

|  | IDENTIFIED | ADMITTED |
| --- | --- | --- |
| Governments' Exhibit No. 4 – 11, 31, 32, 33, 35 & 44 . | 700 | 700 |
| Government's Exhibit No. 15 & 18  . . | 678 | |
| Government's Exhibit No. 19 – 23, 25. | | 758 |
| Government's Exhibit No. 54 - 62  . . | 698 | 758 |
| Government's Exhibit No. 49 . . . . . | 703 | |
| Government's Exhibit No. 34 . . . . . | 720 | 758 |
| Government's Exhibit No. 35 . . . . . | 727 | 758 |
| Government's Exhibit No. 72 . . . . . | | |
| Government's Exhibit No. 32 . . . . . | 757 | 758 |
| Government's Exhibit No. 33 . . . . . | 757 | 758 |
| Petitioner's Exhibit No. 25 . . . . . | 759 | 761 |

645

<u>COURT IN SESSION</u>

(10:35 a.m.)

THE COURT:  Good morning, everybody.  Call case number CIV-09-105-JHP, Kenneth Eugene Barrett versus United States of America.  Attorneys enter their appearances for the record, please.

MR. WILSON:  Christopher Wilson and Jeffrey Kahan for the United States.

MS. FISHER:  Joan Fisher, David Autry and Tivon Schardl for Mr. Barrett.

THE COURT:  Very well.  I think we are ready for Mr. Hilfiger today; is that right?

MR. WILSON:  That's my understanding, Your Honor.

THE COURT:  Great.  Go ahead and call him then.

MR. WILSON:  We would call Roger Hilfiger, Your Honor.

MR. HILFIGER:  Your Honor, before we start, I would like -- you may be aware that I was on a trip.  And from that trip I brought back a little something I didn't anticipate.  I am okay, I think, but I --

THE COURT:  Should we get you a mask?

MR. HILFIGER:  No, it's not -- I feel okay.  It is just I -- I was on a plane for 24 hours of different plane rides and I handled it okay, but when -- you know, I may just have to say I need to take a break real quick.

646

THE COURT:  Okay.

MR. HILFIGER:  But I did pretty good on the plane, so I think I will be okay.

THE COURT:  Well, we are planning on indulging you.

MR. HILFIGER:  Okay.

ROGER HILFIGER, RESPONDENT'S WITNESS, SWORN

DIRECT EXAMINATION

BY MR. WILSON:

Q     Can you state your name for the record, please?

A     Roger Hilfiger.

Q     Mr. Hilfiger, can you tell us what is your business or occupation, sir?

A     I am an attorney.

Q     And how long have you been practicing law here in Oklahoma.

A     Since 1972.

Q     And Mr. Hilfiger, I understand that you've had some experience both in the state and federal system; is that correct?

A     Yes.

Q     What experience have you had in trying cases in the federal system?

A     In the federal system?  Since about 1972 or '73, I've tried a number of cases in criminal defense in the federal system.  I've only done a few civil cases in the federal

647

system.

Q    And I believe you also have experience in federal prosecutions; is that correct?

A    Yes.

Q    What is your experience in federal prosecution?

A    From 1985 until 1990, I was here with the U.S. Attorney's office.

Q    You also have experience in handling cases with the state system; correct?

A    Yes.

Q    And do you have specific experience in handling cases in the state criminal system?

A    Yes.

Q    And how long have you been handling cases in the state system as far as criminal cases?

A    Since about 19 -- since I started practicing in 1972. The basis back then was a little different than it is now. Back then the -- if you wanted to do criminal cases, you just went to the judge and told the judge you wanted to do some criminal cases and he would appoint you, if you didn't get hired, and it was a very open system. I mean, it was just whoever wanted to do it could do it and I started doing it about from the start, from about 1972. I also had a civil practice and did a lot of civil stuff and the occasional criminal stuff from '72 to 1985 in the state system. And

648

then back in 1990, '91, they -- they changed the criminal defense system as far as court appointments so that you had to bid on the contract.  And since 19 -- I think it was '92 or '93, I've been the chief contractor for Muskogee County on the Oklahoma Indigent Defense System.

Q     When you say you've been the chief contractor, what do you mean by that?

A     Well, the contract -- I am the one that bids on the contract and I'm the one that has the contract, but then I have other attorneys that work under that contract.

Q     As the chief contractor, do you handle cases yourself under that contract?

A     Yes, yes.  I handle -- because under -- the way that system is set up, you don't handle a number of cases, you handle a percentage of cases.  So from '92 or '93, whenever we first got the contract, Muskogee County became a little different than a lot of the other counties on how we did it.  In other counties somebody may -- may bid on doing 25 percent of all criminal stuff and another person would do 25 percent of criminal stuff, but they would be separate contracts.  In Muskogee I felt like it would be more efficient if we just had one contract and I would be responsible for 100 percent of it, but I had other attorneys that would do certain percentages.

Q     Okay.

649

A       And under that system, for a long time, I was doing 30 -- I think I always did about 30 percent, maybe 30 or 35 percent, and then I've cut down to 20 percent now.  And I also do another county besides Muskogee too.

Q       And that would be Haskell County?

A       That would be Haskell County.

Q       Let's go back in time a little bit --

A       Okay.

Q       -- in reference to your criminal trial experience back to 2004.

A       Okay.

Q       And back in 2004, I believe you were appointed to represent Kenneth Barrett in the federal case; is that correct?

A       Yes.

Q       And were you the contractor at that time for OIDS for the indigent defense in Muskogee County?

A       Yes, I was.

Q       And were you doing 30 percent or 20 percent back then, or do you recall?

A       I think it was probably 30 percent.

Q       Were you doing Haskell County at that time?

A       Yes.

Q       And did you have other attorneys working with you as far as the Haskell County contract?

650

A     Yes, I did.  As far as Haskell County, really I was more of just the contractor on Haskell County and there was another attorney that really was doing the individual work down there.

Q     All right.  So during your multiple years of criminal experience, have you had occasion specifically to handle capital litigation, death penalty cases?

A     Yes.

Q     Have you had that experience in the state system?

A     Yes.

Q     Approximately -- well, if you know, how many death penalty cases have you been involved in on the state side?

A     I can't tell you exactly how many.  I can tell you -- because there are -- there are a number of them that may have started out as death penalty cases that didn't -- you know, they didn't make it all of the way to death penalty, they changed before we even got to a jury trial.  So I don't know whether you count that or not.  I would say somewhere in the neighborhood of 10.

Q     How many of those were capital cases that went through full-blown litigation, through trial?

A     I think approximately five.

Q     And you also had that same experience handling death penalty cases in the federal system?

A     Yes, but not as much.

651

Q      How many cases have you handled, excluding Mr. Barrett, in the --

A      One other one.

Q      One other one?

A      Yes.

Q      Was that before or after your assistance with Mr. Barrett?

A      Before.

Q      And approximately the time frame between Mr. Barrett and when you had that previous federal experience?

A      It was probably 1993 or '94.

Q      Did you ever prosecute any capital cases as the U.S. Attorney, to your knowledge?

A      I can't -- I know there was another similar case to the '93-'94 case that we prosecuted in '88, I think, but I don't think at that time that we had the death penalty involved, but it was a similar type case, but it didn't provide for the death penalty.

Q      Okay.  In addition to specifically death penalty cases, have you had an occasion in the state system to handle murder non-capital cases?

A      Yes.

Q      All of the way through jury trial?

A      Yes.

Q      Would that be true of cases involving illegal

652

narcotics, for instance methamphetamine, cocaine, other illegal narcotics?  And when I say that, I mean not a death resulting from those but just a case involving distribution or manufacture of a controlled substance.

A    As a death penalty offense?

Q    Non-death penalty.

A    I can't recall.  I mean, just about any of the murder cases that I've been involved with involved illegal drugs in the sense that, you know, some was being taken, some was being used, but whether it was directly a part of the case, I really can't recall that.

Q    I would assume that in your many years that you've handled cases that didn't involve a death, but involved illegal substances, controlled substances?

A    Yes.

Q    Does the same hold true of cases involving firearms?

A    Yes.

Q    Would that be true on the state and the federal system?

A    Yes.

Q    Mr. Hilfiger, in your experience have you had occasion when dealing with clients -- and let's talk about the state system first and then we will move to the federal system. Have you ever had an occasion to deal with a client in the state system that you believed was unable to assist you, rationally unable to assist you?

653

A      Numerous times.

Q      And what type of -- when you had those concerns, what would you do?

A      Well, the normal procedure that I would do would be to request a competency evaluation.

Q      And I believe in the state that would be ordered through the court; is that correct?

A      Yes.

Q      And that person would be evaluated by a mental health professional; correct?

A      Well, normally it is done by Northeast Oklahoma Forensic.

Q      Okay.  But they have mental health professionals; correct?

A      Right.

Q      And why is it that you would make that determination that I need to ask the court for an order to have this person evaluated?

A      Well, usually it is just, you know, based on talking to the individual and listening to what, you know, the individual had to say and making that determination that we need to have something additional here to determine whether he knows and understands what's going on.

Q      And I believe your testimony is that you've had that happen a number of times in the state system?

654

A     Yes.

Q     Would the same hold true in the federal system?  Have you had a situation where you've had clients that you were concerned about their ability to rationally assist you in their defense?

A     Yes.  I can't tell you that it has happened that often, but I -- because I can only remember one time that we did have someone sent to Springfield, but I -- you know, for an evaluation, but I think it might have been more than that. I mean, I can -- in my mind I can remember one time.

Q     And just for the record, so that the record is complete, when you say sent to Springfield...

A     Uh-huh.

Q     What do you mean by that?

A     Well, that's where I understood where they did the mental evaluation.

Q     So the process would be if you had a concern about a federal client that you were representing, you could file a motion with the Court and ask the Court for an evaluation of that person; is that correct?

A     Yes.

Q     And again, what would be the basis of your decision to say I think I need to file a motion to ask for this person to be evaluated?

A     The contact with that person.

655

Q    And would you be using your experience over the last 20 plus years or 30 years?

A    Yes, yes.

Q    And --

A    Well, let me -- and, you know, not only that, but in a lot of occasions it is somebody -- a relative, a friend, something along that line would make some comment, you know, to me that --

Q    A relative or a friend of the defendant?

A    Of the defendant would make a comment, you know, that he doesn't know what he is doing or, you know, that...

Q    All right.  And if you have that information and you consulted with your client and had some concerns, then you would file a motion; is that correct?

A    Yes, uh-huh.

Q    Are you familiar with the expression NGRI?

A    Yes.

Q    Not guilty by reason of insanity?

A    Yes.

Q    In your experience as a defense attorney on the state side, have you ever had an occasion where that particular defense has presented itself?

A    Yes, but I've never had it where we've gone all of the way through a jury trial.

Q    Have you had it where -- to the point where you felt

there was a need to have that person evaluated to determine whether or not they understood the difference between right and wrong?

A     Yes.

Q     And why did you believe that that was a necessity and thinking -- and using that case as a focal point or cases, why in that case or cases did you believe that it was necessary to have your client evaluated to determine whether or not they understood right and wrong?

A     Because of responses -- well, basically because of the contact with that person and responses or lack of responses from that person and actions that the person did too.

Q     Would you also look at the circumstances involving the alleged crime?

A     Yes.

Q     And the behaviors that that person exhibited at the time of the alleged crime?

A     Yes.

Q     And in those situations -- well, let me just ask you this:  Are you a psychologist?

A     No.

Q     Are you a psychiatrist?

A     No.

Q     Have you any specialized training in the field of either psychiatry or psychology?

657

A      No.

Q      So, I take it, you are using just your own personal on-the-job history and experience; is that correct?

A      Yes.

Q      Mr. Hilfiger, we are looking at 2004 and specifically your representation of Mr. Barrett.

A      Yes.

Q      Do you recognize Mr. Barrett today?

A      He looks very different, but we have all aged a little bit.

Q      Is that him seated right there in the orange?

A      Yes.

Q      And do you recall meeting Mr. Barrett back in 2004?

A      2004-2005, yes.

Q      All right.  And did you ever have an occasion to meet with him while he was incarcerated in Muskogee County?

A      Yes.

Q      And did he appear in the same -- I believe you made the comment that we've all aged, but how does he look different now than he did when you first met him back in 2004 or 2005?

A      I really can't recall.  I mean, just -- I can't tell you.

Q      Okay.  At the time that you met him had he just recently been incarcerated?

A      Yes.  He had been -- I think he had been incarcerated

658

and had just recently been released from the state prison system.

Q    Okay.  And what I'm getting at is when you first saw him, had he just come off the street or had he been in prison for a period of time?

A    He had been in prison.

Q    It's my understanding he had been in custody since September of 1999; is that correct?

A    I don't know.  I mean, I would tend to believe that's right, yes.

Q    All right.  At the time that you first encountered Mr. Barrett, were you aware that Mr. Barrett had previously been tried two separate times in Sequoyah County District Court?

A    Yes.

Q    And at the time that you were appointed to represent him, were you appointed solely to represent him or with another attorney?

A    I was appointed along with John Echols to represent him.

Q    Mr. Echols.  How long had you known Mr. Echols at that point?

A    You know, I am not sure that I had actually met him before then.  I don't -- I am not sure.

Q    Okay.  So you had not worked with him in defending

659

anyone prior to Mr. Barrett; is that correct?

A    Not that I recall, no.

Q    Did you have any knowledge of Mr. Echols' trial experience?  Even though you may not have met him before, had you heard of him by reputation at the time that you got appointed along with him to represent Mr. Barrett?

A    I can't recall that.  I mean, I can't say that, yes, I recall him as the trial attorney or no.  I don't know.

Q    Okay.  It is my understanding that you were appointed in approximately October of 2004; is that correct?

A    Yes.

Q    And at the time that you were appointed I take it that you and Mr. Echols had an opportunity to get together and to meet and to talk about the case; is that correct?

A    Yes, but I can't give you a specific answer as to when, where, and what all of the discussion was.

Q    I know we are talking about something that took place just a few years ago.

A    Uh-huh.

Q    Actually several years ago.  But you did, I am sure, meet and talk about the case?

A    Yes.

Q    Did you -- of your own independent recollection, do you recall if you entered into some agreement between the two of you as to how you were going to work together to represent

660

Mr. Barrett?

A      I can't recall if there was a specific agreement.  I know on my part my feeling was that Mr. Echols had been involved in the case for five years or so, four or five years, he had the knowledge of the case and I would sort of defer to whatever he wanted to do and how he wanted to do it.

Q      When you say he had the knowledge, what do you mean by that?

A      Well, he had been involved in the case for five years, four or five years, whatever, had done two trials, knew all of the information about the witnesses and everything.  So I just -- I more or less deferred to what, you know, his ideas were, what he wanted to do.

Q      So you were aware that Mr. Echols had represented Mr. Barrett in the two previous state cases; correct?

A      At the time I was appointed, yes, I was aware of that.

Q      And so you don't recall if there was any division of responsibilities or division of labor that you agreed upon when you began working with Mr. Echols?

A      I can't recall any agreement.  I mean, again, he was the one -- he had been involved in that case, so he knew sort of what positions he wanted to take and what he wanted to do and I was just trying to learn the case.

Q      I understand.  And one of the reasons I asked that question, Mr. Hilfiger, is Mr. Echols and another attorney by

661

the name of Jack Gordon have testified in this case and Mr. Gordon testified that in the state case basically he was the second chair lead counsel.

A      Uh-huh.

Q      And that Mr. Echols was more of the first stage, the guilty/innocence stage and Mr. Gordon was more the penalty phase.  Did you and Mr. Echols have that type of division of responsibility?

A      No.

Q      Due to the fact that Mr. Echols had been involved in this litigation on the state side, were you aware that Mr. Echols had access to much of the investigative files in this matter?

A      Yes.

Q      And do you know where they were physically located?

A      No, I really don't know where they were physically located.  I mean, I assume that he had them at his office, which I sort of learned later that his office is really his home, and also he was very involved in having everything on a computer.  So most of the information, he had it in his computer.

Q      It's my understanding that he had developed some sort of website or internet web browsing system where a person could log -- well, I am showing my ignorance, sorry, Judge -- where a person could log in and access information.  Are

662

1090

you aware of that?

A     Yes.  He had something set up that you could log in to or that you could get in to.  I hate to say log in because I am not sure how -- I can't recall logging in, but he had something set up.

Q     And you were made aware of that?

A     Yes.

Q     And were you given access to that?

A     Yes.

Q     Do you recall accessing that system?

A     I know I did, but I can't recall.  I mean, I can't say I remember I got -- that I accessed the system to get this information because most of the information at that time, that I was getting, was a hard copy to try to understand what the case was about and that was from transcripts.  There were preliminary hearing transcripts and trial transcripts from the Sallisaw cases.

Q     Now, when you say you were looking at hard copies, were you looking at hard copies of discovery provided by the United States Attorney's office or from the files that Mr. Echols had or do you know or do you recall?

A     I believe it was the files that John Echols had.

Q     So I take it from your previous answer when you said I didn't realize until later that his office was his house, I take it you had not gone up to his place and picked up

663

1091

information?

A     Not until later, you know, after he left the case.  I didn't go to his house and pick up information.  I can't tell you how I got the transcripts and everything prior to that time.  I assume he must have brought them to me, but I really don't know.

Q     We talked a moment ago about you meeting Mr. Barrett initially.

A     Yes.

Q     Did you -- during the time that you were assisting with Mr. Echols, did you have an opportunity to talk with Mr. Barrett about what your trial strategy or defense strategy was going to be?

A     Me individually or John and myself?  I don't -- at some point, yes, but I can't tell you that, you know, I sat down with Mr. Barrett and said, okay, Mr. Barrett, this is what the trial strategy is going to be because most of the trial strategy is coming from John Echols based on his two previous trials.  So it wasn't something that -- where I'm saying this is the trial strategy that I'm developing.  I was sort of following along with John Echols.

Q     I understand that.  But when you would visit with Mr. Barrett, did you ever talk with him specifically about issues that he was focused on, concerns that he had?

A     Well, I know early on Mr. Barrett was concerned, as I

664

was concerned, and I think John Echols was concerned, about the issue of should the federal prosecution be able to go forward after the conviction in Sallisaw.

Q    And it is my understanding that there was an attempt made to litigate that particular issue on the double jeopardy grounds?

A    Right, right.

Q    Is that correct?

A    Yes.

Q    Did you, as a part of your initial or early on representation, have an occasion to begin doing research on the issue of trying to get the case dismissed on the federal side?

A    Yes.

Q    Well, in part of your discussions with Mr. Barrett early on and him expressing issues about fairness on -- about being prosecuted by two different entities or sovereigns, did you detect any concerns or any issues with Mr. Barrett that gave you a concern about whether or not he could rationally assist you in the preparation of your defense in this case?

A    No.

Q    Did you ever have any discussions with Mr. Echols in which Mr. Echols gave you some concerns that he may foster or harbor regarding Mr. Barrett's ability to represent or --

excuse me -- assist you in his representation?

A     No.

Q     Any time -- from the time that you became involved in this case until the time that Mr. Echols exited, did your concerns about Mr. Barrett or your position regarding Mr. Barrett ever change concerning his ability to assist you in the case?

A     You mean as far as mental issues?

Q     Yes.

A     No.

Q     After you became lead counsel, after Mr. Echols departed the case, up until the end of this litigation, did you ever have a concern in your mind that Mr. Barrett could not rationally assist you in his defense?

A     No, I did not.

Q     If you had had that concern, would you have filed a motion with the Court?

A     If there was a concern as to his ability to stand trial on a competence issue, yes, I would.

Q     Mr. Hilfiger, as a part of the representation of Mr. Barrett, I understand that there were certain requests made of the court for funding for different means of defense; is that correct?

A     Yes.

Q     Budgeting issues; is that correct?

666

A       Yes.

Q       And can you tell us what your initial involvement was in making those requests of the court to get funding for certain experts and certain information that would assist you in the representation of Mr. Barrett?

A       I think Mr. Echols is the one that actually made those determinations or, you know, made those requests.

Q       Did he --

A       Now, I was signed on it, but, I mean, I -- I don't -- I can't recall really -- you showed me some budget things and I can't really recall having independent conversations with John Echols talking about this is how much we ought to put on for this, this is how much we ought to put on for this because those budget issues were during the early part and John Echols had been involved in that case for five or six years and I was still trying to get caught up to under- stand what the case was about.

Q       At the time that Mr. Echols was preparing these budget requests, did you and he have any discussions regarding what specific assistance you should request from the court as far as budgeting assistance?

A       I really can't recall that.

          MR. WILSON:  Your Honor, I thought, quite frankly, that this was a part of the Petitioner's exhibits and I don't know that it is.  I've looked and I don't know that I can

667

find it, but this is Document Number 16 from the criminal case, Your Honor.

THE COURT:   Whether it is an exhibit or not, the Court can take judicial notice of it since it is a part of the record in the case.

MR. WILSON:   Thank you, Your Honor.

BY MR. WILSON:

Q      Mr. Hilfiger, this purports to be a document which was filed in the criminal case on November the 29th of 2004. Can you see that on the screen there?

A      Yes, uh-huh.

Q      And I am going to zoom in so that you can see it better.

A      Okay.

Q      Do you have any independent recollection of seeing this particular document before, sir?

A      I don't have an independent recollection of having seen it other than when you showed it to me a while ago, but I -- I mean, I know I did see it.

Q      Okay.  And would you agree with me, sir, that this was a first ex parte request for some expenses to be provided to assist in Mr. Barrett's defense?

A      Yes.

Q      And specifically looking at Page 2, which is now up on the screen...

668

A      Yes.

Q      Do you see under Paragraph 5, Subparagraph D, it refers to an expert in the psychology of individual responses to sudden life or death situations with a preliminary estimated cost of $3,000.00 to $4,000.00.  Do you see that?

A      Yes.

Q      And once again, did you and Mr. Echols have any specific discussion that you recall about the need for an expert that meets that specific description on this ex parte request?

A      No.

Q      Based upon, at that point, your limited knowledge of the case, did you independently have any concern in your mind that you might need an expert in that field?

A      No.

Q      You did not have that concern?

A      I didn't know enough about the case to have a concern one way or the other frankly.

Q      Fair enough.  Thank you.  On Page 3 of this document what appears to be Paragraph 5 --

THE COURT:  Mr. Wilson, we are having a technological issue here, so can you hold on for a second?

MR. WILSON:  Oh, I am sorry, sure.

(PAUSE)

THE COURT:  Go ahead, Mr. Wilson.

BY MR. WILSON:

Q    Do you see there, Mr. Hilfiger, at the top of Page 3, Subparagraph 5G an expert in forensic prediction of future dangerousness?  Do you see that?

A    Yes.

Q    Did you have any discussion specifically with Mr. Echols that you can recall about the need for someone -- an expert to help you in that particular field?

A    At this particular time?

Q    Yes.

A    No.

Q    Would the same hold true of -- well, let's move down to Subparagraph I, a mitigation investigator and expert -- do you see that?

A    Yes.

Q    What -- well, first of all, do you know what that is, a mitigation investigator?

A    Yes.  Somebody that would, you know, investigate to see what possible defenses there are on mitigation that a person would have.

Q    And that would be more specifically going to the second stage; correct?

A    The second stage, yes.

Q    And at this stage in the representation of Mr. Barrett had you and Mr. Echols had any specific discussion that you

670

recall regarding the need for a mitigation investigator?

A     No.

Q     Did you have any reason at this point to say -- to think you didn't need one?

A     No.

Q     Okay.  And under J, an expert psychiatrist or psychologist qualified to determine whether Mr. Barrett suffers from psychological disabilities or physiological deficits.  Had you had any discussion with Mr. Echols at that stage as to why you might need that particular type of expert?

A     No.

Q     It's my understanding, Mr. Hilfiger, that that was not the first, nor the only, request for or a budget request being made in this case; is that correct?

A     That's right.

Q     I want to show you another one quickly.

        MR. WILSON:  Your Honor, and for counsel, this would be Number 46, Document Number 46 in the criminal case.  It is not Exhibit 46, but Document 46 in the criminal case.

        THE COURT:  All right.

BY MR. WILSON:

Q     Mr. Hilfiger, I am displaying that one on the monitor next to you.  Do you see this also being as an ex parte motion for approval of the overall budget?

671

1099

A      Yes.

Q      And just so the record is clear, would you agree with me that this is dated January 31st of 2005?

A      Yes.

Q      Now, I am going to be displaying for you from Page 4 of that document and it shows Subparagraph E and it lists a mitigation investigator and expert to develop, organize and present mitigation evidence.  Do you see that?

A      Yes.

Q      And this particular request now identifies a particular expert, Inquisitor Incorporated.  Do you see that?

A      Yes.

Q      Do you know or were you involved in making any contact with this particular agency, Inquisitor Incorporated, to become a mitigation specialist to assist you in this particular case?

A      No.

Q      To your knowledge, did Mr. Echols do that?

A      I didn't.

Q      Okay.  So you don't know?

A      I don't know.

Q      Okay.  On Page 5, Subparagraph G, right up at the top, it shows an expert in the psychology of individual responses to sudden life or death situations.  It is very similar to the previous request I showed you; is that correct?

672

A      Yes.

Q      Do you have any independent recollection of having any additional discussions or having any discussions as to why this has continued to be requested?

A      No.

Q      Anything at this point in your mind that would either support or did -- did you agree or disagree with this particular request at that time?

A      At that time I didn't have any opinion on this request.

Q      And that would be based upon your lack of information; is that correct?

A      Yes.

Q      Now, on Page 7 of that document, Subparagraph L, there is a listing for an expert on assessing future dangerousness. And now would you agree with me that there appears to be a particular person identified or requested to be hired; is that correct?

A      Yes.

Q      And do you see the name Jennie Russell?

A      Yes.

Q      Mr. Hilfiger, do you -- and I know this is a difficult question, but do you know that at that particular time in January -- in January of 2005, did you know who Jeannie Russell was?

A      No.

673

Q    And we will talk more about Dr. Russell here in a few minutes, but the next entry is Subparagraph M, an expert on diagnosing organic brain disorders.  Do you see that?

A    Yes.

Q    Now, would you agree with me that that is a more specific or actually a different request than the previous budget item that I showed you?

A    You are not talking about 'L'?  You are talking about in the previous --

Q    I am talking about 'M' now.

A    Okay.  But, I mean, previous -- do you mean in the previous budget request?

Q    Yes, that's correct.

A    Yes, that is different.

Q    All right.  Now that we are talking about diagnosing a organic brain disorder specifically, do you recall any discussion with Mr. Echols as to why an expert was needed for that specific reason?

A    No.

Q    Now, I want to direct your attention specifically to the information under Subparagraph M.  Would you agree with me that this particular ex parte request says that there is no expert he identified.  Is that right?

A    Yes.

Q    Now, the second or actually the third paragraph where

674

it begins, "The estimate..." do you see that?

A    Yes.

Q    Can you just read that to yourself for a second?

A    Okay.  (PAUSE)  Okay.

Q    Apparently there was some communication in this document that this particular issue had been raised in the state trials; is that right?

A    I don't know whether -- I mean, I can't get -- I don't get from this that it was raised in the state trials.  I get from this that it was considered to be raised.

Q    And that no funding was ever generated, nor was there any evaluation done; is that correct?

A    Right.

Q    Do you know what the circumstances were, why that took place?  Do you know why no evaluation was done by the criminal defense in the state cases?

A    No, I do not.

Q    Do you recall any discussion with Mr. Echols about what took place, why there was no expert on diagnosing organic brain disorders?

A    No.

Q    At this particular time in January of 2005, did you have any independent opinion as to whether or not that particular request should be made of the court?

A    No, I did not.

Q    Did your opinion ever change on that?  Did you ever come to having an opinion as to whether or not an expert needed to be hired to diagnose organic brain disorders?

A    My opinion, you know, based on further discussions with Kenny Barrett and just as time went on was that it wasn't something we needed.

Q    Why?

A    Because I didn't see -- there wasn't any apparent need for a -- to look into organic brain disorders.  There wasn't any appearances that it was needed.

Q    Did Mr. Echols ever say, hey, this guy has got some problems and we need to have him evaluated?

A    I can't recall that he ever did.

Q    Do you believe if he would have made that request that you would have the same opinion that you currently do?

        MS. FISHER:  Objection, Your Honor, that calls for speculation.

        THE COURT:  Overruled.

        MS. FISHER:  Your Honor, it also calls for an ad hoc rationalization of what he might have done in trial under the circumstance that did not exist at that time.

        THE COURT:  Overruled.

BY MR. WILSON:

Q    Do you remember my question?

A    No.

Q      Okay.  I previously asked you if Mr. Echols and you had had a discussion about him saying, hey, this guy has a problem, we need to have him evaluated and I believe you said I don't recall any discussion like that; is that correct?

A      Right, yes.

Q      If there had been a discussion and Mr. Echols would have said, hey, this guy needs to be evaluated, would you have followed Mr. Echols's advice?

A      At that time, before Mr. Echols left the case?

Q      Yes.

A      I probably would have evaluated his request and made a decision, but I can't tell you whether I would have followed what he said.

Q      Fair enough.  And is it true that as you continued to represent him, even as the lead counsel, that you continued to have interaction with Mr. Barrett?

A      Yes.

Q      Did you continue to do your own self-evaluation, if you will, of Mr. Barrett?

A      Yes.

Q      Did Mr. Barrett ever indicate to you that he had had brain damage or significant head injuries?

A      I can't recall if that ever came to -- that he ever told us about that and I can't recall that I ever saw any-thing about it.

677

MR. WILSON:  Your Honor, I would ask the clerk to provide the witness with Government's Exhibit Number 15, please.  (COMPLIED)

BY MR. WILSON:

Q     Mr. Hilfiger, I would ask you if you would just take a moment and look at that and see if you recognize that document, sir?

A     I can't say that I recognize it, no.  I mean, I see what it is, but I can't -- I can't say that I recognize it in the sense of having seen it before.

Q     I would direct your attention to Page 7 of this particular document.

A     Yes.

Q     And it appears that you were carbon copied on this letter; is that correct?

A     Yes.

Q     And would you agree with me that this is a letter that Mr. Echols sent to Judge Payne, who was the presiding judge of the federal criminal case; is that correct?

A     Yes.

Q     Now, look at Page 2, if you will, and specifically I am referring to -- there is no numbered paragraphs, but it appears to be bullet point 4.  It says, "Psychologist Faust Bianco..." do you see that?

A     Yes.

678

MR. WILSON:  And just so the record is clear, Judge, it is Page 2 of the letter, but Page 3 of the exhibit.

THE COURT:  All right.

BY MR. WILSON:

Q     Do you know a person by the name of Faust Bianco?

A     I cannot recall that, no.

Q     That same paragraph refers to a person by the name of Ms. Schaye, S-C-H-A-Y-E.  Do you see that?

A     Yes.

Q     And that same name is a couple of bullet points above, Outside Mitigation Investigator Rosanne Schaye.  Do you see that?

A     Yes.

Q     Do you know a person by the name of Rosanne Schaye?

A     No, I do not.

Q     As a part of your representation of Mr. Barrett while you were assisting Mr. Echols, did you have an occasion to meet Rosanne Schaye?

A     I don't believe so.

Q     I guess the same would be true of Faust Bianco; is that correct?

A     Yes.

Q     Would you agree with me that in this particular letter to the court that Mr. Echols represents the fact that Ms. Schaye had performed some mitigation investigation as a part

of the first or previously prepared some mitigation investigation; is that correct?

A     That's what that bullet point states, yes.

Q     Okay.  And under the bullet point referring to Faust Bianco, it talks about a disagreement between Ms. Schaye and Dr. Bianco; is that correct?

A     Yes.

Q     Do you have any independent knowledge of this disagreement which took place between Ms. Schaye and Dr. Bianco?

A     No, I do not.

Q     And just so that I am clear, when you say you don't know, you do not remember it at this point or you just -- or that you never knew that?

A     Well...

Q     I know, that's a tough question.  I am sorry.

A     I can't tell you that I never knew it, but I can tell you that I don't know it now.  Whether I ever did, I don't -- I can't tell you.

Q     Do you recall ever seeing any of the investigation -- investigative reports or interview summaries that were generated by Rosanne Schaye?

A     I cannot recall seeing them, no, not at this point.

Q     Would that be true any time during the representation of Mr. Barrett?

A     Not necessarily.

680

Q      Okay.  Well, we will come back to that in a second.
There is also a reference in this letter on the same page,
Page 2 of the letter, of OIDS in-house psychologist Kathy
LaFortune.

A      Yes.

Q      Do you know who that is?

A      Kathy LaFortune?  I mean, I -- what do you mean who
that is?

Q      Well, do you know who Kathy LaFortune is?

A      I know who she is, yes.

Q      Okay.  And do you know that she was employed by OIDS
back in 2005?

A      I mean, I remember her name.  I remember there was a
discussion between Bret Smith and myself about Kathy
LaFortune, and that's about what I can remember.

Q      So that would have been later on in the representation,
is that correct, as far as your discussion with Mr. Smith?

A      That would have been in 2005, yes.

Q      Okay.  Well, we will come back to that.  Mr. Hilfiger,
as a part of the initial representation of the defendant,
we talked about you began working on a motion to dismiss;
is that correct?

A      Yes.

Q      It is my understanding also that there was the involve-
ment that you and Mr. Echols had in the decision of whether

681

or not the Department of Justice was going to determine this case eligible for the death penalty.

A     Yes.

Q     Were you aware of that?

A     Yes.

Q     And were you involved in traveling to Washington to discuss the case?

A     Yes.

Q     And you went with Mr. Echols; is that correct?

A     Yes.

Q     Would you agree with me that at some point the judge authorized certain expenditures to be made in helping to represent Mr. Barrett; is that correct?

A     That's right.

Q     As a matter of fact, the judge authorized the hiring of a mitigation specialist; is that correct?

A     I mean, we did hire one.  I assume he authorized it. I don't have an independent recollection of that right now, but yes, I believe that happened.

Q     And would you agree with me that the judge also authorized the hiring of an expert to look into organic brain disorder?

A     I'm assuming.  I don't -- I haven't seen that order and I don't -- and I have not reviewed everything in this case. So I can't -- you know, if it is in there, it was done.

Q     Okay.  So you don't have any reason to disagree that the order was put in place?

A     No.

Q     All right.  We talked about the fact that there were multiple requests made for budgeting; correct?

A     Yes.

Q     And at some point in this litigation Mr. Echols actually withdrew; is that right?

A     Yes.

Q     And do you know why that took place?  What was your understanding of why Mr. Echols got to the point where he asked the Court to allow him to withdraw?

A     Well, my understanding was because he was frustrated with not receiving all of the money that he felt like he ought to get in the budget.

Q     Did you agree with all of Mr. Echols's requests that he made of the Court?

A     No, I did not.

Q     Why not?

A     Some of them -- some requests, I thought, were excessive and in particular I can't tell you which ones right now.  Some I thought were repetitive and some, I thought, were not necessary.

Q     Okay.  The need for a mitigation specialist.  Would that have fallen into any of those categories that you

thought we don't need one of those?

A    No.

Q    The need for an expert on organic brain disorder.  Did you believe, based upon what you knew at the time of Mr. Echols' withdrawal or at the time he withdrew, that you needed one of those?

A    No, I did not.

Q    You did not?

A    I did not believe --

Q    You did not know or you did not agree?

A    I did not believe we needed one.

Q    And again, is that based upon your interaction with Mr. Barrett?

A    Yes.

Q    Was it based upon anything else other than your interaction with Mr. Barrett?

A    Well, you know, this -- some of this stuff comes back to me when I --- like when I see this letter here.  There were some reports, as I recall, that didn't indicate that he had a mental health problem.  Those, of course, were done way back before I even, you know, got in the case.  They were done back with John Echols.

Q    Was your idea of budgeting in this case and Mr. Echols' the same?

A    No.

684

Q    And what was the major difference in your perception of what needed to be requested versus what Mr. Echols' thought needed to be requested?

A    Well, I felt I was more conservative and he was more liberal.

Q    And when you say conservative, you mean just spend less or...

A    Well, I mean, I felt like what he was asking to do was sort of a shotgun approach to a defense and I felt like we needed to, you know, aim the defense a little bit more precise and we didn't need to waste time and effort and money in some other areas.

Q    Well, ultimately I guess you would agree with me that Mr. Echols was allowed to withdraw?

A    Yes.

Q    And did you support Mr. Echols and his request to withdraw?

A    No.

Q    Did you and he discuss the potential impact his withdrawal might have on the defense in this case, if you recall?

A    I can't recall that.  I mean, did we discuss his withdrawal?  I think, yes, we did.  The impact of his withdrawal?  I can't specifically remember that.

Q    Well, once Mr. Echols was out of the case you were

appointed lead counsel; correct?

A    Yes.

Q    And it's my understanding that Bret Smith was appointed to assist you; correct?

A    Yes.

Q    Had you worked with Mr. Smith on any cases before that, to your recollection?

A    I can't recall any particular cases that I've worked with him.  I would almost believe that I worked with him in cases where he may have a co-defendant that I have a co-defendant, but working directly with him in one case I can't recall that.  I mean, you know, where he and I were working with a client.  I can't recall that.

Q    And for the record, Mr. Smith was an attorney here in Muskogee; correct?

A    Yes.

Q    And you are also an attorney here in Muskogee?

A    Yes.

Q    And had you known him for a number of years prior to your working together in this case?

A    Yes.

Q    To your knowledge, had Mr. Smith or did Mr. Smith have any previous capital experience?

A    I do not know.

Q    Okay.  Do you recall when it was specifically that

686

-- when Mr. Echols was allowed to withdraw, when the date was?

A    I can't remember the date.  I think it was sometime in March or April of 2005.

Q    If the record reflects April of 2005, would that be about right?

A    Yes.

Q    And when Mr. Echols was allowed to withdraw, at that time did you have a trial date already set?

A    I am not sure we did at that time.

Q    Well, I take it you are now in the case along with Mr. Smith, no longer having Mr. Echols to rely upon the previous state litigation; correct?

A    Right.

Q    Did you continue to consult with him after his withdrawal?

A    If I did, it was only immediately afterwards, you know, to pick up hard copies of things.  I do know at one time I went to his house and got a number of boxes.

Q    Okay.  Well, let's talk about that transition period for a second.

A    Okay.

Q    When he gets out of the case obviously then you've got to get the information he has; correct?

A    Right.

Q    And your testimony about going to his house and picking it up, is that what you are talking about?

A    Yes.

Q    And can you tell the Court what you picked up from Mr. Echols?

A    Just a number of boxes of things that he had, the hard copies of things that he had from his trials.

Q    And did you receive materials from any other source other than Mr. Echols at his house?

A    Yes.  I believe OIDS sent me a number of boxes.  And how they got there, I don't know, but I know they sent me a number of  things.

Q    And just so we are all clear, when you say OIDS, you are talking about the Oklahoma Indigent Defense System?

A    Yes.

Q    And I believe they have an office up in Sapulpa and they have one in Norman; correct?

A    Yes, and I can't tell you whether it was Sapulpa or Norman.

Q    Do you know a guy by the name of Steve Leavy?

A    I recognize the name, but, you know, other than that, I can't say that I know him, no.

Q    Do you recall anything specifically about Mr. Leavy's involvement in this particular investigation?

A    I can't recall anything right now.  I mean, I do recall

688

his name and we may have had discussions with him.

Q      Well, after you obtained the information from Mr. Echols and from OIDS, did you and Mr. Smith have an occasion to get together and start game planning your representation of Mr. Barrett?

A      Absolutely.

Q      And do you recall specifically conversations that you had with Mr. Smith about the division of responsibilities or the division of tasks on how to represent Mr. Barrett?

A      I can't recall that we actually, you know, said you do this and I'll do this.  I can't recall that.  I mean, I think over a period of time, you know, something would happen and he would go ahead and develop, you know, that information or he would ask about something and I would develop the information, but I don't think there was a real hard and fast separation of what we did.

Q      All right.  Well, let me go back to the example that I used earlier with Mr. Echols and Mr. Gordon in the state case.  Mr. Echols was counsel for the first stage and Mr. Gordon was more the counsel for the second stage.  Now, you and Mr. Echols didn't have that arrangement; correct?

A      No.

Q      Did you and Mr. Smith have that arrangement?

A      No, not really.

Q      Okay.  At the time that you became lead counsel did

689

you have an occasion to go talk with Mr. Barrett about the fact that Mr. Echols was no longer in the case and that you were taking over, along with Mr. Smith?

A     Yes.

Q     And do you recall the reaction that Mr. Barrett had to that news?

A     I do not recall.  I know, you know, that I talked to him about it, but I don't know what reaction there was.

Q     As a part of your discussions -- and I believe you said you don't necessarily have any independent recollection of discussions with Mr. Smith, but as a defense attorney for years, what does -- what's a trial strategy?  What does that mean to have a trial strategy?

A     Well, what I have understood and what -- is that you need to have some kind of idea of a -- of how you are going to treat the case based on what the facts are and that's what your trial strategy is.  And you need to sort of develop that upfront, you know, as quick as you can find out what your -- you know, what the evidence is that you anticipate and then you need to try to get everything consistent with that trial strategy.  That's my view point of it.

Q     Did you and Mr. Smith have any disagreements about that -- your idea of trial strategy?

A     No.

Q     I assume you would try to identify the strengths in the

690

defense case and identify weaknesses as well; correct?

A     Yes.

Q     And I assume you would do that as you are evaluating the government's case; correct?

A     Yes.

Q     Now, I know that Mr. Barrett had been tried in the state, there was a hung jury, and then a retrial and some convictions on lesser included charges; correct?

A     Yes.

Q     And some acquittals of some charges; is that correct?

A     Yes.

Q     And the federal prosecution was going to be somewhat different from the state; is that correct?

A     Yes.

Q     And there was the inclusion of the fact that this was going to be a drug case and a death resulting from; is that right?

A     Yes, that drugs were going to be brought up in this case and they weren't brought up in the Sallisaw case.

Q     Okay.  Now, did that pose some unique issues or concerns for you?

A     It brought up concerns, yes.

Q     Okay.  What kind of concerns did that bring up in your mind as you are trying to identify strengths and weaknesses in handling this defense?

A     Well, let me explain.  I cannot tell you who this person was because I can't remember.  I just remember it was a woman.  When I became involved in the case after John Echols left, she contacted me and I -- and I don't think she was a juror, but she may have been a juror or she was somebody who had been in -- you know, been at the trial, the trial or trials, and I just -- you know, I was -- and she wanted to talk to me about it, so I talked to her.  The concern that I had on the drugs was she basically was saying that if drugs had been made known in the Sequoyah County case, the Sallisaw case, that she felt that the result would have been different and not an acquittal.

Q     So that would pose a unique challenge?

A     Right.

Q     Was there any concern in your mind about trying to limit the amount of discussion about narcotics or drugs before the jury?

A     Yes.

Q     Why was that --

A     Just the -- well, we didn't want to have a lot of discussion or involvement of drugs in the case because we felt that that would, you know, prejudice Mr. Barrett with the jury.

Q     And I apologize, but I am going to go back in time just a little bit.  During the transition period --

A      Yes.

Q      -- when Mr. Echols is leaving and you are taking over, --

A      Yes.

Q      -- did you and Mr. Echols have a discussion regarding the status of the litigation and what his recommendation was about going forward?

A      I cannot recall -- I know we had a discussion as to, you know, him leaving the case after he had already left, about him leaving the case.  My impression from him was that he had just been too involved in it, too wrapped up in it for five or six years and he wanted to get out, other than the budget deal.  That he had just been too -- he had been too much involved in it and just didn't want to have anything to do with it anymore and that's why I didn't really go back with him, you know, and ask him about certain things because he just -- he sounded like he has had it, he is finished with the case.

Q      All right.  I guess what I am specifically asking you about is, did Mr. Echols say I think going forward you need to do this, this and this, which hasn't been done?

A      If he did, I cannot recall it.

Q      Mr. Hilfiger, in addition to evaluating the case of representing Mr. Barrett on the guilt or innocence, --

A      Yes.

Q      -- you would agree with me that there was potentially a second component, a second stage since this was death penalty eligible?

A      Yes.

Q      Did you and Mr. Smith have any discussions regarding a strategy not just for the first stage, but a strategy for the second stage or the potential of a second stage as well in the case?

A      I can't say we had a discussion.  I can say that we discussed it from time to time.

Q      Okay.  As far as sitting down and that being the topic of that particular discussion, you don't recall that?

A      I can't recall a -- you know, hey, let's get together and let's talk about what we are going to do on the second stage.

Q      Did you -- do you recall talking about the second stage during your representation?

A      Absolutely.

Q      Now, earlier I was asking you about a person by the name of Rosanne Schaye.

A      Yes.

Q      And I asked you about whether or not you remembered that person and you said -- and you were limiting it at that point to while you were working with Mr. Echols.  Do you recall that, about seeing any documents of hers?

694

A    Yes.

Q    Well, let's now talk about -- now you are in charge, you and Mr. Smith are working together.

A    Yes.

Q    You receive information from Mr. Echols.  Do you recall at that point ever seeing any documentation, review notes, review summaries generated by a person by the name of Rosanne Schaye?

A    I really cannot recall seeing anything.  Now, that doesn't mean I didn't, but I just can't recall it at this point.

Q    And what I am going to need to do for a few minutes is just show you some documents and just see if that refreshes your memory.  Okay?

A    Yes.

Q    I want to direct your attention, first of all, to Tab Number 18.  If you will take a moment and look at that document, please.

                    (PAUSE)

A    Okay.

Q    Having had an opportunity to look at that, do you recall seeing that particular document?

A    No, I do not.

Q    Do you recall knowing that specific information from a person by the name of Carolyn Joseph?

A       No, I do not.

Q       Can you tell the Court whether or not this particular document was provided to you by Mr. Echols?

A       If it was in -- I gave to the public defender here, I think, nine or ten boxes of everything I had.  If it was in those boxes, then it was there.

Q       If it was in those boxes, did you review it?

A       I would say at some point, yes.

Q       Now, when you say "at some point," I mean, that could have meant the day before they picked them up.

A       Oh, no.  At some point before the trial, yes.

Q       And I am going to try to do this as in a group, so it may take you a little bit.  The next several tabs would be 19 through 25.  If you will just take a moment and look through those and see if you recognize -- once again, I believe these are all interviews conducted by -- or summaries of interviews conducted by Ms. Schaye.

                        (PAUSE)

        MR. WILSON:  Your Honor, may I consult with the clerk while Mr. Hilfiger is looking at those documents for a moment, please?

        THE COURT:  Yes.

        MR. WILSON:  Thank you.

                        (PAUSE)

BY THE WITNESS:

A      25?  Is that the last --

BY MR. WILSON:

Q      Yes.

A      Okay, yes, I've reviewed them.

Q      I'm going to ask you the same thing.  Do you have any independent recollection of seeing those reports after Mr. Echols was out of the case and you were in charge of the case, along with Mr. Smith?

A      I don't have an independent recollection of seeing them, but after reviewing them, I tend to think they had to be in those boxes someplace that I got from John Echols.  I believe --

Q      And why do you believe that?

A      Well, because some of the information given here is what we used to talk to the people that Rosanne Schaye talked to herself.

Q      Can you give me an example of what you are talking about?

A      Well, it's just like this Elnora Long, Sylvia Dotson...I can't remember Linda Riley.  (PAUSE)  Those names sort of, you know, bring back to memory that we did, you know, make some contact with them.

Q      Okay.  And we've been talking about Government's Exhibit Numbers 18 through 25; correct?

A      Right.

Q     Now, some of these names are going to be duplicated, but I want you to look --

MR. WILSON:  I would ask the clerk if he would hand Mr. Hilfiger, please, Government's Exhibit Numbers 54 through 62.

BY MR. WILSON:

Q     Mr. Hilfiger, these appear to be additional interview summaries conducted by Ms. Schaye.  I would ask you to take a moment and look at those as well.

THE COURT:  Mr. Wilson, once he has had a chance to look at those, let's finish this thought and then we will take our lunch break.

MR. WILSON:  Okay, thank you, Judge.

(PAUSE)

BY THE WITNESS:

A     Okay, I've reviewed them.

BY MR. WILSON:

Q     Do you recall seeing those particular documents as a part of your representation of Mr. Barrett?

A     I can't say specifically that I recall seeing them. If they were in the boxes, then I probably did.

Q     The names on these particular interviews, Toby Barrett.

A     Yes.

Q     You know who Toby was; right?

A     Yes.

Q    Who is Toby?

A    The son of Kenneth.

Q    Obviously Kenneth Barrett would be the defendant; correct?

A    Right.

Q    Sylvia Jolene Dotson?

A    Mother.

Q    Ernie Barrett.  Do you know who Ernie Barrett was?

A    Father.

Q    Do you remember Phyllis Crawford, who Phyllis was?

A    The name sounds familiar.  Yes, I see in here it is an aunt.  That sounds right.

Q    Does the name Roger Crawford also ring a bell with you?

A    I believe it was her husband.

Q    Okay.

MR. WILSON:  Your Honor, I know we are going to take a break.  Before I do that -- because I forgot to do this before I started, counsel -- both counsel had a list of exhibits to which there were no objections, and I intended to do this before I started my questioning.  I would move to admit Government's Exhibits 4 through 11, 28, 32, 33, 35, and 44.  I believe all of those there was no objection listed by the defense -- or excuse me -- by the petitioner.

THE COURT:  Are there any objections?

MS. FISHER:  I don't know, Your Honor.  We don't

699

have the list.

MR. WILSON:  And we can do this after lunch.  I will give counsel an opportunity to do that.

THE COURT:  All right.  Then let's do that.  Are we good to go then, Mr. Wilson?

MR. WILSON:  I am ready to take a break at this point.  I asked the questions about that particular area.

THE COURT:  Great.  Let's go ahead and take our lunch break and be back at 1:00.

(12:12 a.m.)

(LUNCH RECESS)

(1:06 p.m.)

COURT IN SESSION

THE COURT:  Go ahead, Mr. Wilson.

MR. WILSON:  Judge, as we were about to recess a moment ago, we had a discussion regarding moving to admit some documents and I believe through the lunch hour we've looked at those and the government moves to admit Government's Exhibits 4 through 11, 29, 31, 32, 33, 35, and 44 at this point.

MR. FISHER:  No objection, Your Honor.

THE COURT:  Very well.  Those exhibits are admitted.

MR. WILSON:  Thank you, Your Honor.  May I proceed?

THE COURT:  Yes.

700

MR. WILSON:  Thank you.

                    DIRECT EXAMINATION CONTINUED

BY MR. WILSON:

Q     Mr. Hilfiger, prior to the lunch break we were talking about some documents and I had shown you some documents, specifically from Rosanne Schaye.  Before we go any further, I need to ask, in addition to documents that you received from Mr. Echols and also from OIDS -- do you know a person by the name of Jack Gordon?

A     I don't know him.  I know of him, yes.

Q     Okay.  Were you aware that Jack Gordon -- and I think we talked about the name earlier -- was second stage or, excuse me, second chair in the second state case?

A     I knew he was involved in the Sallisaw case, yes.

Q     All right.  As a part of the transition of you getting access to documents, did you have an occasion to receive any documents from Mr. Gordon or make contact with Mr. Gordon to obtain documents?

A     There was a -- I am pretty sure there was contact made with Jack Gordon.  I can't tell you that I made the contact or if Bret Smith made the contact.

Q     And was the purpose of it in order to obtain information or documentation?

A     Yes, yes.

Q     And to your knowledge, did you, in fact, receive any

                                701

documentation from Jack Gordon?

A    I really don't have an independent recollection right now.  If there is -- if there was information we got from Jack Gordon, then that's how we got it.

Q    Okay.

A    I don't have, you know, an independent recollection of it.

Q    Okay.  So you don't specifically remember talking to him yourself?

A    I sure don't.

Q    Okay.  Earlier we had a conversation regarding a gentleman by the name of Steve Leavy.  Do you recall that?

A    Yes, and the name sounds familiar.

Q    And I believe you said he was an investigator for OIDS; is that right?

A    Yes.

Q    And do you recall as a part of your representation of Mr. Barrett, once you became lead counsel along with Mr. Smith, if you had an occasion to review any reports of investigation conducted by Mr. Leavy?

A    I cannot recall.  I mean, if there was any hard written information that was supplied, then we did look at it, yes.

Q    Okay.  I would asked the witness -- do you still have the book there?

A    No.

702

MR. WILSON:  I would ask if the clerk would provide the witness with Government's Exhibit Number 49, please.

(COMPLIED)

BY MR. WILSON:

Q     Mr. Hilfiger, I would ask you just to take a look at that, if you will.  It's several pages long.

A     Okay.

(PAUSE)

BY THE WITNESS:

A     Okay, I've reviewed it.

BY MR. WILSON:

Q     Do you recall seeing that particular document, that memo from Mr. Leavy to John Echols?

A     I have no independent recollection of seeing the document.  Some of the information in it, you know, I recall hearing and understanding, but I can't tell you that, yes, I actually saw this document.

Q     And can you give me an example, sir, of information that you recall hearing about or knowing about as a part of your representation?

A     Well, the Jolene Dodson information, the Sheriff Philpot information, the...I thought I saw something in here about Toby.  Toby Barrett, some of the information on that. You know, I can't tell you whether the information that I received came from this document or just from some other

information we got.

Q    I understand.  Now, earlier we talked about certain mental health information.  I ask that you look at Tab Number 12, please.

A    Yes.

Q    An affidavit from a Dr. Bianco.  We talked earlier about Dr. Bianco.

A    Yes.

Q    Do you recall seeing this particular document, sir?

A    I can't recall this document.

Q    Okay.

A    If it's in that box of stuff, then we had it and we saw it.  Most of that -- the boxes were given over to the Public Defender two or three years ago.  I don't remember when it was that they picked them up.  And prior to that, a number of boxes went to the appellate defender.

Q    That would be Mr. Hendrickson?

A    Hendrickson.  So, you know, we are looking at -- if it was there and it was in the boxes, then we saw it.  I can't say, yeah, I remember seeing this one for sure.  I don't.

Q    Okay.  Well, let me ask you -- and I am sure this may lead to the same answers, but for the record, can you look at Tab Number 16 for me, please.

A    Yes.

Q    And it appears to be an evaluation from a Dr. Bill

704

Sharp, PhD.  Do you see that?

A     Yes.

Q     Mr. Hilfiger, do you recall if you ever reviewed this particular document as a part of your representation of Kenneth Barrett?

A     I cannot specifically recall reviewing it.  If it was in the boxes, then we looked at it, yes.

Q     Do you have any independent recollection of Mr. Echols specifically talking with you about any evaluation by a Dr. Bill Sharp?

A     No, I cannot recall that.

Q     Okay.  I would like to direct your attention specifically to this document to Page Number 7, if you will, in this evaluation.  The bottom of the page under Roman Numeral VI says diagnostic impressions.  Do you see that?

A     Yes.

Q     And based upon your experience in dealing with clients who have had evaluations, are you -- have you seen evaluations in the past?

A     Yes.

Q     And are you familiar with evaluations that have axis diagnoses, Axis I, II, III?

A     I am familiar with those terms, yes.

Q     Well, I want to direct your attention to Axis III, which is labeled -- which is right at the very bottom of

Page Number 7.

A     Yes.

Q     Take a moment and look at that, if you will.

A     Okay, I see it.

Q     All right.  Organic impairment relative to tremor and long-term memory difficulty.  Do you see that?

A     Yes.

Q     Now, I understand you testified a moment ago that you have no independent recollection of seeing this particular document; is that correct?

A     That's right.

Q     Let me ask you this.  If you are representing Mr. Barrett and you review this particular document and you see where it says "rule out organic impairment relative to tremor and long-term memory difficulty..." in your dealing with Mr. Barrett did you have any concerns regarding Mr. Barrett's ability to recall events long-term?

A     No.

Q     Was he able to relate to you events which took place on the date of the crime in September of 1999?

A     Well, I mean, we discussed them, yes.

Q     Okay.  Did you have any discussion with him regarding inconsistencies between testimony at the first trial and the second trial and even the third trial?

A     You mean testimonies of the different officers?

706

Q     That's correct.

A     Yes.

Q     And did you determine whether or not Mr. Barrett was able to give you accurate information regarding those prior testimonies?

A     For the most extent, yes.

Q     Would long-term memory issues be consistent or inconsistent with your impressions of Mr. Barrett?

A     Whether he had a long-term memory loss or...I didn't think so.

Q     Okay.  And seeing this report, would that have given you rise to request the court to -- or to hire an expert to determine whether or not Mr. Barrett had organic impairment?

MS. FISHER:  Objection, Your Honor, calls for speculation and ad hoc rationalization of the actions made by counsel.

THE COURT:  Repeat the question.

MR. WILSON:  If looking at this particular document, based upon what he knew about Mr. Barrett, would this document have led him to request an expert to evaluate Mr. Barrett on the issue of long-term memory difficulty?

THE COURT:  Well, we know it didn't; right?

MR. WILSON:  Well, Judge, the question that -- the witness testified that he didn't have an independent recollection of seeing this particular document.  My question

707

is if, in fact, he had seen this document would that have led him to make that request?

THE COURT:  All right.  I'll allow him to answer the question.

BY THE WITNESS:

A     Well, based on just the diagnostic impressions or based on the whole document?

BY MR. WILSON:

Q     Based upon the whole document.

A     Okay.  Based on the whole document, I wouldn't see any reason to.

Q     Turn to Tab Number 37.  Earlier you and I had a discussion about a person by the name of Kathy LaFortune.  Do you recall that?

A     Yes.

Q     And I believe you testified earlier that during the course of your working with Mr. Smith that you recall some discussion you had regarding Kathy LaFortune.  Is that what your testimony was?

A     Yes.

Q     Do you recognize or do you recall seeing this particular psychological evaluation?

A     I do not recall seeing it from an independent recollection, but if it is in the boxes, then it was there and we saw it.

Q     Well, let me ask you this:  Having seen this evaluation at this point, does that in any way refresh your memory as to the content of your discussion you had with Bret Smith, if you know?  That's all I'm asking.

A     Having seen the document?  No.  Just the name Kathy LaFortune recalls, you know, a discussion with Bret Smith that...

Q     But what the content of that discussion was, you don't know?

A     No.

Q     Okay, fair enough.

A     But to say that it -- it didn't lead to any openings for further development.

Q     I don't follow your answer.

A     Okay.  There wasn't anything that we discussed on Kathy LaFortune that -- you know, what she found that would lead us to go do anything additional.

Q     So any discussions you had with him didn't motivate you to do anything further.  Is that your testimony?

A     Right, right.

Q     Look at Tab Number 42, please.

A     Okay.

Q     Again, this appears to be a memo to Steve Leavy from a person by the name of Peter Rausch.  Do you see that?

A     Yes.

709

Q      Do you -- we know who Steve Leavy is; correct?

A      Yes.

Q      Do you know who Peter Rausch is?

A      You know, the name is familiar, but right off the top of my head, no, I can't recall.

Q      If you will just take a look at that document and see if looking at it refreshes your memory at all.

                              (PAUSE)

BY THE WITNESS:

A      You know, I -- other than what I've told you before, I don't recall seeing the document.  Steve Leavy and Peter Rausch name are familiar.  I don't recall that I had any direct contact with Peter Rausch.

Q      Thank you.

A      Yes.

Q      All right.  I am going to try to go chronologically at this point, if I can.

A      Okay.

Q      You are -- and the point in time where I am going to start is you and Roger -- you and Bret are now working together.

A      Yes.

Q      And you are beginning to put together the case.  As a part of your duties, you are required to maintain records of your time that you spend in the litigation; is that correct?

A       If I want to get paid.

Q       Fair enough.  And when you keep those records, then you submit those monthly or they are kind of kept monthly; is that correct?

A       I think we did submit them monthly, yes.

Q       All right.

        MR. WILSON:  I would ask the clerk to provide the witness -- this will be Petitioner's Number 72.

BY THE WITNESS:

A       Yes.

Q       All right.  And it might be easier --

        MR. WILSON:  Your Honor, I didn't realize that the individual pages -- well, maybe they are numbered.  Let's see.

        THE COURT:  Mine aren't.

        MR. WILSON:  I don't think they are.  So I may just have to project them for the witness, Judge.

BY MR. WILSON:

Q       Mr. Hilfiger, instead of just having you try to figure out where in that book to look and coming to you and showing you page after page, I am just going to use the projector.  Okay?

A       Okay.

Q       And I will zoom in a little bit in a second to maybe make this easier, but looking at the top of this document,

711

do you recognize this as being a document which you prepared from Cook & Hilfiger?

A    Yes.

Q    And you would agree with me that it is a reflection of your time in May of 2005; is that correct?

A    Yes.

Q    Now, for instance, just for explanation purposes so I can make sure I understand what this reveals, the first entry -- and I am going to zoom in a little bit.  Can you see that better, Mr. Hilfiger?

A    Yes.

Q    The first line being Wednesday, May 4th of '05.

A    Yes.

Q    For instance, what is that telling us?

A    At about 7:30 in the evening for about two hours, I did a review of the first trial transcript covering Franchini, Morgan, Shelly, Howard, Hoyt and Porter.

Q    All right.

A    Oh, I am sorry.  First trial transcript, Franchini, Morgan Chelly (sic), Howard, Hoyt and Porter.

Q    It is my understanding that those would be witnesses who testified during the state trials; is that correct?

A    In the first trial.

Q    Okay.  And you would be reviewing the trial transcript trying to learn what they testified to during the first

712

trial; is that correct?

A    Right.

Q    All right.  Now, I want to show you another page from the same month.  And specifically I want to direct your attention down here to 5-24-05.  Do you see that?

A    Yes.

Q    It appears that on May 24th, you began looking at some records; is that right?

A    Yes.

Q    And when it says OIDS records, are those the records that you received from Indigent Defense?

A    I would say from the way -- it is OIDS records from John Echols.

Q    Okay.  So those would be files that you picked up when you went to Mr. Echols' home?

A    Yes.

Q    So you've got the same entry on the 24th, the 25th, the 27th.  Would you agree with that?

A    Well, I don't see the 27th.  You will have to move it up.

Q    Oh, I am sorry.  I can see it, but you can't.  Sorry.

A    Yes, that's it.

Q    All right.  And then again, the last one I will show you very quickly is May 30th, same type of investigation; correct?

713

A    Right.

Q    All right.  I want to move ahead in the records to the month of June.  Once again, this appears to be one of your billing records; correct?

A    Yes.

Q    And I want to direct your attention to the last entry, dated entry, of June -- excuse me -- the first entry of June 28th of 2005.  Do you see that?

A    Yes.

Q    And it references a PH/Jolene.  PH refers to...

A    Phone call.

Q    So a phone call to Jolene?

A    Yes.

Q    And who would Jolene be?

A    The mother.

Q    Okay.  That would be Mr. Barrett's mother; correct?

A    Yes.

Q    And basically you are telling her that we've had a change of date and we need to get some clothes for the trial; is that right?

A    Yes.

Q    The next entry is June 29th; correct?

A    Yes.

Q    And there are two different entries, one at 2:00 and one at 4:00.

714

A     Yes.

Q     Look at the 4:00.  Can you tell us what that's about?

A     With Bret Smith on mitigation expert and work assignments for next week.

Q     All right.  With Bret Smith on mit expert.  That's mitigation?

A     Yes.

Q     Do you have any independent recollection of that particular meeting when you discussed mitigation?

A     Well, a mitigation expert.  No, I don't.

Q     Okay.  Do you have any recollection of when you talked about a mitigation expert what that discussion was about?

A     No, I can't tell you whether it was about a detail of what a particular mitigation expert would -- you know, that we would want to try to find or whether it was trying to find a particular mitigation expert.  I don't know.

Q     Okay, very well.  Fair enough.  I want to move now to July and I want to refer you to an entry dated July the 18th.  Do you see that?

A     Yes.

Q     And there are actually a number of different entries on that date, but specifically I want to direct your attention to -- I believe it is the 3:00 entry.

A     Okay.

Q     Can you take a look at that and tell me what that's

715

about?

A     Bret Smith and Doris, we talked about the status of the jury panel, the mitigation expert and the need for additional time and we raised issues -- we talked about issues raised by Kenneth and Doris on investigation needs and southern panel.

Q     Do you have an independent recollection of that particular conversation?

A     No.

Q     And when you and Doris -- who is Doris, by the way?

A     Doris is, I believe, his step-mother.

Q     Mr. Barrett's step-mother?

A     Yes.

Q     And was Mrs. Barrett, Doris Barrett, was she actively involved in assisting Mr. Barrett?

A     Yes.

Q     Did you have multiple conversations with her during your representation of Kenneth Barrett?

A     Yes.  I probably had more conversations with her than I did with any other of the Barrett family.

Q     And just looking at this particular entry...

A     Yes.

Q     It appears to me, and you correct me if I am wrong, that Bret Smith and Doris were involved in the same discussion regarding the mitigation expert; is that correct?

A      Yes, that's the way it appears to me, yes.

Q      Mr. Hilfiger, I want to direct your attention now to August.  And by the time we are getting to August, we are getting closer to trial; is that correct?

A      Yes, yes.

Q      And trial actually began, I believe, in September; is that right?  Do you --

A      I would have thought -- I thought we did something in August, but it doesn't appear that way.

Q      Looking specifically at the first entry, Friday, August the 12th.

A      Yes.

Q      It refers to a call to Doris and Jolene.  Would that be Doris Barrett and Jolene Dotson?

A      Yes.

Q      And then the entry on the same day at 4:00 p.m.  Can you see that?

A      Yes.

Q      All right.  It appears to be another phone call, once again with Doris and Jolene; is that right?

A      Yes.

Q      Now, I want to move -- stay in the month of August, but move a couple of days forward to August the 19th.

A      Okay.

Q      Do you see that entry?

717

A     Yes.

Q     It appears at 11:00 a.m. an appointment and it says meeting with Jeannie Russell and B.S. in Tulsa.

A     Yes.

Q     All right.  Let's talk about that meeting.  Looking at some of the previous time records we've looked at there had been some discussions about mitigation; correct?

A     Yes.

Q     And were you and Mr. Smith talking about mitigation as you are preparing for trial?

A     Yes.

Q     And at that point had you actually secured a mitigation specialist to do an additional investigation?

A     At the August 19th point?

Q     Prior to August 19th.

A     Yes.  I mean, I felt -- you see, Jeannie Russell had already done some stuff and I think we had already made contact with her on it.

Q     Okay.  Well, had you already retained -- is it your understanding that you had retained her already -- prior to that time?

A     That's what I thought, yes.

Q     Okay.

A     You see, I would think Bret was the one that was really, you know, talking to her at that point prior to this

718

August 19th date.

Q    Well, if the records of -- and we can look at these a little bit later.  If the records of Ms. Russell show the initial contact between you and Mr. Smith being August the 19th of 2005, is there any reason to doubt that?

A    No.  I really thought that we had already done -- you know, that there had already been some contact ahead of that time.

Q    As far as --

A    But I had not.

Q    Okay.  When you say contact, you mean just talking about making initial contact or actually retaining that person and having that person do services for you?

A    Having that person do services.

Q    Okay.  Well, if that is inconsistent with her billing records...

A    Then I am wrong.

Q    Okay.  Do you believe that her billing records would be more accurate about what she actually did and the times at which she did those things?

A    Yes.

Q    All right.

A    Except this statement down here where it says she has already done presentation.

Q    Okay.

719

A     Which indicates to me she has already done a presentation on August 19th.  Now, whether she did it under our contract or under previous trial stuff, I don't know, but there was already something done.

Q     Well, that's what we are going to talk about.  Okay?

A     Okay.

Q     I want to direct your attention to Tab Number 34 of Government's -- I am sorry -- Government's Exhibit Number 34.  Different book, sorry.

A     Yes.

Q     All right.  Have you had a chance to look at that, sir?

A      Not all of it.

Q     All right.  Well, take a look at it, please, if you don't mind.

A     Okay.

                              (PAUSE)

BY THE WITNESS:

A     Okay.

BY MR. WILSON:

Q     Do you recall this particular document, sir?

A     I don't independent recall this document, but if it was in the box, you know, the box of information, then we probably had it.

Q     Okay.  Well, let's talk about it for a second.  You would agree with me that it's dated December the 16th of

720

2003; is that right?

A     Yes, yes.

Q     And on that date, December 16th, 2003, were you representing Mr. Barrett?

A     No.

Q     That would be during the state prosecution; is that correct?

A     Yes.

Q     The name Jeannie Russell...

A     Yes.

Q     Is that the same name of Jeannie Russell that showed up on Mr. Echols's request for the budgeting of an expert?

A     I would assume, yes.

Q     Looking at those billing records that we looked at earlier, there was a meeting with Ms. Russell on August the 19th; correct?

A     Yes.

Q     Do you remember that meeting?

A     I remember the meeting, yes.

Q     Okay.  Where did it take place?

A     In Tulsa in her office.

Q     And who was present for that meeting?

A     She was, Bret Smith, and myself.

Q     And do you know how that particular meeting got arranged or scheduled?

721

A     Well, Bret was the one that arranged it.

Q     Okay.  And was that the first time that you had actually -- you, yourself, had actually spoken to Jeannie Russell, Dr. Jeannie Russell?

A     Yes.

Q     And during that discussion that you had with Dr. Russell, did you have a discussion with her about retaining her for purposes of providing services in Mr. Barrett's defense?

A     I would assume.  I can't really recall independently on that.

Q     Okay.  Do you know whether or not you discussed with her what she had previously done in the state case?

A     Yes.

Q     And do you recall whether or not you would have discussed the contents of this 2003 evaluation?

A     Yes.

Q     Now, this 2003 evaluation contains a number of -- a list of a number of records that Dr. Russell had reviewed in preparation of this assessment; is that correct?

A     Yes.

Q     And there appears to be records from Eastern State Hospital of an admission of October of 1986; is that correct?

A     Yes.

Q     On page 2 there appears to be records from Bill Willis

Community Mental Health Center; is that right?

A     Yes.

Q     And Wagoner Community Hospital?

A     Yes.

Q     St. Francis records; correct?

A     Yes.

Q     And specifically those St. Francis records deal with a gunshot wound; is that correct?

A     Yes, at the time of his arrest.

Q     That would be the September of 1999 arrest involving this particular crime; is that correct?

A     Yes, yes.

Q     There was also -- the next entry is from Sequoyah Memorial Hospital of another gunshot incident from the year 1986; is that correct?

A     Yes.

Q     And that would be a self-inflicted gunshot wound; correct?

A     Yes.

Q     It also refers to interview reports by Rosanne Schaye. Do you see that?

A     Yes.

Q     And also interview reports by Steve Leavy, an OIDS investigator; is that right?

A     Yes.

723

Q    And a psychological report or evaluation by a Dr. Bill Sharp; correct?

A    Yes.

Q    Now, Mr. Hilfiger, do you recall during the representation of Mr. Barrett the government giving you notice of an intent to call a person by the name of -- the last name of Horn?

A    The name sounds familiar, yes, and then I saw something that I've seen just recently where it mentioned something about Mr. Horn.

Q    And do you recall the government wishing to elicit testimony in the trial about inconsistencies of memory regarding the testimony of the troopers in the state cases?

A    Yes, yes.

Q    And did you at any time have a discussion with Dr. Russell about seeking her assistance in that area as well?

A    I can't really recall, but now that you mention it, it seems like there was -- you know, that we did talk about it, but I can't -- I mean, if you are asking me to say positively can I remember that, no, I can't.

Q    Okay.  Did you have a discussion with Dr. Russell about using her services in the second stage?

A    Yes.

Q    Can you tell us what the nature of that discussion was and what she was able to provide to you and what decision

724

was made in reference to what she could provide?

A    Well, my recollection is that because she had already done some evaluation, some assessment and that she could pick up where that assessment left off basically and do an assessment for risk assessment --

Q    Are we talking about -- let me interrupt you for just a second.  I am sorry.  When we talk about risk assessment, what impact or what is the relevance of risk assessment in reference to mitigation?

A    Well, you know, in the future how bad is this person going to be, what kind of risk do you run in the future with this person.

Q    Was there an aggravator which the government was trying to use of future dangerousness?

A    Well, I think there was.  I can't -- you know, if it's there, it's there.  I can't remember whether that was an aggravator or not at this point.

Q    Okay, all right.  So you believe you had some discussion regarding her being able to provide you some services in reference to this risk assessment; is that correct?

A    Right, right.

Q    Did you reach an agreement that she, in fact, was going to testify consistent with the findings of this report or an amended report?

A    Well, it would be an updated report, yes.

725

Q      Okay.  And was she actually going to be called as a witness to testify for you?

A      She advised that it would not be beneficial.

Q      And when you say she advised it would not be beneficial, did that take place at this August meeting, if you know?

A      I can't -- I mean, I think there were indications made at this August meeting that it may not be beneficial, but I am not positive that the actual determination wasn't made until a later date.

Q      All right.  Well, let me ask you about the reasoning for that.  What was the reasoning that Dr. Russell gave that using the information in her evaluation might be detrimental?

A      Well, because she felt -- my recollection is that she felt that the government would also be able to have a counter to her assessment that would be more detrimental to him than hers.

Q      Do you know -- do you remember any specifics as to what areas the government might be able to capitalize on, if you will?

A      No, I do not.

Q      Did you follow her advice?

A      Yes.

Q      Did you do that in consultation with anyone else?

A      Bret Smith.

726

Q      Did you do that in consultation with Dr. Russell?

A      Yes.  I mean, she was the one that brought it up and then Bret Smith and I discussed it.

Q      Well, I'll direct your attention now to Tab Number 35, please, Government's Exhibit Number 35.

A      Yes.

Q      Would you agree with me the first page appears to be a CV of Dr. Russell?

A      Yes.

Q      Flip on over to the beginning of Page Number 7.  You will see a Number 7 in a circle at the bottom right.

A      Okay.

Q      I will ask you if you will just take a moment and look at the next -- well, to the end of this document.

                              (PAUSE)

A      Yes.

BY MR. WILSON:

Q      Now, do you have an independent recollection of this particular document?

A      Not really, no.

Q      Okay.  Would you agree with me that it's another risk assessment?

A      Yes.  Well, it's -- it is an updated risk assessment.

Q      Okay.  Different date?

A      Different date.

Q    Okay.  And that would be September the 15th of 2005; is that correct?

A    Yes.

Q    And does it list the defense attorneys at this time?

A    Bret Smith and myself.

Q    And did you receive this risk assessment from Dr. Russell?

A    At some point I would assume, yes, I did.

Q    And to your knowledge, was that risk assessment -- well, let me back up.  Mr. Hilfiger, are you familiar with Federal Rule 12.2 of the Federal Rules of Criminal Procedure?

A    Tell me what it is.

Q    Okay.  It deals with if a defendant intends to present evidence regarding mental health --

A    That you have to --

Q    -- that notice has to be provided.

A    Sure.

Q    And give the government an opportunity to have the person evaluated.

A    Yes.

Q    Does that ring a bell?

A    Yes, yes.

Q    Do you recall in the representation of Mr. Barrett if there came an issue regarding notice under 12.2?

A    Well, the question was whether we wanted to have the

728

government assess him.

Q    What do you mean by that?

A    Well, I mean, whether it would be beneficial for his case to have the government assess him.  We just didn't feel like it would be a good idea.

Q    Okay.  And if you were to present mental health evidence, would that have allowed the government an opportunity to have him independently evaluated and use independent evidence in the second stage?

A    Yes.

Q    Did that enter into your discussion with Dr. Russell as well?

A    Yes.

Q    Mr. Hilfiger, I would direct your attention -- I am going to show you another one of your time sheets.  And this would be August 29th.  Do you see that on the screen, sir?

A    Yes.

Q    Top entry shows 7:30 in the morning on August the 29th, discussed with KB jury instructions, defendants testifying and DP issues.

A    Yes.

Q    Do you have any specific recollection of that event?

A    No.

Q    All right.  And what -- having looked at that, what does that mean to you?

729

A     You know, we are getting ready to start the trial.  I usually like -- in all of the trials that I do, I usually will talk to the person I am representing about their ability to testify if they want to testify or they don't have to testify.  And then try to raise -- let them know of any issues that I see coming up for the trial and that's what the death penalty issues are.

Q     And did you have a discussion with Mr. Barrett about testifying either on the first or the second stage?

A     Yes, at both times.

Q     Okay.

A     I mean, at both stages.

Q     And I am not going to talk about the first stage, but later we are going to talk about the second stage, about him testifying there.  But before we do that --

CLERK:  Mr. Wilson, for the record, can I get that exhibit number, please?

MR. WILSON:  I believe these are Petitioner's Exhibit 72.  Thank you.  Sorry about that, thank you.

BY MR. WILSON:

Q     Showing you another document from Petitioner's 72, this would be a time record from September the 7th.  Do you see that?

A     Yes.

Q     And specifically looking at the entry dealing with

730

travel to Sallisaw, do you see that?

A      Yes.

Q      What does that indicate to us?

A      That I went to Sallisaw.

Q      And what did you do there?

A      I talked to Jolene, Ms. Crawford, Sanders, and Toby Barrett.  And then I looked at the house and -- Kenneth Barrett's house.

Q      All right.  And is this getting ready for trial, I take it?

A      Yes.

Q      When you talk to these people, are you talking to them about potential testimony or do you know?

A      A little bit of -- to let them know what is coming up and then potential testimony.  Most of them, I think, we already had some idea of what their testimony was going to be.

Q      Another document from Petitioner's Number 72.  I want to direct your attention to the entry of October the 1st.

A      Yes.

Q      Can you tell me what that means, if you know?

A      I don't -- apparently I did talk to some of Kenneth Barrett's relatives, but I don't -- but I didn't list who they were.

Q      And I take it you don't have an independent

731

recollection of what the topic was of that discussion?

A      No, I don't.

Q      Now, I want to move ahead in that same month to October 12th.  Do you see this entry right there?

A      Yes.

Q      It shows meet with Jeannie Russell and Norma Gay. Waited at jail, no arrival.  Do you recall that?

A      No, I don't recall it, but apparently I waited at the jail and they did not show up.

Q      Okay.  Do you know whether or not Dr. Russell had an opportunity to go back and to visit with Mr. Barrett after your August 19th meeting with her?

A      Do I know?

Q      Yes.

A      Not unless she said something about in her report, in her October...

Q      Without looking at a report, do you have any independent recollection of that?

A      No.

Q      And if I were to show you her time records in a little bit, would those time records accurately reflect the services that she performed?

A      I would assume, yes.

Q      Okay.  Same page from Petitioner's Number 72, the next entry, October the 13th.

A      Yes.

Q      The second line, 4:00 p.m.  Discussed case and mental health interviews with K.B.

A      Yes.

Q      K.B. obviously being Kenneth Barrett; correct?

A      Yes.

Q      And do you know or do you remember when it talks about discussing the case and mental health interviews with Mr. Barrett what that refers to?

A      I have no independent recollection of what it is.  I would assume that it is --

MS. FISHER:  We will object to his assumption as to what it is or what happened because he said he does not have an independent recollection.  He would not be testifying from his memory.

THE COURT:  Sustained.

BY MR. WILSON:

Q      Would this time record -- is that an accurate repre-sentation of an event which took place there in October?

A      Yes.

Q      And your description of having a meeting with Mr. Barrett about mental health issues, would that be accurate based upon your looking at this document?

A      Except it says mental health interviews.  That is sort of what throws me off.

733

Q     I am sorry, interviews.

A     Yes.

Q     Okay.  Now, you will agree with me that by October, we are in trial now?

A     Yes.

Q     We started jury qualification in September and we move on into trial and we are in trial in September and October; correct?

A     Yes.

Q     Another time sheet from Petitioner's Number 72, just to try to get a time frame in mind.  Look at the last entry on this page.

A     11-4.

Q     11-4 of 2005?

A     Yes.

Q     And that would show jury deliberations began at 9:00 a.m.; is that correct?

A     Yes.

Q     And do you know if that's -- that would be jury deliberation from the first stage; is that correct?

A     Yes.

Q     And the jury deliberated and as we know, there was a guilty verdict -- guilty verdicts; is that correct?

A     Yes.

Q     And, of course, that would necessitate a second stage;

734

right?

A     Yes.

Q     Another document from Petitioner's Number 72.  The first entry on the page, Tuesday, November the 8th, it shows a status conference with the judge to talk about the penalty phase; correct?

A     Yes.

Q     Down lower on this same page an entry of November the 12th.  Do you see that?

A     Yes.

Q     Sorry, skip back up to that to November the 10th. Second entry deals with witness interviews.  Do you see that?

A     Yes.

Q     And those names there, do you recognize any of those names?

A     Not right off.

Q     And I am referring to right here where it says witness interviews in McKee.  Is --

A     I am sorry.  I thought you were looking at 9:00.

Q     Oh, I apologize.  We are looking at the 6:00 p.m. --

A     Right, okay.

Q     When it says "witness interviews in McKee," what is McKee?

A     (PAUSE)  You know, I don't -- I really don't know right off.  I am assuming that's a place, but I -- it doesn't ring

735

a bell with me.

Q     Okay.  G. Dotson, does that ring a bell?

A     Right.

Q     Who would that be?

A     That would be his mother.

Q     R. and P. Crawford?

A     That would be the aunt -- the aunt and uncle, I guess.

Q     All right.  J. Sanders?

A     Off the top of my head, I can't think of a J. Sanders.

Q     Okay.  C. Foster, does that ring a bell?

A     No.

Q     What about A. Stites?

A     That may have had something to do with the jail.

Q     Okay.  Which one, the Foster?

A     The Stites.

Q     Do you remember -- do you know who Abby Stites was?

A     That was -- okay, now that you say it was Abby Stites...the name is familiar.  I can't -- it is a relation to Kenneth's, I thought.

Q     Well, the next entry, November the 12th, witness phone interviews, Harris, S. Barrett, and C. and C. Edgemans.  Do those names ring a bell?

A     S. Barrett I think is his brother, I think.

Q     Okay.

A     C. and C. Edgemans, I think, may be neighbors.  I am

736

not sure on C. and C. Edgemans.

Q     Do you know why you would be talking to those individuals?

A     Yes.  What we are trying to do -- what Bret and I had discussed trying to do is do a risk assessment using live witnesses as opposed to opinion.

Q     And for second stage?

A     Yes.

Q     For mitigation?

A     Yes.

Q     Let's talk about that, let's talk about that strategy. Going into the trial -- and we talked earlier about not wanting to use the information from Dr. Russell because of the potential detrimental information; correct?

A     Right.

Q     So what was your plan?  What were you --

A     Well, one of the things that I recall that we discussed -- and I think we may have even discussed it with Dr. Russell also -- because he already had been in jail for a length of time and in prison for a length of time, in order to -- why do opinion on risk assessment when we can do actual evaluation of risk assessment by his jail time and prison time.  So we have, you know, those people testify.

Q     To accomplish what goal?  What is that -- what does calling somebody from the jail -- what is that going to

737

accomplish for you?

A     Well, how good a prisoner he was, how good of an inmate he was, you know, in jail.

Q     Okay.

A     And in prison.

Q     All right.  At the time that you were visiting with the family members during the representation and even before the second stage as well, did any of the family members indicate to you specifically that Mr. Barrett suffered from any serious mental illness?

A     No.

Q     Was there a discussion with -- to your knowledge, did any family members have that discussion with Mr. Smith that he shared with you?

A     Not that I know of.

Q     Okay.  Did the family report any pass significant head injuries that Mr. Barrett had sustained?

A     I cannot recall that.

Q     And would that also be true of -- to your knowledge, had they shared that information with Mr. Barrett that he shared with you?  And that was a terrible question.  Sorry.

A     But I would also say, I can't recall that Mr. Smith ever, you know, said anything about that.

Q     Are you familiar with the principle or the legal concept of lingering doubt, asking for an instruction for

738

1166

lingering doubt?

A    I am not familiar with that.

Q    Okay.  Mr. Hilfiger, you have got a client who has been convicted of a death eligible crime.

A    Yes.

Q    And as a part of your defense of this individual, it is your obligation obviously to provide mitigation; correct?

A    Yes.

Q    You had a budget which allowed for the hiring of or employing of a mitigation specialist; is that right?

A    Yes, yes.

Q    And under this budget in the federal court, there was not one hired; is that correct?

A    Yes.

Q    It begs the question, Mr. Hilfiger, why not?

A    We just didn't feel like that a mitigation opinion expert would do us any good when we could -- when we used the information we had from previous reports and talked to those people and had them testify.

Q    I want to go back to the other issue regarding in the budget there was permission to hire an expert on diagnosing organic brain disorders.  You remember, we talked about that earlier.

A    Yes, yes.

Q    And there was money in the budget for that; right?

739

A     Yes.

Q     But you didn't do that; right?

A     I didn't see any need to.

Q     Why not?

A     In all of the discussions that we had, you know, Bret Smith and I with Mr. Barrett, we didn't -- and even with his family, we didn't see any need to.

Q     We talked about the decision to not call Dr. Russell; is that right?

A     Yes.

Q     I am going to direct your attention to Government's exhibit under Tab Number 33, please.  I would ask you to just take a moment.  I believe this is a four page document.  Take a moment and look at that, if you will, sir.

A     Okay.  (PAUSE)  Yes.

Q     Do you recognize this communication between you and office of the Federal Public Defender in Tulsa?

A     Yes.

Q     And what is the nature of this communication, sir? Why did you create it?

A     Because Jeannie Russell had applied for, you know, payment and we -- but we split it to explain part of it was for mitigation and part of it was for mental health.

Q     And when you say part for mitigation and part for mental health, what was the difference?  What applied to --

740

because you reference Dr. Horn in here.  Is that the same doctor that you and I had discussed earlier?

A      Yes.

Q      Okay.  So you did, in fact, retain her for purposes of dealing with the Dr. Horn testimony; is that right?

A      Yes.

Q      But you also retained her for purposes of potential future dangerousness or risk assessment; is that correct?

A      Right.

Q      Now, Page 3 and Page 4, would you agree with me, appears to be a statement from Dr. Russell?

A      Yes.

Q      Have you had a chance to look at that?

A      Just briefly.

Q      All right.  And it itemizes a number of services that she provided to the defense team in this particular case; is that correct?

A      Yes.

Q      I don't see an entry for August the 19th, the day of your initial meeting with her; is that right?

A      She starts with August 29th.  I don't se -- I don't see a date either.

Q      Do you know if that's accurate or if there was an additional meeting of two hours ten days after the initial meeting?

741

A      I can't answer that.  I don't know.

Q      All right.  Look at the second page of that, please.

A      Yes.

Q      The last entry, October the 11th...

A      Yes.

Q      It appears to be an entry for travel and also meeting with the defendant.

A      Yes.

Q      And would that be Mr. Barrett, to your knowledge?

A      Yes.

Q      And meeting with an attorney.

A      Yes.

Q      Do you know whether or not on the 11th of October you actually had an opportunity to meet with Dr. Russell or if that was Mr. Smith?

A      I don't -- I don't know.  That may have been Bret.  I don't know.

Q      Was Dr. Russell called at all in this particular case? I mean, was she called to have to testify regarding the Dr. Horn business at all?

A      No, no.

Q      And you did not call her in mitigation; correct?

A      No, we did not call her in mitigation.

Q      Okay.  Now, look at Tab Number 32, Government's Exhibit Number 32.

742

A     Okay.

Q     And just so that the record is clear, this is another document that you prepared; correct?

A     Yes.

Q     And it is dated February 17th of '06; is that right?

A     Yes, yes.

Q     And this is actually a letter to the court; correct?

A     Yes.

Q     Can you take a look at that and tell me what the purpose of this particular communication was, sir?

A     I am -- at this point I would say it was because -- to split up what her payments were for.

Q     Okay.  An explanation or justification for payment? Would that be a fair assessment?

A     Well, as to what category.

Q     All right.  Direct your attention to the second page of this communication.

A     Okay.

Q     And have you had a chance to read it specifically.

A     No.

Q     All right.  I would ask you to just take a moment and read that.

                              (PAUSE)

BY THE WITNESS:

A     Yes.

BY MR. WILSON:

Q     All right.  I want to ask you a couple of things about this last paragraph.  This is obviously a continuation from the first page talking about the service that she provided and you say, "The remaining balance of her time was spent in the area of mitigation."  And you say that she was consulted during the state trials as a mitigation expert.  And you are referring to the state trials of Mr. Barrett in Sequoyah County; correct?

A     Yes.

Q     You make the statement, "Judge Payne" -- well, I am sorry.  You say, "Dr. Russell was able to begin discussions with us with a tremendous knowledge of the particulars of this case and Kenneth Barrett."  Do you see that?

A     Yes.

Q     "Which has not been charged as any of her fees."

A     Right.

Q     And when this discussion -- this discussion that you are talking about, is this the discussion you had regarding all of the background of Mr. Barrett?

A     Yes.

Q     Talking about medical situations, mental health situations, all of those things in the risk assessment report?

A     In the original report, which was not done for us.

744

Q      Right.  The 2003 report?

A      Right.

Q      Now, you say she was also familiar with the Department of Corrections and information like that, but then you say Judge Payne put limitations on mitigation testimony so that it would only be about Barrett's future dangerousness as a prisoner.  What do you mean by that?

A      Well, not future dangerousness to society as a whole because it would be just as to him as a prisoner.

Q      No, I am sorry, that was a terrible question.  I am referring to the Judge Payne part of it, that Judge Payne limited your use of mitigation.  Did the judge say you can't present information about Kenneth Barrett's family?

A      No, I didn't say that about his family.  I am just saying -- you would have to look at the record to see what he said for sure, but my recollection, based on this, is we don't need to make a determination as to Kenneth Barrett's future dangerousness to the society as a whole because he is going to be looked up in prison.

Q      Okay.

A      So we only need to limit it to how he would be as a prisoner.

Q      Oh, I see, okay.  I see what you are saying.  All right.  So the judge didn't say you can't talk about Mr. Barrett's social history or his educational history or is

745

mental health history; is that correct?

A      No, he didn't say that.

Q      But you didn't go into that information, did you?

A      No.

Q      And was that based upon your discussions with Dr. Russell?

A      Yes.

Q      Now, it goes on to say that, "Both sides discussed the use of mitigation experts and we, Dr. Russell" -- and that would mean Jeannie Russell; correct?

A      Yes.

Q      --" Bret Smith, Kenneth Barrett and myself, determined that the information assembled by Dr. Russell and the anticipated counter information from the government -- that mitigation expert would be more detrimental than advantageous to Kenneth Barrett."  Do you see that?

A      Yes.

Q      Do you recall that?  Do you recall -- is that -- do you recall that thought process?

A      Yes.

Q      And is that based upon, once again, your discussion with Dr. Russell?

A      Yes.

Q      And this letter indicates that you had a discussion with the defendant, Mr. Barrett, about your concerns; is

746

that correct?

A    As to the future dangerousness, yes, because we felt we could accomplish that through the testimony as to how he was as an inmate and a prisoner for the past six years.

Q    All right.  We are about to begin the second stage mitigation portion.  You've already heard evidence from the government in aggravation; is that right?

A    Yes.

Q    And you've lined up witnesses; is that correct?

A    Yes.

Q     To testify regarding this issue of his dangerousness in the future; correct?

A    Yes.

Q    Mr. Barrett had previously been convicted obviously in the state case.  Was that going to be communicated to the jury in the second stage about that -- about that previous punishment?  In other words, that he had already been punished?

A    Yes.

Q    Why did you want to let the jury know about the fact that he had just been -- that he had already been previously punished for this crime?

A    Well, because I thought it was important in this case to show that he has already been punished for it.

Q    What did you hope to accomplish in mitigation by that

747

particular strategy of saying ladies and gentlemen of the jury, this gentleman is already doing 30 years in the Department of Corrections?

A      Well, just the hope to get some kind of mitigation or sympathy, empathy or something from the jury that he has already been convicted of the same thing -- convicted and serving time of the same thing that they are convicting him of again.

Q      I believe there was discussion during the second stage about Mr. Barrett receiving a different or a higher classification from another inmate who was convicted -- or other inmates convicted of the same crime, that he was actually at OSP in maximum security; is that correct?

A      Yes.

Q      Why did you think it was important to tell the jury that Mr. Barrett was not in a medium security facility, but he was actually at OSP on 23 hours a day lockdown?

A      I don't think the point was that he was -- you know, to show that he was in maximum security as much as it was to show the penalty that he was serving.

Q      In other words, did it have anything to do with the fact that he had previously been punished?

A      Yes.

Q      Okay.  You earlier testified that as a part of the preparation -- I believe you did -- as preparation for the

748

second stage you had interviewed people from the jail or from DOC.

A    Yes.

Q    And when I say DOC, Department of Corrections?

A    Yes.

Q    And what was the purpose of calling someone from the jail?

A    Well, because he had been an inmate at the jail from the time of this incident until after the second trail, so that's a period of about four years, three or four years, and as to the issue of dangerousness, you know, we talked to the jailers about how -- you know, what kind of a problem was he.

Q    And for purpose of mitigation, what did you hope to attain by that particular evidence?

A    That he is not a dangerous person.

Q    That if he were to be given life, that he is not going to hurt anybody within the prison?

A    Right.

Q    Earlier you talked about the fact that -- we looked at the time records of talking to family members, neighbors; is that right?

A    Yes, yes.

Q    S. Barrett, his brother?

A    Yes.

Q    Why were -- why was S. Barrett, Steve Barrett, why was

749

he called, if you recall?

A      Well, he was the brother and he knew Kenneth and he was a very -- my recollection was he -- I think he was in the school system or something and, you know, he was a fine citizen and we were just trying to show that just being a Barrett is not a bad character.

Q      Okay.  And showing that Mr. Barrett is not a bad character, what did you hope, as far as mitigation, to accomplish?

A      To show that he deserved life.

Q      Now, you mentioned the neighbors, the Edgemans.  Do you remember the purpose of their testimony?

A      For some reason, I think Bret Smith was more familiar with them than I.  I really can't remember.  It seems like he was -- the Edgemans, it may have been that there was -- that he had a -- that he, Kenneth Barrett, had a mechanical ability and had taken care of some of his automobiles.  So he had things he could do, Kenneth Barrett had a life that he could do.

Q      All right.  Based upon your discussions with persons during this investigation, did you determine that about Mr. Barrett, that he had very good mechanical skills?  I mean, he could help -- he could work on cars?

A      Yes.

Q      And by calling these neighbors that he had done work

750

for, what did you hope to accomplish as far as mitigation?

A     To show that he has reason for a life.

Q     Earlier we talked about the fact that you had had a discussion with Mr. Barrett about testifying both at -- regarding the first stage, guilt or innocence, or --

A     Yes.

Q     And I didn't go into that.

A     Yes.

Q     But you also had a discussion with him, I believe, about testifying in the second stage; is that correct?

A     I am positive we did, yes.  I can't independently recall it, but I am almost positive we did, yes.

Q     Do you know why it -- why you would have wanted to call Mr. Barrett as a witness in the second stage?

A     Again, to show that he is a person that deserves a life.

          MR. WILSON:  Can I have just a moment, Your Honor?

          THE COURT:  Yes.

                         (PAUSE)

BY MR. WILSON:

Q     Mr. Hilfiger, again, I know we are talking about some-thing from a number of years ago, but do you know or do you recall whether or not Mr. Barrett was -- or you thought that Mr. Barrett was going to testify in the second stage?  Do you recall that?

751

A    No, I don't recall that.

Q    Do you recall there being a hearing and a record made in front of the Court regarding Mr. Barrett's decision whether to or not to testify in the second stage?

A    I think there was, yes.

Q    Would looking at a transcript of that refresh your memory about that event?

A    Yes.

MR. WILSON:  May I approach, Your Honor?

THE COURT:  Yes.

MR. WILSON:  Your Honor, for the record, I will be providing counsel -- excuse me -- the witness -- it is Volume 25 of the court record beginning on Page 5126.

THE COURT:  What's the date on that transcript?

MR. WILSON:  It is dated November the 15th, 2005.

THE COURT:  Thank you.

BY THE WITNESS:

A    Yes.

BY MR. WILSON:

Q    Does that refresh your memory about the whole issue of Mr. Barrett testifying in the second stage?

A    Well, he didn't testify.

Q    Okay.  About -- do you recall whether or not there was apparently an understanding that he was going to testify at some point?

752

A     Well...and that does indicate that maybe, you know, somewhere down the line we had talked about him testifying at the second stage.

Q     But he chose not to?

A     He chose not to.

Q     And he had absolutely a constitutional right not to; is that correct?

A     Absolutely.

MR. WILSON:  May I approach and get the transcript again, Your Honor?

THE COURT:  Yes.

BY MR. WILSON:

Q     Well, as you are discussing with Mr. Barrett about him testifying, but also about the whole idea of mitigation, what was Mr. Barrett's position on what kind of evidence he wanted you to present?

A     Well, the only thing I can -- and maybe this is putting it my own words and not what he said actually, but he didn't want us to plead for his life.  And that may have been beg for his life, along that line.  He didn't necessarily say he didn't want mitigation, but he didn't want us to beg for his life.

Q     Was there ever a discussion about I would rather have death than life?

A     I wasn't --- no, I don't think he ever said anything

753

like that.

Q    He never said anything to you about that?

A    I can't recall anything like that.

Q    Okay.  Mr. Hilfiger, I am just about finished, but as a part of this particular litigation, the post-conviction litigation, you were -- you prepared a declaration; is that correct?

A    Yes.

Q    And in that declaration there was a discussion about Mr. Barrett's competency to assist you.  Do you recall that?

A    I remember there was, yes.

Q    Okay.  During the trial, first stage and second stage, did Mr. Barrett participate with you in the defense?

A    Yes.

Q    Did he participate with Mr. Smith?

A    Well, I would say -- I mean, the participation, the way it was set up was I sat at the head of the table, Bret sat to my left and Mr. Barrett sat to his left and he had a -- he had a notepad and paper -- I mean, paper and a pencil and was -- and did take notes, I believe.  Now, I don't know how extensive, but he did take notes.  If he had questions, you know, we saw the questions.

Q    So if he had a concern, he would interact with you about any concern he might have?

A    Yes.

754

Q    Did he suggest questions to you, if you recall?

A    I can't say that he really suggested questions.  I mean, this is during the trial that we are talking about, I mean the actual trial itself.  Now, most nights after the trial we talked, you know, outside the jury and everything we talked and at breaks we talked.

Q    And during any of those discussions, either during trial or after trial, again was there anything that would change your opinion as to whether or not he could rationally assist you?

A    No.

Q    Tab Number 38 of Government's exhibits, please.  Mr. Hilfiger, this is a multi-page document.  I am not asking that you read it word-for-word, but if you will just look through it, if you will, and see if you recognize what this is.

                    (PAUSE)

A    This appears to be notes during the trial.

Q    And when you say notes, are those your notes?

A    No.

Q    Are those Bret Smith's notes?

A    No.

Q    Would those be Mr. Barrett's notes?

A    I -- I mean, I -- I can't tell you that I recognize his handwriting, but that's what I would assume from...

755

MS. FISHER:  Objection, that would be an assumption, Your Honor.

THE COURT:  Sustained.

BY MR. WILSON:

Q     Mr. Hilfiger, you looked at those and you said you had a belief.  Okay?

A     Yes.

Q     Looking at the substance of the first page...

A     Yes.

Q     No, strike that.

MR. WILSON:  Your Honor, I would move for admission of Government's Number 38, the handwritten notes, based upon the testimony of Mr. Smith yesterday regarding identifying these as being the notes of Mr. Barrett.

THE COURT:  Any objection?

MS. FISHER:  Can I have one moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MS. FISHER:  Your Honor, we will object.  They have not shown any relevance of this document to issues here. The question of competency was ruled on by the Tenth Circuit Court of Appeals.  We are not here on a competency issue. That's his only -- and that appears to be his line of questioning.  We will object on relevance.

THE COURT:  How would it be relevant if what it

756

shows is that he was competent at the trial?

MR. WILSON:  Well, Judge the Petitioner's expert witness, who testified here, testified that Mr. Barrett was incompetent.  He was unable to rationally assist with his witnesses.

THE COURT:  But that testimony wasn't necessarily relevant either.

MR. WILSON:  Well, but it goes to his credibility and for the accuracy of his diagnosis and his evaluation of this particular defendant.

THE COURT:  Well, for that purpose, I will admit it.

MR. WILSON:  Thank you.

MR. WILSON:  Judge, I would also --

MS. FISHER:  Your Honor, we will object.  He never showed the document itself to Dr. Woods.  Dr. Woods' opinion may have changed had he seen the documents, but until Dr. Woods has an opportunity to challenge -- to at least be confronted with the evidence that they are attempting to impeach Dr. Woods' expertise with, we will object.

THE COURT:  Well, I note your objection.

MR. WILSON:  Judge, I would also move for admission of Government's Exhibit Numbers 32 and 33, which were the letters that Mr. Hilfiger previously talked about.

MS. FISHER:  No objection, Your Honor.

757

THE COURT:  Very well.  Government's Exhibit Numbers 32 and 33 are admitted.

MR. WILSON:  And I apologize, Your Honor, but if they have not been admitted, I would also move for the admission of Government's Exhibit Numbers 34 and 35.

MS. FISHER:  No objection, Your Honor.

THE COURT:  Very well.  Those are admitted as well.

MR. WILSON:  Can I have just one moment to consult with counsel?

THE COURT:  Yes.

(PAUSE)

MR. WILSON:  That's all I have.  I would pass the witness, Your Honor.  Thank you, Mr. Hilfiger.

THE COURT:  Very well.  Let's go ahead and take our afternoon break and be back about 3:10.

(SHORT BREAK)

COURT IN SESSION

(3:15 p.m.)

THE COURT:  Ms. Fisher, you may go ahead.

MS. FISHER:  Your Honor, Mr. Barrett would move to admit Government's Exhibit Numbers 19 through 23, 25, 54 through 62.

THE COURT:  Any objection?

MR. WILSON:  No objection, Judge.

THE COURT:  Those are all admitted.

758

MS. FISHER:  Next, Your Honor, Mr. Barrett would move to admit Exhibit -- Petitioner's Exhibit Number 25, which is Myla Cain's declaration -- Myla Young.

MR. WILSON:  Your Honor, that particular declaration, as I recall, was subject to a Motion to Exclude and was previously excluded and the government would maintain its previously position on that exhibit.  That's my under-standing.

MS. FISHER:  Since that time, Your Honor, Dr. Woods has testified and relied upon Dr. Young's declaration.

THE COURT:  Well, of course, it doesn't have to be admitted for him to rely on it.

MS. FISHER:  True, but we are offering it, Your Honor.  She is unavailable, she died.  You know, she is well-regarded.  Her CV is a part of the exhibit.  She is certainly a well-known expert.

THE COURT:  Are we going to hear anything else about it or is this just in support of Dr. Woods?

MS. FISHER:  Your Honor, I do not know because we haven't heard from the government's experts yet.

THE COURT:  All right.  Well, I am going to reserve a ruling on that.  If it comes up again, we can take it up then.  If not, I probably will admit it just for purposes of supporting Dr. Woods.

MS. FISHER:  Thank you, Your Honor.  At this time,

Your Honor, Mr. Barrett has no questions.  We will pass the witness.

THE COURT:  Well, that would mean we are done for this phase of it.  I was looking at my calendar when we were in there during the break and one of the questions that came up was whether we thought we might get the three doctors' testimony done in two days.  What do you all think about that?

MR. WILSON:  Judge, I am not real optimistic of that.

MS. FISHER:  It is unlikely, Your Honor.

THE COURT:  What did you say?

MS. FISHER:  It is unlikely.

THE COURT:  Unlikely.  Well, that's what I was thinking as well.  So I actually do have the 14th, which would be a third day consecutively, if we need it.  Does that work for everybody else?

MR. WILSON:  That's fine, Your Honor.

MS. FISHER:  Yes, sir.

THE COURT:  And if working late in two days will get it done, I will do it, but if not, we will have the other day available to finish it.

MR. WILSON:  Can Mr. Hilfiger step down now?

THE COURT:  Yes, he can.

MR. HILFIGER:  Thank you.

760

THE COURT:  Well, anything further we need to take up before we recess until June the 12th?

(PAUSE)

MR. FISHER:  That's all right, Your Honor.  We have proffers to make, but we will do it electronically.

THE COURT:  Okay.  I am going to go ahead and admit Exhibit Number 25 for the purpose I said, --

MS. FISHER:  Thank you, Your Honor.

THE COURT:  -- since it doesn't look like we will be coming back to it today anyway.

All right.  If nothing further then, we are in recess until June the 12th.

MR. WILSON:  Thank you, Your Honor.

(PAUSE)

THE COURT:  Are you all -- you all are aware that we have got a minute order regarding those files that -- from Jack Gordon?

MR. SCHARDL:  Yes, April 21st?

THE COURT:  Is that -- that's not too soon, is it?

MR. SCHARDL:  Well, we haven't looked at them. So provisionally, I will say we will devote every --

THE COURT:  I bet it is more like this than this. Wouldn't you?

MR. SCHARDL:  I sure hope so.

THE COURT:  Okay, great.  Thank you.

761

(RECEESSED UNTIL JUNE 12, 2017)

"I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter."

                    s/Karla S. McWhorter

                    _____

                    KARLA S. McWHORTER


                    June 3, 2017

                    _____

                    DATE

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,       )
                                        )
               Petitioner,     )
        **v.**                        )
                                          )  Case No.     CIV-09-105-JHP
UNITED STATES OF AMERICA,   )
                                          )  Date:        6/12/2017
              Respondent.   )
                                          )  Time:       9:38  a.m. - 11:05 a.m.
                                          )                11:18 p.m. - 12:28 p.m.
                                          )               1: 33 p.m. -  2:49 p.m.
                                          )               3:06  p.m. -  4:06 p.m.
                                                             4:13  p.m. -  4:48 p.m.

**MINUTE SHEET - EVIDENTIARY HEARING**

Steven P. Shreder, Judge       K. Davis, Law Clerk       B Neil, Court Reporter
                                  T. Stephens, Deputy Clerk    FTR - Courtroom 4

**Petitioner present with Counsel:**  David B. Autry, Tivon Schardl, and Joan M. Fisher
**Counsel for Respondent:** Jeffrey B. Kahan and Christopher J. Wilson

**MINUTES:** Petitioners evidence resumed with testimony of  Jeanne Russell.   Petitioner provides additional exhibits to Government and Court; Petitioner's exhibits #'s 102-103. Petitioner rested with further objection noted.

Government provides additional exhibits to Petitioner and Court; Government's exhibits #'s 63-66. Government's evidence resumed with testimony of Dr. J. Randall Price.

Discussions regarding further expert testimony.

ENTERING ORDER continuing evidentiary hearing until 6/13/2017 at 9:00 a.m. (SPS)

Total Time:  5:28

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA


KENNETH EUGENE BARRETT,       )
                                    )
        Plaintiff,       )
                                    )
-vs-                     )  No. CIV-09-105-JHP
                                  )
UNITED STATES OF AMERICA,    )
                                  )     VOLUME V
        Defendants.      )


TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

JUNE 12, 2017


A P P E A R A N C E S


David B. Autry, Attorney at Law, 1021 N.W. 16th Street, Oklahoma City, Oklahoma, 73106, and
Joan M. Fisher and Tivon Schardl, Federal Public Defenders, 801 I Street, Third Floor, Sacramento, California, 95814, attorneys on behalf of the Plaintiff;

Christopher J. Wilson, Assistant U.S. Attorney, 520 Denison Avenue, Muskogee, Oklahoma, 74401, and
Jeffrey B. Kahan, Attorney, U.S. Department of Justice, 1331 F Street N.W., Room 345, Washington, D.C., 20530, attorneys on behalf of the Defendant.

REPORTED BY:      BRIAN P. NEIL, RMR-CRR
                  United States Court Reporter

I N D E X


WITNESSES


PAGE

JEANNE RUSSELL, PH.D.

  Direct Examination by Mr. Autry                 765
  Cross-Examination by Mr. Kahan                  793
  Redirect Examination by Mr. Autry              808


J. RANDALL PRICE, PH.D.

  Direct Examination by Mr. Wilson               812
  Cross-Examination by Mr. Schardl               896
  Redirect Examination by Mr. Wilson             927
  Recross-Examination by Mr. Schardl             936

Monday, June 12, 2017

* * * * *

THE COURT:  Morning, everybody.  Call Case No. CIV-09-105-JHP, Kenneth Eugene Barrett v. United States of America.  Would the attorneys enter their appearances for the record, please.

MR. WILSON:  Christopher Wilson and Jeffrey Kahan for the United States of America.

MR. AUTRY:  David Autry and Tivon Schardl and Joan Fisher for the defendant, Your Honor, and we apologize for the delay.

THE COURT:  Very well.  Are you ready to proceed?

MR. AUTRY:  Yes, Your Honor.

THE COURT:  Call your witness then.

MR. AUTRY:  Dr. Jeanne Russell.

JEANNE RUSSELL, PH.D.,

after having been first duly sworn, says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MR. AUTRY:

Q.    Could you state your name for the court, please, ma'am?

A.    Yes.  It's Anita Jeanne Russell.

Q.    And where do you live?

A.    Where do I live?

Q.    Yes, ma'am.

A.      In Tulsa, Oklahoma.

Q.      And what do you do for a living?

A.      I am a licensed psychologist in private practice.

Q.      And could you tell the court a little bit about your educational background?

A.      Yes.  I went to undergraduate school at Northeastern State University.  At that time it was a college, not a university.

Q.      Okay.

A.      I moved on to University of Tulsa, where I completed my master's and my doctorate in psychology.

Q.      Okay.  And how long have you been practicing as a psychologist?

A.      I was licensed in 1991 so I've been practicing since then.

Q.      Are you currently in private practice?

A.      Yes.

Q.      And before you were in private practice, what other kind of jobs did you do as a psychologist?

A.      Well, not as a psychologist, but I started with Department of Corrections in probation and parole and did work for the court there conducting presentence investigations and evaluating people charged with crimes and supervising them. Then I went on to become a supervisor of other probation officers and then moved on into administration of a work

release center there as assistant superintendent.

Q.    Okay.  Do you conduct psychological testing as part of your job?

A.    Yes.  I have since going on to work at Eastern State Hospital, which is now the Oklahoma Forensic Center, in 1990.

Q.    Okay.  Do you do forensic work in your profession or in your job?

A.    Yes.

Q.    Have you ever been involved in a -- preceding this case or aside from this case, have you been involved in death-penalty cases where you've examined people?

A.    Yes, I have.

Q.    Approximately how many?

A.    I don't know the number.  It has been numerous death-penalty cases while I was working at the Oklahoma Forensic Center and Eastern State Hospital, and since I went into private practice I have probably completed 20 to 25.

Q.    All right.  Have you been recognized as an expert witness in the field of psychology in the state courts?

A.    Yes, I have.

Q.    Approximately how many times; do you know?

A.    I don't.  In excess of a hundred.

Q.    All right.  Have you ever testified in federal court before?

A.    No.

Q.   Okay.  Do you know what, in connection with a death-penalty case, a mitigation investigator is?

A.   Yes, I do.

Q.   And what does -- based on your experience in death-penalty cases, what does a mitigation investigator do?

A.   Well, as I understand it, the mitigation expert is actually an advocate and works on the defense team and gathers information for them regarding all aspects of the defendant's life such as family, school history, criminal history, interviews people, finds all that he -- he or she can find about them, and then provides that information to the attorneys.

Q.   All right.  And does that include gathering records such as mental health records, school records, employment records and that kind of thing?

A.   Yes.

Q.   Talking to family members about the defendant, things of that nature?

A.   Yes.  My experience is all that they can find in those areas.

Q.   Okay.  In your experience with death-penalty cases, how soon should a mitigation investigator begin work on a case?

A.   Well, in my experience, they usually are assigned right after the attorneys are assigned and begin work at that time.

Q.   Okay.  Are you a mitigation investigator?

A.    No.

Q.    Have you ever in any case worked as a mitigation investigator for a defendant in a capital case?

A.    No.  Not in any type of case.

Q.    Did you serve as a mitigation investigator in Mr. Barrett's state case?

                (Discussion held off the record)

Q.    (BY MR. AUTRY)  Did you serve as a mitigation investigator in Mr. Barrett's state case?

A.    No.

Q.    Did you serve as a mitigation investigator in Mr. Barrett's federal case?

A.    No.

Q.    Okay.  Do you know Kenneth Barrett?

A.    Yes.

Q.    In what capacity do you know him?

A.    I have met him on at least two occasions when I was asked to conduct a risk assessment for the state back in -- I interviewed him -- back in November of 2003 I first interviewed him.

Q.    And was that in connection with his state murder case?

A.    Yes, it was.

Q.    And who hired you to do that?

A.    The defense attorney, John "Echoes."

Q.    John Echols?

A.     Echols.

Q.     Do you know Mr. Echols pretty well?

A.     I know him, yes.

Q.     Do you know about what his experience is or the extent of his experience in capital cases?

MR. KAHAN:   Objection as to hearsay and relevance.

THE COURT:   Overruled.

A.     Yes.   He has extensive experience in capital and all criminal cases that I know of.

Q.     (BY MR. AUTRY)   Okay.   Have you worked on capital cases with him on more than one occasion?

A.     I don't recall.

Q.     But you're familiar with the kind of work he does and his reputation --

A.     Yes.

Q.     -- as a lawyer?

Okay.   And when you were asked to do a risk assessment in the state case, was that the limits of what you were asked to do?

A.     Yes.

Q.     Okay.   What is a risk assessment?

A.     Well, a risk assessment involves determining in what situations or in what context a person will be dangerous, if you know.

Q.     Okay.

A.     It is based -- you look at background records, criminal records are important, you conduct testing -- or some testing if it's available, and you combine that and complete your assessment.

Q.     Okay.  And you did that for Mr. Barrett in the state case?

A.     Yes.

Q.     Okay.  Were you ever asked in the state case to do any kind of neuropsychological testing of Mr. Barrett?

A.     No.

Q.     Are you a neuropsychologist?

A.     No, I'm not.

Q.     Do you know what a neuropsychologist does?

A.     Yes.

Q.     Could you briefly explain to the court what they do?

A.     Well, in addition to being a psychologist and having skills in that area, they also study the brain in terms of conducting testing and then evaluating that testing to determine if there might be brain damage or problems in that area.

Q.     All right.  And do neuropsychologists, to your knowledge, as a psychologist, do they run various tests or perform various tests to see what a person's neuropsychological functioning is?

A.     Yes.  Primarily cognitive testing.

Q.     All right.  And have you ever worked with

neuropsychologists or in association with neuropsychologists in a case, in a criminal case?

A.    Yes.   I'm currently working with one right now.

Q.    All right.   And let's see.   Are they supposed to do complete testing or complete neuropsychological testing when they examine somebody?

A.    Yes.   Basically, that's what they do, they -- they go through a number of tests to determine if they see indicators of brain damage.

Q.    Okay.   And if they don't do adequate testing, is that a problem?

A.    I think it -- it could be.   There's other ways to determine if you have brain damage, such as MRI's or CT scans, but we count on the neuropsychologists initially to do -- to do the testing.

Q.    Okay.   Now, would it be fair to say that since your participation in Mr. Barrett's state case was limited to doing a risk assessment, would it be fair to say that you did not do a comprehensive mental health examination of Mr. Barrett?

A.    That's correct.

Q.    Okay.   Did you write a report in the state case of your risk assessment or what your findings were on your risk assessment?

A.    Yes, I did.

Q.    And who did you give that report to?

A.    To Mr. Echols.

Q.    Did you testify at either of Mr. Barrett's state trials?

A.    No.

Q.    Why is that?

A.    The testing was done -- the evaluation was done for second stage so -- in a murder case, you have first and second stage, and since he was not found guilty of murder in the first stage, then the second stage was not relevant.

Q.    But during the state case, did you consult with Mr. Echols and Mr. Gordon who were Mr. Barrett's lawyers?

A.    Yes, I did.

Q.    Would you have been prepared to testify in the penalty phase of Mr. Barrett's state case had it gone to a penalty phase?

A.    Yes.

Q.    Now, at some point, Dr. Russell, did you come to learn that Mr. Barrett in approximately 2004 was charged in federal court with offenses arising out of the same incident that he was charged with in the state courts?

A.    Yes.

Q.    Okay.  And did you ever have any contact during the federal case with either -- I'm sorry.

A.    I'm sorry.

Q.    Need a drink?

A.    I have a very dry mouth.

Q.    I need one too.

(Discussion held off the record)

Q.    (BY MR. AUTRY)  Did you ever have any contact with either Bret Smith or Roger Hilfiger, Mr. Barrett's lawyers, in this federal case?

A.    Yes, I did.

Q.    And do you recall when that was, that you first heard from either one of them?

A.    I believe it was in August of 2005.

Q.    Mid August, early August, or late August?

A.    I think it was around mid August.

Q.    And who was it that contacted you?

A.    Mr. Smith.

Q.    How did he contact you?

A.    By telephone.

Q.    Okay.  Before approximately mid August of 2005, had you been contacted by either Mr. Smith or Mr. Hilfiger?

A.    Not that I recall.

Q.    Okay.  Did you come to understand how far away the trial was from beginning to start, the federal trial, when Mr. Smith first contacted you in mid August of 2005?

A.    He said they were very limited with the amount of time that they had, so I think it was starting in September.

Q.    Okay.  When Mr. Smith contacted you in August of 2005, what did he ask of you?

A.    Well, he asked me if I could do the risk assessment, since I had already done work in that -- on this case, if I could do additional work.  So I told him I could update the risk assessment if there was anything new.  And then we talked about Mr. Horn's testimony and I said -- that was in first stage -- and I said that I was familiar with evidence of that nature but I would need to do some research and complete questions for Mr. Horn.

Q.    Okay.  Did Mr. Smith ask you to serve as the mitigation investigator for Mr. Barrett in this federal case?

A.    No.

Q.    He didn't ask you to serve as a mitigation investigator?

A.    Not that I recall.

Q.    Okay.

      MR. AUTRY:  Could I approach the witness, Your Honor?

      THE COURT:  Yes.

Q.    (BY MR. AUTRY)  Before I do that, Dr. Russell, back in 2009, did you sign a declaration as to what you'd done in the state case and what your contact with the defense lawyers in the federal case was?

A.    Yes.

      MR. AUTRY:  Could I approach, Your Honor?

      THE COURT:  You may.  Is that the declaration you're bringing her?

MR. AUTRY:  Yes, sir.

THE COURT:  Has that already been admitted --

MR. AUTRY:  It's in the record.  I mean, it was admitted into the record --

THE COURT:  Okay.

MR. AUTRY:  -- with respect to the 2255 filing.  We have separate ones we can introduce as exhibits, if the court wants us to do that.

THE COURT:  Well, let's just see where it goes.

MR. AUTRY:  Okay.

Q.    (BY MR. AUTRY)  Dr. Russell, let me show you this document here.  Do you recognize what that is?

A.    Yes.

Q.    All right.  Now, what is it?

A.    That is a declaration regarding my experience and involvement in Mr. Barrett's case.

Q.    Okay.  If you could go over to page -- I guess that would be page 2 -- could you read silently to yourself this paragraph at the bottom of page 2 of the declaration?

A.    (Witness complies).

Q.    Have you read that, ma'am?

A.    Yes.

Q.    Okay.  Does that refresh your recollection as to whether or not Mr. Smith asked you to be the mitigation investigator in the federal case when he contacted you in mid August of 2005?

A.     It does.

Q.     Okay.

A.     It indicates that he asked me to do that and that I was unable to do that.  I have to admit that at the time I thought he was asking me to do mitigation --

Q.     Okay.

A.     -- in terms of the risk assessment.

Q.     All right.  What did you tell Mr. Smith with respect to whether or not you could serve as a mitigation investigator or do anything beyond updating your risk assessment and helping maybe with the cross-examination of Dr. Horn in the first stage?

A.     What I told him was that I could update the risk assessment, although there probably wouldn't be any changes other than his behavior in prison or in jail, and that I could review Mr. Horn's testimony and conduct research and provide questions for Mr. Horn for the future trial.

Q.     Okay.  And just to make it clear on the record, what was the nature of Mr. Horn -- or Dr. Horn's testimony or what was he doing in the case?

A.     As I recall, he interviewed the highway patrol and then provided information regarding what they had told him.

Q.     Okay.  When Mr. Smith asked you about being a mitigation investigator or performing that task, did you feel there was enough time to do that before the federal trial was going to

start?

A.   Well, once again, I don't think I fully understood what he was asking in terms of an investigation.  I did not feel there was time to do a full psychological and --

Q.   Okay.

A.   -- other types of mental health evaluations in the month that we had, but I did feel there was time that I could update my risk assessment.

Q.   Okay.  Did you interview any witnesses in the federal case?

A.   I talked with a couple of the guards or officers, correctional officers, at -- I believe it was at Lexington.

Q.   Okay.

A.   I have that in my notes.

Q.   All right.

A.   And he was also in another prison and questioned them regarding his behavior during his incarceration.

Q.   Okay.  Did you interview any other witnesses?

A.   Not that I recall.

Q.   Okay.  Now, when you talked on the phone with Mr. Smith in mid August of 2005, did you later meet with him in person?

A.   Yes, I did.

Q.   Okay.  Did he ask you for a copy of the risk assessment that you had done for the state case back in 2003?

A.   I don't recall him asking for one but he may have.

Q.   He may have.  Okay.  Did you get an impression one way or another whether he had seen the risk assessment you had done for the state case in 2003 at the time he contacted you in mid August of 2005?

A.   I got the impression he was certainly aware of it.  I don't know how.

Q.   Okay.

MR. AUTRY:  Could I approach the witness, Your Honor?

THE COURT:  Yes.

Q.   (BY MR. AUTRY)  Doctor, let me show you from that same document you looked at previously, this declaration.  Could you read the first couple of sentences on page 3, the first full paragraph?

A.   Out loud?

Q.   Just to yourself.

A.   Yes.

Q.   Okay.

A.   According to my declaration, which has been several years ago, I did -- he did ask me for a copy and I did inform him I could not do a new risk assessment but could update the old one.

Q.   Okay.

MR. KAHAN:  Your Honor, I'd strike that as hearsay.

THE COURT:  What was the question again?

MR. AUTRY:  As to whether or not Mr. Smith asked her in mid August of 2005 for a copy of the risk assessment she did in 2003 in connection with the state case.

THE COURT:  Overruled.

Q.    (BY MR. AUTRY)  Did he ask you for a copy?

A.    According to my declaration at that time, yes, he did.

Q.    Now, I understand, Doctor, that there's been many years that have passed during the time litigation in this case has been going on.  Would your memory have been better in 2009 when you did this declaration in connection with Mr. Barrett's federal postconviction application than it is now in 2017?

A.    I certainly hope so.

Q.    Was your declaration accurate when you submitted it in 2009?

MR. KAHAN:  Objection.  The witness just stated she couldn't remember.

THE COURT:  That is what she testified to.

MR. AUTRY:  All right.  Thank you, Your Honor.

Q.    (BY MR. AUTRY)  Did Mr. Smith ever write you a letter around August or September of 2005 about the work they wanted you to do in this federal case?

A.    If he did, I do not have a copy of that letter.

Q.    Okay.  After your initial meeting with Mr. Smith or your initial conversations with him, did you have any contact with Mr. Hilfiger?

A.    I think I had contact with both of them very minimally during that time.

Q.    Do you recall what the nature of your contacts were with them, the minimal contacts you had with them?

A.    It was primarily an update on the court dates and when I would be needed.

Q.    Okay.

A.    And then we talked about Mr. Horn quite a bit.

Q.    All right.  In between updating the risk assessment you did for the state case and the work you did in helping them prepare for cross-examining Dr. Horn, how much time was spent on each if you had to put a percentage on it, if you recall?

A.    On both the 2003 and the 2005?

Q.    Well, no.  In 2005, when you were doing the updated risk assessment, you obviously spent time on that; right?

A.    I -- I spent some time just asking -- or checking the -- an update on if he had been in trouble --

Q.    Okay.

A.    -- since this time.  The rest of the risk assessment would not have changed because it was historical and he had been in prison since then.

Q.    Did you spend an equal or greater amount of time when you assisted the lawyers in the federal case on helping them cross-examine Dr. Horn as you did in updating the risk assessment?

A.    I did not spend time on Mr. Horn in the state case.

Q.    In the federal case because he only testified in federal court.

A.    In the federal case, I spent a lot of time because I did need to read the transcripts and I had to research it, and then I wrote questions for the attorneys that I thought were important to be brought out in the trial.

Q.    All right.  Would it be fair to say that the only things you did on the federal case were, one, update the risk assessment; and two, help prepare them to cross-examine Dr. Horn?

A.    Yes.  That's all I recall.

Q.    I might have asked you this before but I've forgotten already:  Did you act as a mitigation investigator in the federal case for Mr. Hilfiger or Mr. Smith?

A.    I've never been a mitigation specialist.

Q.    Okay.  Did Mr. Smith ever discuss with you why you were approved to do some limited work in the federal case by the court, why the court approved you to do that?

A.    Yes.  As I understood it, the court had provided limited funds for the case for experts, and since I already knew or had done testing and interviewed people for my risk assessment, that I would not have to do that again so it would take less time for me to do that.

Q.    Did Mr. Smith ever discuss with you any limitations that

had been placed on the defense with respect to --

MR. KAHAN:  Objection as to hearsay.

THE COURT:  Sustained.

MR. AUTRY:  Okay.  Could I make an offer of proof?

THE COURT:  Yes.

MR. AUTRY:  Your Honor, my question was going to be whether or not Mr. Smith ever told Dr. Russell about limitations that had been placed on the defense with respect to any mitigation investigator or investigation.  If she were allowed to answer, Dr. Russell would testify that Mr. Smith told her that even if there were time to do so, and even if she were qualified to be a mitigation investigator, the court would not approve funding for a comprehensive mental -- or excuse me -- a comprehensive mitigation investigation.

So that's our offer of proof with respect to that question.

THE COURT:  Very well.  I'll accept your offer but the objection's sustained.

MR. AUTRY:  Thank you, Your Honor.

Q.    (BY MR. AUTRY)  Now, Dr. Russell, based on the work that you did in Mr. Barrett's state case, did you have materials and investigative reports and things of that nature that you could review on Mr. Barrett's background and upbringing?

A.    Yes, I did.

Q.    Okay.  And what did those documents and interviews show

with respect to Mr. Barrett's upbringing, how he was raised?

A.    Well, based on my interview with him and the documents that I reviewed or just the documents reviewed?

Q.    All of it.

A.    Basically, he was raised by his mother after his mother and father divorced, and she both drank and used drugs and had little time to observe what he was doing or pay attention to him while he was growing up.  He never ran away because no one would notice was his statement.  It seemed to appear in other documents or other mental health evaluations that he was basically neglected a lot growing up.

Q.    Okay.  There were drug and alcohol problems in the family?

A.    There were drug and alcohol problems.  And he told me that his mother would get him to do drugs and alcohol with him and then the next day would get mad at him because he had done it.

Q.    Okay.  Was it your understanding that the marriage between Mr. Barrett's parents had been fairly tumultuous based on the records that you reviewed of interviews and things of that nature?

        MR. KAHAN:  Your Honor, I'm going to object because it's not clear to me whether at this point Dr. Russell's testifying as an expert and is therefore appropriately discussing records she's read.  But this is hearsay.

MR. AUTRY:  Well, she's testifying as an expert. She's a psychologist.  She's examined Mr. Barrett.  She did a risk assessment.  She's reviewed records.  She's reviewed reports of interviews.  All of those matters can be taken into account by an expert witness in offering testimony.

MR. KAHAN:  Well --

THE COURT:  We do need to know that whatever she testifies to she relied on in issuing her risk assessment.

MR. AUTRY:  All right.

Q.    (BY MR. AUTRY)  In issuing your risk assessment -- and we're talking about the state case now, Dr. Russell --

A.    Yes.

Q.    -- did you rely on background information from his records, his mental health records, witness interviews, and witness interviews -- or excuse me -- and your interview of Mr. Barrett?  Did you rely on all of that in coming to a conclusion with respect to your risk assessment?

A.    Yes.  I relied on mental health records -- and I have a list of those in my report -- as well as interviews with jail personnel and with his attorney and his investigator at the time and reports by Roseann Schaye, who conducted a thorough background investigation, as I understood it.  I looked at Saint Francis records.  I looked -- well, I think I already said Eastern State Hospital records and Bill Willis Community Mental Health Center records.

Q.   Did you rely on all that in reaching your conclusions with respect to the risk assessment?

A.   Yes, I did.

MR. AUTRY:   Could I have just one second to consult with co-counsel, Your Honor?

THE COURT:   Yes.

(Discussion held off the record)

Q.   (BY MR. AUTRY)   Was it your understanding, Doctor, from reviewing all that stuff, all the stuff you reviewed, that Mr. Barrett -- his parents had a fairly tumultuous marriage?

A.   Yes.   They divorced because they did not get along and because he -- as I understood what was told to me, that his father was involved with other women.

Q.   Okay.   Do you know whether or not the federal attorneys, Mr. Smith or Mr. Hilfiger, had access to all of those materials that you reviewed, including the reports that were done of the interviews conducted by Roseann Schaye?

A.   I don't know.

Q.   Okay.   Did you summarize some of the information that you gleaned from reviewing Mr. Barrett's medical records and the interview witness reports of Roseann Schaye in your risk assessment report that you gave to the lawyers in the state case?

A.   Yes.

Q.   Did Mr. Hilfiger or Mr. Smith ever ask you about any of

that background information or ask you about the reports that Ms. Schaye had done?

A.   Not that I recall, no.

Q.   Do you know if they ever followed up on any of that information that was included in your risk assessment that talked about Mr. Barrett's mental health history, his upbringing, and his background?

A.   I don't know.

Q.   Okay.  Do you know who Dr. Bill Sharp is?

A.   Yes.

Q.   Who is he?

A.   He's a psychologist in Norman, Oklahoma.

Q.   Okay.  Did he do any work on Mr. Barrett's state case?

A.   He completed -- yes.  He completed a psychological evaluation.

Q.   Okay.  And did he make certain findings about Mr. Barrett?

A.   Yes, he did.

Q.   Do you recall him talking about Mr. Barrett's extreme paranoia?

A.   Yes.

Q.   And that, in Dr. Sharp's opinion, Mr. Barrett had avoidant and paranoid personality disorders?

A.   Yes.  It is in his report.

Q.   Okay.  And did he also indicate that there were signs of

neurological damage potentially to Mr. Barrett and that further testing was recommended?

A.   Yes, he did.

Q.   All right.  And was Dr. Sharp and his report mentioned in your risk assessment report?

A.   It wasn't mentioned.

Q.   It was or was not?

A.   It was not included in -- let me review my --

Q.   I think you're misunderstanding me and I can clear this up pretty quick.

A.   Okay.

Q.   You did not include Dr. Sharp's report in your report. All I'm asking you is whether the fact that Dr. Sharp did an evaluation of Mr. Barrett was mentioned in your risk assessment report?

A.   I would have to look.

Q.   Okay.  Do you have that with you?

A.   Yes.

Q.   Okay.

A.   I am aware that Dr. Sharp did an evaluation.

Q.   Okay.

          MR. AUTRY:  Could I approach the witness, Your Honor?

          THE COURT:  Yes.

Q.   (BY MR. AUTRY)  Dr. Russell, let me show you a copy of

the risk assessment you did in connection with Mr. Barrett's federal case. Could you just look at that document?

A.    Okay. I'm sorry. I thought you were referring to his state case.

Q.    No. Federal. Does that look to be the first page of the risk assessment you did in the federal case?

A.    The federal case?

Q.    It's dated --

A.    September 15th, 2005?

Q.    Yes, ma'am.

A.    Yes. That does appear to be --

Q.    Okay. And do you see this --

A.    -- the report.

Q.    Okay. On page 6, do you see a reference to Dr. Sharp?

A.    Yes. It shows that I reviewed the psychological evaluation completed by Dr. Sharp.

Q.    Okay. Were you ever asked by Mr. Smith or Mr. Hilfiger -- did they ever ask you about Dr. Sharp and what he did at the time of the state case or any report that he issued?

A.    No. Not that I recall.

Q.    Did they ever ask you for a copy of Dr. Sharp's report?

A.    Once again, I don't believe so. I don't recall them asking me for a copy.

Q.    Okay. Did they ever ask you if you had a copy of

Dr. Sharp's report?

A.    Not that I recall.

Q.    Okay.  Did your risk assessment detail the previous mental health records for Mr. Barrett that you had reviewed in compiling your risk assessment?

A.    Are you referring to the federal risk assessment?

Q.    Yes.  That you reviewed his previous mental health records; for example, from Eastern State, Bill Willis, Wagoner Hospital, things of that nature.

A.    Yes.

Q.    Did Mr. Hilfiger or Mr. Smith ever discuss Mr. Barrett's mental health history as reflected by those records with you?

A.    No.  Not that I recall.

Q.    Do you know if they ever followed up or did any kind of investigation based on those previous mental health records?

A.    I'm not aware of any.

Q.    Okay.  Would it be correct to say, Dr. Russell, that because the only thing you did in the federal case was update your risk assessment and assist with the cross-examination of Dr. Horn, would it be fair to say that you were not a mental health expert for Mr. Barrett in the federal case?

A.    Well, I did not testify in that case.

Q.    Okay.  Did you do a comprehensive mental health evaluation of Mr. Barrett in connection with the federal case?

A.    No.  I did a risk assessment updated from my previous

risk assessment.

Q.    Okay.  So you were not a mental health expert in terms of being somebody who came in to do a comprehensive mental health evaluation; would that be correct?

MR. KAHAN:  Objection as to whether this witness would fall within the --

THE COURT:  We've pretty well covered what her role was in all that, Mr. Autry.  Let's move on.

MR. AUTRY:  All right.  I apologize, Your Honor.

Q.    (BY MR. AUTRY)  Did you ever tell, Dr. Russell, either Mr. Hilfiger or Mr. Smith not to pursue a mental health mitigation case for Mr. Barrett?  Did you ever tell them, don't do that?

A.    No.

Q.    Okay.  Did you testify in the federal case?

A.    No.

Q.    Okay.  Did you submit a bill for your work in the federal case?

A.    Yes.

Q.    Okay.  Now, based on your knowledge of capital cases and what mitigation investigators do, would a competent mitigation investigation consist solely of doing a risk assessment or updating a risk assessment?

A.    No.

Q.    Why not?

A.     Well, as I stated before, the investigator is an advocate for the defense and works with the lawyers in preparing their case and gathers information that is needed to provide a thorough mitigation.

Q.     Okay.  To your knowledge, was that kind of investigation -- that kind of mitigation investigation done for Mr. Barrett in his federal case?

A.     From reviewing the records, I am not aware of any mitigation investigation or other witnesses.

Q.     Okay.  Did you ever discuss with either Mr. Smith or Mr. Hilfiger the mitigation case they planned to put on, if it came to that, in Mr. Barrett's federal trial?

A.     No.

Q.     Did they ever ask your advice on how to investigate a mitigation case and how to put it together, anything like that?

A.     No.

            MR. AUTRY:  Can I have just a second, Your Honor?

            THE COURT:  Yes.

            MR. AUTRY:  Thank you.

                  (Discussion held off the record)

Q.     (BY MR. AUTRY)  Did you ever advise either Mr. Hilfiger or Mr. Smith not to investigate Mr. Barrett's mental health further?

A.     No.

Q.     Okay.  Thank you, Doctor.

MR. AUTRY:   That's all I have.

THE COURT:   Cross-examination, Mr. Kahan.

MR. KAHAN:   Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. KAHAN:

Q.   Morning, Dr. Russell.

A.   Good morning.

Q.   Now, Dr. Russell, you've testified here today that you performed a risk assessment on Mr. Barrett at the behest of John Echols; is that correct?

A.   Yes.

Q.   And do you recall that John Echols' co-counsel during the state trial was a man named Jack Gordon?

A.   Yes.

Q.   And do you, in fact, recall meeting with both Jack Gordon and Mr. Echols?

A.   Yes.

Q.   All right.  And it's true, isn't it, that you actually corresponded at some point with Mr. Gordon?  Is that correct?

A.   I don't recall.

MR. KAHAN:   If I could ask the clerk to please provide the witness with Government's Exhibit 63.

Q.   (BY MR. KAHAN)  Have you had a moment to review that, ma'am?

A.   I did.

Q.   Okay.  And --

A.   It apparently was a fax that I sent them where I had prepared questions I felt important that they ask in order to bring out the issues of the risk assessment and my qualifications.

Q.   Okay.  And does that appear to be a true and correct copy of the document you sent to Mr. Gordon?

A.   It looks like it, yes.

Q.   And the answers that appear in that document, those are answers that you had come up with on your own; correct?

A.   Yes.

Q.   Okay.  And as I understand it, those are answers that you were prepared to provide during testimony; is that correct?

A.   Yes.

Q.   Now, I believe in that document you note that for a risk assessment it's not necessary to meet with the defendant; is that correct?

A.   It's not necessary to what?

Q.   Meet with the defendant, to interview the defendant.

A.   You can do a risk assessment without interviewing the defendant.  It is more helpful if you can interview them.

Q.   And in this case, you've testified that you did, in fact, meet with him at least twice; correct?

A.   Yes, I did.

Q.   Okay.  Now, in terms of the information that you reviewed

-- and I believe Mr. Autry went over this -- but isn't it true that you, in fact, reviewed records from Eastern State Hospital -- what was then Eastern State Hospital?

A.   Yes, I did review their records.

Q.   And also from the Bill Willis Community Mental Health Center?

A.   Yes.

Q.   And the Wagoner Community Hospital?

A.   Yes.

Q.   And the Saint Francis Hospital?

A.   Yes.

Q.   And Mr. Autry touched on some interview reports by an investigator named Roseann Schaye.  Is that -- do you recall that?

A.   Yes.

Q.   I'd like you, if you could, in that book to look at tabs 18 through 25, and what I'd like to know is if those are among the reports that you reviewed for purposes of the risk assessment?

A.   I can honestly say I'm not sure if these are the exact records that I reviewed.  I did review her records so I assume they were but I don't know.

Q.   You don't know.  Okay.  If you could then, please turn to tab 42.  This is a report by Steve Leidy.  I'd like to know if this is a report you recall reviewing?

A.    I don't recall the report but it looks fairly accurate as far as I know.

Q.    Okay.  Well, let's -- let's move on to, if you would, Government's Exhibit 35.  Now, I believe you covered this with Mr. Autry, but is this a true and correct copy of the report you received from Dr. Sharp and reviewed for purposes of the risk assessment?

A.    Well, this is my curriculum vitae.

Q.    Well, that's embarrassing.

A.    It could be at the back of it but it's not.  Did you say 35?

Q.    I did.

                (Discussion held off the record)

A.    I have a copy of his report with me.

        MR. KAHAN:  I'm sorry.  Apologies, Your Honor.

Q.    (BY MR. KAHAN)  Exhibit 16.

A.    This does appear to be a copy of the evaluation that I reviewed.

Q.    Okay.  Now, when you corresponded with Mr. Gordon in the fax marked at 63, isn't it true that you reported to him that Mr. Barrett had a substance abuse problem but no major mental illnesses?  I direct your attention to question 24.

A.    It's in No. 63?

Q.    Yes.

A.    According to what I'm reading, the question is, "When did

you learn about his criminal record?"

Q.    I'm sorry.  Questions 24 and 25.  Question 24 asks, does it not, "You also reviewed his mental health records; is that correct?"

A.    Yes.

Q.    And your response was?

A.    Yes.

Q.    It was affirmative.  And then the next following question:  "What did you learn from these records that were important to you in conducting this assessment?"  And isn't it true that your response was, "Records consistently indicated a substance abuse problem, no major mental illness was noted"?

A.    Yes.

Q.    Okay.  Now, in 2005, you updated your risk assessment; am I correct in my understanding?

A.    Yes.

Q.    And with regard to that, you relied on Dr. Sharp's psychological evaluation again; is that correct?

A.    For the risk assessment.  I believe I included that, although I wasn't assessing his mental health at the time.

Q.    Okay.  Well, if you could bear with me, back on document 63, question 20, there is a review of documents -- there's a list of documents that you reviewed.  Is this an accurate list?

A.    Could you tell me which number we're on again?

Q.    We are in Exhibit 63, question 20.

A.    I believe that is an accurate list, yes.

Q.    And you'd agree with me that that includes a psychological evaluation by Dr. Sharp; correct?

A.    Yes.

Q.    Now, Dr. Sharp, as I understand it, in performing his evaluation administered an MMPI.  Do you recall that?

A.    I believe so.

Q.    And, in fact, if you would go to Exhibit 35.  And I know that I have taken you there erroneously before but this time I really mean it.

A.    Yes.

Q.    Do you recognize this document?

A.    That is my curriculum vitae.

Q.    Okay.  And if you were to continue back into the pages, would you agree with me that, in addition to your curriculum vitae, there is also a copy of the report you authored for Mr. Smith and Mr. Hilfiger regarding the updated risk assessment?

A.    Yes.

Q.    Okay.  Is that a true and correct copy of that document?

A.    Yes.

Q.    And at the bottom of the pages, you'll see page numbers. If you were to flip over to page 823 -- 8235 --

A.    Yes.

Q.    -- you'd agree with me that again the MMPI is listed --

and that's Minnesota Multiphasic Personality Inventory -- is listed as one of the documents you reviewed?

A. Yes.

Q. Now, in your report, isn't it true that you observed that Mr. Barrett's mood was normal?

A. I believe so, yes.

Q. Okay. And did you also observe that his affect was congruent with his mood?

A. Let me get to that page. You're referring to the mental status exam?

Q. Yes, ma'am.

A. I wrote that he did not appear anxious or depressed, his mood was euthymic, which is normal; and his affect, which is the expressed emotion at that time, was congruent with his mood.

Q. And you further noted that Mr. Barrett did not express any delusional beliefs during your time with him?

A. Yes.

Q. And this is based on the interview you conducted for the 2003 report; is that correct?

A. Yes. For just that period of time when I was observing him.

Q. And isn't it true that you did not observe that Mr. Barrett was exhibiting any symptoms of a major mental illness?

A.      Not when I saw him, that is true.

Q.      And would you agree with me that bipolar disorder is a major mental illness?

A.      Yes.

Q.      Isn't it true that Dr. Sharp as well did not observe a major mental illness?

A.      In his mental status?  Are you referring to that?

Q.      In Dr. Sharp's report.

A.      He provided diagnostic impressions that did not include a major mental disorder but personality disorders and drug problems and a learning disorder.  He also observed organic impairment.

Q.      Do you agree with me that in your report at pages 8240 to 8241, you wrote that neither Dr. Sharp's assessment or the previous risk assessment found symptoms of a major mental illness, and you go on to list schizophrenia, schizoaffective disorder, bipolar disorder, and major depression?

A.      I have no idea what you're referring to right now.  Which report?

Q.      This is your 2005 report, Exhibit 35.

A.      Okay.  I'm sorry.  It's a long report.  Do you have a page?

Q.      It's at the bottom of page 8240.

A.      I wrote, "Neither Dr. Sharp's assessment nor the previous risk assessment found symptoms of a major mental illness, such

as schizophrenia or schizoaffective disorder or bipolar or major depression, at the time of his assessment."

Q. Okay.

A. Is that what you were asking?

Q. Yes. So we agree that you did write that in the 2005 report?

A. Yes, I did.

Q. All right. Now I'm going to make you flip again. I'm going to try and keep you up with me. We're going back to 63.

A. Okay.

Q. All right. Now, at question 30 -- and let me be clear about this. I think you said that you wrote both the questions and the answers; am I correct in that?

A. Yes. I wrote the questions I wanted him to ask me and then what my responses would be.

Q. Okay. And you'd agree with me that you informed him that you had administered a PCL-R test, an HCR-20 test, and had reviewed the results of an MMPI-2; is that correct?

A. Yes.

Q. Now, with regard to the PCL-R, am I correct in my understanding that is a test that is sometimes referred to as the Hare Psychopathy Checklist?

MR. AUTRY: Objection; outside the scope of direct. We didn't go into any of her testing with the PCL or use of the PCL-R or anything else.

MR. KAHAN: Well, Your Honor, I would answer that Mr. Autry represented that she was here testifying as an expert and by that means was able to introduce hearsay through her and is now backing away from that. If that's his position, then we would just simply ask to strike all the hearsay responses.

MR. AUTRY: And that's fine, he can strike the hearsay. She's offered as an expert to the extent that an expert can testify about what they reviewed in forming an opinion or doing an analysis. The point of the examination on direct was you had all these materials about Mr. Barrett's background, upbringing, things of that nature. Did Mr. Smith and Mr. Hilfiger ever ask you about any of that or pursue any of that? But if the court wants to strike all the hearsay, that's fine.

THE COURT: No, I'm not going to strike any hearsay. The objection is overruled. Go ahead.

MR. KAHAN: Thank you, Your Honor.

MR. AUTRY: Thank you.

Q.   (BY MR. KAHAN) Now, in your administration of the PCL-R, what score did you come to? What score did you evaluate Mr. --

A.   His overall score was a 14.1 percentile rank.

Q.   Okay. And that is a relatively low score, is it not?

A.   It is not considered real low. It's kind of right in the middle.

Q.   Now, your administration of the Hare was based on

semi-structured interview; is that correct?

A.    It was based on the background information that I had an interview with him --

MR. AUTRY:  Your Honor, we're going to object again on the same basis, going into the details of all this.  We didn't touch on any of that in direct.

THE COURT:  Overruled.

MR. AUTRY:  Thank you.

A.    -- his criminal history, and I can go through each of the components of the Hare Psychopathy Checklist.

Q.    (BY MR. KAHAN)  Well, in that regard, if I could now ask you to look at Government's Exhibit 64.

THE COURT:  Have we admitted 63?

MR. KAHAN:  No.  And, Your Honor, I would move to move that into evidence.

THE COURT:  Any objection?

MR. AUTRY:  Only to relevance, Your Honor.  Otherwise, we don't have an objection.

THE COURT:  Government's 63 is admitted.

A.    Yes.

Q.    (BY MR. KAHAN)  Do you recognize that document, ma'am?

A.    Yes.

Q.    All right.  And what is that?

A.    Those are notes I wrote on the back of the PCL-R.

Q.    Okay.  You'd agree with me this is the -- these are your

notes from your PCL-R administration to Mr. Barrett; is that correct?

A.    Yes.

Q.    Now, in looking through that, if you were to flip to questions 99 and 100, would you agree with me those are blank?

A.    Ninety-nine and 100 are blank.

MR. AUTRY:  Your Honor, I'm going to object again because he's attacking the validity -- or trying to attack the validity of a PCL-R test or the raw data going into the test that we haven't even offered and don't intend to offer as evidence, nor did we ask Dr. Russell about any of this on direct.

MR. KAHAN:  Well, Your Honor, I -- we believe the administration of this test and some of Dr. Russell's other results go to bias and ultimately to credibility.  For that reason, we'd ask to explore this.

MR. AUTRY:  I don't see how it goes -- sorry, Your Honor.  I don't see how it goes to bias or credibility as to anything we asked her about her contacts with Mr. Hilfiger or Mr. Smith, which was the thrust and the basis of the direct examination, not all this other stuff.

THE COURT:  Yeah, the objection's sustained.  Let's move on.

MR. KAHAN:  Thank you, Your Honor.

Q.    (BY MR. KAHAN)  Going back to Exhibit 63 then, you asked

Mr. Gordon to ask you to describe the experience, tests, interviews, and documents reviewed and then the results; is that correct?

A.    What was the number of the question?

Q.    That is question 31, the last question.

A.    Describe each test and the results, referring to the PCL-R, the HCR-20, and I had reviewed the MMPI-2 results but I did not administer that test.

Q.    Okay.  And you'd agree with me that in your proposed responses to Mr. Gordon, you did provide a response regarding the PCL-R on the next following page?

A.    Yes, yes.

Q.    And also for the HCR-20?

A.    Yes.

Q.    Okay.  But not for the MMPI?

A.    No.  I did not administer that.

Q.    Okay.  Isn't it true, however, that in Dr. Sharp's MMPI findings he found a supplementary scale elevated to a statistically significant degree regarding any social attitude?

          MR. AUTRY:  That's an objection, Your Honor, we've made before to this line of questioning.  It's just irrelevant and a waste of time, got nothing to do with the questions she testified to on direct.

          THE COURT:  What is the relevance of Dr. Sharp's findings in this regard?

MR. KAHAN:  The relevance, Your Honor, we believe is that Dr. Sharp omitted certain testing results that would have run counter to her ultimate findings in this case and goes again to her bias and credibility.

MR. AUTRY:  We haven't even asked her about what her ultimate findings in the case were.  The thrust of the direct examination was her contact and the extent of it with Mr. Hilfiger and Mr. Smith.

MR. KAHAN:  Well, then, again, Your Honor, I would say she's not testified here as an expert and that any hearsay that's come in through her should be stricken.

MR. AUTRY:  That's fine.

THE COURT:  Well, it's up to you guys.  Do you want me to strike all the hearsay testimony and you'll be done?  Is that right?

MR. AUTRY:  That's fine.

THE COURT:  I mean, if she's just a fact witness, that would be fine.

MR. KAHAN:  All right.  May I have just a moment to look for --

THE COURT:  Yes, yes.

MR. KAHAN:  I'll move on then, Your Honor.

THE COURT:  Okay.  Go ahead.

Q.    (BY MR. KAHAN)  You testified on direct that you ultimately did not testify in the federal trial; correct?

A.      Correct.

Q.      And didn't you advise Mr. Smith and Mr. Hilfiger that your testimony would result in rebuttal evidence by Dr. Price?

A.      No, I did not.

Q.      Were you familiar with Dr. Price?

A.      Yes.  I have reviewed his reports.

Q.      Were you then familiar with Dr. Price in 2005?

A.      I was familiar that he was a psychologist, I believe, practicing in Texas.

Q.      Okay.  And you had reviewed his reports at that time?

A.      I don't recall when I reviewed his report but I have done extensive review of his report.

Q.      Okay.

A.      I don't believe I had a copy of it at that time.

Q.      All right.  Were you then familiar with Dr. Price's professional reputation?

A.      I didn't know him and I hadn't read his reports but, as far as I knew, he was a good psychologist.

Q.      Okay.  And you were certainly aware in your conversations with Mr. Smith and Mr. Hilfiger that Dr. Price would testify if you did in the federal trial; is that correct?

A.      No.

Q.      No.  All right.

A.      They did not tell me until the day of the trial when I was driving there that they had decided not to include the

information on the risk assessment.

Q.   All right.

THE COURT:  Are we talking about the federal trial here or the state trial?

MR. KAHAN:  This is the federal trial.

THE COURT:  Okay.

MR. KAHAN:  Your Honor, at this point I pass the witness.

THE COURT:  Very well.  Redirect.

MR. AUTRY:  Very brief, Your Honor.

REDIRECT EXAMINATION

BY MR. AUTRY:

Q.   Dr. Russell, you were asked by Mr. Kahan here about whether or not you stated in your report, and whether or not Dr. Sharp stated in his report, that based on the mental status examination of Mr. Barrett at the time you talked to him, whether he suffered from a major mental illness.  Do you remember those questions?

A.   Yes.

Q.   Okay.  Now, you did not do a comprehensive mental health assessment to determine whether or not Mr. Barrett had a major mental illness; correct?

A.   Correct.

Q.   A mental status exam is something that's done to see if somebody is oriented as to time, place, and person and can

communicate with you; correct?

A.    It is a picture of how he is responding at the current time.

Q.    Okay.  You did not rule out whether or not Mr. Barrett had a major mental illness such as bipolar; correct?

A.    No.  I did not make a diagnosis, as I recall.

Q.    Okay.  And that's because your work in this case, both as to the state case and the federal case, was to do a risk assessment; correct?

A.    Correct.

Q.    You did not do a comprehensive mental health evaluation of Mr. Barrett; true?

A.    True.

Q.    And would it be fair to say that if somebody has a major mental illness, such as just, for example, bipolar, that's something that has to be charted or observed over a period of time; correct?

A.    Yes.  It has to meet the requirements of the DSM-V now. At that time it was the DSM-IV.

Q.    Okay.

A.    I don't think it was the DSM-III, but there's a list of criteria that it has to meet for a diagnosis.

Q.    And Dr. Sharp, when he examined Mr. Barrett, he also did a limited evaluation of him and recommended that further testing be done to rule out various things; is that accurate?

A.    As far as I recall, it is.

Q.    Okay.

A.    He wanted to rule out long-term memory difficulty and organic impairment relative to a tremor on Axis III.  We no longer have axises but that was one area he wanted to rule out.

Q.    Okay.  Well, my point is, Dr. Russell, that neither you nor Dr. Sharp in your evaluations of Mr. Barrett ruled out the fact or stated definitively that he did not have a major mental illness, it was just based on your observations of him at the time; is that right?

            MR. KAHAN:  I'm going to object as to hearsay to Dr. Sharp.

            MR. AUTRY:  Okay.  Well, I'll just limit it to Dr. Russell then.

            THE COURT:  That's fine.

Q.    (BY MR. AUTRY)  The testing you --

A.    I conducted a risk assessment.  That does not include a diagnosis nor is that included in the PCL-R --

Q.    Okay.

A.    -- to make that assessment.

Q.    Additional testing of different types would have to be done to rule in or rule out a major mental illness; true?

A.    Additional testing or a comprehensive review of his mental health history.

Q.    Okay.  And you never ruled out definitively that he had a

major mental illness, true, based on the limited work you did in this case?

A.    I did not.

Q.    Okay.  Thank you, ma'am.

THE COURT:  Anything further from Dr. Russell?

MR. KAHAN:  Nothing further, Your Honor.  Thank you.

THE COURT:  If not, Dr. Russell, you can step down. Thank you.

THE WITNESS:  Thank you.  Sorry I was late.

THE COURT:  No.  Petitioner have another witness?

MR. AUTRY:  Your Honor, we rest our direct case of Mr. Barrett.

THE COURT:  Very well.  The defendant prepared --

MR. AUTRY:  One second, Your Honor.

MR. SCHARDL:  Well, would do.  We just would renew our objection to the court's exclusion of all the evidence that the government moved to exclude.  Strickland v. Washington and subsequent cases require the court to consider all available mitigation evidence.

At the government's request, this court has excluded numerous lay witnesses and all of Mr. Barrett's expert witnesses, save one, so the court is not conducting a prejudice analysis consistent with Strickland and its progeny.  We renew our objection to the court disallowing all of that mitigation evidence.

THE COURT:  Those are the rulings that Judge Payne's previously made?

MR. SCHARDL:  Yes, Your Honor.

MR. AUTRY:  Yes, Your Honor.

THE COURT:  Very well.  Is defendant ready to proceed?

MR. WILSON:  Yes, Your Honor.

THE COURT:  Very well.  Call your first witness.

MR. WILSON:  Call Dr. Randall Price.

MR. SCHARDL:  Your Honor, may I ask, could we take just a five-minute recess before we start with Dr. Price?

THE COURT:  Why?

MR. SCHARDL:  Call of nature, Your Honor.

THE COURT:  Very well.  We'll take a brief recess.

MR. SCHARDL:  Thank you.

(Short break)

J. RANDALL PRICE, PH.D.,

after having been first duly sworn, says in reply to the questions propounded as follows, to-wit:

DIRECT EXAMINATION

BY MR. WILSON:

Q.   Good morning.

A.   Good morning.

Q.   Can you state your name, please, for the record?

A.   Sure.  My name is Randall Price.

Q.    And, Mr. Price, what is your business or occupation, sir?

A.    I'm a psychologist.

Q.    And how long have you been a psychologist?

A.    Thirty-four years.

Q.    And, Dr. Price, where do you currently practice your trade?

A.    Well --

Q.    Where's your office located?

A.    My office is located in Dallas, Texas.

Q.    And are you a licensed psychologist?

A.    I am.

Q.    And can you tell the court about your education and background to become a psychologist?

A.    Sure.  I have a bachelor's degree, a master's degree, and a doctoral degree, all in psychology and all from the University of North Texas in Denton, Texas.  I did a postdoctoral internship at the Baylor Institute for Rehabilitation in Dallas.  Later, I did a postdoctoral fellowship at the University of Kentucky.  Recently, I completed a graduate certificate in veterinary forensic science.  I've been a licensed psychologist since 1983 in Texas.  I'm also licensed in the state of Oklahoma and Arkansas.

Q.    Dr. Price, I'm going to ask you some additional questions about your education and certain certifications that you have.

MR. SCHARDL:  Your Honor, if I may, the defense will stipulate that he's qualified by training and experience to offer expert opinions, not necessarily -- we're not stipulating to the admissibility of his opinions but to his qualifications to offer them.

THE COURT:  Do we need to go through it all?

MR. WILSON:  Judge, if counsel will stipulate to that -- I've got his CV and his report -- I'll just move to admit that.

THE COURT:  Any objection to the admission of his CV?

MR. SCHARDL:  Well, I've never seen it, Your Honor, so I can't say whether I would object to it or not.

THE COURT:  Well, take a look at it and see if we can --

MR. WILSON:  It's Exhibit 51, Counsel.  It's in the original exhibits from last time.

MR. SCHARDL:  That's all right.  Your Honor, there's no objection to the CV.

THE COURT:  Very well.  Government's Exhibit 53 is admitted and we'll dispense with the qualifications.

MR. WILSON:  And I'll take a deep breath.  Thank you.  Appreciate that, Counsel.

Q.    (BY MR. WILSON)  Dr. Price, it's my understanding that back in 2003 you became board-certified as a forensic

psychologist.  Is that correct?

A.    Yes, that's correct.

Q.    Okay.  And what does that entail to become board-certified in forensic psychology?

A.    Well, first, you have to have a certain number of years experience -- I don't remember if it was five or ten but I had more than that -- and then passing first an exam that was written over the field of forensic psychology and then submitting two samples of your work in cases and those had to be approved as being complete and then having an oral examination by your peers over primarily the work samples but also anything in the field of forensic psychology.

Q.    Okay.  Now, also it's my understanding based upon your CV back in 2000 -- excuse me -- in 1990, that you became board-certified in neuropsychology; is that correct?

A.    Yes, that's correct.

Q.    And what were the requirements for that certification?

A.    A certain number of years of experience.  At that time it didn't require a written exam but an oral examination by your peers over the field of neuropsychology.

Q.    Okay.  Let's talk about that for a second.  We've talked about psychology.  We've talked about neuropsychology.  We've talked about forensic psychology, okay?

In layman's terms, what's the difference between the three, if any?

MR. SCHARDL:  Your Honor, I'm going to interpose an objection at this point about Dr. Price testifying in the field of neuropsychology.  Mr. -- as I understand it, Dr. Price is a rebuttal expert.  Mr. Barrett has been barred from presenting an expert in neuropsychology.  He's asked to offer two.  The Tenth Circuit said that testimony from a neuropsychologist that was proffered was one of the most important things they considered in remanding this case but Mr. Barrett is not allowed to present neuropsychological testimony.  So we would object to the government offering rebuttal to neuropsychological testimony that we're not allowed to admit.

THE COURT:  Who was the -- who's your expert in neuropsychology that Judge Payne excluded?

MR. SCHARDL:  There were two, Your Honor.  Just for Your Honor's benefit, with the petition, the 2255 petition, Mr. Barrett submitted a report -- a declaration actually -- from a Dr. Myla Young and that was in 2009.  Dr. Young herself succumbed to a neurological condition and died in 2013.  So Mr. Barrett's counsel had her work reviewed by two neuropsychologists, one, a Deborah Miora; and the second one is a Dr. Erin Bigler.  We offered to present Dr. Young's work through these other neuropsychologists to do exactly what the government is trying to do right now with Dr. Price, to explain the difference between a neuropsychologist and a regular psychologist or forensic psychologist, and Judge Payne excluded

all evidence from Dr. Miora and Dr. Bigler.

THE COURT:  Well, Dr. Russell told us what the difference was.  So haven't we gone there already?

MR. SCHARDL:  Well, the difference.  But, again, we're objecting to the substance of any testimony from this witness because the defense -- she did not offer any opinions about his neuropsychological functioning, she offered no testimony about it, period.

THE COURT:  He didn't ask him for an opinion, just what the difference was, so I think we can go there.  But let's look ahead a little bit.

What do you say about the argument that Judge Payne has excluded neuropsychological testimony in this regard?

MR. WILSON:  Well, Judge, there was a -- there was a ruling by this court excluding the testimony of Dr. Miora and Dr. Bigler.  However, as this court sat through hours of testimony in this last set of hearings, there was extensive testimony by Dr. Woods relying upon Myla Young's testing and it was the basis of his opinion and he used it throughout his testimony about dysexecutive syndrome.  So all of that information has been presented to this court for the -- the petitioner is asking this court to consider it and I believe it's within the purview of this witness to present testimony rebuttal to that.

But also, Judge, we're here on a two-prong analysis,

whether there was a deficient performance but also whether or not there was a prejudice to that.  Counsel argues that the attorneys were deficient in not presenting mental health evidence, and it's the government's position that we look at the prejudice issue because the Tenth Circuit looked at it itself.  The Tenth Circuit said, well, if they would have presented this information, then the testimony of Dr. Price would potentially have been devastating, and it's what the government intends to do is go through that potential devastating testimony.

THE COURT:  But we have to know what they would have heard from the petitioner to know what -- to weigh it against what we're going to hear from the government, though.

MR. WILSON:  Well, we know through Dr. Woods he used all of that information from Dr. Myla Young's testing as part of his evidence and part of his opinion.

THE COURT:  Very well.

MR. SCHARDL:  May I respond to that, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  I don't mean to interrupt the court, though.

THE COURT:  Go ahead.

MR. SCHARDL:  When the government asked for an opportunity to have Mr. Barrett evaluated by Dr. Pitt, it said to this court that they needed a psychiatrist because Dr. Woods

is a psychiatrist.  So the court said, very well, the defense has a psychiatrist, the government should have a psychiatrist. So the government was authorized to have Mr. Barrett evaluated by Dr. Pitt for the purpose of rebutting Dr. Woods because they're both psychiatrists.

Mr. Barrett has not had the opportunity to present a neuropsychologist, and the government represented to this court in support of the motion to have Dr. Pitt evaluate Mr. Barrett that they needed a psychiatrist to rebut a psychiatrist.  Now we're having a neuropsychologist rebut the neuropsychologist who wasn't allowed to testify.

MR. WILSON:  Judge, this exact argument was presented before Judge Payne and he denied this exact request.

THE COURT:  All right.  Well, go ahead.

MR. SCHARDL:  I'm sorry.

THE COURT:  No.  Go ahead.

MR. SCHARDL:  Just for purposes of the record, the case law, such as Ohler v. United States and Luce v. United States, those kinds of in-limine rulings must be revisited at the time of trial, at the time of this hearing, so we renew the objection.

THE COURT:  Well, suppose I changed the court's mind on that and decided to let you present testimony from those two doctors, are you going to have the ability to do it?

MR. SCHARDL:  Well, we just, you know, rested with

that objection having been made.

THE COURT:  I understand.

MR. SCHARDL:  We can certainly bring them at another time.  We don't have them here.  They were excluded.

THE COURT:  But, I mean, this week while we've got time blocked out for this hearing.

MR. SCHARDL:  I could not bring them from California on such short notice, Your Honor.

THE COURT:  All right.  Well, I'm going to take that under advisement but I'm going to overrule the objection for now.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  Go ahead, Mr. Wilson.

Q.   (BY MR. WILSON)  Getting back to, I believe, my question originally, in layman's terms what's the difference between forensic psychology, neuropsychology, and psychology?

A.   Okay.  Well, first of all, psychology's a very broad field, including all kinds of experimental psychologists and applied psychologists.  The most frequent type of applied psychologist is a clinical psychologist who's involved in the diagnosis and treatment of problems, mental, emotional, behavioral problems.  That's what most people think about when they think of a psychologist.

A forensic psychologist is also involved in doing primarily evaluations to determine the presence or absence of a

mental disorder or other conditions relevant to some question before the court or in a case, and so forensic psychology could be described as clinical psychology applied to the legal system.

Neuropsychology is another subspecialty under clinical psychology that's involved in evaluation and sometimes treatment of mainly neurological problems, traumatic brain injury, strokes, tumors, and it's an assessment of potential deficits an individual might have acquired through either some illness or injury. The deficits would mainly be in the area of cognitive or thinking but they could be also in emotions and behavior as well. So it's a subspecialty of clinical psychology focusing on conditions that are directly involving, or known to involve, some brain issue.

Q.    All right. And do the fields of neuropsychology and forensic psychology sometimes overlap?

A.    Yes.

Q.    And if it is alleged potentially that a person who is -- within the parameters of the criminal justice system may have some neurological issue, they could then overlap; is that correct?

A.    Yes, that's correct.

Q.    All right. Now, Dr. Price, I know you've been involved in this case for some time. There was a lapse in the midst. But can you tell the court how you first became involved in the

case involving an individual by the name of Kenneth Eugene Barrett?

MR. SCHARDL:  Excuse me, Your Honor.  If the government is going to offer this witness as an expert, I'd like an opportunity to voir dire him.

THE COURT:  I thought you stipulated to his --

MR. SCHARDL:  Oh, I stipulated to his qualifications.  That's why I specified that I was not stipulating to his ability to testify to opinions necessarily, just that prong of the 702 analysis.  I do agree he's qualified by training and experience.  There are other issues as to whether he may offer the opinions -- he may offer opinions, however.

THE COURT:  What do you want to voir dire him about?

MR. SCHARDL:  I want to voir dire him about what opinions he was asked to offer, whether his report is a complete statement, a summary, of the opinions he's been asked to offer.  I want to ask him about the government's representation -- about whether his opinions are scientifically valid for the purposes, as Mr. Wilson was just saying, that are directly responsive to the allegations that are before this court, following up just on the last question that Mr. Wilson asked about the types of allegations.

THE COURT:  Well, I think I'm going to let you do all that on cross.  If, as a result of cross, I want to strike

some of his testimony, I will.

MR. SCHARDL: Thank you, Your Honor.

THE COURT: Okay. We don't have to worry about a jury hearing something we don't want them to hear so we'll do it that way. Sound good?

MR. SCHARDL: Well, I would like the opportunity to voir dire him and raise the objection, but the court has ruled and I accept that.

THE COURT: Very well. And maybe you can cover some of this stuff for us, Mr. Wilson.

MR. WILSON: I'll try, Your Honor.

Q.    (BY MR. WILSON) How is it that you first became involved in the case involving Kenneth Eugene Barrett?

A.    I received a call in late September 2005 from Sheldon Sperling asking me to review a file and -- at that time it was potentially conduct -- but ultimately to conduct an evaluation of Mr. Barrett, and that would occur in October sometime of 2005, and to do a psychological -- a forensic psychological evaluation for the purposes of potentially testifying in rebuttal to Dr. Russell's testimony. And so it was to do a psychological evaluation and diagnosis of any mental behavior problems that I saw, including those that would be under the umbrella of neuropsychology and conduct a risk assessment or offer opinions about the risk of future violent behavior.

Q.    Of Mr. Barrett?

A.    Yes.

MR. SCHARDL:  I'm sorry to do this, Your Honor, but I have to interpose another objection.  Mr. Sperling was supposed to be walled off.  There was supposed to be a firewall in place so that Mr. Sperling should not have known what was in Dr. Russell's report such that he could have retained the witness in that way.  I think if that's what happened, we need to have a hearing about why that happened because that should not have happened.

The court's order was that the trial attorneys, Mr. Sperling and Mr. Littlefield, were not to know what was in Dr. Russell's report.  That was given only to the assistant United States attorney for the Northern District in Tulsa.  Now the witness is saying he was contacted by Mr. Sperling.  That is a huge violation of this court's order.

THE COURT:  Well, I'm going to -- for now I'm going to take that under advisement.  We'll raise that when we're done with his testimony.  You're suggesting that I ought to exclude him because somehow or another it violated a rule during the original trial?

MR. SCHARDL:  Well, I'm suggesting that there was a violation of the court's protective order, Your Honor, and that if the government was not complying with that order, that could be a basis for excluding the witness' testimony.

THE COURT:  But that's not an issue that's been

raised in this 2255, as I understand.

MR. SCHARDL:  We just learned about it at this moment.

THE COURT:  Well, I know you did.  But I'm here to determine something that this witness has relevant testimony on, which is not that, and we're going to have to raise that some other way, maybe at the end of the proceeding, but I need to hear his testimony.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  Very well.

Q.  (BY MR. WILSON)  Dr. Price, as a result of your conversation you had with Mr. Sperling -- and for the record, Mr. Sperling was the United States Attorney back in 2005 of the Eastern District; is that correct?

A.  Yes.

Q.  Okay.  And as a result of that discussion with Mr. Sperling, did you, in fact, conduct an assessment, an evaluation, of Mr. Barrett?

A.  Yes.

Q.  And did that, in fact, take place in October of 20 -- excuse me -- 2005?

A.  Yes.

Q.  And in order to conduct that evaluation, what specifically did you collect, as far as records and information, to review and then did you also conduct an

interview of Mr. Barrett in anticipation of preparing your report?  And that's a two-part question, I understand, so let me break it out into single questions.

Did you review some records?

A.    Yes.

Q.    And do you recall where you received the source of those records?

A.    From another attorney for the USA that was the firewall attorney.

Q.    Okay.  And was that a person by the name of Scott Woodward?

A.    Yes, it was.

Q.    And do you recall the records that you were asked to review and that you received from Scott Woodward from the United States Attorney's Office?  And I believe he was in the Northern District of Oklahoma; is that correct?

A.    Yes.

Q.    What records did you receive to review?

A.    I received the records from Eastern State Hospital, from the Bill Willis Community Mental Health Center, from the Wagoner Community Hospital, some school records, the psychological evaluation and risk assessment from Dr. Russell that was authored in 2003, and the -- also the psychological evaluation risk assessment that Dr. Russell authored in 2005, the psychological evaluation from Dr. Sharp, and the criminal

investigation file from the U.S. Attorney General's Office.

Q.    And as part of your evaluation in this case, did you review all the records that you received from Mr. Woodward or from the United States Attorney's Office in Muskogee?

A.    Yes.

Q.    And I'm not going to get into a lot of detail, but you mentioned records from Eastern State Hospital.  Those would be records of Kenneth Eugene Barrett; correct?

A.    Yes, that's correct.

Q.    And Eastern State Hospital, is that -- what type of facility is that?

A.    It's a state psychiatric hospital.

Q.    And so I take it that you reviewed some psychiatric records from that facility involving Mr. Barrett?

A.    Yes.

Q.    And as part of your evaluation of Mr. Barrett, did you consider those records as part of your evaluation?

A.    Yes, I did.

Q.    And as -- and in those records from Eastern State Hospital, do you recall whether or not Mr. Barrett had ever been diagnosed with bipolar disorder?

A.    From the Eastern State Hospital records?  They did not indicate a diagnosis of bipolar disorder, as I recall.

Q.    Okay.  You mentioned records from a Bill Willis Mental Health Center.  You reviewed those as well?

A.    Yes.

Q.    Okay.  From the Wagoner Community Hospital?

A.    Yes.

Q.    And, again, those are for Mr. Barrett?

A.    Yes.

Q.    You also discussed specifically records from -- or a report, an evaluation, from a Dr. Sharp; is that correct?

A.    Yes.

Q.    Did you know Dr. Sharp at that time or were you aware of him?

A.    No.

Q.    When you reviewed Dr. Sharp's report of his evaluation, did Dr. Sharp diagnose Mr. Barrett with bipolar disorder?

A.    He did not.

Q.    And I apologize going back just a hair, but back to the records from Eastern State, do you recall any diagnosis of posttraumatic stress disorder?

A.    No, I don't.

Q.    Okay.  From Bill Willis, any diagnosis -- a discharge summary or a diagnosis -- let me back up.

Any final diagnosis from any records in Bill Willis of bipolar disorder?

A.    No.

Q.    What about posttraumatic stress?

A.    No.

Q. What about from Wagoner Community Hospital; any final diagnosis of bipolar disorder for Mr. Barrett?

A. Not that I recall.

Q. Okay. Same true of posttraumatic stress?

A. That's true.

Q. And you also reviewed the criminal investigative file; correct?

A. I did.

Q. Okay. So you were aware of the circumstances involving the 1999 event; is that correct?

A. I was.

Q. Okay. Now, I asked you specifically if there had been any diagnosis in those mental health records of posttraumatic stress disorder or bipolar. But did you see any reference in the records from Eastern State Hospital regarding substance abuse?

A. Yes.

Q. Would the same be true from Bill Willis Mental Health?

A. Yes, it would be.

Q. And also Wagoner Community Hospital?

A. Yes.

Q. What was the common thread running through all of those mental health records in reference to substance abuse?

A. That Mr. Barrett had problems with substance abuse, with several substances, with alcohol and with methamphetamines and

with cannabis.

Q.   And based upon those records, how far back in his life did that substance issue occur?

A.   Early in his life, I think by the beginning of adolescence.  As I recall, he began having problems with substance abuse very early, like around the age of 13.

Q.   And was that an issue solely related to his adolescent years?

A.   Oh, no.  It continued into his adult years.

Q.   And was that information consistent with the information you received directly from Mr. Barrett during your clinical interview of him?

A.   Yes, it was.

Q.   Now, you mentioned it was a number of different substances and you listed marijuana, you listed methamphetamine.  Were there other substances, if you recall, specifically?

A.   Yes.  Those were the most problematic ones, as I recall. But there was also a lot of experimentation with other substances and that this went on for years and a lot of at least experimentation or trying several different substances. I think I noted a few of the ones that we talked about when I conducted an interview with Mr. Barrett, that he at least told me that he had at least tried cocaine, PCP, heroin, LSD, downers, mushrooms, and angel dust, but that the biggest

problems were with alcohol and methamphetamines and with cannabis.

Q.    In your review of the mental health records from Eastern State and Bill Willis and Wagoner Community, did those records have any reference to substance abuse as part of their diagnosis or diagnoses?

A.    Yes, they did.

Q.    And was that consistent throughout?

A.    It was the one thing that was really consistent in this file was a history of what at that time was called polysubstance abuse or dependence, which means a problem, an addiction, to more than one substance.

Q.    As part of your review of the records, did you also determine whether or not Mr. Barrett had a history of a suicide attempt or attempts?

A.    I did.

Q.    And what did -- what did you learn about that from the records?

A.    Well, I learned of one suicide attempt, I believe in the mid-80's, wherein he shot himself in the chest.

Q.    Now, we'll circle back to that in just a second.

Now, I know that you reviewed the records and then you also conducted an interview of Mr. Barrett; is that correct?

A.    Yes.  Yes, sir.

Q.    Now, where did that interview take place and when did it

take place?

A.    Well, it took place October the -- on two dates, October the 13th and 14th of 2005.  As I recall, it took place in the county jail here but I'm not -- I mean, it was a facility, it was a correctional facility, and that's where I believe it to have been.

Q.    And so Mr. Barrett would have been in custody at the time of the interview?

A.    Yes.

Q.    And were you -- or was Mr. Barrett accompanied by anyone during that interview other than yourself?

A.    No.  It was just he and I in the room together.

Q.    Was the environment or the circumstances surrounding the interview conducive to perform the mental health evaluation that you were seeking to perform?

A.    Well, it was a jail.

Q.    Sure.

A.    But as compared to other jail environments that I've conducted an evaluation in, it was adequate.  As I recall, it was relatively private, that the doors were closed, etcetera, it wasn't overly noisy or anything that would be really problematic like that.

Q.    If there would have been a situation like that, would you have reflected that in your report?

A.    Yes, that's correct.

Q.     Okay.  And did Mr. Barrett cooperate with you as part of your evaluation?

A.     He did.

Q.     And can you tell the court, when you conduct one of these in-person evaluations, what are the parts or components of that evaluation?

A.     Well, it may vary slightly.  But, of course, it would -- first of all, typically if it's an evaluation where I'm retained by attorneys that are opposing the person's attorneys that are in the case, I like to get one of -- like in this case -- one of the defense attorneys to be there at the very beginning of the evaluation to introduce me to his or her client and then leave the room and either while the attorney is there, or if I've already shown the attorney the informed consent, maybe it's after the attorney left.

        As I recall, his attorney was there in the room when I gave Mr. Barrett the informed consent, which is the first part, to answer your question, of an evaluation like this.  It's where I tell the person who I am, what I'm there to do, who it is that retained me, I give them the limits of confidentiality and privilege in a forensic evaluation, tell them they can talk to their attorney at any time, if they don't want to answer something, they can just say they don't want to, and how the results will be used or could be used.  And so that's just to make sure we're all on the same page and in agreement about the

context of the evaluation.  That's the first part.

Q.   And I believe in reference specifically with Mr. Barrett, that that took place; is that correct?

A.   That's correct.

Q.   And I believe your testimony was that one of his lawyers -- or one or more of his lawyers was present at that time?

A.   I know there was one of his lawyers there to introduce me.  I don't recall if I showed the lawyer the informed consent beforehand or if the lawyer was there when I went over that informed consent, I don't recall, but it was one of the two.

Q.   Okay.  But that procedure was performed as far as giving Mr. Barrett notice of what you expected and what was going to take place as part of this interview; is that correct?

A.   Yes, that's correct.

Q.   Okay.  Now, did Mr. Barrett's attorney stay in the room while the interview --

A.   No.

Q.   Okay.  And I believe you testified earlier there was no other -- there were no guards present during the interview; is that correct?

A.   That's correct.

Q.   Any other staff, either from your office or from Mr. Barrett's lawyers' office?

A.   No.  Just Mr. Barrett and me and a video camera.

Q.    Okay.  And so this interview and the testing procedure was captured on video; is that correct?

A.    Yes.

Q.    Now, the person that you interviewed back in 2005, is that person here in court today?

A.    He is.

Q.    Okay.  Can you describe where he's sitting and what he's wearing today and point him out for me, please?

A.    Yes.  He's sitting at counsel table dressed in orange coveralls and I recognize him, even though at the time of this evaluation both he and I had hair, as I remember.

         MR. WILSON:  Okay.  The record would reflect the witness identified Mr. Barrett, Your Honor?

         THE COURT:  The record will so reflect.

Q.    (BY MR. WILSON)  Speaking of that, what was your initial observation of Mr. Barrett when you first met him, just overall initial observation?

A.    Well, he was very cooperative and friendly and open about answering things and it was -- as I recall, there was nothing confrontational about my interactions with him.  On the testing I gave, he was involved in it, he put forth good effort.  When I asked him things in the interview, he answered them.  And as I recall, he and I got along fine during this evaluation and he was very cooperative.

Q.    Okay.  We talked earlier about a report that you had

reviewed and an evaluation that you reviewed of Dr. Bill Sharp; correct?

A.     Yes.

Q.     And it's my understanding that Dr. Sharp, one of the findings of his evaluation was that Mr. Barrett was exhibiting very paranoid behaviors?

A.     Yes, that's correct.

Q.     When you observed Mr. Barrett, did you observe those same issues regarding elevated paranoia?

A.     Yes, I would say that I did, at least like a kind of chronic suspiciousness about a lot of things.  He certainly voiced feeling as if he had not been treated fairly by the police, by the legal system, and it had a paranoid quality to it which was part of what I diagnosed him with is having the traits and features of a paranoid personality, which is that kind of very suspicious, attributing motives to others that they were out to get him, treat him unfairly, etcetera.  He was pretty free in voicing those things, as I recall, during my evaluation of him.

Q.     So I take it that someone can be cooperative but yet voice some paranoia during the same interview?

A.     Yes.

Q.     They can coexist?

A.     Yes, that's true.  If -- I did not notice -- like I said, as I recall, he and I got along fine.  He didn't seem very

suspicious or distrustful of me or what I was asking him, but he talked about in the interview feeling that way about the system and about other things that had a paranoid quality to it.

Q.   Now, we earlier -- and I digress and I apologize -- we were talking about the process that you typically follow.  You said you began with the informed consent; is that correct?

A.   Yes.

Q.   And then once you get that completed, what's the next step in this on-site, face-to-face evaluation?

A.   A clinical interview and history, where I'm asking for the person's perceptions of their life and their present circumstances and any symptoms they might be having.  At the same time I'm making behavioral observations of them and including those that would pertain to a mental status evaluation.  So that would be the next part, grouping those together, the clinical interview and history, behavioral observations, mental status examination.

Q.   And that portion of that interview or this evaluation, is that a -- is that standard or accepted practice within your field of psychology?

A.   Yes, it's standard.  It would be considered what we've come to call a best practice in psychology, and that even though there might be an occasion that that might be impossible to do or an attempt was made and it didn't work out but that,

if at all possible, a face-to-face interview where I'm asking questions and the person is answering them is a best practice in clinical and forensic psychology.

Q.   We'll talk specifically about the information that you received during the interview.  But once you complete that clinical interview and receive social history, psychosocial history, what's the next step in the process?

A.   To conduct any standardized testing that I would have determined was important to do, to gather additional information to be used in a psychological evaluation and a diagnosis, and any opinions that I might have been asked to address in either a clinical or a forensic evaluation.  So it would be the administration of standardized tests.

Q.   And is there a battery of tests that you give regardless of the situation?

A.   No.

Q.   What's the basis upon which you make the decision of what test or tests you are going to provide to this particular subject or person during that evaluation process?

A.   Well, a lot of factors go into that, but it's basically from either what is the referral question or questions.  That would be one factor that would go into it.

Another would be if -- and, again, it's highly desirable to have records of past treatment, school history, et cetera, and to have had a chance to review those to see what

other mental health factors might be important to address with standardized testing.

And then it -- in most circumstances, it would be also probably what was learned during the clinical interview and history might impact what test I was giving. As I recall in this case, I was asked to provide the test -- a list of the tests that I was to give prior to the evaluation.

Q.   And so how was it -- based upon that answer you just gave us, how was it that you decided which particular test you were going to administer during this evaluation? If you were required to give those in advance, what went into your decision-making process of why you decided on these particular tests?

A.   Well, first, it was a referral, it was very general, and that it was to conduct a psychological evaluation, to identify any mental or personality disorders that might be present, and to offer opinions about the risks that the individual might pose in the future. Then that was -- of course the first part was what I was asked to do, which was pretty open-ended in general, but I also looked at the records and determined that I should do a neuropsychological screening to determine if there was potentially a problem with cognition or thinking that might be present. And in his case, it could have been present from some indication of some accidents that had occurred with him in the past, where he hit his head or something hit his head.

Also, the substance abuse for all those years would be a red flag to do a neuropsychological screening that would include a screening battery and an IQ test or to -- a standardized test to assess intellectual functioning and the neuropsychological screening to assess other cognitive areas to see if there was a problem there.

Q.    Okay.

A.    Then with regard to the general psychological evaluation, to administer self-report psychological tests, a personality emotional functioning, so I chose two of those.  And then in any forensic evaluation, you need to at least address the potential that the person is not being forthright, that's not -- that's exaggerating their problems or in some cases to minimize them.

And so I gave one test that was a test to see if there was either faking or gross exaggeration of problems that were mental problems.  In a criminal forensic evaluation where the charge -- the situation involves violence and the question is there about the risk the person might pose, I administered this Psychopathy Checklist Revised to assess the presence of psychopathic traits and features.

Q.    Staying with my theme of the general typical procedure, review the records, do the informed consent, you do the clinical interview, you administer testing, and then after you do that what is the next step in the process?  Do you go back

and have additional interviews as a result of those tests?

A.    Well, if it's possible.  You know, it's certainly --
although it's not always possible, it's good if there's a
chance to ask the person questions on another occasion, other
than just the one time, which I was allowed to come back the
second day with a follow-up and ask questions or complete the
testing and that's what happened in this case.

Q.    Any other steps in the process involving the evaluation?

A.    Well, then the scoring of the test, the interpretation of
the test, and an integration of all the information that I had
been able to acquire.

Q.    Then you generate a report; is that correct?

A.    That's correct.

Q.    Okay.  Now, going back to the clinical interview, did you
have an occasion to discuss with Mr. Barrett about his
childhood?

A.    Yes.

Q.    And as part of your interview with Mr. Barrett regarding
his childhood, what, if anything, was significant that you
observed or found out from Mr. Barrett that would be relevant
to an issue of your mental evaluation?

A.    Well, while not every detail of that part of the
evaluation would appear in the report that I gave, certainly he
gave me a history of a childhood where there was family
dysfunction, ultimately the separation and divorce of his

parents, a lot of relocations due to his father's job, and even though it's a separate part of this, the problems he had in school and early substance abuse.  But just about his childhood, that there was family dysfunction present, he ultimately resided with his mother but expressed when he was a child that that was disturbing to him, that he -- his father was not as present as he would have liked.

And then he was married early in life and that his wife was young as well.  They had a child.  He still -- they're both young.  So there was -- it continued and he had problems with his wife, he and she had some dysfunction as well.  You know, his life in general was not very -- it was not one that was very predictable or organized and --

Q.    You mentioned the fact that Mr. Barrett related to you that they moved around a lot; is that correct?

A.    Yes.

Q.    And I think you characterize it as dysfunction between his mother and father; is that correct?

A.    A lot of fighting and that sort of thing, as I recall.

Q.    And did Mr. Barrett relate to you, inform you, that he had siblings of this -- of his same mother and father or his parents?

A.    You know, I don't recall us discussing how he related to his siblings but that he had siblings.

Q.    Okay.  Did you discuss how he related specifically to his

father?

A.    The only thing I recall is him talking about that there was fighting between his parents and that he was separated from his father.

Q.    How did he characterize his relationship with his mother?

A.    I think it was -- that it could be described as variable over the years.  By the time I saw him, he and she had -- had a positive relationship, in his mind, but I think it had been variable in his life.

Q.    Did Mr. Barrett report any substance abuse, either alcohol or drugs, by either his mother or his father?

A.    As I recall, both had problems with alcohol.  I know his father did and I believe -- I'm not certain of this, I don't recall -- but I think so did his mother.

Q.    Now, you mentioned earlier, as part of the records going into the interview, it's sometimes necessary or beneficial to look at educational records or school records; is that right?

A.    Yes.

Q.    And you had some to review of Mr. Barrett; is that correct?

A.    I had some, yes.

Q.    Okay.  And based upon the review of those records, going into the clinical interview, did you have any concerns of potential deficits involving Mr. Barrett that are revealed through the educational records?

A.   Yes.

Q.   What were those concerns that you had going in?

A.   Well, he didn't too well in school and as time went on in school he grew less and less interested and his school performance not good.  He -- he failed eighth grade and then dropped out of school shortly thereafter and went to work.  And so I expected to see, you know, problems with academic abilities.  I think that is the case with him, yes.

Q.   Now, once you got into the clinical interview, began talking with him about his education, was that consistent with what you observed in the records?

A.   It was consistent, yes.

Q.   Did Mr. Barrett indicate to you why he -- why he actually had to -- why he failed the eighth grade?

A.   Mainly he reported to me that he just wasn't interested in school anymore and he would skip school a lot and that there was some placement into some special classes after that eighth grade retention, I believe, and, you know, he said he just wasn't interested and was truant frequently.

Q.   Did he ever indicate to you specifically, I just couldn't do the work, it was just -- I wasn't intellectually capable of performing the tasks that I was asked to do as an eighth-grader?

A.   No.  I don't think that was the case and he didn't think that was the case either.

Q.    It was more just a lack of interest and skipping school?

A.    Yeah.  He just -- those were the problems in school, I think.

Q.    Did he relate to you any problems he had regarding a conflict with administration regarding his hair?

A.    Yes.  He wouldn't cut his hair then and was ultimately either suspended or expelled from school because of that.

Q.    Having that information regarding education, you said it was consistent with the records; correct?

A.    Yes.

Q.    Okay.  Did you also talk with him specifically about his employment history as well?

A.    I did.

Q.    Okay.  You said he dropped out of school in ninth grade, went to work; is that right?

A.    Yes.

Q.    Did he report to you a consistent work history beginning in the ninth grade or was it spotty, times where he just didn't work at all?

A.    Well, he had a lot of different jobs, and some of which didn't last long, but he had a lot of job skills.  He could --

Q.    For instance?

A.    He was a skilled mechanic, according to him, and he had had jobs in that.  He worked in different types of jobs that would require at least a semiskilled level, it wasn't just

labor.  He had jobs early in life most of the time, just quite a few different jobs.

Q.    Did he report to you that he had a history of being very active or even hyperactive?

A.    Yes.  From an early age, he described himself as being hyperactive and it interfering with paying attention when you had to sit still in school and listen to somebody else or attend to an academic task.  That's -- I think that was a factor in his withdrawal from school as well.

Q.    Did you see symptoms of that hyperactivity during your evaluation of him?

A.    No.  Not that I recall.  He did have trouble on testing when it came to attention --

Q.    We'll get to that.

A.    Yeah.

Q.    But as far as not being able to sit still, not being task-oriented, did you observe any of those characteristics?

A.    No.  Like I said, he was cooperative, he got involved in the testing that I did.  You know, I don't remember any problems with not being able to sit still or anything like that.

Q.    You mentioned -- we were talking about employment history.  I believe you said he had a number of different jobs; is that correct?

A.    Yes.

Q.   Did he ever indicate to you any problems that he experienced with employment and substance abuse?

A.   Well, he did say that there were certain jobs that he would go to work and perform his job while he was high.  Mainly those are the ones when he started to use methamphetamines.  I don't recall, as I sit here, if there were times when he had a job that he went to the job intoxicated on alcohol, but he did describe that he -- he had jobs that he could do and do well when high on methamphetamines.

Q.   Well, talking about being a mechanic or doing mechanic work, Mr. Barrett reported that he did quite a bit of that; is that correct?

A.   Yes, that's correct.

Q.   Did Mr. Barrett indicate to you whether or not he had -- was going to actually begin a business or open a garage and do work for the public?

A.   Yes.  He had kind of -- as I recall, he had already started to work on other people's cars at -- I believe at his house, and I think he certainly would have been performing in what we would probably, at one time anyway, refer to as a shade-tree mechanic.  So he was -- had a clientele that he was building up and had a plan to expand that and to have his own auto garage for working on cars.

Q.   Did you discuss with Mr. Barrett about his ability to spend money or deficiencies with spending money?  Did you ever

talk about that?

A.    Yes.

Q.    And what do you recall about your discussion involving finances and his ability or inability to spend money?

A.    While he had a lot of different jobs but -- and was kind of self-employed and had income, he said to me that he was broke before payday and that, I guess, money management was not one of his long suits, and that was a fact that he -- that he told me about.

Q.    Okay.  Did he talk -- did he discuss with you about trying to generate revenue to build up his business, his mechanic business?

A.    Yes.

Q.    And what did he tell you about that?

A.    Well, during that time period when he was planning to open the garage, that --

        MR. SCHARDL:  I'm going to object; vague as to time.

        MR. WILSON:  I'll try and narrow it down, Your Honor.

        THE COURT:  Okay.

Q.    (BY MR. WILSON)  Did Mr. Barrett indicate to you a time frame that we're talking about -- and let's use the day of the crime in September of 1990 -- when it was that he was building up this business, this mechanic business?

A.    Well, as I remember, it was in the months -- at least the

months before the instant offense.

Q.   So in the months leading up to September 1999?

A.   Yeah.  It might have been further back in time than that, and that's as -- I don't recall.

Q.   But based upon your recollection of the months leading up to, what did he tell you about what he was doing to build up finances to build up that business?

A.   He was selling drugs.

Q.   And did he tell you specifically what type of drug he was selling?

A.   Selling mainly -- as far as I know and recall, it was methamphetamines.

Q.   And did he indicate to you that that was on the rise or that that was on the decrease leading up to September of 1999, if you recall?

A.   I don't -- I don't recall.  I know that the plan was -- that he had was to stop doing that.  I don't know if it had slowed down or whatever in that time period.

Q.   Okay.  His plan was to stop that and then support himself doing mechanic work?

A.   Yes.

Q.   And we'll talk more about substances in a second but we talked about employment.  Did he also talk about -- more about his marital history?  You mentioned that he got married early, got married young; is that correct?

A.    Yes.

Q.    What did Mr. Barrett tell you about his marital history and relationship history with other women as well?

A.    Okay.  He told me that he had several --

MR. SCHARDL:  Excuse me, Your Honor.  I'm going to interpose an objection here.  What's the point?  Dr. Price took a history.  Okay.  Is this -- if this is getting to something, if the government is offering this in support of the PCL-R results, then I would renew my request to voir dire on that subject.  Because this is within the scope of what Dr. Price reported on that subject and I have an objection I would like to present to the results of the PCL-R coming in and I would need to be able to voir dire the doctor as to -- for purposes of that.

Again, we don't object to him testifying on some issues, but that particular issue, there's been no testimony offered from the defense on that subject and so I have an objection.  So all of this area that Mr. Wilson is going into at this point may be completely irrelevant.

THE COURT:  What's the government say?

MR. WILSON:  Well, Judge, I can break it into pieces.  I mean, there's been prior testimony by the petitioner regarding a relationship with Abby and so I'm going to inquire of that -- about that.

But also, as counsel mentioned, there is a part of the

PCL-R interview that deals with relationships and how that factors into the scoring of that assessment.  And so I can do it in part, but it all goes as part of what his report is and the results of his report.

THE COURT:  Just doing background at the moment; right?

MR. WILSON:  That's correct.

THE COURT:  Okay.  Well, the objection is overruled for now.  When we do get into the PCL-R you can renew your objection.

MR. SCHARDL:  Well, I guess, Your Honor, if the testimony is -- if this testimony is about, for example, Mr. Barrett's relationships with women, I don't see the relevance of that except as to the PCL-R.  So why are we going into that?

MR. WILSON:  I can ask the witness that question, Judge.

THE COURT:  Sure.

Q.    (BY MR. WILSON)  When you're doing an evaluation similar to this, the question regarding marital history -- let's talk about that first -- is that relevant to your evaluation, a person's marital history?

A.    Yes.

Q.    Okay.  And I'm going to try to separate this in my mind and also in your mind, the psychopathy screening.  Setting that

aside for a second, would the questions regarding marital history, would that be relevant to the rest of your evaluation?

A.   Yes.

Q.   Okay.  Would questions regarding other relationships that Mr. Barrett was involved in, would that be relevant to your evaluation?

A.   Yes.

Q.   Okay.

THE COURT:  Before we go any further, why don't we go ahead and take our lunch break.  Is this a good time to break?

MR. WILSON:  That's fine, Judge.

THE COURT:  Before he gets into the substance of what you're about to ask him about.  And let's be back at 1:30.

MR. WILSON:  Thank you.

THE COURT:  We're adjourned.

(Lunch recess was taken)

THE COURT:  Go ahead, Mr. Wilson.

MR. WILSON:  Thank you, Your Honor.

Q.   (BY MR. WILSON)  Dr. Price, prior to the recess, we were beginning to talk about the marital history of Mr. Barrett. Did Mr. Barrett indicate to you or talk with you about his marital history in relationships specifically with a person by the name of Abby?

A.   Yes, he did.

Q.     What did he tell you about his relationship with his former wife Abby?

A.     Well, again, they were married early, had a child soon thereafter.  They had problems.  He attributed a great deal of the problems to his mainly at that time consumption of alcohol and they fought and argued and he wasn't faithful to her but he had a son with her and they -- they separated at some point.  That's kind of an overview of what he told me.

Q.     Now, when you talked -- when you mentioned the fact that he said that they fought, did you drill down into that anymore or ask more specific questions about the nature of their fights?

            MR. SCHARDL:  Objection; relevance to the rebuttal.

            THE COURT:  Overruled.

A.     Somewhat.  There was -- he told me that she on more than one occasion took out a temporary restraining order against him.  He said we had our fights, we hit each other, and I believe there was some discussion about the time in which he was charged with domestic violence or -- but not much of a discussion of that.

Q.     (BY MR. WILSON)  Okay.  And I believe you testified that ultimately they separated and actually divorced; is that correct?

A.     That's correct.

Q.     And based upon your interview and/or your review of the

records, did you determine what his marital status was at the time of the offense in September of 1999?

MR. SCHARDL: Objection; relevance. Also, Your Honor, this line was gone into during the penalty phase itself. Abby testified, the government brought out all of this information, so this is cumulative of the existing record from the trial.

Again, if this is relevant to the PCL-R, we have an objection to whether that is proper rebuttal. I think if I can ask the witness a few questions, we could get a ruling on that.

THE COURT: Overruled.

A. Could you repeat the question, please?

Q. (BY MR. WILSON) Based upon your interview of Mr. Barrett and/or the records, did you determine what his marital status was at the time of the offense of the crime in September of 1999? Was he divorced at that time?

A. I do not think he was formally legally divorced. I'm not certain.

Q. Okay. Do you know whether or not they were residing together, if Abby was living there at the time?

A. They were at least separated, if not divorced.

Q. Okay. Dr. Price, earlier we talked about Mr. Barrett financially and I believe he made the statement -- or you made the statement that he told you that at the end -- he was always broke at the end of the month; is that correct?

A.    Yes.

MR. SCHARDL:  Same objection, Your Honor.  That is from the doctor's report on the PCL-R.  The government is just trying to get this in without getting a ruling on whether it's admissible.

THE COURT:  Overruled.

Q.    (BY MR. WILSON)  Did Mr. Barrett indicate to you that he experienced episodes of where he just spent money uncontrollably?

MR. SCHARDL:  Same objection, Your Honor.

THE COURT:  Overruled.

Q.    (BY MR. WILSON)  What I mean by that is, would it -- did he indicate to you characteristics which would be consistent with a manic episode of someone who spends money in a manic episode?

MR. SCHARDL:  Objection, Your Honor.  The witness has not offered any opinions in his report on the subject of mania or bipolar disorder.  The court made a ruling that we were entitled to a report under Rule 16 as to whether -- summarizing any opinions.  We have no such report on that subject.

THE COURT:  Is this something that is contained in his report?

MR. WILSON:  About whether or not he -- well, Judge, in his report, which for the record is Exhibit No. 51, which is

the CV and the report, in page 9 of that report -- and actually page 36 is the exhibit, Your Honor.

DEPUTY COURT CLERK:  Government's exhibits?

MR. WILSON:  Yes.  Government's Exhibit No. 51, page 36, the second paragraph -- well, numbered paragraph No. 2 at the bottom, there is a conclusion and an opinion that deals with psychological testing.

THE COURT:  Right.

MR. WILSON:  Also testing indicates traits consistent with antisocial and a paranoid personality disorder. That goes -- the questions I'm asking go to the basis of that opinion.

THE COURT:  All right.  Well, with that limitation, the objection's overruled.

MR. SCHARDL:  Just for the purpose of the record, Your Honor, the limitation is that the witness is not to testify in rebuttal to a diagnosis of bipolar disorder; is that correct?

THE COURT:  Are you planning to offer that testimony?

MR. WILSON:  May I consult with counsel for a second, Your Honor?

THE COURT:  Yes.

(Discussion held off the record)

MR. WILSON:  Your Honor, I believe this witness is

prepared to testify as to his own observation and his own diagnosis of Mr. Barrett when he saw him in 2005.

THE COURT: Well, as I look at the diagnostic formulation here, it doesn't say anything about bipolar disorder. He's not going to testify that he didn't have bipolar disorder, I assume?

MR. WILSON: He's going to give his opinion as to what his diagnosis would have been of Mr. Barrett at that time.

THE COURT: But not as to something that's not in this report?

MR. WILSON: That is correct, Judge.

THE COURT: Okay. Very well.

MR. WILSON: I'm not going to ask him specifically a question about direct rebuttal as to Dr. Woods' testimony.

THE COURT: Okay. Go ahead.

MR. SCHARDL: My objection then would be why is the doctor testifying if not to rebut Dr. Woods?

THE COURT: Overruled.

Q. (BY MR. WILSON) Do you remember my question?

THE COURT: Does anybody?

MR. WILSON: I sort of do, Judge. I'll ask it again.

THE COURT: Go ahead and ask it again.

Q. (BY MR. WILSON) I was asking you about, did he during your interview tell you that he had experienced behaviors

involving spending that were consistent with a manic episode?

A.    No.

Q.    Did you discuss with Mr. Barrett about his own reports of mental health history?

A.    In the past?

Q.    Yes, yes.  I mean, I know you reviewed mental health records; correct?

A.    Yes.

Q.    But did you discuss with him individually about his reports of any mental health treatment or problems that he was having?

A.    Yes.

Q.    Okay.  And did he report to you consistent with what you saw in the report -- in the -- in the reports from the -- from, say, for instance, Eastern State and Bill Willis?

A.    Yes.  His report was consistent with those in terms of the problems being primarily due to substance abuse and that history.  Yes, it was consistent.

Q.    Okay.  In your report, you use the expression that he was hospitalized for depression and behavioral dysfunction.

A.    Yes.

Q.    What do you mean by that?  I mean, I know what substance abuse is obviously -- or, I mean, I know what depression is. But when you say "behavioral disfunction," what do you mean by that?

A.    He was at that time, before he went to Eastern State Hospital, he was agitated, he was angry, he was threatening people, he was tearing up property, and doing things that were not the kind of behaviors that you would call within the normal spectrum they were.  It involved at least anger, agitation, and were related to substance abuse.

Q.    Okay.  Did he also indicate to you about an admission in 1995 to Bill Willis Community Health Center?  Did he talk with you about that?

A.    A little bit.  He told me that he was there, yes.

Q.    Did he tell you why he was there?

A.    I don't recall that he did.  I don't recall that.

Q.    Okay.  From the review of the records, did you determine why he was there?

A.    Yes.

Q.    And what was that?

A.    That was at the time -- that was in 1986, I believe, at the time of the suicide attempt or just before.

Q.    I'm talking about 1995, Bill Willis in 1995.

A.    That was -- as I recall again, it was related to behavioral problems and substance abuse, and I don't remember him and I discussing that, though.

Q.    During your discussion with Mr. Barrett, did you talk with him about injuries that he may have sustained in his past consistent with a head injury?

A.    I did, yes.

Q.    Okay.  And did you also review the records for anything consistent with head injury?

A.    I did.

Q.    Okay.  Based upon -- and let me see if we can separate this, if you can -- based upon your review of the records, were there any reference in any of those records about potential head injuries that Mr. Barrett had suffered?

A.    I think there was a reference to those in other people's reports, but there were no records of evaluation or treatment following any head injury.

Q.    Okay.  Now, specifically I'm referencing a report of an event which took place in Mr. Barrett's childhood regarding being struck in the head with some steel ball.  Do you recall that?

A.    Right, I do.

Q.    And do you recall if Mr. Barrett actually told you about that?

A.    He did.

Q.    And can you tell the court what he related to you about this incident in his childhood?

A.    Well, he said it was sometime in the 1960's.  That was as close to the time frame as we could get.  He said that he did go to the hospital.  He said that he was -- had a period of loss of consciousness for hours.  He said that it came about

from getting hit in the head with some kind of steel ball on the playground. And he said that he did not experience any cognitive problems from that.

Q.   And when you said he said I didn't experience any cognitive problems, was that the words that he used? Did he say, "I didn't experience cognitive problems"?

A.   No.

Q.   Or is that your summary of it?

A.   The word he used was "no" when I asked him if he had any cognitive problems following that.

Q.   Okay. Did he -- did he appear to understand your question?

A.   Oh, yes.

Q.   Now, you're a neuropsychologist; correct?

A.   Right.

Q.   If someone reports to you that they sustained a brain injury resulting in hours of unconsciousness --

A.   Okay.

Q.   -- would that give you any concern?

A.   Well, if somebody -- the principle is that if there is a loss of consciousness, it's an -- it's an indicator of a more problematic head injury that may have caused a brain injury. The longer the period of unconsciousness the more severe the deficits are likely to be from that injury, and hours of unconsciousness would be very significant in that that would

constitute a severe brain injury at the time and it more than likely would result in very serious deficits in more than one area of cognitive functioning.

Q.   First, were you provided any documentation, medical records, reflecting this hospitalization for a ball -- steel ball injury to the head?

A.   No.

Q.   Based upon your observations of Mr. Barrett, did you see any characteristics or deficits which would be consistent with someone who had a brain injury resulting in multiple hours of unconsciousness?

MR. SCHARDL:   Objection.   Unless we have the scientific basis for being able to observe someone and say whether based on observation what, 25, 30 years later you could do that.

THE COURT:   That's a subject for cross.   So the objection is overruled.

MR. SCHARDL:   Well, it is an opinion.   There's no scientific basis for it, Your Honor.

THE COURT:   Overruled.

A.   If someone -- let's see.   The answer to your question is, no, I didn't see that.

Q.   (BY MR. WILSON)   Okay.   What would you expect -- you said you would expect to see significant impairment; is that correct?

A.   Yes.  With that kind of period of unconsciousness, there would likely be signs that you could observe by -- or that you could tell by observation in terms of problems with motor functioning or speech or comprehension and that -- but I didn't rely upon that.  The neuropsychological testing that I did did not reveal evidence of a severe brain injury.

Q.   And we'll get to the test in a second.  Okay.  Thank you.

You reviewed the records and there were -- we talked about this earlier -- references to substance abuse throughout the records; correct?

A.   That's correct.

Q.   And did Mr. Barrett when you talked with him, did he tell you or give you information consistent with what you observed in the records?

A.   Yes.

Q.   And I apologize if I've asked this before and I -- but when you talked with him did you discuss with him specifically about the 1986 suicide attempt?

A.   Yes.

Q.   And did you ask him what brought this about, if you recall, or what led up to his trying to take his own life?

A.   You know, I don't recall us discussing that.  I probably did but I don't recall what the details of that was.  I did -- he did tell me about his history of either suicide attempts or ideation, but I don't remember what his perception was of the

causes of that at that time.

Q.    Well, his reporting regarding suicide attempts or ideation, did that -- did that have any relationship to substance abuse?

A.    Yes.  And that this attempt was the only attempt that he said he'd ever had or the only time he thought about it.

Q.    How long approximately did the actual interview take, if you recall?

A.    I don't remember.  It was several hours but I don't remember how long.

Q.    And also then after the interview, then you began to perform some tests; correct?

A.    Yes.

Q.    Okay.  And are you trained to perform psychological testing?

A.    Yes.

Q.    And is that a function that you typically use as part of your evaluation?

A.    It is.

Q.    Okay.  And I believe we talked about the fact that you had made some decisions in advance on some tests that you were going to provide; is that correct?

A.    That's correct.

Q.    We're going to talk about those tests.  The first one that I want to visit with you about is a test known as the

Reynolds Intellectual Assessment "System," the RIAS.  Are you familiar with that test?

A.    I am.

Q.    And is that a test that you're trained to perform?

A.    Yes.

Q.    And when I say that, was that a test that you were trained to perform back at the time that you did that back in 2005?

A.    Yes.

Q.    And what is the -- what's the purpose of this particular test?

A.    To determine a general level or range of general intellectual functioning, intelligence, and to look at both verbal and nonverbal intellectual functions, verbal being the use of language and nonverbal being more the use of visual-spatial skills and that sort of thing.

Q.    Is that a test that's generally accepted within the scientific community specific to psychology?

A.    Yes.

Q.    And had you performed this test on persons prior to the test that you performed on Mr. Barrett?

A.    Yes.

Q.    Approximately was it -- approximately how many times?

A.    I have no idea, but it was, you know, numerous occasions.

Q.    Okay.  And how is this particular test performed?  Is it

a series of questions?  What do you do?  Or what do you ask Mr. Barrett to do?

A.    Well, on the verbal part, it's questions where the evaluator asks certain questions to which the person taking the test responds orally and --

Q.    Let me interrupt you for a second.  Are these standardized questions or are these just questions you come up with at the time?

A.    No, these are standardized questions.  On any objective psychological test, there's -- you ask the same questions.  The administration of it is standardized so the person can be compared to other people similar to him.

Q.    Okay.  And did you follow that procedure in administering this test to Mr. Barrett?

A.    Yes.

Q.    So you asked him questions on the verbal part and he responds; is that correct?

A.    Right.

Q.    And do you record those responses?

A.    Yes.

Q.    And plus, the whole testing is actually being videotaped; is that correct?

A.    In this case, yes.

Q.    And so you have verbal.  What is the nonverbal component of this test?

A.    It's the administration of problems that I ask him to solve that were not verbal.  You don't -- you don't say the answer but rather you solve something, kind of like a puzzle or something that's done with a response other than words.

Q.    Would this test be beneficial to you in your realm as a neuropsychologist?

A.    Yes.

Q.    And based upon Mr. Barrett's -- first of all, let me ask you this:  Did Mr. Barrett attempt to perform all the tasks that you asked him in reference to the -- to this particular test?

A.    Yes.

Q.    Was he able to perform and complete the test?

A.    Yes.  And it -- I just have to say yes, yes.

Q.    I guess what I mean is, did he just quit and say, no, I'm not going to do that?

A.    Oh, absolutely not.

Q.    And based upon his performance, did you have an opportunity to score that -- that test?

A.    I did.

Q.    And what was -- what was your conclusions or the scoring of this particular test?

A.    Well, overall what it showed was he tested in the range of average intellectual functioning and that there was not a significant difference between his verbal and nonverbal

intellectual functioning.

Q.    Is this one of the tests that you were talking about earlier when you were -- when we were discussing the issue of a significant brain injury?  Is this one of the tests that you were talking about that you considered?

A.    Yes.

Q.    Someone who had sustained a significant head injury with loss of consciousness for a number of hours, would that person typically score in the range that Mr. Barrett scored?

A.    No.  With a severe brain injury, there's typically a consequence of impairment in general intellectual functioning and it would not likely be -- if it was a mild brain injury, potentially overall intellectual functioning could be average but not in the case of a severe.

Q.    Okay.  Is that the only intellectual functioning test that you performed?

A.    Well, it's the only one for general intelligence, yes.

Q.    Let's talk about the next test you performed.  That would be the Repeatable Battery for the Assessment of Neuropsychological Status; is that correct?

A.    Yes.

Q.    The RBANS?

A.    That's correct.

Q.    Once again, is this a standardized test?

A.    It is.

Q.   Is this a test regularly accepted within the scientific community?

A.   Yes.

Q.   And had you had training to administer this particular test?

A.   Yes.

Q.   And did you have that training prior to 2005 when you saw Mr. Barrett?

A.   I did.

Q.   And had you performed this test on persons prior to Mr. Barrett?

A.   Yes.

Q.   And would the answer be the same, that it would have been many, many folks prior to Mr. Barrett?

A.   Yes.  On many occasions.

Q.   And what is the purpose of this particular assessment or test?

A.   It is a test that tests a number of important neurocognitive functions, especially attention, memory, language functioning, and the visual-spatial nonverbal kinds of tasks as well.  It is a screening test that is done to determine if further testing is needed.

Q.   Again, did Mr. Barrett cooperate with you in the administration of this test?

A.   He did cooperate, he was involved in this, he even

appeared to enjoy the challenge of some of them, and, you know, he put forth good effort.

Q.     So he didn't say, no, I'm not going to do that, or quit midway through?

A.     No.  Not at all.

Q.     I noticed that this particular test scores different functions or characteristics.  Is that correct?

A.     Yes.

Q.     And did you have an opportunity to score Mr. Barrett's result or the results of the testing?

A.     I did.

Q.     Okay.  Before we get there, this particular test, how is it administered?  The other one we talked about we had verbal questions and answers and we had problems that Mr. Barrett was asked to solve.  How is this particular test performed?

A.     In the same way.  It's an individually-administered test. It's not one that I would hand to the person and them complete it, but rather I'm asking the questions, I'm presenting the problems for him to solve, and he responds based on the instructions of the test.

Q.     And are you recording the responses?

A.     Yes.

Q.     And, again, are these standardized questions, these are not just questions you come up with at the time?

A.     Right.  It's standardized so he can be compared to others

of his chronological age and education level.

Q.    Now, as to the particular parts of the test, as far as the results of the test, one of the factors that is scored is immediate memory; is that correct?

A.    Yes.

Q.    And how did Mr. Barrett score in reference to immediate memory?

A.    He scored in the average range, towards the bottom of the average range, at what we would refer to as the 25th percentile, which means that he scored higher than 25 percent of the people in the normative sample of his age and education.

Q.    The fact that 75 percent of the population scored better than him, did that give you any pause in reference to your evaluation of Mr. Barrett?

A.    No pause.  It's also consistent with the fact that he has a history and on this test evidenced problems with attention to a task that requires sustained attention.  That was consistent with his history and consistent with the other findings.

Q.    The fact that he scored 25th percentile, would that be consistent with or -- consistent or inconsistent with someone who had a brain injury?

A.    Well, it -- a -- it could be.  If there wasn't a history of problems with attention and concentration and, you know, the kinds of problems he had in school, it could be consistent with

a mild traumatic brain injury.

Q.   Okay.  Well, let's look at the next portion of the test, the visual-spatial constructional ability.  What does that mean?

A.   Well, again, it's solving problems that don't require language.  It's solving problems kind of like -- in as much as we can, it's kind of like a mechanical problem as opposed to a problem involving just language.  It's something that you do.  You have them draw, copy a complex figure and identify pictures of things so it's nonverbal.  And it's more like -- what I said, it's kind of like the things that people who are good at fixing things, solving problems that don't require language.

Q.   And how did Mr. Barrett score on that aspect of the test?

A.   He did very good.

Q.   I believe he was 96th percentile; is that correct?

A.   That's correct.

Q.   Would that be consistent with his self-reporting of his ability to work on cars and to fix things?

A.   It would be.

Q.   This test also looks at language and language functioning; is that correct?

A.   Yes.

Q.   And how did Mr. Barrett score in that regard?

A.   In the average range at the 42nd percentile.

Q.   Okay.  We've talked about attention before, but it also

looks at specifically attention; correct?

A.    Yes.

Q.    And Mr. Barrett scored poorly on attention?

A.    He scored at the 5th percentile.

Q.    So 95 percent of the population have better attention; is that correct?

A.    Right.  That's on a tedious kind of a task that is timed and that it requires the sustained attention of someone, and he scored poorly on that.

Q.    The next component is delayed memory.  How did he score on that?

A.    He scored well, higher than immediate memory.  He scored at the 58th percentile.  And it's the same -- the same stimulus or the same things I asked him to recall but it's after 20 minutes at least.  That happens sometimes that if they're given time for that to consolidate, they score better showing that it's -- that the immediate memory was more related to attention and that there's not a deficit with his longer term recall of things.  He scored at the -- at the 58th percentile.

Q.    Before we move on from that, one of the reports that you looked at was Dr. Sharp's evaluation; is that correct?

A.    Correct.

Q.    And I believe the Dr. Sharp found deficiencies regarding long-term memory; is that right?

A.    That's what the report said, yes.

Q.     Well, is this test consistent or inconsistent with what Dr. Sharp found?

A.     Well, it wouldn't be either because what Dr. Sharp is talking about is a person's ability to recall their own life and their own life history.  So, you know, there's really, really short-term recall, immediate, and then real long term, which means over the years.  That's what he said concerned him is his difficulty in recalling his own life events.

Q.     Well, when you talked with Mr. Barrett, did you notice a problem with him recalling his long-term life events?

A.     In some areas he did not recall the details of his life events, especially the time line and the dates and that sort of thing, so there was some problem with that that I saw.

Q.     All right.  And then this particular test, the RBANS, comes up with a total scale; correct?

A.     Correct.

Q.     And where did Mr. Barrett score on the total scale?

A.     At the 42nd percentile.  So that's also an average range.

Q.     Okay.  Did you -- and this particular test would have dealt with neurological functioning; correct?

A.     Yes.

Q.     Did you perform any other screening test specifically focused on neurological functioning?

A.     No.

Q.     Based upon the screenings that you provided, this one --

or that you had performed, this one and the Reynolds Intellectual Assessment, did you have a concern about Mr. Barrett's neuropsychological functioning?

A.    No.

Q.    Why not?  I mean, he scored on the 5th percent on attention and 25th percent on immediate memory.

A.    Well, in terms of it being something acquired that would be significant in his life, the attention problems are there. He was -- he could relate that history to me and how it affected him in school and that's -- as we know now, having a child with problems with regard to attention and a learning disorder is not that uncommon and it wouldn't be of concern in terms of a severe traumatic brain injury to me, but it was consistent with his history.

Q.    If Mr. Barrett would have scored at some level which gave you concern about brain injury, would you have done something different?

A.    I would have asked that I be able to return, re-evaluate him with a more comprehensive battery of neuropsychological assessments, and I would have had -- but that's what I would have done.

Q.    You also performed another test, a Personality Assessment Inventory, PAI.  What is that?

A.    Well, that is an inventory which means -- and it's a self-report inventory.  It's a test that you give the person

and they read a series of statements of various kinds about themselves and say -- or they have a place to answer if that is entirely false, entirely true, and then on the PAI it has ones in the middle that says that it's mostly true, mostly false. And so it's their own perception, their own self-assessment of those questions and how they apply to him.

Q.   Again, is this a standardized test?

A.   It is.

Q.   A test accepted within the community?

A.   Yes.

Q.   A test that you had been trained to perform prior to 2005?

A.   Yes.

Q.   A test that you had given to other patients or clients or people that you evaluated?

A.   Correct.

Q.   And did Mr. Barrett give you genuine effort in completing this task?

A.   Yes.  I certainly can tell that in addition to observing him.  This, the PAI, has scales that allow us to tell if they're trying to exaggerate problems they have or trying to hide problems.  It didn't show any of those tendencies indicating that the clinical scales then are valid.

Q.   And this particular test, did you have an opportunity to score the results?

A.    Yes.

Q.    And what, if any, results did you find in reference to Mr. Barrett?

A.    Well, the most clear thing was his perception of himself and his problems is that they were mainly due to alcohol and to drugs, to substance abuse.  That was the main finding here.

There's also some level of depressive symptoms and some level of paranoia, and those were the main findings that I thought were relevant in his case.  So in his own perception, his biggest problems in his life have been related to substance abuse.

Q.    And was that consistent with the medical records that you reviewed?

A.    Sure, it was.

Q.    And was that consistent with his own statements he made during the clinical interview.

A.    It was.

Q.    The next test, the MMPI-2, once again, that's a standardized test; is that correct?

A.    That's true.

Q.    And had you received training on that test?

A.    Yes.

Q.    And had you performed that -- or had the training prior to giving it to Mr. Barrett back in 2005?

A.    Yes.

Q.    And did Mr. Barrett attempt to complete this particular task?

A.    He did.

Q.    And correct me if I'm wrong, Doctor, but this particular test is pretty long, a pretty exhausting test; is that right?

A.    Can be.  People generally don't enjoy taking it.

Q.    Okay.  It's a number of standardized questions and you -- it's a written response; is that right?

A.    Yes.

Q.    As far as filling in the circle?

A.    Right.  It's about over 560 statements that they respond true or false for them.  There's no right or wrong answer. Again, a self-report inventory.

Q.    And did you have an opportunity to score Mr. Barrett's results?

A.    I did.

Q.    And does this test also have built in within it a malingering scale to determine whether a person is exaggerating or trying to minimize symptoms?

A.    Yes.

Q.    And any indication that Mr. Barrett was trying to do that?

A.    No.  There was not an indication that he was trying to fake anything or grossly exaggerate any problem he might have had.

Q.    Did he -- he didn't quit in the middle or anywhere during the test and say, I'm tired, I'm not going to do this anymore?

A.    That's correct, he did not.  He was cooperative.

Q.    What were the results of the scoring of this particular test, personality inventory?

A.    Three things.  The first is, a score that indicated antisocial attitudes and behaviors; the second indicated paranoid thinking or chronic suspiciousness; and the third being a combination of three scales that indicated that at that time he was very concerned about his physical medical problems, that he was focusing on things such as pain, discomfort with his body.

Q.    Let's talk about those individually for a second.  The portion you talked about, this antisocial behavior --

A.    Yes.

Q.    -- tell me -- tell me more about that.  How is that determined from this particular test?

A.    Well, again, there's certain items that are known to correlate to people with antisocial attitudes and behaviors and he answered those in that direction.  Antisocial doesn't mean that the person doesn't like people or is -- would rather be alone.  It means that those are attitudes and behaviors that are against society, that are those that are correlated to criminal conduct to other traits and behaviors of -- it's the opposite of prosocial.  It's against the rules and laws of

society.

Q.     Now, earlier we've talked about paranoia, but this test indicates some characteristics consistent with paranoid behavior or thought; is that correct?

A.     That's right.  It's a -- you know, there's several types of disorders that have the element of paranoia.  A paranoid schizophrenic believes very bizarre things are happening only against them, that people are following them, people have cameras and outlets on the wall, they've implanted something, a chip, in their brain, you know, bizarre things such as that.  That's a paranoid schizophrenic disorder.

A paranoid delusional disorder is, again, one where the person has -- has ideas that are false that they believe, and it pertains to things that are -- that, again, can be bizarre, that people are doing things to them, perhaps it's something in the room, in the kind of lights in the room that are planted there.

And then there's a paranoid personality disorder. That's -- one, that's a person that is suspicious of other people but also more than that is very sensitive to criticism, easily slighted, somebody can say something to them and they take it more seriously than it really is, a paranoid personality disorder.

And so he does have those kind of traits and it's more consistent with the paranoid personality disorder.  And we have

seen that, too, on other evaluations, such as the one from Dr. Sharp and others, where there's these features of being overly sensitive to what other people think about them and do to them and suspicious of others and think that the -- that elements of society are out to get them.

Q.    Okay.  The next test we refer to is a specific test involving the issue of malingering; is that right?

A.    That's correct.

Q.    That would be the Structured Inventory of Malingered "Systems"?

A.    That's correct.

Q.    Once again, that's a standardized test; right?

A.    It is.

Q.    And if I were to ask you the same questions about your experience with that, would all the answers be the same?

A.    That's correct.

Q.    And did Mr. Barrett during the performance of this test -- or excuse me -- did this test reveal that Mr. Barrett was malingering in any -- during -- let me just ask:  What were the results of this test?

A.    The results of this test did not indicate that he was trying to fake anything for his own gain in terms of psychological problems, that he was not grossly exaggerating his problems, and so I could rule that out.

Q.    All right.  And the final test that you performed is

known as the PCL-R or the Psychopathy Checklist Revised; is that correct?

MR. SCHARDL:  Your Honor, we have an objection to the relevance of this as to rebuttal.  There's no -- again, I would request the opportunity to voir dire the witness as to whether this is proper rebuttal to the testimony offered by Dr. Woods, which is the only mental health evidence before this court.

THE COURT:  What's the government say?

MR. WILSON:  Can I have just one moment, Your Honor?

THE COURT:  Sure.

(Discussion held off the record)

MR. WILSON:  Your Honor, this particular issue was raised in a motion filed by counsel.  In the government's response to that motion, we cited an Eighth Circuit case of United States v. Lee, where the Eighth Circuit allowed the government to present evidence broader than the testimony that it was sought out to rebut.

In this particular case, the whole basis of this 2255 -- or this portion of the 2255 is dealing with the mental health issues, dealing with failure to present evidence in a second stage involving issues of mental health.  I think this goes to Mr. Barrett's characteristics.  It goes to a number of the aggravators that were listed in the notice of intent to present aggravating evidence, including the substantial

planning, the fact that there are multiple murders of the great risk to others, and also the future dangerousness.  So I think it's all relevant, Your Honor.

THE COURT:  Well, what do you say to the argument that if I hear testimony regarding the PCL-R I heard from this witness, they have a right to put on their witness who would rebut the evidence regarding the psychopathy?

MR. SCHARDL:  That witness has been excluded already, Your Honor.

THE COURT:  I know that.  But he's basically saying that if I let this testimony come in, I need to hear from their witness too.  What do you say to that?

MR. WILSON:  May I have just a moment, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  May I also add, Your Honor, that the government is talking about presenting this witness as part of its case in chief in the penalty phase.  This is supposed to be rebuttal.  Mr. Wilson was just talking about the aggravating circumstances in the notice of intent.  This witness could not have testified to those circumstances because he was only allowed to see Mr. Barrett for purposes of rebutting the PCL-R that was done by Dr. Russell.  That has not been offered in this case.  This case is very distinguishable and easily distinguishable from the Lee case, in that the type of evidence offered in that case the court found opened the door.

In this case, there is no evidence of a nexus -- which is the language that court used -- there's no evidence of any nexus between the PCL-R and the specific mental health evidence that was introduced in these 2255 proceedings.

THE COURT: Didn't Dr. Russell testify about that at the trial?

MR. SCHARDL: Dr. Russell didn't testify at the trial.

THE COURT: No.

MR. SCHARDL: Our position in this 2255 is that trial counsel were ineffective for only going to Dr. Russell and only asking her to update the risk assessment rather than doing the sort of mental health evaluation that the 2255 experts did.

THE COURT: But you did the PCL-R.

MR. SCHARDL: And that evidence didn't come in in this proceeding and it didn't come in in the trial proceeding. That's why it's not relevant. She didn't testify to any of those opinions.

THE COURT: Let me hear from the government.

MR. WILSON: May I have just a moment, Your Honor?

(Discussion held off the record)

MR. SCHARDL: If I may, I wanted to wait until opposing counsel was done. I just wanted to add that if the government is offering this, the PCL-R, as rebuttal to the

diagnoses that Dr. Woods testified to, again, there is nothing in Dr. Price's report that in any way suggests that it is rebuttal to those opinions. We're entitled to notice of how this evidence is going to be used, what the summary of his opinions are. There's absolutely nothing in this report that suggests in any way that the PCL-R findings are rebuttal to the diagnoses of Dr. Woods.

THE COURT: You're talking about for purposes of this hearing; right?

MR. SCHARDL: Well, for purposes of this hearing --

THE COURT: Presumably, there wouldn't be any prohibition against them using all of this in another trial; no?

MR. SCHARDL: Oh, yes, I believe there would be. If the defense did not introduce the sort of testimony that was contemplated by trial counsel with Dr. Russell, if the defendants did not introduce testimony to which the PCL-R is relevant, then it would have been excluded.

THE COURT: Well, the PCL-R is a future dangerousness issue, isn't it?

MR. SCHARDL: Yes.

THE COURT: Part of the complete risk assessment; no?

MR. SCHARDL: Yes, Your Honor. And that was done because the defense in this case did a risk assessment, not a

mental health assessment. The jury in this case acquitted Mr. Barrett of future dangerousness.

THE COURT: Okay. But what you're saying is, you should have got to put on a lot of evidence you haven't put on; and if you had, this would be rebuttal evidence to it.

MR. SCHARDL: No, Your Honor. I'm saying the exact opposite.

THE COURT: No, I'm saying that. Tell me what's wrong with that.

MR. SCHARDL: Well, what's wrong with it is that the -- that's why I asked for the opportunity to voir dire the witness, that the PCL-R is not a rebuttal to a diagnosis of bipolar disorder or posttraumatic stress disorder or any form of brain damage. It is simply a separate sort of construct that is used for future dangerousness, correct, but it is not used in the context of psychiatric diagnoses.

THE COURT: Now, you're -- one of these -- the two witnesses you mentioned earlier that were excluded by Judge Payne --

MR. SCHARDL: Yes, sir.

THE COURT: -- which one was the one that was going to bring forward Dr. Young's work?

MR. SCHARDL: Primarily, Dr. Miora, Your Honor.

THE COURT: Okay. And is there anything that Dr. Miora or Dr. Young would have testified to that would make

this relevant?

MR. SCHARDL: No, Your Honor. I think if I were to ask Dr. Price whether the PCL-R can be used to exclude brain damage or neurocognitive impairment, his answer would be, no, it cannot.

THE COURT: What's the government say to that?

MR. WILSON: I haven't asked Dr. Price that question so I don't know the answer to that question.

THE COURT: Well, I'm going to save all of this -- I'm going to save all of this for cross-examination. If it turns out that there's any evidence -- any direct evidence I want to exclude, I'll exclude it. But for now -- so for now your objection is overruled.

I'll tell you -- as long as we're talking about it, I'll just tell you. I'm seriously considering letting you guys bring those two doctors at a later date. I hate to put this thing off even further, but I am feeling like I need to hear testimony from those two doctors so that I have a complete picture of what could have been presented at trial in order to determine whether it would have made a difference. Because that's really what I'm addressing here, is it not?

MR. SCHARDL: It is, Your Honor. And I would say that if the court's ultimate ruling is that -- well, first, I would say we would welcome the opportunity to bring the experts back. We would have loved to have the opportunity to present

them before this expert in our case in chief, of course.  I would also say that if the court's ultimate ruling is that the PCL-R testimony is admissible, that we have an opportunity to bring our expert on the PCL-R --

THE COURT:  That's Reidy?

MR. SCHARDL:  That's Dr. Reidy.

THE COURT:  I'm talking about Miora and Reidy.

MR. SCHARDL:  Oh, I'm sorry.  I thought you were referring to Dr. Miora and Dr. Bigler.  I apologize.

THE COURT:  No, Miora and Reidy.  And what I'd like for you all to do, since I'm thinking about that, is get together with counsel for the government and figure out when you can get them here and see if we can't put that on my calendar as well.

MR. SCHARDL:  In all candor, Your Honor, I have to say that Dr. Reidy is actually sitting right there.  I did not bring Dr. Miora with me because it wasn't necessary but I hoped you would help me with the cross-examination.  So -- but he's -- I haven't prepared him to testify.  He's here to help me with my cross-examination.  But Dr. Reidy is present.

THE COURT:  If we had time on Wednesday, could you get him prepared?

MR. SCHARDL:  If we had time on Wednesday?  Well, again, if that's the court's ruling, I suppose I could.  But, again, I think that the correct ruling would be that the

testimony on that should be concluded.  But if that is the court's ruling, I suppose so.

THE COURT:  All right.  Well, objection's overruled for now.  Let's go ahead and proceed.

MR. WILSON:  Your Honor, we've had a lot of discussion here and I'm going to maybe short-circuit some of this.  I'm just going to move on.

THE COURT:  Okay.

Q.   (BY MR. WILSON)  Dr. Price, based upon your evaluation of Mr. Barrett, did you have a diagnosis of Mr. Barrett at the time that you -- as a result of your evaluation of him back in 2005?

A.   I did.

Q.   And what was that diagnosis, sir?

A.   Well, there were several things.

Q.   Okay.

A.   The first is a learning disorder, which would have been long-standing, that in my case was not otherwise specified.  I couldn't say what particular areas of academic functioning were impaired with him but there was a history of this.  And also, that learning problem included, at least in the history, signs and symptoms of attention-deficit disorder and hyperactivity that was supported.  So that's more by history than from my evaluation of him other than what was in the records and him saying.

The second was polysubstance dependence, which was at the time in remission secondary to incarceration.

Third, dysthymic disorder, d-y-s-t-h-y-m-i-c, which is a form of depression, a type of a depressive disorder that's long-standing and chronic.  That means that it's gone on for a long time and may increase and decrease but it's relatively mild, not a major depressive disorder at the time.

And then I diagnosed him with a personality disorder with antisocial and paranoid traits and features.

Q.    And what do you mean by that?

A.    A personality disorder is not a mental disorder.  It is -- a mental disorder is where someone is developing or was functioning without problems and then something happens that causes them to have problems.  That's a mental disorder, a mental illness, a mental disease.

Whereas a personality disorder refers to the way the person is.  It's more of a long-term characterological condition that is either a source of distress for that person that it interferes with their functioning and it's always been there, at least since adolescence, early adulthood, or it may not be a source of distress for that person but it is for other people.

And so his personality disorder has those traits and features of both antisocial, against society, and then the easily angered, easily slighted type of paranoia.

Q.   Okay.  Now, I know that as of today in 2017 -- and I believe that Dr. Russell said this a moment ago -- we no longer have axises in diagnoses; is that correct?

A.   Right.

Q.   But what you've been talking about in your report, you actually put those Axis I, Axis II, Axis III; is that correct?

A.   That's correct.

Q.   At the time you performed this evaluation back on Mr. Barrett back in 2005, in the scientific community was it still accepted to have axis of diagnoses?

A.   Right.  That was the standard in what is referred to as the DSM-IV, that Axis I is mental disorders, Axis II is personality disorders or mental retardation, and those are those issues that are developmental, the way they develop is not a decline in functioning.  And then they had Axis III, which is general medical conditions.  Axis IV was to describe any psychosocial environmental problems the person had.  And Axis V was to assess their global functioning.  So we now don't have those five axises in the DSM-V.

Q.   Okay.  But at the time, DSM-IV -- DSM-IV-TR would have had those; is that correct?

A.   Yes, that's correct.

Q.   And in your reports, you actually have an Axis IV diagnosis; is that correct?

A.   Well, it's a -- it's not -- it's part of the formulation.

Q.   Right.

A.   It's a description of the problems that may have been affecting him at the time.

Q.   Which you list as the fact that he was incarcerated?

A.   Right.

Q.   And obviously facing murder charges?

A.   Yes.

Q.   Okay.  And then Axis V, the global assessment --

A.   Yes.

Q.   -- in layman's terms, what do we get from that?

A.   Not much.

Q.   Fair enough.

A.   It's a -- part of the reason we don't have these is that what we were asked to do is to put a number or a range of number that would say how are they doing in life, and it was just too many variables involved but -- so you're trying to function in life regarding everything, where's this person fall in terms of how the problems they have are affecting them.

Q.   Okay.  As a neuropsychologist, are you familiar with a term of "dysexecutive syndrome"?

A.   I am.

Q.   What is that?

     MR. SCHARDL:  Objection.  There's nothing in his report about this.  And, in fact, he did not administer any tests of executive functioning and he's just testified to that

a little while ago.

THE COURT:  What's the government say?

MR. WILSON:  May I just ask a foundational question about that, Judge?

THE COURT:  Sure.

Q.   (BY MR. WILSON)  As part of your evaluation of Mr. Barrett, did you -- are there -- first of all, are there tests specifically designed for executive functioning?

A.   Yes.

Q.   Did you perform any tests specifically designed for executive functioning?

A.   No.

Q.   The tests that you performed as a screening tool, do those have any impact on your assessment of executive functioning?

A.   Yes.

Q.   In what capacity?

MR. SCHARDL:  Objection.  It's not in the report. There's nothing in the report about executive functioning. There's no opinion about it whatsoever.

THE COURT:  Where are we going with this?

MR. WILSON:  Well, Judge, I'm looking at the fact that Mr. -- or excuse me -- Dr. Price was asked to do a general assessment because he didn't know exactly where defense was going, and we can resolve the issue later about firewall

counsel and things like that.

But suffice it to say, Your Honor, I believe the facts are going to bear out the fact that Dr. Price was given very limited instruction because the government knew very limited information about what the defense was going to call and so he was asked to give an analysis, a broad examination.

And as part of the -- of this particular 2255, there have been allegations made that there was information that was available to counsel regarding deficiencies with intellectual functioning that they should have had additional testing and presented evidence on.

At the time that Mr. -- that Dr. Price evaluated Mr. Barrett, he was asked to look at an overall assessment and he was given -- and he gave these foundational or -- I don't know the exact phrasing or wording that he used -- but criteria that he looked at and determined he didn't need to go any further than that.

And I just wanted to talk with him and ask him questions about at the time that he gave those official assessments, was he looking at or considering the idea of executive functioning at that time.

THE COURT:  So why isn't that in the report, or is it?

MR. WILSON:  Judge, the wording "executive syndrome" or "dysexecutive syndrome" or "executive functioning," no, it

is not in this particular report.

THE COURT: Okay. Objection's sustained.

MR. WILSON: Thank you. May I have just one moment, Your Honor?

THE COURT: Yes.

(Discussion held off the record)

MR. WILSON: Your Honor, I'm prepared to pass the witness. Before I do that -- and we've had a long discussion regarding the PCL-R and the court also inquired of counsel about the fact that Dr. Russell performed that test as part of her assessment. The government has made a decision to not go there.

However, I want to -- I want to ask the court, if the court will, to inquire of counsel. There have been a number of allegations made about trial counsel, Mr. Hilfiger and Mr. Smith, failing to present evidence and the petitioner has made a decision today to avoid that in their direct testimony of Dr. Russell. The government doesn't want to find itself in a situation where it has now not gone there itself and now the petitioner wants to come back and say, well, they were -- they should have done this, they had Dr. Russell there, they could have called her, she could have presented all this evidence about the PCL-R, he was really low on the scale and he was not -- he did not meet criteria for psychopathy.

So if they're abandoning that argument in totality,

then the government's prepared to pass this witness.

THE COURT: Well, what do you say?

MR. SCHARDL: There's no argument to abandon. That's never been an allegation in the case. It's not ever going to be an allegation in the case.

THE COURT: All right. And I'm not going to hear any evidence about it so case closed.

Let's go ahead and take our afternoon break. Be back here at, oh, 3:05 and we'll commence with cross-examination.

(Short break)

THE COURT: Go ahead, Mr. Schardl.

MR. SCHARDL: Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. SCHARDL:

Q.    Good afternoon, Dr. Price.

A.    Good afternoon.

Q.    We've never met. So I'm Tivon Schardl. I'm with the federal defender's office in Sacramento, California, and I represent Mr. Barrett. Let me ask you just a few questions here.

You said in your direct examination that you considered the criminal investigation file from the government. Do you have that with you today?

A.    I do.

Q.    Okay.

MR. SCHARDL:  Could I take a look at that, the contents of that file, Counsel?

A.    It's in that gray clear box below your table there, all the records are.

MR. SCHARDL:  If I can have just a minute, Your Honor?

Q.    (BY MR. SCHARDL)  Dr. Price, did you read all of that file, all the transcripts and everything that were in there?

A.    Transcript -- it was offense reports, investigation of the offense.  That part I did read, yes.

Q.    Okay.  Now, when you were testifying about head injuries and so forth -- now, the reason you give a battery of neuropsychological tests is because there are different brain functions that are measured by those different tests that go into the battery; correct?

A.    Yes.

Q.    And the reason you measure different areas of brain function is because different areas of the brain are responsible for, or involved in, those different areas of functioning?

A.    Correct.

Q.    So a person can have damage to one area of the brain and perform -- function perfectly in other areas of the brain?

A.    Yes.

Q.    A person could have -- for example, if he sustains a blow

to the back of the head, it could destroy the visual cortex leaving the patient blind?

A.   It could, among other things.

Q.   It could, among other things.  But it wouldn't necessarily function -- affect, say, memory functions that are mediated in the amygdala?

A.   It might not.

Q.   Similarly, or conversely, a person can suffer an injury to, say, the temporal lobe that is very specifically located, say from a lesion, and the areas of dysfunction that you would find would be those related to that part of the brain?

A.   That's correct.  Especially, as you said, if it's a lesion, a focal part of the brain is injured, as opposed to a generalized brain injury.

Q.   Well, when we speak of brain injury, there's diffuse brain injury?

A.   Correct.

Q.   And then there's localized brain injury?

A.   Correct.

Q.   And when you -- let me ask you just a couple questions about that neuropsychological testing that you did.

You administered the RBANS and that's, as you said, I think, a screening battery; correct?

A.   Right.

Q.   And the reason it's called the repeatable battery is it's

specifically made to measure people's functioning over time?

A.    No.   That's -- that's not what I would -- that's not how I would describe it.

Q.    Well, it was originally designed for use in elderly patients to detect evidence of dementia; correct?

A.    That's the original design.   And by "over time," that you can administer it or the equivalent form to see if there's been improvement, if that's what you meant.

Q.    Yes, that's exactly what I meant.

A.    Okay.   Yes, I agree with that then.

Q.    Or conversely, to see if there's decline?

A.    Correct.

Q.    And the reason is that there's a big practice effect in some neurological tests and the RBANS is repeatable because there's less concern about practice effect in the RBANS?

A.    Because there's an equivalent form that measures the same things but doesn't have the same items on it.

Q.    And when we talk about neuropsychological testing, what we're looking at is, as you were testifying to, how far a person's scores are from the norm -- from the standardized norm; correct?

A.    From the norm that is most similar to them, yes.

Q.    So when you were scoring Mr. Barrett on the RBANS, you're looking at a set of norms that is related to his -- his age, his educational level, I think is what you said?

A.    Yes.

Q.    Is it in your raw data?  I didn't see what norms you used.  Could you tell me where to find that in your raw data?

A.    Well, it's not in the raw data, per se.  The raw data is raw but then you choose the normative group and there's a table.  And so in his case, it would be -- the category you compare him to would be people with -- that were in a range of age, close to 44.  That was the age he was at the time.  And then there's an education range for the highest grade completed, which for him would have been in probably the lowest category of -- because -- and I don't know what the range of education level is, but he -- he would be at like the seventh or eighth grade level.  So that would be the group that I would compare his raw score to.

Q.    Now, when you -- and when you're comparing him, you're looking at -- or the tests -- the standardized norms that you're looking at, they produce a bell curve; correct?

A.    Could you ask me that in a different way?  I'm not sure how to answer that.  I'm not sure I understand your question.

Q.    Well, for each subtest on the RBANS --

A.    Okay.

Q.    -- we talk -- you reported results; right?

A.    Yes.

Q.    And you report them in two ways.  You report them as an index score?

A.     Correct.

Q.     Why don't you tell the court what that means.

A.     Okay.   Now I think I understand.   It doesn't produce a normal curve or a bell-shaped curve, but you use a bell-shaped curve to make the comparison in terms of the standard score is a transformed raw score so that we can compare and that -- it is based on a normal curve, where a standard score of 100 is right in the middle, and then it goes out each way.   Above 100 would be on the positive side of average; if it's below 100, below average.   That interpretation is based on an assumption of a normal curve or, as you said, a bell-shaped curve.

Q.     And when we talk about percentages -- I'm sorry -- percentiles, as you said, that's a comparison to the number of people in the population that they perform better than or worse than, they being the individual you're examining?

A.     Yes.   It indicates where that person on that scale fell in the normative sample, what percentage of people fall below and above him.

Q.     And in general in neuropsych testing, you look at the whole picture.   That's why you give a battery; correct?   You wouldn't want to just say give somebody a test of visual-spatial constructional ability, you gave that to Mr. Barrett, and then you just walked away, you'd say, this guy, man, he's, you know, 96th percentile, end of story?

A.     Correct.

Q.    There's a lot more to brain functioning than that?

A.    Correct.

Q.    And when neuropsychologists talk about whether a person is normal or not normal, they're looking at the differences between scores on a battery like this in part?

A.    Yes.  That's part of the analysis, yes.

Q.    It's a big part of neuropsychological assessment, is comparing strengths and weaknesses?

A.    Yes.

Q.    That's -- going back to what we were talking about before, you give a battery because everybody has strengths and weaknesses?

A.    Everybody.  Everybody would have low -- if you gave a large enough battery of neuropsychological tests to anybody, there would be a good chance they would have some -- some -- low scores on some of the tests, a small percentage of the tests.  So everybody has strengths and weaknesses.

Q.    Right.  Nobody is just going to be uniform across the board on all areas of functioning?

A.    I wouldn't go so far as to say "nobody."  But it would be much more common for people to have strengths and weaknesses.

Q.    So Mr. Barrett, his performance on the attention subtest on the RBANS was in the 5th percentile?

A.    Correct.

Q.    How many standard deviations from the mean would that be?

A.     Two and a half or so.

Q.     Two and a half standard deviations below the mean?

A.     Correct.

Q.     That's a significant impairment?

A.     It is.  I mean, it's a -- it's certainly an impairment and the 5th percentile is low, yes, sir.

Q.     So when we're talking about -- again, that means he's performing worse than 94 -- or yeah, yeah -- 94 percent of the population?

A.     Well, I think it's 95 percent of the population.

Q.     You're right, 95 percent.

A.     Yes.

Q.     And then on Mr. Barrett's score on the visual-spatial constructional ability, that's the 96th percentile?

A.     Correct.

Q.     How many standard deviations from the mean would that be?

A.     Well, the 96, gosh, that would be over three standard deviations above the mean.

Q.     And the difference between those two scores, attention and visual-spatial constructional ability, you can combine those -- or a neuropsychologist would look at the overall distance between those two abilities?

A.     You could.

Q.     Don't neuropsychologists often do that, compare and look for vast deviations like that?

A.    Well, yes.  It would be more in -- as opposed to taking the percentile or the standard score on attention and comparing it directly how far apart it is from the visual-spatial, it would be more how far above -- it's the same thing but they just wouldn't do the subtraction.  They would say the visual-spatial was this far above average and the attention was this far below.  And so you could say there's a difference between the two, but it's more or less comparing it to the mean or the average is a more typical way.

Q.    For each individual area of functioning you're saying?

A.    Yes.

Q.    Right.

A.    Yes.

Q.    But if you're looking at whether the person, the brain you're examining, is itself normal, it's not normal to see a brain that has a difference of more than five standard deviations between two subtests?

A.    Well, I wouldn't do the analysis like that, but I'm not going to -- going to just disagree with the conclusion that that strength is very strong, that weakness is very weak.  But to compare the number of standard deviations between the two, I just wouldn't do it that way but I'd come to the same conclusion.

Q.    Well, there are studies, aren't there, that examine just that issue, how much difference there is in scores on various

subtests?

A.      Probably so.

Q.      And it's not a standard sort of conception of normality in neuropsychology that a person be less -- or within two-thirds of a standard deviation across subtests?

A.      Could you ask me that again?  I'm sorry.

Q.      Normality in neuropsychological terms is in part defined as a person who's -- for whom the difference in subtests is within two-thirds of a standard deviation?

A.      I've not seen that type of, you know, approach to analyzing the scores that in terms of deciding if it's normal or abnormal.  But I'm not disagreeing that his strength is very strong and his weakness is very weak and that's out of ordinary.  That is abnormal in terms of the frequency of that happening.

Q.      Yes, that's what I'm asking.  How frequently do neuropsychologists see people where the difference between two subtests is as great as more than five standard deviations?

A.      Well, it's not typical.  Again, I don't analyze it like you're saying, the five and a half between the two, but arrive at the same conclusion that that isn't typical.

Q.      There's something going on with that brain?

A.      Yeah.  I would say there's a problem with attention.  The strength with the visual-spatial, I mean, isn't abnormal in and of itself, but there's a problem with attentional functioning

with this brain.

Q.    And with regard to this testing, you didn't have a baseline of his functioning before the incident that you are discussing with Mr. Wilson?

A.    No previous neuropsychological testing as a baseline.  We estimate the baseline mainly from level of education completed and so that would be the way it was done here.  I didn't have anything else besides that.

Q.    If the injury occurred in the midst of childhood at some point -- and I believe you testified that it happened sometime in the 1960's -- you couldn't have a premorbid baseline based on the level of education he completed?

A.    It would be unusual for there to have been testing before an incident that occurred in childhood.  I've seen it but it would be unusual.

Q.    That wasn't my question.

A.    Okay.  Sorry.

Q.    If you take as his baseline the level of education he completed, that's not a premorbid baseline for this injury?

A.    It would not be an indication of the way he was functioning before this head injury that he described to me happened, correct.

Q.    You did not have a complete set of Mr. Barrett's medical records, did you?

A.    Okay.  As far as I know, no, I did not.  I had the

records that I was given and they're in the box and I don't remember seeing -- well, I don't know what was complete or not concerning that.

Q.   Did you ask the attorneys for the government with whom you were working for additional medical records?

A.   I asked for all the records about anything, school, medical, employment files, anything that they had or could get, yes.

Q.   Do you happen to recall how far back in time the last medical record was that you looked at?  Like at the time of your evaluation, how old was it at the time of your evaluation?

A.   As far as I recall, there was nothing from before in terms of medical records only.  There may have been some incidental physical medical records in the file from Eastern State.  But other than that, it would have been after the offense in terms of medical records that I would have seen, as far as I recall.

Q.   Oh, okay.  Let me ask:  So in terms of the mental health records, what's the span in time between the most recent mental health -- mental health record you looked at and your evaluation?

A.   Okay.  Are you asking for, what is the earliest mental health record I have or the latest one?

Q.   The latest one, the one that was most -- that was the closest in time to your evaluation.

A.     Like a psychological evaluation?

Q.     (Nods head).

A.     Okay.  I'm sorry.

Q.     I mean, the hospital records, like the -- the Eastern State, the Bill Willis, the Wagoner.  Which of those was closest in time to your evaluation?

A.     I gotcha now.  Well, if you exclude the reports from Dr. Russell, it would have been the report from Dr. Sharp.

Q.     Okay.  And then if you were looking just at the hospitalization or clinic records, what's the --

A.     Well, the --

Q.     Which one?

A.     That would have been the -- the most recent would have been the file from Eastern State Hospital, I think.

Q.     I think if you look at page 2 of your report, that might help.

A.     So, again, the question is, what is the report closest in time before my evaluation?

Q.     (Nods head).

A.     Well, again, that would be that of Dr. Sharp who was in 2002.

Q.     Okay.  And then before that, it would be the Wagoner Hospital records from January of 1995?

A.     Yes.

Q.     And then also Bill Willis, same time period, and then the

Eastern State ran through 1986?

A.    Correct.

Q.    And your evaluation was in 2005?

A.    Yes.

Q.    Okay.  And you said that you asked for all the records. If the government didn't have or hadn't gone out to try to get Mr. Barrett's medical records, say, from his childhood, you just have no access to them?

A.    Right.

Q.    And nobody ever presented -- represented to you that you had a complete set of Mr. Barrett's medical records from birth through the time of your evaluation?

A.    That was never represented to me, only that that was all the records that were available to them.

Q.    Now, you testified that the impairment that you saw on the RBANS, I believe your testimony was essentially that it is inconsistent with the severity of head injury that Mr. Barrett described to you?

A.    Essentially, I think that's what I testified to, that if this was a severe brain injury that he experienced, I would expect more than just attention problems.

Q.    So you're comparing it, your assessment of his functioning, to the description of the injury and its aftermath and that's it?

A.    No.  I am comparing it to that but that's not it.  I'm

also comparing it to the evidence about his problems in school with learning problems and attention, that it was consistent with that.  And then I'm saying it's inconsistent with a severe brain injury in childhood.

Q.    Let me ask you a few questions about the PIA, the personal -- is it assessment inventory?

A.    The personality assessment.

Q.    The personality assessment inventory.  Thank you.

One of the findings there was that he was -- he had a T-score of 70 on the depression scale; correct?

A.    A 74, yes.

Q.    Oh, 74.  Thank you.

A.    Yes.

Q.    How many standard deviations above the mean is that?

A.    Well, it's approximately -- it's a little over two.

Q.    A little over two.

A.    Uh-huh.

Q.    Is that a significant finding?

A.    Yes, it is.

Q.    And his subscale on drug use was the same as depression; correct?

A.    Yes.

Q.    But alcohol up, way up there?

A.    Correct.

Q.    Ninety was the --

A.   Yes.

Q.   What was Mr. Barrett's score on the aggression subscale of the PAI?

A.   It was 55.

Q.   That's about average?

A.   That's an average range, yes.

Q.   Did Mr. Barrett report anything to you during your interview that was consistent with depressive symptoms?

A.   Yes.

Q.   What was that?

A.   Well, he reported that he had a history of being depressed at times.  Let me check exactly what he reported concerning that.

Okay.  He -- he reported that he -- he thought he was depressed in his mid 20's.  And currently at the time I saw him he reported that -- he wouldn't really say he was depressed.  He said, "I just have a lot of worries, uncertainty," and it was about his legal situation at the time.  He reported that he thought that his mood at the time I saw him was okay.

Q.   He also reported a sleep disturbance?

A.   He did report problems with both sleep onset and with maintenance of sleep and that he would wake up but he would go back to sleep.

Q.   You testified on direct about Mr. Barrett's score on the antisocial scale, the PD scale, on the MMPI.  Do you recall

that testimony?

A.     Yes.

Q.     There's also an antisocial scale on the PAI; correct?

A.     Yes.

Q.     What was Mr. Barrett's score on that, the T-score?

A.     It was 58.

Q.     And maybe we should state for the court's benefit, and probably mine too, what is a T-score?

A.     Well, a T-score is a standard score, where the average is 50 and then the standard deviation is 10.  And so, again, it puts the raw score into context so that you can see what level it is.

Q.     And so looking at your raw data, when we look at the full-scale profiles on the PAI, there are these dotted lines.  There's like a dotted line across the 50 level and then there's a dotted line across the 70.  That's because if we see something within that 50 to 70, that's considered within two standard deviations, and if it's -- if it's high, you know, it's a little elevated, but it's the things that are above 70 that are -- you flag as the biggest problems?

A.     Right.  Those would be scores high enough to be statistically significant.  There could be scores, like you said, under that that would be clinically significant.  But those are the big ones, if it's above 70.

Q.     And the antisocial, these things are -- they're divided

-- then there's subscales, right, that go into each of these scales? And on the MMPI in particular, they divide them up like crazy all different ways?

A.    There's hundreds of subscale scores.

Q.    Do they say that, "like crazy," in the literature?

A.    That's what it says, yes.

Q.    Good, good. I want to use the right terms of art.

On the antisocial subscale, do you have that page of the PAI raw data in front of you?

A.    I do.

Q.    Okay. So to get to that T-score of 58 for the scale itself, that's sort of an average of antisocial behaviors, egocentricity, and stimulus-seeking; right?

A.    Yes, yes.

Q.    Is that right?

A.    Yes, yes. Those are the three things, the three subscales, that the PAI uses to combine into their antisocial scale.

Q.    And they average out to that 58?

A.    Correct.

Q.    And all -- well, except for egocentricity, which was a 39, the other two were within that two standard deviation range?

A.    Yes. The antisocial behaviors was close. It was, again, clinically significant, a T-score of 66.

Q.    Right.  Presumably, we wouldn't be here if Mr. Barrett hadn't engaged in some antisocial behavior; correct?

A.    I'd agree with that.

Q.    Now, the PAI, when you give that, the computer, I think, gives you back a sort of narrative report about the results; is that correct?

A.    Yeah.  It is a narrative report, an interpretative report, that is to assist the evaluator in a determination of what in that narrative report is supported in other parts of the information that's available to see if it's valid or not. It's an hypothesis, in other words.

Q.    And it's an hypothesis the way -- or it contains hypotheses just as your clinical judgment about the results contain hypotheses?

A.    It's the same idea, yes.

Q.    And both just in terms of the score and the clinical features described in the report, everyone notes that alcohol is a particular problem for Mr. Barrett?

A.    Yes.

Q.    The report also mentioned that he may have limited social skills; is that correct?

A.    It does say that, yes.

Q.    And particular difficulty interpreting the norms, nuances, and interpersonal behavior that provide the meaning to personal relationships?

A.      That's what the PAI interpretative report says.

Q.      Do you disagree with that?

A.      I certainly would about the poor social skills.  I did not see that in interacting with him at all.

Q.      You had a very positive interaction with him, you'd say?

A.      Yeah.  I think so.

Q.      Now, the PAI also has an aggression -- oh, we talked about that.  I'm sorry.  Never mind.  I don't want to make you go over things you've already done.

        Now, at the end of that report, there's a section -- or towards the end anyway -- treatment consideration -- oh, wait.  That's not what I meant.  Never mind.  Critical item endorsement.

A.      Yes.

Q.      And what was the last thing mentioned under that?

A.      The traumatic stressors.  Is that what you're asking?

Q.      Yeah.  Is that the last one listed?  Yeah, that's it.  Is that it?

A.      Yes.

Q.      And what was the basis for the computer -- or this is a computer-generated report; is that correct?

A.      Yes.

Q.      What were the -- what was the basis for the computer flagging traumatic stressors as a critical item?

A.      Well, the basis is the critical items on the PAI are, I

believe, identified by both the content of them, but also how -- these are items that are rarely endorsed by people so they're unusual.

Q.    And when we say "endorsed," it's because, as you were saying before, the PAI has a gazillion questions and it asks you like those annoying Internet surveys, do you strongly agree, strongly disagree, somewhat true?  What are they?  You tell me.

A.    Well, those are -- on the PAI, it's very true, mostly true, somewhat true, or false.

Q.    Okay.  And there's also a subscale for traumatic stress on the PAI?

A.    When you say "subscale for traumatic stress," traumatic stress is a subtest that's under the anxiety-related scale.  So I don't -- I don't think the traumatic stress subscale -- I mean, it's a subscale itself.

Q.    And what was Mr. Barrett's score on the traumatic stress subscale?

A.    Seventy-five.

Q.    That's two and a half standard deviations above the mean?

A.    Correct.

Q.    Outside that normal range we talked about?

A.    Yes.

Q.    Did you include that in your report?

A.    That -- no, I did not include a discussion of the

traumatic stress subscale.

Q.     Now, the things as to which Mr. Barrett answered very true that caused the computer to list traumatic stressors as a critical item endorsement, am I correct, one of those was, I keep reliving something horrible that happened to me, very true?

A.     Yes.

Q.     And then the second was, I've been troubled by memories of a bad experience for a long time.  What was his response?

A.     That was very true.

Q.     And I've had some horrible experiences that make me feel guilty.  What was his response?

A.     Somewhat true.

Q.     And I've had some very bad -- I've had a very bad experience -- oh, since I had a very bad experience, I am no longer interested in some things that I used to enjoy.  And the response was?

A.     Somewhat true.

Q.     Somewhat true.  Did you mention those experiences that he referred to there in your report?

A.     I did not mention it in the report about what experience it is that he's referring to.  I had an impression in the interview but I did not put that in the report.

Q.     Did you follow up specifically in the interview?

A.     Well, follow up to the score --

Q.    Yes.

A.    -- or to the critical items?  No.

(Discussion held off the record)

Q.    (BY MR. SCHARDL)  Going to the MMPI, Dr. Price, in your raw data -- let me help you find it.  I think it's on page 6 of the extended score report.

A.    Okay.

Q.    Oh, you found it that quick.

A.    Yes.

Q.    Wow.  Again, the PK scale there, what's that?

A.    That's a scale that relates to posttraumatic stress disorder.

Q.    What was Mr. Barrett's score on that?

A.    A T-score of 72.

Q.    And is that in your report?

A.    No.

Q.    There was also on the -- I want to ask you about this -- on the validity and clinical scales profile, page 2 of the extended score report --

A.    Yes.

Q.    -- there was the FB.

A.    Yes.

Q.    What's that?

A.    It's a set of items on the MMPI that relate to some form of exaggeration that's towards the last part of the MMPI.

Q.      Form of exaggeration, you're saying?

A.      Yes.

Q.      And what was Mr. Barrett's T-score on the depression scale on the MMPI?

A.      Seventy-six.

Q.      Is that a significant finding, indication?

A.      Yes, it is.

Q.      Again, that's two and a half -- more than two and a half standard deviations above the mean on that?

A.      Yes.

Q.      And that's consistent with your diagnosis of dysthymic disorder?

A.      Yes, correct.

Q.      I'm sorry.  I should have asked you this before:  Could you go back to that page 6 of the extended score report?

A.      Okay.

Q.      What's the MT scale next to the PK scale?

A.      I don't know.

Q.      Let's move on then to the next page.  Are you familiar with any literature about the relationship between the MT scale and the PK scale?

A.      No.

Q.      So the next page of that extended score report, those five scales -- have you found it?

A.      Yes.

Q.    -- that's like called the big five, as I understand it; is that right?

A.    Yes.

Q.    And is the idea there that they've taken all these gazillion scales and they've come up with sort of five categories from those different scales?  Is that a fair way to describe it?

A.    The big five is a factor analytic -- it's a series of factor analytics studies where they've analyzed all the studies about personality traits and tried to see what are the most -- or the personality traits that explain things the most -- in the simplest way because there's so many studies.  And so what they've come up with are the five that all these studies tend to load on those five personality traits.

Q.    So let me see if I understand.  So the -- they take studies using these other scales and they say -- if we take groups -- we group these scales, according to these five personality traits, we can produce T-scores on those; is that right?

A.    Kind of.  What they did was they looked at the groupings of all of the research that they could use in this approach and those that had the most studies loaded on them they looked to those and to see what the studies were about and then came up with the name of that kind of meta personality trait.

Q.    Yeah, yeah.  Meta personality.  That's perfect.

Okay.  So Mr. Barrett's score on the aggression meta personality trait was what, his T-score?

A.    You know, I'm looking at this and I'm not sure that these are the big five that is the most talked about in the field, but I think these are the big five on the PAI.  But anyway, to answer your question --

Q.    I'm sorry.

A.    Well, it's like on the big five that --

Q.    Wait.  No.

A.    I'm sorry.

Q.    You said "PAI."  But this is the MMPI score; right?

A.    I'm sorry.  On the MMPI.

Q.    Okay.  I just wanted to clarify that.

A.    Okay.

Q.    So the T-score that's listed here for aggression is what?

A.    The T-score on this scale for aggression is 54.

Q.    And so that's pretty much average?

A.    That would be the case.  His perception of himself is that his aggression is average.

Q.    Based on his responses to the questions on the MMPI?

A.    Correct.

Q.    And it doesn't ask, "Do you see yourself as aggressive," and that produces a score of 54?

A.    No.  The items on the MMPI haven't got a lot of face validity.  In other words, you can't look at that and see what

scale that's going to load on.

Q.    So when you say he sees himself that way, he's not saying, it doesn't say, how aggressive do you think you are, and he says, I'm about average, and it says that's a 54?

A.    No.  It's not that kind of face validity to it.

Q.    And then the next scale there that's PSYC, that's -- as I understand it, is that like -- that's like weird thinking, bizarre thinking?

A.    Yeah.  It's like psychotic, like out of touch with reality.

Q.    So he's a little -- a little more elevated there, a T-score of 59; am I reading it right?

A.    Yeah.  There wouldn't be a significant difference between a 54 and a 59.  It's still within the average range.

Q.    The one score on this profile that was above the average range was in what category or what scale?

A.    That's the INTR, which I believe to be introversion.

Q.    Introversion.  Let me ask you to go back and look at the SI scale on the validity and clinical scales profile.

A.    Yes.

Q.    Yes.  So his T-score there is what, a 64?

A.    A 64, yes.

Q.    And am I correct that if you go then -- so the way this works -- correct me if I'm wrong or just come up with a great expression like the meta characteristic that you came up with

before -- the way this works is you get these scores and then these are the Harris-Lingoes -- is that correct? -- scales.

A.   Not -- no.  The scale that we're talking about, the SI, is among the basic clinical scales.  The Harris-Lingoes scales -- again, there's hundreds of these -- are subscales.

Q.   Oh, I see.  But there are these like sort of interpretative tables, where if you see a scale -- a number, a T-score, within a certain range, it gives you a way to interpret that score; correct?

A.   As to how elevated it is, yes.

Q.   As to what it -- thank you.  Also, there's sort of a description of what that person is like?

A.   Yes.

Q.   So in an SI -- that's the social introversion -- that would describe a person, as I understand it, who's shy, timid, lacks self-confidence, reliable, dependable.  Does that sound right to you?

A.   Yes.

Q.   And then on the SC scale -- and normally these are given by number; is that correct?

A.   That's what we do more commonly than using these labels that are old.

Q.   And that's in part because of the PD scale; is that correct?

A.   I don't understand.

Q.   Well, that there was a feeling in the -- in the field, I guess, that some of these -- the names were a little prejudicial or misleading, and that's part of what tended towards using the numbers instead of the word?

A.   Yeah.  I don't know about the prejudicial part.  But about the misleading part, that you wouldn't look at the SC scale, which stands for schizophrenia, and say his is elevated so he's schizophrenic.

Q.   You're right.  Same with the hysteria scale, like that's --

A.   Right.

Q.   We don't use that word anymore?

A.   That's right.

Q.   So the schizophrenia scale is more about like just their -- how unusual their beliefs or thinking is?

A.   It can mean that.  It can mean also -- it can indicate some confusion.  It can indicate a belief in things that most people don't believe in.  It can indicate any of those things.

Q.   So on Mr. Barrett, he had a T-score there of 70 on the schizophrenia or the 8, whatever we want to call it.  And as I understand it, based on those scoring tables, that would be a person of schizoid lifestyle, unusual beliefs, eccentric behavior, confused, fearful, sad, somatic complaints, uninvolved, excessive fantasy, and daydreaming.  Does that sound accurate?

A.    Those would all be possibilities for an elevation here. In addition, just general being distressed can elevate almost any of those, and that's led to another way to interpret the -- the answers that we have, that tries to get rid of that general level of distress.  But those would all be descriptors that you would use as a hypothesis in the rest of the information to see which one fit.

Q.    And then on the scale 6, PA, paranoia, his T-score there is a 79?

A.    Yes.

Q.    So that's almost three standard deviations above the mean; right?

A.    Yes.

Q.    And that would be consistent with somebody who experienced some psychotic symptoms, including delusions of persecution, ideas of reference?

A.    Well, it could be.  It could be that the paranoid thinking is really bizarre like that that's delusional.  Or it could be also feeling like you've been treated unfairly and people aren't really your friends that you thought were and things like that.

Q.    Now, in your interview with Mr. Barrett, did he talk about some dirigibles?

A.    I have no idea.  I don't remember that.

Q.    You don't recall a discussion with him telling you that

he believed that he was being surveilled by dirigibles?

A.    I don't remember that.

MR. SCHARDL:  May I have a moment to confer with counsel, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  Thank you, sir.

(Discussion held off the record)

MR. SCHARDL:  If I could have just another minute, Your Honor.

Just for the record, you know, when I asked for his materials, and the court's ruling earlier was that we could see them when the witness came to court, so this box would contain, I would estimate, 300 pages of material

THE COURT:  I hope you're fast.

MR. SCHARDL:  Have I mentioned my neurological condition that affects my vision?  Could we maybe have five or ten minutes so I can just skim through them and see if there's anything there?

THE COURT:  Yeah.  Let's take a brief recess while you do that.

MR. SCHARDL:  Thank you very much, Your Honor.

(Short break)

MR. SCHARDL:  Thank you for that opportunity, Your Honor.  I'll pass the witness at this point.

THE COURT:  Good.  Redirect, Mr. Wilson.

REDIRECT EXAMINATION

BY MR. WILSON:

Q.    Dr. Price, counsel asked you a series of questions early on in the cross-examination regarding the testing that you performed in reference to brain function, and I believe he asked you that there are a battery of different tests that can be focused on particular types of brain function; is that correct?

A.    Yeah.  There's hundreds of different tests that can be administered.

Q.    Okay.  And at the time that you evaluated Mr. Barrett, the screening mechanism that you used were the tests that we previously talked about; is that right?

A.    That's correct.

Q.    And based upon your evaluation of those tests, did you determine that there was a need for a full-blown evaluation or screening of -- a full battery of additional psychological tests -- neuropsychological tests?

A.    I did.

Q.    And what was your determination on that?

A.    That it was not needed for my evaluation at that time.

Q.    Okay.  And as a result of questions that counsel has asked you about today, have you changed your opinion on that?

A.    No.  Not -- I have not.

Q.    There was a series of questions regarding obviously the

raw testing data, and that raw testing data was not part of the report that you generated in this case; is that correct?

A.   The only -- the only thing that was a part of it would not be raw data but would be the profile of the scores on the PAI and the MMPI.

Q.   Okay.  And when you say profiles, explain what you mean by that.

A.   It's the graph of the -- the T-scores on the basic scales of each of those tests.

Q.   Well, specifically counsel asked you about -- on the MMPI-2 about a subset or subscale involving the MT --

A.   Yes.

Q.   -- designation.  I believe he asked you, do you know what that is, and you said you didn't know.

A.   That's correct.  I just -- I don't know what that scale is.

Q.   Okay.  Are you familiar with the expression -- or are you familiar with the -- I'm not sure what you call it, whether it's a disorder or what it is -- but a college maladjustment?

A.   Well, that's one of the many, many scales available on the MMPI.

Q.   Okay.  Do you know whether or not the MT references a college maladjustment?

A.   I don't know what "MT" stands for as I sit here.  I don't know.

Q.    Okay.  On those set of subscales, the college maladjustment, what would that have to do with Mr. Barrett?

A.    It wouldn't have anything to do with him.

Q.    Now, he also referenced -- and I say "he" -- counsel referred to the PK scale.  And what is the PK scale?

A.    It relates to posttraumatic stress disorder.

Q.    Okay.  And I believe that on one of the raw -- in the raw data of the testing, that particular subscale was elevated; is that correct?

A.    Yes.

Q.    And it was above the standard deviation; correct?

A.    Right.  It was above two standard deviations.

Q.    I'm sorry.  Two standard deviations.

A.    Yes.

Q.    Is that significant to you in your -- or was that significant to you in your mental evaluation of Mr. Barrett?

A.    That elevation on that scale was not -- not significant to me at that time.

Q.    Why not?  I mean, it's above the standard deviation.

A.    Well, it shows stress in relationship to something, but I did not -- as far as it might relate to posttraumatic stress disorder, I did not see anything in my evaluation that would indicate that he was suffering from posttraumatic stress disorder.

Q.    What type of things would you look at or would be

important to you in making that determination if someone was suffering from posttraumatic stress disorder?

A.   Well, you would look at, is there something they're trying to not think about, avoid.  That's kind of the -- well, in the first place, a stressor would be there that would be life-threatening for the person or the possibility of serious injury to them or to somebody else close to them and that it caused them to have flashbacks of that event, to avoid things that reminded them of that event, to be kind of numb to their future and to certain things that they used to do and like to do.  It could be a host of things.  But I didn't see anything, other than his situation at the time, that would be something -- and it was causing him stress.  I mean, he was in trial and that was the main stressor in my evaluation that I saw on his life at that time.

Q.   Did he report any episode in his past that he complained of having flashbacks concerning?

A.   No.

Q.   And I notice when we went through the evaluation -- excuse me -- the diagnosis there was no posttraumatic stress disorder diagnosed.

A.   Correct.

Q.   Let me ask this, Doctor:  If on one of these subscales if you have an elevated trait -- or excuse me -- an elevated subscale, does that necessarily require a diagnosis?

A.   No.  You put the results of the objective testing into context of the rest of the information, the records, the interview, and combine and integrate the information.  And just because there is an elevation on a scale, it doesn't mean one thing and one thing only, it can mean several things.  That's why it's a part of the evaluation, not the end result or the only thing you rely upon.

Q.   Well, during your interview of Mr. Barrett, did he discuss with you an incident in his teenage years involving law enforcement and having being arrested or being beaten up by law enforcement?

A.   Yes, he did.  He certainly told me that.  I don't remember much in the way of detail but it did come up.

Q.   Did he indicate at any time during your interview that he had flashbacks of that event?

A.   No.

Q.   Did he indicate he had any symptoms consistent with posttraumatic stress as a result of that event?

A.   No.

Q.   Did Mr. Barrett indicate any other events in his past of significance which would potentially result in a stressor of post -- that would result in posttraumatic stress disorder?

A.   Well, the event that he -- he discussed the most that was distressing to him, not that he was having flashbacks or wouldn't talk about it, was the offense itself and how it

happened.

Q. And we're talking about the event in September of 1999; is that correct?

A. Yes, correct.

Q. The crime that we're here on today; correct?

A. Yes.

Q. In the raw testing data, there was also an elevation -- or excuse me -- in the MMPI, there was reference to his alcohol consumption, alcohol had a negative impact in his life; is that correct?

A. Yes. Did you say that that was on the --

Q. I'm sorry. The PAI.

A. The PAI has a scale on alcohol impact. And so there's more than one scale on the MMPI that relates to alcohol abuse.

Q. And do you recall whether those were elevated in reference to alcohol abuse?

A. Well, it's the one that's on the MMPI, the scale that relates to whether they just admit having a problem with alcohol, it was slightly elevated. There's another scale that has been thought in the past it's been -- it's not used as much -- that's about having the personality traits that predispose one to addiction. It was not elevated, as I recall.

Q. Well, do those same scales, the PAI and the MMPI, both of those tests, do they have scales in reference to drug abuse --

A. Yes.

Q.    -- or drug usage?

A.    Yes.  The PAI does.

Q.    And was that elevated in reference to drug use?

A.    Yes.

Q.    And when you talked with Mr. Barrett, did you have an indication or did he give you an indication when he quit drinking?

A.    I think so.  It seemed like he quit drinking sometime -- or he told me that he did -- sometime prior to this offense.

MR. WILSON:  May I have just one moment, Your Honor?  I'm sorry.

THE COURT:  Yes.

MR. WILSON:  Thank you.

Q.    (BY MR. WILSON)  Dr. Price, I apologize.  I meant to ask you this a moment ago when we were talking about stressors.

I think counsel asked you a question that after you scored the -- I believe it was the PAI that had a traumatic stressor -- and that may have been the MMPI -- but did you do a follow-up with him, a follow-up interview with him, regarding that?  I believe that question was asked.

A.    Yes.  If I followed up on an interview based on the critical items.

Q.    Okay.  And I believe your answer was no?

A.    That's correct.

Q.    And did you score those -- the MMPI and the PAI -- did

you score those while you were sitting there with him?

A.   No.

Q.   But that scoring was done after the interview and after the testing obviously?

A.   Yes.

Q.   Okay.

A.   That's true.

Q.   And so you spend your two days doing interview and testing and then you went back and you scored them; is that correct?

A.   Correct.

Q.   And no follow-up interview?

A.   Correct.

Q.   And based upon your observations of the information in those -- in that testing and that testing data, did you believe there was a necessity of doing a follow-up interview to talk with him more about the testing results?

A.   Not -- not that I recall.  I did not think -- while it's nice to be able to have unlimited access to somebody, it wasn't an issue here and I didn't feel it was to interview him about the critical items.

Q.   And counsel asked you some questions about the records, the mental health records, that you reviewed.  Did you review all the records that you were provided?

A.   Yes.

Q. And did you consider all those records in your diagnosis you've talked about here today?

A. Yes.

Q. And the medication records, did you review all those that were provided to you?

A. Yes.

Q. And did you consider those?

A. Yes.

Q. And the substance abuse records, did you review those?

A. Yes.

Q. And did you consider those in your diagnosis that you made back in 2005 in which you testified about here today?

A. I did.

Q. Dr. Price, did you intentionally leave out information about these traumatic stressors from your report?

A. No. I mean, I intentionally did because I didn't think those -- every scale that was relevant to what I was opining about. I didn't see a posttraumatic stress disorder, for example, so I didn't comment on that scale that relates to that being high.

Q. Counsel also asked you about whether or not Mr. Barrett reported to you that he observed dirigibles surveilling him.

A. Yes.

Q. And I believe you said you don't recall that?

A. I don't.

Q.    Okay.  If that had been reported to other professionals, and may have even been reported to you, does that in any way change your assessment or your diagnosis of Mr. Barrett?  I mean, if he, in fact, reported that I saw dirigibles and they were real, I saw them, obviously that's bizarre paranoid behavior.  Would you agree with that?

A.    Yes.

Q.    Okay.  Would that change your opinion regarding Mr. Barrett and what you've testified here today?

A.    No.

        MR. WILSON:  May I have just one moment, Your Honor?

        THE COURT:  Yes.

            (Discussion held off the record)

        MR. WILSON:  Your Honor, I believe that's all the questions I have.  I'll pass the witness.  Thank you.

        THE COURT:  Anything further from Dr. Price?

        MR. SCHARDL:  Yes.  A little bit, Your Honor.  Thank you.

        THE COURT:  Okay.

                    RECROSS-EXAMINATION

BY MR. SCHARDL:

Q.    Doctor, you testified that you didn't see a reason to do any additional neuropsychological testing?

A.    Right.

Q.    Is that the same thing as saying you ruled out the

possibility that if you did additional testing you would find dysfunction?

A.    No.   There would always be a possibility of that.

Q.    Counsel referred to the name of the MT subscale as "college maladjustment."  If there is a subscale that should not be factored in, the MMPI report will tell you that -- is that right? -- there's a problem, throw this one out.

A.    I'm not sure of that.  I know that there are the validity scales that would say the clinical scales are invalid, but there would be certainly scales that wouldn't apply to that individual that the program wouldn't tell you to do that but you would know to do that.

Q.    I see.  And we discussed before how the labels, like schizophrenia, isn't really about schizophrenia.  So college maladjustment might not be about college maladjustment?

A.    That's true.  It -- it doesn't -- again, I don't -- I'm not accustomed to looking at that scale in any case so I don't know.

Q.    Now, I've been through your interview with Mr. Barrett at least a couple times.  Can you help me?  Where did you ask him if he ever experienced flashbacks?  At what point do you think that came up?

A.    I don't know at what point that came up.

Q.    Did you ask him that?

A.    I'm pretty sure I didn't say, "Do you have flashbacks

about some traumatic experience?"  I'm pretty sure I didn't ask that question.

Q.      You did not ask that question?

A.      Yeah.  That wouldn't -- I wouldn't have asked that question if there wasn't some indication.

Q.      But Mr. Barrett did respond "very true" when asked "I keep reliving something horrible that happened to me"?

A.      He did.

Q.      Now, in lay terms we talk about a flashback, but in psychological terms we talk about reliving or re-experiencing the trauma.

A.      Re-experiencing, yes.

Q.      And a lay person might take reliving to be the same thing as re-experiencing?

A.      I think so.

Q.      And you didn't specifically ask him if he had numbing experiences; correct?

A.      I wouldn't have asked do you have that experience -- I wouldn't have asked that.

Q.      But he said it was somewhat true that after his very bad experience he's no longer interested in some things that he used to enjoy?

A.      That's -- that's true, he did answer that question like that.

Q.      And similarly, you didn't ask him about avoidance, you

didn't ask him if he tried to avoid things that reminded him of this traumatic stressor, which you never asked about?

A.    I wouldn't have asked that in that way in any case.

Q.    You were asked about the elevated subscale that does not lead inextricably to the diagnosis; right?

A.    Right.

Q.    And you were asked earlier today about his elevated scales on the -- elevated scores on the PD scale, the antisocial scale; correct?

A.    Yes.

Q.    And you also did not diagnose Mr. Barrett with antisocial personality disorder?

A.    That's correct.

Q.    And you mentioned that Mr. Barrett did talk about the events; correct?

A.    To a certain extent, yes.

Q.    And he described his experience of it?

A.    Yes.

Q.    He described hearing his boy screaming in the yard?  He said that several times over, didn't he?

A.    I don't remember if he said it several times but I do recall him saying that.

Q.    Did he appear to be experiencing some distress about that memory?

A.    Oh, he was -- he was distressed about the whole

experience, about other aspects as well, yes.

MR. SCHARDL:  Can I have just one minute, Your Honor?  I'm forgetting something.

THE COURT:  Yes, yes.

(Discussion held off the record)

Q.   (BY MR. SCHARDL)  The last thing, Your Honor, with regard to -- I'm sorry -- I mean, Dr. Price, with regard to the thoughts that Mr. Barrett endorsed, you were asked about dirigibles and strange thinking and everything, Mr. Barrett also answered true when asked on the MMPI if someone has been trying to poison him; is that correct?

A.   I can look and see.  I'm not --

Q.   Would you mind?  It's on page 15 of the extended score report.

A.   He answered true to that, yes.

MR. SCHARDL:  I think that's all I have, Your Honor.  Thank you.

THE COURT:  Dr. Price, you can step down.  Thank you, sir.

Very well.  I think we'll go ahead and adjourn for the evening and resume tomorrow morning at 9 a.m.  Anything you all want me to think about overnight or --

MR. SCHARDL:  Why we should win.

THE COURT:  I'm thinking about that.

MR. KAHAN:  Your Honor, I just want to clean this

up.  I think counsel will agree.  There was some discussion about Mr. Sperling having had an elicit copy of Jeanne Russell's report and I think we've put that to bed.

MR. SCHARDL:  Yes.  If I may, Your Honor, I'd like to clarify.  Thank you, Mr. Kahan, for doing that, for bringing that up.

Mr. Kahan pointed out to me during one of the breaks that -- so there was a fax cover sheet indicating that Mr. Sperling had sent Dr. Russell's report to Dr. Price and that fax cover sheet was dated September 20th.  Mr. Kahan pointed out to me that Judge Payne sua sponte invoked the firewall procedure, that the defense hadn't asked for it, and that Judge Payne did not invoke that procedure until September 29th, I think.

MR. KAHAN:  Yeah.  And my representation we are in sua sponte is based largely on my reading of the moving papers from the government, but it is my understanding that the judge on his own decided to go ahead with that.  But more than that, Mr. Sperling made clear in his own papers that he had custody of Jeanne Russell's report and he had received it from defense counsel so there's nothing that was unknown to the court previously.

THE COURT:  Good.  One other thing.  I guess we probably don't need to hear from Dr. Reidy anymore, but what about Dr. Miora?  What would we hear from Dr. Miora that is not

essentially cumulative of what Dr. Woods told us?

MR. SCHARDL:  Well, Your Honor, Dr. Miora would testify about the methods and procedures used by Dr. Young. And in particular in light of the testimony we heard today about doing something less than a complete battery, I think that she would provide a lot of valuable testimony about why the results Dr. Young obtained are valid and reliable and important considerations in ways that Dr. Woods can't.  Because Dr. Woods, although he is trained to rely on neuropsychological testing to assess how they're significant for his job as a neuropsychiatrist, he's not -- he's not trained in the administration, the scoring, the norming, and everything of these tests.

And so I think that she could provide a lot of valuable testimony about why this comprehensive battery that Dr. Young administered was appropriate and is valuable.  And to the extent the government is going to argue that based on the RBANS that there was no evidence of any brain dysfunction in Mr. Barrett, she could explain why that would be an invalid and unreliable conclusion based on the difference between the two test batteries.

THE COURT:  And Dr. Woods didn't give that opinion?

MR. SCHARDL:  I don't think -- I have to apologize because I wasn't here for Dr. Woods' testimony.  But to the best of my understanding, he did not testify about the

difference between the batteries administered by Dr. Price and Dr. Young.

THE COURT:  All right.  Well, I'm going to let you all think about that tonight.  And if you really -- I mean, I would really like to wrap this up by Wednesday, if possible.  But you might check into whether Dr. Miora would be available, and then I'll decide whether I want to leave it open longer than Wednesday or not.

MR. SCHARDL:  I'll contact her right away.  Thank you, Your Honor.

THE COURT:  Very good.  All right.  So we'll be in recess then.

MR. SCHARDL:  Thank you.

(The proceedings were recessed)

C E R T I F I C A T E

I, Brian P. Neil, a Certified Court Reporter for the Northern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 13th day of June 2017.

s/ Brian P. Neil

_____

Brian P. Neil, RMR-CRR
United States Court Reporter

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

KENNETH EUGENE BARRETT,                    )
                                           )
                    Petitioner,            )
                                           )
          v.                               )
                                           )  Case No.        CIV-09-105-JHP
UNITED STATES OF AMERICA,                  )
                                           )  Date:           6/13/2017
                    Respondent.            )
                                           )  Time:           9:07 a.m. - 10:54 a.m.
                                           )                 11:11 a.m. - 12:29 p.m.
                                           )                  1:32 p.m. -  2:38 p.m.
                                           )

<u>**MINUTE SHEET - EVIDENTIARY HEARING**</u>

Steven P. Shreder, Judge      K. Davis, Law Clerk        K. Sidwell and B. Neil, Reporters
                              T.Stephens, Deputy Clerk   FTR - Courtroom 4

**Petitioner present with Counsel:**  David B. Autry, Tivon Schardl, and Joan M. Fisher
**Counsel for Respondent:** Jeffrey B. Kahan and Christopher J. Wilson

**MINUTES:**

Court inquires regarding expert availability and rebuttal testimony.

Petitioner renews Motion (Doc. No. 432) regarding Dr. Pitt's testimony; Objection **overruled** by Court.

Government's evidence resumed with testimony of Dr. Steven E. Pitt.

Petitioner asks Court to reconsider  previous rulings in Order  (Doc. No. 361) regarding the  testimony of Dr. Kosten and Dr. Stewart; Request **denied** by Court.

Petitioner is directed to provide Government with responsive information as directed by the Court.

ENTERING ORDER continuing evidentiary hearing until 6/26/2017 at 10:00 a.m. (SPS)

Total Time: 4:11

IN THE UNITED STATES DISTRICT COURT FOR THE

EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,   )
           )
    Plaintiff,   )
           )
-vs-         ) No. CIV-09-105-JHP
           )
UNITED STATES OF AMERICA,  )
           )   VOLUME VII
    Defendant.   )

TRANSCRIPT OF EVIDENTIARY HEARING

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

JUNE 13, 2017

A P P E A R A N C E S

   David B. Autry, Attorney at Law, 1021 N.W. 16th Street, Oklahoma City, Oklahoma, 73106, and
   Joan M. Fisher and Tivon Schardl, Federal Public Defenders, 801 I Street, Third Floor, Sacramento, California, 95814, attorneys on behalf of the Plaintiff;

   Christopher J. Wilson, Assistant U.S. Attorney, 520 Denison Avenue, Muskogee, Oklahoma, 74401, and
   Jeffrey B. Kahan, Attorney, U.S. Department of Justice, 1331 F Street N.W., Room 345, Washington, D.C., 20530, attorneys on behalf of the Defendant.

REPORTED BY:  BRIAN P. NEIL, RMR-CRR
       United States Court Reporter

*Brian P. Neil, RMR-CRR*
*U.S. District Court - NDOK*

I N D E X


WITNESSES


                                                          PAGE

STEVEN E. PITT, D.O.

  Continued Cross-Examination by Mr. Autry          1086
  Redirect Examination by Mr. Kahan                 1112
  Recross-Examination by Mr. Autry                  1125

Tuesday, June 13, 2017

* * * * *

THE COURT:  Go ahead, Mr. Autry.

MR. AUTRY:  Okay.  Thank you, Your Honor.

CONTINUED CROSS-EXAMINATION

BY MR. AUTRY:

Q.    Doctor, before I forget to ask you about it, you obviously tape-recorded audio and video the interview you did with Mr. Barrett; correct?

A.    Yes, sir.

Q.    And there's some controversy --

(Discussion held off the record)

Q.    (BY MR. AUTRY)  With respect to videotaping a psychiatric interview, audiotaping a psychiatric interview, there's some controversy in your field as to whether that's appropriate or not; true?

A.    First of all, I -- it's a forensic psychiatric evaluation.

Q.    Yes, sir.

A.    And there's different camps and different schools of thoughts about the -- whether or not this is something that should be part of best practices.  Some people think not, some people think it should be.

Q.    All right.  Are you aware of what an observation effect is?

A.     Sure.

Q.     That's where somebody may tailor their responses or their demeanor if they're being videotaped or audiotaped?

A.     Sure.

Q.     Okay.  And that's one of the reasons that videotaping a forensic psychiatric interview is somewhat controversial within the field.  Would you agree with that?

A.     I think people who are opposed to it, I think that's one of the explanations that they offer.

Q.     All right.  And let me ask you about these BOP records.

A.     Yes, sir.

Q.     One of the reasons you state that Mr. Barrett has neither bipolar disorder nor PTSD is because within the Bureau of Prisons, where he's been since 2006, there's never been a diagnosis by a prison mental health professional of either of those maladies; correct?

A.     That's just one of the many places where there's no diagnosis, yes, sir.

Q.     Okay.  But we're focusing now just on the Bureau of Prisons.

A.     Yes, sir.

Q.     Do you know whether or not the Bureau of Prisons did any kind of comprehensive mental health evaluation of Mr. Barrett since he's been there?

A.     I don't -- hang on one second here, okay?  I know that

Drs. Eckert, Noble, Bleier, and Profitt have seen him. Whether or not they've ever done a comprehensive evaluation, I don't know.

Q. All right. So it could be one of these drive-by deals that they frequently do in prison, where they come up to your cell or see you while you're at work and say, how are you doing, you feel okay today, or some kind of quick mental status evaluation; true?

A. I can't frankly tell you one way or the another how it might be. I can tell you that there's at least four mental health professionals who have said no psychiatric or psychological issues.

Q. But what they base their opinion on and whether they actually did a competent or thorough mental health evaluation of Mr. Barrett, you don't know; correct?

A. I think that's a fair statement.

Q. All right. Now, Mr. Barrett, when you did your forensic psychiatric interview with him, you asked him whether or not he thought he needed some mental health treatment in prison; right?

A. Yes.

Q. And he said that there are times that he wanted to talk to someone or felt like he needed to talk to someone?

A. Yes.

Q. But it wouldn't be anybody with the Bureau of Prisons --

A.      Yes.

Q.      -- right?

A.      Yes.

Q.      Okay.  And did you ask him to explain that?

A.      I don't know if I did or didn't.  I recall the dialogue and I recall Mr. Barrett telling me that he would be loathe to talk with someone at the Bureau of Prisons.

Q.      All right.  Now, you indicated that to the extent Mr. Barrett may have presented by demeanor some kind of affect that might indicate something was going on, that the fact that he was in prison increased his stress level.  Do you remember saying words to that effect or something about that on direct examination?

A.      The second half of your sentence I agree with completely. The first half, I didn't understand the nexus between the two components of your sentence.

Q.      Okay.  That -- okay.  That his stress level might have been increased above what it normally would be because of the prison environment; is that what you were trying to get across?

A.      Well, I think -- I think the response had to do with questions that were asked by Mr. Kahan that spoke about how emotionally people do if they're in a more -- more confined or stressful environment versus those people that have, say, more privileges or more open-ended environment.  And I said I would -- I don't know if I say -- there's literature that supports

that the more constrictive the environment is, the more solitary life the environment is, the more likely you're going to see an exacerbation of, or a development of, emotional problems.

Q.    But the particular prison unit Mr. Barrett was on in Terre Haute he's not in general population?

A.    Certainly is not.

Q.    And general population would probably increase an inmate's stress level over the type of setting that Mr. Barrett was in at Terre Haute; true?

A.    It depends.  I think there's a body of literature out there that talks about the stress associated with being a condemned inmate.  I think there's a -- I can't pull it for you right now, but it talks about because of the privileges that he has are really -- I think what he told me he's in phase two, I think, which allows him to periodically go out into a caged area with another inmate.

But the bigger -- the bigger point is that if what you're suggesting is in a general population where there are different factions and gangs and what have you, could that be more stressful?  Theoretically it's possible.  But what I'm here to tell you is that there's a good body of literature that talks about the stress associated with protracted confinement in a -- for a condemned inmate.

Q.    All right.  And it's a very structured environment on

death row at Terre Haute; correct?

A.     Yes, sir.

Q.     And Mr. Barrett is able to have a job, though, isn't he, he's able to work?

A.     You're asking the question so the answer must be yes.

Q.     Oh, okay.

A.     I'm not -- I'm not -- I'm forgetting what he's -- it's escaping me but I think the answer is yes.

Q.     Okay.  Now, let me ask you a few questions, Doctor, about PTSD.

A.     Yes, sir.

Q.     Do you acknowledge that some of the trauma Mr. Barrett underwent as a child in growing up with his abusive or dysfunctional background and things of that nature could be a precursor to PTSD?

A.     Could be.

Q.     Okay.  And I think you discount that because Mr. Barrett did not adopt or did not endorse certain symptoms of PTSD such as avoiding thoughts that would trigger it and things of that nature?

A.     Well, you're -- you're -- you're quoting from the DSM on the second part of that sentence.  But why I -- why I -- why I discount that diagnosis, there are multiple reasons.  Those reasons include the fact that I'm having a hard time figuring out what the -- notwithstanding the fact that there was some

childhood trauma and some physical abuse, which I'm certainly not condoning, but on a continuum I didn't see anything that rose to the level of a traumatic event that would really qualify for PTSD. That's reason number one.

Reason number two was, when I met with Mr. Barrett I spoke with him about PTSD and Dr. Woods' conclusion that he has PTSD, and I think it's on pages 116 and 117 on the transcript of my interview. At the end of, I think, the bottom of page 117 you get to the spot where he says -- I'm paraphrasing now -- but I'm not quite sure how he got to that diagnosis.

The third reason I discount is because the testing I talked about that Dr. LaFortune did.

The fourth reason I discount it is because based on my training, experience, and knowledge as a psychiatrist and as a forensic psychiatrist, you don't include the diagnosis of -- you don't -- you don't -- if there's a better explanation for some of the symptoms, to the extent they exist, and it's better explained by, say, substance use or some other organic process, then you need to consider that.

And then the last reason is that nowhere else in any other records has Mr. Barrett been diagnosed with PTSD. It's just -- it's nowhere in any of the records that we've discussed.

Q.    Well, you don't dispute that he went through a significant amount of trauma growing up in one form --

A.    I think -- no.  I completely concede that.  I did -- I did earlier.

Q.    Sure.

A.    I'm not going to debate that with you.

Q.    And in addition to that, as we mentioned before, when he was about 17 years old he was beaten by the police?

A.    Yes.

Q.    Had his jaw broken?

A.    Yes.

Q.    Potentially threatened with death and all this stuff?

A.    Yes, potentially.

Q.    Yeah.  That could be a triggering event for PTSD?

A.    Could be.  Could be, sure.

Q.    Okay.  Were you aware that during his interview with Dr. Price, Mr. Barrett said, "I keep reliving something bad that happened to me"?  Do you recall that?

A.    No.  You'll have to -- I don't recall that.  You'd have to show that to me.

Q.    Okay.  It's not in his report.  But were you aware -- I don't know if they've talked to you, but were you aware that he was asked about that yesterday?

A.    Was I aware that who was asked what?

Q.    Dr. Price was asked about that statement that Mr. Barrett made.

A.    No, I was not aware of that.

Q.   Okay.  And it was Dr. Price's impression that he was possibly or probably talking about the incident that led to this charge and the state charges, but he didn't follow up and ask, well, what are you talking about, what experience are you talking about.  Did the government lawyers makes you aware of that?

A.   No.  Here's what they made me -- here's what they made me aware of.

Q.   Well, that's fine.  If they didn't, they didn't.

A.   Well, it's a "no" with a qualifier.

Q.   Okay.

A.   Can I -- do you want me to qualify it?

Q.   Sure, sure.

A.   Here's what I recall.  They made me aware there was some discussion about the incident itself of September 24, 1999, that Dr. Price was asked about could that meet the criteria for PTSD.  That's the essence of what I recall about the conversation.

Q.   Okay.

A.   And I would -- yeah, look, that incident -- certainly, I would -- it could.

Q.   Okay.  You stated throughout -- and everybody concedes -- that Mr. Barrett had a severe drug problem, right, polysubstance abuse over a period of many years?

A.   Yes.  Yes, sir.

Q.    Okay.  And can drug use exacerbate an underlying mental condition just as a general matter?

A.    In certain situations, yes.

Q.    Okay.  Can drug use of the sort Mr. Barrett engaged in affect the structure of the brain or the --

A.    Yeah.

Q.    -- neurological functions of the brain?

A.    Depending on the use and the time of use, sure, that's a possibility.

Q.    And as you indicated before, Mr. Barrett had genetic loading to develop a substance abuse problem based on his family history; correct?

A.    Well, you're -- I didn't quite say it that way.  What I said was -- no, you're shaking your head like this.  Let me -- no, let me finish --

Q.    All right.

A.    -- because you kind of merged a couple concepts.

      There's no dispute that he had genetic loading, that there was a strong family history of substance use.  There's no dispute that there's genetic loading for substance use in Mr. Barrett's family history.

Q.    Okay.  Thank you.  Doctor, you helpfully provided -- and it's one of the exhibits; I don't remember the number -- a chart or a series of charts detailing your court testimony over the years; correct?

A.      Yes, sir.

Q.      From like 1990 to 2016; correct?

A.      That sounds about -- until January 3 of 2017 I think is what it says.

Q.      And I think you list 182 instances of where you've given court testimony?

A.      No, that's not accurate.  You misread that.  It says court or deposition testimony.

Q.      Court or deposition.  Okay.  Well, let's just change it to testimony, whether court or deposition.

A.      Okay.  All right.  I'm okay with that.

Q.      All right.  And about 65 of those cases, give or take -- and please correct me if I'm wrong -- were criminal cases, the rest of them were civil cases?

A.      I haven't bothered to count them up.  But if that's what you count, then I'm not going to sit here and count right now.  I'm not going to quibble with you.

Q.      All right.  And as a percentage of those 65 cases, how often did you appear as a witness on behalf of the government versus for a criminal defendant?

A.      So, again, without counting all the -- all the numbers up and looking at the different issues, whether it was a motion-practice hearing or an actual trial or a competency-to-stand-trial hearings, there's a number of those that make up that 65.

Q.    Yes, sir.

A.    A number of those, at least a dozen of those, are competency-to-stand-trial hearings when I was working as a forensic psychiatric at the state hospital.

In the -- in my private practice, I would say it's probably 15 percent, 10 percent retained by defense and the rest prosecution.

Q.    Okay.  You have some pretty close associations with various law-enforcement agencies and district attorney's offices around the country; correct?

A.    I have consulted to different law-enforcement agencies and district attorney's offices, yes, sir.

Q.    Okay.  Can you -- you've worked with the Phoenix Police Department?

A.    Yes.

Q.    And do you still work with the Phoenix Police Department on occasion?

A.    I consult to the Phoenix Police Department, yes, sir.

Q.    Okay.  How about Tucson or anywhere else in Arizona?

A.    I've done some consulting with an agency up in Flagstaff, the Coconino County Sheriff's Office, but largely the consultation is with the Phoenix Police Department.

Q.    Okay.  And you've also had associations or consultation arrangements with district attorney's offices in Colorado; is that correct?

A.      I've done consultation to district attorney's offices in Colorado, yes, sir.

Q.      Okay.  And how many different district attorney's offices in Colorado?

A.      Well, I've been -- let me be specific here.  I've been retained by district attorney's offices in Colorado.  I was a consultant to district -- to two district attorney's offices, one for the Columbine tragedy, what ended up being what's called the Columbine Psychiatric Autopsy Project, where me and a number of colleagues came together and worked with A&E and did a psychiatric autopsy on Dylan Klebold and Eric Harris and it was made into a documentary.  The other one is with the Boulder District Attorney's Office as it related to the homicide investigation of JonBenet Ramsey.

        Those are the only two consulting district attorney office agencies that I've worked with in that capacity.

Q.      All right.  And are you involved with the sheriff's office in Phoenix?

A.      No.

Q.      Okay.  Just the police department?

A.      "Involved with" is an overly broad statement.  There are cases that I've consulted with the police department on.

Q.      All right.  And you've made a number of professional presentation to legal groups or lawyer groups or whatever over the years, haven't you?

A.      Legal groups and lawyer groups, yes.

Q.      Okay.  Let's see.  Do you remember giving a presentation entitled:  "The Insanity Defense and You:  Are you Ready?" to the Arizona Prosecuting Attorneys' Advisory Council back in 2014?

A.      Yes.  I think I did that with Jonathan Mosher, yes.

Q.      Okay.  And also a presentation "Insane in the Brain: Rebutting the Insanity Defense," 2013, Arizona Prosecuting Attorneys' Advisory Council?

A.      Yes.  That one I definitely did with Jonathan Mosher, yes.

Q.      Okay.  "Using Mental Health Experts to Rebut Mitigation," 2012 Association of Government Attorneys in Capital Litigation --

A.      Yes.

Q.      -- Summer Conference in San Francisco?

A.      Yes.

Q.      "Understanding and Meeting Mental Defenses," 2012 Arizona Prosecuting attorneys' Advisory Council Summer Conference in 2012?

A.      That is true.

Q.      Okay.  "The Art of Interviewing," the University of Arizona College of Medicine?  That had no law enforcement.

A.      No.  But there's an interviewing course that I taught for years to the Phoenix Police Department.

Q.    Have you ever taught interrogation techniques to any police departments?

A.    No, no.  I don't do interrogation.  I leave that up to the police officers.

Q.    Okay.  Do you assist them in formulating questions or means of questioning suspects or interrogating suspects?

A.    I think that's an overly broad generalized statement of what I do.  What I do with them largely has to do with if they have a potential suspect or suspect that's been developed as a person of interest, and it looks like there may be mental health issues in play, working with them to ask the right kinds of questions about that person's mental state so that in the beginning the truth comes out and so that we're not chasing this issue five, six years down the road.  The idea being, if someone was seriously mentally ill when they committed an offense and truly couldn't appreciate the wrongfulness of their conduct or conform their conduct to the requirement of law, it's in the best interest of everyone that that person goes to a mental facility as opposed to prison.

Q.    All right.  Are you ever present, either in the room or looking through a glass window or looking at a video thing, when the police are interrogating a suspect?

A.    It would be -- it would be unethical for me to be in a room with police while they're interrogating a suspect.

Q.    All right.  Do you recall giving a presentation in 2006

entitled:  "Interview and Interrogation Techniques" --

A.    Yeah.

Q.    -- boulder Police Department --

A.    Yes.

Q.    -- looking Beyond the Obvious Training Program?

A.    Yes.

Q.    Okay.  So you talked about interrogation techniques to the Boulder Police Department?

A.    You know what, I probably shouldn't have used that title because I don't consider myself an expert in interrogation.  I do consider myself an expert in interviewing.

Q.    Okay.  And on that particular seminar or presentation, you were the only one giving it?  It wasn't somebody else that gave it that title, it was you that gave --

A.    Yeah, yeah.  what I probably did was talked about the differences between interrogation and interviewing, but I doubt -- there's no way I would lecture on interrogation.  It's not my area of expertise.  I wouldn't be giving guidance on how to -- interrogation.

Q.    Okay.  And another presentation in 2001 to the Phoenix Police Department homicide unit, it says, "Pitt S.E. Interview/Interrogation Techniques."  Is that the same program?

A.    Yeah, same program.

Q.    Okay.  Do you recall giving a presentation in Steamboat Springs, Colorado, in 2001 entitled:  "Mental Defenses - The

Importance of the Forensic' Examination" to the Colorado District Attorneys' Council?

A.   Yes.

Q.   And you gave another presentation in 2000, "Anticipating and Investigating the Insanity Defense," to the Maricopa County Attorney's Office Advanced Trial Advocacy Course?

A.   Yes.

Q.   Okay.  Another presentation to the Maricopa County Attorney's Office in 1999, "Recognizing Lethality in Investigations from a Psychiatric Viewpoint," Threat Management Seminar, do you remember that?

A.   Yes.

Q.   Okay.  "Addressing Mental Defenses," Maricopa County District Attorney's Office Advanced Trial Advocacy Course in June of '99?

A.   Yes.

      THE COURT:  Are we going to go through all of them, Mr. Autry?

      MR. AUTRY:  No.  They're in the record, I guess.

Q.   (BY MR. AUTRY)  Let me -- let me kind of cut to the chase.

A.   You go ahead.

Q.   You do quite bit of work in terms of consulting, presentations, and all that with police departments, sheriff's offices, and prosecuting authorities; true?

A.   I have done presentations to police agencies, prosecuting attorney's offices, and law enforcement authorities, I would agree.

Q.   All right.  Have you ever had any consulting relationship or arrangement with any public defender's office, either federal or state?

A.   Not federal.  There was a -- there was a time period in Arizona where there was some folks in the public defender's office in Phoenix who -- I don't want to say they had me as a consultant -- but there was -- there was some type of an arrangement there.  It wasn't a paid arrangement.  And indeed, that office still sends me work to this day.

Q.   Okay.  Do you have a large number of friends who are police officers or law-enforcement officers?

A.   Friends?  Like friends friends?

Q.   Friends friends.

A.   The kind of people we --

Q.   Social acquaintances and friends.

A.   The kind of people we count on just with a couple three fingers or the kind of people we count on like having a party?

Q.   Just combine them, I guess.

A.   Okay.  I probably have one person who I consider to be a good friend who's a law-enforcement officer and I have other acquaintances that are law-enforcement officers.

Q.   Okay.  Now, this case involves the shooting death of a

law-enforcement officer obviously; is that correct?

A.     Sadly, yes, yes.

Q.     Does your longstanding association, whether as a consultant or giving presentations or anything of that nature, tend to skew your approach at all?

A.     No.  My association and my work with law-enforcement does not at all skew the evaluation.  What I've -- what I've learned about law-enforcement officers is the same thing I've learned about physicians and experts and lawyers, which is there can be really good police officers and there can be really bad police officers.  I've been fortunate enough by and large to work with mostly what I thought were pretty stand-up people and the cases I've been involved in I thought were pretty stand-up folks.

Q.     Okay.  You've made quite a number of media appearances over the years?

A.     I have.

Q.     Okay.  And that's listed on your Web site?

A.     It is.

Q.     Okay.  Let's see.  You've been on CNN; right?

A.     I have.

Q.     Dateline?

A.     Yes.

Q.     NBC?

A.     Well, that's Dateline NBC.

Q.     Oh, okay.

A.    Yeah.  It's all one word, Dateline NBC.

Q.    Thank you.  Fox?

A.    FoxNews, yes.

Q.    ABC News Primetime?

A.    Yes.

Q.    The Today Show?

A.    Yes.

Q.    And then you -- I'm glad you're not just sticking with NBC.  Then Good Morning America, that's ABC; right?

A.    Yes.

Q.    Okay.

A.    Don't forget some of the cable channels too.  I'm just kidding.

Q.    Okay.

A.    Okay.  And The Today Show thing, I'm not quite sure exactly what that was.  It might have been something in the periphery.  But, yeah, those are all accurate.

Q.    All right.  And you've been quoted or had articles written about you, in one way or another, I guess, in various print publications; true?

A.    That is true.

Q.    USA Today?

A.    Yes, sir.

Q.    The LA Times?

A.    Yes, sir.

Q.    New York Times?

A.    Yes, sir.

Q.    Newsweek?

A.    Yes, sir.

Q.    FAHM Magazine?

A.    Yes.

Q.    The Boston Globe?

A.    Yes.

Q.    The Washington Post.

A.    Yes.

Q.    Huffington Post?

A.    Yes.

Q.    U.S. News?

A.    U.S. News & World Report.

Q.    Yes, sir.  And so on, I guess?

A.    Yes.

Q.    Now, when you were on these programs, were you talking about specific cases or what -- what was the -- what's the thrust of your media appearances basically?

A.    Part of it is it's something I've always been interested in and I've always enjoyed doing and tried to learn how to do if over time.  Often times it may be about some newsworthy -- something that's newsworthy in the media about a particular case.  There's -- in only one that I -- or maybe two that I know of has it been about specific cases that I've been

involved in.

Q.    Would you say that in your media appearances you're there primarily to give the point of view of law enforcement or a prosecution office?

A.    No.  Not at all.

Q.    Okay.

A.    No.  I disagree with that.

Q.    All right.  Your Web site states that you have media relations expertise; is that correct?

A.    On some days, I think I do; on other days, it's a little scary at times.

Q.    Oh, okay.

A.    Okay.  But yes.

Q.    And is that you talking to prosecutors or spokesmen for law-enforcement agencies on how to best present themselves to the media?

A.    No, no.

Q.    Okay.  Does this just talk -- does this just concern your own personal media appearances?

A.    Yes.

Q.    Okay.  And your firm also deals in sports security management; right?

A.    Yes.  I have a retired Secret Service agent who was in charge of -- I forget which Super Bowl -- but one of the Super Bowls in Phoenix and that's where that referral comes from --

Q.   Okay.

A.   -- or reference comes from.

Q.   And that -- okay.  I'm sorry I interrupted you.  That particular retired Secret Service officer or agent, is he actually there in your office as part of your firm?

A.   No, no.  Everyone is an independent contractor and they're in different parts of either Arizona or different parts of the country.

Q.   All right.  And your Web site also lists areas of expertise; correct?

A.   Yes.

Q.   And that's for you?  Steven Pitt & Associates, that's the name of your firm; right?

A.   It is.

Q.   Okay.  And do you recall listing 60 different areas of expertise in the section of your Web site that talks about areas of expertise?

A.   I know that there's a lot of areas of expertise listed there.  I didn't know it was 60 but that sounds about right.

Q.   Okay.  It goes all the way -- you know, have you heard of the A to Z law firm, admiralty to zoning?  Have you ever heard about that?

A.   I never -- never heard about that.

Q.   Okay.

A.   But -- but go ahead.

Q.   Okay.  The areas of expertise that you list on your Web site goes from -- starting at the A's, arson and fire-setting, to -- you don't quite get to Z -- but W, wrongful termination?

A.   Right.

Q.   Okay.

A.   So yeah, that's all accurate.

Q.   And everything in between?

A.   Yes.

Q.   Okay.

        MR. AUTRY:  Could I have just a second, Your Honor?

        THE COURT:  Yes.

        (Discussion held off the record)

Q.   (BY MR. AUTRY)  Doctor, you mentioned reviewing a report by Dr. Kathy LaFortune?

A.   Yes.

Q.   Okay.  Do you know whether or not Dr. LaFortune actually ever met personally with Mr. Barrett or whether it was an intern who did it?

A.   It's two signatures on the report.

Q.   Okay.

A.   There's the -- there's the intern and then there's her signature as well.

Q.   Okay.  Does her signature necessarily denote that she personally met with Mr. Barrett?

A.   I don't think it indicates one way or another, I don't

think. Let me take a look at it and I can tell you.

Q. Okay.

A. I'll tell you in one second. It says "clinical supervisor." It doesn't tell us whether or not she met personally.

Q. Okay. And the tests, I guess, that were given to Mr. Barrett on that occasion were screening instruments; would you agree with that?

A. Well, I don't know that the PAI -- you'd have to ask the neuropsychologist. I don't know think of the PAI as a screening instrument. It's a personality assessment inventory.

Q. Are these all self-reporting examinations?

A. The PAI is. I don't know what other -- let me just see. Hang on. I think so, yes, sir. Two out of the three for sure.

Q. Okay.

MR. AUTRY: Could I have one more second, Your Honor?

THE COURT: Yes.

(Discussion held off the record)

Q. (BY MR. AUTRY) Thank you, Doctor. I appreciate it.

A. Thank you, sir.

MR. AUTRY: Your Honor, before I turn the lectern back over to Mr. Kahan, we would request at this time, based on Dr. Pitt's testimony emphasizing the effect of drugs and excluding any underlying mental condition, that we be

permitted, as we requested before, to call Dr. Kosten and/or Dr. Stewart who are drug experts basically.  They filed -- or we filed proffers on their behalf back on March 3rd of this year as to what they would testify to with respect to the effects of drug use and things of that nature and the interplay between that and underlying mental illnesses.

THE COURT:  Those doctors have already examined Mr. Barrett?

MR. AUTRY:  Well, Dr. Stewart, we asked permission for him to examine Mr. Barrett at Terre Haute, and Judge Payne denied that on the grounds that anything done in 2017 is not really relevant to the issues.  Dr. Kosten has not examined -- neither one of them have examined Mr. Barrett, but they've reviewed numerous records and could be, at the very least, prepared to talk about Dr. Pitt's testimony, particularly as it relates to drug addiction and the effects, causes, and whys and wherefores of all that.

THE COURT:  And this is a request that you previously made that Judge Payne ruled on?

MR. AUTRY:  Yes, sir.

THE COURT:  Okay.  Well, at this time anyway I'm going to deny the request.

MR. AUTRY:  All right.  Thank you, sir.  Thank you, Your Honor.  Thank you, Dr. Pitt.

THE WITNESS:  Thank you, sir.

THE COURT:  Redirect?

MR. KAHAN:  Briefly, Your Honor.

REDIRECT EXAMINATION

BY MR. KAHAN:

Q.    Dr. Pitt, during your cross-examination, you were asked some questions about genetic loading.  Do you recall that?

A.    Yes, sir.

Q.    Okay.  Can you explain why the evidence of genetic loading, of mood disorders, other emotional disturbances in Mr. Barrett's family are inadequate to convince you of diagnosis of bipolar disorder or posttraumatic stress disorder?

A.    So the way I can explain this is, is I've used the expression "data points" or "data."  We look at all kinds of different data, whether it's the autopsy report, whether it's the video of the crime scene, whether it's correctional records, whether it's declarations, whether it's medical records, or psychiatric records as the case may be.

And what you're looking for is an aggregate of data, or more specifically, if we were to kind of take it numerically, 10 is the most important piece of data, 1 is the least.  And ultimately what you're looking for -- and I've used this analogy before -- if you think of a football field, and we think of the 50-yard line being at the center, we're looking for where is the aggregate of the data, where does it make the most sense?  To be sure there's going to be some data out at

the 10-yard line, there's going to be some data at the 40-yard line, there's going to be some data in the stands, and there's even going to be some data in the parking lot.

So when we look at data like family history, it's a piece of data, it is something that being not be ignored. But that piece of information in and of itself does not mean that, therefore, it goes that just because Mr. Barrett's family history, whether it's the first-degree relatives or the extended relatives, therefore, it goes that he's going to have bipolar disorder or, therefore, it goes that he's going to have a substance abuse disorder. In the same way that there are families that have a history of diabetes, it doesn't mean that the offspring for sure is going to have diabetes. It's really no different.

And so my point is that is this a piece of data? It is. Do I put it around the 50-yard line or at the 40 or somewhere in there? It's an important piece of data, one that can't be ignored. But does it carry the day that, therefore, it goes just because this family had these particular things that it automatically means that Mr. Barrett has bipolar disorder, is going to have bipolar disorder, or has a substance use disorder? No.

Q.    Would you have a similar response to the information that you discussed regarding history of family dysfunction and/or abuse?

A.    Yeah, same exact answer.  Look, we're not going to ignore that he came from a family of dysfunction.  To do so, again, would be intelligently dishonest, it just wouldn't be truthful.

Q.    And, in fact, aren't there examples of people in Mr. Barrett's immediate family who appear to decidedly not suffer from mental health issues?

A.    His brother, Steve, would be Exhibit A.  Steve had, I believe, some alcohol problems and some other difficulties but he went on to become -- I think it's a principal at a junior high school, if my memory is correct.

Q.    Okay.  Now, with regard to the documentation use of the drug Haldol -- and I know we talked about this before on direct --

A.    Yes.

Q.    -- why, again, does that not get you to the point of a bipolar disorder diagnosis?

A.    We don't make the diagnosis on the basis of just the medication alone.  That -- that's just completely unprofessional and inappropriate.  We just -- we don't do that.  I used to be a board examiner for the American Board of Psychiatry and Neurology and we talked about that.  I would never -- I would be really concerned about a candidate who said, well, based on these medications, this person has this diagnosis.

Q.    Okay.

A.    That's like saying someone has a cast on their leg, and therefore, it means they broke their tibia.  Well, they might have broken their fibula.  You don't know.

Q.    So that would be true also of, say, the Elavil or Asendin.

A.    Yes, yes.

Q.    Would it be fair to say -- well, defense counsel spoke to you at some length about a lot of issues in Mr. Barrett's background.  Do any of those by themselves or an aggregate necessitate a diagnosis of bipolar disorder?

A.    You don't make the diagnosis simply based on that information alone.  You just don't do that.

Q.    Now, with regard to Mr. Barrett's time at Eastern State Hospital --

A.    Yes, sir.

Q.    -- what did he tell you about how he came to be there?  And I don't want to play guessing games with you.  I think that's referenced at page 121 of your transcript.

A.    It starts on page 121, it's line 9, and it says, "Now, what were the events, though" -- this is me talking -- "Now, what were the events, though, that got you to Eastern State?  You don't remember what got" - and he said, "I was nutted out.  I was doing -- fighting with everybody and stuff, eating mushrooms a lot."

Q.    Okay.  That's generally consistent with a pervasive theme

of substance abuse running through Mr. Barrett's behavior, is it not?

A.    Yes, sir.

Q.    Okay.  There was some discussion about learning disabilities.

A.    Yes, sir.

Q.    If Dr. Price related some of that potentially to attention issues, would you be inclined to agree with that -- that sort of finding?

A.    It's certainly possible that his explanation is reasonable.

Q.    Okay.  Now, with regard to the issue of comorbidity -- and correct me if I'm wrong -- but I understand comorbidity to be something like -- I think you used the example of diabetes sometimes leading to arteriosclerosis; is that right?

A.    Yeah, exactly.

Q.    Okay.  And is it your point that if you see someone with arteriosclerosis, you would not thereby deduce that the person had diabetes, that those things can happen independently?

A.    I -- that's terrifically stated.  In fact, it's so good that I think I will use that down the road as an analogy.

Q.    It's a 50-cent --

A.    Okay.  The point is, you could have -- there's other causes is your point and it's well made.

Q.    There was also -- and we played a clip -- there was

discussion about drugs being used in pretrial custody by Mr. Barrett.

A.    Yes.

Q.    And did Mr. Barrett specify what period in his pretrial custody he was using that?

A.    I think --

Q.    Or wasn't it his statement that the drug use was during the period leading up to his state trial?

A.    Yes.

Q.    Okay.

A.    Yes, sir.

Q.    And was not Dr. Sharp's report rendered during that period?

A.    Yes.

Q.    With regard to self-medication, why did you disagree with the statement that Kenny Barrett was self-medicating to improve his mood?  I know Mr. Autry asked you a question about that and you wanted an opportunity to expand on your reasoning for that.

A.    To the extent Kenny Barrett was self-medicating to improve his mood, it was more likely than not, given the extent of substance use history, to medicate the low that was associated with the previous cycle of drug use.

In other words, if you look at what some of the typical symptoms are in someone who uses amphetamines or methamphetamine, you get initially this euphoria and this high

amount of energy and a pressured speech and a go, go, go, go, go and you don't need to sleep, but eventually there's going to be a crash.  And to kind of overcome that crash, it's not uncommon for people who are regular users of -- a regular user of amphetamine to reload, so to speak, and therefore the cycle goes.

Q.    Now, to the extent Mr. Barrett's family members might have reported mood swings --

A.    Yes.

Q.    -- is there any evidence you are aware of that they would have been in a position to distinguish what effect on his mood substances were having at any given point in time?

MR. AUTRY:  That calls for speculation.  We object.

MR. KAHAN:  It only went to what evidence the doctor was aware of.

THE COURT:  Overruled.

A.    Can you just ask the question again there, please?

Q.    (BY MR. KAHAN)  For everybody's benefit.  Are you aware of any reason to believe that Mr. Barrett's family members would have been able to track his mood swings with his substance abuse?

A.    No.  And these are the same family members, mind you, that were -- that talk about his chronic substance use so I don't know how they would be able to ferret out the timing and the sequencing.

Q.    Okay.  So when -- when they, for instance, say "chemical imbalance," that could be speculation on their part?

A.    Yes.

Q.    Now, with regard to Mr. Barrett's truthfulness, during your interview, how did he characterize himself?

A.    Mr. Barrett characterized himself as a pretty truthful person.  He told me that -- I asked him at the end of the interview, I said, a lot of people have -- I've asked you to describe a lot of people.  How would you describe yourself?  We went through a series of descriptors, but the short version is that he said he was an honest person and he said that -- and I also asked him if everything he was telling me at the time of the evaluation was honest, and he said it was.

Q.    Now, counsel asked you about Dr. Price's findings regarding paranoia.

A.    Yes.

Q.    During a break, did you have an opportunity to take a look at those findings?

A.    Yes.

Q.    And what was it that Dr. Price found?

A.    What Dr. Price --

Q.    What did he report?

A.    What Dr. Price says in his report, he says that there's features of antisocial and paranoid personality disorders.  He doesn't say the full disorder.  He says -- excuse me -- he says

there's features of the disorder -- disorders.

Q.    And how do features differ from actual disorders?

A.    So everyone has certain features -- or traits, I should say, of different personality characteristics.  Some of us are a bit more obsessive/compulsive, some of us are a bit more narcissistic, some of us are a bit more paranoid.  It's only when those -- those features become so maladaptive that they interfere with your day-to-day functioning that they become a disorder.

And so the point is, is that you work with a lot of people, I work a lot of people who have features of paranoid personality, they have some of those features.  Hopefully, you don't work with too many people that have features of an antisocial personality disorder.

But the point is, is that the features alone, they're features.  Frankly, I would expect those features in someone with Mr. Barrett's legal history and someone with Mr. Barrett's drug use history.

Q.    You were asked about self-medication.  Why did you reject that as -- and self-medication for specifically bipolar disorder or PTSD.  Why did you reject that as the reason for the substance --

A.    Because when we look at the totality of the information, when we look at that aggregate of data, when we look at that football field, and we look at where all the data accumulates,

it's right smack on the 50-yard line, that it's drugs, drugs, and more drugs.  We can't ignore the fact that you have all these mental health professionals, whether it's Social Security disability, whether it's Dr. Sharp, Dr. LaFortune, Dr. Price, even Dr. Russell in the testing that she initially did, nobody is saying bipolar disorder.

When you look at the -- when you look at the records from Wagoner Community Hospital, when you look at the records from Eastern State Hospital, when you look at the records from Bill Willis community hospital, everyone is saying the same thing and they're all seeing the same thing or variants of it.

The only person who gives this provisional diagnosis of bipolar disorder is a -- I don't mean to disparage her.  Mental health counselors are terrific assets in a community mental health system but she gave a provisional diagnosis, and the best I can tell she's certainly not a physician and she's probably some type of mental health counselor, who then recognized the error of her ways and changed her diagnosis after he was discharged from Wagoner Community Hospital.

So when I look at the aggregate of all this information, I say to myself, based on my years of experience, my training, my expertise, what I know about psychiatric illnesses, what I know about substance use, what I know about bipolar disorder, what I know about PTSD, and I say, wait a minute, you can't be giving these diagnoses as the primary

diagnosis without first giving strong consideration and mentioning and weighing heavily the chronic methamphetamine use that you have someone like Mr. Barrett, who said to me there was never a day that he wasn't -- there wasn't a time when there was an absence of.  There's a reason why I asked him that question, because when you're doing the interview, you want to make sure -- you have to rule out the substance use in terms of getting to those different symptoms.  That's the basis for my answer.

Q.    Okay.  Now, when you were asked about Dr. Price's responses with regard to specific scales -- and recognizing that you were not here for his testimony -- you said you would not look at a specific scale in isolation.

A.    Can you mind taking into the microphone just --

Q.    Sure.

A.    Okay.

Q.    Is that also true with regard to a specific response to a single question on the --

A.    Yes.

Q.    -- MMPI?

A.    Yes.

Q.    You would not look at that?

A.    No.  That's just not how -- that is not how you interpret like an MMPI or a PAI.  You don't isolate questions that are -- that's just not how it's done.  That's not -- again, I am not

here to profess my great knowledge of psychometric testing or personality testing, but I've used the PAI, I've used the MMPI, I used another test called the MCMI, and you don't look at an answer in isolation, you look at the totality of the information. I think in the case of the MMPI, I think it's 500 and -- it's either 63 or 67 -- I think 67 -- true/false questions.

Q. You discussed some records regarding -- that reflected Mr. Barrett's depression and mood lability.

A. Yes.

Q. Why were those insufficient to change your diagnosis with regard to bipolar disorder?

A. The same reason I've been saying all along, which is you can have -- you can have substance-induced mood disorders that mimic drug use. The mental health manuals allow for -- the textbooks allow for conditions that are a substance-induced mood disorder and then they give subcategories, manic, depressed, or mixed. So you -- so there's an allowance for, say, an amphetamine-induced mood disorder that could either be manic, depressed, or mixed. The idea is that that's -- that drug can have people experience symptoms that are manic, depressed, or mixed.

Q. In discussing the records from Eastern State Hospital --

A. Yes.

Q. -- there was some mention of suicidality in those

records; is that correct?

A.    Yes, sir.  Yes, yes.

Q.    Is it fair to attribute that to the fact that those records were actually made shortly after, first, Mr. Barrett's suicide attempt; and second, immediately after family members brought him to the hospital with reports of suicidality?

A.    Yes.

Q.    All right.  Does that necessarily mean that suicidality is an ongoing and pervasive problem going forward?

A.    No.

Q.    And, again, that would be inadequate to change your diagnosis with regard to bipolar disorder?

A.    Right.  There's no bipolar disorder.

Q.    Now, have all your presentations to outside groups been to law enforcement?

A.    No.

Q.    And have you actively solicited law-enforcement groups?

A.    No.  The role with law enforcement -- in fact, there's just an article that some colleagues and I wrote that's in line with all these presentations that we've given to law enforcement.  It's all about -- it's all about educating law enforcement that when you have an individual -- it's what I said earlier -- when you have an individual who commits an offense and there's an issue that looks like a mental illness or serious mental illness, we're trying to educate

law-enforcement officers and detectives to really get these questions out in the beginning during the course of their interview or interrogation.  Again, the idea being that nobody wins if we have someone that's caught up in the correctional system pretrial for years if, in fact, it turns out they were seriously mentally ill at the time and a better disposition could be made for them.  It saves taxpayer money, it saves time all the way around, and it's better for the defendant/suspect.

Q.    And with regard to your Web site, which has an extensive list of areas of expertise --

A.    Right.

Q.    -- is that a reflection, among other things, of just the breadth of human behavior?

A.    A lot of it is that and a lot of it is it's not all my expertise.  There's a number of things listed in there that really belong to my associates in terms of their expertise.

MR. KAHAN:  Your Honor, I have nothing further at this time.

THE COURT:  Anything further from Dr. Pitt?

MR. AUTRY:  Just briefly, Your Honor.

RECROSS-EXAMINATION

BY MR. AUTRY:

Q.    With respect to these presentations, Dr. Pitt, that you've done to nonlaw-enforcement groups and things of that nature, do you have transcripts or recordings of any of that?

A.    No.

Q.    Do you have the handouts or any of that sort of thing?

A.    No.

Q.    Okay.  So you wouldn't be able to provide us with that?

A.    No.

Q.    Okay.  Now, you indicated near the beginning of redirect examination that despite the fact that Mr. Barrett has genetic loading for mental illness and mood disorders and despite the fact that he has genetic loading for substance abuse or substance abuse disorder and the fact that he has family dysfunction, that none of those things individually are sufficient to make a diagnosis of any mental illness; is that correct?

A.    You don't make -- what I think I said -- and if I didn't, I'll say it now -- you don't make the diagnosis on the basis of family history.  If your dad, for example, has a history of high cholesterol, I don't go and say you have high cholesterol.

Q.    Okay.  But nonetheless, all of those things that we've talked about increase the chances, either environmentally or genetically, of developing a mental illness or a mood disorder such as bipolar; right?

A.    I think I said that I don't discount the weight of those when I was giving that analogy of different data points.

Q.    All right.  And you indicated with respect to comorbidity that -- and I forget the example that Mr. Kahan used exactly --

something about liver damage and something else.  Or what was it?

A.    No.  It was arteriosclerosis and diabetes.

Q.    Okay.  But there was also a high rate of comorbidity with mood disorders and the use of narcotics or drugs; right?

A.    I think we've been through that, yes, sir.

Q.    All right.  Would you agree with me, Doctor, that neither Dr. LaFortune nor Dr. Russell nor Dr. Bianco nor Dr. Price nor Dr. Sharp gave a comprehensive mental health examination -- or did a comprehensive mental health examination of Mr. Barrett?

A.    I can't tell you what they consider to be comprehensive or not.  What I can tell you is that I certainly feel that I did.  I interviewed him for 4.8 hours.

Q.    Sure.

A.    And whatever they did in their evaluations, they did enough to render diagnostic opinions that they attached their name to.

Q.    Well, for example, Dr. Russell, she did a risk assessment; right?

A.    Right.

Q.    Is that a comprehensive mental health examination or evaluation?

A.    Well, you'd have to ask Dr. Russell.  But regardless of whether she did a risk assessment or not, she still came to certain conclusions in her report that indicated that

Mr. Barrett did not have a serious mental -- a major mental illness.

Q.    All right.  Well, let me ask you this:  Did any of those people I mentioned do the type of examination you did?

A.    I don't know that any of them did a 4.8-hour evaluation and had the benefit of seeing six Bankers Boxes of records that I had the benefit of seeing.

Q.    All right.  Did you see anywhere in the reports of those individuals that they actually did a comprehensive mental health evaluation, regardless of whether they did an examination that they thought was sufficient for their particular purposes?

A.    I don't know that I've seen the words "comprehensive mental health evaluation" in their --

Q.    But you know what a comprehensive mental health evaluation is; right?

A.    I would say -- well, first of all, I think there's -- I think to be clear, there's a comprehensive psychiatric evaluation that's typically done in a hospital setting or a mental -- or a community mental health center that's an initial evaluation that's usually typically about an hour or so.  I think there's comprehensive forensic psychiatric evaluations that are along the lines of something along -- akin to what I did.

What these other professionals did, they did it for

whatever reasons they had to do but they felt -- the point is, that they felt they had enough information to render the opinions that they did; and more importantly, even rendering those opinions, their data matches up with people that had a longer period of time to see him, such as the records at Eastern State Hospital, such as the records at Wagoner Community Hospital, such as the records at Bill Willis Community Mental Health Center.

Q.    All right.  You indicated that despite the presence of genetic loading or genetic predisposition toward mood disorders or developing some kind of substance abuse disorder, that Steve Barrett would be an example of somebody -- that's Mr. Barrett's brother --

A.    Yes.

Q.    -- who didn't have any of those things.  Did you read Steve Barrett's declaration?

A.    Yes.  And let me just -- I left out Social Security disability evaluation before, the ones that -- I just want -- just want to be complete.

Now, with respect to your question, I did read Steve Barrett's declaration.  What Steve Barrett said, to be fair, he said that he had a different type of upbringing than Mr. Barrett had.

Q.    Right.

A.    Yes.

Q.    He was raised in a much more stable environment?

A.    He did say that, yes.

Q.    Daddy -- abusive daddy really wasn't around because he --

A.    He said that it was a much more -- I forget the word he used -- but we'll go with stable.

Q.    Okay.  And that was unlike Mr. Barrett's, Kenneth Barrett's, right, unlike his --

A.    I think Kenneth Barrett's -- as I've stated before under oath -- and I'll state it again -- I think to say that Mr. Barrett's upbringing was not dysfunctional would be completely intellectually dishonest.

Q.    Okay.  Now, you were asked about when Dr. Sharp saw Mr. Barrett in the Sequoyah County Jail when he was awaiting his state murder case.  Do you remember Mr. Kahan asking you about that?

A.    Yes, sir.  Yes, sir.

Q.    Do you know whether or not that during that period of time when Dr. Sharp examined Mr. Barrett, whether or not Mr. Barrett was in the general population, where he might be able to get access to elicit drugs, or whether he was in isolation which would pretty much eliminate that possibility?

A.    I don't know where he was.  I just know what Mr. Barrett told me about the drug use that he engaged in prior to his state trials.

Q.    Okay.  You were asked about whether or not Mr. Barrett's

family members, when they describe his mood swings, could distinguish whether or not the wild swings in mood that they observed were a function of drug use or some other underlying cause. Do you remember being asked about that?

A. Yes.

Q. Now, you indicated these are the same family members, of course, who talked about Mr. Barrett's drug use, his extensive drug use; right?

A. Yes.

Q. But when they are talking about his mood swings, they're talking about regardless of his drug use, we thought something was wrong with him because of these wild swings in mood. That's the tenor of their remarks, isn't it?

A. Oh, I can't talk about tenor of remarks. You'll have to show me that.

Q. Okay. Did they say, well, we think he had wild mood swings because he's a druggy?

A. No. They didn't draw that nexus.

Q. Okay. Did they draw the nexus, yeah, he's got wild mood swings but that's because, to use your phrase, he's hopped up all the time?

A. No. But these are the same people -- these are the same people who readily acknowledged, either in voluntary statements or petitions to hospitals or who acknowledged it in declarations, his chronic use of substances. They didn't say

it quite exactly it that way, but they're not ignoring or denying his chronic history.  And frankly, most importantly of all, Mr. Barrett is the one that says he's using substances all the time.  So why can't we believe him who said he said he was honest with me?

Q.    I don't doubt that he used substances all the time.  My only point is that in these declarations from the family members, they attribute his moodiness and his wild mood swings to something beyond -- above and beyond drugs, don't they?

A.    I don't -- you'd have to show me where they say that.  I don't know that they gave attribution.

Q.    Now, you indicated that Dr. Price talked about Mr. Barrett having features of antisocial and paranoid personality disorder; correct?

A.    Yeah.  Yes, sir.

Q.    So he had features of paranoia or features of paranoid personality disorder?

A.    Yes, sir.

Q.    Okay.  As we've been over probably more times than anybody cares to remember, is it true or untrue that the drug of choice for somebody who has attention problems, such as AD or ADHD or some kind of attention-deficit, that the drug of choice for people who have that is methamphetamine?  True?

A.    Certainly to treat ADHD the drug of choice is amphetamines.  Whether methamphetamines is the drug of choice

for people that have ADHD, I'm not sure of exactly the answer of that.

Q.    Okay.

MR. AUTRY:  Could I have just a second, Your Honor?

THE COURT:  Yes.

(Discussion held off the record)

Q.    (BY MR. AUTRY)  Thank you, Dr. Pitt.

A.    Thank you sir.

THE COURT:  Dr. Pitt, you can step down.  Thank you, sir.

THE WITNESS:  Thank you, Judge.

THE COURT:  Anything further from the government?

MR. KAHAN:  Your Honor, at this point, and pending whatever evidence may come back in a reopened case, the government's prepared to rest.

THE COURT:  Very well.  I understand we've got rebuttal; is that correct?

MR. SCHARDL:  May we have just a moment to confer, Your Honor?

THE COURT:  Yes.

MR. SCHARDL:  Sorry.

MR. AUTRY:  We may or may not, Your Honor, at this stage.

(Discussion held off the record)

MR. AUTRY:  We're not going to call Dr. Woods in

rebuttal, Your Honor.  But we do, of course, have Dr. Miora that we want to call as a -- sorry.  I'm sorry, Your Honor.  I apologize.

We're not going to call Dr. Woods in rebuttal, but we desire to call Dr. Miora for the reasons previously stated.

THE COURT:  And did you figure out when she'd be available?

MR. SCHARDL:  Yes, Your Honor.  She's available on the 26th.  We could be here then.

THE COURT:  How long do you think it will take?

MR. SCHARDL:  I don't think it will take more than a day.

THE COURT:  Okay.  So if we started at ten, we'd get it done on Monday --

MR. SCHARDL:  I believe so.

THE COURT:  -- the 26th?

Okay.  Well, if there's nothing else to do today, then I guess we'll just be adjourned until the 26th at ten.

MR. SCHARDL:  I think that we did 102 -- that's acceptable to the defense, Your Honor.

THE COURT:  Mr. Wilson.

MR. WILSON:  Your Honor, I would just renew our request for the raw data, testing data.

THE COURT:  Yeah.  You guys need to make that available to them --

MR. SCHARDL:  By the end of the week.  It may be that my paralegal e-mailed it while we were sitting here.  I don't know.  But it will certainly be e-mailed by the end of the week.

THE COURT:  That would be great.

MR. WILSON:  Thank you, Judge.

THE COURT:  Very well.  We're adjourned.

(The proceedings were concluded)

C E R T I F I C A T E

I, Brian P. Neil, a Certified Court Reporter for the Northern District of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in above-captioned case.

I further certify that I am not employed by or related to any party to this action by blood or marriage and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 14th day of June 2017.

s/ Brian P. Neil
_____
Brian P. Neil, RMR-CRR
United States Court Reporter

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,            )
                                  )
        Plaintiff,                )
                                  )
    -vs-                          ) No. CIV-09-105-JHP
                                  )
UNITED STATES OF AMERICA,         )
                                  )
        Defendant.                )


* * * * *

TRANSCRIPT OF EVIDENTIARY HEARING
VOLUME VI
**BEFORE THE HONORABLE STEVEN P. SHREDER**
UNITED STATES MAGISTRATE JUDGE

JUNE 13, 2017

* * * * *

A P P E A R A N C E S

    MR. DAVID B. AUTRY, 1021 Northwest 16th Street,
Oklahoma City, Oklahoma, 73106, and,
    MS. JOAN M. FISHER and MR. TIVON SCHARDL, Federal
Public Defender, Sacramento, 801 I Street, Third Floor,
Sacramento, California, 95814, Attorneys on behalf of the
Plaintiff;

    MR. CHRISTOPHER WILSON, 520 Denison Avenue, Muskogee,
Oklahoma, 74401, Assistant United States Attorney, and,
    MR. JEFFREY B. KAHAN, U.S. Department of Justice,
Capital Case Unit, 1331 F Street Northwest, Room 345,
Washington, D.C., 20530, attorneys on behalf of the
Defendant;


REPORTED BY:                KEN SIDWELL, CSR-RPR
                            United States Court Reporter
                            P.O. Box 3411
                            Muskogee, Oklahoma  74402

946

                              I N D E X
WITNESS                                          PAGE

**Steven Pitt, D.O.**
     (Direct Examination by Mr. Kahan)            956
     (Cross-Examination by Mr. Autry)            1016

JUNE 13, 2017 PROCEEDINGS

*(On the record at  9:07 a.m.)*

THE COURT:  Call case number CIV-09-105-JHP, Kenneth Eugene Barrett versus the United States of America. Would the attorneys enter their appearances for the record, please.

MR. KAHAN:  Jeffrey Kahan and Chris Wilson for the government, Your Honor.

MR. AUTRY:  David Autry, Tivon Schardl, Joan Fisher for Mr. Barrett, Your Honor.

THE COURT:  Very good.  Teka tells me there's a question about recalling Dr. Woods.

MR. AUTRY:  Yes, Your Honor.  Potentially in rebuttal to Dr. Pitt.

THE COURT:  When would he be available?

MR. AUTRY:  He's here.

THE COURT:  Oh, okay.

MR. AUTRY:  He's in the courtroom, so he's available today and tomorrow.

THE COURT:  Okay.  Great.  Well, that shouldn't be an issue then.  If we do hear from Dr. Woods further, are you going to still want to bring that other doctor, or no?

MR. AUTRY:  Yes, Your Honor, because Dr. Woods is a psychiatrist, Dr. Miora is neuropsychologist.  Dr. Woods can sort of explain neuropsychology, but he is not -- he is

not a neuropsychologist.  And Dr. Miora can certainly better explain, from neuropsychological standpoint, Dr. Young's findings and how she supports Dr. Young's findings.

THE COURT:  But they are both testifying about organic brain injury; correct?

MR. AUTRY:  Yes.  But Dr. Miora is actually the person who looked at Dr. Young's work, peer reviewed it, looked at all the raw data, and confirmed that what Dr. Young did was a correct diagnosis, that she used appropriate tests, scored the tests correctly, and things of that nature.

THE COURT:  I don't think we've admitted the exhibit, but is Dr. Young's affidavit in -- or declaration in the record?

MR. AUTRY:  I believe, toward the end of the hearing last time, the Court did admit it into the record. Isn't that right, Ms. Fisher?  Yes, it's been admitted.

THE COURT:  Okay.  That would be, I think, Exhibit 25; is that right?

MR. AUTRY:  And there's also an issue with respect to some of Dr. Price's testimony yesterday that Dr. Miora could address.

THE COURT:  When would she be available?

MR. SCHARDL:  Good morning, Your Honor.  I spoke to her yesterday, and she's not available to come tomorrow.

949

She would have had to leave today.  She had patients and other things scheduled.  She could come next week.  However, I'm not available to come next week because I have a prior commitment.  So I think perhaps the week after would be the earliest that we could come back.

THE COURT:  Well, that's doable on my calendar. What's the government say about that?

MR. WILSON:  Your Honor, a couple of things.  One, we still do not have any of the raw testing data which we requested, and we would obviously need to review that. Also, if, in fact, they are going to call Dr. Miora -- is that right, or Young?

MR. SCHARDL:  Miora.

MR. WILSON:  Okay.  The government would, at that time, make a request for an opportunity to have a neuropsychologist to evaluate Mr. Barrett and be able to review the raw data, testing data, which the government still does not have.  So, obviously, we're not going to be able to -- would not be ready in two weeks.

THE COURT:  Correct me if I'm wrong here, but I thought that Dr. Price was a neuropsychologist?

MR. WILSON:  He is, Your Honor.

THE COURT:  So why do you need another one?

MR. WILSON:  Well --

THE COURT:  I mean, here's what it boils down to,

950

you guys have an M.D. and a neuropsychologist, and they've got an M.D. and they want a neuropsychologist, too.  And I think I understand the point.

MR. WILSON:  I'm sorry, I was consulting with counsel.  I'm sorry.  Yes, Dr. Price is a neuropsychologist, that is correct.

THE COURT:  Okay.

MR. WILSON:  And -- well, that's going to be the government's request.

THE COURT:  Okay.  How soon can you guys make that raw testing data available to them?

MR. SCHARDL:  I think we could make it available very quickly, Your Honor.  It would simply be a matter of, you know, putting the PDF in a -- you know, sending it to them.  The reason it wasn't disclosed is because the witness wasn't going to testify.  And the Court's order was, prior to the testimony -- we got Dr. Price's raw data in the middle of the week last week and had just a few days to review it.  But we're happy to make it available to the government prior to Dr. Miora's testimony.

THE COURT:  Let me go get calendar off my desk.

MR. SCHARDL:  Okay.  And I can't say the specific date for Dr. Miora.  I apologize I don't have all of her available dates.  So rather than have the Court shift -- possibly shift anything, I apologize for not having --

THE COURT:  Well, I have to tell you which days I could do it anyway.

MR. SCHARDL:  Okay.  I just didn't want to create a problem for the Court.  You look querulous, Mr. Wilson.

MR. WILSON:  Well, just for the record, Judge, counsel made a comment that they weren't going to disclose that information because the doctor wasn't going to testify.  However, that information was used as part of Dr. Woods' testimony, and we've made repeated requests for that raw data.  And so --

THE COURT:  Well, if you don't have it by then, we're not going to hear from Dr. Miora.

MR. SCHARDL:  And I apologize, I certainly would have provided.  I didn't realize that was a miscommunication, but --

THE COURT:  I can do it Monday, Wednesday, Thursday, or even Friday if I had to.  But I prefer to do it Monday, Wednesday, or Thursday.  So 26th, 28th or 29th.

MR. SCHARDL:  26th, 28th or 29th.

THE COURT:  And I understand we're trying to sync calendars with a busy professional, but we need -- we need to get this -- need get to the evidentiary part of this completed anyway.

MR. SCHARDL:  Understood, Your Honor.  And those dates are available for me.  And at the earliest

opportunity, I'll contact Dr. Miora and ask her to be available on one of those dates.

THE COURT:  Okay.  Are we ready to go?

MR. KAHAN:  Ready, Your Honor.

THE COURT:  Go ahead and call your next witness then.

MR. AUTRY:  Your Honor, before they call Dr. Pitt, could I make a brief record?

THE COURT:  Yes.

MR. AUTRY:  Thank you.  Your Honor, at this time we would renew new our motion in limine as to Dr. Pint's testimony.  Dr. Pitt was allowed to examine Mr. Barrett in order to rebut evidence Mr. Barrett could have developed and presented in 2005.  And Judge Payne was very careful in his various orders to state that this hearing is supposed to recreate, as closely as possible, what could have been testified to at the time of Mr. Barrett's trial in 2005. However, Dr. Pitt relies on information in forming his opinions on evidence that did not exist in 2005, specifically Bureau of Prisons' records from the time that Mr. Barrett has been on death row in Terre Haute.  None of that obviously was available.

He reaches an opinion as to Mr. Barrett based in part on these Bureau of Prisons' records stating that, because the Bureau of Prisons has not diagnosed Mr. Barrett

953

with a major mental illness, that is highly suggestive or proof that he does not have a major mental illness.  And, of course, those Bureau of Prisons' records were not in existence in 2005 at the time of the trial.

And Judge Payne has also stated that Mr. Barrett's mental health as of 2017 is simply not relevant.

Also, the report by Dr. Pitt relies on the DSM 5, which was not in existence at the time of Mr. Barrett's trial in 2005.  And we believe that Dr. Pitt's reliance on these materials, and the government's reliance on these late-coming or after-the-fact materials are irrelevant because they don't go to what Mr. Barrett's mental condition was in 2005 and the types of evidence that could have been introduced both by Mr. Barrett and by the government at the trial.

And, of course, the government, as we note in our motion, has taken inconsistent positions.  We sought to have Dr. Pablo Stewart examine Mr. Barrett in 2017 not to rely on new information, but based on information that was in existence in 2005.  That request was denied.  Similarly, our request to call Dr. Kosten, Dr. Bigler -- I know Dr. Miora is taken care of for now -- and the other people whose proffers we filed back on March 3rd, they were all excluded on the theory that they didn't have anything relevant to say because it's based on 2017.  However, all of those experts

954

that we sought to call were basing their opinions on information that was available at the time of Mr. Barrett's trial in 2009.

So the government is trying to have it both ways.  They say, on the one hand, you shouldn't allow any new experts to examine Mr. Barrett in 2017 because it's not relevant, yet they want to call Dr. Pitt to testify to opinions based on materials that were not available at the time of trial.

So in addition to all that, we believe that Dr. Pitt's evidence is more prejudicial than probative because he's relying on stuff that couldn't have been relied on back in 2005.

So we reiterate the arguments that we made in the written motion and incorporate that, of course, into this oral request today.

THE COURT:  If there is to be a resentencing in this case, aren't your doctors going to rely on evidence that was adduced since the trial?

MR. AUTRY:  Your Honor, I don't know.  That's a possibility.  However, the posture this case is in, and based on the Tenth Circuit mandate and the orders Judge Payne has issued is that, under *Strickland* and under the Supreme Court authority that follows *Strickland*, when you have a claim of ineffective assistance of counsel and you

have an evidentiary hearing some years down the line after the trial, everything has to be looked at from counsel's perspective at the time.  So regardless of what happens at any potential resentencing --

THE COURT:  That's true with respect to whether there was a breach of duty.  But it's not true with respect to whether there's prejudice or not, is there?

MR. AUTRY:  I think it's apples and oranges, Your Honor.

THE COURT:  I mean, one of the things the Tenth Circuit sent this back for was consideration of whether anything the government might have presented but didn't would change the outcome.

MR. AUTRY:  And that was limited, I believe, in the Tenth Circuit's opinion to Dr. Price.  They discussed Dr. Price, that he could have potentially testified in rebuttal.

THE COURT:  Right.  All right.  Well, objection is overruled.  We are going to hear from Dr. Pitt.  You can obviously attack his opinion based on a lot of things that you just mentioned as you went through that.

MR. AUTRY:  All right.  Thank you, Your Honor.

THE COURT:  Very well.

MR. KAHAN:  Government calls Dr. Steven Pitt.

THE CLERK:  Please raise your right hand.

956

*(The witness was duly sworn by the Clerk.)*

THE WITNESS:  I do.

THE CLERK:  Please be seated.

THE WITNESS:  Thank you.

THE COURT:  Dr. Pitt, we've got plenty of stuff and it looks like you brought more.

THE WITNESS:  It's all good.

STEVEN PITT, D.O.,

being first duly sworn to testify the truth, the whole truth, and nothing but the truth, testified as follows:

DIRECT EXAMINATION

BY MR. KAHAN:

Q.  Good morning, Dr. Pitt.

A.  Good morning.

Q.  Ask you please state and spell your name for the record.

A.  My name is Dr. Steven, S-t-e-v-e-n, Pitt, P as in Peter, i, T as in Tom, T as in Tom.

Q.  And what do you do for a living?

A.  I am a board certified psychiatrist with subspecialty training and board certification in the discipline of forensic psychiatry.

Q.  How long have you been so employed?

A.  I finished my fellowship in forensic psychiatry in 1991. So since 1991, I've been working as a forensic psychiatrist.

Q.  Where are your offices located?

957

A.   My main office is in Scottsdale, Arizona, and I have another office is Century City in Los Angeles, California.

Q.   Okay.  And I know you mentioned that you're currently employed in forensic psychiatry.  Was there a time when you treated patients?

A.   Yes.  Certainly during my residency in psychiatry at the University of Michigan, I treated patients in a mood disorder unit, in the outpatient unit, as well as in the Ann Arbor Veteran's Hospital on the posttraumatic stress disorder unit.  Subsequent to completing my fellowship in forensic psychiatry, I worked for a year in Colorado on a forensic unit there where I also was doing evaluations and treating patients.  And then I moved to Arizona where, for the first 18 months, I worked in a community mental health center seeing about 16 to 18 patients a day.  And then worked at the Arizona State Hospital on the forensic unit there where I was the director of forensic psychiatric services for about four, four and a half years.  And then shortly after that, I worked at a county facility for a year.  But ever since I've been in Arizona, I've also had my own private practice in general psychiatry, which I essentially stopped about three years ago.

Q.   Can you describe your training to -- let's -- why don't we start with schooling.  What sort of schooling did you require to become a forensic psychiatrist?

958

A.   So subsequent to graduating from Michigan State University where I received my bachelor degree in psychology, I went to Michigan State University's College of Osteopathic Medicine.  I graduated there in 1986.  I then did a one-year rotating internship at Oakland General Hospital in Madison Heights, Michigan.  And then I did my residency in psychiatry at the University of Michigan's Hospital at Ann Arbor, Michigan.  And then I did fellowship at the University of Maryland School of Medicine under -- in forensic psychiatry under the supervision of Dr. Jonas Rappaport.

Q.   And is Jonas Rappaport a person of particular significance?

A.   He is to me and a lot of other people, but he's considered the father of modern forensic psychiatry.  He's now retired.  But, yes.

Q.   And how did he become to be so regarded?

A.   He's an extraordinarily intelligent, bright man who was working as a psychiatrist and was doing some forensic work, and realized that other people around the country were doing forensic psychiatry, and he was -- gathered a group of people together to form essentially the American Academy of Psychiatry and Law.

Q.   And are you board certified as a forensic psychiatrist?

A.   Yes, I'm board certified as -- in psychiatry as well as in the subspecialty of forensic psychiatry.

Q.   What was the process to become board certified?

A.   Well, the board certification in general psychiatry, back when I did it was, you passed -- you took a written exam.  And if you had proficiency in the written exam, then you went on and did an oral exam where you were brought into a room to interview a patient that was unknown to you, and there were board examiners in the room.  And you would interview that patient and then get questioned about your assessment.

And then the second part was a -- watching what they called a stimulus interview which was a video of an interview that was done by a psychiatrist, and then you had to come up with your differential diagnosis and treatment plan.

You can't take the forensic psychiatry board exam until you pass the general psychiatry board exam.  And the forensic psychiatry board exam is a written exam that's heavily weighted in legal nuance, landmark cases, issues having to interface with the psychiatry and the law both in a civil, criminal, legislative and correctional context.

Q.   And did you ever participate in the board examining process as an examiner yourself?

A.   Yes.  I was a board examiner for the American Board of

960

Psychiatry and Neurology for ten years.

Q.   Have you held any teaching positions?

A.   Yes.   I'm currently on the faculty at the -- I have a --
I'm a clinical associate professor in the Department of
Psychiatry at the University of Arizona Health Sciences
Center in Phoenix.   And before that time, I was on the
faculty at the University of Arizona Medicine -- Medical
School in Tucson.   They since opened up a school in Phoenix,
so I changed my faculty appointment to there.

Q.   And I know the Court will be relieved to hear that there
is I think only one piece of evidence I need to deal with
today.   But if I could ask the clerk to please show the
witness Exhibit 52, which is the gigando binder.

            THE CLERK:   Government?

            MR. KAHAN:   Government's 52.   Thank you.   It's
actually the separate binder.

            THE COURT:   That's the one?

            MR. KAHAN:   That's the one.   We didn't want to
leave anything out.

Q.   (BY MR. KAHAN)   If you could, ask you to turn your
attention to Section 7 of that binder.

A.   Yes, sir.

Q.   Do you recognize that document?

A.   Yes, sir.

Q.   And what is that document?

961

A.   That's a copy of my curriculum vitae dated January 3, 2017.

Q.   And that is a true and accurate copy of your CV up to that point?

A.   Yes, sir.

Q.   And did you prepare it?

A.   Yes, sir.

Q.   And is it an accurate statement of your training and experience?

A.   Yes, sir.

Q.   At pages 8 to 22, does that -- does that include a list of your professional presentations?

A.   Yes, sir.

Q.   And then at pages 22 to 24, does that contain a complete and accurate list of your publications?

A.   Yes, sir.

Q.   And pages 3 to 4, is that a complete and accurate list of professional honors and other recognition?

A.   Yes.  And all of this is as of January -- January 3, 2017.  We just submitted an article to the Police Chief magazine, and there's a lecture I recently gave at the medical school.

MR. KAHAN:  Your Honor, with the Court's indulgence, I'd like to do this section by section of the exhibit, and move the CV into evidence.

962

THE COURT:  Is there any objection to Section 7 of Exhibit 52?

MR. AUTRY:  Just subject to our previous objections to Dr. Pitt's testimony as a whole, Your Honor.

THE COURT:  Very well.  Objection is overruled. Section 7 of Exhibit 52 is admitted.

Q.  (BY MR. KAHAN)  Dr. Pitt, have you previously been recognized as an expert in state or federal court?

A.  Yes, sir.

Q.  Okay.  So specifically in state court, do you recall which states?

A.  In state court, it's Colorado, Arizona, California. Without looking at the list, I can't tell you.  It's probably a couple of more.

Q.  Okay.  And also in federal court?

A.  Yes.

Q.  And have you been retained as an expert in capital cases?

A.  Yes.

Q.  And specifically in any federal capital cases?

A.  Yes.

Q.  Turning your attention to Section 9 of the -- of Exhibit 52, do you recognize that document?

A.  Yes, sir.

Q.  And what is that document?

A.   That's a list of court and deposition testimony that I've maintained since my fellowship in forensic psychiatry.

Q.   And that accurately recounts your experience as a witness?

A.   As of January 3, 2017.  I think -- since then, I think there was a deposition in a civil case that I was involved in this year.

MR. KAHAN:  Your Honor, government would move Section 9 into evidence.

THE COURT:  Any objection?

MR. AUTRY:  Yes, Your Honor, based on our previous objection, and on the grounds of relevance.  In particular, Dr. Pitt's recitation of his previous testimony doesn't say which side he testified for or who he testified for, so we question the relevance of it.

THE COURT:  Objection is overruled.  Section 9 is admitted.

MR. KAHAN:  Your Honor, at this point, I would move for the Court to recognize Dr. Pitt as an expert in forensic psychiatry and psychiatry.

THE COURT:  Is there any objection to that?

MR. AUTRY:  No, Your Honor.

THE COURT:  Very well.  Dr. Pitt is so recognized and can offer expert testimony.

964

MR. KAHAN:   Thank you, Your Honor.

Q.   (BY MR. KAHAN)   Dr. Pitt, when did you become involved in this case?

A.   I was first contacted by you and Mr. Wilson back on December 15 of 2015.

Q.   And since that time, have you been paid for your time?

A.   Of course.

Q.   And turning your attention to Section 8 of Exhibit 52, do you recognize that document?

A.   Yes, sir.

Q.   And is that a true and accurate copy of your fee schedule?

A.   Yes, sir.

MR. KAHAN:   Your Honor, we move Section 8 into evidence as well.

THE COURT:   Is there any objection?

MR. AUTRY:   Just note the same overriding objection.

THE COURT:   Very well.   Section 8 is admitted.

Q.   (BY MR. KAHAN)   Dr. Pitt, how many hours have you devoted to this case since you've been contacted by Mr. Wilson and myself?

A.   Not including getting ready for appearing today, about 60 hours.

Q.   And how much has your office billed to date?

A.   Total, not including me but the office staff as well in terms of records, chronologies, probably about $70,000.

Q.   And how much do you expect to bill overall?

A.   The contract I think was for $105,000.   I think I have probably another 40 hours of time into this myself.   So it will come close to that.   A little under that.

Q.   Now, at some point after you heard from Mr. Wilson and myself, formalized our agreement, how were you ultimately directed to evaluate -- to perform your evaluation in this case?

A.   Well, I was provided a referral letter from your office.

Q.   Okay.   And if I could ask you to turn to Section 2, do you recognize that document?

A.   Yes, sir.

Q.   And what is that document?

A.   That's the referral letter that your office sent me.

Q.   And that appears to be a true and correct copy of that letter?

A.   Yes, sir.

        MR. KAHAN:   Your Honor, the government moves Section 2 into evidence.

        MR. AUTRY:   Same objection.

        THE COURT:   Very well.   I'll show your general objection to all of these.

MR. AUTRY:  Okay.  So I don't have to keep getting up?

THE COURT:  No, you don't.  Save wear and tear on your knees.  The Section 2 is admitted.

MR. KAHAN:  Thank you, Your Honor.

Q.  (BY MR. KAHAN)  Does the referral letter provide any specific direction?

A.  No, it doesn't provide direction.

Q.  Well, does it make any specific requests of you?

A.  Yes.  There's referral questions.

Q.  And could you describe those questions?

A.  Well, the first question was whether or not Mr. Barrett suffers from a mental illness or defect.  The second question was, if he does suffer from a mental illness or defect, is it a byproduct of substance use.  And the third question was, at or around the time of the crime, could Mr. Barrett distinguish right from wrong.

Q.  Okay.  And did the government ask you to perform any other task?

A.  You asked me to do an evaluation, and I was asked to write a report.

Q.  Right.  And were you have asked to provide any other general opinions regarding the other --

A.  Well, the only other thing, I was not limited in terms of I could add anything else I felt was relevant.

967

Q.   Thank you.   In preparing to provide your opinion in this case, did you review any documents?

A.   Of course.

Q.   And did you prepare a report of both your findings and the bases of those findings?

A.   Yes, sir.

Q.   All right.   And I would ask you to turn to Section 1 of Exhibit 52 -- Government's Exhibit 52.   Do you recognize that document?

A.   Yes, sir.

Q.   And is that a true and accurate copy of the report that you prepared?

A.   Yes, sir.

        MR. KAHAN:   Your Honor, I would move Section 1 into evidence.

        THE COURT:   Over the petitioner's objection, it's admitted.

        MR. KAHAN:   Thank you, Your Honor.

Q.   (BY MR. KAHAN)   Looking at pages 7 and 19 of that report, do you recognize that as a list of the documents you reviewed?

A.   Yes, sir.

Q.   And since authoring that report, have you reviewed any additional documents?

A.   Yes, sir.

Q.   Do you recall what those were?

A.   Yes, sir.

Q.   Could you please tell the Court?

A.   I reviewed some documents from the office of Dr. Bianco. I reviewed Dr. Woods' second declaration.  And I also reviewed records from Sparks Regional Medical Center.

Q.   What was your goal in reviewing that documentary material?

A.   Well, you mean the totality of all the information?

Q.   Yes.

A.   It's part and parcel of doing a forensic psychiatric evaluation.  It's looking at collateral sources of information, everything that includes, but is not limited to, offense reports, supplemental offense reports, crime scene photographs, autopsy reports, various declarations, medical records, mental health records, correctional records, previous contacts with the law, other reports composed by other experts.  It's part and parcel of doing this work.

Q.   Did you ultimately have the opportunity to interview Kenneth Barrett in person?

A.   Yes, sir.

Q.   And do you see him in the court today?

A.   Yes, sir.

Q.   And can you describe him for the record?

969

A.   He's the gentleman sitting right next to counsel, dressed in an orange jumpsuit.

MR. KAHAN:   May the record reflect that the witness has identified the defendant?

THE COURT:   Record will so reflect.

MR. KAHAN:   Thank you.

Q.   (BY MR. KAHAN)   Now, is it accurate to describe your interview with Mr. Barrett as a semi-structured interview?

A.   Yes, sir.

Q.   Okay.   And is that a method that's generally accepted in the field of forensic psychiatry?

A.   Yes, sir.

Q.   Okay.   And is it one for which you've received training?

A.   Yes, sir.

Q.   And had you had experience performing semi-structured interviews in the past?

A.   Yes, sir.

Q.   And as far as you could tell, does it appear that Mr. Barrett was providing genuine effort during that interview?

A.   Yes.

Q.   Where did the interview take place?

A.   At the federal prison in Terre Haute, Indiana.

Q.   And when was it?

A.   It took place on January 19, 2017.

Q.   Now, given the nature of this interview, did you warn Mr. Barrett of limits in confidentiality?

A.   Of course.

Q.   And did you record the interview in any way?

A.   Yes.

Q.   And is that your normal practice?

A.   Yes.  I've been video and audio recording evaluations for -- since about 1999, 1998.  Maybe 1997 even.

Q.   Okay.  And why is that?

A.   Because I believe that video recording forensic psychiatric evaluations is the best way to preserve the integrity of the process.  It leaves no doubt as to who said what.  It holds me up to scrutiny, and it holds the person I'm evaluating up to scrutiny.

Q.   And in your opinion -- well, let me ask you this:  Was Mr. Barrett, during the time of your interview, in restraints?

A.   Yes.

Q.   And you've already said that the interview occurred in a prison setting?

A.   Yes.

Q.   Did you, nonetheless, consider the circumstances to be adequate?

A.   Yes.

Q.   Now, with regard to your recording -- and I would ask you to flip to Section 10 of Government's Exhibit 52.

A.   Yes.

Q.   I realize, from the outside, it's difficult to tell. But is that the portion of the -- that book in which you attached the DVDs memorializing your interview?

A.   Yes, sir.

Q.   And those video recordings, those were true and correct copies of the interview?

A.   Yes, sir.

Q.   And you have since reviewed those recordings?

A.   Yes.

Q.   Okay.  And who appears on screen in the interview?

A.   Mr. Barrett.

Q.   Anyone else?

A.   No.

Q.   Is anyone else's voice audible during the recording?

A.   No.  I think, later in the evaluation, there's some -- something going on in the hallway about chow.  But, no, there's no one else's voice that's audible.

Q.   Okay.  I don't want to ruin the surprise, but is your voice audible?

A.   Oh, sorry about that.  Yeah, my voice is -- my voice is audible.  Forgot about that.

Q.   Yeah.  But you do not appear on screen?

A.   No.

MR. KAHAN:  Your Honor, I would move Section 10 into evidence.

MR. AUTRY:  Your Honor, we'd object to that based not only on our previous objection, but because the video recording -- the video-audio recording of Dr. Pitt's structured interview of Mr. Barrett does not show Dr. Pitt evidently.  It only shows Mr. Barrett.  So I don't think the Court or anybody viewing it can get a full idea or the full flavor of the interview without seeing both participants.

THE COURT:  Very well.  Objection is overruled, and Section 10 is admitted.

Q.   (BY MR. KAHAN)  After the interview was completed, did you cause to be created a transcript of the interview?

A.   Yes.

Q.   Okay.  And I would ask you to turn to Section 3 of Government's Exhibit 52.

A.   Yes, sir.

Q.   Do you recognize that document as a true and accurate transcription of the interview you conducted with Mr. Barrett?

A.   Yes.  It's a representation of the best efforts of my transcriptionist to accurately record the evaluation and the interview that was conducted by myself with Mr. Barrett.

MR. KAHAN:  Your Honor, the government would move

Section 3 into evidence.

MR. AUTRY:  We would object to that because it's not done by a court reporter and there's no certification. So there's no way -- that's our objection.

MR. KAHAN:  In response to that, I would say that it is verifiable with the recording.

THE COURT:  Right.  With that in mind, the objection is overruled, and Section 3 is admitted.

Q.  (BY MR. KAHAN)  During the course of your evaluation with Mr. Barrett, did you conduct -- or, rather, ask of him for a psychosocial history?

A.  Well, I -- as part of the evaluation, I conducted a psychosocial history, yes, sir.

Q.  Okay.  And what topics did you cover?

A.  Oh, everything that includes his personal history, his educational history, his employment history, his legal history, his relationship history, his family history, his family mental health history, his own psychiatric history. All the different topics that I covered I put into a table of contents in the transcript, and they are all listed there.  But what I just shared with you is a sample representation of a number of the topics that were covered.

Q.  Okay.  And did you then summarize that psychosocial history in your own report?

974

A.   Yes, sir.

Q.   And then did you also take a psychiatric history from the defendant?

A.   Well, of course.

Q.   Okay.  And did that include a history of substance abuse?

A.   Yes, sir.

Q.   And when in Mr. Barrett's life did that substance abuse history begin?

A.   About age ten.

Q.   Okay.  And what was the duration of that history?

A.   Throughout his life.

Q.   And did you get a flavor for the frequency of his abuse of substances?

A.   Yes.

Q.   And what was that?

A.   Well, it -- his frequency was such that Mr. Barrett shared with me essentially that there was never a time -- there was essentially never a time that he was abstinent from drugs, and that he was using drugs regularly.

Q.   And did he state with any specificity what substances he was abusing in the years immediately leading up to September 24th, 1999?

A.   Yes.

Q.   And what were those?

A.   The primary drug was amphetamine -- or methamphetamine. The secondary drug, there was marijuana use as well.

Q.   Did you have a sense that Mr. Barrett minimized his drug use at all during your interview?

A.   No.

Q.   Now, as part of that psychiatric history, did you also review the defendant's treatment for any mental health issues?

A.   Yes, sir.

Q.   And did that begin with a review of documents from the Sparks Regional Medical Center?  Let me save you that effort and prove myself a liar.  If I could ask the clerk to show the witness Defendant's Exhibit 102.

THE CLERK:  Defendant's Exhibit?

MR. KAHAN:  102.

Q.   (BY MR. KAHAN)  Dr. Pitt, do you recognize that document as a copy of records from Sparks Regional Medical Center?

A.   Yes, sir.

Q.   Okay.  And does that appear to be a true and accurate copy of the documents that were provided to you and that you reviewed?

A.   Yes, sir.

MR. KAHAN:  Your Honor, partially at the request of counsel, I'd go ahead and move Defendant's 102 into evidence.

THE COURT: Any objection?

MR. AUTRY: No, sir.

THE COURT: Defendant's 102 is admitted.

Q. (BY MR. KAHAN) As you understand it, what events are recounted in these documents?

A. When you say these documents, you're talking about --

Q. About Defendant's 102.

A. Well, essentially what happens is that Mr. Barrett tried to kill himself and he shot himself in the chest. He -- he had come home from work. He -- he thought that he had been laid off from work when, in fact, it turned out he learned after the fact that that wasn't the case. But, regardless, he shot himself in the chest. He was transported to Sequoyah Memorial Hospital where he was stabilized. And then from Sequoyah Memorial Hospital, he was transported to Sparks Regional Medical Center where he remained. He was admitted there on January 19, 1986, and then he was discharged on January 27, 1986.

Q. Within those records within Defendant's Exhibit 102, are you familiar with a report by a psychiatrist named Rowland Vernon?

A. Yes, sir.

Q. If I could ask you to look, and I am aware that it's not paginated. If I could ask you to please find that report. I believe it's about the 14th page?

977

A.   I'm -- I'm looking at the report.

Q.   Okay.   And what conclusions does Dr. Vernon draw?

A.   His impressions were, one, probable antisocial personality.   Two, drug abuse.   And then he has a hyphen, marijuana currently.   And history of hallucinogenic drugs such as LSD and PCP.   Three is alcohol abuse, and then he's got a hyphen, current.   And then, four, is probable major depressive disorder.

Q.   Now, the hospital records in general, do they reflect a history of substance abuse?

A.   Yes.

Q.   Within the records, however, do you find any evidence of a blood test confirming that substance abuse?

A.   I don't think in these particular records, if my memory is right.

Q.   Notwithstanding the absence of such a test, do you -- do you still credit the report?

A.   Sure.

Q.   And why is that?

A.   Well, I credit it for -- for a couple of reasons.   One, the history was gathered by medical personnel.   Two, medical personnel recorded it.   And, three, the assumption is that the medical personnel got that information either from family or from Mr. Barrett directly.

MR. KAHAN:   If I could, Your Honor, I would ask

978

the clerk to remove Defense 102, and please provide the witness with Government's Exhibits 3 through 6.

Q.  (BY MR. KAHAN)  Dr. Pitt, have you had a moment to review Exhibits 3 through 6?

A.  Yes, sir.

Q.  And do you recognize those as records from Eastern State Hospital?

A.  Yes, sir.

Q.  And in particular, do you recognize them as documents from Eastern State Hospital that you reviewed in connection with this case?

A.  Yes, sir.

MR. KAHAN:  Your Honor, I would move Government's 3 through 6 into evidence to the extent we have not before. Okay.  We think only 4 is not in.

THE COURT:  Looks like 4, 5 and 6 have been admitted.  Three is not.  Any objection to 3?

MR. AUTRY:  No, Your Honor.

THE COURT:  Three is admitted.

Q.  (BY MR. KAHAN)  Dr. Pitt, what events do these records reflect to the best of your understanding?

A.  Well, essentially what happens here -- this is back in October 8 of 1986.  What the records reflect is you have some voluntary statements that were authored by Mr. Barrett's spouse as well as his mom.  And what his spouse

979

relates is that she had -- she claiming that he was -- she was sexually abused by him. That he threatened to kill her. That he threatened to kill himself. And that he has come and kidnapped her son and threatened to keep him away where -- where she couldn't find him. She also talks about the fact that he was abusing drugs.

And then the voluntary statement by his mother says that, in part, Kenneth Barrett, my son is -- I think there's a word missing. But essentially it's about threatening to harm himself. And she says, I know that he's using drugs.

And then there's a professional's statement that talks about Mr. Barrett's history, and ultimately he's admitted -- admitted to the hospital. And the admitting diagnoses are marital problems, mixed substance abuse, alcohol abuse, and mixed personality disorder. And they also note the previous history of the gunshot wound from the previous suicide attempt.

Q. Now, I believe you've touched on reports of -- or a history of substance abuse in these documents. Do you credit these reports of substance abuse here?

A. Yes.

Q. And is there any evidence of a blood test to confirm --

A. No, sir, not in these records.

Q. Why then do you credit the reports of substance abuse?

980

A.   Well, I credit them because we have his wife at the time saying he's using drugs, his mom at the time saying he's using drugs, the doctor coming up with the diagnosis that he's got a history of drug use.  And what I'm not completely sure about in these records is whether or not there's an admission by Mr. Barrett that he was using drugs, but if I had to take a guess, there probably is.

Q.   Specifically, looking at Exhibit 5.

A.   Yes, sir.

Q.   What does that appear to be?

A.   Exhibit 5 is a -- I think it's basically a review of systems document.

Q.   Roughly speaking, kind of an abbreviated medical history?

A.   Yes.

Q.   And what does it reflect with regard to head injury?

A.   You know, in the -- denies -- denies head injury.  It's down on the bottom right-hand corner.

Q.   You also spoke briefly about diagnoses here?

A.   Yes, sir.

Q.   What was the diagnosis on discharge from Eastern State Hospital?

A.   The diagnosis -- the diagnosis on discharge on Axis I was marital problems and mixed substance abuse.  The diagnosis on Axis II was mixed personality disorder.

Q.   Okay.   Any indication of a mood disorder?

A.   No, sir.

Q.   Now, let me ask you this:   Did the discharge report in this case include results of a drug screen?

A.   I don't believe so.   I don't believe there's a discussion of a drug screen in these records.   But I could be mistaken, but I don't think so.

Q.   If I could turn your -- I'm sorry -- turn your attention to the second full paragraph of Exhibit 6.

A.   Oh, I stand corrected.   Thank you.   It says a drug screen -- a complete drug screen was requested on admission and was negative.

Q.   Now, the fact that that was negative, does that lead you to doubt that Mr. Barrett was a long-term substance abuser?

A.   No.

Q.   And why is that?

A.   Well, again, because we have the two voluntary statements, we have the history of drug use, and I have Mr. Barrett telling me that he has a history of drug use.

Q.   Dr. Pitt, I'd ask you to turn to Government's Exhibit 10 in that book.

A.   Yes, sir.

Q.   Do you recognize that document as a true and accurate copy of a record from the Social Security Administration

982

that you reviewed in connection with this case?

A.   Yes, sir.

MR. KAHAN:   Your Honor, to the extent not already -- we haven't already done so, we move Exhibit 10 into evidence.

THE COURT:   It's already been admitted.

MR. KAHAN:   Okay.   Thanks.

Q.   (BY MR. KAHAN)   As you understand it, what events are memorialized in this document?

A.   Well, essentially it's Mr. Barrett went for an application, or applied for Social Security disability.   And what the report states in part -- I'm looking at the third from the -- well, working from the bottom up where it starts with you said, you said you're unable to work because of a gunshot wound to the chest and a mental disorder.   And then the report says, "The medical evidence shows that your gunshot wound was healed.   Medical reports show that you are moderately depressed, but there are no signs of a severe mental illness."

Q.   Now, is bipolar disorder a severe mental illness?

A.   I think so, yes.

Q.   Is posttraumatic stress disorder?

A.   Yes.

Q.   And did you rely on these Social Security findings?

A.   Well, it's certainly a data point.   It's a piece of

983

information.

Q.   Okay.   And why rely on these records?

A.   Well, because it's a -- it's an independent evaluation that was done some time ago by mental health professionals who relied on a series -- not only relied on an evaluation of Mr. Barrett, but relied on other documents which they list at the top of that document.   And like I say, it's a piece of information.   It's another data point.

Q.   What did Social Security conclude about Mr. Barrett's ability to think clearly?

A.   What it said is, most of the time you are able to claim -- claim -- excuse me.   Most of the time you are able to think clearly and to carry out your normal activities. Medical evidence does not show any other medical evidence which would keep you from working.

Q.   Is that a sort of finding that is symptomatic of neurological health?

A.   I think it's -- I think it's representative of overall general health, whether it's neurological or mental health.

Q.   If I could ask you to turn to Government's Exhibit 11. Do you recognize this as a true and accurate copy of a report you reviewed in connection with this case from Sequoyah Memorial Hospital?

A.   Yes, sir.

        MR. KAHAN:   And once again, to the extent we've

984

not already moved into evidence --

THE COURT:   That one has been admitted as well.

MR. KAHAN:   Thank you.

Q.   (BY MR. KAHAN)   As you understand it, what events are memorialized in Government's Exhibit 11?

A.   So this is the beginning of a series of events that essentially transpire over a period of, largely, three days. And it starts with at Sequoyah Memorial Hospital back on January 20, 1995 where Mr. Barrett presents to the emergency room.   And his mother states that he is, quote, losing -- quote-unquote, losing his mind.   And then further down below, I can't make out the age, but it says blank-year-old white male complains of, quote-unquote, losing his mind.

Q.   And what does this document reflect about Mr. Barrett's drug usage?

A.   Well, they go ahead and they do -- they, being the facility, do a toxicology screen, and it comes back positive for amphetamines and THC.

Q.   What sort of screening was that?

A.   That's a urine drug screen.

Q.   And urine, not blood, do you still find it credible?

A.   Yes.   Why wouldn't I?

Q.   Is the -- are the results of that test generally consistent with Mr. Barrett's statements to you?

A.   Yes.

Q.   And in your opinion, the reliability not affected by the lack of a confirming blood screen?

A.   Yes.

Q.   Why not?  Why is that?

A.   Well, again, the reason is Mr. Barrett's history of using -- his admitted history to me of using amphetamines, the fact that you have urine drug screen that's popping for the presence of these two drugs.  And, to me, it makes perfect sense.

Q.   Does that record reflect that the hospital or medical staff administered any sort of prescription drug to Mr. Barrett?

A.   On this particular visit, they gave Mr. Barrett a drug that's referred to as Haloperidol or Haldol.

Q.   What sort of drug is that?

A.   Well, it's considered an antipsychotic drug.  It's used commonly in emergency rooms to treat agitation.

Q.   And based on the administration of that drug, do you conclude that Mr. Barrett suffered from a mood disorder of any kind?

A.   No.  That would be -- that would not be a responsible conclusion to reach because Haldol is used for a number of different reasons.  And, frankly, that Haldol is also used in the treatment of Tourette's disorder.  So you don't make the diagnosis on the -- on the basis of a medication that

986

someone has been administered.

Q.   Let me ask you, if you would, to please turn to Exhibits 8 and 9.   If you would review those for a moment. Government's Exhibits 8 and 9.

A.   Yes, sir.

Q.   And do you recognize those as true and accurate copies of documents you reviewed in connection with this case from Bill Willis and Wagoner Hospital?

A.   Yes, sir.

Q.   As you understand it, what events do these two documents memorialize?

A.   Well, this is a -- there is a sequence here of -- of what takes place.   Mr. Barrett first shows up at Sequoyah Memorial Hospital.   He is then transferred -- or evaluated by a woman by the name of Barbara Hughes from Bill Willis Community Mental Health Center.   And I believe that would be your Exhibit Number 9.   And she recounts the history.   And she gives a provisional diagnosis of bipolar disorder.   And she makes a referral to Wagoner Community Hospital where Mr. Barrett is ultimately transferred to and hospitalized for a period of three days.

He's then discharged on the 23rd of January, 1995.   And then, as an outpatient, he's under the auspices of the Bill Willis Community Mental Health Clinic up until, I believe, February 13, 1995, at which point he's discharged

987

from the program for noncompliance.  And the same woman,
Kimberly Hughes --

Q.  I'm sorry.

A.  -- discharges -- gives a discharge.

Q.  Barbara Hughes?

A.  Did I say Barbara?  I misspoke before.  I meant Kimberly
Hughes.  But, anyhow, she writes a discharge summary that
says noncompliant -- reason for discharge, noncompliancy.
And then she gives the diagnoses that he was given at
Wagoner Community Hospital.

Q.  Okay.  Now, if we can roll back a bit?

A.  Sure.

Q.  The Hughes diagnosis.

A.  Yes.

Q.  First, as you understand it, is Ms. Hughes a physician
or mental health professional of some sort?

A.  Well, I'm assuming, at a minimum, she's probably a
mental health counselor.

Q.  Okay.

A.  But she's not a physician.

Q.  And she provides, as you said, a diagnosis for bipolar
disorder; correct?

A.  A provisional diagnosis.

Q.  Okay.  And did you credit that diagnosis?

A.  Well, I certainly considered it.

988

Q.   Okay.   Do you, as a result, conclude that, at the time, Mr. Barrett was suffering with bipolar disorder?

A.   No.

Q.   And why not?

A.   Well, that's a -- there's -- there's just a lot of different data points out there to argue against bipolar disorder.   But starting its most basic and fundamental reason is that --

Q.   Well --

A.   -- is that he has a history of drug use.

Q.   Okay.

A.   And you don't make that diagnosis -- if the symptoms -- if his symptoms can be better explained through the physiological effects of a substance, it's incumbent upon you to have the substance use diagnosis first.

Q.   And let me take you more immediately in time -- that time to Exhibit 8.

A.   Yes, sir.

Q.   What was Mr. Barrett's final diagnosis during this episode?

A.   So when he is discharged from Wagoner Community Hospital, he's given a diagnosis of organic affective disorder, polysubstance abuse, amphetamine dependence, and urine drug screen positive for cannabis, and then marital conflicts.

989

Q.   Okay.   And do you find that to be a reliable diagnosis?

A.   For that period of time, I think that was a reasonable -- I think the differential diagnosis that they presented is certainly reasonable.

Q.   Okay.   Do these records reflect contemporaneous substance abuse?

A.   Yes.

Q.   Okay.   And also a history of substance abuse?

A.   Yes.

Q.   And that all appears to be consistent with the final diagnosis?

A.   Yes.

Q.   Okay.   Now, the final diagnosis of organic affective disorder --

A.   Yes.

Q.   -- does that give you reason to believe that the diagnosticians here suspected some sort of brain damage?

A.   No.

Q.   Okay.   And why don't we back up a bit.   What is the -- or was the meaning of organic affective disorder?

A.   So back in the day, this term was used globally to represent a mood disorder that was a byproduct either of some medical condition or a substance -- a substance.   And what they did in, I belive it's DSM-IV TR, they got rid of

990

the term, organic affective disorder, because, implicit in that diagnosis, you could not separate a functional illness, such as a pure bipolar disorder, from another condition that would be -- that would be causing the same kinds of symptoms.  In other words, a substance-induced bipolar disorder or a brain injury that was mimic -- or causing symptoms of bipolar disorder.

So in the next iteration of DSM, DSM-IV TR, they did away with that and they have something called substance abused or medically induced -- or medical condition to identify the condition that would cause the bipolar disorder.

Back in the day here, when this was done in 1995, this would have been a reasonable diagnosis to give given his substance use.  It does not mean that this is a byproduct of a head injury.  Is it possible that that's what they meant?  Sure, it's possible.  But there's nothing in the records to suggest head injury.

Q.  Okay.

A.  So what they meant was, I believe, this was substance use and a substance-induced mood disorder.

Q.  If I could ask you to turn your attention to Exhibit 7 -- Government's Exhibit 7.  Do you recognize this as a true and correct copy of documents you reviewed in connection with this case from Saint Francis Hospital?

991

A.   Yes, sir.   Just hang on one second.   Yes, sir.

Q.   As you understand it, what events do these documents purport to memorialize?

A.   Well, Saint Francis Hospital is where Mr. Barrett goes following the incident following the instant offense.

Q.   Okay.

A.   And he's -- he's transported there.   And that's why he's at Saint Francis Hospital.

Q.   And why was he taken to the hospital, as you understand it?

A.   Well, because he had -- he had an injury.   He had gunshot wounds.

Q.   And upon his admission there, did he -- or, rather, I should ask, while he was there, do the records reflect that Mr. Barrett made any sort of admission regarding his drug use?

A.   Yes.

Q.   And would you agree with me that on page 2 of these documents, there is just such an admission memorialized?

A.   Yes, sir.   It says, the patient reports using methamphetamine tonight, and smoking marijuana earlier in the day.

Q.   Okay.   Do these records also reflect a so-called serum test?   And specifically it's page 7 of these records.

A.   Yes, sir.

Q.   And what is a serum test?

A.   Well, in the diagnostic studies in what I think this is, the ER note, it says, included serum drug screening positive for cannabinoids, and positive for high levels of amphetamines.

Q.   But the serum test, are we talking about a blood test here?

A.   Yes, sir.

Q.   What, if at all, do the records reflect, and specifically page 7, about the state of Mr. Barrett's hygiene?

A.   You're going to have to -- I don't have my eyes on it right now.  But essentially his hygiene was poor.

Q.   And is that, in your experience, a description consistent with long-term drug use?

A.   It could be.  But -- but he was also, you know, dragged out of the home and it certainly -- there's a couple of explanations for that.  I can't commit to that one way or another.

Q.   Now --

A.   Certainly -- wait, wait.  But the poor oral hygiene piece is common with chronic methamphetamine use.

Q.   Looking at these hospital records overall, these medical records starting from '86 and ending in 1999, do they give you reason to suspect an undiagnosed mood disorder of any

sort?

A.   Well, I think -- I think, to be precise, Mr. Barrett was appropriately, I think, diagnosed with some possible mood disorder following his attempted suicide.  But do these records give me any pause or make me think that there's anything to suggest that he has bipolar disorder?  The answer is absolutely not.

Q.   Okay.  And posttraumatic stress disorder?

A.   No.

Q.   Now, going back -- or I guess moving forward in time to January of this year --

A.   Yes, sir.

Q.   -- did Mr. Barrett report to you any suicide attempts other than the one for which you reviewed records in 1986?

A.   He -- he talked about there were times when he felt chronically suicidal.  And I asked him to give me some examples.  And he talked about just doing things like driving his car at a high rate of speed, or using lots of drugs, you know, as much as he could possibly use at a given time.  He talked about doing that on several occasions as well.

Q.   Is it your impression that all of the attempts that he discussed with you were -- occurred at a time when he was also abusing drugs?

A.   My impression is that the thread that runs throughout

Mr. Barrett's life, beginning at at least around age ten, is chronic substance use. And in the years leading up to the instant offense, it was amphetamine use primarily.

Q. And did you reach any sort of conclusion that his admission to these suicide attempts made a diagnosis of bipolar disorder more likely?

A. No. I think it actually makes it less likely.

Q. And why is that?

A. Again, for the -- for the reason that I stated, which is the DSM 5, DSM-IV TR, I believe even the several iterations of the DSM indicate that you don't make a diagnosis of something like bipolar disorder if the symptoms can be better explained by the physiological effects of a medical condition or a substance. It would be just irresponsible to do that.

Q. Now, in connection with this case, did you have the opportunity to review any records from the Bureau of Prisons?

A. Yes, sir.

Q. And which records were those?

A. Records from the Bureau of Prisons. Records from the -- I looked at the records from the federal Bureau of Prisons up until 2015.

Q. Okay.

A. And I also looked at records from the Oklahoma state

995

correctional -- Department of Corrections.  Those were largely medical records -- largely reception records.

Q.  Any of those reflect a diagnosis for bipolar disorder?

A.  No, sir.

MR. AUTRY:  Your Honor, we're going to object to that because he's basing that opinion on these -- or these records from the Bureau of Prisons, rather, that were not obviously in existence at the time of Mr. Barrett's trial in 2005.  So we object to anything from Dr. Pitt based in whole or in part on these after-the-fact Bureau of Prisons records.

THE COURT:  Objection is overruled.

MR. AUTRY:  Thank you.

Q.  (BY MR. KAHAN)  Just to address that point.  Dr. Pitt, in reaching your ultimate opinions in this case, did you rely on the records from the Bureau of Prisons?

A.  Look, I looked at the records from the Bureau of Prisons.  It's a -- it's a data point in the same way that the records from Saint Francis Hospital are a data point, in the same way that the Social Security records are data point.  It's a piece of information.

Q.  And in the absence of the records from the Bureau of Prisons, would you have reached a different conclusion?

A.  No.  My diagnostic opinion does not rise and fall with the Bureau of Prisons records.  All the Bureau of Prisons

records do is validate and confirm my impression that, when seen by at least four different psychologists, none of them gave a diagnosis of a mental condition.

Q. Now, generally speaking, is confinement considered a stressful event in a person's life?

A. Yes.

Q. Okay. And does the stress of confinement tend to vary in proportion with the security of the institution?

A. Yes.

Q. And in your experience, does stress make it more difficult to hide or otherwise suppress the symptoms of a mental illness?

A. I can tell you that, in general, the more stress you're under, the more likely you're to exhibit emotional problems or mental health symptoms.

Q. Do the records from the Bureau of Prisons, with that in mind, reflect a diagnosis for bipolar disorder?

A. No, sir.

Q. Do they reflect a diagnosis for posttraumatic stress disorder?

A. No, sir.

Q. Now, during the course of your interview with Mr. Barrett, did he express to you that he could not recognize his own symptoms of mental illness?

A. He did.

Q.   And how do you -- how do you interpret that statement?

A.   Well, it's a hard one for me to take in because I actually thought Mr. Barrett when we met was articulate, verbally competent, fairly insightful, and was up to speed on, you know, various issues related to his history and his case.

Q.   So do you credit his statement that prison somehow left him unable to perceive any -- any mental -- mental symptoms of his own?

A.   No.

Q.   And why is that?

A.   For the reasons I just stated.  I think he -- I think if he was really experiencing -- I think he had the capacity to recognize when he's not feeling well or doing well.

Q.   During the course of the interview, did Mr. Barrett mention to you any auditory hallucinations?

A.   He denied -- he denied experiencing auditory hallucinations.

Q.   During the interview, did you review a history of Mr. Barrett's head injuries?

A.   I reviewed with him his history of head injuries, yes, sir.

Q.   Okay.  And how many did he report?

A.   I think there were five that he told me about.

Q.   Okay.  Any particularly serious?

A.   Well, there's a couple.  There's a motor vehicle accident back in June of 1986 from Sequoyah mental health hospital where there was no loss of consciousness.  There's another one from July 18, 2013 at Sequoyah Memorial Hospital.  There's a contusion in the right orbital area.  I'm not sure on that one if he experienced a loss of consciousness.

There's an incident that happens, I believe it's in childhood.  It could be as a teen.  Something happens on a playground with a steel ball.  Mr. Barrett told me, if my memory is right, that he had two times where he lost consciousness.

Q.   Okay.  Did you receive any records for an incident involving a steel ball?

A.   No.

Q.   Now, I believe you stated, with regard to the records from Eastern State Hospital, that there had been a denial of head injury; is that correct?

A.   I believe that's what you -- yes, that was one of the exhibits that was in -- in that one document, yes, sir.

Q.   Okay.  And did you review any records from the Oklahoma Department of Corrections?

A.   Yes, sir.

Q.   Do those include some sort of medical history?

A.   Yes.

999

Q.   And what had did the medical history indicate with regard to head injury?

A.   Well, there's -- there's a form that I -- it's a personal health history form that I believe is actually signed by Mr. Barrett.

Q.   Okay.  If I could ask you to turn to Government's Exhibit 66.

A.   Oh, there it is.  Sorry about that.  Yes, sir.

Q.   Does that appear to be a true and accurate copy of the document you reviewed from the Oklahoma Department of Corrections?

A.   Yes, sir.

MR. KAHAN:  Your Honor, the government would move Government's 66 into evidence.

MR. AUTRY:  No objection.

THE COURT:  Government's 66 is admitted.

Q.   (BY MR. KAHAN)  And, again, that record appears to contain a denial of head injury.  If you could look at the third page --

A.   Yeah, I have it.  It says, periods of unconsciousness, no.  Blurred vision, No.

Q.   In your opinion, did Mr. Barrett have any sort of motive to exaggerate his head injuries when he was received at Oklahoma Department of Corrections?

A.   Sure.

Q.   And let me just back up a piece.  That checklist --

A.   Yes, sir.

Q.   -- what is -- what is the heading just above that checklist?  What does it ask the person responding under system review?

A.   Yes, sir.

Q.   What does that ask the respondent to -- as a --

A.   Yes.  I see where you're at.  It's a terrific question.  It says, have you ever had or do you now have, and then it lists a series of symptoms, everything from periods of unconsciousness, blurred vision, double vision, depression or excessive worry, frequent thoughts of suicide, paralysis, etc.

Q.   Okay.  And those are in the negative?

A.   Yes, sir.

Q.   Thank you.  Now, during the course of your interview, did you have an opportunity to review Mr. Barrett's history of drug abuse with him?

A.   Yes.

        MR. KAHAN:  Your Honor, with the Court's permission, government would like to play a couple of excerpts from the interview.

        THE COURT:  Are the monitors on?

        MR. AUTRY:  Ours is.

        MR. KAHAN:  And for the record, the first of these

excerpts is taken from Dr. Pitt's transcript starting on Page 85 at Line 10.

MR. WILSON:  Judge, are you ready?

THE COURT:  Yes, go ahead.

*(Video played)*

MR. KAHAN:  And then a second excerpt beginning on transcript Page 91, Your Honor, Line 12.

THE COURT:  Go ahead.  Yes.

*(Video played)*

Q.  (BY MR. KAHAN)  Dr. Pitt, do you recognize the two recordings we heard as excerpts from your interview with Mr. Barrett?

A.  Yes, sir.

Q.  What do those statements by Mr. Barrett lead you to believe about the extent of his substance abuse?

A.  He had a serious problem with substance use.

Q.  During another portion of the interview, did he say to you there was no absence of drug abuse?

A.  Yes.

Q.  Did he also tell you that, during a typical day leading up to the murder, that he used meth every morning?

A.  Yes.

Q.  And to be clear, by meth, I'm speaking of methamphetamine.

A.  Yes.

Q.   Didn't he also repeat that he was high every day, though there were moments when he first awoke when he was not yet under the influence?

A.   Yes.

MR. KAHAN:   And Court's permission, we'd play another excerpt.   This is from transcript Page 154.

THE COURT:   Go ahead.

*(Video played)*

Q.   (BY MR. KAHAN)   Dr. Pitt, do you recognize that as accurate recording of part of your interview with Mr. Barrett?

A.   Yes.

Q.   Did Mr. Barrett, in another portion of the interview, indicate to you that he had had access to methamphetamine and OxyContin while in pretrial custody?

A.   Yes.

Q.   What do -- what do these admissions indicate to you about the severity of his drug abuse?

A.   Mr. Barrett had a serious problem with drug addiction.

MR. KAHAN:   And if we could, we'd like to play one last excerpt from the interview.   This is reflecting portion of the interview beginning at transcript Page 108, Line 25.

THE COURT:   Go ahead.

*(Video played)*

Q.   (BY MR. KAHAN)   Dr. Pitt, do you recognize that as an

1003

accurate recording of a portion of your interview with

Mr. Barrett?

A.  Yes.

Q.  During that segment, does he endorse symptoms of a mood

disorder?

A.  No.

Q.  In fact, to what does he attribute changes in his own

mood?

A.  Drug use.

Q.  Let me ask you this:  Is there agreement in the mental

health and medical community that drugs can mimic the

effects of a mood disorder?

A.  Yes.

Q.  And, in particular, are there drugs that can make a

person appear manic?

A.  Yes.

Q.  Okay.  And are there drugs that will make a person

appear irritable?

A.  Yes.

Q.  Can they create pressured speech?

A.  Yes.

Q.  Can they create mood lability?

A.  Yes.

Q.  To be specific, is methamphetamine a drug that can make

a person irritable?

1004

A. Yes.

Q. Give a person pressured speech?

A. Yes.

Q. And mood lability?

A. Yes. And make them feel euphoric and -- yes.

Q. Is cocaine a similar drug?

A. Yes.

Q. During your interview with Mr. Barrett, did you detect pressured speech?

A. No.

Q. Okay. What is -- first, at the time of trial, 2005?

A. Yes.

Q. -- familiar with Diagnostic and Statistical Manual?

A. Yes.

Q. And that's a book that has had several iterations over time?

A. Yes.

Q. In 2005, what version of that manual was in effect?

A. DSM-IV TR.

Q. What does DSM-IV TR say about the effects of methamphetamine use?

MR. AUTRY: Your Honor, we're going to object because there's nothing in Dr. Pitt's report in which he discusses the DSM-TR IV, or IV TR, whatever, as everything is based off the DSM 5 so far as I can determine in his

report.

MR. KAHAN:  Dr. Pitt, is recognized as an expert in this area.  He's -- he was -- he's long been in practice, including the period of time in which DSM-IV TR was in effect.  And we're prepared ultimately to address the differential -- or not the differential -- those few distinctions between DSM 5 and DSM-IV here today.

THE COURT:  Well, what do you say, though, about the claim that that discussion wasn't contained in his report?

MR. KAHAN:  I think it is an accurate statement that there is no specific citation to DSM-IV TR, but the distinction here is one without difference.

THE COURT:  Well, objection is sustained.

Q.  (BY MR. KAHAN)  Dr. Pitt, does the DSM 5 recognize any sort of consensus about intoxication and how it might mimic --

A.  Well, first of all, in footnote number 39, I talk about the changes that have gone through the DSM-IV.  And the reality is that, what I say in footnote number 39, is that, since 1999, the Diagnostic and Statistical Manual mental disorders has been revised --

MR. AUTRY:  Your Honor, objection.

THE COURT:  Sustained.

Q.  (BY MR. KAHAN)  With regard to DSM 5, does it reflect a

1006

consensus of --

A.   Yes.

Q.   Thank you.  And that consensus is that mania can be mimicked by the --

A.   Yes.

Q.   Now, is it your understanding that Mr. Barrett was using drugs on September 24th, 1999?

A.   Yes.

Q.   All right.  And why is that?  What do you base that on?

A.   I'm sorry, say that again.

Q.   What do you base that on?

A.   His self-report.

Q.   And how would you respond to any criticism that the historical record lacks confirming blood tests?

A.   I don't -- I think you've already established that that's not true.

Q.   In your opinion, at the time of the crime, was Mr. Barrett suffering from bipolar disorder?

A.   No.

Q.   All right.  And why do you reject that diagnosis?

A.   I reject that diagnosis because it -- whether you're looking at the DSM-IV TR or the DSM 5 or even the DSM-IV --

         MR. AUTRY:  I object again to any comment about the DSM-IV TR.

THE COURT:  Sustained.

Q.  (BY MR. KAHAN)  With regard to the current version of the DSM, would you -- would you diagnose -- or using DSM 5, what is your opinion regarding bipolar disorder in Mr. Barrett's case?

A.  It's my opinion, based on my practice that goes way beyond DSM 5, that it -- historically, you don't make a diagnosis of bipolar disorder if, in fact, there is evidence that the symptoms are better explained by a -- the physiological effects of a substance or the physiological effects of a medical condition.  That concept has been in place for years.

Q.  Do you maintain that opinion in the face of evidence of suicide attempts?

A.  Yes.

Q.  And why is that?

A.  Same -- same reasoning.

Q.  And do you maintain that opinion -- let me back up.  In your review of records, did you consider a history of mental illness in Mr. Barrett's family?

A.  Of course.

Q.  And what did that history appear to be?

A.  There's an extensive family history in the immediate family as well as in the extended family of mental illness.

Q.   Do you maintain your rejection of bipolar disorder nonetheless?

A.   Mr. Barrett does not have bipolar disorder, nor did he have it at the time of the offense.

Q.   Based on your review of the BOP records, has anyone over the last, I guess 12 years, observed bipolar disorder symptoms?

MR. AUTRY:   Same objection as previously to reliance on BOP records, Your Honor.

THE COURT:   Overruled.

A.   Whether you look at -- the BOP records don't diagnose bipolar disorder.  Nobody diagnoses Mr. Barrett with bipolar disorder.  There's one provisional diagnosis that was done by, as best I can tell, a mental health counselor who ultimately changes her diagnosis after Mr. Barrett is discharged from the Wagoner Community Hospital.  There is no one who has treated Mr. Barrett, to my knowledge, who has given a diagnosis of bipolar disorder.

Q.   (BY MR. KAHAN)  And is bipolar disorder a life-long ailment?

A.   Yes.

Q.   Fair to say that symptoms might come and go, but the underlying disease is always there?

A.   Yes.

Q.   In your experience, can a person suffering from bipolar

disorder hide the symptoms for a protracted period of time?

A.  No.

Q.  And I think you've already said this, but hiding those symptoms is especially difficult in a stressful environment; correct?

A.  Yes.

Q.  Now, are you familiar with a textbook of psychiatry by Kaplan and Sadock?

A.  Yes.

Q.  Now, you're aware I believe that Dr. George Woods has previously testified in this case; correct?

A.  Yes.

Q.  And if, during his testimony, Dr. Woods cited Kaplan and Sadock to say that irritability was the touchstone of bipolar disorder, would you agree with that or disagree?

A.  Well, there's been multiple editions of Kaplan and Sadock.  So to be fair to Dr. Woods, I'm not sure which edition he's referring to.  But I can tell you that, in the 2003 edition, elevated, expansive, or irritable mood is the hallmark of manic episode.

Q.  Now, in your opinion, on September 24th, 1999, was Mr. Barrett suffering from posttraumatic stress disorder?

A.  No.

Q.  Now, you reviewed Mr. Barrett's social history?

A.   Yes.

Q.   Did you take into account reports of abuse or neglect, poverty?

A.   Yes.

Q.   Okay.   And why reject the posttraumatic stress disorder?

A.   Well, because abuse, neglect, poverty doesn't get you to PTSD per se.   I mean, there are certain criteria that one has to consider.

Q.   Was there any specific point where he was asked to endorse any of the symptoms of posttraumatic stress disorder during your interaction with him?

A.   Well, during the course of the interview, I -- there are different places where I asked him about some of the symptoms of PTSD, and he didn't endorse those things.   But more importantly, there's no threshold event in my mind that kind of qualifies for meeting the initial criteria for having posttraumatic stress disorder.   So nowhere in any records that I saw was he diagnosed with PTSD.

The only notation early on that I saw was by Dr. LaFortune who said one of the tests that she gave --

MR. AUTRY:   To which we object, Your Honor, because Dr. LaFortune's report was nothing that was relied on by Dr. Woods, and it wasn't available.

THE COURT:   Overruled.

A.   Doctor -- Dr. LaFortune did not come up with a diagnosis of PTSD.  In fact, she said that there wasn't -- there wasn't any information there to support that diagnosis.

Q.   (BY MR. KAHAN)  And, again, you've worked with PTSD patients in the past?

A.   Yes.

Q.   In your opinion, did you detect any evidence of brain damage that might have affected Mr. Barrett on September 24th, 1999?

MR. AUTRY:  To which we object because Dr. Pitt's report states that, with respect to the neuropsychological examinations that have been done in this case, he's going to defer to the neuropsychologists.

MR. KAHAN:  Well, Your Honor, the government would disagree with that characterization.  Lost my page.  We would -- well, Dr. Pitt said that he is aware of the varied opinions regarding and to the extent Mr. Barrett had neurocognitive deficits, and would defer to the neuropsychologists to argue their respective positions, I do not believe that any such deficits, to the extent they existed, interfered with choices that Mr. Barrett made as it pertained to the events that occurred on September 24th, 1999.

THE COURT:  Objection is overruled.  Do you remember the question?

1012

THE WITNESS:  No, I don't.

Q.  (BY MR. KAHAN)  As of September 24th, 1999, is it your opinion that Mr. Barrett suffered from some sort of brain damage?

A.  Well, as I said in my report and as counsel here has pointed out, I'm aware that there are conflicting opinions about the -- to what extent, if any, Mr. Barrett has brain damage.  And for me to say -- outright dismiss and ignore -- I'm blanking on her name right now.

Q.  Dr. Young?

A.  Dr. Young's -- thank you -- report, that would be intellectually dishonest, which I'm not going to be.  So the point is, am I aware that there are varied opinions here, and the answer is yes.  Regardless, I don't know what that deficit would be that would somehow render Mr. Barrett either, A, incapable of appreciating the wrongfulness of his conduct, or, B, more importantly, go with the Mr. Barrett whose history I know.

For example, Mr. Barrett is someone who built his own home.  He's mechanically inclined.  He worked in the oil fields.  He told me that he was not frivolous with his money.  He told me that he could look at a floor plan and, quote, pop out a slab and build a home.  He told me that he could build motors.  He's a verbally competent person.  He's someone who is able to talk a jailer into giving him the

1013

keys, so to speak, of the jail so that he and the jailer could have sex with other inmates. This is someone who's got, for lack of a better term, some, quote-unquote, game to him. He's a verbally competent guy.

May he have something going on in his head that Dr. Young picked up? I'll let other people fight about that. But to the extent that whatever that is that exists, I don't believe it affects the totality of his behavior in the choices that he made around the time of the offense.

Q. Let me ask you about antisocial personality disorders. There's some discussion in your report about antisocial personality disorder?

A. Yes.

Q. And what is antisocial personality disorder?

A. Well, briefly, essentially it's a condition where someone, for a protracted period of time, disregards the rules and laws of our society, engages in a host of antisocial behavior and conduct, whether that's stealing, lying, fighting, being irresponsible with jobs, engaging in sexual assaults. You name it.

Q. Did you assess Mr. Barrett for ASPD?

A. Yes.

Q. And what did you determine?

A. Well, I thought, in order to have the -- to technically meet the criteria for whether it's DSM-IV TR or DSM 5 --

1014

Q.   Let me stop you.   If you'd please restrict the -- your answer to DSM 5.

A.   Okay.   You have to have the diagnosis of a conduct disorder.   And I was aware that Mr. Barrett had the burglary incident when he was I think around 15.   There may have been some other juvenile conduct -- misconduct.   But I didn't feel like he had met the conduct disorder criteria, and I just didn't think it was a responsible diagnosis for me to make.   And I thought that saying that he had features of an antisocial personality disorder was much more honest.

Q.   In your opinion, could Mr. Barrett distinguish right from wrong at the time of the murder?

MR. AUTRY:   Objection.   Irrelevant.

THE COURT:   Overruled.

A.   Yes.   He told me he -- yes.

Q.   (BY MR. KAHAN)   And what do you base that on?

A.   Well, he told me.

Q.   Okay.   Anything else?

A.   It sounds like there's something else you're getting at that I'm --

Q.   Is there anything else about his mental health, his presentation that we --

A.   Well, no.   Well, again, he's clearly someone -- Mr. Barrett is clearly someone who -- who had previous run-ins with the law.   He was conversant with what constitutes

unlawful behavior.  He had been previously arrested.  He had been previously involved in charges of domestic violence. He was aware that it's unlawful to manufacture and distribute methamphetamine.  He's aware that it's unlawful to kill a police officer.  Those are all things that he shared with me.

Q.  How would you diagnose the defendant as of September 24th, 1999?

A.  Amphetamine dependence with physiologic dependence, features of an antisocial personality disorder, cannabis dependence, and I'd rule out a learning disorder not otherwise specified.

Q.  Would rule out?

A.  Yeah.  It would be like -- there's -- again, this goes to the issue of the neuropsychologists.  There's some debate as to whether or not he has a learning disorder as I understand it.  And so I'm saying I'm considering it.  I don't know if it's in or out.

MR. KAHAN:  Your Honor, at this time the government would pass the witness.

THE COURT:  Very well.  Let's go ahead and take a 15 minute recess and come back at 11:10.

*(Off the record at 10:54 a.m.)*

*(Back on the record at 11:11 a.m.)*

THE COURT:  Mr. Autry, go ahead.

1016

MR. AUTRY:  Thank you, Your Honor.

CROSS-EXAMINATION

BY MR. AUTRY:

Q.  Hello, Dr. Pitt.

A.  Good morning, sir.

Q.  You indicated to Mr. Kahan a little bit ago during direct examination that you had no doubt that there's a extensive history of mental and emotional problems in Mr. Barrett's family; correct?

A.  Yes, sir.

Q.  And that would include his immediate family?

A.  Yes, sir.

Q.  His father?

A.  Yes, sir.  I believe there's some history of issues there.

Q.  Okay.  As well as his mother; correct?

A.  Yes.  Yes.

Q.  And there's also a multigenerational history on both sides of Mr. Barrett's family of --

A.  I concur.

Q.  -- mental and emotional problems?

A.  Yes.

Q.  Including mood disorders?

A.  Yes.

Q.  Okay.  And also including suicides and suicide

attempts?

A.   Yes.   There is -- in the declarations, there is history of that, yes, sir.

Q.   Yes, sir.   And did you also see in the declarations and in the history and various records that there's a history in Mr. Barrett's family of people being committed to mental institutions?

A.   There's at least singularly for sure.   If you say plural, I'll take your word for it.

Q.   Would you agree that mood and affective disorders on Mr. Barrett's mother's side of the family go back at least to Mr. Barrett's grandfather, Hugh Dotson?

A.   I think that's fair to stay.

Q.   All right.   And there's also a history, as we kind of alluded to a little bit before, of mental commitments and suicides on the mother's side, specifically two individuals named Ingram Goodwin and Wallace Dotson?

A.   Yes.

Q.   Okay.   And there's also a history of mood disorders, as I think you indicated a little bit ago, in Mr. Barrett's paternal line?

A.   Yes.

Q.   And would that also include neurocognitive deficits?

A.   That one I do not recall.

Q.   All right.   Do you recall reading in the voluminous

1018

materials you reviewed, Dr. Pitt, that one of Mr. Barrett's aunts, Linda Riley, suffers from depression, has two children with bipolar disorder?

A.   Yes.  Yes.  And she has the grandpa -- or grandson with Aspergers.

Q.   Yes, sir.

A.   And she thought her dad was bipolar.  And the grandfather was in a psyche hospital I believe.

Q.   Okay.

A.   That's who you're talking about, right?

Q.   Yes, sir.

A.   Yeah.

Q.   And also another aunt, Elnora Long, has bipolar disorder and is on high doses of medication.  Do you have any reason to question that?

A.   No, sir.

Q.   Okay.  Would you have any reason to question that the mood disorders in Mr. Barrett's paternal line go back at least four generations?

A.   They go back a while.

Q.   All right.  For example, Mr. Barrett's great-great-grandfather, A.J. Barrett --

A.   Right.

Q.   -- there was a certificate of lunacy?

A.   And I think -- I think that's -- I think is A.J. Barrett

1019

the one who committed suicide?

Q.   I'm about to get to him.

A.   Okay.

Q.   There's a great-grandfather --

A.   Okay.

Q.   Isaac Barrett.

A.   Okay.

Q.   Okay.  But the great-grandfather was committed under what used to be called --

A.   Lunacy.

Q.   -- way back --

A.   Yes.

Q.   -- under a certificate of lunacy, and he was hospitalized --

A.   Yes.

Q.   -- for that?  And the great-grandfather, Isaac Barrett, committed suicide?

A.   Yes.

Q.   Are you familiar with materials that Mr. Barrett's paternal grandfather, A.J. Barrett, had a severe mood imbalance according to family reports?

A.   Yes.

Q.   And that he had disordered thinking?

A.   Yes.

Q.   He was also committed at one point under a certificate

of lunacy?

A.   I believe that's correct, yes.

Q.   And that the grandfather, A.J. Barrett, had auditory hallucinations?

A.   I don't recall that specifically, but I'm not going to quibble with you.

Q.   Okay.  And also suffered from paranoid thinking and what could be termed, I guess, paranoid delusions?

A.   I recall paranoid thinking.

Q.   That he had poor judgment and reasoning?

A.   Sounds true.

Q.   Okay.  That he had wild mood swings?

A.   Yes.

Q.   And that he self-medicated by drinking heavily?

A.   Yes.

Q.   And are you aware of materials, among the things that you reviewed, that the brother of Mr. Barrett's paternal great-grandfather was described by family members as looney, for want of a better term?

A.   So walk me through the tree on that one again.

Q.   Okay.  I'm sorry.  The brother -- and this is complicated.

A.   Right.

Q.   The brother of Mr. Barrett's paternal great-grandfather, Isaac Barrett, the guy who committed suicide.

1021

A. Right.

Q. Okay. Was described in the family lore as looney?

A. I think I saw something along those lines.

Q. And he had a son who committed suicide?

A. Yes.

Q. Would you agree that Ernie Barrett, Mr. Barrett's father, grew up in a really bad, abusive environment?

A. That's what was said, yes.

Q. All right. Now, can growing up in an abusive environment affect somebody's neurocognitive development?

A. Theoretically, sure.

Q. Okay. And I think you said earlier that you agreed that Mr. Barrett's father, Ernie Barrett, exhibited signs of a mood disorder?

A. Yes.

Q. And Mr. Barrett's mother, Gelene Barrett, suffered from severe depression -- or suffers from severe depression and has some kind of mood disorder?

A. Well, I think -- I think it's depression and alcohol --

Q. Okay.

A. -- issues. And I think the father, Ernie, had drinking issues as well.

Q. Yes, sir. So both Mr. Barrett's mother and his father --

A. Yes.

1022

Q.   -- had substance abuse and/or drinking issues?

A.   Yes.   That's true.

Q.   And Mr. Barrett's mother was a really bad -- or is a really bad alcoholic?

A.   That is what is said, yes, sir.

Q.   Okay.   Do you recall Mr. Barrett telling you, during the structured interview you had with him, that he thought his son had some mental health issues?

A.   Yes.   Semi-structured interview, yes.

Q.   Yes, sir.   I'm sorry.   And that's consistent with what you learned from reviewing all these materials about Mr. Barrett's family history?

A.   That is true.

Q.   Okay.   Now, a multigenerational history of mental impairments, mood disorders, and things of that nature, suicidality --

A.   Yes.

Q.   -- and all that stuff, that's relevant to mitigation of punishment potentially, isn't it?

MR. KAHAN:   Objection, Your Honor.   We're here to rebut George Woods' testimony.   Not -- not for mitigation.

THE COURT:   Well, he's asking for his opinion. Overruled.

Q.   (BY MR. AUTRY)   Potentially relevant to mitigation, that family history --

A. Can you repeat the question?

Q. Okay. The family history of mental illness and substance abuse could potentially be relevant to mitigation of punishment?

MR. KAHAN: And, again, I object. He's asking for a legal conclusion.

MR. AUTRY: I'll just move on, Your Honor.

THE COURT: Go ahead.

Q. (BY MR. AUTRY) Okay. Are you familiar with the term, Dr. Pitt, as I'm sure you are, of genetic loading?

A. Yes.

Q. Okay. Could you describe briefly for the Court what that is?

A. Well, essentially, you have -- let's use alcohol as an example because it's probably the easiest to use. You have a multigenerational family that has a history of alcohol use or alcohol -- or problems with alcohol. Alcohol dependence I should say. And it would not be -- it certainly sets up that there could be a genetic load in offspring to have that same problem. Same way there could be a problem with someone that has -- there's a familial history of diabetes. There could be a genetic load for that in offspring.

Q. All right.

A. Or dementia, whatever.

Q. Did Mr. Barrett have genetic loading for mental illness

1024

and mood disorders based on the lengthy history of such in his family on both sides?

A.  Yes, I think that's an accurate statement.

Q.  All right.  And you've indicated earlier that there's a history of mood disorders in the family.  Are you familiar with literature that indicates that somebody who has a lot of bipolar or other mood disorders in the family history has a dramatically increased chance, to the tune of about 60 percent, of developing those kind of maladies?

A.  I'm not sure about 60 percent.  What I am sure about is the incidence -- I can't give you the statistic exactly, but the incident is far greater in first degree relatives, and then it exponentially decreases the further away you move from generation.

Q.  All right.  But in this case I think you've indicated that Mr. Barrett's parents had these problems?

A.  Yes.

Q.  So that increases, maybe not 60 percent, but significantly?

A.  I would say that, given the familial history in the first degree relatives, that it -- that would put an increased risk for Mr. Barrett.  I don't dispute that.

Q.  Okay.  And as well as having a lengthy family history of multigenerational mood impairments, mental disorders, there was also, in Mr. Barrett's family, a multigenerational

1025

history of alcohol and/or substance abuse.  Would you agree with that?

A.  I concur.

Q.  Well, you mentioned before that his mother is a severe alcoholic, and his father was a heavy drinker?

A.  I don't think I used the word alcoholic, but I will acknowledge that the parents had issues with alcohol.

Q.  Okay.

A.  Problems with alcohol.

Q.  All right.  Is substance abuse categorized as a disease?

A.  Yes.

Q.  And because of the family history, Mr. Barrett also had not only genetic loading for mood disorders, mental illness, he also had genetic loading for substance abuse disorder, the addiction or abuse of alcohol and/or drugs; true?

A.  I concur.

Q.  Do you know what modeling is, or modeling behavior?  Is that something you're familiar with?

A.  I think, a little bit.

Q.  Okay.  Mr. Barrett's parents had drinking problems --

A.  Yes.

Q.  -- at the very least; right?

A.  Yes.

Q.  Did you also read in the materials you reviewed that Mr.

Barrett's mother was a drug user herself?

A.   I believe that is true.   I -- I -- either I read that or Mr. Barrett shared it with me, one or the other, yes.

Q.   All right.   And do you recall -- I know you reviewed a lot, but do you recall Mr. Barrett's ex-wife, Abby Stites, saying that there were times Gelene Dotson, Mr. Barrett's mother, would get him up in the middle of the night to do drugs with her?

A.   That's -- I read that somewhere, yes.

Q.   Okay.   And you don't have any reason to dispute that --

A.   No.

Q.   -- correct?   And is it true that, in addition to have a genetic predisposition to developing substance abuse problems, somebody whose parents have alcohol or substance abuse problems kind of learn to do that based on the parents' behavior, or the parents' model that behavior for the child?   Does that make sense?

A.   Well, I think, talking in general terms, it's certainly possible.

Q.   Okay.   And I believe you indicated that, by the time Mr. Barrett was ten years old, he had -- was developing substance abuse issues?

A.   No, I didn't say it quite like that.

Q.   Okay.

A.   What I said --

1027

Q.   Correct me.

A.   What I said was that he began using alcohol at age ten.

Q.   All right.  Do you recall reading anything in the materials you reviewed, Dr. Pitt, about an incident when Mr. Barrett was seven years old --

A.   Yes.

Q.   -- and his father made him drink or --

A.   Yes.

Q.   -- got him drunk as some kind of form of punishment?

A.   Yes.

Q.   Okay.  Do you recall reading in the materials you reviewed that, when he was growing up, Mr. Barrett's mother was very lax on discipline?  Didn't really care what he did. If he wanted to use drugs, if he wanted to drink, no problem.

A.   I don't know about the second half of that sentence, or the second half of the question, but I will acknowledge that Mr. Barrett, as well as declarations that I read, indicated that there was really no discipline imposed by the mother.

Q.   All right.  I think you referred to a little bit, and correct me if I'm wrong, Dr. Pitt, during direct examination that Mr. Barrett's upbringing and background show a history of mental, emotional, and physical abuse.  Do you disagree with that?

A.   You're saying I said that in the direct exam exactly

1028

like that?

Q.  Well, no.  You know, in general terms.  Do you agree that he comes from an abusive background?

A.  I agree that he comes from a dysfunctional background that had elements of emotional abuse and some physical abuse, yes, sir.

Q.  All right.  Can that kind of thing, that kind of a background affect neurocognitive or neurological development in a child?

A.  Theoretically, yes.

Q.  Okay.  I think I asked you that before, didn't I?

A.  Something along those lines, you did.

Q.  Okay.  I apologize for the repetition.

A.  Well, at least I was consistent with my answer.

Q.  All right.  Well, great.  Were you also aware, from the materials you reviewed, that Mr. Barrett's parents were pretty much selfish, did their own thing, and kind of left the kids to fend for themselves?

A.  What I -- what I recall is, I think either in Steve Barrett's declaration or in his testimony, that it was a very permissive environment for Mr. Barrett.

Q.  Okay.  Thank you.  And were problems created within the home because Mr. Barrett's father cheated on mom --

A.  Yes.

Q.  -- and ran around with other women all the time --

A.   Yes.

Q.   -- and was something of a barfly I guess?

A.   He was definitely a philanderer.

Q.   Okay.  And on at least one occasion, Ernie Barrett beat up Gelene, the mother?

A.   Yes.

Q.   Okay.

A.   Yes.

Q.   Gave her black eyes and a busted lip?

A.   I don't recall that.  What I recall is that Mr. Barrett told me that he didn't see any abuse, but in I think the -- in Gelene's declaration, she talks about at least one incidence of physical abuse.  I can't remember if it was a black eye and split lip or not.

Q.   All right.  And was Mr. Barrett, when he was growing up, subjected to frequent separations --

A.   Yes.

Q.   -- by the parents --

A.   Yes.

Q.   -- and reconciliations?

A.   Yes.

Q.   And they moved around a lot, at least up until the time Mr. Barrett was 13 years old?

A.   Yes.

Q.   Did the information that you reviewed indicate that

1030

Mr. Barrett kind of viewed his father as an idol to him, way up here, you know, on the mountain?  But that Mr. Barrett's father pretty much neglected him, especially after the divorce?

A.  I think that there is testimony or declaration -- I can't recall who said it.  But at least one person said that Mr. Barrett did look up to his father and really idolized him.  And that -- and that after the divorce, there was very little contact, if I recall.

Q.  Okay.  And you're aware that Mr. Barrett's father was physically abusive toward him on occasion; correct?

A.  Yes.

Q.  He would hit him in the chest?

A.  That's what he told me.

Q.  Okay.  And you don't have any reason to discount that, or disagree with it?

A.  No.  I -- I took him for his word on that.

Q.  Speaking of taking him for his word, you did not find that Mr. Barrett was a malingerer during your examination of him; correct?

A.  No, I didn't think that Mr. Barrett was intentionally producing false or grossly exaggerated psychological symptoms in furtherance of his case.  I did, however -- there are a couple of inconsistencies, the biggest being the claim of loss of consciousness when, in fact, there's no

records that indicate that.

Q.   Okay.

A.   Or he -- I mean, sorry -- his claim.  But then at the Oklahoma State Department of Corrections reception area, there's no history of a loss of consciousness.  But, no, I didn't -- I found him to be -- he answered all my questions.  He was largely cooperative.  He told me at one point, towards the end, that things were getting a little dicey.  I was amping him up a bit.  But, no, he was completely cooperative and answered everything that I asked him.

Q.   Okay.  Going briefly into the matter of head injuries.

A.   Yes.

Q.   Just because, on a DOC form, it's not indicated that he had previous head injuries, I mean, that doesn't mean that they didn't occur or didn't exist; right?

A.   Well, there's -- that -- that answer requires more than just a yes or no.  Can I give one?

Q.   Sure.

A.   Okay.  So it's not -- it's a piece of information, it's a piece of data.  That's number one.  But more importantly, it's a piece of data that Mr. Barrett himself I believe signed and filled out.

Q.   All right.

A.   Now, having said that, does that mean that there wasn't any head injuries?  Obviously the answer is no because I

have two records from Sequoyah Memorial Hospital that indicate two ER visits.  So could the truth be somewhere in between?  Probably so.

Q.  All right.  Now, did you read accounts from family members that corroborated Mr. Barrett's statement about having been hit with a steel ball in the --

A.  There was --

Q.  -- head on a playground?

A.  Right.  I don't recall.  I think it's maybe Gelene talks about that.  I'm not sure.  But I think it's Gelene talks about the steel ball incident.

Q.  Okay.  And you don't really doubt that Mr. Barrett suffered head injuries, do you?

A.  Well, look, I just talked about two ER records.

Q.  Yes.

A.  I'm not going to deny those --

Q.  Okay.

A.  -- that those do.  No, I don't deny that.

Q.  All right.  Now, let me ask you a couple of more questions about the types of physical abuse Mr. Barrett was subjected to by his father.  We talked about being hit in the chest?

A.  Yes.

Q.  His father, as a form of discipline at the dinner table, would also hit him in the head with a fork --

1033

A.   Yes.

Q.   -- on occasions?

A.   Yes.

Q.   On another occasion, he shoved Mr. Barrett's head through a wall?

A.   Yes.

Q.   Or knocked it up against a wall?

A.   Yes.

Q.   And on another occasion, he inflicted a severe beating on Mr. Barrett over some missing coins, and had to pull him out from under a bed, and then went to whipping on him, right, beating him?

A.   Well, yes.  With the caveat that Mr. Barrett had stolen his father's silver dollars and half dollars, yes.

Q.   Okay.  Yeah.  And that's what I said, in relation to coins.  Do you think that stealing or taking, you know, some silver dollars or half dollars justifies daddy, you know, beating him up?

A.   I don't know, my parents would have done a pretty good whipping on me.

Q.   Okay.  There's a difference between a whipping and being physically beaten; correct?

A.   Sure.

Q.   Okay.  And Mr. Barrett suffered some other trauma when he was about 17 years old when he was beaten by the police

1034

and had his --

A.   Yes.

Q.   -- jaw broken?  You would agree with that; correct?

A.   Yes.

Q.   And speaking of a head trauma, you indicated, and all the records show that, in 1986, Mr. Barrett put a shotgun to his chest, pulled the trigger; right?

A.   Yes.

Q.   Very serious suicide attempt; correct?

A.   Yes.

Q.   And the force of that could have caused a head injury potentially; right?

A.   I think -- I think I recall Dr. Woods saying something about this in his testimony.  That's a tough one for me to -- to tie together.  I can't give you an answer on that.

Q.   Okay.  I think you state in your report that you don't have any doubt that Mr. Barrett's mother, Gelene, drank heavily while she was pregnant with him?

A.   Well, to be precise on that, I know I have a footnote on that issue.  Do you have the page number you're referring to?

Q.   I really don't, Doctor, and I apologize.

A.   Give me a second here.  What -- what she said in her -- well, let me just read from my report, footnote number 13.

And I said that much of the information that Mr. Barrett shared with me was largely consistent with the information contained in his medical records and the declarations that I reviewed. In addition, it appears that, A, Mr. Barrett's mother did, in fact, have, and likely still does, a severe alcohol addiction. B, Mr. Barrett was, more likely than not, exposed to alcohol in utero. And then I put in parens, in her declaration dated March 9, 2009, Gelene Dotson said, quote, I wish we had known then what we know now about having just a little beer can affect your baby, none of us would have had a drop, end quote. And then, C, there is an extensive history of mental illness and/or substance use in Mr. Barrett's immediate and extended family.

Q. Okay. Do you say in there -- and let me see if I can find it at footnote 13 -- Mr. Barrett was more likely than not exposed to alcohol in utero; right?

A. Yeah, I just read that.

Q. Oh, okay. I was looking at something else and I must have --

A. Okay.

Q. -- misheard you.

A. That's all right.

Q. And that can certainly have an effect on the brain's development and things of that nature --

A. Sure.

1036

Q.  -- true?

A.  Sure.

Q.  Okay.  Now, you said that you would need to rule out, I think and correct me if I'm wrong, whether or not Mr. Barrett has a learning disorder or learning disability?

A.  What I said was learning disorder not otherwise specified.

Q.  All right.  And that's consistent with some of his educational records, isn't it?

A.  Right.

Q.  It's consistent with what Dr. Price found I think, at least in part?

A.  I think Dr. Price found something along those lines, yes.

Q.  Okay.  And maybe also Dr. Sharp?

A.  Yes.

Q.  Okay.  Mr. Barrett I guess did poorly in school?

A.  There were times when he did well, but there were other times that he did not so well.

Q.  Okay.  I think his mom described first grade as being very difficult for him because he was not good at either reading or math, and fell behind the other kids pretty rapidly.  Do you recall that?

A.  I don't recall that.  But what I do recall is that Mr.

Wilson, during Dr. Woods' testimony, pointing out some other records where -- academic records where Mr. Barrett actually did pretty well in school.

Q.   Okay.  And that just depends I guess on what kind of teacher you have and what school it is maybe; right?

A.   I detect a little bit of cynicism with that.

Q.   Just a tad.

A.   And for the record, we're both chuckling.  But my point is, is that do I -- do I acknowledge the possibility that there was some type of learning disorder based on what the neuropsychologists are saying?  The answer is yes, I do.

Q.   Okay.

A.   But I'm also aware that, notwithstanding that, that there were time periods where he actually did do well in school.

Q.   He was placed in special education classes, at least at one point?

A.   Yes.

Q.   And he failed the eighth grade, you're aware of that?

A.   He repeated the eighth grade, but he went on to go to ninth grade.

Q.   Okay.  Mr. Barrett has deficits in attention, do you agree with that, concentration and attention?

A.   Well, he says that he does.  But, yet, in the screening mental status examination I did with him during my

evaluation, he did actually remarkably well.

Q.  Okay.  Did you see the materials for Dr. Price which indicated that he had an attention problem --

A.  Yes.

Q.  -- and a concentration problem?

A.  I mean, he talks about a concentration and attentional problem, yes.

Q.  Now, Doctor, you're familiar with the term comorbidity, are you not?

A.  Yes, sir.

Q.  And that indicates two different mental illnesses at play, or two different things that might affect how somebody is diagnosed and things -- well, why don't you explain it to me.  You're the expert.

A.  Two co-occurring conditions.  So, for example, you could have diabetes, a chronic history of diabetes and a comorbid condition, because of the effects of the diabetes on the arterial system, on the vascular system could cause you to start to have some perhaps early onset dementia, so comorbid conditions.

Q.  And there can be comorbidity with, for example, bipolar and substance abuse; right?

A.  Yes.

Q.  In fact, people who have bipolar illness are frequently substance abusers, heavy users of alcohol, or heavy users of

drugs.  Do you agree with that?

A.  I agree with the statement that you will see comorbid conditions of substance use and bipolar disorder.

Q.  And is the same true also for PTSD?

A.  Same true what?

Q.  Where you often find comorbidity with substance abuse and posttraumatic stress disorder?

A.  Yes.

Q.  Because you're self-medicating I guess.  Would that be the correct term for it?

A.  We can work with that term.

Q.  Okay.  Now, you indicated that Mr. Barrett had antisocial features; correct?

A.  Yes, sir.

Q.  Did he also have paranoid features to his personality?

A.  When?

Q.  Throughout.  Throughout most of his life.

A.  I think he had paranoid features to his personality when he was hopped up and using all kinds of different drugs.  I didn't find him to be that particularly paranoid or overtly suspicious when I evaluated him.  I think back in 1999, yeah, he had paranoid features, you bet.  I would, too, if I was all hopped up on amphetamines.

Q.  All right.  Well, you're familiar with Dr. Price's report; correct?

A.   I am.

Q.   And Dr. Price noted paranoia, and, in fact, said that he had both antisocial and paranoid features?

A.   And he may.

Q.   And that was an evaluation that was done in 2005 --

A.   Okay.

Q.   -- while he was in the Muskogee County jail.

A.   All right.

Q.   And I think you indicated on direct examination that Mr. Barrett told you about abusing drugs from time to time when he was in the Sequoyah County jail awaiting trial in state court; right?

A.   What -- what was played in the video clip was Mr. Barrett saying that, while he was in state court -- or while he was in jail awaiting the state trials, that he was using, what he told me was crank.  The word -- the phrasing was opioids, crank, methamphetamine.

Q.   All right.

A.   Notwithstanding crank and methamphetamine can be --

Q.   But he said nothing about drug use while he was in the Muskogee County jail awaiting federal trial; correct?

A.   I'd have to go back and look at that.

Q.   Okay.  And Dr. Price's evaluation was done while Mr. Barrett was in the Muskogee County jail awaiting his trial in federal court; true?

1041

A.   Yes.

Q.   Okay.   And if there's no indication that Mr. Barrett was using drugs while he was in the Muskogee County jail, Dr. Price's finding of paranoid features or possible paranoid personality disorder in Mr. Barrett would not be affected by any drug use; correct?

A.   I don't know that I agree with that statement.

Q.   Okay.

A.   You want to know why?

Q.   Not really.

A.   Okay.

Q.   They can get up here and ask you here in a minute.

A.   Fair enough.

Q.   And then I'll probably ask you about it.

A.   Okay.   Fair enough.

Q.   Now, you do not diagnose Mr. Barrett as having antisocial personality disorder --

A.   Yes.

Q.   -- do you?

A.   Yes, sir, that's correct.

Q.   And the primary reason, or the reason you do not diagnose him with antisocial personality disorder is a lack of evidence of conduct disorder before the age of 15?

A.   Yes.

Q.   Okay.   You say he has antisocial features; correct?

A.   Yes.

Q.   Okay.  A lot of people have antisocial features, don't they?

A.   They do.

Q.   Okay.

A.   But not a lot of people beat their wife and flee police, and --

Q.   Okay.  Well, let's talk about the wife beating.  You read Abby Stites' declaration, didn't you?

A.   Yes.

Q.   And she indicates that she thought, regardless of drug use, that Mr. Barrett was mentally ill; true?

A.   I don't recall that specific verbiage, but I'm not going to dispute.

Q.   Okay.  That he had wild mood swings which she attributed to some sort of mental illness; right?

A.   That, I believe, is correct, yes.

Q.   All right.  And there were also instances of mutual combat between the two?

A.   She did say that.

Q.   Now, with respect to this kidnapping incident with his son that you discussed on direct examination, were you aware that Ms. Stites later stated that she exaggerated what had happened because she wanted to get revenge on Mr. Barrett, and basically get him out of her life?

A.   Somewhere in the recesses, I recall something along those lines, but I can't pull that up for you.

Q.   All right.  And Mr. Barrett was never, in fact, convicted of domestic abuse; right?

A.   I don't know that he -- he was definitely charged with some domestic violence.  I believe there were some charges.

Q.   There was never any conviction, was there?

A.   I don't have a reason to question what you're telling me.  I'm certain you wouldn't make a misrepresentation to me like that, so I will take your word at it.

Q.   All right.  And you're aware that Abby Stites testified as a defense witness in the penalty phase --

A.   Yes.

Q.   -- of Mr. Barrett's case?

A.   Yes.

Q.   And the jury was aware of this history of domestic violence or domestic incidence; correct?

A.   Yes.

Q.   Okay.  And yet they rejected the aggravating circumstance that --

         MR. KAHAN:  Objection as to relevance.

         MR. AUTRY:  I'll move on, Your Honor.

         THE COURT:  Go ahead.

Q.   (BY MR. AUTRY)  You didn't find Mr. Barrett to be

1044

deceitful or overall dishonest; right?

A.   With me?

Q.   Yes.

A.   I don't know that I would say he was deceitful per se. I think he had a stilted sense of himself and his -- and his role in this particular situation.

Q.   And when you say stilted role, you're talking about his version of the offense?

A.   No, I'm not.  I'm talking about, at the end of the evaluation where I asked him to describe himself, and I'm talking about in the beginning of the evaluation when he describes himself and his son as the victims.

Q.   Okay.  You're aware Mr. Barrett was tried in state court --

A.   Yes, sir.

Q.   -- for the killing of a police officer or highway patrolman?

A.   Yes.

Q.   And was charged along with that with several counts of shooting with intent to kill?

A.   Yes.

Q.   And it's always a serious, serious matter when somebody is charged with murdering a law enforcement officer; right?

A.   You bet.  Charge is a serious matter when you're charged

with murdering anybody.

Q. Sure. But the emotions and things like that tend to rise when you talk about the death or the murder of a law enforcement officer. Would you agree with that?

A. I can't tell you what the general emotions are for most people when it comes to regarding law enforcement officer versus you getting killed.

Q. All right.

A. I mean, I would -- people will be upset.

Q. Okay. Well, I don't know about that. Okay. But at any rate, you're aware that, when Mr. Barrett was tried in state court, the first trial ended in a hung jury?

A. Yes.

Q. The second trial, he was acquitted of first degree murder?

A. Yes.

Q. He was also acquitted of second degree murder?

A. Yes.

Q. He was convicted of first degree manslaughter?

A. Yes.

Q. He was acquitted of shooting with intent to kill?

A. Yes.

Q. So Mr. Barrett's view of the offense that you were talking about where his son and he were the victims is at least somewhat validated by that state court verdict, isn't

1046

it?

A.   I'm not sure I agree with you --

Q.   Okay.

A.   -- on that.

Q.   And he raised self-defense, and that's --

A.   I think that's awfully disrespectful to the -- to the people who were shot and to the victim and the victims' families.  I don't know that I --

Q.   Well, I think you misunderstand me.

A.   Okay.

Q.   What I'm saying is, that the jury, in effect, found in convicting him of manslaughter --

A.   Yes.

Q.   -- that he acted in imperfect self-defense basically; right?

A.   Right.  But we're not here to talk about the state case.

Q.   All right.  And the reason I asked you all that stuff is about this statement that you referenced earlier about Mr. Barrett feeling his son and himself were the victims --

A.   Right.

Q.   -- right?  Okay.  Would you agree, Doctor, that having antisocial personality traits does not preclude somebody from having bipolar disorder?

A.   I would agree.

1047

Q.   Nor does it preclude somebody from having PTSD?

A.   I would agree.

Q.   Do you remember Mr. Barrett talking to you about being surveilled by dirigibles?

A.   Yes.

Q.   And you found no evidence to indicate that there were actually any dirigibles that were surveilling him; true?

A.   What I said in the report is I didn't find evidence of dirigibles.  But I think in one of the police reports there's evidence that they did a flyover with a surveillance plane.

Q.   All right.  But he was talking about seeing dirigibles on a fairly frequent basis that he thought were surveilling him; true?

A.   Yeah, he was pretty paranoid because he was hopped up on amphetamines.

Q.   Okay.  He wasn't paranoid just because he's paranoid, in your opinion?

A.   No.

Q.   Even though Dr. Price, just to cite one example, talked about Mr. Barrett's paranoia after he was off drugs when he examined him in 2005?

A.   No, I disagree.

Q.   Did Mr. Barrett also tell you during the interview you had with him, that, on occasion, he would see motions that

1048

nobody else saw?

A.   Yes.

Q.   And he gave you an example of I think grass being three feet high when it was actually --

A.   Yes.

Q.   -- mowed?

A.   Yes.

Q.   Okay.  Is that a visual hallucination?

A.   Yes.

Q.   All right.  You talked about reviewing -- wait just a second here.

          MR. AUTRY:  Could I have just a moment, Your Honor?

          THE COURT:  Yes.

          MR. AUTRY:  Thank you.

Q.   (BY MR. AUTRY)  Do you recall Dr. Sharp having looked at Mr. Barrett and concluded, at least based on his testing, that Mr. Barrett had paranoid and avoidant personality disorders?

A.   Let me just take a look at that real quick.

Q.   Okay.

A.   Well, the Dr. Sharp evaluation I'm reading talks about amphetamine dependence, cannabis dependence, alcohol dependence, nicotine dependence, rule out learning disorder not otherwise specified, rule out attention deficit

hyperactivity disorder, and then avoidant and paranoid personality disorder.

Q.   Okay.  So that was a rule-out; right?

A.   No.  I think the avoidant and paranoid personality disorder was -- was just how I read it, not a rule-out.  I think the ones before that were rule-out.

Q.   Okay.  So the avoidant and paranoid personality disorders that Dr. Sharp discusses were actual diagnoses?

A.   I believe so, yes, sir.

Q.   Okay.  Your bottom line, as I understand it, Doctor, is that Mr. Barrett does not have bipolar, nor does he have PTSD, that any and all of his problems stem from drug use or drug addiction or can be attributed to that.  Is that -- is that accurate?

A.   That requires a little bit more than a yes or no answer.

Q.   Okay.  We'll move on.  No, go ahead.

A.   It's largely my opinion that, based on my years of training, experience in evaluating individuals who have bipolar disorder, amphetamine problems, antisocial personality disorders, bipolar, major depressive disorders, that when you look at the totality of this man's history, when you look -- when you look at his history of amphetamine use, when you look at his behavior during the hours, days, weeks, and years leading up to the commission of the

1050

offense, and when you look at the records from a bunch of different providers, and we can throw out the Bureau of Prisons since you object to that one, nobody, nobody has diagnosed him with bipolar disorder.  Nobody has diagnosed him with PTSD.

And so, yes, it is my opinion that the most honest way, and to a reasonable degree of medical certainty that the way you would diagnose Mr. Barrett if he, say for example, came into my clinic, it would be amphetamine abuse or dependence, first and foremost.

Q.   Okay.  Would you say, though, that his behavior patterns over a period of years mirrored the symptoms of bipolar disorder, but you just attribute it to drug use?

A.   Well, it's not just.  It's -- I don't just attribute it.  I attribute it.  But you don't --

Q.   You --

A.   Wait a minute.  Wait a minute.

Q.   Yes.

A.   This is very important.

Q.   Okay.

A.   You don't have to take my word for this.  Look at what I relied on.  Look at the records --

Q.   We'll get --

A.   -- that I am relying upon, because what I'm relying upon, it speaks for itself.

1051

Q. All right.

A. That's -- that's the basis for my opinion, in addition to my years of experience and training.

Q. Okay.

A. It's not just.

Q. Right. Well, we'll talk about those records here in a little bit. By the way, did you have access to trial counsel's files when you were preparing your report, trial defense counsel?

A. I don't think so.

Q. Okay. Did anybody assist you in writing your 75-page report? Approximately 75 pages.

A. I think you're shortchanging me a few pages here.

Q. Okay.

A. No, nobody assisted me. Actually, you're right. It's 76 pages.

Q. Okay.

A. No, nobody assisted me.

Q. All right. Did anybody assist you in reviewing all the voluminous records --

A. Yes.

Q. -- that you looked at?

A. Yes.

Q. And who would that be?

A. I have someone in my office, Brian Chapman, yes, sir.

Q.   Okay.   And he summarizes the records, gives you the summary, or points out records that you need to read personally, or how does that work?

A.   Yeah, let me -- there's actually a two-part answer.

Q.   Okay.

A.   First of all, I wrote the report myself and I own the typographical errors in the report as well, which includes a couple of places where I said -- I misspoke and I used the word psychological instead of physiologic dependence.  But, yeah, Brian goes through the records and he goes through those, summarize them, and I go in and I look at the source documents of the documents that I want to look at that I believe are relevant.

Q.   Okay.   Now, with respect to the conclusion that you stated here several times about Mr. Barrett's drug dependence or drug addiction versus bipolar or PTSD --

A.   Yes.

Q.   -- do you recall writing in your report at page 61, in this particular case, whether or not the defendant's emotional complaints predate his substance use or his substance use was an attempt to self-medicate his complaints is unknown?

A.   Right.

Q.   Remember writing that?

A.   Right.

1053

Q.   Okay.   Well, if it's unknown whether he had mental or emotional problems before he used or was habituated to using substances, that could well mean, based on the language you use on page 61 of your report, that he did have an underlying mental or emotional condition that he was medicating or self-medicating with alcohol or drugs; true?

A.   I don't agree with that in terms of what that statement means.

Q.   Okay.   It says that it was unknown whether his emotional complaints predate his substance use; right?

A.   It does say that, yes.

Q.   So that means, logically, and just as a matter of pure English -- just looking at the English language, that if it's unknown whether he had some kind of preceding or underlying condition, he could have had some sort of underlying or preexisting condition?

A.   He -- he could have had.   But when you look at the totality of the information, the totality of the information argues against that.   I'm putting that sentence out there to be as intellectually honest and as balanced as I can be.

Q.   But you don't disagree with me as to how I characterize the import of that particular statement; true?

A.   I disagree with you in terms of how you characterize the import.   I agree with you in terms of how you may have interpreted it.

1054

Q.   Okay.   That statement does not say it's known that he had absolutely no emotional complaints that predate his substance use?

A.   That is true.

Q.   All right.   Dr. Woods and Dr. Young found that Mr. Barrett self-medicated; true?

A.   That's what their opinion is, yes.

Q.   All right.   Is it true that self-medication is common in people who have untreated or inadequately treated mental illness?

A.   I'm sorry, say that --

Q.   Self-medication is common with people who have untreated mental illness --

A.   Yes.

Q.   -- or inadequately treated mental illness; correct?

A.   Yes.

Q.   They use the substances -- the illicit substances in lieu of prescription medications or psychotropic medications in order to feel good; right?

A.   I agree.

Q.   All right.   And Mr. Barrett sort of indicated to you during your interview with him that he was self-medicating, didn't he?

A.   I think I used the word -- I may have introduced the word when I spoke to him.   I'm not sure.   But basically,

1055

yes.

Q.   Okay.  You asked him whether he had periods of like two weeks or so where he was just so down that he could do very little, if anything, other than just lay around?

A.   Right.

Q.   Okay.

A.   Right.

Q.   And he said it never went for a period of two weeks; correct?

A.   Yeah.

Q.   And that was because he started using drugs; right?

A.   Right.  But he's not saying he's self-medicating.  The proof is in the pudding.  If Mr. Barrett was self-medicating his bipolar disorder, how do you explain the last 11 or 12 or 13 years --

Q.   Well, I'm just --

A.   -- where Mr. Barrett here, who's on no medications at all, exhibits no signs whatsoever, or symptoms whatsoever of bipolar disorder?

Q.   We'll get into that.

A.   Okay.  Good.

Q.   If somebody is able to feel normal by using drugs, otherwise they're just laying around, that's self-medicating, isn't it?

A.   If -- say that one again.  I want to make sure I heard

1056

it right.

Q.   Okay.  He indicated to you that there were times where he was depressed, listless --

A.   Yes.

Q.   -- just laying around?

A.   Yes.

Q.   And the way he got over that was to use drugs?

A.   Right.  But the flaw isn't --

Q.   Okay.  You've answered the question.

A.   No.  There's a flaw in your -- your argument --

Q.   Okay.  Tell me --

A.   -- but I'm sure it will be cleaned up later.  Are you going to let me do it?

Q.   Well, later.

A.   Okay.

Q.   Okay.  Did he indicate that he felt straightened out when he used drugs?  He felt --

A.   Yes.

Q.   Okay.  Is that an indication of self-medication?

A.   Could be.

Q.   All right.  Would you agree or disagree with the fact that, Doctor, you did not take sufficient account of the history of mood disorders and mental illness in Mr. Barrett's family in concluding that, basically, he's just a drug addict?

1057

A.   No.   And, first of all, I didn't call him just a drug addict, number one.   Number two, I disagree with that assumption.

Q.   All right.   You took all of that into account notwithstanding the --

A.   Yeah, you don't --

Q.   -- significantly increased chance of acquiring a mood disorder due to family history?   It's just the fact that he's a druggie?

A.   Look, my -- both my parents had dementia.   Am I at increased risk to have dementia?   The answer is I am.   Do I look like I'm demented right now, or I'm acting like I'm demented?   The answer is no.   So the point is, does the -- does the history -- family history, is that relevant and important?   The answer is absolutely yes.   It's a piece of data.   It's a piece of information.   But we don't make the diagnosis based on the family history.

Q.   Is that part of the diagnosis, though?   You look at the whole picture and you say, hey, this guy has got a multigenerational history with substance abuse, not only substance abuse, but mood disorders --

A.   Yeah.

Q.   -- mental illness and all of that?

A.   Right.   And I say that in my report.

Q.   And that's a pretty significant factor, isn't it?

1058

A.  It's a data point.  It's a piece of information, sure.

Q.  Okay.  Is it a significant piece of information rather than being just a mere data point?

A.  Well, it's significant -- I think it's more significant piece of information to you than it is to me, because I look at other pieces of data that argue the point the other way such as the fact that no one's diagnosing him with any type of mood disorder or no one's diagnosing him with bipolar disorder, PTSD, with the exception of that one provisional diagnosis by that non-physician during any of the time that he received treatment.  And, to me, the significant and overarching theme and thread is the -- is the data point that speaks to his chronic amphetamine use.  You can't ignore that.

Q.  Well, speaking of mood disorders, when he went to Eastern State Hospital, he was diagnosed with fairly significant depression, wasn't he?

A.  At Eastern State, he's diagnosed with -- hang on one second.  No, Eastern State, it's marital problems, mixed substance use, and mixed personality disorder.

Q.  Okay.  Do they talk about depression also?

A.  Remember, Eastern State is where his wife and mom are filling out petitions about his drug use.  And, no, it's the doctor who talks about the previous history of depression.

Q.  All right.

1059

A.   But he's not given a diagnosis of a mood disorder at Eastern State Hospital.

Q.   He's prescribed Asendin and Elavil, isn't he?

A.   I can't remember if he gets it there or someplace else.

Q.   Those are major antidepressants; correct?

A.   They were anti -- well, they're still antidepressants. But back in the day, those were popular antidepressants.

Q.   All right.  They just didn't say -- they acknowledge, certainly, that he's got a drug problem, but they just don't say, oh, it's just drugs, let him dry out or whatever.  They actually prescribe antidepressants; right?

A.   I'm not -- I'm not seeing that in the discharge -- I'm not seeing that in the discharge summary.

Q.   Okay.  All right.  Would you agree, Doctor, that methamphetamine is similar to the types of drugs that are given to somebody who's suffering from ADHD or ADD?

A.   Amphetamines are, yes.

Q.   And there are indicators that Mr. Barrett suffered from attention problems; right?

A.   Yes.

Q.   Okay.  Do you disagree, and I guess you do, that suicidality -- Mr. Barrett's consistent thoughts of suicide, at least one serious attempt and other attempts to kill himself, indicates a mood disorder?

A.   I will certainly concede that the suicide attempt that

1060

occurred where he shot himself in the chest, and notwithstanding drugs or drug use was in play there as well, that I think it would be reasonable to consider a diagnosis of depressive disorder.

Q.  All right.  And that's something that he talked to you about that has been with him since he was a kid basically, suicidal ideation and things of that nature; true?

A.  He talked about, at different times, having thoughts of kind of chronic suicidal thoughts.  And I used the examples on the direct exam that he spoke about.

Q.  And the reason he attempted to kill himself in 1986, I believe you stated on direct examination, was that he was depressed or agitated because he thought he lost his job; right?

A.  Well, that's what I said on the direct exam, and that is correct.  What happened in the evaluation was, I was asking Mr. Barrett about -- there's always two questions you want to try to figure out is why and why now.  And I couldn't figure out what was the why now, because he was saying that he was chronically depressed for a period of time.  And finally, after a little bit of discussion, it comes out that it sounds like the why now was the fact that he thought he had lost his job.

Q.  Okay.  Do you recall that, in his testing, Dr. Price, on one of the personality inventories he gave Mr. Barrett,

1061

indicated that Mr. Barrett was high on the depression scale or the depression score?

A.   You'll have to show me where he says that.

Q.   Okay.  Do you agree or disagree that, on some of the personality inventories that Dr. Price did with Mr. Barrett, that his testing showed he was high on the schizophrenia scale?

A.   You'll have to show me where he says that.  I don't interpret individual scales.

Q.   Okay.

A.   And if he said that in his report, you'll have to show that --

Q.   Or in his testimony.  Are you aware of any of that?

A.   I don't know what he talked about on scales.

Q.   All right.

A.   And I'm sure what he talked about is that you don't just look at a scale in isolation.  That I'm sure he said.

Q.   Yes, he did.

A.   Okay.

Q.   But nonetheless, that these scales showed increased or significantly increased depression --

A.   Yeah, but --

Q.   -- the schizophrenia scale indicating schizoid lifestyle --

A.   Right.  And while you could -- you could put on the tip

of this pinky finger how much I know about psychological --

Q.   Okay.

A.   -- testing, I will tell you that it would stun me if he didn't -- if he didn't stand strong --

Q.   Yes.

A.   -- and say you don't look at this in isolation.

Q.   Sure.  And he did say that.  But that would be a -- those -- the two things we just asked you about, those would be data points I guess, right, to use your terminology?

A.   Well, they're data points, but they're -- what he will tell you is, by not looking at that -- you don't look at that data in isolation --

Q.   Sure.

A.   -- so they're like -- they're really soft data.

Q.   There are plenty of drug addicts, polysubstance abusers and all that who never attempt suicide or have suicidal ideation for considerable periods of time; correct?

A.   Depending on what drugs they're doing.

Q.   Plenty of meth addicts and are perfectly happy using meth.  They had no thoughts of suicide, never attempted suicide; right?

A.   I can't talk to you about all meth addicts.  I can talk to you about this particular person.

Q.   Well, let's put it this way, the type of suicidality you see in Mr. Barrett is not characteristic of most

methamphetamine addicts, is it?

A.   Mr. Barrett's suicidality -- keep in mind that he starts using substances at age ten.

Q.   I understand that.

A.   So as he himself said, and as the video itself said, he was -- he was always using drugs.

Q.   All right.  But there are plenty people who had always used drugs, who started off using drugs at a young age who are not suicidal all the time, or had suicidal ideation all the time --

A.   I'm not here to talk to you about plenty of people.  I'm talking about Mr. Barrett.

Q.   Well, I'm talking about, you know, a comparison with a general population.  That's something that you look at, isn't it?

A.   Sure.  But I can't tell you right off the top of my head what the general population is.

Q.   Okay.  Well, you've examined a lot of methamphetamine users, haven't you?

A.   I've examined a number of people who have used methamphetamine, yes.

Q.   Okay.  Are all -- do all of them have the type of suicidality that Mr. Barrett's exhibited?

A.   No.  But some of them talk about feeling suicidal when --

1064

Q.   Okay.

A.   -- they're coming off the methamphetamine.

Q.   All right.  Is there an interplay between organic brain damage and mood disorders; yes or no?

A.   Ask that question one more time.

Q.   All right.  Is there an interplay or a potential interplay between organic brain damage and mood disorders?

A.   Yes.

Q.   All right.  Is there a potential interplay between attention problems, or ADHD, and mood disorders?

A.   Potential, yes.

Q.   All right.  Do you recall Mr. Barrett's family, in observing him and describing him over the years, said that he was the most hyperactive kid they'd ever seen?  Do you -- do you remember seeing that?

A.   I recall that.  But I also recall in another declaration someone said that Steve was actually more hyperactive than -- his brother, Steve, was more actually hyperactive than him.  But I do recall that a lot of people talked about him being very hyperactive, yes.

Q.   Okay.  That he couldn't sit still?

A.   Yes.

Q.   Always had to be doing something?

A.   Yes.

Q.   Or into something?

A.   Yes.

Q.   Is that kind of condition relevant to a potential mood disorder?

A.   No.  I wouldn't say it's irrelevant.

Q.   Okay.  Now, you indicated earlier, Dr. Pitt, that you read a number -- or all of the declarations that were submitted in support of Mr. Barrett's 2255 petition?

A.   Well, first of all, I'm not sure that I used the word all, because I'm always loathe to use that word --

Q.   Okay.

A.   -- in situations like this.

Q.   A great number.

A.   The declarations that I reviewed I listed in the source of information section of my report.

Q.   At any rate, you looked at a great number of declarations from Mr. Barrett's family and other people who knew him?

A.   I looked at 18 declarations.

Q.   All right.

A.   And if we -- and included in there is Dr. Bianco, so let's just say 17.

Q.   Okay.  And his family consistently described Mr. Barrett, and I think we talked about this a little bit earlier, of having severe mood swings and deep depressions; right?

1066

A. I concur.

Q. His wife and son and mother all talked about his dramatic mood swings; right?

A. Yes, sir.

Q. And his son thought that Mr. Barrett, because of his mood swings, had a chemical imbalance, in his lay opinion I guess; right?

A. He said -- I don't recall if he used those words. But he definitely said that he thought there was something wrong, yes.

Q. All right. And that Mr. Barrett's mother described him as having intense emotions and dramatic mood shifts or mood swings?

A. Yes.

Q. And Mr. Barrett's father and other relatives talked about how overly sensitive and moody he was as a kid growing up?

A. Yes.

Q. Okay. And are racing thoughts characteristic or could be a characteristic of a mood disorder?

A. Could be.

Q. And Mr. Barrett described racing thoughts to you, didn't he, that he had racing thoughts?

A. Yes.

Q. And that was also indicated by Dr. Young and Dr. Woods;

correct?

A.   Yes.

Q.   Now, let's talk about, if we could, Doctor, the hospitalizations that Mr. Barrett's had which you talked about some on direct examination, okay?

He has a significant or fairly significant history of hospitalizations and contacts with the mental health system; true?

A.   Well, I think it really depends on your reference point. In my world, I wouldn't consider this significant contact with the mental -- I mean, I'm -- it's a little skewed sample.  But I'm used to seeing people that have a long-standing history of purely bipolar disorder or purely major depressive disorder, where they're in and out of facilities and institutions, and their mental health records take up literally --

Q.   Okay.

A.   -- three and four banker boxes.

Q.   Okay.  Well, let me ask you this:  How many capital cases have you testified in?

A.   I've been involved in ten capital cases.

Q.   All right.  Both federal and state?

A.   Both, including federal and state.  And only one was in I think the case in chief.  The other were in post-conviction issues.

1068

Q.  Okay.  Was that testifying for the government each time, or most of the time?

A.  Out of the ten, two were by the defense.

Q.  Okay.

A.  I was retained.  And eight is by the government -- or the state.

Q.  Okay.  And you've had cases where you testified for the government where a defendant, in post-conviction proceedings, is claiming some kind of mental illness and that the lawyers were ineffective I guess for not finding this mental illness, who had no history whatsoever of any kind of contacts with the mental health system; right?

A.  First of all, I don't testify for the government.  I'm retained by the government.

Q.  Okay.

A.  And I don't testify about counsel being ineffective.

Q.  All right.  Well, my point is this:  You have had cases where there's been a claim that somebody has -- a defendant has some kind of mental illness and they have no history whatsoever of any contacts with the mental health system; true?

A.  Yes.

Q.  Okay.  Oh, by the way, there was never any --

A.  Wait, wait.  Ask me that question one more time.  I want to be precise.  Sorry.  One more -- sorry.

1069

Q. Okay. Let me kind of rephrase it. A defendant -- a capital defendant --

A. Yes.

Q. -- files a post-conviction application.

A. Yes.

Q. All right. They claim that they have some kind of a mental illness --

A. Yes.

Q. -- that was undetected --

A. Yes.

Q. -- or evidence was undeveloped; right?

A. Yes.

Q. Yet they have no history of mental health commitments or contacts with the mental health system.

A. Yes. So I stand by my answer, yes.

Q. Okay. All right. Now, preceding Mr. Barrett going to Eastern State back in 1986 -- well, let me back up. Well, I'm sorry. I can't read my own writing here. All right.

Now, preceding Mr. Barrett going to Eastern State Hospital in 1986, there was initially a 72-hour emergency commitment for him. Do you recall that?

A. You're talking about in -- well, let's back up. Where are you talking about?

Q. I'm talking about when he was sent to Eastern State Hospital in 1986.

A.   Yes.

Q.   Okay.  Preceding him actually entering Eastern State Hospital, he was under a 72-hour emergency commitment.  Do you remember that?

A.   I -- certainly I see the voluntary statements, but I don't know that I've seen records, or I can't pull up in my memory records from the actual commitment itself.

Q.   Okay.  Do you recall ever seeing a document dated October 10th, 1986 from the Sequoyah County District Court ordering Mr. Barrett's admission to a medical facility -- that he's admitted to a medical facility for treatment of a mentally ill person.  Did you see any records like that?

A.   So multiple responses.  One, I don't recall seeing it.

Q.   All right.

A.   Two, it doesn't mean that I don't have it.  And, three, it wouldn't surprise me, because he was court ordered for treatment.

Q.   All right.  Do you remember telling Mr. Barrett during your semi-structured interview with him that it's unusual for somebody to be committed to a mental hospital on a 28-day commitment just for drug use --

A.   Yes.

Q.   -- or drug issues?

A.   Yes.

Q.   Do you stand by that, or was that an accurate reflection

of --

A.   Yeah, it's highly -- it's -- it varies from jurisdiction to jurisdiction.  But most jurisdictions, generally speaking, don't civilly commit someone on the -- simply on the basis of drug use.  Usually there has to be some -- some connection or nexus to some alleged emotional problem, along with either a danger to self or danger to others or -- different jurisdictions have some other phraseology as well.

Q.   Okay.  Now, do you recall that when Mr. Barrett was discharged from Eastern State Hospital, he was referred to an outpatient mental health center?

A.   Oh, by the way, you kept talking about Asendin and Elavil.

Q.   Yes.

A.   I'm looking at the discharge summary.  It says he was released to his mother with no medications.

Q.   Okay.

A.   And then it says he will reside at the Cherry Hill Apartment, and gives the address.  And will be seen at -- I can't read the -- Crecks maybe.  C-r-e-c-k-s Mental Health Center.  And I can't make out the city, but -- obviously.

Q.   Okay.

A.   And he was supposed to be seen in follow-up on November 18, 1986.

Q.   Do you recall whether he was prescribed with Asendin and/or Elavil when he was supposed to go to outpatient treatment following his discharge from Eastern State Hospital?

A.   I know that somewhere in his history, there is him being treated with -- or being prescribed Asendin and Elavil.  But it's clearly not connected to the Eastern State Hospital visit.

Q.   All right.  In 1986, is it true that Mr. Barrett was found to be -- and I never can pronounce this word, l-a-b-i-l-e.  How do you say that?

A.   Labile.

Q.   Labile.  Okay.  That he was found to be emotionally labile?

A.   Where are you talking about now?

Q.   I'm asking if you recall it.

A.   There are records where it says he was emotionally labile in different -- in different mental health records, yes.

Q.   All right.  And what does emotionally labile mean?

A.   I think Dr. Woods did a nice job describing that.  Just your emotions are up and down.

Q.   Okay.  And also that he had impaired insight and judgment?

A.   I believe, seeing in some record, but you'll have to

point me where that is.

Q.  Okay.  Do you recall, in the Eastern State records, that Mr. Barrett was found to have depressive neurosis with a high risk of suicide?

A.  You'll have to show me that document.

Q.  Did you -- do you recall in looking at the Bill Willis --

A.  Oh, I see it.  I see it, yes.

Q.  Okay.

A.  It says -- it talks about being emotionally labile, and then it talks about depressive neurosis with suicide potential extremely high.  Yes, you're correct.

Q.  All right.  And do you recall whether or not the medications I keep talking about, Asendin and Elavil, were prescribed while Mr. Barrett was being treated or seeing somebody at Bill Willis before he went into Eastern State?

A.  I think that's closer to more accurate --

Q.  Okay.

A.  -- because when you look at the nursing history and assessment of the same Eastern State hospitalization, it says, was prescribed Elavil but reportedly stopped taking after several weeks.  Prescribed Asendin by doctor -- I can't make out the name.  But patient never returned to clinic for meds.  So the point is, to your point --

Q.  Uh-huh.

1074

A.   -- yeah, he was prescribed Elavil.  Doesn't sound like he really took it.  And Asendin, it sounds like he never picked it up.

Q.   Okay.  Well, are Elavil and Asendin prescribed just for somebody who's a drug addict or has a drug problem, or doesn't there have to be some kind of underlying depression?

A.   Well, there could be some type of --

Q.   Okay.

A.   -- underlying depression, sure.

Q.   All right.  And the tox screen, I think you indicated on direct examination, from Mr. Barrett's stay in Eastern State Hospital, was negative; is that correct?

A.   I concur.

Q.   All right.  So that at the time he was presenting these symptoms of having depressive neurosis with a high risk of suicide, his tox screen was negative; right?

A.   Yes.

Q.   And that's even for cannabis; right?

A.   Yes.  And yet he still discharged with a diagnosis of mixed substance abuse.

Q.   Sure.  Nobody is denying that he had substance abuse, okay?

A.   But there's no depressive diagnosis in here either.

Q.   Well, they talked about, and you just talked about it --

A.   No, but it's not on the discharge summary.

1075

Q.   All right.   Whether it's on the discharge summary or not, the records talk about depressive neurosis with a high risk of suicide; correct?

A.   They talk about that in the -- there's one document that discusses that on the admission form of the professional's statement that's basically designed to get him into the hospital.

Q.   Okay.   And he was referred not to a drug rehabilitation facility.   He was referred, after his discharge from Eastern State Hospital, to a mental health facility on an outpatient basis; correct?

A.   I concur.

Q.   All right.   Now, jumping to 1995, that's when Mr. Barrett was initially at Sequoyah Memorial Hospital, and ultimately referred to the -- I guess the mental health unit at Wagoner hospital; is that correct?

A.   Well, you left out a step.

Q.   Okay.   Go ahead.

A.   It goes Sequoyah mental health, and then he goes -- there's a referral to Bill Willis.

Q.   Yes, sir.

A.   And then, from Bill Willis, they make the referral to the -- to Wagoner Community Hospital.

Q.   All right.   And he was given Haldol?

A.   Yes, sir.

Q.   And Haldol is an antipsychotic?

A.   Yes, sir.

Q.   And he was actually prescribed on an outpatient basis, after he was discharged from the Wagoner Hospital, Haldol; right?

A.   I don't agree with that.  It says, discharge instructions, medications, none.  Page 2 --

Q.   All right.

A.   -- on the discharge summary, right there at the top.

Q.   So you're aware of --

A.   That would be, I think, the government's, or whatever exhibit was, was Number 8.

Q.   So you're not aware of any record that indicates he was prescribed any kind of a psychotropic medication after his discharge from Wagoner Hospital?

A.   Well, that's a different question.  You used any twice, and there's a lot of records here, so --

Q.   Okay.  Do you recall anything about that?

A.   Not -- look, there's a lot for me to recall.  But what I'm telling you in specific response to your question, he was discharged, like he was from Eastern State Hospital, with no medications.

Q.   All right.  Was he referred to an outpatient mental health center in 1995 after he got out of Wagoner Hospital?

A.   Which he was -- which he was noncompliant with, and then he didn't show up, and then he was ultimately discharged from Bill Willis on February 13, 1995.

Q.   And that's not all that uncommon where somebody who is supposed to be undergoing some kind of mental health treatment is noncompliant?  That's not unusual, is it?

A.   I think it depends on what your mental issue -- mental health issues are.

Q.   Okay.

A.   If you're abusing drugs and you need to be hopped up and you need your fix, it's pretty common not to show up.

Q.   What about if you're bipolar?  A lot of bipolar people use street drugs.  That's very common, isn't it?

A.   But he wasn't diagnosed with --

        MR. KAHAN:  Objection as to relevance to other people.

        THE COURT:  Overruled.

A.   He wasn't diagnosed with bipolar disorder --

Q.   (BY MR. AUTRY)  Well --

A.   -- that's the point.

Q.   I understand.

A.   You're coming up -- you keep inserting bipolar, but nowhere in any of these records is he diagnosed with that.

Q.   I'm asking generally about people with bipolar disorder. A lot of them are medication noncompliant, a lot of them do

not seek or get the mental health treatment they're supposed to get; right?

A. Look, sadly in this country, lots of people have mental illness. Sadly, lots of people are referred for treatment. Sadly, lots of people are not compliant. I'm not here to talk about lots of people. I'm talking -- here to talk about Kenneth Eugene Barrett.

Q. Well, I know. But when you say Kenneth Eugene Barrett was noncompliant, you act like that's some kind of unique feature with him, or something like that, that people with mental illness --

A. But only because --

Q. -- don't do.

A. -- your question presupposes that there's this bipolar disorder.

Q. Well, I think my question about bipolar disorder, at least this time, just talked generally about people with bipolar disorder who are not medication compliant, who don't go to the doctor or the outpatient place like they are directed to.

A. Right.

Q. Okay. That's common, isn't it?

A. Some people will not show up for their treatment. I think everybody in this room knows that.

Q. Okay. Do the Wagoner records describe Mr. Barrett as

1079

being agitated, unable to sleep, suicidal, and that kind of thing?

A.   Well, see there, you say that kind of thing, I've got to -- I have to go and check.   Where exactly are you referring to?

Q.   I'm asking you.

A.   Well, what were the words you used?

Q.   Agitated, unable to sleep, suicidal, depressed, irritable.   I added depressed and irritable to that last question.

A.   In the physician H and P, he says, admitted secondary to anxiety, depression, and ineffective coping skills, along with the history of alcohol and drug abuse.

Q.   Okay.   Let me stop you right there.   So they talk about depression, ineffective coping skills, in addition to alcohol and drug abuse?

A.   Right.

Q.   Not based on or stemming from alcohol and drug abuse, but independent of alcohol and drug abuse; right?

A.   That that particular physician who did the history and physical, that is correct.

Q.   All right.   And is that a different physician than the person -- and I guess you indicated that you thought this person was not a physician who provisionally diagnosed Mr. Barrett in 1995 -- January of 1995 with bipolar

1080

disorder?

A.   Yeah, you're conflating the records.  You --

Q.   Okay.  Let's break it down.

A.   Go ahead.  I'll do it again.

Q.   Let's break it down.

A.   He starts at Sequoyah Memorial Hospital.  From there, he's referred to Bill Willis.

Q.   Right.

A.   That's where he sees Kimberly Hughes.

Q.   And she says?

A.   And she gives the provisional diagnosis of bipolar disorder.  She then makes the referral to Wagoner Community Hospital --

Q.   Right.

A.   -- where he is for three days where he is not discharged --

Q.   Uh-huh.

A.   -- with bipolar disorder.  But he's discharged with organic affective disorder, polysubstance abuse, amphetamine dependence, and a urine drug screen that's positive for cannabis, and then marital conflicts.  Subsequent to being discharged from Wagoner, he then is under the care, on an outpatient basis, of Bill Willis.

Q.   Right.

A.   And that's where he becomes noncompliant.  And that's

where she, the same woman, she -- Kimberly Hughes writes the document that mirrors -- she no longer has bipolar disorder in her diagnosis.  She mirrors the diagnosis that he was given from Wagoner Community Hospital.

Q.  All right.  Organic affective disorder can connote, or did connote, I guess, according to you, it's kind of an outmoded phrase now, or an outmoded diagnosis, more than drug abuse; right?

A.  I read what Dr. Woods said, and I already said on direct testimony where I respectfully disagree.  The term, organic affective disorder, back then, using those mental health manuals, and based on my years of experience and training, could have meant one of two things.  It could have meant either a medical issue causing the mood problem, or it could have meant a substance use issue, which is why they changed the terminology going forward.

Q.  All right.

A.  To be more clear, to separate it from true bipolar disorder.

Q.  Okay.  When Mr. Barrett was discharged from Wagoner, he was supposed to go, on an outpatient basis, to Bill Willis; right?

A.  Yes.

Q.  And he was noncompliant there; correct?

A.  Yes.

Q. Bill Willis is a mental health facility, isn't it?

A. My sense is it's an outpatient mental health center.

Q. It's not a drug abuse center, or somewhere you go to do the 12 steps or, you know, a rehab facility; right?

A. I don't know one way or another. It's possible they had a drug program. But I'm assuming it's a mental health clinic.

THE COURT: Mr. Autry, how much longer do you think you have?

MR. AUTRY: Your Honor, it's not -- well, it's going to be probably another 30 minutes or so.

THE COURT: Let's go ahead and break for lunch then --

MR. AUTRY: Thank you.

THE COURT: -- and be back here at 1:30.

*(Off the record at 12:29 p.m.)*

1083

C E R T I F I C A T E

I, Ken Sidwell, Certified Shorthand Reporter for the Eastern/Northern Districts of Oklahoma, do hereby certify that the foregoing is a true and accurate transcription of my stenographic notes and is a true record of the proceedings held in the above-captioned case.

I further certify that I am not employed by nor related to any party to this action, and that I am in no way interested in the outcome of this matter.

In witness whereof, I have hereunto set my hand this 15th day of June, 2017.

s/Ken Sidwell
Ken Sidwell, CSR-RPR
United States Court Reporter

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT )
)
      Petitioner, )
) Case No. 09-CV-00105-JHP
v. )
)
UNITED STATES OF AMERICA, )
)
      Respondent. )

## GOVERNMENT MOTION TO CALL ADDITIONAL REBUTTAL WITNESSES

**COMES NOW** Respondent, United States of America, by and through undersigned counsel and files this motion to call additional rebuttal witnesses.

### PRELIMINARY STATEMENT

Barrett was convicted of three homicide offenses, and the trial jury recommended a death sentence that this Court imposed, and the Tenth Circuit Court of Appeals affirmed on appeal. *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008). This Court subsequently denied § 2255 relief. Doc. 214. On appeal, the Tenth Circuit remanded for an evidentiary hearing to determine whether trial counsel ineffectively failed to investigate and present evidence about Barrett's background and mental health. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

In accordance with the Court's scheduling order (Doc. 246), Barrett transmitted a list of 71 proposed witnesses for appearance at the evidentiary hearing. Doc. 289 Ex. 1. Among those witnesses was Dr. Deborah Miora, whom the government successfully moved to exclude. The government argued that Dr. Miora could properly testify as a hearsay conduit about the findings

1

of Myla Young – an unavailable neuropsychologist who evaluated Barrett in 2009 – but should not be allowed to offer any novel opinion.  Doc. 336 at 4.  The Court ruled that Miora's proposed testimony appeared cumulative to other evidence.  Doc. 361 at 11.  Nonetheless, Barrett proffered Dr. Miora's expert witness report.  Doc. 376.

During the course of the hearing, Barrett offered psychiatrist George Woods, who provided a hearsay account of the 2009 opinion to which Dr. Miora might have also testified. *See e.g*., Tr. Mar. 27, 2017, 207-10.  When the government presented the testimony of neuropsychologist J. Randall Price, the Court granted Barrett's request for reconsideration of the decision barring Dr. Miora's testimony.  But having permitted Barrett to call the additional witness, the Court ordered Barrett to disclose the raw testing data from Dr. Young's 2009 evaluation, and he complied.  The Court continued the hearing to June 26, 2017 to accommodate Dr. Miora's schedule.

The government now requests permission to call two rebuttal witnesses: Dr. Jorge Herrera, a neuropsychologist who will evaluate the raw data generated in 2009, and Dr. Faust Bianco, whose 2000 evaluation of the defendant is the subject of criticism in Dr. Miora's report. *See* Doc. 376-1 at 8.

When reached by phone concerning this motion, Barrett's attorney David Autry objected.

### ARGUMENT

### THE COURT SHOULD PERMIT THE GOVERNMENT TO PRESENT EVIDENCE DESIGNED TO REBUT DR. MIORA'S TESTIMONY

The Court should permit the government to present witnesses whose testimony could respond to the opinions offered by Dr. Miora.

The Federal Death Penalty Act permits the prosecution "to rebut any information received at the [sentencing hearing], and shall be given a fair opportunity to present argument as

<div align="center">2</div>

1568

to the adequacy of the information to establish the existence of any ... mitigating factor." 18

U.S.C. § 3593(c); *United States v. Fell*, 372 F. Supp. 2d 753, 759 (D. Vt. 2005).  Courts,

including this one, have recognized that the right to offer rebuttal to a defendant's mental health

mitigation case, would be hollow without discovery into the alleged condition of the defendant.

*Fell*, at 759; see also Doc. 269 at 14 (holding "[t]he right of the government to offer rebuttal

evidence of the defendant's mental condition would be meaningless unless the government is

provided an opportunity to conduct discovery on this issue.").

In this case, the government presented the testimony of Dr. Price, who offered opinions

based on his 2005 evaluation of the defendant.  Dr. Price could not speak to Dr. Young's

subsequent testing of the defendant, because neither he nor the government had access to her

data.  Now that the government has that data, which forms the basis of Dr. Miora's proposed

testimony, it seeks to exercise its right of fair rebuttal under the Federal Death Penalty Act.[1]  The

government could not have fairly been expected to rebut Dr. Miora's opinion without the data

that underpins it.  In the present circumstances, the government seeks permission to present Dr.

Herrera, who will reanalyze Dr. Young's data, and Dr. Bianco, who will respond directly to Dr.

Miora's criticism of his findings.  While the government might typically request the opportunity

to have a retained neuropsychologist evaluate the defendant, it is sensitive of the need to expedite

this matter and it believes that Dr. Bianco's testing, which occurred close in time to the crime,

will provide the most relevant window into the defendant's neurological health.

---

[1] Though this hearing contemplates alleged ineffectiveness by trial counsel, this Court has already held that it cannot assess any prejudice arising from the attorneys' alleged errors "without hearing the evidence which the government would have brought forward to rebut the evidence which will be offered by petitioner."

The government proposes to provide an expert report from Dr. Herrera on or before June 23, 2017.  As to Dr. Bianco, his opinion is already well known to Barrett, as evidenced by Dr. Miora's report.  Additionally, Dr. Bianco has previously met with counsel for Barrett.  As such, the government seeks leave to dispense with the need for Dr. Bianco to submit a report.

In view of the imminent hearing date, the government respectfully requests an expedited ruling on this motion.

## CONCLUSION

Based on the foregoing reasoning and authority, the government respectfully urges this

Court to permit it to call as witnesses Drs. Faust Bianco and Jorge Herrera.

Dated: June 16, 2017,

Respectfully submitted,

DOUGLAS A. HORN
Acting United States Attorney

CHRISTOPHER J. WILSON
Assistant United States Attorney
1200 West Okmulgee
Muskogee, OK  74401
Telephone: (918) 684-5100
FAX: (918) 684-5150
chris.wilson@usdoj.gov

*/S. Jeffrey B. Kahan*
JEFFREY B. KAHAN
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; Rm. 656
Washington, DC 20530
Telephone: (202) 305-8910
FAX:  (202) 353-9779
Jeffrey.kahan@usdoj.gov

1571

## CERTIFICATE OF ECF FILING AND DELIVERY

   I, hereby certify that on June 16, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

   Mr. David B. Autry dbautry44@hotmail.com
   Ms. Joan M. Fisher Joan_Fisher@fd.org
   Mr. Tivon Schardl Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Section

1572

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Karl J. Saddlemire (karl_saddlemire@fd.org), Tivon Schardl
(tim.schardl@fd.org, tschardl@sbcglobal.net), Sheldon J. Sperling
(usaoke.criminal@usdoj.gov), Christopher J. Wilson (caseview.ecf@usdoj.gov,
chris.wilson@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), District
Judge James H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:901571@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Minute Order
Content–Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 6/16/2017 at 12:45 PM CDT and filed on 6/16/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 456(No document attached) |

**Docket Text:**
 **MINUTE ORDER** by District Judge James H. Payne directing Petitioner to file an expedited Response to Respondent's [455] MOTION to Call Additional Rebuttal Witnesses. Response is due by noon on Monday, 6/19/2017 (dma, Deputy Clerk)

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire     karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has been delivered by other means to:**

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>Respondent. | CASE NO. CV-09-00105-JHP<br><br>**PETITIONER'S RESPONSE IN OPPOSITION TO THE GOVERNMENT'S MOTION TO CALL ADDITIONAL REBUTTAL WITNESSES** |

Petitioner Kenneth Eugene Barrett, by and through undersigned counsel, makes the following Response to the Government's Motion to Call Additional Rebuttal Wtnesses. The Government's Motion is Doc. 455, filed June 16, 2017. Pursuant to this Court's order issued the same day as the government's filing, this Response is timely.

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          1          *Barrett v. U.S.*, CV-09-00105-JHP

1575

The government's motion asks the Court to approve sandbagging the defense by identifying two expert witnesses six months after the date established by the scheduling order for identifying witnesses, and providing an expert report more than three months after the date specified in the scheduling order. The first witness is Jorge Herrera who the government claims is a neuropsychologist, but about whom the government has provided no information. Mot. (Doc. 455) at 2. The second witness is Dr. Faust Bianco, a psychologist whose connection to this case has been a matter of record since 2009 when Dr. Myla Young mentioned his testing in her declaration.

For the following reasons, the government's excuses for failing to identify these witnesses by the date specified in the scheduling order do not stand up to scrutiny and fall far short of constituting a substantial justification for failing to comply with that order. Given the short time that Mr. Barrett's counsel have to prepare to present Dr. Deborah Miora's testimony, time reduced by the need to respond to the government's groundless Motion and this Court's Minute Order, Mr. Barrett will have no opportunity to examine Dr. Herrera's report and otherwise prepare to cross-examine him. In sum, the government has been dilatory, it is seeking rescue from its own strategic decisions that were intended to give the government an unfair advantage, and were the Court to allow the late designation of two experts, it would result in actual prejudice to the defense and unnecessarily prolong these proceedings. The Motion should be denied.

**RELEVANT PROCEDURAL HISTORY**

The government's description of the relevant procedural history omits much and by those omissions presents a false narrative that is at the heart of the Motion.

Pet'r's Opp. Govt. Mot. Cal Add'l Wits                2                *Barrett v. U.S.*, CV-09-00105-JHP

1576

On March 16, 2009, Mr. Barrett served on the government the claim now being heard by the Magistrate Judge. Mr. Barrett supported the claim with the declaration of neuropsychologist, Dr. Myla Young. Dr. Young's declaration contained a detailed description of the neuropsychological testing she did of Mr. Barrett in 2009, and the results of those tests. Young Decl. ¶¶ 26-66. Dr. Young also mentioned that she reviewed the testing Dr. Bianco did in 2000. Young Decl. ¶ 20.

The government's narrative elides the fact that Dr. Young's 2009 declaration put the government on notice that Mr. Barrett's claim was supported by neuropsychological test data and that Dr. Bianco had done neuropsychological testing in 2000.

On August 19, 2015, the Court of Appeals for the Tenth Circuit held that Mr. Barrett was entitled to an evidentiary hearing on the allegations supported by Dr. Young's testing. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015), *cert. denied*, ___ U.S. ___, 137 S. Ct. 36 (2016). On the issue of prejudice, the Tenth Circuit found, "Most important are the findings relating to Defendant's judgment," and first and foremost among them were the findings of Dr. Young. *Barrett*, 797 F.3d at 1230. That decision put the government on notice it would need to prepare to address Dr. Young's neuropsychological testing at the evidentiary hearing.

According to the testimony of Dr. Steven Pitt, in December 2015, the government contacted Dr. Pitt about being a witness at the evidentiary hearing. That testimony shows the government was preparing to meet Mr. Barrett's case expert-by-expert. Mr. Barrett was relying upon a psychiatrist, so the government retained a psychiatrist. Dr. Price, a neuropsychologist, had already evaluated Mr. Barrett.

On November 7, 2016, this Court issued a scheduling order directing the parties to identify and provide contact information for all evidentiary hearing witnesses no later than

Pet'r's Opp. Govt. Mot. Cal Add'l Wits      3      *Barrett v. U.S.*, CV-09-00105-JHP

1577

December 8, 2016, Order (Doc. 246) at 2, although that date was later extended to December 13, 2016. The Court's order directed the parties to file by January 17, 2017, a statement of disputed or contested issues of fact, and to identify all witnesses and describe their expected testimony. *Id.* at 2-3. Those Orders put the government on notice that if it intended to contest the reliability of Dr. Young's test results, it needed to identify its witnesses and prepare them. If the government intended to present Dr. Bianco as an expert, the government had a date certain for naming him.

On November 18, 2016, the government timely filed several discovery motions. Docs. 250, 251, 252, 253, 254, 255, 256. Although one of those motions sought leave to conduct civil Rule 26 discovery of Mr. Barrett's experts, including depositions, the government did not specifically move for the production of Dr. Young's raw data to a neuropsychologist retained by the government. Govt. Mot. Disc. (Doc. 251). The discovery motion shows the government was aware by November 18, 2016, that Dr. Young had died and that the defense would replace her with another neuropsychologist. Govt. Mot. Disc. (Doc. 251) at 3.

In a statement of need that highlights the prejudice to Mr. Barrett of granting the instant Motion, the government insisted it needed to know the bases for Mr. Barrett's experts' opinions "and the credentials and experience" of the experts in order to meaningfully respond. *Ibid.* Four more of the government's motions sought discovery of evidence related to Mr. Barrett's mental health allegations. Docs. 252-256. These filings show the government was acutely aware of the need to prepare for a trial of Mr. Barrett's mental impairments.

The government did not move for a neuropsychological evaluation of Mr. Barrett. In its motion for an order requiring Mr. Barrett to submit to an evaluation by Dr. Pitt, a psychiatrist, the government wrote, "To date, the government has only had the opportunity to obtain a neuropsychological evaluation of the defendant." Gov. Mot. Psych. Eval. (Doc. 253) at 2. That

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          4          *Barrett v. U.S.*, CV-09-00105-JHP

1578

statement is important for at least two reasons. First, it shows the government was aware of what testing Dr. Price did before his report was released. The portion of Dr. Price's report that was made public in 2005 said only that he found Mr. Barrett was a "psychopath." "Psychopathy," to the extent it exists, is considered to be a personality trait; i.e. it is not a neuropsychological condition or diagnosis. Therefore, the government knew that Dr. Price had performed neuropsychological tests, and at least one personality test, and it likely knew that he administered three personality tests.[1] Therefore, the government's claim that Dr. Price "only" conducted a neuropsychological evaluation was false and misleading and the government had the information to know its statement was false and misleading at the time it made the statement.

Second, the government signaled to Mr. Barrett's counsel and this Court that it would rely on Dr. Price as a neuropsychologist, a different different type of expert than the psychological risk-assessor that the Tenth Circuit anticipated. *Barrett*, 797 F.3d at 1232. Although the government moved to have documents relied upon by Dr. Young unsealed and provided to Dr. Pitt, Govt. Mot. Unseal Docs. (Doc. 257) at 4, the government did not seek to have Dr. Price receive those documents.

On December 6, 2016, this Court issued a lengthy discovery order. Of particular relevance, this Court denied both parties' request to receive all of Dr. Price's test data in advance of the hearing. This Court held, "If Dr. Price is ultimately called at the evidentiary hearing

---

[1] The government has asserted that it did not have any substantive conversations with Dr. Price until December 2016. Resp. Mot. Exclude Price (Doc. 436) at 5. This Court's order authorizing Dr. Price's evaluation provided that the firewalled assistant United States Attorney was to provide defense counsel a list of the tests Dr. Price intended to administer. A letter from Dr. Price listing his proposed testing was in defense counsel's files. It may also have been provided to the local United States Attorney's office arguably without violating the spirit of the Court's order. Alternatively, the government's lawyers may have anticipated that the Court would release Dr. Price's report and telephoned him and asked him what tests he administered. In whatever way the government learned, the government knew by November that Dr. Price had performed neuropsychological tests despite that information being out of the public record.

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          5          *Barrett v. U.S.*, CV-09-00105-JHP

1579

herein, he will be required to provide any notes made during his evaluation and testing of the defendant to defense counsel *at the time of his testimony*." Order (Doc. 269) at 17 (emphasis added). Assuming the government had no greater right to notes and test data than Mr. Barrett, this Order establishes that the government had no right to receive Dr. Young's raw test data, or Dr. Miora's scoring of it, until Dr. Miora testified.

Also on December 6, 2016, this Court issued a scheduling order providing that motions in limine and motions raising *Daubert* issues were due no later than February 1, 2017. Order (Doc. 270) at 1. That Order put the government on notice that it had to identify its mental health experts and their opinions in order for Mr. Barrett to have a fair opportunity to file any motions related to them.

On December 13, 2016, the government stated that it intended to present two mental health experts, namely Dr. Pitt and Dr. Price. Mot. Cont. Hr'g (Doc. 273) at 1.

On January 3, 2017, Mr. Barrett filed and served written notice that he would present two neuropsychologists, Dr. Erin Bigler and Dr. Deborah Miora. Doc. 280. This filing put the government on notice of how Mr. Barrett would present Dr. Young's testing and her findings, and that he would rely on additional neuropsychological testimony if the government attempted to rely on Dr. Bianco's 2000 testing. These notices show that a party seeking to be diligent and comply with this Court's scheduling orders could have anticipated the opposing party's case, identified experts to meet that case, and given timely notice in order to give the other party a fair opportunity to prepare, and to ensure an orderly and efficient hearing process.

On January 30, 2017, the government moved to exclude any and all testimony from Mr. Barrett's neuropsychological experts. Mot. Exclude Wits. (Doc. 289) at 1, 8-10. This motion, in conjunction with the previously mentioned filings, shows the government made the strategic

Pet'r's Opp. Govt. Mot. Cal Add'l Wits        6        *Barrett v. U.S.*, CV-09-00105-JHP

1580

decision not to try to confront Mr. Barrett's evidence of neuropsychological impairment head-on (so to speak), but to obtain the double strategic advantage of excluding that evidence while presenting its own neuropsychologist, Dr. Price. The government also "urge[d] the Court to order Barrett to provide an offer of proof, so that [the government could] determine the relevance and timeliness of testimony from proposed witness[] . . . Faust Bianco." *Id.* at 1. The government asserted that Dr. Bianco, its purative new expert, had "no apparent connection to Barrett's claim of ineffectiveness, as the defendant did not identify [him] in support of the contention." *Id.* at 11.

On February 16, 2017, the parties filed a joint statement in which Mr. Barrett repeated his intention to present neuropsychological testimony and the government stuck to its two experts, Dr. Pitt and Dr. Price. Doc. 340.

On February 23, 2017, the government filed a motion for partial summary judgment based, in part, on an affidavit executed by Dr. Bianco, Mot. Summ. Jdmt. (Doc. 347), Ex. 5, and in part on a memorandum discussing Dr. Bianco's work, Mot. Summ. Jdmt. (Doc. 347), Ex. 7.

On February 24, 2017, this Court granted the government's motion to exclude any neuropsychological testimony. Order (Doc. 361) at 10-11. The Court held that the motion for an offer of proof related to Dr. Bianco was moot because Mr. Barrett did not intend to offer any testimony from him. *Id.* at 9-10. The Court also directed the parties to amend their pre-hearing statements. *Id.* at 14. The government did not amend by adding Dr. Bianco as a witness.

On March 3, 2017, the date set for Mr. Barrett to provide expert witness disclosures, Mr. Barrett filed lengthy proffers for Dr. Miora and Dr. Bigler. Dr. Miora's proffer included her scoring of Dr. Young's raw test data. As noted in the government's pending Motion, these experts discussed Dr. Bianco's 2000 testing. However, these proffers were made (a) after the Court barred the witnesses' testimony so that Mr. Barrett had to proffer any evidence the

Pet'r's Opp. Govt. Mot. Cal Add'l Wits                7                *Barrett v. U.S.*, CV-09-00105-JHP

1581

witnesses might offer, and (b) before the testimony of trial counsel on the issue of deficient performance so that Mr. Barrett had to anticipate any evidence the government might offer.

On March 29, 2017, trial counsel Bret Smith testified that he did not play an active role in planning the investigation of the penalty phase defense and he was not familiar with the testing or opinion of Dr. Bianco. On March 30, 2017, lead trial counsel Roger Hilfiger testified, and his testimony also indicated that Dr. Bianco's opinions, if he was aware of them, played no role in his decisions about what penalty phase evidence to investigate and what not to investigate.

On May 9, 2017, Mr. Barrett moved to exclude Dr. Price's testimony on grounds that the government had not complied with Fed. R. Crim. P. 16(c) by supplementing Dr. Price's 2005 report with any opinions he might have to rebut the opinions of Dr. Woods or Dr. Young. Doc. 425. On May 12, 2017, the government responded, telling this Court that "Dr. Price rule[d] out brain damage with a screening test." Resp. Mot. Exclude Price (Doc. 436) at 5. As Dr. Price's report and testimony show, he did not and could not "rule out" brain damage in Mr. Barrett because he did not even test major areas of brain function tested by Dr. Young.

On June 8, 2017, the government emailed Dr. Price's raw data to Mr. Barrett's counsel.

On June 12, 2017, the government called Dr. Price as a witness. Mr. Barrett objected to Dr. Price testifying as a neuropsychologist in rebuttal in part on grounds that Mr. Barrett had been barred from presenting a neuropsychologist in his case in chief. Magistrate Judge Shreder overruled the objection and Dr. Price testified as a neuropsychologist about the findings he made based on a neuropsychological screening battery he administered to Mr. Barrett in October 2005. However, the Magistrate Judge also indicated the Court was considering allowing the testimony of Mr. Barrett's neuropsychologist, Dr. Miora.

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          8          *Barrett v. U.S.*, CV-09-00105-JHP

1582

During his time on the stand, the government asked Dr. Price about Mr. Barrett's condition in what neuropsychologists call executive functioning, an important area of organic impairment identified by Dr. Young. As noted *supra*, Mr. Barrett had previously filed a motion seeking to exclude testimony from Dr. Price on the areas covered by Dr. Young's declaration on grounds that the government had not supplemented Dr. Price's report as required by Fed. R. Crim. P. 16(c). Mot. Exclude Price (Doc. 425). The government's response to that motion indicated the government had not asked Dr. Price to form any opinions about Dr. Young's findings. Resp. Mot. Exclude Price (Doc. 436) at 5. At the evidentiary hearing, Mr. Barrett objected to the question about executive functioning on grounds that Dr. Price's report indicated he conducted no tests of executive functioning and formed no opinions in that area. Magistrate Judge Shreder verified that Dr. Price's report contained no mention of executive functioning, and sustained Mr. Barrett's objection. These events add to the body of evidence that the government's strategy for dealing with Mr. Barrett's neuropsychological evidence has been to seek unfair tactical advantages rather than allow a timely, orderly, full and fair adversarial testing of the evidence.

On June 13, 2017, the Magistrate Judge agreed to hear Dr. Miora's testimony on June 26, 2017. At that point, the government announced in open court its intention to retain another neuropsychologist to evaluate Mr. Barrett and testify in rebuttal to Dr. Miora. Also on June 13, 2017, counsel for Mr. Barrett provided the government a paper copy of Dr. Young's raw test data. On June 15, 2017, Mr. Barrett's counsel provided counsel for the government Dr. Young's raw data in electronic form. That is far more advance notice than Mr. Barrett was allowed for Dr. Price's test data. As the record shows, Mr. Barrett identified experts who could evaluate and testify about Dr. Prices testing procedures and testing far in advance of the hearing. The

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          9          *Barrett v. U.S.*, CV-09-00105-JHP

1583

government now seeks to parlay that windfall into a further unfair advantage by designating Dr. Herrera as a new witness.

This Response follows.

## REASONS THE MOTION SHOULD BE DENIED

### A. Mr. Barrett Has Not Had a Fair Opportunity to Respond

The government's Motion, filed Friday, June 16, 2017, was not accompanied by a request to shorten time for a response. This Court's minute order directing this Response be filed by noon, Central Time, on the following Monday issued within a few hours of the Motion being filed. Accordingly, Mr. Barrett had no notice or an opportunity to be heard regarding the timing of this Response. Obviously, the time includes at most one business day, although it also includes a holiday weekend (Fathers Day). During that time, Mr. Barrett's lead counsel was preparing for a trial. Co-counsel Joan Fisher was returning from New York after serving as faculty at a continuing legal education seminar. Assistant Federal Defender Karl Saddlemire was out of the office for a previously planned weekend. Co-counsel Tivon Schardl was responsible for arranging for Dr. Miora's contract and travel and supposed to be working with Dr. Miora to prepare to present Dr. Young's testing. Decl. Tivon Schardl.

The foregoing procedural history shows the government had since 2015 to identify an expert who could review Dr. Young's testing and be prepared to testify about her findings. Dr. Bianco has been known to the government since 2009. The government knew as early as Tuesday that it wanted to call another neuropsychologist. Since the government's Motion provides no information about Dr. Herrera, and indeed, counsel for the government called defense counsel about the motion before Dr. Herrera had been identified, the government could

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          10          *Barrett v. U.S.*, CV-09-00105-JHP

1584

have filed its motion earlier and named the expert later. This Court's Order rewards the government for its delay and correspondingly disadvantages Mr. Barrett.

Due to the inadequate time to respond, and there being no notice or opportunity to be heard regarding whether the weekend would provide an adequate time, Mr. Barrett cannot be deemed to have forfeited or waived any objections to the naming or calling of Dr. Herrera or Dr. Bianco by the government.

## B. The Government Has Not Justified its Failure to Comply with Scheduling Orders

The government's Motion seeks relief from this Court's scheduling orders, and reconsideration of this Court's discovery order. First, the government seeks leave to designate two neuropsychologists as new expert witnesses on June 16, 2017, although this Court ordered the parties to identify their witnesses no later than December 13, 2016. One of those witnesses, Faust Bianco, has been known to the government since 2009. The government has been aware since 2005 that another neuropsychologist, Randall Price, evaluated Mr. Barrett, and the government presented his testimony as a neuropsychologist on June 12, 2017. The government has offered no justification for failing to have Dr. Price conduct the review that it now seeks from Dr. Herrera. Second, the government seeks to present an expert report one business day before the expert's testimony rather than the ten-days' notice contemplated in the scheduling order.

The government claims that "Dr. Price could not speak to Dr. Young's subsequent testing of the defendant, because neither he nor the government had access to her data." Mot. (Doc. 455) at 3. This claim does not bear scrutiny and Mr. Barrett objects to this Court crediting the government's claim without any supporting evidence and a hearing on that evidence. The

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          11          *Barrett v. U.S.*, CV-09-00105-JHP

1585

government has failed to provide a declaration or other statement from Dr. Price to support the claim that there was nothing he could do to prepare to rebut Dr. Young's findings without her raw data. On at least two previous occasions, cited *supra*, the government misrepresented to this Court the nature of Dr. Price's work on the case or what his testimony would be, first claiming that he only did a neuropsychological evaluation, then claiming he would testify that he ruled out brain damage.

Even on its face, the government's claim does not hold up to scrutiny. Dr. Young's declaration provides a detailed description of the tests she performed, the scores she assigned, and the significance that she gave those scores. On March 3, 2017, Mr. Barrett filed a proffer of Dr. Miora's testimony that included her scoring of Dr. Young's raw data. Doc. 376-1. This Court lifted the firewall between the case prosecutors and Dr. Price on December 6, 2016. The government could have provided Dr. Young's report to Dr. Price at anytime after that. The government's failed attempt to have Dr. Price testify about executive functioning shows the government planned to have him testify in rebuttal to Dr. Young's findings without Dr. Young's raw data and without providing Mr. Barrett's counsel notice of his opinions.

Of course, the government could have looked at the Tenth Circuit's finding that Dr. Young's conclusions were "[m]ost important," and tried to cross-examine Dr. Miora about how Dr. Young reached her conclusions. (Mr. Barrett was already at a potential minor disadvantage due to the tragic and untimely death of the neuropsychologist who administered the tests.) If this Court provided the government the same access to raw data that it provided the defense, the government would have been able to see Dr. Young's raw data at the time Dr. Miora testified. The government could have had Dr. Price in court for that purpose, and then Dr. Price could have testified to any anomalies he claimed to find in the data. But the government did not want a

Pet'r's Opp. Govt. Mot. Cal Add'l Wits      12      *Barrett v. U.S.*, CV-09-00105-JHP

1586

fair fight, so it moved to exclude that most important evidence. This Court granted that motion. Then the government presented neuropsychological rebuttal to neuropsychological evidence that had been excluded. Magistrate Judge Shreder's ruling allowing Dr. Miora to testify merely seeks to reset the balance. Thus, if the government finds itself in an awkward position now, it is only reaping the fruits of the unfair advantages it sought earlier and that this Court granted.

In at least two ways the record fails to support the government's claim that Dr. Price could not prepare. If Dr. Price had been asked to prepare to rebut Dr. Young but he was stymied by the lack of raw data, (a) the government would have filed a discovery motion asking that the data be turned over to him, and (b) the government would not have tried to ask Dr. Price about executive functioning when he testified. The government cannot credibly claim that it did not file a discovery motion because by the time it could contact Dr. Price, the time for discovery motions had past. If Dr. Price had told the government in December or January that he needed the data, the government would have had obvious, compelling grounds to seek relief from the scheduling order, namely, the lifting of the protective order. But that would have put Mr. Barrett on notice that Dr. Price was forming new opinions that the government would have been required to disclose under Fed. R. Crim. P. 16(c). As evidenced by the government's response to Mr. Barrett's motion to exclude Dr. Price for failing to comply with Rule 16(c), and the attempt to elicit unreported opinions from him at the hearing, the government had strategic reasons for not seeking the data.

The government's motion suggests that the content of Dr. Young's data, not its existence, triggered its duty to prepare for rebuttal. Mot. (Doc. 455) at 5 ("The government could not have fairly been expected to rebut Dr. Miora's opinion without the data that undermines it.") If the government's claim is true, it proves too much. The government knew in 2009 that Dr. Young

Pet'r's Opp. Govt. Mot. Cal Add'l Wits  13  *Barrett v. U.S.*, CV-09-00105-JHP

1587

had raw data. It knew in October 2015, that there would be a hearing at which it would have to decide whether and how to rebut Dr. Young's findings. Thus, if the raw data were necessary for the government to prepare rebuttal, the government knew at the time it filed its discovery motions in November 2016 that it needed to get the data. Yet, it filed no such motion. If the government wanted an expert other than Dr. Price to review the raw data and opine on it, the government knew at least as early as December 2015, when the government contacted Dr. Pitt, that it needed to identify an expert.

As set forth *supra*, this Court did not allow Mr. Barrett's counsel to see Dr. Price's raw data until he testified. Yet Mr. Barrett's counsel were expected to prepare to meet his testimony. In the event, the government's counsel provided Dr. Price's raw data four (4) days before he testified. The government previously told this Court it would rebut Dr. Young's findings with testimony from Dr. Price that he "rule[d] out brain damage" with a limited neuropsychological screening battery. Mr. Barrett's counsel provided Dr. Young's raw data thirteen (13) days before Dr. Miora's scheduled testimony. Thus, the government's claim that it is being treated unfairly has no basis in fact, reason or law.

As to Dr. Bianco, the government claims he should testify because Dr. Miora was critical of his evaluation in her declaration. As shown in the procedural history *supra*, Dr. Miora's proffer declaration was prepared at a time when the government was claiming (without a factual basis) in its summary judgment motion that trial counsel justifiably relied upon Dr. Bianco to forego neuropsychological testing. Now that trial counsel have testified and there is no factual basis for the government's claim, it may be unnecessary for Dr. Miora to discuss Dr. Bianco at all. His work simply is not relevant to the issues that are yet to be resolved.

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          14          *Barrett v. U.S.*, CV-09-00105-JHP

1588

The government has known about Dr. Bianco's prior work since 2009, when Dr. Young mentioned him in her declaration. The government has known the details of his work since January 2017, when it obtained the relevant portions of trial counsel's files. If the government had any intention of trying to comply with the scheduling orders or to act fairly and not sandbag the defense, it would have attempted to identify him as a witness many months ago. The government's claim "that Dr. Bianco's testing . . . will provide the most relevant window into the defendant's neurological health," is unsupported, false, and very late.[2] There is no evidence that Mr. Barrett suffered any injury or disease that would have made his neuropsychological functioning different in 2000 than it was in 2005 when Dr. Price did his testing,[3] or in 2009. If it were true, and the government had a good faith basis for the claim, the government had every reason to designate Dr. Bianco as a witness months ago, and/or to give his testing to Dr. Price. As previously noted, the government relied upon Dr. Bianco's 2002 declaration in support of the motion for partial summary judgment it filed in February. There is no justification for the government naming him as a witness months later and only after the failure of its effort to obtain an unfair advantage.

This Court has repeatedly said that the hearing should give the government an opportunity to call rebuttal experts who could have been called at the time of trial. Dr. Bianco would not have been known to or available to the government at the time of trial. He served as a

---

[2] This Court may recall that in response to Mr. Barrett's motion to exclude Dr. Pitt on grounds that he relied on post-judgment information, the government maintained that a retrospective evaluation was not a problem.

[3] As previously noted, Dr. Price did not test Mr. Barrett's executive functioning. Given the importance of executive judgment in any homicide case, and especially one in which the defendant was required to react to an assault on his property and child in the middle of the night, and where the evidence created a disputed issue about when he might have become aware that the attackers were law enforcement officers, Dr. Price's decision not to test Mr. Barrett's executive functioning could have been strategic.

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          15          *Barrett v. U.S.*, CV-09-00105-JHP

1589

confidential consultant to the Oklahoma Indigent Defense System prior to the first state trial.

Memoranda submitted with the government's motion for partial summary judgment show people

at OIDS had trouble figuring out what Dr. Bianco had done and, for that reason, they were

reluctant to place much stock in his opinions. Mr. Barrett's federal trial counsel either did not

know about Dr. Bianco's opinions or did not rely upon them. The government's § 2255 counsel

only learned about Dr. Bianco because this Court gave them access to all the accumulated files

of prior defense counsel. Thus, there is no way the government could have identified Dr. Bianco

as a witness at the time of trial.

In these post-conviction proceedings, Mr.Barrett's § 2255 counsel retained Dr. Bianco as

a consultant with the stipulation that all communications between him and counsel would be

covered by the attorney-client privilege or work-product protection. Schardl Decl. As this Court

previously found, Mr. Barrett dropped any idea about calling Dr. Bianco to testify. Accordingly,

any information Dr. Bianco obtained in these federal proceedings is covered by a claim of

privilege which Mr. Barrett and his counsel hereby assert. [4]

Rule 16(f) of the Federal Rules of Civil Procedure presumes that sanctions will be

imposed when a party fails to comply with a scheduling order unless the party "substantially

justifie[s]" its noncompliance. The government moves to be rewarded for failing to comply with

this Court's scheduling orders while offering no credible, much less substantial, justification for

noncompliance. In order to comply with the spirit of Rule 16(f), the government, at a minimum,

the government must "substantially justif[y]" its failure to comply with the scheduling

orders. For the reasons stated *supra*, it has not done so. The government's attempt to disrupt the

---

[4] Upon receipt of information that the government intended to call Dr. Bianco, the undersigned counsel, Tivon Schardl, notified the government of the possible privilege issue and his intent to research that issue further. Given the time constraints in filing this Response and supporting declaration, the research has not yet been completed and the issue remains unresolved.

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          16          *Barrett v. U.S.*, CV-09-00105-JHP

hearing with the six-months-late designation of new experts should be subject to sanctions, not reward.

### C.  Mr. Barrett will Be Prejudiced if the Motion is Granted

Due to the untimely death of Dr. Young, presenting her testing and findings will require more work than would ordinarily be required. Due to the unfair exclusion of neuropsychological testimony earlier in the case, Mr. Barrett's counsel and Dr. Miora have been forced to scramble to prepare her testimony on June 26, 2017. Due to the government's untimely and groundless Motion and the unfair shortening of time for this Response, Mr. Barrett's counsel has less time to prepare.

As the government stated in one of its discovery motions, without knowing an expert's background or qualifications, a party cannot adequately prepare for cross-examination. The government has provided no information about Dr. Herrera such as his qualifications, his prior testimony, what materials he will review, what his opinions are, etc. The government proposes to provide his report on the Friday before the Monday of Dr. Miora's and Dr. Herrera's testimony. Surely, the government knows that Mr. Barrett's counsel will have to spend one of those days traveling.

If there are grounds to challenge Dr. Herrera under *Daubert*/Rule 703, or to impeach him, they cannot be ascertained prior to his proposed testimony.

### CONCLUSION

For the foregoing reasons, the government's Motion should be denied.

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          17          *Barrett v. U.S.*, CV-09-00105-JHP

1591

DATED:       June 19, 2017

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

/s/ *Tivon Schardl*
TIVON SCHARDL
Trial & Habeas Counsel

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          18          *Barrett v. U.S.*, CV-09-00105-JHP

1592

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 19th day of June 2017, I caused the foregoing Petitioner's Response in Opposition to the Government's Motion to Identify New Witnesses to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

Pet'r's Opp. Govt. Mot. Cal Add'l Wits          19          *Barrett v. U.S.*, CV-09-00105-JHP

1593

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>        Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>        Respondent. | CASE NO. CV-09-00105-JHP<br><br><br>**DECLARATION OF COUNSEL IN SUPPORT OF OPPOSITION TO MOTION TO CALL ADDITIONAL REBUTTAL WITNESSES** |

I, Tivon Schardl, declare the following:

I am an attorney licensed to practice law by the State of Florida and am a member of the

bar of this Court. Since 2008, I have represented Kenneth Barrett in his pursuit of post-

conviction relief. I am making this declaration in support of Mr. Barrett's opposition to the

government's motion to call additional rebuttal witnesses (Doc. 455).

I was given the tasks of cross-examining Dr. Randall Price and presenting the testimony of Dr. Deborah Miora. Due to the order excluding Dr. Miora, prior to the hearing, I had done nothing to prepare to present her testimony other than ask her to prepare a proffer declaration.

At the time I received the government's motion, I was handling the paperwork necessary to contract with Dr. Miora for her preparation time, travel and testimony. Lead counsel David Autry advised me that he could not draft and file the response to the government's motion because he was due to be in trial on Monday, June 19, 2017. Joan Fisher was in New York serving as faculty for a long-planned continuing legal education seminar. Karl Saddlemire offered to help prepare the response, but he was leaving work early for a previously planned weekend trip out of town. I have a doctor's appointment at 8:30 a.m. on June 19.

In May 2009, I entered into a contract for confidential consultation services with Dr. Faust Bianco. Dr. Bianco signed the contract and we had at least two conversations about the neuropsyhological testing that he and Dr. Myla Young performed on Mr. Barrett. On June 16, 2017, as soon as the government notified me that it was seeking to present Dr. Bianco as a government expert, I asked my assistant to retrieve a copy of Dr. Bianco's signed contract, and I retrieved a copy of the letter I sent to him. I then notified counsel for the government that Dr. Bianco was privy to confidential communications regarding this case and I requested counsel cease communications with him. Opposing counsel advised me that he would comply with that request.

I am currently scheduled to fly to Oklahoma on June 25, 2017, and I anticipate Dr. Miora will arrive the same day.

I declare, under penalty of perjury as provided in the laws of the United States of America, that the foregoing is true and correct and based on my personal knowledge.

Subscribed to by me this 19th day of June 2017 in Sacramento County, California.


/s/ *Tivon Schardl*
TIVON SCHARDL

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Karl J. Saddlemire (karl_saddlemire@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net),
Christopher J. Wilson (caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), District Judge James
H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:901994@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion for
Miscellaneous Relief
Content–Type: text/html
```

# U.S. District Court

# Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 6/19/2017 at 2:16 PM CDT and filed on 6/19/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 459(No document attached) |

**Docket Text:**
**MINUTE ORDER by Magistrate Judge Steven P. Shreder: [455] Government's Motion to Call Additional Rebuttal Witnesses is GRANTED IN PART to the extent that the USA may call Dr. Faust Bianco as a rebuttal witness to the testimony of Dr. Miora on Monday, 6/26/2017. Motion is otherwise DENIED. (tls, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Tivon Schardl     tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire    karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has been delivered by other means to:**

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | **PETITIONER'S MOTION FOR IMMEDIATE PRODUCTION OF REPORT FROM EXPERT WITNESS** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

Petitioner Kenneth Eugene Barrett, by and through undersigned counsel, respectfully

moves this Court, pursuant to its discovery and scheduling orders and the authorities cited herein,

for an order directing the government immediately to produce a summary and report from Faust

Pet'r's Mot. Expert Rpt.                    1                    *Barrett v. U.S.*, CV-09-00105-JHP

Bianco, Ph.D., that sets forth all the information required by Fed. R. Crim. P. 16(a)(1)(F) and (G). Mr. Barrett states the following as good cause for granting this Motion:

## I.     RELEVANT BACKGROUND

Mr. Barrett incorporates by this specific reference all averments and arguments made in his Response in Opposition to the Government's Motion to Call Additional Rebuttal Witnesses, as if fully set forth herein.

On December 6, 2016, the District Judge issued an order requiring the defense to provide the government with written summaries of expert testimony under Fed. R. Crim. P. 16(b)(1)(C). Order (Doc. 270) at 11. That ruling triggered a corresponding requirement that the government produce summaries to Mr. Barrett's counsel. The Order also required the government to provide the defense with the audio and video recording Dr. Pitt's evaluation at least ten days before the evidentiary hearing. Order (Doc. 270) at 15. In the same Order, the Court directed the Clerk to make a copy of Dr. Price's report available to both parties. *Id.* at 17.

On June 16, 2017, the government filed a motion for leave to present additional rebuttal experts, Jorge Herrera and Dr. Bianco. Mot. (Doc. 455). The government promised in its motion to produce a report from Dr. Herrera, but made no such promise regarding Dr. Bianco. *Id.* at 4. The government stated that it would present Dr. Bianco's testing from 2000. *Id.* at 2, 4.

On June 19, 2017, without giving Mr. Barrett a fair opportunity to be heard in response, the Court granted the government's motion to the extent the government sought to call Dr. Bianco. Min. Order (Doc. 459).

The following day, the government informed Mr. Barrett's counsel that it was moving beyond the 2000 testing and providing Dr. Bianco the opinions of Mr. Barrett's experts so that he

could form new opinions in rebuttal to them.[1] Ex. A (email from Chris Wilson dated June 20, 2017). Contrary to the government's claim that Mr. Barrett's counsel are familiar with Dr. Bianco's opinions, Mot. (Doc. 455) at 4, Mr. Barrett has already submitted expert declarations stating that Dr. Bianco's data do *not* reveal his opinions, the reasons and the bases therefor, and counsel cannot be familiar with opinions Dr. Bianco has not yet formed.

On June 21, 2017, the government advised Mr. Barrett's counsel that the government would oppose the instant Motion on grounds that (a) state-court trial counsel John Echols instructed Dr. Bianco not to prepare a report, and (b) "we know from the Affidavit he prepared (and introduced during the hearing), [that Dr. Bianco] found 'any further neurological testing is unwarranted at this time' and 'Further testing will not provide evidence that is inconsistent with Mr. Barrett's neurological test results, and would not be indicative of significant deficits in Mr. Barrett's functioning.'" Ex. B.

## II. CONTINUED ASSERTION OF PRIVILEGE & WORK PRODUCT PROTECTION

Mr. Barrett continues to assert that Dr. Bianco's testimony is barred by attorney-client privilege and the work-product doctrine. Resp. Opp. Mot. Call Add'l Wits. (Doc. 457) at 15-16. The government obtained Dr. Bianco's raw data and scoring sheet only through this Court's order granting the government access to trial counsel's files. That order, and the case law

---

[1] To the extent the government intends to call Dr. Bianco to respond to criticisms of his work, as stated in Mr. Barrett's Response in Opposition to Motion for Leave to Call Additional Rebuttal Witnesses, there will be no testimony from Dr. Miora to rebut. Mr. Barrett had only one reason to mention Dr. Bianco and that was to respond to the government's claim in its Motion for Partial Summary Judgment that trial counsel's failure to conduct neuropsychological testing was not deficient performance. Now that trial counsel have testified and it is clear that Dr. Bianco's affidavit, prepared at the direction of a state-court investigator, played no role their decisionmaking, Mr. Barrett has no reason to elicit from Dr. Miora any opinions about Dr. Bianco's testing. That is, unless the government is allowed to use Dr. Bianco for purposes of its case on prejudice or as a post-hoc rationalization for trial counsel's omissions.

---

Pet'r's Mot. Expert Rpt.   3   *Barrett v. U.S.*, CV-09-00105-JHP

underlying it, grants the government access to the extent necessary to defend against a claim of ineffectiveness, which is to say, the performance prong of *Strickland v. Washington*, 466 U.S. 668 (1984). *United States v. Pinson*, 584 F.3d 972, 978 (10th Cir. 2009), *cert. denied*, 559 U.S. 955 (2010). Absent the implied waiver that gave the government access to trial counsel's files, the government would never have known about the work of Dr. Bianco who was a confidential consultant to Mr. Barrett's state-court counsel. Fed. R. Crim. P. 16(b)(2). Mr. Barrett has never relied upon any evidence related to Dr. Bianco for purposes of the prejudice prong of *Strickland* and therefore there could be no implied waiver for that purpose. Additionally, in 2009, Dr. Bianco served as a consulting expert for Mr. Barrett's post-conviction counsel regarding the work performed by Dr. Myla Young. *See* Mot. Disqualify Govt. Expert Faust Bianco. Mr. Barrett has never waived the attorney-client privilege or work-product protections that attach to that work. This Motion is made without waiver or forfeiture of those claims of privilege and work-product protection.

## III.    GOVERNING LAW ON DISCOVERY

"A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Criminal Procedure or Civil Procedure, or in accordance with the practices and principles of law." Rule 6(a), R. Gov. § 2255 Proc. ("2255 R."). "A party requesting discovery must provide reasons for the request. The request must also . . . specify any requested documents." 2255 R. 6(b).

Under 2255 Rule 6(a), good cause exists "'where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief . . . .'" *Bracy v. Gramley*, 520 U.S. 899, 908-09

(1997) (quoting *Harris v. Nelson*, 394 U.S. 286, 299 (1969)). Then, "it is the duty of the courts to provide the necessary facilities and procedures for an adequate inquiry." *Ibid.*

Federal Rule of Criminal Procedure 16(a)(1)(G) provides in relevant part:

> At the defendant's request, the government must give to the defendant a written summary of any testimony that the government intends to use under Rules 702, 703, or 705 of the Federal Rules of Evidence during its case-in-chief at trial. * * * The summary provided under this subparagraph must describe the witness's opinions, the bases and reasons for those opinions, and the witness's qualifications.

In addition, Mr. Barrett is entitled to the disclosure of favorable evidence in the possession of the prosecution. *Brady v. Maryland*, 373 U.S. 83 (1963).[2] "'Impeachment evidence, ... as well as exculpatory evidence, falls within the *Brady* rule.'" *United States v. Headman*, 594 F.3d 1179, 1183 (10th Cir. 2010) (quoting *United States v. Bagley*, 473 U.S. 667, 676 (1985)). The "government's disclosure duty 'continues throughout the judicial process.'" *Headman*, 594 F.3d at 1183 (quoting *Douglas v. Workman*, 560 F.3d 1156, 1174 (10th Cir. 2009)). Due process requires that favorable evidence must be disclosed in time for the defense to make use of it. *United States v. Burke*, 571 F.3d 1048, 1054 (10th Cir. 2009).

## IV.    GROUNDS FOR GRANTING DISCOVERY

### A.  Mr. Barrett Satisfied *Bracy*

The Tenth Circuit's conclusion that Mr. Barrett has presented facts which, if proved, would entitle him to relief, *United States v. Barrett*, 797 F.3d 1207, 1224, 1232 (10th Cir. 2015), *cert. denied*, ___ U.S. ___, 137 S. Ct. 36 (2016); *id.* at 1229 ("Taking Defendant's proffered

---

[2] Supreme Court Justices recently reminded prosecutors that the duty to disclose is not based on the probable consequences of non-disclosure, but on whether the evidence is favorable to the defense. Tr. O.A. at 28-29 (comments of Breyer, J.) *Smith v. Cain*, 565 U.S. 73 (2012) (No. 10-8145), 2011 WL 5360052 at *28-*29; *id.* at 30-31 (comments of Roberts, C.J.); *id.* at 49 (comments of Kennedy, J.), *48; *id.* at 51-52, *52 (comments of Scalia, J.); *id.* at 52-53, *51-*52 (comments of Sotomayor, J.).

mitigation as true, it is sufficient to require an evidentiary hearing."), means he has already surpassed the good cause standard with respect to the claim at issue here, because a showing of good cause under 2255 Rule 6(a) requires less than a showing of a prima facie case.[3] *Bracy* unanimously held that a district court abused its discretion when it denied the petitioner's discovery requests because the petitioner had "made a sufficient factual showing to establish 'good cause,' as required by Habeas Rule 6(a)." *Bracy*, 520 U.S. at 901. The *Bracy* Court found the petitioner's factual showing sufficient even though his "sort of compensatory bias" claim was "quite speculative," "only a theory at this point," and premised on facts that "might be equally likely" to support an inference contrary to the one the petitioner advanced. *Bracy*, 520 U.S. at 905, 909.

In order to obtain discovery, Mr. Barrett need not show that he may be entitled to relief, only that there is "*reason to believe*" he "*may*" be able establish an entitlement for relief "*if* the facts are *fully developed*." *Bracy*, 520 U.S. at 908-09 (emphasis added). This standard is more permissive than the standard for establishing entitlement to an evidentiary hearing, i.e., "whether such a hearing could enable an applicant to *prove* the petition's factual allegations, which, if true, would entitle the applicant to federal habeas relief." *Schriro v. Landrigan*, 550 U.S. 465, 474 (2007) (emphasis added).[4] Accordingly, the Tenth Circuit has already found Petitioner's

---

[3] Although *Harris v. Nelson* used the "prima facie case" language, 394 U.S. at 290, the Court in *Bracy* makes clear that the *Bracy* holding applies to the standard adopted in Habeas Rule 6(a) which was created after *Harris*. *Bracy*, 520 U.S. at 904. The *Bracy* Court held that the "reason to believe . . ." language from *Harris* was to be applied in the context of Rule 6(a). Neither *Bracy* nor the Advisory Committee Notes on Rule 6(a) refer to the "prima facie case" language of *Harris*.

[4] *See also* Advisory Committee Notes to R. Gov. § 2254 Cases 6 ("Discovery may, in appropriate cases, aid in developing facts necessary to decide whether to order an evidentiary hearing or to grant the writ following an evidentiary hearing."). *Accord  Blackledge v. Allison*, 431 U.S. 63, 81-82 (1977) (approving common practice of granting discovery to habeas petitioners before need for an evidentiary hearing has been determined); *Jones v. Wood*, 114 F.3d

allegations as to exceed the showing required for discovery. The Tenth Circuit's decision goes far beyond concluding that Mr. Barrett presented a speculative, theoretical claim.

The Tenth Circuit asked whether an evidentiary hearing would enable Mr. Barrett to prove "'factual allegations, which, if true, would entitle the [movant] to ... relief.'" *Barrett*, 797 F.3d at 1224 (quoting *Landrigan*, *supra*, 550 U.S. at 474). The Court of Appeals answered that question by holding that "an evidentiary hearing is necessary" and "remand[ing] for further proceedings on the issue." *Ibid.*

In *Moore v. Gibson*, 195 F.3d 1152 (10th Cir. 1999), *cert. denied*, 530 U.S. 1208 (2000), the Tenth Circuit held that a district court abused its discretion when it denied discovery on a claim after it concluded the "trial record … lends some support and does not contravene petitioner's allegations which, if proved, would warrant habeas relief." *Moore*, 195 F.3d at 1166. Given that the Court of Appeals has reached the same conclusion in this case, "it is the duty of the court[] to provide the necessary facilities and procedures for an adequate inquiry." *Bracy*, 520 U.S. at 909 (internal quotation marks and citation omitted).

### B. The Facts Support Ordering a Report

Mr. Barrett was required to produce expert reports and the government was required to produce a report from its other rebuttal witnesses. The government acknowledges that Dr. Bianco has not produced a report. Ex. B. Dr. Bianco's 2002 affidavit, as quoted in Exhibit B, makes *predictions* about what *future* testing would reveal. It does not summarize his own findings from his 2000 testing and it obviously does not summarize his opinions about the testing

---

1002, 1009 (9th Cir. 1997) (under Rule 6(a) "discovery is available to habeas petitioners at the discretion of the district court judge for good cause shown, regardless of whether there is to be an evidentiary hearing").

done by Dr. Young that Dr. Miora will testify to. As to bases and reasons, the affidavit says nothing.

The government asserted in its motion for leave to call Dr. Bianco, that "his opinion is already well known to Barrett, as evidenced by Dr. Miora's report." Mot. (Doc. 455) at 4. That assertion is false and contradicted by the record. With respect to Dr. Bianco's 2000 testing, as set forth in the declaration of Erin Bigler, Ph.D., Doc. 376-2, Dr. Bianco has never produced a report or other statement setting forth his opinions, the bases and the reasons therefor. Mr. Barrett's counsel also have no complete or current information about Dr. Bianco's qualifications as required by Fed. R. Crim. P. 16(a)(1)(G). Dr. Bigler and Dr. Miora identified *omissions* in the raw data and scoring that Dr. Bianco produced in 2000. Doc. 376-2 at ¶¶ 6-15, 25-26; Doc. 376-1 at pp. 7-8. Omitted information includes, but is not limited to, the areas of neuropsychological functioning on which Dr. Bianco formed opinions, what opinions he formed regarding specific areas of neuropsychological functioning, the normative data Dr. Bianco relied upon, the meaning of handwritten notations on his scoring sheet, whether he formed an opinion about executive functioning despite having not completed testing in that area. In other words, the point of Dr. Miora's and Dr. Bigler's declarations, consistent with their focus on the performance prong of *Strickland*, was that Dr. Bianco's opinions about specific areas of neuropsychological functioning cannot be known, and therefore could not be relied upon, because he never produced a report, did not complete testing instruments, did not explain indecipherable notations on his scoring sheet, and did not identify the normative data he relied upon. Without that information, Mr. Barrett's counsel cannot be prepared to file a motion to exclude Dr. Bianco under Fed. R. Evid. 702(b)-(d), as contemplated in the Scheduling Order (Doc. 270), and counsel cannot be prepared to conduct *voir dire* of Dr. Bianco at the hearing or to cross-examine him.

With respect to Dr. Bianco's opinions about Mr. Barrett's post-conviction experts, Dr. Bianco consulted with Mr. Barrett's post-conviction counsel but produced no report. Mr. Barrett's counsel cannot prepare to cross-examine Dr. Bianco.

In *United States v. Jackson*, 51 F. 3d 646 (7th Cir. 1995), the Seventh Circuit held a summary was "barely" sufficient under Rule 16(a)(1)(G) where it identified the *specific* areas experts would testify to. *See United States v. Goxcon-Chagal*, 866 F. Supp. 2d 1222, 1253 (D. N.M. 2012). Dr. Bianco's affidavit contains no specifics. Given that neuropsychologists use specific tests to assess functioning in specific areas of the brain and their conclusions on each specific area and test must be based on appropriate normative data for the individual being evaluated, Rule 16 requires far more detail than can be found in Dr. Bianco's affidavit. *See United States v. Duvall*, 272 F.3d 825, 828-29 (7th Cir. 2001) (finding insufficient summary that listed general topics but not actual opinions); *United States v. White*, 492 F.3d 380, 406-407 (6th Cir. 2007); *United States v. Liscomb*, 539 F.3d 32, 38 (10th Cir. 2010) (where scientific or technical knowledge will be relied upon great detail is required to comply with rule).

In addition, Mr. Barrett will be prejudiced in the sense that the government has had eight years to prepare to cross-examine Dr. Miora on Dr. Young's declaration, and will have had 13 days to examine Dr. Young's raw data in relation to her declaration. Without a report from Dr. Bianco, Mr. Barrett cannot undertake the same or similar preparations.

As set forth in Mr. Barrett's Response in Opposition to the Government's Motion to Call Additional Witnesses, which is fully incorporated herein by this specific reference, Mr. Barrett's counsel and Dr. Miora are already experiencing difficulty preparing on short notice to present direct testimony on June 26, 2017. Each day's delay in receiving a report from Dr. Bianco makes it less likely that Mr. Barrett's counsel will be prepared for cross-examination.

Pursuant to 18 U.S.C. § 3599(a)(2) and (c), Mr. Barrett is entitled to effective representation in these proceedings. These proceedings are Mr. Barrett's only opportunity to vindicate his Sixth Amendment right to effective assistance of counsel. *See Massaro v. United States*, 538 U.S. 500, 505 (2003). As such, these are initial-review collateral proceedings. *See Trevino v. Thaler*, 569 U.S. ___, 133 S. Ct. 1911, 1919 (2013); *Ramirez v. United States*, 799 F.3d 845, 852-85 (7th Cir. 2015). The Tenth Circuit has held that Mr. Barrett has presented facts which, if proved, will entitle him to relief. Under a due-process balancing test, Mr. Barrett is entitled to a report from Dr. Bianco: (1) the Tenth Circuit's conclusion that Mr. Barrett pled a prima facie case of ineffective assistance shows there is a significant risk of an erroneous deprivation of a fundamental right if Mr. Barrett does not receive a full and fair hearing, including through the cross-examination of a witness designated in the last week before his testimony will be presented; (2) this Court has already held that Mr. Barrett is entitled to receive reports from the government's experts; (3) there is no cost to providing the report.

**CONCLUSION**

For the foregoing reasons, this Court should order the government to produce a report from Dr. Bianco immediately.

///

///

///

///

///

///

///

Pet'r's Mot. Expert Rpt.                    10                    *Barrett v. U.S.*, CV-09-00105-JHP

DATED:        June 21, 2017

                                        RESPECTFULLY SUBMITTED,

                                        /s/ *David Autry*
                                        DAVID AUTRY

                                        HEATHER E. WILLIAMS
                                        Federal Defender

                                        /s/ *Joan M. Fisher*
                                        JOAN M. FISHER
                                        Assistant Federal Defender

                                        /s/ *Tivon Schardl*
                                        TIVON SCHARDL
                                        Trial & Habeas Counsel

                                        Attorneys for Petitioner,
                                        KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 21st day of June 2017, I caused the foregoing Petitioner's

Motion for Immediate Production of Report from Expert Witness to be filed with the Clerk of the

Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J.

Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To

counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

> /s/ *Tivon Schardl*
> TIVON SCHARDL

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner, | CASE NO. CV-09-00105-JHP |
| vs. | **PETITIONER'S MOTION FOR IMMEDIATE PRODUCTION OF REPORT FROM EXPERT WITNESS** |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

# Exhibit A



RE: Faust Bianco
Wilson, Chris (USAOKE)
to:
Tim Schardl
06/20/2017 05:21 AM
Cc:
"david autry (via Google Docs)", "Horn, Doug (USAOKE)", "Kahan, Jeffrey (CRM)", Joan Fisher, Karl Saddlemire
Hide Details
From: "Wilson, Chris (USAOKE)" <Chris.Wilson@usdoj.gov> Sort List...
To: Tim Schardl <Tim_Schardl@fd.org>
Cc: "david autry (via Google Docs)" <dbautry77@gmail.com>, "Horn, Doug (USAOKE)" <Doug.Horn@usdoj.gov>, "Kahan, Jeffrey (CRM)" <Jeffrey.Kahan@usdoj.gov>, Joan Fisher <Joan_Fisher@fd.org>, Karl Saddlemire <Karl_Saddlemire@fd.org>

Tim,

In light of the Court's ruling yesterday allowing the government to call Dr. Bianco as a witness, I am preceding with contacting Dr. Bianco.  I sent him the following series of texts yesterday afternoon:

"Dr. Bianco – The Judge approved our request to call you as a witness on June 26.  Please call me at your earliest convenience.  I need to finalize the contract details.  I am sending you the data and affidavits from defense experts via overnight fedex.  Thanks."

"The password for the CD you will be receiving is [redacted]."

"Remember: no work can be performed until the contract approved."

I did not speak with Dr. Bianco.  He left a voice message at 5:20pm.  I intend to call him this morning.  I do not intend to discuss with the him the substance of any communications he had with you or your team or any services he may have performed as a result of your 2009 contract.  I will advise Dr. Bianco of the same. My focus will be on the testing and evaluation he performed on Mr. Barrett in 2000.  I will also be asking him to respond to the criticisms of his testing and evaluation raised by Drs. Young and Miora in their declarations.

Christopher J. Wilson
Criminal Chief
United States Attorney's Office
Eastern District of Oklahoma
(918) 684-5175

*This transmission may contain confidential or privileged information, which is intended only for use by the individual or entity to which the transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited. If you received this transmission in error, please notify the sender immediately.*

**From:** Tim Schardl [mailto:Tim_Schardl@fd.org]
**Sent:** Friday, June 16, 2017 5:44 PM
**To:** Wilson, Chris (USAOKE) <CWilson3@usa.doj.gov>
**Cc:** david autry (via Google Docs) <dbautry77@gmail.com>; Horn, Doug (USAOKE) <DHorn@usa.doj.gov>; Kahan, Jeffrey (CRM) <Jeffrey.Kahan@usdoj.gov>; Joan Fisher <Joan_Fisher@fd.org>; Karl Saddlemire

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:      (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:      (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>          Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>          Respondent. | CASE NO. CV-09-00105-JHP<br><br>**PETITIONER'S MOTION FOR IMMEDIATE PRODUCTION OF REPORT FROM EXPERT WITNESS** |

# Exhibit B



RE: Barrett Motion For Report
Wilson, Chris (USAOKE)
to:
Joan Fisher, Kahan, Jeffrey (CRM)
06/21/2017 05:59 AM
Cc:
david autry, Tim Schardl, "Karl Saddlemire"
Hide Details
From: "Wilson, Chris (USAOKE)" <Chris.Wilson@usdoj.gov>
To: Joan Fisher <Joan_Fisher@fd.org>, "Kahan, Jeffrey (CRM)"
<Jeffrey.Kahan@usdoj.gov>
Cc: david autry <dbautry77@gmail.com>, Tim Schardl <Tim_Schardl@fd.org>, "Karl
Saddlemire" <Karl_Saddlemire@fd.org>

Counsel:

This is to advise we object to the motion to exclude on the basis of privilege/work product.  We also object to your request for immediate disclosure of a report.  As you well know from Mr. Echols' testimony, Dr. Bianco was instructed not to prepare a report by Mr. Echols. To my knowledge, no report currently exists.  However, we know from the Affidavit he prepared (and introduced during the hearing), he found "any further neurological testing is unwarranted at this time" and "Further testing will not provide evidence that is inconsistent with Mr. Barrett's neurological test results, and would not be indicative of significant deficits in Mr. Barrett's functioning."

Christopher J. Wilson
Criminal Chief
United States Attorney's Office
Eastern District of Oklahoma
(918) 684-5175

*This transmission may contain confidential or privileged information, which is intended only for use by the individual or entity to which the transmission is addressed. If you are not the intended recipient, you are hereby notified that any disclosure, dissemination, copying or distribution of this transmission is strictly prohibited. If you received this transmission in error, please notify the sender immediately.*

---

**From:** Joan Fisher [mailto:Joan_Fisher@fd.org]
**Sent:** Tuesday, June 20, 2017 7:21 PM
**To:** Wilson, Chris (USAOKE) <CWilson3@usa.doj.gov>; Kahan, Jeffrey (CRM) <Jeffrey.Kahan@usdoj.gov>
**Cc:** david autry <dbautry77@gmail.com>; Tim Schardl <Tim_Schardl@fd.org>; Karl Saddlemire <Karl_Saddlemire@fd.org>
**Subject:** Barrett Motion For Report

Counsel:

In the event that our Motion to Disqualify Dr. Bianco as a witness based on Mr. Barrett's assertion of privilege and work product, we are also filing a Motion for the Immediate Production of a Report by Dr. Bianco. The basis of that motion is that we do not know what Dr. Bianco's opinion is as it relates to his 2000 testing because he never generated a report or other statement setting out his opinions, the bases and the reasons therefore. Nor do we have a current statement of Dr. Bianco's qualifications and expert services.

As pointed out in Drs. Bigler and Miora declarations, because he never produced a report, did not complete testing instruments, did not explain indecipherable notations on his scoring sheet, and did not identify the

normative date upon which he relied.  Without that information we cannot be prepared to file a motion to exclude Dr. Bianco under Evidence rule 702(b)-(d), nor can we be adequately prepared to conduct voir dire of Dr. Bianco or cross-examine him at the hearing.

Please note that Drs. Bigler's and Miora's Declarations only mention Dr. Bianco in anticipation of the government's apparent argument that somehow Bianco's work excused trial counsel's deficient performance.

We are ready to file the Motion for the Report as soon as we are advised of your position on it.

I am hopeful we will also be able to file the Motion to Disqualify on the basis of privilege and work product tomorrow, so if you'd like to let us know your position on that, as well, it will be appreciated.
Joan M. Fisher
Assistant Federal Defender
Federal Defender's Office for the Eastern District of California
801 I St., 3rd Flr.
Sacramento, CA  95814
Telephone: 916-498-6666
Facsimile:   916-498-6656

*This e-mail contains PRIVILEGED and CONFIDENTIAL information intended only for the use of the addressee (s) named above.  If you are not the intended recipient of this e-mail, or an authorized employee or agent responsible for delivering it to the intended recipient, you are hereby notified that any dissemination or copying of this e-mail is strictly prohibited.  If you have received this e-mail in error, please notify me by reply e-mail.  Thank you for your cooperation.

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Karl J. Saddlemire (karl_saddlemire@fd.org), Jeffrey B. Kahan
(jeffrey.kahan@usdoj.gov), Tivon Schardl (tim.schardl@fd.org, tschardl@sbcglobal.net),
Christopher J. Wilson (caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org), District Judge James
H. Payne (amy_green@oked.uscourts.gov, okedml_jhp_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oked.uscourts.gov)
--No Notice Sent:

Message-Id:902748@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-JHP Barrett v. USA Ruling on Motion for Disclosure
Content-Type: text/html
```

# U.S. District Court

# Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 6/21/2017 at 3:30 PM CDT and filed on 6/21/2017

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–JHP |
| **Filer:** | |
| **Document Number:** | 461(No document attached) |

**Docket Text:**

 **MINUTE ORDER** **by Magistrate Judge Steven P. Shreder: Since the Petitioner has indicated that Dr. Miora will not implicate Dr. Bianco's testimony, it appears Dr. Bianco will not testify at the hearing set for Monday, June 26, 2017, at 10:00 a.m. Consequently, Petitioner's Motion For Immediate Production Of Report From Expert Witness (Docket No. [460]) is hereby DENIED. (tls, Deputy Clerk)**

**6:09–cv–00105–JHP Notice has been electronically mailed to:**

Christopher J. Wilson    Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry    dbautry77@gmail.com

Tivon Schardl    tim.schardl@fd.org, tschardl@sbcglobal.net

Jeffrey B. Kahan    jeffrey.kahan@usdoj.gov

Joan M. Fisher    joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org

Karl J. Saddlemire     karl_saddlemire@fd.org

**6:09−cv−00105−JHP Notice has been delivered by other means to:**

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | | |
|---|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | | |
| | ) | | |
| Petitioner/Defendant, | ) | | |
| | ) | | |
| v. | ) | | Case No. CV-09-00105-JHP |
| | ) | | |
| **UNITED STATES OF AMERICA**, | ) | | |
| | ) | | |
| Respondent/Plaintiff. | ) | | |

**PETITIONER'S THIRD AMENDED EXHIBIT LIST**

Exhibits to be presented at evidentiary hearing:

| Number | Exhibit | Where in Record |
|---|---|---|
| 1 | In the Matter of Mental Illness of Billy Dean Maxwell, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982 | Exhibit 26 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 2 | In the Matter of the Sanity of A.J. Barrett, Case Number 141, Lunacy Record, dated August 12, 1918 | Exhibit 27 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 3 | In the Matter of the Sanity of A.J. Barrett, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital | Exhibit 28 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 4 | Declaration of Mark Henricksen | Exhibit 29 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 5 | In the Matter of the Sanity of Wallace Dotson, Lunacy Record, Case Number 366, dated May 4, 1948 | Exhibit 32 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 6 | In the Matter of Mental Illness of Kenneth Barrett, Case Number 481, Record of Mental Health Proceeding | Exhibit 33 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 7 | Declaration of John Echols | Exhibit 34 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |

| Number | Exhibit | Where in Record |
|---|---|---|
|  |  |  |
| 8 | Excerpts from Kenneth Barrett's Baby Book | Exhibit 35 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 9 | Letter from Kenneth Barrett | Exhibit 36 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 10 | Declaration of Bill Sharp, Ph.D. | Exhibit 55 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 11 | Declaration of Jeanne Russell, Ed.D. | Exhibit 56 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 12 | Letter from John Echols to Honorable James H. Payne, dated February 28, 2005 | Exhibit 64 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 13 | Letter from Honorable James H. Payne to John Echols, dated February 22, 2005 | Exhibit 65 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 14 | Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008 | Exhibit 66 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 15 | Photographs of Kenneth Barrett's shack | Exhibit 73 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 16 | Declaration of Ada Blount | Exhibit 74 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 17 | Declaration of Brandy Hill | Exhibit 77 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 18 | Declaration of Carolyn Joseph | Exhibit 78 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 19 | Declaration of Doris Barrett | Exhibit 80 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 20 | Declaration of Ernest Barrett | Exhibit 81 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 21 | Declaration of Gwendolyn Crawford | Exhibit 83 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |

| Number | Exhibit | Where in Record |
|--------|---------|-----------------|
| 22 | Declaration of Janice Sanders | Exhibit 85 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 23 | Declaration of Kathy Trotter | Exhibit 86 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 24 | Declaration of Linda Riley | Exhibit 87 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 25 | Declaration of Dr. Myla Young | Exhibit 89 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 26 | Declaration of Paul Rickie Lunsford | Exhibit 90 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 27 | Declaration of Phyllis Crawford | Exhibit 91 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 28 | Declaration of Roger Crawford | Exhibit 92 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 29 | Declaration of Ruth Harris | Exhibit 93 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 30 | Declaration of Toby Barrett | Exhibit 96 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 31 | Declaration of Sylvia Gelene Dotson | Exhibit 97 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 32 | Declaration of Mark Dotson | Exhibit 98 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 33 | Declaration of Steve Barrett | Exhibit 99 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 34 | Declaration of Warren Dotson | Exhibit 100 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 35 | Declaration of Nona Reich | Exhibit 101 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 36 | Declaration of Carl Cook | Exhibit 102 From Doc 70 - Amended Motion for Collateral Relief |

| Number | Exhibit | Where in Record |
|---|---|---|
| | | 6:09-cv-00105-JHP. 9/25/2009 |
| 37 | Declaration of Abby Stites | Exhibit 103 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 38 | Declaration of Doris Barrett | Exhibit 105 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 39 | Declaration of Steve Leedy | Exhibit 111 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 40 | Declaration of Dr. George Woods | Exhibit 117 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 41 | Educational Records for Kenneth Barrett | Exhibit 136 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 42 | Educational Records for Gwendolyn Barrett | Exhibit 137 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 43 | Educational Records for Ernest Barrett | Exhibit 138 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 44 | Medical Records for Carolyn Joseph | Exhibit 139 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 45 | Medical Records for Kathy Trotter | Exhibit 140 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 46 | Medical Records for Brandy Hill | Exhibit 141 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 47 | Medical Records for Toby Barrett | Exhibit 142 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 48 | Medical Records for Travis Crawford | Exhibit 143 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 49 | Medical Records for Linda Riley | Exhibit 145 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 50 | Medical Records for A.J. Barrett | Exhibit 146 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |

| Number | Exhibit | Where in Record |
|---|---|---|
| 51 | Medical Records for Kenneth Barrett | Exhibit 147 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 52 | Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999 | Exhibit 148 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 53 | Sylvia Gelene Dotson's Genealogy Memorandum | Exhibit 155 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 54 | Military Records for Travis Crawford | Exhibit 196 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 55 | Educational Records for Kenneth Barrett | Exhibit 200 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 56 | Medical Records for Gwen Crawford | Exhibit 201 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 57 | Medical Records for Carolyn Joseph | Exhibit 202 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 58 | Social Security Records for Travis Crawford | Exhibit 203 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 59 | Supplemental Declaration of Ernie Barrett | Exhibit 206 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 60 | Supplemental Declaration of Doris Barrett | Exhibit 207 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 61 | Supplemental Declaration of Phyllis Crawford | Exhibit 209 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 62 | Supplemental Declaration of Gelene Dotson | Exhibit 210From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 63 | Supplemental Declaration of Mark Dotson | Exhibit 211 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 64 | Supplemental Declaration of Ruth Harris | Exhibit 212 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 65 | Supplemental Declaration of Carolyn Joseph | Exhibit 213 From Doc 178 – Reply to Amended Motion |

| Number | Exhibit | Where in Record |
|--------|---------|-----------------|
| | | 6:09-cv-00105-JHP. 7/1/2010 |
| 66 | Supplemental Declaration of Linda Riley | Exhibit 214 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 67 | Supplemental Declaration of Janice Sanders | Exhibit 215 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 68 | Supplemental Declaration of Abbie Stites | Exhibit 216 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 69 | Supplemental Declaration of Kathy Trotter | Exhibit 217 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 70 | Supplemental Declaration of Toby Barrett | Exhibit 218 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 71 | Supplemental Declaration of Toby Barrett | Exhibit 220 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 72 | UNDER SEAL: Billing Records of Roger Hilfiger and Bret Smith | Appendix A - Doc No. 01019206246, 10th Circuit Case No. 12-7086 |
| 73 | Additional Education Records for Kenneth Barrett | N/A, Attached to email of 1/6/2017 |
| 74 | Declaration of Judy House | N/A, Attached to email of 1/6/2017 |
| 75 | All Documents turned over to US Attorney on 12/21/2016 in Compliance with Discovery Order | Submitted to US Attorney on Disc. Specific documents within may be identified as separate exhibits at the appropriate time. |
| 76 | Medical Records of Kelly Cochran | Procured February, 2017. |
| 77 | Sealed Budget Conference Minutes | 6:04-cr-00115-JHP, 12/9/2004 |
| 78 | SEALED ORDER by Mag. Judge Steven P. Shreder re: defendant's Ex Parte Motion for Approval of "Pre-Authorization" Budget for the Defense | Doc 38, 6:04-cr-00115-JHP, 1/19/2005 |
| 79 | SEALED LETTER (copy) from Hon. James H. Payne to defense counsel John David Echols regarding the eight ex parte budget requests | 2/22/2005, 6:04-cr-00115-JHP, |
| 80 | SEALED LETTER from John David Echols to Hon. James H. Payne in answer to the | 2/28/2005, 6:04-cr-00115-JHP, |

| Number | Exhibit | Where in Record |
|--------|---------|-----------------|
|  | 2/22/05 letter of Judge Payne regarding ex parte litigation budget requests. |  |
| 81 | Minutes: SEALED HEARING: Defense counsel John D. Echols and Roger Hilfiger present. Before Hon. James H. Payne. …Discussion held regarding the Court's order on the budget. | 3/22/2005, 6:04-cr-00115-JHP, |
| 82 | SEALED ORDER by District Judge James H. Payne adopting the U.S. Magistrate's SEALED REPORT AND RECOMMENDATION on interim requests for attorneys' fees and costs [106-1], DENYING defendant's NINTH EXPARTE (SEALED) Motion [107-1], GRANTING defendant's motion TENTH EXPARTE (SEALED) and allowing John Echols to withdraw [113-1], DENYING defendant's EXPARTE (SEALED) ELEVENTH Motion [118-1], DENYING defendant's motion for ex parte conference on defense budget and funding [116-1] and [126-1] | Doc 128, 6:04-cr-00115-JHP, 5/5/2005 |
| 83 | SEALED BUDGET HEARING MINUTES before Honorable James H. Payne | 10/3/2005, 6:04-cr-00115-JHP, |
| 84 | MINUTES: Further Sealed Hearing regarding budget matters. | 10/20/2005, 6:04-cr-00115-JHP, See Doc. 395, Motion to Unseal Budget Hearing Transcript |
| 85 | SEALED MINUTE ORDER before District Judge James H. Payne GRANTING defendant's motion to modify order approving budget of 3/18/05 | Doc. 244, 6:04-cr-00115-JHP, 11/4/2005 |
| 86 | SEALED MINUTE ORDER before District Judge James H. Payne regarding Defendant's Ex Parte Litigation Budget (Henricksen) | Doc 275, 6:04-cr-00115-JHP, 12/15/2005 |
| 87 | Childhood photos of Kenneth Barrett | N/A, Attached to email of 1/6/2017 |
| 88 | Defendant's Pro Se Motion for Change of Appointed Counsel | Doc 135, 6:04-cr-00115-JHP, 5/23/2005 |
| 89 | ORDER by District Judge James H. Payne denying defendant Barrett's pro se motion for Change of Appointed Counsel | Doc 137, 6:04-cr-00115-JHP, 5/24/2005 |
| 90 | Declaration of Bret Smith | Doc 175, Exh. 11, 6:04-cr-00115-JHP, 5/17/2010 |

| Number | Exhibit | Where in Record |
|---|---|---|
| 91 | Declaration of Roger Hilfiger | Doc 175, Exh. 12, 6:04-cr-00115-JHP, 5/17/2010 |
| 92 | Chart of Trial Counsel File Boxes | Sent to Government |
| 93 | List of Roger Hilfiger's Caseload during relevant period | Sent to Government |
| 94 | Hilfiger Letter to Shreder | Petitioner's Disc. No. 003889-91 |
| 95 | Handwritten Notes | Petitioner's Disc. No. 005806-07 |
| 96 | Aba Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | |
| 97 | ABA Standards for Criminal Justice Providing Defense Services | |
| 98 | Declaration of Iva Hines | |
| 99 | Declaration of Roger Crawford | |
| 100 | Declaration of Judy House | |
| 101 | Declaration of Gary Nelson | |
| 102 | Sparks Medical Records of Kenneth Barrett | |
| 103 | Excerpts of Dr. Randall Price's Evaluation of Kenneth Barrett on DVD | |
| 104 | Declaration of Dr. Deborah S. Miora | Doc. 376-1 in 6:09-cv-00105-JHP, filed 3/1/2017 |
| 105 | Curriculum Vitae of Dr. Deborah S. Miora | Doc. 376-1 in 6:09-cv-00105-JHP, filed 3/1/2017 |
| 106 | Score Summary Sheets of Dr. Deborah S. Miora | Doc. 376-1 in 6:09-cv-00105-JHP, filed 3/1/2017 |
| 107 | PowerPoint slides of Dr. Deborah S. Miora | |

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 23rd day of June 2017, I caused the foregoing Petitioner's Third Amended Exhibit List to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*

TIVON SCHARDL

**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | Case No.    CIV-09-105-JHP |
| | ) | |
| Petitioner, | ) | Date:        6/26/2017 |
| **v.** | ) | |
| | ) | Time:        10:07 a.m. - 11:54 a.m. |
| UNITED STATES OF AMERICA, | ) | 1:01 p.m. -   2:25 p.m. |
| | ) | 2:45 p.m. -   4:48 p.m. |
| Respondent. | ) | 5:02 p.m. -   6:03 p.m. |
| | ) | |
| | ) | |
| | ) | |

## MINUTE SHEET - EVIDENTIARY HEARING

Steven P. Shreder, Judge        K. Davis, Law Clerk        K. McWhorter, Reporter
                              N. Davis, Deputy Clerk        FTR - Courtroom 4
                              T. Stephens, Deputy Clerk

**Petitioner present with Counsel:**  David B. Autry, Tivon Schardl, and Joan M. Fisher
**Counsel for Respondent:** Jeffrey B. Kahan and Christopher J. Wilson

| Date: | **3/27/2017** | **3/28/2017** | **3/29/2017** | **3/30/2017** |
|---|---|---|---|---|
| | 9:04 - 10:56 | 9:02 - 11:00 | 9:13 - 11:27 | 10:35 - 12:12 |
| | 11:12 - 12:11 | 11:17 - 12:11 | 11:49 - 12:06 | 1:06 -  2:53 |
| | 1:01 -  4:02 | 1:20 -  3:20 | 1:02 -  2:30 | 3:15 -  3:21 |
| | 4:16 -  4:45 | 3:33 -  4:57 | | |

| | **6/12/2017** | **6/13/2017** | **6/26/2017** |
|---|---|---|---|
| | 9:38 - 11:05 | 9:07 - 10:54 | 10:07 - 11:54 |
| | 11:18 - 12:28 | 11:11 - 12:29 | 1:01 -  2:25 |
| | 1: 33 -  2:49 | 1:32 -  2:38 | 2:45 -  4:48 |
| | 3:06 -  4:06 | | 5:02 -  6:03 |
| | 4:13 -  4:48 | | |

**WITNESSES: (Petitioner)**

1.  Ruth Harris          3/27/2017
2.  Mark Dotson          3/27/2017
3.  Steve Barrett        3/27/2017
4.  Doris Barrett        3/27/2017
5.  Jack Gordon          3/27/2017
6.  Dr. George Woods     3/27/2017, 3/28/2017
7.  Steve Leedy          3/28/2017
8.  John Echols          3/28/2017
9.  Bret Smith           3/29/2017
10. Dr. Jeanne Russell   6/12/2017
11. Dr. Deborah Miora    6/26/2017

**WITNESSES: (Respondent)**

1.  Roger Hilfiger       3/30/2017
2.  Dr. J. Randall Price  6/12/2017
3.  Dr. Steven E. Pitt   6/13/2017

**MINUTES:**

Petitioner provides additional exhibits to Government and Court; Petitioner's exhibits #'s 105-107.

Government provides additional exhibits to Petitioner and Court; Government's exhibits #'s 67-68.

Petitioner's evidence resumed with testimony of Dr. Deborah Miora. Petitioner proffered paragraphs 39-42 of Petitioner's exhibit #25.

Government makes Oral Motion to Strike the Testimony of Dr. Miora, Petitioner responds; Government replies. Motion OVERRULED, all of Dr. Miora's testimony admitted.(SPS)

Petitioner asks Court to reconsider  previous rulings in Order  (Doc. No. 361) regarding the  testimony of Dr. Bigler; Request **denied** by Court.

Government asks Court to reconsider  previous rulings in Order  (Doc. No. 459) regarding the  testimony of Dr. Bianco; Request **denied** by Court.

Proposed Findings of Facts and Conclusions of Law to be filed by 07/31/2017.  Briefing allowed, but not required. Court will issue a Report and Recommendation (SPS).

COURT ADJOURNED

Total time: 6:35

1628

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,    )
                           )
Petitioner/Defendant,      )
                           )
v.                         )        Case No. CV-09-00105-JHP
                           )
UNITED STATES OF AMERICA,  )
                           )
Respondent/Plaintiff.      )

---

Petitioner's witnesses to be called at the evidentiary hearing in the following order (tentative):



3/27/17    ①.  Ruth Harris

           ②.  Mark Dotson

           ③.  Steve Barrett

           ④.  Doris Barrett

           ⑤.  Jack Gordon

3/28/17    ⑦.6.  Steve Leedy

3/28/17    ⑧7.  John Echols

3/27 +3/28/17  ⑥. 8.  George Woods

3/29/17    ⑨.  Bret Smith

4/12/17    ⑩. Jeanne Russell

4/26/17    ⑪.  Dr. Deborah S. Miora

1

1629

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

PETITIONER'S THIRD AMENDED EXHIBIT LIST

Exhibits to be presented at evidentiary hearing:

| Number | Exhibit | Where in Record |
|---|---|---|
| 1 Adm. w/o obj | In the Matter of Mental Illness of Billy Dean Maxwell, Case Number MH-82-12, Record of Mental Health Proceeding, dated May 5, 1982 | Exhibit 26 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 2 | In the Matter of the Sanity of A.J. Barrett, Case Number 141, Lunacy Record, dated August 12, 1918 | Exhibit 27 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 3 Adm. w/o obj. | In the Matter of the Sanity of A.J. Barrett, Case Number 709, Mental Health Record and Petition for Order of Admission to State Hospital | Exhibit 28 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 4 | Declaration of Mark Henricksen | Exhibit 29 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 5 Adm w/o obj | In the Matter of the Sanity of Wallace Dotson, Lunacy Record, Case Number 366, dated May 4, 1948 | Exhibit 32 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 6 Adm w/o obj. | In the Matter of Mental Illness of Kenneth Barrett, Case Number 481, Record of Mental Health Proceeding | Exhibit 33 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 7 | Declaration of John Echols | Exhibit 34 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |

3/27/17

3/27/17

3/27/17

3/27/17

1630

| Number | Exhibit | Where in Record |
|---|---|---|
| | | |
| 8 Adm. w/o obj. | Excerpts from Kenneth Barrett's Baby Book | Exhibit 35 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 9 | Letter from Kenneth Barrett | Exhibit 36 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 10 | Declaration of Bill Sharp, Ph.D. | Exhibit 55 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 11 | Declaration of Jeanne Russell, Ed.D. | Exhibit 56 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 12 Adm. w/o obj. | Letter from John Echols to Honorable James H. Payne, dated February 28, 2005 | Exhibit 64 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 13 Adm. w/o obj. | Letter from Honorable James H. Payne to John Echols, dated February 22, 2005 | Exhibit 65 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 14 Adm w/o obj. | Letter from Ronald Lax to Tivon Schardl, dated September 24, 2008 | Exhibit 66 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 15 | Photographs of Kenneth Barrett's shack | Exhibit 73 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 16 Adm. w/o obj. | Declaration of Ada Blount | Exhibit 74 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 17 | Declaration of Brandy Hill | Exhibit 77 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 18 | Declaration of Carolyn Joseph | Exhibit 78 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 19 | Declaration of Doris Barrett | Exhibit 80 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 20 Adm o/obj. | Declaration of Ernest Barrett | Exhibit 81 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 21 | Declaration of Gwendolyn Crawford | Exhibit 83 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |

| Number | Exhibit | Where in Record |
|---|---|---|
| 22 | Declaration of Janice Sanders | Exhibit 85 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 23 | Declaration of Kathy Trotter | Exhibit 86 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 24 | Declaration of Linda Riley | Exhibit 87 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 25 Adm. o obj. | Declaration of Dr. Myla Young | Exhibit 89 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 26 | Declaration of Paul Rickie Lunsford | Exhibit 90 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 27 Adm. o obj. | Declaration of Phyllis Crawford | Exhibit 91 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 28 | Declaration of Roger Crawford | Exhibit 92 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 29 | Declaration of Ruth Harris | Exhibit 93 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 30 | Declaration of Toby Barrett | Exhibit 96 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 31 | Declaration of Sylvia Gelene Dotson | Exhibit 97 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 32 | Declaration of Mark Dotson | Exhibit 98 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 33 | Declaration of Steve Barrett | Exhibit 99 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 34 Adm. o obj. | Declaration of Warren Dotson | Exhibit 100 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 35 | Declaration of Nona Reich | Exhibit 101 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 36 Adm o obj. | Declaration of Carl Cook | Exhibit 102 From Doc 70 - Amended Motion for Collateral Relief |

1632

| Number | Exhibit | Where in Record |
|---|---|---|
| | | 6:09-cv-00105-JHP. 9/25/2009 |
| 37 | Declaration of Abby Stites | Exhibit 103 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 38 | Declaration of Doris Barrett | Exhibit 105 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 39 | Declaration of Steve Leedy | Exhibit 111 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 40 | Declaration of Dr. George Woods | Exhibit 117 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 41 Adm. w/o obj. | Educational Records for Kenneth Barrett | Exhibit 136 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 42 | Educational Records for Gwendolyn Barrett | Exhibit 137 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 43 | Educational Records for Ernest Barrett | Exhibit 138 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 44 | Medical Records for Carolyn Joseph | Exhibit 139 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 45 Adm. w/o obj. | Medical Records for Kathy Trotter | Exhibit 140 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 46 Adm. w/o obj. | Medical Records for Brandy Hill | Exhibit 141 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 47 Adm. w/o obj. | Medical Records for Toby Barrett | Exhibit 142 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 48 Adm. w/o obj. | Medical Records for Travis Crawford | Exhibit 143 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 49 Adm. w/o obj. | Medical Records for Linda Riley | Exhibit 145 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 50 Adm. w/o obj. | Medical Records for A.J. Barrett | Exhibit 146 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |

Handwritten margin notes: 3/27/17 (beside rows 41, 45, 46, 47, 48, 49, 50)

| Number | Exhibit | Where in Record |
|---|---|---|
| 51 Adm. w/o obj. | Medical Records for Kenneth Barrett | Exhibit 147 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 52 | Report of Interview with Kenneth Barrett by the Oklahoma State Bureau of Investigation, dated October 11, 1999 | Exhibit 148 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 53 Adm. w/o obj. | Sylvia Gelene Dotson's Genealogy Memorandum | Exhibit 155 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 54 Adm. w/o obj. | Military Records for Travis Crawford | Exhibit 196 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 55 Adm. w/o obj. | Educational Records for Kenneth Barrett | Exhibit 200 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 56 Adm. w/o obj. | Medical Records for Gwen Crawford | Exhibit 201 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 57 Adm. w/o obj. | Medical Records for Carolyn Joseph | Exhibit 202 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 58 Adm. w/o obj. | Social Security Records for Travis Crawford | Exhibit 203 From Doc 70 - Amended Motion for Collateral Relief 6:09-cv-00105-JHP. 9/25/2009 |
| 59 | Supplemental Declaration of Ernie Barrett | Exhibit 206 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 60 | Supplemental Declaration of Doris Barrett | Exhibit 207 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 61 | Supplemental Declaration of Phyllis Crawford | Exhibit 209 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 62 | Supplemental Declaration of Gelene Dotson | Exhibit 210 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 63 | Supplemental Declaration of Mark Dotson | Exhibit 211 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 64 | Supplemental Declaration of Ruth Harris | Exhibit 212 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 65 | Supplemental Declaration of Carolyn Joseph | Exhibit 213 From Doc 178 – Reply to Amended Motion |

3/27/17
3/27/17
3/27/17
3/27/17
3/27/17
3/27/17
3/27/17

| Number | Exhibit | Where in Record |
|---|---|---|
| | | 6:09-cv-00105-JHP. 7/1/2010 |
| 66 | Supplemental Declaration of Linda Riley | Exhibit 214 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 67 | Supplemental Declaration of Janice Sanders | Exhibit 215 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 68 | Supplemental Declaration of Abbie Stites | Exhibit 216 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 69 | Supplemental Declaration of Kathy Trotter | Exhibit 217 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 70 | Supplemental Declaration of Toby Barrett | Exhibit 218 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 71 | Supplemental Declaration of Toby Barrett | Exhibit 220 From Doc 178 – Reply to Amended Motion 6:09-cv-00105-JHP. 7/1/2010 |
| 72 Adm. w/o obj. | UNDER SEAL: Billing Records of Roger Hilfiger and Bret Smith | Appendix A - Doc No. 01019206246, 10th Circuit Case No. 12-7086 |
| 73 Adm. w/o obj. | Additional Education Records for Kenneth Barrett | N/A, Attached to email of 1/6/2017 |
| 74 | Declaration of Judy House | N/A, Attached to email of 1/6/2017 |
| 75 | All Documents turned over to US Attorney on 12/21/2016 in Compliance with Discovery Order | Submitted to US Attorney on Disc. Specific documents within may be identified as separate exhibits at the appropriate time. |
| 76 | Medical Records of Kelly Cochran | Procured February, 2017. |
| 77 Adm. w/o obj. | Sealed Budget Conference Minutes | 6:04-cr-00115-JHP, 12/9/2004 |
| 78 Adm. w/o obj. | SEALED ORDER by Mag. Judge Steven P. Shreder re: defendant's Ex Parte Motion for Approval of "Pre-Authorization" Budget for the Defense | Doc 38, 6:04-cr-00115-JHP, 1/19/2005 |
| 79 Adm w/o obj. | SEALED LETTER (copy) from Hon. James H. Payne to defense counsel John David Echols regarding the eight ex parte budget requests | 2/22/2005, 6:04-cr-00115-JHP, |
| 80 Adm. w/o obj. | SEALED LETTER from John David Echols to Hon. James H. Payne in answer to the | 2/28/2005, 6:04-cr-00115-JHP, |

3/27/17

3/27/17

3/27/17

3/27/17

3/27/17

3/27/17

| Number | Exhibit | Where in Record |
|---|---|---|
| | 2/22/05 letter of Judge Payne regarding ex parte litigation budget requests. | |
| 81 Adm w/o Obj. | Minutes: SEALED HEARING: Defense counsel John D. Echols and Roger Hilfiger present. Before Hon. James H. Payne. …Discussion held regarding the Court's order on the budget. | 3/22/2005, 6:04-cr-00115-JHP, |
| 82 Adm w/o Obj. | SEALED ORDER by District Judge James H. Payne adopting the U.S. Magistrate's SEALED REPORT AND RECOMMENDATION on interim requests for attorneys' fees and costs [106-1], DENYING defendant's NINTH EXPARTE (SEALED) Motion [107-1], GRANTING defendant's motion TENTH EXPARTE (SEALED) and allowing John Echols to withdraw [113-1], DENYING defendant's EXPARTE (SEALED) ELEVENTH Motion [118-1], DENYING defendant's motion for ex parte conference on defense budget and funding [116-1] and [126-1] | Doc 128, 6:04-cr-00115-JHP, 5/5/2005 |
| 83 Adm w/o obj. | SEALED BUDGET HEARING MINUTES before Honorable James H. Payne | 10/3/2005, 6:04-cr-00115-JHP, |
| 84 Adm. w/o obj. | MINUTES: Further Sealed Hearing regarding budget matters. | 10/20/2005, 6:04-cr-00115-JHP, See Doc. 395, Motion to Unseal Budget Hearing Transcript |
| 85 Adm w/o obj | SEALED MINUTE ORDER before District Judge James H. Payne GRANTING defendant's motion to modify order approving budget of 3/18/05 | Doc. 244, 6:04-cr-00115-JHP, 11/4/2005 |
| 86 Adm w/o obj. | SEALED MINUTE ORDER before District Judge James H. Payne regarding Defendant's Ex Parte Litigation Budget (Henricksen) | Doc 275, 6:04-cr-00115-JHP, 12/15/2005 |
| 87 Adm. w/o obj. | Childhood photos of Kenneth Barrett | N/A, Attached to email of 1/6/2017 |
| 88 Adm. w/o obj | Defendant's Pro Se Motion for Change of Appointed Counsel | Doc 135, 6:04-cr-00115-JHP, 5/23/2005 |
| 89 Adm. w/o obj. | ORDER by District Judge James H. Payne denying defendant Barrett's pro se motion for Change of Appointed Counsel | Doc 137, 6:04-cr-00115-JHP, 5/24/2005 |
| 90 | Declaration of Bret Smith | Doc 175, Exh. 11, 6:04-cr-00115-JHP, 5/17/2010 |

Pet'r's 3ʳᵈ Amended Ex. List          7          U.S. v. Barrett, 09-cv-105-JHP

1636

| Number | Exhibit | Where in Record |
|---|---|---|
| 91 | Declaration of Roger Hilfiger | Doc 175, Exh. 12, 6:04-cr-00115-JHP, 5/17/2010 |
| 92 | Chart of Trial Counsel File Boxes | Sent to Government |
| 93 | List of Roger Hilfiger's Caseload during relevant period | Sent to Government |
| 94 | Hilfiger Letter to Shreder | Petitioner's Disc. No. 003889-91 |
| 95 | Handwritten Notes | Petitioner's Disc. No. 005806-07 |
| 96 | Aba Guidelines for the Appointment and Performance of Defense Counsel in Death Penalty Cases | |
| 97 | ABA Standards for Criminal Justice Providing Defense Services | |
| 98 | Declaration of Iva Hines | |
| 99 | Declaration of Roger Crawford | |
| 100 | Declaration of Judy House | |
| 101 | Declaration of Gary Nelson | |
| 102 Adm. w/o obj. | Sparks Medical Records of Kenneth Barrett | |
| 103 | Excerpts of Dr. Randall Price's Evaluation of Kenneth Barrett on DVD | |
| 104 | Declaration of Dr. Deborah S. Miora | Doc. 376-1 in 6:09-cv-00105-JHP, filed 3/1/2017 |
| 105 | Curriculum Vitae of Dr. Deborah S. Miora | Doc. 376-1 in 6:09-cv-00105-JHP, filed 3/1/2017 |
| 106 | Score Summary Sheets of Dr. Deborah S. Miora | Doc. 376-1 in 6:09-cv-00105-JHP, filed 3/1/2017 |
| 107 | PowerPoint slides of Dr. Deborah S. Miora | |

*(handwritten in margin: 4/13/17)*

1637

1638

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

This is to certify that on this 23rd day of June 2017, I caused the foregoing Petitioner's Third Amended Exhibit List to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

*/s/ Tivon Schardl*

TIVON SCHARDL

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,               )
                                      )
            Movant,                   )
                                      )
v.                                    )    Case No. CIV-09-105-JHP
                                      )
UNITED STATES OF AMERICA,             )
                                      )
            Respondent.               )

## GOVERNMENT'S LIST OF WITNESSES

1.    Bret Smith

2.    Roger Hilfiger

3.    J. Randall Price, Ph.D.

4.    Steven E. Pitt, D.O.

Dated: March 27, 2017

                              Respectfully submitted,

                              DOUGLAS A. HORN
                              Acting United States Attorney

                              CHRISTOPHER J. WILSON
                              Assistant United States Attorney

                              JEFFREY B. KAHAN
                              Trial Attorney, Capital Case Unit

1

IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,       )
                              )
            Movant,           )
                              )
v.                            )       Case No. CIV-09-105-JHP
                              )
UNITED STATES OF AMERICA,     )
                              )
            Respondent.       )

## GOVERNMENT'S THIRD AMENDED LIST OF EXHIBITS

1.   Declaration of Roger Hilfiger

2.   Declaration of Bret Smith

4/13/17   (3.)   Voluntary statement of Abby Stites — Adm. w/o obj.

3/30/17   (4.)   Eastern State Hospital Report of Contact   Adm w/o obj.

3/30/17   (5.)   Eastern State Hospital Medical History   Adm w/o obj.

3/30/17   (6.)   Eastern State Hospital Discharge Summary   Adm w/obj.

3/30/17   (7.)   St. Francis Chart Print Report   Adm w/o obj.

3/30/17   (8.)   Wagoner Community Hospital Psychiatric Evaluation   Adm w/o obj.

3/28/17   (9.)   Bill Willis Community Mental Health Center Referral Form   Adm w/o obj.

3/30/17   (10.)   Social Security Administration Explanation of Determination   Adm. w/o obj.

3/30/17   (11.)   Sequoyah Memorial Hospital medical record of Kenneth Barrett   Adm w/o obj.

3/28/17   (12.)   Affidavit of Faust Bianco, Ph.D.   Adm O/obj

13.   Professional Services Request for Faust Bianco, Ph.D.

14.   Kenneth Barrett Medical Release to Faust Bianco, Ph.D.

15.   John Echols Letter to Judge Payne dated 2/28/2005

3/28/17   (16.)   Psychological Evaluation of Kenneth Barrett by Bill Sharp, Ph.D.   Adm w/o obj.

1

17. Kenneth Barrett BOP Intake Screening

18. Roseann Schaye Memo of Interview of Carolyn Joseph

3/30/17 (19) Roseann Schaye Memo of Interview of Elnora Long - Adm. w/o obj.

3/30/17 (20) Roseann Schaye Memo of Interview of Sylvia Gelene Dotson - Adm. w/o obj.

3/30/17 (21) Roseann Schaye Memo of Interview of Kenneth Barrett - Adm. w/o obj.

3/30/17 (22) Roseann Schaye Memo of Interview of Linda Riley - Adm. w/o obj.

3/30/17 (23) Roseann Schaye Memo of Interview of Richard Barrett - Adm. w/o obj.

3/27/17 (24) Roseann Schaye Memo of Interview of Ruth Harris - Adm. w/o obj.

3/30/17 (25.) Roseann Schaye Memo of Interview of Tracy Swearingen - Adm w/o obj.

26. Declaration of Roseann Schaye

27. Roseann Schaye State of Arizona Board of Behavioral Health Examiners 2009
Disciplinary Action Record

3/30/17 (28.) John Echols billing records - Adm. w/o obj.

29. Gelene Dotson memo

30. Hattie Dotson memo

3/30/17 (31.) Roger Hilfiger letter to Magistrate Judge Shreder dated 1/17/2006 - Adm. w/o obj.

3/30/17 (32) Roger Hilfiger letter to Magistrate Judge Shreder dated 2/17/2006 - Adm w/o obj.

3/30/17 (33) Roger Hilfiger letter to Office of Federal Public Defender dated 12/29/2005 - Adm. w/o obj.

3/28/17 (34) Psychological Evaluation – Risk Assessment of Kenneth Barrett by Jeanne - Adm. w/o obj.
Russell, Ed.D.

3/30/17 (35.) Risk Assessment of Kenneth Barrett by Jeanne Russell, Ed.D.) - Adm. w/o obj.

36. Kenneth Barrett Driving Record

37. Psychological Evaluation of Kenneth Barrett by Kathy LaFortune, Ph.D.

3/30/17 (38.) Handwritten notes  Adm. o/obj.

2

1641

39.     Handwritten notes

40.     Handwritten notes

41.     Handwritten notes

42.     Memo from Peter Rausch to Steve Leedy

43.     Letters from Roseann Schaye

3/30/17   (44.)   OIDS Expert Service Providers Fee Schedule Table – Adm. w/o obj.

45.     Phyllis Crawford memo

46.     Roger Crawford memo

47.     OIDS Interoffice Memo re: Tracy Swearingen

48.     Tommy C. Sanders memo

3/28/17   (49)   OIDS Interoffice Memo – Adm. w/o obj.

50.     Kenneth Barrett BOP file

6/12/17   (51.)   Psychological Evaluation of Kenneth Barrett by J. Randall Price, Ph.D.  –Adm. w/o obj

6/13/17   (52.)   Psychiatric Evaluation of Kenneth Barrett by Steven E. Pitt, D.O.
Adm o/obj  Sections: 1,2,3, 7, 8, 9, 10

3/27/17   (53.)   Recording of telephone calls between Kenneth Barrett and Doris Barrett (October 21, 2005, November 7, 2005, and November 8, 2005). – Adm. w/o obj.

3/30/17   (54.)   Roseann Schaye Memo of Interview of Toby Wayne Barrett. – Adm. w/o obj.

3/30/17   (55)   Roseann Schaye Memo of Interview of Kenneth E. Barrett. – Adm. w/o obj.

3/30/17   (56.)   Roseann Schaye Memo of Interview of Sylvia Gelene Dotson – Adm. w/o obj.

3/30/17   (57.)   Roseann Schaye Memo of Interview of Ernie Barrett.– Adm. w/o obj.

3/30/17   (58.)   Roseann Schaye Memo of Interview of Phyllis Crawford. – Adm. w/o obj.

3/30/17   (59)   Roseann Schaye Memo of Interview of Kenneth E. Barrett.  – Adm. w/o obj.

3/30/17   (60.)   Roseann Schaye Memo of Interview of Sylvia Gelene Dotson. – Adm. w/o obj.

3/30/17   (61.)   Roseann Schaye Memo of Interview of Ernie Barrett. – Adm. w/o obj.

1642

3/30/17  (62.)  Roseann Schaye Memo of Interview of Ike Barrett – Adm w/o obj.

6/12/17  (63.)  Gordon Questionnaire to Jeanne Russell  Adm o/obj.

64.  PCL-R Interview Guideline (Jeanne Russell)

65.  HCR-20 Coding Sheet (Jeanne Russell)

6/13/17  (66.)  Kenneth Barrett DOC Personal Health History  Adm. w/o obj.

4/26/17  (67.)  Raw testing Data (Dr. Myla Young)  Adm. w/o obj.

4/26/17  (68.)  Raw Testing Data (Dr. Faust Bianco)  Adm. o/obj.

Dated: June 26, 2017

Respectfully submitted,

DOUGLAS A. HORN
Acting United States Attorney

CHRISTOPHER J. WILSON
Assistant United States Attorney

JEFFREY B. KAHAN
Trial Attorney, Capital Case Section

4

1643

IN THE UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,              )

        Plaintiff,                   )

VS.                                  )          NO. CIV-09-105-JHP

UNITED STATES OF AMERICA,            )

        Defendant.                   )

* * *

MOTION HEARING PROCEEDINGS

BEFORE THE HONORABLE STEVEN P. SHREDER

UNITED STATES MAGISTRATE JUDGE

JUNE 26, 2017

VOLUME VIII

* * *

1137

A P P E A R A N C E S:

FOR THE PETITIONER: MR. TIVON SCHARDL & MS. JOAN M. FISHER, Federal Public Defender - Sacramento, 801 I St., Third Floor, Sacramento, California 95814

FOR THE PETITIONER: MR. DAVID B. AUTRY, Attorney at Law, 1021 NW 16th Street, Oklahoma City, Oklahoma 73106

FOR THE RESPONDENT: MR. CHRISTOPHER J. WILSON, Assistant United States Attorney, 520 Denison Avenue, Muskogee, Oklahoma 74401

FOR THE RESPONDENT: MR. JEFFREY B. KAHAN, US Department of Justice - Capital Case Unit, 1331 F St. NW, Room 345, Washington, DC 20530

COURT REPORTER:          KARLA S. McWHORTER, CSR-RPR
                         UNITED STATES COURT REPORTER

1138

I N D E X

PAGE

WITNESS CALLED ON BEHALF OF THE PETITIONER:

Direct Examination by Mr. Schardl . . . . . .   1140

Voir Dire Examination by Mr. Wilson . . . . .   1145

Direct Examination Continued by Mr. Schardl .   1151

Cross Examination by Mr. Wilson . . . . . .   1253

Redirect Examination by Mr. Schardl . . . .   1333

Recross Examination by Mr. Wilson . . . . .   1355

End of Proceedings  . . . . . . . . . . . . . . . . . .   1366

1139

<u>COURT IN SESSION</u>

(10:08 a.m.)

THE COURT: Good morning, everybody. Call Case Number CIV-09-105-JHP, Kenneth Eugene Barrett versus United States of America. Would the attorneys enter their appearances for the record, please?

MR. WILSON: Christopher Wilson and Jeff Kahan for the United States, Your Honor.

MR. SCHARDL: Tivon Schardl and David Autry and Joan Fisher for Mr. Barrett.

THE COURT: Very well. Is the defendant ready to proceed, Mr. Schardl?

MR. SCHARDL: Yes, Your Honor.

THE COURT: Go ahead and call your witness then.

MR. SCHARDL: The petitioner calls Dr. Deborah Miora.

<u>DR. DEBORAH S. MIORA, PETITIONER'S WITNESS, SWORN</u>

<u>DIRECT EXAMINATION</u>

BY MR. SCHARDL:

Q    Good morning.

A    Good morning.

Q    You will need to have that microphone in front of you so that the court reporter can pick it up.

Would you, please, state your name and spell it for the record?

1140

A      Yes, my name is Deborah S. Miora.  That's D-E-B-O-R-A-H, middle initial 'S', and then M-I-O-R-A.

Q      What's your occupation?

A      I am a clinical and neuropsychologist.

Q      Where do you do that?

A      In Los Angeles, California.

Q      How long have you been working in neuropsychology?

A      I have been doing neuropsychologist for 30 plus years.

Q      Could you describe your education beginning with your undergraduate work?

A      Yes.  My undergraduate work was done at Ithaca College in Ithaca, New York, with majors in psychology and sociology. It was research oriented psychology.  I then went on to graduate work in California.  So I traveled to the wild, wild west to study at the California School of Professional Psychology, now known as Alliant.  I got -- I earned by my Master's and PhD degrees there between 1979 and 1987.  While I was in my graduate program, I studied what neuropsychology was made available to me, as well as doing or performing neuropsych assessments at internships.

Q      Did you move on -- did you do a residency or anything after that?

A      I was going to say during and after my graduate work I did internships pre-doctorally, which was before I did my dissertation and then after.  Before I got my doctoral

1141

dissertation, I worked at an out-patient program for offenders coming out of state hospitals who had been declared not guilty by reason of insanity and mentally disordered sex offenders.  I had to do risk assessments and treatment and write quarterly progress reports to the courts.  As well during my pre-doctoral internship years, I was training in pediatrics.  So I learned a lot about the pediatric brain and development and was assessing and treating children.

Q     Can you tell the Court what your training is in the administration of neuropsychological tests?

A     In addition to the training that I obtained while I was in graduate school and at my internships, I then went on and got a post-doctoral certificate in neuropsychology, which required two years of training in neuro anatomy, administration of tests, being supervised on a number of cases, and I continue with continuing education and training.  I was accepted to sit for the American Board of Pediatric Neuropsychology.  My work samples were accepted and all, but I've just been too busy.

Q     And do you have any other work experience related to neuropsychological testing?  For example, teaching or anything like that.

A     Oh, yes.  First of all, I've done over 300 to 400 cases in and out of the criminal justice system and the juvenile justice system.  As well, I was program director and then

1142

taught as a full-time faculty person at a program -- a forensic graduate program where we emphasized neuropsychological assessment, as well as other ways of evaluating within the forensic world.

Q     And are you a licensed psychologist in California?

A     Yes.

Q     Could you describe the nature of your work on this case, what you were asked to do on this case?

A     Yes.  In this case I was asked to review the work of the neuropsychologist who was no longer alive and in so doing there are a number of elements involved in the actual review of the work.

Q     Let me ask you first, is that something that in the field of neuropsychology is considered an acceptable thing to do, to review another neuropsychologist's work?

A     Yes.  In many contexts that is done.  And, in fact, I've done that for over 13 years for the California Appellate Project where I review data, yes.

Q     And before I forget, just going back to your experience, you mentioned that you've worked on a number of cases.  Have you been accepted as an expert in neuropsychology to testify in court?

A     Yes.

Q     In state courts in California?

A     Yes.

1143

Q   In federal courts?

A   Yes.

Q   What federal courts?

A   Oh, federal courts in Los Angeles, federal courts in New Mexico, hopefully here.

Q   Okay.  So going back to your work on this case, what -- when you were asked to review another neuropsychologists work, what does that entail, what does that review entail?

A   The review is complex.  It has a number of dimensions starting with securing all of the data from the actual testing that was administered, if there were clinical inter- views done, mental status examinations done.  Reviewing records from other neuropsychologists, psychologists, medical records, declarations of relevant involved persons.  So reviewing as much as possible in order to have the background information.  Once I have all of that, then I will actually rescore the tests that were administered to make sure that the numbers that were derived and the kinds of conclusions that were reached were based on sound data.  I consider whether the tests themselves were appropriate for the individual, the examinee, the person being evaluated, whether they are generally peer accepted and scientifically sound tests.  And I look at the entire battery of tests, which is the group of tests administered, to determine whether they actually would be sufficient to evaluate brain function in

1144

the number of dimensions that we as neuropsychologists evaluate.

Q   Did you feel like you had sufficient information in this case to do what was asked of you, to review the other neuropsychologist's work?

A   Yes.

Q   And who was the other neuropsychologist whose work you were being asked to review?

A   The other neuropsychologist was Dr. Myla Young.

Q   And is that somebody you were familiar with prior to your work on this case?

A   Yes.  I had seen her work before and had contact with her, but not about this case.

Q   Very well.

MR. SCHARDL:  At this time, Your Honor, the defense would tender Dr. Miora as an expert in neuropsychology.

THE COURT:  Is there any objection?

MR. WILSON:  Your Honor, may I just briefly voir dire this witness, please?

THE COURT:  Okay.

VOIR DIRE EXAMINATION

BY MR. WILSON:

Q   Dr. Miora, counsel asked you about being qualified as an expert witness in federal court.  I believe you testified that that took place in federal court in Los Angeles; is that

1145

correct?

A     Yes.

Q     How many times have you been qualified as an expert in federal court in Los Angeles?

A     If I may ask you, are you talking about how many times I have been qualified to testify or appointed by the court as a neuropsychologist to evaluate --

A     How many times -- well, counsel asked you the question and you responded.  So I am just trying to find out what your qualifications are.  Let me ask you specifically, have you been -- how many times have you been qualified to testify as an expert in a court of law in Los Angeles?

A     Yes.  The reason I asked is that --

Q     The questions is very simple, Doctor.

A     Yeah, okay.  I have testified probably a handful of times, maybe five to six times in federal court.

Q     And each one of those times you have been qualified as an expert?

A     Yes.

Q     And were those in felony criminal cases?

A     Yes.

Q     And they were not juvenile matters, they were adult matters?

A     Right.

Q     And you also testified that you  had been qualified as

1146

an expert in federal court in New Mexico; is that correct?

A     Yes.

Q     And would that be the same, that you were actually qualified to testify as an expert witness in federal court?

A     Yes.

Q     And those would be in adult matters?

A     Yes.

Q     And in any of those handful of times -- well, how many times in New Mexico?

A     It was in one case.

Q     So of those five or six times total that you've been qualified, how many times have you testified as an expert witness in reviewing another individual's work?

A     That's a difficult question to answer because I am always reviewing other people's work.  If you are asking specifically solely for that purpose, this is the first time. I have consulted in many matters as a neuropsychologist, but only this one time in testimony.

Q     And is there any particular process for peer review to testify as an expert reviewing another expert's testimony or -- excuse me -- another expert's testing and data and to testify about that?  Is there any peer reviewed process of that?

A     Not that I'm aware of, no formal peer review process for that.

1147

MR. WILSON:  May I have just one moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

BY MR. WILSON:

Q    Dr. Miora, I was provided by counsel a list of cases where you've testified as a witness and I believe -- if I can't correctly, I only count two federal cases that you've testified as a witness.

A    Um, which cases are those?  I mean, I don't have the list in front of me, so I can't speak to that.

MR. WILSON:  May I approach, Your Honor?

THE COURT:  Yes.

THE WITNESS:  Thank you.

MR. SCHARDL:  Can the defense know what is being shown to the witness?

THE COURT:  Yes.

(PAUSE)

MR. WILSON:  May I proceed, Your Honor?

THE COURT:  Go ahead.

MR. WILSON:  For the record, Your Honor, this is -- the document which I handed the witness is from the defense's -- it is docket number 376-1, which is a document which was filed earlier in this particular case, and it is purported to be a list of cases in which Dr. Miora testified

1148

as an expert.

BY MR. WILSON:

Q      Have you had an opportunity to review that list, Dr. Miora?

THE COURT:  What exhibit is that a part of?

MR. WILSON:  It is -- I believe it is the defendant's -- the Petitioner's 105, Your Honor.

THE COURT:  Oh, okay.  Have we admitted that already?  We have, okay.

Go ahead, Mr. Wilson.

MR. WILSON:  May I approach again, Your Honor?

THE COURT:  Yes.

BY MR. WILSON:

Q      Doctor, just so we are at the same context, I have handed you what has been marked as Petitioner's 105 and that's your entire CV; is that correct?

A      Um, I am not sure what the date of it is.  There are research papers that have been accepted and may not be listed, but it -- to whatever date this was, this is my CV. I didn't answer your question.

Q      Well, I'll get there.

A      Okay.

Q      I just want to make sure we are all on the same page.

A      All right.

Q      Well, this particular document that I showed you, and

1149

it is the list of the cases, what is the date of that list?

A      I am not sure.  I don't know when I submitted that.

Q      All right.  Well, is that list accurate?

A      That list is accurate.  What is not accurate on the list perhaps is that in one of the cases I went in several times, but I listed it as one case.  So I was qualified each time.  I didn't need to be re-qualified, but it was one case, USA versus Choi.  You have that down there.  There were other cases where I was qualified and then the case settled, but I don't put those down as cases if I didn't actually testify.  So I...

Q      All right.  So this particular document, which shows the list of cases, these are cases where you were qualified as a witness and actually testified?

A      Yes.

Q      And you would agree with me that there is actually two in which that took place in?

A      Yes, on that list, yes.

Q      That would indicate to me that there are some other cases in which you've actually testified that are not on this list?

A      No.  Federal cases there are the two and one of the two I went in two or three times at different points in the proceedings.

Q      Thank you.

1150

A    I am on a Los Angeles Superior Court panel --

Q    I didn't ask a question.

A    Okay.

MR. WILSON:  Your Honor, I have no further questions and I have no objection.

THE COURT:  No objection, very well then.  Dr. Miora will be allowed to testify as an expert for purposes of this hearing.

MR. WILSON:  May I retrieve 105?

THE COURT:  Yes.

<u>DIRECT EXAMINATION CONTINUED</u>

BY MR. SCHARDL:

Q    So, Dr. Miora, before we get too far into the details of your work in this case, let's take a step back.  Let me ask you, what is a neuropsychological evaluation?

A    A neuropsychological evaluation is the assessment of an individual's brain behavior relationships through the administration of tests, clinical interview, neuro behavioral status examination, record review and whatever other relevant sources are available to generate information and opinions.

Q    What is the -- what's the purpose of the neuro in neuropsychological?  What is that meant to tell us?

A    What one is doing is establishing the status of an individual's brain function.  So it is based on the neurology, the neuro anatomy, the neuro chemistry of an

1151

individual's brain.

Q     Is that different than a test of personality?

A     Yes.

Q     Is it different than a psychiatric evaluation?

A     Yes.  It is beyond a psychiatric or a psychological evaluation.

Q     And I think you mentioned testing.  How -- what's the -- what are neuropsychological tests?

A     Neuropsychological tests are those that are developed to evaluate function.  We infer behavior based on performances on these tests.  So the tests are very carefully developed to evaluate a variety of brain functions that we all hopefully possess.

Q     Well, in this case did Dr. Young administer neuropsychological tests?

A     Yes.

Q     And are they -- how many did she administer?

A     I have a list, if you would like to put that up.

Q     Well, if you -- I will make it simple for you.  Did she administer more than one?

A     Yes, she administered what's called a battery of tests.

Q     Okay.  Why does a neuropsychologist administer a battery?

A     For a number of reasons.  First of all, one is hoping to evaluate the status of the brain overall which involves a

1152

number of different areas of the brain, neuroanatomically, as well as a number of brain functions that contributes -- that contribute to a person's behavior, their cognition, their emotions, and how they think.

Q    So are different -- the different tests, are they geared toward -- within this battery, are different tests geared towards different functions or different areas of the brain?  How does that work?

A    Yes.  They are -- the tests are oriented toward different brain functions, some of which localize to particular areas of the brain and some of which may cover a variety of brain regions, but they are actual functions such as attention or verbal learning or memory.

Q    So can you tell us, like, what areas of the brain are associated with different functions that Dr. Miora tested in her battery?

A    That Dr. Young tested?

Q    Oh, sorry, you are Dr. Miora.

A    And I evaluated.

Q    I am probably going to make that mistake a lot over the course of the day.  So, okay, yes, you can?

A    Yes.  The temporal lobe, for example -- should I...

         MR. SCHARDL:  Your Honor, we have prepared some power point slides to help the doctor describe this.  They are Exhibit 107, I think.  With the Court's permission, we

1153

would like to show the first -- or actually the second slide in that deck?

THE COURT:  Well, give us a little foundation before we launch into it.

MR. SCHARDL:  Okay.

BY MR. SCHARDL:

Q     Doctor, you -- can you show us through an image, to help us sort of get oriented into the brain that you are going to be talking about, the areas of the brain that you are going to be talking about in your testimony?

A     Yes.

Q     Do you think it would help us to understand the tests and how each test relates to another test and to an area of the brain if you could show us a brain?

A     Yes.

MR. SCHARDL:  With that, Your Honor, I would like to show the Court a brain.

THE COURT:  Okay, go ahead.

BY MR. SCHARDL:

Q     Dr. Miora, looking at the second slide in Petitioner's Exhibit 107, what's this showing us?

A     Well, this is showing us a pretty image of a brain. The blue area on the left side is what we call the frontal lobe, which comprises 20 to 25 percent of what we've got going on in the brain.  The frontal lobe --

1154

Q    Let me ask you first --

A    Yes.

Q    You say 20 to 25 percent, is that by volume or in terms of function?

A    That is by volume.

Q    Okay, thank you.

A    Yeah.

Q    Okay.

A    I apologize.

Q    Go ahead.

A    The frontal lobes are considered to be the seat of reason, the capacity to think, to make decisions, to weigh the consequences of one's actions, to anticipate and -- I mean, essentially to think and it is supposedly what distinguishes us from the rest of the animal kingdom.  What is important as well about the frontal lobe is that it is associated with the output of behavior or responses. Whereas, most of the rest of the brain receives information and stores information or does something with its senses. The temporal lobe, that yellow region, for example, has to do with memory and learning and -- go ahead.

Q    Let me stop you for just a second because I think that the printouts of the slides are in black and white.  So when you say the yellow area, could you locate that for us sort of within that oblong shape there?

1155

A      Thank you.  Somebody just pointed me to the screen.
I am busy in my notes.

Q      Oh, okay.

A      The temporal region is below the left side where it
juts out, which is the frontal lobe.  And that region under-
neath extends from the left side all of the way back.  So the
temporal lobe, as I was saying, has to do with learning,
verbal learning, language, understanding both verbal and
nonverbal language, and it is receiving information as well
as learning and -- so that is the temporal lobe.

Q      Okay.

A      It is related to motivation and emotion as well.

Q      Let me ask you --

A      Yes.

Q      We are looking at the sort of exterior surface of the
brain.  Are each of these lobes one sort of separate
functioning area the way like a ventricle of the heart is
separate and does one thing?

A      Yes and no because the ventricles of the heart are
related to other arteries and ventricles and systems.  So
while they do comprise separate sections like the ventricles,
they are also a system and the picture that we are looking
at here is of the outermost layer of the brain, which is the
cerebral cortex.  And way at the bottom where you see a sort
of half-moon area down on the right-hand side, that is called

1156

the cerebellum and that is related to the rest of the cerebral cortex as well.

Q    So we are seeing -- when you use this word cortex, that is the sort of outer area of the brain?

A    Yes.

Q    Okay.  So I stopped you.  You had described the temporal lobe.  What are the other lobes that we should be concerned with in this case?

A    We also have to the right of the front lobe the parietal lobe.  The parietal lobe is very involved with visual attention and sensation of one's self in space and one's kinesthetic perception and seeing objects in perspective.  Very important again in relationship to the frontal lobe.

Q    They have to work together as a --

A    Exactly, as a system.

Q    Finally, on the right-hand side where you see the tip, not at the bottom but to the right most area, that is called the occipital lobe and it has to do with the processing of visual information.  Whereas, the temporal lobe is more involved with auditory kinds of information, the occipital lobe is involved with the reception and processing of visual kinds of information.

Q    Now, are there areas beneath the cortex that you have been describing that are also relevant to understanding

1157

Dr. Young's testing?

A     Yes.

Q     And did you prepare an image to sort of orient the court and to show us those structures?

A     Yes.

Q     And would it assist the court in understanding Dr. Young's results if we could describe those different areas and functions?

A     Yes.

        MR. SCHARDL:  So at this point, Your Honor, I would like to show the witness the next slide in the deck.

        THE COURT:  Go ahead.

BY MR. SCHARDL:

Q     Okay.  Dr. Miora, what are the components, the brain components that we are looking at here that are -- well, let me ask you first -- that are relevant to Dr. Young's testing?

A     Yes.  This is called the neocortex.  A lot of what you are seeing here is called the neocortex rather than the iso or cerebral cortex.  So we are down a layer or two internally.  Relevant specifically to Dr. Young's testing are the hippocampus -- which is considered to some extent the seed of memory, the storage of memory or the orchestrator of locating memories if they are not in the hippocampus itself.  The amygdaloid body is -- amygdaloid, A-M-Y-G-D-A-L-O-I-D.  Sometimes it is also referred to as

1158

the amygdala, almond shaped.  That is the -- this the seat of what we call the limbic system.  The limbic system is the oldest system in the brain and is very connected with fight/flight reactions, you know, the perception of danger. Now, not so much the perception of it, but the reaction.

Q    So when you say limbic, is that like from the Latin limbis, like a shore, a coast type of --

A    Yes.

Q    And what's the -- why -- why that metaphor?

A    That metaphor because of its relationship with the other areas of the brain.

Q    Okay.  So you were describing the amygdaloid.  Are there other areas within this -- these internal brain components that are going to be described in Dr. Young's test results?

A    I don't recall specifically if she referred to the corpus callosum, but it is important.  It is the area just under the top rim of the picture there, the top portion of the rim, the next area down the corpus callosum.  That is the connective tissue that links the right and left side of the brain and it has to do with the transfer of information and communication of information between the two sides of the brain, and it is very important.

Q    You mentioned sides.  I guess for the record we should say we are looking at -- you say we are describing internal

1159

structures.  This is a cross section of sorts?

A     Yes.

Q     And what kind of cross section?

A     This is a -- I am trying to think of its Latin --

Q     Sagittal?

A     Sagittal, exactly.  It is a sagittal section.  So we are actually seeing what would be a brain cut in half so that you get to see one side.

Q     So it is cut into half down the midline of the body, vertically down the midline?

A     Yes.

Q     Okay.  Are there other areas illustrated here, internal brain structures that you will talk about in Dr. Young's testing that you want to point to for the Court's benefit?

A     No.  What's most important about this image and under-standing the internal workings of the brain beneath the cerebral cortex is the idea of emotion, fight/flight reaction and the idea that there is circuitry that permits for the communication between the different levels and areas of the brain.

Q     So how do neuropsychologists, neuroscientists know what these different functions do?  It is not like I can -- obviously I can see that my arm is grabbing the microphone. I can't see what part of my brain is making me talk.  How do you know?

1160

A     Well, through pathological populations, in other words people who have had brain injuries, people who have had strokes, people who have had traumatic accidents.  What you see is what is not working anymore.  So, for example, if an individual has a stroke and the right side of his body is not functioning or is drooping, we know that that is a left-side stroke because the right side of the body is associated in a motor sense with the left hemisphere of the brain.  If an individual is no longer able to speak after having a stroke, that is more evidence that in all likelihood it is a left-sided stroke because language in large part is represented in the left side of the brain, not wholly but to some extent.  And there have been famous cases, like Fineas Gage, who was a railroad worker who had a pipe in an accident pierce his orbital frontal right behind the eye and pierced his entire -- it pierced through his brain and he was -- his behavior changed in ways that were unusual.  He was very reserved, well-mannered soft-spoken person who became disinhibited and -- and what that indicated was, oh, these areas of the brain might be associated with frontal function with certain behaviors and -- and, of course, there have been experiments done with people who have epilepsy where they took out portions of the brain, whether it be frontal areas or temporal areas, and if they saw repeatedly that people who had those kinds of surgeries or those injuries to

1161

particular areas and those areas were damaged, language was taken out, for example, you see that over time and you have a sample large enough to be able to say, oh, okay, so the frontal area -- the left frontal area has to do with language expression.  And if the individual -- yeah, okay.

Q    So over time, I guess, science accumulates these accounts of stroke, disease, accidents and intentional lobectomies, I guess, and you accumulate a body of -- okay, well, we took this bit out, now he no longer does this, so we know this bit did that.  Is that sort of the way it works?

A    That's correct.

Q    And then how do neuropsychologists, without taking bits of the brain out, figure out that the area of the brain -- or that the thing they are testing is working or not?

A    Through the administration of a battery of tests, clinical observation, records available, but through the tests themselves one gets a sense of an individual's strengths and weakness, where they are able to function, where they are adequately able to function, and in some cases where they are not able to function well at all.

Q    When you say strengths and weaknesses, if a person is tested and they present results on the test, are those tests only relevant to them?  In other words, is the strength relative to their weaknesses or relative to their norm or is it relative to a larger group of people?

A     Well, the process of test development is such that the tests are normed.  We develop a sense of what is an average performance on an intelligence test, for example, or at what points is the person better than average and to what extent are they better than average.  So the tests are developed by administration to different populations, numbers of people, different ages, different educational levels, and then, you know, the tests are refined and they are reviewed to -- they are subject to peer review and ultimately they are put out as tests that measure certain kinds of functions.

So, for example, we have tests that measure certain kinds of language functions, we have a variety of tests that measure different aspects of attention.

Q     Let me -- let me stop you for a second.

A     Sorry.

Q     So within any given area that is being tested, you are saying that the test is given to a bunch of people to kind of figure out what is a normal range of functioning for that specific thing?

A     Yes, and to be sure that the test is measuring what it is designed to measure.  So in the process of test develop-ment, they will throw out items that do not measure that function that they are working to assess.  So, yes, once all of that is done, then you have a sound test.

Q     Do they also administer the same test to people --

1163

going back to what you were describing before -- who have known injuries or lesions or something to that area of the brain?

A    Yes, and those are called special interest groups.  So you want to look at language in, you know, normal populations and then you will look at language in individuals who have known damage to the areas that affect language.

Q    And then how do you know or how does a neuropsychologist know what is a normal score versus a high score or a low score?

A    Well, we -- we look at the tests -- there are cut-off sets for what is considered to be an average performance, what is considered to be low average, high average, superior.  So those cut-offs are established in the process of test development and we also are using -- if we could put up a slide -- a --

Q    Yeah.  Well, let me ask you -- so when they administer these tests to people, is there a particular distribution of results that they see during this norming process?

A    Yes, and during that norming process they are then able to establish --

Q    Well, wait.

A    Yeah.

Q    What is that distribution, what does it look like?

A    It is called a normal distribution.  And if a quality

1164

or a behavior is considered to be normally distributed throughout a population, then we are able to place levels of performance according to that normal curve.

Q     And did you prepare a slide to illustrate that for the Court and --

A     Yes.

MR. SCHARDL:  If I could, Your Honor, could I move to the next slide in that deck?

THE COURT:  Yes, go ahead.

BY MR. SCHARDL:

Q     So is this the normal curve, looking at the fourth slide in Petitioner's Exhibit --

A     Yes.

Q     Number 107?

A     Yes.

Q     So this -- is this is what is called a bell curve?

A     Yes.

Q     And I see some -- so there is a vertical line down the center of this -- the highest point of the bell curve. Underneath that there are some numbers written along the -- below the X axis there --

A     Yes.

Q     Okay.  So what do those -- so the first row there along the X axis, what does that mean?  Where it says standard deviations from the mean, what are we talking about ---

1165

A    Yes.  Standard deviations are a statistical way of describing the extent to which a person's performance, on any number of kinds of measures, deviates from the mean, the average performance.  So when we see standard deviations, minus one on the left side -- you see minus one, minus two, minus three, you are talking about degrees -- statistically determined degrees to which an individual's performance is weaker than or lesser than the average performance.

Q    And at what point do you -- or do neuropsychologists say something is above or below average, like outside of that range of normal?

A    Okay.  Once you are beyond one standard deviation, either above or below, you are talking about a performance that may be mildly above to moderately above, mildly to moderately below or -- we use the term impairment when we are talking about -- we are looking for impairment.  We are interested in whether there is impairment and what kind of impairment.  That's what brings a neuropsychologist in.  And so we may find relative strengths where a person is doing exceptionally well, so to the right of average we have standard deviations above the mean, and if a person is performing 1.5 to more standard deviations above the mean there, exceptional in a positive way perhaps...

Q    Let me stop you.  So I think as we get into the testing results, we will see these different expressions, I guess is

how to phrase it, of how he does, but I just want to orient us all here.  So if we see -- looking down the Y axis here of this graph, going below standard deviations in the next row there, it says cumulative percentage.  So these are -- and then below that, Z score.  These are all essentially the same values?  Is that how I am supposed to understand that?

A     Yes, and there is another term you may see from Dr. Young's data, T scores, but they are all ways of describing performances relative to a mean or average.

Q     Thank you.  Lastly with regard to neuropsychological testing, how do we know that -- or do we know that a person's performance on one of these tests tells us anything about how they do out in the real world?

A     One of the ways we assess the value of the test is its -- what's called ecological validity.  So in other words, we want to know whether the performance on the test reflects something about adaptation or behavior in the outside world. So, for example, there is one test where an individual has to switch -- drawing a line they have got to switch between numbers and letters alternating.  That test has been shown to be -- performance on that test has been shown to be related to driving ability.  So in older adults, at least in the state of California -- I can't speak for other places -- that is one of a number of tests that might be given where there is some concern about an older adult's capacity, for

1167

example, to drive.

I am desperate for some water.  I apologize.

Q    I am sorry.  No, no, please, I am glad you said that.

A    Sorry about that.

(PAUSE)

A    Thank you very much.

Q    So do researchers then take these tests and they look at people's results and then they actually go out and explore whether somebody's daily functioning, I guess, correlates with their test results?  Is that what you are describing, like with the example of driving and drawing the lines?

A    Yes, and in the process of test development.  So at the front end you want to be sure that the test you have constructed is measuring a function that you want to measure and that comes from what is the behavior that you are wanting to -- or the function, the brain function, that you are wanting to assess.

Q    So that process of ecological validity is part of what gets a test accepted as good or something that is relied upon in the field?

A    Yes, exactly.

Q    So moving on to this case and the work done by Dr. Young in this case, in your review of the materials was there anything that caused you to think it was appropriate to do neuropsychological testing in this case?

1168

A    Yes.

Q    What, what gave you an indication that it would be appropriate to test Mr. Barrett?

A    There were a number of what we often refer to as triggers for a neuropsychological evaluation from the time that he was in utero where there may have been maternal alcohol exposure and according to some of the declarations from individuals who knew Mr. Barrett, indeed his mother was drinking.  She was know to be a drinker.  So that right away is a trigger.

A    Let me --

Q    The fact -- I am sorry.

A    Let me ask you this.  So a mother's ingestion of alcohol while she is pregnant, that can have neuropsychological consequences for her fetus?

A    Yes, it is considered teratogenic and that toxicity can influence the development of the brain in utero.

Q    Were there any indications related to Mr. Barrett as a child that suggested it might be appropriate to test him?

A    Yes.  I was going to go on and say that during childhood he had some difficulties at school and was diagnosed with learning disorders, which are another indication for neuropsychological testing.

Q    Were there reports of any injuries to Mr. Barrett as a child that might also trigger testing?

1169

A      Yes.  One of the things I would like to say is that the more triggers you see, the more important it becomes to consider --

Q      Why is that?

A      -- what the effects might be.

Q      Why is that?

A      Because insults to the brain are cumulative or in some ways exponential.  So the more signs and symptoms there are, the more likely there is brain damage, brain dysfunction.

Q      What do you mean it is cumulative?  What does that mean?

A      Well, if you think about the National Football Players, for example, we have now learned that when there is a concussion, if there is another concussion and another concussion, the effects become cumulative.

Q      So we were talking about reports of injury.  Was there any particular report of an injury in childhood that you saw in your review of the materials that were a trigger?

A      Yes.  There were a number of references to Mr. Barrett having been hit with some kind of a steel ball as a child and having been knocked down.  It doesn't really matter, but it is not clear whether he lost consciousness or not, but there can be brain insult even if somebody doesn't lose consciousness.  Additionally, later on there was a record of a motorcycle accident in which there was damage to a right

1170

frontal -- what is called the periorbital area of the brain. And sometimes while you may not see any marked effect, there can be affect internally.  So I would consider that to be a trigger as well.

Q      Do you --

A      There was a further incident noted of Mr. Barrett having shot himself and I might then be thinking about hypoxia to the brain, loss of oxygen to the brain, possibly a fall.  So, you know, you put that altogether and that's absolutely sufficient for -- actually there was one other factor.  Early substance use in Mr. Barrett himself.  And when I say substance, I am referring to drugs and alcohol. I do a lot of juvenile justice work, which opposing counsel must know from the list of my testimony, and in juveniles, in -- you know, up until the early twenties, the brain is still developing.  So the use of alcohol and other substances is a serious insult to the brain.

Q      Backing up then to the possible prenatal exposure, does it matter when in the course of a person's life and development an injury or an insult happens?

A      Yes.

Q      In what way?

A      Well...

Q      Taking for example, in utero exposure, is that a greater or a lesser risk?

1171

A    It is a greater risk for more diffuse and ongoing difficulties, if indeed it is determined there was that teratogenic effect, because it effects development of the brain in utero and then that individual's capacity to learn and develop outside of the uterus once they are born.

Q    What about an injury sustained at say age eight or nine?

A    It can effect learning and memory, language development.

Q    Why that specifically?

A    Well, those are the times where children are learning. Language is developing exponentially and they are in school and, yeah, they -- and there is the social learning, interacting with other people.  So there is learning to understand language, there is learning to express one's self.

Q    And you are saying that occurs at a different time of life, like that area of the brain develops at a different time of life?

A    That area of the brain is undergoing additional development.  So when you are born, you have a brain and then it is a question -- yes, across the course of one's life and particularly during childhood the brain is continuing to develop.  Synaptic connections are being made, so, yes, indeed.

Q    And you mentioned in adolescence.  What areas are undergoing the greatest development during that period?

1172

A    During that period what is really left in a big way to continue to develop into young adulthood, we now know, are the frontal lobes, the area of the brain that has to do with decision making, thinking, planning, intending, deciding when to do something, when not to do something, being able to orchestrate all of the information that is coming.

Q    So that area of the brain that is responsible for that is undergoing development in adolescence?  Is that what you are trying to --

A    Yes, oh, yes.

Q    And it is, therefore, more vulnerable to damage from something like alcohol or drugs at that stage?

A    The -- yes, the final stages.  Front lobe development is really going on from zero to two, early -- sort of in latency into adolescence and then from late adolescence into early adulthood.  So, yes, if an adolescence is substance using with regularity and excessiveness, it is quite likely that judgment, impulse control, the areas inside of the brain that are subsumed under the front lobes are going to be injured.

Q    Was there anything else in accounts of Mr. Barrett that you read that raised a concern or that suggested it would be appropriate to do neuropsychological testing?

A    Well, as a forensic neuropsychologist, the circumstances of the offense would certainly trigger a

1173

neuropsychologist evaluation because neuropsychological --

neurocognitive function is related to culpability, I mean,

both from a legal perspective obviously with Roper and

Atkins and so forth, but also, you know, from a

neurocognitive perspective.

Q     From a neurocognitive perspective, how does brain function relate to culpability?

A     Well, if there is --

MR. WILSON:  Objection, Your Honor, as to the relevance of this.

THE COURT:  What is the relevance?

MR. SCHARDL:  Of culpability in a capital penalty...

THE COURT:  Well, I think you are asking for something that is kind of outside her area of expertise. Culpability is a legal concept versus the psychological concepts that she has been testifying about.

MR. SCHARDL:  Right.  That's why I was asking how she can relate them to each other, if they can be.

THE COURT:  Well, all right, let me go ahead and hear what she has to say about that.

MR. SCHARDL:  Thank you, Your Honor.

BY THE WITNESS:

A     I understand the difference in the term and maybe responsibility would be a better term since it does have the

1174

legal connotation, although they are related.  If somebody is intellectually disabled, previously we called that mental retardation, they are considered less culpable because of psychological phenomenon --

Q    That's what --

A    -- which have to do with -- yeah, I am sorry.

Q    That's not really my question, Doctor.

A    Okay, sorry about that.

Q    So my question is -- let me be more specific about it. These areas of frontal lobe function that you were describing, what areas of frontal lobe functioning would be implicated by the circumstances of this case?

A    Do you want me to state specific areas of the brain in the frontal lobe or how would the frontal lobe be implicated?

Q    No.  How, if at all, would the frontal lobe be implicated in the circumstances of this case?

A    The frontal lobe has to do with planning, decision making, deciding, being able to inhibit oneself or deciding that one is going to do something.  So it is very much about thinking about what one might do, what one does, as opposed to simply reacting.

Q    I think you mentioned earlier that the frontal lobe is involved in output of -- is that what you said?

A    Yes.

Q    So it is behavior?

1175

A    Yes.

Q    So how does -- well, strike that.  I apologize.  Let's move on to Dr. Young's evaluation.  Were you able to tell what the circumstances of her evaluation were in terms of where she did it and when?

A    Yes.

Q    And were you able to identify the tests that she administered?

A    Yes.

Q    Were you able to tell whether the tests she administered, the battery that she put together, was that appropriate to the circumstances?

A    Yes.

Q    In what way?

A    Um, the -- okay.  In what way were the tests appropriate?

Q    Well, were they dictated by anything in his background or how --

A    Okay.

Q    Were you able to tell how she chose the battery?

A    Yes.  They were normatively appropriate.  The battery of tests covered the variety of brain functions, so it was comprehensive.

Q    Let me stop you right there.  When you said normatively appropriate, what does that mean?

1176

A      Oh, sorry about that.  Meaning they were age appropriate, they were appropriate to his cultural context, and he would be -- one would be able to compare his performances to the populations on which the tests were normed.

Q      So is there, like, a sort of shelf-life for these tests?

A      Yes, some of them in particular.

Q      Like they should be used by a certain date and like after that you throw them away or what -- is that how it works?

A      It is not quite like that, but, for example, with a test of intelligence, the Wechsler tests have been around for decades.  It will be a century soon enough, but they get updated, they get updated because populations change, society changes.  They also get updated to reflect better technology, better ways of assessing brain function.  The field of neuropsychology is constantly undergoing change.  So we need to update the tests to reflect the most current representation of the population.

Q      Is that so that you know, looking back at the slide, that when you see a result that it fits within the population that is being tested?

A      Yes.

Q      Okay.

A      And I wanted to mention one more thing in answering your question.  Mr. Barrett's hands were not shackled; thus, in that regard the testing and the tests selected were appropriate.

Q      Where was the testing done?

A      The testing was done, I believe -- I believe it may have been at Terre Haute.

Q      And did --

A      In a private face-to-face interview room, which is important so that the standardized testing conditions are met and there won't be confounding variables, such as somebody else sitting in on the testing, which can alter performances, or if it is an open area with others around and that noise can affect the test results.  So it was appropriate.

Q      And were you able to tell the amount of time that Dr. Young devoted to the evaluation?

A      Yes.  I could have estimated it based on having reviewed her test date, but more importantly she noted that she had spent approximately 16 hours with Mr. Barrett.

Q      Let me ask if I could --

        MR. SCHARDL:  Your Honor, she said that she noted...if I could ask the clerk to show the witness Petitioner's Exhibit Number 25.  I hope I got that right.

BY THE WITNESS:

A     Thank you.  Would it be acceptable for me to look at my own copy or do I need to look at this copy?

BY MR. SCHARDL:

Q     Just for the time being, if you would look at that one.

A     Yes.

Q     So do you recognize that document?

A     I do.

Q     And is that the document that you looked at to understand what Dr. Young's findings were?

A     Yes.

Q     Did you -- in addition to looking at that document, her declaration, did you have an opportunity to look at other materials that she relied on?

A     Yes, I did.

Q     What were those?

A     I looked at her raw data.

Q     What does that mean, "her raw data?"

A     That's a very good question.  I was provided the numbers that she generated based on having conducted the testing, some of which was on score sheet protocols that one purchases in order to use the tests and some were her reports of numbers when there isn't necessarily a score sheet, but I was able to look at all of the notes on the test protocols and administered tests -- yes, go ahead.

Q     So these tests, are they all, like, paper and pencil

1179

tests?

A      No.

Q      But some are?

A      Yes.

Q      And are they -- so I assume did you -- where there was a pencil and paper test, is that included into the category of raw data?

A      Yes.  So, for example, if drawings were rendered...

Q      Okay.  So you were able to determine the amount or she reported an amount of time that she devoted to the evaluation.  And what was that?

A      16 hours.

Q      And did that seem inappropriate to you as far as the number of tests that were administered and the time it takes to do that?

A      No, not at all.

Q      Now, did Dr. Young do anything to tell whether Mr. Barrett was trying to game the tests?

A      Are you referring to whether he attempted to malinger or for any other number of reasons had suspect effort?

Q      Yes.

A      Yes, she did evaluate his effort throughout the time that she was evaluating him.

Q      How do neuropsychologists figure out whether an individual is putting forth their best effort?

1180

A       We and the leading neuropsychological bodies recommend highly that any neuropsychological evaluation should include what we call embedded effort tests and standalone effort tests.  Standalone effort tests are measures that are developed simply to determine if a person is exerting full effort.  It doesn't necessarily tell you why because somebody could have back pain, for example, and not able to pay attention or somebody could be feigning, but in administering those standalone tests one has actual measures of whether a person made his best effort.  In addition, within existing tests, neuropsychological tests, there are elements in the tests that we can look at to determine whether a person is making his best effort.  For example, if it is a test of increasing difficulty, you would expect to see what is called a negative performance curve where the person does well up 'til the point the items are too difficult.  If you see variable effort and they get some of the most difficult ones right and some of the least difficult ones wrong, you know, that might cause you to suspect a problem with effort.

Q       Okay.  Did Dr. Young do anything to determine whether Mr. Barrett was incapacitated in some way physically, for example, like whether he was ill?

A       Yes.  In her clinical interview and behavioral observations, she asked about injuries, medication, other sources that might contribute to his performance adversely or

1181

positively in that regard.

Q    Physiologically was there anything significant that she reported that could have affected his performance?

A    No.

Q    What about as far as any psychiatric condition?  Was there anything significant in her clinical observations?

A    Yes.  And I can tell you what that is, but it raises an important point.

Q    Can you tell us what it is?

A    Yeah.  She described Mr. Barrett's manner as hypomanic.

Q    What does that mean?

A    Well, fast.  So, for example, pressured, fast, he would talk fast.  A couple of times he apologized because he had started to respond before she had finished providing an instruction or asking a question.  So that's relevant in the sense that that might be something she was measuring.  At the same time one could also wonder whether it was an impediment.

Q    Okay.  What about any medicines that he might have been taking?  Did she inquire as to whether he was taking anything that might impair his performance?

A    Yes.

Q    And was there anything?

A    No.

Q    Okay.  So you mentioned that there was these stand

1182

alone, I think was the phrase you used, measures of effort.
How many of those did Dr. Young administer?

A    She administered three different tests of three different types, but basically they are memory tests, three different kinds of memory tests.  And he made full effort, he passed.  We talk about passing and failing these kind of measures and he passed them all.

Q    Indicating that he was exerting his best efforts on these?

A    Yes.

Q    And these are -- are they sort of like designed to trick the person, like to, you know, make them think that what they are doing would produce a certain result, but it wouldn't?

A    Yes.  They are designed to look difficult.  For example, one of the tests is designed to look difficult, but it really isn't difficult.

Q    Okay.  And then you mentioned that there were embedded measures.  Are those just sort of throughout the battery or is there anything in specific?

A    They were -- they are present throughout the battery. She commented on a couple of the embedded effort measures. I am aware that there are others within the battery of tests she gave.  So in reviewing the data, I was able to look at those myself to determine whether her opinion was sustained

1183

and --

Q      Okay.  In total --

A      It solidified it.

Q      Okay.  In total was there any reason to question whether Mr. Barrett was giving his best efforts?

A      No.

Q      So he passed all of these standalone measures?

A      He passed the stand alone and the embedded effort measures.  There were aspects of clinical observations she pointed to that told her he was making his best effort.  For example, asking to go back on an item he failed and to have a chance to do it again, which you can't do, but it showed his interest.  There was another I picked up on when he was given a spelling test that even though the words weren't necessarily all spelled properly, especially as they became more difficult, he spelled them correctly phonetically.  And if you have ever seen a child with phonological processing difficulties, they don't have an easy time spelling words or reading them correctly and he clearly was making an effort.

Q      Moving on to the overall tests, the list of tests that Dr. Young included in her battery, can we just run those off?  If you could just list them and -- and I think -- did you prepare a slide as well to list those for the Court?

A      I did.  I thought that might be easier and not ad nauseum if you could just see the list.

1184

MR. SCHARDL:  Could I turn to slide 5, Your Honor?

THE COURT:  Go ahead.

MR. SCHARDL:  Thank you.

BY MR. SCHARDL:

Q     That is up there now.  This is 1 of 2, I think that lists them.

A     Correct.

Q     So I would like to -- before we get into the details on each individual test, if you could just, as we go down this list, tell the Court generally what each test measures.  So beginning with this first list, WAIS-IV, what does that stand for?

A     I apologize.  That's the Wechsler Adult Intelligence Scale, 4th Edition.

Q     Okay.  So what does that measure?

MR. WILSON:  Objection, Your Honor.  I am going to interpose an objection to this witness testifying about any results from the Wechsler-IV.  That test was not available at the time that any of this testing could have been performed on Mr. Barrett at the time of trial.  So any testing as a result of that is irrelevant to this determination.

THE COURT:  Mr. Schardl, what do you say about that?

MR. SCHARDL:  Well, Your Honor, that's a legitimate

1185

concern and an objection that we raised previously and that the Court overruled, I think, but Dr. Miora will speak to why the WAIS-IV as opposed to the WAIS-III, which was the one in use at the time of trial, and I think she will describe how it is necessary to use the IV because that's the one norm for the time period in which the test was administered.  So she can relate it to whether it would produce the same results if the III was used in 2005.  It is strictly a matter of their protocols.

THE COURT:  Isn't this similar to the issue that arose regarding which version of the DSM applied?

MR. SCHARDL:  I would say yes and no, Your Honor. It is -- with the DSM you are talking about a whole diagnostic system, a set of criteria.

THE COURT:  But the witness, as I recall, wanted to relate -- wanted to testify a couple of times with regard to it would have been the same under DSM-IV than it was under DSM-V and we didn't let him do that, as I recall.

MR. SCHARDL:  Correct, because he hadn't reported anything about that.  And I believe there is something in Dr. Young's declaration that explains why she was using the test that she used.  If the Court will give me just a minute, I will look it up.

THE COURT:  Sure, go ahead.

(PAUSE)

1186

MR. SCHARDL:  I don't see it specifically, Your Honor.  It is just the point that Dr. Miora was making before that the tests have to be -- the difference between the DSM and the test is the DSM is an overall classification scheme. Here the test is being given in a specific point in time. The condition of the individual has to be measured against the population for which that -- that is contemporaneous. So you can't administer -- well, you can, but you would have to make certain mathematical adjustments if you administer a test that was not normed for the time you are giving it. So there is this thing called the Flynn effect and - so I guess I could have the witness discuss that, but it is apples and oranges, I guess, is the point.  The DSM has a separate set of criteria.  The WAIS-IV and the WAIS-III apply the same criteria, they are just using different normative numbers.  So there is a test of intelligence and we know how it measures it.  The test itself is a refinement.  It is not a different test, it is just a different set of norms.

THE COURT:  Well, Doctor, is there any reason why -- even though the current test would have been a WAIS-IV, is there any reason why they couldn't have tested according to WAIS-III?

THE WITNESS:  Well, the reason would be having to do with the norms and that it might over --

THE COURT:  I mean, but you still have the norms

1187

around for a WAIS-III, don't you?

THE WITNESS:  Yes, but I don't know that the Flynn effect was accepted back then.  So there would have had to have been a statistical correction made that may have been called into question.  And as neuropsychologists if you feel ready to use a new instrument, we are encouraged to do so.  So, in fact, she was -- I understand the legal issue, but she was complying with --

THE COURT:  But understanding that the appropriate time frame would have been at the time this case was tried, wouldn't that have been a reason to use the previous norms?

MR. SCHARDL:  Well, that's the issue, Your Honor.  It is inappropriate to apply the norms from one time period to a test that is administered at a different time period.  That's what the normalization process is about in part.

THE COURT:  I am going to sustain the objection.

MR. SCHARDL:  Well, we would like to offer Dr. Young's declaration, Petitioner's Exhibit 25, as a proffer, paragraphs in particular 39 through 42.  And I would also say that Dr. Pitt did testify regarding -- he didn't identify the DSM-IV-TR, but he reached the same conclusion by stating that based on his training and experience and the work that was being done at the time, he would have reached the same conclusion, which I think is mutatis mutandis what Dr. Miora would be testifying to here.

1188

(PAUSE)

THE COURT:  Well, let's go ahead and hear the testimony with -- bearing in mind that I may or may not take it into consideration, depending on whether I decide it is relevant or not.

MR. SCHARDL:  Okay, Your Honor, thank you.

BY MR. SCHARDL:

Q    Okay.  I think we were just on the list.  So, Dr. Miora, the Wechsler Adult Intelligence Scale IV, what does that measure?

A    I would like to start by saying that it is not formally a neuropsychological test instrument, but in a neuropsychological assessment we evaluate intellectual functioning.  That is what it measures and it measures different facets of intellectual functioning through performance on a series of what are called sub-tests and out of which are derived index scores, which I'll get into later, and a full scale I.Q. score.

Q    It is a measure of intelligence?

A    Yes.

Q    Along different areas?

A    Yes.

Q    Okay.  Moving to the next test there, the WRAT-III. What is that?  What does WRAT-III stand for?

A    My apologies again.  It is the Wide Range Achievement

1189

Test 3rd Edition. This is a -- essentially a measure of academic function. It is not a brain function per se. It measures reading, spelling and arithmetic, word decoding, word encoding and arithmetic skills.

Q    And the next test listed there, the Smell Identification Test. What on earth does that have to do with a forensic case?

A    The Smell Identification Test evaluates olfactory functioning. So you are exposed to different scents and asked to determine what they are or which one is lime, you know, that kind of thing.

Q    Why in a forensic case would you --

A    In a forensic case and where there is a question of brain damage and head injury, and specifically frontal dysfunction, it is helpful to see because of the area of the olfactory bulbs (sic) in the frontal region of the brain, which have to do with smell, how someone functions.

Q    All right. The next test administered there, the Reitan-Klove Sensory Perception Examination, what does that do?

A    Yes. That examination is a bit complicated. It covers several different functions, but basically it has to do with the sensation of, you know, somebody's ability to discern different sensations.

Q    Physical sensations?

1190

A      Yes.  And they've got to be able to use the regions of the brain, the parietal lobe and other regions, to be able to make those discerning recognitions.

Q      Is that tactile perception or like -- I mean, I am assuming that sensory perception, that covers olfactory and taste and everything.  So what specific sensory perception is being --

A      This is touch and --

Q      And --

A      Yes, tactual or tactile.

Q      What is the Finger Tapping Test?

A      The Finger Tapping Test is a test measuring speed of -- it is a motor test, but it is really just a test of motor speed where a person taps on a finger tapper.

Q      And Dr. Young administered that as well?

A      Yes.

Q      And what is the next test listed there and what does it do?

A      The Grooved Peg Board is another motor test.  I missed an important point.  On each of these tests, the Finger Tapping Test and Grooved Peg Board, one is able to compare performances between an individual's preferred hand and non-preferred hand or dominate and non-dominate.  The value in that is possibly being able to lateralize brain damage to one hemisphere, the left hemisphere or the right hemisphere.

1191

The finger tapper is really just a measure of psychomotor speed.  Whereas, the Grooved Peg Board Test is more complicated.  It has to do with fine motor coordination.  So you are evaluating a more complex aspect of motor function.

Q     Okay.  What's the next test that Dr. Young administered?

A     The Seashore Rhythm Test is -- both the Seashore Rhythm Test and the next one, the Speech Sounds Perception Test, are measures of attention.  You know, rhythms, that's an aspect of temporal lobe function, being able to discern rhythms.  As well as the Speech Sounds Perception Test is looking at discerning differences in different sounds.

Q     So we have gone from olfactory, scents, smells, tactile senses, motor speed, the speed at which he can move his fingers, I guess, and now we are talking about his ability to take in auditory information; is that correct?

A     Yes.

Q     Attend to it?

A     Uh-huh, attend to it and make distinctions, yes.

Q     Now, on the -- what's the next test that Dr. Young administered?

A     The California Verbal Learning Test 2nd Edition.

Q     And what does that measure?

A     That measures in general or overall auditory verbal

1192

learning.  It measures different aspects of auditory verbal learning, including the initial registration of verbal information and then the retaining of that verbal information and then being able to call it up both on a short-term basis and a long-term basis.

Q    So that would come from attention -- like can Kenny pay attention to auditory information and then it is whether he actually takes that in; is that correct?

A    Yes, whether he processes it and whether he can learn over time if he is repeatedly exposed to it.  It is a list learning task.

Q    So are those different, the idea of immediately recalling the information and learning it over time?  Are those different neurocognitive functions?

A    Yes.  There is frontal function, there is temporal function, yes, it is complex.

Q    Now, what's the next test that Dr. Young administered?

A    I don't know if I am looking at this -- we need to go to the next slide, I think.

Q    I am sorry.

        MR. SCHARDL:  Can I go to the next slide, Your Honor?

        THE COURT:  Go ahead.

BY MR. SCHARDL:

Q    It is called the Wechsler Memory Test 4th Edition.

MR. WILSON:  I am going to renew my objection.  I believe this test was also not available at the time of the original testing back at the time of trial.

THE COURT:  I am going to go ahead and reserve a ruling on the relevance of that test, but we will go ahead and hear what the doctor has to say about it.

MR. SCHARDL:  Thank you, Your Honor.

BY MR. SCHARDL:

Q     So the Wechsler Memory Test, what does -- I assume it tests memory?

A     Yes, but I have to say there is an error.  It is the Wechsler Memory Scale.

Q     Oh, I am sorry.

A     It is WMS, just so you have that correctly.  I apologize.  It measures different aspects of memory, both immediate memory and delayed memory, as well as recognition and in different spheres.  Again, auditory/verbal information, visual information, and different aspects of each of those systems as well.

Q     So someone can -- you measure these separately, auditory/visual memory separately?

A     Yes.

Q     What's the next test that Dr. Young administered?

A     The Rey Complex Figure Test.

Q     What does that look at?

A    That looks at certain motor function to some extent, but also visuospatial, visuoperceptual function.  So it actually incorporates different areas of the brain.  You have to be able to perceive the figure that you are being asked to copy.  It also deals with memory because you are asked to draw it from memory, both shortly after you've seen the copy and drawn the copy and then you are supposed to render a copy later.  So that's Delayed Recall Visual Memory.  It also measures what we call right frontal function, organization.  This is a complex figure and they have got to be able to perceive it and organize it and render it, which is output again, frontal function.  So it is a complicated and useful test.

Q    And what's the next test that Dr. Young administered?

A    I don't know what an Executive Functioning Test is.  I think that supposed to say the Delis-Kaplan Executive Function --

Q    Okay.  So you --

A    -- System.

Q    Delis-Kaplan Executive Function System?

A    Yes.

Q    Is that just one test?

A    It is a set of tests.

Q    And --

A    Normed together and administered as a battery of

1195

executive functioning.

Q    And again, executive functioning is what?

A    Executive functioning is what I described as frontal functioning, making decisions, being able to switch back and forth and to alternate between different stimuli, being able to respond to one target stimulus while ignoring other stimuli.

Q    Okay.

A    Being able to reason conceptually.

Q    All right.  So we've gone from sensory testing to attention testing to memory, different auditory and verbal... do I have that right?  Auditory and visual, correct, do I have it right?

A    Yes.

Q    And different tests of memory, immediate, delayed, long-term; is that correct?

A    Verbal and visual.

Q    Visual, yes.  Okay, and now we are into executive functioning.  And there are all of these -- what you've described as subcategories that, I guess, we will get into. What's the next test that she administered?

A    The next two tests actually are also tests of executive function, problem solving and abstract reasoning.  The Wisconsin Card Sort Test and the Short Category Test.

Q    Are there any other tests that Dr. Young tried to

administer?

A    She aborted an effort to administer the Paste Auditorial Serial Addition Task or Test, I am sorry, which is a test of attention as well, but complicated.

Q    Why did she abort it?

A    She reported that having given the instructions several times, Mr. Barrett still did not really understand the instructions and at that point, the appropriate thing to do is discontinue it.

Q    So is that it?  Are those all of the tests that we've got?

A    I believe so.

Q    How would you characterize that battery?  Is that normal, unusual?  How do we understand that?

A    I would consider this a comprehensive, well-selected battery of tests to assess overall brain functioning and the brain functions more specifically, as well as effort.

Q    And I think you mentioned this earlier, but did you go back and look at the raw data and see what results the raw data produced?

A    Yes, I rescored the data myself.

        MR. SCHARDL:  If I could ask the clerk to show you Petitioner's Exhibit 106.

BY THE WITNESS:

A    I have it.

1197

BY MR. SCHARDL:

Q    Okay.  Are those the scoring sheets that you produced based on Dr. Young's raw data?

A    Yes, although some of them are actually hers because they were the same and I just reproduced them.

Q    So they are a combination of --

A    Yeah.

Q    So having reviewed the data and scored it, can you give us sort of an overview of what the test battery showed about Mr. Barrett, just in broad strokes what are his areas of strength and weakness and normality?

A    Yes.

Q    Let's start with his strengths.  What are his greatest strengths?

MR. WILSON:  Judge, I would just ask for a continuing objection regarding the Wechsler test, both the I.Q. test and the memory test.

THE COURT:  Doctor, what can the results of a WAIS-IV test administered in 2009 tell us about what you would have gotten with a WAIS-III test administered in 2005, if anything?

THE WITNESS:  They reveal what you would have seen in 1995 or 1999.  What did you say?  I am sorry.  Could you repeat that?

THE COURT:  Well, 2005.

1198

THE WITNESS:  2005, yes.  They show performances on the tests, most of which were included in the WAIS-III and in the areas of function that both tests evaluate, verbal, comprehension, perceptual reasoning, working memory function and processing speed.

THE COURT:  So, in other words, so it is your belief, anyway, that whatever you discovered or whatever was discovered in 2009 would be substantially the same as what would have been discovered in 2005?

THE WITNESS:  Yes.

THE COURT:  And what about intervening circumstances?  Would that have made any difference?

THE WITNESS:  It would depend on the intervening circumstances.  It might.

THE COURT:  Right.

THE WITNESS:  If he had had a serious heart attack or, you know, other kinds of -- you know, there could be circumstances that would have to be considered.

THE COURT:  Right.  Well, I am going to -- as I said, I am going to reserve ruling on your objection, but I want to hear the testimony.

MR. SCHARDL:  Thank you, Your Honor.

BY MR. SCHARDL:

Q    Okay.  So I think I was asking you for sort of a broad overview and the first question is, what were Mr. Barrett's

1199

particular strengths on the battery that Dr. Young administered?

A    And -- well, okay.  Relatively speaking, he has a strength in verbal -- in the auditory verbal area.  This covers such a broad range.  Do you want me to get into specifics?

Q    We will get into the specifics later.  I want to talk about the -- in broad terms right now.  So auditory/verbal information is a strength for him?

A    Yes, verbal comprehension, verbal expression, verbal memory to some extent.

Q    And what were particular areas of weakness for Mr. Barrett?

A    Particular areas of weakness were problem solving, abstract reasoning, attention, planning...please give me a moment, I am looking at my score sheets.

Q    Sure.

A    When he was required to alternate between two different sets of stimuli, going back and forth like I was describing with numbers and letters, tasks that required him to inhibit one response in favor of another were difficult for him and an area of weakness.  I would also add working with information on line or in his head, in the moment or on his feet was an area of difficulty, which relates to attention but it is more than attention.

Q    So working with information on line...contrast that with some other way of working with information so we can have some idea of --

A    Here is an example.

Q    Okay.

A    A trial attorney has to be on his feet and thinking and working at the moment and working with what comes up in the moment and responding to it as opposed to sitting and researching for trial where you don't have time pressure necessarily and you are working at your own pace and -- yeah, go ahead.

Q    So time sensitive, things that are timed Mr. Barrett did more poorly on than things where he could take his time and do it at his own speed.  Is that what you are saying?

A    Or needed to pay attention very quickly and generate a response.

Q    And are there things in Mr. Barrett's history that you've looked at that make that pattern of strengths and weaknesses either make sense or not make sense?  How do you relate that pattern of strengths and weaknesses to his history?

A    Well, in cases of brain injury or head injury often what gets blown out right away, regardless of where the head injury occurred, is attention and processing speed.  So head injury, substance use, attention deficit, which was

1201

diagnosed, learning disorders, those kind of difficulties are consistent with his problems in attention and processing speed.

Q      What is --

A      As well as -- pardon me, I am sorry.  There is another factor which is that him being strong with verbal information, that is stuff that is learned.  We learn the definition of words, you know, learning a list that is given to you a number of times.  In those kind of situations he does much better relatively speaking than in situations that are novelle and ever changing.  And that's what I meant about being able think on your feet.  You've got to be able to respond in the moment to whatever is going on.  It is very different functions.

Q      What areas of the brain are involved in those areas where he showed particular weakness on the testing?

A      Temporal lobe, frontal lobe, parietal lobe, but I think that the two main areas would be the frontal and temporal lobes that are implicated.

Q      So now I would like to move into the specifics, the specific tests that were administered.

MR. SCHARDL: I note, Your Honor, that it is five minutes until twelve and I am about to get into the details of this thing.  If the Court might be interested in a lunch break at this time, this would be a natural breaking point

1202

in the examination.

THE COURT:  Very well.  Let's go ahead and take our lunch break.  Be back at 1:00.

MR. SCHARDL:  Thank you, Your Honor.

(11:55 a.m.)

(LUNCH RECESS)

(1:00 p.m.)

COURT IN SESSION

THE COURT:  Go ahead, Mr. Schardl.

MR. SCHARDL:  Thank you, Your Honor.  Your Honor, may I correct something that I said before the break?  I think I made a mistake.  I think I reversed -- in our discussion of what was available or unavailable in relation to Dr. Pitt's testimony, I think I stated it backwards.  Dr. Pitt relied upon diagnostic criteria published in 2013 throughout his report and that was all admitted.  And he relied upon BOP documents that did not exist at the time of trial and I believe his testimony regarding that was admitted and I think I earlier had stated the opposite.  So I just wanted to correct myself.

THE COURT:  Very well.  Go ahead.

MR. SCHARDL:  Thank you.

DIRECT EXAMINATION CONTINUED

BY MR. SCHARDL:

Q     Dr. Miora, going back to the intelligence testing that

1203

Dr. Young did, the WAIS, was the WAIS itself, the Wechsler Adult Intelligence Scale, has that been around for a long time?

A      Yes.

Q      How long?

A      For seven some decades.

Q      And the version of the test that Dr. Young administered was the WAIS-IV, I think you said?

A      Yes.

Q      The criteria that the WAIS-IV used to measure intelligence, what are the components of that?

A      Attention or what they call Working Memory Index, processing speed, which is a processing speed index score, verbal comprehension, which is the Verbal Comprehension Index score and perceptual reasoning, which is the Perceptual Reasoning Index score.

Q      And how long have those components been a part of the Wechsler Adult Intelligence Scale?

A      They were a part of the III and they were a part of IV.  Prior to III, the processing index score was not included.

Q      And what is the reason that companies release new versions of -- or is it a version or a -- I guess, yeah, a new version of the test?

A      The new version of the test was prompted by the fact

that so many years had passed that the normative population that had been used in test development back in 1997, I believe, for the III is not the same as the people on whom the test might be normed. So it was outdated norms that prompted the development.

Q    When you say norms, are you referring back to that slide we looked at before with the bell curve, like normal is -- when you say norm, normal is the center of that bell curve?

A    Right. And the idea that any measure on that bell curve was part of the -- yes, there was a population upon which that was established, the normal bell curve and any-thing in or out of it.

Q    So you are saying that after time, as I understand it, the normative data for the older version is no longer good?

A    Right. It kind of times out, so to speak.

Q    What was Mr. Barrett's full scale I.Q. on the WAIS-IV?

A    Do you want the slide up? No?

Q    You could just give us the number.

A    Okay. It was 82, which is at the 12th percentile.

Q    And where does that fall in the bell curve?

A    Low average.

Q    And is that the only thing that one would look at when examining results on tests like the WAIS?

A    No.

Q      What other components do you look at?

A      Well, you look at the index scores that go into the full scale I.Q.

Q      What are the index scores -- can you just name the index scores for the WAIS?

A      Yes, those are the ones that I just named, the verbal comprehension, perceptual reasoning, processing speed and working memory.

Q      Okay.  And were there any domains or subtests where Mr. Barrett's performance was impaired on the WAIS?

A      Yes.

Q      Which were those?

A      Are you asking about subtest scores or index scores that come from the subtests?

Q      I appreciate that.  Perhaps let's clarify that for the Court.  When we say index score, what do we mean?

A      Each index score is made up of various subtests.  So, you know, the person is tested on the 10 standard subtests, they get scored and then out of that are derived the index scores.

Q      So the index score is sort of an amalgam of the scores on all of these subtests?

A      Yes, a composite and then the full-scale I.Q. is the, you know, Crem de la Crem.  Although if there are variabilities in the index scores, it is very important to

1206

consider those because they may inflate or lower a full scale I.Q. score.

Q    And was there a variability in Mr. Barrett's index scores?

A    Yes.

Q    And did you prepare a slide to illustrate that for the Court?

A    I did.

THE COURT:  Can I show the Court -- I don't know what number I am on here, but -- this would be slide 8, I think, in the deck.

THE COURT:  Go ahead.

BY MR. SCHARDL:

Q    Okay.  Looking at this slide, Doctor, that says intellectual functioning, what are the index scores that are of a significant difference that you were talking about?

A    The Processing Speed Index score, the bottom score there where it says standard score of 65 --

Q    PSI, the row PSI?

A    Yes, which stands for Processing Speed Index.

Q    Okay.

A    It is significantly lower than any of the other index scores.

Q    And why is it important or is it important that that one score is significantly lower than the others?

1207

A      Yes, it is significant because it speaks to a particular area of deficit.  In addition, coupled with the lower working memory index score, it tells us that the full scale I.Q. score is probably not an adequate representation of Mr. Barrett's abilities.

Q      So what was his percentile rank on the processing speed index?

A      It was a the first percentile.

Q      And what does that mean?  Can you translate that into something that isn't statistics?

A      It means that 99 percent -- I am sorry, that's statistics again.  Most people, 99 percent of age matched cohorts, would do better than he on those kinds of tasks.

Q      Now, what exactly is processing speed?

A      This version of processing speed has to do with the ability to visually scan, analyze and associate material and select from a -- well, there were two different aspects of it, but basically it involves visual attention and quickness, speed.

Q      Were there other -- are those the only index scores? that you wanted to call to our attention on the WAIS?

A      There is a global general abilities index score, which I apologize for not having up there.  If you could hang on a moment...(PAUSE)  the general abilities index score is calculated if you see this kind of variability that is

1208

significant.  It is statistically significant in terms of the -- you know, the manual and it also -- just even eyeballing it to see an 18 point spread between the two lowest scores is significant.  Just a moment...(PAUSE)  Okay.  I am looking at the WAIS-IV printout that I generated.  I apologize for the delay.  I don't have it.  So the basic idea is his score would be a bit higher, the full scale I.Q. score because it would be made up of the verbal comprehension and the perceptual reasoning tasks.  So it would be in the low 90s rather than at 82.  It shows areas of deficit and it neglects to show the strengths, which we've discussed.

Q     Now, whenever you administer a test like this are you able to test the person's functioning at some time in the past?  Is it going to give you a picture of their performance at some date in the past?

A     I have a compound answer, yes and no.

Q     Fair enough.  Okay.  Can you explain it?

A     Yes, in the sense that some of the functions measured are what they call hold functions or hold tests.  For example, the meaning of words is something that you learn and you will know.  You don't lose that as quickly as you might with a not hold test like attention.  Attention -- that can be long-term problems and -- and, you know, it can be in the moment, but I am not sure I am answering the question you are asking.

1209

Q    Would you also -- when administering tests would you look back at other tests that were done in the past?

A    Absolutely.

Q    To check for consistency?

A    Yes.

Q    Hypothetically if you knew that Mr. Barrett had been given a WAIS back in 2002 and you knew that his verbal score in 2002 was 99 and his performance in 2002 was 93, would that be consistent with the results seen on the WAIS-IV in 2009?

A    Yes, and the confidence interval, the range within which the real score would be expected to fall, is a good way of thinking about that.

MR. WILSON:  Your Honor, I need to object because I am not sure where counsel is getting the numbers.  So I am just asking if -- for some explanation of where those numbers are coming from.

THE COURT:  Well, I think they were hypothetical, weren't they?

MR. SCHARDL:  I believe that's right, Your Honor.

THE COURT:  Okay.

MR. SCHARDL:  But for the record, if it assists, I was drawing on Dr. Sharp's report from 2002.

THE COURT:  Okay.

BY MR. SCHARDL:

Q    Moving on, Dr. Miora, were there other measures on --

1210

or measures on the WAIS that you thought were significant in this case?

A     Yes.

Q     What were those?

A     Within the area of perceptual reasoning, his matrix reasoning score of 9 -- I am sorry -- of 7 as compared to his scaled score of 10 on block design is a one standard deviation difference.  The 10 is at the 50th percentile.  So when he is asked to put blocks together to make them look like designs, he has an average performance.  By contrast, when he was asked to look, visually attend to puzzles of increasing complexity --

Q     That's the matrix?

A     Yes.

Q     Okay.

A     He was less capable.  And while the score is only at the low average range, that difference relative to other scores in the battery -- that's how you develop a profile, is by looking at things that are similar and different across the test.  So that will become useful when we go over some of the other results.

Q     Are you --

A     And the other thing, I guess I mentioned, was his working memory index was lower than the other two categories and is significant in thinking about his having had

1211

attention difficulties, was having time registering digits of increasing length, numbers, and being able to recall them back or recall them in reverse and also putting together numbers and letters.

Q    Are you familiar with the repeatable battery for assessing neuropsychological symptoms?

A    Yes.

Q    The RBANS?

A    Yes.

Q    And are you familiar with that battery having an index for attention?

A    Yes.

Q    Hypothetically you knew that Mr. Barrett had a --

MR. WILSON:  Objection, Your Honor.  This goes beyond the scope of any declaration, any raw testing data, anything provided to the government as a part of this particular witness's testimony.  I am going to object to any reference to RBANS or questions about RBANS.

THE COURT:  Did Dr. Young use the RBANS?

MR. SCHARDL:  No, Your Honor.  But if I may, in notifying the government of Dr. Miora's testimony, we stated that she would be prepared to testify to anything in either of her two declarations or in the declaration of Dr. Bigler. And Dr. Bigler did specifically refer to the administration of the RBANs in this case.  Again, it is a hypothetical

1212

1719

question about testimony that has already come in.  The Court

has received testimony about the administration of the RBANs

in this case.

THE COURT:  Objection sustained.

BY MR. SCHARDL:

Q     Doctor, I think you testified before that you would look for consistency across different measures; is that correct?

A     Yes.

Q     So on the attention on the WAIS, where was Mr. Barrett's performance?

A     Attention on the WAIS was at the 13th percentile, which is in the low average range.

Q     The 13th?  Can you tell me what you are looking at there?

A     The Working Memory Index score.  You are talking about attention on the WAIS?

Q     13th percentile?

A     Yes.

Q     Was there anything about Dr. Young's assessment of sensory and motor functions that you found significant in this case?

A     Yes.

Q     What was that?

A     Mr. Barrett's performances ranged from extremely low

1213

to mildly to moderately impaired on finger tapping, which is more a measure of a speed.  On the grooved peg board he was one standard deviation below the mean on a task that required more fine motor coordination.  Additionally he performed very poorly on the tactile number recognition, the Reitan Klove Sensory Perceptual Examination.

Q     And what's the significance of that?

A     It tells the examiner that there is information that is not getting to his brain.  He is not able to process it. What they do in the Sensory Klove is to draw numbers on your fingers and it is a task that most people can complete.  He did very poorly on it suggesting there is something interfering with that information getting to his brain at a sensory level, as well as I've already talked about visual attention.

Q     And what areas of the brain are involved in that --

A     I was going to say the parietal lobe is very involved in that.

Q     And the parietal lobe, that's behind the front lobe; is that right?

A     Yes.

Q     And above the temporal lobe?

A     Yes.

Q     Sort of at the top side of that?

A     Exactly.

1214

Q     And is that consistent with the results seen on the WAIS?

A     Uh...

Q     Or are they measuring just completely different things?

A     I would say they are measuring different things.

Q     Moving on to the next area of Dr. Young's testing, how did she go about assessing attention and concentration?

A     Okay.  In terms of attention and concentration, that area was covered by some of the subtests on the WAIS, like coding and simple search, which are tasks which require visual attentional focus and then executing an action.

Q     Let me take those one at a time.  So coding, how long have people used this coding task to measure attention and concentration?

A     That's been around for decades.

Q     And what is it?  What is the test?  How does it work?

A     The way the test works is that an individual sees at the top of the page boxes.  There are numbers in the top part and there are special marks in the bottom part with each number having its own mark.  And then what they are to do is on a sheet below that model, they are to fill in boxes with the special marks that should go there, according to the key, and they are supposed to do it as quickly as possible. It is called an associate of learning task, but hopefully if your working memory -- you know, if you are processing, after

a while, you know, you continue to remember what the mark is for the one or the nine or the six. They are simple marks.

Q    So his performance should go up? Is that what you are saying?

A    Yes.

Q    Okay. And how did Mr. Barrett do on coding?

A    He performed at the second percentile on that task.

Q    Okay. And that means that 98 percent of the population performs better at that?

A    Yes, and his score is two standard deviations below the mean, which is when we are talking about moderate impairment.

Q    Okay. Moving on to simple search, how does that test work?

A    The way that test works is the individual looks at a sheet on which there are two symbols. They have to deter-mine if either of those symbols appears in a next row of symbols and they have a number of these items to do as quickly as possible. These are both timed tasks, so time is key, visual attention is key, and being able to perform them as quickly as possible is key. And he clearly has a weakness, a significant weakness in that area.

Q    What was his score on that?

A    His score on that was a scale score of 3, which is at the first percentile.

Q    Meaning that 99 percent of the population did better?

A     Yes.

Q     Right.  And that is, again, a test of attention?

A     That's a test of attention.  Attention is a complex system.  This is a test of his capacity to focus and execute.

Q     Focus and execute.  Focus and attention sound synonymous to me.  How does -- what's the difference between what's being measured there and on the coding?

A     Coding is also a focus and execute test.

Q     Oh, okay.  All right.  What other specific tests of attention and concentration did Dr. Young rely on?

A     The digit span task, the letter number sequencing task.  Those are both on the WAIS.  The start of the list learning task that I was talking about, all of those involve being able to encode information.  You have to attend in order to be able to encode.

Q     And digit span, has that been around for a long time?

A     Yes.

Q     And can you tell the Court what you mean by digit span?

A      What happens is the individual is read a series of numbers.  The numbers increase in length, so it gets harder and harder, and they have to repeat them back.  A second portion of the task involves them being read numbers, so auditory verbal.  And then they have got to repeat them in reverse.  So you see where there is kind of a working memory component because they have got to take what they've heard,

1217

hopefully they have registered it, and then reverse it, the order.  So that's the thinking on your feet in a very basic way.

Q     And how did Mr. Barrett do on that?

A     He obtained a score one standard deviation below the mean at the 16th percentile.

Q     Is there a test called the trail making test that you were referring to before, the drawing lines between the -- it is like connect the dots?

A     Yes.

Q     Is that basically it, connect the dots?

A     Well, it is connect the dots.  However, it might be ignore the other dots or it might be letters and numbers. There are a number of different conditions and he showed some difficulties in some of those trail making tasks.

Q     And what is that measuring?

A     That is -- well, if we could pull up the slide, it might be helpful for people to see it.  If you can't find it, I understand.

Q     Which one...is that the --

A     There is one where the focus is -- oh, you've got it up.  Okay, thank you.

        MR. SCHARDL:  Your Honor, is that okay, if I show the Court that, slide 10 of the deck?

        THE COURT:  That's fine.

1218

MR. SCHARDL:  Thank you, Your Honor.

THE WITNESS:  My apologies for not having page numbers also.  That was definitely a limitation on my part.

BY THE WITNESS:

A     You see TMT visual scanning, so it is tell us, once again, that when he is asked to visually scan, that is an area of impairment.  He got what is called a scaled score of 4, which if 10 is the mean and the standard deviation is 3 points, he is two standard deviations below the mean and that's considered moderate neurocognitive impairment.

BY MR. SCHARDL:

Q     So these are all measures, it sounds like, of visual attention; is that correct?

A     Yes.  Now, digit span, no.

Q     Oh, that's the measure of --

A     Yeah, but coding, symbol search, trail making, visual scanning are all about visual attention and quick.  The idea in all of these tasks are you are being timed as well.

Q     And what's the sort of sum total of the take away from all of these measures of attention and concentration?

A     The take away is that he has difficulty in -- he has shown to have difficulty in pressured situations where he has to visually attend to what is going on and generate a response.  And, of course, the other take away is it is related to circuitry in the brain.  It wasn't permitting him

1219

to --

Q      What is --

A      Frontal to subcortical circuitry.

Q      Moving on to the next area that Dr. Young measured, her assessment of memory and learning, what test did she use to measure memory and learning function?

A      She used the California Verbal Learning Test, the CVLT.  She used the Rey Complex Figure Test.  She used --

Q      Let me take you through those one at a time.

A      Oh, okay.

Q      The California Verbal Learning Test, was that available in 2005?

A      Yes.

Q      The Rey Complex Figure Test, was that available in 2005?

A      Yes.

Q      That's a pretty old test, is it not?

A      Yes.

Q      Back to like the '40s or something like that?

A      I can't give you a specific date, but it has been around for quite some time.  And the version she used was clearly around well before 2005.

Q      So the Rey, the CVLT, what other measures of memory and learning ability?

A      The WMS, the Wechsler Memory Scale.

1220

Q    And she used which version of that?

A    She used the 4th Edition.

Q    And did it -- did the 4th edition use the same criteria for measuring the same thing as the 3rd edition?

A    Yes, the functions are the same.

Q    It is not like a different way of assessing memory or learning?

A    No.

Q    And were there any significant results from the administration of those tests of learning and memory?

A    Yes.

Q    What were the deficits that Mr. Barrett showed in that testing?

A    Well, there was a significant decrement between a really high scaled score when he was asked to remember a story narrative right away and then when he was asked to remember it 20 minutes later, 20 to 30 minutes later. Although they are both in the normal range, it is something that as neuropsychologist one would be looking at and thinking ah-hah.

Q    Well, what was the difference?

A    84th percentile for the immediate recall as compared to 37th percentile for the Delayed Recall.

Q    Was this verbal information or auditory information?

A    Verbal information, auditory verbal.

1221

Q      Auditory verbal.  I meant visual, not --

A      Right, it is not visual and that is significant.  Like the scores on the WAIS, in the areas of verbal it is higher than what you see in the visual domain.

Q      Okay.  Were there any deficits that appeared in his testing on these instruments?

A      Yes.

Q      And what were they?

A      I am just referring to my notes here.  There was one huge discrepancy between his visual memory, which is an index score, which was at 130, a standard score of 130 with a mean of 100, meaning it was well above the mean, at the 98th percentile.

Q      And I am sorry, what was that specific ability there?

A      Visual memory.

Q      Visual memory.  But as I understood your testimony before, you were saying there is a difference between short term and medium term and long term.  So which of those are we talking about?

A      Visual memory, we are talking about not -- we are talking about something that stayed in his mind and he was able to bring up, not something he had to recall immediately. If you look right below -- oh, you are not in the slide.

Q      Did you prepare a slide of all of the measures for memory and learning?

1222

A      Not all of them, but a good number of them.

Q      Those that you felt were significant?

A      Yes, in positive or negative ways.  If you look at visuospacial and working memory functions...

Q      You are saying that that's a slide?

A      Yes.

MR. SCHARDL:  May I turn to that, Your Honor?

THE COURT:  Yes.

BY MR. SCHARDL:

Q      Okay.  Could you explain what -- are any of the scores that you were just talking about on this slide?

A      If you look at the third to last and second to last --

Q      Excuse me one second.

MR. SCHARDL:  For the record, we are looking at slide 13 of the deck.

BY MR. SCHARDL:

Q      So -- I am sorry, Doctor, you were saying which scores?

A      If you look at the third to last and the second to last items under score, visual memory and visual working memory, visual memory, as I was saying, was an exceptionally strong performance, at the 98th percentile.  However, the Visual Working Memory Index score was at 70, which is two standard deviations below the mean, like na I.Q. score, at the 2nd percentile, borderline, should say extremely low.

Q      So what's the difference between visual memory and

1223

visual working memory?

A    Visual working memory is in the moment, on your feet, you are being asked to respond to something right away and visual memory is over time.

Q    But the same pattern of disparity that we were talking about before?

A    Yes.  And the reason I have the slide as I do is that it shows problems in working memory that span visual attention and some, though not as low, in auditory attention, but it seems that attentional systems are key to his profile.

Q    So moving on to the tests that Dr. Young did to assess language, is there anything of significance to you in that testing?

A    Yes.  Consistent with the kinds of disparities you see between intellectual ability and academic functioning, you see that spelling and arithmetic are quite low.

Q    On what tests are you talking about?

A    This is -- I am sorry -- the Wide Range Achievement Test, 3rd Edition.

Q    Okay.  So is that an instrument that was in wide use back in 2005?

A    Yes.

Q    I think it is called the WRAT, in the trade; is that right?

A    That's correct.

1224

Q    The silent 'W' for some reason.  And has the WRAT been used for quite a long time to measure academic achievement?

A    Yes.  And when you see a large disparity between academic functioning and intellectual, you know, I.Q., intellectual ability, it is suggestive of possible areas of a learning disability.

Q    Is that consistent with the history that you have of Mr. Barrett?

A    Yes.

Q    I would like to move on, Doctor, to Dr. Young's assessment of Mr. Barrett's executive functioning.

MR. SCHARDL:  One moment, Your Honor.  (PAUSE)

BY MR. SCHARDL:

Q    So, Doctor, moving on to executive functioning, just -- I think we've gone over what that is.  So let me ask you how Dr. Young measured executive function.

A    She used a battery of tests specifically devoted to the assessment of executive functions.  It is called the D-KEFS. The Delis-Kaplan Executive Function System.

Q    Is that a widely used instrument?

A    Oh, yes.

Q    How long has that been around?

A    That has been around for at least two decades now.

Q    Are tests of executive function common in a forensic context?

A    Yes.

Q    And the D-KEFS, the Delis-Kaplan Executive Function System, is there ecological validity testing behind that test?

A    Yes.

Q    So let's -- and again, the areas of the brain that are involved in executive functions are which?

A    Well, it is the frontal lobes, but we have to remember that it is the frontal lobes in relationship to the regions that come from subcortical regions, the reticular activating system, a person has to be aroused to be able to respond to what is going on out there or what they are being asked to do.

Q    And going down the tests that Dr. Young administered on executive functioning, what is the first test that is a part of that system that she produced results for?

A    That would have been the trail making test.

Q    And that's the connect the dots kind of thing that we were talking about before?

A    Yes.

Q    Now, how is that -- you said that there are variations of it, that it is not like a child's game, I guess, of one, two, three, four, five, A, B, C, D or whatever.  What are the variations that make it a little more interesting than a child's connect the dots?

1226

A      Well, one has to flexibly shift between numbers and letters, for example, or one has to visually scan and only respond to a particular number, like a 3 and make a mark through only the 3s.  So those kinds of tasks.

Q      So does the neuropsychologist give the person different sheets, I guess, to perform each of these different tasks on?  Is that how it works?

A      Yes.  Basically the trail making test has a number of different conditions, they are called, and so they are provided the sheet on which they are asked to perform the task.  They are timed and, you know, errors are -- where they responded when they shouldn't or where they failed to respond, those kinds of things are evaluated as well as the time, so time and accuracy.

Q      Okay.  And how many of these conditions did Mr. Barrett -- how many was he asked to - requested to meet or perform?

A      All, all, all of them.  And when he was asked to visually scan, he showed moderate impairment, two standard deviations below the mean.

Q      On visual scanning?

A      Yes, which again is that -- yes, visual attention. When he was asked to sequentially process numbers, his performance was slightly below average.

Q      Is the trail making test, is that considered fairly

1227

sensitive or how -- where does it fall on that scale?

A    It is very sensitive and I think I may have mentioned earlier they use it in conjunction with trying to decide if somebody should be driving, for example, with an older adult.

Q    So his visual scanning, that was impaired you said?

A    Yes.

Q    Were there other impairments that showed up on the trail making test?

A    There were mild impairments in his ability to shift from -- to alternate between letters and numbers.

Q    So let's -- could you explain that a little more, what you mean by shifting?  How does that -- how does it test that?

A    Well -- and this goes for the old trail making test as well.  One is asked to draw a line alternating between numbers and letters.  So it might be 1 to A to 2 to B to 3 to C.  So it is a little more cognitively complex, maybe not for everybody, but, you know, it is more complex than simply drawing a line in numbers 1 to 9.

Q    And then this test is normed, I assume, against the population like all of the others that we are talking about, so that --

A    Yes, these were all co-normed, all of the subtests of the D-KEFs were co-normed together just like WAIS and the WIMS (sic).

1228

Q      So that area, that type of switching where he had to go from performing the task in one way to another way, that was an area of difficulty?

A      Yes.

Q      And what other tests -- were there any other tests of executive function that were in the same area of like visual scanning and switching?

A      No.  And if there were, I am missing something.

Q      Well, on the test of the number/letter switching, that you were talking about, what did you say was Mr. Barrett's percentile rank there?

A      Oh, my gosh, yes, I have this on another side.  I apologize.  His letter/number switching, which is that alternating, was at a scaled score of 7.

Q      A scaled score of 7?

A      Yes.

Q      And you translate that into --

A      That is one standard deviation below the mean, which would be a score of 10 and at the 16th percentile.

Q      The standard deviation being 3, it is one standard below --

A      Yes, sorry.

Q      And what about on visual scanning, was there a measure of that on the trail making test?

A      Yes, and that was the one I had noted was a scaled

1229

score of 4 and is in the moderate range for impairment because it is two standard deviations below the mean of 10 which a standard deviation of 3.

Q    I think you noted that the examiner is looking not only at what the person does, but the things that they don't do, the omissions.

A    Yes.

Q    Was that at all significant in Mr. Barrett's case?

A    He did score at the 13th percentile in terms of omissions and while this may not seem significant unto itself, it is mild impairment, it is significant in the overall context of looking at how he processes visual information as well as when he has got to think on his feet.

Q    It is consistent with that being a weakness?  Is that what you are saying is --

A    Correct.

Q    And you were mentioning also that the examiner looks at the errors that the person makes.  Does that all just get fed into it or is that a separate measure that you score?

A    Well, there are different kinds of errors.  There are errors of omission, which is when they should have done something that they did not do, and then there are errors of commission, which is when you do something that you shouldn't have done.  There are also errors of what is called set loss. Set loss has to do with -- you know, you have been going

1230

along and going from 1 to A to 2 to B and you've been doing

what you were asked to do, but suddenly you either lose focus

or you get lost.  So whatever you were doing is suddenly --

it is like an intentional blip.

Q     So it would be like applying a rule and then suddenly

it is just like you -- it is not there to be applied?  Is

that what you are saying?

A     Right.

Q     And did that show up on this test?

A     It did.  He had 22 percent of all of his responses

that were what we call set loss errors and this was a below

average score.  The sequencing errors that he made were at

the 16th percentile, which is also below average.  So, you

know, little cognitive complexity got added to the equation

and he had more difficulty.

Q     Moving on in the D-KEFS, what is the next component

of that system that Dr. Young looked at?

A     I have verbal fluency, but I am not sure --

Q     And was there any impairment shown in the test of

verbal fluency?

A     Yes.  And again, it was the percent -- switching

accuracy that was at issue.

Q     And what was his score on that?

A     You know, again -- okay, the score was a scaled score

of 4, which is 2 standard deviations below the mean of 10.

1231

It is moderate impairment.  So you might be asked, for example, to say girls' names and pieces of furniture.  You've got to switch back and forth between Jane/table, Bobby/desk, you know, that kind of thing.  So, again, it is being asked to do something rapidly and to switch.

Q     And this time though it is not visual information as in the trail making, it's verbally communicated information?

A     Yes.  And again, working memory is a huge part of executive function, that idea of being able to think on your feet and respond to what you are being asked to respond to and accurately.

Q     What was the next test of executive functioning within that D-KEFS?

A     Well, what I have down here of note was the Tower Test.  I can explain what that is, if that would be helpful.

Q     Yes.  What's the -- well, was there any impairment that showed up on that test?

A     Yes.

Q     Okay.  So what is it, what is the Tower Test?

A     The Tower Test is one in which there is a wooden peg board and there are disks of different dimensions, bigger ones, littler ones, and you've got to move them to make a pattern that copies the pattern made by the examiner and you've got to follow the rules.  You've got to put only the right size disks on the right spindles and, you know, you

1232

are not allowed to move two at a time.  He showed very strong problem solving, it was average, it was slightly above average in a scored scale of 11.  However, that can't be thought about outside of the fact that his move accuracy was at a scaled score of 3.  So, you know, it showed -- which is clearly a moderate to severe level of impairment.  And when it is --

Q    So move accuracy means what?

A    Move accuracy means you are following the rules and accurately working to solve the task.  So it tells us that -- this is the kind of task that requires planning.  You know, you see what you are supposed to do with the model and then you are supposed to do the same thing as quickly as you can and following the rules in as few moves as possible.

Q    So is --

A    The move accuracy relates to the number of moves. So sometimes people don't think before they take action and they are going to have to make more moves to create the same -- the model in a --

Q    The examiner creates a model and tells the person to recreate the model in the least number of moves and in the least amount of time.  Is that the idea?

A    And following the rules, right.

Q    By following the same rules, like you --

A    Right, yeah.

Q      -- can't --

A      Right.

Q      -- move two at the --

A      Uh-huh, yeah.

Q      -- same time or something like that?

A      So his move accuracy was moderately impaired.  His rule violations were mildly impaired.  So he had difficulty remaining within the framework even though he did well on the task.

Q      Now, was there another test on the D-KELFS that Dr. Young administered?

A      Yes.  (PAUSE)  I am just going through my notes.

Q      Is that the sorting test?

A      Yes.

Q      And was there any impairment shown on the sorting test?

A      I'm having trouble locating it.  I apologize to the Court.  I just need to look to find the information so I can respond to it.

            THE COURT:  Take your time.

                            (PAUSE)

BY THE WITNESS:

A      Okay, so I have found the sorting test.  Could you repeat your question?

BY MR. SCHARDL:

Q      Was there any impairment shown on the sorting test?

1234

A     Yes, and the impairment was in the area of sort recognition.

Q     What is sort recognition?

A     He correctly sorted by category, but he had difficulty recognizing in a --

Q     Let me stop you.  What is being sorted in this test?

A     To tell you the truth, I am not remembering right now. I am having a conventional blip.  I believe the idea is that there are categories of information and the individual has to sort whether it is colors or other kinds of concepts and they have to sort to the category.  I am not sure about the sort recognition score.  I am sorry.  I see it is impaired, but I right now cannot tell you why.

Q     All right.  Well, let's move on.  So summing up the results of the D-KEFS, the Delis-Kaplan Executive Function System, is there an area of the brain that these results indicate was damaged?

A     Yes.

Q     What area is that?

A     The areas of the brain are the dorsal lateral and the orbitofrontal.  The dorsal --

Q     Okay.

A     Yeah.

Q     So dorsal, like dorsal fin; correct?

A     Yes.

1235

Q     So that's like the top; correct?

A     Yes.

Q     Lateral like in football, like to the side?

A     Yes.

Q     So dorsal lateral is top side and pre-frontal means like right before the frontal?

A     Yes.

Q     Okay.  So dorsal lateral frontal -- just so that we are all looking at the same brain space, I guess.

A     Well -- and he shows impairment in all of those areas, his frontal function and his -- yeah, impaired.

Q     And is that the sort of take away from all of the descriptions you gave previously regarding the switching and the other measures of executive function on the D-KEFS?

A     To some extent, yes.  I haven't really talked much about inhibition and the idea of -- I mean, maybe I have, but there was another element of the D-KEFS which had to do one has to read colors, words that are -- the names of colors.  Then one has to name ink color and then one has to inhibit one's self from responding to the written word and name the ink color.  So, in other words, you are being asked to divide your attention, inhibit your tendency to respond to one item and respond to another.  So two things are going on at once.

Q     So this is a separate test within the D-KEFS?

1236

A      Yes.

Q      Okay.  So let me make sure I understand what you just said.

A      Okay.

Q      You have a word written on a page; correct?

A      (No Response).

Q      We need a verbal response.

A      Yes.  I apologize.

Q      So you have a word written.  And then you said there is -- you have to inhibit -- the word is printed in a particular color?  Is that the idea?

A      Yes.

Q      And so --

A      No, not initially.  First you have just words.

Q      Like --

A      And then you have got to read the words --

Q      Like on a piece of paper --  I am sorry.  Okay.  Go ahead.  At first the person is just shown --

A      The first condition is color naming on this version of this task.  So they have to name colors.  The second condition they have got to read words.  And you are seeing how quickly they can do it and how accurately they do it.

Q      Excuse me.  But the word you are reading is the word like red or green; is that correct?

A      Yes.

1237

Q    All right.  So that's the second condition.  Next.

A    And the third condition you have to inhibit the inclination to read the word and name the color of the ink. So you have got the words printed of color names and then you've got the ink in a contrasting color.

Q    Red would be written in --

A    So the word green --

Q    -- green --

A    -- might be written in blue, right.

THE COURT:  Don't, don't -- try not to talk over each other, if you can.

MR. SCHARDL:  I apologize, Your Honor.

THE WITNESS:  I apologize.

THE COURT:  It's okay.  We have just got to be able to get it all down.

THE WITNESS:  I apologize.

BY MR. SCHARDL:

Q    I believe you were saying the word green might be written in red, for example?

A    Right.

Q    And the patient is told tell me the color it is printed in not the word; is that right?

A    Right.

Q    Or vice versa?

A    Right, to read -- to name the color and not -- oh, is

1238

that the same as what you said?  Right.  But the idea is you've got to inhibit one response which would be to read the word and just name the color or, right, just name the color and don't read the word.  So on that third inhibition condition, he made a total of -- his total number of errors placed his score at a scaled score of 6, which is slightly below low average, but it shows an inclination to have difficulties with inhibiting one response in favor of another if presented with more than one stimulus.  It is very similar to the trail making where there was the difficulty with switching...

Q     So a consistent result there?

A     Right.

Q     I apologize.  I did skip over that Color Word Interference Test.  Does that complete the D-KELFS?

A     No.  He did take a design fluency test.

Q     Was there any impairment in that?

A     No.

Q     In general, something like the D-KELFS, is it designed to measure how a person will perform in daily life?

A     Some of the tasks are -- it is not a one-to-one correlation, but the skills, the functions that are measured by the D-KELFS, do predict and say something about how that person would function in different circumstances.  You know, depending on whether there are verbal demands or demands

1239

for, you know, quickly being able to move from one kind of activity to another, yeah.

Q      Is it designed to measure how someone would perform in an extreme situation?

A      No, it's not normed in that way in any way, shape or form.  It is looking at functioning.

Q      So when you establish someone's performance on these tests, does that give you like a sort of baseline of their functioning?

A      Yes.

Q      And does that tell you necessarily how they are going to perform under similar circumstances, but that are more extreme?  For example, you said that Mr. Barrett had difficulty when more than one piece of information was provided, I think; is that correct?

A      Yes, or there were competing -- yes, stimuli and he was asked to respond to one thing and not another, yeah. Increasing cognitive complexity is a challenge for him.

Q      So does the science tell you anything about whether someone is likely to perform better or worse than their base line when under extreme stress?

A      Some predictions can be made about that based on -- yes, based on their functioning and predictions can be made similarly about where they might do well.

Q      And in this case, based on the results on the D-KELFS,

1240

are you able to say anything about how Mr. Barrett would do compared to that base line when under extreme stress?

A       Yes.

Q       What would that be?

A       When he has to perform -- and specific to the D-KELFS, not the overall testing?

A       Yes.

Q       Okay.  When he has to act quickly and has to pay visual attention and has to switch between different kinds of activities very quickly and in a thoughtful guided way, he will have more difficulty when he is under stress.  He would be inclined to make errors.

Q       And his base line on those measures was impaired; correct?

A       The ones I am talking about, yes.

Q       And then he would be expected to perform worse when under extreme stress?

A       Exactly.  I think the -- could I say something or no?

Q       Well, I didn't ask you a question, so...I would like to move on to the Wisconsin Card Sort, if I can, because I think that's the next test that Dr. Young administered in the executive function category; is that correct?

A       Yes.

Q       And this Wisconsin Card Sort test, is that a frequently used measure of executive functioning?

1241

A     Yes, very frequently and has good ecological validity.

Q     Has it been around for a long time?

A     Yes.

Q     Decades?

A     Yes.

Q     And what areas of the brain are being implicated or brought to bear when doing the Wisconsin Card Sort Test?

A     The dorsal lateral area of the front cortex is highly implicated in this task.

Q     So some of the same areas that we were talking about previously?  And did Mr. Barrett show any impairment on Dr. Young's administration of the Wisconsin Card Sorting test?

A     Yes.

Q     And what was that?

A     There were several areas that were highly impaired, the most obvious of which is that he was unable to complete any of the six categories accurately.  Would it help to explain the --

Q     Well, yeah, let's talk about it.  So we are sorting cards, I guess, from the name?

A     One is sorting cards, one is sorting cards in response to an unknown principle.  They have got to figure out what the principle is, you don't tell them.  However, the examiner is providing feedback after each sorting effort correct/

1242

incorrect.  Of course, in the best of circumstances the hope is somebody will be able to hear and use the feedback to alter their performance.

Q    Okay.  So you are handed a deck of cards and you are told there is some organizing principle, like suits, like -- something like that?

A    Uh-huh.

Q    Is that correct?

A    Yes.

Q    But it is not as obvious as suits?  Is that the idea?

A    No, it is -- no, they are pretty obvious.

Q    And you have to figure it out though?

A    Yes.

Q    Okay.  And --

A    There are a number of ways one might sort the cards and you've got to figure out which is the right way and the right way is based on, you know, the examiner knows how the test goes.  So...

Q    So like with a standard deck of playing cards, you might organize them by red -- all of the red face cards or all of the black face cards or whatever --

A    Exactly.

Q    -- or the suits or --

A    Exactly, right.

Q    And so --

A    All of the 2s, all of the 4s, whatever it is, yeah.

Q    So in what areas was Mr. Barrett impaired on this test?

A    Well, along with not having actually solved any of the categories, there is an index for the percent conceptual level responses.  Well, you have to be able to think about it and think about the feedback and his score was at the less than first percentile.  He was not able to think about it and figure it out.  As a misleading score, which is the percent perseverative errors, you know, how many times did he keep trying to sort the same way even though he was told incorrect, incorrect --

Q    Excuse me.  So perseverative meaning what?

A    Perseverative meaning you keep trying to sort the same way.  You keep on going even though you are being given feedback that is not the correct way and you keep on going and you keep on going.  He did not do that.  So his score on the percent perseverative errors was at the 68th percentile, which sounds wonderful, but when you put it in the context of the other scores, that he didn't solve any categories and there were no -- you know, less than first percentile in terms of conceptual level responses, it is meaningless.

Q    I see.  So you said that he was -- he didn't solve any of the categories.  Were there other measures on this test to which he showed impairment?

A    Yes.

Q    What were those?

A    He -- the percent of errors itself, by definition, given that he didn't sort any categories, was at the less than first percentile.

Q    And what is the -- is category sorting a separate area of executive functioning or what is -- or what is being measured by this?  Are we inferring some other ability from this one?

A    Well, it is like sorting in the sense that the idea is to get a concept and to be able to sort, in this case, the cards, not colors and other variables like in D-KEFS, but you are supposed to be able to sort the cards.  If I sort -- if I put a King under a King, let's take a standard deck of cards, and that's correct, then you would say correct and I would realize, ah-hah, maybe it is kings.  On the other hand, I might put a 10 of hearts under a king of hearts and you say correct and I think ah-hah, you know, maybe it is the hearts. So the idea is -- and then you have got to stick with -- you have to be able to stick with the concept until it changes, it changes unbeknownst to the examinee.  So for a time there is one principle and then you alter the principle, but since he didn't get any, there was no altering the principle. They have to complete 10 trials correctly before you change to another principle.

1245

Q    So I assume then what is being measured is your ability to get the concept and to follow through; is that correct?

A    To problem solve, to reason.  Now, I will say, on a positive note, he did not lose set, meaning he didn't get the concept and then, you know, forget it, but that's because he never got the concept.  So...

Q    Okay.  I would like to move onto the next test of executive functioning that Dr. Young administered.  Is that the Short Category Test?

A    Yes.

Q    And what does it measure?

A    Very similar to the Wisconsin Card Sorting Test.  It is measuring problem solving, reasoning, dorsal lateral kinds of functioning.  Again, the person is given four numbers and then they see designs.  The numbers are 1, 2, 3, 4.  They see these designs and they have to associate what they see, the designs, with a number, 1, 2, 3 or 4, and then they are told it is correct or incorrect.  Same idea in which the principle changes after a time.

Q    Let me ask you, is this test, the Short Category Test, has that been around for a long time?

A    The Short Category Test is newer but it is based on the original categories test developed in the '50s by Halstead- and Reitan and the Short Category Test has a very high correlation to the original.  So it is considered perfectly

1246

fine and acceptable, peer reviewed and acceptable.

Q    So was there any impairment shown on this instrument?

A    Yes, comparable to his performance on the Wisconsin Card Sorting Test, the categories test he earned a score at the less than first percentile.  So they are consistent and it was an opportunity to see how he would perform on different -- on tests with different stimuli, but with a similar concept behind them and a similar function being evaluated.

Q    Yeah, these tests sound very similar.  What is the -- what is the point of giving all of these different tests that seem to be measuring very similar abilities?

A    Well, for one, you then get to look at somebody's performance across two different tests and to see if they are consistent, which is a nice way of looking at effort. In addition, many of the tests that we give really measure more than one thing and this is particularly true with executive function.  Sometimes, you know, visual information is more important, sometimes verbal information is more important.  So it permits you to do what we call double disassociating to figure out where is the real problem.  Is it that they can't attend visually or is it that they are having trouble with their motor function, for example, on block design?  It could be they can't visualize the design they are supposed to copy or it could be they are having trouble

1247

actually manipulating the blocks and they are slow with their motor function.  So --

Q      Is that why you would do, like, the tower test, is -- which obviously involves motor dexterity when you were describing moving the disk; is that correct?

A      (NO RESPONSE)

Q      The court reporter needs a verbal response.

A      Oh, yes, sorry.

Q      And then the others, the card sorting, you were describing that is visual information; correct?

A      Yes.  There are other differences between those tests.

Q      There being feedback, auditory information as well. Is that a difference?

A      Ongoing feedback rather than having to plan and -- yeah, carry out the task one's self.

Q      So is the idea that after you have given all of these different measures, you can tell, I guess, whether the person is really impaired or just impaired in one narrow area? What's the point?

A      The point is to determine what their strengths are, what their weaknesses are.  Yes, to try to determine whether there might be damage localized to a particular region or what kinds of dysfunction exist.

Q      And in going through all of these tests of executive functioning and I suppose other parts of the battery, did

that give you an indication of what parts of Mr. Barrett's brain, if any, were impaired?

A     Yes.

Q     What part?

A     In terms of his dysfunction, clearly there are problems with visual attention, which involves the parietal systems and the frontal lobes.  Working memory, very frontally oriented, the ability to work with information online, to work it quickly, in the moment.  Problem solving and even on the tower where he did --

Q     I am sorry.  I was asking for regions.

A     Yeah.

Q     So you said problem solving, that's a function.  What region is associated with that?

A     The frontal function.

Q     Okay.  And I guess all of these areas of impairment that we are talking about, do they all point to the same general area of the brain or multiple areas?

A     There are multiple areas of the brain, which include the temporal region, the frontal region, some of the frontal subcortical circuitry so that information isn't going back and forth in a way that would be helpful to his functioning.

          MR. SCHARDL:  Your Honor, may I have just one moment?

          THE COURT:  Yes.

1249

(PAUSE)

BY MR. SCHARDL:

Q    So these areas of impairment that you are talking about, would they have affected Mr. Barrett's functioning just on a regular daily basis?

A    Yes.

Q    And is the impairment that is being tested here or shown in the testing here, is that -- as we were talking about before, Mr. Barrett's -- I guess is that his best effort at performing these functions?

A    I have a yes and no answer and preferably more, but yes.

Q    And what's the no?

A    Well, it is not a no, it is an elaboration.  I am sorry, but...

Q    Oh, okay.

A    So, yes, it is --

Q    We need to understand --

A    There is no indication that he -- yes, he made his best effort.  This is his best level of functioning at the time he was being evaluated.  What would need to be considered from an ecological position is that he has been in a structured and directed setting and ostensibly more substance free than he would have been out on the streets.  So, therefore, we are really getting a better brain than we

1250

might have gotten.

Q    So Mr. Barrett's ability to attend to information, to focus his attention on that, I believe you testified that was impaired; is that correct?

A    Yes.

Q    And did he have any impairments in being able to recognize changing circumstances, visual cues of changing circumstances?

A    He had impairment in those areas.

Q    And did he have any impairment in his ability to inhibit responses in light of changing information?

A    Yes.

Q    How severe is the impairment in that area?

A    Very severe in some areas, moderately to -- yes.

Q    Was that one of his better areas or worse areas?

A    That was one of his worse areas, not a strength. Changing course of action was difficult for him, as we saw on the numerous executive function tests.

Q    And if he was being given -- hypothetically if Mr. Barrett was being fed lots of information very rapidly, would he tend to perform better or worse under those circumstances?

A    Worse under those circumstances because he would be overwhelmed.

Q    And that shows up in the testing?

1251

A       Yes, it showed up on the CVLT, which we forgot to get to.

Q       We forgot?  What was the test -- what was the measure there?

A       The CVLT is a list -- a learning test and the individual five times is presented the same list and you are looking to see if they learn.  It is a 16 word list.  And he did fairly well on that, but then he was given a second list and with the new information he was 1.5 standard deviations below the mean, which is getting into the mild to moderate range because he couldn't handle any more information.  So that to me is just another example of a situation in which if the task is simple and clear and predictable, he performs well relative to when he is faced with changing circumstances, changing designs that he has got to figure out which one would best fit to complete the design, matrix reasoning or trail making when you are going from letters to numbers, et cetera.

Q       So performing some sort of task where you have to regulate your behavior to the circumstances?

A       Right.

Q       Exercising judgment?

A       Yeah, an unpredictable situation, you don't know what is coming, what's next.

Q       That's where he is most impaired?

1252

A     Yes.

MR. SCHARDL:  May I have just a moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. SCHARDL:  Okay.  At this point, Your Honor, I will pass the witness.

THE COURT:  Very well.  Let's take about a 10 minute break and then we will come back and commence with cross examination.

MR. WILSON:  Judge, can I ask for a little bit longer break than that, please?

THE COURT:  15?

MR. WILSON:  20?

THE COURT:  20?  All right.  We will come back at a quarter 'til.

MR. WILSON:  Thank you.

(2:25 p.m.)

(SHORT RECESS)

(2:45 p.m.)

THE COURT:  Go ahead, Mr. Wilson.

MR. WILSON:  Thank you, Your Honor.

CROSS EXAMINATION

BY MR. WILSON:

Q     Dr. Miora, you would agree with me that you are not a

1253

board certified forensic neurologist; isn't that correct?

A     I am not a neurologist at all.

Q     I am sorry.  Forensic neuropsychologist, you are not board certified in neuropsychology; correct?

A     That's correct.

Q     And you would also agree with me, ma'am, that you had, until today, never met Mr. Barrett; is that correct?

A     That's correct.

Q     And a neuropsychologist performs a number of standardized tests; correct?

A     Yes.

Q     And you would agree with me that based upon that scoring and based upon the clinical evaluation that a neuropsychologist performs there can be a differing opinion between neuropsychologists; isn't that correct?

A     There can be differences of opinions; that is correct.

Q     And you would agree with me, would you not, that especially in the forensic setting objectivity and honesty are very important when you evaluate and ultimately testify in a court of law?

A     Yes.

Q     And in order to be objective and honest, it is important to review the data and to report on it accurately; isn't that correct?

A     Yes.

1254

Q      And it would also be important to review all available data in making your assessment; is that correct?

A      All data made available, yes.

Q      Absolutely.  And I believe that as a part of your testimony here, you testified that you reviewed a number of pieces of data; isn't that correct?

A      Yes.

Q      You reviewed all of the raw testing data from Dr. Young; correct?

A      Yes.

Q      Did you review any written notes, handwritten notes from her?

A      Not handwritten.  There were some typed notes.

Q      Okay.  And were those included in the raw data that you were provided?

A      Yes.

Q      And were those notes of the clinical interview of Mr. Barrett?

A      I am not remembering off-hand.  I know there were some written notes that were responses to actual tests items and I don't recall whether it was specifically of the clinical interview.  It may not have been.

Q      Would you agree with me that Dr. Young's -- the testing that she did and ultimately the opinions that she reached were based on more than just the psychological

1255

testing; isn't that correct?

A    Yes.

Q    It was based in part upon review of the medical history; correct?

A    Yes.

Q    A review of some declarations that she was provided; is that correct?

A    Yes.

Q    It was based upon a clinical interview of Mr. Barrett or I would say an interview of Mr. Barrett?

A    Yes.

Q    And you would agree with me that you weren't present during that interview?

A    Absolutely not.

Q    That you have not seen any video or audio recording of that interview?

A    No.

Q    You weren't able to assess Mr. Barrett's behavior during that interview; isn't that correct?

A    No.

Q    You could not assess his hesitancy to respond or his ability to perform the tasks that were asked of either to be performed --

        MR. WILSON:  Let me back up, Judge.  I apologize.
Terrible question.

1256

BY MR. WILSON:

Q    You weren't able to personally assess his performance on either the testing or the interview?

A    I was not there.

Q    Now, you mentioned that you reviewed the raw data.

MR. WILSON:  I would ask the clerk to hand the witness Government's Exhibit Number -- I believe it is Number 67.

BY MR. WILSON:

Q    And do you have that in front of you, ma'am?

A    Yes.

Q    Doctor, it is my understanding this is 190 pages of information.  And by looking at that, can you tell the Court that that is all of the raw data that you reviewed as a part of this -- of your testimony today?

A    I will need a moment to kind of leaf through it...

Q    Oh, absolutely.

(PAUSE)

BY THE WITNESS:

A    I believe there may be data in here I did not review. I can't be 100 percent sure without comparing it to mine, but I see things that I don't recall having seen.  Of course, I don't know if they are hers.

Q    Doctor, I will hand you what has been purported to me or been purported to the government to be the raw testing

1257

data.  So, specifically, what pages are you referring to that are documentation that you have never seen?

A    I don't think I have seen this pretrial criminal report.  See, there is other stuff in here.  I may be seeing other people's stuff.  An MMPI profile, pretrial criminal report?

MR. WILSON:  Judge, may I approach the witness?  I think -- and let me make sure we are looking at apples and apples?

THE COURT:  Sure.

THE WITNESS:  Okay, thank you.

BY THE WITNESS:

A    Yes.

BY MR. WILSON:

Q    All right.  And when you say yes, I assume that means that the information which is in Government's Exhibit Number 67 is, in fact, the raw data that you were provided in this case?

A    Yes.

Q    And earlier when you were testifying about some documents that you had not seen, those were not within 67, those were looking at 68?

A    That's correct.  I had --

Q    All right.

A    Yes.

1258

Q     And so we talked earlier and I was asking about handwritten notes from Dr. Young of the interview.  I don't -- do you agree that there are not any handwritten notes concerning the interview?

A     Yes.  As I said before, I did not have access to any handwritten notes.

Q     So, in essence, you don't know what happened during the clinical interview, what was said?

A     From the perspective of having written notes, that's correct.

Q     Now, I believe that you adopted or do adopt the findings of Dr. Young; is that correct?

A     Uh, that's not the way I would put it.

Q     Well, did you not say I can and do concur with her findings, interpretations of the data, the opinions she developed and the conclusions she drew about Mr. Barrett's neurocognitive deficits and relative strengths?

A     Yes, based on my own analysis.

Q     And you would agree with me, and I believe you testified, that it was important and would be important to review all testing data that is available; correct?

A     That's correct.

Q     And you reviewed the testing data of a Dr. Faust Bianco; isn't that correct?

        MR. SCHARDL:  Objection, Your Honor.  We covered

1259

this in motions previously.  She hasn't testified about it and the Court's ruling was that if the witness doesn't testify about it, if we don't bring it up, then it is not coming into evidence and there was no testimony about it on direct.

THE COURT:  Well, I think what the ruling was that if she didn't criticize it during direct examination, then we weren't going to hear from Dr. Bianco, but just because they bring it up on cross doesn't mean I am going to let him put the witness on.  So overruled.

BY MR. WILSON:

Q    Do you agree with me that you examined that data as a part of your findings in this particular case; isn't that correct?

A    Yes.

Q    And you will agree with me that Dr. Bianco conducted a WAIS-III or gave Mr. Barrett a WAIS-III test back in 2000; isn't that correct?  Excuse me, back in 2002.

A    Yes, and that would have been his only option as compared to -- there was no WAIS-IV.

Q    Thank you.  I appreciate that, but it wasn't my question, but thank you.

A    You are welcome.

Q    And you will agree with me that Mr. Barrett -- back in 2000, I believe it was actually, that Mr. Barrett scored in

1260

the average category on the WAIS-IV, back in 2000; isn't that correct?

A    I just want to check to make sure and that I am answering clearly.  (PAUSE)  Might you direct me to that section in the data?

Q    Which section, Doctor, are you --

A    I see the WAIS data, but I don't see the overall scoring.

Q    Well, let me ask you, do you recall what the scoring was for the WAIS-III of Mr. Barrett back in 2000?

A    I will need to have my memory refreshed to be more accurate.

Q    Well, I am going to direct your attention to Government's Exhibit Number 68 and ask you if you recognize that.

A    Thank you.

MR. SCHARDL:  Your Honor, I am going to interpose an objection.  The government is trying to get in through Dr. Miora what it couldn't do by calling Dr. Bianco.

THE COURT:  Well, the objection is overruled.  The basis for my ruling, before the hearing commenced, was simply not to allow another witness if you all didn't bring it up.  And I think this is all pretty relevant.  It doesn't mean he is going to get to call Dr. Bianco to testify, but I think it is all pretty relevant to the opinions that we have heard

1261

here today.  So the objection is overruled.

MR. WILSON:  Thank you.

BY THE WITNESS:

A      I have found the score report.

BY MR. WILSON:

Q      Okay.  Isn't it true that on the verbal I.Q. he scored in the average range?

A      Yes, he did.

Q      Is it also true that in the performance I.Q. he scored in the average range?

A      Yes.

Q      It is also true that on the verbal comprehension he scored in the average range?

A      That's correct.

Q      On the perceptual organization he scored actually in the low average; isn't that correct?

A      Yes.

Q      On the working memory, he scored in the average range; isn't that correct?

A      Yes.

Q      On the processing speed, he scored in the average range; isn't that correct?

A      Yes.

Q      And on the full scale I.Q., he scored in the average range; isn't that correct?

A    It is.

Q    And so from 2000 to 2009, there was, in fact, a decline in his processing speed, according to the testing of Dr. Young; isn't that correct?

A    Right.

Q    But one year after the commission of this crime, Mr. Barrett is scoring in the average range on all except one of those categories; isn't that correct?

A    Yes, but he --

Q    Thank you.

A    Okay.

Q    He was also given the WIMS-III back in 2000; isn't that correct?

A    Yes.

Q    And I'll give you a moment to find that data as well.

                    (PAUSE)

A    I am looking at the printout.  I haven't analyzed his -- I don't have the analysis of his data.

Q    All right.  Well, looking at the printout, I will ask you this question:  Would you agree with me that in auditory immediate Mr. Barrett scored in the average range; is that correct?

A    Yes, yes.

Q    On auditory delay, in the average range; correct?

A    Yes.  It's a little hard to read this, but yes.

1263

Q    On the logical memory, average range; correct?

A    Yes.

Q    Logical memory 2, average range?

A    Yes.

Q    Verbal paired association, average range on both 1 and 2; correct?

A    It is close to average, yes.

Q    Auditory recognition average.

A    Yes.

Q    And I don't know what Faces 1 and Faces 2 are.  Can you tell the Court what that is?

A    Yes.  The individual is exposed to 48 pictures of kids one after the other.  So they are serially or sequentially presented.  Then they are presented with another series of faces right away and asked yes or no as to whether each of the 48 faces was one of the original faces.

Q    And that's done very quickly, correct, that's a timed test; correct?

A    Well, timed in the sense that there is a couple of seconds between each presentation, but it is not timed as in they are being timed or pressured.

Q    I guess what I am trying to get at, Doctor, is in this particular test you don't hand the examinee these photographs and say take all of the time that you want to study through these photographs; isn't that correct?

1264

A     Right, that's correct.

Q     It is just a matter of a few seconds that they are able to look through them; correct?

A     Yes.

Q     And he scored very superior on both Faces 1 and 2; isn't that correct?

A     I am looking for them.

Q     Okay, take your time.

                                        (PAUSE)

A     Ah-hah, yes, I see it.  And what was your question?

Q     On Faces 1, isn't it true that he scored in the 99th percentile?

A     I have -- no, I don't have that.

Q     What do you show?

A     And we may be looking at different aspects of the same thing.  I see facial recognition.  Are you looking at the primary subtest scores?

Q     Yes.

A     Okay.  I don't see any percentile rank there.

Q     Do you have the score of 18?

A     Yes.

Q     Well, that would be in the well above average range; correct?

A     Yes, it is.  I just didn't see the score and you were asking me --

Q     I am sorry.

A     Okay.

Q     And would you agree with me that on Faces 2 it was a scaled score of 16, which would be well above average?

A     Yes.

Q     The Visual Reproduction score is a 13, which is high average; correct?

A     I am sorry, I can't see the scores there.

Q     Okay.

A     It is not visible to me, but I'll take your word for it.

Q     I will move on down.  Spatial span, do you see that?

A     I don't.  Oh, yes, I do, I do see that.

Q     Would you agree with me that it is in the average range?

A     Yes.

Q     Do you see now the Visual Reproduction?  Have you seen that?

A     I don't believe I have that here.

Q     Okay, that's fine.  We will move on.  In addition to the WAIS-III and the WIMS-III, you would agree with me that Dr. Bianco also performed what is known as the -- a processing speed test, also a trail -- what is called a trail making test; is that correct?

A     Yes.

Q     And you would agree with me that the Trail Making Test then became a part of the D-KEFS later; is that correct?

A     Essentially, yes.  They borrowed the ideas and created their own versions.

Q     And you will agree with me that actually the D-KEFS didn't come into existence until 2001; isn't that right?

A     Yes.

Q     Okay.  So it hasn't been around for decades?

A     A couple of decades, close.

Q     As of now, I guess, we are close.

A     Yes.

Q     But in 2000, D-KEFS wasn't available; correct?

A     Right.

Q     So when Dr. Young  criticized -- well, I'll move on. On the Trail Making Test, do you -- I'll give you a moment to see if you can find the raw data on that.

A     Is it right after the prior printout that we were looking at?

Q     I don't have it thumb marked.  I apologize.

          THE COURT:  Mr. Wilson, is there a page number?

          MR. WILSON:  Well, that's what I am trying to find myself.  I'm sorry, Judge.

          MR. SCHARDL:  If I may, Your Honor, there is a page number.  It begins at 3389.

          MR. WILSON:  Thank you, Counsel.

1267

BY MR. WILSON:

Q     You would agree with me that Pages 3389 through 3392 are the actual diagrams themselves; correct?

A     Yes.

Q     And on those diagrams is there any particular scoring right there?

A     I see a number in the upper right-hand side.  I don't think that is the -- the item you are looking for, so the answer is no.

Q     All right.  I'll direct your attention to Page -- at the bottom it is KEB-503266 and there are some bates numbers at the top, actually Page Number 10.  Do you recall reviewing this particular document as a part of your analysis of the data in this particular case?

A     Yes.

Q     What is this particular document -- this page of this document?

A     It's a -- well, it is a mental status examination and actually I would call it a neuro behavioral status examination.  He has it down as a mental status examination.

Q     And it purports to have the data from multiple tests correct that were performed?

A     I am not sure what you are asking.  This is -- these are his observations in addition to reports of tests.  Is what that you are...

1268

Q      Are you looking at the page which -- in the top right has the Page Number 10?

A      Yes.

Q      Okay.

A      Yes, it does have some test results on it.

Q      And -- but I guess the question I am asking you is is the Trial Making Test on that particular document?

A      Oh, yes.

Q      All right.  Sorry, I went around the long way to get there.  Now, having that document in front of you, would you agree with me that on the trial making test Mr. Barrett scored in the average range back in 2000?

A      Yes, but that does not take into account other features.  If you look at the protocol, he overshot in one place and he made an error and those are important considera-tions as well, not just the time.

Q      But you will agree with me that the scoring is average on that test, isn't that correct?

A      The numerical value is average.

Q      Thank you.

A      A little lower than average, but yeah, it is in the "normal," quote, unquote, range.

Q      You mentioned some tests that were performed, a Seashore Rhythm test and also Speech Sounds or Speech Sound Recognition Tests; is that correct?

1269

A     Speech Sounds Perception Test, right.

Q     Those were performed by Dr. Bianco, correct, as well?

A     Yes.

Q     And you agree with me that Mr. Barrett scored on the average range on the Seashore Rhythm; correct?

A     I am looking for it now.  (PAUSE)  I am having trouble locating it.  What aisle is it in or column?

A     Well, let me ask you this.  When Dr. Young tested Mr. Barrett in 2009, he did not report any deficits in the Seashore Rhythm even in 2009; is that correct?

A     I believe that is correct.

Q     Okay.  And that would also be correct of Speech Sounds Perception?  Isn't that also correct?

A     I believe so.  I am still not finding them on this page.

Q     That's fine.  We can move along.  There is also a test that was performed by Dr. Bianco, a Visuospatial Memory Test, the Rey -- I don't recall the name of it.

A     The Rey Complex Figure Test?

Q     That may be it.  I apologize.  And that test was Immediate Recall, Delayed Recall and Recognition; is that correct?

A     Yes.  I would characterize it differently, with due respect, from what you said.  It is not simply a Visuospatial Test.

1270

Q     All right.

A     It is looking at spatial organization and there is an output aspect to it, but, yeah, okay.

Q     All right.  And you would agree with me that Dr. Bianco performed that test; is that correct?

A     That he performed it?  Yes.

Q     I am sorry.  That he --

A     Administered it --

Q     That he allowed Mr. Barrett to perform the test.

A     Yeah.  He administered that test.

Q     Thank you, administered.  And you would agree with me that Mr. Barrett, back in 2000, performed in the immediate recall in the average range?

A     Could you please tell me if you are still looking at the sheet?

MR. SCHARDL:  Objection, Your Honor.  The defense has no idea what page is being referred to.

THE COURT:  Can you be a little more specific about that, Mr. Wilson?

MR. WILSON:  I will try, Your Honor.

BY THE WITNESS:

A     Ah-hah, I found it.

BY MR. WILSON:

Q     Well, help me out, Doctor.  Which column is it in -- is that particular one located in?

1271

A     Can we make a deal?  It is down in the lower quadrant of the first column.  And interestingly enough, his copy was as poor as it was -- it was precisely the same as when administered by Dr. Young.  It was at the less than first percentile.  Do I have that right?

Q     Let me ask you about that.  And you are looking at --

MR. WILSON:  For counsel's benefit and the Court's benefit, we are talking about in the bottom left-hand quadrant, line B -- I am sorry -- about midway through under the heading of A it shows R, U, Y and then copy and 1 percent; is that correct?

A     Less than or equal to the first percentile, yes.

Q     All right.  Now, what is that telling us?  What is that test in particular telling us?

A     One would need to look at the drawing because -- I didn't say it, but quantitative analysis is essential, of course.  That's the numbers behind the science.  But as equally as important is the qualitative science.  So one would want to go to the drawing to see how he did it.  Were there elements missing?  Were they misdrawn?  Were they misplaced?  Because depending on that analysis, it might tell you something about possible hypotheses about brain regions implicated.  So I don't recall the drawing and would need to look at it to tell you what it tells.  There could be problems in visual attention, visual organization of the material.

1272

Do you know where the drawing is?  I do.  Hold on.  (PAUSE)

It is on Page 503314, is where you would find it.  There

are some problems with accuracy.  There are missing elements.

It has got problems.

Q     Okay.  And that would be he was asked to copy the

diagram that he previously had seen earlier in a part of

the test; is that correct?

A     Actually the copy is done while you have the stimulus

in front of you.  So you are literally copying it.  It is

only later that you copy it from memory or render it from

memory.  So this is an actual copy of what he saw at the time

he was drawing.

Q     And according to his testing data that you've seen,

he would have scored very low on just copying that down

right off the piece of paper; is that correct?

A     Yes, which could be visual attention problems.  I would

be -- you know, neuropsychological assessment is a process

of developing hypotheses and testing them out.  So in this

case, if this was all I had, I would wonder about problems

in visual attention and...

Q     Okay.

A     Yeah.

Q     Mr. Barrett was also administered the WRAT Test back

in 2000; correct?

A     Yes.

Q      And he scored in reading on a seventh grade level; correct?

A      Pardon me one moment.  In reading/language -- where do you see that?  Oh, I see -- is it under A/B or 3B, the second aisle or column?

Q      I see something that is in the fifth percentile.  I see something else that is at the -- oh, yes.  Which one were you suggesting was the --

A      The Reading.

Q      Reading, okay.  Yes, at the seventh grade level, that's correct, the 8th percentile.

Q      And Mr. Barrett only completed the ninth grade; correct?

A      That's my understanding.

Q      There is no reason to doubt that?  There is no reason to doubt that he only completed the ninth grade?

A      No.

Q      And that his spelling was a sixth grade equivalent; correct?

A      At the 5th percentile, yes.

Q      And he only completed the ninth grade; correct?

A      I am sorry?

Q      He only completed the ninth grade?

A      That's true.

Q      That his math was a sixth grade level; correct?

1274

A      I am not seeing that, but -- let me see.  Is it in that same area?

Q      I believe so.  Let me ask it this way.  It is not significantly different from 2009?

A      That's true.  I remember that.

Q      Now, there were a number of aphasia screenings or tests that were done.  What is aphasia?

A      Aphasia has to do with language.

Q      And you will agree with me Dr. Bianco performed a number of tests or administered several tests dealing with language; correct?

A      Yes.

Q      And you will agree with me that Mr. Barrett did not display any deficiencies in reference to language in 2000, during the time of Dr. Bianco's testing?

        MR. SCHARDL:  I am going to object.  That is a very, very broad question.  Any deficiencies as to language that --

        THE COURT:  I will rephrase the question, Counsel.  Thank you.

BY THE WITNESS:

A      Did you ask me a question before there was an objection?

BY MR. WILSON:

Q      I am going to rephrase it.

1275

A      Okay.

Q      Have you been able to locate that particular testing data?

A      Yes, but I still don't see the WRAT arithmetic, but I will just pass for now because I didn't respond to it.  So it is okay if --

Q      We have moved on to the aphasia now.

A      That's fine.

Q      Do you see that?

A      The Aphasia Screening Test?  No, I don't.  I would be happy to look if you would direct me to it.

Q      I'll come back to that in a second.  Doctor, what is the STROOP Test?

A      The STROOP Test is similar to the Color Word Interference Test that one finds on the D-KEFS.  First one is asked to read a list of words that are the names of colors, red, blue, green, and it is timed.  Then one is asked to name ink color on patches of ink and the ink colors are green, red and blue.  And then one is asked to inhibit the word reading and just name the color.

Q      So it is very similar to the test that you and counsel were talking about earlier; correct?

A      Minus some variations, yes.  The D-KEFS has more conditions, but, yes, the concept and what it is measuring are similar.

1276

Q    And it is an executive functioning test; correct?

A    Yes, it is.

Q    And it is a standard test that was given back in 2000; isn't that correct?

A    That is true.

Q    It was a part of the original Halstead-Reitan Neurological Battery, wasn't it?

A    No.

Q    It was not?

A    Not to the best of my knowledge, no.  It was a commonly given test, but I don't think it was one of the Halstead-Reitan or Big 7 or whatever, no.

Q    But you are not -- but you agree with me that it is an acceptable test?

A    Yes.

Q    And you agree with me that -- and have you had an opportunity or can you find that on the document showing the results of the STROOP test?

A    I see one number listed.  So I don't -- there are four -- depending on the system you are using for scoring, there should be four different scores so that you can compare how they did on word reading to how they did on the color naming to how they did in the condition where they have to suppress the word reading and simply name the color, which was in contrast to the written word.  And then you

1277

develop what is called an interference score, that's a fourth score. So I don't see that, so I am not sure what a STROOP W -- the W -- to what he is referring there. Okay, there is color in another area. So I think he has got those separated out. I have found two. And I don't know what these numbers represent. Are those raw scores? Are those 'T' scores?

Q   I want to direct your attention to Page 503300.

A   300?

Q   Yes, ma'am.

A   Here we are.

Q   Do you recognize that document as a document that you reviewed as a part of your evaluation of the data in this case?

A   Yes.

Q   What is that document?

A   That document is some type of way of looking at 'T' scores for the STROOP data. I don't know where it is from or what kind of norms are being used there, but that's what it appears to be, for young adults. I am not sure what Mr. Barrett's age was at the time it was given.

Q   Now, Doctor, you will also agree with me that when Mr. Barrett was examined in 2000 by Dr. Bianco that he experienced some deficiency when it came to finger tapping, isn't that correct, which would be consistent with what you

found or what Dr. Young found in 2009?

A    I am just looking for it, but if that's so, yes, it would be consistent.  (PAUSE)  Do you see where the finger-tapping is?  I see it...

Q    Page 367, I believe.

A    What he has written down on that score sheet isn't clear on 266.  You said 367?

Q    Yes, it appears to be the score sheet 367, that is correct.

A    Okay.  (PAUSE)  I don't see -- oh, yes, there's the tapping.

Q    Do you agree with me that on the left hand side would be a scale score of 40 or a score of 40; is that right?

A    Well, no.  That is a raw score that is an average of his three performances.

Q    Okay.

A    So the 38, the 42 and the 40 --

Q    And what does that 40 indicate to us?

A    Well, I would have to look it up.  That's why we have norms -- books full of norms.  And I would have to know whose norms were being used.  You know, you put in different factors such as age and --

Q    Did you do that when you examined the raw data of Dr. Bianco?

A    No, actually I didn't because I didn't know what norms

1279

he used.  I had no way to do it.  I could have done it with my norms, but I would have been imposing them on his data. I don't know what he used and I did the best I could to evaluate what was there.

Q     And on that same page, 3367, do you see the STROOP scores?

A     Yes, those I see.  And again, I don't know what norms were used, but I do see it is a mechanism for translating raw scores into 'T' scores.

Q     And based upon this document that was within the raw data, you would agree with me that the STROOP scores fall within the average category?

A     Yeah.  The color word shows some interference.  It is almost a 'T' score below, one 'T' score below the mean.  40 would be a full 'T' score below the mean, but -- so that was more challenging for him --

Q     But it is still within --

A     -- relative to the other scores.

Q     But is still within the average --

A     Yeah.

Q     Okay.  And would you agree with me that also the STROOP color is within the average; correct?

A     Yes.

Q     And also the Color Word Test; correct?

A     Well, that's what I was saying, was...

Q     And you --

A     Yes, basically yes.  There is not a lot of variation there.

Q     And you would agree with me that Color Word is the exact same testing or very similar testing that you had talked about with the D-KEFS, where you are given a word and it is in a particular color, but it may be a different word and you are given instructions on which one to inhibit; correct?

A     Right.  But what I am saying is there are -- there are -- one of the things about the D-KEFS that makes it exceptional are that there are other conditions, so it is not just the three.  And for trail making, there are not just the two conditions.  So they get to evaluate in greater detail what is going on at an executive function level.  That's all I am saying.

Q     All right.

A     And it is meaningful because the switching accuracy -- having a measure of switching accuracy is looking at some-thing beyond, you know, were they able to just do the switching.  Remember with the trail making test I was telling you there were problems where he made errors?  Those aren't noted in this scoring because those errors --

Q     I appreciate that --

A     Well, that's important.

1281

Q    But you would agree with me that when you look at the scores, they fall within the average range?

A    Yes, for whatever this normative group is.

Q    Thank you.  Now, Doctor, you testified that it is important to look at records and you looked at some school records; correct?

A    Looked at some what records?  I am sorry.

Q    Some school records, educational records.

A    Yes, yes.

Q    And you will agree with me that there were records from first and second grade and then there weren't any records for third through -- up to the seventh grade; isn't that correct?

A    Yes, I believe that is so.

Q    So we don't know Mr. Barrett's educational scores in third, fourth, fifth or sixth grade; is that correct?

A    I believe so.  I would like to see the records just to refresh my memory, but if -- to see if we all have the same records.

Q    Do you have them with you?  Did you bring them with you today?

A    I did not.  I assumed -- I mean, if I had brought everything -- I have it on a disk, but my computer isn't allowed in.  If there is an exhibit with them, I would be happy to do a quick review.

Q    Well, I think all of the records are put in -- all of

1282

the records that are available are in evidence.

A     Okay, thank you.

Q     Now, you also reviewed some medical records; is that correct?

A     Yes.

Q     And you reviewed medical records from Eastern State Hospital where Mr. Barrett was admitted back in 1986; isn't that correct?

A     Yes.

Q     And you will agree with me that he was admitted there under a court commitment because of some violent behavior with his wife and his mother; is that correct?

A     That was part of what I recall.

Q     And isn't it correct, sir -- excuse me -- Doctor, that --

A     I am okay with sir.

Q     -- that Mr. Barrett was allegedly very suicidal; is that correct?

A     That is what I was --

MR. SCHARDL:  I object.  The witness wasn't asked about this on direct examination and she hasn't testified that it was a part of her conclusions.

THE COURT:  Yes.  Why are we going through all of this stuff?  It is in the records, is it not?

MR. WILSON:  It is, Judge.  I mean, I am just trying to get -- to find out what the basis of her opinions

1283

were based upon her review of Mr. Young's opinions and Dr. Young allegedly looked at all of this information as well.

THE COURT:  Well, that's -- I mean --

MR. WILSON:  And I'll -- if I could just ask a couple of very --

THE COURT:  I mean, I am wondering if you are just going through all of it or if you are going to ask her --

MR. WILSON:  I am going to ask her about drug use specifically.

THE COURT:  Okay.  Go ahead then.

BY MR. WILSON:

Q     Would you agree with me that in 1996 -- excuse me -- in 1986 at the time of the admission Mr. Barrett was diagnosed with mixed substance abuse; isn't that correct?

A     Yes.

Q     And he had reported a history of polysubstance abuse at that time; isn't that correct?

A     Yes, he had.

Q     And you will agree with me also that in 1995, he was seen by a series of different medical providers during a short span in January of 1995; is that correct?

A     Would you refresh my memory?

Q     I believe he ultimately shows up by ambulance or to the E.R. at Wagoner Community Hospital.

1284

A     Yes.

Q     And then he is referred out to a couple of other facilities; isn't that correct?

A     Yes.

Q     And you will agree with me that at the time of those admissions that Mr. Barrett was -- tested positive for high levels amphetamine, isn't that correct?

A     Yes.

Q     And that he was diagnosed with organic effective disorder and polysubstance abuse; isn't that correct?

A     Yes, I do recall that.

Q     But he denied headaches; correct?

A     Yes.

Q     I am sorry?

A     Yes.  I said if you say so.  I mean, I don't recall that specific detail.

Q     Well, the reason I bring it up is isn't it true that Dr. Young made mention that Mr. Barrett reported having a history of migraine headaches?  Isn't that right?  Isn't that what she reported?

A     Yes, but I am not sure how that relates to substance abuse.  I mean, it is possible he was not aware of anything when he was high all of the time.

Q     I appreciate that.

A     That is not uncommon.

1285

Q    I appreciate that, Doctor.  But is it not true that Dr. Young, as a part of her findings, referenced that Mr. Barrett reported having a history of migraine headaches?

A    Yes.

Q    But that is inconsistent with the medical history; isn't that correct?

A    No, that's one record where he didn't mention that he had headaches, no headaches --

Q    So what medical record did you find --

A    That's an emergency record and, you know, they are finding out what is going on in the minute.  So he may not have felt headaches and wasn't thinking about headaches.  I mean, I really can't -- I don't think I can honestly respond to that.

Q    Well, let me ask you this question then:  What medical record do you recall from your review that purports that Mr. Barrett has migraine headaches?

A    I don't recall that.

Q    And what medical record have you reviewed that shows that Mr. Barrett suffered an injury to his head from a steel ball?

A    It was -- I evaluated not medical records, but this was --

Q    My --

A    But this was --

1286

Q    My question is:  What medical record did you look at?

A    No medical records, just --

Q    Thank you.

A    -- reports from a number of different people independently who reported the event, including himself.

Q    But again, the question is, did you see any medical record of any event regarding Mr. Barrett being injured by a steel ball to the head?

A    No, I don't recall a medical record to that effect from his childhood.

Q    And did -- Dr. Young, did she report any medical record that she found of any incident of Mr. Barrett being struck in the head with a steel ball?

A    No.  She reported what she had reviewed that suggested that he had had the injury, not medical records, but kids often don't go to the hospital.  That is certainly something to be considered, unless they are --

THE COURT:  Doctor, you really need to let him ask a question rather than just volunteering.

THE WITNESS:  I apologize.

THE COURT:  That's okay.

BY MR. WILSON:

Q    Well, I will follow-up on what you just said.  You said kids don't always go to the hospital; is that right?

A    Yes.  I mean, if you look at culture and class and a

1287

number of other variables, a lot of kids, unless there is an open wound that can't be managed, don't necessarily go to hospitals.

Q    Okay, I understand that.  But you would agree with me that looking at the reports that were given in this particular case, Mr. Barrett reported that he woke up in a doctor's office from this event; isn't that correct?  Isn't that what he reported?

A    Yes, and he may well have.

Q    But there is no medical record of that, is there?

A    Well, I have done a lot of capital cases and it is often hard to find records.  So I don't know what to say.

Q    So the answer to that would be, yes, there is no medical record?

A    There is no medical record that I know of.

Q    Thank you.  And you have reviewed the records from the State of Oklahoma Disability Determination; isn't that correct?

A    Yes, I did.

Q    Dr. Miora, this is the third federal case in which you've testified as an expert; is that correct?

A    In which I've testified?

Q    Yes.

A    Yes.

Q    And this will be the first time that you've testified

1288

as an expert reviewing some other doctor's reports, solely for that purpose; correct?

A     That's correct, yes.

Q     But you would agree with me that you've -- in those times that you've testified as an expert in federal courts you've never testified for the government, have you?

A     No, unfortunately I haven't been -- well, for the government, no.  I have been agreed upon by the government and the defendants.

Q     All right, thank you.  You are a regular consultant with the California Appellate Project; correct?

A     As regular as it is these days, yes.

Q     And you would agree with me that is a non-profit corporation established by the California Bar for indigent people who are facing the death penalty; correct?

A     No.  It is people who have been convicted and sentenced to the death penalty.  They are not facing it, they have already --

Q     Oh, I am sorry.

A     Yeah.

Q     I apologize for the way I asked the question.  They have been sentenced to death; is that correct?

A     Right.  That's why they are appellate, yeah.

Q     And you've been paid for your services, is that correct, already in this case?

1289

A      No.  I have been paid for some of my services, not all of them.

Q      And you are being paid or will be paid for your services today; correct?

A      I sure hope so.

Q      And you are being paid, I believe according to your C.V., at $250.00 an hour; is that correct?

A      Yes.

Q      And that includes courtroom testimony?

A      Yes.

Q      And how much have you been paid in this case to-date?

A      To-date?  Probably, I am going to guess, about $9,000.00, maybe a little more, nine to $11,000.00.

Q      Okay.  Nine, ten, eleven, it keeps going up.  Is eleven going to be the cap?

A      I said between nine and eleven because I am not 100 percent sure.  I haven't calculated it.

Q      Okay.

A      It is not going up or down.

Q      Now, I believe you testified earlier that when you look at data, specifically scoring data, that -- I believe it was your testimony that one point -- one standard deviation above the mean -- excuse me -- below the mean would be impairment.  Is that what your testimony was earlier?

A      No, I don't believe so.  It is below the mean, but not

1290

until it is 1.5 are you really thinking, oh, my gosh, we are looking at some impairment.  I may look at scores that are just one standard deviation below the mean relative to other scores in a test battery and I may begin to see a pattern. We are very interested in patterns of performances across tests.

Q     Okay.  And as I read through your declaration and I read through Dr. Young's declaration actually, there seems to be some inconsistency about whether it was low average or was it mild impairment.

A     Meaning inconsistencies between hers and mine?

Q     Within the same document, what appeared to be within the same range of deviation was referred to sometimes as mildly impaired but sometimes low average.

A     I am not sure -- I apologize.  Are you referring to a document that I drafted or that she authored?  You mentioned mine and hers.

Q     Let's talk about Dr. Young's declaration.

A     Oh, okay.

Q     Would you agree with me there were some times where there was an inconsistent determination or reference to whether it was low function or -- I mean mild impairment versus low average?

A     If you could direct me to it, it is quite possible. I, I don't know where right now, but, yes, I do remember

1291

some --

Q    All right.  Well, let's --

A    But, yes, I do remember some, you know, sort of synonyms or different terminology.

Q    Now, you had to rescore or you -- I say had to.  You re-scored the data; correct?

A    I had to, yes.

Q    And there were some errors in Dr. Young's numbers?

A    Yes.

Q    Well, one of the errors -- and I shouldn't characterize this as an error, but a difference, I believe, was on the WAIS-IV, the processing speed.

A    Yes, uh-huh.

Q    And it was a significant difference between the number that she had and the number that you have?

A    That's correct.

Q    Have you had an opportunity to determine what the difference was, what was the reason why your numbers were so much lower than hers?

A    Yes.  I mean, what I determined -- well, no.  I apologize.  I cannot answer why her number is so different from mine.  I just know that when I re-scored it I came up with a different figure than she did, which suggests that there had been an addition error or some other kind of clerical error --

1292

Q     All right.  Well, let's --

A     -- that would explain that difference.

Q     I want to direct your attention back to Number 67, Government's Exhibit 67.  And specifically, I want to direct your attention to Pages 161 through 167.

A     Unfortunately, I don't think I have them numbered.  Oh, okay.

Q     Top right-hand corner.

A     Okay.  And please tell me again which numbers.

Q     161 through 167.

A     Okay.  I am with you.

Q     All right.  Do you recognize that document or series of documents?

A     I do.

Q     Can you tell the Court what that is?

A     That is the response booklet for the Symbol Search Test, as well as -- well, I'll say that.

Q     And is that one of the tests that you talked about with counsel earlier during your direct examination?

A     Yes.

Q     And that's one of the tests where you reported that there was some impairment of Mr. Barrett; isn't that correct?

A     Yes.

Q     And this is one of the scores that there was a difference -- this is one of the tests that there was a

1293

significant difference between your scoring and Dr. Young's; correct?

A    Yes.

Q    If a page is missing of data, would that effect your numbers?

A    Yes, it could.

Q    Well, let's look at that.  Page 161, top right, and then turn to 162.  At the bottom of that that is Page Number 2; correct?

A    That would be the case.

Q    All right.  Then flip over to 163...

A    Right.

Q    What page is that?

A    That would be Number 3.

Q    But it says what?

A    No, no, no, you are misunderstanding what she has there.  Those are correct and incorrect responses.  You mean the number she has got at the bottom?

Q    No.

A    I should wait --

Q    No, no, I am talking about the page number that is pre-printed on this form in the bottom middle.

A    Oh, I see what you are referring to.  Ah-huh, uh-huh.

Q    There is a page missing; right?

A    Good point, yes.

1294

Q    That's a full page of ten scores which you did not have?

A    That's correct.

Q    And that would make up the difference, wouldn't it?

A    It very well may.  Thank you for pointing that out.

Q    So his processing speed is not as bad as you re-calculated it; isn't that correct?

A    It is more believable actually.

Q    Okay.

A    And it is still bad.  I mean, that's the thing.  It is still very low.  I was having difficulty and you've helped me solve the problem in recognizing, yeah, what the problem was.

Q    All right.  Well, let's go back to her scores.  What was -- so her scores would be correct because she had all of the pages and you didn't have them.

A    Well, assuming that he got them all correct on that page that we are missing, which I don't know.

Q    Well, let's check her scores.  What score did she give him?

A    Just a minute, I am going to have to look.  I don't -- hold on.  (PAUSE)  I don't have a score report from Dr. Young for the WAIS.  I had to do it myself and didn't have hers, to which I could compare it.  My guess is it was on a disk and, you know, in a locked place where it couldn't be

1295

obtained.

Q     But it is in her declaration; right?

A     Okay, I can go to the declaration, okay.

Q     If you will look at that for me...

MR. SCHARDL:  Your Honor, can counsel direct the witness to -- the declaration is 17 pages long.  Are we supposed to wait for her to read the whole thing?

THE COURT:  Can you point out the paragraph, Mr. Wilson?

MR. WILSON:  I believe I can, Judge.

THE WITNESS:  I have it, 1096, the end of the first paragraph.

BY THE WITNESS:

A     Processing speed 76 at the 5th percentile.  That still means 95 percent of people do better than he and it is still in the -- it is in the -- yeah -- borderline range.

BY MR. WILSON:

Q     Okay.  But it is not in the severely impaired range as you testified earlier?

A     Right.

Q     Thank you.

A     Actually I think I had written borderline but said severely impaired, so, yes, you are correct.

Q     And you would agree with me that with that score, then that brings down the entire score -- the rest of the scores;

isn't that correct?

A    Slightly.  It is not a big difference.  82/84 full scale I.Q. score.

Q    But it brings them down; correct?

A    Bupkis as we say in the business.

Q    Sorry?

A    It is nothing, it is really -- it is not significant is what I'm trying to say.  Can you spell that? (TO COURT REPORTER)

Q    You would agree with me that in this battery of tests that were performed that there is some -- nearly one hundred different scores; correct?

A    I believe so.

Q    And would you also agree with me that a person's I.Q. and education level could impact their scores on a number of these tests; isn't that correct?

A    It is possible.  One would have to be very careful to determine which tests, and there is research behind it, are affected by I.Q. and education and which are not.

Q    Okay.

A    So, for example, the sensory motor tasks, those aren't affected by education.

Q    Okay, I appreciate that.

A    Yeah.

Q    And I am sure you are familiar with the research that deals with the testing of normal people, healthy people in

1297

the population.

A     Yes.

Q     That if you give a large battery of tests to normal individuals, that a sixth of the population is going to have 25 percent of those scores being in the impaired range; isn't that correct?

A     I don't know that particular body of research and I would say that what is important is to look at the patterns of performances because to have a bit of a lower score here and there -- and it depends on what you mean by impairment. Are you talking about one standard deviation or are you talking about three?  But the point is that you won't necessarily in those normals see patterns of scores that group around certain areas of dysfunction, which is really what I am seeing here.

Q     But you would agree with me with the more tests that you give, the more -- the higher potential of there being lower scores even in a healthy population?

A     Not a higher potential of lower scores, a higher potential of finding something that is less than average.

Q     All right.

A     That I have read.

Q     All right.  One particular article I am familiar with is an article known as "To Err is Human."  Are you familiar with that particular article?

1298

A     Yes.

Q     It deals with what we've been talking about; correct?

A     Yes.

Q     All right.  And you would agree with me that when we look at the testing scores as a whole, -- and I said there was some nearly 100 of them from Mr. Barrett's testing that was performed by Dr. Young -- that if you were to look at them that roughly 22 percent would fall in the below average -- the mild impairment or below category; is that correct?

A     I didn't eyeball it in that way, so I am not comfortable to answer, but I know there were a combination of relative strengths and a number of patterned weaknesses.

Q     On the WAIS-IV you would agree with me that verbal comprehension was in the average range; correct?

A     Yes.

Q     That perceptional reasoning was in the average range; correct?

A     I believe so.  I can't remember if it was low average or average.  Let me get a look.  (PAUSE)  Yes, that is correct.

Q     And you would agree with me that working memory, I believe you testified, was in the low average; correct?

A     Right.

Q     That processing speed was down in the mild to moderate impairment range; is that correct, or was that in the mild

1299

impairment?

A    No, it was not in the mild impairment.

Q    So was it in the --

A    That was two standard deviations.  1.5, so I would give it -- yeah.

Q    Okay.  And that was significantly lower than the testing back in 2000; correct?

A    Yes, and I -- and I will say I can't speak to -- as you pointed out that I wasn't in the room, I wasn't in the room with Bianco, Dr. Bianco, and I don't know what the conditions were for his testing.  I just don't know.

Q    Okay.

A    I just don't know.  Maybe he follows different rules.

Q    All right.  You would agree with me that on the verbal comprehension -- that would be under the subtest -- that Mr. Barrett scored in the average range?

        MR. SCHARDL:  Objection, asked and answered.

        THE COURT:  We did cover that already, didn't we?

        MR. WILSON:  I will move on, Judge.

BY MR. WILSON:

Q    How about block design?  You would agree with me he scored in the average range; correct?

A    Yes, and that's where it becomes important to look at subtest scatter --

Q    The question is do you agree with me that he scored in

1300

the average range?

A     I do.

Q     Do you agree with me that on the matrix reasoning he scored in the low average range?  Correct?

A     Yes.

Q     You will also agree that on visual puzzles he scored in the average range; correct?

A     Yes, close to average.

Q     And on the working memory subtest, digital span, low average; correct?

A     Yes.

Q     The arithmetic, low average?

A     That's correct.

Q     Letter numbering sequencing, low average?

A     Yes.

Q     The Processing Speed Subtest, the simple search -- I mean, we talked about that one already, that he was in the low average; correct?

A     No.  Symbol search?

Q     Symbol search; isn't that correct?  That's the one that was mis-scored; right?

A     Right, but I don't know that it brings it up to a low average.  I would have to do the calculation.  I don't -- let me look at her -- Dr. Young's declaration.  Have you calculated it?  Because I can't answer that and I don't have

1301

the manual.  (PAUSE)  If you could direct me to somewhere where she spoke specifically about the symbol search, I would be happy to take a look.  I can't imagine with a score of the 5th percentile for the two tests combined it would be low average.

MR. WILSON:  May I have just one moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. WILSON:  Your Honor, if I may, I'll just move on from there.

THE COURT:  Okay.

BY MR. WILSON:

Q     Let's move to the CVLT.  That was right toward the end of the discussion you had with counsel earlier.  Would you agree with me that on the CVLT-2 that on trial one he scored in the average range; correct?

A     Correct.

Q     And trial 5 was in the above average range; correct?

A     Yes.  It shows he can learn.

Q     I am sorry?

A     It shows he learned over repeated exposure, which is consistent.

Q     Okay.  And he was above average in trials 1 through 5; correct?

1302

A       No, he wasn't above average, he was average.  A T score of 49 is average.  50 is average actually.

Q       All right.  On the Short Delay Free Recall, it was above average?

A       Right.

Q       Short Recall Quad Recall, above average?

A       Yes.

Q       Long Delay Free Recall, above average?

A       Are you asking a question?  I am sorry.  You made a statement.  I didn't know if you were asking a question.

Q       Is that correct, that he was above average on that?

A       Yes.

Q       Is it correct that he was above average on Repetition Errors?  Isn't that correct?

        MR. SCHARDL:  Your Honor, I am going to object.  I don't know what is being referred to in the scoring.

        THE COURT:  Can you be more specific?

        MR. WILSON:  I will ask about each one, Judge, sure.

BY MR. WILSON:

Q       Short Delay Free Recall.  Can you tell the Court what that is?

        THE COURT:  Where are we looking at?

        MR. WILSON:  We are looking at the CVLT-2.

BY THE WITNESS:

1303

A      Do you want me to tell the Court what that is?

Q      Yes.  What is the Short Delay Free Recall?

A      The Short Delay Free Recall is after they have been exposed to a -- they have the five trials of the first 16 word list.  Then they are exposed to a new list that he bombed horribly, trial B, and then --

Q      And that's on -- I am asking about the Short Delayed Free Recall.

A      I am getting there.  And then --

Q      That's all I am asking about.  What is the Short Delay Free Recall?

A      And then, and then after that, they return to the first list, the one that was presented several times and are simply asked tell me as many words as you can from the first list, the one that I read to you several times.

Q      And he scored above average?

A      Yes.

Q      The Short Delay Quad Recall, what is that?

A      The Short Delay Free Recall is they are provided queues --

Q      Hints, right?

A      I am sorry?

Q      Like a hint; correct?

A      Right.  They are provided category queues and he did better being provided a category queue and similarly was above

1304

average, yes.

I was just noticing that you had neglected to talk about trial B, which is important to his pattern of difficulties.

Q    Doctor, if you will just answer my questions, ma'am, and quit volunteering, it will -- and I will ask the Court again to instruct the witness to just answer the questions.

A    Okay, I will do that.

THE COURT:  Just whatever he asks you -- we can clear some of this stuff up on redirect, if necessary.

THE WITNESS:  Sounds good.

BY MR. WILSON:

Q    There is a scoring in the CVLT of repetition errors; is that correct?

A    Yes.

Q    And you would agree with me that he scored in the above average range on that; correct?

A    No, I don't think he did.  I am not sure.  I will have to look at the protocol.  What was the score associated with it?  Was it a one?

Q    I am just looking at a grid on repetition errors.  I don't have the number in front of me.  I am sorry.

A    Let me look for you.

Q    And I am sorry, the Z score is .05.

A    Thank you.  Yes, that's fine, average.

Q    And on trial B, as you've testified in direct, that's

1305

when another set of information is provided and that he scored 1.5 below the mean; correct?

A     Yes, meaning there was the interference of the old information with learning new information.

Q     But then when you come back to the original information, he was able to recall the original information; correct?

A     It's still there, that's right.

Q     Now, on the WIMS-IV, there is a score or subtest on Auditory Memory Index; correct?

A     That's correct.

Q     And you would agree with me that Mr. Barrett scored in the low average on that; correct?

A     I am just looking.  Give me a moment, please.  (PAUSE) Ah, here we are.  And what are you looking at specifically?

Q     The Auditory Memory Index.

A     Okay.  Might you tell me which page you are looking at of those page numbers at the bottom.  I am just missing the particular reference you are making.

Q     Well, do you recall what his score was on the WIMS Auditory Memory Index?

A     Okay.  So you are having trouble finding it too?

Q     Yes, ma'am, I am.

A     Okay.  I believe it was 91.  I just found it.  Here it is.  So, yeah, that's average.

Q    And the Visual Memory Index was -- it was above average; correct?

A    The Visual Memory Index, yes, was very high.

Q    And the Immediate Memory Index was average; correct?

A    That's correct.

Q    The Delayed Memory Index was average?

A    No, it was above average.

Q    Oh, I am sorry, above average.

A    Call it like it is.

Q    Absolutely, thank you.  But as you testified earlier, the Visual Working Memory Index was impaired; correct?

A    Highly impaired, yes, moderately impaired, two standard deviations below the mean.

Q    Highly or moderately?

A    Moderately.

Q    Okay.  Logical Memory average; correct?

A    One moment.  I believe so, yes, yes, above average.

Q    Okay.  But then Verbal Paired Association, can you tell me what that is?

A    Yes.

Q    Verbal Paired Association?

A    Right.  They are given two words and what they are asked to do is to remember the words that pair -- there has been a list of words actually with two word pairs and then they are given one word and they have got to give the other word

1307

that is paired with it.

Q    And Mr. Barrett scored in the impaired category on that; correct?

A    Yes, very low on the immediate recall, moderate, two standard deviations below.

Q    Within a -- what's the difference between the Verbal Paired Association 1 and a Verbal Paired Association 2?

A    It is when you receive it.  One is Immediate Recall and one is Delayed Recall.

Q    But on Delayed Recall he moves up to average; right?

A    Yes.  It is very similar to the Rey.

Q    Okay.

A    The problem is with registration of the information, but then later he is able to call up more of it, which tells you something is going on there that is not -- something is rotten in Denmark.

Q    I probably wouldn't have said it that way, but I appreciate that.

A    I know.  I apologize if that offends anyone in the court.

Q    Designs 1, that was above average?

A    Yes.

Q    And 2?

A    Correct.

Q    Visual Reproduction, that was average, on the 1 and

1308

on the 2 above average; correct?

A      Exactly.

Q      Now, we've already talked about the Symbol Span earlier; correct?

A      I believe so, yes.

Q      All right.  Counsel spent during direct examination a considerable amount of time on the D-KEFS.  And when you were testifying you didn't go through all of the sub-scores and subtest scores, did you?

A      All of them?  No.

Q      It would take a long time, wouldn't it?

A      That's right.  And what I did was to make general comments.  If they were generally fine, I said they were fine.  The only ones I spoke to were the areas that were impaired.

Q      Okay.  You would agree with me, looking at the D-KEFS scores in their totality, if you look at all of the scores and the sub-scores of the subtests, you would have about 94 different scores just on the D-KEFS; isn't that correct?  Would you agree?

A      Yes, that's true.  It has got a lot of conditions and analyses.

Q      And if you look at this in its totality, Mr. Barrett scored in the mild impairment or below about 14 percent, 14.9 percent; is that correct?

1309

A      I don't know, but I'll take your word for it.  I have not done any calculation like that.

Q      All right.  Well, let's look at some of these quickly. Under the design fluency, there is a test on what is called the Filled Dots.  Are you familiar with that?

A      Yes.

Q      And you've administered that test in the past yourself?

A      Yes.

Q      Mr. Barrett scored above average; correct?

A      I am just trying to locate that data right now. (PAUSE)  I am not able to locate it, but if you would like to show me an exhibit so that I can respond to each area, I will.  (PAUSE)  I found it.  You are talking about the Filled Dots?

Q      That's correct.

A      Yeah, there are many scores in the normal range, many, many, many.

Q      You would agree with me that empty dots is average?

A      Yes.

Q      Switching...

A      Yes.

Q      His total composite was within the average?

A      That's correct.  There is no question that this man has strengths and many things he is able to do well.  The

1310

trick of neuropsychology is the Sherlock Holmes in looking at patterns and clues and if there is something there, then being able to put it together.  So there are highly functioning people with deficits and --

Q      Well, before I got to anymore tests, did you -- during your examination, you talked about potential insults to the brain.  You talked about the mother using alcohol; correct?

A      Yes.

Q      You are not telling the Court that Mr. Barrett suffers from Fetal Alcohol Syndrome, are you?

A      No, I am not.

Q      As a matter of fact, Dr. Woods told us that he was not making that diagnosis; isn't that correct?

A      That's correct.

Q      You are not saying that Mr. Barrett's alleged steel ball to the head caused a brain injury, are you?

A      I am not in a position to make causative analyses of those sorts.

Q      So you can't say whether or not his decades long use of illegal drugs caused any of these problems?

A      It very well may have, but I --

Q      But you can't say it for sure, can you?

A      No, I don't have a method to say that is a definite, yeah.

Q    Well, I am going to direct your attention to the Color Wod Interference we talked about earlier.  It was part of the STROOPs we talked about earlier.  Specifically on the D-KEFS there is a color word interference portion; correct?

A    Right.

Q    On that test he scored in the average range for color name; correct?

A    Yes, he did.

Q    For word reading, he was low average; right?

A    Yes.

Q    But for inhibition, average?

A    No.  Oh, that inhibition, yes.

Q    Yes.

A    This is completion times though.  I want to -- well...

Q    I am asking a question.  When we are looking at these test results and there is a test result for inhibition -- and I believe you testified that he scored in the average range; correct?

A    On completion time --

      MR. SCHARDL:  I am going to object, Your Honor.

A    Yes, please.

      MR. SCHARDL:  Counsel is asking about these results.  The exhibit has page numbers.  I don't know why we can't have page numbers so that everybody can clearly be looking at the same page that we are talking about when he

1312

says, "these results."  I can't follow the questions.

THE COURT:  Well, are you working from notes or are you working from the exhibits, Mr. Wilson?

MR. WILSON:  Obviously I am working from notes, Judge.  So I --

THE COURT:  And it would be helpful if we were all working off of the same page.

MR. WILSON:  Okay.  I will try my best to...

BY MR. WILSON:

Q    All right.  We are looking specifically at Page 74, Government's Exhibit Number 67, Page 74.

A    Well, I don't have that exhibit in front of me.  I have my version of the printouts.  If that is sufficient, I will try to --

THE COURT:  Can you give her the right book, Nick, if you would, please?

THE CLERK:  Yes, Judge, it is there underneath her notes.

THE WITNESS:  Thank you.  That's got my -- my data in it?

THE CLERK:  It has the page he is referencing, Exhibit 67, Page 74.

BY THE WITNESS:

A    I am here.

BY MR. WILSON:

1313

Q     All right.  Are you on Page 74?

A     Yes.

Q     You mentioned that these are the primary measures, the completion time; correct?

A     Yes.

Q     And you will agree that on the category of color naming he has an average score?

A     Yes.

Q     And word reading was low average; correct?

A     But then you go -- inhibition, that's average?

A     Yes.

Q     And also true of inhibition and switching, was average?

A     His completion time on inhibition and switching was average, yes.

                    (PAUSE)

Q     The Tower Test that counsel asked you about --

A     Yes.

Q     And I believe you testified that the individual is shown a pattern and they are asked to repeat that?

A     That's correct.

Q     Mr. Barrett in that particular test on his total achievement was average; correct?

A     That's correct.  He was even a little bit above average.

1314

1821

Q     So he performed that task; is that right?

A     I am sorry?

Q     He performed that task a little above average, comparatively speaking; is that correct?

A     What I need to tell you is to look at these scores independently of the other scores, it is like looking at half an elephant or a quarter of an elephant and say, ah, you know...

Q     Well, you will agree with me that the only part of the Tower Test which Mr. Barrett score as impaired was on his move accuracy; correct?  That's the number of moves that it took him to complete the task.

A     That's correct.  So the move accuracy and the rule violation was low average.

Q     Okay.  Now, the Proverbs Test -- I don't know that counsel talked much about that, but what is the Proverbs Test or the Proverb Test?

A     It is giving them an opportunity to state the meaning of Proverbs.

Q     That's a test of -- the ability to abstract concepts; correct?

A     Of a particular type, yes.

Q     And Mr. Barrett scored on all either average or above average; correct?

        MR. SCHARDL:  Again, Your Honor, same objection.

1315

If we could have a reference to --

MR. WILSON:  Page 80, Counsel.  Sorry about that.

Thank you.

BY MR. WILSON:

Q      Do you see average or above average by Mr. Barrett on that test?

A      I am sorry, I didn't hear the question.

Q      On the Proverbs Test, did he score average or above average?

A      On the achievement of common proverbs he scored above average ane he scored slightly below, but really average on the others.  However, there is an abstraction only score that was very low.  So the point is, you know, you need to take that into account in considering his performance.

Q      The abstraction score is the one you are talking about here?

A      Yes.  Do you see that?

Q      Is that the one that is scale scored as a 1?

A      Yes.

Q      Is that an accurate scoring?

A      I believe so based on what I found in her data.

Q      Now, a couple of other tests that counsel talked with you about were the Card Sorting Test and the Sort Categories Test.

A      Okay.

1316

Q      And those are specifically tests that look at executive functioning.  That was your testimony; correct?

A      Yes.

Q      And I believe you testified that Mr. Barrett didn't complete a single sort; is that correct?  He didn't get 10 in a row as required to move to the next sort; is that correct?

A      That's correct.

Q      But isn't it true that he was correctly naming the rule, but simply not putting the card correctly to match that rule?

A      I don't know how often he was doing that, but I did read, yes -- to answer your question, yes, I read that he appeared to be doing that.

Q      So when you testified earlier he just didn't get the rule, that's not correct, is it?  He got the rule, he just simply couldn't -- he just didn't put the card in the right stack?

A      Honestly I wasn't clear on Dr. Young's testimony in that area.  So I would be making something up to respond to it.

Q      Well, you weren't there when the test was given, were you?

A      Exactly.  And nor when Bianco was doing his testing either.

1317

Q     That wasn't my question, Doctor.  Again, would you, please, just answer my questions.

A     Yes.

Q     Thank you.

MR. WILSON:  Referring counsel to Page 21 of the declaration.

THE COURT:  Exhibit 25?

MR. WILSON:  It's the declaration of Dr. Young.  I believe that is Number 25, Judge.  Well, I think I might have misspoke.  Hang on a second.  Sorry, Judge.  (PAUSE) Oh, I am sorry.  It is Page 22 of Exhibit Number 25.  It would be Paragraph 60.

(PAUSE)

BY MR. WILSON:

Q     Do you see that, Paragraph 60?

A     I do, but I don't see any reference to her saying that the rule that he was thinking about was accurate but simply that the rule that he came up with was not what he actually sorted.

Q     So is it your impression of that language that the rule was wrong, plus the action on the rule was also wrong?

A     No.  I am saying that it is ambiguous.  That when she writes, quote, "He was unable to carry out the, quote, 'rule,'" end quote, "he had stated," parentheses, "(categories completed equal zero)," end parentheses -- oh,

1318

I am sorry. Basically he was repeating the "rule", in quotes, that he was using, but she didn't say that that rule was accurate. So I don't know if the rule that he said out loud was accurate and just different from the one he sorted to, but there was some disconnect between what he was saying and he was doing. She didn't say -- she didn't say he came up with the correct rule. It was the rule he was using in the --

Q    Okay. So, again, we just don't know for sure?

A    I would say I couldn't answer that, correct.

Q    Okay. Mr. Barrett's inability to get a single sort, that's inconsistent with the rest of the testing, isn't it?

A    No, not at all.

Q    Not a single sort? He can't get 10 in a row?

A    If he got the concept, he might be able to get 10 in a row. His short categories test, which was given and they are often given in a battery together -- especially if there is a poor performance on one, then the other will be given. It is recommended. He did very poorly on that conceptual level task as well, which is nonverbal. Those are nonverbal tasks and one of the patterns I found was problems with visual attention and nonverbal changing kinds of tasks.

Q    Now, you examined the errors that he made as a part of this Wisconsin Card Sort; correct?

A    Yes.

Q     Mr. Barrett didn't get stuck, he didn't -- correct?

A     That's correct.

Q     What we call preserve -- I knew I was going to get that wrong.  Perseverative errors?

A     Correct.

Q     So when Dr. Woods testified a couple of months ago in this hearing that Mr. Barrett had a problem with getting stuck, that's not correct, is it?

MR. SCHARDL:  I am going to object.  Because of the Court's ruling earlier, we weren't able to bring Dr. Miora to listen to Dr. Woods' testimony.  She doesn't know what he testified to.  It is unfair.

THE COURT:  Okay.  And we really are here to talk about her work with Dr. Young's --

MR. WILSON:  Well, Judge, we objected to having this witness testify because Dr. Young -- excuse me -- Dr. Woods had already testified about all of what Dr. Young had done.  And now he testifies one way and now she comes in and testifies differently.  I am just pointing out that inconsistency.

THE COURT:  All right, so noted.

MR. WILSON:  Thank you.

BY MR. WILSON:

Q     Would you agree with me that Mr. Barrett committed, I believe, some 48 errors that simply didn't match anything

1320

on the card sorting?

A     Yes, and I had a hypothesis about it.

Q     That's over 60 percent completely wrong, didn't match anything; correct?

A     No.

Q     That's not correct?

A     I can't be sure about that.  I discovered something that I have not published about, but that I wonder about with the card sorting test when it is given the way it is given, when it is not on a computer.

Q     Well, if someone misses 48 times with complete mismatches...

A     Mismatches, unless something else is considered.  They may not have been mismatches.  They were mismatches to the four cards to which you are supposed to sort.  They may not have been mismatches to the piles underneath and I see this time and time --

Q     Do you think Mr. Barrett just didn't understand the rules?

A     What's that?

Q     Maybe Mr. Barrett just didn't understand the rules. Is that a possibility?

A     Yes, that is a possibility.

Q     And if he missed 48 times, that's pretty clear, he just didn't understand what he was supposed to do; correct?

1321

He didn't get the rules.

A     Well, it is not about him getting the rules.  One is you develop the concept in your mind.  The other is he may have understood the rules and he just didn't get the concepts.

Q     But we can't say for sure, can we?

A     Well, I suppose that's another hypothesis, yeah.

Q     And fatigue will play into that; correct?  Fatigue will play into your performance on the sorting test; correct?

A     Fatigue on the actual -- just the sorting test?  Not likely.

Q     I have been testing for 3 hours and that's not going to play into it?

A     Well, Dr. Young reported that he got breaks.  She was very careful about giving him breaks.  So --

Q     Looking at the raw data, can you tell us what order the tests were given in?

A     No.

Q     Can you tell us what time of day the card sorting test was given?

A     No.  I could come up with a number of hypotheses, but I don't have the data.

Q     Now, you testified that -- well, tell me with the card sorting test, Dr. Young --

1322

MR. WILSON:  And, Counsel, I am referring to Page 22 again, Paragraph 60.

BY MR. WILSON:

Q    Remember, we were discussing Mr. Barrett calling out the rule and then not following his own rule that he called out.

A    He called out the rule he was using --

Q    Correct.

A    -- to solve this problem.

Q    Now, in the latter part of that paragraph Dr. Young makes a comment.  "Current research demonstrates a significant relationship between ability and inability to grasp and consistently carry out the demands of the WCST," which is the Wisconsin Card Sort Test, "and daily functioning such as driving an automobile or successfully returning to work after a closed head trauma."  Right, that's what she says?

A    She did.

Q    Mr. Barrett didn't get a single sort; correct?

A    That's correct.

Q    And according to what Dr. Young is saying, there is a significant relationship between that inability and the ability to drive a car; correct?

A    Yes, she notes that there is that relationship.

Q    Are you suggesting that the fact that he is in the

1323

90th -- sorry -- the one percentile that this man can't even drive a car?

A    I don't believe she was suggesting that and I wouldn't suggest that.  And I --

Q    So do you know why she put this in here?

A    No, I can't tell you why she put that in there.

Q    But you adopted her findings in totality; correct?

A    No, I did not.  If you are asking me, did I adopt that sentence --

Q    Well, you don't agree with that --

A    I don't know if I agree or disagree with it.  I hadn't considered it.

Q    Mr. Barrett was able to operate a motor vehicle.  We all agree with that; correct?

A    I don't know.

Q    You don't even know whether he can drive a car?

A    Now?  How long has he been in custody?  No, I have no idea.  Do you --

Q    At the time --  back in 1999 when Mr. Barrett murdered a trooper, do you know whether he could drive a car?

A    Yes.

Q    You do know that?

A    Yes.  I thought you were asking me about --

Q    Do you know whether he had the ability --

A    -- now.

Q    Do you know whether he had the ability when stopped by a law enforcement officer to convince a law enforcement officer to let him drive -- to let him drive home?  You were aware of that; right?

A    I am not sure.

Q    He was able conceptually to understand the circumstance he was in.  He knew he had been stopped by a police officer; correct?

A    That's pretty concrete.

Q    Okay.  And to be able to convince that officer -- he said don't take me to jail, let me drive myself home and then you can take me into custody.  He was able to formulate that concept, wasn't he?

A    Uh, according to what you are saying.  It is not a difficult concept.

THE COURT:  Are you familiar with that incident or not, Doctor?

THE WITNESS:  I believe I am.  I believe I have seen that, but I wasn't 100 percent sure, so I didn't want to -- yeah.

THE COURT:  All right.

BY MR. WILSON:

Q    So you are familiar with that event?

A    Yes.

Q    You are aware that on the night of this particular

event Mr. Barrett was using methamphetamine?

A      Yes.

Q      And that Dr. Miora can affect a person's ability to perceive their surroundings; isn't that correct?

A      Absolutely true.

Q      And substantial use -- or historical use of methamphetamine can affect a person's ability to perceive their circumstances; isn't that correct?

A      Absolutely true.

Q      But Mr. Barrett was able to obtain a firearm in the midst of this event; isn't that correct?

A      I don't know when he obtained a firearm.  I can't answer that.

Q      Have you read the facts of the event?

A      Yes.

Q      So you've read all of the law enforcement reports?

A      All of the law enforcement reports?  Probably not.  No, I would --

Q       Because I didn't see any of that in your declaration about the things that you reviewed, so I didn't know whether you had --

A      No, I was asked to review Dr. Young's work, not to get into anything having to do with the police reports and accounts of events.

Q      All right.  So getting back to my question, --

A      I am consulting on neuropsych data.

Q      -- the law enforcement --

A      No, I did not review all of those police reports.  Are they in my ---

Q      But you are here testifying about the cognitive abilities of Mr. Barrett; correct?

A      Based on Dr. Young's assessment, declarations I read and other professional reports I read, that's correct.  I am not testifying about --

Q      Counsel has asked you --

A      -- when he bought a gun or how he bought a gun or anything like that.  I don't know about that.

Q      Well, counsel was asking you about the ecological validity of these tests, the real world application of the findings of the tests; is that correct?

A      Yes.

Q      And wouldn't it be important to know the facts of the crime when you are talking about the ecological validity of these tests on Mr. Barrett's behavior back in September of 1999?

A      I am not called in, as far as I know, to make any -- to develop any opinion about what was going on with him at the time of the crime.

Q      Well, I --

A      I was asked to come in and opine about the validity

1327

and reliability and robustness of Dr. Young's work in the case.

Q    Well, if I am not mistaken, I believe you testified that Mr. Barrett was incapable of taking in information, that it was difficult for Mr. Barrett and to act upon that information in real time; isn't that correct?

A    Honestly it feels out of context for you to make that big general statement.  I don't feel like I can answer that yes or no.

MR. WILSON:  Can I have just a moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

MR. WILSON:  Your Honor, I believe that's all of the questions I have.  At this time I would move to strike this testimony of this witness.  If the witness is not here to render an opinion, then it's not relevant to this Court's determination.  So I would ask to strike the testimony of Dr. Miora.

THE COURT:  What do you say about the motion, Mr. Schardl?

MR. SCHARDL:  I would say, Your Honor, that the Tenth Circuit remanded this case for a hearing in particular on the findings of Dr. Young as it relates to Mr. Barrett -- the findings of impairment that she identified.  So the Tenth Circuit obviously thinks that it is relevant and the

1328

doctor has testified to possible etiology causes for the impairment that was found.  Those possible causes, she has testified, would be cumulative.  She has testified that they existed before the events and she has testified -- and counsel has brought out a number of similarities between his functioning in 2000 and 2009.  So I would say we have measures of his functioning and his ability in the relevant areas of judgment and responding to stimuli or visual stimuli.  And the witness has testified to the relevance of it and I think it is apparent from what the Tenth Circuit has ruled.

THE COURT:  Anything further on this point, Mr. Wilson?

MR. WILSON:  Well, Judge, I asked the witness specifically about the events in September of 1999 and what this testing -- any impact, what that has and she was not and did not render an opinion.  So it is not relevant to this Court's determination as to the prejudice of any potential ineffective assistance of counsel by Mr. Smith or Mr. Hilfiger back at the time of trial.

THE COURT:  Well, let me reserve a ruling on that. I will take it under advisement.

MR. WILSON:  Thank you.

THE COURT:  Is there any redirect?

MR. SCHARDL:  A bit, Your Honor.  I think I can do

1329

it in about half an hour.

THE COURT:  Okay.  Well, let's take about a 10 minute break then, come back at 5:00 and do it in half an hour.

(4:48 p.m.)

(SHORT RECESS)

(5:02 p.m.)

COURT IN SESSION

THE COURT:  Mr. Wilson?

MR. WILSON:  If I may before counsel begins, I would move to introduce Government's Exhibit Numbers 67 and 68, which are the testing data that we were talking about earlier.

THE COURT:  Any objection?

MR. SCHARDL:  We will object to the introduction of Dr. Bianco's, whichever one that was, I don't recall if it was 67 or 68, but -- I am sorry?  Thank you, Counsel. We object to 68 in that the witness hasn't testified to it and we don't have his normative -- we don't know what norms he used.  So there is a big question about whether the Court would even be considering his --

(PAUSE)

THE COURT:  Go ahead and finish.

MR. SCHARDL:  I am sorry, Your Honor.  So we would want to voir dire Dr. Bianco about his methods and whether

1330

they were scientifically valid and reliable at the time he used them.  As Dr. Bigler stated in his declaration, which is at Document Number 376-2, there are indications that Dr. Bianco's raw test data, the Exhibit 68, that he may have been using norms from the 1950s.  In which case, the Court in 2005 would probably exclude his testimony under Rule 703 on the grounds that it wasn't based on reliable, accepted scientific methods.

THE COURT:  Isn't all of that data a part of the record already?  We haven't admitted that exhibit, but wasn't that attached to the petition or...

MR. SCHARDL:  No, Your Honor, it was not.

THE COURT:  The government's response?

MR. WILSON:  Well, Judge, no, it was not attached to the --

THE COURT:  The affidavit -- it is not attached to the affidavit from Dr. Bianco?

MR. WILSON:  No, no, it was not.

THE COURT:  Okay.

MR. WILSON:  The reason I am moving for it, Judge, is because it was specifically relied upon by this witness and by Dr. Young and by Dr. Woods for their testimony.

THE COURT:  All right.  Well, I am going to admit both of those exhibits.  I will note your objection on the records of Dr. Bianco.

1331

MR. SCHARDL:  We will -- if I may, Your Honor, the defense would renew its request to have Dr. Bigler testify. If the Court is going to consider that evidence, the Court should consider whether it is reliable and what it means.

THE COURT:  Well, this witness reviewed it and relied on it.  That's the reason I am letting it in, not because it is independent proof of anything.

MR. SCHARDL:  Your Honor, the witness relied upon it for the reasons stated in our opposition to the motion to call Dr. Bianco.  That is, if trial counsel had testified on the issue of deficient performance that they relied upon the one page affidavit from Dr. Bianco, Dr. Miora or Dr. Bigler is going to testify that that would be unreasonable for some of the reasons stated in other documents.  That is -- and it is the reason I stated before, nobody knows what that stuff means because there is no norm attached to it.  If somebody says average or below average, it is in relationship to a population, to a base rate.  Nobody knows what that is because Dr. Bianco never said.  So the witness did not rely upon it in forming her opinions about Mr. Barrett's neuropsychological functioning.  She testified about Dr. Young's opinions of his neuropsychological functioning. Again, it was only to be considered for the purpose of this deficient performance issue, which never emerged because the trial attorneys testified they never relied upon anything

1332

-- or that one page affidavit from Dr. Bianco.

THE COURT: Okay. Well, we will --

MR. SCHARDL: I won't deny that they consider it, but I am just saying that they considered it for a different purpose than the one for which this witness's testimony is being offered in this hearing.

THE COURT: All right. Go ahead and do your redirect.

MR. SCHARDL: Thank you, Your Honor.

REDIRECT EXAMINATION

BY MR. SCHARDL:

Q    Dr. Miora, is it considered necessary in the field of psychology or neuropsychology to be board certified in order to render opinions about neuropsychological testing?

A    No.

Q    Do you know whether Dr. Young was board certified?

A    Yes, she was.

Q    You were asked a number of questions about Mr. Barrett's performance on various tests of his verbal abilities, such as the California Verbal Learning Test, the CVLT-II; correct?

A    Yes.

Q    In neuropsychological assessment, is there such a thing called discrepancy analysis?

A    Yes.

1333

Q      What is that?

A      Desrepency analysis allows for the comparison of different scores to determine whether there are any significant differences, statistically significant differences between the scores.

Q      And is there a type of discrepancy analysis that is between two subtests within the same index?  Is that one kind of discrepancy analysis?

A      Yes.

Q      So, if you are shown, as you were on cross examination, scores in an average range on tests within one index and then there is an impaired scored on another test within the same index, would you apply discrepancy analysis in that situation?

A      Yes.

Q      Is that what neuropsychologists basically do?

A      It is a -- yes, it is one of the methods used to establish discrepancies and in pattern analysis of the data. In other words, looking at the lower scores, for example, or higher scores and seeing if there is any pattern to them that emerges.

Q      Looking for any strengths and weaknesses?

A      Yes.

Q      How important is discrepancy analysis in neuropsychological assessment?

1334

A    Very important.

Q    So do you base conclusions as a neuropsychologist on the percentage of total tests given in which there is impairment?

A    No, I am not familiar with that as a method.

Q    You were asked on cross examination whether Mr. Barrett only showed impairment and -- and I think the number was 22 percent of the tests that were administered in the battery.  Are you familiar with any research that shows that kind of subtraction is indicative of any -- of anything at all?

A    No.

Q    There is no scientific basis for just saying...well, he did well on 78 percent of the tests?

A    Not to the best of my knowledge, and I do keep up on the literature.

Q    You were asked a number of questions about the testing that Dr. Bianco did.

     MR. SCHARDL:  And for the record, I just want to say that we continue our objection to this, but to the extent that the Court is considering it in relation to Dr. Young's findings, I am just offering it for that purpose.

     THE COURT:  Very well.

BY MR. SCHARDL:

Q    Could I refer you to Government's Exhibit Number 68?

(PAUSE)

Q    And if you could turn to the bates numbered page in the bottom right-hand corner that is 503266.

A    I am there.

Q    Okay.  Do you recognize the tests or any subset of the tests, I guess I should say, listed on this sheet as being part of a battery?  And let me be more specific, part of a fixed battery.

A    Yes.

Q    What is the difference between a fixed battery and a non-fixed battery?

A    A fixed battery is a battery of tests that are given each and every time and are generally normed together and serve as a way of evaluating neurocognitive function.

Q    And do you recognize the fixed battery of which constituent parts were used in Dr. Bianco's testing?

A    Yes.

Q    What is it?

A    He used tests that are a part of the Halstead-Reitan Battery.  It is not an entire battery but facets of it.

Q    And how long as the Halstead-Reitan Battery been around?

A    The original battery?  For 67 -- 60 plus years.

Q    It was published in about 1950?

A    Yes.

1336

Q      And we were talking before the beginning of your direct testimony about normative data; correct?

A      Yes.

Q      And could you just -- to refresh our recollection, what does it mean to have normative data?  What is its purpose for neuropsychological testing?

A      The purpose of normative data is in addition to the development of the test, then having comparison groups, having samples to which you can compare an individual you are assessing relative to those -- relative to the normative sample.

Q      So would you norm a test for different age groups, for example?

A      Yes.

Q      And I suppose if there is -- if there is a test that involves language, would you norm it for their education level?

A      Yes.

Q      And do they also change the norms of tests over time for those subcategories?

A      Yes.  They get re-normed or, you know, maybe a new test comes into being.  The WAIS is a good example of that happening.

Q      If you don't know the normative sample to which an individual's scores are being compared, do you know the

1337

meaning of the score in a given range?

A     It opens up -- the answer is no.  It opens up a lot of questions about the meaning of the data.

Q     And in the -- in Government's Exhibit Number 68 did you see any indications of what the normative data used to do assigned -- well, let me strike that and ask you another question.  I am sorry.

MR. SCHARDL:  I apologize to the Court.  Let me strike that and back up.

BY MR. SCHARDL:

Q     You were asked a number of questions about whether Mr. Barrett's performance on these tests were average or below average or above average.  Do you recall that?

A     Yes.

Q     Or impaired or mildly impaired, et cetera.

A     Yes.

Q     Those terms, average, below average, above average, impaired, mildly impaired, what are those called in the trade or in your profession?  I apologize.

A     It's a trade of sorts.  Classification, it is a classification of the level of functioning.

Q     Are those qualitative descriptors considered something different than the quantitative numbers that you see?

A     Yes.  The numbers get put -- they will apply a classification to the numbers because the numbers stand on

1338

their own, but then they get classified according to different systems.

Q    When you say the numbers stand on their own, I want to clarify, if I can, the best I can, the process by which we get numbers and the different numbers that we are talking about.  So what's the first number that a neuropsychologist comes to after administering a test?

A    A raw score on that test.

Q    And if you just know a raw score, do you really know much of anything?

A    No.

Q    What's the next thing that a neuropsychologist does with the raw score?

A    The raw score then gets converted to a -- it could be a scaled score, if it is a subtest that has scaled scores with a mean of 10, a standard deviation of three.  It could be a standard score of 100, you know, with a standard deviation, but it is put into a statistical format which permits neuropsychologists to look at the scores and to understand something about them.

Q    And that putting it into something is putting into the set of normative data; is that correct?

A    Precisely.

Q    So if you take the raw score alone, you don't know anything.  If you stake the scaled score, which you were

1339

just describing, you may know something, but you may not

depending on what the norms are?

A      Right.  And some tests -- for example, the Wechsler

Test have their norms published and, you know, you print out,

if you wish to do it by computer, you know, the scoring such

as you saw in this case and that's pretty clear, you know

where the norms are coming from because the manual tells you.

In the event that you have a list of 'T' scores for different

raw scores, but you don't know the source, it is a problem.

Q      The Trails B or the Trail Making Test, is that a part

of the Halstead?

A      Yes.

Q      The Seashore Rhythm Test, is that a part of the

Halstead?

A      Yes, it is.

Q      I don't recall if you were asked about the TPT.

A      No, I was not asked about it, the Tactual Performance

Test.

Q      All right, then never mind.  With regard to the

STROOP, the Color Word Sort Test, you were asked about that

on cross examination.  Do you recall that?

A      Yes.

Q      First, the STROOP administered by Dr. Bianco, is it

the same thing as the Color Word Interference Test on the

Delis-Kaplan Executive Function System administered by Dr.

1340

Young?

A      No.  It is designed to basically assess the same brain functions and areas of the brain, the dorsal/lateral area of the brain.  However, they are constructed differently.

Q      Do you know the norms that were used by Dr. Bianco for assigning these qualitative assessments of average on that test?

A      No.  I have a speculation, but I am not sure.

Q      Well, I want to back up actually.  Let me ask you to look at Page 503300 of that -- that is Government's Exhibit Number 68.

A      Yes.

Q      Well, now I can't find it.  What page did I say?

A      Oh, you said --

THE COURT:  3300.

A      -- 3300, yes.

Q      Thank you.  I am beginning to have a guess of how I would do on the Wisconsin Card Sorting Test.

I am sorry.  So we do know that there were -- looking at this page, does that indicate that there were norms?  Would you know what the norms were?

A      No.  It could be ten individuals who were 16 years old and 20 who are 20 -- no, I have no idea.

Q      Okay.  So just knowing that there is -- that this is the scale that is used doesn't tell is where it comes from?

1341

A      Correct.

Q      And was -- I think you said there was a subset there. Did Dr. Bianco complete the Halstead Battery?

A      No, I don't believe so.  There was a subset of tests from that battery.

Q      Did he complete the Delis-Kaplan Executive Functioning Test?

A      No.

Q      Without completing those tests, can a neuropsychologist give a score on the impairment index on the Halstead-Reitan Test?

A      There are seven tests that would permit for an original Halstead impairment index score.  I would have to go through what is a difficult, you know, document there to determine if he gave each of those seven.  I think he may have.

Q      But you don't know because he didn't list a score?

A      Right.  I don't recall seeing any Halstead impairment index score.

Q      You were asked if Mr. Barrett complained of a headache when he was seen at the hospital one time.  Was it your interpretation of Dr. Young's findings that the presence of a migraine was a necessary condition for Mr. Barrett to have the impairments she found?

A      No.  My sense was she wanted to be sure that he was in good shape for the assessment and maybe in taking the medical

1342

history -- and again I am hypothesizing, but he asked about -- she asked about it.

Q      If a person doesn't have headaches, does that mean they don't have brain damage?

A      No.

Q      If you have brain damage, do you necessarily have a headache?

A      No, and especially if it is a head injury from a long time ago.  You may have had headaches at the time, but...

Q      With regard to events occurring in the distant past, do neuropsychologists typically rely on reports from family members and the patient themselves when assessing whether there is a possible root cause of impairment?

A      Yes, those are one source of valuable data.

Q      Do you base your conclusion that Mr. Barrett has brain damage on the existence of records of a cause?

A      No.

Q      Do you base it on the test data?

A      Yes.  I cannot establish a cause.  There are a number of triggers, like I had said, but I don't...

Q      If you were presented an individual about whom you knew nothing in his background and you administered a battery and it showed impairment, would you conclude that the person was impaired?

A      Yes.

1343

(PAUSE)

A     The knowing can be helpful for rehabilitation and intervention, but --

Q     Thank you.  You were asked a question about the symbol search.  Do you recall that?

A     Yes.

Q     On the WAIS-IV.

A     Yes.

Q     And I think there was something you wanted to say about the scores on that test and -- and I am not sure -- let me see if I can find the page with the data.  (PAUSE) Well, I'll come back to that, if I can find the page I am looking for.

You mentioned something about the Block Design Test and the importance of looking at subtest scatter.  Would you like to explain your answer on that?

A     Yes.  Just like you look at discrepancies between index scores, you look at discrepancies within a test such as the WAIS in which there are 10 primary required subtests. And if within, for example, processing speed I found a really high score on symbol search and a really low score on coding, it would be worth trying -- you know, at least noting and then as I proceeded with my test battery and looking at the data, I might get some information about it.  It is very Sherlock Holmes'ium (sic).  You get clues and then you, you

1344

know, work to see how they all fit together and you can't know.  So, for example, block design average score and matrix reasoning for Mr. Barrett of a low average score -- it is one standard deviation.  It doesn't mean anything statistically, but it might mean something in terms of an analysis of the patterns of performance across tests.

Q     So if you look at the patterns of performance in Mr. Barrett's case across tests using different instruments, how is this -- how is his performance on the block design consistent with other scores that he achieved on these tests?

A     It is a very structured and directed task.  He has some strength in constructional abilities that came out on the block design and -- as well, even though there were problems with his performance on the Tower Test, for example, he was able to look at the model and make patterns with the disks that were placed on the pegs.  Those are similar kinds of tasks that are structured and directed and the stimulus isn't changing over and over, as with some of the processing speed tasks where it is, you know, a rapid changing of stimuli.

Q     And again, that issue, that specific ability, I guess -- is that the right word?  To respond to rapidly changing stimuli, that's separately measured from other abilities?

A     Well, it is separately measured and in some tests, as

1345

I was saying, there is an overlap of different brain functions and in those cases you want to try to sort out what's-what. You know, what is the real problem. Is it vision or is it motor functioning? Yeah --

Q    And with Mr. Barrett, where was the greater problem?

A    The greater problem was with visual attention. And to give an analogous test, on the Rey Complex Figure Test, that complex figure that you have to copy, it wasn't taking pre-existing shapes and putting them together like block design to look like the model. He did have something to copy, but his visual attention interfered with his accurately counting the number, if he even counted them, but making them -- there were parts missing and that's visual attention. It got in there somewhere. His scores were fine on immediate and delayed recall, but it is that visual attention. So I saw that across a number of different kinds of tests. It is visual working memory on the Wechsler Memory Scale.

Q    Is it unusual to see an individual who has a particular area of deficits like this?

A    No, not at all.

Q    So if you --

A    Some people have defused (sic) damaged, but, no, not at all.

Q    So if you see somebody who has average overall

1346

intellectual functioning, does well on verbal tests, does well on 78 percent of the neuropsychological tests that they are given, does that call into question the results of the tests of specific areas where they did poorly?

A     No.  It, in fact, kind of accentuates it because that's what you see == for example, in learning disorders, it will be the particular area that is difficult or in attention disorders or in executive function disorders, you see certain kinds of patterns of performances and the other stuff might be untouched.

Q     And you -- strike that.  On the California Verbal Learning Test, the proactive interference measure -- do you recall that?

A     Yes.

Q     What was his 'Z' score on that?

A     I believe it was minus 1.5.

Q     And is that significant in any way?

A     Yes.  It indicates that this is an individual who once he is filled up, he has got about as much as he can manage.  He gets overwhelmed and he can't take in any more.  So, you know, he does well when he is repeatedly exposed to some-thing and he can learn it and do well with it.  That was seen over the five trials of the first list on the CVLT.  He really progressed nicely.  However, when he was then offered something new, which is not the case necessarily in the

1347

normative data or you wouldn't see the score we saw, he was unable to hold on to anything new.  His brain was overwhelmed.

Q    So is Mr. Barrett a person easily overwhelmed by especially visual information?

A    Yes.

Q    You were --

A    And particularly changing visual information.

Q    I am sorry, I think I spoke over you.  What was it -- you were --

THE COURT:  It wasn't responsive.  Just go ahead and ask her another question.

THE WITNESS:  Sorry.

BY MR. SCHARDL:

Q    You were asked about Mr. Barrett's particularly low performance on the Wisconsin Card Sort.  Do you recall those questions?

A    Yes.

Q    Did Dr. Young throw out any tests where she felt that Mr. Barrett was not able to complete it in such a way that the results would be invalid?

A    Yes, there was one such test.

MR. WILSON:  Objection, Your Honor.  That goes beyond the scope of my cross examination.

THE COURT:  We are beyond the scope.

1348

MR. SCHARDL:  May I be heard on that, Your Honor?

I believe the implication was -- of the questioning was that Dr. Young included this even though it should have been tossed out.  Whereas, I want to show that she tossed out a test where in her exercise of clinical judgment she felt it should be.

THE COURT:  Well, let's do it quick because I don't recall the testimony the same way you do, but let's do it quickly.

BY MR. SCHARDL:

Q     In any event, Dr. Miora, did Dr. Young throw out a test that she felt she couldn't score?

A     Yes.  She aborted the test --

MR. WILSON:  Objection, Your Honor.  That is beyond the scope and --

THE COURT:  Overruled.

BY THE WITNESS:

A     Yes.

BY MR. SCHARDL:

Q     And which test was that?

A     That was the PASAT, the Paste Auditory Serial -- it is called the PASAT, P-A-S-A-T.

Q     And that stands for --

A     The Paste Auditory Serial Attention Test.

Q     And did Dr. Young describe the circumstances that

1349

caused her to throw that out?

A     Yes.

Q     Do you recall what she said?

A     Yes.  She wrote that he was unable to understand the instructions which she repeated several times and at which point when there was no improvement she discontinued the test.

Q     So after considering all of the questions presented to you on cross examination about Mr. Barrett's strengths, do they cause you to question Dr. Young's conclusions about her -- about his weaknesses?

A     No, and I think she fairly addressed the strengths and weaknesses.

Q     After considering the questions you were posed on cross examination on the testing done by Dr. Bianco, does that cause you to question Dr. Young's findings about Mr. Barrett's functioning?

A     No.

Q     Were there consistencies between their testing?

A     Indeed there were.

Q     And taking into account that we don't know exactly what the norms were that Dr. Bianco used?  Even if you take that into account, is your answer the same?  That's my question.  Sorry.

A     Some of his tests did have norms, to which I could

1350

refer.  So particularly on those tests, such as the WAIS-III and the WAIS-IV, I could know the norming population and be able to make some comparative analysis.

Q   On the color word, you were asked about -- and I believe this is the Color Word Interference Test on the D-KEFS.  Do you recall being asked about Mr. Barrett's scores on completion time?

A   Yes.

Q   Are there other measures of performance on that?

A   Yes, and they are important.

Q   And where -- were there other measures of performance on the Color Word Interference, again on the D-KEFS, that indicated impairment?

A   Yes.

Q   Do you recall what those were?

A   I believe one was an accuracy ratio.  Uh, I would need to see...

Q   Well, let me just ask you --

A   Yes.

Q   Again, referring to this concept of discrepancy analysis, does the performance on the completion time in any way invalidate the performance on the accuracy?

A   No.  In fact, it is very important to consider.  Like with the Tower Test where he did really well, but there were problems with his move count.  So within a task, you

1351

absolutely need to compare and contrast and do a discrepancy analysis, or you are not doing a good job.

Q    We talked quite a bit at the beginning of your direct examination about test development and norming.  And I guess we are now talking about all of these subtests.  So my question is, are these subtests there for a reason?

A    Yes.

Q    And is the reason that if you don't include a subtest on one specific area of functioning, you might miss it?

A    Yes.

Q    And you wouldn't want to draw an inference about one area of functioning based on performance in another area of functioning?

A    I am --

Q    The two subtests are there to discriminate?

A    Oh, okay.  Well, the two -- yes, the two subtests help you to discern and to discriminate where the areas of strength and weakness lie, yes.

MR. SCHARDL:  May I have just a moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

BY MR. SCHARDL:

Q    So just in conclusion, Doctor, do you believe to a reasonable degree of neuropsychological certainty that the

1352

testimony you have given about Mr. Barrett's impairments is a fair representation of his functioning?

A    Yes, at the time he was evaluated.

Q    And do you know if any pathology that would have changed his functioning between 1999 and the time of his evaluation?

A    No.

Q    Are you aware of any injury that would have changed his functioning from 1999 until 2000?

A    No.

Q    If -- you were asked questions about Mr. Barrett's drug use.  If Mr. Barrett was clean for a period of years before the testing in 2009, would that affect his performance?

A    Yes, it well could.

Q    And would it tend to make his performance improve or get worse?

A    Get better, a better brain, a clean brain.

Q    You were asked about Mr. Barrett being under the influence of methamphetamine on the night of the raid on his property.  Did -- and you were asked how methamphetamine effects perception, I think.

A    Yes, or does it, yes.

Q    Does it improve perceptual ability or not?

A    It would distort perceptual ability.  And given temporal lobe issues, it can lead to paranoia and -- I mean,

1353

it does anyway, but, yeah, perception would be distorted, not improved to the best of my knowledge.

Q    So if Mr. Barrett's base line was impaired on neuropsychological tests with regard to visual perception, would his performance tend to be better or worse under the influence of methamphetamine?

A    I would like to say visual attention and I would expect -- I would predict that it would be worse.

Q    I stand corrected.

A    I am sorry.

Q    Visual attention, not visual perception.  Those are different things?

A    Yes.

Q    I stand corrected.  Thank you.

A    I apologize.

Q    So his performance could have been worse?

A    Yes, I would predict it would have been worse.

Q    So his base line is impaired.  If he is under the influence, it would be worse?

A    Yes.

Q    Thank you.

        MR. SCHARDL:  No further questions.

        THE COURT:  Mr. Wilson, I assume you have some more questions?

        MR. WILSON:  I assume you are correct.

1354

THE COURT:  Briefly.

MR. WILSON:  Yes, I am going to make it brief, Judge.

### RECROSS EXAMINATION

BY MR. WILSON:

Q     Counsel asked you at the very end if Mr. Barrett was impaired at the time of the crime, if methamphetamine would make it worse and I believe your answer was yes.

A     Correct.

Q     Is visual perceptive -- is that what you said?

A     No visual attention.

Q     His visual attention would be worsened by the affects of methamphetamine; correct?

A     Potentially.  I mean, I can't say for sure, but, yes, I would...

Q     That would also be correct of a completely healthy person?

A     On methamphetamine?

Q     They are --

A     On methamphetamine?

Q     Yes.

A     Yes.

Q     So if Mr. Barrett did not have impairments on September of 1999 and he was high on methamphetamine and had been for several days, that would affect his visual --

1355

THE COURT:  Visual attention.

MR. WILSON:  What?

THE COURT:  Visual attention.

MR. WILSON:  Attention, sorry.  It has been a long day.

BY MR. WILSON:

Q     Visual attention.

A     Yes, it very well could.

Q     Okay, thank you.

MR. WILSON:  Thank you, Judge.  I appreciate that.

BY MR. WILSON:

Q     And Mr. Barrett, you testified, would have been overwhelmed by visual information, is that correct, and especially rapidly changing visual information.

A     That's a piece of it, that's correct.

Q     But Mr. Barrett was not so impaired to the point where he wasn't able to grab a firearm and fire it multiple times striking one vehicle, was he?

A     To the best of my knowledge, no.

Q     He wasn't impaired to the point where he wasn't able to go inside his home and obtain a firearm and fire off multiple rounds, was he?

A     No.

Q     He wasn't so impaired that he could not tell persons that he was watching for them and that he was prepared for

1356

the police to arrive at his house?  He wasn't that impaired, was he?

MR. SCHARDL:  Objection, that misstates the evidence.  It was a completely different area of functioning.

THE COURT:  Overruled.

BY MR. WILSON:

Q    He wasn't so impaired that he could not tell people I am prepared for the police to show up at my house?

A    Uh, I don't know.  I can't speak to that.

Q    He wasn't so impaired that he was unable to fire a firearm, was he?

A    Correct.

(PAUSE)

BY MR. WILSON:

Q    He wasn't so impaired that he was unable to respond to the cries of his son calling out his name?  He could respond to that; is that correct?

A    That's my understanding.  I just -- I have a thought though.

Q    Counsel asked you about the card sorting test and then went on to talk about the PASAT, the PASAT Test.

A    Right.

Q    And I believe it was your testimony that Dr. Young threw that one out because he didn't understand the directions; is that correct?

1357

A     Right.  She repeated them several times and he still didn't get it.

Q     And did the raw data indicate when that test was given in relationship to the card sorting test?

A     I don't have that information.

Q     You are familiar with the literature that deals with malingering in the card -- in the Wisconsin Card Sorting Test; isn't that correct?

A     Yes.

Q     And it is your testimony, based upon your review of Dr. Young, that the fact that he made no matches, no matches, no sorts that he was not malingering?

A     It is not based on that.  It is based on my analysis of the data.

Q     But you agree with me that there is research out there, there are studies out there dealing with the issue of malingering in that particular test?

A     Yes, there is.

Q     And there are some concerns about the potential of malingering in that test; isn't that correct?

A     Yes.

                              (PAUSE)

A     He passed one of the embedded effort measures that --

          MR. WILSON:  Objection, Your Honor, that is nonresponsive.

1358

THE COURT:  You need to wait for a question.

THE WITNESS:  Okay.  Sorry, Your Honor.

THE COURT:  That's okay.

(PAUSE)

MR. WILSON:  Can I have just one moment, Your Honor?

THE COURT:  Yes.

(PAUSE)

BY MR. WILSON:

Q     Just briefly, in reference to the Card Sorting Test and the -- and some 48 unique responses, isn't it true that that is potential evidence of malingering on this particular test?

A     I don't know of any research to that effect, so I can't answer that.

Q     I am sorry?

A     I don't know of any research to that effect on that test and I do malingering research with one of the leading malingering researchers.  I don't know of any literature having to do with the Card Sorting Test.

Oh, you are talking about the Wisconsin Card Sorting Test?

Q     Yes.

A     I am sorry.  Go ahead.  I strike my answer.  I misunderstood what you were referring to.  I thought you

1359

were talking about the D-KEFS sorting test.

Q     Sorry.  The Wisconsin, are you familiar with the literature regarding malingering on the Wisconsin Card Sorting Test?

A     Yes, I am.

Q     And would you agree with me that 48 unique responses which don't match anything was potential evidence of malingering on that particular testing?

A     Yes, but there are other explanations.  As I said, I would like to research my hypothesis.

Q     Fair enough.  Thank you.

MR. WILSON:  That's all I have, Your Honor.

THE WITNESS:  Thank you.

THE COURT:  Dr. Miora, you can step down.  Thank you.

All right.  With regard to the Motion to Strike, I am going to overrule the Motion to Strike.  And with regard to the objection to the testimony concerning the WAIS-IV, I am going to overrule that as well.  So all of her testimony is admitted.

I know that probably both of you wanted to put on additional evidence.  Is there anything we absolutely have to have?  Let me hear from the Petitioner first.

MR. SCHARDL:  Well, Your Honor, we would say, as we said previously, that the --

1360

THE COURT:  You need Dr. Bigler?

MR. SCHARDL:  Well, I was speaking more broadly than that.

THE COURT:  Okay.  Go ahead.

MR. SCHARDL:  But, yes, thank you, Dr. Bigler.  And we have a number of other witnesses whose testimony that we proffered after it was excluded.  And in particular, we would present testimony from Richard Burr regarding the issue of deficient performance.  And with regard to prejudice, I would just say that the case law is very clear that the Court consider all available mitigation evidence, both introduced at trial and anything introduced post-conviction if it was available at the time of trial.  So to the extent that any mitigation evidence has been excluded, we believe that is in error and we would renew our request for an opportunity to present any and all available mitigation evidence.

THE COURT:  What else from the government?

MR. KAHAN:  Your Honor, in light of the testimony today, we would renew our request to put on Dr. Bianco.

THE COURT:  Well, if I allow you to put on Dr. Bianco, are you going to object then to Dr. Bigler?

MR. KAHAN:  Well, I -- I mean, yes.  I think the short answer to that is yes.  We feel that Dr. Miora has already addressed that and so has Dr. Woods.  They have certainly had their fair opportunity to take their shots at

1361

Dr. Bianco at this point.

THE COURT:  With that in mind, then why do we need to hear from Dr. Bianco?

MR. KAHAN:  Well, we believe that Dr. Bianco has a lot to say about Mr. Barrett's performance closer in time to the crime.  And that information has come in through this witness, but as the defense has taken pains to point out, it is not complete as of yet.

THE COURT:  What do you all say about that?

MR. SCHARDL:  As to whether Dr. Miora testified as to all of the things that Dr. Bigler could have, that is simply not the case.  Dr. Bigler is the author of one of the leading text -- or one of the authors of one of the leading texts on neuropsychological assessment.  There were things in Dr. Bianco's data that he saw that frankly are just beyond the knowledge of Dr. Miora.

And with regard to what Dr. Bianco has to say, we would go back to our previous objection that whether he had some-thing to say was known to the government in time for the government to have prepared a report and submitted it consistent with the Court's orders.  The difference between Mr. Barrett's proffered evidence and what the government is seeking to do is that Mr. Barrett complied with the rules.  Mr. Barrett and his legal team spent time and money and effort to make sure that we complied with Judge Payne's

schedule.  The government could have done that with regard to Dr. Bianco, but it chose not to.

So with regard to the equities of the case and whether anybody is being treated unfairly, the government had a perfectly fair opportunity to present a report from him and chose not to do that.  And then to delay the resolution of the case so that they could backfill that way after Mr. Barrett had put in all of the effort to comply, I think would be grossly unfair.

MR. KAHAN:  Well, I -- first, I think that this elides (sic) an entire issue of whether or not the government could have, in the defense's other position, even spoken to Dr. Bianco.  On the one hand they've claimed that he is their witness and we can't talk to him.  And on the other, they've taken this position.  In all honestly, while Dr. Young in her declaration stated that she relied on Dr. Bianco and his findings, which was misleading to the government in terms of going out and finding that evidence, we then found ourselves much closer in time to the hearing when this witness, Dr. Miora, was excluded.  So it was really only at the last moment when we saw Dr. Miora actually coming in with a full understanding of her position, vis-a-vie, Dr. Bianco, that his testimony became fully relevant.

THE COURT:  Well, do you still want to put on Dr. Bianco if I let them put on Dr. Bigler too?

1363

(PAUSE)

MR. SCHARDL:  While they are discussing that, can I...

(PAUSE)

MR. KAHAN:  Your Honor, given that obvious choice, the government's answer is no.

THE COURT:  That's kind of what I thought.  So from an evidentiary standpoint then, I guess I am going to hold the hearing as concluded.

I don't know if you all mentioned this or if I maybe dreamed it up or what, but there was some suggestion somewhere along the way that you all wanted to prepare new Proposed Findings and Conclusions; is that correct or not?  Is everybody happy with what they've already submitted?

MR. SCHARDL:  Well, for the defense, the answer is no because that was, of course, before Dr. Miora was allowed to testify.  I think that the evidence has -- it would be a worthwhile thing to do, post-hearing briefing, for different Proposed Findings of Facts.

THE COURT:  And how long would it take to --

MR. SCHARDL:  From the defense, I would think -- I am sorry, I am just thinking.  I am really bad at dates. I am supposed to be out of the country in August, so I don't want to commit us to anything that I can't meet.  So I would say 90 days.

1364

THE COURT:  Well, I can't do 90 days.  I was thinking about 30 days.

MR. KAHAN:  Your Honor, can I suggest 30 days from the final transcript coming in?

MR. SCHARDL:  May I ask, Your Honor, do you want a brief or Proposed Findings of Fact?

THE COURT:  Proposed Findings of Fact and Conclusions of Law.

MR. SCHARDL:  Okay, we can do that.

THE COURT:  Yeah.  Do you need the transcript to do that?

MR. KAHAN:  We would prefer it, but...

MR. SCHARDL:  I will sweeten the deal by offering -- by offering to have the Defender pay for an expedited transcript, assuming that she doesn't fire me for saying that.  So I will ask about that.

THE COURT:  All right.  Then let's say Proposed Findings of Fact and Conclusions of Law due July 31st.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  Does that sound good?

MR. KAHAN:  That's fine, Your Honor.

THE COURT:  And if anybody wants to brief anything along with it, go ahead, but it is not required.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  Anything further?

MR. WILSON:  Not from the government, Your Honor.

MR. SCHARDL:  Not from the defense.  I would just like to say as an out-of-towner, I really appreciate the hospitality of opposing counsel and the Court and everybody involved.

THE COURT:  Well, let me say for everybody here that I think it was very well tried and I will take it under advisement, at least until I've seen the Proposed Findings and Conclusions of Law from both sides.  We will see where we are at after that.

MR. SCHARDL:  Thank you, Your Honor.

THE COURT:  We are adjourned.

(END OF PROCEEDINGS)

"I certify that the foregoing is a correct transcript from the record of proceedings in the above-entitled matter."

s/Karla S. McWhorter

_____

KARLA S. McWHORTER

July 10, 2017

_____

DATE

1366

DAVID AUTRY, OBA No. <u>11600</u>
<u>1021 N.W. 16</u>th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:         dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:         Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | CASE NO. CV-09-00105-JHP |
| Petitioner, | |
| vs. | |
| UNITED STATES OF AMERICA, | |
| Respondent. | |

## PETITIONER'S PROPOSED
## POST-HEARING FINDINGS OF FACT
## AND CONCLUSIONS OF LAW

Pet. Prop. Post-Hr'g FF&CL                                         *Barrett v. U.S.*, CV-09-00105-JHP

**TABLE OF CONTENTS**

I.     INTRODUCTION ................................................................................................ 1

   A.   Overview ....................................................................................................... 1

   B.   Preservation of Objections .......................................................................... 2

      1.   Deficient Performance ............................................................................ 2

      2.   Prejudice .................................................................................................. 4

II.    PROPOSED FINDINGS OF FACT .................................................................. 6

   A.   Deficient Performance ................................................................................. 6

      1.   The Defense Team ................................................................................... 6

      2.   Family & Social History Investigation ................................................ 11

      3.   Mental Health Investigation ................................................................ 19

   B.   Prejudice ..................................................................................................... 22

      1.   Family Witnesses .................................................................................. 23

      2.   Stephen Barrett. .................................................................................... 23

      a.   The differences in their upbringings ................................................... 24

      b.   Their mother and Petitioner's home life ............................................. 25

      c.   Mental health observations of Kenneth Barrett ................................. 26

      d.   Observations based on Stephen Barrett's experience as an educator .......... 27

      3.   The testimony of Ernest Barrett. ........................................................ 28

      4.   The testimony of Phyllis Crawford. ................................................... 30

      5.   Ruth Harris and Mark Dotson. ........................................................... 31

      6.   Ada Blount, Warren Dotson and Carl Cook. .................................... 32

      7.   State counsel Jack Gordon and the state mitigation investigation. .......... 33

   C.   MENTAL HEALTH EXPERTS ............................................................... 35

      1.   Areas on which Dr. George Woods and Dr. Steven Pitt Agreed ..... 35

      a.   Family History of Mental Illness ........................................................ 35

      b.   No anti-social personality disorder ..................................................... 37

      c.   Family history of substance abuse. ..................................................... 37

      d.   Mr. Barrett had a dysfunctional, chaotic, and abusive upbringing. .......... 38

      e.   Learning disability ................................................................................ 39

      f.   Neuropsychological deficits ................................................................. 40

      2.   Areas of Disagreement ......................................................................... 42

      a.   Bipolar disorder .................................................................................... 42

      b.   Post-traumatic stress disorder (PTSD). ............................................. 47

Pet. Prop. Post-Hr'g FF&CL                    i                    *Barrett v. U.S.*, CV-09-00105-JHP

1875

3. Conclusions regarding the psychiatric testimony............................................................. 48

4. Neuropsychological Evidence............................................................................................ 49

a. Frontal lobe description.................................................................................................... 51

b. Parietal lobe description. ................................................................................................. 51

c. Indications of a need for neuropsychological testing....................................................... 51

d. Dr. Young's Evaluation .................................................................................................... 53

e. Impaired executive functioning........................................................................................ 57

D. The Risk Assessments........................................................................................................ 60

1. Dr. Jeanne Russell ............................................................................................................. 60

2. Dr. Randall Price ............................................................................................................... 62

E. Faust Bianco....................................................................................................................... 69

III. CONCLUSIONS OF LAW ..................................................................................................... 71

A. Counsel's Performance was Deficient ................................................................................ 71

1. The Government's Defense of Trial Counsel ................................................................... 71

a. Was it true that defense counsel had "no indications that defendant suffered from a mental impairment"?...................................................................................................................... 71

b. Were the trial attorneys "constrained from conducting a mental-health investigation by their client"?......................................................................................................................... 73

c. Did trial counsel make an informed decision not to investigate?.................................... 74

2. Conclusions from the Hearing Evidence.......................................................................... 76

B. Mr. Barrett Suffered Prejudice .......................................................................................... 81

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
TIVON SCHARDL, FL Bar #73016
Trial & Habeas Attorney
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org

Attorneys for Petitioner,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT,<br><br>              Petitioner,<br><br>vs.<br><br>UNITED STATES OF AMERICA,<br><br>              Respondent. | CASE NO. CV-09-00105-JHP<br><br>**PETITIONER'S PROPOSED POST-HEARING FINDINGS OF FACT AND CONCLUSIONS OF LAW** |

## I.    INTRODUCTION

### A.  OVERVIEW

COMES NOW Petitioner, KENNETH EUGENE BARRETT, by and through

undersigned counsel, who, pursuant to this Court's order, respectfully submits proposed findings

of fact and conclusions of law based on the evidence introduced during the evidentiary hearing.

Pet. Prop. Post-Hr'g FF&CL                    1                    *Barrett v. U.S.*, CV-09-00105-JHP

1877

The structure of these proposed findings and conclusions tracks the two prongs of the test for ineffective assistance from *Strickland v. Washington*, 466 U.S. 668 (1984). Mr. Barrett first addresses the facts and law related to assessing trial counsel's performance, then addresses prejudice. These proposed findings and conclusions also address the specific issues the Court of Appeals identified as needing resolution in *United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015), *cert. denied*, ___ U.S. ___, 137 S. Ct. 36 (2016).

### B.  PRESERVATION OF OBJECTIONS

By submitting these proposed findings of fact and conclusions of law Mr. Barrett does not waive, forfeit, or retreat from any prior objections he made, or grounds he asserted in opposition to the government's or the Court's efforts to limit the scope of evidence or issues to be presented or considered during this hearing. Due to the Court's exclusion of witnesses and the narrow scope of issues the Court has been willing to consider, Mr. Barrett did not receive a full and fair hearing on his claim of ineffective assistance of counsel during the penalty phase of trial. The excluded evidence and issues that preclude a full and fair consideration of the issues as required by *Strickland* and its progeny include, but are not necessarily limited to the following:

### 1.  *Deficient Performance*

(a)     Exclusion of witnesses the Tenth Circuit deemed relevant. In its decision, the Court of Appeals cited declarations from Julia O'Connell and Richard Burr as evidence that trial counsel failed to conduct a timely, thorough investigation into Mr. Barrett's background and mental health. *Barrett*, 797 F.3d at 1225. This Court excluded all testimony from Federal Defender O'Connell and Federal Death Penalty Resource Counsel Burr while simultaneously stating, before hearing the evidence, that trial counsel did not have time to develop the mitigation evidence presented with Mr. Barrett's post-conviction motion. Order (Doc. 269) at 12-13.

(b)      Exclusion of evidence regarding how counsel spent their time. The Tenth

Circuit's decision also reflects concern over the timing of trial counsel's mitigation investigation.

*Barrett*, 797 F.3d at 1225 quoting *Hooper v. Mullin*, 314 F.3d 1162, 1171 (10th Cir. 2002). That

concern is consistent with prevailing professional norms which require prompt investigation.

American Bar Association, Standards for Criminal Justice ("ABA Standards"), Defense

Function, Standard 4-4.1; American Bar Association, Guidelines for the Appointment and

Performance of Counsel in Death Penalty Cases, 31 Hofstra L. Rev. 913, 1023 (2003) ("ABA

Guidelines") ("The mitigation investigation should begin as quickly as possible" because results

could affect first stage strategy, selection and work of experts, motions, plea negotiations).

During the hearing, Mr. Barrett attempted to elicit testimony regarding how Judge Payne

compelled first lead trial counsel John D. Echols to devote a great deal of his time to budgeting,

and how delays in budgeting impacted the mitigation investigation, but the Court sustained the

government's objection and excluded that evidence. Tr. 453. Consequently, the record is

incomplete on an issue the Court both created and cited as a reason to deny Mr. Barrett's claim.

The Court's action in creating the conditions that interfered with counsel having time to work on

the substance of the defense then citing that lack of time as a reason for the defense to have been

reasonable, then barring evidence to the contrary, violates Mr. Barrett's right to due process of

law.

(c)      Exclusion of evidence regarding prevailing professional norms. As reflected in

their proffered declarations, Federal Defender O'Connell and Resource Counsel Burr also would

have testified regarding the prevailing professional norms of capital defense practice in

Oklahoma in 2005, specifically with regarding to (1) the use of mitigation specialists and other

experts to present mitigation evidence; (2) how mitigation evidence works and is understood by

Pet. Prop. Post-Hr'g FF&CL                    3                    *Barrett v. U.S.*, CV-09-00105-JHP

1879

attorneys and jurors; (3) how counsel address defendants' concerns about or sensitivities to potential mitigation evidence. This Court excluded all such testimony. Consequently, the findings proposed here do not cover the full range of the available evidence regarding another issue the Tenth Circuit considered. *Barrett*, 797 F.3d at 1226.

(d)     Allowance for post-hoc rationalizations. Prior to the hearing, Mr. Barrett sought an order excluding testimony in which trial counsel speculated about what they would have done with information they did not have at the time of trial. This Court denied that motion and, during the hearing, allowed some testimony that could be used to support post-hoc rationalizations for trial counsel's challenged acts and omissions. Mr. Barrett renews his objection to the Court considering post-hoc justifications for trial counsel's conduct and proposes no such speculative findings here.

### 2. Prejudice

(a)     Exclusion of available mitigation evidence. *Strickland*'s prejudice prong requires the Court "to evaluate the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding in reweighing it against the evidence in aggravation." *Williams (Terry) v. Taylor*, 529 U.S. 362, 397-98 (2000). This Court has excluded numerous lay and expert witnesses who Mr. Barrett has identified as having been available to testify at the time of trial. These proposed findings and conclusions reflect only the evidence admitted during the evidentiary hearing. Due to this Court's exclusion of evidence, this Court is unable to conduct the required prejudice analysis.

(b)     Exclusion of mitigating circumstances. *Strickland*'s prejudice analysis requires the reviewing court to consider mitigation evidence just as jurors would be required to consider it in a capital penalty proceeding. *See Wiggins v. Smith*, 539 U.S. 510, 535 (2003) (citing in context

Pet. Prop. Post-Hr'g FF&CL                    4                    *Barrett v. U.S.*, CV-09-00105-JHP

1880

of prejudice from excluded mitigation *Penry v. Lynaugh*, 492 U.S. 302, 319 (1989); *Eddings v. Oklahoma*, 455 U.S. 104, 112 (1982); *Lockett v. Ohio*, 438 U.S. 586, 604 (1978)). Jurors in federal death penalty cases must consider, and weigh against the mitigation evidence presented in the penalty phase, all evidence presented in the first phase of trial. 18 U.S.C. § 3593(c). Initial trial counsel Echols sought to develop evidence of Mr. Barrett's organic brain impairments in part because it could bear on his perceptions and intentions at the time of the offense. Tr. 498-99, 501-02. Prior to the hearing Mr. Barrett served notice that he would attempt to present evidence as to how his psychological and neuropsychological impairments would mitigate the evidence that he intended to kill law enforcement officers. This Court excluded all that evidence and these proposed findings and conclusions do not address the excluded evidence and how jurors could have applied and weighed it. Therefore, these proposed findings and conclusions reflect, but do not concede the appropriateness of, this Court's unduly restrictive view of the issues.

(c)   Allowance of opinion testimony without considering reliability. The Court barred Mr. Barrett from conducting a voir dire of Dr. J. Randall Price on the last three prongs of Fed. R. Evid. 702 after Mr. Barrett's counsel stipulated to the first prong of the test for admissibility of expert opinion evidence. Tr. 822-23. The Court never made the threshold findings regarding reliability that are necessary before admitting expert opinion testimony. *Summers v. Missouri Pacific R.R. System*, 132 F.3d 599, 603 (10th Cir. 1999) ("district court 'must determine at the outset'" whether all aspects of *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), have been satisfied) (quoting *Daubert*, 509 U.S. at 592); *United States v. Nichols*, 169 F.3d 1255, 1262 (10th Cir. 1999) (Rule 702 and *Daubert* are "threshold standard of reliability"). Based on the erroneous legal rationale that the question whether Dr. Price had a reliable scientific basis for his opinions was "a subject for cross," Tr. 862*, see also* Tr. 887, rather than a

"basic gatekeeping obligation" of the court as stated in the case law, *Kumho Tire Co., Ltd. V. Carmichael*, 526 U.S. 137, 147 (1999), the Court allowed Dr. Price to testify without any inquiry into whether his opinions had a scientific basis. Therefore, Dr. Price's opinions are not properly before this Court. Mr. Barrett proposes findings and conclusions based on Dr. Price's testimony without waiving, forfeiting, or in any way retreating from his continuing assertion that Dr. Price's opinions were not properly admitted and should not be considered.

(d)　　Admission of opinions that could not have been presented at trial. Over Mr. Barrett's objection this Court admitted the opinions of Dr. Steven Pitt based on evidence that did not exist at the time of trial, specifically, records generated by the Bureau of Prisons after 2005. For the reasons stated in Mr. Barrett's Motion to Exclude Witness Steven Pitt (Doc. 432), and in Mr. Barrett's Reply to the government's opposition to that motion (Doc. 443), which are incorporated by this specific reference as if fully set forth herein, and those reasons stated in court, Mr. Barrett renews his objection to the Court considering Dr. Pitt's opinions. Mr. Barrett proposes findings and conclusions regarding Dr. Pitt's testimony without prejudice to his objections.

In listing the foregoing objections, Mr. Barrett does not explicitly or implicitly waive, forfeit, or retreat from any other objections or arguments he raised prior to or during the hearing regarding the scope of the evidence or scope of the issues.

## II. PROPOSED FINDINGS OF FACT

### A. DEFICIENT PERFORMANCE

#### 1. *The Defense Team*

1.　　Attorney John D. Echols represented Mr. Barrett as his lead defense attorney during the two state trials before being appointing lead counsel in the federal case. The first

Pet. Prop. Post-Hr'g FF&CL　　　　　6　　　　　*Barrett v. U.S.*, CV-09-00105-JHP

1882

state-court trial ended in a hung jury. The second jury acquitted Mr. Barrett of murder and found him guilty of manslaughter. In both state cases, the State of Oklahoma sought the death penalty but, due to the results, there were no penalty phases. Tr. 426-28.

2.      Although Echols was the lead attorney in the state cases, and therefore considered himself ultimately responsible for all aspects of the case, prior to each state-court trial, he delegated to a different attorney primary responsibility for any penalty phase. The second chair attorney in the first state case was Geoffrey Standing Bear. Tr. 475.

3.      Jack E. Gordon is an Oklahoma criminal defense attorney. Tr. 145. He was appointed to assist John Echols in the defense of Kenneth Barrett at his second state trial. Tr. 147. Mr. Gordon was responsible for marshalling mitigation evidence in that case. Tr. 147.

4.      Prior to the first state-court trial, the defense team included a mitigation specialist, Roseann Schaye. Tr. 428-29. Before she completed her investigation, Schaye left the case due to dissatisfaction with Echols. Tx. 429.

5.      After Schaye resigned, responsibility for investigating mitigation evidence fell to Steve Leedy who was employed by the Oklahoma Indigent Defense System. Tr. 478.

6.      During the state court proceedings, Echols had Mr. Barrett evaluated by psychologist Bill Sharp. Tr. 437, 439.

7.      Roger Hilfiger has been a Muskogee, Oklahoma attorney since 1972. He is a former United States Attorney and tried a number of criminal cases in the federal system and has done only a few civil cases. Tr. 647-48. Prior to his appointment in Mr. Barrett's case, Mr. Hilfiger served as counsel on one federal capital case 1993-94. Tr. 652.  He had handled drugs and firearms cases but could not recall if he tried any murder cases in which drugs were directly involved. Tr. 653.

8.      On October 25, 2004, the Court appointed Echols and Hilfiger to represent Mr. Barrett in the federal case. Crim. Doc. 4.

9.      Mr. Echols had never handled a federal death penalty case before. In order to gain a better understanding of the process, and in particular case budgeting and strategic issues concerning a penalty trial, Echols consulted with Federal Death Penalty Resource Counsel Richard Burr. Tr. 464, 466, 505. Echols filed declarations from Burr in support of requests for authorization to retain a mitigation specialist, mental health experts, and requests for authorization to expend attorney time. Crim. Doc. 107(c); Crim. Doc. 118.

10.     On March 18, 2005, the Court authorized trial counsel to retain a "mitigation expert" and a mental health expert. Crim. Doc. 97.

11.     Echols and Hilfiger were co-counsel until May 5, 2005, when the District Judge granted Mr. Echols's motion to withdraw from the case. Crim. Doc. 128. There is no evidence in the record of any other personnel working as part of the defense team prior to Echols's withdrawl.

12.     During their time as co-counsel, Echols and Hilfiger had only intermittent contact. They never discussed how they would divide the work on Mr. Barrett's case. Tr. 450 (Echols); Tr. 661-62 (Hilfiger).

13.     Hilfiger deferred to Echols on strategy because Echols had successfully tried the case twice and was more familiar with the facts. Tr. 661-62.

14.     Echols was dissatisfied with the amount of work Hilfiger did on the case while they were both appointed. Tr. 451-52. He testified that Mr. Hilfiger was out of the country during part of the time. Tr. 450-51.

15.     Mr. Echols was not aware of Mr. Hilfiger doing any work on the penalty phase during the time they were both on the federal case. Tr. 451. Echols considered himself responsible for the penalty phase. Tr. 467. By the time of his withdrawal from the case, Echols believed Hilfiger had done very little work on the case overall. Tr. 467.

16.     Echols withdrew from the case because he believed he was not accomplishing anything and defense counsel could not aggressively present Mr. Barrett's case. Tr. 463. His primary concern was funding. Tr. 663. Mr. Hilfiger was opposed to Mr. Echols withdrawing from the case. Tr. 465. Echols viewed his motion to withdraw as an unsuccessful power play. Tr. 486-87. He had hoped Judge Payne would deny the motion and he would be able to get appellate review. Tr. 487.

17.     After Echols withdrew, on May 13, 2005, the Court appointed Bret A. Smith to represent Mr. Barrett. Crim. Doc. 130.

18.     Mr. Smith is a Muskogee, Oklahoma attorney with a general practice that includes a significant number of criminal cases. Prior to his work on this case, Smith had no training or experience in the litigation of capital cases. Tr. 519-20. He believed he discussed this matter with Judge Payne at the time Judge Payne offered him the appointment. Tr. 520-21.

19.     Smith did not speak with Hilfiger before agreeing to accept the appointment to represent Mr. Barrett. Tr. 522. He did not recall Hilfiger laying out a strategy for the case at the time of their first meeting, the day after his appointment. Tr. 523.

20.     Mr. Hilfiger and Mr. Smith did not specifically divide responsibilities but responded to what came up in the course of litigation. There was no "hard and fast separation of what [they] did."  They did not divide by guilt and sentencing stages. Tr. 689.

Pet. Prop. Post-Hr'g FF&CL                    9                    *Barrett v. U.S.*, CV-09-00105-JHP

1885

21.     Mr. Smith's role in relation to the case in general, and to the penalty phase in particular, was limited to assisting Mr. Hilfiger, Tr. 525-26, and doing those tasks Mr. Hilfiger assigned to him. Tr. 634 ("I was there to assist. I wasn't there to lead."). Smith believed that after the first stage of trial, the decision was made that Smith would give the opening statement for the penalty phase. Tr. 525-26; Tr. 534.

22.     After Echols withdrew and Smith was appointed, there was only one meeting between Echols, Hilfiger and Smith. Tr. 490-91 (Echols); Tr. 531 (Smith); Tr. 687 (Hilfiger). Echols testified that at that meeting he described for Hilfiger and Smith what he believed needed to be done to bring the case to trial. Tr. 490. In particular, he advised them to complete the budgeting process, retain experts, and put the experts to work "immediately." Tr. 490-91.

23.     Echols's view at the time of his withdrawal was that neither the first nor second stage defense case was ready for trial. Tr. 467-68. Through consultation with Federal Defender Paul Brunton and resource counsel Burr, Echols's view of the situation was that he "had a train wreck heading down the track." Tr. 487.

24.     At the time of their first meeting, Smith brought up with Hilfiger the ABA Guidelines call for a mitigation specialist to work on the case. Tr. 523-24. Although the Court authorized defense counsel to retain a mitigation specialist from Inquisitor, Inc., neither Mr. Hilfiger nor Mr. Smith had any contact with that firm. Tr. 528 (Smith); Tr. 671 (Hilfiger).

25.     The defense team included an investigator, but he did not work on the penalty phase.

Pet. Prop. Post-Hr'g FF&CL                    10                    *Barrett v. U.S.*, CV-09-00105-JHP

1886

26.     In late mid- to late-August, 2005, Mr. Hilfiger instructed Mr. Smith to contact Dr. Jeanne Russell. Mr. Smith believed he first contacted Dr. Russell in August 2005, Tr. 541, perhaps one week before their meeting on August 29, 2005. Tr. 607. Russell testified the contact was made in mid-August. Tr. 774. Echols retained Dr. Russell to perform a risk assessment on Mr. Barrett sometime in 2003. Tr. 769-70; Tr. 150 (Gordon).

27.     Russell's role consisted in consulting with counsel regarding the penalty phase and the cross-examination of prosecution expert James Horn and updating the risk assessment she did in 2003. Tr. 778, 781. Dr. Russell did not serve as a mitigation investigator or specialist. Tr. 782.

### 2.   *Family & Social History Investigation*

28.     At the time of Echols's withdrawal from the federal case, trial counsel had conducted no mitigation investigation beyond that which had been done during the state court proceedings. Tr. 462-63. Echols could not recall ever discussing the state of the mitigation case with Mr. Hilfiger. Tr. 466.

29.     At the time of his first meeting with Mr. Hilfiger, Mr. Smith brought up the ABA Guidelines's call for a mitigation specialist to work on the case. Hilfiger led Smith to understand that he would be relying on the work that had been done in state court, although there had been no penalty trial there. Tr. 523-24. When Smith brought up the need for a mitigation specialist, Hilfiger gave Smith the impression that he was "confident that those materials could be taken from what Echols had done and whipped into shape for trial." Tr. 527.

30.     According to Smith, the defense plan for developing mitigation evidence was to "build on the information that had already been compiled" by state court counsel. Tr. 538; *id.* at 575.

Pet. Prop. Post-Hr'g FF&CL                    11                    *Barrett v. U.S.*, CV-09-00105-JHP

1887

31.     Echols's view, based on his consultation with resource counsel and his reading of the case law, was that the mitigation investigation that had been done in state court fell below prevailing standards of representation in capital cases. Tr. 466. Echols believed that "just about everything" was left to be done on the mitigation case. Tr. 465. Echols also communicated to Mr. Hilfiger his views that the defense needed a mitigation investigator and mental health evaluation by providing Mr. Hilfiger copies of the budget requests, and the justifications for them, that he submitted to the court. Tr. 504-05.

32.     Smith expressed shock at the possibility that a mitigation case had not been investigated by the time of his appointment in May 2005. Tr. 534; *id.* at 573 ("I can't believe those two (Echols and Hilfiger) didn't discuss what had been done prior whenever they get together in January or December"). Smith indicated in his testimony that he did not review the files of state-court counsel related to mitigation evidence. Tr. 534.

33.     Mr. Hilfiger was responsible for deciding what mitigation investigation would be done. Mr. Smith emphatically testified that his role in the penalty phase was limited and did not emerge until later in his work on the case. To wit: "I was not the mitigation guy. Okay? I was not tasked with developing this mitigation case." Tr. 529. *See also* Tr. 609 (Smith explaining that plan for penalty phase regarding Russell was not his plan). Mr. Hilfiger assigned him some specific duties related to the penalty phase such as contacting Jack Gordon to find his materials, Tr. 597, contacting Jeanne Russell, Tr. 534, 545, 559, 607, and, possibly, arranging a meeting with Echols. But "as far as Bret being the mitigation guy, I was not that guy." Tr. 534.

34.     Smith did not work on the penalty phase during the first phase of his work on the case. Tr. 529. At a meeting on August 29, 2005, between Hilfiger, Smith and Jeanne Russell,

Smith was not familiar with the subject-matter that Hilfiger and Russell discussed, including the content of Russell's 2003 report. Tr. 558-59.

35.     Mr. Smith could not say when he became aware of Rosanne Schaye's work on the case, whether it was before the trial or during the post-conviction proceedings. Tr. 529-30. When asked whether he reviewed her reports, Mr. Smith testified "that was Mr. Hilfiger's area that he was working on." Tr. 557. Mr. Smith did not know who Steve Leedy was. Tr. 557. When asked more generally whether he reviewed the files from state-court counsel to determine what mitigation evidence had been developed, Mr. Smith protested that he was not the "mitigation guy." Tr. 534.

36.     Mitigation specialist Schaye interviewed Mr. Barrett several times and also interviewed members of his family. Tr. 429, 476. She produced memoranda and reports memorializing the status of her investigation and pointing to further investigation. Govt. Exs. 19-25 & 54-62.

37.     Echols had Schaye's memoranda in paper and digital form, Tr. 477, and he turned them over, or made them available through a secure website, along with all other documentation he had, to Hilfiger and Smith after he withdrew from the case. Tr. 456-58.

38.     Hilfiger and Smith took possession of Echols's files around the time of their one meeting in late May 2005. Tr. 687. Mr. Hilfiger testified that OIDS also sent boxes files to him after he took over for Echols. Tr. 688. Neither Mr. Hilfiger nor Mr. Smith made use of their access to Echols's database of information about the case. Tr. 621-22 (Smith); Tr. 663 (Hilfiger).

39.     Hilfiger kept the boxes of materials from Echols and OIDS at his office, and Smith would borrow documents to review, then return them. Tr. 559.

Pet. Prop. Post-Hr'g FF&CL                    13                    *Barrett v. U.S.*, CV-09-00105-JHP

1889

40.     Dr. Russell also had Schaye's memoranda, and relied upon them in drafting the report she prepared in 2003 and updated in 2005. Tr. 786-87. Dr. Russell also had a report prepared by Dr. Sharp in 2002. Tr. 787-88; Govt. Ex. 34.

41.     Based on Schaye's memoranda and Dr. Russell's summary of information in her 2003 report, federal counsel were on notice that witnesses were available to testify to the following mitigating information that was not fully presented at trial:

a.  Kenny Barrett's parents showed little interest in him, even after he had been badly beaten by police, Govt. Ex. 19;

b.  Kenny Barrett's father, Ernie, would tell his sons that he would visit them when he was in town, but then he would not show up, Govt. Ex. 19, Govt. Ex. 22;

c.  There was little structure in Kenny's life after his father left home, Govt. Ex. 21;

d.  In infancy and childhood, Kenny Barrett was extraordinarily active, Govt. Ex. 56;

e.  When Kenny was a toddler, he pulled a bag of groceries off a table and a large can fell on his head, Govt. Ex. 56;

f.  Ken's parents had an unstable marriage that included infidelity, Govt. Ex. 56;

g.  Ken's parents only cared about themselves and often left their children to fend for themselves, Govt. Ex. 62

h.  Ken's father Ernie was violent towards his mother, Gelene, and she was violent towards him, Govt. Ex. 20, Govt. Ex. 57, Govt. Ex. 61;

i.  Ken found it extremely difficult to be without his father, Govt. Ex. 20, Govt. Ex. 55, Govt. Ex. 57, Govt. Ex. 58;

j.  The parents' divorce was very difficult for Ken because he wanted to be with his father but his father would spend little time with him, Govt. Ex. 56;

Pet. Prop. Post-Hr'g FF&CL                14                *Barrett v. U.S.*, CV-09-00105-JHP

1890

k.   Ken showed intense emotions and dramatic mood swings, Govt. Ex. 56;

l.   There is an extensive history of mental illness in the family of Ken's mother, Gelene and father, Gov. Ex. 56, Govt. Ex. 58;

m.  Ken's maternal great grandfather was murdered in Sequoya County, Govt. Ex. 20;

n.   Steve Barrett had explained to his mother that he had more success in life than his brothers because he did not grow up in the broken home his brothers lived in, Govt. Ex. 20;

o.   Gelene smoked and drank alcohol during pregnancy, Govt. Ex. 60;

p.   Gelene always favored Ken's brother Richie, Govt. Ex. 21, Govt. Ex. 22, Govt. Ex. 25;

q.   Ken's relationship with his mother was full of turmoil, and Ken believes she resents him but does not know why, Govt. Ex. 21;

r.   Gelene drank heavily, and would be mean to him when she was drunk, Govt. Ex. 21;

s.   When Ken was 13 or 14 years old, Gelene would come home drunk late at night with a boyfriend, wake Ken up, and make him roll a cannabis cigarette for her boyfriend, then smoke cannabis with Ken, Govt. Ex. 21;

t.   Ken recognized that he was always hyperactive, Govt. Ex. 21;

u.   Ernie gave Ken his first experience with alcohol by forcing him to drink Jack Daniels as a punishment, Govt. Ex. 21;

v.   Although Ken took full responsibility for his problems with Abby, he believed they came from his drinking, Govt. Ex. 21;

w.  Ken stopped going to town because he believed he was being harassed by the police, Govt. Ex. 21;

Pet. Prop. Post-Hr'g FF&CL                    15                    *Barrett v. U.S.*, CV-09-00105-JHP

1891

x.   Ken's parents beat him, Govt. Ex. 55;

y.   In the eighth grade, Ken was placed in a class for children with learning disabilities, and was whipped by the principal, Govt. Ex. 55;

z.   Ken started using drugs when he was 13 or 14 and believed he used them to help him cope, but he now believes he functions better without them, Govt. Ex. 55;

aa.  At the time of the raid, Ken's son Toby was living with him as part of an agreement that would keep Toby in school until he finished high school, Govt. Ex. 55;

bb.  Ken had memories of his parents fighting, especially about his mother's drinking, Govt. Ex. 59;

cc.  After the divorce, the family was very poor, and the kids' poor clothing made it difficult to go to school, Govt. Ex. 59;

dd.  The first time Gelene left Ernie, she was depressed and failed to care for Kenny and Richie, leaving them to their own devices, Govt. Ex. 22;

ee.  When his parents separated Kenny felt sad and lonely, Govt. Ex. 22;

ff.  Ken's paternal grandfather had mental health problems and was a drunk who abused his wife, and threatened to kill her in front of Ken, Govt. Ex. 22, Govt. Ex. 61;

gg.  Ken was neglected by his mother, but his aunt Linda Reilly would take him home and bathe him and wash his clothes, Govt. Ex. 22;

hh.  Ken was underweight when Linda Reilly intervened in his care, Govt. Ex. 22;

ii.  After Gelene and Ernie split up a second time, Ken as rowdier and more distant, Govt. Ex. 22;

jj.  Ken was a hyperactive child, Govt. Ex. 24, Govt. Ex. 57, Govt. Ex. 58;

kk.  There is a history of alcoholism in Ken's extended family, Govt. Ex. 24;

Pet. Prop. Post-Hr'g FF&CL                    16                    *Barrett v. U.S.*, CV-09-00105-JHP

1892

ll. Ken and his brothers were not well supervised, Govt. Ex. 24;

mm. Ken and his brothers were left alone a lot, Govt. Ex. 25;

nn. Ken suffered from depression as a young man and would isolate himself, Govt. Ex. 25;

oo. At the time of the raid, Ken was isolating himself at home, Govt. Ex. 25;

pp. Ken's son Toby loves him, Govt. Ex. 54;

qq. Ken's son observed his dramatic mood swings, Govt. Ex. 54;

rr. Ken's father taught him to swim by throwing him into deep water, Govt. Ex. 57;

ss. Ken's mother beat him with a belt, usually because she was mad, Govt. Ex. 57;

tt. Ernie had a drinking problem, Govt. Ex. 57.

42. Mr. Smith did not review Schaye's memoranda, which he testified fell under Mr. Hilfiger's area of responsibility. Tr. 557.

43. Mr. Hilfiger had no recollection of Roseann Schaye or her memoranda, Tr. 679, 680, 695, although he believes he had them and would have reviewed them prior to trial. Tr. 696-998.

44. State-court penalty phase counsel Gordon testified that if the case had gone to a penalty phase, the defense believed it could present evidence supporting the following mitigating circumstances: Mr. Barrett's mother was an alcoholic who brought men home when Mr. Barrett was a boy and made him drink and do drugs with them; Mr. Barrett's mother was physically abusive to him; Mr. Barrett was arrested when he was 16 or 17 and severely beaten by the police; Mr. Barrett had Post-Traumatic Stress Disorder; Mr. Barrett had contacts with the mental health system and a mental health history; Mr. Barrett's suicide attempt, his reclusive personality, his

Pet. Prop. Post-Hr'g FF&CL                    17                    *Barrett v. U.S.*, CV-09-00105-JHP

1893

paranoia and his sense of failure in everything he did; and, in addition, Mr. Gordon would have provided an explanation for Mr. Barrett's drug abuse. Tr. 149-51.

45.     Echols testified to a similar, if shorter, list of mitigating information the defense possessed at the time of his departure from the case. Tr. 429-30.

46.     Trial counsel did not interview the following potential mitigation witnesses about Mr. Barrett's background or mental health, or interviewed them in the most cursory fashion:

   a.   Steve Barrett

   b.   Ernie Barrett

   c.   Gelene Barrett

   d.   Phyllis Crawford

   e.   Ruth Harris

   f.   Mark Dotson

   g.   Ada Blount

   h.   Warren Dotson

   i.   Carl Cook

   j.   Doris Barrett

   k.   Elnora Long

   l.   Linda Reilly

   m.   Richie Barrett.

47.     During a hearing held on September 9, 2005, Mr. Smith advised the court that federal defense counsel had located "very little on mitigation" at that point in time. Mr. Smith testified his account to the court in 2005 would better reflect his understanding than his memory in 2017. Tr. 538.

48.     Neither Mr. Hilfiger nor Mr. Smith testified to a strategic or tactical reason for failing to follow-up and interview Mr. Barrett's family members, or for failing to present potentially mitigating information identified in the Schaye memoranda.

49.     Mr. Hilfiger testified that when he visited Mr. Barrett's cabin in September 2005, he had "a little bit" of discussion about potential testimony with Mr. Barrett's family members because by then the defense "already had some idea what they're testimony was going to be." Tr. 731.  On October 1, Hilfiger's billing shows he "talked to some of Barrett's relatives but didn't list who they were." Tr. 731.

50.     Dr. Russell did not serve as a mitigation investigator in Mr. Barrett's case and has never been a mitigation specialist at any time. Tr. 782.

### 3.  Mental Health Investigation

51.     The only person with expertise on mental health matters whom trial counsel consulted was Dr. Russell. As regards the penalty phase, that consultation consisted in one meeting that took place at the end of August 2005.[1]

52.     Echols stated in his funds requests, which were provided to Hilfiger, that he believed the defense needed to have Mr. Barrett evaluated for organic brain disorders because "Mr. Barrett is known to have used drugs and suffered significant head injuries during his life." Crim. Doc. 50 at 8. The purpose of this sought-after evaluation was to be "assessing the likelihood that Mr. Barrett suffers from any psychological or physiological deficits, including possible organic brain disorders, affecting his judgment and ability to respond cognitively in a crisis setting." *Ibid.*

---

[1] The date of this meeting is unclear. In Dr. Russell's billing records, the date is given as August 29, 2005. In Mr. Hilfiger's billing records, the date is listed as August 19, 2005. Pet. Ex. 72 at 33.

Pet. Prop. Post-Hr'g FF&CL                    19                    *Barrett v. U.S.*, CV-09-00105-JHP

1895

53.     Mr. Smith testified that he was not aware of Echols's request or of the Court's order authorizing funds for that purpose. Tr. 578. Mr. Smith made no decision regarding whether Mr. Barrett should be examined for organic brain dysfunction, and he had no conversation with Mr. Hilfiger about that subject. Tr. 579.

54.     Mr. Smith could not say whether he knew that Mr. Barrett had suffered head injuries, although he had access to documents that memorialized Mr. Barrett reporting head injuries. Tr. 578.

55.     Although not stated in Mr. Echols's funds requests, Dr. Sharp had recommended such an evaluation in 2002. Govt. Ex. 16. Trial counsel stated in their declarations and testified at the hearing that they were not familiar with Dr. Sharp or his work in the state-court case, Tr. 704, 705-06 (Hilfiger); Tr. 555-556; id. at 557-58 (Smith), even though his work was mentioned in Dr. Russell's reports. Govt. Exs. 33 & 34.

56.     In a motion for summary judgment filed before the hearing, the government suggested that trial counsel did not have Dr. Sharp's report. However, trial counsel knew of Dr. Russell's work, and she had the report, and even provided it to the government's expert, Dr. Price. Govt. Ex. 51. Neither Mr. Hilfiger nor Mr. Smith asked Dr. Russell about Dr. Sharp's report. Tr. 789.

57.     Dr. Russell reviewed Dr. Bill Sharp's psychological evaluation of Mr. Barrett and his findings that Mr. Barrett had avoidant and paranoid personality disorders and potential neurological damage, and that further testing was indicated. Tr. 787-88.

58.     The government attempted to develop evidence that federal trial counsel did not pursue the examination requested by Echols because an affidavit by psychologist Faust Bianco

dissuaded them from doing so. However, neither Mr. Hilfiger nor Mr. Smith was familiar with Bianco's affidavit, and neither testified to having relied upon it for any decision. Tr. 679.

59.    The government also attempted to show that defense counsel decided not to have Mr. Barrett evaluated by a mental health professional because it would lead to evidence that he used drugs. The trial record reflects that the jury heard evidence of Mr. Barrett's drug use from numerous witnesses, and convicted him of a drug trafficking offense.

60.    According to Mr. Smith, the defense did no investigation into why Mr. Barrett used drugs. Tr. 588. The defense did not consult any experts about whether Mr. Barrett's drug use might have been a response to an underlying mental or emotional problem, or to traumatic experiences he had. Tr. 588-89. The defense conducted no investigation into whether someone with a learning disability might use drugs. Tr. 589.

61.    The government elicited from Mr. Hilfiger testimony indicating that he did not want the defense case to focus on Mr. Barrett's drug use, Tr. 692, but there was no testimony linking that desire to any decision about what should or should not be investigated.

62.    As far as any penalty phase was concerned, Dr. Russell's work for the defense in state and federal court was limited to performing and updating a risk assessment. A risk assessment involves determining in what situations or in what context a person will become dangerous. Tr. 770.  It is not the same as neuropsychological testing. Tr. 771.

63.    According to Mr. Smith, it was at the late-August meeting between defense counsel and Dr. Russell that the penalty phase strategy was decided upon. Tr. 542; *id.* at 544-46; *id.* at 559; *id.* at 609. During that meeting Hilfiger, Smith and Russell discussed "what had been done, what needed to be done, and what she was willing to do." Tr. 558.

Pet. Prop. Post-Hr'g FF&CL                    21                    *Barrett v. U.S.*, CV-09-00105-JHP

1897

64.     The plan developed then was to "limit the government's intrusion into Kenny's past and their exploitation of that and proceeding along the lines of dangerousness as opposed to a full-blown mitigation strategy." Tr. 559. The focus was on limiting future dangerousness, not a mitigation case. Tr. 559-60.

65.     Mr. Hilfiger's recollection is consistent. He testified that they discussed Dr. Russell's previous work and her 2003 report. Tr. 722-23. Hilfiger's understanding was that Dr. Russell would update her risk assessment for the federal case. Tr. 724-25. The focus of that assessment was to be limiting the government's ability to prove future dangerousness. Tr. 725.

66.     Both Mr. Hilfiger and Mr. Smith testified that they concluded, on the basis of the meeting with Dr. Russell, that she should not testify because the government's counter expert would result in testimony that was a net loss for the defense. Tr. 726 (Hilfiger); Tr. 737; Tr. 739; Tr. 746; Tr. 563; *id.* at 575 (Smith); Tr. 609.

67.     Dr. Russell never told Mr. Hilfiger or Mr. Smith not to pursue mental health mitigation in Mr. Barrett's case. Tr. 791.

68.     The only context in which Mr. Hilfiger considered presenting a mental health expert in the penalty phase was in the context of Dr. Russell's risk assessment and combatting future dangerousness. Tr. 739. Mr. Hilfiger believed that the defense was constrained to limit its mitigation evidence to rebutting future dangerousness. Tr. 745.

### B. PREJUDICE

1.     Trial counsel informed the jury that four categories of "mitigation evidence" would be presented:  (1) evidence of the sentencing options available to the jury; (2) "a discussion about Kenny Barrett's felony conviction;" (3) "Kenny Barrett's incarceration;" (4)

Pet. Prop. Post-Hr'g FF&CL                    22                    *Barrett v. U.S.*, CV-09-00105-JHP

1898

"Then finally, we're going to give you some insight into Kenny Barrett's life, both before and after the events that occurred on September the 24th of 1999."  Tr. 4704.

2.      The evidence of Kenny Barrett's life that was presented was incomplete and not "an accurate representation of Mr. Barrett."

### 1.  Family Witnesses

3.      A reasonable mitigation investigation conducted in a timely manner would have produced significantly more compelling testimony from family witnesses.  Mr. Barrett was prejudiced by defense counsel's failure to adequately prepare and present mitigating witnesses who would have testified to Mr. Barrett's family and personal history of mental illness, childhood deprivation and the physical and psychological abuse he suffered, including excessive corporal punishment, neglect, illegal and immoral acts by a parent imposed on a juvenile, and abandonment.

### 2.  Stephen Barrett.

4.      Had Stephen Barrett been properly interviewed and prepared to testify in mitigation of his brother, Kenneth Barrett, his testimony would have shown the following. Stephen Wayne "Steve" Barrett, Kenneth Barrett's younger brother, by 7 years, was called as a witness at Kenneth Barrett's sentencing.  Tr. 5029 -5051. Stephen and Petitioner have the same parents, Sylvia Gelene Dotson and Ernest Eugene Barrett. Though Stephen Barrett was called to testify at the trial, his testimony was much shorter, much less detailed and, far less compelling than that elicited in the § 2255 evidentiary hearing.  See Cr-115, pp. 5029 – 5052.

5.      At trial, Stephen Barrett was asked no questions about family home life, no questions about his mother's alcoholism, or his mother's lifestyle, such as her partying, bringing strangers home from bars, her drug use, her mood swings, her anger or the beatings she inflicted

Pet. Prop. Post-Hr'g FF&CL                        23                        *Barrett v. U.S.*, CV-09-00105-JHP

1899

on the boys. He was asked no questions about his family's mental health or observations he'd made about Ken's mental health and no questions about Ken's suicide attempt. He is asked no questions about how his upbringing differed from that of Ken's, and how that, along with Ken's mental illness, was a major factor in the way their paths diverged. *See id.*

6.      Because of that, the prosecution was able to cross-examine Mr. Barrett in such a way as to compare Petitioner's successes to his brother's failures as simply a matter of a series of bad choices, made by Petitioner rather than presenting it in the manner to which Steve Barrett testified at the evidentiary hearing.

7.      Mr. Barrett's testimony was credible. His testimony at the evidentiary hearing differed in substance and intensity from the sentencing

8.      Steve Barrett, who by his profession now sees and works with many children who have difficulties in their home life and suffer from mental health issues (Tr. 84, 88-90, 120) offered an objective perspective to the troubling environment in which his brother Kenneth was raised, testimony that would have impacted a jury's consideration of the appropriate sentence.

9.      Steve Barrett is a successful, productive member of society.  He is presently high school principal in Noble and previously was an assistant principal at the high school, head middle school principle and before that taught chemistry and physics and was football coach. Stephen Barrett has undergraduate and graduate degrees from University of Oklahoma. 11 years in Army National Guard. Tr. 78-79.  Steve Barrett left the family home in Sallisaw at 19 and, he didn't stay in touch much after that. Tr. 98.

### a.   The differences in their upbringings

10.      Steve Barrett's adolescent years were very different than Kenneth Barrett's. When Steve was an adolescent, the family lived on family land, a quarter mile from five different

Pet. Prop. Post-Hr'g FF&CL                 24                 *Barrett v. U.S.*, CV-09-00105-JHP

1900

relatives' families. He spent a lot of time out of the house with his grandfather, uncles Mark Dotson, Roger Crawford and Tom Sanders, and aunts Phyllis Crawford and Janice Sanders. He was very close to a number of cousins with whom he used to hunt and fish. Kenneth Barrett, on the other hand, didn't have access to these people or activities during his adolescence. Rather Petitioner was an adolescent in an unstable household, full of drama, arguing all the time with his mother and/or younger brother, the middle son Richard, riddled with physical altercations - all about simple things. Tr. 81-82, 93-94.

11.     The family lived in town in Sallisaw when Kenneth Barrett was a teenager. Though it was only 8 or 9 miles to Vian, where his aunts, uncles and cousins lived, they didn't go out there very much. He remembers two violent outbursts from Ken, one of which caused Steve to get stitches. Stephen Barrett's opinion based on his professional experience with children like Kenneth Barrett opined that was the time in Ken's life when intervention would have been most helpful. Tr. 113, 117. In his job, it is "times like those with students you want to develop strategies they can use to become productive citizens." Tr. 119

12.     Steve Barrett was two when his parents divorced, so he was never raised with a father. It was different for Ken who missed his father, clung to his dad whenever he was around, and was "very fixated on dad." Tr. 85. As to why Steve Barrett was a principal and Kenneth was in trouble, Steve believes that Ken has psychological problems that Steve did not have, partly due to their father leaving at different times in their childhoods, compounded by drugs and alcohol. Tr. 92.

### b. Their mother and Petitioner's home life

13.     Kenneth Barrett's mother, Sylvia Gelene Dotson is an alcoholic. Tr. 82. She suffered from severe depression. She would come into Steve Barrett's room late at night and cry.

He found her diary in which she said she wanted to die. Tr. 96. Stephen Barrett could not remember when there wasn't alcohol involved in growing up. Tr. 83. His mother came home late at night, frequented the bar scene. Tr. 83. There were many occasions when Steve woke up in the morning and there was a strange man in the house. Tr. 121. The more Gelene drank the more argumentative she became. Tr. 84. She drank every day, but to excess mostly on the weekends. Tr. 87.  Steve Barrett believes his mother has mental or emotional problems. She was like a roller coaster of mood swings, extremely happy to crying and depressed, and then angry. Tr. 86. She struggled being mother and father, was overwhelmed and sometimes broke down. Tr. 94. Corporal punishment was normal in the house. Tr. 109.

14.     Steven Barrett played high school football junior and senior years. His mother came to only two games. He was the top hurdler on the east side of state in his senior year; she came to one track meet. Tr. 107.  Steve felt neglected, had to rely on others as far as transportation to school activities and sports. Tr. 85

### c.  *Mental health observations of Kenneth Barrett*

15.     Kenny Barrett failed at school. He dropped out in the 9th grade. Tr. 90. He was reeling from the breakup of the family and never got any counseling or help for his special needs. There might have been interventions that would have helped him stay in school. Tr. 90-91.

16.     Steve and Ken have always had a similar work ethic. Tr. 119

17.     Steve used drugs himself in late adolescence. He overcame it in the military, where non-comissioned officers were drug-tested. Tr. 92.

18.     Ken was very hyperactive growing up. Tr. 95.

19.     Ken grew up in a dysfunctional family in his adolescent years. It was a volatile household. Tr. 95.

Pet. Prop. Post-Hr'g FF&CL                    26                    *Barrett v. U.S.*, CV-09-00105-JHP

1902

20.     Steve Barrett vividly described Kenneth Barrett's suicide attempt. Ken came in and borrowed Steve's shotgun. Then Steve saw Ken leaning against the truck, but not the gun. And then Kenneth Barrett pulled the trigger. He was hospitalized for 10-11 days. Ken never told Steve why he shot himself. Kenneth Barrett and his wife, Abby, had broken up at the time. That greatly affected Kenneth Barrett. Tr. 99 –100.

### d.   Observations based on Stephen Barrett's experience as an educator

21.     Steve Barrett believes that any case where there's heavy drinking, the absence of a parent is going to have an effect on the children.  Stephen Barrett felt it; he is sure Kenneth Barrett felt it. Tr. 84. Based on his experience as a principal and seeing similar behavioral patterns in some students that he saw with his brother, Stephen Barrett believes that Kenneth Barrett had mental health issues, evidenced by impulsive behavior, acting out over maybe small things, inability to moderate himself, or to identify triggers and refrain from behavior that caused more damage. Tr. 88-89.

22.     Stephen Barrett and his staff design individualized programs for these kinds of students to help them manage their days and get through school, provide safe places to relax and then re-enter, various strategies that he's not aware that Ken ever got the benefit of. Tr. 89-90.

23.     Stephen Barrett's observations over the years show him that behavior is not entirely by choice; other factors affect one's ability to make positive choices, including mental illness, or underlying emotional problems. It can be very bad. Tr. 120.

24.     Stephen Barrett would have been a powerful witness in mitigation had he been interviewed, and prepared to testify in a manner consistent with the prevailing professional norms. His testimony would have provided the jury with an inside view of the dysfunctional

home life in which Kenneth Barrett grew up, abandoned by his father and desperate for a connection with him, and relegated to the of a raging alcoholic mother.

25.     Gelene Dotson's relationship with her oldest son, Kenneth Barrett, was rife with argument and her violence. Gelene Dotson, burdened by extreme mood swings, was overwhelmed by being the single parent to three boys, the oldest of whom was hyperactive and suffered from psychological problems, later compounded by drugs and alcohol.

26.     Counsel's failures to develop and present the testimony, that Steven Barrett would have given had he only been prepared and asked, fell below the prevailing professional norms of appointed counsel in a capital case. The lapse was prejudicial to Mr. Barrett. A reasonable juror or jurors could find Steven Barrett's insight and analysis into his brother's psychological problems true and the conclusions significantly mitigating, calling for a lesser sentence.

### 3. The testimony of Ernest Barrett.

27.     Like Stephen Barrett, Kenneth Barrett's father, Ernest Barrett was called to testify without appropriate preparation or understanding of the purpose and underlying significance of his testimony. Tr. 132.

28.     The defense did not elicit from Kenneth's father Ernest Barrett that his family had serious mental problems, and the details thereof. Pet. Ex. 20 at 3. The defense did not elicit from Mr. Barrett that Kenneth's mother was a full-blown alcoholic who drank when she was pregnant with Petitioner, or that Ernie himself was a hard-drinker who was brought before judges on numerous occasions over incidents caused by his use of alcohol. *Id.* at 5-7.  Nor did the defense bring out the inter-generational use of alcohol or that Ernie's father was a raging, violent alcoholic who had been committed to a mental institution. Id. at 3.

Pet. Prop. Post-Hr'g FF&CL                    28                    *Barrett v. U.S.*, CV-09-00105-JHP

1904

29.     The defense did not elicit from Mr. Barret that Kenneth's mother whipped Kenneth out of anger due more to her mood swings than to her boy's conduct, and that "she whipped them all the time" and said "cruel things" to them. *Id.* at 7, Tr. 22-23. Counsel did not elicit testimony about the anger and violence inherent in Mr. Barrett's marriage, nor testimony of witness, Ernie Barrett's serial infidelities and absence from the home. Pet. Ex. 20 at 6-7.

30.     There was no testimony of the observations that Petitioner's father had made of his child that reflected on Ken's mental health: "Kenny had bouts of depression and did things that did not make any sense. Sometimes he would be very down but other times he would be manic…he could not sit still… his feet were always moving and he was bouncing…was not an independent person and had to be close to home...a sensitive little boy too who cried if you hurt his feelings…. He was not an independent person and had to be close to home," or of the trauma his parent's divorce caused him, or even that he had a hard time in school. *Id.* at 6-9.

31.     On cross examination at trial, when the prosecutor asked Ernie if he was the best dad he could have been and Ernie said, "Probably not" (Tr. 5117), the defense did not follow up on redirect. In fact, there was no redirect. Tr. 5125.

32.     Ernie Barrett made clear in his declaration that he regretted his mistakes in parenthood and would have gladly testified to his deficiencies as a father had counsel only asked. Pet. Ex. 20 at 10; *see also*, Tr.132-33.

33.     Counsel's failures to develop and present the testimony that Ernest Barrett would have given had he only been asked fell below the prevailing professional norms of appointed counsel in a capital case. The lapse was prejudicial to Mr. Barrett. A reasonable juror or jurors could find Mr. Barrett's father's abandonment and poor parental modeling and their impact on Barrett's development was a significant mitigating factor.

Pet. Prop. Post-Hr'g FF&CL                29                *Barrett v. U.S.*, CV-09-00105-JHP

1905

#### 4. *The testimony of Phyllis Crawford.*

34.     The defense put Roger Crawford on the stand at the last minute in lieu of his wife Phyllis Crawford, (Petitioner's maternal aunt) because she was too nervous to testify.Tr.5054 Unfortunately for Petitioner, Roger did not know "a whole lot" about his nephew by marriage. Tr. 5054

35.     Had a proper investigation been conducted and Ms. Crawford properly prepared and therefore less nervous, beyond the nervousness that any prepared witness suffers, she would have testified that "depression and mental illness" runs in her family, and that she herself was under treatment for depression, Pet. Ex.27,at 3, a subject that was not raised by defense counsel when they had her husband on the stand. Likewise, Roger and Phyliss's daughter is bipolar, and her son has a rare disorder that makes him unable to talk or mature. In addition, the Crawford's son Travis had long been under psychiatric treatment for anxiety and panic attacks. *Id.*

36.     She would have testified that Petitioner's mother was an alcoholic and that Phyllis lived with her and her husband during four early months of her pregnancy with Petitioner, and Petitioner's mother drank from morning till night during all those months. Pet. Ex. 27 at1 Additionally, she would have testified that her father and his relatives were heavy drinkers, as was Petitioner's father, who had hardly anything to do with his son after the divorce, and how hard Ken took that divorce.  Id., at 2.

37.     The jury would have heard that Ken's mother never had a kind word for him, that she screamed at him all the time which Phyllis could hear across their yards and through her walls, and that Ken could not get his mother's voice out of his head. *Id.* And that his mother had different men in the house all the time, just when Kenny was entering his teenage years, and that it was very confusing for her nephew." *Id.*

38.     The jury would have heard that Phyllis knew Petitioner "was different because he needed so much more attention as a child than the other children. He was extremely sensitive and cried over every little thing from the time he was small until he was a grown man. He was always hyperactive, on the go, into everything, and could not sit still. He would break down and cry easily." *Id.*, at 1. And that Ken's emotions did not allow him to be independent as a grown man," (*id.*, at 2) and that his suicide attempt tells it all. *Id.*, at 3

39.     Importantly, Phyllis Crawford would have informed jurors of an incident when the police came to arrest Ken for a minor offense and Ken ran to her, asking what he should do, because at the time there were newspaper accounts of someone having been beaten to death at the county jail. She told Ken, "that we were going to walk out of the house and that he was going to get in the police car and that's just what he did." *Id.* at 3.

40.     Had trial counsel appropriately prepared Mrs. Crawford to testify and alleviated the natural nervousness of anyone called to testify on behalf of a beloved nephew at risk of being sentenced to death, there is a reasonably likelihood that at least one juror would have found the testimony, either separately or cumulatively to be sufficiently mitigating, to sentence Mr. Barrett to a sentence less than death.

### 5.   *Ruth Harris and Mark Dotson.*

41.     Though easily available, trial counsel failed to contact or call Mr. Barrett's maternal aunt Ruth Harris (Tr. 42-51) or uncle Mark Dotson (Tr. 56 -65) to testify.  The testimony would have confirmed the family history of mental health issues (Tr. 54-55, 61, 62, 63) and alcoholism (Tr. 42, 44, 64).  Both witnesses testified in particular to Gelene's drinking and mood swings (Tr.45, 55, 59).  Mark Dotson testified that Gelene always picked on Kenneth, argued with him, never let up on him. Tr. 58.  Ruth Harris testified that Gelene

Pet. Prop. Post-Hr'g FF&CL                 31                 *Barrett v. U.S.*, CV-09-00105-JHP

1907

was too busy to provide structure and support for him. Tr. 55.  Both would have acknowledged Kenneth's hyperactivity. Tr. 46 (Kenny was the most hyper child Ruth Harris had ever seen); Tr. 56, 57. Notwithstanding the difficulty he had navigating the world, he willingly helped his family in the ways that he could, e.g., attending Mark's wedding (Tr. or helping his aunt out with an automobile problem. Tr. 64, 65.  Mark Dotson confirmed the family genetic propensity to mental health issues (Tr. 54, 61-63) and alcoholism (Tr. 55, 64). The fact that notwithstanding his difficulties, his addictions and mental health concerns, Mr. Barrett loved and was loved, (e.g., Tr. 51) would have humanized him in a broader more complete way that the limited testimony presented by trial counsel. Counsel's failure to call two close relatives easily accessible and consistent with counsel's limited efforts, fell short of the prevailing professional standards.

### 6.   Ada Blount, Warren Dotson and Carl Cook.

42.     Ada Blount was Kenneth Barrett's maternal aunt. Now deceased, her testimony is set out in Pet. Ex. 16.  She was willing and ready to testify that Kenny was "a hyper little boy who could not sit still." *Id.* "He did not bother me any, but I worried about him because I thought drugs made him do things he wouldn't do otherwise.. . . He was living by himself and got mad at himself sometimes. . . . Once he shot himself. . . .Kenny never had much of a father, never had any guidance. . . .We all still love him very much." *Id.*

43.     Warren Dotson, maternal great uncle, now deceased, would have testified to the fact that his daughters, rather than Gelene, took care of Ken after he was released from the hospital Pet. Ex.34 at 4. He would have made clear to the jury that Ken was a good worker and was loved. Id. Like so many family members and community residents, Mr. Dotson would have told the jury that "The law did not have to go to Kenny's place in the middle of the night to arrest

Pet. Prop. Post-Hr'g FF&CL                    32                    *Barrett v. U.S.*, CV-09-00105-JHP

1908

him. Our people live all around Kenny's place and know that he was not dangerous." Id. Kenny was a good worker and always respectful. Id. at 4.

44.     Carl Cook, now deceased, also would have offered testimonial support for Mr. Barrett, his maternal great nephew. Pet. Ex. 36. He would have testified, in part, as follows. "I think what got Kenny, what affected him more than anything, was their mother. I don't think Gelene knew how to raise a child. And as far as I know, Ernie wasn't a father. I blame him for a lot of it. I know Gelene was a drinker. It is hard on children not to have a father, but when their mother is a drinker too, it takes a toll on them." Pet. Ex.36 at 4. "John E [maternal uncle] was an alcoholic, and Hugh [maternal grandfather] drank quite a bit when he was young." Id.at 4.

45.     Carl Cook and Warren Dotson both could have laid out the history of Ken's family on both sides, fleshing out a family who struggled through poverty and war and simply survive.  Pet. Ex. 36 at 1-4; Pet. Ex. 34

46.     Though individually testimonially sparse, the cumulative consistency in the family history of addiction, neglect, abandonment and Ken as a beloved but troubled member of families with deep roots in the Oklahoma would have made more credible the mitigating humanization of Kenneth Barrett.  That he deserves "a life," as trial counsel Roger Hilfiger repeatedly asserted was their goal  was to show that Mr. Barrett was not a bad character and deserved life (Tr. 109,111) – a goal they fell far short of as a result of too little investigation and preparation.

### 7.  *State counsel Jack Gordon and the state mitigation investigation.*

47.     Jack E. Gordon is an Oklahoma criminal defense attorney. Tr. 145. He was appointed to assist John Echols in the defense of Kenneth Barrett at his second state trial. Tr. 147. Mr. Gordon was responsible for marshalling mitigation evidence. Tr. 147.

Pet. Prop. Post-Hr'g FF&CL                                33                       *Barrett v. U.S.*, CV-09-00105-JHP

1909

48.     Prior to Mr. Gordon's involvement, Roseann Schaye served as the mitigation investigator in Mr. Barrett's case. Tr. 148. Ms. Schaye conducted interviews with Mr. Barrett's family. Tr. 148.  Those interviews were introduced by the government.  Govt. Exs. 19-25.[2]

49.     The second state trial did not go on to a penalty phase but if it had, Mr. Gordon would have presented the following kinds of mitigation evidence:

> Mr. Barrett's mother was an alcoholic who brought men home when Mr. Barrett was a boy and made him drink and do drugs with them; Mr. Barrett's mother was physically abusive to him; Mr. Barrett was arrested when he was 16 or 17 and severely beaten by the police; Mr. Barrett had PTSD; Mr. Barrett had contacts with the mental health system and a mental health history; Mr. Barrett's suicide attempt, his reclusive personality, his paranoia and his sense of failure in everything he did; and, in addition, Mr. Gordon would have provided an explanation for Mr. Barrett's drug abuse.

Tr. 149-51.

50.     Jeanne Russell is a psychologist who John Echols hired to do a risk assessment of Mr. Barrett. Tr. 150.

51.     Dr. Russell would have testified in state court that Mr. Barrett was not a psychopath and would not be a risk if put in a prison population. Tr. 151.

52.     Mr. Barrett was a completely cooperative client during the state proceedings.

53.     Mr. Barrett encouraged Mr. Gordon to speak to his family and develop mitigating evidence. Tr. 152. Mr. Barrett never said that he did not want his attorneys to go into his background or that he would rather have a death sentence than a life sentence. Tr. 152-53.

54.     Mr. Gordon believed that the mitigation investigation was incomplete but he still had significant mitigating evidence had they gone to a penalty phase. Tr. 155.

---

[2] Family and Client Interviews of Elnora Long, Gelene Dotson, Ernie Barrett, Linda Reilly, Richard Barrett, Ruth Harris. (Govt. Ex. 24).

Pet. Prop. Post-Hr'g FF&CL                     34                     *Barrett v. U.S.*, CV-09-00105-JHP

1910

55.      Mr. Gordon would have been happy to share his files, discuss the case or provide any assistance to Mr. Hilfiger or Mr. Smith had he been asked. Tr. 158-59. Neither Roger Hilfiger nor Bret Smith or their representatives ever contacted Mr. Gordon Tr. 157.

56.      Mr. Barrett was prejudiced by the failure of either Mr. Hilfiger or Mr. Smith to contact state trial counsel responsible for mitigation and as a result failed to meaningfully review or appreciate the mitigating value of the Roseann Schaye's mitigative files they possessed.

57.      Had counsel spoken with Jack Gordon and reviewed his mitigation preparation with him and availed themselves of Mr. Gordon's insights and presented the aforesaid facts, developed additional evidence and apprised the jury of it, at least one reasonable juror would have been likely to consider it significant mitigation making a lesser sentence than death sufficient punishment.

### C.  MENTAL HEALTH EXPERTS

#### *1.  Areas on which Dr. George Woods and Dr. Steven Pitt Agreed*

58.      Mr. Barrett was prejudiced by hi trial counsel's failure to develop and present significantly compelling mitigation through psychiatrist, Dr. George Woods.

59.      A reasonable mitigation investigation would have produced a social history and psychiatric testimony that revealed the following:

#### *a.  Family History of Mental Illness*

60.      Dr. Woods and Dr. Pitt agreed Mr. Barrett had "genetic loading," or a genetic predisposition, to developing mental illness (specifically, a mood disorder such as Bipolar Disorder) due to his family history. Tr. 188-89, 192-93, 319, 1023-24, 1095.  Because of Mr. Barrett's family history, he was more likely to develop mental illness, specifically, a mood disorder. Tr. 190, 1023.

Pet. Prop. Post-Hr'g FF&CL                    35                    *Barrett v. U.S.*, CV-09-00105-JHP

1911

61.     Dr. Woods and Dr. Pitt agreed there is a multi-generational history of mood disorders, including Bipolar disorder, and other mental illness, in both the paternal line and the maternal line of Mr. Barrett's family. This includes a history of mental commitments. Tr. 188-89, 192, 226-27, 1016-24.

62.     The history of inter-generational mental illness was supported by numerous medical and other records admitted without objection, none of which was produced by defense counsel at Mr. Barrett's sentencing. See Pet. Ex. 1 (Billy Dean Maxwell, second cousin), Pet. Exs.3, 50 (A.J. Barrett, paternal grandfather); Pet. Ex. 5 (Wallace Dotson, maternal first cousin, twice removed); Pet. Ex. 45 (Kathy Trotter, paternal first cousin); Pet. Ex. 46 (Brandy Hill, maternal second cousin); Pet. Ex. 47 (Toby Barrett, son); Pet. Exs. 48, 54, 58 (Travis Crawford, maternal first cousin); Pet. Ex. 49  (Linda Riley, paternal aunt), Pet. Ex. 50 (A.J. Barrett, paternal grandfather); Pet. Ex. 56 (Gwen Crawford, maternal first cousin); Pet. Ex. 57 (Carolyn Joseph, maternal aunt).

63.     Dr. Woods and Dr. Pitt agreed that in addition to the multi-generational history of mood disorders or mental illness among Mr. Barrett's ancestors and extended family, Mr. Barrett's parents, Ernie Barrett and Gelene Dotson, suffered from mood disorders (depression in the case of Gelene Dotson). Tr. 188-89, 261, 1007, 1016, 1021, 1023.

64.     Dr. Woods and Dr. Pitt agreed there is a history of suicides and suicidal ideation in Mr. Barrett's family. Tr. 189, 1017. Dr. Pitt acknowledged Mr. Barrett's serious suicide attempt in 1986, where he shot himself in the chest with a shotgun. Tr. 196, 976).

65.     Dr. Woods and Dr. Pitt both spoke to Mr. Barrett's history of chronic suicidality, which began in childhood, as well as other attempts at suicide (deliberately attempting to overdose on methamphetamine, driving his car at high speeds). Tr. 195, 200-01, 993, 1059-60,

1062-63, G-52. Although Mr. Barrett does not suffer from schizophrenia, he reported that he "heard things," and also discussed visual hallucinations with Dr. Pitt. Tr. 268-70, 352, 1048.

### b. No anti-social personality disorder

66.     Dr. Woods and Dr. Pitt agreed Mr. Barrett does not have anti-social personality disorder. Tr. 233, 1013-14.

67.     Dr. Pitt declined to diagnose Mr. Barrett with antisocial personality disorder because he could not find evidence of conduct disorder in Petitioner's youth. Tr. 1041.

68.     Antisocial acts associated with drug use cannot be used to diagnose a person with antisocial personality disorder. Tr. 234.  Before the offense, no mental health professional who saw Mr. Barrett during his several significant contacts with the mental health system had diagnosed him as having antisocial personality disorder. Tr. 201.

69.     The defense did not elicit from Mr. Ernie Barrett that Kenneth's mother whipped Kenneth out of anger due more to her mood swings than to her boy's conduct, and that "she whipped them all the time" and said "cruel things" to them. Ex. 20 at 7.  Nor did they elicit testimony about the anger and violence inherent in Mr. Barrett's marriage, nor testimony of Mr. Barrett's serial infidelities and absence from the home. Ex. 20 at 5,7.

### c. Family history of substance abuse.

70.     Dr. Woods and Dr. Pitt agreed there is a multi-generational history of substance abuse, including alcohol abuse, in Mr. Barrett's family. The history of substance abuse is present in both the paternal and maternal lines. Tr. 192, 1025. Both doctors agreed there is a high incidence of co-morbidity between mood disorders, such as Bipolar disorder, and substance abuse. Tr. 191, 246, 1038-39, 1127. In the immediate family, Mr. Barrett's father, Ernie

71.     Barrett, had an alcohol problem. Mr. Barrett's mother, Gelene Dotson, had and has a severe drinking problem and can be termed an alcoholic. Tr. 194, 1021-22, 1035. She also used drugs. Tr. 1026.

72.     Both Dr. Woods and Dr. Pitt agreed Mr. Barrett was genetically predisposed to developing a substance abuse disorder. E.g., Tr. 1025.  Dr. Pitt characterized substance abuse disorder as a disease. Tr. 1025.

### d.   Mr. Barrett had a dysfunctional, chaotic, and abusive upbringing.

73.     Based on his review of declarations from Mr. Barrett's family members and other materials (which he had no reason to question), and which are discussed in further detail elsewhere in these findings of fact, Dr. Pitt agreed with Dr. Woods that Mr. Barrett suffered from a dysfunctional, chaotic, and abusive upbringing.  Tr. 195, 206, 226-27, 235, 238, 1028.

74.     Gelene Dotson, Mr. Barrett's mother, drank heavily while she was pregnant with him. E.g., Tr. 194-95. See discussion of Mr. Barrett's neurological deficits, infra. She continued to drink heavily during his childhood and teenage years, and also used drugs. She would sometimes get Mr. Barrett to use drugs with her. Tr. 194-95, 1026.

76.     The marriage of Mr. Barrett's parents was marked by continual domestic discord, including frequent arguments (and at least one act of domestic violence) and frequent separations and reconciliations before they finally divorced. Tr. 1028-29; Pet. Ex. 20 at 5,6 (Declaration of Ernest Barrett, Petitioner's father) . Much of the domestic turmoil was sparked by Ernie Barrett's unfaithfulness, as he caroused and carried on multiple affairs with other women. Tr. 1028-29; Pet. Ex. 20 at 6, 7. The family also moved fairly frequently during Mr. Barrett's childhood. Tr. 1029; see generally.,Pet. Ex. 20. Family members state that when he was a child, Mr. Barrett's mother frequently worked out her frustrations on him, subjecting him to excessive physical

Pet. Prop. Post-Hr'g FF&CL                    38                    *Barrett v. U.S.*, CV-09-00105-JHP

1914

"discipline." Id. See e.g., Pet. Ex. 27 at 1, 2 (Declaration of Phyllis Crawford); Pet. Ex. 36 at 3 (Declaration of Carl Cook, maternal great uncle).

77.     Dr. Pitt acknowledged that Petitioner's father subjected him to physical abuse by, among other things, hitting him in the head with a fork at the dinner table, ramming his head through a wall, and inflicting a serious beating over some stolen coins. Tr. 1030, 1032.  Dr. Pitt agreed Mr. Barrett lacked guidance due to his parents' selfishness, and was pretty much allowed to do as he pleased. Tr. 1027-28. Although Mr. Barrett looked up to his father and wanted a close relationship with him, following the divorce Ernie Barrett largely ignored him. Tr. 1030.

78.     Both Dr. Woods and Dr. Pitt stated Mr. Barrett's abusive and dysfunctional upbringing had or could well have had a negative impact on his neurocognitive development as a child. E.g., Tr. 1028. The government nowhere contests the facts surrounding Mr. Barrett's background and upbringing.

### e.  *Learning disability*

79.     In his testimony, Dr. Woods described Mr. Barrett's learning disabilities, as evidenced by Dr. Young's neuropsychological testing, his educational records, and statements by family members. Tr. 204, 209, 217, 283-89, 337.  See also, Pet. Ex. 41, 55. Mr. Barrett failed reading and math in the first grade, failed the eighth grade, and was placed in special education classes on occasion. Tr. 283- 89, 1037.  Both Drs. Sharp and Dr. Price found evidence of a learning disorder. Tr. 337, 1036.

80.     Dr. Pitt did not dispute that Mr. Barrett had a learning disorder. Tr. 227, 1036-37. Nor did he dispute, as found by Dr. Price, Dr. Young, and Dr. Woods, that Mr. Barrett had attention problems or deficits. Tr. 1036-38, 1064, 1116.

### f.   Neuropsychological deficits

81.   Dr. Woods and Dr. Pitt agreed Mr. Barrett's mother drank heavily while she was pregnant with him. Dr. Pitt agreed Mr. Barrett was "most likely" exposed to alcohol in utero. Both doctors stated exposure to alcohol before birth can have an adverse effect on the development of the brain. Tr. 194-95, 1035.

82.   The doctors also agreed, although the particulars differed, that Mr. Barrett had suffered several head injuries throughout his life, including approximately two occasions when he lost consciousness. Tr. 213, 997-98, 1032. The first such incident was when he was knocked unconscious by a steel ball when he was in elementary school. Tr. 213, 997-98, 1032.

83.   Although the government tried to question this incident because it was not supported by medical records from the 1960s, Dr. Pitt did not doubt this incident happened. He acknowledged this incident had been mentioned by Petitioner's mother, Gelene Dotson. Tr. 334, 1032. As pointed out by Dr. Woods, Mr. Barrett had reported this incident to every mental health expert who had examined him since the beginning of the state case. Tr. 334-35. Mr. Barrett also suffered a head injury when he was beaten by police when he was 17 years old and had his jaw broken. Tr. 335-36, 1034. Mr. Barrett's history of head injuries was relevant to assessing his neurocognitive functioning. Tr. 212, 336. Mr. Barrett's heavy use of methamphetamine over the years could also alter the structure of his brain. Tr. 1095.

84.   Mr. Barrett's neuropsychological damage is discussed in more detail in the findings of fact addressing the testimony of Dr. Miora (who testified to the findings of Dr. Myla Young) and Dr. Price. Dr. Woods also endorsed Dr. Young's findings and relied on them in making a neuropsychiatric diagnosis of Mr. Barrett. Tr. 207-08. Stated briefly, Dr. Young's testing showed Mr. Barrett had significant damage to the left side of his brain. The orbital part of the left frontal lobe, which is the seat of executive functioning, showed significant impairments.

Mr. Barrett has dysexecutive syndrome, which impairs his ability reason, plan, control impulses, weigh and deliberate actions, accurately perceive and process incoming information and alter behavior accordingly, and the like. Tr. 209, 211-12, 213-16, 219, 335. Mr. Barrett's executive functioning is especially compromised in stressful and rapidly unfolding situations. Tr. 211, 233. Mr. Barrett's dysexecutive syndrome is relevant to understanding his actions and reactions at the time of the law enforcement raid on his property (Tr. 218-19), and is a mitigating factor in its own right. Mr. Barrett's left temporal lobe, which is related to academic functioning, is also impaired. Tr. 209, 217. Petitioner's neuropsychological deficits are not a function of his drug abuse.

85.     While Dr. Pitt acknowledged Mr. Barrett's neurological deficits, he stated he would defer to the findings of the neuropsychologists (E.g., Tr. 222), and testified that it would be "intellectually dishonest" to dismiss Dr. Young's findings (which he could not and did not quibble with), he discounted their significance because they did not prevent Mr. Barrett from knowing right from wrong; he could still make choices. Tr. 1011-12.

86.     The question here is not whether Mr. Barrett could have mounted an insanity or diminished capacity defense, but whether Mr. Barrett's neurological damage provided a mitigating explanation for his conduct, and was itself a mitigating a mitigating circumstance. The Court answers "yes" to both. Mr. Barrett's neuropsychological deficits are significant, and had an adverse impact on his daily living. Tr. 233.

87.     Dr. Pitt also discounted Mr. Barrett's neurological deficits as having much effect on his life because he could build things and was a good mechanic. Tr. 1012. But, as Dr. Woods pointed out, Mr. Barrett had no neuropsychological abnormalities on the right side of his brain, which controls the type of mechanical activities Dr. Pitt referred to. Tr. 210.

Pet. Prop. Post-Hr'g FF&CL                    41                    *Barrett v. U.S.*, CV-09-00105-JHP

1917

### 2. *Areas of Disagreement*

#### a. *Bipolar disorder*

88.     Dr. Woods diagnosed Mr. Barrett with bipolar disorder.[3]  He based his diagnosis on Petitioner's extensive family history of Bipolar disorder or mood disorders; previous medical records; testing and evaluation by other experts during the state and federal cases; Mr. Barrett's dysfunctional upbringing; descriptions of Mr. Barrett's behavior by family members; Mr. Barrett's lifetime history of depression and suicidality, which included the serious suicide attempt in 1986; and his own examinations of Mr. Barrett in 2009 and 2017. Tr. 188-91, 193, 195-201, 203, 339-41. In addition to having a genetic predisposition to substance abuse, Dr. Woods opined that Petitioner's drug use was in the nature of self-medication for his underlying mental illness. Tr. 204-05. Dr. Woods noted also, consistent with the findings of Dr. Sharp, that Mr. Barrett exhibited a high degree of paranoia during his hospitalizations, and that his paranoid ideation was not simply a product of his drug use. Tr. 220-21. Both Drs. Woods and Pitt agree there is a degree of co-morbidity between Bipolar disorder and neuropsychological deficits. Tr.218, 1064.

89.     Dr. Pitt stated Mr. Barrett does not have Bipolar disorder. Tr. 988, 993-94, 996-97, 1003, 1006, 1008. His chief reason for rejecting this diagnosis is that Petitioner was, at bottom, a drug addict. Any behaviors that mirrored those of Bipolar disorder were attributable to drug use. Since Mr. Barrett was "always on drugs," there is no way to attribute his behavior and mental state to anything but drug use. Tr. 974, 994, 1001, 1007, 1049. Because, in Dr. Pitt's

---

[3] Bipolar disorder is a serious mental illness. Tr. 982. It adversely affects a person's ability to control mood, including feelings of anxiety, depression, and elation. Irritability, rather than mania, is its chief feature in what used to be called the "manic" phase. Mood lability and pressured speech are features of the disorder, as are reactivity, intrusive behaviors, hyper-sexuality, impulsivity, and flight of ideas. Depression is obviously a feature of the disorder. Bipolar disorder causes significant disruption in a person's life. Tr. 190-91, 203, 235.

Pet. Prop. Post-Hr'g FF&CL                42                *Barrett v. U.S.*, CV-09-00105-JHP

1918

opinion, Mr. Barrett was simply a drug user, he was not self-medicating an underlying mental illness. Dr. Pitt also pointed out that before Dr. Woods did so, no mental health professional who had examined Mr. Barrett previously had diagnosed him with Bipolar disorder, including personnel in the Bureau of Prisons while Petitioner has been on death row. Tr. 979-81, 983, 993, 994-96. Dr. Pitt noted that despite the well-documented and conceded multi-generational history of mood disorders in Mr. Barrett's family, Petitioner's brother, Steve Barrett does not suffer from a mood disorder.[4] Tr. 1007, 1114.  Dr. Pitt chalked up Mr. Barrett's paranoia, which was first noted by Dr. Sharp, as the product of drug use. But Dr. Price, the government's other expert, noted Mr. Barrett's paranoid personality features in his 2005 examination. Tr. 1047-49.

90.     The Court concludes that a reasonable juror or jurors could find Mr. Barrett does suffer from Bipolar disorder, and that this is a significant mitigating factor.

91.     There is no question Mr. Barrett was addicted to drugs for many years, with his drug of choice being methamphetamine. Yet this does not tell the whole story.

92.     As noted, Mr. Barrett was genetically predisposed to a drug abuse disorder, and there is a high degree of co-morbidity between Bipolar disorder and drug abuse. Tr. 191, 1127. Before his significant drug use began, Mr. Barrett's family described him as extremely hyper, moody and sensitive, characteristics Dr. Pitt admitted could be indicators of a developing mood disorder. Tr. 1065-66. Common sense shows that Mr. Barrett's chronic suicidality, with suicidal ideation beginning in childhood, one serious suicide attempt, and other suicide attempts, speak to a mood disorder, not just chronic drug use. Dr. Pitt grudgingly conceded as much, and agreed the probable diagnosis of a depressive disorder when Mr. Barrett was admitted to Sparks Hospital

---

[4] The fact one sibling in a family having a long history of mental illness is obviously not determinative of whether another sibling has mental illness. Tr. 349. Dr. Pitt agreed that with respect to one of the factors relevant to the development of mental illness (the family environment), Steve Barrett was raised in a stable environment, while Kenneth Barrett was not. Tr. 1129.

immediately after his 1986 suicide attempt was appropriate. Tr. 993, 1060. Dr. Pitt acknowledged that regardless of drug use, Mr. Barrett's family, including his mother, ex-wife, and son described Petitioner as mentally ill, as evidenced by his wild mood swings, excessive emotionality, and deep depressions, which are indicative of a mood disorder and which were discussed, for example, in Dr. Russell's report. Tr. 199, 299, 203, 339-40, 1065-66. Dr. Pitt acknowledged that the "racing thoughts" Petitioner described to him, as well as Drs. Woods and Young, were a sign of a mood disorder. Tr. 1065-67. Although Dr. Pitt stated he did not know how Mr. Barrett's family members could distinguish between signs of mental illness and the effects of drug use, he conceded that their statements did not connect the disturbing behaviors they saw in him to his undoubted drug use. Tr. 1131.

93.     Dr. Pitt's rejection of a Bipolar disorder diagnosis because no mental health professional before Dr. Woods had diagnosed him with this malady, and the fact he has not been diagnosed with a mood disorder in the Bureau of Prisons, fails to convince. As Dr. Woods pointed out, Mr. Barrett's pre-offense contacts with the mental health system are replete with references to symptoms of Bipolar disorder or a mood disorder. Tr. 196-98, 220-21, 236, 322, 327-28, 341-

94.     Against Dr. Pitt's contention that Mr. Barrett is simply a drug addict, and that his behavioral problems stem exclusively from drug use, the medical records (and Dr. Woods's testimony) show that in his contacts with the Bill Willis Community Health Center and Eastern State Hospital in 1986, he was treated not as just an addict who needed treatment, but as someone with an underlying mental condition. Tr. 196-98, 236-37, 322, 327-28, 1073. Dr. Pitt more or less acknowledged Mr. Barrett was admitted to Eastern State as a "mentally ill person." Tr. 1069-70. Mr. Barrett's toxicology screens at Eastern State were negative, which conflicts

with Dr. Pitt's statement that he was always on drugs and that any problems were caused by drug use. Tr. 308, 1074. He was prescribed Elavil and Ascendin (which are anti-depressants) as a Bill Willis outpatient before he was court-ordered to Eastern State. Tr. 197, 328, 1073. These drugs are not prescribed for someone who simply has a substance abuse disorder. Prescribing them indicates an underlying depression. Tr. 328, 1074. Interestingly, during his examination, Dr. Pitt told Mr. Barrett it was unusual to have a 28-day court ordered commitment to a mental hospital for a drug problem alone. Tr. 1069-71. The Eastern State records show Mr. Barrett was characterized as being emotionally labile (a characteristic of Bipolar disorder, not drug abuse), having depressive neurosis with a high risk of suicide, and having a previous history of depression. Tr. 342, 1057-58, 1072-74. On discharge from Eastern State, he was again referred to Bill Willis, which is a mental health facility, not a drug rehabilitation center. Tr. 1075. Mr. Barrett was noncompliant. Tr. 1075.

95.     In January 1995, Mr. Barrett was seen at the Sequoyah Memorial Hospital, the Bill Willis facility, and Wagoner Hospital. He was provisionally diagnosed with Bipolar disorder. (Tr. 330-31, 1080, Gov't Exh. 9) He was then admitted to Wagoner Hospital, and thereafter referred back to Bill Willis for outpatient mental health treatment (where he was again noncompliant). (Tr. 1076-77) Dr. Pitt stated that in addition to substance abuse problems, the personnel at Bill Willis and Wagoner Hospital spoke of Petitioner having anxiety, depression, and inadequate coping skills. Tr. 1079.

96.     During these 1995 contacts with the mental health system, Petitioner was treated with Haldol, an anti-psychotic. Tr. 196, 331, 1076. As Dr. Woods stated in his testimony, Haldol is not prescribed for someone with drug addiction, or someone in the throes of an acute drug-induced psychosis. Tr. 328. Mr. Barrett was not given any medication to treat the symptoms of

methamphetamine withdrawal. Tr. 342. Although his drug urine screen was positive for amphetamines and cannabis, his blood test for amphetamines was negative. Tr. 312, 341. In addition to diagnosing Mr. Barrett with a drug abuse problem, he was diagnosed on discharge with organic affective disorder.[5]  Tr. 360-61, 1081. As with the previous hospitalization in 1986, Mr. Barrett was not simply treated for drug abuse or its effects, but for an underlying mental condition, and was referred for additional mental health treatment, not to a drug program. Tr. 313, 322, 327-28, 1080, 1082.

97.     While Dr. Pitt testified that any symptomology of Bipolar disorder exhibited by Petitioner was simply a reflection of his drug use (e.g., Tr. 1123), Dr. Woods testified (without any contradiction during Dr. Pitt's testimony) that the behavioral effects of Mr. Barrett's drug of choice (methamphetamine) and the other drugs he was habituated to using do not mirror the symptoms of Bipolar disorder manifested in Mr. Barrett's documented behavior. Tr. 329, 339. As to the question whether Mr. Barrett's drug use was a form of self-medication, Dr. Pitt's opinion that Petitioner was not self-medicating an underlying mental condition (Tr. 1120-21) is undercut by his own report, where he states "whether or not defendant's emotional complaints predate his substance use or his substance use was an attempt to self-medicate his complaints is unknown." (Tr. 1052, Gov't Exh. 52, p. 61) Dr. Pitt acknowledged Mr. Barrett's description to him of his drug use was consistent with someone who was self-medicating, and that self-medicating is common among individuals with untreated mental illness. Tr. 1054-55.

98.     Dr. Pitt also acknowledged that Mr. Barrett's description of being depressed for up to two weeks at a time and unable to work, but that he felt "normal" when he was using drugs,

_____

[5] Dr. Woods and Dr. Pitt disagreed on the meaning of organic affective disorder, as it was used in 1995. Dr. Woods stated it referred to an underlying mental condition, while Dr. Pitt said it could refer to that or the effects of drug abuse. Tr. 360-61, 1081. The Court need not decide which interpretation is correct, since it is clear that Petitioner was not being treated in 1995 for no more than the effects of drug abuse.

Pet. Prop. Post-Hr'g FF&CL                    46                    *Barrett v. U.S.*, CV-09-00105-JHP

1922

was consistent with self-medicating (although Dr. Pitt explained this listlessness as "coming down" off a drug high). Tr. 1055-56, 1117-18.

99.     On balance, the Court concludes the evidence Mr. Barrett suffered from Bipolar disorder is more persuasive than a rejection of that diagnosis. This is particularly (but by no means exclusively) true considering the multi-generational family history of mood disorders, which the Court believed Dr. Pitt did not take into sufficient account. Although Dr. Woods is the only mental health expert to have diagnosed Petitioner with Bipolar disorder (aside from the provisional diagnosis of Bipolar given by Bill Willis in 1995), he had access to more materials and information than the mental health professionals who saw Mr. Barrett before the commission of the offense, and the mental health professionals who examined him during the state case. Tr. 327. Before he was seen by Drs. Woods and Young, Mr. Barrett had not been subjected to a comprehensive mental health/neuropsychological examination. Tr. 185-86, 228-29, 231, 294.

100.    The fact that personnel at USP Terre Haute have not diagnosed Mr. Barrett with a mental illness is of little moment, as Dr. Pitt stated he did not know the nature or adequacy of any examinations, or what these individuals based their conclusions on. Tr. 1087-89. There is nothing in the record to show a comprehensive mental health examination was conducted in the Bureau of Prisons. Tr. 239.

### b.  Post-traumatic stress disorder (PTSD).

101.    Dr. Woods diagnosed Mr. Barrett with PTSD based on his turbulent upbringing and the trauma he suffered in his childhood. Tr. 206. Although Dr. Pitt rejected this finding because (for one) he could not identify a "triggering event," (Tr. 1010-11) he acknowledged that Mr. Barrett's abusive and dysfunctional upbringing as well as his beating by police could be considered precipitating events for developing PTSD. Tr. 1091-93. Regardless, there is no

question that Mr. Barrett suffered physical and emotional trauma during his childhood, which are mitigating facts.

### 3. Conclusions regarding the psychiatric testimony.

102.    As illustrated in the discussion of the areas of agreement between Drs. Woods and Pitt, the government's expert, Dr. Pitt, bolstered a number of lines of mitigating evidence that could have been, but were not developed at trial. Not the least of these areas of agreement, or at worst quasi-agreement, concern Mr. Barrett's significant neurocognitive deficits, which the Tenth Circuit stated was the most important aspect of the mental health evidence that has been developed in these post-conviction proceedings. *Barrett*, 797 F.3d at 1230.

103.    Beyond this, as previously alluded to, there is persuasive evidence that Mr. Barrett suffers from Bipolar disorder, a serious mental illness which adversely impacted his daily life. He also suffered significant trauma in his childhood that at the very least suggests post-traumatic stress disorder, but is a mitigating fact in its own right. All the evidence discussed above could have been, but was not, discovered and developed before trial. The failure to investigate this evidence (and the other omitted mitigating evidence addressed elsewhere in these findings of fact) and to present it to the jury prejudiced Petitioner in the penalty phase of trial. This is true because it could have given a mitigating explanation for Mr. Barrett's drug use, of which the jury was well aware, and the incidents of domestic violence the jury heard about. This is especially true because as the Tenth Circuit has found repeatedly, evidence of mental or organic impairments and an abusive and dysfunctional childhood are perhaps the most persuasive types of evidence leading juries to sentence capital defendants to life.Mr. Barrett meets diagnostic criteria for bipolar mood disorder, a major psychiatric disease with a strong genetic component.

*4. Neuropsychological Evidence*

104.   Dr. Deborah Miora testified to the neuropsychological testing by Dr. Myla Young, now deceased.  Dr. Young's Declaration was relied upon in Dr. George Woods' testimony and admitted into evidence at the conclusion of Roger Hilfiger's testimony.  Tr. 758.

105. Deborah S. Miora is a licensed psychologist who practices clinical neuropsychology in California. Tr. 1143.

106.   Neuropsychology is the study of brain function through the administration, scoring and interpretation of standardized neuropsychological tests. Tr. 1151-53, 1254. A neuropsychological examination focuses on the relationship between the individual's brain and his behavior. Tr. 1151. It is different than a psychiatrist's evaluation or tests of personality. A neuropsychologist draws inferences about behavior based on the individual's performance on tests. Tr. 1152. Each test is designed to measure a distinct type of brain function.

107.   The results of the tests are compared to normative scales drawn from tests on people with similar characteristics to the individual being tested, Tr. 1163 & 1337-39, and with people who are known to have damage to the area of the brain involved in the function the test is supposed to measure. Tr. 1163-64. The normative data for a test provide the cut-offs for what is considered below average, average, and above average. Tr. 1164. It is the statistical range on which a raw score is scaled that gives it meaning. Tr. 1339. Performances on a given test are distributed across a bell curve in which most people perform in the average range. Tr. 1165. If an individual's performance is one standard deviation above the mean, it is mildly or moderately above average. If a score is one standard deviation below the mean, it shows mild or moderate impairment in that function. Tr. 1166.

108.   Because different areas of the brain are involved in different brain functions, the neuropsychologist administers a battery of tests assessing different functions in order to assess

Pet. Prop. Post-Hr'g FF&CL                              49                              *Barrett v. U.S.*, CV-09-00105-JHP

1925

the individual's strengths and weaknesses. Tr. 1153, 1162. The neuropsychologist compares test results, looking for discrepancies that show an individual's strengths and weaknesses, and analyzes those discrepancies in order to determine whether there is a pattern. Tr. 1334. Discrepancies in scores on subtests within the same instrument are used to discriminate between types of functioning as to which there may be a weakness. Tr. 1352. By administering tests that require different aspects of the same general function, the neuropsychologist can identify the individual's strengths and weakness and thereby locate a specific area of the brain that has been damaged. Tr. 1248.

109.    Lastly, neuropsychological tests are subjected to review for their ecological validity, their reliability in predicting real-world performance outside the testing context. Tr. 1167-68.

110.    In 2009, Myla Young, a board-certified neuropsychologist, Tr. 1333, administered a battery of neuropsychological tests to Mr. Barrett. She also reviewed medical and educational records and conducted a clinical interview. Tr. 1255-56. The results she obtained in 2009 showed how Mr. Barrett functioned in 2005 and earlier. Tr. 1199, 1209. There was no indication in any of Mr. Barrett's records that he suffered from an injury or a disease that would have caused him to function worse in 2009 than he did in 1999. Tr. 1353. Dr. Miora noted that Mr. Barrett may have functioned better in 2009 due to being away from drugs while he was in prison. Tr. 1353.

111.    Dr. Young died in 2013.

112.    In 2017, Dr. Miora reviewed Dr. Young's testing of Mr. Barrett. Tr. 1143-44. The review consisted in (a) reading the same background materials that Dr. Young relied upon; (b) gathering and reading her notes and raw test data; (c) assessing whether the tests in Dr. Young's battery were reliable, appropriate for Mr. Barrett, and appropriate for the purpose of the

Pet. Prop. Post-Hr'g FF&CL                    50                    *Barrett v. U.S.*, CV-09-00105-JHP

1926

evaluation, Tr. 1197; (d) rescoring the tests Dr. Young administered, Tr. 1197; (e) interpreting the test results. Tr. 1144-45.

113.    Dr. Miora reviewed the testing material and scoring originally done by Dr. Young. Tr. 1179.

### a.  Frontal lobe description.

114.    The frontal lobes are considered to be the seat of reason, the capacity to think, to make decisions, to weigh the consequences of one's actions, to anticipate essentially to think and it is supposedly what distinguishes us from the rest of the animal kingdom. What is important as well about the frontal lobe is that it is associated with the output of behavior or responses. Whereas, most of the rest of the brain receives information   19 and stores information or does something with its senses. Tr. 1155.

### b.  Parietal lobe description.

115.    The parietal lobe is very involved with visual attention and sensation of one's self in space and one's kinesthetic perception and seeing objects in perspective. It is very important again in relationship to the frontal lobe. Tr. 1157.

### c.  Indications of a need for neuropsychological testing

116.    Dr. Young and Dr. Miora reviewed records that made neuropsychological testing an appropriate area of inquiry regarding Mr. Barrett. Tr. 1169. In considering these possible sources of brain damage, Dr. Miora stressed that "insults to the brain are cumulative" in their effects so that the more evidence there is of incidents, the more likely it is that the individual will have brain damage and brain dysfunction. Tr. 1170. In Mr. Barrett's case, the first indication of potential damage came from people who knew Mr. Barrett's mother and reported that she drank

alcohol when she was pregnant with him. Such in utero exposure can have a negative impact on brain development. Tr. 1169.

117.    Second, school records show Mr. Barrett had difficulty in school and was diagnosed with a learning disability. Tr. 1169.

118.    Third, Mr. Barrett suffered head injuries. Mr. Barrett and family members reported that during childhood, he was struck in the head with a steel ball and possible knocked unconscious. Tr. 1170. Later, he was in a motorcycle accident and sustained an injury in the area around the right frontal or periorbital area of the brain. Tr. 1170-71. Later still, Mr. Barrett shot himself in the chest with a shotgun, an event that could have caused loss of oxygen to the brain and a closed head injury from the subsequent fall. Tr. 1171.

119.    Fourth, Mr. Barrett began drinking alcohol and using drugs at an early age which "is a serious insult to the brain." Tr. 1171.

120.    Areas of the brain that are undergoing development are at greater risk of injury. Tr. 1171-72. During development in utero, the entire brain is vulnerable. Tr. 1172. During adolescence, the frontal lobe is undergoing development and it is more vulnerable to damage from alcohol or drugs. Tr. 1172-73. If an adolescent uses drugs and alcohol to excess, it is very likely that his judgment and impulse control, functions largely associated with the frontal lobe, will be impaired. Tr. 1173.

121.    A neuropsychologist also would see a need for neuropsychological testing in the circumstances of the offense Mr. Barrett was charged with. Tr. 1173-74. The frontal lobe of the brain is involved in this case because it has to do with planning, decision-making, being able to inhibit oneself, or deciding to act. Tr. 1174. It is the area of the brain involved in considered actions, as opposed to spontaneous reaction. Tr. 1174.

1928

#### d.   Dr. Young's Evaluation

122.    Dr. Young examined Mr. Barrett for 16 hours in early 2009. Tr. 1178. That amount of time was appropriate for the battery Dr. Young used. Tr. 1180. During that time, she administered a battery of neuropsychological tests that comprehensively covered relevant brain functions and whether Mr. Barrett was giving full effort to the tests. Tr. 1176, 1197. Dr. Young gave Mr. Barrett breaks so that fatigue did not affect his performance. Tr. 1322. Dr. Young chose tests that were appropriate for someone of Mr. Barrett's background and for the timing of the evaluation. Tr. 1176-77, 1163.

123.    Dr. Young's testing conditions were appropriate. Tr. 1178. She documented that Mr. Barrett was physically well enough to put his best efforts into the tests. Tr. 1181-82. Although Dr. Young found Mr. Barrett to be hypomanic--meaning he was exhibiting fast, pressured speech--he was psychologically capable of producing valid test results. Tr. 1182.

124.    Dr. Miora was able to evaluate whether Mr. Barrett was attempting to malinger symptoms because Dr. Young administered several tests of effort and malingering. Dr. Miora was able to review both the effort-testing materials and the scoring done by Dr. Young. Tr. 1180-81; 1182-84. The tests showed Mr. Barrett was putting forth his best efforts. Tr. 1183-84.

125.    Dr. Young measured Mr. Barrett's intelligence using the Wechsler Adult Intelligence Scale-IV ("WAIS-IV"). Tr. 1189. She measured his academic functioning using the Wide Range Achievement Test-III ("WRAT-III"). Tr. 1190. She assessed his auditory verbal learning with the California Verbal Learning Test-II. Tr. 1192-93. Dr. Young administered the Wechsler Memory Scale-IV. Tr. 1194. Dr. Young evaluated Mr. Barrett's ability to handle complex, non-verbal visual information using the Rey Complex Figure Test. Tr. 1194-95.

126.    Dr. Young administered the Delis-Kaplan Executive Function System ("D-KEFS") which is a battery of different tests that have been normed to be considered together. Tr.

1195-96. This battery measured Mr. Barrett's executive functioning in areas such as his ability to make decisions, and to switch back and forth between stimuli, and to respond to one stimulus while ignoring another, and his ability to reason conceptually. Tr. 1196.  To further assess Mr. Barrett's executive functioning, Dr. Young administered the Wisconsin Card Sort Test and the Short Category Test to assess Mr. Barrett's ability to solve problems and reason abstractly. Tr. 1196.

127.    Dr. Young measured Mr. Barrett's attention using a variety of tests. Tr. 1192.

128.    In addition, Dr. Young administered tests of Mr. Barrett's olfaction and tactile sensation, Tr. 1190, his fine motor speed and coordination, Tr. 1191-92, and his ability to discern rhythms and other sounds, Tr. 1192.

129.    Overall, Dr. Young found that Mr. Barrett had both strengths and weaknesses in brain functions. Tr. 1200, 1299. As the government brought out on cross-examination, in many areas of functioning, Mr. Barrett is average or slightly below average, Tr. 1299-1303. And on a few tasks, Mr. Barrett's functioning was above average. Tr. 1304, 1307. But the government did not establish how those areas of strength relate to the circumstances of the case or to the areas in which Mr. Barrett functioned significantly below average. The government's own neuropsychological expert, Dr. Price, testified that his test results were valid although Mr. Barrett scored in the first percentile on attention, in the average range on intelligence and other measures, and in the 96th percentile on visuospatial/constructional ability. Tr. 872. The evidence before the Court is that it is not unusual for an impaired individual to function normally in some areas. Tr. 1346-47. However, Dr. Price testified that the vast difference between Mr. Barrett's attentional and visuospatial abilities was abnormal. Tr. 905.

Pet. Prop. Post-Hr'g FF&CL                              54                              *Barrett v. U.S.*, CV-09-00105-JHP

1930

130.    Mr. Barrett showed weakness in areas of executive functioning such as problem solving, attention, planning, shifting responses by inhibiting one and carrying out an alternative, and working with information in the moment or under pressure, as opposed to after time for reflection. Tr. 1200-01. Mr. Barrett does poorly when he is required to think on his feet. Tr. 1201. Although Mr. Barrett can learn information over time, he is impaired in his ability to respond to novel or changing situations. Tr. 1202. The areas of the brain most associated with Mr. Barrett's weaknesses are in the frontal and temporal lobes. Tr. 1202.

131.    The areas of impairment that Dr. Young found using neuropsychological tests were consistent with Mr. Barrett's history of being diagnosed with a learning disability, having poor attention, and having suffered a head injury. Tr. 1201-02, id. at 1347.

132.    Dr. Young measured Mr. Barrett's general intelligence in the low-average range. Tr. 1205. That result was consistent with the result obtained in 2002 when Dr. Faust Bianco administered the WAIS-III to Mr. Barrett. Tr. 1261-62. The WAIS-III was one instrument from Dr. Bianco's testing that Dr. Miora could rely upon because she knew the normative data. Tr. 1350-51. However, Mr. Barrett was impaired on the Processing Speed Index of the WAIS, meaning that he was impaired in his ability to scan, analyze and associate information conveyed visually. Tr. 1207-08. Id. at 1295-96 (explaining that after correcting an error to Dr. Miora's re-scoring of the test, Dr. Young's original score showed Mr. Barrett's processing speed as "very bad" and in the fifth percentile). There was a statistically significant difference between Mr. Barrett's scaled scores on a test of how he handled a simple task involving visual information, in which he did fair, and how he handled complex visual information, which he handled poorly. Tr. 1211. Dr. Miora found that contrast significant for understanding Mr. Barrett. Tr. 1211.

133. Mr. Barrett was in the 13th percentile of performance on the WAIS's measure of attentional ability. Tr. 1213.

134. Dr. Young's testing of sensory and motor functioning showed something interferes with sensory information reaching Mr. Barrett's brain, both tactile and visual information. Tr. 1214.

135. The neuropsychological tests administered by Dr. Young showed Mr. Barrett's frontal to subcortical brain circuitry was damaged such that he was impaired when he was in a situation that required him to attend to visual information and generate a response. Tr. 1219-20. When he was required to visually scan for information and respond appropriately, Mr. Barrett scored two standard deviations below the mean. Tr. 1219. That test is similar to, and a complex variation on, connect-the-dots. Tr. 1218, 1226-27. On a test that required him to associate a simple shape with a number, as one would do when using a code that substitutes a shape for a letter or number, Mr. Barrett performed in the second percentile, below 98 percent of the population. Tr. 1215-16. When Mr. Barrett was given a timed test that required him to focus his attention on visual information, and identify the correct association, he performed in the first percentile, below 99 percent of the population. Tr. 1216-17. Dr. Young's finding on this test was consistent with Mr. Barrett's score on a test purportedly administered by Dr. Bianco in 2002 in which Mr. Barrett scored below the first percentile. Tr. 1272-73. By contrast, when called upon to respond to auditory, verbal information, Mr. Barrett performed in the 16th percentile. Tr. 1217-18.

136. Although Dr. Young's tests showed Mr. Barrett was well above average in his ability to learn from visually presented information, he was far below average (more than two standard deviations below the mean) in his ability to work with visual information in the

1932

moment. Tr. 1223-24. He also was impaired, scoring two standard deviations below the mean, when he had to perform a task involving verbal working memory, but not when the task involved delayed recall. Tr. 1307-08. That discrepancy between working with stored information and in-the-moment information appeared repeatedly. Tr. 1224, 1229. It also appeared in the testing of Dr. Price, the government's expert who found that Mr. Barrett scored very high on a test of visuospatial and constructional ability, Tr. 872, he was in the 25th percentile on a test of immediate memory, Tr. 871-72, and in the fifth percentile on a test of attention. Tr. 872-73, 902-03. (Dr. Young's testing also showed Mr. Barrett had constructional ability. Tr. 1345.)

137.    The results of Dr. Young's testing were consistent with historical information about Mr. Barrett going back to childhood. Mr. Barrett was reported to have been hyperactive and to have a learning disability. See, e.g., Tr. 6, 56, 57, 95, 846,1065-1066; Pet. Exs. 16, 27. Mr. Barrett was in a class for children with a learning disability when he was in the eighth grade. Pet. Ex. 73 at 4. Other experts, including the government's expert, Dr. Price, diagnosed Mr. Barrett with a learning disorder, probably Attention Deficit Hyperactivity Disorder. Tr. 889. Dr. Young's tests showed a disparity between Mr. Barrett's intellectual ability and his academic performance that Dr. Miora explained is consistent with a learning disability. Tr. 1224.

### e.   Impaired executive functioning

138.    Dr. Young measured Mr. Barrett's executive functioning using the D-KEFS, a battery that has been in use for decades, and is considered to be a good measure of a person's real-world functioning. Tr. 1225-26. Tests of executive functioning are common in a forensic setting. Tr. 1225-26. Executive functions are carried out by the frontal lobe through communication from subcortical systems that arouse the individual. Tr. 1226. Mr. Barrett's test results showed he is impaired in frontal lobe functions. Tr. 1235-36.

Pet. Prop. Post-Hr'g FF&CL                    57                    *Barrett v. U.S.*, CV-09-00105-JHP

1933

139.    On the Trail Making Test, which is considered very sensitive to brain damage, Mr. Barrett showed moderate impairment (two standard deviations below the mean) in his ability to visually scan for information. Tr. 1227, 1229-30. Mr. Barrett's test results also showed impairment in his ability to alternate his thinking, for example when instructed to draw a line alternating between numbers and letters, from 1 to A to 2 to B to 3 to C, and so on. Tr. 1228. On that test, Mr. Barrett scored in the 16th percentile, one standard deviation below the mean. Tr. 1229.

140.    Dr. Miora found that Mr. Barrett's performance on a test of inhibition, another frontal lobe, executive function, was consistent with his poor performance on the Trail Making Test. Tr. 1239. Mr. Barrett's performance was below average. Dr. Miora found the consistently poor performance appeared when Mr. Barrett was required to inhibit one action in favor of another one when he was presented with more than one stimulus. Tr. 1239.

141.    Similarly, Mr. Barrett scored very low on a test that required him to learn a concept through trial and error, and inhibit actions that the examiner told him were incorrect. Tr. 1242-44. Mr. Barrett failed to grasp any of the concepts Dr. Young was conveying through positive or negative responses to his actions. Tr. 1244-45. Those results were consistent with still more results on a test that required Mr. Barrett to learn to associate a visual design with a number. Tr. 1246-47; id., at 1319.

142.    Mr. Barrett also demonstrated that he is impaired when he must show verbal fluency by alternating between verbal concepts. Tr. 1231-32. The common thread between his poor performance on visual tasks and verbal tasks was in what Dr. Miora called working memory, and described as the ability to think on ones feet. Tr. 1232.

143.     Mr. Barrett's testing showed there are times when his mind loses its grasp on the task at hand, or the rule that he is following. Tr. 1231.

144.     When a test required Mr. Barrett to manipulate objects in order to solve a puzzle, his performance showed impairment, insofar as he was bad at planning according to a set of rules or instructions, although he could eventually solve the puzzle. Tr. 1232-34.

145.     Performance on the D-KEFS has been shown to predict how an individual will behave in situations similar to those in the testing, for example, as in Mr. Barrett's case, when conditions demand that he quickly shift from one kind of response to another. Tr. 1239-40. The test results show the individual's baseline functioning. Tr. 1240. In a more extreme set of conditions, Mr. Barrett could be expected to perform worse than his baseline because the testing showed he is challenged by increases in complexity. Tr. 1240-41; id. at 1345-46 (Mr. Barrett performed well compared to norms on structured tasks and poorly on those with changing conditions).

146.     Mr. Barrett's performance across all the various measures of executive functioning showed a pattern of impairment in visual attention, "working memory" which Dr. Miora described as the ability to work with information quickly, in the moment, and impaired problem-solving ability. Tr. 1249. Impairment in these functions indicates damage to the frontal, temporal, and parietal regions of Mr. Barrett's brain. Tr. 1249. These impairments are present for Mr. Barrett on a daily basis. Tr. 1250. At the time of Dr. Young's testing in 2009, Mr. Barrett would have been performing better than he would have been when he was out of custody and had access to drugs. Tr. 1250-51, id. at 1353.

147.     Mr. Barrett's areas of impairment are probative of his culpability during the raid in August 1999. The tactical team gave no auditory signal of its approach or identity. Mr.

Barrett's first indication that something was happening came when he heard his son yelling in alarm from the yard outside. The only potential source of information about who was alarming his son came from visual cues. However, the lead vehicle was unmarked. According to all law enforcement accounts, Mr. Barrett immediately opened fire on the lead vehicle. The entire shootout lasted 11 to 30 seconds, according to testimony from the tactical team. Dr. Young's testing showed that Mr. Barrett was most impaired in his ability to attend to visual cues. Tr. 1346. Mr. Barrett was impaired in his ability to recognize changing conditions based on visual cues. Mr. Barrett was moderately to severely impaired in his ability to inhibit one type of response in light of changing conditions or information. Test results indicated Mr. Barrett would tend to become overwhelmed when being fed lots of information at a rapid rate. Tr. 1347-48. He was most impaired in exercising judgment in an unpredictable situation. Tr. 1251-52. The government elicited evidence that Mr. Barrett's visual attentional abilities were further diminished by methamphetamine intoxication at the time of the raid. Tr. 1326, id. at 1354.  Thus, even assuming one of the trailing vehicles had its emergency lights on, Mr. Barrett had brain impairments that restricted his ability to attend to all the visual information that was available, to shift his attention from the lead vehicle to others, to incorporate the all the visual information into his thinking, and to inhibit his response to the initial threat he perceived.

### D. THE RISK ASSESSMENTS

#### 1. Dr. Jeanne Russell

148.    Jeanne Russell is a psychologist licensed to practice in Oklahoma. Tr. 766.

149.    John Echols retained Dr. Russell to perform a risk assessment on Mr. Barrett sometime in 2003. Tr. 769-70.

Pet. Prop. Post-Hr'g FF&CL                    60                    *Barrett v. U.S.*, CV-09-00105-JHP

1936

150.    In mid-August 2005, Bret Smith asked Dr. Russell for assistance in the federal trial. Tr. 774. Dr. Russell stated that she did not think she fully understood what Mr. Smith was asking her to do in terms of an investigation, but she told him that in the month they had available, she could update the risk assessment she had previously prepared. Tr. 778. She also could assist him in the cross-examination of Dr. Horn. Tr. 781.

151.    Mr. Hilfiger and Mr. Smith decided not to use Dr. Russell because of the potential information. Tr. 737. They did not "feel like it would be a good idea to have the government assess him." Tr. 729. "Bret Smith, Kenneth Barrett and [Roger Hilfiger] determined that the information assembled by Dr. Russell and the anticipated counter information from the government – that mitigation expert would be more detrimental than advantageous to Kenneth Barrett." Tr. 746. Thus, they did not present evidence to the jury about Mr. Barrett's social history or his educational history or his mental health history because of the conversation with Dr. Russell on risk assessment.  Tr. 747.

152.    The problem with Dr. Russell, from defense counsel's perspective, was that she performed a risk assessment, a form of assessment that, if rebutted by the government, would draw testimony potentially damaging to the defense case. Trial counsel's view of mental health mitigation was thus skewed by their failed to consult anyone other than Dr. Russell.

153.    Mr. Barrett was prejudiced by the lack of investigation into his mental health based on an unfounded fear of an unknown expert. As shown at the hearing, if trial counsel had followed the initial idea of Echols to have Mr. Barrett evaluated for organic brain disorders, defense counsel could have presented mental health mitigation without drawing the testimony they feared would damage Mr. Barrett's case.

Pet. Prop. Post-Hr'g FF&CL                    61                    *Barrett v. U.S.*, CV-09-00105-JHP

1937

### 2. *Dr. Randall Price*

154.    Psychologist J. Randall Price, Ph.D., evaluated Mr. Barrett in October 2005. Dr. Price's evaluation on behalf of the government was allowed after the defense gave notice that it might rely on the risk assessment done by Dr. Jeanne Russell in 2003 that the federal defense lawyers asked her to update in 2005. The defense did not call Dr. Russell as a witness, at least in part because they were concerned that her testimony would trigger damaging testimony from Dr. Price. In these post-conviction proceedings, Mr. Barrett also did not call Dr. Russell as an expert.

156.    The government did not ask Dr. Price to prepare to rebut the opinions of Mr. Barrett's expert witnesses in these post-conviction proceedings. Tr. 893-94. Consequently, Dr. Price offered no opinions regarding whether Mr. Barrett suffered from Bipolar Disorder or Post-Traumatic Stress Disorder ("PTSD") as indicated by Dr. Woods. Tr. 857. Although Mr. Barrett reported symptoms of PTSD such as reliving a traumatic experience and longstanding, troubling memories, Tr. 917, Dr. Price did not inquire about those things. Tr. 937-38. Dr. Price did not perform neuropsychological tests on Mr. Barrett's executive functioning and did not issue a report on that area of functioning. Tr. 893. Dr. Price testified that he could not rule out dysfunction in areas he did not test. Tr. 936-37. Consequently, Dr. Price did not testify regarding the deficits in executive functioning as diagnosed by Dr. Young and Dr. Miora, or the dysexecutive syndrome diagnosed by Dr. Woods.

157.    In September 2005, United States Attorney Sheldon Sperling retained Dr. Price to conduct a forensic evaluation of Mr. Barrett for the purpose of rebutting testimony by Dr. Russell if it were offered at trial. Tr. 823, 825.

158.    As part of his work in 2005, Dr. Price reviewed records related to Mr. Barrett's prior treatment at mental health facilities. Tr. 826-29. Dr. Price found that Mr. Barrett's abuse of alcohol and drugs was a common thread running through those records. Tr. 829-30.

159.    Mr. Barrett began having problems with substances "very early" in life, and it continued into his adult years. Tr. 830. Although Mr. Barrett experimented with a wide variety of substances, alcohol, cannabis, and marijuana were the most problematic for him. Tr. 830-31. Records indicate Mr. Barrett was dependent upon more than one substance. Tr. 831.

160.    Dr. Price found the records documented one suicide attempt in the mid-1980's when Mr. Barrett shot himself in the chest. Tr. 831.

161.    Dr. Price evaluated Mr. Barrett over two days, October 13 and 14, 2005, in a jail. Tr. 832. Mr. Barrett cooperated with the evaluation. Tr. 832-33. In fact, although Mr. Barrett's attorney explained the purpose of the evaluation, Tr. 834, and it took place in the middle of his capital murder trial, "he was very cooperative and friendly and open about answering things." Tr. 835. Mr. Barrett put forth full effort on the tests Dr. Price gave him. Tr. 835.

162.    Like Dr. Sharp, who evaluated Mr. Barrett for his defense in 2002, Dr. Price found Mr. Barrett exhibited paranoid thinking such that Dr. Price diagnosed Mr. Barrett with the features of a paranoid personality. Tr. 836.

163.    Based on the referral question presented by the prosecution and the background materials Dr. Price reviewed prior to his evaluation, he determined that he "should do a neuropsychological screening to determine if there was potentially a problem with cognition or thinking that might be present." Tr. 839. Dr. Price explained he thought the neuropsychological screening was appropriate based on the information he had that Mr. Barrett had suffered head injuries and "the substance abuse for all those years would be a red flag to do a neuropsychological screening battery . . . ." Tr. 839-40.

164.    Dr. Price had the opportunity on the second day of his evaluation to follow up information he obtained on the first day. Tr. 841.

165.    The social history Dr. Price took from Mr. Barrett indicated his childhood was marked by "family dysfunction" that included his parents separating and eventually divorcing, "a lot of relocations due to his father's job," and Mr. Barrett being disturbed by his father's absences from the home. Tr. 841-42. Mr. Barrett's parents fought. Tr. 842. "[B]oth [his parents] had problems with alcohol." Tr. 843. Mr. Barrett also began using substances early in life, he married very young. His marriage included a lot of dysfunction. In general his life "was not one that was very predictable or organized." Tr. 842.

166.    Dr. Price reviewed school records showing that Mr. Barrett did not perform well. Tr. 844. Those records raised concerns for Dr. Price that Mr. Barrett might have deficits. Tr. 843-44.

167.    Mr. Barrett reported being hyperactive as a child and having difficulty paying attention in school, and that report was consistent with his performance on a neuropsychological test of attention. Tr. 846.

168.    Mr. Barrett reported that as an adult he could perform some jobs well when he was high on methamphetamine. Tr. 847.

169.    Mr. Barrett reported that he had success as a mechanic and in the months before the raid on his house, or perhaps for a longer period, he was increasing his clientele and business. Tr. 847-49. Mr. Barrett admitted that he had sold methamphetamine to support building his business, and his plan was to stop selling drugs when he could afford to. Tr. 849.

170.    Dr. Price assessed Mr. Barrett's general intellectual functioning using the Reynolds Intellectual Assessment System that measures verbal and non-verbal intellectual functioning. Tr. 864-67. Dr. Price found that Mr. Barrett had average intellectual functioning and there was not a "significant difference" between his verbal and non-verbal intellectual

Pet. Prop. Post-Hr'g FF&CL                    64                    *Barrett v. U.S.*, CV-09-00105-JHP

1940

functioning. Tr. 867-68. A person with a "severe brain injury" "typically" would have impaired intellectual functioning, although a person with a mild brain injury could have average functioning. Tr. 868.

171.    Dr. Price administered the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"). Tr. 868. The RBANS measures attention, memory, language functioning and visual-spatial non-verbal tasks. Tr. 869. It is necessary to measure multiple areas of functioning because different areas of the brain are involved in different functions such that a person with damage to an area involved in one function could have impairment in that function, but be normal in undamaged areas. Tr. 897-98.

172.    The RBANS is considered a screening test to determine whether further testing is needed. Tr. 869; id. at 898. Dr. Price distinguished the RBANS from a "comprehensive battery of neuropsychological assessments." Tr. 875.

173.    On the RBANS, on the measure of immediate memory, Mr. Barrett scored in the 25th percentile compared with a normative sample of people of similar age and education. Tr. 871. That 75 percent of people perform better than Mr. Barrett did not concern Dr. Price because Mr. Barrett's low performance was consistent with his history and attention problems. Tr. 871. Mr. Barrett's performance was consistent with someone who suffered a mild traumatic brain injury. Tr. 871-72.  Mr. Barrett's school records were consistent with his impairments appearing after a brain injury that occurred earlier in childhood. Tr. 906.

174.    Mr. Barrett scored in the 96th percentile on the RBANS measure of visuospatial/constructional ability. Tr. 872. That, too, was consistent with his history and self-report of being a skilled mechanic. Tr. 872.

Pet. Prop. Post-Hr'g FF&CL                    65                    *Barrett v. U.S.*, CV-09-00105-JHP

1941

175.    Mr. Barrett was in the average range on the RBANS measure of language functioning. Tr. 872.

176.    Mr. Barrett showed deficits on the RBANS measure of attention, in which he scored in the fifth percentile, worse than 95 percent of the population. Tr. 872-73. The test was timed and required sustained attention. Tr. 873. Mr. Barrett's impaired attention was consistent with his history of having a learning disorder. Tr. 875. Mr. Barrett's attention measure was two and a half standard deviations below the mean. Tr. 902-03. That is significant impairment. Tr. 903. Mr. Barrett's attentional deficits are consistent with his school records, Tr. 909-10, indicating that the cause of his brain impairment occurred in childhood.

177.    Mr. Barrett scored in the average range (58th percentile) on the RBANS measure of delayed memory, indicating that once his brain has time to consolidate information, he can retain and recall that information. Tr. 873.

178.    Although Dr. Price testified that Mr. Barrett's overall functioning on the RBANS was average, when all the index scores were averaged together, he also testified that the large difference between Mr. Barrett's very strong visuospatial ability and his very weak attentional ability, was abnormal, an infrequent finding. Tr. 905.

179.    Dr. Price administered the Personality Assessment Inventory to Mr. Barrett. In this test, the individual is presented with various statements about himself to which he must select the most appropriate answer from among four options: entirely false, mostly false, mostly true, and entirely true. Tr. 875-76. Mr. Barrett put effort into the test and did not exaggerate. Tr. 876.

180.    Dr. Price found the most clear thing about Mr. Barrett's answers on the PAI is that he recognized his substance abuse problem and its negative affects on his life. Tr. 876. Mr.

1942

Barrett also showed depressive symptoms and paranoia. Dr. Price testified that those were "the main findings that [he] thought were relevant to this case." Tr. 876.

181. Mr. Barrett's results on the PAI indicated that depression and drug abuse were equal concerns for him, but alcohol was a significantly greater concern. Tr. 910. The Court finds that the government's witness, Dr. Price, would have if appropriately deposed or cross-examined undermined the government's expert, Dr. Pitt, and his insistence that the drug abuse by Mr. Barrett effectively ends the efforts to mitigate. Tr. 1121. It also directly undermines trial counsel's fear of and failure to educate themselves on the potentially mitigating or less than fatal emphasis on Mr. Barrett's drug use. Tr. 653, 691-692.

182. The PAI also measures an individual's aggression. Mr. Barrett's score on the aggression subscale was average. Tr. 911. That result was consistent with the aggression measurement from the MMPI-2. Dr. Price testified that Mr. Barrett's "meta personality trait" for aggression was average. Tr. 921. Mr. Barrett also scored high on measures of introversion. Tr. 922, 923.

183. Mr. Barrett scored in the average range on the antisocial scale on the PAI. Tr. 912.

184. The PAI is scored by a computer which generates an interpretive report that is intended to assist the evaluator in understanding the data. Tr. 914. The interpretive report on Mr. Barrett's PAI was consistent with Dr. Price's description of the results in that it indicated that alcohol was a major concern for him. Tr. 914.

185. Some results from Dr. Price's testing support Dr. Woods's conclusions. The PAI interpretive report included a section titled "critical item endorsement" which indicated that traumatic stress was a particular concern for Mr. Barrett. Tr. 915. On cross-examination, Dr.

Pet. Prop. Post-Hr'g FF&CL       67       *Barrett v. U.S.*, CV-09-00105-JHP

1943

Price acknowledged that Mr. Barrett scored two and one half standard deviations above the mean on the PAI scale for traumatic stress, which is outside the normal range. Tr. 915. The results of the MMPI-2 also included a high score on a scale associated with PTSD. Mr. Barrett scored 72 on the PK scale that Dr. Price testified (on cross-examination) relates to Post-traumatic Stress Disorder. Tr. 918.

186.    On the PAI, Mr. Barrett responded "very true" to the prompt "I keep reliving something horrible that happened to me." Tr. 917. Mr. Barrett responded "very true" to the prompt "I've been troubled by memories of a bad experience for a long time." Tr. 917. He responded "somewhat true" to the prompt "I've had some horrible experiences that make me feel guilty." Tr. 917. And he responded "somewhat true" to the prompt "since I had a very bad experience I am no longer interested in some things that I used to enjoy." Tr. 917.

187.    Dr. Price administered the MMPI-2 to Mr. Barrett. Tr. 877. The results included high scores for antisocial attitudes and behaviors, paranoia, and physical concerns. Tr. 879. The indications of paranoia were consistent with Dr. Sharp's findings and others. Tr. 880-81. Mr. Barrett believes elements of society are out to get him. Tr. 881. He also scored high on scales indicating opposition to society. Tr. 880.

188.    Mr. Barrett scored 76 on the MMPI-2 depression scale. Tr. 918. Although Dr. Price testified on cross-examination that was a significant finding, Tr. 918, he did not mention it as one of the issues of concern during his direct testimony.

189.    Dr. Price diagnosed Mr. Barrett with a learning disorder that he could not specify although he found "signs and symptoms of attention-deficit disorder and hyperactivity that was supported" by history, records and Dr. Prices evaluation. Tr. 889.

Pet. Prop. Post-Hr'g FF&CL                    68                    *Barrett v. U.S.*, CV-09-00105-JHP

1944

190.    Dr. Price diagnosed Mr. Barrett with polysubstance dependence in remission due to his incarceration. Tr. 890.

191.    Dr. Price diagnosed Mr. Barrett with dysthymia, a longstanding, chronic form of depression that is not as severe as major depressive disorder. Tr. 890.

192.    Dr. Price diagnosed Mr. Barrett with an unspecified personality disorder with antisocial and paranoid features. Tr. 890. Dr. Price did not diagnose Mr. Barrett with Antisocial Personality Disorder. Tr. 939.

193.    Norms are important for understanding neuropsychological test results. Tr. 899-900, 901.

### E. FAUST BIANCO

194.    The government cross-examined Dr. Miora at length regarding the results of intelligence tests and neuropsychological tests purportedly administered by Dr. Faust Bianco in 2000. Testimony from John Echols established that someone from the Oklahoma Indigent Defense System, someone other than Mr. Barrett's attorneys, retained Dr. Bianco to evaluate Mr. Barrett before the first state-court trial. Tr. 434-35. Mr. Echols did not put much stock in Dr. Bianco's opinion. Tr. 435-36. Federal defense counsel did not recognize Dr. Bianco's name. Tr. 679 (Hilfiger).

195.    Dr. Bianco did not produce a report and the record contains no evidence regarding the conditions under which he evaluated Mr. Barrett. The government chose not to present testimony from Dr. Bianco if the Court were willing to have his testing or scoring methods scrutinized by a defense expert. Tr. 1363-64. Therefore, the record contains no evidence regarding his qualifications, whether the facts or data he relied upon were sufficient, whether his methods were reliable, or whether he reliably applied his methods to the facts. The expert

Pet. Prop. Post-Hr'g FF&CL                    69                    *Barrett v. U.S.*, CV-09-00105-JHP

1945

proffered by the defense would have testified to the reliability of Dr. Bianco's methods. Doc. 376-2 (Bigler proffer). Therefore, the Court could not and did not find Dr. Bianco qualified to offer opinions in the field of neuropsychology. Fed. R. Evid. 702.

196.    Although some of the tests Dr. Bianco purportedly administered were the same as tests administered by Dr. Young, the government offered no evidence regarding whether other tests Dr. Bianco purportedly administered were comparable to tests administered by Dr. Young, or whether they tested the same areas of brain function in which Dr. Young and Dr. Miora found that Mr. Barrett was impaired. The government also provided no evidence regarding the normative data to which Dr. Bianco may have compared Mr. Barrett's results. The evidence before the court is that an opinion as to whether or not a test result is normal must be based on a comparison to a set of norms. Tr. 1163-64; id. at 1337. Without knowing the norms to which Dr. Bianco compared Mr. Barrett's scores, the Court cannot make any determinations about the meaning or significance of those scores. Tr. 1337-39, id. at 1341. The defense proffered evidence that Dr. Bianco relied upon out-of-date standardized scores on at least one battery of neuropsychological tests he is purported to have administered to Mr. Barrett, Doc. 376-2 at 7-8 (CM/ECF page numbers), and, as stated, the government elected not to call Dr. Bianco as a witness if the Court also considered the defense evidence. When Dr. Miora questioned whether Dr. Bianco had appropriately or reliably scored a test of executive functioning, the government demurred and moved on without adducing any evidence regarding what the test might or might not have shown. Tr. 1276-78, 1281-82. Similarly, the government was unable to elicit from Dr. Miora an opinion about what Dr. Bianco's scoring of another test showed because there was no information about the norms against which he compared Mr. Barrett's performance. Tr. 1279-80. Finally, Dr. Bianco did not complete all the batteries he started, he did not produce an index

Pet. Prop. Post-Hr'g FF&CL                    70                    *Barrett v. U.S.*, CV-09-00105-JHP

1946

score for one battery, and there is no explanation for that in the record. Tr. 1342. For all these reasons, except where Dr. Miora was able to identify the norms Dr. Bianco relied upon, the Court cannot find that Dr. Bianco's testing is probative, and the Court gives it no weight.

## III. CONCLUSIONS OF LAW

### A. COUNSEL'S PERFORMANCE WAS DEFICIENT

#### 1. The Government's Defense of Trial Counsel

1.      In its decision remanding this case for an evidentiary hearing, the Tenth Circuit indicated this Court should resolve disputes over the following three assertions made by the government:

> first, [defense counsel] had no indications that Defendant suffered from a mental impairment, so there was no reason to pursue that line of inquiry; second, Defendant opposed a mitigation strategy based on personal sympathy or his childhood; and third, [defense counsel] already had a reasonable mitigation strategy.

*Barrett*, 797 F.3d at 1226. The Tenth Circuit found these assertions were "questionable" on the record before it. *Ibid*.

#### a. Was it true that defense counsel had "no indications that defendant suffered from a mental impairment"?

2.      The government supported the claim that "there were no 'red flags'" with the declarations of Mr. Hilfiger and Mr. Smith. The hearing evidence does not support the government's position. First, the testimony of trial counsel indicated that statements about whether they were concerned about Mr. Barrett's mental health were made in reference to competence, not mitigation.

3.      Second, the government's own expert, Dr. Price, testified that Mr. Barrett's drug use alone was a red flag for a neuropsychological evaluation. Tr. 839-40. That is precisely the type of evaluation that Mr. Echols requested funding for, and he, too, cited Mr. Barrett's long-

Pet. Prop. Post-Hr'g FF&CL                71                *Barrett v. U.S.*, CV-09-00105-JHP

1947

time drug use as one reason. Both Dr. Price and Mr. Echols testified that Mr. Barrett's reported history of a head injury in childhood, also raised a question about whether Mr. Barrett had neurological problems. As Mr. Hilfiger testified, at the time Mr. Echols requested the funds, he knew Mr. Barrett, his history, and the case, far better than Mr. Hilfiger did.

4.      The Tenth Circuit noted that the declarations of Mr. Hilfiger and Mr. Smith did not state "whether they ever asked about Defendant's mental health, background, or family history." Mr. Smith did not do any mitigation investigation. Mr. Hilfiger did not testify that he asked family members about a history of mental illness. The record from the hearing indicates that the only inquiry trial counsel made came at the end of August 2005, some two weeks before the beginning of jury selection. Although the government asked Mr. Hilfiger whether family members *told* him about a family history of mental illness, and he replied in the negative, Tr. 738, there is no evidence that Hilfiger asked.

5.      The record from the hearing shows Mr. Hilfiger and Mr. Smith possessed, or had access to, all the of the materials the Tenth Circuit referred to that raised questions about Mr. Barrett's mental health including mental health records, the report of Dr. Sharp and the investigative memoranda from mitigation specialist Roseann Schaye. Throughout the hearing the government has pointed out that these documents did not state that Mr. Barrett suffered from a major mental illness. As the Tenth Circuit's opinion makes clear, these documents contained sufficient indications of disturbance to trigger an expert evaluation. In addition, the hearing evidence shows trial counsel possessed memoranda from Schaye in which family members described a family history of mental illness. The issue is not whether trial counsel were told Mr. Barrett suffered from a major mental illness, but whether, given the information available to counsel, it was reasonable not to investigate for possible mental health mitigation.

Pet. Prop. Post-Hr'g FF&CL                          72                          *Barrett v. U.S.*, CV-09-00105-JHP

1948

6.      Given that the evidence was sufficient to call for further investigation, the question is whether trial counsel considered the information and made a strategic decision not to pursue it. The answer is no. According to Mr. Smith, the decision would have been Mr. Hilfiger's. Mr. Hilfiger could not say he reviewed the medical records and made a decision not to pursue the matter further.

7.      The Court finds that trial counsel possessed information that would have caused a reasonable capital defense lawyer to make use of the available funds and have Mr. Barrett evaluated for potential mental health mitigation.

### b.  Were the trial attorneys "constrained from conducting a mental-health investigation by their client"?

8.      The evidence adduced during the evidentiary hearing "does not establish an unambiguous command to refrain from investigating or presenting evidence of Defendant's personal history or mental health." *Barrett*, 797 F.3d at 1226. Mr. Barrett cooperated with mental health evaluations in state court and provided Roseann Schaye with detailed information about his background for use in developing mitigation evidence. That information was provided to Mr. Hilfiger and Mr. Smith and Mr. Smith testified that the plan was to build on that evidence. Thus, whatever Mr. Barrett might have said after Mr. Echols left the case, trial counsel already had the fruits of his cooperation to work from.

9.      Mr. Hilfiger, who was responsible for developing evidence for the penalty phase, and for making the strategic decisions about what would or would not be presented testified, said no more at the hearing than what he said in his declaration. He did add that Mr. Barrett never said anything to suggest he would prefer a death sentence to a life sentence. Mr. Smith also testified that the goal of the penalty phase was to get a life sentence.

Pet. Prop. Post-Hr'g FF&CL                              73                              *Barrett v. U.S.*, CV-09-00105-JHP

1949

10.     The evidence supports a finding that trial counsel never explained to Mr. Barrett that federal death penalty law does not allow anyone to beg for the defendant's life. Additionally, because trial counsel were not aware of the mitigation evidence that could be presented, and they consulted neither a mitigation specialist nor a mental health expert other than Dr. Russell,  they were not able to inform Mr. Barrett about what could be presented or how it could be presented. Because counsel did not fully inform themselves of the evidence that was available, and consequently could not have formed a strategy for presenting that evidence that would not appear to "beg" for Mr. Barrett's life, counsel also could not have made a reasonable decision about how to proceed in light of Mr. Barrett's concerns.

11.     There is no evidence that trial counsel attempted in any way to understand their client's feelings and work to assuage them. In sum, as regards any reluctance about mitigation strategy on Mr. Barrett's part, trial counsel did not perform according to prevailing professional norms which required them to advise Mr. Barrett after becoming fulling informed about the law and the facts. ABA Criminal Justice Standard 4-5.1.

12.     Both the prevailing professional norms, and the case law are clear that the decision about what witnesses to call is consigned to the discretion of counsel. ABA Criminal Justice Standard 4-5.2; *Jones v. Barnes*, 463 U.S. 745, 751 (1983) ("the accused has the ultimate authority to make certain fundamental decisions regarding the case, as to whether to plead guilty, waive a jury, testify in his or her own behalf, or take an appeal") (citing ABA Standard 4-5.2). There is no evidence that counsel relinquished to their client any decisions about second stage strategy.

### c.  Did trial counsel make an informed decision not to investigate?

13.     Mr. Smith testified that he did not make any strategic decisions about what mitigation evidence the defense should pursue or not pursue. The decisions whether to hire a

Pet. Prop. Post-Hr'g FF&CL                    74                    *Barrett v. U.S.*, CV-09-00105-JHP

1950

mitigation specialist, whether to inquire about certain potential areas of mitigation, and whether to have Mr. Barrett evaluated by a mental health expert were not his to make. Further, he did not believe he had the knowledge of the facts or the experience to make those decisions.

14.     Mr. Hilfiger's testimony, like his letter requesting compensation for Dr. Russell, indicated that he equated Dr. Russell with a mitigation expert or specialist. That is, the only context in which he considered having an expert investigate or testify in mitigation was in relation to the issue of future dangerousness. That decision was made only in the last weeks before the trial.

15.     Mr. Hilfiger and Mr. Smith testified that the decision made after the meeting with Dr. Russell at the end of August 2005, was to have lay witnesses testify to mitigation contained in Dr. Russell's report so that the government would not be able to respond with expert testimony. Counsel's testimony contradicts the government's assertion that counsel made an informed decision not to present lay evidence in mitigation.

16.     With regard to mental health evidence, Mr. Hilfiger made the decision about what would be investigated and presented. He testified that he consulted Dr. Russell because she had worked on the case previously. He could not recall any of the other mental health professionals who had worked on the case, including Dr. Sharp who is mentioned repeatedly in Dr. Russell's report. Mr. Hilfiger testified that he only considered mental health testimony in the context of rebutting the government's case of future dangerousness. The Court cannot find that defense counsel made an informed decision not to have Mr. Barrett evaluated for mental health mitigation independent of the risk assessment and its attendant evidentiary and strategic downsides.

Pet. Prop. Post-Hr'g FF&CL                    75                    *Barrett v. U.S.*, CV-09-00105-JHP

1951

17.     In summary, this Court finds the evidence did not support the government's defenses of trial counsel's challenged acts and omissions.

### 2. Conclusions from the Hearing Evidence

18.     This Court's assessment of counsel's performance must be guided by objective criteria such as published prevailing professional norms. *Wiggins v. Smith*, 539 U.S. 510, 524-25 (2003).

19.     In 2005, one of the prevailing professional norms of capital defense practice that was both codified in the ABA Guidelines and practiced locally, was for the defense to work as a multi-disciplinary team including attorneys, investigators, a mitigation specialist and experts in fields indicated by the evidence, including the client's medical and mental health history. Guideline 4.1, 31 Hofstra L. Rev. at 956, 1003; Crim. Doc. 46; Crim. Doc. 50; Crim. Doc. 107; Crim. Doc. 107-A; Crim. Doc. 107-C; Crim. Doc. 118.

20.     To the extent Mr. Barrett had a defense team, it did not function reasonably. Neither the team of Echols and Hilfiger nor the team of Hilfiger and Smith communicated reasonably about their respective roles and duties. Although the short time available to trial counsel overwhelmingly pointed to the need for a mitigation specialist to complete the work begun by Schaye, Hilfiger inexplicable testified he did not believe such assistance was needed. Trial counsel did not consult Russell until virtually the eve of trial, and consulted no mental health expert who could testify without drawing evidence of future dangerousness from the prosecution.

21.     A prevailing professional norm of capital defense work that was well-established at the time of this case was for defense counsel to "seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." ABA

Pet. Prop. Post-Hr'g FF&CL          76          *Barrett v. U.S.*, CV-09-00105-JHP

1952

Guideline 10.10.1, 31 Hofstra L. Rev. at 1059 (commentary on Guideline 10.11). During the first six months of the case, Echols and Hilfiger did not discuss a division of labor or penalty phase strategy. During the second six months, Hilfiger and Smith discussed division of labor in the sense that Hilfiger would assign tasks to Smith. Smith testified they never discussed how to develop a consistent two-stage strategy.

22.     Investigation is a core function of defense counsel, and the prevailing professional norms expressly call for "prompt investigation." ABA Standards, Defense Function, Standard 4-4.1. Hilfiger and Smith did not discuss penalty phase strategy in any meaningful way until the end of August, when it was too late to investigate or retain experts. Although they started the case with a significant head start based on the work done in state court, trial counsel did nothing to follow up.

23.     The prevailing professional norm at the time of this federal death penalty trial was for defense counsel, or more often a mitigation specialist acting on their behalf, to speak with "[w]itnesses familiar with [and obtain] evidence relating to the client's life and development from conception to the time of sentencing, that would be explanatory of the offense . . . would rebut or explain evidence presented by the prosecutor, would present positive aspects of the client's life, or would otherwise support a sentence less than death." ABA Guideline 10.11(F)(1), 31 Hofstra L. Rev. at 1055-56.

24.     Mr. Hilfiger considered how to present evidence that would rebut the government's case for future dangerousness, and he presented such evidence. He also presented limited amounts of evidence about Mr. Barrett's good character. However, counsel did not investigate mitigation evidence that could have explained why Mr. Barrett was holed up on his

property or why he reacted as he did to the raid, nor did counsel present abundant evidence in mitigation that was consistent with counsel's stated objectives and readily available.

25.     The prevailing professional norms of capital defense practice at the time of this case recognized a need for defense counsel to develop and maintain a relationship of trust and confidence with the client due to the extraordinary stress and psychological strain the case can impose. ABA Guideline 10.5, 31 Hofstra L. Rev. at 1005-1011.

26.     The testimony from the hearing indicated that Mr. Smith developed a relationship of trust with Mr. Barrett despite his client's initial reluctance. Mr. Hilfiger also felt that he had a good relationship with Mr. Barrett although it appears the bond was stronger with Mr. Smith.

27.     The evidence does not support a finding that trial counsel attempted to use their relationship with Mr. Barrett to help him understand how a mitigation case could be presented so as not to appear to beg for his life or invoke sympathy as opposed to understanding.

28.     Trial counsel ultimately failed to retain the services of a mitigation specialist, although the court had authorized funds to retain one. The Supreme Court has found that delaying preparation for the penalty phase until shortly before trial is evidence of deficient performance. *Williams (Terry)*, *supra*, 529 U.S. at 395. The Court also has found that the failure to obtain readily available assistance with mitigation evidence is evidence of deficient performance. *Ibid.* Both trial counsel's delay and their failure to retain a mitigation specialist at all fell below prevailing professional norms of practice in federal death penalty cases.

29.     Trial counsel unreasonably believed that the only mitigation evidence that could be presented was evidence related to whether Mr. Barrett would be a future danger as a prisoner. It was clearly established long before Mr. Barrett's trial that the Eighth Amendment requires a capital sentencing jury to hear and consider any evidence that could be relied upon in support of

a sentence less than death. The Supreme Court has held that a failure to take action that is based on a misunderstanding of the law constitutes deficient performance. *Williams (Terry)*, <u>529 U.S. at 395</u>; *Kimmelman v. Morrison*, <u>477 U.S. 365, 385</u> (1986). Trial counsel's misunderstanding of Mr. Barrett's constitutional right to present mitigation evidence fell below prevailing professional norms.

30.     Trial counsel's unreasonable belief about the limited scope of mitigation evidence had an adverse influence on their preparation for the penalty phase and the evidence they presented. Under *Williams* and *Kimmelman*, trial counsel's performance was constitutionally deficient.

31.     Trial counsel's penalty phase investigation fell below prevailing professional norms. It was well understood by capital defense counsel at the time that developing evidence of a neglectful or abusive childhood and its effects very often required the use of expert interviewers. Trial counsel in this case had such expertise at their disposal but unreasonably failed to retain an expert. It was well understood at the time of the trial in this case that defense counsel could need to spend many hours developing the trust and confidence of a client and his family members in order to discover and develop evidence of childhood neglect and abuse. Trial counsel in this case unreasonably failed to spend time needed to investigate and present readily available evidence that Mr. Barrett experienced neglect and abuse as a child.

32.     It was commonplace at the time of this trial for prosecutors to contrast one sibling who was successful with the defendant who was convicted of murder. Trial counsel in this case unreasonably failed to anticipate that the prosecution would use this tactic when the defense presented Mr. Barrett's brother Steve as a penalty phase witness. Trial counsel failed to interview Steve Barrett about the difference between his childhood and Mr. Barrett's, even though

1955

information about that difference was in one of Schaye's memoranda. Trial counsel's performance fell below prevailing professional norms.

33.     The Supreme Court has held trial counsel ineffective for failing to make use of mitigation evidence that was made readily available to them. *Williams (Terry)*, 539 U.S. at 396. Here, trial counsel had in Schaye's memoranda abundant sources of mitigating circumstances. Trial counsel unreasonably failed to interview witnesses about what they told Schaye. Although trial counsel testified that they decided to use lay witnesses instead of an expert to convey the mitigating aspects of Mr. Barrett's life, they failed to call the witnesses, or if called, failed to elicit the information, contained in Schaye's reports.

34.     The Supreme Court also has held trial counsel ineffective for unreasonably ending an investigation despite indications that further, helpful evidence could be developed. *Wiggins*, 539 U.S. at 525-27. As indicated, trial counsel for Mr. Barrett unreasonably failed to follow-up on a great deal of mitigating information described in Schaye's memoranda, the Sharp report, Mr. Barrett's school records, records of Mr. Barrett's prior hospitalizations and mental health treatment, and in Dr. Russell's report.

35.     There was limited time available for defense counsel to develop mitigation evidence based on the information they had. The only reasonable response to that limitation was to bring in additional labor. Trial counsel had funds to retain a mitigation specialist to assist them, but unreasonably failed to make use of that resource.

36.     When trial counsel chose to abandon their investigation at an unreasonable juncture, it made "a fully informed decision with respect to sentencing strategy impossible." *Wiggins*, 539 U.S. at 527-28.

Pet. Prop. Post-Hr'g FF&CL                    80                    *Barrett v. U.S.*, CV-09-00105-JHP

1956

37.     This Court concludes the performance of trial counsel in this case fell far below prevailing professional norms. Their performance was deficient within the meaning of Strickland.

### B. MR. BARRETT SUFFERED PREJUDICE

198.     Due to trial counsel's deficient performance, the jury was not informed of the mitigating circumstances in Kenneth Barrett's background, including, the alcoholism of his parents, his mother's use and abuse of alcohol the entire time she carried him, his father's ceaseless philandering, his mother's verbal, psychological, and physical abuse, the psychologically damaging, and harsher treatment than his brothers, he received from his mother, his father's abandonment of the family, this constant  uprooting throughout his childhood, his abandonment by his mother due when she was most depressed, his mother's abuse of him in encouraging him to party with drugs with her ever-changing boyfriends and other friends, his early childhood and other head injuries, his potential early childhood exposure to chemicals from the glass works in which both his parents worked, and that his suicide attempt was a symptom of mental disease.

199.     By failing to conduct an adequate investigation before deciding against presenting mental health evidence through mental health experts, trial counsel unconstitutionally limited Mr. Barrett's right to present any information or evidence that supported a sentence less than death. *See Lockett v. Ohio*, 438 U.S. 586, 604 (1978) (holding that the Eighth and Fourteenth Amendments require that the sentencer, in all but the rarest kind of capital case, not be precluded from considering, as a mitigating factor, any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death.).

Pet. Prop. Post-Hr'g FF&CL                                81                     *Barrett v. U.S.*, CV-09-00105-JHP

1957

200.   Counsels' abdication of the "duty to investigate" leading them to foresake even expert testimony identified to them by state counsel, rendered their performance below the standard of prevailing professional representation. *Strickland*, 466 U.S. at 690.

201.   If trial counsel had gathered these readily available facts and provided them to qualified experts, as prevailing professional norms required, the jury would have understood how Kenneth Barrett's life history, while intrinsically compelling and heartbreaking, also had profound implications for understanding the scientific underpinnings of Mr. Barrett's s mental health and actions.

202.   If trial counsel had followed prevailing professional norms and had timely retained appropriate mental health experts to assist the defense, Kenneth Barrett's jury would have heard extensive evidence of his mental illness and impaired brain functions due to organic damage.

203.   The government's expert, Dr. Pitt, bolstered a number of lines of mitigating evidence that could have been, but were not developed at trial. Not the least of these areas of agreement, or at worst quasi-agreement, concern Mr. Barrett's significant neurocognitive deficits, which the Tenth Circuit stated was the most important aspect of the mental health evidence that has been developed in these post-conviction proceedings. *Barrett*, 797 F.3d at 1230.

204.   Had trial counsel conducted a reasonable mitigation investigation, there was abundant, available evidence that a life sentence or a ter, of years, as the jury was instructed, was sufficient for Mr. Barrett. The information included facts surrounding the raid, Mr. Barrett's state convictions, and he impact of a childhood shaped by parental abandonment, neglect, immoral and illegal behavior and substance abuse, as well as Mr. Barrett's own mental illness and

substance abuse, the genetic components of which were pervasive, and most compelling his brain damage that impaired his ability to process events realistically and exercise reasonable and judgment in his response to the unforeseeable and traumatic events of September 2, 1999.

205.    Residual doubt is a reasonable mitigating circumstance to be presented at sentencing in a capital case.

206.    The evidence of the impact the dead of night raid had on a drug-addicted, paranoid, mentally-ill person like Kenneth Barrett, and his inability to assess and appropriately react to the situation would have been mitigating in nature.

207.    The overwhelming weight of the mitigating evidence from both stages of a competently tried case would have shown the jury that law enforcement made tragic errors in assessing the situation before the raid, and in its conduct of the raid itself, which made it likely that there would be a firefight and that someone might die.

208.    Had the jury heard all of the evidence in mitigation including Kenneth Barrett's cultural and family and personal history, the medical, psychological and psychiatric history, the mitigating facts, (known to the Drug Enforcement Agency, the Drug Task Force, the Oklahoma Highway Patrol and local law enforcement),surrounding the raid, which was opposed by the Sequoyah County Sheriff, that led to the death of Trooper Eales, the jury would probably have made findings that ultimately concluded that just as Trooper Eales should not have been put in danger, it is at least reasonably probable that Kenneth Barrett would not have been sentenced to death.

209.    Had counsel presented the powerful case in mitigation that could have been marshaled, but which Kenneth Barrett's jury never heard, at least one juror would have opted not to impose the death penalty.

Pet. Prop. Post-Hr'g FF&CL                    83                    *Barrett v. U.S.*, CV-09-00105-JHP

1959

210. The mental health evidence that could have and should have been presented on Kenneth Barrett's behalf was not only powerful evidence in mitigation of punishment, as the Supreme Court has recognized repeatedly, but was also directly relevant to refuting the statutory aggravating circumstances that Kenneth Barrett knowingly created a grave risk of death to one or more persons in addition to Trooper Eales, and that Kenneth Barrett committed the offense after substantial planning and premeditation.

211. Dr. Price's findings support Petitioner. Dr. Young's and Dr. Miora's findings were consistent with Dr. Price's findings. Dr. Price also testified that his observations of Mr. Barrett's long-term memory was consistent with Dr. Sharp's report. Both sets of tests showed Mr. Barrett was in the average range of general intellectual ability. Both sets of test showed Mr. Barrett's ability to attend, to focus his concentration, and to perform under time pressure was impaired. And both sets of tests showed Mr. Barrett performed poorly on measures of immediate or working memory, but average on measures of delayed memory. Dr. Price did not perform tests of executive functioning, so no comparison can be made there. But where the testing evaluated the same or similar functions, the results were consistent. That consistency supports a finding that Dr. Young's testing was reliable, her results were valid, and Dr. Miora's re-scoring and interpretation of those results is accurate.

214. Dr. Price's findings in other areas are of little value. Dr. Price testified that the "main findings" that he thought were relevant to this case related to Mr. Barrett's substance abuse, depression, and paranoia. He omitted any mention of symptoms of post-traumatic stress even though Petitioner's expert diagnosed Mr. Barrett with PTSD and Dr. Price's own testing showed Mr. Barrett reported symptoms of post-traumatic stress and produced elevated scales on two objective measures of PTSD symptomology.

215.    In its opinion remanding this case, the Court of Appeals for the Tenth Circuit, noted that if Dr. Price were to testify that Mr. Barrett was a "psychopath," that testimony could prove "devastating." *Barrett*, 797 F.3d at 1232. Faced with potential cross-examination and expert testimony on the validity and relevance of that label, the government "made a decision not to go there." Tr. 895. The Court infers from this decision that testimony from Dr. Price on this issue would not have been devastating to Mr. Barrett.

216.    Overall, Dr. Price's testimony tended to support the finding of mitigating circumstances more than it undermined them or supported aggravating circumstances.

217.    Although Dr. Price testified that Mr. Barrett showed antisocial attitudes and his record included antisocial behavior, neither Dr. Price, nor Dr. Pitt diagnosed Mr. Barrett with antisocial personality disorder. They explained that was because the diagnostic criteria for that disorder requires that a conduct disorder be present in childhood, and there is no evidence for that in Mr. Barrett's life. His misbehavior appears in the record in early adolescence. That is the same time his learning disability appears in the record. It is possible that the same brain injury that caused Mr. Barrett's attention deficits caused his executive function impairments.

218.    Additionally, although both Dr. Price and Dr. Pitt found Mr. Barrett's personality had antisocial features, Dr. Price's testing showed Mr. Barrett was low on measures of aggression. Mr. Barrett scored high on the antisocial scale on one test administered by Dr. Price, the MMPI-2, but in the average range on another test he gave, the PAI.

219.    For the foregoing reasons, the Court finds the evidence adduced at the hearing would not have added to the aggravating side of the scales. The jury heard testimony that Mr. Barrett abused drugs and alcohol and that he was violent towards his wife. The jury also heard

1961

testimony about his antisocial behavior, and they could have inferred from the testimony about his drug dealing and the sign on the gate to his property that he harbored antisocial attitudes.

220.    The evidence presented at the § 2255 proceedings shows that trial counsel's lack of investigation, understanding of the capital sentencing jurisprudence and expert consultation fell below the objective standards of reasonableness codified in the ABA Standards and Guidelines and in case law that predated the guidelines.

221.    There was abundant "undiscovered mitigating evidence [that], taken as a whole, might well have influenced the jury's appraisal" of Kenneth Barrett's culpability.

222.    Had the jury been able to weigh the evidence that should have been presented in both phases of the trial "on the mitigation side of the scale, there a reasonable probability that at least one juror would have struck a different balance." *Wiggins*, 539 U.S. at 537.

223.    The totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the [§ 2255] proceeding" outweighs the evidence in aggravation and would have affected the jury's consideration. *Barrett*, 797 F. 3d at 1229.

224.    Prejudice from trial counsel's failures to properly investigate and present available evidence in mitigation is manifest.

225.    Mr. Barrett has shown by the preponderance of the evidence that he was prejudiced by trial counsel's deficient performance.

226.    Accordingly, the sentence of death should be vacated and a new sentencing proceeding held.

DATED:      July 31, 2017            RESPECTFULLY SUBMITTED,

                                     /s/ *David Autry*
                                     DAVID AUTRY

                                     HEATHER E. WILLIAMS
                                     Federal Defender

                                     /s/ *Joan M. Fisher*
                                     JOAN M. FISHER
                                     Assistant Federal Defender

                                     /s/ *Tivon Schardl*
                                     TIVON SCHARDL
                                     Trial & Habeas Counsel

                                     Attorneys for Petitioner,
                                     KENNETH EUGENE BARRETT

Pet. Prop. Post-Hr'g FF&CL            87            *Barrett v. U.S.*, CV-09-00105-JHP

1963

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 31st day of July 2017, I caused the foregoing Petitioner's Proposed Post-Hearing Findings of Fact and Conclusions of Law to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Tivon Schardl*
TIVON SCHARDL

1964

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW

**COMES NOW** the United States of America, by and through undersigned counsel and submits the following Findings of Fact and Conclusions of Law:

## FINDINGS OF FACT

A. Counsel's Performance

1. John Echols represented Barrett in his two state trial for the killing of Trooper Eales. Though the state sought the death penalty, the jury hung on guilt in the first trial and returned a manslaughter verdict in the second. As a result, Mr. Echols never presented a penalty-phase case in mitigation. Tr. 426-28.

2. Mr. Echols and others who represented the defendant in his state murder trials, undertook investigative efforts on behalf of Barrett. He amassed records of those investigation, which included mental health evaluations and the collection of a social history based on witness interviews conducted by Steve Leedy and Rosanne Schaye. Tr. 428-32, 476-77.

3. At the time of the state trials, Mr. Echols knew of Barrett's suicide attempt and contacts with the mental health system. He was also aware of Barrett's drug use. Tr. 478, 483.

4. During the state investigation, Mr. Echols received mental health reports from Faust Bianco, Peter Rausch, and Kathryn LaFortune indicating that Barrett did not have a mental illness that merited further investigation. Tr. 412-14, 433-36, 469-70, 493, 513.

1

1965

5. Mr. Echols retained Dr. Jeanne Russell in state court to perform a risk assessment of Barrett. Written in 2003, the report was generally favorable and recounted Barrett's family dysfunction, suicide attempt, and history of mental health treatment. Dr. Russell stated that Barrett was not exhibiting the symptoms of a major mental illness. Tr. 440-44, 484, 500-01; Gov't Ex. 34.

6. In evaluating Barrett, Dr. Russell relied on background information about him,[1] including reports of interviews conducted by Ms. Schaye and Dr. Sharp. Tr. 784-89.

7. Jack Gordon was one of Barrett's attorneys during his second state trial, which occurred in 2004, in Sequoyah County. Tr. 145-46.

8. Mr. Gordon retained only one mental health expert for the state trial, Jeanne Russell. Tr. 160.

9. Mr. Gordon was familiar with Dr. LaFortune's report, which recommended against the retention of a mental health expert. Tr. 161; Gov't Ex. 37.

10. Mr. Gordon intended to obtain more mental health expert assistance during a two-to-three-week break between phases, had the state court convicted Barrett's of a capital crime. Tr. 149-54.

11. Prior to Mr. Gordon's involvement in the case, Ms. Schaye had interviewed Barrett and his relatives about dysfunction in his upbringing. Tr. 148.

12. According to Mr. Gordon, the attorneys who represented Barrett during his federal trial never contacted him about Barrett's state case or retrieved his files. Tr. 157-59.

13. The Oklahoma Indigent Defense System ("OIDS") refused to fund mental health evaluations of Barrett beyond those noted above. Tr. 433.

14. Steve Leedy, an OIDS investigator also amassed a file in connection with Barrett's state trials, which included a memo memorializing his social history interview and those conducted by Ms. Schaye. Tr. 379-82, 401-02.

15. Mr. Leedy believed that he provided all the material to Mr. Echols, but he separately retained a copy at the OIDS office. Tr. 393, 403-11, 413-14.

16. Mr. Leedy did not remember if he told Mr. Echols of the existence of his file after Barrett was charged in federal court. Tr. 418-19.

17. Mr. Leedy did not recall any contact from Bret. Smith or Roger Hilfiger regarding the file, nor did he inform them of its existence. Tr. 383, 420-21.

---

[1] Initially, Dr. Russell testified to the substance of that background material. See, e.g., Tr. 784-86. However, the Court subsequently struck her references to hearsay at the request of Defendant's counsel. Tr. 806.

1966

18. Bret Smith, who ultimately acted as Barrett's second-chair trial counsel, did not have any reason to suspect that OIDS had any records relating to Barrett's case and did not recall contacting OIDS to obtain its files.   Tr. 531-32, 599.

19. The federal court appointed Mr. Echols as Barrett's attorney after the U.S. Attorney secured an indictment.  Mr. Echols intended to focus his investigation on possible brain dysfunction.  *See* Tr. 436-37.

20. Mr. Echols never formally divided the workload in the case with Mr. Hilfiger.  Tr. 450, 689.

21. Mr. Echols did not know if he ever discussed Dr. Sharp with Mr. Hilfiger or ever said that he considered the mitigation investigation incomplete.  Tr. 439-40, 466.

22. Mr. Hilfiger's co-counsel, Bret Smith, was unfamiliar with Dr. Sharp.  Tr. 555-58.

23. Mr. Echols withdrew from the case in a failed effort to obtain appellate review of the defense budget.  Tr. 460-61, 487, 683.

24. Roger Hilfiger began practicing law in 1972, and confined his practice almost entirely to criminal law.  During his career, he estimated that he had tried five capital cases, including two in federal court.  Tr. 647-52.

25. Mr. Hilfiger represented Barrett in 2004 and 2005.  Tr. 658-59.

26. Mr. Hilfiger's was appointed to the case while Mr. Echols also represented Barrett. Mr. Hilifger did not, at the time of his appointment, believe he was expected to prepare the penalty phase case, exclusively.  Tr. 659-62.

27. Mr. Hilfiger followed Mr. Echols's lead regarding trial strategy, initially focusing on a double-jeopardy issue.  Tr. 664-65.

28. Mr. Hilfiger discussed with Barrett having him testify in his own mitigation case, but the defendant declined to do so in open court.  Tr. 730, 753.

29. Mr. Echols had previously represented Barrett.  Accordingly, Mr. Hilfiger believed Mr. Echols possessed the investigative files in the case, presumably at his office.  Tr. 662.

30. Mr. Hilfiger did not recall discussing with Mr. Echols the need for resources sought in a budget request: At the time Mr. Echols filed the request, Mr. Hilfiger did not have adequate knowledge of the case to have opined about resources.  Tr. 668-71; Trl. Doc. 16.

31. Mr. Hilfiger did not agree with all of Mr. Echols's budget requests, and thought some of them were excessive or repetitive. Tr. 683.

3

32. Mr. Hilfiger did not believe the defense required an expert in organic brain disorders, based on his interactions with Barrett and some reports Mr. Echols had previously received.  Tr. 684.

33. Barrett's relatives gave trial counsel no reason to suspect they should retain an expert in brain damage.  Tr. 740.

34. Mr. Hilfiger characterized Mr. Echols budgeting strategy as a "shotgun approach," and felt the case required more precision.  Tr. 685

35. While representing Barrett, Mr. Hilfiger could not recall any indication that his client had brain damage or a history of significant head injuries.  Tr. 677.

36. Mr. Hilfiger could not recall Roseanne Schaye's investigative reports.  However, he thought the documents could have been in the materials he received from Mr. Echols, given that Mr. Smith interviewed some of the same people as Ms. Schaye.  Tr. 679-80, 695-99; Gov't Exs. 18-25, 54-62.

37. Mr. Hilfiger could not recall if he received a report from Mr. Leedy, but remembered some of the information in Mr. Leedy's investigative report.  Tr. 702-03; Gov't Ex. 49.

38. Mr. Hilfiger did not recall Dr. Sharp's report, which noted the possibility that Barrett suffered from an organic brain impairment, based on an evident tremor and long-term memory difficulty.  But, Mr. Hilfiger never observed that Barrett suffered from any long-term memory impairment, as he could accurately recall testimony from his prior trials.  Tr. 705-07; Gov't Ex. 16.

39. Given the totality of Dr. Sharp's report, Mr. Hilfiger would not have seen any reason to seek further expert assistance.  Tr. 708.

40. Mr. Hilfiger could not recall a report authored by Dr. LaFortune, but remembered discussing her findings with Mr. Smith.  Tr. 708-09; Gov't Ex. 37.

41. Mr. Hilfiger's billing records reflected – among other things – conversations with Barrett, Barrett's relatives, and Barrett's neighbors.  Tr. 713-18, 729, 731, 733-37; Pet. Ex. 72.

42. While Mr. Hilfiger interviewed Barrett's relatives, he was generally aware what their testimony would be.  Tr. 731.

43. Barrett's relatives did not share with Mr. Hilfiger any concerns that he suffered from any serious mental illness.  Tr. 738.

44. Mr. Hilfiger acknowledged that the defense did not hire a mitigation specialist, but explained, "We just didn't feel like that a mitigation opinion expert would do us any good when we could - when we used the information we had from previous reports and talked to those people and had them testify."  Tr. 739.

4

45. In May 2004, following Mr. Echols withdrawal, Bret Smith was appointed as second-chair counsel and had no responsibility for the budget.  Tr. 519-20, 526-27.

46. Mr. Smith did not have training in defending capital cases, but had extensive experience in criminal law and witness interviews.  Tr. 520, 532, 593-96.

47. Mr. Smith knew the defense had successfully litigated the case in state court, did not believe Mr. Hilfiger intended to employ a new strategy, and believed Mr. Hilfiger viewed the investigation as completed by Mr. Echols.  Tr. 523-24, 527, 538.

48. In their initial meeting, Barrett was suspicious of Mr. Smith, having had a strong relationship with Mr. Echols, but Mr. Smith understood the need to identify himself to the defendant, who might have rightfully suspected he was an agent.  Tr. 549-51.

49. Though Barrett was suspicious of Mr. Smith and sought to fire him, the pair developed a rapport, starting with their second meeting.  Tr. 551-52.

50. Messrs. Smith and Hilfiger never formally divided the workload in the Barrett case.  Tr. 694.

51. Mr. Echols surrendered his paper files to either Mr. Smith or Mr. Hilfiger.  *See* Tr. 457, 459, 487-89, 530-31, 687-88.

52. Mr. Echols maintained a separate computer file of other documents that Messrs. Smith and Hilfiger either did not access or accessed infrequently.  *See* Tr. 454-56, 458, 621-22, 662-63.

53. Mr. Echols would have printed the contents of the computer file had he received a request.  Tr. 508.

54. Mr. Smith contacted Mr. Gordon in an effort to obtain his files regarding previously-developed mitigation evidence.  Mr. Gordon told Mr. Smith he had no records from his representation of Barrett, having surrendered them to Mr. Echols.  Tr. 597-98, 701-02.

55. After his appointment as lead counsel, Mr. Hilfiger also received boxes of material in the Barrett case that he believed came directly from OIDS.  Tr. 688.

56. If Messrs. Smith and Hilfiger did not receive the totality of prior counsel's file or the Leedy investigative records, they did not realize what they were missing.

57. Mr. Smith first contacted Dr. Russell in August of 2005.  She agreed to update her earlier risk assessment of Barrett.  Tr. 541, 774-75.

58. In her 2005 report, updating the earlier risk assessment, Dr. Russell observed that Barrett's mood was normal, his affect was congruent with his mood, he did not appear anxious or depressed, his mood was euthymic (normal), he did not express any

delusional beliefs, and he did not exhibit any symptoms of a major mental illness, which would include bipolar disorder. Tr. 798-800; Gov't Ex. 35.

59. Dr. Russell reported that Dr. Sharp had no found no symptoms that Barrett was suffering from a major mental illness. Tr. 800, 808.

60. In her report, Dr. Russell summarized some background information from prior evaluations and investigations, but she did not recall if Messrs. Smith and Hilfiger requested the underlying documents and did not know if they had access to the material. Tr. 786-87, 789-90.

61. During a meeting with her and Mr. Hilfiger, they developed strategy to limit the government's future dangerousness case. Tr. 543, 545, 559.

62. Mr. Hilfiger knew Dr. Russell had completed some work on Barrett's case before he met with her and Mr. Smith in her Tulsa office, where he believed they discussed her 2003 report and potential testimony. Tr. 718-25.

63. Mr. Smith understood that Dr. Russell was not a mitigation specialist, but he recalled discussion of her testimony as a conduit for information from Barrett's relatives. Tr. 562-64, 576-78.

64. At the August meeting or later, Mr. Hilfiger recalled that Dr. Russell persuasively indicated that she did not believe her testimony would benefit the defense because it would invite damaging rebuttal. Tr. 726-27, 746.

65. Mr. Hilfiger shared Dr. Russell's concern that a government evaluation of Barrett would not benefit the defense. Tr. 729.

66. Following the decision to forgo Dr. Russell's testimony, Messrs. Smith and Hilfiger decided to rebut future dangerousness using lay witnesses to demonstrate Barrett was a well-behaved inmate. Tr. 737-38, 747.

67. During the penalty phase, Mr. Hilfiger also wanted to demonstrate that Barrett had already been punished for the murder. Tr. 747-49.

68. Dr. Russell read from a previously-executed declaration that Mr. Smith had asked her to act as a mitigation investigator. She noted "at the time I thought he was asking me to do mitigation . . . [] in terms of the risk assessment." She later stated, "I don't think I fully understood what he was asking in terms of an investigation." Tr. 777-78.

69. Dr. Russell never testified that Mr. Smith asked her to act as a mitigation "specialist." Her memory of events was clearly incomplete, and Barrett's counsel referred her repeatedly to her declaration, even when she did not claim a failure of recollection. *See* Tr. 775-76, 779, 780.

6

70. Dr. Russell did not advise Messrs. Smith and Hilfiger not to pursue a mental health mitigation case, but was wary of testifying, herself. She appeared familiar with Dr. Price and thought he would be a dangerous witness. Tr. 609-10, 791.

71. Even if Dr. Russell did not mention Dr. Price, the defense was concerned about government rebuttal. Tr. 631.

72. Mr. Smith found Barrett higher functioning than most criminal defendants: "nothing in our conversations indicated to me that Kenny is nuts." Tr. 553-55, 567-69, 603

73. Mr. Smith believed Barrett did not want to present family members to beg for his life or to rely on personal sympathy for him, much less to place anyone else in a bad light. Mr. Smith doubted an appeal to sympathy would work given the conservative jury, the all-American victim and Barrett's history of drug abuse and criminal acts. Tr. 547, 579-81, 587-88, 612, 616-17.

74. Barrett made clear that he did not want his attorneys to beg for his life. Tr. 753.

75. Mr. Hilfiger interviewed a former juror from Barrett's state trials and determined that he should minimize evidence of drug use as much as possible. Tr. 691-92.

76. Mr. Smith wanted to focus the case away from Barrett's emotional volatility and show he "was a decent enough person not to execute. Tr. 612-13.

77. Mr. Smith did not consult with an expert about the possibility that Barrett used drugs to self-medicate, but had experience with a prior client who had done so but limited his drug use in a way that this defendant did not. Tr. 589, 614-15, 633.

78. Mr. Smith visited the crime scene repeatedly and interviewed Barrett's relatives. He also spoke in depth to his client, and was familiar with Barrett's personal history, but did not believe he was developing mitigation for the first time, just prior to the third trial of this offense. Tr. 571-73.

B. Lack of Prejudice

79. Barrett's aunt, Ruth Harris, could not describe the relationship her nephew had with his mother, Gelene Dotson, but recalled that his father, Ernie Barrett, was largely absent from family life. Tr. 41-45.

80. In Ms. Harris's opinion, the divorce of his parents hurt Barrett. Tr. 45.

81. Barrett appeared "hyper" to Ms. Harris, who believed Ms. Dotson had a difficult time raising her sons, Kenneth, Richie and Stephen Barrett. Tr. 45-46.

82. Ms. Harris recalled that Ms. Dotson sometimes drank "a lot." Tr. 46.

83. Ms. Harris loved Barrett and wanted him to have the best. Tr. 46-47.

84. Ms. Harris had little contact with Barrett and his family during his childhood.  Tr. 47-49.

85. Ms. Harris thought she recalled speaking with a newspaper reporter around the time of the crime and had no reason to invent any statements she might have made during the interview.  She denied specific recollection of two statements attributed to her by the reporter: that Ms. Dotson had lived in a decent neighborhood until Barrett erected a shack next to her home, and that Barrett deterred prospective homebuyers when his mother attempted to sell her residence.  Tr. 49-51.

86. Ms. Harris had previously averred that Barrett's trial team did not interview her, but she believed an interview report from the time of trial accurately reflected her contemporaneous thoughts.  Tr. 51-52.

87. According to Barrett's uncle, Mark Dotson, his youngest sister, Carolyn, suffered from clinical depression; his sister, Gelene Dotson, had problems with alcohol and mood swings.  Tr. 53-55.

88. Barrett is two years older than Mark Dotson and was a "hyper" child.  Tr. 55-56.

89. Mark Dotson had little contact with Barrett during their childhoods.  Prior to adolescence, they lived in different states; Barrett kept to himself as a teenager.  Tr. 55-56, 66, 76.

90. Mark Dotson did not believe Barrett was especially hyper as a teenager.  Tr. 67.

91. Mark Dotson had believed that Barrett's youngest brother, Steve, was exceptionally hyper, to the point of appearing retarded, but his perceptions were inaccurate - Steve Barrett is "extremely intelligent."  Tr. 67-69.

92. According to Mark Dotson, Steve Barrett made good choices in his life, furthering his education despite any problems he might have once had with drugs.  Tr. 69-70.

93. Mark Dotson recalled that, as a teenager, Barrett argued frequently with his mother, who "would sort of pick at him."  Tr. 58, 75.

94. Mark Dotson had heard from another sister that Gelene Dotson had men "in and out" of her home, but did not know if she engaged in that behavior during Barrett's childhood.  Tr. 59-61.

95. Mark Dotson avoided Gelene Dotson.  Tr. 75.

96. According to Mark Dotson, his sister, Phyllis Crawford, had two sons, both of whom appeared to suffer from attention deficit disorder, one of whom had received a formal diagnosis for the condition.  Tr. 61-62.

97. Mark Dotson recalled that Phyllis Crawford had "some depression," but did not know if she received treatment for it.  Tr. 63.

8

98. Mark Dotson thought, his sister, Carolyn, and one of her daughters had received treatment for depression. Tr. 63-64.

99. Mark Dotson had no mental health training and had not consulted with any professionals concerning the mental conditions of his relatives. Tr. 72.

100. Mark Dotson thought his father and grandfather drank heavily. Tr. 64.

101. Mark Dotson does not personally suffer from mental illness, nor do his wife and three children. Tr. 66-67.

102. According to Mark Dotson, Barrett has a talent for auto mechanics and once repaired a car that belonged to Mark Dotson's wife, but the cousins did not otherwise have much contact. Tr. 64-65.

103. Mark Dotson had heard Barrett had a drug problem. Tr. 70.

104. Mark Dotson had also heard his aunt, Ms. Harris, was concerned about Barrett's well-being and once counseled him, albeit ineffectively, about his use of illegal drugs: Barrett murdered a state trooper within a year of the conversation. Tr. 72-73.

105. At the time of the killing, Mark Dotson had not seen Barrett for about eight months and had never visited his cabin. Tr. 70-71.

106. Kenneth Barrett's brother, Stephen Barrett, was a high school principal, who had taught science and coached football. He had under graduate and graduate degrees from the University of Oklahoma and served in the Army National Guard. Tr. 78-79.

107. Stephen Barrett was seven years younger than his brother, Kenneth Barrett. Tr. 80.

108. Following their parents' divorce, Barrett and his brothers lived with their mother, during which time Barrett sometimes engaged in physically fights with her. Tr. 81-82, 94-95.

109. On at least two occasions, Kenneth Barrett attacked Stephen Barrett - once permanently scarring his younger brother and once causing injuries that required stitches. Tr. 91, 117.

110. Stephen Barrett observed his mother exhibit dramatic mood swings, sometimes appearing depressed. Tr. 86-87, 96-97.

111. Stephen Barrett believed his mother was overwhelmed by responsibility and struggled to parent three sons, including Kenneth Barrett, who was defiant. Tr. 94-95.

112. According to Stephen Barrett, his mother was an alcoholic, who frequented bars and regularly drank beer. Tr. 82-85.

113.   Despite her daily drinking, Ms. Dotson maintained employment and went to work regularly, largely limiting excessive alcohol ingestion to the weekends.  Tr. 87-88.

114.   Stephen Barrett believed that Kenneth Barrett was fixated on their father and missed him greatly.  Stephen Barrett did not believe his father had a drinking problem.  Tr. 85-86, 120-22.

115.   Stephen Barrett observed that Kenneth Barrett was an impulsive child, unable to moderate himself, identify triggers or refrain from damaging behavior, but he did not know if he received any of the assistance he would offer his own students as an educational administrator.  Tr. 88-90.

116.   Kenneth and Stephen Barrett attended the same high school, where Stephen Barrett had a positive experience.  Tr. 122.

117.   Stephen Barrett conceded that Kenneth Barrett elected to drop out of high school. Tr. 23.

118.   Stephen Barrett acknowledged he was more successful than Kenneth Barrett, but attributed that to the defendant's childhood mental health issues, compounded by substance abuse. Tr. 91-92.

119.   Stephen Barrett believed he benefitted, as an adolescent, from living in a rural area near other relatives, unlike Kenneth Barrett.  Tr. 93-94, 106, 110-13.

120.   However, Stephen Barrett recalled that Kenneth Barrett had the opportunity to live with Ruth Harris's family, but did not know why the arrangement ended.  Tr. 113-14.

121.   Stephen Barrett also recalled that he and his brothers had spent extended amounts of time with another relative, Eleanor Long.  Tr. 114.

122.   Stephen Barrett agreed he succeeded through his own hard work, despite a lack of encouragement or effective parenting from his mother.  Tr. 108-10.

123.   As an adult, Stephen Barrett had little contact with Kenneth Barrett.  Tr. 97-98.

124.   Stephen Barrett did not know of anything that prevented Kenneth Barrett from ceasing his drug use or forging close relationships with his extended family.  Tr. 115-16.

125.   Stephen Barrett recalled that Kenneth Barrett borrowed his shotgun and used it to attempt suicide.  Tr. 98-100.

126.   Stephen Barrett opined that Kenneth Barrett might have attempted suicide in response to his divorce, but could not recall when the divorce occurred.  Tr. 99-100.

127.    Without extensive preparation, Stephen Barrett testified at Kenneth Barrett's trial, answering questions similar to those posed at the instant hearing.  Tr. 102-03.

128.    During interviews, Messrs. Smith and Hilfiger did not ask Stephen Barrett about Kenneth Barret's response to his parent's divorce, Gelene Dotson's alcohol abuse, or Gelene Dotson's mood swings.  Tr. 103.

129.    Kenneth Barrett's step-mother, Doris Barrett, had little contact with him before he murdered Trooper Eales, but forged a strong relationship with him during his state and federal trials.  Tr. 123-26, 130-31.

130.    Doris Barrett did not notice any growth or change in Kenneth Barrett during his trials.  Tr. 131.

131.    Doris Barrett observed that her husband (the defendant's father), Ernie Barrett also strengthened his ties with Kenneth Barrett after the killing, visiting him regularly in jail.  Tr. 126-27, 131.

132.    Doris and Ernie Barrett testified at the defendant's federal trial but were never interviewed by Roger Hilfiger.  Tr. 129-30.

133.    According to Doris Barrett, she and Ernie Barrett had little interaction with Mr. Hilfiger: if they had concerns, they communicated them to Mr. Smith.  Tr. 130.

134.    Doris and Ernie Barrett had no reservations about testifying in the federal trial, apart from feeling unprepared to do so.  Tr. 132-33.  Though Doris Barrett was nervous about testifying, she did so without any difficulty, without requesting a break, or any opportunity to refresh her recollection.  Tr. 134-35.

135.    Doris Barrett did not attend meetings between Mr. Hilfiger and any other person. As a result, she had previously speculated in a declaration that he had no trial strategy.  Tr. 133-34.

136.    Doris Barrett believed that she had seen a defense strategy during Kenneth Barrett's state trials, but not his federal trial.  Tr. 140-41.

137.    Despite having testified that she "never really associated much with Mr. Hilfiger," Doris Barrett conceded that he requested her assistance in convincing Barrett to testify at trial.  Tr. 135.

138.    In recorded phone conversations, Doris Barrett implies that she had significant contact with Mr. Hilfiger about legal strategies.  Tr. 135-37; Gov't Ex. 53.

139.    Consistent with Mr. Echols's guidance, Doris Barrett told Kenneth Barrett he should refuse to testify.  Gov't Ex. 53.

11

140.    During his phone calls with Doris Barrett, Kenneth Barrett stated that he would prefer the death penalty to life in prison and had felt that way since the outset of his litigation.  Gov't Ex. 53.

141.    Dr. George Woods, a psychiatrist and neuropsychiatrist, was retained by § 2255 counsel and evaluated Barrett on two occasions, once in 2009 and once in 2017.  Tr. 176-85.

142.    Dr. Woods had testified 80 or 90 times for capital defendants, and once for a state government.  Tr. 259.

143.    In preparing for the first evaluation, Dr. Woods reviewed materials prepared by Dr. Russell, Dr. Bill Sharp, Dr. Randall Price, and Dr. Myla Young, in addition to a variety of historical documents concerning the murder and Barrett's family history. Before the second evaluation, Dr. Woods reviewed materials prepared by Dr. Erin Bigler and Dr. Deborah Miora.  Tr. 186-87.

144.    As part of his evaluation, Dr. Woods also reviewed an affidavit signed by Dr. Faust Bianco, which stated that he had performed a neuropsychological evaluation of Barrett, did not discover any significant deficits in functioning and therefore recommended against further testing.  Tr. 292-95; Gov't Ex. 12.

145.    Dr. Woods opined that Barrett's family included generations of people who exhibited symptoms consistent with psychiatric disorders, including indications of bipolar disorder and substance abuse, leading him to conclude that the defendant had genetic predisposition to developing a mood disorder and substance abuse disorder. Tr. 188-90, 192-93.

146.    Dr. Woods found that Barrett's fetal and childhood development further predisposed him to developing bipolar disorder.  Tr. 193-95.

147.    Dr. Woods diagnosed Barrett with bipolar disorder.  Tr. 193.

148.    Dr. Woods based the diagnosis of bipolar disorder on Barrett's family history, his reports of suicidal ideation, his three psychiatric hospitalizations, and his history of treatment with psychotropic medications.  Tr. 195-97.

149.    Dr. Woods acknowledged that Stephen Barrett had the potential for the same genetic predisposition to mental illness as the defendant.  Tr. 321.

150.    Dr. Woods noted that Barrett's mental health records included the term "lability," which is used when describing bipolar disorder, and found that the defendant displayed pressured speech.  Tr. 197-98, 200.

151.    In support of his diagnosis of bipolar disorder, Dr. Woods also noted Barrett's history of hyper-sexuality and irritability, citing Kaplan and Sadock's Comprehensive Textbook of Psychiatry for the proposition that irritability constitutes the foremost symptom in bipolar disorder.  Tr. 199.

152. Dr. Woods conceded that depression can accompany substance abuse, but said that Barrett's paranoia and suicidality indicated his depression was symptomatic of bipolar disorder, not methamphetamine use. Tr. 200-01, 220-21.

153. Dr. Woods asserted methamphetamine could not induce symptoms of bipolar disorder, such as mood lability and pressured speech, and noted that Barrett received a preliminary diagnosis for bipolar disorder at the Bill Willis Community Mental Health Center. Tr. 330-31, 339; Gov't Ex. 9.

154. Dr. Woods conceded that Barrett's diagnosis on discharge from Bill Willis was for organic affective disorder, polysubstance abuse, and marital conflict. Tr. 360.

155. Dr. Woods explained that bipolar disorder impairs the ability to weigh and deliberate, and can affect daily life. Tr. 199-200, 202.

156. According to Dr. Woods, Barrett's poor academic performance was symptomatic of his bipolar disorder, because it concerned the functioning of his brain, which may have also been compromised by fetal exposure to alcohol. Tr. 202-04.

157. Dr. Woods also noted that Barrett exhibited attentional deficits. Tr. 204.

158. Medical professionals prescribe amphetamines to treat attention disorders, and Dr. Woods opined that Barrett's drug dependency was consistent with self-medication. Tr. 204-05.

159. Dr. Woods opined that Barrett exhibited symptoms consistent with post-traumatic stress disorder, stemming from family dysfunction. Tr. 206.

160. Dr. Woods agreed that Dr. Russell and Dr. LaFortune did not diagnose Barrett with bipolar disorder, and he could not identify another mental health professional who had diagnosed Barrett with post-traumatic stress disorder. Tr. 295-300; Gov't Exs. 34 & 37.

161. Dr. Woods reviewed neuropsychological testing administered to Barrett by Dr. Myla Young, especially the Wisconsin Card Sorting Test and Category Test, and agreed with her conclusion that the results indicated Barrett had suffered impairments of brain regions responsible for executive functioning. Tr. 207-09, 212.

162. Dr. Woods explained executive functioning as the ability to abstract, understand context, and figure things out, and asserted that impairments in that regard can inhibit the ability to react appropriately to stimuli. Tr. 211-12, 214-16.

163. Dr. Woods attributed Barrett's brain impairments to fetal alcohol exposure and a history of head injuries. Tr. 213-14.

164. Dr. Woods opined that the neuropsychological testing demonstrated that Barrett perseverated. Tr. 215.

13

165.   Dr. Woods opined that Barrett's alleged psychiatric and neurological disorders interacted with one another and impaired his ability to perceive events and deliberate during the police raid that preceded his murder of Trooper Eales.  Tr. 218-20.

166.   Dr. Woods allowed that Barrett's drug use exacerbated the symptoms of his supposed mental illnesses.  Tr. 223.

167.   Dr. Woods disagreed with Dr. Steven Pitt's rejection of bipolar disorder, citing Barrett's pressured speech, his family history, and his history of mental health treatment.  Tr. 235-39.

168.   Dr. Woods asserted that Barrett was less likely to exhibit symptoms of mental illness in custody than he would outside of it.  Tr. 240-41, 301.

169.   Dr. Woods acknowledged that Dr. Price and Dr. Russell had each administered the Hare Psychopathy Checklist to Barrett, and that Dr. Price had found that the defendant was a psychopath, but Dr. Price had reached the contrary conclusion.  Tr. 242-44.

170.    Dr. Woods asserted, on the basis of studies from the late 2000s, that the Hare Psychopathy Checklist was not reliable predictor of future dangerousness in custodial settings.  Tr. 244-45.

171.   Dr. Woods did agree that stress can cause the manifestation of mental health symptoms, and that death row is a stressful environment.  Tr. 300-01; see Tr. 353-54.

172.   In support of his opinion, Dr. Woods relied on the lunacy record of A.J. Barrett, Kenneth Barrett's great-grandfather, which reflected a petition for, but not a finding of, mental illness.  Tr. 261-63; Deft. Ex. 2.

173.   Dr. Woods also relied on a record concerning Kenneth Barrett's grandfather, also named A.J. Barrett, for proof of auditory hallucinations, though the document does not support that finding.  Tr. 267-68.

174.   Dr. Woods credited Barrett's self-report of auditory hallucinations though no other mental health professional had ever observed such a symptom.  Tr. 268-69.

175.   Barrett only began reporting auditory hallucinations during the course of his § 2255 litigation.  Tr. 271.

176.   Even in the absence of corroborating medical records, Dr. Woods credited Barrett's self-report of a childhood head injury, inflicted by a steel ball, that the defendant said resulted in a brief loss of consciousness.  Tr. 272-74.

177.   As far as Dr. Woods knew, Barrett's parents never reported the steel ball incident.  Tr. 278.

178.    But Dr. Woods conceded that Barrett reported to Dr. Pitt that the steel ball incident caused a significant period of unconsciousness, and asserted that he only awoke at a doctor's office.  Tr. 275-77.

179.    Dr. Woods also conceded that Barrett told Dr. Pitt, alone among known mental health professionals, that his head had been run over by a car.  Tr. 279-80.

180.    Dr. Woods admitted that Barrett failed math and reading in the first grade but received promotion to the second grade, where he obtained satisfactory grades in all classes.  Tr. 287.

181.    Dr. Woods further conceded that in the ninth grade, Barrett did not fail any classes, and dropped out when the principal told him to cut his hair.  Tr. 283-86; Pet. Ex. 55.

182.    Dr. Woods agreed that the fifth edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-V") states that "a primary diagnosis of bipolar disorder must be established based on symptoms that remain once substances are no longer being used."  Tr. 306.

183.    Dr. Woods agreed that the fourth revised edition of the Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV-TR") stated that "in order to make a diagnosis of bipolar, a person has to be separate from the use of substances for a period of time."  Tr. 306-07.

184.    While acknowledging a history of positive drug tests, Dr. Woods disputed the reliability of information concerning Barrett's drug use, opining that the reports were not definitive, for lack of confirmation that Barrett was actually intoxicated.  Tr. 307-12, 324-26.

185.    Dr. Woods maintained his skepticism of Barrett's drug use despite a 1995 diagnosis for substance abuse disorder, because the defendant received an anti-psychotic medication during his treatment.  Tr. 312-13.

186.    Dr. Woods relied on Dr. Sharp's 2002 report of institutional remission in finding that Barrett was not under the influence of any intoxicant when evaluated in state custody.  Tr. 332-33.

187.    Dr. Woods found in 2009 that Barrett could not have rationally assisted his trial counsel, despite interviewing Mr. Echols, who did not mention any such observation.  Tr. 314-15.

188.    Mr. Echols never requested a competency evaluation for Barrett and opined that the defendant had good insight into the case, "a very good mind in many areas . . . . was interested in his case . . . . [and] demonstrated recall."  Tr. 471-74, 509.

189.    Mr. Smith had experience representing clients he thought were incompetent, but he did not harbor any suspicions that Barrett was incompetent or suffered from any

15

significant mental health condition (though he understood that the defendant's apparent competence did not foreclose the possibility of mental health mitigation evidence).  Tr. 533-34, 552-53, 604-05.

190.   Mr. Hilfiger had numerous experiences representing defendants whom he believed were incompetent, but never harbored any concern about Barrett's ability to rationally assist him.  Tr. 653-54, 665-66, 754-55; Gov't Ex. 38.

191.   Dr. Woods found that at the time of the murder, Barrett could not distinguish right and wrong.  Tr. 317-19.

192.   Dr. Deborah Miora was a neuropsychologist who rescored psychometric testing performed on Barrett by the deceased Dr. Young.  Tr. 1140-53.

193.   Dr. Miora explained that the brain's frontal lobes are considered the seat of reason, thought, and decision making.  Tr. 1155.

194.   Dr. Miora premised the appropriateness of neuropsychological testing on Barrett's personal history, which included substance abuse, fetal alcohol exposure, reported head injuries, and a gunshot wound to the chest.  Tr. 1169-71.

195.   According to Dr. Miora, testing revealed that Barrett had strengths in verbal comprehension, verbal expression and verbal memory, but weaknesses in problem solving, abstract reasoning, attention, planning, and alternating between stimuli.  Tr. 1200-01.

196.   Barrett received a full scale IQ score of 82, on a test to which the government interposed a continuing objection.  Tr. 1185, 1194, 1198-99, 1205.

197.   As part of his full-scale IQ score, Barrett received a score of 65 in processing speed, revealing an area of particular deficit.  Tr. 1207-08, 1214.

198.   Barrett exhibited low average attention.  Tr. 1213.

199.   Based on Barrett's poor performance on coding tasks, simple search and TMT visual scanning, Dr. Miora concluded that he had difficulty in pressured situations in which he had to generate a response to visual stimuli.  Tr. 1215-16, 1219.

200.   Barrett scored in the normal range for recall and delayed recall, but Dr. Miora believed that the variation between his normal scores was significant.  Tr. 1221.

201.   Barrett scored in the 98th percentile for visual memory, but his visual working memory index was two standard deviations below the mean – a variation Dr. Miora attributed to attentional problems.  Tr. 1222-24.

202.   Dr. Miora found that Barrett's academic functioning reflected a possible learning disability.  Tr. 1225.

203.   To test executive functioning, Dr. Young administered the Delis-Kaplan Executive Function System (D-KEFS).  Tr. 1225.

204.   Barrett exhibited difficulty in switching between tasks, scoring one standard deviation below the norm on letter/number switching, while showing moderate impairment in visual scanning.  Tr. 1229-30.

205.   On the "Tower" test, Barrett exhibited slightly above-average problem-solving ability, but exhibited moderate impairment in "move accuracy," demonstrating a failure to follow test rules.  Tr. 1232-34.

206.   On the sorting portion of the D-KEFS, Barrett received an impaired score in "sort recognition."  Tr. 1234-35.

207.   Barret had trouble inhibiting responses based on conflicting stimuli.  Tr. 1236-39.

208.   According to Dr. Miora, Barrett's D-KEFS performance indicated damage to the dorsal lateral and orbitofrontal portions of his brain.  Tr. 1235.

209.   Dr. Miora conceded there is no one-to-one correlation between daily life and the skills tested on the D-KEFS, but said it did "say something about how that person would function in different circumstances," albeit not in an extreme situation.  Tr. 1239-40.

210.   Based on the D-KEFS scores, Dr. Miora predicted that Barrett would have difficulty under stress and likely make errors if he had to pay visual attention and switch between different kinds of activities quickly.  Tr. 1241.

211.   Dr. Miora did not testify about all of the 94 substests in the D-KEFS.  Tr. 1309.

212.   Over the course of all the D-KEFS testing, Barrett had a mild impairment or below in only about 14.9 percent of them.  Tr. 1309-11.

213.   Barrett had an impaired score on the Wisconsin Card Sorting Test (WCST), with some highly impaired sub-scores.  Tr. 1241-42.

214.   Dr. Miora stated that Barrett's performance on the WCST did not involve perseverative errors, but opined that his scores were meaningless given a failure to solve underlying conceptual problems.  Tr. 1244

215.   Barrett performed poorly on the Short Category Test.  Tr. 1246-47, 1320.

216.   Dr. Miora conceded that Barrett's performance on the WCST was consistent with malingering, though it could have been explained by other circumstances.  Tr. 1360.

217.   Dr. Miora later conceded that she did not understand the portion of Dr. Young's declaration that concerned the WCST.  Tr. 1317-18.

218.    It appears Barrett could verbally repeat the applicable rules of the WCST, but misapplied them.  Tr. 1318-19.

219.    Dr. Miora admitted that Barrett may have simply misunderstood the rules of the WCST.  Tr. 1321-22.

220.    In her declaration, Dr. Young correlated WCST performance with daily functioning, identifying a significant relationship between test performance and the ability to drive a car.  Tr. 1323-24.

221.    Dr. Miora did not know if Barrett could drive a car.  Tr. 1324.

222.    Dr. Miora was not certain she had reviewed records concerning an incident in which Barrett was stopped by the police while operating a vehicle and managed to convince the officer to let him drive home.  Tr. 1324-25.

223.    Considering Barrett's performance on all tests of executive functioning, Dr. Miora concluded that he demonstrated problems with frontal function, which included the temporal region and some of the frontal subcortical circuitry, impairments that would have affected him on a daily basis.  Tr. 1249-50.

224.    Dr. Miora stated that Barrett did poorly in inhibiting responses in light of changing stimuli and would tend to do worse if he received a rapid infusion of information.  Tr. 1251-52.

225.    Dr. Miora conceded that in 2000, Barrett scored in the normal range on verbal IQ, performance IQ, verbal comprehension, working memory, processing speed, and full scale IQ, in testing administered by Dr. Bianco.  Tr. 1261-62.

226.    Barrett experienced a decline in processing speed between 2000 and 2009.  Tr. 1263.

227.    In memory testing administered by Dr. Bianco, Barrett scored in the average to very superior ranges.  Tr. 1263-64.

228.    Dr. Miora conceded that Dr. Bianco could not have administered the D-KEFS to Barrett during his 2000 evaluation, because the test was not published until 2001.  Tr. 1267.

229.    Dr. Bianco administered a trail making test that was later adapted into the D-KEFS, on which Barrett received an average score.  Tr. 1266-69.

230.    Dr. Bianco also administered a color word interference test, similar to one on the D-KEFS, and Barrett scored in the normal range.  Tr. 1276-78, 1280.

231.    Dr. Miora did not review any of Barrett's medical records.  Tr. 1287.

232.    In rescoring Dr. Young's raw test data, Dr. Miora failed to notice that she was missing a page of information.  Tr. 1292-95.

233.    The missing data may well have improved Barrett's processing speed to something Dr. Miora conceded was "more believable," in the borderline range and raised his full scale IQ to 84.  Tr. 1295-97.

234.    Dr. Miora referred to the impact of her IQ scoring error as "bupkis."  Tr. 1297.

235.    Dr. Miora conceded that Barrett demonstrated strengths in many areas of neuropsychological functioning.  Tr. 1298-1301.

236.    Dr. Miora likewise conceded that Barrett scored above average on several components of the California Verbal Learning Test-2.  Tr. 1302-05

237.    Dr. Miora conceded that Barrett had scored in low average or average range for several subtests of the WIMS-IV.  Tr. 1306-08.

238.    Dr. Miora could not say if Barrett's decades of drug abuse caused his alleged brain injury, but allowed that it very well could have.  Tr. 1311.

239.    Dr. Miora explained that she was not testifying about the facts of the crime and had not reviewed the police reports stemming from the murder: she would not agree that Barrett "was incapable of taking in information, that it was difficult for [him] to act upon that information in real time."  Tr. 1328.

240.    Dr. Miora conceded that if Barrett were under the influence of drugs at the time of the crime, it could have impaired his visual attention.  Tr. 1355-56.

241.    Despite any impairments, Dr. Miora conceded that Barrett was capable of the perceptions necessary to commit the crime.  Tr. 1356-57.

242.    In 2005, former U.S. Attorney Sheldon Sperling retained board certified neuropsychologist and forensic psychologist Dr. J. Randall Price to evaluate Barrett, which included two days of interviews and testing. Tr. 812-15; 821, 825, 832-35; Gov't Ex. 53.

243.    Barrett cooperated during the interview with Dr. Price but voiced chronic suspiciousness about a variety of subjects, leading to a finding that the defendant had the traits of a paranoid personality.  Tr. 836-37.

244.    As part of the evaluation, Dr. Price reviewed records detailing the murder of Trooper Eales and Barrett's history of mental health treatment, which reflected the substance abuse but not diagnoses for bipolar disorder or post-traumatic stress disorder.  Tr. 826-31.

245.    During the interview, Dr. Price learned of dysfunction in Barrett's upbringing and marriage, and formed the impression that the quality of the defendant's relationship with his mother varied over time.  Tr. 841-43.

246.    Barrett told Dr. Price that he and his ex-wife had physically fought, and that she had obtained restraining orders against him.  Tr. 853-54.

247.    In reviewing educational records, Dr. Price determined that Barrett had performed poorly in school and lost interest, but not the ability to perform – failing the eighth grade as a result of chronic truancy and suffering suspension or expulsion because he refused to cut his hair.  Tr. 844-45.

248.    After dropping out of school, Barrett held jobs that required at least semi-skilled performance and claimed that he was a skilled mechanic who hoped to open a garage that, for want of money-management skills, he intended to finance through the sale of methamphetamine.   Tr. 845-49.

249.    Despite his poor money-management skills, Barrett did not express to Dr. Price that he engaged in spending sprees consistent with manic episodes.  Tr. 857-58.

250.    Barrett reported a history of hyperactivity to Dr. Price, but did not display such traits during their interview.  Tr. 846.

251.    During his interview with Dr. Price, Barrett reported a childhood incident in which he was struck by steel ball and lost consciousness, but did not experience any cognitive problems as a result.  Tr. 860-61.

252.    Dr. Price explained that a person who experienced hours of unconsciousness would have sustained a severe brain injury likely to result in multiple serious cognitive deficits – symptoms that Barrett did not display.  Tr. 861-63.

253.    Dr. Price administered a Reynolds Intellectual Assessment on which Barrett performed in the average range, without a significant difference between verbal and non-verbal abilities, a result he could not have achieved had he sustained a severe brain injury with a resulting loss of consciousness lasting several hours.  Tr. 865-68.

254.    Dr. Price administered a Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS") to Barrett, who performed in the overall average range for neurological functioning (a result inconsistent with traumatic brain injury) while displaying a deficit in short-term memory consistent with his attentional issues.  Tr. 868-75, 902-03.

255.    Dr. Price agreed that a person can suffer brain damage that affects one area of functioning but not another.  Tr. 897-98.

256.    Dr. Price stated that most people have strengths and weaknesses in their neurological functioning.  Tr. 902.

257.    Dr. Price acknowledged that the variation in Barrett's strengths and weaknesses was atypical.  Tr. 905.

258.    Dr. Price maintained his opinion, formed in 2005, that Barrett's RBANS performance did not merit further testing for brain damage.  Tr. 927.

259.    On a Personality Assessment Inventory administered by Dr. Price, Barrett attributed his problems to substance abuse and displayed some depressive symptoms and paranoia.  Tr. 875-77.

260.    On a Minnesota Multiphasic Personality Inventory administered by Dr. Price, Barrett's results indicated antisocial attitudes and behaviors; paranoid thinking or chronic suspiciousness; and concern about medical problems.  Tr. 877-80.

261.    Dr. Price did not report on some of Barrett's elevated personality scales, including traumatic stressors, traumatic stress, post-traumatic stress disorder, but did note results on the "big-five" scales, which reflect meta-personality traits.  Tr. 912-20.

262.    While acknowledging the elevated scores for post-traumatic stress disorder, Dr. Price did not see anything in his evaluation, like the endorsement of flashbacks to a life-threatening event – that indicated Barrett suffered from the condition.  Tr. 929-32.

263.    Barrett scored in the average range for aggression, had somewhat elevated scores for psychosis and introversion, and had an elevated score on a schizophrenia scale that can also indicate confusion or eccentric beliefs.  Tr. 921-22, 924.

264.    Dr. Price explained mental health professionals do not evaluate individual testing scales in isolation, as the scales can reflect many things.  Tr. 931

265.    Dr. Price administered a malingering test, which indicated that Barrett did not grossly exaggerate his psychological problems.  Tr. 881.

266.    Following the evaluation, Dr. Price diagnosed Barrett with a learning disorder, not otherwise specified; polysubstance dependence; dysthymic disorder; and personality disorder with antisocial and paranoid traits and features.  Tr. 889-90.

267.    Dr. Steven Pitt, a board certified forensic psychiatrist, evaluated Barrett.  Tr. 956-64, 968-69; Gov't Ex. 52.

268.    The government asked Dr. Pitt to opine whether Barrett suffered from a mental illness or defect; to determine if any such mental illness was a byproduct of substance use; and to determine if Barrett could distinguish right from wrong at the time of the murder.  Tr. 966.

269.    Dr. Pitt memorialized his findings in a written report.  Tr. 966-67; Gov't Ex. 52, § 1.

270.    Dr. Pitt explained that bipolar disorder is a lifelong illness, the symptoms of which can ebb and flow but cannot be hidden for protracted periods of time, especially in stressful environments.  Tr. 1008-09.

271.    On January 19, 2017, Dr. Pitt interviewed Barrett at the U.S. Penitentiary in Terre Haute, Indiana, and made audio and video recordings of the meeting.  Tr. 969-70; Gov't Ex. 52, § 10.

272.    Dr. Pitt also arranged for a transcription of the interview with Barrett.  Tr. 972; Gov't Ex. 52; § 3.

273.    Dr. Pitt acknowledged controversy within the profession regarding taping of forensic interviews.  Tr. 1087.

274.    Dr. Pitt elicited Barrett's admission to regular, long-term drug use, and to primarily abusing marijuana and methamphetamine in the years preceding the murder of Trooper Eales.  Tr. 974-75, 1001-02.

275.    Barrett also indicated to Dr. Pitt that he had access to methamphetamine and OxyContin while in custody awaiting his state trials.  Tr. 1002, 1117.

276.    Dr. Pitt understood that Barrett's mother was a lax disciplinarian, and that his family life was dysfunctional.  Tr. 1027-28.

277.    Dr. Pitt acknowledged that Kenneth Barrett's father, Ernie Barrett, was a philanderer, who physically abused the defendant and, at least once, beat up the defendant's mother, Gelene Dotson.  Tr. 1028-29, 1030, 1033.

278.    Dr. Pitt also acknowledged that Barrett's mother, Gelene Dotson, appeared to have an alcohol addiction and likely exposed the defendant to alcohol in utero.  Tr. 1035.

279.    Dr. Pitt noted that Kenneth Barrett's brother, Stephen Barrett, did not suffer from a debilitating mental illness, and that the family's history of dysfunction constituted a data point, but not one upon which he would premise a diagnosis.  Tr. 1113-14.

280.    Barrett suffered a beating while in custody as a teenager.  Tr. 1033-34.

281.    During his interview with Dr. Pitt, Barrett did not endorse the symptoms of a mood disorder and attributed changes in his mood to drug use.  Tr. 1003.

282.    According to Dr. Pitt, drugs – especially cocaine and methamphetamine – can mimic the effects of mood disorder, creating mania, irritability, pressured speech, and mood lability.  Tr. 1003-04.

283.    Dr. Pitt did not detect any pressured speech in his interactions with Barrett.  Tr. 1004.

284. As part of his evaluation, Dr. Pitt reviewed documents from Sparks Regional Medical Center concerning Barrett's treatment following his suicide attempt. Tr. 975-76; Pet. Ex. 102.

285. The treating psychiatrist at Sparks diagnosed Barrett with probable antisocial personality, drug abuse (marijuana with a history of hallucinogenic drugs), alcohol abuse, and probable major depressive disorder, and Dr. Pitt credited the information about drug use because medical personnel gathered it, likely from the defendant or his relatives. Tr. 977.

286. As part of his evaluation, Dr. Pitt reviewed documents from Eastern State Hospital, where the staff admitted Barrett with a diagnosis of marital problems, mixed substance abuse, alcohol abuse, and mixed personality disorder, information that appeared credible because they it evidently came from, at least, the defendant's wife and mother. Tr. 978-80; Gov't Exs, 3, 4, 5 & 6.

287. During his interview, Barrett told Dr. Pitt that he was taken to Eastern State Hospital because "I was nutted out. I was doing - fighting with everybody and stuff, eating mushrooms a lot." Tr. 1115.

288. A drug screen at Eastern State Hospital was negative, but Dr. Pitt nonetheless credited Barrett's self-reports of long-term substance abuse. Tr. 981.

289. During the course of his treatment at Eastern State Hospital, Barrett denied a history of head injury. Tr. 980; Gov't Ex. 5.

290. He was discharged from Eastern State Hospital with diagnoses of marital problems, mixed substance abuse, and mixed personality disorder, but no mood disorder. Tr. 980-81.

291. As part of his evaluation, Dr. Pitt reviewed documents from Barrett's application for Social Security benefits, which was denied in light of the fact that he exhibited no signs of a severe mental illness. Tr. 982; Gov't Ex. 10.

292. The Social Security Administration concluded that Barrett could think clearly most of the time and carry out normal activities. Tr. 983.

293. As part of his evaluation, Dr. Pitt reviewed documents concerning Barrett's treatment at Sequoyah Memorial Hospital following his reports that he was "losing his mind," but which included a urine toxicology screen that was positive for amphetamines and THC. Tr. 983-84; Gov't Ex. 11.

294. Sequoyah Memorial medical staff administered Haldol to Barrett, but emergency room staff commonly use it to treat agitation, and Dr. Pitt characterized as "irresponsible" any inference that its administration to the defendant signified a diagnosis for a mood disorder. Tr. 985-86, 1114-15.

295. Dr. Pitt acknowledged that Barrett had received prescriptions for two anti-depressants, Asendin and Elavil, but observed that the records indicated that he never actually took the medications. Tr. 1073-74.

296. As part of his evaluation, Dr. Pitt reviewed documents from Bill Willis Community Mental Health Center and Wagoner Hospital, where Barrett received treatment following a provisional diagnosis of bipolar disorder by a non-physician and was discharged for non-compliance. Tr. 986-87, 1080-81; Gov't Exs. 8 & 9.

297. When discharged, Barrett received a diagnosis of organic affective disorder, polysubstance abuse, amphetamine dependence, and urine drug screen positive for cannabis, and then marital conflicts. (The now-disused term "organic affective disorder," referred to a mood disorder that was, according to Dr. Pitt, the apparent byproduct of substance abuse). Tr. 989-90, 1080-81.

298. Dr. Pitt rejected the provisional diagnosis Barrett received for bipolar disorder. Tr. 987-88.

299. Barrett's history of substance abuse precluded a diagnosis for Bipolar disorder. Tr. 988; *see* Tr, 1120-22 ("You can't be giving these diagnoses as the primary diagnosis without first giving strong consideration and mentioning and weighing heavily the chronic methamphetamine use").

300. As part of his evaluation, Dr. Pitt reviewed documents from St. Francis Hospital concerning Barrett's treatment for wounds sustained after murdering Trooper Eales, including a drug screen positive for cannabinoids and high levels of amphetamines and a record of the defendant's admission to using methamphetamine and marijuana that night. Tr. 991-92; Gov't Ex. 7.

301. Taken together, the medical records did not, in Dr. Pitt's opinion, suggest Barrett suffered from bipolar disorder or post-traumatic stress disorder. Tr. 993.

302. As part of his evaluation, Dr. Pitt reviewed Barrett's Bureau of Prisons records, which did not reflect diagnoses for bipolar disorder or post-traumatic stress disorder, though custodial settings are stressful and therefore impede the suppression of mental health symptoms. Tr. 995-96, 1088-90.

303. Dr. Pitt did not credit Barrett's claim that he could not recognize his own symptoms of mental illness in prison: he was verbally competent and insightful. Tr. 996-97.

304. Dr. Pitt rejected the notion that Barrett used illicit drugs to self-medicate bipolar disorder, as he had no access to drugs in federal custody but exhibited no symptoms of the illness. Tr. 1055.

305. To the extent he thought Barrett might have self-medicated with drugs, Dr. Pitt opined that the defendant was ameliorating the low that came at the end of each cycle of drug use. Tr. 1117-18.

24

306. While mentally ill people sometimes self-medicate, Dr. Pitt stated that mental health professionals do not deduce underlying illnesses from the existence of a commonly-occurring co-morbid condition.  Tr. 1038-39, 1116.

307. Dr. Pitt opined that Barrett's suicide attempts or gestures were attributable to substance abuse.  Tr. 994.

308. Barrett denied a history of head injuries at Eastern State Hospital and upon intake in the Oklahoma Department of Corrections.  Tr. 998-999; Gov't Ex. 66.

309. In a checklist completed at the Oklahoma Department of Corrections, Barrett also denied symptoms consistent with mental illness or head injury, including "periods of unconsciousness, blurred vision, double vision, depression or excessive worry, frequent thought of suicide and paralysis."  Tr. 1000.

310. Dr. Pitt acknowledged some records that Barrett had sustained head injuries, and thought the truth lay somewhere between his litigation claims and his earlier denials.  Tr. 1031-32.

311. On the night of the murder, Dr. Pitt opined that Barrett was not, irrespective of his family history, suffering from bipolar disorder, as a mental health professional could not diagnose bipolar disorder if the symptoms were better explained by the physiological effects of a substance or by a medical condition.  Tr. 1006-08, 1016-26.

312. Dr. Pitt explained that he considered Barrett's family history, but that mental health professional do not diagnose on that basis alone.  Tr. 1057; see Tr. 1112-13.

313. Dr. Pitt noted that not a single mental health professional had ever treated Barrett for bipolar disorder and that the only person who ever made such a diagnosis later changed it.  Tr. 1008, 1049-50.

314. Dr. Pitt also concluded that, despite a dysfunctional upbringing, Barrett did not suffer from post-traumatic stress disorder: the defendant did not endorse the symptoms of the condition, and Dr. Pitt could not identify a threshold event that met the initial criteria for it.  Tr. 1009-10, 1049-50.

315. While acknowledging Barrett's sometimes abusive upbringing, Dr. Pitt did not identify any incident that "rose to the level of a traumatic event that would really qualify for PTSD," and observed that no mental health professional apart from Dr. Woods had made the diagnosis, while Dr. LaFortune had specifically rejected it.  Tr. 1091-92.

316. While conceding that testing might have detected neurological deficits, Dr. Pitt did not find evidence of brain damage that affected Barrett on the night of the murder: the defendant's verbal, social and mechanical competence foreclosed a finding of brain damage that impacted Barrett's choices at the time of the offense.  Tr. 1012-13.

317.    Dr. Pitt did not diagnose Barrett with anti-social personality disorder, as he could not establish that the defendant had exhibited qualifying behaviors in his youth. Tr. 1013-14.

318.    Dr. Pitt opined that Barrett could distinguish right from wrong at the time of the murder, largely because he said so, but also because the defendant had prior legal problems and understood what constituted unlawful behavior. Tr. 1014.

319.    On the night of the murder, Dr. Pitt diagnosed Barrett with amphetamine dependence with physiologic dependence, features of an antisocial personality disorder, cannabis dependence, and a possible learning disorder. Tr. 1015, 1036-37.

320.    While Barrett reported attention deficits to Dr. Pitt, he did "remarkably well" on a screening evaluation. Tr. 1037-38.

321.    Dr. Pitt acknowledged some professionals had observed paranoid features in Barrett, but attributed the behavior to drug use. Tr. 1039-40, 1047.

322.    Dr. Pitt also acknowledged the possibility that Barrett had elevated scores on specific psychometric depression and schizophrenia scales, but explained that mental health professionals do not interpret individual scales in isolation, and he referred to the results as "soft" data points. Tr. 1061-62, 1122-23.

323.    While Dr. Price had observed in Barrett features of a paranoid personality, Dr. Pitt explained the finding did not represent the diagnosis of a disorder that interfered with daily functioning, and further stated, "I would expect those features in someone with Mr. Barrett's legal history and . . . drug use history." Tr. 1119-20.

324.    To the extent that Barrett's relatives observed that he exhibited mood swings, Dr. Pitt could not find any reason to believe they could distinguish his behavior from the effects of drug use. Tr. 1118.

### CONCLUSIONS OF LAW

1. To demonstrate ineffective assistance, Barrett must show his attorneys' performance was deficient and that the deficiencies were prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

2. Thus, Barrett first must show that counsel's performance fell below prevailing professional norms. *Knowles v. Mirzayance*, 556 U.S. 111, 124 (2009); *United States v. Salazar*, 323 F.3d 852, 857 (10th Cir. 2003).

3. In demonstrating unreasonable performance, Barrett must overcome a strong presumption that counsel provided adequate assistance. *United States v. Kennedy*, 225 F.3d 1187, 1197 (10th Cir. 2000) (citation omitted).

26

4. The prejudice prong of *Strickland* imposes a heavier burden on the petitioner than the harmless error test applied on direct appeal. *United States v. Haddock*, 12 F.3d 950, 958 (10th Cir. 1993).

5. Under the prejudice prong, Barrett must show that, absent an alleged error, a reasonable probability exists that he would have received a more favorable verdict. *See Haddock*, 12 F.3d at 958.

6. An attorney need not investigate all leads or present all available mitigating evidence, so long as the decision to forego a particular lead or present particular evidence is reasonable under the circumstances. *See Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008).

7. "[R]easonably diligent counsel may draw a line when they have good reason to think further investigation would be a waste." *Rompilla v. Beard*, 545 U.S. 374, 383 (2005).

8. When Messrs. Smith and Hilfiger took over Barrett's representation in federal court, the homicide had been tried twice in state court as a capital case.

9. Messrs. Smith and Hilfiger believed they received all the files from prior counsel and their investigators, and any error in that regard was reasonable given the volume of material they received.

10. Messrs. Smith and Hilfiger had no reason to believe that prior counsel had completely failed to develop a case in mitigation.

11. During the state proceedings, Mr. Echols received reports from multiple mental health experts, including Dr. Bianco and Dr. LaFortune, which indicated Barrett did not suffer from a major mental illness.

12. Even if Messrs. Smith and Hilfiger were unaware of the Bianco and LaFortune, their ignorance of extant facts should not create a professional obligation to undertake an investigation they had reason to avoid. *See Rompilla v. Beard*, 545 U.S. 374, 383 (2005); *Williams v. Woodford*, 384 F.3d 567, 611 (9th Cir. 2002).

13. It would not advance the fairness of any trial to punish Messrs. Smith and Hilfiger for actions that would have been justified in light of prior counsel's records. *See Kimmelman v. Morrison*, 477 U.S. 365, 397 (1986) (holding the right to counsel would be shaken from "its constitutional moorings to hold that the Sixth Amendment protects criminal defendants against errors that merely deny those defendants a windfall").

14. Burdening successor counsel with investigative duties based on ignorance of documents they should have received from Mr. Echols would require a novel rule in violation of *Teague v. Lane*, 489 U.S. 288 (1989).

27

15. Barrett indicated to his trial attorneys that he did not want them to beg for his life and did not want to place his relatives in a bad light.

16. Trial counsel's recollections of Barrett's attitude toward mitigation evidence is corroborated by the defendant's own statements to his step-mother, Doris Barrett.

17. By at least his adolescent years, Barrett was a full participant in his family's dysfunction – defying his mother, abusing drugs, dropping out of school, abusing his much younger brother, and impregnating an underage girl.

18. Barrett was 38 years old when he murdered Trooper Eales and presumably well beyond the control of his mother, but he was then voluntarily living next door to Gelene Dotson -- facts that would have blunted an attempt to develop mitigation evidence based on their relationship

19. At the time he murdered Trooper Eales, Barrett was under the influence of marijuana and methamphetamine, having heavily abused drugs for most of his life, all facts that trial counsel reasonably sought to minimize.

20. Some of Barrett's relatives testified against him at trial, indicating that family support for him was, at best, unreliable.

21. Messrs. Smith and Hilfiger interviewed their client and his relatives and knew enough about his upbringing to make a reasonable tactical choice to avoid a mitigation case based on family dysfunction.

22. Given the Barrett's evidence and the ambiguous evidence concerning his relationships with his relatives, and the potentially damning evidence of his drug use, Messrs. Smith and Hilfiger reasonably selected a mitigation strategy to place the defendant in the best possible light before the jury.

23. Ms. Harris's recollection of past events was unreliable: she had little factual basis for expressed opinions about Barrett's upbringing, and the positive light she attempted to cast on him was inconsistent the opinions she held at the time of the crime.

24. Any testimony Ms. Harris might have offered on Barrett's behalf at trial would have been subject to significant impeachment.

25. Mark Dotson had little personal knowledge of Barrett, as they had little contact as children, adolescents or adults.

26. Given his lack of personal knowledge, Mark Dotson could have offered little value to the defense during Defendant's trial.

27. Mark Dotson's testimony also made clear that Barrett would not cease his drug abuse even when counseled to do so by relatives.

28

28. The family life details developed through Stephen Barrett added nothing of weight to the mitigation testimony he provided at trial.

29. Stephen Barrett's recollections only served to demonstrate that he and Defendant both experienced dysfunctional upbringings by an ineffective, alcohol-abusing mother. But, while Stephen Barrett succeeded in life, he did so because he chose to apply himself in school and reject the drug abuse Kenneth Barrett embraced in the face of express discouragement.

30. Stephen Barrett had little, if any, relationship with Kenneth Barrett and sparse foundation for opinions about the causes of his brother's behavior.

31. Stephen Barrett's own success, during an upbringing marred by dysfunction and drug use, tended to place Kenneth Barrett's failures in a more negative light.

32. According to Stephen Barrett, Kenneth Barrett was a violent and defiant adolescent, who apparently rejected the assistance and counsel offered by extended family members throughout his life, choosing instead to abuse drugs to his own detriment.

33. Doris Barrett may have had a close relationship with Defendant, but she did not directly participate in trial counsel's planning, and could only speculate about their strategies.

34. Doris Barrett testified inaccurately, if not dishonestly, about the extent of her relationship with Mr. Hilfiger: her recorded calls made clear she had far more access to Mr. Hilfiger than she claimed during her testimony before this Court.

35. To the extent that she was privy to Mr. Hilfiger's plans, Doris Barrett demonstrated a willingness to thwart them when she advised Kenneth Barrett not to testify based on advice she received from Mr. Echols.

36. Trial counsel would have reasonably rejected the opportunity to present the testimony of Ruth Harris, Mark Dotson, Stephen Barrett, and Doris Barrett, as adduced before this Court.

37. No reasonable likelihood exists that the failure to adduce the opinions of Barrett's relatives – as presented to this Court – prejudiced the verdict at trial.

38. Dr. Woods's testimony would have provided little mitigating weight at trial, as he did not provide credible expert testimony.

39. Dr. Woods evinced an obvious bias, based on his consistent history of testimony for capital defendants.

40. Dr. Woods evinced a further obvious bias in his willingness to selectively rely on facts: crediting a rejected preliminary diagnosis for bipolar disorder but rejecting evidence of drug abuse that included multiple drug tests, admissions by Barrett and a final diagnosis of polysubstance abuse.

29

41. Dr. Woods rendered a diagnosis of bipolar disorder in the face of published limitations on his ability to do so in the face of evidence of drug abuse.

42. Dr. Woods relied on historical records that did not support the facts for which he cited them.

43. Dr. Woods relied on Barrett's self-reports of head injuries despite a lack of corroborating records and evidence that the defendant exaggerated his claims in other statements.

44. Dr. Woods inferred mental health diagnoses from family history, rather than using that information to corroborate findings based on observable symptoms.

45. Dr. Woods inferred mental health diagnoses from a scant record of psychotropic drugs administered to Barrett, without learning the reasons for their use.

46. Dr. Woods rendered a diagnosis of post-traumatic stress disorder though Barrett subsequently failed to endorse the symptoms of that disorder.

47. Dr. Woods misunderstood the neuropsychological testing, asserting that Barrett tended to perseverate, when the psychometrics demonstrated otherwise.

48. Dr. Woods found that Barrett could not rationally assist his trial counsel, though not one of his trial attorneys ever observed such an issue.

49. Dr. Woods found that Barrett could not distinguish right from wrong at the time he murdered Trooper Eales, but Barrett stated otherwise when asked.

50. No reasonable likelihood exists that the absence of Dr. Woods's opinion prejudiced the outcome of Barrett's trial.

51. Dr. Miora's testimony would have provided little mitigating weight at trial, as she did not provide credible expert testimony.

52. Dr. Miora evinced an obvious bias, based on her consistent history of testimony for the defense.

53. Dr. Miora evinced a lack of credibility in her sloppy test scoring and flippant attitude toward her errors – overlooking a missing page of data and referring to the resulting impact on Barrett's IQ score as "bupkis."

54. Dr. Miora's conclusions were inconsistent with known facts, as she seemed willing to posit that Barrett's WCST score indicated he could not drive though the historical record demonstrate he could.

55. Dr. Miora could not relate the results of neuropsychological testing to Barrett's daily functioning.

30

56. Dr. Miora never familiarized herself with the facts of Trooper Eales's murder and could not relate the results of neuropsychological testing to the crime.

57. Dr. Miora could not explain Barrett's demonstrated decline in processing speed between 2000 and 2009.

58. Dr. Miora could not identify the genesis of Barrett's supposed brain damage.

59. Specifically, Dr. Miora could not state that Barrett's own drug use had not cause any apparent brain damage.

60. Dr. Miora testified vaguely to the significance of variations in Barrett's test performance, but never identified a scientific theory or principle that supported her stated concerns.

61. Dr. Miora testified vaguely to the significance of variation s in Barrett's test performance, but never explained what inferences she could draw from them.

62. Dr. Miora never explained how she could find brain damage in the face of Barrett's average or better scores on the overwhelming majority of the D-KEFS.

63. Dr. Miora never explained why neuropsychological testing in 2009 was more reliable than the data available from Dr. Bianco and Dr. Price, much closer in time to the crime.

64. Dr. Miora never explained why Barrett's deficits might have had significance to his behavior at the time of the crime, given his obvious verbal, social and mechanical functioning, as noted by Dr. Pitt.

65. Had trial counsel adduced the opinions of Dr. Woods and Dr. Miora, the government would have rebutted the evidence with testimony from Dr. Pitt and Price, underscoring Barrett's drug abuse and anti-social traits.

66. No reasonable likelihood exists that the absence of Dr. Miora's opinion prejudiced the outcome of Barrett's trial.

67. No reasonable likelihood exists that Barrett would have received a more favorable sentencing verdict had he presented any of the evidence he adduced before this Court.

**CONCLUSION**

Based on the foregoing, the government respectfully urges this Court to deny § 2255

relief.

Dated: July 31, 2017.

> Respectfully submitted,
>
> DOUGLAS A. HORN
> Acting United States Attorney
> Eastern District of Oklahoma
>
> /S/ *Christopher J. Wilson*
> CHRISTOPHER J. WILSON, OBA # 13801
> Assistant United States Attorney
> 520 Denison Avenue
> Muskogee, OK 74401
> Telephone: (918) 684-5100
> FAX: (918) 684-5150
>
>
> /S/ *Jeffrey B. Kahan*
> JEFFREY B. KAHAN, PaBN #93199
> Trial Attorney, Capital Case Unit
> U.S. Dept. of Justice
> 1331 F Street, NW; 6th Fl.
> Washington, DC 20530
> Telephone: (202) 305-8910
> FAX: (202) 353-9779

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on July 31, 2017, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit

1997

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| v. | ) | **Case No. CIV-09-105-JHP** |
| | ) | |
| UNITED STATED OF AMERICA, | ) | |
| | ) | |
| **Defendant.** | ) | |

## REPORT AND RECOMMENDATION

The Plaintiff Kenneth Eugene Barrett was tried and convicted in this Court in 2005 on two counts of felony murder pursuant to 18 U.S.C. § 924(c)(1)(A) and one count of killing a state law enforcement officer in the commission of a drug trafficking crime pursuant to 21 U.S.C. § 848(e)(1)(B).  He was sentenced to life in prison on the felony murder counts, and to death on the third count.  *See* Case No. CR-04-115-JHP, Docket No. 285.  The convictions and sentences were affirmed on direct appeal.  *See United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).  Barrett (the plaintiff or petitioner in this case, and the defendant in Case No. CR-04-115-JHP, referred to herein as "the Defendant") then sought post-conviction relief pursuant to 28 U.S.C. § 2255, which this Court denied without a hearing.  *See Barrett v. United States*, Case No. CIV-09-105-JHP, Docket No. 214, 2012 WL 3542609 (E.D. Okla. Aug. 16, 2012) [unpublished opinion].  The United States Court of Appeals for the Tenth Circuit granted a certificate of appealability (COA) on seven of the Defendant's claims for ineffective assistance of counsel, and affirmed the this Court's decision as to all claims but one, *i. e.*, whether the Defendant's "trial attorneys were

ineffective by failing to investigate and present evidence of his background and mental health for the trial's penalty phase." *Barrett v. United States,* 797 F.3d 1207, 1211 (10th Cir. 2015). The Tenth Circuit found that an evidentiary hearing was needed to resolve factual disputes and determine the merits of the claim. *Id.* at 1232 ("In short, we believe that Defendant presented sufficient evidence of deficient performance and prejudice to entitle him to an evidentiary hearing."). On remand, the District Judge referred the case to the undersigned Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) for an evidentiary hearing and a report and recommendation. The undersigned Magistrate Judge heard evidence on March 27-30, 2017, June 12-13, 2017, and June 26, 2017, and afterward granted the parties until July 31, 2017 to submit Proposed Findings of Fact and Conclusions of Law. For the reasons set forth below, the undersigned Magistrate Judge recommends that the Defendant be granted relief under 28 U.S.C. § 2255 and given a new sentencing hearing on the charge of intentionally killing a state law enforcement officer in the commission of a drug trafficking crime.

<div align="center">**FINDINGS AND ANALYSIS**</div>

The background and facts of this case have been set out at length in previous decisions over the past twelve years and will not be reiterated here other than as needed to address Barrett's claim of ineffective assistance of counsel at the sentencing phase of his trial. With regard to such a claim, Barrett must demonstrate that the performance of his trial attorneys fell below an objective standard of reasonableness, and that he was prejudiced thereby. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). And although ordinarily "counsel is strongly presumed to have rendered adequate assistance and made

<div align="center">-2-</div>

all significant decisions in the exercise of reasonable professional judgment[,]" *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011), *quoting Dever v. Kansas State Penitentiary,* 36 F.3d 1531, 1537 (10th Cir. 1994), closer scrutiny must be applied "when reviewing attorney performance during the sentencing phase of a capital case." *Cooks v. Ward,* 165 F.3d 1283, 1294 (10th Cir. 1998). *See also Osborn v. Shillinger,* 861 F.2d 612, 626 n.12 (10th Cir. 1988) ("[T]he minimized state interest in finality when resentencing alone is the remedy, combined with the acute interest of a defendant facing death, justify a court's closer scrutiny of attorney performance at the sentencing phase."). Counsel's performance is judged "by reference to 'prevailing professional norms,' which in capital cases include the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases[.] 'Among the topics defense counsel should investigate and consider presenting include medical history, educational history, employment and training history, family and social history, prior adult and juvenile correctional experiences, and religious and cultural influences.'" *Hooks v. Workman*, 689 F.3d 1148, 1201 (10th Cir. 2012), *quoting Young v. Sirmons,* 551 F.3d 942, 957 (10th Cir. 2008).

### 1. Deficient Performance

In addressing the question of deficient performance, the Tenth Circuit observed that the Defendant had "presented a case that his defense team did little to investigate his background and mental condition . . . [I]t may never have hired a mitigation expert or a mental-health professional to assess Defendant's mental capacity" [and] "also apparently did little to investigate his background or mental health through his family." Barrett, 797 F.3d at 1225. Noting that any such omissions would ordinarily constitute deficient

-3-

performance, the Tenth Circuit proceeded to examine three explanations proffered by the government for such a strategy: (i) there was no reason to suspect the Defendant suffered from any mental impairment, and thus no need to investigate; (ii) the Defendant opposed such a mitigation strategy; and (iii) defense counsel developed a reasonable mitigation strategy without such investigation. *Id*. at 1225-1226. Finding these explanations doubtful on the existing record, the Tenth Circuit determined that the case should be remanded for an evidentiary hearing and further factual development. *See, e. g., Barrett,* 797 F.3d at 1228 ("We express no opinion on the issue; an evidentiary hearing can resolve the matter.").

Lack of Mitigation Expert/Background Investigation. The record before the Tenth Circuit as well as the evidence presented at the evidentiary hearing before this Court is consistent with the Tenth Circuit's observations that the Defendant's attorneys apparently never hired an expert on the issue of mitigation or otherwise themselves investigated the Defendant's mental health history or family background. *See, e. g., Barrett,* 797 F.3d at 1225 ("Additional evidence further supports Defendant's assertion of a lack of effort to retain mitigation expertise."). The undersigned Magistrate Judge therefore finds that the Defendant's attorneys neither retained any experts to assist in the investigation or presentation of mitigation evidence nor investigated that avenue of defense themselves.

Any analysis on this point must begin with the procedural history of the case prior to the indictment of the Defendant herein. The Defendant was tried twice for capital murder in the District Court of Sequoyah County for the episode giving rise to the charges in this case. The first trial resulted in a hung jury and the second in a manslaughter conviction. Attorney John Echols represented the Defendant at both trials, and was initially appointed

-4-

lead counsel (along with attorney Roger Hilfiger) to represent the Defendant in this case. Mr. Echols retained Roseann Schaye to serve as the mitigation investigator prior to the first state court trial (Tr. 428-429), but eventually settled on investigator Steve Leedy of the Oklahoma Indigent Defense System (Tr. 431). Mr. Echols also retained psychologist Dr. Jeanne Russell for an assessment as to future dangerousness, but she did not perform any comprehensive mental health evaluation or otherwise act as a mitigation investigator in the state court trials (Tr. 440, 444-45). Ultimately, no mitigation evidence was needed at the state court trials, as the Defendant was not convicted of any capital crime.

Mr. Echols sought leave to withdraw from representation of the Defendant in this case early in the proceedings. Mr. Hilfiger became lead counsel, and attorney Bret Smith was appointed to assist him. At the evidentiary hearing, Mr. Hilfiger testified that Mr. Echols initially provided the strategic planning for the Defendant's trial in this Court because he had done so for the two previous state court trials (Tr. 664). Billing records filed prior to Mr. Echols' withdrawal indicate that he requested authorization and funding for a mitigation investigator, *see* Case No. CIV-04-115-JHP, Docket Nos. 46, p. 4, & 97, p. 3, which was approved by the Court, and that Inquisitor, Inc. was chosen for this purpose (Tr. 672). Mr. Echols also requested an evaluation of the Defendant for organic brain dysfunction. But Mr. Hilfiger testified that he never had any contact with Inquisitor, Inc. (Tr. 672), and he decided after Mr. Echols withdrew that an evaluation for organic brain dysfunction was unnecessary as nothing in his interaction with the Defendant gave him any concerns about his mental capacity (Tr. 666, 676, 684). Mr. Hilfiger indicated that he

-5-

disagreed with Mr. Echols' "shotgun approach" to defense of the case in any event, preferring instead his own "more specific" approach (Tr. 685).

Mr. Hilfiger's billing records from June 29 and July 18, 2005 reflect that Mr. Hilfiger discussed a mitigation expert with Mr. Smith, but Mr. Hilfiger had no independent recollection of the substance of the conversation (Tr. 714-716). *See* Pet. Hr'g Ex. 72.  Mr. Hilfiger did recall meeting with Dr. Russell and Mr. Smith in August 2005, but could not recall the exact details of the meeting (Tr. 721).  It was his testimony that they discussed her continuing with and completing an updated risk assessment with regard to the Defendant's future dangerousness (Tr. 725).  Mr. Hilfiger recalled that Dr. Russell did not believe her actual testimony at trial would be beneficial, because she believed the government's rebuttal would be detrimental to the Defendant (Tr. 726).  In reviewing billing records and who he interviewed between the two phases of trial, Mr. Hilfiger testified that their strategy became the use of live witnesses, rather than opinions from experts such as Dr. Russell, with regard to the Defendant's future risk of danger (Tr. 737).

When asked why they did not hire a mitigation expert, Mr. Hilfiger testified that he did not believe it would do the defense any good because they had previous reports and live witnesses to testify (Tr. 739).  Although Mr. Hilfiger testified that he believed he had access to these reports, he generally had no recollection of them and there is no indication he acted upon any of the information in them.  Moreover, he did not recall any family members discussing a possible mental illness with regard to the Defendant, nor any information regarding possible head injuries (Tr. 738).  Rather, he testified that the mitigation strategy included informing the jury that the Defendant had already been

convicted in state court, in order to garner sympathy or empathy since he was already convicted and serving time for the same thing (Tr. 747-748).  They also called jailers and prison guards to talk about the Defendant's conduct and demonstrate he was not a future danger to anyone within the prison (Tr. 749).  Mr. Hilfiger recalled that the Defendant did not want the defense team to "beg for his life," but he did not recall the Defendant saying he preferred a death sentence over a life sentence (Tr. 753-754).

Mr. Hilfiger had no independent recollection of a psychological evaluation done by Bill Sharp, Ph.D. in 2002, or any of Roseann Schaye's reports, although he seemed to believe he likely had received them from Mr. Echols, he had access to them, and would have reviewed them (Tr. 705, 688, 695-697).  Dr. Sharp concluded in his evaluation that, *inter alia*, the Defendant follow up on the possibility of organic neurological damage, and that he seek mental health services.  Gov't Hr'g Ex. 16. Nevertheless, Mr. Hilfiger did not believe there was a need for an expert on diagnosing organic brain disorders, because "we didn't see any need to."  (Tr. 739-740).

Mr. Smith's testimony at the evidentiary hearing confirmed that the defense team did not hire any mitigation expert to assist in preparing for a penalty-phase presentation.  He testified that upon first meeting with Mr. Echols, he thought "a mitigation specialist was required from his reading of the guides" and "at a minimum this case required two trial lawyers, an investigator and a mitigation specialist" (Tr. 524), but felt it was not his to lead in the case but rather to assist Mr. Hilfiger (Tr. 634).  Mr. Smith added that Mr. Hilfiger planned to rely on what Mr. Echols had done in the state court trials and believed that a mitigation case could be "whipped into shape for trial" (Tr. 527).  Though they were

-7-

planning to use the preparation work done in the state court cases as a starting point for developing mitigation evidence, they apparently did not believe there was no duty on their part to develop a mitigation strategy (Tr. 538).

When asked about whether he considered mental health problems as mitigating evidence for the Defendant, Mr. Smith noted that the Defendant had been through two previous state trials with no concerns regarding his *competence*, and he repeatedly stated a belief that the Defendant's mental condition would have been explored prior to his entry into the case in May 2005 (Tr. 533-534, 573, 604). Mr. Smith characterized the Defendant as a person who had "good recall," and knew "a lot of details about his case that [Mr. Smith was] interested in hearing" (Tr. 552). He testified that, in his interactions, he never experienced the Defendant as having "serious mental health problems," but offered no opinion on the Defendant's background (Tr. 555). He was not familiar with Dr. Sharp's report, either (Tr. 555-556).

Mr. Smith recalled the meeting with Mr. Hilfiger and Dr. Russell in August 2005. They discussed pursuing a mitigation strategy based on the Defendant's dangerousness, rather than pursuing a "full-blown mitigation strategy" (Tr. 559). His understanding was that in general a mitigation specialist performs an investigation including the history of the defendant and family members (including extended family) that encompasses, *inter alia*, health, background, and education, but that Dr. Russell's scope of work in *this* case was limited to the issue of future dangerousness (Tr. 562-563). As part of that limitation, Mr. Smith recalled that Dr. Russell did not have the time to do the work of a mitigation specialist, asserting, "I don't think anybody had an idea when we left that meeting that she

-8-

was our mitigation specialist." (Tr. 563).  Referring to Dr. Russell's report, he interpreted it as stating that "nothing in [her interview of the Defendant] indicated to [her] that Kenny is nuts . . . It doesn't exclude the fact that he may have some underlying mental health issues that meet these psychological criteria." (Tr. 569).  Mr. Smith also indicated that he and Mr. Hilfiger were concerned about potential testimony from Dr. Randall Price, a government expert, as to the dangerousness of the Defendant, and that conversations with Dr. Russell helped steer them away from any evidence that might implicate his testimony (Tr. 610).  During the penalty phase, the mitigation strategy thus included establishing the unfairness of the federal prosecution (after the state-court prosecution), as well as the Defendant's lack of dangerousness (Tr. 613).

Dr. Russell's testimony makes clear the extent to which she was to provide assistance as mitigation evidence. She testified that she had never worked a mitigation investigator for a criminal defendant in any type of case, capital or otherwise (Tr. 768-769).  She first met the Defendant in 2003 when Mr. Echols asked her to conduct a risk assessment on the Defendant, which involved determining in what situations or context a person will be dangerous (Tr. 769-771).  She did not conduct a comprehensive mental health examination of the Defendant, but would have testified as to future dangerousness of the Defendant in the state court trials had there been a penalty phase (Tr. 772-773, 790-791).  She met with Mr. Hilfiger and Mr. Smith in August 2005 and agreed to do an updated risk assessment and to help prepare cross-examination for the guilt phase of the trial (Tr. 774).  Counsel

asked her about serving as a mitigation investigator, but she declined (Tr. 769, 775-776).[1]

In her opinion, a competent mitigation investigation would not just be a risk assessment or

an updated risk assessment (Tr. 791).

In summary, the undersigned Magistrate Judge finds that the Defendant's federal

trial counsel neither hired a mitigation or mental-health professional nor attempted to

investigate themselves in any depth the Defendant's mental health or family background.

The undersigned Magistrate Judge next turns to the reasons offered by the government why

such failures by defense counsel did not amount to deficient performance.

Reasons for Failure to Investigate.  As noted by the Tenth Circuit, the government

offers three reasons why the Defendant's trial attorneys' failure to investigate his mental

health history or family background was not deficient performance: "first, they had no

indications that Defendant suffered from a mental impairment, so there was no reason to

pursue that line of inquiry; second, Defendant opposed a mitigation strategy based on

personal sympathy or his childhood; and third, they already had a reasonable mitigation

strategy."  *Barrett*, 797 F.3d at 1226.  Taking each of these arguments in turn, the

undersigned Magistrate Judge first addresses the Government's argument that there was

no reason to pursue a line of inquiry related to mental impairments.

The testimony and declarations by Mr. Hilfiger and Mr. Smith state that their

interactions with him made them feel there was no need to go further.  *See* Gov't Hr'g Exs.

---

[1] Dr. Russell originally testified that she was not asked to serve as a mitigation investigator, but upon having her recollection refreshed by a 2009 affidavit, she recalled that she was asked by Mr. Hilfiger and Mr. Smith to serve as a mitigation investigator and declined (Tr. 775-776).

-10-

1-2. But this ignores the evidence available to them in records from Mr. Echols and from the state court mitigation investigation by Steve Leedy indicating the Defendant's personal history included head injuries, a suicide attempt in 1986 and another mental health hospitalization in 1995, and a tumultuous childhood that included impermanence, violence, and substance abuse, as well as the Defendant's extended family history which included generations of suicide attempts, volatility, substance abuse, and other mental health problems. Mr. Hilfiger testified that he met with family members but that they did not volunteer information about past head injuries, nor is there any indication in the record that he inquired on any of these subjects, and Mr. Smith testified that while he met with members of the Defendant's family, he did not interview them on the issues a mitigation specialist would have (Tr. 572, 738). Rather, their testimony indicated that they believed the Defendant was competent, and that they looked no further with regard to mental impairments or organic brain injury. This was error. *See Littlejohn v. Trammell*, 704 F.3d 817, 860 n. 23 (10th Cir. 2013) ("[W]here there are credible, reasonably discernable clues that a capital defendant's circumstances will support a mitigation theory based on organic brain damage, it is at the core of a defense counsel's constitutional responsibilities to conduct a reasonable investigation into the existence of evidence to validate or bolster such a theory and, ordinarily, to present such evidence to the jury, if it is found."). The Tenth Circuit makes clear that the issue is whether they even asked these questions in an attempt to discover mitigating evidence, and the undersigned Magistrate Judge finds that they did not. *Barrett*, 797 F.3d at 1226, *citing Cole v. Trammell*, 755 F.3d 1142, 1161 (10th Cir. 2014) ("[b]ecause 'family and social history' is one of the crucial areas of investigation

-11-

emphasized in the ABA Guidelines," the Court assumes that a failure to contact family members was constitutionally deficient performance.).

In fact, nothing in counsels' testimony indicates that they ever asked about "Defendant's mental health, background, or family history." *Id.* This is borne out further by Mr. Hilfiger's testimony, where he testified that although he did not recall that Mr. Echols had advised him about what he ought to do regarding mental health experts (as Mr. Echols testified that he did (Tr. 490-491, 693)), he was aware of the requests for an expert on an organic brain disorder and disagreed with Mr. Echols's opinion that they were necessary (Tr. 683-684). For his part, Mr. Smith does not recall being aware of the request for an expert in the area of organic brain dysfunction, or history of head injuries, although he was aware of the Defendant's 1986 suicide attempt (Tr. 578-579). He nevertheless agrees that he had access to all of Mr. Echols's files, which included a substantial amount of evidence relevant to mitigation (Tr. 531-532, 534, 574, 687-688). *See also Barrett*, 797 F.3d at 1226-1227. Moreover, we know that Mr. Hilfiger and Mr. Smith were in possession of Dr. Russell's original risk assessment at least as early as August 2005 when they met with her originally, as well as the updated risk assessment done for the federal trial, both of which set out in detail the records upon which she relied, including, *inter alia*, the 1986 hospital records, the 1995 hospital and mental health records, and reports from Ms. Schaye and Dr. Sharp (Tr. 544-545, 718-719, 722). *See also* Gov't Exs. 34, pp. 1-2 & 35, pp. 8-9. As such, the undersigned Magistrate Judge finds that there was sufficient evidence and indication for them to pursue an investigation into the Defendant's background, family history, and mental health, and that Mr. Hilfiger and Mr. Smith chose not to do so.

-12-

Furthermore, their actions were contrary to 2003 Supreme Court precedent which holds that failing to conduct an investigation was unreasonable where "counsel abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources." *Wiggins v. Smith*, 539 U.S. 510, 524 (2003) (describing as a "well-defined norm" that "investigations into mitigating evidence 'should comprise efforts to discover *all reasonably available* mitigating evidence and evidence to rebut any aggravating evidence that may be introduced by the prosecutor.'") (emphasis in original), *quoting* ABA Guidelines for the appointment and Performance of Counsel in Death Penalty Cases 11.4.1(C) p. 93 (1989). *See also Strickland*, 466 U.S. at 690-691 ("[S]trategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation.").

The Government's position seems to be that Mr. Hilfiger and Mr. Smith's actions were not deficient because they could not tell the Defendant had a mental impairment, *i. e.*, he was competent (Tr. 604). But as the Tenth Circuit has stated:

> While counsel is afforded a great amount of deference in presenting a defense, *see Danny Hooks*[ *v. Workman*, 606 F.3d 715, 723 (10th Cir. 2010)], the failure to investigate a compelling mitigation theory can constitute ineffective assistance, *see Anderson*[ *v. Sirmons*, 476 F.3d 1131, 1145 (10th Cir. 2007)]. "[W]e focus on whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . *was itself reasonable.*" *Wiggins,* 539 U.S. at 523, 123 S. Ct. 2527. And, in making this determination, we cannot rely on "hindsight." *Rompilla*[ *v. Beard*, 545 U.S. 374, 381 (2005)]. Instead, we examine the reasonableness of "counsel's perspective at the time investigative decisions are made." *Id.* (quoting *Strickland,* 466 U.S. at 689, 104 S. Ct. 2052).

-13-

*Littlejohn v. Trammell*, 704 F.3d 817, 862 (10th Cir. 2013) (emphasis in original) (internal quotation marks omitted).  *See also Wilson v. Sirmons,* 536 F.3d 1064, 1084–85 (10th Cir. 2008) ("First, the question is not whether counsel did *something;* counsel must conduct a full investigation and pursue reasonable leads when they become evident. Second, to determine what is reasonable investigation, courts must look first to the ABA guidelines, which serve as reference points for what is acceptable preparation for the mitigation phase of a capital case. Finally, because of the crucial mitigating role that evidence of a poor upbringing or *mental health problems* can have in the sentencing phase, defense counsel must pursue this avenue of investigation with due diligence.") (emphasis added), *citing*, *inter alia*, *Rompilla*, 545 U.S. at 387 n.7; *Wiggins*, 539 U.S. at 524. "[S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland v. Washington,* 466 U.S. at 690–691.  Thus, "[t]he proper measure of attorney performance remains simply reasonableness under prevailing professional norms.  We long have recognized that prevailing norms of practice as reflected in American Bar Association standards and the like . . . are guides to determining what is reasonable . . . .  Although they are only guides and not inexorable

-14-

commands, these standards may be valuable measures of the prevailing professional norms of effective representation, especially as these standards have been adapted to deal with the intersection of modern criminal prosecutions and immigration law." *Padilla v. Kentucky*, 559 U.S. 356, 366-367 (2010) (internal quotations and citations omitted).

Moreover, the undersigned Magistrate Judge finds that the concerns regarding the government's rebuttal evidence in the form of Dr. Price were not sufficient to forego an entire mitigation *investigation*. *Eaton v. Wilson*, 2014 WL 6622512, at *155 (D. Wyo. Nov. 20, 2014) ("The significant mitigation evidence presented to this Court, through lay and expert testimony, was not discovered, and if discovered, not utilized by Mr. Skaggs and the trial team. This lack of discovery and/or lack of use was apparently based on a concern an in-depth investigation might "open the door" to presentation of adverse information, arguably through the *possible* cross-examination of the potential mitigation witnesses. This type of mitigation investigation is inevitably ineffective as a judgement as to whether potential mitigation evidence will be helpful or harmful is not possible when there is absolutely no knowledge or understanding, based on a reasonable investigation, of the nature and character of the potential evidence. This is why a 'counsel's failure to uncover and present voluminous mitigating evidence at sentencing could not be justified as a tactical decision to focus on Williams' voluntary confessions, because counsel had not 'fulfill[ed] their obligation to conduct a thorough investigation of the defendant's background.'"), *quoting Wiggins*, 539 U.S. at 522, *quoting Williams v. Taylor*, 529 U.S. 362, 396 (2000).

<div align="center">-15-</div>

Next, the Government asserts that Mr. Hilfiger and Mr. Smith were constrained in their mitigation investigation by the Defendant himself, who did not want them to beg for his life. This was supported by statements in declarations by Mr. Hilfiger and Mr. Smith, presented by the Government. Gov't Hr'g Exs. 1-2. However, neither Mr. Hilfiger nor Mr. Smith testified they were constrained in such a fashion by the Defendant with regard to their mitigation strategy. There *is* evidence that the Defendant changed his mind from time to time, but ultimately after Mr. Echols withdrew from the case the Defendant instructed Mr. Hilfiger to "try [his] hardest to beat this." *See* Docket No. 71, Ex. 26. Mr. Hilfiger recalled that the Defendant did not want them to beg or plead for his life, but he did not recall the Defendant expressing a preference for the death penalty over a life sentence (Tr. 753-754). In fact, the Defendant was cooperative, particularly with Mr. Smith who stated that the Defendant "impressed [him] as among the most cooperative criminal defense clients [he had] ever had." (Tr. 547, 600). Neither of the attorneys recalled specific conversations with the Defendant regarding a mitigation investigation, its purpose, and how it would be used (Tr. 634-635, 715-718). Rather, most of their testimony regarding mitigation work revolved around their August 2005 meeting with Dr. Russell and her subsequent contributions to their defense. Additionally, both Mr. Hilfiger and Mr. Smith referred to the work done in the previous state court trial as explanation for their actions, indicating a belief that they could "build on" what had previously been done (Tr. 527, 685).

As part of the Government's argument regarding the Defendant's constraints on their mitigation efforts, the government also references the Defendant's outburst in the

middle of the Prosecution's penalty-phase closing argument.  However, both Mr. Hilfiger and Mr. Smith seemed to consider the Defendant's outburst an aberration, and related to ensuring that the focus of the trial was him and not his family members.  Gov't Hr'g Exs. 1-2.  Mr. Smith also testified that the Defendant had not wanted his ex-wife to testify, and Mr. Smith believed that the Defendant felt sorry about their past and did not want to further involve her or embarrass her (Tr. 633).  But this opinion regarding his ex-wife and discussion of his family members is easily distinguishable from a complete opposition to any mitigating evidence or investigation.  And startling though the outburst itself may have been at the time of trial, it is not conclusive evidence that the Defendant opposed an entire mitigation strategy, nor did Mr. Hilfiger and Mr. Smith attempt to make such an assertion at the evidentiary hearing.  Furthermore, no additional evidence or testimony as to the outburst was presented at the evidentiary hearing in support of this argument.  In any event, the undersigned Magistrate Judge finds that Mr. Hilfiger and Mr. Smith were not so constrained by the Defendant that they were prevented from even considering or conducting a mitigation investigation into the Defendant's background and mental health status.

Finally, the government asserts that the Defendant's attorneys made an alternative choice with regard to the mitigation strategy, *i. e.*, that he would be presented as a loving family member and that he posed no future danger in prison.  But as the Tenth Circuit noted, "an uninformed choice is not a reasonable tactical decision." *Barrett*, 797 F.3d at 1228.  The evidence adduced at the hearing supports a finding that the "alternative mitigation strategy" used by the Defendant's trial counsel was made not after a reasonable

-17-

investigation but rather was done out of expedience.  *Barrett*, 797 F.3d at 1228-1229 ("[A] decision to focus on one potentially reasonable trial strategy [cannot be] justified by a tactical decision when counsel did not fulfill their obligation to conduct a thorough investigation of the defendant's background."), *quoting Sears v. Upton*, 561 U.S. 945, 954 (2010).

In summary, the undersigned Magistrate Judge finds no merit in any of the reasons offered by the government as justification for the failure of defense counsel to investigate the Defendant's mental health history or family background (whether by professionals or otherwise).  The undersigned Magistrate Judge therefore concludes that the defense team rendered constitutionally deficient performance in developing a mitigation strategy.

### 2. Counsel's Deficient Performance Prejudiced the Defendant

"If we find that counsel's performance at sentencing was deficient, we must then analyze the prejudicial effect on [the] defense."  *Hooks*, 689 F.3d at 1202.  The Supreme Court has stated that "the *Strickland* inquiry requires . . . probing and fact-specific analysis" that "will necessarily require a court to 'speculate' as to the effect of the new evidence—regardless of how much or how little mitigation evidence was presented during the initial penalty phase."  *Sears v. Upton*, 561 U.S. 945, 955-956.  However, "[i]n judging the defense's investigation, as in applying *Strickland* generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time' investigative decisions are made, and by giving a 'heavy measure of deference to counsel's judgments.'"  *Rompilla*, 545 U.S. at 381, *quoting Strickland*, 466 U.S. at 689, 691.  Furthermore, "we must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the

-18-

prosecution's response to that evidence would have been." *Wilson v. Trammell*, <u>706 F.3d 1286, 1306</u> (10th Cir. 2013).

"To assess [the] probability [that the Defendant would have received a different sentence], we consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, <u>558 U.S. 30, 41</u> (2009), *quoting Williams v. Taylor*, <u>529 U.S. 362, 397-398</u> (2000). "A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial; it does not require that the petition show that counsel's deficient conduct more likely than not altered the outcome in the case." *Byrd v. Workman*, <u>645 F.3d 1159, 1168</u> (10th Cir. 2011) (internal quotations and citations omitted). On the issue of prejudice, the Tenth Circuit found that the proffered mitigation evidence was sufficient for an evidentiary hearing.

Specifically, the Tenth Circuit noted that the expert opinions of Dr. Bill Sharp, Dr. Myla Young, and Dr. George Woods required additional findings at the evidentiary hearing. Additionally, the Tenth Circuit found, *Barrett*, <u>797 F.3d at 1229-1230</u>, and it was again demonstrated at the evidentiary hearing, that the Defendant had a long family history including mental health problems going back to great-great grandparents, and that the Defendant's own immediate family included parents who were violent with each other, and whose relationship was characterized by infidelity and ultimately divorce, as well as both engaging in alcohol abuse. *See* Pet. Hr'g Exs. 1, 3, 5, 20, 27, 34, 36, 45-46, 48-50, 56-57. As such, the Defendant's childhood was characterized by early exposure to alcohol and alcohol abuse, as well as physical and emotional abuse and neglect. The record further

reflects that the Defendant himself was developmentally delayed, repeated the eighth grade while in special education classes, and began consuming alcohol, tobacco, and illegal drugs somewhere between the ages of eleven and fourteen. *Barrett*, 797 F.3d at 1229-1230. The Defendant dropped out of school in the ninth grade, ostensibly over a dispute with the principal related to cutting his hair (Tr. 285). *See also* Pet. Hr'g Ex. 55. Furthermore, the Defendant was hospitalized twice in 1986 following a suicide attempt, and again in 1995 after he reported he was afraid he was losing his mind. Pet. Hr'g Exs. 6, 51, 102; Gov't Hr'g Exs. 4-6, 8-9, 11. Additional testimony was presented to suggest that the Defendant was hit in the head with a steel ball as a child, and was beaten by police officers at the age of seventeen (Tr. 213, 334, 335-336). In addition to the above evidence that was readily available to Mr. Hilfiger and Mr. Smith, the Petitioner presented the following evidence and testimony with regard to the claimant's mental impairments and judgment.

Bill Sharp, Ph.D. On September 28, 2002, Dr. Bill Sharp conducted a psychological examination of the claimant, which has been made part of the record. Govt. Hr'g Ex. 16. Upon exam, he found that the claimant had average intellectual ability, but that judgment and insight "would range from only fair to good." *Id.*, pp. 5-6. More specifically, Dr. Sharp noted that the claimant's reading was consistent with his education, but that his spelling and arithmetic were "considerably below" his education level. *Id.* at p. 6. Dr. Sharp assessed the claimant with amphetamine dependence, cannabis dependence, and alcohol dependence, each in sustained full remission in a controlled environment; nicotine dependence in early partial remission in a controlled environment; rule out learning disorder not otherwise specified; and rule out attention-deficit/hyperactivity disorder,

-20-

predominantly hyperactive-impulsive type. Additionally, he found that the claimant had avoidant personality disorder and paranoid personality disorder, and he included a rule out organic impairment relative to tremor and long-term memory difficulty. *Id.* at p. 7. Among Dr. Sharp's recommendations was that the Defendant should pursue the possibility of organic neurological damage, as well as mental health services to address the existence of obstructive personality related issues and/or family-of-origin related issue. *Id.* at p. 8.

Dr. George Woods. Dr. George Woods is a physician specializing in psychiatry and neuropsychiatry (Tr. 177). In 2009, he examined the Defendant over two days at the federal prison in Terre Haute, Indiana, conducting, in his opinion, the first "comprehensive psychiatric examination" in this case (Tr. 184-185). He also examined the Defendant again in January 2017 in preparation for the evidentiary hearing. At the evidentiary hearing, Dr. Woods testified that he found the Defendant's family history significant in the following ways: a long history of suicidal behavior and completed suicides going back three or four generations, family history of bipolar disorder and depression going back three or four generations, two family members hospitalized for behaviors consistent with the Defendant, and a long history of hypersexual behavior (Tr. 189). In addition, Dr. Woods testified that the Defendant's mother drank while pregnant with him, and that he suffered a series of head injuries, including being hit in the head with a steel ball as a child and a physical assault which caused a loss of consciousness when he was seventeen, in addition to the fact that he had a learning disability (Tr. 212-213, 335-336, 337). Dr. Woods also discussed the differences that can arise between siblings with the same parents, and agreed that the

-21-

Defendant and his brother, Stephen, had significantly different structure and support in their upbringing, which can make a difference (Tr. 349).

As to his evaluation of the Defendant, Dr. Woods diagnosed the Defendant with bipolar disorder and post-traumatic stress disorder, while noting that about 65% of people who carry a diagnosis of chemical dependency also meet the criteria for bipolar disorder (Tr. 191, 193, 219). He further stated that the Defendant's own description of chemical dependency was consistent with self-medication (Tr. 205). Dr. Woods pointed out that, in addition to his noted drug use, the Defendant was also given psychiatric diagnoses in his three previous hospitalizations (Tr. 196-197). Dr. Woods testified that the Defendant's mental impairment of bipolar disorder was thus distinguishable from his drug use in that recognizable symptoms of pressured speech and depression were not results of the drug use (Tr. 200-201). On cross-examination, however, Dr. Woods agreed that neither Dr. Russell, Dr. Faust Bianco, Dr. Kathy LaFortune (who each examined the Defendant prior to the federal trial), nor anyone from the Bureau of Prisons which had housed the Defendant since the federal trial, had diagnosed the Defendant with bipolar disorder (Tr. 299-300). And in discussing the 1995 discharge from Bill Willis Community Hospital, he agreed that the discharge diagnosis was not bipolar disorder, but organic affective disorder, which he described as "an excellent diagnosis, because what they are saying is, this person has an organic brain problem and they have a mood disorder" and characterized this diagnosis as a "more accurate diagnosis than even bipolar" (Tr. 360-361).

Dr. Woods further found that the Defendant could not rationally assist his attorneys in the preparation of his defense, and he stood by that assessment at the evidentiary hearing

-22-

(Tr. 314-315). In support, he relied on the Defendant's statements (continued to the present) that he was defending himself and his son when Trooper Eales was shot and killed, which Dr. Woods attributed to his (in)ability to distinguish right from wrong (Tr. 350-351).

Dr. Deborah S. Miora. At the evidentiary hearing, neuropsychologist Dr. Deborah Miora testified that she reviewed neuropsychologist Dr. Myla Young's report on the Defendant after Dr. Young passed away in 2013 (Tr. 1143). Dr. Young had administered a battery of tests regarding different brain functions, and Dr. Miora reviewed and re-scored them (Tr. 1152-1153). Dr. Miora testified that a neuropsychological evaluation was implicated by factors including the Defendant's mother's drinking while she was pregnant with him, learning disorders in his childhood, multiple reports of head injuries, and the 1986 suicide attempt, as well as the circumstances of the offense in the present case (Tr. 1169-1174). In Dr. Miora's opinion, Dr. Young administered a normatively appropriate and comprehensive battery of tests as to the Defendant's variety of brain functions (Tr. 1176).

Dr. Young's testing was done at the federal prison in Terre Haute in a face-to-face interview room, the Defendant was not shackled for the assessment, and Dr. Young described the Defendant's manner as "hypomanic," meaning pressured or fast (Tr. 1178, 1182). Dr. Miora testified that verbal comprehension, verbal expression, and verbal memory were areas of strength for the Defendant, while areas of weakness included problem solving, abstract reasoning, attention, planning, tasks that required him to inhibit

-23-

one response in favor or another, and working with information in the moment or on his feet (Tr. 1200).

Dr. Miora testified that the Defendant's full-scale IQ score on the WAIS-IV was 82, which was the 12th percentile, or low average (Tr. 1205). She noted that his processing speed was "significantly lower" than other index speeds, at 65, which falls into the first percentile (Tr. 1207-1208). She testified that this meant that the IQ score was "probably not an adequate representation" of the Defendant's capability (Tr. 1208). In referring to other subcategories of testing, Dr. Miora stated that "[t]he take away is that he has difficulty in – he has shown to have difficulty in pressured situations where he has to visually attend to what is going on and generate a response." (Tr. 1219). On cross-examination, the government pointed out that Dr. Miora had been missing a page in aid of scoring the WAIS-IV, which had resulted in a different score between Dr. Young and Dr. Miora such that Dr. Young had placed the Defendant in the borderline range for processing speed, at the fifth percentile, rather than the severely impaired range, or first percentile, as Dr. Miora had found (Tr. 1294-1295). When it was pointed out, Dr. Miora agreed that that this would account for the difference in their scores, but testified that it was a slight difference that was not significant, or that it was "bupkis" (Tr. 1296-1297). The undersigned Magistrate Judge notes the Government's objection to the use and administration of the WAIS-IV because the WAIS-III would have been the available test at the time of the federal trial (Tr. 1185-1186), but nevertheless allows the admission of the WAIS-IV test results because they would be admissible should a new sentencing hearing be granted. Moreover, Dr. Miora testified that the testing done by Dr. Young was a fair representation of the

-24-

Defendant's functioning at the time of the evaluation in 2009, and that she was not aware of any pathology or injury that would change his functioning from 1999 until 2009 other than the fact that he was no longer under the influence of drugs, which in her opinion would only improve his performance (Tr. 1352-1353).

Other tests administered were also suggestive of brain injury. On the Wide Range Achievement Test, Dr. Miora noted a disparity between academic functioning and intellectual ability, which she stated was suggestive of a learning disability (Tr. 1225). As to the Defendant's executive functioning, Dr. Young administered the Delis-Kaplan Executive Function System, which is comprised of a battery of tests ("D-KEFS") (Tr. 1225-1226). Based on this battery of tests, Dr. Miora testified that the results of the D-KEFS indicated that the dorsal lateral and orbitofrontal areas of the brain were damaged (Tr. 1235). Dr. Miora then opined that in extreme stress, the Defendant "would be inclined to make errors" (Tr. 1240-1241). On the Wisconsin Card Sorting Test, Dr. Miora testified that the Defendant was unable to perform any of the sorting tests, placing him at less than the first percentile (Tr. 1241-1245). As to the Short Category Test, Dr. Miora testified that the Defendant again tested at less than the first percentile, which was consistent with the Wisconsin Card Sorting Test (Tr. 1246-1247).

Dr. Miora testified that the results of these tests indicated impairments in multiple areas of the brain, including "the temporal region, the frontal region, [and] some of the frontal subcortical circuitry" (Tr. 1249). She noted, however, that this testing was performed in 2009 in a structured setting in which the Defendant was "ostensibly more substance free" than when he was not in prison, meaning that the testing resulted in "a

-25-

better brain than we might have gotten" (Tr. 1250-1251, 1353). She further testified that the Defendant was moderately to severely impaired in the ability to inhibit responses in light of changing information, and that he would perform worse in situations where he was being fed information rapidly (Tr. 1251). She said this was further demonstrated in the CVLT test, which indicated mild to moderate impairment when given new, changing information (Tr. 1252).

On re-direct, Dr. Miora testified that her finding that the Defendant has brain damage was based on test data, rather than records (or lack thereof) related to childhood injuries or reports from family members (Tr. 1343). She also characterized the Defendant as a person who is easily overwhelmed by changing visual information (Tr. 1348). When asked about the Defendant's perceptual impairments, she testified that methamphetamine would have further distorted the Defendant's visual attention, predicting his visual attention would likely have been worse than the test results showed with the addition of methamphetamine (Tr. 1354).

The undersigned Magistrate Judge thus finds that this evidence regarding the Defendant's brain could have had a "powerful mitigating effect" on the jury in this case. *Hooks*, 689 F.3d at 1205 ("Evidence of organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect."), *citing Rompilla,* 545 U.S. at 392; *Wilson v. Sirmons,* 536 F.3d at 1094; *Smith v. Mullin,* 379 F.3d 919, 942–43 (10th Cir. 2004). As the Tenth Circuit has instructed, however, the undersigned Magistrate Judge has not "consider[ed] omitted mitigation evidence in a vacuum." *Wilson v. Trammell*, 706 F.3d at 1305. Rather, the undersigned

-26-

Magistrate Judge has considered the following evidence from the Government as to what the response would have been to the mitigation evidence presented. *Id.* at 1306 ("[W]e must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been.").

The Tenth Circuit accurately assessed that the Government's response surely would have challenged the Defendant's mental health diagnoses with the evidence related to his extensive drug use, including the evidence of drugs in his system on the night of the offense, as well as his volatile relationship that including physical violence with his ex-wife, and the denial of benefits from the Social Security Administration which found he did not have signs of a severe mental illness. *Barrett*, 797 F.3d at 1231-1232. However, the undersigned Magistrate Judge finds that, as the Tenth Circuit suggested, the jury *did hear* extensive testimony regarding the Defendant's drug use and his relationship with his ex-wife during both stages of the trial. *Id.* at 1232. Nevertheless, the question remained as to whether other mental health evidence from the Government might have been "devastating," particularly testimony from Dr. Randall Price. *Id.* At issue with Dr. Price's testimony was the possibility that he would be testifying that the Defendant was a psychopath, and at high risk of committing violent offenses if freed, which admittedly could have been a powerful counterpoint to the mitigation evidence. However, such testimony and evidence was not presented before the undersigned Magistrate Judge at the evidentiary hearing, although both Dr. Price and another expert psychiatrist testified.

Dr. J. Randall Price. Dr. Randall Price is a licensed and board-certified forensic psychologist, who was originally retained by the Government in 2005 for the federal trial

-27-

(Tr. 813-815). He reviewed records including the Bill Willis Community Mental Health Center records, Wagoner Community Hospital records, school records, Dr. Russell's evaluations, and Dr. Sharp's evaluation, and he also noted that the claimant had problems with substance abuse in early adolescence, around the age of 13 (Tr. 826, 830). The interview took place while the Defendant was in custody, on October 13-14, 2005 (Tr. 832). At the evidentiary hearing in 2017, Dr. Price testified that the Defendant in 2005 exhibited elevated paranoia with regard to his circumstances, but was cooperative with the examination itself, which consisted of a clinical interview and history, based on a referral to conduct a psychological evaluation and offer opinions as to the risk the Defendant might pose in the future (Tr. 835-838).

At the evidentiary hearing, Dr. Price noted that the Defendant did not have symptoms of hyperactivity during the evaluation, and that he did have some trouble when it came to attention, but that the neuropsychological testing did not reveal evidence of a severe brain injury (Tr. 846, 863). Dr. Price found that the Defendant had average intellectual functioning and that there was not a significant difference between his verbal and nonverbal intellectual functioning (Tr. 867).

As part of his 2005 examination, Dr. Price administered the Repeatable Battery for the Assessment of Neuropsychological Status ("RBANS"), a standardized test in which the Defendant scored in the 25th percentile with respect to immediate memory, 96th percentile on visual-spatial constructional ability, the 42nd percentile on language and language functioning, the 5th percentile on attention, and the 58th percentile on delayed memory (Tr. 868-873). Dr. Price testified that these results did not cause him any concerns

-28-

regarding the Defendant's neuropsychological functioning, and that they were consistent with his history (Tr. 875).  However, he agreed on cross-examination that "his strength is very strong and his weakness is very weak," which was "out of ordinary" and "abnormal" (Tr. 905).

Dr. Price also administered the Personality Assessment Inventory ("PAI"), a self-reporting test, which indicated his perception of his problems as being due to substance abuse, as well as indications of depressive symptoms and paranoia (Tr. 876-877).  On cross-examination, Dr. Price agreed that the Defendant scored in the 75th percentile (2.5 standard deviations above the mean) on the traumatic stress subscale, but he did not include a discussion of that in his report (Tr. 916).  He likewise administered the MMPI-2, which indicated antisocial attitudes and behaviors, paranoid thinking or chronic suspiciousness, and concern with physical medical problems including pain and discomfort with his body (Tr. 877-879).  Dr. Price ultimately diagnosed the claimant with a long-standing learning disorder, not otherwise specified; polysubstance dependence; dysthymic disorder; and personality disorder with antisocial and paranoid traits and features (Tr. 889-890).  He provided no testimony or opinion as to whether the Defendant is a psychopath.[2]

Dr. Steven Pitt.  Dr. Pitt is a board certified psychiatrist with additional board certification in forensic psychiatry, and he also testified at the evidentiary hearing on behalf

---

[2] Both Dr. Russell and Dr. Price had administered the Hare Psychopathy Checklist-Revised (PCL-R), to purportedly widely varying results.  However, the Defendant did not put forth Dr. Russell's findings, and the government did not put forth Dr. Price's, at the evidentiary hearing.  As such, the question of psychopathy was not at issue as part of the evidentiary hearing, and the undersigned Magistrate Judge has not considered it in these Findings and Recommendations.

-29-

of the government (Tr. 956).  He interviewed the Defendant on January 17, 2017, at the federal prison in Terre Haute, Indiana, and the Defendant was interviewed while he was in restraints (Tr. 969-970).  Dr. Pitt noted the Defendant's history of substance abuse, particularly around the time of the offense in September 1999, and that the Defendant himself reported that he was using drugs regularly at that time, specifically methamphetamine as well as marijuana (Tr. 974-975).  Dr. Pitt testified that he reviewed records related to the Defendant's 1986 suicide attempt, which included a negative drug screen, and discharge diagnoses of marital problems, mixed substance abuse, and mixed personality disorder, but not a mood disorder (Tr. 976-981).  He also noted the Social Security Administration's 1987 denial of benefits, which indicated that he was moderately depressed but had no signs of a severe mental illness (Tr. 982).  *See also* Gov't Hr'g Ex.10.

He further noted that he reviewed the January 1995 Sequoyah Memorial Hospital records, which included a positive toxicology screen for amphetamines and THC, and the Defendant's subsequent transfer to Bill Willis Community Mental Health Center (Tr. 984-987).  The records on admission contained a provisional diagnosis of bipolar disorder, but Dr. Pitt noted that the Defendant's *discharge* diagnosis was organic affective disorder, polysubstance abuse, amphetamine dependence, a urine drug screen positive for cannabis, and marital conflicts (Tr. 988).  Contrary to Dr. Woods's testimony, Dr. Pitt testified that he believed the 1995 diagnosis of organic affective disorder was reasonable in light of the Defendant's substance use and for a substance-induced mood disorder, and that it was not related to head trauma (Tr. 990).  As to the diagnosis of organic affective disorder, he stated that this "could have meant either a medical issue causing the mood problem, or it could

-30-

have meant a substance use issue" (Tr. 1081). He further testified that he believed the Defendant was appropriately diagnosed with a possible mood disorder in 1986 following his suicide attempt, but that he had no reason to find the claimant had bipolar disorder or PTSD (Tr. 993, 996).

In reaching his conclusions, Dr. Pitt also had the benefit of the Defendant's records from the Bureau of Prisons (BOP), which go to the Defendant's behavior after his conviction in the federal trial. Dr. Pitt considered these records an additional "data point" similar to the records prior to the offense, and which he found to confirm his opinion that the Defendant did not have a mental condition (Tr. 995-996). Furthermore, the BOP records contain a notation indicating that the Defendant had experienced no loss of consciousness in his life, which Dr. Pitt agrees was contrary to the Defendant's reports of multiple head injuries including two incidents in which he reported losing consciousness, as well as hospital records reflecting reports that the Defendant had lost consciousness (Tr. 997-1000, 1031-1032). He further testified that methamphetamine use could cause irritability, mood lability, and pressured speech, mimicking the effects of a mood disorder (Tr. 1003-1004). Dr. Pitt again stated that he rejected a diagnosis of bipolar disorder or PTSD because he felt that the Defendant's symptoms were better explained by the physiological effects of a substance or the physiological effects of a medical condition (Tr. 1006-1010).

Dr. Pitt is not a neuropsychologist and thus did not conduct a neuropsychological examination. Nevertheless, he noted the varying opinions as to whether the Defendant had brain damage and opined, "[T]o the extent that whatever that is that exists, I don't believe

-31-

it affects the totality of his behavior in the choices that he made around the time of the offense." (Tr. 1013).  Dr. Pitt characterized the Defendant as someone "conversant with what constitutes unlawful behavior," and thought he could distinguish right from wrong at the time of the offense (Tr. 1014).  He testified that he would diagnose the Defendant as of September 24, 1999 with amphetamine dependence with physiologic dependence, features of an antisocial personality disorder, cannabis dependence, and rule out learning disorder not otherwise specified (Tr. 1015).  On cross-examination, Dr. Pitt conceded that the Defendant had "genetic loading," defined as multigenerational exposure to a problem, for mental illness and mood disorders, and that particularly his parents' problems placed him at increased risk for mood disorders, mental illness, and substance abuse disorder (Tr. 1023-1024).  He also agreed that the Defendant came from a dysfunctional background that had elements of physical and emotional abuse (Tr. 1027-1028).  Dr. Pitt further testified that, in looking at the features of different personality traits and the "totality of the information," this conclusion remained:  "it's drugs, drugs, and more drugs" (Tr. 1120-1121).  It was his opinion that "you can have substance-induced mood disorders that mimic drug use" and "[t]he idea is that . . . drug[s] can have people experience symptoms that are manic, depressed, or mixed."  (Tr. 1123).

Based on all of the evidence and testimony presented, the undersigned Magistrate Judge thus finds that counsel's failure to put forth the previously-described evidence, in combination with his personal and family history, caused the Defendant prejudice.  *See Sears*, 561 U.S. at 955–956 ("A proper analysis of prejudice under *Strickland* would have taken into account the newly uncovered evidence of Sears' 'significant' mental and

-32-

psychological impairments, along with the mitigation evidence introduced during Sears' penalty phase trial, to assess whether there is a reasonable probability that Sears would have received a different sentence after a constitutionally sufficient mitigation investigation.") (citations omitted).  *See also Wilson v. Trammel*, 706 F.3d at 1307 ("In evaluating these claims of prejudice, we look to the testimony at the evidentiary hearing, together with the exhibits offered in evidence at that hearing, to see what likely would [have] been presented at trial if Defendant's counsel had done what he contends they should have.").  The evidence potentially available to the Defendant regarding his mental health history and his family background would in all likelihood have aided substantially in mitigation, and the rebuttal evidence provided by the Government would not appear to have added substantially to the calculus of aggravation.  *Porter*, 558 U.S. at 41 ("To assess that probability [that the Defendant would have received a different sentence], we consider the totality of the available mitigation evidence—both adduced at trial, and the evidence adduced in the habeas proceeding—and reweig[h] it against the evidence in aggravation."), *quoting Williams v. Taylor*, 529 U.S. at 397-398.  Specifically, the undersigned Magistrate Judge finds that the evidence and testimony from Dr. Price was not as "devastating" as originally believed.  Dr. Price offered no testimony or evidence that the Defendant was a psychopath, nor did any other witness presented by the Government.  As such, this most potentially detrimental evidence is not a part of the undersigned Magistrate Judge's reweighing of the evidence in aggravation.  The undersigned Magistrate Judge therefore finds that, based on *all* of the evidence presented both in mitigation and in aggravation, there is a reasonable probability that the result of the penalty phase of the Defendant's trial

-33-

would have been different.  *See Strickland*, <u>466 U.S. at 694</u> ("A reasonable probability is a probability sufficient to undermine confidence in the outcome.").  *See also Byrd*, <u>645 F.3d at 1168</u> ("A reasonable probability is a probability sufficient to undermine confidence in the outcome of the trial; it does not require that the petitioner show that counsel's deficient conduct more likely than not altered the outcome in the case[.]") (internal quotations and citations omitted).

### CONCLUSION

In sum, the undersigned Magistrate Judge finds that the Defendant's counsel were deficient in their performance, which ultimately prejudiced the Defendant, and that the Defendant is therefore entitled to relief under <u>28 U.S.C. § 2255</u> and to a new sentencing hearing.  Accordingly, the undersigned Magistrate Judge recommends that the Petitioner be granted relief under <u>28 U.S.C. § 2255</u> and given a new sentencing hearing as set forth above.  Any objections to this Report and Recommendation must be filed within fourteen days.  *See* <u>18 U.S.C. § 636(b)(1)</u>; <u>Fed. R. Civ. P. 72(b)</u>.

IT IS SO ORDERED this 10th day of August, 2018.

_____
Steven P. Shreder
United States Magistrate Judge
Eastern District of Oklahoma

-34-

2031

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S MOTION FOR EXTENSION OF TIME
TO OBJECT TO MAGISTRATE'S REPORT AND RECOMMENDATION**

**COMES NOW** the United States of America, by and through undersigned counsel, and hereby moves this Court for a sixty-day extension of time, to and including October 23, 2018, in which to file its objection to the Magistrate's Report and Recommendation.

On August 14, 2018, the United States attempted to contact Joan Fisher, Counsel for Kenneth Barrett, to ascertain the defense position on the Government's requested relief.  On August 15, 2018 at 11:21 a.m., the Government received the following via electronic mail from Ms. Fisher:  "We have no objection to an extension of 30 days to file any objections to the August 10th Magistrate's Report and Recommendation."  Later on August 15, 2018 at 4:21 p.m., the Government received the following additional email from Ms. Fisher:

> ". . . we anticipate any extension to file objections would apply equally to both parties.  I trust that is amenable to you and will be included in your motion."

Fed. R. Civ. P. 6(b)(1) allows extensions "for good cause" and should be liberally construed.  *Rachel v. Trout*, 820 F.3d 390, 394 (10th Cir. 2016).  When requests are made before the time to respond has expired, as here, "district courts should normally grant extension requests, . . . in the absence of bad faith by the requesting party or prejudice to another party."

1

Generally, decisions on whether to grant an extension of time are upheld in the absence of an abuse of discretion. *Id.*

## PROCEDURAL BACKGROUND

After being convicted by a jury in 2005, Plaintiff Kenneth Eugene Barrett was sentenced to death by this Court in Case No. CR-04-115-JHP, Docket No. #85.  The Tenth Circuit affirmed on direct appeal.  *See United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007).

Barrett's post-conviction claim was denied by this Court without a hearing.  *See Barrett v. United States*, Case No. CIV-09-105, Docket Number 214, 2012 WL 3542609 (E.D.Ok. Aug. 16, 2012) (unpublished opinion).  The Tenth Circuit affirmed as to all but one claim: whether Barrett's trial attorneys were ineffective in "failing to investigate and present evidence of his background and mental health for the trial's penalty phase." *Barrett v. United States*, 797 F.3d 1207, 1211 (10th Cir. 2015).  The appellate court remanded for an evidentiary hearing on that issue.

After extensive pre-hearing litigation, (Doc. # 233-390), this Court referred the matter to the Magistrate for an evidentiary hearing and a report and recommendation.  (Doc. #391).  The seven-day hearing was conducted on March 27-30, 2017, June 12-13, 2017 and June 26, 2017. (Doc. #399, 403, 407, 410, 448, 451, 463).  The parties submitted proposed findings and conclusions on July 31, 2017. (Doc. # 465-466).

On August 10, 2018, the Magistrate Judge filed a 34-page Report and Recommendation finding Barrett's counsel were deficient and concluding Barrett is entitled to a new sentencing hearing.  (Doc. #467 at 34).

Pursuant to the Magistrate's order, 18 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the government must file any objections to the Report and Recommendation within fourteen days. *Id.*

Unless extended by this Court, the fourteen-day deadline will run on August 24, 2018.

## REASONS FOR EXTENSION OF TIME

Since June 8, 2009, the principal government attorney in the handling of Barrett's application for post-conviction relief has been Jeffrey B. Kahan from the Department of Justice's Capital Case Unit. (Doc. #47 at 2). Mr. Kahan was a Trial Attorney with the Capital Case Unit when this litigation commenced. He now serves as Deputy Chief of the Capital Case Section where his immediate schedule includes the following:

1.     Mr. Kahan is responsible for the day-to-day management of seven trial attorneys and an administrator, as well as oversight of the Death Penalty Protocol – the process through which the Department of Justice reviews cases for potential capital prosecution. *See* U.S.A.M. §§ 9-10.010 to 9-10.190. At present, there are 67 cases under review by the Department, and 47 of them are awaiting transmission to the Attorney General at CCS. Mr. Kahan reviews each case before it is transmitted to the Attorney General, and generally anticipates three-to-five submissions a week. He is personally overseeing the Protocol review of a 14-defendant case, in which the U.S. Attorney seeks an expedited decision ahead of an early 2019 trial and in anticipation of a cooperation agreement with two potential witnesses.

2.     As of August 13, 2018, the Acting Chief of the Capital Case Section was out of the office for one week, leaving Mr. Kahan with overall responsibility for management of the section.

3

3. On August 21, 2018, Mr. Kahan is scheduled to travel to the National Advocacy Center in Columbia, South Carolina, where the Capital Case Section is presenting a three-day death penalty seminar where he will be one of the instructors.

4. From August 27 to August 31, 2018, Mr. Kahan has a scheduled pre-paid out-of-state vacation with his family.

5. Assistant United States Attorney Christopher J. Wilson has been assisting in the representation of the United States in this matter. In addition to his supervisory duties as Criminal Chief, Mr. Wilson is lead counsel in *United States v. Paul Dean Cantrell*, CR-18-69-RAW and *United States v. Erickson Clay Ward*, CR-18-67 scheduled for jury trial on October 2, 2018.

6. Mr. Wilson is currently responding to a Motion to Suppress filed by Defendant Cantrell and an evidentiary hearing on the Motion to Suppress has been set for August 29, 2018.

7. Mr. Wilson is the ATAC Coordinator for the United States Attorney's Office and is primarily responsible for facilitating a training session on August 23, 2018, which will be attended by approximately 130 law enforcement personnel.

8. Mr. Wilson is currently scheduled to attend a training in Columbia, South Carolina from September 10, 2018 through September 13, 2018.

9. As noted, the Tenth Circuit previously affirmed the denial of collateral relief as to Barrett's conviction, thereby ensuring he will serve his current life sentence, as to at least one conviction under 18 U.S.C. § 924. Barrett and his counsel have access to the witnesses he claims to need for a fulsome penalty phase retrial, as demonstrated by their appearance during evidentiary proceedings. As such, any delay in drafting and resolving the government's objections to the Report and Recommendation should not prejudice Barrett.

**CONCLUSION**

Based on the foregoing, the government respectfully urges this to grant the government an additional sixty days, or until October 23, 2018, to file an objection to the Magistrate's Report and Recommendation.

Dated: August 17, 2018.

Respectfully submitted,

BRIAN KUESTER
United States Attorney
Eastern District of Oklahoma

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA #13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

/S/ *Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Trial Attorney, Capital Case Unit
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on August 20, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing.  A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry dbautry44@hotmail.com
Ms. Joan M. Fisher Joan_Fisher@fd.org
Mr. Tivon Schardl Tim_Schardl@fd.org

/S/ *Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney

2037

## IN THE UNITED STATES DISTRICT COURT FOR THE
## EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. 09-CIV-105-JHP |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## ORDER

This matter comes before the court on the Government's Motion for Extension of Time to Object to the Magistrate's Report and Recommendation (Dkt. # 468) in which the government requests this court grant a sixty (60) day extension of time, to and including October 23, 2018, in which to file its objection to the Magistrate's Report and Recommendation. Respondent has indicated he has no objection to an extension of thirty (30) days as long as the extension applies equally to both parties.

After considering the motion, this court finds, pursuant to Fed.R.Civ.P. 6(b)(1), "good cause" exists to grant the government's requested extension. Accordingly, the court hereby sets the following schedule:

Objections to the Magistrate's Report and Recommendation due October 23, 2018.

Responses to any objections due November 26, 2018.

Replies relating only to any new matters in the responses due December 10, 2018.

It is so ordered on this 21st day of August, 2018.

James H. Payne
United States District Judge
Eastern District of Oklahoma

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:       (405) 521-9600
Facsimile:       (405) 521-9669
E-mail:       dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
KARL SADDLEMIRE, State Bar #275856
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:       (916) 498-6666
Facsimile:       (916) 498-6656
E-mail:       Joan_Fisher@fd.org
              Karl_Saddlemire@fd.org

Attorneys for Petitioner/Defendant,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner/Defendant, | CASE NO. CV-09-00105-JHP |
| vs. | **PETITIONER'S OBJECTION TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION** |
| UNITED STATES OF AMERICA, | |
| Respondent/Respondent. | |

Out of an abundance of caution and to fully preserve the record and pursuant to 28 U.S.C.

§ 636(b)(1)(C) and LCivR 73.1, Petitioner Kenneth E. Barrett respectfully objects in part to the

Magistrate Judge's Report and Recommendation issued on August 10, 2018 (Doc. 467).  Fully

recognizing that the Magistrate Judge and this Court are confined to the scope of the remand

Petitioner's Objection to Magistrate
Judge's Report & Recommendation                    1                    *Barrett v. U.S.*, CV-09-00105-JHP

from the Tenth Circuit Court of Appeals, Mr. Barrett nonetheless objects to the limitation of the relief of a new sentencing recommended on Count 3.  Although Mr. Barrett was convicted of three counts that were death eligible, the jury sentenced him to life as to Counts 1 and 2 and to death on Count 3.  Mr. Barrett was denied the effective assistance of counsel on all three counts of the indictment at the single sentencing.[1]  An order for a new sentencing on all counts, Counts 1, 2 and 3, is within the scope of the mandate.  Failure to grant a new sentencing proceeding on all counts would constitute an abuse of discretion and would result in a manifest injustice.

## PROCEDURAL HISTORY

Mr. Barrett was tried and convicted in 2005 on two counts of felony murder for use of a firearm in the commission of a drug trafficking crime (Count 1); or, crime of violence (killing of a state law enforcement officer engaged in or on account of the performance of such official duties) (Count 2); pursuant to 18 U.S.C. § 924(c)(1)(A) and (j) and one count of killing a state law enforcement officer while engaged in and on account of the performance of official duties pursuant to 21 U.S.C. § 848(e)(1)(B) (Count 3). Upon conviction, Mr. Barrett faced a sentence on each count ranging from death to life to a fixed number of years.[2]  See Case No. CR-6:04-115-JHP at TR vol. 27 pp. 5294-97.  After a single penalty phase hearing on the multi-count

---

[1] The Tenth Circuit Court recognized this in remand, finding that,"[b]ecause Defendant may be entitled to relief on his contention that his trial attorneys were ineffective by failing to investigate and present evidence of his background and mental health for the *trial's penalty phase*, we reverse and remand for an evidentiary hearing on this issue."  (*United States v. Barrett*, 797 F.3d, 1207, 1211 (10th Cir. 2015)(Emphasis added).  "The issue before us is whether Defendant's trial attorneys prepared a mitigation case that measures up to professional norms and, if not, whether that made a difference." 797 F.3d at 1224.  "We therefore reverse and remand for further proceedings on the issue."  (*Id*.).

[2] Counts 1 and 2 carried the punishment of death or by imprisonment for any terms of years or for life. 18 U.S.C. §924(c) (1)(A) and (j) (1); Count 3 carried "any term of imprisonment, which shall not be less than 20 years, and which may be up to life imprisonment, or may be sentenced to death.  21 U.S.C. § 848(e)(1)(B). *See also* CR -6:04-115. Docs. 52, 257.

indictment and convictions, a jury sentenced Mr. Barrett to life in prison on Counts 1 and 2, and to death on Count 3. *See* Case No. CR-04-115-JHP (Doc. 285).

The convictions and sentences were affirmed on direct appeal. *See United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007). Mr. Barrett sought post-conviction relief under 28 U.S.C. § 2255, which this Court denied without a hearing. *See Barrett v. United States*, Case No. CIV-09-105-JHP (Doc. 214), 2012 WL 3542609 (E.D. Okla. Aug. 16, 2012) [unpublished opinion]).[3]  This Court denied Mr. Barrett a certificate of appealability. *Id*.

The United States Court of Appeals for the Tenth Circuit granted a certificate of appealability (COA) on seven of Mr. Barrett's claims for ineffective assistance of counsel. The Court found the record before it "inadequate to resolve the issue." *U.S. v. Barrett*, 797 F. 3d at 1224.  The Tenth Circuit held "that an evidentiary hearing [was] needed to enable the district court to make the findings needed to determine whether Defendant has a valid claim." *Id*.

On remand, the district judge referred the case to a Magistrate Judge pursuant to 28 U.S.C. § 636(b)(1)(B) and LCvR 73.1.  After hearing evidence over seven days and the submission by both parties of Proposed Findings of Fact and Conclusions of Law, Docs. 465, 466, the Magistrate Judge issued and recommended "that the Defendant be granted relief under 28 U.S.C. § 2255 and given a new sentencing hearing on the charge of intentionally killing a state law enforcement officer in the commission of a drug trafficking crime." (Doc. 467 at 2). The Magistrate Judge's report is succinct, discussing the evidence produced as that evidence

---

[3] The Magistrate Judge's findings fully support the recommendation for a new sentencing. Mr. Barrett does not object to any specific factual finding or lack thereof but reserves his right to expand, explain, clarify or modify the facts as reflected by the record and the evidence submitted at or in support of the evidentiary hearing on remand as reflected in Petitioner's Proposed Post-Hearing Findings of Fact and Conclusions of Law. Doc. 465.  *See Jennings v. Stephens*, __U.S.__, 135 S. Ct. 793, 802 (2015).

related to the specific questions and concerns of the Tenth Circuit Court of Appeals. The

magistrate concluded:

> In sum, the undersigned Magistrate Judge finds that the Defendant's counsel were deficient in their performance, which ultimately prejudiced the Defendant, and that the Defendant is therefore entitled to relief under 28 U.S.C. § 2255 and to a new sentencing hearing. Accordingly, the undersigned Magistrate Judge recommends that the Petitioner be granted relief under 28 U.S.C. § 2255 and given a new sentencing hearing as set forth above

Doc. 467 at 34.

## ARGUMENT

### 1. The Tenth Circuit's Firm Waiver Rule Compels the Objections Made Here.

The Tenth Circuit has adopted "a firm waiver rule "to advance the policies behind the

Magistrate's Act[.]." *See United States v. One Parcel of Real Prop., With Buildings,*

*Appurtenances, Improvements, & Contents, Known as: 2121 E. 30th St., Tulsa, Oklahoma*, 73

F.3d 1057, 1059–60 (10th Cir. 1996). That rule "provides that the failure to make timely

objections to the magistrate's findings or recommendations waives appellate review of both

factual and legal questions." *Id.*, citing *Moore v. United States*, 950 F.2d 656, 659 (10th

Cir.1991). The United States Supreme Court approved a similar firm waiver rule when the

district court adopts a Magistrate's recommendation as adopted by the Sixth Circuit. *Thomas v.*

*Arn*, 474 U.S. 140 (1985) ("We hold that a court of appeals may adopt a rule conditioning an

appeal, when taken from a district court judgment that adopts a magistrate's recommendation,

upon the filing of objections with the district court identifying those issues on which further

review is desired."). Though certainly not firmly rooted in its jurisprudence, the Tenth Circuit

has applied the rule to a prevailing party. See *Martin v. Cornell Companies, Inc.*, 377 F. Appx.

762, 765 (10th Cir. 2010) (unpubl.).

Accordingly, Mr. Barrett must raise this issue as an objection at this point in the proceedings or forever risk forfeiting this argument.

### 2. This Court's Review of the Sentences Imposed in Counts 1 and 2 is Within the Scope of the Mandate.

The Magistrate Judge's limitation of relief to the Count 3 death sentence only, while understandable, is nonetheless objectionable. The review of the life sentences imposed in Counts 1 and 2 is within the scope of the mandate. Therefore, the Magistrate's recommendation should include a new sentencing on all three Counts.

This Court is subject to the "mandate rule." The rule, which generally requires a trial to conform to the remand as articulated, "is a discretion-guiding rule subject to exception in the interests of justice." *United States v. Moore*, 83 F. 3d 1231, 1234 (10th Cir. 1996). "[W]here the appellate court has not specifically limited the scope of the remand, the district court has discretion to expand the resentencing beyond the sentencing error causing the reversal." *Id*. The mandate in this case lacks the specificity required to limit the magistrate's recommendation and this Court's authority to consider the sentences of all three counts impacted by the ineffective assistance of counsel on remand. See *United States v. Hicks*, 146 F. 3d 1198, 1200 (10th Cir. 1998).

The language of the opinion and mandate define the scope of the remand. *Id*. The Court in *Hicks* looked to the particular language of the appellate decision and judgment in question to determine the scope of the mandate. That opinion, like the appellate court's here, read "AFFIRMED in all other respects." *Hicks*, 146 F.3d at 1200. The mandate reads exactly as Mr. Barrett's: "[T]he judgment ... is affirmed in part and reversed in part" and ordered the case remanded "for further proceedings in accordance with the opinion of this Court." *Hicks*, 146 F. 3d at 1201.

In its opinion in Mr. Barrett's case, the appellate court "reversed and remanded for further proceedings on the issue." *U.S. v. Barrett*, 797 F. 3d at 1224. In conclusion, it said:

> We REVERSE and REMAND Defendant's death sentence for the district court to hold an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial. In all other respects we AFFIRM.

*Id*. at 1232. In the mandate, the court of appeals stated that "[t]he judgment is affirmed in part and reversed in part. The case is remanded to the United States District Court for the Eastern District of Oklahoma for further proceedings in accordance with the opinion of this Court."

Comparison of the language of the opinion and the mandate in *Hicks* makes clear that the Tenth Circuit's mandate in this case does not preclude granting a resentencing on all three counts following the finding of ineffective assistance of counsel. Mr. Barrett's case mirrors the facts in *Hicks*, in that both defendants were subject to a single penalty proceeding. A jury was called upon to sentence on all three counts of a multi-count indictment. In Mr. Barrett's case, the multi-count indictment included three separate charges regarding a single criminal act, all subject to capital punishment. The defense counsel was thus obligated to investigate and present evidence in mitigation equally for each count and the deficient performance per count cannot be separated out simply because the jury returned a sentence of life rather than death as to Counts 1 and 2. The sentence post-dates the performance and thus has no bearing on a determination of the trial defense counsel's deficiencies throughout the penalty phase. Here, the Circuit Court's remand called upon the district court to determine whether there was deficient performance resulting in prejudice "during the penalty phase of his trial." *United States v. Barrett*, 146 F.3d at 1211.

As in *Hicks*, Mr. Barrett's convictions and sentences arise from a multi-count indictment. There was a single sentencing trial on three separate capital counts, based upon the same evidence under the same professional standards of performance required of the same trial counsel. The same jury heard and imposed sentence on the three counts, specifically imposing a significantly lighter sentence on Counts 1 and 2. The only real question that could conceivably render limited relief only as to the Count 3 death sentence, is the question of prejudice. While in most capital charges the only available punishment is life or death, here the minimum sentence for all three counts on Mr. Barrett's indictment was a term of years. It is reasonable to conclude that the jury's consideration of the sentences of life was equally susceptible to trial counsel's deficiencies and adversely impacted by them as the death sentence.

Under *Hicks*, the relief granted on only one of three jury verdicts must be extended to the other two. Relief on all three counts is the only result consistent with the sentencing packaging doctrine.

> When a defendant is convicted of more than one count of a multicount indictment, the district court is likely to fashion a sentencing package in which sentences on individual counts are interdependent. When, on appeal, one or more counts of multicount conviction are reversed and one or more counts are affirmed, the result is an "unbundled" sentencing package. Because the sentences are interdependent, the reversal of convictions underlying some, but not all, of the sentence renders the sentencing package ineffective in carrying out the district court's sentencing intent as to any one of the sentences on the affirmed convictions.

Thus,...[upon remand] the district court ha[s] the authority to reevaluate the sentencing package ... and resentence the defendant to effectuate the original sentencing intent.

*Hicks, supra* at 1202, quoting (the oft-quoted ) *United States v. Shue*, 825 F. 2d 1111, 1114 (7th Cir. 1987) ("[D]espite the previous panel's failure to vacate explicitly the sentencing package on

remand for resentencing, we hold that the district court had the authority to ... resentence the defendant to effectuate the original sentencing intent.").

Even assuming this Court disagrees, this Court should still extend the magistrate's recommendations as to Counts 1 and 2 in order to avoid a manifest injustice. In the instant case, the "packagers" were the jury, and it will be a jury that will sentence Mr. Barrett after hearing competent evidence presented by competent counsel, a right never afforded Mr. Barrett.

Mr. Barrett was entitled to the effective assistance of counsel at the sentencing, the entire sentencing trial, not only as it related to the death sentence imposed. He is entitled to a jury who hears and considers all the relevant mitigation as it relates to all of the counts. To deny him the effective assistance of counsel on two-thirds of his penalty phase trial would be to an abuse of discretion resulting in a manifest injustice. Petitioner therefore objects to the Magistrate's Report and Recommendation for its failure to recommend a new sentencing proceeding on Counts 1 and 2, as well as Count 3.

**CONCLUSION**

For the foregoing reasons, Mr. Barrett respectfully requests that the Court consider this objection, and in accepting the Magistrate Judge's recommendation for a new sentencing order, that the recommendation and subsequent order of this Court apply to all three counts.

DATED:       October 12, 2018

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

/s/ *Karl Saddlemire*
KARL SADDLEMIRE
Assistant Federal Defender

Attorneys for Petitioner/Defendant,
KENNETH EUGENE BARRETT

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 12th day of October 2018, I caused the foregoing Petitioner's Objection To Magistrate Judge's Report And Recommendation to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S OBJECTIONS TO REPORT AND RECOMMENDATION**

---

**COMES NOW** the United States of America, by and through undersigned counsel and submits the following Objections to the Magistrate Judge's Report and Recommendation.

**STATEMENT OF THE CASE**

On September 24, 1999, Petitioner Kenneth Eugene Barrett ("defendant") fatally shot Oklahoma State Trooper David Eales, who – as part of a police Tactical Team ("Tac Team") – attempted to serve a warrant at the defendant's residence, which was used to manufacture and distribute methamphetamine.

In 2005, a petit jury empaneled in this district found Barrett guilty, as charged, on two counts of felony firearm murder (18 U.S.C. § 924(c)(1)(A)) and one count of killing a state law enforcement officer during the commission of a drug trafficking crime (21 U.S.C. § 848(e)(1)(B)).  Following a bifurcated penalty trial, the jury recommended a death sentence, which the district court imposed.  Case No. CR-04-115-JHP, Docket No. 285 ("TR Doc. 285").  On direct appeal, the Tenth Circuit Court of Appeals affirmed the judgment in a published opinion.  *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) ("*Barrett, I*"), *cert. denied*,

1

552 U.S. 1260 (2008).  Following the affirmance, Barrett sought collateral relief under 28 U.S.C. § 2255, which the district court denied.  Case No. CIV-09-105-JHP, § 2255 Docket Nos. 1, 214 ("§ 2255 Doc. 1, 214").  In a published opinion, the Tenth Circuit reversed on a single issue, remanding for an evidentiary hearing to assess trial counsel's effectiveness in investigating and presenting mitigating information. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015) ("*Barrett, II*").  Following that decision, Barrett sought permission to file a second collateral attack on his death sentence, which the Tenth Circuit denied in a third published opinion.  *In re Barrett*, 840 F.3d 1223 (10th Cir. 2016 ("*In re Barrett*").

On remand, this Court received a referral to conduct the evidentiary hearing.  Following six days of testimony,[1] the Court issued a Report and Recommendation that advised the district court to grant relief and a new penalty phase trial, based on a finding that trial counsel performed ineffectively and prejudicially.  § 2255 Doc. 467 ("R&R").  These objections follow.

## ARGUMENT

### GIVEN BARRETT'S SUBSTANTIAL PLANNING AND PREMEDITATION OF THE MURDER, THE FORGONE MENTAL HEALTH EVIDENCE WOULD HAVE HAD NO IMPACT ON THE OUTCOME OF THE TRIAL

The government respectfully objects to the Court's prejudice analysis under *Strickland*.  The Court did not evaluate the credibility of Barrett's mental health evidence.  Rather, it appears to have considered that testimony, alongside the government's rebuttal evidence, as reliable for purposes of decision.  The government's rebuttal evidence better explains Barrett's conduct than the theories advanced by his experts,[2] and no reasonable likelihood exists that a jury would have

---

[1] In view of this Court's familiarity with the facts giving rise to this litigation (R&R 2) and the testimony adduced before it, the government omits a recitation of the evidence.

[2] The Court premised its prejudice finding on trial counsel's failure to present mental health evidence, not on the absence of testimony by the defendant's relatives.  The government limits the scope of these Objections to the Court's opinion, but notes that Barrett's relatives provided a

2

relied on that testimony.  Moreover, the Court considered the impact of the omitted mental health testimony as if it had a nexus to the crimes of conviction.  In fact, Barrett's mental health experts did not, and could not, explain his commission of this murder.  Although the experts identified issues that supposedly compromised Barrett's ability to process information under pressure, the defendant had resolved to murder Trooper Eales long before the opportunity arose.  Accordingly, the omission of mental health evidence, which merits little mitigating weight when divorced from the homicide, does not cast any doubt on the outcome of the penalty phase trial.

As the Court recognized, Barrett must demonstrate that the performance of his trial attorneys fell below an objective standard of reasonableness, and that he was prejudiced as a result.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  "To assess [the] probability [that the Defendant would have received a different sentence], we consider 'the totality of the available mitigation evidence – both that adduced at trial, and the evidence adduced in the habeas proceeding' – and 'reweig[h] it against the evidence in aggravation.'"  *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000)).  Furthermore, "we must consider not just the mitigation evidence that Defendant claims was wrongfully omitted, but also what the prosecution's response to that evidence would have been."  *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013).  The court must determine whether trial counsel's alleged errors resulted in a reasonable probability "'that at least one juror would have struck a different balance."  *Grant v. Trammell*, 727 F.3d 1006, 1018-19 (10th Cir. 2013) (quoting *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)).  "A reasonable probability is one that is

---

less-than-salutary view of the defendant, and one unlikely to have resulted in a more favorable verdict.  *See, e.g.*, EH Tr. 70, 74, 92-93 (noting Barrett's drug use), 73 (noting Barrett's "chaotic" life), 91, 103, 117 (noting Barrett's violence).

3

'substantial, not just conceivable.'" *Id*. at 1019 (quoting *Harrington v. Richter*, 562 U.S. 86, 112 (2011).

The expert testimony adduced by this defendant during the evidentiary hearing should receive little, if any, weight in any rebalancing of aggravators and mitigators.

A. Assessment of Reliability

The evidentiary hearing concerned testimony the defendant allegedly could have offered in mitigation during the penalty phase of his trial.  Had Barrett adduced the supposedly forgone testimony at trial, the jury would have rejected it as incredible.  This Court should do the same.

At trial, a capital defendant may submit any relevant mitigating evidence in support of a sentence less than death and has wide latitude to raise any aspect of his character, or record, or circumstance of the offense.  *Roper v. Simmons*, 543 U.S. 551, 568 (2005); *Eddings v. Oklahoma*, 455 U.S. 104, 110-12 (1982).  In regard to theories of mitigation, the defendant must meet a burden of persuasion by a preponderance of the evidence. 18 U.S.C. § 3593(c); *United States v. Caro*, 597 F.3d 608, 612 n.4 (4th Cir. 2010).  Simply put, the Constitution requires the jury's exposure to proffered mitigation evidence, but does not oblige the finding of any mitigator, even those supported by uncontradicted evidence.  *United States v. Jackson*, 549 F.3d 963, 983 (5th Cir. 2008); *United States v. Higgs*, 353 F.3d 281, 327 (4th Cir. 2003).  On collateral review, courts conducting evidentiary hearings may make credibility determinations regarding testifying witnesses.  *See Griffith v. United States*, 871 F.3d 1321, 1330 & n.9 (11th Cir. 2017); *Earp v. Ornoski*, 431 F.3d 1158, 1169-70 (9th Cir. 2005).  As such, this Court need not accept the credibility of evidence, even when descriptions of it caused an appellate court to order a hearing to consider it.  *See Griffith*, at 1330 & n.9.

4

During the evidentiary hearing, the government offered two experts, Seven Pitt and J. Randall Price, who opined that Barrett did not suffer from the mental health conditions with which his own experts had diagnosed him, principally bipolar disorder and organic brain damage involving executive functioning.  The government offered this evidence to dispute the reliability and credibility of Barrett's experts, George Woods and Deborah Miora, not to support a theory of aggravation, alleged or otherwise.

The Court, however, rejected the government's evidence because it relied on Barrett's extensive drug use, about which the jury "did hear extensive testimony."  R&R at 27.  It further stated that the rebuttal evidence "would not appear to have added substantially to the calculus of aggravation."[3]  R&R 33.  The Court, however, failed to consider whether a jury would have credited Barrett's forgone mental health evidence in the first instance.  The government objects to the Court's conclusions, because Barrett's recreational drug use better explained his mental state at the time of the killing than the theories advanced by the defense.

As this Court has recognized, the government's experts explained Barrett's mental health, in simple vernacular: "drugs, drugs, and more drugs."  R&R 32 (quoting EH Tr. 1120-21).  More formally, Dr. Pitt found that Barrett "[e]xperienced psychiatric symptoms (mood swings and paranoid ideation), that were the byproduct of substance use and not the result of a mental disease or defect."  EH Gov't Ex. 52 at 69.  As Dr. Pitt, explained, Barrett's history of substance abuse precluded a diagnosis for bipolar disorder.  EH Tr. 988; *see* EH Tr, 1120-22 ("You can't be giving these diagnoses as the primary diagnosis without first giving strong consideration and mentioning and weighing heavily the chronic methamphetamine use").  And Barrett was hardly

---

[3] The government did not allege drug use as an aggravating factor, precluding reliance on such a theory at trial.  *See* 18 U.S.C. § 3593(d).

coy about his drug use, flatly informing Dr. Pitt, "there was no absence of drug use . . . . I've always used drugs . . . there was never a day that went by I wasn't [using]." EH Gov't Ex. 52 at 59. Indeed, as Dr. Pitt observed, Barrett himself attributed any history of manic episodes to his own abuse of intoxicants. EH Gov't Ex. 52 at 65.

Attempting to sidestep the intuitive conclusion that Barrett's mood varied with his drug ingestion, Dr. Woods opined that the defendant used drugs in an effort to self-medicate a mental health disorder. EH Tr. 204-05. Dr. Pitt, however, explained that Barrett had no access to drugs in federal custody but exhibited no symptoms of bipolar disorder. EH Tr. 1055. Dr. Pitt rejected any diagnosis of bipolar disorder premised on family history, as a mental health professional could not make such a determination if the symptoms were better explained by the physiological effects of a substance or a medical condition. EH Tr. 1006-08, 1016-26. Dr. Pitt also concluded that Barrett did not suffer from post-traumatic stress disorder: the defendant did not endorse the symptoms of the condition, and Dr. Pitt could not identify a threshold event that met the initial criteria for it. Tr. 1009-10, 1049-50.

For his part, Dr. Price diagnosed Barrett with a learning disorder, attention deficit/hyperactivity disorder, polysubstance dependence, mild depression, and a personality disorder with antisocial and paranoid traits and features. EH Tr. 889-90. Dr. Price specifically recognized that Barrett engaged in substance abuse, beginning in adolescence, as noted by mental health professionals who had treated him through the years. EH Tr. 829-31. Dr. Price's neuropsychological testing revealed no evidence that Barrett suffered from a severe brain injury. EH Tr. 863. Had Dr. Price observed any evidence of brain injury in Barrett, he would have re-evaluated him with more comprehensive assessments. EH Tr. 875.

The government experts' opinions were consistent with the findings of mental health workers who treated Barrett in non-forensic settings.  At Sparks Regional Medical Center, where Barrett received treatment following a suicide attempt, the treating psychiatrist diagnosed the defendant with probable antisocial personality, drug abuse (marijuana with a history of hallucinogenic drugs), alcohol abuse, and probable major depressive disorder.  EH Tr. 975-77. At Eastern State Hospital, the staff admitted Barrett with a diagnosis of marital problems, mixed substance abuse, alcohol abuse, and mixed personality disorder. EH Tr. 978-80; Gov't Exs, 3, 4, 5 & 6.  On discharge from Eastern State Hospital, Barrett received diagnoses of marital problems, mixed substance abuse, and mixed personality disorder, but no mood disorder. EH Tr. 980-81.  At Sequoyah Memorial Hospital, Barrett reported that he was "losing his mind," but a urine toxicology screen was positive for amphetamines and THC.  EH Tr. 983-84; EH Gov't Ex. 11. The Social Security Administration rejected Barrett's application for benefits, finding he exhibited no signs of a severe mental illness. EH Tr. 982; EH Gov't Ex. 10.  The government's evidence provided ample reason to reject the testimony of Drs. Woods and Miora.

The rebuttal aside, however, the evident exaggerations of the defense experts, both of whom had a long history of testifying only on behalf of the defense bar (*see* EH Tr. 259; EH Pet. Ex. 105), undermined the credibility of their findings.  Dr. Woods described Barrett as exhibiting pressured speech, attentional deficits and "flight of ideas," (*see* EH Tr. 200, 224) but Dr. Pitt's videotaped interview with the defendant depicts Barrett exhibiting no difficulty attending to the conversation over a period of hours or responding in a logical, paced fashion.  EH Gov't Ex. 52 video.  Just as tellingly, Dr. Woods described Barrett as incompetent at the time of trial and unable to assist his counsel, but his trial attorneys described him as cooperative and helpful. *Compare* EH 314-15 (conceding an expert opinion that Barrett could not rationally assist his

7

counsel); *with* EH Tr. 547 (acknowledging a description of Barrett as "among the most cooperative criminal . . . defense clients I've ever had" and noting "He was very helpful during the trial to me. He knew as much about it as I did"), 665-66 (recalling no concerns about Barrett's ability to assist counsel); *see also* EH Gov't Ex. 38-40 (defendant's notes to counsel concerning case). Dr. Woods determined that Barrett was legally insane when he murdered Trooper Eales, as he could not differentiate right from wrong. EH Tr. 317-19. But Barrett specifically denied any such difficulty. EH Tr. 1014; EH Gov't Ex. 52 at 71-72.

Dr. Woods went so far as to assert that the effects of methamphetamine could not mimic symptoms of bipolar disorder (EH Tr. 330-31, 339), although his profession's *Diagnostic and Statistical Manual-V* states otherwise. EH Tr. 1006. Perhaps most incredibly, Dr. Woods maintained in the face of medical evidence to the contrary that the defendant did not regularly use drugs around the time he killed trooper Eales. *Compare* EH Tr. 307-08 (testifying "his toxicology screens were negative for methamphetamines."), 310 (testifying the medical records "do not reflect" daily methamphetamine use in 1999); *with* EH Gov't Ex. 7 at 2, 7 (Sept. 24-25, 1999 medical records noting "patient reports using . . . methamphetamine and marijuana"; "serum drug screening positive for cannabinoids, and positive for high levels of amphetamines"); EH Gov't Ex. 8 (1995 medical record noting amphetamine dependence).

Apart from Dr. Woods' self-evident deflections and exaggerations, Dr. Miora partially premised her diagnosis of dysexecutive syndrome on the Wisconsin Card Sorting test. EH Tr. 1218-22; 1360. But Barrett's performance on that test suggested either malingering or a failure to understand the exam. *Id*. Indeed, Barrett's performed so terribly on the test that Dr. Miora's predecessor, Dr. Young, correlated his performance with an inability to drive a car. EH Tr. 1323. For her part, Dr. Miora did not know whether Barrett could drive a car, though the trial

8

evidence clearly demonstrated he could. *Compare* EH Tr. 1324; *with* TR Tr. 4595-97; *see also* EH Gov't Ex. 36 (Barrett's driving record). Not only was Barrett demonstrably capable of driving, he presented evidence that he repaired cars. *See* TR Tr. 4929. In short, Dr. Miora's own evidence of a deficit in Barrett's executive functioning relied on test results inconsistent with the defendant's demonstrated abilities.

Given the obviously incredible opinions offered about Barrett's competence, sanity, and neurological functioning, this Court should reject the credibility of the defense experts in toto: the defendant's admitted drug use, as found by the government's experts, far better explains his behavior and mental state at and around the time of the murder.

B. Assessment of Evidentiary Weight

Assuming, arguendo, this Court credited the opinions of Drs. Woods and Miora, despite the indicia of incredibility noted above, the evidence still should not merit relief. In its Report and Recommendation, the Court did not analyze the expert testimony in reference to the strength of the government's case in aggravation. *Cf. Porter*, 558 U.S. at 41 (requiring reweighing of aggravating and mitigating factors). Rather, it treated the government's case as a theoretical construct – a case adequate to merit a death verdict, devoid any detail or distinction – against which seemingly *any* showing of previously-unexplored mitigation would result in a life sentence. A fair evaluation of the supposed prejudice requires a complete review of the government's evidence. Against that showing, the mental health evidence cited by the Court would not merit relief.

The government's case in aggravation portrayed Barrett as a man consumed with killing the police and the victim as a pillar of his family and community. The government proved beyond a reasonable doubt two statutory aggravating factors: substantial planning and

9

premeditation; and multiple murders or attempted murders in a single criminal episode.  Tr. Doc. 258.  In regard to the multiple murder aggravator, the trial prosecutor appropriately observed that nothing short of "Providence, fate, [or] dumb luck" prevented Barrett from actually killing more than one person on September 24, 1999.  TR. Tr. 5402.  Barrett fired two shots at the driver of Eales' vehicle, Trooper Hamilton, who sustained wounds to his eye, cheek, and left shoulder.  TR. Tr. 5343.  Indeed, Barrett loosed nineteen .223 caliber bullets on the night of the killing, any one of which could have killed a member of Tac team as he entered the property.  Barrett clearly intended to kill, indiscriminately, any and all members of the team, and wounded Trooper Hamilton in the eye and shoulder.

As to the substantial planning and premeditation of this homicide, the prosecutor observed that Barrett plotted the killing for months, preparing the murder weapon with 91 rounds and maintaining it, always, at hand.  TR Tr. 5340-41.  The prosecutor also noted Barrett's mental preparations and his statements to friends: "["]I'm going to take those bastards out, as many of them as I can.  I'm going to kill the first one through the door.[']  He was hyping himself up, building himself up mentally."  TR Tr. 5341.

As a non-statutory aggravator, the government also established victim impact.  TR Doc. 258.  To explain the impact of Trooper Eales' murder, the government proffered five witnesses, including two friends, William DeWeese and Gene Hise.  DeWeese knew Trooper Eales from the Marine Corps.  TR. Tr. 4527-40.  He was "devastated" by his friend's death, describing him as "this splendid manifestation of American manhood, this exemplary marine and law enforcement officer."  *Id*. at 4535.  Another friend, Trooper Hise, served with the victim on the Oklahoma Highway Patrol Tac Team.  TR. Tr. 4663-5.  He described the impact of Trooper Eales' death: "I lost a part of me. I lost a brother. . . . Somebody I had to put more trust in than I

10

would somebody in my own family.  Almost lost my wife and my son because I suffered for three years with Post-Traumatic Stress Syndrome. Our team fell apart. Almost half of the men in the team are divorced.  And it literally crushed my world." TR Tr. 4665.

In addition to friends, the government called Trooper Eales' sister, Nancy Stalcup, his mother, Bobby Eales, and his widow, Kelli Eales.  The relatives testified about the victim's personal qualities and the loss they felt due to his death.  Ms. Stalcup testified about the impact of the death upon her child.  TR. Tr. 4641-50.  Trooper Eales' mother tearfully recounted her loss.  TR. Tr. 4650-60.  Kelli Eales described her life, her loss, and the impact of the death on her two children.  She explained her son wished he could go to heaven to be with his father.  She read a prize-winning essay written by her twelve-year-old daughter, observing her father "was killed when I was six and a half years old, but in that short time, he made enough memories to last a lifetime. . . . Some kids go through their entire life not having a good father. I am thankful that my dad showed me how to love in six and a half short years to last me my whole life.  I am so very thankful to have had him." TR. Tr. 4666-93.

The remaining penalty phase evidence concerned Barrett's violent encounters, with friends and adversaries.  On one occasion, Barrett fled from a police officer who generously permitted him to drive his own vehicle to a pre-arranged meeting place.  The officer pursued Barrett to his home, where the defendant had armed himself with a long-barreled revolver. When the officer withdrew momentarily from the confrontation, Barrett fled again.  TR Tr. 4541-50.  On another occasion, Barrett attempted to run down officers at a checkpoint.  TR Tr. 4591-98, 4612-18.  The wife of Barrett's cousin described the defendant's failed effort to seduce her.  TR Tr. 4575-79.  When she spurned his advanced, Barrett threatened her with a shotgun.

TR Tr. 4578.  Barrett openly discussed his desire to murder the person who informed on him. TR Tr. XXII, pp. 4587-88.

The government adduced the evidence of uncharged violence in support of a future dangerousness aggravator that the jury rejected.  TR Doc. 258.  Nonetheless, that evidence rebutted Barrett's mitigation theory of non-dangerousness, which ten jurors rejected.  *Id*. Likewise, that evidence tends to rebut any theory that Barrett's actions stemmed from mental illness or neurological damage, rather than a proclivity for violence and an aversion for authority.

The Court, however, ignored the weight of the evidence in aggravation and focused solely on the mental health evidence at the core of Barrett's § 2255 claim.  Furthermore, the Court treated that mental health evidence – especially as to brain damage – as virtually insurmountable, given the Tenth Circuit's observation, under *Hooks v. Workman*, that "organic brain damage is something that we and other courts, including the Supreme Court, have found to have a powerful mitigating effect."  R& R at 26 (quoting *Hooks v. Workman*, 689 F.3d 1148, 1205 (10th Cir. 2012)).  Apart from the fact that the Tenth Circuit remanded for an evaluation of the foregone mental health evidence, rather than a mere confirmation of its existence, the *Hooks* opinion does not create a per se rule that mandates a finding of persuasive mitigation whenever evidence of neurological damage appears.  Rather, the Court of Appeals recognized that juries often credit such information because it "tends to diminish moral culpability, altering the causal relationship between impulse and action."  *Id*.; *see also Barrett, II*, 797 F.3d at 1231 (citing *Grant*, 727 F.3d at 1020-21for the proposition that brain damage evidence permits counsel to explain the reasons for the defendant's conduct).

In this case, however, Barrett never established a nexus between his supposed mental illnesses and his crime.  His expert on brain damage, Dr. Miora expressly rejected any suggestion

12

that she could relate her findings to the facts of Trooper Eales' murder: "I am not called in, as far as I know, to make any -- to develop any opinion about what was going on with him at the time of the crime. . . . [¶] I was asked to come in and opine about the validity and reliability and robustness of [her predecessor's] work." EH Tr. VIII pp. 1327-28. 209; She conceded there was no one-to-one correlation between daily life and the executive functioning deficits Barrett had shown on the D-KEFS neuropsychological instrument. EH Tr. 1239-40. On the basis of the D-KEFS, Dr. Miora predicted only that Barrett would have difficulty under stress if he had to pay visual attention and quickly switch between different kinds of activities. EH Tr. 1241. It does not appear that Dr. Miora's predecessor, Dr. Young, could have offered any theory of her own explaining Barrett's commission of the crime in terms of any organic brain damage. *See* Doc. 72-38 (Dr. Young's declaration).

Barrett's other mental health expert, Dr. Woods., did relate the mental health findings to the night of the murder, but evinced a misapprehension of the events. Dr. Woods suggests that Barrett killed Trooper Eales during an exchange of gunfire, in which the defendant suffered non-fatal wounds. EH Tr. 218. In view of that apparent misperception, he opined that Barrett's mental conditions led him to believe he justifiably killed Trooper Eales. EH Tr. 220. Dr. Woods' testimony is consistent with his 2009 declaration, in which he suggested that Barrett killed Trooper Eales during the course of a gunfight. Doc. 72-66 (asserting that Barrett's mental health symptoms set "the stage for his brain, with little executive functioning ability, to misprocess everything that was going on, to limit his ability to understand the input from each of these symptoms, and, eventually, to be shot himself multiple times and kill an officer").

Had an exchange of gunfire preceded the killing, Barrett might have subjectively concluded that he had a right to fire on Trooper Eales, a circumstance that would have lent

13

relevance to his alleged mental health conditions.  But the truth, as the jury found it, nullifies any effort to attribute the killing to deficits in Barrett's perception or information processing.  Barrett announced well ahead of the murder that he would violently confront the police if they entered his land.  *See e.g.*, TR Tr. 466, 3067-69, 3492.  When he, in fact, saw the police on his property, he acted in accordance with his plan, using of the most deadly of his three loaded firearms to engage the nearest target.  TR Tr. 536-37.  Barrett opened fire on Eales' vehicle before it stopped moving or any of its occupants could have threatened him in any way.  *Id.*  Indeed, Trooper Eales lay dying behind his police vehicle before any member of the Tac Team was able to return Barrett's fire.  TR Tr. 543-48.

Even if Dr. Woods understood that the murder preceded the troopers' fire, his opinion still fails to shed mitigating light on Barrett's motives under the circumstances found by the jury. Dr. Woods concluded that Barrett – unable to efficiently process information – misperceived the threat presented by the Tac Team and felt justified in his actions.  EH Tr. 220, 350-51; *see also* Doc. 72-66 ¶ 73 (noting Barrett's alleged "inability to accurately perceive the nature of the police officers' assault on his property, particularly the inability to recognize the action as a police action").  Those opinions might have merited weight in mitigation if the jury had believed Barrett misapprehended the identity and nature of the threat at hand.  But the jury's verdicts under 28 U.S.C. § 848(e) (murder of a law enforcement officer during the course of a drug crime) and 18 U.S.C. § 3591(c)(9) (substantial planning and premeditation) reflect its reliance on evidence that the defendant not only had knew he was shooting at the police but doing so because he recognized them as law enforcement – acting on his-oft mentioned plan.  Under these circumstances, Dr. Woods' conclusion that Barrett felt justified in shooting would not have merited any weight in mitigation (EH Tr. 220), given that the defendant told Dr. Pitt that he

14

shooting at the police was wrong at the time he did so (*see* EH Gov't Ex. 52 at 70-71).  Dr. Woods' opinion fails to inform the facts of the case as developed to the satisfaction of the jury, and should not merit a presumption of prejudice under *Hooks* or a finding of prejudice under any other standard.  Dr. Woods cannot, by force of will or expertise, transmogrify a premeditated murder into some lesser offense.

Given Barrett's premeditation, to say nothing of the lethality with which he executed his plan, none of his alleged mental conditions – ranging from bipolar disorder, to paranoia, to organic attention deficits – meaningfully explain, negate or mitigate his nakedly-homicidal conduct.  Simply stated, Barrett sprung a well-planned ambush, wounding one police officer and killing another.[4]  Not only did the jury find that Barrett had substantially planned and premeditated the murder, the Tenth Circuit observed that the trial evidence overwhelmingly demonstrated as much:

> When asked what Defendant "sa[id] that he was intending to do if the laws came to his place," [Randy] Turman replied that Defendant declared "[t]here was going to be a shootout" and "he was going to take out as many as he could before they got him." [Citation.]  Cindy Crawford testified that . . . Defendant said there was a chance law enforcement would come to his home and "that's why . . . he had protection"; and that Defendant boasted if ''Police, or anyone, [came to his home] that he would go out in a blaze of glory.'' [Citation.]  Karen Real testified that Defendant said "if they [cops] ever come out he would shoot them" (although she did not believe him at the time).  [Citation.]  Finally, Brandi Price testified that when discussing the warrant, Defendant told her and some friends that if they were there when law enforcement showed up they were to ''either grab a gun or hit the floor'' and that ''[h]e was going to open fire on them and . . . [t]ake as many of them bastards with him as he could.'' [Citation.] . . . .  We concluded on Defendant's direct appeal that the "evidence was more than sufficient to allow the jury to reasonably find that [Defendant] knew that [Trooper] Eales and the other persons approaching his residence were law enforcement officers and that he intended to kill Eales."

---

[4] Barrett's ability to accurately acquire Trooper Eales as a target, fatally wound him, and then shoot Trooper Hamilton following the deployment of flashbang (TR Tr. 543-44) gives the lie to Dr. Miora's assertion that the defendant suffered from a deficit in his ability attend to visual information and switch activities under pressure.  *Cf.* EH Tr. 218-20.

*In re Barrett*, 840 F.3d 1231-32 n.4. Barrett's presentation of mental health evidence meant to explain a version of events that found no traction with the jury should not receive any weight in mitigation at this juncture.

Barrett would no doubt answer that mental health evidence need not have a nexus to the crime of conviction to have mitigating effect. *See Tennard v. Dretke*, 542 U.S. 274, 288 (2004). The government has no quarrel with that rule, but *Hooks* presumes weight in mitigation to evidence that *does* explain the crime of conviction. *See* 689 F.3d at 1205. Indeed, the Tenth Circuit has observed the lack of any presumed prejudice for evidence of "'generalized personality orders'" that fail to provide "'a compelling or sympathetic explanation for [the defendant's] violent behavior'" *Grant*, 727 F.3d at 1021. Absent some connection to the murder, the evidence Barrett has presented deserves far less weight than this Court has attributed to it, if it merits any at all. Indeed, the mental health evidence leaves Barrett with an untenable choice between the case he presented at trial and the case his current attorneys would present. On the one hand, he could maintain – as he asserted at trial – that he was beloved family member and a profitable shade-tree mechanic. *See* TR Tr. 4715-5125. On the other, he could seek sympathy as a self-medicating victim of bipolar disorder and organic deficits that render him incapable of maintaining attention.

Given the tension between the two potential portraits, Barrett cannot establish that a full-throated presentation of both would have had additive impact. Indeed, insistence that the defendant suffered from brain damage and was physiologically incapable of sorting visual stimuli would have undermined evidence that he provided a valuable community service repairing cars at modest prices. Insistence that he suffered from paranoia driven by bipolar disorder would have tended to underscore a government allegation of future dangerousness that

16

the jury rejected, while detracting from the weight of mitigators concerning Barrett's role in family life.  As such, the forgone mental health evidence has little mitigating effect, in and of itself.  *See Grant*, 727 F.3d at 1021 (noting the potentially "double-edged nature" of evidence concerning mental illness and abusive family environments).

Barrett might also assert that the Tenth Circuit's remand order implicitly rejected any tension between the trial evidence and his experts' opinions.  But the Tenth Circuit never expressly considered the proposition, and its opinion does not constitute law of the case or otherwise bind this Court in regard to this issue.  *See United States v. West*, 646 F.3d 745, 748 (10th Cir. 2011) (holding "[t]he law of the case doctrine precludes re-litigation of a ruling of law in a case once it has been decided").  In any event, the government's rebuttal evidence provides new and stronger bases upon which to conclude that the defense experts' opinions cannot and do not address the crimes of conviction as found by the jury.  Principally, the rebuttal provides ample reason – as discussed above – to question the reliability of the mental health evidence, quite apart from the fact that it does not address the actual facts of the crime.  *See, supra*, part A. Even evidence adduced outside of the government's case-in-chief tends to undermine the notion that the murder represented an aberration driven by mental illness or deficit.  Steven Barrett's testimony demonstrated that his brother lashed out violently as a teenager, permanently scarring his elementary school aged brother.  *See* EH Tr. 117.

Accordingly, this Court should hold that the omission of mental health evidence from Barrett's penalty phase trial did not have a prejudicial impact under *Strickland*.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to deny § 2255

relief.

Dated: October 23, 2018.

Respectfully submitted,
BRIAN J. KUESTER
United States Attorney
Eastern District of Oklahoma

*/S/ Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on October 23, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry: Dbautry77@gmail.Com
Ms. Joan M. Fisher:  Joan.Fisher@fd.Org
Karl J. Saddlemire:  Karl_Saddlemire@fd.Org
Mr. Tivon Schardl:  Tim_Schardl@fd.org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Unit

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| v. | ) | Case No. CV-09-00105-JHP |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

**GOVERNMENT'S RESPONSE IN OPPOSITION TO PETITIONER'S OBJECTION TO
MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

---

**COMES NOW** the United States of America, by and through undersigned counsel and submits the following Response in Opposition to Petitioner's Objection to Magistrate Judge's Report and Recommendation.

## STATEMENT OF THE CASE

On September 24, 1999, Petitioner Kenneth Eugene Barrett ("defendant") fatally shot Oklahoma State Trooper David Eales, who – as part of a police Tactical Team ("Tac Team") – had attempted to serve a warrant at the defendant's residence, which was used to manufacture and distribute methamphetamine.

In 2005, a petit jury empaneled in this district found Barrett guilty, as charged, on two counts of felony firearm murder (18 U.S.C. § 924(c)(1)(A)) and one count of killing a state law enforcement officer during the commission of a drug trafficking crime (21 U.S.C. § 848(e)(1)(B)).  Following a bifurcated penalty trial, the jury recommended a death sentence for the § 848 offense and life sentences for the § 924 offenses, all of which the district court

1

imposed.  Case No. CR-04-115-JHP, Docket No. 285 ("TR Doc. 285").  The Tenth Circuit Court

of Appeals affirmed the judgment in a published opinion.  *United States v. Barrett*, 496 F.3d

1079 (10th Cir. 2007) ("*Barrett, I*"), *cert. denied*, 552 U.S. 1260 (2008).  One year after finality

of the affirmance, Barrett sought collateral relief under 28 U.S.C. § 2255, which the district court

denied.  Case No. CIV-09-105-JHP, § 2255 Docket Nos. 1, 214 ("§ 2255 Doc. 1, 214").  In a

published opinion, the Tenth Circuit "REVERSE[ed] and REMAND[ed] Defendant's death

sentence for the district court to hold an evidentiary hearing on whether the performance of trial

counsel was deficient in not investigating Defendant's background and mental health and

whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial.

In all other respects [it] AFFIRM[ed]." *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir.

2015) ("*Barrett, II*").

On remand, this Court conducted the evidentiary hearing and issued a Report and

Recommendation advising the district court to grant a new penalty phase trial as to the § 848

offense for which Barrett received a death sentence.  § 2255 Doc. 467 at 2 ("R&R").   Barrett

objected, arguing that this Court should have held that trial counsel's alleged ineffectiveness

permeated the verdict as to all three counts and this Court should have granted resentencing for

all charges.  Doc. 470.  This Response in Opposition Follows.

## ARGUMENT

**THIS COURT PROPERLY LIMITED THE RECOMMENDED RELIEF TO THE
AMBIT OF PETITIONER'S TIMELY FILED CLAIM**

Reasoning that his trial counsel's alleged ineffectiveness infected the jury's penalty

verdict as to his three counts of conviction, Barrett claims that this Court should have granted

resentencing as to all charges, rather than the offense for which he received the death penalty.

According to Barrett, the Court enjoys discretion to order such relief, notwithstanding the limited

2

scope of the Tenth Circuit's mandate – reversing only his death sentence and affirming in all other respects. Doc. 470. Barrett has never before articulated the theory that his trial attorneys' performance affected his non-capital sentences. To permit him to pursue such a claim more than ten years after the finality of his appeal would require an untimely amendment of his § 2255 motion that he cannot justify.

After the following of an answer, a § 2255 movant may amend his motion only with the government's written consent or with leave of court, which should be freely given when justice requires. Fed. R. Civ. Proc. 15(a)(2); *see United States v. Harrison*, 469 F.3d 1216, 1217 (8th Cir. 2006) (concerning the applicability of the rule to § 2255 proceedings); *see* § 2255 Doc. 214 at 17-18. The courts' discretion to provide such leave is limited by the Antiterrorism and Effective Death Penalty Act of 1996, which imposes a one-year period of limitations in which federal prisoners may seek collateral relief from criminal judgments. 28 U.S.C. § 2255(f); *United States v. Willis*, 202 F.3d 1279, 1280 (10th Cir. 2000); *see* § 2255 Doc. 214 at 17-18. The limitation period begins on the date the Supreme Court denies a defendant's petition for writ of certiorari from a direct appeal. *Willis*, 202 F.3d at 1280-81. "In this case, the petitioner's conviction became final on March 17, 2008, the date the United States Supreme Court denied certiorari review of his direct appeal.

The limitation period bars untimely amendments that add new claims to an initial § 2255 motion. *United States v. Guerrero*, 488 F.3d 1313, 1316 (10th Cir. 2007). The limitation period is not an absolute bar: Section 2255 movants may make untimely amendments that relate back to existing claims. *United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000). Arguments premised on new facts do not, however, relate back to earlier contentions just because they both rely on the same constitutional principle. *See id*. An untimely amendment

3

that "clarifies or amplifies" an existing claim relates back to the original motion.  *United States v. Weeks*, 653 F.3d 1188, 1206 n.12 (10th Cir. 2011) (quoting *Espinoza– Saenz*, 235 F.3d at 505); *see also Mayle v. Felix*, 545 U.S. 644, 655 (2005) ("Amendments made after the statute of limitations has run relate back to the date of the original pleading if the original and amended pleadings arise out of the same conduct, transaction, or occurrence").  Thus, a proposed amendment may not introduce a new theory based on facts different from those underlying existing issues.  *See Dean v. United States*, 278 F.3d 1218, 1221 (11th Cir. 2002) ("Congress did not intend Rule 15(c) to be so broad as to allow an amended pleading to add an entirely new claim based on a different set of facts").  An untimely amendment may receive review only if the movant excuses the delay by establishing a need for equitable tolling based on extraordinary circumstances beyond his or her control.  *United States v. Gabaldon*, 522 F.3d 1121, 1124 (10th Cir. 2008); *see generally Holland v. Florida*, 560 U.S. 631, 648 (2010) (holding equitable tolling applicable to § 2254 cases when the petitioner diligently pursued his rights but an extraordinary circumstance prevented timely filing).

Barrett has consistently claimed since the outset of this litigation that trial counsel's ineffectiveness during the penalty phase resulted in an undeserved death sentence.  *See* § 2255 Doc 1 at 237 ("Just as Trooper Eales should not have been put in danger, Mr. Barrett should not have been sentenced to death."); Doc 95 at 247 (same); *see also* § 2255 Doc. 178 at 112 (asserting "Barrett's death sentence must be vacated."); § 2255 Doc. 149 at 115 (citing *Wiggins v. Smith*, 539 U.S. 510, 537 (2003)for the proposition that "[i]n a capital case," a defendant establishes prejudicial ineffective assistance of counsel if "'there is a reasonable probability that at least one juror would have struck a different balance'").  Barrett did not alter course when he reached the Tenth Circuit, arguing, "Had the omitted mitigating evidence been presented, there is

4

a reasonable probability that at least one juror would have refused to vote for the death penalty." *United States v. Barrett*, case no. 12-7086, Doc. 01019181992 at 54 (January 6, 2014); *see also id*. at 87 (asserting, "The Court should vacate Mr. Barrett's death sentence and order a new sentencing trial"); *United States v. Barrett*, case no. 12-7086, Doc. 01019274910 (reply brief) (arguing "the appropriate remedy is to vacate the death sentence").  Following remand, Barrett continued to assert that the alleged ineffectiveness prejudiced him only in regard to his death sentence.  *See, e.g*., § 2255 Doc. 366 at 20 ("If one juror found Mr. Barrett's emotional and mental health problems sufficiently weighty, a life sentence would be imposed"); § 2255 Doc. 265 at 7 (arguing "[o]n the basis of trial counsels' [*sic*] profound constitutional inadequacies and shortfalls, Mr. Barrett was sentenced to death"); § 2255 Doc. 249 at 5 (asserting that the Tenth Circuit's mandate required an inquiry as to "Whether it is reasonably probable that a jury made aware of [omitted] facts would have imposed a sentence less than death").

Having never before asked to vacate his life sentences, Barrett now claims this Court erred in tailoring the scope of recommended relief to the very arguments he has made for the better part of a decade.  The present argument amounts to an untimely attempt to amend a nearly 10-year-old § 2255 motion.

Barrett cannot, in the eleventh hour, avoid the limited reach of his own claim by asserting that counsel's performance infected the penalty verdicts as to all counts, as the jury could have recommended terms of years where it instead advised life sentences.  To show meaningful prejudice, Barrett would have to demonstrate a reasonable likelihood that the district court would have – in the absence of any ineffectiveness – imposed a less-than-life sentence.  *See Strickland v. Washington*, 466 U.S. 668, 687 (1984); *United States v. Washington*, 619 F.3d 1252, 1262 (10th Cir. 2010).  He cannot satisfy that standard by arguing the likelihood one or more jurors

5

would have recommended determinative sentences his § 924 offenses.  Jury recommendations of less-than-life terms are not binding.  *See* 18 U.S.C. § 3594 (binding the court to impose only sentences of life or death recommended by the jury under § 3593 and stating "Notwithstanding any other law, if the maximum term of imprisonment for the offense is life imprisonment, the court may impose a sentence of life imprisonment without possibility of release."); *United States v. Kee*, no. S1 98 CR 778(DLC), 2000 WL 863119, *8 (S.D.N.Y. June 27, 2000); *see also United States v. Catalan-Roman*, 585 F.3d 453, 460 n.6 (1st Cir. 2009) (noting that recommended sentences of life or death bind the sentencing court).  Thus, to extend his ineffectiveness claims to embrace his life sentences, Barrett must show that counsel's alleged errors infected the district court's sentencing as well as the jury's penalty phase verdict.

The need to expand the reach of his claim ultimately undermines any effort to assert it. Barrett can only pursue his novel contention if it relates back to his old claim of error in the penalty phase trial.  But the present claim contemplates the impact of alleged error on the judge at sentencing rather than at the jury during the penalty phase trial.  As such, the newly-conceived claim seeks to smuggle into this case an entirely new theory of prejudice.  *See Dean*, 278 F.3d at 1221.  Having, thus, failed to show relation back to his original claim, Barrett makes no effort to demonstrate the need for equitable tolling based on extraordinary circumstances beyond his control.  *See Gabaldon*, 522 F.3d at 1124.

Ignoring the tardiness of his claim, Barrett argues that the Tenth Circuit's mandate controls the scope of his present claim, or permits an exercise of discretion to expand it.  *See* Doc. 470 at 5-8.  As demonstrated above, Barrett asserted from the first – and long before his appeal to the Tenth Circuit – that counsel's alleged ineffectiveness resulted in a death sentence, not a life term.  The Tenth Circuit could no more permit an untimely amendment of his claim on

review than this Court can on remand.  The Tenth Circuit's mandate, to the extent it might otherwise permit discretion for expansion on remand, cannot afford this Court with any license to allow an untimely amendment of Barrett's § 2255 motion.

Accordingly, this Court should bar him from altering the ambit of his claim to embrace possible error in the imposition of his life sentences.

## CONCLUSION

Based on the foregoing, the government respectfully urges this Court to reject Barrett's

Objections to the Report and Recommendation and refuse to vacate his life sentences.

Dated: November 26, 2018.

Respectfully submitted,

BRIAN J. KUESTER
United States Attorney
Eastern District of Oklahoma

*/S/ Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

## CERTIFICATE OF ECF FILING AND DELIVERY

       I, hereby certify that on November 26, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

- Mr. David B. Autry: Dbautry77@gmail.Com
- Ms. Joan M. Fisher:  Joan.Fisher@fd.Org
- Karl J. Saddlemire:  Karl_Saddlemire@fd.Org
- Mr. Tivon Schardl:  Tim_Schardl@fd.org

/*S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Unit

2077

**DAVID AUTRY**, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:     (405) 521-9600
Facsimile:     (405) 521-9669
E-mail:        dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
**JOAN M. FISHER,** ID Bar #2854
Assistant Federal Defender
**KARL J. SADDLEMIRE**, State Bar #275856
Assistant Federal Defender
**CARRIE L. WARD,** MO Bar #57581
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:     (916) 498-6666
Facsimile:     (916) 498-6656
E-mail:        Joan_Fisher@fd.org
               Karl_Saddlemire@fd.org

Attorneys for Petitioner/Defendant,

KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT

### FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,

        Petitioner/Defendant,

vs.

UNITED STATES OF AMERICA,

        Respondent/Respondent.

CASE NO. CV-09-00105-JHP

**PETITIONER'S RESPONSE TO GOVERNMENT'S OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION**

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          1          *Barrett v. U.S.*, CV-09-00105-JHP

2078

**TABLE OF CONTENTS**

I.   INTRODUCTION ................................................................................................ 1

II.  THE GOVERNMENT'S OBJECTIONS ARE FATALLY FLAWED, UNSUPPORTED BY THE FACTUAL RECORD AND THE LAW.  THIS COURT SHOULD OVERRULE THE GOVERNMENT'S OBJECTIONS AND ADOPT THE  MAGISTRATE'S REPORT AND RECOMMENDATION IN FULL SUBJECT ONLY TO ITS SCOPE AS LAID OUT IN PETITIONER'S OBJECTIONS. ...................................................................... 3

   A.  The Government's Objections Are Too Broad For Review. ............................... 3

   B.  The Magistrate's Report and Recommendation is Wholly Consistent with Constitutional and Relevant Legal Standards. ...................................................... 3

   C.  Contrary to the Government's Objections and Argument, Judge Shreder Made Findings of Credibility of Both Mr. Barrett's and the Government's Experts That Amply Support the Finding of Prejudice. ...................................................... 4

   D.  Respondent's Imposition of a Nexus Requirement Contravenes Clearly Established Federal Law, and Grossly Misinterprets Tenth Circuit Precedent on "Connecting the Dots" between Brain Damage and Petitioner's Behavior. Omitted Evidence of Petitioner's Brain Damage, and Its Attendant Effects Is Inherently Mitigating, and Explains Petitioner's Behavior Under Governing Law.  As Judge Shreder Concluded, Petitioner Was Prejudiced by Trial Counsels' Deficient Performance. ............................................. 10

   E.  Respondent's Central Claim that Barrett's Behavior Was "Better Explained" by "Recreational Drug Use" is Baseless, as this Assertion was First Rejected by the Jury at Trial, Again Rejected by the Tenth Circuit on Remand, and Rejected by Judge Shreder after considering all of the evidence on the issue. ............................................. 16

   F.  Where, as Here, the Magistrate Judge's Findings of Fact and Conclusions of Law are Both Amply Supported by the Evidence Adduced at the Hearing and Consistent with the Tenth Circuit Remand, this Court Cannot Grant the Government's Objections Without Violating the Tenth Circuit's Order on Remand and Denying Mr. Barrett's Right to Due Process under the Fifth and Eighth Amendment's to the United States Constitution. ................... 21

III. CONCLUSION .................................................................................................. 22

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          i          *Barrett v. U.S.*, CV-09-00105-JHP

2079

## TABLE OF AUTHORITIES

**Federal Cases**

*Amlong v. Amlong, P.A. v. Denny's, Inc.*, 500 F.3d 1230 (11th Cir. 2007) ........................... 22-23

*Anderson v. Sirmons*, 476 F.3d 1131 (10th Cir. 2007) .............................................. 14

*Byrd v. Workman*, 645 F.3d ................................................................ 4

*Cannon v. Gibson*, 259 F.3d 1253 (10th Cir. 2001) ................................................ 13, 16

*Caro v. Woodford*, 280 F.3d 1247 (9th Cir. 2002) .................................................. 11

*Elzour v. Ashcroft*, 378 F.3d 1143 (10th Cir. 2004) .............................................. 4, 5, 7

*Frazier v. Huffman*, 343 F.3d 780 (6th Cir.2003) ................................................. 11

*Frierson v. Woodford*, 463 F.3d 982 (9th Cir. 2006) .............................................. 11

*Grant v. Trammell*, 727 F.3d 1006 .............................................................. 4, 8, 9

*Hooks v. Workman*, 689 F.3d 1148 ............................................................. 4, 12, 14, 15

*Orpiano v. Johnson*, 687 F.2d 44 (4th Cir. 1982) ................................................. 3

*Porter v. McCollum*, 558 U.S. 30 (2009) ......................................................... 4

*Proffitt*, supra, 685 F. 2d ................................................................... 22

*Rompilla v. Beard*, 545 U.S. 374 (2005) ...................................................... 4, 10-11, 12, 13

*Sears v. Upton*, 561 U.S. 945 (2010) .......................................................... *passim*

*Smith v. Mullin*, 279 F.3d 91 ................................................................. 4, 15

*Smith v. Texas*, 543 U.S. 37 (2004) (per curiam) ............................................... 10

*Strickland v. Washington*, 466 U.S. 668 (1984) ................................................. 2, 4

*Tennard v. Dretke*, 542 U.S. 274 (2004) ....................................................... 10, 12-13, 13

*United States v. Barrett*, 797 F.3d 1207 (10th Cir. 2015) ....................................... *passim*

*United States v. One Parcel Real Prop.*, 797 F.3d 1057 (10th Cir. 1996) ......................... 3

*United States v. Quaintance*, 608 F.3d 717 (10th Cir. 2010) ..................................... 7-8

*Wessel v. City of Albuquerque*, 463 F.3d 1138 (10th Cir. 2006) .................................. 7

*Wiggins v. Smith*, 539 U.S. 510 (2007) ........................................................ 4, 12, 13

*Williams v. Taylor*, 529 U.S. 362 (2000) ...................................................... *passim*

*Williams, supra, Hooks v. Mullin*, 379 F.3d 919 ............................................... 4, 14, 15, 17

*Wilson v. Trammell*, 706 F.3d 1286 (10th Cir. 2013) ............................................ 4

*Wilson*, 536 F.3d at 1064 ..................................................................... 15

**State Cases**

*Cannon v. State*, 933 P.2d 926 (Okla.Crim.App. 1997) ........................................... 16

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          ii          *Barrett v. U.S.*, CV-09-00105-JHP

2080

**Federal Statutes**

28 U.S. C. § 636 ....................................................................................................... 3

28 U.S.C. § 636 ........................................................................................................ 22

28 U.S.C. § 2254 ....................................................................................................... 9

28 U.S.C. § 2255 ..................................................................................................... 1, 2

**Other**

US Const. Amend. 5 ............................................................................................. 21, 22

US Const. Amend. 8 ............................................................................................. 21, 22

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation           iii           *Barrett v. U.S.*, CV-09-00105-JHP

2081

Kenneth E. Barrett, Defendant/Petitioner herein, files his Response in Opposition to the Government's Objections (Doc. 471; hereinafter "Govt's Objections") to the Magistrate's Report and Recommendation (Doc. 467).  Subject to Mr. Barrett's objection to the limited scope of the relief granted, Doc. 470, the Magistrate's Report and Recommendation should be adopted *in toto*.

## I.    INTRODUCTION

On appeal from this Court's denial of Mr. Barrett's 28 U.S.C. § 2255 Motion to Vacate, the Tenth Circuit vacated the death sentence on count 3 and remanded for an evidentiary hearing on Mr. Barrett's ineffective assistance of counsel (IAC) claim for failure to investigate and present mitigating evidence. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015) ("*Barrett II*"). The Court found that Mr. Barrett "had presented sufficient evidence of deficient performance and prejudice to entitle him to a hearing." *Id*. at 1232. This Court, the Hon. James H. Payne, District Judge, referred the hearing to the Magistrate Judge, the Hon. Steven P. Shreder. Doc. 391.  Judge Shreder heard evidence over 7-days[1] followed by submission by both parties of detailed proposed findings of fact and conclusions of law.

The Magistrate Judge issued his Report and Recommendations reciting detailed findings of fact in direct response to the observations and concerns raised by the Tenth Circuit. *See generally* Doc. 467 (hereinafter "R&R") at 3, 4, 10, 11, 13, 17, 19, 26, 27. The magistrate judge first found that Mr. Barrett's "federal trial counsel neither hired a mitigation or mental-health professional nor attempted to investigate themselves in any depth the Defendant's mental health or family background." R&R at 10. Judge Shreder found "no merit in *any of the reasons offered by the government* as justification for the failure of defense counsel to investigate the Defendant's mental health history or family background (whether by professionals or otherwise),

---

[1] March 27-30, 2017, June 12-13, 2017 and June 26, 2017.

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          1          *Barrett v. U.S.*, CV-09-00105-JHP

2082

and concluded that "the defense team rendered constitutionally deficient performance in developing a mitigation strategy." R&R at 18 (emphasis added).

The Magistrate Judge addressed in detail the evidence of both parties related to the question of prejudice under *Strickland*.  R&R at 18-33. Judge Shreder found that "based on all of the evidence presented both in mitigation and in aggravation, there is a reasonable probability that the result of the penalty phase of the Defendant's trial would have been different." R&R at 33-34 (emphasis added), citing *Strickland v. Washington*, 466 U.S. 668, 694 (1984). Judge Shreder concluded "Defendant's counsel were deficient in their performance, which ultimately prejudiced the Defendant, and that the Defendant is therefore entitled to relief under 28 U.S.C. § 2255 and to a new sentencing hearing." R&R at 34.

In reply, Respondent filed its Objections conceding deficiency of performance[2] and disputing prejudice as found under Judge Shreder's *Strickland* analysis. Specifically the government's objections are as follows:

"The government respectfully objects to the Court's prejudice analysis under *Strickland*." Govt's Objections at 2. "The government objects to the Court's conclusions, because Barrett's recreational drug use better explained his mental state at the time of the killing than the theories advanced by the defense." Govt's Objections at 5. The government asks this Court to "hold that the omission of mental health evidence from Barrett's penalty phase trial did not have a prejudicial impact under *Strickland*."  *Id*. at 17. The government's objections are without merit and without apposite legal authority; lack specificity; conflict with the record, including the record of the evidentiary hearing; and seek a remedy that is unavailable.

---

[2] The government does, however, consistently reference the mental health evidence proffered on the question of prejudice as "the *forgone* (or *foregone*) mental health evidence" implying *a decision* by counsel explained the absence of such evidence. (Govt's Objections at 2, 4, 5, 12, 17) (emphasis added), an implication in direct conflict with the extensive findings made by the Magistrate Judge. *See, e.g., Dictionary.com,"forgone"*.

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          2          *Barrett v. U.S.*, CV-09-00105-JHP

2083

II. **THE GOVERNMENT'S OBJECTIONS ARE FATALLY FLAWED, UNSUPPORTED BY THE FACTUAL RECORD AND THE LAW. THIS COURT SHOULD OVERRULE THE GOVERNMENT'S OBJECTIONS AND ADOPT THE MAGISTRATE'S REPORT AND RECOMMENDATION IN FULL SUBJECT ONLY TO ITS SCOPE AS LAID OUT IN PETITIONER'S OBJECTIONS.**

As set out below, the government's objections are without merit. They lack specificity and are in conflict with the record, including the record of the evidentiary hearing. The government's objections lack legal support, and seek a remedy that is unavailable. The objections should be summarily rejected and overruled.

A. **The Government's Objections Are Too Broad For Review.**

This Court designated Judge Shreder under the Magistrate's Act, 28 U.S. C. § 636(b)(1) to conduct the evidentiary hearing ordered by the Tenth Circuit Court. Doc. 391. The government objects generally that Judge Shreder failed to make credibility determinations. Their objection is too conclusory to merit de novo review. See *Orpiano v. Johnson*, 687 F.2d 44, 47 (4th Cir. 1982). "[W]hen a party makes general and conclusory objections that do not direct the court to a specific error in the magistrate's proposed findings and recommendations," *de novo* review by the District Court is unnecessary. *Id*. (citations omitted). Similarly the Tenth Circuit mandates that "a party's objections to the magistrate judge's report must be . . . specific to preserve an issue for *de novo* review by the district court . . . ."). *United States v. One Parcel Real Prop*., 797 F.3d 1057, 1060 (10th Cir. 1996) (adopting the firm waiver rule). This procedural bar prohibits review and the objections should therefore be rejected and overruled.

B. **The Magistrate's Report and Recommendation is Wholly Consistent with Constitutional and Relevant Legal Standards.**

The legal standard applied by the Magistrate Judge is clearly laid out in his Report. R&R at 2-3. On the issue of prejudice, the Magistrate Judge relies on the same Supreme Court precedent as cited by the Tenth Circuit. *Compare* R&R at 18-19 (citing *Sears v. Upton*, 561 U.S.

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation     3     *Barrett v. U.S.*, CV-09-00105-JHP

2084

945, 955-56 (2010); *Rompilla v. Beard*, 545 U.S. 374, 381 (2005), quoting *Strickland*, 466 U.S. at 689, 691; *Porter v. McCollum*, 558 U.S. 30, 41 (2009), quoting *Williams v. Taylor*, 529 U.S. 362, 397-98 (2000); *Byrd v. Workman*, 645 F.3d at 1168; *Hooks v. Workman*, 689 F.3d 1148, 1202; *Wilson v. Trammell*, 706 F.3d 1286, 1306 (10th Cir. 2013)) with *Barrett II*, 797 F.3d at 1229-31 (similarly relying on *Sears*, *supra*; *Porter*, *supra*; *Byrd*, *supra*; *Wiggins v. Smith*, 539 U.S. 510, 537-38 (2007) , *Williams*, *supra*, *Smith v. Mullin*, 379 F.3d 919, 942 (10th Cir. 2004); *Grant v. Trammell*, 727 F.3d 1006, 1020-21; *Wilson*, *supra*.). The government does not dispute the legal framework set out by the Tenth Circuit in *Barrett II* or by the Magistrate Judge; in fact, their objections internally cite that same framework, recognizing these as the relevant legal precedents for the issues at hand. *See generally* Govt's Objections at 2-3

### C. Contrary to the Government's Objections and Argument, Judge Shreder Made Findings of Credibility of Both Mr. Barrett's and the Government's Experts That Amply Support the Finding of Prejudice.

The government objects to Judge Shreder's prejudice analysis because it "did not evaluate the credibility of Barrett's mental health evidence," but "appears to have considered that testimony . . . as reliable for purposes of [its] decision." Govt's Objections at 2 -3. The government does not cite *Sears*, a Supreme Court precedent relied on by both the Tenth Circuit and Judge Shreder. This position seems to manifest a distinction between fact-finding and credibility assessments that is not supported by law. Credibility determinations *are* findings of fact. See *Elzour v. Ashcroft*, 378 F.3d 1143, 1150 (10th Cir. 2004). Judge Shreder's report is replete with factual findings based on the evidence presented at the hearing and weighed against *all* of the evidence leading to the ultimate conclusion of *Strickland* prejudice. *See* R&R at 32.

Judge Shreder found Mr. Barrett's expert psychiatrist, Dr. Woods, "diagnosed the Defendant with bipolar disorder and post-traumatic stress disorder, while noting that 65% of people who carry a diagnosis of chemical dependency also meet the criteria for bipolar disorder."

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          4          *Barrett v. U.S.*, CV-09-00105-JHP

2085

R&R at 22 (citations omitted). While Dr. Woods recognized on cross-examination that he was focused the only mental health expert to diagnose Mr. Barrett with bipolar disorder, he noted that Mr. Barrett was diagnosed with "organic affective disorder" in 1995, which was "an excellent diagnosis, because what they are saying is, this person has an organic brain problem and they have a mood disorder." R&R at 22. Judge Shreder noted that Woods characterized "this diagnosis as a 'more accurate diagnosis than even bipolar,'" and that the government failed to seriously challenge Dr. Woods' conclusion that Mr. Barrett suffered from a mood disorder. *See id.*

Similarly, the Court credited Mr. Barrett's new mitigating evidence of brain damage by Dr. Deborah Miora, who validated prior neuropsychological testing by the late Dr. Myla Young. Dr. Miora admitted to a solitary scoring error that elevated Mr. Barrett's performance in processing speed on the Wechsler Adult Intelligence Scale, Fourth Edition (WAIS-IV), from the first-percentile to the fifth-percentile: or as Dr. Miora observed, and Judge Shreder noted, the "slight difference was not significant" amounting to "bupkis." R&R at 24. The Court found test after test administered by Dr. Young to be "suggestive of brain injury." R&R at 25 (Dr. Miora validating Dr. Young's administration of executive functioning tests which placed Mr. Barrett in the first percentile, and revealed damage "in multiple areas of the brain, including 'the temporal region, the frontal region, [and] some of the front subcortical circuitry"). 561 U.S. at 946, 949-50. This evidence is directly on point with *Sears* where the Court found constitutionally ineffective performance based on an objective test performance that fell below the bottom first percentile, and the "cause of this abnormality appears[ed] to be significant frontal lobe brain damage" as a result of "several serious head injuries Sears suffered as a child, as well as drug and alcohol abuse in his teens." 561 U.S. at 50. The Supreme Court found the evidence sufficient

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          5          *Barrett v. U.S.*, CV-09-00105-JHP

2086

for relief, quoting the expert's "clear and compelling evidence" of Petitioner's "pronouncing frontal lobe pathology." *Id.,* at 949-50.

Based on evidence adduced through Dr. Miora's testimony, Judge Shreder made factual findings that confirmed evidence of brain damage and its attendant effects on *every point* for which the Tenth Circuit ordered the remand in this case. *See Barrett II*, 797 F.3d at 1230-31 (remanding for further fact-findings regarding: i) Dr. Young's findings of brain damage that inhibits Petitioner's ability to process new information, and ii) her tests on executive functioning, which revealed his "ability to reason, anticipate consequences to actions, and to respond to new information and act accordingly . . . was significantly impaired," and that "his abilities to organize, think, reason, plan, anticipate consequences of his actions and change actions as needed based on information he received from his environment" were also impaired and "would [be] further exacerbated under conditions of complexity and/or highly stressful situations"). Addressing the Tenth Circuit Court's concerns, Judge Shreder observed that Dr. Miora testified without challenge:

- that neuropsychological evaluation was implicated [in Petitioner's case] by [multiple] factors" that encompassed several possible etiologies of impairment and their prospective ties to the instant offense "including the Defendant's mother's drinking while she was pregnant with him, learning disorders in his childhood, multiple reports of head injuries, and the 1986 suicide attempt, as well as the circumstances of the offense in the present case;"

- that Mr. Barrett exhibits neurocognitive "weakness, includ[ing] problem solving, abstract reasoning, attention, planning, tasks that required him to inhibit one response in favor o[f] another, and working with information in the moment or on his feet;"

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation      6      *Barrett v. U.S.*, CV-09-00105-JHP

2087

- regarding other subcategories of WAIS-IV testing, "[t]he take-away is that he has difficulty in – he shows difficulty in pressured situations where he has to visually attend to what is going on and generate a response;"

- that Mr. Barrett's performance on Dr. Young's executive functioning tests demonstrate that, based upon Petitioner's Wisconsin Card Sort Test and Short Category Test, he performs in the first percentile, and that "in extreme stress, the Defendant 'would be inclined to make errors;'"

- that Mr. Barrett suffers brain damage in "the temporal region, the frontal region, [and] some of the subcortical circuitry," evidence demonstrated that he is "moderately to severely impaired in [his] ability to inhibit responses in light of changing information, and he would perform worse when being fed information rapidly;"

- that "Defendant has brain damage" "based on [the] test data," and he was "easily overwhelmed by changing visual information;"

- "that *methamphetamine would have further distorted the Defendant's visual attention*, predicting his visual attention would likely have been worse than the test results showed with the addition of methamphetamine . . . .") (emphasis added).

R&R 23-25.

Controlling legal precedent presumes that this Court will defer to the findings and recommendations of the magistrate judge. The government's failure to address this standard of deference, coupled with the mischaracterization of Judge Shreder's many findings, renders their objections frivolous. *See, e.g., Elzour*, 378 F.3d at 1150. Great deference is due to the credibility determinations made by a judge observing a witness testifying. *Wessel v. City of Albuquerque*, 463 F.3d 1138, 1145 (10th Cir. 2006); *see also United States v. Quaintance*, 608 F.3d 717, 723

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          7          *Barrett v. U.S.*, CV-09-00105-JHP

2088

(10th Cir. 2010) (applying great deference to prior credibility determinations; leaving fact-findings undisturbed where Court was "able to hear [witnesses] testify, observe their demeanor on the witness stand, and consider their testimony in light of weaknesses identified" by opposition; crediting testimony that lacked "the sort of glaring inconsistencies or wild details that might render it incredible").

Further, Respondent's reliance on *Grant v. Trammel*, 727 F.3d 1006 (10th Cir. 2013), is misplaced. The government argues for an unsupported application of the law, asking this Court to find a "lack of presumed prejudice" from the significant mental health evidence presented, or that it should be given "little mitigating effect" in light of the evidence in aggravation.[3] (Govt's

---

[3] The government's arguments contain two stark omissions and thus mislead this Court in its request to overrule the magistrate judge's findings and recommendations. One, the government wholly fails to take into account the profound, newly-discovered evidence of government misconduct: specifically, that Mr. Barrett's conviction was based, at least in part, upon perjured testimony. *See e.g.,* Evidentiary Hearing ["EH"] Exhs. 17, 28; CV-09-105-JHP Doc 199, 199 Exhs. 6-15; CR-115-JHP Doc. 434; *see also, In re Barrett,* 10th Cir. Case No. 16-7035, Doc. 01019619071). Second, the government's focus on the victim impact evidence adduced at trial ignores the predicate *Williams* test. The description of the evidence in aggravation that was adduced at trial is both inaccurate and wildly exaggerated in an attempt to conflate their perception of the prejudicial impact of that evidence with its argument to now require a nexus between the mental health evidence and the *actus reas*. (See, Gov't Objections, p. 12). The government's staunch defense of the trial record is an argument that is perhaps appropriate before the newly seated jury, but it is inappropriate to answer the issue per the scope of the Tenth Circuit's remand in this case, and otherwise improperly ignores the deference owed to the magistrate judge, who reviewed the record in total, made concise factual findings and applied the correct legal standard in deciding that "there is a reasonable probability that the result of the penalty phase of the Defendant's trial would have been different." R&R at 33.

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation       8       *Barrett v. U.S.*, CV-09-00105-JHP

2089

Objections at 16-17). The panel in *Grant* did find no relief was warranted. However, *Grant* is easily distinguished from the facts in this case; the government's citation to *Grant* inadvertently demonstrates why Mr. Barrett is presumptively entitled to the remedy recommended by Judge Shreder.

Grant was decided under the very different and doubly deferential standard of review under 28 U.S.C. § 2254(d). *Grant*, 727 F.3d at 1016-23. The *Grant* panel weighed wholly different aggravating evidence, including an affirmative jury finding on "perhaps [the] most important" aggravator (future dangerousness), and "potent" evidence including prior violent felonies such as "kill[ing] a prison employee who was previously his friend." *Id.* Indeed, the Tenth Circuit found lack of prejudice due to the actual absence of mitigating evidence of brain injury, prior abuse, and corrupting family members. In stark contrast, each of these categories of mitigating evidence were *firmly established* here by Mr. Barrett and *found to be facts by Judge Shreder*. R&R at 26. The defendant in *Grant* failed to obtain relief because the Court found "there is no evidence [] suggesting organic brain injuries . . . , no evidence of physical abuse before he started down the path of illegal activity, and no evidence his other family members felt the need due to difficulties of their family life to travel down a similar path . . . .". 727 F.3d at 1022. The government's reliance on *Grant* as a basis for denial of relief in this case is disingenuous. Their faltering argument of its applicability is the best evidence that Mr. Barrett was presumptively prejudiced by his trial counsel's failure to investigate and present this evidence.

---

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          9          *Barrett v. U.S.*, CV-09-00105-JHP

2090

**D. Respondent's Imposition of a Nexus Requirement Contravenes Clearly Established Federal Law, and Grossly Misinterprets Tenth Circuit Precedent on "Connecting the Dots" between Brain Damage and Petitioner's Behavior. Omitted Evidence of Petitioner's Brain Damage, and Its Attendant Effects, Is Inherently Mitigating, and Explains Petitioner's Behavior Under Governing Law.  As Judge Shreder Concluded, Petitioner Was Prejudiced by Trial Counsels' Deficient Performance.**

As Respondent acknowledges, its imposition of a "nexus requirement" violates clearly established federal law. Govt's Objections at 16 (citing *Tennard*, "Barrett would no doubt answer that mental health evidence need not have a nexus to the crime of conviction to have a mitigating effect"). The Supreme Court has repeatedly and unmistakably rejected any nexus requirement, holding that evidence of "impaired intellectual functioning is inherently mitigating" at the penalty phase of a capital case, regardless of whether defendant has established a nexus between his mental capacity and the crime. *Tennard v. Dretke*, 542 U.S. 274, 287-88 (2004); *see also Smith v. Texas*, 543 U.S. 37, 43-45 (2004) (per curiam) (again rejecting nexus requirement and following its prior decision in *Tennard*; "as we explained in *Tennard*, '[e]vidence of significantly impaired intellectual functioning is obviously evidence that "might serve as a basis for a sentence less than death;" "[w]e rejected the Fifth Circuit's 'nexus' requirement in *Tennard* . . . (noting that none of our prior opinions 'suggested that a[n] [impaired] individual must establish a nexus between her mental capacity and her crime . . . and holding that the jury must be allowed the opportunity to consider *Penry* evidence even if the defendant cannot establish 'a nexus to the crime'")).

In subsequent cases, the U.S. Supreme Court has found that inherently mitigating evidence of organic brain damage outweighs evidence in aggravation, even when such aggravating evidence spans several aggravators, including torture and prior violent felonies such as rape, and petitioner's substance abuse affected commission of the offense. *Rompilla v. Beard*, 545 U.S. 374, 391-93 (2005), *rev'g Rompilla v. Horn*, 355 F.3d 233, 256 n. 13 (3d Cir. 2004)

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          10          *Barrett v. U.S.*, CV-09-00105-JHP

2091

(three aggravators of murder while perpetrating felony, murder by means of torture, and significant history of violent felony convictions outweighed by previously omitted mitigating evidence of brain damage, where victim was stabbed 16 times to the head and neck, beaten with a blunt object, robbed and lit on fire; when finding prejudice, reasoning the "jury never heard" about troubled family background or from Petitioner's "mental health experts" who "when they tested, . . . found that [Petitioner] 'suffers from organic brain damage . . . significantly impairing several of his cognitive functions," and that Petitioner's "problems . . . were likely caused by fetal alcohol syndrome [and] [Petitioner's] capacity to appreciate the criminality of his conduct or to conform his conduct to the law was substantially impaired at the time of the offense"); *see also Frazier v. Huffman*, 343 F.3d 780, 797 (6th Cir.2003) (finding, in case where almost no mitigating evidence was presented, that there was prejudice based on failure to present brain injury evidence alone); *Frierson v. Woodford*, 463 F.3d 982, 990-994 (9th Cir. 2006) (inherently mitigating evidence of brain damage, along with Petitioner's learning disability and evidence that he was a "chronic lifelong substance abuser" outweighed special circumstances of premeditated murder, and murder committed during course of robbery and kidnapping); *Caro v. Woodford*, 280 F.3d 1247, 1257-58 (9th Cir. 2002) (holding omission of evidence of brain damage rendered death sentence unreliable; concluding "[Petitioner's] moral culpability would have been reduced," "by explaining that his behavior was physically compelled, and not premeditated;" and finding evidence of premeditation "was not particularly strong" in the face of countervailing evidence of brain damage).

The critical prejudice standard is simply this: a finding of prejudice is required if omitted mitigating evidence provides an alternate view that Petitioner's behavior may not have been the result of cold-blooded pre-meditation. This standard was first enunciated by the U.S. Supreme

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          11          *Barrett v. U.S.*, CV-09-00105-JHP

2092

Court in *Williams v. Taylor*, 529 U.S. at 397-98, and followed time and time again by the U.S. Supreme Court in, for example, *Rompilla*, and the Tenth Circuit in *Hooks*, *Wilson*, *Smith*, and other case law.  The *Williams* standard was repeatedly and appropriately relied upon by Judge Shreder.  His findings and recommendations provide a well-founded and detailed outline as to why the omitted mitigating evidence of brain damage might well have influenced the jury's appraisal of Petitioner's moral culpability.

When weighed against evidence in aggravation, the inherently mitigating evidence proves broadly "*consistent with the view*" that "*[Petitioner's] violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation*."  *Williams*, 529 U.S. 362, 397-98 (2000) (emphasis added); R&R 19, 32-33 (finding prejudice; citing *Porter*, quoting pin-cite to *Williams v. Taylor*); *id*. at 26 (citing *inter alia Hooks*, *Rompilla*, *Wilson*, and *Smith*, that evidence of brain damage has a "powerful mitigating effect"); *Rompilla*, 545 U.S. at 392-93 (finding prejudice; citing *Wiggins*, *supra*, quoting pin-cite to *Williams v. Taylor*); *Hooks*, 689 F.3d at 1204-07 (finding prejudice; pin-citing *Williams v. Taylor* for proposition that mental health evidence shows that "violent behavior was a compulsive reaction rather than the product of cold-blooded premeditation," and *Rompilla*).

Although Respondent repeatedly argues that "none of [Petitioner's] alleged mental conditions . . . meaningfully explain, negate or mitigate his naked homicidal conduct," the government fails to understand the *Williams* standard. Govt's Objections at 15. The *Williams* standard does not mandate a nexus requirement for omitted mitigating evidence, whereby a petitioner somehow conclusively demonstrates with mathematic certainty that petitioner's capital murder was caused by his brain damage or his other, previously neglected mental condition, *Tennard*, 542 U.S. at 287-88 (rejecting nexus requirement that Petitioner's "criminal act was

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          12          *Barrett v. U.S.*, CV-09-00105-JHP

2093

attributable to [his] severe permanent [mental] condition;" a determination of the appropriate weight to be given mitigating evidence is not whether that evidence can provide a causal basis or excuse for the crime of conviction, as the government would have this Court believe. Instead, "[t]he question is simply whether the [neglected] evidence is of such a character that it might serve as a basis for a sentence less than death"), *reversing Tennard v. Cockrell*, 284 F.3d 591, 597 (5th Cir. 2002).

A finding of prejudice under *Williams* is required if omitted mitigating evidence provides an alternate view that Mr. Barrett's behavior may not have been the result of cold-blooded pre-meditation. *Williams*, 529 U.S. at 397-98. Evidence of compulsion or impulse control problems wholly distinct from evidence of premeditation satisfies this standard.[4]  The U.S. Supreme Court made plain in Williams that such omitted mitigating evidence may also be *completely unrelated* to a prior, affirmative jury finding of future dangerousness, and nevertheless still tip the scales in favor of prejudice. *Id*. ("[m]itigating evidence unrelated to dangerousness may alter the jury's selection of penalty, even if it does not undermine or rebut the prosecution's death-eligibility case"). Prejudice is especially apparent here.  The jury sentenced Mr. Barrett to life rather than

---

[4] The U.S. Supreme Court holds that evidence of impaired intellectual functioning has inherent mitigating effect that is separate and apart from aggravation: or as the *Tennard* Court emphasized, evidence of "[i]mpaired intellectual functioning has mitigating dimension beyond the impact it has on the individual's ability to act deliberately." *Tennard*, 542 U.S. at 288. It is doubtful that any Tenth Circuit decisions failing to find prejudice by emphasizing the aggravating effect of impulse control problems from brain damage would withstand a properly-briefed challenge. *Compare Cannon v. Gibson*, 259 F.3d 1253 (10th Cir. 2001) 1253, 1276-78 (cited in *Grant v. Trammell*) (pre-dating *Tennard* and *Rompilla*) (with aggravating evidence of brutal sex attack of 84-year old and murder by torture; elderly woman was kidnapped, vaginally raped, and sodomized before being "set on fire" with gasoline poured from orange soda bottle; victim "had been burned over sixty percent of her body, but was still alive," prior to suffering "blunt force injury" to the forehead, facial bruises, and cuts prior to death) *with Tennard*, 542 U.S. at 287-88 *and Rompilla*, 545 U.S. at 391-393 (finding prejudice from omitted mitigating evidence of brain damage and troubled family background despite murder by torture), *Id*. at 397-98 (Kennedy, J., dissenting) (enumerating aggravating evidence of murder by torture that was outweighed by omitted mitigating evidence in *Strickland* calculus).

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          13          *Barrett v. U.S.*, CV-09-00105-JHP

2094

death on counts 1 and 2, and rejected the "continuing threat" aggravating circumstance on count 3. Simply put, if there is a reasonable probability that at least one juror would have struck a different balance with the aid of the previously omitted mitigating evidence, prejudice has been shown. *Wiggins*, 539 U.S. at 537-38 (2007) (citing *Williams*; finding prejudice); *Williams*, 529 U.S. at 398 (prejudice shown where omitted mitigating evidence "might well have influenced the jury's appraisal of his moral culpability").

The Tenth Circuit's standard is not exacting. Mr. Barrett must connect the dots between his mental conditional and the offense itself; *i.e.*, when his omitted mitigating evidence is "consistent with the view" that the murder may have instead resulted from something other than cold-blooded premeditation. *Williams*, 529 U.S. at 398; *see Hooks*, 689 F.3d at 1204-07; *Smith*, 379 F.3d at 942-44; *Anderson v. Sirmons*, 476 F.3d 1131, 1145-48 (10th Cir. 2007). In conformity with the Tenth Circuit's remand order, and the Supreme Court's standard in *Williams*, Judge Shreder found that Mr. Barrett's omitted mitigating evidence provided a possible explanation apart from premeditation. *See generally* R&R 18-34; *see supra* at 6-7 (laying out Judge Shreder's extensive findings regarding Dr. Miora's testimony).

In the same vein, the government's claim that Dr. Woods offered a faulty nexus that "evinced a misapprehension of the events" of the crime is misguided. Govt's Objections at 13-15. As Judge Shreder noted, Dr. Woods testified that Mr. Barrett had made statements "that he was defending himself," "which Dr. Woods attributed to his (in)ability to distinguish right from wrong." R&R at 22-23 (pin-citing Tr. March 28, 2017, at 350-51). Like Dr. Miora, Dr. Woods testified that the effects of Mr. Barrett's brain damage (and psychiatric disorders) provide a possible alternate explanation for his behavior apart from premeditation. Tr. March 28, 2017, at 350-51 (Woods cross exam; "[f]irst of all, Mr. Barrett has bipolar disorder . . . . He also has . . .

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation     14     *Barrett v. U.S.*, CV-09-00105-JHP

2095

significant brain impairments. And I said before that both of those impair his ability to weigh and deliberate effectively, to understand . . . context effectively."); *see also id*. at 212, 217-20[5]; *id*. at 350-51; R&R at 22-23. Respondent's argument discounting Dr. Woods' testimony ignores the intent of the U.S. Supreme Court's Williams standard and should be dismissed.[6]

Moreover, Respondent's objection about prior jury fact-findings is self-defeating: by that logic, Mr. Barrett's jury *rejected* the future dangerousness aggravator, and *failed to find* the especially heinous, atrocious, or cruel murder aggravator, *both of which* were integral, affirmative jury findings in Tenth Circuit cases concluding that the defendants were not

---

[5] Dr. Woods' direct examination on neurological impairments and psychiatric disorders affecting behavior, including during offense; brain damage affecting Mr. Barrett's ability to inhibit stimuli and react appropriately to information, "particularly in stressful situations;" Petitioner has "comorbid" brain damage, bipolar disorder, and PTSD that "interact with each other;" "the idea of a hyperreactive response is completely consistent with both his history, his mood disorder, as well as what we would see in someone that ha[s] these kinds of brain impairments, this misperception of – of the circumstances. Once again, we talk about executive functioning, being able to weigh and deliberate, effectively weigh and deliberate. And this [offense] clearly was an example of misperceiving and not being able to effectively weigh and deliberate"). Dr. Woods testified to a possible explanation for Mr. Barrett's behavior apart from premeditation, and Judge Shreder made allied findings about Petitioner's impairments supporting his conclusion of prejudice under controlling authority.

[6] In its critique of Dr. Woods, Respondent objects that Dr. Woods "cannot . . . transmogrify a premeditated murder into some lesser offense" because—it *thrice* notes—contrary facts were previously "developed to the satisfaction of the jury." Govt's Objections at 13-15. This argument remains utterly beside the point. In case after case relied upon which Judge Shreder relied, previously omitted mitigating evidence does, in fact, change the *Strickland* calculus despite prior jury fact-findings regarding premeditated behavior; instead, mitigating evidence of the effects of brain damage outweighs prior evidence in aggravation when it meets the governing legal standard, *i.e.*, Petitioner proffers previously omitted mitigating evidence "consistent with the view" that his behavior may not have been the result of cold-blooded premeditation. *Williams*, 529 U.S. at 397-98; *compare* R&R at 26 (despite aggravating evidence, finding prejudice due to omission of new mitigating evidence, citing *inter alia Hooks v. Workman*, 689 F.3d 1148 (10th Cir. 2012); *Wilson v. Sirmons*, 536 F.3d 1064 (10th Cir. 2008), and *Smith v. Mullin,* 279 F.3d 919 (10th Cir. 2004)(internal citations omitted). In all of the cases, evidence of premeditation and unspeakable evidence in aggravation coexists with and is outweighed by new mitigating evidence of inability to inhibit responses and/or brain abnormality that may provide a different explanation for Petitioner's violent behavior, *see id.*

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          15          *Barrett v. U.S.*, CV-09-00105-JHP

prejudiced. *See, e.g., Cannon*, 259 F.3d at 1257-58, 1276-78, *affm'g Cannon v. State*, 933 P.2d 926, 927 (Okla.Crim.App. 1997).

> **E. Respondent's Central Claim that Barrett's Behavior Was "Better Explained" by "Recreational Drug Use" is Baseless, as this Assertion was First Rejected by the Jury at Trial, Again Rejected by the Tenth Circuit on Remand, and Rejected by Judge Shreder after considering all of the evidence on the issue.**

Boiled down to its essence, the government assumes that its theory that Mr. Barrett's "recreational drug use better explained his mental state at the time of the killing than the theories advanced by the defense" is sufficient to overcome trial counsels' deficiencies in the magistrate's prejudice assessment. Govt's Objections at 5. That is precisely evidence as to how Mr. Barrett's trial counsel failed him by inexusably failing to address the overarching (if unsupported) theme of the government's case in the adversarial process.

The government ignores Judge Shreder's factual findings that the jury heard extensive evidence of Petitioner's drug use at trial, found it inconsequential, and rejected the aggravator of future dangerousness. *See, e.g.*, R&R at 27 ("[T]he undersigned Magistrate Judge finds that . . . the jury did hear extensive testimony regarding Defendant's drug use and his relationship with his ex-wife during both stages of the trial") (citation omitted).

In remanding the case to the District Court, the Tenth Circuit noted, at length, all of the drug evidence previously rejected by the jury as a basis for finding any aggravating circumstance. *See, e.g., Barrett II*, 797 F.3d at 1232 ("The jury was also presented with significant evidence of Defendant's drug use, including the testimony of a drug addict that he took methamphetamine with Defendant, and the testimony of a state prison employee that Defendant self-reported first using alcohol at age 12, cocaine and heroin at age 14, and methamphetamine at age 20, and had been using marijuana, methamphetamine, heroin, tranquilizers, and other drugs up until the time of the shooting.). Relying on its own precedent,

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          16          *Barrett v. U.S.*, CV-09-00105-JHP

2097

the *Barrett* court suggested that this evidence of drug use would likely pale by comparison to Mr. Barrett's overwhelming mitigating evidence, which could best explain his mental condition, drug use, and behavior. *Id.* at 1232 ("Perhaps the evidence of . . . drug involvement would not have surprised the jury and presented little downside risk to Defendant's offering evidence of his mental condition. *See Smith*, 379 F.3d at 943 & n. 11 (when aggravating aspects of defendant's mental illness have already been presented to the jury, little risk to presenting the mitigating aspects as explanation for Defendant's behavior)"). In turn, after hearing all of the testimony, Judge Shreder agreed with the Tenth Circuit: the jury already heard the government's stale evidence of Petitioner's drug use and found it unpersuasive to maintain the sentence in light of the omitted mental evidence adduced at the evidentiary hearing. R&R at 27.

In concluding that Petitioner was prejudiced by trial counsels' ineffectiveness, Judge Shreder adhered to U.S. Supreme Court precedent: the *Sears* Court acknowledged that evidence of drug use proves consistent with compelling mitigation theories previously neglected. R&R at 32-33 (citing *Sears v. Upton*, 561 U.S. at 950 (advancing mitigation theory portraying Petitioner "as an individual with diminished judgment and reasoning skills," whose drug use and criminality could be attributed to his elder brother, a convicted drug dealer and user; Petitioner "may have desired to follow in the footsteps of an older brother who had shut him out of his life")).

The government's own expert, Dr. Steven Pitt conceded Mr. Barrett has genetic loading for mood disorders and mental illness, including substance abuse disorder. R&R at 32; *cf. Sears*, 561 U.S. at 949 (attributing Petitioner's brain damage to various etiologies, including substance abuse; "[f]rom an etiological standpoint, one expert explained that [Petitioner's] 'history is

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          17          *Barrett v. U.S.*, CV-09-00105-JHP

replete with multiple head trauma, substance abuse, and traumatic experiences of the type expected' to lead to these significant [frontal lobe] impairments.").

The government's other expert, Dr. J. Randall Price, admitted Mr. Barrett's neuropsychological functioning was "very weak," "out of ordinary," and "abnormal;" agreeing on cross that Petitioner was elevated, "in the 75 percentile[,] . . . on the traumatic stress subscale [on the Personality Assessment Inventory], but failed to include a discussion of that in his report." R&R at 28-29. Judge Shreder relied upon evidence provided by *the government's own expert*, to identify traumatic stress, polysubstance dependence, and other etiologies, as possible bases for Petitioner's brain dysfunction. *Id.*

The jury previously rejected Petitioner's drug use as a basis for the future dangerousness aggravator.  CR 115 Doc. 258 at 13-14. The Tenth Circuit indicated the jury already weighed such "not . . . surpris[ing]" evidence without learning the mitigating aspects of Petitioner's mental condition that explained his behavior. *Barrett II*, 797 F.3d at 1232. Judge Shreder agreed that the new mitigating evidence better accounted for Mr. Barrett's behavior than drugs. R&R at 27-32. The government's wearied cries of "drugs, (p. 32) drugs, and more drugs" add nothing to evidence now thrice rejected—by the jury, the Tenth Circuit, and Judge Shreder. This Court should do the same.

The government's assertion that Dr. Price's "neuropsychological testing revealed no evidence that Barrett suffered from a severe brain injury" Govt's Objections at 6, mischaracterizes the evidence. R&R at 28 (citation therein). Dr. Price testified that Mr. Barrett's test results in "attention" on the Repeated Battery for the Assessment of Neuropsychological Status (RBANS) "*could be consistent with mild traumatic brain injury*," Tr. June 12, 2017 at 871-72 (emphasis added), *see also id.*, at 868, 875 (acknowledging attention and immediate

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation        18        *Barrett v. U.S.*, CV-09-00105-JHP

2099

memory problems as "something acquired that would be significant in his life"). Dr. Price also testified that Mr. Barrett evinced "significant impairment" on testing, demonstrated "a problem with attentional functioning of his brain," possessed "very weak" neurocognitive deficits and brain "abnormal[ity], and elevated scores on the PAI "traumatic stress subscale." The PK scale on the Minnesota Multiphasic Personality Inventory (MMPI) related to post-traumatic stress disorder which Dr. Price disingenuously omitted from his report.[7] *Id*. at 903, 905-06, 904, 915-18. Judge Shreder noted Dr. Price's critical concessions of Mr. Barrett's brain abnormalities, and the possible etiologies thereof, in his findings. *See supra*; R&R 28-29 (discussing Petitioner's abnormal brain and traumatic stress impairments, along with Price's diagnoses of learning disorder not otherwise specified, dysthymic disorder, and polysubstance dependence).

Similarly, Judge Shreder critically evaluated Dr. Pitt's testimony. The Court found Dr. Pitt was not qualified to opine on Petitioner's lack of brain damage, and that he was thus not persuasive when alleging Petitioner's "drug use" was a catch-all explanation in the face of the new mitigating evidence about "genetic loading," multigenerational exposure to mental illness, mood disorders, and substance abuse, and his troubled family background of mental illness and chemical dependence. R&R at 31, 32; *see also id*. at 11 (deficiency analysis; noting Mr. Barrett's history included head injuries, "a tumultuous childhood that included impermanence, violence, and substance abuse," and an "extended family history which included generations of suicide attempts, volatility, substance abuse, and other mental health problems"); *id*. at 19 (prejudice analysis; the Court noting Tenth Circuit's recitation of post-conviction evidence and further

---

[7] Dr. Price further acknowledged that he performed limited neuropsychological testing that was not specifically designed to assess executive functioning, which was of interest to the Tenth Circuit, *see, e.g.*, Tr. June 12, 2017, at 893-95; *Barrett II*, 797 F.3d at 1230-31, and that Mr. Barrett was not malingering during all testing, *see, e.g.*, Tr. June 12, 2017, at 870, 878, 881. Thus, per Price, his test results were valid, if not expansive enough to address the main question posed by the *Barrett* panel on remand. *Id*.

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation       19       *Barrett v. U.S.*, CV-09-00105-JHP

2100

testimony adduced at the evidentiary hearing concerning "long family history" of "mental health problems" and "alcohol abuse," Petitioner's "early exposure to alcohol and alcohol abuse, as well as physical and emotional abuse and neglect," along with adolescent drug use).

Petitioner's drug use was mitigated in other ways — as genetic loading, as family inheritance of mental illness and related substance abuse, as childhood exposure attributable to family members and peers. *See id; Sears*, 561 U.S. at 950, 949 (acknowledging new mitigating theory of Petitioner's drug use along with various etiologies of brain damage, including chemical abuse). Here, Judge Shreder found that the government's experts simply added nothing to the *Strickland* calculus, and therefore, Petitioner's new mitigating evidence outweighed all of the government's evidence of drug use and otherwise in aggravation. R&R at 33.

Judge Shreder ultimately found "[t]he evidence potentially available to the Defendant regarding his mental health history and his family background would in all likelihood have aided substantially in mitigation, and the rebuttal evidence provided by the government would not appear to have added substantially to the calculus of aggravation . . . ." *Id*. Judge Shreder concluded, "based on *all* of the evidence presented in mitigation and in aggravation, there is a reasonable probability that the result of the penalty phase of the Defendant's trial would have been different . . . .") (citations omitted).

Judge Shreder's report makes clear he did not simply accept Petitioner's experts as reliable without scrutiny. He carefully laid out and discussed the testimony of each expert for both parties. After all testimony was adduced, Judge Shreder found that Drs. Woods and Miora were unrefuted and unimpeached; he further emphasized the potentially powerful mitigating effect this evidence would have had at Mr. Barrett's trial.

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          20          *Barrett v. U.S.*, CV-09-00105-JHP

2101

The government's attempt to reduce the events of September 24, 1999 to a direct consequence of Mr. Barrett's methamphetamine use, abuse, and addiction is not factually accurate, and this was well-known to the jury. Due to trial counsels' deficient performance, the jury was not able to view Mr. Barrett's conduct—including his drug use—through the prism of his mental health issues.  As the Tenth Circuit observed and Judge Shreder considered in its factual and legal context, the "drugs, drugs, and more drugs" explanation enhances rather than undermines a finding a prejudice because the evidence shows that Mr. Barrett's drug use was in and of itself a product of his mental illness.

**F.  Where, as Here, the Magistrate Judge's Findings of Fact and Conclusions of Law are Both Amply Supported by the Evidence Adduced at the Hearing and Consistent with the Tenth Circuit Remand, this Court Cannot Grant the Government's Objections Without Violating the Tenth Circuit's Order on Remand and Denying Mr. Barrett's Right to Due Process under the Fifth and Eighth Amendment's to the United States Constitution.**

Though suggesting otherwise, the government is asking this Court to reject the Magistrate's credibility findings. By its request that this Court reverse the magistrate judge's finding of prejudice, the government seeks to have this Court reject the testimony of the experts and other witnesses laying out Mr. Barrett's mental health deficits and background.  Because the findings and conclusions are rooted in the testimony of the live witnesses at the hearing presided over by the Magistrate Judge and not this Court, rejection of those findings by this Court and denial of a new sentencing will violate Mr. Barrett's right to due process under the Fifth and Eighth Amendments to the United States Constitution.

The Federal Magistrate Act grants a district court judge the authority to refer a magistrate judge to conduct hearings and submit proposed findings of facts and recommendations. 28 U.S.C. § 636(b)(1)(B). After the magistrate judge submits the proposed findings and recommendations report, the parties may object to that report. The district court then must make

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation        21        *Barrett v. U.S.*, CV-09-00105-JHP

2102

a "de novo determination" of the parts of the report to which objection was made. *Id*. at 636(b)(1). The Act grants district courts discretion to "accept, reject or modify, in whole or in part," the magistrate's proposed findings or recommendations. *Id*.

There is little question that the government's objection to the Magistrate's Report is directed at the Court's findings on credibility (or as the government's suggests by synonym, "reliability"). The government's disagreement with Judge Shreder primarily stems from differences in its biased view of the evidence rather than the standard for judging ineffective assistance of counsel claims. *See Proffitt, supra*, <u>685 F. 2d at 1240</u>. The government asks this Court to reject the Judge Shreder's material credibility findings that are clearly based on the judge's observation of in-person testimony. If the court accepts the government's invitation to reject the credibility findings, it will err. *See, e.g., Amlong v. Amlong, P.A. v. Denny's, Inc.*, <u>500 F.3d 1230</u> (11th Cir. 2007) (after referring the matter to a magistrate judge to conduct an evidentiary hearing, the district court may not override essential, demeanor-intensive fact-findings without hearing evidence itself or citing an exceptional justification for discarding the magistrate's findings). Moreover, by rejecting the magistrate judge's material credibility findings, the district court will be effectively denying the evidentiary hearing that the Tenth Circuit ordered. It will be a violation of Mr. Barrett's right to Due Process guaranteed by the Fifth Amendment and to be free from cruel and unusual punishment guaranteed by the Eighth Amendment to the United States Constitution. US Const. Amend. 5.; US Const. Amend. 8.

## III. CONCLUSION

For the reasons stated herein, the government's Objections Should be Overruled, Denied and Dismissed and the Magistrate's Report and Recommendation Adopted Verbatim, subject only to Mr. Barrett's Objection to the Limited Scope of the Relief Granted (Doc. 470).

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation       22       *Barrett v. U.S.*, CV-09-00105-JHP

2103

DATED:          November 26, 2018

                              RESPECTFULLY SUBMITTED,

                              /s/ *David Autry*
                              DAVID AUTRY

                              HEATHER E. WILLIAMS
                              Federal Defender

                              /s/ *Joan M. Fisher*
                              JOAN M. FISHER
                              Assistant Federal Defender

                              /s/ *Karl J. Saddlemire*
                              KARL J. SADDLEMIRE
                              Assistant Federal Defender

                              /s/ *Carrie L. Ward*
                              CARRIE L. WARD
                              Assistant Federal Defender

                              Attorneys for Petitioner/Defendant,
                              KENNETH EUGENE BARRETT

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          23          *Barrett v. U.S.*, CV-09-00105-JHP

2104

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 26th day of November 2018, I caused the foregoing Petitioner's Response To Government's Objections To Magistrate Judge's Report And Recommendation to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record. To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Joan M. Fisher*
JOAN M. FISHER

Petitioner's Response to Government's Objections
to Magistrate Judge's Report & Recommendation          24          *Barrett v. U.S.*, CV-09-00105-JHP

2105

# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | | |
|---|---|---|
| **KENNETH EUGENE BARRETT**, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | Case No. CV-09-00105-JHP |
| v. | ) | |
| | ) | |
| **UNITED STATES OF AMERICA**, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

## GOVERNMENT'S REPLY IN SUPPORT OF OBJECTIONS TO REPORT AND RECOMMENDATION

**COMES NOW** the United States of America, by and through undersigned counsel and submits the following Reply in Support of its Objections to the Magistrate Judge's Report and Recommendation (Doc. 471).

## STATEMENT OF THE CASE

On remand, the Magistrate Judge received a referral to conduct an evidentiary hearing. Following testimony, the Magistrate Judge issued a Report and Recommendation that advised this Court to grant relief and a new penalty phase trial, based on a finding that trial counsel performed ineffectively and prejudicially. § 2255 Doc. 467 ("R&R"). In a scheduling Order concerning objections to the Report and Recommendation, the Court granted leave to file replies relating only to new matters. Doc. 469.

The government subsequently filed objections (Doc. 471), and Barrett filed a response (Doc. 474). The government now offers this Reply, limited to the novel assertion in Barrett's response that the United States presented objections too broad for review.

1

## ARGUMENT

### THE GOVERNMENT PRESENTED SPECIFIC OBJECTIONS APPROPRIATE TO REVIEW

Barrett claims the government defaulted its objections by presenting overbroad arguments about the Magistrate Judge's lack of credibility findings.  Doc. 474 at 3.  The government, however, presented specific objections that exceeded the threshold for review.

The Tenth Circuit Court of Appeals has held that objections to a report and recommendation "must be both timely and specific to preserve an issue for de novo review by the district court."  *United States v. One Parcel*, 73 F. 3d 1057, 1060 (10th Cir. 1996).  In announcing that rule, the court found inadequate one brief that "consisted of only two sentences" and another that "was equally general" but identified one irrelevant factual discrepancy.  *See id*. at 1060 & n.2.  Despite recognizing the waiver rule, the Court of Appeals held that a district court could overlook inadequate objections "when the interests of justice so dictate."  *Id*. at 1060.

In this case, the government argued that the Magistrate Judge failed to make specific credibility findings about the testifying mental health experts, and should have rejected the testimony of Barrett's witnesses in favor of those called by the government.  In support of that argument, the government recited excerpts of the record in which its expert – Dr. Pitt – explained Barrett's mental health issues as a function of voluntary drug use, clearly providing an alternative to the theories advanced by defendant.  *See* Doc. 471 at 5-6.  The government observed that Barrett's expert, Dr. Woods, attempted to sidestep the effects of the defendant's drug use by asserting it amounted to self-medication of an underlying mental illness.  *Id*. at 6.  The government explained why Barrett's mental functioning in custody undermined the believability of Dr. Woods' essentially circular reasoning.  *Id*.  The government noted that Dr. Woods should not have diagnosed Barrett with bipolar disorder given that drug use better

2

explained his behavior.  *Id*.  The government observed that Dr. Woods' diagnosis of post-traumatic stress disorder lacked reliability because the defendant had not experienced a known threshold event and personally declined to endorse the symptoms of the condition when he spoke with Dr. Pitt.  *Id*.  The government attacked the believability of the defense experts' diagnoses of brain dysfunction on the basis of Dr. Price's testimony.  *Id*.  The government questioned the reliability of the defense experts' findings in light of determinations made outside the context of criminal proceedings.  *Id*. at 7.  Even putting aside its witnesses' testimony, the government identified evidence that called into question the candor of the defense witnesses.  *Id*. at 7-8.

In short, the government identified a series of definite, cross-corroborating arguments to supports its position that the Magistrate Judge should have rejected the testimony of Barrett's expert witnesses.  Ironically, in advancing a theory that the government waived its position for want of specificity, Barrett provides no analysis.  Regardless of Barrett's efforts, the extent of the government's Objections distinguish them from the sort of perfunctory briefing at issue in *One Parcel*.  As such, Barrett's waiver argument ought to fail.  Should this Court disagree, however, it should nonetheless reassess the credibility of Barrett's experts under *One Parcel's* exception doctrine: given the significance of this capital case and the breadth of litigation to date, the interests of justice should dictate a complete evaluation of the evidence presented at the direction of the Court of Appeals on remand.

**CONCLUSION**

Based on the foregoing, the government respectfully urges this Court to reject Barrett's

waiver argument and deny § 2255 relief.

Dated: December 10, 2018.

Respectfully submitted,

BRIAN J. KUESTER
United States Attorney
Eastern District of Oklahoma

*/S/ Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

2109

## CERTIFICATE OF ECF FILING AND DELIVERY

I, hereby certify that on December 10, 2018, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

David B. Autry: Dbautry77@gmail.Com
Joan M. Fisher:  Joan.Fisher@fd.Org
Karl J. Saddlemire:  Karl_Saddlemire@fd.Org
Carrie L. Ward:  Carrie_Ward@fd.Org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Section

DAVID AUTRY, OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone:      (405) 521-9600
Facsimile:       (405) 521-9669
E-mail:           dbautry77@gmail.com

HEATHER E. WILLIAMS, CA Bar #122664
Federal Defender
JOAN M. FISHER, ID Bar #2854
Assistant Federal Defender
KARL SADDLEMIRE, State Bar #275856
Assistant Federal Defender
CARRIE L. WARD, MO Bar #57581
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:      (916) 498-6666
Facsimile:       (916) 498-6656
E-mail:           Joan_Fisher@fd.org
                        Karl_Saddlemire@fd.org
                        Carrie_Ward@fd.org

Attorneys for Petitioner/Defendant,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | |
| Petitioner/Defendant, | CASE NO. CV-09-00105-JHP |
| vs. | **PETITIONER'S REPLY TO GOVERNMENT'S RESPONSE RE: OBJECTIONS TO MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION** |
| UNITED STATES OF AMERICA, | |
| Respondent/Respondent. | |

**COMES NOW** Petitioner Kenneth E. Barrett, by and through undersigned counsel,

submits the following Reply to Government's Response in Opposition to Petitioner's Objection

to the Magistrate Judge's Report and Recommendation.

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                                     1                    *Barrett v. U.S.*, CV-09-00105-JHP

2111

## STATEMENT OF THE CASE

The government, claiming waiver regarding Petitioner's request for relief as to Counts I and II of his conviction and sentence, culls quotes from a "nearly 10-year-old" § 2255 motion. (Doc. 472, p. 5)[1]. Rather than recapitulating its statement of the case, the following information outlines only that information pertinent to the Government's Reply and to the specific objections contained therein.

**1. Mr. Barrett was tried and convicted on three death eligible counts, each interwoven with the others and each alleging an intentional *mens rea*, or more: an element of premeditation or malicious aforethought.**

On February 09, 2005, the government filed the superseding indictment upon which Mr. Barrett was tried and convicted. (Doc. 052, CR-04-115-P).

## COUNT I

Title 18, U.S.C. §§ 924(c)(1)(A) and (j), knowingly use and carry, during and in relation to, and possess in furtherance of drug trafficking crimes: to wit, possession of materials for the purpose of manufacturing methamphetamine, and possession of firearms,

"and in the course of this violation, caused the death of David Eales through the use of a firearm, such killing being murder as defined in Title 18, U.S.C., § 1111, in that it was an unlawful, willful, deliberate, malicious and premeditated killing committed with malice aforethought." (*Id*. at 2).

## COUNT II

Title 18, U.S.C., §§ 924(c)(1)(A) and (j), the use and carry of a firearm during and relation to a crime of violence and possession of a firearm in furtherance of such crime of violence.

Title 21, U.S.C. Section 848(e)(1)(B), the killing of a state law enforcement officer engaged in or on account of the performance of such officer's official duties.

---

[1] Government's Response in Opposition to Petitioner's Objection to Magistrate Judge's Report and Recommendation, Doc. 472, CV-00105-JHP, filed November 26, 2018 [hereinafter, "Doc. 472"].

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation      2      *Barrett v. U.S.*, CV-09-00105-JHP

2112

. . . and in the course of this violation, caused the death of David Eales through the use of a firearm, such killing being murder as defined in Title 18, U.S.C., § 1111, in that it was an unlawful, willful, deliberate, malicious and premeditated killing committed with malice aforethought."

(*Id*. at 3).

## COUNT III

Title 21, U.S.C. §848(e)(1)(B), Intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties.

attempting to avoid apprehension and prosecution of a felony violation of Title 21, United States Code, Sections 841(a), 841(c), 843(a), 846, and 856, did intentionally kill David Eales, an officer of the Oklahoma Highway Patrol, a state law enforcement officer, while David Eales was engaged in and on account of the performance of David Eales' official duties, and such killing resulted.

(*Id*. at 4).

Each count references the same *actus reas*, occurring within at most a thirty second period in the late evening hours of September 24, 1999 (*Id*.); each count required an intentional *mens rea*, or even greater evidence of premeditation. Each count was eligible for the death penalty. (*See* Federal Death Penalty Act of 1994, 8 U.S.C. § 3591(a)(2)(A)-(D), and the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848(e)-(r); Judicial Instructions at Sentencing, Trial Transcript, Vol. 27, p. 5294-96.

**2. The post-conviction procedural history reflects multiple occasions when Petitioner raised the issues of deficient performance as to Counts I and II.**

The government's primary argument, that Petitioner has waived claims for relief as to Counts I and II, because he "never before articulated the theory that his trial attorneys' performance affected his non-capital sentences," is groundless. (Doc. 472, at 3). Even a cursory review of the record -- spanning countless thousands of pages shows that Mr. Barrett has sought post-conviction relief from all three of his convictions and sentences. The listed

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                    3                    *Barrett v. U.S.*, CV-09-00105-JHP

2113

references are not all-inclusive, but rather serve to entirely disprove the government's erroneous claim of waiver without unduly burdening the Court:

    a.    On March 16, 2009, Petitioner filed his first motion for collateral relief in the Eastern District of Oklahoma, District Court, IAW 28 U.S.C. §2255. (Doc. 1, Case No. CIV-09-105-JHP) [hereinafter, "§2255, Doc. 1"].  From the outset, Petitioner framed the import of lost evidence in mitigation and the dismal performance of his trial counsel: his attorneys' ineffectiveness in failing to investigate and present a mitigation case was relevant to both the guilt and penalty phases of his trial, as well as to all three of his convictions and sentences.  (*Id*. at 7-8).  Specifically, Petitioner asked he "be granted relief from his convictions and sentences."

    b.    On September 25, 2009, Petitioner filed an Amended Motion for Collateral Relief, per 28 U.S.C. § 2255.  (Doc. 70, Case No. CIV-09-105-JHP) [hereinafter "Amended § 2255, Doc. 70"].  Here again, Petitioner concluded his recitation of trial counsel's ineffectiveness in mitigation, with a broad request for relief: "the numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences." (*Id*. at 8).

    c.    On December 12, 2009, Petitioner filed a second Amended Motion per 28 U.S.C. § 2255 (Doc. 95, Case No. CIV-09-105-JHP) [hereinafter "2d Amended §2255, Doc. 95"].

    (1) "The [mental health] testimony that could have been developed and offered, but was not, would have refuted the Government's theory of the case as to both stages of trial regarding intent, and supported defense theory instructions and instructions on lesser included offenses." (*Id*. at  48).

    (2) Citing Dr. Woods' conclusions, "Mr. Barrett's mental function was impaired at the time of the offense by psychiatric illness and significant brain damage, which prevented him from knowing or deliberating on the nature of his responses to the police incursion before he acted." (*Id*. at 49, couched as constitutional error at FN7 therein); both Counts I and II allege murder with premeditation and malicious aforethought.

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation        4        *Barrett v. U.S.*, CV-09-00105-JHP

2114

(3) That the outcomes of both the trial and appeal are unreliable due to trial counsel's unreasonable failure to preserve a record of error, *i.e.*, "the misjoinder of offenses in violation of <u>Fed. R. Crim. P. 8</u>." (*Id.* at 179).

(4) Unreasonable Acts and Omissions Primarily Affecting the Second Stage of Trial.  (*Id.* at 185).  Because "[t]rial counsels' unreasonable omissions [of mental health and mitigation evidence] denied the jury a thorough understanding of the events of September 24, 1999, and denied Mr. Barrett a defense applicable to both stages of trial."  (*Id.* at 194).

(5) That the missing evidence in mitigation, "was also directly relevant to refuting the statutory aggravating circumstances that Mr. Barrett *knowingly* created a grave risk of death … and committed the offense after substantial planning and premeditation." (*Id.* at 242).  This special circumstance was noticed for both Counts I and II.

(6) That the court's denial of expert assistance, particularly that of a neuropsychiatrist, prejudiced Mr. Barrett in that he "could have presented substantial evidence to counter the Government's case at both stages of trial." (*Id.* at 262).

(7) That Mr. Barrett is entitled to relief from his *convictions and sentences* based on newly discovered evidence.  (*Id.* at 270).  The second Amended Motion specifically incorporated the facts raised above.  This motion returned to the mental health issue, when it exposed the prosecutor's threats to witness Cindy Crawford, who was coached "to make Mr. Barrett appear violent and an imminent threat to those around him." (*Id.* at 284) (emphasis added).

d.    On March 1, 2010, Petitioner filed his brief in support of his Second Amended

Motion and in support of his motion for evidentiary hearing and motion for record expansion.

(Doc. 149, Case No. CIV-09-105-JHP) [hereinafter, "Doc. 149"].

(1) In the summary of the argument, Petitioner again follows his account of trial counsels' ineffectiveness in mitigation with request for total relief: "[t]he numerous constitutional errors that marred Mr. Barrett's trial require that he be granted relief from his convictions and sentences." (*Id.* at 9).

(2) Ground 2, Part A(2) failure to investigate and present evidence of . . .  mental impairment (at both stages of trial) called into question evidence that Petitioner manifested the requisite intent for all three convictions and sentences;

(3)  "The Court also must consider the effect the undiscovered mitigation evidence would have had on the aggravating evidence. . .  the aggravating circumstances they found all related to the circumstances of the offense." (*Id.* at 151). "[T]he likelihood of a different result if the evidence had gone in is sufficient to undermine confidence in

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                              5                    *Barrett v. U.S.*, CV-09-00105-JHP

the outcome actually reached at sentencing." (*Id*. at 152) (citing *Rompilla v. Beard*, 545 U.S. at 393 (2005)).

(4) "As discussed herein and in relation to Ground 1 and Ground 2 of the Amended § 2255 Motions, the verdict in the criminal case was not the product of the adversarial testing process contemplated by the Fifth, Sixth, Eighth and Fourteenth Amendments."  (*Id*. at 140).

(5) Petitioner concluded his Second Amended Motion with another request for total relief: "[f]or the foregoing reasons . . . this Court should grant the following relief: . . . 8.  Vacate Petitioner's convictions and sentences and order that appropriate retrial and/or sentencing hearings be conducted." (*Id*. at 248-49).

## ARGUMENT

Respondent ignores the sentence-packaging doctrine in its response, although this doctrine, almost always relied upon by the government as a safeguard to protect a conviction, should be equitably applied.  There is ample Supreme Court precedent that provides when deficiencies of trial counsel pervade a consolidated sentencing proceeding, relief must be applied to all adjudged sentences.  This premise is discussed below, in the analysis of the sentence-packaging doctrine, and in controlling precedent, *i.e.*, *Ake v. Oklahoma,* which ordered relief on all sentences when the capital Petitioner alleged similar error in his capital sentencing case.

When the prosection alleges one act, and trial counsel presents one theory of defense at trial, it is impossible to distinguish how the errors did not infect all three sentences.  The deficiencies of Mr. Barrett's trial counsel have been proven both pervasive and prejudicial, calling into question the reliability of Mr. Barrett's trial. The broadest possible relief on Mr. Barrett's sentences is appropriate.

The government's argument is analogous to the exhaustion doctrine.  Federal authority on the fair presentation of claims for exhaustion purposes indicates Petitioner simply needs to state the constitutional basis for the legal claim, or call to mind the particular right protected. See Hertz and Liebman, 2 Federal Habeas Corpus Practice & Procedure 23.3 (c)(i) ("Pleading legal

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                    6            *Barrett v. U.S.*, CV-09-00105-JHP

2116

claims in the state courts for exhaustion purposes requires reasonable clarity and specificity. The petitioner should present the legal claim in a form that is understandable and specific enough to give the state courts a meaningful opportunity to address it…. Under the majority approach, "a claim may be 'fairly presented to the state courts … without citing chapter and verse of the Constitution if there is (a) reliance on pertinent federal cases employing constitutional analysis, (b) reliance on state cases employing constitutional analysis [in factually similar situations], (c) assertions of the claims in terms so particular as to call to mind a specific right protected by the Constitution, and (d) allegations of a pattern of facts that is well within the mainstream of constitutional litigation.")

The government's argument that we have hazarded an untimely amendment does not comport with the cases cited therein.  Compare Govt's Reply at 3 (citing *United States v. Espinoza-Saenz*, 235 F.3d 501, 504-05 (10th Cir. 2000), for proposition about untimely amendment) with *United States v. Espinoza-Saenz*, 235 F.3d at 504-05 (citing circuit authority *Davenport, Pittman*, and *Craycraft*, all of which raised new grounds alleging novel error.  There is no circuit authority holding that a request for remedy is barred under this statutory provision).

I.    **From the outset of Mr. Barrett's federal trial, all parties have treated the three death-eligible counts as indistinguishable, one from the other.  It is disingenuous to argue that relief is lost because Mr. Barrett's counsel failed to overburden this court with three separate briefings on all issues, when each capital charge is based upon one incident that resulted in Mr. Eales' death.**

In all capital cases, prevailing norms of defense practice dictate that "[c]ounsel should seek a theory that will be effective in connection with both guilt and penalty, and should seek to minimize any inconsistencies." (ABA Guideline 10.10.1; ABA Guidelines, 31 HOFSTRA L. REV. 913, 1059, 1065 (2003) (commentary on Guideline 10.11) ("counsel should begin to develop a theme that can be presented consistently through both the first and second phases of the trial").) (§2255, Doc. 1, at 188).  Faced with three capital counts, Mr. Barrett's trial counsel

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                          7                 *Barrett v. U.S.*, CV-09-00105-JHP

2117

presented a unified defense.  In his motion for collateral relief, Petitioner outlined the

deficiencies in trial counsels' failures to investigate evidence of mental health issues and other

evidence in mitigation as expected in a capital case:

> Because of trial counsel's abysmal failures to investigate, prepare and present anything approaching a proper case in mitigation, the prosecution was free to tell the jury that Mr. Barrett was simply a cold, calculating and unrepentant killer who had little if anything going for him in the sentencing balance.  (R. 5340-42, 5402, 5404, 5405-09, 5411-13, 5420-22).  Because the jury never learned of Mr. Barrett's abusive, neglected, chaotic and troubled upbringing; his lengthy history of severe mental illness; the extensive history of mental illness in his family; his low I.Q.; and, despite it all, his good and positive qualities, the prosecution had a field day depicting Mr. Barrett as a prime candidate for the death penalty.  (§2255, Doc. 1, at 233).[2]

---

[2] The trial record demonstrates this approach by both parties at trial.  Mr. Littlefield's closing argument, "I'm going to lump Counts One and Two together." Vol. 20, p. 4277.  "What about Count 3 . . . "But it [sic] also established by all of the other drug trafficking evidence that we presented previously and I will not waste any time discussing it again.  This was a drug house." Vol. 20, p. 4295.  After 30 pages of rambling argument, Mr. Littlefield concludes with only, "Kenny Barrett intentionally, knowingly and with premeditation killed Rocky Eales.  Six years and a month and several days, now is the time for justice.  Find him guilty beyond a reasonable doubt."  Vol. 20, p. 4309.

Mr. Hilfiger argued in the guilt phase, "Now, if they all sound sort of intertwined, you know, One sounds [sic] Two and Two sounds like Three and Three sounds like One, it's because they are." Vol. 20, p. 4313. "I want to tell you that the three counts do appear in the – and they're wrapped together and they all deal with the same incident." Vol. 20, p. 4372, distinguishing Count 3 only in that "Kenneth Barrett knew David Eales was a law enforcement officer at the time the shooting occurred."  Vol. 20, p. 4372.

Mr. Sperling, in the government's rebuttal.  "Ladies and gentlemen, time to call this and characterize it what the evidence established him to be.  We've been sitting in this room for weeks now with a cold-blooded murderer." Vol. 20, p. 4375.

"[G]uilty of each of the counts, the three counts, of which he is charged.  That he used and carried firearms during and in relationship to drug trafficking criminality.  The success was the success that he sought, a blaze of glory.  Taking as many with him as he could.  It did, the firearms did, facilitate the success of his venture as he sought.  The Defendant used and carried firearms during and in relationship to the murder of a highway patrolman, a violent crime, and the Defendant intentionally killed Trooper Rocky Eales." Vol. 20, p. 4402.

Sentencing phase (Vol. 27). Mr. Littlefield, arguing for the government.  "You are about to begin a process of deciding what is the appropriate sentence for Kenneth Eugene Barrett.  Should his sentence be death, life imprisonment without the possibility of release or a term of years to be

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                     8                     *Barrett v. U.S.*, CV-09-00105-JHP

2118

The government's arguments serve to avoid its own responsibilities, assuming that because it failed to convince a jury of several aggravating circumstances and the jury declined to impose three death sentences, that Mr. Barrett's life was somehow not at stake for all three counts as charged.  As *Ake* contemplates, this was a capital case, period.  *Ake v. Oklahoma*, 470 U.S. 68 (1985), is directly on point in both fact and law.  In that case, the Petitioner was charged and convicted for multiple acts all arising from a single incident (in that case the murder of a couple and wounding their two children).  *Id*, at 70.  At a single sentencing phase, Petitioner Ake was sentenced to death as to both murders and 500 years' imprisonment on each of the two counts of shooting with intent to kill.  *Id*., at 73.  In ordering a total reversal of both the conviction and the sentences on all charges, including the two non-capital offenses, the Supreme Court began "by considering the pivotal role that psychiatry has come to play in criminal proceedings." *Id*. At 79 (Emphasis added).

Since *Ake* was a capital case, much of the Court's discussion revolved around the heightened scrutiny and standards of practice in a capital trial.  However, the Court concluded with a total reversal on all counts, without further analysis of that decision.  In so holding, it is apparent that the constitutional violation upset the reliability of the criminal proceeding, not simply the death sentence.  *Id*. at 86-87.[3]

---

decided by the Court."  Vol. 27, p. 5331.  And most glaringly, "The death penalty is an appropriate, correct and just punishment for this crime and it should be your verdict."  Vol. 27, p. 5358, emphasis added).

[3] See, *Ake v. State*, 1989 OK CR 30, 778 P.2d 460 (Okla. Crim. App. 1989), on review of his retrial, the Court affirmed Mr. Ake's two life sentences and 200 years for each count of shooting with intent to kill.  This sentence embodies the original spirit of the sentence-packaging doctrine, exposing Mr. Ake to increased sentences on the shootings, whereby he was originally sentenced to 100 years per count.

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                                  9                    *Barrett v. U.S.*, CV-09-00105-JHP

2119

In Mr. Barrett's case, the impact of his counsel's errors is even more glaring.  His three convictions do not merely arise from one incident.  The government hedged its bets with three versions of one indivisible act, to guarantee that Mr. Barrett was somehow, someway, sentenced to death.  Its failure to achieve that goal thrice over does not retroactively cure the deficiencies of Mr. Barrett's own trial counsel.  It is likewise disingenuous to assume that because the jury did not return a death sentence on all three counts, that Mr. Barrett's sentences to life without the possibility of release on Counts I and II were a windfall, rather than another tragic result of his counsel's deficiencies.

As argued repeatedly throughout Mr. Barrett's post-conviction litigation, the cumulative and conflated effect of the errors that have permeated Mr. Barrett's case resulted in a manifest injustice.  One murder, three convictions.  One act, one alleged mindset.  As argued by the government at trial, this was a drug case, enabled by guns that resulted in a murder.  (See, e.g., FN 2, *supra* and Trial Transcript, Vol. 20, p. 4295.  The government now seeks some kind of dividend based on the ineptitude and lethargy that permeated his trial and led to Mr. Barrett's conviction and sentences to life without the possibility of release and death.  This position presumes a legal fallacy – that dividing a single episode into three separate counts somehow requires three separate legal defenses.  In so doing, the government impertinently suggests that in his fight for his life, Mr. Barrett should be happy to accept the rest of his days in a federal prison, and long ago opted to waive the possibility of his release.  That has never been the case.

Mr. Barrett's trial counsel were woefully ineffective.  The prevailing norms at the time of his trial and the evolving perceptions on the impacts of mental health evidence, as it relates to criminal culpability, is not a doctrine specific to a death sentence.  In fact, Justice Scalia, stated that "same pressure would exist, and the same risk of wrongful convictions [would continue] if

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                10                *Barrett v. U.S.*, CV-09-00105-JHP

2120

horrendous death-penalty cases were converted into equally horrendous life-without-parole cases." "The lifer languishes unnoticed behind bars." (*Glossip v. Gross*, 135 S. Ct. 2726, 2747 (2015). Not only is the government's response disingenuous in its statement of the case, it is misguided in its application of the law, ignoring the intertwined charges that led to the interwoven arguments requesting relief as to all three convictions and the adjudged sentences.

Moreover, the government seems to call Mr. Barrett's post-conviction counsel ineffective for failing to raise the issue. Per the government's position, Mr. Barrett's post-conviction attorneys are ineffective in failing to file each argument thrice over, and not giving the Court a paint-by-numbers color chart leading it from each allegation of error to the appropriate and judicious relief. That simply ignores the basic premise of judicial efficiency.

**II.   Despite its argument, Mr. Barrett is not required to demonstrate that both a recommending jury and a sentencing court would both be equally swayed to impose a lesser sentence.**

At page 5 of its brief, the government argues that "Barrett would have to demonstrate a reasonable likelihood that the district court would have – in the absence of any ineffectiveness – imposed a less-than-life sentence." (improperly citing to *Strickland*, for this position, despite the test for prejudice which requires the Petitioner show "that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Strickland v. Washington*, 466, U.S. 668, 687 (1984). That is further defined as "a reasonable probability is a probability sufficient to undermine confidence in the outcome." *Byrd v. Workman*, 645 F.3d 1159, 1168 (10th Cir. 2011)(internal citations omitted). The government, arguing that if the jury were to return a sentence of anything less than life without the possibility of release, the district court can and likely would dismiss that recommendation and enter sentences of life without the possibility of release. (See, Doc. 472, p. 1-2, "Following a bifurcated penalty trial, the jury recommended a

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                    11                    *Barrett v. U.S.*, CV-09-00105-JHP

2121

death sentence for the § 848 offense and life sentences for the § 924 offenses, all of which the district court affirmed).

Only the jury matters. "Although we suppose it is possible that a jury could have heard it all and still have decided on the death penalty, that is not the test." *See*, Judge Sotomayer's dissent, *Elmore v. Holbrook*, 137 S. Ct. 3, 10 (citing *Rompilla*, 545 U.S. at 393). The government would have this court abandon the adversarial process and argues the worst of implications; they are sure that it would be a waste of this Court's time, since the Court would inevitably dismiss any jury recommendations for a sentence less than life without the possibility of release.[4]

If the Court is aligned with the current and controlling position of the U.S. Supreme Court, then it should be moved by the deeply mitigating impact of evidence of mental illness, *see, e.g., Porter v. McCollum*, 558 U.S. 30, 41 (2009), that "evidence about the defendant's background and character is relevant because of the belief, long held by this society, that defendants who commit criminal acts that are attributable to a disadvantaged background . . . may be less culpable." (*id.*, citing, *Penry v. Lynaugh*, 492 U.S. 302, 319, 109 S. Ct. 2934, (1989). The Tenth Circuit and the Supreme Court have long recognized the "powerful mitigating effect" this type of evidence may have on a sentencing case. (See, *Hooks*, 689 F.3d at 1205, citing *Rompilla* 545 U.S. at 392 (additional citations omitted). "Had the judge and jury been able to place [Mr. Barrett's] life history 'on the mitigating side of the scale,' and appropriately reduced the ballast on the aggravating side of the scale, there is clearly a reasonable probability that the advisory jury – and the sentencing judge – 'would have struck a different balance." *Porter*, 558

---

[4] As to Counts I and II, Mr. Barrett faced the maximum punishment of death, but the jury could recommend any lawful punishment, to include a term of years. As to Count III, Mr. Barrett faced the maximum punishment of death, but could have received a term of years not less than 20 years confinement. See Federal Death Penalty Act of 1994, 8 U.S.C. § 3591(a)(2)(A)-(D), and the Anti-Drug Abuse Act of 1988, 21 U.S.C. § 848(e)-(r); Judicial Instructions at Sentencing, Trial Transcript, Vol. 27, p. 5295-96.

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                    12                    *Barrett v. U.S.*, CV-09-00105-JHP

2122

U.S. at 42 (citing *Wiggins v. Smith*, 539 U.S. 510, 537 (2003).  In extending *Strickland* to require a showing that the sentencing judge would likely have been swayed to return a different result, the government proffers a test that is not supported in law.  As cited herein, both the Tenth Circuit and the U.S. Supreme Court find that the calculus to determine material error lies in whether a reasonable juror might be persuaded.  Reading *Porter* and *Wiggins*, it is thereby presumed that should defense meets it burden as to the likelihood that new evidence may sway a reasonable jurist, then a sentencing judge would likewise have struck a different balance.

**III.     The sentence-packaging doctrine requires the full remand as a procedural mandate.**

The government seems to concede the applicability of the sentence-packaging doctrine, with absolutely no reference to it in its response, which is odd considering that this is the only basis for the objections raised by Mr. Barrett.  "The sentence packaging doctrine was deemed applicable when the sentences on the underlying count were interdependent." *United States v. Shue*, 825 F.2d 1111, 1114 (7th Cir. 1987).  As outlined above, Mr. Barrett is convicted of three counts of murder that were not just intertwined, but indistinguishable from each other, based on the same alleged murder, each sharing the same special circumstances that increased his punitive exposure to three death sentences.  (See, Superseding Indictment, Doc. 52, Case # CR-04-115-P).

The sentence-packaging doctrine is a "common judicial practice grounded in a basic notion" that "sentencing on multiple counts is an inherently interrelated, interconnected, and holistic process which requires a court to craft an overall sentence—the 'sentence package'—that reflects the guidelines and the relevant [18 U.S.C.] § 3553(a) factors." *United States v. Fowler*, 749 F.3d 1010, 1015 (11th Cir. 2014).  This doctrine applies whether the resentencing occurs in a § 2255 proceeding or on remand from a direct appeal.  *Id*.  What is usually a doctrine skewed to

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                                      13                          *Barrett v. U.S.*, CV-09-00105-JHP

2123

favor the government and maintain the intent of the original sentence can and should be equitably applied to the benefit of a petitioner that succeeds in demonstrating a requirement for relief on his post-conviction appeal. In this case, the counts are interdependent and Mr. Barrett's counsel ineffectively pursued a single strategy in his capital sentencing trial. Both prosecution and defense argued for a single sentence, declining to parse out three separate arguments, making an "inherently interrelated, interconnected, and holistic" plea to Mr. Barrett's jury. *Fowler*, 749 F.3d at 1015. One error, found worthy of relief, equally infected Mr. Barrett's entire sentencing phase, and thereby mandates that this Court grant reconsideration of the sentences on all counts.

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                14                *Barrett v. U.S.*, CV-09-00105-JHP

2124

## CONCLUSION

Based upon the arguments set forth in Petitioner's Objections, Doc. 470, and herein above, Mr. Barrett respectfully requests that this court approve the recommendations and report of the magistrate judge and further sustain Mr. Barrett's objections and thereby expand that recommendation for a new sentencing trial as to all three counts on which he stands convicted.

DATED:   December 10, 2018

RESPECTFULLY SUBMITTED,

/s/ *David Autry*
DAVID AUTRY

HEATHER E. WILLIAMS
Federal Defender

/s/ *Joan M. Fisher*
JOAN M. FISHER
Assistant Federal Defender

/s/ *Karl Saddlemire*
KARL SADDLEMIRE
Assistant Federal Defender

/s/ *Carrie Ward*
CARRIE WARD
Assistant Federal Defender

Attorneys for Petitioner/Defendant,
KENNETH EUGENE BARRETT

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                15                *Barrett v. U.S.*, CV-09-00105-JHP

2125

**CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY**

This is to certify that on this 10th day of December 2018, I caused the foregoing Petitioner's Objection To Magistrate Judge's Report And Recommendation to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.  To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ *Carrie L. Ward*
CARRIE L. WARD

Petr's Reply to Govt's Response re:
Objections to Magistrate Judge's Report
And Recommendation                    16                    *Barrett v. U.S.*, CV-09-00105-JHP

2126

```
MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Carrie L. Ward (carrie_ward@fd.org), Karl J. Saddlemire
(karl_saddlemire@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Christopher J.
Wilson (barbara.elmore@usdoj.gov, caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org,
lindsay_bennett@fd.org), District Judge James H. Payne (amy_green@oked.uscourts.gov,
okedml_jhp_chambers@oked.uscourts.gov), Judge Ronald A. White
(amy_green@oked.uscourts.gov, okedml_raw_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oknd.uscourts.gov), Intake
(cm-ecfintake_oked@oked.uscourts.gov)
--No Notice Sent:

Message-Id:1018274@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-RAW Barrett v. USA Minute Order
Content-Type: text/html
```

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 1/31/2019 at 2:56 PM CST and filed on 1/31/2019

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–RAW |
| **Filer:** | |
| **Document Number:** | 477(No document attached) |

**Docket Text:**

 **MINUTE ORDER by Court Clerk: Pursuant to the recusal of Judge James H. Payne and at the direction of the Court, this case is reassigned to Judge Ronald A. White. All documents filed in this case in the future shall reflect the new case number CIV–09–105–RAW. (cjt, Deputy Clerk)**

**6:09–cv–00105–RAW Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, barbara.elmore@usdoj.gov, sheryl.hanshaw@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org, lindsay_bennett@fd.org

Karl J. Saddlemire     karl_saddlemire@fd.org

Carrie L. Ward     carrie_ward@fd.org

**6:09−cv−00105−RAW Notice has been delivered by other means to:**

**IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KENNETH EUGENE BARRETT, )  | |
| ) | |
| Petitioner/Defendant, ) | |
| ) | |
| vs. ) | Case No. CIV-09-105-RAW |
| ) | |
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Respondent/Plaintiff. ) | |

**OPINION AND ORDER**

Before this court is the Report and Recommendation of the magistrate judge in which the magistrate judge found that petitioner's counsel were deficient in their performance, which ultimately prejudiced petitioner. As a result, the magistrate judge recommended that the petitioner be given a new sentencing hearing on Count III, intentionally killing a state law enforcement officer in the commission of a drug trafficking crime. Both the petitioner and the government have filed objections to the report and recommendation. *See*, Dkt. #s 470 and 471.

**Statement of the Case**

On November 17, 2005, petitioner was convicted of three counts, including: Count I: using and carrying a firearm during and in relation to drug trafficking crimes and possessing a firearm in furtherance of such drug trafficking offenses, resulting in death, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); Count II: using and carrying a firearm during

1

and in relation to a crime of violence and possessing a firearm in furtherance of such crime of violence, in violation of 18 U.S.C. § 924(c)(1)(A) and (j); and Count III, intentionally killing, during the commission of a drug trafficking crime, a state law enforcement officer, engaged in the performance of his official duties, in violation of 21 U.S.C. § 848(e)(1)(B). The jury returned verdicts of life in prison without the possibility of release on Counts I and II and a death sentence on Count III.   Petitioner was sentenced, on December 15, 2005, in accordance with the jury verdicts.   The court ordered the sentences to run consecutively. Additionally, petitioner was ordered to pay a special assessment of $100 on each count for a total assessment of $300.

Petitioner filed a direct appeal and the Tenth Circuit Court of Appeals affirmed the judgment.   *United States v. Barrett*, 496 F.3d 1079 (10th Cir. 2007) (*Barrett I*). Thereafter, petitioner sought collateral relief pursuant to 28 U.S.C. § 2255, which was denied by this court on August 16, 2012.  Dkt. # 214.   On August 19, 2015, the Tenth Circuit affirmed in part and reversed in part, holding:

> We REVERSE and REMAND Defendant's death sentence for the district court to hold an evidentiary hearing on whether the performance of trial counsel was deficient in not investigating Defendant's background and mental health and whether Defendant suffered prejudice from any deficiency during the penalty phase of his trial.   In all other respects we AFFIRM.

*United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015) (*Barrett II*).

On March 8, 2017, the case was referred to the magistrate judge pursuant to 28 U.S.C. § 636(b)(1)(B) for an evidentiary hearing and for findings and recommendation.

2

2130

The assigned magistrate judge heard evidence on March 27-30, 2017, June 12-13, 2017, and June 26, 2017.[1]   At the hearing, petitioner called eleven (11) witnesses and introduced forty-four (44) exhibits.   The respondent called three (3) witnesses and introduced forty-three (43) exhibits.   Thereafter, the parties were given until July 31, 2017 to file proposed findings of fact and conclusions of law.   On August 10, 2018, the magistrate judge issued a report and recommendation that concluded ". . . [trial] counsel were deficient in their performance, which ultimately prejudiced the Defendant, and that the Defendant is therefore entitled to relief under 28 U.S.C. § 2255 and to a new sentencing hearing."   Dkt. # 467 at 34.   The court granted an extension of time to file objections and objections were timely filed.   *See*, Dkt. #s 470 and 471.

### Standard of Review

Because this matter was referred to the magistrate judge to conduct an evidentiary hearing, Rule 72(b) of the Federal Rules of Civil Procedure required any party that disagreed with the magistrate judge's report and recommendation to file "specific written objections" to the report.   Under Rule 72(b)(3), this court must make a de novo determination of any part of the report or specified proposed findings or recommendations

---

[1]Transcripts of the evidentiary hearing were filed as Dkt. #s 429, 430, 446, 447, 450, 453, 454, and 464.   The magistrate judge's report utilized the actual page numbers of the evidentiary hearing transcript itself as opposed to the CM/ECF docket #s and the page numbers contained in the CM/ECF headers.   For ease of reference and because the transcript is filed as eight different documents, this court will refer to the evidentiary transcript by Dkt. # and the page number contained on the CM/ECF headers.

to which an objection was made. *See also*, 28 U.S.C. § 636(b)(1)(C). This court is not required to conduct another hearing to review the magistrate judge's findings or credibility determinations. *Goffman v. Gross*, 59 F.3d 668, 671 (7th Cir. 1995) (citing *United States v. Raddatz,* 447 U.S. 667, 675 (1980)). Rather, the district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C); Fed.R.Civ.P. 72(b)(3). Thus, it is clear that "[t]he authority—and the responsibility—to make an informed, final determination . . . remains with the [district court] judge." *Raddatz*, 447 U.S. at 681 (citing *Mathews v. Weber*, 423 U.S. 261, 271 (1976)).

### Government's objections to magistrate's findings

The government does not object to the magistrate judge's finding regarding counsel's deficient performance in developing a mitigation strategy. Rather, the government objects to the prejudice analysis arguing that the magistrate judge failed to evaluate the credibility of petitioner's mental health evidence. Dkt. # 471. The government argues that the magistrate judge premised its prejudice finding solely on trial counsel's failure to present mental health evidence, as opposed to the absence of testimony by the petitioner's relatives. *Id*., at n. 2. Based upon the petitioner's substantial planning and premeditation of the murder, the government argues the evidence presented by petitioner at the evidentiary hearing would not have had an impact on the outcome of the trial. Thus, the government is actually arguing that the foregone mitigating evidence did

4

not tip the scale in favor of a sentence less than death.   In his response, petitioner argues the government's objections are fatally flawed because they are not specific enough.

### Legal Principles applicable to claims of ineffective assistance of counsel during penalty phase of trial

Counsel's performance at the sentencing stage of a capital trial is governed by the principles enunciated in *Strickland v. Washington*, 466 U.S. 668 (1984).   Thus, in order to prevail on this claim, petitioner must establish both deficient performance and prejudice. In order to establish that counsel's performance was deficient, the petitioner must establish that   counsel made errors so serious that counsel was not functioning as 'counsel' guaranteed by the Sixth Amendment.  *Id*., 466 U.S. at 687.   During the second stage of trial, counsel's role is "to ensure that the adversarial testing process works to produce a just result under the standards governing the decision."   *Id*., 466 U.S. at 686.   The focus of the deficient prong is "not what is prudent or appropriate, but only what is constitutionally compelled."  *Breechen v. Reynolds*, 41 F.3d 1343, 1365 (10th Cir. 1994).

As recognized in this case by the Tenth Circuit, trial counsel's penalty-phase performance is evaluated "under the prevailing professional norms at the time of . . . trial [September 2005 in this case]."  *Barrett II,* 797 F.3d at 1223.   Counsel's duty is to undertake a reasonable investigation or make a reasonable decision that a particular investigation is unnecessary.  *Walker v. Gibson,* 228 F.3d 1217, 1233 (10th Cir. 2000); *Brecheen,* 41 F.3d at 1366.   In light of the extremely important role that mitigating

5

evidence plays in the "just imposition of the death penalty,"[2] this court is required to apply close scrutiny when reviewing the performance of counsel at the sentencing stage. *Battenfield v. Gibson*, 236 F.3d 1215, 1226 (10th Cir. 2001). At the same time, the "failure to present available mitigating evidence is not per se ineffective assistance." *Hale v. Gibson*, 227 F.3d 1298, 1315 (10th Cir. 2000) (quoting *Brecheen*, 41 F.3d at 1368). "In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." *Strickland*, 466 U.S. at 691. Thus, an attorney "'is not required to investigate all leads' as long as the decision not to pursue a particular lead, or to pursue a particular lead only so far, is reasonable under the circumstances." *Breechen*, 41 F.3d at 1366; *see also Strickland*, 466 U.S. at 691 ("[C]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.") Moreover, "the reasonableness of an attorney's investigation is dependent on the circumstances of the case." *Smith v. Workman*, 550 F.3d 1258, 1270 (10th Cir. 2008) (citing *Walker*, 228 F.3d at 1233).

Petitioner must also establish that any deficient performance prejudiced the defense. *Strickland*, 466 U.S. at 687. During the second stage of trial, a petitioner must show there is a reasonable probability that, absent the errors, the sentencer would have concluded, after balancing the aggravating and mitigating factors, that the death penalty was not warranted.

---

[2]*Mayes v. Gibson*, 210 F.3d 1284, 1288 (10th Cir. 2000).

6

*Id*., at 694.   Put another way, deficient performance is prejudicial only where it is clear that "but for trial counsel's errors, there is a reasonable probability that the ultimate result would have been different."   *Washington v. Johnson*, 90 F.3d 945, 953 (5th Cir. 1996). Thus, deficient performance in a capital sentencing proceeding prejudices the defendant if "there is a reasonable probability that one juror would have chosen a sentence other than death."   *Wood v. Carpenter*, 907 F.3d 1279, 1290 (10th Cir. 2018) (quoting *Matthews v. Workman*, 577 F.3d 1175, 1190 (10th Cir. 2009)).   "To assess that probability, [this court] must consider 'the totality of available mitigation evidence—both that adduced at trial, and the evidence adduced [at the evidentiary hearing]'—and 'reweig[h] it against the evidence in aggravation.'" *Porter v. McCollum*, 558 U.S. 30, 41 (2009) (quoting *Williams v. Taylor*, 529 U.S. 362, 397-398 (2000).   *See also*, *Littlejohn v. Royal*, 875 F.3d 548, 552 (10th Cir. 2017).

### Legal Analysis

#### A.   Performance of counsel

Since the government has not objected to the magistrate judge's finding that counsel's performance was deficient, this court adopts the magistrate judge's conclusion that trial counsel rendered constitutionally deficient performance in developing a mitigation strategy.   In determining that trial counsel's performance was deficient, however, the magistrate judge stated that "federal trial counsel neither hired a mitigation or mental-health professional nor   attempted to investigate themselves in any depth the [petitioner's] mental health or family background."   Dkt. # 467 at p. 10.   This court would

7

like to correct this finding by noting that trial counsel did hire Jeanne Russell, Ed.D. (a licensed psychologist).   While the scope of Russell's work for the federal trial was apparently limited to completing an updated risk assessment, based upon the information contained within Russell's 2003 report,[3] there can be no question that petitioner's federal trial counsel was, in fact, aware of the very information which petitioner has been relying upon to establish that counsel's investigation of his mental health and/or family history was not comprehensive and/or in-depth enough to uncover important mitigating evidence.[4] According to Russell's psychological evaluation, the petitioner was "not exhibiting symptoms of a major mental illness (*i.e.*, Schizophrenia, Schizoaffective Disorder, Bi-

---

[3]*See* Govt. Exh. # 34.

[4]At the evidentiary hearing, trial counsel's recollections of exactly what they knew and when they learned the information was sketchy at best.  For instance, Brett Smith recalled various things that occurred during his representation of the petitioner only when those things were pointed out to him and at one point during his testimony he stated that his "recollection has probably been tainted by my recent work because . . . I have read some materials recently, which has probably contaminated my memory as it relates to 2005." Dkt. # 446, at p. 28 and 56 (Smith again indicates his memory has been tainted by recent readings).   Smith did remember, however, having discussed with Roger Hilfiger, shortly after his appointment to the case, hiring a mitigation specialist but based upon their discussions they did not hire one.

Hilfiger also had difficulty remembering details concerning his time representing the petitioner, but stated he did not hire a mitigation opinion expert because "We just didn't feel like that a mitigation opinion expert would do us any good when we could -- when we used the information we had from previous reports and talked to those people and had them testify."   Dkt. # 447 at p. 97.    It is inconceivable that trial counsel would have known to call Russell to update her report if they were not aware of her report and the information that was contained within that report.

8

Polar Disorder, or Major Depression)"[5] and while acknowledging that persons close to the petitioner had described symptoms they associated with mental illness and other records indicated a history of paranoia and impulsiveness, Russell opined these "behaviors appear exacerbated by drug use."[6]   Moreover, in compiling this report, Russell reviewed all of the petitioner's mental health records and her report contained, among other information, a list of all of the records she had reviewed, a summary of petitioner's legal history, family history, education, relationships, employment history, medical and mental health history/treatment, and a significant substance abuse history.   *See* Govt. Exh. # 34.

In considering the reasonableness of counsel's actions, this court cannot rely on "hindsight;" but must examine the reasonableness of counsel's actions from "'counsel's perspective at the time' the investigative decisions [were] made."   *Rompilla v. Beard*, <u>545 U.S. 374, 381</u> (2005) (quoting *Strickland*, <u>466 U.S. at 689</u>).   It seems axiomatic that an attorney should be able to rely on a mental health expert's prior opinion in determining the significance of a defendant's mental health records, including whether or not that defendant has a major mental illness; and then, based upon that opinion, decide to forego further mental health testing of that defendant.   While none of the mental health professionals who had examined the petitioner prior to 2005 had ever diagnosed the petitioner with a major mental illness, *see* Govt. Exh. #s 4-6, 8-9, 11, 16, 34 and 35, petitioner's counsel did

---

[5]Govt. Exh. # 34 at p. 9.

[6]*Id*.

not actually   consult with Russell prior to deciding to forgo any further mental health evaluations. [7]   For this reason alone, this court agrees with the magistrate judge's conclusion that trial counsel's performance was deficient.

## B.   Lack of prejudice

This court finds, however, based upon the evidence presented at the evidentiary hearing, that petitioner was not prejudiced by counsels' performance.   Simply because petitioner was able to obtain experts who described the petitioner as having mental health disorders so severe that he could not have rationally assisted his attorneys in the preparation of his defense,[8] does not mean the jury would have given much weight to that testimony in light of the evidence it heard over the course of the entire trial.   That evidence was summarized by the Tenth Circuit Court of Appeals as follows:

> Barrett had been aware for some time of the outstanding warrant for his arrest, and anticipated that law enforcement officials would come to his house to arrest him at some point.   Tr. at 400-01.   Despite that awareness, or perhaps because of it, Barrett exhibited a defiant attitude towards law enforcement officials.   On the front gate leading to his residence, Barrett had

---

[7]If counsel had consulted with Russell, they would have learned that she had not conducted a "comprehensive" mental health evaluation.   *But see* Govt. Exh. 12 (affidavit Faust Bianco, Ph.D., a psychologist licensed in Oklahoma, who performed a neuropsychological evaluation of the petitioner prior to the federal court trial, opining that further neurological testing was unwarranted).   Counsel also did not consult with Bianco prior to deciding to forgo any further mental health evaluations.

[8] *Contra* Govt. Exh. # 52 at 71-72; Dkt. # 446, at p. 33 (defense counsel acknowledged that the petitioner was "among the most cooperative criminal . . . defense clients I've ever had" and "[h]e was very helpful during the trial to me.   He knew as much about it as I did."; and Govt. Exh. # 38-40 (defendant's notes to counsel).   *See also*, Govt. Exh. # 34.

10

installed a sign reading:  "Keep Out.   I don't give a shit who you are, if you cross my gate or come on my property, I'll shoot."  *Id.* at 399.   Further, in the months and weeks leading up to the date of the shooting, Barrett regularly told friends and family that if law enforcement officers came to his house, "[t]here was going to be a shootout," *id.* at 412, "he would shoot the first police that came through his door," *id.* at 2515, and "he was going to take out as many [law enforcement officers] as he could before they got him."  *Id.* at 412-13; *see id.* at 3068-69, 3106, 3493.   Indeed, on the evening of September 23, 1999, Barrett observed three of the Tact Team members drive by his residence in an unmarked vehicle, and subsequently stated to his cousin, Travis Crawford, that he knew the vehicle belonged to law enforcement officials, that he didn't "give a fuck" if they came back to serve the arrest warrant, and that "he was going out in a blaze of glory" if they did so.  *Id.* at 466.

Barrett's conduct in the months, weeks, and days leading up to the shooting incident suggests his threats were far from idle.   Barrett possessed multiple firearms at his residence, including five rifles, three shotguns, and two pistols. *Id.* at 401, 1862-63, 1882-83, 1888, 1895, 1899-1901.   During the day, Barrett typically kept a rifle nearby.   *Id.* at 461-62, 3086, 3493-94.   He also carried a nine millimeter pistol in his pants at all times. *Id.* at 409-10, 3106, 3496.

As for the night of the shooting incident, the evidence presented at trial was more than sufficient to have allowed the jury to reasonably find that Barrett knew it was law enforcement officials who were approaching his residence en masse.   At the time the Tact Team approached Barrett's property, there was a full moon and no clouds in the sky.  *Id.* at 993.   The two lead Tact Team vehicles that approached Barrett's residence from the east were white Ford Broncos.  *Id.* at 984.   Although the Broncos were unmarked, Barrett had observed one of these vehicles on the afternoon prior to the shooting (it was used in the drive-by performed by Tact Team members), and suspected that it belonged to law enforcement officials. Further, although the lead Bronco did not exhibit any flashing lights (because Barrett began shooting at it before the two officers inside had an opportunity to turn on the lights), *id.* at 610, the second Bronco did.  *Id.* at 732.   More specifically, the second Bronco had a flashing strobe-type light on the sun visor and "wig-wag" headlights, all of which had been activated.  *Id.* at 732, 1094.   The third vehicle to enter Barrett's property, immediately following the two lead Broncos, was a marked Oklahoma Highway Patrol car with its emergency lights activated (including a standard light bar on top and "wig-wag" headlights).  *Id.* at 760, 987, 991. The lights from this third vehicle

were described by witnesses as sufficient to illuminate the scene in front of Barrett's residence. *Id.* at 1101 (testimony from Trooper Steve Hash, the driver of the second Bronco, that he observed red and blue strobe lights reflecting off of Trooper Eales as he got out of the lead Bronco), 1158-59 (indicating the lights of marked unit lit up the whole area), 1343 (indicating that light bar on top of marked unit was very visible), 1496 (indicating that red and blue lights from marked unit were reflecting off the shards of glass coming from the lead Bronco), 1797-98 (indicating that lights from marked unit illuminated a wide area around the vehicle).

Finally, and perhaps most significantly, Barrett's conduct in shooting at the officers that night clearly would have allowed the jury to reasonably find that he intended to kill one or more of those officers, including Eales. Barrett began shooting at the lead vehicle, a Ford Bronco driven by Trooper Hamilton, as soon as the vehicle cleared a ditch that ran between Barrett's house and a property to the east. *Id.* at 537. According to Hamilton, Barrett's shots were hitting in the middle of the windshield of the Bronco, at approximately "head level." *Id.* As Hamilton continued driving the Bronco westward towards Barrett's residence, the gunfire intensified and the windshield of the Bronco began to disappear. *Id.* at 539. The gunfire continued after Hamilton stopped the Bronco near the edge of the front porch of Barrett's residence. *Id.* at 540. Eales, who was a passenger in the lead Bronco driven by Hamilton, opened the passenger side door (which was closest to the front porch of Barrett's house), got out, and began heading towards the rear of the Bronco (presumably to obtain cover). As he did so, Eales was struck by three separate rounds of gunfire from Barrett. *Id.* at 1687 (testimony from pathologist opining that Eales' wounds were sustained while facing away from Barrett). One round struck the handgun that Eales carried on his right hip and then ricocheted and struck Eales' right elbow. *Id.* at 1661. A second round struck Eales' left flank region, entering approximately twenty-five inches from the top of Eales' head, down from the area on the back of his left arm pit where the skin is folded. *Id.* at 1605. A third, and fatal, round entered Eales' chest on the left side of his upper back. *Id.* at 1611. After shooting Eales, Barrett continued firing rounds at the Tact Team members, stopping only after he himself was shot in the legs by a Tact Team member. *Id.* at 545, 548. Even after being shot and dragged outside of his residence by Tact Team members, Barrett made movements as if reaching for a pistol he had concealed in the waistband of his jeans. *Id.* at 1113. Subsequent investigation of the crime scene by law enforcement officials revealed that Barrett used a Colt Sporter .223 rifle, equipped with three loaded magazines taped together (with a total of ninety-one rounds of

ammunition), to fire at least nineteen shots at Tact Team members, including the three shots that hit Eales.   *Id.* at 1884, 3256.   The Colt Sporter rifle had a lethal range of approximately 541 to 595 yards, and was capable of penetrating the metal of an automobile.   *Id.* at 3573, 3586.   At the time Barrett fired the three shots that wounded Eales, he was no more than ten to fifteen feet away from Eales.   *Id.* at 4304-05.

In sum, although Barrett's defense during the first-stage proceedings was that he was unaware that the persons entering his property were law enforcement officials, and that he was simply reacting in defense of himself and his son, the above-described evidence was more than sufficient to allow the jury to reasonably find that Barrett knew that Eales and the other persons approaching his residence were law enforcement officers and that he intended to kill Eales.

*Barrett I*, 496 F.3d at 1113-15 (footnotes omitted).

While petitioner's experts identified issues at the evidentiary hearing that they opined might have compromised the petitioner's ability to process information under pressure, petitioner had clearly resolved to murder Trooper Eales or any other law enforcement officer long before this incident played out.   Moreover, several aspects of the testimony presented at the evidentiary hearing convince this court that the jury would have rejected the mental health diagnosis provided by petitioner's expert witnesses.   First, according to the government's expert witness, Steven Pitt, D.O. (psychologist licensed in Texas, Oklahoma and Arkansas and a board-certified neuropsychologist) petitioner's extensive history of substance abuse precluded a diagnosis for bipolar disorder and petitioner admitted to numerous mental health professionals that there was never a time when he was not abusing drugs, even attributing any history of manic episodes to his own abuse of intoxicants.   Dkt. # 454 at p. 30.   *See also* Govt. Exh. # 52 at p. 59 and 65.

13

Second, petitioner's recollections of his prior head injuries differed over the years including whether, and for how long, petitioner had lost consciousness.   Dkt. # 430 at p. 271-81.   In fact, some of petitioner's medical records revealed that the petitioner denied a history of head injury.   *See* Govt. Exh. #s 5 (Eastern State Hospital record dated October of 1986 which indicates petitioner "denies head injuries")   and 66 at p. 3 (personal health history completed sometime after 2004 and signed by the petitioner which indicated that he had never had any periods of unconsciousness, blurred vision, double vision, depression or excessive worry, frequent thoughts of suicide, paralysis, etc.).   Additionally, despite George Woods, M.D. (board certified psychiatrist and a neuropsychiatrist licensed in California) testifying that petitioner's left lobe injury would impact him being able to do math effectively, Woods admitted that petitioner's educational records showed that petitioner had made an "A" in the first semester and a "B" in the second semester of ninth grade in math.   Dkt. # 430 at 33-36. *See also*, Pet. Exh. # 41 at p. 1, Pet. Exh. # 55 at p. 3.

Further, despite petitioner's experts denying any malingering by the petitioner on the neuropsychological tests which were administered by Mila Young, Ph.D. (clinical psychologist licensed in California and a board-certified neuropsychologist), petitioner's performance on the Wisconsin Card Sorting Test (WCST) (a test which measures ones ability to develop a simple concept and then to carry out that simple concept) was in the severe range.   According to Young, petitioner's performance on the WCST correlated to one's ability/inability to grasp and consistently carry out daily functions such as driving an

14

automobile.   Pet. Exh. # 25 at p. 22.[9]   The evidence heard by the jury at trial, however, demonstrated the petitioner was not only capable of driving a car,[10] but also was considered by one witness, in his criminal trial, as "a real good mechanic."   Dkt. # 352 at p. 230-32 in Case No. CR-04-115-RAW (J.T. Tr., Vol. 24 at p. 4930-32).   This evidence was consistent with evidence from the petitioner's maternal uncle at the evidentiary hearing.[11]   Additionally, petitioner was employed as a carpenter for approximately three years[12] and testimony in the jury trial revealed that the petitioner had personally built the cabin/home where he lived.[13]   *See also* Govt. Exh. # 52, § 3 at p. 158 (petitioner told Pitt he was good at working on motors).   Furthermore, and perhaps most significant (as demonstrated by the facts set out above regarding the petitioner's conduct in the months, weeks, and days leading up to the shooting), the petitioner was able to make plans, grasp weapons and carry out his long term threats to kill any law enforcement officers who

---

[9] Deborah Miora, Ph.D. (clinical psychologist and neuropsychologist from California) testified she partially premised her diagnosis of dysexecutive syndrome on the WCST administered by Young.   Dkt. # 464 at p. 187-92.

[10]*See* Govt. Exh. # 34 at pp. 4-5 (petitioner's employment history which included a job as a truck driver "until he lost his license due to accumulating too many points because of traffic violations").

[11]Mark Dotson testified that the petitioner was a good mechanic, having a natural talent for it.   Dkt. # 429 at p. 64.   *See also* Pet. Exh. # 16 (declaration of maternal great aunt stating that the   petitioner "tried to make a living fixing cars").

[12]*See* Govt. Exh. # 34 at 5.

[13]Dkt. # 325 at p. 477 in Case No. CR-04-115-RAW (J.T. Tr., Vol. III at p. 477).

15

entered his property. More specifically, the petitioner was able to perform functions including the taping together of three loaded magazines with a total of ninety-one rounds of ammunition, concealing a gun in his waist band (just in case he needed more firepower), and aiming a rifle "at approximately head level, middle of the windshield of the lead vehicle."[14] As a result, this court finds the jury would not have been impressed by the petitioner's experts' opinions and, therefore, would have given little, if any weight to those opinions.

Moreover, the government's experts offered a more rational explanation of the petitioner's conduct to the jury, "it's drugs, drugs, and more drugs." Dkt. # 453 at pp. 37-38. Specifically, Randall Price, Ph.D. (psychologist licensed in Dallas, Texas) testified that while the neuropsychological testing did not reveal evidence of a severe brain injury, petitioner did have a long-standing learning disorder, not otherwise specified; polysubstance dependence; dysthymic disorder (a form of depression) that is long-standing and chronic, but not a major depressive disorder; and a personality disorder[15] with antisocial and paranoid traits and features. Dkt. # 450 at p. 127-28.

---

[14]*Barrett I*, 496 F.3d at 1114 (petitioner began shooting at lead vehicle hitting the middle of the windshield at head level). *See also* Govt. Exh. # 52 at p. 72.

[15]According to Price, "[a] personality disorder is not a mental disorder, rather it is more of a long-term characterological condition that is either a source of distress for that person that it interferes with their functioning and it's always been there, at least since adolescence, early adulthood, or it may not be a source of distress for that person but it is for other people." Dkt. # 450, at p. 128.

16

Pitt testified that the petitioner "had a serious problem with drug addiction"[16] and he attributed petitioner's changes in mood to his drug usage.   Dkt. # 454 at p. 59.   Pitt also testified that, in his opinion, the petitioner does not and did not, at the time of the offense, have bipolar disorder.   *Id.* at p. 64.   Moreover, the records reveal that none of the health professionals who treated the petitioner prior to this offense ever diagnosed him with bipolar disorder.   *See*, Govt. Exh. # 6 at p. 2; Govt Exh. #s 7-11; and Govt. Exh. # 102 at p. 17.   Furthermore, Pitt testified that the petitioner was not suffering from posttraumatic stress disorder at the time of the shooting.   Dkt. # 454 at p. 65.   While admitting that Bill Sharp, Ph.D. (licensed clinical psychologist) had diagnosed the petitioner with avoidant and paranoid personality disorder, Pitt indicated that, in his opinion, petitioner's paranoia was caused by his drug use.[17]   *Id*. at 103.   Finally, Pitt diagnosed the petitioner with "amphetamine dependence with physiologic dependence, features of an antisocial personality disorder, cannabis dependence;" but stated that he did not know if the petitioner had a learning disorder.   *Id*. at 71.

In light of the significant amount of evidence that the Tenth Circuit found the jury heard at trial about the petitioner's drug use, this court finds it much more likely that the

---

[16]Dkt. # 454 at p. 58.   *See also* Govt. Exh. # 52, § 3 at p. 91, lines 12-27 and p. 154-57.

[17]This opinion was consistent with Russell's personality assessment which trial counsel apparently relied upon in forgoing additional mental health testing.   *See* Govt. Exh. 34.   According to Russell, petitioner's behaviors "appear to be exacerbated by drug use."   *Id*. at p. 9.

jury would have found that the defendant did, in fact, have a significant drug problem as opposed to a major mental health disorder.[18]   In fact, the testimony at the evidentiary hearing revealed that the petitioner had such a significant problem with narcotics, that within a year of this incident, petitioner's maternal aunt, Ruth Harris, had made contact with the petitioner in an unsuccessful effort to convince him to make a lifestyle change by getting off of illegal drugs.[19]   *See also* Pet. Exh. # 16 (petitioner's maternal great aunt acknowledged that the petitioner had a drug problem) and Dkt. # 429 at 74 (testimony from Mark Dotson, petitioner's uncle and a podiatrist, regarding the effects which methamphetamine has on the human body, including significant dental problems, paranoia, and trouble sleeping).

---

[18]According to the Tenth Circuit,

> The jury was also presented with significant evidence of [petitioner's] drug use, including the testimony of a drug addict that he took methamphetamine with [petitioner] and the testimony of a state prison employee that [petitioner] self-reported first using alcohol at age 12, cocaine and heroin at age 14, and methamphetamine at age 20, and had been using marijuana, methamphetamine, heroin, tranquilizers, and other drugs up until the time of the shooting.   And, of course, there was the guilt-phase evidence of [petitioner's] outstanding warrant for failure to appear in state court on drug charges and the drug paraphernalia found on [petitioner's] person and property after the shooting.

*Barrett II*, 797 F.3d at 1232.

[19]*See* Dkt. # 429 at p. 70-73.

While the magistrate judge found that the petitioner had a "long family history including mental health problems going back to great-great grandparents, and that the [petitioner's] own immediate family included parents who were violent with each other, and whose relationship was characterized by infidelity and ultimately divorce, as well as both engaging in alcohol abuse,"[20] even if true, this evidence did not add anything of value to the personal and family history[21] of the petitioner that was actually heard by the jury at trial nor did it offer any compelling mitigation evidence when weighed against the evidence

---

[20]Dkt. # 467 at p. 19.   The generational history evidence included things such as the petitioner's grandfather and father had a tendency to drink heavily; petitioner's mother was an alcoholic but was able to function and always maintained employment; petitioner's father did not provide a lot of guidance to the petitioner and was not around a lot when the petitioner was growing up; and some of his relatives had mood swings, including a cousin who has been diagnosed with bipolar disorder and another cousin, Travis Crawford, who has experienced   anxiety and panic attacks.   *See* Pet. Exh. #s 16, 20, 27, and 36.   The jury heard testimony at trial from Travis Crawford, however, that indicated Crawford had used methamphetamine for fifteen years, including around the time of this incident, some of which he obtained while he was inside the petitioner's house.   *See* Dkt. # 325 at p. 64-65 in Case No. CR-04-115-RAW (Vol. III of Jury Trial Transcript at p. 457-58).

[21]This is not a case where no mitigation investigation regarding petitioner's family was ever conducted.   Rather, records at the evidentiary hearing revealed that a mitigation investigator, Roseanne Schaye, had interviewed numerous family members, some of them more than one time during the course of the state court proceedings.   *See* Govt. Exh. #s 19-25 and 54-62.   Additionally, during the state court trials an investigator for the Oklahoma Indigent Defense System ("OIDS") collected those interview summaries and documentation from facilities, hospitals, and schools.   Dkt. # 430 at p. 141.   Boxes of files from the state court cases were delivered to Hilfiger by OIDS and additional paper files were picked up from John Echols after he was allowed to withdraw from the federal case.   Dkt. # 447 at 45-46.

19

that the jury heard regarding petitioner's cold-blooded and premeditated killing of a state law enforcement officer engaged in the performance of his official duties.

In other words, this court finds the petitioner has failed to establish that there is a reasonable probability that even one juror's decision would have been different. This is especially true when the court considers the totality of the mitigating evidence adduced at trial[22] and that adduced at the evidentiary hearing from petitioner's witnesses regarding organic brain disorder, which was unconnected to the facts presented to the jury and included symptoms of mood swings described as "reactive violence" and/or "chronic irritability," and the additional witnesses who discussed petitioner's less than ideal childhood.[23] This additional mitigating evidence was countered by the government with

---

[22]Evidence summarized by the Tenth Circuit included:

> The jury did not find unanimously that the government had proved beyond a reasonable doubt that [petitioner] would pose a continuing and serious danger to others in prison, and unanimously found that [petitioner] was a father and a loved son and stepson, and that his death would have an impact on his family and friends. Seven jurors found that he was a good neighbor and friend; five found that he had accepted responsibility for Eales's death from his state-court conviction and that he had been convicted and punished for the killing; and two found that he would not be a danger to society if imprisoned for life without parole.

*Barrett II*, 797 F.3d at 1224.

[23]While similar to testimony heard by the jury at trial, the government would have been able, through these witnesses, to again emphasize the petitioner's substance abuse.

20

testimony which included that described above, as well as statements by the petitioner that: 1) revealed the petitioner has not accepted responsibility for Eales's death; rather, he maintains that he was shot in the act of retrieving a weapon to defend his son and that he had no idea that the vehicles entering his property were police vehicles;[24] 2) petitioner maintains that he and his son were the victims in this case;[25] 3) the jury might have found that the petitioner was a continuing danger to others in prison and/or to society since he was not afraid to violate the rules;[26] 4) petitioner's brother recalled having seen his mother and the petitioner in physical altercations;[27] and 5) petitioner violently attacked his younger brother on at least two separate occasions.[28]   Weighing all of the mitigating evidence adduced at trial and the evidentiary hearing against the aggravating factors found by the jury, *i.e.,* 1) knowingly creating a grave risk of death to one or more persons in addition to the victim of the offense; 2) commission of the offense after substantial planning and

---

[24]*Compare* Dkt. # 429 at p. 220 (Woods testimony that the petitioner believed his actions were justified on the night of the shooting) and Dkt. # 72-66 (petitioner's description of the events leading to his arrest) *with* Govt. Exh. # 52, § 3 at pp. 7-17, 71-72 (petitioner states that he did not shoot Eales) and p. 281.

[25]Govt. Exh. # 52, § 3 at p. 56-57.

[26]Petitioner admitted to having obtained and using drugs while in jail.  *See* Govt. Exh. # 52, § 3 at p. 154 and 157.  Petitioner also admitted to having talked a jailer into letting him out of his cell for the purpose of engaging in sexual activity with another inmate. *See* Govt. Exh. # 52, § 3 at p. 254-257.

[27]Dkt. # 429 at p. 94-95.

[28]Dkt. # 429 at p. 117.

premeditation; and 3) that petitioner caused injury, harm, and loss to the victim's family because of the victim's personal characteristics as an individual human being and the impact of the death on the victim's family and friends[29] and the evidence the government produced at the evidentiary hearing to counter the additional mitigating evidence, convinces this court that there is no reasonable probability that even one juror would have voted for a sentence less than death.   Accordingly, this court rejects the magistrate judge's conclusion that the petitioner was prejudiced by counsel's performance.

## Conclusion

In light of the facts of this case, and for the reasons set forth herein, the Report and Recommendation (Dkt. # 467) is accepted in part and rejected in part; the report and recommendation is accepted as to the magistrate judge's conclusion that trial counsel's performance was deficient; but the report and recommendation is rejected as to the magistrate judge's conclusion that petitioner was prejudiced by counsel's performance. Accordingly, the court denies petitioner's § 2255 motion as it relates to his claim of ineffective assistance of counsel during the penalty phase of trial.

Furthermore, in light of this order, Petitioner's Objection to the Magistrate Judge's Report and Recommendation (Dkt. # 470), requesting to be resentenced on all three counts of the indictment, is denied as moot.

---

[29]*See* Penalty Phase Special Verdict Form, Dkt. # 258, in *United States v. Barrett*, Case No. CR-04-0115-RAW.

22

Finally, Rule 11 of the Rules Governing Section 2255 Proceedings, requires this court to "issue or deny a certificate of appealability when it enters a final order adverse to the applicant."   This court recognizes that "review of a death sentence is among the most serious examinations any court of law ever undertakes."   *Brecheen*, 41 F.3d at 1370.   A certificate of appealability, however, may only be granted if petitioner has made "a substantial showing of the denial of a constitutional right."   28 U.S.C. § 2253(c)(2).   This standard can be met by demonstrating that the issues raised are debatable among jurists of reason or that the questions deserve further proceedings.   *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).   While this court strongly believes petitioner was not prejudiced by counsel's failure to develop the evidence at trial which was admitted at the evidentiary hearing herein, this court hereby grants a certificate of appealability thereby allowing further consideration of this issue.

It is so ordered on this 28th day of March, 2019.

Ronald A. White
United States District Judge
Eastern District of Oklahoma

## IN THE UNITED STATES DISTRICT COURT FOR THE
### EASTERN DISTRICT OF OKLAHOMA

|  |  |  |
|---|---|---|
| KENNETH EUGENE BARRETT, | ) | |
| | ) | |
| Petitioner/Defendant, | ) | |
| | ) | |
| vs. | ) | Case No. CIV-09-105-RAW |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent/Plaintiff. | ) | |

### **JUDGMENT**

This matter came before the Court for consideration of defendant's motion to vacate, set aside, or correct sentence, pursuant to 18 U.S.C. § 2255.  The issues having been duly considered and a decision having been rendered in accordance with the Order filed simultaneously herewith,

IT IS HEREBY ORDERED, ADJUDGED AND DECREED that judgment is entered for respondent, United States of America, and against petitioner, Kenneth Eugene Barrett, on his challenge to the legality of his sentence.

IT IS SO ORDERED this 28th day of March, 2019.

_____
Ronald A. White
United States District Judge
Eastern District of Oklahoma

2152

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: David B. Autry (dbautry77@gmail.com), Joan M. Fisher
(brenda_turbeville@fd.org, brittany_kasik@fd.org, joan.fisher@fd.org,
karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org,
lindsay_bennett@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Karl J. Saddlemire
(karl_saddlemire@fd.org), Sheldon J. Sperling (usaoke.criminal@usdoj.gov), Carrie L. Ward
(carrie_ward@fd.org), Christopher J. Wilson (barbara.elmore@usdoj.gov,
caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov, usaoke.criminal@usdoj.gov), District Judge
James H. Payne (amy_green@oked.uscourts.gov), Judge Ronald A. White
(amy_green@oked.uscourts.gov, okedml_raw_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oknd.uscourts.gov)
--No Notice Sent:

Message-Id:1033514@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-RAW Barrett v. USA Minute Order
Content–Type: text/html

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 4/10/2019 at 11:59 AM CDT and filed on 4/10/2019

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–RAW |

**Filer:**

**WARNING: CASE CLOSED on 03/28/2019**

**Document Number:** 480(No document attached)

**Docket Text:**

 **MINUTE ORDER** **by Magistrate Judge Steven P. Shreder: It is ordered that each party is directed to withdraw their respective exhibits offered and admitted into evidence at the evidentiary hearings conducted on 3/27/2017, 3/28/2017, 3/29/2017, 3/30/2017, 6/12/2017, 6/13/2017 and 6/26/2017,the same to be kept and maintained for possible appeal purposes. (cjt, Deputy Clerk)**

**6:09–cv–00105–RAW Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, barbara.elmore@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org, lindsay_bennett@fd.org

Karl J. Saddlemire    karl_saddlemire@fd.org

Carrie L. Ward    carrie_ward@fd.org

**6:09−cv−00105−RAW Notice has been delivered by other means to:**

**DAVID AUTRY,** OBA No. <u>11600</u>
<u>1021 N.W. 16</u>th Street
Oklahoma City, OK 73106
Telephone:  (405) 521-9600
Facsimile:  (405) 521-9669
E-mail:       dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
**KARL SADDLEMIRE**, State Bar #275856
Assistant Federal Defender
**CARRIE L. WARD**, MO Bar #57581
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone:  (916) 498-6666
Facsimile:  (916) 498-6656
E-mail:     Joan_Fisher@fd.org
            Karl_Saddlemire@fd.org
            Carrie_Ward@fd.org

Attorneys for Petitioner/Defendant,
KENNETH EUGENE BARRETT

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | **CAPITAL CASE** |
| Petitioner/Defendant, | Case No. 6:09-cv-00105-RAW |
| vs. | |
| | **UNOPPOSED MOTION TO VACATE MINUTE ORDER AND HOLD EXHIBITS PENDING TRANSMITTAL TO THE CIRCUIT COURT OF APPEALS** |
| UNITED STATES OF AMERICA, | |
| Respondent/Respondent. | |

Unopposed Motion To Vacate Minute Order        1        *Barrett v. United States,*
And Hold Exhibits Pending Transmittal                 OK-ED No. 6:09-cv-00105-RAW
To The Circuit Court Of Appeals

Movant/Petitioner KENNETH E. BARRETT, through counsel of record, respectfully moves this Court To Vacate the MINUTE ORDER (Doc. 480) entered by this Court on April 10, 2019 ordering "each party to withdraw their respective exhibits, offered and admitted into evidence at the evidentiary hearings".

Petitioner respectfully advises the Court of his intention to appeal and his intent pursuant to Federal Rule of Appellate Procedure 10 to designate the record to include the exhibits the Court asks the parties to withdraw. *See also* Local Rule 10.3, 10.4. The exhibits should remain in the custody of the Court until such time as they are designated as part of the record for appeal and the Court Clerk transmits the same to the Tenth Circuit Court of Appeals pursuant to Federal Rule of Appellate Procedure 11(b)(2).

Mr. Barrett's counsel conferred with opposing counsel by email advising counsel for the government of its intent to file this motion to which opposing counsel responded that there was no objection to the motion.

The Motion is based on proceedings herein and the Federal Rules of Appellate Procedure.

Unopposed Motion To Vacate Minute Order       2              *Barrett v. United States,*
And Hold Exhibits Pending Transmittal                    OK-ED No. 6:09-cv-00105-RAW
To The Circuit Court Of Appeals

2156

DATED:  April 11, 2019          Respectfully submitted,

                                */s/ Joan M. Fisher*
                                JOAN M. FISHER,
                                Assistant Federal Defender

                                */s/ David Autry*
                                DAVID AUTRY
                                Attorney at Law

                                Attorney for Petitioner/Defendant,
                                KENNETH EUGENE BARRETT

Unopposed Motion To Vacate Minute Order          3          *Barrett v. United States,*
And Hold Exhibits Pending Transmittal                      OK-ED No. 6:09-cv-00105-RAW
To The Circuit Court Of Appeals

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

On this 11th day of April, 2019, I caused the foregoing Motion to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.

To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ Joan M. Fisher
JOAN M. FISHER

Unopposed Motion To Vacate Minute Order            4                  *Barrett v. United States,*
And Hold Exhibits Pending Transmittal                              OK-ED No. 6:09-cv-00105-RAW
To The Circuit Court Of Appeals

2158

MIME-Version:1.0
From:CM-ECFRetMail_OKED@oked.uscourts.gov
To:CM-ECFLive_OKED@oked.uscourts.gov
Bcc:
--Case Participants: Sheldon J. Sperling (usaoke.criminal@usdoj.gov), David B. Autry
(dbautry77@gmail.com), Carrie L. Ward (carrie_ward@fd.org), Karl J. Saddlemire
(karl_saddlemire@fd.org), Jeffrey B. Kahan (jeffrey.kahan@usdoj.gov), Christopher J.
Wilson (barbara.elmore@usdoj.gov, caseview.ecf@usdoj.gov, chris.wilson@usdoj.gov,
usaoke.criminal@usdoj.gov), Joan M. Fisher (brenda_turbeville@fd.org,
brittany_kasik@fd.org, joan.fisher@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org,
leticia_valdez@fd.org, lindsay_bennett@fd.org), District Judge James H. Payne
(amy_green@oked.uscourts.gov), Judge Ronald A. White (amy_green@oked.uscourts.gov,
okedml_raw_chambers@oked.uscourts.gov)
--Non Case Participants: Chambers jhp3 (denise_graham@oknd.uscourts.gov)
--No Notice Sent:

Message-Id:1034403@oked.uscourts.gov
Subject:Activity in Case 6:09-cv-00105-RAW Barrett v. USA Ruling on Motion to Vacate
Order/Judgment
Content-Type: text/html

## U.S. District Court

## Eastern District of Oklahoma

## Notice of Electronic Filing

The following transaction was entered on 4/15/2019 at 10:42 AM CDT and filed on 4/15/2019

| | |
|---|---|
| **Case Name:** | Barrett v. USA |
| **Case Number:** | 6:09–cv–00105–RAW |
| **Filer:** | |

**WARNING: CASE CLOSED on 03/28/2019**

**Document Number:** 482(No document attached)

**Docket Text:**
 **MINUTE ORDER by Judge Ronald A. White: granting [481] Petitioner's Unopposed Motion to Vacate Minute Order and Hold Exhibits Pending Transmittal to the Circuit Court of Appeals. The Clerk is directed to maintain the exhibits until further order of the Court. (Re: [480] Minute Order) (cjt, Deputy Clerk)**

**6:09–cv–00105–RAW Notice has been electronically mailed to:**

Christopher J. Wilson     Chris.Wilson@usdoj.gov, CaseView.ECF@usdoj.gov, barbara.elmore@usdoj.gov, usaoke.criminal@usdoj.gov

David B. Autry     dbautry77@gmail.com

Jeffrey B. Kahan     jeffrey.kahan@usdoj.gov

Joan M. Fisher     joan.fisher@fd.org, brenda_turbeville@fd.org, brittany_kasik@fd.org, karina_rodriguez@fd.org, kelly_nolan@fd.org, leticia_valdez@fd.org, lindsay_bennett@fd.org

Karl J. Saddlemire    karl_saddlemire@fd.org

Carrie L. Ward    carrie_ward@fd.org

**6:09−cv−00105−RAW Notice has been delivered by other means to:**

**DAVID AUTRY,** OBA No. 11600
1021 N.W. 16th Street
Oklahoma City, OK 73106
Telephone: (405) 521-9600
Facsimile: (405) 521-9669
E-mail: dbautry77@gmail.com

**HEATHER E. WILLIAMS**, CA Bar #122664
Federal Defender
**JOAN M. FISHER**, ID Bar #2854
Assistant Federal Defender
**KARL SADDLEMIRE**, State Bar #275856
Assistant Federal Defender
**CARRIE L. WARD**, MO Bar #57581
Assistant Federal Defender
801 I Street, 3rd Floor
Sacramento, CA 95814
Telephone: (916) 498-6666
Facsimile: (916) 498-6656
E-mail: Joan_Fisher@fd.org
Karl_Saddlemire@fd.org
Carrie_Ward@fd.org

Attorneys for Petitioner/Defendant,
KENNETH EUGENE BARRETT

### IN THE UNITED STATES DISTRICT COURT
### FOR THE EASTERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| KENNETH EUGENE BARRETT, | **CAPITAL CASE** |
| Petitioner/Defendant, | Case No. 6:09-cv-00105-RAW |
| vs. | **PETITIONER'S MOTION TO ALTER OR AMEND JUDGMENT and BRIEF IN SUPPORT** |
| UNITED STATES OF AMERICA, | |
| Respondent/Respondent. | |

Petitioner/Defendant, Kenneth Eugene Barrett, moves to alter, correct or amend the Court's opinion and order and judgment, entered on March 28, 2019. (Docs. 478, 479)  Fed.R.Civ.P. 59(e).

This motion is limited to one issue.  Failure to address any other particular claims or issues arising from the Court's opinion and order, which Mr. Barrett will appeal, does not constitute a waiver of any such claims.

In assessing the strength of the government's case in aggravation against the magistrate judge's finding of prejudice, the Court improperly relied on evidence the trial court excluded from the government's penalty phase case.  (Doc. 478, p. 21, n.26).  This excluded evidence consisted of stale allegations that Mr. Barrett had broken the rules of the Muskogee County Jail while awaiting, well before he was indicted in federal court, trial on his state charges.  It was claimed Mr. Barrett had (consensual) sexual contact with a female inmate, and that he had used drugs while in jail. The trial judge excluded the sex evidence because Mr. Barrett's access to the female area of the jail was occasioned by a jailer who was sexually exploiting female inmates, and who was later charged with a crime. There were no threats, physical violence, or corrupt persuasion on Mr. Barrett's part to gain access to the women's wing of the jail.  Mr. Barrett was not charged with a crime as a result of this supposed episode.  This evidence was deemed by the trial judge to be irrelevant to any aggravating circumstance alleged by the government.

Petitioner's Motion to Alter or Amend                    2                    *Barrett v. United States,*
Judgment and Brief in Support                                            OK-ED No. 6:09-cv-00105-RAW

2162

The trial court also excluded evidence about Mr. Barrett's alleged drug use in the jail. (Jury Tr. Vol. 22, p. 4491: 16-21, Jury Tr. Vol. 26, p. 5200: 10-25).

Because this excluded evidence cannot now be considered by the Court, the Court has artificially and wrongly inflated the evidence in aggravation, improperly skewing its analysis of the strength of the government's penalty phase case.  This affected, in an improper way, the Court's conclusion on the question of prejudice stemming from trial counsels' admitted deficient performance.  The Court should therefore excise reference to these alleged jailhouse incidents, and amend and correct its opinion and order accordingly.  Failure to do so would violate Mr. Barrett's Fifth, Sixth and Eighth Amendment rights.  See also, *Williams v. Taylor*, 529 U.S. 262, 297 (2000).

In addition to improperly relying on this excluded evidence, the Court does not characterize it accurately.  (Doc. 478 p. 21, fn. 26).  The Court says it was claimed Mr. Barrett had sexual contact with "another inmate" in the Muskogee County Jail, when in fact it was a female inmate.  The Court's implication that the "other inmate" might have been a male subjects Mr. Barrett, a heterosexual, to harm including physical danger from other inmates in prison society, which is strictly segregated along lines of sexual preference.  Placing Mr. Barrett in danger due to the false assumption that might arise from the language "another inmate"

Petitioner's Motion to Alter or Amend   3   *Barrett v. United States,*
Judgment and Brief in Support   OK-ED No. 6:09-cv-00105-RAW

2163

raises an Eighth Amendment issue, *Ramos v. Hamblin*, 840 F.3d 442, 444-45 (7th Cir. 2016), and is a violation of 42 U.S. C. § 15601 *et seq.* (2003).

The Court takes no account of the trial judge's reasons for excluding the evidence, and incorrectly states or implies that Mr. Barrett used some sort of corrupt influence to gain access to the female wing of the jail.  (Jury Tr. Vol. 22 p. 4491: 16-21, Jury Tr. Vol. 26 p. 5200:10-25).  Nor does the Court take into account Mr. Barrett's discussion of this alleged incident with Dr. Steven Pitt, the government's psychiatric expert.  Mr. Barrett talked to Dr. Pitt about a single female inmate and corrupt actions by the jail staff. (Gov't Exh. 52 p. 263).

Rule 59(e) permits a court to correct its own mistakes shortly after entering judgment.

The Court has broad discretion to do so, and the circumstances for when correction or amendment is appropriate are judged on a case-by-case basis.  *White v. New Hampshire Dep't of Employment Sec.*, 455 U.S. 445, 450 (1982).  The Court should exercise its discretion to correct or amend the order and judgment by eliminating reference to these jailhouse incidents.  Mr. Barrett also re-urges the Court to adopt the report and recommendation of the Magistrate Judge that he was prejudiced by trial counsels' deficient performance. Mr. Barrett should be granted a new sentencing trial on all counts.  This is especially true because the Court relied on the evidence which was excluded from Mr. Barrett's trial.  The Court

both improperly considered this evidence and mischaracterized it in rejecting the

Magistrate Judge's recommendation.

DATED:  April 24, 2019          Respectfully submitted,

                                */s/ Joan M. Fisher*
                                JOAN M. FISHER,
                                Assistant Federal Defender

                                */s/ Carrie L. Ward*
                                CARRIE L. WARD
                                Assistant Federal Defender

                                */s/ David Autry*
                                DAVID AUTRY
                                Attorney at Law

                                Attorneys for Petitioner/Defendant,
                                KENNETH EUGENE BARRETT

Petitioner's Motion to Alter or Amend          5          *Barrett v. United States,*
Judgment and Brief in Support                             OK-ED No. 6:09-cv-00105-RAW

2165

## CERTIFICATE OF ELECTRONIC SERVICE AND DELIVERY

On this 24th day of April, 2019, I caused the foregoing Motion to be filed with the Clerk of the Court using the ECF System for filing, with service via CM/ECF to be made to Christopher J. Wilson, AUSA, Jeffrey B. Kahan, U.S. Department of Justice, and to all counsel of record.

To counsel's knowledge, there are no non-ECF registrants who are counsel in this case.

/s/ Joan M. Fisher
JOAN M. FISHER

Petitioner's Motion to Alter or Amend          6          *Barrett v. United States,*
Judgment and Brief in Support                              OK-ED No. 6:09-cv-00105-RAW

2166

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF OKLAHOMA

KENNETH EUGENE BARRETT,           )
                                  )
          Petitioner/Defendant,   )
                                  )        Case No. CV-09-00105-RAW
     v.                           )
                                  )
UNITED STATES OF AMERICA,         )
                                  )
          Respondent/Plaintiff.   )

RESPONSE IN PARTIAL OPPOSITION TO PETITIONER'S MOTION TO ALTER OR
AMEND JUDGMENT

COMES NOW the United States of America, by and through undersigned counsel and

submits the following Response in Partial Opposition to Petitioner's Motion to Alter or Amend

Judgment.

STATEMENT OF THE CASE

On September 24, 1999, Petitioner Kenneth Eugene Barrett ("defendant") fatally shot

Oklahoma State Trooper David Eales, who – as part of a Tactical Team – had attempted to serve

a warrant at the defendant's residence.  In 2005, a petit jury in this district found Barrett guilty on

two counts of felony firearm murder (18 U.S.C. § 924(c)(1)(A)) and one count of killing a state

law enforcement officer during the commission of a drug trafficking crime (21 U.S.C. §

848(e)(1)(B)).  Following a bifurcated penalty trial, the jury recommended a death sentence,

which the court imposed.  E.D. Okla. case no. CR-04-115-JHP, Docket No. 285.  The Tenth

Circuit Court of Appeals affirmed the judgment (*United States v. Barrett*, 496 F.3d 1079 (10th

Cir. 2007), *cert. denied*, 552 U.S. 1260 (2008)), and Barrett moved for relief under 28 U.S.C. §

1

2167

2255, which this Court denied.  Case No. CIV-09-105-JHP, § 2255 Docket Nos. 1, 214 ("§ 2255 Doc. 1, 214").  However, the Tenth Circuit reversed and remanded for an evidentiary hearing to assess trial counsel's effectiveness in investigating and presenting mitigating information. *United States v. Barrett*, 797 F.3d 1207, 1232 (10th Cir. 2015).

On remand, Magistrate Judge Shreder heard six days of testimony and recommended relief.  Doc. 467.  This Court rejected the recommendation and entered an opinion and order denying § 2255 relief.  Doc. 478.  Barrett moved to alter or amend the opinion and order (Doc. 483), and this partial opposition follows.

## ARGUMENT

### THIS COURT APPROPRIATELY CONSIDERED THE POSSIBILITY THAT NEW DEFENSE EVIDENCE WOULD HAVE ALTERED THE PERMISSIBLE SCOPE OF REBUTTAL

Barrett claims this Court's opinion denying § 2255 relief (Doc. 478) improperly considered evidence, excluded at trial, that the defendant used drugs and had sex while awaiting trial.  He claims the consideration skewed, to the government's benefit, the Court's assessment of prejudice stemming from trial counsel's failure to present mental health evidence.  He also argues that the opinion fails to note that his sexual misconduct involved a female inmate, implying he was gay and therefore exposing him to potential prison violence.  Doc. 483.  In fact, the Court appropriately, but hypothetically, considered evidence the government could not adduce at trial.  During the trial, the evidence lacked the relevance it enjoyed as rebuttal to the mitigation presented at the evidentiary hearing.

Specifically, the Court observed in its opinion rejecting § 2255 relief "the jury *might* have found that the petitioner was a continuing danger to others in prison and/or to society since he was not afraid to violate [jail] rules."  Doc. 478 at 21 & n. 26 (emphasis added).  The Court

premised its findings on admissions Barrett made to the government's mental health expert, Steven Pitt. This observation did not improperly skew the Court's prejudice analysis, given that it arose from evidence that did not exist at the time of trial—the defendant's admissions. Those admissions rebutted other evidence that did not exist during trial, testimony concerning the defendant's mental health.

The Federal Rules of Civil Procedure permit litigants to request alteration or amendment of an adverse judgment under Federal Rule of Civil Procedure 59(e). *Van Skiver v. United States*, 952 F.2d 1241, 1178 n.2 (10th Cir. 2010). "Grounds warranting a [Rule 59(e)] motion to reconsider include (1) an intervening change in the controlling law, (2) new evidence previously unavailable, and (3) the need to correct clear error or prevent manifest injustice." *Devon Energy Production Co., v. Mosaic Potash Carlsbad, Inc.*, 693 F.3d 1195, 1212 (10th Cir. 2012) (quoting *Servants of Paraclete v. Does*, 204 F.3d 1005, 1012 (10th Cir. 2000)).

Barrett cannot establish any grounds that might merit exclusion of his admissions of misconduct from the opinion and order. The opinion properly considered the mitigation information that animated the evidentiary hearing on remand and the information developed in rebuttal. Indeed, the evidentiary hearing, as conceived by the Tenth Circuit, was supposed to "'consider the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the [§ 2255] proceeding—and reweigh it against the evidence in aggravation . . . a probing and fact specific analysis." *United States v. Barrett*, 797 F.3d 1207, 1229 (10th Cir. 2015) (internal quotes omitted). Given this mandate, Barrett cannot bar, as novel, evidence developed to rebut his previously-untested case in mitigation: "[I]t is petitioner's burden to establish prejudice. The government's burden is to rebut the arguments presented by petitioner." *Fields v. United States*, No. 10-CIV-115-RAW, 2016 WL 7264579, at *8 (E.D.

Okla. Dec. 15, 2016) (rejecting an argument that the government could not appropriately rely on rebuttal evidence developed to counter information first developed during § 2255 litigation).

The evidence Barrett now seeks to bar from consideration does not sound within the ambit of the trial court's order.  The information has a different and more credible source—Barrett's own statements against interest, rather than the observations of a third party.  Moreover, those admissions rebutted mitigation evidence omitted at trial, altering the calculus of its probity versus prejudice under 18 U.S.C. § 3593(c).  The trial court's decision to exclude different evidence concerning Barrett's jailhouse misconduct (*see* Tr. 22: 4491, 26: 5200) offered under different circumstances should not bar observations made at this juncture about the potential impact of information offered to rebut Barrett's new mental health evidence.

To the extent Barrett asks that this Court clarify its opinion to indicate that his misconduct specifically involved sexual contact with a woman, the government has no objection.

**CONCLUSION**

Based on the foregoing reasoning and authority, the government respectfully urges this

Court to deny the motion to alter or amend, except to the extent it might acknowledge the

heterosexual nature of Barrett's misconduct.

Dated: May 7, 2019.

<div style="text-align: right">

Respectfully submitted,
BRIAN J. KUESTER
United States Attorney
Eastern District of Oklahoma

*/S/ Christopher J. Wilson*
CHRISTOPHER J. WILSON, OBA # 13801
First Assistant United States Attorney
520 Denison Avenue
Muskogee, OK 74401
Telephone: (918) 684-5100
FAX: (918) 684-5150

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Section
U.S. Dept. of Justice
1331 F Street, NW; 6th Fl.
Washington, DC 20530
Telephone: (202) 305-8910
FAX: (202) 353-9779

</div>

2171

**CERTIFICATE OF ECF FILING AND DELIVERY**

I, hereby certify that on May 7, 2019, I electronically transmitted the attached document to the Clerk of Court using the ECF System for filing. A Notice of Electronic Filing will be sent via the Court's ECF system to the following counsel of record for the Petitioner/Appellant:

Mr. David B. Autry: Dbautry77@gmail.Com
Ms. Carrie L. Ward: Carrie_Ward@fd.org
Ms. Joan M. Fisher:  Joan.Fisher@fd.Org
Karl J. Saddlemire:  Karl_Saddlemire@fd.Org

*/S/ Jeffrey B. Kahan*
JEFFREY B. KAHAN, PaBN #93199
Deputy Chief, Capital Case Section

6

2172



PATRICK KEANEY
U.S. COURT CLERK

TELEPHONE
(918) 684-7920

## United States District Court
Eastern District of Oklahoma
P.O. Box 607
Muskogee, Oklahoma 74402

May 9, 2019

Clerk, U. S. Court of Appeals
For the Tenth Circuit
Byron White United States Courthouse
Denver, Colorado  80257

ATT:  Tammy DuVall

### RECORDS / ORIGINAL FILE RETURNS
### 10ᵀᴴ CIRCUIT CASE NUMBER – 12-7086

*USA v. Kenneth Barrett* – 04-cr-115-JHP and 09-cv-105-JHP
U.S. District Court for the Eastern District of Oklahoma

Pursuant to our conversation, please find enclosed the following:

A copy of the Transmittal Sheet from10th sending us the records in November, 2016;

Sealed Pleading #237 – Psychological Evaluation/Risk Assessment with one Videotape
and six disk attachments

Sealed Pleading #265 – Sealed Notice with one Disk attachment

Please receive stamp the copy of this Transmittal Sheet and return to our Court.  If you have any questions, please do not hesitate to contact our office.  Thank you.

Sincerely,

*JBrown*

Jeanne Brown, Deputy Clerk

**UNITED STATES COURT OF APPEALS**
**TENTH CIRCUIT**
Office of the Clerk
Byron White United States Courthouse
Denver, Colorado 80257
(303) 844-3157

Betsy Shumaker
Clerk of Court

Chris Wolpert
Chief Deputy Clerk

November 28, 2016

**To:** Clerk, U.S. District Court or Agency

**District** Eastern District of Oklahoma Muskogee

**Subject:** Records /Original File Returns
From: Tammy DuVall
303-335-2983

**Shipped via:** Fed Ex

Attention Carla Trzcinski
918-684-7906

**Attention:** Records Clerk

The mandate(s) have issued in the appeal(s) listed below. Materials are being returned to you under cover of this letter. Please acknowledge receipt of the materials by receive stamping, dating, signing and returning this letter to our office.

| 10th Circuit Case Number | District Court Case Number | Short Caption | Volumes/File | Document Number |
|---|---|---|---|---|
| 12-7086 | 6:09-CV-00115-JHP-1 <br> 09-cv-105-JHP + 04-cr-115-JHP | US vs.Barnett | Volume 6-Videotape attachments to pleading 237 and Disk attachment to pleading 265 | 10424846 |

\*\*\* Please return at your convenience.

**RECEIVED**

NOV 2 9 2016

PATRICK KEANEY
Clerk, U.S. District Court
By_____
Deputy Clerk